**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| vs. | Case No.  3:19-cv-02281-K |
| MATCH GROUP, INC., a corporation, | |
| Defendant. | |

## MATCH GROUP, INC.'S MOTION TO DISMISS AND BRIEF IN SUPPORT

## TABLE OF CONTENTS

I.    SUMMARY OF ARGUMENT ......................................................................1

II.   RELEVANT PROCEDURAL HISTORY AND ALLEGATIONS ...................5

  A.   The FTC's Current Complaint. ..........................................................6

  B.   The Complaint Specifically Pleads That the Conduct at Issue in Counts I–IV Has Ceased. ..................................................................................................7

III.  ARGUMENTS AND AUTHORITIES................................................................9

  A.   The FTC Lacks Statutory Authority to Sue Based on Past Conduct Absent Any Plausible Factual Allegations That the Challenged Conduct Is "About To" Resume. .....9

    1.   The FTC's Section 13(b) Authority Is Expressly Limited to Suing a Defendant That "Is Violating" or "Is About to" Violate the Law. ....................................................10

    2.   The FTC Has Not—And Cannot—Plead Anything Beyond Mere Speculation That Match Is About to Violate the Law ..........................................................................12

  B.   There Is No Statutory Authority for the Equitable Monetary Relief the FTC Seeks Under Section 13(b). ............................................................14

  C.   Even If the FTC Were Authorized to Sue Under Section 13(b) for Discontinued Conduct, the Communications Decency Act Would Bar Suit for the Conduct at Issue in Counts I and II. .................................................................17

  D.   Count V Fails Because the FTC Fails to Allege a Violation of ROSCA as Written. .....27

IV.   CONCLUSION AND REQUESTED RELIEF ................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.*,
    135 S. Ct. 1378 (2015)...................................................................................16

*Arrow-Hart & Hegeman Elec. Co. v. FTC*,
    291 U.S. 587 (1934).......................................................................................9

*Asadi v. G.E. Energy (USA), L.L.C.*,
    720 F.3d 620 (5th Cir. 2013) .......................................................................10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................9, 27

*Beckman v. Match.com*,
    No. 2:13-CV-97 JCM NJK, 2013 WL 2355512 (D. Nev. May 29, 2013), *aff'd
    in part, rev'd in part sub nom. Beckman v. Match.com, LLC*, 668 F. App'x
    759 (9th Cir. 2016)......................................................................................23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................9, 13

*Brown v. Aetna Life Ins. Co.*,
    No. EP-13-CV-131-KC, 2013 WL 3442042 (W.D. Tex. July 8, 2013) ...............................14

*Daniel v. Armslist, LLC*,
    926 N.W.2d 710 (Wis. 2019) pet. filed................................................20, 21, 23, 26

*Doe v. GTE Corp.*,
    347 F.3d 655 (7th Cir. 2003) ........................................................................19

*Doe v. Myspace, Inc.*,
    528 F.3d 413 (5th Cir. 2008) ..................................................................4, 18, 24

*Dyroff v. Ultimate Software Group, Inc.*,
    934 F.3d 1093 (9th Cir. 2019) ..............................................................19, 22, 24, 26

*Dyroff v. Ultimate Software Grp., Inc.*,
    No. 17-CV-05359-LB, 2017 WL 5665670 (N.D. Cal. Nov. 26, 2017), *aff'd*,
    934 F.3d 1093 (9th Cir. 2019) .................................................................21, 22

*Force v. Facebook, Inc.*,
    No. 18-397, 2019 WL 3432818 (2d Cir. July 31, 2019)......................................18, 19

*FTC v. Credit Bureau Center*,
  937 F.3d 764 (7th Cir. 2019) ........................................................................................ *passim*

*FTC v. Hornbeam Special Situations, LLC*,
  No. 1:17-CV-3094-TCB, 2018 WL 6254580 (N.D. Ga. Oct. 15, 2018) .................... 11, 12, 13

*FTC v. Shire ViroPharma, Inc.*,
  917 F.3d 147 (3d Cir. 2019) ........................................................................................ *passim*

*Gines v. D.R. Horton, Inc.*,
  699 F.3d 812 (5th Cir. 2012) ...................................................................................................... 5

*Herrick v. Grindr*,
  306 F. Supp. 3d 579 (S.D.N.Y. 2018) ................................................................. 19, 23, 24, 25

*Holomaxx Techs. v. Microsoft Corp.*,
  783 F. Supp. 2d 1097 (N.D. Cal. 2011) ............................................................................ 19, 26

*Jane Doe No. 1 v. Backpage.com, LLC*,
  817 F.3d 12 (1st Cir. 2016) ............................................................................................ 19, 23, 24

*Marshall's Locksmith Serv., Inc. v. Google, LLC*,
  925 F.3d 1263 (D.C. Cir. 2019) .................................................................................... *passim*

*McDade v. Smurfit-Stone, Inc.*,
  No. CIV.A.3:05CV1478-B, 2006 WL 435315 (N.D. Tex. Feb. 23, 2006) ............................ 14

*Mitchell v. DeMario Jewelry, Inc.*,
  361 U.S. 288 (1960) .................................................................................................................... 16

*Porter v. Warner Holding Co.*,
  328 U.S. 395 (1946) .................................................................................................................... 16

*R2 Invs. LDC v. Phillips*,
  401 F.3d 638 (5th Cir. 2005) ...................................................................................................... 9

*Romanello v. Bank United, Inc.*,
  No. 5:12-CV-371-FL, 2013 WL 6531082 (E.D.N.C. Dec. 12, 2013) ...................................... 1

*In re Settoon Towing, L.L.C.*,
  859 F.3d 340 (5th Cir. 2017) .................................................................................................... 10

*Sonnier v. State Farm Mutual Auto. Ins. Co.*,
  509 F.3d 673 (5th Cir. 2007) ...................................................................................................... 7

*TDX Energy, L.L.C. v. Chesapeake Operating, Inc.*,
  857 F.3d 253 (5th Cir. 2017) .................................................................................................... 10

*Texas v. United States*,
    497 F.3d 491 (5th Cir. 2007) ................................................................9

*United States v. JS & A Group, Inc.*,
    716 F.2d 451 (7th Cir. 1983) ..............................................................12

*United States v. Kaluza*,
    780 F.3d 647 (5th Cir. 2015) ..............................................................12

*Warter v. Boston Sec., S.A.*,
    No. 03-81026-CIV/RYSKAMP, 2004 WL 691787 (S.D. Fla. Mar. 22, 2004) ........................1

*Zeran v. America Online, Inc.*,
    129 F.3d 330-31 (4th Cir. 1997) ............................................5, 18, 26

**Statutes**

Communications Decency Act, 47 U.S.C. §230 .................................................... *passim*

FTCA Section 5, 15 U.S.C. § 45 ................................................................... *passim*

FTCA Section 13(b), 15 U.S.C. § 53(b) .............................................................. *passim*

FTCA Section 19, 15 U.S.C. § 57b ........................................................14, 17, 28

Restore Online Shoppers' Confidence Act , ROSCA .......................................... *passim*

15 U.S.C. § 8403 ...................................................................................5, 27

**Other Authorities**

S. Rep. No. 93-151 (1973) ...........................................................................12

Pursuant to Federal Rule of Civil Procedure 12(b)(6),[1] Defendant Match Group, Inc.

("Match") moves this Court to dismiss Plaintiff the Federal Trade Commission's ("FTC")

Complaint.[2]

## I.     SUMMARY OF ARGUMENT

This case is a classic example of government overreach.  The FTC has impermissibly

bypassed its statutorily prescribed administrative processes by suing Match Group, Inc. in federal

court under Section 13(b) of the Federal Trade Commission Act (the "FTCA") and seeking

injunctive and monetary relief based on permanently *discontinued* conduct.  The text and

structure of the FTCA demonstrate, and recent cases confirm, that the FTC cannot venture

beyond the confines of its mandate from Congress, and its failure to respect those limits requires

dismissal under Rule 12(b)(6).

