# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| vs. | Case No.  3:19-cv-02281-K |
| MATCH GROUP, INC.,  a corporation, | |
| Defendant. | |

## APPENDIX IN SUPPORT OF DEFENDANT MATCH GROUP, INC.'S
## MOTION TO DISMISS AND BRIEF IN SUPPORT

Defendant Match Group, Inc. ("Match") by and through its counsel, submits this

Appendix in support of its Motion to Dismiss and Brief in Support.

| Ex. | Description | App. Page(s) |
|-----|-------------|--------------|
| 1 | Declaration of Angela C. Zambrano | App. 001–002 |
| 1-A | The Complaint that the FTC Voted to Approve | App. 003–028 |
| 1-B | October 9, 2019 Email from Match to the FTC | App. 029 |
| 1-C | October 11, 2019 Email Response from the FTC to the October 9, 2019 Email | App. 030 |
| 2 | Declaration of Laurie Braddock | App. 031–032 |

Dated: October 17, 2019                    Respectfully Submitted,


*/s/ Angela C. Zambrano*
Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
David Sillers
State Bar No. 24072341
dsillers@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, TX 75201
Telephone:  214.981.3300
Fax:  214.981.3400

Chad S. Hummel (*Pro Hac Pending*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone:  310.595.9500
Fax:  310.595.9501

*Attorneys for Match Group, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

On October 17, 2019, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas.  I hereby certify that I have served the document on all counsel by a manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Angela C. Zambrano*
Angela C. Zambrano

# EXHIBIT  1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

FEDERAL TRADE COMMISSION,

                 Plaintiff,

    vs.

MATCH GROUP, INC.,  a corporation,

                 Defendant.

Civil Action No.  3:19-cv-02281

## DECLARATION OF ANGELA C. ZAMBRANO

I, Angela C. Zambrano, declare as follows:

1.       I am an attorney licensed to practice in the State of Texas.  I am a partner at Sidley Austin LLP, counsel for Defendant Match Group, Inc. in the above-captioned case.  I submit this declaration in support of Match Group, Inc.'s Motion to Dismiss.  I have personal knowledge of the matters set forth herein.  If called upon to testify, I could and would testify competently hereto.

2.       The Complaint that Plaintiff Federal Trade Commission ("FTC") voted to approve is attached to this declaration as Exhibit A.

3.       Match further informed the FTC that Match Group, Inc. is not the correct defendant in this lawsuit.  On October 9, 2019, I, as counsel for Match, sent to counsel for the FTC an email indicating that Match Group, Inc. had not performed "the activities challenged by the Complaint" and that "Match.com is owned and operated by Match Group, LLC and not by Match Group, Inc."  As a result, I asked the FTC to dismiss Match Group, Inc.  The October 9, 2019 email is attached to this declaration as Exhibit B.  The response is attached as Exhibit C.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 16th day of October 2019, at Dallas, Texas.


_____
Angela C. Zambrano

# EXHIBIT 1-A

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. _____ |
| Plaintiff, | **COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION, AND OTHER RELIEF** |
| v. | |
| MATCH GROUP, INC., a corporation, | |
| Defendant. | |

Plaintiff, the United States of America, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("FTC" or the "Commission"), pursuant to Section 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 56(a)(1), for its Complaint alleges:

1. Plaintiff brings this action under Sections 5(a), 5(m)(1)(A), 13(b), 16(a), and 19 of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a), and 57b, and Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendant's acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 4 of ROSCA, 15 U.S.C. § 8403.

## SUMMARY OF THE CASE

2. Defendant operates Match.com, an online dating services provider. Consumers using Match.com create profiles and communicate using either free, limited services ("nonsubscribers") or a broader range of paid services ("subscribers").

APP 003

3.      Since at least 2013, Defendant has maintained the following five deceptive or unfair practices to induce consumers to subscribe to Match.com and to keep them subscribed. First, Defendant has sent consumers misleading advertisements that tout communications from persons Defendant has identified as potentially fraudulent users of Match.com and has led consumers to believe that the communications are from persons interested in establishing a dating relationship with them. Second, between 2013 and 2018, Defendant exposed consumers to the risk of fraud by providing recent subscribers access to communications that Defendant knew were likely to have been sent by persons engaging in fraud. Third, Defendant has guaranteed certain consumers a free six-month subscription renewal if they fail to "meet someone special" but has failed to disclose the requirements of its "guarantee" adequately. Fourth, Defendant has misled consumers with a confusing and cumbersome cancellation process that causes consumers to believe they have canceled their subscriptions when they have not. Fifth, when consumers dispute charges relating to any of these practices and lose the dispute, Defendant has denied consumers access to paid-for services.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355, and 15 U.S.C. §§ 45(m)(1)(A), 53(b), and 56(a). This action arises under 15 U.S.C. § 45(a).

