**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | **Case No.** 3:19-cv-02281-K |
| Plaintiff, | **Plaintiff's Opposition to** |
| v. | **Defendant's Motion to Dismiss** |
| MATCH GROUP, INC., a corporation, | |
| Defendant. | |

**Table of Contents**

Summary ...................................................................................................................1

I.      Background ......................................................................................................2

II.     Legal Standard ...............................................................................................4

III.    Argument ........................................................................................................4

        A. A Section 13(b) Proceeding is Appropriate Because the FTC Has
           Reason to Believe Match's Wrongdoing is Likely to Recur ...................4

           1.  The Fifth Circuit Standard for Relief Applies and the Complaint Meets It.......5

           2.  The Court Should Decline to Follow *Shire* Because it Conflicts with
               Fifth Circuit Law, is an Outlier, and Was Wrongly Decided ...........................8

           3.  Even if the Third Circuit Standard Did Apply, the Complaint Meets it ..........10

        B. Fifth Circuit Precedent Establishes the FTC's Right to Seek
           Monetary Relief, and There Is No Reason to Depart from It ................12

           1.  Long-Settled Fifth Circuit Precedent Provides that The Court Has
               its Full Equitable Powers in This Matter, Including the Power
               to Award Monetary Relief ...............................................................................12

           2.  *CBC* Conflicts with Fifth Circuit Precedent and was Wrongly Decided.........17

        C. Section 230 of the Communications Decency Act Does Not Bear
           on the Conduct the FTC Challenges .....................................................24

           1.  The CDA Does Not Apply Because the FTC Challenges Match's
               Own Conduct .....................................................................................................24

           2.  The CDA Does Not Apply Because the Complaint Holds Match
               Accountable Only for the Harm It Directly Caused ........................................32

           3.  Immunizing Match's Conduct Would be Inconsistent with
               Congressional Intent ........................................................................................33

        D. The FTC's ROSCA Count is Properly Pled .........................................34

IV.     Conclusion .....................................................................................................35

**Table of Authorities**

## Cases

*Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257 (N.D. Cal. 2006) ................................................. 27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................ 4

*Beckman v. Match.com*, LLC, 668 F. App'x 759 (9th Cir. 2016) ............................................... 27

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................ 4

*Cedillo v. Valcar Enters. & Darling Del. Co.*, 773 F. Supp. 932 (N.D. Tex. 1991) ................... 12

*Chicago, M. & S. P. R. Co. v. Minneapolis Civic & Commerce Ass'n*, 247 U.S. 490 (1918)........ 3

*Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 894 F.3d 1313 (11th Cir. 2018) ...... 9

*Cotherman v. FTC*, 417 F.2d 587 (5th Cir. 1969) ..................................................................... 8, 9

*Daniel v. Armslist, LLC*, 926 N.W.2d 710 (Wis. 2019).......................................................... 26, 27

*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008) ............................................................. 25, 28

*Dyroff v. Ultimate Software Grp., Inc.*, No. 18-15175, 2019 U.S. App. LEXIS 24737 (9th Cir. Aug. 20, 2019). ...................................................................................................................... 26

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 938 F.3d 1026 (9th Cir. 2019) ........... 33

*Erlenbaugh v. United States*, 409 U.S. 239 (1972)...................................................................... 21

*FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009)............................................................. 9

*FTC v. Accusearch, Inc.*, No. 06-CV-105-D, 2007 U.S. Dist. LEXIS 74905 (D. Wyo. Sept. 28, 2007) ........................................................................................................................................ 33

*FTC v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011);............................................. passim

*FTC v. Cephalon, Inc.* 100 F. Supp. 3d 433 (E.D. Pa. 2015) ................................................. 22, 23

*FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016) .............................................. 12, 22

*FTC v. Credit Bureau Ctr.*, 937 F.3d 764 (7th Cir. 2019)................................................... passim

*FTC v. Dalbey*, No. 11-cv-1396-RBJ-KLM, 2012 U.S. Dist. LEXIS 67393 (D. Colo., May 15, 2012) ........................................................................................................................................ 22

*FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010) ................................................ 12

*FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985) ............................................................. 9

*FTC v. Freecom Commc'ns*, 401 F.3d 1192 (10th Cir. 2005) ....................................................... 12

*FTC v. Gem Merchandising Corp.*, 87 F.3d 466 (11th Cir. 1996) ................................... 16, 20, 22

*FTC v. GTP Marketing, Inc.*, No. 4-90-123-K, 1990 U.S. Dist. LEXIS 3325 (N.D. Tex. Mar. 15, 1990) ............................................................................................................................................ 7

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) ............................................................ 20

*FTC v. Health Formulas, LLC*, No. 2:14-cv-01649-RFB-GWF, 2015 U.S. Dist. LEXIS 59387 (D. Nev. May 6, 2015) ............................................................................................................. 34, 35

*FTC v. Hornbeam Special Situations, LLC*, 391 F. Supp. 3d 1218 (N.D. Ga. 2019) .................. 10

*FTC v. Hornbeam Special Situations, LLC*, No. 1:17-cv-3094-TCB, 2018 U.S. Dist. LEXIS 204340 (N.D. Ga. Oct. 15, 2018) .............................................................................................. 10

*FTC v. Investment Dev., Inc.*, No. 89-642, 1989 U.S. Dist. LEXIS 6502 (E.D. La. June 7, 1989) 6

*FTC v. Kennedy*, 574 F. Supp. 2d 714 (S.D. Tex. 2008) ............................................................. 15

*FTC v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016) ............................................... 30, 33

*FTC v. Liberty Supply Co.*, No. 4:15-CV-829, 2016 U.S. Dist. LEXIS 99224 (E.D. Tex. July 29, 2016) ......................................................................................................................................... 16

*FTC v. Magazine Sols.*, 432 F. App'x 155 (3d Cir. 2011) ........................................................... 12

*FTC v. Ross*, 743 F.3d 886 (4th Cir. 2014) ........................................................................... 12, 22

*FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312 (8th Cir. 1991) .................. 12, 20, 22

*FTC v. Shire Viropharma*, 917 F.3d 147 (3d Cir. 2019) ....................................................... passim

*FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982) ............................................ passim

*FTC v. Swish Mktg.*, No. C 09-03814, 2010 U.S. Dist. LEXIS 47948 (N.D. Cal., Apr. 14, 2010) ....................................................................................................................................................... 23

*FTC v. Think All Publ'g, L.L.C.*, 564 F. Supp. 2d 663 (E.D. Tex. 2008) .............................. 15, 23

*FTC v. USA Fin., LLC*, 415 F. App'x 970 (11th Cir. 2011) .......................................................... 9

*FTC v. Verity Int'l, Ltd.*, 443 F.3d 48 (2d Cir. 2006) ................................................................. 16

*Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) ...................................................... 3, 17

*Holomaxx Tech. v. Microsoft Corp.*, 783 F. Supp. 2d 1097 (N.D. Cal. 2011) ............................ 32

*In re Katrina Canal Breaches Litig.*, 495 F.3d 191 (5th Cir. 2007) ................................. 4

*Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398 (6th Cir. 2014) .............................. 30

*Kansas v. Nebraska*, 135 S.Ct. 1042 (2015) ......................................................... 22, 23

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) ......................................... 4

*Marshall's Locksmith Serv., Inc. v. Google, LLC*, 925 F.3d 1263 (D.C. Cir. 2019) ............. 26, 27

*Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464 (5th Cir. 2004).............. 4

*Mattox v. FTC*, 752 F.2d 116 (5th Cir. 1985) ........................................................ 21

*MCW, Inc. v. Badbusinessbureau.com, LLC*, No. 3:02-CV-2727-G, 2004 U.S. Dist. LEXIS 6678 (N.D. Tex. Apr. 19, 2004).......................................................................... 28, 30

*Meghrig v. K.F.C. Western, Inc.*, 516 U.S. 479 (1996) ................................... 18, 22, 23

*Norfolk S. Ry. V. Trinity Indus., Inc.*, No. 3:07-CV-1905-O, 2008 U.S. Dist. LEXIS 110274 (N.D. Tex. Sept. 2, 2008).......................................................................... 3

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946)................................ 13, 14, 22, 23

*SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978)..................................................... 6, 7

*SEC v. First Fin. Grp. of Texas*, 645 F.2d 429 (5th Cir. 1981) .................................... 9

*SEC v. Manor Nursing Centers, Inc.*, 482 F.2d 1082 (2d Cir. 1972) ............................ 6

*Slough v. FTC*, 396 F.2d 870 (5th Cir. 1968) ..................................................... 9

*Smith v. Trusted Universal Standards in Electronic Transactions, Inc.*, No. 09-4567, 2011 U.S. Dist. LEXIS 26757 (D.N.J. Mar. 15, 2011)............................................................ 31

*Standard Oil Co. v. FTC*, 596 F.2d 1381 (9th Cir. 1979)........................................ 9

*United States v. Bestfoods, Inc.*, 524 U.S. 51 (1998)............................................ 2, 3

*United States v. Cornerstone Wealth Corp.*.................................................... 6, 7, 15

*United States v. Lane Labs-USA, Inc.*, 427 F.3d 219 (3d Cir. 2005)............................. 23

*United States v. Rx Depot, Inc.*, 438 F.3d 1052 (10th Cir. 2006) ............................... 23

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953)............................................ 8

iv

*Zale Corp. & Corrigan-Republic, Inc. v. FTC*, 473 F.2d 1317 (5th Cir. 1973) ................. 3, 7, 8, 9

**Statutes**

15 U.S.C. § 53(b) ........................................................................................... 1, 9, 16, 19

15 U.S.C. § 57b(b) ................................................................................................... 21

15 U.S.C. § 57b(e) ............................................................................................. 18, 20

15 U.S.C. § 8401 *et seq.* ............................................................................................ 2

21 U.S.C. § 301 ....................................................................................................... 23

47 USC § 230 ....................................................................................... 1, 25, 29, 31

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 4

Pub. L. 93-153 ......................................................................................................... 19

S. Rep. No. 93 151, 93d Cong., 1st Sess. 31 (1973) ............................................... 20

**Summary**

In its Motion, (Dkt. 20), Defendant Match Group, Inc. ("Match") does not deny that it engaged in the practices the FTC challenges. It does not deny that it suspended most of them only in 2019, long after it knew it was under FTC investigation, or that it could easily resume them. Nor does it deny that it harmed consumers. Yet Match moves the Court to dismiss the FTC's action holding it to account, raising four flawed arguments:

First, Match argues that the FTC has not pled sufficient facts to allege that the FTC has reason to believe Match's violations are ongoing or likely to recur, as required under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). In fact, the Complaint meets the pleading standard for Section 13(b) in the Fifth Circuit and would meet the standard in any circuit, including the Third Circuit standard Match prefers.

