## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | **Case No.** 3:19-cv-02281-K |
| Plaintiff, | **Appendix in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss** |
| v. | |
| MATCH GROUP, INC., a corporation, | |
| Defendant. | |

Plaintiff Federal Trade Commission ("FTC") submits this Appendix in Support of its

Opposition to Defendant's Motion to Dismiss:

| Ex. | Description | App. Page(s) |
|---|---|---|
| 1 | Declaration of Kelle A. Slaughter | App. 001-002 |
| 1-A | Form 8-K Submitted to Securities and Exchange Commission by Match Group, Inc. on September 27, 2019 | App. 004-007 |
| 1-B | Amended Complaint filed in *FTC v. Health Formulas, LLC, et al.*, Case No. 2:14-cv-1649-RFB-GWF (D. Nev.) | App. 009-056 |
| 1-C | FTC's Motion to Stay in *FTC v. Credit Bureau Center, LLC, et al.*, Case Nos. 18-2847 and 18-3310 (7th Cir.) | App. 058-071 |
| 1-D | Order Granting Stay in *FTC v. Credit Bureau Center, LLC, et al.*, Case Nos. 18-2847 and 18-3310 (7th Cir.) | App. 073 |

DATED: November 5, 2019 Respectfully submitted,


     _____/s/ Zachary A. Keller_____
     ZACHARY A. KELLER, Texas Bar No. 24087838
     M. HASAN AIJAZ, Virginia Bar No. 80073
     MATTHEW WILSHIRE, California Bar No. 224328
     Federal Trade Commission
     1999 Bryan St. Ste. 2150
     Dallas, Texas 75201
     T: (214) 979-9382 (Keller); (214) 979-9386 (Aijaz);
       (214) 979-9362 (Wilshire)
     F: (214) 953-3079
     E: zkeller@ftc.gov; maijaz@ftc.gov; mwilshire@ftc.gov
     Attorneys for Federal Trade Commission

**CERTIFICATE OF SERVICE**

On November 5, 2019, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on counsel by a manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/Zachary A. Keller*
Zachary A. Keller

# EXHIBIT 1

## DECLARATION OF KELLE A. SLAUGHTER
## PURSUANT TO 28 U.S.C. § 1746

I, Kelle A. Slaughter, hereby declare as follows:

1.      My name is Kelle A. Slaughter.  I am a United States citizen and over eighteen years of age.  I am employed as an investigator with the Federal Trade Commission ("FTC"), a position that I have held for approximately 17 months.  My office address is 1999 Bryan Street, Suite 2150, Dallas, Texas 75201.  I have personal knowledge of the facts stated in this declaration, and if called as a witness, I would testify to the same.

2.      As an FTC investigator, my duties include monitoring and investigating entities that are suspected of engaging in unfair or deceptive acts or practices in violation of statutes and rules enforced by the FTC.  In the course of my employment, I have supported the FTC's investigation of Match Group, Inc. ("Match"), as well as the subsequent litigation against Match.  *See FTC v. Match Group, Inc.*, Case No. 3:19-cv-02281-K (N.D. Tex. Sept. 25, 2019).

3.      On October 25, 2019, I downloaded Match's Form 8-K Report dated September 27, 2019, from the United States Securities and Exchange Commission website, located at <https://www.sec.gov/Archives/edgar/data/1575189/000157518919000067/mtch-20190927.htm>.  A true and accurate copy of the filing is attached hereto as **Exhibit A**.

4.      Additionally, on October 25, 2019, I downloaded the Amended Complaint for Permanent Injunction and other Equitable Relief filed February 5, 2015, in the matter *FTC v. Health Formulas, LLC, et al.*, Case No. 2:14-cv-1649-RFB-GWF, 2015 U.S. Dist. LEXIS 59387 (D. Nev. Feb. 5, 2015), from the Public Access to Court Electronic Records ("PACER") website (pacer.gov).  A true and accurate copy of the Complaint is attached hereto as **Exhibit B**.

5.      Likewise, on November 1, 2019, I downloaded the Federal Trade Commission's Motion to Stay the Mandate filed September 17, 2019, and the September 20, 2019 Order granting that Motion, in the matter *FTC v. Credit Bureau Center, LLC*, et al., No. 18-2547 (7th Cir.), from the PACER website (pacer.gov).  A true and accurate copy of the Motion to Stay the

1

Mandate is attached hereto as **Exhibit C**, and the Order granting the Motion is attached hereto as **Exhibit D**.

I declare under penalty of perjury that the foregoing statement is true and correct.

Executed on November 4, 2019.

Kelle A. Slaughter

APP 002

# EXHIBIT A

Case 3:19-cv-02281-K   Document 27-1   Filed 11/05/19   Page 8 of 77   PageID 209

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

---

# FORM 8-K

### CURRENT REPORT
**Pursuant to Section 13 OR 15(d) of The Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): **September 27, 2019**

# MATCH GROUP, INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **001-37636** | **26-4278917** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**8750 North Central Expressway, Suite 1400**
**Dallas, TX 75231**
(Address of principal executive offices) (Zip Code)

Registrant's telephone number, including area code: **(214) 576-9352**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol | Name of exchange on which registered |
|:---:|:---:|:---:|
| Common Stock, par value $0.001 | MTCH | The Nasdaq Stock Market LLC (Nasdaq Global Select Market) |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

APP 004

Case 3:19-cv-02281-K   Document 27-1   Filed 11/05/19   Page 9 of 77   PageID 210

**Item 7.01. Regulation FD Disclosure.**

On September 27, 2019, Match Group, Inc. ("Match Group") announced the below update of its prior disclosure regarding a U.S. Federal Trade Commission ("FTC") investigation of certain Match.com business practices. The update reflects developments since Match Group filed its quarterly report on Form 10-Q for the quarter ended June 30, 2019.

In March 2017, the FTC requested information and documents in a civil investigation regarding certain business practices of Match.com. The FTC raised potential claims relating to Match.com's marketing, chargeback, and online cancellation practices. In November 2018, the FTC proposed to resolve its potential claims via a consent judgment requiring certain changes in those practices, as well as a $60 million payment. Ensuing discussions between the Company and the FTC ended without resolution.

On August 7, 2019, the FTC voted to assert claims against the Company and referred the matter to the Department of Justice ("DOJ"). DOJ subsequently declined to pursue a civil case against the Company and referred the matter back to the FTC.

On September 25, 2019, the FTC filed a lawsuit in the Northern District of Texas against Match Group. See FTC v. Match Group, Inc., No. 3:19:cv-02281-K (N.D. Tex.). The complaint alleges that, prior to mid-2018, for marketing purposes Match.com told non-paying users that other users were trying to communicate with them, even though Match.com had identified those subscriber accounts as potentially fraudulent, thereby inducing non-paying users to subscribe and exposing them to the risk of fraud should they subscribe. The complaint also challenges the adequacy of Match.com's disclosure of its six-month guarantee, the efficacy of its cancellation process, and its handling of chargeback disputes. The complaint seeks among other things permanent injunctive relief, civil penalties, restitution, disgorgement, and costs of suit.

On September 26, 2019, the Company received a grand-jury subpoena from DOJ for documents relating to certain of the marketing-related claims in the FTC's complaint.

Match Group believes that the FTC's claims regarding Match.com's practices, policies, and procedures are without merit and will defend vigorously against them. The Company intends to cooperate with DOJ in responding to its subpoena.

Case 3:19-cv-02281-K   Document 27-1   Filed 11/05/19   Page 11 of 77   PageID 212

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

MATCH GROUP, INC.

By:    /s/ Jared F. Sine
        Jared F. Sine
        Chief Legal Officer & Secretary

Date: September 27, 2019

APP 007

# EXHIBIT B

JONATHAN E. NUECHTERLEIN
General Counsel

SHAMEKA L. WALKER
swalker@ftc.gov
DANIELLE ESTRADA
destrada@ftc.gov
Federal Trade Commission
600 Pennsylvania Avenue, NW, CC-8528
Washington, DC 20580
202-326-2570 (Walker)
202-326-2630 (Estrada)
202-326-3395 (Fax)

BLAINE T. WELSH
blaine.welsh@usdoj.gov
Assistant United States Attorney
Nevada Bar No. 4790
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, NV 89101
702-388-6336
702-388-6787 (Fax)

Attorneys for Plaintiff Federal Trade Commission

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

APP 009

**FEDERAL TRADE COMMISSION,**

**Plaintiff,**

**v.**

**HEALTH FORMULAS, LLC, a California limited liability company, also doing business as SIMPLE PURE NUTRITION,**

**PURE VITAMINS, LLC, a Nevada limited liability company,**

**LONGHORN MARKETING, LLC, a Nevada limited liability company, also doing business as MEN'S HEALTH FORMULAS, LLC, LIFE VITAMINS, and UNLEASH THE THUNDER,**

**METHOD DIRECT, LLC, a Nevada limited liability company, also doing business as EXTAMAX, LLC, VITAMAN LABS, INC., VITAFIT, AND PLAYBOY OFFER/DVD ENTERTAINMENT,**

**WEIGHT LOSS DOJO, LLC, a Nevada limited liability company, also doing business as FITNESS DVDS,**

**VIP SAVINGS, LLC, a Nevada limited liability company, also doing business as VIP SAVINGS CENTER,**

**DJD DISTRIBUTION, LLC, a California limited liability company,**

**MDCC, LLC, a Nevada limited liability company, also doing business as METHOD DIRECT CALL CENTER,**

**CHAPNICK, SMUKLER & CHAPNICK, INC., a California corporation,**

Case No. 2:14-cv-1649-RFB-GWF

**AMENDED COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**

2

**458 MEDIA LLC, a Nevada limited liability company,**

**ALPHA BRANDS, LLC, a Nevada limited liability company,**

**BLU STELLA, LLC, a Nevada limited liability company,**

**BRILLIANT SKIN LLC, a Nevada limited liability company,**

**DISCOUNT PROVISIONS L.L.C., a Nevada limited liability company,**

**EXTAMAX, LLC, a Nevada limited liability company,**

**F12 MEDIA LLC, a Nevada limited liability company,**

**FLEX FORMULAS, LLC, a Nevada limited liability company,**

**GCB MARKETING LLC, a Nevada limited liability company,**

**LUMINOUS SKIN LLC, a Nevada limited liability company,**

**MEN'S HEALTH FORMULAS, LLC, a Nevada limited liability company,**

**METABOLIC LABS, LLC, a Nevada limited liability company,**

3

1  **MIRACLE MALE, LLC, a Nevada limited liability company,**

2

3  **MORINGA MARKETING LLC, a Nevada limited liability company,**

4  **NORTHBOUND MARKETING LLC, a Nevada limited liability company,**

5

6  **SKINNY 7 LLC, a Nevada limited liability company,**

7

8  **WELLNESS LABS, LLC, a Nevada limited liability company,**

9

10  **YACON MARKETING LLC, a Nevada limited liability company,**

11  **BARREL ROLL, LLC, a Nevada limited liability company,**

12

13  **BSC MARKETING, LLC, a Nevada limited liability company,**

14

15  **CHERRY HILL MARKETING, LLC, a Nevada limited liability company,**

16

17  **CSA VENTURES, LLC, a Nevada limited liability company,**

18  **DIET CONCEPTS, LLC, a Nevada limited liability company,**

19

20  **HEALTH PRODUCTS DIRECT LLC, a Nevada limited liability company,**

21

22  **KMS MARKETING LLC, a Nevada limited liability company,**

23  **NATURAL PRODUCTS DIRECT LLC, a Nevada limited liability company,**

24

25

4

APP 012

1  **NORTHERN HEALTH PRODUCTS LLC, a Nevada limited liability company,**

2

3  **PURE AND NATURAL HEALTH PRODUCTS LLC, a Nevada limited liability company,**

4

5  **PURE AND SIMPLE HEALTH PRODUCTS LLC, a Nevada limited liability company,**

6

7  **RADIANT SKIN LLC, a Nevada limited liability company,**

8

9  **SHIMMERING SKIN LLC, a Nevada limited liability company,**

10  **TINDY FILMS LLC, a Nevada limited liability company,**

11

12  **WELLNESS PRODUCTS, LLC, a Nevada limited liability company,**

13

14  **METHOD FILMS, INC., a Nevada corporation,**

15  **BRANDON CHAPNICK, individually and as an officer or manager of Chapnick, Smukler & Chapnick, Inc., Method Direct, LLC, Pure Vitamins, LLC, Weight Loss Dojo, LLC, and MDCC, LLC,**

