**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | Case No.  3:19-cv-02281-K |
| vs. | |
| MATCH GROUP, INC., a corporation, | |
| Defendant. | |

## <u>MATCH GROUP, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS</u>

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ...................................................................................1

II.  ARGUMENT AND AUTHORITIES ..........................................................................3

    A.   The FTC Has Not Satisfied Section 13(b)'s Prerequisites for Suing Directly in
    Federal Court ..............................................................................................................3

    B.   Equitable Monetary Relief Is Not Available Under Section 13(b) ...........................7

        1.   The FTCA's Plain Text and Structure Authorize Only Injunctive Relief under
        Section 13(b) ..........................................................................................................8

        2.   The Fifth Circuit Has Never Approved Equitable Monetary Relief under Section
        13(b) 9

        3.   The Section 13(b) Caselaw Does Not Support the FTC's Position .........................10

    C.......The CDA Immunizes Match from Liability for the Conduct Alleged in Counts I &
    II ...............................................................................................................................11

        1.   The FTC Cannot Amend Its Complaint via Its Opposition Brief ...........................12

        2.   The Conduct Actually Challenged in Counts I and II is Immunized by the CDA ...12

    D.   The FTC Fails to Plead a ROSCA Violation .............................................................15

III. CONCLUSION .........................................................................................................15

ACTIVE 251234795

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Asadi v. G.E. Energy (USA), L.L.C.*,
  720 F.3d 620 (5th Cir. 2013) ...................................................................................4

*Energy Coal v. CITGO Petroleum Corp.*,
  836 F.3d 457 (5th Cir. 2016) .................................................................................12

*FTC v. AMG Cap. Mgmt, LLC*,
  910 F.3d 417 (9th Cir. 2018) .................................................................................11

*FTC v. Commerce Planet, Inc.*,
  815 F.3d 593 (9th Cir. 2016) .................................................................................11

*FTC v. LeadClick Media, LLC*,
  838 F.3d 158 (2d Cir. 2016)...................................................................................14

*FTC v. Ross*,
  743 F.3d 886 (4th Cir. 2014) .................................................................................11

*FTC v. Shire ViroPharma*,
  917 F.3d 147 (3d Cir. 2019)........................................................................... *passim*

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002)..................................................................................................8

*Herrick v. Grinder*,
  306 F. Supp. 3d 579 (S.D.N.Y. 2018)....................................................................14

*Karahalios v. Nat'l Fed'n of Fed. Emps.*,
  489 U.S. 527 (1989)................................................................................................10

*Sw. Sunsites. Southwest Sunsites*'s
  665 F.2d 711 (5th Cir 1982) ................................................................................2, 9

*Stokes v. SW Airlines*,
  887 F.3d 199 (5th Cir. 2018) .................................................................................10

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
  444 U.S. 11 (1979)....................................................................................................8

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017)............................................................................................10

ii

## <u>Statutes/Rules</u>

15 U.S.C. § 8403 ..................................................................................................................3, 15

FTCA Section 13(b), 15 U.S.C. § 53(b) ............................................................. *passim*

FTCA Section 19, 15 U.S.C. § 57.......................................................................... *passim*

Fed. R. Civ. P. 5(b)(2).....................................................................................................16

Fed. R. Civ. P. 12.............................................................................................................3

Fed. R. Civ. P. 56.2(b) .....................................................................................................1

## <u>Other</u>

S. Rep. No. 93 151, 93d Cong., 1st Sess. 31 (1973).......................................................7

ACTIVE 251234795

## I.     PRELIMINARY STATEMENT

In hopes of avoiding the fatal effect of unambiguous statutory language on its case, the FTC's Opposition to Match's Motion to Dismiss misstates and misapplies legal precedent and offers up new and unsupported factual allegations found nowhere in the Complaint.  Cutting through the FTC's unwarranted attacks and outlandish and impermissible accusations beyond its pleading, there are four purely legal reasons why the Motion to Dismiss should be granted:[1]

First, the plain language of the FTCA makes clear that the FTC cannot sue Match in federal court under Section 13(b) based on admittedly discontinued conduct, without any factual allegation that Match is "about to" resume the conduct.  This is true regardless of why the conduct was discontinued, how long it has been stopped, and whether it is possible that the conduct could one day be resumed.  Because the FTC did not (and cannot) make allegations in the Complaint that could satisfy the unambiguous pleading standard in the text of Section 13(b), the agency instead proceeds to distort legal precedent and conflate the standards for (1) bringing an action under Section 13(b) ("about to violate" the law) with (2) obtaining injunctive relief from a federal court ("likely to resume" unlawful conduct)—an argument that has been rejected by every court that has considered this issue.

