# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:20-cv-01979-M |
| | § | |
| NEORA LLC, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

**ORDER**

Before the Court is the Motion for Judgment on the Pleadings (ECF No. 55), filed by Defendants Neora, LLC and Jeffrey Olson. For the reasons explained below, the Motion is **GRANTED** in part and **DENIED** in part.

**I. FACTUAL & PROCEDURAL BACKGROUND**

In November 2019, the FTC filed its Complaint against Signum Biosciences, Inc., Signum Nutralogics, Neora, LLC, and Jeffrey Olson under § 13(b) of the FTC Act, alleging violations of §§ 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, in connection with Neora, LLC's health supplement multi-level marketing business, formerly known as "Nerium."[1] Compl. (ECF No. 1) ¶¶ 1, 4. Specifically, the Complaint alleges that Nerium—which the FTC describes as "an international multi-level marketing company that sells supplements, skin creams, and other products using a network of 'Brand Partners' ('BPs')"—is an illegal pyramid scheme, in which BPs pay Nerium for the right to sell Nerium products, and in return for recruiting other participants, receive rewards unrelated to product sales to end users. *Id.* ¶¶ 12,

---

[1] The Complaint primarily makes reference to "Nerium." Accordingly, for purposes of this Order, the Court shall use "Nerium" to refer to Defendant Neora, LLC.

1

132–33.  Nerium's compensation scheme allegedly emphasizes recruiting new BPs and encouraging them to make significant upfront purchases, as opposed to selling Nerium products to consumers outside of the organization.  *Id.* ¶¶ 12, 14–50.  Profits are passed to those higher up in the organization.  *Id.* ¶¶ 26–27, 46.

The Complaint further alleges that Nerium and its BPs consistently and deceptively portray Nerium as a business opportunity with "Significant Earning Potential" and "lifestyle-changing income."  *Id.* ¶¶ 32–50.  The Complaint references various promotional materials describing lavish incomes and bonuses that Nerium BPs may earn, including social media posts by Nerium featuring Defendant Jeffrey Olson, and posts by Nerium BPs.  *Id.*; *see, e.g.*, *id.* ¶ 38 ("Social media posts by Nerium BPs describe all the people who have 'given up their corporate America 9-5 jobs to work exclusively with Nerium.' Nerium BPs commonly post a banner on Instagram and Facebook saying 'DON'T LET $50K/YEAR KEEP YOU FROM $50K/MONTH.'"); *id.* ¶ 43 ("Nerium regularly hypes a 'free' Lexus automobile . . . that BPs can earn from working for Nerium.  For example, Nerium posts numerous photographs on its Facebook page featuring BPs posing beside their new Lexuses.").  But the Complaint further alleges that due to the challenges of retail and recruiting, as well as fees Nerium charges to BPs, the most recent data reflects that more than 95% BPs pay more to Nerium each month than they earn in commissions and bonuses, and that among active BPs, average annual earnings are only $65.  *Id.* ¶¶ 46–50.

According to the Complaint, Signum Biosciences, Inc. and Signum Nutralogics (collectively, the "Signum Defendants") manufacture Nerium EHT (and its predecessor product, ME Sports), which is licensed exclusively to Nerium and sold by Nerium BPs.  *Id*. ¶ 13.  The Complaint alleges that, in conjunction with the Signum Defendants, Nerium and its BPs have

