IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:19-CV-2281-K |
| | § | |
| MATCH GROUP, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are: (1) Defendant Match Group, Inc.'s Motion to Dismiss ("Motion to Dismiss") (Doc. No. 20); (2) Plaintiff Federal Trade Commission's Motion to Exclude Matters Outside the Pleadings Pursuant to Fed. R. Civ. P. 12(d) ("Motion to Exclude") (Doc. No. 26); and (3) Plaintiff Federal Trade Commission's Motion for Leave to File Sur-Reply ("Motion for Leave") (Doc. No. 32).  The Court has carefully considered each of the motions, the responses, the replies, the supporting appendices, the applicable law, and the relevant portions of the record.

For the reasons set forth in Section II, the Court **GRANTS in part and DENIES in part** Match Group, Inc.'s Motion to Dismiss. For the reasons set forth in Sections III and IV, the Court **DENIES** Plaintiff Federal Trade Commission's Motion to Exclude and Motion for Leave, respectively.

ORDER – PAGE 1

I.      **Factual and Procedural Background**

Defendant Match Group, Inc. ("Match") is "the dominant online dating service provider in the United States" and it owns, operates, and controls Match.com.  Compl. (Doc. No. 1) at 3, ¶¶10-11.  Match "primarily generates revenue on Match.com by selling subscriptions to consumers in 25 countries, including the United States."  *Id.* Consumers of online dating services, such as Match.com, are given access to the service's database of other users to find a romantic partner.  *Id.* at 4, ¶13.  Consumers create profiles containing certain information about themselves, and it is these profiles which other users are able to view.  *Id.* at ¶14.   Consumers are able to communicate with one another through various means; on Match.com this includes "likes", "winks" (until May 2018), and personalized "emails".  *Id.* at ¶13; 6, ¶20.  The types of communications a consumer can send and also read depend upon whether they are a subscriber or not.  *Id.* at ¶¶20-21.

Plaintiff Federal Trade Commission (the "FTC") alleges that online dating services such as those Match owns, operates, and controls, are "often misused to facilitate fraud or to promote dubious or unlawful products or services to consumers." *Id.* at ¶15.  This includes romance scams such as gifting or loaning the culprit money, stealing the consumer's personal information, and obtaining through extortion compromising videos or pictures of the consumer.  *Id.* at ¶15; 5, ¶19.  These schemes

have allegedly resulted in substantial injury to consumers of online dating services.  *Id.* at ¶16.  The FTC alleges that, between 2015 and 2017, consumers reported to the FTC and the Federal Bureau of Investigation losses totaling an estimated $884 million.  *Id.*

Match.com offers subscriptions in 1-, 3-, 6-, or 12-month packages, and all packages automatically renew.  *Id.* at 5, ¶17.  Consumers can also create a free "nonsubscriber" profile which gives them limited access to services.  *Id.*  Consumers using Match.com's services are not able to identify whether another user is a subscriber or nonsubscriber.  *Id.* at ¶18.  The FTC alleges that, from 2013 to mid-2018, nonsubscribers were unaware that "as many as 25-30 percent of Match.com members who registered each day were using Match.com to perpetrate scams." *Id.* at ¶19.  The FTC alleges that Match knew, or suspected, certain users were engaging in fraud.  *Id.* at 10, ¶36.  Knowing that, Match allegedly used communications from these fraudulent accounts to induce nonsubscribers to purchase a subscription, touting the communications as romantic interest from a legitimate user, which then exposed these consumers to a "risk of falling victim to a romantic scam or other form of fraud" when accessing these fraudulent communications.  *Id.* at 6-7, ¶¶22-26; 10, ¶34-37.

The FTC also alleges that, until mid-2019, Match marketed a deceptive "match GUARANTEE" to users purchasing a six-month Match.com subscription service.  *Id.* at 11, ¶38.  The "match GUARANTEE" promised these subscribers a free six-month

ORDER – PAGE 3

subscription if they did not "meet someone special" during the paid six-month subscription. *Id.* at ¶39. Match "did not disclose that the guarantee is subject to any additional terms or conditions" even though several requirements set forth in "a lengthy 'Program Rules' section" must be satisfied in order to receive the guarantee. *Id.* at ¶¶40-43. The FTC alleges that few subscribers actually received a free six-month subscription because Match did not clearly state the requirements of the "match GUARANTEE" or the required process by which to claim it. *Id.* at 15-17, ¶¶46, 48, 51-52.

The FTC also alleges that Match has a confusing and complicated subscription cancellation process. Match.com subscriptions have a "negative option renewal", meaning the subscription automatically renews and the subscriber is charged unless he affirmatively cancels the subscription. *Id.* at 17, ¶¶53-54. The cancellation process allegedly has "several steps", including two pages of "survey questions", consumers must complete before reaching the actual confirmation cancellation page. *Id.* at ¶¶55-56. The FTC alleges this practice has resulted in Match billing "thousands of consumers" for subscription auto-renewals "after they believed they effectively canceled their Match.com subscriptions." *Id.* at 19, ¶58. The FTC also alleges Match has deceptive billing practices, in particular those related to Match.com billing disputes and access to paid-for subscription services or accounts. *Id.* at ¶¶61-63.

ORDER – PAGE 4

The FTC initiated action against Match directly in federal court. In filing this suit, the FTC alleges, generally, that Match violated 15 U.S.C. § 45(a) by: (1) misleading users that "dating communications" were sent from legitimate user accounts when Match knew the account was fraudulent or flagged for review as set up by a third-party for illegitimate purposes; (2) exposing legitimate customers to fraud because Match failed to investigate these fake accounts before sending notification of those communications; (3) offering a "money back guarantee" that was deceptive; and (4) unfairly denying customers access to paid-for accounts in relation to billing disputes. The FTC also alleges that Match violated the Restore Online Shoppers' Confidence Act ("ROSCA") in (5) failing to provide a simple way for customers to cancel recurring charges. In its Complaint, the FTC seeks injunctive relief, disgorgement, restitution, monetary civil penalties, costs, and any other relief to which it is entitled. Match filed the instant Motion to Dismiss in response to the Complaint. The FTC then filed its Motion to Exclude and Motion for Leave to file Sur-reply.

