EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 3:19-cv-02281 |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, CIVIL PENALTIES, AND OTHER RELIEF** |
| v. | |
| MATCH GROUP, INC., a corporation, and | |
| MATCH GROUP, LLC, formerly known as MATCH.COM, LLC, a limited liability company, | |
| Defendants. | |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.      The FTC brings this action under Sections 5(a), 5(m)(1)(A), 13(b), 16(a), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a), and 57b, and Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, which authorize the FTC to seek, and the Court to order, permanent injunctive relief, monetary relief, civil penalties, and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 4 of ROSCA, 15 U.S.C. § 8403.

## SUMMARY OF THE CASE

2.      Defendants operate Match.com, an online dating service. Consumers using Match.com create profiles and communicate using either free, limited services ("nonsubscribers") or a broader range of paid services ("subscribers").

3.      Since at least 2013, Defendants have maintained the following five deceptive or unfair practices to induce consumers to subscribe to Match.com and to keep them subscribed. First, until mid-2018, Defendants sent consumers misleading advertisements that touted communications from persons Defendants identified as potentially fraudulent users of Match.com and led consumers to believe that the communications are from persons interested in establishing a dating relationship with them. Second, until mid-2018, Defendants exposed consumers to the risk of fraud by providing recent subscribers access to communications that Defendants knew were likely to have been sent by persons engaging in fraud. Third, until mid-2019, Defendants guaranteed certain consumers a free six-month subscription renewal if they failed to "meet someone special" but failed to disclose the requirements of its "guarantee" adequately. Fourth, Defendants have misled consumers with a confusing and cumbersome cancellation process that causes consumers to believe they have canceled their subscriptions when they have not. Fifth, until mid-2019, when consumers disputed charges relating to any of these practices and lose the dispute, Defendants denied consumers access to paid-for services.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

5.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(2), and (d), 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFF

6.      The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also

enforces ROSCA, 15 U.S.C. §§ 8401-05, which prohibits certain methods of negative option marketing on the Internet.

7.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and ROSCA and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, and 8404. The FTC is also authorized to obtain civil penalties for violations of ROSCA. *See* 15 U.S.C. § 45(m)(1)(a).

## DEFENDANTS

8.     Defendant Match Group, Inc. is a Delaware corporation with its principal place of business at 8750 North Central Expressway, Suite 1400, Dallas, Texas 75231. The company transacts or has transacted business in this District and throughout the United States. Match Group, Inc. is the parent corporation and sole member of Match Group LLC.

9.     Defendant Match Group LLC, formerly known as Match.com LLC, is a Delaware limited liability corporation with its principal place of business at 8750 North Central Expressway, Suite 1400, Dallas, Texas 75231. The company transacts or has transacted business in this District and throughout the United States. Match Group, LLC is a wholly owned subsidiary of Defendant Match Group, Inc. It has no board of directors, and its sole member is Match Group, Inc. Match Group, LLC has had executive officers who have also been executive officers of Match Group, Inc.

## COMMERCE

10.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

FEDERAL TRADE COMMISSION'S FIRST AMENDED COMPLAINT

## DEFENDANTS' BUSINESS PRACTICES

11.     Defendant Match Group, Inc. is the dominant online dating service provider in the United States. It controls approximately 25 percent of the online dating market, which is more than twice the market share of its nearest competitor. Defendant Match Group, Inc. owns, operates, and controls approximately 45 online dating services, including several of the most popular services in the United States, such as Tinder, OKCupid, and Plenty of Fish.

12.     Defendant Match Group, Inc. also owns, operates, and controls the online dating service Match.com. Moreover, Defendant Match Group, Inc. has represented to investors, the federal judiciary, and federal regulatory agencies that it operates Match.com. Defendant Match Group, Inc. operates and controls Match.com in part through wholly owned subsidiaries, including Match Group, LLC. Defendants primarily generate revenue on Match.com by selling subscriptions to consumers in 25 countries, including the United States.

