**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>             Plaintiff,<br><br>    vs.<br><br>MATCH GROUP, INC., a corporation, and<br>MATCH GROUP, LLC, formerly known as<br>MATCH.COM, LLC, a limited liability company,<br>             Defendants. | Case No. 3:19-cv-02281-K |

**APPENDIX IN SUPPORT OF DEFENDANT MATCH GROUP, INC. OBJECTION TO
THE MAGISTRATE ORDER**

Defendant Match Group, Inc., by and through its counsel, submits this Appendix in support

of the Objection to the Magistrate Order.

| Ex. | Description | App. Page(s) |
|-----|-------------|--------------|
| 1 | FTC 30(b)(6) Deposition Excerpts | APP 001-003 |
| 2 | Letter from Linda A. Goldstein, Baker & Hostetler LLP, to Zachary A. Keller, Federal Trade Commission (August 6, 2019) | APP 004-005 |
| 3 | Letter from Chad Hummel, Sidley Austin LLP, to Reid Tepfer, Federal Trade Commission (May 20, 2022) | APP 006 |
| 4 | Plaintiff Federal Trade Commission's First Set of Requests for Production of Documents | APP 007-022 |
| 5 | Plaintiff Federal Trade Commission's First Set of Interrogatories to Defendant Match Group, Inc | APP 023-035 |
| 6 | Defendant Match Group Inc.'s First Amended Responses and Objections to Plaintiff Federal Trade Commission's First Requests for Production | APP 036-094 |
| 7 | Defendant Match Group Inc.'s First Amended Responses and Objections to Plaintiff Federal Trade Commission's First Set of Interrogatories | APP 095-121 |
| 8 | Verification of Match Group, Inc.'s First Amended Responses to Plaintiff Federal Trade Commission's First Set of Interrogatories | APP 122-123 |

| Ex. | Description | App. Page(s) |
|---|---|---|
| 9 | April 15, 2019 Email, *Match Update: 6 Month Guarantee No Longer Available* [MATCHFTC774521] | APP 124 |
| 10 | Match.com Q/A Webpage, *What happened to Match Guarantee?* [MATCHFTC774522] | APP 125 |
| 11 | October 7, 2021 Email, *QA – Information about your Match account* [MATCHFTC774668] | APP 126-127 |
| 12 | 2022-09-28 Match Group, LLC's Responses and Objections to FTC First Set of Interrogatories | APP 128-165 |
| 13 | Final Amended Hearing Transcript from 11/1/22 Hearing | APP 166-224 |

Dated: November 15, 2022

Respectfully submitted,

*/s/ Angela C. Zambrano*
Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Fax: 214.981.3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310.595.9500
Fax: 310.595.9501

*Attorneys for Match Group, Inc. and Match Group, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

On November 15, 2022, I filed the foregoing document with the clerk of court for the

U.S. District Court, Northern District of Texas.  I hereby certify that I have served the document

on all counsel by a manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Angela C. Zambrano*

Angela C. Zambrano

```
1                    UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF TEXAS

2                        DALLAS DIVISION

3

4     FEDERAL TRADE COMMISSION,        :  Civil Action

5            Plaintiff,                :  Case No. 3:19-cv-02281-K

6        vs.                          :

7     MATCH GROUP, INC., a corporation, :

      MATCH GROUP, LLC, formerly

8     MATCH.COM, LLC, a Limited        :

      Liability Company,

9                                      :

             Defendant.

10    _____/

11

12            Deposition of BIKRAM BANDY, taken on behalf of

13    Defendant, by Chad Hummel, of Sidley Austin, LLP, at 1501 K

14    Street, NW, Washington, D.C., commencing at 10:09 a.m., on

15    October 24, 2022, before Linda C. Marshall, RPR.

16

17    APPEARANCES:

18    FOR THE PLAINTIFF:    M. HASAN AIJAZ, Esquire

                           Federal Trade Commission

19

20

      FOR THE DEFENDANT:    CHAD HUMMEL, Esquire

21                         Sidley Austin, LLP

22

23

24

25

                                                   Page 1
```

APP 001

1   A   I would expect that whatever -- the facts alleged in the
2   complaint are the facts the commission has a reason to believe
3   occurred.
4   Q   Right.  Could you look at page 11, paragraph 39 and could
5   you read the second full sentence of paragraph 39 into the
6   record, please?
7   A   The second full sentence.  Until mid-2019, consumers who
8   visit the Match.com website were offered a, quote, Match
9   guarantee if they purchased a six-month subscription.  And there
10   is a graphic here.  It says, bundle plans, basic plans,
11   12-month, 17.99 per month, save 65 percent.  Six months, 19.99
12   per month, save 62 percent.  Match guarantee graphic, three
13   months, 23.99 per month, save 54 percent.  All bundles include
14   these great features, email read notification, first
15   impressions, highlighted profile.  There's a "continue" button.
16   I guess that's the end of the sentence.
17   Q   And what were the first two words of the second sentence of
18   paragraph 39?
19   A   Until mid-2019.
20   Q   Correct.  Now, let's look at paragraph 62, which relates to
21   the chargeback policy.  And could you please read into the
22   record what the FTC alleged in this case on page 20, paragraph
23   62, second sentence?
24   A   Where am I reading again?
25   Q   Paragraph 62, page 20, second sentence.

Page 74

1   email, any indication whatsoever that Match Group, LLC or
2   Match.com plans to re-implement the chargeback policy that you
3   read into the record from page 20, paragraph 62?
4       MR. AIJAZ:  Objection, vague and (indecipherable).
5       THE WITNESS:  To the best of my knowledge, we
6   currently do not have any information indicating that.
7   BY MR. HUMMEL:
8   Q   So, the FTC presently has no evidence whatsoever that Match
9   Group, LLC or Match.com plan to reinstitute the chargeback
10   policy or the guarantee that is alleged in this complaint, true?
11   A   We currently do not have that information.
12   Q   No witness has told you, oh, boy, they're gonna -- as soon
13   as they file that stipulation under oath with federal court
14   under Rule 11, we are going to go ahead and circumvent that.
15       MR. AIJAZ:  Objection, form.
16   BY MR. HUMMEL:
17   Q   Is that true?
18   A   Well --
19   Q   It's a yes or no question.
20   A   We currently don't have that, although I will note that
21   Match's -- my understanding is Match is not producing discovery
22   related to those two counts.  So, that's -- so it makes it
23   difficult for us to assess that.
24   Q   Well, Match has agreed to produce every single document
25   related to the issue of permanent discontinuation.  Are you

Page 76

1   A   Until mid-2019, when defendants prevailed in a billing
2   dispute, defendants often failed to provide consumers access to
3   their Match.com accounts or to the subscription services that
4   the consumers paid for.
5   Q   Okay.  And then the next sentence reads?
6   A   Instead, defendants terminated the consumers' accounts and
7   deleted their profiles.
8   Q   So, according to the FTC, that practice lasted until
9   mid-2019, true?
10   A   It appears that that's what we are alleging, yes.
11   Q   And you're also alleging, are you not, that on -- in
12   paragraph 39, relating to the guarantee, that the guarantee was
13   offered, quote, until mid-2019, true?
14   A   I think I read that before, yes.
15   Q   Okay.  Does the FTC have any document, any witness, any
16   memo, any writing, any evidence whatsoever that Match.com or
17   Match, LLC, Match Group, LLC plans to start offering the
18   guarantee described in Exhibit 3 again?
19   A   No.
20   Q   Same question with respect to the old, discontinued
21   chargeback policy that's described in the complaint?
22       MR. AIJAZ:  Objection as to form.
23       THE WITNESS:  So, what, what is the question?
24   BY MR. HUMMEL:
25   Q   Does the FTC have any document, any witness, any memo, any

Page 75

1   aware of that?
2   A   I'm not aware of that.
3   Q   Okay.  Do you have any basis to dispute that that's what
4   Match has produced already?
5       MR. AIJAZ:  Objection, outside the scope of the
6   notice.
7       THE WITNESS:  I don't know one way or the other.
8   BY MR. HUMMEL:
9   Q   Does the FTC have any evidence whatsoever that Hinge,
10   OkCupid, Plenty of Fish, or Tinder have offered a six-month
11   guarantee of the type challenged in the complaint in this case,
12   Exhibit 3?
13       MR. AIJAZ:  Objection, scope --
14       THE WITNESS:  What were those sites again?
15       MR. HUMMEL:  Hinge, OkCupid, Plenty of Fish, and
16   Tinder.  And I'm talking specifically about the guarantee that's
17   alleged to have violated the FTC act in Count Three of the
18   complaint.
19       THE WITNESS:  I did not see anything in my preparation
20   that indicated that those websites offer the six-month guarantee
21   that's at issue in Count Three of the complaint.
22   BY MR. HUMMEL:
23   Q   And with respect to the chargeback policy, I take it you've
24   reviewed the terms of use of Hinge, OkCupid, Plenty of Fish and
25   Tinder?

Page 77

20 (Pages 74 - 77)

**APP 002**

**CERTIFICATE OF COURT REPORTER**

1        CERTIFICATE OF COURT REPORTER
2    I, Linda C. Marshall, certify that the foregoing is a
3  correct transcript from the record of proceedings in the
4  above-entitled matter.
5
6
7
8      Linda C. Marshall, RPR
         Official Court Reporter
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 122

---

1 Federal Trade Commission v. Match Group, Inc., Et Al.
2 Bikram Bandy 5535418
3      ACKNOWLEDGEMENT OF DEPONENT
4    I, Bikram Bandy, do hereby declare that I
5 have read the foregoing transcript, I have made any
6 corrections, additions, or changes I deemed necessary as
7 noted above to be appended hereto, and that the same is
8 a true, correct and complete transcript of the testimony
9 given by me.
10
11 _____  _____
12 Bikram Bandy          Date
13 *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15      _____ DAY OF _____, 20___.
16
17
18      _____
19    NOTARY PUBLIC
20
21
22
23
24
25

Page 124

---

1 Federal Trade Commission v. Match Group, Inc., Et Al.
2 Bikram Bandy Job No. 5535418
3    E R R A T A S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Bikram Bandy          Date
25

Page 123

---

1 maijaz@ftc.gov
2      November 10, 2022
3 Federal Trade Commission v. Match Group, Inc., Et Al.
4 DEPOSITION OF: Bikram Bandy 5535418
5    The above-referenced witness transcript is
6 available for read and sign.
7    Within the applicable timeframe, the witness
8 should read the testimony to verify its accuracy. If
9 there are any changes, the witness should note those
10 on the attached Errata Sheet.
11    The witness should sign and notarize the
12 attached Errata pages and return to Veritext at
13 errata-tx@veritext.com.
14    According to applicable rules or agreements, if
15 the witness fails to do so within the time allotted,
16 a certified copy of the transcript may be used as if
17 signed.
18        Yours,
19        Veritext Legal Solutions
20
21
22
23
24
25

Page 125

32 (Pages 122 - 125)

# BakerHostetler

**Baker&Hostetler** LLP

45 Rockefeller Plaza
New York, NY 10111

T 212.589.4200
F 212.589.4201
www.bakerlaw.com

Linda A. Goldstein
direct dial: 212.589.4206
lgoldstein@bakerlaw.com

August 6, 2019

**VIA E-MAIL (ZKELLER@FTC.GOV)**

Zachary A. Keller, Esq.
Federal Trade Commission
Southwest Region
1999 Bryan Street, Suite 2150
Dallas, TX 75201

*Re:     FTC / Match*

Dear Zach:

Match and the FTC have repeatedly discussed the FTC's concerns about certain of Match's practices. In addition, you have provided Match with a draft Complaint that details the FTC's legal theories as to why the FTC believes Match's practices are unlawful. While we have denied any wrongdoing related to the FTC's proposed claims and will continue to do so until the investigation either closes or the claims are dismissed, as you know, our business has changed over the time period of this investigation. This letter is to leave absolutely no doubt regarding Match's current and future practices.

In short, Match does not engage in any of the following practices in the FTC's draft Complaint, nor does it have any plans or intentions to do so in the future:

- Send notifications ("PTRs") associated with communications from any subscriber account then under fraud review to any non-subscriber as alleged in Count I;

- Allow communications from any subscriber account then under fraud review to reach any non-subscriber (or, for that matter, recent subscribers, which Match has never done) as alleged in Count II;

- Offer a "guarantee" program that allows consumers who meet certain terms and conditions to extend their subscriptions without cost as alleged in Count III,

Atlanta     Chicago     Cincinnati     Cleveland     Columbus     Costa Mesa     Denver
Houston     Los Angeles     New York     Orlando     Philadelphia     Seattle     Washington, DC

Zachary A. Keller, Esq.
August 6, 2019
Page 2

> without clearly and conspicuously disclosing the full terms and conditions of the
> guarantee program;

- Bar consumers who have unsuccessfully disputed charges through their financial
  institutions, including preventing them from using paid Match.com subscription
  services as alleged in Count IV.

Moreover, Match has no plans or intentions ever to reinstitute any of these practices.

If the FTC chooses to pursue legal action against Match, it cannot plead any facts in good faith
inconsistent with the foregoing, including but not limited to alleging that Match is violating, or is
about to violate, the FTC Act with respect to any of the discontinued practices described above.

Sincerely,

Linda A. Goldstein



SIDLEY AUSTIN LLP
1999 AVENUE OF THE STARS
17TH FLOOR
LOS ANGELES, CA 90067
+1 310 595 9500
+1 310 595 9501 FAX

+1 310 595 9505
CHUMMEL@SIDLEY.COM

AMERICA   •   ASIA PACIFIC   •   EUROPE

May 20, 2022

Reid Tepfer
Federal Trade Commission
1999 Bryan St Ste 2150
Dallas, TX 75201
rtepfer@ftc.gov

 Re: *FTC v. Match Group, Inc.*, No. 3:19-cv-02281-K (N.D. Tex.)

Dear Reid:

 Match Group, Inc. ("Match") and the FTC have repeatedly discussed the FTC's allegations about certain practices on Match.com that the FTC claims violate the FTC Act.  Although Match has denied any wrongdoing related to the FTC's allegations and continues to do so, as you are aware, these practices were discontinued by March and April 2019, prior to the FTC filing its Complaint against Match.  Additionally, in an August 6, 2019, letter to the FTC, Match left absolutely no doubt regarding any intent to resume these practices, writing that there were "no plans or intentions ever to reinstitute any of these practices" on Match.com.  It has now been over three years since these practices were discontinued, and the same remains true today.  There are no plans or intentions to either:

- Offer a "guarantee" program that allows consumers who meet certain terms and conditions to extend their subscriptions without cost, as alleged in Count III, or

- Bar consumers who have unsuccessfully disputed charges through their financial institutions, including preventing them from using paid Match.com subscription services, as alleged in Count IV.

 Given that these practices were discontinued many years ago, and there are no plans or intentions to reinstitute those practices, there is no evidence that Match Group, Inc. (or Match Group, LLC) is violating or is about the violate the FTC Act with respect to any of the permanently discontinued practices described above.  As a result, Match requests that the FTC dismiss its FTC Act claims to avoid the unnecessary expenditure of the parties' and the Court's time and resources litigating about permanently discontinued practices.

     Sincerely,

     */s/  Chad S. Hummel*

     Chad S. Hummel

cc:  Counsel of Record

Sidley Austin (CA) LLP is a Delaware limited liability partnership doing business as Sidley Austin LLP and practicing in affiliation with other Sidley Austin partnerships.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>MATCH GROUP, INC., a corporation,<br><br>    Defendant. | Case No. 3:19-cv-02281-K<br><br>**PLAINTIFF FEDERAL TRADE COMMISSION'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS** |

Pursuant to Federal Rule of Civil Procedure 34, Plaintiff the Federal Trade Commission ("FTC"), by its undersigned attorneys, submits to Defendant Match Group, Inc. ("Match") the following First Request for Production of Documents (the "Request").

## INSTRUCTIONS

A.    These instructions and definitions should be construed to require Request responses based upon your actual or constructive knowledge, information available to you, as well as that of your attorneys, accountants, consultants, employees, independent contractors representatives, agents, and other acting on your behalf. This Request must be responded to by the party to whom they are directed within thirty (30) days of the date of service, as defined by Rule 6 of the Federal Rules of Civil Procedure. For any specific document or range of documents You reference in response to this Request that has been or will be produced to the FTC, identify such document(s) by the associated Bates number or other identifying information in Your response. In construing this Request, the present tense includes the past and future tenses, the singular includes the plural, and the plural includes the singular.

B.      This Request covers Documents and information in Your possession or under Your actual or constructive custody or control, including Documents and information in the possession, custody, or control of Your attorneys, accountants, directors, officers, employees, service providers, and other agents and consultants, whether or not such Documents or information were received from or disseminated to any person or entity

C.      If, in responding to this Request, You encounter any ambiguities, Your response shall set forth the matter deemed ambiguous and the construction used in responding.

D.      This Request is continuing in nature, up to and during trial. If, after You serve Your response, You become aware of additional or corrective information or material responsive to this Request, You must supplement Your Request response and promptly produce the responsive material or information to Plaintiff in accordance with Federal Rule of Civil Procedure 26(e).

E.      The relevant time period for this Request shall be from January 1, 2013, to the completion of this action, unless otherwise specified. If the response to any Request is different for different periods within the applicable time period, provide a complete response for each time period and designate the specific time period for which the response is applicable.

F.      If you are withholding a document or information, provide the basis for withholding, including:

1.   If you are withholding the document or information under claim of privilege or the work product doctrine, provide the information set forth in Fed. R. Civ. P. 26(b)(5), including the type of document, the general subject matter of the document, including, where appropriate, the author, addressee, custodian, and any other recipient of the document, and where not apparent, the relationship

PLAINTIFF FTC'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

APP 008

of the author, addressee, custodian, and any other recipient to each other, in a manner that, without revealing the information claimed to be protected, will enable the FTC to assess the applicability of the privilege or protection claimed by you;

2.  If you are withholding the document or information for any reason other than a claim of privilege or the work product doctrine, provide the reason for withholding the document.

G.      If a responsive document or information contains non-privileged material as well as material you contend is privileged, you must disclose the non-privileged material to the fullest extent possible without disclosing the privileged material. You must clearly indicate the portions of the document or information to which privilege is claimed. If you redact or alter a document, identify the reason for the redaction or alteration. Any redactions must be clearly visible on the redacted document.

H.      Personally Identifiable Information ("PII") or Sensitive Health Information ("SHI"): If You believe that Your response would require You to disclose PII or SHI, please contact Plaintiff's counsel Reid Tepfer before providing Your response to discuss whether there are steps You can take to minimize the amount of PII or SHI You include in Your response, and how to securely transmit such information to the FTC. Plaintiff's counsel may instruct You to encrypt any electronic copies of such material with encryption software such as PKZip and provide the encryption key in a separate communication.

PII includes an individual's Social Security number, an individual's name, address, or phone number in combination with one or more of the following: date of birth, Social Security

PLAINTIFF FTC'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

APP 009

number, driver's license number or state identification number (or a foreign country equivalent), passport number, financial account number, credit card number, or debit card number.

SHI includes medical records and other individually identifiable health information relating to the past, present, or future physical or mental health or conditions of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

I.        In producing documents consisting of electronically stored data in machine-readable form in response to any Request, provide such data in a machine-readable form that does not require specialized or proprietary hardware or software.

J.        Unless otherwise requested, in lieu of producing original hard-copy documents, you may produce photocopies, provided that you shall retain the original documents and produce them to the FTC upon request. Further, copies of original documents may be submitted in lieu of originals only if they are true, correct, and complete copies of the original documents, and their submission constitutes a waiver of any claim as to the authenticity of the copy should it be necessary to introduce such copy into evidence in any legal proceeding. Provide color copies of any document originally produced in color or containing type, writing, or other marks in any color other than black.

K.        If any document requested herein was formerly in your possession, custody, or control and has been lost, destroyed, or otherwise disposed of, you shall submit in lieu of any such document a written statement describing in detail:  (a) the nature of the document and its contents; (b) the identity of the person(s) who prepared or authored the document and, if applicable, the identity of the person(s) to whom the document was sent or shown; (c) the date on which the document was prepared or transmitted; and (d) the date the document was lost or

PLAINTIFF FTC'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

destroyed and, if destroyed, the events of and reason(s) for such destruction and the identity, employer(s), current address, and position(s) of the person(s) requesting and/or performing the destruction.

L.    If any document requested herein was previously produced to the FTC, identify it by bates number.

M.    Each response shall be organized and labeled to correspondent to the numbered Request to which it is responsive.

N.    If You cannot answer all or part of any Request in full after exercising due diligence to secure the full information to do so, state and answer to the extent possible, specifying Your inability to answer the remainder, stating the information or knowledge You have concerning the unanswered portion, and detailing what You did in attempting to secure the unknown information.

O.    The Commission often makes its files available to other civil and criminal federal, state, local, or foreign law enforcement agencies. The FTC may make information supplied by you available to such agencies where appropriate pursuant to the FTC Act and 16 C.F.R. §§ 4.11(c) and (j). Information you provide may be shared with other federal, state, or foreign civil or criminal agencies.

**DEFINITIONS**

Notwithstanding any definition set forth below, each word, term, or phrase used in this Request is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure.  As used in this Request, the following terms are to be interpreted in accordance with these definitions:

PLAINTIFF FTC'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

APP 011

A.     "**Match**" or the "**Company**" or "**You**" means Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing. The term shall include any descriptor used by Match in its business practices.

B.     **2017 CID**" means the Civil Investigative Demand the FTC issued to Match Group, Inc. in March 2017

C.     "**Advertisement**" or "**Advertising**" or "**Ad**" means any written or verbal statement, illustration, or depiction that promotes the sale of a good or service or is designed to increase consumer interest in a brand, good, or service. Advertising media include, but are not limited to, packaging and labeling; promotional materials; print; television; radio; and internet, social media, email, and other digital content.

D.     "**and**," as well as "**or**," shall be construed both conjunctively and disjunctively, as necessary, in order to bring within the scope of any specification in this Request all information that otherwise might be construed to be outside the scope of the specification.

E.     "**any**" shall be construed to include "all," and "**all**" shall be construed to include the word "any."

F.     "**Chargeback**" means a transaction that is returned as a financial liability to an acquirer by a card issuer, usually because of a disputed transaction. The acquirer may then return or "charge back" the transaction to the merchant.

G.     "**Customer**" or "**Customers**" means any individual or individuals who have maintained an account on any website owned or operated by the Company, including

PLAINTIFF FTC'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

APP 012

Match.com, OKCupid, Plenty of Fish, and Tinder, regardless of whether such individual or individuals paid for those accounts or not.

   H. "**Document**" means the complete original and any non-identical copy (whether different from the original because of notations on the copy or otherwise), regardless of origin or location, of any written, typed, printed, transcribed, taped, recorded, filmed, punched, computer-stored, or graphic matter of every type and description, however and by whomever prepared, produced, disseminated or made, including any advertisement, book, pamphlet, periodical, contract, correspondence, file, invoice, memorandum, note, telegram, report, record, handwritten note, working paper, routing slip, chart, graph, paper, index, map, tabulation, manual, guide, outline, script, abstract, history, calendar, diary, agenda, minute, code book, or label. "Document" shall also include Electronically Stored Information.

   I. "**each**" shall be construed to include "every," and "**every**" shall be construed to include "each."

   J. "**Guarantee Extension**" means any free or additional subscriptions, services, or access to Match.com provided to a Customer under the terms of any guarantee.

   K. "**Identify**" or "**the identity of**" shall be construed, (a) when used in connection with identification of a natural Person, to require identification of the person's name, contact phone number(s), email address, and zip code, (b) when used in connection with businesses or other organization, to require identification of name, address, telephone number, email address, and identities of natural Persons who are officers, directors or managers of the business or organization, and contact Persons, where applicable; and (c) with respect to any document produced in connection with the 2017 CID or in response to discovery requests in this lawsuit, to require that You state the Bates number and production date associated with such document.

PLAINTIFF FTC'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

APP 013

L.      "**Match Group, LLC**" means Match Group, LLC and includes operations under assumed names, prior names, and predecessor entities, including Match.com, LLC.

M.      "**Match Guarantee**" means any Company offer to provide free subscription services to Match.com for Customers who fulfill certain criteria during their subscription period.

N.      "**Match.com**" means the dating platform available at www.match.com.

O.      "**OKCupid**" means the dating platform marketed using the brand name "OKCupid" available at www.okcupid.com and on the Apple App Store or Google Play App Store.

P.      "**Person**" or "**Persons**" shall mean all natural persons, corporations, partnerships, or other business associations and all other legal entities, including all members, officers, predecessors, assigns, divisions, affiliates and subsidiaries.

Q.      "**Plenty of Fish**" means the dating platform marketed using the brand name "Plenty of Fish" available at www.pof.com or on the Apple App Store or Google Play app store.

R.      "**referring to**" or "**related to**" means discussing, describing, reflecting, containing, analyzing, studying, reporting, commenting, evidencing, constituting, setting forth, considering, recording, transcribing, recommending, concerning, or pertaining to, in whole or in part.

S.      "**Subscriber**" means any user who has had either a paid account or a "free trial" account on any website owned or operated by the Company.

T.      "**Tinder**" means the dating platform marketed using the brand name "Tinder" available at www.tinder.com or on the Apple App Store or Google Play app store.

PLAINTIFF FTC'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

## REQUEST FOR PRODUCTION OF DOCUMENTS

1. The Company's certificate of incorporation, bylaws, rules, regulations, procedures, and any amendments to them.

2. All minutes (including attachments) of meetings of the Company's Board of Directors and all materials submitted to the Board.

3. All materially different versions of the Company's organizational charts and personnel directories.

4. Documents sufficient to show all relationships that have existed between Match Group, Inc. and any other corporate entity, including Match Group, Inc.'s subsidiaries, entities with an ownership interest the Company, and any other entity You claim has operated match.com.

5. Documents sufficient to show all corporate officers of:

   a. Match Group, Inc.;

   b. Any corporate subsidiary of Match Group, Inc.;

   c. Any corporation that has had an ownership interest in Match Group, Inc.;

   d. Any other entity You claim has operated match.com;

   e. Any other entity You contend has operated Tinder;

   f. Any other entity You contend has operated OKCupid;

   g. Any other entity You contend has operated Plenty of Fish.

6. Documents sufficient to identify all current and former employees of Match Group, Inc. whose responsibilities include or relate to:

   a. advertising or marketing;

   b. customer service;

PLAINTIFF FTC'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

APP 015

    c.   corporate governance or operations;

    d.   general management;

    e.   research and development;

    f.   legal compliance;

    g.   accounting or finance;

    h.   cancellation of subscriptions;

    i.   the Match Guarantee; and

    j.   policies and practices related to chargebacks.

7. Documents sufficient to identify all current and former Match executives.

8. Documents sufficient to show all transfers of money between Match Group, Inc., and any corporate subsidiary or owner or any other entity You claim has operated match.com, OKCupid, Plenty of Fish, and Tinder.

9. All Documents You contend tend to show that Match Group, Inc., is not liable for the violations alleged in the Complaint filed in this case, including documents supporting the claim that another entity has operated match.com, OKCupid, Plenty of Fish, and Tinder.

10. All Documents You contend tend to show that Match Group LLC operates or has operated Match.com, OKCupid, Plenty of Fish, and Tinder.

11. All Documents You contend tend to show that Match Group Inc. does not or has not operated Match.com, OKCupid, Plenty of Fish, and Tinder.

12. Documents sufficient to show the Company's quarterly and annual gross and net revenue, including profit and loss statements and accounting documents for Match.com, OKCupid, Plenty of Fish, and Tinder.

PLAINTIFF FTC'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

13. Documents showing the Company's projections of its gross and net revenue, including Documents provided to prospective investors.

14. Documents sufficient to show quarterly and annual revenue from:

    a.  Subscriptions to Match.com;

    b.  Subscriptions to OKCupid;

    c.  Subscriptions to Plenty of Fish;

    d.  Subscriptions to Tinder;

    e.  Subscriptions to Match.com that included or was subject to a Match Guarantee;

    f.  Payments from accounts on Match.com that had been automatically renewed; and

    g.  Payments from Subscribers who had clicked on the "retention offer" or "Cancel Subscription" hyperlinks described in Paragraph 55 of the Complaint filed in this case.

15. Each unique version of all Ads related to a Match Guarantee.

16. Each unique version of all Ads related to cancellation of a Match.com, OkCupid, Plenty of Fish, or Tinder subscription, including Ads related to the ease or availability of cancellation.

17. Documents sufficient to show each unique disclosure You contend disclosed policies concerning terminating subscriptions in response to a Customer Chargeback.

18. Representative copies of all visual content shown to Customers during the process of purchasing or signing up for a paid subscription.

PLAINTIFF FTC'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

19. Representative copies of all visual content that Match has shown to Customers concerning the Match Guarantee, including concerning:

    a.  Advertisements relating to Subscriptions subject to the Match Guarantee;

    b.  Customer "progress" with regard to the Match Guarantee; and

    c.  Redeeming a Match Guarantee or receiving a Guarantee Extension.

20. Representative copies of all visual content that Customers have had to view to cancel their subscriptions.

21. Representative copies of all visual content that the Company has shown to Customers concerning the available means of cancelling their subscriptions.

22. All documents related to any change or contemplated change to any means of subscription cancellation available to Customers.

23. All documents related to account takeovers.

24. All documents related to software flaws that prevented Customers from:

    a.  logging into their accounts;

    b.  using their accounts; or

    c.  canceling their accounts.

25. All communications relating to:

    a.  Match Guarantees;

    b.  Cancellation of paid subscriptions by Customers;

    c.  Customer Chargebacks;

    d.  Denial of Customers' access to accounts in response to chargebacks;

    e.  The marketing or advertising of Tinder Gold or Tinder Boost; and

APP 018

f.   The marketing or advertising of Incognito Mode, OKCupid Premium, or Profile Boosts on OKCupid.

26. All Documents related to how consumers or Customers view, read, react to, understand, or have been influenced by Ads relating to Match Guarantees; chargeback policies; Ads relating to subscription renewal or cancellation; or the means of subscription renewal or cancellation, including documents relating to copy tests, A/B testing, click-through data, consumer or Customer surveys, usability tests, and focus groups.

27. All Documents, including internal and third-party studies or audits, relating to Customers' efforts to cancel their subscriptions to Match.com, Tinder, or OKCupid.

28. All Documents relating to the policies and practices of the Company, Match.com, Tinder, or OKCupid regarding the following:

a.   Match Guarantees;

b.   account cancellation;

c.   Availability of customer support services;

d.   availability of refunds;

e.   Customer Chargebacks;

f.   Customer access to accounts; and

g.   compliance with consumer protection laws, including the FTC Act and the Restore Online Shoppers' Confidence Act.

29. All Documents relating to any internal or external review concerning compliance by the Company with consumer protection laws, including the FTC Act and the Restore Online Shoppers' Confidence Act.

