**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                              Plaintiff,<br><br>        vs.<br><br>MATCH GROUP, INC., a corporation, and<br>MATCH GROUP, LLC, formerly known as<br>MATCH.COM, LLC, a limited liability company,<br>                              Defendants. | Case No. 3:19-cv-02281-K |

**APPENDIX IN SUPPORT OF REPLY TO DEFENDANT MATCH GROUP, INC.
OBJECTION TO THE MAGISTRATE ORDER**

Defendant Match Group, Inc. by and through its counsel, submits this Appendix in support

of its Reply to its Objection to the Magistrate Order.

| Ex. | Description | App. Page(s) |
|:---:|---|:---:|
| 14 | Final Hearing Transcript from 11/8/22 Hearing | APP 225-303 |
| 15 | Defendant Match Group, LLC's Responses and Objections to Plaintiff Federal Trade Commission's First Set of Interrogatories | APP 304-341 |
| 16 | Attachment A to Plaintiff's Third Amended Responses to Defendant's First Set of Interrogatories | APP 342-356 |

Dated: December 20, 2022,                          Respectfully submitted,

                                                 */s/ Angela C. Zambrano*
                                                 Angela C. Zambrano
                                                 State Bar No. 24003157
                                                 angela.zambrano@sidley.com
                                                 Chelsea A. Priest
                                                 State Bar No. 24102375
                                                 cpriest@sidley.com
                                                 Tayler G. Bragg
                                                 State Bar No. 24109943
                                                 tbragg@sidley.com

SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Fax: 214.981.3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310.595.9500
Fax: 310.595.9501

*Attorneys for Match Group, Inc. and Match Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

On December 20, 2022, I filed the foregoing document with the clerk of court for the

U.S. District Court, Northern District of Texas.  I hereby certify that I have served the document

on all counsel by a manner authorized by Federal Rule of Civil Procedure 5(b)(2).


*/s/ Angela C. Zambrano*
Angela C. Zambrano

```
                    IN THE UNITED STATES DISTRICT COURT
 1                 FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
 2
     FEDERAL TRADE COMMISSION,  )   Case No. 3:19-cv-02281-K
 3                              )
             Plaintiff,         )   Dallas, Texas
 4                              )   November 8, 2022
     v.                         )   9:00 a.m.
 5                              )
     MATCH GROUP, INC., et al., )   MOTION TO COMPEL
 6                              )   [#133]
             Defendants.        )
 7   _____)
```

                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE IRMA CARRILLO RAMIREZ,
                 UNITED STATES MAGISTRATE JUDGE.

APPEARANCES:

For the Plaintiff:          Reid Abram Tepfer
                            M. Hasan Aijaz
                            FEDERAL TRADE COMMISSION
                            1999 Bryan Street, Suite 2150
                            Dallas, TX  75201
                            (214) 979-9395

For the Defendants:         Chad S. Hummel
                            SIDLEY AUSTIN, LLP
                            1999 Avenue of the Stars,
                              17th Floor
                            Los Angeles, CA  90067
                            (310) 595-9505

For the Defendants:         Angela C. Zambrano
                            Taylor Bragg
                            Chelsea Priest
                            SIDLEY AUSTIN, LLP
                            2021 McKinney Avenue, Suite 2000
                            Dallas, TX  75201
                            (214) 981-3405

For the Defendants:         Samuel Kitchens
                            MATCH GROUP, INC.

1    Recorded by:                    Marie Gonzales
                                     UNITED STATES DISTRICT COURT
2                                    1100 Commerce Street, Room 1452
                                     Dallas, TX  75242-1003
3                                    (214) 753-2167

4    Transcribed by:                 Kathy Rehling
                                     311 Paradise Cove
5                                    Shady Shores, TX  76208
                                     (972) 786-3063

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25            Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.

1                    DALLAS, TEXAS - NOVEMBER 8, 2022 - 9:08 A.M.

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  All right.  We are

4    here in the matter of Federal Trade Commission versus Match

5    Group, Inc., et al.  This is Civil Action 3:19-cv-2281-K.  And

6    before the Court this morning is Defendant Match Group, Inc.'s

7    motion to compel discovery responses and production of

8    documents from Plaintiff Federal Trade Commission.  And I have

9    the joint submission filed by the parties on September 13th.

10       If counsel would please make their appearances for the

11   record.

12             MR. TEPFER:  Good morning, Your Honor.  Reid Tepfer

13   and Hasan Aijaz for the FTC.

14             THE COURT:  All right.

15             MR. HUMMEL:  Good morning, Your Honor.  My name is

16   Chad Hummel, H-U-M-M-E-L, Sidley Austin.  I'm here with my

17   colleagues Angela Zambrano, Chelsea Priest, Taylor Bragg, and

18   in-house at the Defendants, Match, Sam Kitchens is also

19   present.

20             THE COURT:  All right.  All right.  As we did last

21   week, I'm going to ask the parties to please remain seated for

22   purposes of the hearing.  I've got questions for both sides.

23   Please move the microphones close to you.  While I appreciate

24   that you stand, as how we do in federal court, we're still

25   trying to maintain social distancing, and the further away you

1   get from the microphone, the harder it is to hear and

2   understand.  So please stay close to your mics.

3       All right.  So I've got questions for both sides.  And

4   who'll be arguing on behalf of the Plaintiff?

5            MR. TEPFER:  I will, Your Honor.

6            THE COURT:  All right.  Any dispute, as we discussed

7   last week, with the party having -- with the party resisting

8   discovery having the burden?

9            MR. TEPFER:  No, Your Honor.

10           THE COURT:  All right.  Did I miss any affidavits or

11  evidence in support of the objections?

12           MR. TEPFER:  No, Your Honor.

13           THE COURT:  All right.  So it's just the -- just the

14  argument in the joint submission?

15           MR. TEPFER:  Yes, Your Honor.

16           THE COURT:  All right.  Let's -- we're going to work

17  through the joint submission.

18      All right.  With regard to Issue No. 1, Interrogatory No.

19  2, let's start with the first part.  Mr. Hummel, in reading

20  the response, while I agree that there are certainly some

21  things here that, under the case law in this district, are not

22  appropriate, and in particular the "subject to and without

23  waiving the foregoing objections" language, which was

24  specifically addressed by Judge Horan in the *Heller v. City of*

25  *Dallas* case, if I go on to the rest of the answer, it looks

1  like the Plaintiff has identified what it contends is not

2  simple about the process.  So tell me why this response is not

3  sufficient.

4        MR. HUMMEL:  I will, Your Honor.  And thank you.  Let

5  me answer your question first.  The response is not close to

6  sufficient.  As Your Honor knows, the allegation in the case

7  is that the Match.com online cancellation flow is not simple.

8  The interrogatory asked them, Describe -- Identify and

9  describe all features of the online cancellation flow that you

10  contend are not simple.  In response, on the merits, they say

11  the following.  It's -- and by the way, they don't say that

12  this is what they contend.  They say this is what purportedly

13  identified documents show.  We asked for their contentions,

14  which is perfectly permissible under the Federal Rules.  They

15  don't even respond to that.  But what they give is a number of

16  categories.  That it's hard to find.  Your Honor, what is hard

17  to find?  They don't even tell us.

18      Number two, there are too many clicks.  What does too many

19  mean?

20      Number three, it is difficult to understand.  What part of

21  the flow is difficult to understand?  There is no response.

22      It leaves consumers with the mistaken belief that they

23  have canceled.  What is that based on?

24      Number four, that there are -- that there is a save offer,

25  which is when you're almost done with the cancellation, they

1   say, hey, will you take a 50 percent discount?  Perfectly

2   permissible under FTC rules, but they say that creates --

3   somehow that's not simple.

4       We ask a survey:  Why did you cancel?  Again, perfectly

5   permissible, so long as it doesn't take unreasonable time to

6   complete.

7       And three, we ask an NPS survey, which is a Net Promoter

8   Score:  How would you rank Match.com on a scale of 1 to 10 in

9   terms of would you recommend it?

10      We require a password.  What's not simple about that?

11      And that it's misleading.  Well, what is misleading?

12      So, Your Honor, the answers actually beg more questions.

13  They do not identify what in particular about this flow is not

14  simple.  You can't find it in this response.

15      Not only that, Your Honor, they -- the key issues -- by

16  the way, the statute only says, ROSCA only says that a

17  cancellation mechanism must be simple.  That's it.  There is

18  no judicial gloss on this statute.  There is no -- there is

19  some limited FTC guidance on it.  But we asked specifically,

20  and they are required to meet the interrogatory as drafted,

21  what specifically is the problem?  And they won't tell us.

22  They say, here are a bunch of documents where internal Match

23  executives purportedly say it's not simple.  By the way, the

24  documents don't say that.  Not even close.  What they offer is

25  ways to improve the web -- the web flow.

1        So, Your Honor, that's in answer to your question.  But

2    the -- another significant problem is they object that this is

3    overbroad.  That should be overruled.  This is the heart of

4    the case that's remaining, Your Honor.

5        That it's vague.  If it's vague, then the statute is

6    vague, and we've got a real constitutional problem, which we

7    may anyway.

8        That it's unduly burdensome.  It's unduly burdensome for

9    the FTC to tell us what their case is?  I don't think so.

10       And that it's premature.  Hardly.  This investigation has

11   been going on four, five years, and they can't tell us within

12   a month or two of the close of fact discovery what is not

13   simple about our flow?

14       So, in short, Your Honor, the answer begs the questions.

15   Number two, they list documents that don't answer the

16   question.  And number three, they have objections that should

17   be summarily overruled.

18       And I'll make one other point, Your Honor.  They say, they

19   actually write this:  No part of this response should be

20   interpreted or construed as a limit on the materials or

21   arguments the FTC will present at trial.  Well, that

22   contravenes the very purpose of asking an interrogatory.  So

23   they know, they know that they haven't answered.  They know

24   they haven't answered.  Otherwise, they wouldn't have inserted

25   that objection, which is not an appropriate objection in any

 1   event.

 2         So I hope I've answered your question.  But let me just

 3   focus on two things.  The issue ought to be, can people

 4   cancel?  Is it an effective cancellation flow?  They don't

 5   address that.  They don't address that.

 6         Number two, how long does it take people to do it?  That

 7   gets to RFAs, which are Requests for Admissions, which you've

 8   seen.  This can be done in less than 30 seconds.  It is not a

 9   complicated flow.  We need them to tell us specifically, your

10   flow takes nine clicks and that's too many.  They won't say

11   that.  You should ask, Your Honor, respectfully, why won't

12   they say it?  Why won't they answer this question?  This is

13   the heart of the case.

14         And this -- and I want to end with a practical note.  If

15   you were trying this case, if you were trying it from the

16   defense side, you wouldn't know what to meet based on this

17   interrogatory response.  If they contend that five is too many

18   clicks, okay, we'll deal with that.  We can have experts

19   address that question.  If they contend that it's hard to find

20   because people can't locate the Settings tab or because people

21   can't find the Manage Subscription part of the flow, that's

22   another thing.  But they don't tell us anything.

23         So, with respect, those categories, when you say it looks

24   like they've answered, they've answered, but with the word

25   that I like to use, it's pablum.  It's useless from a defense

1  perspective.  It doesn't tell us anything.

2      So, (a) objections overruled; (b) they need to meet the

3  response and they need to tell us something substantive.

4      Unless you have further questions, Your Honor, I tried to

5  answer your question.

6          THE COURT:  All right.  I don't see that the

7  Plaintiff is arguing any objections.  It looks like the FTC's

8  position is that it has adequately answered, not it's not

9  standing on its objections.  Is that correct?

10         MR. TEPFER:  No, Your Honor, we -- we've -- that's --

11 that is correct.  We believe that our response was sufficient.

12 You know, we identified the features that we're challenging.

13 The fact that Defendants are able to think of follow-up

14 questions doesn't mean that our response was inadequate.

15     And, you know, this is not mentioned in the briefing

16 because this just happened in the past couple of weeks, but

17 the Defendants had a 30(b)(6) witness -- or, deposition on

18 this exact issue, and defense counsel is quoting additional

19 evidence that we've given on our position.

20     So it's certainly not the case that we've been trying to,

21 you know, mislead or hide what we're challenging with our

22 response.

23         THE COURT:  Okay.  So, my -- I appreciate that, but

24 my question was simply on whether I'm ruling on your

25 objections, you're standing on your objections, or this is

1    simply a -- the issue is simply sufficiency of the answer.

2         MR. TEPFER:  We believe our objections are valid, but

3    our -- the focus on our response is the sufficiency of the

4    answer.

5         THE COURT:  All right.  So that's what I'm going to

6    rule on, is sufficiency of the answer.

7         All right.  Mr. Hummel, the question is, essentially, and

8    I'm paraphrasing here, but tell me why it's, you know, what --

9    it says, Identify and describe all features that make the

10   online cancellation flow not simple, as the term is used in

11   the statute.

12        And while I see that it could be a little confusing to say

13   your own documents identified the problems, it can also be

14   interpreted as saying that it's adopting that.  It's too hard

15   to find.  It takes too many clicks.  It's difficult to

16   understand.

17        If the interrogatory asked to identify and describe the

18   features that make it not simple, they've done that.  Have

19   they done that in the detail that you want?  Have they told

20   you the why?  The question is, before me, have they answered

21   what's been asked, and the response does.

22        MR. HUMMEL:  It doesn't, Your Honor, with respect.

23   What it does is it identifies what is found in our documents.

24   It doesn't tell us what the FTC is contending.

25        And too many clicks?  Your Honor, with respect, that's

1    meaningless.  What does that mean in the context of a statute

2    that only requires simple?  What does too many mean?  Is it

3    one, two, five, nine?  That's not a follow-up question.

4        And, Your Honor, I will point out that the interrogatory

5    also asks a description of what changes you contend would be

6    necessary to make the online cancellation flow simple.  They

7    are seeking injunctive relief in this case.

8             THE COURT:  Okay.

9             MR. HUMMEL:  What would their injunction say?

10            THE COURT:  All right.

11            MR. HUMMEL:  And that -- and that gets to the heart

12   of it, Your Honor.  And this is beyond the scope of a motion

13   to compel that we're asking you to rule on.  But, Your Honor,

14   --

15            THE COURT:  So let's not go there.

16            MR. HUMMEL:  Well, --

17            THE COURT:  I'm focusing on the motion.

18            MR. HUMMEL:  But it is, it is relevant to the

19   question.  How is a business supposed to know, from the FTC,

20   the Federal Trade Commission, this is the Federal Government,

21   telling businesses, your flow isn't simple enough because it

22   has too many clicks.  Well, is that -- as I've said before, is

23   that five?  Is it seven?  Is it nine?

24       It's hard to find.  What about it is hard to find?  That

25   is simply not a sufficient answer that allows the defense fair

1   notice of what to do at trial.

2       And with that, I'll submit, Your Honor.

3           THE COURT:  All right.  With regard to the issue on

4   the sufficiency of the answer as to whether they have -- the

5   Plaintiff has sufficiently identified the flaws -- I think

6   that's how you all described it, flaws, the features that make

7   it not simple -- I'm over -- I am denying the motion to

8   compel.  It's not the answer you want, but they have answered

9   the question asked.

10      Now, with regard to the second part on how to fix it, I

11  don't see any objection.  You tell me that you're going to

12  answer it as a separate -- a separate interrogatory, but the

13  answer to that interrogatory is here.  I don't have any

14  objections to that part.

15          MR. TEPFER:  Well, Your Honor, I believe that we did,

16  in the submission, note that that's -- you know, what is

17  necessary to fix a cancellation mechanism isn't even a

18  response -- well, for one, it doesn't go to the claims or

19  defenses.  That's -- it's not relevant to this case.

20      But even just practically speaking, that's really an

21  impossibility to answer.  There's a million ways that a flow

22  can -- a cancellation flow can be simple or not simple, and it

23  -- you know, it's -- we're not able to even answer that if we

24  wanted to.

25      As far as the injunctive relief, we can -- we can and have

 1   provided Defendants the injunctive relief we're seeking.  But

 2   in terms of like website design, that's far outside the scope

 3   of discovery and not something that we could realistically

 4   answer even if we wanted to.

 5          THE COURT:  Sure.  I understand the position and

 6   argument you made.  What I'm looking for is what objections

 7   were actually asserted and what I'm ruling on.  If there's no

 8   answer here, how are the objections that you're making today

 9   timely?

10          MR. TEPFER:  In the -- sorry, Your Honor.  I believe

11   that this -- I can find this in the response, but it's --

12          THE COURT:  Not the response.  I'm looking at the

13   joint submission.

14          MR. TEPFER:  On Page 7, --

15          THE COURT:  Okay.

16          MR. TEPFER:  -- let's see.

17          THE COURT:  Page 7?  Your argument starts at Page 6.

18   But where is the part of the -- where is the answer to

19   Interrogatory No. 8?  Where did you respond to the actual

20   question?

21          MR. TEPFER:  I'm sorry, Your Honor.  One moment.

22   We'll --

23          THE COURT:  Uh-huh.

24          MR. TEPFER:  -- find this real quick here.

25          THE COURT:  That was my issue, too.

1      (Pause.)

2           MR. TEPFER:  Your Honor, I believe it's in the

3  appendix on APP 69.

4           THE COURT:  Well, I'm -- where do you cite me to APP

5  69 in your part of the argument?

6           MR. TEPFER:  And I apologize, Your Honor.  I --

7           THE COURT:  I'm willing to rule on the issues you all

8  present, but if you look at the wording of my order on the

9  face-to-face and what should be in the joint submission, this

10 is where I'm going through and this is what I'm going from,

11 this is where I'm looking at what's left after the face-to-

12 face.

13          MR. TEPFER:  The -- so, our objection is described on

14 Page 7 of the joint submission.  Our actual response is in the

15 APP.

16     One issue that I would note, and this is addressed in

17 Footnote 1, you know, we -- there were some last-minute edits

18 made to this document.  So to the extent there were, you know,

19 revisions or deletions, you know, we -- we apologize for that,

20 but that was, you know, an issue of receiving an updated draft

21 at the -- at the last minute.

22     But, you know, I want to assure the Court we did address

23 this both in -- on Page 7 of the submission and our

24 interrogatory response does raise the issue of, you know, our

25 inability to answer that.  We'll find that in the response

1    itself.

2            THE COURT:  Okay.  Footnote 1 says:  "Online

3    cancellation flow" means the Match.com automated online

4    cancellation process.  So that doesn't tell me what you said

5    it does.

6        If I look at Page 3, no, Page 2, --

7            MR. TEPFER:  Sorry.  You're --

8            THE COURT:  -- that has your entire response to

9    Interrogatory No. 2, the third paragraph talks about the

10   issue.  It says you're going to answer it as request to

11   Interrogatory No. 8, but you never tell me -- you don't give

12   me No. 8.  You don't make any objections there.

13           MR. TEPFER:  Your Honor, --

14           THE COURT:  I'm not sure why -- what authority you

15   have to just separately create your own interrogatory.  So

16   what am I ruling on here?

17           MR. TEPFER:  Well, --

18           THE COURT:  Tell me, if I'm looking at your answer to

19   No. 2, --

20           MR. TEPFER:  Yes, Your Honor.

21           THE COURT:  -- where are the objections.

22           MR. TEPFER:  The -- so, Your Honor, I was mistaken in

23   the footnote cite.  That's Footnote 4 I was referencing.  The

24   answer, we answered on APP 70.  It's with the separate

25   interrogatory responses, where we state that it's not feasible

1   for the FTC to provide a description of every possible online

2   cancellation flow.  So it is included in the response, and

3   it's described on Page 6 to 7.

