## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

FEDERAL TRADE COMMISSION,
Plaintiff,

vs.

MATCH GROUP, INC., a corporation, and
MATCH GROUP, LLC, formerly known as
MATCH.COM, LLC, a limited liability
company,

Defendants.

Case No. 3:19-cv-02281-K

ORAL ARGUMENT REQUESTED

## DEFENDANTS MATCH GROUP, INC. AND MATCH GROUP, LLC'S
## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

I.   PRELIMINARY STATEMENT ......................................................................................... 1

II.  UNDISPUTED MATERIAL FACTS .............................................................................. 6

   A.   The Match.com Practices at Issue in the Amended Complaint .......................................... 6

   B.   Match.com Offers Numerous Methods for Subscribers to Cancel Their Subscriptions, Including Through an Online Cancelation Flow ........................................................................ 6

   C.   Match.com Permanently Discontinued the Guarantee and Chargeback Policy .............. 12

   D.   Before It Was Permanently Discontinued, the Guarantee Was Offered for the Purpose of Helping Match.com Users Be Successful on the Website ......................................................... 14

   E.   Match.com Had Legitimate Business Reasons for the Permanently Discontinued Chargeback Policy and Publicly Disclosed the Policy ............................................................ 16

   F.   MGI Was Not, and Is Not, Involved in the Guarantee, Chargeback Policy, or Online Cancelation Flow ..................................................................................................................... 18

III. STANDARD OF REVIEW ............................................................................................ 21

IV.  ARGUMENT AND AUTHORITIES ............................................................................. 22

   A.   The Court Should Grant MGI and MGL Summary Judgment on Count V ..................... 22

      1.   The FTC Failed To Provide Defendants Fair Notice of Its Interpretation of ROSCA's "Simple Mechanisms" Requirement, Which Is Void for Vagueness as Applied ................ 22

      2.   There Is No Genuine Dispute of Material Fact that Match.com Provides Simple Cancelation Mechanisms .................................................................................................... 36

      3.   At a Minimum, Defendants Are Entitled to Summary Judgment on the FTC's Claims for Civil Penalties Because There Is No Scienter ..................................................................... 42

      4.   The FTC's Civil Penalties and Consumer Redress Claims Against MGL Are Barred in Part By the Statute of Limitations ........................................................................................ 43

   B.   The Court Should Grant MGI and MGL Summary Judgment on Counts III and IV ....... 44

      1.   Counts III and IV Are Moot Because the Guarantee and Chargeback Policy Could Not Reasonably Be Expected to Recur ...................................................................................... 44

      2.   There Is No Evidence that MGI or MGL Is Violating or About to Violate the FTC Act for Count III or Count IV .................................................................................................... 47

   C.   The Court Should Separately Grant MGI Summary Judgment on All Counts ................. 54

V.   CONCLUSION ............................................................................................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aishman v. GCIU Ret. Fund CEO,*
    No. 1:16-CV-268, 2017 WL 6994638 (E.D. Tex. Dec. 18, 2017) .........................................54

*Already, LLC v. Nike, Inc.,*
    568 U.S. 85 (2013)........................................................................................................45, 46

*Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.,*
    No. 3:17-CV-1147, 2019 WL 329545 (N.D. Tex. Jan. 25, 2019) .........................................57

*Bayway Lincoln Mercury, Inc. v. Universal Underwriters Ins. Co.,*
    No. CV H-19-3817, 2020 WL 8093495 (S.D. Tex. Dec. 4, 2020).........................................44

*Buzancic v. Kane,*
    No. CV-09-1943, 2011 WL 336395 (D. Ariz. Jan. 31, 2011) .................................................45

*Carr v. United States,*
    560 U.S. 438 (2010)..............................................................................................................53

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)..............................................................................................................21

*City Nat'l Rochdale Fixed Income Opps. (Ireland) Ltd v. Am. Gen. Life Ins. Co.,*
    No. 3:17-CV-2067, 2018 WL 4732431 (N.D. Tex. 2018), *report and*
    *recommendation adopted*, No. 3:17-CV-2067, 2018 WL 4725249 (N.D. Tex.
    Sept. 30, 2018) .....................................................................................................................54

*Cunningham v. Advanta Corp.,*
    No. 3:08-CV-1794-K, 2009 WL 290031 (N.D. Tex. Feb. 3, 2009) .................................54, 56

*In re ECM BioFilms, Inc.,*
    No. 9358, 2015 FTC LEXIS 22 (FTC Jan. 28, 2015).......................................................46, 47

*Exxon Mobil Corp. v. Mnuchin,*
    430 F. Supp. 3d 220 (N.D. Tex. 2019) ......................................................................24, 25, 35

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012)....................................................................................................22, 24, 26, 35

*FTC v. DIRECTV, Inc.,*
    No. 15-CV-01129, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018) .........................................50

*FTC v. Neora LLC,*
    552 F. Supp. 3d 628 (N.D. Tex. 2021) .................................................................................48

*FTC v. Sw. Sunsites, Inc.*,
    665 F.2d 711 (5th Cir. 1982) ...............................................48

*FTC v. Traffic Jam Events, LLC*,
    No. 20-1740, 2020 WL 3490434 (E.D. La. June 26, 2020)...................48

*First Colony Life Ins. Co. v. LFC Resol. Payment Fund, Ltd.*,
    83 F. Supp. 2d 767 (N.D. Tex. 1999) ..............................45, 46

*Forest Guardians v. U.S. Forest Serv.*,
    329 F.3d 1089 (9th Cir. 2003) ...............................................45

*Free Speech Coalition, Inc. v. Colmenero*,
    No. 1:23-CV-917, 2023 WL 5655712 (W.D. Tex. Aug. 31, 2023)...............23

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000).......................................44, 45, 46

*Isaacson v. Brnovich*,
    610 F. Supp. 3d 1243 (D. Ariz. 2022) ...................................23

*Jerman v. Carlisle, McNellis, Rini, Kramer & Ulrich LPA*,
    559 U.S. 573 (2010)...........................................................43

*Montana Shooting Sports Ass'n, Inc. v. Norton*,
    355 F. Supp. 2d 19 (D.D.C. 2004), *aff'd*, No. 04-5434, 2005 WL 2810686
    (D.C. Cir. June 14, 2005)...............................................45

*Naughton Ford, Inc. v. Ford Motor Co.*,
    862 F. Supp. 264 (D. Colo. 1994).......................................23

*NetChoice, LLC v. Griffin*,
    No. 5:23-CV-05105, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)...............23

*NEWCO Enterprises, LLC v. Super Heaters N. Dakota, LLC*,
    No. 7:14-CV-00087, 2023 WL 4029660 (N.D. Tex. June 15, 2023) .............57

*Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*,
    783 F.3d 527 (5th Cir. 2015) ...............................................21

*Posely v. Eckerd Corp.*,
    433 F. Supp. 2d 1287 (S.D. Fla. 2006) ...............................23

*Tapp v. Gulf Stream Coach, Inc.*,
    No. 08-1134, 2011 WL 3502023 (E.D. La. Aug. 10, 2011), *aff'd sub nom.*
    *Tapp v. Whirlpool Corp.*, 471 F. App'x 353 (5th Cir. 2012)...............44

iv

*Tapp v. Shaw Env't, Inc.*,
  401 F. App'x 930 (5th Cir. 2010) ........................................................44

*Teemac v. Frito Lay, Inc.*,
  No. 3:14-CV-2908, 2015 WL 4385777 (N.D. Tex. July 16, 2015), *aff'd,* 644
  F. App'x 331 (5th Cir. 2016) ..............................................................54

*TransFirst Grp., Inc. v. Magliarditi*,
  237 F. Supp. 3d 444 (N.D. Tex. 2017) ..........................................39, 41

*United States v. Cornerstone Wealth Corp.*,
  549 F. Supp. 2d 811 (N.D. Tex. 2008) .....................................42, 48, 49

*In re Universal Seismic Assocs., Inc.*,
  288 F.3d 205 (5th Cir. 2002) ........................................................39, 41

## Statutes

1 U.S.C. § 1 ........................................................................................53

15 U.S.C. § 45 ...............................................................42, 43, 52, 53

15 U.S.C. § 53 .................................................................................5, 47

15 U.S.C. § 57b ................................................................................44

15 U.S.C. § 8403(3) ...............................................................1, 25, 40

28 U.S.C. § 2462 ..............................................................................44

## Rules

Fed. R. Civ. P. 15 ............................................................................44

Fed. R. Civ. P. 56 .........................................................................1, 21

## Internet Sources

FED. TR. COMM'N, *Federal Trade Commission Proposes Rule Provision Making
  it Easier for Consumers to "Click to Cancel" Recurring Subscriptions and
  Memberships* (Mar. 23, 2023), https://www.ftc.gov/news-events/news/press-
  releases/2023/03/federal-trade-commission-proposes-rule-provision-making-
  it-easier-consumers-click-cancel-recurring..............................................2

*About Match.com*, Match.com, https://www.match.com/help/aboutus.aspx?lid=4
  (last visited Sept. 11, 2023)...............................................................3

*Canceling*, Match.com, https://help.match.com/hc/en-us/articles/6077124196891-
  Canceling .........................................................................................11

**Other Authorities**

156 Cong. Rec. S3983-07, 2010 WL 1992981 ..................................................................42

156 Cong. Rec. S8305-02, 2010 WL 4861284 ..................................................................42

156 Cong. Rec. S8305-05, 2010 WL 4861287 ..................................................................42

86 Fed. Reg. 60822-01 ................................................................................................25, 26

86 Fed. Reg. 60826 ................................................................................................ *passim*

S. Rep. 111-240, 2010 WL 3002003 ...........................................................25, 40, 42

S. Rep. No. 93-1408 (1974) .........................................................................................43

Statement by the Press Secretary, 2010 WL 5384575 .......................................25, 40

Advanced Notice of Proposed Rulemaking, Rule Concerning the Use of
    Prenotification Negative Option Plans, 84 Fed. Reg. 52393-01 (Oct. 2, 2019) .................2, 34

Notice of Proposed Rulemaking, Negative Option Rule, 88 Fed. Reg. 24716-01
    (Apr. 24, 2023)............................................................................................2, 27, 35

Pursuant to Rule 56 of the Federal Rules of Civil Procedure (the "Rules") and Local Civil Rule 56.5, Defendants Match Group, Inc. ("MGI") and Match Group, LLC ("MGL") respectfully submit this Brief in Support of their Motion for Summary Judgment (the "Motion").[1]

## I.      PRELIMINARY STATEMENT

Summary judgment should be entered in favor of Defendants on each remaining claim in this case. The only truly live issue that survived this Court's Order on MGI's Rule 12 Motion, Dkt. 86, is in Count V: whether Match.com provides "simple mechanisms"—as required by the Restore Online Shoppers' Confidence Act ("ROSCA")—for users to cancel their online dating subscriptions. 15 U.S.C. § 8403(3). The other claims in Counts III and IV relate to conduct—the Match.com Guarantee and Chargeback Policy (both defined below)—that was discontinued years ago (over *half a year* before the FTC brought this case), that will never be resumed, and about which there is no empirical evidence that either practice was unfair or deceptive.

With respect to the ROSCA claim in Count V, the FTC is attempting to impose an unprecedented and entirely novel legal standard on Match.com that has never before been sanctioned by statute, rule, court, or government agency—that Match.com's desktop online cancelation flow is not "simple" essentially because it takes more than a single computer click to cancel a subscription. Prior to bringing this lawsuit, the FTC had issued zero public guidance on the meaning of "simple." Indeed, the only public guidance the FTC has *ever* provided on what ROSCA's "simple" requirement could mean was issued years after the FTC brought this case. That new guidance recommends that (1) a cancelation mechanism should be as easy to use as the mechanism used to initiate the negative option feature; (2) if a subscription mechanism is online, a means to cancel should also be online; (3) no save offer should cause unreasonable delay; and

---

[1] Defendants have filed an Appendix in Support of the Motion (the "Appendix"). The exhibits to the Appendix are referenced as "Defs. App. Ex." and references to specific pages in the Appendix are referenced as "App."

(4) a cancelation request should be honored, such that the seller should not, for example, provide false information about how to cancel. Match.com's online cancelation flow meets all of these newly suggested criteria.

Despite this, the FTC is now seeking more than $200 million in monetary relief (astronomically higher than the FTC's earlier estimation of $8 million in claimed monetary relief, *see* Defs. App. Ex. 47 at App. 471) all for Defendants' failure to divine that the FTC would unveil this new legal requirement for the first time in this litigation. Obviously, as discussed herein, this claim runs afoul of constitutional requirements of fair notice. Indeed, the FTC has actually conceded repeatedly that the term "simple" as used in ROSCA "lacks specificity about cancellation procedures" and "does not specify what methods would satisfy this ['simple mechanism'] requirement." Advanced Notice of Proposed Rulemaking, Rule Concerning the Use of Prenotification Negative Option Plans, 84 Fed. Reg. 52393-01 (Oct. 2, 2019); *see* Notice of Proposed Rulemaking, Negative Option Rule, 88 Fed. Reg. 24716-01 (Apr. 24, 2023) (admitting ROSCA "requires marketers to provide 'simple mechanisms' for the consumer to stop recurring charges without guidance about what is simple").

In fact, the only place the FTC has ever suggested that a single-click cancelation flow could be required was in a recent Notice of Proposed Rulemaking, where the FTC has sought comment on a *proposed new rule* governing online subscription cancelation. *See* Notice of Proposed Rulemaking, Negative Option Rule, 88 Fed. Reg. 24716-01 (Apr. 24, 2023). This proposed rule—if ultimately promulgated by the FTC—would, for the first time, require a "click to cancel."[2] While

---

[2] *See* Notice of Proposed Rulemaking, Negative Option Rule, 88 Fed. Reg. 24716-01 (Apr. 24, 2023) ("The seller must immediately cancel the negative option feature upon request from a consumer."); FED. TR. COMM'N, *Federal Trade Commission Proposes Rule Provision Making it Easier for Consumers to "Click to Cancel" Recurring Subscriptions and Memberships* (Mar. 23, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/03/federal-trade-commission-proposes-rule-provision-making-it-easier-consumers-click-cancel-recurring (explaining "seller . . . must immediately implement the cancellation process").

the merits of that proposed rule are still being debated, what is not up for debate is that the FTC has not promulgated that rule yet. The FTC cannot, consistent with the Due Process Clause, retroactively impose a rule that has not even been promulgated and fine Defendants $200 million for failing to meet that possible future standard.

To the extent the FTC pivots and asserts that more than one click is acceptable, but that Match.com's online cancelation flow is not simple because it requires too many clicks or steps, that claim too would also fail. Prior to this lawsuit, the FTC never provided any notice that an online cancelation flow like Match.com's, which consists of only three or four steps and can be completed in less than a minute, is not simple. Instead, the FTC's 30(b)(6) witness conceded that, while the time to cancel, number of clicks or steps, and percentage of successful cancelation attempts are all relevant to the issue of simplicity, the FTC has *never* imposed a limitation or provided guidance as to how long is too long, how many clicks is too many clicks, or what percentage of customers must successfully cancel. Thus, the FTC's standard is nothing more than "I know it when I see it." This amounts to arbitrary enforcement that would subject countless law-abiding businesses to the threat of hundreds of millions or billions of dollars in penalties (not to mention the legal costs necessary to defend against such claims), solely at the whim of the FTC, because Match.com's online cancelation flow is no different than the flows of countless companies. The Court should grant Defendants summary judgment because the FTC failed to provide fair notice of the interpretation of "simple" that the FTC is advancing in this case, which is void for vagueness as applied.

In addition, the Court should separately grant Defendants summary judgment on Count V because the undisputed evidence shows that Match.com's online cancelation flow meets the ordinary and plain definition of "simple."

3

- Match.com's online cancelation flow has three or four easy-to-follow steps.

- Match.com's own subscribers who cancel, do so in an average of only 44 seconds, and over 95% of subscribers that enter the online cancelation flow successfully cancel or take a save offer (i.e., decide to renew at a discount rather than cancel).

- An unrebutted empirical study performed by an independent expert for this litigation similarly confirmed that 91.5% of study participants successfully canceled through the Match.com online cancelation flow, with an average time to completion of 74 seconds.

