# EXHIBIT 1

1               UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF TEXAS

2                    DALLAS DIVISION

3

4    FEDERAL TRADE COMMISSION,        :  Civil Action

5          Plaintiff,                 :  Case No. 3:19-cv-02281-K

6       vs.                           :

7    MATCH GROUP, INC., a corporation, :

     MATCH GROUP, LLC, formerly

8    MATCH.COM, LLC, a Limited        :

     Liability Company,

9                                     :

          Defendant.

10   _____/

11

12          Deposition of BIKRAM BANDY, taken on behalf of

13   Defendant, by Chad Hummel, of Sidley Austin, LLP, at 1501 K

14   Street, NW, Washington, D.C., commencing at 10:09 a.m., on

15   October 24, 2022, before Linda C. Marshall, RPR.

16

17   APPEARANCES:

18   FOR THE PLAINTIFF:    M. HASAN AIJAZ, Esquire

                           Federal Trade Commission

19

20

     FOR THE DEFENDANT:    CHAD HUMMEL, Esquire

21                         Sidley Austin, LLP

22

23

24

25

                                                  Page 1

**Page 2**

```
 1                    I-N-D-E-X
 2                    Witness
 3                              Page
 4   Bikram Bandy
 5     Examination by Mr. Hummel ........................  4
 6
 7
 8                    EXHIBITS
 9   Exhibit 1 Notice of Deposition .......................  9
10   Exhibit 2 Plaintiff Initial Disclosure ...............  46
11   Exhibit 3 First Amended Complaint ....................  73
12   Exhibit 4 Responses to MGI Interrogatories ...........  88
13   Exhibit 5 Enforcement Policy Statement ...............  113
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                   P-R-O-C-E-E-D-I-N-G-S
 2        THE VIDEOGRAPHER:  Good morning.  We're going on the
 3   record at 10:09 a.m. on October 24, 2022.  Please note that the
 4   microphones are sensitive and can pick up private conversations.
 5   Please mute your phones at this time.  Audio and video recording
 6   will continue to take place unless both parties agree to go off
 7   the record.
 8        This is media unit one of the video recorded
 9   deposition of Bikram Bandy taken by counsel for the defendant in
10   the matter of Federal Trade Commission versus Match Group, Inc.,
11   et al. filed in the United States District Court for the
12   Northern District of Texas, Case Number 3:19-CV-02281-K.
13   Location of this deposition is Sidley Austin, 1501 K Street
14   Northwest, Suite 600, Washington, D.C.
15        My name is Gene Aronov representing Veritext and I am
16   the videographer.  The court reporter is Linda Marshall from the
17   firm Veritext.  I'm not authorized to administer an oath.  I'm
18   not related to any party in this session nor am I financially
19   interested in the outcome.
20        If there are any objections to proceeding, please
21   state them at the time of your appearance.
22        Counsel and all present, including remotely, you may
23   now state your appearances and affiliations for the record.
24        MR. HUMMEL:  Good morning.  My name is Chad Hummel,
25   law firm Sidley Austin.  I represent the defendants, Match
```

**Page 4**

```
 1   Group, Inc. and Match Group, LLC.
 2        MS. TECKMAN:  Jeanette Teckman, in-house counsel for
 3   Match Group, LLC.
 4        MS. BRAGG:  Taylor Bragg, Sidley Austin, LLC on behalf
 5   of Match Group, Inc. and Match Group, LLC.
 6        MR. KITCHENS:  And Samuel Kitchens, in-house counsel
 7   at Match Group, LLC.
 8        MR. AIJAZ:  Hasan Aijaz representing the Federal Trade
 9   Commission.
10        MR. TEPFER:  Reid Tepfer with FTC.
11        THE VIDEOGRAPHER:  Is that everyone?
12        Will the court reporter please swear in the witness?
13                   BIKRAM BANDY,
14   having been first duly sworn, was examined and testified as
15   follows:
16                   EXAMINATION
17   BY MR. HUMMEL:
18   Q   Good morning.  My name is Chad Hummel.  As I just said, I
19   represent the defendants in this case, which has been filed by
20   the Federal Trade Commission against Match Group, Inc. and Match
21   Group, LLC.  The case is pending in the Northern District of
22   Texas, Dallas division.
23        Will you please state your full name for the record?
24   A   Bikram Bandy.
25   Q   Mr. Bandy, you are the chief litigation counsel for the
```

**Page 5**

```
 1   FTC's Bureau of Consumer Protection.  Is that correct?
 2   A   That is correct.
 3   Q   And you've held that position for approximately four years?
 4   A   Yes.
 5   Q   You're a lawyer?
 6   A   I am.
 7   Q   Where are you admitted to practice?
 8   A   District of Columbia.
 9   Q   In your role, you advise the Bureau of Consumer Protection
10   director on complex litigation matters, true?
11   A   Among other things, yes.
12   Q   And you provide legal, strategic and tactical advice to
13   case teams who are investigating and litigating consumer
14   protection matters, correct?
15   A   Yes.
16   Q   And your job also includes providing guidance on
17   e-discovery and ESI issues, right?
18   A   Yes.
19   Q   And you assist case teams in preparing for hearings and
20   trials and advise on appeals that arise from the FTC's Consumer
21   Protection cases, true?
22   A   That is true.
23   Q   And you're responsible for developing training materials
24   and programs for bureau attorneys and investigators, correct?
25   A   Yes.
```

2 (Pages 2 - 5)

App. 3

1 Q   And currently you serve as head of the bureau's -- that's
2 the FTC's Bureau of Consumer Protection -- the bureau's
3 litigation committee, true?
4 A   The litigation committee has not been very active lately
5 and so, I guess, technically true.  But, yeah, we have -- the
6 litigation committee has not been.  But I am head of the
7 litigation committee.  I suppose that's true.
8 Q   Okay.  And you also manage special projects relating to the
9 bureau's investigation and litigation matters, correct?
10 A   Yes, that's right.
11 Q   Okay.  As an attorney representing the FTC, you owe a duty
12 of loyalty to the FTC.  Is that true?
13 A   Yes.
14 Q   And you owe a duty of zealous advocacy to the FTC, correct?
15 A   When I am representing the FTC, of course.
16 Q   In your position here today, you're not representing the
17 FTC.  Is that true?
18 A   I have been designated as a representative under Rule
19 30(b)6.  So, whatever the legal implications of that are, that
20 is what it is.  I don't -- that, that's -- I'm here today as the
21 corporate designee for the Federal Commission.
22 Q   That I understand.  But even as a corporate designee,
23 you're still a lawyer representing the FTC.  And in that
24 capacity, you owe the FTC a duty of loyalty, correct?
25 A   I am not counsel for the FTC in this -- in its action

Page 6

1 against Match Group, Inc. and Match Group, LLC.
2 Q   Prior to the time that you were chief litigation counsel
3 for the FTC's Bureau of Consumer Protection, you were a senior
4 staff attorney?
5 A   That's true.
6 Q   And you worked in the Washington, D.C. FTC offices when you
7 held that title, correct?
8 A   Can you repeat your question?
9 Q   Sure.  And you worked in Washington, D.C. in the main
10 office of the FTC when you were a senior staff attorney?
11 A   Yes.
12 Q   All right.  And you were a senior staff attorney in the
13 Division of Marketing Practices, correct?
14 A   That's right.
15 Q   And at that time, you worked on investigations and
16 litigation relating to consumer fraud, right?
17 A   Yes.
18 Q   Telemarketing fraud, correct?
19 A   Yes.
20 Q   And business opportunity scams, is that correct?
21 A   Yes.
22 Q   Okay.  Prior to the time that you were a senior staff
23 attorney, you were counsel to the director of the Bureau of
24 Consumer Protection, correct?
25 A   Yes.

Page 7

1 Q   Who was the director to whom you reported at that time?
2 A   It was mostly Jessica Rich.  For a period of time, it would
3 have been Reilly Dolan and for a period of time it was Tom Pahl.
4 Q   To whom do you currently report?
5 A   The bureau director.
6 Q   And who is that now?
7 A   Samuel Levine.
8 Q   Have you spoken with Mr. Levine about your testimony here
9 today?
10 A   No.
11 Q   You were, at some point, the coordinator of the FTC's Do
12 Not Call program, correct?
13 A   Yes.
14 Q   And prior to your joining the FTC -- well, strike that.
15 How many years have you been with the FTC?  About ten, roughly?
16 A   Yes, it was ten years in April of this year.
17 Q   And before that, you were a partner at McKenna Long and
18 Aldridge, right?
19 A   Correct.
20 Q   And you were a litigator there?
21 A   Yes, I was a litigation partner.  Before that, a litigation
22 associate.
23 Q   And you attended GW University Law School?
24 A   I did.
25 Q   You went to Duke undergrad?

Page 8

1 A   That's correct.
2 Q   And your undergraduate degree was in 1995.  Is that right?
3 A   That's right.
4   (Deposition Exhibit No. 1, marked for identification.)
5 BY MR. HUMMEL:
6 Q   All right.  Let's look at what I've marked as Exhibit 1.
7 Exhibit 1 is the Notice of Deposition of plaintiff Federal Trade
8 Commission served in this case in September 2022.  I take it
9 you're familiar with this document?
10 A   I have reviewed it.  I've seen it before, yes.
11 Q   And you're designated to be the FTC's Rule 30(b)6 designee
12 on topics one, two and three, correct?
13 A   Yes.
14 Q   And the first topic reads, any and all facts in evidence
15 supporting the FTC's allegation that Match.com does not have,
16 quote, simple mechanisms for a consumer to stop recurring
17 charges from being placed on the consumer's credit card, debit
18 card, bank account or other financial account as alleged in the
19 FTC's complaint.  You're designated to testify on that topic?
20 A   Yes.
21 Q   You understand that the FTC has alleged that the Match.com
22 cancelation mechanism is not simple.  The online cancelation
23 mechanism is not simple, correct?
24   MR. AIJAZ:  Objection, misstates the facts.
25   THE WITNESS:  Can you repeat your question?

Page 9

3 (Pages 6 - 9)

BY MR. HUMMEL:

2  Q   Sure.  You understand, do you not, that the allegation in
3  this case, one of the allegations, particularly in Count Five of
4  the complaint, is that the Match.com online cancelation
5  mechanism is not simple and therefore violates ROSCA?
6  A   Yes.
7  Q   All right.  And you're aware, are you not, that Match.com
8  offers multiple other means for consumers to cancel their
9  recurring charges?
10  A   No.
11  Q   You don't know whether or not Match.com offers email
12  cancelation?
13  A   I wouldn't say they offer it.  It exists, but it's not
14  offered.
15  Q   Okay.  What's your definition of offered?
16  A   Offered, I would say -- to me, offered means, like, it's
17  advertised or people know about it, that there are -- people are
18  told.  Does an email cancelation mechanism exist?  Yes, it
19  exists.
20  Q   And subscribers to Match.com can also cancel via online
21  chat, correct?
22  A   They can, yes.
23  Q   And they can also cancel by telephone.  In other words,
24  they can call up a care representative and cancel their
25  subscription in that way, correct?

Page 10

---

1  A   It is my understanding that they can, yes.
2  Q   All right.  Now, what did you do to prepare for your
3  testimony here today on topic number one?
4  A   I had several meetings with the case team, the attorneys
5  representing Match in this matter.  I reviewed documents.  I --
6  yeah, that's, that's -- those are the two things I did.
7  Q   All right.  Who on the case team did you meet with?
8  A   I met with counsel here today, Hasan Aijaz.  I met with
9  Reid Tepfer, Jason Moon, Sarah Zuckerman and also Brad Winter.
10  Q   Are these all lawyers of the FTC?
11  A   Yes.
12  Q   So, in preparation for your testimony, you met with five
13  different FTC lawyers?
14  A   Not individually, but we had meetings.
15  Q   Okay.  And how many meetings?
16  A   I think six.
17  Q   Six meetings.  When was the first one?
18         MR. AIJAZ:  Objection to the extent this calls for
19  privileged information.
20         MR. HUMMEL:  He's a 30(b)6 designee.  There's no
21  privilege if it's in preparation for a deposition.
22         MR. AIJAZ:  Just to the extent it calls for it.  I'm
23  just concerned about this line of questioning.
24         So, of course, answer to the extent it doesn't violate
25  attorney-client privilege.

Page 11

---

1  BY MR. HUMMEL:
2  Q   When was the first meeting?
3  A   I don't remember the exact date.
4  Q   Proximate?
5  A   It was this month.  Oh, no.  Strike that.
6         Maybe it was late September or early October.  I don't
7  remember the exact date.
8  Q   Was it in person or on Zoom?
9  A   It was via Zoom.
10  Q   Were all the prep sessions via Zoom?
11  A   Yes.
12  Q   Were they recorded?
13  A   No.
14  Q   And you said there were six separate meetings.  When was
15  the last meeting in preparation for your deposition here today?
16  A   Saturday.
17  Q   In D.C.?
18  A   I was in D.C.
19  Q   The rest were via Zoom?
20  A   The other participants were via Zoom, yes.
21  Q   And this was all in connection with topic one.  We're going
22  to focus on the other topics later.  But in connection with
23  topic one, all the six meetings with these five separate FTC
24  attorneys related to your preparation to testify about the facts
25  and evidence supporting the allegation that Match.com does not

Page 12

---

1  have simple mechanisms to cancel?
2  A   That was a really long question.  You're going to have to
3  repeat that one.
4  Q   Okay.  Were all of the the six meetings in preparation for
5  your deposition here today that included five separate FTC
6  lawyers, were they all -- did they all, in some respect, cover
7  the topic number one, which is the allegation that Match.com
8  does not have simple cancelation mechanisms?
9         MR. AIJAZ:  Objection, misstates the testimony.
10         THE WITNESS:  No.
11  BY MR. HUMMEL:
12  Q   Okay.  How many of the meetings focused on topic one, if
13  you remember?
14         MR. AIJAZ:  Objection, privilege.
15         Don't answer.
16         MR. HUMMEL:  You're instructing him not to answer,
17  yes?
18         MR. AIJAZ:  Yes.
19         MR. HUMMEL:  Okay.  Basis, attorney-client privilege?
20         MR. AIJAZ:  Correct.
21  BY MR. HUMMEL:
22  Q   Okay.  Now, did any of the meetings -- I take it, in all
23  the meetings, you had discussions with these FTC lawyers,
24  correct?
25  A   Yes.

Page 13

---

4 (Pages 10 - 13)

1  Q   And some of them related to topic one, correct?

2      MR. AIJAZ:  Again, objection, attorney-client

3  privilege.

4      Don't answer.

5  BY MR. HUMMEL:

6  Q   Did you, in these meetings, learn facts and evidence from

7  these lawyers that support the FTC's allegation that Match.com

8  does not have simple cancelation mechanisms?

9      MR. AIJAZ:  Objection, attorney-client privilege and

10  also relevancy as to the entire line of questioning.

11     Don't answer.

12  BY MR. HUMMEL:

13  Q   Prior to the meetings with the FTC lawyers, did you know

14  anything about Match.com's cancelation mechanisms?

15  A   Yes.

16  Q   How did you know that?

17  A   I had some discussions with the case team when the matter

18  was, I think, at the time the matter was -- whether it was --

19  when the bureau was deciding -- let me think of the timing.

20     I can't remember whether it was when there were settlement

21  negotiations going on or whether it was at the time the

22  complaint package came to the bureau for approval.  But I was

23  familiar with the basic allegations in the complaint as my role

24  in -- as chief litigation counsel.

25  Q   During that time, prior to the time that you were preparing

Page 14

---

1  for this deposition, were you aware of why the FTC alleged that

2  Match.com did not have simple cancelation mechanisms?

3      MR. AIJAZ:  Objection, vague.

4      THE WITNESS:  I was aware that there was issues with

5  people having difficulty canceling, but not in deep in the

6  details.

7  BY MR. HUMMEL:

8  Q   What was the basis of your awareness?

9  A   I'm the chief litigation counsel, so I have -- I get

10  information about all the matters that come into the bureau for

11  approval.  So, I had a general idea of what the case was about.

12  Q   So, you knew -- well, you were aware that some consumers

13  had had trouble canceling.  Is that the extent of your

14  testimony?

15  A   I had a general understanding of what the complaint was

16  about and that was in the complaint.  So, yeah.  And my main

17  memory of that time was more about what was in Counts, I think,

18  One and Two.

19  Q   Understood.

20  A   That's what I remember more, but the simple cancelation

21  thing -- I mean, I can't remember what I remembered four years

22  ago.  But, you know, I would have had some general familiarity

23  with the case and what was, what -- the conduct that was at

24  issue.

25  Q   What was it at that time, to the best of your recollection,

Page 15

---

1  that made Match.com's online cancelation mechanism not simple?

2  A   You're asking for my memory?

3  Q   Yes.

4  A   I don't remember the specifics.

5  Q   Okay.  So, as of today, what is it about Match.com's online

6  cancelation flow or mechanism that renders it not simple?

7  A   Well, there's several things about it.  Let's see if I can

8  start by going through my memory of what the cancelation flow

9  is.  First, the cancelation flow is difficult to find.  You have

10  -- it's -- to get to it, you have to go to a gear, a little gear

11  icon on the, I think, upper right corner of the Match.com home

12  page.  And you hover over the gear and then you get to the

13  settings.

14     And you click on settings and then it pulls up a menu,

15  which, in the more recent iterations of the website, has a menu

16  of options that include a bunch of other things.  But one of

17  them is "manage subscription", okay?  There's nothing on the

18  current settings page that says anything about cancelation.  So,

19  then you click on "manage subscription" and you're then prompted

20  to input your password.  And there is a Captcha and you do that.

21  And I think, in the current iteration, you hit "continue".  And

22  then when you get that, you finally see a page that has the

23  word -- there are two links on it.  I think one is subscription

24  status and the other is "cancel subscription".

25     So, then you click on "cancel subscription" and then you

Page 16

---

1  get to a page where the title says "before you go".  And then

2  there's a survey underneath it.  And if you click on, like,

3  survey responses, it'll pop up another survey or sometimes two.

4  And then there's a button at the bottom that says "continue

5  cancelation".  And you get to that and then you get to another

6  page, which, in the current iteration says "tell us more".  And

7  there is a survey for, I think, would you recommend Match to a

8  friend?  And it has, like, buttons from, like, one to ten or

9  zero to ten.

10  Q   Like an NPS?

11  A   I don't know what an NPS is.

12  Q   Net Promoter Score, you know?  Okay.

13  A   It's a survey that goes from one to ten or zero to ten on

14  how much you would recommend -- whether you'd recommend Match to

15  a friend.  And then I think you hit "continue cancelation" and

16  then you get to "your subscription has been canceled".

17     But I forgot one thing.  I think for some users, they are

18  presented with what I think Match employees called, like, a save

19  offer page, where -- I think it appears -- I don't know whether

20  it typically appears between the "before you go" page and the

21  "tell us more" page or whether it typically appears after people

22  hit "cancel subscription".  But for some users, they get a save

23  offer which, I think, typically offers, like, three months for

24  the price of one.  And so, consumers can accept that offer or

25  they can -- at one point there was just, like, a little link

Page 17

1 that said, no thanks, I want to resign.
2     Then there was a -- then it would change to, like, a button
3 that said "continue". I think the most recent, relatively
4 recent change has been to change that to "continue cancelation".
5 So, at some point in the process, I'm not -- I can't remember
6 exactly where, that save offer is presented to some consumers.
7 And then finally, you get through all that and you get to the
8 "your subscription is canceled" page.
9     There is some confirmation number that's provided there.
10 There's a date that's provided on that page that says, you
11 know -- I guess when you cancel a subscription, you can still
12 use your subscription until the last day of the term that you
13 purchased. So, that -- it says, you know, your subscription
14 will cancel on whatever that day is. You have X number of days,
15 you know, before that happens. So, it's essentially indicating
16 that you still have a subscription, but it's not going to
17 auto-renew.
18     And then there are buttons there at the bottom. I think
19 one is to, like, hide or deactivate profile. So, you can go
20 there. I didn't dig too much into what happens with that. And
21 I think the other button is "back to home", I think it's what it
22 says now. Yeah, "back to home", I think is what it says. But
23 in terms of what's -- it's hard to find. On the account
24 settings page, it doesn't say cancel.
25     You get to the password page and, you know, a lot of users

Page 18

1 abandon at the password page. Because, to use Match, it is my
2 understanding that typically consumers don't have to input their
3 Match password. So, it's not something that a lot of users of
4 Match use a lot, so a lot of them forget. So, you can't get --
5 so, a lot -- I saw an email saying that consumers, because of
6 that, would have to go to "forget password" flow. There's a
7 link on that page, "forget password". And so they go through
8 that flow. That flow, according to Match employees, was bad.
9     And if you get through the password page, you go to hit
10 "cancel", but it all -- you have all the save offer, the two
11 pages of surveys before you can get to the cancelation. So,
12 that's time-consuming. And I think one employee referred to
13 them as nag screens. It's nagging.
14     And then you've got the confusing verbiage. Like,
15 consumers click on "cancel your subscription" and they see a
16 page that's titled "before you go". So, consumers and
17 complaints bear this out, think that by clicking "cancel
18 subscription", they have canceled their subscription and that
19 the company is just asking for a survey before they leave Match.
20 And so, so that -- the confusing verbiage makes it not simple.
21 And this is something that Match employees also noted, that the
22 verbiage is confusing and makes consumers think they've actually
23 canceled when they haven't.
24     The save offer was confusing, especially in the prior
25 iterations because -- the save offer was not simple because

Page 19

1 it -- the link to "no thanks, I want to resign". Like, the
2 resign language is not a term that's used anywhere else in the
3 flow. It was far less prominent than the button that you would
4 click, that you would use to accept the offer. Then when they
5 changed it to "continue", it was even more confusing because
6 with the save offer there, you would -- consumers would look at
7 that page and wonder if you hit "continue", does that mean I
8 continue to accept the save offer? Or if the other button says,
9 "accept the save offer"? Very confusing.
10     And then you sort of get the nags with the two, the
11 back-to-back-to-back surveys. You've got the survey. You click
12 on a button. More questions come. Then maybe more questions
13 come. Then you get that done and you have to take another --
14 you know, you're asked to fill out another survey. In earlier
15 iteration of the website, there was a text box. I can't
16 remember -- the question was, tell us how we can make finding
17 love easier, I think, was a text box. So, that was there.
18     You know, these surveys were unnecessary, according to
19 Match employees. They noted that the survey information wasn't
20 particularly helpful or useful, but they were there. There were
21 complaints from the care team saying the process is too
22 complicated. It's -- you know, it needs to be simplified.
23 There were requests to move the survey to after when cancelation
24 was complete, but others in Match rejected that. There were
25 requests to eliminate the password requirement. That was

Page 20

1 rejected. So, yeah, that's why the -- that's what I have on why
2 the cancelation flow was not simple.
3 Q  Is whether or not a cancelation flow simple, online
4 cancelation flow simple, an objective test or is it subjective?
5     MR. AIJAZ:  Objection, calls for a legal conclusion.
6     THE WITNESS:  Objective.
7 BY MR. HUMMEL:
8 Q  So, if it's objective, what's too many clicks required to
9 cancel? What's the number?
10 A  I don't think it's -- just because it's objective doesn't
11 mean that it's based on a number of clicks.
12 Q  I understand, but can you answer my question? Is there
13 such a thing as too many clicks?
14 A  Yes.
15 Q  Okay. What's the number? What's too many clicks?
16 A  Depends on the circumstances.
17 Q  Okay. So, you can't give a number.
18     MR. AIJAZ:  Objection, asked and answered.
19     THE WITNESS:  It depends on the circumstance.
20 BY MR. HUMMEL:
21 Q  Okay. So, in some circumstances, would two be too many
22 clicks?
23 A  I don't know. I'd have to see that survey. That's a
24 hypothetical question.
25 Q  It's actually not. It's objective. But the question is,

Page 21

6 (Pages 18 - 21)

1  is six too many?
2  A  I don't know.
3  Q  Nine too many?
4  A  I don't know.  Depends on the circumstances.
5  Q  All right.  And what about time to completion?  What's too
6  long to cancel an online subscription?
7  A  It depends.
8  Q  Okay.  Is a minute too long?
9  A  Could be.
10  Q  Is two minutes too long?
11  A  Could be.
12  Q  But there's no objective standard that the FTC uses to
13  measure time of completion?
14  A  I think you look at -- whether a mechanism is simple is
15  dependent on facts and circumstances of the mechanism that
16  you're analyzing.
17  Q  Is it a performance test, like clear and conspicuous?
18       MR. AIJAZ:  Objection, vague.
19       THE WITNESS:  I don't know what you mean by that.
20       MR. HUMMEL:  Sure you do.  The FTC's Dot Com
21  guidelines talk about the clear and conspicuous requirement for
22  online disclosure.
23       THE WITNESS:  I'm familiar with that.
24  BY MR. HUMMEL:
25  Q  Right.  And it says that whether something is clear and

1  to the extent that expert disclosures are due November 4th, to
2  the extent that your answer relies on the opinion of an expert.
3       You can discuss that.
4       MR. HUMMEL:  Can or cannot?
5       MR. AIJAZ:  Can.
6       THE WITNESS:  I don't know whether the case team is
7  planning to have expert testimony on that topic, but it was not
8  part of my preparation.  So, I'm -- my assumption is that it
9  is -- whether they're going to do it or not, it hasn't been done
10  yet.
11  BY MR. HUMMEL:
12  Q  Got it.  For sure, would you say that no heuristic analysis
13  or empirical study or survey regarding the simplicity vel non of
14  the Match.com flow was not done prior to filing the complaint?
15  A  Heuristic, vel non.  I don't understand that question.
16  Q  Then I'll repeat it.
17  A  Can you simplify it?
18  Q  I'm not sure I can, but I'll try.  Is it true that there
19  was no empirical study done -- and empirical would include a
20  heuristic analysis by a usability expert or a consumer survey or
21  a consumer usability study.  None of that was done, to your
22  knowledge, prior to the filing of the complaint in this case?
23  A  I don't want to embarrass myself here, but I don't
24  understand what the term heuristic means.  So, can you use
25  another word to describe that?  My vocabulary is not as good as

1  conspicuous is a performance test.  Are you familiar with that,
2  with the guidelines?
3  A  I am not familiar with the term, performance test from the
4  Dot Com guidelines.  I didn't review them specifically for
5  preparation of my testimony today.
6  Q  So, my question is -- it's an objective test and the number
7  of clicks depends on the circumstances.  The time to complete
8  depends on the circumstances.  How do you measure objectively
9  whether something is simple or not?
10  A  I think it's -- would a reasonable consumer consider it to
11  be simple?  So, I think it's a reasonableness test.
12  Q  Okay.  So, what empirical study has the FTC done to
13  determine whether the Match.com online subscription flow is
14  simple for the reasonable consumer?
15  A  I'm not sure whether we have or not.
16  Q  You don't know one way or the other?
17  A  It didn't come up in my preparation.
18  Q  All right.  So, the topic calls for all facts and evidence.
19  So, I assume if there was any empirical study that was designed
20  to elicit or to determine whether a reasonable consumer could
21  simply cancel their subscription, you would know about it.
22  A  What do you mean by empirical study?
23  Q  Survey.  Usability study, heuristic analysis, anything like
24  that.
25       MR. AIJAZ:  With that explanation, I'm going to object

1  yours, apparently.
2  Q  I don't believe that.  But having said all that --
3  A  Yes.
4  Q  Heuristic analysis is, from a website usability
5  standpoint -- and you guys challenge websites all the time,
6  right?  You've got 20 complaints I'm going to ask you about
7  later in the case, later in the day.  It's an expert in website
8  usability and this expert knows industry standard mechanisms for
9  triggering consumer behavior.  Do you know if the FTC engaged or
10  performed such analysis prior to filing the complaint?
11       MR. AIJAZ:  Same objection regarding the date for
12  expert disclosures.
13       MR. HUMMEL:  This is before the filing of the
14  complaint.
15       Was any sort of analysis like that done, to your
16  knowledge?
17       THE WITNESS:  I didn't --
18       MR. HUMMEL:  If you don't know, it's fine.
19       THE WITNESS:  No, I am trying to process your
20  question.  So, can you ask it again?
21  BY MR. HUMMEL:
22  Q  Was any sort of analysis regarding the usability of the
23  Match.com cancelation flow done prior to filing the complaint?
24  A  I don't know.
25  Q  Okay.  So, now, for -- another example that I'll give you

1  is, you said that the Match.com cancelation flow is difficult to
2  find.  And you said that's because the consumer has to find a
3  gear, right?  Do you remember that?
4  A  I do remember that.
5  Q  Well, on the Apple iPhone, settings is a gear.  It's a
6  common industry convention to put settings and cancelation
7  subscription flows and all that sort of thing under a gear.  Are
8  you aware of that?
9      MR. AIJAZ:  Objection, assumes facts not in evidence,
10  compound and vague.
11      THE WITNESS:  That didn't come up in my preparation.
12  BY MR. HUMMEL:
13  Q  Okay.  So, the FTC is not going to say -- well, strike
14  that.
15      Is the FTC going to contend in this case that the
16  Match.com cancelation flow is not simple in part because you
17  have to find it by clicking on a gear?  That's how I heard your
18  testimony.
19  A  It's difficult.  It's not simple because it's difficult to
20  find.
21  Q  Because it's under a gear?  Is that what you said?
22  A  The settings menu is not easy to find on the website
23  because it's -- you have to find the -- yeah, because you have
24  to hover over the gear.
25  Q  Over the gear, same as you would on an iPhone --

Page 26

1  A  I did not --
2  Q  Where literally billions of consumers hit their settings by
3  hitting a gear.
4      MR. AIJAZ:  Objection, argument.
5      MR. HUMMEL:  I'll withdraw it.
6  BY MR. HUMMEL:
7  Q  All right.  Let's see.  Have you -- are you relying in,
8  giving this testimony today, that -- where you describe your
9  reasons or the FTC's reasons why the Match.com flow is not
10  simple, are you relying on what you were told by the FTC
11  lawyers?
12      MR. AIJAZ:  Objection, attorney-client privilege.
13  That's --
14      Do not answer.
15      MR. HUMMEL:  It calls for a yes or no.  It doesn't
16  call for the content of the communication.
17  BY MR. HUMMEL:
18  Q  Are you relying on anything that was told to you by these
19  lawyers in connection with your description of why the FTC
20  contends Match.com's cancelation flow is not simple?
21      MR. AIJAZ:  That's the same question.
22      Do not answer.
23      MR. HUMMEL:  Basis?
24      MR. AIJAZ:  Attorney-client privilege.
25      MR. HUMMEL:  Okay.

Page 27

1  BY MR. HUMMEL:
2  Q  Other than communications with counsel and your review of
3  documents, are you relying on anything else in providing your
4  testimony here today as a 30(b)6 designee of the FTC?
5  A  Not that I can recall.
6  Q  And who provided the documents for you to review in
7  connection with your preparation?
8      MR. AIJAZ:  Objection, attorney-client privilege.
9      Don't answer.
10  BY MR. HUMMEL:
11  Q  Did the lawyers for the FTC select the documents that you
12  relied on in connection with formulating your testimony here
13  today?
14      MR. AIJAZ:  Same objection, privileged.
15      Do not answer.  It's attorney-client privilege.
16  BY MR. HUMMEL:
17  Q  What documents did you review, if you recall?
18  A  Sure, okay.  So, I reviewed selected items from the docket
19  in this case.  That would be the complaint, the Amended
20  Complaint.  I reviewed the ruling on Match's motion to dismiss.
21  I reviewed the ruling on the motion for leave to amend.  I
22  reviewed some exhibits to -- the motion to dismiss, the --
23  Match's motion to dismiss the complaint.  I reviewed some
24  exhibits to the opposition to the motion for leave to amend,
25  Match's opposition and some exhibits from the opposition to --

Page 28

1  from the FTC's reply in support of its motion for leave to
2  amend.  I reviewed the verified stipulation that was filed in
3  this case by Match.  I think that's everything from the docket
4  that I reviewed.
5      I reviewed discovery responses.  I reviewed the FTC's
6  original, first and second amended responses to -- I can't
7  remember which party's interrogatories, but interrogatory
8  responses.  Parts of them.  I don't know that I read them cover
9  to cover, but I read some of their answers.  I reviewed Match
10  Group, Inc. and Match Group, LLC's interrogatory responses to
11  the -- responses to the FTC's interrogatories.  Some of them,
12  not cover to cover.  I reviewed some of the documents that were
13  cited in the FTC's interrogatory responses for some of them.  I
14  reviewed -- what other discovery did I review?  I may have
15  reviewed some other discovery, but that's all I can remember.
16      Then I reviewed a lot of documents produced by Match in
17  this case.  I reviewed a whole variety of versions of the
18  cancelation flow, both videos and screenshots.  I reviewed
19  screenshots of the sign-up flow.  I reviewed screenshots of the
20  FAQ's.  I reviewed the terms of use.  I reviewed -- there was
21  one video of cancel flow that I believe an FTC investigator
22  captured, which was the very recent one.  I reviewed that.
23      I reviewed lots of emails, internal Match employee emails
24  and the attachments to those including -- I remember some
25  spreadsheets that had cancel flow abandon rate data on it.  I

Page 29

8 (Pages 26 - 29)

1  Q   My question was, how was the 64,000 derived?

2      MR. AIJAZ:  Again, objection, relevancy to the

3  superceding response if it has been superceded.

4      THE WITNESS:  Okay.  I didn't delve too deeply into

5  this, but it is my understanding that this is based on the 8.7

6  million that we talked about in the initial disclosure, because

7  if you multiply 64,000 times 136, it's 8.7 million.  And it was

8  based on data that calculated the average subscription cost.  It

9  divided the -- so, it split the 8.7 million into 5 million and

10  3.7 million, 5 million being the un-refunded amounts from

11  consumers who complained that they thought they had canceled and

12  the 3.7 million was the time spent dealing with refunds.

13     So, it takes the 5 million, divides that by the average

14  subscription cost amount, which was, like, I want to say, $78 or

15  something that they derive from Match data.  That gives you

16  about 64,000 consumers.  And then they took the

17  64,000 consumers, divided the 3.7 million by that and that ends

18  up being 50 some dollars.  And you add the 78 to the 50 sum and

19  that gives you the 136.  So, in some sense it was -- those

20  figures were reverse-engineered from the $8.7 million figure we

21  talked about earlier from the initial disclosure.

22  BY MR. HUMMEL:

23  Q   The 64,000 harmed consumers and the $136 of average harm

24  per consumer were reverse-engineered from the 8.7 million?

25  A   That came from the original analysis I spoke about earlier

*Page 90*

---

1  when we were talking about the initial disclosure number.

2  Q   What is the time period applicable to restitution in this

3  case?  In other words, how far did it go back?

4  A   It would be three years from September 25th, 2019, so

5  September 25th, 2016.

6  Q   For MGI?

7  A   No, for all defendants.

8  Q   MGI wasn't sued until recently, right?

9  A   Our position is that the complaint would -- it would relate

10  back even as to MGL.

11  Q   Even though the FTC didn't sue MGL?

12  A   That's our position.

13  Q   Okay.  Now you're a lawyer advocating.

14     MR. AIJAZ:  Objection, argumentative.

15     THE WITNESS:  I'm just stating our position.

16  BY MR. HUMMEL:

17  Q   In other words, your position is restitution three years

18  back from September 25th, 2019?

19  A   Yes, three years back from that date.

20  Q   And how far back for civil penalties?

21  A   It would be five years from that date, so that would be

22  2014.

23  Q   And what is a violation for purposes of calculating civil

24  penalties in a ROSCA case like this?

25  A   Well, you know, it would be every consumer who tried to

*Page 91*

---

1  cancel but was unable to do so.

2  Q   Even though the flow didn't change?

3  A   The flow did change.

4  Q   Okay.  So, every iteration of the flow would be a separate

5  violation or every consumer that tried to cancel and couldn't?

6      MR. AIJAZ:  Objection, form.

7      THE WITNESS:  The latter.

8  BY MR. HUMMEL:

9  Q   The latter.  Is there any precedent for that, that you're

10  aware of, that a court has imposed a judgment for every consumer

11  who tried to cancel and couldn't using the same flow?

12     MR. AIJAZ:  Objection, outside the scope.

13     THE WITNESS:  It didn't come up in my preparation.  I

14  don't know one way or the other.

15  BY MR. HUMMEL:

16  Q   All right.  In your personal experience, ten years at the

17  FTC, has there ever been a litigating decision where it's every

18  consumer who tried to access a particular flow?

19  A   I don't know whether we have litigated decisions on that

20  particular point, but I do know that that is a position we have

21  taken and in settlements.

22  Q   I know that.

23     Okay.  Why don't we take our lunch break?  Let's go -- how

24  about 45 minutes?  Is that okay with you guys?

25     MR. AIJAZ:  That works.

*Page 92*

---

1      MR. HUMMEL:  So, it's ten to one now.  Why don't we

2  come back at 1:40?

3      MR. AIJAZ:  1:40?

4      MR. HUMMEL:  Is that okay with you?

5  (Recess taken at 12:51 p.m., and resuming at 1:48 p.m.)

6      THE VIDEOGRAPHER:  We're back on the record.  This is

7  media unit number four.  The time is 1:48 p.m.

8          EXAMINATION (Continuing)

9  BY MR. HUMMEL:

10 Q   Mr. Bandy, good afternoon.

11 A   Good afternoon.

12 Q   You understand you're still under oath?

13 A   I do.

14 Q   And you're still designee for the FTC for topics identified

15  in the notice?

16 A   Yes.

17 Q   Let's look at Exhibit 3, which is the Amended Complaint in

18  this case.  And I'll call your attention, please, to page 25,

19  which has listed count five, alleged failure to provide a simple

20  mechanism for consumers to stop recurring charges.  Do you see

21  that?

22 A   I do.

23 Q   Okay.  So, this is the ROSCA counter to the complaint

24  alleging a violation of section four of ROSCA, 15 U.S.C. 8403,

25  correct?

*Page 93*

24 (Pages 90 - 93)

1  A  Yes.
2  Q  All right.  Do you see in paragraph 86, the complaint says,
3  in numerous instances in connection with charging consumers for
4  goods or services sold in transactions effected on the Internet
5  through a negative option feature as described in paragraphs 54
6  through 60 above.  Defendants have failed to provide simple
7  mechanisms for a consumer to stop recurring charges from being
8  placed the consumer's credit card, debit card, bank account or
9  other financial account.  My question is this.  What does
10  numerous mean?  Does that mean numerous consumers can't do it?
11  A  Many, it means many, in many instances, in numerous --
12  many, lots.
13  Q  But numerous refers to consumers, not the number of
14  mechanisms?
15      MR. AIJAZ:  Objection, vague.
16      MR. HUMMEL:  Do you understand what I mean?  It just
17  says, in numerous instances.  Does that mean --
18      THE WITNESS:  Numerous defendants have failed to
19  provide a simple mechanism for a consumer to stop recurring
20  charges.
21  BY MR. HUMMEL:
22  Q  Right.  But the allegation here is that the online flow is
23  not simple, correct?
24      MR. AIJAZ:  Objection, misstates the testimony.
25      THE WITNESS:  The online -- yes, we allege that the,

Page 94

1  the -- well, the online cancelation flow is not a simple
2  mechanism.
3  BY MR. HUMMEL:
4  Q  Okay.  I'm going to use your phrase.  Online cancelation
5  flow, okay.  Now, in the -- paragraph 86, it says, defendants
6  have failed to provide simple mechanisms.  Again, referring to
7  the online cancelation flow?  Can you tell me --
8      MR. AIJAZ:  Objection, misstates the testimony.
9  Sorry, I should have waited.
10      MR. HUMMEL:  Thank you.
11  BY MR. HUMMEL:
12  Q  Can you tell me the mechanisms that Match does offer for
13  consumers to stop recurring charges?
14      MR. AIJAZ:  Objection, misstates the testimony.
15      THE WITNESS:  Again, I don't understand your question.
16  Is it referring to this paragraph or in general?
17  BY MR. HUMMEL:
18  Q  In general, what mechanisms does Match offer for consumers
19  to stop recurring charges?
20  A  So, it is my understanding that consumers can cancel their
21  Match auto-renew subscription through the online cancelation
22  flow by email, phone call to customer care, facsimile, mail and
23  online chat.  Yes.
24  Q  Is it the FTC's contention that email cancelation is not
25  simple?

Page 95

1  A  It's not relevant for purposes of this count.
2  Q  What about chat, same thing?
3  A  Same thing.
4  Q  Phone, same thing?
5  A  Correct.
6  Q  So, does this online cancelation mechanism apply only to
7  those consumers who subscribed online?
8  A  Yes.
9  Q  Okay.  For purposes of the online cancelation flow, can you
10  describe what simple means?
11      MR. AIJAZ:  Objection, that's outside the scope of the
12  notice.
13      THE WITNESS:  Yes, a flow that is easy to find and
14  easy to use.
15  BY MR. HUMMEL:
16  Q  What does easy mean?
17  A  Not difficult.
18  Q  Would you agree with me that the ROSCA statute does not
19  define simple?
20  A  Yes.
21  Q  And when you say easy to find and easy to use, that is not
22  difficult.  That is for the reasonable consumer, right?
23      MR. AIJAZ:  Objection, form and calls for legal
24  conclusion.
25      THE WITNESS:  Yes.

Page 96

1  BY MR. HUMMEL:
2  Q  And you agree that ROSCA does not require an online
3  cancelation mechanism, correct?
4      MR. AIJAZ:  Objection, calls for legal conclusion,
5  outside the scope of the notice.
6      THE WITNESS:  It's not stated in the statute.  I agree
7  with that.
8  BY MR. HUMMEL:
9  Q  And you would agree that Match.com offers an online method
10  to cancel subscriptions for subscribers who registered through
11  the website, correct?
12  A  There is a way for consumers who signed up online to cancel
13  online.
14  Q  Now, I want to explore some of the factors that might be
15  used to evaluate whether something is easy to use or not, or
16  easy to find, okay?
17  A  Okay.
18  Q  One would be time to completion.  Do you agree with that?
19  A  Sure.
20  Q  Okay.  And is there any objective standard against which
21  the FTC measures simplicity with respect to time of completion?
22      MR. AIJAZ:  Objection, outside the scope of the
23  notice.
24      THE WITNESS:  So, when you say objective, I just think
25  reasonable person standard.  So, it would be measured by a

Page 97

25 (Pages 94 - 97)

App. 11

1  reasonable person, their experience under the similar facts and
2  circumstances.
3  BY MR. HUMMEL:
4  Q  Okay. So, does the FTC have in mind a maximum time that a
5  reasonable consumer or subscriber of Match.com could take to
6  cancel their subscription online?
7  A  No.
8  Q  Is that issue relevant in terms of evaluating simplicity,
9  in your view?
10      MR. AIJAZ: Objection, form.
11      THE WITNESS: Not really.
12  BY MR. HUMMEL:
13  Q  Okay. What about the number of clicks it takes to complete
14  the transaction, the cancelation?
15      MR. AIJAZ: Objection.
16      THE WITNESS: I don't understand.
17  BY MR. HUMMEL:
18  Q  Is that issue relevant to whether or not -- the number of
19  clicks, is it relevant to whether or not a canceling mechanism
20  is simple or not?
21      MR. AIJAZ: Objection as to scope.
22      THE WITNESS: Could be, sure.
23  BY MR. HUMMEL:
24  Q  And the question of whether or not a cancelation mechanism
25  is simple, online cancelation is simple, you'd also want to look

Page 98

1      MR. AIJAZ: Same objection.
2      THE WITNESS: We have been over that repeatedly. My
3  answer is still the same.
4  BY MR. HUMMEL:
5  Q  And whether or not the website contains -- or the
6  cancelation flow contains clear labels, understandable labels,
7  that is a factor that could be considered in determining whether
8  or not cancelation flow is simple, correct?
9      MR. AIJAZ: Objection, vague and scope.
10      THE WITNESS: I'm not sure what I understand -- what
11  you mean by clear labels.
12  BY MR. HUMMEL:
13  Q  Well, in the Match.com cancelation flow, I think you
14  described the steps that would be taken. You first have to
15  click on the gear. Then you click on "manage subscription".
16  Does the FTC contend that those links are not clear?
17      MR. AIJAZ: Objection, misstates the testimony.
18      THE WITNESS: I think that's more about difficulty in
19  finding the cancelation flow. I think I'd use the term, clear
20  verbiage, clear wording. And that -- when I said that, I was
21  more referring to things like the "before you go" language,
22  after the, you know, canceled subscription link, that that's not
23  clear. When the "continue" button was on the save offer, that's
24  not clear.
25      Things that -- the wording that makes it ambiguous

Page 100

1  at whether consumers can find the cancelation flow, correct?
2      MR. AIJAZ: Objection, form and scope.
3      THE WITNESS: Right, the first thing is easy to find,
4  right?
5  BY MR. HUMMEL:
6  Q  Easy to find?
7  A  So, if it's not easy to find, then it's not simple.
8  Q  How would you evaluate that, whether something is easy to
9  find?
10  A  I think it's an objective standard based on, you know, what
11  a reasonable consumer's experience on the website would be.
12  Q  What evidence would you look at?
13  A  We could just look at the website.
14  Q  So, facial review.
15      MR. AIJAZ: Objection as to scope.
16      THE WITNESS: Among other things.
17  BY MR. HUMMEL:
18  Q  What other things?
19  A  I don't know, but that's one thing you could look at.
20  Q  You could also study it, right? You could ask a series of
21  consumers, hey, look at this website. Where would you go to
22  find your subscription cancelation flow?
23  A  Sure, you could do that. It's possible.
24  Q  And the FTC, to your knowledge, has not done that kind of
25  study?

Page 99

1  what the consumer -- like, how to cancel. If you have consumers
2  who are, who are confused by -- if the language is confusing to
3  a reasonable consumer, then that would be a factor that would
4  make a mechanism simple. It's essentially the cancelation
5  mechanism is something consumers can't use because it's
6  confusing.
7  BY MR. HUMMEL:
8  Q  Isn't it true that the only way to evaluate whether
9  something is confusing to a consumer is to do an empirical
10  study?
11  A  No.
12      MR. AIJAZ: Objection, calls for legal conclusion.
13  BY MR. HUMMEL:
14  Q  Is one factor in assessing whether a cancelation flow is
15  simple or not its effectiveness?
16      MR. AIJAZ: Objection, vague.
17      THE WITNESS: Could be relevant. Could be relevant.
18  BY MR. HUMMEL:
19  Q  In other words, the percentage of consumers who attempt to
20  cancel using a flow and succeed, that could be relevant?
21  A  Sure.
22  Q  What would be the -- if you know, the sort of objective
23  standard for whether or not any particular percentage of
24  effectiveness, as I just defined it, would constitute not
25  simple?

Page 101

26 (Pages 98 - 101)

App. 12

1    MR. AIJAZ:  Objection, scope.
2    THE WITNESS:  I don't think there's a set percentage
3  amount.  I think you'd have to look at it based on the data that
4  you had, the facts and circumstances.
5  BY MR. HUMMEL:
6  Q   So, it's possible that if 80 percent of consumers
7  effectively canceled once they entered the flow, that would be
8  strong evidence that the flow is simple?
9    MR. AIJAZ:  Objection, speculation.
10    THE WITNESS:  I would say that's probably strong
11  evidence it's not simple.
12  BY MR. HUMMEL:
13  Q   So, what is the number?
14  A   Twenty percent just seems a lot for people who have found
15  the flow but can't complete it.  That seems like a lot, just in
16  my personal view.
17  Q   Sure.  I didn't say, can't complete it.  I said, didn't
18  complete it.
19  A   Didn't complete it.
20  Q   All right.  And there are certainly, as we talked about it
21  before, there are a number of reasons why somebody might not
22  complete it when they enter, right?
23  A   I mean, of the reasons you gave, I acknowledge that perhaps
24  the save offer was a possibility.  The other reasons that you
25  speculated on seemed a little far-fetched to me.  So, I would

Page 102

1  say, other than the save offer, I don't think I heard anything
2  from you that suggests a plausible reason why someone would
3  abandon the cancelation flow midstream.
4  Q   What about if you're in the flow and the doorbell rings and
5  you just forget?
6    MR. AIJAZ:  Objection, speculation.
7    THE WITNESS:  So, that's a reason.  But to have that
8  be of such high level of frequency that it would make a
9  difference, I'm skeptical of it.  But that's my personal view.
10  BY MR. HUMMEL:
11  Q   Right, and there are a number of other reasons why a
12  consumer who was in the cancelation flow might get distracted
13  and not complete, right?
14  A   Sure, I mean, anything's possible.
15  Q   And whether or not there's a password wall, that is a
16  factor that you would consider in whether or not, in total, a
17  cancelation flow is not simple, correct?
18  A   In context, sure.  In the context here, I think it makes a
19  difference.  I think the presence of a password requirement to
20  cancel is not, you know, per se makes a mechanism not simple.
21  But in this context here, where you've got a user base that
22  typically does not have to enter their password, you know, that
23  additional step, especially when it was flagged by Match
24  employees as being a source of people not canceling or not
25  abandoning the cancel flow, I think that, in this particular

Page 103

1  context, you know, is something that makes the mechanism not
2  simple.
3  Q   And you keep saying that, in this circumstance, consumers
4  don't typically have to enter their password to use the site.
5  What's your basis for that?
6  A   That's the information that was told to me.
7  Q   By whom?
8  A   By the case team.
9  Q   By counsel?
10    MR. AIJAZ:  Objection, attorney-client privilege.
11    Don't answer.
12  BY MR. HUMMEL:
13  Q   Okay.  You don't have any evidence of the percentage of
14  consumers who attempt to cancel -- strike that.  You don't have
15  any evidence of the percentage of consumers who want to log on
16  to the site, to their Match.com profile, who don't have to enter
17  a password, correct?
18    MR. AIJAZ:  Objection, form.
19    THE WITNESS:  I don't understand the question.  Repeat
20  it.  Repeat it.
21  BY MR. HUMMEL:
22  Q   Sure.  So, you don't have any evidence of the percentage of
23  consumers who tried to log on to their profile or account on
24  Match.com who don't have to enter their password?
25  A   I don't know.  I don't know.  My understanding is that if

Page 104

1  the browser has cookies enabled that they don't have to enter
2  their password.  Maybe they do the first time, but when they go
3  back to the website, they don't have to enter the password to --
4  and to use the site's features.
5  Q   Sure.  And again, that information is something you
6  received from counsel?
7    MR. AIJAZ:  Objection, attorney-client privilege.
8    Don't answer.
9  BY MR. HUMMEL:
10  Q   Do you have any other basis for that statement other than
11  what lawyers told you?
12  A   That is my understanding, but I did not specifically look
13  at documents on that particular point.
14  Q   I am asking a different question, which is, do you have any
15  source for that understanding other than what lawyers told you?
16    MR. AIJAZ:  Objection, attorney-client privilege.
17    THE WITNESS:  I'm thinking.  Well, there's a common
18  sense point that, that made me not question it, which is that if
19  consumers have to routinely enter their password to use the
20  site, then why would it be necessary for them to enter their
21  password to then access the cancelation flow?  Why would you ask
22  them to enter the password twice?
23  BY MR. HUMMEL:
24  Q   Well, if a consumer does have to input their password to
25  access their account, would you agree that having a password

Page 105

27 (Pages 102 - 105)

1   requirement in order to cancel is reasonable?
2           MR. AIJAZ:  Objection, calls for speculation.
3           THE WITNESS:  Repeat the question.
4   BY MR. HUMMEL:
5   Q   If a consumer does have to input their password regularly
6   to access their account, would you agree that having a password
7   requirement to cancel is reasonable?
8           MR. AIJAZ:  Calls for speculation, not relevant.
9           THE WITNESS:  Yeah, I don't know.  I don't know.
10  Yeah, maybe.
11  BY MR. HUMMEL:
12  Q   Would you agree with me that Match.com discloses its
13  cancelation methods or mechanisms at the time the consumer
14  subscribes?
15          MR. AIJAZ:  Objection, calls for legal conclusion.
16          THE WITNESS:  Can you repeat your question?
17          So, methods plural, no.  I believe -- I'm not sure,
18  but if anything, it would be the online cancelation method.  But
19  I'm not certain I remember that in the sign-up flow.  I think
20  it's there, but, but methods, plural, I'm almost certain not.
21  BY MR. HUMMEL:
22  Q   Would you agree that the online cancelation mechanism is
23  disclosed at the time of subscription?
24  A   I think so, but I'm not sure.  I mean, if you show me the
25  sign-up flow, we can see, but I can't remember.

Page 106

1   employees feel that it's five or six is like the minimum you
2   could do it in.
3   Q   Do you know what the average time to complete the
4   cancelation flow is for a reasonable consumer?
5   A   I didn't see any data on that.  I, my -- yeah, I didn't see
6   any data on that.
7   Q   Did you see any data on the percentage of consumers who
8   attempt to find the cancelation flow and who can't?
9   A   Not any data on that, no.
10  Q   Did you see any data on whether or not consumers are
11  confused by the labels on the cancelation flow?
12          MR. AIJAZ:  Objection.
13          THE WITNESS:  Data on it?
14          MR. HUMMEL:  Yeah.
15          THE WITNESS:  No, I don't think -- I mean, I can't
16  recall seeing -- no, not data, not data.
17  BY MR. HUMMEL:
18  Q   Does the FTC consider or take into account how many ways
19  there are to get to the cancelation flow in determining whether
20  or not it is simple?
21          MR. AIJAZ:  Objection, scope.
22          THE WITNESS:  Sort of?
23  BY MR. HUMMEL:
24  Q   What does that mean, sort of?
25  A   Well, I think that we would look at -- if there are

Page 108

1   Q   All right.  We discussed a number of the factors that might
2   be relevant to ascertaining whether a flow is simple or not.
3   And I understand we're not isolating anyone or your position is
4   you're not isolating anyone.  But taken in total, there's an
5   allegation in this case that the Match.com online cancelation
6   flow is not simple.
7   A   If you look at the totality of this, the factors that I
8   mentioned at the beginning that makes the cancelation flow, it's
9   not easy to find.  It's not easy to use.  Therefore, it's not
10  simple.
11  Q   All right.  And let's talk about the evidence with respect
12  to those factors.  How many clicks, to the best of your
13  knowledge, the best of the FTC's knowledge, does it take to
14  cancel on the online flow?
15  A   I don't think there's one specific answer to that because
16  it varies, right?  Because you may -- some people don't get the
17  save offer.  I'm not sure everyone gets the Captcha.  I'm not
18  sure.  My understanding is you can get through the cancelation
19  flow without answering the survey questions.  So, if you click
20  on the survey question and you click on another question, that's
21  more clicks.
22          So, I don't know that there's a definitive answer to that.
23  I think maybe.  I think Match employees said five or six is the
24  minimum.  I think that's if you click through the surveys and
25  maybe no save offer.  I don't know, but I think maybe Match

Page 107

1   multiple ways to get to the cancelation flow, we would look at,
2   how easy are those ways to find?  So, if there are, like, five
3   different ways to get to the cancelation flow but they're all
4   buried or difficult to find, then I don't know that we would
5   really consider those.  So, it depends more on -- it's more than
6   just the number of ways.  It matters qualitatively how those
7   ways work.
8   Q   Sure, all right.  In terms of effectiveness, what does the
9   FTC believe is the percentage of consumers who attempt to cancel
10  using the online flow and succeed?
11          MR. AIJAZ:  Objection, vague.
12          THE WITNESS:  I mean, that would be in Match's data.
13  I think Match has data on that.  There was one -- there was that
14  one spreadsheet that had, like, the 20 -- I think it was 24.  It
15  was a spreadsheet that was sent in 2015, early 2015 that had
16  annual -- or no, no.  That was -- okay.
17          There was an email in September of 2015 that attached
18  a spreadsheet of data from August of -- the spreadsheet says
19  August and there is a tab on that spreadsheet that says,
20  abandonment cancel or cancel abandonment.  And on that tab it
21  has -- it reports, on the sheet itself, it says, one week in
22  August.  So, given that it was September 20 -- I want to say --
23  I'm pretty sure it was 2015.  It was August of 2015.
24          And on that spreadsheet, it has -- it takes those two
25  weeks and it extrapolates it out.  But I think on that

Page 109

28 (Pages 106 - 109)

1  spreadsheet, they have successful resignations and abandoned
2  ones, but I cannot remember the percentage breakdown.  But it
3  was -- there were a lot of abandonments.  Like, it wasn't like a
4  small percentage of the successful.  That's my recollection.
5  BY MR. HUMMEL:
6  Q   To your knowledge, sir, has the FTC ever brought a case
7  under ROSCA alleging that an online cancelation flow is not
8  simple where the, where the allegation is simply that the flow
9  is not simple?
10       MR. AIJAZ:  Objection, scope.
11       THE WITNESS:  What do you mean by flow is not simple?
12  BY MR. HUMMEL:
13  Q   So, here you have -- you concede that Match.com has an
14  online subscription process, right?  And Match.com has an online
15  cancelation flow.  Has the FTC ever brought a case before where
16  it's alleging that only the online cancelation flow is not
17  sufficiently simple?
18  A   I don't know.
19  Q   Okay.  In every case I'm aware of, and I do study this a
20  little bit, the FTC has also alleged that the telephone -- that
21  there's not an online cancelation flow at all and the telephone
22  cancelation mechanism has inordinate wait times.  The companies
23  are defrauding consumers as to whether they are actually
24  canceled or not and they keep the recurring charges, or you
25  can't get through to customer service at all.  I'm not aware of

1  a single case where the FTC has alleged where there is an online
2  subscription method and an online cancelation method that the
3  cancelation method is not sufficiently simple.  Are you aware of
4  any other case?
5       MR. AIJAZ:  Objection, scope, relevancy and form.
6       THE WITNESS:  I'm not sure.  But now that I think of
7  it, maybe.  Maybe I can think of one.
8  BY MR. HUMMEL:
9  Q   Which one?
10  A   ABCmouse.
11  Q   Age of Learning?
12  A   I think that sounds right.
13  Q   The allegations in that complaint were that there was
14  inordinate wait times on the phone.  There was never an issue
15  about the simplicity of flow, only that it was under the parent
16  section of the website and not under the subscription section of
17  the website.
18  A   I thought that was the one where they kept presenting you
19  with offer after offer after offer.
20  Q   Not a save offer case?
21  A   I didn't delve into that for preparation today, so I may be
22  misremembering it.  That was the one that occurred to me, but I
23  might have had my case names mixed up.
24  Q   I know the case and it had to do with where you got into
25  the flow initially, if you recall.

1       MR. AIJAZ:  It's not a question pending.
2       MR. HUMMEL:  Not a question pending.  All right.
3  BY MR. HUMMEL:
4  Q   But other than ABCmouse, which is the Age of Learning case,
5  you can't think of anyone else?
6       MR. AIJAZ:  Objection, scope.
7       THE WITNESS:  I'm not sure that ABCmouse is the Age of
8  Learning case.
9       MR. HUMMEL:  It is.
10       THE WITNESS:  Okay.  I mean, that's your
11  representation.
12       MR. HUMMEL:  Litigate your case.  That's fine.
13       THE WITNESS:  Whatever.  Anyways, I did not study all
14  the ROSCA cases in preparation for today, so I don't know
15  whether it is or not.  In terms of what I can personally
16  remember, I can't think of one where the online flow was, was
17  the -- where the online cancelation mechanism is what we were
18  alleging was simple, other than this case.  And I think maybe
19  ABCmouse may be one of those cases, but you know, it is what it
20  is.
21       MR. HUMMEL:  Sure.
22       THE WITNESS:  And -- but that does not mean that
23  definitively that the FTC is representing that it has never done
24  that.  I personally cannot remember that and it was not part of
25  my preparation for the topics today.

1  BY MR. HUMMEL:
2  Q   That's fine.  What public guidance has the FTC ever given
3  to companies on what constitutes a simple online cancelation
4  flow?
5       MR. AIJAZ:  Objection, outside the scope of the
6  notice.
7       THE WITNESS:  I think that the negative option policy
8  statement provides some guidance.  Maybe there is some stuff in
9  the dark patterns workshop report.  I think some of the
10  principles in the Dot Com Disclosures guideline would have
11  bearing there.
12       MR. HUMMEL:  Let's look at the enforcement policy
13  statement regarding negative option marketing.
14       MR. AIJAZ:  Thank you.
15       Is this five?
16       MR. HUMMEL:  Yeah, sorry.
17       (Deposition Exhibit No. 5, marked for identification.)
18  BY MR. HUMMEL:
19  Q   Exhibit 5 is a copy of the FTC's enforcement policy
20  statement regarding negative option marketing.  I think you
21  mentioned that you reviewed this in connection with the
22  deposition today, right?
23  A   I have.  While I'll say this is in a -- I reviewed the
24  federal registered version of this, so it's in a little
25  different format, but -- in terms of the layout of the page.

App. 15

1 But, but I will accept your representation that this is an
2 accurate reprinting of the negative option policy statement.
3 Q   And a policy statement is not a rule, right?  It's a guide?
4      MR. AIJAZ:  Objection, calls for leading conclusion
5 outside the scope of the notice.
6      THE WITNESS:  I mean, policy statement is not a rule.
7 That's true.  I don't know whether I can -- I don't know whether
8 I would say it's a guide.  A policy statement is a policy
9 statement.
10 BY MR. HUMMEL:
11 Q   Okay.  So, are you aware of any -- if you look at page 14
12 of this enforcement policy statement regarding negative option
13 marketing, it has a section relating to cancelation.
14 A   Yes.
15 Q   And it starts, ROSCA requires negative option sellers to
16 provide a simple, reasonable means for consumers to cancel their
17 contracts.  See that?
18 A   I do.
19 Q   And this is a statement by the FTC, correct?
20 A   This is a statement by the commission.
21 Q   Right.  So, ROSCA does not in fact say, reasonable means.
22 All it says is simple, right?
23 A   I think that's right.  But, I mean, if you want to put
24 ROSCA, the statute in front of me so that I can -- yeah, I think
25 that's right.

Page 114

1 Q   Then the FTC writes, in connection with its policy
2 statement, to meet this standard, negative option sellers should
3 provide cancelation mechanisms that are at least as easy to use
4 as the method the consumer used to initiate the negative option
5 feature.  Do you see that?
6 A   I do see that.
7 Q   Has the FTC analyzed whether the subscription mechanism to
8 subscribe to Match.com is easier or more difficult than the
9 cancelation mechanism?
10 A   Oh, it's much easier.
11 Q   Subscribing?
12 A   Yes.
13 Q   How many clicks does it take to subscribe?
14 A   Zero.
15 Q   Have you logged into Match.com and tried to sign up?
16 A   My understanding is when you sign up for a Match.com
17 account, if you choose to purchase a subscription, you have to
18 buy it with the negative option.  You can't not buy it without
19 it.  So, it's a zero click.  You buy a subscription, it comes
20 with the negative option.
21 Q   But that's not signing up.  You have to sign up for
22 Match.com.
23 A   It says, used to initiate the negative option feature.  So,
24 if you have a website where you can purchase one month but not
25 have AR on, auto-renew on, then you can maybe -- if you have to

Page 115

1 click a button, if you have to check a box to turn auto-renew
2 on, that's one click, one step.  But my understanding with Match
3 is that if you purchase a subscription, it automatically comes
4 initiated with the negative option feature.
5 Q   So, you don't consider the registration mechanism as part
6 of the subscription process?
7 A   No.
8 Q   I'm correct that you don't.  I don't want to do a double
9 negative again.
10      MR. AIJAZ:  Objection.
11      THE WITNESS:  So, why don't you ask the question
12 again?
13 BY MR. HUMMEL:
14 Q   Am I correct that the FTC doesn't consider the registration
15 process to be part of the subscription process for the negative
16 option?
17      MR. AIJAZ:  Objection, misstates the exhibit.
18      THE WITNESS:  You are correct.
19 BY MR. HUMMEL:
20 Q   Okay.  And then it says, going on, on page 14, for example,
21 to ensure compliance with the simple cancelation mechanism
22 requirement, negative option sellers should not subject
23 consumers to new offers or similar attempts to save a negative
24 option arrangement that impose unreasonable delays on consumers'
25 cancelation efforts.  Do you see that?

Page 116

1 A   I do.
2 Q   And then, important footnote, while requests to consider an
3 offer or discount would not amount to unreasonable delay,
4 multiple requests for a consumer to listen to additional offers,
5 lengthy pitches or ignoring a consumer's request to decline
6 further offers could amount to an unreasonable delay.  Is it the
7 FTC's contention in this case that Match's surveys and save
8 offers constitute unreasonable delay?
9      MR. AIJAZ:  Objection, relevancy.
10      THE WITNESS:  Yes.
11 BY MR. HUMMEL:
12 Q   Do you know the average time that it takes for a consumer
13 to answer the survey or respond affirmatively or negatively to
14 the same offer?
15      MR. AIJAZ:  Objection, asked and answered.
16      THE WITNESS:  No.
17 BY MR. HUMMEL:
18 Q   So, what does unreasonable delay mean?
19 A   I mean, in this context, I'd say unnecessary.
20      MR. AIJAZ:  Objection, outside the scope of the
21 notice.
22 BY MR. HUMMEL:
23 Q   And it says, in addition -- I'm going up in the page again.
24 In addition, negative option sellers should provide their
25 cancelation mechanisms at least through the same medium, such as

Page 117

30 (Pages 114 - 117)

App. 16

1  website or mobile application the consumer used to consent to
2  the negative option feature. Match.com does that, correct?
3  A    Yes, the online cancelation flow satisfies this.
4  Q    Right. And then it says, the negative option seller should
5  provide, at a minimum, the simple mechanism over the same
6  website or web-based application the consumer used to purchase
7  the negative option feature. Match.com complies with that
8  guidance too, correct?
9        MR. AIJAZ: Objection as to form.
10       THE WITNESS: For website, yes. I thought there was
11  some time period where consumers could only cancel on desktop,
12  but I could never quite figure all the details out of that. But
13  I think that's no longer the case. I think people can cancel on
14  a mobile browser now. Yeah, because that -- yeah, I think
15  that's right. So, subject to that, I think the answer is, yes.
16  BY MR. HUMMEL:
17  Q    To your knowledge, has the FTC ever litigated a case to
18  judgment in which it applied any specific standard for
19  simplicity?
20       MR. AIJAZ: Objection, scope and relevance.
21       THE WITNESS: I can't think of any litigated to
22  judgment.
23  BY MR. HUMMEL:
24  Q    Given the -- your view, your statement of what the FTC
25  believes is the subscription mechanism for the negative option

Page 118

1  feature of the Match.com website, would anything other than a
2  single click to un-subscribe violate the negative option policy?
3        MR. AIJAZ: Objection as to scope and form.
4        THE WITNESS: Well, it depends. Like, in general or
5  as it relates to Match?
6        MR. HUMMEL: As it relates to -- in general?
7        THE WITNESS: Well, no. If you had a, if you had a
8  method that required many steps to initiate the negative option
9  feature, then the cancelation mechanism would be evaluated
10  against that for purposes of this statement.
11  BY MR. HUMMEL:
12  Q    To your knowledge, has the FTC ever promulgated any other
13  guidance than the negative option guidance that defines what
14  simple means for online cancelation mechanisms?
15       MR. AIJAZ: Objection, as to scope.
16       THE WITNESS: I don't think so, but I'm not certain.
17       MR. HUMMEL: Can we take a five-minute break and go
18  off the record?
19       THE WITNESS: All right.
20       THE VIDEOGRAPHER: We're going off the record. This
21  is media unit number four. The time is 2:24 p.m.
22       (Recess from 2:24 p.m. to 2:48 p.m.)
23       THE VIDEOGRAPHER: Back on the record. Beginning
24  media unit five. The time is 2:48 p.m.
25       EXAMINATION (Continuing)

Page 119

1        MR. HUMMEL: I want to apologize. I just had a rapid
2  onset stomach problem and I don't think I can continue
3  physically. I literally need to be somewhere else. So, I would
4  request that the FCC agrees to adjourn, continue at a mutually
5  convenient date and time and I'll make it convenient for the
6  FTC. But I don't want anyone in the room to get this and I want
7  to do it effectively.
8        MR. TEPFER: Of course. Well, Chad, I was going to
9  say, I'm really sorry to hear you're not feeling well. I hope
10  you get better soon.
11       We're happy to suspend the deposition for today. I
12  just want to ask if we can get into agreement just because
13  Bikram spent so long preparing. He doesn't work on this all the
14  time, so his memory will fade. If we could reconvene within a
15  week and get the parties to do this over Zoom perhaps, as a Zoom
16  deposition, you know, we would appreciate agreement on that.
17  But I certainly understand, given your situation, you're not
18  able to continue.
19       MR. HUMMEL: No, I'm fine with that and I hope to be
20  able to reconvene as soon as I can fly back to L.A. and we can
21  do it by Zoom. I'm fine with that.
22       MR. AIJAZ: Okay.
23       MR. HUMMEL: I need client approval for that, but I
24  assume you're okay with it. Jeanette's okay with it too.
25       So, let's recess the deposition. Let's plan to do it,

Page 120

1  you know, Thursday or Friday of this week if you're available at
2  a reasonably convenient time. I don't think I have more than
3  two and a half hours left. Don't hold me to that because it
4  depends on the length of answers, but I'm about halfway done.
5        MR. AIJAZ: I mean, obviously as long as the lapse
6  time is still going to continue counting, it's the same
7  deposition. And I think it makes sense for you to tell us, you
8  know, when you get home, get some rest or whatever, when you'd
9  be ready. I think that makes the most sense.
10       MR. HUMMEL: Yeah.
11       THE WITNESS: So, Thursday and Friday are pretty good
12  for me right now. So, the sooner, the sooner that we can get it
13  on the calendar, the more gooder [ph] it will remain.
14       MR. HUMMEL: That's a good way to put it. Let's stop
15  there. Let's go off the record.
16       THE VIDEOGRAPHER: We're off the record at 2:50 p.m.
17  and this concludes this testimony given by Mr. Bandy.
18       (The matter concluded at 2:50 p.m.)
19
20
21
22
23
24
25

Page 121

31 (Pages 118 - 121)

## Page 122

```
 1          CERTIFICATE OF COURT REPORTER
 2      I, Linda C. Marshall, certify that the foregoing is a
 3   correct transcript from the record of proceedings in the
 4   above-entitled matter.
 5
 6
 7
 8      Linda C. Marshall, RPR
        Official Court Reporter
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 124

```
 1   Federal Trade Commission v. Match Group, Inc., Et Al.
 2   Bikram Bandy 5535418
 3          ACKNOWLEDGEMENT OF DEPONENT
 4      I, Bikram Bandy, do hereby declare that I
 5   have read the foregoing transcript, I have made any
 6   corrections, additions, or changes I deemed necessary as
 7   noted above to be appended hereto, and that the same is
 8   a true, correct and complete transcript of the testimony
 9   given by me.
10
11   _____   _____
12   Bikram Bandy           Date
13   *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15      _____ DAY OF _____, 20___.
16
17
18   _____
19   NOTARY PUBLIC
20
21
22
23
24
25
```

## Page 123

```
 1   Federal Trade Commission v. Match Group, Inc., Et Al.
 2   Bikram Bandy Job No. 5535418
 3      E R R A T A   S H E E T
 4   PAGE_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____   _____
24   Bikram Bandy           Date
25
```

## Page 125

```
 1   maijaz@ftc.gov
 2            November 10, 2022
 3   Federal Trade Commission v. Match Group, Inc., Et Al.
 4   DEPOSITION OF: Bikram Bandy 5535418
 5      The above-referenced witness transcript is
 6   available for read and sign.
 7      Within the applicable timeframe, the witness
 8   should read the testimony to verify its accuracy. If
 9   there are any changes, the witness should note those
10   on the attached Errata Sheet.
11      The witness should sign and notarize the
12   attached Errata pages and return to Veritext at
13   errata-tx@veritext.com.
14      According to applicable rules or agreements, if
15   the witness fails to do so within the time allotted,
16   a certified copy of the transcript may be used as if
17   signed.
18            Yours,
19            Veritext Legal Solutions
20
21
22
23
24
25
```

32 (Pages 122 - 125)

# EXHIBIT 2

```
1                IN THE UNITED STATES DISTRICT COURT

2                FOR THE NORTHERN DISTRICT OF TEXAS

3                         DALLAS DIVISION

4        ----------------------------:

5    FEDERAL TRADE COMMISSION,       :

6                   Plaintiff,       :

7          vs.                       : Case No.:

8    MATCH GROUP, INC., a            : 3:19-cv-02281-K

9    corporation, and MATCH GROUP, :

10   LLC, formerly known as          :

11   MATCH.COM, LLC, a limited       :

12   liability company,              :

13                   Defendants.     :   VOLUME II

14       ----------------------------:

15

16      Remote Zoom Deposition of CORPORATE REP OF THE

17                 FEDERAL TRADE COMMISSION

18                  APPEARING REMOTELY

19                 Monday, October 31, 2022

20                      1:30 p.m.

21   Pages 126 - 221

22   Reported by:  Robert M. Jakupciak, RPR
```

                                                  Page 126

| | |
|---|---|
| 1 | |
| 2 | Remote Zoom Deposition of BIKRAM BANDY, |
| 3 | held at the offices of: |
| 4 | Veritext - Washington, D.C. |
| 5 | 1250 Eye Street, N.W. |
| 6 | Washington, D.C. |
| 7 | |
| 8 | Pursuant to Notice, before Robert Michael |
| 9 | Jakupciak, RPR, a Notary Public in and for the |
| 10 | District of Columbia, when were present on behalf of |
| 11 | the respective parties: |

Page 127

C O N T E N T S

| | |
|---|---|
| 1 | |
| 2 | THE WITNESS:  BIKRAM BANDY |
| 3 | EXAMINATION                    PAGE NO. |
| 4 | By Mr. Hummel                132 |

E X H I B I T S

BANDY EXHIBIT NUMBER                    PAGE NO.

Exhibit 10 Stipulated Order for Permanent     134
    Injunction and Monetary Judgment
Exhibit 7  Stipulated Order For Permanent     142
    Injunction and Other Equitable
    Relief
Exhibit 6  Video                                157
Exhibit 11 Excel PDF                          171
Exhibit 8  How to Make Effective Disclosures  172
    in Digital Advertising
Exhibit 9  Plaintiff's Second Amended         174
    Responses to First Set of
    Interrogatories

Page 129

A P P E A R A N C E S

On behalf of the Plaintiff:
    M. HASAN AIJAZ, ESQUIRE
    REID ABRAM TEPFER, ESQUIRE
    Federal Trade Commission
    1999 Bryan Street, Suite 2150
    Dallas, Texas  75201
    (214) 979-9386
    maijaz@ftc.gov

On behalf of the Defendants:
    CHAD S. HUMMEL, ESQUIRE
    TAYLOR G. BRAGG, ESQUIRE
    Sidley Austin, LLP
    1999 Avenue of the Stars, 17th Floor
    Los Angeles, California  90067
    (310) 595-9500
    chummel@sidley.com

Also Present:  Videographer: Samuel Francis
        Jeannette Teckman, Esquire
        Samuel Kitchens, Esquire

Page 128

E X H I B I T S

BANDY EXHIBIT NUMBER                    PAGE NO.

Exhibit 12 Stipulated Order for Permanent     183
    Injunction, Monetary Relief,
    Civil Penalties, and Other Relief
Exhibit 13 Letter dated 8/6/19          201
Exhibit 14 Letter dated 5/20/22         202
Exhibit 15 Email dated 4/15/19          205
Exhibit 16 Document Bates No. MATCHFTC774522  208
Exhibit 17 Email dated 10/7/21          210
Exhibit 18 Credit, Refund and 6MG Guidelines
Exhibit 19 Responses and Objections to First  212
    Set of Interrogatories
Exhibit 20 Verification of Responses to
    Interrogatories

    (Exhibits attached to transcript.)

Page 130

2 (Pages 127 - 130)

1 the same as the proposed stipulated Order for
2 permanent injunction that was provided to Match, I
3 think that's the only written notice we have of what
4 you will be seeking in court, so I think I'm
5 entitled to use it for purposes of understanding the
6 scope of the injunctive relief that you are seeking.
7 So you don't have to say it, but you can have a
8 standing objection is my point.
9        MR. AIJAZ:  Yeah.  And that's fine as to
10 the admissibility issue, but other issues of course
11 I'm going to object to preserve those.  But just so
12 it's clear, for the purposes of this line of
13 questioning regarding topic two, there will be a
14 standing objection to the extent you are talking
15 about this document that was provided in, through
16 mediation and settlement negotiations.  There will
17 be a standing objection to any question about the
18 document or relating to it.
19        MR. HUMMEL:  I appreciate that.  Can you
20 send the one that the witness looked at?
21        MR. AIJAZ:  It should be on its way.
22        MR. HUMMEL:  Do we have it, Taylor?
                                              Page 151

1 any company that has a subscription set-up that has
2 an auto-renewal automatically with it would always
3 be in violation of ROSCA because nothing was
4 required to initiate the auto-renewal and there
5 would be more than one click to cancel?
6        MR. AIJAZ:  Objection.  Scope of the
7 notice.
8    A   I don't know what the FTC's general
9 position is on that.
10   Q   Why isn't buying a subscription to
11 Match.com part of the method used to initiate the
12 negative option feature?
13        MR. AIJAZ:  Objection.  Form of the
14 question.
15   A   Well, in the negative option policy
16 statement it does say initiate the negative option,
17 and sometimes you can go to a website and purchase
18 something and purchase without the auto-renew.  So
19 when you purchase something and the auto-renew is
20 automatically there, then it's, you know, it's a
21 very simple way to initiate the auto-renew because
22 you can't purchase anything without the auto-renew.
                                              Page 153

1        MS. BRAGG:  Yeah.  We just got it.
2        MR. HUMMEL:  Can you mark it as 221?  And
3 let's go ahead and mark it now then.  Taylor, can
4 you interrupt at a convenient time and tell me when
5 220 is in the Sidley private folder?
6 BY MR. HUMMEL:
7    Q   Okay.  So my question, Mr. Bandy, is just
8 to confirm that the FTC was not requiring that the
9 cancellation mechanism, which has to be simple under
10 ROSCA, be at least as simple as the mechanism the
11 consumer used to initiate the negative option piece?
12 It doesn't say that; correct?
13        MR. AIJAZ:  Objection.  Form and misstates
14 the exhibit.
15   A   I mean this paragraph does say earlier in
16 connection with the advertising, marketing,
17 promoting, offering for sale or selling of any
18 online dating service with a negative option
19 feature.  So a negative option feature is part of
20 this.
21   Q   Well, it's in that language now.  Let me
22 ask you a question.  Is it the FTC's position that
                                              Page 152

1    Q   So if you subscribed to a service and as
2 part of that subscription you get an auto-renew
3 feature, which the FTC has previously recognized can
4 be a benefit to consumers because they don't have to
5 constantly renew and constantly think about paying
6 as long as it's adequately disclosed, if that
7 negative option feature automatically comes with a
8 subscription and the FTC's position is that
9 acquiring the negative option feature is automatic,
10 requiring no clicks, how can a company ever comply
11 with the enforcement policy statement regarding
12 negative option marketing?
13        MR. AIJAZ:  Objection.  Form of the
14 question, scope of notice and calls for a
15 hypothetical, and speculation.
16   A   So I don't think -- I mean you keep
17 talking about clicks as if clicks are the only
18 measure or one of the key measures of how simple a
19 mechanism or not.  It is one thing you can look at,
20 how many clicks does it take, but it -- just because
21 you can have zero clicks to sign up for the
22 auto-renew doesn't necessarily mean that the only
                                              Page 154

8 (Pages 151 - 154)

1  way you can cancel is via some zero click mechanism.
2      But when you have zero clicks to sign up
3  for the auto-renew, which is what the case is here
4  to the best of my understanding, you know, when you
5  have seven, eight clicks to cancel, well, I think
6  that's something that you would weigh as one of many
7  factors in determining the simplicity of the
8  cancellation mechanism vis-a-vis the simplicity of
9  the mechanism to turn on the auto-renew.
10      So when you are looking at that
11  comparison, you would start saying, hey, it's
12  really, really easy to turn on the auto-renew here,
13  and so you would measure that to the cancellation
14  flow, which here does take far more than zero
15  clicks.
16    Q   But isn't it true in the case here that it
17  requires nothing to activate the auto-renew. All
18  you have to do is subscribe?
19      MR. AIJAZ: Objection. Form.
20    A   That is my understanding.
21    Q   And isn't it true that when you, for
22  example, subscribe to the New York Time online or

Page 155

1  the Wall Street Journal online, or the Washington
2  Post online, it's auto-renew? So you don't -- you
3  just subscribe and it automatically is auto-renew?
4      MR. AIJAZ: Objection. Calls for facts
5  not in evidence, calls for speculation, outside the
6  scope of the notice. He didn't test all these
7  websites.
8    A   Yeah, I, I don't know whether you can buy
9  subscriptions to those services without auto-renew,
10  what you have to do to agree to the auto-renew, nor
11  do I know what the cancellation mechanisms of those
12  sites are. I didn't, I didn't -- that did not come
13  up in my preparation.
14    Q   Have you looked at the relative simplicity
15  of how to cancel on an iPhone for a subscription,
16  the Apple pay mechanism, how many clicks that takes?
17      MR. AIJAZ: Objection. Form.
18    A   That did not come up in my preparation.
19    Q   All right. How would a company that has a
20  subscription set to auto-renew automatically ever
21  have a cancellation method as simple as the, as the
22  method, let me quote from the policy statement here,

Page 156

1  "used to initiate the negative option feature"?
2      MR. AIJAZ: Objection. Outside the scope
3  of the notice.
4    A   Yeah, that didn't come up in my
5  preparation, but if you have an auto-renew that's
6  very, that consumers essentially have to sign up
7  for, then the cancellation mechanism would have to
8  be pretty simple, sure.
9    Q   What does pretty simple mean?
10    A   It would have to be really easy to find
11  and really easy to use.
12    Q   Really easy to find and really easy to
13  use. Okay.
14      (Bandy Exhibit Number 6
15      was marked for identification.)
16  BY MR. HUMMEL:
17    Q   Let's go, if you wouldn't mind, to Exhibit
18  6. And if you open that, you'll see it's a video.
19    A   All right. Do you want me to start
20  playing it?
21    Q   So I'm marking Exhibit 6 as a video. It
22  is, has been marked in this case as MATCHFTC Bates

Page 157

1  Number 774671.webm.
2      And yes, I would like you to -- I can't --
3  I don't think I can share screen on this, on this
4  particular application, but why don't you just play
5  it, Mr. Bandy, and tell me when you've completed.
6  It takes about 55 seconds to play the video. Okay?
7    A   Okay.
8    Q   As you are playing it, you'll see that
9  somebody enters a password and signs in. Then their
10  account page comes up. They find the gear at the
11  top and go to settings, click on settings. Then
12  they go to manage subscription and they click on
13  manage subscription.
14      Then a wheel spins, they have to reenter
15  the password they just entered, do a recapture that
16  says they are not a robot and click a continue
17  button. Then they have something that says cancel
18  subscription. They hit that and then they are
19  presented with a help us make Match better and they
20  continue cancellation.
21      And then there is --
22    A   One second. I want to go back for a

Page 158

9 (Pages 155 - 158)

1    second and look.
2       Q   Sure.
3       A   Okay. I'm now on the "before you go"
4    page.
5       Q   Okay.
6       A   Now I'm on the offer.
7       Q   Then there is an offer for a discount.
8       A   Yep. I see that.
9       Q   And then what's next is a, what I will
10   call an NPS survey. It's a net promoter score
11   survey. You click that and then you are cancelled.
12   Do you see that?
13      A   Yes.
14      Q   Do you recognize this as the Match.com
15   cancellation flow?
16      A   I haven't seen this one before, but it
17   looks similar to the -- what I saw was the latest
18   version of the cancellation form. So the only
19   difference with this one is I did not see any
20   cancellation flow where it began with someone
21   entering their password to get to the Match home
22   page where the year is.

Page 159

1        So that was different. But other than
2    that, it does appear to be similar to the later, the
3    last iteration of the cancellation flow that I
4    viewed in preparation for my testimony.
5       Q   And this flow has both what you and I can
6    refer to as a save offer. It's an offer to save
7    subscribe for a discounted rate; correct?
8       A   Yes. It does have that. Yes.
9       Q   And it has a survey question that says
10   essentially why are you leaving, why are you
11   canceling your subscription, correct? And it has a
12   number of options; right?
13      A   I mean it has a survey. Yeah. It asks
14   what's the primary reason that you are looking to
15   cancel your subscription. That's the first survey
16   page.
17      Q   And then there is a net promoter score
18   page. Which I understand you weren't previously
19   familiar in the prior session with the phrase NPS or
20   net promoter score, but do you --
21      A   That's right.
22      Q   Okay. Have you --

Page 160

1       A   But I'm willing to call this zero through
2    10 how likely would it be for you to recommend
3    Match.com to a friend, if you want to call that an
4    NPS for purposes of the deposition, that's fine.
5       Q   Okay. And is there anything about those
6    three pages, the save offer or the net promoter
7    score survey question or the why you are canceling
8    that you believe renders this flow complex or
9    confusing?
10          MR. AIJAZ: Objection. Asked and
11   answered. Chad, he answered the question.
12   BY MR. HUMMEL:
13      Q   I didn't hear the answer. I didn't hear.
14          MR. AIJAZ: Bikram, go ahead. You can
15   answer.
16      A   Yes.
17      Q   And what's your basis for saying that?
18   That it adds unnecessary time?
19      A   So I went over this in my first session,
20   but with respect to those particular pages, when you
21   have a consumer that hits "cancel subscription" on
22   the page after the password, you get to the first

Page 161

1    page, which is the survey. And first of all, there
2    is confusing language there, because the consumer
3    has just clicked "cancel subscription" and then you
4    have this language that's in large type at the top
5    of the screen "before you go," and then you have a
6    survey.
7           And so some consumers could reasonably
8    read that and conclude that they have cancelled
9    their subscription because they clicked on something
10   that says "cancel" and they are being presented a
11   survey to collect some more information. There is
12   not any indication that's prominent on this page
13   that they still have steps to go.
14          Then you do have the survey that does take
15   time, it's something else a consumer would have to
16   click through to get to cancellation. Then once you
17   get to the next page -- and the other thing with
18   this sometimes in iterations of the cancel flow
19   that I have seen in other formats, I think for most
20   of these options, maybe not for the other that was
21   clicked here, but for the other options that are
22   presented, there is usually a second question, maybe

Page 162

1  sometimes a third question that's presented, so
2  consumers would have to wade through that as well.
3      So it's not -- it's probably the fastest
4  way you could answer this survey and get through it,
5  with by clicking other. Then you get to the save
6  offer, which is -- which in previous iterations this
7  was actually quite confusing because it didn't have,
8  the continue cancellation was not a button, it was a
9  link that said "no thanks, I want to resign." Far
10 less prominent than the button on the left to get,
11 to accept the save offer.
12     Then at some point it just said
13 "continue," which also was confusing because in the
14 context of the page I think reasonable consumers
15 could wonder whether continue means you're
16 continuing with the save offer or whatever. Now it
17 says "continue cancellation," so that has improved
18 since the earlier iterations.
19     Then, the consumer would -- and my
20 understanding is not every consumer received a safe
21 offer, but many do. Then you get to the page where
22 you have the NPS as you call it. You know, it has

Page 163

1  "tell us more." Which in the context of the prior
2  page, it says "before you go." A consumer may say,
3  okay, well, they just want more survey stuff, they
4  may have already thought that they cancelled.
5      I know in prior iterations it was actually
6  another text box here that some more information was
7  sought, but the text box I think was stopped after
8  2017. Then you continue cancellation. And then
9  finally you get to the page which I understand is
10 the actual completion of the cancellation flow that
11 says your subscription has been cancelled.
12     So all of those things in terms of the
13 multiple pages, the language on the pages that
14 suggest that a consumer has already cancelled and
15 the time it takes to do all those things and the
16 necessity of those things, cancellation, is what
17 makes this a not simple mechanism, among other
18 things.
19     Q   Okay. You would agree that unless a save
20 offer or surveys amount to unreasonable delay, they
21 are not prohibited under FTC guidance; correct?
22     MR. AIJAZ: Objection. Calls for

Page 164

1  speculation.
2      A   I don't think that the FTC's negative
3  option policy statement would necessarily prohibit
4  like a save offer or a survey, but it depends on the
5  execution, and I think it has to be looked at in
6  context.
7      Q   I understand. And when you say you are
8  looking at it in context, just to reiterate your
9  prior testimony, the FTC presently has no empirical
10 evidence that a consumer survey, a study, a
11 heuristic analysis, that demonstrates that in
12 context these three pages would amount to an
13 unreasonable delay in cancellation?
14     MR. AIJAZ: Objection. Misstates prior
15 testimony and to the extent it relies on the opinion
16 of an expert, those are due on 11/4. But to the
17 extent your opinion relies on it, you can disclose
18 that.
19     A   So in my preparation I was not, no expert
20 analysis of the ease of use of the cancellation
21 flow, that did not, is not something I saw in my
22 preparation. I also still don't know what the word

Page 165

1  "heuristic" means. I did not look that up since the
2  first session. So I'm noting that there is a word
3  in your question that I don't know what it means.
4      Oh. The other point I was going to make
5  is that what we do know is that a lot of consumers
6  and Match employees did note that they found that
7  this process was complicated and difficult and time
8  consuming and included unnecessary survey questions.
9      Q   Would you have any basis to dispute that
10 Match has a legitimate reason at the time of
11 cancellation to understand or to assess how likely a
12 consumer would be to recommend Match to a friend?
13     MR. AIJAZ: Objection. Relevancy and
14 outside the scope of the notice.
15     A   What do you mean by at the time of
16 cancellation? Before cancellation?
17     Q   No.
18     A   No. I don't think --
19     Q   All right. So have you ever run a
20 business, sir?
21     MR. AIJAZ: Objection. Outside the scope
22 of the notice and argumentative most likely.

Page 166

11 (Pages 163 - 166)

BY MR. HUMMEL:

Q   Okay.  My question is have you ever run a business?

A   I'll say no.

Q   Okay.  And so you would have no real world experience in assessing whether it would be important to a business to understand whether their customers are likely to recommend that business to a friend?

MR. AIJAZ:  Objection.  Relevancy, misstates testimony, assumes facts not in evidence.

BY MR. HUMMEL:

Q   You can answer the question, sir.

A   That does misstate my testimony.  That's not what I said.

Q   I understand.  It may have misstated it, but I asked a different question.

MR. AIJAZ:  There is no question pending.

THE WITNESS:  Could you repeat the question?

MR. HUMMEL:  Could I have the question read back, please, Robert?

Page 167

- - -

(Whereupon the following portion of the testimony was repeated by the Court Reporter:

QUESTION:  Okay.  And so you would have no real world experience in assessing whether it would be important to a business to understand whether their customers are likely to recommend that business to a friend?)

- - -

BY MR. HUMMEL:

Q   Are you able to answer that question?

MR. AIJAZ:  Same objections.

A   It may be important to a business to do that, but it's something that they can do after cancellation is complete.

Q   But nowhere in FTC guidance is that required; correct?

A   Is that specifically addressed in FTC guidance?  I don't think so, but I think it falls within the principles laid out in FTC guidance.  I think it's also our principle of what constitutes a simple mechanism of canceling.  Is it

Page 168

necessary to get an NPS done before, to effectuate a cancellation?  It's not necessary.  It doesn't mean that the company can't try to get that information after cancellation is done.

Q   Yeah, but there is nothing in the FTC guidance that says that you can only ask necessary questions relevant to the cancellation process in the context of a cancellation flow; correct?

MR. AIJAZ:  Objection.  Outside the scope of the notice and not relevant.

A   I think there is some stuff about not including unnecessary steps in the cancellation.  But I didn't memorize it, but I think that concept is there.

Q   What the guidance actually says is, quote, "to ensure compliance with the simple cancellation mechanism requirement, negative option sellers should not subject consumers to new offers or similar attempts to save the negative option arrangement that impose unreasonable delays on consumer's cancellation efforts."

Footnote; "while a request to consider an

Page 169

offer or discount would not amount to an unreasonable delay, multiple requests for a consumer to listen to additional offers, lengthy pitches or ignoring a consumer's request to decline further offers could amount to unreasonable delay."

Now you would agree, sir, that in this flow there is only one request to consider a discount; correct?

MR. AIJAZ:  Objection.  Form and misstates the policy statement.

MR. HUMMEL:  I read it verbatim.

MR. AIJAZ:  But not all of it relating to cancellation.  Bikram, you can answer if you are able.

A   Yes.  You are correct.  There is only one save offer in this cancellation flow that is Exhibit 6.

Q   And is it the FTC's position in this case that that save offer amounts to unreasonable delay?

A   In context, yes.

Q   What empirical evidence do you have to support that contention?

Page 170

12 (Pages 167 - 170)

App. 26

1    A   I would say that the large number of
2   complaints that Match received about consumers who
3   thought they cancelled but were charged auto-renew;
4   the persistency of those complaints, Match employees
5   noting that that was one of the highest sources of
6   complaints that Match Customer Care received. I
7   think that's evidence.
8    Q   You recall a high number of complaints
9   about the save offer?
10    A   About the save offer? I don't recall
11   whether I saw complaints that Match received
12   relating to the save offer. I do remember that
13   Match employees noted that that page was confusing.
14        MR. HUMMEL: Taylor, could you please put
15   in the shared exhibit folder tabs, tab 83?
16        MS. BRAGG: Yes. And by the way, the
17   order we received earlier has been marked as 221.
18        MR. HUMMEL: I think that will be marked
19   as Exhibit 11.
20        (Bandy Exhibit Number 11
21        was marked for identification.)
22        MR. HUMMEL: While she is doing that,

Page 171

1   could you open Exhibit 8, please?
2        THE WITNESS: Okay. I'm on Exhibit 8.
3        MR. HUMMEL: Exhibit 8?
4        THE WITNESS: Yes. I have it open.
5        (Bandy Exhibit Number 8
6        was marked for identification.)
7   BY MR. HUMMEL:
8    Q   Could you look, please -- do you recognize
9   this exhibit as the FTC's dot com disclosure
10   guidelines?
11    A   I see that's what it is. I did not review
12   this in preparation for my testimony today.
13    Q   Okay. Could I ask you to turn, please, to
14   page two, Footnote 5?
15    A   Okay. I see that.
16    Q   All right. Footnote 5, it defines what a
17   guide is as opposed to a rule, which is defined in
18   Footnote 4. Can you confirm for me, please, that
19   Footnote 5 defines what a guide is for purpose of,
20   for purposes of the FTC Act?
21        MR. AIJAZ: Objection. Calls for a legal
22   conclusion.

Page 172

1    A   Yeah. I did not look at that Reg
2   beforehand, I did not look into what the law is
3   relating to guides. So I see what it says there,
4   but I can't independently -- it was not part of my
5   preparation. To me it was not within the scope of
6   the topics for me to understand, you know, what are
7   the legal implications of the dot come disclosures
8   guide.
9    Q   Are the FTC's -- is the FTC's enforcement
10   policy statement regarding negative option marketing
11   a guide or a rule?
12        MR. AIJAZ: Objection. Calls for a legal
13   conclusion, outside the scope of the notice.
14    A   I didn't look into that for preparation
15   for my testimony today, but my guess is that it's
16   not a rule.
17    Q   Okay. And my question here, since you are
18   the litigation chief for the Consumer Protection
19   Bureau, in the context of Footnote 5, what is an
20   enforcement action?
21        MR. AIJAZ: Objection. Calls for a legal
22   conclusion and objection as to Bikram testifying in

Page 173

1   his capacity as litigation chief. He is here as a
2   30(b)(6) witness. You can answer.
3    A   I read this an enforcement action would be
4   either a federal court lawsuit against someone for a
5   violation or an administrative proceeding to force
6   someone who is violating the FTC Act or any of the
7   other laws enforced by the commission.
8    Q   You don't read enforcement action to mean
9   only administrative proceeding?
10    A   No, I don't. I would not read it that
11   way.
12        (Bandy Exhibit Number 9
13        was marked for identification.)
14   BY MR. HUMMEL:
15    Q   Could you open what's been marked as
16   Exhibit 9?
17    A   Yes. I have it open.
18    Q   All right. And if you could look at the
19   last page of Exhibit 9, it is the verification of
20   interrogatory answers signed by a Matthew J.
21   Wilshire.
22    A   Okay. I see it.

Page 174

13 (Pages 171 - 174)

1  cancellation is simple for purposes of ROSCA.

2      Q   Isn't it true, sir, that a cancellation

3  flow that includes steps that are objectively

4  unnecessary to cancel, if those steps do not cause

5  undue delay, does not violate ROSCA?

6      MR. AIJAZ:  Objection.  Calls for a legal

7  conclusion, calls for a hypothetical, speculation.

8      A   I think you are trying to read that or

9  restate that footnote from the negative option

10 policy statement.  So I mean I feel like it's

11 testing my memory of like what the negative option

12 policy statement words are.

13     Q   Let me interrupt you.  I'm really not.

14 Let me rephrase the question and withdraw that one.

15 Here is the question.

16     So the FTC promulgates these negative

17 option guidelines, right, and they are supposed to

18 provide some meat around the bones of a single word

19 that the statute uses, which is "simple," right?

20 They are supposed to do that?  Would you agree with

21 me on that?

22     MR. AIJAZ:  Objection.  Calls for facts

Page 195

1  not in evidence.

2  BY MR. HUMMEL:

3      Q   I'm just trying to set the stage for a

4  question and it's really not rhetorical.  How in the

5  world is a business supposed to know how to

6  construct a cancellation flow and whether they

7  violate ROSCA or not, that requires a simple

8  cancellation mechanism, if nowhere in the guidelines

9  is it prohibited to have objectively unnecessary

10 steps if it doesn't cause undue delay?  How is a

11 business supposed to conduct itself?

12     MR. AIJAZ:  Objection.  Form and outside

13 the scope of the notice.

14     Q   We are in like Koska land.

15     A   I think --

16     MR. AIJAZ:  Objection.  Argumentative.

17     MR. HUMMEL:  It is.  I withdraw that

18 comment.

19 BY MR. HUMMEL:

20     Q   Can you answer my question, please?

21     A   I think it might help for you to point me

22 to where the question was.

Page 196

1      Q   How is a business supposed to know what it

2  can or can't do with respect to a cancellation flow

3  without objective guidance from Congress or the

4  Federal Trade Commission?

5      MR. AIJAZ:  Objection.  Assumes facts not

6  in evidence and outside the scope of the notice.

7      A   So I think that there are -- first of all,

8  simple, it's a plain English word, and I do think

9  the negative option policy statement gives some

10 guidance as to what kinds of things businesses

11 should be thinking about when they are designing a

12 cancellation mechanism.

13     And I think the general gist of what the

14 negative option policy statement is getting at, and

15 it's not exclusive, but it's providing some

16 guidance, some meat on the bones as you said

17 earlier, is that it has to be easy to use, easy to

18 find, a mechanism that when a consumer decides that

19 they want to cancel, that they can do that without

20 too much difficulty.

21     I think that that's built into the term

22 "simply," I think the commission has put some meat

Page 197

1  on the bones through the guides.  There have been

2  some -- there is some case law on ROSCA, there is

3  some enforcement actions that have been brought,

4  that we talked about the ABCmouse one that provides

5  some guidance on that.  So there are plenty of

6  resources that a business can turn to to get some

7  guidance on that.

8      And also specifically here I think you had

9  a lot of Match employees that had identified ways to

10 make, that identified that the cancellation flow was

11 a mess, was confusing, and they offered ideas for

12 how they could make the process simpler.

13     Q   I have a number of questions that followed

14 up on that.  One; you are not aware of a single case

15 that defined "simple" for purposes of a company's

16 compliance with ROSCA, are you?  A single judicial

17 decision?

18     MR. AIJAZ:  Objection.  Not in the scope

19 of testimony.  Not in the scope of the notice.

20     A   I didn't look into that, but I want to say

21 that maybe the summary judgment decision in my life

22 may have addressed it, but I'm not certain about

Page 198

19 (Pages 195 - 198)

| | Page 199 |
|---|---|

1   that.

2     Q  Okay.  The second question.  How is a

3   company supposed to know, Match in particular, what

4   an objectively unnecessary step is in the

5   cancellation flow if you can't even define it?

6     MR. AIJAZ:  Objection.  Misstates

7   testimony, outside the scope of the notice.

8     A  Yeah, I didn't say that I couldn't define

9   it.

10     Q  Okay.  Please define what an objectively

11   unnecessary step to cancel is.

12     A  It's a step that a reasonable person would

13   not feel was necessary to cancel.

14     Q  And that would include a save offer?

15     MR. AIJAZ:  Objection.  Calls for a legal

16   conclusion.

17     Q  Survey?

18     MR. AIJAZ:  Objection.  Calls for a legal

19   conclusion.  Form.  Wasn't even a question.

20     A  As I said before, probably, but not sure.

21   But I think a survey would probably be objectively

22   unnecessary to cancel.

*Page 199*

---

1     Q  And so it's the FTC's position now, after

2   they have sued Match and after Match designed its

3   flow, the FTC's position now, that a step that is

4   objectively unnecessary to cancel violates ROSCA?

5     MR. AIJAZ:  Objection.  Misstates the

6   testimony and assumes facts not in evidence.

7     A  Yeah, that's not, that's not what I said

8   and that's not what this Order means.  The Order is

9   not purporting to define what user isn't a violation

10   of ROSCA, because in any Order you can have some

11   fencing in, which is conduct that may not

12   necessarily be, violate the law, but is nonetheless

13   enjoined because the defendant's actions warrant

14   certain steps that maybe go beyond just simple

15   compliance with law to ensure that future violations

16   of law do not occur.

17     Q  So again, going back to Exhibit 12, page 6

18   and 7, capital A, little subsection C, is it your

19   testimony that that's fencing in?

20     MR. AIJAZ:  Objection.  Calls for a legal

21   conclusion.

22     A  So I didn't parse in preparation of my

*Page 200*

---

1   testimony like which of these are ROSCA-related,

2   like not, you know, within simple mechanism and

3   cancel and which of these would be, you know,

4   fencing in because they go beyond what ROSCA

5   prohibits.  I didn't parse it out that way because I

6   don't know that it mattered much for my preparation

7   in that its either a violation of ROSCA or it's

8   fencing in.

9     MR. HUMMEL:  Taylor, could you please mark

10   tab 188?  The next in order will be Exhibit 13, and

11   Mr. Bandy, you will need to refresh.

12     (Bandy Exhibit Number 13

13     was marked for identification.)

14     THE WITNESS:  I just refreshed and it

15   didn't come up.

16     MR. HUMMEL:  Yeah.  It takes a minute.

17     THE WITNESS:  Okay.  I see it.  I have the

18   Exhibit 13 open.

19   BY MR. HUMMEL:

20     Q  Okay.  Do you recognize that, Exhibit 13?

21   Is it a letter that counsel from Match sent to the

22   FTC on August 6, 2019?

*Page 201*

---

1     A  I did review this letter in preparation

2   for my testimony, so yes, I have seen this letter

3   before.

4     Q  Right.  And have I correctly described the

5   letter?  It's a letter that Match's counsel then,

6   Linda Goldstein, sent to the FTC on August 6, 2019?

7     A  Yes.

8     Q  Did the FTC receive that letter?

9     A  Yes.

10     MR. HUMMEL:  Taylor could you mark tab 189

11   as next in order, Exhibit 14?

12     (Bandy Exhibit Number 14

13     was marked for identification.)

14     THE WITNESS:  Let me know when you upload

15   it and I will know when to refresh.

16     MS. BRAGG:  It should be there now.

17     THE WITNESS:  It is.

18   BY MR. HUMMEL:

19     Q  Do you recognize Exhibit 14, sir, as a

20   letter sent by counsel for Match Group, Inc. to the

21   FTC on May 20, 2022?

22     A  I did not review this letter in

*Page 202*

1  preparation for my testimony.  This is the first
2  time I'm seeing this letter.
3      Q   On behalf of the FTC --
4      A   Would you like me to read it?
5      Q   This letter would have been within the
6  scope of I think topic three.  Can you -- yeah.  You
7  can read it and tell me if the FTC received this
8  letter from Match's counsel on May 20, 2022.
9          MR. AIJAZ:  Chad, I'm going to have
10  standing objections to both 13 and 14 as
11  inadmissible as part of settlement negotiations.
12  And, again, those would be standing for 13 and 14.
13         THE WITNESS:  Okay.  I've read the letter.
14  BY MR. HUMMEL:
15     Q   Do you have any reason to believe the FTC
16  did not receive this letter from Match counsel on
17  May 20, 2022?
18     A   I don't know whether they did or not.  I
19  have never seen this letter before.  There was no
20  discussion of this letter.  So I can't say one way
21  or the other.
22     Q   In preparation for your testimony on the
Page 203

1      MR. AIJAZ:  Yeah.  As I understood it, you
2  asked about our conversations.
3          MR. HUMMEL:  All I asked was is it true
4  that in preparation for your deposition here on the
5  three notice topics you were not shown this letter?
6          MR. AIJAZ:  Can you just say what this
7  letter is?
8          MR. HUMMEL:  Yeah.  Sure.  It's Exhibit
9  14.
10         MR. AIJAZ:  Bikram, you can answer that
11  question.
12         THE WITNESS:  As I stated before, I did
13  not see this letter as part of my preparation.
14  First time I'm seeing this letter.
15         MR. HUMMEL:  All right.  Taylor, could you
16  mark tab 205, please?
17         MS. BRAGG:  That will be 15.  I'm adding
18  it now.
19         (Bandy Exhibit Number 15
20         was marked for identification.)
21         MS. BRAGG:  It should be there now.
22         MR. HUMMEL:  Taylor, you can go ahead
Page 205

1  topic dealing with permanent discontinuation or the
2  FTC's allegation that Match is violating or about to
3  violate the FTC Act through the guarantee program or
4  the chargeback policy, are you telling me that FTC
5  counsel did not show you a letter sent by Match's
6  counsel stating that there are no plans or
7  intentions to either, one, offer a guarantee program
8  that allows consumers who meet certain terms and
9  conditions to extend their subscriptions without
10  cost, as alleged in Count III, or bar consumers who
11  have unsuccessfully disputed charges through their
12  financial institutions, including preventing them
13  from using paid Match.com subscription services, as
14  alleged in Count IV?
15         MR. AIJAZ:  Objection.  Don't answer.  You
16  asked about attorney/client privilege.  Also
17  misstates the scope of the notice.  You didn't
18  mention anything about permanent discontinuation in
19  your notice, but you referenced that in your
20  question.
21         MR. HUMMEL:  Are you instructing him not
22  to answer on attorney/client privilege grounds?
Page 204

1  while I'm asking him about tab or what will be
2  Exhibit 15, go ahead and mark 206, 209, 207.  Okay?
3          THE WITNESS:  Okay.  I have 15 open and I
4  have reviewed it.
5  BY MR. HUMMEL:
6      Q   Have you seen Exhibit 15 before?
7      A   I don't think so.
8      Q   Exhibit 15 is an internal email within
9  Match that says:  "All, the following has been added
10  to Daily Updates in RNT.  6 Month Guarantee No
11  Longer Available.  (April 15, 2019)."
12         Did I read that correctly?
13     A   I was looking at the document, I wasn't
14  paying attention to whether you read it accurately
15  or not, but let me do this.  This document is an
16  email that says 6 month guarantee no longer
17  available, in parentheses, April 15, 2019.
18     Q   Okay.  And the FTC doesn't dispute that
19  the 6-month guarantee was discontinued effective mid
20  2019; correct?
21         MR. AIJAZ:  Objection.  Assumes facts not
22  in evidence.
Page 206

21 (Pages 203 - 206)

1  signing happens on a separate track than a motion to
2  compel further answers.  In other words, we are not
3  conceding this deposition is concluded because we
4  may have disputes, but we can talk about that
5  off-line.  And, Mr. Bandy, I appreciate your time
6  and preparation here and we may have some disputes
7  that I will raise with litigation counsel.  Okay --
8         THE WITNESS:  That works.  Thank you.
9         VIDEOGRAPHER:  The time now is 3:57 p.m.
10  This concludes the testimony given by Bikram Bandy.
11  Thank you, sir.
12         (Whereupon, at 3:57 p.m., the
13         deposition of BIKRAM BANDY
14         was concluded.)
15              * * * * *
16
17
18
19
20
21
22

Page 219

1         UNITED STATES OF AMERICA   )
2                       ss:
3  DISTRICT OF COLUMBIA       )
4         I, ROBERT M. JAKUPCIAK, an RPR and Notary
5  Public within and for the District of Columbia do
6  hereby certify:
7         That the witness whose deposition is
8  hereinbefore set forth, was duly sworn and that the
9  within transcript is a true record of the testimony
10  given by such witness.
11         I further certify that I am not related to
12  any of these parties to this action by blood or
13  marriage and that I am in no way interested in the
14  outcome of this matter.
15         IN WITNESS WHEREOF, I have hereunto set my
16  hand this 14th d
17
18
19
20
21  My Commission Expires:
                         Job No. TX5554644
22  February 29, 2024

Page 221

1  A C K N O W L E D G M E N T   O F   D E P O N E N T
2
3
4  I, BIKRAM BANDY, do hereby acknowledge I
5  have read and examined the foregoing pages of
6  testimony, and the same is a true, correct and
7  complete transcription of the testimony given by
8  me, and any changes or corrections, if any, appear
9  in the attached errata sheet signed by me.
10
11
12
13
14
15
16
17
18
19  _____   _____
20  Date              BIKRAM BANDY
21  Job No. TX5554644
22

Page 220

1  M. HASAN AIJAZ, ESQUIRE
2  maijaz@ftc.gov
3         November 14, 2022
4  RE:   Federal Trade Commission v. Match Group, Inc., Et Al.
5  10/31/2022, Bikram Bandy , Corp Rep - Vol 2 (#5554644)
6   The above-referenced transcript is available for
7  review.
8   Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  errata-tx@veritext.com.
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22         Yours,
23         Veritext Legal Solutions
24
25

Page 222

25 (Pages 219 - 222)

```
 1  Federal Trade Commission v. Match Group, Inc., Et Al.
 2  Bikram Bandy , Corp Rep - Vol 2 (#5554644)
 3          E R R A T A  S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Bikram Bandy , Corp Rep - Vol 2           Date
25
                                            Page 223
```

```
 1  Federal Trade Commission v. Match Group, Inc., Et Al.
 2  Bikram Bandy , Corp Rep - Vol 2 (#5554644)
 3        ACKNOWLEDGEMENT OF DEPONENT
 4    I, Bikram Bandy , Corp Rep - Vol 2, do hereby declare that I
 5  have read the foregoing transcript, I have made any
 6  corrections, additions, or changes I deemed necessary as
 7  noted above to be appended hereto, and that the same is
 8  a true, correct and complete transcript of the testimony
 9  given by me.
10
11  _____  _____
12  Bikram Bandy , Corp Rep - Vol 2           Date
13  *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18        _____
19        NOTARY PUBLIC
20
21
22
23
24
25
                                            Page 224
```

26 (Pages 223 - 224)

# EXHIBIT 3

```
 1                    IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF TEXAS
 2                    DALLAS DIVISION
 3
                      CASE NO.  3:19-CV-02281-K
 4
 5
       FEDERAL TRADE COMMISSION,
 6
 7                         Plaintiff,
 8     vs.
 9
       MATCH GROUP, INC., a
10     corporation, and MATCH GROUP,
       LLC, formerly known as
11     MATCH.COM, LLC, a limited
       liability company,
12
13
                          Defendants.
14     _____/
15
16
                         1001 Brickell Bay Drive
17                       Miami, Florida
                         Friday, January 13, 2023
18                       9:00 a.m. to 1:08 p.m.
19
20
               VIDEOTAPED DEPOSITION OF GREG BLATT
21
22          Taken before Marlene Gutierrez, Notary
23     Public, State of Florida at Large, pursuant to Notice of
24     Taking Deposition filed in the above cause.
25                              - - - - - -
```

Page 1

**Page 2**

```
1   APPEARANCES:
2       SARAH ZUCKERMAN, ESQ.
        JASON MOON, ESQ.
3       Federal Trade Commission
        1999 Bryan Street
4       Suite 2150
        Dallas, Texas 75201
5       Szuckerman@ftc.gov
        On behalf of the Plaintiff.
6
7
        CHAD S. HUMMEL, ESQ.
8       Sidley Austin, LLP
        1999 Avenue of the Stars
9       Los Angeles, California 90067
        Chummel@sidley.com
10      On behalf of the Defendants.
11
12
13
        ALSO PRESENT:
14
        JEANETTE TECKMAN
15      SAMUEL KITHEN, Via Zoom
        ALEJANDRO MONTALVO, Videographer
16
                - - - - - -
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                   I N D E X
2
    Witness
3
    GREG BLATT
4
    Direct Examination By Ms. Zuckerman        5
5
    Cross-Examination By Mr. Hummel            125
6
    Redirect Examination By Ms. Zuckerman      140
7
8
9
              PLAINTIFF'S EXHIBITS
10
11  Number      Description             Page
12  Exhibit 1   Match FTC521397          40
13  Exhibit 2   Match FTC379039          45
14  Exhibit 3   Match FTC748121          52
15  Exhibit 4   Match FTC519936          56
16  Exhibit 5   Match FTC661136          64
17  Exhibit 6   Match FTC771220          84
18  Exhibit 7   multi-page document Not  97
                Just Another Broken Window
19
20  Exhibit 8   Match FTC746049         105
21  Exhibit 9   Match FTC517210         113
22  Exhibit 10  Match FTC601377         117
23  Exhibit 11  Match FTC433153         120
24
25
```

**Page 4**

```
1        THE VIDEOGRAPHER:  Good morning.  We're now on
2   the video record.  This is the videotaped deposition
3   of Greg Blatt in the matter of Federal Trade
4   Commission versus Match Group, Inc.  Today is
5   Friday, January 13 of 2023 and the local time is
6   9:05 a.m.
7        At this time, Counsel, please state your appearance
8   for the record, and after this, the court reporter
9   will swear in the witness.
10       MS. ZUCKERMAN:  Sarah Zuckerman for the Federal
11  Trade Commission.
12       MR. MOON:  Jason Moon, Federal Trade
13  Commission.
14       MR. HUMMEL:  Chad Hummel.  I represent the
15  defendants, Match Group, Inc., and Match Group, LLC.
16       MS. TECKMAN:  Jeanette Teckman, in-house for
17  Match.
18       MS. ZUCKERMAN:  On Zoom, we also have Samuel
19  Kitchens; is that right?
20       MR. HUMMEL:  Uh-huh.
21       MS. ZUCKERMAN:  So --
22       THE COURT REPORTER:  Sir, would you raise your
23  right hand, please.
24
25
```

**Page 5**

```
1   Thereupon --
2               GREG BLATT
3   was called as a witness by the Plaintiff and, having
4   been first duly sworn, and responding, "I do," was
5   examined and testified as follows:
6            DIRECT EXAMINATION
7   BY MS. ZUCKERMAN:
8   Q   Good morning, Mr. Blatt.
9   A   Good morning.
10  Q   I see Mr. Hummel is sitting next to you.  Are
11  you being represented by Mr. Hummel in connection with
12  this deposition?
13  A   Yes.
14  Q   Okay.  And moments ago, the court reporter swore
15  you in.  And you are under oath under the penalty of
16  perjury.  That means you're testifying as if you're in
17  court in front of a judge or a jury.
18       Do you understand?
19  A   I do.
20  Q   Okay.  And do you agree to answer my questions
21  truthfully today?
22  A   I do.
23  Q   Great.  And for today's deposition the court
24  reporter is taking down everything that is being said
25  out loud, so it's important to get your record on -- as
```

2 (Pages 2 - 5)

1     A   He would've been CEO of -- of the Match Group of
2   businesses.  We hadn't created Match Group yet, but he
3   was responsible for our dating businesses.  I don't
4   know what his title was.  CEO of gaming, or CEO Match
5   businesses, or Match segment, or something like that.
6   And then when -- when -- the end of 2013, we created
7   Match Group as a formal entity, and then he was CEO of
8   that.
9     Q   You said "we created."  Who is "we"?
10    A   IAC created it.
11    Q   And then on the, sort of, middle of Page 2
12  there, from you, you sent an email on Monday,
13  April 22nd, 2013, at 9:03 p.m. to Michelle Watson,
14  Amarnath Thrombre, with Sam Yagan copied.  It appears
15  Sam Yagan has OkCupid in parenthesis next to his name,
16  correct?
17    A   Yeah, he -- he kept his -- he had been the CEO
18  of OkCupid before he was promoted to CEO of Match
19  Group, and he kept his email address because that was
20  where people knew to reach him.
21    Q   Okay.  And in that email, you state:  "I thought
22  we" -- with Adrian in parenthesis -- "were making
23  progress.  No?"  Question mark.
24        Did I read that correctly?
25    A   You did.

Page 122

1     Q   What did you mean by saying that?
2     A   You know, we were under constant attack from
3   fraudsters, spammers, et cetera, right?  And just like
4   if you go to your Gmail, right, it's got processes for
5   trying to filter out spam, right?  You've got a spam
6   filter.  Some of it gets through, right?  New spammers
7   come up with new ways; they adjust their algorithm,
8   their fight.  They're never a hundred percent able to
9   keep the spam out, right?  Same thing here.
10        So we would get surges of fraudsters trying to
11  get by our controls, right, and sometimes it would get
12  worse, and sometimes it would get better based on
13  whether they developed -- it's almost like a freaking
14  Omicron variance or COVID variance, like, sometimes
15  your defenses are good; sometimes they're not good.
16  You're always playing catch up because they're always
17  finding new ways.  This woman's complaint -- or this
18  man's complaint was that too many of the people she was
19  -- he was interacting with were fraudsters, and I was
20  expressing a belief that we've made significant
21  progress on that, and so I was frustrated that this
22  person had that experience.
23        And then I think Adrian goes on to explain that,
24  yes, we have, but then there's still lots who are
25  coming, and there was a constant battle.  The same way,

Page 123

1   again, Google fights a constant, and Facebook fights a
2   constant battle, and, you know, it's like hacking, you
3   know.  There's always people trying to get in, and
4   you're trying to keep them out.
5     Q   Was Adrian reporting to you --
6     A   No.
7     Q   -- regarding --
8     A   No.
9     Q   Was Sam Yagan reporting to you on Match.com
10  matters?
11    A   Sam Yagan reported to me on all matters relating
12  to our dating businesses, so on Match, on People Media,
13  on Meetic.  He was the CEO, and I was the CEO of IAC.
14        MR. MOON:  You want to do a lunch break?  We
15  talked about 45 minutes.
16  Will that work for you, Madam Court Reporter?
17  Okay.
18        MS. ZUCKERMAN:  Let's go off the record.
19        THE VIDEOGRAPHER:  All right.  Going off the
20  video record.  The time is 12:37.
21        (A break was taken from 12:37 p.m. to
22        12:48 p.m.)
23        THE VIDEOGRAPHER:  We're now back on the video
24  record.  The time is 12:49.  Media Number 4.
25        MS. ZUCKERMAN:  I will pass the witness at this

Page 124

1   time.
2         MR. HUMMEL:  Thank you.
3              CROSS-EXAMINATION
4   BY MR. HUMMEL:
5     Q   Mr. Blatt, good afternoon.  I have a few
6   questions for you.  My name is Chad Hummel, as you
7   know.  I represent the defendants in the case that has
8   been brought by the Federal Trade Commission.
9         During the course of your testimony this morning
10  there was a distinction that you drew, and I want to
11  get nomenclature very clear.  There is IAC and Match
12  Group, Inc., and at some point you referred to those as
13  holdings companies or corporate.  Do you understand on
14  one side of the ledger there's that.  Do you understand
15  that?
16    A   Yes.
17    Q   If in my questioning I refer to the holding
18  company, will you understand what I mean?
19    A   Unless there's confusion about whether you mean
20  IAC or Match Group, I will understand it, yes.
21    Q   Okay, good.  And sometimes I think you refer to
22  that as corporate versus the business?
23    A   Yes.
24    Q   I may -- you may refer to corporate, but if
25  we're referring to holding company, corporate, IAC,

Page 125

32 (Pages 122 - 125)

App. 36

1  Match Group, Inc., we're talking about the holding
2  company entity?
3    A  Yes.
4    Q  Okay.  And on the other side of the ledger,
5  there was Match.com which I think you referred to at
6  times as the business or the operating entity.  Okay?
7    A  Yes.  Again, one clarification.
8    Q  Sure.
9    A  Whenever you throw Inc. or LLC at the back of
10  something, I have to protest because I don't remember
11  which is which.  When I talk about Match Group, I think
12  of Match Group as synonymous with corporate and the
13  holding company.  And I think of Match, Match.com, as
14  synonymous with the operating business or operating
15  company.  Once you start affixing the legal suffix at
16  the end, I don't know which is which.
17    Q  And is it correct to say that with respect to
18  your personal role, you worked at the operating company
19  level only from 2009 to 2010; is that right?
20    A  Correct.
21    Q  Okay.  On all other times you were at the
22  holding company or the corporate level, correct?
23    A  Correct.
24    Q  All right.  Now, with respect --
25    A  Sorry.  With the exception of when I was CEO of

Page 126

1    A  No.
2    Q  There was one complaint that they showed you
3  relating to the guarantee, as far as I know.  Did the
4  holding company address, to your knowledge, the
5  complaint with respect to the guarantee?
6    A  No.
7    Q  Is it correct to say that all issues relating to
8  the guarantee at Match.com from 2010 on, to the best of
9  your knowledge, was designed, implemented, and changed
10  if at all, including the level of disclosure to
11  consumers, that was handled at the operating company
12  level?
13    A  Yes.
14    Q  Okay.  Now, same with respect to the charge-back
15  policy.  To your knowledge, did the holding company
16  ever design the charge-back policy for Match.com?
17    A  To the extent of my understanding about the
18  charge-back policy, no.
19    Q  That would've been a -- an operating company
20  level issue, correct?
21    A  Yes.
22    Q  All right.  And again, I don't think you even
23  saw a single complaint about the charge-back policy in
24  all their questioning this morning, right?
25    A  I don't recall seeing one, no.

Page 128

1  Tinder, simultaneously with being at Match Group, where
2  I was the Tinder operating company not at the Match.com
3  operating company.
4    Q  Tinder is not involved in this case.
5    A  I understand.
6    Q  Let's just talk about Match.com.  The only time
7  you worked at the Match.com operating company level,
8  was 2009, 2010?
9    A  Correct.
10    Q  After that time, entirely holding company
11  corporate level?
12    A  Correct.
13    Q  All right.  Now, with respect to the discrete
14  issues that are involved in this case, the guarantee,
15  the charge-back policy, and the cancellation flow,
16  those are the three things I am going to ask you about.
17  Okay?
18    A  Okay.  Have we discussed the charge-back policy?
19    Q  I don't know, but it's an issue in the case, so
20  I want to ask you about it.  Let's focus on the
21  guarantee first, all right?  To your knowledge, did
22  you, at the holding company level, have any involvement
23  in the creation of the guarantee?
24    A  No.
25    Q  In the implementation of the guarantee?

Page 127

1    Q  All right.  Do you recall ever, in your capacity
2  at the holding company level, dealing with issues
3  relating to Match.com's charge-back policy?
4    A  I have no recollection of doing that.
5    Q  Do you have any personal knowledge -- I think
6  she asked you this question -- but do you have any
7  personal knowledge of when the guarantee was
8  discontinued?
9    A  I do not.  Again, I knew that in 2009, it ceased
10  to be prominent, and I don't know whether and to what
11  extent it was used after that.
12    Q  Did the holding company, to your knowledge, have
13  any role whatsoever in how the terms and conditions
14  with respect to the guarantee were disclosed on the
15  website?
16    A  No.
17    Q  To your knowledge, did the holding company have
18  any role whatsoever in determining how can consumers
19  who initiated a charge-back with respect -- with their
20  financial institution for a Match.com account were
21  treated?  Did the holding company have any involvement,
22  to your knowledge?
23    A  Not to my recollection or knowledge, no.
24    Q  That was entirely at the operating level?
25    A  Yes.

Page 129

33 (Pages 126 - 129)

App. 37

1  Q  Now, the -- do you know whether or not the
2  charge-back policy at Match.com was ever changed over
3  time?
4  A  I do not know.
5  Q  Do you know if the charge-back policy as
6  challenged in the Complaint in this case was ever
7  eliminated or discontinued?
8  A  I have been made aware in connection with this
9  deposition that something changed at some point, but
10  other than that, I have no knowledge of that, and I
11  don't know the specifics of what changes were made or
12  when they were made or anything else.
13  Q  When you were at the -- in charge at the holding
14  company level did the question of changing the
15  charge-back policy for Match.com ever come to your
16  attention, to your recollection?
17  A  Not to my recollection.
18  Q  All right.  Now, with respect to the web
19  cancellation flow, you understand, based on your review
20  of the allegations in this case, that the FTC is
21  contending that it was -- that the cancellation flow
22  online was not simple.  You have that basic
23  understanding, right?
24  A  I do.
25  Q  At the holding company level, did -- well strike

Page 130

1  that.
2      Did you ever become aware that anyone at the
3  holding company level had any involvement whatsoever in
4  the design of the online cancellation flow?
5  A  I have no knowledge of that ever happening.
6  Q  Did you ever have any involvement in designing
7  the cancellation flow?
8  A  I didn't design anything.  No, I did not.
9  Q  Okay.  And I think, in all the documents, the
10  maybe more than million documents in the case, the FTC
11  today showed you one document, I think, that showed a
12  complaint about the online cancellation flow.  Did you
13  ever address, to your knowledge, ever, any consumer
14  complaints relating to Match.com cancellation flow?
15  A  No.  As I think I said earlier, I was aware that
16  cancellation/refund issue was one of the issues that
17  the company needed to deal with because of its ongoing
18  need to ferret out legitimate complaints or issues from
19  illegitimate ones due to -- and I knew that that
20  existed and it was something that was managed by
21  customer care and by product.  But it never came to my
22  attention as a discrete matter that required my
23  attention or anything else.  It was just one of the
24  hundreds of things that the company did.
25  Q  Now, FTC counsel in this case showed you this

Page 131

1  morning one email exchange that related to your -- I
2  think it related to your desire to eliminate the use of
3  the .com and used some colorful language in connection
4  with that desire, right?
5  A  Yes.
6  Q  Maybe there's a suggestion that the FTC might
7  make in this case that somehow the holding company
8  approved ads or advertising for the -- for the
9  operating entity Match.com.  Is that true?  And if so,
10  or if not, can you explain when, if at all, did
11  advertising come to your attention at the holding
12  company level?
13      MS. ZUCKERMAN:  Objection to form.
14      THE WITNESS:  With respect to that particular
15  email, but that comment obviously really wasn't
16  about the advertising per se.  It was about the
17  presentation of the company's names across all of
18  Match Group.  So that was a Match Group-wide thing.
19  I did, however, as I said, one of the things that I
20  was involved in even at the Match Group level were
21  significant television marketing campaigns.  So to
22  the extent that a company was going to spend, you
23  know, many millions of dollars on brand marketing in
24  the -- specifically television, which is what we
25  did -- I would be involved.  Again, I don't know

Page 132

1  I -- I wouldn't call it a matter of approval; I
2  would call it involvement.  People didn't present
3  ads to me for approval; instead, I would review
4  things that people were working on and would give
5  feedback about whether we wanted to present the
6  company this way or that way.  And whether or not
7  that was the right amount of money or whether we
8  could afford to spend 40 million or 20 million on
9  the advertising, so it was -- it was probably the
10  area of operations that I was most involved in at
11  the holding company level because it's not
12  iterative, meaning if you go out and you develop a
13  marketing campaign, you've developed a marketing
14  campaign, you've spent millions of dollars and you
15  have to spend it.  So that's one area where I was
16  involved in.  Very different from the areas that
17  were raised in this case.
18  BY MR. HUMMEL:
19  Q  With respect to Match.com, which we'll call it
20  the operating entity for now, to your knowledge, at the
21  holding company level, did you or the other executives
22  at the holding company level get involved in approving
23  specific ad copy?
24  A  For television marketing?
25  Q  Generally speaking.

Page 133

34 (Pages 130 - 133)

1    A   Again, I wouldn't -- I wouldn't try and
2  distinguish between copy and not copy on television
3  ads.  We were involved in television ads.  That is an
4  area -- that is one of the few areas of the operating
5  companies that I was involved in.
6    Q   How about website design?
7    A   Very rarely.  Only if someone were -- you know,
8  from time to time people wanted to do controversial
9  campaigns, for instance, and they might come see, like,
10  are we okay with this risqué thing or this may cause
11  whatever.  So I would opine on that sort of thing, but
12  I didn't approve regular copy for online marketing.
13   Q   And what about the manner in which terms and
14  conditions were disclosed; was that ever addressed at
15  the holding company level?
16   A   No, not to my knowledge.
17   Q   To your knowledge, where was that addressed?
18   A   At the operating company.
19   Q   There were some questions asked about -- about
20  operating company executives, including you, overseeing
21  the business or the operating entity.  What do you mean
22  by "overseeing"?
23   A   Any time I use the word oversee, I like to think
24  of the board analogy, which is, it is not the
25  day-to-day operations of the company, it is approving

Page 134

1  significant -- significant actions or decisions that
2  can have significant impact on the company, usually in
3  the eyes of the people running the company, right?  So
4  again, if a company wants to do an acquisition or
5  meaningfully change the product in a particular way or
6  do something that would cause profitability to tank
7  because they're investing significant money or the
8  financial plan for the company, that's something that
9  would go to -- that would be part of oversight.
10       Also, oversight involves evaluating the
11  performance of the senior executive at the company.
12  And deciding whether they're doing a good job running
13  the day-to-day because you're not running it, right, so
14  your job is to approve that person.
15       And then it's to be a sounding board.  So
16  nothing prevented, in fact, it was encouraged for a CEO
17  at the operating company if they've got something that
18  they're wrestling with or something that they'd like
19  guidance on, they can obviously bring whatever they
20  wanted but that was at their discretion.
21   Q   Near the end of the deposition session with
22  FTC's lawyer, you mentioned a man named Sam Yagan, and
23  he's -- do you remember that?
24   A   I remember talking about Sam Yagan.
25   Q   Okay.  And I think the testimony was that

Page 135

1  somehow in some respect he reported on some issues with
2  respect to the business.  I think that's the word you
3  used.  Would that have been day-to-day operations or on
4  big ticket items?
5    A   Can you be more specific about what we're
6  talking about and when?
7    Q   I can, except it was one of the last exhibits
8  that was referenced.
9    A   I mean, there was a time when Sam Yagan ran
10  OkCupid, and he reported to me about things at OkCupid.
11  There was a time when he was CEO of Match Group, and I
12  was CEO of IAC, in that capacity, he was like -- and
13  again, when I was CEO of IAC, I had a number of direct
14  reports.  I had the CEO the Match businesses.  I had
15  the CEO of the search businesses, the CEO of the local
16  businesses, and they would report to me as I described,
17  like a board.
18       When I became executive chairman of Match Group
19  and Sam continued CEO of Match Group at the time, it
20  was a similar relationship.  And then at some point,
21  Sam also became CEO of Match.com, the operating
22  company, for again, less than a year, I believe.  But
23  in that capacity, he acted the same, which is he didn't
24  report to me on a different level of things than he
25  would have before.

Page 136

1    Q   Did he report to you on all dating sites and
2  businesses at some point?
3    A   Yes, from the time he became CEO of the Match
4  businesses and sometime in 2012 until the end of 2015.
5    Q   All right.  Now, FTC counsel showed you
6  Exhibit 7 which is a deck that was prepared, and it's
7  entitled "Not Just Another Broken Window - Account
8  Settings Redesign."  I think you testified you never
9  saw this before.
10   A   To the best of my recollection, I never saw it.
11   Q   It appears to be a one-person suggestion for a
12  redesign of the cancellation flow.  Did that issue, a
13  redesign of the cancellation flow, ever reach your
14  level, to your knowledge?
15   A   No, no.  And I only saw the page that wasn't
16  really redesign, but I take your word for it that
17  there's a redesign in there.
18   Q   Going back to Mr. Yagan.  To your knowledge, was
19  he ever reporting to you about the day-to-day
20  operations of any of the businesses, or is it more
21  macro level?
22   A   Always macro level.  He was that CEO of a
23  business.  They didn't report on the day-to-day things.
24  They were the end report on day-to-day operations.
25   Q   All right.  Let me show you what was marked as

Page 137

35 (Pages 134 - 137)

1       CERTIFICATE OF OATH
2   STATE OF FLORIDA:
                    :  SS
3   COUNTY  OF  DADE:
4
5       I, Marlene Gutierrez, Shorthand Reporter and
6   Notary Public, State of Florida, certify that GREG
7   BLATT appeared before me via videoconference on the
8   13th of January, 2023, and was duly sworn.
9
10      WITNESS my hand and official seal this 25th day
11  of January, 2023.
12
13
14      _Marlene Gutierrez_
15      Marlene Gutierrez
16      Notary Public-State of Florida
17      My Commission #GG 126375
18      Expires:  July 20, 2025
19
20
21
    Personally known_____
22
    Or Produced Identification_____
23
    Type of Identification Produced_____
24
25
                                        Page 142

---

1   Federal Trade Commision v. Match Group, Inc., Et Al.
2   Greg Blatt (#5651530)
3        E R R A T A  S H E E T
4   PAGE_____ LINE_____ CHANGE_____
5   _____
6   REASON_____
7   PAGE_____ LINE_____ CHANGE_____
8   _____
9   REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Greg Blatt              Date
25
                                        Page 144

---

1       REPORTER'S  DEPOSITION CERTIFICATE
2
3   STATE OF FLORIDA:
                    :  SS
4   COUNTY  OF  DADE:
5
6       I, Marlene Gutierrez, Notary Public, certify
7   that I was authorized to and did stenographically
8   report the deposition of GREG BLATT; that a review of
9   the transcript was not requested; and that the
10  transcript is a true and complete record of my
11  stenographic notes.
12
13      I further certify that I am not a relative,
14  employee, attorney, or counsel of any of the parties,
15  parties' attorney, or counsel connected with the
16  action, nor financially interested in the action.
17
18      Dated this 25th day of January, 2023.
19
20      _Marlene Gutierrez_
21      MARLENE GUTIERREZ
22
23
24
25
                                        Page 143

---

1   Federal Trade Commision v. Match Group, Inc., Et Al.
2   Greg Blatt (#5651530)
3       ACKNOWLEDGEMENT OF DEPONENT
4       I, Greg Blatt, do hereby declare that I
5   have read the foregoing transcript, I have made any
6   corrections, additions, or changes I deemed necessary as
7   noted above to be appended hereto, and that the same is
8   a true, correct and complete transcript of the testimony
9   given by me.
10
11  _____  _____
12  Greg Blatt              Date
13  *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15      _____ DAY OF _____, 20___.
16
17
18      _____
19      NOTARY PUBLIC
20
21
22
23
24
25
                                        Page 145

---

37 (Pages 142 - 145)

# EXHIBIT 4

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION
 3  FEDERAL TRADE COMMISSION,      §
                                   §   Case No. 3:19-cv-02281-K
 4        Plaintiff,               §
                                   §
 5        v.                       §
                                   §
 6  MATCH GROUP, INC., a           §
    corporation, and MATCH         §
 7  GROUP, LLC, formerly known     §
    as MATCH.COM, LLC, a           §
 8  limited liability company,     §
                                   §
 9        Defendants.              §
    _____
10
                       ORAL DEPOSITION OF
11
                        MELISSA CLINCHY
12
                       February 16, 2023
13  _____
14           ORAL DEPOSITION OF MELISSA CLINCHY,
15  produced as a witness at the instance of the Plaintiff,
16  and duly sworn, taken in the above-styled and numbered
17  cause on February 16, 2023, from 9:10 a.m. to
18  4:57 p.m., before Joseph D. Hendrick, Certified
19  Shorthand Reporter in and for the State of Texas,
20  reported by machine shorthand, at the offices of Sidley
21  Austin LLP, 2021 McKinney Avenue, Suite 2000, Dallas,
22  Texas, pursuant to Notice and the Federal Rules of
23  Civil Procedure and any provisions stated on the record
24  or attached hereto.
25  Job No. 5651545
```

                                                    Page 1

## Page 2

```
 1              A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
        Jason Moon
 3      Sarah Zuckerman
        FEDERAL TRADE COMMISSION
 4      1999 Bryan St, Suite 2150
        Dallas, TX 75201
 5      (214) 979-9350
        jmoon@ftc.gov
 6      szuckerman@ftc.gov
 7  FOR THE DEFENDANTS:
        Angela Zambrano
 8      Tayler Bragg
        SIDLEY AUSTIN LLP
 9      2021 McKinney Ave Suite 2000,
        Dallas, TX 75201
10      (214) 981-3405
        angela.zambrano@sidley.com
11      tbragg@sidley.com
12  ALSO PRESENT:
        Sam Kitchens
13      Jeanette Teckman
14
15
16
17
18
19
20
21
22
23
24
25
                                        Page 2
```

## Page 3

```
 1                  INDEX
 2  Appearances ........................  2
 3  MELISSA CLINCHY
 4    EXAMINATION BY MR. MOON ................  7
      EXAMINATION BY MS. ZAMBRANO ............ 219
 5    RE-EXAMINATION BY MR. MOON ............. 225
      RE-EXAMINATION BY MS. ZAMBRANO ......... 231
 6    RE-EXAMINATION BY MR. MOON ............. 233
      RE-EXAMINATION BY MS. ZAMBRANO ......... 239
 7
    Signature and Changes ........................242
 8
    Reporter's Certification ......................244
 9
10             EXHIBITS
11  NO.    DESCRIPTION         PAGE(S)
12  EXHIBIT 1  MATCHFTC672309       32
       Online desktop cancellation
13     flow video
14  EXHIBIT 2  MATCHFTC199115       33
       Online desktop cancellation
15     flow video
16  EXHIBIT 3  FOIA CONFIDENTIAL     42
       MATCHFTC519412-519415
17     Email chain, top email from
       Rachel Walzl dated 12-17-2015;
18     Subject: RE: CSA cancel note?
19  EXHIBIT 4  FOIA CONFIDENTIAL     49
       MATCHFTC320168-320169
20     Email chain, top email from
       Sharmistha Dubey dated
21     2-24-2016; Subject: RE:
       Resignation flow
22  EXHIBIT 5  PowerPoint presentation; Not  56
       just another broken window;
23     Account Settings Redesign
24
25
                                        Page 3
```

## Page 4

```
 1  EXHIBIT 6  CONFIDENTIAL       68
       MATCHFTC681480
 2     Email chain, top email from
       Kris Auderer dated 5/10/2016;
 3     Subject: FW: Match Lunch &
       Listen Recap
 4
    EXHIBIT 7  FOIA CONFIDENTIAL    79
 5     MATCHFTC330643-330645
       Email chain, top email from
 6     Adrian Ong dated 12/2/2016;
       Subject: RE: Account question
 7
    EXHIBIT 8  CONFIDENTIAL       87
 8     MATCHFTC846346-846347
       Slack conversation; Channel:
 9     Operations-mgmt; Organization:
       Match Group; Team: Match;
10     Channel Type: Slack Channel
       Private; Start date:
11     2017-03-16 01:27:23 UTC, End
       date: 2018-04-13 15:19:49 UTC
12
13  EXHIBIT 9  CONFIDENTIAL       91
       MATCHFTC816591
14     Email from Melissa Clinchy
       dated 6/13/2017; Subject:
15     Updated Slides
16  EXHIBIT 10  Match Group Community  93
       Operations Update, May 2017
17     PowerPoint
18  EXHIBIT 11  CONFIDENTIAL      116
       MATCHFTC782131-782132
19     Jira document, "Mock-up cancel
       flow," created 5/26/17
20  EXHIBIT 12  FOIA CONFIDENTIAL   121
       MATCHFTC000344-0372
21     Dallas Better Business Bureau
       document, June 29, 2017
22
    EXHIBIT 13  CONFIDENTIAL      124
23     MATCHFTC745297-745313
       Email chain, top email from
24     Adrian Ong dated 5/12/2017;
       Subject: Re: Billing member
25     after cancellation
                                        Page 4
```

## Page 5

```
 1  EXHIBIT 14  FOIA CONFIDENTIAL   155
       MATCHFTC559978-559981
 2     Email chain, top email from
       Melissa Clinchy dated
 3     10/6/2015; Subject: RE: Revlon
       Ad
 4
    EXHIBIT 15  FOIA CONFIDENTIAL   162
 5     MATCHFTC493138-493140
       Email chain, top email from
 6     Melissa Clinchy dated
       4/7/2016; Subject: RE: POF
 7     Logs 4.6
 8  EXHIBIT 16  FOIA CONFIDENTIAL   169
       MATCHFTC327460-327462
 9     Email chain, top email from
       Krystal Roloff dated
10     9/27/2016; Subject: RE: TELUS
       Request
11
    EXHIBIT 17  FOIA CONFIDENTIAL   174
12     MATCHFTC485530-485532
       Email chain, top email from
13     Melissa Clinchy dated
       6/12/2017; Subject: RE: BBB
14     Question
15  EXHIBIT 18  CONFIDENTIAL      188
       MATCHFTC731717
16     Email from McKay Hinckley
       dated 9/15/2017; Subject:
17     Feedback observations
18  EXHIBIT 19  CONFIDENTIAL      193
       MATCHFTC789544-789551
19     Email chain, top email from
       LaShonda Pero dated
20     10/27/2015; Subject: RE:
       Congrats! Here's Your
21     Subscription Information
22  EXHIBIT 20  CONFIDENTIAL      197
       MATCHFTC800116-800119
23     Email chain, top email from
       Melissa Clinchy dated
24     1/9/2018; Subject: FW:
       Congrats! Here's Your
25     Subscription Information
                                        Page 5
```

2 (Pages 2 - 5)

1 EXHIBIT 21  CONFIDENTIAL                    199
      MATCHFTC798148-798150
2     Email chain, top email from
      Jeremy Ruggaber dated
3     10/5/2016; Subject: Re: 6mg
      progress page
4
  EXHIBIT 22  CONFIDENTIAL                    203
5     MATCHFTC799944
      Email from LaShonda Pero dated
6     3/6/2015; Subject: Match.com
      guarantee
7
8
        CERTIFIED QUESTIONS/INSTRUCTIONS NOT TO ANSWER
9
   NO.                      PAGE/LINE
10
    1 Can you tell me which documents
11    you reviewed in preparation for
      your deposition today?
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

---

1    Q.   And are you familiar with the general
2 nature of the lawsuit?
3    A.   Yes.
4    Q.   Okay.  And now are you represented by
5 Ms. Zambrano here today?
6        MS. ZAMBRANO:  She is.
7    A.   Yes.
8 BY MR. MOON:
9    Q.   Okay.  Have you had an opportunity to meet
10 with Ms. Zambrano to prepare for your deposition?
11   A.   Yes.
12   Q.   On how many occasions have you met with
13 her?
14   A.   Three.
15   Q.   Okay.  Do you know how many hours total you
16 have spent with her?
17   A.   I don't think I could give a total number
18 of hours, no.
19   Q.   Okay.  And I am trying not to ask you about
20 any communications you had between her, I'm just asking
21 questions -- other questions around that.
22       Have you given a deposition before?
23   A.   No.
24   Q.   Okay.  Well, let me -- I do think that this
25 will take most of the day unfortunately.  We do have a

Page 8

---

1        THE REPORTER:  Would you raise your right
2 hand, please.
3        THE WITNESS:  (Complied)
4        THE REPORTER:  Do you swear or affirm that
5 the testimony you are about to give in this case will
6 be the truth, the whole truth, and nothing but the
7 truth?
8        THE WITNESS:  I do.
9            MELISSA CLINCHY
10 having been duly sworn, testified as follows:
11            EXAMINATION
12 BY MR. MOON:
13   Q.   Good morning, Ms. Clinchy.
14   A.   Good morning.
15   Q.   My name is Jason Moon and I am here with my
16 co-counsel Sarah Zukerman and also Marsha Felcus who is
17 an intern with our office, she is going to watch today.
18 We are all with the FTC, and the FTC has filed an
19 action which you probably know against Match Group Inc.
20 and Match Group LLC, and we have alleged violations of
21 the FTC Act and the Restore Online Shoppers Confidence
22 Act.
23       And so you understand what our role is in
24 the litigation?
25   A.   Yes.

Page 7

---

1 lot of material to cover, I'll try to move through it
2 quickly.  We will try to take breaks every hour.  If
3 you feel like you need a break other than once an hour,
4 let me know and I'll be happy to do that.
5        The only thing I'd ask is that if there is
6 a question on the table, I'd ask for you to answer that
7 and then we will take our break.  Is that agreeable to
8 you?
9    A.   Yes.
10   Q.   Okay.  From time to time there may be --
11 Ms. Zambrano may -- or one of the other attorneys may
12 make an objection.  There's no judge here to rule on
13 objections so the proper thing to do there is just let
14 the discussion happen and then go ahead and answer your
15 question.
16       MS. ZAMBRANO:  Unless I instruct you not to
17 answer based on privilege.
18       MR. MOON:  Right.
19 BY MR. MOON:
20   Q.   And if your counsel instructs you not to
21 answer, then you will have to decide whether or not you
22 are going to follow that instruction.  So that would be
23 the exception to what I'm telling you.
24       Okay.  And what often happens with
25 witnesses is after there's been a discussion a lot of

Page 9

3 (Pages 6 - 9)

1 phone call.
2 BY MR. MOON:
3    Q.    Do you have a sense of how many, like,
4 request cancellation -- cancellation requests by mail
5 you guys would process like within a typical week?
6    A.    No, I couldn't say.
7    Q.    Do you recall something called the Match
8 Guarantee?
9    A.    Yes.
10    Q.    And how did you become familiar -- well,
11 tell me in your own words your understanding of what
12 the Match Guarantee was?
13    A.    The Match Guarantee was if you purchased a
14 6-month subscription with a guarantee on it, if you
15 fulfilled the requirements of the 6-month guarantee,
16 you would receive an additional 6 months on the site at
17 no cost.
18    Q.    Okay.  And how did -- how was it that you
19 became familiar with the Match Guarantee?
20    A.    When you are hired on to the customer
21 support team as an agent you were trained on the
22 website, so I would have been trained on what the Match
23 Guarantee was when I was hired on to the customer
24 support team and went through a training, you had to be
25 trained on the site and/or policies before you were

Page 182

1 allowed to interact with members.
2    Q.    Okay.  Did you have any job
3 responsibilities that related to the 6-month guarantee?
4    A.    I --
5        MS. ZAMBRANO: Objection. Vague. Go
6 ahead.
7    A.    When I was an agent, I would assist members
8 with questions about the 6-month guarantee or the
9 concerns about the 6-month guarantee, and so in that
10 aspect, like, yes, I assisted members with the 6-month
11 guarantee.
12 BY MR. MOON:
13    Q.    Okay.  Are you familiar with conditions
14 that a member had to qualify in order to redeem the
15 Match Guarantee?
16    A.    Do you mean do I remember what you had to
17 do to get the 6-month guarantee?
18    Q.    Yes.
19    A.    I don't recall all of them.
20    Q.    You had to -- do you recall that you had to
21 put up a profile picture that was approved by Match?
22    A.    Yes, you did have to have a photo on your
23 account.
24    Q.    And that photo had to be approved by Match;
25 is that right?

Page 183

1        MS. ZAMBRANO: Objection, form.
2    A.    Our photos went through -- do you mean
3 approved by, like, our photos went through moderation
4 to make sure that no one was uploading anything
5 inappropriate to the site.
6 BY MR. MOON:
7    Q.    Right.  You had to upload a profile that
8 made it through Match's content moderation policy.
9    A.    Yes, I -- it had to be an approved photo,
10 yes.
11    Q.    And you had to keep it up the entire time
12 during the 6-month subscription?
13    A.    I don't recall the rules around that.
14    Q.    Do you recall that you had to message five
15 people a month?
16    A.    Yes, five unique members a month, yes.
17    Q.    Okay.  And do you recall that there was
18 something called the Guarantee Tracker website or web
19 page I guess?
20    A.    Yes, I remember there was a guarantee
21 tracker.
22    Q.    And do you recall that you had to access
23 the customer tracker website and accept the renewal
24 within 7 days before expiration?
25    A.    I don't remember the guidelines around

Page 184

1 accepting the guarantee. I don't -- I -- I don't
2 remember what it looks like.  Like, just sitting here
3 trying to think back, I don't remember what it looks
4 like.  I don't know.
5    Q.    Okay.  Do you recall Match, while you were
6 there did Match receive complaints from Match members
7 about the Match Guarantee?
8        MS. ZAMBRANO: Objection, form.
9    A.    We received members contacting us about the
10 Match Guarantee, yes.
11 BY MR. MOON:
12    Q.    Do you remember the nature of the
13 complaints?
14        MS. ZAMBRANO: Objection, form.
15    A.    I do know that if someone had met the
16 requirements and contacted us that we were able to
17 provide the Match Guarantee; our agents were able to
18 add the time on to their account.
19 BY MR. MOON:
20    Q.    Okay.  Do you recall whether people
21 complained to Match that they didn't understand the
22 requirements of the Match Guarantee?
23        MS. ZAMBRANO: Objection, form.
24    A.    I don't -- I -- I'm sure that happened.  I
25 don't recall specific instances, but people contacted

Page 185

47 (Pages 182 - 185)

1  us all the time if they didn't understand a lot of
2  things about the website. So I don't remember that
3  specifically, but I know that members contacted us
4  about the 6-month guarantee.
5  BY MR. MOON:
6      Q.   Do you remember members contacting Match
7  and claiming that they were entitled to the redemption
8  to the guarantee but were unable to redeem it?
9      A.   I know that members contacted us to --
10  about the 6-month guarantee or assisting them in
11  redeeming it. Yes, I remember members contacting us
12  about it.
13      Q.   Okay. Do you remember any members
14  complaining about the requirements of the Match
15  Guarantee?
16          MS. ZAMBRANO: Objection, form.
17      A.   I do know members that contacted us about
18  the guarantee, and I do remember explaining that we had
19  requirements on the guarantee to encourage members
20  to -- not use the site correctly, but these
21  requirements helped members have a more successful time
22  on the website.
23  BY MR. MOON:
24      Q.   Okay. And that was in the context of
25  responding to members who were asking questions with

Page 186

1  the requirements?
2      A.   Exactly.
3      Q.   Okay. Do you ever remember handling any
4  complaints about the Match guarantee that you thought
5  were valid and the customer had a point about the Match
6  Guarantee?
7      A.   I mean I think all the member feedback was
8  valid at some point. I don't think I necessarily
9  agreed with all of it, and I think it was important for
10  customer to -- customer support to provide information
11  on why we had that. And I do remember an example I
12  would use is, if you go into a bar and you just put
13  your head down on a bar, no one's going to come talk to
14  you, right? Like, you're the person with your head on
15  the bar.
16          But if you go into a bar and you are
17  chatting with people and you are interacting, you're
18  more likely to meet someone. It's just common sense.
19  So when you have the Match Guarantee requirements, this
20  is just to encourage people to take the steps that they
21  might need to use the website successfully.
22          Someone might be shy about uploading a
23  photo, well, if you have the 6-month guarantee we know
24  that uploading a photo you are going to have better
25  success on the site so uploading a photo is only to

Page 187

1  your advantage. The same with having a visible
2  profile. How is anyone going to contact you if you
3  don't have a visible profile?
4          So I felt that the requirements were there
5  to help our members, and that's why I was working at
6  match.com. I wanted to help our members be successful
7  on the site and I feel like those requirements helped
8  our members have a more successful experience.
9      Q.   Did you ever propose changes to the
10  requirements of the Match Guarantee?
11      A.   I don't recall doing that.
12      Q.   Did you ever propose any changes to how
13  consumers were made aware of the Match Guarantee
14  requirements?
15      A.   No, I don't recall that.
16      Q.   Did you ever propose any changes to how
17  consumers were to be made aware of how to redeem the
18  Match Guarantee?
19      A.   No, I don't recall that.
20      Q.   Do you know of anyone else proposing
21  changes to the requirements of the Match Guarantee?
22      A.   No, I don't recall that.
23          (Marked Deposition Ex. 18)
24  BY MR. MOON:
25      Q.   Okay. I hand you what has been marked as

Page 188

1  Deposition Exhibit 18. This is 731717.
2      A.   Thank you.
3      Q.   Take a moment to review that one,
4  Ms. Clinchy.
5      A.   Okay.
6      Q.   Okay. Do you recall this particular email
7  thread?
8      A.   No, I don't remember this email.
9      Q.   Do you know who McKay Hinckley was?
10      A.   Yes.
11      Q.   Okay. What was McKay Hinckley's position?
12      A.   He was on the customer support team. I see
13  here it says he was quality analyst. I know he had
14  different roles within the customer support team when
15  he was there.
16      Q.   What does "customer support team" refer to?
17      A.   Like Community or, you know, the team that
18  we were on.
19      Q.   Oh, that's -- we're still talking about
20  your department?
21      A.   Yes. Yes, yes, yes.
22      Q.   Okay. Do you remember specifically what
23  his role was within your department?
24      A.   Here it says he was quality analyst, but I
25  do know that he was also a corporate -- he was an agent

Page 189

48 (Pages 186 - 189)

App. 46

1    at one time as well.
2    Q.   Okay.  And then Sydney Yensull, do you know
3    who that was?
4    A.   Yes.
5    Q.   And what is mister -- was that a man or a
6    woman?
7    A.   It's a woman.
8    Q.   Okay.  What was Ms. Yensull's position with
9    Match?
10   A.   She was within customer support.
11   Q.   Do you know what her specific role was
12   within customer support?
13   A.   I don't remember what her title was, but
14   she did report to me.
15   Q.   What was her job, what was her focus of her
16   duties as she worked for you?
17   MS. ZAMBRANO:  Objection, form.  Compound.
18   A.   I can't tell you what she was doing day to
19   day.  I'm sorry, I -- I don't -- I don't recall.
20   BY MR. MOON:
21   Q.   Do you have -- okay.  So Mr. Hinckley
22   writes, "Here is the list I sent Brett," correct?
23   A.   Yes, I see that.
24   Q.   Okay.  And then do you know which Brett he
25   is referring to there?
                                        Page 190

1    MS. ZAMBRANO:  Objection.  Calls for
2    speculation.
3    A.   No, I can't say.
4    BY MR. MOON:
5    Q.   Was there a Bret Williams who worked for
6    Match?
7    A.   Yes, but Bret Williams spelled his name
8    with one T.
9    Q.   Okay.  Was there a Brett Richards that
10   worked for Match?
11   A.   Yes, there was.
12   Q.   Was that a person --
13   MS. ZAMBRANO:  Excuse me.  Objection.
14   Calls for speculation.
15   A.   I can't say.  I don't remember.
16   BY MR. MOON:
17   Q.   Okay.  So go down to Mr. Hinckley's
18   signature tag line, it's got a North Central Expressway
19   address; is that right?
20   A.   I see that, yes.
21   Q.   Do you have an understanding of which
22   functions were within the Central Expressway address
23   versus the Douglas address?
24   MS. ZAMBRANO:  Objection, form of the
25   question.
                                        Page 191

1    A.   No, I just know that we moved to that
2    office, that match.com moved to that office.
3    BY MR. MOON:
4    Q.   Okay.  You moved there from Douglas?
5    A.   Yes.
6    Q.   Okay.  Do you know when that was?
7    MS. ZAMBRANO:  Objection.  Asked and
8    answered.
9    A.   Before September of 2017.  Like -- no, I
10   don't know when we moved there.
11   BY MR. MOON:
12   Q.   Okay.  So do you remember you testified you
13   don't remember this email exchange, right?
14   A.   No, I don't remember.
15   Q.   Do you remember that Mr. Hinckley, if
16   Mr. Hinckley in fact did send a list to Brett, somebody
17   named Brett, that includes the recommendation, "Make it
18   more clear that Match Guarantee has requirements and
19   that it requires an extra step to be redeemed"?
20   A.   No, I don't know.
21   Q.   Okay.  Any idea what he is referring to
22   when he says "extra step to be redeemed"?
23   MS. ZAMBRANO:  Objection.  Calls for
24   speculation.
25   A.   No, I -- I don't know.
                                        Page 192

1    (Marked Deposition Ex. 19)
2    BY MR. MOON:
3    Q.   Okay.  I'm handing you a document that's
4    been marked as Deposition Exhibit Number 19, Bates
5    labeled 789544.
6    A.   Okay.
7    Q.   Okay.  So this email -- is this email chain
8    about the issue of whether or not the confirmation
9    email that a subscriber -- I mean, I'm sorry.  A member
10   would receive would contain a link to the rules for the
11   6-month guarantee?
12   MS. ZAMBRANO:  Objection, form of the
13   question.
14   A.   So a lot of different things in the email.
15   BY MR. MOON:
16   Q.   That's okay, we can -- I can break it down,
17   that's fine, if you'd rather -- yeah, that's fine.  I'm
18   trying to save some time, but let's go through it so we
19   can know what we're doing here.
20   Okay.  So let's look, then, at page 789547
21   in the middle of the page, email from you to LaShonda
22   Pero October 21st, 2015.  Do you see that?
23   A.   Yes.
24   Q.   Okay.  And it says, "Here's what you get
25   when you buy a 6-month sub in CSA."
                                        Page 193

                                   49 (Pages 190 - 193)

| | |
|---|---|
| 1      CHANGES AND SIGNATURE | 1      REPORTER'S CERTIFICATION |

1      CHANGES AND SIGNATURE

2 WITNESS: MELISSA CLINCHY

3 DATE: February 16, 2023

4 Page/Line   Change        Reason

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

                         Page 242

---

1      REPORTER'S CERTIFICATION

2     DEPOSITION OF MELISSA CLINCHY

3       February 16, 2023

4     I, Joseph D. Hendrick, Notary Public and

5 Certified Shorthand Reporter in the State of Texas,

6 hereby certify to the following:

7     That the Witness, MELISSA CLINCHY, was duly

8 sworn by the officer and that the transcript of the

9 oral deposition is a true record of the testimony given

10 by the witness;

11     I further certify that pursuant to FRCP

12 Rule 30(f)(1) the signature of the deponent:

13       X    was requested by the deponent or

14 a party before the completion of the deposition and is

15 to be returned within 30 days from date of receipt of

16 the transcript;

17     _____ was not requested by the

18 deponent or a party before the completion of the

19 deposition;

20     I further certify that the amount of time

21 used by each party is as follows:

22     Jason Moon - 05:42:06

23     Angela Zambrano - 00:14:00

24     I further certify that I am neither counsel

25 for, related to, nor employed by any of the parties or

                         Page 244

---

1     I, MELISSA CLINCHY, have read the foregoing

2 deposition and hereby affix my signature that same is

3 true and correct, except as noted above.

4

5     _____

       MELISSA CLINCHY

6

7 STATE OF _____)

8 COUNTY OF _____)

9

10     Before me _____ on this day

11 personally appeared MELISSA CLINCHY, known to me (or

12 proved to me on the oath of _____ or

13 through _____ (description of identity card

14 or other document)) to be the person whose name is

15 subscribed to the foregoing instrument and acknowledged

16 to me that he executed the same for the purposes and

17 consideration therein expressed.

18     Given under my hand and seal of office this

19 _____ day of _____, _____.

20

21     _____

       Notary Public in and for the

22        State of _____

23

24

25   Job No. TX5651545

                         Page 243

---

1 attorneys in the action in which this proceeding was

2 taken;

3     Further, I am not a relative or employee of

4 any attorney of record, nor am I financially or

5 otherwise interested in the outcome of the action.

6     Subscribed and sworn to on this date:

7 March 2, 2023.

8

9

10

11

12

13

14

15

16

    _Joseph D. Hendrick_

    Joseph D. Hendrick, CSR #947

    Expiration Date: 04/30/2023

17     Notary Comm. Exp. 01/13/23

    Veritext Legal Solutions

18     Firm Registration No. 571

    300 Throckmorton Street, Ste. 1600

19     Fort Worth, TX 76102

20     Telephone (800) 336-4000

21

22

23

24

25

                         Page 245

---

                        62 (Pages 242 - 245)

App. 48

# EXHIBIT 5

```
1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF TEXAS
2                          DALLAS DIVISION
3     FEDERAL TRADE COMMISSION,     §
                                    §   Case No. 3:19-cv-02281-K
4          Plaintiff,               §
                                    §
5          v.                       §
                                    §
6     MATCH GROUP, INC., a          §
      corporation and MATCH         §
7     GROUP, LLC, formerly known    §
      as Match.com, LLC, a          §
8     limited liability company,    §
                                    §
9          Defendants.              §
      _____

10
                   ORAL AND VIDEOTAPED DEPOSITION OF
11
                             MANDY GINSBERG
12
                            February 23, 2023
13    _____

14              ORAL AND VIDEOTAPED DEPOSITION OF MANDY
15    GINSBERG, produced as a witness at the instance of the
16    Plaintiff, and duly sworn, taken in the above-styled
17    and numbered cause on February 23, 2023, from 9:09 a.m.
18    to 4:07 p.m., before Joseph D. Hendrick, Certified
19    Shorthand Reporter in and for the State of Texas,
20    reported by machine shorthand, at the offices of Sidley
21    Austin LLP, 2021 McKinney Avenue, Suite 2000, Dallas,
22    Texas, pursuant to Notice and the Federal Rules of
23    Civil Procedure and any provisions stated on the record
24    or attached hereto.
25    Job No. 5651550
```

Page 1

**Page 2**

```
 1        A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
       Sarah Zuckerman
 3     M. Hasan Aijaz
       FEDERAL TRADE COMMISSION
 4     1999 Bryan St., Suite 2150
       Dallas, TX 75201
 5     (214) 979-9350
       szuckerman@ftc.gov
 6     maijaz@ftc.gov
 7  FOR THE DEFENDANTS:
       Angela Zambrano
 8     Shelby Greaves
       SIDLEY AUSTIN LLP
 9     2021 McKinney Ave., Suite 2000
       Dallas, TX 75201
10     (214) 981-3405
       angela.zambrano@sidley.com
11     sgreaves@sidley.com
12  ALSO PRESENT:
       Sam Kitchens
13     Jeanette Teckman (Via Zoom)
       Marshall Feltus, FTC Intern
14     Randall Johnson, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1            INDEX
 2  Appearances ................................... 2
 3  MANDY GINSBERG
 4    EXAMINATION BY MS. ZUCKERMAN ............. 9
      EXAMINATION BY MS. ZAMBRANO ............. 198
 5    RE-EXAMINATION BY MS. ZUCKERMAN ......... 209
      RE-EXAMINATION BY MS. ZAMBRANO .......... 216
 6    RE-EXAMINATION BY MS. ZUCKERMAN ......... 218
 7  Signature and Changes .......................221
 8  Reporter's Certification ....................223
 9          EXHIBITS
10  NO.      DESCRIPTION          PAGE(S)
11  EXHIBIT 1  FOIA CONFIDENTIAL          56
             MATCHFTC601377-1378
12     April 25, 2017 email from Greg
       Blatt to Mandy Ginsberg;
13     Subject: RE: Misappropriated
       ID
14
   EXHIBIT 2  CONFIDENTIAL          63
15     FTC v. Match
       Case No. 3:19-cv-02281-K
16     MATCHFTC48736-8737
       3/14/2018 email from Adrian
17     Ong to Mandy Ginsberg;
       Subject: Fwd: Cancellation
18     Policy
19  EXHIBIT 3  CONFIDENTIAL          74
       FTC v. Match
20     Case No. 3:19-cv-02281-K
       MATCHFTC750173-0183
21     1/22/2013 EMAIL FROM Sydney
       Lam to Sushil Sharma and
22     others; Subject: Match Product
       Team Highlights Week Ending
23     1/18/12 (Domestic &
       International)
24
25
```

**Page 4**

```
 1  EXHIBIT 4  CONFIDENTIAL          81
       FTC v. Match
 2     Case No. 3:19-cv-02281-K
       MATCHFTC766737-6739
 3     January 03, 2013 email from
       Michele Watson to Mandy
 4     Ginsberg; Subject: FW:
       Response to 6 Moth guarantee
 5     Complaint
 6  EXHIBIT 5  FOIA Confidential          86
       MATCHFTC365570-5575
 7     October 21, 2016 email from
       Mandy Ginsberg to Alexis
 8     Ferraro; Subject: RE:
       Guarantee Page
 9
   EXHIBIT 6  CONFIDENTIAL          93
10     FTC v. Match
       Case No. 3:19-cv-02281-K
11     MATCHFTC731875
       11/1/2017 email from Adrian
12     Ong to Melissa Clinchy;
       Subject: RE: Cancelled service
13     #neverAgainCustomer
14  EXHIBIT 7  CONFIDENTIAL          100
       FTC v. Match
15     Case No. 3:19-cv-02281-K
       MATCHFTC816457
16     5/5/2017 calendar request from
       Mandy Ginsberg to Steven
17     Bailey; Subject:
       Match/Affinity Chargebacks
18
   EXHIBIT 8  CONFIDENTIAL          102
19     FTC v. Match
       Case No. 3:19-cv-02281-K
20     MATCHFTC816527-6528
       5/23/2017 email from Mandy
21     Ginsberg to reports@match.com;
       Adrian Ong and others
22     Subject: RE: Match and PM
       Chargeback Rates - Summary
23
24
25
```

**Page 5**

```
 1  EXHIBIT 9  CONFIDENTIAL          105
       FTC v. Match
 2     Case No. 3:19-cv-02281-K
       MATCHFTC800794-0795
 3     8/26/2017 email from Mandy
       Ginsberg to Bryan Jewell;
 4     Subject: FW: Match and PM
       Chargeback Rates - Summary
 5
   EXHIBIT 10  CONFIDENTIAL          107
       FTC v. Match
 7     Case No. 3:19-cv-02281-K
       MATCHFTC827057-7058
 8     10/18/2018 email from Ian
       Purves to Adrian Ong and
 9     others; Subject: RE: Match
       and PM Chargeback Rates -
10     Summary was executed at
       10/18/2018 3:02:02 PM
11  EXHIBIT 11  CONFIDENTIAL          116
       FTC v. Match
12     Case No. 3:19-cv-02281-K
       MATCHFTC746951
13     7/13/2016 email from Mandy
       Ginsberg to Sharmistha Dubey;
14     Subject: FW: Refund Results
       through 7/11
15
   EXHIBIT 12  CONFIDENTIAL          140
16     FTC v. Match
       Case No. 3:19-cv-02281-K
17     MATCHFTC766453-6455
       6/12/2013 email from Leah
18     Mikulenka to Product 5.0;
       Subject: Member Feedback May
19     2013
20
   EXHIBIT 13  CONFIDENTIAL          147
21     FTC v. Match
       Case No. 3:19-cv-02281-K
22     MATCHFTC749741-9753
       5/19/2013 email from Match
23     Production Customer Care to
       undisclosed-recipients@
24     custhelp.com; Subject: Weekly
       Customer Suggestions Reported
25     By Care
```

2 (Pages 2 - 5)

| | | |
|---|---|---|
| 1 | EXHIBIT 14  CONFIDENTIAL | 153 |
| | FTC v. Match | |
| 2 | Case No. 3:19-cv-02281-K | |
| | MATCHFTC680927-0928 | |
| 3 | 2/25/2016 email from | |
| | Poossenjeet Bhattacharya to | |
| 4 | Kris Auderer; Subject: RE; | |
| | Match - CSAT Survey Detail - | |
| 5 | Daily | |
| 6 | EXHIBIT 15  PowerPoint Deck: "Not just | 160 |
| | another broken window - | |
| 7 | Account Settings Redesign" | |
| 8 | EXHIBIT 16  CONFIDENTIAL | 164 |
| | FTC v. Match | |
| 9 | Case No. 3:19-cv-02281-K | |
| | MATCHFTC746901 | |
| 10 | 5/17/2016 email from Kate | |
| | Feller to Mandy Ginsberg; | |
| 11 | Subject: RE: Customer Feedback | |
| | update | |
| 12 | | |
| 13 | EXHIBIT 17  CONFIDENTIAL | 164 |
| | DO NOT DISCLOSE | |
| 14 | May 17, 2016 PowerPoint Deck: | |
| | "Match Group Customer Care | |
| 15 | Feedback" | |
| 16 | EXHIBIT 18  FOIA CONFIDENTIAL | 171 |
| | MATCHFTC323458-3459 | |
| 17 | July 01, 2016 email from Brett | |
| | Richards to Kris Auderer; | |
| 18 | Subject: RE: Cancel account | |
| | confirmation | |
| 19 | EXHIBIT 19  CONFIDENTIAL | 173 |
| | FTC v. Match | |
| 20 | Case No. 3:19-CV-02281-K | |
| | MATCHFTC846458 | |
| 21 | 2019-09-25 Slack thread; | |
| | Purpose: What's going on | |
| 22 | within Match Group? | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 6

| | | |
|---|---|---|
| 1 | EXHIBIT 20  CONFIDENTIAL | 184 |
| | FTC v. Match | |
| 2 | Case No. 3:19-cv-02281-K | |
| | MATCHFTC760881-0883 | |
| 3 | 2/21/2013 email from Michele | |
| | Watson to Sharmistha Dubey; | |
| 4 | Subject: Member Complaints - | |
| | Not being able to find our | |
| 5 | phone number on site | |
| 6 | EXHIBIT 21  FOIA Confidential | 190 |
| | MATCHFTC528101 | |
| 7 | May 30, 2017 email from | |
| | Florian Hottier to Sushil | |
| 8 | Sharma; Subject: RE: FAQs | |
| 9 | | |
| 10 | | |

CERTIFIED QUESTIONS/INSTRUCTIONS NOT TO ANSWER

| | | |
|---|---|---|
| 11 | NO. | PAGE/LINE |
| 12 | | |
| | 1  What did you review? | 14:6 |
| 13 | | |
| | 2  So you were the Match.com CEO when | 135:4 |
| 14 | Match received the civil | |
| | investigative demand from the FTC; | |
| 15 | is that correct? | |
| 16 | 3  Did Match Group, Inc. perform any | 138:14 |
| | tests related to privacy or | |
| 17 | security? | |
| 18 | 4  What actions did you take to make | 139:21 |
| | sure that Match.com user | |
| 19 | information would not be | |
| | compromised? | |
| 20 | | |
| | 5  Were you aware of the negotiations | 180:23 |
| 21 | that occurred around 2018 between | |
| | the FTC and Match Group, Inc.? | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 7

---

```
 1                  - - -
 2          P R O C E E D I N G S
 3           February 23, 2023
 4      Commencing at Approximately 9:09 a.m.
 5                  - - -
 6
 7        THE VIDEOGRAPHER:  We are now on the record
 8   for the video deposition of Mandy Ginsberg.  The time
 9   is 9:09 a.m. The date is February 23rd, 2023.  In the
10   matter of the Federal Trade Commission Versus Match
11   Group, Inc. et al., Civil Action Number
12   3:19-CV-02281-K, being held in the United States
13   District Court for the Northern District of Texas,
14   Dallas Division.
15        The court reporter is Joe Hendrick.  The
16   videographer is Randy Johnson.  Both are
17   representatives of Veritext Legal Solutions.
18        Will counsel please state their appearances
19   for the record.
20        MS. ZUCKERMAN:  Sarah Zuckerman for the
21   Federal Trade Commission.
22        MR. AIJAZ:  Hasan Aijaz for the Federal
23   Trade Commission.
24        MS. ZAMBRANO:  Good morning.  I'm Angela
25   Zambrano with Sidley Austin, and I am here with my
```

Page 8

```
 1   colleague Shelby Greaves for Match as well as our
 2   client Sam Kitchens, and on the phone is Jeanette
 3   Teckman, both from Match.
 4        THE VIDEOGRAPHER:  Court reporter, please
 5   administer the oath.
 6        THE REPORTER:  Would you raise your right
 7   hand, please.
 8        THE WITNESS:  (Complied)
 9        THE REPORTER:  Do you swear or affirm that
10   the testimony you are about to give in this case will
11   be the truth, the whole truth, and nothing but the
12   truth?
13        THE WITNESS:  Yes, I do.
14              MANDY GINSBERG
15   having been duly sworn, testified as follows:
16              EXAMINATION
17   BY MS. ZUCKERMAN:
18     Q.   Good morning, Ms. Ginsberg.
19     A.   Good morning.
20     Q.   Could you please state your full name for
21   the record.
22     A.   Amanda Ginsberg.  But everyone calls me
23   Mandy.
24     Q.   Is it okay if I call you Mandy or
25   Ms. Ginsberg today?
```

Page 9

3 (Pages 6 - 9)

App. 52

1 time scaling it, I became CEO.
2    Q.   Okay.  And then after the tutor.com, you
3 then went on to serve as the CEO of Match Group North
4 America; is that right?
5    A.   Yes, the CEO of Match Group North America,
6 yes.
7    Q.   How were you hired for that position?
8        MS. ZAMBRANO:  Objection, form.  Vague.
9    A.   I can't remember the details, but I
10 remember Greg Blatt - but I can't remember any other
11 board member - said that, "We were becoming a public
12 company, we have a lot of exciting opportunities and
13 growth, but I really would like for you to come back
14 because we've got -- given that we are a public company
15 and given we've got so much to do on our plate, I need
16 more bench strength, and so I want to talk to you about
17 coming back."
18        So we discussed it for several months and I
19 ultimately came back into the business.
20        MS. ZUCKERMAN:  I pass the witness.
21        MS. ZAMBRANO:  Okay.  Thank you.
22               EXAMINATION
23 BY MS. ZAMBRANO:
24    Q.    Ms. Ginsberg, I am going to ask you some
25 questions about your prior testimony today.

Page 198

1 I am going to start with the subject of the
2 customer contacts that you have seen a couple of
3 examples of before, and I think you have the stack of
4 exhibits in front of you.  I'm just going to give
5 you -- call out one was an example.
6        Okay.  Exhibit 2 is an example of a
7 customer contact that you received when you were at CEO
8 of Match Group North America, correct?
9    A.   Yes.
10    Q.   Okay.  And I think you were also shown
11 examples of customer contacts that you received at CEO
12 of Match Group, Inc.
13        Do you recall seeing some of those emails
14 today?
15    A.   Yes.
16    Q.   Okay.  Was it common for you in your role
17 as CEO of Match Group, Inc., to receive Match.com
18 customer complaints?
19    A.   Not common, but not -- not shocking, but it
20 wasn't common that people would reach out to me.
21    Q.   And was it your responsibility to handle
22 the Match.com contacts as the CEO of Match Group, Inc.?
23    A.   It was definitely not my responsibility and
24 I received emails from various customers from various
25 brands, and so if I saw them and noticed them in my

Page 199

1 inbox, I would forward them on to the appropriate
2 brand.
3    Q.   Why did you do that?
4    A.   Because I could have ignored them, but I
5 just feel like you shouldn't ignore customers and so I
6 forwarded them on to the brand that could respond to
7 those customers.
8    Q.   Okay.  I want to talk to you about the use
9 of the word "we" in the deposition today.  The FTC's
10 counsel has asked you a couple of times in particular
11 questions what you meant by "we."  But you have used
12 the term "we" several times during the deposition.  Do
13 you recall using that word today?
14    A.   I'm sure I used "we" and "I" lots of times,
15 yes.
16    Q.   When you have used the word "we" in this
17 deposition, have you always meant to be referring to
18 Match Group, Inc.?
19    A.   No.  I mean, as humans, we -- so I was the
20 captain of a soccer team, and so I wouldn't say I; I
21 would say "we."  So as part of a group or a family or
22 an organization, we'd say "we."  So, you know, I talk
23 in human talk, not legal talk, but I would refer to we
24 a lot of different ways throughout the day.
25    Q.   Okay.  So you haven't been testifying with

Page 200

1 respect to legal entities today?
2    A.   No.
3    Q.   Do you know if Match Group, Inc. -- let's
4 talk about Match Group, Inc. for a second.
5        Do you know if Match Group, Inc. had any
6 programmers, that entity?
7    A.   Match Group, Inc. had no programmers, no
8 engineers.
9    Q.   So when I -- so I'm going to ask you some
10 more questions again just on the Inc. entity.
11        Did Match Group, Inc. have any customer
12 care agents?
13    A.   No.  Zero.
14    Q.   What about designers?  Did Match Group,
15 Inc. have designers?
16    A.   No, there are no designers at Match Group,
17 Inc.
18    Q.   Okay.  I want to ask you about a couple of
19 parts of your testimony today.
20        One -- and I'm reading from the rough draft
21 today, and Joe has done an excellent job transcribing,
22 but I may get a word wrong or it may not be perfectly
23 transcribed; so I'll just read it the way it is in the
24 rough transcript.  Okay?
25        All right.  You were asked the following

Page 201

51 (Pages 198 - 201)

App. 53

1  question:  Did you consider changing the Match.com
2  online cancellation flow?  And the word that was used
3  was "you."  Did you consider changing the Match.com
4  online cancellation flow?  And your answer was as
5  follows:  Like I said, this is one of those businesses
6  where we constantly iterating, changing, testing, you
7  know, sort of investigate new flows; so that's not
8  something I recall, but I would not be surprised if we
9  looked at all those flows.
10       What were you referring to as "we" in that
11  sentence?
12       A.   "We" would mean members of the team, but I
13  personally would never go in and make decisions about
14  the individual product lists.
15       Q.   So when you were at Match Group, Inc. as
16  CEO, was any part of your job responsibility to design
17  or maintain a cancellation flow for any brand?
18       A.   No.
19       Q.   And the same question regarding a
20  chargeback policy; did any part of your job
21  responsibilities relate to designing or maintaining a
22  policy relating to chargebacks?
23       A.   No.
24       Q.   And the Match.com guarantee that we have
25  talked about today and that you referred to as the

Page 202

1  guarantee, was any part of your job responsibility when
2  you were MGI CEO to design or maintain or otherwise
3  deal with the Match.com guarantee?
4       A.   No.
5       Q.   Well, did Match dot -- excuse me.
6       Did Match Group, Inc. direct the brands on
7  decisions about things like this:  Cancellation flows,
8  guarantees, or chargebacks?
9       A.   The individual brands managed all aspects
10  of their business; marketing, product, analytics.  That
11  was their responsibility, not mine.
12       Q.   Well, were the brands managed collectively
13  as a unit?
14       A.   No.  Each -- each brand would operate
15  independently and in their financials meaning their P&L
16  their financials would rollup and we would report it to
17  the street, but the individual brands would manage
18  their businesses independently of the other brands.
19       Q.   Other than the financial reporting at the
20  public company level that you just testified about, was
21  there integration generally across functions of the
22  brands?
23       A.   There was not integration across all the
24  various brands.  The only exception was finance and
25  legal where we would coordinate across those brands.

Page 203

1       Q.   Okay.  You were asked about a couple of
2  other exhibits that I am going to ask you about now.
3  First about Exhibit 19, if you would get that one in
4  front of you.  Do you remember being questioned about
5  Exhibit 19?
6       A.   Yes.  Earlier today I was.
7       Q.   Okay.  And, again, I'm looking at the rough
8  transcript, but in the rough transcript on page 165,
9  you had referred to consciously misleading figures in
10  Exhibit 19 and the FTC's counsel asked you what you
11  meant by that, and I'm going to read your response that
12  was taken down and then ask you a question about it.
13       You said, "I don't remember the specifics,
14  but I remember I was deeply offended because everyone
15  at the company knew that I had real integrity when it
16  came to running the business and really believed in
17  treating our customers right and the fact that we were
18  being litigated Match.com was being litigated based on
19  practices that I didn't agree with.  I felt like I had
20  to speak out because employees cared about the tone at
21  the top in their leaders and that was important to me."
22       That's the way that your answer was taken
23  down.  But I have a question about that phrase that you
24  used based on practices that I didn't agree with.
25       What were you referring to there?

Page 204

1       A.   I misspoke because clearly I feel strongly
2  about it.  I did not agree with the accusations that
3  were being lodged against Match.com.
4       Q.   In the litigation that was filed by the
5  FTC?
6       A.   In the litigation.  So I didn't agree with
7  the accusations.  I think I misspoke when I said
8  practices, but I meant accusations.
9       Q.   Now I want to ask you about an exhibit.
10  Let me show you 17, actually.  You were asked about a
11  few pages in this deck, and I understand that you don't
12  recall receiving the deck or communicating about the
13  deck.  Is that fair?
14       A.   Yes.
15       Q.   Okay.  But I do want to ask you about the
16  list of issues that were reported on page 25 of
17  Exhibit 17, and specifically the first one that says,
18  "Current, locate account settings, difficult to find."
19       So I think that's referring to the next
20  page in the deck, which is not numbered, but it's the
21  26th page.  Do you see where the heading says Account
22  Settings Page Confusing and Cluttered?
23       A.   I read that.
24       Q.   Okay.  Do you agree that the account
25  settings page that we are looking at was confusing and

Page 205

52 (Pages 202 - 205)

1  cluttered?
2      A.   I don't agree.
3      Q.   Why not?
4      A.   Because "account settings" at the top
5  left-hand side is the very first thing you see, and
6  then every account setting is very clearly laid out
7  both on the top across and on the left-hand side; so
8  not only is it once but twice to make sure people see
9  it.
10     Q.   And then going back to the list of topics
11 on page 25, the third one says, "Enter password,
12 already entered on login."
13          Did you have any concerns about the fact
14 that the cancellation -- let me start again.
15          Do you have any concerns, as you sit here
16 today, that the Match.com cancellation flow required
17 the subscriber to enter the password?
18     A.   No.
19     Q.   Why not?
20     A.   Well, it says, "The information you are
21 about to view is private," so this is to make sure you
22 protect information from users and then very clear
23 "continue cancelation" button.
24     Q.   When you say "protect information from
25 users," what do you mean?

Page 206

1      A.   I mentioned before that as in order to make
2  sure -- I don't remember this flow, so I don't remember
3  the specifics, but the reason that we asked people for
4  information about user name or password is to make sure
5  that there are no bad architects entering this page, so
6  to make sure that they can't get in and access any
7  information including user information or other
8  information.
9      Q.   And then back to the list of topics, there
10 is a survey question that's referenced Number 6.  Do
11 you see that?
12     A.   Yes.
13     Q.   Okay.  Are you -- you just testified you're
14 not familiar with the Match.com flow per se, but do you
15 recall that the cancellation flow asked subscribers why
16 they were cancelling their membership?
17     A.   I don't remember the specifics of the flow,
18 but we have a very unique category in business that is
19 episodic, and so people leave because they're happy and
20 they might leave because they're not happy.  So they
21 leave because they found someone.
22          Well, we don't know why people are leaving,
23 and in order for us to understand why people leave and
24 how to improve the product either for other people in
25 the community or when and if they come back, it's

Page 207

1  important for us to understand success rates and who
2  was -- who were the people that actually found success.
3      Q.   And when you were the CEO of Match.com, did
4  you ever have any concerns about the Match.com
5  cancellation flow that you can recall as you sit here
6  today?
7      A.   I don't recall; although, I see the
8  "continue to cancel" button on each of these screens.
9          MS. ZAMBRANO:  One moment.
10 BY MS. ZAMBRANO:
11     Q.   Do you understand that the allegation of
12 the FTC in this case is that Match.com's cancellation
13 flow is not simple?
14     A.   Yes, I understand that.
15     Q.   Do you -- did you ever hear anyone at
16 Match.com when you were the CEO express that there was
17 an intent to make the cancellation flow not simple?
18     A.   There was never any intention to make a
19 cancellation flow not simple; in fact, we looked at all
20 the data that suggests high 90 percent of people had no
21 problem cancelling.
22     Q.   Do you recall any discussions when you were
23 the CEO of Match.com about making the product more
24 difficult to cancel?
25     A.   No.  We would not want to make the product

Page 208

1  difficult to cancel because at the end of the day, our
2  customers would either tell people about it or come
3  back themselves, and so if we made -- if customers were
4  unhappy leaving our site or app, they wouldn't come
5  back, and as I mentioned before, half the people that
6  come every day are past customers, and so it would not
7  make sense to make our customers unhappy or frustrated.
8          MS. ZAMBRANO:  Pass the witness.
9                RE-EXAMINATION
10 BY MS. ZUCKERMAN:
11     Q.   Ms. Ginsberg, could you please look at
12 Exhibit 2?
13          So in this exhibit, the email thread is
14 dated March 14, 2018, right?
15     A.   Yes.
16     Q.   At this point in time, you were the CEO of
17 Match Group, Inc.; is that correct?
18     A.   Yes.
19     Q.   Did you serve as the CEO of Match Group
20 North America at this point as well?
21     A.   '18, '19, I do not believe; so no, I do not
22 think so.
23     Q.   Do you know who served as the Match Group
24 North America CEO at this point in time?
25     A.   I believe it was Match -- so can you ask me

Page 209

1    I, MANDY GINSBERG, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5    _____
     MANDY GINSBERG
6
7  STATE OF _____)
8  COUNTY OF _____)
9
10    Before me _____ on this day
11  personally appeared MANDY GINSBERG, known to me (or
12  proved to me on the oath of _____ or
13  through _____ (description of identity card
14  or other document)) to be the person whose name is
15  subscribed to the foregoing instrument and acknowledged
16  to me that he executed the same for the purposes and
17  consideration therein expressed.
18    Given under my hand and seal of office this
19  _____ day of _____, _____.
20
21    _____
     Notary Public in and for the
22   State of _____
23
24
25
                                        Page 222

1  for, related to, nor employed by any of the parties or
2  attorneys in the action in which this proceeding was
3  taken;
4    Further, I am not a relative or employee of
5  any attorney of record, nor am I financially or
6  otherwise interested in the outcome of the action.
7    Subscribed and sworn to on this date:
8  March 13, 2023.
9
10
11
12
13
14
15
16
     Joseph D. Hendrick, CSR #947
17   Expiration Date: 04/30/2023
     Notary Comm. Exp. 01/13/23
18   Veritext Legal Solutions
     Firm Registration No. 571
19   300 Throckmorton Street, Ste. 1600
     Fort Worth, TX  76102
20   Telephone (800) 336-4000
21
22
23
24
25
                                        Page 224

1    REPORTER'S CERTIFICATION
2    DEPOSITION OF MANDY GINSBERG
3    February 23, 2023
4    I, Joseph D. Hendrick, Notary Public and
5  Certified Shorthand Reporter in the State of Texas,
6  hereby certify to the following:
7    That the Witness, MANDY GINSBERG, was duly
8  sworn by the officer and that the transcript of the
9  oral deposition is a true record of the testimony given
10  by the witness;
11    I further certify that pursuant to FRCP
12  Rule 30(f)(1) the signature of the deponent:
13    X    was requested by the deponent or
14  a party before the completion of the deposition and is
15  to be returned within 30 days from date of receipt of
16  the transcript;
17    _____ was not requested by the
18  deponent or a party before the completion of the
19  deposition;
20    I further certify that the amount of time
21  used by each party is as follows:
22    Sarah Zuckerman - 04:45:47
23    Angela Zambrano - 00:17:32
24    All Other Counsel - 00:00:00
25    I further certify that I am neither counsel
                                        Page 223

1  Angela Zambrano
2  angela.zambrano@sidley.com
3                         March 13, 2023
4  RE:   Federal Trade Commission v. Match Group, Inc., Et Al.
5    2/23/2023, Mandy Ginsberg (#5651550)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  errata-tx@veritext.com.
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19  If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22    Yours,
23    Veritext Legal Solutions
24
25
                                        Page 225

                              57 (Pages 222 - 225)

# EXHIBIT 6

```
1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF TEXAS
2                       DALLAS DIVISION
3   FEDERAL TRADE COMMISSION,    §
                                 §   Case No. 3:19-cv-02281-K
4         Plaintiff,             §
                                 §
5         v.                     §
                                 §
6   MATCH GROUP, INC., a         §
    corporation, and MATCH       §
7   GROUP, LLC, formerly known   §
    as MATCH.COM, LLC, a         §
8   limited liability company,   §
                                 §
9         Defendants.            §
      _____
10
                       ORAL DEPOSITION OF
11
                       SHARMISTHA DUBEY
12      as 30(b)(6) Representative of Match Group, Inc.,
13                      March 3, 2023
      _____
14
15
16
          ORAL DEPOSITION OF SHARMISTHA DUBEY as 30(b)(6)
17   Representative of Match Group, Inc., produced as a
     witness at the instance of the Plaintiff, and duly
18   sworn, taken in the above-styled and numbered cause on
     March 3, 2023, from 9:04 a.m. to 5:26 p.m., before
19   Joseph D. Hendrick, Certified Shorthand Reporter in and
     for the State of Texas, reported by machine shorthand,
20   at the offices of Sidley Austin LLP, 2021 McKinney
     Avenue, Suite 2000, Dallas, Texas, pursuant to Notice
21   and the Federal Rules of Civil Procedure and any
     provisions stated on the record or attached hereto.
22
23
24
25   Job No. 5651555
```

Page 1

Page 2 (left column):

```
 1        A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
        Reid Tepfer
 3      Sarah Zuckerman
        FEDERAL TRADE COMMISSION
 4      1999 Bryan Street, Suite 2150
        Dallas, TX 75201
 5      (214) 979-9350
        rtepfer@ftc.gov
 6      szuckerman@ftc.gov
 7  FOR THE DEFENDANTS:
        Benjamin M. Mundel
 8      SIDLEY AUSTIN LLP
        1501 K Street, N.W.
 9      Washington, D.C. 20005
        202-736-8000
10      bmundel@sidley.com
11      Chelsea Priest
        SIDLEY AUSTIN LLP
12      2021 McKinney Avenue, Suite 2000
        Dallas, TX 75201
13      (214) 981-3405
        cpriest@sidley.com
14
    ALSO PRESENT:
15      Sam Kitchens
        Jeanette Teckman (Via Zoom)
16      Katy Johnson (Via Zoom)
17
18
19
20
21
22
23
24
25
                                    Page 2
```

Page 3 (left column):

```
 1            INDEX
 2  Appearances  ................................  2
 3  SHARMISTHA DUBEY as 30(b)(6) Representative of Match
    Group, Inc.
 4
        EXAMINATION BY MR. TEPFER ................  7
 5      EXAMINATION BY MR. MUNDEL ................ 245
 6  Signature and Changes  .........................256
 7  Reporter's Certification  .....................259
 8            EXHIBITS
 9  NO.      DESCRIPTION       PAGE(S)
10  EXHIBIT 1  Plaintiff Federal Trade      23
        Commission's Amended Notice of
11      Rule 30(b)(6) Deposition of
        Defendant Match Group, Inc.,
12
    EXHIBIT 2   MATCHFTC672169-2175      41
13      Amended and Restated Limited
        Liability Compan Agreement of
14      Match.com, L.L.C.
15  EXHIBIT 3  CONFIDENTIAL-FTC v. Match,   59
        Case No. 3:19-cv-02281-K
16      MATCHFTC774684-4685
        Match Group, Inc., Q4 2021 Org
17      Chart
18  EXHIBIT 4  CONFIDENTIAL - FTC v, Match,   63
        Case No. 3:19-cv-02281-K
19      MATCHFTC777052-7054
        January 1, 2018 Written
20      Consent of The Sole Member of
        Match Group, LLC,
21
    EXHIBIT 5  CONFIDENTIAL - FTC v. Match.  106
22      Case No 3:19-cv-02281-K
        MATCHFTC742346-2409
23      Match Group North America Org
        Chart
24
25
                                    Page 3
```

Page 4 (right column):

```
 1  EXHIBIT 6  FOIA Confidential        112
        MATCHFTC405364-5365
 2      December 02, 2015 email from
        Sam Yagan to Sydney Lam;
 3      Subject: RE: Terms
 4  EXHIBIT 7  FOIA Confidential        128
        MATCHFTC568737-8738
 5      May 04, 2013 email from
        Michele Watson to Atin
 6      Kulkarni; Subject: Re: Member
        Suggestions & Survey Comments
 7      for April
 8  EXHIBIT 8  FOIA Confidential        143
        MATCHFTC000145-0150
 9      Match.com Terms of Use
        Agreement
10
    EXHIBIT 9  Defendant Match Group, Inc's   147
11      Second Amended Responses and
        Objections to Plaintiff
12      Federal Trade Commission's
        First Set of Interrogatories
13
    EXHIBIT 10  CONFIDENTIAL-FTC V. Match.   152
14      Case No. 3:19-cv-02281-K
        MATCHFTC27057-7058
15      10/18/2018 email from Ian
        Purves to Adrian Ong; Subject:
16      RE: Match and PM Chargeback
        Rates - Summary was executed
17      at 10/18/2018 3:02:02 PM
18  EXHIBIT 11  Match Group, Inc.'s Initial   156
        Disclosures
19
    EXHIBIT 12  FOIA Confidential        159
20      MATCHFTC603392-3393
        January 21, 2016 email from
21      Adrian Ong to steven Bailey;
        Sbject: RE: 1 slide on Refund
22      Policy
23
24
25
                                    Page 4
```

Page 5 (right column):

```
 1  EXHIBIT 13  FOIA Confidential        167
        MATCHFTC543664-3665
 2      February 24, 2016 email from
        Sharmistha Dubey to Sydney
 3      Lam; Subject: FW: Resignation
        flow
 4
    EXHIBIT 14  FOIA Confidential        177
 5      MATCHFTC543542
        February 18, 2016 email from
 6      Sydney Lam to Sushil Sharma;
        Subject: RE: Resignation flow
 7
    EXHIBIT 15  PowerPoint Deck: "Not just   190
 8      another broken window Account
        Setins Redesign"
 9
    EXHIBIT 16  FOIA Confidential        193
10      MATCHFTC545967-5972
        July 13, 2016 email from
11      Sharmistha Dubey to Tom Cox;
        Subject: Re: Deep Dive with Gb
12      on Thursday
13  EXHIBIT 17  CONFIDENTIAL-FTC v. Match,   202
        Case No. 3:19-cv-02281-K
14      MATCHFTC680143-0145
        59/2016 email from Kris
15      Auderer to Lakshmi Renarajan;
        Subject: RE: Match Lunch &
16      Listen Recap
17  EXHIBIT 18  FOIA Confidential        205
        MATCHFTC323458-3459
18      July 01, 2016, email from
        Brett Richards to Kris
19      Auderer; Subject: RE: Cancel
        account confirmation
20
    EXHIBIT 19  FOIA CONFIDENTIAL        212
21      May 15, 2017 correspondence
        from Hogan Lovells to Zachary
22      A. Keller; Re: First
        Production In Response to
23      Civil Investigative Demand
        issued to Match Group,
24      Inc. on March 14, 2017
25
                                    Page 5
```

2 (Pages 2 - 5)

App. 59

| | |
|---|---|
| 1 | EXHIBIT 20   FOIA Confidential        228 |
| | MATCHFTC537085-7086 |
| 2 | January 12, 2016 email from |
| | Sharmistha Dubey to Michael |
| 3 | Dunn; Subject: FW: Reverting a |
| | decision - want to loop you in |
| 4 | |
| | EXHIBIT 21   FOIA Confidential        234 |
| 5 | MATCHFTC536801-6802 |
| | January 06, 2016 email |
| 6 | fromSharmistha Dubey to Steven |
| | Bailey; Subject: Re: 2016 GM |
| 7 | Plan - Product Initiatives |
| 8 | EXHIBIT 22   FOIA Confidential        237 |
| | MATCHFTC519878-9881 |
| 9 | January 10, 2017 email from |
| | Sushil Sharma to Alexis |
| 10 | Ferraro; Subject: RE: TV - |
| | launching new product features |
| 11 | 1H 2017 |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 6

1     MR. TEPFER:  And anyone on Zoom, please?
2          MR. MUNDEL:  We have Jeanette Teckman and
3  Katy Johnson, in-house counsel on Zoom.
4  BY MR. TEPFER:
5     Q.   And, Ms. Dubey, would you mind stating your
6  name for the record?
7     A.   Yes, it is Sharmistha Dubey.
8     Q.   And do you also go by Shar?
9     A.   Yes, I do.
10     Q.   So, Ms. Dubey, do you understand that you
11  were just given an oath and swore to tell the truth
12  under penalty of perjury?
13     A.   I do.
14     Q.   And do you understand what that means?
15     A.   I do.
16     Q.   And do you understand that is the same as
17  if you were testifying in court here today?
18     A.   I do.
19     Q.   Is there any reason that you can't testify
20  accurately or truthfully today?
21     A.   No.
22     Q.   And you're not on any medication that would
23  affect your memory or ability to testify accurately or
24  truthfully today?
25     A.   No.

Page 8

1          THE REPORTER:  Would you raise your right
2  hand, please.
3          THE WITNESS:  (Complied)
4          THE REPORTER:  Do you swear or affirm that
5  the testimony you are about to give in this case will
6  be the truth, the whole truth, and nothing but the
7  truth?
8          THE WITNESS:  I do.
9     SHARMISTHA DUBEY as 30(b)(6) Representative of Match
10              Group, Inc.,
11     having been duly sworn, testified as follows:
12              EXAMINATION
13  BY MR. TEPFER:
14     Q.   Good morning, Ms. Dubey.  My name is Reid
15  Tepfer and this is my colleague Sarah Zuckerman.  We
16  represent the FTC in litigation against Match Group
17  Inc. and Match Group, LLC, which is currently pending
18  in the Northern District of Texas.
19          MR. TEPFER:  If folks could introduce
20  themselves?
21          MR. MUNDEL:  Ben Mundel from Sidley Austin.
22          MS. PRIEST:  Chelsea Priest from Sidley
23  Austin.
24          MR. KITCHENS:  Samuel Kitchens, in-house
25  counsel at Match Group.

Page 7

1     Q.   If you don't understand my question or hear
2  me, just let me know.  I can repeat, rephrase, speak
3  up, whatever you need.
4     A.   Sure.
5     Q.   We can also take breaks whenever you would
6  like; I'd just ask if there is a question pending, if
7  you could please answer that question before the break,
8  if that's okay with you.
9     A.   That sounds good.
10     Q.   Your lawyer may object periodically.  That
11  of course doesn't mean that you don't answer the
12  question, unless, you know, he has specifically
13  instructed you not to; and if that happens, we can
14  discuss it at that time.  Do you understand?
15     A.   Yes.
16     Q.   Okay.  So you are here today as the
17  30(b)(6) designee or representative for Match Group,
18  Inc.; is that correct?
19     A.   That is right.
20     Q.   Are you employed by Match Group, Inc.?
21     A.   No.
22     Q.   And --
23     A.   I am -- so, I'm not employed by Match
24  Group.  I am on the -- a director on the board.
25     Q.   And what does that mean, to be a director

Page 9

3 (Pages 6 - 9)

1  on the board?
2      A.   I am a member of the board of directors who
3  oversees the public company.
4      Q.   And just for -- to make things a bit easier
5  today, instead of me saying, you know, "Defendant Match
6  Group, Inc.," over and over, is it okay if I say
7  Defendant MGI or MGI; will you know what I mean?
8      A.   Yes, MGI is fine.
9      Q.   And when I talk about defendant MG, LL --
10 or "Defendant Match Group, LLC," is it okay if I just
11 say MG LLC or Defendant MG LLC, will you know what I
12 mean?
13     A.   Sure.
14     Q.   Okay.  So, were you previously employed by
15 defendant MGI?
16     A.   Yes.
17     Q.   What time period?
18     A.   I want to be careful I answer the MGI
19 question.  I think MGI came into existence after we
20 went public to the best of my knowledge, so that would
21 have been 2016, end of 2015, early 2016 up until end of
22 May 2022.
23     Q.   And what was your position during that time
24 period at MGI?
25     A.   The first couple of years, 2016 and 2017, I

Page 10

1  products.
2      Q.   So when were you at -- in this position at
3  Match Group North America, what company was actually
4  your employer?
5          MR. MUNDEL:  We will object to the form.
6          Go ahead.
7      A.   I think there was Match Group, LLC, which
8  was the operating company that operated a few brands,
9  was probably the entity that paid my paycheck if that's
10 sort of your question.  And that was primarily designed
11 for efficiency and, you know, there was one benefits
12 and payroll processing group there that wrote out our
13 checks.
14 BY MR. TEPFER:
15     Q.   And to your knowledge, when you had this
16 position at Match Group North America, did you also
17 have a position at Match Group, Inc.?
18     A.   No.
19     Q.   And so when you had this position at Match
20 Group North America, my understanding is you believed
21 your paycheck was paid by Match Group, LLC; is that
22 correct?
23     A.   I believe so, yes.
24     Q.   And when you had this position at Match
25 Group North America and were being paid by Match Group,

Page 12

1  was actually president of Match Group North America.
2  And then in 2018 I became president of Match Group
3  overall.  And in 2020, early 2020, I became CEO of
4  Match Group.
5      Q.   And is that Match Group, Inc., when you say
6  Match Group?
7      A.   Correct, yes.
8      Q.   What's Match Group North America?
9      A.   Match Group North America is just an
10 aggregated -- aggregation of a few operating companies
11 that have their development teams, engineering teams,
12 et cetera, based out of North America.  So at that time
13 it was a few -- a handful of different businesses.
14     Q.   So when you say Match Group North America,
15 you are not referring to like a particular company, you
16 are referring to a group of companies?
17     A.   It is actually -- the Match Group North
18 America is just a -- the oversight role that I had was
19 overseeing four different operating companies that were
20 based in North America.
21     Q.   What are those four operating companies?
22     A.   Match.com, OKCupid, Overture is the
23 brand -- and it's easier for me to say the brands
24 because those are the consumer brands that everybody
25 knows them by -- Plenty of Fish, and the Affinity

Page 11

1  LLC, you oversaw, you said, OKCupid, Plenty of Fish,
2  Match.com, and was it Tinder also?
3      A.   No, not initially.  In 2017 I was asked to
4  wear an additional hat and become the COO of Tinder,
5  because we were going through a particular period in
6  the history and lifecycle of that company, and because
7  of my history, I was tapped to go help Tinder out.
8      Q.   And I apologize if I am asking you to
9  repeat yourself, but I think you -- there was a fourth
10 company you said, when you had this position at Match
11 Group, LLC, that you were overseeing.  Do you -- would
12 you mind reminding me of what the fourth one was?
13     A.   Yes.  It was an acquisition we had done
14 called People Media and they had a few brands that they
15 ran.
16     Q.   Okay.  Thank you.
17          So, in 2020 you became Match Group, Inc.
18 CEO; is that correct?
19     A.   That is correct.
20     Q.   And how long did you hold that position?
21     A.   About two-and-a-half years.
22     Q.   Okay.  And so you recently stepped down
23 from that position?
24     A.   End of May 2022.
25     Q.   Did you take a position elsewhere?

Page 13

4 (Pages 10 - 13)

1    A.   No.
2    Q.   Did you retire?
3    A.   Yes, I have transitioned to a different
4  chapter of my life which is mostly advisory.
5    Q.   Okay. Was there a time when you were
6  simultaneously CEO of Match Group Inc. and Match Group,
7  LLC?
8    A.   It is possible that technically I was
9  designated the CEO of Match Group, LLC, but really the
10  way we operated, I was CEO of the public company, Match
11  Group, Inc., which is a holding company, of a bunch of
12  operating brands, and each of these operating brands
13  has a fairly autonomous product, engineering,
14  marketing, customer care, and a few other functions led
15  by a GM or CEO of that company. So, that's how we
16  mostly operated is these operating brands have their
17  own groups, a separate platform, their own technology
18  stacks, they have their leader, and then all their
19  financials rolled out to the MGI level.
20    Q.   And when you were MGI CEO what were your
21  roles and responsibilities?
22    A.   Since M -- Match Group, Inc. was a public
23  company, some of the main responsibilities is reporting
24  out to the street, the investors, shareholders,
25  managing the board of directors, and also we did -- I

Page 14

1  did have the power to hire and fire the leaders of
2  these operating businesses. But all the other
3  day-to-day of these operating businesses were handled
4  by the leaders that we had.
5    Q.   And during the time that you were -- was it
6  president of Match Group North America -- who did you
7  report to?
8    A.   I believe I reported to Mandy Ginsberg.
9    Q.   And who reported to you concerning the
10  different platforms?
11    A.   I can't remember who it was because all the
12  leaders of the companies reported into Mandy, and I
13  don't believe I had any particular direct, direct
14  employee, but Mandy and I worked together quite a bit
15  in solving these problems.
16      I probably had direct employees; I can't
17  remember who they were.
18    Q.   And who was the CEO of Match Group, Inc. at
19  the time that you were president of Match Group North
20  America?
21    A.   It was Greg Blatt.
22    Q.   And did you report to him concerning the
23  various plat -- or dating websites that you were
24  overseeing?
25    A.   Actually Mandy would, and she and I often

Page 15

1  did talk to him together.
2    Q.   And what sorts of things would you discuss
3  with Greg Blatt?
4      MR. MUNDEL: Object to the form. Time
5  period. Vague.
6    A.   Yes, and again, look, you have to be
7  specific. It depends on what we were talking about,
8  but if the -- if your question is largely around what
9  sort of information does an operating leader give to
10  the -- to the MGI CEO for instance, the types of things
11  I would say are an annual strategic plan and budget,
12  that would be something we would discuss. We would
13  have monthly forecast check-ins where it was largely
14  around how these operating businesses or any of these
15  operating businesses were tracking relative to their
16  forecast, and if there were any major deviances against
17  what the plan was, why, and so on. Those would be the
18  primary things that we would discuss. And, of course,
19  there's ad hoc things that would emerge.
20      It's a big, complicated business. If
21  something of -- you know, something major would come
22  up, that would be something we would discuss.
23  BY MR. TEPFER:
24    Q.   And can you think of any examples of some
25  of, I guess, major issues that you discussed with Greg

Page 16

1  Blatt during the time that you were president of Match
2  Group North America?
3    A.   I -- I can't remember specifics at that
4  time, but if you are getting to a similar sort of
5  set-up, when I was the MGI -- when I was the CEO of
6  Match Group, Inc., you know, things like the pandemic
7  and lockdown and shutdown, that would be something I
8  would -- because that happened during my tenure, that
9  was a big topic that I would discuss with the operating
10  leaders of those businesses.
11      There were -- there was a lot of -- 2020
12  was a challenging year relative to social justice
13  issues. Post George Floyd, there was a lot of employee
14  activism in general, sort of issues with our employee
15  set in North America in particular. Those would be
16  issues that I would discuss with the leaders of the
17  businesses who had U.S.-based employees, for instance.
18    Q.   What about, like, for example, major
19  advertising campaigns, is that something that in your
20  role as MGI CEO you would discuss with the brand
21  leaders?
22    A.   No, I wouldn't.
23    Q.   Would -- to your knowledge, did other Match
24  Group, Inc. CEOs discuss major advertising campaigns
25  with leaders?

Page 17

5 (Pages 14 - 17)

1    MR. MUNDEL:  Object.  You are asking her in
2    her corporate capacity or individual knowledge?
3        MR. TEPFER:  Oh.  That -- sorry.  That was
4    in corporate capacity.
5        MR. MUNDEL:  What topic is that on?
6        MR. TEPFER:  I think it's probably 5.
7        MR. MUNDEL:  You can answer.
8    A.    I'm not sure I can remember specifics, but
9    one of the things, just by virtue of us having been
10   with the business and have institutional knowledge of
11   particular areas, it wouldn't be unusual for one of the
12   operating brand leaders to tap into our expertise on a
13   consulting basis and, you know, for me marketing was
14   not my area of expertise, so that's not something
15   people would come to me very often unless there was a
16   big marketing spend that they want to put behind a
17   campaign that they may come to me to discuss.
18       But, you know, Greg Blatt was a -- he was a
19   very good writer, and he loved writing in general, like
20   scripts, et cetera, he's written script -- screenplays,
21   et cetera, so it's possible that, you know, some of
22   the marketing folks, while they were coming up with the
23   new campaign they would consult with him on a handful
24   of specific things.
25       But it's not our role and it's not humanly

Page 18

1    possible for someone at the MGI CEO level to be
2    reviewing marketing campaigns across the brands.
3    BY MR. TEPFER:
4        Q.    What was your email address when you worked
5    at Match Group?
6        A.    So there was a -- over time, I've had many.
7    It started out as Match.com, because Matchgroup.com was
8    a very challenging where we had to go through a lot of
9    IT rigmarole to actually get that domain.  Eventually I
10   do think there was an email address that eventually
11   became Matchgroup.com.
12       I've had Gotinder.com during the time that
13   I was --
14       Q.    And what was the full email?
15       A.    I've had many different versions of it.
16   There were probably shortcuts too, but I would imagine
17   it's Sharmistha.Dubey at any of these domains.
18       Q.    Okay.  And so if there is an email address
19   with your name at Match.com for example, is it safe to
20   assume that that is your email address?
21       MR. MUNDEL:  Object.
22       You can answer if you know.
23       A.    In the documents, if you find something
24   that says Sharmistha.Dubey@Match.com, yes, that would
25   be me.

Page 19

1    BY MR. TEPFER:
2        Q.    And as far as you know, you are the only
3    one that used that email address?
4        A.    Yes, Sharmistha.Dubey.  I am fairly unique.
5        MR. MUNDEL:  We looked for a second one and
6    couldn't find a second person with that name.
7        THE WITNESS:  Sharmistha Dubey, yes.
8        MR. MUNDEL:  It's probably safe.
9    BY MR. TEPFER:
10       Q.    So, in your positions at MGI and MG LLC,
11   did you have reason to become familiar with the MGI
12   corporate structure?
13       A.    If the question is while I was the CEO was
14   I familiar with it, no, that was having the -- that was
15   largely, you know, said -- the legal -- the lawyers
16   would be more familiar with it and I didn't really have
17   quite the need to be familiar with it, but, as
18   preparation for this deposition, I have done some
19   homework on it.
20       Q.    And are you familiar with the relationship
21   between MGI and MG LLC?
22       A.    I do.
23       Q.    And are you familiar with MGI's policies
24   and procedures relating to consumer chargebacks?
25       A.    MGI has a policy -- MGI does not have any

Page 20

1    policies related to consumer chargebacks.
2        Q.    Sorry.  To rephrase, are you familiar with
3    Match Group -- or sorry -- with Match.com's policies
4    and procedures with regard to consumer chargebacks?
5        MR. MUNDEL:  Object as beyond the scope.
6        You can answer in your personal capacity.
7        A.    Yeah, I'm sure they do, but I'm not
8    familiar with any specifics.
9    BY MR. TEPFER:
10       Q.    And similarly, are you familiar with
11   Match.com's cancellation procedures for consumer
12   subscriptions?
13       MR. MUNDEL:  Object as beyond the scope.
14       You can answer in your personal capacity.
15       A.    I am not familiar with the specifics.  I
16   know they have one, but I'm not familiar with the
17   specifics.
18   BY MR. TEPFER:
19       Q.    And similarly for refund policies at
20   Match.com, did you have reason to become familiar with
21   those during your time working for Match Group?
22       MR. MUNDEL:  I am going to object as beyond
23   the scope.
24       You can answer in your personal capacity.
25       And you are asking not whether she knows

Page 21

6 (Pages 18 - 21)

1  team, with our lawyers, and one particular session with
2  the treasury, finance, accounting and tax.
3      Q.   And how many hours total would you estimate
4  that you spent in preparation for today's testimony?
5      A.   As I said, I think it is a better part of
6  three to four working days, full working days.
7      Q.   And are you receiving any benefits in
8  exchange for testifying today?
9      A.   I am not.
10     Q.   And so you're not being compensated for
11 your testimony?
12     A.   Absolutely not.
13     Q.   Do you own any MGI stock?
14     A.   I do.
15     Q.   How much?
16     A.   I --
17         MR. MUNDEL:  We would object.
18     A.   I -- I don't remember, but these were all
19 grants given to me when I was employed and I had an
20 actual role with the company.
21 BY MR. TEPFER:
22     Q.   And do you have any family members that
23 work for Match Group properties?
24     A.   No.
25     Q.   Is it -- so, Match.com, is that within

Page 26

1  Match Group, Inc.'s portfolio of brands; is that
2  correct?
3      A.   Match.com is one of the operating brands
4  that's part of the portfolio of companies that MGI
5  holds.
6      Q.   And would you agree that it's accurate to
7  say that Match Group, Inc. provides its customers
8  digital technologies through its portfolio companies?
9         MR. MUNDEL:  Object to the form.  Beyond
10 the scope.
11         You can answer in your personal capacity.
12     A.   I'm not sure what the question means.
13         MR. TEPFER:  If I could just clarify, I
14 believe -- you know, I certainly understand if, you
15 know, the objection's about beyond the scope, but I
16 believe she would -- you know, if she's able to
17 testify, I believe she would still need to testify in
18 her capacity as Match Group, Inc.'s corporate
19 representative, even if it's outside of the noticed
20 topics.  There's just not an obligation to have
21 prepared for topics outside of the noticed topics.
22         MR. MUNDEL:  I don't understand exactly
23 what you are saying, but if it's -- if you are asking
24 her a question beyond the scope of the noticed topics,
25 then she's not testifying on behalf of MGI.

Page 27

1      She's only been designated to speak on
2  behalf of -- on particular topics.  I mean, I haven't
3  instructed her not to answer --
4         MR. TEPFER:  Sure.
5         MR. MUNDEL:  -- but her testimony is not on
6  behalf of MGI.
7         MR. TEPFER:  I -- yeah, I have to disagree
8  on that particular -- I -- I understand if, you know,
9  it happens to be the case that, because this wasn't a
10 noticed topic she wasn't prepared to speak on it, but
11 she's still here today as a representative of MGI.
12         MR. MUNDEL:  What is your -- are you
13 suggesting that she can provide testimony on behalf of
14 MGI outside the scope of what you have noticed?
15         MR. TEPFER:  Yes.
16         MR. MUNDEL:  What is the basis for that?
17         MR. TEPFER:  I can provide a few cases.  So
18 the -- you know, the reasonable particularity
19 requirement of 30(b)(6), that's a minimum of what the
20 corporate designee has to prepare for.  It's not the
21 maximum of what I'm allowed to ask the corporate
22 designee concerning.
23         So, you know, that's what she has to
24 prepare for, it's not a limit on what the corporate
25 designee has to discuss.  And I can provide case cites

Page 28

1  if necessary on that point.
2         MR. MUNDEL:  Yes, please provide those case
3  points.
4         MR. TEPFER:  So Eng-Hatcher versus Sprint,
5  and that's number 07 Civ. 7350 2008 WL4104015, Southern
6  District New York, August 28th, 2008.
7         UniRAM Tech Inc. versus Monolithic Systems
8  Tech Inc., and that's 2007 WL915225, and that's the
9  Northern District of California, March 23rd, 2007.
10        McMahon versus Presidential Airlines, Inc.,
11 and that's 2006 WL535979.
12        MR. MUNDEL:  Can you give that number
13 again?
14        MR. TEPFER:  Sorry.  2006 WL5359797, and
15 that's Northern District California, August 25th, 2016.
16        But -- but, yes, in essence, my point is
17 simply that these noticed topics are the minimum of
18 what has to be prepared for, but not a limitation on
19 the corporate designee's testimony, and so I don't
20 believe it's appropriate to limit her testimony to
21 being in her personal capacity.
22        MR. MUNDEL:  So we disagree with that as a
23 legal proposition.
24        MR. TEPFER:  Okay.
25        MR. MUNDEL:  We're happy to read those

Page 29

8 (Pages 26 - 29)

1 cases and read them for what they're worth.
2     But as a matter of continuing the
3 testimony, the witness has been designated only on
4 particular topics, not on other topics, so she is here
5 to testify about those topics as we have agreed to
6 revise them to be reasonable, and so we will continue
7 to object as beyond the scope for anything beyond
8 those --
9     MR. TEPFER: Sure, I just wanted to explain
10 our position.
11     MR. MUNDEL: Sure.
12 BY MR. TEPFER:
13     Q.   So generally speaking, what is Defendant
14 Match Group, Inc.?
15     A.   What is Match Group, Inc.?
16     Q.   Yes.
17     A.   Match Group, Inc., is a holding company
18 that is public -- its stock is publicly traded, and it
19 has a portfolio of operating companies that run a
20 number of dating and social connection brands, consumer
21 brands.
22     Q.   And when you say holding company, what do
23 you mean by that?
24     A.   It is a holding company that the businesses
25 are managed on the operating company levels, their

Page 30

1 financials are rolled up.  Match Group, Inc., is
2 responsible for reporting out the overall consolidated
3 financials, and so that's what it is.
4     Q.   And when you say the financials are rolled
5 up, what do you mean by that?
6     A.   It is the P&Ls of each of these operating
7 businesses are then consolidated in full, and then it's
8 reported out to the street on a quarterly basis.
9     Q.   Does Match Group, Inc., do any sort of
10 coordination between the different brands within its
11 portfolio?
12     MR. MUNDEL: I am going to object to the
13 form and vague as to coordination.
14     A.   Yeah, I mean, you've got to be more
15 specific.
16     So clearly they, you know, just even in the
17 event of consolidating financials, they're obviously
18 having conversations with each of these operating
19 companies to understand what their P&L looks like -
20 right? - so that's -- if that's coordination, that's
21 coordination.
22     But you've got to give me more specifics
23 around your question.
24 BY MR. TEPFER:
25     Q.   And when did Match Group, Inc., go public?

Page 31

1     A.   I believe in Q4 of 2015.
2     Q.   And so MGI, Defendant MGI was previously
3 owned by IAC, Inc.; is that correct?
4     A.   I don't think MGI existed.  I couldn't tell
5 you what the -- what the entity was, but yes, IAC was
6 the public company, holding company, that owned these
7 assets.
8     Q.   And when -- when IAC owned those assets,
9 what was the company that operated Match.com?
10     MR. MUNDEL:  Object as beyond the scope.
11     A.   I won't get it right.  I didn't look back
12 and see the whole sort of chronology of what happened.
13 BY MR. TEPFER:
14     Q.   When was Match Group, Inc., spun off from
15 IAC, Inc.?
16     MR. MUNDEL:  Beyond the scope.
17     You can answer if you know.
18     A.   So as I said, it went public in fall of --
19 Q4 of 2015, so that is when it would have -- public
20 shareholders could buy stock in the company; however,
21 IAC remained a majority shareholder up until -- I won't
22 get the timeline right -- but 2020 I think, but
23 somebody should confirm that.
24 BY MR. TEPFER:
25     Q.   When was Match Group, LLC, created?

Page 32

1     MR. MUNDEL:  Object as beyond the scope.
2 The witness can answer in her personal capacity.
3     A.   I couldn't tell you actually.
4 BY MR. TEPFER:
5     Q.   Did the relationship between MGI and MG,
6 LLC, change in any way as a result of Match Group,
7 Inc., spinning off from IAC?
8     MR. MUNDEL:  Object as beyond the scope and
9 vague to relationship changing in any way.
10     A.   I'm not sure.  From an operate -- I'm not
11 sure if anything changed by name or, you know, some
12 legal technicalities, but nothing changed from a
13 day-to-day, the way we operated the business.
14 BY MR. TEPFER:
15     Q.   Does MGI currently play any role in
16 overseeing the operation of Match.com?
17     A.   As I said, MGI is a holding company that
18 does oversee the financial performance of all of its
19 operating businesses, and that would include Match.com.
20     Q.   And when you say overseeing the financial
21 performance of Match.com, does that include making
22 recommendations to improve the financial performance of
23 Match.com?
24     A.   Nobody at the MGI level has that much
25 knowledge of each of the underlying businesses to be

Page 33

9 (Pages 30 - 33)

1  able to make that kind of recommendation, but yes, on a
2  high level, macro level, if let's say the G -- leader
3  of that -- of a business comes and tells us, "Well, I'm
4  gonna lose a bunch of money next year," then that's a
5  conversation I as an MGI CEO will have. "Mike, I'm not
6  sure we can afford to lose the money, so much money,
7  what can you do to cut some costs," and that would be
8  the level of conversation that would happen.
9      Q.   And has MGI's role in the operation of
10  Match.com changed over time, or is the role that you
11  are describing to me now the same that it's been over
12  the course of that relationship?
13          MR. MUNDEL:  Objection.  Vague.  Go ahead.
14      A.   It -- I mean, the only thing I can say is,
15  as far as I know, since MGI became a thing, it's always
16  operated that way.
17  BY MR. TEPFER:
18      Q.   Did -- was Match Group, LLC, previously
19  known as Match.com, LLC, to your knowledge?
20          MR. MUNDEL:  Can you just state those names
21  again?  I think --
22          MR. TEPFER:  Sure.
23  BY MR. TEPFER:
24      Q.   Did -- was -- was Defendant MG, LLC,
25  previously called Match.com, LLC?

Page 34

1          MR. MUNDEL:  Objection.  Beyond the scope.
2          You can answer in your personal capacity.
3      A.   I actually don't know.
4  BY MR. TEPFER:
5      Q.   Have you ever heard of Match.com, LLC?
6          MR. MUNDEL:  Same objection.
7      A.   Yeah.  I couldn't be sure.
8  BY MR. TEPFER:
9      Q.   Are you familiar with a company called
10  Match Group Holdings I, LLC?
11          MR. MUNDEL:  Beyond the scope.
12          You can answer in your personal capacity.
13      A.   Yes, I believe it is a level below MGI,
14  which is largely -- there is a Holdings Company I and a
15  Holdings Company II, and their -- their primary
16  function is to aggregate the financials and some
17  capital structures, and that came out of the spinoff of
18  IAC, to the best of my knowledge.
19  BY MR. TEPFER:
20      Q.   And so you said to aggregate financials.
21  What do you mean by that?
22      A.   Meaning, I think the cash is pooled at a
23  Holdings I level, if I remember right, the cash from
24  all of the operating businesses, because that's an
25  easier way to then roll up and report out and pay taxes

Page 35

1  at the federal level and so on.
2      Q.   And so those companies, I guess Match Group
3  Holdings I, LLC, and Match Group Holdings II, LLC,
4  exist for tax purposes; is that correct?
5          MR. MUNDEL:  Objection.  Misstates
6  testimony.  Beyond the scope.
7          You can answer in your personal capacity.
8      A.   Yeah, it's not just tax, it's all -- I
9  think operational efficiency around financials.
10          MR. TEPFER:  And I just want to state for
11  the record, I do think that these questions concerning
12  the intermediary LLCs are fairly within the scope of
13  topic 1, which is -- concerns the relationship between
14  Match Group, Inc., and Match Group, LLC, those are the
15  intermediary companies of those two companies, part of
16  the relationship, but, again, just to reiterate our
17  position that, you know, we do believe she is test --
18  should be testifying in her corporate capacity, and,
19  you know, we will reserve the right to seek to compel,
20  you know, testimony on -- on that basis at a subsequent
21  time.
22          MR. MUNDEL:  Well, two things.  First, your
23  last question was whether a particular company was set
24  up for tax purposes alone.  There's absolutely no topic
25  on that, particularly when the entity that you were

Page 36

1  asking about was not MGI or MGL, but a completely
2  different entity, and what the intent was for that.  So
3  that is far beyond any of the topics that you noticed,
4  number one.
5          Number two, as to your point about personal
6  capacity versus corporate capacity, we have not
7  instructed the witness not to answer, so this idea of
8  moving to compel strikes me as completely far-fetched.
9          But my very kind colleagues have looked at
10  the cases that you cited while I've been paying very
11  close attention to your questioning, and it's clear
12  from those cases that they don't support the FTC's
13  position here.
14          MR. TEPFER:  Sure.
15          MR. MUNDEL:  Nick Mahone versus
16  Presidential --
17          MR. TEPFER:  Well, if --
18          MR. MUNDEL:  Rina Moffitt -- I'm not
19  finished yet.
20          MR. TEPFER:  Sorry.  I know, but if -- I'm
21  happy to discuss this off the record, but it's getting
22  kind of lengthy, if we could -- I'm happy to talk off
23  the record, but I don't want to go into a case level
24  discussion while the clock's ticking --
25          MR. MUNDEL:  Well, you cited these cases

Page 37

10 (Pages 34 - 37)

1    A.   I'm not sure how to answer that.  The way
2    this works, to the best of my knowledge, and, again,
3    this wasn't something I dealt with, it would have been
4    the accounting team that deals with it, but I -- you
5    know, the cash is obviously collected at the operating
6    company levels.  Many of the expenses are paid out
7    there.  Some expenses on behalf of these are paid up at
8    a corporate level, and then the net cash gets rolled up
9    into various -- from an accounting perspective, the net
10   cash would roll up at one of the holding level and then
11   reported out at the MGI level.
12   BY MR. TEPFER:
13   Q.   And so Match Group, Inc., you said, does
14   not itself make revenue.
15   A.   Correct.
16   Q.   But the company incurs expenses of course;
17   is that right?
18        MR. MUNDEL:  I am going to object as beyond
19   the scope, the expenses of Match Group, Inc.
20        Go ahead.
21   A.   Yeah, I -- I mean, there's -- I'm sure
22   there are some expense lines related to public
23   company -- company running like audits, et cetera,
24   which are handled at the corporate cost line.  But,
25   otherwise, most of our operating costs are at the

Page 70

1    operating cost line.
2    BY MR. TEPFER:
3    Q.   To the extent that Match Group, Inc., does
4    incur costs, those costs are paid using revenue derived
5    from, I guess, the operating companies beneath it?
6         MR. MUNDEL:  I am going to object to the
7    form of the question and also beyond the scope.  If you
8    understand it.
9    A.   I'm a little confused about what the
10   question is trying to answer, but this is the best
11   understanding I have:
12        Each of these operating companies makes
13   revenue, has expenses, they deal with it, most of it
14   themselves.  There are -- there's a corporate line and
15   some shared services.  Shared services generally get
16   allocated to these operating companies, but there is a
17   corporate cost line, and, yes, those checks and
18   expenses would be paid out of the cash, the rolled-up
19   aggregate cash from all of these operating businesses.
20   BY MR. TEPFER:
21   Q.   Thank you.
22        And so the -- for example, the MGI CEO, his
23   or her salary would be paid out of that same pool of
24   funds from the operating companies; is that correct?
25        MR. MUNDEL:  Object as beyond the scope and

Page 71

1    vague.
2    A.   The MGI CEO's salary cost sits in that
3    corporate line from an accounting perspective.
4    BY MR. TEPFER:
5    Q.   Does MCI play a role in the hiring of any
6    MG LLC employees?
7    A.   The CEO of M -- MGI, for instance, does
8    have the right to hire and fire the operating company
9    heads, leaders.
10   Q.   What about other employees?
11   A.   Generally any employee that's in those
12   operating companies, they are the -- the leader of that
13   operating company is responsible for hiring and firing
14   them.  Now, the -- there are some shared services which
15   a few of those leaders could be hired and fired, for
16   instance, by -- the CFO, for instance.  The CFO could
17   hire the head of treasury, which is a shared service.
18   Q.   And would you mind defining what a shared
19   service is?
20   A.   So, there are a few functions like legal,
21   accounting, tax, mostly those kinds of services which
22   are, you know, functionally similar and they are --
23   they don't make a difference to how the consumer views
24   the brand.  Everything that is consumer-facing is part
25   of the -- the operating team that runs those brands.

Page 72

1    So, product, engineering, marketing, design, analytics,
2    customer care, all of that sits independently, and they
3    are -- their sole job is to make sure they are running
4    a platform and a brand that works for the consumers
5    that they are trying to target.  And they run that
6    fairly autonomously, but something like tax or treasury
7    or accounting or legal is a function that sits at -- a
8    little bit at the higher level, and they have employees
9    that allocate their time onto these different brands,
10   so -- and all of that cost would get assign --
11   attributed from an accounting per -- purpose to that
12   particular brand, but there could be some corporate
13   level stuff that they have to deal with like paying of
14   federal tax, for instance, or managing the employee
15   stock purchase plan for instance.  Those are generally
16   housed at the corporate expense line.
17   Q.   So --
18   A.   But those are the people, like benefits,
19   stock plan management, a lot of accounting, tax, those
20   are shared services.
21   Q.   So shared services are things that are at
22   the corporate level, those sorts of services?
23        MR. MUNDEL:  Object as beyond the scope and
24   to the form.
25   A.   It -- it -- from an accounting perspective,

Page 73

19 (Pages 70 - 73)

1  those expenses hit the corporate line.
2  BY MR. TEPFER:
3      Q.   And so, for example, does MG, LLC, have its
4  own legal department?
5          MR. MUNDEL:  Beyond the scope.
6      A.   There is a shared service legal department.
7  There are lawyers that work on specific brands,
8  sometimes all of their work is on a particular brand,
9  sometimes they spend -- you know, they wear a hat and
10  they help Tinder or they wear a hat, they help someone
11  else, for instance.
12  BY MR. TEPFER:
13      Q.   So there are some attorneys that are
14  assigned to particular brands and some attorneys that
15  work for multiple brands?
16          MR. MUNDEL:  Object as beyond the scope.
17      A.   The -- it's -- all of the -- their times
18  are actually accounted for by some brand, they just
19  wear different hats and help and work on those
20  particular brands.
21  BY MR. TEPFER:
22      Q.   In terms of who the employer is, is that
23  Match Group, Inc., for those attorneys you are
24  referencing?
25          MR. MUNDEL:  Object as beyond the scope.

Page 74

1      Q.   Where does Match Group, Inc., have office
2  space, if you know?
3          MR. MUNDEL:  Beyond the scope.
4      A.   I don't believe Match Group, Inc., has
5  office space.
6  BY MR. TEPFER:
7      Q.   Does Match Group, Inc., have employees?
8      A.   To the best of my knowledge, there are only
9  three employees of Match Group, Inc.
10      Q.   And has Match Group, Inc., ever had office
11  space that you know of?
12          MR. MUNDEL:  Beyond the scope.
13      A.   I don't believe so.
14  BY MR. TEPFER:
15      Q.   And who are those three employees, the
16  current MGI employees that you are referring to?
17      A.   Today, it would be Bernard Kim, who is the
18  CEO of MGI, Gary Swidler is the CFO, and Jared Sine
19  who is the general counsel, chief legal officer.
20      Q.   And the three individuals that you
21  mentioned, would you mind telling me where their
22  offices are located?
23          MR. MUNDEL:  Beyond the scope.
24          Go ahead.
25      A.   Bernard lives and works out of LA.  Gary

Page 76

1      A.   No.  I believe the corporate team, in terms
2  of getting their paychecks, just for ease, happens to
3  sit under Match Group, LLC, because a lot of them
4  happen to be in Dallas.
5  BY MR. TEPFER:
6      Q.   And where is Match Group, Inc.,
7  headquartered?
8          MR. MUNDEL:  Beyond the scope, but you can
9  answer if you know.
10      A.   I think our HQ is Dallas.  So I imagine it
11  is Dallas.
12  BY MR. TEPFER:
13      Q.   Does Match Group, Inc., have office space
14  in Dallas?
15          MR. MUNDEL:  Beyond the scope.
16      A.   I -- I don't believe so, but -- I don't
17  believe so.
18  BY MR. TEPFER:
19      Q.   Does any employee of Match Group, Inc.,
20  work in Dallas, to your knowledge?
21          MR. MUNDEL:  Beyond the scope.
22      A.   Probably one.
23  BY MR. TEPFER:
24      Q.   And who are you thinking of?
25      A.   Jared Sine, the general counsel.

Page 75

1  lives and works out of New York.  And Jared lives and
2  works out of Dallas.
3  BY MR. TEPFER:
4      Q.   And the offices that they work from, are
5  those MG LLC offices?
6          MR. MUNDEL:  Beyond the scope.
7          You can answer in your personal capacity.
8      A.   Yeah, I don't -- I -- I can't tell you who
9  owns each of those different.  We have many, many
10  pieces of real estate leased or owned in many parts and
11  I couldn't tell you who owns them, but I don't believe
12  MGI owns anything.
13  BY MR. TEPFER:
14      Q.   You stated that the legal team is housed
15  in -- or strike that.
16          You stated, I believe, that MG LLC is the
17  actual employer for the attorneys that handle legal
18  representation for the Match Group properties; is that
19  correct?
20          MR. MUNDEL:  I am going to object as being
21  beyond the scope and also misstating the testimony.
22      A.   I said the shared service function of legal
23  and the lawyers get paid, their paychecks probably come
24  from Match Group, LLC, but their costs are all assigned
25  to the operating company or brand that they serve.

Page 77

20 (Pages 74 - 77)

BY MR. TEPFER:

1  Q.   And do you know who supervises those
2  attorneys you are referencing?
3       MR. MUNDEL:  Object as beyond the scope of
4  the noticed topics.
5       A.   I don't know how the legal -- what the
6  legal organization runs today.  They probably have a
7  few levels.  There are -- and based again on functions.
8  So I couldn't tell you for sure how they -- because
9  there's litigation attorneys, there are privacy
10 lawyers, there are all kinds of different things.  I
11 don't know how they organize.
12 BY MR. TEPFER:
13     Q.   Does the general counsel supervise any
14 attorneys?
15     MR. MUNDEL:  I am going to object as beyond
16 the scope, and I'll just, due to the privilege issue
17 here, I think you can just say "yes" or "no" or you
18 don't know and leave it there.
19     So the question is, does the general
20 supervise who?
21     MR. TEPFER:  The attorneys she's
22 referencing.
23 BY MR. TEPFER:
24     Q.   And to be clear I'm not asking for, you

Page 78

---

know, any communications with attorneys or anything
like that.  I'm just trying to understand how it
operates.
     MR. MUNDEL:  So the question I think that
you can answer is, does the general counsel supervise
the legal department -- any particular attorneys at --
do you know whether that's true or not.
     A.   I think he has somebody reporting to him,
and I can't be sure who it is.
BY MR. TEPFER:
     Q.   But he's the -- is that an attorney you are
referencing that reports to him?
     A.   Yes, that's what I mean, some --
     Q.   And --
     A.   Some attorney, I'm sure, reports to him.
     Q.   And the general counsel is the only
attorney that works at Match Group, Inc., correct?
     A.   That is correct.
     Q.   So this would be an attorney that works for
Match Group, LLC, you are referring to?
     MR. MUNDEL:  Object as beyond the scope.
     A.   I couldn't tell you.  I don't know how they
are organized.
BY MR. TEPFER:
     Q.   Do the attorneys in, I guess, shared

Page 79

---

services represent Match Group, Inc.?
     MR. MUNDEL:  I am going to object.  You are
asking her whether shared services attorneys represent
Match Group, Inc.?
     MR. TEPFER:  Yeah, the attorneys we have
been discussing, whether they, as a practice, represent
Match Group, Inc.
     MR. MUNDEL:  So this is -- this is getting
close to some privilege issues.
     So you can answer this question:  Do you
know whether shared services attorneys represent the
entity Match Group, Inc., just give a yes or no answer,
or "I don't know."
     A.   I don't know.
BY MR. TEPFER:
     Q.   And the accounting services that you
discussed, do those individuals work for Match Group,
LLC?
     MR. MUNDEL:  Beyond the scope.
     A.   Again, practically the way it works is
there are accountants who work on the specific
operating companies and brands, but there are some
consolidated work that is at a corporate level and they
sit at the corporate level.  None of them work for MGI,
most likely because the corporate function gets its

Page 80

---

paychecks out of Match Group, LLC, they probably get
their paychecks from Match Group, LLC, but again, from
an accounting perspective, the costs are either
allocated to the various brands that they spend time
working on, or the corporate line.
BY MR. TEPFER:
     Q.   And those arrangements that you are
referencing about cost allocation, are those
memorialized in contractual agreements?
     MR. MUNDEL:  Object as beyond the scope.
     Go ahead.
     A.   I don't know the answer to that.  I know
just operationally it is tracked, hours are tracked,
and -- and that's how the expenses are.
BY MR. TEPFER:
     Q.   So in terms of Match Group, LLC's,
location, you referenced that it was headquartered in
Dallas; is that correct?
     MR. MUNDEL:  Objection as beyond the scope.
     A.   Yeah, there is an HQ in Dallas of Match
Group, Inc.
BY MR. TEPFER:
     Q.   Of Match Group, Inc.?
     A.   Yeah, I think the company, the public
companies has an address that is Dallas.

Page 81

21 (Pages 78 - 81)

1    Q.   But it doesn't actually operate at that
2  physical address; is that correct?
3         MR. MUNDEL:  Objection.  Beyond the scope.
4    A.   As I said, there's no operations at MGI
5  level.  So -- and the current three employees for
6  instance, they operate out of three different parts of
7  the country.
8  BY MR. TEPFER:
9    Q.   And those three parts of the country are
10 Los Angeles, Dallas, and New York?
11   A.   Correct.
12   Q.   Does -- do Match.com employees share office
13 space with employees of other dating platforms?
14        MR. MUNDEL:  Beyond the scope.
15   A.   Generally not, but there could be some
16 employees from other brands, if they are closer to
17 Dallas for instance, especially in this new remote
18 working paradigm that we have, they could have -- they
19 could come to the Dallas office and work, and, if there
20 is somebody who is getting a space out of Match.com's
21 office, I'm sure the -- that person's brand pays for
22 it, so it gets allocated out, that cost.
23 BY MR. TEPFER:
24   Q.   If the MGI CEO wants to replace the MG LLC
25 CEO does it need approval from anyone at MG LLC to do

Page 82

1         If, along the way, one of the operating
2  businesses deviates meaningfully from the -- small
3  changes doesn't make a difference, but if it is
4  meaningful deviance against the plan, then that is
5  something that has to be brought up to the MGI because
6  that's what they have to manage, investors and
7  shareholders, for.
8  BY MR. TEPFER:
9    Q.   And when you say meaningful deviance, what
10 would constitute a meaningful deviance in your eyes?
11   A.   There's no defined thing.  It is more a --
12 you know, what -- let's say somebody came out with an
13 extra $10 million of marketing spend they want to do
14 that wasn't budgeted for.  That is not something that
15 will show up in the earnings beyond the expectation of
16 what the -- even the street expects, and so that is a
17 conversation that will have to happen, whether--
18   Q.   So -- oh, I'm sorry.
19   A.   Whether that's a thing to do or not.
20   Q.   And if for -- if MG -- if the CEO of MG LLC
21 had wanted to, for example, acquire another dating
22 platform as an acquisition, is that something that the
23 MG LLC CEO is obligated to get approval from the MGI
24 CEO for?
25        MR. MUNDEL:  Object as beyond the scope.

Page 84

1  so?
2         MR. MUNDEL:  I am going to object as beyond
3  the scope and also incomplete hypothetical.
4    A.   As a practical matter, when I was CEO, if I
5  wanted to remove the Match.com CEO, I could do it
6  myself.  It's generally not great practice to just
7  solely do that.  I would talk to them -- I mean, there
8  has to be good reason.  I should discuss it with the
9  board, I should discuss it with other folks and make
10 that decision.  These are not easy decisions to make.
11 BY MR. TEPFER:
12   Q.   And looking at, you know, the general
13 practice between 2013 and the present, in the instance
14 where, you know, MG LLC is assessing its budget, is
15 there a cap beyond which MG LLC has to seek authority
16 from MGI to exceed?
17        MR. MUNDEL:  Object to the form, the
18 hypothetical, incomplete.
19   A.   That is not how we operate.  As I said,
20 once a year, every operating business comes up with
21 their plan, their strategy and their financial plan.
22 They -- we roll it out -- it is rolled up at the MGI
23 level because that is ultimately what gets -- has to --
24 you know, the performance against that plan is what
25 needs to be reported out to the street.

Page 83

1  Incomplete hypothetical.
2         Go ahead.
3    A.   As I said, these operating businesses
4  are -- we call them financial companies, their big job
5  is really to operate the company, the P&L that they are
6  in ownership of.  Mergers and acquisitions -- if they
7  wanted a piece of technology that they are acquiring,
8  then, you know, it does -- certainly they can go do
9  that.  That's not an issue.
10        If it's another large dating player, then
11 it's not the operating company, it will eventually be
12 managed at the MGI level if there is a big
13 mergers/acquisition target transaction that needs to
14 happen.
15 BY MR. TEPFER:
16   Q.   Does MGI offer MG LLC employees stock
17 options?
18        MR. MUNDEL:  Objection.  Beyond the scope.
19        Do you have a topic for that, Reid?
20        MR. TEPFER:  I think topic 1, although --
21        MR. MUNDEL:  Topic 1 says nothing about
22 stock options, so it's not that topic.  Do you have
23 another topic?
24        MR. TEPFER:  Not offhand.  I -- I don't
25 have it in front of me, but --

Page 85

22 (Pages 82 - 85)

1      MR. MUNDEL: He marked it as Exhibit 1 to
2  the deposition.
3      MR. TEPFER: Thanks.
4      MR. MUNDEL: So do you have a topic?
5      MR. TEPFER: No. But I'm not going to
6  engage in providing topics for each question. If you
7  want to make an objection you can go ahead and do so;
8  otherwise we need to go on.
9      MR. MUNDEL: Yeah, we do object as beyond
10 the scope, but we also make a broader objection which
11 is we've been going a few hours now, and I would say
12 80 percent of the questions are beyond the scope of the
13 noticed topics, which is improper under Rule 30(b)(6).
14 So we are going to need to have the topics -- the
15 questions focused on the topics that are at hand.
16     MR. TEPFER: We're not going to so limit
17 our questioning.
18     MR. MUNDEL: Then you are not going to be
19 complying with Rule 30(b)(6).
20     MR. TEPFER: We disagree.
21     If you wouldn't mind reading the question
22 back?
23     THE REPORTER: Question: "Does MGI offer
24 MG LLC employees stock options?"
25     MR. MUNDEL: Maintain the objection to

Page 86

1  scope.
2      A.  To the best of my knowledge, that -- some
3  employees have the -- are granted equity and there
4  is -- one of the instruments that we have is the MDCH
5  stock, and it is granted, but it's all accounted for in
6  terms of expenses, et cetera, at these operating
7  company -- or wherever the -- at these operating
8  company levels, basically.
9  BY MR. TEPFER:
10     Q.  What about 401(k) plans, does MGI offer MG
11 LLC employees a 401(k) plan?
12     MR. MUNDEL: I am going to object as beyond
13 the scope of the noticed topics.
14     You can answer in your individual capacity
15 if you know.
16     A.  And, again, this is complicated, because
17 401(k) is probably not applicable to international
18 employees, and so it is -- the 401(k) is, again,
19 administered at the corporate level. I wouldn't know
20 any more details than that.
21 BY MR. TEPFER:
22     Q.  Are there any other benefits for MG LLC
23 employees that are administered by MGI?
24     MR. MUNDEL: Object as beyond the scope and
25 to the form.

Page 87

1      A.  Again, the things like insurance is at a
2  corporate level. I -- I'm sure there's others that I
3  can't think of.
4  BY MR. TEPFER:
5      Q.  And does MGI have the authority to veto MG
6  LLC management decisions?
7      MR. MUNDEL: I am going to object as to
8  incomplete hypothetical, what management decisions and
9  what folks you are referring to, and beyond the scope
10 of the noticed topics.
11     Go ahead. You can answer.
12     A.  As I said, the way we operate is we
13 delegate authority to the leaders of these operating
14 businesses and we trust them to -- we hopefully hire
15 the right kind of people and trust them to make
16 decisions related to that operating business and, you
17 know, the tool -- there is no tool for vetoing
18 anything, that's not how we operate.
19     If we generally find a leader to be not
20 making good decisions for the brand, we would fire
21 them. That is a -- a more commonly used tool, and
22 there's no sort of veto process necessarily.
23 BY MR. TEPFER:
24     Q.  And on the topic of firing, does any other
25 entity aside from MGI have the authority to remove MG

Page 88

1  LLC executives?
2      MR. MUNDEL: I am going to object. When
3  you are asking about other entities beyond MGI that's
4  clearly beyond the scope of the noticed topics, and if
5  you are asking about legal authority, I object as
6  calling for a legal conclusion.
7      But go ahead. You can answer to the extent
8  you know.
9      A.  Yeah, I -- legally, I -- I don't know what
10 who has. But just the leaders of the business
11 generally are -- generally fall under the Match Group,
12 Inc., CEO's responsibility.
13 BY MR. TEPFER:
14     Q.  Do MGI and MG LLC have any joint bank
15 accounts?
16     MR. MUNDEL: I am going to object as beyond
17 the scope when you ask about particular bank accounts.
18     You can answer if you know.
19     A.  I don't know all the details of bank
20 accounts, but I would say no.
21 BY MR. TEPFER:
22     Q.  And why would you say no?
23     A.  The only reason I'm saying this is they
24 were trying to explain to me in that one call that I
25 had with the finance folks, bank -- different levels at

Page 89

23 (Pages 86 - 89)

1  which banks' accounts sat, and it didn't -- I don't
2  remember catching anything that said there's a joint
3  bank account.  The joint bank account term was not
4  something that I heard.
5      Q.   Are you aware if there are accounts where
6  both MGI and MG LLC employees are signatories?
7          MR. MUNDEL:  Object as beyond the scope.
8          Go ahead.
9      A.   I don't know the answer to that.
10 BY MR. TEPFER:
11     Q.   Do you know the payment processor that is
12 used to process charges relating to Match.com?
13         MR. MUNDEL:  I am going to -- what topic is
14 that, Reid?
15         MR. TEPFER:  I -- I don't want to engage in
16 this.  If you have an objection, if you believe it's
17 outside the scope, so state it.
18         MR. MUNDEL:  I certainly think it's outside
19 the scope, but if I'm wrong I'd be happy to hear it if
20 there's any topic on payment processing.  Is there one?
21         MR. TEPFER:  I'm not going to engage in
22 back and forth on that.
23         MR. MUNDEL:  We object as beyond the scope
24 of the noticed topics, and also wholly inappropriate
25 given this last hour of questioning.
                                            Page 90

1      A.   I don't know, but I can't imagine them
2  having -- they're all separate, they run separate,
3  they're on different platforms, completely independent,
4  tech stacks, they -- all the code is written separately
5  for most of these brands so I don't know.
6  BY MR. TEPFER:
7      Q.   Do you know if charges have ever been
8  processed for Match.com customers on a merchant account
9  that was also used to process charges for customers of
10 other dating websites?
11         MR. MUNDEL:  I am going to object, again,
12 as well beyond the scope of the noticed topics.  If you
13 wanted a topic on that you should have noticed it.
14         You can answer in your individual capacity
15 if you know.
16     A.   I have no idea.
17 BY MR. TEPFER:
18     Q.   So is it accurate that between 2013 and
19 today there have been a number of individuals who had
20 positions simultaneously at MG LLC and MGI?
21     A.   I don't think that's accurate.  As I said,
22 there's only three employees of MGI, the CEO, the CFO,
23 and the general counsel, and they generally - generally
24 - don't have any operating roles in the underlying
25 operating companies except in for entering times on to
                                            Page 92

1  BY MR. TEPFER:
2      Q.   You can answer.
3      A.   I don't know what payment processing they
4  are using now.  And again, I'm -- I would imagine it
5  depends on the app and the platform.  For instance, if
6  it's the iOS app, Apple does it, I would imagine fully.
7  For the other transactions I'm not sure who they use
8  now.
9      Q.   Does MG LLC maintain all the payment
10 processors that are used -- sorry.
11         Does MG LLC maintain all the merchant
12 accounts that are used for the processing of Match.com
13 charges for customers?
14         MR. MUNDEL:  I am going to object again,
15 beyond the scope and vague, ill-defined question.
16         You can answer if you know.
17     A.   I haven't the vaguest idea.
18 BY MR. TEPFER:
19     Q.   Does -- do any MGI brands utilize shared
20 merchant accounts?
21         MR. MUNDEL:  I am going to object as beyond
22 the scope.  You are talking about, I think, things
23 beyond MGI and MGL, and also to the form of the
24 question.
25         Go ahead and answer if you understand it.
                                            Page 91

1  special occasions, meaning, let's say they fired the
2  CEO of a brand and they are in the process of hiring a
3  new CEO, for that period of time they could step in and
4  wear an additional hat of being the CEO of that brand.
5  That can happen from time to time.  But that's not
6  desired, it's not ideal, and not something we try -- we
7  try to avoid it for sure.
8      Q.   So is it the case that -- am I correct in
9  understanding that between, say, 2013 and the present,
10 if an individual was an executive at MGI, they would
11 not have played a role in the day-to-day operations of
12 Match.com?
13         MR. MUNDEL:  I'm just going to object as to
14 the breadth of that question.
15         You can answer if you understand it.
16     A.   An MGI person generally would not have the
17 time to deal with Match.com day to day.
18 BY MR. TEPFER:
19     Q.   Between 2013 and the present, did MGI at
20 any point have a COO?
21     A.   I believe Gary got an additional title,
22 addition to his title, in addition to CFO as -- and COO
23 for a couple of years.  I don't know how many years,
24 but he might have had an extension to his thing.
25     Q.   So in the circumstance where an individual
                                            Page 93

24 (Pages 90 - 93)

1     A.   I can't remember this.  I -- I'm not sure.
2  I don't remember.
3     Q.   What was Mr. Blatt's position at this time?
4     A.   This is what, January 2017?  He was MGI's
5  CEO as well as Tinder CEO.
6     Q.   And did Ms. Ginsberg have a position at MGI
7  at this time?
8     A.   In 2017?  No.
9     Q.   And what about Ayesha Gilard --
10     A.   No.  Gilarde.
11     Q.   I'm sorry.  Gilarde.
12          Ayesha Gilarde, did she have a position at
13  MGI at that time?
14     A.   Where are you seeing --
15     Q.   I'm sorry.  I'm on the very last page of
16  the document and I'm looking at the email addresses
17  here.
18     A.   Sorry.  Let me read this.
19     Q.   Sure.
20     A.   Okay.  No, Ayesha was Match.com CMO.
21     Q.   And what does CMO stand for?
22     A.   Chief marketing officer.
23     Q.   And did Mr. Thombre have an MGI position at
24  this time?
25     A.   I don't believe -- I'm pretty sure no.

Page 238

1  that part.  Mandy is tapping into his -- his expertise
2  and making sure that she gets another point of view.
3          Now, Greg has -- doesn't have to, and
4  oftentimes I remember she would not hear from him and
5  they're like, okay, we're going to ship this out
6  without him chiming in on anything.  He doesn't have
7  to.
8          But because it was his particular area of
9  expertise and interest, Mandy specifically would go to
10  Greg on specifically the marketing, especially new --
11  new scripts.
12     Q.   Would Ms. Ginsberg regularly go to Greg on
13  marketing scripts like that?
14     A.   This doesn't happen often.  Has it
15  happened?  This might be the only campaign in -- we
16  might have done or maybe we did another one.  I can't
17  remember.  But it would have happened like once a year
18  kind of thing.
19     Q.   Do you recall if Mr. -- or did Mr. Blatt
20  provide feedback concerning these Missed Connection
21  scripts?
22          MR. MUNDEL:  Beyond the scope.
23          You can answer if you remember.
24     A.   I don't remember any of this specifics.  I
25  hope he did.  But I do remember the team getting

Page 240

1     Q.   Ms. Ginsberg appears to have provided
2  something called Missed Connections scripts in this
3  first email.  Do you see that there?
4     A.   I do.
5     Q.   Do you know what Missed Connection scripts
6  are?
7          MR. MUNDEL:  Let me just ask.  Again, this
8  wasn't a topic for 30(b)(6) so are you asking her
9  whether MGI knows or whether she personally knows?
10          MR. TEPFER:  I'm just wanting to know about
11  Match Group Inc.'s role in Match.com's advertising, and
12  this appears to be Match Group Inc.'s CEO reviewing
13  scripts relating to Match.com advertising.
14          MR. MUNDEL:  So what's your question?  Does
15  MGI or does she know something?
16  BY MR. TEPFER:
17     Q.   Does MGI know what -- what these revised
18  Missed Connection scripts are?
19     A.   So generally the question is, does MGI do
20  reviews of marketing scripts?  The answer is no.  I
21  never once reviewed any brand's marketing campaign
22  script.
23          Is Greg looking at this?  This is one of
24  those exception scenarios where, because Greg is a
25  screenwriter, he has -- he's -- he sort of really likes

Page 239

1  frustrated that they would hear from him, he'd say yes,
2  I want to see it and then he won't respond, and they
3  keep bugging him.  Again, can you -- we're on a
4  deadline, can you do it, and then sometimes he would
5  and sometimes he's, like, just go ahead and I don't
6  have time to look through this.
7  BY MR. TEPFER:
8     Q.   So was it the case that Mr. Blatt was more
9  involved in the weeds, so to speak, concerning
10  Match.com advertising?
11          MR. MUNDEL:  I am going to object as to
12  scope, time period, and also vagueness as to "in the
13  weeds."
14     A.   Here's what you should know:  A new
15  marketing campaign is not in the weeds necessarily,
16  first of all.  Actually the way a guarantee or a rule
17  or a cancellation flow, et cetera, is, but generally
18  speaking, a Match Group, Inc., CEO does not get
19  involved because there are many brands doing many
20  different marketing campaigns over time.
21          There's a bit of history here.  Greg used
22  to run Match.com back in 2009 and so he has a
23  particular affinity for this brand, and he thinks he is
24  an expert at screenwriting, too, and, again, Mandy
25  valued his opinion.

Page 241

61 (Pages 238 - 241)

1    My guess is whoever was running Match
2 before Mandy probably didn't go to him and that was
3 okay because it's not expected, but Mandy, specifically
4 for new marketing campaigns, did go to Greg from an
5 advisory -- as an advisor.  And honestly Greg didn't
6 have time in 2017, which is why often he would just --
7 he's, like, just go ahead, I don't have time to look at
8 it or sometimes he would just look at it sometimes and
9 give some high level opinion about it, but that was it.
10 BY MR. TEPFER:
11    Q.    And so you stated that Mr. Blatt had a
12 particular affinity for Match.com?
13    A.    Yes, because it's our first brand and he
14 was very close to it many years ago.
15    Q.    Did this result in Mr. Blatt paying
16 particular attention to Match.com over the other brands
17 during his time as Match Group Inc.'s CEO?
18         MR. MUNDEL:  Object as beyond the scope.
19         Go ahead.
20    A.    No, because he had no time.  He was also
21 the Tinder CEO in 2017 and that's where he was spending
22 most of his time.  In fact, he was not spending much
23 time on the non-Tinder portfolio.
24 BY MR. TEPFER:
25    Q.    Does Match Group, Inc., maintain any data

Page 242

1 flow?
2    Q.    For example, summaries of dropout rates at
3 particular pages?
4    A.    No.
5    Q.    Does Match Group, Inc., have access to such
6 data?
7    A.    Not directly.  They can certainly ask
8 someone if they were interested in it, curious about
9 it, but not directly.
10    Q.    And if a Match Group, Inc., employee was
11 interested to get that data, is there a particular
12 person at Match Group, LLC, they would contact
13 regarding that?
14         MR. MUNDEL:  Beyond the scope.
15         Go ahead.
16    A.    They would go to the GM or CEO of Match.com
17 and then that person would then go to whoever has
18 the -- some -- whoever's on the analytics side who has
19 the data, and that's how that data would flow.
20 BY MR. TEPFER:
21    Q.    Does Match Group, Inc., have knowledge
22 concerning where that data is stored?
23    A.    Absolutely not.
24    Q.    Or the format of that data?
25    A.    No way.  It's not humanly possible to know.

Page 244

1 relating to Match.com's online cancellation flow?
2    A.    Match Group, Inc., does not maintain any
3 data of any kind.
4    Q.    Has Match Group employees ever reviewed
5 such data?
6         MR. MUNDEL:  Beyond the scope.
7         Go ahead.
8    A.    What data?
9 BY MR. TEPFER:
10    Q.    Has Match Group employees ever reviewed
11 data relating to the online cancellation flow?
12         MR. MUNDEL:  Let me just be clear, Reid.
13 You know this is designated on a different top, right?
14         MR. TEPFER:  I thought 32 was the separate
15 topic.  I thought maybe it was 31.
16         MR. MUNDEL:  I'm sorry.
17         Go ahead.
18         MR. TEPFER:  No worries.
19         MR. MUNDEL:  You can ask the question
20 again.
21 BY MR. TEPFER:
22    Q.    Has Match Group, Inc. -- have Match Group,
23 Inc., employees ever reviewed data relating to
24 Match.com's online cancellation flow?
25    A.    What is data related to online cancellation

Page 243

1    Q.    Did Match Group, Inc., ever create
2 something called The Happiness Project?
3         MR. MUNDEL:  Beyond the scope.
4         You can answer if you know.
5    A.    Match Group, Inc., did not create anything.
6 And I don't remember all the details of it, but I think
7 Match.com had a happiness project at some point, and I
8 can't remember timing or specifics.
9         MR. TEPFER:  Do you mind if we take a short
10 break?
11         MR. MUNDEL:  Sure.
12         (Break from 4:51 p.m. until 5:12 p.m.)
13         MR. MUNDEL:  Ready to go back on?
14         THE REPORTER:  Back on.
15         MR. TEPFER:  Sure.  Pass the witness.
16         MR. MUNDEL:  Okay.  We just have a few
17 questions.
18         EXAMINATION
19 BY MR. MUNDEL:
20    Q.    Ms. Dubey, I want to talk a bit more about
21 Match Group, Inc., and Match Group, LLC, as well as
22 Match.com.
23         Let me first start with this question.  Did
24 Match Group, Inc., have any involvement with
25 Match.com's cancellation flow?

Page 245

62 (Pages 242 - 245)

App. 74

1    A.    No.
2    Q.    Did Match Group, Inc., have any involvement
3  with Match.com's guarantee?
4    A.    No.
5    Q.    Did Match Group, Inc., have any involvement
6  with Match.com's chargeback policy?
7    A.    No.
8    Q.    Why did Match Group, Inc., not have any
9  involvement in those three items?
10    A.    These are very detailed in-the-weeds level
11  of things that our operating businesses would know more
12  about and would make decisions around.
13    Q.    So who made the decisions about Match.com
14  cancel flow?
15    A.    It would be the Match.com product team, and
16  most likely would be at the product team, but they
17  could consult and get sort of the involvement of the GM
18  or CEO of Match.com.
19    Q.    And what about the guarantee, who made
20  decisions about Match.com's guarantee?
21        MR. TEPFER:  Objection, vague as to time.
22  BY MR. MUNDEL:
23    Q.    Go ahead.
24    A.    It -- it would -- whenever it was done, it
25  would be the Match.com marketing team primarily working

Page 246

1  with the product team, if there is a product component
2  to it, and with the final approval of the GM or CEO of
3  Match.com.
4    Q.    And who made the decisions about
5  Match.com's chargeback policy?
6        MR. TEPFER:  Objection.  Vague.
7    A.    Again, it would be the product team,
8  Match.com product team that could consult with other
9  teams within Match.com, for instance, the Customer Care
10  team, and it would be -- the highest it would go up to
11  is the GM or CEO of Match.com.
12  BY MR. MUNDEL:
13    Q.    Now, it's been alleged in this case that
14  Match.com's cancellation flow is not simple.  How do
15  you respond to that allegation?
16    A.    For anybody that's ever tried to build a
17  consumer business, especially a consumer digital
18  business, you have to know that you design for the most
19  optimum user experience and -- otherwise, users won't
20  use it, and the cancellation -- and that -- that's
21  universally true for every part of the experience, of
22  the site experience.
23        It's particularly true for the cancellation
24  flow because businesses like Match.com have two primary
25  ways, things about them?  One, their main avenue for

Page 247

1  growth and consumer adoption for that matter is word of
2  mouth.  So, somebody comes, has a good experience,
3  meets someone, goes and tells somebody else to join.
4  That has been the driving force of this category
5  creation in some ways.  I mean, people were not online
6  dating 25 years ago.
7        And the second big reason for this is more
8  than half of our business comes from returning users.
9  So, not only does it conflate with our fundamental
10  pieces and philosophies and principle of being consumer
11  friendly, which is something we -- we as in me when I
12  was in operating roles at Match.com or, quite frankly,
13  any executive that runs these various businesses
14  understands and tries to set the tone, but also it
15  doesn't make business sense.  Why would you want to
16  piss off your consumers on their way out, if more than
17  half of your business is by returning users?  So it
18  just would never make sense to do.
19    Q.    And while you were working at Match.com
20  were customers able to effectively cancel online?
21        MR. TEPFER:  Objection.  Leading.
22    A.    We had everyday thousands and thousands of
23  users successfully cancel their subscription.  Very,
24  very small handful of people would call in to complain.
25  A lot of times -- and we generally took every complaint

Page 248

1  seriously.  The Customer Care person dealing with it
2  would do the first level of investigation, oftentimes
3  it would be, you know, they had just forgotten, that
4  they sort of allege that they had canceled and we
5  forgot, we didn't take -- you know, it didn't stick,
6  which happens in the consumer world quite a bit.
7        But, you know, if there was ever any kind
8  of increase or anything coming, from time to time we
9  would have appropriate people -- we as in when I was in
10  the Match.com operating role -- we would have the
11  relevant teams, the product, the engineering teams, the
12  data analytics team, go investigate and make sure that
13  we haven't produced a systematic bug that was causing
14  problems or there wasn't something really that needed
15  to be changed.  And our teams -- again, I'm speaking
16  from experience at the times when I was directly
17  responsible for Match.com product -- we were always
18  solving for optimizing the experience for the largest
19  number of consumers.
20  BY MR. MUNDEL:
21    Q.    And while you were working on Match.com and
22  later Match Group, Inc., did you ever direct anybody to
23  make Match.com's cancellation flow more complicated?
24    A.    Never.  And as I said, that would be a very
25  dumb business decision.

Page 249

63 (Pages 246 - 249)

App. 75

1    Q.    And did you ever hear anyone else at the
2    company suggest that they should make the Match.com
3    cancellation flow more complicated?
4          MR. TEPFER:  Objection.  Leading.
5    A.    Never.
6    BY MR. MUNDEL:
7    Q.    If someone had proposed making the
8    Match.com cancellation flow more complicated, how would
9    you respond?
10   A.    As I said, it would -- first of all, it
11   goes against our fundamental principle of consumer
12   friendly applications, are the only way you drive
13   consumer business growth.
14         But, again, as I mentioned, those two
15   reasons, word of mouth and repeat customers, it would
16   be a dumb decision, dumb thing to do long-term for the
17   brand.
18   Q.    Now, have you heard of the phrase "tone
19   from the top"?
20   A.    Yes.
21   Q.    And what type of tone from the top did you
22   try to set, if any, while you were the CEO of Match
23   Group, Inc.?
24   A.    Both as in my -- during my tenure at Match
25   Group, Inc., and the decade-plus experience in various

Page 250

1    operating roles within the various brands, I took a lot
2    of pride in working for a mission-driven company.  We
3    woke up every day, every morning with a passion, and
4    mission to connect people, to find dates,
5    relationships, marriages.  It's the -- the outcome,
6    this ultimate outcome of connecting people was the
7    reason we did anything, and so to be -- quite frankly,
8    I'm super offended by many of the questions from the
9    day to even insinuate that we would intentionally try
10   to mislead the customer, consumer in any way.  I mean,
11   that is just so far from everything that I have spent
12   my entire -- my last 16-plus years running these
13   businesses in many different roles and capacities with
14   the utmost integrity, but most importantly to build
15   valuable consumer-facing products.
16         I hope I never have to sit and defend this
17   again, but I will say this, we -- when I started back
18   in 2006, only 3 percent of marriages happened online.
19   Today, it's close to 50 percent and that kind of
20   category -- and Match.com started it all, and to think
21   that you would have that level of consumer acceptance
22   of a brand-new way of doing something that's so
23   personal to everyone, which is meeting someone for the
24   rest of your life, that's just so preposterous I can't
25   even -- I'm sorry, I'm a little -- at the end of the

Page 251

1    day it -- it's -- it's insulting, quite frankly.
2    BY MR. MUNDEL:
3    Q.    Well, thank you for that, Ms. Dubey.
4          Let me just ask a few smaller points.  As
5    the Match Group North America president I think you
6    testified earlier that you were technically getting a
7    payroll stub from Match Group, LLC.  Do you recall
8    that?
9    A.    Yes.
10   Q.    And who was actually paying for your salary
11   though at that time?
12   A.    So the way that worked for me, I think the
13   paychecks were signed by Match Group, LLC, but my cost,
14   my salary cost would get allocated to the business
15   where I spent time.  And at that time I was spending --
16   that particular year I was spending time on four
17   businesses, so my time and costs would get allocated to
18   those four businesses.
19   Q.    And during your testimony you also
20   mentioned that Match Group, Inc., has the right to
21   replace leaders of the operating brands.  Who are the
22   leaders, what positions were you referring to?
23   A.    It's generally the CEO or the GM of those
24   operating businesses.
25   Q.    And you also mentioned that sometimes in

Page 252

1    your role when you were the Match Group, Inc., CEO
2    folks would come to you and seek advice.  Do you
3    remember that testimony?
4    A.    Yes.  Yes.
5    Q.    And when they would seek your advice about
6    topics, did they do so in your formal CEO capacity or
7    was it something else?
8    A.    Oh, it was not at all because -- in my
9    formal Match Group, Inc., CEO capacity.  Most of the
10   time when I was asked for advice and to consult, it was
11   because of my institutional knowledge about this
12   category and this business and related to my expertise,
13   and often, almost every single time I would try to
14   qualify it, saying, look, this is -- back then we tried
15   this, this is what worked, this didn't work, maybe you
16   should think about it this way.  But, quite frankly,
17   I'm no longer close enough to what consumers are doing
18   today, or how people are using these platforms so you
19   should take what you can from this, but you have to
20   apply it based on your current knowledge and
21   understanding of the platforms as they exist today.
22   Because I had, by then, been too distanced and far
23   removed.
24   Q.    Based on that, when you gave this advice,
25   did you expect that it would be followed?

Page 253

64 (Pages 250 - 253)

State of _____

Page 258

---

1  Reid Tepfer - 05:55:21
2  Sarah Zuckerman - 00:00:00
3  Benjamin M. Mundel - 00:17:35
4  Chelsea Priest - 00:00:00
5    I further certify that I am neither counsel
6  for, related to, nor employed by any of the parties or
7  attorneys in the action in which this proceeding was
8  taken;
9    Further, I am not a relative or employee of
10 any attorney of record, nor am I financially or
11 otherwise interested in the outcome of the action.
12   Subscribed and sworn to on this date:
13 March 17, 2023.

_Joseph D. Hendrick_

Joseph D. Hendrick, CSR #947
22 Expiration Date: 04/30/2023
   Notary Comm. Exp. 01/13/23
23 Veritext Legal Solutions
   Firm Registration No. 571
24 300 Throckmorton Street, Ste. 1600
   Fort Worth, TX  76102
25 Telephone (800) 336-4000

Page 260

---

1    REPORTER'S CERTIFICATION
2    DEPOSITION OF SHARMISTHA DUBEY as 30(b)(6)
3    Representative of Match Group, Inc.
4    March 3, 2023
5    I, Joseph D. Hendrick, Notary Public and
6  Certified Shorthand Reporter in the State of Texas,
7  hereby certify to the following:
8    That the Witness, SHARMISTHA DUBEY as
9  30(b)(6) Representative of Match Group, Inc., was duly
10 sworn by the officer and that the transcript of the
11 oral deposition is a true record of the testimony given
12 by the witness;
13   I further certify that pursuant to FRCP
14 Rule 30(f)(1) the signature of the deponent:
15    X    was requested by the deponent or
16 a party before the completion of the deposition and is
17 to be returned within 30 days from date of receipt of
18 the transcript;
19   _____ was not requested by the
20 deponent or a party before the completion of the
21 deposition;
22   I further certify that the amount of time
23 used by each party is as follows:
24 //
25 //

Page 259

---

1  Benjamin M. Mundel
2  bmundel@sidley.com
3    March 17, 2023
4  RE:  Federal Trade Commision v. Match Group, Inc., Et Al.
5    3/3/2023, Sharmistha Dubey 30(b)(6) (#5651555)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 errata-tx@veritext.com.
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19  If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22   Yours,
23   Veritext Legal Solutions
24
25

Page 261

---

Job No. TX5651555

66 (Pages 258 - 261)

# EXHIBIT 7

Redacted in its Entirety

(Filed Under Seal Pursuant to Protective Order Regarding Confidential Materials)

# EXHIBIT 8

**1**

```
 1
 2          IN THE UNITED STATES DISTRICT COURT
 3               NORTHERN DISTRICT OF TEXAS
 4   ------------------------------------
 5   FEDERAL TRADE COMMISSION,
 6               Plaintiff,
 7            vs.               Index No.
                               3:19-CV-
 8   MATCH GROUP, INC, a corporation,    02281-K
     and MATCH GROUP, LLC, formerly
 9   known as MATCH.COM, LLC, a
     limited liability company,
10
               Defendants.
11   ------------------------------------
12
13
14          DEPOSITION OF DUSHYANT SARAPH
15               New York, New York
16             Thursday, June 22, 2023
17
18
19
20
21   Reported by:
     Jeremy Frank, MPM
22   JOB NO. 2172
23
24
25
```

**2**

```
 1
 2                    June 22, 2023
 3                    9:21 a.m.
 4
 5          Deposition of DUSHYANT SARAPH, held at
 6   the offices of Sidley Austin, 787 Seventh
 7   Avenue, New York, New York, pursuant to
 8   Notice, before Jeremy Frank, a Stenographic
 9   Court Reporter and Notary Public of the State
10   of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1   A P P E A R A N C E S:
 2
 3        FEDERAL TRADE COMMISSION
 4        Attorneys for Plaintiff
 5            1999 Bryan Street, Suite 2150
 6            Dallas, TX 75201
 7        BY:   REID TEPFER, ESQ.
 8            RTepfer@ftc.gov
 9            M. HASAN AIJAZ, ESQ.
10            Maijaz@ftc.gov
11            (214) 979-9350
12
13        SIDLEY AUSTIN LLP
14        Attorneys for Defendants
15            1501 K Street, N.W.
16            Washington, DC 20005
17        BY:   BEN MUNDEL, ESQ.
18            BMundel@sidley.com
19            (202) 736-8157
20
21        ALSO PRESENT:
22            SAMUEL KITCHENS, Esq.
23            ERICA HILLIARD
24            CHELSEA PRIEST
25            JEANETTE TECKMAN
```

**4**

```
 1                  I N D E X
 2
 3   WITNESS          EXAMINATION         PAGE
 4   MR. SARAPH         MR. TEPFER           8
 5   MR. SARAPH         MR. MUNDEL         346
 6
 7                  EXHIBITS
 8
 9   EXHIBIT      DESCRIPTION           PAGE
10   1          FTC 774671, video deemed
11            Marked                    12
12   2          FTC 672329, video deemed
13            Marked                    31
14   3          MATCHFTC 752776         38
15   4          MATCHFTC 782186         60
16   5          MATCHFTC 761906, video deemed
17            Marked                    73
18   6          MATCHFTC 751483         89
19   7          MATCHFTC 751484         89
20   8          MATCHFTC 672309, video deemed
21            Marked                   102
22   9          MATCHFTC 846944, Excel
23            Spreadsheet deemed marked 121
24
25            (Index continued)
```

5

| | | (Index continued) | |
|---|---|---|---|
| 1 | | (Index continued) | |
| 2 | EXHIBIT | DESCRIPTION | PAGE |
| 3 | 10 | MATCHFTC 846945, Excel | |
| 4 | | Spreadsheet deemed marked | 138 |
| 5 | 11 | MATCHFTC 774726, Excel | |
| 6 | | Spreadsheet deemed marked | 149 |
| 7 | 12 | MATCHFTC 846511, Excel | |
| 8 | | Spreadsheet deemed marked | 173 |
| 9 | 13 | MATCHFTC 846469, Excel | |
| 10 | | Spreadsheet deemed marked | 181 |
| 11 | 14 | MATCHFTC 846519, Excel | |
| 12 | | Spreadsheet deemed marked | 187 |
| 13 | 15 | MATCHFTC 846839, Excel | |
| 14 | | Spreadsheet deemed marked | 192 |
| 15 | 16 | MATCHFTC 846838, Excel | |
| 16 | | Spreadsheet deemed marked | 194 |
| 17 | 17 | Defendant Match Group, LLC's | |
| 18 | | Second Amended Responses and | |
| 19 | | Objections to Plaintiff | |
| 20 | | Federal Trade Commission's | |
| 21 | | First Set of Interrogatories | 213 |
| 22 | 18 | MATCHFTC 672345 | 218 |
| 23 | 19 | MATCHFTC 846847 | 221 |
| 24 | | | |
| 25 | | (Index continued) | |

6

| | | (Index continued) | |
|---|---|---|---|
| 1 | | (Index continued) | |
| 2 | EXHIBIT | DESCRIPTION | PAGE |
| 3 | 20 | MATCHFTC 846848, PDF deemed | |
| 4 | | Marked | 230 |
| 5 | 21 | MATCHFTC 846849 | 233 |
| 6 | 22 | F01-MG-0052426, PDF deemed | |
| 7 | | Marked | 256 |
| 8 | 23 | MATCHFTC 700480 | 262 |
| 9 | 24 | MATCHFTC 700484 | 262 |
| 10 | 25 | MATCHFTC 774724, Excel | |
| 11 | | Spreadsheet deemed marked | 273 |
| 12 | 26 | Apple cancellation Match app | 296 |
| 13 | 27 | MATCHFTC 753000 | 313 |
| 14 | 28 | MATCHFTC 753001 | 313 |
| 15 | 29 | MATCHFTC 782034, video deemed | |
| 16 | | Marked | 335 |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

7

```
 1          IT IS HEREBY STIPULATED AND AGREED, by
 2    and between counsel for the respective
 3    parties hereto, that the filing, sealing and
 4    certification of the within deposition shall
 5    be and the same are hereby waived;
 6          IT IS FURTHER STIPULATED AND AGREED that
 7    all objections, except as to the form of the
 8    question, shall be reserved to the time of the
 9    trial;
10          IT IS FURTHER STIPULATED AND AGREED that
11    the within deposition may be signed before any
12    Notary Public with the same force and effect
13    as if signed and sworn to before the Court.
14
15
16
17
18
19
20
21
22
23
24
25
```

8

```
 1          D U S H Y A N T   S A R A P H,  called
 2    as a witness, having been duly sworn by
 3    a Notary Public, was examined and
 4    testified as follows:
 5    EXAMINATION BY
 6    MR. TEPFER:
 7          Q. We are on the record.
 8          Good morning, Mr. Saraph, my
 9    name is Reid Tepfer.
10          A. Good morning.
11          Q. This is Hasan Aijaz, as you know
12    we represent the FTC in this litigation
13    against Match Group, Inc and Match
14    Group, LLC which currently is pending
15    in the Northern District of Texas.
16    I'll give everyone a chance in the room
17    to introduce themselves.
18          MR. MUNDEL:  Benjamin Mundel
19    from Sidley Austin and I'm with
20    Sam Kitchens, Jeanette Teckman
21    and Chelsea Priest.
22          MR. TEPFER:  Thanks so much.
23          Q. And would you mind stating your
24    name for the record.
25          A. Dushyant Saraph.
```

2 (Pages 5 to 8)

---

89

1        So again MATCHFTC 751483 is
2   going to be Exhibit 6, and ending
3   Bates 1484 is going to be Exhibit
4   7.
5        (Exhibit 6, MATCHFTC 751483,
6   marked for identification, as of
7   this date.)
8        (Exhibit 7, MATCHFTC 751484,
9   marked for identification, as of
10   this date.)
11   BY MR. TEPFER:
12       Q. Take a look at Exhibit 6 first,
13   let me know after you had a chance to
14   look at it.
15       A. I looked at it.
16       Q. Do you know what this exhibit
17   is?
18       A. Is it an e-mail.
19       Q. An e-mail to you; is that right?
20       A. An e-mail from me to someone.
21       Q. It appears that Shamika Naik
22   says, "Here you go to you." Is that
23   right?
24       A. Yes.
25       THE COURT REPORTER:  Please

---

90

1   spell that.
2        MR. TEPFER:  S-H-A-M-I-K-A
3   N-A-I-K sent you this e-mail.
4        THE COURT REPORTER:  Thank
5   you.
6   BY MR. TEPFER:
7        Q. This e-mail is from February
8   9th, 2018, correct?
9        A. Correct.
10       Q. It appears to include a Power-
11   Point with some screenshots of the
12   resignation flow; is that right?
13       A. Correct.
14       Q. I'll represent that Exhibit 7
15   here is the attached PowerPoint the
16   company produced to us.  Do you
17   remember receiving the e-mail in
18   Exhibit 6?
19       A. I don't recall 2018, long time
20   ago.
21       Q. Do you remember this PowerPoint
22   here, Exhibit 7?
23       A. I can go through it now but I
24   don't recall it from that time.
25       Q. No worries, if you wouldn't mind

---

91

1   taking a look and just letting me know
2   if you remember it.
3        A. Yes, this looks like the resig-
4   nation flow one desktop.
5        Q. I'll draw your attention to
6   slide five of the PowerPoint.
7        A. That's page five?
8        Q. Yes, sir, sorry.
9        A. Yes, I'm there.
10       Q. Here this is the survey page of
11   the cancellation.
12       Is that correct?
13       A. Yes.
14       Q. And cancellation flow, it
15   appears the user in this capture has
16   selected the option "very few profiles
17   pique my interest," correct?
18       A. Yes.
19       Q. And it appears there is a second
20   follow up question that is displaying
21   as a result of that selection; is that
22   correct?
23       A. Yes.
24       Q. The follow up question is, "How
25   could we have helped?"

---

92

1        A. Yes, it says, "We are sorry to
2   hear that, how can we have helped?"
3        Q. If you go to page seven of this
4   PowerPoint, it appears that if you
5   selected on the survey page the option,
6   "I didn't receive enough replies to
7   e-mails I sent out," you would be
8   presented with a follow up question,
9   "We are sorry to hear that, how many
10   people did you e-mail."
11       Is that right?
12       A. Yes.
13       Q. So skipping forward to page nine
14   in the PowerPoint, it looks like if you
15   click "I met someone," you're asked,
16   "Where did you two meet;" is that
17   right?
18       A. Yes.
19       Q. Is there also a version that
20   asks for the membership ID of the
21   person that you met if you state that
22   you met the person on Match.com?
23       A. I'm aware of a version that has
24   that, again it says optional in
25   brackets.

---

23 (Pages 89 to 92)

93

1    **Q. So for the survey page you**
2    **don't, if I'm understanding you**
3    **correctly, you don't have to answer the**
4    **question, you can click continue**
5    **cancel; is that right?**
6         A. Correct, the whole question is
7    optional.
8         **Q. Has that always been the case**
9    **you can click continue cancel since**
10   **2014?**
11        A. That's always been the case as
12   far as I'm aware.
13        **Q. Does the website inform**
14   **customers anywhere that they can click**
15   **continue cancellation without answering**
16   **a survey question?**
17        A. That's pretty normal behavior
18   where the error is presented to a user
19   if they were not able to do something.
20        THE COURT REPORTER:  Did you
21   say error or arrow?
22        THE WITNESS:  Error.
23        THE COURT REPORTER:  Please
24   continue.
25        A. For example, if the user was to

94

1    click cancellation and continue, we are
2    not able to do that without answering
3    the question, they would have seen an
4    error at the top.  So generally in UX
5    design you assume the user always wants
6    to move forward and would be able to do
7    that here.
8         **Q. So to be clear, there is no**
9    **explicit language that states that,**
10   **correct?**
11        A. Correct, as I mentioned because
12   of the UX behaviors we believe that
13   consumers use product by.
14        **Q. So the user would determine that**
15   **through trial and error, correct?**
16        A. Trial and error just using any
17   other consumer technology product they
18   have used.
19        **Q. And so why does Match.com**
20   **include the survey screen in the**
21   **cancellation flow?**
22        A. There are significant sorts of
23   data we get from the user answering the
24   survey for how we can make our product
25   better.  This data is tracked and we do

95

1    have our product team look to see how
2    the experience can be made better.
3         **Q. Why did Match.com decide to put**
4    **the survey question at this spot in the**
5    **cancellation flow?**
6         A. The users obviously expressed
7    their interest to cancel their
8    subscription, so we would like to know
9    why they were perhaps unhappy or maybe
10   happy with their experience on Match.
11   So it seems intuitive to ask this as
12   part of the experience.  We also get
13   the highest number of answers as part
14   of this experience so we have the most
15   data to inform how we drive our product
16   direction forward.
17        **Q. So if I am understanding you**
18   **correctly, you're stating at this point**
19   **the user has expressed the intent to**
20   **cancel.**
21        **Is that correct?**
22        MR. MUNDEL:  Objection
23   scope, form, misstates the
24   testimony.
25        **Q. Sorry, I guess to rephrase, am I**

96

1    **understanding you correctly that the**
2    **reason the survey page is placed here**
3    **is because Match.com understands the**
4    **user has expressed an intent to cancel?**
5         MR. MUNDEL:  Same objec-
6    tions.
7         A. Yes, yes.
8         I mean, the user is going
9    through the resignation flow and has
10   expressed an interest to resign their
11   Match.com subscription.  And so, this
12   is a point in time where we can
13   understand why they are trying to do
14   that.
15        **Q. But at this point, at this point**
16   **in the flow the cancellation is yet not**
17   **effective.**
18        **Is that right?**
19        A. I think so.
20        The intent the user has given,
21   they clicked on cancel subscription is
22   to go through and cancel their
23   subscription so they are in that flow
24   basically from a mind state perspec-
25   tive.

24 (Pages 93 to 96)

Sarah
FTC v. Match Group, Inc., et al.                                            6/22/2023

---

97

1  Q. Is there a reason the survey
2  isn't placed after the cancellation
3  confirmation is received?
4  A. There is a couple reasons.  One
5  is there are answers here that could
6  lead to, for example, offering the
7  user a cheaper subscription.  If you
8  were to say I can't afford a subscrip-
9  tion we would say hey, can we offer you
10  something that's a cheaper price point
11  so you can continue your subscription.
12  Obviously if you cancel that we
13  wouldn't have that information to be
14  able to do that.  We also know that
15  once people cancel they are not going
16  to answer this question, this becomes
17  an afterthought.  So again given how
18  important it is in informing our
19  overall product strategy why people not
20  be happy with our experience, we would
21  like to get as many people to answer as
22  possible.
23  The last thing I'll say is the
24  whole thing is optional.  If you really
25  didn't want do to this you can click

---

98

1  continue cancellation and continue on.
2  Q. Did Match.com ever consider
3  moving the survey page until after the
4  cancellation was effective?
5  A. Not that I'm aware of.
6  Q. Are you familiar with a Match.
7  Com employee named Chris Auderer?
8  A. Yes, in my preparation I was
9  made aware.
10  Q. Did you review any proposals by
11  Chris Auderer concerning online
12  cancellation flow in your preparation
13  for your testimony?
14  A. Yes, I did.
15  Q. So Ms. Auderer proposed to the
16  company they move the survey question
17  until after the cancellation was
18  complete.
19  Is that correct?
20  A. I can't remember the specifics
21  of the recommendation that Ms. Auderer
22  made.
23  THE COURT REPORTER:  How do
24  you spell Auderer?
25  MR. MUNDEL:  A-U-D-E-R-E-R.

---

99

1  THE COURT REPORTER:  Thank
2  you.
3  BY MR. TEPFER:
4  Q. So you mentioned that the survey
5  is optional, correct?
6  A. Yes.
7  Q. Does the fact that not all users
8  complete the survey effect the quality
9  of the data that Match.com receives
10  from the survey?
11  A. We just need a large enough
12  sample size completion to be able to
13  gain insights from the data in terms of
14  how we can make our product better.
15  Q. So self selection doesn't effect
16  the quality of the data that Match.com
17  receives from the survey?
18  A. It should not.
19  Q. You mentioned that if it was
20  placed after the cancellation was
21  effective, less users would complete
22  the survey.
23  Is that right?
24  A. Yes, that's our belief.
25  Q. Why do you believe that's the

---

100

1  case?
2  A. Once the user has cancelled
3  their subscription they'll probably
4  exit the browser and not really pay
5  attention to our survey.  And given how
6  critical the survey is informing our
7  product direction, how we can make
8  product better, we would like more
9  people to answer it obviously.
10  Q. Has Match.com ever conducted an
11  AB test to determine what the effect on
12  cancellation rates is by including the
13  survey page?
14  A. Not that I'm aware of.
15  Again it is an optional page,
16  there's not a lot of friction from my
17  perspective.  A user can move through
18  this very easily, that's not the only
19  reason we have it in that spot.  I
20  mentioned earlier because some answers
21  to the questions could lead you to
22  receiving an offer, for example.
23  Q. You use the word friction, how
24  are you defining, what do you mean by
25  that?

---

25 (Pages 97 to 100)

---

101

1      A. A user getting stuck on the
2  page, for example.  Our belief this is
3  a very simple flow, you see the survey,
4  you can move past it if you don't want
5  to answer it, you can hit continue
6  cancellation which is clearly stated on
7  the page, or you can answer and move
8  forward, you have the optionality.
9      **Q. What are some of the things that**
10 **add friction, I suppose?**
11         MR. MUNDEL:  Objection
12 scope, form.
13     A. A pretty vague question, depends
14 on the situation what we are talking
15 about.
16     **Q. Has Match.com ever determined**
17 **whether any aspect of the online**
18 **cancellation flow added friction?**
19     A. My understanding is that there
20 is not much friction in this flow given
21 that when a user starts canceling and
22 ends their cancellation, north of 90
23 percent of users are able to success-
24 fully do that.  We also don't see a lot
25 of complaints from their users that

---

102

1  they are not able to do that.
2      **Q. Some users in the cancellation**
3  **flow you mentioned receive a retention**
4  **offer?**
5      A. Yes.
6      **Q. Also known as a save offer,**
7  **right?**
8      A. Yes.
9      **Q. And between 2014 and the present**
10 **were there versions of the online**
11 **cancellation flow that didn't include a**
12 **save offer?**
13     A. Not that I'm aware of.
14     **Q. I'm going to play MATCHFTC**
15 **672309.**
16         MR. TEPFER:  If we can mark
17 this as Exhibit 8.
18         (Exhibit 8, MATCHFTC 672309,
19 video deemed marked, marked for
20 identification, as of this date.)
21 BY MR. TEPFER:
22     **Q. This is starting with somebody**
23 **named Amber.**
24         (Video played)
25     **Q. We have seen the whole thing,**

---

103

1  **I'll go back, I want to ask about at**
2  **22 seconds or 21 seconds rather, the**
3  **save offer page here.  In this version**
4  **of the flow the user skips the survey**
5  **page and they are presented with this**
6  **save offer.**
7      **Is that right?**
8      A. Can you go back to see what they
9  did on the prior page to this?
10     **Q. Yes, going back to we are now at**
11 **16 seconds.**
12     A. Okay.
13     **Q. And playing, pausing again at**
14 **21.**
15     A. Okay.
16     (Video played)
17     **Q. So my question again if the user**
18 **skips the survey page they are**
19 **presented with this save offer; is that**
20 **right?**
21     A. In this flow, yes.
22     **Q. They are getting here 50 percent**
23 **off six months; is that right?**
24     A. Yes.
25     **Q. There is another version that**

---

104

1  **has three months for the price of one;**
2  **is that right?**
3      A. That's possible.  There is
4  multiple different save offers as part
5  of the program.
6      **Q. So in terms of visuals they are**
7  **all substantially the same.**
8      **Is that right?**
9      A. That's correct.
10     **Q. Going back now to that resig-**
11 **nation flow PowerPoint that was**
12 **exhibit, going back to MATCHFTC 751484,**
13 **that's Exhibit 7, if we can look at**
14 **page 16, please.**
15         MR. MUNDEL:  We don't have
16 the Bates numbers on 7, we will
17 trust and hope that you got it
18 right.
19         MR. TEPFER:  Sorry.
20 BY MR. TEPFER:
21     **Q. Let's see, looking at this page**
22 **16 on Exhibit 7, it says, "Save offers**
23 **governed by attached rules up at the**
24 **top."**
25     **Do you see that language?**

---

FTC v. Match Group, Inc., et al.                                    6/22/2023

---

                                                              105

1     A. Yes.
2     Q. This one here offers three
3  months for the price of one as the save
4  offer; do you see that?
5     A. Yes.
6     Q. Then there is on the right some
7  annotation about the save offer rules;
8  is that right?
9     A. Yes.
10    Q. It states, "These are the save
11 offer rules as of January 2011."
12    A. Yes.
13    Q. Do you know if these save offer
14 rules were accurate at the time this
15 PowerPoint was sent in February 2018?
16    MR. MUNDEL:  I object, for
17 clarity are you saying is it
18 accurate as of 2018 or is it
19 accurate as of January 2011?
20    Q. 2018 because when these was sent
21 to you in 2018, it references 2011.  I
22 just want to know if these are still
23 the save offer rules that were in place
24 at that time?
25    MR. MUNDEL:  Objection,

---

                                                              106

1  beyond the scope.
2     A. I'm not aware.
3     Q. Are you familiar with the save
4  offer rules for this page?
5     MR. MUNDEL:  Objection to
6  form and scope.
7     A. I'm not aware of the specific
8  rules.
9     Q. Do you know what the save offer
10 rules are currently right now?
11    MR. MUNDEL:  Same objection,
12 beyond the scope.
13    A. Not aware.
14    Q. Do you know if they have changed
15 over time?
16    A. I'm not aware that they have
17 changed.
18    Q. So the save offer page does it
19 always come, if a user presented the
20 save offer page, does it always come
21 after a save offer page in the cancel-
22 lation flow?
23    A. Not aware, but in the two
24 examples that I have seen it always
25 comes right after that page, yes.

---

                                                              107

1     Q. And then after the save offer
2  page is, to play the video here, we are
3  presented with this page, start at the
4  top it says Tell us more, it asks how
5  likely someone is to recommend Match.
6  Com to a friend.
7     Do you have a name for this
8  page?
9     A. We can just call it the NPS
10 page.
11    (Video played)
12    Q. And I know the acronym NPS, I
13 forget what's it for again?
14    A. Net Promoter Score.
15    Q. All right.
16    If we can call this the NPS
17 page.  Are you aware of any version of
18 the online cancellation flow that
19 doesn't have the save offer page in
20 between the survey page and the NPS
21 page?
22    A. Not that I'm aware of in the
23 instance save offer is being presented.
24    Q. Let's see, sorry, to make sure
25 I'm clear, what are the instances in

---

                                                              108

1  which user is not presented a save
2  offer, do you recall?
3     A. I don't know the specific rules
4  but its not that every user is given a
5  save offer.
6     Q. Are most users presented a save
7  offer?
8     A. Not aware.
9     Q. Do you know if most responses to
10 the survey result in a save offer being
11 displayed?
12    A. Not aware.
13    Q. If we can go back now to
14 MATCHFTC 774671, again I believe this
15 is Exhibit 1.  We are back on Exhibit
16 1, I'll take us to the NPS page.  This
17 is second 44 in the video here.  The
18 user is given the option of rating how
19 likely it is they recommend Match.com
20 to a friend with a score of 0 to 10; is
21 that right?
22    A. Yes.
23    Q. The user does not have to
24 actually answer this to progress
25 through the flow.

---

                                              27 (Pages 105 to 108)

Sarah

FTC v. Match Group, Inc., et al.                                    6/22/2023

109

1    **Is that right?**
2    A. It is optional.
3    **Q. And has that always been the**
4    **case?**
5    A. As far as I'm aware, yes.
6    **Q. Same question, is there a reason**
7    **this was presented to the user before**
8    **the cancellation is confirmed?**
9    A. Can you repeat the question?
10   **Q. Sorry, is there a reason that**
11   **this NPS page comes before the**
12   **cancellation confirmation?**
13   A. Yes, the reason it comes before
14   is so we can get data on whether the
15   user is likely to recommend Match to a
16   friend, so how happy were they with
17   their product experience. It also
18   lists the benefits that the user would
19   be losing as a result of cancellation
20   so they are aware these benefits would
21   no longer be available to them. And
22   once a user is made aware of those they
23   can continue the cancellation and get
24   the confirmation page.
25   **Q. So given, you mentioned the**

110

1    **importance of the survey and the**
2    **information received from the survey**
3    **page.**
4    **Is that correct?**
5    A. Yes.
6    **Q. And given the importance of that**
7    **survey, why does Match.com make it**
8    **optional?**
9    A. The survey page why is it
10   optional?
11   **Q. Yes.**
12   A. Because we don't want to add
13   friction in the cancellation flow. So
14   if a user doesn't want to answer the
15   survey and just cancel their subscrip-
16   tion, we want to make sure they are
17   able to do that in a very simple flow
18   with three pages, and you have
19   cancelled.
20   And of course we want the
21   information but the user might not want
22   to give it to us and just wants to
23   continue, we want to make sure they
24   were able to do that.
25   **Q. Would making a survey page add**

111

1    **friction, you're stating?**
2    MR. MUNDEL:  Would you say
3    the question again.
4    MR. TEPFER:  Sure.
5    BY MR. TEPFER:
6    **Q. Would it add friction to make**
7    **the survey page nonoptional?**
8    MR. MUNDEL:  Objection form,
9    scope.
10   A. If the user has to answer the
11   survey page, I would think yes, that's
12   not the best UX practice when they are
13   trying to get through a cancellation
14   flow. I think it is better it is
15   optional to be able to continue on.
16   **Q. Why is that not best UX**
17   **practice?**
18   A. The user wants to continue
19   through and cancel their subscription,
20   and we are asking them to do something
21   that maybe they don't want to do.
22   **Q. And does requiring the entry**
23   **password add friction to the cancel-**
24   **lation process?**
25   A. The requirement to have a

112

1    password is part of security features
2    as we have discussed prior. So I think
3    its serves a purpose in terms of making
4    sure that the user's account is
5    protected.
6    **Q. Sure, I understand Match.com is,**
7    **MGLLC taking the position it adds, has**
8    **a purpose?**
9    A. Yes.
10   **Q. But what I'm asking is a little**
11   **different, does it add friction to the**
12   **cancellation process?**
13   A. I'm not aware.
14   **Q. Continuing we are on ending**
15   **Bates 671 again, and this is Exhibit 1,**
16   **I am going to hit play here at second**
17   **44.**
18   **(Video played)**
19   **Q. So stopping here at second 51,**
20   **the user at this point, this screen is**
21   **the cancellation confirmation page?**
22   A. Yes.
23   **Q. Only once the user views this**
24   **page is the cancellation effective; is**
25   **that right?**

28 (Pages 109 to 112)

Case 3:19-cv-02281-K   Document 206-1   Filed 09/11/23   Page 88 of 110   PageID 9430
Sarah
FTC v. Match Group, Inc., et al.                                                    6/22/2023

113

1    A. Yes.
2    Q. So we talked about whether there
3    were any other versions of flow up to
4    the subscription status or cancellation
5    option page, right; do you remember
6    that?
7    A. Yes.
8    Q. And I want to ask sort of the
9    same question about from that page
10   going forward whether there are any
11   versions of the online cancellation
12   flow that we haven't discussed here
13   today beginning from September 2014 to
14   the present of which you're aware?
15       MR. MUNDEL: Objection to
16   form.
17   A. As far as I'm aware there have
18   not been material changes to the flow
19   from the cancellation page to the
20   confirmation page other than increasing
21   clarity and copy to say continue
22   cancellation, that was not always the
23   case, for example.
24   Q. So if you said there was a
25   change to add at the bottom the button

114

1    that says continue cancellation; is
2    that right?
3    A. That's not what I said.
4    Q. Sorry.
5    A. The button always existed, the
6    copy on the button was updated to say
7    continue cancellation to give the
8    utmost clarity to our users.
9    Q. So just to make sure we are
10   talking about the same thing, I am
11   going to go here to and we are back in
12   Exhibit 1, we are looking at second 33
13   in the video. We are here on the
14   survey page, right?
15   A. Correct.
16   Q. So the copy you're referencing
17   on the second blue button says continue
18   cancellation at the bottom.
19   A. Correct, I can't recall if its
20   for this page that was made or a
21   different page, but that language was
22   updated. It is from the perspective
23   that we want this process to be easy
24   for users and clear to our users.
25       The other thing I'll add is half

115

1    the users that cancel come back to our
2    product later, so we want them to have
3    a positive experience throughout the
4    process.
5    Q. Do you recall what the copy was
6    for that button before the change was
7    made?
8    A. I don't recall exactly.
9    Q. Do you recall approximately when
10   that copy was added to the button?
11   A. I don't recall.
12   Q. Was it in the past five years?
13   A. I would rather not speculate.
14   Q. In terms of discussing the
15   cancellation flow between 2014 and
16   present, has there ever been different
17   copy on the survey page that you are
18   aware of?
19   A. I'm not aware.
20   Q. Has there ever been any
21   different versions of the NPS page of
22   which you're aware?
23   A. I'm not aware.
24   Q. And looking at, we are here at
25   second 38 in the video, there was a

116

1    period of time in which the buttons at
2    the bottom, one was a link, one was a
3    blue button.
4    Is that the case?
5    A. Yes, I believe instead of
6    continue cancellation it was a link at
7    the time, this change was made to
8    continue cancellation.
9    Q. And do you recall when that
10   change took place?
11   A. I don't recall when that change
12   took place. It was done again with
13   this consistent clarity from each page
14   to the next that so we can keep the
15   continued cancellation language.
16   Q. So did Match ever consider
17   implementing any changes to shorten the
18   length of the online cancellation flow
19   at any time between September 2014 and
20   the present?
21       MR. MUNDEL: One second.
22       MR. TEPFER: Sure.
23       MR. MUNDEL: No objection.
24   A. Not that I'm aware of.
25   BY MR. TEPFER:

29 (Pages 113 to 116)

Case 3:19-cv-02281-K   Document 206-1   Filed 09/11/23   Page 89 of 110   PageID 9431
Saraph
FTC v. Match Group, Inc., et al.                                    6/22/2023

357

```
 1            C E R T I F I C A T E
 2
 3    STATE OF _____:
 4    COUNTY/CITY OF_____:
 5
 6    Before me, this day, personally appeared
 7    DUSHYANT SARAPH, who, being duly sworn, states
 8    that the foregoing transcript of his
 9    Deposition, taken in the matter, on the date,
10    and at the time and place set out on the title
11    page hereof, constitutes a true and accurate
12    transcript of said deposition.
13
14                _____
15                DUSHYANT SARAPH
16
17    SUBSCRIBED and SWORN to before me this
18    _____ day of _____, 2023, in the
19    jurisdiction aforesaid.
20
21
22
23    _____  _____
24    My Commission Expires     Notary Public
25
```

359

```
 1        INSTRUCTIONS TO WITNESS
 2
 3        Please read your deposition over
 4    carefully and make any necessary corrections.
 5    You should state the reason in the appropriate
 6    space on the errata sheet for any corrections
 7    that are made.
 8        After doing so, please sign the errata
 9    sheet and date it.
10        You are signing same subject to the
11    changes you have noted on the errata sheet,
12    which will be attached to your deposition.  It
13    is imperative that you return the original
14    errata sheet to the deposing attorney within
15    thirty (30) days of receipt of the deposition
16    transcript by you.  If you fail to do so, the
17    deposition transcript may be deemed to be
18    accurate and may be used in court.
19
20
21
22
23
24
25
```

358

```
 1            C E R T I F I C A T E
 2    STATE OF NEW YORK   )
 3                       : ss.
 4    COUNTY OF NEW YORK  )
 5
 6        I, Jeremy Frank, a Notary Public within
 7    and for the State of New York, do hereby
 8    certify:
 9        That DUSHYANT SARAPH, the witness whose
10    deposition is hereinbefore set forth, was duly
11    sworn by me and that such deposition is a true
12    record of the testimony given by the witness.
13        I further certify that I am not related
14    to any of the parties to this action by blood
15    or marriage, and that I am in no way
16    interested in the outcome of this matter.
17        IN WITNESS WHEREOF, I have hereby
18    set my hand on the 27th day of June, 2023.
19
20            s/Jeremy Frank
21            JEREMY FRANK, MPM
22
23
24
25
```

360

```
 1        *** ERRATA SHEET ***
 2
     NAME OF CASE: FTC VS. MATCH
 3   DATE OF DEPOSITION:  June 22, 2023
     NAME OF WITNESS:  SARAPH
 4   PAGE  LINE    FROM      TO
 5   ____|____|_____|_____
 6   ____|____|_____|_____
 7   ____|____|_____|_____
 8   ____|____|_____|_____
 9   ____|____|_____|_____
10   ____|____|_____|_____
11   ____|____|_____|_____
12   ____|____|_____|_____
13   ____|____|_____|_____
14   ____|____|_____|_____
15   ____|____|_____|_____
16   ____|____|_____|_____
17
          _____
18            DUSHYANT SARAPH
19   Subscribed and sworn to before me
     this _____ day of _____, 2023.
20
          _____  _____
21   JEREMY FRANK    My Commission Expires:
22
23
24
25
```

90 (Pages 357 to 360)

# EXHIBIT 9

Redacted in its Entirety

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT 10

```
 1
 2                 UNITED STATES DISTRICT COURT
 3                 FOR THE DISTRICT OF TEXAS
 4                       DALLAS DIVISION
 5                        ---oOo---
 6     FEDERAL TRADE COMMISSION,
 7              Plaintiff,
 8                   vs.            No. 3:19-cv-02281-K
 9     MATCH GROUP, INC., a
       corporation, MATH GROUP, LLC,
10     formerly MATCH.COM, LLC, a
       Limited Liability Company,
11
                  Defendants.
12     _____/
13
14
15
16                   DEPOSITION OF
17                 JENNIFER KING, PH.D.
                   ***CONFIDENTIAL***
18     _____
19                THURSDAY, JULY 27, 2023
20
21
22
23     REPORTED BY:  HOLLY THUMAN, CSR No. 6834, RMR, CRR
24     JOB NUMBER 6028094
25
```

Page 1

--oOo--

Videotaped deposition of JENNIFER KING, PH.D., taken by the Defendant, at SIDLEY AUSTIN LLP, 555 California Street, San Francisco California 94104, commencing at 9:02 A.M., on THURSDAY, JULY 27, 2023, before me, HOLLY THUMAN, CSR, RMR, CRR.

--oOo--

APPEARANCES

FOR THE PLAINTIFF:

U.S. FEDERAL TRADE COMMISSION
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
By:  M. HASAN AIJAZ, Attorney at Law
     MAijaz@ftc.gov

FOR DEFENDANT:

SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, California 90067
By:  CHAD S. HUMMEL, Attorney at Law
     CHummel@sidley.com

SIDLEY AUSTIN
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
By:  CHELSEA A. PRIEST, Attorney at Law
     CPriest@sidley.com

ALSO PRESENT:

JEANETTE TECKMAN, In-house counsel, Match.com
SAMUEL KITCHENS, Match.com (Remote)
BRANDON WARD, Precocity (Remote)

Page 2

---

(Exhibits, cont'd)

Exhibit 11   Printout of web page from          214
             public.govdelivery.com

--oOo--

INSTRUCTIONS TO WITNESS/REQUESTS TO MARK TRANSCRIPT

              PAGE   LINE

Instruction not to answer    42     12

Instruction not to answer    66     21

--oOo--

Page 4

---

I N D E X

INDEX OF EXAMINATIONS

EXAMINATION BY:                     PAGE

MR. HUMMEL                            5

MR. AIJAZ              228

--oOo--

EXHIBITS MARKED FOR IDENTIFICATION

NO.        DESCRIPTION          PAGE

Exhibit 1   Expert Report of Dr. Jennifer       5
            King

Exhibit 2   Rebuttal Report of Dr. Jennifer     5
            King

Exhibit 3   Neilsen Norman Group document,      34
            "How to Conduct a Heuristic
            Evaluation"

Exhibit 4   Neilsen Norman Group Heuristic      44
            Evaluation Workbook

Exhibit 5   2016 Flow Figures - King Report     95

Exhibit 6   2019 Flow Figures - King Report     95

Exhibit 7   2022 Flow Figures - King Report     95

Exhibit 8   Expert Report of Brandon Ward      112
            Regarding Match.com's Online
            Subscription Cancelation Flow,
            January 13, 2023

Exhibit 9   Screenshot headed on the first     184
            page at the top "Dating"

Exhibit 10   Screenshot headed at top of       195
            first page "Suggested"

(Cont'd)

Page 3

---

THURSDAY, JULY 27, 2023

9:02 A.M.

--oOo--

JENNIFER KING, PH.D.,
_____
called as a witness, having been first duly sworn, was examined and testified as follows:

---oOo---

EXAMINATION BY MR. HUMMEL

(Deposition Exhibits 1 and 2 were marked for identification.)

BY MR. HUMMEL:

Q.  Good morning.

A.  Good morning.

Q.  My name is Chad Hummel.  I represent Match, the defendants in this case.

    You understand you're under oath?

A.  I do.

Q.  And you are providing expert testimony in this case?

A.  I am.

Q.  And you're being paid by the Federal Trade Commission for that testimony.  Correct?

A.  I am.

Q.  Okay.  And you formed some opinions, have you,

Page 5

---

Veritext Legal Solutions
800-336-4000

1  workbooks.
2      Q.  How were they guided, if you know, in what to
3  look for in a heuristic analysis?
4      A.  Well, I mean, we were all familiar with
5  Nielsen's Ten Heuristics.  That's why I work with them.
6      Q.  And by "Nielsen's Ten Heuristics," can you
7  define what you mean?
8      A.  Jakob Nielsen's 10 Usability Heuristics.  I
9  don't have them memorized, but I'll be happy to read
10  them off if you have a copy of that article.
11      Q.  I do, and we'll talk about that later.
12      Do you know what the Nielsen Norman Group is?
13      A.  I sure do.
14      Q.  So what is it?
15      A.  So it's a consulting firm that was founded by
16  Jakob Nielsen and Professor Donald Norman.  I'm not
17  sure when; mid- or late '90s.
18      But Nielsen was a usability expert and
19  researcher, I believe, at Sun Microsystems.
20      Donald Norman's been a professor of cognitive
21  psych at UC San Diego, I think, for decades.
22      And so they formed a research and consulting
23  group during the first dot-com boom.
24      Q.  Do you consider the Nielsen Norman Group to
25  have authoritative expertise in the field of usability?
Page 10

1  you were asking; heuristic analysis and --
2      Q.  How much time you actually spent looking at
3  the website versus how much time you spent doing the
4  heuristic analysis versus the writing.
5      A.  I mean, that's hard to say because you go back
6  and look at the website continuously as you're writing.
7      But, you know, as an independent task, looking
8  at the website, I'm going to guess in the magnitude of
9  5 to 10 hours.
10      Q.  Do you agree that the purpose of heuristic
11  analysis or a heuristic evaluation is to find usability
12  problems on an interface?
13      A.  Yes.
14      Q.  Okay.  And do you agree that a heuristic
15  evaluation is difficult for a single individual to do
16  because one person will never be able to find all the
17  usability problems on an interface?
18      A.  I disagree that it's difficult to do.  I think
19  you have to understand Nielsen's framing of what a
20  heuristic analysis is supposed to accomplish.
21      So it -- if I may, Nielsen developed this --
22  this method in order to give practitioners a way to
23  provide a -- a concise analysis without the need or
24  requirement to engage in user testing in order to spot
25  a handful of particular canonical usability issues.
Page 12

1      A.  I do.
2      Q.  Can you tell me how much time each of the
3  individuals who worked on your heuristic analysis with
4  you spent analyzing Match.com cancellation web flows?
5      A.  I would have to look at my record.  I don't
6  remember off the top of my head.  Not as much as me,
7  but --
8      Q.  And how much did you spend doing your
9  heuristic analysis?
10      A.  I would have to go back to my records.  I
11  don't have a clear division of that piece versus the
12  writing piece versus, you know, everything else.
13      Q.  So, as you sit here today, you can't discern
14  between the amount of time you spent doing the analysis
15  versus the analysis -- excuse me, the heuristic study
16  versus the analysis versus the writing?
17      MR. AIJAZ:  Objection.  Misstates testimony.
18      THE WITNESS:  I mean, I can estimate for you.
19  BY MR. HUMMEL:
20      Q.  Please.
21      A.  Okay.  So I probably spent in the order of
22  5 to 10 hours working through the heuristic analysis.
23  I'm trying to remember how much time I spent writing.
24  There was a lot of writing.
25      And, I'm sorry, what was the other piece of it
Page 11

1      So it comes out of a tradition I would argue
2  he started called "discount usability."  This was back
3  in the early '90s, mid-1990s, and he was essentially
4  trying to develop this method in order to, I would say,
5  democratize, essentially, this practice to make it more
6  widespread.
7      So it is a way of identifying errors without
8  having to engage in user testing.
9      That said, it does not necessarily uncover all
10  errors, and user testing can also find different
11  errors.
12  ==Q.  You did not do a usability study.  Correct?==
13  ==A.  I did not do a usability study.==
14      Q.  Is it true, as Jakob Nielsen wrote in
15  November 1, 1994, in his article called "How to Conduct
16  a Heuristic Analysis," that the output from using the
17  heuristic evaluation method is a list of usability
18  problems in the interface with references to those
19  usability principles that were violated by the design
20  in each case in the opinion of the evaluator?
21      A.  Yeah.
22      MR. AIJAZ:  Objection.  Form.
23      THE WITNESS:  Sorry.
24      I mean, as you have read that definition, I --
25  yes, I agree with the way he has described it.
Page 13

4 (Pages 10 - 13)

App. 125

1      MR. AIJAZ:  And, Chad, I just ask if you're
2  going to read long passages and ask her to agree or
3  disagree that you provide it to her so that she could
4  review it.
5      MR. HUMMEL:  Okay.  Noted.
6      Q.  Do you agree that the results of the
7  evaluation should be recorded either as written reports
8  from each evaluator, or by having the evaluators
9  verbalize their comments to an observer as they go
10  through the interface?
11     MR. AIJAZ:  Objection.  Form.
12     THE WITNESS:  I mean, yes.  As far as what
13  Nielsen has said, yeah.
14  BY MR. HUMMEL:
15     Q.  Your assignment in this case from the FTC was
16  twofold.  Correct?
17     A.  If you are referring to the two questions on
18  page 3 of my report, yes.  We -- it was -- well, I'll
19  allow you to ask me.
20     Q.  I am.
21     In your report, you write:
22     "The FTC asked me to evaluate Match.com's
23     cancellation flow based on the following
24     inquiries:  one, was Match.com's cancellation
25     flow easy to use; and, two, was Match.com's

Page 14

1  cancellation process easy to find?"
2     And I said "flow" in the first one.  It says
3  "process."  Right?
4     A.  Yes.
5     Q.  So were those the two inquiries that the FTC
6  asked you to examine?
7     A.  Yes.
8     Q.  And does "easy" mean simple?
9     MR. AIJAZ:  Objection.  Calls for a legal
10  conclusion.
11     THE WITNESS:  I assumed that "easy" was
12  another word for simple as I did this analysis.
13  BY MR. HUMMEL:
14     Q.  You used them synonymously?
15     A.  Yes.
16     Q.  Okay.  Do you -- do you understand the
17  allegations that the FTC has made in this case about
18  the Match.com online cancellation flow over time?
19     A.  I mean, I believe I do, but is there something
20  specific you are --
21     Q.  What's your understanding?
22     MR. AIJAZ:  Objection.  Vague.
23     THE WITNESS:  Well, I have certainly read the
24  complaint --
25

Page 15

1  BY MR. HUMMEL:
2     Q.  Okay.
3     A.  -- and it is my understanding that they
4  believe that the cancellation process was not simple to
5  use and that a number of consumers would have not been
6  able to complete it.
7     Q.  Okay.  So -- and do you understand that the
8  FTC alleges that the Match cancellation flow over time
9  has violated the Restore Online Shoppers Confidence
10  Act?
11     A.  I'm not a lawyer, but to the best of my
12  understanding of that, yes.
13     Q.  Have you read ROSCA?
14     A.  Yes.
15     Q.  What guidance does ROSCA give to companies in
16  the statute itself as to what the meaning of "simple"
17  is?
18     MR. AIJAZ:  Objection.  Calls for a legal
19  conclusion -- legal analysis, rather.
20     THE WITNESS:  I -- I mean, I'd like to look at
21  ROSCA again, but I don't recall.
22  BY MR. HUMMEL:
23     Q.  What guidance, if you know, has the FTC
24  publicly given to companies about how methods of
25  cancellation can comply with ROSCA's admonition that a

Page 16

1  cancellation flow be simple?
2     MR. AIJAZ:  Objection.  Scope.  It's outside
3  her area of expertise, and also, again, it calls for a
4  legal analysis.
5     THE WITNESS:  I am familiar with the FTC.com
6  disclosures and their guidance on negative -- negative
7  option continuity plans.
8     But I can't remember off the top of my head if
9  that specifically addresses cancellation as we've been
10  discussing it here.
11  BY MR. HUMMEL:
12     Q.  The second publication, Ms. King, that you
13  referenced does provide guidance on the meaning of
14  "simplicity."
15     A.  Okay.
16     Q.  And, basically, what it says is that the
17  cancellation flow has to be at least as easy to use as
18  the method used to subscribe.  Right?
19     A.  Yes.
20     MR. AIJAZ:  Objection.  Lacks foundation.
21  BY MR. HUMMEL:
22     Q.  What analysis did you do, if any, for your
23  initial report to compare the relative simplicity of
24  the methods consumers used to sign up for Match.com
25  versus the cancellation method?

Page 17

5 (Pages 14 - 17)

CONFIDENTIAL

1    A. I did not -- I -- it was outside the scope of
2  my report to look at the sign-up process.
3       Q. So you didn't attempt, did you, to evaluate
4  the FTC's own standard for evaluating simplicity.
5  Correct?
6       MR. AIJAZ: Objection. Calls for legal
7  analysis. Outside the scope of her expertise.
8       THE WITNESS: I'm not sure that that is a
9  standard. My sense is that it's a recommendation; but,
10  no, I did not look at the cancellation flow -- I mean,
11  sorry -- I apologize.
12      I did not look at the sign-up flow
13  specifically.
14  BY MR. HUMMEL:
15      Q. Have you read the FTC's sworn testimony in
16  this case given pursuant to Rule 30(b)(6) of the
17  Federal Rules of Civil Procedure?
18      MR. AIJAZ: Objection. Vague.
19      THE WITNESS: I'm not sure what you mean,
20  actually.
21  BY MR. HUMMEL:
22      Q. So the FTC designated a witness.
23      A. Okay.
24      Q. His name was Bikram Bandy, and he testified
25  under oath on behalf of the FTC; in fact, as the FTC

Page 18

1  under the rule, and the deposition was on
2  October 24, 2022.
3       Have you read that transcript?
4       A. I have not.
5       Q. All right. I'm going to put a copy in front
6  of you in case you want to reference it.
7       I am for counsel as well, and I just want to
8  ask you if some of the things that the FTC considers
9  relevant in terms of evaluating whether a flow is
10  simple or not were things that you considered. Okay?
11      A. Okay.
12      Q. Before we do that, let me just ask you this:
13      You evaluated three separate web flows.
14  Right?
15      A. Yes. Two thousand -- sorry.
16      Go ahead.
17      Q. 2016, 2019, and 2022. Correct?
18      A. Yes.
19      Q. And you viewed those on video. Right?
20      A. I viewed them on video as well as static
21  screenshots.
22      Q. And who chose the videos that were provided to
23  you to evaluate?
24      A. They were provided to me by the FTC.
25      Q. By counsel for the FTC?

Page 19

1       A. Yes.
2       Q. All right. And who selected the screenshots
3  to use?
4       Did you make the screenshots, or did the FTC
5  give you the screenshots?
6       A. The FTC gave them to me.
7       Q. Okay. And based on those, the videos -- the
8  three videos and the three sets of screenshots, you
9  attempted to evaluate whether Match.com's cancellation
10  process was simple and whether the cancellation process
11  was easy to find. Correct?
12      A. I did. Yes.
13      Q. All right. Now --
14      MR. AIJAZ: I'll just say objection.
15  Misstates the report.
16  BY MR. HUMMEL:
17      Q. Okay. So I asked the FTC what factors might
18  be relevant in assessing whether a cancellation flow
19  was simple or not.
20      And if you can look at page 97.
21      And one of the things I asked them was: Would
22  time to completion be a relevant standard or a relevant
23  factor in considering whether a flow is simple or not?
24      That's at line 18 through 19 on page 97.
25      So my question is this: For any of the flows

Page 20

1  that you evaluated, did you consider the average time
2  that it would take a consumer to start the cancellation
3  flow and to complete it?
4       A. Okay. First, let me just verify: It's this
5  page with the yellow --
6       Q. Yeah.
7       A. Okay. Because there is a transcript page, and
8  then there's the actual --
9       Q. Right, right --
10      A. -- 97.
11      (The reporter requested that people not speak
12      at once.)
13  BY MR. HUMMEL:
14      Q. I asked -- I asked the FTC on line 14:
15      "QUESTION: I want to explore some of the
16  factors that might be used to evaluate whether
17  something is easy to use or not or easy to
18  find. Okay?"
19      I didn't even have your report when I asked
20  that question. Turns out I asked the same questions of
21  the FTC that you were asked by the FTC to solve.
22  Right?
23      So, then, I said:
24      "QUESTION: One would be time to
25  completion.

Page 21

6 (Pages 18 - 21)

CONFIDENTIAL

1    "Do you agree with that?
2    "ANSWER: Sure."
3    So here's my question:
4    A. Uh-huh.
5    Q. Did you independently evaluate the average
6    time it took for a user to complete the cancellation
7    flow for any of the three flows that you -- that you
8    examined?
9    A. I did not.
10    Q. Okay. And you would agree with the FTC that
11    the question of whether or not a cancellation flow is
12    simple is a, quote, "reasonable person standard," which
13    is what the FTC testified to under oath on page 97,
14    line 25.
15    MR. AIJAZ: Objection. Calls for legal
16    analysis. Outside the scope.
17    THE WITNESS: Yeah. I mean, I -- I don't know
18    specifically what you mean by "reasonable person" here.
19    BY MR. HUMMEL:
20    Q. I don't know either. That's what the FTC
21    testified.
22    Did you ever ask the FTC what they meant by
23    "reasonable person standard"?
24    A. No, I have not, but it was not a part of our
25    discussion as far as I recall.

Page 22

1    Q. Okay. Now let's look at page 98:
2    "QUESTION: Given the nature of the
3    Match.com flows that you analyzed, do you
4    believe there should have been a maximum time
5    that a reasonable consumer or subscriber of
6    Match.com could take to cancel their
7    subscription on line?"
8    A. I'm sorry. Can you repeat it?
9    Q. Sure. And you can read the question. It's
10    on --
11    A. Oh, sorry.
12    Q. -- page 99, line -- excuse me, page 98,
13    starting on line 4.
14    Do you believe, Ms. King, that there should be
15    a maximum time that a reasonable consumer or subscriber
16    of Match.com should take to cancel their subscription
17    on line?
18    MR. AIJAZ: Objection. Vague.
19    THE WITNESS: No. Actually, I don't think
20    that time is a determinative factor.
21    BY MR. HUMMEL:
22    Q. Right. Not determinative.
23    But did you -- in assessing whether or not the
24    process is easy to use or whether it's easy to find,
25    did you evaluate how much time on average it took a

Page 23

1    consumer to find the flow?
2    MR. AIJAZ: Objection. Asked and answered.
3    THE WITNESS: No, I did not.
4    BY MR. HUMMEL:
5    Q. Did you evaluate for any of the flows you
6    looked at the average amount of time that it took a
7    consumer -- strike that.
8    Did you evaluate the maximum amount of time
9    that it took a consumer to complete the flow?
10    MR. AIJAZ: Objection. Asked and answered.
11    THE WITNESS: No, I did not.
12    BY MR. HUMMEL:
13    Q. And I asked the FTC:
14    "QUESTION: Is that issue relevant to
15    whether or not a flow is simple or not?"
16    But you didn't evaluate that.
17    A. I did not evaluate maximum or minimum amounts
18    of time.
19    Q. Or average time?
20    A. Or average time, no.
21    Q. Okay. Now, the next thing I asked, if you
22    look at page 98, lines 18 through 22, is:
23    "QUESTION: Is the number of clicks
24    relevant to whether or not a canceling
25    mechanism is simple or not?"

Page 24

1    And the witness said:
2    "ANSWER: Could be. Sure."
3    Now, I take it you did evaluate the number of
4    clicks it takes to cancel on the Match.com flows that
5    you evaluated. I think you wrote seven or eight.
6    Right?
7    A. So I measured steps. You can also measure
8    clicks.
9    I would not say that they are automatically
10    synonymous, but I think steps, usually, is a -- I
11    would -- I prefer to evaluate looking at steps rather
12    than clicks just because I think clicks can potentially
13    overmeasure in some cases.
14    Q. I understand.
15    And how many steps does it take during this
16    time frame, 2019 through 2022 -- how many steps did it
17    take for a user to subscribe to Match.com?
18    A. So I think it depends on what you're meaning
19    by "subscribe."
20    I mean at what point of the process are you
21    talking about?
22    Q. From the time you log in to Match.com until
23    you're a paying subscriber.
24    A. I mean, does that include creating a
25    profile --

Page 25

7 (Pages 22 - 25)

CONFIDENTIAL

1   Q. Sure.
2   A. -- and filling out the profile?
3   Q. Of course. You have to. Right?
4   A. I don't know if you have to, actually.
5   Q. Have you signed on?
6      Have you become a member?
7   A. I am not a member of Match.com.
8   Q. Have you gone through the subscription
9   process?
10  A. I have never subscribed to Match.com.
11  Q. But in connection with your examination of the
12  issues presented to you in this case, have you
13  evaluated the subscription process?
14  A. I have not evaluated the subscription process.
15  Q. Okay. Then I asked a question starting on
16  page 98, going on to 99. And I asked the question:
17     "QUESTION: And the question of whether or
18     not a cancellation mechanism is simple, online
19     cancellation is simple, you'd also want to
20     look at whether consumers can find the
21     cancellation flow. Correct?"
22     And the witness says:
23     "ANSWER: Right. The first thing is easy
24  to find. Right.
25     "QUESTION: Easy to find. So if it's not

Page 26

1   A. Right.
2   Q. For any of the flows you evaluated, did you
3   attempt to determine the percentage of consumers who
4   attempted to find the cancellation flow and who were
5   able to find it?
6   A. Okay. No, I did not.
7   Q. Okay. Then if you look at --
8      MR. AIJAZ: Just one second.
9      (Discussion between the witness and counsel.)
10     MR. HUMMEL: Do you want to put that on the
11  record?
12     MR. AIJAZ: No.
13  BY MR. HUMMEL:
14  Q. What did he just tell you?
15     MR. AIJAZ: That's privileged.
16     MR. HUMMEL: No, it's not. You just talked to
17  a witness during a deposition. It's absolutely not
18  privileged, and it's absolutely subject to discovery.
19     What did he just tell you?
20     MR. AIJAZ: I'll tell you what I said. I
21  said --
22     MR. HUMMEL: No, no. I want it from the
23  witness. I don't want it from you.
24     MR. AIJAZ: I said, "Make sure you understand
25  the question before you answer." That's what I said.

Page 28

1   easy to find, it's not simple."
2      All right. My question is this:
3      Did you ever evaluate or study the percentage
4   of consumers who attempted to find the cancellation
5   flow on Match.com and who were able to find it?
6   A. I'm sorry, can you repeat it just so I make
7   sure I have it?
8      MR. HUMMEL: Could I have that read back,
9   please?
10     (Record read as follows:
11     "QUESTION: All right. My question is this:
12     Did you ever evaluate or study the percentage
13     of consumers who attempted to find the
14     cancellation flow on Match.com and who were
15     able to find it?")
16     THE WITNESS: No, I did not.
17  BY MR. HUMMEL:
18  Q. Okay. For any of the flows you evaluated.
19  Right?
20  A. I'm sorry. In what -- did I -- can you repeat
21  that?
22     I want to make sure I'm following you
23  precisely.
24  Q. Sure. Sure.
25     You evaluated three online cancellation flows?

Page 27

1   BY MR. HUMMEL:
2   Q. Is that what he told you?
3   A. Yes.
4   Q. Okay. So I then asked the FTC on page 99,
5   line 8:
6      "QUESTION: How would you evaluate that,
7   whether something is easy to find?"
8      And the answer is:
9      "ANSWER: I think it's an objective
10     standard based on, you know, what a reasonable
11     consumer's experience on the website would
12     be."
13     Do you see that?
14  A. Uh-huh.
15  Q. Did you study what a reasonable consumer's
16  experience on the website actually would be?
17     MR. AIJAZ: Objection. Vague.
18     THE WITNESS: That's difficult to answer
19  without, again, grasping precisely what you mean by
20  "reasonable consumer."
21  BY MR. HUMMEL:
22  Q. Do you have an understanding of what the
23  reasonable consumer standard is?
24  A. I don't recall off the top of my head.
25  Q. Do you know what a performance standard is?

Page 29

8 (Pages 26 - 29)

1   A. I mean, maybe, but I'd rather hear you tell me
2   what it is.
3   Q. Well, you're the -- you're the purported
4   expert in usability.
5       From a usability standpoint --
6   A. Okay.
7   Q. -- what is a performance standard?
8   A. I mean, I think that depends on what you're
9   measuring. I'm not -- again, I'm just not sure exactly
10  what you are --
11  Q. Well, in this --
12  A. -- alluding to.
13  Q. -- in this case, you're measuring how many
14  consumers to find the --
15  A. Okay --
16  Q. -- cancellation flow.
17  A. Sure.
18  Q. -- and how many --
19      (The reporter requested that people not speak
20      at once.)
21  BY MR. HUMMEL:
22      Q. In this case, the question to be evaluated is
23  whether consumers can find a cancellation flow, and a
24  performance standard would be how consumers actually
25  perform in attempting to find the flow.

Page 30

1   that it -- I was not -- I did not understand the
2   origination of those numbers and how they were
3   analyzed.
4   Q. Okay. Did you ask the FTC to provide you that
5   information?
6   A. So it's my understanding that there has been
7   information presented at different points throughout
8   this whole process.
9       I believe I asked questions about that back in
10  January, and I think -- I believe I was told that they
11  didn't have that data.
12      But, again, I don't know precisely which piece
13  of the data you're talking about.
14      But at any rate, it wasn't clear to me that
15  the FTC was given data that we could objectively say
16  measured these things in a way that I could crystally
17  clear say, "Yes, I understand this and could do
18  something with it."
19      Q. All right. So let's look at, again, the FTC's
20  sworn testimony on page 99 of -- of the deposition,
21  lines 20 through 23.
22      And this is, again, in connection with the
23  question of whether Match.com's cancellation process is
24  easy to find.
25      And I asked him:

Page 32

1       And I take it you didn't study that. Correct?
2       MR. AIJAZ: Objection. Foundation.
3       THE WITNESS: I'm sorry. I just wouldn't have
4   used that terminology, so I'm trying to parse exactly
5   what you mean.
6       Did I study -- did I conduct a usability study
7   of the flow?
8   BY MR. HUMMEL:
9   Q. Yes.
10  A. No. I did not conduct a usability study of
11  the flow with users.
12  Q. And you didn't conduct a -- a performance
13  study; in other words, an assessment of data which
14  shows how many consumers attempted to find the flow and
15  how many actually found it.
16  A. Okay. Now I --
17      MR. AIJAZ: Objection. Vague and foundation.
18      THE WITNESS: Now I understand what you mean.
19      No, I did not.
20  BY MR. HUMMEL:
21  Q. Okay. And you have no critique that I can see
22  in your rebuttal report of Mr. Ward's use of the
23  company data relating to average time for completion
24  and effectiveness and completion rates. Correct?
25  A. It's not that I didn't have a critique. It's

Page 31

1       "QUESTION: You could do a study. Right?
2   You could ask a series of consumers, 'Hey,
3   look at this website. Where would you go to
4   find our subscription cancellation flow?'"
5       I asked that question.
6       And the FTC, under oath, said:
7       "ANSWER: Sure. You could do that. It's
8   possible."
9       Why didn't you do that?
10  A. That was outside the scope of what I agreed to
11  do on this case. They didn't ask me to conduct a
12  usability study.
13  Q. That's my question. They didn't ask you to
14  conduct a usability study.
15      Why? Do you know?
16  A. No. I don't know.
17  Q. Did you attempt a usability study in this
18  case?
19  A. No, I did not.
20  Q. So you didn't attempt a usability study, get
21  bad results, and then not put it in your report?
22  A. No.
23  Q. Okay. I'm correct, you didn't do that?
24  A. Right. I did not do that.
25  Q. Did you ask the FTC, "Hey, I really should do

Page 33

9 (Pages 30 - 33)

App. 130

1   a usability study?"
2       A. No, I did not.
3       Q. Okay.
4           Could you show me, please --
5           This is a document that was marked by the FTC
6   in their deposition of Brandon Ward.
7       A. Brandon Ward? Yeah.
8       Q. I'm sorry, I'll keep my voice up.
9           Have you read the deposition of Brandon Ward?
10      A. I skimmed a rough copy of it.
11      Q. What does "skimmed" mean?
12      A. It was provided to me yesterday or the day
13  before; I think, maybe, two days before at most. So
14  I ...
15          MR. HUMMEL: Exhibit 3?
16          (Discussion off the record.)
17          (Deposition Exhibit 3 was marked for
18          identification.)
19  BY MR. HUMMEL:
20      Q. Do you have in front of you a document
21  entitled "How to Conduct a Heuristic Evaluation"?
22      A. Yes, I do.
23      Q. And this is published by the
24  Nielsen Norman Group?
25      A. Yes, it is.

Page 34

1       Q. And you considered them, I think you said, the
2   authoritative guide to how to conduct a heuristic
3   evaluation. Right?
4           MR. AIJAZ: Objection. Misstates the
5   testimony.
6           THE WITNESS: An authoritative, yeah; not the
7   only.
8   BY MR. HUMMEL:
9       Q. I understand.
10          But if you look, please, the first sentence of
11  this summary says:
12          "Step-by-step instructions to
13      systematically review your product to find
14      potential usability and experience problems."
15          Do you see that?
16      A. Sorry. No, I don't.
17          Wait.
18      Q. Under "How to Conduct" --
19      A. Yes. Yes. I see the subhead.
20      Q. And then this is written by Kate Moran and
21  Kelley Gordon.
22          Do you see that?
23      A. Yes, I do.
24      Q. On June 25, 2023.
25          So it's timely. Right?

Page 35

1       A. This one is very new.
2       Q. Have you seen this before?
3       A. Let me take a moment to look at it.
4           This is so new that I may not have seen it.
5   That's right. June 25. And today is, what, July 27?
6           No, I don't think I've seen this one. I'm
7   familiar with the articles they cite at the
8   beginning --
9       Q. Sure.
10      A. -- but I don't think I have seen this one.
11      Q. Okay. The first sentence of the article
12  reads:
13          "A heuristic evaluation is a method for
14      identifying design problems in a user
15      interface."
16          Do you see that?
17      A. I do.
18      Q. Do you agree that that is the definition of a
19  heuristic evaluation?
20      A. Yes, I do.
21      Q. Okay. So doing a heuristic analysis does not
22  answer the question of whether a process is simple or
23  not; it simply identifies problems. Correct?
24          MR. AIJAZ: Objection. Calls for a legal
25  analysis. Outside the scope.

Page 36

1           THE WITNESS: It's a method for identifying
2   design problems, but it is up to the expertise of the
3   evaluator to apply that method and use their training
4   as a basis for explaining what those problems mean.
5   BY MR. HUMMEL:
6       Q. And then you see a heading that says:
7           "When to Conduct an Heuristic Evaluation."
8           Do you see that?
9       A. Yes.
10      Q. First sentence there reads:
11          "Heuristic evaluations are useful for
12      identifying glaring problems in an interface."
13          Do you see that?
14      A. I do.
15      Q. All right. And then there's a sentence --
16  there's a next paragraph which reads:
17          "Heuristic evaluations are useful for
18      stretching a limited UX research budget."
19          Do you see that?
20      A. Yes.
21      Q. Did the FTC place any limits on the amount you
22  could spend in conducting your analysis to answer the
23  questions they posed?
24      A. I mean, there was certainly a budget for the
25  contract. I did not have unlimited funds.

Page 37

10 (Pages 34 - 37)

BY MR. HUMMEL:

Q. Did you tell the FTC, "Hey, in order for any conclusions I give you based on a heuristic analysis to be valid or reliable, I need to test them with a usability study"?

MR. AIJAZ: Chad, objection. That calls for protected information.

The rule is very clear on what you can ask about with respect to communications. This is far outside of what's allowable.

So don't answer.

MR. HUMMEL: You're instructing her not to answer?

MR. AIJAZ: Yeah, because, you know, it's not allowed what you're asking for. 26(b)(4)4 if you want it.

MR. HUMMEL: Well, what she did and didn't do is highly probative of whether what she did is reliable or not.

MR. AIJAZ: I agree. What she did. But not communications.

MR. HUMMEL: Look. If the FTC wants to --

Q. Would you be comfortable in a situation whereby the Federal Trade Commission, which is formed in part to enforce consumer protection laws including

Page 42

---

ROSCA, told you to do an assignment that you couldn't validate based on some test that you could -- according to the FTC, that could be done?

MR. AIJAZ: Objection. Form. This is an incomplete hypothetical. And it's vague.

But you can answer.

THE WITNESS: So I think that you are reading this article extremely literally.

And if you look back at the citing research into what -- how you develop heuristic evaluations, what you would find is that what -- how the Nielsen Norman Group frames this discussion is very much focused toward a set of practitioners.

But, fundamentally, what underlies it is a method; a method that was developed that you can apply in a variety of different contexts.

And the way that Nielsen has developed this method has been mostly -- I wouldn't -- "commercialize" is maybe not the right word, but he's tried to make it accessible and put it within a particular context.

But if you look at the academic literature on this topic, you don't necessarily have to follow what this article says line by line in order to conduct a heuristic evaluation.

MR. HUMMEL: I'm going to ask the court

Page 43

---

reporter to mark as Exhibit 4 a document entitled "Nielsen Norman Group Heuristic Evaluation Workbook."

MR. AIJAZ: Do you want to take a break while you're looking for it?

MR. HUMMEL: Sure. We can go off the record.

(Recess from 9:40 A.M. to 9:51 A.M.)

(Deposition Exhibit 4 was marked for identification.)

BY MR. HUMMEL:

Q. Ms. King, you understand you're still under oath?

A. I do.

Q. Any reason you can't continue to give your best truthful testimony here this morning?

A. Nope.

Q. Okay. I have marked as Exhibit Number 4 a document also published by the Neilsen Norman Group called a "Heuristic Evaluation Workbook."

Do you see that?

A. I do see it.

Q. Did you utilize this workbook in connection with your heuristic evaluation?

A. I did not.

Q. Did the two individuals that also did or assisted you in your evaluation use this workbook, to

Page 44

---

your knowledge?

A. I do not believe they did.

Q. Now, you said you've conducted 30 usability studies in your career, or at least 30. Right?

A. Approximately.

Q. That's a best estimate.

So back to the transcript of Mr. Bandy, page 99, line 20, where I asked him:

"QUESTION: You could do a study. Right?"

And he says:

"ANSWER: Sure. You could do that. It's possible."

Right?

Have you thought about how you would design a study that would evaluate whether consumers who are attempting to cancel on the Match.com website -- any of the versions you examined -- how you would design a study that would examine whether a reasonable consumer could find a cancellation flow?

MR. AIJAZ: Objection. Form. And vague.

THE WITNESS: I mean, I have some general ideas, but I did not spend much time thinking that through.

BY MR. HUMMEL:

Q. What are those general ideas, if you can?

Page 45

---

1     A. Well, I mean, the -- the challenge, of course,
2  is recreating the website.
3        So if you are going to study 2016, 2018,
4  and -- sorry, 2022, then, you know, there are a number
5  of different ways you could approach it. But, you
6  know, the -- the first starting point is how you
7  recreate some approximation of the website and provide
8  a -- I would say, like, a native task for people to
9  engage with.
10       Now, that's all possible. You don't even have
11 to make a fully functional prototype of the website to
12 do that. But that -- if you did that -- I mean, again,
13 that's one way you could do it.
14       You know, you could in some cases, although
15 maybe not as ideal, use, you know, paper prototyping to
16 take somebody through a similar type of task.
17       But overall, the goal in doing so is to
18 conduct a study that is reliable and that is not overly
19 directive, meaning that you want to situate a task
20 within somebody's -- to the best that you can,
21 somebody's natural experience with the website.
22       So if you put the website in front of them and
23 say, "Go cancel," that's a very directed task. And
24 that potentially influences the outcome in the sense
25 that if you direct them to cancel, they are going to

Page 46

BY MR. HUMMEL:
2     Q. What was your budget given to you by the FTC
3  to perform this analysis that ultimately resulted in
4  your first report?
5     A. I believe the first phase was around $40,000.
6     Q. And how much have you been paid to date for
7  your opinions?
8        MR. AIJAZ: Objection. I didn't like the form
9  of that, but go ahead and answer.
10       THE WITNESS: You mean per hour or total
11 billing --
12 BY MR. HUMMEL:
13    Q. Total.
14    A. -- up until now?
15       I am not sure. I want to say that we're at --
16 and this includes my assistants. I don't have my rate
17 pulled out separately. I think we've billed in the
18 order of $75,000. But, again, not 100 percent sure.
19       MR. AIJAZ: Let me just get a cleaner
20 objection.
21       She was not paid for her opinion, so that
22 misstates -- there's a lack of foundation there. She
23 was paid for her report.
24       MR. HUMMEL: Well, that's testimony and
25 speaking objection and completely improper.

Page 48

1  probably do everything they can to cancel because you
2  are paying them for their time in order to do that.
3        So the challenge is to work in a task in a way
4  that doesn't encourage them to modify their use and is
5  as naturalistic as possible.
6     Q. Sure. My question was actually simpler, which
7  is:
8        How could you test whether a consumer could
9  find the cancellation flow?
10    A. Well, again, I mean, I think it's dependent on
11 how you would -- how you would kind of construct the --
12 the site in order to actually run such a study.
13    Q. Could -- I mean, could you imagine how you
14 would design a study where you would test whether it's
15 easy for a consumer to -- well, to -- whether it's easy
16 to find the cancellation process?
17       MR. AIJAZ: Objection. Scope and calls for
18 speculation.
19       THE WITNESS: It's possible. And I will say
20 that, you know, as I am talking -- as I am talking
21 through this, I am thinking mostly about testing those
22 older versions. You know, there is a difference
23 between doing that and testing the live website, for
24 example. That's a different potential tactic.
25

Page 47

1        MR. AIJAZ: It was a bad question.
2        MR. HUMMEL: It's a really bad objection, and
3  it's improper and might be sanctionable.
4     Q. So let's look at --
5        MR. AIJAZ: No.
6        MR. HUMMEL: You can't testify.
7     Q. So let's go on.
8        On page 101, I asked the FTC a question at
9  line 14.
10       "QUESTION: Is one factor in assessing
11 whether a cancellation flow is simple or not
12 its effectiveness?"
13       I go on:
14       "In other words, the percentage of
15 consumers who attempt to cancel using a flow
16 and succeed, could that be relevant?
17       "ANSWER: Sure."
18       In connection with any of the flows that you
19 evaluated in this case to answer the FTC's two
20 inquiries, did you measure the effectiveness of the
21 flow?
22       MR. AIJAZ: Objection. Vague.
23 BY MR. HUMMEL:
24    Q. As defined in this question?
25    A. Okay. So you're defining "effectiveness" as

Page 49

13 (Pages 46 - 49)

1  the percentage of consumers who attempt to cancel using
2  a flow and succeed. Is that correct?
3      Q. Exactly.
4      A. Okay. Let me consider that for a moment.
5        I'm sorry. So now take me back to the first
6  question, which was, did I --
7      Q. Measure effectiveness.
8      A. Okay. Did I measure effectiveness by looking
9  at consumer behavior, whether in a usability test or
10  other --
11      Q. Performance test. Right.
12      A. No, I did not.
13      Q. Is there a reason why?
14      A. Again, that was not -- outside the scope of
15  the work that I agreed to do.
16      Q. Well, Mr. Ward's report cited company data on
17  effectiveness, and you had no rebuttal to that data.
18        Do you have any opinions about that data, as
19  you sit here today, that you intend to express at trial
20  that are not contained in either report?
21      MR. AIJAZ: Objection. Foundation.
22      THE WITNESS: I would need to look at
23  precisely what data we're talking about.
24  BY MR. HUMMEL:
25      Q. The effectiveness data; the percentage of

Page 50

1  consumers who attempted to cancel -- entered the flow
2  intending to cancel and effectively did so.
3      A. Okay. Can you point me to his report so we
4  can discuss precisely those numbers?
5        I mean, I think I know what you're talking
6  about, but --
7      Q. I'm not going to do that now.
8      A. Okay.
9      Q. My question is: Do you have -- as you sit
10  here today, is there any opinion about that company
11  data that you intend to offer at trial that is not
12  contained in your two report?
13      MR. AIJAZ: Objection. She answered the
14  question, and she said what she would need to do to
15  answer it.
16      THE WITNESS: I mean, I have some thoughts
17  related to how it was presented in his report, but I
18  have not independently looked at that data because,
19  again, I'm not even sure it was available to me at the
20  time I was doing either report.
21  BY MR. HUMMEL:
22      Q. You could attempt to measure effectiveness by
23  doing a usability study. Correct?
24      MR. AIJAZ: Objection. Calls for speculation.
25      THE WITNESS: Sorry. I'm making sure -- I'm

Page 51

1  reading "effectiveness" again.
2      Yes. That is possible.
3  BY MR. HUMMEL:
4      Q. And you didn't do it.
5      A. I did not do that.
6      Q. So just to wrap this up, you didn't look at
7  effectiveness, you didn't look at average time to
8  completion; you didn't look at maximum or minimum times
9  that it takes for a consumer to cancel on the Match.com
10  flows that you studied; you didn't do any sort of
11  evaluation of whether a consumer -- any sort of study
12  to determine whether consumers, in fact, find the
13  flow.
14      Is that all correct?
15      MR. AIJAZ: Objection. Vague. Form. And
16  misstates testimony.
17      THE WITNESS: Can we go through them one by
18  one so I can answer?
19  BY MR. HUMMEL:
20      Q. Yeah. So you didn't attempt to measure
21  effectiveness as defined in this question on page 101
22  of the FTC's deposition testimony.
23      A. You know, I did not attempt to do that using a
24  user study. True.
25      Q. By the way, in terms of the -- a question of

Page 52

1  whether Match.com's cancellation flow is easy to use,
2  what would you consider to be an appropriate
3  effectiveness percentage?
4      MR. AIJAZ: Objection. Vague.
5      THE WITNESS: I'm sorry. So are you asking me
6  what percentage of consumers who are subscribed, what
7  is an effective cancellation rate?
8  BY MR. HUMMEL:
9      Q. Yeah.
10      A. Ideally, 100 percent.
11      Q. Okay.
12      A. If I have subscribed to a service and I do not
13  wish to be subscribed anymore, I should be able to
14  unsubscribe. Full stop.
15      Q. Sure.
16        And in this case, in Match, if you weren't
17  able to do the online flow, you could call customer
18  service. Right?
19      A. I believe so. But I have not seen precisely
20  how individuals locate that phone number, meaning I
21  don't know where it was offered.
22      So I don't have a -- I'm sorry, did you --
23      MR. AIJAZ: No, no. I'll wait.
24      THE WITNESS: Okay. So I will say, in theory,
25  yes, but it is dependent on how accessible that phone

Page 53

14 (Pages 50 - 53)

CONFIDENTIAL

| | |
|---|---|
| 1 number was. | 1 it's easy to cancel by text message. |
| 2 BY MR. HUMMEL: | 2     MR. AIJAZ:  Objection.  Foundation. |
| 3   Q.  Sure. | 3     THE WITNESS:  I wasn't sure if that was |
| 4     MR. AIJAZ:  Objection.  Foundation to the | 4 possible; but, no. |
| 5 question. | 5 BY MR. HUMMEL: |
| 6 BY MR. HUMMEL: | 6   Q.  How about chat function? |
| 7   Q.  And you haven't offered any opinions with | 7   A.  I don't know if Match had a chat function for |
| 8 whether or not that phone number is easily accessible. | 8 the scope of time during which I looked at the |
| 9 Correct? | 9 report -- |
| 10     MR. AIJAZ:  Objection.  Form. | 10   Q.  Either way -- |
| 11     THE WITNESS:  I would need to go back to my | 11   A.  I mean, looked at the site. |
| 12 report because I believe I talk about it -- I may talk | 12   Q.  -- you have no opinion.  Correct? |
| 13 about it in relation to looking at some of the FAQs. | 13   A.  Right. |
| 14 So I'm -- I can't say definitively off the top of my | 14   Q.  So your sole focus was the online cancellation |
| 15 head right now. | 15 flow for the Match.com website.  Correct? |
| 16 BY MR. HUMMEL: | 16   A.  In terms of evaluation, yes. |
| 17   Q.  Let me ask it a better way. | 17   Q.  And you have no opinions about mobile app |
| 18     Do you have an opinion as you sit here today | 18 cancellation processes.  Right? |
| 19 that you're willing to offer under penalty of perjury | 19   A.  That is correct.  I was not asked to look at |
| 20 as to whether the phone number to contact customer | 20 the mobile flows. |
| 21 service is easily accessible to consumers on the | 21   Q.  Now, if you look at -- just to finish up on |
| 22 Match.com website? | 22 the FTC's sworn testimony here on page 100. |
| 23   A.  I have concerns about it.  But I don't -- I | 23     So I ask a question that starts on line 13: |
| 24 did not study specifically all of the different places | 24 "QUESTION:  Well, in the Match.com |
| 25 where one could access the phone number. | 25 cancellation flow, I think you described the |
| Page 54 | Page 56 |

| | |
|---|---|
| 1   Q.  Do you have an opinion about whether or not it | 1 steps that would be taken:  You first have to |
| 2 is easy for a Match.com subscriber to cancel by phone? | 2 click on the gear, then you click on 'Manage |
| 3     MR. AIJAZ:  Objection.  Scope. | 3 Subscription.' |
| 4     MR. HUMMEL:  Right.  I'm trying to determine | 4 "Does the FTC contend that those links are |
| 5 the scope. | 5 not clear? |
| 6     I don't want her to get up on the stand and | 6 "ANSWER:  I think that's more about |
| 7 testify at trial, in other words, Counsel, "Hey, I've | 7 difficulty in finding the cancellation flow. |
| 8 looked at the phone cancellation process now, and it's | 8 I think you'd use the term 'clear verbiage,' |
| 9 not easy or simple." | 9 'clear wording,' and that when I said that, I |
| 10   Q.  You have no opinion about the phone | 10 was more referring to the things like 'before |
| 11 cancellation process.  Correct? | 11 you go' language and after, you know, 'cancel |
| 12   A.  If by "process" you mean, you know, calling | 12 subscription link.'  That's not clear.  When |
| 13 and the actual process somebody goes through when | 13 the 'Continue' button was on the 'Save' offer, |
| 14 they're talking to the agent or how simple or easy that | 14 that's not clear." |
| 15 is, no, I have no insight into that piece of it. | 15     Do you see that? |
| 16   Q.  And no opinions about wait times on the | 16   A.  I do see that. |
| 17 phone -- | 17   Q.  Did you do any empirical study of how users |
| 18   A.  Right.  None. | 18 actually react to the "before you go" language? |
| 19     (The reporter requested that people not speak | 19   A.  Such as a copy test, for example? |
| 20       at once.) | 20   Q.  Yes. |
| 21 BY MR. HUMMEL: | 21   A.  No, I did not. |
| 22   Q.  And you have no opinions about whether or not | 22   Q.  Did you do any sort of empirical study or copy |
| 23 it's easy to cancel by email.  Correct? | 23 test about how consumers receive the subscription link? |
| 24   A.  No.  I do not. | 24   A.  No, I did not. |
| 25   Q.  And you have no opinions about whether or not | 25   Q.  Did you do any copy test or empirical analysis |
| Page 55 | Page 57 |

15 (Pages 54 - 57)

App. 135

1   about how consumers perceive and act upon "Continue"
2   buttons on the flow?
3        MR. AIJAZ:  Objection.  Vague.
4        THE WITNESS:  No, not specifically.
5   BY MR. HUMMEL:
6        Q.  I just want to be clear.
7        You -- when you talked about effectiveness
8   rate before, you said ideally, it would be
9   "100 percent.  Full stop."  Is that right?
10       A.  Yeah.
11       Q.  Now, are you saying that anything less than
12   100 percent violates ROSCA?
13       MR. AIJAZ:  Objection.  Misstates the
14   testimony and calls for legal analysis.
15   BY MR. HUMMEL:
16       Q.  Let me say it another way:
17       Are you saying that anything less than
18   100 percent in a usability study would make something
19   not easy to use?
20       A.  No.  That's not what I'm saying.
21       Q.  All right.  I just want to be clear.
22       So it's your -- it's the goal that it would be
23   100 percent --
24       A.  Right.
25       Q.  -- but you're not opining that something less

Page 58

1   than 100 percent might still be simple.
2        MR. AIJAZ:  Objection.  Form.
3        THE WITNESS:  I'm just trying to make sure I'm
4   parsing your question correctly.
5   BY MR. HUMMEL:
6        Q.  Me too.  Let's rephrase it.
7        It's not your testimony, Ms. King, that
8   something less than 100 percent could not also be
9   simple.
10       A.  I'm sorry, I'm just trying to take that in.
11       What I am saying is that the goal -- if a
12   consumer wants to cancel a subscription, they should be
13   able to cancel it.  Full stop.
14       Ideally, you would have a cancellation flow
15   that would allow that as -- at as high of an
16   effective -- effectiveness rate, sorry, as possible.
17       That would be the goal.
18       Q.  Do you have any opinions about -- well, strike
19   that.
20       Let me ask you this:  There's an old maxim --
21   strike that.
22       There's an old maxim in marketing consumer
23   perception research that 10 percent of people in the
24   world, when asked "Is Chad holding up a pen right now?"
25   would say no because they just get it wrong.  Right?

Page 59

1        So that's sort of a 90 percent, and you do
2   that using controls, et cetera, to eliminate the noise.
3        You know that.  You've done consumer surveys.
4   Right?
5        Correct?
6        MR. AIJAZ:  Objection.  Form.
7   BY MR. HUMMEL:
8        Q.  That's why you have a control.
9        MR. AIJAZ:  Objection.  Form and foundation.
10       THE WITNESS:  I've done consumer surveys.  If
11   you're asking about an experimental survey with a
12   control group, I'm not quite following how that leads
13   to your 10 percent yet, but please continue.
14   BY MR. HUMMEL:
15       Q.  Did you do a consumer survey in the
16   Commerce Planet case?
17       A.  It was a long time ago.
18       No, I did not.
19       Q.  Your opinion was, basically, that material
20   terms were presented below the fold on a website.
21   Right?
22       That was kind of --
23       A.  Yeah, I think that's an okay summary of that.
24       Q.  And the judge ultimately, in calculating
25   restitution amounts, said, "I'm going to assume

Page 60

1   50 percent of the people didn't read below the fold, so
2   I'm going to cut the FTC's restitution demand in half."
3        Do you remember that?
4        MR. AIJAZ:  Objection.  Calls for a legal
5   analysis.
6        THE WITNESS:  I was not involved in the case
7   at that point.
8   BY MR. HUMMEL:
9        Q.  Okay.  Your testimony was limited to whether
10   consumers would reasonably perceive disclaimers that
11   were below the fold; that this is the package they were
12   actually buying as opposed to what was advertised on
13   top.
14       Do you remember that?
15       A.  Like I said, it's been a while.
16       MR. AIJAZ:  Objection.  Form.
17       THE WITNESS:  I mean, the -- it wasn't just
18   the disclaimers, though, if I'm remembering correctly.
19   It was also that there were, I think, preselected check
20   boxes that were enrolling them in a negative option
21   continuity plan.
22   BY MR. HUMMEL:
23       Q.  Without a disclosure of what they were
24   actually buying up front.  Right?
25       A.  Correct.

Page 61

16 (Pages 58 - 61)

App. 136

CONFIDENTIAL

1    Q. Yeah. Okay.
2       And in that case, you didn't do a usability
3    study -- or a consumer perception study.
4    A. I didn't. I can't remember if somebody else
5    did. It's just been too long.
6    Q. Okay. Have you ever been qualified as an
7    expert in the field of consumer perception?
8    A. I don't believe I've been specifically offered
9    in that context.
10   Q. Have you ever been qualified as an expert in
11   survey design?
12   A. I have expertise in survey design, but I don't
13   believe I've ever been offered up to the court as a
14   survey expert. It's generally been within the capacity
15   of human-computer interaction which, of course, survey
16   analysis is one of our methods.
17   Q. And human-consumer interaction is --
18   A. Human-computer interaction. Sorry.
19   Q. Human-computer interaction is often referred
20   to as "HCI."
21   A. Yes.
22   Q. And you consider yourself an expert in HCI.
23   A. Yes.
24   Q. Okay. How many times have you been qualified
25   to testify in court as an expert?

Page 62

1    A. I have only testified in one case. Everything
2    else I've worked on has settled.
3    Q. And that was Commerce Planet?
4    A. Yes.
5    Q. And you've never been retained or offered
6    testimony on behalf of a private party; only
7    government. Right?
8    A. I have been retained by a class action firm,
9    just to make sure I'm understanding you correctly.
10   Q. No, that's fair. That's a fair clarification.
11      But you don't provide consulting or advice for
12   private companies. Is that correct?
13   A. No. Generally due to conflict of interest
14   with my role at Stanford.
15   Q. Are what does that mean, with your role at
16   Stanford?
17   A. Yes. My full-time job.
18   Q. No, I -- I understand that.
19      My question is: Why does your role at
20   Stanford present a conflict for you consulting with or
21   providing advice to private companies, including
22   startups?
23   A. Because most of my work in that space is
24   focused on public interest technology.
25   Q. What does "public interest technology" mean?

Page 63

1    A. Technology developed for the public interest.
2       Can be thinking -- you can -- can be for
3    government, but more that it's independent of private
4    influence.
5    Q. Can you tell me how you came to be retained in
6    this case?
7    A. The FTC --
8       MR. AIJAZ: Objection. Vague.
9       THE WITNESS: The FTC called me.
10   BY MR. HUMMEL:
11   Q. Do you recall who called you?
12      THE WITNESS: It might have been you. I can't
13   remember.
14      MR. AIJAZ: You might want to clarify.
15      THE WITNESS: I realize I haven't actually
16   said your last name out loud, so I'm struggling with
17   it.
18      MR. AIJAZ: Aijaz.
19      THE WITNESS: Mr. Aijaz may have been the one
20   that called me.
21   BY MR. HUMMEL:
22   Q. Do you recall that he called you?
23   A. I know I spoke with him on the phone. I know
24   he was the one -- Mr. Tepfer -- Tepfler.
25   Q. Reid Tepfer.

Page 64

1    A. Yes. Sorry. I put an extra L in there.
2    Q. It might have been the two of them?
3    A. It probably was the two of them --
4    Q. And in that --
5    A. -- one of the two.
6    Q. And in that initial call, did they convey to
7    you the assignment they were interested in having you
8    pursue?
9    A. So, I mean, we spoke at different points in
10   time as often happens. You know, there's usually an
11   introductory call that brings up kind of the bare facts
12   of the case, and then there's often a follow-up call.
13      I don't know -- I can't recall what happened
14   when.
15   Q. Do you recall who ultimately gave you the
16   assignment?
17   A. I believe both of them.
18   Q. And the assignment is as set forth in -- on
19   page 3 of your expert report?
20   A. Yes.
21   Q. Okay. And did you then develop your own
22   methodology on how you would assess answering the
23   questions that they presented as your assignment?
24   A. So I have conducted multiple heuristic
25   evaluations over my career, and I follow a specific

Page 65

17 (Pages 62 - 65)

App. 137

1    The NPS survey is that -- "How likely is it
2  you would recommend Match.com to a friend?"
3    Q. Yes.
4    A. All right. We're on the same page, literally,
5  now.
6    Q. Did you ever attempt to assess how long it
7  takes a consumer to answer that question on the 0 to 10
8  scale?
9    A. No, I did not.
10   Q. What percentage of the consumers on this flow
11 actually answered the open-ended question presented in
12 the survey, which is: "In your own words, how can you
13 make finding love easier?"
14   A. I was not given data on that point.
15   Q. But did you attempt to figure that out?
16   A. No, I did not.
17   Q. Did you attempt to figure out how long on
18 average consumers spent answering that open-ended
19 question?
20   A. How long consumers spent --
21   Q. Answering that open-ended question.
22   A. Oh. No, I did not.
23   Q. So the FTC in their guidance on cancellation
24 flows has a couple of things that they say.
25     One is, it should be no more -- it should be

Page 90

1  negative option marketing?
2    A. I haven't looked at it in the last few months,
3  so I don't remember that specifically. I'd need to
4  look at the document.
5    Q. So you don't recall whether one of the tests
6  the FTC has for assessing surveys or save offers in the
7  context of cancellation flows, whether it unreasonably
8  delays the process of canceling?
9    A. It doesn't -- that's not surprising to me, but
10 I am just saying I haven't looked at that document in
11 some time. So --
12   Q. And because you didn't measure the time it
13 takes an average consumer or consumers, generally, to
14 accomplish the surveys or to consider and either accept
15 or reject the save offer, you have no opinion about
16 whether those aspects of Match.com's cancellation flow
17 unreasonably delay the process of cancellation.
18 Correct?
19     MR. AIJAZ: Objection. Foundation. And form.
20     THE WITNESS: No. I think I disagree with the
21 way you phrased that.
22 BY MR. HUMMEL:
23   Q. Okay. How so?
24   A. I apologize. Can you please repeat the
25 question?

Page 92

1  no more difficult than it was to sign up generally.
2  Right?
3    We talked about that before.
4    MR. AIJAZ: Objection. Foundation. Misstates
5  the guidance and calls for legal analysis.
6  BY MR. HUMMEL:
7    Q. That's one of -- I'm just referring -- point
8  of reference. Right?
9    And the other thing they said -- do you
10 recall, generally, that topic --
11   A. Yes, proportionality.
12   Q. Yeah, yeah. Okay. Fine. That's a good way
13 to refer to it.
14     And you did nothing to assess proportionality.
15     We already talked about that. Correct?
16   A. Yes. We talked about that.
17   Q. And the other thing it says is, it's okay to
18 present a save offer or to have surveys so long as they
19 don't take an unreasonable -- so long as they don't
20 unreasonably delay the cancellation process.
21     Do you recall that language?
22     MR. AIJAZ: Objection. Foundation.
23     THE WITNESS: I'm sorry, from where again?
24 BY MR. HUMMEL:
25   Q. From the FTC guidance that you referenced on

Page 91

1    (Record read as follows:
2    "QUESTION: And because you didn't measure the
3    time it takes an average consumer or
4    consumers, generally, to accomplish the
5    surveys or to consider and either accept or
6    reject the save offer, you have no opinion
7    about whether those aspects of Match.com's
8    cancellation flow unreasonably delay the
9    process of cancellation. Correct?")
10   THE WITNESS: Okay. No. I disagree with that
11 statement.
12     I mean, I certainly have opinions about
13 whether or not I believe it obstructed or caused, you
14 know, some additional work for the consumer.
15     You know, precisely the timing, no. That, I
16 do not have data on.
17 BY MR. HUMMEL:
18   Q. Do you know what percentage of consumers did
19 not complete the cancellation process because they
20 accepted a save offer?
21   A. I feel like I have seen that statistic in
22 either Langenfeld or Ward's rebuttal reports, but we'd
23 have to look at it precisely because I'm not sure.
24     But, again, I also don't -- I can't say with
25 confidence that I know exactly how those things are

Page 93

24 (Pages 90 - 93)

**Page 94**

1 being measured.
2        So, of course, I would have questions about
3 the statistic itself, but I have seen a number included
4 in those reports.
5    Q. What prevented you from performing your own
6 usability study on any of the Match.com flows that you
7 analyzed?
8        MR. AIJAZ: Objection. Foundation.
9        THE WITNESS: Nothing prevented me from doing
10 it. I generally don't find it to be necessary if there
11 is supporting information that would -- that would add
12 context to my heuristic evaluation.
13 BY MR. HUMMEL:
14    Q. What evidence do you have that stores the
15 proposition or the assumption on your part that
16 consumers who reach the password page intend to cancel
17 their subscription?
18    A. Well, I think I need to look at the
19 screenshots in order to --
20        Do we have different screenshots beyond what's
21 in my report, or are we just going to refer to these
22 today?
23    Q. I have them. I have the screenshots for the
24 three flows you analyzed --
25    A. I mean, do we have -- because these are a

**Page 95**

1 little bit hard to read, and they're not in color.
2        MR. HUMMEL: Let's mark all of them.
3        Let's go off the record.
4        (Discussion off the record.)
5        (Deposition Exhibits 5, 6, and 7 were marked
6        for identification.)
7        MR. HUMMEL: All right. We took a break to
8 mark some exhibits which are the pages of the flows
9 that Dr. King elected to put in her report.
10    Q. The question remains the same, which is: What
11 evidence do you have that supports the proposition that
12 consumers who reach the password page intend to cancel
13 their subscription?
14    A. So I believe that there was some -- there has
15 been data provided on this point, but I didn't have it
16 when I was writing the report.
17        But I don't know if -- I don't know the status
18 of where that is in this larger discussion.
19    Q. So the answer is you don't know?
20    A. I didn't have that data specifically at the
21 time I wrote the report, but I have since -- although I
22 can't -- again, I don't know precisely -- I haven't
23 seen the spreadsheet, I don't know where the data has
24 been crunched, but it's been relayed to me that there
25 was some significant dropoff at that stage.

**Page 96**

1        And I believe, also, some of the consumer --
2 I'm sorry, not the consumer -- I believe some of the
3 company emails, documents, I reviewed, attest to the
4 fact that people hit that password page and found it to
5 be a stumbling block.
6    Q. What percentage of individuals who reached the
7 password page did not ultimately cancel because they
8 couldn't get past that password page?
9    A. That, I don't have data on.
10    Q. Okay. Was there anything you could have done
11 to investigate that question?
12    A. Well, again, if -- if we had had, I guess,
13 data on those points that tracked precisely to the
14 pages over the time period in which I was analyzing at
15 the time I was writing this, that could have
16 potentially added some context.
17    Q. Is it your opinion that by having a password
18 page requirement, the cancellation flow is not simple?
19        MR. AIJAZ: Objection. Form.
20        THE WITNESS: No. I would restate that
21 myself.
22        I mean, it is one of multiple factors that, I
23 think, make the flow less simple, but it is not, like,
24 a single, determinative feedback or on its -- alone
25 that makes the flow less simple or easy.

**Page 97**

1 BY MR. HUMMEL:
2    Q. Now, in your report, you describe the
3 heuristic analysis in which you engaged. Right?
4    A. Yes.
5    Q. And you also described the -- what you believe
6 to have been dark patterns in the cancellation flow.
7 Correct?
8    A. Yes.
9    Q. Now, Nielsen has ten heuristics to utilize in
10 connection with evaluating user experience. Correct?
11    A. Ten. Yes, ten.
12    Q. And in your report, you describe violation of
13 only three heuristics; that is, starting on page 35:
14 "Visibility of System Status, Consistency and
15 Standards, Aesthetic and Minimalist Design." Correct?
16    A. Yes. Those were the three I had the greatest
17 concerns with.
18    Q. You didn't opine or offer any opinions about
19 the other seven heuristics in your report. Correct?
20    A. Right. I did not.
21    Q. And you did not comment on the -- let
22 me -- Nielsen's usability components, the five
23 usability components that he's published about.
24 Correct?
25    A. Correct.

25 (Pages 94 - 97)

1    Q. So you didn't evaluate Heuristic Number 2,
2  which is the "Match between the system and the real
3  world." Correct?
4    A. Correct.
5    Q. And you didn't evaluate Heuristic Number 3,
6  which is "User control and freedom." Correct?
7    A. Well, actually, it's not that I didn't
8  evaluate them. I didn't find them relevant. Let's
9  make that clear.
10     It's not like I skipped them. I looked at all
11  ten, and I applied the ones I thought that the -- the
12  cancellation flow potentially violated.
13    Q. Right. So you didn't think it violated
14  Heuristic 2, which is "Match between the system and the
15  real world," because you didn't put that in your
16  report. Correct?
17    A. Correct.
18    Q. And you didn't think it violated Heuristic 3,
19  which is "User control and freedom." Correct?
20    A. Correct.
21    Q. And you didn't opine that the Match
22  cancellation flow violated Heuristic 5, which is "Error
23  prevention." Correct?
24    A. Correct.
25    Q. And you didn't opine that the Match

Page 98

1    Q. And you understand that the opinions that
2  you're going to be allowed to testify about at trial
3  are those that are contained in your report. Correct?
4    A. Correct.
5    MR. AIJAZ: Objection. Calls for a legal
6  conclusion and analysis and foundation.
7  BY MR. HUMMEL:
8    Q. That's your understanding. Right?
9    A. That's -- yes.
10    Q. Why was it that you didn't consider any of
11  Nielsen's usability components -- strike that.
12     Why is it that you didn't opine about any of
13  Nielsen's usability components in your expert report?
14    A. Those are components that, generally, are not
15  something I use in my work.
16    Q. Why?
17    A. They -- I just haven't seen them as relevant.
18    Q. So learnability, efficiency, memorability,
19  errors, and satisfaction are not relevant?
20    A. They are -- for the purposes of -- of my
21  analysis, no. I wasn't concerned with reviewing those
22  components.
23     Let's go back and talk about your expertise.
24    A. Sure.
25    Q. You hold yourself out as an information

Page 100

1  cancellation flow violated Heuristic 6, which is
2  "Recognition rather than recall." Correct?
3    A. Right.
4    Q. And you didn't opine that the Match
5  cancellation flow violated Heuristic 7, which is
6  "Flexibility and efficiency of use." Correct?
7    A. Correct.
8    Q. And you didn't opine that the Match
9  cancellation flow violated Heuristic Number 9, which is
10  "Help users recognize, diagnose, and recover from
11  errors." Correct?
12    A. Correct.
13    Q. And you didn't opine about -- you didn't opine
14  that Match's cancellation flow violated Heuristic
15  Number 10, "Help and documentation."
16     Do you see that?
17    A. I do.
18    Q. Is that true?
19    A. I did not include that.
20     Retrospectively, I might have included it the
21  more I considered questions around those help pages,
22  but -- but the --
23    Q. Right. But it's not in your report. Correct?
24     That's all I'm saying.
25    A. Right. It's not in my report.

Page 99

1  privacy expert. Correct?
2    A. Yes.
3    Q. This case doesn't involve information privacy.
4  Right?
5    A. That's true.
6    Q. Are you an expert in cognitive psychology?
7    A. I am an expert in some aspects of cognitive
8  psychology as they relate to HCI; but, no, I am not a
9  cognitive psychologist.
10    Q. Are you familiar with Shari Diamond's treatise
11  on appropriate consumer surveys?
12    A. No, I'm not.
13    Q. So I take it you didn't use any of her
14  criteria for assessing whether Mr. Ward's usability
15  study satisfied the criteria that Shari Diamond set
16  forth for such consumer empirical study.
17    MR. AIJAZ: Objection. Foundation.
18    THE WITNESS: I don't believe I've ever
19  covered her work in my survey research background.
20  BY MR. HUMMEL:
21    Q. What is survey bias?
22    A. I think that could have potentially several
23  answers.
24     Can you be more specific? I'm not sure where
25  you're -- what you mean precisely.

Page 101

26 (Pages 98 - 101)

--oOo--

1
2    I declare under penalty of perjury that the
3    foregoing is true and correct.  Subscribed at
4    _____, California, this ____ day of
5    _____ 2023.
6
7    _____
8        JENNIFER KING, PH.D.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                      Page 234

1    M. Hasan Aijaz
2    maijaz@ftc.gov
3              August 10, 2023
4    RE:   Federal Trade Commision v. Match Group, Inc., Et Al.
5    7/27/2023, Dr. Jennifer King (#6028094)
6      The above-referenced transcript is available for
7    review.
8      Within the applicable timeframe, the witness should
9    read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   errata-tx@veritext.com.
16
17    Return completed errata within 30 days from
18   receipt of testimony.
19    If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22         Yours,
23         Veritext Legal Solutions
24
25
                                      Page 236

1        CERTIFICATE OF REPORTER
2        I, HOLLY THUMAN, a Certified Shorthand
3    Reporter, hereby certify that the witness in the
4    foregoing deposition was by me duly sworn to tell the
5    truth, the whole truth, and nothing but the truth in
6    the within-entitled cause; that said deposition was
7    taken down in shorthand by me, a disinterested person,
8    at the time and place therein stated; and that the
9    testimony of the said witness was thereafter reduced to
10   typewriting, by computer, under my direction and
11   supervision;
12       That before completion of the deposition,
13   review of the transcript [X] was [ ] was not
14   requested/offered.  If requested, any changes made by
15   the deponent (and provided to the reporter) during the
16   period allowed are appended hereto.
17       I further certify that I am not of counsel or
18   attorney for either or any of the parties to the said
19   deposition, nor in any way interested in the event of
20   this cause, and that I am not related to any of the
21   parties thereto.
22
23
24
25   HOLLY THUMAN, CSR No. 6834
                                      Page 235

1    Federal Trade Commision v. Match Group, Inc., Et Al.
2    Dr. Jennifer King (#6028094)
3          E R R A T A  S H E E T
4    PAGE____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10   PAGE____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Dr. Jennifer King                      Date
25
                                      Page 237

60 (Pages 234 - 237)