# EXHIBIT 11

Amended 11/08/2022

1

2                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
3                              DALLAS DIVISION

    FEDERAL TRADE COMMISSION,    )   **Case No. 3:19-cv-02281-K**
4                                )
           Plaintiff,            )   Dallas, Texas
5                                )   November 1, 2022
    v.                           )   10:00 a.m.
6                                )
    MATCH GROUP, INC., et al.,   )   MOTIONS TO COMPEL
7                                )   [#133, #140]
           Defendants.           )
8   _____ )

9                        TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE IRMA CARRILLO RAMIREZ,
10                 UNITED STATES MAGISTRATE JUDGE.

11  APPEARANCES:

12  For the Plaintiff:          Reid Abram Tepfer
                                M. Hasan Aijaz
13                              FEDERAL TRADE COMMISSION
                                1999 Bryan Street, Suite 2150
14                              Dallas, TX  75201
                                (214) 979-9395
15
16  For the Defendants:         Angela C. Zambrano
                                Taylor Bragg
17                              Chelsea Priest
                                SIDLEY AUSTIN, LLP
18                              2021 McKinney Avenue, Suite 2000
                                Dallas, TX  75201
19                              (214) 981-3405

20  For the Defendants:         Chad S. Hummel
                                SIDLEY AUSTIN, LLP
21                              1999 Avenue of the Stars,
                                 17th Floor
22                              Los Angeles, CA  90067
                                (310) 595-9505

23  For the Defendants:         Samuel Kitchens
                                MATCH GROUP, INC.
24

25

2

```
 1    Recorded by:               Marie Gonzales
                                 UNITED STATES DISTRICT COURT
 2                               1100 Commerce Street, Room 1452
                                 Dallas, TX  75242-1003
 3                               (214) 753-2167

 4    Transcribed by:            Kathy Rehling
                                 311 Paradise Cove
 5                               Shady Shores, TX  76208
                                 (972) 786-3063
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25              Proceedings recorded by electronic sound recording;
                transcript produced by transcription service.
```

**App. 144**

```
 1              DALLAS, TEXAS - NOVEMBER 1, 2022 - 10:06 A.M.
 2              THE CLERK:  All rise.
 3              THE COURT:  Good morning.  Please be seated.  All
 4   right.  We are here in the matter of Federal Trade Commission
 5   versus Match Group, Inc., et al.  This is Civil Action 3:19-
 6   cv-2281-K.  And before the Court this morning are three
 7   different motions.  I am going to take a couple of them up
 8   together.  I have set aside two hours for this hearing.  If we
 9   go beyond that, we will need to reschedule.
10      If counsel would please make their appearances for the
11   record.
12              MR. TEPFER:  Good morning, Your Honor.  Reid Tepfer
13   and Hasan Aijaz for the FTC.
14              THE COURT:  I'm sorry.  Say your name again.
15              MR. TEPFER:  Reid Tepfer and Hasan Aijaz.
16              THE COURT:  Okay.
17              MS. ZAMBRANO:  Good morning, Your Honor.  Angela
18   Zambrano from Sidley Austin, here with my partner Chad Hummel
19   and our colleagues Taylor Bragg and Chelsea Priest, and our
20   client, Sam Kitchens.
21              THE COURT:  All right.  For purposes of our hearing
22   this morning, rather than have each side make a presentation
23   from the podium, as is customary in Federal Court, in order to
24   maintain -- continue to try to maintain some social
25   distancing, I'm going to ask you to remain at counsel table.
```

1    The masks muffle the sound a little bit, and the words.

2  The closer you are to the microphone, the better the recording

3  is, so please do move the microphones close to you and speak

4  up into them.

5    I have gone through your joint submissions over and over,

6  and I've got questions for both sides.  So, rather than have

7  you each make a presentation, I'm just going to jump straight

8  into the questioning, and then give you a chance to tell me

9  anything else that you would like for me to consider before

10  making my ruling.  I do intend to rule from the bench this

11  morning and then enter a short order memorializing my rulings.

12    All right.  Let's start with the FTC's motion to compel

13  production of documents and interrogatory responses from

14  Defendant Match Group.  This is Document 140.  And I've got

15  the joint submission here, which is Document 147.

16    All right.  So, just to be sure that I understand what's

17  at issue here -- who will be arguing on behalf of the

18  Defendants?

19    MS. ZAMBRANO:  I will, Your Honor.  Angela Zambrano.

20  Thank you.

21    THE COURT:  All right.  Ms. Zambrano, so MGI is a

22  holding company.  It is the parent company of the entities

23  that actually own and control the platforms on which these

24  dating websites are found?

25    MS. ZAMBRANO:  I think I got that right.  It is the

1   -- it is a holding company.  It owns multiple levels of

2   companies.  At a couple levels down is MGL, what we refer to

3   as MGL, and MGL then operates the Match.com platform.

4           THE COURT:  All right.  Are there companies between

5   MGI and MGL?

6           MS. ZAMBRANO:  Yes.  Two, Your Honor.

7           THE COURT:  All right.  This was not addressed in the

8   parties' joint submission.  My understanding of the case law,

9   the majority line of cases in this district is that the party

10  resisting discovery has the burden on its objections.  Any

11  issue with that?

12          MS. ZAMBRANO:  No, Your Honor.  I also noticed that

13  in preparing this morning, am prepared to meet it.

14          THE COURT:  All right.  In order to meet it, did MGI

15  present any affidavits or evidence in support of its

16  objections that I missed in the appendix?

17          MS. ZAMBRANO:  No, Your Honor, other than the sworn

18  stipulation that is before the Court.  I think we would

19  consider that evidence.

20          THE COURT:  Okay.

21          MS. ZAMBRANO:  Mainly because of the Rule 26

22  standard, you know, as with that -- with those things decided

23  -- well, not decided, but agreed to, we think that affects the

24  claims and defenses before the Court.

25          THE COURT:  All right.  But in other words, no -- no

**App. 147**

1    affidavits regarding burdensomeness, hours, extrapolation of

2    how much time it would take to get this information?  Anything

3    like that?

4            MS. ZAMBRANO:  Not at this time, Your Honor.

5            THE COURT:  All right.  Okay.  At this point, there

6    has been no preliminary or permanent injunction entered on the

7    subject matter in the stipulation.  Is that correct?

8            MS. ZAMBRANO:  I'm going to answer your question, but

9    can you just allow me to elaborate a little bit?

10            THE COURT:  Well, can you answer my question first

11    and then elaborate?

12            MS. ZAMBRANO:  Yes.  There has not been, and we don't

13    know why.

14            THE COURT:  Okay.

15            MS. ZAMBRANO:  And the reason we don't understand

16    why, we learned a little bit last week when we took a

17    deposition of the FTC.  But we have agreed to the relief as

18    pled in the complaint with respect to the chargeback practice

19    and what we refer to as the guarantee.  We asked the FTC then

20    what remains, why don't we have an injunction, what is still

21    in dispute?  And they referred us to a stipulation that they

22    had submitted during mediation that contains relief that is

23    broader than Match.com.  It relates to other dating sites.

24            THE COURT:  Okay.

25            MS. ZAMBRANO:  So we don't understand why we don't

1   have an injunction.

2           THE COURT:  Okay.  Well, that wasn't my question.  My

3   question was whether there was one, in fact.

4           MS. ZAMBRANO:  Yeah.

5           THE COURT:  All right.  I did not see in the joint

6   submission a specific response to the FTC's citation of a

7   couple of cases, one from the Supreme Court, where injunctive

8   relief beyond just the product at issue was awarded.  And I'm

9   talking in particular about the, oh, where --

10          MS. ZAMBRANO:  The *Kraft Foods* and the --

11          THE COURT:  Well, the Supreme Court.

12          MS. ZAMBRANO:  -- *Colgate*?

13          THE COURT:  *Colgate-Palmolive* case.

14          MS. ZAMBRANO:  Yes, Your Honor.

15          THE COURT:  So, if I've got a Supreme Court case that

16  clearly allows injunctive relief beyond just the product pled

17  in the pleadings, then how is discovery regarding other

18  products that might have the same type of policies, I guess as

19  we'll call them -- the cancellation policy, the chargeback

20  policy, the guarantee policy -- why -- if I've got a Supreme

21  Court case cited by the FTC where the Court allowed relief

22  beyond what was pled and looked at a specific practice or type

23  of product, that was an injunction.  We're talking about

24  discovery.  Why is discovery not appropriate here?

25          MS. ZAMBRANO:  Your Honor, I read those cases

1  carefully.  I don't see them to stand for the proposition that

2  they can get relief beyond what was pled.  I believe they can

3  get relief beyond the particular product at issue.

4          THE COURT:  Okay.

5          MS. ZAMBRANO:  And here, they have not pled that,

6  which is important, because discovery, of course, comes from

7  complaints and defenses in the case and so forth.  So we

8  understand that that's the -- that's the other side -- that's

9  where they want to go, but they haven't started on a path that

10  would allow them to get discovery and obtain that relief.