Even if the Court were to ignore these limitations on the FTC's authority and reach the

Complaint's specific allegations, it would conclude that the FTC has also overreached on the

merits.  The crux of the FTC's Complaint is three-fold:  (i) Match's industry-leading anti-fraud

tools, systems, and strategies (described in the Complaint itself) are not good enough, even

---

[1] Match has filed an Appendix in Support of its Motion to Dismiss and Brief in Support ("Appendix").  The exhibits to the Appendix are referenced as ("Def. App. Ex.") and references to specific pages in the Appendix are referenced as ("App.").

[2] The FTC did not sue the correct legal entity, insisting incorrectly that it can sue a parent company for the acts of its subsidiary.  The FTC complains about certain actions of the Match.com service, but Match Group, LLC (not Match Group, Inc.) is the entity that owns and operates Match.com, as the FTC has been repeatedly advised.  (*See* Def. App. Ex. 1 (Declaration of Angela C. Zambrano, hereinafter, "Zambrano Decl.") at App. 001–002, 029–030.) Defendant Match Group, Inc. is the parent company of Match Group, LLC, and none of the activities challenged in the Complaint were performed by Match Group, Inc.  (*See* Def. App. Ex. 2 (Declaration of Laurie Braddock) at App. 031–032.)  For this reason alone, the Complaint as against Match Group, Inc. should be dismissed.  *See, e.g.,* *Warter v. Boston Sec., S.A.*, No. 03-81026-CIV/RYSKAMP, 2004 WL 691787, at *13 (S.D. Fla. Mar. 22, 2004) (dismissing claim alleging wrongdoing by bank where plaintiff incorrectly sued holding company because "[t]he holding company and the bank are not one and the same, and the holding company does not conduct any banking activities"); *Romanello v. Bank United, Inc.*, No. 5:12-CV-371-FL, 2013 WL 6531082, at *4 (E.D.N.C. Dec. 12, 2013) (dismissing complaint under Rule 12(b)(6) where publicly-available documents demonstrated that "plaintiffs have named the wrong corporate entity in this suit").  After the Complaint was filed, Match alerted the FTC to this problem, but the FTC refuses to remedy this fatal defect.  (*See* Def. App. Ex. 1 (Zambrano Decl.) at App. 001–002, 029–030.)

though there is no legal requirement that Match implement any such tools to begin with; (ii) Match's customers are not responsible for reading Match's online disclosures to those users; and (iii) Match's online method for cancelling a subscription could be simpler (while ignoring entirely Match's other available cancellation methods—including telephone, email, chat, fax, and U.S. mail).

Each of the five Counts fail as a matter of law and should be dismissed for the reasons described below:

**First,** the FTC cannot sue in federal court under Section 13(b) of the FTCA absent plausible factual allegations that the defendant is "violating" or is "about to violate" the FTCA. 15 U.S.C. § 53(b). The Complaint acknowledges that Match's conduct at issue in Counts I–IV was discontinued and affirmatively pleads the dates on which the conduct ceased. (*See, e.g.*, Compl. ¶¶ 3, 19–20, 38.) This admission is critical and should result in dismissal. Having admitted that Match's alleged unlawful conduct has ceased, the FTC cannot obtain relief for past violations in federal court under Section 13(b) unless the Complaint alleges specific facts demonstrating that Match "is about to violate" the FTCA by imminently resuming the challenged practices. Here, the Complaint alleges nothing of the sort, relying instead upon a single paragraph alleging in conclusory fashion that Match has a "long history of continuous conduct" and the purported "ease with which" Match "can" resume it. (*Id.* ¶ 64.) "Can" resume does not equal "is about to" resume, and the FTC has no good-faith "reason to believe" that Match "is about to" resume the conduct, as required by Section 13(b). Therefore, based on the unambiguous language of the statute, Counts I–IV should be dismissed.

*FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 158 (3d Cir. 2019), is directly on point. In that recent case, the Third Circuit rejected "the FTC's invitation to stretch Section 13(b) beyond

2

its clear text" and held that "'is about to violate' means something more than a past violation and a likelihood of recurrence." *Id.* at 150. The Third Circuit explained: "Simply put, Section 13(b) does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation." *Id.* at 156. Here, the FTC's transparent attempt to plead around *Shire* with a single conclusory paragraph devoid of any factual basis should be rejected.

**Second**, even if the FTC could sue to enjoin Match from engaging in conduct that has been permanently discontinued (which it cannot), equitable *monetary* relief, including restitution, is not available under Section 13(b) of the FTCA. That provision expressly authorizes *only injunctive relief*.[3] Thus, the FTC's prayer for monetary relief on Counts I-IV should be dismissed as a matter of law. The Seventh Circuit extensively analyzed this issue in its recent decision in *FTC v. Credit Bureau Center*, 937 F.3d 764 (7th Cir. 2019). The *Credit Bureau* court rejected the FTC's position that it may seek and obtain restitution for past conduct in a Section 13(b) lawsuit, holding that "nothing in the text or structure of the FTCA supports an implied right to restitution in Section 13(b), which by its terms authorizes only injunctions." *Id.* at 775.

The *Credit Bureau* court's holding was based on a detailed analysis of the FTCA and precedent, including binding precedent from the Supreme Court. Congress provided the FTC with a clear and explicit means for seeking monetary relief—an administrative proceeding under Section 5(b) of the FTCA,[4] *followed by* a federal lawsuit under Section 19.[5] That statutory mechanism contains critical safeguards and limitations placed by Congress on the FTC,

---

[3] This argument applies to all forms of equitable monetary relief, "including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies." (*See* Compl. ¶ 90(c).)
[4] 15 U.S.C. § 45(b).
[5] 15 U.S.C. § 57b.

3

including strict notice requirements, a higher burden of proof, and a three-year statute of limitations.  By suing first under Section 13(b), the FTC impermissibly seeks to circumvent those safeguards.  But, as the Seventh Circuit explained, the Supreme Court requires that where Congress includes particular language (in this case, restitution or "relief as the court finds necessary to redress injury to consumers") in one section of a statute (Section 19(b)), but omits it in another section of the same statute (Section 13(b)), it is presumed that Congress is intentionally drawing a distinction between the two provisions.  *Credit Bureau*, 937 F.3d at 774 (citing *Nken v. Holder*, 556 U.S. 418, 430 (2009)).  If the FTC wished to seek restitution or other monetary relief for the conduct at issue in this case, it was free to do so, by pursuing relief in an administrative hearing pursuant to Section 5(b) of the FTCA *and then* seeking consumer redress in federal court under Section 19.  Seeking restitution without first pursuing the mandated administrative avenue under Section 5(b) might be more convenient for the FTC, but the plain language of the FTCA does not allow such a maneuver.

**Third**, even if the FTC's claims were properly in federal court, which they are not, Counts I and II are barred by the Communications Decency Act, 47 U.S.C. §230 (the "CDA"). In the CDA, Congress conferred "broad immunity" upon "[w]eb-based service providers" (like Match) against attempts to hold them liable for publishing content created by third parties, such as the users of their websites.  *Doe v. Myspace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).  Count I alleges that Match deceived users by sending them automatic notifications, without adequate disclaimers, about third-party communications, but the CDA, as confirmed by numerous recent cases, forecloses liability based upon such a theory.  Similarly, Count II alleges that Match engaged in unfair practices by allowing the delivery of potentially fraudulent communications

4

from third parties to some users while withholding them from others, but the CDA likewise immunizes this conduct as well.