5.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(2), and (d), 1395(a), and 15 U.S.C. § 53(b). Defendant resides in or transacts business in this District.

## DEFENDANT

6.      Defendant Match Group, Inc. is a Delaware corporation with its principal place of business at 8750 North Central Expressway, Suite 1400, Dallas, Texas 75231. The company transacts or has transacted business in this District and throughout the United States.

## COMMERCE

7.      At all times material to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS PRACTICES

8.      Defendant is the dominant online dating service provider in the United States. It controls approximately 25 percent of the online dating market, which is more than twice the market share of its nearest competitor. Defendant owns, operates, and controls approximately 45 online dating services, including several of the most popular services in the United States, such as Tinder, OKCupid, and Plenty of Fish.

9.      Defendant also owns, operates, and controls the online dating service Match.com. Defendant primarily generates revenue on Match.com by selling subscriptions to consumers in 25 countries, including the United States.

10.      Defendant's online dating service websites provide consumers a forum where they can contact and communicate with other like-minded people over the Internet, typically for the express or implied purpose of developing romantic relationships.

### *Background*

11.      Defendant and other online dating service providers allow consumers access to databases of other enrolled consumers to find potential romantic partners, typically based on

APP 005

certain criteria. These criteria include age, gender, sexual orientation, and location. To facilitate finding a compatible person, providers typically enable consumers to interact with one another, often by utilizing Internet-based communications such as email, instant messages, and video or telephone chat.

12.     To use an online dating service, consumers must typically first create profiles that contain information about themselves. Within these profiles, consumers often are able to upload pictures and to provide descriptive and personal information that is viewable by other consumers using the service.

13.     Online dating services, including Defendant's, are often misused to facilitate fraud or to promote dubious or unlawful products or services to consumers. Most notably, online dating services are used to find and contact potential romance scam victims. In these scams, the perpetrator poses as a suitor and, after establishing a trusting relationship with a consumer, deceives the consumer into giving or loaning the perpetrator money.

14.     Consumers have incurred substantial injury from romance scams. Indeed, consumers' losses reported to the FTC and FBI between 2015 and 2017 totaled an estimated $884 million. This figure likely underreports the true scale of consumer harm because many victims do not report this type of fraud. In addition, because perpetrators of romance scams manipulate their victims to exploit their trust and goodwill, these crimes cause significant emotional distress and injury to consumers beyond monetary losses.

### *Defendant's Match.com Dating Service*

15.     Consumers can purchase Match.com subscriptions in 1-, 3-, 6-, or 12-month packages, and these packages automatically renew for terms equivalent to the original subscription length. Alternatively, consumers may establish free "nonsubscriber" user profiles

APP 006

that allow them to use limited services at no cost. On occasion, consumers may also take advantage of temporary "free trial" offers, which allow consumers to use services that are otherwise generally available only to paid subscribers.

16.     Consumers using Match.com create online profiles with photographs and other personal information and can view the profiles of other Match.com users. Consumers create Match.com profiles and purchase Match.com subscriptions to interact with and to establish dating relationships with these members. Consumers using Match.com cannot distinguish nonsubscribers' profiles from subscribers' profiles.

17.     Consumers who are considering purchasing a Match.com subscription are generally not aware that as many as 25-30 percent of Match.com members who register each day are using Match.com to perpetrate scams. These scams include romance scams, stealing consumers' personal information through "phishing," promoting dubious or unlawful products or services, and extortion scams, in which a scammer will induce a consumer to send the scammer compromising videos or pictures of the consumer that the scammer then uses to extort money from the consumer by threatening to send the materials to the consumer's friends or family.

*Defendant's Use of Communications from Illegitimate Users to Generate Deceptive Advertisements and Sell Subscriptions*

18.     Nonsubscribers' ability to communicate with other Match.com users is restricted. Generally, nonsubscribers have been able to send limited communications, such as "likes" and, until May 2018, "favorites" and "winks," to other users, but not any communications with personalized messages. Subscribers, in contrast, have been able to send other users personalized "emails" and, until April 2017, "instant messages."

19.     Nonsubscribers are also unable to read personalized communications they receive from Match.com users or to view the identities of users that interact with them through likes or

APP 007

favorites. Instead, Defendant sends nonsubscribers advertisements notifying them of these communications and encouraging them to upgrade to paid subscriptions so that they can view and respond to these communications, and otherwise use all of Match.com's available features.

20. Consumers are often unaware that, in many instances, communications received through Match.com are not from users interested in establishing dating relationships, but are instead from persons seeking to perpetrate scams. For example, in some months between 2013 and 2016, more than half of instant message initiations and favorites that consumers received originated from accounts that Defendant identified as "fraudulent," meaning that Defendant determined the Match.com user was likely to be perpetrating some form of scam.