Second, Match asks the Court to depart from long-settled authority that the Fifth Circuit considered "indisputably clear"—that Section 13(b) provides courts the "full range of equitable remedies" for effecting relief, *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 718 (5th Cir. 1982)—to prevent this Court from granting financial relief to injured consumers. Match invites the Court to instead align itself with the Seventh Circuit's self-described "depart[ure] from the consensus view of our sister circuits" in *FTC v. Credit Bureau Ctr.* ("*CBC*"), 937 F.3d 764, 785 (7th Cir. 2019), to hold restitution unavailable under Section 13(b). The Court should decline to follow the *CBC* court because doing so would be contrary to both Fifth Circuit and Supreme Court case law while also subverting Section 13(b)'s plain meaning and purpose.

Third, Match argues that the Court should dismiss Counts I and II, contending that they run afoul of Section 230 of the Communications Decency Act ("CDA"), 47 USC § 230. In fact, the CDA does not apply to Counts I and II for three reasons. First, the counts challenge Match's

1

own marketing practices, not third-party content or any good-faith actions to restrict access to offensive content, as the CDA protects. Second, the counts would not hold Match financially or otherwise liable for the consequences of third-party conduct or for restricting access to content. Finally, the counts challenge conduct—Match's lining its own pockets with false ads and the deliberate exposure of consumers to the risk of fraud—that is antithetical to the CDA's purpose.

Finally, Match argues that the Complaint fails to state a claim under the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8401 *et seq.* Here, Match goes well beyond the confines of the Complaint, introducing counterstatements of fact that are impermissible in a 12(b)(6) motion.[1] Moreover, the pleadings clearly state a proper claim under ROSCA: the Complaint sets forth a burdensome cancellation process that disrupted—and often deceived— consumers attempting to cancel their subscriptions, *see* Compl. ¶¶ 54-57, and resulting consumer harm the Court can remedy. *Id.* at ¶ 58. Any purportedly mitigating considerations, such as cancellation mechanisms beyond the scope of the Complaint, do not affect whether the FTC has stated a claim the Court can remedy. They are instead fact questions subject to later proceedings.

## I.    Background

The FTC filed this action against Match[2] on September 25, 2019, after an investigation of the Match.com platform that began in March 2017. *See* Ex. 1-A at App. 6 (Match Group, Inc.

---

[1] Match's Motion is replete with matters beyond the pleadings that the Court should exclude under Rule 12(d), and the FTC has filed a separate motion to that effect. *See* (Dkt. 26).

[2] In a drive-by footnote, Match again improperly introduces matters outside the pleadings, arguing that the Complaint should have named a different defendant. *See* Match's Brief in Support (hereinafter abbreviated "Br.") at 1 n.2. While the FTC has filed a motion to exclude Match's submission, *see* (Dkt. 26), the FTC responds here that Match is wrong for two reasons: First, the FTC alleges that Match Group, Inc. owns and operates Match.com and has directed the wrongful practices charged. *See* Compl. ¶ 11. Those allegations state a claim against Match because they hold Match Group, Inc. accountable for its own conduct. *See, e.g., United States v. Bestfoods, Inc.*, 524 U.S. 51, 64-65 (1998).

Regulation FD Report (Form 8-K) (Sept. 27, 2019)).[3] The FTC's investigation found Match had

been engaging in five unlawful practices:

1.  Match was knowingly touting fraudulent messages to consumers by sending them

    personalized advertisements representing the messages to be from real people with a

    romantic interest in order to generate subscriptions;

2.  Match was maintaining its flow of deceptive ads by delivering messages sent by fraud-

    flagged accounts only when those messages were sent to non-paying members, thereby

    placing them at the risk of being defrauded;

3.  Match was marketing a "Guarantee" that promised a free six-month subscription to

    consumers without adequately disclosing the terms of the offer;

4.  Match was deleting accounts of certain consumers who paid for the service; and

5.  Match was maintaining an online cancellation mechanism for its subscription service that

    was burdensome and confusing to complete.

---

Second, even if Match's subsidiaries, rather than Match, had solely operated Match.com, Match
would still be liable. It is a "fundamental principle of corporate law . . . that the corporate veil
may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia*, the
corporate form would otherwise be misused to accomplish certain wrongful purposes, most
notably fraud, on the shareholder's behalf." *Bestfoods*, 524 U.S. at 62. The FTC enforcement
action here resulted from fraudulent conduct, and shielding Match from liability would
wrongfully allow it to limit liability to entities that it "used as a mere agency or instrumentality
of the owning company." *Chicago, M. & S. P. R. Co. v. Minneapolis Civic & Commerce Ass'n*,
247 U.S. 490, 501 (1918); *see also Bestfoods*, 524 U.S. at 62-63. Naming Match also accords
with Fifth Circuit law in FTC enforcement actions. *See Zale Corp. & Corrigan-Republic, Inc. v.
FTC*, 473 F.2d 1317, 1321 (5th Cir. 1973) ("the inte[]grated operation[,] interlocking
directorate[,] and unified advertising strongly militate for finding . . . application of the
exceptions to recognition of separate corporate entities where to do so frustrates a statutory
policy.") Whether Match and its subsidiaries are subject to corporate veil piercing is a question
of fact that is improper to dispose of in a motion to dismiss. *See Norfolk S. Ry. V. Trinity Indus.,
Inc.*, No. 3:07-CV-1905-O, 2008 U.S. Dist. LEXIS 110274, at *16-17 (N.D. Tex. Sept. 2, 2008).

[3] The FTC respectfully requests the Court to take judicial notice of Match's SEC filing, attached
as Exhibit 1, containing undisputed background information. *See Funk v. Stryker Corp.*, 631 F.3d
777, 783 (5th Cir. 2011) (approving notice where there is "no actual asserted factual dispute" and
the "matters of public record [are] directly relevant to the issue at hand").

Except for its cancellation practices, which are ongoing, Match suspended these practices between mid-2018 and mid-2019, more than a year after the FTC's investigation began. *See* Compl. ¶ 64(b). The Commission approved a complaint in 2019 that it referred to the Department of Justice, which referred the civil case back to the FTC while issuing a grand-jury subpoena to Match regarding the conduct in the FTC's complaint. *See* Ex. 1-A at App. 6.

## II.     Legal Standard

A motion to dismiss under FED. R. CIV. P. 12(b)(6) tests the legal sufficiency of a complaint. When evaluating a 12(b)(6) motion, the "court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotations omitted) (citing *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). The Court should "draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc*., 565 F.3d 228, 232 (5th Cir. 2009). To survive, a complaint need only contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its own face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The allegations must merely be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct." *Iqbal*, 556 U.S. at 678.

## III.    Argument

### A.  A Section 13(b) Proceeding is Appropriate Because the FTC Has Reason to Believe Match's Wrongdoing is Likely to Recur

Match first argues that the Complaint fatally fails to plead that the company "is violating, or is about to violate the FTC Act" as required under Section 13(b). 15 USC § 53(b). To do so,

4

Match ignores Fifth Circuit precedent, instead attempting to jam the square peg of this action into the round hole of the Third Circuit's recent decision in *FTC v. Shire Viropharma, Inc.*, 917 F.3d 147 (3d Cir. 2019). *Shire*, an antitrust action against a company that had divested itself of the product at issue five years before the FTC brought the case, held that "Section 13(b) does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation." 917 F.3d at 156. Match would have this Court rule similarly here.

Match argues that the Court should treat its own practices like those in *Shire* by leading the Court through a mistaken two-step—first, wrongly characterizing its conduct as "permanently discontinued," Br. at 1, and as "ceas[ing] well before the Complaint was filed," Br. at 10, then mischaracterizing *Shire* as adopting a 13(b) standard that the *Shire* court expressly disclaimed. These stumbles find Match urging this Court to adopt a 13(b) pleading standard that no court has embraced and that is contrary to Fifth Circuit law. Wrong on the facts and on the law, Match's position fails for three reasons. First, the FTC's pleadings meet the controlling Fifth Circuit standard for relief under Section 13(b). Second, the Court should decline to follow the Third Circuit's *Shire* standard because it reflects an incomplete evaluation of Section 13(b)— a fact that the *Shire* court itself acknowledged in its holding. Third, even if the Third Circuit standard applied, the FTC's pleadings would meet it.

### 1. *The Fifth Circuit Standard for Relief Applies and the Complaint Meets It*

Match's reliance upon *Shire* is inconsistent with precedent in this Circuit and this District, which have held injunctive relief appropriate where there is a likelihood that the defendant will violate the FTC Act again. The Fifth Circuit applied this "likelihood to recur" standard in *FTC v. Southwest Sunsites*, 665 F.2d 711 (5th Cir. 1982). In that case, a defendant moved for dismissal on cross-appeal by arguing that the FTC failed to show continuing or future

violations. *Id.* at 723. Denying the defendant's request, the Fifth Circuit held that an injunction was proper under Section 13(b) because the defendant's "business operations are still in place . . . the evidence developed to date suggests a large-scale systematic scheme tainted by fraudulent and deceptive practices." *Id.* The *Sunsites* court went on to note that the defendant's ongoing operations raised "a 'fair inference of a reasonable expectation of continued violations,'" which was sufficient under 13(b) for injunctive relief. *Id.* (quoting *SEC v. Manor Nursing Centers, Inc.*, 482 F.2d 1082, 1100-01 (2d Cir. 1972)); *see also FTC v. Investment Dev., Inc.*, No. 89-642, 1989 U.S. Dist. LEXIS 6502, at *10 (E.D. La. June 7, 1989) ("A district court has authority to grant a permanent injunction . . . against violation of any provision of law enforced by the Commission where there is a cognizable danger of recurrent violation.").