16

17

18  **KEITH SMUKLER, individually and as an officer or manager of Chapnick, Smukler & Chapnick, Inc., Health Formulas, LLC, Method Direct, LLC, VIP Savings, LLC, MDCC, LLC, Longhorn Marketing, LLC, Pure Vitamins, LLC, Weight Loss Dojo, LLC, and DJD Distribution, LLC,**

19

20

21

22

23

24

25

APP 013

1   **DANELLE MILLER, also known as Danelle
2   Folta and Danelle Kenealy, individually and as
    an officer or manager of Method Direct, LLC,
3   Health Formulas, LLC, MDCC, LLC, Pure
    Vitamins, LLC, and Weight Loss Dojo, LLC,**

4   **JASON MILLER, individually and as an
5   officer or manager of Weight Loss Dojo, LLC,
    Health Formulas, LLC, Method Direct, LLC,
6   Pure Vitamins, LLC, and MDCC, LLC,**

7                    **Defendants.**

8

9          Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

10         1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade

11  Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, Section 917(c) of the Electronic

12  Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693o(c), Section 5 of the Restore Online Shoppers

13  Confidence Act ("ROSCA"), 15 U.S.C. § 8404, and the Telemarketing and Consumer Fraud and

14  Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary,

15  preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution,

16  the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for

17  Defendants' acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C.

18  §§ 45(a) & 52, Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), Section 4 of the ROSCA, 15

19  U.S.C. § 8403, Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b), and the FTC's

20  Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

21                         <u>**SUMMARY OF THE CASE**</u>

22         2.      Defendants trick consumers into disclosing their credit and debit card information

23  to enroll them into expensive programs with recurring monthly charges.  Whether Defendants

24  offer weight loss, virility, muscle-building, or other dietary supplement products, or skin creams,

25  they deceptively tout offers for purportedly "free" trials that cost only a nominal shipping and

APP 014

1   handling fee or for greatly discounted prices.  Consumers often experience the same result:

2   substantial and unexpected recurring charges or debits.  Defendants often upsell additional

3   products in the same manner, and for consumers, getting a refund is an exercise in frustration.

4   Furthermore, Defendants advertise their green coffee bean extract and raspberry ketone weight

5   loss supplements (marketed under the names "RKG Extreme" and "Pure Green Coffee Bean

6   Plus") by claiming they offer rapid and substantial weight loss without the need for diet or

7   exercise, but Defendants fail to deliver on these promises.

8          3.       Defendants engage in these deceptive practices to sell dietary supplements, skin

9   creams, and various upsell products including:

10                 A.      Weight Loss Supplements: RKG Extreme, Pure Green Coffee Bean Plus,

11                         Pure Raspberry Ketone, Simple Pure HCG, Pure Green Coffee Bean

12                         Cleanse, Pure Garcinia Cambogia Extract (also labeled Pure GC 60,

13                         Authentic Garcinia Cambogia, or Garcinia Cambogia Lean), Altatrim,

14                         Restore Digestive Cleanse, Skinny 6 Super Supplement, Skinny 7 Super

15                         Supplement, Pure Yacon Plus, Peak Metabolic;

16                 B.      Virility, Muscle-Building and Strengthening, and Energy-Building

17                         Supplements: Black Bull, ExtaMax, Formula T-10, Superior Antler,

18                         Superior Velvet, Instamax, Sensimax, MaxoFirm, Peak Nitric Oxide,

19                         Nitro Shred, Nitro Prime, Alpha Prostate 1000, Peak Prostate, Cyladex;

20                 C.      Other Supplements:  Peak Joint Flex, Miracle Flex, Pure Focus X, Focus

21                         Formula;

22                 D.      Skin Creams:  Remarkable Skin (Remarkable Snake Venom), Bright Skin

23                         Super C, Rx Repair Snake Venom Peptide Cream, Rx Repair Advanced

24                         Eye Gel, Liso Skin, Anana Skin, Bravo Skin, Bleu Star Skin, Peak

25                         Skincare; and

7

APP 015

1    E.  Upsells:  Fitness DVDs, Adult DVDs, VIP Savings Center, Super Grocery

2      Savers, Free Shipping Rewards, Magazine Rewards Plus.

3    4.  As explained more fully below, Defendants:  (1) deceptively market dietary

4 supplements and other products by offering free trials or buy-one-get-one free offers, but failing

5 to disclose, or to disclose adequately, the material terms and conditions of Defendants' offers,

6 including that Defendants enroll consumers who order the products into one or more

7 membership programs and that consumers must cancel the programs within a limited time period

8 to avoid costly recurring monthly charges (a feature known as a "negative option"), and that

9 Defendants impose charges for the initial full month's supply upon the expiration of a trial

10 period, which expires after just fourteen days; (2) claim they have a 100% satisfaction guarantee

11 but fail to disclose, or to disclose adequately, material facts about the refund policy and the costs

12 associated with returning products; (3) make false or unsubstantiated claims that their products

13 RKG Extreme and Pure Green Coffee Bean Plus cause rapid and substantial weight loss without

14 diet or exercise; (4) debit consumers' bank accounts on a recurring basis without obtaining a

15 written authorization as required by the EFTA; (5) sell their products and services online through

16 a negative option feature without providing clear and conspicuous disclosures, obtaining the

17 consumer's express informed consent, and providing simple mechanisms for a consumer to stop

18 recurring charges, as required by the ROSCA; (6) in telemarketing calls, sell additional products

19 and services ("upsells") with negative option features but fail to disclose that the consumer's

20 account will be charged unless he takes affirmative action to avoid the charge, the date the

21 charge will be submitted for payment, and the specific steps he must take to avoid the charge, as

22 required by the TSR; and (7) refuse to honor consumers' requests to stop calling as required by

23 the TSR.

24

25

APP 016

**JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b), and other applicable provisions.

6.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (b)(3), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

**PLAINTIFF**

7.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces Section 12 of the FTC Act, 15 U.S.C. § 52, which prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.  The FTC also enforces the EFTA, which regulates the rights, liabilities, and responsibilities of participants in electronic fund transfer systems, 15 U.S.C. §§ 1693, et seq.  The FTC further enforces the ROSCA, 15 U.S.C. §§ 8401-05, which, among other things, bans the use of negative option features in transactions effected on the internet that do not meet certain conditions for disclosure, consent, and cancellation.  Moreover, the FTC enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

8.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, the EFTA, the ROSCA, and the TSR, and to secure such other equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A)-(B), 57b, 1693o(c), 6102(c), and 6105(b).

APP 017

**DEFENDANTS**

9.      Defendants operate through a tangled web of interrelated companies that include sales or marketing companies that sell the products and funnel proceeds to the other operations and owners ("Sales Entities"), processing and merchant companies that operate merchant accounts to process debit card and credit card payments from their various Sales Entities ("Merchant Card Processing Entities"), service companies that provide financial and operational support services to the other entities ("Support Entities"), and a holding company through which certain individual defendants receive regular distributions and salaries from Defendants' profits ("Holding Entity").  In some instances, Defendants use their companies for multiple purposes, such as sales and merchant card processing, as described below.

**Sales Entities**

10.      Defendant Health Formulas, LLC ("Health Formulas"), also doing business under numerous fictitious names, including "Simple Pure Nutrition," is a California limited liability company registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California.  This company is at the center of Defendants' fraud.  At all times material to this Complaint, acting alone or in concert with others, Defendants have used Health Formulas as a sales entity to promote and sell Defendants' products, such as those that bear the "Simple Pure" name.  Health Formulas transacts or has transacted business in this District and throughout the United States.

11.      Defendant Longhorn Marketing, LLC ("Longhorn Marketing"), also doing business under numerous fictitious names, including, "Men's Health Formulas, LLC," "Life Vitamins," and "Unleash the Thunder," is a Nevada limited liability company registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California.  At all times material to this Complaint, Defendants have used Longhorn Marketing as a sales entity to promote and sell Defendants' products, such as Black Bull, a virility product, and Superior Antler and Superior

APP 018

1  Velvet, supposed muscle-building products.  Longhorn Marketing transacts or has transacted

2  business in this District and throughout the United States.

3        12.     Defendant Method Direct, LLC ("Method Direct"), also doing business under

4  numerous fictitious names, including, "Extamax, LLC," "Vitaman Labs, Inc.," "Vitafit," and

5  "Playboy Offer/DVD Entertainment," is a Nevada limited liability company registered to do

6  business at 4545 West Spring Mountain Road, Suite 104, Las Vegas, Nevada.  At all times

7  material to this Complaint, Defendants have used Method Direct as a sales entity to promote and

8  sell products, such as their Extamax virility product and a monthly adult film DVD program

9  offered as an upsell to purchasers of Defendants' male enhancement products.  Method Direct

10  transacts or has transacted business in this District and throughout the United States.

11        13.     Defendant Weight Loss Dojo, LLC ("Weight Loss Dojo"), also doing business

12  under numerous fictitious names, including, "Fitness DVDs," is a Nevada limited liability

13  company registered to do business at 4545 West Spring Mountain Road, Suite 104, Las Vegas,

14  Nevada.  At all times material to this Complaint, Defendants have used Weight Loss Dojo as a

15  sales entity to promote and sell products, such as a monthly fitness DVD program offered as an

16  upsell to purchasers of Defendants' dietary supplements.  Weight Loss Dojo transacts or has

17  transacted business in this District and throughout the United States.

18        14.     Defendant VIP Savings, LLC ("VIP Savings") also doing business as "VIP

19  Savings Center," is a Nevada limited liability company registered to do business at 16000

20  Ventura Boulevard, Suite 1102, Encino, California.  At all times material to this Complaint,

21  Defendants have used VIP Savings as a sales entity to promote and sell products, such as a

22  discount card as an upsell to consumers who have purchased other products from Defendants.

23  VIP Savings transacts or has transacted business in this District and throughout the United

24  States.

25

11

APP 019

15.     Defendant 458 Media LLC ("458 Media") is a Nevada limited liability company registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California.  At all times material to this Complaint, Defendants have operated 458 Media as a sales entity to promote and sell Defendants' products.  458 Media transacts or has transacted business in this District and throughout the United States.

16.     Defendant Alpha Brands LLC ("Alpha Brands") is a Nevada limited liability company registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California.  At all times material to this Complaint, Defendants have operated Alpha Brands as a sales entity to promote and sell Defendants' products, such as Alpha Prostate 1000 and Peak Prostate.  Alpha Brands transacts or has transacted business in this District and throughout the United States.

17.     Defendant Blu Stella LLC ("Blu Stella") is a Nevada limited liability company registered to do business at 318 North Carson Street, Suite 208, Carson City, Nevada.  At all times material to this Complaint, Defendants have operated Blu Stella as a sales entity to promote and sell Defendants' products.  Blu Stella transacts or has transacted business in this District and throughout the United States.

18.     Defendant Brilliant Skin, LLC ("Brilliant Skin") is a Nevada limited liability company registered to do business at 5550 Painted Mirage Road, Suite 320, Las Vegas, Nevada.  At all times material to this Complaint, Defendants have operated Brilliant Skin as a sales entity to promote and sell Defendants' products, such as their Bright Skin products.  Brilliant Skin transacts or has transacted business in this District and throughout the United States.

19.     Defendant Discount Provisions L.L.C. ("Discount Provisions") is a Nevada limited liability company registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California.  At all times material to this Complaint, Defendants have operated Discount Provisions as a sales entity to promote and sell Defendants' products, such as their monthly "Super Grocery Savers" program offered as an upsell to purchasers of Defendants' other

APP 020

1    products.  Discount Provisions transacts or has transacted business in this District and throughout

2    the United States.

3         20.    Defendant Extamax, LLC is a Nevada limited liability company registered to do

4    business at 4545 West Spring Mountain Road, Suite 104, Las Vegas, Nevada.  At all times

5    material to this Complaint, Defendants have operated Extamax, LLC as a sales entity to promote

6    and sell Defendants' products, such as Extamax and Nitro Prime.  Extamax, LLC transacts or has

7    transacted business in this District and throughout the United States.

8         21.    Defendant F12 Media LLC ("F12 Media") is a Nevada limited liability company

9    registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California.  At all

10   times material to this Complaint, Defendants have operated F12 Media as a sales entity to

11   promote and sell Defendants' products.  F12 Media transacts or has transacted business in this

12   District and throughout the United States.

13        22.    Defendant Flex Formulas LLC ("Flex Formulas") is a Nevada limited liability

14   company registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California.