Second, even if the FTC could pursue a Section 13(b) claim without alleging that Match is "about to violate" the FTCA, Section 13(b) does not authorize equitable monetary relief.  The unambiguous language and structure of the FTCA expressly authorizes *only* injunctive relief under Section 13(b) and requires the FTC to use Section 19 of the FTCA to seek monetary relief, as

---

[1] If necessary, Match will prove that the FTC has sued the wrong entity.  However, this issue need not distract from the dispositive reasons why the Complaint should be dismissed, and Match elects to preserve it for later.  That said, the Opposition makes abundantly clear that the FTC has improperly sued Match Group, Inc. on an unpleaded (and unsupportable) alter ego theory.  Match will fully bring this issue to the Court's attention in a motion for leave to file an early summary judgment under Rule 56.2(b), which the FTC has indicated it will oppose.

1

clearly articulated in the Seventh Circuit's *Credit Bureau* decision.  In an attempt to muddy the waters, the FTC badly mischaracterizes the Fifth Circuit's *Southwest Sunsites* decision, incorrectly suggesting that the court held that monetary equitable remedies are available under Section 13(b); that issue was not even presented in that case.  Instead, the Fifth Circuit merely approved an asset freeze after granting a motion for a preliminary injunction pending FTC administrative proceedings.  Preserving the status quo with a prohibitory injunction *pendente lite* is hardly equivalent to authorizing the pursuit of monetary relief on an affirmative claim.  Accepting the FTC's interpretation of *Southwest Sunsites* would allow the agency to circumvent and render meaningless clear and critical due process safeguards mandated by Congress when the FTC seeks retrospective monetary remedies—including a higher burden of proof under Section 19 of the FTCA following an administrative finding under Section 5 and a three-year statute of limitations.

Third, in an attempt to avoid the immunity from suit conferred by Section 230 of the Communications Decency Act ("CDA"), the Opposition mischaracterizes the allegations in the Complaint and ignores the analysis applied in the CDA decisions cited by Match.  The Complaint's actual allegations unmistakably seek to hold Match liable for (a) automated notifications alerting its registered users to the existence of third-party generated content (Count I) and (b) the methods Match employed to restrict access to that third-party content (Count II).  Under the extensive CDA precedents Match cited in the Motion, Match cannot be liable for such conduct.  Simply put, sending notifications alerting users of communications from other users, even with modifications, cannot amount to "content" under the CDA unless the defendant materially contributes to the alleged unlawfulness of the content—which is clearly not accomplished by adding a generic phrase such as "Could he be the one?" to a message notification from a potential suitor on a dating site.

ACTIVE 251234795

<u>Fourth</u>, even assuming for Rule 12 purposes that Match.com's online subscription cancellation method is not "simple," the FTC has failed to plead a ROSCA violation. The statute requires only that Match provide simple "mechanisms for a consumer to stop recurring charges." 15 U.S.C. § 8403. The FTC cannot assert a ROSCA violation unless it alleges (which it does not) that none of the various cancellation mechanisms offered by Match are "simple." The FTC's failure to address any of Match's cancellation mechanisms other than the online method is fatal to its ROSCA claim.[2]

## II.    ARGUMENT AND AUTHORITIES

### A.    The FTC Has Not Satisfied Section 13(b)'s Prerequisites for Suing Directly in Federal Court.

The FTC's Complaint (1) pleads that Match voluntarily discontinued the challenged conduct underlying Counts I and II over a year before the FTC brought suit, and the conduct underlying Counts III and IV many months prior to the filing; and (2) pleads no facts indicating that Match is "about to" resume any of the challenged conduct. (Mot. at 10–13.) This omission is fatal because Section 13(b)'s unambiguous text requires that the FTC make such allegations if it elects to sue directly in federal court under that provision, as recognized by the only Court of Appeals decision to examine the "about to violate" language, *FTC v. Shire ViroPharma*, 917 F.3d 147 (3d Cir. 2019) ("*Shire*").

The Opposition is notable for what it does not challenge: the FTC does not dispute that Section 13(b)'s unambiguous text authorizes the FTC to seek injunctive relief in federal district

---

[2] The FTC's specious assertion that Match has not "denied" the allegations of wrongdoing in the Complaint barely merits mention. As the FTC knows, Match must assume for purposes of a Rule 12(b)(6) motion that the plausible factual allegations of the Complaint are true, no matter how devoid of evidentiary support and demonstrably false they in fact are. Lest there be any doubt on that score, Match wholly denies any liability and the many false allegations made by the FTC in the Complaint, as Match previously stated in the Form 8-K attached to the FTC's Appendix, which plainly rejects the allegations as "without merit." (Opp. App. 6.) This Court need not reach those factual issues, however, as the legal defects in the FTC's pleading mandate dismissal.

court only when a defendant is "violating" or is "about to violate" the FTCA.[3]  The FTC also admits that Counts I–IV are not based on any current conduct by Match, but rather solely on discontinued conduct.  (Compl. ¶ 3.)  Accordingly, the only question is whether the Complaint plausibly pleads facts indicating that Match is "about to" violate the law.  It clearly does not.  Realizing this, the Opposition offers several flawed arguments to divert attention from the statutory text.