made unsupported health claims about EHT, the primary ingredient of both Nerium EHT and ME Sports. *Id.* ¶¶ 13, 51–127.  Specifically, through various promotional materials, presentations, and social media, Nerium and its BPs have allegedly made unsubstantiated claims that EHT and products containing EHT (including Nerium EHT and ME Sports) can help with various health ailments, including concussions, chronic traumatic encephalopathy ("CTE"), Alzheimer's disease, and Parkinson's disease.  *Id.*  The Complaint points to promotional materials allegedly promulgated by Nerium relating to Nerium EHT and ME Sports containing claims that EHT promotes brain health, as well as specific social media posts by Nerium and its BPs containing similar claims.  *Id.*; *see, e.g.*, *id.* ¶ 104 ("Nerium's website also includes a description of Nerium EHT's health benefits, and links to a Signum study suggesting that EHT may reduce the risk of Alzheimer's disease."); *id.* ¶ 125 ("'EHT for brain health . . . #alzheimers #dementia . . . #parkinsonsdisease #parkinsons.' (Carrie Skowronek Instagram, Sept. 1, 2019)."). The Complaint also describes Nerium conferences attended by thousands of BPs, during which BPs were told of EHT's purported ability to benefit patients with concussions, Alzheimer's disease, and Parkinson's disease.  *Id.* ¶¶ 62, 67–69, 85–86, 95, 105–106, 118–19.

Shortly after filing the Complaint, the FTC settled with the Signum Defendants, who stipulated to a permanent injunction prohibiting them from making misleading statements regarding the health benefits of EHT contained in Defendants' products.  ECF No. 10.  The two remaining defendants are Neora, LLC and its founder, Jeffrey Olson (together, "Defendants").

Based on the foregoing allegations, the FTC alleges that Defendants violated the FTC Act by making deceptive or misleading product claims in connection with EHT, making false claims about the potential income BPs could earn by enrolling in Nerium, operating as an illegal pyramid scheme, and providing BPs with the means and instrumentalities to violate the FTC Act.

Pursuant to § 13(b), the FTC seeks preliminary injunctive relief as necessary to prevent consumer injury during pendency of the action, a permanent injunction to prevent future violations of the FTC Act, relief necessary to redress injury to consumers, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, and costs.  Compl., at 42.

## II.  LEGAL BACKGROUND

### a.  FTC Act § 13(b)

The Federal Trade Commission Act prohibits and authorizes Plaintiff the Federal Trade Commission ("FTC") to prevent "[u]nfair methods of competition" and "unfair or deceptive acts or practices."  15 U.S.C. §§ 45(a)(1)–(2).  The FTC is authorized to enforce the Act through administrative proceedings and court actions.  *See AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341, 1346–47 (2021) (summarizing the FTC's statutory enforcement authority).  Section 5 of the Act describes the FTC's enforcement powers through administrative proceedings: if, following a hearing, the FTC concludes that a party has engaged in prohibited conduct, an administrative law judge may issue a cease and desist order to stop the unlawful conduct.  FTC Act § 5(b), 15 U.S.C. § 45(b).  In 1973, Congress amended § 5(*l*) of the Act to authorize district courts to award civil penalties against respondents who violate final cease and desist orders, and in 1975, amended § 19 of the Act to permit the district court to award consumer redress in the form of money or return of property against those who violated a final cease and desist order.  *AMG Cap.*, 141 S. Ct. at 1347; *see* FTC Act § 5(*l*); 15 U.S.C. § 45(*l*); FTC Act § 19, 15 U.S.C. § 57.  In 1973, Congress also amended the Act to amend § 13(b)—the section at issue here—which permits the FTC to proceed directly to the district court to seek a

Case 3:29-cv-02979-M   Document 72-2   Filed 08/02/21   Page 5 of 17   PageID 1856

temporary restraining order or preliminary injunction, and in "proper cases . . . after proper proof," a permanent injunction:

> (b) Temporary restraining orders; preliminary injunctions
>
> Whenever the Commission has reason to believe--
>
>> (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and
>>
>> (2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public--
>
> the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: Provided, however, That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: *Provided further*, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction. . . .

FTC Act § 13(b), 15 U.S.C. § 53.

On April 22, 2021, the Supreme Court issued its opinion in *AMG Capital Management, LLC v. Federal Trade Commission*, 141 S. Ct. 1341 (2021), and held that § 13(b)'s language authorizing the FTC to obtain "in proper cases," a "permanent injunction" in federal court against "any person, partnership, or corporation" that it believes "is violating, or is about to violate, any provision of law" enforced by the FTC, does not authorize the FTC to seek equitable monetary relief, such as restitution or disgorgement. *Id.* at 1344.