Before the Court ruled on those motions, Match filed a motion to stay the case pending the Supreme Court's resolution of a key issue before the Court in this case— whether the Federal Trade Commission Act (the "Act") permits the FTC to seek equitable monetary relief directly in federal court. *See generally* Mot. to Stay (Doc. No. 51). This Court granted the stay. *See* Order Staying Case (Doc. No. 54). The Supreme

Court issued its decision in *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, — U.S. —,
141 S. Ct. 1341 (2021), on April 22, 2021.  The Supreme Court held that Section
13(b) of the Act explicitly authorizes the FTC to seek injunctive relief in federal court,
including, "in proper cases", a "permanent injunction", but this authorization does not
extend to equitable monetary relief.  *Id.* at 1344.  The Act, as its currently written, does
not authorize the FTC to obtain, or the courts to award, equitable monetary relief,
including disgorgement and restitution.  *Id.* at 1352.

The Court turns now to the pending motions.

## II.     Match's Motion to Dismiss Under Rule 12(b)(6)

### A.     Applicable Law

#### 1.     Rule 12(b)(6) Standard

In considering a Rule 12(b)(6) motion, a court must determine whether the
plaintiff has sufficiently stated a claim upon which relief may be granted. FED. R. CIV.
P. 12(b)(6).  A well-pleaded complaint must allege facts upon which the claims are
based and not merely recite the elements of a cause of action.  *Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 555 (2007).  The facts must be sufficiently alleged such that the "claim
has facial plausibility" and is not merely "possible".  *Aschcroft v. Iqbal*, 556 U.S. 662,
678 (2009).  A plaintiff pleads a claim with facial plausibility when the "factual content
. . . allows the court to draw the reasonable inference that the defendant is liable." *Id.*

In other words, the alleged facts must nudge the plaintiff's claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  The Court "accept[s] all well-pleaded facts as true and view[s] those facts in the light most favorable to the plaintiff." *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007) (per curiam).  The Court does not, however, "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)).

The Court must generally determine a motion to dismiss for failure to state a claim based solely on the pleadings, including any attachments thereto.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).  The Fifth Circuit also allows the district court to consider documents attached to the motion to dismiss when those documents "are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim." *Id.* at 498–99 (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

"Although dismissal under Rule 12(b)(6) is ordinarily determined by whether the facts alleged in the complaint, if true, give rise to a cause of action, a claim may also be dismissed if a successful affirmative defense appears clearly on the face of the pleadings." *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986); *see also EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir.

2006) ("Although dismissal under rule 12(b)(6) may be appropriate on a successful affirmative defense, that defense must appear on the face of the complaint.").

### 2.    Section 13(b) of the Federal Trade Commission Act

Section 45(a) of the Act prohibits "[u]nfair methods of competition . . . and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a)(1). This section also empowers the FTC to take action against such prohibited conduct. *Id.* § 45(a)(2).   The FTC is authorized to enforce the Act through the FTC's own administrative proceedings and in court actions. *AMG Cap.*, 141 S. Ct. at 1346-47. Relevant to this case, the Act permits the FTC "in proper cases" to file an action directly in court seeking a permanent injunction.   15 U.S.C. § 53(b) (the "Section 13(b)"). When the FTC reasonably believes:

> (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the [FTC], and (2) that the enjoining thereof pending the issuance of a complaint by the [FTC] and until such complaint is dismissed by the [FTC] or set aside by the court on review, or until the order of the [FTC] made thereon has become final, would be in the interest of the public—
> The [FTC] by any of its attorneys designated by it for such purpose may bring suit in a district court of the United State to enjoin any such act or practice. . . . *Provided further*, That in proper cases the [FTC] may seek, and after proper proof, the court may issue, a permanent injunction.

*Id.*

ORDER – PAGE 8

### 3.    Section 4 of the Restore Online Shoppers' Confidence Act

Recognizing the importance of consumer confidence to online commerce, Congress enacted the Restore Online Shoppers' Confidence Act ("ROSCA") in response to finding "that the aggressive sales tactics many companies use against their online customers have undermined consumer confidence in the Internet and thereby harmed the American economy."  15 U.S.C § 8401.  Section 4 of ROSCA makes it unlawful to charge a consumer for goods or services sold online using a "negative option feature" unless the seller:  (1)  provides clear and conspicuous disclosure of all material terms of the transaction before obtaining the consumer's billing information; (2) obtains the consumer's express informed consent before charging the consumer; and (3) provides a simple method for the consumer to stop recurring charges.  *Id.* § 8403. "Negative option feature" is defined as, "in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w).

### B.    Analysis

In its Motion to Dismiss, Match argues all five of the FTC's claims must be dismissed.  Match first contends the Court must dismiss Counts I-IV because the FTC cannot bring them in federal court under Section 13(b) which is premised on the FTC's

reasonable belief Match "is violating, or is about to violate" the law. Match asserts the FTC admits in its Complaint that the complained-of conduct has ceased and fails to allege specific facts that Match "is imminently resuming" the unlawful conduct.  Next, Match contends equitable monetary relief is not authorized under Section 13(b) because that provision authorizes only injunctive relief.  Third, Match submits it is entitled to immunity for Counts 1 and II under the Communications Decency Act ("CDA") which provides web-based service providers, like Match, immunity from liability for publishing third-party generated content.  Finally, Match asserts the ROSCA claim fails as a matter of law because the FTC alleges only that Match's online method for cancelling a subscription is not simple. Because the FTC fails to allege Match's other five cancellation methods are also not simple, the Court must dismiss the ROSCA claim.

The FTC responds first that it does plausibly allege a claim against Match under Section 13(b) based on the "likelihood to recur" standard used by the Fifth Circuit, which the Court must apply rather than the Third Circuit standard Match submits. Next, the FTC contends it is entitled to seek equitable monetary relief under Fifth Circuit precedent and this Court should not apply the conflicting Seventh Circuit law on which Match relies.  On the third point, the FTC argues the CDA does not bar Counts I and II because the FTC seeks to hold Match liable only for Match's own

conduct and the resulting harm, not that of any third-party, and for its actions taken in "bad faith". Finally, the FTC asserts it properly pled the ROSCA claim because it alleges conduct sufficient to find Match liable for a ROSCA violation. The FTC also contends that Match's argument and evidence regarding other available cancellation methods are not relevant at this stage. In its reply, Match maintains its arguments the FTC has not sufficiently pled any of its five claims and each must be dismissed.