13.     Defendants' online dating service websites provide consumers a forum where they can contact and communicate with other like-minded people over the Internet, typically for the express or implied purpose of developing romantic relationships.

### *Background*

14.     Defendants and other online dating service providers allow consumers access to databases of other enrolled consumers to find potential romantic partners, typically based on certain criteria. These criteria include age, gender, sexual orientation, and location. To facilitate finding a compatible person, providers typically enable consumers to interact with one another, often by utilizing Internet-based communications such as email, instant messages, and video or telephone chat.

15.     To use an online dating service, consumers must typically first create profiles that contain information about themselves. Within these profiles, consumers often are able to upload pictures and to provide descriptive and personal information that is viewable by other consumers using the service.

16.     Online dating services, including Defendants', are often misused to facilitate fraud or to promote dubious or unlawful products or services to consumers. Most notably, online dating services are used to find and contact potential romance scam victims. In these scams, the perpetrator poses as a suitor and, after establishing a trusting relationship with a consumer, deceives the consumer into giving or loaning the perpetrator money.

17.     Consumers have incurred substantial injury from romance scams. Indeed, consumers' losses reported to the FTC and FBI between 2015 and 2017 totaled an estimated $884 million. This figure likely underreports the true scale of consumer harm because many victims do not report this type of fraud. In addition, because perpetrators of romance scams manipulate their victims to exploit their trust and goodwill, these crimes cause significant emotional distress and injury to consumers beyond monetary losses.

### *Defendants' Match.com Dating Service*

18.     Consumers can purchase Match.com subscriptions in 1-, 3-, 6-, or 12-month packages, and these packages automatically renew for terms equivalent to the original subscription length. Alternatively, consumers may establish free "nonsubscriber" user profiles that allow them to use limited services at no cost. On occasion, consumers may also take advantage of temporary "free trial" offers, which allow consumers to use services that are otherwise generally available only to paid subscribers.

19.     Consumers using Match.com create online profiles with photographs and other personal information and can view the profiles of other Match.com users. Consumers create Match.com profiles and purchase Match.com subscriptions to interact with and to establish dating relationships with these members. Consumers using Match.com cannot distinguish nonsubscribers' profiles from subscribers' profiles.

20.     Between 2013 and at least mid-2018, consumers who were considering purchasing a Match.com subscription were generally not aware that as many as 25-30 percent of Match.com members who registered each day were using Match.com to perpetrate scams. These scams include romance scams, stealing consumers' personal information through "phishing," promoting dubious or unlawful products or services, and extortion scams, in which a scammer will induce a consumer to send the scammer compromising videos or pictures of the consumer that the scammer then uses to extort money from the consumer by threatening to send the materials to the consumer's friends or family.

### Defendants' Use of Communications from Illegitimate Users to Generate Deceptive Advertisements and Sell Subscriptions

21.     Nonsubscribers' ability to communicate with other Match.com users is restricted. Generally, nonsubscribers have been able to send limited communications, such as "likes" and, until May 2018, "favorites" and "winks," to other users, but not any communications with personalized messages. Subscribers, in contrast, have been able to send other users personalized "emails" and, until April 2017, "instant messages."

22.     Nonsubscribers are also unable to read personalized communications they receive from Match.com users or to view the identities of users that interact with them through likes or favorites. Instead, Defendants send nonsubscribers advertisements notifying them of these

communications and encouraging them to upgrade to paid subscriptions so that they can view and respond to these communications, and otherwise use all of Match.com's available features.

23.     Consumers are often unaware that, in many instances, communications received through Match.com are not from users interested in establishing dating relationships, but are instead from persons seeking to perpetrate scams. For example, in some months between 2013 and 2016, more than half of instant message initiations and favorites that consumers received originated from accounts that Defendants identified as "fraudulent," meaning that Defendants determined the Match.com user was likely to be perpetrating some form of scam.