PLAINTIFF FTC'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

APP 019

30. All Documents relating to Customer complaints.

31. All communications with Customers relating to the Match Guarantee or the
Company's chargeback or cancellation policies or practices.

32. All documents relating to any lawsuit alleging that the operators of Match.com,
Tinder, Plenty of Fish, or OKCupid have engaged in fraud or violated any federal,
state, or foreign consumer protection laws.

33. All versions of customer service telephone scripts, chat scripts or prepared responses,
customer support manuals, employee manuals, and other training materials.

34. All Documents referring to or relating to:

    a.  The Federal Trade Commission;

    b.  The FTC Act;

    c.  The Restore Online Shoppers' Confidence Act;

    d.  Unfair, deceptive, or abusive acts or practices or "UDAAP" or "UDAP";

    e.  The Department of Justice; and

    f.  The lawfulness or unlawfulness of any practices related to Match Guarantees,
Customer chargebacks, or the cancellation of subscriptions.

35. All Documents that support, contradict, refute, or rebut any affirmative defense You
have asserted in Your Answer.

36. All Documents You referred to in the course of responding to any Request for
Admission, Request for Production, or Interrogatory served by the Federal Trade
Commission in this case.

37. All Documents considered or relied upon by any witness you disclose under Fed. R.
Civ. P. 26(a)(2).

PLAINTIFF FTC'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

Dated: June 3, 2022

> /s/ M. Hasan Aijaz
> REID A. TEPFER
> M. HASAN AIJAZ
> MATTHEW WILSHIRE
> SARAH ZUCKERMAN
> Texas Bar No. 24079444 (Tepfer)
> Virginia Bar No. 80073 (Aijaz)
> California Bar No. 224328 (Wilshire)
> New York Bar No. 5603832 (Zuckerman)
> Federal Trade Commission
> 1999 Bryan St. Ste. 2150
> Dallas, Texas 75201
> T: (214) 979-9395 (Tepfer)
> T: (214) 979-9386 (Aijaz)
> T: (214) 979-9362 (Wilshire)
> T: (214) 979-9376 (Zuckerman)
> Email: rtepfer@ftc.gov; maijaz@ftc.gov;
> mwilshire@ftc.gov; szuckerman@ftc.gov
> Attorneys for Plaintiff
> FEDERAL TRADE COMMISSION

## CERTIFICATE OF SERVICE

I, M. Hasan Aijaz, certify that on June 3, 2022, I caused the foregoing Plaintiff's First Request for Production of Documents to be served on counsel of record by email.


By: /s/ M. Hasan Aijaz

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>MATCH GROUP, INC., a corporation,<br><br>    Defendant. | Case No. 3:19-cv-02281-K<br><br>**PLAINTIFF FEDERAL TRADE COMMISSION'S FIRST SET OF INTERROGATORIES TO DEFENDANT MATCH GROUP INC.** |

Pursuant to Federal Rule of Civil Procedure 33, Plaintiff, the Federal Trade Commission ("FTC"), by its undersigned attorneys, requests that Match Group, Inc. ("Defendant") respond in writing to the FTC's First Set of Interrogatories, provided below.

**INSTRUCTIONS**

**A.**    These instructions and definitions should be construed to require Interrogatory responses based upon your actual or constructive knowledge, information available to you, as well as that of your attorneys, accountants, consultants, employees, independent contractors, representatives, agents, and other acting on your behalf. These Interrogatories must be responded to by the party to whom they are directed within thirty (30) days of the date of service, as defined by Rule 6 of the Federal Rules of Civil Procedure. For any specific document or range of documents You reference in response to these Interrogatories that has been or will be produced to the FTC, identify such document(s) by the associated Bates number or other identifying information in Your response to the Interrogatory. In construing these Interrogatories, the present

APP 023

tense includes the past and future tenses, the singular includes the plural, and the plural includes the singular.

**B.**     These Interrogatories cover Documents and information in Your possession or under Your actual or constructive custody or control, including Documents and information in the possession, custody, or control of Your attorneys, accountants, directors, officers, employees, service providers, and other agents and consultants, whether or not such Documents or information were received from or disseminated to any person or entity.

**C.**     If You object to any portion of an Interrogatory, state the grounds of Your objection with specificity and answer the remainder of the Interrogatory as required by Federal Rule of Civil Procedure 33(b)(4) and 33(b)(3). If You object to any Interrogatory on the grounds that responding is unduly burdensome, describe in detail the burden or expense.

**D.**     If, in responding to these Interrogatories, You encounter any ambiguities when construing an Interrogatory, instruction, or definition, Your response shall set forth the matter deemed ambiguous and the construction used in answering the Interrogatory.

**E.**     These Interrogatories are continuing in nature, up to and during trial. If, after You serve Your response, You become aware of additional or corrective information responsive to these Interrogatories, You must supplement Your Interrogatory response and promptly produce the responsive material or information to Plaintiff in accordance with Federal Rule of Civil Procedure 26(e).

**F.**     Unless otherwise specified, the applicable period for the Interrogatories is from January 1, 2013, to the completion of this action. If the response to any Interrogatory is different

for different periods within the applicable time period, provide a complete response for each time period and designate the specific time period for which the response is applicable.

     **G.**     If You refuse to answer any Interrogatory (or any part of any Interrogatory) on the basis that it calls for information that is protected from disclosure under any privilege, work product protection, statutory exemption, or any similar claim, You must assert the claim no later than the date that Your written responses are due and Your written response must set forth the basis of Your claim and provide sufficient detail to enable the FTC and the Court to determine the validity of Your claim without disclosing the protected information, as required by Federal Rule of Civil Procedure 26(b)(5)(A).

     If you contend that both privileged and non-privileged information or material is responsive to any Interrogatory, You must provide the non-privileged information or material in Your response. If You refuse to answer any Interrogatory (or any part of any Interrogatory) on a basis other than described above, Your written response shall set forth the basis of Your claim and provide sufficient detail to enable the FTC and the Court to determine the validity of Your claim.

     **H.**     Personally Identifiable Information ("PII") or Sensitive Health Information **("SHI"):** If You believe that Your response to an Interrogatory would require You to disclose PII or SHI, please contact Plaintiff's counsel Reid Tepfer before providing Your response to discuss whether there are steps You can take to minimize the amount of PII or SHI You include in Your response, and how to securely transmit such information to the FTC. Plaintiff's counsel may instruct You to encrypt any electronic copies of such material with encryption software such as PKZip and provide the encryption key in a separate communication.

PLAINTIFF FTC'S FIRST SET OF INTERROGATORIES
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

PII includes an individual's Social Security number, an individual's name, address, or phone number in combination with one or more of the following: date of birth, Social Security number, driver's license number or state identification number (or a foreign country equivalent), passport number, financial account number, credit card number, or debit card number.

SHI includes medical records and other individually identifiable health information relating to the past, present, or future physical or mental health or conditions of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

**I.**      If information responsive to any Interrogatory was contained in a document that was, but no longer is, in Your possession, provide in Your written response a description of the document and an explanation of the reason for its disposition. If the document was destroyed, provide in Your written response a statement describing in detail: (a) the nature of the document and its contents; (b) the identity of the person(s) who prepared or authored the document and, if applicable, the identity of the person(s) to whom the document was sent or shown; (c) the date on which the document was prepared or transmitted; and (d) the date the document was lost or destroyed and, if destroyed, the events of and reason(s) for such destruction and the identity, employer(s), current address, and position(s) of the person(s) requesting and/or performing the destruction.

**J.**      If You cannot answer all or part of any Interrogatory in full after exercising due diligence to secure the full information to do so, state and answer to the extent possible, specifying Your inability to answer the remainder, stating the information or knowledge You

have concerning the unanswered portion, and detailing what You did in attempting to secure the unknown information.

**K.** The Commission often makes its files available to other civil and criminal federal, state, local, or foreign law enforcement agencies. The FTC may make information supplied by you available to such agencies where appropriate pursuant to the FTC Act and 16 C.F.R. §§ 4.11(c) and (j). Information you provide may be shared with other federal, state, or foreign civil or criminal agencies.

**DEFINITIONS**

Notwithstanding any definition set forth below, each word, term, or phrase used in these Interrogatories is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure. As used in these Interrogatories, the following terms are to be interpreted in accordance with these definitions:

**D-1.** "**Match**" or the "**Company**" or "**You**" or "**Your**" shall mean **Match Group, Inc.**, its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, any predecessor or successor entities of such entities, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing. The term shall include any descriptor used by **Match Group, Inc.** in its business practices.

**D-2.** "**2017 CID**" means the Civil Investigative Demand the FTC issued to Match Group, Inc. in March 2017.

**D-3.** "**Advertisement**" or "**advertising**" or "**ad**" means any written or verbal statement, illustration, or depiction that promotes the sale of a good or service or is designed to

PLAINTIFF FTC'S FIRST SET OF INTERROGATORIES
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

APP 027

increase consumer interest in a brand, good, or service. Advertising media includes: packaging and labeling; promotional materials; print; television; radio; and Internet, social media, and other digital content.

**D-4.** "**and**," as well as "**or**," shall be construed both conjunctively and disjunctively, as necessary, in order to bring within the scope of any specification in this Request all information that otherwise might be construed to be outside the scope of the specification.

**D-5.** "**any**" shall be construed to include "all," and "**all**" shall be construed to include the word "any."

**D-6.** "**Chargeback**" shall mean a transaction that is returned as a financial liability to an acquirer by a card issuer, usually because of a disputed transaction. The acquirer may then return or "charge back" the transaction to the merchant.

**D-7.** "**Customer**" or "**Customers**" means any individual or individuals that have maintained an account on any website owned or operated by the Company, including Match.com, OKCupid, Plenty of Fish, and Tinder, regardless of whether such individual or individuals paid for those accounts or not.

**D-8.** "**Document**" means the complete original and any non-identical copy (whether different from the original because of notations on the copy or otherwise), regardless of origin or location, of any written, typed, printed, transcribed, taped, recorded, filmed, punched, computer-stored, or graphic matter of every type and description, however and by whomever prepared, produced, disseminated or made, including any advertisement, book, pamphlet, periodical, contract, correspondence, file, invoice, memorandum, note, telegram, report, record, handwritten note, working paper, routing slip, chart, graph, paper, index, map, tabulation, manual, guide,

outline, script, abstract, history, calendar, diary, agenda, minute, code book, or label. "Document" shall also include Electronically Stored Information.

**D-9.** "**each**" shall be construed to include "every," and "**every**" shall be construed to include "each."

**D-10.** "**Fraud**" means in violation of Match.com's terms of use. "Fraud" further shall include any conduct or practice that Match employees have internally referred to as "fraud" or "fraudulent" and shall also include any conduct or practice that Match referred to using the terms "fraud" or "fraudulent" in its written responses to the 2017 CID.

**D-11.** "**Guarantee Extension**" means any free or additional subscriptions, services, or access to Match.com provided to a Customer under the terms of any guarantee.

**D-12.** "**Identify**" or "**the identity of**" shall be construed, (a) when used in connection with identification of a natural Person, to require identification of the person's name, contact phone number(s), email address, and zip code, (b) when used in connection with businesses or other organization, to require identification of name, address, telephone number, email address, and identities of natural Persons who are officers, directors or managers of the business or organization, and contact Persons, where applicable; and (c) with respect to any document produced in connection with the 2017 CID or in response to discovery requests in this lawsuit, to require that You state the Bates number and production date associated with such document.

**D-13.** "**Match Guarantee**" shall mean any Company offer to provide free subscription services to Match.com for Customers who fulfill certain criteria during their subscription period.

**D-14.** "**Match.com**" shall mean the dating platform available at www.match.com.

**D-15.** "**Person**" or "**Persons**" shall mean all natural persons, corporations, partnerships, or other business associations and all other legal entities, including all members, officers, predecessors, assigns, divisions, affiliates and subsidiaries.

**D-16.** "**Plenty of Fish**" means the dating platform marketed using the brand name "Plenty of Fish" available at www.pof.com or on the Apple App Store or Google Play app store.

**D-17.** "**referring to**" or "**related to**" shall mean discussing, describing, reflecting, containing, analyzing, studying, reporting, commenting, evidencing, constituting, setting forth, considering, recommending, concerning, or pertaining to, in whole or in part.

**D-18.** "**Tinder**" means the dating platform marketed using the brand name "Tinder" available at www.tinder.com or on the Apple App Store or Google Play app store.

## INTERROGATORIES

1. Identify, including by job title, place of employment, and dates of service, all persons that Match consulted with while preparing its response to the 2017 CID, Plaintiff's First Set of Interrogatories, Plaintiff's First Requests for Production, Plaintiff's First Request for Admission, or any other submission or presentation the Company sent to the FTC. For each such person, state the 2017 CID request, discovery request, interrogatory, or other submission or presentation for which the person answered or otherwise assisted in answering.

2. Describe any criteria Match uses or has used to determine whether to grant a Customer's request for a refund relating to PTR Ads, fraud or alleged fraud, Match Guarantees,

PLAINTIFF FTC'S FIRST SET OF INTERROGATORIES
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

8

consumer's belief that they had already canceled their subscription, or his or her claimed lack of knowledge about recurring charges.

3. Identify and describe in complete detail the full basis for each affirmative defense You have asserted in Your Answer, including but not limited to every fact and document that supports, contradicts, refutes, or rebuts that particular affirmative defense, and every witness who may have information or testimony relevant to that particular defense.

4. Identify any tests, reports, A/B testing, Customer surveys, usability tests, focus groups, or other user experience studies, whether formal or informal, You have conducted related to:

   a. Match Guarantees;

   b. Chargebacks; and

   c. means of subscription renewal or cancellation.

Your response to this Interrogatory should include descriptions of the types of usability studies, beta studies, and surveys that the response covers. In addition, please provide Your response in machine-readable format, for example, in a .csv or spreadsheet file format.

5. On a monthly basis, state:

   a. the number of Match.com subscriptions subject to the Guarantee sold;

   b. the number of Guarantee Extensions that Match provided Customers;

   c. the number of Customer inquiries regarding the automatic renewal of subscriptions subject to the Match Guarantee;

   d. the number of refund requests Customers submitted to Match relating to Match Guarantees and the dollar amount of these requested refunds; and

PLAINTIFF FTC'S FIRST SET OF INTERROGATORIES
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

    e.  the number of refunds Match granted relating to Match Guarantees and the amount of money refunded relating to Match Guarantees.

6. State all limitations on Customers' rights to redeem a Match Guarantee or receive a Guarantee Extension and all actions consumers had to complete to redeem a Match Guarantee or receive a Guarantee Extension. For each such limitation or action Identify:

    a.  the date such limitation was implemented and/or eliminated;

    b.  all advertisements, notices, disclosures, or other notifications where Match disclosed the need to complete that action; and

7. The number of consumers whose request for a Guarantee Extension were denied due to that limitation or for failing to complete that particular action. Describe all of Match's policies relating to Customer Chargebacks, including regarding:

    a.  the circumstances in which Match will dispute a Customer Chargeback;

    b.  denying Customer account access due to a Chargeback request;

    c.  deleting or reinstating accounts of consumers who unsuccessfully attempt a Chargeback and when such deletions or reinstatements are effective; and

    d.  the effective dates of the policies.

8. On a monthly basis, state:

    a.  the number of Customer communications Match received regarding account cancellation or cancellation processes;

    b.  the number of refund requests made by Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

PLAINTIFF FTC'S FIRST SET OF INTERROGATORIES
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

   c.  the dollar value of the refund requests made by Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

   d.  the number of refunds Match provided to Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

   e.  the dollar value of the refunds provided to Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

   f.  the amount charged to Customers who had requested a refund on the basis that they believed they had cancelled and had this request denied by Match; and

   g.  the amount charged to Customers who had requested a refund on the basis that they were unaware of Match's recurring charge and had this request denied by Match.

9.  Describe each method through which consumers could cancel their subscriptions. For each such method, describe in detail:

   a.  how Match informed or disclosed to consumers the availability of each method;

   b.  each step that consumers would have to take in order to successfully cancel;

   c.  each representation that Match would make to consumers at each step in the cancellation process; and

   d.  by month, how many Customers attempted to cancel via that particular method;

   e.  by month, how many Customers successfully canceled via that particular method.

Dated: June 3, 2022          /s/ M. Hasan Aijaz

                              REID TEPFER
                              M. HASAN AIJAZ
                              MATTHEW WILSHIRE

PLAINTIFF FTC'S FIRST SET OF INTERROGATORIES
FTC v. Match Group, Inc., Case No. 3:19-cv-02281-K

SARAH ZUCKERMAN
Texas Bar No. 24079444 (Tepfer)
Virginia Bar No. 80073 (Aijaz)
California Bar No. 224328 (Wilshire)
New York Bar No. 5603832 (Zuckerman)
Federal Trade Commission
1999 Bryan St. Ste. 2150
Dallas, Texas 75201
T: (214) 979-9395 (Tepfer)
T: (214) 979-9386 (Aijaz)
T: (214) 979-9362 (Wilshire)
T: (214) 979-9376 (Zuckerman)
Email: rtepfer@ftc.gov; maijaz@ftc.gov;
mwilshire@ftc.gov; szuckerman@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## CERTIFICATE OF SERVICE

I, M. Hasan Aijaz, certify that on June 3, 2022, I caused the foregoing Plaintiff's First Set of Interrogatories to be served on counsel of record by email.


By: /s/ M. Hasan Aijaz

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| vs. | Case No. 3:19-cv-02281-K |
| MATCH GROUP, INC., a corporation, | |
| Defendant. | |

## DEFENDANT MATCH GROUP, INC.'S FIRST AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF FEDERAL TRADE COMMISSION'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure (the "Rules"), Defendant Match Group, Inc. ("Match"), by and through its undersigned counsel, amends its objections and responses to Plaintiff Federal Trade Commission's ("Plaintiff" or "FTC") First Request for Production of Documents (each a "Request" and, collectively, the "Requests") as follows:

## I.    GENERAL OBJECTIONS

1.    <u>Irrelevant</u>. Match objects to each and every Request to the extent that it purports to seek information that is irrelevant to Plaintiff's claims or Match's defenses and is not proportional to the needs of the case. In particular, Match objects to each and every Request to the extent that it seeks information only about the FTC's claims that were dismissed with prejudice in the Court's March 24, 2022 Order on Match's Motion to Dismiss (the "Dismissed Claims").[1] For the

---

[1] ECF No. 86 (dismissing Counts I & II of FTC's Original Complaint, filed on September 25, 2019, at ECF No. 1, due to Match's affirmative defense of CDA § 230 immunity). The FTC amended its Original Complaint on July 19, 2022, ECF No. 116. All references herein to the Complaint refer to the operative Complaint.

avoidance of doubt, Match will not withhold a document merely because it is related to the Dismissed Claims, if such document is otherwise responsive to the Requests related to non-dismissed claims. Match further objects to each and every Request to the extent that it seeks documents or information from an entity not named in the operative Complaint, including, but not limited to, a website or dating app not relevant to the live Complaint, including, but not limited to, OKCupid, Plenty of Fish, and Tinder.

2.     Undue Burden. Match objects to each and every Request to the extent that it seeks to impose obligations beyond what is required under the Rules or is unduly burdensome. Accordingly, Match objects to each and every Request where the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

3.     Overbroad. Match objects to each and every Request to the extent that it seeks information that is beyond the scope of Plaintiff's claims in the Complaint, including, but not limited to, documents and information related to Plaintiff's Dismissed Claims, and documents and information related to entities and/or dating sites that are not party to, or otherwise related to, this litigation, such as OKCupid, Plenty of Fish, and Tinder. Match further objects to each and every Request to the extent that it seeks documents and information that are not within Match's possession, custody, or control, including by seeking documents and information from and related to entities that are not named as parties to this litigation.

4.     Privilege. Match objects to each and every Request to the extent it seeks documents that are or information that is subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity from discovery (including, without limitation, all

communications with, or work product of, any outside attorney) (collectively, "Privileged Information"). Any inadvertent disclosure of Privileged Information by Match shall not constitute a waiver of any applicable privilege, doctrine, or immunity.

5.      Vagueness and Ambiguity. Match objects to each and every Request to the extent that such Request is so vague, ambiguous, or confusing as not to be susceptible to a reasoned interpretation or response. In the absence of clear instructions or definitions associated with terms that are too vague, ambiguous, or confusing, Match will give the terms used in the Request a reasonable interpretation.

6.      Accessibility. Match objects to each and every Request to the extent that it seeks information that is not reasonably accessible in the ordinary course of business.

7.      Cumulative Requests and Availability of Information Elsewhere. Match objects to each and every Request that is cumulative, duplicative of, or to which documents or information already are in the possession, custody, or control of Plaintiff, or have been or could be obtained from another source that is equally available to Plaintiff or is more convenient, less burdensome, or less expensive. In particular, Match objects to each and every Request insofar as it seeks documents or information already obtained by Plaintiff during the FTC's prior investigation in connection with the Civil Investigative Demand served on Match in 2017 (the "2017 CID"). In connection with the 2017 CID, Match produced over 225,000 documents that spanned a date range of 2013 to 2018. Such prior productions and the massive volume of documents produced therein should be sufficient to provide the FTC with the information it requires. For the avoidance of doubt, Match will comply with the ESI Order, which provides, "The parties need not re-produce in discovery documents that were already produced to the FTC in response to the FTC's CID. Instead, the parties will refer to the bates number of the relevant documents." ECF No. 132 at 4.

Attached hereto and incorporated herein is Exhibit A, which includes each CID Document Request and the corresponding reference(s) to location(s) of bates numbers responsive to each CID Document Request. The responses herein identify which of these Requests correspond to which CID Document Request. All documents referenced in Exhibit A were previously served or produced in the CID and shall be treated as Confidential Information, pursuant to the Protective Order.

8.    <u>Lack of Possession, Custody, or Control</u>. Match objects to each Request to the extent it does not appear to be addressed to Match and seeks documents that are necessarily outside Match's possession, custody, or control.

9.    <u>Legal Conclusions</u>. Match objects to each and every Request to the extent that it requires Match to draw legal conclusions.

10.    <u>Reservation of Right to Supplement</u>. Given the stage of the litigation, Match has not completed its investigation of the facts or law relating to this action, and discovery in this matter is ongoing. Accordingly, consistent with the Rules, these responses and objections are made without prejudice to, and are not a waiver of, Match's right to amend, correct, or supplement these responses, and are subject to Match's right to produce evidence of any subsequently discovered facts, or additional facts, information, or documents that may exist. Match provides these responses in good faith after a reasonable inquiry and based on information that it knows or can readily obtain.

11.    <u>No Waiver</u>. By responding to these Requests, Match does not concede the relevancy of a Request nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to a particular Request does not mean that it is probative of any particular issue in this case. Match expressly reserves its right to assert

any and all objections to the admissibility of any responses into evidence at any hearing or trial of this proceeding, or in any other actions or proceedings, on any and all grounds, including, but not limited to, competency, relevancy, materiality, privilege, confidentiality, hearsay, or admissibility as evidence for any other purpose. Moreover, the right to object on any ground to the use of the responses or information provided, in any aspect of this or any other court action, arbitration, or judicial or administrative proceeding or investigation, is reserved.

## II.     SPECIFIC OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.     Match specifically objects to the Requests' Instructions and Definitions to the extent they purport to impose obligations on Match that exceed those imposed by the Rules. In responding to these Requests, Match will follow the requirements set forth in the Rules.

2.     Match specifically objects to the definitions of "Match," the "Company," and "You" because they are vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines these terms as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." This definition necessarily and inappropriately includes attorneys and other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Match objects to Plaintiff's definitions of "Match," the "Company," and "You" as defined to "include any descriptor used by Match in its business practice," again encompassing other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. In responding to these Requests, Match will construe the terms "Match," the "Company," and "You" to refer only to Match Group, Inc.

APP 040

3.      Match specifically objects to the definitions of "and" and "or" and because they are ambiguous and confusing. Match will interpret these terms to have their plain, ordinary, and common sense meaning. Match further objects to these definitions to the extent they purport to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense, nor proportional to the needs of the case. In responding to these Requests, Match will comply with the Rules.

4.      Match specifically objects to the definition of "any" as ambiguous and confusing. Match will interpret this term to have its plain, ordinary, and common sense meaning. Match further objects to this definition to the extent it purports to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of this term as overly broad, unduly burdensome, and oppressive to the extent it purports to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Requests, Match will comply with the Rules.

5.      Match specifically objects to the definitions of "Customer" and "Customers" as overbroad, unduly burdensome, and oppressive, insofar as they purport to cover individual(s) "who have maintained an account on *any website* owned or operated by" Match, including "OKCupid, Plenty of Fish, and Tinder," which encompasses websites and entities that are not party to, or otherwise related to, the present litigation. Match further objects that the definitions of "Customer" and "Customers" are thus not tailored to the allegations in the complaint, not proportional to the needs of the case, and exceedingly burdensome. In responding to these Requests, Match will

construe the terms definitions of "Customer" and "Customers" to refer only to Customer(s) of Match.com.

6.      Match objects to the definition of "Document" as overly broad and unduly burdensome. Match further objects to this definition to the extent it refers to items outside of Match's possession, custody, or control, particularly through its use of the phrases "regardless of origin or location" and "however and by whomever prepared, produced, disseminated, or made." Match further objects to this definition to the extent it refers to items in Plaintiff's possession, custody, or control, or to items that have been or could be obtained from another source that is equally available to Plaintiff or is more convenient, less burdensome, or less expensive. Match further objects to this definition to the extent it purports to impose obligations on Match that exceed those required by the Rules. In responding to these Requests, Match will interpret the word "Document" to have its plain, ordinary, and common sense meaning and will comply with the Rules.

7.      Match specifically objects to the definition of "each" as ambiguous and confusing. Match will interpret this term to have its plain, ordinary, and common sense meaning. Match further objects to this definition to the extent it purports to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of this term as overly broad, unduly burdensome, and oppressive to the extent it purports to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Requests, Match will comply with the Rules.

8.      Match specifically objects to the definitions of "Identity" and "the identity of" and because they are ambiguous and confusing. Match will interpret these terms to have their plain, ordinary, and common sense meaning. Match further objects to these definitions to the extent they

purport to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Requests, Match will comply with the Rules.

9.    Match specifically objects to the definition of "Match Group, LLC" as vague, ambiguous, confusing, and overbroad.

10.    Match objects to the definition of "OKCupid" because it is overbroad, ambiguous, and confusing. Match further objects to the definition of "OKCupid" as irrelevant, since OKCupid is not referenced in the Complaint, and thus any Request relying on the definition of "OKCupid" is not proportional to the needs of the case and is unduly burdensome.

11.    Match objects to the definition of "Plenty of Fish" because it is overbroad, ambiguous, and confusing. Match further objects to the definition of "Plenty of Fish" as irrelevant, since Plenty of Fish is not referenced in the Complaint, and thus any Request relying on the definition of "Plenty of Fish" is not proportional to the needs of the case and is unduly burdensome.

12.    Match specifically objects to the definitions of "referring to" and "relating to" because they are ambiguous and confusing. Match will interpret these terms to have their plain, ordinary, and common sense meaning. Match further objects to these definitions to the extent they purport to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Requests, Match will comply with the Rules.

APP 043

13.     Match specifically objects to the definition of "Subscriber" as overbroad, unduly burdensome, and oppressive, insofar as it purports to cover a "Subscriber" to "any website owned or operated by" Match, which would necessarily encompass websites and entities that are not party to, or otherwise related to, the present litigation. Match further objects that the definition of "Subscriber" is thus not tailored to the allegations in the Complaint and not proportional to the needs of the case. In responding to these Requests, Match will construe the term "Subscriber" to refer only to Subscribers to Match.com.

14.     Match objects to the definition of "Tinder" because it is overbroad, ambiguous, and confusing. Match further objects to the definition of "Tinder" as irrelevant, since Tinder is not referenced in the Complaint, and thus any Request relying on the definition of "Tinder" is not proportional to the needs of the case and is unduly burdensome.

15.     The foregoing general objections and specific objections to the instructions and definitions provided by Plaintiff shall be fully incorporated by reference into each of the below specific objections to the Requests.

## III.     SPECIFIC OBJECTIONS AND RESPONSES TO THE REQUESTS

**REQUEST NO. 1:** The Company's certificate of incorporation, bylaws, rules, regulations, procedures, and any amendments to them.

**RESPONSE:** Match objects to this Request because "rules," "regulations," and "procedures" are vague and undefined, and also to the extent Plaintiff seeks Privileged Information. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of

"the Company" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "the Company," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder.

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, as the Company's corporate formation documents are not relevant to any of Plaintiff's claims, live or dismissed. Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control.

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the burden of searching for documents.

**REQUEST NO. 2:** All minutes (including attachments) of meetings of the Company's Board of Directors and all materials submitted to the Board.

**RESPONSE:** Match objects to this Request on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. The "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," have been permanently discontinued, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence

that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Request. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects to this Request because "attachments" and "materials" are vague and undefined, and also to the extent Plaintiff seeks Privileged Information. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities or dating sites that are not relevant to the claims or allegations in the Complaint.

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, by requesting "*[a]ll* minutes" and "materials" regardless of subject matter.

Subject to and without waiving the foregoing specific and general objections, Match will conduct a reasonable search for minutes (including attachments) of meetings of the Company's Board of Directors and all materials submitted to the Board that reference or are reasonably related

to Match.com's cancelation flow. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 3:** All materially different versions of the Company's organizational charts and personnel directories.

**RESPONSE:** Match objects to this Request because "organizational charts" and "personnel directories" are vague and undefined, and also to the extent Plaintiff seeks Privileged Information. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "the Company," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder.

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, as the Company's "organizational charts" and "personnel directories" are not relevant to Plaintiff's claims in the Complaint. Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession,

custody, or control. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request No. 4. Any response to this Request that is provided before a protective order is entered will be deemed subject to any protective order entered at a later date.

Subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 3 in connection with the 2017 CID, in response to CID Document Request No. 2. Notwithstanding its prior production, Match will conduct a reasonable search for reasonably available responsive documents with respect to Match.com only. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 4:** Documents sufficient to show all relationships that have existed between Match Group, Inc. and any other corporate entity, including Match Group, Inc.'s subsidiaries, entities with an ownership interest the Company, and any other entity You claim has operated match.com.

**RESPONSE:** Match objects to this Request because "relationships" is vague and undefined, and also to the extent Plaintiff seeks Privileged Information. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "the Company," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder.

APP 048

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, as "all relationships that have existed between Match Group, Inc. and any other corporate entity" are not relevant to Plaintiff's claims in the Complaint. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request No. 3. Any response to this Request that is provided before a protective order is entered will be deemed subject to any protective order entered at a later date.

Subject to and without waiving the foregoing specific and general objections, Match responds that it will conduct a reasonable search for documents sufficient to show any relationships that have existed between Match Group, Inc. and the entity or entities that operate Match.com, including Match Group, LLC. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 5:** Documents sufficient to show all corporate officers of:

    a.  Match Group, Inc.;

    b.  Any corporate subsidiary of Match Group, Inc.;

    c.  Any corporation that has had an ownership interest in Match Group, Inc.;

    d.  Any other entity You claim has operated match.com;

    e.  Any other entity You contend has operated Tinder;

    f.  Any other entity You contend has operated OKCupid;

    g.  Any other entity You contend has operated Plenty of Fish.