4        And, yeah, and it's -- the -- Interrogatory 8 is

5   referenced in our first paragraph of that response.

6             THE COURT:  Right.  It's referenced, but you never

7   tell me where it is.

8             MR. TEPFER:  I apologize, Your Honor.

9             THE COURT:  You don't give it to me.  So how do I

10  know, from reading this, that that's what I'm supposed to be

11  looking at?

12            MR. TEPFER:  I apologize, Your Honor.  It's -- the

13  same -- we include the same arguments in Page 6 and 7 of the

14  submission, but I apologize for not referencing the APP in

15  there.

16            THE COURT:  Isn't this the flip side of the issue the

17  other side had last week, wanting to argue what "all" meant

18  when it wasn't in the joint submission?  I mean, the same rule

19  is going to apply to both sides.

20            MR. TEPFER:  Well, Your Honor, I do believe the

21  argument is all in there.  I mean, that's a substantial

22  portion of our response on this issue.  You know, there isn't

23  -- and we -- we cite the interrogatory.  All that's really

24  missing here is the APP number.

25       But, you know, the FTC -- we state on Page 7 that the FTC

1  is not obligated to provide advice concerning how to fix its

2  cancellation flow.

3          THE COURT:  Okay.

4          MR. TEPFER:  And then, you know, we also state that

5  there's unlimited hypothetical simple cancellation mechanisms.

6      So perhaps I'm misunderstanding.  I mean, the issue

7  appears simply to be the APP cite was missing, but certainly,

8  you know, the answer and the arguments are all there.

9          THE COURT:  What's the authority for creating your

10  own separate interrogatory?

11          MR. TEPFER:  Your Honor, I -- I don't offhand know

12  what basis we have for that.  You know, so I can certainly

13  understand the Court ruling that this should have been

14  included in the original response.  But I think that the

15  issues that we raised in that response -- and we did provide a

16  full response concerning this issue -- I think those issues

17  are valid.

18      (Pause.)

19          THE COURT:  All right.  So you can't give any

20  authority for creating your own interrogatory.  You didn't

21  include the response to Interrogatory No. 8 that you contend

22  is responsive to this part of Interrogatory No. 4.  Tell me

23  how you haven't waived this part.

24          MR. TEPFER:  Well, Your Honor, we do specifically

25  reference Interrogatory No. 8, and we provide in the appendix

1   Interrogatory No. 8.  The only -- the only thing that appears

2   to be missing is the APP cite, and I don't believe that the

3   FTC should be held to have waived a very, you know, important

4   right simply on the basis of having missed or having omitted

5   the APP cite.  The same arguments are made in both the

6   interrogatory response and the -- and our joint submission.

7   So it's all there.

8       You know, I certainly understand the Court, you know,

9   believing that we should not have created a separate

10  interrogatory.  We simply wanted to give notice to the fact

11  that we believe these are separate interrogatories and should

12  be counted as two interrogatories.

13          THE COURT:  Okay.  This isn't about my belief.  I'm

14  looking for legal bases here.

15          MR. TEPFER:  Yes, Your Honor.

16          THE COURT:  So, you can't give me a legal basis for

17  treating it this way.  My order for the joint submission

18  specifically says, list and brief whatever issues are -- I'm

19  ruling on.  You don't really separately point me to any

20  objections.  It's there.  282-page appendix.  So I'm supposed

21  to go looking for this, I suppose.

22          MR. TEPFER:  No.  I'm sorry.

23          THE COURT:  I mean, do --

24          MR. TEPFER:  I certainly -- I certainly understand.

25  That was an oversight on our part to not have the APP.  But we

1   very -- very much briefed this issue in the -- in the joint

2   submission.

3          THE COURT:  But do you see how it looks like you

4   briefed an objection that wasn't raised in the answer to

5   Interrogatory No. 2?  Because if it wasn't timely asserted,

6   it's waived, right?

7          MR. TEPFER:  I'm sorry.  Would you -- would you mind

8   repeating that, Your Honor?

9          THE COURT:  Isn't -- doesn't the case law

10  specifically -- well, the Rules actually say that any

11  objection not timely asserted is waived.  There's a Fifth

12  Circuit case, *In re Grant*, I believe, that says that as well.

13     So if I'm looking at this, I see no objections to No. 2,

14  and briefing on an objection that's not been asserted.  Do you

15  see how it looks like there's no objection to this part of No.

16  2?

17          MR. TEPFER:  I can understand that, Your Honor, but I

18  believe that -- I believe that it's clear from both the

19  briefing and our response that, you know, we asserted this,

20  this objection.

21          THE COURT:  Well, if I'm looking at your response,

22  and it's on 6 and 7, right, Page 6 and 7 of the appendix?  I

23  mean, I'm sorry, of the joint submission?

24          MR. TEPFER:  Yes, Your Honor.

25          THE COURT:  Okay.  Sentence No. 3 says, The FTC is

1    not obligated to provide an explanation.  It's already

2    explained its position in response to similarly-worded

3    Interrogatory No. 8.

4        Where here on 6 and 7 do you tell me that you've objected

5    to it on the basis of relevance, which is what your answer

6    says on Page 72 of the appendix, not Page 70, --

7                MR. TEPFER:  Uh, --

8                THE COURT:  Um, --

9                MR. TEPFER:  I believe that's -- the two paragraphs

10   on Page 7 are addressing that issue by stating that the FTC is

11   not obligated to provide advice and noting -- and the second

12   paragraph notes the impossibility of even responding.

13               THE COURT:  I understand.  It's a very -- it's a good

14   argument.  But rules are rules.  Tell me where -- and the

15   order is the order.  Tell me where you've specifically advised

16   the Court that you've objected to this on the basis of

17   relevance.  Because the only language I see, not obligated to,

18   which I'm having trouble converting into a legal basis or an

19   objection.

20               MR. TEPFER:  Well, Your Honor, I suppose that it is

21   true that we did not use the word relevance, but I believe

22   that the description of our objection makes clear the basis

23   of, you know, of our objection, that it's the relevance, that

24   it's outside of the claims and defenses.

25       But I, you know, I certainly appreciate the Court's

1  position that it is not -- that specific word is not used.

2  But I believe our objection is clear and was understood by the

3  Defendants.

4        THE COURT:  I don't believe it's my position.  I am

5  looking for the word relevance.  I'm having trouble saying "We

6  don't have to give them this answer" is the same as "The

7  information requested is not relevant."

8     Now, I'm not trying to give you a hard time.  I'm not

9  trying to make this difficult.  I'm trying to rule on the

10  validly-asserted objections, and I'm having a hard time

11  deciphering what they are.

12     And if it makes both sides feel any better, I'm going to

13  go back and make changes to my face-to-face order, because it

14  needs to be clarified.

15        MR. TEPFER:  Your Honor, on Page 70, we do -- of our

16  actual response -- I understand it's not that we created the

17  separate -- you know, and I understand we should have

18  addressed that in the same interrogatory.  But, you know, we

19  describe -- we describe the issues.  We, you know, cite to

20  Interrogatory 8 in our response.  And Interrogatory 8 begins

21  by stating that the interrogatory seeks irrelevant

22  information.

23     You know, I certainly appreciate that it creates a burden

24  for the Court to not -- you know, to cite the interrogatory

25  without including the APP, and, you know, I will -- I believe

1   we need to be more careful about that going forward.  But in

2   terms of did we make clear that the objection was relevancy,

3   in the response itself, you know, we state that they seek

4   irrelevant information.

5              THE COURT:  Okay.  Page 70 of what?

6              MR. TEPFER:  Of the joint appendix, which has our --

7   the response at issue, Interrogatory No. 8, which is cited on,

8   I believe, Page 6 of the joint submission.

9         (Pause.)

10        THE COURT:  All right.  (Pause.)  Document 136 is my order

11   for the face-to-face.  And on Pages 2 and 3, under Joint

12   Submission, it says, The joint submission must include only an

13   item-by-item listing of each specific issue, discovery

14   request, deposition topic, and/or corresponding objections

15   that was alleged in the motion and that remains in dispute

16   after the face-to-face conference.

17        And I call those disputed requests.

18        Disputes that have been resolved during the parties' face-

19   to-face conference should not be included in the joint

20   submission.  Only those issues or discovery requests or

21   objections that are listed in the joint submission will be

22   considered.

23        Where in your joint submission do you list relevance as an

24   objection remaining for me to rule on?

25              MR. TEPFER:  Well, Your Honor, respectfully, I would

```
 1    suggest that the, you know, joint appendix should be
 2    considered, given that it's incorporated by reference to
 3    Interrogatory No. 8.  I would -- and that it's, you know, I
 4    believe on Page 7 very clearly described, although the word
 5    relevance is not used.
 6              THE COURT:  Okay.
 7              MR. TEPFER:  For example, we state, you know, MGI's
 8    liability, quote, does not turn on the FTC's opinion about,
 9    you know, how hypothetically Match should allow subscribers to
10    cancel.  It's, you know, the description of relevance.
11              THE COURT:  I'm not sure that's the description of
12    relevance that I'm familiar with under the case law.
13              MR. TEPFER:  And Your Honor, I apologize if, you
14    know, we misunderstood the order.  I thought we had, you know,
15    by, you know, it states issues or objections.  I thought those
16    were different ways of, you know, that we could, I guess, you
17    know, outline the various issues.  But it was not my
18    interpretation of the order that, you know, the specific
19    objection, that, you know, for example, relevance had to be
20    stated that precisely.  I thought we gave both fair notice to
21    the Defendants of our objection with our description and in
22    the response.
23              THE COURT:  I got it.  You think my order is bad.
24    I'm going to go back and fix it.  I said that.
25         But in terms of identifying the objection that I'm ruling
```

1   on -- I understand your position.  And I've got a question for

2   the other side.  But I could not tell from your joint

3   submission that relevance was an issue that you were

4   specifically wanting me to address or an objection that you

5   were specifically wanting me to address.  It just said, we

6   don't have to.

7       All right.  I heard a lot, Mr. Hummel, last week I heard a

8   lot about how the extended discovery the FTC was seeking was

9   not warranted because these practices were not being used any

10  more, that you'd filed an affidavit that the specific

11  processes at issue were no longer in use.  So if they're no

12  longer in use, and how to fix it is not necessarily an issue

13  or claim or defense, how is it relevant?

14          MR. HUMMEL:  Respectfully, Your Honor, there are

15  three issues.  The first one is the online cancellation flow.

16  That is a live issue in the case.  That is Count Five.  That

17  cancellation flow is still in use.  Okay?  The FTC is seeking

18  injunctive relief on that flow.

19      The two practices, Counts Three and Four in the complaint,

20  that have been discontinued since mid-2019, according to the

21  FTC's own complaint, are the guarantee and the chargeback

22  policy.  Those have nothing to do with the cancellation flow.

23      Interrogatory No. 2, which we're dealing with, and this

24  alleged Subpart 8, is a live issue in the case.  It's,

25  candidly, one of three live issues in the case that remain.

1    And we're going to talk about all those today.

2        So, with respect to the guarantee -- with respect to the

3    cancellation flow, what Your Honor, I take it, did with

4    respect to the first part of Interrogatory No. 2 was overrule

5    the objections and say that the response was sufficient.  I

6    take it that's what Your Honor did.

7            THE COURT:  No.  I specifically said, I believe --

8    I'll have to look at the transcript, but I believe I

9    specifically said I wasn't ruling on the objections because

10   the Plaintiff's position was that they were standing on the

11   sufficiency of the answer, so I didn't need to look at the

12   objections, that I was determining whether the answer was

13   sufficient.

14           MR. HUMMEL:  As long as those --

15           THE COURT:  Is that not what I said?

16           MR. HUMMEL:  I believe that's what you said, Your

17   Honor.  But, but, we can't go to trial with an interrogatory

18   that has those objections in it.  If they're withdrawing them,

19   that's fine.  If that's what is being -- is being decided here

20   today, that's fine.  What we can't do is go to trial and have

21   them say, well, we objected on burdensomeness and we're not

22   going to be bound by this answer, these answers, at trial.

23   If it's very clear on the record that they're not standing on

24   those objections anymore, we accept Your Honor's order,

25   although I disagree with it.  But it's very clear that we want

1    those objections overruled or withdrawn.  That's one.

2        Part two.  Part two, which is clearly a central issue in

3    the case, is the injunctive relief the FTC would seek with

4    respect to the Count Five cancellation flow issue.  And they

5    have never told us in a sworn response what the injunctive

6    relief is they're seeking.  In other words, what are the

7    problems and how do you fix it?

8        It is simply not adequate for any Defendant or a company

9    trying to run its business to say the flow is hard to find.

10   We need the specific injunctive relief.

11       And Your Honor, if you look at Appendix 70, which they

12   referenced for you, which is their answer to what they self-

13   created as Interrogatory No. 8, without authority, they do say

14   that they have, if you look -- tell me, Your Honor, if you can

15   have that in front of you.

16            THE COURT:  I have it.

17            MR. HUMMEL:  All right.  If you look at the second

18   paragraph:  Furthermore, the changes to the online

19   cancellation flow that the FTC would find acceptable in a

20   settlement -- that's not what we asked.  They're seeking

21   injunctive relief.  Then they go on to say:  Last, the FTC has

22   already described, repeatedly and in detail, specific problems

23   with online cancellation flow.  And then they reference the

24   answer to Interrogatory No. 2.

25       Now, we all can sit in this courtroom, but nobody could

1   say, sitting in this courtroom, that they have answered what

2   are the problems with the flow specifically -- wait, I'm

3   trying to find the words -- repeatedly and in detail.  So this

4   reference back to their response to the first part of No. 2,

5   that's inadequate.

6        Your Honor, we're asking the FTC -- we're asking the Court

7   to order the FTC to tell us the injunctive relief they're

8   seeking with respect to the cancellation flow.  It's centrally

9   relevant.  It's not irrelevant.  It's not hypothetical.  It's

10  real world.  In fact, it's the exact opposite of hypothetical.

11  So it is clearly relevant, and they have to tell us.

12       And, by the way, they do say, waiving the relevance

13  objection, in my view, they do say, The FTC contends that an

14  adequately disclosed one-click cancellation process would be

15  simple.  If that's their position, we can try the case.  But

16  it's surrounded by verbiage that makes it -- that is improper

17  objections that should be overruled, including relevance, and

18  they should be ordered to answer.

19            THE COURT:  All right.  I understand what you're

20  saying you need and want in order to try your case.  I am

21  looking at the language of your interrogatory.  You are

22  demanding today a level of specificity that is not requested

23  in your interrogatory.  I'm looking at what you have asked.

24  You've asked them to identify the features that they contend

25  make it not simple, and how to fix it.  The issue, we're

1    looking at flaws and fixes, both parts of Interrogatory No. 2.

2    I've already ruled on the first part.  If you've asked them to

3    identify what makes it not simple, I believe the answer does.

4    Does it go into the detail that you've asked for today?  No.

5    But your question doesn't ask for that level of detail.  It

6    asked for an identification of the flaws.  So I'm done with

7    that part of it.

8        I do note and I asked at the beginning of this hearing

9    whether Plaintiff acknowledged that it had the burden to meet

10   its objections.  It does not dispute that.  The case law in

11   this district supports it, as well as the Fifth Circuit's

12   opinion in *McLeod*.  So this is simply, in my mind, simply an

13   issue of has the question been answered, has the Plaintiff

14   supported the objections that I'm ruling on today?  And the

15   answer to that on the second part is no.

16           MR. TEPFER:  Your Honor, would you -- as for the

17   second part, do you mean the -- the fixes --

18           THE COURT:  The fixes.

19           MR. TEPFER:  -- issue?

20           THE COURT:  Yes.  The fixes issue.  I can't find

21   you've met your burden here.  I can't even tell what your

22   objection is, and you're citing back to a response that you

23   didn't give, even looking at your response.

24       Now, you went ahead and answered No. 2, despite the

25   objections.  You told me you're not arguing your objections.

1              MR. TEPFER:  Well, --

2              THE COURT:  So I don't see a reason not to overrule

3     the objections, since we're looking solely at the sufficiency

4     of the answer.

5              MR. TEPFER:  Your Honor, just to -- if I can clarify

6     just a couple of issues.  The -- you know, we -- our position

7     is that our answer was adequate, but that we, you know, but

8     not that our -- we necessarily withdrew our objections.  Just

9     that we believe our answer was -- that we adequately

10    responded, despite the objections.

11             THE COURT:  Okay.  I'm going to stop you right there,

12    because we've been going for some time and we're still on the

13    first one.

14             MR. TEPFER:  Yes, Your Honor.

15             THE COURT:  All right.  You have the burden to meet

16    your objections.  You haven't presented any argument on your

17    objections.  Your argument is limited to the sufficiency of

18    the answer.

19      Because you've not even argued your objections on the

20    flaws, I can't find that you've met your burden.  You've not

21    even presented any argument on them.  You've stood on the

22    sufficiency of your response.  Therefore, I don't see a reason

23    not to overrule the objections.

24             MR. TEPFER:  Your Honor, if I could respectfully

25    disagree.  I believe most of our response is about the

1    irrelevance of -- of the --

2              THE COURT:  Of the flaws?

3              MR. TEPFER:  Yes, Your Honor.  The -- you know, after

4    -- I believe all of Page 7 concerns the fix -- I apologize,

5    Your Honor.  The fix.  You know, Defendants --

6              THE COURT:  I'm talking about the flaws.

7              MR. TEPFER:  Oh.  Sorry.

8              THE COURT:  All right.  Let's -- all right.

9    Interrogatory No. 2 is about the flaws and the fix.  You've

10   broken it up that way in the joint submission.  With regard to

11   the objections to the flaws, --

12             MR. TEPFER:  Yes, Your Honor.

13             THE COURT:  -- you told me earlier you were standing

14   on the sufficiency of your answer.  There's no argument at all

15   presented on any objections to the part of the question about

16   flaws.  Is that correct?

17             MR. TEPFER:  Yes, Your Honor.  I misunderstood.  I'm

18   sorry.

19             THE COURT:  All right.  So is there any reason not to

20   overrule those objections as to the flaws?

21             MR. TEPFER:  No, Your Honor.  I apologize.  I was

22   misunderstanding.

23             THE COURT:  Yes.  All right.  So the objections as to

24   that portion of the interrogatory are overruled.  I'm finding

25   that the answer to the interrogatory, as asked, as part of the

flaws, is sufficient.  So I'm denying the motion to compel.

I'm overruling the objections to that portion, but I'm denying

the motion to compel.  They've answered it.

Now, with regard to the fix part, I don't see where you

have argued relevance in the joint submission, even if I look

at the part of the appendix that you've cited me to for the

first time today.  If the other side -- I understand.  How you

fix it is not necessarily relevant to a claim or defense.  But

the other side has pointed out the fact that it does go to the

scope of any injunctive relief.  And given the answer on Page

-- and I'm calling it Page 72; I use the blue numbers at the

top so that I can look at the page as opposed to having to

come down to the bottom of the page -- I agree that there is

some relevance to it.  So I am -- I am going to grant the

motion to compel as to the fixes part, for the fix part of

Interrogatory No. 2.  What you called Interrogatory No. 8,

which I still don't understand, well, there's not been any

legal basis provided for doing it this way, but I am -- I'm

ordering a response from the FTC.