This unrebutted evidence demonstrates that the flow is simple as a matter of law.

The Court could, however, avoid these issues and decide Count V on straightforward statutory interpretation grounds. The plain language of ROSCA requires that companies provide "simple mechanisms" for cancelation. It does not require that *every* cancelation method be simple (nor does it prohibit non-simple mechanisms, so long as there are "simple mechanisms"). The online cancelation flow at issue here is one of the five (and for most of the time period at issue, six) methods that Match.com offers for subscribers to cancel. Specifically, Match.com offers the following other cancelation options: (i) internet chat, (ii) email, (iii) standard mail, (iv) fax, and (v) phone (for most of the time period at issue). The FTC challenges only the sixth Match.com method for cancelation—the online cancelation flow, and there is no admissible evidence for a factfinder to conclude that the other cancelation methods are not simple. In fact, the evidence demonstrates that Match.com's other five methods *are* simple. Because Match.com has undisputedly simple (and unchallenged) mechanisms to cancel, that meets the express requirements of ROSCA. ROSCA does not prohibit companies from voluntarily providing an *additional* cancelation method, even if that method does not meet the simple cancelation requirement. Thus, Match.com's other unchallenged cancelation methods defeat the FTC's claim as a matter of law, regardless of the simplicity of the additional online cancelation flow method.

4

For the remaining Counts III and IV, the FTC can seek only injunctive relief for its claims for which Match.com permanently discontinued the relevant conduct well before the FTC brought this lawsuit. Not only is there no admissible evidence upon which a reasonable factfinder could conclude that this conduct was unlawful, but Defendants have also filed with this Court a Verified Stipulation (defined below), which confirms that the Guarantee and Chargeback Policy ceased in 2019 and will never be reinstated. Moreover, the undisputed evidence in discovery shows that Match.com stopped these practices and will never resume them. Because Defendants have given the FTC the only relief that it seeks in the Amended Complaint, and the Guarantee and Chargeback Policy will never recur, Counts III and IV are moot. Similarly, no reasonable factfinder could find that Defendants are "violating, or about to violate" the FTC Act, as Section 13(b) requires, or that an injunction for permanently ceased conduct is proper.

Finally, summary judgment is appropriate on the claims against MGI, the indirect holding company of MGL, because it has no operational control or involvement in the Match.com practices at issue. The question becomes why the FTC sued MGI in the first place. The most likely answer is the FTC seeks to obtain injunctive relief for dating sites other than Match.com that MGI's other indirect subsidiaries own and operate. But those subsidiaries are not defendants in this case and have their own management and operations. Notably, the FTC admitted that it cannot allege— even based on information and belief—that any other dating site engaged in the conduct at issue in the Amended Complaint. The FTC's speculation about other dating sites and desire to bind them through MGI, their indirect holding company, certainly is not sufficient to justify holding MGI liable for another indirect subsidiary's conduct in which MGI was not involved.

For these reasons, the Court should enter summary judgment in Defendants' favor on the FTC's remaining claims, Counts III, IV, and V.

## II.     UNDISPUTED MATERIAL FACTS

### A.     The Match.com Practices at Issue in the Amended Complaint

Match.com is a subscription-based online dating platform that has brought together countless marriages and families over its nearly 30-year history.[3] The FTC challenges three Match.com practices, two of which were permanently discontinued before the FTC sued. Am. Compl., Dkt. 116 ¶ 3. In Count III, the FTC alleges that Match.com failed to adequately disclose the material terms and conditions of a "guarantee" that Match.com permanently discontinued over four years ago in April 2019 (the "Guarantee"). Am. Compl. ¶¶ 3, 39–53, 75–77.[4] In Count IV, the FTC alleges that a Match.com chargeback policy, which was also permanently discontinued over four years ago in March 2019 (the "Chargeback Policy"), unfairly denied subscribers access to paid-for services if the subscribers disputed credit card charges and lost the dispute. Am. Compl. ¶¶ 3, 61–65, 78–80.[5] In Count V, the FTC alleges that the Match.com online cancelation flow is not "simple" and therefore violates ROSCA. Am. Compl. ¶¶ 54–60, 86–87.

### B.     Match.com Offers Numerous Methods for Subscribers to Cancel Their Subscriptions, Including Through an Online Cancelation Flow

Count V challenges one of Match.com's cancelation methods. In fact, Match.com offers several options for users to cancel their subscriptions: online cancelation flow, internet chat, email, standard mail, fax, and (for most of the time period at issue) phone. Defs. App. Ex. 44 at App. 351 (Saraph Decl. ¶ 61); Defs. App. Ex. 52 at App. 595–600 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 15). Data produced in this litigation shows that there were at least the following number of cancelations since 2013, as of October 2022:

---

[3] *About Match.com*, MATCH.COM, https://www.match.com/help/aboutus.aspx?lid=4 (last visited Sept. 11, 2023).
[4] The Guarantee is explained further below, *see infra* Section II.D.
[5] The Chargeback Policy is explained further below, *see infra* Section II.E.

| METHOD | CANCELATIONS |
|---|---|
| Online cancelation flow | 15,914,587 |
| Internet chat | 123,421 |
| Email | 119,722 |
| Phone | 1,027,815 |
| Cancelations by Match.com Customer Care, method not identified | 550,512 |

Defs. App. Ex. 44 at App. 351–52 (Saraph Decl. ¶ 62). Although Match.com does not separately record cancelations by standard mail or fax, Match.com has produced examples of consumers using those methods to cancel. Defs. App. Ex. 44 at App. 351–52 (Saraph Decl. ¶¶ 62–63).[6]

The FTC does not dispute that Match.com offers the internet chat, email, standard mail, fax, or (for most of the time period at issue) phone cancelation methods. Defs. App. Ex. 49 at App. 486–89 (FTC's 2d Am. Resps. to MGI's 1st Reqs. for Admiss. No. 13 (admitting that "Match.com has a chat feature that Match.com subscribers have used to cancel"), No. 17 (admitting that Match.com "maintains a customer service number that Match.com subscribers have used to cancel"), No. 21 (admitting that "consumers have cancelled their Match.com subscription by mailing a letter to Defendants"), No. 25 (admitting that "users have cancelled their subscription by fax"), No. 29 (admitting that "Match.com has an email feature that [] Match.com subscribers have used to cancel")). The FTC ignores Match.com's five other cancelation methods and challenges only Match.com's online cancelation flow. Defs. App. Ex. 9 at App. 109 (Bandy Dep. Tr. (June 26, 2023) 30:2–13 ("[Q.] Is it true that the only mechanism at issue in this case is the online cancellation mechanism, singular? . . . A. I think I testified to this before, but for purposes of Count V, that is the mechanism that we are alleging was not simple."));[7] Am. Compl. ¶¶ 54–60, 86. The

---

[6] The mailing address and fax number can be found in the Match.com Terms of Use. *See* Defs. App. Ex. 44 at App. 352, 426, 433 (Saraph Decl. ¶ 64 & Ex. M).

[7] *See* Defs. App. Ex. 1 at App. 5, 11 (Bandy Dep. Tr. (Oct. 24, 2022) 10:2–6 ("Q. . . . You understand, do you not, that the allegation in this case, one of the allegations, particularly in Count Five of the complaint, is that the Match.com online cancelation mechanism is not simple and therefore violates ROSCA? A. Yes."), 94:22–95:2 ("Q. . . . But the

FTC has no evidence that Match.com's five other cancelation methods are not simple (because they are).[8]

And Match.com's online cancelation flow is simple too. Match.com places the online cancelation flow in an obvious and easy to find location (and allows customers to search for it through its FAQs as well, *see* Defs. App. Ex. 44 at App. 350–51 (Saraph Decl. ¶¶ 55–57)). While the online cancelation flow has varied slightly over time, Match.com subscribers can get to the online cancelation flow by the following:

- **Select Settings from Gear Icon** (Defs. App. Ex. 12 at App. 203)



- **Select "Manage subscription"** (Defs. App. Ex. 13 at App. 205)



---

allegation here is that the online flow is not simple, correct? . . . [A.] The online -- yes, we allege that the, the -- well, the online cancelation flow is not a simple mechanism.")).

[8] As explained below, summary judgment should be granted in Defendants' favor on Count V for this reason alone. *See* Section IV.A.2.b.

- **Enter Password and Complete reCaptcha** (Defs. App. Ex. 14 at App. 207)



Canceling a Match.com subscription via the online cancelation flow takes, at most, three or four steps, depending on whether a consumer is presented with a save offer (i.e., an offer to renew at a lower price rather than cancel), as shown below:

- **Step 1: Select "Cancel Subscription"** (Defs. App. Ex. 15 at App. 209)



- **Step 2: Answer or Skip Optional Survey** (Defs. App. Ex. 16 at App. 211)



- **Step 3 (Offered Only to Some Users): Accept or Skip Save Offer** (Defs. App. Ex. 17 at App. 213)



- **Step 4: Answer or Skip Optional Net Promoter Score** (Defs. App. Ex. 18 at App. 215)



- **Cancelation Confirmation** (Defs. App. Ex. 19 at App. 217)



Videos of the online cancelation flow demonstrate that it can be completed in less than a minute. *See* Defs. App. Ex. 60–63 at App. 1159–62.[9]

Match.com's data shows that it takes actual subscribers only 44 seconds on average to cancel, and over 95% of Match.com subscribers that enter the cancelation flow successfully cancel or take a save offer (i.e., decide to renew rather than cancel).[10] Defs. App. Ex. 57 at App. 744–45. In addition, Defendants' usability expert conducted an empirical usability study to independently test whether the online cancelation flow is clear and effective. *Id.* at App. 742. This independent study confirmed that 91.5% of study participants successfully canceled through the online cancelation flow, with an average time to completion of 74 seconds.[11] *Id.* at App. 743–44.[12] Based on these data, as well as the expert's review of the flow, Defendants' usability expert concluded that Match.com's cancelation flow was simple. The FTC has no contrary evidence. The FTC's expert did not conduct any empirical analysis or objective study on Match.com's online cancelation flow. Defs. App. Ex. 10 at App. 125 (King Dep. Tr. 13:12–13 ("Q. You did not do a usability study. Correct? A. I did not do a usability study.")). Defendants incorporate by reference their concurrently filed Rule 702 Motion to Exclude Dr. Jennifer King's Testimony.

---

[9] Match.com also offers FAQs to illustrate the online cancelation flow, including a FAQ that provides a video with step-by-step instructions on how to cancel a subscription through the online cancelation flow. Defs. App. Ex. 44 at App. 350–51 (Saraph Decl. ¶¶ 54–57). That video (Defs. App. Ex. 63 at App. 1162) is also publicly available at https://help.match.com/hc/en-us/articles/6077124196891-Canceling.

[10] This data is the amount of time and percentage of success after consumers enter the online cancelation flow by clicking "Cancel Subscription." Defs. App. Ex. 57 at App. 744–45. The subscribers that did not cancel after entering the cancelation flow did not necessarily "fail" to cancel due to the design of the flow. A subscriber may have entered the flow without intending to cancel (e.g., they were just exploring the website, or trying to trigger a save offer) or may have not completed the flow for reasons having nothing to do with the design of the flow (e.g., they decided that they wanted to keep their subscription or were interrupted by someone at their door or by a phone call).

[11] Because this data is from Defendants' expert's usability study, it measures the number of seconds from the time consumers were given the task on the testing platform (i.e., they were starting from the Match.com homepage) through the time they indicated that they completed the task (which was a successful cancelation 91.5% of the time). *See* Defs. App. Ex. 57 at App. 797.

[12] Indeed, Match.com's online cancelation flow is comparable to the flows on popular sites with which many users are familiar, such as LinkedIn Premium, the New York Times, and Disney+. Defs. App. Ex. 57 at App. 766–67, 908–17, 935–47, 952–64.

11

### C.     Match.com Permanently Discontinued the Guarantee and Chargeback Policy

As to Counts III and IV, Match.com permanently discontinued the Guarantee and the Chargeback Policy approximately four and a half years ago in April 2019 and March 2019, respectively, well before the FTC filed this case on September 25, 2019. Defs. App. Ex. 46 at App. 449–50 (Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146 (the "Verified Stipulation") ¶¶ 3, 6). Since that time, Defendants have reiterated the permanent discontinuance in a variety of forms.

On August 6, 2019, before the FTC sued, MGI's counsel sent a letter to the FTC that confirmed the discontinuation of the Guarantee and Chargeback Policy and that Match.com had "no plans or intentions ever to reinstitute any of these practices." Defs. App. Ex. 42 at App. 341–42. The FTC nevertheless sued, but in its Original Complaint, Dkt. 1, even the FTC acknowledged that the Guarantee and Chargeback Policy had ceased in "mid-2019," Orig. Compl. ¶ 3, although Match.com actually permanently discontinued the practices in March and April 2019. On May 20, 2022, counsel for MGI sent another letter to the FTC confirming that there were still no plans or intentions to reinstate those practices. Defs. App. Ex. 43 at App. 344. The FTC amended its Complaint on July 19, 2022, to name MGL as an additional defendant, and the FTC continued to allege that the Guarantee and Chargeback Policy had ceased in "mid-2019." Am. Compl. ¶ 3.

Throughout discovery, MGI and MGL represented to the FTC in verified interrogatory responses that the Guarantee and Chargeback Policy had been permanently discontinued and that Match.com would not reinstitute those practices. Defs. App. Ex. 51 at App. 539 (MGI's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 3); Defs. App. Ex. 52 at App. 577, 588–89 (MGL's

2d Am. Resps. and Objs. to FTC's 1st Interrogs. Nos. 8, 12). MGL also described the current Match.com chargeback policy in a verified interrogatory response.[13]

On September 20, 2022, MGI and MGL filed the Verified Stipulation to "serve as a binding and sincere commitment by [MGI and MGL] to never again engage" in the Guarantee or Chargeback Policy. Defs. App. Ex. 46 at App. 450. The undisputed evidence shows that the Guarantee and Chargeback Policy have been permanently discontinued. *See, e.g.*, Defs. App. Ex. 20 at App. 219 (training email dated April 15, 2019, providing, "Effective immediately, the [Guarantee] is no longer available" and "should not be offered when subscribing a member"); Defs. App. Ex. 21 at App. 221 (FAQ providing Guarantee "was discontinued on 4/11/2019"); Defs. App. Ex. 22 at App. 227 (training document noting Guarantee was "no longer available"); Defs. App. Ex. 23 at App. 231 (example of email sent to Match.com users who initiate chargeback dispute and lose, confirming cessation of Chargeback Policy and existence of current chargeback policy that Defendants explained to FTC in verified interrogatory response).

Indeed, in connection with this Motion, to make clear for the Court that MGI and MGL had not changed their position, Defendants submitted yet another declaration confirming that the Guarantee and Chargeback Policy have been permanently discontinued, and there are no plans to reinstate them. Defs. App. Ex. 45 at App. 443 (Sine Decl. ¶¶ 3–6).[14]

---

[13] Defs. App. Ex. 52 at App. 588–89 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 12 ("MGL's current chargeback policy is as follows: When a user with an active subscription initiates a chargeback, MGL hides that user's profile (because that user has indicated that he or she no longer wishes to appear on the site), and disables the user's account login (because the user is disputing payment for the service that MGL provides). If MGL disputes the chargeback and prevails, and has not already refunded the user, then MGL re-enables the user's account login, restores the amount of subscription time the user had remaining at the time the account was disabled, and sends the user an email notifying the user that his or her account has been reactivated and containing instructions about how to un-hide his or her profile.")).