11  That's my first answer.

12      The second answer is that's not a holding company case.

13  That is a case about a company that has multiple products.

14          THE COURT:  Uh-huh.

15          MS. ZAMBRANO:  And I'm thinking in particular about

16  the one with the cheese, but it's the razors as well, as I

17  understand it, is the *Colgate-Palmolive*.  Those are cases

18  about a company that has products.  MGI does not have

19  products.  They're asking for an extension of that case law

20  well beyond where it sits right now.

21          THE COURT:  Where is any of this addressed in the

22  joint submission?  That's actually where I started.  Where

23  does MGI specifically address this argument?

24          MS. ZAMBRANO:  I believe it's on Footnote 29 on Page

25  15.

1          THE COURT:  Footnote 29?  Okay.  So, Footnote 29 is

2     two cites, the *Colgate-Palmolive* and *Kraft*.  And it cites them

3     for the proposition that neither permitted discovery into or

4     injunctive relief relating to subsidiaries' products merely by

5     virtue of suing parent or holding.

6        You've pointed out that neither one of them was specific

7     to it.  What have you provided me to meet your burden that

8     discovery regarding the same type of practice at issue in this

9     lawsuit should not be allowed?

10          MS. ZAMBRANO:  Well, I think it's what the -- what

11     the FTC has provided, which is there aren't any allegations

12     relating to it.  I think they're asking you to take

13     allegations relating to one website and then assume a bunch of

14     things that would permit them to maybe someday get recovery,

15     but more importantly, to wade around into discovery.  And I

16     don't think that's even what's pled in front of you, Your

17     Honor.

18          THE COURT:  Okay.  Well, again, going back to the

19     party resisting discovery having the burden, how has MGI met

20     its burden to show that discovery regarding the same type of

21     practice at other websites should not be allowed?

22        I don't even have anything, any evidence or affidavit that

23     tells me that MGI doesn't have other websites or -- we'll

24     circle back to that a little bit later.

25          MS. ZAMBRANO:  Yeah.

1           THE COURT:  But, again, with no evidence, how can I

2      find that MGI has met its burden here?

3           MS. ZAMBRANO:  Well, I think it's a matter of the

4      rule, Rule -- of course, our basic rule, which we're trying to

5      meet the burden under, is it related to the claims and

6      defenses in the case and proportional?  And when they haven't

7      alleged something at all, it was hard for me to imagine that

8      we would need to deal with that by an affidavit, because they

9      didn't even allege it.

10          THE COURT:  Okay.

11          MS. ZAMBRANO:  There's no allegations about what any

12     practices are.  First of all, there's no allegations that MGI

13     controls any website's behavior like this.

14          THE COURT:  Uh-huh.

15          MS. ZAMBRANO:  And second of all, there's not even

16     any allegations as to what other dating platforms do.  The

17     entire complaint is Match.com this, Match.com that.  Other

18     dating websites are mentioned once.

19          THE COURT:  Uh-huh.

20          MS. ZAMBRANO:  So, I guess, in terms of meeting a

21     burden, we would deal first with what was in the complaint,

22     and we don't see that they've even alleged something properly

23     against the -- against other dating -- relating to other

24     dating websites.

25        We think they're -- they're making a bunch of assumptions

1   that are way beyond this.

2        And Your Honor, it's no -- it's no accident here that, you

3   know, they've -- our amendment period has lapsed.  So there's

4   -- there's a reason that they're stretching this far and, you

5   know, trying to do this.  They -- our amendment period has

6   passed, and they don't have it.  They would have pointed to

7   you if they did.

8        So we didn't meet a burden on something that wasn't pled.

9   I think we still meet Rule 26, satisfy Rule 26, that when the

10  claims are not before the Court it can't be relevant or

11  proportional to what's at issue.

12       I would cite you to Page 22 and Page 23 of our materials,

13  which just, I said, I think just discuss our position in

14  general on this point.

15            THE COURT:  Doesn't that go to the second issue?  I'm

16  still on the first one.

17            MS. ZAMBRANO:  Yes, Your Honor.  They're a little bit

18  mixed up to me because of what they told us, the only thing

19  that's left is other websites.  But I understand.

20            THE COURT:  Okay.  Well, if I'm looking at this, if

21  the *Colgate-Palmolive* case went beyond the product that was

22  talked about in the pleadings, and the allegations here -- and

23  I understand, both sides are being masterful in their

24  arguments -- but this is somewhere in the middle, and I'm

25  having trouble figuring that out because nobody's really

1  telling me where the overlap is.

2      Yes, Rule 26 says claims and defenses.  But the claim is,

3  here, about a particular practice.  I've got a Supreme Court

4  case that goes beyond a particular product.  I've got nothing

5  that tells me that this discovery is not -- how it's not

6  proportional, other than, well, it's not pled so it's not

7  proportional.  I'm having a hard time understanding why this

8  discovery should not be allowed.

9          MS. ZAMBRANO:  I would note that the other Defendant

10  or the other entities themselves were served with third-party

11  subpoenas, and they made, as I understand it, objections

12  relating to burdensomeness and so forth.  We really, because

13  of, again, the allegations, we focused on proportion and

14  relevance.  But those objections, my understanding, were made.

15  The third parties, though, did want, these other entities, did

16  want guidance from Your Honor, first on this issue before they

17  delved further.

18          THE COURT:  Okay.  That's Motion 152.  Let's continue

19  to focus on 140 --

20          MS. ZAMBRANO:  Okay.

21          THE COURT:  -- and the first issue in the joint

22  submission.

23          MS. ZAMBRANO:  Okay.  Your Honor, if I could just

24  comment a little bit more on *Colgate-Palmolive*.

25          THE COURT:  Okay.

1          MS. ZAMBRANO:  I think the difference in this case is
2    MGI is a holding company, so there are no products to apply
3    the *Colgate-Palmolive* case to.  It's several layers below.
4    And, again, that's as -- they pled that, that it's a holding
5    company.
6          Now, they pled that there is involvement.  They didn't
7    plead alter ego, but they definitely pled that there was
8    control at different layers below.  But *Colgate-Palmolive*
9    would say that it's the product at, you know, at the product
10   level.  And MGI does not have products.  And so I think it's a
11   significant extension.
12         It's also not a case about discovery.  It's a case about
13   relief, of course.  And so you have to imagine at some time
14   before that, in the case as it played out, somebody made
15   allegations.  And there was allegations.  There was relevant
16   evidence about that.  They got into that.  And they were able
17   then to ask for this relief, to fashion the relief in the way
18   they did, and the Court sanctioned that.
19         That's not, as you point out, that's not what we have
20   here.  And so we think that it has to start with what has been
21   pled and what is before Your Honor.
22         THE COURT:  Right.  Okay.  So where in the brief,
23   other than Footnote 29, that basically one parenthetical,
24   that's the extent of your brief on this was a parent company,
25   there's no product?

1          MS. ZAMBRANO:  Give me just a moment, Your Honor.

2          THE COURT:  Okay.

3      (Pause.)

4          MS. ZAMBRANO:  I actually think there's a little bit

5  more on this issue, as we said later in the brief, relating to

6  just discovery relating to those entities.  I sort of think,

7  as the two issues, of, one, of discontinued practice, and two,

8  of other dating sites.  I kind of think, as most of our

9  argument was related to what I think -- I think we're thinking

10  of Issue 2.  So I think that's why we referred you to those

11  later pages.  Because in that case, in that argument, it's

12  really -- it's not about whether the practices are

13  discontinued.  It's relating to whether those entities'

14  documents are at issue.

15          THE COURT:  Okay.  Well, I'm going by the way that

16  the parties --

17          MS. ZAMBRANO:  Yes.

18          THE COURT:  -- divided up these issues.  So I didn't

19  choose this randomly.  This is how the parties differentiated

20  the issues.

21          MS. ZAMBRANO:  Yeah.  So, our position, though, I do

22  think, is between -- on Pages 20 through 26.  I'm going to

23  point you to anything in particular about the -- about the

24  entities, though, in just a moment.

25      Yeah.  I think the best place to sum up our argument, as I

1   tried to do just a moment ago, was on Page 24 and 25.  We

2   asked the FTC, I asked the FTC, in a meeting, to explain, why

3   do you need this discovery based on what we have before?  And

4   essentially this is why.  They have this following string of

5   hypotheticals.  If MGI controls Match.com, if MGI instructed

6   Match.com to engage in the conduct, if MGI also controls other

7   sites, and if those sites engage in conduct similar to that

8   challenged in the amended complaint.

9       And this is the part in particular that is not pled, Your

10  Honor.  There is no allegation relating to what's happening on

11  other sites.  In fact, the allegations are the opposite.  They

12  talk about the Match.com guarantee.  It's the Match.com terms

13  of use and the Match.com's chargeback practices.  So it's that

14  series of hypotheticals that we think causes, you know, that's

15  the heart of our argument, Your Honor.