**Finally**, Count V of the Complaint fails to state a claim under the Restore Online Shoppers' Confidence Act ("ROSCA"). This claim alleges that one of Match's multiple subscription cancellation methods—its ***online*** cancellation process—is not "simple" while ignoring the other methods of cancellation. (Compl. ¶ 84.) ROSCA's unambiguous text requires only that Internet sellers "provide[] simple mechanisms for a consumer to stop recurring charges." 15 U.S.C. § 8403(3). It does *not* require that every available method of cancellation[6] be simple, and it does not even require that an online method of cancellation be provided. Because the FTC fails to plead that the other cancellation methods available to subscribers— including email, online chat, telephone, fax, and U.S. mail—are also not "simple," the FTC fails to plausibly plead a violation of ROSCA. In short, the FTC cannot re-write ROSCA to create a violation based on an allegation that only one of multiple cancellation mechanisms is not "simple."

## II.    RELEVANT PROCEDURAL HISTORY AND ALLEGATIONS

Match.com was the first and is the longest-operating online dating platform. Match's business is built on the ability of its customers to find someone special—a mission that has succeeded by helping to foster millions of relationships, marriages, and families over its 25-year history. Today, in part because of Match's pioneering efforts, more than one out of every three marriages start online. The great popularity of online dating platforms also presents challenges for responsible companies like Match. To enhance the experience of its legitimate users, Match

---

[6] The Complaint refers to cancellation "practices" **(plural)** (Compl. ¶ 54), yet addresses only the online method as allegedly violating ROSCA. Because the Complaint expressly refers to Match's cancellation "practices," this Court may consider the existence of multiple other cancellation mechanisms that are a matter of public record for purposes of deciding this Rule 12(b)(6) motion. *See Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 & n.9 (5th Cir. 2012).

expends extraordinary time and resources to keep spammers, bots, scammers, and others who seek to use the service for improper purposes off its platform and to remove questionable accounts from the platform promptly upon detection.

The FTC's Complaint contorts Match's fraud-prevention efforts to focus on a few ways in which it thinks it can run Match better than Match itself.  The FTC's predominant criticism is that Match did not root out all the bad acts of third parties on its platform in the manner the FTC believes, in hindsight, it should have done.  The practical, and predictable, effect of this kind of governmental overreach is to discourage companies from undertaking any screening or blocking measures at all, out of fear that the FTC will later look back (as here) and declare that those measures should have been implemented differently.

### A.     The FTC's Current Complaint.

After a lengthy investigation, on August 7, 2019, the FTC voted to approve a different version of the Complaint than the one that was filed in this Court.  After the vote, the FTC referred the case to the United States Department of Justice ("DOJ") for consideration pursuant to 15 U.S.C. §56(a), as required, because the FTC sought civil penalties for an alleged violation of ROSCA.  The version of the Complaint voted on by the Commission and referred to the DOJ contained false allegations that the conduct at issue in Counts I–IV was then "continuing."[7]  The DOJ *declined* the case within the statutory 45-day consideration period.  Thereafter, by operation of law, the FTC re-assumed control of the case.

Without further public vote by the Commissioners, and perhaps to avoid Rule 11 consequences, the FTC modified the Complaint that was voted out on August 7 by eliminating the false allegation that Match's conduct at issue in Counts I–IV was continuing.  While those

---

[7] (*See* Def. App. Ex. 1 (Zambrano Decl.) at App. 001–002, 003–028 (attaching public record Complaint as approved by the FTC).)

false allegations were removed from the filed version, in a transparent attempt to avoid dismissal based on Section 13(b)'s requirement that the defendant be "about to violate" the FTCA, the Complaint retains a single conclusory Paragraph 64, in which the FTC alleges (i) that Match has a "long history" of continuous conduct as charged in the Complaint, (ii) that Match can easily resume similar conduct, and, (iii) *without any evidence or factual allegations*, that the FTC has "reason to believe" that Match "is about to violate laws enforced by the Commission." (Compl. ¶ 64.)  This bald allegation is entitled to no weight under the established federal pleading standards discussed below.

> **B.**      **The Complaint Specifically Pleads That the Conduct at Issue in Counts I–IV Has Ceased.**

In Counts I–IV, the Complaint describes four categories of allegedly either deceptive or unfair conduct under Section 5 of the FTCA and pleads the approximate dates by which the practices were terminated:

**Count I** alleges that Match engaged in a deceptive practice by sending non-paying registered users automated notifications (so-called "pay to read" or "PTR" communications) when paying subscribers had expressed interest in them and offering them a subscription to enable them to see the underlying communication[8] without adequately notifying the registered users that some of those subscriber accounts were then under review by Match for potential violations of Match's terms of use.[9]  But the Complaint admits that this practice was

---

[8] Non-subscribers (also known as registered users) cannot read any messages sent to them.

[9] For purposes of this Rule 12 motion, this Court must accept only plausibly pleaded allegations as true.  *Sonnier v. State Farm Mutual Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007).  Match vigorously disputes that any of the conduct described in the Complaint was deceptive or unfair.  Indeed, the FTC has it exactly backwards in this case. Match's efforts to combat improper use of its platform, including removing the small subset of users identified in its review who are would-be scammers, have set the industry standard.  The Complaint suggests all users in reviewed by Match are scammers, but nothing could be further from the truth.  A significant portion of those entering review are later cleared, and the majority are being reviewed for being spammers or bots, not fraud.

**discontinued** by mid-2018 (Compl. ¶ 3) when Match stopped sending PTRs to registered users based on messages sent by subscriber accounts flagged for review.

**Count II** alleges that Match acted unfairly and caused consumer harm by exposing consumers to the risk of fraud in providing recent subscribers access to communications that had been flagged for review. The practice was **discontinued** by mid-2018, when Match stopped delivering to any users communications from subscriber accounts that were flagged for review. (*Id.*)

**Count III** alleges that Match deceptively induced customers into purchasing subscriptions by offering a "guarantee" to prospective six-month subscribers, but failed to adequately disclose the terms and conditions of the guarantee, including that the subscriber create a profile with a photo and communicate with other users, as well as "claim" the guarantee within the last seven days of the subscription period (*id.* ¶¶ 74–76), even though the FTC concedes that all the allegedly non-disclosed information appears in multiple places on Match's site. (*See id.* ¶¶ 41–42, 44–45, 47.) Match **stopped offering a guarantee** altogether in mid-2019. (*Id.* ¶¶ 3, 38.)

**Count IV** alleges that Match acted unfairly by denying subscribers access to paid-for services if the consumer disputed credit-card charges and lost the dispute. The FTC ignores that the policy was fully disclosed on Match's site. In any event, the practice was **discontinued** by mid-2019. (*Id.* ¶ 3.)[10]

In **Count V**, the FTC complains about Match's online cancellation method. While Match has not changed any of the *multiple* ways that consumers can cancel subscriptions, this Count is defective as a matter of law. The Complaint in effect alleges that because *one* of Match's

---

[10] Although the issue is beyond the scope of this Motion, the FTC also ignores that Match honored any request by such users to regain access to the site after losing a chargeback dispute.

cancellation methods is purportedly not "simple," Match has violated ROSCA.  (*Id.* ¶¶ 55–59.)

As set forth below, the FTC misreads ROSCA, which contains no requirement that *every*

cancellation method qualify as "simple" under the statute.

### III.    ARGUMENTS AND AUTHORITIES

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts

to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While well-pleaded facts of a complaint

are to be accepted as true, legal conclusions are not "entitled to the assumption of truth."  *Iqbal*,

556 U.S. at 679 (citation omitted).  Further, a court should not strain to make inferences

favorable to the plaintiff and should not accept conclusory allegations, unwarranted deductions,

or mere legal conclusions.  *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations

omitted).

### A.    The FTC Lacks Statutory Authority to Sue Based on Past Conduct Absent Any Plausible Factual Allegations That the Challenged Conduct Is "About To" Resume.