21. Defendant has used these fraudulent communications to induce consumers to subscribe to Match.com. When consumers have received these communications, they have also received accompanying advertisements from Defendant encouraging them to subscribe to Match.com in order to view the content of the communication and the identity of the sender. These advertisements do not disclose whether Defendant had identified the Match.com user as likely to attempt to defraud the consumer receiving the message or as requiring further review by Match's fraud review process due to the likelihood that the user is engaging in fraud.

22. Specifically, when nonsubscribers have received likes, favorites, emails, and instant messages on Match.com, they have also received automatically generated emailed advertisements from Defendant encouraging them to subscribe to Match.com to view the identity of the sender or the communication they received. These advertisements represent that the communication the nonsubscriber received was sent from a legitimate user of the site who has expressed interest in the consumer receiving the message:

**match**.com

### He just emailed you!

You caught his eye and now he's expressed

interest in you… Could he be the one?



You will be notified when other Match.com members express interest in you.

Please note: This email may contain advertisements.

Match.com P.O. Box 25472, Dallas TX 75225

23.     Consumers also receive discount offers for subscription packages at reduced

prices that similarly represent expressly that specific Match.com users are interested in them:

## Someone's Interested in You!
[username], 1 woman has shown interest in you this month!
And best of all, **PAY 25% LESS** when you subscribe today. Find out
who's interested and save big with this limited-time offer!
Match.com Members

\*At least one member has sent you a wink or email, l ke your photo, added you to their Favorites, or rated you "Yes" in
their Daily Matches.
Offer expires [date] at 11:59 Central Time. Match.com reserves the right to modify or discontinue promotions at any time.
Because you asked to be notified of Match.com Special Offers, we will send you emails such as this on a periodic basis.
To unsubscribe from this type of email, please click here within 30 days of receipt. Or contact Customer Service.
Please note: This email may contain advertisements.
Match.com P.O. Box 25472, Dallas TX 75225

24.     Consumers reasonably believe, based upon these advertisements, that other

Match.com users are interested in establishing a possible dating relationship with them.

25.     As a result, consumers have often purchased Match.com subscriptions from

Defendant so that they can communicate with the users that Defendant has advertised as being

interested in them.

26.     When consumers subscribe to view these communications, they either gain access

to the fraudulent communication or receive a notification stating that the profile that sent the

communication is "unavailable." This outcome depends upon whether consumers subscribe to

**APP 009**

Match.com before or after Defendant completes its fraud review process: if the consumer subscribes before the review is completed, the consumer receives the communication that was sent; if Defendant has already completed its review process and deleted the account as fraudulent before the consumer subscribes, the consumer will receive a notification that the profile is "unavailable."

27.     Indeed, in numerous instances, Defendant has not notified consumers that the Match.com users contacting them were removed from Match.com due to the high likelihood that these users were seeking to defraud consumers.

28.     When consumers contact Defendant to complain about subscribing to Match.com only to receive a notification that a sender's account is "unavailable," Defendant has replied, "Please be assured, Match.com does not send members misleading notifications, e-mails or winks professing romantic interest. We have too much respect for our members to ever compromise their trust. If you have received communications from members with profiles that are not immediately available, the member may have temporarily hidden their profile."

29.     Between at least 2013 and mid-2017, Defendant tracked the number of fraud-generated personalized advertisements it sent to nonsubscribers and those advertisements' effect on Match.com's subscriber numbers.

30.     Hundreds of thousands of consumers have subscribed to Match.com shortly after receiving a fraudulent communication. In fact, Defendant has consistently tracked how many subscribers these communications have generated, typically by measuring the number of consumers who subscribe to Match.com within 24 hours of receiving an advertisement that touts a fraudulent communication. From June 2016 to May 2018, for example, Defendant's analysis

APP 010

found that consumers purchased 499,691 subscriptions within 24 hours of receiving an advertisement touting a fraudulent communication.

***Defendant Exposed Consumers to the Risk of Falling Victim to Fraud by Marketing Communications from Users That It Knew to be Likely to be Engaging in Fraud***

31.     Defendant is aware that these communications reach consumers and automatically generate personalized advertisements encouraging them to subscribe to Match.com. In fact, Defendant screens users that send communications through Match.com to identify users that are likely to be perpetrating romance scams or other frauds. In many instances, Defendant has withheld communications sent by these users.

32.     Between 2013 and mid-2018, however, Defendant delivered email communications from fraud-flagged users to nonsubscribers while withholding them from subscribers until it had completed its fraud review. If, for example, a user Defendant flagged as potentially fraudulent had sent three emails to subscribers and three emails to nonsubscribers, Defendant would have withheld the three emails sent to subscribers until its fraud review was complete while allowing the three emails sent to nonsubscribers to reach their recipients.

33.     Without this practice, the vast majority of these fraud-flagged Match.com users would never have been able to contact their intended recipients: between June 2016 and the beginning of May 2018, for example, approximately 87.8 percent of accounts whose messages Defendant withheld were later confirmed by Defendant to be fraudulent.