This District followed a substantially similar Section 13(b) pleading standard in *United States v. Cornerstone Wealth Corp.*, in which the government sought an injunction under Section 13(b) based on past wrongs. 549 F. Supp. 2d 811, 816 (N.D. Tex. 2008). Granting the injunction, the court held that "[i]n deciding whether to issue an injunction based on past violations of the law" under Section 13(b), courts should look to factors the Fifth Circuit set forth in *SEC v. Blatt*:

- The egregiousness of the defendant's actions,

- The isolated or recurrent nature of the infraction,

- The degree of scienter involved,

- The sincerity of the defendant's assurances against future violations,

- The defendant's recognition of the wrongful nature of his conduct, and

- Whether the defendant's occupation presents opportunities for future violations.

*Id.* (quoting *SEC v. Blatt*, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978)). The *Cornerstone* court also quoted *Blatt* to note that "'[t]he critical question in issuing the injunction and also the ultimate

test on review is whether defendant's past conduct indicates that there is a *reasonable likelihood of further violations* in the future.'" *Id.* (quoting *Blatt*, 583 F.2d at 1334) (emphasis added); *see also FTC v. GTP Marketing, Inc.*, No. 4-90-123-K, 1990 U.S. Dist. LEXIS 3325, at *12-13 (N.D. Tex. Mar. 15, 1990) ("The Court also finds that there is a strong likelihood of recurring violations based upon the pervasive nature of the fraudulent activity. An extensive history of violations does beget an inference that future violations are likely to occur.").

The facts in the Complaint meet the Fifth Circuit standard for Section 13(b) injunctive relief, showing a reasonable likelihood that Match will resume its violations absent an injunction and meeting the more specific *Blatt* factors as well. Regarding the egregious and recurrent nature of its conduct, the Complaint alleges that Match engaged in the conduct at issue since at least 2013, *see* Compl. ¶3, continually turning a profit by duping consumers while exposing them to the risk of falling victim to scams. Regarding scienter, Match engaged in these practices knowingly and systematically, implementing each of them to fatten its bottom line at consumers' expense. *See* Compl. ¶¶ 3, 23, 29-37, 50, 57-59, 64 (describing Match's knowledge).

Regarding the sincerity of Match's assurances not to engage in further wrongful conduct and its remorsefulness, Match suspended its activities only once the FTC began asking questions about them, and Match has never acknowledged its wrongdoing. *See* Compl. ¶ 64. Instead, Match has treated its being held to account as "a classic example of government overreach," Br. at 1, without denying that it engaged in the conduct at issue. In light of its lack of remorse, the breadth of its wrongful conduct, and the long history of its engaging in these practices, Match suspending its practices gives no assurances that it will not resume them later. Indeed, as the Fifth Circuit recognized when it upheld an FTC action against Zales Corporation, "Zale's statement that it has amended its form and no longer will violate the Act . . . is insufficient to

convince us that the Commission abused its discretion in entering a cease and desist order. . . . 'A promise to go and sin no more is merely one of the circumstances that the Commission should consider in determining how the public interest in stopping the deceptive practices can best be accomplished.'" *Zale Corp. & Corrigan-Republic, Inc. v. FTC*, 473 F.2d 1317, 1320 (5th Cir. 1973) (quoting *Cotherman v. FTC*, 417 F.2d 587, 595 (5th Cir. 1969)). Match's similar assurance to sin no more deserves similarly short shrift: the Court should disregard it entirely.

Finally, Match retains the ability to engage in future violations. Match's continued operation of not only the Match.com platform but also the other 45+ similar platforms that it owns and operates, along with the ease with which it can resume the practices it has purportedly suspended, provides it abundant opportunities for future violations. *See* Compl. ¶¶ 10-15, 64 (describing Match's business holdings and the possibility of continued harm).

   2.   ***The Court Should Decline to Follow* Shire *Because it Conflicts with Fifth Circuit Law, is an Outlier, and was Wrongly Decided***

Contrary to the Fifth Circuit standard, Match argues that this Court should adopt the pleading framework in *Shire*—the only court to hold that showing a likelihood of recurrence is insufficient to bring an action under 13(b) and that the FTC must provide "some evidence" of a probable future violation. 917 F.3d at 156. The Court should decline to do so for two reasons.

First*, Shire* not only conflicts with the Fifth Circuit standard, *see* Section III.A.1, *supra*., but is also inconsistent with the consensus view among other circuits and Supreme Court authority. The Supreme Court has long held that when a defendant has already violated the law but the illegal conduct has ceased, courts should grant injunctive relief if "there exists some cognizable danger of recurrent violation." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). Courts in Section 13(b) cases have consistently applied that principle, ordering injunctions when defendants are no longer violating the law but are likely to do so again. *See,*

*e.g.*, *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201-02 (10th Cir. 2009); *FTC v. USA Fin., LLC*, 415 F. App'x 970, 975 (11th Cir. 2011); *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087-88 (9th Cir. 1985). This standard is also observed in other regulatory enforcement contexts as well. *See, e.g., SEC v. First Fin. Grp. of Texas*, 645 F.2d 429, 434 (5th Cir. 1981); *Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1328 (11th Cir. 2018).

Second, even if *Shire* did not conflict with the Fifth Circuit, the consensus of other circuits, and the Supreme Court, it would not be proper to follow because *Shire*, by its own admission, did not address a key component of 13(b). Section 13(b) provides that the FTC may take action "[w]henever the Commission has *reason to believe* . . . that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the [FTC]." 15 U.S.C. § 53(b) (emphasis added). This "reason to believe" standard authorizes the FTC to exercise discretion regarding whether a violation is about to occur. While the Fifth Circuit has not directly confronted this issue in the 13(b) context, it has recognized that "[c]ourts properly leave to the Commission's non-abusive discretion the question whether the public interest requires the protection of an order in cases where unlawful practices have been discontinued."[4]

Contrary to Match's contention that the *Shire* court rejected the "reason to believe" standard of 13(b), *see* Br. at 13, the *Shire* court expressly declined to consider it because the FTC did not raise it at the district court level. *See Shire*, 917 F. 3d at 159 n.17. However, at least one district court since *Shire*—the very same court that Match claims to have rejected the "reason to believe" standard, Br. at 13-14—has incorporated the "reason to believe" standard regarding

---

[4] *Cotherman v. FTC*, 417 F.2d 587, 594 (5th Cir. 1969); *see also Zale Corp.*, 473 F.2d at 1320 (quoting *Cotherman*, 417 F.2d at 594); *Slough v. FTC*, 396 F.2d 870, 872 (5th Cir. 1968); *Standard Oil Co. v. FTC*, 596 F.2d 1381, 1385 (9th Cir. 1979) ("Reason to believe" determinations are a matter of agency discretion because "[j]udicial intervention in this legitimate decision making process would serve only to hamper or thwart the FTC's exercise of the power granted to it by Congress."), *rev'd on other grounds* 449 U.S. 232.

whether a defendant is about to violate the FTC Act. In *FTC v. Hornbeam Special Situations, LLC*, the district court considered whether an FTC action involving claims "based largely on long-ceased misconduct"—including conduct by two men who died after the action was brought—should move forward under Section 13(b). No. 1:17-cv-3094-TCB, 2018 U.S. Dist. LEXIS 204340, at *5, 10 (N.D. Ga. Oct. 15, 2018). Match cited an initial decision from *Hornbeam* dismissing the FTC's complaint, Br. at 13-14, but that decision was not that court's last word on the matter. After the FTC amended its complaint, the *Hornbeam* court again considered whether the Commission met its pleading burden under 13(b). This time, the court held that the Commission did. After noting that the *Shire* court "did not address the merits of the FTC's internal standard argument," 391 F. Supp. 3d 1218, 1223 (N.D. Ga. 2019), the *Hornbeam* court held that Section 13(b)'s plain meaning rendered the FTC's "internal standard argument . . . persuasive because the FTC has pled at least *some facts to show that it had 'reason to believe'* that Defendants were 'about to violate' the law." *Id.* (emphasis added). The *Hornbeam* court went onto explain that the FTC's complaint need only allege "at least some facts to support a reasonable inference that the behavior will reoccur in the future." *Id*. Like the *Hornbeam* court, this Court should decline to adopt the circumscribed interpretation of 13(b) applied by *Shire*.

### 3.  *Even if the Third Circuit Standard Did Apply, the Complaint Meets It*

Finally, even if *Shire* were the appropriate standard, the Complaint would meet it. *Shire* involved a company that delayed generic drugs from entering the market, and the FTC brought its antitrust action *five years* after the company had divested itself of the product at issue. 917 F.3d at 149. Affirming the trial court's dismissal, the Third Circuit held that the FTC did not meet its burden under Section 13(b) due to two factors, neither of which apply here.

First, the *Shire* court found that the company had long ago divested itself of the product

10

so could not violate the FTC Act with it. *Id.* at 160. In contrast, the Complaint specifies that

Match began its unlawful conduct by 2013, *see* Compl. ¶¶ 3, 22, 31, 34, 52, continued it while

the FTC was investigating, Compl. ¶ 64, and can easily continue engaging in similar conduct.