15   At all times material to this Complaint, Defendants have operated Flex Formulas as a sales entity

16   to promote and sell Defendants' products, such as Peak Joint Flex and Miracle Flex.  Flex

17   Formulas transacts or has transacted business in this District and throughout the United States.

18        23.    Defendant GCB Marketing LLC ("GCB") is a Nevada limited liability company

19   registered to do business at 8275 S. Eastern Avenue, Suite 200-676, Las Vegas, Nevada.  At all

20   times material to this Complaint, Defendants have operated GCB as a sales entity to promote and

21   sell Defendants' products.  GCB transacts or has transacted business in this District and

22   throughout the United States.

23        24.    Defendant Luminous Skin LLC ("Luminous Skin") is a Nevada limited liability

24   company registered to do business at 8275 S. Eastern Avenue, Suite 200-658, Las Vegas,

25   Nevada.  At all times material to this Complaint, Defendants have operated Luminous Skin as a

APP 021

sales entity to promote and sell Defendants' products, such as their garcinia cambogia and Rx Repair products.  Luminous Skin transacts or has transacted business in this District and throughout the United States.

25.     Defendant Men's Health Formulas, LLC ("Men's Health Formulas") is a Nevada limited liability company registered to do business at 4545 West Spring Mountain Road, Suite 104, Las Vegas, Nevada.  At all times material to this Complaint, Defendants have operated Men's Health Formulas as a sales entity to promote and sell Defendants' products, such as Black Bull, Superior Velvet, Nitro Shred, and Formula T-10.  Men's Health Formulas transacts or has transacted business in this District and throughout the United States.

26.     Defendant Metabolic Labs LLC ("Metabolic Labs") is a Nevada limited liability company registered to do business at 318 North Carson Street, Suite 208, Carson City, Nevada. At all times material to this Complaint, Defendants have operated Metabolic Labs as a sales entity to promote and sell Defendants' products, such as Peak Metabolic.  Metabolic Labs transacts or has transacted business in this District and throughout the United States.

27.     Defendant Miracle Male, LLC ("Miracle Male") is a Nevada limited liability company registered to do business at 1810 East Sahara Avenue, Suite 214, Las Vegas, Nevada. At all times material to this Complaint, Defendants have operated Miracle Male as a sales entity to promote and sell Defendants' products, such as Cyladex.  Miracle Male transacts or has transacted business in this District and throughout the United States.

28.     Defendant Moringa Marketing LLC ("Moringa Marketing") is a Nevada limited liability company registered to do business at 9550 S. Eastern Avenue, Suite 253, Las Vegas, Nevada.  At all times material to this Complaint, Defendants have operated Moringa Marketing as a sales entity to promote and sell Defendants' products.  Moringa Marketing transacts or has transacted business in this District and throughout the United States.

14

APP 022

29.     Defendant Northbound Marketing LLC ("Northbound") is a Nevada limited liability company registered to do business at 6130 Elton Avenue, Las Vegas, Nevada.  At all times material to this Complaint, Defendants have operated Northbound as a sales entity to promote and sell Defendants' products.  Northbound Marketing transacts or has transacted business in this District and throughout the United States.

30.     Defendant Skinny 7 LLC ("Skinny 7") is a Nevada limited liability company registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California.  At all times material to this Complaint, Defendants have operated Skinny 7 as a sales entity to promote and sell Defendants' products, such as the Skinny 6 dietary supplement.  Skinny 7 transacts or has transacted business in this District and throughout the United States.

31.     Defendant Wellness Labs, LLC ("Wellness Labs") is a Nevada limited liability company registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California. At all times material to this Complaint, Defendants have operated Wellness Labs as a sales entity to promote and sell Defendants' products, such as Peak Nitric Oxide and Focus Formula. Wellness Labs transacts or has transacted business in this District and throughout the United States.

32.     Defendant Yacon Marketing LLC ("Yacon Marketing") is a Nevada limited liability company registered to do business at 3651 Lindell Road, Suite D259, Las Vegas, Nevada.  At all times material to this Complaint, Defendants have operated Yacon Marketing as a sales entity to promote and sell Defendants' dietary supplement products.  Yacon Marketing transacts or has transacted business in this District and throughout the United States.

**Merchant Card Processing Entities**

33.     Defendant Pure Vitamins, LLC ("Pure Vitamins") is a Nevada limited liability company registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California. At all times material to this Complaint, Defendants have operated Pure Vitamins as a merchant

APP 023

card processing entity that owns merchant accounts that process payments for the sales of Defendants' products, such as their RKG Extreme, Pure Green Coffee Bean Plus, and garcinia cambogia products.  Pure Vitamins is a processor for other Defendants, including Health Formulas, and as such, transfers proceeds of sales to other Defendants within the common enterprise.  Pure Vitamins transacts or has transacted business in this District and throughout the United States.

34.     Defendant Barrel Roll, LLC ("Barrel Roll") is a Nevada limited liability company registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California.  At all times material to this Complaint, Defendants have operated Barrel Roll as a merchant card processing entity that owns merchant accounts that process payments for the sale of Defendants' products, such as their garcinia cambogia and DVD products.  Barrel Roll transacts or has transacted business in this District and throughout the United States.

35.     Defendant BSC Marketing, LLC ("BSC") is a Nevada limited liability company registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California.  At all times material to this Complaint, Defendants have operated BSC as a merchant card processing entity that owns merchant accounts that process payments for the sale of Defendants' products, such as their green coffee bean extract, fitness DVD, Formula T-10, Black Bull, and Superior Velvet products.  BSC transacts or has transacted business in this District and throughout the United States.

36.     Defendant Cherry Hill Marketing, LLC ("Cherry Hill") is a Nevada limited liability company registered to do business at 3651 Lindell Road, Suite D354, Las Vegas, Nevada.  At all times material to this Complaint, Defendants have operated Cherry Hill as a merchant card processing entity that owns merchant accounts that process payments for the sales of Defendants' products, such as their green coffee bean extract and Bright Skin products.  Cherry Hill transacts or has transacted business in this District and throughout the United States.

16

APP 024

37.     Defendant CSA Ventures, LLC ("CSA Ventures") is a Nevada limited liability company registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California. At all times material to this Complaint, Defendants have operated CSA Ventures as a merchant card processing entity that owns merchant accounts that process payments for the sales of Defendants' products, such as their green coffee bean extract, fitness DVD, and Rx Repair products.  CSA Ventures transacts or has transacted business in this District and throughout the United States.

38.     Defendant Diet Concepts, LLC ("Diet Concepts") is a Nevada limited liability company registered to do business at 3651 Lindell Road, Suite D354, Las Vegas.  At all times material to this Complaint, Defendants have operated Diet Concepts as a merchant card processing entity that owns merchant accounts that process payments for the sales of Defendants' products, such as Skinny 6.  Diet Concepts transacts or has transacted business in this District and throughout the United States.

39.     Defendant Health Products Direct, LLC ("Health Products") is a Nevada limited liability company registered to do business at 1810 East Sahara Avenue, Suite 1360, Las Vegas, Nevada.  At all times material to this Complaint, Defendants have operated Health Products as a merchant card processing entity that owns merchant accounts that process payments for the sale of Defendants' products, such as their green coffee bean extract, garcinia cambogia, Superior Antler Velvet, Black Bull, and Rx Repair products.  Health Products transacts or has transacted business in this District and throughout the United States.

40.     Defendant KMS Marketing, LLC ("KMS") is a Nevada limited liability corporation registered to do business at 4545 Spring Mountain Road, Suite 104, Las Vegas, Nevada.  At all times material to this Complaint, Defendants have operated KMS as a merchant card processing entity that owns merchant accounts that process payments for the sales of Defendants' products, such as green coffee bean extract, garcinia cambogia, Formula T10, Black

APP 025

1   Bull, and DVD products.  KMS transacts or has transacted business in this District and

2   throughout the United States.

3        41.     Defendant Natural Products Direct, LLC ("Natural Products") is a Nevada limited

4   liability corporation registered to do business at 3430 East Russell Road, Suite 301-41, Las

5   Vegas, Nevada.  At all times material to this Complaint, Defendants have operated Natural

6   Products as a merchant card processing entity that owns merchant accounts that process

7   payments for the sales of Defendants' products, such as green coffee bean extract, garcinia

8   cambogia, and Formula T10.  Natural Products transacts or has transacted business in this

9   District and throughout the United States.

10       42.     Defendant Northern Health Products, LLC ("Northern Health") is a Nevada

11  limited liability corporation registered to do business at 3430 East Russell Road, Suite 301-40,

12  Las Vegas, Nevada.  At all times material to this Complaint, Defendants have operated Northern

13  Health as a merchant card processing entity that owns merchant accounts that process payments

14  for the sales of Defendants' products, such as Superior Antler Velvet and Formula T10.

15  Northern Health transacts or has transacted business in this District and throughout the United

16  States.

17       43.     Defendant Pure and Natural Health Products, LLC ("Pure and Natural Health") is

18  a Nevada limited liability corporation registered to do business at 16000 Ventura Boulevard,

19  Suite 1102, Encino, California.  At all times material to this Complaint, Defendants have

20  operated Pure and Natural Health as a merchant card processing entity that owns merchant

21  accounts that process payments for the sales of Defendants' products, such as their green coffee

22  bean extract, garcinia cambogia, and RX Repair products.  Pure and Natural Health transacts or

23  has transacted business in this District and throughout the United States.

24       44.     Defendant Pure and Simple Health Products, LLC ("Pure and Simple Health") is

25  a Nevada limited liability corporation registered to do business at 16000 Ventura Boulevard,

18

APP 026

1    Suite 1102, Encino, California.  At all times material to this Complaint, Defendants have

2    operated Pure and Simple Health as a merchant card processing entity that owns merchant

3    accounts that process payments for the sales of Defendants' products, such as their green coffee

4    bean extract, garcinia cambogia, Skinny 6, and Bright Skin products.  Pure and Simple Health

5    transacts or has transacted business in this District and throughout the United States.

6          45.    Defendant Radiant Skin, LLC ("Radiant Skin") is a Nevada limited liability

7    corporation registered to do business at 3651 Lindell Road, Suite D163, Las Vegas, Nevada.  At

8    all times material to this Complaint, Defendants have operated Radiant Skin as a merchant card

9    processing entity that owns merchant accounts that process payments for the sales of

10   Defendants' products, such as their RX Repair and Bright Skin products.  Radiant Skin transacts

11   or has transacted business in this District and throughout the United States.

12         46.    Defendant Shimmering Skin, LLC ("Shimmering Skin") is a Nevada limited

13   liability corporation registered to do business at 1810 East Sahara Avenue, Suite 1358, Las

14   Vegas, Nevada.  At all times material to this Complaint, Defendants have operated Shimmering

15   Skin as a merchant card processing entity that owns merchant accounts that process payments for

16   the sales of Defendants' products, such as their green coffee bean extract, garcinia cambogia, RX

17   Repair, and Bright Skin products.  Shimmering Skin transacts or has transacted business in this

18   District and throughout the United States.

19         47.    Defendant Tindy Films, LLC ("Tindy Films") is a Nevada limited liability

20   corporation registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino,

21   California.  At all times material to this Complaint, Defendants have operated Tindy Films as a

22   merchant card processing entity that owns merchant accounts that process payments for the sales

23   of Defendants' products, such as their DVD upsell products.  Tindy Films transacts or has

24   transacted business in this District and throughout the United States.

25

19

48.     Defendant Wellness Products, LLC ("Wellness Products") is a Nevada limited liability corporation registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California.  At all times material to this Complaint, Defendants have operated Wellness Products as a merchant card processing entity that owns merchant accounts that process payments for the sales of Defendants' products, such as Nitro Shred and Peak Nitric Oxide.  Wellness Products transacts or has transacted business in this District and throughout the United States.

**Support Entities**

49.     Defendant DJD Distribution, LLC ("DJD Distribution") is a California limited liability company registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California.  It also has a secondary address at 9601 Owensmouth Avenue, Number 29, Chatsworth, California.  At all times material to this Complaint, acting alone or in concert with others, DJD Distribution has served as a fulfillment company incorporated by Defendants for the distribution of their products.  DJD Distribution transacts or has transacted business in this District and throughout the United States.