First, the Opposition attacks *Shire* and advocates application of an inapposite legal standard.  (Opp. at 5–8.)  *Shire* stands for the unremarkable proposition that Section 13(b)'s unambiguous text "prohibits existing or impending [unlawful] conduct," nothing more.  917 F.3d at 156.  The *Shire* court, after considering the same cases and arguments that the FTC raises here,[4] determined that the agency was improperly ignoring the plain text of Section 13(b) by conflating the statute's "about to" standard with the standard governing the issuance of injunctions.  *Id.* at 156–57.  Noting that the FTC's argument would allow it to bring a Section 13(b) case merely by alleging a vague and generalized "likelihood" of recurrent conduct, the *Shire* court rejected the FTC's approach and held that the statute's "about to" language erected a higher threshold in order to proceed under Section 13(b); only later, on an application for injunctive relief, would the traditional injunction standards cited by the agency come into play.  *Id.* at 157, 159.  Put another way, the "about to" standard governs whether the court may even entertain a Section 13(b) claim, regardless of what relief might eventually be available in such an action.  Accordingly, to survive

---

[3] As the Fifth Circuit has unequivocally held, "[i]f the statutory text is unambiguous, our inquiry begins and ends with the text."  *Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 622 (5th Cir. 2013).

[4] The Opposition cuts and pastes nearly the same text from the FTC's opening brief in *Shire* and cites the same cases found unpersuasive by *Shire—United States v. W.T. Grant Co.*, *FTC v. Accusearch, Inc.*, and *FTC v. Evans Products*.  *Compare* FTC's Appeal Brief in *Shire*, 2018 WL 3101438, at *22 ("The Supreme Court ruled long ago . . ." and citing above cases) *with* Opp. at 8–9 ("The Supreme Court has long held . . ." and citing same cases).  Notably, the FTC did not appeal the *Shire* decision.

the Motion, the FTC must first plead "some evidence that the defendant 'is' or 'is about to' commit another violation."  *Id.* at 156; *see* (Mot. at 10–12.)

The Opposition seeks to undermine the plain meaning of the statute's actual text with an extended discussion of cases "which have **held injunctive relief appropriate** where there is a likelihood that the defendant will violate the FTC Act again."  (Opp. at 5 (emphasis added); *see* Opp. at 8.)  But, as shown above, that is **not** the question before this Court.  None of the cases the FTC cites, including *Southwest Sunsites*, *FTC v. Investment Development*, and *U.S. v. Cornerstone Wealth Corp.*, examined the threshold issue of whether the defendant was "about to violate" the FTCA and therefore could be subject to a Section 13(b) claim.  Each case involved injunctions. For example, *Southwest Sunsites* involved a challenge to a preliminary injunction supported by "substantial evidence" and a finding of likelihood of success on the merits.  Importantly, the decision did not address whether the Complaint itself had sufficiently alleged that discontinued conduct was "about to" resume.  665 F.2d at 715–16.  Therefore, contrary to the FTC's contention, *Shire* does not conflict with any Fifth Circuit case.  Further, there is no support for the FTC's argument that following *Shire* would "conflict with the consensus view among other circuits and Supreme Court authority" (Opp. at 8), because none of the cases relied upon by the FTC actually examined Section 13(b)'s "about to violate" standard, and again, all involve injunctions.  *See* footnote 4.  Instead, the actual "consensus" among the only two courts that have analyzed the "about to violate" question held that the statute's plain text means what it says and requires the FTC to allege facts plausibly demonstrating that the defendant is "about to" commit a violation of the FTCA.  *See Shire*, 917 F.3d at 156-7; *Hornbeam*, 2018 WL 6254580, at *2 (N.D. Ga. Oc..

Second, the FTC argues that it need only have a subjective "reason to believe" that Match is "about to" violate the statute and that the Court must defer to the agency's belief regardless of

whether any facts are pleaded to support it.[5]  This argument, too, has been considered and rejected.

*Shire* rejected the argument as "unpersuasive" because the FTC had failed to plead *any facts* to

support its bald assertion—just as here.  917 F.3d at 159 n.17.  Similarly, the *Hornbeam* court did

not defer to the FTC's unsupported "reason to believe," but instead dismissed its initial complaint

and required the agency to "plead at least some facts to show that it had 'reason to believe' that

Defendants were 'about to violate' the law."  *Hornbeam*, 391 F. Supp. 3d 1218, 1223 (N.D. Ga.

2019).  The case proceeded only after the FTC amended to allege "facts and circumstances which

demonstrated the ongoing nature of Defendants' activities," including prior violations of orders

entered into after FTC investigations, resulting contempt orders, continued operation of schemes

prohibited by prior settlements, and continuing collection of payments related to those schemes.