Specifically, the Supreme Court analyzed whether Congress's use of "permanent injunction" in § 13(b) was intended to grant the FTC authority to obtain monetary relief directly

5

from the district courts, effectively bypassing the "cease and desist" process set forth in § 5 and § 19. The Court noted the language of § 13(b) reflected the provision's prospective nature, which addresses "a specific problem, namely that of stopping seemingly unfair practices from taking place while the Commission determines their lawfulness." *Id.* at 1348. Moreover, the Court was doubtful that Congress would have authorized limited and conditioned recovery of monetary relief under § 19—*i.e.*, available only after a cease and desist order has been violated—if § 13(b) had "already implicitly allowed the Commission to obtain that same monetary relief and more without satisfying those conditions and limitations." *Id.* at 1349. Accordingly, the Supreme Court concluded that "§ 13(b) as currently written does not grant the Commission authority to obtain equitable monetary relief." *Id.* at 1352.

### b. Federal Rule of Civil Procedure 12(c)

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12 (c) provides a means to dispose of a case where the parties do not dispute the material facts "and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Hebert Abstract v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990). The standard for resolving a motion for judgment on the pleadings is the same as a motion to dismiss under Rule 12(b)(6). *Gentilello v. Rege*, 627 F.3d 540, 543–44 (5th Cir. 2010). When reviewing a Rule 12(b)(6) motion to dismiss, courts must "accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff." *Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015) (quoting *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010)).

### III. ANALYSIS

Defendants seek judgment on the pleadings on two grounds: first, that dismissal with prejudice of the entire action is appropriate because the FTC did not first engage in administrative enforcement proceedings, and second, that the FTC has not pleaded that Defendants are violating or are about to violate the law, a prerequisite to seeking a permanent injunction under § 13(b). *See* Mot. (ECF No. 55) at 5, 8.

Defendants also challenge the FTC's claim for monetary relief in light of *AMG Capital*. In response, the FTC concedes that *AMG Capital* forecloses its ability to obtain equitable monetary relief, and thus does not object to dismissal of its requests for "recission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies." Opp. (ECF No. 64) at 10. Accordingly, in light of the unambiguous pronouncement from the Supreme Court in *AMG Capital* regarding the unavailability of monetary relief under § 13(b), Defendants' Motion as to FTC's claim for monetary relief is granted. The remainder of Defendants' Motion is denied, as discussed further below.

> **a. The FTC did not need to obtain a prior preliminary injunction or temporary restraining order via the administrative process prior to seeking a permanent injunction under § 13(b).**

Defendants argue that in cases where permanent injunctive relief is sought, such as here, the FTC is required to use the administrative process provided under § 5 of the FTC Act. For support, Defendants rely on dicta in *AMG Capital* that § 13(b) permits the issuance of temporary restraining orders and preliminary injunctions to "address[] a specific problem, namely, that of stopping seemingly unfair practices from taking place while the Commission determines their lawfulness" through an administrative proceeding, and that "the appearance in that section of the words 'permanent injunction' (as a proviso) suggests that those words are directly related to a previously issued preliminary injunction." *See* Mot. at 8 (quoting *AMG Cap.*, 141 S. Ct. at

7

1348–49). Thus, Defendants argue that because the FTC brings claims under § 13(b) but did not previously engage in administrative enforcement proceedings or obtain a preliminary injunction or temporary restraining order, the case must be dismissed.