The Court has taken the well-pleaded facts as true and has viewed those in the light most favorable to the FTC as the plaintiff. The Court **denies** the Motion to Dismiss as to Counts I-IV on Match's argument that the FTC fails to allege plausible facts that Match "is violating" or "is about to violate" the law as required under Section 13(b). *FTC v. Sw. Sunsites, Inc.*, 665 F.2d 711, 723 (5th Cir. 1982); *see FTC v. Neora LLC*, 552 F. Supp. 3d 628, *6 (N.D. Tex. 2021)(Lynn, CJ.) ("Regarding the FTC's pleading burden, to plead that a defendant 'is violating, or is about to violate' under § 13(b), the FTC need only allege practices 'giving rise to a "fair inference of a reasonable expectation of continued violations" absent restrain.'") (quoting *Sw. Sunsites*, 665 F.2d at 723); *see also Neora*, 552 F. Supp. 3d at *7 ("Accordingly, simply because the Complaint contains allegations of past violations does not mean that the FTC has not sufficiently alleged that similar violations are likely to reoccur. Instead, allegations of past violations must be assessed in [the] context of the FTC's other

allegations, including the *Cornerstone Wealth* factors[.]"); *cf. United States v. Cornerstone Wealth Corp., Inc.*, 549 F. Supp. 2d 811, 816-17 (N.D. Tex. 2008)(Fitzwater, CJ.) (listing non-exclusive factors the court should consider in whether to issue a §13(b) permanent injunction based on past violations of the law).

The Court also **denies** the Motion to Dismiss as to Count V of the FTC's Complaint based on Match's alleged violation of ROSCA. The Court looks only to the allegations contained in the Complaint; argument or evidence of other cancellation methods Match might offer but which are not alleged in the Complaint are not properly considered by the Court on the Motion to Dismiss. The FTC sufficiently pled Count V with facial plausibility as the "factual content . . . allows the court to draw the reasonable inference that the defendant is liable." *Iqbal*, 556 U.S. at 678; *see also* 15 U.S.C. § 8403.

The Court turns now to the claims on which the Motion to Dismiss is **granted**.

### 1.    Equitable Monetary Relief

In its Motion to Dismiss, Match asks the Court to find the FTC is not entitled to equitable monetary relief under § 13(b). The FTC argues in its Response such relief is permitted under Fifth Circuit caselaw and asks the Court deny Match's Motion to Dismiss this relief. Before the Court issued a ruling on the Motion to Dismiss, the Supreme Court granted certiorari to consider this exact issue and held that Section

13(b) does not authorize the FTC to seek, or a federal court to award, equitable monetary relief in an action filed directly in court. *AMG Capital*, 141 S. Ct. at 1344, 1352.

After issuance of the Supreme Court's decision, the parties filed a Joint Report with the Court explaining each party's position of the effect on this case. *See generally* Joint Report (Doc. No. 62). In that Joint Report, the FTC concedes the Supreme Court's *AMG Capital* decision "precludes this Court from awarding equitable monetary relief under Section 13(b)" which the FTC seeks in relation to Counts I-IV. Joint Report at 3. In light of the Supreme Court's holding in *AMG Capital*, the Court **grants** the Motion to Dismiss the FTC's claim for equitable monetary relief under Section 13(b) for Counts I-IV—the FTC has no authority to seek, and this Court is not empowered to award, any equitable monetary relief. The Court, therefore, **dismisses with prejudice** the FTC's claim for monetary relief.

### 2. Counts I and II—Immunity under Section 230 of the Communications Decency Act

A defendant is entitled to immunity under the Communications Decency Act (the "CDA") where: (1) the defendant is "a provider or user of an interactive computer service"; (2) the plaintiff's claims treat the defendant as a "publisher" of the allegedly damaging information; and (3) that information was "provided by another information content provider". 47 U.S.C. § 230(c)(1). The CDA further provides that no liability

attaches for any voluntary action taken in good faith by an interactive computer service provider "to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." *Id.* § 230(c)(2).

In its Motion to Dismiss, Match contends it is entitled to immunity under § 230. Case law in the Fifth Circuit is well-established that dismissal under Rule 12(b)(6) may be appropriate where an affirmative defense appears clearly on the face of the complaint. *Clark*, 794 F.2d at 970 ("[A] claim may also be dismissed if a successful affirmative defense appears clearly on the face of the pleadings."); *EPCO*, 467 F.3d at 470 ("Although dismissal under rule 12(b)(6) may be appropriate on a successful affirmative defense, that defense must appear on the face of the complaint."). Courts in the Fifth Circuit have determined the affirmative defense at issue here, § 230 immunity, is an appropriate basis for dismissal under Rule 12(b)(6). *See, e.g., La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981 (S.D. Tex. 2017) (court found defendant was entitled to § 230 immunity and dismissed plaintiff's claims with prejudice under Rule 12(b)(6)); *Hinton v. Amazon.com.dedc, LLC*, 72 F. Supp. 3d 685 (S.D. Miss. 2014) (court found eBay was entitled to § 230 immunity and dismissed plaintiff's claims with prejudice under Rule 12(b)(6)); *Wells v. YouTube, LLC*, Civ. Action No. 3:20-CV-2849-

BH, 2021 WL 2652966 (N.D. Tex. May 17, 2021), *adopting rec.*, 2021 WL 2652514 (June 28, 2021)(Scholer, J.) (court dismissed *pro se* plaintiff's claims with prejudice under Rule 12(b)(6) as barred by § 230 immunity); *Inge v. Walker*, Civ. Action No. 3:16-CV-0042-B, 2017 WL 4838981 (N.D. Tex. Oct. 26, 2017)(Boyle, J.) (on Rule 12(b)(6) motion, court dismissed with prejudice defamation claim against one defendant because defendant was immune under § 230 from any liability); *Doe v. Bates*, No. 5:05-CV-91-DF-CMC, 2006 WL 8440858 (E.D. Tex. Jan. 18, 2006), *adopting rec.*, 2006 WL 3813758 (Dec. 27, 2006) (court dismissed plaintiffs' claims against defendant with prejudice on Rule 12(b)(6) motion having found requirements for § 230 immunity appeared on face of complaint); *MCW, Inc. v. Badbusinessbureau.com, L.L.C.*, Civ. Action No. 3:02-CV-2727-G, 2004 WL 833595 (Apr. 19, 2004)(Fish, CJ.) (court considered § 230 immunity on defendants' Rule 12(b)(6) motion but found defendants did not meet requirements for immunity on face of complaint); *cf. Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008) ("*MySpace II*") (affirming district court's dismissal of plaintiff's claims, having construed defendant's Rule 12(b)(6) motion as Rule 12(c) motion, because defendant was entitled to § 230 immunity).

For the following reasons, the Court agrees with Match and finds Match is entitled to § 230 immunity for both Count I and Count II as that affirmative defense appears clearly on the face of the FTC's Complaint.