24.     Defendants used these fraudulent communications to induce consumers to subscribe to Match.com. When consumers received these communications, they also received accompanying advertisements from Defendants encouraging them to subscribe to Match.com in order to view the content of the communication and the identity of the sender. These advertisements did not disclose whether Defendants had identified the Match.com user as likely to attempt to defraud the consumer receiving the message or as requiring further review by Match's fraud review process due to the likelihood that the user is engaging in fraud.

25.     Specifically, when nonsubscribers have received likes, favorites, emails, and instant messages on Match.com, they have also received automatically generated emailed advertisements from Defendants encouraging them to subscribe to Match.com to view the identity of the sender or the communication they received. These advertisements represent that the communication the nonsubscriber received was sent from a legitimate user of the site who has expressed interest in the consumer receiving the message:

**match**.com

## He just emailed you!

You caught his eye and now he's expressed

FEDERAL TRADE COMMISSION'S FIRST AMENDED COMPLAINT

interest in you… Could he be the one?



You will be notified when other Match.com members express interest in you.

Please note: This email may contain advertisements.

Match.com P.O. Box 25472, Dallas TX 75225

26.    Consumers also receive discount offers for subscription packages at reduced

prices that similarly represent expressly that specific Match.com users are interested in them:

### Someone's Interested in You!

[username], 1 woman has shown interest in you this month!
And best of all, **PAY 25% LESS** when you subscribe today. Find out
who's interested and save big with this limited-time offer!
Match.com Members

*At least one member has sent you a wink or email, like your photo, added you to their Favorites, or rated you "Yes" in

their Daily Matches.

Offer expires [date] at 11:59 Central Time. Match.com reserves the right to modify or discontinue promotions at any time.

Because you asked to be notified of Match.com Special Offers, we will send you emails such as this on a periodic basis.

To unsubscribe from this type of email, please click here within 30 days of receipt. Or contact Customer Service.

Please note: This email may contain advertisements.

Match.com P.O. Box 25472, Dallas TX 75225

27.    Consumers reasonably believe, based upon these advertisements, that other

Match.com users are interested in establishing a possible dating relationship with them.

28.    As a result, consumers have often purchased Match.com subscriptions from

Defendants so that they can communicate with the users that Defendants have advertised as

being interested in them.

29.    When consumers subscribe to view these communications, they either gain access

to the fraudulent communication or receive a notification stating that the profile that sent the

communication is "unavailable." This outcome depends upon whether consumers subscribe to

Match.com before or after Defendants complete its fraud review process: if the consumer

subscribes before the review is completed, the consumer receives the communication that was sent; if Defendants have already completed its review process and deleted the account as fraudulent before the consumer subscribes, the consumer will receive a notification that the profile is "unavailable."

30.     Indeed, in numerous instances, Defendants have not notified consumers that the Match.com users contacting them were removed from Match.com due to the high likelihood that these users were seeking to defraud consumers.

31.     When consumers contact Defendants to complain about subscribing to Match.com only to receive a notification that a sender's account is "unavailable," Defendants have replied, "Please be assured, Match.com does not send members misleading notifications, e-mails or winks professing romantic interest. We have too much respect for our members to ever compromise their trust. If you have received communications from members with profiles that are not immediately available, the member may have temporarily hidden their profile."

32.     Between at least 2013 and mid-2017, Defendants tracked the number of fraud-generated personalized advertisements it sent to nonsubscribers and those advertisements' effect on Match.com's subscriber numbers.

33.     Hundreds of thousands of consumers subscribed to Match.com shortly after receiving a fraudulent communication. In fact, Defendants have consistently tracked how many subscribers these communications have generated, typically by measuring the number of consumers who subscribe to Match.com within 24 hours of receiving an advertisement that touts a fraudulent communication. From June 2016 to May 2018, for example, Defendants' analysis found that consumers purchased 499,691 subscriptions within 24 hours of receiving an advertisement touting a fraudulent communication.