**RESPONSE:** Match objects to this Request as vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "You" as

including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "You" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "You," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder.

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, as Plaintiff seeks documents and information about entities and dating sites that are not party to, or otherwise related to, this litigation (OKCupid, Plenty of Fish, and Tinder). Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Match further objects to this Request to the extent it is duplicative of other Requests, including Request Nos. 3, 4, 6, and 7. Finally, subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 5 in connection with the 2017 CID, in response to CID Document Request No. 2.

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the additional burden of searching for more documents.

**REQUEST NO. 6:** Documents sufficient to identify all current and former employees of Match Group, Inc. whose responsibilities include or relate to:

    a.  advertising or marketing;

    b.  customer service;

    c.  corporate governance or operations;

    d.  general management;

    e.  research and development;

    f.  legal compliance;

    g.  accounting or finance;

    h.  cancellation of subscriptions;

    i.   the Match Guarantee; and

    j.  policies and practices related to chargebacks.

**RESPONSE:** Match objects to this Request because "corporate governance or operations" and "general management" are vague and undefined, and also to the extent Plaintiff seeks Privileged Information, particularly in light of Plaintiff's request for documents related to "legal compliance." Match further objects to this Request on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Request insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee" or maintained a "Chargeback" policy. The "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," have been permanently discontinued, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at

issue in this Request. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass. Finally, subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 6 in connection with the 2017 CID, in response to CID Document Request No. 1.

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the additional burden of searching for more documents.

**REQUEST NO. 7:** Documents sufficient to identify all current and former Match executives.

**RESPONSE:** Match objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Match" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "Match" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "Match," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder.

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, by seeking documents regarding "all current and former Match executives" regardless of their relevance to the claims in the Complaint. Match further objects to

the extent that the requested documents already are in Plaintiff's possession, custody, or control,

or to the extent that the requested documents are not in Match's possession, custody, or control.

Match further objects to this Request to the extent that it is duplicative of other Requests, including

Request Nos. 3, 5, and 6. Finally, subject to and without waiving the foregoing specific and general

objections, Match responds that it has already produced documents responsive to Request No. 7

in connection with the 2017 CID, in response to CID Document Request No. 2.

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the

additional burden of searching for more documents.

**REQUEST NO. 8:** Documents sufficient to show all transfers of money between Match Group,
Inc., and any corporate subsidiary or owner or any other entity You claim has operated match.com,
OKCupid, Plenty of Fish, and Tinder.

**RESPONSE:** Match objects to this Request because "transfers of money" is vague and undefined.

Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional

to the needs of the case, and overly burdensome in that Plaintiff defines "You" as including "Match

Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures,

operations under assumed names, and affiliates, and all directors, officers, employees, agents,

consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of

"You" necessarily and inappropriately includes other entities that are not relevant to the claims or

allegations in the Complaint. Furthermore, Plaintiff's definition of "You," which is defined to

"include any descriptor used by Match in its business practice," encompasses other entities and

dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of

Fish, and Tinder.

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional

to the needs of the case because it purports to seek information beyond the scope of Plaintiff's

claims in the Complaint, as Plaintiff seeks documents and information about entities and dating sites that are not party to, or otherwise related to, this litigation (OKCupid, Plenty of Fish, and Tinder). Match further objects to this Request because it is overbroad and unduly burdensome by seeking documents and information about financial transactions that are irrelevant to Plaintiff's claims, even if limited only to Match Group, Inc. and Match.com. Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control.

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the additional burden of searching for more documents.

**REQUEST NO. 9:** All Documents You contend tend to show that Match Group, Inc., is not liable for the violations alleged in the Complaint filed in this case, including documents supporting the claim that another entity has operated match.com, OKCupid, Plenty of Fish, and Tinder.

**RESPONSE:** Match objects to this Request to the extent Plaintiff seeks Privileged Information. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "You" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "You" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "You," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and

APP 054

dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder.

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, as Plaintiff seeks documents and information about entities and dating sites that are not party to, or otherwise related to, this litigation (OKCupid, Plenty of Fish, and Tinder). Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Match further objects to this Request as overbroad, unduly burdensome, and oppressive, because it is not proportionate to the needs to the case and because it requires Match to marshal all of its evidence before trial. Match further objects to this Request to the extent it is duplicative of other Requests, potentially including each and every other Request. Finally, subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 9 in connection with the 2017 CID, in response to each and every CID Document Request and Interrogatory.

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the additional burden of searching for more documents.

**REQUEST NO. 10:** All Documents You contend tend to show that Match Group LLC operates or has operated Match.com, OKCupid, Plenty of Fish, and Tinder.

**RESPONSE:** Match objects to this Request to the extent Plaintiff seeks Privileged Information. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional

APP 055

to the needs of the case, and overly burdensome in that Plaintiff defines "You" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "You" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "You," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder.

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, as Plaintiff seeks documents and information about entities and dating sites that are not party to, or otherwise related to, this litigation (OKCupid, Plenty of Fish, and Tinder). Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request Nos. 4 and 11.

Subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 10 in connection with the 2017 CID, in response to CID Interrogatory No. 1.Notwithstanding its prior production, Match will conduct a reasonable search for documents sufficient to show the operation of Match.com.

Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 11:** All Documents You contend tend to show that Match Group Inc. does not or has not operated Match.com, OKCupid, Plenty of Fish, and Tinder.

**RESPONSE:** Match objects to this Request because the phrase "does not or has not operated" requires Match to prove a negative, and to the extent Plaintiff seeks Privileged Information. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "You" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "You" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "You," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder.

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, as Plaintiff seeks documents and information about entities and dating sites that are not party to, or otherwise related to, this litigation (OKCupid, Plenty of Fish, and Tinder). Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the

requested documents are not in Match's possession, custody, or control. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request Nos. 4 and 10.

Subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 11 in connection with the 2017 CID, in response to CID Interrogatory No. 1. Notwithstanding its prior production, Match will conduct a reasonable search for documents sufficient to show the operation of Match.com. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 12:** Documents sufficient to show the Company's quarterly and annual gross and net revenue, including profit and loss statements and accounting documents for Match.com, OKCupid, Plenty of Fish, and Tinder.

**RESPONSE:** Match objects to this Request because "accounting documents" is vague, undefined, and overbroad, and to the extent Plaintiff seeks Privileged Information. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "the Company," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. Match further objects to this Request insofar as it seeks information that Plaintiff can obtain elsewhere and/or is publicly available.

APP 058

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the burden of searching for documents.

**REQUEST NO. 13:** Documents showing the Company's projections of its gross and net revenue, including Documents provided to prospective investors.

**RESPONSE:** Match objects to this Request because "projections" and "prospective investors" are vague and undefined, and to the extent Plaintiff seeks Privileged Information. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "the Company," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder.

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, as "the Company's projections of its gross and net revenue, including Documents provided to prospective investors," are not relevant to Plaintiff's claims in the Complaint. Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process.

APP 059

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the burden of searching for documents.

**REQUEST NO. 14:** Documents sufficient to show quarterly and annual revenue from:

    a.  Subscriptions to Match.com;

    b.  Subscriptions to OKCupid;

    c.  Subscriptions to Plenty of Fish;

    d.  Subscriptions to Tinder;

    e.  Subscriptions to Match.com that included or was subject to a Match Guarantee;

    f.  Payments from accounts on Match.com that had been automatically renewed; and

    g.  Payments from Subscribers who had clicked on the "retention offer" or "Cancel Subscription" hyperlinks described in Paragraph 55 of the Complaint filed in this case.

**RESPONSE:** Match objects to this Request on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. The "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," have been permanently discontinued, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Request. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, as Plaintiff seeks documents and information about entities and dating sites that are not party to, or otherwise related to, this litigation (OKCupid, Plenty of Fish, and Tinder). Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Finally, subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced information responsive to Request No. 14 in connection with the 2017 CID, in response to CID Interrogatory No. 3.

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the additional burden of searching for more documents.

**REQUEST NO. 15:** Each unique version of all Ads related to a Match Guarantee.

**RESPONSE:** Match objects to this Request as vague and undefined because it is unclear what the FTC means by "unique." Match further objects to this Request on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. The "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," have been permanently discontinued, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The

FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Request. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.  Finally, subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 15 in connection with the 2017 CID, in response to CID Request No. 3(b)(i).

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the additional burden of searching for more documents.

**REQUEST NO. 16:** Each unique version of all Ads related to cancellation of a Match.com, OKCupid, Plenty of Fish, or Tinder subscription, including Ads related to the ease or availability of cancellation.

**RESPONSE:** Match objects to this Request as vague and undefined because it is unclear what the FTC means by "unique."  Match also objects to this Request to the extent Plaintiff seeks Privileged Information. Match further objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, as Plaintiff seeks documents and information about entities and dating sites that are not party to, or otherwise related to, this litigation (OKCupid, Plenty of Fish, and Tinder). Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the

requested documents are not in Match's possession, custody, or control. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request No. 15. Any response to this Request that is provided before a protective order is entered will be deemed subject to any protective order entered at a later date.

Subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 16 in connection with the 2017 CID, in response to CID Request No. 3(c)(i). Notwithstanding its prior production, Match will conduct a reasonable search for reasonably available responsive documents with respect to Match.com only. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 17:** Documents sufficient to show each unique disclosure You contend disclosed policies concerning terminating subscriptions in response to a Customer Chargeback.

**RESPONSE:** Match objects to this Request to the extent Plaintiff seeks Privileged Information. Match further objects to this Request on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Request insofar as it suggests that Match Group, Inc. ever maintained a "Chargeback" policy. The "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," have been permanently discontinued, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any

claim by the FTC for monetary relief based on the conduct at issue in this Request. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass. Finally, Match responds that it has already produced documents responsive to Request No. 17 in connection with the 2017 CID, in response to CID Request No. 9(e).

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the additional burden of searching for more documents.

**REQUEST NO. 18:** Representative copies of all visual content shown to Customers during the process of purchasing or signing up for a paid subscription.

**RESPONSE:** Match objects to this Request because "[r]epresentative copies of all visual content" is vague, confusing, and overbroad. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Customer" as "any individual or individuals who have maintained an account on any website owned or operated by the Company" and "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "the Company," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. Plaintiff's definition of "Customer" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint by

including "individuals who have maintained an account on . . . OKCupid, Plenty of Fish, and Tinder."

Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request No. 19. Any response to this Request that is provided before a protective order is entered will be deemed subject to any protective order entered at a later date.

Subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 18 in connection with the 2017 CID, in response to CID Request Nos. 3(a)(i), 3(a)(iii), 3(b)(i), 3(b)(iii), 3(c)(i), and 3(c)(iii). Notwithstanding its prior production, Match will conduct a reasonable search for reasonably available responsive documents with respect to Match.com only. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 19:** Representative copies of all visual content that Match has shown to Customers concerning the Match Guarantee, including concerning:

    a.  Advertisements relating to Subscriptions subject to the Match Guarantee;

    b.  Customer "progress" with regard to the Match Guarantee; and

    c.  Redeeming a Match Guarantee or receiving a Guarantee Extension.

**RESPONSE:** Match objects to this Request because "[r]epresentative copies of all visual content" is vague and confusing, because "progress" is vague and undefined. Match specifically objects to this Request on the grounds that it seeks discovery that is not relevant to either party's claims or

defenses and is not proportional to the needs of the case. Match further objects to this Request insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee." The "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," have been permanently discontinued, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Request. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. Finally, subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 19 in connection with the 2017 CID, in response to CID Request Nos. 3(b)(i), 3(b)(iii), and 9(b).

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the additional burden of searching for more documents.

**REQUEST NO. 20:** Representative copies of all visual content that Customers have had to view to cancel their subscriptions.

**RESPONSE:** Match objects to this Request because "[r]epresentative copies of all visual content" is vague and confusing. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Customer" as "any individual or individuals who have maintained an account on any website

APP 066

owned or operated by the Company" and "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "the Company," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. Plaintiff's definition of "Customer" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint by including "individuals who have maintained an account on . . . OKCupid, Plenty of Fish, and Tinder."

Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request No. 19. Any response to this Request that is provided before a protective order is entered will be deemed subject to any protective order entered at a later date.

Subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 20 in connection with the 2017 CID, in response to CID Request No. 9(d). Notwithstanding its prior production, Match

will conduct a reasonable search for reasonably available responsive documents with respect to Match.com only. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 21:** Representative copies of all visual content that the Company has shown to Customers concerning the available means of cancelling their subscriptions.

**RESPONSE:** Match objects to this Request because "[r]epresentative copies of all visual content" is vague and confusing. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Customer" as "any individual or individuals who have maintained an account on any website owned or operated by the Company" and "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "the Company," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. Plaintiff's definition of "Customer" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint by including "individuals who have maintained an account on . . . OKCupid, Plenty of Fish, and Tinder."

Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested

documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request No. 20. Any response to this Request that is provided before a protective order is entered will be deemed subject to any protective order entered at a later date.

Subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 21 in connection with the 2017 CID, in response to CID Request No. 9(d). Notwithstanding its prior production, Match will conduct a reasonable search for reasonably available responsive documents with respect to Match.com only. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 22:** All documents related to any change or contemplated change to any means of subscription cancellation available to Customers.

**RESPONSE:** Match objects to this Request to the extent Plaintiff seeks Privileged Information. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Customer" as "any individual or individuals who have maintained an account on any website owned or operated by the Company" and "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "the Company," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that

APP 069

are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. Plaintiff's definition of "Customer" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint by including "individuals who have maintained an account on . . . OKCupid, Plenty of Fish, and Tinder."

Additionally, Match objects to this Request as irrelevant, overbroad, not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, as any "change" that may have been contemplated but never implemented is not relevant to the allegations in Plaintiff's Complaint. Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request No. 17. Any response to this Request that is provided before a protective order is entered will be deemed subject to any protective order entered at a later date.

Subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 22 in connection with the 2017 CID, in response to CID Request Nos. 8(e) and 9(d). Notwithstanding its prior production, Match will conduct a reasonable search for reasonably available responsive documents with respect to Match.com only. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 23:** All documents related to account takeovers.

**RESPONSE:** Match objects to this Request because "account takeovers" is vague and undefined, and to the extent Plaintiff seeks Privileged Information. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, because by failing to specify any limiting principle on "account takeovers," this Request necessarily captures documents and information that fall outside the scope of what is relevant to that allegations in Plaintiff's Complaint. Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control.

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the burden of searching for documents.

**REQUEST NO. 24:** All documents related to software flaws that prevented Customers from:

    a.  logging into their accounts;

    b.  using their accounts; or

    c.  canceling their accounts.

**RESPONSE:** Match objects to this Request because "software flaws" is vague, undefined, and overbroad, and to the extent Plaintiff seeks Privileged Information. Match further objects to this Request on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match objects to this Request because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, as not every "software flaw" related to account functionality is relevant to the allegations in Plaintiff's Complaint. Moreover, Match objects that this Request is part of an attempted fishing expedition

by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process.

Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Customer" as "any individual or individuals who have maintained an account on any website owned or operated by the Company" and "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "the Company," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. Plaintiff's definition of "Customer" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint by including "individuals who have maintained an account on . . . OKCupid, Plenty of Fish, and Tinder."

Additionally, Match objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request Nos. 19, 20, 21, 22, 23, and 25.

**<u>AMENDED RESPONSE</u>:** Based on the foregoing objections, Match will not undertake the burden of searching for documents.

**REQUEST NO. 25:** All communications relating to:

    a.  Match Guarantees;

    b.  Cancellation of paid subscriptions by Customers;

    c.  Customer Chargebacks;

    d.  Denial of Customers' access to accounts in response to chargebacks;

    e.  The marketing or advertising of Tinder Gold or Tinder Boost; and

    f.  The marketing or advertising of Incognito Mode, OKCupid Premium, or Profile Boosts on OKCupid.

**RESPONSE:** Match objects to this Request because "[a]ll communications" is overbroad and unduly burdensome, and to the extent Plaintiff seeks Privileged Information. Match further objects to this Request on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Request insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee" or maintained a "Chargeback" policy. The "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," have been permanently discontinued, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Request. For these reasons, discovery into the questions of what occurred or whether the

alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Additionally, Match objects to this Request as irrelevant, overbroad, not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, as neither "[t]he marketing or advertising of Tinder Gold or Tinder Boost" nor "[t]he marketing or advertising of Incognito Mode, OkCupid Premium, or Profile Boosts on OkCupid" are relevant to Plaintiff's claims in the Complaint. Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request Nos. 17, 19, 20, 21, 22, 23, 24, 27, 28 and 31.

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the burden of searching for documents.

**REQUEST NO. 26:** All Documents related to how consumers or Customers view, read, react to, understand, or have been influenced by Ads relating to Match Guarantees; chargeback policies; Ads relating to subscription renewal or cancellation; or the means of subscription renewal or cancellation, including documents relating to copy tests, A/B testing, click-through data, consumer or Customer surveys, usability tests, and focus groups.

**RESPONSE:** Match specifically objects to this Request because "tests," "A/B testing," "click-through data," "surveys," "usability tests," and "focus groups" are vague and undefined. Match further objects to this Request to the extent Plaintiff seeks Privileged Information. Match further objects to this Request on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this

Request insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee" or maintained a "Chargeback" policy. The "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," have been permanently discontinued, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Request. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Customer" as "any individual or individuals who have maintained an account on any website owned or operated by the Company," and "Match" or "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities and dating sites that are not relevant to the claims or allegations in the Complaint.

Additionally, Match objects to this Request as irrelevant, overbroad, not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, because by seeking information under such a broad category as "how consumers or Customers view, read, react to, understand, or have been influenced," this Request is not tailored to the allegations in Plaintiff's Complaint. Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Any response to this Request that is provided before a protective order is entered will be deemed subject to any protective order entered at a later date.

Subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 26 in connection with the 2017 CID, in response to CID Request Nos. 3(a)(iv), 3(b)(iv), 3(c)(iv), and 4. Notwithstanding its prior production, Match will conduct a reasonable search for reasonably available responsive documents with respect to subscription renewal and cancelation for Match.com only. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 27:** All Documents, including internal and third-party studies or audits, relating to Customers' efforts to cancel their subscriptions to Match.com, Tinder, or OKCupid.

**RESPONSE:** Match objects to this Request because "efforts" is vague and undefined, and to the extent Plaintiff seeks Privileged Information. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Customer" as "any individual or individuals who have maintained an account on any website owned or operated by the Company," and "the Company" as including

"Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "the Company," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. Plaintiff's definition of "Customer" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint by including "individuals who have maintained an account on . . . OKCupid, Plenty of Fish, and Tinder."

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, as Plaintiff seeks documents and information about entities and dating sites that are not party to, or otherwise related to, this litigation (OKCupid, Plenty of Fish, and Tinder). Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request Nos. 19, 20, 21, 22, 24, 25, 26, and 28. Any response to this Request that is provided before a protective order is entered will be deemed subject to any protective order entered at a later date.

APP 077

Subject to and without waiving the foregoing specific and general objections, Match will conduct a reasonable search for reasonably available responsive documents with respect to Match.com only. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 28:** All Documents relating to the policies and practices of the Company, Match.com, Tinder, or OKCupid regarding the following:

    a.  Match Guarantees;

    b.  account cancellation;

    c.  Availability of customer support services;

    d.  availability of refunds;

    e.  Customer Chargebacks;

    f.  Customer access to accounts; and

    g.  compliance with consumer protection laws, including the FTC Act and the Restore Online Shoppers' Confidence Act.

**RESPONSE:** Match objects to this Request because "availability" is vague and undefined. Match further objects to this Request to the extent Plaintiff seeks Privileged Information, specifically because the term "relating to" as used in this Request necessarily captures Privileged Information. Match further objects to this Request on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Request insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee" or maintained a "Chargeback" policy. The "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," have been permanently discontinued, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint,

to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Request. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities and dating sites that are not relevant to the claims or allegations in the Complaint. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request Nos. 19, 20, 21, 22, 24, 25, 26, and 27.

Subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 28 in connection with the 2017 CID, in response to CID Request No. 8. Notwithstanding its prior production, Match will conduct a reasonable search for reasonably available responsive documents with respect to subparts (b)-(d) and (g) for Match.com and ROSCA compliance only. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 29:** All Documents relating to any internal or external review concerning compliance by the Company with consumer protection laws, including the FTC Act and the Restore Online Shoppers' Confidence Act.

**RESPONSE:** Match objects to this Request to the extent Plaintiff seeks Privileged Information, specifically because the term "relating to" as used in this Request necessarily captures Privileged Information, and because the Request overall appears calculated to specifically seek Privileged Information. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities and dating sites that are not relevant to the claims or allegations in the Complaint.

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, because not every document related to every prior investigation of Match's compliance with consumer protection laws is relevant to the allegations in Plaintiff's Complaint. Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request Nos. 27, 28, 32, and 34. Any response to this Request that is provided before a protective order is entered will be deemed subject to any protective order entered at a later date.

Subject to and without waiving the foregoing specific and general objections, Match responds that will conduct a reasonable search for reasonably available responsive documents with respect to Match.com's compliance with ROSCA only. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 30:** All Documents relating to Customer complaints.

**RESPONSE:** Match objects to this Request because "complaints" is vague and undefined, and to the extent Plaintiff seeks Privileged Information. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Customer" as "any individual or individuals who have maintained an account on any website owned or operated by the Company" and "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities and dating sites that are not relevant to the claims or allegations in the Complaint.

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, since by seeking "all Documents" related to the inherently broad category of "Customer complaints," this Request necessarily captures a whole host of documents, communications, and other information that are not relevant to the claims in Plaintiff's Complaint. Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is

an abuse of the discovery process. Any response to this Request that is provided before a protective order is entered will be deemed subject to any protective order entered at a later date.

Subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 30 in connection with the 2017 CID, in response to CID Request No. 10. Notwithstanding its prior production, Match will conduct a reasonable search for reasonably available responsive documents relating to Customer complaints regarding the Match.com online cancelation flow, as alleged in the Complaint. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 31:** All communications with Customers relating to the Match Guarantee or the Company's chargeback or cancellation policies or practices.

**RESPONSE:** Match objects to this Request to the extent Plaintiff seeks Privileged Information. Match further objects to this Request on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Request insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee" or maintained a "Chargeback" policy. The "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," have been permanently discontinued, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at

issue in this Request. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Customer" as "any individual or individuals who have maintained an account on any website owned or operated by the Company," and "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities and dating sites that are not relevant to the claims or allegations in the Complaint. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request Nos. 25, 28, and 30. Any response to this Request that is provided before a protective order is entered will be deemed subject to any protective order entered at a later date.

Subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 31 in connection with the 2017 CID, in response to CID Request No. 10. Notwithstanding its prior production, Match will conduct a reasonable search for reasonably available responsive documents with respect to Match.com's cancelation policies or practices only. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 32:** All documents relating to any lawsuit alleging that the operators of Match.com, Tinder, Plenty of Fish, or OKCupid have engaged in fraud or violated any federal, state, or foreign consumer protection laws.

**RESPONSE:** Match objects to this Request because "the operators of" is vague and undefined, and to the extent Plaintiff seeks Privileged Information, specifically because the term "relating to" as used in this Request necessarily captures Privileged Information. Match further objects to this Request as irrelevant, overbroad, oppressive, and inappropriate to the extent Plaintiff seeks discovery about "fraud" or consumer protection violations of any kind, as the Court dismissed with prejudice Plaintiff's claims related to alleged fraud (Counts I & II) in its Memorandum Opinion & Order on Match's Motion to Dismiss. ECF No. 86.

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, as Plaintiff seeks documents and information about entities and dating sites that are not party to, or otherwise related to, this litigation (OKCupid, Plenty of Fish, and Tinder). Match further objects to this Request as irrelevant, overbroad, and unduly burdensome, to the extent that its use of the undefined term "the operators of" assumes that Match Group, Inc. is "the operator[] of" Match.com, Tinder, Plenty of Fish, or OKCupid. Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Match likewise objects to this Request to the extent the requested documents are publicly available. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request No. 34.

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the burden of searching for documents.

**REQUEST NO. 33:** All versions of customer service telephone scripts, chat scripts or prepared responses, customer support manuals, employee manuals, and other training materials.

**RESPONSE:** Match objects to this Request because "prepared responses," "customer support manuals," and "employee manuals" are vague and undefined, and to the extent Plaintiff seeks Privileged Information. To the extent Plaintiff meant "Customer," as opposed to "customer," Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Customer" as "any individual or individuals who have maintained an account on any website owned or operated by the Company" and "the Company" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "the Company" necessarily and inappropriately includes other entities and dating sites that are not relevant to the claims or allegations in the Complaint.

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, because by failing to specify any subject matter limitation on any of the materials referenced therein, this Request necessarily captures documents and information that fall outside the scope of what is relevant to Plaintiff's claims. Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Finally, Match objects to this Request to the extent it is duplicative of other Requests,

including Request Nos. 25, 28, and 30. Any response to this Request that is provided before a protective order is entered will be deemed subject to any protective order entered at a later date.

Subject to and without waiving the foregoing specific and general objections, Match responds that it has already produced documents responsive to Request No. 33 in connection with the 2017 CID, in response to CID Request No. 8. Notwithstanding its prior production, Match will conduct a reasonable search for reasonably available responsive documents that address or relate to Match.com account cancelation only. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 34:** All Documents referring to or relating to:

    a.  The Federal Trade Commission;

    b.  The FTC Act;

    c.  The Restore Online Shoppers' Confidence Act;

    d.  Unfair, deceptive, or abusive acts or practices or "UDAAP" or "UDAP";

    e.  The Department of Justice; and

    f.  The lawfulness or unlawfulness of any practices related to Match Guarantees, Customer chargebacks, or the cancellation of subscriptions.

**RESPONSE:** Match objects to this Request to the extent Plaintiff seeks Privileged Information, specifically because the terms "referring to" and "relating to" as used in this Request necessarily capture Privileged Information. Match further objects to this Request on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. The "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," have been permanently discontinued, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the

conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Request. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, as this Request necessarily encompasses entities not party to, or otherwise related to, the present litigation. Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including Request Nos. 29 and 32.

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the burden of searching for documents.

**REQUEST NO. 35:** All Documents that support, contradict, refute, or rebut any affirmative defense You have asserted in Your Answer.

**RESPONSE:** Match objects to this Request to the extent Plaintiff seeks Privileged Information. Match further objects that this Request is vague, ambiguous, confusing, irrelevant, not proportional

to the needs of the case, and overly burdensome in that Plaintiff defines "You" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants and other persons working for or on behalf of the foregoing." Plaintiff's definition of "You" necessarily and inappropriately includes other entities and dating sites that are not relevant to the claims or allegations in the Complaint.

Additionally, Match objects to this Request as oppressive, overbroad, and not proportional to the needs of the case because it requires Match to marshal all of its evidence before trial. Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including potentially each and every other Request.

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the burden of searching for documents.

**REQUEST NO. 36:** All Documents You referred to in the course of responding to any Request for Admission, Request for Production, or Interrogatory served by the Federal Trade Commission in this case.

**RESPONSE:** Match objects to this Request to the extent Plaintiff seeks Privileged Information, specifically because the terms "referring to" and "relating to" as used in this Request necessarily capture Privileged Information. Match further objects to this Request on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the

needs of the case. The "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," have been permanently discontinued, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Request. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Additionally, Match objects to this Request as oppressive, overbroad, and not proportional to the needs of the case, because it purports to require Match to re-produce each and every document it has previously produced to the FTC. Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including potentially each and every other Request.

Subject to and without waiving the foregoing specific and general objections, Match will conduct a reasonable search for reasonably available responsive documents with respect to

APP 089

Match.com account cancelation only. Match will produce non-privileged responsive documents identified through such search, if any are located.

**REQUEST NO. 37:** All Documents considered or relied upon by any witness you disclose under Fed. R. Civ. P. 26(a)(2).

**RESPONSE:** Match objects to this Request to the extent Plaintiff seeks Privileged Information. Additionally, Match objects to this Request as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Complaint, because it does not specify any subject matter limitations. Moreover, Match objects that this Request is part of an attempted fishing expedition by Plaintiff to impermissibly probe matters beyond the scope of the present litigation, and that this Request is an abuse of the discovery process. Match further objects to the extent that the requested documents already are in Plaintiff's possession, custody, or control, or to the extent that the requested documents are not in Match's possession, custody, or control. Match objects to this Request as oppressive, overbroad, and not proportional to the needs of the case because it requires Match to marshal all of its evidence before trial. Match further objects to this Request to the extent it seeks to require production or disclosure of expert-related documents prior to the time specified in the Court's scheduling order. Finally, Match objects to this Request to the extent it is duplicative of other Requests, including potentially each and every other Request.

**AMENDED RESPONSE:** Based on the foregoing objections, Match will not undertake the burden of searching for documents.

Dated: September 14, 2022

/s/ Angela C. Zambrano
Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375

cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Fax: 214.981.3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310.595.9500
Fax: 310.595.9501

*Attorneys for Match Group, Inc. and*
*Match Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned certifies that a true and correct copy of the above and forgoing document

was served on all counsel of record via e-mail as outlined below on September 14, 2022.