All right.  Let's move on to No. 2.  As I understand it

from the joint submission, going to Page 19, the objections

I'm ruling on are relevance, vagueness, and ambiguity.  Is

that correct?

MR. HUMMEL:  Your Honor, what specific discovery

request are we talking about?

1          THE COURT:  Requests for Admissions 40 through 43.

2          MR. HUMMEL:  Okay.  Thank you, Your Honor.

3          THE COURT:  I'm sorry.  It's the second part of Issue

4     No. 1.

5          MR. HUMMEL:  Yeah, it's Page 7.

6          THE COURT:  Page 7.  And the FTC's position starts on

7     Page 12.  Line No. 2:  Relevance, vagueness, and ambiguity.

8     Those are the objections I'm ruling on; is that correct?

9          MR. TEPFER:  Yes, Your Honor.

10         THE COURT:  Okay.  Any others?

11         MR. TEPFER:  No, Your Honor.

12         THE COURT:  Okay.  As I understand it, these requests

13    for admissions are dealing with the online cancellation flow,

14    which was --

15         MR. TEPFER:  Your Honor, one correction, if I could

16    just note.  It's also -- the FTC does not have adequate

17    information to admit or deny.  So that was another basis.  I

18    just wanted to be clear.

19         THE COURT:  Okay.  But that's not a legal objection,

20    correct?

21         MR. TEPFER:  No, Your Honor.

22         THE COURT:  Okay.  Now, these requests are limited to

23    the online cancellation flow.  Everybody knows what that is,

24    right, that that deals with a specific issue in this case?

25         MR. TEPFER:  Yes, Your Honor, with one clarification,

1   that there are -- there were multiple versions of the online

2   cancellation flow over time, and the RFAs did not specify a

3   particular version of the online cancellation flow.  So we

4   under -- we understand what they're referencing, but not, for

5   example, a time period or a specific version of the online

6   cancellation flow.

7           THE COURT:  Tell me where that is in your objections

8   listed on Pages 7 to 8.  Because I don't remember anything

9   about you can't tell which version they're talking about.

10      (Counsel confer.)

11          THE COURT:  And as I read the cases you've cited,

12  *Abbott*, *Morley*, and *Buchanan*, this talked about hypotheticals

13  unrelated to the facts in the case.  Here, they're talking

14  about the specific cancellation flow at issue in the case.  So

15  why aren't those cases distinguishable?

16          MR. TEPFER:  Well, Your Honor, the reason that we

17  believed that this was hypothetical is it appears -- well,

18  it's unclear to us whether they're referencing real users or,

19  you know, a hypothetical user.  So that's, that's the basis

20  that we believed that they're asking for, you know, what --

21  how long would it take a potential hypothetical user to

22  cancel.

23          THE COURT:  Okay.  But, unlike in those cases, there

24  is an actual connection to the facts of this case because

25  they're talking about the specific process at issue in this

1    case, correct?

2              MR. TEPFER:  Yes, Your Honor.

3              THE COURT:  Okay.  So, in my mind, that disposes of

4    the relevance objection.  How would it not?

5              MR. TEPFER:  Your Honor, I certainly understand that

6    position.  My, you know, my thought was that because it

7    doesn't even appear that they're referencing actual users,

8    merely that somebody who may or may not be a Match.com user is

9    able to do that, that's -- that was the basis of our position.

10             THE COURT:  Okay.

11             MR. TEPFER:  And, you know, the fastest time that an

12   individual could do it versus the average time, you know, that

13   seemed to be a different issue.

14             THE COURT:  And you all are jumping ahead to the

15   ultimate --

16             MR. TEPFER:  I apologize.

17             THE COURT:  -- issues in the case.  No, no, I'm

18   talking about -- I understand your arguments.  I understand

19   your arguments.  We're here in the context of discovery.  Got

20   a request for admission.  You've got a duty to admit, deny, or

21   explain why you can't admit or deny.  Right?

22             MR. TEPFER:  Yes, Your Honor.

23             THE COURT:  Okay.  That's what I'm looking at.  How

24   it will be used at summary judgment or at trial, not at issue.

25   I'm looking at your question.  Did you answer it as the rules

 1    require?  That's all I'm doing here.

 2              MR. TEPFER:  Yes, Your Honor.

 3              THE COURT:  All right.  So, because it relates to --

 4    can we agree that, because it relates to one of the processes

 5    at issue in this case, it is relevant?

 6              MR. TEPFER:  Yes, Your Honor.

 7              THE COURT:  All right.  Now, I understand your

 8    objections about vagueness and what kind of person, but don't

 9    you have to be a Match.com user in order to cancel your policy

10    or your membership?

11              MR. TEPFER:  Yes, Your Honor, but the -- the evidence

12    that had been presented to us on this issue, and which, you

13    know, which is referenced by the Defendants, I believe, in

14    their section, is a video of one of their employees clicking

15    through the cancellation mechanism.  So that, you know, that

16    to us didn't constitute any evidence to come to that

17    conclusion.

18         And in fact, you know, we understand we have a due

19    diligence burden to, you know, to answer these

20    interrogatories, but we simply don't have -- the Defendants

21    have never pointed us to evidence concerning actual users that

22    would obligate us to admit any of this.  It seems that it's an

23    open question.

24         And Defendants have suggested, you know, that we have a

25    due diligence obligation to, you know, conduct an extensive

1    survey concerning an aspect of the cancellation mechanism that

2    we're not actually challenging, as, you know, our response to

3    Interrogatory 2 made clear.

4           THE COURT:  All right.  Again, you're making the

5    arguments for the jury here to me.  Did you answer the -- I

6    understand you're going to --

7           MR. TEPFER:  Your Honor, --

8           THE COURT:  Why you think you shouldn't have to

9    answer it.  But if I'm ruling on vagueness and ambiguity now,

10   it's the only two objections I've got left here, --

11          MR. TEPFER:  To address the vagueness issue, you

12   know, it's not clear, are they talking about, you know, are

13   these consumers who have read the -- read the prompts?  Are

14   they, you know, where does the cancellation flow begin?  You

15   know, that's an issue that has been, you know, of some

16   dispute.  So, you know, I do believe, as written, they are

17   vague.  But I apologize for jumping ahead to the admit or deny

18   issue.

19          THE COURT:  Okay.  Well, and that's part of the

20   problem here.  You've got a lot of objections here that you're

21   telling me you can't -- well, don't you have a duty if you are

22   able to admit part of it or to answer part of it and deny the

23   rest and explain why you can't admit or deny?  And we're going

24   to get to that with some of the later ones.  How does your

25   answer tell me specifically -- actually, I can't tell what the

1   answer is.

2           MR. TEPFER:  Well, Your Honor, I don't believe there

3   -- I certainly agree that, you know, parties have an

4   obligation to admit or -- to admit any part that can be

5   admitted, but the issue is that there isn't any aspect of this

6   that we can admit or deny because we simply don't know how

7   long it takes consumers to cancel.  We've not tested this.

8   Defendants haven't pointed us to evidence concerning how long

9   it takes consumers to cancel.  So it -- you know, we don't

10  know how long it takes consumers to even find the flow.  So

11  that, you know, that's just, to us, that's an open question.

12  If Defendants have evidence of this, you know, they can of

13  course present that or cite it to us to get us --

14          THE COURT:  It's your case.  You brought this case.

15          MR. TEPFER:  Yes, Your Honor.  We're not --

16          THE COURT:  The issue in this case is whether this

17  process is simple.

18          MR. TEPFER:  But not -- not how long it takes to

19  cancel.  That's not an issue that we're challenging.

20          THE COURT:  True.  But didn't you concede somewhere,

21  and I'll go and find it, that -- let's see.  Is how long it

22  takes maybe a way to look at whether this is simple or not?

23          MR. TEPFER:  Certainly there's, you know, as I

24  mentioned, there's thousands of factors that can be relevant.

25  So this is certainly one.

1      But it wouldn't be a -- I feel that it wouldn't be a

2   reasonable reading of the due diligence requirement for us to,

3   you know, have to conduct surveys based on each of those

4   various factors just because Defendants ask an RFA about it.

5   We certainly will check, you know, any records or evidence we

6   have on the issue, but for us to determine this would -- you

7   know, that's a very difficult process to determine.

8           THE COURT:  Okay.  I'm not asking you to conduct

9   surveys.  I'm asking whether it's possible to answer this

10  question.  I understand you will argue later on that how long

11  it takes -- they're going to argue that the fact that it takes

12  this amount of time is evidence of its simplicity.  You're

13  going to argue that that's not the only factor to be

14  considered.  Got it.

15          MR. TEPFER:  Yes, Your Honor.

16          THE COURT:  Got it.

17          MR. TEPFER:  And how -- but my question is, how would

18  we -- how would we determine this if not from testing actual

19  users?

20          THE COURT:  Well, I'm not going to tell you how to

21  answer this.

22          MR. TEPFER:  Yes, Your Honor.

23          THE COURT:  That's not my role here.

24          MR. TEPFER:  Yes, Your Honor.

25          THE COURT:  But you've told me today they provided

1   you evidence, some evidence of this.  The purpose of requests

2   for admissions is to narrow the evidence, to narrow the

3   issues.

4           MR. TEPFER:  Your Honor, they presented us what they

5   purport to be evidence of this but which we contend is not

6   evidence, and it's certainly not, even if it were evidence,

7   it's certainly not evidence sufficient for us to admit or deny

8   it.

9           THE COURT:  All right.  Then how do you explain --

10  tell me how your answer explains that.  You say, "based on

11  these ambiguities."

12          MR. TEPFER:  Your Honor, we state on Page 13 in the

13  last paragraph that the FTC has no data concerning this at

14  this time, and to the extent any such data currently exists it

15  would be in MGI's possession.  So that's -- I believe that's

16  what we intended to get at, that, you know, we don't have data

17  that would help us determine how long it takes a real

18  Match.com user to do this.

19          THE COURT:  All right.  I'm overruling your relevance

20  objection.  I've already -- I've already done that.  In fact,

21  I think you even essentially conceded that at the bottom of

22  Page 12, so I'm not sure why it was listed as one for me to

23  rule on, but there it is.

24       The way that you have phrased your -- argued your

25  vagueness objection, I understand it, but I don't necessarily

1    think that that means that you can't answer this interrogatory

2    some way, whether it's to admit or deny or say that you can't

3    for specific reasons.  The way you've answered it does not

4    make clear why you cannot admit or deny.

5        So I'm granting the motion to compel as to these

6    interrogatories.

7                MR. HUMMEL:  Requests for admissions, Your Honor?

8                THE COURT:  I'm sorry.  Requests for admissions.  RFA

9    40 through 43.  They are connected to the facts.  I understand

10   that there are some issues that you pointed out, but that's

11   not reflected in the response.  So I'm ordering a new

12   response.

13               MR. TEPFER:  Yes, Your Honor.  And just I want to be

14   sure that we comply with the Court's ruling.  In terms of

15   responding on the admit or deny issue, is it sufficient that

16   we, you know, note with more specificity the types of data

17   that we contend would be necessary for us to make that sort of

18   admission?

19               THE COURT:  I can't tell you how to answer it.

20               MR. TEPFER:  Yes, Your Honor.

21               THE COURT:  I can't tell you the sufficiency of an

22   answer I don't have in front of me without a motion to compel.

23   I'm just telling you, this is not a sufficient answer.

24               MR. TEPFER:  Yes, Your Honor.

25               THE COURT:  All right.  So it's granted.

1      Now we're moving on to Issue No. 2.  Requests for

2  Admission, the first part, Requests for Admissions 33 to 38,

3  talks about (a) cancellation method.  And now I'm looking at

4  Page 19.  What is the specific issue or specific objection?

5          MR. HUMMEL:  Your Honor, for the record, we're

6  talking about RFA Numbers 33 through 38, which are listed on

7  Pages 13 through 16?

8          THE COURT:  I believe I -- I just said that.

9          MR. HUMMEL:  Okay.

10         THE COURT:  I believe I just said that, --

11         MR. HUMMEL:  Okay.

12         THE COURT:  -- and that I am looking at the FTC's

13 response on Page 19.

14         MR. HUMMEL:  Thank you, Your Honor.

15      (Pause.)

16         THE COURT:  Which I've got -- I think I've got

17 vagueness here.  Line 3.

18         MR. TEPFER:  Yes, Your Honor.  We also contend that

19 they're irrelevant and I believe, you know, that is made

20 clear.  And, again, I apologize for the -- for not stating

21 this more plainly.  But midway through the first paragraph, we

22 state that these requests are explicitly not connected to the

23 facts of this case, and thus we contend they're irrelevant.

24      We also contend they improperly call for a legal

25 conclusion.  And I believe -- sorry.  I just want to make sure

1   that we included this.  We do mention that it's a -- we have a

2   quote concerning it being an improper hypothetical.

3          THE COURT:  Okay.  Tell me where improper

4   hypothetical is in the actual objection and response.

5          MR. TEPFER:  Your Honor, looking at -- if I could

6   cite to RFA 34 on Page 14.

7          THE COURT:  I'm looking at it.  Uh-huh.

8          MR. TEPFER:  It states, you know, vague and

9   ambiguous, and the hypothetical as a whole is vague.

10          THE COURT:  Okay.

11          MR. TEPFER:  The request does not describe the

12   entirety of the hypothetical cancellation method, how the

13   offer is presented, et cetera.

14          THE COURT:  Okay.  And it talks about the specificity

15   of the question.  How am I to understand that that means the

16   same thing that you've argued on Page 19, that it's not

17   connected to the facts of this case?

18      I agree, if it's not dealing with the specific issues in

19   this case, it might be overbroad, but that's not an objection

20   that you made.

21          MR. TEPFER:  Your Honor, I believe, because it's not

22   connected to the facts of this case, that makes it an improper

23   hypothetical.

24          THE COURT:  Is there a cancellation mechanism at

25   issue in this case?

1          MR. TEPFER:  Yes, Your Honor, although the Defendants

2    make explicit that this question does not concern that

3    cancellation mechanism.

4          THE COURT:  Didn't you answer with extent to that

5    cancellation mechanism?  I believe the last sentence says, To

6    the extent this request is intended to refer to Match.com's

7    online cancellation mechanism, Plaintiff denies.

8          MR. TEPFER:  Yes, Your Honor.  My interpretation of

9    it was that that was not what was being referred to, but if I

10   was, you know, if we were misreading it, we wanted to make

11   sure we admitted to the -- or denied to the extent that we're

12   able to do so, as is our obligation.

13         THE COURT:  All right.  You know -- well, I'm not so

14   sure that these requests are the most effective way to limit

15   or narrow the issues.  I can see an argument being made for

16   these are gotcha requests, and we're spending a lot of time on

17   them.  But I have a denial here with regard to the specific

18   policy at issue in the lawsuit, so why is that not sufficient

19   an answer?

20         MR. HUMMEL:  Because it's not what the RFA asks.

21   This is -- look, let's just speak plainly, if I might, Your

22   Honor?

23         THE COURT:  Please.

24         MR. HUMMEL:  So, they say, in response to

25   Interrogatory No. 2, where we ask them specifically what's

1   wrong with our site, what's wrong with our cancellation flow,

2   and they say by presenting surveys, by having a cancellation

3   flow that has a misleading survey or a save offer, and that it

4   therefore -- and the only reason under FTC guidance, Your

5   Honor, that that would be a problem is if it caused undue

6   delay.

7        So we're asking, in a perfectly-permissible non-

8   hypothetical, tied-to-the-facts-of-this-case RFA, admit in 33

9   that a cancellation method can be simple if it includes a save

10  offer.  The answer to that has to be admit.  It's not a --

11  it's not a gotcha question.  It eliminates an issue for trial,

12  where they will say you have a save offer, therefore it's not

13  simple.  But thousands of online cancellation flows in this

14  country have save offers that the FTC hasn't challenged and

15  that are simple.

16       This is a straightforward request, it is directly tied to

17  what's at issue in this case, and they're required to admit it

18  or deny it in good faith.

19       Now, they do have a denial, but they have a denial only

20  with respect to our flow, which they contend is not simple,

21  but that's not what the RFA asks.

22            THE COURT:  We spent an awful lot of time last week

23  talking about why discovery served by the FTC was not relevant

24  because it wasn't limited to the specific policies at issue in

25  this case.

1          MR. HUMMEL:  Nope.  Different -- respectfully, Your

2     Honor, different issues.  The -- those two issues, and I'll

3     argue that again, and I know you don't want me to, those

4     issues, those two questions, whether there's a guarantee or

5     not that had adequate disclosures or whether there's a

6     chargeback policy that they contend was somehow unfair under

7     the FTC Act, they're eliminated.  We don't do it anymore.  We

8     haven't done it since mid-2019.

9          This is a live issue in the case that will be tried, which

10    is:  Is our cancellation flow simple?  And this asks, in the

11    real world, if a cancellation flow has a save offer, does

12    that, from the FTC's perspective, render it not simple?

13    That's the question.  And it is directly relevant, easily

14    responded to, and they haven't in their denial met the

15    question.

16         So we have to distinguish between a cancellation flow,

17    which is still a live issue, and the guarantee and the

18    chargeback policy.  Those issues, from our perspective, are

19    off the table.  The fact that we have to engage in merits

20    discovery on issues that are not going to be tried is,

21    candidly, beyond me.  But this one is live.  They are

22    contending and arguing that our cancellation flow violates

23    ROSCA, the Restore Online Shoppers' Act -- Confidence Act.

24    And they say it's not simple.

25         Your Honor ruled that they gave us an answer, albeit

1    vague, that responds, but these are real issues in the case

2    and the FTC needs to take a position in this case on whether a

3    save offer, a survey, and a Net Promoter Score question render

4    it not simple as a matter of law.  And RFAs are allowed to do

5    that under the Federal Rules.

6         So, with that, I'll submit, Your Honor.

7         (Pause.)

8              MR. TEPFER:  Your Honor, would I be able to respond

9    to those issues?

10             THE COURT:  You may respond.

11             MR. TEPFER:  First, I'd like to note, you know, as

12   the Court has, that these are really gotcha RFAs.  They're,

13   you know, vaguely described.  This is a totality of the

14   circumstances test where you have to actually usually look at

15   these various features to make any sort of conclusion.

16        Of course, and as Defendants note in their own section on

17   this issue, there is not case law addressing whether, you

18   know, these features are, as a matter of law, and which is

19   what they're asking us to conclude, to provide the legal

20   conclusion that various features are, as a matter of law, not

21   simple.  There's not case law on that.

22        You know, the statute doesn't state that because it wanted

23   -- Congress presumably wanted to provide leeway to courts, you

24   know, without a prescriptive standard.  And courts have not

25   interpreted that.  And so whether these are, as a matter of

 1   law, simple or not simple is an open question.

 2        But more importantly, you know, these gotcha RFAs are

 3   exceedingly vague.  And so all we can really respond to is the

 4   cancellation mechanism in this case, the one that's actually

 5   at issue, as opposed to these vague hypotheticals.

 6            THE COURT:  Let me ask you this.  And I see the

 7   argument for some vagueness in the question.  But if I read

 8   this as admit that a cancellation method can be simple even if

 9   it includes a save offer.  And cancellation methods -- well,

10   does a save offer in and of itself, and I'm not asking for a

11   legal conclusion, I'm just saying, does the fact that a

12   cancellation method has a save offer in it automatically mean

13   that it's not simple?