[14] Even if Match.com wanted to reinstate the practices, which it does not, there would be substantial cost to do so. Defs. App. Ex. 44 at App. 348, 350 (Saraph Decl. ¶¶ 26–27, 46–47 ). It would also not be easy to reinstate them. *Id.*

Notwithstanding the overwhelming mountain of evidence of permanent discontinuance produced by Defendants and commitments to not reinstate the Guarantee or the Chargeback Policy, the FTC remains dissatisfied. The FTC, however, has not identified a single shred of evidence that there are any plans to reinstate the Guarantee or the Chargeback Policy.[15]

### D.    Before It Was Permanently Discontinued, the Guarantee Was Offered for the Purpose of Helping Match.com Users Be Successful on the Website

Before it was permanently discontinued, the Guarantee offered certain users a free six-month extension if they purchased a six-month subscription and did not meet "someone special," so long as they satisfied the requirements of the Guarantee. *See* Defs. App. Ex. 44 at App. 347–48 (Saraph Decl. ¶¶ 8–27). The Guarantee's requirements "encourage[d] people to take the steps that they might need to use the website successfully" and "helped [Match.com's] members have a more successful experience." Defs. App. Ex. 4 at App. 46 (Clinchy Dep. Tr. 187:3–188:8).

When consumers viewed subscription plans offered on Match.com, they were presented with a graphic that offered subscription plans of varying lengths. *See* Defs. App. Ex. 44 at App. 347 (Saraph Decl. ¶ 8). Next to the six-month subscription option, an icon stated "Match* Guarantee." *Id.* (Saraph Decl. ¶ 9). Hovering over the icon opened a text balloon that stated, "If you haven't found someone special within 6 months, we'll give you an extra 6 months FREE" and was followed by a hyperlink labeled, "Learn more." *Id.* (Saraph Decl. ¶ 10). Clicking on the "Learn more" hyperlink took consumers to a webpage where the complete terms of the Guarantee were presented (the "Program Rules"). *Id.* (Saraph Decl. ¶¶ 11–12).

---

[15] *See, e.g.*, Defs. App. Ex. 49 at App. 484 (FTC's 2d Am. Resps. to MGI's 1st Reqs. for Admiss. No. 7 ("Plaintiff admits that it does not currently have evidence of 'plans' to reinstate the Match.com Guarantee."), No. 8 ("Plaintiff admits that it does not currently have evidence of 'plans' to reinstate this [chargeback] policy.")); Defs. App. Ex. 56 at App. at 698–703 (FTC's 4th Am. Resps. to MGI's 1st Interrogs. No. 1 (identifying zero evidence of plans to reinstate the Guarantee or Chargeback Policy)).

As identified in the Program Rules, to assist consumers in tracking their progress toward the Guarantee, Match.com designed a webpage specifically dedicated to displaying consumers' status toward meeting the Guarantee requirements: the "Progress Page." *Id.* (Saraph Decl. ¶ 13). Subscribers could track their Guarantee progress during their six-month Guarantee-eligible subscription by visiting the Progress Page. *Id.* (Saraph Decl. ¶¶ 14–15).

In addition, all of Match.com's webpages displayed a "Guarantee" hyperlink along a bottom banner. *Id.* (Saraph Decl. ¶ 16). If subscribers who were participating in the Guarantee program clicked that link, they were taken to their Progress Page. *Id.* (Saraph Decl. ¶ 17). Consumers who were not participating in the Guarantee program were taken to the Program Rules. *Id.* (Saraph Decl. ¶ 18).

The Guarantee was redeemable directly on the Match.com platform through the Progress Page. *Id.* at App. 348 (Saraph Decl. ¶ 19). During the last seven days of the Guarantee-eligible subscription, when subscribers visited the Progress Page, they were prompted to indicate whether or not they had met someone. *Id.* (Saraph Decl. ¶ 20). If they had taken all of the Guarantee-required actions and indicated that they had not met someone during the Guarantee-eligible subscription period, Match.com would automatically provide the subscriber with complimentary access to Match.com for the following six-month period subscription, i.e., a Guarantee Extension. *Id.* (Saraph Decl. ¶ 21). Subscribers could also contact Match.com Customer Care to redeem the Guarantee. *Id.* (Saraph Decl. ¶ 22).[16] The seven-day period to redeem the Guarantee, like all other terms, was disclosed in the Program Rules. *Id.* (Saraph Decl. ¶ 25). The Guarantee was removed in April 2019 because "there was no revenue implication associated with [it]" and "to make room

---

[16] Subscribers could contact Customer Care even after the seven-day period to get the Guarantee Extension. Defs. App. Ex. 44 at App. 348 (Saraph Decl. ¶ 23). Match.com sometimes made exceptions to the requirements in the Program Rules. *Id.* (Saraph Decl. ¶ 24).

for other improvements to the rate card." Defs. App. Ex. 7 at App. 8 (Saraph Dep. Tr. (Apr. 6, 2023) 14:2–12). As described above, Match.com has not taken any steps to reinstate the Guarantee. *See supra* Section II.C; *see also* Defs. App. Ex. 45 at 443 (Sine Decl. ¶¶ 3–6).

      **E.**      **Match.com Had Legitimate Business Reasons for the Permanently Discontinued Chargeback Policy and Publicly Disclosed the Policy**

The Chargeback Policy (which was discontinued in March 2019) was as follows: if a user initiated a chargeback of Match.com's subscription charges, the user's subscription was suspended. Defs. App. Ex. 44 at App. 348 (Saraph Decl. ¶¶ 28–29). The rationale for the policy was that the user had indicated that he or she was disputing the charge for Match.com's services, and no longer wished to appear on the site. *Id.* (Saraph Decl. ¶ 30). If the user prevailed on the chargeback (i.e., the user proved to the satisfaction of the financial institution that the charge was not authorized), the charge was reversed, and no further action was required by the user or taken by Match.com—meaning the user's subscription remained suspended, and the user remained not visible on the Match.com site. *Id.* (Saraph Decl. ¶ 31). If the dispute was resolved in Match.com's favor (i.e., the financial institution concluded that the user had in fact authorized the charge, although the user claimed that he or she did not), a user's subscription would not be automatically reactivated unless the user requested reactivation. *Id.* at App. 349 (Saraph Decl. ¶ 32). The rationale for the policy was that the user had—by disputing the charge—indicated to Match.com that the user no longer wanted to be on the Match.com service and/or had never even signed up for the Match.com account. *Id.* (Saraph Decl. ¶ 33).

Although the Chargeback Policy was permanently discontinued, it was a legitimate practice. First, the Chargeback Policy helped protect the Match.com ecosystem. *Id.* (Saraph Decl. ¶ 34); *see* Defs. App. Ex. 7 at App. 91 (Saraph Dep. Tr. (Apr. 6, 2023) 292:5–18). Subscribers who initiated a billing dispute were clearly indicating that they no longer wished to appear on

Match.com—and many claimed that they never even signed up for a Match.com account. Defs. App. Ex. 44 at App. 349 (Saraph Decl. ¶ 35); *see* Defs. App. Ex. 7 at App. 85 (Saraph Dep. Tr. (Apr. 6, 2023) 212:15–213:13). In some cases (e.g., if the consumer is in a serious relationship), maintaining their profiles on Match.com could cause significant embarrassment or harm. Defs. App. Ex. 44 at App. 349 (Saraph Decl. ¶ 36); *see* Defs. App. Ex. 7 at App. 91 (Saraph Dep. Tr. (Apr. 6, 2023) 292:23–293:19). In addition, Match.com aims to provide users with a vibrant and engaged online dating community, which means not displaying subscribers who had indicated that they did not want to be on the Match.com website (unless the user indicated interest in rejoining the site, at which point Match.com would restore the user's account). Defs. App. Ex. 44 at App. 349 (Saraph Decl. ¶ 37); *see* Defs. App. Ex. 7 at App. 84–85, 91 (Saraph Dep. Tr. (Apr. 6, 2023) 209:23–210:13, 292:5–18, 292:23–293:19).

Second, the Chargeback Policy addressed consumer abuse of Match.com. Defs. App. Ex. 44 at App. 349 (Saraph Decl. ¶ 38); *see* Defs. App. Ex. 24 at App. 234–35 (explaining rationale for Chargeback Policy). Match.com is regularly faced with situations when a subscriber pays for a subscription, uses it extensively, and then submits a chargeback to their financial institution (such as a credit card company) to attempt to get the Match.com subscription for free. Defs. App. Ex. 44 at App. 349 (Saraph Decl. ¶ 39); *see* Defs. App. Ex. 24 at App. 234–35. Match.com has to incur costs to defend against those chargebacks, and such costs ultimately must be passed onto subscribers. Defs. App. Ex. 44 at App. 349 (Saraph Decl. ¶ 40); *see* Defs. App. Ex. 24 at App. 235. The Chargeback Policy prevented consumers from re-joining the platform if the user's financial institution concluded that the user had authorized the charge, although the user claimed, by initiating the chargeback, that he or she did not (unless the user indicated interest in rejoining the

site, at which point Match.com would restore the user's account). Defs. App. Ex. 44 at App. 349 (Saraph Decl. ¶ 41).

Third, Match.com disclosed the Chargeback Policy in its then-applicable Terms of Use. *See, e.g.*, Defs. App. Ex. 25 at App. 244 ("If you initiate a chargeback . . . , the Company may . . . terminate your account immediately. If the Company successfully disputes the reversal, and the reversed funds are returned, you are not entitled to a refund or to have your account or subscription reinstated.").

Fourth, when the Chargeback Policy was instituted, Match.com did not have the mechanisms it has today. Defs. App. Ex. 44 at App. 349 (Saraph Decl. ¶ 42); *see supra* n.13 (describing Match.com's current chargeback policy). For example, Match.com had to manually log in to a payment processing portal to see the outcome of a chargeback dispute (i.e., whether Match.com won or lost), whereas that process is now automated. Defs. App. Ex. 44 at App. 349 (Saraph Decl. ¶ 43); *see* Defs. App. Ex. 7 at App. 88 (Saraph Dep. Tr. (Apr. 6, 2023) 250:20– 251:13). It was burdensome to repeatedly check the portal for users who had initiated a chargeback. Defs. App. Ex. 44 at App. 350 (Saraph Decl. ¶ 44). Match.com also did not have the mechanisms it has now to trigger emails notifying users that their accounts have been reactivated (and, in any event, the user's financial institution presumably notified the user of the outcome of the dispute). *Id.* (Saraph Decl. ¶ 45); *see* Defs. App. Ex. 7 at App. 88 (Saraph Dep. Tr. (Apr. 6, 2023) 250:20– 251:13). As described above, Match.com has not taken any steps to reinstate the Chargeback Policy. *See supra* Section II.C; *see also* Defs. App. Ex. 45 at 443 (Sine Decl. ¶¶ 3–6).

### F.    MGI Was Not, and Is Not, Involved in the Guarantee, Chargeback Policy, or Online Cancelation Flow

The FTC's Amended Complaint names two defendants, MGI and MGL. *See* Dkt. 116. MGI is an indirect holding company of Defendant MGL (and numerous other entities). *See* Defs.

18

App. Ex. 6 at App. 65 (Dubey Dep. Tr. 30:13–31:3). MGI does not operate Match.com or any other brand. *See* Defs. App. Ex. 6 at App. 65, 75 (Dubey Dep. Tr. 30:13–31:3, 246:8–12); *see also* Defs. App. Ex. 5 at App. 54 (Ginsberg Dep. Tr. 203:6–25). MGI has approximately *three* employees. *See* Defs. App. Ex. 6 at App. 68 (Dubey Dep. Tr. 76:7–9). MGL is the entity that owns, operates, and controls Match.com. Defs. App. Ex. 44 at App. 346 (Saraph Decl. ¶ 4); Defs. App. Ex. 52 at App. 566–67 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 4).[17]

At a high level, the *holding* company (MGI) rolls up and reports financial information from its various indirect subsidiaries to the financial markets, while the *operating* company (MGL) handles the day-to-day business and decision-making about platform operations. Defs. App. Ex. 6 at App. 62, 71 (Dubey Dep. Tr. 14:20–15:4, 88:5–22); *see* Defs. App. Ex. 5 at App. 54 (Ginsberg Dep. Tr. 203:6–25). While MGL disputes whether the practices at issue in the Amended Complaint are illegal, MGL is the sole entity that (1) created, implemented, disclosed the terms of, and ultimately permanently discontinued the Guarantee; (2) designed, implemented, and ultimately permanently discontinued the Chargeback Policy; and (3) designed, maintained, and currently maintains the online cancelation flow. Defs. App. Ex. 44 at App. 346–47 (Saraph Decl. ¶¶ 5–7).

By contrast, MGI was not involved in any of the practices at issue in the Amended Complaint. *See* Defs. App. Ex. 3 at App. 37–38 (Blatt Dep. Tr. 127:19–131:24); Defs. App. Ex. 5 at App. 54 (Ginsberg Dep. Tr. 202:15–203:4); Defs. App. Ex. 6 at App. 74–75 (Dubey Dep. Tr. 245:20–247:11). Every MGI representative that was deposed consistently testified that MGI had no involvement with the Guarantee, including the creation, implementation, disclosure of the terms, or ultimately permanent discontinuation. *See* Defs. App. Ex. 3 at App. 37 (Blatt Dep. Tr.

---

[17] The Match.com Terms of Use state that MGL operates Match.com. Defs. App. Ex. 25–28, 44-M at App. 240, 249, 264, 276, 426. MGL is also the entity that owns the Match.com trademarks (Defs. App. Ex. 29–32 at App. 292, 295, 298, 301); is the contact for the domain Match.com (Defs. App. Ex. 33 at App. 304–05); and owns the Match.com app on the Apple and Google Play stores (Defs. App. Ex. 34–37 at App. 309, 311, 313, 315).

127:19–128:13, 129:5–16); Defs. App. Ex. 5 at App. 54 (Ginsberg Dep. Tr. 202:24–203:4); Defs. App. Ex. 6 at App. 75 (Dubey Dep. Tr. 246:2–4, 246:19–247:3). Moreover, although the FTC sued MGI for failure to adequately disclose the terms and conditions of the Guarantee, Am. Compl. ¶ 3 (and refused multiple requests to dismiss MGI, *see, e.g.*, Dkt. 21 at 37), the FTC admitted that it has no evidence that MGI was involved in the Guarantee's disclosure regime. Defs. App. Ex. 9 at App. 119 (Bandy Dep. Tr. (June 26, 2023) 198:14–199:16).

In addition, every MGI representative to testify confirmed that MGI had no involvement with the Chargeback Policy, including the design, implementation, or ultimate permanent discontinuation. *See* Defs. App. Ex. 3 at App. 37–38 (Blatt Dep. Tr. 128:14–129:4, 129:17–25, 130:1–17); Defs. App. Ex. 5 at App. 54 (Ginsberg Dep. Tr. 202:19–23); Defs. App. Ex. 6 at App. 75 (Dubey Dep. Tr. 246:5–7, 247:4–11). Again, despite suing MGI for the Chargeback Policy, Am. Compl. ¶ 3, the FTC admitted that it has no evidence that MGI was involved in the design or implementation of the Chargeback Policy. Defs. App. Ex. 9 at App. 119 (Bandy Dep. Tr. (June 26, 2023) 199:17–200:17). Further, every MGI representative to testify confirmed that MGI did not, and does not, have any involvement with the Match.com online cancelation flow, including the design or maintenance of the flow. *See* Defs. App. Ex. 3 at App. 38 (Blatt Dep. Tr. 130:25–131:24); Defs. App. Ex. 5 at App. 54 (Ginsberg Dep. Tr. 202:15–18); Defs. App. Ex. 6 at App. 74–75 (Dubey Dep. Tr. 245:20–246:1, 246:13–18). The FTC admitted that it has no evidence that MGI was involved in the design of the online cancelation flow. Defs. App. Ex. 9 at App. 117 (Bandy Dep. Tr. (June 26, 2023) 190:4–191:6).

Despite MGI's lack of involvement, the FTC insists on suing MGI because the FTC seeks to broaden the scope of any injunctive relief to dating sites other than Match.com, which are operated by indirect MGI subsidiaries that are not defendants in this case. The FTC seeks to enjoin

all other subsidiaries of MGI, despite the fact that (1) MGI does not operate them, (2) MGI does not make decisions related to the practices for any of them, and (3) each brand is owned and operated by separate companies that each have their own management and operations. *See* Defs. App. Ex. 11 at App. 174 (Am. Hearing Tr. (Nov. 1, 2022) 32:5–20 (admitting FTC wants injunction broader than Match.com)); Defs. App. Ex. 54 at App. 664–77 (FTC's Resps. and Objs. to MGL's 1st Interrogs. Attach. A (seeking injunction against MGI subsidiaries)); *see also* Defs. App. Ex. 5 at App. 54 (Ginsberg Dep. Tr. 203:6–25) (explaining each brand operated by independent companies and not by MGI); Defs. App. Ex. 6 at App. 65, 75 (Dubey Dep. Tr. 30:13–31:3, 246:8–12) (same).