16          THE COURT:  All right.  Well, I'm going to go back to

17  the issue, the first issue identified by the parties.  Is

18  there anything else on that specific issue?

19          MS. ZAMBRANO:  The only other thing I would say on

20  that, Your Honor, is I think it's rather confusing on the

21  discontinued practices, and that's why I answered that

22  question that way.

23      We -- we were sued for something.  We told them we weren't

24  doing that anymore.  We told the Court we weren't doing that

25  anymore.  The Court said, they've alleged enough to get past a

1   motion to dismiss.

2             THE COURT:  Right.

3             MS. ZAMBRANO:  So we said at that point, you know

4   what, hands up, you can have that.  We will commit to never

5   doing it again.  We're not doing it again.  We'll put it in

6   front of the Court.  We will live by that in an injunction.

7   And we don't understand why we're still -- we would have this

8   level of discovery over discontinued practices.

9             THE COURT:  Okay.

10            MS. ZAMBRANO:  That's the only other thing I would

11  say.

12            THE COURT:  And I think that's abundantly clear from

13  the filing.

14       All right.  Let me hear from the FTC on the first issue,

15  please.

16            MR. TEPFER:  Your Honor, if I could just correct a

17  couple of mischaracterizations of the record.  The verified

18  stipulation that Defendants are referring to, a so-called

19  verified stipulation, that's a -- that's a one-party document

20  that is denying one of the central issues in this case.  It's

21  been, you know, referred to as a stipulation, as an

22  injunction.  It's none of those things.  It's just a

23  declaration from the Defendants.  And it shouldn't shut down

24  discovery into whether what they're saying is true, just the

25  same way that if, you know, a defendant said in a deposition

1    they're not, you know, engaging in some sort of conduct.  We

2    don't shut down discovery at that moment.  We're allowed to

3    get discovery to see, is this true?  And, you know, if those

4    practices have temporarily been suspended, why were they

5    suspended?  Because that's relevant for the Court to

6    determine, are they likely to recur?

7         There's all kinds of factors that the Court should be able

8    to consider to determine whether injunctive relief is

9    appropriate.  We're of course willing to, you know, agree to

10   an injunction, but that's not what's before the Court.  What

11   we have here is a narrowly-drafted nonbinding denial,

12   essentially.

13        And just to address the issue of, you know, the *Palmolive*

14   case, the *Palmolive* case was about fencing in.  There weren't

15   allegations of wrongdoing on these other -- as to these other

16   products.  But the Court said, well, to make sure that we have

17   an effective remedy, so that this, you know, they can't just

18   change what they're doing and do it on a different product, we

19   need an injunction that's going to cover all of these other

20   products.  So of course there weren't allegations of

21   wrongdoing about those products.  It's just, you know, what

22   we're allowed to get discovery into to determine -- to fashion

23   an effective remedy.

24        And of course, the Court would want to consider whether

25   Defendants are engaging in this conduct on other platforms,

1  whether they've considered doing it.  All of that is relevant

2  both to the likelihood of recurrence -- if they're doing it on

3  other platforms, it's likely to recur -- and to the scope of

4  the injunction.  If they're, you know, doing it on other

5  platforms, then a narrowly-tailored injunction is improper

6  here.

7          THE COURT:  All right.  I want to be sure that I'm

8  specific about the objections that I'm ruling on with regard

9  to the first issue.  As I see from the joint submission, the

10  objections that MGI is relying on are overbreadth, undue

11  burden, and proportionality, for the first issue.

12          MS. ZAMBRANO:  Yes, Your Honor.

13          THE COURT:  Okay.  All right.  Well, given that

14  discovery is going to be broader than the amount of injunctive

15  relief allowed, I don't see -- I can't see here that MGI has

16  met its burden on these objections.  If the FTC is seeking

17  injunctive relief broader than what's being offered here,

18  obviously, there's still a live issue here.  The objections

19  are overruled.

20     Let's talk about other dating websites.  It looks like the

21  only objection I'm looking at is relevance.  And the argument

22  is that it's not relevant because the amended complaint is

23  limited to allegations concerning Match.com.  Is that

24  accurate?

25          MS. ZAMBRANO:  Yes, and not proportional, Your Honor.

**App. 160**

1   Overbroad as well.

2          THE COURT:  Where is that?

3          MS. ZAMBRANO:  I think it's on Page 20 and 21.  We're

4   referring to it as a fishing expedition, Your Honor.

5          THE COURT:  Okay.  So, "improper fishing expedition"

6   equals overbreadth?

7          MS. ZAMBRANO:  We do refer to proportionality or

8   overly broad a couple times, too, I think, in a quick scan.

9          THE COURT:  Tell me where.

10          MS. ZAMBRANO:  On Page 22.  The Federal Rules of

11   Civil Procedure make clear that discovery must be relevant to

12   the allegations in the complaint.  And then, parentheses, and

13   proportional to the needs of the case to be discoverable.

14          THE COURT:  Okay.  And, again, in the parentheticals.

15   I'm just trying to figure out where the argument is, --

16          MS. ZAMBRANO:  Yes.  Yes.

17          THE COURT:  -- where your support is.

18          MS. ZAMBRANO:  Well, on Page 25, there's also that

19   paragraph that says, Because the requested discovery about

20   other sites is not necessary, it is unnecessary and would be

21   disproportionate to the needs of the case.

22          THE COURT:  Okay.  All right.  And, so, again, no

23   affidavit or evidence on the proportionality.  This is simply

24   limited -- and it's simply, I don't mean that it's a simple

25   argument; I'm just saying basically your argument is the

1    allegations in the complaint are only about Match.com, and

2    that's the real substance for your objections on relevance and

3    overbreadth or proportionality or any other objections that

4    are here?

5           MS. ZAMBRANO:  It's the allegations.  It's the

6    request for relief.  They're only seeking relief against the

7    Defendants.  And the injunction is relating to the Defendants'

8    practices.  There's no -- guarantee is a Match.com practice.

9    The chargeback policy that's mentioned is a Match.com

10   practice.  They're not practices related to other entities.

11          THE COURT:  All right.  Let's -- give me a summary of

12   your argument.  I mean, I've looked at this.  I've looked at

13   your joint submission.  I've looked at your cases.  I'm

14   struggling -- I understand your argument.  I'm struggling,

15   though, with, again, how the Defendant has met its burden

16   here, because I think your cases are subject to being a

17   distinguished here.

18     *Murphy v. Deloitte*.  It's an ERISA case.  The Court looked

19   at whether the magistrate judge applied the correct standard.

20   And, you know, discovery typically isn't allowed in an ERISA

21   case.  I see that as --

22          MS. ZAMBRANO:  Yes.

23          THE COURT:  -- not really helpful here.

24     *Torch Liquidating* talked about the amendment of a

25   complaint.

1          In *Fraserside*, completely different issue again.  The

2     Court's looking at contacts with the jurisdiction for purposes

3     of personal jurisdiction.

4          So how does any of this show me why this is not

5     proportional or irrelevant, given *Colgate-Palmolive*?  That's

6     really what I was looking for, is tell me why, if the Supreme

7     Court can give -- can affirm relief beyond a specific product

8     pled in a complaint, then why discovery shouldn't be allowed

9     here.

10          MS. ZAMBRANO:  Because it also has to be related to a

11     particular practice in a complaint.

12          THE COURT:  Okay.

13          MS. ZAMBRANO:  A particular practice has to be

14     alleged.  And there is nothing about any other entity other

15     than the -- not entity, excuse me, platform -- other than

16     Match.com.  There's just not.  It's -- the other platforms are

17     -- it's a throwaway line in one paragraph in the complaint.

18     The entire complaint seeks relief against Match.com for

19     Match.com practices.

20          And so we don't think that those Supreme Court cases,

21     which are, again, sort of looking at the issue from the end,

22     not the beginning, they're saying, okay, if we had this

23     evidence in front of me, and there is a test, as I recall, in

24     the -- in the case law relating to whether you get that

25     injunction.  One is whether it's related to the other.  So,

1   for example, in the *Kraft* case, I believe they said, well,

2   cheese and the processed cheese and the Velveeta, it -- you're

3   going to have the same issue.  It's, do you have enough

4   calcium?  Okay?

5           THE COURT:  Uh-huh.

6           MS. ZAMBRANO:  There are no -- there are no practices

7   relating to the issue in this complaint that relate to another

8   website.  So, for example, they're not alleging that there's

9   -- in the *Kraft* case, it was the five percent calcium, and

10  that could be easily applied to other cheese.  Okay.  There's

11  no practice here that could be easily applied to another

12  website.  And that's no mistake.  It's because they were

13  focused on Match.com.

14     If you can't sue a holding company that owns a single

15  company over specific conduct, you know, you shouldn't be able

16  to, I should say this, sue a holding company at the top for

17  conduct of a particular -- on a particular website three

18  levels down, and then try to figure out all of the other

19  holding company's practices.  There has to be some Rule 11

20  allegation first.