The FTC's power is limited to the statutory authority delegated to it by Congress.  *Texas

v. United States*, 497 F.3d 491, 500–01 (5th Cir. 2007) ("The authority of administrative

agencies is constrained by the language of the statute they administer."); *see Arrow-Hart &

Hegeman Elec. Co. v. FTC*, 291 U.S. 587, 598 (1934) ("The [FTC] is an administrative body

possessing only such powers as are granted by statute.").  The FTC has brought four counts

against Match pursuant to Section 13(b) of the FTCA (Counts I–IV).  Section 13(b), however,

grants the FTC authority to file suit in federal court *only* when the defendant "is violating, or is

about to violate" the law.  15 U.S.C. § 53(b).  In other words, the FTC must plead *facts* plausibly

9

establishing that the defendant (a) is currently violating the law or (b) is "about to" violate the law. *Id.*

Here, as detailed above, the Complaint unambiguously pleads that Match is *not* currently violating the law and even affirmatively pleads that the accused conduct ceased well before the Complaint was filed. (*See, e.g.*, Compl. ¶ 3 (admitting discontinuance of challenged practices).) And the sole basis for the allegation that Match is "about to violate" the law as applicable to Counts I–IV is a single conclusory paragraph that includes no factual support. Thus, Counts I–IV fail to state a claim.

     1.    <u>The FTC's Section 13(b) Authority Is Expressly Limited to Suing a Defendant That "Is Violating" or "Is About to" Violate the Law.</u>

In construing Section 13(b), the Court need only to look to its unambiguous text. *See In re Settoon Towing, L.L.C.*, 859 F.3d 340, 345 (5th Cir. 2017) ("If the statute's language is unambiguous, we apply the plain language absent some resulting absurdity."); *Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 622 (5th Cir. 2013) ("If the statutory text is unambiguous, our inquiry begins and ends with the text."). Section 13(b) states in relevant part:

> Whenever the Commission has reason to believe . . . **that any person, partnership, or corporation is violating, or is about to violate**, any provision of law enforced by the [FTC] . . . the Commission . . . **may bring suit in a district court of the United States to enjoin any such act or practice.**

§ 53(b) (emphasis added). Where, as here, Congress has used the present and future tense, the statute must be construed as reaching only those acts that are ongoing or will occur in the future, and not acts that occurred in the past. *See, e.g., TDX Energy, L.L.C. v. Chesapeake Operating, Inc.*, 857 F.3d 253, 266 (5th Cir. 2017) (explaining "use of the present and future tenses shows legislative intent that the provision did not apply to [past conduct]").

Section 13(b) imposes a clear outer limit on the FTC's ability to bring suit in federal court under that provision: to do so, the FTC must allege in good faith and with good reason that

the defendant "is violating, or is about to violate" the law.  Conversely, the FTC lacks the power

under Section 13(b) to bring suit in federal court for *past* conduct.  This limitation goes hand-in-

hand with Section 5(b) of the FTCA, which allows the FTC to bring an administrative

proceeding to address past conduct.  *See* 15 U.S.C. § 45(b).  The courts as well have concluded

that Section 13(b) is unambiguous and requires the FTC to plausibly plead current or impending

violations of law.

In an extensive and well-reasoned opinion, the Third Circuit in *Shire* analyzed this very

issue and concluded that Section 13(b) only "empowers the FTC to speedily address ongoing or

impending illegal conduct":

> Section 13(b) requires that the FTC have reason to believe a wrongdoer "is
> violating" or "is about to violate" the law.  *Id.* § 53(b)(1).  We conclude that this
> language is unambiguous; it prohibits existing or impending conduct.  **Simply put,
> Section 13(b) does not permit the FTC to bring a claim based on long-past
> conduct without some evidence that the defendant "is" committing or "is
> about to" commit another violation**.

*Shire*, 917 F.3d at 156 (emphasis added).

The Northern District of Georgia also analyzed the same statute under analogous

circumstances and agreed that the text of Section 13(b) is unambiguous and requires pleading

specific facts establishing ongoing violations or that the defendant is "about to" violate the law.

*FTC v. Hornbeam Special Situations, LLC*, No. 1:17-CV-3094-TCB, 2018 WL 6254580, at *2

(N.D. Ga. Oct. 15, 2018).  A rote, formulaic statement that the FTC had "reason to believe" that

a defendant was "about to" violate the law was insufficient; rather, the "FTC must make factual

averments regarding its reason to believe."  *Id.* at *4.  Like the Third Circuit, the *Hornbeam*

court recognized that without such pleading, a complaint could not survive a challenge under

Rule 12(b)(6).  *Id.* at *3–4.  Accordingly, to survive a motion to dismiss, the FTC was required

11

to plead specific facts showing current violations or those "about to" occur.  The FTC has not

done so here.[11]

> 2.      The FTC Has Not—And Cannot—Plead Anything Beyond Mere
> Speculation That Match Is About to Violate the Law

The FTC attempts to plead around the statutory limitation and the confirming case law

with a single, conclusory paragraph.  In that Paragraph 64, the FTC alleges:  (a) Match has a

"long history of continuous conduct;" (b) the persistence of the challenged practices after the

FTC began its investigation (though each ended well before the investigation concluded); (c) a

self-contradictory allegation of "continued use" of those practices (which appears to be an un-cut

hold-over from a prior draft of the Complaint); and (d) the "ease with which [Match] can engage

in or resume similar conduct."  The FTC thereupon alleges that it "has reason to believe that

[Match] is violating or about to violate laws enforced by the Commission."  *Id.*  There are two

fatal problems with this conclusory allegation.

First, coupling allegations regarding past conduct with a bare assertion that it "could be"

resumed with "ease" does not satisfy the requirement of a plausible factual allegation that the

defendant is "about to" violate the law.  This is not the first time the FTC has argued for this

false equivalency:  the agency tried and failed to convince both the Third Circuit in *Shire* and the

Northern District of Georgia in *Hornbeam* to conflate the plain language of the limitations on its

Section 13(b) authority with the "likelihood of recurrence" standard for issuance of a preliminary

injunction.  The Third Circuit "**reject[ed] the FTC's invitation to stretch Section 13(b)**

---

[11] While the Court need not consider it given the unambiguous terms of the statute, the legislative history of Section 13(b) squarely reinforces the plain meaning of the statute.  *See United States v. Kaluza*, 780 F.3d 647, 658 (5th Cir. 2015).  Before Section 13(b) was enacted in 1973, the FTC lacked the authority to bring a civil action of any kind in federal court; its only procedural avenue was an administrative proceeding under Section 5.  *See United States v. JS & A Group, Inc.*, 716 F.2d 451, 452 (7th Cir. 1983).  In 1973, Congress enacted Section 13(b) to address this issue; as explained in the accompanying Senate report, **"[t]he purpose of [Section 13(b)] is to permit the Commission to bring an immediate halt to unfair or deceptive acts or practices** . . . **until agency action is completed**."  S. Rep. No. 93-151, at 30-31 (1973) (emphasis added).

**beyond its clear text**" through adoption of a standard satisfied by "a past violation and a reasonable likelihood of recurrent future conduct." *Shire,* 917 F.3d at 150 (emphasis added). The FTC's allegation of a past violation and its claim that the defendant was "perfectly positioned" to violate in the future—what the Complaint in effect asserts here about Match— were insufficient to meet the statutory requirement. *Id.* at 160.  The Northern District of Georgia agreed with the district court in the *Shire* case and held that Section 13(b)'s text "should not be conflated" with the preliminary injunction standard. *Hornbeam,* 2018 WL 6254580, at *4. Unlike the preliminary injunction standard, Section 13(b) authority "require[s] more than a mere likelihood of resuming the offending conduct"; rather, the facts alleged must show that the "defendant is about to violate the law." *Hornbeam,* 2018 WL 6254580, at *6.