34.     As a result, consumers who subscribed to Match.com after receiving an ad touting these messages were at risk of receiving communications that Defendant knew to be from users that were likely to be engaging in fraud. Between June 2016 and the beginning of May 2018, for example, Defendant delivered approximately 4 million communications that Defendant would have withheld had the approximately 2.25 million consumers who received them already been

APP 011

subscribers when the communications were sent. More than 250,000 of those consumers subscribed to Match.com within 24 hours of receiving the email communications.

35.     Due to these practices, Defendant has delivered millions of advertisements to consumers touting communications that Defendant knew to be sent by users likely engaging in fraud and that those consumers would not have received had they already been subscribers to Match.com. In addition, consumers who subscribed to Match.com to view these communications were placed at risk of falling victim to a romance scam or other form of fraud.

### *Defendant's Use of Deceptive Guarantees to Promote Match.com Subscriptions*

36.     Consumers interested in using Defendant's online dating services can purchase a subscription from the Match.com website. Often, consumers who visit the Match.com website are offered a "match GUARANTEE" if they purchase a six-month subscription:

37.     When consumers hover their cursors over the "match GUARANTEE" hyperlink, Defendant promises a free six-month subscription to any consumer who purchases a six-month paid subscription but does not "meet someone special" during the first six months:



38.     Although Defendant's offer does not disclose that the guarantee is subject to any additional terms or conditions, consumers who click "Learn more" are directed to a rules page that provides several requirements that the consumer must satisfy to receive the guarantee.

39.     According to the "Learn more" page, consumers must sign up for a six-month subscription, create a truthful public profile with a primary photo, initiate or respond to communications with at least five unique Match.com members each month, and comply with the guarantee program rules:

APP 013



     40.    Underneath this description, Defendant provides a lengthy "Program Rules" section. This section provides six bolded, individually numbered eligibility rules that explain the requirements further, including both maintaining a public profile photo that is approved by Match.com and contacting five unique Match.com subscribers each month. For example, the rules clarify that to satisfy the primary photo requirement, consumers must submit a photo and have it approved by Defendant within the first seven days of purchasing the guarantee:

**I Met Someone GUARANTEE (formerly "Make Love Happen Guarantee") Program Rules**

We know you'll meet tons of great people during your 6-month subscription with us. But, if you don't find someone special during that time, we'll give you an ADDITIONAL 6 months to continue your search. Check out the rules below, then get out there and start connecting today!

- Under the I Met Someone GUARANTEE Program, (the "Guarantee Program" or the "Program") if you don't find someone special during a qualifying six-month paid subscription to the Match.com service, we'll give you an additional six-month subscription (the "Guarantee Extension") to the Match.com service at no additional expense. See Match.com Terms of Use for details regarding the Match.com service and use of the Match.com website.

- The Guarantee Program is available for a limited time only, and open to anyone not currently participating in the Program. Additionally, to be eligible for the Program and the Guarantee Extension, you must:

- (1) Comply at all times with the Match.com Terms of Use. By using the Match.com website and participating in the Program, you agree to be bound by the Match.com Terms of Use.

- (2) Pay in full the applicable rate for a **six-month subscription** to the Match.com service (the "Guarantee Program Subscription"). The Guarantee Program Subscription consists of five consecutive 30-day periods followed by a final period of 33 days, all of which are referred to as a "Month" in these Program rules. If you are enjoying the benefits of a free trial of the Match.com service, your Guarantee Program Subscription will not begin until your free trial period ends.

- (3) Use your Guarantee Program Subscription to **create a profile with a primary photo**. Your profile and primary photo must be approved by Match.com within the first seven days of your Guarantee Program Subscription in order for you to be eligible for the Guarantee Program. Details on approval of profile and primary photo available at FAQ and How It Works.

- (4) **Keep your profile with primary photo visible at all times** during your Guarantee Program Subscription.

- (5) **Communicate** during your Guarantee Program Subscription with other Match.com subscribers with whom you have not previously communicated during your Guarantee Program Subscription ("Unique Match.com Subscribers").

- (6) Send a **"Qualifying Email" to a minimum of five other Unique Match.com Subscribers each Month during your Guarantee Program Subscription.** A "Qualifying Email" may be either one you send to a Unique Match.com Subscriber who has not yet emailed you or an email response you send to a Unique Match.com Subscriber who has emailed you. A "Qualifying Email" must be an email sent through the Match.com service and does not include any other method of communicating (such as Match.com winks, MatchPhone™, Match.com Instant Messaging or emails sent outside of the Match.com system).