Compl. ¶ 64; *see also* Compl. ¶¶ 3, 34, 38, and 61 (time periods conduct concluded).[5]

Second, the *Shire* court held that the FTC's complaint "contain[ed] no allegations that

Shire engaged in [the challenged conduct] in the five-year gap between the 2012 cessation [of

activity] and the 2017 lawsuit" and "lack[ed] specific allegations that Shire is 'about to violate'

the law" by engaging in similar conduct in the future, including through any other product that

the court found plausible. 917 F.3d at 160. Contrary to Match's repeated invoking of an

imminence standard, Br. at 2, 28, *Shire* did not hold that the Commission must allege imminent

recurrence. *See* 917 F.3d at 157 n.15 ("The District Court never imposed an imminence

requirement. In fact, it didn't even use the word 'imminent'"). Instead, *Shire* held that "[i]n this

case, given the paucity of allegations in the complaint, the FTC fails to state a claim under any

reasonable definition of 'about to violate.'" *Id.* at 160. Here, the FTC alleges that Match is about

to engage in future violations and that it engaged in almost all conduct the FTC challenges within

approximately six months of this action and long after the FTC had begun its investigation. *See*

Compl. ¶¶ 3, 64. Further, and unlike the court's finding in *Shire*, Match still operates and can

easily modify the services at issue—online dating websites—to resume its abusive practices.

Simply put, the facts and pleadings in this action do not correspond to either factor that

led the *Shire* court to its dismissal. The *Shire* dismissal turned on long-past conduct and, in that

---

[5] Match contends that the *Shire* court rejected the relevance of whether the company "discontinued the challenged practices after the FTC commenced its investigation," Br. at 14 n.12, but Match's claim is not supported by the record: the *Shire* court's holding only centered upon "the paucity of allegations in the complaint" regarding whether Shire was "about to violate" the FTC Act. *See Shire*, 917 F.3d at 160.

court's view, insufficient allegations to show that the company could engage in similar conduct in the future. In contrast, this action involves recently ceased conduct and pleadings that explicitly set out Match's long history of wrongdoing and the ease with which it could resume. Thus even under the *Shire* standard, the Court should deny Match's Motion with respect to whether the FTC has properly pled that Match "is violating, or is about to violate" the FTC Act.

### B. Fifth Circuit Precedent Establishes the FTC's Right to Seek Monetary Relief, and There Is No Reason to Depart from It

Match next requests the Court to foreclose restitution as a remedy under Section 13(b), but the Court should decline to do so for two reasons. First, the Fifth Circuit—like seven other circuits—has already ruled on the scope of relief available under Section 13(b) and held that the statute provides the Court the full equitable powers needed to effect relief. *See Sunsites*, 665 F.2d at 718 (5th Cir. 1982).[6] Second, even had *Sunsites* not resolved the issue, the Court should refuse to follow an out-of-circuit decision that contravenes 13(b)'s plain language, legislative history, and, as it acknowledged, "the consensus view" among circuit courts. *CBC*, 937 F.3d at 785.

#### 1. Long-Settled Fifth Circuit Precedent Provides that The Court Has its Full Equitable Powers in This Matter, Including the Power to Award Monetary Relief

When considering Match's arguments regarding monetary relief under Section 13(b), the Court first must consider "decisions of the [Fifth] circuit court to ascertain whether they command the outcome in this case." *Cedillo v. Valcar Enters. & Darling Del. Co.*, 773 F. Supp. 932, 936 (N.D. Tex. 1991). Here, the scope of courts' equitable powers under 13(b) has been settled law since the Fifth Circuit held that such courts have full equitable authority in *Sunsites*,

---

[6] *See also FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 598-99 (9th Cir. 2016); *FTC v. Ross*, 743 F.3d 886, 890-91 (4th Cir. 2014); *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 365 (2d Cir. 2011); *FTC v. Magazine Sols.*, 432 F. App'x 155, 158 n.2 (3d Cir. 2011) (unpublished); *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 15 (1st Cir. 2010); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 n.6 (10th Cir. 2005); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1314-15 (8th Cir. 1991).

665 F.2d 711. Because this settled law empowers the Court to award all equitable remedies under 13(b), including monetary relief, it should deny Match's request to strike restitution.

In *Sunsites*, the Fifth Circuit confronted a magistrate and district court finding that "from a plain reading of Section 13(b), the Commission may seek only that preliminary relief necessary to restrain alleged unfair practices," foreclosing the possibility of ancillary relief such as an asset freeze to secure later restitution. 665 F.2d at 717. Overturning the lower court's decision and authorizing ancillary relief, the Fifth Circuit held that its evaluation of the history and language of the statute made "indisputably clear that a grant of jurisdiction such as that contained in Section 13(b) carries with it the authorization for the district court to exercise the full range of equitable remedies traditionally available to it." *Id.* at 718.

To reach its holding, the *Sunsites* court applied a long-standing standard of statutory interpretation established by the Supreme Court in *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946). There, the Court held Congress's authorization of an "injunction" to invoke all equitable powers, including restitution. *Id.* at 397-98. *Porter* involved a statute that permitted a federal agency to seek "an order enjoining" violations of the statute. *Id.* at 397. After lower courts held that an order under that statute could not include restitution without a specific grant of authority, the Supreme Court reversed, holding that because the statute "invoked the jurisdiction of the District Court to enjoin acts and practices . . . [s]uch a jurisdiction is an equitable one. Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available," including restitution. *Id.* at 397-98. The Court went on to hold that where "the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character." *Id.* at 398. This broad equitable authority emanated from Congress's use of general terms such as "restrain" or "enjoin" to authorize law enforcement,

such that "the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Id.*

The *Sunsites* court held 13(b) to fit perfectly within the broad authority at issue in *Porter*. It grounded this holding in both the plain language of 13(b) and its legislative history. Regarding the language of the statute, the court noted that "Section 13(b) is virtually identical to the language of other legislation that has been found to invoke the district court's equitable jurisdiction" and that there is no "'clear and valid legislative command[] . . . or necessary and inescapable inference' required by *Porter* to negate the comprehensiveness of the Court's equitable jurisdiction." 665 F.2d at 721 (quoting *Porter*, 328 U.S. at 398).[7] The court also examined Section 13(b)'s history to confirm this understanding of its plain language, noting that Congress intended to remedy the inadequate relief the FTC was able to secure before its passage. 665 F.2d at 719-720. Reviewing this legislative history in light of *Porter* led the *Sunsites* court to hold that "Section 13(b) contains no express limitations on the otherwise full powers of the district court to mold appropriate decrees under its traditional equitable jurisdiction, and we decline to tie the hands of the district court without such express limitation." *Id.* at 719.

To circumvent *Sunsites*, Match argues that its core holding—that Section 13(b) provides the "full range of equitable remedies"—is mere "dicta" that the court noted "in passing." Br. at 16 n.14. To make this argument, Match relies on footnoted dicta from the Seventh Circuit's opinion in *CBC*, which opined that *Sunsites* held Section 13(b) to "implicitly authorize[] asset

---

[7] Notably, this holding that 13(b) invokes the Court's full equitable powers directly contradicts Match's contention—made without any supporting legal authority—that "[b]ecause the text of Section 13(b) does not set forth an explicit, or even suggest an implicit, restitutionary remedy, the FTC would have to show that Congress nevertheless intended to imply one." Br. at 15.

freezes" for preliminary injunctions while also "appear[ing] to preclude the possibility of restitution in section 13(b)." 937 F.3d at 777 n.2. Thus, as Match would have it, the *Sunsites* decision not only limited the scope of the holding to asset freezes but also implicitly foreclosed restitution for the permanent injunctions that the statute expressly authorizes.

The Court should reject this misleading gloss on *Sunsites* for two reasons. First, it flies in the face of both the case's clear holding and the manner in which other courts have applied it for nearly 40 years. The *Sunsites* holding clearly states that *Porter* and its progeny "are directly applicable to this case" and that, as noted above, "Section 13(b) contains no express limitations on the otherwise full powers of the district court to mold appropriate decrees under its traditional jurisdiction, and we decline to tie the hands of the district court without such express limitation." 665 F.3d at 719. District courts in the Fifth Circuit, including this District, have consistently applied *Sunsites* to define the broad equitable powers available to them under Section 13(b). This District, for example, has explained that in *Sunsites* "the Fifth Circuit held that § 13(b) of the [FTC Act] permits courts to enjoin more than mere unlawful acts . . . the court concluded that '[t]hese cases make indisputably clear that a grant of jurisdiction such as that contained in Section 13(b) carries with it the authorizations for the district court to exercise the full range of equitable remedies traditionally available to it.'" *Cornerstone Wealth*, 549 F. Supp. 2d at 816-17 (quoting *Sunsites*, 665 F.2d at 718). Other districts in this Circuit have held similarly, including by specifically holding that *Sunsites* authorized restitution under 13(b),[8] and at least one other

---

[8] *See FTC v. Think All Publ'g, L.L.C.*, 564 F. Supp. 2d 663, 665 (E.D. Tex. 2008) ("[i]n *Southwest Sunsites*, the Fifth Circuit Court of Appeals made clear that in Section 13(b) cases, the district courts may use 'the full range of equitable remedies traditionally available.' That is, the court may order relief in the form of an injunction, disgorgement, rescission, restitution or in any other fashion as equity may dictate."); *FTC v. Kennedy*, 574 F. Supp. 2d 714, 724 (S.D. Tex. 2008) (holding "that *FTC v. Southwest Sunsites, Inc.* controls. There, the Fifth Circuit held that Section 13(b) . . . grants to the Court the discretion to exercise the 'full range of equitable

circuit has cited *Sunsites* to support that 13(b) "permits courts to grant ancillary equitable relief, including equitable monetary relief." *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 365 (2d Cir. 2011) (citing *Sunsites*, 665 F.2d at 718); *see also FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 469 (11th Cir. 1996); *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 66 (2d Cir. 2006) (collecting cases including *Sunsites* to "assume without deciding" that 13(b) authorizes restitution).