50.     Defendant MDCC, LLC ("MDCC"), also doing business as "Method Direct Call Center," is a Nevada limited liability company registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California.  MDCC also has operations and employees at 4545 West Spring Mountain Road, Suite 104, Las Vegas, Nevada.  At all times material to this Complaint, Defendants have operated MDCC as a call center to handle inbound and outbound sales and customer service telephone calls for their products.  MDCC transacts or has transacted business in this District and throughout the United States.

51.     Defendant Chapnick, Smukler & Chapnick, Inc. ("CSC") is a California corporation registered to do business at 16000 Ventura Boulevard, Suite 1102, Encino, California.  CSC is owned and operated by Brandon Chapnick and Keith Smukler, who individually and collectively have formulated, directed, controlled, had the authority to control,

APP 028

1  or participated in the acts and practices of the other corporate Defendants.  CSC's headquarters

2  serves as the corporate address or mailing address for Health Formulas and many, if not all, of

3  the other Defendants listed above.  Moreover, all corporate bank accounts for the above

4  Defendants are held in the name of CSC.  CSC transacts or has transacted business in this

5  District and throughout the United States.

6  **Holding Entity**

7  52.    Defendant Method Films, Inc. ("Method Films") is a Nevada corporation with its

8  principal place of business at the same location that its registered to do business, 16000 Ventura

9  Boulevard, Suite 1102, Encino California.  Method Films is owned and operated by Danelle and

10  Jason Miller, who individually and collectively have formulated, directed, controlled, had the

11  authority to control, or participated in the acts and practices of the other corporate Defendants.

12  Method Films is funded by the operations and sales of other companies within the common

13  enterprise and transfers profits and compensation from companies within the common enterprise

14  to Danelle and Jason Miller.  Method Films also has an ownership interest in several other

15  corporate defendants.  From January 1, 2010 to October 16, 2014, Method Films received

16  approximately $12 million from the profits of the Enterprise.

17  **Individual Defendants**

18  53.    Defendant Brandon Chapnick ("Chapnick") is an owner of each corporate

19  defendant except Method Films.  He is also the Chief Financial Officer and Director of CSC,

20  Managing Member of BSC Marketing, CSA Ventures, and Men's Health Formulas, and

21  Manager of Wellness Labs.  He is also a bank signatory for the corporate accounts for CSC,

22  Method Direct, Pure Vitamins, Weight Loss Dojo, and MDCC.  At all times material to this

23  Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the

24  authority to control, or participated in the acts and practices of the corporate defendants that

25  constitute the common enterprise, including the acts and practices set forth in this Complaint.

APP 029

1  Chapnick resides in California. In connection with the matters alleged herein, he transacts or has

2  transacted business in this District.

3        54.    Defendant Keith Smukler ("Smukler") is an owner of each corporate defendant

4  except Method Films. He is also the Secretary and Director of CSC, Chief Executive Officer of

5  Health Formulas, and Manager of Longhorn Marketing, Pure Vitamins, Weight Loss Dojo, DJD

6  Distribution, and Discount Provisions. Moreover, he is a bank signatory for the corporate

7  accounts of CSC, Method Direct, Pure Vitamins, Weight Loss Dojo, and MDCC. At all times

8  material to this Complaint, acting alone or in concert with others, he has formulated, directed,

9  controlled, had the authority to control, or participated in the acts and practices of the corporate

10  defendants that constitute the common enterprise, including the acts and practices set forth in this

11  Complaint. Smukler resides in California. In connection with the matters alleged herein, he

12  transacts or has transacted business in this District.

13        55.    Defendant Danelle Miller ("Danelle Miller"), also known as Danelle Folta and

14  Danelle Kenealy, is an owner of each corporate defendant except CSC. She is also the Manager

15  of Health Formulas, MDCC, and Luminous Skin. She is also a bank signatory for the corporate

16  accounts of Method Direct, Pure Vitamins, Weight Loss Dojo, and MDCC. At all times material

17  to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled,

18  had the authority to control, or participated in the acts and practices of the corporate defendants

19  that constitute the common enterprise, including the acts and practices set forth in this

20  Complaint. Danelle Miller resides in California. In connection with the matters alleged herein,

21  she transacts or has transacted business in this District.

22        56.    Defendant Jason Miller ("Jason Miller") is an owner of each corporate defendant

23  except CSC. He is also a Manager of Health Formulas, Method Direct, Pure Vitamins, 458

24  Media, Alpha Brands, Extamax, LLC, F12 Media, Flex Formulas, GCB Marketing, Moringa

25  Marketing, Northbound Marketing, Skinny 7, and Yacon Marketing. He is moreover a bank

APP 030

signatory for the corporate accounts of Method Direct, Pure Vitamins, Weight Loss Dojo, and

MDCC.  He is further the domain registrant for all of the above corporate defendants' websites

and registered many of the above corporate defendants' toll-free telephone numbers.  At all times

material to this Complaint, acting alone or in concert with others, he has formulated, directed,

controlled, had the authority to control, or participated in the acts and practices of the corporate

defendants that constitute the common enterprise, including the acts and practices set forth in this

Complaint.  Jason Miller resides in California.  In connection with the matters alleged herein, he

transacts or has transacted business in this District.

## COMMON ENTERPRISE

57.     Defendants Health Formulas, Pure Vitamins, Longhorn Marketing, Method

Direct, Weight Loss Dojo, VIP Savings, DJD Distribution, MDCC, CSC, 458 Media, Alpha

Brands, Blu Stella, Brilliant Skin, Discount Provisions, Extamax, LLC, F12 Media, Flex

Formulas, GCB Marketing, Luminous Skin, Men's Health Formulas, Metabolic Labs, Miracle

Male, Moringa Marketing, Northbound Marketing, Skinny 7, Wellness Labs, Yacon Marketing,

Barrel Roll, BSC Marketing, Cherry Hill Marketing, CSA Ventures, Diet Concepts, Health

Products Direct, KMS Marketing, Natural Products Direct, Northern Health Products, Pure and

Natural Health Products, Pure and Simple Health Products, Radiant Skin, Shimmering Skin,

Tindy Films, Wellness Products, and Method Films (collectively, "Corporate Defendants")[1] have

---

[1] Throughout this Complaint, the FTC uses the term "Corporate Defendants" to refer collectively
to Health Formulas, Pure Vitamins, Longhorn Marketing, Method Direct, Weight Loss Dojo,
VIP Savings, DJD Distribution, MDCC, CSC, 458 Media, Alpha Brands, Blu Stella, Brilliant
Skin, Discount Provisions, Extamax, LLC, F12 Media, Flex Formulas, GCB Marketing,
Luminous Skin, Men's Health Formulas, Metabolic Labs, Miracle Male, Moringa Marketing,
Northbound Marketing, Skinny 7, Wellness Labs, Yacon Marketing, Barrel Roll, BSC
Marketing, Cherry Hill Marketing, CSA Ventures, Diet Concepts, Health Products Direct, KMS
Marketing, Natural Products Direct, Northern Health Products, Pure and Natural Health
Products, Pure and Simple Health Products, Radiant Skin, Shimmering Skin, Tindy Films,

APP 031

1   operated as a common enterprise while engaging in the deceptive acts and practices and other

2   violations of law alleged below.  The Corporate Defendants have conducted the business

3   practices described below through an interrelated network of companies that have common

4   ownership, officers, managers, business functions, employees, office locations, telephone

5   numbers, domain registrants, and bank signatories.  While several of the defendants are

6   registered to do business at several different addresses in Los Angeles and Las Vegas, all of the

7   Corporate Defendants perform business operations at three shared business addresses:  16000

8   Ventura Boulevard, Suite 1102, Encino California; 9200 Lurline, Unit F, Chatsworth, California;

9   and 4545 Spring Mountain Road, Suite 104, Las Vegas, Nevada.  The Corporate Defendants also

10  regularly transfer funds between corporate accounts and have certain unified accounting

11  functions.  Because these Corporate Defendants have operated as a common enterprise, each of

12  them is jointly and severally liable for the acts and practices alleged below.  Defendants

13  Chapnick, Smukler, Danelle Miller, and Jason Miller (collectively, "Individual Defendants")

14  have formulated, directed, controlled, had the authority to control, or participated in the acts and

15  practices of the Corporate Defendants that constitute the common enterprise.

16                                                    **COMMERCE**

17          58.      At all times material to this Complaint, Corporate Defendants and Individual

18  Defendants (collectively, "Defendants") have maintained a substantial course of trade in or

19  affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

20                                    **DEFENDANTS' BUSINESS PRACTICES**

21          59.      Since at least January 2010, Defendants have deceptively marketed, labeled,

22  advertised, promoted, offered to sell, sold, and distributed numerous dietary supplements and

23

24  _____

25  Wellness Products, and Method Films even though several of these entities have elected other
    forms of business association.

                                                    24

1   other products under various brand names, including, but not limited to, "RKG Extreme," "Pure

2   Green Coffee Bean Plus," "SimplePure HCG Diet Drops," "Pure Garcinia Cambogia Extract,"

3   "Black Bull," "Superior Antler," Superior Velvet," and "Bright Skin Super C serum," to

4   consumers throughout the United States.

5       60.     Defendants market and sell their products through several media channels,

6   including Internet websites that Defendants own and operate; Internet advertisements on third-

7   party websites such as Facebook; print, radio and television advertisements; and telemarketing.

8       61.     Defendants entice consumers to call the toll-free telephone numbers listed in their

9   advertisements or visit their websites by advertising a month's supply of their product to try for

10  free or by making a buy-one-get-one free offer.  Defendants lure consumers to provide their

11  credit or debit card information by representing that consumers only need to pay a nominal

12  shipping and handling charge, typically $6.95 or less, for the free month's supply, or in

13  telemarketing transactions, by offering a drastically reduced cost on a buy-one-get-one free offer.

14      62.     After consumers provide their credit or debit card information, Defendants

15  automatically enroll consumers into continuity membership programs with negative option

16  features, confusingly named "guarantee programs" or something similar, and charge consumers

17  on a recurring basis for monthly product shipments until the consumer takes affirmative action to

18  cancel.  A provision in which a seller interprets the customer's silence or failure to take an

19  affirmative action to reject goods or services or to cancel the agreement as an acceptance of the

20  offer, is known as a "negative option" feature.

21      63.     In telemarketing transactions, after consumers provide their credit card numbers,

22  Defendants pitch other upsell products, but Defendants fail to disclose or disclose adequately the

23  negative option feature on those upsells, including the recurring monthly charges.

24      64.     Consumers often first learn of the ongoing charges after they have received their

25  financial account statement or received an unexpected product shipment.

25

APP 033

65.     Defendants create multiple barriers for consumers to cancel these continuity membership programs and obtain refunds, as discussed below.  As a result, numerous consumers across the U.S. have expended considerable time attempting to cancel the Defendants' continuity membership plans, dispute charges, and have only sometimes obtained refunds.

66.     From January 2010 to present, total sales revenue for Defendants' products has exceeded $100 million.

### Defendants' Free Trial Website Sales

67.     Defendants' many websites differ in aspects of their text and appearance, but share the same structure and characteristics.  Typically, Defendants offer their products on the Internet to consumers on a "free" trial basis and represent that consumers need only pay a nominal charge for shipping and handling, usually $6.95 or less. Defendants' websites prominently display its dietary supplement or skin cream promotions with offers such as, "CLAIM YOUR FREE BOTTLE TODAY!," "TRY A FREE BOTTLE!,"  or "TRY IT RISK FREE WITH OUR MONEY BACK GUARANTEE!"  Examples of the Defendants' landing pages for their "Pure Garcinia Cambogia Extract," "Pure Green Coffee Bean Plus," and "SimplePure HCG Diet Drops" products are attached at Exhibits A, B, and C, respectively.

68.     In addition, Defendants' websites bear prominent and bright "100% Satisfaction" or "100% Satisfaction Guaranteed" gold medal graphics.  On some websites, especially those that make a "Buy 1, Get 1 Free" offer, Defendants also specifically offer a "30 day money back guarantee."  (*See* Exhibit D at 12.)

69.     To create a false sense of urgency, the Defendants sometimes represent that the offered "trial" is available only for a limited time by prominently displaying on their websites or landing pages, such as buygcb.com, skimserumoffer.com, or www.unleashthethunder.com, one or more of the following statements:

APP 034

- WARNING:  Due to recently being featured on T.V. we cannot guarantee supply. As of [date website visited] we currently have product IN STOCK (*See* Exhibit B at 6.)