*Id.* at 1221.[6]

The FTC's allegations in *Hornbeam* are nothing like its threadbare allegations in this

matter.  Instead of pleading forward-looking allegations or allegations of attempted avoidance of

the agency's scrutiny, the FTC here relies on conclusory allegations in a single paragraph asserting

an alleged "long history of continuous conduct."  (Compl. ¶ 64.)  The Opposition also introduces

unfounded allegations nowhere in the Complaint, such as a purported "lack of remorse" for having

engaged in the discontinued practices, seemingly in support of an imaginary preliminary injunction

that the FTC has not sought.[7]  (*See* Opp. at 5–7.)  The only forward-looking allegation the

Complaint can muster is that Match, as a going concern, "can engage or resume similar conduct"

---

[5] The cases cited by the FTC in Opposition footnote 4 do not even involve Section 13(b), but rather deference to
administrative actions or the reviewability of final agency action.  (Opp. at 9.)

[6] In denying dismissal of the FTC's amended complaint, the *Hornbeam* court nonetheless noted that if a complaint
does not contain any factual allegations creating an inference that the law was about to be violated, then there would
be no "reason to believe" a violation is "about to" occur.  The denial of dismissal was stayed pending interlocutory
appeal.  *Id.*

[7] It is telling that the FTC has not sought a preliminary injunction.  If the agency truly believed that Match was about
to violate the FTCA by resuming the supposedly harmful practices alleged in the Complaint, it presumably would
have sought a preliminary injunction, rather than waiting possibly years for its claims to be decided.

"with ease." (Compl. ¶ 64; Opp. at 11.)  Obviously, just because one "can easily" do something (for example, start an exercise regimen) does not mean one is "about to" do so.  The FTC cannot change the unambiguous language and resulting requirements of Section 13(b), and, despite "investigat[ing] extensively before bringing this action," the agency has not alleged that Match is "about to" violate the FTCA.  (Opp. at 20.)  Counts I–IV must be dismissed as a result.[8]

### B.   Equitable Monetary Relief Is Not Available Under Section 13(b).

Section 13(b) makes no mention whatsoever of monetary relief, equitable or otherwise.  It expressly allows only preliminary or permanent *injunctive* relief.[9]  15 U.S.C. § 53(b).  Congress enacted a different provision, Section 19, to allow the FTC to seek monetary relief in court—but if, and only if, the agency first procures an administrative adjudication of liability and then proves in court that a reasonable person would have known that the conduct at issue was dishonest or fraudulent, and all subject to a three-year limitations period.  15 U.S.C. § 57b.  These are important procedural protections that establish the outer bounds of the FTC's authority.  The text and structure of the FTCA delineate the relief available under each provision, and the Seventh Circuit's decision in *FTC v. Credit Bureau Center* extensively analyzes the statutory interplay directly at issue here.[10]  937 F.3d 764 (7th Cir. 2019).

---

[8] The Opposition suggests that *Shire* and *Hornbeam* hold that a Section 13(b) action is available to the FTC unless the conduct in question was discontinued (a) many years ago, (b) before an investigation even began, and (c) involved a business line that the defendant later sold.  (Opp. at 10-12.)  This argument finds no support in the text of Section 13(b), nor in *Shire* or *Hornbeam*, and is simply another attempt to shirk the pleading obligations imposed by the statute.  The FTC offers no reason why Match's voluntary discontinuance of business practices long before suit—over a year ago as to Counts I and II—remotely suggests that a law is "about to" be violated.  There is no such inference.

[9] The Senate Report cited by the FTC is in accord, contemplating only that Section 13(b) would permit the FTC to "seek a permanent injunction."  S. Rep. No. 93 151, 93d Cong., 1st Sess. 31 (1973).

[10] The FTC argues that Section 19's savings clause somehow endorses the availability of monetary relief under Section 13(b).  (Opp. at 18–20.)  Section 19 says no such thing.  The relevant subsection states "Remedies provided in this section are in addition to, and not in lieu of, any other remedy or right of action provided by State or Federal law.  Nothing in this section shall be construed to affect any authority of the Commission under any other provision of law."  15 U.S.C. § 57b(e).  This standard provision does not address whether Section 13(b) authorizes monetary relief, and certainly does not purport to *expand* the available relief under Section 13(b).  If Congress wanted to give the FTC the right to seek equitable monetary relief under Section 13(b), it could, and would, have said so.  Further, an implied, judicially created equitable remedy is not "provided by [] law" or found in "any other provision of law."

7

With no answer to that analysis, the Opposition casts *Credit Bureau* as an outlier among "settled" law, particularly the Fifth Circuit's decision, *Southwest Sunsites*. As the *Credit Bureau* court explained, however, there is no conflict between its decision and *Southwest Sunsites*, which instead "appear[s] to preclude the possibility of restitution in section 13(b)."  937 F.3d at 777 n.2. Furthermore, prevailing Supreme Court jurisprudence counsels against judicially implied remedies under federal statutes, which is what the FTC is admittedly advocating for here.  Although *Credit Bureau* may be the first decision recently to analyze the interplay between Section 13(b) and Section 19 of the FTCA, it stands in a long line of cases recognizing that courts should not read implied remedies into a comprehensive statutory scheme that carefully prescribes available procedures and remedies.