The Court is not persuaded by Defendants' arguments. The Supreme Court in *AMG Capital* made no definitive statement regarding the availability of permanent injunctions vis-à-vis administrative enforcement proceedings, nor any pronouncement as to what constitutes a "proper" case under § 13(b), in which a permanent injunction could be available. Instead, *AMG Capital*'s holding is narrow, limited to the question of whether § 13(b) authorizes the FTC to seek and be awarded equitable monetary relief such as restitution or disgorgement.[2] 141 S. Ct. at 1344. Accordingly, any statement as to the availability of permanent injunctions in *AMG Capital* is not necessary to the ultimate holding and, therefore, constitutes dictum. *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir.), *opinion corrected on other grounds on denial of reh'g*, 380 F.3d 231 (5th Cir. 2004) ("A statement is not dictum if it is necessary to the result or constitutes an explication of the governing rules of law.").

The Court is obligated to give "serious consideration" to recent and detailed discussions of the law by the Supreme Court, even if dicta. *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013); *see also Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 757 (7th Cir. 1994)

---

[2] In fact, the Supreme Court denied a petition for certiorari in July 2020 which sought to address the issue raised by Defendants here. In *Credit Bureau Center, LLC v. Federal Trade Commission*, No. 19-914 (U.S. Jan. 20, 2020), the issue presented by petitioner was: "[w]hether the second proviso of Section 13(b) of the Federal Trade Commission Act, providing that the Federal Trade Commission 'may seek' a permanent injunction, is an independent grant of authority to 'file suit' seeking implied consumer redress remedies circumventing the elaborate enforcement scheme set by Congress." Although denial of a petition for certiorari is not authoritative, the Supreme Court apparently did not see a pressing need to address the decisions of multiple circuits holding that the FTC can pursue a permanent injunction without invoking the administrative process. *See F.T.C. v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984); *United States v. JS & A Grp., Inc.*, 716 F.2d 451, 456 (7th Cir. 1983); *F.T.C. v. H. N. Singer, Inc.*, 668 F.2d 1107, 1111 (9th Cir. 1982).

8

("[R]ecent [Supreme Court] dictum . . . provides the best, though not an infallible, guide to what the law is, and it will ordinarily be the duty of a lower court to be guided by it."). However, the language Defendants rely on—that the words "'permanent injunction' . . . *suggests*" the existence of a related, previously issued preliminary injunction or temporary restraining order— is far from a compelling endorsement of the position they urge this Court to take. *See AMG Capital*, 141 S. Ct. at 1348 (emphasis added). To the extent the Supreme Court is construing § 13(b) here, its use of qualifying language like "suggests" indicates that any interpretation is far from final. Indeed, other language in *AMG Capital*—including the sentence immediately following the sentence Defendants rely on—indicates that permanent injunctions are, in fact, available under § 13(b) even in the absence of parallel administrative proceedings:

> [T]he appearance of the words "permanent injunction" (as a proviso) suggests that those words are directly related to a previously issued preliminary injunction. <u>They might also be read, for example, as granting authority for the Commission to go one step beyond the provisional and ("in proper cases") dispense with administrative proceedings to seek what the words literally say (namely, an *injunction*)</u>.
>
> . . .
>
> At the same time, to read § 13(b) to mean what it says, as authorizing injunctive but not monetary relief, produces a coherent enforcement scheme: The Commission may obtain monetary relief by first invoking its administrative procedures and then § 19's redress provisions (which include limitations). <u>And the Commission may use § 13(b) to obtain injunctive relief while administrative proceedings are foreseen or in progress, or when it seeks only injunctive relief</u>.

*Id.* at 1348, 1349 (underlined emphasis added).

Accordingly, giving due consideration to the dicta in *AMG Capital* regarding permanent injunctions under § 13(b), the Court finds no clear directive from the Supreme Court that permanent injunctions are wholly unavailable absent a prior administrative proceeding or previously issued preliminary injunction or temporary restraining order. On the contrary, *AMG Capital* contemplates that a permanent injunction under § 13(b) would be available in

9

circumstances, such as here, where the FTC dispenses with administrative proceedings and seeks only injunctive relief.