ORDER – PAGE 15

<u>a.</u>    <u>Count   I—"Misrepresentation   Regarding   Users   of
Defendant's Service"</u>

Match argues § 230 bars Count I because the FTC seeks to hold Match liable

for content provided by third-parties and for acting as the publisher of third-party

information.   47 U.S.C. § 230(c)(1).   Match also contends it is immune from any

liability arising from its efforts to conduct fraud review as asserted in Count I.

<u>1)</u>    <u>Immunity Under Section 230(c)(1)</u>

*a)    Provider of Interactive Computer Service*

For § 230(c) to apply, Match must be a provider of an "interactive computer

service".   An "interactive computer service" is "any information service, system, or

access software provider that provides or enables computer access by multiple users to

a computer server, including specifically a service or system that provides access to the

internet. . . ." *Id.* § 230(f)(2).   Based on the briefing, it appears undisputed that Match

is an "interactive computer service" provider for purposes of the CDA.   Moreover, it is

apparent from the Complaint that Match is an "interactive computer service" provider

under the CDA.   Compl. at 3, ¶10; 4, ¶12; *see also Beckman v. Match.com,* No. 2:13-CV-

97JCM-NJK, 2013 WL 2355512, at *3-4 (D. Nev. May 29, 2013) (finding Match to

be an "interactive computer service" provider), *rev'd on other grounds*, 668 F. App'x 759

(9th Cir. 2016).

ORDER – PAGE 16

>       b)      *Information from Another Information Content Provider*

An interactive computer service provider has immunity under the CDA as long as it is not also the provider for the content in question. *GW Equity LLC v. Xcentric Ventures LLC*, Civ. Action No. 3:07-CV-0976-O, 2009 WL 62173, at *3 (N.D. Tex. Jan. 9, 2009)(O'Connor, J.) (citing *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003)); *see also Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016) (affirming "Congress's grant of 'broad immunity' [under § 230] to internet service providers 'for all claims stemming from their publication of information created by third parties,' which we and other circuits have consistently given wide scope."). The CDA defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

In its Complaint, the FTC affirmatively alleges the advertisements Match sent were automatically generated when a communication was sent by one user to another. *See, e.g.*, Compl. at 6, ¶21; 7, ¶24; 9, ¶33. In support of Count I, the FTC alleges Match, "in numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of its online dating service, . . . represented, directly or indirectly, expressly or by implication, that communications received by consumers

ORDER – PAGE 17

using Match.com are from people interested in establishing a dating relationship with those consumers." Compl. at 20-21, ¶68. But, "[i]n truth and in fact, in numerous instances," these communications allegedly "are not from people interested in establishing a dating relationship with those consumers but are instead from fake accounts created by fraudsters to deceive consumers." *Id.* at ¶69; *see id.* at 4, ¶¶15-16 (alleging user profiles are set up by "perpetrators" to carry out "romance scams"). Match allegedly "used these fraudulent communications to induce consumers to subscribe to Match.com" to view them and also to communicate with sender, a supposedly legitimate user. *Id.* at 6, ¶23; 8, ¶27. Instead of genuine romantic interest, new subscribers sometimes either found a profile that was unavailable (with no indication it was fraudulent) or accessed a fraudulent communication. *Id.* at ¶28. In its advertisements, Match allegedly did not disclose that the communication or user account was flagged or identified as fraudulent. *Id.* at ¶29. The FTC alleges "hundreds of thousands of consumers" purchased a Match.com subscription "after receiving a fraudulent communication." *Id.* at 9, ¶32.

"[T]he immunity analysis turns on who was responsible for the specific harmful material at issue, not on whether the service provider was responsible for the general features and mechanisms of the service or content (such as advertisements) that might also have appeared on the service." *Bates*, 2006 WL 8440858, at *10. For Match to

be the provider of the content at issue, the FTC must plausibly allege that Match "itself *authored or created* the content." *La'Tiejira*, 272 F. Supp. 3d at 994.  No matter how artfully pled, it is clear from the Complaint that the underlying communication created by a third-party, a Match.com user, is truly "the specific harmful material at issue," not the automatically generated advertisement sent by Match.

The FTC alleges the advertisements themselves are deceptive because they incorrectly lead a consumer to believe a fraudulent communication was sent by a legitimate user seeking a romantic relationship and this misrepresentation induces the consumer to purchase a subscription.  *See,* Compl. at 7, ¶24; 8, ¶26.  The FTC does not allege that *every* advertisement was deceptive or that only fraudulent communications triggered an advertisement representing a user's romantic interest or including a subscription discount.  In fact, the Complaint affirmatively (and repeatedly) asserts that these advertisements were *automatically* generated when a communication was sent from one user (without reference to legitimacy of the account) to another user. *See, e.g.,* Compl. at 6, ¶21; 7, ¶24; 9, ¶33 (emphasis added).  By the FTC's own allegations, the advertisement could be deceptive only in the instance that a fraudulent or flagged account sent the communication and not every advertisement was triggered solely by those communications.

ORDER – PAGE 19

Without those fraudulent communications, there could be no harm to these consumers. *Cf. Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 19-20 (1st Cir. 2016) (allegations treated defendant Backpage as publisher or speaker of third-party content where "there would be no harm to [plaintiffs] but for the content of the postings."). But the FTC does not allege Match "created or developed" the fraudulent or flagged communication that triggered the automatic advertisement. *See La'Tiejira*, 272 F. Supp. 3d at 994.  Nor could the FTC make such allegations based on its other allegations that these fake accounts are created by "persons seeking to perpetrate scams." *See, e.g.,* Compl. at 6, ¶22.  It is the fraudulent or flagged communication that caused an advertisement to be deceptive based on these allegations and Match is not alleged to have had any hand in the creation of that content. *See Carafano*, 339 F.3d at 1124-25 (affirming that defendant Matchmaker.com could not be liable for fraudulent profile created by third party because it was that user, not Matchmaker.com, who supplied the information); *cf. Dryoff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019) (defendant did not "create or develop the posts that lead to Greer's death", it merely published the third-party content that injured Greer, and its recommendations and notifications are just tools, "not content in and of themselves.").