***Defendants Exposed Consumers to the Risk of Falling Victim to Fraud by Marketing Communications from Users That It Knew to be Likely to be Engaging in Fraud***

34.    Defendants are aware that these communications reach consumers and automatically generate personalized advertisements encouraging them to subscribe to Match.com. In fact, Defendants screen users that send communications through Match.com to identify users that are likely to be perpetrating romance scams or other frauds. In many instances, Defendants have withheld communications sent by these users.

35.    Between 2013 and mid-2018, however, Defendants delivered email communications from fraud-flagged users to nonsubscribers while withholding them from subscribers until it had completed its fraud review. If, for example, a user Defendants flagged as potentially fraudulent had sent three emails to subscribers and three emails to nonsubscribers, Defendants would have withheld the three emails sent to subscribers until its fraud review was complete while allowing the three emails sent to nonsubscribers to reach their recipients.

36.    Without this practice, the vast majority of these fraud-flagged Match.com users would never have been able to contact their intended recipients: between June 2016 and the beginning of May 2018, for example, approximately 87.8 percent of accounts whose messages Defendants withheld were later confirmed by Defendants to be fraudulent.

37.    As a result, consumers who subscribed to Match.com after receiving an ad touting these messages were at risk of receiving communications that Defendants knew to be from users that were likely to be engaging in fraud. Between June 2016 and the beginning of May 2018, for example, Defendants delivered approximately 4 million communications that Defendants would have withheld had the approximately 2.25 million consumers who received them already been subscribers when the communications were sent. More than 250,000 of those consumers subscribed to Match.com within 24 hours of receiving the email communications.

38.     Due to these practices, Defendants delivered millions of advertisements to consumers touting communications that Defendants knew to be sent by users likely engaging in fraud and that those consumers would not have received had they already been subscribers to Match.com. In addition, consumers who subscribed to Match.com to view these communications were placed at risk of falling victim to a romance scam or other form of fraud.

### Defendants' Use of Deceptive Guarantees to Promote Match.com Subscriptions

39.     Consumers interested in using Defendants' online dating services can purchase a subscription from the Match.com website. Until mid-2019, consumers who visit the Match.com website were offered a "match GUARANTEE" if they purchased a six-month subscription:



40.    When consumers hovered their cursors over the "match GUARANTEE" hyperlink, Defendants promised a free six-month subscription to any consumer who purchased a six-month paid subscription but did not "meet someone special" during the first six months:



41.    Although Defendants' offer did not disclose that the guarantee is subject to any additional terms or conditions, consumers who clicked "Learn more" were directed to a rules page that provided several requirements that the consumer had to satisfy to receive the guarantee.

42.    According to the "Learn more" page, consumers had to sign up for a six-month subscription, create a truthful public profile with a primary photo, initiate or respond to communications with at least five unique Match.com members each month, and comply with the guarantee program rules:



43.     Underneath this description, Defendants provided a lengthy "Program Rules" section. This section provided six bolded, individually numbered eligibility rules that explained the requirements further, including both maintaining a public profile photo that is approved by Match.com and contacting five unique Match.com subscribers each month. For example, the rules clarify that to satisfy the primary photo requirement, consumers must submit a photo and have it approved by Defendants within the first seven days of purchasing the guarantee:

**I Met Someone GUARANTEE (formerly "Make Love Happen Guarantee") Program Rules**

We know you'll meet tons of great people during your 6-month subscription with us. But, if you don't find someone special during that time, we'll give you an ADDITIONAL 6 months to continue your search. Check out the rules below, then get out there and start connecting today!

- Under the I Met Someone GUARANTEE Program, (the "Guarantee Program" or the "Program") if you don't find someone special during a qualifying six-month paid subscription to the Match.com service, we'll give you an additional six-month subscription (the "Guarantee Extension") to the Match.com service at no additional expense. See Match.com Terms of Use for details regarding the Match.com service and use of the Match.com website.