Reid Abram Tepfer
rtepfer@ftc.gov
M Hasan Aijaz
maijaz@ftc.gov
Matthew James Wilshire
mwilshire@ftc.gov
Sarah Zuckerman
szuckerman@ftc.gov
John R. O'Gorman
jogorman@ftc.gov
Erica Rollins Hilliard
ehilliard@ftc.gov

                                 */s/  Angela C. Zambrano*
                                   Angela C. Zambrano

## EXHIBIT A: CID PRODUCTIONS KEY

*FTC v. Match Group, Inc. et al.*, Case No. 3:19-cv-02281-K (N.D. Tex.)

| CID | Bates Location |
|---|---|
| CID RFP 2 | • 20170515 Hogan First Production Cover Letter **(Ex. 1 at 32)** |
| CID RFP 3 | • 20170515 Hogan First Production Cover Letter **(Ex. 1 at 32)** – *RFP 3(a)(iii), 3(b)(iii), and 3(c)(iii)*<br>• 20170713 Match Fourth Production in Response to the CID **(Ex. 3 at 3)**<br>• 20171030 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC004_Document_Requests **(Ex. 6)**<br>• 20171113 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC005_Document_Requests **(Ex. 7)**<br>• 20171127 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC006_Document_Requests **(Ex. 8)**<br>• 20171211 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC007_Document_Requests **(Ex. 9)**<br>• 20180111 Match Letter re Final ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC008_Document_Requests **(Ex. 10)** |
| CID RFP 4 | • 20170713 Match Fourth Production in Response to the CID **(Ex. 3 at 4)**<br>• 20171030 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC004_Document_Requests **(Ex. 6)**<br>• 20171113 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC005_Document_Requests **(Ex. 7)**<br>• 20171127 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC006_Document_Requests **(Ex. 8)**<br>• 20171211 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC007_Document_Requests **(Ex. 9)**<br>• 20180111 Match Letter re Final ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC008_Document_Requests **(Ex. 10)** |
| CID RFP 6 | • 20170613 Letter from L. Goldstein to Z. Keller at FTC with Document and Interrogatory Responses **(Ex. 2 at 3)**<br>• 20171030 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC004_Document_Requests **(Ex. 6)**<br>• 20171113 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC005_Document_Requests **(Ex. 7)**<br>• 20171127 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC006_Document_Requests **(Ex. 8)**<br>• 20171211 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC007_Document_Requests **(Ex. 9)**<br>• 20180111 Match Letter re Final ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC008_Document_Requests **(Ex. 10)** |
| CID RFP 7 | • 20170515 Hogan First Production Cover Letter **(Ex. 1 at 33)** |
| CID RFP 8 | • 20170515 Hogan First Production Cover Letter **(Ex. 1 at 33)**<br>• 20170713 Match Fourth Production in Response to the CID **(Ex. 3 at 5)** |

1

| CID | Bates Location |
|---|---|
| | • 20171030 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC004_Document_Requests **(Ex. 6)**<br>• 20171113 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC005_Document_Requests **(Ex. 7)**<br>• 20171127 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC006_Document_Requests **(Ex. 8)**<br>• 20171211 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC007_Document_Requests **(Ex. 9)**<br>• 20180111 Match Letter re Final ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC008_Document_Requests **(Ex. 10)** |
| CID RFP 9 | • 20170613 Letter from L. Goldstein to Z. Keller at FTC with Document and Interrogatory Responses **(Ex. 2 at 4–5)**<br>• 20170713 Match Fourth Production in Response to the CID **(Ex. 3 at 5)**<br>• 20171020 Match Letter re ESI Production in Response to CID **(Ex. 5 at 1)**<br>• 20171030 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC004_Document_Requests **(Ex. 6)**<br>• 20171113 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC005_Document_Requests **(Ex. 7)**<br>• 20171127 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC006_Document_Requests **(Ex. 8)**<br>• 20171211 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC007_Document_Requests **(Ex. 9)**<br>• 20180111 Match Letter re Final ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC008_Document_Requests **(Ex. 10)** |
| CID RFP 10 | • 20171030 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC004_Document_Requests **(Ex. 6)**<br>• 20171127 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC006_Document_Requests **(Ex. 8)**<br>• 20171211 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC007_Document_Requests **(Ex. 9)**<br>• 20180111 Match Letter re Final ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC008_Document_Requests **(Ex. 10)**<br>• 20180604 Match Letter re Customer Complaint Samples for DR 10 **(Ex. 11 at 1)** |
| CID RFP 11 | • 20170713 Match Fourth Production in Response to the CID **(Ex. 3 at 6)**<br>• 20171018 Match Letter re Suppl Resp to DR 11 **(Ex. 4 at 1)**<br>• 20171030 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC004_Document_Requests **(Ex. 6)**<br>• 20171127 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC006_Document_Requests **(Ex. 8)**<br>• 20171211 Match Letter re ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC007_Document_Requests **(Ex. 9)**<br>• 20180111 Match Letter re Final ESI Production in Response to CID and corresponding sortable spreadsheet MatchFTC008_Document_Requests **(Ex. 10)** |

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| vs. | Case No. 3:19-cv-02281-K |
| MATCH GROUP, INC., a corporation, | |
| Defendant. | |

**DEFENDANT MATCH GROUP, INC'S FIRST AMENDED RESPONSES AND**
**OBJECTIONS TO PLAINTIFF FEDERAL TRADE COMMISSION'S**
**FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Rules")

Defendant Match Group, Inc. ("Match"), by and through its undersigned counsel, amends its

objections and responses to Plaintiff Federal Trade Commission's ("Plaintiff" or "FTC") First Set

of Interrogatories (each an "Interrogatory" and, collectively, the "Interrogatories") as follows:

**I.      GENERAL OBJECTIONS**

1.      <u>Irrelevant</u>. Match objects to each and every Interrogatory to the extent that it

purports to seek information that is irrelevant to Plaintiff's claims and is not reasonably calculated

to lead to the discovery of admissible evidence. In particular, Match objects to each and every

Interrogatory to the extent that it seeks information relevant only to the claims that were dismissed

in the Court's March 24, 2022 Order on Match's Motion to Dismiss (the "Dismissed Claims").[1]

For the avoidance of doubt, Match will not withhold information merely because it is related to

---

[1] ECF No. 86 (dismissing Counts I & II of FTC's Original Complaint, filed on September 25, 2019, at ECF No. 1, due to Match's affirmative defense of CDA § 230 immunity). The FTC amended its Original Complaint on July 19, 2022, ECF No. 116. All references herein to the Complaint refer to the operative Complaint.

the Dismissed Claims, if such information is otherwise responsive to the Interrogatories related to non-dismissed claims. Match further objects to each and every Interrogatory to the extent that it seeks documents or information from an entity or dating site not named in the present litigation in any operative pleading, including but not limited to OKCupid, Plenty of Fish, and Tinder. These responses are being provided solely by Match Group, Inc. based on information within its possession, custody and control.

2.      Undue Burden. Match objects to each and every Interrogatory to the extent that it seeks to impose obligations beyond what is required under the Rules or Local Rules or is unduly burdensome. Accordingly, Match objects to each and every Interrogatory where the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

3.      Overbroad. Match objects to each and every Interrogatory to the extent that it seeks information that is beyond the scope of Plaintiff's claims, including, but not limited to, documents and information related to Plaintiff's Dismissed Claims, and documents and information related to entities or dating sites that are not yet party to, or otherwise related to, this litigation, such as OKCupid, Plenty of Fish, and Tinder. Match further objects to each and every Interrogatory to the extent that it seeks documents and information that are not within Match's possession, custody, or control, including by seeking documents and information from and related to entities that are not named as parties to this litigation.

4.      Privilege. Match objects to each and every Interrogatory to the extent it seeks documents or information that is subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity from discovery (including, without limitation, all

communications with, or work product of, any outside attorney) (collectively, "Privileged Information"). Any inadvertent disclosure of Privileged Information by Match shall not constitute a waiver of any applicable privilege, doctrine, or immunity.

5.     <u>Vagueness and Ambiguity</u>. Match objects to each and every Interrogatory to the extent that such Interrogatory is so vague, ambiguous, or confusing as not to be susceptible to a reasoned interpretation or response. In the absence of clear instructions or definitions associated with terms that are too vague, ambiguous, or confusing, Match will give the terms used in the Interrogatory a reasonable interpretation.

6.     <u>Accessibility</u>. Match objects to each and every Interrogatory to the extent that it seeks information that is not reasonably accessible in the ordinary course of business.

7.     <u>Cumulative Interrogatories and Availability of Information Elsewhere</u>. Match objects to each and every Interrogatory that is cumulative, duplicative of, or to which documents or information already are in the possession, custody, or control of Plaintiff, or have been or could be obtained from another source that is equally available to Plaintiff or is more convenient, less burdensome, or less expensive. In particular, Match objects to each and every Interrogatory insofar as it seeks documents or information already obtained by Plaintiff during the FTC's prior investigation in connection with the Civil Investigative Demand served on Match in 2017 (the "2017 CID"). For the avoidance of doubt, Match will comply with the ESI Order, which provides, "The parties need not re-produce in discovery documents that were already produced to the FTC in response to the FTC's CID. Instead, the parties will refer to the bates number of the relevant documents." ECF No. 132 at 4.

8.      <u>Lack of Possession, Custody, or Control</u>. Match objects to each Interrogatory to the extent it does not appear to be addressed to Match and seeks information that is necessarily outside Match's knowledge.

9.      <u>Legal Conclusions</u>. Match objects to each and every Interrogatory to the extent that it requires Match to draw legal conclusions.

10.     <u>Reservation of Right to Supplement</u>. Given the stage of the litigation, Match has not completed its investigation of the facts or law relating to this action, and discovery in this matter is ongoing. Accordingly, consistent with the Rules, these responses and objections are made without prejudice to, and are not a waiver of, Match's right to amend, correct, or supplement these responses, and are subject to Match's right to produce evidence of any subsequently discovered facts, or additional facts, information, or documents that may exist. Match provides these responses in good faith after reasonable inquiry and based on information that it knows or can readily obtain.

11.     <u>No Waiver</u>. By responding to these Interrogatories, Match does not concede the relevancy of an Interrogatory, nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to a particular Interrogatory does not mean that it is probative of any particular issue in this case. Match expressly reserves its right to assert any and all objections to the admissibility of any responses into evidence at any hearing or trial of this proceeding, or in any other actions or proceedings, on any and all grounds, including, but not limited to, competency, relevancy, materiality, privilege, confidentiality, hearsay, or admissibility as evidence for any other purpose. Moreover, the right to object on any ground to the use of the responses or information provided, in any aspect of this or any other court action, arbitration, or judicial or administrative proceeding or investigation, is reserved.

## II.     SPECIFIC OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.     Match specifically objects to the Interrogatories' Instructions and Definitions to the extent they purport to impose obligations on Match that exceed those imposed by the Rules and the Local Rules. In responding to these Interrogatories, Match will follow the requirements set forth in the Rules and the Local Rules.

2.     Match specifically objects to the definitions of "Match," the "Company," and "You" because they are vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines these term as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." This definition necessarily and inappropriately includes attorneys and other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Match objects to Plaintiff's definitions of "Match," the "Company," and "You" as defined to "include any descriptor used by Match in its business practice," again encompassing other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. In responding to these Interrogatories, Match will construe the terms "Match," the "Company," and "You" to refer only to Match Group, Inc.

3.     Match specifically objects to the definitions of "and" and "or" and because they are ambiguous and confusing. Match will interpret these terms to have their plain, ordinary, and common sense meaning. Match further objects to these definitions to the extent they purport to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor

proportional to the needs of the case and exceedingly burdensome. In responding to these Interrogatories, Match will comply with the Rules and the Local Rules.

4.      Match specifically objects to the definition of "any" as ambiguous and confusing. Match will interpret this term to have its plain, ordinary, and common sense meaning. Match further objects to this definition to the extent it purports to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of this term as overly broad, unduly burdensome, and oppressive to the extent it purports to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, Match will comply with the Rules and the Local Rules.

5.      Match specifically objects to the definitions of "Customer" and "Customers" as overbroad, unduly burdensome, and oppressive, insofar as they purport to cover individual(s) "who have maintained an account on *any website* owned or operated by the Company, including OKCupid, Plenty of Fish, and Tinder," which Match does not actually own or operate, and which encompasses websites and entities that are not party to, or otherwise related to, the present litigation. Match further objects that the definitions of "Customer" and "Customers" are thus not tailored to the allegations in the complaint, not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence. In responding to these Interrogatories, Match will construe the terms "Customer" and "Customers" to refer only to Customer(s) of Match.com.

6.      Match objects to the definition of "Document" as overly broad and unduly burdensome. Match further objects to this definition to the extent it refers to items outside of Match's possession, custody, or control, particularly through its use of the phrases "regardless of origin or location" and "however and by whomever prepared, produced, disseminated, or made."

Match further objects to this definition to the extent it refers to items in Plaintiff's possession, custody, or control, or to items that have been or could be obtained from another source that is equally available to Plaintiff or is more convenient, less burdensome, or less expensive. Match further objects to this definition to the extent it purports to impose obligations on Match that exceed those required by the Rules. In responding to these Interrogatories, Match will interpret the word "Document" to have its plain, ordinary, and common sense meaning and will comply with the Rules.

7.    Match specifically objects to the definition of "each" as ambiguous and confusing. Match will interpret this term to have its plain, ordinary, and common sense meaning. Match further objects to this definition to the extent it purports to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of this term as overly broad, unduly burdensome, and oppressive to the extent it purports to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, Match will comply with the Rules and the Local Rules.

8.    Match specifically objects to the definitions of "Identity" and "the identity of" because they are ambiguous and confusing. Match will interpret these terms to have their plain, ordinary, and common sense meaning. Match further objects to these definitions to the extent they purport to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, Match will comply with the Rules and the Local Rules.

9.      Match specifically objects to the definition of "Match Group, LLC" as vague, ambiguous, confusing, and overbroad.

10.      Match objects to the definition of "OKCupid," because it is overbroad, ambiguous, and confusing. Match further objects to the definition of "OKCupid" as irrelevant, since OKCupid is not referenced in the operative Complaint, and thus any Interrogatory relying on the definition of "OKCupid" is not proportional to the needs of the case and is unduly burdensome.

11.      Match objects to the definition of "Plenty of Fish," because it is overbroad, ambiguous, and confusing. Match further objects to the definition of "Plenty of Fish" as irrelevant, since Plenty of Fish is not even referenced in the Complaint, and thus any Interrogatory relying on the definition of "Plenty of Fish" is not proportional to the needs of the case and is unduly burdensome.

12.      Match specifically objects to the definitions of "referring to" and "relating to" and because they are ambiguous and confusing. Match will interpret these terms to have their plain, ordinary, and common sense meaning. Match further objects to these definitions to the extent they purport to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, Match will comply with the Rules and the Local Rules.

13.      Match specifically objects to the definition of "Subscriber" as overbroad, unduly burdensome, and oppressive, insofar as it purports to cover a "Subscriber" to "any website owned or operated by" Match, which would necessarily encompass websites and entities that are not party to, or otherwise related to, the present litigation. Match further objects that the definition of

"Subscriber" is thus not tailored to the allegations in the complaint and not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence. In responding to these Interrogatories, Match will construe the term "Subscriber" to refer only to Subscribers to Match.com.

14.     Match objects to the definition of "Tinder," because it is overbroad, ambiguous, and confusing. Match further objects to the definition of "Tinder" as irrelevant, since Tinder is not even referenced in the Complaint, and thus any Interrogatory relying on the definition of "Tinder" is not proportional to the needs of the case and is unduly burdensome.

15.     The foregoing general objections and specific objections to the instructions and definitions provided by Plaintiff shall be fully incorporated by reference into each of the below specific objections to the Interrogatories.

## III.     SPECIFIC OBJECTIONS AND RESPONSES TO THE INTERROGATORIES

**INTERROGATORY NO. 1:** Identify, including by job title, place of employment, and dates of service, all persons that Match consulted with while preparing its response to the 2017 CID, Plaintiff's First Set of Interrogatories, Plaintiff's First Requests for Production, Plaintiff's First Request for Admission, or any other submission or presentation the Company sent to the FTC. For each such person, state the 2017 CID request, discovery request, interrogatory, or other submission or presentation for which the person answered or otherwise assisted in answering.

**RESPONSE:** Match objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee" or maintained a "Chargeback" policy. Match.com has permanently discontinued the "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and

IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects to this Interrogatory because, by asking for the identity of all persons that Match "consulted with" in responding to the FTC's CID or discovery requests, it seeks documents or information that is subject to the attorney-client privilege and work-product doctrine. The FTC is not entitled to know the identity of every individual with whom Match's attorneys consulted.

**INTERROGATORY NO. 2:** Describe any criteria Match uses or has used to determine whether to grant a Customer's request for a refund relating to PTR Ads, fraud or alleged fraud, Match Guarantees, consumer's belief that they had already canceled their subscription, or his or her claimed lack of knowledge about recurring charges.

**RESPONSE:** Match objects to this Interrogatory because "PTR Ads" is vague and undefined, and to the extent this Interrogatory seeks Privileged Information. Match further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee." Match.com has permanently discontinued the "Match Guarantee" and related practices, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint,

to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects to this Interrogatory as irrelevant, overly broad, unduly burdensome, and disproportionate to the needs of the case, in that it seeks information that is beyond the scope of Plaintiff's Complaint, because Count I and II relating to PTR Ads and fraud or alleged fraud were dismissed with prejudice by the Court on March 24, 2022. *See* ECF No. 86 ("The Court [] grants Defendant Match Group, Inc.'s Motion to Dismiss Counts I and II because Match is entitled to immunity under 47 U.S.C. § 230 of the Communications Decency Act, thus those claims are barred and dismissed with prejudice."). Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

Subject to and without waiving the foregoing objections, Match responds as follows: Match Group, Inc. does not use any criteria to determine whether to grant a Match.com Customer's request for a refund relating to a consumer's belief that they had already canceled their subscription, or his or her claimed lack of knowledge about recurring charges because Match

Group, Inc. does not own or operate Match.com. Match expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 3:** Identify and describe in complete detail the full basis for each affirmative defense You have asserted in Your Answer, including but not limited to every fact and document that supports, contradicts, refutes, or rebuts that particular affirmative defense, and every witness who may have information or testimony relevant to that particular defense.

**RESPONSE:** Match objects to this Interrogatory because "relevant" is vague and undefined and to the extent this Interrogatory seeks Privileged Information. Match further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee" or maintained a Chargeback policy. Match.com has permanently discontinued the "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects that this Interrogatory is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "You" as

including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." Plaintiff's definition of "You" necessarily and inappropriately includes other entities or dating sites that are not relevant to the claims or allegations in the Complaint. Match also objects to this Interrogatory as premature and to the extent it seeks to require Match to marshal all of its evidence before trial. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules. Match also objects to this Interrogatory to the extent it seeks to require Match to provide information that is not in its possession, custody, or control, or that is already in Plaintiff's possession, custody, or control.

Subject to and without waiving the foregoing objections, Match responds as follows:

First Affirmative Defense (Failure to State a Claim): Match asserts FTC's Complaint fails to state a claim, including because the Complaint names the wrong entity. Since March 2017, when the FTC served Match Group, Inc. with the Civil Investigative Demand ("CID"), Match has repeatedly informed the FTC that Match Group, Inc. is in fact a separate holding company, and Match Group, LLC (formerly named Match.com, LLC) actually owns and operates Match.com. For example, Match stated in its May 15, 2017 Interrogatory Responses to the FTC's CID that Match.com, LLC is the general operating company that operates Match.com. Delaware Secretary of State records show that Match.com, LLC filed a certificate of amendment on September 12, 2017, changing its name from Match.com, LLC to Match Group, LLC. Match continued to raise these concerns in a December 16, 2018 White Paper and in negotiating a potential Consent Order with the FTC. Additionally, shortly after the Complaint was served, counsel for Match emailed the FTC to again inform it that Match Group, Inc. was incorrectly named as a defendant in the

lawsuit and should be voluntarily dismissed. *See* Dkt. 21 at 35. Counsel for the FTC acknowledged the email but declined to voluntarily dismiss the Complaint against Match Group, Inc. *See id.* at 37.

The Complaint fails to state a claim for the additional reason that the Guarantee and Chargeback policy at issue in the Complaint were discontinued prior to the FTC filing suit, and there are no plans to resume those practices, as the FTC is aware from multiple communications. Thus, both Match Group, Inc. and Match.com are not violating, nor are they about to violate, the FTC Act.

<u>Second Affirmative Defense (Compliance with Applicable Law):</u> The Complaint's Count V fails as Match did not violate Section 4 of ROSCA, 15 U.S.C. § 8403. As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. Rather, at all times with respect to Count V, Match.com complied with all applicable laws and acted reasonably and in good faith. As a preliminary matter, even assuming that the online cancelation flow at issue in Count V is not simple (although it is), the plain language of ROSCA requires only "simple mechanisms" for cancelation, and ROSCA does not provide that every cancelation method must be simple. Count V fails because Match.com offers several other cancelation methods in full compliance with ROSCA, including simple methods to cancel by phone, fax, email, internet chat, or standard mail, and the FTC challenges only the online cancelation method. Thus, even if the FTC were correct (which it is not) that the online cancelation flow is not simple, the existence of other unchallenged methods of cancelation defeats the FTC's claim.

Count V also fails because the Match.com online cancelation flow is not complicated or in any material way different from numerous other online subscription cancelation mechanisms. It is

essentially industry standard. Consumers in fact readily canceled using the Match.com online cancelation flow, as reflected by data proving that subscribers have no difficulty canceling via the online cancelation flow, which can be completed in less than one minute. Based on data reviewed during the FTC's pre-suit investigation, on average, 89% of Match.com subscribers who initiated an online cancelation request successfully canceled their subscription within the same day.

Third Affirmative Defense (Good Faith Belief and Conduct): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. Match.com's subscription cancelation flow was designed and implemented to be simple and readily accessible to users.

Fourth Affirmative Defense (Requested Relief Contrary to Public Policy): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. The FTC's requested relief with respect to Count V is contrary to the public interest because Match.com's online cancelation flow is intended to benefit consumers by protecting their privacy (by requiring them to insert their passwords prior to accessing private account information, such as billing), offering them discounted rates, and allowing Match.com to understand how to better serve them.

Fifth Affirmative Defense (Alleged Failure to Clearly and Conspicuously Disclose Not Material): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. Any alleged failure by Match.com to clearly and conspicuously disclose some requirements of the guarantee practice was not material because most consumers who did not qualify for the guarantee failed to satisfy the requirements that were unquestionably adequately disclosed (i.e., the requirements in the numbered and bullet-pointed list in the Program Rules). So even had other requirements been *more*

clearly and conspicuously disclosed (or waived), most users would not have been eligible for a guarantee regardless.

Sixth Affirmative Defense (Mootness): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. As to Count III, Match asserts the FTC's claim for injunctive relief is moot under applicable law. The FTC admits in its Complaint that this guarantee practice at issue in Count III ceased in mid-2019 (but it was actually permanently discontinued in April 2019). Match asserts Count IV is also moot, because, as the FTC admits in its Complaint, Match.com's chargeback practice ceased in mid-2019 (but it was actually permanently discontinued in March 2019). Count IV's claim for injunctive relief is therefore also moot. There is nothing to enjoin because the challenged practices have been discontinued.

Seventh Affirmative Defense (Overbroad Injunction): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. The FTC's requested injunction with respect to Count III and the "guarantee" practice is overbroad and not specifically tailored to the violations alleged in the Complaint. The FTC's requested injunction with respect to Count IV and the chargeback policy is overbroad and not specifically tailored to the violations alleged in the Complaint. Finally, the FTC's requested injunction is overbroad and not specifically tailored to the violations alleged in the Complaint. In particular, the FTC's requested injunction is overbroad not only because the Complaint fails to allege all necessary facts, but also because the FTC attempts to apply such injunction to Match Group, Inc., which does not own or operate Match.com, and to brands other than Match.com that are not implicated by the Complaint.

Eighth Affirmative Defense (Mitigation): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. With respect to Count V, the FTC has not offered any reliable methodology for quantifying alleged consumer harm, and any restitution amount would be subject to mitigation to the extent that consumers received refunds or utilized the services on the renewed subscription.

Ninth Affirmative Defense (Reservation of Other Affirmative Defenses): Match lacks sufficient information regarding the facts and evidence alleged and is therefore unable to ascertain at this time any additional affirmative defenses which Match may have. Therefore, Match expressly reserves the right to amend its Answer to assert such other affirmative defenses as may become apparent subsequent to the filing of its Answer, whether in discovery, at trial, or otherwise.

Match expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**AMENDED RESPONSE:** For the avoidance of doubt, the Match Guarantee and Chargeback practices challenged in the Complaint were permanently discontinued in April 2019 and March 2019, respectively, and Match.com will not reinstitute those practices.

**INTERROGATORY NO. 4:** Identify any tests, reports, A/B testing, Customer surveys, usability tests, focus groups, or other user experience studies, whether formal or informal, You have conducted related to:

  a.  Match Guarantees;
  b.  Chargebacks; and
  c.  means of subscription renewal or cancellation.

Your response to this Interrogatory should include descriptions of the types of usability studies, beta studies, and surveys that the response covers. In addition, please provide Your response in machine-readable format, for example, in a .csv or spreadsheet file format.

**RESPONSE:** Match objects to this Interrogatory because "tests," "reports," "A/B testing,"

"surveys," "usability tests," "focus groups," "user experience studies," "formal," and "informal"

are vague and undefined, and to the extent this Interrogatory seeks Privileged Information. Match further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee" or maintained a Chargeback policy. Match.com has permanently discontinued the "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects that this Interrogatory is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "You" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." Plaintiff's definition of "You" necessarily and inappropriately includes other entities or dating sites that are not relevant to the claims or allegations in the Complaint. Additionally, Match objects to

this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

Subject to and without waiving the foregoing objections, Match responds with respect to subpart (c) as follows: pursuant to Federal Rule of Civil Procedure 33(d), Match directs the FTC to any documents that will be produced in response to the FTC's RFP No. 26. Match expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 5:**

On a monthly basis, state:

   a.   the number of Match.com subscriptions subject to the Guarantee sold;

   b.   the number of Guarantee Extensions that Match provided Customers;

   c.   the number of Customer inquiries regarding the automatic renewal of subscriptions subject to the Match Guarantee;

   d.   the number of refund requests Customers submitted to Match relating to Match Guarantees and the dollar amount of these requested refunds; and

   e.   the number of refunds Match granted relating to Match Guarantees and the amount of money refunded relating to Match Guarantees.

**RESPONSE:** Match objects to this Interrogatory because "subscriptions" and "inquires" are vague and undefined and to the extent this Interrogatory seeks Privileged Information. Match further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee" or maintained a Chargeback policy. Match.com has permanently discontinued the "Match Guarantee" and related practices, and Match has repeatedly told the FTC this orally

and in writing.  Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery solely relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects that this Interrogatory is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Match" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." Plaintiff's definition of "Match" necessarily and inappropriately includes other entities or dating sites that are not relevant to the claims or allegations in the Complaint. Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

**INTERROGATORY NO. 6:** State all limitations on Customers' rights to redeem a Match Guarantee or receive a Guarantee Extension and all actions consumers had to complete to redeem a Match Guarantee or receive a Guarantee Extension. For each such limitation or action Identify:

      a.     the date such limitation was implemented and/or eliminated;

      b.     all advertisements, notices, disclosures, or other notifications where Match disclosed the need to complete that action; and

      c.     The number of consumers whose request for a Guarantee Extension were denied due to that limitation or for failing to complete that particular action.

**RESPONSE:** Match objects to this Interrogatory because "rights to redeem," "that limitation," and "that particular action" are vague and undefined and to the extent this Interrogatory seeks Privileged Information. Match further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee." Match.com has permanently discontinued the "Match Guarantee" and related practices, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery solely relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

**INTERROGATORY NO. 7:** Describe all of Match's policies relating to Customer Chargebacks, including regarding:

    a.    the circumstances in which Match will dispute a Customer Chargeback;

    b.    denying Customer account access due to a Chargeback request;

    c.    deleting or reinstating accounts of consumers who unsuccessfully attempt a Chargeback and when such deletions or reinstatements are effective; and

    d.    the effective dates of the policies.

**RESPONSE:** Match objects to the extent this Interrogatory seeks Privileged Information. Match further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever had any policy relating to a Chargeback—or offered any kind of "Match Guarantee" or maintained a Chargeback policy. Match.com has permanently discontinued "Chargebacks" and related practices, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery solely relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the

conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules. Match also objects to this Interrogatory to the extent it seeks to require Match to provide information that is not in its possession, custody, or control, or that is already in Plaintiff's possession, custody, or control.

**INTERROGATORY NO. 8:** On a monthly basis, state:

    a.     the number of Customer communications Match received regarding account cancellation or cancellation processes;

    b.     the number of refund requests made by Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

    c.     the dollar value of the refund requests made by Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

    d.     the number of refunds Match provided to Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

    e.     the dollar value of the refunds provided to Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

    f.     the amount charged to Customers who had requested a refund on the basis that they believed they had cancelled and had this request denied by Match; and

    g.     the amount charged to Customers who had requested a refund on the basis that they were unaware of Match's recurring charge and had this request denied by Match.

**RESPONSE:** Match objects to this Interrogatory because "communications," "account cancellation or cancellation processes," "attempted," "believed," and "claimed," are vague and undefined and to the extent this Interrogatory seeks Privileged Information. Match further objects

that this Interrogatory is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Match" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." Plaintiff's definition of "Match" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "Match," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules. Match also objects to this Interrogatory to the extent it seeks to require Match to provide information that is not in its possession, custody, or control, or that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, Match does not concede the relevancy of this Interrogatory nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case.

Subject to and without waiving the foregoing objections, Match responds as follows: Match Group, Inc. has not received any Customer communications or refund requests because Match Group, Inc. does not own or operate Match.com (or any other dating site).

Match expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 9:** Describe each method through which consumers could cancel their subscriptions. For each such method, describe in detail:

a.   how Match informed or disclosed to consumers the availability of each method;

b.   each step that consumers would have to take in order to successfully cancel;

c.   each representation that Match would make to consumers at each step in the cancellation process; and

d.   by month, how many Customers attempted to cancel via that particular method;

e.   by month, how many Customers successfully canceled via that particular method.

**RESPONSE:** Match objects to this Interrogatory because "attempted" is vague and undefined and to the extent this Interrogatory seeks Privileged Information. Match further objects that this Interrogatory is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Match" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." Plaintiff's definition of "Match" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "Match," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match also objects to this Interrogatory as premature and to the extent it seeks to require Match to marshal all

of its evidence before trial. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules. Match also objects to this Interrogatory to the extent it seeks to require Match to provide information that is not in its possession, custody, or control, or that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, Match does not concede the relevancy of this Interrogatory nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case.

Subject to and without waiving the foregoing objections, Match responds as follows: Match Group, Inc. does not inform, disclose to, or make representations to Match.com subscribers, because Match Group, Inc. does not own or operate Match.com (or any other dating site). Therefore, Match Group, Inc. does not have the cancelation data requested by this Interrogatory.

Match expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

Dated: September 14, 2022

/s/ Angela C. Zambrano
Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Fax: 214.981.3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com

SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310.595.9500
Fax: 310.595.9501

*Attorneys for Match Group, Inc. and
Match Group, LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above and forgoing document

was served on all counsel of record via e-mail as outlined below on September 14, 2022.

Reid Abram Tepfer
rtepfer@ftc.gov
M Hasan Aijaz
maijaz@ftc.gov
Matthew James Wilshire
mwilshire@ftc.gov
Sarah Zuckerman
szuckerman@ftc.gov
John R. O'Gorman
jogorman@ftc.gov
Erica Rollins Hilliard
ehilliard@ftc.gov

*/s/  Angela C. Zambrano*
Angela C. Zambrano

DocuSign Envelope ID: 8C4CAC53-0690-4A66-89E4-213AFAAAF10E

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| vs. | Case No. 3:19-cv-02281-K |
| MATCH GROUP, INC., a corporation, | |
| Defendant. | |

### AMARNATH THOMBRE'S VERIFICATION OF MATCH GROUP, INC.'S FIRST AMENDED RESPONSES TO PLAINTIFF FEDERAL TRADE COMMISSION'S FIRST SET OF INTERROGATORIES

I, Amarnath Thombre, state that I am an employee of Match Group, LLC and a CEO-appointed officer of Match Group, Inc ("MGI").  I serve as the Chief Executive Officer of Match Group Americas and provide this verification of MGI's First Amended Responses to Plaintiff Federal Trade Commission's First Set of Interrogatories (the "Responses").  I further state that the Responses have been prepared by counsel for MGI in consultation with me and others with knowledge of the matters involved; that the facts are based upon the business records of MGI, with which I have general familiarity; and that, to the best of my knowledge and belief, all of the facts stated therein are true and correct in all material respects with the understanding that MGI is continuing to research its Responses and reserves the right to supplement its Responses as authorized by the Federal Rules of Civil Procedure and any other applicable law.