14            MR. TEPFER:  And to that, you know, on the issue of

15   whether these features, any of them, are necessarily -- render

16   something not simple, I don't believe that that -- the courts

17   have addressed that legal conclusion.  So the FT -- what's at

18   issue is, you know, under the law, are those features

19   necessarily -- do they necessarily render something not

20   simple, and there is just not case law that states either way

21   on that.

22            THE COURT:  Well, I'm not talking about case law.

23   I'm talking about Mr. Hummel pointed out that there are

24   cancellation methods used, other cancellation methods used

25   that also include a save offer.

1              MR. TEPFER:  Yes, Your Honor.

2              THE COURT:  I'm not talking about a legal conclusion.

3  I think I already said that.

4              MR. TEPFER:  Yes, Your Honor.

5              THE COURT:  Again.  I'm just saying, does the fact

6  that a cancellation method includes a save offer automatically

7  make it not simple?  Are there ways to have save offers that

8  are simple?  I'm talking on a factual basis here.

9              MR. TEPFER:  Well, Your Honor, because this is a

10 totality of the circumstances test, I believe that's a

11 difficult answer for us to make.  I don't -- you know, the FTC

12 has provided guidance on, you know, when it will seek to

13 enforce, but I, you know, I don't believe that the Court --

14 that the FTC has, you know, issued anything saying that

15 particular features are necessarily out of bounds, and I don't

16 think that's what ROSCA, you know, I don't believe that's

17 really how the statute is written, that --

18             THE COURT:  Let me ask it this way.  I'm not trying

19 to trick you here.

20             MR. TEPFER:  Yes, Your Honor.

21             THE COURT:  I'm not trying to get you to admit

22 something.  I'm asking a question.  Can a cancellation process

23 have a save offer and still be simple?

24             MR. TEPFER:  Your Honor, I do believe it's

25 theoretically possible.  Of course, you would have to look at

1    the save offer.  But --

2              THE COURT:  Okay.  Okay.  So is that a -- is that --

3    is there a save offer in the cancellation process at issue

4    here?

5              MR. TEPFER:  Yes, Your Honor.

6              THE COURT:  Okay.  So this is -- there is a

7    cancellation method with a save offer at issue in this

8    lawsuit?

9              MR. TEPFER:  Yes, Your Honor, although -- sorry.  I

10   would just note that, as Defendants made clear in their -- I

11   believe that's in this -- in their position, that their save

12   offer is specifically not at issue.  Or that, rather, their

13   cancellation flow is not what they're referring to with --

14   with these.

15             THE COURT:  Okay.  Didn't you give me an answer just

16   a few minutes ago, though?  I mean, if we're looking -- in

17   theory, anything's possible, right?

18             MR. TEPFER:  Yes, Your Honor.

19             THE COURT:  Okay.  And what you're telling me today

20   is that you have to look at the specifics of a particular

21   process.

22             MR. TEPFER:  That's -- that's my understanding of how

23   the Court should approach whether something is simple.

24             THE COURT:  Okay.  So how can -- how -- why could

25   this not be construed as a theoretical question, or these

1  series of requests for admissions, that have some connection

2  to the facts in this case?

3          MR. TEPFER:  Well, Your Honor, we agree that it is a

4  theoretical question.  That's why we objected as it being an

5  improper hypothetical.  But I believe Defendants have made

6  clear that this is not about, you know, the facts of this

7  case.  And what, you know, essentially what they're asking for

8  is policy guidance, trying to get a more, you know,

9  prescriptive ROSCA standard than what Congress, you know,

10  intentionally wrote, I guess to require that we, you know,

11  state as a -- as a matter of law, save offers are not

12  necessarily an issue, or, you know, seven clicks is okay but

13  not eight.  And that's simply not how the statute is written.

14          THE COURT:  Okay.  Can you not answer this to make

15  clear what you've just said?

16          MR. TEPFER:  Your Honor, we -- we could certainly --

17  you know, I believe we would be able to add additional detail

18  about our need to, you know, review a particular save offer.

19  And, you know, I believe it's -- I don't have the response in

20  front of me, but I think we do --

21          THE COURT:  Page 14.  Joint submission.

22          MR. TEPFER:  We do talk about, you know, the need,

23  that we don't look at particular -- or, our understanding of

24  the law is that you don't look at particular features in

25  isolation.

 1          You know, I believe that we do provide some detail for the

 2    basis of our, you know, denial.  So I -- I believe, you know,

 3    they're asking us to make admissions that go beyond the

 4    statute and create a more prescriptive standard than what --

 5    than what Congress wrote.

 6              THE COURT:  So, to admit or deny or say you can't

 7    admit or deny --

 8              MR. TEPFER:  Oh, well, Your --

 9              THE COURT:  -- forces you to create a policy?

10              MR. TEPFER:  No.  No, Your Honor.  I suppose I

11    misunderstood you.  We could, you know, we could note that,

12    you know, talking generally -- I misunderstood.  We could

13    certainly note that, as to Defendants' specific cancellation

14    mechanism, we deny, but we can't --

15              THE COURT:  It did.

16              MR. TEPFER:  Yeah.  And -- but -- but also note that

17    we cannot admit or deny the more general statement on the

18    basis that it's a totality of the circumstances test and that,

19    you know, that this is inherently a visual, you know,

20    analysis.  That's, you know, all information that we can add.

21    That's information that we provided to Defendants in, you

22    know, our 30(b)(6).

23          But, you know, on -- our position was that the response

24    was adequate, but -- but that's certainly, you know,

25    additional information.

1          THE COURT:  Your response is limited to a specific

2     policy that is not the issue in this request for admission,

3     correct?

4          MR. TEPFER:  I'm --

5          THE COURT:  I'm sorry.  Let me rephrase that.  That's

6     -- okay.  Your answer is limited to Match.com's online

7     cancellation mechanism, but the question is beyond that?

8          MR. TEPFER:  Yes, Your Honor.  On the basis that, you

9     know, we -- we were standing on our objections for the

10    vagueness and the -- the fact that they are improper

11    hypotheticals, and then attempted to admit or deny to the

12    extent possible, which was concerning the Match.com

13    cancellation mechanism.

14         THE COURT:  I'm going to sustain your vagueness

15    objection because it's not limited to a specific -- you've

16    sufficiently identified that there are issues in terms of why

17    you can't specifically answer it as phrased.  But in our

18    discussion, it seems like there are certainly portions that

19    you can admit or deny, and that's part of it.  You're making a

20    whole bunch of objections, some denial.  I honestly had

21    trouble with some of the answers in trying to figure out what

22    part was answered, what part was denied, and what part wasn't

23    and why.

24        So I am going to grant the motion as to this set of

25    requests for admission.  I'm sustaining your vagueness

 1  objection.  But I'm still going to require you to answer

 2  around that vagueness objection.

 3      In other words, the Rules require you, if you make an

 4  objection, you can answer the rest of it.  You can explain

 5  your answer in terms of why you can or can't -- why you can or

 6  cannot admit.  But this answer is truly confusing.

 7          MR. TEPFER:  Yes, Your Honor.

 8          THE COURT:  I understand what you're trying to say.

 9  I'm overruling the relevance.  I understand it goes beyond the

10  specific methods that are at issue in this lawsuit.  But it is

11  about the methods that are at issue in this -- or, the type of

12  method.

13      We did have that discussion last week about whether

14  similar policies in other websites, so I see it as the same

15  kind of issue generally, but I think that there is -- these

16  can be answered in some manner.  There's a limitation here

17  that's not in the question.  I'm looking at whether you

18  answered the question.

19      So, I'm going to -- I'm going to grant the motion as to

20  these but sustain the vagueness.

21          MR. TEPFER:  Um, --

22          THE COURT:  And overrule the relevance.

23          MR. TEPFER:  And Your Honor, would you be able to

24  clarify the limitation that you referenced, just so I

25  understand?

1          THE COURT:  I agree that, as asked, the question is

2     vague.  I don't see this as a hypothetical.  So I'm not seeing

3     that there is a hypothetical presented here.  It's more of a

4     rhetorical question, as we discussed:  Is it theoretically

5     possible to have this type of save offer and still have -- and

6     a process to still be simple?  You told me theoretically

7     that's possible.  But you also told me that it is a fact-

8     specific determination.

9          MR. TEPFER:  Yes, Your Honor.

10          THE COURT:  You've basically answered the question

11     orally today that you didn't answer on paper.

12          MR. TEPFER:  Well, Your Honor, I believe that we

13     answered the question, you know, that Defendants posed.  I

14     felt like there was more clarification today than -- but --

15     but I certainly, yeah, I certainly understand.

16          THE COURT:  Okay.  All right.  RFPs 5 through 6.  All

17     right.  And the objections here are relevance.  That's at Page

18     23.  And the deliberative process privilege.  Is that correct?

19          MR. TEPFER:  Yes, Your Honor.

20          THE COURT:  All right.  This one does look very much

21     like what we talked about last week, evaluations of another

22     subscription service's cancellation mechanisms.  And so I am

23     sustaining the relevance objections.

24          MR. HUMMEL:  May I be heard, Your Honor?

25          THE COURT:  If you'll give me just a minute.

1    (Pause.)  All right.  Mr. Hummel?

2          MR. HUMMEL:  So, let me clarify a couple things, Your

3    Honor.  One is you've heard the FTC say this morning that

4    whether or not a cancellation flow is simple is a "totality of

5    the circumstances test."  Right?

6          THE COURT:  Uh-huh.

7          MR. HUMMEL:  That's nowhere articulated in the case

8    law, in the statute, or in FTC guidance.  So that's made up

9    this morning.

10       Number two, the only test regarding save offers, surveys,

11   et cetera, and this is going back a little bit to the other

12   one but I'll bring it together, the only test the FTC has ever

13   articulated is whether the save offer, survey, et cetera,

14   causes unreasonable delay in cancellation.  Okay?

15       So what we're looking for, Your Honor, is what does the

16   FTC look at?  What is the Court supposed to look at in

17   determining whether a cancellation flow is simple?  Is it

18   difficulty in finding it?  Is it how many clicks it takes?  Is

19   it do consumers understand it when they see it?  Is it is

20   there a save offer?  Is there a password wall that they have

21   to look at?  Et cetera.  Here, --

22         THE COURT:  Mr. Hummel, not to interrupt you, but

23   we're talking about two requests for production here.

24         MR. HUMMEL:  I understand.  I'm getting there.  If --

25   if the FT --

1          THE COURT:  Get there a little faster.

2          MR. HUMMEL:  I'm sorry.  I'm trying to be clear in my

3    arguments.

4        If the FTC has looked at cancellation flows and sued on

5    them -- and we're aware of two times they've done this -- what

6    do they look at?  What are the documents?

7        And, Your Honor, a subset of this request would be let's

8    assume you grant their relevance objection on other websites.

9    What is their analysis of why this particular cancellation

10   flow at issue in Count Five of this case, what empirical

11   evidence do they have and what have they looked at that

12   determines whether this flow is simple or not?

13       And that -- and if it's privileged, log it.  If it is work

14   product, log it.  If it is deliberative process privilege, log

15   it.  But we need to know what empirical evidence they have.

16   How long does it take people to complete?  How many clicks, in

17   fact, do they contend we have?  What are the documents that

18   prove their case as to this one?  Put aside the other ones.

19   I'm not going to argue that for you.  But -- I could, but I

20   have limited time.  But you need to order what they looked at

21   to make an allegation under Rule 11 in this case that our flow

22   is not simple.  And with all due respect, Your Honor, 'Rog Two

23   doesn't do it for us, so let's see what they in fact looked

24   at.

25       I'll submit.

1          THE COURT:  All right.  Thank you.  You used the

2     words "this case" several times during that argument.  Your

3     discovery request is not limited to the type of cancellation

4     method used in this case.  It says cancellation methods,

5     period.  It is the universe of cancellation methods.  That's

6     overbroad, which makes at least part of the request

7     irrelevant.

8          MR. HUMMEL:  I'd respectfully disagree, but if you're

9     going -- but you certainly have the power today to order them

10    to produce anything that relates to the Match.com cancellation

11    flow --

12         THE COURT:  All right.

13         MR. HUMMEL:  -- that's subsumed within these

14    requests.

15         THE COURT:  Sure.  And their answer says, The FTC has

16    conducted a reasonable search of documents possibly relevant

17    to cancellation methods on the Defendants' dating platforms

18    and has not identified any responsive documents.

19         MR. HUMMEL:  Subject --

20         THE COURT:  So their answer has limited it to the

21    cancellation methods in your -- in your platform, in the

22    Defendants' platforms.

23         MR. HUMMEL:  Fair.  Subject to privilege and subject

24    to other objections, which should be overruled.  Or if they

25    have privileged material, let's log it and make a -- and

 1    decide whether it's in fact privileged or not.

 2              THE COURT:  Okay.

 3              MR. HUMMEL:  This is in a vacuum.

 4              THE COURT:  It's not a vacuum.  Page 24, the last

 5    sentence right before Roman Paragraph III:  Defendant is not

 6    withholding any documents.

 7              MR. HUMMEL:  So then why make the privilege

 8    objection?  I don't understand.  They've made a privilege -- a

 9    very specific privilege objection, and if they're saying

10    they're not standing on privilege, then we're going to some

11    there's nothing, that they have no empirical evidence.  And

12    that's fine.  That helps me at trial.

13              THE COURT:  It does not help me resolve the discovery

14    issues that I need to resolve.  Again, part of the face-to-

15    face is what am I ruling on.  Are we fighting over documents

16    that don't exist?

17              MR. TEPFER:  Well, Your Honor, just to clarify, we

18    state that we have conducted, in that last sentence, a search

19    of relevant documents concerning Defendants' dating platforms.

20    So to the extent we're talking about, you know, Defendants'

21    dating platforms, we're not withholding on the basis of

22    privilege concerning Defendants' dating platforms.

23              THE COURT:  I --

24              MR. TEPFER:  The privilege objection concerns the,

25    you know, the other platforms, which are also irrelevant, but

1   also, we believe, you know, concern -- would, you know, be

2   within the deliberative process privilege.

3           THE COURT:  All right.  Have you provided -- I mean,

4   going back to -- well, let me ask it this way.  I've got a lot

5   of objections here.  What it looks like, according to your

6   answer, is that you have looked for documents relevant to the

7   cancellation methods on the Defendants' platforms and you

8   don't have any.

9           MR. TEPFER:  Yes, Your Honor.

10          THE COURT:  And your answer says you're not

11  withholding any documents at all.

12          MR. TEPFER:  To the extent, you know, --

13          THE COURT:  Your portion of the joint submission, in

14  other words.

15          MR. TEPFER:  To the extent the, you know, the term

16  analysis refers to attorney discussions, you know, our -- like

17  the case teams analysis, that would be responsive.  But that

18  is privileged.  And we did provide a privilege log to

19  Defendants concerning, you know, our internal analysis.  But

20  to the extent we're talking about studies that -- which is

21  what I -- my understanding of what this RFP is to get at,

22  those documents don't exist.

23          THE COURT:  Okay.  You just told me today something

24  that's not in your answer and that's inconsistent with what I

25  think you said on Page 24.  Are you withholding any documents

1   relating to cancellation methods on the Defendants' dating

2   platforms on the basis of privilege?  Because your answer or

3   your portion of the joint submission says you are not

4   withholding any documents.

5           MR. TEPFER:  Your Honor, looking at --

6           THE COURT:  Yes or no?  Are you withholding any

7   documents relating to cancellation methods on the Defendants'

8   dating platforms?

9           MR. TEPFER:  And just to be clear, --

10          THE COURT:  Yes or no?

11          MR. TEPFER:  I don't believe so, Your Honor.  I --

12  the privilege log I reference, I don't -- I'm looking at this

13  closely, you know, at RFP 5 and 6, and I don't believe our

14  internal emails would be responsive.

15      I just wanted to clarify, you know, to the -- that we have

16  provided a privilege log, but I apologize for, you know,

17  muddying the waters.  I don't believe those are necessarily

18  responsive to these RFPs, as it's not analysis conducted or

19  done for the FTC regarding it.

20          THE COURT:  You're only required to answer the

21  question asked or to provide the categories of documents

22  requested.  So, again, to be clear for the record, crystal

23  clear, --

24          MR. TEPFER:  Yes, Your Honor.

25          THE COURT:  -- is the Plaintiff withholding any

1    documents on the basis of privilege that are possibly relevant

2    to the cancellation methods on the Defendants' dating

3    platforms?

4            MR. TEPFER:  No, Your Honor.

5            THE COURT:  Okay.  How is that not sufficient?  I

6    agree that that language should have been in the answer,

7    because the Rules do require the parties to state whether or

8    not they are withholding documents on the basis of privilege.

9    But with regard to the cancellation policy -- cancellation

10   methods at issue in this lawsuit, you're telling me you're not

11   withholding any documents relating -- on the basis of

12   privilege or any other objection?

13           MR. TEPFER:  Not -- not documents that are responsive

14   to these requests.

15           THE COURT:  Okay.  And that's the universe, is the

16   specific requests?

17           MR. TEPFER:  Yes, Your Honor.

18           THE COURT:  I'm going to deny the motion to compel,

19   but I'm going to require you to amend your answer to make

20   clear that you are not withholding.

21           MR. TEPFER:  Yes, Your Honor.

22           THE COURT:  All right.  Issue No. 3.  And I'm going

23   to kind of take these together.  Why is it that the FTC was

24   able to provide an answer and now it can't provide an answer?

25           MR. TEPFER:  Well, Your Honor, that -- that answer

1   that we provided was based off of the data that we had

2   received, I believe, in 2017.  And since that time, you know,

3   five years of -- have elapsed.  And we amended, you know,

4   after -- on the basis that that number is simply not accurate.

5   The requests -- Defendants request that we identify and

6   describe the harm that we contend occurred, and that's not the

7   harm that we are contending occurred anymore.

8        We -- our -- you know, and at this point, we're still, you

9   know, months later, awaiting the evidence that we need to be

10  able to make those precise calculations, the harm that we

11  contend occurred, and which, you know, may end up the --

12  negotiations are ongoing, but that may end up the subject of a

13  motion to compel.  But until we get that data, all we can

14  really do is describe as best we can the methodologies that we

15  will likely use.

16       Of course, those methodologies will -- you know, are also

17  contingent upon what type of data Defendants produce.  So

18  there's -- there's a limitation in terms of what we can answer

19  until we get that data.

20       But the reason we amended is to make it more accurate, not

21  to, you know, hide our calculations or anything like that.

22  That's simply just not what we contend the harm is anymore.

23  And so that -- that explains the revision.

24            THE COURT:  Is it the answer based on the best

25  information that you have?

1          MR. TEPFER:  Yes.  That's -- you know, all we can do

2    is describe how -- the things that we intend to consider once

3    we get it, so that's the best we -- I believe we can do.

4          THE COURT:  No, that's not what I'm asking.

5          MR. TEPFER:  I'm sorry.

6          THE COURT:  Rule 26(a), as part of your initial

7    disclosures, requires the Plaintiff to provide a calculation

8    of damages.  I understand that, as the Plaintiff obtains

9    discovery, that calculation may change.  But the Defendant is

10   still required -- is still entitled to a calculation.  You

11   made a calculation, then you took it back and have no

12   calculation.  This is part of what was required to be produced

13   initially.

14      So I understand that you want to have the best

15   calculation, but they're entitled to something, because it may

16   or may not change based on discovery that you have.

17      So I am granting the motion to compel as to the  discovery

18   requests in Section 3.  They're entitled to your calculation,

19   the best calculation that you can give them based on what you

20   have now.  You have a duty to supplement as you get more

21   discovery, but they're entitled to a calculation.  So I'm

22   granting the motion as to Section 3.