### III.   STANDARD OF REVIEW

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015); *see* Fed. R. Civ. P. 56(e). To establish a genuine issue of material fact, the non-moving party may not rely upon mere allegations in its pleadings, but rather is required to tender evidence of specific facts in the form of affidavits or discovery. *Celotex*, 477 at 324.

## IV.    ARGUMENT AND AUTHORITIES

### A.    The Court Should Grant MGI and MGL Summary Judgment on Count V

The Court should grant summary judgment in favor of Defendants on Count V for three separate reasons. First, the FTC failed to provide Defendants fair notice of its novel and unprecedented interpretation of ROSCA's "simple mechanisms" requirement, which is thus void for vagueness as applied here. Second, there is no genuine factual dispute that Match.com's online cancelation flow is "simple," under the ordinary and plain meaning of the word. And third, there is no dispute that, in addition to the online cancelation flow, Match.com has, at all relevant times, provided at least four or five other simple cancelation methods. Even if the *online* cancelation flow were not simple (and it is), that would not be a sufficient showing for a ROSCA violation.

### 1.    The FTC Failed To Provide Defendants Fair Notice of Its Interpretation of ROSCA's "Simple Mechanisms" Requirement, Which Is Void for Vagueness as Applied

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). This "clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *Id.* If a law "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement," the Constitution prohibits its enforcement. *Id.* This "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*

In evaluating whether the statutory language provides the notice that due process requires, courts look at whether the statute "define[s] the term" at issue and whether the statute "ha[s] been

subject to judicial and/or administrative interpretations limiting or interpreting it" (neither of which exists here). *See Posely v. Eckerd Corp.*, 433 F. Supp. 2d 1287, 1312–13 (S.D. Fla. 2006).

For example, a court held that a statute was void for vagueness as applied to a defendant because the statute had never "been the subject of *any* judicial interpretation" aside from a decision whose holding was not pertinent to the case at bar, and "no administrative agency ha[d] cured the statute's defects," so the court was "wholly at a loss as to how it would instruct any jury, let alone on what standards would apply here at the summary judgment stage, on what constitutes [the terms at issue]." *Eckerd*, 433 F. Supp. 2d at 1313 (emphasis in original). Thus, the statute was "so vague and indefinite as really to be no rule or standard at all." *Id.*; *see Isaacson v. Brnovich*, 610 F. Supp. 3d 1243, 1253–56 (D. Ariz. 2022) (finding likelihood of success on as-applied void for vagueness challenge because it was "entirely unclear" what it meant to "acknowledge" the rights of the unborn, when "acknowledge" was not defined, and there was "no guidance" as to its meaning, such that it could be "anyone's guess"); *Naughton Ford, Inc. v. Ford Motor Co.*, 862 F. Supp. 264, 270–71 (D. Colo. 1994) (holding statute unconstitutionally vague when statute that prohibited automobile manufacturer from establishing additional franchises "if such addition would be inequitable to the existing dealer" because statute "provide[d] no guidance for determining when the addition of a new franchise by a manufacturer 'would be inequitable to the existing dealer,'" and "[p]enalties simply cannot be imposed for violating a standard with a meaning dependent upon surmise or conjecture").[18]

---

[18] Recent cases across the country, including in Texas, striking down parental consent and age verification requirements are instructive, though they also present other legal challenges. *See, e.g.*, *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at \*12–15 (W.D. Ark. Aug. 31, 2023) (finding likelihood of success on vagueness claim when statute did not define key terms, "it [was] impossible for companies to know whether they [were] subject to regulation," and state's expert and state's attorney gave "contrary answer[s]" that "illustrate[d] the ambiguous nature of key terms"); *Free Speech Coalition, Inc. v. Colmenero*, No. 1:23-CV-917, 2023 WL 5655712, at \*11–12 (W.D. Tex. Aug. 31, 2023) (although not resting holding on vagueness, explaining law was problematic because the law did not define "minors" and "offer[ed] no guidance," yet "risk[ed] enormous financial harm").

An agency's later clarification of a statute is evidence of vagueness. The Fifth Circuit has "considered an agency's decision to later clarify the language at issue to be 'at least some support' that the language lacked clarity at the time of an alleged violation." *Exxon Mobil Corp. v. Mnuchin*, 430 F. Supp. 3d 220, 233 (N.D. Tex. 2019) (Boyle, J.) (quoting *Emp. Sols. Staffing Grp. II, L.L.C. v. Off. of Chief Admin. Hearing Officer*, 833 F.3d 480, 488 (5th Cir. 2016)). Similarly, a court in this District recently held that a federal agency did not provide fair notice of its interpretation of regulations when, among other reasons, the federal agency issued an FAQ prohibiting the conduct after the alleged violations occurred. *Exxon Mobil*, 430 F. Supp. 3d at 224, 229, 233.

Just as the Due Process Clause prohibits enforcing vague rules, it likewise prohibits retroactive application of new interpretations. An agency must provide "fair notice" of its standards "*prior* to the [conduct] in question." *Fox*, 567 U.S. at 258 (emphasis added). In this case, Defendants repeatedly asked the FTC what Match.com needed to do to comply with ROSCA's simple requirement. The FTC (begrudgingly)[19] offered only a single interpretation: a "one-click cancellation mechanism" would comply with ROSCA's "simple" requirement. Defs. App. Ex. 56 at App. 706 (FTC's 4th Am. Resps. to MGI's 1st Interrogs. No. 2).[20] The FTC's expert in this case then applied a different standard. The FTC failed to provide Match.com fair notice of its purported one-click requirement, the FTC's expert's new standard, or any other requirement that would render Match.com's online cancelation flow not simple, as set forth below.

---

[19] The FTC provided this information only after MGI was forced to move to compel the FTC to tell Defendants what changes the FTC believed would be necessary for the Match.com online cancelation flow to be "simple." *See* Order, Dkt. 174 at 1–2 ("The plaintiff's objections to the portion of Interrogatory No. 2 . . . relating to fixes (i.e., changes the plaintiff[] contends would be necessary to 'make the Online Cancelation Flow 'simple'" are overruled"); *cf.* Defs. App. Ex. 53 at App. 612 (FTC's Resps. to MGI's 1st Interrogs. No. 2 (objecting that "the FTC does not need to show what a simple mechanism would look like to establish that Match's flow was not simple")).

[20] Moreover, it is only in the FTC's new *proposed* rule that the FTC has suggested that it *may* require—in the future—that companies provide a one-click cancelation method without any save offers or surveys. *See supra* n.2.

### a.      The FTC Has Never Provided Notice of Its Current Position

ROSCA requires "simple mechanisms for a consumer to stop recurring charges." 15 U.S.C.

§ 8403(3). "Simple mechanisms" is not defined in ROSCA or in any regulation.[21] Moreover, the

FTC has never litigated to judgment the meaning of simple as it applies to an online cancelation

flow. *See, e.g.*, Defs. App. Ex. 1 at App. 17 (Bandy Dep. Tr. (Oct. 24, 2022) 118:17–22 ("Q. To

your knowledge, has the FTC ever litigated a case to judgment in which it applied any specific

standard for simplicity? . . . [A.] I can't think of any [case] litigated to judgment.")). There is no

other developed or established definition of "simple" in caselaw. In addition, the legislative history

indicates that Congress did not intend to require an online cancelation mechanism, *see infra*

Section IV.A.2.b, but merely for consumers to have "simple, convenient ways to cancel"[22] and for

companies to meet "minimum requirements."[23] Critically, before the FTC brought this lawsuit, the

FTC had provided no guidance on the meaning of "simple mechanisms" in ROSCA.

### b.      The FTC's Position Here Is Inconsistent with Past Guidance

Over two years *after* the FTC brought this case, the FTC issued an Enforcement Policy

Statement Regarding Negative Option Marketing (the "Policy Statement"). *See* 86 Fed. Reg.

60822-01 (announced Oct. 29, 2021; issued Nov. 4, 2021). The FTC's attempt to clarify the

language at issue in ROSCA demonstrates that the language lacked clarity at the time of the alleged

violation. *See Exxon Mobil*, 430 F. Supp. 3d at 233 (quoting *Emp. Sols.*, 833 F.3d at 488).

---

[21] *See, e.g.*, Defs. App. Ex. 50 at App. 518 (FTC's Resps. and Objs. to MGL's 1st Reqs. for Admiss. No. 53 ("The FTC interprets this request to be asking the FTC to admit that the word 'simple' as used in [ROSCA] is not a defined term in the Act. Based on this interpretation, the FTC admits.")).

[22] S. Rep. 111-240, 2010 WL 3002003, at *3–4 ("Section 3(c) would establish rules under which Internet retailers may periodically charge consumers for goods or services until the consumer cancels the arrangement ('negative option feature'). It would prohibit a seller from charging a consumer through a negative option feature unless: . . . 3) the seller provides the consumer simple, convenient ways to cancel the negative option plan.").

[23] Statement by the Press Secretary, 2010 WL 5384575 ("On Wednesday, December 29, 2010, the President signed into law: . . . the 'Restore Online Shoppers' Confidence Act,' which protects online consumers . . . by: (3) requiring companies that use 'negative options' (i.e., require consumers to take an affirmative action to reject goods or services) to meet certain minimum requirements.").

Even had the FTC issued its Policy Statement prior to suing Defendants, the Policy Statement explicitly states that it is not binding—even on the FTC. *See* 86 Fed. Reg. 60822-01 n.1. In fact, the FTC in this case has articulated stricter views of the guidance in the Policy Statement and has also taken positions nowhere to be found in that guidance, as explained below. This "arbitrary" and "discriminatory enforcement" reflects the unfairness that the Due Process Clause prohibits. *Fox*, 567 U.S. at 253.

First, the Policy Statement advises that "negative option sellers should provide cancellation mechanisms at least as easy to use as the method the consumer used to initiate the negative option feature." 86 Fed. Reg. 60826. As explained below, *see infra* Section IV.A.2.a, the Match.com online cancelation flow meets this guidance because the Match.com registration and subscription process takes up to 65 clicks, while the Match.com online cancelation flow takes a maximum of 12 clicks (as a conservative estimate using the FTC's definition of the flow). *See* Defs. App. Ex. 59 at App. 1084–85. Faced with those facts, the FTC in this case articulated a more stringent view of this guidance. The FTC testified in its 30(b)(6) deposition that "the method the consumer used to initiate the negative option feature" means only the number of clicks required to "initiate" auto-renew—and thus *excludes* the number of clicks required to register for or subscribe at Match.com. Defs. App. Ex. 1 at App. 16 (Bandy Dep. Tr. (Oct. 24, 2022) 115:13–116:18).

Doubling down on this unprecedented interpretation, the FTC took the position that it takes "zero" clicks to "initiate" auto-renew because a Match.com subscription "automatically comes initiated with the negative option feature." *Id.* That interpretation would mean that consumers would have to be able to automatically have their subscriptions canceled, which would render autorenewals illusory.[24] Faced with that absurdity, the FTC has since taken the position that,

---

[24] Because subscriptions would seemingly have to be automatically canceled under the FTC's zero-click theory, that would mean that autorenewals could not exist. Moreover, the provision of ROSCA at issue governs autorenewals.

because "a subscriber must check a box next to a disclosure about the auto-renew feature during the signup process," that "checkbox is how Match.com customers initiate the negative option feature, as opposed to the signup process more broadly." Defs. App. Ex. 54 at App. 660–61 (FTC's Resps. and Objs. to MGL's 1st Interrogs. No. 16).[25]

Second, and relatedly, in response to Defendants' requests that the FTC explain what ROSCA would actually require, the FTC indicated that a "one-click cancellation mechanism" would comply with ROSCA's "simple" requirement, but the FTC offered no other option. *See* Defs. App. Ex. 56 at App. 706 (FTC's 4th Am. Resps. to MGI's 1st Interrogs. No. 2).[26] Not only is the FTC's "one-click cancellation mechanism" theory nowhere in the Policy Statement, but it is affirmatively inconsistent with the Policy Statement. This is because the Policy Statement expressly permits "a request to consider an offer or discount" (as explained below), but a "one-click cancellation mechanism" cannot possibly incorporate an offer or discount (given that the offer or discount would necessitate a second click). Thus, the FTC's 30(b)(6) testimony in this case suggests that businesses that follow the Policy Statement's guidance are in violation of the law. Moreover, a so-called "one-click cancellation mechanism" is not practical. To comply with the standard articulated by the FTC in its deposition, Match.com would need to provide a button

---

There is no point in having rules governing autorenewals if, under the FTC's nonsensical interpretation, autorenewals are not actually allowed.

[25] Match.com has not always had a checkbox, however. Thus, the FTC's apparent position is that when Match.com did not have a checkbox, consumers had to be able to automatically cancel their subscriptions (rendering autorenewals illusory), *see supra* n.24. The FTC's position would render countless other companies' autorenewals illusory because a checkbox is not required. The FTC has *proposed* a possible requirement in its Notice of Proposed Rulemaking. *See, e.g.*, Notice of Proposed Rulemaking, Negative Option Rule, 88 Fed. Reg. 24716-01 (Apr. 24, 2023) ("[T]he proposed Rule provides guidance for sellers making written offers . . . to assure they have obtained the consumer's unambiguously affirmative consent. Specifically, for all written offers . . . , sellers may obtain express informed consent through a check box . . . or other substantially similar method, which the consumer must affirmatively select . . . to accept the negative option feature[.]").

[26] The FTC's proposed injunction in this case does not even require a "one-click" method. Instead, the FTC would require "a simple mechanism" that must "[b]e easy to find," "[b]e easy to use," and "[n]ot require the consumer to take any action that is objectively unnecessary to cancel." Defs. App. Ex. 54 at 670 (FTC's Resps. and Objs. to MGL's 1st Interrogs. Attach. A).

on its home page to immediately effect cancelation,[27] which would lead to inadvertent clicks (and cancelations) and remove value from consumers who might benefit from a save offer. *See* Defs. App. Ex. 44 at App. 350 (Saraph Decl. ¶ 53).

Third, the Policy Statement explicitly allows "new offers or similar attempts to save the negative option arrangement" so long as those offers or attempts do not "impose unreasonable delays on consumers' cancellation efforts." 86 Fed. Reg. 60826. The Policy Statement goes even farther, explaining that "a request to consider an offer or discount would not amount to an unreasonable delay." 86 Fed. Reg. 60826 n.48. Only "multiple requests for a consumer to listen to additional offers, lengthy pitches, or ignoring a consumer's request to decline further offers"— none of which exist in Match.com's flow—"could amount to an unreasonable delay." *Id.* As explained below, *see infra* Section IV.A.2.a, the Match.com online cancelation flow is consistent with this guidance because Match.com consumers are asked only two optional surveys (about why they are looking to cancel and how likely they would be to recommend Match.com to a friend), and some consumers are given one save offer (in which they are given an opportunity to renew at a discounted price, instead of canceling). By no stretch of the imagination do these few short questions—which are optional, can be completed in less than a minute if consumers choose to answer, and which also benefit consumers, as explained below, *see infra* Section IV.A.2.a—cause "unreasonable delay."