21     And so if Your Honor -- if Your Honor needed evidence on

22  those things, we think that goes to -- beyond the pale of the

23  complaint.  But they are not related to these practices.

24  Those entities are not related at all to these practices.

25          THE COURT:  Okay.  Well, I'm going to do what I

1   really don't like the parties to do, but it's just sort of to

2   illustrate.  If I jump ahead to the related issue in Motion

3   152, the Defendants are here in the context of a motion for

4   protective order, as I understand it, for subpoenas issued to

5   other companies.

6            MS. ZAMBRANO:  Your Honor, I'm sorry to interrupt

7   you.  We did not have that one on -- set for today's hearing.

8   I apologize.  Is that on the docket?

9            THE COURT:  152?

10            MS. ZAMBRANO:  No?  And I'm saying that in particular

11   because there's separate counsel that represents those

12   entities.  So I'm -- I think it's 133 and 140.

13            THE COURT:  Isn't 152 related?

14            MR. TEPFER:  Yes, Your Honor.

15            THE COURT:  I mean, it's the motion for protective

16   order -- hold on.

17            MS. ZAMBRANO:  Yeah, I -- I do think the -- a lot of

18   these arguments are -- are put in there, but we -- I don't

19   have those materials prepared for today, Your Honor.  I

20   apologize.

21            THE COURT:  Well, I did not catch that my electronic

22   order did not include it.  I intended to do that.  All right.

23            MR. TEPFER:  Your Honor, given the overlap, we're

24   happy to address it today if you'd like, but --

25            THE COURT:  Well, if I didn't, that's -- yeah.  I did

1    not set it for hearing.  I did not give the parties notice of

2    that.  I did not miss that the electronic order did not

3    include that one.

4            MS. ZAMBRANO:  And, again, I apologize, Your Honor.

5    I agree that -- yeah.

6            THE COURT:  That's my --

7            MS. ZAMBRANO:  Yeah.  Okay.

8            THE COURT:  That is on our end.  I did not double-

9    check that electronic order.

10       All right.  Well, let's go back to 140, then.  So, let's

11   get back to discovery regarding other dating websites.  If the

12   relief that can be granted goes beyond just the specific

13   product -- and I understand your arguments.  I truly am.  I

14   have worked very hard to try to understand them.  If discovery

15   is broader than what relief can be granted, why can't

16   discovery about similar practices on these other websites be

17   allowed?

18           MS. ZAMBRANO:  Because there had to be a good faith

19   allegation that anything like this was happening.  And I'm

20   trying very hard not to get into the merits, Your Honor,

21   because I don't think it's appropriate, but it's -- it's not

22   true, and so it's hard to prove a negative, but that's why

23   they didn't allege it.  So now we're getting into things that

24   we know are not true.  That's why they didn't file that

25   complaint.  It's a Match.com guarantee.

1          THE COURT:  Okay.

2          MS. ZAMBRANO:  It's a six-month subscription.  They

3   know that, it's public, that they don't have -- there's not a

4   six-month subscription on these other sites.  This is a

5   fishing expedition.  So they're working backwards.  My -- our

6   submission is that you have to work from the complaint.  And I

7   don't disagree that the law would, if they obtained discovery,

8   that they would be able to obtain relief consistent with those

9   cases.  But you have to make the allegation first under Rule

10  11.

11      And this is not a secret.  These things are -- these are

12  websites.  They're public websites.  They have public

13  practices.  And they haven't made the allegations.

14          THE COURT:  All right.  Let's hear from the FTC.

15          MR. TEPFER:  First, Your Honor, I just want to

16  address, the case law, Defendants have cited nothing that says

17  that there has to be an allegation in the complaint regarding

18  these other websites.  And to be clear, this wasn't, you know,

19  an end run around the amendment deadline.  This discovery was

20  served before the amendment deadline.

21      And these practices that we're discussing here, I believe

22  counsel referred to the *Kraft* decision, where, you know, the

23  issue could be applied to other cheeses or that sort of thing.

24  We have the same sort of situation here, where there's a bunch

25  of dating websites.  They're all substantially similar.

1    Different demographics or that sort of thing.  But they're all

2    very similar dating websites with identical chargeback

3    policies or substantially similar chargeback policies.  So

4    there is, you know, there is a, I guess, a broadly applicable

5    allegation there.

6        But to be clear, we did not have to mention those other

7    entities in the complaint.

8        And I also want to state that the FTC is entitled to

9    discovery not just on the likelihood of recurrence issue and

10   about the scope of injunctive relief, but also on Defendants'

11   affirmative defenses.  And there are two affirmative defenses

12   here that would entitle the FTC to this discovery.  It's sort

13   of the flipside of the coin, the overbroad injunction

14   affirmative defense and the mootness affirmative defense.  And

15   both of those are very relevant here and would entitle the FTC

16   to discovery on that basis.

17            THE COURT:  So, tell me where you talk about this

18   discovery going to those affirmative defenses in your joint

19   submission.

20            MR. TEPFER:  Sure.

21            THE COURT:  And, again, we're talking about Issue #2.

22            MR. TEPFER:  Yes, Your Honor.  And --

23        (Pause.)

24            MR. TEPFER:  Your Honor, I apologize, I don't see

25   that we use the phrase affirmative defense, but we do talk

```
1  about the likelihood of recurrence issue, which is intertwined
2  with that mootness defense.
3            THE COURT:  So in this case, recurrence equals
4  mootness?
5            MR. TEPFER:  It's --
6            THE COURT:  You all are making me work really hard to
7  read between the lines here.  It just, it's helpful if you
8  just tell me.
9            MR. TEPFER:  Yes, Your Honor.  The Court has to
10 consider whether, you know, conduct is likely to recur.  And
11 Defendants are arguing that essentially it's moot, that it's,
12 you know, not likely to recur because it's "permanently
13 discontinued."
14    And so from, you know, from my perspective, Your Honor,
15 those are really one and the same issue.
16           THE COURT:  Okay.  But you don't tell me that you see
17 them as one and the same issue in this?
18           MR. TEPFER:  No.  I apologize, Your Honor.
19           THE COURT:  Okay.  Or mention that it's an
20 affirmative defense that you're looking for discovery on?
21           MR. TEPFER:  No, Your Honor, we do not characterize
22 it that way.
23           THE COURT:  Okay.  All right.  I'm not trying to be
24 difficult here.  I really am trying to understand the parties'
25 positions so that I can give you the best ruling.  I'm hearing
```

1  some new things today that I did not quite hear or did not

2  read here in the joint submission.

3      All right.  So, back to discovery regarding other

4  websites.  You're saying you don't have to -- the FTC doesn't

5  have to plead that this practice is also available on other

6  websites that are --

7          MR. TEPFER:  No, Your Honor, because it's, you know,

8  to go back to that *Colgate-Palmolive*, you know, the Court is

9  entitled to discovery to determine what is the appropriate

10  scope of injunctive relief.  Should it be narrowly tailored,

11  limited to one of Defendants', you know, dozens of websites,

12  or should it be against the Defendant generally, without that

13  sort of restriction?

14      And that's, you know, and that's what we believe the

15  *Colgate-Palmolive* case stands for, that, you know, the Court

16  can assess whether a broader injunction is appropriate.  And

17  the Court is entitled to look and see, well, what -- what is

18  this Defendant currently engaged in?

19      One of the factors for determining that, of course, is,

20  you know, does their occupation present the ability to engage

21  in this type of conduct in the future?  That's, you know, it

22  makes it more likely to recur.  And if, you know, Defendants

23  are engaging in this same conduct in other websites, as

24  public-facing evidence suggests, then that suggests strongly

25  that the conduct is likely to recur.

1      THE COURT:  But if the conduct, just looking at it

2  from a due process standpoint, if the FTC is taking the

3  position that this similar -- there are similar policies or

4  similar conduct relating to other websites, why not include

5  that in the complaint?

6      MR. TEPFER:  Well, Your Honor, because we -- we have

7  a reason to think that this is something that should be

8  investigated.  It's not -- it's not apparent -- you know, I

9  want to be clear.  These chargeback policies are ambiguous.

10 And so, you know, it gives us concern, and that's why, you

11 know, that's why we want to determine definitively what

12 exactly is going on, because I think the Court is going to

13 want to know that when providing injunctive relief.

14     But we do not believe that there is, you know, an adequate

15 basis to include that in the complaint at this time.  Of

16 course, you know, if the evidence bears this out, as we

17 believe it might, we may seek leave to amend.  But -- but

18 there was not a basis -- or to include it before the amendment

19 deadline, Your Honor.

20     THE COURT:  Well, if the FTC -- if this is something

21 that needs to be investigated, doesn't the FTC have the

22 authority to do that?  You know, didn't you have an

23 investigation leading up to this lawsuit?