Second, the Complaint does not make a single factual allegation that would plausibly suggest that Match is "about to" resume any of the challenged conduct (which it is not)—and conversely contains several explicit admissions that the challenged practices were voluntarily discontinued, some well over a year ago.  (*See* Compl. ¶¶ 3, 19–20, 34.)  A complaint cannot survive a motion to dismiss through mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  The FTC's counter-factual and conclusory assertion that it has "reason to believe" that the challenged conduct is "about to" resume is not entitled to any weight or credence under *Twombly*, and prior claims by the FTC that its bare-bones form pleading is entitled to some sort of administrative "deference" were both squarely rejected. *See Shire*, 917 F.3d 147, 159 n.17 (describing FTC's argument that it has "unreviewable discretion" over "reason to believe" standard as "unpersuasive"); *Hornbeam*, 2018 WL 6254580, at *2–3 (rejecting FTC's argument that its "reason to believe"

assertion was entitled to any deference).[12]  Simply put, the FTC has failed to allege plausible

facts indicating that Match is about to violate the law.  Accordingly, the FTC has no authority to

bring Counts I–IV in federal court under Section 13(b).

**B.      There Is No Statutory Authority for the Equitable Monetary Relief the FTC
          Seeks Under Section 13(b).**

The Complaint is independently defective for similar reasons insofar as it seeks equitable

*monetary* relief under Section 13(b), and the FTC's request for such relief should be dismissed or

stricken.[13]  (Compl. ¶¶ 87, 89.)  Like the FTC's lack of authority to bring suit based upon past

conduct that is not about to recur, this is again a pure question of law, with the FTC seeking to

push past the outer bounds of the authority that Congress granted under the FTCA.

Section 13(b) of the FTCA only authorizes the FTC to seek *injunctive relief*.  It contains

no language authorizing the recovery of any other form of equitable relief, including restitution

or other monetary relief.  Section 19 of the FTCA, on the other hand, expressly allows the FTC

to seek such consumer redress by following a two-step process for the conduct challenged as

violating Section 5 of the FTCA:  First, the FTC must prevail in an administrative proceeding;

second, it must file a district court action and demonstrate that "a reasonable man would have

known under the circumstances [that the conduct in question] was dishonest or fraudulent."  15

U.S.C. § 57b(a)(2).  However, despite this clearly delineated legislative scheme, the FTC has

been able to persuade some courts (although not the Fifth Circuit, as explained below) that it also

may seek monetary relief as an *implied* remedy under Section 13(b), and thereby skip the

---

[12] While the FTC might argue that *Shire* is inapposite because Match discontinued the challenged practices after the FTC commenced its investigation, there is no statutory support for this argument, and the *Shire* court rejected it as well.  *See* 15 U.S.C. § 53(b); *Shire*, 917 F.3d at 160.

[13] The Court has ample authority to dismiss improper claims for relief under Rule 12(b)(6).  *See Brown v. Aetna Life Ins. Co.*, No. EP-13-CV-131-KC, 2013 WL 3442042, at *4 (W.D. Tex. July 8, 2013) (dismissing demand for punitive damages under Rule 12(b)(6)); *McDade v. Smurfit-Stone, Inc.*, No. CIV.A.3:05CV1478-B, 2006 WL 435315, at *3 (N.D. Tex. Feb. 23, 2006).

14

administrative proceeding and avoid the heightened evidentiary standards imposed by Section

19.  This is precisely what the FTC has attempted here.

Two months ago, the Seventh Circuit extensively analyzed this very issue and held in

*FTC v. Credit Bureau Center, LLC* that Supreme Court precedent prohibits judicial implication

of a restitutionary remedy under Section 13(b).  937 F.3d at 767 ("Stare decisis cannot justify

adherence to an approach that Supreme Court precedent forecloses.").  The Seventh Circuit first

reviewed the distinction Congress drew in the FTCA between Section 13(b) (authorizing

injunctions) and Section 19 (authorizing consumer redress).  *Id.* at 771–73.  The court then

analyzed whether a provision authorizing only injunctions could be construed as also authorizing

restitution.  The court "start[ed] with the obvious:  Restitution isn't an injunction."  *Id.* at 771.

Because the text of Section 13(b) does not set forth an explicit, or even suggest an implicit,

restitutionary remedy, the FTC would have to show that Congress nonetheless intended to imply

one.  Modern Supreme Court jurisprudence, however, counsels against implied remedies under a

"statute that expressly enumerate[s] the remedies available to plaintiffs," and "[i]t is . . . an

elemental canon of statutory construction that where a statute expressly provides a remedy,

courts must be especially reluctant to provide additional remedies."  *Id.* at 780 (quoting *Franklin*

*v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 69 n.6 (1992), and *Karahalios v. Nat'l Fed'n of Fed.*

*Emps.*, 489 U.S. 527 (1989)).

Applying these principles to the FTCA, the Seventh Circuit concluded that Section 13(b)

does not contain an implied restitutionary remedy.  The FTCA's structure—which affords the

FTC multiple other avenues to seek and obtain restitution, with distinct statutory and

administrative requirements—demonstrates that "[r]eading an implied restitution remedy into

section 13(b) makes the other provisions largely pointless."  *Id.* at 774.  Conversely, the

15

"tensions we've just discussed dissipate if **we read section 13(b) to mean what it says:  The remedy is limited to injunctive relief**." *Id.* (emphasis added).

The only Fifth Circuit case to address the availability of implied remedies under Section 13(b), *FTC v. Southwest Sunsites, Inc.*, strongly supports this textual interpretation of the FTCA. 665 F.2d 711, 714 (5th Cir 1982).  In *Southwest Sunsites*, the Fifth Circuit affirmed the district court's authority to freeze disputed assets pending the outcome of an administrative proceeding under Section 5 of the FTCA and potential district court proceeding for consumer redress.  *Id.* at 715–16.  The court reasoned that the power to freeze assets was necessary to preserve the prospect of a "complete resolution" of the matter, which would involve a "two-step process" of an administrative proceeding followed by a Section 19 court proceeding.  *Id.* at 719.  It was precisely because the availability of consumer redress would be the subject of a "**subsequent determination in another forum** of the rights of parties in the property" that the status quo needed to be preserved.  *Id.* (emphasis added).  Indeed, the Seventh Circuit in *Credit Bureau* described the Fifth Circuit's holding as "**preclud[ing] the possibility of restitution in 13(b)**, pointing instead to [Section 19] for monetary remedies."  937 F.3d at 777 n.2 (emphasis added).[14]

This Court should adopt the Seventh Circuit's persuasive analysis here.  Congress has granted the FTC an array of options for effective enforcement of the FTCA.  There is no reason

---

[14] The *Southwest Sunsites* court noted in passing that the district court had the "full range of equitable remedies traditionally available to it." *Id.* at 718.  However, this dicta no longer describes the state of the law.  The two Supreme Court cases cited for this proposition, *Mitchell v. DeMario Jewelry, Inc.*, 361 U.S. 288 (1960), and *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946), were decided in an era when the Supreme Court favored implied remedies.  The change in the prevailing jurisprudence is extensively detailed in *Credit Bureau*, which shows that *Mitchell* and *Porter* have been effectively overruled by more recent Supreme Court implied-remedies decisions.  *See Credit Bureau*, 937 F.3d. at 777–82 (describing how *Porter* and *Mitchell* have been replaced by a "more limited understanding of judicially implied remedies" and citing multiple recent Supreme Court cases declining to imply equitable remedies).  As recently stated by the Supreme Court, "the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."  *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385 (2015) (collecting cases).