- Progress toward eligibility for the Guarantee Extension may be determined at any time during a Guarantee Program Subscription by visiting the progress page associated with such Guarantee Program Subscription (the "Guarantee Program Progress Page"). If, during the last seven days of a Guarantee Program Subscription, you are eligible for a Guarantee Extension (and have not met that "special someone"), you may accept the Guarantee Extension by affirming on the Guarantee Program Progress Page that you have not met someone special during your Guarantee Program Subscription. Please see the Match.com Guarantee FAQ for further information. You may also contact Customer Care with any questions related to the Match.com service or the Program. Match.com alone will make all decisions under these Program rules regarding Program policies, including but not limited to Program and Guarantee Extension eligibility.

- Customers eligible to receive a Guarantee Extension will not receive a refund, money or any other thing of value as a substitute for the Guarantee Extension. The Guarantee Extension may only be used by the purchaser of the Guarantee Program Subscription, and the Guarantee Extension may not be sold or transferred in any way.

- Guarantee Program Subscriptions which do not result in a Guarantee Extension (due to ineligibility of the subscriber or failure of the subscriber to accept the Guarantee Extension) will automatically be continued for successive six-month subscription periods at the subscription rate in effect at the time of continuation. See Match.com Terms of Use for details regarding Match.com subscriptions and charges on your billing account.

- The Match.com Terms of Use and the Match.com Guarantee Program Rules are subject to change by Match.com at any time, effective upon posting on the Match.com website, and your use of the Match.com service and your initial or continued participation in the Match.com Guarantee Program after such posting will constitute acceptance by you of such changes. Match.com reserves all rights to modify, suspend or cancel the Program at any time and without notice.

- Program rules last updated January 24th, 2008.

41.     After the numbered list of rules, the page contains several unnumbered paragraphs. Despite containing neither numbered nor conspicuously set off language, these paragraphs contain additional requirements related to consumers' ability to comply with Defendant's Match guarantee program rules.

**COMPLAINT**
13

42.     Consumers who continue reading after the numbered list of requirements will find that Defendant's website includes a "progress page" tracking their compliance with the guarantee's rules that consumers must access to comply with the offer's terms:

• Progress toward eligibility for the Guarantee Extension may be determined at any time during a Guarantee Program Subscription by visiting the progress page associated with such Guarantee Program Subscription (the "Guarantee Program Progress Page"). If, during the last seven days of a Guarantee Program Subscription, you are eligible for a Guarantee Extension (and have not met that "special someone"), you may accept the Guarantee Extension by affirming on the Guarantee Program Progress Page that you have not met someone special during your Guarantee Program Subscription. Please see the Match.com Guarantee FAQ for further information. You may also contact Customer Care with any questions related to the Match.com service or the Program. Match.com alone will make all decisions under these Program rules regarding Program policies, including but not limited to Program and Guarantee Extension eligibility.

43.     Consumers who view the progress page are reminded that they are required to create a public profile with a photograph and to start a conversation with at least five Match.com members each month, but not that they must provide an approved photo within the first seven days of subscribing or that the members they contact must be subscribers:



44.     In numerous instances, however, consumers are unaware of the existence of the progress page and do not understand the requirements of the guarantee.

45.     Consumers who continue reading after the numbered list of requirements and the progress page description will also find an additional requirement to receive the free six-month package: they must "accept" the free six months during the final week of the initial six-month term.

APP 017

- Progress toward eligibility for the Guarantee Extension may be determined at any time during a Guarantee Program Subscription by visiting the progress page associated with such Guarantee Program Subscription (the "Guarantee Program Progress Page"). If, during the last seven days of a Guarantee Program Subscription, you are eligible for a Guarantee Extension (and have not met that "special someone"), you may accept the Guarantee Extension by affirming on the Guarantee Program Progress Page that you have not met someone special during your Guarantee Program Subscription. Please see the Match.com Guarantee FAQ for further information. You may also contact Customer Care with any questions related to the Match.com service or the Program. Match.com alone will make all decisions under these Program rules regarding Program policies, including but not limited to Program and Guarantee Extension eligibility.

46.     Consumers are often not aware that they must accept the guarantee during the final week of their initial subscription because this requirement is not clearly or conspicuously disclosed alongside the guarantee's other requirements.

47.     Moreover, even when consumers are aware that they must timely accept the guarantee, consumers must also access their progress page during the last week of their initial six-month period and answer the question, "Did you meet anyone during your 6-month guarantee program?"



48.     According to one of Defendant's customer service executives, this question has been "obviously misunderstood" by many consumers, who believe it to ask whether they met anyone at all through the service instead of whether they met "someone special." Consumers who respond "Yes" to the question are prohibited from claiming a guarantee.

49.     As a result of Defendant's failure to clearly disclose the guarantee program requirements and to maintain a clear process to claim the guarantee, few consumers receive the free six-month subscription that they were promised. Instead, consumers are often surprised to find that their payment instruments are billed for another six-month subscription at the end of the initial period due to the negative option feature of Match.com's subscriptions.