Second, the *CBC* gloss on *Sunsites* creates an absurd outcome that is incompatible with the *Sunsites* court's clear language and logic. If, as Match would have it, *Sunsites* provides full equitable authority for preliminary relief but not full equitable authority for permanent injunctions, that would leave the *Sunsites* court cutting the statute in half, applying *Porter* to 13(b)'s first proviso but not the second.[9] This reading of the *Sunsites* court as a latter-day Solomon splitting the 13(b) baby is untenable: the *Sunsites* court's analysis—from its evaluation of 13(b)'s plain language, to its application of *Porter*, to its examination of 13(b)'s legislative history—unambiguously applied to the entire statute, holding "indisputably clear" that *Porter* applies and that "13(b) contains no express limitations on the otherwise full powers of the district court . . . and we decline to tie the hands of the district court." 665 F.2d at 718-19.[10]

---

remedies traditionally available to it.' . . . This would include a finding that Kennedy is jointly and severally liable to the consumers for all their damages irrespective of other settlements.") (internal citations omitted); *FTC v. Liberty Supply Co.*, No. 4:15-CV-829, 2016 U.S. Dist. LEXIS 99224, at *6 (E.D. Tex. July 29, 2016) (quoting *Sunsites*, 665 F.2d at 718).

[9] Section 13(b) contains two provisos that authorize courts to provide equitable relief. First, "a temporary restraining order or a preliminary injunction may be granted" subject to the FTC issuing an administrative complaint. 15 U.S.C. § 53(b). The statute then "[p]rovide[s] further, [t]hat in proper cases, . . . the court may issue, a permanent injunction." *Id.*

[10] Moreover, the CBC court wrongly characterizes the *Sunsites* court as "pointing instead to [Section 19] for monetary remedies," 937 F.3d at 777 n.2, when the *Sunsites* court was merely assessing the relief the FTC sought: a preliminary injunction under 13(b) so that it could seek final relief under Section 19. Nowhere does the *Sunsites* court suggest that Section 19 is the exclusive basis under which the FTC could have sought final relief; instead, it only evaluated the relief that the FTC's enforcement action presented. And regardless of *Sunsites* directly involving asset freezes, the court's holding turned on its interpretation of Section 13(b) in its entirety.

16

Thus, contrary to Match's contention that *Sunsites* "strongly supports" that restitution is unavailable under 13(b) and that its authorization of equitable relief was "dicta," Br. at 16, Match's analysis is at odds with long-standing, controlling Fifth Circuit law. The FTC agrees with Match's request that "this Court follow the teachings of the Fifth Circuit in *Southwest Sunsites*," Br. at 17, but the FTC would have the Court follow the Fifth Circuit's actual holding instead of Match's revisionist presentation of it. Following *Sunsites* as the Fifth Circuit court wrote it and as district and circuit courts have interpreted it leads to one result: that 13(b) empowers this Court to bring its full equitable powers to bear upon providing a remedy, including by providing restitution to consumers harmed by Match's wrongdoing.

### 2. CBC *Conflicts with Fifth Circuit Precedent and was Wrongly Decided*

In its attempt to displace Fifth Circuit law and avoid accountability for its actions, Match further parrots the *CBC* court in hopes that this Court will follow it to hold restitution unavailable under Section 13(b). In *CBC*, the FTC sought a permanent injunction and $5 million in equitable restitution under Section 13(b). 937 F.3d at 766. After holding that the district court properly levied injunctive relief, the Seventh Circuit court went on to "depart[] from the consensus view of our sister circuits" and its own long-standing precedent to vacate the district court's award of restitution. *Id.* at 785. In so doing, the court held "that [S]ection 13(b)'s permanent-injunction provision [the second proviso of 13(b)] does not authorize monetary relief." *Id*. at 786.[11]

The *CBC* court's opinion generally flowed from two arguments: that 13(b)'s plain language precluded restitution and that the line of Supreme Court cases beginning with *Porter* upon which courts such as the Fifth Circuit had relied were "unsettled" by a 1996 Supreme Court

---

[11] The FTC is conferring with the Solicitor General regarding whether to file a petition for certiorari. *See* Ex. 1-C at App. 60 and 1-D at App. 73 (Motion to Stay Mandate and Grant of Stay). The FTC requests judicial notice of these case filings. *See Stryker Corp.*, 631 F.3d at 783.

holding, *Meghrig v. K.F.C. Western, Inc.*, 516 U.S. 479 (1996). *CBC*, 937 F.3d at 782. This Court should decline to follow the *CBC* decision for three reasons. First, as argued above and contrary to the *CBC* court's characterization, *CBC* is inconsistent with Fifth Circuit law. Second, the *CBC* court misconstrued 13(b)'s plain language and legislative history, unduly constricting the scope of the relief it authorizes. Third, the *CBC* court's interpretation of Supreme Court law—particularly *Meghrig*—is inconsistent with *Meghrig* itself and other courts' treatment of it.

> *a.   Match's Reliance Upon* CBC *is Inconsistent with Fifth Circuit Law*

First, as explained in Section III.B.1, *supra.*, controlling precedent at odds with Match's *CBC*-based argument dictates the result, requiring that Match's Motion be denied. Simply put, the *Sunsites* court has already recognized Section 13(b)'s "indisputably clear . . . authorization for the district court to exercise the full range of equitable remedies," 665 F.2d at 718, and Fifth Circuit district courts' consistent validation of this authority shows that it controls the issue.

> *b.   Match's Reliance on CBC Misconstrues the Plain Meaning and Legislative History of the FTC Act*

Alongside its divergence from Fifth Circuit law, Match's reliance on the *CBC* court's arguments also leads it to misconstrue the plain language and legislative history of the FTC Act. Match parrots the *CBC* court in arguing that the FTC Act's structure "demonstrates that '[r]eading an implied restitution remedy into section 13(b) makes the other provisions largely pointless.'" Br. at 15 (quoting *CBC*, 937 F.3d at 784). Match then incongruently interprets Section 19 of the FTC Act—a provision whose remedies are expressly "in addition to, and not in lieu of, any other remedy," 15 U.S.C. § 57b(e)—as a "clearly delineated legislative scheme" that precludes full equitable relief under 13(b). Br. at 14. The Court should reject this narrow reading of Section 13(b) because it conflicts with the statute's plain meaning and legislative history, both of which support the *Sunsites* court's holding Section 13(b) to grant broad equitable authority.

Section 13(b)'s plain language provides clear pathways for either preliminary or permanent injunctive relief, expressly authorizing district courts to "enjoin any [] act or practice" that the FTC challenges under the FTC Act. 15 U.S.C. § 53(b). It then then provides two avenues for the FTC to seek relief. Under 13(b)'s first proviso, the FTC may seek a preliminary injunction while issuing an administrative complaint; under the second, "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." *Id.* This structure provides the FTC the option of either proceeding administratively, where the FTC can evaluate a defendant's conduct itself, or through a district court, depending on the circumstances of a given case. For example, the FTC might proceed administratively where it chooses to develop the law of unfair and deceptive acts and practices.[12]

Section 13(b)'s legislative history validates the statute's broad remedial mandate and demonstrates that seeking permanent injunctive relief is appropriate. Regarding 13(b)'s scope of authority, Congress expressly enacted Section 13(b) "to grant the [FTC] the requisite authority to insure prompt enforcement of the laws the Commission administers" by reinforcing its injunctive authority. Pub. L. 93-153, 87 Stat. at 591.[13] The Senate Report discussing the statute's purpose goes on to note two examples where a permanent injunction is appropriate under 13(b), both of which apply here. First, the Senate Report explained that where the FTC "does not desire to

---

[12] While the *CBC* court focuses on 13(b)'s first proviso, which dissolves the preliminary injunction when an administrative complaint is not filed within at least 20 days, as evidence of the limits of the statute's reach, *see* 937 F.3d at 773, it ignores the second proviso's broad "permanent injunction" remedial mandate. The statute lays out the filing of an administrative complaint and the seeking of permanent injunctive relief through the district court as alternative options: if the Commission does not file an administrative complaint, then the temporary order or preliminary injunction would be dissolved "[p]rovided further" that the Commission may seek a "permanent injunction" as well. 15 U.S.C. § 53(b).

[13] S*ee also Sunsites*, 665 F.2d at 719-720 (legislative history describing 13(b) as "designed to enable the [FTC] to carry out its mandate to protect the public interest through a prompt and aggressive enforcement of the laws it administers" and observing that "without injunctive powers the [FTC] frequently is left with having to impose remedies that are conspicuously inadequate.").

further expand upon the prohibitions of the [FTC] Act through the issuance of a cease-and desist

order" after administrative proceedings, the Commission could "seek a permanent injunction"

directly in district court. S. Rep. No. 93 151, 93d Cong., 1st Sess. 31 (1973). That discretion is

precisely at issue here: the FTC chose to bring the action in district court instead of going

through administrative and subsequent district court litigation. Second, the Senate Report notes

that 13(b) "will allow the Commission to seek a permanent injunction when a court is reluctant

to grant a temporary injunction because it cannot be assured of a[n] early hearing on the merits."

*Id*. at 30-31. Here, Match's conduct required the FTC to investigate extensively before bringing

this action, so the FTC determined a permanent injunction was the appropriate vehicle for relief.

Match further relies on *CBC* to argue that Section 19's provision for consumer redress

implies that restitution is not available under 13(b). *See* Br. at 14-15. But this argument fails for

three reasons. First, it is inconsistent with a broad consensus among the circuits that Section 19

does not constitute the "clear and valid legislative command" that *Porter* requires. To the

contrary, *Sunsites* expressly held that there is no clear legislative command limiting the scope of

relief under 13(b), 665 F.2d at 719, and several circuits have gone on to expressly hold that

Section 19 is not such a command. *See*, *e.g.*, *Bronson Partners*, 654 F.3d at 366-67; *FTC v.

Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1315 (8th Cir. 1991); *Gem Merchandising

Corp.*, 87 F.3d at 469; *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982).

Second, Section 19's plain language expressly avoids limiting the scope of relief

otherwise available under the FTC Act. Section 19 states that its remedies "are in addition to, and

not in lieu of, any other remedy" and that "[n]othing in this section shall be construed to affect

any authority of the Commission under any other provision of law." 15 U.S.C. 57b(e). This

preserving language plainly avoids precluding equitable relief under other avenues. Instead, and

20

far from providing Match's preferred "clearly delineated legislative scheme" that presents an alternative to 13(b), Br. at 14, Section 19's plain language goes to great lengths to ensure that the FTC retains the option to pursue other avenues of relief, including monetary relief.