- Hurry! Only while supplies last!! Trials are very limited! (*See* Exhibit E at 17.)

70.     Defendants' marketing efforts have also included the use of pop ups designed to discourage consumers from leaving the offer sites.  In several instances, when consumers attempt to leave the offer sites, a confirmation box pops up urging consumers to remain on the site. Screen prints of the Pure Garcinia Cambogia Extract Offer Site, which capture the appearance of a confirmation box, are attached hereto as Exhibit A at 5.

71.     Versions of the Defendants' websites offering weight loss products include specific claims in bold and large letters about the efficacy and performance of the products, such as:

Exhibit B at 6-7:
**Burn Fat Without Diet Or Exercise**
**Shed Pounds Fast**

Exhibit D at 12:
**Super Concentrated Double Fat Burning**
**Extreme Weight Loss!**

72.     Many of Defendants' weight loss websites and promotional materials also include prominent images of young, thin women in bikinis who are happily holding tape measures around their waists or celebrating while standing on a scale, or images of thin women holding out the waistband of pants that are several sizes too large to indicate their substantial weight loss. They also feature purported testimonials from consumers and "medical experts" that support the message to consumers that Defendants' products will result in rapid and substantial weight loss. Examples of these images appear at Exhibit B at 6-8 and Exhibit D at 12-13.

27

APP 035

73.     Defendants require consumers who wish to order these products to click on a prominent "Send My Order Now" button on the website.  Other websites require consumers to enter contact and shipping information on the home page and then click on a prominent "Order Now," "Send Now," or "Rush My Trial" button.  Upon clicking on the button, Defendants' websites take consumers to a payment page.

74.     For "free" trial offers, Defendants' payment page contains prominent statements indicating that consumers will receive, without charge, a one-month supply of the product.  For example, the payment page of the PureGC60.com Offer Site (Exhibit A at 4) states in bold large font:

> **1 Month Supply of Garcinia Cambogia Extract**
> **1 Month Supply Free Trial**
> **Just pay shipping**

75.     Typically, this payment page distinguishes the "free" trial offer from other options to pay for greater quantities of product.  Defendant's dietary supplement products cost approximately $60 to $210 per bottle.  By comparison, Defendants frequently list the trial offer as "free," or zero dollars, or simply the cost of shipping and handling.  For example, the payment page for the Black Bull Offer Site at www.unleashthethunder.com (Exhibit F at 24) states in bold and bright black and red text:

|  | Price |
| --- | --- |
| **Black Bull** | **$0.00** |
| Month Supply | |

76.     Immediately adjacent to the menu of ordering options is a box requesting the consumer's financial account information, as well as a button labeled "Order Now" or "Rush My Trial."

APP 036

77.     In numerous instances, consumers must click a separate link for terms and conditions or scroll down the payment page to see any further fine print disclosures about the cost of the product.

78.     Adjacent to the "Order Now" or "Rush My Trial" button on the payment information page is a smaller box next to to the statement, "I agree to the Terms and Conditions."  Consumers are not required to read the Defendants' terms and conditions before they check the box adjacent to the statement, "I agree to the Terms and Conditions," and Defendants' terms and conditions can be found nowhere near that statement on Defendants' websites.  Instead, the terms and conditions appear on a separate page that consumers must reach by scrolling through the equivalent of two printed pages to the bottom of the webpage and clicking on a hyperlink for "terms and conditions" that appears in much smaller font.  The terms and condition document is typically ten pages long.

79.     The only disclosure paragraph that typically appears on the Defendants' payment webpage is in much smaller font than most others used on the webpage and buried in boxes with other fine print information that is confusing and difficult to read.  For instance, the first sentence of the disclosure typically reiterates the consumer's understanding:  "You must pay a shipping and handling fee of $4.95 for us to send you a full 30 day supply of Garcinia Cambogia Extract." (*See* Exhibit A at 4.)  It is not until the middle of the paragraph that any statement appears indicating that the trial period lasts only fourteen days, that it begins when the items are shipped (rather than when they are received), or that additional charges will be imposed thereafter.

80.     In some instances, Defendants' disclosure paragraph does not give any disclosures about when the free trial starts.

81.     Nowhere on the payment page or in proximity to the Defendants' promotional statements concerning the free trial do the Defendants disclose the steps that consumers must

APP 037

take to avoid being charged for the trial samples and for recurring monthly shipments.  These

obligations are referenced only in the separate lengthy multi-page terms and conditions webpage.

82.     After a consumer completes the payment page, Defendants' websites take

consumers to a confirmation page with offers for additional upsell products.

83.     Defendants sometimes send consumers a confirmation e-mail regarding the order

that, in numerous instances, reinforces the consumers' impression that they have simply acquired

the Defendants' product to try for free for one month.  In numerous instances, Defendants' e-

mail shows no charges for the trial product other than the nominal shipping and handling fee.

84.     In numerous instances, Defendants' e-mail does not indicate that the "free" trial is

a continuity program, such that consumers will incur a monthly charge unless they cancel the

membership, or that Defendants will charge or debit the financial account the consumer

provided, when the charge will be imposed, or how to avoid the charge.

85.     In numerous instances, the Defendants' e-mail reiterates that the consumer

ordered a "trial month supply," but fails to disclose that the trial period lasts only fourteen days.

86.     For example, one e-mail sent to consumers who purchased a Pure Garcinia

Cambogia Extract trial is included at Exhibit G at 28-29.  It states:

> "Congratulations on taking advantage of Pure Garcinia Cambogia
> w/60% HCA.
>
> Please print a copy of this email receipt for your records.  The shipping
> charge you have authorized today will appear on your credit card
> statement…"

87.     In connection with the "free" trial offers, the Defendants fail to disclose, or to

disclose adequately, that consumers will be charged for the full bottle of product, usually an

amount between $60 and $210, unless the consumer takes affirmative steps to cancel within the

fourteen-day trial period.  In addition, Defendants fail to disclose, or to disclose adequately, that

consumers who order a "free" trial bottle are also automatically enrolled in a negative option

APP 038

1  continuity plan with charges each month for recurring shipments of the products without

2  Defendants obtaining the consumer's consent.

3  **Defendants' Deceptive and Abusive Telephone Sales**

4  88.   In addition to online marketing, Defendants sell their dietary supplement and

5  other products, as well as the products of third parties, through telemarketing call centers.

6  Defendants' telemarketing representatives frequently fail to disclose, or to disclose adequately,

7  that they enroll consumers who order a product from a "free" trial and sometimes a buy-one-get-

8  one free offer into a continuity program.

9  89.   Defendants advertise online, in local newspapers, and on the radio, soliciting

10  consumers to call the toll-free telephone numbers Defendants provide.  Examples of the print

11  advertisements appear at Plaintiff's Exhibits H and I.  During the telemarketing sales calls, which

12  typically last about thirty minutes, Defendants' telemarketers have induced consumers to

13  purchase their weight loss products by representing that Defendants offer a "money-back

14  guarantee" or will pay consumers for each pound they lose.

15  90.   In numerous instances during the telemarketing sales calls, Defendants'

16  telemarketers make assurances that Defendants' products are backed by a money back guarantee.

17  For example, Defendants state that they provide a full refund of the product price if consumers

18  are not completely satisfied within a specified period of time, and state that consumers do not

19  need any reason to return Defendants' products for a full refund.

20  91.   Once consumers agree to purchase the product, Defendants' telemarketers take

21  the consumers' debit or credit card information.  After taking the consumers' billing information,

22  Defendants' telemarketers quickly mention that consumers will receive another bottle of the

23  product in thirty days and every thirty days thereafter, purportedly to ensure the consumer has a

24  sufficient supply of product to meet their goals.  Defendants' telemarketers do not seek

25  consumers' consent before signing them up for this program.  They also fail to communicate the

31

APP 039

1  costs associated with this recurring automatic shipment program or when consumers must cancel

2  the program to avoid further charges.

3       92.     Next, Defendants' telemarketers quickly roll into an announcement that

4  Defendants will automatically enroll the consumer in "free" trial offers for various additional

5  products  including, but not limited to:  Free Shipping Rewards (a program that offers "free

6  shipping" on Defendants' products and other products for a monthly fee), Magazine Rewards

7  Plus (a program that offers consumers subscriptions to various magazines and publications for a

8  monthly or annual fee), VIP Savings (a program that offers discounts and coupons for stores,

9  restaurants and other products or services for a monthly fee), My Fitness DVDs/My Exercise

10 DVDs (a program that offers two "free" exercise DVDs when a consumer enrolls and agrees to

11 pay monthly fees for additional DVDs), Playboy Offer/DVD Entertainment (a parallel DVD

12 program for adult films), and/or Super Grocery Savers (a program that offers discounts and

13 coupons for groceries for a monthly fee).  Defendants' telemarketers offer these products and

14 services on behalf of the Defendants or on behalf of third party sellers.

15      93.     Defendants' telemarketers frequently gloss over the terms of these upsells during

16 the call or speak about them at an excessive speed or in a vague manner that renders the

17 disclosures regarding the cost and the negative option continuity program incomprehensible.

18      94.     When consumers indicate that they are not interested in the additional offers,

19 Defendants' telemarketers assure them that the additional products are free and that consumers

20 can simply cancel them once they receive the products in the mail.

21      95.     In numerous instances, Defendants' telemarketers enroll consumers into these

22 upsell membership programs without their affirmative consent.

23      96.     Defendants also have initiated calls to consumers who had previously stated that

24 they did not wish to receive calls from Defendants' telemarketers.

25

APP 040

**Defendants Impose Additional Charges and Debits**

97.     Whether Defendants obtain consumers' account information through a website order or a telephone order, Defendants use the consumer's payment information to charge the consumer's credit card or debit the consumer's bank account for the full price of the product or other upsell products, several days after a consumer agrees to Defendants' offer.  The charge for dietary supplement products typically ranges from $60 to $210.  The charge for upsell products ranges from $7.95 to $60.97.

98.     In addition, Defendants enroll consumers who agree to the free trial and certain buy-one-get-one free offers, into a negative option continuity program with recurring monthly charges.

99.     In numerous instances, consumers are unaware that Defendants enrolled them into continuity programs and imposed charges on their credit card accounts or debited their bank accounts in excess of the shipping and handling fee.  In numerous instances, consumers have not discovered that Defendants were imposing charges or debits in excess of the shipping and handling fee until the consumers reviewed their credit or bank account statements.

100.     In many instances, consumers first become aware of their enrollment in Defendants' negative option continuity programs when they receive a second shipment from Defendants.  By this time, the Defendants will have charged consumers not only for the initial shipment and handling fees, the full price of a month's supply of product, but also for this second shipment.

101.     Defendants do not obtain authorization in a writing signed or similarly authenticated by the consumer to debit consumers' bank accounts on a recurring basis. Defendants also fail to provide consumers with a copy of any purported authorization to debit the consumers' bank accounts on a recurring basis.

33

102.     Upon discovering the charge, many consumers call the Defendants.  Defendants'
customer service representatives inform consumers who complain that the consumers had agreed
to the charges because they were disclosed in the terms and conditions page of the Defendants'
websites or during the telemarketing call.  For many consumers, this is the first time they learn of
the material terms and conditions of the offer.

103.     Despite touting their "100% Satisfaction Guarantee" on their websites,
Defendants leave many consumers dissatisfied when consumers discover these additional
charges and are referred to the terms and conditions page of Defendants' websites.

104.     In numerous instances, Defendants also enroll consumers in, and charge
consumers' credit cards or debit their bank accounts for, continuity programs for the additional
upsell products identified above in Paragraph 92.  Many of these upsell products are also offered
on a "free" trial basis.  Consumers are frequently unaware of their enrollment in Defendants'
continuity programs for the upsell products until they receive a second shipment of the products.
By this time, the Defendants will have charged consumers for the initial shipment and handling
fees as well as the full price of at least two months' supply of product.  The additional upsell
products, like the underlying products, frequently generate recurring monthly charges that
consumers have not authorized and have terms and conditions, including cancellation policies
that consumers do not understand.

**Defendants' Unlawful Practices Relating to Refunds and Cancellations**

105.     In numerous instances, when consumers call Defendants to complain about the
unexpected charges or debits, Defendants tell consumers that the continuity plan will be
cancelled, but that their money will not be refunded.  In some instances, Defendants tell
consumers that they can receive a partial refund, or that they can keep the unused product for a
discounted rate.