       1.     <u>The FTCA's Plain Text and Structure Authorize Only Injunctive Relief under Section 13(b)</u>

If the FTC could seek monetary relief under Section 13(b), the procedural safeguards in Section 19 would be rendered meaningless and would impermissibly expand Congress' clear limited purpose for Section 13(b)—to allow the FTC to address ongoing or imminent misconduct through injunctions.[11]  *See Credit Bureau*, 937 F.3d at 773–74 (explaining that Section 13(b) was enacted because "existing enforcement processes couldn't quickly address ongoing or imminent violations").  The Court should not allow the FTC to exceed its legitimate authority and side-step the FTCA's congressionally mandated safeguards.  *See Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 220–21 (2002); *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979) ("If monetary liability . . . is to be found, it must be read into the Act. Yet it is an

---

[11] The FTC's argument that Section 19 is narrower in scope than Section 13 because its remedies are available only to "redress injury to consumers or other persons," (Opp. at 21), is contradicted by the Complaint itself, which asserts monetary relief precisely to "redress injury to consumers."  (Compl. ¶ 90(d).)

elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.").

2.    <u>The Fifth Circuit Has Never Approved Equitable Monetary Relief under Section 13(b)</u>

The FTC grossly mischaracterizes *Southwest Sunsites* by relying on dicta discussing the range of equitable remedies generally available to courts. However, the *Southwest Sunsites* court was not asked to decide whether the FTC could use Section 13(b) to obtain monetary relief for historical violations in lieu of using Section 19. Rather, the only equitable relief that the *Southwest Sunsites* court approved was an asset freeze in support of a preliminary injunction. 665 F.2d at 718-19. The district court held that it lacked the authority to freeze assets pending a separate, Section 19 proceeding because Section 13(b) authorized it only to enjoin the impermissible conduct. *Id*. at 715–16. The Fifth Circuit reversed, because an asset freeze (itself a form of injunctive relief) furthered the purpose of the preliminary injunction by ensuring the funds sought in a Section 19 proceeding—which the court described as a "two-phase process" separate from the district court proceeding—would still be available after its completion. *Id*. at 719–20.[12] Thus, a court could freeze assets to preserve the possibility of complete relief. *Id*. at 718.

Further, *Southwest Sunsites*'s approval of an asset freeze aligns with the purpose of injunctive relief under Section 13(b): an asset freeze complements an injunction as a forward-looking remedy to maintain the status quo until the FTC can seek monetary relief through the proper channel—Section 19. *See id.* at 720 (noting that an asset freeze was appropriate to "assure the possibility of complete relief following administrative adjudication"). In fact, *Southwest*

---

[12] *Credit Bureau* recognized that *Southwest Sunsites* focused on this two-step process, through which monetary relief was available under Section 19. 937 F.3d at 777 n.2. The FTC argues that, in doing so, *Credit Bureau* determined that monetary relief was unavailable under Section 13(b) only for permanent injunctions, thereby "splitting the 13(b) baby." (Opp. at 15–16.) This does not make any sense and badly misreads *Credit Bureau* and *Southwest Sunsites*. *Southwest Sunsites*'s recognition that monetary relief is available under Section 19 indicates that such relief cannot be implied under Section 13(b) *regardless* of whether the FTC seeks a preliminary or a permanent injunction.

9

*Sunsites* repeatedly notes that monetary relief is available under a separate Section 19 proceeding—exactly as Match advocates here.  *Id.* at 719.  The FTC's argument that *Southwest Sunsites* controls this issue is simply wrong.

> 3.    The Section 13(b) Caselaw Does Not Support the FTC's Position

The FTC argues that *Porter v. Warner Holding Co*, cited in *Southwest Sunsites*, is still good law, and that *Meghrig v. KFC Western*, relied upon by *Credit Bureau*, is inapposite.  (Opp. at 21–24.)  Here again, the FTC focuses on the wrong question, because the Court does not need to rely on *Porter* <u>or</u> *Meghrig* to conclude that Section 13(b) does not impliedly authorize monetary relief.