The Court notes the circuits that have already considered this question reached a similar result. *See F.T.C. v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984); *United States v. JS & A Grp., Inc.*, 716 F.2d 451, 456 (7th Cir. 1983) ("[P]ermanent injunctive relief may be sought by the Commission, and granted by a district court, irrespective of the pendency of an administrative proceeding."); *F.T.C. v. H. N. Singer, Inc.*, 668 F.2d 1107, 1111 (9th Cir. 1982) ("We hold that § 13(b) gives the Commission the authority to seek, and gives the district court the authority to grant, permanent injunctions in proper cases even though the Commission does not contemplate any administrative proceedings."); *see also FTC v. Am. Future Sys., Inc.*, Case No. 2:20-cv-02266-JHS, ECF No. 108, at 1 & n.1 (E.D. Pa. July 26, 2021) ("*AMG Capital* does not stand for the proposition that a permanent injunction under Section 13(b) must be sought in conjunction with an administrative proceeding under Section 5."). In addition, the legislative history for this provision indicates that Congress contemplated that permanent injunctive relief would be available in certain cases absent the initiation of administrative proceedings. *See JS & A Grp.*, 716 F.2d at 456–57 ("[T]he Commission will have the ability, in the routine fraud case, to merely seek a permanent injunction in those situations in which it does not desire to further expand upon the prohibitions of the Federal Trade Commission Act through the issuance of a cease-and-desist order.'" (quoting S. Rep. 93–151, 93rd Cong., 1st Sess. 30–31 (1973))).

In sum, other than one sentence in *AMG Capital* suggesting that a permanent injunction under § 13(b) may be related to a previously issued preliminary injunction or temporary restraining order, there does not appear to be any support for Defendants' position. Thus, although the Defendant is correct that dicta from the Supreme Court should be "accorded great

weight," *see* Reply Br. (ECF No. 72) at 2 (quoting *United States v. Santana*, 6 F.3d 1, 9 (1st Cir. 1993)), the Court declines to take the drastic step urged by Defendants and interpret the Supreme Court's irresolute commentary on § 13(b) as a clear directive that permanent injunctions are not available absent concurrent administrative proceedings, a prior injunctive relief, or a temporary restraining order, particularly where doing so is not only inconsistent with the legislative history and relevant precedent, but also the Court's own statements elsewhere in the same opinion. *See Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 35 (2012) ("We resist reading a single sentence unnecessary to the decision as having done so much work.").

### b. The Complaint sufficiently alleges both that Defendants' alleged lawbreaking is ongoing and that it is likely to reoccur.

Defendants next argue that the Complaint alleges past violations, and because relief under § 13(b) is only available when the FTC has reason to believe that someone "is violating, or is about to violate" the FTC Act, the FTC's claims for a permanent injunction must be dismissed. Defendants argue that numerous allegations in the Complaint are based on past conduct, including that the pyramid scheme allegations rely on a compensation plan that was discontinued years ago, the Complaint's acknowledgment that the ME Sports product was last marketed in 2015, and the fact that the Signum Defendants have already settled with the FTC. Mot. at 10; Reply at 10. Defendants further argue that the FTC has not met its pleading burden.

Regarding the FTC's pleading burden, to plead that a defendant "is violating, or is about to violate" under § 13(b), the FTC need only allege practices "giving rise to a 'fair inference of a reasonable expectation of continued violations' absent restraint." *Federal Trade Commission v. Southwest Sunsites, Inc.*, 665 F.2d 711, 723 (5th Cir. 1982). Defendants argue that the FTC's reliance on this standard is misplaced, contending the Fifth Circuit borrowed this standard from another case interpreting a different statute. Reply at 8 ("[T]he dicta cited by Plaintiff relies

11

upon the judicial interpretation of a different statute enforced by a different government agency."). Even if true, the Fifth Circuit in *Sunsites* applied the standard in an FTC enforcement case, and Defendants do not point to any authority specifically rejecting that standard or implying that it is wrong. Nor do the Defendants provide an alternate standard.