Website features such as recommendations and email notifications are "the type of content-neutral tools" that are used "to facilitate the communication and content of

others. . . . [and] are not content in and of themselves." *See, e.g., id.* at 1096-98.  Again, the FTC affirmatively alleges the advertisements Match sent were generated automatically when one user sent a communication to another user.  Compl. at 6, ¶23; 7, ¶24-25; 9, ¶33.  The Court is not persuaded by the FTC's attempt to distinguish *Dryoff* in arguing that these advertisements are not "content-neutral tools".  Just as in *Dryoff*, these automatically generated advertisements, as alleged by the FTC, are a tool used by Match to assist users in communicating with each other.  *See id.*  That the advertisements allegedly include a message "touting" the communication was sent by a user having romantic interest and also a discount offer to "induce" a nonsubscriber to purchase a subscription package does not alter the analysis.  The FTC "cannot plead around Section 230 immunity by framing these website features as content."  *Dryoff*, 934 F.3d at 1098.  These automatically generated advertisements are not themselves content.

The FTC argues that the advertisements "deliberately withheld" the third-party content apparently inferring that because Match did not include or copy the communication into the advertisement, it is content created solely by Match which takes the advertisement outside the scope of § 230(c)(1) immunity.  Although creative, this argument is not persuasive.  It is without merit and legal support.  *Cf. id.* (holding that Ultimate Software acted as a publisher through its recommendations of user

ORDER – PAGE 21

groups and notifications of communications sent by users).   The FTC cannot get around its own allegations which undoubtedly place third-party content at the core of Count I; without the communication from a fraudulent or flagged account, there can be no harm to any consumer.  *Cf. Backpage.com*, 817 F.3d at 19-20 (allegations treat Backpage as publisher or speaker of third-party content where "there would be no harm to [plaintiffs] but for the content of the postings.").

As alleged in the Complaint, these advertisements are not content in and of themselves.   Match used the advertisement to "help[] facilitate this user-to-user communication, but it did not materially contribute . . . to the alleged unlawfulness of the content." *Dryoff*, 934 F.3d at 1099.

c)    *Publisher of Information from Another Information Content Provider*

An interactive computer service provider is entitled to § 230 immunity if the plaintiff seeks to hold it liable as a publisher or speaker of information created by another information content provider, in other words a third-party.   § 230(c)(1). Screening, blocking, monitoring, or editing allegedly harmful third-party content falls within "a 'publisher's traditional editorial functions,'" and a defendant is entitled to § 230 immunity for claims grounded in allegations of such conduct.  *Bates*, 2006 WL 8440858, at *12 (quoting *Zeran v, Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)); *accord MySpace II*, 528 F.3d at 420; *Fair Housing Council of San Fernando Valley v.*

ORDER – PAGE 22

*Roommates.Com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under Section 230."). The Fifth Circuit continues to affirm "Congress's grant of 'broad immunity' [under § 230] to internet service providers 'for all claims stemming from their publication of information created by third parties,' which we and other circuits have consistently given wide scope." *Google*, 822 F.3d at 220; *see MySpace II*, 528 F.3d at 418 ("Courts have construed the immunity provisions in § 230 broadly in all cases arising from the publication of [third-party] user-generated content.") (collecting cases); *Diez v. Google, Inc.*, 831 F. App'x 723, 724-25 (5th Cir. 2020).

In Count I, the FTC seeks to hold Match liable for its advertisements that allegedly misrepresent the communication sent from a user "interested in establishing a dating relationship" with the consumer, but, "in numerous instances," it was sent from an account set up by someone with nefarious motives. Compl. at 20-21, ¶¶68-69. Despite the FTC's creative arguments to the contrary, the allegations ultimately rest on Match's efforts, or conversely failures, to screen these fraudulent accounts and their communications, particularly with respect to automatically generated advertisements sent to nonsubscribers. and Match's failure to disclose or warn of a fraudulent or flagged account to consumers. *Cf. Herrick*, 306 F. Supp. 3d at 590-91.

ORDER – PAGE 23

"It would be impossible for service providers to screen each of their millions of postings for possible problems." *Zeran*, 129 F.3d at 331.  The Court has already concluded the content at issue is created by third-parties, not Match.  In truth, liability for Count I is predicated on alleged actions that Match took as a publisher performing traditional editorial functions, such as editing, screening, and removing content.  *See id.*; *Dryoff*, 934 F.3d at 1098 ("By recommending user groups and sending email notifications, [defendant] . . . was acting as a publisher of other's content."); *see also MySpace II*, 528 F.3d at 420 (claim based on MySpace's alleged failure to implement measures to prevent minor user from communicating with adult user who sexually assaulted her was simply "another way of claiming that MySpace was liable for publishing the communications and they speak to MySpace's role as a publisher of online third-party-generated content.").

In its Response, the FTC cites *Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257 (N.D. Cal. 2006) in support of its argument that § 230 does not apply to these "deceptive" advertisements.  Resp. at 27 fn. 19.  The FTC submits that the *Anthony* court "held that where an online dating service's 'manner of presenting the profiles—not the underlying profiles themselves—constitute fraud, the CDA does not apply." *Id.* (quoting *Anthony*, 421 F. Supp. 2d at 1263).  That court's actual determination is not as broad as the FTC implies. The plaintiff in *Anthony* alleged defendant "Yahoo! sent

'profiles of actual, legitimate former subscribers whose subscriptions had expired and who were no longer members of the service, to current members of the service.'" *Anthony*, 421 F. Supp. 2d at 1263.  The plaintiff specifically "allege[d] that Yahoo! *creates* false profiles, not merely fails to delete them[]" and that Yahoo! sent "users false profiles for the purpose of luring them into renewing their subscriptions."  *Id.* at 1262 (emphasis added).  Based on those allegations, Yahoo! was not "'the publisher or speaker' of the profiles" even though they were created by third parties because the plaintiff alleged Yahoo! manufactured false profiles and also misrepresented profiles that it knew to be false or no longer active.  *Id.* at 1262-63.

Although the FTC attempts to characterize Match's conduct as akin to Yahoo! in *Anthony*, the FTC's allegations are in no way similar.  The FTC does not allege Match created or manufactured fraudulent accounts.  *But see, e.g.,* Compl. at 5, ¶19; 6, ¶22. Furthermore, the FTC simply does not allege Match deliberately generated advertisements upon communications sent *only* from fraudulent or flagged user accounts for the purpose of selling advertisements.  Here, the FTC challenges *automatically generated* advertisements sent by Match which, by the FTC's own allegations, were triggered by any communication sent from one Match.com user to another.  *See, e.g.,* Compl. at 6.  The FTC does not allege that *every* advertisement was deceptive or that *every* communication which triggered an advertisement was deceptive.