- The Guarantee Program is available for a limited time only, and open to anyone not currently participating in the Program. Additionally, to be eligible for the Program and the Guarantee Extension, you must:

- (1) Comply at all times with the Match.com Terms of Use. By using the Match.com website and participating in the Program, you agree to be bound by the Match.com Terms of Use.

- (2) Pay in full the applicable rate for a **six-month subscription** to the Match.com service (the "Guarantee Program Subscription"). The Guarantee Program Subscription consists of five consecutive 30-day periods followed by a final period of 33 days, all of which are referred to as a "Month" in these Program rules. If you are enjoying the benefits of a free trial of the Match.com service, your Guarantee Program Subscription will not begin until your free trial period ends.

- (3) Use your Guarantee Program Subscription to **create a profile with a primary photo**. Your profile and primary photo must be approved by Match.com within the first seven days of your Guarantee Program Subscription in order for you to be eligible for the Guarantee Program. Details on approval of profile and primary photo available at FAQ and How It Works.

- (4) Keep your profile with primary photo visible at all times during your Guarantee Program Subscription.

- (5) **Communicate** during your Guarantee Program Subscription with other Match.com subscribers with whom you have not previously communicated during your Guarantee Program Subscription ("Unique Match.com Subscribers").

- (6) Send a **"Qualifying Email" to a minimum of five other Unique Match.com Subscribers each Month during your Guarantee Program Subscription**. A "Qualifying Email" may be either one you send to a Unique Match.com Subscriber who has not yet emailed you or an email response you send to a Unique Match.com Subscriber who has emailed you. A "Qualifying Email" must be an email sent through the Match.com service and does not include any other method of communicating (such as Match.com winks, MatchPhone™, Match.com Instant Messaging or emails sent outside of the Match.com system).

- Progress toward eligibility for the Guarantee Extension may be determined at any time during a Guarantee Program Subscription by visiting the progress page associated with such Guarantee Program Subscription (the "Guarantee Program Progress Page"). If, during the last seven days of a Guarantee Program Subscription, you are eligible for a Guarantee Extension (and have not met that "special someone"), you may accept the Guarantee Extension by affirming on the Guarantee Program Progress Page that you have not met someone special during your Guarantee Program Subscription. Please see the Match.com Guarantee FAQ for further information. You may also contact Customer Care with any questions related to the Match.com service or the Program. Match.com alone will make all decisions under these Program rules regarding Program policies, including but not limited to Program and Guarantee Extension eligibility.

- Customers eligible to receive a Guarantee Extension will not receive a refund, money or any other thing of value as a substitute for the Guarantee Extension. The Guarantee Extension may only be used by the purchaser of the Guarantee Program Subscription, and the Guarantee Extension may not be sold or transferred in any way.

- Guarantee Program Subscriptions which do not result in a Guarantee Extension (due to ineligibility of the subscriber or failure of the subscriber to accept the Guarantee Extension) will automatically be continued for successive six-month subscription periods at the subscription rate in effect at the time of continuation. See Match.com Terms of Use for details regarding Match.com subscriptions and charges on your billing account.

- The Match.com Terms of Use and the Match.com Guarantee Program Rules are subject to change by Match.com at any time, effective upon posting on the Match.com website, and your use of the Match.com service and your initial or continued participation in the Match.com Guarantee Program after such posting will constitute acceptance by you of such changes. Match.com reserves all rights to modify, suspend or cancel the Program at any time and without notice.

- Program rules last updated January 24th, 2008.

44.     After the numbered list of rules, the page contained several unnumbered paragraphs. Despite containing neither numbered nor conspicuously set off language, these paragraphs contained additional requirements related to consumers' ability to comply with Defendants' Match guarantee program rules.