I verify under penalty of perjury that the foregoing is true and correct in all material respects.

DocuSign Envelope ID: 8C4CAC53-0690-4A66-89E4-213AFAAAF10E

Dated: Sep 15, 2022

Respectfully submitted,

Amarnath Thombre

| | |
|---|---|
| **From:** | Anastasia Burman [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=3CB1E3395BFF4456AA63211D0D3EE775-ANASTASIA B] |
| **Sent:** | 4/15/2019 10:19:50 AM |
| **To:** | Terrance Thomas [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a941e3c9d3ab4f3686ffb74731be56d4-Terrance Th]; 'DL_Match_Support' [DL_Match_Support@telusinternational.com]; MatchDomesticSynergiesServices [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a594a78cf3484723a581b581a8296680-MatchDomest]; matchops@ballenamedia.com; Community Operations Support [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=171d3f31a28343b5bd5b450fb18418a7-Match Custo]; Community Operations Training [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=8a26f1e6f4584f8bb93998b818294f7f-Customer Su]; Community Operations Quality [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=7d0412db501a42dc8d231e0d50cfebfa-Community O]; Community Operations Management [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=222193c76d4c4bef9ce65e241d0bc0ba-Customer Su]; Community Operations Escalations [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=548d5275915949acbc1e4ca0bdbd7535-Community O]; Community Operations Pilot [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=4cda4b0c13b04a1e959fc5b327540fd1-Community O] |
| **CC:** | Laurie Braddock [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=2cf0ae69281a49ae8430e9005a76230e-Laurie Brad]; Sarah Meade [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=71807a64e9f344be91d5394c537b2026-Sarah Meade] |
| **Subject:** | Match Update: 6 Month Guarantee No Longer Available |

All,

The following has been added to Daily Updates in RNT.

**6 Month Guarantee No Longer Available (April 15, 2019)**

Effective immediately, the 6MG is no longer available for purchase on any platform and should not be offered when subscribing a member.

Agents should continue assisting members who have previously purchased the 6MG with guarantee tracking and redemption.

Let us know if you have any questions.

Thanks,

**Anastasia Burman**
Manager, Training & Development
Match & Match Affinity

8750 N. Central Expwy, Ste 1400 | Dallas, Texas 75231
469.859.8453



CONFIDENTIAL – FTC v. MATCH, Case No. 3:19-cv-02281-K

**APP 124**

MATCHFTC774521

# match♥community

| Guarantee | Search |
| --- | --- |

E.g. "reset password" or "cookies"


Account
Settings


Billing &
Subscription


Member
Communication


Paid Features
& Power-Ups


Profile &
Photos


Searching &
Matching


Technical
Issues


Contact
Us

## What happened to the Match Guarantee?

The Match Guarantee program was discontinued on 4/11/2019. Any new subscription purchases after that date will not include the Match Guarantee.

If you bought a new 6-month subscription through the Match site before 4/11/2019, then you can take advantage of the Match Guarantee one last time. Simply go to your Progress Page to track how you're doing and redeem the Guarantee at the end of your subscription term.

Even without the Match Guarantee, we still know you'll meet plenty of great people during your time on Match, and we want to give you all the tools you need to find someone special! That's why we updated our subscription bundles to include more features for an even better experience.

When you're purchasing a new subscription, make sure you review all the options to find the package that fits your needs. You can always contact us by phone or chat if you need help understanding the options or making a purchase.

MATCHFTC774522

| | |
|---|---|
| **From**: | Match [mailer@QA.connect.match.com] |
| **Sent**: | 10/7/2021 3:31:48 AM |
| **To**: | cpqateam@gmail.com |
| **Subject**: | QA - Information about your Match account |

Dear Bill,

You recently initiated a chargeback related to your subscription. While your account was deactivated for a period of time it has now been reactivated and you have been credited with whatever time was remaining on your subscription at the time of your chargeback request. Your profile is currently hidden. In order to unhide your profile, take the steps below depending on whether you are accessing your account on desktop, the Match app, or Mobile Web. Your subscription will end on 01/01/2022 and will not autorenew.

For Desktop

Access the profile edit screen by clicking your primary photo icon on the main site menu (at the top of the screen). Next, look at the top right-hand side of the profile edit screen to see your current visibility in bold text. Then click the circle next to "Anyone can see you" to make your profile visible.

For App

Access the profile edit screen by tapping on the profile icon on the bottom right of your screen. Next, look at the top right-hand side of the screen and tap the gear icon. (Note for iPhone users: Tap Profile Visibility at the top of the menu that appears on the next screen). Then click the circle next to "Visible" so that anyone can see you on the Match site.

For Mobile Web

Access the profile edit screen by tapping on the profile icon on the bottom right of your screen. Next, look at the top of the screen to see your current visibility in bold text. Then click the blue text that says "Control who sees your profile." On the screen that appears, you can click the circle next to "Anyone can see you" to make your profile visible.

CONFIDENTIAL – FTC v. MATCH, Case No. 3:19-cv-02281-K

**To keep your account secure, please do not forward this email. Forwarding could give others access to your account.**

Match P.O. Box 25472
Dallas, TX 75225

**Get the Match app**

Please do not reply to this email. Replies will not be received.

If you have a question, or need assistance, please contact Customer Care.

**APP 127**

MATCHFTC774669

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                    Plaintiff,<br><br>    vs.<br><br>MATCH GROUP, INC., a corporation, and<br>MATCH GROUP, LLC, formerly known as<br>MATCH.COM, LLC, a limited liability<br>company,<br>                              Defendants. | Case No. 3:19-cv-02281-K |

**DEFENDANT MATCH GROUP, LLC'S RESPONSES AND OBJECTIONS TO
PLAINTIFF FEDERAL TRADE COMMISSION'S FIRST SET OF
INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Rules") Defendant Match Group, LLC ("MGL"), by and through its undersigned counsel, objects and responds to Plaintiff Federal Trade Commission ("Plaintiff" or "FTC") First Set of Interrogatories to MGL (each an "Interrogatory" and, collectively, the "Interrogatories") as follows:

## I.  GENERAL OBJECTIONS

1.     <u>Irrelevant</u>. MGL objects to each and every Interrogatory to the extent that it purports to seek information that is irrelevant to Plaintiff's claims and is not reasonably calculated to lead to the discovery of admissible evidence. In particular, MGL objects to each and every Interrogatory to the extent that it seeks information relevant only to the claims that were dismissed in the Court's August 24, 2022 Order on MGL's Motion to Dismiss (the "Dismissed Claims").[1] For the avoidance of doubt, MGL will not withhold any information merely because it is related

---

[1] Dkt. 129 (dismissing Counts I & II of FTC's First Amended Complaint for Permanent Injunction, Monetary Relief, Civil Penalties, and Other Relief, filed on July 19, 2022 at Dkt. 116 (the "Amended Complaint"), due to MGL's CDA § 230 immunity).

to the Dismissed Claims, if such information is otherwise responsive to the Interrogatories related to non-dismissed claims. MGL further objects to each and every Interrogatory to the extent that it seeks documents or information from an entity or dating site not named in the present litigation, including but not limited to Tinder. MGL objects to Plaintiff's use of the discovery process to conduct a fishing expedition into dating sites that are not at issue in this lawsuit.

2. <u>Undue Burden</u>. MGL objects to each and every Interrogatory to the extent that it seeks to impose obligations beyond what is required under the Rules or Local Rules or is unduly burdensome. Accordingly, MGL objects to each and every Interrogatory where the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

3. <u>Overbroad</u>. MGL objects to each and every Interrogatory to the extent that it seeks information that is beyond the scope of Plaintiff's claims, including, but not limited to, documents and information related only to Plaintiff's Dismissed Claims, and documents and information related to entities or dating sites that are not party to, or otherwise related to, this litigation, such as Tinder. MGL will only respond with respect to Match.com. MGL further objects to each and every Interrogatory to the extent that it seeks documents and information that are not within MGL's possession, custody, or control, including by seeking documents and information from and related to entities that are not named as parties to this litigation.

4. <u>Privilege</u>. MGL objects to each and every Interrogatory to the extent it seeks documents or information subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity from discovery (including, without limitation, all communications with, or work product of, any outside attorney) (collectively, "Privileged

Information"). Any inadvertent disclosure of Privileged Information by MGL shall not constitute a waiver of any applicable privilege, doctrine, or immunity.

5.      <u>Vagueness and Ambiguity</u>. MGL objects to each and every Interrogatory to the extent that such Interrogatory is so vague, ambiguous, or confusing as not to be susceptible to a reasoned interpretation or response. In the absence of clear instructions or definitions associated with terms that are too vague, ambiguous, or confusing, MGL will give the terms used in the Interrogatory a reasonable interpretation.

6.      <u>Accessibility</u>. MGL objects to each and every Interrogatory to the extent that it seeks information that is not reasonably accessible in the ordinary course of business.

7.      <u>Cumulative Interrogatories and Availability of Information Elsewhere</u>. MGL objects to each and every Interrogatory that is cumulative, duplicative of, or to which documents or information already are in the possession, custody, or control of Plaintiff, or have been or could be obtained from another source that is equally available to Plaintiff or is more convenient, less burdensome, or less expensive. In particular, MGL objects to each and every Interrogatory insofar as it seeks documents or information already obtained by Plaintiff during the FTC's prior investigation in connection with the Civil Investigative Demand in 2017 (the "2017 CID") and documents or information produced by Match Group, Inc. ("MGI") during the course of this litigation. For the avoidance of doubt, MGL will comply with the ESI Order, which provides, "The parties need not re-produce in discovery documents that were already produced to the FTC in response to the FTC's CID. Instead, the parties will refer to the bates number of the relevant documents." Dkt. 132 at 4.

8.      <u>Lack of Possession, Custody, or Control</u>. MGL objects to each Interrogatory to the extent it does not appear to be addressed to MGL and seeks information that is necessarily outside MGL's knowledge.

9.      <u>Legal Conclusions</u>. MGL objects to each and every Interrogatory to the extent that it requires MGL to draw legal conclusions.

10.      <u>Reservation of Right to Supplement</u>. Given the stage of the litigation, MGL has not completed its investigation of the facts or law relating to this action, and discovery in this matter is ongoing. Accordingly, consistent with the Rules, these responses and objections are made without prejudice to, and are not a waiver of, MGL's right to amend, correct, or supplement these responses, and are subject to MGL's right to produce evidence of any subsequently discovered facts, or additional facts, information, or documents that may exist. MGL provides these responses in good faith after reasonable inquiry and based on information that it knows or can readily obtain.

11.      <u>No Waiver</u>. By responding to these Interrogatories, MGL does not concede the relevancy of an Interrogatory nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to a particular Interrogatory does not mean that it is probative of any particular issue in this case. MGL expressly reserves its right to assert any and all objections to the admissibility of any responses into evidence at any hearing or trial of this proceeding, or in any other actions or proceedings, on any and all grounds, including, but not limited to, competency, relevancy, materiality, privilege, confidentiality, hearsay, or admissibility as evidence for any other purpose. Moreover, the right to object on any ground to the use of the responses or information provided, in any aspect of this or any other court action, arbitration, or judicial or administrative proceeding or investigation, is reserved.

## II.  SPECIFIC OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.      MGL specifically objects to the Interrogatories' Instructions and Definitions to the extent they purport to impose obligations on MGL that exceed those imposed by the Rules and the Local Rules. In responding to these Interrogatories, MGL will follow the requirements set forth in the Rules and the Local Rules.

2.      MGL specifically objects to the definitions of "Match Group[,] LLC," "Company," and "You" as vague, ambiguous, confusing, and overbroad because the definition includes "assumed names, prior names, and predecessor entities, including Match.com, LLC," and MGL is not sure what the FTC means by "assumed names, prior names, or predecessor entities" (other than Match.com, LLC). MGL further objects to this definition to the extent it encompasses any website other than Match.com, which is the only dating site at issue in the Amended Complaint. Additionally, MGL objects because the correct name of the entity named as a defendant in this litigation is Match Group, LLC, not Match Group LLC.

3.      MGL specifically objects to the definition of "Match Group[,] Inc[.]" because the correct name of the entity named as a defendant in this litigation is Match Group, Inc., not Match Group Inc.

4.      MGL specifically objects to the definitions of "and" and "or" and because they are ambiguous and confusing. MGL will interpret these terms to have their plain, ordinary, and common sense meaning. MGL further objects to these definitions to the extent they purport to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case and exceedingly burdensome. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

5.      MGL specifically objects to the definition of "any" as ambiguous and confusing. MGL will interpret this term to have its plain, ordinary, and common sense meaning. MGL further objects to this definition to the extent it purports to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of this term as overly broad, unduly burdensome, and oppressive to the extent it purports to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

6.      MGL specifically objects to the definitions of "Customer" and "Customers" as overbroad, unduly burdensome, and oppressive, insofar as they purport to cover individual(s) "who have maintained an account on *any website* owned or operated by" MGL, including "Tinder," which encompasses websites that are not related to the present litigation. MGL further objects that the definitions of "Customer" and "Customers" are thus not tailored to the allegations in the Amended Complaint, not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence. In responding to these Interrogatories, MGL will construe the terms "Customer" and "Customers" to refer only to Customer(s) of Match.com.

7.      MGL objects to the definition of "Document" as overly broad and unduly burdensome. MGL further objects to this definition to the extent it refers to items outside of MGL's possession, custody, or control, particularly through its use of the phrases "regardless of origin or location" and "however and by whomever prepared, produced, disseminated, or made." MGL further objects to this definition to the extent it refers to items in Plaintiff's possession, custody, or control, or to items that have been or could be obtained from another source that is equally available to Plaintiff or is more convenient, less burdensome, or less expensive. MGL further objects to this definition to the extent it purports to impose obligations on MGL that exceed those

required by the Rules. In responding to these Interrogatories, MGL will interpret the word "Document" to have its plain, ordinary, and common sense meaning and will comply with the Rules.

8.      MGL specifically objects to the definition of "each" as ambiguous and confusing. MGL will interpret this term to have its plain, ordinary, and common sense meaning. MGL further objects to this definition to the extent it purports to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of this term as overly broad, unduly burdensome, and oppressive to the extent it purports to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

9.      MGL specifically objects to the definitions of "Identify" and "the identity of" because they are ambiguous and confusing. MGL will interpret these terms to have their plain, ordinary, and common sense meaning. MGL further objects to these definitions to the extent they purport to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

10.     MGL specifically objects to the definitions of "referring to" and "relating to" and because they are ambiguous and confusing. MGL will interpret these terms to have their plain, ordinary, and common sense meaning. MGL further objects to these definitions to the extent they purport to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they

purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

11.     MGL specifically objects to the definition of "Subscriber" as overbroad, unduly burdensome, and oppressive, insofar as it purports to cover a "Subscriber" to "any website owned or operated by" MGL, which would necessarily encompass websites that are not related to the present litigation. MGL further objects that the definition of "Subscriber" is thus not tailored to the allegations in the Amended Complaint and not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence. In responding to these Interrogatories, MGL will construe the term "Subscriber" to refer only to Subscribers to Match.com.

12.     MGL objects to the definition of "Tinder" because it is overbroad, ambiguous, and confusing. MGL further objects to the definition of "Tinder" as irrelevant, since Tinder is not even referenced in the Amended Complaint, and thus any Request relying on the definition of "Tinder" is not proportional to the needs of the case and is unduly burdensome.

13.     The foregoing general objections and specific objections to the instructions and definitions provided by Plaintiff shall be fully incorporated by reference into each of the below specific objections to the Interrogatories.

## I.   SPECIFIC OBJECTIONS AND RESPONSES TO THE INTERROGATORIES

**INTERROGATORY NO. 1:** Identify any current or former Match Group[,] LLC employee that has ever had a position at Match Group[,] Inc[.], the time period in which the employee held that position at Match Group[,] Inc[.], the time period of the employee's employment at Match Group[,] LLC, and all responsibilities that individual has held at Match Group[,] Inc[.] and Match Group[,] LLC.

**RESPONSE:** MGL objects to this Interrogatory because "responsibilities" is vague and undefined. MGL objects to this Interrogatory as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Amended Complaint, by seeking discovery of extensive information regarding "any current and former Match Group[,] LLC employee" regardless of their relevance to the claims in the Amended Complaint. MGL will only respond with respect to employees that may have, or had, a role in Match.com's cancellation processes or directly reports to anyone who is responsible or has a role in the cancellation process. MGL further objects to the extent that the requested information is already in Plaintiff's possession, custody, or control. Finally, MGL further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

Subject to and without waiving the foregoing objections, MGL responds as follows:

As of January 1, 2013, Sharmistha Dubey was employed at MGL, until April 2013, and then was employed again from December 2015 until May 2022. Ms. Dubey, while being an MGL employee, also had an engagement agreement with MGI from August 8, 2018 to May 2, 2022. The responsibilities Ms. Dubey held at MGI were President, from January 2018 to March 2020, and CEO, from March 2020 until May 2022. Ms. Dubey also currently serves as a Board Member of MGI, a role she has held since September 2019. The responsibilities Ms. Dubey held at MGL were Chief Product Officer, as of January 2013 until April 2013, President of Match Group NA, from December 2015 to December 2017, Chief Operating Officer of Tinder, from July 2017 to

December 2017,[2] President, from January 2018 to March 2020, and CEO from March 2020 until May 2022.

As of January 1, 2013, Mandy Ginsberg was employed at MGL until April 2013, and then was employed again from December 2015 until January 2020. Ms. Ginsberg, while being an MGL employee, also had an engagement agreement with MGI from December 5, 2017 to March 1, 2020. The responsibilities Ms. Ginsberg held at MGI was CEO, from December 2017 to March 2020. Ms. Ginsberg also served as a Board Member of MGI from December 2017 to March 2020. The responsibilities Ms. Ginsberg held at MGL were CEO of Match.com, as of January 2013 until April 2013, CEO of Match Group NA, from December 2015 to December 2017, and CEO, from January 2018 to March 2020.

From January 2016 until December 2017, Gregory Blatt was employed at MGL.  Mr. Blatt, while being an MGL employee, also had an engagement agreement with MGI from April 27, 2016 to December 5, 2017.  The responsibilities Mr. Blatt held at MGI was Executive Chairman, from December 2013 to January 2016, and Chairman & CEO, from January 2016 to December 2017. Following MGI's Initial Public Offering in November 2015, Mr. Blatt also served as a Board Member of MGI from November 2015 to August 2018. The responsibilities Mr. Blatt held at MGL were CEO & President from January 2016 to December 2017.

As of January 1, 2013, Sam Yagan was employed at MGL until December 2015.  The responsibilities Mr. Yagan held at MGI was CEO, as of January 2013 to December 2015. Mr. Yagan also served as a Board Member of MGI from December 2015 to September 2019. The responsibility Mr. Yagan held at MGL was CEO from April 2013 to December 2015.

---

[2] Ms. Dubey served as COO of Tinder starting in January 2017, when it was owned and operated by Tinder, Inc., a separate entity from MGL. Pursuant to a July 2017 merger, Tinder, Inc.'s assets and liabilities were acquired by Match Group, LLC.

As of January 1, 2013, and continuing until today, Amarnath Thombre has been employed at MGL. The responsibilities Mr. Thombre has held at MGI has been Chief Strategy Officer, as of January 2013 to December 2017, and CEO of Match Group Americas, from January 2018 to present. The responsibilities Mr. Thombre has held at MGL has been Chief Strategy Officer, as of January 2013 to December 2017, and VP & CEO of Match Group Americas, from January 2018 to present.

As of May 3, 2022, and continuing until today, Bernard Kim has been employed at MGL. Mr. Kim, while being an MGL employee, also has an engagement agreement with MGI as of May 3, 2022. The responsibilities Mr. Kim holds at MGI is CEO, and at MGL is CEO. Mr. Kim also currently serves as a Board Member of MGI, a role he has held since May 2022.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 2:** Identify any contractual agreements that have ever existed between Match Group[,] Inc[.] and Match Group, LLC and state in detail the nature of those contractual agreements, the dates of their execution, and the terms of those agreements, and state on a month by month basis any payments made by or between Match Group[,] Inc[.] and Match Group[,] LLC as a result of any such contractual agreement.

**RESPONSE:** MGL objects to this Interrogatory as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Amended Complaint, by seeking exceedingly broad discovery regarding "any contractual agreements that have ever existed" between MGI and MGL, the detailed nature of those contractual agreements, the dates of their execution, the terms of those agreements, and a month-by-month statement of "any payments" made by or between MGI and MGL as a result of any such contractual agreement—regardless of any relevance to the claims in the Amended Complaint. MGL will respond only with respect to contractual agreements between MGI and MGL relating to Match.com's cancellation mechanisms. MGL further objects to the applicable time period for

this Interrogatory as vague, ambiguous, and confusing because it seeks "*any* contractual agreements that have *ever* existed," which implies an unlimited time period aside from any relevance to the claims in the Amended Complaint. Likewise, MGL objects to the extent that the requested information already is in Plaintiff's possession, custody, or control, or is publicly available. Additionally, MGL objects to this Interrogatory as vague, ambiguous, and confusing in that it is not clear what the FTC means by the separate requirements it lists to "state in detail the nature of those contract agreements" and "the terms of those agreements." Moreover, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as two of interrogatories against the 25 interrogatory limit.

Subject to and without waiving the foregoing objections, MGL responds as follows: There are no contractual agreements between MGI and MGL regarding Match.com's cancellation mechanisms.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 3:** Describe any criteria Match Group[,] LLC uses or has used to determine whether to grant a Customer's request for a refund relating to Ads, fraud or alleged fraud, Match Guarantees, consumer's belief that they had already canceled their subscription, or his or her claimed lack of knowledge about recurring charges.

**RESPONSE:** MGL objects to this Interrogatory as vague and confusing because this Interrogatory uses the defined term "Customer" before using the undefined term "consumer," and it is unclear whether the FTC intends for the terms to have the same meaning or different meanings. MGL further objects to this Interrogatory as overly broad and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Amended Complaint, as detailed below. Any information related to "fraud or alleged fraud" relates solely to

Counts I and II, which the Court dismissed with prejudice on August 24, 2022. *See* Dkt. 129. Moreover, MGL objects to this Interrogatory because Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as five of interrogatories against the 25 interrogatory limit. MGL further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules. Finally, MGL objects to this Interrogatory to the extent the information is already in Plaintiff's possession, custody, or control. MGL will respond solely as to the criteria used to determine whether to grant a Customer's request for a refund relating to the Customer's belief that they had already cancelled their subscription or his or her claimed lack of knowledge about recurring charges.

Subject to and without waiving the foregoing objections, MGL responds as follows: pursuant to Federal Rule of Civil Procedure 33(d), MGL directs the FTC to documents produced by MGI at MATCHFTC740484, MATCHFTC740485, MATCHFTC740487,

MATCHFTC740492,    MATCHFTC740500,    MATCHFTC740502,    MATCHFTC740507,

MATCHFTC740509,    MATCHFTC740514,    MATCHFTC740519,    MATCHFTC740527,

MATCHFTC740532,    MATCHFTC740535,    MATCHFTC740536,    MATCHFTC740542,

MATCHFTC740548,    MATCHFTC740549,    MATCHFTC740551,    MATCHFTC740553,

MATCHFTC740555,    MATCHFTC740561,    MATCHFTC740564,    MATCHFTC740570,

MATCHFTC740578,    MATCHFTC740586,    MATCHFTC740587,    MATCHFTC740619,

MATCHFTC740684,    MATCHFTC740687,    MATCHFTC740690,    MATCHFTC740693,

MATCHFTC740700,    MATCHFTC740865,    MATCHFTC740929,    MATCHFTC740967,

MATCHFTC740989,  MATCHFTC741061,  MATCHFTC741062,  MATCHFTC741063,  and

MATCHFTC741158.

MGL expressly reserves the right to supplement or amend this response, as discovery and

document production is ongoing.

**INTERROGATORY NO. 4:** Describe in complete detail the basis for your contention that Match.com is wholly owned by Match Group[,] LLC or operated exclusively by Match Group[,] LLC.

**RESPONSE:** MGL objects to this Interrogatory as vague and confusing because "wholly owned" and "operated exclusively" are vague and undefined. MGL also objects to this Interrogatory to the extent it seeks Privileged Information. MGL further objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control. MGL further objects to this Interrogatory as overly broad and unduly burdensome to the extent that it requires MGL to describe "in complete detail" the basis for its contentions. Additionally, MGL objects to this Interrogatory to the extent it calls for a legal conclusion.

Subject to and without waiving the foregoing objections, MGL responds as follows:

The basis for our contention that Match.com is owned and operated by MGL, is that MGL is the general operating company that owns and operates Match.com, as evidenced by numerous

documents produced during the CID and this litigation showing MGL employees operating and controlling Match.com. Likewise, the Match.com Terms of Use provide that Match.com is operated by Match Group, LLC. Additionally, MGL is the entity that is the registrant, administrative, and technical contact for the domain Match.com, and MGL is the owner of the Match.com trademark.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 5:** Describe in complete detail any role that Match Group[,] Inc[.] or its employees have ever had relating to the operation or advertisement of Match.com, any action Match Group[,] Inc. or its employees have ever taken relating to the operation or marketing of Match.com, or any report that Match Group[,] LLC has ever made to Match Group[,] Inc[.] concerning the operation or advertisement of Match.com, including relating to the following topics:

    a.    Match.com's terms and conditions;

    b.    Polices or procedures related to the Match Guarantee;

    c.    Match.com's refund policies and procedures; and

    d.    Policies and procedures related to Match.com's cancellation mechanisms or the disclosure or advertisement of cancellation mechanisms.

**RESPONSE:** MGL objects to this Interrogatory as vague and confusing because it is unclear whether the Plaintiff is referring only to actions MGI's employees have taken in their role as an employee of or on behalf of MGI or actions an MGI employee has taken in their role as an employee of or on behalf of another entity that they may be employed by. MGL interprets this Interrogatory as referring to actions an employee of MGI has taken in their role as an MGI employee. MGL objects to "role," "report," "terms and conditions," and "policies or procedures" as vague and undefined, as MGL is not sure what Plaintiff means by such references. MGL will give those terms their plain and ordinary meanings, and MGL will interpret "report," as it is used in this Interrogatory, to mean that the person receiving the communication from MGL on behalf of MGI was acting in his or her capacity as an MGI officer at the time of the communication. MGL

further objects to this Interrogatory as extraordinarily broad and not proportional to the needs of the case because Plaintiff in this Interrogatory purports to seek "complete detail" about information far beyond the scope of Plaintiff's claims in the Amended Complaint, by seeking discovery of extensive information regarding "*any* role" MGI or its employees "*ever* had," "*any* action . . . *ever* taken," and "*any* report . . . *ever* made." MGL also objects to this Interrogatory because it improperly demands that MGL respond as to the knowledge of persons and/or entities other than MGL, namely MGI, as it seeks information regarding the actions and roles of MGI and its employees. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as four of interrogatories against the 25 interrogatory limit.

Moreover, Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. MGL also objects to the extent that this Interrogatory suggests Match.com "cancellation mechanisms" are advertised and to the extent it suggests MGI operates Match.com. MGL will only respond with respect to subpart (d).

Subject to and without waiving the foregoing objections, MGL responds as follows:

Neither MGI nor its employees acting in their capacities as MGI employees has ever had any role or taken any action regarding the policies and procedures related to the design of Match.com's cancellation mechanisms or the disclosure or advertisement of cancellation mechanisms, as MGL is responsible for the policies and procedures related to Match.com's cancellation mechanisms and any disclosure of cancellation mechanisms. With respect to reports MGL has made to MGI related to Match.com's cancellation mechanisms or the disclosure of cancellation mechanisms, pursuant to Rule 33(d), MGL directs the FTC to any documents that may be produced by MGI responsive to Request for Production No. 2 in the FTC's First Set of Requests for Production to MGI.

**INTERROGATORY NO. 6**: Identify and describe in complete detail the full basis for each affirmative defense You have asserted in Your Answer, including but not limited to every fact and document that supports, contradicts, refutes, or rebuts that particular affirmative defense, and every witness who may have information or testimony relevant to that particular defense.

**RESPONSE:** MGL objects to this Interrogatory because "relevant" is vague and undefined because MGL and the FTC may have different understandings of what is "relevant" in this case. MGL also objects to the extent this Interrogatory seeks Privileged Information. MGL also objects to this Interrogatory as premature and to the extent it seeks to require MGL to marshal all of its evidence before trial. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is not in its possession, custody, or control, or that is already in Plaintiff's possession, custody, or control. To that end, MGL directs the FTC to MGL's Initial Disclosures, served on August 22, 2022, in which MGL provided the name of individuals likely to have discoverable information, along with the subjects of that information, that MGL may use to support its claims or defenses. Lastly, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single

questions, including subparts. MGL will treat this as ten interrogatories against the 25 interrogatory limit. *See White v. Cinemark USA, Inc.*, No. 04CV0397 GEB CMK, 2005 WL 3881658, at *3 (E.D. Cal. Mar. 28, 2005)(holding that "each affirmative defense should be treated as a separate interrogatory, since each defense may be both factually and logically different").

Subject to and without waiving the foregoing objections, MGL responds as follows:

First Affirmative Defense (Failure to State a Claim): The Amended Complaint fails to state a claim for the reason that the Guarantee and Chargeback policy at issue in Counts III and IV of the Amended Complaint were permanently discontinued prior to the FTC filing suit, and those practices have never and will never be reinstated, as the FTC is aware from multiple communications, along with the Notice of Stipulation Regarding Permanently Discontinued Practices on Match.com, recently filed on September 20, 2022, at Dkt. 146. Thus, neither MGL nor Match.com are violating, nor are they about to violate, the FTC Act.

Second Affirmative Defense (Compliance with Applicable Law): The Amended Complaint's Count V fails as MGL did not violate Section 4 of ROSCA, 15 U.S.C. § 8403. Rather, at all times with respect to Count V, Match.com complied with all applicable laws and acted reasonably and in good faith. As a preliminary matter, even assuming that the online cancellation flow at issue in Count V is not simple (although it is), the plain language of ROSCA requires only "simple mechanisms" for cancellation, and ROSCA does not provide that every cancellation method must be simple. Count V fails because Match.com offers several other cancellation methods in full compliance with ROSCA, including simple methods to cancel by phone, fax, email, internet chat, or standard mail. *See infra* Resp. to Interr. No. 15 (explaining multiple cancellation mechanisms and citing documents related to same). And the FTC challenges only the online cancellation method. Thus, even if the FTC were correct (which it is not) that the online

cancellation flow is not simple, the existence of other unchallenged methods of cancellation defeats the FTC's claim.