23      All right.  Section 4.  Or Issue 4.  I see these requests

24   for admissions in the same light as the ones that we talked

25   about earlier.  I understand your objection and limitation on

1   use of the words "are" and "were."  But you've still got this

2   language in here, "subject to and without waiving the

3   foregoing objections."

4        I don't think that you have answered -- I don't think that

5   you have answered.  There's not an admission, a denial, or a

6   statement of why you can't admit or deny.  So I'm granting the

7   motion as to Category No. 4.

8           MR. TEPFER:  Well, Your Honor, if I could just

9   clarify our position.  I think that we do state that, you

10  know, what Defendants are asking here is completely different

11  than what they describe in their joint submission.  They're

12  asking whether, you know, these mechanisms exist, is the way

13  they describe it.  But what the answers are actually

14  requesting is whether users are able to.

15       And we simply -- you know, at the time, these were valid

16  responses because we didn't have data concerning how many

17  users actually cancel via these various mechanisms, which, you

18  know, and that's a valid issue, given that, you know, for many

19  of these mechanisms, consumers have no idea that they even

20  exist.

21       So, without getting the data concerning are you -- are

22  consumers actually canceling via this mechanism, there's no

23  way for us to know whether they're able to.  You know, for

24  example, whether they can cancel via a fax number that's

25  buried in a terms of use document that doesn't even describe

1    that it's for cancellation.  You know, without knowing whether

2    consumers are doing that, there's -- you know, we would

3    contend it seems likely that they can't cancel via that

4    mechanism, but we didn't have, you know, data going either

5    way.  And so that's, you know, that's why we believe that was

6    a proper response, because this isn't, as Defendants contend,

7    about the existence of cancellation mechanisms.  It's about

8    whether users understand and are actually doing that.

9           THE COURT:  I understand.  There are bits and pieces

10   in here.  Your answer states that the Defendant has

11   represented that it offers these cancellation methods.

12          MR. TEPFER:  And that's, you know, simply our efforts

13   to admit what we can, that they state that these exist.  You

14   know, but given the ambiguity of the "are able to" language --

15   and that's, you know, not us being difficult; that's a central

16   issue in this case, is whether users actually have any idea of

17   this -- you know, because of that ambiguity in the language,

18   we are unable to admit.

19      If these were, you know, plainly worded RFAs asking, you

20   know, is there, you know, a fax number on the website, well,

21   that's, you know, that's a different question that may be more

22   easily responded to.  But --

23          THE COURT:  They are plainly worded.  They are

24   plainly worded.

25          MR. TEPFER:  Well, Your Honor, I believe the

 1   Defendants telegraph exactly how they intend to misuse this in

 2   their own joint submission, where they said -- they refer to

 3   the existence, but really what they're asking is, are

 4   consumers able to?  And the answer, I believe, is -- is not.

 5       Plus, add to many of these reference "at all relevant

 6   times."

 7       And, of course, you know, the fact that Defendants state

 8   that, you know, there's a fax number now doesn't mean for the

 9   entire, you know, seven or eight-year period it has existed.

10   We, you know, we don't have information to know either way on

11   that.

12           THE COURT:  I'm granting the motion as to these

13   requests.

14       Yes, you have partially admitted.  You've got a lot of

15   objections in here.  Some of these, you're not arguing them

16   here, but some of them are clearly improper.  Information is

17   in Match's possession, custody, or control.  You've gone into

18   cutting of customer service hours.  You've gone into -- you've

19   gone into a lot here.

20       I get it.  They're trying to get you to admit that their

21   system works.  You adequately describe in here why you can't

22   admit or deny.  But if I look at the substance of your

23   answers, it's hard to tell that.  So I think they're entitled

24   to better answers that clarify what you admit, what you deny,

25   and what you can't admit or deny and why.

1          MR. TEPFER:  And so it's -- our response needs to be

2   more plainly worded as to what we are admitting or denying?

3   Is that the ruling?

4          THE COURT:  The ruling is that these are awfully

5   confusing answers.

6          MR. TEPFER:  Yes, Your Honor.  I apologize.

7          THE COURT:  Your point is well taken about the "are"

8   and "were," but you've got some admission in here and a whole

9   bunch of objections that make it very hard to determine what

10  specifically you're admitting and what you're denying and the

11  whys.

12         MR. TEPFER:  Yes, Your Honor.

13         THE COURT:  So I'm ordering new responses on these.

14     All right.  Section 5.  Or Issue No. 5.  I've got

15  inconsistent answers within the same -- statements within the

16  same answer.  For example, on Page 42, you can't independently

17  assess the truth or falsity, but you deny.  Is it a denial or

18  is it a can't-admit-or-deny?  Because it sounds like you've

19  got both in here.

20         MR. TEPFER:  Well, Your Honor, I apologize for the

21  ambiguity of that.  These are intended to be denials.  The --

22  you know, I will note that these were difficult for us to

23  respond to because they concern, you know, evidence that was

24  at that time being withheld by MGI and was the basis of last

25  week's motion to compel.  So that is --

```
 1              THE COURT:  Telling me why they've been bad, why you
 2    think they've been bad, is not helping me --
 3              MR. TEPFER:  Yes, Your Honor.
 4              THE COURT:  -- get your answer to the question I've
 5    asked.
 6              MR. TEPFER:  Yes, Your Honor.  But just to be clear,
 7    these, you know, we -- we denied that the practice has been
 8    ceased, as we understand the word ceased to mean a permanent
 9    discontinuation, as opposed to a suspension.  And so, on that
10    -- based on that understanding, we believe -- we believe it's
11    appropriate to deny.
12              THE COURT:  I'm not telling you whether to deny or
13    admit or neither.  I'm saying I can't tell from reading your
14    answer to these interrogatories, I mean, to these requests for
15    admissions which one you did, because you used both phrases.
16    You say you can't independently assess the truth or falsity
17    and you deny.  So I can't tell which one of those three
18    categories this is.  You say it at the very end, but it's
19    subject to the objections above where you say you can't
20    independently assess.  You spend a lot of time talking about
21    how you can't independently verify information, --
22              MR. TEPFER:  Well, --
23              THE COURT:  -- which makes it sound like you're not
24    admitting or denying.  But then you're saying that you're
25    denying.
```

1        MR. TEPFER:  Your Honor, we -- we simply, you know,

2   we -- I believe we clarified that we're denying.  We are

3   simply, you know, as -- simply intending to note the issue

4   with assessing Defendants' representations because evidence

5   was being withheld.

6        But, you know, I believe we are very clear, you know, in

7   -- in our denial.  It, you know, probably could have been more

8   artfully phrased in pointing out the issue.  But I, you know,

9   I believe the response is unambiguous and that we were

10  denying.

11       THE COURT:  It's not unambiguous, --

12       MR. TEPFER:  Yes, Your Honor.

13       THE COURT:  -- is what I'm saying.  It's not a simple

14  denial.  There is a whole lot of explaining why you can't

15  verify, which makes it sound like you're saying that you can't

16  admit or deny.  You cap off with a denial, but all -- it's not

17  a simple denial.  That's what I'm saying.  It's not clear,

18  unambiguous, or simple at all.  From the reader's perspective.

19       MR. TEPFER:  Yes, Your Honor.

20       THE COURT:  So I'm granting as to Section -- or,

21  Issue No. 5.

22       All right.  7 and 8, it looks like I'm not ruling on any

23  objections, I'm looking at whether the responses were

24  sufficient.

25       MR. TEPFER:  On -- Your Honor, I believe on --

1          THE COURT:  I'm sorry.  Sections -- Disputes 6 and 7.

2     It's Interrogatory 1 and Interrogatory 7.  The FTC's bases for

3     believing that violations were occurring or about to occur and

4     that MGI owns, operates, or controls Match.com.

5          MR. TEPFER:  Your Honor -- (sotto voce) did we

6     already address this?

7          MR. AIJAZ:  No.

8          MR. TEPFER:  Your Honor, I believe we may have

9     skipped an issue.  On, Your Honor, RFA 7 and 8, I apologize if

10    I misunderstood, but I wasn't sure if we got a ruling on -- on

11    Page 53.

12         THE COURT:  I -- you did get a ruling.

13         MR. TEPFER:  Okay.  I apologize.

14         THE COURT:  To the extent that I didn't make it

15    clear, I said Section 5, or Section 5, Issue No. 5.  It has

16    two subsets.  But --

17         MR. TEPFER:  I understand now.

18         THE COURT:  Yeah.  And my order will make it clear.

19    I'm granting -- I am granting the motion as to Disputed Issues

20    3, 4, and 5, all of the requests that are encompassed within

21    those disputes.

22       All right.  So, Number -- Issues No. 6 and 7.  Am I ruling

23    on the sufficiency of the answer or am I determining specific

24    objections?

25         MR. TEPFER:  Your Honor, I believe this is just on

1    the basis of the sufficiency of our response.

2              THE COURT:  Okay.

3              MR. TEPFER:  The only -- you know, I'm not sure that

4    this is a major issue.  We simply note in our response that

5    the Defendants appear to confuse the legal standard, but that

6    is not -- our response is, I believe, sufficient regardless,

7    and we stand on that.

8              THE COURT:  And my understanding of their argument is

9    that they're saying the exact same thing about you, your

10   answer.

11        Your citation to Judge Horan's observation that the

12   pleading standard is not the same as discovery obligations,

13   and we do spend time in here talking about the pleading

14   standard and what was found in the motion to dismiss, which is

15   merely a finding regarding the sufficiency of the allegations.

16        But if I look at this, Mr. Hummel, the answers do go well

17   beyond that.  They're not resting on that.  There are

18   identification of specific documents.  There is an answer --

19   let's see.  Let me pull up the other one.  If I'm looking at

20   the answer to Interrogatory No. 1, you get past the objections

21   and the citation to the finding in the motion to dismiss, at

22   the top of Page 58 they contend there's no evidence that the

23   cancellation practices have changed.  They're contending that

24   past conduct can indicate that there's a reasonable likelihood

25   of further violations.  They're talking about the lack of

1   "sincere assurances against future violations."  It's

2   contending that Match knew its problems were longstanding.

3   It's citing documents.  It's citing why it believes this

4   illustrates "the egregiousness of Match's practices" at the

5   top of Page 59.

6       It looks like they've answered the question.  Tell me why

7   this answer isn't sufficient.

8           MR. HUMMEL:  The answer is sufficient, Your Honor,

9   for us to -- I think it meets the interrogatory response.  I

10  will submit it's more argument than facts and evidence, which

11  is what this is looking for.

12      We understand their position.  So here's what this

13  interrogatory is after, though.  They can't make these

14  objections and then provide this answer.  So the (a) the

15  objection should be overruled.  Again, I come back to this

16  part:  No part of this response should be interpreted or

17  construed as a limit on the materials or argument the FTC will

18  present at trial.

19      That doesn't fly.  Under the Federal Rules or any

20  appropriate objection, that should be stricken.

21      Now, what this is after, though, Your Honor, is, again,

22  we're talking about the guarantee and the chargeback, not the

23  cancellation flow.  And the answer with respect to the

24  cancellation flow, in part, that's not disputed we're still

25  doing that.  The guarantee and the chargeback, by their own

1    complaint, ceased in mid-2019.  All right?  By -- and that is

2    Docket No. 116, Count Three, Paragraph 39; Count Four,

3    Paragraph 62.  They have judicially admitted these have

4    ceased.  All right?

5         So then our question is, what evidence do you have that

6    they're about to violate -- that Match is about to violate the

7    law?  If they have a witness that has come forward and said,

8    ah, there's a secret plan, if they have a document that says,

9    oh, there's a plan, we're entitled to that.  But they haven't

10   given it.  And as long as Your Honor is saying this is a

11   sufficient answer, fine.  But they now can't come to trial and

12   say there's a witness, there's a document that we knew about,

13   there is some secret plan that we know about.  We've asked

14   them.  And they -- this is -- if they stand on this, it's

15   legal argument, we'll deal with it down the road.

16             THE COURT:  I think Rule 37 is pretty clear.  You

17   don't get a surprise at trial.

18             MR. HUMMEL:  Right.

19             THE COURT:  If you didn't turn it over in discovery,

20   you don't get to use it.  I --

21             MR. HUMMEL:  That's it.

22             THE COURT:  It sounds like the issue is more with the

23   correctness of their answer or the -- you disagree with the

24   answer.  But they've answered it.  Whether it's a good answer

25   or bad answer, that's not the issue here, is did they answer

 1    it?  And if this is their -- and it looks like a fairly

 2    extensive answer.

 3              MR. HUMMEL:  Oh, it's -- if that's their answer,

 4    we've got it.

 5              THE COURT:  Okay.

 6              MR. HUMMEL:  Rule 37 is very clear and there will be

 7    -- they should anticipate on the record a motion *in limine* on

 8    anything else.

 9              THE COURT:  Okay.  Of course, they do have the

10    obligation, ongoing obligation to supplement --

11              MR. HUMMEL:  Correct.

12              THE COURT:  -- based on discovery as it develops.

13    But --

14              MR. HUMMEL:  Exactly.

15              THE COURT:  -- it looks like you got an answer.  So,

16    --

17              MR. HUMMEL:  Right.  And for summary judgment

18    purposes, too.  Of course.  That's the issue.

19              THE COURT:  This is -- this is the answer.  They're

20    saying it's sufficient.  I'm looking at, did they answer the

21    question?  They answered the question.

22              MR. HUMMEL:  Thank you, Your Honor.

23              THE COURT:  So I'm denying the motion to compel.  I

24    am overruling the objections, since there's no -- since you're

25    standing on the sufficiency of the answer, you've answered

 1   subject to those objections, but --

 2            MR. TEPFER:  Well, --

 3            THE COURT:  -- there's no argument here on any

 4   objections, so I'm overruling them, like I did with the first

 5   one.

 6            MR. TEPFER:  The only thing I'd like to note is that

 7   the Defendant argues today about the objections, but that's

 8   not -- it was not an issue raised in their section.

 9        And I just want to note, you know, I certainly understand

10   about, you know, we can't -- we're not able to surprise

11   Defendants.  But, you know, some of -- we cited the evidence

12   that we have to the absolute best of our ability.  Some of

13   this evidence is still in Defendants' possession and going to

14   be turned over, and we have a, you know, duty to supplement.

15   But that's, you know, that may be forthcoming once we receive

16   that production.

17            THE COURT:  Okay.  But remember the discussion we had

18   at the beginning about who's got the burden on objections.  If

19   you're not telling me I need to rule on these objections and

20   sustain your objections, and it looks like you went ahead and

21   answered despite any objections, --

22            MR. TEPFER:  Yes, Your Honor.

23            THE COURT:  -- so I'm over -- there's nothing here

24   for me to make any finding on any objection in the FTC's

25   favor.  So I'm overruling the objections.  You've answered.

1  We're looking at the sufficiency of the answer.

2          MR. TEPFER:  Yes, Your Honor.

3          THE COURT:  All right.  All right.  So, I've granted

4  in part and denied in part.  My order will be specific as to

5  the specific requests.

6      But with regard to Issue 1, interrogatory has two parts.

7  I've denied as to the first part, on the flaws.  I've granted

8  as to the second part, on the fixes.

9      On Requests for Admissions 40 through 43, I've granted.

10      Disputed Issue 2, Requests for Admissions 33 through 38,

11  I've granted.

12      Requests for Production 5 through 6, I've denied.

13      Disputed Issues 3, 4, and 5, I've granted.

14      And then Disputed Issues 6 and 7, I have denied.

15      Did I miss anything?

16          MR. TEPFER:  I don't believe so, Your Honor.

17          THE COURT:  Mr. Hummel?

18          MR. HUMMEL:  I'm sorry.

19          THE COURT:  Did I miss any issues?

20          MR. HUMMEL:  No, Your Honor.  Just on the last one, I

21  take it your ruling on the last section applied to both

22  interrogatory responses.

23          THE COURT:  I'm sorry.

24          MR. HUMMEL:  Overruling objections and -- and

25  standing on the answer.

1        THE COURT:  That's -- I am -- I overrule the

2  objections but I'm denying the motion to compel.

3        MR. HUMMEL:  Understood.

4        THE COURT:  All right.

5        MR. HUMMEL:  Thank you, Your Honor.

6        THE COURT:  So, for future discovery requests, I need

7  to know specifically what objections I'm ruling on and the

8  parties' objections.  The whole joint submission process is

9  not to give you homework or make you go away.  It is for you

10  to at least agree on what the issue is that I need to resolve,

11  what objections I'm ruling on, what your specific arguments

12  are, so that we can get through this more quickly.  That's

13  all.

14        MR. HUMMEL:  Understood, Your Honor.

15        THE COURT:  It's just an organization of the issues

16  so we can cover them faster and I can understand what they

17  are.  And sometimes during the process parties understand how

18  really there's not a dispute if there aren't documents that

19  are being withheld, so that's not an issue that we have to

20  cover.  That's all.

21        MR. TEPFER:  Thank you, Your Honor.

22        MR. HUMMEL:  Understood.

23        THE COURT:  All right.

24        MR. HUMMEL:  Thank you.

25        THE COURT:  Good luck to both sides.  We are

1    adjourned.

2              MR. HUMMEL:  Thank you, your honor.

3              MS. ZAMBRANO:  Thank you, Your Honor.

4              THE CLERK:  All rise.

5         (Proceedings concluded at 11:09 a.m.)

6                           --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20                       CERTIFICATE

21        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   **/s/ Kathy Rehling**                        **11/16/2022**

24   _____        _____

25   Kathy Rehling, CETD-444                            Date
     Certified Electronic Court Transcriber

79

INDEX

1

PROCEEDINGS                                                              3

2

WITNESSES

3

-none-

4

EXHIBITS

5

-none-

6

RULINGS

7

Match Group, Inc.'s Motion to Compel Discovery Responses
and Production of Documents from Federal Trade Commission
(#133) - 12/28/30/39/52/54/61/63/64/66/69/70/74/76

8

9

END OF PROCEEDINGS                                                       78

10

INDEX                                                                   79

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>MATCH GROUP, INC., a corporation, and MATCH GROUP, LLC, formerly known as MATCH.COM, LLC, a limited liability company,<br><br>　　　　　　　Defendants. | Case No. 3:19-cv-02281-K |

**DEFENDANT MATCH GROUP, LLC'S RESPONSES AND OBJECTIONS TO
PLAINTIFF FEDERAL TRADE COMMISSION'S FIRST SET OF
<u>INTERROGATORIES</u>**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Rules") Defendant Match Group, LLC ("MGL"), by and through its undersigned counsel, objects and responds to Plaintiff Federal Trade Commission ("Plaintiff" or "FTC") First Set of Interrogatories to MGL (each an "Interrogatory" and, collectively, the "Interrogatories") as follows:

## I.  GENERAL OBJECTIONS

1.  <u>Irrelevant</u>. MGL objects to each and every Interrogatory to the extent that it purports to seek information that is irrelevant to Plaintiff's claims and is not reasonably calculated to lead to the discovery of admissible evidence. In particular, MGL objects to each and every Interrogatory to the extent that it seeks information relevant only to the claims that were dismissed in the Court's August 24, 2022 Order on MGL's Motion to Dismiss (the "Dismissed Claims").[1] For the avoidance of doubt, MGL will not withhold any information merely because it is related

---

[1] Dkt. 129 (dismissing Counts I & II of FTC's First Amended Complaint for Permanent Injunction, Monetary Relief, Civil Penalties, and Other Relief, filed on July 19, 2022 at Dkt. 116 (the "Amended Complaint"), due to MGL's CDA § 230 immunity).

to the Dismissed Claims, if such information is otherwise responsive to the Interrogatories related to non-dismissed claims. MGL further objects to each and every Interrogatory to the extent that it seeks documents or information from an entity or dating site not named in the present litigation, including but not limited to Tinder. MGL objects to Plaintiff's use of the discovery process to conduct a fishing expedition into dating sites that are not at issue in this lawsuit.