But again, the FTC in this case has taken an even more restrictive view of its own guidance. The FTC testified in its 30(b)(6) deposition that "unreasonable delay" actually means "unnecessary." Defs. App. Ex. 1 at App. 16 (Bandy Dep. Tr. (Oct. 24, 2022) 117:2–19). The FTC further testified that an objectively unnecessary step is "a step that a reasonable person would not

---

[27] It is unclear how Match.com would know who clicked the button or what subscription to cancel, without the user entering this information before clicking a button to cancel.

feel was necessary to cancel." Defs. App. Ex. 2 at App. 29 (Bandy Dep. Tr. (Oct. 31, 2022) 199:10–13). Thus, although nothing in ROSCA or the Policy Statement (which was issued years after this case was brought) indicated that "unreasonable delay" means "unnecessary"—and the Policy Statement actually indicated the contrary—the FTC contends in this case that the Match.com online cancelation flow violates ROSCA because it contains two short *optional* surveys and, on occasion, a save offer. Defs. App. Ex. 2 at App. 26, 29 (Bandy Dep. (Oct. 31, 2022) Tr. 170:18–20 (testifying that FTC's position in this case is that save offer amounts to unreasonable delay), 199:10–22 (testifying that "a survey would probably be objectively unnecessary to cancel")); *cf.* Defs. App. Ex. 56 at App. 706 (FTC's 4th Am. Resps. to MGI's 1st Interrogs. No. 2 (suggesting Match.com would need to eliminate the save offer and survey pages to comply with ROSCA)).

The Policy Statement (again, that was issued after the FTC filed this lawsuit) contains two other pieces of guidance. It provides that "negative option sellers should provide their cancellation mechanisms at least through the same medium (such as website or mobile application) the consumer used to consent to the negative option feature." 86 Fed. Reg. 60826. It also provides that "a seller's cancellation procedures for negative option features should be effective," meaning "[s]ellers should not impede the effective operation of promised cancellation procedures, and should honor cancellation requests that comply with such procedures." *Id.* There is no dispute that Match.com's online cancelation flow complies with these two pieces of guidance. *See infra* Section IV.A.2.a.

### c.    The FTC's 30(b)(6) Deposition Testimony Confirms the Agency Failed to Give Notice of Its Novel Interpretation

The FTC attempted to annunciate *during its deposition in this case* more factors to evaluate the meaning of "simple," as explained below. These factors were never published when the FTC brought this lawsuit and are not in the Policy Statement or any statute, regulation, or caselaw.

The FTC's Standardless "Reasonable Consumer Test" for Placement of the Online Cancelation Flow and Language Used in It. The FTC testified that "simple" means "easy to find and easy to use," and in the case of auto-renewal, "the cancellation mechanism would have to be pretty simple," meaning "really easy to find and really easy to use." Defs. App. Ex. 1 at App. 11 (Bandy Dep. Tr. (Oct. 24, 2022) 96:9–14); Defs. App. Ex. 2 at App. 23 (Bandy Dep. Tr. (Oct. 31, 2022) 156:19–157:13). The FTC further testified that "easy to find" is "an objective standard based on . . . what a reasonable consumer's experience on the website would be." Defs. App. Ex. 1 at App. 12 (Bandy Dep. Tr. (Oct. 24, 2022) 98:24–99:11). The FTC admitted that evidence of the "easy to find" factor could be a consumer study. *Id.* (Bandy Dep. Tr. (Oct. 24, 2022) 99:12–23). The FTC also testified that an online cancelation flow must have "clear verbiage" and "clear wording," which requires that "the language [not be] confusing to a reasonable consumer." *Id.* (Bandy Dep. Tr. (Oct. 24, 2022) 100:5–101:6).

Time to Cancel, But How Long Is Too Long Depends. The FTC also testified that a factor used to evaluate whether a cancelation mechanism is simple is time to completion. *Id.* at App. 11 (Bandy Dep. Tr. (Oct. 24, 2022) 97:18–19 ("Q. One would be time to completion. Do you agree with that? A. Sure.")). The FTC testified that this factor "would be measured by a reasonable person, their experience under the similar facts and circumstances." *Id.* at App. 11–12 (Bandy Dep. Tr. (Oct. 24, 2022) 97:20–98:2). But the FTC refused to testify as to how much time is too long to complete an online cancelation flow. *See id.* at App. 7–8 (Bandy Dep. Tr. (Oct. 24, 2022) 21:21–22:11 (testifying that amount of time that is too long to cancel an online subscription "depends" and that one or two minutes "[c]ould be" too long)).[28]

---

[28] Under the FTC's varying interpretations of the number of clicks required to "initiate the negative option feature," *see supra* Section IV.A.1.b, the time required to cancel would seemingly need to be zero (or close to zero) seconds, which is unreasonable and conflicts with the FTC's testimony that how long is too long "depends."

Number of Clicks, But How Many Clicks Are Too Many Depends. The FTC also testified that another factor used to evaluate whether a cancelation mechanism is simple is the number of clicks that it takes to complete the transaction. *Id.* at App. 12 (Bandy Dep. Tr. (Oct. 24, 2022) 98:13–22 ("Q. Is that issue relevant to whether or not -- the number of clicks, is it relevant to whether or not a canceling mechanism is simple or not? . . . [A.] Could be, sure.")). Again, the FTC refused to testify as to how many clicks to cancel in an online cancelation flow are too many. *See id.* at App. 7–8 (Bandy Dep. Tr. (Oct. 24, 2022) 21:21–22:4 (refusing to testify as to whether two, six, or nine clicks would be too many and testifying that number of clicks that is too many "depends on the circumstances")). This testimony also conflicts with the FTC's zero or one-click cancelation requirement discussed above. *See supra* Section IV.A.1.b.

Effectiveness Rate, But Minimum Required Effectiveness Depends. The FTC also testified that effectiveness (meaning the percentage of consumers who attempt to cancel using a flow and succeed) is yet another factor used to evaluate whether a cancelation flow is simple. Defs. App. Ex. 1 at App. 12 (Bandy Dep. Tr. (Oct. 24, 2022) 101:14–21). The FTC likewise refused to testify as to how effective an online cancelation flow must be. *Id.* at App. 12–13 (Bandy Dep. Tr. (Oct. 24, 2022) 101:22–102:4 (testifying that "there's [no] set percentage amount," as "you'd have to look at it based on the data that you had, the facts and circumstances")). Tellingly, however, the FTC's own usability expert admitted that 100% effectiveness is not required. Defs. App. Ex. 10 at App. 136 (King Dep. Tr. 58:16–20 ("Q. Let me say it another way: Are you saying that anything less than 100 percent in a usability study would make something not easy to use? A. No. That's not what I'm saying.")).

The unfairness of the FTC's "it depends" positions in this case demonstrates the fact that the FTC does not even know what "simple" means yet expects businesses not only to know but

also to face hundreds of millions or billions of dollars in civil penalties and consumer redress if they follow the FTC's published guidance.

### d. The FTC's Own Expert Did Not Even Consider the Factors that the FTC Testified Are Relevant

Strikingly, even the FTC's own expert did not apply the factors that the FTC articulated in the Policy Statement and 30(b)(6) testimony, further demonstrating that Defendants did not have fair notice of the factors that the FTC applies when analyzing "simple." What is more, the FTC's expert applied *yet another* set of factors not listed anywhere in any statute, regulation, caselaw, or other FTC guidance regarding whether a cancelation mechanism is "simple." Specifically, the FTC's expert evaluated what she believed to have been so-called "dark patterns"[29] in the flow and three of ten factors that are used in a heuristic analysis.[30] *See* Defs. App. Ex. 10 at App. 139 (King Dep. Tr. 97:2–20). Tellingly, in her incomplete analysis, the FTC's expert cherry-picked only the three heuristic factors that she believed Match.com violates. *See id.* (King Dep. Tr. 97:12–17).

No Evaluation of Registration or Subscription Process. Contrary to the FTC's Policy Statement, the FTC's own expert did no analysis to compare the relative simplicity of the Match.com sign-up or subscription flow, on the one hand, to the online cancelation flow, on the other. *See id.* at App. 126–27, 129 (King Dep. Tr. 17:22–18:2 (admitting "outside the scope of my report to look at the sign-up process"), 26:8–14 (admitting "never subscribed to Match.com" and "have not evaluated the subscription process")).

---

[29] The FTC's expert's area of study and focus is on dark patterns, so she is naturally biased toward seeing dark patterns that are not relevant to an actual subscriber's use of the site or to the question of simplicity. *See* Defs. App. Ex. 58 at App. 981.

[30] A heuristic evaluation typically involves an evaluator examining an interface and judging its compliance with ten recognized principles (or heuristics). The three heuristics that the FTC's expert opined on were (1) visibility of system status (meaning "design should always keep users informed about what is going on, through appropriate feedback within a reasonable amount of time"), (2) consistency and standards (meaning "users should not have to wonder whether different words, situations, or actions mean the same thing"), and (3) aesthetic and minimalist design (meaning "[i]nterfaces should not contain information that is irrelevant or rarely needed"). *See* Defs. App. Ex. 58 at App. 1010–13; Defs. App. Ex. 10 at App. 139 (King Dep. Tr. 97:12–20 (admitting opined on only three heuristics)).

No Understanding of Reasonable Consumer Test. The FTC's expert also did not understand (or apply) the "reasonable person" test that the FTC's own witness articulated, *see* Defs. App. Ex. 1 at App. 11–12 (Bandy Dep. Tr. (Oct. 24, 2022) 96:9–14, 98:24–99:11), for the first time in the FTC's 30(b)(6) deposition. *See* Defs. App. Ex. 10 at App. 128–29 (King Dep. Tr. 22:10–25 (admitting did not "know specifically what you mean by 'reasonable person' here"), 29:15–24 (admitting could not grasp what is meant by "reasonable consumer" and not "recall[ing]" an understanding of what the reasonable consumer standard is)).

No Evaluation of Consumers' Ability to Find the Flow. Although "easy to find" based on a reasonable consumer's perspective is a component of the test that the FTC representative articulated in his 30(b)(6) testimony, Defs. App. Ex. 1 at App. 12 (Bandy Dep. Tr. (Oct. 24, 2022) 98:24–99:23), the FTC's expert did not evaluate the percentage of consumers who successfully found the online cancelation flow, did not evaluate the average amount of time it took for consumers to find the flow, and did not conduct a usability or performance study to assess whether consumers can find the flow. *See* Defs. App. Ex. 10 at App. 128–30 (King Dep. Tr. 23:22–24:3 (admitting "did not" evaluate how much time on average it took a consumer to find the flow), 28:2–6 (admitting "did not" attempt to determine percentage of consumers who attempted to find the cancelation flow and were able to find it), 30:22–31:19 (admitting "did not" conduct a usability or performance study), 32:19–33:16 (explaining did not conduct usability study because FTC did not ask her to conduct a usability study)).

No Study of Consumers' Understanding of Language in the Flow. While the test the FTC's witness articulated in 30(b)(6) testimony provided that language must not be confusing to a reasonable consumer, Defs. App. Ex. 1 at App. 12 (Bandy Dep. Tr. (Oct. 24, 2022) 100:5–101:6), the FTC's expert did no empirical study of how consumers react to certain language in the online

33

cancelation flow, instead basing her opinion on her "know it when I see it" approach. *See* Defs. App. Ex. 10 at App. 135–36 (King Dep. Tr. 57:17–58:4 (admitting "did not" conduct empirical study or copy test of how users actually react to language in flow)).

No Evaluation of Time to Complete the Flow. Even though the FTC's witness said that a relevant factor is time to completion, Defs. App. Ex. 1 at App. 11 (Bandy Dep. Tr. (Oct. 24, 2022) 97:18–19), the FTC's expert did not evaluate the average amount of time it took for consumers to complete the online cancelation flow. Defs. App. Ex. 10 at App. 128 (King Dep. Tr. 22:5–9 (admitting "did not" independently evaluate average time for user to complete cancelation flow)).

No Evaluation of Effectiveness of the Flow. While the FTC testified that a relevant factor is the percentage of consumers who attempt to cancel using a flow and succeed, Defs. App. Ex. 1 at App. 12 (Bandy Dep. Tr. (Oct. 24, 2022) 101:14–21), the FTC's expert did not attempt to measure the effectiveness of the online cancelation flow by looking at consumer behavior. Defs. App. Ex. 10 at App. 133–34 (King Dep. Tr. 49:7–50:12 (admitting "did not" measure effectiveness by looking at consumer behavior in a usability or performance test), 52:20–24 (admitting "did not attempt" to measure effectiveness with user study)).

Defendants cannot be expected to have notice of factors that the FTC articulated in the Policy Statement and 30(b)(6) testimony in this case when the FTC's own usability expert did not even understand or use them in her analysis.

### e.    The FTC Has Repeatedly Admitted that "Simple" Is Vague

Days after the FTC filed this case on September 25, 2019, Dkt. 1, the FTC publicly admitted that the term "simple" as used in ROSCA "lacks specificity." Advanced Notice of Proposed Rulemaking, Rule Concerning the Use of Prenotification Negative Option Plans, 84 Fed. Reg. 52393-01 (Oct. 2, 2019) ("ROSCA *lacks specificity* about cancellation procedures" and "does not specify what methods would satisfy this ['simple mechanism'] requirement." (emphasis

added)). Approximately two years later, the FTC then issued the Policy Statement that still provided inadequate guidance. *See supra* Section IV.A.1.b. For this reason, years later, there is still confusion about the meaning of "simple," and the FTC knows it.

The FTC recently sought comments on a proposed rule governing online subscription cancelation. *See* Notice of Proposed Rulemaking, Negative Option Rule, 88 Fed. Reg. 24716-01 (Apr. 24, 2023). In addressing the limitations of existing regulatory requirements, the FTC admitted that there is no guidance as to what "simple" in ROSCA means. *See id.* ("ROSCA lacks specificity about cancellation procedures and the placement, content, and timing of cancellation-related disclosures. Instead, the statute requires marketers to provide 'simple mechanisms' for the consumer to stop recurring charges ***without guidance about what is simple***." (emphasis added)).

If the FTC itself cannot provide guidance or specificity about what "simple" means, how can it accuse Defendants of violating ROSCA? The FTC's repeated admissions that it does not know what "simple" means illustrate how "regulated parties [cannot] know what is required of them," and there is no "precision and guidance" to ensure "that those enforcing the law do not act in an arbitrary or discriminatory way." *See Fox*, 567 U.S. at 253. Moreover, the FTC's "decision[s] to later clarify the language at issue [is] 'at least some support' that the language lacked clarity at the time of [the] alleged violation." *See Exxon Mobil*, 430 F. Supp. 3d at 233 (quoting *Emp. Sols.*, 833 F.3d at 488).

It is only in this new proposed rule that the FTC has suggested that it may require—in the future—that companies provide a one-click cancelation method without any save offers or surveys. *See supra* n.2. But the FTC cannot impose this ***yet-to-be-promulgated rule*** retroactively on Match.com—that is a clear Due Process violation. *See Fox*, 567 U.S. at 258.

35

### 2. There Is No Genuine Dispute of Material Fact that Match.com Provides Simple Cancelation Mechanisms

Even though the FTC has offered no guidance on what a "simple" cancelation mechanism is, it cannot be disputed that Match.com offered not just one, but multiple, simple methods. Defendants should be granted summary judgment on Count V for these two additional reasons.

### a. The Online Cancelation Flow Is Simple as a Matter of Law

There is no genuine dispute of material fact that the online cancelation flow *is* "simple" under ordinary parlance. This is demonstrated by actual Match.com user data, Defendants' expert's usability study, and common sense. Match.com's user data shows that the average time to complete the online cancelation flow is only 44 seconds and that over 95% of Match.com subscribers that enter the cancelation flow successfully cancel or take a save offer (i.e., decide to renew rather than cancel) before being charged a renewal.[31] Defs. App. Ex. 57 at App. 744–45. Moreover, videos of the online cancelation flow demonstrate that it can be completed in less than a minute. *See* Defs. App. Ex. 60–63 at App. 1159–62. Defendants' usability expert's study confirmed that 91.5% of study participants successfully canceled through the flow, with an average time to completion of 74 seconds. Defs. App. Ex. 57 at App. 743–44.

None of this objective and empirical evidence on simplicity is in dispute. No reasonable factfinder can conclude that a less-than-one-minute, three-to-four step process, that over 90% of people who start ultimately complete, lacks simplicity. By contrast, the FTC's usability expert in this case did not conduct any empirical analysis or objective study on Match.com's online cancelation flow. *See supra* Section IV.A.1.d; Defs. App. Ex. 10 at App. 125 (King Dep. Tr. 13:12– 13 ("Q. You did not do a usability study. Correct? A. I did not do a usability study.")). All she did

---

[31] Still others do not cancel but are nevertheless not charged due to canceling their credit card, for example. Defs. App. Ex. 44 at App. 351 (Saraph Decl. ¶ 60).

was her own subjective analysis, but that analysis did not incorporate *any* of the factors that the FTC's own Policy Statement and 30(b)(6) representative said were determinative of simplicity. *See supra* Section IV.A.1.d. The FTC's "expert" analysis therefore cannot create a genuine dispute of fact.[32] Based on Defendants' usability expert's study, evaluation of empirical Match.com user data, comparison to other online subscription cancelation flows, and his own analysis of the flow, he concluded that Match.com's cancelation flow is simple. Defs. App. Ex. 57 at App. 743–45.