24     MR. TEPFER:  Well, Your Honor, we believe, given that

25 this is appropriately within the scope of injunctive relief,

1    we believe, you know, in the interests of judicial efficiency,

2    you know, the Court could simply determine, well, the

3    Defendant is doing this on one website.  It's -- it has broad

4    equitable authority to give -- to grant this type of equitable

5    relief.  And, you know, this is the same Defendant that we're

6    alleging is engaging in this same practice on other websites.

7    So, you know, we think it's proper to show the Court

8    discovery, saying, oh, if it's engaging in it on this website,

9    but a -- you know, the order should not be so limited to

10   Match.com and it should instead be a general order against

11   Match Group, Inc.

12           MS. ZAMBRANO:  Your Honor, may I correct something?

13           THE COURT:  If you'll give me just a second.

14       (Pause.)

15           MR. TEPFER:  And Your Honor, I also want to make the

16   point that, you know, it's relevant to the fact that, you

17   know, Match Group, Inc. has claimed that it does not operate

18   any website -- of these dating websites.  That's another

19   relevant issue here.  We believe the evidence shows that it

20   does, that it's, you know, it's perhaps technically a holding

21   company but plays a more active role in the operation of its,

22   you know, the many dating websites it owns.  And so we believe

23   the discovery is also relevant and proper for that reason.  I

24   just wanted to add that as well.

25           THE COURT:  Sure.  But your statement that there's

1   not an adequate -- there was not an adequate basis to include

2   allegations regarding the same policies in other websites has

3   me really concerned.  You didn't say that in your joint

4   submission, --

5           MR. TEPFER:  Well, --

6           THE COURT:  -- but you said it today, and --

7           MR. TEPFER:  -- Your Honor, we -- because this is an

8   internal policy, we believed, looking at the chargeback

9   policies, it leaves open the possibility that they're engaging

10  in this same illegal conduct.  It's a very unusual chargeback

11  policy, but it is not explicit about, you know, the internal

12  aspect of what occurs when a consumer has made a chargeback

13  and lost.

14      So, you know, we would want to, you know, flesh out what

15  exactly is happening before, you know, including that sort of

16  allegation.

17      But we also don't believe that it's necessary to, you

18  know, add those allegations, given that this is properly

19  within the scope of injunctive relief and the Court can

20  consider these without having to make an explicit allegation

21  in the complaint.

22          THE COURT:  Well, you've kind of -- you've gone out

23  on a limb now.  You've gone beyond, right?  You're saying

24  there's not enough -- you hadn't -- you did not have enough

25  evidence to be able to include it in the complaint or an

1   allegation.  It needs to be investigated.  You've got the

2   power to investigate, but you haven't, despite an extensive

3   investigation before this lawsuit.  You're treading awfully

4   close to this fishing expedition that they were talking about.

5          MR. TEPFER:  Well, Your Honor, we -- based on public-

6   facing documents.  That's what really clued us in to this

7   particular issue.  And that's, you know, that's exactly what

8   discovery is for, to determine, well, we have a good faith

9   basis to seek discovery because it looks like, you know, this

10  same entity that operated Match.com and engaged in this

11  illegal chargeback policy has substantially similar policies.

12  But we can't know that without, you know, examining how

13  they're handling these chargebacks internally.  It's just not

14  something that we're able to assess.

15     And so it's proper to get discovery on those issues, both

16  to determine whether Defendants are engaging in this or have

17  engaged in it in the past, for, you know, the likelihood of

18  recurrence issue, and to determine whether the scope of the

19  injunction should be limited to Match.com, as Defendants would

20  like, or just against the Defendants generally.

21         THE COURT:  But if it's public-facing and that's a

22  basis for discovery but not enough to --

23         MR. TEPFER:  Sure.

24         THE COURT:  -- allege that you believe that the

25  practice may be also used on other websites, what's --

**App. 174**

1          MR. TEPFER:  So, the -- the aspects of the policy are

2    public-facing, that they suspend -- so, essentially, if the

3    Defendants or, you know, some of their other dating websites,

4    if you seek a chargeback, they'll suspend your account, which

5    is -- and there is nothing that states that you will, you

6    know, that you will get account access back or how this is

7    handled.

8       I believe some of the websites may refer to, you know,

9    contacting customer care, if I recall correctly, but it

10   doesn't say what happens there.

11      And so what we need to understand is, you know, what does

12   happen.  Do you get your -- do you get your account access

13   back?  Because Match.com didn't provide that account access

14   back, and that's what we allege is illegal.  And we can't know

15   that without discovery into that issue.

16          THE COURT:  For the sake of argument, if you're

17   entitled to some discovery to determine whether that same

18   policy is applied by the Defendants on any other website,

19   isn't the scope of that discovery much more limited than what

20   you've asked for here?

21          MR. TEPFER:  I apologize, Your Honor.  Would you mind

22   repeating that?

23          THE COURT:  Sure.  If the point is to determine

24   whether this policy exists on any other website related to or

25   controlled by or owned by or -- and I know that's at issue;

1  going for purposes of this argument with what you seem to be

2  contending -- isn't what would be allowable to allow you to

3  determine that much more limited than what you've asked for?

4        MR. TEPFER:  I believe, Your Honor, we -- we did seek

5  -- I'm not sure if there are specific requests you're

6  referring to, but we did attempt to limit our discovery to the

7  types of issues that are alleged in the complaint, simply

8  because we believe, you know, the injunctive relief should --

9  although it shouldn't be narrowly tailored to just what's

10 alleged in the complaint, there should be some fencing-in, but

11 it needs to have some sort of relationship to what's in the

12 complaint.  And so the discovery that we requested, we did try

13 to tailor it to be related to what -- to the types of

14 practices in the complaint.

15       THE COURT:  Right.  But you've identified specific

16 websites that you want discovery about, as opposed to asking

17 whether these same types of policies that were used at

18 Match.com were used at any of the Defendants' other

19 subsidiaries, as opposed to asking about specific

20 subsidiaries.

21       MR. TEPFER:  Oh, Your Honor, we did, in the

22 discovery, limit it to particular subsidiaries that we were

23 aware had these, you know, had the chargeback practice that we

24 were -- that we wanted to learn more about.  And the, you

25 know, not to take us off topic, but the subpoenas were to the

**App. 176**

1    entities that we had, you know, those same sort of basis to

2    believe that we had found external policies that raised these

3    same issues.

4        So it wasn't just a fishing expedition to all of

5    Defendants' websites.  You know, they have 50-something

6    websites.  We only sent it to a few or concerning a few, like

7    maybe I think it was three that we knew had the policy.

8            THE COURT:  Let me see if I can make my question more

9    specific.  If you are seeking to determine whether the

10   Defendant had the same policy that's alleged -- that you

11   allege it had with regard to Match.com, recognizing that you

12   contend it's not your policy, isn't the type of discovery that

13   would be warranted to allow you to make that determination

14   much more narrow than what you've asked for?

15       In other words, isn't the discovery to ask the Defendant

16   whether it has the same policy at others, as opposed to asking

17   about the specific entities --

18           MR. TEPFER:  Oh, --

19           THE COURT:  - that you believe also have the same --

20           MR. TEPFER:  -- of course.

21           THE COURT:  -- policies?

22           MR. TEPFER:  And I apologize for misunderstanding.  I

23   believe I understand your question.  What's relevant is -- in

24   this situation is not just whether they have the policy, but,

25   for instance, if they have stopped this policy, why did they

1  stop?  Did they stop because, for example, they got a lot of

2  consumer complaints and realized that this was improper, or

3  did they stop because, you know, they -- the FTC sued the

4  parent company?

5      You know, again, it gets to the likelihood of recurrence

6  issue.  You know, if this policy has been suspended, why was

7  it suspended?  So there's the broader factors, which I believe

8  are in that *Black* case cited, are all relevant.

9          THE COURT:  Okay.  Now, you've -- you've confused me.

10  I thought we were talking about discovery relating to other

11  websites.

12          MR. TEPFER:  Yes, Your Honor.

13          THE COURT:  All right.  What I'm trying to understand

14  here is, if you don't have enough evidence to be able to

15  allege in the complaint that you believe the chargeback,

16  cancellation, and what was the other one?

17          MR. TEPFER:  The Match guarantee, Your Honor?

18          THE COURT:  Yes.  The guarantee.  All right.  If you

19  don't have enough evidence to make a good faith allegation in

20  the complaint that these three policies are being used by the

21  Defendant on other websites, at best isn't the discovery that

22  you're -- that would be warranted to ask the Defendant whether

23  it had these same types of policies on other websites, as

24  opposed to asking about these specific other websites?

25          MR. TEPFER:  Well, Your Honor, I believe -- I believe

1    the discovery would be broader because we're entitled to know

2    whether they have these same policies, but also relevant is

3    just generally does Match Group, Inc., you know, play an

4    active role in operating these other websites?  Because, you

5    know, also at issue, as I mentioned, one of the factors for

6    determining whether, you know, injunctive relief is

7    appropriate is are they going to have the opportunity to do

8    this again?