16

in law or logic for this Court to grant the FTC an additional enforcement option that Congress

plainly chose to withhold, and thereby enable the FTC to avoid the statutory limitations that

Congress has placed on available remedies.  These statutory limitations are not arbitrary; they are

intended to protect the defendant's rights to fair notice and due process.  Indeed, the

requirements in Section 19 that a defendant must have violated an enacted rule or a practice a

reasonable person would have known was fraudulent and that the FTC must first issue a cease-

and-desist order are meant to safeguard against unfairly imposing retrospective monetary

sanctions.  *See* 15 U.S.C. § 57b.  Thus, Match respectfully requests that this Court follow the

teachings of the Fifth Circuit in *Southwest Sunsites*, as well as the Seventh Circuit in *Credit*

*Bureau*, and rule that the FTC cannot seek or obtain restitution or other equitable monetary relief

in this action.

> **C.     Even If the FTC Were Authorized to Sue Under Section 13(b) for Discontinued Conduct, the Communications Decency Act Would Bar Suit for the Conduct at Issue in Counts I and II.**

Even if the FTC possessed the requisite statutory authority to sue in federal court, the

Communications Decency Act, 47 U.S.C. § 230, confers immunity from suit on the PTR-related

claims, Counts I and II, as a matter of law.[15]  Counts I and II are barred because each of the

Counts seeks to hold Match liable for both (i) content created and provided solely by third parties

(*i.e.*, users) and (ii) Match's own voluntary screening and removal of potentially offending

content on its platform.

---

[15] These Counts allege that Match sends non-paying registered users notifications of communications directed to them by other users, regardless of whether the sender of those underlying communication is under review, which allegedly deceives consumers (Count I) and exposes them to risk of fraud (Count II).

17

1.   The CDA Bars Attempts to Hold Providers of Interactive Computer
Services Liable as the Publisher or Speaker of Third-Party Content.

Section 230(c)(1) of the CDA states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  A principal purpose of the CDA is to remove the "threat that tort-based lawsuits pose to freedom of speech" online, and to "maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum."  *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997). The statute also incentivizes service providers to self-regulate content on their platforms without the "specter of tort liability in an area of such prolific speech [posing] an obvious chilling effect."  *Id.* at 331.  Accordingly, "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to **publish, withdraw, postpone or alter** content—are barred."  *Id.* at 330 (emphasis added).  Courts nationwide have "construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content."  *MySpace, Inc.*, 528 F.3d at 418  (citing cases); *Force v. Facebook, Inc.*, No. 18-397, 2019 WL 3432818, at *7 (2d Cir. July 31, 2019) ("[T]he Circuits are in general agreement that the text of Section 230(c)(1) should be construed broadly in favor of immunity.").  The case law has developed a three-part test for application of CDA immunity that closely tracks the language of the statute:

The Communications Decency Act mandates dismissal if (i) [the defendant] is a "provider or user of an interactive computer service," (ii) the information for which [the plaintiff] seeks to hold [the defendant] liable was "information provided by another information content provider," and (iii) the complaint seeks to hold [the defendant] liable as the "publisher or speaker" of that information.

18

*Marshall's Locksmith Serv., Inc. v. Google, LLC*, 925 F.3d 1263, 1268 (D.C. Cir. 2019).  As

shown below, Match satisfies all three prongs of the CDA test as to both Counts I and II.[16]

> 2.    The CDA Also Immunizes Service Providers from Liability for Their
>         Good-Faith Efforts to Remove Objectionable Content.

Section 230(c)(2) of the CDA provides in pertinent part:

> (2) No provider or user of an interactive computer service shall be held liable on
> account of—
>
> > (A) any action voluntarily taken in good faith to restrict access to or
> > availability of material that the provider or user considers to be obscene,
> > lewd, lascivious, filthy, excessively violent, harassing, or otherwise
> > objectionable, whether or not such material is constitutionally protected.[17]

Section 230(c)(2) "allows website operators to engage in blocking and screening of third-

party content, free from liability for such good-faith efforts."  *Jane Doe No. 1 v. Backpage.com,

LLC*, 817 F.3d 12, 18 (1st Cir. 2016) (emphasis added).  As noted by the Seventh Circuit,

"[r]emoving the risk of civil liability may induce web hosts and other informational

intermediaries to take more care to protect the privacy and sensibilities of third parties."  *Doe v.

GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003).  For example, in *Holomaxx Technologies v.

Microsoft Corporation*, Section (c)(2) applied to software designed to block or remove "spam"

emails.  783 F. Supp. 2d 1097, 1104 (N.D. Cal. 2011).  Microsoft had broad discretion under the

statute to block or remove content that it considered objectionable.  *Id.*

---

[16] The Act broadly defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server."  47 U.S.C. § 230(f)(2). "Courts applying this definition have had no trouble concluding that social networking sites like Facebook.com, and on-line matching services like Roommates.com and Matchmaker.com are 'interactive computer services.'"  *Herrick v. Grindr*, 306 F. Supp. 3d 579, 588 (S.D.N.Y. 2018) (collecting cases and holding that dating website is classic example of interactive computer service); *see also Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019) (noting that definition is construed "expansively" and that the "most common interactive computer services are websites").  There is no doubt that Match is an "interactive computer service" under the CDA.

[17] Congress's purpose in enacting this provision of the CDA was, in part, to overrule *Stratton Oakmont v. Prodigy*, a New York state decision holding that an online service provider could be held liable for taking voluntary steps to remove online content it found objectionable.  1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).  Congress's intent was to foreclose liability in a situation where, for example, "a service provider filtered its content in an effort to block obscene material."  *Force*, 2019 WL 3432818, at *6–7 (quotations and citations omitted).

3.    Both Provisions of the CDA Bar Count I

a.    *Count I Is Barred by Section 230(c)(1).*

(i)    Count I Is Based on "Information Provided by Another
Information Content Provider."

The analysis begins with determining whether the FTC is seeking to hold Match

responsible for information provided by others, or whether Match itself is the "information

content provider."  *See Marshall's Locksmith Serv.*, 925 F.3d at 1268.  That inquiry turns on

whether the defendant is "responsible, in whole or in part, for the creation or development" of

the offending content.  47 U.S.C. § 230(f)(3).  A interactive computer service provider is entitled

to CDA immunity unless it "materially contributes to the illegality of the content itself."  *Daniel*

*v. Armslist, LLC*, 926 N.W.2d 710, 721 (Wis. 2019), pet. filed. (citing cases using "material

contribution" test).  This prong of the CDA test has spawned litigation where, as here, the

plaintiff complains about the defendant's role in communicating information that originated with

a third-party bad actor, but which was changed or affected in some way by a website's automatic

processes.

For example, in *Marshall's Locksmith*, the plaintiffs sued Google, alleging that it flooded

the market with search results featuring "scam" locksmiths in order to increase advertising

revenue.  925 F.3d at 1269.  Similar to the FTC's claim here, the plaintiffs claimed that Google

included in search results locksmith listings it knew were inaccurate, publishing the false

locations of scam businesses that did not exist in the cities in question and had entered fake

addresses into Google's systems.  The plaintiffs alleged that Google (not the scammers) would

then create a specific map "pinpoint," based on the fake address, which would cause a consumer

to choose the scam business instead of one their own.  *Id.* at 1269.  But, as the D.C. Circuit

reasoned when it affirmed the district court's Rule 12(b)(6) dismissal of the plaintiffs' complaint,

Google's use of automated algorithms that converted (fraudulent) third-party content into (allegedly fraudulent) location pinpoints could not transform Google into the "information content provider," and thus Google was immune from suit under the CDA.  *Id.* at 1270–71. Because Google translated "legitimate and scam information in the same manner," it could not be held liable for the ultimate harm to the plaintiffs.[18]  Likewise, in this case, Match conveyed to non-paying registered users expressions of interest from senders under review and from senders not under review in the same manner, namely by sending a PTR.

Similarly, in *Daniel v. Armslist, LLC*, allegations that a website operator knew its service was being used for illegal activities and had certain features that facilitated such activity were held insufficient to avoid CDA immunity.  926 N.W.2d at 716.  These principles apply to bar suit against Match as well:  Match's sending of a notification conveying that another user expressed interest or sent a message did not contribute to any wrongdoing associated with the underlying message.