**COMPLAINT**
16

50.     Between 2013 and 2016, consumers purchased nearly 2.5 million subscriptions subject to the guarantee but only received 32,438 free six-month subscription packages during the same period. In contrast, Defendant billed nearly 1 million consumers who purchased a guarantee for an additional six-month package when the first six-month period expired.

### *Defendant's Billing and Cancellation Practices for Match.com Subscriptions*

51.     Consumers who purchase a subscription package must complete an online enrollment process at Match.com and provide their credit card or other payment information to pay for the initial subscription package. Defendant's subscription packages include a "negative option renewal" feature, meaning that Defendant will automatically charge consumers for a new term at the end of each subscription period, unless the consumer has affirmatively canceled the subscription.

52.     Consumers who subscribe to Match.com thus continue to have their subscriptions renewed and are charged until they affirmatively act to cancel their subscriptions. Often, consumers who attempt to cancel their Match.com subscriptions or subscription renewals are deterred by confusing and cumbersome cancellation practices.

53.     To cancel a Match.com subscription, consumers must complete several steps. After locating the cancellation tab and inputting their passwords, consumers have first either had to click through a "retention offer" or, as of 2017, a "Cancel Subscription" hyperlink.

54.     Next, subscribers have had to click through two pages of survey questions, in which the subscriber's response to one question causes a follow-up question to pop up. For example, clicking "I had too much going on and did not have time to date," results in the follow up question, "When do you feel you might be ready to date again?" with three possible answers. Finally, consumers reach the cancellation confirmation page.

APP 019

55.     Defendant illustrated the cumbersome nature of this process in a 2015 internal presentation, the notes to which described the cancellation flow as "hard to find, tedious, and confusing. Members often think they've cancelled when they have not and end up with unwanted renewals. The current process takes over 6 clicks":



COMPLAINT
18

56.     Thousands of consumers have complained about Match.com's cancellation procedures. They have also claimed that Defendant has billed them after they believed they effectively canceled their Match.com subscriptions.

57.     Defendant's executives have acknowledged that Match.com's cancellation process is "convoluted and confusing." Defendant's head of customer service stated in 2016, for example, that "it's been the same complaint for the past decade that I've been with Match . . . It takes up to 7 or 8 clicks to complete the flow to turn off [subscriptions] if you can even figure out how to do it."

### *Defendant's Terminating Accounts in Response to Billing Disputes*

58.     Because of Defendant's deceptive advertising, billing, and cancellation practices, consumers often raise billing disputes with Defendant. In numerous instances, consumers dispute Defendant's charges through their financial institutions.

59.     When consumers dispute these charges, Defendant contests the disputes. When Defendant prevails in a billing dispute, Defendant often fails to provide consumers access to their Match.com accounts or to the subscription services that the consumers paid for. Instead, Defendant terminates the consumers' accounts and deletes their profiles.

60.     In fact, Match.com's Terms of Use warns that if Defendant "successfully disputes the reversal [of charges], and the reversed funds are returned, you are not entitled to a refund or to have your account or subscription reinstated." Defendant has placed this disclosure near the end of its lengthy Terms of Use document and has not set it off or otherwise made it conspicuous to consumers.

61.     Defendant has estimated that 60 percent of chargebacks occur within one month of the disputed charge and that 82 percent of chargebacks occur within the first two months of

the charge. Thus, consumers who dispute a charge and lose the dispute will often have remaining time in their 3-, 6-, or 12-month subscriptions and are banned from accessing the services they paid for.

62.     Based on (a) Defendant's long history of continuous conduct of the type described above; (b) Defendant's continued use of the practices challenged above—including delivering communications from fraud-flagged accounts sent to nonsubscribers while withholding them from subscribers—after learning of the Commission's investigation; (c) Defendant's continued use of the personalized advertisements, guarantee offers, cancellation practices, and account termination practices described above; and (d) the ease with which Defendant can engage in or resume similar conduct, the FTC has reason to believe that Defendant is violating or is about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

63.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

64.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

65.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

### Count I
### Misrepresentation Regarding Users of Defendant's Service

66.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of its online dating service, Defendant has represented, directly or

indirectly, expressly or by implication, that communications received by consumers using Match.com are from people interested in establishing a dating relationship with those consumers.

67.    In truth and in fact, in numerous instances in which Defendant has made the representation set forth in Paragraph 66 of this Complaint, the communications received by consumers using Match.com are not from people interested in establishing a dating relationship with those consumers but are instead from fake accounts created by fraudsters to deceive consumers.

68.    Therefore, Defendant's representation as set forth in Paragraph 66 of this Complaint is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II
## Exposing Consumers to Risk of Fraud

69.    Through the means described in Paragraphs 31-35, Defendant exposed consumers to the risk of fraud by providing recent subscribers access to communications that Defendant knew were likely to have been sent by persons engaging in fraud.