Third, Match's contention that providing restitution under 13(b) renders Section 19 "'largely pointless,'" Br. at 15 (quoting *CBC*, 937 F.3d at 774), is belied by the differences in relief available under the two statutes. Unlike 13(b), whose remedies are solely equitable, Section 19 provides for remedies at law, including "payment of damages" that are unavailable under Section 13(b), while also expressly limiting the scope of its relief to "redress injury to consumers or other persons." 15 U.S.C. § 57b(b). These remedies contrast with equitable relief, which can reach beyond consumer injury but does not include damages. *See, e.g., Bronson Partners*, 654 F.3d at 367-68. Thus while Match argues that a Section 13(b) authorizing restitution duplicates the relief available under Section 19, the statutes authorize distinct types of relief, reach that relief through different processes, and seek relief to achieve different ends.[14]

    *c.  Match's Reliance Upon* CBC *Wrongly Suggests that* Porter *is Unsettled Law*

Alongside its constrained reading of 13(b), Match mischaracterizes Supreme Court doctrine by describing *Porter* and its progeny as "effectively overruled" and no longer applying to Section 13(b). Br. at 16 n.14. As discussed above, *see* Section III.B.1, *supra.*, *Porter* established that when statutes "invoke[] the jurisdiction of the District Court to enjoin acts and practices made illegal," the court's authority to provide redress "is an equitable one" and "assume[s] an even broader and more flexible character" when "the public interest is involved."

---

[14] Moreover, to the extent that Match or the *CBC* court compare the language of 13(b) to that of Section 5(b) of the FTC Act, *see* 937 F.3d at 774, the Court should decline to follow because these two sections were enacted six decades apart, and such comparisons "make[] the most sense when the statutes were enacted by the same legislative body at the same time." *Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972); *see also Mattox v. FTC*, 752 F.2d 116, 122 (5th Cir. 1985) (declining to compare the FTC Act to another statute enacted decades later).

328 U.S. at 397-98. Six circuits, including the Fifth Circuit in *Sunsites*, have held *Porter* to apply to Section 13(b),[15] and district courts in the Third Circuit and Tenth Circuit have found the same.[16] Moreover, and contrary to Match's position that *Porter* and its progeny "no longer describe[] the state of the law," Br. at 16 n.14, the Supreme Court has continued to endorse *Porter's* holding—including as recently as 2015—that monetary equitable relief is available to "give complete effect to public law. As we have previously put the point: When federal law is at issue and 'the public interest is involved,' a federal court's 'equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.'" *Kansas v. Nebraska*, 135 S.Ct. 1042, 1053 (2015) (quoting *Porter*, 328 U.S. at 398).

To find otherwise, the *CBC* court—and Match through its request that the Court adopt *CBC*'s flawed analysis, Br. at 16—rely heavily upon the Supreme Court's decision in *Meghrig v. K.F.C. Western, Inc.*, 516 U.S. 479 (1996). *Meghrig* involved a private citizen seeking restitution for environmental cleanup costs under a statute that the Supreme Court noted "is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards." 516 U.S. at 483. The Court rejected restitution because the statute's comprehensive framework, viewed in light of a parallel law that expressly authorized restitution, "amply demonstrate[s] that Congress did not intend for a private citizen to be able to undertake a cleanup and then proceed to recover its costs." 516 U.S. at 487. In so holding, the Court expressly contrasted the "limited remedies described" in the statute at issue

---

[15] *See Sunsites*, 665 F.2d at 718-19; *Bronson Partners*, 654 F.3d at 365-66; *Ross*, 743 F.3d at 890; *Security Rare Coin & Bullion Corp.*, 931 F.2d at 1314-15; *Commerce Planet, Inc.*, 815 F.3d at 598-99; *Gem Merchandising Corp.*, 87 F.3d at 469.

[16] *See FTC v. Cephalon, Inc.* 100 F. Supp. 3d 433, 438-39 (E.D. Pa. 2015); *FTC v. Dalbey*, No. 11-cv-1396-RBJ-KLM, 2012 U.S. Dist. LEXIS 67393, at *5-6 (D. Colo., May 15, 2012).

with the statutes in *Porter* and other "cases holding that district courts retain inherent authority to award any equitable remedy that is not expressly taken away from them." 516 U.S. at 487.

Despite the Supreme Court's endorsement of *Porter* in *Meghrig* and subsequent cases, *see Kansas*, 135 S.Ct. at 1053, the *CBC* court nevertheless held *Meghrig* to have "unsettled" the state of the law. 937 F.3d at 782. In contrast, at least two district courts have summarily addressed—and dismissed—this expansive reading of *Meghrig* in the 13(b) context,[17] and at least two circuits have addressed—and similarly dismissed—applying *Meghrig* to a similar statute, the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq*. *See United States v. Rx Depot, Inc.*, 438 F.3d 1052 (10th Cir. 2006); *United States v. Lane Labs-USA, Inc.*, 427 F.3d 219 (3d Cir. 2005).[18] None of these courts have held, as Match argues, that *Porter* and

---

[17] *See FTC v. Cephalon, Inc.* 100 F. Supp. 3d 433, 438 (E.D. Pa. 2015) (declining to apply *Meghrig* to Section 13(b)); *FTC v. Swish Mktg.*, No. C 09-03814, 2010 U.S. Dist. LEXIS 47948, at *7-8 (N.D. Cal., Apr. 14, 2010) (same).

[18] In *Lane Labs*, for example, the defendants argued that *Meghrig* superseded *Porter* and thus foreclosed restitution under the FDCA, but the Third Circuit held *Meghrig* "distinguishable from the instant case, and from *Porter*," 427 F.3d at 231, raising four factors that apply equally here:

First, *Meghrig* involved a citizen's suit, not a government action, and the *Porter* Court held that "a court's equitable powers 'assume an even broader and more flexible character' when the public interest is involved than when 'only a private controversy is at stake.'" *Lane Labs*, 427 F.3d at 231 (quoting *Porter*, 328 U.S. at 398). Similarly, the FTC represents the public interest.

Second, the statute at issue in *Meghrig* limited the equitable powers of the district court by permitting only specific types of relief, 427 F.3d at 231, while the FDCA provided a broad, general grant of authority. Similarly, the FTC Act avoids specific remedies, instead providing broad authority similar to the statute at issue in *Porter*. *See* Section III.B.1, *supra*.

Third, the *Lane Labs* court distinguished between the cleanup costs for contamination at issue in *Meghrig*, which sounded in "traditional damages," with the restitution sought by the government in its case sounded in equity. *Id.* at 231. Similarly, the FTC seeks equitable restitution under Section 13(b) that properly invokes this Court's equitable jurisdiction. *See, e.g., Think All Publ'g*, 564 F.Supp. 2d at 665 ("That the Defendants may ultimately be liable in terms of money does not convert the matter into a suit at law.") (citing *Sunsites*, 665 F.2d at 718).

Finally, unlike the "detailed remedial scheme" at issue in *Meghrig*, the FDCA included provisions that "broadly grant[] authority to restrain," while also containing other "more specific remedial provisions address[ing] a few particular types of violations." *Id.* at 231-32. Like Section

its progeny are "effectively overruled," nor have courts limited relief available under a statute

similar to the FTC Act. This Court should therefore decline Match's invitation to make new law.

**C.  Section 230 of the Communications Decency Act Does Not Bear on the Conduct the FTC Challenges**

After arguing that restitution is unavailable under 13(b), Match raises the CDA as an

affirmative defense with respect to Count I, which challenges Match's deceptive ads, and Count

II, which challenges Match's marketing practice of generating ads by deliberately exposing

consumers to users that Match itself had identified as likely to be fraudulent. The CDA does not

apply to these counts for three reasons. First, the counts do not hold Match responsible for the

acts of any third parties or for good-faith actions restricting access to third-party content, as the

CDA protects. Instead, the counts only hold Match responsible for its own actions. Second, they

do not hold Match financially or otherwise liable for the actions or consequences of conduct

perpetrated by third parties or for its own good-faith actions to restrict access to offensive

content. Instead, the FTC seeks injunctive and other equitable relief only for the harm Match

itself caused consumers. Finally, immunizing Match's profiting from deliberately exposing

consumers to the risk of fraud would be inconsistent with the CDA's basic purpose: to allow

companies to protect consumers and to empower consumers to protect themselves.

*1.  The CDA Does Not Apply Because the FTC Challenges Match's Own Conduct*

*Background*

Congress enacted the CDA to make the Internet a safer place and to allow companies to

engage in *good-faith* actions without fear of liability. Among other things, Congress intended it

to encourage "the development and utilization of blocking and filtering technologies that

---

332(a) of the FDCA, Section 13(b) has no such detailed remedial scheme but is instead is a broad grant of authority that exists alongside more specific remedial provisions, such as Section 19.

24

empower parents to restrict their children's access to objectionable or inappropriate online

material," 47 U.S.C. 230(b)(4); *see also Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir.

2008), while "ensur[ing] vigorous enforcement of Federal criminal laws to deter and punish

trafficking in obscenity, stalking, and harassment by means of computer." 47 U.S.C. § 230(b)(5).

"To achieve that policy goal, Congress provided broad immunity under the CDA to Web-based

service providers for all claims stemming from their publication of information created by third

parties, referred to as the 'Good Samaritan' provision." *MySpace*, 528 F.3d at 418.

To these ends, the CDA contains two exemptions from liability. The first exemption, set

forth in 47 U.S.C. § 230(c)(1) and referred to hereafter as the "(c)(1) exemption," immunizes

companies like Match that allow third parties to communicate between each other from liability

"arising from the publication of user-generated content." *Myspace*, 528 F.3d at 418 (citing the

Third, Fourth, Ninth, and Tenth Circuits holding similarly). In *Doe v. Myspace, Inc.*, for

example, the Fifth Circuit held that the (c)(1) exemption immunized Myspace, an online social

network, from liability for the sexual assault of a minor whose abuser messaged her on the

platform because Myspace did not generate the content that led to the harm. *Id.* at 422.