106.     Defendants impose various cancellation requirements on free trial offers.

34

107.     For example, in numerous instances, Defendants require consumers to obtain a Return Merchandise Authorization ("RMA") number from Defendants, then mail the product back in time for Defendants to receive it before the expiration of the trial period, and obtain delivery confirmation.  Defendants have denied refunds to consumers who have failed to meet all of these conditions.

108.     In numerous instances, in the sale of products on a buy-one-get-one free offer, Defendants have denied refunds to consumers on the basis that the consumer opened the bottle of product.  Defendants have failed to disclose or disclose adequately that a condition to the "100% Satisfaction Guarantee" or the 30-day money back guarantee is that the consumer leave the supply of product unopened.

109.     In telemarketing transactions, Defendants require consumers to call a separate and different number to cancel each and every product that they upsell to the consumer.  In numerous instances, consumers who have called to cancel one product, have continued to be charged for other upsells they were not aware they had ordered or they believed they had already cancelled.

110.     In numerous instances, even when consumers successfully have satisfied the Defendants' conditions for a refund, Defendants have promised refunds but never issued them.

111.     In other instances, consumers have received refunds from Defendants, but only after they have complained to their credit card companies, law enforcement, or the Better Business Bureau.  Even in those instances, however, Defendants have not always issued full refunds.

APP 043

**Defendants' Misrepresentations Regarding Weight Loss Product Claims**

112.    Defendants label, advertise, market, distribute, promote, offer to sell, and sell various purported weight loss products, including RKG Extreme and Green Coffee Bean Plus,[2] through telemarketing, and through Internet, print, radio, and television advertisements.  For example, Defendants use www.rkgextreme.com (the RKG Extreme Offer Site) (Exhibit D) and www.buygcb.com (the Pure Green Coffee Bean Plus Offer Site) (Exhibit B).

113.    To induce consumers to purchase Defendants' weight loss supplement products, Defendants have disseminated, or caused to be disseminated, advertisements for RKG Extreme and Pure Green Coffee Bean Plus, including, but not limited to the below Exhibits.  These advertisements contain the following statements among others:

    A.    Print Advertisement for RKG Extreme (*See* Exhibit H at 30.)

- **RKG Extreme is paying you by the pound!**
  - SimplePure Nutrition is looking for participants in their ground breaking "Pay per pound" program featuring the popular green coffee bean extract. The bean made national news recently with the scientific discovery that it triggers weight loss and improves cardio health!

- **GET PAID TO LOSE WEIGHT AND BOOST ENERGY**
  - …Lose weight with RKG Extreme and get paid $5 per pound of weight loss. . . .

- **Extreme Results with RKG**

- **Rapid Weight Loss**

---

[2] Although advertised under different names, RKG Extreme and Green Coffee Bean Plus appear to contain the same ingredients.

B.      Print Advertisement for RKG Extreme (*See* Exhibit I at 31.)

**get paid to lose weight**

. . .With the recent clinical studies of the green coffee bean showing and[sic] average of 17lbs of weight loss without diet and exercise, we are excited to introduce our advanced new formula**, RKG Extreme**.  By combining green coffee bean extract with raspberry ketones, we've designed a dual action fat burning formula that not only speeds up weight loss but prevents fat absorption so when[sic] you take it off and keep it off!

**Get Paid, Lose Weight!**

C.      Website Advertisement for RKG Extreme (*See* Exhibit D at 12, 15.)

- **Extreme Weight Loss!**

- **Super Concentrated Double Fat Burning**

- RKG Extreme is a revolutionary new weight loss system – combining the incredible fat-burning components of Green Coffee Bean and Raspberry Ketone. Both organic compounds have been endorsed by America's most trusted Doctors, who've referred to them as miracle fat burning supplements.

- RKG Extreme packs the biggest punch against excess fat and will change the way you approach weight loss forever.

D.      Website Advertisement for Green Coffee Bean Plus (*See* Exhibit B at 6-7.)

**PURE GREEN COFFEE BEAN PLUS**

**BURN FAT *WITHOUT* DIET OR EXERCISE**

- Shed Pounds Fast!

37

- Citing a recent study: "Subjects taking the full dose of the green coffee extract lost an average of 17.5 pounds in 22 weeks and reduced their overall body weight by 10.5%!"

114. In addition, Defendants' weight loss advertisements and promotional materials prominently feature images of attractive young women who are extremely thin and typically appearing in bikinis or clothing that highlights their toned and thin bodies. The women appear to be celebrating while holding tape measures around their waists, standing on a scale, or holding out the waistband of pants that are several sizes too large. Each of these images appears designed to indicate that the women have lost substantial weight as a result of Defendants' products. Examples of these images appear at Exhibit B at 6-8 and Exhibit D at 12-13.

115. Defendants do not have a reasonable basis to substantiate their claims that consumers who use their products will experience rapid and substantial weight loss without diet or exercise.

## VIOLATIONS OF THE FTC ACT

116. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

117. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act. Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics. For the purposes of Section 12 of the FTC Act, 15 U.S.C. § 52, Defendants' dietary supplements, including those identified in Paragraph 3 above, are either a "food" or "drug" as defined in Section 15(b) and (c) of the FTC Act, 15 U.S.C. § 55(b), (c).

38

## COUNT I

**Failure to Disclose the Material Terms and Conditions of Defendants' Offers**

118.     In numerous instances in connection with the labeling, advertising, marketing, promotion, offering for sale, or sale of a variety of dietary supplements, skin creams, and upsell products, Defendants have represented, directly or indirectly, expressly or by implication, that consumers can try a one-month supply of the products for free, for just the cost of shipping and handling, or purchase the products on a buy-one-get-one free basis.

119.     In numerous instances in which Defendants have made the representation set forth in Paragraph 118 of this Complaint, Defendants have failed to disclose, or to disclose adequately, to consumers material terms and conditions of their offer, including:

A.     That Defendants will use consumers' credit or debit card information to charge consumers for the initial full month's supply of the products upon the expiration of a limited trial period, typically lasting fourteen days;

B.     That Defendants enroll consumers who order the products they sell into a membership program or programs that consumers must cancel within a limited time period in order to avoid recurring charges;

C.     That Defendants will use consumers' credit or debit card information to periodically charge consumers for the membership or other program;

D.     The cost of the membership or other program, and the frequency and duration of the recurring charges;

E.     When consumers must cancel the trial, membership, or other program to avoid further charges; and

F.      The means consumers must use to cancel the trial, membership, or other programs.

APP 047

120.    Defendants' failure to disclose, or to disclose adequately, the material information described in Paragraph 119, above, in light of the representation described in Paragraph 118, above, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

**Failure to Disclose Terms of Refund and Cancellation Policy**

121.    In numerous instances in connection with the labeling, advertising, marketing, promotion, offering for sale, or sale of a variety of Defendants' dietary supplements, skin creams, and upsell products, Defendants have represented, directly or indirectly, expressly or by implication, that Defendants offer a 100% satisfaction guarantee, a money back guarantee, or that consumers will be able to avoid further risks or obligations.

122.    In numerous instances in which Defendants have made the representations set forth in Paragraph 121 of this Complaint, Defendants have failed to disclose, or disclose adequately, to consumers the material terms and conditions of their refund and cancellation policy, including, but not limited to:

    A.    That consumers must take steps to cancel each product and upsell product separately;

    B.    That consumers must return each product separately by mail, sometimes to different post office boxes;

    C.    That consumers must identify the appropriate and unique customer service telephone number for each of the products, and call to obtain so-called "RMA" numbers for each of the products, affix the "RMA" numbers to their return packages;

    D.    That consumers must obtain tracking or delivery confirmation for each package;

40

APP 048

E.      That for products bought on a buy-one-get-one free offer,  Defendants will not accept the product for return or refund unless it is unopened and in re-sellable condition; and

F.      That Defendants' 30-day money back return policy runs from the date of the initial order, rather than the date of receipt.

123.    Defendants' failure to disclose, or to disclose adequately, the material information described in Paragraph 122, above, in light of the representation described in Paragraph 121, above, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

### Misrepresentations Concerning Defendants' Dietary Supplement Products

124.    In connection with the labeling, advertising, marketing, promotion, offering for sale, or sale of RKG Extreme and Pure Green Coffee Bean Plus, Defendants have represented, directly or indirectly, expressly or by implication, that use of Defendants' products will result in rapid and substantial weight loss without diet or exercise, including losing more than seventeen pounds or sixteen percent of body fat in twenty-two weeks.

125.    The representations set forth in Paragraph 124 of this Complaint are false, misleading, or were not substantiated at the time the representations were made.

126.    Therefore, the making of the representations set forth in Paragraph 124 constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Section 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) & 52.

## VIOLATIONS OF THE ELECTRONIC FUND TRANSFER ACT AND REGULATION E

127.    Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), provides that a "preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."

41

1   Section 903(10) of the EFTA, 15 U.S.C. § 1693a(10), provides that the term "preauthorized

2   electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at

3   substantially regular intervals."

4        128.    Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b), provides that

5   "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by

6   a writing signed or similarly authenticated by the consumer.  The person that obtains the

7   authorization shall provide a copy to the consumer."

8        129.    Section 205.10 of the Federal Reserve Board's Official Staff Commentary to

9   Regulation E, 12 C.F.R. § 205.10(b), Supp. I, provides that "[t]he authorization process should

10   evidence the consumer's identity and assent to the authorization."  *Id.* ¶ 10(b), cmt 5.  The

11   Official Staff Commentary further provides that "[a]n authorization is valid if it is readily

12   identifiable as such and the terms of the preauthorized transfer are clear and readily

13   understandable."  *Id.* ¶ 10(b), cmt 6.

## <u>COUNT IV</u>

### Unauthorized Debiting of Consumers' Bank Accounts

16        130.    In numerous instances, Defendants have debited consumers' bank accounts on a

17   recurring basis without obtaining a written authorization signed or similarly authenticated from

18   consumers for preauthorized electronic fund transfers from their accounts, thereby violating

19   Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12

20   C.F.R. § 205.10(b).

21        131.    In numerous instances, Defendants have debited consumers' bank accounts on a

22   recurring basis without providing a copy of a written authorization signed or similarly

23   authenticated by the consumer for preauthorized electronic fund transfers from the consumer's

24   account, thereby violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section

25   205.10(b) of Regulation E, 12 C.F.R. § 205.10(b).

APP 050

132.     Pursuant to Section 917 of the EFTA, 15 U.S.C. § 1693o(c), every violation of the EFTA and Regulation E constitutes a violation of the FTC Act.

133.     By engaging in violations of the EFTA and Regulation E as alleged in Paragraphs 130 and 131 of this Complaint, Defendants have engaged in violations of the FTC Act.  15 U.S.C. § 1693o(c).

**VIOLATIONS OF THE RESTORE ONLINE SHOPPERS CONFIDENCE ACT**

134.     In passing the ROSCA, Congress found that "consumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business."  Section 2, 15 U.S.C. § 8401.  The ROSCA took effect on December 29, 2010.

135.     Section 4 of the ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the TSR, 16 C.F.R. § 310.2(u), unless the seller clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, obtains the consumer's express informed consent before making the charge, and provides a simple mechanism to stop recurring charges.  *See* 15 U.S.C. § 8403.

136.     The TSR defines a negative option feature as:  "an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(u).

137.     Defendants' continuity plans, confusingly named "guarantee programs" or something similar, as described in Paragraphs 62-65, are a negative option feature as defined by the TSR.  16 C.F.R. § 310.2(u).

APP 051

138.     Pursuant to Section 5 of the ROSCA, 15 U.S.C. § 8404, a violation of the ROSCA

is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

<u>**COUNT V**</u>

**Violation of the ROSCA—Auto-Renewal Continuity Plans**

139.     In numerous instances since December 29, 2010, Defendants have charged

consumers for dietary supplements and other products sold in transactions effected on the

Internet through a negative option feature while failing to disclose, clearly and conspicuously, all

material terms of the transaction before obtaining the consumer's billing information, failing to

obtain the consumer's express informed consent before making the charge, or failing to provide a

simple mechanism to stop recurring charges.

140.     Defendants' acts and practices as described above in Paragraph 139 are a

violation of Section 4 of the ROSCA, 15 U.S.C. § 8403, and are therefore a violation of a rule

promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

<u>**VIOLATIONS OF THE TELEMARKETING SALES RULE**</u>

141.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive

telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, in

1994.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended

certain sections thereafter.  16 C.F.R. Part 310.