Instead, this Court need only look to recent Supreme Court and Fifth Circuit jurisprudence that counsels against courts finding implied remedies in the face of explicit ones elsewhere in the same statute.  *See Karahalios v. Nat'l Fed'n of Fed. Emps.*, 489 U.S. 527, 533 (1989) (noting that "where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies").  The Fifth Circuit has explained that "[d]uring the mid-twentieth century, the Supreme Court viewed the fashioning of statutory remedies as within the proper judicial role." However, recent Supreme Court jurisprudence requires courts to adhere to statutory text in determining congressional intent.  *See*, *e.g.*, *Stokes v. SW Airlines*, 887 F.3d 199, 201–02 (5th Cir. 2018) (overturning Fifth Circuit precedent finding private right of action because prior analysis relied on Supreme Court's "*ancien regime*"); *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855-56 (2017) (explaining same evolution in Supreme Court jurisprudence).  The Court should follow the Fifth Circuit's reasoning to conclude that because Section 19 explicitly provides for monetary remedies, the same monetary remedies cannot be read into Section 13(b).

The clear shift in Supreme Court precedent demonstrates that the out-of-circuit cases concluding that Section 13(b) allows for implied monetary relief are suspect anachronisms.  These decisions did not even analyze the text and structure of the FTCA, but instead relied on *Amy Travel*

(overturned by *Credit Bureau*) and its progeny to conclude that Section 13(b) authorizes implied remedies.[13]   The ***only*** court to have actually examined the text and history of Sections 13(b) and 19 in depth is *Credit Bureau*.  Yet the FTC mischaracterizes *Credit Bureau* as an outlier by failing to acknowledge the clear trend of restricting the relief available under Section 13(b) to what is expressly authorized by the statutory text.  *See Shire*, 917 F.3d at 150 (refusing to "stretch Section 13(b) beyond its clear text"); *FTC v. AMG Cap. Mgmt, LLC*, 910 F.3d 417, 429 (9th Cir. 2018) (O'Scannlain and Bea, JJ., concurring) (noting that Ninth Circuit's interpretation of Section 13(b) to allow for monetary relief is "no longer tenable [b]ecause the text and structure of the statute unambiguously foreclose [that result]" and court's "invention of this power wrests from Congress its authority to create rights and remedies" but deferring to prior precedent under *stare decisis*).

Finally, the FTC argues that, by filing this Motion to Dismiss, Match is somehow seeking to "avoid accountability for its actions." (Opp. at 17.)  In fact, it is the FTC that is attempting to bypass the congressionally mandated means for seeking monetary relief, Section 19, because it wishes to avoid application of the protections conferred by that provision.

### C.     The CDA Immunizes Match from Liability for the Conduct Alleged in Counts I & II

While the Court need not reach the CDA issue because of the fatal defects described above, the CDA immunizes Match's alleged conduct underlying Counts I and II.  The Opposition fails to rebut the application of CDA immunity for two reasons:  <u>First</u>, in an impermissible attempt to amend the Complaint via its Opposition, the FTC grossly misrepresents what the Complaint

---

[13] *See, e.g.*, *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 598–99 (9th Cir. 2016) (noting that although Section 13(b) "mentions only injunctive relief," Ninth Circuit precedent reads the section more broadly and "under *Porter* and our cases applying it," restitution was permissible under Section 13(b)); *FTC v. Ross*, 743 F.3d 886, 891–92 (4th Cir. 2014) (allowing restitution because of *Porter* and uniform circuit case law).  The Texas cases the FTC cites as applying *Southwest Sunsites* to find implied monetary remedies under Section 13(b) are similarly devoid of statutory interpretation.  (*See* Opp. at 15 n.8 (citing *FTC v. Liberty Supply Co.*, 2016 WL 4063793, at *2 (E.D. Tex. July 29, 2016); *FTC v. Think All Publ'g, L.L.C.*, 564 F. Supp. 2d 663, 665 (E.D. Tex. 2008); *FTC v. Kennedy*, 574 F. Supp. 2d 714, 724 (S.D. Tex. 2008)).)

actually alleges; and <u>second</u>, the Opposition fails to explain why Match's conduct is not immunized by the analyses in the *Dyroff* and *Marshall's Locksmith* cases (among others that Match cites), glossing over the critical point that those cases (and this one) all involve "third-party harms committed either through neutral push notifications or messaging systems."  (Opp. at 26.)

### 1.    The FTC Cannot Amend Its Complaint via Its Opposition Brief

The Opposition's first tactic is to level allegations against Match not found anywhere in the actual Complaint.  As just one example, the Opposition levels a new and inflammatory allegation that Match has "design[ed] its own fraud screening protections to funnel fraud-flagged messages toward non-subscribers."  (Opp. at 30–31.)  Not only is that statement outright false, it appears nowhere in the Complaint, which instead alleges that Match did not withhold communications uniformly sent to non-subscribers, regardless of the sender's status. (*Cf.* Compl. ¶ 34.)  The Opposition may not amend the actual allegations in the Complaint, which describe vastly different conduct immunized by the CDA, as shown below.  *See Energy Coal v. CITGO Petroleum Corp.*, 836 F.3d 457, 462 n.4 (5th Cir. 2016).  For the Court's convenience, Exhibit A to this Reply compares the actual allegations in the Complaint with those made for the first time in the Opposition.