Instead, Defendants point to cases restating the proposition that allegations relating to "long-past conduct" alone will not suffice to show a defendant is or is about to violate the FTC Act. Reply at 8 (citing *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019); *FTC v. Advocare*, 2020 WL 6741968 (E.D. Tex. Nov. 16, 2020)). Defendants primarily rely on the Third Circuit's decision in *Shire* for the proposition that "long-past conduct" cannot alone justify injunctive relief under § 13(b). However, the court in *Shire* expressly did not opine on what *would* satisfy a showing of "about to violate" under § 13(b). *See* 917 F.3d at 160 ("Whatever the outer reach of 'about to violate' may be, the facts in this case do not approach it. We therefore leave for another day the exact confines of Section 13(b)'s 'about to violate' language."). Nor did *Shire* state that allegations of past conduct can never be considered when evaluating whether injunctive relief is available. *See id.* Thus, *Shire* only stands for the proposition that, in that case, the amount of time between the violation and the filing of the complaint—5 years—was too far removed temporally to establish that the defendant was about to commit more violations.

Courts in the Fifth Circuit have concluded that allegations of past conduct can give rise to a reasonable inference of current or future violations, either in conjunction with other circumstances or where the past violations are extensive. *See, e.g.*, *FTC v. Educare Ctr. Servs., In*c., 433 F. Supp. 3d 1008, 1014 (W.D. Tex. 2020) ("Following *Sunsites*, when applying § 13(b), district courts have analyzed whether the surrounding circumstances—in addition to the past violations alleged—create a reasonable expectation that violations will continue.");

*Advocare*, 2020 WL 6741968, at *6 ("[A] plaintiff may state a plausible claim under Section 13(b) by showing that a past violation or series of past violations is likely to recur. In some instances, courts have found that an extensive history of past violations is itself sufficient to create an inference of ongoing violations."); *FTC v. GTP Mktg., Inc.*, No. 4-90-123-K, 1990 WL 54788, at *5 (N.D. Tex. Mar. 15, 1990) ("An extensive history of violations does beget an inference that future violations are likely to occur."). In addition, in *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811 (N.D. Tex. 2008), Judge Fitzwater relied on the following factors—articulated by the Fifth Circuit in an SEC case as non-exclusive factors to consider in deciding whether to issue an injunction based on past violations of the law—in a § 13(b) permanent injunction case:

> [T]he egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*Id.* at 816 (quoting *SEC v. Blatt*, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978)).

Accordingly, simply because the Complaint contains allegations of past violations does not mean that the FTC has not sufficiently alleged that similar violations are likely to reoccur. Instead, allegations of past violations must be assessed in context of the FTC's other allegations, including the factors articulated in the *Cornerstone Wealth* case quoted above.

With that in mind, the Court concludes that the FTC's allegations in the Complaint are sufficient to infer a reasonable expectation of continued violations absent restraint at least as of the date of the Complaint's filing on November 1, 2019. The Complaint contains numerous allegations in the present tense—indicating the Defendants are currently engaging in the alleged conduct—as well as specific examples dated shortly before the Complaint was filed. Compl. ¶¶ 12–51, 65, 71–72, 95–98, 108, 112-15, 120–26. For instance, the Complaint contains

examples of social media posts containing alleged misrepresentations dated in September and October of 2019. *E.g.*, *id.* ¶ 125.