ORDER – PAGE 25

*But see, e.g.,* Compl. at 6 (alleges communications are sent from an illegitimate user "in many instances" and, between 2013 and 2016, more than half of certain communications were identified as fraudulent.).   The FTC also does not allege the advertisement's representation of romantic interest was included only when a flagged or fraudulent account was involved.   In fact, the Complaint affirmatively (and repeatedly) asserts that these advertisements were *automatically* generated when a communication was sent from one third-party user (without reference to legitimacy of the account) to another user. *See, e.g.,* Compl. at 6, ¶21; 7, ¶24; 9, ¶33 (emphasis added).   As alleged by the FTC, the advertisement could be deceptive only in the instance that a fraudulent or flagged account sent the communication and not every advertisement was triggered solely by those communications.

The FTC also argues the advertisement "deliberately withheld" the third-party content.   The FTC appears to infer that because Match did not include or copy the communication into the advertisement, it is then truly content created solely by Match which takes the advertisement outside the scope of § 230(c)(1).   This argument is without merit and legal support. *Cf. Dryoff*, 934 F.3d at 1098 (holding that Ultimate Software acted as a publisher through its recommendations of user groups and notifications of communications sent by users).   As alleged in the Complaint, third-party content is most certainly at the heart of Count I because without it, there could

be no harm to any consumer.  *See Backpage.com*, 817 F.3d at 19-20 (allegations treat Backpage as publisher or speaker of third-party content where "there would be no harm to [plaintiffs] but for the content of the postings.").

d)     *Conclusion*

As alleged in the Complaint, the true basis for the FTC's claim is third-party content.  *See La'Tiejira*, 272 F. Supp. 3d at 994; *Bates*, 2006 WL 8440858, at *11 ("In sum, because the [first amended complaint] affirmatively asserts that someone other than Defendant created and developed the particular unlawful and injurious photographs at issue in this case, those photographs as a matter of law constitute 'information provided by another information content provider.'"); *GW Equity LLC*, 2009 WL 62173, at *3 (an interactive computer service provider has immunity under the CDA as long as it is not also the provider for the content in question).  The automatically generated advertisements, as alleged by the FTC, are not content created by Match such that it is the information content provider.  The FTC does not plausibly allege Match materially contributed to the communications (or the user accounts sending them) which triggered the advertisements.  At the end of the day, the FTC is seeking to hold Match liable for acting as a publisher of third-party content.  *See Google*, 822 F.3d at 220 (affirming "Congress's grant of 'broad immunity' [under § 230] to internet service providers 'for all claims stemming from their publication of information

ORDER – PAGE 27

created by third parties,' which we and other circuits have consistently given wide scope."); *MySpace II*, 528 F.3d at 418; *see also Dryoff*, 934 F.3d at 1098 (Section 230 immunity applies if the claims "inherently require[ ] the court to treat the defendant as the 'publisher or speaker' of content provided by another.") (quotations omitted). It is apparent from the face of the FTC's Complaint that Match is entitled to immunity under § 230 (c)(1) for Count I.

2)    Immunity Under Section 230(c)(2)

Section 230(c)(2) provides, in relevant part, that no interactive computer service provider may be liable for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene . . . or otherwise objectionable[.]" § 230(c)(2). Because immunity under § 230 (c)(1) applies, the Court need not reach the question of whether § 230 (c)(2) also bars Count I. However, if the Court were to consider whether § 230(c)(2) immunity applies, Match is immune to the extent the FTC seeks to impose liability on March for actions related to its fraud review process. *Id.*; *see also Doe v. MySpace, Inc.*, 474 F. Supp. 2d 843, 850 (W.D. Tex. 2007) ("*MySpace I*"), *aff'd*, *MySpace II*, 528 F.3d 413 ("[T]he CDA also immunizes [interactive computer] services from liability based on efforts to self-regulate material.").

ORDER – PAGE 28

b.      Count II—Exposing Consumers to Risk of Fraud

In Count II, the FTC alleges Match "exposed consumers to the risk of fraud by

providing recent subscribers access to communications that [Match] knew were likely

to have been sent by persons engaging in fraud."  Compl. at 21, ¶71.  The FTC alleges

that Match's "actions cause or are likely to cause substantial injury to consumers that

consumers cannot reasonably avoid themselves and that is not outweighed by

countervailing benefits to consumers or competition."  *Id.* at ¶72.  In support of this

claim, the FTC alleges that Match "screens users that send communications through

Match.com to identify users that are likely to be perpetrating romance scams or other

frauds."  *Id.* at 9, ¶33.  The FTC alleges that, from 2013 through mid-2018, Match

exposed   nonsubscribers   to   a   fraud   risk   through   its   automatically   emailed

advertisements of "communications from fraud-flagged users" allowing them access to

fraudulent or flagged communications upon subscribing "while withholding [fraud-

flagged   communications]   from   subscribers   until   [Match]   had   completed   its   fraud

review."  *Id.* at 10, ¶34.  The FTC alleges "[w]ithout this practice, the vast majority of

these fraud-flagged Match.com users would never have been able to contact their

intended recipients."  *Id.* at ¶35.  Because of this "practice", the FTC alleges Match

"delivered   millions   of   advertisements   to   consumers   touting   communications   that

[Match] knew to be sent by users likely engaging in fraud and that those consumers

would not have received had they already been subscribers to Match.com." *Id.* at ¶37. The FTC alleges that consumers who subscribed to Match.com in order to view these communications "were placed at risk of falling victim to a romance scam or other form of fraud." *Id.*

An interactive service provider has immunity under the (c)(2) exemption for voluntary actions taken in good faith to block or screen offensive material. § 230(c)(2). Section 230(c)(2) "reflects Congress's recognition that the potential for liability attendant to implementing safety features and policies created a disincentive for interactive computer services to implement any safety features or policies at all." *MySpace I,* 474 F. Supp. 2d at 850. It is apparent from the Complaint that the FTC seeks to hold Match liable for exposing nonsubscribers to potential fraud because they received notification of communications from fraud-flagged accounts before Match completed its fraud review process; in other words, the FTC challenges the fraud review process Match conducted for its subscribers as compared to nonsubscribers. Match is clearly entitled to immunity on this claim under § 230(c)(2). *See id.* ("[T]he CDA also immunizes such services from liability based on efforts to self-regulate material."); *cf. Herrick,* 306 F. Supp. 3d. at 590 ("Herrick's claim that Grindr is liable because it failed to incorporate adequate protections against impersonating or fake accounts is just

ORDER – PAGE 30

another way of asserting that Grindr is liable because it fails to police and remove impersonating [or fake] content.").