**FEDERAL TRADE COMMISSION'S FIRST AMENDED COMPLAINT**

14

45.     Consumers who continued reading after the numbered list of requirements would find that Defendants' website included a "progress page" tracking their compliance with the guarantee's rules that consumers must access to comply with the offer's terms:

• Progress toward eligibility for the Guarantee Extension may be determined at any time during a Guarantee Program Subscription by visiting the progress page associated with such Guarantee Program Subscription (the "Guarantee Program Progress Page"). If, during the last seven days of a Guarantee Program Subscription, you are eligible for a Guarantee Extension (and have not met that "special someone"), you may accept the Guarantee Extension by affirming on the Guarantee Program Progress Page that you have not met someone special during your Guarantee Program Subscription. Please see the Match.com Guarantee FAQ for further information. You may also contact Customer Care with any questions related to the Match.com service or the Program. Match.com alone will make all decisions under these Program rules regarding Program policies, including but not limited to Program and Guarantee Extension eligibility.

46.     Consumers who view the progress page were reminded that they were required to create a public profile with a photograph and to start a conversation with at least five Match.com members each month, but not that they must provide an approved photo within the first seven days of subscribing or that the members they contact must be subscribers:



47.     In numerous instances, however, consumers were unaware of the existence of the progress page and did not understand the requirements of the guarantee.

48.     Consumers who continued reading after the numbered list of requirements and the progress page description would also find an additional requirement to receive the free six-month package: they had to "accept" the free six months during the final week of the initial six-month term.

- Progress toward eligibility for the Guarantee Extension may be determined at any time during a Guarantee Program Subscription by visiting the progress page associated with such Guarantee Program Subscription (the "Guarantee Program Progress Page"). If, during the last seven days of a Guarantee Program Subscription, you are eligible for a Guarantee Extension (and have not met that "special someone"), you may accept the Guarantee Extension by affirming on the Guarantee Program Progress Page that you have not met someone special during your Guarantee Program Subscription. Please see the Match.com Guarantee FAQ for further information. You may also contact Customer Care with any questions related to the Match.com service or the Program. Match.com alone will make all decisions under these Program rules regarding Program policies, including but not limited to Program and Guarantee Extension eligibility.

49.     Consumers were often not aware that they must accept the guarantee during the final week of their initial subscription because this requirement was not clearly or conspicuously disclosed alongside the guarantee's other requirements.

50.     Moreover, even when consumers were aware that they must timely accept the guarantee, consumers had to also access their progress page during the last week of their initial six-month period and answer the question, "Did you meet anyone during your 6-month guarantee program?"



Your 6-month subscription is almost up.
Did you meet anyone during your 6-month guarantee program?   Yes   No

51.     According to one of Defendants' customer service executives, this question has been "obviously misunderstood" by many consumers, who believed it to ask whether they met anyone at all through the service instead of whether they met "someone special." Consumers who responded "Yes" to the question are prohibited from claiming a guarantee.

52.     As a result of Defendants' failure to clearly disclose the guarantee program requirements and to maintain a clear process to claim the guarantee, few consumers received the free six-month subscription that they were promised. Instead, consumers were often surprised to find that their payment instruments were billed for another six-month subscription at the end of the initial period due to the negative option feature of Match.com's subscriptions.

53.     Between 2013 and 2016, consumers purchased nearly 2.5 million subscriptions subject to the guarantee but only received 32,438 free six-month subscription packages during the same period. In contrast, Defendants billed nearly 1 million consumers who purchased a guarantee for an additional six-month package when the first six-month period expired.

### *Defendants' Billing and Cancellation Practices for Match.com Subscriptions*

54.     Consumers who purchase a subscription package must complete an online enrollment process at Match.com and provide their credit card or other payment information to pay for the initial subscription package. Defendants' subscription packages include a "negative option renewal" feature, meaning that Defendants will automatically charge consumers for a new term at the end of each subscription period, unless the consumer has affirmatively canceled the subscription.