Count V also fails because the Match.com online cancellation flow is not complicated or in any material way different from numerous other online subscription cancellation mechanisms. It is essentially industry standard. Consumers in fact readily canceled using the Match.com online cancellation flow, as reflected by data proving that subscribers have no difficulty canceling via the online cancellation flow, which can be completed in less than one minute. *See infra* Resp. to Interr. No. 15 (explaining multiple cancellation mechanisms and citing documents related to same). Based on data reviewed during the FTC's pre-suit investigation, on average, 89% of Match.com subscribers who initiated an online cancellation request successfully canceled their subscription within the same day.

Third Affirmative Defense (Good Faith Belief and Conduct): Match.com's online cancellation flow was designed and implemented to be simple and readily accessible to users. *See infra* Resp. to Interr. No. 15 (explaining online cancellation flow and citing documents and videos related to same).

Fourth Affirmative Defense (Requested Relief Contrary to Public Policy): The FTC's requested relief with respect to Count V is contrary to the public interest because Match.com's online cancellation flow is intended to benefit consumers by protecting their privacy (by requiring them to insert their passwords prior to accessing private account information, such as billing), offering them discounted rates, and allowing Match.com to understand how to better serve them. *See infra* Resp. to Interr. No. 15 (explaining online cancellation flow and citing documents and videos related to same).

Fifth Affirmative Defense (Alleged Failure to Clearly and Conspicuously Disclose Not Material): Any alleged failure by Match.com to clearly and conspicuously disclose some requirements of the Guarantee practice was not material because most consumers who did not qualify for the Guarantee failed to satisfy the requirements that were unquestionably adequately disclosed (i.e., the requirements in the numbered and bullet-pointed list in the Program Rules). So even had other requirements been *more* clearly and conspicuously disclosed (or waived), most users would not have been eligible for a Guarantee regardless.

Sixth Affirmative Defense (Mootness): As to Count III, MGL asserts the FTC's claim for injunctive relief is moot under applicable law. The FTC admits in its Amended Complaint that this Guarantee practice at issue in Count III ceased in mid-2019 (but it was actually permanently discontinued in April 2019). MGL asserts Count IV is also moot, because, as the FTC admits in its Amended Complaint, Match.com's chargeback practice ceased in mid-2019 (but it was actually permanently discontinued in March 2019). Count IV's claim for injunctive relief is therefore also moot. There is nothing to enjoin because the challenged practices have been permanently discontinued, and MGL will not reinstitute those practices. *See, e.g.*, Notice of Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146.

Seventh Affirmative Defense (Overbroad Injunction): The FTC's requested injunction with respect to Count III and the "Guarantee" practice is overbroad and not specifically tailored to the violations alleged in the Amended Complaint. The FTC's requested injunction with respect to Count IV and the chargeback policy is overbroad and not specifically tailored to the violations alleged in the Amended Complaint. Finally, the FTC's requested injunction is overbroad and not specifically tailored to the violations alleged in the Amended Complaint. In particular, the FTC's requested injunction is overbroad not only because the Amended Complaint fails to allege all

necessary facts, but also because the FTC attempts to apply such injunction to brands other than Match.com that are not implicated by the Amended Complaint.

Eighth Affirmative Defense (Mitigation): With respect to Count V, the FTC has not offered any reliable methodology for quantifying alleged consumer harm, and any restitution amount would be subject to mitigation to the extent that consumers received refunds or utilized the services on the renewed subscription.

Ninth Affirmative Defense (Statute of Limitations): The FTC's claims are barred in part by the statute of limitations, including, but not limited, to the extent that the FTC seeks civil penalties, monetary relief, or redress for purported violations that occurred outside of the applicable statute of limitations.

Tenth Affirmative Defense (Reservation of Other Affirmative Defenses): MGL lacks sufficient information regarding the facts and evidence alleged and is therefore unable to ascertain at this time any additional affirmative defenses which MGL may have. Therefore, MGL expressly reserves the right to amend its Answer to assert such other affirmative defenses as may become apparent subsequent to the filing of its Answer, whether in discovery, at trial, or otherwise.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 7:** Identify any tests, reports, A/B testing, Customer surveys, usability tests, focus groups, or other user experience studies, whether formal or informal, related to:

    a.    Match Guarantees;

    b.    Chargebacks related to Match.com subscriptions; and

    c.    Means and ease of subscription renewal or cancellation for Match.com subscriptions.

Your response to this Interrogatory should include descriptions of the types of usability studies, beta studies, and surveys that the response covers. In addition, please provide Your response in machine-readable format, for example, in a .csv or spreadsheet file format.

**RESPONSE**: MGL objects to this Interrogatory because "tests," "reports," "A/B testing," "Customer surveys," "usability tests," "focus groups," "other user experience studies," "formal," "informal," "usability studies," "beta studies," and "surveys" are vague and undefined, and to the extent this Interrogatory seeks Privileged Information. MGL also objects to this Interrogatory to the extent the request to "provide [the] response in machine-readable format" imposes obligations on MGL that exceed those imposed by the Rules or the ESI Order. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Counts III and IV in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as three interrogatories against the 25 interrogatory limit. MGL further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

Subject to and without waiving the foregoing objections, MGL responds with respect to subpart (c) as follows: pursuant to Federal Rule of Civil Procedure 33(d), MGL directs the FTC to documents produced in response to the FTC's RFP No. 26 to MGI.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 8:** On a monthly basis, state:

    a.    the number of Match.com subscriptions subject to the Guarantee sold;

    b.    the number of Guarantee Extensions that Match Group[,] LLC provided Customers;

    c.    the number of Customer inquiries regarding the automatic renewal of subscriptions subject to the Match Guarantee;

    d.    the number of refund requests Customers submitted to Match Group[,] LLC relating to Match Guarantees and the dollar amount of these requested refunds; and

    e.    the number of refunds Match Group[,] LLC granted relating to Match Guarantees and the amount of money refunded relating to Match Guarantees.

**RESPONSE:** MGL objects to this Interrogatory because "subscriptions" and "inquiries" are vague and undefined and to the extent this Interrogatory seeks Privileged Information. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match

Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as five interrogatories against the 25 interrogatory limit.

Subject to and without waiving the foregoing objections, MGL responds that it permanently discontinued the Guarantee in April 2019. It has not offered the Guarantee since that date, and it will not reinstitute the Guarantee in the future.

**INTERROGATORY NO. 9:** State all limitations on Customers' rights to redeem a Match Guarantee or receive a Guarantee Extension and all actions consumers had to complete to redeem a Match Guarantee or receive a Guarantee Extension. For each such limitation or action Identify:

    a.    the date such limitation was implemented and/or eliminated; and

    b.    all advertisements, notices, disclosures, or other notifications where Match disclosed the need to complete that action.

**RESPONSE:** MGL objects to this Interrogatory because "rights to redeem" and "Match" are vague and undefined and to the extent this Interrogatory seeks Privileged Information. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related

to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as two interrogatories against the 25 interrogatory limit.

Subject to and without waiving the foregoing objections, MGL responds that it permanently discontinued the Guarantee in April 2019. It has not offered the Guarantee since that date, and it will not reinstitute the Guarantee in the future.

**INTERROGATORY NO. 10:** Describe in complete detail the basis for your contention that the terms of the Match Guarantees were adequately disclosed.

**RESPONSE:** MGL objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Subject to and without waiving the foregoing objections, MGL responds that it permanently discontinued the Guarantee in April 2019. It has not offered the Guarantee since that date, and it will not reinstitute the Guarantee in the future.

**INTERROGATORY NO. 11:** Identify the number of consumers whose request for a Guarantee Extension were denied due to that limitation or for failing to complete that particular action.

**RESPONSE:** MGL objects to this Interrogatory because "that limitation" and "that particular action" are vague and undefined and to the extent this Interrogatory seeks Privileged Information. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Subject to and without waiving the foregoing objections, MGL responds that it permanently discontinued the Guarantee in April 2019. It has not offered the Guarantee since that date, and it will not reinstitute the Guarantee in the future.

**INTERROGATORY NO. 12:** Describe all of Match's policies relating to Customer Chargebacks, including regarding:

    a.    the circumstances in which Match Group[,] LLC will dispute a Customer Chargeback;

    b.    denying Customer account access due to a Chargeback request;

    c.    deleting or reinstating accounts of consumers who unsuccessfully attempt a Chargeback and when such deletions or reinstatements are effective; and

    d.    the effective dates of the policies.

**RESPONSE:** MGL objects to this Interrogatory because "Match" is undefined, and it is unclear what the FTC means by "Match," given the FTC's history and positions taken in this litigation. MGL further objects to this Interrogatory because "denying Customer account access due to a Chargeback request" is vague and confusing; MGL will interpret that subpart of the Interrogatory to mean users that had active subscriptions and were not refunded. MGL also objects to the extent this Interrogatory seeks Privileged Information. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued "Chargebacks" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count IV in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass. Furthermore, the circumstances in which MGL decides to dispute a chargeback are irrelevant, as they are unrelated to the conduct challenged

in the Amended Complaint (conduct *after* a chargeback dispute has been resolved). Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as four interrogatories against the 25 interrogatory limit. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control.

Subject to and without waiving the foregoing objections, MGL responds as follows: in March 2019, Match.com, by and through its owner and operator, MGL, discontinued the chargeback policy challenged in the Amended Complaint. It has not implemented the challenged chargeback policy since that date, and it will not reinstitute the challenged chargeback policy in the future. MGL's current chargeback policy is as follows: When a user with an active subscription initiates a chargeback, MGL hides that user's profile (because that user has indicated that he or she no longer wishes to appear on the site), and disables the user's account login (because the user is disputing payment for the service that MGL provides). If MGL disputes the chargeback and prevails, and has not already refunded the user, then MGL re-enables the user's account login, restores the amount of subscription time the user had remaining at the time the account was disabled, and sends the user an email notifying the user that his or her account has been reactivated and containing instructions about how to un-hide his or her profile. For the avoidance of doubt, if MGL prevails in a chargeback billing dispute with a consumer, MGL does not fail to provide the Consumer access to the consumer's Match.com account or to the subscription service(s) that the consumer paid for, nor does it terminate the consumer's account or delete the consumer's profile because of the chargeback billing dispute in which MGL prevailed.

**INTERROGATORY NO. 13:** Describe in complete detail the basis for your contentions that:

    a.    Match.com's Chargeback policy was a reasonable policy designed to protect consumers;

    b.    That Match.com's Chargeback policy was employed to address wrongful Chargeback requests; and

    c.    That subscribers disputing subscription charges were "de facto indicating" that they no longer desired access to their accounts.

**RESPONSE:** MGL objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued "Chargebacks" and related practices, and MGL has repeatedly told the FTC this orally and in writing MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count IV in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The FTC has not alleged that MGL's current chargeback policy (described in response to Interrogatory No. 12) is unreasonable or in violation of the law. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as three interrogatories against the 25 interrogatory limit.

        Subject to and without waiving the foregoing objections, MGL responds as follows: MGL discontinued the chargeback policy challenged in the Amended Complaint in March 2019. It has

not implemented the challenged chargeback policy since that date, and it will not reinstitute the challenged chargeback policy in the future.

**INTERROGATORY NO. 14:** On a monthly basis, state:

a. the number of Customer communications Match Group[,] LLC received regarding account cancellation or cancellation processes;

b. the number of refund requests made by Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

c. the dollar value of the refund requests made by Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

d. the number of refunds Match provided to Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

e. the dollar value of the refunds provided to Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

f. the amount charged to Customers who had requested a refund on the basis that they believed they had cancelled and had this request denied by Match Group[,] LLC; and

g. the amount charged to Customers who had requested a refund on the basis that they were unaware of Match Group[,] LLC's recurring charge and had this request denied by Match Group[,] LLC.

**RESPONSE:** MGL objects to this Interrogatory because "Match" is undefined, and it is unclear what the FTC means by "Match," given the FTC's history and positions taken in this litigation. MGL will respond only as to Match.com, the only dating site relevant in this action. MGL further objects to this Interrogatory because "Customer communications," "account cancellation or cancellation processes," "attempted," "believed," and "claimed," are vague and undefined. In particular, MGL objects that it would be impossible to provide the "the number of Customer communications Match Group[,] LLC received regarding account cancellation or cancellation processes," as requested in subpart (a), so MGL will provide the number of Customers who cancelled their subscriptions. MGL also objects that it is impossible to identify Customers who "attempted to cancel," so MGL will respond to subparts (b), (d), and (e) only as to "Customers who claimed they believed they already canceled their subscriptions." MGL further objects that

subpart (c) is vague and incalculable because, although MGL is able to ascertain which Customers requested and received a refund, MGL is not able to provide the amount of the refund that each Customer sought from MGL, which could be different from the amount of the refund that the Customer actually received from MGL. MGL also objects that subpart (f) is confusing and impossible to calculate, as MGL does not understand what information the FTC seeks in this subpart, and MGL is not able to interpret the subpart in such a way that it could provide any other information than what MGL is already providing for the other subparts. MGL further objects to this entire Interrogatory as overly broad and unduly burdensome, particularly as it relates to subpart (g), as recurring charges (in the absence of a request to cancel) are not relevant to any party's claim or defense. MGL also objects that each subpart seeks information beyond the scope of the applicable statute of limitations period for any purported right of the FTC to monetary relief or redress against MGL, so MGL will provide information for the period beginning three years before the FTC filed the Amended Complaint and named MGL as a defendant. *See* Am. Compl., Dkt. 116 (filing Amended Complaint and naming MGL as defendant on July 19, 2022).

MGL also objects to this Interrogatory to the extent this Interrogatory seeks Privileged Information. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as seven interrogatories against the 25-interrogatory limit. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, MGL does not concede the relevancy of this Interrogatory nor the relevancy or admissibility of any information provided in response thereto. That information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case.

Subject to and without waiving the foregoing objections, MGL responds as follows:

Pursuant to Rule 33(d), MGL directs the FTC to documents that will be produced by MGL containing data responsive to the Interrogatory. Once produced, MGL will identify those documents by Bates number.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 15:** Describe each method through which consumers could cancel their subscriptions. For each such method, describe in detail:

    a.    every instance in which Match Group[,] LLC informed consumers of or disclosed to consumers the availability of each method;

    b.    each step that consumers would have to take in order to successfully cancel their Match.com subscription; and

    c.    each representation that Match has made to consumers at each step in the cancellation process.

**RESPONSE:** MGL objects to this Interrogatory because "Match" is undefined, and it is unclear what the FTC means by "Match," given the FTC's history and positions taken in this litigation; MGL will interpret "Match" to mean MGL. MGL also objects that this Interrogatory is vague and ambiguous because it does not identify what subscriptions are at issue. MGL will interpret this Interrogatory to ask about Mach.com subscription. MGL further objects that subparts (b) and (c) of this Interrogatory are vague and undefined because the differences between what the FTC seeks within each subpart are not clear. MGL also objects to the extent this Interrogatory seeks Privileged Information. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, MGL does not concede the relevancy of this Interrogatory nor the relevancy or

admissibility of any information provided in response thereto. The fact that information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case.

Subject to and without waiving the foregoing objections, MGL responds as follows:

Match.com offers multiple simple mechanisms for consumers to cancel their subscriptions, including by the Match.com online cancellation flow, online chat, telephone, email, U.S. mail, and fax. Match.com discloses these simple cancellation mechanisms throughout the registration process and Match.com, including in Match.com Frequently Asked Questions ("FAQ") pages. Consumers frequently and successfully use such mechanisms to cancel their subscriptions. *See, e.g.*, *infra* Resp. to Interr. No. 16.

Match.com discloses how to cancel a subscription throughout the registration process on the first page of the subscription flow, the billing page before the consumer subscribes, and the subscription confirmation page if the consumer subscribes. Before consumers select a subscription plan or provide billing information, consumers have access to a "Billing—Continuous Service" screen, which provides, "To change or cancel your subscription at any time, click the 'Account' link on the upper-right corner of the website and follow the directions. You can also change or cancel your subscription by contacting our Customer Care team as directed on the website."

Before consumers subscribe, Match.com again informs consumers of the cancellation mechanisms on the billing page with a disclosure above the "Subscribe Now" button. The disclosure provides that consumers can "cancel via the Account Settings page." A hyperlink with the words "Learn More" also appears in blue text near the "Subscribe Now" button, and "Learn More" again leads to the "Billing—Continuous Service" screen that describes the cancellation mechanisms in greater detail. In addition, immediately to the left of the "Subscribe Now" button

is a hyperlink to the Match.com Terms of Use in blue text. The Terms of Use[3] provide in red text, "If you purchase a subscription, it will automatically renew until you cancel, in accordance with the terms disclosed to you at the time of purchase, as described below." The Terms of Use further provide a mailing address and fax number to send cancellation notices, which consumers have recently utilized to cancel their subscriptions. *See, e.g.*, MATCHFTC744797 (cancelling via U.S. mail); MATCHFTC744802 (same); MATCHFTC744806 (same); MATCHFTC744810 (same); MATCHFTC744801 (cancelling via fax).

Following payment of a subscription, consumers are directed to a subscription confirmation page, which provides, "To cancel, you may visit your Account Settings at any time." The words "Account Settings" are a hyperlink in blue text that directs consumers to the Account Settings page for cancellation through the online cancellation flow, described in more detail below.

Consumers may also find information about how to contact Customer Care or otherwise cancel a subscription by visiting various Match.com FAQ pages. The "Contact Us" FAQ page[4] provides several options to contact Customer Care, including through chat or email, and a phone number may be displayed if the consumer is logged into the consumer's account when viewing that FAQ page. The "Cancelling" FAQ page,[5] which may be found by merely searching "cancel" on the FAQ page, describes how to cancel a subscription (i.e., turn off auto-renewal).

The simple steps to cancel through each cancellation mechanism are outlined below:

**Online Cancellation Flow.** A consumer may cancel a Match.com subscription by utilizing the online cancellation flow, which easily can be completed in less than one minute. *See, e.g.*,

---

[3] https://cp.match.com/en-us/resources/TermsOfUse_02_28_22.pdf
[4] https://help.match.com/hc/en-us/articles/6140024199195-Contact-Us
[5] https://help.match.com/hc/en-us/articles/6077124196891-Cancelling

MATCHFTC672322-MATCHFTC672329 (videos of Match.com online cancellation flow).[6] From the "Account Settings" page, the consumer clicks "Manage subscription" (which is in the "Manage account" group), inserts the consumer's password and completes a reCaptcha (to ensure that a consumer's billing data remains secure), and then clicks "Cancel Subscription." The consumer is asked a few optional survey questions; the consumer may answer the survey questions or may simply click "Continue Cancellation." The consumer then reaches a cancellation confirmation page, which provides (1) a confirmation number, (2) that the consumer does not have to do anything further to complete the subscription cancellation, (3) the last day of the consumer's subscription, and (4) that the consumer will receive an email confirming the cancellation.

**Online Chat.** A consumer may cancel a Match.com subscription by sending the consumer's cancellation request via chat to Match.com Customer Care. The chat mechanism can be found on the Customer Care Contact Us FAQ page. Customer Care will then process the request.

**Telephone.** A consumer may cancel a Match.com subscription by calling the Match.com Customer Care phone number, 800-926-2824, and stating the consumer's request to cancel the consumer's subscription. The phone number has been generally available on the FAQ pages. Customer Care will then process the request.

**Email.** A consumer may cancel a Match.com subscription by emailing the consumer's cancellation request to Match.com Customer Care. The email mechanism can be found on the Customer Care Contact Us FAQ page. Customer Care will then process the request. Customer Care has offshore agents that respond to e-mails after hours and during weekends.

---

[6] In early 2019, "Change/Cancel Membership" was changed to "Manage subscription," a Captcha was added to the password page, and "No thanks, I want to resign" was changed to "Continue Cancellation."

**U.S. Mail.** A consumer may cancel a subscription by mailing the consumer's cancellation to Match, Attn: Cancellations, P.O. Box 25472, Dallas, Texas 75225. The address can be found in the Match.com Terms of Use. The request should state that the consumer is cancelling the agreement, or words of similar effect, and include the consumer's name and email address, phone number, or other unique identifier used to sign up for the account so that Match.com can identify the appropriate account. Customer Care will then process the request.

**Fax.** A consumer may cancel a Match.com subscription by sending a fax with the consumer's request to cancel the consumer's subscription to 214-853-4309. The fax number can be found in the Match.com Terms of Use. The request should state that the consumer is cancelling the agreement, or words of similar effect, and include the consumer's name and email address, phone number, or other unique identifier used to sign up for the account so that Match.com can identify the appropriate account. Customer Care will then process the request.

**INTERROGATORY NO. 16:** State on a month by month basis the number of consumers that have cancelled a Match.com subscription by the following mechanisms:

    a.      fax;

    b.      online chat;

    c.      telephone;

    d.      U.S. mail;

    e.      Match.com's cancellation flow; and

    f.      Any other method.

**RESPONSE:** MGL objects to this Interrogatory to the extent this Interrogatory seeks Privileged Information. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, MGL does not concede the relevancy of this Interrogatory nor the relevancy or

admissibility of any information provided in response thereto. The fact that information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case. MGL further objects to this Interrogatory as overly broad and unduly burdensome to the extent that it requests information that is not reasonably available to MGL, particularly insofar as Plaintiff is demanding almost ten years' worth of data, from 2013-present. MGL also objects that each subpart seeks information beyond the scope of the applicable statute of limitations period for any purported right of the FTC to monetary relief or redress against MGL, so MGL will provide information for the period beginning three years before the FTC filed the Amended Complaint and named MGL as a defendant. *See* Am. Compl., Dkt. 116 (filing Amended Complaint and naming MGL as defendant on July 19, 2022). MGL sometimes does not have data about the method by which a consumer canceled his or her subscription. MGL will respond to the best of its knowledge and ability.

Subject to and without waiving the foregoing objections, MGL responds as follows:

Pursuant to Rule 33(d), MGL directs the FTC to documents that will be produced by MGL containing data responsive to the Interrogatory. Once produced, MGL will identify those documents by Bates number.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

Dated: September 28, 2022

*/s/ Angela C. Zambrano*
Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com

SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Fax: 214.981.3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310.595.9500
Fax: 310.595.9501

*Attorneys for Match Group, Inc. and*
*Match Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the above and forgoing document

was served on all counsel of record via e-mail as outlined below on September 28, 2022.

Reid Abram Tepfer
rtepfer@ftc.gov
M Hasan Aijaz
maijaz@ftc.gov
Matthew James Wilshire
mwilshire@ftc.gov
Sarah Zuckerman
szuckerman@ftc.gov
John R. O'Gorman
jogorman@ftc.gov
Erica Rollins Hilliard
ehilliard@ftc.gov

*/s/ Angela C. Zambrano*
Angela C. Zambrano

**Amended 11/08/2022**

```
                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

FEDERAL TRADE COMMISSION,    )    Case No. 3:19-cv-02281-K
                             )
         Plaintiff,          )    Dallas, Texas
                             )    November 1, 2022
v.                           )    10:00 a.m.
                             )
MATCH GROUP, INC., et al.,   )    MOTIONS TO COMPEL
                             )    [#133, #140]
         Defendants.         )
_____)

                      TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE IRMA CARRILLO RAMIREZ,
                    UNITED STATES MAGISTRATE JUDGE.

APPEARANCES:

For the Plaintiff:          Reid Abram Tepfer
                            M. Hasan Aijaz
                            FEDERAL TRADE COMMISSION
                            1999 Bryan Street, Suite 2150
                            Dallas, TX  75201
                            (214) 979-9395

For the Defendants:         Angela C. Zambrano
                            Taylor Bragg
                            Chelsea Priest
                            SIDLEY AUSTIN, LLP
                            2021 McKinney Avenue, Suite 2000
                            Dallas, TX  75201
                            (214) 981-3405

For the Defendants:         Chad S. Hummel
                            SIDLEY AUSTIN, LLP
                            1999 Avenue of the Stars,
                             17th Floor
                            Los Angeles, CA  90067
                            (310) 595-9505

For the Defendants:         Samuel Kitchens
                            MATCH GROUP, INC.
```

2

```
 1   Recorded by:              Marie Gonzales
                               UNITED STATES DISTRICT COURT
 2                             1100 Commerce Street, Room 1452
                               Dallas, TX  75242-1003
 3                             (214) 753-2167

 4   Transcribed by:           Kathy Rehling
                               311 Paradise Cove
 5                             Shady Shores, TX  76208
                               (972) 786-3063
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
               transcript produced by transcription service.
```

1          <u>DALLAS, TEXAS - NOVEMBER 1, 2022 - 10:06 A.M.</u>

2          THE CLERK:  All rise.

3          THE COURT:  Good morning.  Please be seated.  All

4    right.  We are here in the matter of Federal Trade Commission

5    versus Match Group, Inc., et al.  This is Civil Action 3:19-

6    cv-2281-K.  And before the Court this morning are three

7    different motions.  I am going to take a couple of them up

8    together.  I have set aside two hours for this hearing.  If we

9    go beyond that, we will need to reschedule.

10      If counsel would please make their appearances for the

11   record.

12          MR. TEPFER:  Good morning, Your Honor.  Reid Tepfer

13   and Hasan Aijaz for the FTC.

14          THE COURT:  I'm sorry.  Say your name again.

15          MR. TEPFER:  Reid Tepfer and Hasan Aijaz.

16          THE COURT:  Okay.

17          MS. ZAMBRANO:  Good morning, Your Honor.  Angela

18   Zambrano from Sidley Austin, here with my partner Chad Hummel

19   and our colleagues Taylor Bragg and Chelsea Priest, and our

20   client, Sam Kitchens.

21          THE COURT:  All right.  For purposes of our hearing

22   this morning, rather than have each side make a presentation

23   from the podium, as is customary in Federal Court, in order to

24   maintain -- continue to try to maintain some social

25   distancing, I'm going to ask you to remain at counsel table.

1    The masks muffle the sound a little bit, and the words.

2    The closer you are to the microphone, the better the recording

3    is, so please do move the microphones close to you and speak

4    up into them.

5    I have gone through your joint submissions over and over,

6    and I've got questions for both sides.  So, rather than have

7    you each make a presentation, I'm just going to jump straight

8    into the questioning, and then give you a chance to tell me

9    anything else that you would like for me to consider before

10   making my ruling.  I do intend to rule from the bench this

11   morning and then enter a short order memorializing my rulings.

12   All right.  Let's start with the FTC's motion to compel

13   production of documents and interrogatory responses from

14   Defendant Match Group.  This is Document 140.  And I've got

15   the joint submission here, which is Document 147.

16   All right.  So, just to be sure that I understand what's

17   at issue here -- who will be arguing on behalf of the

18   Defendants?

19   MS. ZAMBRANO:  I will, Your Honor.  Angela Zambrano.

20   Thank you.

21   THE COURT:  All right.  Ms. Zambrano, so MGI is a

22   holding company.  It is the parent company of the entities

23   that actually own and control the platforms on which these

24   dating websites are found?

25   MS. ZAMBRANO:  I think I got that right.  It is the

1   -- it is a holding company.  It owns multiple levels of

2   companies.  At a couple levels down is MGL, what we refer to

3   as MGL, and MGL then operates the Match.com platform.

4           THE COURT:  All right.  Are there companies between

5   MGI and MGL?

6           MS. ZAMBRANO:  Yes.  Two, Your Honor.

7           THE COURT:  All right.  This was not addressed in the

8   parties' joint submission.  My understanding of the case law,

9   the majority line of cases in this district is that the party

10  resisting discovery has the burden on its objections.  Any

11  issue with that?

12          MS. ZAMBRANO:  No, Your Honor.  I also noticed that

13  in preparing this morning, am prepared to meet it.

14          THE COURT:  All right.  In order to meet it, did MGI

15  present any affidavits or evidence in support of its

16  objections that I missed in the appendix?

17          MS. ZAMBRANO:  No, Your Honor, other than the sworn

18  stipulation that is before the Court.  I think we would

19  consider that evidence.

20          THE COURT:  Okay.

21          MS. ZAMBRANO:  Mainly because of the Rule 26

22  standard, you know, as with that -- with those things decided

23  -- well, not decided, but agreed to, we think that affects the

24  claims and defenses before the Court.

25          THE COURT:  All right.  But in other words, no -- no

1  affidavits regarding burdensomeness, hours, extrapolation of

2  how much time it would take to get this information?  Anything

3  like that?

4           MS. ZAMBRANO:  Not at this time, Your Honor.

5           THE COURT:  All right.  Okay.  At this point, there

6  has been no preliminary or permanent injunction entered on the

7  subject matter in the stipulation.  Is that correct?

8           MS. ZAMBRANO:  I'm going to answer your question, but

9  can you just allow me to elaborate a little bit?

10          THE COURT:  Well, can you answer my question first

11  and then elaborate?

12          MS. ZAMBRANO:  Yes.  There has not been, and we don't

13  know why.

14          THE COURT:  Okay.

15          MS. ZAMBRANO:  And the reason we don't understand

16  why, we learned a little bit last week when we took a

17  deposition of the FTC.  But we have agreed to the relief as

18  pled in the complaint with respect to the chargeback practice

19  and what we refer to as the guarantee.  We asked the FTC then

20  what remains, why don't we have an injunction, what is still

21  in dispute?  And they referred us to a stipulation that they

22  had submitted during mediation that contains relief that is

23  broader than Match.com.  It relates to other dating sites.

24          THE COURT:  Okay.

25          MS. ZAMBRANO:  So we don't understand why we don't

1    have an injunction.

2             THE COURT:  Okay.  Well, that wasn't my question.  My

3    question was whether there was one, in fact.

4             MS. ZAMBRANO:  Yeah.

5             THE COURT:  All right.  I did not see in the joint

6    submission a specific response to the FTC's citation of a

7    couple of cases, one from the Supreme Court, where injunctive

8    relief beyond just the product at issue was awarded.  And I'm

9    talking in particular about the, oh, where --

10            MS. ZAMBRANO:  The *Kraft Foods* and the --

11            THE COURT:  Well, the Supreme Court.

12            MS. ZAMBRANO:  -- *Colgate*?

13            THE COURT:  *Colgate-Palmolive* case.

14            MS. ZAMBRANO:  Yes, Your Honor.

15            THE COURT:  So, if I've got a Supreme Court case that

16   clearly allows injunctive relief beyond just the product pled

17   in the pleadings, then how is discovery regarding other

18   products that might have the same type of policies, I guess as

19   we'll call them -- the cancellation policy, the chargeback

20   policy, the guarantee policy -- why -- if I've got a Supreme

21   Court case cited by the FTC where the Court allowed relief

22   beyond what was pled and looked at a specific practice or type

23   of product, that was an injunction.  We're talking about

24   discovery.  Why is discovery not appropriate here?