2.      Undue Burden. MGL objects to each and every Interrogatory to the extent that it seeks to impose obligations beyond what is required under the Rules or Local Rules or is unduly burdensome. Accordingly, MGL objects to each and every Interrogatory where the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

3.      Overbroad. MGL objects to each and every Interrogatory to the extent that it seeks information that is beyond the scope of Plaintiff's claims, including, but not limited to, documents and information related only to Plaintiff's Dismissed Claims, and documents and information related to entities or dating sites that are not party to, or otherwise related to, this litigation, such as Tinder. MGL will only respond with respect to Match.com. MGL further objects to each and every Interrogatory to the extent that it seeks documents and information that are not within MGL's possession, custody, or control, including by seeking documents and information from and related to entities that are not named as parties to this litigation.

4.      Privilege. MGL objects to each and every Interrogatory to the extent it seeks documents or information subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity from discovery (including, without limitation, all communications with, or work product of, any outside attorney) (collectively, "Privileged

Information"). Any inadvertent disclosure of Privileged Information by MGL shall not constitute a waiver of any applicable privilege, doctrine, or immunity.

5.    <u>Vagueness and Ambiguity</u>. MGL objects to each and every Interrogatory to the extent that such Interrogatory is so vague, ambiguous, or confusing as not to be susceptible to a reasoned interpretation or response. In the absence of clear instructions or definitions associated with terms that are too vague, ambiguous, or confusing, MGL will give the terms used in the Interrogatory a reasonable interpretation.

6.    <u>Accessibility</u>. MGL objects to each and every Interrogatory to the extent that it seeks information that is not reasonably accessible in the ordinary course of business.

7.    <u>Cumulative Interrogatories and Availability of Information Elsewhere</u>. MGL objects to each and every Interrogatory that is cumulative, duplicative of, or to which documents or information already are in the possession, custody, or control of Plaintiff, or have been or could be obtained from another source that is equally available to Plaintiff or is more convenient, less burdensome, or less expensive. In particular, MGL objects to each and every Interrogatory insofar as it seeks documents or information already obtained by Plaintiff during the FTC's prior investigation in connection with the Civil Investigative Demand in 2017 (the "2017 CID") and documents or information produced by Match Group, Inc. ("MGI") during the course of this litigation. For the avoidance of doubt, MGL will comply with the ESI Order, which provides, "The parties need not re-produce in discovery documents that were already produced to the FTC in response to the FTC's CID. Instead, the parties will refer to the bates number of the relevant documents." Dkt. 132 at 4.

8.      Lack of Possession, Custody, or Control. MGL objects to each Interrogatory to the extent it does not appear to be addressed to MGL and seeks information that is necessarily outside MGL's knowledge.

9.      Legal Conclusions. MGL objects to each and every Interrogatory to the extent that it requires MGL to draw legal conclusions.

10.      Reservation of Right to Supplement. Given the stage of the litigation, MGL has not completed its investigation of the facts or law relating to this action, and discovery in this matter is ongoing. Accordingly, consistent with the Rules, these responses and objections are made without prejudice to, and are not a waiver of, MGL's right to amend, correct, or supplement these responses, and are subject to MGL's right to produce evidence of any subsequently discovered facts, or additional facts, information, or documents that may exist. MGL provides these responses in good faith after reasonable inquiry and based on information that it knows or can readily obtain.

11.      No Waiver. By responding to these Interrogatories, MGL does not concede the relevancy of an Interrogatory nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to a particular Interrogatory does not mean that it is probative of any particular issue in this case. MGL expressly reserves its right to assert any and all objections to the admissibility of any responses into evidence at any hearing or trial of this proceeding, or in any other actions or proceedings, on any and all grounds, including, but not limited to, competency, relevancy, materiality, privilege, confidentiality, hearsay, or admissibility as evidence for any other purpose. Moreover, the right to object on any ground to the use of the responses or information provided, in any aspect of this or any other court action, arbitration, or judicial or administrative proceeding or investigation, is reserved.

## II.  SPECIFIC OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.      MGL specifically objects to the Interrogatories' Instructions and Definitions to the extent they purport to impose obligations on MGL that exceed those imposed by the Rules and the Local Rules. In responding to these Interrogatories, MGL will follow the requirements set forth in the Rules and the Local Rules.

2.      MGL specifically objects to the definitions of "Match Group[,] LLC," "Company," and "You" as vague, ambiguous, confusing, and overbroad because the definition includes "assumed names, prior names, and predecessor entities, including Match.com, LLC," and MGL is not sure what the FTC means by "assumed names, prior names, or predecessor entities" (other than Match.com, LLC). MGL further objects to this definition to the extent it encompasses any website other than Match.com, which is the only dating site at issue in the Amended Complaint. Additionally, MGL objects because the correct name of the entity named as a defendant in this litigation is Match Group, LLC, not Match Group LLC.

3.      MGL specifically objects to the definition of "Match Group[,] Inc[.]" because the correct name of the entity named as a defendant in this litigation is Match Group, Inc., not Match Group Inc.

4.      MGL specifically objects to the definitions of "and" and "or" and because they are ambiguous and confusing. MGL will interpret these terms to have their plain, ordinary, and common sense meaning. MGL further objects to these definitions to the extent they purport to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case and exceedingly burdensome. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

5.      MGL specifically objects to the definition of "any" as ambiguous and confusing. MGL will interpret this term to have its plain, ordinary, and common sense meaning. MGL further objects to this definition to the extent it purports to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of this term as overly broad, unduly burdensome, and oppressive to the extent it purports to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

6.      MGL specifically objects to the definitions of "Customer" and "Customers" as overbroad, unduly burdensome, and oppressive, insofar as they purport to cover individual(s) "who have maintained an account on *any website* owned or operated by" MGL, including "Tinder," which encompasses websites that are not related to the present litigation. MGL further objects that the definitions of "Customer" and "Customers" are thus not tailored to the allegations in the Amended Complaint, not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence. In responding to these Interrogatories, MGL will construe the terms "Customer" and "Customers" to refer only to Customer(s) of Match.com.

7.      MGL objects to the definition of "Document" as overly broad and unduly burdensome. MGL further objects to this definition to the extent it refers to items outside of MGL's possession, custody, or control, particularly through its use of the phrases "regardless of origin or location" and "however and by whomever prepared, produced, disseminated, or made." MGL further objects to this definition to the extent it refers to items in Plaintiff's possession, custody, or control, or to items that have been or could be obtained from another source that is equally available to Plaintiff or is more convenient, less burdensome, or less expensive. MGL further objects to this definition to the extent it purports to impose obligations on MGL that exceed those

required by the Rules. In responding to these Interrogatories, MGL will interpret the word "Document" to have its plain, ordinary, and common sense meaning and will comply with the Rules.

8.      MGL specifically objects to the definition of "each" as ambiguous and confusing. MGL will interpret this term to have its plain, ordinary, and common sense meaning. MGL further objects to this definition to the extent it purports to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of this term as overly broad, unduly burdensome, and oppressive to the extent it purports to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

9.      MGL specifically objects to the definitions of "Identify" and "the identity of" because they are ambiguous and confusing. MGL will interpret these terms to have their plain, ordinary, and common sense meaning. MGL further objects to these definitions to the extent they purport to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

10.     MGL specifically objects to the definitions of "referring to" and "relating to" and because they are ambiguous and confusing. MGL will interpret these terms to have their plain, ordinary, and common sense meaning. MGL further objects to these definitions to the extent they purport to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they

purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

11.     MGL specifically objects to the definition of "Subscriber" as overbroad, unduly burdensome, and oppressive, insofar as it purports to cover a "Subscriber" to "any website owned or operated by" MGL, which would necessarily encompass websites that are not related to the present litigation. MGL further objects that the definition of "Subscriber" is thus not tailored to the allegations in the Amended Complaint and not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence. In responding to these Interrogatories, MGL will construe the term "Subscriber" to refer only to Subscribers to Match.com.

12.     MGL objects to the definition of "Tinder" because it is overbroad, ambiguous, and confusing. MGL further objects to the definition of "Tinder" as irrelevant, since Tinder is not even referenced in the Amended Complaint, and thus any Request relying on the definition of "Tinder" is not proportional to the needs of the case and is unduly burdensome.

13.     The foregoing general objections and specific objections to the instructions and definitions provided by Plaintiff shall be fully incorporated by reference into each of the below specific objections to the Interrogatories.

## I.   SPECIFIC OBJECTIONS AND RESPONSES TO THE INTERROGATORIES

**INTERROGATORY NO. 1:** Identify any current or former Match Group[,] LLC employee that has ever had a position at Match Group[,] Inc[.], the time period in which the employee held that position at Match Group[,] Inc[.], the time period of the employee's employment at Match Group[,] LLC, and all responsibilities that individual has held at Match Group[,] Inc[.] and Match Group[,] LLC.

**RESPONSE:** MGL objects to this Interrogatory because "responsibilities" is vague and undefined. MGL objects to this Interrogatory as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Amended Complaint, by seeking discovery of extensive information regarding "any current and former Match Group[,] LLC employee" regardless of their relevance to the claims in the Amended Complaint. MGL will only respond with respect to employees that may have, or had, a role in Match.com's cancellation processes or directly reports to anyone who is responsible or has a role in the cancellation process. MGL further objects to the extent that the requested information is already in Plaintiff's possession, custody, or control. Finally, MGL further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

Subject to and without waiving the foregoing objections, MGL responds as follows:

As of January 1, 2013, Sharmistha Dubey was employed at MGL, until April 2013, and then was employed again from December 2015 until May 2022. Ms. Dubey, while being an MGL employee, also had an engagement agreement with MGI from August 8, 2018 to May 2, 2022. The responsibilities Ms. Dubey held at MGI were President, from January 2018 to March 2020, and CEO, from March 2020 until May 2022. Ms. Dubey also currently serves as a Board Member of MGI, a role she has held since September 2019. The responsibilities Ms. Dubey held at MGL were Chief Product Officer, as of January 2013 until April 2013, President of Match Group NA, from December 2015 to December 2017, Chief Operating Officer of Tinder, from July 2017 to

December 2017,[2] President, from January 2018 to March 2020, and CEO from March 2020 until May 2022.

As of January 1, 2013, Mandy Ginsberg was employed at MGL until April 2013, and then was employed again from December 2015 until January 2020. Ms. Ginsberg, while being an MGL employee, also had an engagement agreement with MGI from December 5, 2017 to March 1, 2020. The responsibilities Ms. Ginsberg held at MGI was CEO, from December 2017 to March 2020. Ms. Ginsberg also served as a Board Member of MGI from December 2017 to March 2020. The responsibilities Ms. Ginsberg held at MGL were CEO of Match.com, as of January 2013 until April 2013, CEO of Match Group NA, from December 2015 to December 2017, and CEO, from January 2018 to March 2020.

From January 2016 until December 2017, Gregory Blatt was employed at MGL.  Mr. Blatt, while being an MGL employee, also had an engagement agreement with MGI from April 27, 2016 to December 5, 2017.  The responsibilities Mr. Blatt held at MGI was Executive Chairman, from December 2013 to January 2016, and Chairman & CEO, from January 2016 to December 2017. Following MGI's Initial Public Offering in November 2015, Mr. Blatt also served as a Board Member of MGI from November 2015 to August 2018. The responsibilities Mr. Blatt held at MGL were CEO & President from January 2016 to December 2017.

As of January 1, 2013, Sam Yagan was employed at MGL until December 2015.  The responsibilities Mr. Yagan held at MGI was CEO, as of January 2013 to December 2015. Mr. Yagan also served as a Board Member of MGI from December 2015 to September 2019. The responsibility Mr. Yagan held at MGL was CEO from April 2013 to December 2015.

---

[2] Ms. Dubey served as COO of Tinder starting in January 2017, when it was owned and operated by Tinder, Inc., a separate entity from MGL. Pursuant to a July 2017 merger, Tinder, Inc.'s assets and liabilities were acquired by Match Group, LLC.

As of January 1, 2013, and continuing until today, Amarnath Thombre has been employed at MGL.  The responsibilities Mr. Thombre has held at MGI has been Chief Strategy Officer, as of January 2013 to December 2017, and CEO of Match Group Americas, from January 2018 to present. The responsibilities Mr. Thombre has held at MGL has been Chief Strategy Officer, as of January 2013 to December 2017, and VP & CEO of Match Group Americas, from January 2018 to present.

As of May 3, 2022, and continuing until today, Bernard Kim has been employed at MGL. Mr. Kim, while being an MGL employee, also has an engagement agreement with MGI as of May 3, 2022. The responsibilities Mr. Kim holds at MGI is CEO, and at MGL is CEO. Mr. Kim also currently serves as a Board Member of MGI, a role he has held since May 2022.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 2:** Identify any contractual agreements that have ever existed between Match Group[,] Inc[.] and Match Group, LLC and state in detail the nature of those contractual agreements, the dates of their execution, and the terms of those agreements, and state on a month by month basis any payments made by or between Match Group[,] Inc[.] and Match Group[,] LLC as a result of any such contractual agreement.

**RESPONSE:** MGL objects to this Interrogatory as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Amended Complaint, by seeking exceedingly broad discovery regarding "any contractual agreements that have ever existed" between MGI and MGL, the detailed nature of those contractual agreements, the dates of their execution, the terms of those agreements, and a month-by-month statement of "any payments" made by or between MGI and MGL as a result of any such contractual agreement—regardless of any relevance to the claims in the Amended Complaint. MGL will respond only with respect to contractual agreements between MGI and MGL relating to Match.com's cancellation mechanisms. MGL further objects to the applicable time period for

this Interrogatory as vague, ambiguous, and confusing because it seeks "*any* contractual agreements that have *ever* existed," which implies an unlimited time period aside from any relevance to the claims in the Amended Complaint. Likewise, MGL objects to the extent that the requested information already is in Plaintiff's possession, custody, or control, or is publicly available. Additionally, MGL objects to this Interrogatory as vague, ambiguous, and confusing in that it is not clear what the FTC means by the separate requirements it lists to "state in detail the nature of those contract agreements" and "the terms of those agreements." Moreover, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as two of interrogatories against the 25 interrogatory limit.

Subject to and without waiving the foregoing objections, MGL responds as follows: There are no contractual agreements between MGI and MGL regarding Match.com's cancellation mechanisms.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 3:** Describe any criteria Match Group[,] LLC uses or has used to determine whether to grant a Customer's request for a refund relating to Ads, fraud or alleged fraud, Match Guarantees, consumer's belief that they had already canceled their subscription, or his or her claimed lack of knowledge about recurring charges.

**RESPONSE:** MGL objects to this Interrogatory as vague and confusing because this Interrogatory uses the defined term "Customer" before using the undefined term "consumer," and it is unclear whether the FTC intends for the terms to have the same meaning or different meanings. MGL further objects to this Interrogatory as overly broad and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Amended Complaint, as detailed below. Any information related to "fraud or alleged fraud" relates solely to

Counts I and II, which the Court dismissed with prejudice on August 24, 2022. *See* Dkt. 129. Moreover, MGL objects to this Interrogatory because Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as five of interrogatories against the 25 interrogatory limit. MGL further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules. Finally, MGL objects to this Interrogatory to the extent the information is already in Plaintiff's possession, custody, or control. MGL will respond solely as to the criteria used to determine whether to grant a Customer's request for a refund relating to the Customer's belief that they had already cancelled their subscription or his or her claimed lack of knowledge about recurring charges.

Subject to and without waiving the foregoing objections, MGL responds as follows: pursuant to Federal Rule of Civil Procedure 33(d), MGL directs the FTC to documents produced by MGI at MATCHFTC740484, MATCHFTC740485, MATCHFTC740487,

MATCHFTC740492,    MATCHFTC740500,    MATCHFTC740502,    MATCHFTC740507,

MATCHFTC740509,    MATCHFTC740514,    MATCHFTC740519,    MATCHFTC740527,

MATCHFTC740532,    MATCHFTC740535,    MATCHFTC740536,    MATCHFTC740542,

MATCHFTC740548,    MATCHFTC740549,    MATCHFTC740551,    MATCHFTC740553,

MATCHFTC740555,    MATCHFTC740561,    MATCHFTC740564,    MATCHFTC740570,

MATCHFTC740578,    MATCHFTC740586,    MATCHFTC740587,    MATCHFTC740619,

MATCHFTC740684,    MATCHFTC740687,    MATCHFTC740690,    MATCHFTC740693,

MATCHFTC740700,    MATCHFTC740865,    MATCHFTC740929,    MATCHFTC740967,

MATCHFTC740989,  MATCHFTC741061,  MATCHFTC741062,  MATCHFTC741063,  and

MATCHFTC741158.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 4:** Describe in complete detail the basis for your contention that Match.com is wholly owned by Match Group[,] LLC or operated exclusively by Match Group[,] LLC.

**RESPONSE:** MGL objects to this Interrogatory as vague and confusing because "wholly owned" and "operated exclusively" are vague and undefined. MGL also objects to this Interrogatory to the extent it seeks Privileged Information. MGL further objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control. MGL further objects to this Interrogatory as overly broad and unduly burdensome to the extent that it requires MGL to describe "in complete detail" the basis for its contentions. Additionally, MGL objects to this Interrogatory to the extent it calls for a legal conclusion.

Subject to and without waiving the foregoing objections, MGL responds as follows:

The basis for our contention that Match.com is owned and operated by MGL, is that MGL is the general operating company that owns and operates Match.com, as evidenced by numerous

documents produced during the CID and this litigation showing MGL employees operating and controlling Match.com. Likewise, the Match.com Terms of Use provide that Match.com is operated by Match Group, LLC. Additionally, MGL is the entity that is the registrant, administrative, and technical contact for the domain Match.com, and MGL is the owner of the Match.com trademark.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 5:** Describe in complete detail any role that Match Group[,] Inc[.] or its employees have ever had relating to the operation or advertisement of Match.com, any action Match Group[,] Inc. or its employees have ever taken relating to the operation or marketing of Match.com, or any report that Match Group[,] LLC has ever made to Match Group[,] Inc[.] concerning the operation or advertisement of Match.com, including relating to the following topics:

    a.    Match.com's terms and conditions;

    b.    Polices or procedures related to the Match Guarantee;

    c.    Match.com's refund policies and procedures; and

    d.    Policies and procedures related to Match.com's cancellation mechanisms or the disclosure or advertisement of cancellation mechanisms.