The Match.com online cancelation flow also meets the guidance in the Policy Statement, although it was issued years after this case was brought, *see supra* Section IV.A.1.b. First, the online cancelation flow is at least as easy to use as the Match.com registration and subscription process. The Match.com registration and subscription process takes up to 65 clicks, while the Match.com online cancelation flow takes a maximum of 12 clicks (using the most conservative estimate that the FTC defines as the flow). *See* Defs. App. Ex. 59 at App. 1084–85. Completion rates further evidence the relative simplicity of the flows: while over 95% of subscribers that enter the cancelation flow successfully complete it prior to their renewal, an average of only about 40% of users that visit a payment page complete the subscription process within 90 days. *See id.* at App. 1080–81. Moreover, Defendants' usability expert's study confirmed that participants were able to cancel more easily than they were able to sign up for Match.com—cancelation was 6.1 times faster than sign-up. Defs. App. Ex. 57 at App. 744. Participants in the study also subjectively believed that cancelation was at least as easy as signing up—in fact, 84.7% of participants thought canceling was at least as simple as signing up. *Id.*

---

[32] Furthermore, Match.com's online cancelation flow is comparable to the flows on popular sites with which many Match.com users are familiar, such as LinkedIn Premium, the New York Times, and Disney+. Defs. App. Ex. 57 at App. 766–67, 908–17, 935–47, 952–64.

There is also no evidence that the Match.com online cancelation flow imposes "unreasonable delays" or "subject[s] consumers to multiple requests for a consumer to listen to additional offers, lengthy pitches, or ignore[s] a consumer's request to decline further offers." *See* 86 Fed. Reg. 60826 & n.48. Instead, consumers are asked only why they are looking to cancel[33] (i.e., a survey) and how likely they would be to recommend Match.com to a friend (known as a net promoter score or NPS).[34] Defs. App. Ex. 44 at App. 350 (Saraph Decl. ¶ 48). Consumers are not required to answer either question. Defs. App. Ex. 8 at App. 98, 101–02 (Saraph Dep. Tr. (June 22, 2023) 93:1–7 (explaining survey optional); 108:13–109:2 (explaining NPS optional)). It is important for Match.com's business to know why subscribers are looking to cancel and if they had a positive or negative experience on the site. Defs. App. Ex. 44 at App. 350 (Saraph Decl. ¶ 49). Match.com regularly uses the information received in these cancelation surveys to better understand consumer behavior and improve the site (e.g., if the user reports a bug on the site or a bad experience with another user). *Id.* (Saraph Decl. ¶ 50); *see* Defs. App. Ex. 38 at App. 317–19 (Match.com using cancelation survey data); Defs. App. Ex. 39 at App. 322–23 (same). It is also important for Match.com to know if the consumer is looking to cancel because Match.com succeeded at helping the user find a permanent match. Defs. App. Ex. 44 at App. 350 (Saraph Decl. ¶ 51). Some consumers are also given one save offer, in which they are given an opportunity to renew at a discounted price, instead of canceling.[35] *Id.* (Saraph Decl. ¶ 51); Defs. App. Ex. 8 at App. 100 (Saraph Dep. Tr. (June 22, 2023) 102:2–8 (explaining some users receive save offer)). The save offer benefits consumers by saving them money on a Match.com subscription. Defs. App. Ex. 44 at App. 350 (Saraph Decl. ¶ 53).

---

[33] *See* Defs. App. Ex. 16 at App. 211.
[34] *See* Defs. App. Ex. 18 at App. 215.
[35] *See* Defs. App. Ex. 17 at App. 213.

Second, the FTC admitted that the online cancelation flow is available at the same website the consumer used to consent to the negative option feature. *See* 86 Fed. Reg. 60826; Defs. App. Ex. 1 at App. 16–17 (Bandy Dep. Tr. (Oct. 24, 2022) 117:23–118:15). And third, there is no evidence that Match.com "impede[s] the effective operation of promised cancellation procedures." *See* 86 Fed. Reg. 60826. There is no evidence, for example, that Match.com "provide[s] false information about how to cancel." *See id.* To the contrary, Match.com offers FAQs to provide consumers with the answers they need, including how to cancel via the online cancelation flow. Defs. App. Ex. 44 at App. 350–51 (Saraph Decl. ¶¶ 54–57). This includes a video with step-by-step instructions on how to cancel and FAQs with a direct link to the online cancelation flow. *Id.* (Saraph Decl. ¶ 55). If Match.com were trying to make it difficult for subscribers to cancel, it would not offer these resources. *Id.* at App. 351 (Saraph Decl. ¶ 58). Moreover, Match.com relies heavily on repeat-customers, so Match.com has no incentive to provide them with a negative cancelation experience. *Id.* (Saraph Decl. ¶ 59). Lastly, the online cancelation flow ends with a confirmation page,[36] so there are no "delays in processing consumers' cancellation requests," nor could there be any evidence of misrepresentations regarding delays. *See* 86 Fed. Reg. 60826. For these reasons, the online cancelation flow is simple as a matter of law.

### b. Match.com Offers Multiple Methods to Cancel, and the FTC Challenges Only the Online Cancelation Flow

Another way to resolve Count V and avoid the issues above is to look at the plain language of ROSCA. *See, e.g.*, *In re Universal Seismic Assocs., Inc.*, 288 F.3d 205, 207 (5th Cir. 2002) (explaining courts should look to "plain language"); *TransFirst Grp., Inc. v. Magliarditi*, 237 F. Supp. 3d 444, 457 (N.D. Tex. 2017) ("No court should engage in judicial overreaching to interpret and 'write in' a limitation . . . that is repugnant to the statute's clearly stated text.").

---

[36] *See* Defs. App. Ex. 19 at App. 217.

The plain language of ROSCA requires only "simple mechanisms" for cancelation. 15 U.S.C. § 8403(3). The plain language does not require that *every* cancelation method offered be simple, nor does it prohibit non-simple methods of cancelation (so long as there are "simple mechanisms"). The plain language also does not prohibit companies from voluntarily providing an additional cancelation method, even if that method does not meet the simple cancelation requirement. Interpreting ROSCA otherwise would mean that a company could provide ten simple methods to cancel, and if the company tried to offer one more method that the FTC thought was not simple enough, the company could be liable under ROSCA, whereas the company would not face liability if it had just not offered the eleventh method to cancel. Such an interpretation would conflict with the legislative history because Congress merely wanted for consumers to have "simple, convenient ways to cancel"[37] and for companies to meet "minimum requirements."[38]

The plain language of the statute does not even require an online cancelation mechanism, which the FTC acknowledges.[39] By contrast, only non-binding guidance that the FTC issued years after the FTC brought this case (and after MGI moved to dismiss on this basis, Dkt. 20) provides that ROSCA *may* require an online cancelation mechanism. *See supra* Section IV.A.1.b.[40] A plain reading of the statute would require either two simple cancelation methods or that the mechanisms

---

[37] S. Rep. 111-240, 2010 WL 3002003, at *3–4 ("Section 3(c) would establish rules under which Internet retailers may periodically charge consumers for goods or services until the consumer cancels the arrangement ('negative option feature'). It would prohibit a seller from charging a consumer through a negative option feature unless: . . . 3) the seller provides the consumer simple, convenient ways to cancel the negative option plan.").

[38] Statement by the Press Secretary, 2010 WL 5384575 ("On Wednesday, December 29, 2010, the President signed into law: . . . the 'Restore Online Shoppers' Confidence Act,' which protects online consumers . . . by: (3) requiring companies that use 'negative options' (i.e., require consumers to take an affirmative action to reject goods or services) to meet certain minimum requirements.").

[39] Defs. App. Ex. 1 at App. 11 (Bandy Dep. Tr. (Oct. 24, 2022) 97:2–7 ("Q. And you agree that ROSCA does not require an online cancelation mechanism, correct? . . . [A.] It's not stated in the statute. I agree with that.")).

[40] While the FTC may wish that ROSCA contained more detailed guidance as to the required medium to cancel, the Policy Statement illustrates how "simple" in ROSCA lacked clarity at the time of the purported violation. *See supra* Section IV.A.1.

that comprise a single method to cancel are simple. Either way, Count V fails as a matter of law because Match.com indisputably meets either requirement.

Here, the FTC admits that Match.com offers four (and, at most times relevant to this suit, five) methods for consumers to cancel their subscriptions other than the online cancelation flow: internet chat, email, standard mail, fax, and phone. Defs. App. Ex. 49 at App. 486–89 (FTC's 2d Am. Resps. to MGI's 1st Reqs. for Admiss. No. 13 (admitting that "Match.com has a chat feature that Match.com subscribers have used to cancel"), No. 17 (admitting that Match.com "maintains a customer service number that Match.com subscribers have used to cancel"), No. 21 (admitting that "consumers have cancelled their Match.com subscription by mailing a letter to Defendants"), No. 25 (admitting that "users have cancelled their subscription by fax"), No. 29 (admitting that "Match.com has an email feature that [] Match.com subscribers have used to cancel")). And the undisputed evidence shows that consumers regularly used the other methods that Match.com offers. *See* Defs. App. Ex. 44 at App. 351–52 (Saraph Decl. ¶ 62).

The FTC does not challenge that those other methods exist, nor is there any evidence that they are not simple. Rather, the FTC challenges only the Match.com online cancelation flow. *See* Defs. App. Ex. 9 at App. 109 (Bandy Dep. Tr. (June 26, 2023) 30:2–13 ("[Q.] Is it true that the only mechanism at issue in this case is the online cancellation mechanism, singular? . . . A. I think I testified to this before, but for purposes of Count V, that is the mechanism that we are alleging was not simple.")). Because Match.com meets the plain requirement of ROSCA (having more than one simple cancelation method), summary judgment is appropriate for that reason alone. *See Universal Seismic*, 288 F.3d at 207; *TransFirst*, 237 F. Supp. 3d at 457.

The legislative history of ROSCA confirms that the statute was not intended to require a simple online cancelation flow. Specifically, drafts of the bill that became ROSCA (S. 3386)

rejected a requirement that companies provide a simple online cancelation method requirement:

- May 19, 2010: When the Senate introduced S. 3386, there was no requirement for "simple mechanisms." 156 Cong. Rec. S3983-07, 2010 WL 1992981. Rather, the bill required "**a simple process that is available via—(a) the Internet; *and* (B) telephone**." *Id.* (emphasis added).

- August 2, 2010: A Senate Report then revised this language and provided that "companies would be required to . . . provide the consumers with simple, convenient ways to cancel the 'negative options' via the Internet *or* through e-mail." S. Rep. 111-240, 2010 WL 3002003, at *3–4 (emphasis added). The bill was amended to require "**a simple process that is available via—(A) the Internet; *or* (B) e-mail.**" 156 Cong. Rec. S8305-05, 2010 WL 4861287 (emphasis added).

- November 30, 2010: The Senate then agreed to another amendment, which provided for the "**simple mechanisms**" requirement that ROSCA now has, and passed the bill. 156 Cong. Rec. S8305-02, 2010 WL 4861284 (emphasis added).

Thus, the legislative history confirms the plain reading that Match.com satisfies ROSCA as a matter of law because it provides "simple mechanisms" to cancel. At least two (and in fact, many more) of its methods of cancelation are undisputedly simple.

### 3. At a Minimum, Defendants Are Entitled to Summary Judgment on the FTC's Claims for Civil Penalties Because There Is No Scienter

For the reasons explained above, Defendants cannot be held liable *at all* for violating ROSCA. Even if the Court found that the FTC met the fair notice constitutional requirement, no reasonable factfinder could conclude that the FTC provided enough notice such that Defendants acted with the scienter required for civil penalties—that they knew or reasonably should have known that the conduct on Match.com violated ROSCA.

Under 15 U.S.C. § 45(m)(1)(A), the FTC can obtain civil penalties only if it shows that the violation was made "***with actual knowledge or knowledge fairly implied on the basis of objective circumstances* that such act is unfair or deceptive and is prohibited by such rule.**" *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 822 (N.D. Tex. 2008) (Fitzwater, J.) ("[B]efore . . . conduct can serve as the basis for imposing a civil penalty under § 5(m)(1)(A), the

government must prove that the violations were committed knowingly or with knowledge fairly implied based on objective circumstances.") (emphasis added). "In determining whether knowledge of a Commission rule may be fairly implied" for purposes of this civil penalties provision, Congress "intended that the courts hold a defendant responsible" only if "a reasonable and prudent man under the circumstances *would have known*" both (1) "of the existence of the rule," and (2) "that the act or practice was in violation of its provisions." S. Rep. No. 93-1408, at 40 (1974) (emphasis added). The Supreme Court has observed that Section 5(m)(1)(A)'s "actual knowledge or knowledge fairly implied" language "explicitly" provides a "mistake-of-law defense." *Jerman v. Carlisle, McNellis, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583–84 (2010) (distinguishing Section 5(m)(1)(A) of the FTC Act, which "explicitly" provides for a "mistake-of-law defense," in holding there was no such defense under the Fair Debt Collection Practices Act).

Here, no reasonable factfinder could conclude that the FTC met this heavy burden to prove that Defendants knew they were violating ROSCA, or that a reasonable person in the same circumstances "would have known" that the conduct at issue violated ROSCA. For all of the reasons that Defendants lack fair notice of "simple mechanisms," which is void for vagueness as applied, *see supra* Section IV.A.1, there is no possible intentional violation of ROSCA's "simple" requirement. Defendants could not have knowingly violated this standard because it did not exist until after the FTC brought this case.

### 4.     The FTC's Civil Penalties and Consumer Redress Claims Against MGL Are Barred in Part By the Statute of Limitations

Finally, if the Court does not grant MGL summary judgment in the entirety on Count V or summary judgment on civil penalties, summary judgment on the FTC's claims for civil penalties and consumer redress against MGL should be partially granted on statute of limitations grounds. The FTC seeks civil penalties under 15 U.S.C. § 45(m), Am. Compl. ¶ 85, which is governed by

a five-year statute of limitations, 28 U.S.C. § 2462. The FTC seeks "relief necessary to redress injury to consumers" (Defs. App. Ex. 48 at App. 475; *see* Am. Compl. ¶ 7) under 15 U.S.C. § 57b(b), which is governed by a three-year statute of limitations, under 15 U.S.C. § 57b(d).