9        And so, you know, if we get an injunction against

10   Match.com, but Match Group, Inc. is actually, you know, doing

11   this on OkCupid and all those other things, then the Court is

12   going to want to know -- or, that, you know, the Court's going

13   to want to know that Match Group, Inc. is actually actively

14   involved in operating these websites, too.

15          THE COURT:  Okay.  Let me -- let me -- you keep going

16   off into other things.

17          MR. TEPFER:  I'm sorry, Your Honor.

18          THE COURT:  And so I'm obviously asking bad

19   questions.  If you think MGI is using these policies on other

20   websites, you're asking about these other -- you're asking

21   about OkCupid and specific websites.  You're not asking

22   Defendant, do you use these same policies on any other

23   websites, and if so, which ones?  You're going straight to

24   these specific websites.

25          MR. TEPFER:  Yes.

1          THE COURT:  And I'm saying, if you don't have enough

2     to plead in your complaint, then if I'm looking at a

3     proportionality analysis, which Judge Horan's opinions make

4     very clear the Court has a responsibility to look at it, too,

5     --

6          MR. TEPFER:  Yes, Your Honor.

7          THE COURT:  -- isn't the starting point to ask the

8     Defendant if it does in fact have these and to ask those

9     questions before allowing discovery straight into those

10    websites, given that you don't even have enough to allege it

11    in your complaint?

12         MR. TEPFER:  Well, Your Honor, I believe the approach

13    that we took actually limits the Defendants' burden, because,

14    you know, we limit -- we took a look at the websites and went

15    to the ones that we have a good faith basis to believe there's

16    a real question here.

17         If we were to ask Defendants, you know, examine all 50-

18    something of your websites, even ones that we know don't have

19    that chargeback policy, that's unduly burdensome for them.  So

20    we are trying to narrow the scope of just saying, just look at

21    a few of these, because we believe that, you know, if the

22    Court sees this occurring on, you know, three of them, we

23    don't need to show 50.

24         And so that -- the whole purpose of limiting it to those

25    specific websites was to make sure it wasn't a fishing

1    expedition and that we were limiting the Defendants' burden to

2    the extent possible while still proving our case.

3           THE COURT:  Isn't the concept of a fishing expedition

4    to look for evidence in support of a new claim?  And you've

5    just told me you didn't have enough evidence to be able to

6    plead that in the complaint, that this went beyond just

7    Match.com.

8           MR. TEPFER:  So, --

9           THE COURT:  Why isn't that more properly the subject

10   of a separate investigation, then?

11          MR. TEPFER:  Because, Your Honor, this is the -- this

12   really gets back to both the likelihood of recurrence issue,

13   because it matters in this case for showing that the conduct

14   is likely to recur.  If we're not allowed to get discovery

15   into this issue, say just hypothetically that Defendants have

16   stopped this practice on Match.com but they're doing it on all

17   these other websites.  Well, Defendants, you know, say under

18   oath, we're not doing this on Match.com anymore, and so the

19   Court says, well, we have nothing to worry about, no

20   injunction is necessary, but in truth an injunction was

21   appropriate because it was occurring on these other websites.

22   So it's appropriate for that.

23       And then it's also appropriate for this case because the

24   Court needs to consider the scope of the injunction.  So, you

25   know, rather than having the FTC file, if, you know, there's

1    50-something websites, having the FTC do 50 investigations and

2    50 separate lawsuits, the FTC is able to get, you know, an

3    appropriate injunction based off the Court's, you know,

4    equitable authority that goes to the Defendant generally.  So

5    that's why we believe this is properly within the scope of

6    this case.

7              THE COURT:  If it was properly within the scope of

8    this case, then why wasn't it included in the investigation?

9              MR. TEPFER:  Well, Your Honor, because, you know,

10   that I believe would expand the burden both of the FTC and the

11   Defendants.  You know, rather than sending, you know, CIDs and

12   making them produce as to 50 websites, the FTC's burden is to

13   show, you know, that these are illegal practices and that they

14   can be applied widely on the various different websites.  Just

15   like in the *Kraft* case, you know, you don't have to

16   investigate all of the different cheeses and have separate

17   investigations for Swiss and Cheddar, you just have to show

18   they're doing something bad as to, you know, as to this

19   product.  It can be easily applied on all these other

20   different products.

21      And so -- and that's simply what we're trying to establish

22   in the least burdensome way possible, that we have a bad

23   practice that Defendants may be engaging in and could easily

24   engage in on different platforms.

25              THE COURT:  Okay.  All right.  Ms. Zambrano?

1          MS. ZAMBRANO:  I do have a couple clarifications to

2     that.

3          Your Honor, as you know very well, we have something

4     called "upon information and belief" pleading.  They didn't

5     even plead any of this upon information and belief.  They are

6     public websites.

7          I heard him say just a moment ago that they knew about

8     certain charge policies and they didn't know about -- they

9     knew of about certain charge policies.  They didn't make

10    allegations relating to any other -- any other website.

11         I think Your Honor has sufficiently covered the they-

12    could-have-investigated point, so I won't hit that.

13         I would say, though, that the representation regarding the

14    amount -- regarding the amendment deadlines was not right.

15    The amendment deadline was May 13th.  And this discovery was

16    served June 3rd.  They did not plead these allegations.

17         Lastly, I would say, Your Honor, if you -- on Request #25,

18    it's in Joint Appendix 169, this is an example of the

19    overbroad discovery that Your Honor was alluding to relating

20    to these other practices.  I'll let you get there and then

21    I'll start talking about it.

22         THE COURT:  All right.  So we're talking Document 141

23    at what page?

24         MS. ZAMBRANO:  No, I'm sorry, I think it's Document

25    148, J Appendix 169.  So it's -- it's Request #25, Your Honor.

1          THE COURT:  Oh, I'm sorry.  148.  All right.  Okay.

2   And it's Page 169?

3          MS. ZAMBRANO:  Yes, Your Honor.

4          THE COURT:  Using the number at the top or the number

5   at the bottom?

6          MS. ZAMBRANO:  Let me -- at the bottom.  The bottom

7   right.  Correct?  Yeah.  The app cite at the bottom right.

8   Yeah.

9          THE COURT:  All right.

10          MS. ZAMBRANO:  So this is the particular request at

11   issue.  And your question that you posed -- again, I'm not

12   agreeing that they even get discovery relating to other sites'

13   practices, for the many reasons.  But your question was right

14   on.  Here, they have all communications relating to, and you

15   see that there's customer chargebacks and you see that there's

16   other things that are referred to customers.  Well, customers,

17   they define as -- and this is also Docket 148, but it's at J

18   Appendix 206 and 207, this is how customers are defined -- and

19   it's broad.  I think this is in their interrogatories.  They

20   use the same definition.  But they know how to list other

21   websites, and they do in their definition of customers.  They

22   say, Any individual or individuals who have maintained an

23   account on any website owned or operated by the Company,

24   including Match.com, OkCupid, Plenty of Fish, and Tinder.  And

25   they go on.

1    So that's exactly -- what you said was exactly right.

2    This discovery is in no way tailored to the injunction request

3    that they are now trying to pin this on.  This is a fishing

4    expedition.  It's a perfect example of one.

5    There are a number of other requests, Your Honor, that go

6    to all practices and policies relating to other websites, all

7    advertisements, all surveys, all summaries relating to

8    customers.  And customers, when it's used in their discovery

9    requests, relates to all of these other websites that do not

10   relate to the complaint.

11   Your Honor, I think you hit the nail on the head.  If they

12   didn't have the amount of evidence needed to plead something,

13   why would we have discovery relating to those issues?  They

14   had that burden and they didn't meet that burden.  They're

15   free to ask the District Court to amend their complaint again.

16   We think it should be denied.  But that's their remedy, not to

17   try to back-door it in this way, when they have admitted today

18   that they have nothing that would satisfy Rule 11 to make

19   those allegations.

20        THE COURT:  All right.  Anything else from the FTC?

21        MR. TEPFER:  Simply to note that, you know, I want to

22   again contest the suggestion that we have an obligation to

23   have, you know, made any sort of allegations against these

24   other entities.  That's -- you know, what we're seeking

25   discovery concerning is the equitable relief that we believe

1   we're entitled to, and that's not something that has to be

2   pled in the complaint, or even if, you know, even if we had

3   definitive proof of this and even if there wasn't, you know,

4   an amendment deadline.  That's just not something that needs

5   to be in the complaint, as Defendants seem to suggest.

6           THE COURT:  Then what's the purpose of notice

7   pleading?

8           MR. TEPFER:  Well, Your Honor, you know, I understand

9   that issue, but it's about the injunction.  So, you know,

10  Defendants are aware of the injunction that we're seeking.

11  They're aware of the practices at issue.  It's the same

12  Defendant.

13      And just like in the Supreme Court case, you know, those

14  weren't allegations about other products, but the Court is

15  allowed to consider those other products, even without

16  mentioning them in the complaint.