Finally, and especially relevant here is *Dyroff v. Ultimate Software Grp., Inc.*, No. 17-CV-05359-LB, 2017 WL 5665670, at *1 (N.D. Cal. Nov. 26, 2017), *aff'd*, 934 F.3d 1093 (9th Cir. 2019), which involved a website that used proprietary algorithms to "make recommendations" to its users based on their site activity, as well as send them notifications whenever another user attempted to contact them.  The plaintiff alleged that the defendant had "sent users emails and other push notifications of new posts in [online] groups related to the sale of deadly narcotics" and "steered users to 'additional' groups dedicated to the sale of such

---

[18] In holding that the CDA barred suit, the *Marshall's Locksmith* court rejected the plaintiffs' claims that the CDA did not apply because (a) Google had notice that the content was fraudulent but failed to act; (b) Google had augmented or altered the third-party content; or (c) Google had created original content by using its algorithms or search engines to generate the false or fictitious addresses for the scam locksmiths.  *Id.* at 1268-71.  The similar allegations against Match in the instant Complaint should be rejected as well.

narcotics" through algorithms, and was therefore responsible for a certain user's narcotics overdose. *Id.* at *3–4. The district court dismissed the suit as barred by the CDA because, as here, the website "did not create or use unlawful content and merely provided its neutral social-network functionalities." *Id.* at *9. The automatic push notifications could not transform the website into an "information content provider" of offending material. *Id.* at *10. Merely "facilitat[ing] communication does not create liability" even if the website functionality "facilitates the expression of [harmful or unlawful] information." *Id.* (citations omitted). In affirming the district court's Rule 12(b)(6) dismissal, the Ninth Circuit stated that "recommending user groups and sending email notifications . . . **are tools meant to facilitate the communication and content of others. They are not content in and of themselves[,]**" nor did they materially contribute to the unlawfulness of the underlying content. *Dyroff,* 934 F.3d at 1098-99 (emphasis added).

The Court should dismiss Count I for the same reasons. Count I does not allege that Match "developed" fraudulent messages or that it "contributed materially" to the alleged illegality of those messages. Nor could it. In fact, the Complaint repeatedly focuses on the wrongfulness of the underlying messages from third parties. (*See, e.g.*, Compl. ¶ 22 (complaining of messages from "persons seeking to perpetrate scams").) The Complaint alleges—at best—that Match's automated systems uniformly sent out PTRs to non-paying registered users regardless of whether or not the originating subscriber was flagged for review. However, as shown above, courts have repeatedly held that claims based upon this type of automated service provider activity are within the scope of CDA immunity and therefore subject to dismissal under Rule 12(b)(6).[19]

---

[19] The FTC may claim that Match knew or should have known that the senders of the underlying messages were potentially bad actors. However, as the D.C. Circuit recently held, the CDA cannot be avoided by alleging the

         (ii)       Count I Impermissibly Treats Match as the "Publisher Or
                   Speaker" of the Offending Content.

As the First Circuit has stated, "the broad construction accorded to Section 230 as a

whole has resulted in a capacious conception of what it means to treat a website operator as the

publisher or speaker of information provided by a third party." *Jane Doe No. 1,* 817 F.3d at 19.

Here, when a Match user expressed interest in another user, Match's algorithms automatically

generated a notification of that expression of interest.  (Compl. ¶¶ 21, 23-24.)  Any alleged harm

is traceable to one third-party user's expression of interest in communicating with another user. [20]

In such cases, the CDA applies because the claims "implicitly require[] recourse to the

[underlying wrongful content] and the traditional function of a publisher to supervise content."

*Grindr*, 306 F. Supp. 3d at 591.  In *Herrick v. Grindr*, for example, the court ruled that the CDA

barred a failure-to-warn claim where Grindr failed to inform users that there was a risk that the

service could be misused by wrongdoers.  The Court held that because the claims were

"inextricably related to Grindr's role in editing or removing offensive content," Grindr was

impermissibly being turned into a publisher, and that is "precisely the role for which [the CDA]

provides immunity." *Id.* at 588-92.  Similarly, the Fifth Circuit rejected an attempt to hold

MySpace liable for failure to implement certain safety measures, because such allegations were

---

provider's purported knowledge of the likelihood of fraud by third parties.  *See Marshall's Locksmith*, 925 F.3d at 1269; *Armslist*, 926 N.W.2d at 722–23 (rejecting consideration of defendant's knowledge as "a distinction without a difference").

[20] Similarly, courts have rejected attempts to plead around the CDA where the wrongdoing traces "back to the publication of third-party content" and where the allegation is that the plaintiff was "eventually harmed because of third party content published by Match on its website."  *Beckman v. Match.com*, No. 2:13-CV-97 JCM NJK, 2013 WL 2355512, at *5 (D. Nev. May 29, 2013), *aff'd in part, rev'd in part sub nom. Beckman v. Match.com, LLC*, 668 F. App'x 759 (9th Cir. 2016).

"merely another way of claiming that MySpace was liable for publishing the communications." *Myspace, Inc.*, 528 F.3d at 420.

Dismissal is likewise warranted here.  As in *Grindr*, the FTC's theory is one of "indirect" liability, seeking to impose on Match a duty to "post a warning at the outset or along with each" message, or notification of a message, sent from a paying subscriber.  306 F. Supp. 3d at 591. Also, as in *Grindr*, Count I's theory is "no different than requiring [Match] to edit the third-party content itself." *Id.*  And, as in *Myspace*, Count I is "merely another way of claiming that [Match] was liable for publishing the communications." 528 F.3d at 420.  The CDA does not permit the imposition of liability under such a theory.

> b.      *Count I Is Barred by Section 230(c)(2).*

Section 230(c)(2)(A) of the CDA "allows website operators to engage in blocking and screening of third-party content free from liability for such good-faith efforts."  *Jane Doe No. 1*, 817 F.3d at 18.  The Complaint alleges that Match automatically sent PTRs about "email communications from fraud-flagged users" to non-subscribers while at the same time withholding such notifications from subscribers until the review process was complete.  (Compl. ¶ 34.)  Under these circumstances, Match would be better off—indeed, could have no liability under Count I—if it did no fraud screening at all and sent notifications to subscribers and non-subscribers alike.  *See Dyroff*, 934 F.3d at 1098 (immunizing push notifications).  Match's "Good Samaritan" efforts to protect its user base by screening users and placing accounts under review to find bad actors are the indispensable factual predicate for the FTC's theory of liability. Under Section (c)(2)(A), liability may not flow from such good-faith efforts.

> 4.      Both Provisions of the CDA Bar Count II.

Count II alleges that Match "exposed consumers to the risk of fraud by providing recent subscribers access to communications that Defendant knew were likely to have been sent by

persons engaging in fraud."  (Compl. ¶ 71.)  Specifically, the FTC alleges that this practice

caused "consumers who subscribed to Match to view these communications [to be] at risk of

falling victim to a romance scam or other form of fraud."  (*Id.* ¶ 37.)  The FTC also alleges that

this practice was "unfair" because "Defendant delivered email communications from fraud-

flagged accounts to nonsubscribers while withholding them from subscribers until it had

completed its fraud review."  (*Id.* ¶ 34.)[21]  Regardless of the chosen characterization, Count II is

barred by the CDA.