70.    Defendant's actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

71.    Therefore, Defendant's practices as described in Paragraph 69 above constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## Count III
## Deceptive "Guarantee" Program

72.    In numerous instance in connection with the advertising, marketing, promotion, offering for sale, or sale of its online dating service, Defendant has represented, directly or

APP 023

indirectly, expressly or by implication, that consumers would receive a free six-month subscription if they purchased a six-month Match.com subscription and did not "meet someone special" during that initial six-month period on Match.com.

73.     In numerous instances in which Defendant has made the representation set forth in Paragraph 72 of this Complaint, Defendant has failed to disclose, or disclose adequately to consumers, that the consumer must take specific steps to claim the guarantee during the final week of the initial six-month subscription period, including (a) securing and maintaining a public profile with a primary photo approved by Defendant within the first seven days of purchase, (b) messaging five unique Match.com subscribers per month, and (c) using Defendant's progress page to redeem the free six months during the final week of the initial six-month subscription period. This additional information would be material to consumers in deciding to purchase or in their conduct regarding the online dating service that Defendant sells.

74.     Defendant's failure to disclose or disclose adequately the material information described in Paragraph 73, above, in light of the representation described in Paragraph 72, above, constitutes a deceptive act or practice in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

### Count IV
### Unfair Denial of Access to Consumers' Accounts

75.     In numerous instances, Defendant has barred consumers who have disputed charges through their financial institutions from using paid-for Match.com subscription services.

76.     Defendant's actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

APP 024

77.     Therefore, Defendant's practices as described in Paragraph 75 above constitute unfair acts or practices in violation of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

78.     In 2010, Congress passed ROSCA, 15 U.S.C. §§ 8401-05, which became effective on December 29, 2010. Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." Section 2 of ROSCA, 15 U.S.C. § 8401.

79.     Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(u), unless the seller (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, (b) obtains the consumer's express informed consent before making the charge, and (c) provides a simple mechanism to stop recurring charges. *See* 15 U.S.C. § 8403(1)–(3).

80.     The TSR defines a negative option feature as: "an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

81.     Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is treated as a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

COMPLAINT
23

**Count V**
**Failure to Provide a Simple Mechanism for Consumers to Stop Recurring Charges**

82.     In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 51-57 above, Defendant has failed to provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

83.     Defendant's practices as described in Paragraph 82, above, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

## CONSUMER INJURY

84.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act and ROSCA. In addition, Defendant has been unjustly enriched as a result of its unlawful acts or practices. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

85.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

86.     Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74,

APP 026

§ 701 (amending the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C.

§ 2461), as amended, and as implemented by 16 C.F.R. § 1.98(d), authorizes this court to award

monetary civil penalties of not more than $42,530 for each violation of ROSCA. The

Defendant's violations of ROSCA were committed with the knowledge required by Section

5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

87.     Section 19 of the FTC Act, 15 U.S.C. § 57b , and Section 5 of ROSCA, 15 U.S.C.

§ 8404, authorize this Court to grant such relief as the Court finds necessary to redress injury to

consumers resulting from Defendant's violations of ROSCA, including the rescission or

reformation of contracts, and the refund of money.

## **PRAYER FOR RELIEF**

88.     Wherefore, Plaintiff, pursuant to Sections 5(a), 5(m)(1)(A), 13(b), 16(a), and 19

of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a), and 57b, and Section 5 of

ROSCA, 15 U.S.C. § 8404, and the Court's own equitable powers, requests that the Court:

a.  Enter a permanent injunction to prevent future violations of the FTC Act and
    ROSCA by Defendant;

b.  Award monetary civil penalties from Defendant for every violation of
    ROSCA;

c.  Award such relief as the Court finds necessary to redress injury to consumers
    resulting from Defendant's violations of the FTC Act and ROSCA, including
    but not limited to, rescission or reformation of contracts, restitution, the refund
    of monies paid, and the disgorgement of ill-gotten monies; and

d.  Award Plaintiff the costs of bringing this action, as well as such other and
    additional relief as the Court may determine to be just and proper.

Respectfully submitted,

DATED: [Date]

**FOR THE UNITED STATES:**

[Name]                                              *Of Counsel:*
Assistant Attorney General
Civil Division

[Name]                                              DAMA J. BROWN
Deputy Assitant Attorney General          Regional Director
                                                            Southwest Region

[Name]
Director
Consumer Protection Branch

_____              _____
[Department of Justice Staff]              ZACHARY A. KELLER, Managing Attorney
[Contact Information]                          M. HASAN AIJAZ
                                                            Texas Bar No. 24087838 (Keller)
                                                            Virginia Bar No. 80073 (Aijaz)
                                                            Federal Trade Commission
                                                            1999 Bryan St. Ste. 2150
                                                            Dallas, Texas 75201
                                                            T: (214) 979-9382 (Keller)
                                                            T: (214) 979-9386 (Aijaz)
                                                            Email: zkeller@ftc.gov; maijaz@ftc.gov
                                                            Attorneys for Plaintiff
                                                            FEDERAL TRADE COMMISSION