The second exemption, set forth in 47 U.S.C. § 230(c)(2) and referred to hereafter as the

"(c)(2) exemption," applies not where the speech of third parties is at issue but instead where

good-faith action to limit access to offensive content from its platform is taken. The exemption

immunizes companies from "any action voluntarily taken in good faith to restrict access to or

availability of material that the provider or user considers to be obscene . . ." 47 U.S.C. §

230(c)(2). Thus service providers that take good-faith measures to restrict access to potentially

offensive content are immune from suit for denying users access to that content.

*Count I*

Match argues that the CDA applies to Count I by attempting to recast this case as challenging the adequacy of Match's fraud controls, Br. at 3-4, and by claiming its ads are mere "automated notifications." Br. at 4. Because these false ads offered Match's victims access to a third party's communication, Match then asserts that "[a]ny alleged harm is traceable to one third-party user's expression of interest" to another user, Br. at 23, despite the fact that Match wrote every word of the ads and collected the payments for subscriptions they generated.

Match supports its argument by comparing its advertising practices to three recent cases where courts upheld CDA immunity. The recent Ninth Circuit case, *Dyroff v. Ultimate Software Grp., Inc.*, for example, involved an internet-based social media platform that recommended user groups and sent email notifications to the service's users. 934 F.3d 1093 (9th Cir. 2019). The plaintiff sued the service provider for its role in helping her son secure illegal narcotics. *Id.* at 1095. The court held that the CDA provided immunity from liability for the user's death because the defendant's "website features" at issue—such as push notifications and recommendations to join user groups generated by third parties—"are tools meant to facilitate the communication and content of others. They are not content in and of themselves." *Id.* at 1098. The court thus applied the (c)(1) exemption because the notifications and recommendations the service provider sent the user merely reproduced or recommended third-party content. *Id.* Match's other two cases— *Daniel v. Armslist, LLC*, 926 N.W.2d 710 (Wis. 2019) and *Marshall's Locksmith Serv., Inc. v. Google, LLC*, 925 F.3d 1263 (D.C. Cir. 2019)—follow this same general pattern: the defendant received CDA immunity because the plaintiff sought to hold the companies liable for the third-party harms committed either through neutral push notifications or messaging systems. For *Armslist*, Armslist was not liable for the consequences of third parties selling firearms on its

26

website; 926 N.W. 2d at 725-27; for *Marshall's Locksmith*, Google was not liable for the

algorithmic translation of fraudsters' addresses into Google Map pincites. 925 F.3d at 1269.

The conduct at issue in Count I is not analogous to *Dyroff* or the other cases Match raises

and does not fall under the (c)(1) exemption for two reasons. First, the ads at issue are not

"neutral assistance" as in *Dyroff*, third-party messages as in *Armslist*, or algorithmic translations

of third-party content as in *Marshall's Locksmith*. In fact, Match's false ads did not reproduce or

even directly provide access to any third-party content. To the contrary, the Complaint sets forth

that the ads at issue were wholly developed and transmitted by Match. *See* Compl. ¶¶ 23-27.

They exclusively contained Match's own teaser "Could he be the one?" content and also

*withheld* all third-party content sent to the consumer. *See id*. Unlike any of the cases Match cites

or any other case where a defendant received CDA immunity, here the challenged

representations involve advertisements that were created and developed by the defendant and

that deliberately withheld access to third-party content.[19] As set forth in the Complaint,

consumers harmed by the practices at issue in Count I often did not even receive a third-party

communication. *See* Compl. ¶ 28 (noting that consumers often received no message but instead

only a notice that the profile is "unavailable."). The fact that the ads at issue in Count I contained

no information about the sender or the content of the message was precisely how Match profited

from scammers: Match's deceptive ads led consumers to subscribe *before* the consumer could

---

[19] At least one federal court has held that where an online dating service's "manner of presenting the profiles—not the underlying profiles themselves—constitute fraud, the CDA does not apply." *Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257, 1263 (N.D. Cal. 2006) (appeal of attorney's fees declined at 376 Fed. App'x 775 (9th Cir. 2010)). Moreover, although Match cites with approval a district court's finding that the CDA applied to Match, Br. at 23, it ignores Ninth Circuit's reasoning in partially reversing and remanding the decision. *See Beckman v. Match.com, LLC*, 668 F. App'x 759, 760 (9th Cir. 2016) (CDA does not apply where the claim does not seek liability for "the website owner's role as a 'publisher or speaker' of third-party content, for its failure to remove that content, or for its failure to monitor third-party content on its website.").

realize that the ad touted a scammer on the other end. Contrary to Match's contention that the alleged harm resulted from third-party contact, Br. at 23, Match's conduct and the resulting injury had already occurred by the time that the consumer had access to the third-party content.

Second, even if the Court were to consider the underlying message to be part of the conduct at issue in this case, Match's ads render it partially responsible for the content at issue, and Match can still be held liable. This District held similarly in *MCW, Inc. v. Badbusinessbureau.com, LLC*, which involved a defendant who maintained a website where it would, among other things, post titles and headings for content generated by third-party messages. No. 3:02-CV-2727-G, 2004 U.S. Dist. LEXIS 6678, at *5 (N.D. Tex. Apr. 19, 2004). Rejecting the defendant's CDA defense, the court held that "the CDA does not distinguish between acts of creating or developing the content of reports, on the one hand, and acts of creating or developing the titles or headings of those reports, on the other. The titles and headings are clearly part of the web page content." *Id*. at *33. Because the defendant had produced the titles and headings relating to the reviews posted on its platform, the court held that the CDA did not apply with respect to that content. *Id.* Unlike *Dyroff*, *Armslist*, and *Marshall's Locksmith*, the FTC seeks to hold Match responsible here only for its own deceptive content, not any third-party content the company was touting. Therefore, because Count I only challenges Match's own ads while the (c)(1) exemption only covers harm "arising from the publication of user-generated content," *Myspace*, 528 F.3d at 418, the exemption does not apply.

Count I similarly does not implicate the (c)(2) exemption. While (c)(2) prohibits liability for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, . . . or otherwise objectionable," 47 U.S.C. § 230(c)(2)(A), Count I only challenges the deceptive ads that Match sent consumers, not any

good-faith action taken to block offensive content. Simply put, Count I relates only to Match's own deceptive conduct, not its decisions about whether to transmit or restrict access to content.

Moreover, to the extent that Match withheld messages behind its teaser ads, Match only did so to sell subscriptions to unsuspecting consumers—a practice that had nothing to do with whether Match or any user would consider the messages to be "obscene . . . or otherwise objectionable" as required by the statute. *Id*. To the contrary, Match knowingly marketed offensive content as if it were legitimate, which is hardly the type of "good faith" attempt to screen offensive material that the statute immunizes. Thus Count I falls well outside the CDA because it only holds Match to account for ads containing content that Match generated and for conduct unrelated to good-faith withholding of potentially offensive content.

*Count II*

Match also misapplies the (c)(1) and (c)(2) exemptions with respect to Count II, which challenges Match's designing its platform to funnel fraud-flagged communications toward its nonpaying members to generate subscriptions. Match argues that the conduct at issue in Count II holds it liable for third-party content and for its good-faith efforts to police its platform, but the facts belie that defense. In truth, the FTC seeks to hold Match liable only for its own bad-faith conduct—precisely the opposite of the "good faith" the CDA protects. 47 U.S.C. § 230(c)(2)(A).

The (c)(1) exemption does not apply to Count II because Count II does not hold Match liable as the publisher or speaker of another's content but instead only for its own conduct—its own facilitation of the deceptive schemes that were executed on Match.com. Here, Match has "gone beyond the publisher's role" and deliberately designed its platform to market fraud-flagged communications as if they were messages from real users. *See MCW*, 2004 LEXIS 6678, at *35. Count II only challenges that marketing practice, not the neutral transmission of

fraudulent messages on Match.com, nor does it seek to hold Match liable for the actual resulting harm directly caused by third parties. Because the (c)(1) exemption applies only to holding the platform liable for third-party conduct, the exemption cannot apply to Match's own conduct.

The Second Circuit held similarly when it evaluated comparable circumstances in *FTC v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016). In *LeadClick*, the FTC challenged LeadClick's use of fake news sites presenting fake studies and other information that marketed consumer goods, and LeadClick sought CDA immunity under the (c)(1) exemption because third parties generated the content it marketed. *Id.* at 172-73. Rejecting the CDA defense, the Second Circuit held that LeadClick was liable "for its *own* deceptive acts or practices—by directly participating in the deceptive scheme." *Id.* at 176 (emphasis in original). Three factors guided the court's decision: that the defendant "knew that deceptive false news sites were prevalent on its affiliate marketing network, directly participated in the deception, and had the authority to control the deceptive content of these fake news sites, but allowed the deceptive content to be used in [consumer good] advertisements on its network." *Id.* at 171. As a result, because liability was "not derived from its status as a publisher or speaker, imposing liability under Section 5 does not 'inherently require[] the court to treat the [LeadClick] as the 'publisher or speaker' of its affiliates' content, and Section 230 immunity should not apply." *Id.* at 176-77.[20]

The same elements are present here. The Complaint alleges Match to have knowingly sent ads despite knowing they were false. *See* Compl. ¶¶ 31-37. The Complaint also alleges that Match participated in the deception by withholding the messages while marketing them as if they were legitimate, *id.* at ¶¶ 24-31, going so far as to design its own fraud screening protections to

---

[20] The *LeadClick* court's analysis reflected the consensus view that the (c)(1) exemption applies only to "neutral" platform tools that do not "materially contribute" to the fraud. *See Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 412-13 (6th Cir. 2014) ("Consistent with our sister circuits, we adopt the material contribution test.").

funnel fraud-flagged messages toward non-subscribers. *Id.* at ¶¶ 33-37. Finally, the Complaint alleges that Match knew of its own marketing of these fraudulent communications and had the ability to block them but did not. *Id*. Like in *LeadClick*, the FTC is challenging only Match's own conduct—knowingly using third-party content to generate its own deceptive ads to induce consumer purchases. As a result, the Court should not apply the (c)(1) exemption to Count II.