142.     Under the TSR, an "outbound telephone call" means a telephone call initiated by

a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.

16 C.F.R. § 310.2(v).

143.     Under the TSR, "upselling" means soliciting the purchase of goods or services

following an initial transaction during a single telephone call. The upsell is a separate

telemarketing transaction, not a continuation of the initial transaction.  16 C.F.R. § 310.2(ee).

APP 052

144.     If an offer includes a negative option feature, the TSR prohibits sellers and telemarketers from failing to disclose truthfully, in a clear and conspicuous manner, material information, such as the fact that the consumer will be charged unless the consumer takes affirmative action to avoid the charges, the date the charge will be submitted for payment, and the specific steps the customer must take to avoid the charges.  16 C.F.R. § 310.3(a)(1)(vii).

145.     The TSR prohibits sellers and telemarketers from engaging in or causing others to engage in initiating an outbound telephone call to a consumer who has previously stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered.  16 C.F.R. § 310.4(b)(1)(iii)(A).

146.     Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(aa), (cc), and (dd).

147.     Defendants have violated several provisions of the TSR, including 16 C.F.R. § 310.3(a)(1)(vii) and § 310.4(b)(1)(iii)(A).

148.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c) and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VI

### Failure to Disclose that Consumers Will Be Entered Into Negative Option Continuity Memberships for Upsell Products in Violation of the TSR

149.     In numerous instances, in connection with the telemarketing of goods and services that are the subject of their upsell sales offers, Defendants have failed to disclose truthfully, in a clear and conspicuous manner, before a consumer pays for the goods or services offered, all material terms and conditions of the negative option feature, including, but not limited to, the following:  (1) that consumers who agree to one of the upsell products offered by Defendants

45

APP 053

1    will be charged for additional unrelated upsell products unless consumers take affirmative action

2    to avoid the charges; (2) the date(s) that the Defendants will submit charge(s) for payment; and

3    (3) the specific steps consumers must take to avoid further charges.

4         150.    Defendants' acts and practices, as described in Paragraph 149 above, are

5    deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(1)(vii).

6                                    **COUNT VII**

7                    **Ignoring Entity-Specific Do Not Call Requests**

8         151.    In numerous instances, in connection with telemarketing, Defendants initiated, or

9    caused others to initiate, an outbound telephone call to a person who has previously stated that he

10   or she does not wish to receive an outbound telephone call made by or on behalf of the seller

11   whose goods or services are being offered, in violation of the TSR, 16 C.F.R.

12   § 310.4(b)(1)(iii)(A).

13                                  **CONSUMER INJURY**

14        152.    Consumers have suffered and will continue to suffer substantial injury as a result

15   of Defendants' violations of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) & 52,

16   Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), Section 205.10(b) of Regulation E, the

17   ROSCA, and the TSR.  In addition, Defendants have been unjustly enriched as a result of their

18   unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to

19   continue to injure consumers, reap unjust enrichment, and harm the public interest.

20                    **THIS COURT'S POWER TO GRANT RELIEF**

21        153.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant

22   injunctive and such other relief as the Court may deem appropriate to halt and redress violations

23   of any provision of law enforced by the FTC, including the EFTA, Regulation E, the ROSCA

24   and the TSR.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief,

25   including rescission or reformation of contracts, restitution, the refund of monies paid, and the

APP 054

1    disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law

2    enforced by the FTC.

3         154.    Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the

4    Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court

5    finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR,

6    including the rescission or reformation of contracts, and the refund of money.

7                                    **PRAYER FOR RELIEF**

8         Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C.

9    §§ 53(b) and 57b, Section 917(c) of the EFTA, 15 U.S.C. § 1693o(c), Section 5 of the ROSCA,

10   15 U.S.C. § 8404, the Telemarketing Act, 15 U.S.C. §§ 6101-6108, and the Court's own

11   equitable powers, requests that the Court:

12        A.    Award Plaintiff such preliminary injunctive and ancillary relief as may be

13   necessary to avert the likelihood of consumer injury during the pendency of this action and to

14   preserve the possibility of effective final relief, including but not limited to, temporary and

15   preliminary injunctions, an order freezing assets, immediate access, and appointment of a

16   receiver;

17        B.    Enter a permanent injunction to prevent future violations of the FTC Act, the

18   EFTA, Regulation E, the ROSCA, and the TSR by Defendants;

19        C.    Award such relief as the Court finds necessary to redress injury to consumers

20   resulting from Defendants' violations of the FTC Act, the EFTA, Regulation E, the ROSCA, and

21   the TSR, including but not limited to, rescission or reformation of contracts, restitution, the

22   refund of monies paid, and the disgorgement of ill-gotten monies; and

23        D.    Award Plaintiff the costs of bringing this action, as well as such other and

24   additional relief as the Court may determine to be just and proper.

25

APP 055

1

2                              Respectfully submitted,

3                              Jonathan E. Nuechterlein
                               General Counsel
4
   Dated: February 5, 2015     *Danielle Estrada*
5                              Shameka L. Walker
                               Tel: (202) 326-2570
6                              E-mail: swalker@ftc.gov

7                              Danielle Estrada
                               Tel: (202) 326-2630
8                              E-mail: destrada@ftc.gov

9
                               Federal Trade Commission
10                             600 Pennsylvania Ave., NW
                               Mail Stop CC-8528
11                             Washington, DC 20580
                               Fax: (202) 326-3395
12
13                             Attorneys for Plaintiff
                               FEDERAL TRADE COMMISSION
14

15

16

17

18

19

20

21

22

23

24

25

APP 056

# EXHIBIT C

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>　　　Plaintiff-Appellee,<br><br>　　　v.<br><br>CREDIT BUREAU CENTER, LLC, et al.,<br>　　　Defendants-Appellants. | Nos. 18-2847, 18-3310 |

## FEDERAL TRADE COMMISSION'S MOTION TO STAY
## THE MANDATE PURSUANT TO FED. R. APP. P. 41(d)

Pursuant to Fed. R. App. P. 41(d) and 28 U.S.C. § 2101(f), the Federal Trade Commission respectfully moves to stay the mandate of this Court pending the filing and disposition of a petition for a writ of certiorari in the Supreme Court. The Court issued its decision on August 21, and the mandate is due to issue on October 15. *See* Fed. R. App. P. 26(a)(1), 40(a)(1), 41(a).

As discussed below, a stay of the mandate is necessary to preserve the *status quo* pending likely Supreme Court review. The FTC is currently holding approximately $1.1 million obtained from defendants Michael Brown and his company Credit Bureau Center, LLC (collectively, "Brown") in partial satisfaction of the district court's $5.2 million restitution award. Because the panel vacated the restitution award, the FTC will be required to return this money if the mandate issues. Given Brown's extensive history of dishonesty, both before and after the

initiation of this case, it is highly likely that if the Supreme Court were to reinstate the restitution award, these assets would be dissipated. That would mean the FTC could not recover the money and consumer injury would be left unredressed. To avert that outcome, the Court should stay its mandate, allowing the FTC to safeguard the funds until the conclusion of Supreme Court proceedings.

## BACKGROUND

The facts of this case are set forth in detail in the Court's August 21 opinion. Briefly, the FTC brought this action under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), which allows a court to grant a "permanent injunction" when the FTC has shown a violation of the Act. The FTC showed that Brown violated the Act through a deceptive scheme that tricked consumers into signing up for a $30/month credit monitoring service. The district court permanently enjoined Brown from engaging in similar conduct and ordered him to pay $5.2 million in restitution. The FTC is currently holding approximately $1.1 million in funds obtained from Brown; the rest of the judgment remains unsatisfied. The district court stayed any distribution of the funds to injured consumers or the Treasury "pending conclusion of defendants' appeal." ECF No. 266 at 3.

On August 21, this Court affirmed the district court's liability determination and behavioral injunction, but vacated the restitution award. Overruling longstanding circuit precedent pursuant to Circuit Rule 40(e), the Court held that

2

the permanent injunction authority in Section 13(b) of the FTC Act does not allow monetary relief.  Op. 3. The Court acknowledged that its decision "creates a circuit split" with numerous other courts of appeals because its "conclusion departs from the consensus view of our sister circuits."  Op. 3 n.1; 41.  Three judges dissented from the denial of rehearing *en banc*.

The FTC and the Office of the Solicitor General are currently evaluating whether to file a petition for a writ of certiorari in this case.  Under the FTC Act, the Solicitor General may decide whether to seek certiorari on behalf of the FTC, but if he decides not to do so, the FTC may file a petition on its own.  *See* 15 U.S.C. § 56(a)(3).

## ARGUMENT

This Court may stay its mandate pending the filing of a petition for a writ of certiorari when "the petition would present a substantial question and … there is good cause for a stay."  Fed. R. App. P. 41(d)(1).  The inquiry focuses on "whether the applicant has a reasonable probability of succeeding on the merits and whether the applicant will suffer irreparable injury" if the mandate issues.  *Books v. City of Elkhart*, 239 F.3d 826, 827 (7th Cir. 2001) (Ripple, J., in chambers).  The success factor requires "a reasonable probability that four Justices will vote to grant certiorari and a reasonable possibility that five Justices will vote to reverse the judgment of this court."  *Id.* at 828; *see also United States ex rel. Chandler v. Cook*

3

*County*, 282 F.3d 448, 450-51 (7th Cir. 2002) (Ripple, J., in chambers) (granting motion to stay mandate given the importance of the issue to the government, the conflict among the courts of appeals, and possible prejudice to the government). The FTC satisfies all requirements for a stay.

1.a.    There is a reasonable probability that four Justices will vote to grant certiorari.  The Supreme Court's rules state that certiorari is appropriate where "a United States court of appeals has entered a decision in conflict with the decision of another United States court of appeals on the same important matter."  Sup. Ct. R. 10(a).  As a leading treatise explains, demonstrating a circuit split is the "most assured way" of obtaining Supreme Court review.  23 *Moore's Federal Practice – Civil* § 510.21[1] (3d ed. 1999), Lexis (database updated 2019).  The decision here created a circuit split, as the panel acknowledged.  As matters stand, the law in seven circuits is that Section 13(b) authorizes awards of equitable monetary relief (restitution or disgorgement).[1]  In this circuit, the law is now the exact opposite.

---

[1] *See, e.g., FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 598-99 (9th Cir. 2016); *FTC v. Ross*, 743 F.3d 886, 890-92 (4th Cir. 2014); *FTC v Bronson Partners, LLC*, 654 F.3d 359, 365-67 (2d Cir. 2011); *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 15 (1st Cir. 2010); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 n.6 (10th Cir. 2005); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996); *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d. 1312, 1314-15 (8th Cir. 1991); *see also FTC v. Magazine Sols., LLC,* 432 F. App'x 155, 158 n.2 (3d Cir. 2011) (unpublished).

4

Beyond the mere existence of a circuit split, "[t]he important and recurring nature of the issue in conflict often plays a decisive role in the grant or denial of certiorari." Robert L. Stern *et al.*, *Supreme Court Practice* 228 (8th ed. 2002). Here, the question whether monetary relief is available under Section 13(b) is a recurring one of great public importance. Suits for injunctions and equitable monetary relief have been a cornerstone of the FTC's enforcement program for more than 30 years, and the agency files dozens of cases each year under Section 13(b). And while this Court is the only court of appeals that has held that Section 13(b) does not authorize equitable monetary relief, litigants have advocated that position in several other cases, including at least three currently pending appeals in different circuits.[2]

The matter is also of great public importance. Over the years, the FTC has utilized Section 13(b) to return billions of dollars to victimized American consumers, and the Court's ruling casts doubt on the future availability of that remedy. Moreover, the question whether a statute that authorizes grant of a "permanent injunction" also allows equitable monetary relief implicates not just

---

[2] The case farthest along in the appellate process is *FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417 (9th Cir. 2018), in which the Ninth Circuit adhered to its precedent holding that Section 13(b) does authorize equitable monetary relief; the Supreme Court has granted an extension of time to file a petition for a writ of certiorari in that case until October 18. Defendants have also raised the same issue in *FTC v. AbbVie, Inc.*, No. 18-2621 (3d Cir.), and *FTC v. Simple Health Plans, LLC*. No. 19-11932 (11th Cir.), which have not yet been argued.

APP 062

the FTC, but other federal agencies as well.  Like the FTC Act, the organic acts of

the Securities and Exchange Commission and the Food and Drug Administration

authorize courts to issue injunctions but do not expressly mention monetary relief.