### 2.    The Conduct Actually Challenged in Counts I and II is Immunized by the CDA.

The FTC fails to come to grips with the cases cited by Match that immunized conduct virtually identical to that alleged here, including cases in which plaintiffs claimed that they were suing based upon the service provider's own conduct, and where the service provider had manipulated or created the content at issue.  Count I alleges that registered non-subscribers uniformly received "automatically generated email advertisements" sent to all "nonsubscribers [who] received likes, favorites, emails, and instant messages" regardless of the sender's status.

ACTIVE 251234795

(Compl. ¶¶ 22–24.)  *Dyroff* is on all fours: in that case, the defendant website created automated email notifications each time a user received a message, regardless of its content—precisely like Match's PTR notifications at issue here.  934 F.3d 1093, 1098 (9th Cir. 2019).  The FTC tries to distinguish the case by arguing that the push notifications and recommendations in *Dyroff* were mere tools meant to facilitate communication and were not substantive content themselves.  (Opp. at 26.)  But the same can be said for Match's notifications, which simply alerted registered users to a communication and contained a "button" to read the communication.  (Compl. ¶ 27.)  The Ninth Circuit in *Dyroff* held that such notifications do not foreclose CDA immunity unless they "materially contribute" to the underlying communication's illegality.  934 F.3d at 1098.  There is no such allegation here.  Similarly, the FTC does not even try to meaningfully distinguish *Marshall's Locksmith*, in which Google was found immune despite allegations that it "created out of whole cloth" map pinpoints that Google "know[s] are seriously inaccurate or even nonexistent" as part of a "scheme" to "generate advertising revenue."  925 F.3d 1263, 1266 (D.C. Cir. 2019);[14] (*see* Opp. at 27; Mot. at 20–21 (explaining why *Marshall's Locksmith* applies).)[15]

The Opposition makes even more deeply flawed arguments with respect to Count II.  This Count asserts liability arising from an alleged "exposure to fraud" because Match allowed access to communications from users still under review—users who should not be judged guilty before the review process is complete.  (Compl. ¶¶ 71–73.)  It is impossible to square these allegations with the Opposition's assertions that the FTC is not "challenging the adequacy of Match's fraud

---

[14] *MCW, Inc. v. Badbusinessbureau.com* bears little resemblance to this case.  The *MCW* defendants created defamatory content without use of neutral tools like those analyzed by *Dyroff* and *Marshall's Locksmith*; here, the FTC concedes that "Match's algorithms automatically generate[] a notification."  (Opp. at 23.)  The *MCW* defendants also encouraged and provided input on the underlying wrongful content.  2004 U.S. Dist. LEXIS 6678, at *33-34.

[15] Count I is also barred by Section 230(c)(2) because the supposed duty arises only because of Match's application of more restrictive messaging rules to subscribers than non-subscribers, which the FTC also fails to confront.  (*See* Opp. at 29.)

controls" (Opp. at 26),[16] and that it does not "seek to hold Match liable for the actual resulting harm caused directly by third parties" (Opp. at 30), as if there were some metaphysical harm from "exposure to fraud" that is untethered to the underlying fraud itself.  This is plainly derivative liability of the type disallowed in *Herrick v. Grinder*, 306 F. Supp. 3d 579 (S.D.N.Y. 2018); (*see* Mot. at 25.).  Despite the FTC's attempt to recast the claim in its Opposition, Count II is concerned with the harm that may result from reading a message that Match allowed on its platform from someone who later may have turned out to be fraudulent, conduct that the CDA immunizes.

More fundamentally, the FTC does not, and cannot, assert that website operators have a general duty to "prevent exposure to fraud" if they have no duty to perform anti-fraud screening in the first place.  Count II necessarily imposes such a duty on Match precisely and solely <u>because</u> it engages in extensive fraud-fighting efforts—the allegedly insufficient breadth of which the FTC claims is purportedly "unfair."  (Compl. ¶¶ 34-37, 71.)  This is the same attempt at "artful pleading" that the Fifth Circuit rejected in *Doe v. Myspace*, which recognized that pleadings asserting a "failure to implement measures that would have prevented" harm are "merely another way of claiming that Myspace was liable for publishing" the content resulting in the harm.  528 F.3d 413, 420 (5th Cir. 2008).  This is exactly what the CDA prevents. The FTC never confronts this reality, instead misrepresenting its own allegations to attempt to escape the conclusion that its theory of liability in Count II is necessarily premised on a purported inadequacy, a purported failure to do more, in Match's fraud prevention efforts.  This theory fails under the CDA.[17]

---

[16] The FTC cannot distinguish *Holomaxx*, which states "the appropriate question is whether Holomaxx has 'pled an absence of good faith,'" under the standards of *Twombly*.  783 F. Supp. 2d at 1105 (N.D. Cal. 2011).