Moreover, the Complaint touches on several of the *Cornerstone Wealth* factors, including allegations that the violations reoccurred frequently and had a high degree of scienter. The Complaint alleges income and product misrepresentations made on a vast scale to thousands of BPs, whether online via social media or during conferences. The Complaint also alleges that the vast majority of Nerium BPs—*i.e.*, 95%—paid more to Nerium each month than they earned in commissions or bonuses. *Id.* ¶¶ 46–50. Regarding scienter, the Complaint contains allegations that Defendants were aware of the potential regulatory issues associated with their product claims, but chose to continue making them. *E.g.*, *id.* ¶ 61 ("Presenting EHT to thousands of BPs at the April 2015 GetReal Conference, a Signum representative touted the significant funding Signum received from the Michael J. Fox Foundation and linked the claim that EHT protects and stabilizes proteins in the brain to the brain damage suffered by NFL player Junior Seau. Immediately afterwards, Jeff Olson told the crowd, 'a lot of things you can't say, we'll talk about that later on, because all those things you can't say – it does!'"). Finally, the Complaint contains no acknowledgement from Defendants regarding recognition of past wrongs or assurances that it will not happen again in the future.

Defendants argue that the Complaint's acknowledgment that ME Sports was no longer marketed after 2015 represents a "long-past violation" insufficient to show current or future violations. However, the Complaint also alleges Defendants referred consumers and BPs back to the ME Sports marketing materials when marketing Nerium EHT, and continued making the claims first used in those materials through the filing date of the Complaint. *E.g.*, *id*. ¶¶ 61–63, 90, 95, 108, 112, 124–25, 127. Accordingly, even if ME Sports was no longer marketed, the

14

FTC's allegations regarding the availability of and reliance on the ME Sports marketing materials can still support a reasonable inference of a present or future violation.

Defendants also posit that, in support of the FTC's allegations that Defendants are engaging in an illegal pyramid scheme, the Complaint describes a compensation scheme for Nerium BPs which has since been replaced. However, when ruling on a Rule 12(c) motion for judgment on the pleadings, the court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). Accordingly, the Court accepts the FTC's allegations regarding the compensation scheme as pleaded; to the extent those allegations lack sufficient evidentiary support to justify a permanent injunction, that can be addressed at summary judgment.

Finally, Defendants seemingly argue that the settlement of the Signum Defendants affects whether the remaining Defendants can commit future violations. *See* Reply at 10 ("Plaintiff goes to great lengths to discuss allegedly improper conduct . . . that would have been prevented at the outset of this litigation by Plaintiff's settlement with the Signum Defendants."). Defendants also point to the decision in *Advocare*, where the court dismissed a § 13(b) suit in part because certain co-defendants had settled with the FTC around the filing of the Complaint. There, because the settling defendants agreed to numerous sanctions, including dismantling and restructuring of the entire business, the court held that the "channel of misconduct" for the lone remaining individual defendant "was either permanently defunct (in the case of the MLM program) or reformed, lawful, and monitored for compliance (in the case of Advocare more broadly)." *Advocare*, 2020 WL 6741968, at *6. Accordingly, the court concluded the FTC "appear[ed] to affirmatively concede that the channels through which the [remaining defendant] engaged in misconduct are permanently closed," rendering any inference of present or future violations unreasonable. *Id.*

That is not the case here. The fact that the Signum Defendants have settled already could potentially affect whether Defendants are or are about to violate the FTC's prohibitions, if that settlement closed avenues or channels for Defendants' alleged wrongdoing. However, the Signum Defendants agreed only to compliance reporting and to avoid making product misrepresentations about EHT. ECF No. 10, at 4. No part of the settlement agreement relates to the operation of Defendants' multi-level marketing business, alleged income claims and product misrepresentations, or BPs and product distributors. Accordingly, the FTC's settlement with the Signum Defendants did not close the "channel of wrongdoing" as to the remaining Defendants, and as discussed, the FTC's allegations support a reasonable inference of present or future violations by Defendants.

IV. **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Judgment on the Pleadings is **GRANTED** in part and **DENIED** in part. The Motion is granted with respect to Plaintiff's claim for monetary relief, but denied in all other respects.

**SO ORDERED**.

August 2, 2021.

BARBARA M. G. LYNN
CHIEF JUDGE

Case 3:20-cv-02879-M Document 242 Filed 08/02/21 Page 16 of 17 PageID 1868