The FTC tries to argue around the § 230(c)(2) exemption in asserting that liability arises from Match's "own bad faith conduct" which is "precisely the opposite of the 'good faith' the CDA protects." Resp. at 29.  The FTC also argues that Match designed "its platform to funnel fraud-flagged communications towards its nonpaying members to generate subscriptions." *Id.*  By its allegations in its Complaint, the FTC takes aim at the fraud review process Match performed with respect to communications sent to subscribers but that Match did not likewise perform or complete for those sent to nonsubscribers. *See, e.g.,* Compl. at 10, ¶¶34-37.  The FTC alleges Match withheld fraud-flagged communications from subscribers until a fraud review was completed, whereas Match's automatically generated advertisements notified nonsubscribers of the communication before the fraud review was done. *See, e.g.*, Compl. at 10, ¶34.  The FTC raises allegations of bad faith and a system "to funnel potentially fraudulent messages to Match.com users" for the first time in its Response.  Resp. at 31.  Nowhere in the Complaint does the FTC allege Match "developed a system" or "designed its platform to systematically peddle false advertisements." *Id.* at 29 & 31.  The FTC cannot amend its Complaint in the Response to the Motion to Dismiss. *See Cody v. Allstate Fire & Cas. Ins. Co.*, Civ. Action No. 3:19-CV-1935-K, 2021 WL 389768, at *7

ORDER – PAGE 31

(N.D. Tex. Feb. 3, 2021)(Kinkeade, J.) (citing *Skidmore Energy, Inc. v. KPMG LLP*, Civ. Action No. 3:03-CV-2138-B, 2004 WL 3019097, at \*5 (N.D. Tex. Dec. 28, 2004)), *aff'd*, 19 F.4th 712 (5th Cir. 2021); *see Diamond Beach Owners Assoc. v. Stuart Dean Co., Inc.*, Civ. Action No. 3:18-CV-0173, 2018 WL 7291722, at \*4 (S.D. Tex. Dec. 21, 2018) ("[I]t is wholly inappropriate to use a response to a motion to dismiss to essentially raise a new claim for the first time.").  Also, allowing the FTC leave to amend its allegations on this point would be futile because Match is nevertheless entitled to immunity on Count II based on § 230(c)(1) as discussed *infra*.  Moreover, as discussed at length in the analysis on Count I, the FTC has alleged the advertisements were automatically generated by a communication sent from one user to another, not just those sent from fraud-flagged user accounts.  The FTC has pled its best case on this claim.  *See Wells*, 2021 WL 2652966, at \*6.

Even so, the FTC's argument that Match acted in "bad faith" is merely semantics.  Based on its own allegations, the FTC challenges Match's conduct related to its internal efforts to review user accounts for being fake.  The FTC seeks to impose liability on Match for failing to conduct or complete its "fraud review" process before sending nonsubscribers advertisements of fraud-flagged communications thereby allowing them access to those communications.  "It would be impossible for service providers to screen each of their millions of postings for possible problems." *Zeran*,

129 F.3d at 331.  Congress chose to provide immunity for multiple reasons, including to avoid the "chilling effect" of service providers choosing to "severely restrict the number and types of messages" and "to encourage service providers to self-regulate the distribution of offensive material over their service."  *Id.*; *see MySpace I*, 474 F. Supp. 2d at 850 ("[S]ection [230(c)(2)] reflects Congress's recognition that the potential for liability attendant to implementing safety features and policies created a disincentive for interactive computer services to implement any safety features or policies at all."). Match is entitled to immunity for liability stemming from its actions (or inaction) in reviewing user accounts sending communications.  *See Herrick*, 306 F. Supp. 3d. at 590 ("Herrick's claim that Grindr is liable because it failed to incorporate adequate protections against impersonating or fake accounts is just another way of asserting that Grindr is liable because it fails to police and remove impersonating [or fake] content."). Count II is barred by § 230(c)(2).

Even if the Court agreed with the FTC that immunity under § 230(c)(2) does not apply, which it does not, Match would still be entitled to immunity for this claim under § 230(c)(1).  In Count II, the FTC seeks to impose liability on Match for allegedly "expos[ing] consumers to the risk of fraud" in providing access to communications from third-party user accounts that were potentially fake.  *See* Compl. at 21, ¶71.  Such conduct goes to the heart of Match's "role as a publisher of online

third-party-generated content." *MySpace II*, 528 F.3d at 420; *see also Bates*, 2006 WL 8440858, at *10 ("The case law confirms that the immunity analysis turns on who was responsible for the specific harmful material at issue, not on whether the service provider was responsible for the general features and mechanisms of the service or other content (*such as advertisements*) that might have also appeared on the service.") (emphasis added).  The Court's detailed analysis on § 230(c)(1) immunity for Count I, *supra*, applies equally here.  Accordingly, Match is entitled to immunity on Count I under § 230(c)(1).

<u>c.</u>    <u>Conclusion</u>

"Courts have construed the immunity provisions in § 230 broadly in all cases arising from the publication of [third-party] user-generated content." *MySpace II*, 528 F.3d at 418.  No matter how artfully pleaded, the FTC is attempting to impose liability on Match for content created and developed by third-party users of Match.com in both Counts I and II.  Based on the allegations in the Complaint, Match is acting as a publisher of third-party generated content and is entitled to immunity under § 230(c)(1) on both Counts I and II.  *See GW Equity*, 2009 WL 62173, at *3 (an interactive computer service provider has immunity under the CDA as long as it is not also the provider for the content in question).  Furthermore, Match is entitled to immunity under § 230(c)(2) on both Counts I and II for any actions related to its fraud

review process of user accounts. *MySpace I*, 474 F. Supp. 2d at 850 ("[T]he CDA also immunizes [interactive computer] services from liability based on efforts to self-regulate material."); *see Herrick*, 306 F. Supp. 3d. at 590 (defendant is entitled to immunity under § 230(c)(2) for claims arising from alleged failure to protect plaintiff against fake accounts because it goes to efforts to police and remove fake content).

It is apparent from the face of the Complaint that Match is entitled to § 230(c) immunity on both Counts I and II. Therefore, the Court **grants** the Motion to Dismiss and Counts I and II are **dismissed with prejudice**. *See La'Tiejira*, 272 F. Supp. 3d at 981.

### 3.    Leave to Amend

In a single sentence of its conclusory paragraph, the FTC ask the Court to "provide the FTC leave to amend any deficiencies the Court may find." It is well established that a party seeking to amend a pleading under Rule 15(a) need not always file a formal motion but the party must "give the court some notice of the nature of his or her proposed amendments" and support the request for leave to amend with "*some* specificity" which is required. *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016). A plaintiff that simply "tack[s] on a general curative amendment request" in response to a motion to dismiss does not provide a sufficient basis for why the court should grant leave. *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003).