55.     Consumers who subscribe to Match.com thus continue to have their subscriptions renewed and are charged until they affirmatively act to cancel their subscriptions. Often, consumers who attempt to cancel their Match.com subscriptions or subscription renewals are deterred by confusing and cumbersome cancellation practices.

56.     To cancel a Match.com subscription, consumers must complete several steps. After locating the cancellation tab and inputting their passwords, consumers have first either had to click through a "retention offer" or, as of 2017, a "Cancel Subscription" hyperlink.

57.     Next, subscribers have had to click through two pages of survey questions, in which the subscriber's response to one question causes a follow-up question to pop up. For example, clicking "I had too much going on and did not have time to date," results in the follow up question, "When do you feel you might be ready to date again?" with three possible answers. Finally, consumers reach the cancellation confirmation page.

58.     Defendants illustrated the cumbersome nature of this process in a 2015 internal presentation, the notes to which described the cancellation flow as "hard to find, tedious, and confusing. Members often think they've cancelled when they have not and end up with unwanted renewals. The current process takes over 6 clicks":



59.     Thousands of consumers have complained about Match.com's cancellation procedures. They have also claimed that Defendants have billed them after they believed they effectively canceled their Match.com subscriptions.

60.     Defendants' executives have acknowledged that Match.com's cancellation process is "convoluted and confusing." Defendants' head of customer service stated in 2016, for example, that "it's been the same complaint for the past decade that I've been with Match . . . It takes up to 7 or 8 clicks to complete the flow to turn off [subscriptions] if you can even figure out how to do it."

### *Defendants' Terminating Accounts in Response to Billing Disputes*

61.     Because of Defendants' deceptive advertising, billing, and cancellation practices, consumers often raise billing disputes with Defendants. In numerous instances, consumers dispute Defendants' charges through their financial institutions.

62.     When consumers dispute these charges, Defendants contest the disputes. Until mid-2019, when Defendants prevailed in a billing dispute, Defendants often failed to provide consumers access to their Match.com accounts or to the subscription services that the consumers paid for. Instead, Defendants terminated the consumers' accounts and deleted their profiles.

63.     In fact, Match.com's Terms of Use warned that if Defendants "successfully dispute[] the reversal [of charges], and the reversed funds are returned, you are not entitled to a refund or to have your account or subscription reinstated." Defendants placed this disclosure near the end of its lengthy Terms of Use document and not set it off or otherwise made it conspicuous to consumers.

64.     Defendants estimated that 60 percent of chargebacks occur within one month of the disputed charge and that 82 percent of chargebacks occur within the first two months of the

charge. Thus, consumers who disputed a charge and lost the dispute often had remaining time in their 3-, 6-, or 12-month subscriptions and have been banned from accessing the services they paid for.

65.     Based on (a) Defendants' long history of continuous conduct of the type described above; (b) Defendants' continued use of the practices challenged above—including delivering communications from fraud-flagged accounts sent to nonsubscribers while withholding them from subscribers—after learning of the Commission's investigation; (c) Defendants' continued use of the personalized advertisements, guarantee offers, cancellation practices, and account termination practices described above; and (d) the ease with which Defendants can engage in or resume similar conduct, the FTC has reason to believe that Defendants are violating or is about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

66.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

67.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

68.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

### Count I
### Misrepresentation Regarding Users of Defendants' Service

69.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of its online dating service, Defendants have represented, directly or

indirectly, expressly or by implication, that communications received by consumers using Match.com are from people interested in establishing a dating relationship with those consumers.

70.     In truth and in fact, in numerous instances in which Defendants have made the representation set forth in Paragraph 69 of this Complaint, the communications received by consumers using Match.com are not from people interested in establishing a dating relationship with those consumers but are instead from fake accounts created by fraudsters to deceive consumers.

71.     Therefore, Defendants' representation as set forth in Paragraph 69 of this Complaint is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II**
**Exposing Consumers to Risk of Fraud**

72.     Through the means described in Paragraphs 34-38, Defendants exposed consumers to the risk of fraud by providing recent subscribers access to communications that Defendants knew were likely to have been sent by persons engaging in fraud.