25            MS. ZAMBRANO:  Your Honor, I read those cases

1    carefully.  I don't see them to stand for the proposition that

2    they can get relief beyond what was pled.  I believe they can

3    get relief beyond the particular product at issue.

4           THE COURT:  Okay.

5           MS. ZAMBRANO:  And here, they have not pled that,

6    which is important, because discovery, of course, comes from

7    complaints and defenses in the case and so forth.  So we

8    understand that that's the -- that's the other side -- that's

9    where they want to go, but they haven't started on a path that

10   would allow them to get discovery and obtain that relief.

11   That's my first answer.

12        The second answer is that's not a holding company case.

13   That is a case about a company that has multiple products.

14           THE COURT:  Uh-huh.

15           MS. ZAMBRANO:  And I'm thinking in particular about

16   the one with the cheese, but it's the razors as well, as I

17   understand it, is the *Colgate-Palmolive*.  Those are cases

18   about a company that has products.  MGI does not have

19   products.  They're asking for an extension of that case law

20   well beyond where it sits right now.

21           THE COURT:  Where is any of this addressed in the

22   joint submission?  That's actually where I started.  Where

23   does MGI specifically address this argument?

24           MS. ZAMBRANO:  I believe it's on Footnote 29 on Page

25   15.

 1              THE COURT:  Footnote 29?  Okay.  So, Footnote 29 is

 2    two cites, the *Colgate-Palmolive* and *Kraft*.  And it cites them

 3    for the proposition that neither permitted discovery into or

 4    injunctive relief relating to subsidiaries' products merely by

 5    virtue of suing parent or holding.

 6         You've pointed out that neither one of them was specific

 7    to it.  What have you provided me to meet your burden that

 8    discovery regarding the same type of practice at issue in this

 9    lawsuit should not be allowed?

10              MS. ZAMBRANO:  Well, I think it's what the -- what

11    the FTC has provided, which is there aren't any allegations

12    relating to it.  I think they're asking you to take

13    allegations relating to one website and then assume a bunch of

14    things that would permit them to maybe someday get recovery,

15    but more importantly, to wade around into discovery.  And I

16    don't think that's even what's pled in front of you, Your

17    Honor.

18              THE COURT:  Okay.  Well, again, going back to the

19    party resisting discovery having the burden, how has MGI met

20    its burden to show that discovery regarding the same type of

21    practice at other websites should not be allowed?

22         I don't even have anything, any evidence or affidavit that

23    tells me that MGI doesn't have other websites or -- we'll

24    circle back to that a little bit later.

25              MS. ZAMBRANO:  Yeah.

1          THE COURT:  But, again, with no evidence, how can I

2     find that MGI has met its burden here?

3          MS. ZAMBRANO:  Well, I think it's a matter of the

4     rule, Rule -- of course, our basic rule, which we're trying to

5     meet the burden under, is it related to the claims and

6     defenses in the case and proportional?  And when they haven't

7     alleged something at all, it was hard for me to imagine that

8     we would need to deal with that by an affidavit, because they

9     didn't even allege it.

10          THE COURT:  Okay.

11          MS. ZAMBRANO:  There's no allegations about what any

12     practices are.  First of all, there's no allegations that MGI

13     controls any website's behavior like this.

14          THE COURT:  Uh-huh.

15          MS. ZAMBRANO:  And second of all, there's not even

16     any allegations as to what other dating platforms do.  The

17     entire complaint is Match.com this, Match.com that.  Other

18     dating websites are mentioned once.

19          THE COURT:  Uh-huh.

20          MS. ZAMBRANO:  So, I guess, in terms of meeting a

21     burden, we would deal first with what was in the complaint,

22     and we don't see that they've even alleged something properly

23     against the -- against other dating -- relating to other

24     dating websites.

25        We think they're -- they're making a bunch of assumptions

1   that are way beyond this.

2       And Your Honor, it's no -- it's no accident here that, you

3   know, they've -- our amendment period has lapsed.  So there's

4   -- there's a reason that they're stretching this far and, you

5   know, trying to do this.  They -- our amendment period has

6   passed, and they don't have it.  They would have pointed to

7   you if they did.

8       So we didn't meet a burden on something that wasn't pled.

9   I think we still meet Rule 26, satisfy Rule 26, that when the

10  claims are not before the Court it can't be relevant or

11  proportional to what's at issue.

12      I would cite you to Page 22 and Page 23 of our materials,

13  which just, I said, I think just discuss our position in

14  general on this point.

15          THE COURT:  Doesn't that go to the second issue?  I'm

16  still on the first one.

17          MS. ZAMBRANO:  Yes, Your Honor.  They're a little bit

18  mixed up to me because of what they told us, the only thing

19  that's left is other websites.  But I understand.

20          THE COURT:  Okay.  Well, if I'm looking at this, if

21  the *Colgate-Palmolive* case went beyond the product that was

22  talked about in the pleadings, and the allegations here -- and

23  I understand, both sides are being masterful in their

24  arguments -- but this is somewhere in the middle, and I'm

25  having trouble figuring that out because nobody's really

1  telling me where the overlap is.

2      Yes, Rule 26 says claims and defenses.  But the claim is,

3  here, about a particular practice.  I've got a Supreme Court

4  case that goes beyond a particular product.  I've got nothing

5  that tells me that this discovery is not -- how it's not

6  proportional, other than, well, it's not pled so it's not

7  proportional.  I'm having a hard time understanding why this

8  discovery should not be allowed.

9          MS. ZAMBRANO:  I would note that the other Defendant

10  or the other entities themselves were served with third-party

11  subpoenas, and they made, as I understand it, objections

12  relating to burdensomeness and so forth.  We really, because

13  of, again, the allegations, we focused on proportion and

14  relevance.  But those objections, my understanding, were made.

15  The third parties, though, did want, these other entities, did

16  want guidance from Your Honor, first on this issue before they

17  delved further.

18          THE COURT:  Okay.  That's Motion 152.  Let's continue

19  to focus on 140 --

20          MS. ZAMBRANO:  Okay.

21          THE COURT:  -- and the first issue in the joint

22  submission.

23          MS. ZAMBRANO:  Okay.  Your Honor, if I could just

24  comment a little bit more on *Colgate-Palmolive*.

25          THE COURT:  Okay.

 1          MS. ZAMBRANO:  I think the difference in this case is
 2  MGI is a holding company, so there are no products to apply
 3  the *Colgate-Palmolive* case to.  It's several layers below.
 4  And, again, that's as -- they pled that, that it's a holding
 5  company.
 6      Now, they pled that there is involvement.  They didn't
 7  plead alter ego, but they definitely pled that there was
 8  control at different layers below.  But *Colgate-Palmolive*
 9  would say that it's the product at, you know, at the product
10  level.  And MGI does not have products.  And so I think it's a
11  significant extension.
12      It's also not a case about discovery.  It's a case about
13  relief, of course.  And so you have to imagine at some time
14  before that, in the case as it played out, somebody made
15  allegations.  And there was allegations.  There was relevant
16  evidence about that.  They got into that.  And they were able
17  then to ask for this relief, to fashion the relief in the way
18  they did, and the Court sanctioned that.
19      That's not, as you point out, that's not what we have
20  here.  And so we think that it has to start with what has been
21  pled and what is before Your Honor.
22          THE COURT:  Right.  Okay.  So where in the brief,
23  other than Footnote 29, that basically one parenthetical,
24  that's the extent of your brief on this was a parent company,
25  there's no product?

 1              MS. ZAMBRANO:  Give me just a moment, Your Honor.

 2              THE COURT:  Okay.

 3          (Pause.)

 4              MS. ZAMBRANO:  I actually think there's a little bit

 5    more on this issue, as we said later in the brief, relating to

 6    just discovery relating to those entities.  I sort of think,

 7    as the two issues, of, one, of discontinued practice, and two,

 8    of other dating sites.  I kind of think, as most of our

 9    argument was related to what I think -- I think we're thinking

10    of Issue 2.  So I think that's why we referred you to those

11    later pages.  Because in that case, in that argument, it's

12    really -- it's not about whether the practices are

13    discontinued.  It's relating to whether those entities'

14    documents are at issue.

15              THE COURT:  Okay.  Well, I'm going by the way that

16    the parties --

17              MS. ZAMBRANO:  Yes.

18              THE COURT:  -- divided up these issues.  So I didn't

19    choose this randomly.  This is how the parties differentiated

20    the issues.

21              MS. ZAMBRANO:  Yeah.  So, our position, though, I do

22    think, is between -- on Pages 20 through 26.  I'm going to

23    point you to anything in particular about the -- about the

24    entities, though, in just a moment.

25          Yeah.  I think the best place to sum up our argument, as I

 1   tried to do just a moment ago, was on Page 24 and 25.  We

 2   asked the FTC, I asked the FTC, in a meeting, to explain, why

 3   do you need this discovery based on what we have before?  And

 4   essentially this is why.  They have this following string of

 5   hypotheticals.  If MGI controls Match.com, if MGI instructed

 6   Match.com to engage in the conduct, if MGI also controls other

 7   sites, and if those sites engage in conduct similar to that

 8   challenged in the amended complaint.

 9       And this is the part in particular that is not pled, Your

10   Honor.  There is no allegation relating to what's happening on

11   other sites.  In fact, the allegations are the opposite.  They

12   talk about the Match.com guarantee.  It's the Match.com terms

13   of use and the Match.com's chargeback practices.  So it's that

14   series of hypotheticals that we think causes, you know, that's

15   the heart of our argument, Your Honor.

16       THE COURT:  All right.  Well, I'm going to go back to

17   the issue, the first issue identified by the parties.  Is

18   there anything else on that specific issue?

19       MS. ZAMBRANO:  The only other thing I would say on

20   that, Your Honor, is I think it's rather confusing on the

21   discontinued practices, and that's why I answered that

22   question that way.

23       We -- we were sued for something.  We told them we weren't

24   doing that anymore.  We told the Court we weren't doing that

25   anymore.  The Court said, they've alleged enough to get past a

1  motion to dismiss.

2              THE COURT:  Right.

3              MS. ZAMBRANO:  So we said at that point, you know

4  what, hands up, you can have that.  We will commit to never

5  doing it again.  We're not doing it again.  We'll put it in

6  front of the Court.  We will live by that in an injunction.

7  And we don't understand why we're still -- we would have this

8  level of discovery over discontinued practices.

9              THE COURT:  Okay.

10             MS. ZAMBRANO:  That's the only other thing I would

11 say.

12             THE COURT:  And I think that's abundantly clear from

13 the filing.

14     All right.  Let me hear from the FTC on the first issue,

15 please.

16             MR. TEPFER:  Your Honor, if I could just correct a

17 couple of mischaracterizations of the record.  The verified

18 stipulation that Defendants are referring to, a so-called

19 verified stipulation, that's a -- that's a one-party document

20 that is denying one of the central issues in this case.  It's

21 been, you know, referred to as a stipulation, as an

22 injunction.  It's none of those things.  It's just a

23 declaration from the Defendants.  And it shouldn't shut down

24 discovery into whether what they're saying is true, just the

25 same way that if, you know, a defendant said in a deposition

1   they're not, you know, engaging in some sort of conduct.  We

2   don't shut down discovery at that moment.  We're allowed to

3   get discovery to see, is this true?  And, you know, if those

4   practices have temporarily been suspended, why were they

5   suspended?  Because that's relevant for the Court to

6   determine, are they likely to recur?

7       There's all kinds of factors that the Court should be able

8   to consider to determine whether injunctive relief is

9   appropriate.  We're of course willing to, you know, agree to

10  an injunction, but that's not what's before the Court.  What

11  we have here is a narrowly-drafted nonbinding denial,

12  essentially.

13      And just to address the issue of, you know, the *Palmolive*

14  case, the *Palmolive* case was about fencing in.  There weren't

15  allegations of wrongdoing on these other -- as to these other

16  products.  But the Court said, well, to make sure that we have

17  an effective remedy, so that this, you know, they can't just

18  change what they're doing and do it on a different product, we

19  need an injunction that's going to cover all of these other

20  products.  So of course there weren't allegations of

21  wrongdoing about those products.  It's just, you know, what

22  we're allowed to get discovery into to determine -- to fashion

23  an effective remedy.

24      And of course, the Court would want to consider whether

25  Defendants are engaging in this conduct on other platforms,

 1   whether they've considered doing it.  All of that is relevant

 2   both to the likelihood of recurrence -- if they're doing it on

 3   other platforms, it's likely to recur -- and to the scope of

 4   the injunction.  If they're, you know, doing it on other

 5   platforms, then a narrowly-tailored injunction is improper

 6   here.

 7           THE COURT:  All right.  I want to be sure that I'm

 8   specific about the objections that I'm ruling on with regard

 9   to the first issue.  As I see from the joint submission, the

10   objections that MGI is relying on are overbreadth, undue

11   burden, and proportionality, for the first issue.

12           MS. ZAMBRANO:  Yes, Your Honor.

13           THE COURT:  Okay.  All right.  Well, given that

14   discovery is going to be broader than the amount of injunctive

15   relief allowed, I don't see -- I can't see here that MGI has

16   met its burden on these objections.  If the FTC is seeking

17   injunctive relief broader than what's being offered here,

18   obviously, there's still a live issue here.  The objections

19   are overruled.

20       Let's talk about other dating websites.  It looks like the

21   only objection I'm looking at is relevance.  And the argument

22   is that it's not relevant because the amended complaint is

23   limited to allegations concerning Match.com.  Is that

24   accurate?

25           MS. ZAMBRANO:  Yes, and not proportional, Your Honor.

 1   Overbroad as well.

 2          THE COURT:  Where is that?

 3          MS. ZAMBRANO:  I think it's on Page 20 and 21.  We're

 4   referring to it as a fishing expedition, Your Honor.

 5          THE COURT:  Okay.  So, "improper fishing expedition"

 6   equals overbreadth?

 7          MS. ZAMBRANO:  We do refer to proportionality or

 8   overly broad a couple times, too, I think, in a quick scan.

 9          THE COURT:  Tell me where.

10          MS. ZAMBRANO:  On Page 22.  The Federal Rules of

11   Civil Procedure make clear that discovery must be relevant to

12   the allegations in the complaint.  And then, parentheses, and

13   proportional to the needs of the case to be discoverable.

14          THE COURT:  Okay.  And, again, in the parentheticals.

15   I'm just trying to figure out where the argument is, --

16          MS. ZAMBRANO:  Yes.  Yes.

17          THE COURT:  -- where your support is.

18          MS. ZAMBRANO:  Well, on Page 25, there's also that

19   paragraph that says, Because the requested discovery about

20   other sites is not necessary, it is unnecessary and would be

21   disproportionate to the needs of the case.

22          THE COURT:  Okay.  All right.  And, so, again, no

23   affidavit or evidence on the proportionality.  This is simply

24   limited -- and it's simply, I don't mean that it's a simple

25   argument; I'm just saying basically your argument is the

1    allegations in the complaint are only about Match.com, and

2    that's the real substance for your objections on relevance and

3    overbreadth or proportionality or any other objections that

4    are here?

5        MS. ZAMBRANO:  It's the allegations.  It's the

6    request for relief.  They're only seeking relief against the

7    Defendants.  And the injunction is relating to the Defendants'

8    practices.  There's no -- guarantee is a Match.com practice.

9    The chargeback policy that's mentioned is a Match.com

10   practice.  They're not practices related to other entities.

11       THE COURT:  All right.  Let's -- give me a summary of

12   your argument.  I mean, I've looked at this.  I've looked at

13   your joint submission.  I've looked at your cases.  I'm

14   struggling -- I understand your argument.  I'm struggling,

15   though, with, again, how the Defendant has met its burden

16   here, because I think your cases are subject to being a

17   distinguished here.

18     *Murphy v. Deloitte*.  It's an ERISA case.  The Court looked

19   at whether the magistrate judge applied the correct standard.

20   And, you know, discovery typically isn't allowed in an ERISA

21   case.  I see that as --

22       MS. ZAMBRANO:  Yes.

23       THE COURT:  -- not really helpful here.

24     *Torch Liquidating* talked about the amendment of a

25   complaint.

1          In *Fraserside*, completely different issue again.  The
2    Court's looking at contacts with the jurisdiction for purposes
3    of personal jurisdiction.
4          So how does any of this show me why this is not
5    proportional or irrelevant, given *Colgate-Palmolive*?  That's
6    really what I was looking for, is tell me why, if the Supreme
7    Court can give -- can affirm relief beyond a specific product
8    pled in a complaint, then why discovery shouldn't be allowed
9    here.
10              MS. ZAMBRANO:  Because it also has to be related to a
11   particular practice in a complaint.
12              THE COURT:  Okay.
13              MS. ZAMBRANO:  A particular practice has to be
14   alleged.  And there is nothing about any other entity other
15   than the -- not entity, excuse me, platform -- other than
16   Match.com.  There's just not.  It's -- the other platforms are
17   -- it's a throwaway line in one paragraph in the complaint.
18   The entire complaint seeks relief against Match.com for
19   Match.com practices.
20         And so we don't think that those Supreme Court cases,
21   which are, again, sort of looking at the issue from the end,
22   not the beginning, they're saying, okay, if we had this
23   evidence in front of me, and there is a test, as I recall, in
24   the -- in the case law relating to whether you get that
25   injunction.  One is whether it's related to the other.  So,

1    for example, in the *Kraft* case, I believe they said, well,

2    cheese and the processed cheese and the Velveeta, it -- you're

3    going to have the same issue.  It's, do you have enough

4    calcium?  Okay?

5              THE COURT:  Uh-huh.

6              MS. ZAMBRANO:  There are no -- there are no practices

7    relating to the issue in this complaint that relate to another

8    website.  So, for example, they're not alleging that there's

9    -- in the *Kraft* case, it was the five percent calcium, and

10   that could be easily applied to other cheese.  Okay.  There's

11   no practice here that could be easily applied to another

12   website.  And that's no mistake.  It's because they were

13   focused on Match.com.

14       If you can't sue a holding company that owns a single

15   company over specific conduct, you know, you shouldn't be able

16   to, I should say this, sue a holding company at the top for

17   conduct of a particular -- on a particular website three

18   levels down, and then try to figure out all of the other

19   holding company's practices.  There has to be some Rule 11

20   allegation first.

21       And so if Your Honor -- if Your Honor needed evidence on

22   those things, we think that goes to -- beyond the pale of the

23   complaint.  But they are not related to these practices.

24   Those entities are not related at all to these practices.

25             THE COURT:  Okay.  Well, I'm going to do what I

1    really don't like the parties to do, but it's just sort of to

2    illustrate.  If I jump ahead to the related issue in Motion

3    152, the Defendants are here in the context of a motion for

4    protective order, as I understand it, for subpoenas issued to

5    other companies.

6           MS. ZAMBRANO:  Your Honor, I'm sorry to interrupt

7    you.  We did not have that one on -- set for today's hearing.

8    I apologize.  Is that on the docket?

9           THE COURT:  152?

10          MS. ZAMBRANO:  No?  And I'm saying that in particular

11    because there's separate counsel that represents those

12    entities.  So I'm -- I think it's 133 and 140.

13          THE COURT:  Isn't 152 related?

14          MR. TEPFER:  Yes, Your Honor.

15          THE COURT:  I mean, it's the motion for protective

16    order -- hold on.

17          MS. ZAMBRANO:  Yeah, I -- I do think the -- a lot of

18    these arguments are -- are put in there, but we -- I don't

19    have those materials prepared for today, Your Honor.  I

20    apologize.

21          THE COURT:  Well, I did not catch that my electronic

22    order did not include it.  I intended to do that.  All right.

23          MR. TEPFER:  Your Honor, given the overlap, we're

24    happy to address it today if you'd like, but --

25          THE COURT:  Well, if I didn't, that's -- yeah.  I did

1   not set it for hearing.  I did not give the parties notice of

2   that.  I did not miss that the electronic order did not

3   include that one.

4           MS. ZAMBRANO:  And, again, I apologize, Your Honor.

5   I agree that -- yeah.

6           THE COURT:  That's my --

7           MS. ZAMBRANO:  Yeah.  Okay.

8           THE COURT:  That is on our end.  I did not double-

9   check that electronic order.

10     All right.  Well, let's go back to 140, then.  So, let's

11  get back to discovery regarding other dating websites.  If the

12  relief that can be granted goes beyond just the specific

13  product -- and I understand your arguments.  I truly am.  I

14  have worked very hard to try to understand them.  If discovery

15  is broader than what relief can be granted, why can't

16  discovery about similar practices on these other websites be

17  allowed?

18           MS. ZAMBRANO:  Because there had to be a good faith

19  allegation that anything like this was happening.  And I'm

20  trying very hard not to get into the merits, Your Honor,

21  because I don't think it's appropriate, but it's -- it's not

22  true, and so it's hard to prove a negative, but that's why

23  they didn't allege it.  So now we're getting into things that

24  we know are not true.  That's why they didn't file that

25  complaint.  It's a Match.com guarantee.

1          THE COURT:  Okay.

2          MS. ZAMBRANO:  It's a six-month subscription.  They

3  know that, it's public, that they don't have -- there's not a

4  six-month subscription on these other sites.  This is a

5  fishing expedition.  So they're working backwards.  My -- our

6  submission is that you have to work from the complaint.  And I

7  don't disagree that the law would, if they obtained discovery,

8  that they would be able to obtain relief consistent with those

9  cases.  But you have to make the allegation first under Rule

10  11.

11      And this is not a secret.  These things are -- these are

12  websites.  They're public websites.  They have public

13  practices.  And they haven't made the allegations.

14          THE COURT:  All right.  Let's hear from the FTC.

15          MR. TEPFER:  First, Your Honor, I just want to

16  address, the case law, Defendants have cited nothing that says

17  that there has to be an allegation in the complaint regarding

18  these other websites.  And to be clear, this wasn't, you know,

19  an end run around the amendment deadline.  This discovery was

20  served before the amendment deadline.

21      And these practices that we're discussing here, I believe

22  counsel referred to the *Kraft* decision, where, you know, the

23  issue could be applied to other cheeses or that sort of thing.

24  We have the same sort of situation here, where there's a bunch

25  of dating websites.  They're all substantially similar.

1    Different demographics or that sort of thing.  But they're all
2    very similar dating websites with identical chargeback
3    policies or substantially similar chargeback policies.  So
4    there is, you know, there is a, I guess, a broadly applicable
5    allegation there.
6         But to be clear, we did not have to mention those other
7    entities in the complaint.
8         And I also want to state that the FTC is entitled to
9    discovery not just on the likelihood of recurrence issue and
10   about the scope of injunctive relief, but also on Defendants'
11   affirmative defenses.  And there are two affirmative defenses
12   here that would entitle the FTC to this discovery.  It's sort
13   of the flipside of the coin, the overbroad injunction
14   affirmative defense and the mootness affirmative defense.  And
15   both of those are very relevant here and would entitle the FTC
16   to discovery on that basis.
17            THE COURT:  So, tell me where you talk about this
18   discovery going to those affirmative defenses in your joint
19   submission.
20            MR. TEPFER:  Sure.
21            THE COURT:  And, again, we're talking about Issue #2.
22            MR. TEPFER:  Yes, Your Honor.  And --
23       (Pause.)
24            MR. TEPFER:  Your Honor, I apologize, I don't see
25   that we use the phrase affirmative defense, but we do talk

 1   about the likelihood of recurrence issue, which is intertwined

 2   with that mootness defense.

 3          THE COURT:  So in this case, recurrence equals

 4   mootness?

 5          MR. TEPFER:  It's --

 6          THE COURT:  You all are making me work really hard to

 7   read between the lines here.  It just, it's helpful if you

 8   just tell me.

 9          MR. TEPFER:  Yes, Your Honor.  The Court has to

10   consider whether, you know, conduct is likely to recur.  And

11   Defendants are arguing that essentially it's moot, that it's,

12   you know, not likely to recur because it's "permanently

13   discontinued."

14      And so from, you know, from my perspective, Your Honor,

15   those are really one and the same issue.

16          THE COURT:  Okay.  But you don't tell me that you see

17   them as one and the same issue in this?

18          MR. TEPFER:  No.  I apologize, Your Honor.

19          THE COURT:  Okay.  Or mention that it's an

20   affirmative defense that you're looking for discovery on?

21          MR. TEPFER:  No, Your Honor, we do not characterize

22   it that way.

23          THE COURT:  Okay.  All right.  I'm not trying to be

24   difficult here.  I really am trying to understand the parties'

25   positions so that I can give you the best ruling.  I'm hearing

1   some new things today that I did not quite hear or did not

2   read here in the joint submission.

3       All right.  So, back to discovery regarding other

4   websites.  You're saying you don't have to -- the FTC doesn't

5   have to plead that this practice is also available on other

6   websites that are --

7           MR. TEPFER:  No, Your Honor, because it's, you know,

8   to go back to that *Colgate-Palmolive*, you know, the Court is

9   entitled to discovery to determine what is the appropriate

10  scope of injunctive relief.  Should it be narrowly tailored,

11  limited to one of Defendants', you know, dozens of websites,

12  or should it be against the Defendant generally, without that

13  sort of restriction?

14      And that's, you know, and that's what we believe the

15  *Colgate-Palmolive* case stands for, that, you know, the Court

16  can assess whether a broader injunction is appropriate.  And

17  the Court is entitled to look and see, well, what -- what is

18  this Defendant currently engaged in?

19      One of the factors for determining that, of course, is,

20  you know, does their occupation present the ability to engage

21  in this type of conduct in the future?  That's, you know, it

22  makes it more likely to recur.  And if, you know, Defendants

23  are engaging in this same conduct in other websites, as

24  public-facing evidence suggests, then that suggests strongly

25  that the conduct is likely to recur.

1          THE COURT:  But if the conduct, just looking at it

2    from a due process standpoint, if the FTC is taking the

3    position that this similar -- there are similar policies or

4    similar conduct relating to other websites, why not include

5    that in the complaint?

6          MR. TEPFER:  Well, Your Honor, because we -- we have

7    a reason to think that this is something that should be

8    investigated.  It's not -- it's not apparent -- you know, I

9    want to be clear.  These chargeback policies are ambiguous.

10   And so, you know, it gives us concern, and that's why, you

11   know, that's why we want to determine definitively what

12   exactly is going on, because I think the Court is going to

13   want to know that when providing injunctive relief.

14      But we do not believe that there is, you know, an adequate

15   basis to include that in the complaint at this time.  Of

16   course, you know, if the evidence bears this out, as we

17   believe it might, we may seek leave to amend.  But -- but

18   there was not a basis -- or to include it before the amendment

19   deadline, Your Honor.

20         THE COURT:  Well, if the FTC -- if this is something

21   that needs to be investigated, doesn't the FTC have the

22   authority to do that?  You know, didn't you have an

23   investigation leading up to this lawsuit?

24         MR. TEPFER:  Well, Your Honor, we believe, given that

25   this is appropriately within the scope of injunctive relief,

 1  we believe, you know, in the interests of judicial efficiency,

 2  you know, the Court could simply determine, well, the

 3  Defendant is doing this on one website.  It's -- it has broad

 4  equitable authority to give -- to grant this type of equitable

 5  relief.  And, you know, this is the same Defendant that we're

 6  alleging is engaging in this same practice on other websites.

 7  So, you know, we think it's proper to show the Court

 8  discovery, saying, oh, if it's engaging in it on this website,

 9  but a -- you know, the order should not be so limited to

10  Match.com and it should instead be a general order against

11  Match Group, Inc.

12          MS. ZAMBRANO:  Your Honor, may I correct something?

13          THE COURT:  If you'll give me just a second.

14      (Pause.)

15          MR. TEPFER:  And Your Honor, I also want to make the

16  point that, you know, it's relevant to the fact that, you

17  know, Match Group, Inc. has claimed that it does not operate

18  any website -- of these dating websites.  That's another

19  relevant issue here.  We believe the evidence shows that it

20  does, that it's, you know, it's perhaps technically a holding

21  company but plays a more active role in the operation of its,

22  you know, the many dating websites it owns.  And so we believe

23  the discovery is also relevant and proper for that reason.  I

24  just wanted to add that as well.

25          THE COURT:  Sure.  But your statement that there's

1  not an adequate -- there was not an adequate basis to include

2  allegations regarding the same policies in other websites has

3  me really concerned.  You didn't say that in your joint

4  submission, --

5          MR. TEPFER:  Well, --

6          THE COURT:  -- but you said it today, and --

7          MR. TEPFER:  -- Your Honor, we -- because this is an

8  internal policy, we believed, looking at the chargeback

9  policies, it leaves open the possibility that they're engaging

10  in this same illegal conduct.  It's a very unusual chargeback

11  policy, but it is not explicit about, you know, the internal

12  aspect of what occurs when a consumer has made a chargeback

13  and lost.

14      So, you know, we would want to, you know, flesh out what

15  exactly is happening before, you know, including that sort of

16  allegation.

17      But we also don't believe that it's necessary to, you

18  know, add those allegations, given that this is properly

19  within the scope of injunctive relief and the Court can

20  consider these without having to make an explicit allegation

21  in the complaint.

22          THE COURT:  Well, you've kind of -- you've gone out

23  on a limb now.  You've gone beyond, right?  You're saying

24  there's not enough -- you hadn't -- you did not have enough

25  evidence to be able to include it in the complaint or an

1    allegation.  It needs to be investigated.  You've got the

2    power to investigate, but you haven't, despite an extensive

3    investigation before this lawsuit.  You're treading awfully

4    close to this fishing expedition that they were talking about.

5             MR. TEPFER:  Well, Your Honor, we -- based on public-

6    facing documents.  That's what really clued us in to this

7    particular issue.  And that's, you know, that's exactly what

8    discovery is for, to determine, well, we have a good faith

9    basis to seek discovery because it looks like, you know, this

10   same entity that operated Match.com and engaged in this

11   illegal chargeback policy has substantially similar policies.

12   But we can't know that without, you know, examining how

13   they're handling these chargebacks internally.  It's just not

14   something that we're able to assess.

15       And so it's proper to get discovery on those issues, both

16   to determine whether Defendants are engaging in this or have

17   engaged in it in the past, for, you know, the likelihood of

18   recurrence issue, and to determine whether the scope of the

19   injunction should be limited to Match.com, as Defendants would

20   like, or just against the Defendants generally.

21             THE COURT:  But if it's public-facing and that's a

22   basis for discovery but not enough to --

23             MR. TEPFER:  Sure.

24             THE COURT:  -- allege that you believe that the

25   practice may be also used on other websites, what's --

1          MR. TEPFER:  So, the -- the aspects of the policy are

2     public-facing, that they suspend -- so, essentially, if the

3     Defendants or, you know, some of their other dating websites,

4     if you seek a chargeback, they'll suspend your account, which

5     is -- and there is nothing that states that you will, you

6     know, that you will get account access back or how this is

7     handled.

8        I believe some of the websites may refer to, you know,

9     contacting customer care, if I recall correctly, but it

10    doesn't say what happens there.

11       And so what we need to understand is, you know, what does

12    happen.  Do you get your -- do you get your account access

13    back?  Because Match.com didn't provide that account access

14    back, and that's what we allege is illegal.  And we can't know

15    that without discovery into that issue.

16          THE COURT:  For the sake of argument, if you're

17    entitled to some discovery to determine whether that same

18    policy is applied by the Defendants on any other website,

19    isn't the scope of that discovery much more limited than what

20    you've asked for here?

21          MR. TEPFER:  I apologize, Your Honor.  Would you mind

22    repeating that?

23          THE COURT:  Sure.  If the point is to determine

24    whether this policy exists on any other website related to or

25    controlled by or owned by or -- and I know that's at issue;

1    going for purposes of this argument with what you seem to be

2    contending -- isn't what would be allowable to allow you to

3    determine that much more limited than what you've asked for?

4            MR. TEPFER:  I believe, Your Honor, we -- we did seek

5    -- I'm not sure if there are specific requests you're

6    referring to, but we did attempt to limit our discovery to the

7    types of issues that are alleged in the complaint, simply

8    because we believe, you know, the injunctive relief should --

9    although it shouldn't be narrowly tailored to just what's

10   alleged in the complaint, there should be some fencing-in, but

11   it needs to have some sort of relationship to what's in the

12   complaint.  And so the discovery that we requested, we did try

13   to tailor it to be related to what -- to the types of

14   practices in the complaint.

15          THE COURT:  Right.  But you've identified specific

16   websites that you want discovery about, as opposed to asking

17   whether these same types of policies that were used at

18   Match.com were used at any of the Defendants' other

19   subsidiaries, as opposed to asking about specific

20   subsidiaries.

21          MR. TEPFER:  Oh, Your Honor, we did, in the

22   discovery, limit it to particular subsidiaries that we were

23   aware had these, you know, had the chargeback practice that we

24   were -- that we wanted to learn more about.  And the, you

25   know, not to take us off topic, but the subpoenas were to the

1   entities that we had, you know, those same sort of basis to

2   believe that we had found external policies that raised these

3   same issues.

4       So it wasn't just a fishing expedition to all of

5   Defendants' websites.  You know, they have 50-something

6   websites.  We only sent it to a few or concerning a few, like

7   maybe I think it was three that we knew had the policy.

8           THE COURT:  Let me see if I can make my question more

9   specific.  If you are seeking to determine whether the

10  Defendant had the same policy that's alleged -- that you

11  allege it had with regard to Match.com, recognizing that you

12  contend it's not your policy, isn't the type of discovery that

13  would be warranted to allow you to make that determination

14  much more narrow than what you've asked for?

15      In other words, isn't the discovery to ask the Defendant

16  whether it has the same policy at others, as opposed to asking

17  about the specific entities --

18          MR. TEPFER:  Oh, --

19          THE COURT:  - that you believe also have the same --

20          MR. TEPFER:  -- of course.

21          THE COURT:  -- policies?

22          MR. TEPFER:  And I apologize for misunderstanding.  I

23  believe I understand your question.  What's relevant is -- in

24  this situation is not just whether they have the policy, but,

25  for instance, if they have stopped this policy, why did they

 1   stop?  Did they stop because, for example, they got a lot of

 2   consumer complaints and realized that this was improper, or

 3   did they stop because, you know, they -- the FTC sued the

 4   parent company?

 5       You know, again, it gets to the likelihood of recurrence

 6   issue.  You know, if this policy has been suspended, why was

 7   it suspended?  So there's the broader factors, which I believe

 8   are in that *Black* case cited, are all relevant.

 9            THE COURT:  Okay.  Now, you've -- you've confused me.

10   I thought we were talking about discovery relating to other

11   websites.

12            MR. TEPFER:  Yes, Your Honor.

13            THE COURT:  All right.  What I'm trying to understand

14   here is, if you don't have enough evidence to be able to

15   allege in the complaint that you believe the chargeback,

16   cancellation, and what was the other one?

17            MR. TEPFER:  The Match guarantee, Your Honor?

18            THE COURT:  Yes.  The guarantee.  All right.  If you

19   don't have enough evidence to make a good faith allegation in

20   the complaint that these three policies are being used by the

21   Defendant on other websites, at best isn't the discovery that

22   you're -- that would be warranted to ask the Defendant whether

23   it had these same types of policies on other websites, as

24   opposed to asking about these specific other websites?

25            MR. TEPFER:  Well, Your Honor, I believe -- I believe

1  the discovery would be broader because we're entitled to know

2  whether they have these same policies, but also relevant is

3  just generally does Match Group, Inc., you know, play an

4  active role in operating these other websites?  Because, you

5  know, also at issue, as I mentioned, one of the factors for

6  determining whether, you know, injunctive relief is

7  appropriate is are they going to have the opportunity to do

8  this again?

9      And so, you know, if we get an injunction against

10  Match.com, but Match Group, Inc. is actually, you know, doing

11  this on OkCupid and all those other things, then the Court is

12  going to want to know -- or, that, you know, the Court's going

13  to want to know that Match Group, Inc. is actually actively

14  involved in operating these websites, too.

15          THE COURT:  Okay.  Let me -- let me -- you keep going

16  off into other things.

17          MR. TEPFER:  I'm sorry, Your Honor.

18          THE COURT:  And so I'm obviously asking bad

19  questions.  If you think MGI is using these policies on other

20  websites, you're asking about these other -- you're asking

21  about OkCupid and specific websites.  You're not asking

22  Defendant, do you use these same policies on any other

23  websites, and if so, which ones?  You're going straight to

24  these specific websites.

25          MR. TEPFER:  Yes.

1            THE COURT:  And I'm saying, if you don't have enough

2       to plead in your complaint, then if I'm looking at a

3       proportionality analysis, which Judge Horan's opinions make

4       very clear the Court has a responsibility to look at it, too,

5       --

6            MR. TEPFER:  Yes, Your Honor.

7            THE COURT:  -- isn't the starting point to ask the

8       Defendant if it does in fact have these and to ask those

9       questions before allowing discovery straight into those

10      websites, given that you don't even have enough to allege it

11      in your complaint?

12           MR. TEPFER:  Well, Your Honor, I believe the approach

13      that we took actually limits the Defendants' burden, because,

14      you know, we limit -- we took a look at the websites and went

15      to the ones that we have a good faith basis to believe there's

16      a real question here.

17           If we were to ask Defendants, you know, examine all 50-

18      something of your websites, even ones that we know don't have

19      that chargeback policy, that's unduly burdensome for them.  So

20      we are trying to narrow the scope of just saying, just look at

21      a few of these, because we believe that, you know, if the

22      Court sees this occurring on, you know, three of them, we

23      don't need to show 50.

24           And so that -- the whole purpose of limiting it to those

25      specific websites was to make sure it wasn't a fishing

1   expedition and that we were limiting the Defendants' burden to

2   the extent possible while still proving our case.

3        THE COURT:  Isn't the concept of a fishing expedition

4   to look for evidence in support of a new claim?  And you've

5   just told me you didn't have enough evidence to be able to

6   plead that in the complaint, that this went beyond just

7   Match.com.

8        MR. TEPFER:  So, --

9        THE COURT:  Why isn't that more properly the subject

10  of a separate investigation, then?

11       MR. TEPFER:  Because, Your Honor, this is the -- this

12  really gets back to both the likelihood of recurrence issue,

13  because it matters in this case for showing that the conduct

14  is likely to recur.  If we're not allowed to get discovery

15  into this issue, say just hypothetically that Defendants have

16  stopped this practice on Match.com but they're doing it on all

17  these other websites.  Well, Defendants, you know, say under

18  oath, we're not doing this on Match.com anymore, and so the

19  Court says, well, we have nothing to worry about, no

20  injunction is necessary, but in truth an injunction was

21  appropriate because it was occurring on these other websites.

22  So it's appropriate for that.

23     And then it's also appropriate for this case because the

24  Court needs to consider the scope of the injunction.  So, you

25  know, rather than having the FTC file, if, you know, there's

1   50-something websites, having the FTC do 50 investigations and

2   50 separate lawsuits, the FTC is able to get, you know, an

3   appropriate injunction based off the Court's, you know,

4   equitable authority that goes to the Defendant generally.  So

5   that's why we believe this is properly within the scope of

6   this case.

7          THE COURT:  If it was properly within the scope of

8   this case, then why wasn't it included in the investigation?

9          MR. TEPFER:  Well, Your Honor, because, you know,

10  that I believe would expand the burden both of the FTC and the

11  Defendants.  You know, rather than sending, you know, CIDs and

12  making them produce as to 50 websites, the FTC's burden is to

13  show, you know, that these are illegal practices and that they

14  can be applied widely on the various different websites.  Just

15  like in the *Kraft* case, you know, you don't have to

16  investigate all of the different cheeses and have separate

17  investigations for Swiss and Cheddar, you just have to show

18  they're doing something bad as to, you know, as to this

19  product.  It can be easily applied on all these other

20  different products.

21     And so -- and that's simply what we're trying to establish

22  in the least burdensome way possible, that we have a bad

23  practice that Defendants may be engaging in and could easily

24  engage in on different platforms.

25          THE COURT:  Okay.  All right.  Ms. Zambrano?

1          MS. ZAMBRANO:  I do have a couple clarifications to

2   that.

3      Your Honor, as you know very well, we have something

4   called "upon information and belief" pleading.  They didn't

5   even plead any of this upon information and belief.  They are

6   public websites.

7      I heard him say just a moment ago that they knew about

8   certain charge policies and they didn't know about -- they

9   knew of about certain charge policies.  They didn't make

10  allegations relating to any other -- any other website.

11     I think Your Honor has sufficiently covered the they-

12  could-have-investigated point, so I won't hit that.

13     I would say, though, that the representation regarding the

14  amount -- regarding the amendment deadlines was not right.

15  The amendment deadline was May 13th.  And this discovery was

16  served June 3rd.  They did not plead these allegations.

17     Lastly, I would say, Your Honor, if you -- on Request #25,

18  it's in Joint Appendix 169, this is an example of the

19  overbroad discovery that Your Honor was alluding to relating

20  to these other practices.  I'll let you get there and then

21  I'll start talking about it.

22          THE COURT:  All right.  So we're talking Document 141

23  at what page?

24          MS. ZAMBRANO:  No, I'm sorry, I think it's Document

25  148, J Appendix 169.  So it's -- it's Request #25, Your Honor.

1        THE COURT:  Oh, I'm sorry.  148.  All right.  Okay.

2   And it's Page 169?

3        MS. ZAMBRANO:  Yes, Your Honor.

4        THE COURT:  Using the number at the top or the number

5   at the bottom?

6        MS. ZAMBRANO:  Let me -- at the bottom.  The bottom

7   right.  Correct?  Yeah.  The app cite at the bottom right.

8   Yeah.

9        THE COURT:  All right.

10       MS. ZAMBRANO:  So this is the particular request at

11  issue.  And your question that you posed -- again, I'm not

12  agreeing that they even get discovery relating to other sites'

13  practices, for the many reasons.  But your question was right

14  on.  Here, they have all communications relating to, and you

15  see that there's customer chargebacks and you see that there's

16  other things that are referred to customers.  Well, customers,

17  they define as -- and this is also Docket 148, but it's at J

18  Appendix 206 and 207, this is how customers are defined -- and

19  it's broad.  I think this is in their interrogatories.  They

20  use the same definition.  But they know how to list other

21  websites, and they do in their definition of customers.  They

22  say, Any individual or individuals who have maintained an

23  account on any website owned or operated by the Company,

24  including Match.com, OkCupid, Plenty of Fish, and Tinder.  And

25  they go on.

1    So that's exactly -- what you said was exactly right.

2  This discovery is in no way tailored to the injunction request

3  that they are now trying to pin this on.  This is a fishing

4  expedition.  It's a perfect example of one.

5    There are a number of other requests, Your Honor, that go

6  to all practices and policies relating to other websites, all

7  advertisements, all surveys, all summaries relating to

8  customers.  And customers, when it's used in their discovery

9  requests, relates to all of these other websites that do not

10  relate to the complaint.

11    Your Honor, I think you hit the nail on the head.  If they

12  didn't have the amount of evidence needed to plead something,

13  why would we have discovery relating to those issues?  They

14  had that burden and they didn't meet that burden.  They're

15  free to ask the District Court to amend their complaint again.

16  We think it should be denied.  But that's their remedy, not to

17  try to back-door it in this way, when they have admitted today

18  that they have nothing that would satisfy Rule 11 to make

19  those allegations.

20        THE COURT:  All right.  Anything else from the FTC?

21        MR. TEPFER:  Simply to note that, you know, I want to

22  again contest the suggestion that we have an obligation to

23  have, you know, made any sort of allegations against these

24  other entities.  That's -- you know, what we're seeking

25  discovery concerning is the equitable relief that we believe

1    we're entitled to, and that's not something that has to be

2    pled in the complaint, or even if, you know, even if we had

3    definitive proof of this and even if there wasn't, you know,

4    an amendment deadline.  That's just not something that needs

5    to be in the complaint, as Defendants seem to suggest.

6              THE COURT:  Then what's the purpose of notice

7    pleading?

8              MR. TEPFER:  Well, Your Honor, you know, I understand

9    that issue, but it's about the injunction.  So, you know,

10   Defendants are aware of the injunction that we're seeking.

11   They're aware of the practices at issue.  It's the same

12   Defendant.

13      And just like in the Supreme Court case, you know, those

14   weren't allegations about other products, but the Court is

15   allowed to consider those other products, even without

16   mentioning them in the complaint.

17             THE COURT:  Okay.  All right.  I understand your

18   point.  But I am putting a finer distinction on this.  I

19   questioned aggressively on the *Colgate-Palmolive* case.  But

20   the key here for me is that that case is about using the same

21   practice for other products.  You've gone straight into other

22   websites.  You've gone straight into the other products, in

23   other words, without ever having provided the link in your

24   complaint or through the discovery you're asking about whether

25   the practice that's at issue in this lawsuit exists on other

1  websites.  That's where you start.  You don't go directly to

2  other websites, especially when you've just told me today that

3  you didn't have an adequate basis to include it in the

4  complaint.

5       I'm not talking about pleading against the other websites.

6  I'm talking about an allegation that this practice that is at

7  issue with regard to Match.com also exists or may exist with

8  regard to other websites.  If you can't even make that

9  allegation in your complaint, then the extent of the discovery

10 you're requesting regarding other websites is a fishing

11 expedition.

12      So what you've asked for is way too broad for what you've

13 pled.  The focus is the practice, and this isn't even tailored

14 to a practice that may or may not exist on other websites.

15 You've gone straight into asking for discovery from other

16 websites about the practice.

17      So, I'm granting your motion as to the first issue, but

18 I'm denying the motion as to the second issue.  I'm sustaining

19 the relevance objection, --

20           MR. TEPFER:  And --

21           THE COURT:  -- pretty much based on what you told me

22 today.

23           MR. TEPFER:  And Your Honor, just to make sure I

24 understand, are you ruling that we are entitled to discovery

25 concerning whether those, you know, same practices in the

 1   complaint are occurring on any websites but not as to specific

 2   websites or as to broader issues?

 3         THE COURT:  You still have a couple of months left on

 4   discovery.  I'm not going to tell you or give you an advisory

 5   opinion as to what discovery you should ask for.  When the

 6   disputes arise, and I suspect they will, I'll address it at

 7   that time.  But where we are today, I have pointed out what

 8   you haven't asked for, I've pointed out that you've gone

 9   directly to the source without ever having made that first

10   connection that this practice does in fact apply.  And given

11   where we are in the timing of this case, I am not prepared to

12   say one way or the other.

13         MR. TEPFER:  Yes, Your Honor.  If I could address one

14   issue.  You know, you referenced granting as to the first, the

15   first issue on our motion to compel.  And we appreciate that

16   finding.  But I wanted to raise, if I may, you know, the issue

17   of we served these requests, you know, about five months ago,

18   and we have depositions coming up, and we have the concern

19   that -- whether we're even going to be able to use this

20   discovery for these depositions.  You know, the Defendants

21   withheld discovery on two of the three FTC counts.  So we have

22   -- you know, these are very basic requests that haven't

23   received any discovery on.

24       We had previously filed a motion for a continuance, which

25   was denied without prejudice on the basis that it concerned

1 the issues that were being decided here today.  And you know,

2 I just wanted to ask if the Court can make a finding on that

3 issue, simply because we plan to seek again, you know, based

4 on the Court's finding, a motion for a continuance.  We have a

5 -- you know, it is relatively urgent.  You know, we have an

6 expert deadline in like three days, and Defendants are

7 attempting to prevent us from even continuing on with these

8 depositions.  But we really want to be able to use this

9 evidence in our depositions.

10    THE COURT:  Okay.  This is Judge Kinkeade's case.

11 Judge Kinkeade has specifically referred three discovery

12 motions to me.

13    MR. TEPFER:  Yes, Your Honor.

14    THE COURT:  So the scope of my authority extends only

15 to these three discovery motions.  To the extent you need to

16 go back to him for any other relief, you are free to do that.

17 My authority extends to ruling on the objections and whether

18 discovery should be produced and when.

19  So you raise a good point.  I would have covered it at the

20 end.  But I typically allow 21 days for a party to produce its

21 responses.  So when I grant --

22    MS. ZAMBRANO:  Your Honor?

23    THE COURT:  Yes?

24    MS. ZAMBRANO:  I'm sorry to interrupt you.  I do have

25 a question about the relief that's actually been granted on

1     #1.

2                THE COURT:  Uh-huh.

3                MS. ZAMBRANO:  And it's going to affect what you're

4     about ready to say in terms of the timing.

5                THE COURT:  Okay.

6                MS. ZAMBRANO:  Could I -- could I ask my question on

7     clarification?

8                THE COURT:  Sure.  Certainly.

9                MS. ZAMBRANO:  Okay.  The joint submission had the

10    first issue being whether MGI may refuse to engage in

11    discovery simply because it conducts the conduct -- excuse me,

12    it contends the conduct has been previously discontinued.

13    Okay.  Permanently discontinued.  Excuse me.  So my question

14    to you is, most of our discussion on that related to -- on

15    that issue related to what was happening on other websites,

16    because, again, it's not happening on Match.com.  So could you

17    clarify:  Is your ruling that we cannot -- we cannot -- we

18    should just produce discovery relating to current practices,

19    if any, for the entities in the case, or could you just help

20    me with that a little bit, please?

21               THE COURT:  Well, as I understand it, the discovery

22    was related to the entities in the case.

23               MS. ZAMBRANO:  Yes, Your Honor.  Yes.

24               THE COURT:  And I cannot give relief that wasn't

25    asked for.  So I'm -- I am looking at the issue as the parties

1    phrased it.  And I understand you disagree with the phrasing.

2    Your -- the issue seems to be whether there should be

3    discovery allowed on whether this practice exists or when it

4    stopped.  I'm not going to get into the specifics of each

5    discovery request.  If we need to go through them one by one

6    like we did in the 70-page joint submission that we're about

7    to get to, we do.  That's not what you gave me.

8        The issue as the parties presented was whether there

9    should be any discovery on these policies, given the filing,

10   where the Defendant stipulated to not doing this.

11       I agree with the FTC that the fact that you've said you

12   won't do it anymore is not necessarily binding and should not

13   preclude further discovery without any litigation-ending or

14   dispositive order from the Court.  The Court hasn't ruled on

15   it.

16       Their point is, we still get to look at whether it could

17   continue, whether it could reoccur.  So to the extent that

18   there's discovery relating to those practices, it's a live

19   issue still.  Yes, you filed a, quote, stipulation that says

20   the Defendants won't do this anymore, but they're entitled to

21   have discovery on whether you will or you won't or how that

22   would work.

23           MS. ZAMBRANO:  And so my question is, does that mean

24   for nine years, or does that mean as the -- as it present --

25   as the conduct presently exists?

1          THE COURT:  You've -- I don't see anything in here

2     about limiting it to -- you reference going back almost 10

3     years.

4          MS. ZAMBRANO:  Yes.  That's part of the overbreadth.

5     Yeah.

6          THE COURT:  Right.

7          MS. ZAMBRANO:  Yeah.

8          THE COURT:  That's overruled as well.

9        There -- there's reference in here to documents -- if the

10    practice ceased, based on the representation, in 2019, you go

11    back four years, five years, that's 2014.  There is an

12    argument here that some of the documents were from 2013.

13    That's only going back one year.  So going back to 2013, I

14    think is appropriate.  So any -- to the extent that there's an

15    objection on going beyond 2013, or going back to 2013, that's

16    overruled.

17         MS. ZAMBRANO:  Okay.  So, for example, the one we

18    just looked at, Request #25.  It is, we should be searching

19    our systems for all communications for nine and a half years

20    relating to a guarantee?

21       And I'm asking because there is a specific period in time

22    that the practice changed.  It was in '19.  And we informed

23    them of that.  This suit was filed after '19.  So we think the

24    relevant time period obviously would be after that, not to go

25    back before the suit was even filed.  And I'm just, I'm just

1  making sure that I understand Your Honor's ruling.

2          THE COURT:  Discovery is allowed from prior to when

3  the suit was filed routinely.

4      If the argument is that this goes to whether this could

5  reoccur, and I'm looking at your briefing in the joint

6  submission, we're making more specific arguments today than

7  were made in the joint submission.  I've spent a lot of time

8  with this.  I understand that you're unhappy with the 10 years

9  of discovery.

10          MS. ZAMBRANO:  I've really been trying to avoid doing

11  the one by one, but it is relevant on each of these requests

12  what is -- what -- how does that relate to this could occur

13  again?  I mean, they asked for all of our minutes related to

14  the chargeback.  Is there any -- all policies and procedures

15  from 2013.  How is that relevant to whether something is going

16  to happen again?  That's my point.

17          THE COURT:  Sure.

18          MS. ZAMBRANO:  If we should interpret them with that

19  guidance, we can do that.  And we will meet and confer and

20  won't bother Your Honor with that today.

21          THE COURT:  It's not that you're bothering me.  I

22  tried very hard to make sure I was prepared on the issues you

23  presented to me.  And to do that, I looked at what you told me

24  the issues were in the joint submission.  I don't see in the

25  joint submission where we're getting into the all -- I see

1    that there's a general issue about the time scope.  There's

2    argument here about some of the documents going back to 2013.

3    That's only a year beyond the five years before the lawsuit

4    was filed.  So if you've got specific objections about the

5    scope, I did not see that that's what I would be ruling on

6    today.

7             MS. ZAMBRANO:  Give me just one minute.

8         (Pause.)

9             THE COURT:  Maybe I'm being obtuse.  Maybe I didn't

10    read it right.  But I'm looking at what I thought the issues

11    were based on how you presented them.

12        (Pause.)

13             MS. ZAMBRANO:  Well, I think it is on Page 7, and it

14    is wrapped up into the time issue.  Despite all this, the FTC

15    served extraordinarily broad and burdensome discovery requests

16    -- we obviously made a lot of burdensome objections in the

17    discovery that was attached -- seeking information about long

18    and permanently discontinued practices, claiming that they

19    need it because it relates to an injunction.

20        The only live issue in the case is about whether we are

21    about ready to continue.  That's the FTC Act.  That's what the

22    judge decided.  And so the discovery should be tailored, Your

23    Honor, to the factors that the Court cited, the *Cornerstone*

24    factors.  It's not tailored at all as to whether we are about

25    ready to continue.  It's just all communications.

```
 1              MR. TEPFER:  Your Honor?
 2              MS. ZAMBRANO:  All policies.  All visual contact that
 3    we have showed to customers relating to a guarantee that we
 4    quit doing three and a half years ago.
 5         This is incredibly burdensome, as we said in the
 6    stipulation.  Or in the joint submission, excuse me.
 7              THE COURT:  You've said extraordinarily broad and
 8    burdensome discovery requests.  That is not sufficient to
 9    specifically identify how these are broad and burdensome.  I
10    don't have an affidavit.  I don't have any evidence.  This is
11    exactly --
12              MS. ZAMBRANO:  Can we submit --
13              THE COURT:  No.
14              MS. ZAMBRANO:  --an affidavit, Your Honor?
15              THE COURT:  I'm here to rule on it today.
16              MS. ZAMBRANO:  Okay.
17              THE COURT:  This is -- we have a joint submission.
18    We're here.  I'm ready to rule on this.  I'm ruling on what
19    was presented.
20         If you look at the case law, and Judge Horan has got
21    several opinions, and I'll cite you one, but just a party has
22    the burden to show why the discovery is broad and burdensome,
23    and you're raising arguments today that I did not see here in
24    your joint submission.
25         So, as far as the objection on the time scope, it's
```

1   overruled.  I was prepared to overrule that.  If you want to
2   get into the all, that's not in here.
3          MS. ZAMBRANO:  Well, I think it is in here in this
4   regard.  I'm looking at the next paragraph, too.  What we're
5   saying is if you're asking for all, it's inherently overbroad
6   if it's relating to communications that happened for
7   discontinued practices.  So there is a line in the sand in
8   April of 2019.  That was when the practices were discontinued.
9   If they're looking at whether we are about ready to do it
10  again, it should go from that -- that's the relevant slash --
11  it's not quite a time argument.  It's really a relevance
12  argument.
13         THE COURT:  And I disagree with that for the reasons
14  that I've already explained.  There is a representation on
15  file that it won't happen anymore.  I understand you're trying
16  to focus on that.  But there --
17         MS. ZAMBRANO:  Could I show you one more thing, Your
18  Honor?  And this is out, but I'll make the representation.  We
19  asked the FTC last week, what is it that's beyond what we have
20  agreed to in the stipulation?  It's not just a we're not doing
21  it.  Is that we are committing to not do it.
22         THE COURT:  Uh-huh.
23         MS. ZAMBRANO:  And so we think it's as close as you
24  can like judicially admit an injunction, a permanent
25  injunction, as you possibly can.  I mean, I don't know how to

 1    judicially admit one any more than that.

 2        So we said, what is it that you want more than this?  And

 3    what they said was, We want it to apply to other websites.  So

 4    that is the only thing that is still at issue.  There's

 5    nothing at issue -- they -- we asked them, under oath, what is

 6    at issue relating to the guarantee that we haven't given you?

 7            MR. TEPFER:  That mischaracterizes the testimony.

 8    I'd be happy to --

 9            MS. ZAMBRANO:  I have the sworn testimony, Your

10    Honor.

11            THE COURT:  Okay.  Let's -- you know what, what you

12    all discussed during your attempts to settle or resolve this,

13    it didn't get resolved.  We're here in the context of a motion

14    to compel.  You've presented a specific issue.  I've given you

15    a ruling on the issue as I see it, how you've presented it.  I

16    certainly understand the arguments you're making today, but I

17    went by what you put in the joint submission as being the

18    issues.

19        I am allowing discovery despite this representation or

20    stipulation, whatever you want to call it.  I don't think that

21    that is, in and of itself, enough to say there should not be

22    any discovery.  I don't believe the Defendant has met its

23    burden to show that further discovery shouldn't be held on

24    this issue or how far back it should go based on the briefing

25    before me.

1        So I am overruling that objection.  I'm allowing the

2   discovery as it's identified in Issue #1.  Going back 10

3   years.

4        Was there anything you needed to add to that?

5             MR. TEPFER:  No, Your Honor.

6             THE COURT:  Okay.  All right.  So we've got 30

7   minutes left for the big one.  I have to set your other one

8   anyway.  Let's get our calendars out.  Are the parties

9   available next Tuesday at 10:00 o'clock to hear 133 and 152?

10            MS. ZAMBRANO:  I'm sorry, Your Honor.  Next Tuesday

11  at 10:00 o'clock?

12            THE COURT:  Yes.  October --

13            MS. ZAMBRANO:  Okay.

14            THE COURT:  November 8th.

15            MS. ZAMBRANO:  Okay.  Just give me one minute to get

16  my electronic calendar open.

17            THE COURT:  Sure.

18            MR. HUMMEL:  May I have permission to take my mask

19  off so my --

20            THE COURT:  Yes.

21            MR. HUMMEL:  -- iPhone Face ID will recognize me?

22            THE COURT:  Yes.  Absolutely.

23            MR. HUMMEL:  Thank you.

24            MR. TEPFER:  Your Honor, that works for the FTC.

25            MS. ZAMBRANO:  Your Honor, I apologize.  It does not

 1   for -- no, I think we can move something back.  We'll move

 2   something back.  Yes, Your Honor.  And this is for the other

 3   motion, Your Honor?

 4          THE COURT:  I'm going -- for the other two motions.

 5   We're obviously not even going to get past the first issue on

 6   133, your motion to compel.  So I'm going to go ahead and set

 7   those.  We can start earlier.  We can start at 9:00 o'clock on

 8   the 8th.  So we'll cover 152 and 133.

 9          MR. TEPFER:  And Your Honor, you said that was at

10   9:00 a.m.?

11          THE COURT:  I'm going to set it for 9:00.  If it took

12   us an hour and a half to get through 27 pages, I'm not hopeful

13   for 20 -- 70 and the other 30.  That's a hundred.

14      All right.  I will issue an order today memorializing my

15   ruling on 140.  So, Ms. Zambrano, you are available next

16   Tuesday, then, at 9:00?

17          MS. ZAMBRANO:  I am, Your Honor.  I just want to

18   confirm.  My partner, Mr. Hummel, from LA is actually going to

19   handle that one, so I want to confirm.  He might have other

20   remarks.  Go ahead.

21          MR. HUMMEL:  Love coming to Dallas.  I'll be here.

22          THE COURT:  Okay.  Well, then we will see you next

23   Tuesday at 9:00 o'clock.  I'll issue an electronic order that

24   resets that motion, Motion #133, plus 152.

25          MR. HUMMEL:  Thank you, Your Honor.

1          THE COURT:  All right.  Thank you.  We are adjourned.

2          MS. ZAMBRANO:  Thank you, Your Honor.

3          THE CLERK:  All rise.

4      (Proceedings concluded at 11:28 a.m.)

5                          --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19                        CERTIFICATE

20      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
21   above-entitled matter.

22   **/s/ Kathy Rehling**                        **11/03/2022**

23   **/s/ Kathy Rehling**              **As Amended 11/08/2022**

24   _____     _____
    Kathy Rehling, CETD-444                        Date
25   Certified Electronic Court Transcriber

59

INDEX

PROCEEDINGS                                                    3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

    Plaintiff Federal Trade Commission's Motion    18/44/50/53
    to Compel Production of Documents and
    Interrogatory Responses from Defendant Match
    Group, Inc. (#140)

    Match Group, Inc.'s Motion to Compel Discovery       57
    Responses and Production of Documents from Federal
    Trade Commission (#133) - *Continued to 11/08/2022
    at 9:00 a.m.*

END OF PROCEEDINGS                                            58

INDEX                                                        59

E   R   R   A   T   A

Index Page 59 Amended to Indicate

Rulings Pertain to ECF #140

and that ECF #133 is Continued