**RESPONSE:** MGL objects to this Interrogatory as vague and confusing because it is unclear whether the Plaintiff is referring only to actions MGI's employees have taken in their role as an employee of or on behalf of MGI or actions an MGI employee has taken in their role as an employee of or on behalf of another entity that they may be employed by. MGL interprets this Interrogatory as referring to actions an employee of MGI has taken in their role as an MGI employee. MGL objects to "role," "report," "terms and conditions," and "policies or procedures" as vague and undefined, as MGL is not sure what Plaintiff means by such references. MGL will give those terms their plain and ordinary meanings, and MGL will interpret "report," as it is used in this Interrogatory, to mean that the person receiving the communication from MGL on behalf of MGI was acting in his or her capacity as an MGI officer at the time of the communication. MGL

further objects to this Interrogatory as extraordinarily broad and not proportional to the needs of the case because Plaintiff in this Interrogatory purports to seek "complete detail" about information far beyond the scope of Plaintiff's claims in the Amended Complaint, by seeking discovery of extensive information regarding "*any* role" MGI or its employees "*ever* had," "*any* action . . . *ever* taken," and "*any* report . . . *ever* made." MGL also objects to this Interrogatory because it improperly demands that MGL respond as to the knowledge of persons and/or entities other than MGL, namely MGI, as it seeks information regarding the actions and roles of MGI and its employees. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as four of interrogatories against the 25 interrogatory limit.

Moreover, Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. MGL also objects to the extent that this Interrogatory suggests Match.com "cancellation mechanisms" are advertised and to the extent it suggests MGI operates Match.com. MGL will only respond with respect to subpart (d).

Subject to and without waiving the foregoing objections, MGL responds as follows:

Neither MGI nor its employees acting in their capacities as MGI employees has ever had any role or taken any action regarding the policies and procedures related to the design of Match.com's cancellation mechanisms or the disclosure or advertisement of cancellation mechanisms, as MGL is responsible for the policies and procedures related to Match.com's cancellation mechanisms and any disclosure of cancellation mechanisms. With respect to reports MGL has made to MGI related to Match.com's cancellation mechanisms or the disclosure of cancellation mechanisms, pursuant to Rule 33(d), MGL directs the FTC to any documents that may be produced by MGI responsive to Request for Production No. 2 in the FTC's First Set of Requests for Production to MGI.

**INTERROGATORY NO. 6**: Identify and describe in complete detail the full basis for each affirmative defense You have asserted in Your Answer, including but not limited to every fact and document that supports, contradicts, refutes, or rebuts that particular affirmative defense, and every witness who may have information or testimony relevant to that particular defense.

**RESPONSE:** MGL objects to this Interrogatory because "relevant" is vague and undefined because MGL and the FTC may have different understandings of what is "relevant" in this case. MGL also objects to the extent this Interrogatory seeks Privileged Information. MGL also objects to this Interrogatory as premature and to the extent it seeks to require MGL to marshal all of its evidence before trial. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is not in its possession, custody, or control, or that is already in Plaintiff's possession, custody, or control. To that end, MGL directs the FTC to MGL's Initial Disclosures, served on August 22, 2022, in which MGL provided the name of individuals likely to have discoverable information, along with the subjects of that information, that MGL may use to support its claims or defenses. Lastly, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single

questions, including subparts. MGL will treat this as ten interrogatories against the 25 interrogatory limit. *See White v. Cinemark USA, Inc.*, No. 04CV0397 GEB CMK, 2005 WL 3881658, at *3 (E.D. Cal. Mar. 28, 2005)(holding that "each affirmative defense should be treated as a separate interrogatory, since each defense may be both factually and logically different").

Subject to and without waiving the foregoing objections, MGL responds as follows:

First Affirmative Defense (Failure to State a Claim): The Amended Complaint fails to state a claim for the reason that the Guarantee and Chargeback policy at issue in Counts III and IV of the Amended Complaint were permanently discontinued prior to the FTC filing suit, and those practices have never and will never be reinstated, as the FTC is aware from multiple communications, along with the Notice of Stipulation Regarding Permanently Discontinued Practices on Match.com, recently filed on September 20, 2022, at Dkt. 146. Thus, neither MGL nor Match.com are violating, nor are they about to violate, the FTC Act.

Second Affirmative Defense (Compliance with Applicable Law): The Amended Complaint's Count V fails as MGL did not violate Section 4 of ROSCA, 15 U.S.C. § 8403. Rather, at all times with respect to Count V, Match.com complied with all applicable laws and acted reasonably and in good faith. As a preliminary matter, even assuming that the online cancellation flow at issue in Count V is not simple (although it is), the plain language of ROSCA requires only "simple mechanisms" for cancellation, and ROSCA does not provide that every cancellation method must be simple. Count V fails because Match.com offers several other cancellation methods in full compliance with ROSCA, including simple methods to cancel by phone, fax, email, internet chat, or standard mail. *See infra* Resp. to Interr. No. 15 (explaining multiple cancellation mechanisms and citing documents related to same). And the FTC challenges only the online cancellation method. Thus, even if the FTC were correct (which it is not) that the online

cancellation flow is not simple, the existence of other unchallenged methods of cancellation defeats the FTC's claim.

Count V also fails because the Match.com online cancellation flow is not complicated or in any material way different from numerous other online subscription cancellation mechanisms. It is essentially industry standard. Consumers in fact readily canceled using the Match.com online cancellation flow, as reflected by data proving that subscribers have no difficulty canceling via the online cancellation flow, which can be completed in less than one minute. *See infra* Resp. to Interr. No. 15 (explaining multiple cancellation mechanisms and citing documents related to same). Based on data reviewed during the FTC's pre-suit investigation, on average, 89% of Match.com subscribers who initiated an online cancellation request successfully canceled their subscription within the same day.

Third Affirmative Defense (Good Faith Belief and Conduct): Match.com's online cancellation flow was designed and implemented to be simple and readily accessible to users. *See infra* Resp. to Interr. No. 15 (explaining online cancellation flow and citing documents and videos related to same).

Fourth Affirmative Defense (Requested Relief Contrary to Public Policy): The FTC's requested relief with respect to Count V is contrary to the public interest because Match.com's online cancellation flow is intended to benefit consumers by protecting their privacy (by requiring them to insert their passwords prior to accessing private account information, such as billing), offering them discounted rates, and allowing Match.com to understand how to better serve them. *See infra* Resp. to Interr. No. 15 (explaining online cancellation flow and citing documents and videos related to same).

Fifth Affirmative Defense (Alleged Failure to Clearly and Conspicuously Disclose Not Material): Any alleged failure by Match.com to clearly and conspicuously disclose some requirements of the Guarantee practice was not material because most consumers who did not qualify for the Guarantee failed to satisfy the requirements that were unquestionably adequately disclosed (i.e., the requirements in the numbered and bullet-pointed list in the Program Rules). So even had other requirements been *more* clearly and conspicuously disclosed (or waived), most users would not have been eligible for a Guarantee regardless.

Sixth Affirmative Defense (Mootness): As to Count III, MGL asserts the FTC's claim for injunctive relief is moot under applicable law. The FTC admits in its Amended Complaint that this Guarantee practice at issue in Count III ceased in mid-2019 (but it was actually permanently discontinued in April 2019). MGL asserts Count IV is also moot, because, as the FTC admits in its Amended Complaint, Match.com's chargeback practice ceased in mid-2019 (but it was actually permanently discontinued in March 2019). Count IV's claim for injunctive relief is therefore also moot. There is nothing to enjoin because the challenged practices have been permanently discontinued, and MGL will not reinstitute those practices. *See, e.g.*, Notice of Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146.

Seventh Affirmative Defense (Overbroad Injunction): The FTC's requested injunction with respect to Count III and the "Guarantee" practice is overbroad and not specifically tailored to the violations alleged in the Amended Complaint. The FTC's requested injunction with respect to Count IV and the chargeback policy is overbroad and not specifically tailored to the violations alleged in the Amended Complaint. Finally, the FTC's requested injunction is overbroad and not specifically tailored to the violations alleged in the Amended Complaint. In particular, the FTC's requested injunction is overbroad not only because the Amended Complaint fails to allege all

necessary facts, but also because the FTC attempts to apply such injunction to brands other than Match.com that are not implicated by the Amended Complaint.

Eighth Affirmative Defense (Mitigation): With respect to Count V, the FTC has not offered any reliable methodology for quantifying alleged consumer harm, and any restitution amount would be subject to mitigation to the extent that consumers received refunds or utilized the services on the renewed subscription.

Ninth Affirmative Defense (Statute of Limitations): The FTC's claims are barred in part by the statute of limitations, including, but not limited, to the extent that the FTC seeks civil penalties, monetary relief, or redress for purported violations that occurred outside of the applicable statute of limitations.

Tenth Affirmative Defense (Reservation of Other Affirmative Defenses): MGL lacks sufficient information regarding the facts and evidence alleged and is therefore unable to ascertain at this time any additional affirmative defenses which MGL may have. Therefore, MGL expressly reserves the right to amend its Answer to assert such other affirmative defenses as may become apparent subsequent to the filing of its Answer, whether in discovery, at trial, or otherwise.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 7:** Identify any tests, reports, A/B testing, Customer surveys, usability tests, focus groups, or other user experience studies, whether formal or informal, related to:

    a.    Match Guarantees;

    b.    Chargebacks related to Match.com subscriptions; and

    c.    Means and ease of subscription renewal or cancellation for Match.com subscriptions.

Your response to this Interrogatory should include descriptions of the types of usability studies, beta studies, and surveys that the response covers. In addition, please provide Your response in machine-readable format, for example, in a .csv or spreadsheet file format.

**RESPONSE**: MGL objects to this Interrogatory because "tests," "reports," "A/B testing," "Customer surveys," "usability tests," "focus groups," "other user experience studies," "formal," "informal," "usability studies," "beta studies," and "surveys" are vague and undefined, and to the extent this Interrogatory seeks Privileged Information. MGL also objects to this Interrogatory to the extent the request to "provide [the] response in machine-readable format" imposes obligations on MGL that exceed those imposed by the Rules or the ESI Order. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Counts III and IV in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as three interrogatories against the 25 interrogatory limit. MGL further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

Subject to and without waiving the foregoing objections, MGL responds with respect to subpart (c) as follows: pursuant to Federal Rule of Civil Procedure 33(d), MGL directs the FTC to documents produced in response to the FTC's RFP No. 26 to MGI.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 8:** On a monthly basis, state:

    a.    the number of Match.com subscriptions subject to the Guarantee sold;

    b.    the number of Guarantee Extensions that Match Group[,] LLC provided Customers;

    c.    the number of Customer inquiries regarding the automatic renewal of subscriptions subject to the Match Guarantee;

    d.    the number of refund requests Customers submitted to Match Group[,] LLC relating to Match Guarantees and the dollar amount of these requested refunds; and

    e.    the number of refunds Match Group[,] LLC granted relating to Match Guarantees and the amount of money refunded relating to Match Guarantees.

**RESPONSE:** MGL objects to this Interrogatory because "subscriptions" and "inquiries" are vague and undefined and to the extent this Interrogatory seeks Privileged Information. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match

Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as five interrogatories against the 25 interrogatory limit.

Subject to and without waiving the foregoing objections, MGL responds that it permanently discontinued the Guarantee in April 2019. It has not offered the Guarantee since that date, and it will not reinstitute the Guarantee in the future.

**INTERROGATORY NO. 9:** State all limitations on Customers' rights to redeem a Match Guarantee or receive a Guarantee Extension and all actions consumers had to complete to redeem a Match Guarantee or receive a Guarantee Extension. For each such limitation or action Identify:

    a.    the date such limitation was implemented and/or eliminated; and

    b.    all advertisements, notices, disclosures, or other notifications where Match disclosed the need to complete that action.

**RESPONSE:** MGL objects to this Interrogatory because "rights to redeem" and "Match" are vague and undefined and to the extent this Interrogatory seeks Privileged Information. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related

to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as two interrogatories against the 25 interrogatory limit.

Subject to and without waiving the foregoing objections, MGL responds that it permanently discontinued the Guarantee in April 2019. It has not offered the Guarantee since that date, and it will not reinstitute the Guarantee in the future.

**INTERROGATORY NO. 10:** Describe in complete detail the basis for your contention that the terms of the Match Guarantees were adequately disclosed.

**RESPONSE:** MGL objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Subject to and without waiving the foregoing objections, MGL responds that it permanently discontinued the Guarantee in April 2019. It has not offered the Guarantee since that date, and it will not reinstitute the Guarantee in the future.

**INTERROGATORY NO. 11:** Identify the number of consumers whose request for a Guarantee Extension were denied due to that limitation or for failing to complete that particular action.

**RESPONSE:** MGL objects to this Interrogatory because "that limitation" and "that particular action" are vague and undefined and to the extent this Interrogatory seeks Privileged Information. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Subject to and without waiving the foregoing objections, MGL responds that it permanently discontinued the Guarantee in April 2019. It has not offered the Guarantee since that date, and it will not reinstitute the Guarantee in the future.

**INTERROGATORY NO. 12:** Describe all of Match's policies relating to Customer Chargebacks, including regarding:

    a.    the circumstances in which Match Group[,] LLC will dispute a Customer Chargeback;

    b.    denying Customer account access due to a Chargeback request;

    c.    deleting or reinstating accounts of consumers who unsuccessfully attempt a Chargeback and when such deletions or reinstatements are effective; and

    d.    the effective dates of the policies.

**RESPONSE:** MGL objects to this Interrogatory because "Match" is undefined, and it is unclear what the FTC means by "Match," given the FTC's history and positions taken in this litigation. MGL further objects to this Interrogatory because "denying Customer account access due to a Chargeback request" is vague and confusing; MGL will interpret that subpart of the Interrogatory to mean users that had active subscriptions and were not refunded. MGL also objects to the extent this Interrogatory seeks Privileged Information. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued "Chargebacks" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count IV in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass. Furthermore, the circumstances in which MGL decides to dispute a chargeback are irrelevant, as they are unrelated to the conduct challenged

in the Amended Complaint (conduct *after* a chargeback dispute has been resolved). Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as four interrogatories against the 25 interrogatory limit. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control.

Subject to and without waiving the foregoing objections, MGL responds as follows: in March 2019, Match.com, by and through its owner and operator, MGL, discontinued the chargeback policy challenged in the Amended Complaint. It has not implemented the challenged chargeback policy since that date, and it will not reinstitute the challenged chargeback policy in the future. MGL's current chargeback policy is as follows: When a user with an active subscription initiates a chargeback, MGL hides that user's profile (because that user has indicated that he or she no longer wishes to appear on the site), and disables the user's account login (because the user is disputing payment for the service that MGL provides). If MGL disputes the chargeback and prevails, and has not already refunded the user, then MGL re-enables the user's account login, restores the amount of subscription time the user had remaining at the time the account was disabled, and sends the user an email notifying the user that his or her account has been reactivated and containing instructions about how to un-hide his or her profile. For the avoidance of doubt, if MGL prevails in a chargeback billing dispute with a consumer, MGL does not fail to provide the Consumer access to the consumer's Match.com account or to the subscription service(s) that the consumer paid for, nor does it terminate the consumer's account or delete the consumer's profile because of the chargeback billing dispute in which MGL prevailed.

**INTERROGATORY NO. 13:** Describe in complete detail the basis for your contentions that:

    a.    Match.com's Chargeback policy was a reasonable policy designed to protect consumers;

    b.    That Match.com's Chargeback policy was employed to address wrongful Chargeback requests; and

    c.    That subscribers disputing subscription charges were "de facto indicating" that they no longer desired access to their accounts.

**RESPONSE:** MGL objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued "Chargebacks" and related practices, and MGL has repeatedly told the FTC this orally and in writing MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count IV in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The FTC has not alleged that MGL's current chargeback policy (described in response to Interrogatory No. 12) is unreasonable or in violation of the law. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as three interrogatories against the 25 interrogatory limit.

    Subject to and without waiving the foregoing objections, MGL responds as follows: MGL discontinued the chargeback policy challenged in the Amended Complaint in March 2019. It has

not implemented the challenged chargeback policy since that date, and it will not reinstitute the challenged chargeback policy in the future.

**INTERROGATORY NO. 14:** On a monthly basis, state:

a.    the number of Customer communications Match Group[,] LLC received regarding account cancellation or cancellation processes;

b.    the number of refund requests made by Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

c.    the dollar value of the refund requests made by Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

d.    the number of refunds Match provided to Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

e.    the dollar value of the refunds provided to Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

f.    the amount charged to Customers who had requested a refund on the basis that they believed they had cancelled and had this request denied by Match Group[,] LLC; and

g.    the amount charged to Customers who had requested a refund on the basis that they were unaware of Match Group[,] LLC's recurring charge and had this request denied by Match Group[,] LLC.

**RESPONSE:** MGL objects to this Interrogatory because "Match" is undefined, and it is unclear what the FTC means by "Match," given the FTC's history and positions taken in this litigation. MGL will respond only as to Match.com, the only dating site relevant in this action. MGL further objects to this Interrogatory because "Customer communications," "account cancellation or cancellation processes," "attempted," "believed," and "claimed," are vague and undefined. In particular, MGL objects that it would be impossible to provide the "the number of Customer communications Match Group[,] LLC received regarding account cancellation or cancellation processes," as requested in subpart (a), so MGL will provide the number of Customers who cancelled their subscriptions. MGL also objects that it is impossible to identify Customers who "attempted to cancel," so MGL will respond to subparts (b), (d), and (e) only as to "Customers who claimed they believed they already canceled their subscriptions." MGL further objects that

subpart (c) is vague and incalculable because, although MGL is able to ascertain which Customers requested and received a refund, MGL is not able to provide the amount of the refund that each Customer sought from MGL, which could be different from the amount of the refund that the Customer actually received from MGL. MGL also objects that subpart (f) is confusing and impossible to calculate, as MGL does not understand what information the FTC seeks in this subpart, and MGL is not able to interpret the subpart in such a way that it could provide any other information than what MGL is already providing for the other subparts. MGL further objects to this entire Interrogatory as overly broad and unduly burdensome, particularly as it relates to subpart (g), as recurring charges (in the absence of a request to cancel) are not relevant to any party's claim or defense. MGL also objects that each subpart seeks information beyond the scope of the applicable statute of limitations period for any purported right of the FTC to monetary relief or redress against MGL, so MGL will provide information for the period beginning three years before the FTC filed the Amended Complaint and named MGL as a defendant. *See* Am. Compl., Dkt. 116 (filing Amended Complaint and naming MGL as defendant on July 19, 2022).

MGL also objects to this Interrogatory to the extent this Interrogatory seeks Privileged Information. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as seven interrogatories against the 25-interrogatory limit. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, MGL does not concede the relevancy of this Interrogatory nor the relevancy or admissibility of any information provided in response thereto. That information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case.

Subject to and without waiving the foregoing objections, MGL responds as follows:

Pursuant to Rule 33(d), MGL directs the FTC to documents that will be produced by MGL containing data responsive to the Interrogatory. Once produced, MGL will identify those documents by Bates number.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 15:** Describe each method through which consumers could cancel their subscriptions. For each such method, describe in detail:

    a.    every instance in which Match Group[,] LLC informed consumers of or disclosed to consumers the availability of each method;

    b.    each step that consumers would have to take in order to successfully cancel their Match.com subscription; and

    c.    each representation that Match has made to consumers at each step in the cancellation process.

**RESPONSE:** MGL objects to this Interrogatory because "Match" is undefined, and it is unclear what the FTC means by "Match," given the FTC's history and positions taken in this litigation; MGL will interpret "Match" to mean MGL. MGL also objects that this Interrogatory is vague and ambiguous because it does not identify what subscriptions are at issue. MGL will interpret this Interrogatory to ask about Mach.com subscription. MGL further objects that subparts (b) and (c) of this Interrogatory are vague and undefined because the differences between what the FTC seeks within each subpart are not clear. MGL also objects to the extent this Interrogatory seeks Privileged Information. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, MGL does not concede the relevancy of this Interrogatory nor the relevancy or

admissibility of any information provided in response thereto. The fact that information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case.

Subject to and without waiving the foregoing objections, MGL responds as follows:

Match.com offers multiple simple mechanisms for consumers to cancel their subscriptions, including by the Match.com online cancellation flow, online chat, telephone, email, U.S. mail, and fax. Match.com discloses these simple cancellation mechanisms throughout the registration process and Match.com, including in Match.com Frequently Asked Questions ("FAQ") pages. Consumers frequently and successfully use such mechanisms to cancel their subscriptions. *See, e.g.*, *infra* Resp. to Interr. No. 16.

Match.com discloses how to cancel a subscription throughout the registration process on the first page of the subscription flow, the billing page before the consumer subscribes, and the subscription confirmation page if the consumer subscribes. Before consumers select a subscription plan or provide billing information, consumers have access to a "Billing—Continuous Service" screen, which provides, "To change or cancel your subscription at any time, click the 'Account' link on the upper-right corner of the website and follow the directions. You can also change or cancel your subscription by contacting our Customer Care team as directed on the website."

Before consumers subscribe, Match.com again informs consumers of the cancellation mechanisms on the billing page with a disclosure above the "Subscribe Now" button. The disclosure provides that consumers can "cancel via the Account Settings page." A hyperlink with the words "Learn More" also appears in blue text near the "Subscribe Now" button, and "Learn More" again leads to the "Billing—Continuous Service" screen that describes the cancellation mechanisms in greater detail. In addition, immediately to the left of the "Subscribe Now" button

is a hyperlink to the Match.com Terms of Use in blue text. The Terms of Use[3] provide in red text, "If you purchase a subscription, it will automatically renew until you cancel, in accordance with the terms disclosed to you at the time of purchase, as described below." The Terms of Use further provide a mailing address and fax number to send cancellation notices, which consumers have recently utilized to cancel their subscriptions. *See, e.g.*, MATCHFTC744797 (cancelling via U.S. mail); MATCHFTC744802 (same); MATCHFTC744806 (same); MATCHFTC744810 (same); MATCHFTC744801 (cancelling via fax).

Following payment of a subscription, consumers are directed to a subscription confirmation page, which provides, "To cancel, you may visit your Account Settings at any time." The words "Account Settings" are a hyperlink in blue text that directs consumers to the Account Settings page for cancellation through the online cancellation flow, described in more detail below.

Consumers may also find information about how to contact Customer Care or otherwise cancel a subscription by visiting various Match.com FAQ pages. The "Contact Us" FAQ page[4] provides several options to contact Customer Care, including through chat or email, and a phone number may be displayed if the consumer is logged into the consumer's account when viewing that FAQ page. The "Cancelling" FAQ page,[5] which may be found by merely searching "cancel" on the FAQ page, describes how to cancel a subscription (i.e., turn off auto-renewal).

The simple steps to cancel through each cancellation mechanism are outlined below:

**Online Cancellation Flow.** A consumer may cancel a Match.com subscription by utilizing the online cancellation flow, which easily can be completed in less than one minute. *See, e.g.*,

---

[3] https://cp.match.com/en-us/resources/TermsOfUse_02_28_22.pdf
[4] https://help.match.com/hc/en-us/articles/6140024199195-Contact-Us
[5] https://help.match.com/hc/en-us/articles/6077124196891-Cancelling

MATCHFTC672322-MATCHFTC672329 (videos of Match.com online cancellation flow).[6] From the "Account Settings" page, the consumer clicks "Manage subscription" (which is in the "Manage account" group), inserts the consumer's password and completes a reCaptcha (to ensure that a consumer's billing data remains secure), and then clicks "Cancel Subscription." The consumer is asked a few optional survey questions; the consumer may answer the survey questions or may simply click "Continue Cancellation." The consumer then reaches a cancellation confirmation page, which provides (1) a confirmation number, (2) that the consumer does not have to do anything further to complete the subscription cancellation, (3) the last day of the consumer's subscription, and (4) that the consumer will receive an email confirming the cancellation.

**Online Chat.** A consumer may cancel a Match.com subscription by sending the consumer's cancellation request via chat to Match.com Customer Care. The chat mechanism can be found on the Customer Care Contact Us FAQ page. Customer Care will then process the request.

**Telephone.** A consumer may cancel a Match.com subscription by calling the Match.com Customer Care phone number, 800-926-2824, and stating the consumer's request to cancel the consumer's subscription. The phone number has been generally available on the FAQ pages. Customer Care will then process the request.

**Email.** A consumer may cancel a Match.com subscription by emailing the consumer's cancellation request to Match.com Customer Care. The email mechanism can be found on the Customer Care Contact Us FAQ page. Customer Care will then process the request. Customer Care has offshore agents that respond to e-mails after hours and during weekends.

---

[6] In early 2019, "Change/Cancel Membership" was changed to "Manage subscription," a Captcha was added to the password page, and "No thanks, I want to resign" was changed to "Continue Cancellation."

**U.S. Mail.** A consumer may cancel a subscription by mailing the consumer's cancellation to Match, Attn: Cancellations, P.O. Box 25472, Dallas, Texas 75225. The address can be found in the Match.com Terms of Use. The request should state that the consumer is cancelling the agreement, or words of similar effect, and include the consumer's name and email address, phone number, or other unique identifier used to sign up for the account so that Match.com can identify the appropriate account. Customer Care will then process the request.

**Fax.** A consumer may cancel a Match.com subscription by sending a fax with the consumer's request to cancel the consumer's subscription to 214-853-4309. The fax number can be found in the Match.com Terms of Use. The request should state that the consumer is cancelling the agreement, or words of similar effect, and include the consumer's name and email address, phone number, or other unique identifier used to sign up for the account so that Match.com can identify the appropriate account. Customer Care will then process the request.

**INTERROGATORY NO. 16:** State on a month by month basis the number of consumers that have cancelled a Match.com subscription by the following mechanisms:

    a.     fax;

    b.     online chat;

    c.     telephone;

    d.     U.S. mail;

    e.     Match.com's cancellation flow; and

    f.     Any other method.

**RESPONSE:** MGL objects to this Interrogatory to the extent this Interrogatory seeks Privileged Information. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, MGL does not concede the relevancy of this Interrogatory nor the relevancy or

admissibility of any information provided in response thereto. The fact that information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case. MGL further objects to this Interrogatory as overly broad and unduly burdensome to the extent that it requests information that is not reasonably available to MGL, particularly insofar as Plaintiff is demanding almost ten years' worth of data, from 2013-present. MGL also objects that each subpart seeks information beyond the scope of the applicable statute of limitations period for any purported right of the FTC to monetary relief or redress against MGL, so MGL will provide information for the period beginning three years before the FTC filed the Amended Complaint and named MGL as a defendant. *See* Am. Compl., Dkt. 116 (filing Amended Complaint and naming MGL as defendant on July 19, 2022). MGL sometimes does not have data about the method by which a consumer canceled his or her subscription. MGL will respond to the best of its knowledge and ability.

Subject to and without waiving the foregoing objections, MGL responds as follows:

Pursuant to Rule 33(d), MGL directs the FTC to documents that will be produced by MGL containing data responsive to the Interrogatory. Once produced, MGL will identify those documents by Bates number.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

Dated: September 28, 2022

*/s/ Angela C. Zambrano*
Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com

SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Fax: 214.981.3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310.595.9500
Fax: 310.595.9501

*Attorneys for Match Group, Inc. and
Match Group, LLC*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that a true and correct copy of the above and forgoing document

was served on all counsel of record via e-mail as outlined below on September 28, 2022.

Reid Abram Tepfer
rtepfer@ftc.gov
M Hasan Aijaz
maijaz@ftc.gov
Matthew James Wilshire
mwilshire@ftc.gov
Sarah Zuckerman
szuckerman@ftc.gov
John R. O'Gorman
jogorman@ftc.gov
Erica Rollins Hilliard
ehilliard@ftc.gov

*/s/ Angela C. Zambrano*
Angela C. Zambrano

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>MATCH GROUP, INC., a corporation,<br><br>    Defendant. | **Case No. 3:19-cv-02281-K**<br><br>**STIPULATED ORDER FOR PERMANENT INJUNCTION, MONETARY RELIEF, CIVIL PENALTIES, AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), filed its Complaint for Permanent Injunction and Other Equitable Relief ("Complaint") in this matter, pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b and Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404. The Commission and Defendant stipulate to the entry of this Stipulated Order for Permanent Injunction, Monetary Relief, Civil Penalties, and Other Relief ("Order") to resolve all matters in dispute in this action between them.

**THEREFORE, IT IS ORDERED** as follows:

## FINDINGS

1.    This Court has jurisdiction over this matter.

2.    The Complaint charges that Defendant participated in deceptive and unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 4 of ROSCA, 15 U.S.C. § 8403, in connection with Defendant's marketing and sale of online dating services.

1

3.      Defendant neither admits nor denies any of the allegations in the Complaint, except as specifically stated in this Order. Only for purposes of this action, Defendant admits the facts necessary to establish jurisdiction.

4.      Defendant waives any claim it may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agrees to bear its own costs and attorney fees.

5.      Defendant waives all rights to appeal or otherwise challenge or contest the validity of this Order.

## **DEFINITIONS**

For the purpose of this Order, the following definitions apply:

A.  "**Billing Information**" means any data that enables any person to access a customer's account, such as a credit card, checking, savings, share or similar account, utility bill, mortgage loan account, or debit card.

B.  "**Charge**," "**Charged**," or "**Charging**" means any attempt to collect money or other consideration from a consumer, including but not limited to causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account, telephone bill, or other account.

C.  "**Clear(ly) and Conspicuous(ly)**" means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

    1.  In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible

2

means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2. A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3. An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4. In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5. The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6. The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7. The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8. When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

D. **"Defendant"** means Match Group, Inc. and its successors and assigns.

3

Att. A

**APP 344**

E. "**Negative Option Feature**" means, in an offer or agreement to sell or provide any good or service, a provision under which the consumer's silence or failure to take an affirmative action to reject a good or service or to cancel the agreement is interpreted by the seller or provider as acceptance or continuing acceptance of the offer or agreement.

F. "**Person**" or "**Persons**" means any natural person, organization, or other entity, including, but not limited to, a corporation, partnership, proprietorship, association, cooperative, or any other group or combination acting as an entity.

## <u>ORDER</u>

### I. PROHIBITION AGAINST MISREPRESENTATIONS

**IT IS ORDERED** that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, in connection with the advertising, marketing, promoting, offering for sale, or selling of any online dating services:

A. Any material restrictions, limitations, or conditions to purchase, receive, or use the online dating services, or to receive any discount, "guarantee," or special offer;

B. Any cost to the consumer to purchase, receive, use, or return the initial good or service;

C. That the consumer will not be Charged for any good or service;

4

Att. A

**APP 345**

D.      That a good or service is offered on a "guarantee," "free," "trial," "sample,"

"bonus," "gift," "no obligation," "discounted" basis, or words of similar import,

denoting or implying the absence of an obligation on the part of the recipient of

the offer to affirmatively act in order to avoid Charges, including where a Charge

will be assessed pursuant to the offer unless the consumer takes affirmative steps

to prevent or stop such a Charge;

E.      That the consumer can obtain a good or service for a processing, service,

shipping, handling, or administrative fee with no further obligation;

F.      The purpose(s) for which the consumer's Billing Information will be used;

G.      The date by which the consumer will incur any obligation or be Charged unless

the consumer takes an affirmative action on a Negative Option Feature;

H.      That a transaction has been authorized by the consumer;

I.      Any material aspect of the nature or terms of a refund, cancellation, exchange, or

repurchase policy for the good or service;

J.      Any other material fact; and

K.      In connection with promoting or offering for sale any good or service with a

Negative Option Feature, any material aspect of the nature or terms of a refund,

cancellation, exchange, or repurchase policy for the good or service. Compliance

with this Section is separate from, and in addition to, the disclosures required in

Sections II and III, *infra*.

## II. REQUIRED DISCLOSURES

**IT IS FURTHER ORDERED** that Defendant, Defendant's officers, agents, employees,

and attorneys, and all other persons in active concert or participation with any of them, who

5

Att. A

**APP 346**

receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, offering for sale, or selling of any online dating services, are permanently restrained and enjoined from:

A. Failing to Clearly and Conspicuously disclose that consumers registering for a six-month "guarantee" must, to the extent applicable, (a) secure and maintain a public profile with a primary photo approved by Defendant within the first seven days of purchase, (b) message five unique subscribers per month, and (c) use Defendant's progress page to redeem the free six months during the final week of the initial six-month subscription period;

B. Failing to Clearly and Conspicuously disclose any material restrictions, limitations, or conditions to purchase, receive, or use the online dating services, or to receive any discount, "guarantee," or special offer; and

C. In connection with promoting or offering for sale any. good or service with a Negative Option Feature obtaining Billing Information from a consumer, without first disclosing Clearly and Conspicuously, the simple cancellation mechanism to stop all recurring Charges, as required by Section III.

**III. SIMPLE MECHANISM TO CANCEL NEGATIVE OPTION FEATURE**

IT IS FURTHER ORDERED that Defendant, Defendant's officers, agents, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any good or service with a Negative Option Feature, are permanently restrained and enjoined from:

Att. A
APP 347

A.  failing to provide a simple mechanism for the consumer to: (1) avoid being Charged, or Charged an increased amount, for a good or service and (2) immediately stop any recurring Charge.  Such mechanism must:

  a.  be easy to find;

  b.  be easy to use to stop such Charge;

  c.  not require the consumer to take any action that is objectively unnecessary to cancel

including using a Dark Pattern.  A "Dark Pattern" refers to a user interface that has the effect of impeding consumers' expression of preference, manipulating consumers into taking certain action or otherwise subverting consumers' choice;

B.  If any consumers entered into the agreement to purchase a good or service including a Negative Option Feature over the Internet or a mobile phone application, failing to provide the mechanism through the same website, email address or other application.

C.  If any consumers entered into the agreement to purchase a good or service including a Negative Option Feature through an oral offer or acceptance, failing to provide such mechanisms through the use of a telephone number and a postal address.

### IV. PROHIBITED BUSINESS ACTIVITIES

**IT IS FURTHER ORDERED** that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, offering for sale, or selling of any online dating service, are permanently restrained and enjoined from:

Att. A

**APP 348**

A.   Retaliating, threatening to take, or taking any adverse action against any consumer who files, or threatens to file, a billing dispute with their financial institutions or with any law enforcement or consumer protection agency by denying such consumers access to and use of paid-for goods or services; *provided, however*, that nothing herein shall be deemed to preclude Defendant from suspending a consumer's service during the pendency of a billing dispute or from suspending or terminating a consumer's service if a refund has been issued.

B.   Violating the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401-05, a copy of which is attached.

## V. JUDGMENT FOR MONETARY RELIEF

**IT IS FURTHER ORDERED** that:

A.   Judgment in the amount of XX Million Dollars ($XX,000,000) is entered in favor of the Commission against Defendant, as monetary relief.

B.   Defendant is ordered to pay to the Commission XX Million Dollars ($XX,000,000), which, as Defendant stipulates, its undersigned counsel holds in escrow for no purpose other than payment to the Commission. Such payment must be made within 7 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

## VI. JUDGMENT FOR CIVIL PENALTY

A.   Judgment in the amount of XX Million Dollars ($XX,000,000) is entered in favor of the Commission against Defendant, as a civil penalty.

B.    Defendant is ordered to pay to the Commission XX Million Dollars ($XX,000,000), which, as Defendant stipulates, its undersigned counsel holds in escrow for no

Att. A

APP 349

purpose other than payment to the Commission. Such payment must be made within 7 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

## VII. ADDITIONAL MONETARY PROVISIONS

**IT IS FURTHER ORDERED** that:

A.  Defendant relinquishes dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

B.  The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

C.  The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D.  Defendant acknowledges that its Taxpayer Identification Numbers (Employer Identification Number), which Defendant must submit to the Commission, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

E.  All money received by the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for consumer relief, such as redress and any attendant expenses for the administration of any redress fund. If a representative of the Commission decides that direct redress to consumers is

Att. A

APP 350

wholly or partially impracticable or money remains after such redress is completed, the Commission may apply any remaining money for such related relief (including consumer information remedies) as it determines to be reasonably related to Defendant's practices alleged in the Complaint. Any money not used for relief is to be deposited to the U.S. Treasury as an additional civil penalty.  Defendant has no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

### VIII. CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, are permanently restrained and enjoined from directly or indirectly failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress. If a representative of the Commission requests in writing any information related to redress, Defendant must provide it, in the form prescribed by the Commission, within 14 days.

### IX. ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that Defendant obtain acknowledgments of receipt of this Order:

A. Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B. For 10 years after entry of this Order, Defendant must deliver a copy of this Order to: (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter

Att. A

**APP 351**

of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting. Delivery must occur within 7 days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C. From each individual or entity to which Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## X. COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that Defendant make timely submissions to the Commission:

A. One year after entry of this Order, Defendant must submit a compliance report, sworn under penalty of perjury. Defendant must:

　　1. Identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Defendant;

　　2. Identify all of Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

　　3. Describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales;

　　4. Describe in detail whether and how Defendant is in compliance with each Section of this Order; and

11

    5.   Provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.  For 10 years after entry of this Order, Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following, Defendant must report any change in:

    1.   Any designated point of contact; or

    2.   The structure of Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.  Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against Defendant within 14 days of its filing.

D.  Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.  Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600

Att. A

Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: FTC v. Match Group, Inc.

## XI. RECORDKEEPING

**IT IS FURTHER ORDERED** that Defendant must create certain records for 10 years after entry of the Order, and retain each such record for 5 years. Specifically, Defendant, in connection with advertising, marketing, or promoting any online dating services, must create and retain the following records:

A.  accounting records showing the revenues from all goods or services sold;

B.  personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C.  records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response;

D.  all records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

E.  a copy of each unique advertisement or other marketing material featuring a negative option plan.

## XII. COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Defendant's compliance with this Order:

A.  Within 14 days of receipt of a written request from a representative of the Commission, Defendant must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for

13

Att. A

**APP 354**

depositions; and produce documents for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.  For matters concerning this Order, the Commission is authorized to communicate directly with Defendant. Defendant must permit representatives of the Commission to interview any employee or other person affiliated with Defendant who has agreed to such an interview. The person interviewed may have counsel present.

C.  The Commission may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to Defendant or any individual or entity affiliated with Defendant, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## XIII. RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

**IT IS SO ORDERED**, this _____ day of _____, 20__.

_____

**[Remainder of Page Intentionally Left Blank]**

14

Att. A

APP 355

**SO STIPULATED AND AGREED:**

**FOR PLAINTIFF:**

_____     Date: _____
REID TEPFER
M. HASAN AIJAZ
MATTHEW WILSHIRE
SARAH ZUCKERMAN (admitted *pro hac vice*)
Texas Bar No. 24079444 (Tepfer)
Virginia Bar No. 80073 (Aijaz)
California Bar No. 224328 (Wilshire)
New York Bar No. 5603832 (Zuckerman)
Federal Trade Commission
1999 Bryan St. Ste. 2150
Dallas, Texas 75201

**FOR DEFENDANT:**

_____     Date: _____
[NAME]
as an officer of MATCH GROUP, INC.


_____     Date: _____
Chad S. Hummel
As counsel for MATCH GROUP, INC.

15

Att. A