Here, the FTC did not file suit against MGL until it filed the Amended Complaint on July 19, 2022. Dkt. 116. Based on the July 19, 2022 filing date, any award of civil penalties against MGL must be limited to alleged violations that occurred after July 19, 2017, under 28 U.S.C. § 2462, and any consumer redress must be limited to alleged injuries that occurred after July 19, 2019, under 15 U.S.C. § 57b(d). Yet the FTC erroneously seeks civil penalties for a time period beginning September 26, 2014, and consumer redress for a time period beginning October 2016. *See* Defs. App. Ex. 48 at App. 476–77.[41]

### B. The Court Should Grant MGI and MGL Summary Judgment on Counts III and IV

#### 1. Counts III and IV Are Moot Because the Guarantee and Chargeback Policy Could Not Reasonably Be Expected to Recur

Counts III and IV are moot as a matter of law because it is "absolutely clear" that the Guarantee and Chargeback Policy "could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). The Constitution limits

---

[41] The amendment does not relate back to the original filing against MGI. Relation back under Rule 15(c) is permitted if "the amendment changes the party or the naming of the party against whom a claim is asserted" and other conditions are met. Fed. R. Civ. P. 15(c)(1)(C). Courts have made clear that Rule 15(c) refers "only to substituting or changing a defendant rather than adding a new defendant." *Bayway Lincoln Mercury, Inc. v. Universal Underwriters Ins. Co.*, No. CV H-19-3817, 2020 WL 8093495, at *4 (S.D. Tex. Dec. 4, 2020) ("The Fifth Circuit has interpreted Rule 15(c)(1)(C) to refer 'only to substituting or changing a defendant rather than adding a new defendant,' except in instances involving misnomer of a defendant." (*quoting Tapp v. Shaw Env't, Inc.*, 401 F. App'x 930, 931 (5th Cir. 2010) (per curiam))); *Tapp v. Gulf Stream Coach, Inc.*, No. 08-1134, 2011 WL 3502023, at *2 (E.D. La. Aug. 10, 2011), *aff'd sub nom. Tapp v. Whirlpool Corp.*, 471 F. App'x 353 (5th Cir. 2012) (holding a party's claim did not relate back when the plaintiff "failed to sue [the new defendants] when she could have, not because of mistaken identity, but rather as part of deliberate and conscious case strategy"). The FTC forewent any ability to claim the Amended Complaint relates back to the Original Complaint when the FTC insisted that MGL was an additional party, rather than agreeing to drop MGI and replace it with MGL. *See* Dkt. 21 at 37 (FTC acknowledging on October 11, 2019, an MGI email dated October 9, 2019, explaining Match.com is owned and operated by MGL and not MGI, and refusing to voluntarily dismiss MGI).

federal courts to decide only actual, ongoing cases and controversies. Art. III § 2. An actual controversy must exist "through 'all stages' of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Alvarez v. Smith*, 558 U.S. 87, 92 (2009)). Notably, "[a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 189.

Stipulations can moot a case. For example, a court in this District held that a stipulation mooted an action when, after the case was filed, the defendants, through a stipulation, "conceded all of the relief the plaintiffs sought in their amended complaint." *First Colony Life Ins. Co. v. LFC Resol. Payment Fund, Ltd.*, 83 F. Supp. 2d 767, 770–72 (N.D. Tex. 1999). The court rejected the plaintiffs' arguments that the conduct was likely to recur because the defendants had refused to execute a consent judgment or admit that the challenged conduct was illegal. *Id.* at 770. The court reasoned that there was "no reasonable expectation the alleged violations [would] recur" because the language of the stipulation "plainly demonstrate[d]" that neither defendant had "any intention of attempting" to engage in the challenged conduct, and there was no reason for the defendants to agree to a consent judgment when they had "already stipulated" that they would not engage in the challenged conduct. *Id.* at 770–71. Moreover, courts across the country have found that behavior could not reasonably be expected to recur when the defendants ceased the allegedly wrongful conduct and made public statements or took public actions to confirm the permanent cessation.[42]

---

[42] For instance, a case became moot because the "plaintiffs ha[d] obtained everything that they could recover by a judgment of th[e] [c]ourt in their favor" when, after the plaintiffs filed the action for declaratory and injunctive relief, a defendant rescinded the order that was the subject of the lawsuit. *Montana Shooting Sports Ass'n, Inc. v. Norton*, 355 F. Supp. 2d 19, 20–21 & n.1 (D.D.C. 2004), *aff'd*, No. 04-5434, 2005 WL 2810686 (D.C. Cir. June 14, 2005). Another case became moot because it was "unreasonable to think" that the defendant would return to conduct after it had made certain admissions to the court, and it was "clear that the [defendant] [did] not intend to (nor even think it could) return to the original policy." *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1095 (9th Cir. 2003). Yet another case became moot when the respondents showed that the adoption of policies regarding the alleged wrongful conduct, "coupled with [a] declaration . . . detailing efforts made to ensure that those policies were being implemented," made it clear that the allegedly wrongful policies underlying the action could not reasonably be expected to recur. *Buzancic v. Kane*, No. CV-09-1943, 2011 WL 336395, at *1–2 (D. Ariz. Jan. 31, 2011). And the

Here, it is "absolutely clear" that the Guarantee and Chargeback Policy "could not reasonably be expected to recur" in light of Defendants' repeated assurances over the course of four years to the FTC and this Court, *see supra* Section II.C. This includes the Verified Stipulation, Defs. App. Ex. 46 at App. 448–52, which provides (under penalty of perjury) that the Guarantee and Chargeback Policy permanently ceased in 2019 and will never be reinstated. *See Laidlaw*, 528 U.S. at 189. Additionally, discovery elucidated not a single shred of evidence that the conduct will recur. *See supra* Section II.C. Because the FTC can seek only injunctive relief for Counts III and IV, Dkt. 86, Defendants have "conceded all of the relief" that the FTC seeks in its Amended Complaint with respect to the Guarantee and Chargeback Policy, so Counts III and IV have become moot. *See First Colony*, 83 F. Supp. 2d at 770. Neither Defendant has "any intention of attempting" to engage in the challenged conduct, now or in the future. *See id.*

Instead of using its limited resources to solve "actual, ongoing" problems, the FTC has complained that the Verified Stipulation is not as broad as the injunction that the FTC would seek (in the unlikely event that it could prevail) at trial. But the Verified Stipulation prevents all of the allegedly unlawful conduct in Counts III and IV of the FTC's Amended Complaint, and the injunction the FTC seeks bears "no reasonable relation" to the practices at issue in the Amended Complaint. *In re ECM BioFilms, Inc.*, No. 9358, 2015 FTC LEXIS 22, at *633–34 (FTC Jan. 28, 2015) (rejecting injunctive provision when "not sufficiently similar or related to" claims found to be deceptive). The FTC not only improperly seeks to bind dating sites other than Match.com, *see infra* Section IV.C, but the FTC also seeks an injunction over virtually every aspect of Match.com's business. For example, one provision of the FTC's proposed injunction is as follows:

> Defendants . . . in connection with the advertising, marketing, promoting, offering
> for sale, or ***selling of any online dating services***, are permanently restrained and

Supreme Court held that a case became moot when there was an "unconditional and irrevocable" agreement that prohibited the defendant from engaging in the challenged activity. *Already*, 568 U.S. at 93.

enjoined from . . . [f]ailing to [c]learly and [c]onspicuously disclose any material restrictions, limitations, or conditions to purchase, receive, ***or use the online dating services***, or to receive any discount, 'guarantee,' or special offer[.]

Defs. App. Ex. 54 at App. 633, 669 ((FTC's Resps. and Objs. to MGL's 1st Interrogs. No. 4 (verifying Attachment A contains injunction FTC seeks) & Attach. A (emphasis added)).[43] Thus, the FTC seeks an injunction over the "use [of] the online dating services" (i.e., ***everything***), based merely on a permanently discontinued Guarantee and Chargeback Policy. *See id.* This relief bears "no reasonable relation" to the practices at issue in the Amended Complaint. *See ECM BioFilms*, 2015 FTC LEXIS 22, at \*633–34.

In sum, because there is no genuine dispute of material fact that the Guarantee and Chargeback Policy "could not reasonably be expected to recur," continuing to litigate Counts III and IV is a waste of agency, court, and party resources and violates the Constitution.

> **2.      There Is No Evidence that MGI or MGL Is Violating or About to Violate the FTC Act for Count III or Count IV**
>
> **a.      There Is No Reasonable Likelihood of Violations in the Future**

Even if the Court does not find that Counts III and IV are moot, Counts III and IV fail for a separate but related reason. A reasonable factfinder could not find that the FTC met its burden to show that both MGI and MGL are "violating, or about to violate" the FTC Act as to both Counts III and IV, as is required under Section 13(b), 15 U.S.C. § 53(b)—or that an injunction is appropriate when there is no ongoing conduct to enjoin. Whether the analysis is under Section 13(b) or the standard injunction requirements, courts in this Circuit consider various factors in

---

[43] In an attempt to understand the breadth of the FTC's proposed injunction, MGL asked the FTC in discovery to identify and describe "every discount, 'guarantee,' or special offer" that the FTC contends that Match.com has offered since 2013. Defs. App. Ex. 54 at App. 647 (FTC's Resps. and Objs. to MGL's 1st Interrogs. No. 9). The FTC refused to answer because "[a]t issue in this case is the Match Guarantee, not 'every discount, "guarantee," or special offer.'" *Id.* Exposing the problem with the FTC's own injunction, the FTC objected to a term in its own proposed injunction, "special offer," as "vague" because "[i]t is unclear what would constitute a 'special offer' beyond Match.com's guarantees or discounts." *Id.* at 648.

determining whether to issue an injunction based on past violations of the law, including the sincerity of the defendant's assurances against future violations. *Cornerstone*, 549 F. Supp. 2d at 816 (quoting *SEC v. Blatt*, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978)).

When evaluating the non-exclusive factors, the "critical question" is "whether defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *Cornerstone*, 549 F. Supp. 2d at 816 (issuing permanent injunction when multiple prior court orders prohibited defendants from engaging in certain conduct, defendants still persisted in conduct "[t]he court [had] clearly identified . . . as illegal," and defendants also believed they could continue to violate the court's orders); *see FTC v. Sw. Sunsites, Inc.*, 665 F.2d 711, 723 (5th Cir. 1982) (justifying injunction when "evidence developed to date suggest[ed] a large-scale systematic scheme tainted by fraudulent and deceptive practices, giving rise to a 'fair inference of a reasonable expectation of continued violations' absent restraint"); *FTC v. Traffic Jam Events, LLC*, No. 20-1740, 2020 WL 3490434, at *5 (E.D. La. June 26, 2020) (applying *Southwest Sunsites* in TRO context, and holding FTC failed to show there was reason to believe defendants were violating or about to violate the FTC Act because "[t]here was no evidence presented that future mailings [involving the same alleged violation of the FTC Act] were conceived, attempted, or contemplated"); *cf. FTC v. Neora LLC*, 552 F. Supp. 3d 628, 638 (N.D. Tex. 2021) (finding allegations "sufficient to infer a reasonable expectation of continued violations absent restraint at least as of the date of the [c]omplaint's filing on November 1, 2019" because "[t]he [c]omplaint contain[ed] numerous allegations in the present tense" and "examples of social media posts containing alleged misrepresentations dated in September and October of 2019").

In this case, there is no genuine dispute of material fact as to the "critical question" for consideration: the conduct at issue in Counts III and IV has permanently ceased and is not likely

to recur. *See Cornerstone*, 549 F. Supp. 2d at 816. The FTC admits *in its Complaint* that the conduct has ceased. Am. Compl. ¶ 3; *see* Orig. Compl. ¶ 3. Defendants have repeatedly assured the FTC over the several years that this case has been pending (and before) that the Guarantee and Chargeback Policy were permanently discontinued. *See supra* Section II.C. This includes the Verified Stipulation confirming that the Guarantee and Chargeback Policy permanently ceased in 2019 and will never be reinstated. Defs. App. Ex. 46 at App. 448–52; *see* Defs. App. Ex. 45 at App. 443 (Sine Decl. ¶¶ 3–6). Defendants also produced other documents substantiating the permanent discontinuation of the Guarantee and Chargeback Policy.[44] The discovery record is replete with testimony that the conduct has ceased and will not recur. *See, e.g.*, Defs. App. Ex. 7 at App. 82, 84–85 (Saraph Dep. Tr. (Apr. 6, 2023) 17:10–16, 209:23–211:8). There is not a shred of evidence in the record from which a reasonable factfinder could conclude that the Guarantee or Chargeback Policy will recur. *See supra* Section II.C. And separately, as detailed below, *see infra* Section IV.C, MGI also could never itself reinstate the practices because it does not own, operate, or control Match.com. Thus, there is no genuine dispute of material fact as to the "critical question"—whether there is a "reasonable likelihood" of violations in the future under the *Cornerstone* factors. Defendants should be granted summary judgment on Counts III and IV.

> **b.  A Reasonable Factfinder Could Not Conclude that Defendants Violated the Law in Counts III and IV**

Even if the Court finds triable issues with respect to whether Defendants' past conduct is likely to recur, the FTC has not adduced evidence to show a violation of the FTC Act.

---

[44] *See, e.g.*, Defs. App. Ex. 20 at App. 219 (training email dated April 15, 2019, providing, "Effective immediately, the [Guarantee] is no longer available" and "should not be offered when subscribing a member"); Defs. App. Ex. 21 at App. 221 (FAQ providing Guarantee "was discontinued on 4/11/2019"); Defs. App. Ex. 22 at App. 227 (training document noting Guarantee was "no longer available"); Defs. App. Ex. 23 at App. 231 (example of email sent to Match.com users who initiate chargeback dispute and lose, confirming cessation of Chargeback Policy and existence of current chargeback policy that Defendants explained to FTC in verified interrogatory response).

### (i) Not Sufficient Evidence To Create a Triable Issue That the Guarantee Violated the FTC Act

The FTC alleges in Count III that the material terms of the Guarantee were not adequately disclosed to consumers and thus constituted a "deceptive" practice under Section 5(a) of the FTC Act. Am. Compl. ¶¶ 3, 39–53, 75–77. The FTC does not claim that the terms were *not* disclosed but that they were disclosed behind the Guarantee's "Learn more" button. *See* Defs. App. Ex. 44 at App. 347 (Saraph Decl. ¶¶ 9–12). Thus, this is not a case of an alleged false or deceptive statement, or even a material omission. Rather, it is a case of an alleged insufficient disclosure that purportedly creates a false impression in the minds of consumers. In cases like this, empirical evidence is required to prove that the admittedly present disclosure is insufficient. *See FTC v. DIRECTV, Inc.*, No. 15-CV-01129, 2018 WL 3911196, at *6 (N.D. Cal. Aug. 16, 2018). There is no such evidence here. Indeed, the FTC did not designate an expert witness to testify that the disclosure of the Guarantee terms was too small or not understandable by a consumer, let alone an expert that did any empirical or objective analysis on the issue. *See* Defs. App. Ex. 9 at App. 116 (Bandy Dep. Tr. (June 26, 2023) 186:6–187:8).

A practice is "deceptive" in violation of Section 5(a) only if "(1) there is a representation, omission, or practice; (2) that is likely to mislead consumers acting reasonably under the circumstances; and (3) the representation, omission, or practice is material." *DIRECTV*, 2018 WL 3911196, at *5 (internal quotation marks omitted)

First, the FTC cannot show materiality. Indeed, there is no evidence that the Guarantee was relevant to any purchase decision. The FTC has no empirical evidence of the percentage of consumers who purchased a six-month Match.com subscription and knew or cared about the Guarantee. *See* Defs. App. Ex. 9 at App. 116 (Bandy Dep. Tr. (June 26, 2023) 186:6–187:8). The only evidence in this case suggests the contrary—that many users did *not* care about the Guarantee,

such that the Guarantee was not material to their purchasing decision. *See* Defs. App. Ex. 7 at App. 82 (Saraph Dep. Tr. (Apr. 6, 2023) 14:2–12).[45]

Second, and relatedly, the FTC also has no empirical evidence of the percentage of consumers who were misled because they did not know the material terms of the Guarantee. *See* Defs. App. Ex. 9 at App. 116 (Bandy Dep. Tr. (June 26, 2023) 186:6–187:8). For good reason, it is likely that consumers would understand those terms as they were disclosed in a number of ways, including in the Program Rules upon purchasing a six-month subscription, by clicking the "Guarantee" hyperlink displayed along the bottom banner of all of Match.com's webpages and navigating to the Program Rules, and by viewing the Progress Page specifically dedicated to displaying consumers' status toward meeting the terms of the Guarantee. *See supra* Section II.D.

Third, the FTC has no empirical evidence of the percentage (if any) of consumers who qualified for the Guarantee but did not claim it because of the alleged inadequate disclosure. *See* Defs. App. Ex. 9 at App. 116 (Bandy Dep. Tr. (June 26, 2023) 186:6–187:8). There could be many reasons (other than the alleged inadequate disclosure) that a user did not redeem the Guarantee. For example, users could have purchased a six-month subscription without even knowing about the Guarantee. Or the Guarantee could have been unimportant to the user, so the user was unconcerned about meeting the Guarantee requirements. Or a user could have been fully aware of the requirements but failed to satisfy them (like a dieter that does not stick to a meal plan, despite best efforts). Thus, the FTC's reliance on the percentage of subscribers who redeemed the Guarantee, or occasional complaints about the *existence* of the Guarantee requirements (not the adequacy of the disclosure of them), Defs. App. Ex. 9 at App. 112–13 (Bandy Dep. Tr. (June 26,

---

[45] *See also* Defs. App. Ex. 40 at App. 334 (expecting no net impact to revenue from removal of Guarantee); Defs. App. Ex. 41 at App. 337 (noting "topline impact of the [G]uarantee is very small").

2023) 101:15–104:8), prove nothing about whether consumers were misled about the alleged inadequate disclosure.

For these reasons, the FTC could put forth no evidence at trial that the material terms of the Guarantee were not adequately disclosed and thus that Defendants are liable.[46]

### (ii)     Not Sufficient Evidence To Create a Triable Issue That the Chargeback Policy Violated the FTC Act

The FTC also has insufficient evidence to withstand summary judgment and show that the Chargeback Policy was unfair in violation of the FTC Act. The FTC alleges in Count IV that the Chargeback Policy unfairly denied subscribers access to paid-for services if the subscribers disputed credit card charges and lost the dispute. Am. Compl. ¶¶ 3, 61–65, 78–80. The FTC alleges that the Chargeback Policy constituted an "unfair" practice under Section 5(a) of the FTC Act, so the FTC must at least[47] prove that the Chargeback Policy "[1] causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. §§ 45(a), 45(n). The FTC cannot rely on "public policy considerations" as a "primary basis" for determining an act or practice is unfair. 15 U.S.C. § 45(n).

In this case, the FTC could put forth no evidence at trial that the Chargeback Policy was unfair under Sections 5(a) and 5(n). As a preliminary matter, Section 5(n) explicitly requires the FTC to prove that the Chargeback Policy "causes or is likely to cause substantial injury," which is in the present tense. Federal statutes using the present tense generally do not include the past tense.

---

[46] The FTC separately has no evidence that MGI is liable under Count III because every MGI representative to testify confirmed that MGI had nothing to do with the Guarantee. *See infra* Section IV.C.

[47] The three requirements in Section 5(n) are written as negative limitations on the FTC's authority, rather than as an exhaustive list of elements. *See* 15 U.S.C. § 45(n) ("The Commission shall have no authority under this section or section 57a of this title to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.").

*See* Dictionary Act, 1 U.S.C. § 1 (providing "words used in the present tense include the future as well as the present"); *Carr v. United States*, 560 U.S. 438, 448 (2010) ("By implication, then, the Dictionary Act instructs that the present tense generally does not include the past."). Because the Chargeback Policy was permanently discontinued before the FTC brought this lawsuit, *see supra* Section II.C, there is no genuine dispute of material fact that the Chargeback Policy does not currently "cause" and is not "likely to cause substantial injury." It did not exist when the FTC brought this lawsuit and does not exist now. *See* 15 U.S.C. § 45(n).

The FTC also cannot show that any harm was not reasonably avoidable. Indeed, by definition it was. The only way a consumer could be harmed under the FTC's theory in Count IV is if the consumer submitted a false or fraudulent chargeback request that was *rejected* by the consumer's own financial institution. *See* Defs. App. Ex. 44 at App. 349 (Saraph Decl. ¶¶ 32–33). It was easy for any consumer to avoid this harm—by not submitting a false or fraudulent chargeback request to a financial institution. *See id.*

Moreover, any harm was avoidable because Match.com clearly disclosed the Chargeback Policy in the then-applicable Terms of Use. *See, e.g.*, Defs. App. Ex. 25 at App. 244 ("If you initiate a chargeback . . . , the Company may in its discretion terminate your account immediately. If the Company successfully disputes the reversal, and the reversed funds are returned, you are not entitled to a refund or to have your account or subscription reinstated."). In addition, Match.com would restore users' accounts if they asked to rejoin the site, which also means consumers could reasonably avoid the alleged harm from the Chargeback Policy. *See* Defs. App. Ex. 7 at App. 84–85 (Saraph Dep. Tr. (Apr. 6, 2023) 209:23–210:13). Finally, the only supposed harm is that consumers could not access a platform that they claimed that they did not agree to pay for or want. That is no harm at all.

For these reasons, the FTC could put forth no evidence at trial that the Chargeback Policy is unfair and thus that Defendants are liable.[48]

### C.      The Court Should Separately Grant MGI Summary Judgment on All Counts

Even if the Court does not grant summary judgment in Defendants' favor on the points above, the Court should still enter summary judgment in favor of MGI on all remaining counts because MGI is the wrong defendant. In sum, MGI did not engage in the practices at issue in Counts III, IV, or V, and MGI, as indirect parent, is not liable for the acts of its subsidiary, MGL.

Summary judgment is appropriate when a plaintiff sues the wrong party. *Cunningham v. Advanta Corp.*, No. 3:08-CV-1794-K, 2009 WL 290031, at *5 (N.D. Tex. Feb. 3, 2009) (Kinkeade, J.). For example, when a plaintiff sued a parent company instead of the entity that engaged in the activity at issue, and the parent company submitted evidence that it did not engage in any of the challenged activity, this Court adopted a report and recommendation that granted summary judgment. *Id.*; *see Aishman v. GCIU Ret. Fund CEO*, No. 1:16-CV-268, 2017 WL 6994638, at *3 (E.D. Tex. Dec. 18, 2017) ("Summary judgment is appropriate when a plaintiff sues the wrong party."). Importantly, "[i]t is a general principle of corporate law that a parent corporation is not liable for the acts of its subsidiaries." *Cunningham*, 2009 WL 290031, at *5 (citing *U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998)); *City Nat'l Rochdale Fixed Income Opps. (Ireland) Ltd v. Am. Gen. Life Ins. Co.*, No. 3:17-CV-2067, 2018 WL 4732431, at *3 (N.D. Tex. 2018), *report and recommendation adopted*, No. 3:17-CV-2067, 2018 WL 4725249 (N.D. Tex. Sept. 30, 2018) (holding "that Defendant may be a wholly-owned subsidiary [] does not defeat their presumably separate corporate identities or the necessity of making separate allegations as to each entity"); *Teemac v. Frito Lay, Inc.*, No. 3:14-CV-2908, 2015 WL 4385777, at *6 (N.D. Tex. July 16, 2015),

---

[48] The FTC also has no evidence that MGI is liable under Count IV because every MGI representative to testify confirmed that MGI had nothing to do with the Chargeback Policy. *See infra* Section IV.C.

*aff'd,* 644 F. App'x 331 (5th Cir. 2016) (granting summary judgment in favor of parent company because "[parent company] cannot be held liable for [subsidiary's] conduct simply because of their corporate relationship").

Here, the Court should grant summary judgment in MGI's favor because the FTC sued the wrong party. MGI is an indirect holding company of MGL (and numerous other entities). *See* Defs. App. Ex. 6 at App. 65 (Dubey Dep. Tr. 30:13–31:3). MGI does not operate Match.com or any other brand. *See* Defs. App. Ex. 6 at App. 65, 75 (Dubey Dep. Tr. 30:13–31:3, 246:8–12); *see also* Defs. App. Ex. 5 at App. 54 (Ginsberg Dep. Tr. 203:6–25). MGI has approximately three employees. *See* Defs. App. Ex. 6 at App. 68 (Dubey Dep. Tr. 76:7–9). By contrast, MGL is the entity that owns, operates, and controls Match.com. Defs. App. Ex. 44 at App. 346–47 (Saraph Decl. ¶¶ 4–7); Defs. App. Ex. 52 at App. 566–67 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 4). More specifically, every MGI representative to testify confirmed that MGI had no involvement with the Guarantee, including the creation, implementation, disclosure of the terms, or ultimately permanent discontinuation. *See* Defs. App. Ex. 3 at App. 37 (Blatt Dep. Tr. 127:19–128:13, 129:5–16); Defs. App. Ex. 5 at App. 54 (Ginsberg Dep. Tr. 202:24–203:4); Defs. App. Ex. 6 at App. 75 (Dubey Dep. Tr. 246:2–4, 246:19–247:3). Although the FTC sued MGI for failure to adequately disclose the terms and conditions of the Guarantee, Am. Compl. ¶ 3 (and refused multiple requests to dismiss MGI, *see, e.g.*, Dkt. 21 at 37), the FTC admitted that it has no evidence that MGI was involved in the Guarantee's disclosure regime. Defs. App. Ex. 9 at App. 119 (Bandy Dep. Tr. (June 26, 2023) 198:14–199:16).

In addition, every MGI representative to testify confirmed that MGI had no involvement with the Chargeback Policy, including the design, implementation, or ultimate permanent discontinuation. *See* Defs. App. Ex. 3 at App. 37–38 (Blatt Dep. Tr. 128:14–129:4, 129:17–25,

130:1–17); Defs. App. Ex. 5 at App. 54 (Ginsberg Dep. Tr. 202:19–23); Defs. App. Ex. 6 at App. 75 (Dubey Dep. Tr. 246:5–7, 247:4–11). Again, despite suing MGI for the Chargeback Policy, Am. Compl. ¶ 3, the FTC admitted that it has no evidence that MGI was involved in the design or implementation of the Chargeback Policy. Defs. App. Ex. 9 at App. 119 (Bandy Dep. Tr. (June 26, 2023) 199:17–200:17). Similarly, every MGI representative to testify confirmed that MGI did not, and does not, have any involvement with the online cancelation flow, including the design or maintenance of the flow. *See* Defs. App. Ex. 3 at App. 38 (Blatt Dep. Tr. 130:25–131:24); Defs. App. Ex. 5 at App. 54 (Ginsberg Dep. Tr. 202:15–18); Defs. App. Ex. 6 at App. 74–75 (Dubey Dep. Tr. 245:20–246:1, 246:13–18). The FTC also admitted that it has no evidence that MGI was involved in the design of the online cancelation flow. Defs. App. Ex. 9 at App. 117 (Bandy Dep. Tr. (June 26, 2023) 190:4–191:6).

To justify the suit against MGI, the FTC has pointed only to normal parent subsidiary relations, like a parent appointing a subsidiary's officers. *See* Defs. App. Ex. 55 at App. 685–86 (FTC Resp. to MGI 2d ROGs No. 8 (pointing to MGI's authority to appoint and remove officers at MGL)). But as noted above, "[i]t is a general principle of corporate law that a parent corporation is not liable for the acts of its subsidiaries." *Cunningham*, 2009 WL 290031, at *5 (citing *Bestfoods*, 524 U.S. at 61). And none of those relations involved the Guarantee, Chargeback Policy, or online cancelation flow.

The FTC also contends that MGI should be held liable because it alleges that MGI executives had knowledge of customer complaints (either because a customer complained to the executive and the executive forwarded the complaint to the appropriate person at MGL, or because the executive obtained relevant knowledge while working at MGL and then later became an MGI executive), but that the senior executives did not remedy the alleged violations—even though it is

not MGI's role to deal with the details of those MGL-specific policies. *See* Defs. App. Ex. 6 at App. 62, 71, 75 (Dubey Dep. Tr. 14:20–15:4, 88:5–22, 246:8–12 (explaining roles of MGI and MGL); Defs. App. Ex. 9 at App. 116–17 (Bandy Dep. Tr. (June 26, 2023) 188:6–189:12 (explaining FTC's evidence related to MGI and Guarantee), 189:13–190:3 (explaining FTC's evidence related to MGI and Chargeback Policy), 190:4–191:6 (explaining FTC's evidence related to MGI and online cancelation flow)). None of this evidence creates a genuine issue of material fact because it does not change the critical fact that MGI was not involved in the practices at issue in the Amended Complaint.

The FTC also has no basis to hold MGI liable on any theory that disregards the corporate entity. The FTC disavowed an alter ego theory to hold MGI liable. *See, e.g.*, Joint Sub. on Defs. MGI and MGL's Mot. for a Prot. Order, Dkt. 158 at 14 ("As Defendants know, the FTC does not seek to hold Defendants liable for the actions of their subsidiaries on an alter-ego theory; it seeks to hold Defendants liable for their roles in the alleged illegal practices on Match.com and requests injunctive relief that will prevent them from doing so again on any website."). Nor could the FTC hold MGI liable as MGL's alter ego. In addition to the fact that they are not alter egos, the FTC did not affirmatively plead that they are alter egos or plead any evidence of fraud, both of which are required. *See Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, No. 3:17-CV-1147, 2019 WL 329545, at *9 (N.D. Tex. Jan. 25, 2019) ("Plaintiffs have simply not alleged facts sufficient to support their contention that a corporate entity should be disregarded in this case."); *NEWCO Enterprises, LLC v. Super Heaters N. Dakota, LLC*, No. 7:14-CV-00087, 2023 WL 4029660, at *5 (N.D. Tex. June 15, 2023) ("[T]he various doctrines for disregarding the corporate entity, including alter ego and a sham to perpetrate a fraud, are still very much alive, but these doctrines must be supported by facts showing actual fraud." (internal quotation marks omitted)).

Without any evidence of conduct by MGI, the question becomes why did the FTC sue MGI in the first place. The most likely answer is the FTC seeks to obtain injunctive relief for dating sites other than Match.com (when the FTC admittedly has no basis at all to allege that the other dating sites engaged in the practices at issue in the Amended Complaint). Indeed, MGI's indirect subsidiaries own and operate other dating sites; however, those subsidiaries are not defendants in this case and have their own management and operations. *See* Defs. App. Ex. 6 at App. 65, 75 (Dubey Dep. Tr. 30:13–31:3, 246:8–12); *see also* Defs. App. Ex. 5 at App. 54 (Ginsberg Dep. Tr. 203:6–25). Notably, the FTC admitted to Judge Ramirez that it cannot allege—even based on information and belief—that any other dating site engaged in any of the conduct at issue in the Amended Complaint:

> THE COURT: But if the conduct, just looking at it from a due process standpoint, if the FTC is taking the position that this similar -- there are similar policies or similar conduct relating to other websites, why not include that in the complaint?

> MR. TEPFER: Well . . . we have a reason to think that this is something that should be investigated. . . . ***But we do not believe that there is, you know, an adequate basis to include that in the complaint at this time.*** Of course, you know, if the evidence bears this out, as we believe it might, we may seek leave to amend. ***But -- but there was not a basis -- or to include it before the amendment deadline*** . . . .

> . . .

> THE COURT: . . . But your statement that there's not an adequate -- that there was not an adequate basis to include allegations regarding the same policies in other websites has me really concerned."

Defs. App. Ex. 11 at App. 171–73 (Am. Hearing Tr. (Nov. 1, 2022) 29:1–31:4 (emphasis added)). And Judge Ramirez rightly determined that other websites are beyond the scope of this dispute and are "more properly the subject of a separate investigation." *Id.* at App. 181 (Am. Hearing Tr. (Nov. 1, 2022) 39:9–10). The FTC's speculation about other websites and desire to bind them through MGI, their indirect holding company, certainly is not sufficient to justify holding MGI

liable for another indirect subsidiary's conduct in which MGI was not involved. The Court should grant summary judgment in MGI's favor.

## V.     CONCLUSION

For these reasons, Defendants respectfully request that the Court grant this Motion in its entirety and dismiss Counts III, IV, and V with prejudice.

Dated: September 11, 2023

/s/ Angela C. Zambrano
Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: 214-981-3300
Fax: 214-981-3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310-595-9500
Fax: 310-595-9501

Benjamin M. Mundel (admitted *pro hac vice*)
bmundel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: 202-736-8000
Fax: 202-736-8711

*Attorneys for Match Group, Inc. and
Match Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 11, 2023, I caused true and correct copies of the foregoing to be served on all counsel of record in accordance with Federal Rules of Civil Procedure and this Court's CM/ECF filing system.

Reid Abram Tepfer
rtepfer@ftc.gov
M. Hasan Aijaz
maijaz@ftc.gov
Matthew James Wilshire
mwilshire@ftc.gov
Sarah Zuckerman
szuckerman@ftc.gov
John R. O'Gorman
jogorman@ftc.gov
Erica Rollins Hilliard
ehilliard@ftc.gov
Jason C. Moon
jmoon@ftc.gov

*/s/ Angela C. Zambrano*
Angela C. Zambrano