17          THE COURT:  Okay.  All right.  I understand your

18  point.  But I am putting a finer distinction on this.  I

19  questioned aggressively on the *Colgate-Palmolive* case.  But

20  the key here for me is that that case is about using the same

21  practice for other products.  You've gone straight into other

22  websites.  You've gone straight into the other products, in

23  other words, without ever having provided the link in your

24  complaint or through the discovery you're asking about whether

25  the practice that's at issue in this lawsuit exists on other

1    websites.  That's where you start.  You don't go directly to

2    other websites, especially when you've just told me today that

3    you didn't have an adequate basis to include it in the

4    complaint.

5        I'm not talking about pleading against the other websites.

6    I'm talking about an allegation that this practice that is at

7    issue with regard to Match.com also exists or may exist with

8    regard to other websites.  If you can't even make that

9    allegation in your complaint, then the extent of the discovery

10   you're requesting regarding other websites is a fishing

11   expedition.

12       So what you've asked for is way too broad for what you've

13   pled.  The focus is the practice, and this isn't even tailored

14   to a practice that may or may not exist on other websites.

15   You've gone straight into asking for discovery from other

16   websites about the practice.

17       So, I'm granting your motion as to the first issue, but

18   I'm denying the motion as to the second issue.  I'm sustaining

19   the relevance objection, --

20           MR. TEPFER:  And --

21           THE COURT:  -- pretty much based on what you told me

22   today.

23           MR. TEPFER:  And Your Honor, just to make sure I

24   understand, are you ruling that we are entitled to discovery

25   concerning whether those, you know, same practices in the

1   complaint are occurring on any websites but not as to specific

2   websites or as to broader issues?

3         THE COURT:  You still have a couple of months left on

4   discovery.  I'm not going to tell you or give you an advisory

5   opinion as to what discovery you should ask for.  When the

6   disputes arise, and I suspect they will, I'll address it at

7   that time.  But where we are today, I have pointed out what

8   you haven't asked for, I've pointed out that you've gone

9   directly to the source without ever having made that first

10  connection that this practice does in fact apply.  And given

11  where we are in the timing of this case, I am not prepared to

12  say one way or the other.

13        MR. TEPFER:  Yes, Your Honor.  If I could address one

14  issue.  You know, you referenced granting as to the first, the

15  first issue on our motion to compel.  And we appreciate that

16  finding.  But I wanted to raise, if I may, you know, the issue

17  of we served these requests, you know, about five months ago,

18  and we have depositions coming up, and we have the concern

19  that -- whether we're even going to be able to use this

20  discovery for these depositions.  You know, the Defendants

21  withheld discovery on two of the three FTC counts.  So we have

22  -- you know, these are very basic requests that haven't

23  received any discovery on.

24      We had previously filed a motion for a continuance, which

25  was denied without prejudice on the basis that it concerned

1   the issues that were being decided here today.  And you know,

2   I just wanted to ask if the Court can make a finding on that

3   issue, simply because we plan to seek again, you know, based

4   on the Court's finding, a motion for a continuance.  We have a

5   -- you know, it is relatively urgent.  You know, we have an

6   expert deadline in like three days, and Defendants are

7   attempting to prevent us from even continuing on with these

8   depositions.  But we really want to be able to use this

9   evidence in our depositions.

10          THE COURT:  Okay.  This is Judge Kinkeade's case.

11  Judge Kinkeade has specifically referred three discovery

12  motions to me.

13          MR. TEPFER:  Yes, Your Honor.

14          THE COURT:  So the scope of my authority extends only

15  to these three discovery motions.  To the extent you need to

16  go back to him for any other relief, you are free to do that.

17  My authority extends to ruling on the objections and whether

18  discovery should be produced and when.

19      So you raise a good point.  I would have covered it at the

20  end.  But I typically allow 21 days for a party to produce its

21  responses.  So when I grant --

22          MS. ZAMBRANO:  Your Honor?

23          THE COURT:  Yes?

24          MS. ZAMBRANO:  I'm sorry to interrupt you.  I do have

25  a question about the relief that's actually been granted on

1   #1.

2           THE COURT:  Uh-huh.

3           MS. ZAMBRANO:  And it's going to affect what you're

4   about ready to say in terms of the timing.

5           THE COURT:  Okay.

6           MS. ZAMBRANO:  Could I -- could I ask my question on

7   clarification?

8           THE COURT:  Sure.  Certainly.

9           MS. ZAMBRANO:  Okay.  The joint submission had the

10  first issue being whether MGI may refuse to engage in

11  discovery simply because it conducts the conduct -- excuse me,

12  it contends the conduct has been previously discontinued.

13  Okay.  Permanently discontinued.  Excuse me.  So my question

14  to you is, most of our discussion on that related to -- on

15  that issue related to what was happening on other websites,

16  because, again, it's not happening on Match.com.  So could you

17  clarify:  Is your ruling that we cannot -- we cannot -- we

18  should just produce discovery relating to current practices,

19  if any, for the entities in the case, or could you just help

20  me with that a little bit, please?

21          THE COURT:  Well, as I understand it, the discovery

22  was related to the entities in the case.

23          MS. ZAMBRANO:  Yes, Your Honor.  Yes.

24          THE COURT:  And I cannot give relief that wasn't

25  asked for.  So I'm -- I am looking at the issue as the parties

1    phrased it.  And I understand you disagree with the phrasing.

2    Your -- the issue seems to be whether there should be

3    discovery allowed on whether this practice exists or when it

4    stopped.  I'm not going to get into the specifics of each

5    discovery request.  If we need to go through them one by one

6    like we did in the 70-page joint submission that we're about

7    to get to, we do.  That's not what you gave me.

8         The issue as the parties presented was whether there

9    should be any discovery on these policies, given the filing,

10   where the Defendant stipulated to not doing this.

11        I agree with the FTC that the fact that you've said you

12   won't do it anymore is not necessarily binding and should not

13   preclude further discovery without any litigation-ending or

14   dispositive order from the Court.  The Court hasn't ruled on

15   it.

16        Their point is, we still get to look at whether it could

17   continue, whether it could reoccur.  So to the extent that

18   there's discovery relating to those practices, it's a live

19   issue still.  Yes, you filed a, quote, stipulation that says

20   the Defendants won't do this anymore, but they're entitled to

21   have discovery on whether you will or you won't or how that

22   would work.

23             MS. ZAMBRANO:  And so my question is, does that mean

24   for nine years, or does that mean as the -- as it present --

25   as the conduct presently exists?

1          THE COURT:  You've -- I don't see anything in here

2     about limiting it to -- you reference going back almost 10

3     years.

4          MS. ZAMBRANO:  Yes.  That's part of the overbreadth.

5     Yeah.

6          THE COURT:  Right.

7          MS. ZAMBRANO:  Yeah.

8          THE COURT:  That's overruled as well.

9       There -- there's reference in here to documents -- if the

10    practice ceased, based on the representation, in 2019, you go

11    back four years, five years, that's 2014.  There is an

12    argument here that some of the documents were from 2013.

13    That's only going back one year.  So going back to 2013, I

14    think is appropriate.  So any -- to the extent that there's an

15    objection on going beyond 2013, or going back to 2013, that's

16    overruled.

17         MS. ZAMBRANO:  Okay.  So, for example, the one we

18    just looked at, Request #25.  It is, we should be searching

19    our systems for all communications for nine and a half years

20    relating to a guarantee?

21      And I'm asking because there is a specific period in time

22    that the practice changed.  It was in '19.  And we informed

23    them of that.  This suit was filed after '19.  So we think the

24    relevant time period obviously would be after that, not to go

25    back before the suit was even filed.  And I'm just, I'm just

1    making sure that I understand Your Honor's ruling.

2           THE COURT:  Discovery is allowed from prior to when

3    the suit was filed routinely.

4      If the argument is that this goes to whether this could

5    reoccur, and I'm looking at your briefing in the joint

6    submission, we're making more specific arguments today than

7    were made in the joint submission.  I've spent a lot of time

8    with this.  I understand that you're unhappy with the 10 years

9    of discovery.

10          MS. ZAMBRANO:  I've really been trying to avoid doing

11    the one by one, but it is relevant on each of these requests

12    what is -- what -- how does that relate to this could occur

13    again?  I mean, they asked for all of our minutes related to

14    the chargeback.  Is there any -- all policies and procedures

15    from 2013.  How is that relevant to whether something is going

16    to happen again?  That's my point.

17          THE COURT:  Sure.

18          MS. ZAMBRANO:  If we should interpret them with that

19    guidance, we can do that.  And we will meet and confer and

20    won't bother Your Honor with that today.

21          THE COURT:  It's not that you're bothering me.  I

22    tried very hard to make sure I was prepared on the issues you

23    presented to me.  And to do that, I looked at what you told me

24    the issues were in the joint submission.  I don't see in the

25    joint submission where we're getting into the all -- I see

1    that there's a general issue about the time scope.  There's

2    argument here about some of the documents going back to 2013.

3    That's only a year beyond the five years before the lawsuit

4    was filed.  So if you've got specific objections about the

5    scope, I did not see that that's what I would be ruling on

6    today.

7            MS. ZAMBRANO:  Give me just one minute.

8        (Pause.)

9            THE COURT:  Maybe I'm being obtuse.  Maybe I didn't

10   read it right.  But I'm looking at what I thought the issues

11   were based on how you presented them.

12       (Pause.)

13           MS. ZAMBRANO:  Well, I think it is on Page 7, and it

14   is wrapped up into the time issue.  Despite all this, the FTC

15   served extraordinarily broad and burdensome discovery requests

16   -- we obviously made a lot of burdensome objections in the

17   discovery that was attached -- seeking information about long

18   and permanently discontinued practices, claiming that they

19   need it because it relates to an injunction.

20       The only live issue in the case is about whether we are

21   about ready to continue.  That's the FTC Act.  That's what the

22   judge decided.  And so the discovery should be tailored, Your

23   Honor, to the factors that the Court cited, the *Cornerstone*

24   factors.  It's not tailored at all as to whether we are about

25   ready to continue.  It's just all communications.

1          MR. TEPFER:  Your Honor?

2          MS. ZAMBRANO:  All policies.  All visual contact that

3    we have showed to customers relating to a guarantee that we

4    quit doing three and a half years ago.

5       This is incredibly burdensome, as we said in the

6    stipulation.  Or in the joint submission, excuse me.

7          THE COURT:  You've said extraordinarily broad and

8    burdensome discovery requests.  That is not sufficient to

9    specifically identify how these are broad and burdensome.  I

10   don't have an affidavit.  I don't have any evidence.  This is

11   exactly --

12         MS. ZAMBRANO:  Can we submit --

13         THE COURT:  No.

14         MS. ZAMBRANO:  --an affidavit, Your Honor?

15         THE COURT:  I'm here to rule on it today.

16         MS. ZAMBRANO:  Okay.

17         THE COURT:  This is -- we have a joint submission.

18   We're here.  I'm ready to rule on this.  I'm ruling on what

19   was presented.

20      If you look at the case law, and Judge Horan has got

21   several opinions, and I'll cite you one, but just a party has

22   the burden to show why the discovery is broad and burdensome,

23   and you're raising arguments today that I did not see here in

24   your joint submission.

25      So, as far as the objection on the time scope, it's

1    overruled.  I was prepared to overrule that.  If you want to

2    get into the all, that's not in here.

3          MS. ZAMBRANO:  Well, I think it is in here in this

4    regard.  I'm looking at the next paragraph, too.  What we're

5    saying is if you're asking for all, it's inherently overbroad

6    if it's relating to communications that happened for

7    discontinued practices.  So there is a line in the sand in

8    April of 2019.  That was when the practices were discontinued.

9    If they're looking at whether we are about ready to do it

10   again, it should go from that -- that's the relevant slash --

11   it's not quite a time argument.  It's really a relevance

12   argument.

13         THE COURT:  And I disagree with that for the reasons

14   that I've already explained.  There is a representation on

15   file that it won't happen anymore.  I understand you're trying

16   to focus on that.  But there --

17         MS. ZAMBRANO:  Could I show you one more thing, Your

18   Honor?  And this is out, but I'll make the representation.  We

19   asked the FTC last week, what is it that's beyond what we have

20   agreed to in the stipulation?  It's not just a we're not doing

21   it.  Is that we are committing to not do it.

22         THE COURT:  Uh-huh.

23         MS. ZAMBRANO:  And so we think it's as close as you

24   can like judicially admit an injunction, a permanent

25   injunction, as you possibly can.  I mean, I don't know how to

1    judicially admit one any more than that.

2        So we said, what is it that you want more than this?  And

3    what they said was, We want it to apply to other websites.  So

4    that is the only thing that is still at issue.  There's

5    nothing at issue -- they -- we asked them, under oath, what is

6    at issue relating to the guarantee that we haven't given you?

7            MR. TEPFER:  That mischaracterizes the testimony.

8    I'd be happy to --

9            MS. ZAMBRANO:  I have the sworn testimony, Your

10   Honor.

11           THE COURT:  Okay.  Let's -- you know what, what you

12   all discussed during your attempts to settle or resolve this,

13   it didn't get resolved.  We're here in the context of a motion

14   to compel.  You've presented a specific issue.  I've given you

15   a ruling on the issue as I see it, how you've presented it.  I

16   certainly understand the arguments you're making today, but I

17   went by what you put in the joint submission as being the

18   issues.

19       I am allowing discovery despite this representation or

20   stipulation, whatever you want to call it.  I don't think that

21   that is, in and of itself, enough to say there should not be

22   any discovery.  I don't believe the Defendant has met its

23   burden to show that further discovery shouldn't be held on

24   this issue or how far back it should go based on the briefing

25   before me.

1      So I am overruling that objection.  I'm allowing the

2   discovery as it's identified in Issue #1.  Going back 10

3   years.

4      Was there anything you needed to add to that?

5           MR. TEPFER:  No, Your Honor.

6           THE COURT:  Okay.  All right.  So we've got 30

7   minutes left for the big one.  I have to set your other one

8   anyway.  Let's get our calendars out.  Are the parties

9   available next Tuesday at 10:00 o'clock to hear 133 and 152?

10          MS. ZAMBRANO:  I'm sorry, Your Honor.  Next Tuesday

11  at 10:00 o'clock?

12          THE COURT:  Yes.  October --

13          MS. ZAMBRANO:  Okay.

14          THE COURT:  November 8th.

15          MS. ZAMBRANO:  Okay.  Just give me one minute to get

16  my electronic calendar open.

17          THE COURT:  Sure.

18          MR. HUMMEL:  May I have permission to take my mask

19  off so my --

20          THE COURT:  Yes.

21          MR. HUMMEL:  -- iPhone Face ID will recognize me?

22          THE COURT:  Yes.  Absolutely.

23          MR. HUMMEL:  Thank you.

24          MR. TEPFER:  Your Honor, that works for the FTC.

25          MS. ZAMBRANO:  Your Honor, I apologize.  It does not

1    for -- no, I think we can move something back.  We'll move

2    something back.  Yes, Your Honor.  And this is for the other

3    motion, Your Honor?

4            THE COURT:  I'm going -- for the other two motions.

5    We're obviously not even going to get past the first issue on

6    133, your motion to compel.  So I'm going to go ahead and set

7    those.  We can start earlier.  We can start at 9:00 o'clock on

8    the 8th.  So we'll cover 152 and 133.

9            MR. TEPFER:  And Your Honor, you said that was at

10   9:00 a.m.?

11           THE COURT:  I'm going to set it for 9:00.  If it took

12   us an hour and a half to get through 27 pages, I'm not hopeful

13   for 20 -- 70 and the other 30.  That's a hundred.

14       All right.  I will issue an order today memorializing my

15   ruling on 140.  So, Ms. Zambrano, you are available next

16   Tuesday, then, at 9:00?

17           MS. ZAMBRANO:  I am, Your Honor.  I just want to

18   confirm.  My partner, Mr. Hummel, from LA is actually going to

19   handle that one, so I want to confirm.  He might have other

20   remarks.  Go ahead.

21           MR. HUMMEL:  Love coming to Dallas.  I'll be here.

22           THE COURT:  Okay.  Well, then we will see you next

23   Tuesday at 9:00 o'clock.  I'll issue an electronic order that

24   resets that motion, Motion #133, plus 152.

25           MR. HUMMEL:  Thank you, Your Honor.

1          THE COURT:  All right.  Thank you.  We are adjourned.

2          MS. ZAMBRANO:  Thank you, Your Honor.

3          THE CLERK:  All rise.

4      (Proceedings concluded at 11:28 a.m.)

5                         --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19                     CERTIFICATE

20      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
21 above-entitled matter.

22 **/s/ Kathy Rehling**                        **11/03/2022**

23 **/s/ Kathy Rehling**            **As Amended 11/08/2022**

24 _____      _____
   Kathy Rehling, CETD-444                  Date
25 Certified Electronic Court Transcriber

**App. 200**

59

1

INDEX

2

PROCEEDINGS                                               3

3

WITNESSES

4

-none-

5

EXHIBITS

6

-none-

7

RULINGS

8

    Plaintiff Federal Trade Commission's Motion    18/44/50/53
to Compel Production of Documents and

9

    Interrogatory Responses from Defendant Match
Group, Inc. (#140)

10

    Match Group, Inc.'s Motion to Compel Discovery          57

11

    Responses and Production of Documents from Federal
Trade Commission (#133) - *Continued to 11/08/2022*

12

    *at 9:00 a.m.*

13

END OF PROCEEDINGS                                        58

14

INDEX                                                     59

15

16

E R R A T A

17

Index Page 59 Amended to Indicate

18

Rulings Pertain to ECF #140

19

and that ECF #133 is Continued

20

21

22

23

24

25

**App. 201**