> a.   *Count II Is Barred by Section 230(c)(1).*

As noted above, Section 230(c)(1) states that "[n]o provider or user of an interactive

computer service shall be treated as the publisher or speaker of any information provided by

another information content provider."  Yet this is exactly what Count II seeks to do:  The

Complaint admits, as it must, that the fraudulent messages that users were allegedly exposed to

were *created by other users*—not Match.  (*See* Compl. ¶ 37 (noting that communications in

question were "from users that were likely to be engaging in fraud").)  Thus, there is no

argument that Match was "responsible, in whole or in part, for the creation or development" of

the offending information under the second prong of the inquiry.  47 U.S.C. § 230(f)(3).  And, as

discussed above, the CDA bars claims that impermissibly seek to treat the service-provider

defendant as the publisher of the offending user or other third-party content.  *See Grindr*,

306 F.  Supp. 3d at 591.  The FTC's allegation that Match "knew [the underlying

communications] were likely to have been sent by persons engaging in fraud" does not affect the

analysis, as courts have repeatedly rejected attempts avoid CDA immunity with allegations of the

---

[21] What the Complaint loosely describes as "fraud review" (*see* Compl. ¶¶ 23, 28, 34), actually refers to review that Match conducts when users are believed to be on Match potentially for an improper purpose–which encompasses a variety of conduct other than potential fraud (*e.g.*, spammers, bots).

service provider's "knowledge" or "notice" of offending user content.  (Compl. ¶ 71); *see Zeran*,

129 F.3d 327 (rejecting argument that CDA does not apply where defendant has "notice" or

"knowledge" of wrongful content); *Marshall's Locksmith*, 925 F.3d at 1269; *Armslist*, 926

N.W.2d at 722–23 (rejecting consideration of defendant's knowledge as "distinction without a

difference").

　　　　As Count II is directly based upon the availability of access to communications from

potentially fraudulent users, it fails under a straightforward application of Section 230(c)(1).

*See, e.g.*, *Dyroff*, 934 F.3d at 1097-98 (immunizing website where harmful information was

developed by third parties).

　　　　b.　　　*Count II Is Barred by Section 230(c)(2).*

　　　　Section 230(c)(2)(A) bars Count II for largely the same reasons it bars Count I.  The FTC

alleges it was "unfair" to allow access to purportedly fraudulent communications to "recent

subscribers" while withholding those communications from subscribers.[22]  (*See* Compl. ¶¶ 34,

37, 71.)  This alleged "unfairness" derives solely from the methodology of Match's

implementation on its platform of its voluntary efforts to restrict user access to potentially

objectionable content.[23]  That is exactly the type of liability theory that Section 230(c)(2)(A) was

designed to foreclose—the imposition of liability as a collateral consequence of voluntary, good-

faith efforts to block or remove offending content.  *See Holomaxx*, 783 F. Supp. 2d at 1104-05.

Again, the FTC's claim is based on the conclusion that Match's screening through its review

queue should have caused Match to withhold the offending message from recent subscribers, just

---

[22] Again, non-subscribers cannot read any messages, regardless of source.

[23] The Complaint does not allege that Match's efforts to restrict subscriber access were not made in good faith; to the contrary, Paragraph 33 states that "in fact, Defendant screens users that send communications through Match to identify users that are likely to be perpetrating romance scams or other frauds."  Bad faith is not affirmatively pleaded as required.  *See Holomaxx*, 783 F. Supp. 2d at 1105 (N.D. Cal. 2011) ("[T]he appropriate question is whether Holomaxx has 'pled an absence of good faith.'").

as the same message would have been withheld from other subscribers.  Had Match done no

screening and just allowed all messages to be delivered, it could not be liable.  Thus, it cannot be

liable based upon its effort to screen.  The CDA prohibits the imposition of liability for Match's

undertaking to screen and remove potentially harmful content, and thus defeats Count II.

**D.     Count V Fails Because the FTC Fails to Allege a Violation of ROSCA as Written.**

Finally, the Court should dismiss the FTC's ROSCA claim (Count V) because, as a

matter of law, the FTC does not allege facts constituting a violation of the statute as written.  The

Complaint refers to Match's "billing and cancellation practices," but the FTC complains only

that the online cancellation method is not "simple," ignoring Match's phone, fax, email, internet

chat, or standard mail methods of cancellation.  (*See* Compl. ¶¶ 53–59.)

ROSCA makes it unlawful for "any person to charge or attempt to charge any consumer

for any goods or services sold in a transaction effected on the Internet through a negative option

feature . . . unless the person . . . **provides simple mechanisms for a consumer to stop**

**recurring charges**."  15 U.S.C. § 8403 (emphasis added).  Nothing in the straightforward text of

the statute requires that any of the "simple [cancellation] mechanisms" be online.  *Id.*  Match has

*five* other cancellation mechanisms.[24]  The FTC has failed to plead facts that could support an

allegation that each of those five methods is not "simple."  (*See* Compl. ¶¶ 53–59, 84–85.)  The

FTC's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  *Iqbal*, 556 U.S. at 678; (Compl. ¶ 84).  Accordingly, because the

---

[24] Match informed the FTC—as early as May 15, 2017, in response to the FTC's interrogatories—that Match offers cancellation methods that include "contacting customer service by voice, email, or online chat, or by writing to Match's physical address."

FTC has failed to allege facts plausibly demonstrating that Match does not provide "simple mechanisms" for cancellation, its ROSCA claim fails as a matter of law.[25]

## IV.   CONCLUSION AND REQUESTED RELIEF

The Complaint is fatally defective on several independent grounds, and should be dismissed with prejudice because it attempts to impermissibly expand the FTC's authority outside its statutory mandate in several related ways.[26]

First, as the Third Circuit and the Seventh Circuit have recently explained (in *Shire* and *Credit Bureau*), the structure of the FTCA allows the FTC to rush to court under Section 13(b) only for the narrow purpose of obtaining injunctive relief, not monetary relief, and only where the FTC reasonably believes, based on well-pled factual allegations, that the defendant "is violating, or is about to violate the law"—in other words, to enjoin ongoing or imminent future conduct. The FTC has utterly failed to heed these legal standards here.

Second, as here, where the FTC seeks to obtain *monetary* relief under Section 13(b) for *past* conduct, the FTC must proceed within the strictures and confines of the statutory provisions that authorize that relief, including by first pursuing an administrative action against the defendant for the past conduct and then by demonstrating to a court that the defendant knew or should have known that the accused conduct was "dishonest or fraudulent."[27]  Again, the FTC has failed to do so.

Instead, the FTC has attempted to sidestep these important structural and procedural requirements, which Congress intended as critical limitations on the FTC's legitimate regulatory

---

[25] As Match will show if Count V somehow survives dismissal, its online cancellation process is indeed "simple."

[26] As a threshold matter, the FTC sued Match Group, Inc.—a holding company—rather than Match Group, LLC, which actually operates Match.com and should also be dismissed for this reason.

[27] *See* FTCA Section 5(b), 15 U.S.C. § 45(b) (authorizing administrative proceeding); FTCA Section 19, 15 U.S.C. § 57b (authorizing consumer redress action); 15 U.S.C. § 57b(a)(2); *Shire*, 917 F.3d at 155.

power and cannot be ignored.  The FTC essentially asks the Court to grant it powers not authorized by Congress through an implied remedy, something that Supreme Court precedent and multiple courts have recently held to be impermissible.  And, even if the FTC had statutory authority to bring any of these claims, which it does not, the CDA independently bars Counts I and II.  Finally, the FTC seeks to bring a ROSCA claim that, if allowed, would impermissibly expand the unambiguous statutory text.

For all of these reasons, Match respectfully requests that the Court dismiss Counts I–V with prejudice, as well as grant it all other relief to which it is justly entitled.  Match respectfully requests oral argument pursuant to Local Rule 7.1(g).

Dated:  October 17, 2019

Respectfully submitted,

/s Angela C. Zambrano
Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
David Sillers
State Bar No. 24072341
dsillers@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, TX 75201
Telephone:  214.981.3300
Fax:  214.981.3400

Chad S. Hummel (*pro hac vice* pending)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone:  310.595.9500
Fax:  310.595.9501

*Attorneys for Match Group, Inc.*

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served in compliance with the Federal Rules of Civil Procedure on October 17, 2019, on counsel of record for this case through the ECF system.

/s David Sillers<br>David Sillers