APP 028

# EXHIBIT 1-B

| From: | Zambrano, Angela |
|---|---|
| To: | Zkeller@ftc.gov |
| Cc: | Hummel, Chad S.; Sillers, David |
| Subject: | FTC v. Match Group Inc. |
| Date: | Wednesday, October 9, 2019 11:25:32 AM |
| Attachments: | image001.png |

Hi Zach,

The FTC named Match Group, Inc. as the defendant in its recent lawsuit, No. 3:19-cv-02281-K (N.D. Tex.).  As you know, the Complaint challenges conduct related to Match.com.  Match.com is owned and operated by Match Group, LLC and not by Match Group, Inc.  In fact, as our client has repeatedly told the FTC, none of the activities challenged by the Complaint were performed by Match Group, Inc.  Instead, Match Group, Inc. is simply the parent of Match Group, LLC.  Thus, Match Group, Inc. is incorrectly named as a defendant in this lawsuit and should be voluntarily dismissed.  In the interests of efficiency and to avoid unnecessary motion practice, we request that the FTC voluntarily dismiss its Complaint on or before Friday October 11th

Thanks - Angela



**ANGELA C. ZAMBRANO**

**SIDLEY AUSTIN LLP**
2021 McKinney Avenue
Suite 2000
Dallas, TX 75201
+1 214 981 3405
angela.zambrano@sidley.com
www.sidley.com



# EXHIBIT 1-C

**From:** Keller, Zachary A.
**To:** Zambrano, Angela
**Cc:** Hummel, Chad S.; Sillers, David; Wilshire, Matthew; Aijaz, Hasan
**Subject:** RE: FTC v. Match Group Inc.
**Date:** Friday, October 11, 2019 12:08:24 PM
**Attachments:** image001.png

Hi Angela,

We appreciate your reaching out but decline to voluntarily dismiss the Complaint.

Please let me know if you have any other requests or need anything else.

Best,
Zachary A. Keller
Attorney
Federal Trade Commission
Southwest Region
1999 Bryan St. Suite 2150
Dallas, TX 75201
214-979-9382
zkeller@ftc.gov

---

**From:** Zambrano, Angela <angela.zambrano@sidley.com>
**Sent:** Wednesday, October 09, 2019 11:26 AM
**To:** Keller, Zachary A. <zkeller@ftc.gov>
**Cc:** Hummel, Chad S. <chummel@sidley.com>; Sillers, David <dsillers@sidley.com>
**Subject:** FTC v. Match Group Inc.

Hi Zach,
The FTC named Match Group, Inc. as the defendant in its recent lawsuit, No. 3:19-cv-02281-K (N.D. Tex.).  As you know, the Complaint challenges conduct related to Match.com.  Match.com is owned and operated by Match Group, LLC and not by Match Group, Inc.  In fact, as our client has repeatedly told the FTC, none of the activities challenged by the Complaint were performed by Match Group, Inc.  Instead, Match Group, Inc. is simply the parent of Match Group, LLC.  Thus, Match Group, Inc. is incorrectly named as a defendant in this lawsuit and should be voluntarily dismissed.  In the interests of efficiency and to avoid unnecessary motion practice, we request that the FTC voluntarily dismiss its Complaint on or before Friday October 11th
Thanks - Angela


**ANGELA C. ZAMBRANO**


**SIDLEY AUSTIN LLP**
2021 McKinney Avenue
Suite 2000
Dallas, TX 75201
+1 214 981 3405
angela.zambrano@sidley.com
www.sidley.com


*********************************************************************************************************
This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

*********************************************************************************************************

# EXHIBIT  2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

FEDERAL TRADE COMMISSION,

        Plaintiff,

vs.

MATCH GROUP, INC., a corporation,

        Defendant.

Civil Action No. 3:19-cv-02281

## DECLARATION OF LAURIE BRADDOCK

I, LAURIE BRADDOCK, declare:

1.    I am the Senior Director – Legal Affairs for Match Group, LLC. I have held this position since February 2014. I have personal knowledge of the matters stated below and can truthfully testify to those matters if called upon as a witness.

2.    In my capacity as Senior Director – Legal Affairs, I am familiar with the corporate structure of Match Group, Inc., including its parent and subsidiary companies and the ownership and operation of Match Group, LLC. Defendant Match Group, Inc. is the sole member of Match Group, LLC.

3.    Match.com is owned and operated by Match Group, LLC and not by Match Group, Inc.

4.    None of the activities challenged by the Complaint were performed by Match Group, Inc.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of October, 2019 at Dallas, Texas.

Laurie Braddock
Laurie Braddock