The (c)(2) exemption also does not apply to Count II for two reasons. First, Match did not take the actions at issue to "restrict access to or availability of material that the provider or user considers to be obscene," as provided in 47 U.S.C. § 230(c)(2). To the contrary, Match developed a system to funnel potentially fraudulent messages to Match.com users—consumers who would then receive ads when the fraud-flagged accounts contacted them. Thus, Match's conduct is outside the scope of the plain language of the statute.

Second, even accepting the premise that Match's anti-fraud procedures related to editorial functions seeking to withhold communications, Match's conduct does not reflect the "good faith" required by the statute. *Id.* Instead, Match designed its platform to systematically peddle false advertisements toward unsuspecting consumers who would then receive access to a fraudster trying to scam them or no message at all. Compl. ¶¶ 24-37.[21] Thus because the FTC only challenges conduct that neither sought to restrict access to obscene content nor acted in "good faith" to protect consumers, the (c)(2) exemption does not apply.[22]

---

[21] *See also Smith v. Trusted Universal Standards in Elec. Transactions, Inc*., No. 09-4567, 2011 U.S. Dist. LEXIS 26757, at *24-26 (D.N.J. Mar. 15, 2011) (unpublished) (denying dismissal under (c)(2) because "a reasonable jury could conclude that Comcast acted in bad faith").

[22] Contrary to Match's contention that the FTC must "affirmatively plead[]" bad faith to respond to a CDA defense, Br. at 26 n.23, neither the case Match cited nor other case law supports its contention. The *Holomaxx* court it cited found that the plaintiff failed to plead an absence of good faith because it pled "no facts in support of its conclusory claim that Microsoft's filtering program is faulty, nor does it identify an objective industry standard that Microsoft fails to meet" while also failing to support any of its other factual allegations. *Holomaxx Tech. v. Microsoft*

### 2. The CDA Does Not Apply Because the Complaint Holds Match Accountable Only for the Harm it Directly Caused

Just as the FTC only challenges Match's own conduct, it also only seeks equitable relief for the harms directly arising out of that conduct, not for harms caused by any third parties. Contrary to Match's insistence that the counts hold Match "indirect[ly] liabl[e]" for publishing communications sent through its platform, Br. at 24, the Complaint instead challenges only Match's own conduct and seeks relief only for the content it generated through Count I and the means by which it did so through Count II. The conduct at issue in Counts I and II generated millions of deceptive advertisements that led consumers to subscribe to Match.com under false pretenses. *See* Compl. ¶¶ 24-37. Although these deceptive ads touted fraudulent messages that likely resulted in harm caused by third parties, the FTC only seeks equitable relief for consumers who purchased subscriptions under these false pretenses, not for any further resulting harm.

This focus on Match's own conduct reflects how other circuits have addressed similar circumstances. In *LeadClick*, for example, the FTC sought, and the Second Circuit affirmed, the disgorgement of all revenues LeadClick generated as part of its own participation in the scheme—not for harms caused by third parties. *See LeadClick Media,* 838 F.3d at 167, 177.[23] The FTC seeks the same relief in this action: that this Court hold Match accountable for its own conduct and provide redress for the consumers it harmed.

---

*Corp.*, 783 F. Supp. 2d 1097, 1105 (N.D. Cal. 2011). The FTC's Complaint, in contrast, describes Match's scheme to profit from deceptive ads—a scheme that clearly demonstrates a lack of good faith that is not entitled to CDA immunity. *See* Compl. ¶¶ 23-37.

[23] The Tenth Circuit similarly affirmed disgorgement where the defendant's "actions were not 'neutral' with respect to generating offensive content; on the contrary, its actions were intended to generate such content." *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009).

### 3. *Immunizing Match's Conduct Would be Inconsistent with Congressional Intent*

Lastly, immunizing Match from liability for its teaser ads and its deliberate funneling of likely fraudsters toward their marks would undermine the basic purpose underlying the CDA. As discussed above, *see* Section III.C.1, *supra.*, Congress enacted the CDA to empower businesses and consumers to protect themselves from obscene content, not to allow companies like Match to profit from it. Because Match's conduct is antithetical to the CDA's purpose, the Court should not allow the company to use the CDA to shield itself from liability.

Although the Fifth Circuit has not directly addressed a similar case, the Ninth Circuit recently confronted—and dismissed—a CDA defense where conduct ran counter to the CDA's purpose. In *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, the court found that "interpreting the [CDA] to give providers unbridled discretion to block online content would . . . enable and potentially motivate internet-service providers to act for their own, and not the public, benefit." 938 F.3d 1026, 1036 (9th Cir. 2019). Dismissing the CDA defense, the court held that immunizing "practices aimed at suppressing competition, rather than protecting internet users" should not receive CDA protection because the practices were contrary to purpose the CDA was enacted. *Id.* Failed attempts to use the CDA to protect conduct antithetical to its purpose has precedent in FTC actions as well, with the court in *FTC v. Accusearch* noting, for example, that:

> "It is ironic that [the defendant has attempted to use] a law intended to reflect a policy aimed at deterring 'stalking and harassment by means of computer' . . . as a basis for immunizing the sale of phone records used for exactly those purposes. In light of the legislative intent and statutory purpose of the CDA's immunity provision, such an interpretation is simply untenable."

No. 06-CV-105-D, 2007 U.S. Dist. LEXIS 74905, at *14 (D. Wyo. Sept. 28, 2007), *aff'd* 570 F.3d 1187 (10th Cir. 2009); *see also LeadClick*, 838 F.3d at 171. Because Match similarly seeks to shield its wrongdoing, the Court should hold similarly here.

**D.  The FTC's ROSCA Count is Properly Pled**

Lastly, Match launches a perfunctory and inappropriately fact-based argument that the FTC "fail[ed] to plausibly plead a violation," Br. at 5, because the FTC "failed to plead facts that could support an allegation that each of [Match's] five methods [of cancellation are] not 'simple.'" Br. at 27.[24] Match is wrong for two reasons.

First, the Complaint alleges conduct sufficient for the Court to find a violation of ROSCA and that it should provide a remedy. The FTC's Complaint alleges that consumers were subject to recurring billing, *see* Compl. ¶ 53, that they needed to cancel their recurring billing but were often prevented by Match's "confusing and cumbersome cancellation practices," Compl. ¶ 54, that the online mechanism was burdensome and confusing, Compl. ¶¶ 55-57, and that consumers were harmed by the practice by finding themselves billed after they thought they already canceled their subscriptions. Compl. ¶ 58. The Complaint also alleges that Match's management knew that this cancellation process was burdensome and led to consumer harm. *See* Compl. ¶ 59. These pleadings set forth Match as engaging in the conduct and provide a group—consumers billed for periods after thinking they already canceled—for whom the Court can provide redress.

Second, any evidence Match has of providing mechanisms that might have mitigated the violation and resulting harm the FTC alleges are relevant not in the 12(b)(6) context but instead for subsequent litigation. Although ROSCA's cancellation requirement has seen almost no litigation resulting in a judgment on the merits, *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649-RFB-GWF, 2015 U.S. Dist. LEXIS 59387 (D. Nev. May 6, 2015), is informative. There, a Nevada district court granted summary judgment to the FTC's cancellation-based ROSCA

---

[24] As with Match's inappropriate introduction of extrinsic matters regarding Match Group, LLC, *see* note 1, *supra.*, the FTC responds to Match's improper introduction of facts beyond the pleadings here but has moved the Court to exclude them from consideration. *See* (Dkt. 26).

count after the FTC provided evidence of the company's failure to provide a simple mechanism. As here, the FTC filed a complaint in *Health Formulas* that set forth ways that the defendant frustrated consumers' attempts to cancel, *see* Ex. 1-B at App. 42-43,[25] and there the court upheld the ROSCA violation after the FTC provided evidence of the defendant's failure at the summary judgment phase of the litigation. 2015 U.S. Dist. LEXIS 59387, at *48-49. Similarly here, whether Match provided other methods of cancellation, such as (hypothetically) an online chat that less than one percent of consumers used, is a matter of fact that Match can raise at a later stage of these proceedings, but these alleged facts do not bear on whether the FTC's Complaint has stated a claim. Therefore, the Court should deny Match's Motion with respect to dismissal of the ROSCA complaint, leaving Match's purported facts for future proceedings.

## IV.    Conclusion

For the reasons set forth above, the FTC respectfully requests the Court to deny Match's Motion or, alternatively, provide the FTC leave to amend any deficiencies the Court may find.

DATED: November 5, 2019              Respectfully submitted,


                                 __/s/ Zachary A. Keller_____
                                 ZACHARY A. KELLER, Texas Bar No. 24087838
                                 M. HASAN AIJAZ, Virginia Bar No. 80073
                                 MATTHEW WILSHIRE, California Bar No. 224328
                                 Federal Trade Commission
                                 1999 Bryan St. Ste. 2150
                                 Dallas, Texas 75201
                                 T: (214) 979-9382 (Keller); (214) 979-9386 (Aijaz);
                                      (214) 979-9362 (Wilshire)
                                 F:  (214) 953-3079
                                 E: zkeller@ftc.gov; maijaz@ftc.gov; mwilshire@ftc.gov
                                 Attorneys for Federal Trade Commission

---

[25] The FTC requests the Court take judicial notice of the First Amended Complaint in that case. *See Bauer v. Texas*, 341 F.3d 352, 362 n.8 (5th Cir. 2003) (taking judicial notice of matters of public record).

35

## **CERTIFICATE OF SERVICE**

On November 5, 2019, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on counsel by a manner authorized by Federal Rule of Civil Procedure 5(b)(2).


/s/ Zachary A. Keller
Zachary A. Keller