*See* 15 U.S.C. § 77t(b); *id.* § 78u(d); 21 U.S.C. § 332(a).  Relying on the same

legal theory used to interpret Section 13(b), courts have consistently held that these

statutes likewise allow restitution or disgorgement.[3]  The Court's decision thus

threatens to undermine a wide swath of federal law enforcement.

    b.    If certiorari is granted, there is a reasonable possibility that five

Justices will vote to reverse the judgment of this Court.  The cases holding that

Section 13(b) authorizes equitable monetary relief rest on the Supreme Court's

decisions in *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946), and *Mitchell v.

Robert DeMario Jewelry, Inc.*, 361 U.S. 288 (1960).  *Porter* and *Mitchell* hold that

when a statute authorizes issuance of an injunction, "all the inherent equitable

powers of the District Court are available for the proper and complete exercise of

that jurisdiction" unless Congress has restricted that jurisdiction "in so many

words" or "by a necessary and inescapable inference."  *Porter*, 328 U.S. at 398;

---

[3] *See, e.g.*, *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989);
*SEC v. Manor Nursing Ctrs.*, 458 F.2d 1082, 1103-06 (2d Cir. 1972); *SEC v. Tex.
Gulf Sulfur Co.*, 446 F.2d 1301, 1307-08 (2d Cir. 1971); *United States v. Rx Depot,
Inc.*, 438 F.3d 1052, 1054-63 (10th Cir. 2006); *United State v. Lane Labs-USA,
Inc.*, 427 F.3d 219, 223-36 (3d Cir. 2005); *United States v. Univ. Mgmt. Servs.,
Inc.*, 191 F.3d 750, 760-62 (6th Cir. 1999).

6

*see also Mitchell*, 361 U.S. at 291.  In other words, when Congress grants a court

authority to issue a permanent injunction, that grant includes the power to award

all equitable remedies, including monetary relief, unless it clearly says otherwise.

Instead of following that rule, this Court effectively applied the opposite

rule, holding that Section 13(b) cannot be read to authorize equitable monetary

relief because Congress did not explicitly authorize that remedy.  The Court

concluded that *Meghrig v. KFC Western, Inc.*, 516 U.S. 479 (1996), signaled a

change in the way the Supreme Court reads injunctive relief statutes: "[s]ince

*Meghrig*, the Court has adhered to this more limited understanding of judicially

implied remedies."  Op. 33.  But other courts have read *Meghrig* differently.  The

Third Circuit explained after careful examination of *Meghrig* that there is no

"indication, either in *Meghrig* or since, that the Court has abandoned the holdings

of *Porter* and *Mitchell*," which remain controlling.  *United States v. Lane Labs-*

*USA, Inc.*, 427 F.3d 219, 225, 232, 236 (3d Cir. 2005).  Similarly, the Tenth Circuit

stated bluntly that "*Meghrig* does not overrule or limit *Porter* and *Mitchell.*"

*United States v. Rx Depot, Inc.*, 438 F.3d 1052, 1057 n.3 (10th Cir. 2006).

Among other differences, *Meghrig* was a private party suit, not an

enforcement action by the government to protect the public.  *Lane Labs*, 427 F.3d

at 231; *Rx Depot*, 438 F.3d at 1057.  There is also a "considerable difference"

between the relief requested in *Meghrig*, which "resemble[d] traditional damages,"

7

and an equitable remedy seeking the return of sums paid by consumers for illegally marketed products. *Lane Labs*, 427 F.3d at 231. Certainly it is at least reasonably possible that five Justices would agree with the Third and Tenth Circuits that *Meghrig* does not undermine or limit the reasoning of *Porter* and *Mitchell*. Indeed, three judges of this Court dissented from the panel's opinion and opined that *Meghrig* did not have the effect ascribed to it by the panel. *See* Op. 56-59 (Wood, C.J., dissenting).

Furthermore, far from questioning the continuing vitality of *Porter* and *Mitchell*, the Supreme Court has continued to cite and rely upon *Porter* in cases subsequent to *Meghrig*. In *United States v. Oakland Cannabis Buyers' Co-Op.*, 532 U.S. 483 (2001), the Court cited *Porter* for the proposition that a court of equity has broad discretion to fashion injunctive relief considering the public interest, which can be "displaced only by a 'clear and valid legislative command.'" *Id.* at 496-97 (cleaned up). Even more recently, in *Kansas v. Nebraska*, 135 S. Ct. 1042 (2015), the Court invoked *Porter* to uphold an equitable disgorgement award in a water-rights dispute between two States. *Id.* at 1051, 1053. These decisions suggest, contrary to this Court's opinion, that the Court has not retreated from the reasoning of *Porter* and *Mitchell*.

To be sure, the Supreme Court may abandon the interpretive approach that it endorsed in *Porter* and *Mitchell.* But there is at least a reasonable possibility that it

APP 065

will adhere to its existing precedents.  Just this past term, the Court reiterated that

"[o]verruling precedent is never a small matter."  *Kisor v. Willkie*, 139 S. Ct. 2400,

2422 (2019) (quoting *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2409

(2015)).  The Court emphasized that "[a]dherence to precedent is a foundation

stone of the rule of law," which "promotes the evenhanded, predictable, and

consistent development of legal principles, fosters reliance on judicial decisions,

and contributes to the actual and perceived integrity of the judicial process."  *Id.*

(cleaned up).  A departure from precedent "demands 'special justification'—

something more than 'an argument that the precedent was wrongly decided.'"  *Id.*

(quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014)).

Respect for precedent is especially important in statutory interpretation

cases, where Congress is free to alter what the courts have done.  *Id.*, 139 S. Ct. at

2422-23.  If anything, the Court is especially reluctant to depart from existing

precedent where "Congress has long acquiesced in the interpretation" at

issue.  *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008); *see

also Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 338 (1988).  In the case of

Section 13(b), Congress has long known that courts have interpreted the statute as

authorizing equitable monetary relief, has amended the FTC Act many times, and

has never once sought to limit this authority.  Nor has Congress limited the ability

of other agencies to obtain equitable monetary relief under injunctive-relief

statutes.  Congress's decision to leave intact the consistent judicial interpretation of these statutes is a strong indication that it has acquiesced in, and apparently agrees with, the rule of *Porter* and *Mitchell.*

2.    The FTC and the consumers harmed by Brown's illegal scheme will suffer irreparable injury if the mandate is not stayed.  To date, the FTC has been able to recover only $1.1 million of the $5.2 million judgment; the district court stayed the distribution of those funds to injured consumers "pending conclusion of defendants' appeal."  ECF No. 266 at 3.  If the mandate issues, the FTC will be required to return these funds to Brown, who will be free to spend them or place them beyond the reach of a court judgment.  Even if the Supreme Court reinstates the restitution award, there is a high probability that the assets will be dissipated, the FTC will not be able to recover on the judgment, and the monetary injury to consumers will go unredressed.

Brown's dishonest conduct both before and after the initiation of this suit shows that he cannot be trusted to retain these funds while Supreme Court proceedings are pending.  Brown scammed consumers out of more than $5 million by promising them "free" credit reports, when he was actually signing them up for a $30/month credit monitoring service.  And through his accomplices, Brown posted Craigslist ads for fake rental properties to drive consumers to his deceptive websites.  Given this egregious misconduct, this Court had "no trouble" affirming

10

the district court's liability determination.  Op. 2.  Brown also continued to engage

in misconduct after the suit was filed.  Among other things, he continued to bill

customers for credit monitoring services even after the district court entered a

preliminary injunction barring him from doing so; the court found Brown in

contempt in July 2017.  ECF No. 106; *see also* ECF No. 113 at 44 (finding

"beyond a shadow of a doubt" that Brown violated the preliminary injunction and

"there's no question that he didn't make a reasonable and diligent effort to

comply.").  And in denying Brown's motion for a stay pending appeal, the district

court noted that "Brown has displayed an unwillingness, both before and during

the lawsuit, to conform his conduct to the requirements of the law."  ECF No. 266

at 3.

Both the Supreme Court and this Court have recognized that an inability to

recover money after Supreme Court reversal may be an irreparable injury sufficient

to support a stay.  In *Heckler v. Turner*, 486 U.S. 1305 (1984), then-Justice

Rehnquist held that the government would suffer irreparable injury if forced to

make certain payments to welfare beneficiaries because in the event of reversal "it

is extremely unlikely that the [government] would be able to recover funds

improperly paid out."  *Id.* at 1308.  Justice Powell reached a similar conclusion in

another case involving welfare payments, holding that Georgia would suffer

irreparable injury because "it is unlikely that disputed payments made pursuant to

the District Court's judgment could be recovered" in the event of reversal.

*Ledbetter v. Baldwin*, 479 U.S. 1309, 1310 (1986).  In *Gates v. Syrian Arab*

*Republic*, No. 13-2280, 2014 U.S. App. LEXIS 21445 (7th Cir. July 30, 2014)

(Hamilton, J., in chambers), this Court denied a stay on the grounds that the

movant had not shown either a likelihood of certiorari being granted or a

reasonable possibility of reversal.  But it nonetheless recognized the possibility of

irreparable injury, noting that "[i]f the funds … are distributed and if the Supreme

Court were later to reverse this court's judgment, it could be difficult to recover all

of the funds," and "some of the money might no longer be recoverable."  *Id.* at *3.

In this case, given Brown's demonstrated history of dishonesty and the fact

that the FTC has thus far been able to recover less than a quarter of the money he

took from consumers, it is extremely unlikely that the FTC will be able to recover

anything for consumers if it returns the $1.1 million now but prevails at the end of

the day.  Given the likelihood of Supreme Court review and the reasonable

possibility of reversal, a stay of the mandate to prevent this outcome is warranted.

APP 069

## CONCLUSION

For the foregoing reasons, the Court should stay its mandate pending the

filing and disposition of a petition for a writ of certiorari.

Respectfully submitted,

ALDEN F. ABBOTT
*General Counsel*

JOEL MARCUS
*Deputy General Counsel*

/s/*Michael D. Bergman*

|  |  |
|---|---|
| *Of Counsel:* | MICHAEL D. BERGMAN |
| GUY G. WARD | *Attorney* |
| *Attorney* | Office of the General Counsel |
| FEDERAL TRADE COMMISSION | FEDERAL TRADE COMMISSION |
| Chicago, IL  60604 | Washington, D.C. 20580 |
|  | (202) 326-3184 |
| Dated: September 17, 2019 | mbergman@ftc.gov |

APP 070

## CERTIFICATE OF COMPLIANCE

I certify that the FTC's foregoing motion complies with the form, typeface,

type style, and length of motions requirements in Fed. R. App. P. 27(d), 32(a)(5),

32(a)(6), because it contains 2982 words (excluding the parts exempted by Fed. R.

App. P. 32(f)), and has been prepared in proportionally spaced typeface using

Microsoft Word 2016 in Times New Roman 14-point font.

/s/ *Michael D. Bergman*
Michael D. Bergman
Date: September 17, 2019          Attorney, Federal Trade Commission

## CERTIFICATE OF SERVICE

I certify that on September 17, 2019, I filed the foregoing via the Court's

electronic filing system.  All parties will be served by the CM/ECF system.

/s/ *Michael D. Bergman*
Michael D. Bergman
Date: September 17, 2019          Attorney, Federal Trade Commission

# EXHIBIT D

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## ORDER

September 20, 2019

Before

DIANE S. SYKES, *Circuit Judge*

| | |
|---|---|
| Nos. 18-2847 & 18-3310 | FEDERAL TRADE COMMISSION,<br>Plaintiff - Appellee<br><br>v.<br><br>CREDIT BUREAU CENTER, LLC, et al.,<br> Defendants - Appellants |

| **Originating Case Information:** |
|---|
| District Court No: 1:17-cv-00194<br>Northern District of Illinois, Eastern Division<br>District Judge Matthew F. Kennelly<br>Clerk/Agency Rep Thomas G. Bruton |

Upon consideration of the **MOTION TO STAY THE MANDATE PURSUANT TO FED. R. APP. P 41(d)**, filed on September 17, 2019, by counsel for the appellee,

**IT IS ORDERED** that the motion is **GRANTED**. The mandate of this court is **STAYED** until the expiration of the time allowed for filing a petition for writ of certiorari. If a timely petition is filed and the appellee notifies this court in writing, this stay shall remain in force until the conclusion of all proceedings before the Supreme Court of the United States, *See* Fed. R. App. P. 41(d)(2).