[17] *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 176 (2d Cir. 2016), is inapposite because LeadClick was held responsible for its own conduct in "directly participating in the deceptive scheme by providing edits to affiliate webpages" of the fraudsters.

14

### D.     The FTC Fails to Plead a ROSCA Violation.

Finally, the plain text of ROSCA requires that Internet sellers "provide[] simple mechanisms for a consumer to stop recurring charges," but does *not* require that every available method of cancellation be simple, or even that an online method be provided.  (Mot. at 5, 27–28 (quoting 15 U.S.C. § 8403(3)).)  Thus, even assuming Match's online cancellation method is not "simple," (which Match vehemently denies), the FTC cannot state a ROSCA claim unless it alleges that Match does not offer any *other* simple mechanisms.  15 U.S.C. § 8403(3).  The Complaint lacks any such allegation.  (Compl. ¶¶ 53–59, 84–85.)  The Opposition does not dispute that the FTC has failed to plead the absence of other simple methods, but doubles down on attacking only the online cancellation method and asserts that the Court "should provide a remedy."  (Opp. at 34–35.)[18]  But there can be no remedy without a violation.  The FTC then asks the Court to allow the agency to proceed without properly pleading a violation of the statute because "any evidence Match has of providing mechanisms that might have mitigated the violation" will be a question for discovery.  (Opp. at 34.)  Of course, this puts the cart before the horse, as the FTC again ignores that it has the burden to adequately plead a violation of the statute in the first place, and it has failed to do so.

### III.     CONCLUSION

The Court should reject the FTC's improper attempts to salvage a Complaint that is legally defective in multiple ways, and grant Match's Motion to Dismiss.  If the FTC wants to seek monetary relief from Match, nothing is preventing it from seeking it in the way that Congress established under Section 19.

---

[18]  The only case the FTC offers in support of its position is not only inapposite but not even a summary judgment decision as the FTC asserts.  (Opp. at 34–35 (citing *FTC v. Health Formulas, LLC*, 2015 WL 2130504, at *1, *16–17, *38 (D. Nev. May 6, 2015)).)  The court actually decided whether to issue a preliminary injunction, which is irrelevant to the pleading defects here.

ACTIVE 251234795

Date:  November 19, 2019

By: */s/ Angela C. Zambrano*

Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
David Sillers
State Bar No. 24072341
dsillers@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, TX 75201
Telephone:  214.981.3300
Fax: 214.981.3400

Chad S. Hummel *(pro hac vice)*
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone:  310.595.9500
Fax:  310.595.9501

*Attorneys for Match Group, Inc.*

## **CERTIFICATE OF SERVICE**

On November 19, 2019, I filed the foregoing document with the clerk of court for the

U.S. District Court, Northern District of Texas.  I hereby certify that I have served the document

on all counsel by a manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ David Sillers*

David Sillers

16

# EXHIBIT A

**Demonstrative Exhibit:  Allegations in Complaint vs. Opposition**

| ALLEGATIONS IN COMPLAINT | ALLEGATIONS IN OPPOSITION |
|---|---|
| **Misleading Group 1:**  The Complaint does <u>not</u> allege that Match designed its platform to funnel fraudulent communications to non-subscribers. | |
| "Defendant is aware that these communications reach consumers and automatically generate personalized advertisements encouraging them to subscribe to Match.com."  (Compl. ¶ 33.)<br><br>"Defendant delivered email communications from fraud-flagged users to nonsubscribers while withholding them from subscribers until it had completed its fraud review."  (Compl. ¶ 34.)<br><br>"Defendant exposed consumers to the risk of fraud by providing recent subscribers access to communications that Defendant knew were likely to have been sent by persons engaging in fraud."  (Compl. ¶ 71.) | "Count II . . . challenges Match's designing its platform to funnel fraud-flagged communications toward its nonpaying members to generate subscriptions."  (Opp. at 29.)<br><br>"Match has . . . deliberately designed its platform to market fraud-flagged communications as if they were messages from real users."  (Opp. at 29.)<br><br>"The Complaint also alleges that Match participated in the deception . . . , going so far as to design its own fraud screening protections to funnel fraud-flagged messages toward non-subscribers."  (Opp. at 30–31.)<br><br>"Match developed a system to funnel potentially fraudulent messages to Match.com users—consumers who would then receive ads when the fraud-flagged accounts contacted them."  (Opp. at 31.)<br><br>"Match designed its platform to systematically peddle false advertisements toward unsuspecting consumers who would then receive access to a fraudster trying to scam them or no message at all."  (Opp. at 31.) |
| **Misleading Group 2:**  The Complaint does <u>not</u> allege that Match knowingly sent ads despite knowing they were false. | |
| "Defendant exposed consumers to the risk of fraud by providing recent subscribers access to communications that Defendant knew were likely to have been sent by persons engaging in fraud."  (Compl. ¶ 71.) | "The Complaint alleges Match to have knowingly sent ads despite knowing they were false."  (Opp. at 30.) |