"[A] bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which the amendment is sought, *cf.* FED. R. CIV. P. 7(b)—does not constitute a motion within the contemplation of Rule 15(a)." *U.S. ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) (quotation omitted).

The Fifth Circuit has "not provided strict guidelines as to what constitutes a sufficient request for leave to amend," but that court has stated that "it is clear that *some* specificity is required." *See Thomas*, 832 F.3d at 590. A district court does not abuse its discretion in denying a plaintiff leave to amend where, as here, the plaintiff: (1) did not amend its complaint as a matter of right, (2) submitted a general curative request to amend its complaint in its response to the motion to dismiss, (3) did not submit a proposed amended complaint to the court, and (4) failed to provide "some specificity" to the court and defendant of the substance of its proposed amendment. *McKinney v. Irving Indep. Sch. Dist.*, 309 F.3d 308, 315 (5th Cir. 2002). For those same reasons, the Court denies the FTC's curative request to amend its Complaint. *See id.*; *see also Goldstein*, 340 F.3d at 254-55 (affirming denial of motion for leave to amend where plaintiffs stated only that "Should this Court find that the Complaint is insufficient in any way, however, plaintiffs respectfully request leave to amend.").

ORDER – PAGE 36

### III.   The FTC's Motion to Exclude

The FTC filed a Motion to Exclude (Doc. No. 26) arguing that Match improperly included matters outside the pleadings with its Motion to Dismiss.  The FTC submits five categories of improper representations:  (1) "Match claims the wrong entity was sued"; (2) "Match claims to have 'permanently ceased' its unlawful conduct"; (3) "Match claims to offer alternative simple cancellation methods"; (4) "Match's claims about the FTC investigation"; and (5) "Match's generic praising of its own business and business practices".  Mot. to Exclude at 3-8.  In its response, Match agrees the Court should not rely on matters outside of the pleadings in deciding the Motion to Dismiss, and the FTC's Motion to Exclude should be denied because none of these matters must be considered by the Court in deciding the Motion to Dismiss. Resp. (Doc. No. 31) at 1.

The Court agrees with Match and **denies** this Motion to Exclude.  Match does not ask the Court to take judicial notice of any matter, including within those five categories defined by the FTC.  Furthermore, the Court did not take into consideration any of these "matters" identified by the FTC in deciding the Motion to Dismiss.  *See Collins*, 224 F.3d at 498 (court determines a motion to dismiss for failure to state a claim based solely on the pleadings, including any attachments thereto).  For these reasons, the Court **DENIES** the Motion to Exclude.

## IV.    The FTC's Motion for Leave to File Sur-Reply

The FTC seeks leave to file a sur-reply to Match's Motion to Dismiss.  *See* (Doc. No. 32).   In this motion, the FTC contends that a sur-reply is necessary to:  (1) address "a significant Fifth Circuit opinion" which raises "three issues critical to the Court's decision in this case"; and (2) Match raised a new argument in its reply "regarding the pleading standard for Section 13(b)".  Mot. for Leave at 1.  Match responds that the FTC is simply trying to get the "last word" on Match's Motion to Dismiss because there is no new relevant legal authority and Match did not raise a new argument in its reply.  Resp. (Doc. No. 35) at 1.

Sur-replies are highly disfavored and permitted only in very limited circumstances.  *Campoamor v. Cengage Learning, Inc.*, 3:09-CV-0921-M, 2010 WL 11618843, at *1 (N.D. Tex. June 10, 2010)(Lynn, J.); *see also* L.R. 7.1 (motion practice limited to response filed by nonmovant and reply filed by movant).  A sur-reply may be permitted in the district court's discretion where the movant asserts new legal theories or evidence in its reply.  *Williams v. Aviall Servs. Inc.*, 76 F. App'x 534, 535 (5th Cir. 2003); *Zurich Am. Ins. Co. v. Centex Corp.*, 373 F. Supp. 3d 692, 695 (N.D. Tex. 2016)(Godbey, J); *cf. Domain Vault LLC v. Rightside Grp., Ltd*., 3:17-CV-0789-B, 2017 WL 4298133, at *1 (Sept. 28, 2017)(Boyle, J.) (sur-reply standard applies to motions other than just summary judgment).  However, leave to file a sur-reply is not

justified if the proposed sur-reply is simply a restatement of the arguments made in the party's response. *See Williams*, 76 F. App'x at 535. Moreover, arguments in a reply are not "newly asserted" if they were raised in the motion or are within the scope of the arguments contained in the response. *Campoamor*, 2010 WL 11618843, at *1; *accord Austin v. Kroger Tex. L.P.*, 3:11-CV-1169-B, 2016 WL 1322248, at *2 (Apr. 5, 2016)(Boyle, J.); *cf. Murray v. TXU Corp.*, 3:03-CV- 0888-P, 2005 WL 1313412, at *4 (May 27, 2005)(Solis, J.) ("Assuming no new arguments were raised, the Court finds it nonsensical to believe a party must limit its research to previous briefings.").

The Court has carefully considered the Motion for Leave with the attached proposed sur-reply, the response, and the reply. The Court is not persuaded by either of the FTC's proffered reasons that a sur-reply is warranted. Rather, the Court agrees with Match and concludes that the proposed sur-reply is nothing more than the FTC's attempt to get the "last word." *See Murray*, 2005 WL 1313412, at *4 ("Plaintiff simply wants an opportunity to continue the argument."). The Court **denies** the FTC's Motion for Leave

## V.    Conclusion

The Court **grants** Defendant Match Group, Inc.'s Motion to Dismiss as to the claim for equitable monetary relief in Counts I-IV. The Court also **grants** Defendant Match Group, Inc.'s Motion to Dismiss Counts I and II because Match is entitled to

immunity under 47 U.S.C. § 230 of the Communications Decency Act, thus those claims are barred and **dismissed with prejudice**.   Defendant Match Group, Inc.'s Motion to Dismiss is **denied** in all other respects.   The Court **denies** Plaintiff Federal Trade Commission's Motion to Exclude.   The Court also **denies** Plaintiff Federal Trade Commission's Motion for Leave to File a Sur-reply.

The Court hereby **lifts the stay** in this case.

**SO ORDERED.**

Signed March 24th, 2022.

_Ed Kinkeade_

ED KINKEADE
UNITED STATES DISTRICT JUDGE

ORDER – PAGE 40