73.     Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

74.     Therefore, Defendants' practices as described in Paragraph 72 above constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

**Count III**
**Deceptive "Guarantee" Program**

75.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of its online dating service, Defendants have represented, directly or

indirectly, expressly or by implication, that consumers would receive a free six-month subscription if they purchased a six-month Match.com subscription and did not "meet someone special" during that initial six-month period on Match.com.

76.     In numerous instances in which Defendants have made the representation set forth in Paragraph 75 of this Complaint, Defendants have failed to disclose, or disclose adequately to consumers, that the consumer must take specific steps to claim the guarantee during the final week of the initial six-month subscription period, including (a) securing and maintaining a public profile with a primary photo approved by Defendants within the first seven days of purchase, (b) messaging five unique Match.com subscribers per month, and (c) using Defendants' progress page to redeem the free six months during the final week of the initial six-month subscription period. This additional information would be material to consumers in deciding to purchase or in their conduct regarding the online dating service that Defendants sell.

77.     Defendants' failure to disclose or disclose adequately the material information described in Paragraph 76, above, in light of the representation described in Paragraph 75, above, constitutes a deceptive act or practice in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

**Count IV**
**Unfair Denial of Access to Consumers' Accounts**

78.     In numerous instances, Defendants have barred consumers who have disputed charges through their financial institutions from using paid-for Match.com subscription services.

79.     Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

80.     Therefore, Defendants' practices as described in Paragraph 78 above constitute unfair acts or practices in violation of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

81.     In 2010, Congress passed ROSCA, 15 U.S.C. §§ 8401-05, which became effective on December 29, 2010. Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." Section 2 of ROSCA, 15 U.S.C. § 8401.

82.     Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, (b) obtains the consumer's express informed consent before making the charge, and (c) provides a simple mechanism to stop recurring charges. *See* 15 U.S.C. § 8403(1)–(3).

83.     The TSR defines a negative option feature as: "an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

84.     Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is treated as a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

85. Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), authorizes this Court to award monetary civil penalties for each violation of ROSCA. The Defendants' violations of ROSCA were committed with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

**Count V**
**Failure to Provide a Simple Mechanism for Consumers to Stop Recurring Charges**

86. In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 54-60 above, Defendants have failed to provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

87. Defendants' practices as described in Paragraph 86, above, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

**CONSUMER INJURY**

88. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and ROSCA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**PRAYER FOR RELIEF**

89. Wherefore, Plaintiff requests that the Court:

a. Enter a permanent injunction to prevent future violations of the FTC Act and ROSCA by Defendants;

b. Award monetary and other relief within the Court's power to grant;

c. Award monetary civil penalties from each Defendant for every violation of ROSCA; and

FEDERAL TRADE COMMISSION'S FIRST AMENDED COMPLAINT

25

d.   Award any additional relief as the Court may determine to be just and proper.

Respectfully submitted,

Dated:  5/13/2022          /s/ Reid Tepfer
REID TEPFER, Managing Attorney
M. HASAN AIJAZ
MATTHEW WILSHIRE
SARAH ZUCKERMAN (admitted *pro hac vice*)
Texas Bar No. 24079444 (Tepfer)
Virginia Bar No. 80073 (Aijaz)
California Bar No. 224328 (Wilshire)
New York Bar No. 5603832 (Zuckerman)
Federal Trade Commission
1999 Bryan St. Ste. 2150
Dallas, Texas 75201
T: (214) 979-9395 (Tepfer)
T: (214) 979-9386 (Aijaz)
T: (214) 979-9362 (Wilshire)
T: (214) 979-9376 (Zuckerman)
F: (214) 953-3079
Email: rtepfer@ftc.gov;
maijaz@ftc.gov
mwilshire@ftc.gov;
szuckerman@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION