# EXHIBIT 51

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

FEDERAL TRADE COMMISSION,

                 Plaintiff,

    vs.

MATCH GROUP, INC., a corporation,

                 Defendant.

Case No. 3:19-cv-02281-K

## DEFENDANT MATCH GROUP, INC'S SECOND AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF FEDERAL TRADE COMMISSION'S <u>FIRST SET OF INTERROGATORIES</u>

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Rules") Defendant Match Group, Inc. ("Match"), by and through its undersigned counsel, amends its objections and responses (the "Second Amended Responses")[1] to Plaintiff Federal Trade Commission's ("Plaintiff" or "FTC") First Set of Interrogatories (each an "Interrogatory" and, collectively, the "Interrogatories") as follows:

## I.    GENERAL OBJECTIONS

1.    <u>Irrelevant</u>. Match objects to each and every Interrogatory to the extent that it purports to seek information that is irrelevant to Plaintiff's claims and is not reasonably calculated to lead to the discovery of admissible evidence. In particular, Match objects to each and every

---

[1] The following defined terms are used in these Second Amended Responses:
(1) The Match.com guarantee at issue in Count III of the Amended Complaint (defined below) is the "Guarantee."
(2) The Match.com chargeback policy at issue in Count IV of the Amended Complaint is the "Chargeback Policy."
(3) The Order that Magistrate Judge Ramirez issued on November 1, 2022 (Dkt. 164), overruling Match Group, Inc.'s objections at issue in Disputed Issue #1 of the FTC's Amended Joint Submission regarding whether Match Group, Inc. may refuse to engage in discovery simply because Match Group, Inc. contends that the conduct at issue in Counts III and IV has been permanently discontinued (Dkt. 149 at 2) is the "November 1 Order."
(4) Match Group, LLC, which is the entity that owns and operates Match.com, is "MGL."
(5) Match Group, Inc. is "MGI."

Interrogatory to the extent that it seeks information relevant only to the claims that were dismissed in the Court's March 24, 2022 Order on Match's Motion to Dismiss (the "Dismissed Claims").[2] For the avoidance of doubt, Match will not withhold information merely because it is related to the Dismissed Claims, if such information is otherwise responsive to the Interrogatories related to non-dismissed claims. Match further objects to each and every Interrogatory to the extent that it seeks documents or information from an entity or dating site not named in the present litigation in any operative pleading, including but not limited to OKCupid, Plenty of Fish, and Tinder. These responses are being provided solely by Match Group, Inc. based on information within its possession, custody and control.

2.      Undue Burden. Match objects to each and every Interrogatory to the extent that it seeks to impose obligations beyond what is required under the Rules or Local Rules or is unduly burdensome. Accordingly, Match objects to each and every Interrogatory where the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

3.      Overbroad. Match objects to each and every Interrogatory to the extent that it seeks information that is beyond the scope of Plaintiff's claims, including, but not limited to, documents and information related to Plaintiff's Dismissed Claims, and documents and information related to entities or dating sites that are not yet party to, or otherwise related to, this litigation, such as OKCupid, Plenty of Fish, and Tinder. Match further objects to each and every Interrogatory to the extent that it seeks documents and information that are not within Match's possession, custody, or

---

[2] ECF No. 86 (dismissing Counts I & II of FTC's Original Complaint, filed on September 25, 2019, at ECF No. 1, due to Match's affirmative defense of CDA § 230 immunity). The FTC amended its Original Complaint on July 19, 2022, ECF No. 116. All references herein to the Complaint refer to the operative Complaint.

control, including by seeking documents and information from and related to entities that are not named as parties to this litigation.

4.     Privilege. Match objects to each and every Interrogatory to the extent it seeks documents or information that is subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity from discovery (including, without limitation, all communications with, or work product of, any outside attorney) (collectively, "Privileged Information"). Any inadvertent disclosure of Privileged Information by Match shall not constitute a waiver of any applicable privilege, doctrine, or immunity.

5.     Vagueness and Ambiguity. Match objects to each and every Interrogatory to the extent that such Interrogatory is so vague, ambiguous, or confusing as not to be susceptible to a reasoned interpretation or response. In the absence of clear instructions or definitions associated with terms that are too vague, ambiguous, or confusing, Match will give the terms used in the Interrogatory a reasonable interpretation.

6.     Accessibility. Match objects to each and every Interrogatory to the extent that it seeks information that is not reasonably accessible in the ordinary course of business.

7.     Cumulative Interrogatories and Availability of Information Elsewhere. Match objects to each and every Interrogatory that is cumulative, duplicative of, or to which documents or information already are in the possession, custody, or control of Plaintiff, or have been or could be obtained from another source that is equally available to Plaintiff or is more convenient, less burdensome, or less expensive. In particular, Match objects to each and every Interrogatory insofar as it seeks documents or information already obtained by Plaintiff during the FTC's prior investigation in connection with the Civil Investigative Demand served on Match in 2017 (the "2017 CID"). For the avoidance of doubt, Match will comply with the ESI Order, which provides,

"The parties need not re-produce in discovery documents that were already produced to the FTC in response to the FTC's CID. Instead, the parties will refer to the bates number of the relevant documents." ECF No. 132 at 4.

8.      <u>Lack of Possession, Custody, or Control</u>. Match objects to each Interrogatory to the extent it does not appear to be addressed to Match and seeks information that is necessarily outside Match's knowledge.

9.      <u>Legal Conclusions</u>. Match objects to each and every Interrogatory to the extent that it requires Match to draw legal conclusions.

10.     <u>Reservation of Right to Supplement</u>. Given the stage of the litigation, Match has not completed its investigation of the facts or law relating to this action, and discovery in this matter is ongoing. Accordingly, consistent with the Rules, these responses and objections are made without prejudice to, and are not a waiver of, Match's right to amend, correct, or supplement these responses, and are subject to Match's right to produce evidence of any subsequently discovered facts, or additional facts, information, or documents that may exist. Match provides these responses in good faith after reasonable inquiry and based on information that it knows or can readily obtain.

11.     <u>No Waiver</u>. By responding to these Interrogatories, Match does not concede the relevancy of an Interrogatory, nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to a particular Interrogatory does not mean that it is probative of any particular issue in this case. Match expressly reserves its right to assert any and all objections to the admissibility of any responses into evidence at any hearing or trial of this proceeding, or in any other actions or proceedings, on any and all grounds, including, but not limited to, competency, relevancy, materiality, privilege, confidentiality, hearsay, or admissibility as evidence for any other purpose. Moreover, the right to object on any

ground to the use of the responses or information provided, in any aspect of this or any other court action, arbitration, or judicial or administrative proceeding or investigation, is reserved.

## II.     SPECIFIC OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.     Match specifically objects to the Interrogatories' Instructions and Definitions to the extent they purport to impose obligations on Match that exceed those imposed by the Rules and the Local Rules. In responding to these Interrogatories, Match will follow the requirements set forth in the Rules and the Local Rules.

2.     Match specifically objects to the definitions of "Match," the "Company," and "You" because they are vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines these term as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." This definition necessarily and inappropriately includes attorneys and other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Match objects to Plaintiff's definitions of "Match," the "Company," and "You" as defined to "include any descriptor used by Match in its business practice," again encompassing other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. In responding to these Interrogatories, Match will construe the terms "Match," the "Company," and "You" to refer only to Match Group, Inc.

3.     Match specifically objects to the definitions of "and" and "or" and because they are ambiguous and confusing. Match will interpret these terms to have their plain, ordinary, and common sense meaning. Match further objects to these definitions to the extent they purport to impose obligations on Match that exceed those imposed by the Rules. Match objects to the

definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case and exceedingly burdensome. In responding to these Interrogatories, Match will comply with the Rules and the Local Rules.

4.      Match specifically objects to the definition of "any" as ambiguous and confusing. Match will interpret this term to have its plain, ordinary, and common sense meaning. Match further objects to this definition to the extent it purports to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of this term as overly broad, unduly burdensome, and oppressive to the extent it purports to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, Match will comply with the Rules and the Local Rules.

5.      Match specifically objects to the definitions of "Customer" and "Customers" as overbroad, unduly burdensome, and oppressive, insofar as they purport to cover individual(s) "who have maintained an account on *any website* owned or operated by the Company, including OKCupid, Plenty of Fish, and Tinder," which Match does not actually own or operate, and which encompasses websites and entities that are not party to, or otherwise related to, the present litigation. Match further objects that the definitions of "Customer" and "Customers" are thus not tailored to the allegations in the complaint, not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence. In responding to these Interrogatories, Match will construe the terms "Customer" and "Customers" to refer only to Customer(s) of Match.com.

6.      Match objects to the definition of "Document" as overly broad and unduly burdensome. Match further objects to this definition to the extent it refers to items outside of

Match's possession, custody, or control, particularly through its use of the phrases "regardless of origin or location" and "however and by whomever prepared, produced, disseminated, or made." Match further objects to this definition to the extent it refers to items in Plaintiff's possession, custody, or control, or to items that have been or could be obtained from another source that is equally available to Plaintiff or is more convenient, less burdensome, or less expensive. Match further objects to this definition to the extent it purports to impose obligations on Match that exceed those required by the Rules. In responding to these Interrogatories, Match will interpret the word "Document" to have its plain, ordinary, and common sense meaning and will comply with the Rules.

7.     Match specifically objects to the definition of "each" as ambiguous and confusing. Match will interpret this term to have its plain, ordinary, and common sense meaning. Match further objects to this definition to the extent it purports to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of this term as overly broad, unduly burdensome, and oppressive to the extent it purports to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, Match will comply with the Rules and the Local Rules.

8.     Match specifically objects to the definitions of "Identity" and "the identity of" and because they are ambiguous and confusing. Match will interpret these terms to have their plain, ordinary, and common sense meaning. Match further objects to these definitions to the extent they purport to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor

proportional to the needs of the case. In responding to these Interrogatories, Match will comply with the Rules and the Local Rules.

9.      Match specifically objects to the definition of "Match Group, LLC" as vague, ambiguous, confusing, and overbroad.

10.      Match objects to the definition of "OKCupid," because it is overbroad, ambiguous, and confusing. Match further objects to the definition of "OKCupid" as irrelevant, since OKCupid is not referenced in the operative Complaint, and thus any Interrogatory relying on the definition of "OKCupid" is not proportional to the needs of the case and is unduly burdensome.

11.      Match objects to the definition of "Plenty of Fish," because it is overbroad, ambiguous, and confusing. Match further objects to the definition of "Plenty of Fish" as irrelevant, since Plenty of Fish is not even referenced in the Complaint, and thus any Interrogatory relying on the definition of "Plenty of Fish" is not proportional to the needs of the case and is unduly burdensome.

12.      Match specifically objects to the definitions of "referring to" and "relating to" and because they are ambiguous and confusing. Match will interpret these terms to have their plain, ordinary, and common sense meaning. Match further objects to these definitions to the extent they purport to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, Match will comply with the Rules and the Local Rules.

13.      Match specifically objects to the definition of "Subscriber" as overbroad, unduly burdensome, and oppressive, insofar as it purports to cover a "Subscriber" to "any website owned

or operated by" Match, which would necessarily encompass websites and entities that are not party

to, or otherwise related to, the present litigation. Match further objects that the definition of

"Subscriber" is thus not tailored to the allegations in the complaint and not proportional to the

needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence.

In responding to these Interrogatories, Match will construe the term "Subscriber" to refer only to

Subscribers to Match.com.

14.    Match objects to the definition of "Tinder," because it is overbroad, ambiguous,

and confusing. Match further objects to the definition of "Tinder" as irrelevant, since Tinder is not

even referenced in the Complaint, and thus any Interrogatory relying on the definition of "Tinder"

is not proportional to the needs of the case and is unduly burdensome.

15.    The foregoing general objections and specific objections to the instructions and

definitions provided by Plaintiff shall be fully incorporated by reference into each of the below

specific objections to the Interrogatories.

## III.    SPECIFIC OBJECTIONS AND RESPONSES TO THE INTERROGATORIES

**INTERROGATORY NO. 1:** Identify, including by job title, place of employment, and dates of service, all persons that Match consulted with while preparing its response to the 2017 CID, Plaintiff's First Set of Interrogatories, Plaintiff's First Requests for Production, Plaintiff's First Request for Admission, or any other submission or presentation the Company sent to the FTC. For each such person, state the 2017 CID request, discovery request, interrogatory, or other submission or presentation for which the person answered or otherwise assisted in answering.

**RESPONSE:** Match objects to this Interrogatory on the grounds that it seeks discovery that is not

relevant to either party's claims or defenses and is not proportional to the needs of the case. Match

further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any

kind of "Match Guarantee" or maintained a "Chargeback" policy. Match.com has permanently

discontinued the "Match Guarantee" and related practices, as well as all practices related to

"Chargebacks," and Match has repeatedly told the FTC this orally and in writing. Match is

prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects to this Interrogatory because, by asking for the identity of all persons that Match "consulted with" in responding to the FTC's CID or discovery requests, it seeks documents or information that is subject to the attorney-client privilege and work-product doctrine. The FTC is not entitled to know the identity of every individual with whom Match's attorneys consulted.

**SECOND AMENDED RESPONSE:** Based on the November 1 Order, MGI responds that it is not withholding documents or information due to the permanent discontinuation of the Guarantee or Chargeback Policy in Counts III and IV, but MGI cannot respond with the identity of all persons that MGI "consulted with" in responding to the FTC's CID or discovery requests because such information is subject to the attorney-client privilege and work-product doctrine.

**INTERROGATORY NO. 2:** Describe any criteria Match uses or has used to determine whether to grant a Customer's request for a refund relating to PTR Ads, fraud or alleged fraud, Match Guarantees, consumer's belief that they had already canceled their subscription, or his or her claimed lack of knowledge about recurring charges.

**RESPONSE:** Match objects to this Interrogatory because "PTR Ads" is vague and undefined, and to the extent this Interrogatory seeks Privileged Information. Match further objects to this

Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee." Match.com has permanently discontinued the "Match Guarantee" and related practices, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects to this Interrogatory as irrelevant, overly broad, unduly burdensome, and disproportionate to the needs of the case, in that it seeks information that is beyond the scope of Plaintiff's Complaint, because Count I and II relating to PTR Ads and fraud or alleged fraud were dismissed with prejudice by the Court on March 24, 2022. *See* ECF No. 86 ("The Court [] grants Defendant Match Group, Inc.'s Motion to Dismiss Counts I and II because Match is entitled to immunity under 47 U.S.C. § 230 of the Communications Decency Act, thus those claims are barred and dismissed with prejudice."). Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single

questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

Subject to and without waiving the foregoing objections, Match responds as follows: Match Group, Inc. does not use any criteria to determine whether to grant a Match.com Customer's request for a refund relating to a consumer's belief that they had already canceled their subscription, or his or her claimed lack of knowledge about recurring charges because Match Group, Inc. does not own or operate Match.com. Match expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**SECOND AMENDED RESPONSE:** Based on the November 1 Order, MGI responds that MGI does not use any criteria to determine whether to grant a Match.com customer's request for a refund relating to the Guarantee because MGI does not own or operate Match.com. This Interrogatory will be answered by MGL in response to Interrogatory No. 3 that the FTC served on MGL.

**INTERROGATORY NO. 3:** Identify and describe in complete detail the full basis for each affirmative defense You have asserted in Your Answer, including but not limited to every fact and document that supports, contradicts, refutes, or rebuts that particular affirmative defense, and every witness who may have information or testimony relevant to that particular defense.

**RESPONSE:** Match objects to this Interrogatory because "relevant" is vague and undefined and to the extent this Interrogatory seeks Privileged Information. Match further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee" or maintained a Chargeback policy. Match.com has permanently discontinued the "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation

in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects that this Interrogatory is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "You" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." Plaintiff's definition of "You" necessarily and inappropriately includes other entities or dating sites that are not relevant to the claims or allegations in the Complaint. Match also objects to this Interrogatory as premature and to the extent it seeks to require Match to marshal all of its evidence before trial. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules. Match also objects to this Interrogatory to the extent it seeks to require Match to provide information that is not in its possession, custody, or control, or that is already in Plaintiff's possession, custody, or control.

Subject to and without waiving the foregoing objections, Match responds as follows:

First Affirmative Defense (Failure to State a Claim): Match asserts FTC's Complaint fails to state a claim, including because the Complaint names the wrong entity. Since March 2017, when the FTC served Match Group, Inc. with the Civil Investigative Demand ("CID"), Match has repeatedly informed the FTC that Match Group, Inc. is in fact a separate holding company, and Match Group, LLC (formerly named Match.com, LLC) actually owns and operates Match.com. For example, Match stated in its May 15, 2017 Interrogatory Responses to the FTC's CID that Match.com, LLC is the general operating company that operates Match.com. Delaware Secretary of State records show that Match.com, LLC filed a certificate of amendment on September 12, 2017, changing its name from Match.com, LLC to Match Group, LLC. Match continued to raise these concerns in a December 16, 2018 White Paper and in negotiating a potential Consent Order with the FTC. Additionally, shortly after the Complaint was served, counsel for Match emailed the FTC to again inform it that Match Group, Inc. was incorrectly named as a defendant in the lawsuit and should be voluntarily dismissed. *See* Dkt. 21 at 35. Counsel for the FTC acknowledged the email but declined to voluntarily dismiss the Complaint against Match Group, Inc. *See id.* at 37.

The Complaint fails to state a claim for the additional reason that the Guarantee and Chargeback policy at issue in the Complaint were discontinued prior to the FTC filing suit, and there are no plans to resume those practices, as the FTC is aware from multiple communications. Thus, both Match Group, Inc. and Match.com are not violating, nor are they about to violate, the FTC Act.

Second Affirmative Defense (Compliance with Applicable Law): The Complaint's Count V fails as Match did not violate Section 4 of ROSCA, 15 U.S.C. § 8403. As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged

in the practices at issue in the Complaint. Rather, at all times with respect to Count V, Match.com complied with all applicable laws and acted reasonably and in good faith. As a preliminary matter, even assuming that the online cancelation flow at issue in Count V is not simple (although it is), the plain language of ROSCA requires only "simple mechanisms" for cancelation, and ROSCA does not provide that every cancelation method must be simple. Count V fails because Match.com offers several other cancelation methods in full compliance with ROSCA, including simple methods to cancel by phone, fax, email, internet chat, or standard mail, and the FTC challenges only the online cancelation method. Thus, even if the FTC were correct (which it is not) that the online cancelation flow is not simple, the existence of other unchallenged methods of cancelation defeats the FTC's claim.

Count V also fails because the Match.com online cancelation flow is not complicated or in any material way different from numerous other online subscription cancelation mechanisms. It is essentially industry standard. Consumers in fact readily canceled using the Match.com online cancelation flow, as reflected by data proving that subscribers have no difficulty canceling via the online cancelation flow, which can be completed in less than one minute. Based on data reviewed during the FTC's pre-suit investigation, on average, 89% of Match.com subscribers who initiated an online cancelation request successfully canceled their subscription within the same day.

Third Affirmative Defense (Good Faith Belief and Conduct): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. Match.com's subscription cancelation flow was designed and implemented to be simple and readily accessible to users.

Fourth Affirmative Defense (Requested Relief Contrary to Public Policy): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged

in the practices at issue in the Complaint. The FTC's requested relief with respect to Count V is contrary to the public interest because Match.com's online cancelation flow is intended to benefit consumers by protecting their privacy (by requiring them to insert their passwords prior to accessing private account information, such as billing), offering them discounted rates, and allowing Match.com to understand how to better serve them.

Fifth Affirmative Defense (Alleged Failure to Clearly and Conspicuously Disclose Not Material): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. Any alleged failure by Match.com to clearly and conspicuously disclose some requirements of the guarantee practice was not material because most consumers who did not qualify for the guarantee failed to satisfy the requirements that were unquestionably adequately disclosed (i.e., the requirements in the numbered and bullet-pointed list in the Program Rules). So even had other requirements been *more* clearly and conspicuously disclosed (or waived), most users would not have been eligible for a guarantee regardless.

Sixth Affirmative Defense (Mootness): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. As to Count III, Match asserts the FTC's claim for injunctive relief is moot under applicable law. The FTC admits in its Complaint that this guarantee practice at issue in Count III ceased in mid-2019 (but it was actually permanently discontinued in April 2019). Match asserts Count IV is also moot, because, as the FTC admits in its Complaint, Match.com's chargeback practice ceased in mid-2019 (but it was actually permanently discontinued in March 2019). Count IV's claim for injunctive relief is therefore also moot. There is nothing to enjoin because the challenged practices have been discontinued.

Seventh Affirmative Defense (Overbroad Injunction): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. The FTC's requested injunction with respect to Count III and the "guarantee" practice is overbroad and not specifically tailored to the violations alleged in the Complaint. The FTC's requested injunction with respect to Count IV and the chargeback policy is overbroad and not specifically tailored to the violations alleged in the Complaint. Finally, the FTC's requested injunction is overbroad and not specifically tailored to the violations alleged in the Complaint. In particular, the FTC's requested injunction is overbroad not only because the Complaint fails to allege all necessary facts, but also because the FTC attempts to apply such injunction to Match Group, Inc., which does not own or operate Match.com, and to brands other than Match.com that are not implicated by the Complaint.

Eighth Affirmative Defense (Mitigation): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. With respect to Count V, the FTC has not offered any reliable methodology for quantifying alleged consumer harm, and any restitution amount would be subject to mitigation to the extent that consumers received refunds or utilized the services on the renewed subscription.

Ninth Affirmative Defense (Reservation of Other Affirmative Defenses): Match lacks sufficient information regarding the facts and evidence alleged and is therefore unable to ascertain at this time any additional affirmative defenses which Match may have. Therefore, Match expressly reserves the right to amend its Answer to assert such other affirmative defenses as may become apparent subsequent to the filing of its Answer, whether in discovery, at trial, or otherwise.

Match expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**FIRST AMENDED RESPONSE:** For the avoidance of doubt, the Match Guarantee and Chargeback practices challenged in the Complaint were permanently discontinued in April 2019 and March 2019, respectively, and Match.com will not reinstitute those practices.

**INTERROGATORY NO. 4:** Identify any tests, reports, A/B testing, Customer surveys, usability tests, focus groups, or other user experience studies, whether formal or informal, You have conducted related to:

     a.     Match Guarantees;

     b.     Chargebacks; and

     c.     means of subscription renewal or cancellation.

Your response to this Interrogatory should include descriptions of the types of usability studies, beta studies, and surveys that the response covers. In addition, please provide Your response in machine-readable format, for example, in a .csv or spreadsheet file format.

**RESPONSE:** Match objects to this Interrogatory because "tests," "reports," "A/B testing," "surveys," "usability tests," "focus groups," "user experience studies," "formal," and "informal" are vague and undefined, and to the extent this Interrogatory seeks Privileged Information. Match further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee" or maintained a Chargeback policy. Match.com has permanently discontinued the "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has

also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects that this Interrogatory is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "You" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." Plaintiff's definition of "You" necessarily and inappropriately includes other entities or dating sites that are not relevant to the claims or allegations in the Complaint. Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

Subject to and without waiving the foregoing objections, Match responds with respect to subpart (c) as follows: pursuant to Federal Rule of Civil Procedure 33(d), Match directs the FTC to any documents that will be produced in response to the FTC's RFP No. 26. Match expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**<u>SECOND AMENDED RESPONSE:</u>** Based on the November 1 Order, MGI responds with respect to subparts (a) and (b) as follows: pursuant to Federal Rule of Civil Procedure 33(d), MGI

directs the FTC to any documents produced in response to the FTC's RFP No. 26 to MGI or to the

FTC's RFP No. 33 to MGL.

**INTERROGATORY NO. 5:** On a monthly basis, state:

    a.    the number of Match.com subscriptions subject to the Guarantee sold;

    b.    the number of Guarantee Extensions that Match provided Customers;

    c.    the number of Customer inquiries regarding the automatic renewal of subscriptions subject to the Match Guarantee;

    d.    the number of refund requests Customers submitted to Match relating to Match Guarantees and the dollar amount of these requested refunds; and

    e.    the number of refunds Match granted relating to Match Guarantees and the amount of money refunded relating to Match Guarantees.

**RESPONSE:** Match objects to this Interrogatory because "subscriptions" and "inquires" are

vague and undefined and to the extent this Interrogatory seeks Privileged Information. Match

further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to

either party's claims or defenses and is not proportional to the needs of the case. Match further

objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of

"Match Guarantee" or maintained a Chargeback policy. Match.com has permanently discontinued

the "Match Guarantee" and related practices, and Match has repeatedly told the FTC this orally

and in writing.  Match is prepared to enter a binding stipulation in a form acceptable to the Court

that Match could never and would never, and Match.com would never, engage in the conduct

challenged in Counts III and IV in the Complaint, to which this discovery solely relates. The FTC

has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the

question of whether any injunctive relief should be issued that addresses this alleged conduct is

moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim

by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these

reasons, discovery into the questions of what occurred or whether the alleged conduct related to

the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects that this Interrogatory is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Match" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." Plaintiff's definition of "Match" necessarily and inappropriately includes other entities or dating sites that are not relevant to the claims or allegations in the Complaint. Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

**SECOND AMENDED RESPONSE:** Based on the November 1 Order, MGI responds that, before the Guarantee was permanently discontinued, MGI did not provide any Guarantee Extension to customers or issue refunds relating to the Guarantee because MGI does not own or operate Match.com. This Interrogatory will be answered by MGL in response to Interrogatory No. 8 that the FTC served on MGL. As provided by MGL in response to Interrogatory No. 8, that Interrogatory will be answered pursuant to Rule 33(d) by producing a document containing data responsive to the Interrogatory. Once produced, the document will be identified by Bates number.

**INTERROGATORY NO. 6:** State all limitations on Customers' rights to redeem a Match Guarantee or receive a Guarantee Extension and all actions consumers had to complete to redeem a Match Guarantee or receive a Guarantee Extension. For each such limitation or action Identify:

      a.    the date such limitation was implemented and/or eliminated;

      b.    all advertisements, notices, disclosures, or other notifications where Match disclosed the need to complete that action; and

      c.    The number of consumers whose request for a Guarantee Extension were denied due to that limitation or for failing to complete that particular action.

**RESPONSE:** Match objects to this Interrogatory because "rights to redeem," "that limitation," and "that particular action" are vague and undefined and to the extent this Interrogatory seeks Privileged Information. Match further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee." Match.com has permanently discontinued the "Match Guarantee" and related practices, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery solely relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

**SECOND AMENDED RESPONSE:** Based on the November 1 Order, MGI responds that, before the Guarantee was permanently discontinued, MGI did not make any disclosures regarding the Guarantee because MGI does not own or operate Match.com. MGI directs the FTC to MGL's responses to duplicative Interrogatory Nos. 9 and 11 that the FTC served on MGL.

**INTERROGATORY NO. 7:** Describe all of Match's policies relating to Customer Chargebacks, including regarding:

  a.    the circumstances in which Match will dispute a Customer Chargeback;

  b.    denying Customer account access due to a Chargeback request;

  c.    deleting or reinstating accounts of consumers who unsuccessfully attempt a Chargeback and when such deletions or reinstatements are effective; and

  d.    the effective dates of the policies.

**RESPONSE:** Match objects to the extent this Interrogatory seeks Privileged Information. Match further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever had any policy relating to a Chargeback—or offered any kind of "Match Guarantee" or maintained a Chargeback policy. Match.com has permanently discontinued "Chargebacks" and related practices, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint,

to which this discovery solely relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules. Match also objects to this Interrogatory to the extent it seeks to require Match to provide information that is not in its possession, custody, or control, or that is already in Plaintiff's possession, custody, or control.

**SECOND AMENDED RESPONSE:** Based on the November 1 Order, MGI responds that MGI does not have any Match.com chargeback policies because MGI does not own or operate Match.com. This Interrogatory will be answered by MGL in response to Interrogatory No. 12 that the FTC served on MGL.

**INTERROGATORY NO. 8:** On a monthly basis, state:

    a.    the number of Customer communications Match received regarding account cancellation or cancellation processes;

    b.    the number of refund requests made by Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

    c.    the dollar value of the refund requests made by Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

d.      the number of refunds Match provided to Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

e.      the dollar value of the refunds provided to Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

f.      the amount charged to Customers who had requested a refund on the basis that they believed they had cancelled and had this request denied by Match; and

g.      the amount charged to Customers who had requested a refund on the basis that they were unaware of Match's recurring charge and had this request denied by Match.

**RESPONSE:** Match objects to this Interrogatory because "communications," "account cancellation or cancellation processes," "attempted," "believed," and "claimed," are vague and undefined and to the extent this Interrogatory seeks Privileged Information. Match further objects that this Interrogatory is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Match" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." Plaintiff's definition of "Match" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "Match," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules. Match also objects to this Interrogatory to the extent it seeks to require Match to provide information that is not in its possession, custody, or

control, or that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, Match does not concede the relevancy of this Interrogatory nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case.

Subject to and without waiving the foregoing objections, Match responds as follows: Match Group, Inc. has not received any Customer communications or refund requests because Match Group, Inc. does not own or operate Match.com (or any other dating site).

Match expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 9:** Describe each method through which consumers could cancel their subscriptions. For each such method, describe in detail:

    a.     how Match informed or disclosed to consumers the availability of each method;

    b.     each step that consumers would have to take in order to successfully cancel;

    c.     each representation that Match would make to consumers at each step in the cancellation process; and

    d.     by month, how many Customers attempted to cancel via that particular method;

    e.     by month, how many Customers successfully canceled via that particular method.

**RESPONSE:** Match objects to this Interrogatory because "attempted" is vague and undefined and to the extent this Interrogatory seeks Privileged Information. Match further objects that this Interrogatory is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Match" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." Plaintiff's definition of "Match" necessarily

and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "Match," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match also objects to this Interrogatory as premature and to the extent it seeks to require Match to marshal all of its evidence before trial. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules. Match also objects to this Interrogatory to the extent it seeks to require Match to provide information that is not in its possession, custody, or control, or that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, Match does not concede the relevancy of this Interrogatory nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case.

Subject to and without waiving the foregoing objections, Match responds as follows: Match Group, Inc. does not inform, disclose to, or make representations to Match.com subscribers, because Match Group, Inc. does not own or operate Match.com (or any other dating site). Therefore, Match Group, Inc. does not have the cancelation data requested by this Interrogatory.

Match expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

Dated: January 12, 2023

/s/ *Angela C. Zambrano*
Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Fax: 214.981.3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310.595.9500
Fax: 310.595.9501

*Attorneys for Match Group, Inc. and Match Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

     The undersigned certifies that a true and correct copy of the above and forgoing document

was served on all counsel of record via e-mail as outlined below on January 12, 2023.

Reid Abram Tepfer
rtepfer@ftc.gov
M Hasan Aijaz
maijaz@ftc.gov
Matthew James Wilshire
mwilshire@ftc.gov
Sarah Zuckerman
szuckerman@ftc.gov
John R. O'Gorman
jogorman@ftc.gov
Erica Rollins Hilliard
ehilliard@ftc.gov

                    */s/  Angela C. Zambrano*
                    Angela C. Zambrano

# EXHIBIT 52

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>MATCH GROUP, INC., a corporation, and<br>MATCH GROUP, LLC, formerly known as<br>MATCH.COM, LLC, a limited liability<br>company,<br>　　　　　　　Defendants. | Case No. 3:19-cv-02281-K |

**DEFENDANT MATCH GROUP, LLC'S SECOND AMENDED RESPONSES AND
OBJECTIONS TO PLAINTIFF FEDERAL TRADE COMMISSION'S FIRST SET OF
<u>INTERROGATORIES</u>**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Rules") Defendant Match Group, LLC ("MGL"), by and through its undersigned counsel, amends its objections and responses (the "Second Amended Responses") to Plaintiff Federal Trade Commission ("Plaintiff" or "FTC") First Set of Interrogatories to MGL (each an "Interrogatory" and, collectively, the "Interrogatories")[1] as follows:

---

[1] MGL amended its objections and responses to the Interrogatories on January 12, 2023 (the "First Amended Responses"). The following defined terms are used in the First Amended Responses:

(1) The Match.com guarantee at issue in Count III of the Amended Complaint (defined below) is the "Guarantee."

(2) The Match.com chargeback policy at issue in Count IV of the Amended Complaint is the "Chargeback Policy."

(3) The Order that Magistrate Judge Ramirez issued on November 1, 2022 (Dkt. 164), overruling MGI's (defined below) objections at issue in Disputed Issue #1 of the FTC's Amended Joint Submission regarding whether MGI may refuse to engage in discovery simply because MGI contends that the conduct at issue in Counts III and IV has been permanently discontinued (Dkt. 149 at 2) is the "November 1 Order."

(4) The FTC and MGL's agreement reached on October 18, 2022, that "[t]o the extent that MGL makes the same objections that MGI made (e.g., relevance/burden with regard to Counts III and IV) and the Court decides those issues, . . . both sides will be bound by the Court's decision on those overlapping issues" is the "Counts III and IV Agreement."

# I.  GENERAL OBJECTIONS

1.   <u>Irrelevant</u>. MGL objects to each and every Interrogatory to the extent that it purports to seek information that is irrelevant to Plaintiff's claims and is not reasonably calculated to lead to the discovery of admissible evidence. In particular, MGL objects to each and every Interrogatory to the extent that it seeks information relevant only to the claims that were dismissed in the Court's August 24, 2022 Order on MGL's Motion to Dismiss (the "Dismissed Claims").[2] For the avoidance of doubt, MGL will not withhold any information merely because it is related to the Dismissed Claims, if such information is otherwise responsive to the Interrogatories related to non-dismissed claims. MGL further objects to each and every Interrogatory to the extent that it seeks documents or information from an entity or dating site not named in the present litigation, including but not limited to Tinder. MGL objects to Plaintiff's use of the discovery process to conduct a fishing expedition into dating sites that are not at issue in this lawsuit.

2.   <u>Undue Burden</u>. MGL objects to each and every Interrogatory to the extent that it seeks to impose obligations beyond what is required under the Rules or Local Rules or is unduly burdensome. Accordingly, MGL objects to each and every Interrogatory where the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

3.   <u>Overbroad</u>. MGL objects to each and every Interrogatory to the extent that it seeks information that is beyond the scope of Plaintiff's claims, including, but not limited to, documents and information related only to Plaintiff's Dismissed Claims, and documents and information

---

[2] Dkt. 129 (dismissing Counts I & II of FTC's First Amended Complaint for Permanent Injunction, Monetary Relief, Civil Penalties, and Other Relief, filed on July 19, 2022 at Dkt. 116 (the "Amended Complaint"), due to MGL's CDA § 230 immunity).

related to entities or dating sites that are not party to, or otherwise related to, this litigation, such as Tinder. MGL will only respond with respect to Match.com. MGL further objects to each and every Interrogatory to the extent that it seeks documents and information that are not within MGL's possession, custody, or control, including by seeking documents and information from and related to entities that are not named as parties to this litigation.

4.    Privilege. MGL objects to each and every Interrogatory to the extent it seeks documents or information subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity from discovery (including, without limitation, all communications with, or work product of, any outside attorney) (collectively, "Privileged Information"). Any inadvertent disclosure of Privileged Information by MGL shall not constitute a waiver of any applicable privilege, doctrine, or immunity.

5.    Vagueness and Ambiguity. MGL objects to each and every Interrogatory to the extent that such Interrogatory is so vague, ambiguous, or confusing as not to be susceptible to a reasoned interpretation or response. In the absence of clear instructions or definitions associated with terms that are too vague, ambiguous, or confusing, MGL will give the terms used in the Interrogatory a reasonable interpretation.

6.    Accessibility. MGL objects to each and every Interrogatory to the extent that it seeks information that is not reasonably accessible in the ordinary course of business.

7.    Cumulative Interrogatories and Availability of Information Elsewhere. MGL objects to each and every Interrogatory that is cumulative, duplicative of, or to which documents or information already are in the possession, custody, or control of Plaintiff, or have been or could be obtained from another source that is equally available to Plaintiff or is more convenient, less burdensome, or less expensive. In particular, MGL objects to each and every Interrogatory insofar

as it seeks documents or information already obtained by Plaintiff during the FTC's prior investigation in connection with the Civil Investigative Demand in 2017 (the "2017 CID") and documents or information produced by Match Group, Inc. ("MGI") during the course of this litigation. For the avoidance of doubt, MGL will comply with the ESI Order, which provides, "The parties need not re-produce in discovery documents that were already produced to the FTC in response to the FTC's CID. Instead, the parties will refer to the bates number of the relevant documents." Dkt. 132 at 4.

8.    <u>Lack of Possession, Custody, or Control</u>. MGL objects to each Interrogatory to the extent it does not appear to be addressed to MGL and seeks information that is necessarily outside MGL's knowledge.

9.    <u>Legal Conclusions</u>. MGL objects to each and every Interrogatory to the extent that it requires MGL to draw legal conclusions.

10.    <u>Reservation of Right to Supplement</u>. Given the stage of the litigation, MGL has not completed its investigation of the facts or law relating to this action, and discovery in this matter is ongoing. Accordingly, consistent with the Rules, these responses and objections are made without prejudice to, and are not a waiver of, MGL's right to amend, correct, or supplement these responses, and are subject to MGL's right to produce evidence of any subsequently discovered facts, or additional facts, information, or documents that may exist. MGL provides these responses in good faith after reasonable inquiry and based on information that it knows or can readily obtain.

11.    <u>No Waiver</u>. By responding to these Interrogatories, MGL does not concede the relevancy of an Interrogatory nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to a particular Interrogatory does not mean that it is probative of any particular issue in this case. MGL expressly reserves its

right to assert any and all objections to the admissibility of any responses into evidence at any hearing or trial of this proceeding, or in any other actions or proceedings, on any and all grounds, including, but not limited to, competency, relevancy, materiality, privilege, confidentiality, hearsay, or admissibility as evidence for any other purpose. Moreover, the right to object on any ground to the use of the responses or information provided, in any aspect of this or any other court action, arbitration, or judicial or administrative proceeding or investigation, is reserved.

## II.  SPECIFIC OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.      MGL specifically objects to the Interrogatories' Instructions and Definitions to the extent they purport to impose obligations on MGL that exceed those imposed by the Rules and the Local Rules. In responding to these Interrogatories, MGL will follow the requirements set forth in the Rules and the Local Rules.

2.      MGL specifically objects to the definitions of "Match Group[,] LLC," "Company, and "You" as vague, ambiguous, confusing, and overbroad because the definition includes "assumed names, prior names, and predecessor entities, including Match.com, LLC," and MGL is not sure what the FTC means by "assumed names, prior names, or predecessor entities" (other than Match.com, LLC). MGL further objects to this definition to the extent it encompasses any website other than Match.com, which is the only dating site at issue in the Amended Complaint. Additionally, MGL objects because the correct name of the entity named as a defendant in this litigation is Match Group, LLC, not Match Group LLC.

3.      MGL specifically objects to the definition of "Match Group[,] Inc[.]" because the correct name of the entity named as a defendant in this litigation is Match Group, Inc., not Match Group Inc.

4.      MGL specifically objects to the definitions of "and" and "or" and because they are ambiguous and confusing. MGL will interpret these terms to have their plain, ordinary, and common sense meaning. MGL further objects to these definitions to the extent they purport to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case and exceedingly burdensome. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

5.      MGL specifically objects to the definition of "any" as ambiguous and confusing. MGL will interpret this term to have its plain, ordinary, and common sense meaning. MGL further objects to this definition to the extent it purports to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of this term as overly broad, unduly burdensome, and oppressive to the extent it purports to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

6.      MGL specifically objects to the definitions of "Customer" and "Customers" as overbroad, unduly burdensome, and oppressive, insofar as they purport to cover individual(s) "who have maintained an account on *any website* owned or operated by" MGL, including "Tinder," which encompasses websites that are not related to the present litigation. MGL further objects that the definitions of "Customer" and "Customers" are thus not tailored to the allegations in the Amended Complaint, not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence. In responding to these Interrogatories, MGL will construe the terms "Customer" and "Customers" to refer only to Customer(s) of Match.com.

7.     MGL objects to the definition of "Document" as overly broad and unduly burdensome. MGL further objects to this definition to the extent it refers to items outside of MGL's possession, custody, or control, particularly through its use of the phrases "regardless of origin or location" and "however and by whomever prepared, produced, disseminated, or made." MGL further objects to this definition to the extent it refers to items in Plaintiff's possession, custody, or control, or to items that have been or could be obtained from another source that is equally available to Plaintiff or is more convenient, less burdensome, or less expensive. MGL further objects to this definition to the extent it purports to impose obligations on MGL that exceed those required by the Rules. In responding to these Interrogatories, MGL will interpret the word "Document" to have its plain, ordinary, and common sense meaning and will comply with the Rules.

8.     MGL specifically objects to the definition of "each" as ambiguous and confusing. MGL will interpret this term to have its plain, ordinary, and common sense meaning. MGL further objects to this definition to the extent it purports to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of this term as overly broad, unduly burdensome, and oppressive to the extent it purports to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

9.     MGL specifically objects to the definitions of "Identify" and "the identity of" because they are ambiguous and confusing. MGL will interpret these terms to have their plain, ordinary, and common sense meaning. MGL further objects to these definitions to the extent they purport to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they

purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

10.     MGL specifically objects to the definitions of "referring to" and "relating to" and because they are ambiguous and confusing. MGL will interpret these terms to have their plain, ordinary, and common sense meaning. MGL further objects to these definitions to the extent they purport to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

11.     MGL specifically objects to the definition of "Subscriber" as overbroad, unduly burdensome, and oppressive, insofar as it purports to cover a "Subscriber" to "any website owned or operated by" MGL, which would necessarily encompass websites that are not related to the present litigation. MGL further objects that the definition of "Subscriber" is thus not tailored to the allegations in the Amended Complaint and not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence. In responding to these Interrogatories, MGL will construe the term "Subscriber" to refer only to Subscribers to Match.com.

12.     MGL objects to the definition of "Tinder" because it is overbroad, ambiguous, and confusing. MGL further objects to the definition of "Tinder" as irrelevant, since Tinder is not even referenced in the Amended Complaint, and thus any Request relying on the definition of "Tinder" is not proportional to the needs of the case and is unduly burdensome.

13.     The foregoing general objections and specific objections to the instructions and definitions provided by Plaintiff shall be fully incorporated by reference into each of the below specific objections to the Interrogatories.

## I.   SPECIFIC OBJECTIONS AND RESPONSES TO THE INTERROGATORIES

**INTERROGATORY NO. 1:** Identify any current or former Match Group[,] LLC employee that has ever had a position at Match Group[,] Inc[.], the time period in which the employee held that position at Match Group[,] Inc[.], the time period of the employee's employment at Match Group[,] LLC, and all responsibilities that individual has held at Match Group[,] Inc[.] and Match Group[,] LLC.

**RESPONSE:** MGL objects to this Interrogatory because "responsibilities" is vague and undefined. MGL objects to this Interrogatory as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Amended Complaint, by seeking discovery of extensive information regarding "any current and former Match Group[,] LLC employee" regardless of their relevance to the claims in the Amended Complaint. MGL will only respond with respect to employees that may have, or had, a role in Match.com's cancellation processes or directly reports to anyone who is responsible or has a role in the cancellation process. MGL further objects to the extent that the requested information is already in Plaintiff's possession, custody, or control. Finally, MGL further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

Subject to and without waiving the foregoing objections, MGL responds as follows:

As of January 1, 2013, Sharmistha Dubey was employed at MGL, until April 2013, and then was employed again from December 2015 until May 2022. Ms. Dubey, while being an MGL employee, also had an engagement agreement with MGI from August 8, 2018 to May 2, 2022. The responsibilities Ms. Dubey held at MGI were President, from January 2018 to March 2020, and CEO, from March 2020 until May 2022. Ms. Dubey also currently serves as a Board Member of

MGI, a role she has held since September 2019. The responsibilities Ms. Dubey held at MGL were Chief Product Officer, as of January 2013 until April 2013, President of Match Group NA, from December 2015 to December 2017, Chief Operating Officer of Tinder, from July 2017 to December 2017,[3] President, from January 2018 to March 2020, and CEO from March 2020 until May 2022.

As of January 1, 2013, Mandy Ginsberg was employed at MGL until April 2013, and then was employed again from December 2015 until January 2020. Ms. Ginsberg, while being an MGL employee, also had an engagement agreement with MGI from December 5, 2017 to March 1, 2020. The responsibilities Ms. Ginsberg held at MGI was CEO, from December 2017 to March 2020. Ms. Ginsberg also served as a Board Member of MGI from December 2017 to March 2020. The responsibilities Ms. Ginsberg held at MGL were CEO of Match.com, as of January 2013 until April 2013, CEO of Match Group NA, from December 2015 to December 2017, and CEO, from January 2018 to March 2020.

From January 2016 until December 2017, Gregory Blatt was employed at MGL. Mr. Blatt, while being an MGL employee, also had an engagement agreement with MGI from April 27, 2016 to December 5, 2017. The responsibilities Mr. Blatt held at MGI was Executive Chairman, from December 2013 to January 2016, and Chairman & CEO, from January 2016 to December 2017. Following MGI's Initial Public Offering in November 2015, Mr. Blatt also served as a Board Member of MGI from November 2015 to August 2018. The responsibilities Mr. Blatt held at MGL were CEO & President from January 2016 to December 2017.

---

[3] Ms. Dubey served as COO of Tinder starting in January 2017, when it was owned and operated by Tinder, Inc., a separate entity from MGL. Pursuant to a July 2017 merger, Tinder, Inc.'s assets and liabilities were acquired by Match Group, LLC.

As of January 1, 2013, Sam Yagan was employed at MGL until December 2015. The responsibilities Mr. Yagan held at MGI was CEO, as of January 2013 to December 2015. Mr. Yagan also served as a Board Member of MGI from December 2015 to September 2019. The responsibility Mr. Yagan held at MGL was CEO from April 2013 to December 2015.

As of January 1, 2013, and continuing until today, Amarnath Thombre has been employed at MGL. The responsibilities Mr. Thombre has held at MGI has been Chief Strategy Officer, as of January 2013 to December 2017, and CEO of Match Group Americas, from January 2018 to present. The responsibilities Mr. Thombre has held at MGL has been Chief Strategy Officer, as of January 2013 to December 2017, and VP & CEO of Match Group Americas, from January 2018 to present.

As of May 3, 2022, and continuing until today, Bernard Kim has been employed at MGL. Mr. Kim, while being an MGL employee, also has an engagement agreement with MGI as of May 3, 2022. The responsibilities Mr. Kim holds at MGI is CEO, and at MGL is CEO. Mr. Kim also currently serves as a Board Member of MGI, a role he has held since May 2022.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**FIRST AMENDED RESPONSE:**  In addition to the roles and responsibilities of Sam Yagan included above, Mr. Yagan was also employed at MGL as the General Manager of Match.com from March 2015 until March 2016.

Amarnath Thombre was employed at MGL until January 8, 2023. The responsibilities Mr. Thombre held at MGI as CEO of Match Group Americas ended January 8, 2023. The responsibilities Mr. Thombre held at MGL as VP & CEO of Match Group Americas ended January 8, 2023.

Furthermore, based on the November 1 Order and the Counts III and IV Agreement, MGL responds with respect to employees that had a role in the Guarantee or Chargeback Policy, or directly reported to anyone who was responsible or had a role in the Guarantee or Chargeback Policy: Ms. Dubey, Ms. Ginsberg, Mr. Blatt, Mr. Yagan, and Mr. Thombre.

**INTERROGATORY NO. 2:** Identify any contractual agreements that have ever existed between Match Group[,] Inc[.] and Match Group, LLC and state in detail the nature of those contractual agreements, the dates of their execution, and the terms of those agreements, and state on a month by month basis any payments made by or between Match Group[,] Inc[.] and Match Group[,] LLC as a result of any such contractual agreement.

**RESPONSE:** MGL objects to this Interrogatory as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Amended Complaint, by seeking exceedingly broad discovery regarding "any contractual agreements that have ever existed" between MGI and MGL, the detailed nature of those contractual agreements, the dates of their execution, the terms of those agreements, and a month-by-month statement of "any payments" made by or between MGI and MGL as a result of any such contractual agreement—regardless of any relevance to the claims in the Amended Complaint. MGL will respond only with respect to contractual agreements between MGI and MGL relating to Match.com's cancellation mechanisms. MGL further objects to the applicable time period for this Interrogatory as vague, ambiguous, and confusing because it seeks "*any* contractual agreements that have *ever* existed," which implies an unlimited time period aside from any relevance to the claims in the Amended Complaint. Likewise, MGL objects to the extent that the requested information already is in Plaintiff's possession, custody, or control, or is publicly available. Additionally, MGL objects to this Interrogatory as vague, ambiguous, and confusing in that it is not clear what the FTC means by the separate requirements it lists to "state in detail the nature of those contract agreements" and "the terms of those agreements." Moreover, MGL objects

to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as two of interrogatories against the 25 interrogatory limit.

Subject to and without waiving the foregoing objections, MGL responds as follows: There are no contractual agreements between MGI and MGL regarding Match.com's cancellation mechanisms.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 3:** Describe any criteria Match Group[,] LLC uses or has used to determine whether to grant a Customer's request for a refund relating to Ads, fraud or alleged fraud, Match Guarantees, consumer's belief that they had already canceled their subscription, or his or her claimed lack of knowledge about recurring charges.

**RESPONSE:** MGL objects to this Interrogatory as vague and confusing because this Interrogatory uses the defined term "Customer" before using the undefined term "consumer," and it is unclear whether the FTC intends for the terms to have the same meaning or different meanings. MGL further objects to this Interrogatory as overly broad and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Amended Complaint, as detailed below. Any information related to "fraud or alleged fraud" relates solely to Counts I and II, which the Court dismissed with prejudice on August 24, 2022. *See* Dkt. 129. Moreover, MGL objects to this Interrogatory because Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur.

Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as five of interrogatories against the 25 interrogatory limit. MGL further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules. Finally, MGL objects to this Interrogatory to the extent the information is already in Plaintiff's possession, custody, or control. MGL will respond solely as to the criteria used to determine whether to grant a Customer's request for a refund relating to the Customer's belief that they had already cancelled their subscription or his or her claimed lack of knowledge about recurring charges.

Subject to and without waiving the foregoing objections, MGL responds as follows: pursuant to Federal Rule of Civil Procedure 33(d), MGL directs the FTC to documents produced by MGI at MATCHFTC740484, MATCHFTC740485, MATCHFTC740487, MATCHFTC740492, MATCHFTC740500, MATCHFTC740502, MATCHFTC740507, MATCHFTC740509, MATCHFTC740514, MATCHFTC740519, MATCHFTC740527, MATCHFTC740532, MATCHFTC740535, MATCHFTC740536, MATCHFTC740542, MATCHFTC740548, MATCHFTC740549, MATCHFTC740551, MATCHFTC740553, MATCHFTC740555, MATCHFTC740561, MATCHFTC740564, MATCHFTC740570, MATCHFTC740578, MATCHFTC740586, MATCHFTC740587, MATCHFTC740619, MATCHFTC740684, MATCHFTC740687, MATCHFTC740690, MATCHFTC740693,

MATCHFTC740700,    MATCHFTC740865,    MATCHFTC740929,    MATCHFTC740967,

MATCHFTC740989,  MATCHFTC741061,  MATCHFTC741062,  MATCHFTC741063,  and

MATCHFTC741158.

MGL expressly reserves the right to supplement or amend this response, as discovery and

document production is ongoing.

**FIRST AMENDED RESPONSE:** Based on the November 1 Order and the Counts III and IV

Agreement,  MGL  directs  the  FTC  to  documents  produced  at  MATCHFTC741158,

MATCHFTC741063,    MATCHFTC740989,    MATCHFTC740967,    MATCHFTC740937,

MATCHFTC740929,    MATCHFTC740865,    MATCHFTC740803,    MATCHFTC740651,

MATCHFTC740619,    MATCHFTC740587,    MATCHFTC740578,    MATCHFTC740570,

MATCHFTC740555,    MATCHFTC740542,    MATCHFTC740536,    MATCHFTC740527,

MATCHFTC740514,    MATCHFTC810928,    MATCHFTC810933,    MATCHFTC810934,

MATCHFTC810986,    MATCHFTC810988,    MATCHFTC811088,    MATCHFTC811144,

MATCHFTC846462, MATCHFTC846464, and MATCHFTC846466.

**INTERROGATORY NO. 4:** Describe in complete detail the basis for your contention that
Match.com is wholly owned by Match Group[,] LLC or operated exclusively by Match Group[,]
LLC.

**RESPONSE:** MGL objects to this Interrogatory as vague and confusing because "wholly owned"

and "operated exclusively" are vague and undefined. MGL also objects to this Interrogatory to the

extent it seeks Privileged Information. MGL further objects to this Interrogatory to the extent it

seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or

control. MGL further objects to this Interrogatory as overly broad and unduly burdensome to the

extent that it requires MGL to describe "in complete detail" the basis for its contentions.

Additionally, MGL objects to this Interrogatory to the extent it calls for a legal conclusion.

Subject to and without waiving the foregoing objections, MGL responds as follows:

The basis for our contention that Match.com is owned and operated by MGL, is that MGL is the general operating company that owns and operates Match.com, as evidenced by numerous documents produced during the CID and this litigation showing MGL employees operating and controlling Match.com. Likewise, the Match.com Terms of Use provide that Match.com is operated by Match Group, LLC. Additionally, MGL is the entity that is the registrant, administrative, and technical contact for the domain Match.com, and MGL is the owner of the Match.com trademark.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 5:** Describe in complete detail any role that Match Group[,] Inc[.] or its employees have ever had relating to the operation or advertisement of Match.com, any action Match Group[,] Inc. or its employees have ever taken relating to the operation or marketing of Match.com, or any report that Match Group[,] LLC has ever made to Match Group[,] Inc[.] concerning the operation or advertisement of Match.com, including relating to the following topics:

      a.    Match.com's terms and conditions;

      b.    Polices or procedures related to the Match Guarantee;

      c.    Match.com's refund policies and procedures; and

      d.    Policies and procedures related to Match.com's cancellation mechanisms or the disclosure or advertisement of cancellation mechanisms.

**RESPONSE:** MGL objects to this Interrogatory as vague and confusing because it is unclear whether the Plaintiff is referring only to actions MGI's employees have taken in their role as an employee of or on behalf of MGI or actions an MGI employee has taken in their role as an employee of or on behalf of another entity that they may be employed by. MGL interprets this Interrogatory as referring to actions an employee of MGI has taken in their role as an MGI employee. MGL objects to "role," "report," "terms and conditions," and "policies or procedures" as vague and undefined, as MGL is not sure what Plaintiff means by such references. MGL will

give those terms their plain and ordinary meanings, and MGL will interpret "report," as it is used in this Interrogatory, to mean that the person receiving the communication from MGL on behalf of MGI was acting in his or her capacity as an MGI officer at the time of the communication. MGL further objects to this Interrogatory as extraordinarily broad and not proportional to the needs of the case because Plaintiff in this Interrogatory purports to seek "complete detail" about information far beyond the scope of Plaintiff's claims in the Amended Complaint, by seeking discovery of extensive information regarding "*any* role" MGI or its employees "*ever* had," "*any* action . . . *ever* taken," and "*any* report . . . *ever* made." MGL also objects to this Interrogatory because it improperly demands that MGL respond as to the knowledge of persons and/or entities other than MGL, namely MGI, as it seeks information regarding the actions and roles of MGI and its employees. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as four of interrogatories against the 25 interrogatory limit.

Moreover, Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. MGL also objects to the extent that this Interrogatory

suggests Match.com "cancellation mechanisms" are advertised and to the extent it suggests MGI operates Match.com. MGL will only respond with respect to subpart (d).

Subject to and without waiving the foregoing objections, MGL responds as follows:

Neither MGI nor its employees acting in their capacities as MGI employees has ever had any role or taken any action regarding the policies and procedures related to the design of Match.com's cancellation mechanisms or the disclosure or advertisement of cancellation mechanisms, as MGL is responsible for the policies and procedures related to Match.com's cancellation mechanisms and any disclosure of cancellation mechanisms. With respect to reports MGL has made to MGI related to Match.com's cancellation mechanisms or the disclosure of cancellation mechanisms, pursuant to Rule 33(d), MGL directs the FTC to any documents that may be produced by MGI responsive to Request for Production No. 2 in the FTC's First Set of Requests for Production to MGI.

**INTERROGATORY NO. 6**: Identify and describe in complete detail the full basis for each affirmative defense You have asserted in Your Answer, including but not limited to every fact and document that supports, contradicts, refutes, or rebuts that particular affirmative defense, and every witness who may have information or testimony relevant to that particular defense.

**RESPONSE:** MGL objects to this Interrogatory because "relevant" is vague and undefined because MGL and the FTC may have different understandings of what is "relevant" in this case. MGL also objects to the extent this Interrogatory seeks Privileged Information. MGL also objects to this Interrogatory as premature and to the extent it seeks to require MGL to marshal all of its evidence before trial. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is not in its possession, custody, or control, or that is already in Plaintiff's possession, custody, or control. To that end, MGL directs the FTC to MGL's Initial Disclosures, served on August 22, 2022, in which MGL provided the name of individuals likely to have discoverable information, along with the subjects of that information, that MGL may use

to support its claims or defenses. Lastly, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as ten interrogatories against the 25 interrogatory limit. *See White v. Cinemark USA, Inc.*, No. 04CV0397 GEB CMK, 2005 WL 3881658, at *3 (E.D. Cal. Mar. 28, 2005)(holding that "each affirmative defense should be treated as a separate interrogatory, since each defense may be both factually and logically different").

Subject to and without waiving the foregoing objections, MGL responds as follows:

First Affirmative Defense (Failure to State a Claim): The Amended Complaint fails to state a claim for the reason that the Guarantee and Chargeback policy at issue in Counts III and IV of the Amended Complaint were permanently discontinued prior to the FTC filing suit, and those practices have never and will never be reinstated, as the FTC is aware from multiple communications, along with the Notice of Stipulation Regarding Permanently Discontinued Practices on Match.com, recently filed on September 20, 2022, at Dkt. 146. Thus, neither MGL nor Match.com are violating, nor are they about to violate, the FTC Act.

Second Affirmative Defense (Compliance with Applicable Law): The Amended Complaint's Count V fails as MGL did not violate Section 4 of ROSCA, 15 U.S.C. § 8403. Rather, at all times with respect to Count V, Match.com complied with all applicable laws and acted reasonably and in good faith. As a preliminary matter, even assuming that the online cancellation flow at issue in Count V is not simple (although it is), the plain language of ROSCA requires only "simple mechanisms" for cancellation, and ROSCA does not provide that every cancellation method must be simple. Count V fails because Match.com offers several other cancellation methods in full compliance with ROSCA, including simple methods to cancel by phone, fax, email, internet chat, or standard mail. *See infra* Resp. to Interr. No. 15 (explaining multiple

cancellation mechanisms and citing documents related to same). And the FTC challenges only the online cancellation method. Thus, even if the FTC were correct (which it is not) that the online cancellation flow is not simple, the existence of other unchallenged methods of cancellation defeats the FTC's claim.

Count V also fails because the Match.com online cancellation flow is not complicated or in any material way different from numerous other online subscription cancellation mechanisms. It is essentially industry standard. Consumers in fact readily canceled using the Match.com online cancellation flow, as reflected by data proving that subscribers have no difficulty canceling via the online cancellation flow, which can be completed in less than one minute. *See infra* Resp. to Interr. No. 15 (explaining multiple cancellation mechanisms and citing documents related to same). Based on data reviewed during the FTC's pre-suit investigation, on average, 89% of Match.com subscribers who initiated an online cancellation request successfully canceled their subscription within the same day.

Third Affirmative Defense (Good Faith Belief and Conduct): Match.com's online cancellation flow was designed and implemented to be simple and readily accessible to users. *See infra* Resp. to Interr. No. 15 (explaining online cancellation flow and citing documents and videos related to same).

Fourth Affirmative Defense (Requested Relief Contrary to Public Policy): The FTC's requested relief with respect to Count V is contrary to the public interest because Match.com's online cancellation flow is intended to benefit consumers by protecting their privacy (by requiring them to insert their passwords prior to accessing private account information, such as billing), offering them discounted rates, and allowing Match.com to understand how to better serve them.

*See infra* Resp. to Interr. No. 15 (explaining online cancellation flow and citing documents and videos related to same).

Fifth Affirmative Defense (Alleged Failure to Clearly and Conspicuously Disclose Not Material): Any alleged failure by Match.com to clearly and conspicuously disclose some requirements of the Guarantee practice was not material because most consumers who did not qualify for the Guarantee failed to satisfy the requirements that were unquestionably adequately disclosed (i.e., the requirements in the numbered and bullet-pointed list in the Program Rules). So even had other requirements been *more* clearly and conspicuously disclosed (or waived), most users would not have been eligible for a Guarantee regardless.

Sixth Affirmative Defense (Mootness): As to Count III, MGL asserts the FTC's claim for injunctive relief is moot under applicable law. The FTC admits in its Amended Complaint that this Guarantee practice at issue in Count III ceased in mid-2019 (but it was actually permanently discontinued in April 2019). MGL asserts Count IV is also moot, because, as the FTC admits in its Amended Complaint, Match.com's chargeback practice ceased in mid-2019 (but it was actually permanently discontinued in March 2019). Count IV's claim for injunctive relief is therefore also moot. There is nothing to enjoin because the challenged practices have been permanently discontinued, and MGL will not reinstitute those practices. *See, e.g.*, Notice of Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146.

Seventh Affirmative Defense (Overbroad Injunction): The FTC's requested injunction with respect to Count III and the "Guarantee" practice is overbroad and not specifically tailored to the violations alleged in the Amended Complaint. The FTC's requested injunction with respect to Count IV and the chargeback policy is overbroad and not specifically tailored to the violations alleged in the Amended Complaint. Finally, the FTC's requested injunction is overbroad and not

specifically tailored to the violations alleged in the Amended Complaint. In particular, the FTC's requested injunction is overbroad not only because the Amended Complaint fails to allege all necessary facts, but also because the FTC attempts to apply such injunction to brands other than Match.com that are not implicated by the Amended Complaint.

Eighth Affirmative Defense (Mitigation): With respect to Count V, the FTC has not offered any reliable methodology for quantifying alleged consumer harm, and any restitution amount would be subject to mitigation to the extent that consumers received refunds or utilized the services on the renewed subscription.

Ninth Affirmative Defense (Statute of Limitations): The FTC's claims are barred in part by the statute of limitations, including, but not limited, to the extent that the FTC seeks civil penalties, monetary relief, or redress for purported violations that occurred outside of the applicable statute of limitations.

Tenth Affirmative Defense (Reservation of Other Affirmative Defenses): MGL lacks sufficient information regarding the facts and evidence alleged and is therefore unable to ascertain at this time any additional affirmative defenses which MGL may have. Therefore, MGL expressly reserves the right to amend its Answer to assert such other affirmative defenses as may become apparent subsequent to the filing of its Answer, whether in discovery, at trial, or otherwise.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**SECOND AMENDED RESPONSE:** Match.com no longer operates a Customer Care call center. Instead, consumers are encouraged to use Match.com self-help options (such as the Help/FAQ pages on Match.com or the online cancellation flow), or to contact Customer Care via other methods, such as the Customer Care online chat or email address. Match.com does not currently include a Customer Care phone number on its website. Consumers that contact Match.com's Customer Care phone number are provided with an automated recording. That recording provides consumers with help regarding various topics, including providing instructions on how to cancel their Match.com subscription via the online cancellation flow. Consumers are also informed that they may receive personalized support through the Customer Care online chat or email address. Each segment of the automated phone recording has been produced at MATCHFTC846840–MATCHFTC846846. While a consumer may no longer cancel a Match.com subscription by calling the Match.com Customer Care phone number and talking to a live agent, the consumer may still cancel a Match.com subscription via numerous other methods, including the online cancellation flow, online chat, email, U.S. mail, and fax. *See infra* Resp. to Interr. No. 15.

**INTERROGATORY NO. 7:** Identify any tests, reports, A/B testing, Customer surveys, usability tests, focus groups, or other user experience studies, whether formal or informal, related to:

    a.     Match Guarantees;

    b.     Chargebacks related to Match.com subscriptions; and

    c.     Means and ease of subscription renewal or cancellation for Match.com subscriptions.

Your response to this Interrogatory should include descriptions of the types of usability studies, beta studies, and surveys that the response covers. In addition, please provide Your response in machine-readable format, for example, in a .csv or spreadsheet file format.

**RESPONSE**: MGL objects to this Interrogatory because "tests," "reports," "A/B testing," "Customer surveys," "usability tests," "focus groups," "other user experience studies," "formal,"

"informal," "usability studies," "beta studies," and "surveys" are vague and undefined, and to the extent this Interrogatory seeks Privileged Information. MGL also objects to this Interrogatory to the extent the request to "provide [the] response in machine-readable format" imposes obligations on MGL that exceed those imposed by the Rules or the ESI Order. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Counts III and IV in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as three interrogatories against the 25 interrogatory limit. MGL further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

Subject to and without waiving the foregoing objections, MGL responds with respect to subpart (c) as follows: pursuant to Federal Rule of Civil Procedure 33(d), MGL directs the FTC to documents produced in response to the FTC's RFP No. 26 to MGI.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**FIRST AMENDED RESPONSE:** Based on the November 1 Order and the Counts III and IV Agreement, MGL responds with respect to subparts (a) and (b) as follows: pursuant to Federal Rule of Civil Procedure 33(d), MGL directs the FTC to documents produced in response to the FTC's RFP No. 26 to MGI or to the FTC's RFP No. 33 to MGL.

**INTERROGATORY NO. 8:** On a monthly basis, state:

a.      the number of Match.com subscriptions subject to the Guarantee sold;

b.      the number of Guarantee Extensions that Match Group[,] LLC provided Customers;

c.      the number of Customer inquiries regarding the automatic renewal of subscriptions subject to the Match Guarantee;

d.      the number of refund requests Customers submitted to Match Group[,] LLC relating to Match Guarantees and the dollar amount of these requested refunds; and

e.      the number of refunds Match Group[,] LLC granted relating to Match Guarantees and the amount of money refunded relating to Match Guarantees.

**RESPONSE:** MGL objects to this Interrogatory because "subscriptions" and "inquiries" are vague and undefined and to the extent this Interrogatory seeks Privileged Information. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons,

discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as five interrogatories against the 25 interrogatory limit.

Subject to and without waiving the foregoing objections, MGL responds that it permanently discontinued the Guarantee in April 2019. It has not offered the Guarantee since that date, and it will not reinstitute the Guarantee in the future.

**FIRST AMENDED RESPONSE:** Based on the November 1 Order and the Counts III and IV Agreement, MGL responds as follows: pursuant to Rule 33(d), MGL directs the FTC to a document that will be produced containing data responsive to the Interrogatory. Once produced, MGL will identify the document by Bates number.


**INTERROGATORY NO. 9:** State all limitations on Customers' rights to redeem a Match Guarantee or receive a Guarantee Extension and all actions consumers had to complete to redeem a Match Guarantee or receive a Guarantee Extension. For each such limitation or action Identify:

  a.    the date such limitation was implemented and/or eliminated; and
  b.    all advertisements, notices, disclosures, or other notifications where Match disclosed the need to complete that action.

**RESPONSE:** MGL objects to this Interrogatory because "rights to redeem" and "Match" are vague and undefined and to the extent this Interrogatory seeks Privileged Information. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding

Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as two interrogatories against the 25 interrogatory limit.

Subject to and without waiving the foregoing objections, MGL responds that it permanently discontinued the Guarantee in April 2019. It has not offered the Guarantee since that date, and it will not reinstitute the Guarantee in the future.

**FIRST AMENDED RESPONSE:** Based on the November 1 Order and the Counts III and IV Agreement, MGL responds as follows: from January 1, 2013 (the beginning of the applicable time period, as specified in the Interrogatories) until April 2019, when the Guarantee was permanently discontinued, all requirements for consumers to redeem the Guarantee or receive a Guarantee Extension are detailed below. A more detailed explanation of how the requirements to redeem the Guarantee were clearly and conspicuously disclosed is below. *See infra* Resp. to Interr. No. 10.

Before the Guarantee was permanently discontinued in April 2019, there were three reasonable and clearly disclosed requirements for the Guarantee. To qualify, a new subscriber had to (1) post an approved profile within seven days of activating the subscriber's membership; (2) communicate with at least five unique Match.com members each month; and (3) if eligible,

redeem the Guarantee sometime during the last seven days of the initial six-month subscription. These requirements were disclosed in order of occurrence. Clicking on a "Learn more" hyperlink took a user to the below box with graphics that highlight the need to create and post a profile and communicate with at least five unique Match.com members each month. This is shown below. *See* MATCHFTC774536;



Below this box, the full Guarantee requirements appeared in 13 clearly bulleted points with space between each bullet, many of which were either requirements of using the site in the first place (such as obeying the terms of use) or basic best practices for its use (such as creating a profile with a photograph). The Program Rules are reproduced below. *See* MATCHFTC774568; MATCHFTC774563.

We know you'll meet tons of great people during your 6-month subscription with us. But, if you don't find someone special during that time, we'll give you an ADDITIONAL 6 months to continue your search. Check out the rules below, then get out there and start connecting today!

- Under the I Met Someone GUARANTEE Program, (the "Guarantee Program" or the "Program") if you don't find someone special during a qualifying six-month paid subscription to the Match.com service, we'll give you an additional six-month subscription (the "Guarantee Extension") to the Match.com service at no additional expense. See Match.com Terms of Use for details regarding the Match.com service and use of the Match.com website.

- The Guarantee Program is available for a limited time only, and open to anyone not currently participating in the Program. Additionally, to be eligible for the Program and the Guarantee Extension, you must:

- (1) Comply at all times with the Match.com Terms of Use. By using the Match.com website and participating in the Program, you agree to be bound by the Match.com Terms of Use.

- (2) Pay in full the applicable rate for a **six-month subscription** to the Match.com service (the "Guarantee Program Subscription"). The Guarantee Program Subscription consists of five consecutive 30-day periods followed by a final period of 33 days, all of which are referred to as a "Month" in these Program rules. If you are enjoying the benefits of a free trial of the Match.com service, your Guarantee Program Subscription will not begin until your free trial period ends.

- (3) Use your Guarantee Program Subscription to **create a profile with a primary photo**. Your profile and primary photo must be approved by Match.com within the first seven days of your Guarantee Program Subscription in order for you to be eligible for the Guarantee Program. Details on approval of profile and primary photo available at FAQ and How It Works.

- (4) **Keep your profile with primary photo visible at all times** during your Guarantee Program Subscription.

- (5) **Communicate** during your Guarantee Program Subscription with other Match.com subscribers with whom you have not previously communicated during your Guarantee Program Subscription ("Unique Match.com Subscribers").

- (6) Send a "Qualifying Email" to a minimum of five other Unique Match.com Subscribers each Month during your Guarantee Program Subscription. A "Qualifying Email" may be either one you send to a Unique Match.com Subscriber who has not yet emailed you or an email response you send to a Unique Match.com Subscriber who has emailed you. A "Qualifying Email" must be an email sent through the Match.com service and does not include any other method of communicating (such as Match.com winks, MatchPhone™, Match.com Instant Messaging or emails sent outside of the Match.com system).

- Progress toward eligibility for the Guarantee Extension may be determined at any time during a Guarantee Program Subscription by visiting the progress page associated with such Guarantee Program Subscription (the "Guarantee Program Progress Page"). If, during the last seven days of a Guarantee Program Subscription, you are eligible for a Guarantee Extension (and have not met that "special someone"), you may accept the Guarantee Extension by affirming on the Guarantee Program Progress Page that you have not met someone special during your Guarantee Program Subscription. Please see the Match.com Guarantee FAQ for further information. You may also contact Customer Care with any questions related to the Match.com service or the Program. Match.com alone will make all decisions under these Program rules regarding Program policies, including but not limited to Program and Guarantee Extension eligibility.

- Customers eligible to receive a Guarantee Extension will not receive a refund, money or any other thing of value as a substitute for the Guarantee Extension. The Guarantee Extension may only be used by the purchaser of the Guarantee Program Subscription, and the Guarantee Extension may not be sold or transferred in any way.

- Guarantee Program Subscriptions which do not result in a Guarantee Extension (due to ineligibility of the subscriber or failure of the subscriber to accept the Guarantee Extension) will automatically be continued for successive six-month subscription periods at the subscription rate in effect at the time of continuation. See Match.com Terms of Use for details regarding Match.com subscriptions and charges on your billing account.

- The Match.com Terms of Use and the Match.com Guarantee Program Rules are subject to change by Match.com at any time, effective upon posting on the Match.com website, and your use of the Match.com service and your initial or continued participation in the Match.com Guarantee Program after such posting will constitute acceptance by you of such changes. Match.com reserves all rights to modify, suspend or cancel the Program at any time and without notice.

- Program rules last updated January 24th, 2008.

The requirements above were repeated in the bullet points. Information on how to redeem the Guarantee at the end of the six-month subscription appeared as the ninth bullet point. Notably, because MGL recognized that certain users might have needed to refresh their understanding of how the Guarantee worked, all of Match.com's webpages displayed a "Guarantee" hyperlink, which could take the subscriber to this information, as they near the end of their six-month subscription.

In April 2019, the Guarantee was permanently discontinued.

**INTERROGATORY NO. 10:** Describe in complete detail the basis for your contention that the terms of the Match Guarantees were adequately disclosed.

**RESPONSE:** MGL objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Subject to and without waiving the foregoing objections, MGL responds that it permanently discontinued the Guarantee in April 2019. It has not offered the Guarantee since that date, and it will not reinstitute the Guarantee in the future.

**FIRST AMENDED RESPONSE:** Based on the November 1 Order and the Counts III and IV Agreement, MGL responds as follows: the Guarantee was permanently discontinued in April 2019. Even when the Guarantee was offered, the terms of the Guarantee were clearly and conspicuously disclosed, as detailed below.

When consumers viewed subscription plans offered on Match.com, they were presented with a graphic chart that offered three multi-month subscription plans of varying lengths. Next to

the six-month subscription option, a prominent and colorful icon stated "Match* Guarantee." Clicking the icon opened a text balloon with text explaining the general nature of the Guarantee and inviting consumers to click on a hyperlink labeled "Learn more" to see the full details of the Guarantee. This is reproduced below. *See* MATCHFTC774523.



Clicking on the "Learn more" hyperlink took consumers to a webpage where the complete terms of the Guarantee were presented.

In addition, all of Match.com's webpages displayed a "Guarantee" hyperlink along a bottom banner, and consumers who clicked on this hyperlink were taken directly to a page with additional information about Match.com subscriptions and the Guarantee. This page also provided another copy of the full "Program Rules." This is reproduced below. *See* MATCHFTC774536; MATCHFTC774568; MATCHFTC774563.



## I Met Someone GUARANTEE (formerly "Make Love Happen Guarantee") Program Rules

**We know you'll meet tons of great people during your 6-month subscription with us. But, if you don't find someone special during that time, we'll give you an** ADDITIONAL 6 months **to continue your search. Check out the rules below, then get out there and start connecting today!**

- Under the I Met Someone GUARANTEE Program, (the "Guarantee Program" or the "Program") if you don't find someone special during a qualifying six-month paid subscription to the Match.com service, we'll give you an additional six-month subscription (the "Guarantee Extension") to the Match.com service at no additional expense. See Match.com Terms of Use for details regarding the Match.com service and use of the Match.com website.

- The Guarantee Program is available for a limited time only, and open to anyone not currently participating in the Program. Additionally, to be eligible for the Program and the Guarantee Extension, you must:

- (1) Comply at all times with the Match.com Terms of Use. By using the Match.com website and participating in the Program, you agree to be bound by the Match.com Terms of Use.

- (2) Pay in full the applicable rate for a **six-month subscription** to the Match.com service (the "Guarantee Program Subscription"). The Guarantee Program Subscription consists of five consecutive 30-day periods followed by a final period of 33 days, all of which are referred to as a "Month" in these Program rules. If you are enjoying the benefits of a free trial of the Match.com service, your Guarantee Program Subscription will not begin until your free trial period ends.

- (3) Use your Guarantee Program Subscription to **create a profile with a primary photo**. Your profile and primary photo must be approved by Match.com within the first seven days of your Guarantee Program Subscription in order for you to be eligible for the Guarantee Program. Details on approval of profile and primary photo available at FAQ and How It Works.

- (4) **Keep your profile with primary photo visible at all times** during your Guarantee Program Subscription.

- (5) **Communicate** during your Guarantee Program Subscription with other Match.com subscribers with whom you have not previously communicated during your Guarantee Program Subscription ("Unique Match.com Subscribers").

- (6) **Send a "Qualifying Email" to a minimum of five other Unique Match.com Subscribers each Month during your Guarantee Program Subscription.** A "Qualifying Email" may be either one you send to a Unique Match.com Subscriber who has not yet emailed you or an email response you send to a Unique Match.com Subscriber who has emailed you. A "Qualifying Email" must be an email sent through the Match.com service and does not include any other method of communicating (such as Match.com winks, MatchPhone™, Match.com Instant Messaging or emails sent outside of the Match.com system).

- Progress toward eligibility for the Guarantee Extension may be determined at any time during a Guarantee Program Subscription by visiting the progress page associated with such Guarantee Program Subscription (the "Guarantee Program Progress Page"). If, during the last seven days of a Guarantee Program Subscription, you are eligible for a Guarantee Extension (and have not met that "special someone"), you may accept the Guarantee Extension by affirming on the Guarantee Program Progress Page that you have not met someone special during your Guarantee Program Subscription. Please see the Match.com Guarantee FAQ for further information. You may also contact Customer Care with any questions related to the Match.com service or the Match.com alone will make all decisions under these Program rules regarding Program policies, including but not limited to Program and Guarantee Extension eligibility.

- Customers eligible to receive a Guarantee Extension will not receive a refund, money or any other thing of value as a substitute for the Guarantee Extension. The Guarantee Extension may only be used by the purchaser of the Guarantee Program Subscription, and the Guarantee Extension may not be sold or transferred in any way.

- Guarantee Program Subscriptions which do not result in a Guarantee Extension (due to ineligibility of the subscriber or failure of the subscriber to accept the Guarantee Extension) will automatically be continued for successive six-month subscription periods at the subscription rate in effect at the time of continuation. See Match.com Terms of Use for details regarding Match.com subscriptions and charges on your billing account.

- The Match.com Terms of Use and the Match.com Guarantee Program Rules are subject to change by Match.com at any time, effective upon posting on the Match.com website, and your use of the Match.com service and your initial or continued participation in the Match.com Guarantee Program after such posting will constitute acceptance by you of such changes. Match.com reserves all rights to modify, suspend or cancel the Program at any time and without notice.

- Program rules last updated January 24th, 2008.

As shown above, the Program Rules page disclosed the Guarantee requirements that consumers were required to satisfy during a six-month subscription in clear, easy to read text, and in easily understandable language. The information was also presented in separate bulleted paragraphs with space between the paragraphs, making the page easy for consumers to read. Match.com further emphasized the primary actions that each subscriber had to take to become eligible for the Guarantee by using a bolded font.

As identified in the Program Rules, to assist consumers in tracking their progress toward the Guarantee, Match.com designed a webpage specifically dedicated to displaying consumers' status toward meeting the Guarantee requirements: the "Progress Page." Subscribers could track their Guarantee progress at all times during their six-month Guarantee-eligible subscription by visiting the Progress Page. The Progress Page is reproduced below. *See* MATCHFTC774538; MATCHFTC774527.



The Guarantee was designed to be easily redeemable directly on the Match.com platform through the Progress Page. During the last seven days of the Guarantee-eligible subscription, when subscribers visited the Progress Page, they were prompted to indicate whether or not they had met someone. If they had not met someone, subscribers could directly affirm that fact on the Progress Page. If they had taken all of the Guarantee-required actions and affirmed that they had not met someone during the Guarantee-eligible subscription period, Match.com would automatically

provide the subscriber with complimentary access to Match.com for the following six-month period subscription, i.e., a Guarantee Extension. Subscribers could also contact Match.com Customer Care directly during the last seven days of the Guarantee-eligible subscription period to redeem the Guarantee.

**INTERROGATORY NO. 11:** Identify the number of consumers whose request for a Guarantee Extension were denied due to that limitation or for failing to complete that particular action.

**RESPONSE:** MGL objects to this Interrogatory because "that limitation" and "that particular action" are vague and undefined and to the extent this Interrogatory seeks Privileged Information. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Subject to and without waiving the foregoing objections, MGL responds that it permanently discontinued the Guarantee in April 2019. It has not offered the Guarantee since that date, and it will not reinstitute the Guarantee in the future.

**FIRST AMENDED RESPONSE**: Based on the November 1 Order and the Counts III and IV Agreement, MGL responds as follows: the terms "that limitation" and "that particular action" are so vague and undefined that MGL does not understand the information that the FTC is seeking with this Interrogatory. MGL invites the FTC to serve a more precise interrogatory or to otherwise explain to MGL the information that the FTC seeks with this Interrogatory.

**INTERROGATORY NO. 12:** Describe all of Match's policies relating to Customer Chargebacks, including regarding:

a.    the circumstances in which Match Group[,] LLC will dispute a Customer Chargeback;

b.    denying Customer account access due to a Chargeback request;

c.    deleting or reinstating accounts of consumers who unsuccessfully attempt a Chargeback and when such deletions or reinstatements are effective; and

d.    the effective dates of the policies.

**RESPONSE:** MGL objects to this Interrogatory because "Match" is undefined, and it is unclear what the FTC means by "Match," given the FTC's history and positions taken in this litigation. MGL further objects to this Interrogatory because "denying Customer account access due to a Chargeback request" is vague and confusing; MGL will interpret that subpart of the Interrogatory to mean users that had active subscriptions and were not refunded. MGL also objects to the extent this Interrogatory seeks Privileged Information. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued "Chargebacks" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count IV in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus,

the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass. Furthermore, the circumstances in which MGL decides to dispute a chargeback are irrelevant, as they are unrelated to the conduct challenged in the Amended Complaint (conduct *after* a chargeback dispute has been resolved). Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as four interrogatories against the 25 interrogatory limit. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control.

Subject to and without waiving the foregoing objections, MGL responds as follows: in March 2019, Match.com, by and through its owner and operator, MGL, discontinued the chargeback policy challenged in the Amended Complaint. It has not implemented the challenged chargeback policy since that date, and it will not reinstitute the challenged chargeback policy in the future. MGL's current chargeback policy is as follows: When a user with an active subscription initiates a chargeback, MGL hides that user's profile (because that user has indicated that he or she no longer wishes to appear on the site), and disables the user's account login (because the user is disputing payment for the service that MGL provides). If MGL disputes the chargeback and prevails, and has not already refunded the user, then MGL re-enables the user's account login, restores the amount of subscription time the user had remaining at the time the account was disabled, and sends the user an email notifying the user that his or her account has been reactivated and containing instructions about how to un-hide his or her profile. For the avoidance of doubt, if

MGL prevails in a chargeback billing dispute with a consumer, MGL does not fail to provide the Consumer access to the consumer's Match.com account or to the subscription service(s) that the consumer paid for, nor does it terminate the consumer's account or delete the consumer's profile because of the chargeback billing dispute in which MGL prevailed.

**FIRST AMENDED RESPONSE**: Based on the November 1 Order and the Counts III and IV Agreement, MGL responds as follows: since July 2013, MGL has disputed chargebacks if it has reason to believe that the chargebacks were frivolous or fraudulent. *See, e.g.*, MGI Resp. to FTC's Suppl. Written Questions, dated June 8, 2018, at 28-29 (providing percentage of chargebacks successfully disputed on monthly basis from Jan. 1, 2013 (though Match.com did not start disputing chargebacks until July 2013) to Apr. 1, 2018).

Before the Chargeback Policy was permanently discontinued in March 2019, if a user initiated a chargeback of Match.com's subscription charges, the user's subscription was suspended because the user had indicated that he or she was disputing the charge for Match.com's services, and no longer wished to appear on the site. If the user prevailed, the charge was reversed, and no further action was required by the user or taken by MGL. If the dispute was resolved in MGL's favor, a user's subscription would not be automatically reactivated for the time that remained until the user requested that the user's account be reactivated, due to MGL's understanding that the user no longer wanted the Match.com service. However, MGL's policy was to reactivate the account and provide a credit for lost time in the event of such contact by a user.

**INTERROGATORY NO. 13:** Describe in complete detail the basis for your contentions that:

    a.    Match.com's Chargeback policy was a reasonable policy designed to protect consumers;

    b.    That Match.com's Chargeback policy was employed to address wrongful Chargeback requests; and

    c.    That subscribers disputing subscription charges were "de facto indicating" that they no longer desired access to their accounts.

**RESPONSE:** MGL objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued "Chargebacks" and related practices, and MGL has repeatedly told the FTC this orally and in writing MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count IV in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The FTC has not alleged that MGL's current chargeback policy (described in response to Interrogatory No. 12) is unreasonable or in violation of the law. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as three interrogatories against the 25 interrogatory limit.

Subject to and without waiving the foregoing objections, MGL responds as follows: MGL discontinued the chargeback policy challenged in the Amended Complaint in March 2019. It has not implemented the challenged chargeback policy since that date, and it will not reinstitute the challenged chargeback policy in the future.

**FIRST AMENDED RESPONSE:** Based on the November 1 Order and the Counts III and IV Agreement, MGL responds as follows: the Chargeback Policy was permanently discontinued in March 2019. Even when the Chargeback Policy did exist, the Chargeback Policy was used to

address wrongful chargeback requests. When subscribers started a chargeback, it indicated to MGL that they no longer desired access to their accounts.

First, the Chargeback Policy was intended to comply with a consumer's obvious directive to no longer be on the Match.com platform. Prior to the permanent discontinuation of the Chargeback Policy, when a consumer initiated a chargeback through the consumer's financial institution, the consumer's subscription was suspended because the consumer had indicated that he or she was disputing the charge for Match.com's services, and no longer wished to appear on the site. If MGL disputed the chargeback and the dispute was resolved in MGL's favor, the consumer was able to request that the consumer's account be reactivated. MGL's policy was to reactivate the account and provide a credit for lost time in the event of such contact by a consumer; however, the consumer's account was not automatically reactivated due to MGL's understanding that the consumer no longer wanted to be on the Match.com platform.

In other words, if the consumer initiated a dispute of Match.com's subscription charges, the consumer was indicating that the consumer no longer wanted the Match.com subscription service. By initiating a chargeback, the consumer was indicating that the consumer had not authorized the charge in which access to the Match.com subscription at issue had been purchased. According to the FTC's own guidance, consumers can dispute a credit card for "unauthorized charges."[4] Additionally, in some cases (for example, if the consumer was in a serious relationship), maintaining the consumer's profile on Match.com could cause significant embarrassment or harm for the consumer. Conversely, if the consumer did in fact want to be on the Match.com platform, it was MGL's policy to reactivate the consumer's account and provide a credit to the consumer for lost time in the event the consumer contacted Match.com. These terms were clearly and

---

[4] https://consumer.ftc.gov/articles/using-credit-cards-disputing-charges

conspicuously set forth in the Match.com Terms of Use Agreement effective at the time of the Chargeback Policy. *See* MATCHFTC774614.

Second, the Chargeback Policy was also a reasonable policy designed to protect consumers because it served as a deterrent to consumers filing frivolous or costly billing disputes with Match.com, as such costs would ultimately have to be passed onto subscribers. More specifically, Match.com must defend against an unusually high number of frivolous (and likely fraudulent) billing disputes, which is shown by Match.com's greater than average win rate in billing disputes. *See, e.g.*, MGI Resp. to FTC's Suppl. Written Questions, dated June 8, 2018, at 28-29 (providing percentage of chargebacks successfully disputed on monthly basis from Jan. 1, 2013 (though Match.com did not start disputing chargebacks until July 2013) to Apr. 1, 2018). Match.com's costs in defending billing disputes are substantial, and such costs must ultimately be passed onto subscribers. Thus, the Chargeback Policy served as a deterrent to consumers filing illegitimate billing disputes, which is another reason the Chargeback Policy was a reasonable policy designed to benefit consumers.

**INTERROGATORY NO. 14:** On a monthly basis, state:

    a.    the number of Customer communications Match Group[,] LLC received regarding account cancellation or cancellation processes;

    b.    the number of refund requests made by Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

    c.    the dollar value of the refund requests made by Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

    d.    the number of refunds Match provided to Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

    e.    the dollar value of the refunds provided to Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

    f.    the amount charged to Customers who had requested a refund on the basis that they believed they had cancelled and had this request denied by Match Group[,] LLC; and

g.      the amount charged to Customers who had requested a refund on the basis that they were unaware of Match Group[,] LLC's recurring charge and had this request denied by Match Group[,] LLC.

**RESPONSE:** MGL objects to this Interrogatory because "Match" is undefined, and it is unclear what the FTC means by "Match," given the FTC's history and positions taken in this litigation. MGL will respond only as to Match.com, the only dating site relevant in this action. MGL further objects to this Interrogatory because "Customer communications," "account cancellation or cancellation processes," "attempted," "believed," and "claimed," are vague and undefined. In particular, MGL objects that it would be impossible to provide the "the number of Customer communications Match Group[,] LLC received regarding account cancellation or cancellation processes," as requested in subpart (a), so MGL will provide the number of Customers who cancelled their subscriptions. MGL also objects that it is impossible to identify Customers who "attempted to cancel," so MGL will respond to subparts (b), (d), and (e) only as to "Customers who claimed they believed they already canceled their subscriptions." MGL further objects that subpart (c) is vague and incalculable because, although MGL is able to ascertain which Customers requested and received a refund, MGL is not able to provide the amount of the refund that each Customer sought from MGL, which could be different from the amount of the refund that the Customer actually received from MGL. MGL also objects that subpart (f) is confusing and impossible to calculate, as MGL does not understand what information the FTC seeks in this subpart, and MGL is not able to interpret the subpart in such a way that it could provide any other information than what MGL is already providing for the other subparts. MGL further objects to this entire Interrogatory as overly broad and unduly burdensome, particularly as it relates to subpart (g), as recurring charges (in the absence of a request to cancel) are not relevant to any party's claim or defense. MGL also objects that each subpart seeks information beyond the scope of the

applicable statute of limitations period for any purported right of the FTC to monetary relief or redress against MGL, so MGL will provide information for the period beginning three years before the FTC filed the Amended Complaint and named MGL as a defendant. *See* Am. Compl., Dkt. 116 (filing Amended Complaint and naming MGL as defendant on July 19, 2022).

MGL also objects to this Interrogatory to the extent this Interrogatory seeks Privileged Information. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as seven interrogatories against the 25-interrogatory limit. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, MGL does not concede the relevancy of this Interrogatory nor the relevancy or admissibility of any information provided in response thereto. That information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case.

Subject to and without waiving the foregoing objections, MGL responds as follows:

Pursuant to Rule 33(d), MGL directs the FTC to documents that will be produced by MGL containing data responsive to the Interrogatory. Once produced, MGL will identify those documents by Bates number.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 15:** Describe each method through which consumers could cancel their subscriptions. For each such method, describe in detail:

 a. every instance in which Match Group[,] LLC informed consumers of or disclosed to consumers the availability of each method;

 b. each step that consumers would have to take in order to successfully cancel their Match.com subscription; and

 c. each representation that Match has made to consumers at each step in the cancellation process.

**RESPONSE:** MGL objects to this Interrogatory because "Match" is undefined, and it is unclear what the FTC means by "Match," given the FTC's history and positions taken in this litigation; MGL will interpret "Match" to mean MGL. MGL also objects that this Interrogatory is vague and ambiguous because it does not identify what subscriptions are at issue. MGL will interpret this Interrogatory to ask about Mach.com subscription. MGL further objects that subparts (b) and (c) of this Interrogatory are vague and undefined because the differences between what the FTC seeks within each subpart are not clear. MGL also objects to the extent this Interrogatory seeks Privileged Information. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, MGL does not concede the relevancy of this Interrogatory nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case.

 Subject to and without waiving the foregoing objections, MGL responds as follows:

 Match.com offers multiple simple mechanisms for consumers to cancel their subscriptions, including by the Match.com online cancellation flow, online chat, telephone, email, U.S. mail, and

fax. Match.com discloses these simple cancellation mechanisms throughout the registration process and Match.com, including in Match.com Frequently Asked Questions ("FAQ") pages. Consumers frequently and successfully use such mechanisms to cancel their subscriptions. *See, e.g.*, *infra* Resp. to Interr. No. 16.

Match.com discloses how to cancel a subscription throughout the registration process on the first page of the subscription flow, the billing page before the consumer subscribes, and the subscription confirmation page if the consumer subscribes. Before consumers select a subscription plan or provide billing information, consumers have access to a "Billing—Continuous Service" screen, which provides, "To change or cancel your subscription at any time, click the 'Account' link on the upper-right corner of the website and follow the directions. You can also change or cancel your subscription by contacting our Customer Care team as directed on the website."

Before consumers subscribe, Match.com again informs consumers of the cancellation mechanisms on the billing page with a disclosure above the "Subscribe Now" button. The disclosure provides that consumers can "cancel via the Account Settings page." A hyperlink with the words "Learn More" also appears in blue text near the "Subscribe Now" button, and "Learn More" again leads to the "Billing—Continuous Service" screen that describes the cancellation mechanisms in greater detail. In addition, immediately to the left of the "Subscribe Now" button is a hyperlink to the Match.com Terms of Use in blue text. The Terms of Use[5] provide in red text, "If you purchase a subscription, it will automatically renew until you cancel, in accordance with the terms disclosed to you at the time of purchase, as described below." The Terms of Use further provide a mailing address and fax number to send cancellation notices, which consumers have recently utilized to cancel their subscriptions. *See, e.g.*, MATCHFTC744797 (cancelling via U.S.

---

[5] https://cp.match.com/en-us/resources/TermsOfUse_02_28_22.pdf

mail); MATCHFTC744802 (same); MATCHFTC744806 (same); MATCHFTC744810 (same); MATCHFTC744801 (cancelling via fax).

Following payment of a subscription, consumers are directed to a subscription confirmation page, which provides, "To cancel, you may visit your Account Settings at any time." The words "Account Settings" are a hyperlink in blue text that directs consumers to the Account Settings page for cancellation through the online cancellation flow, described in more detail below.

Consumers may also find information about how to contact Customer Care or otherwise cancel a subscription by visiting various Match.com FAQ pages. The "Contact Us" FAQ page[6] provides several options to contact Customer Care, including through chat or email, and a phone number may be displayed if the consumer is logged into the consumer's account when viewing that FAQ page. The "Cancelling" FAQ page,[7] which may be found by merely searching "cancel" on the FAQ page, describes how to cancel a subscription (i.e., turn off auto-renewal).

The simple steps to cancel through each cancellation mechanism are outlined below:

**Online Cancellation Flow.** A consumer may cancel a Match.com subscription by utilizing the online cancellation flow, which easily can be completed in less than one minute. *See, e.g.*, MATCHFTC672322-MATCHFTC672329 (videos of Match.com online cancellation flow).[8] From the "Account Settings" page, the consumer clicks "Manage subscription" (which is in the "Manage account" group), inserts the consumer's password and completes a reCaptcha (to ensure that a consumer's billing data remains secure), and then clicks "Cancel Subscription." The consumer is asked a few optional survey questions; the consumer may answer the survey questions or may simply click "Continue Cancellation." The consumer then reaches a cancellation

---

[6] https://help.match.com/hc/en-us/articles/6140024199195-Contact-Us
[7] https://help.match.com/hc/en-us/articles/6077124196891-Cancelling
[8] In early 2019, "Change/Cancel Membership" was changed to "Manage subscription," a Captcha was added to the password page, and "No thanks, I want to resign" was changed to "Continue Cancellation."

confirmation page, which provides (1) a confirmation number, (2) that the consumer does not have to do anything further to complete the subscription cancellation, (3) the last day of the consumer's subscription, and (4) that the consumer will receive an email confirming the cancellation.

**Online Chat.** A consumer may cancel a Match.com subscription by sending the consumer's cancellation request via chat to Match.com Customer Care. The chat mechanism can be found on the Customer Care Contact Us FAQ page. Customer Care will then process the request.

**Telephone.** A consumer may cancel a Match.com subscription by calling the Match.com Customer Care phone number, 800-926-2824, and stating the consumer's request to cancel the consumer's subscription. The phone number has been generally available on the FAQ pages. Customer Care will then process the request.

**Email.** A consumer may cancel a Match.com subscription by emailing the consumer's cancellation request to Match.com Customer Care. The email mechanism can be found on the Customer Care Contact Us FAQ page. Customer Care will then process the request. Customer Care has offshore agents that respond to e-mails after hours and during weekends.

**U.S. Mail.** A consumer may cancel a subscription by mailing the consumer's cancellation to Match, Attn: Cancellations, P.O. Box 25472, Dallas, Texas 75225. The address can be found in the Match.com Terms of Use. The request should state that the consumer is cancelling the agreement, or words of similar effect, and include the consumer's name and email address, phone number, or other unique identifier used to sign up for the account so that Match.com can identify the appropriate account. Customer Care will then process the request.

**Fax.** A consumer may cancel a Match.com subscription by sending a fax with the consumer's request to cancel the consumer's subscription to 214-853-4309. The fax number can

be found in the Match.com Terms of Use. The request should state that the consumer is cancelling the agreement, or words of similar effect, and include the consumer's name and email address, phone number, or other unique identifier used to sign up for the account so that Match.com can identify the appropriate account. Customer Care will then process the request.

**SECOND AMENDED RESPONSE:** Match.com no longer operates a Customer Care call center. Instead, consumers are encouraged to use Match.com self-help options (such as the Help/FAQ pages on Match.com or the online cancellation flow), or to contact Customer Care via other methods, such as the Customer Care online chat or email address. Match.com does not currently include a Customer Care phone number on its website. Consumers that contact Match.com's Customer Care phone number are provided with an automated recording. That recording provides consumers with help regarding various topics, including providing instructions on how to cancel their Match.com subscription via the online cancellation flow. Consumers are also informed that they may receive personalized support through the Customer Care online chat or email address. Each segment of the automated phone recording has been produced at MATCHFTC846840–MATCHFTC846846. While a consumer may no longer cancel a Match.com subscription by calling the Match.com Customer Care phone number and talking to a live agent, the consumer may still cancel a Match.com subscription via numerous other methods, including the online cancellation flow, online chat, email, U.S. mail, and fax.

Additionally, the "Contact Us" FAQ page cited in footnote 6, as it existed at the time MGL served its First Amended Responses, was produced at MATCHFTC672345. The link is dynamic, so the website has since changed. The link cited in footnote 6, as it exists at the time of the Second Amended Responses, is titled "Does Customer Support have a phone number?" and was produced at MATCHFTC846847.

The "Cancelling" FAQ page cited in footnote 7, as it existed at the time MGL served its First Amended Responses, was produced at MATCHFTC846848. The link is dynamic, so the website has since changed. The link cited in footnote 7, as it exists at the time of the Second Amended Responses, is titled "Canceling" and was produced at MATCHFTC846849. The "How to Cancel Auto Renewal" video embedded within that "Canceling" FAQ page was produced at MATCHFTC846853.

**INTERROGATORY NO. 16:** State on a month by month basis the number of consumers that have cancelled a Match.com subscription by the following mechanisms:

- a.    fax;
- b.    online chat;
- c.    telephone;
- d.    U.S. mail;
- e.    Match.com's cancellation flow; and
- f.    Any other method.

**RESPONSE:** MGL objects to this Interrogatory to the extent this Interrogatory seeks Privileged Information. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, MGL does not concede the relevancy of this Interrogatory nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case. MGL further objects to this Interrogatory as overly broad and unduly burdensome to the extent that it requests information that is not reasonably available to MGL, particularly insofar as Plaintiff is demanding almost ten years' worth of data, from 2013-present. MGL also objects that

each subpart seeks information beyond the scope of the applicable statute of limitations period for any purported right of the FTC to monetary relief or redress against MGL, so MGL will provide information for the period beginning three years before the FTC filed the Amended Complaint and named MGL as a defendant. *See* Am. Compl., Dkt. 116 (filing Amended Complaint and naming MGL as defendant on July 19, 2022). MGL sometimes does not have data about the method by which a consumer canceled his or her subscription. MGL will respond to the best of its knowledge and ability.

Subject to and without waiving the foregoing objections, MGL responds as follows:

Pursuant to Rule 33(d), MGL directs the FTC to documents that will be produced by MGL containing data responsive to the Interrogatory. Once produced, MGL will identify those documents by Bates number.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

[signature page to follow]

Dated: May 19, 2023

/s/  Angela C. Zambrano
Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Fax: 214.981.3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310.595.9500
Fax: 310.595.9501

*Attorneys for Match Group, Inc. and*
*Match Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the above and forgoing document

was served on all counsel of record via e-mail as outlined below on May 19, 2023.

Reid Abram Tepfer
rtepfer@ftc.gov
M Hasan Aijaz
maijaz@ftc.gov
Matthew James Wilshire
mwilshire@ftc.gov
Sarah Zuckerman
szuckerman@ftc.gov
John R. O'Gorman
jogorman@ftc.gov
Erica Rollins Hilliard
ehilliard@ftc.gov

/s/ *Angela C. Zambrano*
Angela C. Zambrano

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

FEDERAL TRADE COMMISSION,

                        Plaintiff,

        vs.

MATCH GROUP, INC., a corporation, and
MATCH GROUP, LLC, formerly known as
MATCH.COM, LLC, a limited liability
company,

                        Defendants.

Case No. 3:19-cv-02281-K

### DUSHYANT SARAPH'S VERIFICATION OF MATCH GROUP, LLC'S SECOND AMENDED RESPONSES TO PLAINTIFF FEDERAL TRADE COMMISSION'S FIRST SET OF INTERROGATORIES

I, Dushyant Saraph, state that I am the General Manager of Match and Match Verticals, for Match Group, LLC ("MGL"). I provide this verification of MGL's Second Amended Responses to Plaintiff Federal Trade Commission's First Set of Interrogatories (the "Responses"). I further state that the Responses have been prepared by counsel for MGL in consultation with me and others with knowledge of the matters involved; that the facts are based upon the business records of MGL, with which I have general familiarity; and that, to the best of my knowledge and belief, all of the facts stated therein are true and correct in all material respects with the understanding that MGL is continuing to research its Responses and reserves the right to supplement its Responses as authorized by the Federal Rules of Civil Procedure and any other applicable law.

I verify under penalty of perjury that the foregoing is true and correct in all material respects.

Dated: May 19, 2023                    Respectfully submitted,

DocuSigned by:

*Dushyant Saraph*

7F104C69C6034B9...

Dushyant Saraph

# EXHIBIT 53

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 3:19-cv-02281-K |
| Plaintiff, | **PLAINTIFF'S RESPONSES TO** |
| | **DEFENDANT'S FIRST SET OF** |
| v. | **INTERROGATORIES** |
| MATCH GROUP, INC., | |
| Defendant. | |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and subject to the general and specific objections set forth below, Plaintiff, the Federal Trade Commission ("FTC") responds to Defendant Match Group Inc. ("Match" or "MGI")'s First Set of Interrogatories.

## I.    GENERAL OBJECTIONS

1. **Compound Interrogatories.** Plaintiff objects to interrogatories that contain discrete requests and therefore constitute compound interrogatories. Including subparts, no more than twenty-five interrogatories may be given without a leave of court. Fed. R. Civ. P. 33(a). "'[W]here the first question can be answered fully and completely without answering the second question, then the second question is totally independent of the first and not factually subsumed within it.'" *FTC v. Think All Pub LLC*, No. 4:07-CV-011, 2008 WL 687455, *1 (E.D. Tex. 2008).

2. **Blockbuster Interrogatories.** Plaintiff objects to Match's impermissible "blockbuster interrogatories" seeking *all* facts without regard for materiality, proportionality, time, and expense. A party cannot "indiscriminately hurl[] interrogatories at every conceivable detail and fact which may relate to a case." *Nieman v. Hale*, No. 3:12-CV-2433-L-BN,

1

**App. 607**

2013 WL 6814789, at *11 (N.D. Tex. Dec. 26, 2013) (quoting *Grynberg v. Total S.A.,*
*Inc.*, No. 3–cv–1280, 2006 WL 1186836, at *5–*7 (D. Colo. May 3, 2006)). Blockbuster
interrogatories "ask not merely for material or principal facts. They seek 'each and every
fact' supporting the allegations of plaintiff, no matter how insignificant or minor." *Hilt v.*
*SFC Inc.*, 170 F.R.D. 182, 186 (D. Kan. 1997).

3. **Lack of Waiver; Right to Modify.** The following responses are made without waiving
any objections raised by the FTC in this proceeding or any objections the FTC may have
with respect to the subsequent use of these answers. The FTC specifically reserves: (a)
the right to challenge authenticity or admissibility of documents referred to in the
interrogatory responses; (b) the right to object on any and all proper grounds, at any time
to other discovery procedures involving or relating to the subject matter of interrogatories
answered herein; and (c) the right, at any time, upon proper showing, to revise, correct or
clarify the following responses.

4. **Right to Supplement.** The FTC reserves the right to supplement and will supplement
these responses as required under Fed. R. Civ. P. 26(e) if additional responsive
information becomes available.

5. **Attorney Client Privilege, Deliberative Process Privilege, and Attorney Work**
**Product Doctrine.** Plaintiff generally objects to Match's requests to Plaintiff insofar as
these seek, directly or indirectly, information subject to the attorney client privilege,
deliberative process privilege or work product doctrine.

6. **Scope of Discovery.** Plaintiff objects to Match's Interrogatories to the extent that the
instructions and definitions attempt to impose upon the Plaintiff obligations greater than
those required by the Federal Rules of Civil Procedure.

**App. 608**

## II.    OBJECTIONS AND RESPONSES

**INTERROGATORY NO. 1:** Identify and Describe the basis for Your belief that Match Group, Inc. "is about to violate" the FTC Act, Including a statement of all facts and evidence that You believe give rise to a fair inference of a reasonable expectation of continued violations absent restraint.

**ANSWER:**

The FTC objects to this Interrogatory because it is a Blockbuster Interrogatory, as discussed in General Objection 2, above. The FTC also objects to this Interrogatory as it is overbroad, vague, unduly burdensome, and not proportional to the needs of the case. Additionally, the FTC objects to this request to the extent that it seeks information that is more readily available to Match. Moreover, this Interrogatory is vague, so the FTC is construing this to refer to a "reasonable expectation" of continued FTC Act violations on Match's dating platforms. The FTC further objects to this Interrogatory on the grounds that it is premature as it asks for information that will be obtained during discovery from documents that are in Match's possession and is therefore inconsistent with the Court's scheduling order. No part of this response should be interpreted or construed as a limit on the materials or arguments the FTC will present at trial.

Subject to and without waiving the foregoing objections, the FTC responds that it has already disclosed to Match the basis for Plaintiff's belief that a reasonable expectation exists that Match would violate the law absent restraint, allegations this Court found sufficient to reject Match's contrary motion to dismiss arguments. *See* Dkts 1, 20, 27, and 86. Specifically, in deciding whether to issue an injunction courts in the Fifth Circuit look at factors, including: the egregiousness of the defendant's actions; the isolated or recurrent nature of the infraction; the degree of scienter involved; the sincerity of the defendant's assurances against future violations; the defendant's recognition of the wrongful nature of his conduct; and whether the defendant's

**App. 609**

occupation presents opportunities for future violations. *See* Dkt. 27 at 6 (citations omitted). Each of these factors support the issuance of an injunction here. Match engaged in egregious, recurring conduct with the scienter of knowing it was earning money at its customer's expense, as described in paragraphs ¶¶ 3, 23, 29-37, 50, 57-59, 64 of the complaint.

Match has yet to offer sincere assurances against future violations; it only suspended its activities while under federal investigation for its unlawful conduct, Match has never acknowledged that any of its practices were deficient in any manner, and Match has not committed to not engaging in the challenged practices in the future. Match's ability to engage in this conduct on this platform and the dozens of other platforms it owns and controls, would allow it to easily resume and expand any of the practices challenged in the complaint. *See* Compl. ¶¶ 10-15, 64; *see also* Dkt. 27 at 6-7. Match knew that its problems were longstanding, affected all five counts described in the complaint, and failed to correct its wrongdoing. Match employees noted long-standing problems with the guarantee, including its flawed tracker, that it had a poor redemption flow, and that even eligible consumers missed redeeming the guarantee. The numbers perfectly illustrate the egregiousness of Match's practices, of more than 2.5 million subscriptions sold that were subject to the guarantee, not even 2 percent of subscribers redeemed the guarantee whereas close to half were billed for at least one additional subscription period. Similarly, Match egregiously kept its consumers money while removing paid-for services of those consumers who initiated a chargeback that Match successfully challenged. Match's chargeback behavior is "likely to recur," in part, because it has never stopped—Match continues to engage in similar practices across its other dating websites, including PlentyOfFish, Tinder, and OkCupid.

Last, Match's ROSCA practices are as egregious as the rest. Match's own records characterize the online cancelation process as confusing, misleading, in need of repair, hard to find, and tedious. Match designed a misleading cancelation process that, for at least ten years, allowed consumers to think they had canceled their subscriptions when, in fact, they had just been duped by the cancelation process. During this time, Match failed to fix this misleading process. The FTC also refers Match to the FTC's responses to Interrogatories 2 through 7.

Match's established practice of knowingly engaging in egregious business practices, coupled with its failure to even acknowledge its wrongdoing let alone bind itself to not returning to those practices in the future, all support an injunction in this matter.

**INTERROGATORY NO. 2:** Identify and Describe all features of Match.com's Online Cancelation Flow that You contend make the Online Cancelation Flow not "simple," as that term is used in ROSCA, 15 U.S.C. § 8403, Including a description of what changes You contend would be necessary to make the Online Cancelation Flow simple.

**ANSWER:**

The FTC objects to this Interrogatory because it is a Blockbuster Interrogatory, as discussed in General Objection 2, above.  The FTC also objects to this Interrogatory as it is overbroad, vague, unduly burdensome, and premature.

The FTC further objects to this Interrogatory on the grounds that it is premature as it asks for information that will be obtained during discovery from documents that are in Match's possession and is therefore inconsistent with the Court's scheduling order. No part of this response should be interpreted or construed as a limit on the materials or arguments the FTC will present at trial.

The FTC also objects to the Interrogatory as ambiguous to the extent it implies that each feature of a cancelation mechanism needs to not be "simple" to violate ROSCA.  The FTC objects to the request as the word "feature" is vague and undefined. The FTC also objects to the

**App. 611**

Interrogatory to the extent that it seeks a description of changes needed to make the cancelation flow simple – this part of the Interrogatory is both a discrete request separate from the first part of the Interrogatory and is instead an impermissible attempt to join two interrogatories into one, and is also irrelevant as the FTC does not need to show what a simple mechanism would look like to establish that Match's flow was not simple.

Subject to and without waiving the foregoing objections, Match's own executives have described its cancelation method as confusing, burdensome, cumbersome, hard to find, tedious, convoluted and that they knew consumers were getting billed after they had thought they canceled their subscriptions. *See* Compl. ¶ 53-59. Match's own internal documents flagged the problems with its cancelation process, including that it was hard to find, took many clicks, was difficult to understand, and had been that way for at least 10 years. *Id.* Match's cancelation flow also had misleading text in the middle of the cancelation flow that states "Before you go" above a survey – misleading consumers into thinking the cancelation is complete and the survey is optional, when in fact consumers needed to continue past the survey to actually cancel. Match has had a flawed password reset mechanism that also prevented consumers from simply canceling their account if they had forgotten their password. Consumers have complained consistently about Match's misleading cancelation process to the company, and it was aware of and agreed that the process was misleading, but it decided not to fix the cancelation process, instead keeping it as a profit center. To the extent Match produces responsive documents and answers in discovery, the FTC may supplement this answer.

**INTERROGATORY NO. 3:** Identify and Describe the harm to consumers that You contend resulted from the alleged lack of a simple online cancelation method, Including how the damages caused by that harm were calculated, the number of users that You believe were unable to cancel

**App. 612**

their subscription as a result of the alleged lack of a simple cancelation method, and the amount of harm/damages per user.

**ANSWER:**

The FTC objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and premature as it asks for information that will be obtained during discovery from documents that are in Match's possession and is therefore inconsistent with the Court's scheduling order. No part of this response should be interpreted or construed as a limit on the materials or arguments the FTC will present at trial.

Subject to and without waiving the foregoing objections, the FTC responds that consumers were harmed by, among other things, being billed for unwanted recurring subscriptions, costs imposed on consumers by time spent rectifying failed cancelation attempts, and by failing to receive refunds when being billed after they thought they had already canceled. The number of consumers harmed by Match's ROSCA violation is approximately 64,000, with each harmed by an average amount of $136. The number of harmed consumers, the types of harm, and amount of harm per user will be further revised as the case proceeds and as the FTC obtains additional discovery.

**INTERROGATORY NO. 4:** State whether You contend that the Match.com methods of cancelation other than the Online Cancelation Flow (Including online chat, telephone, mail, and fax) are not simple, and explain why You contend each method is simple or not simple, Including a description of all facts supporting Your contentions.

**ANSWER:**

The FTC alleges in Count V that "Defendants have failed to provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account." This contention is not limited to any particular method of cancelation, but to the service as a whole. To the extent that this Interrogatory

**App. 613**

requests further information, FTC objects on the grounds that it is overbroad, vague, unduly burdensome, and not proportional to the needs of the case. The FTC also objects to the Request to the extent it implies that every method of cancelation must not be simple in order for a company to violate ROSCA. The FTC further objects to this Interrogatory on the grounds that it is premature as it asks for information that will be obtained during discovery from documents that are in Match's possession and is therefore inconsistent with the Court's scheduling order. No part of this response should be interpreted or construed as a limit on the materials or arguments the FTC will present at trial.

Notwithstanding the foregoing, the FTC responds that Match's failure to inform users about these methods make them hard to find and not simple, as evidenced by how few subscribers used these methods. For example, of all online cancelations in 2017 and 2018, less than two-tenths of one percent used Match's chat feature. Moreover, the availability of Match's chat and voice cancellation are highly dependent on the availability and wait times to contact a customer service representative, which Match controls. When Match reduced the hours of operation for voice and chat customer service it increased the difficulty of canceling using those methods and tracked a dramatic reduction in cancellations.

To the extent Match produces responsive documents and answers in discovery, the FTC may supplement this answer.

**INTERROGATORY NO. 5:** Identify and Describe the features that You contend make a cancelation method simple (or not), Including (but not limited to) all factors You consider in that analysis and the weight that You give each of those factors.

**ANSWER:**

The FTC objects to this Interrogatory because it is a Blockbuster Interrogatory, as discussed in General Objection 2, above. The Interrogatory is also irrelevant because it asks

**App. 614**

about cancelation methods that are not at issue in this case and is therefore not reasonably calculated to lead to the discovery of relevant evidence. The FTC also objects to this Interrogatory because it is duplicative of Interrogatories 2 and 4.

The FTC further objects to this Interrogatory on the grounds that it is premature as it asks for information that will be obtained during discovery from documents that are in Match's possession and is therefore inconsistent with the Court's scheduling order. No part of this response should be interpreted or construed as a limit on the materials or arguments the FTC will present at trial.

Notwithstanding the foregoing, the FTC refers to its answers for Interrogatories 2 and 4.

**INTERROGATORY NO. 6:** Identify and Describe in what way(s) You contend that Match.com's Online Cancelation Flow is not as simple as subscribing to Match.com via the Match.com website, Including by comparing the two processes.

**ANSWER:**

The FTC objects to this Interrogatory because it is a Blockbuster Interrogatory, as discussed in General Objection 2, above. The FTC also objects to this Interrogatory as it is overbroad, vague, unduly burdensome, and not proportional to the needs of the case.

The FTC further objects to this Interrogatory on the grounds that it is premature as it asks for information that will be obtained during discovery from documents that are in Match's possession and is therefore inconsistent with the Court's scheduling order. No part of this response should be interpreted or construed as a limit on the materials or arguments the FTC will present at trial.

Subject to and without waiving the foregoing objections, the FTC responds that Match's internal documents characterize its cancelation as burdensome, cumbersome, hard to find, tedious, convoluted and that they knew consumers were getting billed after they had thought they

**App. 615**

canceled their subscriptions. *See* Compl. ¶ 53-59. There is not similar evidence that Match's sign-up process is burdensome, cumbersome, hard to find, tedious or that consumers believed they had signed up for a subscription service when they had not. Match's own internal documents flagged the problems with its cancelation process, including that it was hard to find and was difficult to understand, but there is no similar evidence that consumers had difficulty understanding, finding, or completing the sign-up process. Moreover, Match presents an offer to consumers that would abandon the cancelation process if selected, but it does not present an offer to consumers to abandon the subscription process. Match's signup process has no misleading text that suggests the signup process is complete, whereas Match's cancelation process has misleading text in the middle of the cancelation flow that states "Before you go" above a survey – misleading consumers into thinking the cancelation is complete and the survey is optional, when in fact the survey is not optional.

**INTERROGATORY NO. 7:** Identify and Describe the basis for Your allegation that Match Group, Inc. owns, operates, and controls Match.com, as stated in Your Complaint, Including a statement of all facts and evidence that You believe support this allegation. If You have no basis or evidence, You should so state.

**ANSWER:**

The FTC objects to this Interrogatory because it is a Blockbuster Interrogatory, as discussed in General Objection 2, above. The FTC also objects to this Interrogatory to the extent it seeks information that is in Match's possession and readily available to Match.

The FTC further objects to this Interrogatory on the grounds that it is premature as it asks for information that will be obtained during discovery from documents that are in Match's possession and is therefore inconsistent with the Court's scheduling order. No part of this response should be interpreted or construed as a limit on the materials or arguments the FTC will present at trial.

**App. 616**

Notwithstanding the foregoing, Match's responses to the FTC's CID described various policies of Match, which Match defined as Match Group Inc., in operating Match.com. For example, Match stated that: Match.com was the primary top-level URL contributing to Match's business operations; Match maintained several URLs that directed users to Match.com; and Match had policies and practices relating to Test profiles and free trials. Match has also stated in a filing with the Ninth Circuit that it operates match.com, and email records show Match's senior executives and CEO directing day-to-day activities and business practices and receiving reports about those activities and practices.

The FTC may supplement this answer to the extent it obtains additional responsive documents from Match or Match Group, LLC.

Date: August 8, 2022

*/s/ M. HASAN AIJAZ*
REID TEPFER
M. HASAN AIJAZ
SARAH ZUCKERMAN (admitted pro hac vice)
JOHN R. O'GORMAN (admitted pro hac vice)
ERICA ROLLINS HILLIARD
Texas Bar No. 24079444 (Tepfer)
Virginia Bar No. 80073 (Aijaz)
New York Bar No. 5603832 (Zuckerman)
Texas Bar No. 2421292 (O'Gorman)
Mississippi Bar No. 104244 (Hilliard)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
T: (214) 979-9395 (Tepfer)
T: (214) 979-9386 (Aijaz)
T: (214) 979-9376 (Zuckerman)
T: (214) 979-9382 (O'Gorman)
T: (214) 979-9379 (Hilliard)
Email: rtepfer@ftc.gov;
maijaz@ftc.gov;
szuckerman@ftc.gov;
jogorman@ftc.gov;
ehilliard@ftc.gov

App. 617

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

App. 618

## CERTIFICATE OF SERVICE

I, M. HASAN AIJAZ, certify that, on August 8, 2022, I served the foregoing Plaintiff's Responses to Defendant's First set of Interrogatories by email on the following counsel of record at the email address listed below:

Angela C. Zambrano
angela.zambrano@sidley.com
David Sillers
dsillers@sidley.com
Chad Hummel
chummel@sidley.com
Sidley Austin LLP

*Attorneys for Defendant Match Group, Inc.*

By: /s/ M. HASAN AIJAZ

# EXHIBIT 54

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>MATCH GROUP, INC., a corporation, MATCH GROUP, LLC, formerly known as MATCH.COM, LLC, a limited liability company,<br><br>    Defendants. | Case No. 3:19-cv-02281-K<br><br>**PLAINTIFF FEDERAL TRADE COMMISSION'S RESPONSES AND OBJECTIONS TO DEFENDANT MATCH GROUP, LLC'S FIRST SET OF INTERROGATORIES** |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and subject to the objections set forth below, Plaintiff, the Federal Trade Commission ("FTC") responds to Defendant Match Group, LLC's ("MGLLC") First Set of Interrogatories below.

**INTERROGATORY NO. 1:**

Identify and Describe any and all evidence that the FTC contends supports its allegations regarding the Guarantee contained in paragraphs 39 through 53 of the Complaint.

**Response:**

The FTC objects to this request as overbroad and unduly burdensome to the extent that it seeks to require Plaintiff to identify "any and all evidence" supporting an entire count in this case. Such a request would constitute an overbroad contention interrogatory.[1] The FTC will

---

[1] *See, e.g.*, *Uniloc 2017, LLC v. Google, LLC*, No. 2:18-cv-00496 , 2020 U.S. Dist. LEXIS 81190 (E.D. Tex. May 8, 2020) (citing *Sol IP, LLC v. AT&T Mobility LLC*, 2:18-cv-00526, 2020 U.S. Dist. LEXIS 2945 (E.D. Tex. Jan. 6, 2020)) (holding that "a court may deny a motion to compel with respect to an overly broad contention interrogatory" and holding that the interrogatory at issue, which sought "all evidence" concerning the case, to be overbroad); *Lewis v. Eye Care*

**App. 621**

reasonably identify evidence supporting its allegations concerning Match.com's Guarantee policy described in the FTC's Amended Complaint.

The FTC has provided an extensive list of evidence supporting the allegations included in Count III of its Amended Complaint, including in response to MGLLC's Requests for Production Nos. 3, 5, 7, 9, 10, 11, 12, and 13. The documents listed in those responses are incorporated by reference here. Additional evidence is described below.

Extensive evidence shows that Match's purported "Guarantee" was illusory. The FTC's allegations are supported by web captures of the Match.com website relating to the Match Guarantee, including those produced by Defendant MGI as part of its interrogatory responses to the FTC's 2017 Civil Investigative Demand.[2] These captures show that Match.com prominently advertised the Match Guarantee and represented that consumers who purchased a six-month subscription would be entitled

---

*Surgery Ctr., Inc.*, No. 21-cv-475, 2023 U.S. Dist. LEXIS 69014, *13 n.4 (M.D. La. Apr. 20, 2023) ("As with any interrogatory, however, a contention interrogatory may be overly broad where it seeks 'each and every' single fact upon which a party bases its case."); *In & Out Welders, Inc. v. H & E Equip. Servs. Inc.*, No. 16-86, 2018 WL 4224856, at *3 (M.D. La. Sept. 5, 2018) (same); *Linde v. Arab Bank, PLC*, No. 04-2799, 2012 U.S. Dist. LEXIS 39518, 2012 WL 957970 (E.D.N.Y. Mar. 21, 2012) (noting that courts have "tended toward a middle ground, requiring parties to explain the factual bases for their contentions by providing the material facts upon which they will rely, but not a detailed and exhaustive listing of all of the evidence that will be offered"); *United States v. Louisiana*, No. 11-cv-470, 2015 U.S. Dist. LEXIS 168039, *13 (M.D. La. Dec. 16, 2015) (noting that while "interrogatory may reasonably ask for the material or principal facts which support a contention," it may be overbroad if "it seeks 'each and every' single fact upon which a party bases its case").

[2] *See, e.g.*, MATCHFTC000032; MATCHFTC000052; MATCHFTC000080; July 13, 2017 letter from Linda Goldstein of Baker Hostetler and attachments; F01-MG-0052350; F01-MG-0004313; MATCHFTC002504; MATCHFTC416289; MATCHFTC000334; MATCHFTC000335; MATCHFTC004041; MATCHFTC521072; MATCHFTC521097; MATCHFTC521098; MATCHFTC521099; MATCHFTC521100; MATCHFTC774523; MATCHFTC774563; MATCHFTC774568; MATCHFTC782510; MATCHFTC782640; MATCHFTC782642; MATCHFTC809422; MATCHFTC822697; MATCHFTC822698; MATCHFTC822699; MATCHFTC822700; MATCHFTC822770; MATCHFTC846770; MATCHFTC521231; MATCHFTC789544; MATCHFTC798148; MATCHFTC99944; MATCHFTC002516; MATCHFTC520538; MATCHFTC002505; MATCHFTC521172; MATCHFTC000032.

**App. 622**

to an additional six months free ("Guarantee Extension") if they failed to meet someone special on the website. The captures further show that Defendants inadequately disclosed the numerous limitations on this Guarantee. Most critically, Defendants failed to disclose that to qualify consumers must (a) create public profile with a primary photo approved by Defendants within the first seven days of purchase and maintain it for the entire subscription period, (b) message five *unique* Match.com subscribers per month, and (c) use Defendants' progress page to redeem the free six months during the final week of the initial six-month subscription period. The FTC's allegations are further supported by Match.com's public representations and advertisements concerning the Match Guarantee, including mockups or drafts of these advertisements, which demonstrate Match.com's intent and actions to make the Match Guarantee front and center in its marketing.[3]

Additionally, the FTC's allegations are confirmed by the fact that consumers routinely and repeatedly complained about being denied the promised free six months, including those previously identified in response to Defendant MGI's prior discovery requests and produced on August 25, 2022.[4] Consumers made these complaints to the FTC, the Better Business Bureau, various law enforcement agencies, and Defendants themselves. These complaints highlight the inadequacy of Defendants' disclosures concerning the Match Guarantee, including Match.com's failure to

---

[3] *See, e.g.*, MATCHFTC520906; MATCHFTC520994; MATCHFTC520997; MATCHFTC520791; MATCHFTC520790; MATCHFTC521073; MATCHFTC521080, MATCHFTC521081, MATCHFTC521083, MATCHFTC521084, MATCHFTC521085, MATCHFTC521086, MATCHFTC521087; MATCHFTC520972; MATCHFTC066184; MATCHFTC066196; MATCHFTC521142; MATCHFTC521246; MATCHFTC521305; MATCHFTC522561; MATCHFTC782590; MATCHFTC365570; MATCHFTC521262; MATCHFTC520980; MATCHFTC520791; MATCHFTC520979; MATCHFTC520790; MATCHFTC521123; MATCHFTC521130; MATCHFTC520997; MATCHFTC520994; MATCHFTC521134; MATCHFTC588771; MATCHFTC846835; MATCHFTC846836; MATCHFTC846837;

[4] *See also* MATCHFTC668518; MATCHFTC668524; MATCHFTC729479; MATCHFTC732530; MATCHFTC770946; MATCHFTC774871; MATCHFTC783719.

**App. 623**

adequately disclose the many limitations on qualifying for a Guarantee Extension,[5] the existence of a Match Guarantee "Progress Page," and the requirement that users act affirmatively to redeem the guarantee offer within a specific seven-day window.[6]

In addition to the above-described web captures, Match.com's policies and procedures relating to the Match Guarantee, including the burdensome and inadequately disclosed requirements to qualify for the Guarantee Extension and exceptions (or lack thereof) made to consumers who failed to meet these requirements, are illustrated by Match.com's FAQ pages, internal correspondence, internal reports, and customer service manuals.[7] That consumers were deceived is made clear by the small number of consumers who (1) qualified for the Guarantee Extension and (2) accepted the Guarantee Extension.[8] It is further made clear by Defendants' internal correspondence and presentations, which among other things reflect that its employees knew its

---

[5] Notably, the Guarantee's requirements were not even mentioned in the website's terms of use. See, e.g., MATCHFTC000094 thru -0231 (21 different iterations of the TOU document produced by Defendants); MATCHFTC549666.

[6] See, e.g., MATCHFTC521098; MATCHFTC774538; MATCHFTC774527. Notably, Match.com's customer care manual strictly limited employees' ability to grant Guarantee Extensions for members that failed to satisfy the Guarantee's requirements. See, e.g., MATCHFTC780142 ("If the member missed any requirements, they are not eligible for the free 6 months.").

[7] See, e.g., MATCHFTC001663; MATCHFTC000308; MATCHFTC731517; MATCHFTC731523; MATCHFTC841258; MATCHFTC357527; MATCHFTC779811; MATCHFTC835578; MATCHFTC789332; MATCHFTC846771; MATCHFTC733359; MATCHFTC307962; MATCHFTC001792; MATCHFTC468251; MATCHFTC729476; MATCHFTC821474; MATCHFTC798159; MATCHFTC733919; MATCHFTC745317; MATCHFTC828805; MATCHFTC001729; MATCHFTC815301.

[8] See Second Production in Response to Civil Investigative Demand Issued to Match Group, Inc. on March 14, 2017," sent on May 30, 2017, at p. 3-4, Response to Interrogatory #7; MATCHFTC846514; MATCHFTC846839.

**App. 624**

customers were confused by the program's requirements and redemption process.[9] As a result of these deceptive practices, millions of consumers were harmed.[10]

**INTERROGATORY NO. 2:**

Identify and Describe any and all evidence that the FTC contends supports its allegations regarding the Match.com response to Chargeback disputes contained in paragraphs 61 through 64 of the Complaint.

**Response:**

The FTC objects to this request as overbroad and unduly burdensome to the extent that it seeks to require Plaintiff to identify "any and all evidence" supporting an entire count in this case. Such a request would constitute an overbroad contention interrogatory.[11] The FTC will

---

[9] *See, e.g.*, MATCHFTC568737, MATCHFTC344243, MATCHFTC801010, MATCHFTC419106, MATCHFTC415890, MATCHFTC467915, MATCHFTC451515, MATCHFTC786749, MATCHFTC707349, MATCHFTC419111, MATCHFTC417553, MATCHFTC731717; MATCHFTC700484; MATCHFTC329585; MATCHFTC846210; MATCHFTC416286; MATCHFTC717261; MATCHFTC452091; MATCHFTC644116; MATCHFTC647238; MATCHFTC835693; MATCHFTC661136; MATCHFTC822812; MATCHFTC833443; MATCHFTC471469; MATCHFTC469164; MATCHFTC766737; MATCHFTC731875; MATCHFTC766453; MATCHFTC749741; MATCHFTC760881; MATCHFTC800116; MATCHFTC416276; MATCHFTC785890; MATCHFTC839891; MATCHFTC521299; MATCHFTC452092; MATCHFTC644115; MATCHFTC672601; MATCHFTC729476; MATCHFTC647239.

[10] MATCHFTC417633; Second Production in Response to Civil Investigative Demand Issued to Match Group, Inc. on March 14, 2017," sent on May 30, 2017, at p. 3-4, Response to Interrogatory #7; MATCHFTC846514; MATCHFTC846839.

[11] *See, e.g.*, *Uniloc 2017, LLC v. Google, LLC*, No. 2:18-cv-00496 , 2020 U.S. Dist. LEXIS 81190 (E.D. Tex. May, 8 2020) (citing *Sol IP, LLC v. AT&T Mobility LLC*, 2:18-cv-00526, 2020 U.S. Dist. LEXIS 2945 (E.D. Tex. Jan. 6, 2020)) (holding that "a court may deny a motion to compel with respect to an overly broad contention interrogatory" and holding that the interrogatory at issue, which sought "all evidence" concerning the case, to be overbroad); *Lewis v. Eye Care Surgery Ctr., Inc.*, No. 21-cv-475, 2023 U.S. Dist. LEXIS 69014, *13 n.4 (M.D. La. Apr. 20, 2023) ("As with any interrogatory, however, a contention interrogatory may be overly broad where it seeks 'each and every' single fact upon which a party bases its case."); *In & Out Welders, Inc. v. H & E Equip. Servs. Inc.*, No. 16-86, 2018 WL 4224856, at *3 (M.D. La. Sept.

**App. 625**

reasonably identify evidence supporting its allegations concerning relating to Match.com's chargeback policy described in in paragraphs 61 through 64 and Count IV of the FTC's Amended Complaint.

As described in paragraphs 61 through 64 and Count IV of the FTC's Amended Complaint, Match had an unfair chargeback policy from 2013 until at least mid-2019.[12] This unfair policy provided that a customer who exercised their right to seek a chargeback of a Match.com charge would automatically have their Match.com account suspended. A consumer's account would remain suspended, and the user would be without access to their account, even if Match.com subsequently won the chargeback dispute and kept the consumer's money. In other words, Defendants kept its customers' money without providing them the access they had paid for. This policy is described in Match.com's internal correspondence and training materials.[13] It

---

5, 2018) (same); *Linde v. Arab Bank, PLC*, No. 04-2799, 2012 U.S. Dist. LEXIS 39518, 2012 WL 957970 (E.D.N.Y. Mar. 21, 2012) (noting that courts have "tended toward a middle ground, requiring parties to explain the factual bases for their contentions by providing the material facts upon which they will rely, but not a detailed and exhaustive listing of all of the evidence that will be offered"); *United States v. Louisiana*, No. 11-cv-470, 2015 U.S. Dist. LEXIS 168039, *13 (M.D. La. Dec. 16, 2015) (noting that while "interrogatory may reasonably ask for the material or principal facts which support a contention," it may be overbroad if "it seeks 'each and every' single fact upon which a party bases its case").

[12] Further, Match.com may not have been the only MGI-owned dating platform with this unfair chargeback policy. PlentyOfFish and People Media appear to have had similar chargeback policies. *See, e.g.*, MATCHFTC313570 (PlentyOfFish employee states "Yes, if there is a chargeback, we always delete and ban the user."); MATCHFTC365179 (PeopleMedia's internal customer service documents reflect a chargeback policy substantially similar to the Match.com chargeback policy at issue in Count IV); MATCHFTC359317; MATCHFTC471504; MATCHFTC701453; MATCHFTC795485 (reflecting that Chemistry.com had the same chargeback policy in its Terms of Use as Match.com).

[13] *See, e.g.*, MATCHFTC838839; MATCHFTC795699; MATCHFTC795485; MATCHFTC844244; MATCHFTC843397; MATCHFTC355107; MATCHFTC471504; MATCHFTC002212; MATCHFTC785535; MATCHFTC811362; MATCHFTC783253; MATCHFTC794091; MATCHFTC791009; MATCHFTC471805; MATCHFTC471740; MATCHFTC064246; MATCHFTC362408; MATCHFTC362417; MATCHFTC362432;

**App. 626**

is also described in Match.com's Terms of Use, which provided that "[i]f we successfully dispute the reversal, and the reversed funds are returned to us, you are not entitled to a refund or to have your account or subscription reinstated."[14]

Match.com's unfair chargeback policy harmed thousands of consumers.[15] That the harm was so widespread is unsurprising given that Match.com had a policy of disputing all consumer chargebacks regardless of their merit.[16] Due to Match.com's deceptive marketing,[17] confusing and complicated online cancellation mechanism,[18] and strict refund policy,[19] Match.com received many thousands of consumer chargebacks. Match.com opposed these chargebacks across the board and kept consumers' money without providing them the benefits they paid for.

---

MATCHFTC779334; MATCHFTC779965; MATCHFTC780025; MATCHFTC780084; MATCHFTC780267; MATCHFTC780322; MATCHFTC785859; MATCHFTC811362; MATCHFTC308796 ; MATCHFTC811144; MATCHFTC780322; MATCHFTC780378; MATCHFTC780437; MATCHFTC846772. Notably, 2020 versions of Match.com's customer service training materials contain this same chargeback policy despite Defendants claiming to have discontinued this illegal practice in 2019. *See* MATCHFTC780489.

[14] *See, e.g.*, MATCHFTC000117 thru -0231 (different iterations of the TOU document produced by Defendants); MATCHFTC774614; *see also* Match.com's responses to Better Business Bureau Complaints, which are in Defendants' possession, were previously provided to MGI in response its prior discovery requests on August 25, 2022, and are identified by Bates numbers in response to Defendant's Request for Production No. 4.

[15] *See, e.g.*, MATCHFTC846838; *see also* consumer complaints, which were previously provided to MGI in response its prior discovery requests on August 25, 2022, and are identified by Bates numbers in response to Defendant's Request for Production No. 4

[16] *See, e.g.*, MATCHFTC780084 ("Match disputes all chargebacks issued by members."); MATCHFTC811362.

[17] *See* Response to Interrogatory #1, *supra*.

[18] *See, e.g.*, FTC's Response to Interrogatory #5 from Defendant Match Group, Inc.'s First Set of Interrogatory's to Plaintiff Federal Trade Commission.

[19] *See* MATCHFTC748407; MATCHFTC600785; MATCHFTC427555; MATCHFTC681835 ("Match.com operates under a strict refund policy.").

**App. 627**

Defendants restored account access for some consumers who lost chargeback disputes if they contacted Match.com customer care and requested that their account access be reinstated.[20] However, this limited practice did not remedy Defendants' law violations. Defendants did not disclose anywhere on their website this purported policy of restoring account access to customers if they requested it. And in fact, Match.com's Terms of Use documents (identified above) explicitly stated the opposite, advising consumers that they were "not entitled to a refund or to have your account or subscription reinstated." Defendants also failed to notify consumers that the chargeback dispute had been resolved in Match.com's favor.[21] As a result, very few customers contacted Match.com to ask that their account access be restored after losing their chargeback dispute.[22]

Even for those very few customers who knew to contact Match.com customer care, it is unclear that Defendants provided those customers their paid-for access. Internal Match.com correspondence reveals that Defendants viewed a customer's exercise of his or her right to seek a chargeback as "a Terms of Use violation, [and as such] these members are not entitled to re-instatement."[23] As such, for at least some time period, Defendants appear to have required that customers convince Match.com customer care that "extenuating circumstances" justify restoring their account access.[24] Match.com customer care were advised to assess whether to restore a

---

[20] *See, e.g.*, MATCHFTC355107.

[21] In 2013, Match.com considered implementing such a policy but decided against it. *See, e.g.*, MATCHFTC795568.

[22] *See, e.g.*, MATCHFTC420258; MATCHFTC669499.

[23] MATCHFTC838839.

[24] *See* MATCHFTC420258; MATCHFTC420244 (Match.com employee Pradeep Shetty stated in September 2013: "As a Terms of Use violation, these members are not entitled to re-instatement. If there are other extenuating circumstances, it would be a case-by-case

---

**App. 628**

customer's account access on a "case by case" basis.[25] Moreover, even for Members who had their account access restored, Match.com's policy was not to compensate customers for the subscription time lost during which their account access was suspended while the chargeback dispute was under review.[26] Given that this the chargeback resolution process can take as much as 60 days, this policy often resulted in a loss in a significant portion of a customer's subscription time, even for those who requested that their access be restored and had this request granted.[27]

**INTERROGATORY NO. 3:**

Identify and Describe any and all empirical studies or surveys performed by or known to the FTC that relate to consumers' subscription experience on Match.com, the perceptions of consumers regarding disclosures on the Match.com website, or consumers' ability to cancel subscriptions on Match.com.

**Response:**

Plaintiff objects to this Request insofar as it seeks documents that were prepared in anticipation of litigation or for trial by or for Plaintiff or its representative. FED. R. CIV. P. 26(b)(3)(A). Plaintiff further objects to this Request insofar as it seeks information related to

---

determination. The language in the TOU is fairly clear 'If we successfully dispute the reversal, and the reversed funds are returned to us, you are not entitled to a refund or to have your account or subscription reinstated.'").

[25] *See id.*

[26] *See, e.g.*, MATCHFTC780084; MATCHFTC780142; MATCHFTC780200; MATCHFTC780267; MATCHFTC788183; MATCHFTC780322; MATCHFTC793435; MATCHFTC780378; MATCHFTC039097 ("Member will not be provided with credited days for any time lost."); MATCHFTC780437; MATCHFTC780489; MATCHFTC785859; MATCHFTC788183; MATCHFTC790506 ("'I'm sorry, but we are unable to provide compensation when your loss of access to the site was the result of a chargeback initiated by your financial institution. What I have done is enabled your login, so you can begin using Match.com again immediately.'").

[27] *See id.*

facts known by or opinions held by experts who have been retained or specifically employed by Plaintiff in anticipation of litigation or to prepare for trial and who are not expected to be called as witnesses at trial.[28] Protected documents are being withheld pursuant to these two provisions. Specifically, Plaintiff is withholding documents associated with draft analyses related to consumer interaction with certain online content. These documents were created by consulting experts who were retained by Plaintiff after the commencement of litigation for the specific purpose of preparing for trial. These consulting experts are not expected to be called at trial. No such unprotected or nonprivileged information exists as it relates to empirical studies or surveys performed by or on behalf of the FTC other than that previously disclosed.

The FTC further objects to the phrase "consumers' subscription experience on Match.com" as vague and confusing. The FTC interprets this phrase as referring to customers' subjective satisfaction or dissatisfaction with their experience on Match.com.

The FTC responds substantively as follows concerning empirical studies or surveys not performed by or on behalf of the FTC that relate to consumers' subscription experience on Match.com, the perceptions of consumers regarding disclosures on the Match.com website, or consumers' ability to cancel subscriptions on Match.com. Defendants themselves routinely analyzed data concerning actual user experience on Match.com to assess user perception and the profitability of potential changes to the website and Match.com user experience.[29]

---

[28] *See* FED. R. CIV. P. 26(b)(4)(D); *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989) (holding that a survey prepared by a consulting expert who was specially employed in preparation for trial and who was not expected to be called a witness was protected from discovery).

[29] *See, e.g.*, MATCHFTC766286. MATCHFTC782215; MATCHFTC782110; MATCHFTC766132; MATCHFTC809764; MATCHFTC782109; MATCHFTC647239.

For example, Match.com employees tracked where customers dropped out in Match.com's "confusing" cancellation flow.[30] Moreover, Match.com employees conducted A/B testing to determine whether changes to Match.com's online cancellation flow resulted in fewer cancellations.[31] In other words, Match.com employees tested whether a change would make their cancellation mechanism more difficult or confusing and—after determining that it did—kept the change. Match.com employees made additional changes to the cancel flow to discourage cancellation when data suggested that customers were currently too successful in cancelling as they had intended.[32]

Defendants' employees conducted a similar A/B testing concerning potential changes to policies and procedures relating to the Match Guarantee. Defendants often received complaints from customers who failed to accept the extra six months offered by the Match Guarantee ("Guarantee Extension") despite qualifying because they were unaware how to do so (or that they even had to affirmatively accept it).[33] Defendants were aware of this issue. In fact, Match.com employees agreed in internal emails that the redemption process was flawed.[34] To address this problem, Match.com employees tested sending members an email notifying them

---

[30] *See, e.g.*, MATCHFTC766286.

[31] *See* MATCHFTC782215; *see also* MATCHFTC782110; MATCHFTC766132; MATCHFTC809764 (discussing an "AB test evaluation" of potential changes to Match.com's online cancellation mechanism to address concerns that the cancellation flow is "[v]ery confusing and is likely causing the high care call volume and chargeback rates").

[32] *See, e.g.*, MATCHFTC782109 ("Due to a huge increase in sub [i.e., subscription] cancellations this year, we would like to change the copy in the help section of the settings page from 'Manage/Cancel Subscription' to 'Manage subscription'").

[33] *See, e.g.*, MATCHFTC729476.

[34] *See* MATCHFTC568737; MATCHFTC415890; MATCHFTC467915; MATCHFTC786749; MATCHFTC731717; MATCHFTC707349.

**App. 631**

when they qualified for a Guarantee Extension.[35] That email test succeeded in its intended goal: more eligible consumers redeemed the Guarantee Extension. Despite this, Defendants elected to keep their customers in the dark about how to redeem the Guarantee Extension. As Defendants' employees explained they intended to discontinue the test due to resulting "sub [*i.e.*, subscription] and revenue loss."[36]

**INTERROGATORY NO. 4:**

Identify and Describe the specific remedies that the FTC seeks for the alleged violation of Section 5 of the FTC Act described in Count III of the Complaint, including the specific terms of an injunction or other relief sought, and the factual bases that the FTC contends support such relief.

**Response:**

The FTC objects to the phrase "the factual bases that the FTC contends support such relief" as vague. The FTC interprets this phrase to request facts concerning Defendants' misconduct that the Court may view as requiring or rendering appropriate the FTC's requested relief. The FTC further objects that the request is overbroad to the extent that it seeks to require that the FTC describe specifically all injunctive relief sought for its count and every fact justifying such relief.

The FTC further objects to this request to the extent it seeks to require that the FTC identify the relief it intends to seek at trial nearly a year before the trial date. Injunctive relief is not a proper subject of discovery, as it is not "relevant to any party's claim or defense."[37]

---

[35] *See, e.g.*, MATCHFTC846210.

[36] *See* MATCHFTC647239.

[37] *See* Fed. R. Civ. P. 26(b)(1).

**App. 632**

Accordingly, the FTC identifies below only the relief that is seeking at the time of these responses.

To respond to the substance of the request, the injunctive relief that the FTC seeks at this time for Count III, in addition to the other Counts in this case, is contained in the proposed stipulated order attached hereto as **Attachment A**. In addition to prohibiting the exact conduct at issue in the FTC's Amended Complaint, this proposed order contains appropriate and narrowly tailored "fencing-in" relief. Federal courts commonly award such fencing-in relief in FTC cases, and such relief has been expressly upheld by the Supreme Court.[38] In short, the Court has authority to award preventative injunctive relief, not merely remedial.

The requested relief in the attached proposed order relating to Count III and supporting factual bases includes the following: Section I concerns prohibitions against misrepresentations. Central to Count III is Defendants' deceptive representations about the nature of their purported Guarantee. The prohibited misrepresentations in this section are reasonably related to Defendants' alleged misconduct as described specifically below.

Section I.A. prohibits Defendants from misrepresenting "Any material restrictions, limitations, or conditions to purchase, receive, or use the online dating services, or to receive any discount, 'guarantee,' or special offer Section II concerns required disclosures." This relief is appropriate because Defendants misrepresented "material restrictions, limitations, [and] conditions" concerning the Match Guarantee, as described further below and in response to Interrogatory No. 1 above.

---

[38] *See, e.g.*, *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965); *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952) (stating that the FTC "cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity"); *see also Kraft, Inc. v. FTC*, 970 F.2d 311, 326 (7th Cir. 1992).

Likewise, Section I.B. prohibits misrepresentations about "[a]ny cost to the consumer to purchase, receive, use, or return the initial good or service." This relief is appropriate because Defendants misrepresented that consumers were guaranteed to receive an additional six months free if they did not meet someone on Match.com. But in fact, there were numerous limitations on this Guarantee that hardly any customers satisfied.

Section I.C. prohibits Defendants from misrepresenting "[t]hat the consumer will not be Charged for any good or service." This relief is appropriate because Defendants represented that consumers were guaranteed to receive an additional six months free if they did not meet someone on Match.com. But in fact, most consumers did not qualify, and those that did had to accept the additional six months in the final seven days of their subscription or contact Match customer care within thirty days (an option Defendants did not disclose). Most consumers did not receive the promised additional six months but were instead charged for another six-month subscription pursuant to the subscription's autorenewal feature. Defendants received numerous complaints from customers who were surprised by this charge and believed that they were entitled to an additional six months free.

Section I.D. prohibits Defendants from misrepresenting "[t]hat a good or service is offered on a 'guarantee,' 'free,' 'trial,' 'sample,' 'bonus,' 'gift,' 'no obligation,' 'discounted' basis, or words of similar import, denoting or implying the absence of an obligation on the part of the recipient of the offer to affirmatively act in order to avoid Charges, including where a Charge will be assessed pursuant to the offer unless the consumer takes affirmative steps to prevent or stop such a Charge." This relief is appropriate because Defendants represented that consumers were guaranteed to receive an additional six months free if they did not meet someone on Match.com. Defendants failed to disclose that there were numerous limitations on

14

this Guarantee that hardly any customers satisfied. Moreover, consumers that failed to qualify were instead charged for another six-month subscription pursuant to the subscription's autorenewal feature. Defendants received numerous complaints from customers who were surprised by this charge and believed that they were entitled to an additional six months free.

Section I.E. prohibits Defendants from misrepresenting "[t]hat the consumer can obtain a good or service for a processing, service, shipping, handling, or administrative fee with no further obligation." This relief is appropriate because Defendants misrepresented that consumers could receive an additional six-month subscription to Match.com for free if they failed to meet someone special on Match.com and with no further obligation when in fact customers had to take numerous steps in order to qualify for and to accept the additional six months of service.

Section I.F. prohibits Defendants from misrepresenting "[t]he purpose(s) for which the consumer's Billing Information will be used." Section I.G. prohibits Defendants from misrepresenting "[t]he date by which the consumer will incur any obligation or be Charged unless the consumer takes an affirmative action on a Negative Option Feature." Section I.H. prohibits Defendants from misrepresenting "[t]hat a transaction has been authorized by the consumer." The relief in these sections is appropriate because Defendants represented that consumers would receive an additional six months free if they failed to meet someone special on Match.com. Defendants failed to disclose the numerous limitations on this Guarantee, however. Consumers that failed to qualify were instead charged for another six-month subscription pursuant to the subscription's autorenewal feature. Defendants received numerous complaints from customers who were surprised by this charge and believed that they were entitled to an additional six months free. Despite this, Defendants often refused to provide refunds to customers who were charged and in fact disputed all chargebacks from consumers—even those

that had been deceived by Defendants' misrepresentations and deceptive omissions about the Match Guarantee.

Section I.J. prohibits misrepresentations concerning any other material fact. This section is appropriate fencing-in relief that is reasonably related to Count III given that Defendants misrepresented numerous material facts concerning their product as described throughout this response and in response to Interrogatory No. 1.

The FTC's proposed stipulated order further contains several sections that are intended to ensure the FTC will be able to monitor compliance with and enforce this order. *See* Sections IX through XIII. Such relief is standard in FTC cases and commonly awarded by federal courts.

As a whole, the FTC's requested relief concerning Count III is justified by Defendants' long history of knowing illegal conduct, which establishes that the illegal conduct is likely to recur. For well over a decade, Defendants offered a deceptive guarantee that induced millions of consumers to join their dating website. While the FTC need not establish that Defendants knew they were deceiving consumers, the evidence shows that they did know. Consumers complained again and again to Defendants about the deceptive and confusing nature of their Guarantee. Defendants' employees discussed these complaints, responded to them, and even at time credited consumers' allegations internally. But despite this, Defendants never corrected their conduct. Defendants in fact explored at least some of these obvious means of addressing their deceptive Guarantee, as described in the FTC's Response to Interrogatory No. 1 correspondence and the cited internal correspondence.

This relief is further justified by all the evidence establishing that Defendants violated the FTC Act as alleged in Count III, which is recounted in detail in the FTC's Response to Interrogatory No. 1.

**App. 636**

Notwithstanding the above, the FTC reserves the right to request additional or different injunctive relief as described in its prayer for relief. The proposed order at **Attachment A** represents only the relief that the FTC seeks at this time. Moreover, the Court will ultimately decide what relief is necessary to address Defendants' law violations.

**INTERROGATORY NO. 5:** Identify and Describe the specific remedies that the FTC seeks for the alleged violation of Section 5 of the FTC Act described in Count IV of the Complaint, including the specific terms of an injunction or other relief sought, and the factual bases that the FTC contends support such relief.

**Response:**

The FTC objects to the phrase "the factual bases that the FTC contends support such relief" as vague. The FTC interprets this phrase to request facts concerning Defendants' misconduct that the Court may view as requiring or rendering appropriate the FTC's requested relief. The FTC further objects that the request is overbroad to the extent that it seeks to require that the FTC describe specifically all injunctive relief sought for its count and every fact justifying such relief.

The FTC further objects to this request to the extent it seeks to require that the FTC identify the relief it intends to seek at trial nearly a year before the trial date. Injunctive relief is not a proper subject of discovery, as it is not "relevant to any party's claim or defense."[39] Accordingly, the FTC identifies below only the relief that is seeking at the time of these responses.

To respond to the substance of the request, the injunctive relief that the FTC seeks for Count IV at this time, in addition to the other Counts in this case, is contained in the proposed

---

[39] *See* FED. R. CIV. P. 26(b)(1).

**App. 637**

stipulated order attached hereto as **Attachment A**. In addition to prohibiting the exact conduct at issue in the FTC's Amended Complaint, the FTC's proposed order contains appropriate and narrowly tailored "fencing-in" relief. Federal courts commonly award such fencing-in relief in FTC cases, and such relief has been expressly upheld by the Supreme Court.[40] In short, the Court has authority to award preventative injunctive relief, not merely remedial.

The requested relief in that order relating to Count IV and supporting factual bases includes the following:

Section II.B., under "Required Disclosures," prohibits Defendants from "[f]ailing to Clearly and Conspicuously disclose any material restrictions, limitations, or conditions to purchase, receive, or use the online dating services." This relief is appropriate because Defendants did not properly inform customers that by using Match.com, they were agreeing to provisions that would cause them to forfeit paid-for services if they exercised their right to seek a chargeback.

Section IV.A., under "Prohibited Business Practices," enjoins Defendants from "[r]etaliating, threatening to take, or taking any adverse action" against consumers who seek chargebacks. This relief is appropriate because Defendants previously threatened to take adverse actions, and in fact did so, against consumers who sought chargebacks relating to Match.com charges. Specifically, Match.com retaliated against such customers who sought chargebacks and lost by suspending their accounts and failing to reinstate their accounts unless consumers contacted customer care with this request. Most did not contact Match.com customer care. Even

---

[40] *See, e.g.*, *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965); *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952) (stating that the FTC "cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity"); *see also Kraft, Inc. v. FTC*, 970 F.2d 311, 326 (7th Cir. 1992).

**App. 638**

if customers did, Match.com, in many instances, failed to compensate or credit customers for time lost on their subscription while their account was suspended. *See* the FTC's Response to Interrogatory No. 2, *supra*.

The FTC's proposed stipulated order further contains several sections that are intended to ensure the FTC will be able to monitor compliance with and enforce this order. *See* Sections IX through XIII. Such relief is standard in FTC cases and commonly awarded by federal courts.

As a whole, this relief is justified by Defendants' long history of knowing illegal conduct, described in the FTC's Response to Interrogatory No. 2, which establishes that the illegal conduct is likely to recur. For years, Defendants employed the unfair chargeback policy at issue in Count IV of the FTC's Amended Complaint.[41] Further, Defendants challenged all consumer chargebacks without consideration for the merit of the chargebacks despite their awareness of consumer confusion relating to the Match Guarantee and Match.com's cancellation procedures, as described further in response to Interrogatory No. 1 and 2 and the FTC's Second Amended Response to Interrogatory 2 from Defendant Match Group, Inc.'s First Set of Interrogatories. As a result, many consumers lost access to their Match.com account, and this access was not automatically restored for the thousands of consumers who lost their chargeback disputes. While Defendants contend that customers who lost their chargeback dispute could have had their accounts reinstated had they requested, Defendants were aware that the vast majority of customers did not make such a request—likely the result of Match.com having failed to disclose this policy anywhere and in fact making representations to the contrary in its Terms of Use document.

---

[41] Notably, this practice appears to have not been limited to Match.com. *See* Response to Interrogatory No. 2, *supra*.

Notwithstanding the above, the FTC reserves the right to request additional or different injunctive relief as described in its prayer for relief. The proposed order at **Attachment A** represents only the relief that the FTC seeks at this time. Moreover, the Court will ultimately decide what relief is necessary to address Defendants' law violations.

**INTERROGATORY NO. 6:**

Identify and Describe the specific terms of an injunction that the FTC seeks for the alleged violation of the Restore Online Shoppers' Confidence Act in Count V of Your Complaint, and the factual bases that the FTC contends support such relief.

**Response:**

The FTC objects to the phrase "the factual bases that the FTC contends support such relief" as vague. The FTC interprets this phrase to request facts that the Court may view as establishing that the FTC's requested relief is appropriate. The FTC further objects that the request is overbroad to the extent that it seeks to require that the FTC describe specifically all injunctive relief sought for its count and every fact justifying such relief.

The FTC further objects to this request to the extent it seeks to require that the FTC identify the relief it intends to seek at trial nearly a year before the trial date. Injunctive relief is not a proper subject of discovery, as it is not "relevant to any party's claim or defense."[42] Accordingly, the FTC identifies below only the relief that is seeking at the time of these responses.

To respond to the substance of the request, the injunctive relief that the FTC seeks at this time for Defendants violations of the Restore Online Shoppers' Confidence Act at issue in Count V, in addition to the other Counts in this case, is contained in the proposed stipulated order

---

[42] *See* FED. R. CIV. P. 26(b)(1).

attached hereto as **Attachment A**. In addition to prohibiting the exact conduct at issue in the FTC's Amended Complaint, the FTC's proposed order contains appropriate and narrowly tailored "fencing-in" relief. Federal courts commonly award such fencing-in relief in FTC cases, and such relief has been expressly upheld by the Supreme Court. *See, e.g.*, *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965); *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952) (stating that the FTC "cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity"); *see also Kraft, Inc. v. FTC*, 970 F.2d 311, 326 (7th Cir. 1992). In short, the Court has authority to award preventative injunctive relief, not merely remedial.

The requested relief in that order relating to Count V and supporting factual bases includes the following:

Section I.K. enjoins Defendants from misrepresenting, in the sale of goods or services with negative option features, any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy. This relief is justified by Defendants having sold their Match.com membership with an autorenewal feature and having misrepresented many material terms related to this product, as described in the FTC's responses to Interrogatories 1 and 2. Match.com further created a difficult and confusing cancellation mechanism that limited member cancellations and retained consumer funds using a strict refund policy and by challenging all customer chargebacks, as described in the FTC's responses to Interrogatories 1 and 2.

Section II.C. enjoins Defendants, in the sale of goods or services with negative option features, from obtaining consumers' billing information without first disclosing Clearly and Conspicuously, the simple cancellation mechanism to stop all recurring Charges.

**App. 641**

Section III enjoins Defendants from failing to provide a simple mechanism for consumers to avoid being charged. This section describes with specificity the requirements of the required cancellation mechanism. The provision requires that Match.com provide consumers the ability to cancel via the same website, email address or other application used to sign up for a subscription. If Match.com allows consumers to sign up orally for a Match.com subscription, this section provides that Match.com is required to provide a mailing address and phone number for cancellation.

Section IV.B. prohibits Defendants from violating the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401-05, which is the statute at issue in Count V of the FTC's Amended Complaint.

Section VIII requires that Defendants provide necessary consumer information to administer monetary redress to customers injured by Defendants violations of ROSCA.

The FTC's proposed stipulated order further contains several sections that are intended to ensure the FTC will be able to monitor compliance with and enforce this order. *See* Sections IX through XIII. Such relief is standard in FTC cases and commonly awarded by federal courts.

As a whole, this relief is justified by Defendants failure to offer simple cancellation mechanisms—a law violation that is ongoing even now—as alleged in the FTC's Complaint and further described in the FTC's Second Amended Response to Interrogatory 2 from Defendant Match Group, Inc.'s First Set of Interrogatories and at the 30(b)(6) deposition of the FTC. As described, Defendants' online cancellation flow was not simple, and Defendants did not adequately disclose alternative cancellation mechanisms to consumers.

Notwithstanding the above, the FTC reserves the right to request additional or different injunctive relief as described in its prayer for relief—up to and including a ban prohibiting

22

Defendants from engaging in negative option marketing in the future on their site. The proposed order at **Attachment A** represents only the relief that the FTC seeks at this time. Moreover, the Court will ultimately decide what relief is necessary to address Defendants' law violations.

**INTERROGATORY NO. 7:** Identify and Describe the requirements of the Match.com Guarantee that You contend were not disclosed or were not adequately disclosed, Including a description of in what specific way(s) You allege the disclosure of those requirements was not sufficient.

**Response:**

Defendants failed to adequately disclose *all* requirements of the Guarantee. Most critically, Defendants failed to disclose that to qualify, consumers must (a) create public profile with a primary photo approved by Defendants within the first seven days of purchase and maintain it for the entire subscription period, (b) message five *unique* Match.com subscribers per month since subscription (i.e., not calendar month), and (c) use Defendants' progress page to redeem the Guarantee Extension during the final week of the initial six-month subscription. To the extent Defendants contend that consumers could contact Match.com customer care to receive an exception from these limitations, Defendants failed to disclose this to consumers as well.

Defendants failed to adequately disclose these requirements in several ways. First, Defendants failed to adequately disclose that there were any terms, conditions, or requirements at all relating to its guarantee because Match.com hid them during the subscription process. A user could easily purchase a Match.com subscription without being presented with the terms and conditions of the guarantee offer, or even notified of the existence of such terms and conditions, and consumer complaints establish this was a frequent occurrence. This is because Match utilized an "infohover" bubble to notify consumers that there were limitations on this Guarantee, which only became visible to users if they happened to "hover" their mouse over a "match

**App. 643**

GUARANTEE" logo. Further, even when this "infohover" bubble did appear to the user, it simply included the text, "If you haven't found someone special within 6 months, we'll give you an extra 6 months FREE. Learn more."[43] This text did not identify that terms and conditions applied, and the "Learn more" hyperlink did not make clear that pertinent information such as requirements would be found at the linked "Program Rules" webpage.

Second, even the limited subset of users who did happen to see the "Program Rules" page were still not properly informed of all of its requirements. Visitors to this webpage were met with a large graphic presenting the guarantee as a two-part process, with requirements regarding the subscriber's profile and communications highlighted.[44] But critical additional details about these requirements as well as additional further requirements were only identified in extensive fine print found further down the page.[45]

Third, users who scrolled past the two-step graphic to find this this fine print would see, among more than a dozen paragraphs of text, a list of six numbered requirements with bold print. However, additional key terms were included further down in the fine print without numbering, bold type, or any offset to indicate their significance. Among these additional terms, in the fine print's longest paragraph, were the need for users to refer to an unlinked "Progress Page" and the requirement that customers use this "Progress Page" to affirmatively act to redeem the offer within a seven-day time window at the end of the subscription period.

Fourth, while the "Progress Page" described several of the Guarantee's requirements, using graphics to purportedly show a subscriber's compliance with the program, it did not

---

[43] *See, e.g.*, MATCHFTC000089.

[44] *See* MATCHFTC000089.

[45] *See* MATCHFTC000090.

**App. 644**

identify the need for users to affirmatively act in the last week of the six-month period to redeem the Guarantee Extension until that seven-day time period arrived.[46] Even when the seven-day window arrived, users were presented with a prompt that asked, "Did you meet anyone during your 6-month guarantee program?," but still did not identify that answering this confusing question, let alone a second question, was necessary to redeem the guarantee.[47]

Notably, Defendants did not even disclose the terms and conditions of the guarantee offer on the site's Terms of Use Agreement. As such, a user who failed to visit the above pages would be wholly unaware of the Guarantee's stringent requirements.[48] As a result of Defendants' failure to disclose these material limitations, exceedingly few customers qualified for the Guarantee Extension and fewer received it.[49]

**INTERROGATORY NO. 8:** Identify and Describe the basis of Your contention that "additional information would be material to consumers in deciding to purchase or in their conduct regarding the online dating service that Defendants sell," as alleged in paragraph 76 of Your Complaint.

**Response:**

---

[46] *See* MATCHFTC000091.

[47] *See* MATCHFTC000093.

[48] *See, e.g.*, MATCHFTC000117; MATCHFTC000227.

[49] *See* "Second Production in Response to Civil Investigative Demand Issued to Match Group, Inc. on March 14, 2017," sent on May 30, 2017, at p. 3-4, Response to Interrogatory #7 (establishing that as little as 1.3 percent of customers who purchased six month subscriptions actually received a Guarantee Extension); MATCHFTC846514; *see also* MATCHFTC001729 (2017 Match.com training manual for new hires states: "6 Month Guarantee - No Exceptions[.] There will be members who do not qualify for the guarantee. If the member missed a requirement no exception can be made.").

**App. 645**

The limitations on Defendants' "Match Guarantee," which Defendants failed to adequately disclose, were material to its customers. As a preliminary matter, that the Match Guarantee was material to consumers is evidenced by the fact that subscriptions subject to the Match Guarantee were Match.com's most popular subscription.[50] Further, Shar Dubey, Defendant MGI's former CEO and Match Group North America executive, stated that "the test to eliminate the 6MG was a loser."[51]

Defendants were keenly aware of consumer interest in their Guarantee and that it was a driver of sales. Defendants routinely highlighted their guarantee offer on their website and even centered an advertising campaign around it.[52] As described in response to Interrogatory 7 above, consumers were presented with enticing representations such as "It works so well, we guarantee it," and could subscribe to Match.com service without ever viewing a description of the numerous limitations on this Guarantee.

That these limitations were material to consumers is evinced by Defendants' own internal communications, cited in Interrogatory No. 1. Their materiality is further made clear by the thousands of complaints consumers made to the FTC, the BBB, other law enforcement agencies, and Defendants themselves. In these complaints, consumers expressed frustration with the many undisclosed limitations. Further, it would unquestionably have been material to consumers to know that almost no one satisfied these conditions and qualified for a Guarantee Extension, as

---

[50] *See, e.g.*, MATCHFTC417633; MATCHFTC000575; MATCHFTC001725; MATCHFTC779838.

[51] MATCHFTC568737.

[52] *See, e.g.,* MATCHFTC000080; MATCHFTC000334; MATCHFTC846835; *see also* FTC's Response to Interrogatory No. 1, *supra*.

**App. 646**

described in the FTC's Response to Interrogatory 1 above.[53] Moreover, Defendants' representations are express claims concerning a core aspect of their six-month subscription. Such express claims are presumed material.[54]

**INTERROGATORY NO. 9:**

Identify and Describe every discount, "guarantee," or special offer that You contend Match.com has offered since 2013.

**Response:**

The FTC objects to this request as irrelevant and unduly burdensome. At issue in this case is the Match Guarantee, not "every discount, 'guarantee,' or special offer that . . . Match.com has offered since 2013." Accordingly, the FTC will not undertake efforts to identify additional discounts, guarantees, or special offers that are not at issue in this case beyond those identified below, which the FTC became aware of by reviewing Defendants' discovery responses and production. Moreover, the FTC could not identify such historical offers, as any such evidence would be in Defendants' possession and has not been produced to the FTC in this case given that it is irrelevant. Lastly, the FTC notes that such evidence is already in Defendants' possession and more easily accessible by Defendants than the FTC, rendering this request unduly burdensome.

---

[53] *Cf. FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 532-33 (S.D.N.Y. 2000) ("Common sense alone dictates that most consumers would not have joined Five Star had Defendants disclosed that due to the very structure of the scheme, the vast majority of participants would neither receive substantial income, nor a free car.").

[54] *See, e.g.*, *FTC v. Pantron I. Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994); *FTC v. Ideal Fin. Sols., Inc.*, No.: 2:13-cv-00143, 2014 WL 2565688, at *6 (D. Nev. June 5, 2014).

The FTC further objects to the phrase "special offer" as vague. It is unclear what would constitute a "special offer" beyond Match.com's guarantees or discounts. Accordingly, the FTC interprets this phrase as surplusage.

The FTC responds substantively to this Interrogatory as follows. The interrogatory requests that the FTC identify every discount, guarantee, or special offer that "You contend" Match.com has offered since 2013. The offer relevant to Count III of the FTC's Amended Complaint is the "Match Guarantee," also referred to by Match.com at different times as the "I Met Someone GUARANTEE," "Six Months Guarantee," and "Make Love Happen Guarantee."[55] The Match Guarantee was offered prior to 2013 and continued to be offered until at least April 2019. Although this is the only relevant discount, guarantee, or special offer in this case, the Match Guarantee was a significant part of Match.com's business. Defendants advertised it prominently on their website and even created an advertising campaign around this Guarantee as well as television and video advertisements.[56] Millions of customers purchased Match.com subscription packages that were subject to the Match Guarantee.[57] In fact, the six-month package with the Match Guarantee had been Match.com's most popular plan.[58]

---

[55] *See, e.g.*, MATCHFTC000089; MATCHFTC000334; MATCHFTC000032; Defendant's Resp. to FTC's Interrog. 8.

[56] *See, e.g.*, MATCHFTC520994; MATCHFTC846835; MATCHFTC520997; MATCHFTC520790; MATCHFTC520791; MATCHFTC521073; MATCHFTC000080; MATCHFTC521299; MATCHFTC521080, MATCHFTC521081, MATCHFTC521083, MATCHFTC521084, MATCHFTC521085, MATCHFTC521086, MATCHFTC521087; MATCHFTC496842; MATCHFTC846836; MATCHFTC846837; MATCHFTC521113

[57] *See, e.g.*, "Second Production in Response to Civil Investigative Demand Issued to Match Group, Inc. on March 14, 2017," sent on May 30, 2017, at p. 3-4, Response to Interrogatory #7; MATCHFTC846514.

[58] *See, e.g.*, MATCHFTC417633; MATCHFTC000575; MATCHFTC001725; MATCHFTC779838.

**App. 648**

To the extent Defendant requests that the FTC identify other discounts, guarantees, or special offers that are not at issue in this case (*i.e.*, excluding the Match Guarantee), the FTC is unaware of any other such discounts, guarantees, or special offers aside from the discounts listed on Match.com's rate cards available in the document beginning with the Bates number FTCMATCH00080.

**INTERROGATORY NO. 10:** Identify and Describe every promotion since 2013 in which You contend that Match.com has offered a good or service on a "guarantee," "free," "trial," "sample," "bonus," "gift," "no obligation," or "discounted" basis.

**Response:** The FTC objects to this request as irrelevant and unduly burdensome. It is unclear how it is relevant to this case to identify all instances in which Match.com has "has offered a good or service on a 'guarantee,' 'free,' 'trial,' 'sample,' 'bonus,' 'gift,' 'no obligation,' or 'discounted' basis" over the past ten years. Moreover, the FTC could not identify such historical offers, as any such evidence would be in Defendants' possession, not the FTC's. Lastly, the FTC notes that such evidence is already in Defendant's possession and is accordingly more easily accessible by Defendant than the FTC, rendering this request unduly burdensome. Based on the foregoing, the FTC will not undertake efforts to identify additional discounts, guarantees, or special offers that are not at issue or relevant to this case, which Match.com may or may not have offered to consumers in the past ten years, other than those identified below.

The FTC responds substantively to this Interrogatory as follows. The interrogatory requests that the FTC identify every discount, guarantee, or special offer that "You contend" Match.com has offered since 2013. The FTC has made allegations or contentions concerning only one guarantee—the Match Guarantee that is at issue in this case. Although the FTC has only made contentions about one Guarantee, the Match Guarantee was an important part of

**App. 649**

Match.com's business model. Defendants advertised it prominently on their website and even designed an advertising campaign around this Guarantee. Further, the six-month package with the Match Guarantee had been Match.com's most popular plan.[59]

To the extent Defendant requests that the FTC identify other goods or services that it offered on a 'guarantee,' 'free,' 'trial,' 'sample,' 'bonus,' 'gift,' 'no obligation,' or 'discounted' basis over the past ten years that are not at issue in this case (*i.e.*, excluding the Match Guarantee), the FTC is unaware of any aside from the discounts listed on Match.com's rate cards available in the document beginning with the Bates number FTCMATCH00080 and the free trial offers of its Match.com subscriptions that it has marketed to consumers.

**INTERROGATORY NO. 11:** Identify and Describe the features of Match.com's Chargeback Policy that You contend in paragraph 80 of Your Complaint constitute "unfair acts or practices," Including a description of any changes that would be necessary to make Match.com's Chargeback Policy not unfair.

**Response:**

The FTC objects to this interrogatory, as it requests legal advice or an advisory opinion that is irrelevant to the case, in that it seeks "any changes that would be necessary to make Match.com's Chargeback Policy not unfair." The FTC further objects to the extent this Interrogatory is duplicative of Interrogatory No. 5, which asks the FTC to describe the proposed injunctive relief described for Count IV and the factual bases for the relief.

The FTC responds substantively as follows. Defendants' chargeback policy, as described in Match.com's Terms of Use, provided that "[i]f we successfully dispute the reversal, and the

---

[59] *See, e.g.*, MATCHFTC417633; MATCHFTC000575; MATCHFTC001725; MATCHFTC779838.

**App. 650**

reversed funds are returned to us, you are not entitled to a refund or to have your account or subscription reinstated." In other words, if a consumer lost their chargeback dispute, they were not entitled to have their account reinstated. This policy is described in greater detail in the FTC's Response to Interrogatory No. 2.

It was unfair for Defendants to retain consumer funds after winning a chargeback dispute and failing to automatically reinstate the customer's account, credit customers for the time that their account was suspended, and notify its customers of these actions. Defendants claim that customers could have requested that their accounts be reinstated after losing their chargeback.

Regardless, even if some consumers knew about and requested such account reinstatement and Defendants granted it, Defendants' practices remained unfair—reinstatement of some limited number of accounts merely mitigated the harm of such unfair practices. And importantly, evidence makes clear consumers were unaware of Defendants' purported willingness to reinstate accounts. In particular, as described in the FTC's Response to Interrogatory No. 2, Defendants did not notify customers about the resolution of the chargeback dispute or that they were purportedly entitled to request that their account be reinstated. Further, this purported policy is contrary to the policy as outlined in Match.com's Terms of Use, which expressly advises customers that "you are not entitled to a refund or to have your account or subscription reinstated." As a result, exceedingly few customers contacted Match.com after losing their chargeback dispute to request this remedy. And even in those limited circumstances, Match.com still did not credit customers for the time period during which their account was suspended. Given that the chargeback dispute process can take 60 days and Match.com's most popular subscription was six months, this service time that Defendants failed to credit its customers was significant. Moreover, Defendants may have had a policy requiring that

31

**App. 651**

customers who contact Match.com provide "extenuating circumstances" justifying that they receive the remaining time on their subscription and that this determination be made on a case-by-case basis.[60]

To comply with the FTC Act, Defendants should have automatically reinstated customer accounts after winning a chargeback dispute, credited its customers for the time period that the account was suspended, and notified its customers of these actions. In fact, the head of Match.com's customer care department suggested employing several of these measures in 2013.[61]

**INTERROGATORY NO. 12:** Identify and Describe the "substantial injury to consumers that consumers cannot reasonably avoid themselves" that You allege is caused by Defendants' actions with respect to chargebacks, as alleged in paragraph 79 of Your Complaint.

**Response:**

As described in the FTC's Responses to Interrogatories 2 and 11, Defendants instituted the chargeback policy at issue in Count IV, which caused "substantial injury to consumers that consumers cannot reasonably avoid themselves."

Match.com had a policy of disputing all consumer chargebacks regardless of their merit.[62] Due to Match.com's deceptive marketing,[63] confusing and complicated online

---

[60] *See* MATCHFTC420244.

[61] *See* MATCHFTC783255 (In April 2013, Michele Watson, Match's Vice President of Global Customer Care, stated: "please give me some background on where the new dispute of chargeback process is coming from? It seems to me that (on Match), if we win the dispute, the system should automatically unblock the member's account and send them an email based upon the funds being released.").

[62] *See, e.g.*, MATCHFTC780084; MATCHFTC811362.

[63] *See* Response to Interrogatory #1, *supra*.

**App. 652**

cancellation mechanism,[64] and strict refund policy,[65] Match.com received thousands of consumer chargebacks. Nevertheless, Match.com opposed these chargebacks across the board, won many of them, and kept those consumers' money without providing them the benefits they paid for.

A substantial injury occurred when a consumer paid for access to Match.com then was restricted from accessing their account solely because the consumer exercised the consumer's right to challenge a charge to their credit card.  The consumer cannot reasonably avoid this injury, as simply exercising their right to challenge a charge to their credit card made them victim to Match's unfair chargeback account restriction. Additionally, nowhere in Match's Terms of Use did Match inform consumers of the additional obligations – as outlined in responses 2 and 11 above – that Match placed on its consumers to regain access to the accounts for which consumers had paid.  Therefore, consumers were left without redress for the substantial injuries inflicted by Match.

**INTERROGATORY NO. 13:** Identify and Describe the basis for the obligations in the "Recordkeeping" portion of Your proposed Stipulated Order attached to Your Third Amended Responses to Defendant's First Set of Interrogatories, including how such obligations are reasonably related to Your claims.

**Response:**

The FTC objects that the request is overbroad to the extent that it seeks to require that the FTC describe every fact justifying such relief. The FTC further objects to this request to the extent it seeks to require that the FTC identify the relief it intends to seek at trial nearly a year

---

[64] *See, e.g.*, FTC's Response Interrogatory #5 from Defendant Match Group, Inc.'s First Set of Interrogatory's to Plaintiff Federal Trade Commission.

[65] *See* MATCHFTC748407; MATCHFTC600785; MATCHFTC427555; MATCHFTC681835; ("Match.com operates under a strict refund policy.")

**App. 653**

before the trial date. Injunctive relief is not a proper subject of discovery, as it is not "relevant to any party's claim or defense."[66] Accordingly, the FTC identifies below only the relief that is seeking at the time of these responses.

The FTC's proposed injunctive relief is appropriate because it is reasonably related to Defendants illegal practices and has sufficient breadth to provide fencing-in relief to ensure Defendants will not merely transfer their business tactics to their other products or services. The recordkeeping provision specifically is needed to ensure Defendants' compliance with the injunctive relief in the proposed stipulated order. Without such relief, the order's injunctive relief would be undermined because it would not provide a means of effectively ensuring that Defendants remain in compliance. Such relief is standard in FTC cases and federal courts have awarded the FTC such relief countless times in similar cases.

The recordkeeping provision is specifically limited to the "advertising, marketing, or promoting any online dating services." Given that this case concerns Defendants' deceptive advertising and marketing of their online dating services, this scope is appropriate. The requirement that Defendants maintain accounting records concerning their revenue from their goods or services is needed should it later be established that Defendants have continued to engage in such illegal conduct. *See* Order at § XI.A. Such records will be needed by the Court to determine how widespread Defendants' illegal activity is, whether consumer redress should be awarded, and if so, to whom such redress should be awarded. The provision further requires that Defendants maintain certain personnel records. *See* Order at § XI.B. These provisions are appropriate in case it later becomes necessary for employees to testify concerning Defendants' violations of the order. Next, the order requires that Defendants maintain their customer

---

[66] *See* FED. R. CIV. P. 26(b)(1).

complaints and refund requests. *See* Order at § XI.C. Such records would be necessary to determine whether customers are in fact being deceived by any subsequent deceptive advertising and to locate potential witnesses. Such evidence would also be necessary for providing consumer redress to any such deceived consumers. Subsection D requires that Defendants maintain "all records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission." *See* Order at § XI.D. Such provision is self-explanatory; Defendants should be required to maintain records to allow the Court and the FTC to assess Defendants' compliance. Lastly, the Order requires that Defendants maintain advertisements or other marketing material featuring a negative option plan. This case concerns Defendants' deceptive advertisements and their failure to provide a simple cancellation mechanism for the subscriptions that included negative option features. Defendants should be ordered to maintain such advertisements so that the FTC and the Court can later determine whether such advertisements complied with the Order if necessary. Such a provision would allow the FTC to avoid the difficulty of attempting to track down advertisements that Defendants failed to maintain, as it has had to do during the pendency of this litigation.

This relief is particularly critical in this case, where Defendants engaged in these illegal practices for many years, in some instances over more than a decade. They did so despite knowing that their conduct was deceiving thousands of consumers. In some instances, they took steps to ensure that Defendants would continue to be deceived by their misrepresentations.[67]

---

[67] *See, e.g.*, MATCHFTC782109 ("Due to a huge increase in sub [*i.e.*, subscription] cancellations this year, we would like to change the copy in the help section of the settings page from 'Manage/Cancel Subscription' to 'Manage subscription'"); MATCHFTC647239 (Match.com employees stated that they would discontinue a test email notifying eligible customers that they had met the qualifications for the Guarantee Extension because too many customers were accepting the offer, resulting in "sub [*i.e.*, subscription] and revenue loss").

Defendants will have a significant financial incentive to reinstitute these practices or similar practices even despite an injunction: Defendants made millions through these deceptive practices, which were central to Defendants business model for years. Moreover, these recordkeeping provisions are not burdensome. They merely require that Defendants maintain the types of records that any legitimate business would maintain unless it were attempting to hide illegal activity.

**INTERROGATORY NO. 14:**

Identify and Describe in what way(s) You contend that Match.com's password reset mechanism was or is flawed, including the time period over which You contend that flaw existed.

**Response:**

The FTC objects to this request as premature. Defendants have refused to search for and produce responsive evidence on this precise topic on the basis that such a request is irrelevant, among other things. *See* Match Group, Inc.'s Second Amended Responses and Objections, Response to Request No. 24 (objecting that the FTC's requests related to this issue are irrelevant and not proportional to the needs of this case and refusing to search for and produce documents on this basis). Because Defendants have withheld evidence on this topic, the FTC is unable to provide a complete answer and such evidence is more easily accessible by Defendants than the FTC. The FTC further objects to this request as premature because this issue is a topic for the upcoming second 30(b)(6) deposition of Match Group, LLC. The FTC will amend its response, as permitted by the Federal Rules, if and when new testimony or documentary evidence is provided by Defendants responsive to this Interrogatory.

Although Defendants have withheld evidence on this topic, the FTC responds as follows based on the limited evidence in its possession. Former Match Group, Inc. CEO Sharmistha Dubey specifically identified the Match.com password reset mechanism as flawed.[68] Ms. Dubey's conclusion is supported by Defendants' records and internal correspondence, which indicate specific technical issues occurred periodically.[69] These password issues prevented members from logging in to their account, which is a prerequisite to cancel a Match.com subscription.

---

[68] *See* MATCHFTC465940 ("Our Forgot Password flow is bad – which we know is true. Probably results in a lot of abandons").

[69] *See, e.g.*, MATCHFTC782210 (describing a "bug in the password wall" had rendered the "[p]assword wall [] broken for resign member flow due" for unspecified time period in or around November 2015); MATCHFTC782210; MATCHFTC782167 (Jira ticket where Match.com employees, in around April 2018, identified another defect in their password reset flow that resulted in an improper "error message [] displayed for user having more than 16 characters password."); MATCHFTC782167; MATCHFTC354693 (Internal correspondence from October 2013 in which Match.com employees discussed an issue where members with passwords longer than 16 characters were unable to login); MATCHFTC313769 (Internal correspondence from May 2017 in which a Match.com employee stated in an email with the subject "RE: Password error for 'Change/Cancel Sub' page" that there was a "known issue" where there were "a few places" on the site "that ask for a password but do not include any way to provide Recaptcha," preventing members from logging in.); MATCHFTC514561 (In May 2015, a Match.com employee sent a "Top Match Defects Report" for the period of May 15 through May 17 that identified two defects related to login difficulties.) MATCHFTC753030 (Internal correspondence describing account takeovers and related difficulties customers experienced with logging in to their Match.com accounts); MATCHFTC330612; MATCHFTC359762 (In an email with the subject "RE: Example of ATO / Reset Password issue" a Match.com employee states that "[t]his is becoming an increasing issue – we had around 20 reports of this issue yesterday. We are having to manually reset these passwords and send them in plain text to the members to resolve the issue."); MATCHFTC752028 (Internal correspondence where Match.com employees discuss an issue where users from "legit IPs" were being prevented from resetting their passwords and noting that "[w]e are getting absolutely HAMMERED by this issue – it's having a tremendous impact on member."); MATCHFTC764949.

**App. 657**

**INTERROGATORY NO. 15:** To the extent that You contend that disclosures accessible via hyperlink and/or infohover are not adequate, Describe in full the basis for that contention.

**Response:** The FTC objects to this request as irrelevant to the extent that it requests the FTC's general policy position on disclosures via hyperlink of "infohover," as opposed to the specific allegations in this case. Moreover, this request is overbroad and unduly burdensome to the extent it seeks to require the FTC to provide a general policy position concerning the use of hyperlinks or "infohover" graphics not at issue in this case.

The FTC responds substantively as follows. The FTC has not taken the position in this lawsuit that disclosures accessible via hyperlink, "infohovers", or "mouse-overs" are per se inadequate in all instances. In fact, the FTC has provided businesses public guidance concerning the proper use of hyperlinks or "infohover" for clearly and conspicuously disclosing information to consumers.[70] Like any disclosure, whether a disclosure made via hyperlink or "infohover" is sufficient under the law is determined on a case-by-case basis and depends on the consumer's net impression.

In this case, the net impression of Match.com's disclosures and omissions were deceptive because Defendants failed to adequately disclose material limitations on their Guarantee. Defendants prominently advertised the Match Guarantee, including on their website and through a television campaign.[71] A consumer who visited Match.com to purchase a subscription eligible for the Guarantee would see the language on Match.com's rate card stating that the six-month

---

[70] *See .com Disclosures: How to Make Effective Disclosures in Digital Advertising*, *available* at https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf, at p. 4-21.

[71] *See* FTC's Response to Interrogatory No. 1.

**App. 658**

subscription came with a guarantee.[72] To learn about the many limitations on the Guarantee, the consumer would have had to hover over the Guarantee logo. Even then, the text box that appeared did not make clear that there were limitations on this Guarantee. Instead, it merely reinforced Defendants' deceptive claim, informing consumers that "If you haven't found someone special within 6 months, we'll give you an extra 6 months FREE. Learn more." Accordingly, this link failed to convey the importance, nature, and relevance of the information to which it leads. Further, even if a consumer were to have found Match.com's infohover, opted to click "Learn More," and visited the "Program Rules" page, this page failed to clearly outline the terms and conditions of the Match Guarantee.

Defendants knew that their disclosures concerning the Match Guarantee were ineffective. As described in the FTC's Response to Interrogatory No. 1, Defendants received thousands of complaints about this, and Match.com employees discussed the flaws in these disclosures themselves. Moreover, the vast majority of customers did not qualify for the Guarantee. And of the few who did, many did not redeem the Guarantee and were instead renewed for another paid subscription. Defendants' actions made clear this was by design. For example, Defendants tested an email notifying qualifying members that they had satisfied the terms of the Match Guarantee and were eligible for a Guarantee Extension. The test was a success: many more members accepted the Guarantee Extension. Nevertheless, Match.com employees canceled the test due to resulting "sub [*i.e.*, subscription] and revenue loss."[73]

---

[72] *See, e.g.*, MATCHFTC000080; MATCHFTC000064; MATCHFTC000065.
[73] MATCHFTC647239.

**App. 659**

**INTERROGATORY NO. 16:** Describe any way(s) in which Match.com's Online Cancelation Flow is more or less difficult than Match.com's process for signing up for a subscription.

**Response:** The FTC objects to this interrogatory as irrelevant, as the FTC need not prove that a defendants' cancellation flow is more difficult than its signup flow to prove a ROSCA violation. The Restore Online Shoppers' Confidence Act requires that consumers be provided "simple mechanisms for a consumer to stop recurring charges." *See* Section 4(3) of ROSCA. The statute does not address signup flows. Further, the FTC's Negative Option Policy Statement, which provides guidance to businesses, states that "negative option sellers should provide cancellation mechanisms at least as easy to use as the method the consumer used *to initiate the negative option feature*."[74] Initiating a negative option feature is not necessarily equivalent to signing up for an account. This is particularly true in this case, where Match.com's sign-up process for new subscribers invites them to create a dating profile. Moreover, Match.com has free and paid members. Free members have already created a Match.com profile. Therefore, many members signing up for a Match.com membership are not creating an account but merely upgrading their accounts.

The FTC responds substantively as follows. Match.com has made initiating the negative option feature exceedingly easy, requiring only a single step: a subscriber must check a box next to a disclosure about the auto-renew feature during the signup process. In contrast, Match.com's online cancellation process has had as many as eight steps.[75]

---

[74] 86 C.F.R. § 60822 (emphasis added).

[75] See Dr. King's Expert Report at p. 17 ("[T]his [cancellation] process can take *eight* steps.") (emphasis in original); *see also* Mr. Ward's Expert Report at p. 31 (noting that Match.com requires "5+ Steps to Cancel").

**App. 660**

The FTC contends that this checkbox is how Match.com's customers initiate the negative option feature, as opposed to the signup process more broadly. Nevertheless, the FTC notes that there are differences between Match.com's profile creation/signup process and cancellation process that render the cancellation process more difficult. Below is a non-exhaustive list of such differences:

- Match.com's signup process includes a "skip" button for inessential aspects of the profile-creation flow. Although customers can skip Match.com's survey questions in its online cancellation flow, there is nothing that indicates to customers that they need not answer the survey's questions.

- Match.com's signup process does not contain distractions or links that will result in consumers being diverted from the flow and cause them not to complete the process like those described in Dr. King's expert report in this matter.

- Match.com's signup process provides a progress bar at the top of the page, letting the consumer know how close they are to completing the flow and ensuring that the consumer is aware that they have not completed the process. Match.com's cancellation process contains no such progress bar, although records indicated that they considered (and rejected) including one in their cancellation flow.

In short, Match.com's signup process contains features to ensure that consumers stay in the flow and complete the process, and Match.com's cancellation process contains features to ensure that they do not successfully navigate and complete the cancellation flow.

**INTERROGATORY NO. 17:** Describe all rules and guidance issued by the FTC describing what constitutes a "simple" cancelation mechanism under ROSCA.

**Response:** The FTC objects to this request, as FTC rules and guidance are publicly available and equally accessible to Defendants. As such, the request is unduly burdensome. The FTC has therefore not conducted a comprehensive search but identifies the documents below of which it is aware.

The FTC responds substantively by pointing Defendants to the FTC's Negative Option Policy Statement.[76] The FTC has provided further guidance by publicly announcing cases and providing summaries of those allegations in press releases available on its website.[77] Further, the FTC provides guidance to businesses relating to recently filed cases, including those with ROSCA allegations, on its Business Blog.[78]

Date: May 18, 2023

*/s/ REID TEPFER*
REID TEPFER
M. HASAN AIJAZ
SARAH ZUCKERMAN (admitted pro hac vice)
JOHN R. O'GORMAN (admitted pro hac vice)
ERICA ROLLINS HILLIARD
Texas Bar No. 24079444 (Tepfer)
Virginia Bar No. 80073 (Aijaz)
New York Bar No. 5603832 (Zuckerman)
Texas Bar No. 2421292 (O'Gorman)
Mississippi Bar No. 104244 (Hilliard)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
T: (214) 979-9395 (Tepfer)
T: (214) 979-9386 (Aijaz)
T: (214) 979-9376 (Zuckerman)
T: (214) 979-9382 (O'Gorman)
T: (214) 979-9379 (Hilliard)
Email: rtepfer@ftc.gov;
maijaz@ftc.gov;
szuckerman@ftc.gov;
jogorman@ftc.gov;
ehilliard@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

---

[76] See 86 Fed. Reg. 60822, *available at* https://www.federalregister.gov/documents/2021/11/04/2021-24094/enforcement-policy-statement-regarding-negative-option-marketing.

[77] *See* https://www.ftc.gov/news-events/news/press-releases.

[78] *See* https://www.ftc.gov/business-guidance/blog.

**App. 662**

## CERTIFICATE OF SERVICE

I, Reid Tepfer, certify that, on May 18, 2023, I served the foregoing Plaintiff's Responses to Defendant Match Group, LLC's First Set of Interrogatories by email on the following counsel of record at the email address listed below:

Angela C. Zambrano
angela.zambrano@sidley.com
Chad Hummel
chummel@sidley.com
Sidley Austin LLP

*Attorneys for Defendant Match Group, Inc.
and Match Group, LLC*

By: /s/ Reid Tepfer

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>MATCH GROUP, INC., a corporation; and<br><br>MATCH GROUP, LLC, formerly known as<br>MATCH.COM, LLC, a limited liability company,<br><br>　Defendants. | Case No. 3:19-cv-02281-K<br><br>**STIPULATED ORDER FOR<br>PERMANENT INJUNCTION,<br>MONETARY RELIEF, CIVIL<br>PENALTY JUDGMENT, AND<br>OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), filed its Complaint for Permanent Injunction and Other Equitable Relief ("Complaint") in this matter, pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b and Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404. The Commission and Defendants stipulate to the entry of this Stipulated Order for Permanent Injunction, Monetary Relief, Civil Penalties, and Other Relief ("Order") to resolve all matters in dispute in this action between them.

**THEREFORE, IT IS ORDERED** as follows:

## FINDINGS

1.　　This Court has jurisdiction over this matter.

2.　　The Complaint charges that Defendants participated in deceptive and unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 4 of ROSCA, 15 U.S.C. § 8403, in connection with Defendants' marketing and sale of online dating services.

1

3. Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Order. Only for purposes of this action, Defendants admit the facts necessary to establish jurisdiction.

4. Defendants waive any claim they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agrees to bear their own costs and attorney fees.

5. Defendants waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## **DEFINITIONS**

For the purpose of this Order, the following definitions apply:

A. "**Billing Information**" means any data that enables any person to access a customer's account, such as a credit card, checking, savings, share or similar account, utility bill, mortgage loan account, or debit card.

B. "**Charge**," "**Charged**," or "**Charging**" means any attempt to collect money or other consideration from a consumer, including but not limited to causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account, telephone bill, or other account.

C. "**Clear(ly) and Conspicuous(ly)**" means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1. In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible

2

means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2. A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3. An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4. In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5. The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6. The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7. The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8. When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

3

D. "**Defendants**" means Match Group, Inc., Match Group, LLC, and their successors and assigns.

E. "**Negative Option Feature**" means, in an offer or agreement to sell or provide any good or service, a provision under which the consumer's silence or failure to take an affirmative action to reject a good or service or to cancel the agreement is interpreted by the seller or provider as acceptance or continuing acceptance of the offer or agreement.

F. "**Person**" or "**Persons**" means any natural person, organization, or other entity, including, but not limited to, a corporation, partnership, proprietorship, association, cooperative, or any other group or combination acting as an entity.

## <u>ORDER</u>

## I. PROHIBITION AGAINST MISREPRESENTATIONS

**IT IS ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, in connection with the advertising, marketing, promoting, offering for sale, or selling of any online dating services:

A. Any material restrictions, limitations, or conditions to purchase, receive, or use the online dating services, or to receive any discount, "guarantee," or special offer;

B. Any cost to the consumer to purchase, receive, use, or return the initial good or service;

4

C. That the consumer will not be Charged for any good or service;

D. That a good or service is offered on a "guarantee," "free," "trial," "sample," "bonus," "gift," "no obligation," "discounted" basis, or words of similar import, denoting or implying the absence of an obligation on the part of the recipient of the offer to affirmatively act in order to avoid Charges, including where a Charge will be assessed pursuant to the offer unless the consumer takes affirmative steps to prevent or stop such a Charge;

E. That the consumer can obtain a good or service for a processing, service, shipping, handling, or administrative fee with no further obligation;

F. The purpose(s) for which the consumer's Billing Information will be used;

G. The date by which the consumer will incur any obligation or be Charged unless the consumer takes an affirmative action on a Negative Option Feature;

H. That a transaction has been authorized by the consumer;

I. Any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy for the good or service;

J. Any other material fact; and

K. In connection with promoting or offering for sale any good or service with a Negative Option Feature, any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy for the good or service. Compliance with this Section is separate from, and in addition to, the disclosures required in Sections II and III, *infra*.

Att. A
App. 668

## II. REQUIRED DISCLOSURES

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, offering for sale, or selling of any online dating services, are permanently restrained and enjoined from:

A.    Failing to Clearly and Conspicuously disclose that consumers registering for a six-month "guarantee" must, to the extent applicable, (a) secure and maintain a public profile with a primary photo approved by Defendants within the first seven days of purchase, (b) message five unique subscribers per month, and (c) use Defendants' progress page to redeem the free six months during the final week of the initial six-month subscription period;

B.    Failing to Clearly and Conspicuously disclose any material restrictions, limitations, or conditions to purchase, receive, or use the online dating services, or to receive any discount, "guarantee," or special offer; and

C.    In connection with promoting or offering for sale any good or service with a Negative Option Feature obtaining Billing Information from a consumer, without first disclosing Clearly and Conspicuously, the simple cancellation mechanism to stop all recurring Charges, as required by Section III.

## III. SIMPLE MECHANISM TO CANCEL NEGATIVE OPTION FEATURE

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or

6

offering for sale any good or service with a Negative Option Feature, are permanently restrained and enjoined from:

A. Failing to provide a simple mechanism for the consumer to: (1) avoid being Charged, or Charged an increased amount, for a good or service and (2) immediately stop any recurring Charge. Such mechanism must:

    a. Be easy to find;

    b. Be easy to use to stop such Charge;

    c. Not require the consumer to take any action that is objectively unnecessary to cancel

including using a Dark Pattern. A "Dark Pattern" refers to a user interface that has the effect of impeding consumers' expression of preference, manipulating consumers into taking certain action or otherwise subverting consumers' choice;

B. If any consumers entered into the agreement to purchase a good or service including a Negative Option Feature over the Internet or a mobile phone application, failing to provide the mechanism through the same website, email address or other application.

C. If any consumers entered into the agreement to purchase a good or service including a Negative Option Feature through an oral offer or acceptance, failing to provide such mechanisms through the use of a telephone number and a postal address.

## IV. PROHIBITED BUSINESS ACTIVITIES

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the

advertising, marketing, promoting, offering for sale, or selling of any online dating service, are permanently restrained and enjoined from:

A. Retaliating, threatening to take, or taking any adverse action against any consumer who files, or threatens to file, a billing dispute with their financial institutions or with any law enforcement or consumer protection agency by denying such consumers access to and use of paid-for goods or services; *provided, however*, that nothing herein shall be deemed to preclude Defendants from suspending a consumer's service during the pendency of a billing dispute or from suspending or terminating a consumer's service if a refund has been issued.

B. Violating the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401-05, a copy of which is attached.

## V. JUDGMENT FOR MONETARY RELIEF

**IT IS FURTHER ORDERED** that:

A. Judgment in the amount of XX Million Dollars ($XX,000,000) is entered in favor of the Commission against Defendants, as monetary relief.

B. Defendants are ordered to pay to the Commission XX Million Dollars ($XX,000,000), which, as Defendants stipulate, their undersigned counsel holds in escrow for no purpose other than payment to the Commission. Such payment must be made within 7 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

## VI. JUDGMENT FOR CIVIL PENALTY

A. Judgment in the amount of XX Million Dollars ($XX,000,000) is entered in favor of the Commission against Defendants, as a civil penalty.

Att. A
**App. 671**

B.   Defendants are ordered to pay to the Commission XX Million Dollars ($XX,000,000), which, as Defendants stipulate, their undersigned counsel holds in escrow for no purpose other than payment to the Commission. Such payment must be made within 7 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

## VII. ADDITIONAL MONETARY PROVISIONS

**IT IS FURTHER ORDERED** that:

A.  Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

B.  The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

C.  The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D.  Defendants acknowledge that their Taxpayer Identification Numbers (Employer Identification Numbers), which Defendants must submit to the Commission, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

E.  All money received by the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for consumer relief,

Att. A
**App. 672**

such as redress and any attendant expenses for the administration of any redress fund. If a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after such redress is completed, the Commission may apply any remaining money for such related relief (including consumer information remedies) as it determines to be reasonably related to Defendants' practices alleged in the Complaint. Any money not used for relief is to be deposited to the U.S. Treasury as an additional civil penalty.  Defendants have no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

## VIII. CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, are permanently restrained and enjoined from directly or indirectly failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress. If a representative of the Commission requests in writing any information related to redress, Defendants must provide it, in the form prescribed by the Commission, within 14 days.

## IX. ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that Defendants obtain acknowledgments of receipt of this Order:

A. Each Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B. For 20 years after entry of this Order, each Defendant must deliver a copy of this Order to: (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting. Delivery must occur within 7 days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C. From each individual or entity to which a Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## X. COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that Defendants make timely submissions to the Commission:

A. One year after entry of this Order, each Defendant must submit a compliance report, sworn under penalty of perjury. Each Defendant must:

1. Identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Defendant;

2. Identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

3. Describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales;

Att. A
**App. 674**

    4.   Describe in detail whether and how that Defendant is in compliance with each Section of this Order; and

    5.   Provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.   For 20 years after entry of this Order, each Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following, each Defendant must report any change in:

    1.   Any designated point of contact; or

    2.   The structure of any Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.   Each Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D.   Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.   Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or

sent by overnight courier (not the U.S. Postal Service) to: Associate Director for

Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600

Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: FTC

v. Match Group, Inc. and Match Group, LLC.

## XI. RECORDKEEPING

**IT IS FURTHER ORDERED** that Defendants must create certain records for 10 years

after entry of the Order, and retain each such record for 5 years. Specifically, Defendants, in

connection with advertising, marketing, or promoting any online dating services, must create and

retain the following records:

A.  Accounting records showing the revenues from all goods or services sold;

B.  Personnel records showing, for each person providing services, whether as an

employee or otherwise, that person's: name; addresses; telephone numbers; job title

or position; dates of service; and (if applicable) the reason for termination;

C.  Records of all consumer complaints and refund requests, whether received directly or

indirectly, such as through a third party, and any response;

D.  All records necessary to demonstrate full compliance with each provision of this

Order, including all submissions to the Commission; and

E.  A copy of each unique advertisement or other marketing material featuring a negative

option plan.

Att. A
**App. 676**

## XII. COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Defendants'

compliance with this Order:

A.  Within 14 days of receipt of a written request from a representative of the

Commission, each Defendant must: submit additional compliance reports or other

requested information, which must be sworn under penalty of perjury; appear for

depositions; and produce documents for inspection and copying. The Commission is

also authorized to obtain discovery, without further leave of court, using any of the

procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including

telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.  For matters concerning this Order, the Commission is authorized to communicate

directly with each Defendant. Defendant must permit representatives of the

Commission to interview any employee or other person affiliated with any Defendant

who has agreed to such an interview. The person interviewed may have counsel

present.

C.  The Commission may use all other lawful means, including posing, through its

representatives as consumers, suppliers, or other individuals or entities, to Defendants

or any individual or entity affiliated with Defendants, without the necessity of

identification or prior notice. Nothing in this Order limits the Commission's lawful

use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C.

§§ 49, 57b-1.

## XIII. RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

**SO ORDERED**, this _____ day of _____, 20__.

_____
UNITED STATES DISTRICT JUDGE

**[Remainder of Page Intentionally Left Blank]**

**SO STIPULATED AND AGREED:**

**FOR PLAINTIFF:**

_____     Date: _____
REID TEPFER
M. HASAN AIJAZ
MATTHEW WILSHIRE
SARAH ZUCKERMAN (admitted *pro hac vice*)
JOHN R. O'GORMAN (admitted *pro hac vice*)
ERICA ROLLINS HILLIARD
JASON C. MOON
Texas Bar No. 24079444 (Tepfer)
Virginia Bar No. 80073 (Aijaz)
California Bar No. 224328 (Wilshire)
New York Bar No. 5603832 (Zuckerman)
Texas Bar No. 2421292 (O'Gorman)
Mississippi Bar No. 104244 (Hilliard)
Texas Bar No. 24001188 (Moon)
Federal Trade Commission
1999 Bryan St. Ste. 2150
Dallas, Texas 75201

**FOR DEFENDANTS:**

_____     Date: _____
[NAME]
As an officer of MATCH GROUP, INC.

_____     Date: _____
Chad S. Hummel
As counsel for MATCH GROUP, INC.

_____     Date: _____
[NAME]
As an officer of MATCH GROUP, LLC.

_____     Date: _____
Chad S. Hummel
As counsel for MATCH GROUP, LLC.

Att. A
**App. 679**

# EXHIBIT 55

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>MATCH GROUP, INC., et al.<br><br>    Defendant. | Case No. 3:19-cv-02281-K<br><br>**PLAINTIFF FEDERAL TRADE COMMISSION'S RESPONSES TO DEFENDANT MATCH GROUP, INC.'S SECOND SET OF INTERROGATORIES** |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and subject to the objections set forth below, Plaintiff, the Federal Trade Commission ("FTC") responds to Defendant Match Group, Inc. ("Match" or "MGI")'s Second Set of Interrogatories.

**OBJECTIONS AND RESPONSES**

**Interrogatory No. 8**:

Identify and Describe any and all evidence that supports Your contention that MGI created, directed, or controlled any practices, policies, or procedures relating to the Guarantee, the Chargeback Policy, or the means through which Match.com subscribers cancel their subscriptions.

**Response:**

The FTC objects to this request as overbroad and unduly burdensome to the extent that it seeks to require Plaintiff to identify and describe "any and all evidence" supporting Counts III, IV, and V of the Amended Complaint. Such a request would constitute an overbroad contention

1

interrogatory.[1] The FTC also objects to this Request insofar as it seeks documents that were prepared in anticipation of litigation or for trial by or for Plaintiff or its representative. FED. R. CIV. P. 26(b)(3)(A).

The FTC further objects to this request as premature. Such evidence is more easily accessible by Defendants than the FTC, yet Defendants have failed to adequately answer, search for and produce responsive evidence on this topic on the basis that such a request is irrelevant and not proportional to the needs of the case, among other things. *See* Match Group, Inc.'s Second Responses and Objections to the FTC's Second Set of Interrogatories, Response to Interrogatory No. 11.. *See also* Match Group, Inc.'s Second Amended Responses and Objections to the FTC's First Set of Interrogatories, Response to Interrogatory No. 7; Second Amended Response to Interrogatory No. 7 (MGI claiming that it does not own or operate Match.com). Because Defendants have failed to fully respond and produce evidence on this topic, the FTC is unable to identify and describe "any and all evidence" supporting Counts III, IV, and V. The FTC will address the numerous serious deficiencies in Defendants' responses to the FTC's

---

[1] *See, e.g.*, *Uniloc 2017, LLC v. Google, LLC*, No. 2:18-cv-00496, 2020 U.S. Dist. LEXIS 81190 (E.D. Tex. May 8, 2020) (citing *Sol IP, LLC v. AT&T Mobility LLC*, 2:18-cv-00526, 2020 U.S. Dist. LEXIS 2945 (E.D. Tex. Jan. 6, 2020)) (holding that "a court may deny a motion to compel with respect to an overly broad contention interrogatory" and holding that the interrogatory at issue, which sought "all evidence" concerning the case, was overbroad); *Lewis v. Eye Care Surgery Ctr., Inc.*, No. CV 21-475-SDD-RLB, 2023 WL 3029239, at *5 (M.D. La. Apr. 20, 2023) ("As with any interrogatory, however, a contention interrogatory may be overly broad where it seeks 'each and every' single fact upon which a party bases its case."); *In & Out Welders, Inc. v. H & E Equip. Servs. Inc.*, No. 16-86, 2018 WL 4224856, at *3 (M.D. La. Sept. 5, 2018) (same); *Linde v. Arab Bank, PLC*, No. 04-2799, 2012 U.S. Dist. LEXIS 39518, 2012 WL 957970 (E.D.N.Y. Mar. 21, 2012) (noting that courts have "tended toward a middle ground, requiring parties to explain the factual bases for their contentions by providing the material facts upon which they will rely, but not a detailed and exhaustive listing of all of the evidence that will be offered"); *United States v. Louisiana*, No. 11-cv-470, 2015 U.S. Dist. LEXIS 168039, at *13 (M.D. La. Dec. 16, 2015) (noting that while "interrogatory may reasonably ask for the material or principal facts which support a contention," it may be overbroad if "it seeks 'each and every' single fact upon which a party bases its case").

**App. 682**

discovery requests in a forthcoming deficiency letter. The FTC will amend its response, as permitted by the Federal Rules, if and when new testimony or documentary evidence is provided by Defendants responsive to this Interrogatory.

The FTC will reasonably identify evidence supporting its allegations concerning or relating to MGI's liability in the Counts alleged in this case. Although Defendants have failed to fully respond and produce evidence, the FTC responds as follows based on the information and documents in its possession. Below, the FTC has provided an extensive (but not exhaustive) list of evidence supporting the allegations that MGI created, directed, or controlled practices, policies, or procedures relating to Count III, Count IV, and Count V of the FTC's Amended Complaint. Further, while the FTC is not obligated under the Federal Rules to identify and describe every conceivable piece of evidence supporting its allegations, specific examples are provided below.

The FTC's allegations are supported by Defendants' internal correspondence, which reflect that various MGI executives and Match.com employees who subsequently became MGI executives were involved in and regularly apprised of Match.com's day-to-day business, as well as its practices, policies, or procedures, including those related to the Guarantee, Match.com customer chargebacks and related policies and procedures, or Match.com subscription cancellation methods.[2]

---

[2] *See, e.g.,* MATCHFTC380042; MATCHFTC748121; MATCHFTC748471; MATCHFTC748736; MATCHFTC_Sample0000307; MATCHFTC519878; MATCHFTC519936; MATCHFTC536801; MATCHFTC537085; MATCHFTC545967; MATCHFTC561205; MATCHFTC601018; MATCHFTC601119; MATCHFTC601377; MATCHFTC603392; MATCHFTC603553; MATCHFTC000843; MATCHFTC675343; MATCHFTC680620; MATCHFTC298594; MATCHFTC365570; MATCHFTC387821; MATCHFTC405364; MATCHFTC433153; MATCHFTC_Sample0001921; MATCHFTC517210; MATCHFTC519936; MATCHFTC521397; MATCHFTC528101; MATCHFTC536801; MATCHFTC557155; MATCHFTC601035; MATCHFTC601438;

**App. 683**

Further, MGI and MGLLC knew they were deceiving consumers. But despite this, Defendants never corrected their conduct. For several years, consumers submitted complaints to Defendants about the deceptive and confusing nature of the Guarantee and cancellation. Indeed, the MGI CEO and Chairman was aware of these issues and forwarded several consumer complaints to employees at MGI and its subsidiary, Match Group, LLC ("MGLLC"), including employees working directly for Match.com.[3] Defendants and their employees discussed these complaints, responded to them, and even at times credited consumers' allegations internally. A Match.com employee working in the customer service department even presented a PowerPoint presentation and recommended that the company make specific changes to the cancellation flow.[4] Despite MGI and its executives' intimate knowledge and awareness of these issues, MGI did not take measures to correct these issues, nor did it direct any of their employees or subsidiaries to do so.

As an example, in a 2017 email thread, Sharmistha Dubey ("Shar Dubey")—the individual that testified as the MGI Representative in the MGI 30(b)(6) deposition and the soon-to-be CEO of MGI—acknowledges that "auto renewal is such a sensitive thing" and requests approval from MGI's General Counsel and Secretary.[5] In another striking example, an internal email thread shows that Defendants knew their cancellation methods were not simple. In fact,

---

MATCHFTC650110; MATCHFTC650287; MATCHFTC654132; MATCHFTC745343; MATCHFTC748484; MATCHFTC752309; MATCHFTC766621; MATCHFTC816240; MATCHFTC816333; MATCHFTC821066; MATCHFTC822812; MATCHFTC825479; MATCHFTC825936; MATCHFTC825959; MATCHFTC826492; MATCHFTC826869; MATCHFTC827057; MATCHFTC519918.

[4] *See* Kristina Auderer Dep. 68-79, November 18, 2022.

[5] *See* MATCHFTC298594.

**App. 684**

Defendants acknowledged that Match "puts you through the ringer [sic] if you want to cancel your subscription or get a refund."[6] Further, in 2016, Shar Dubey noted that "1 thing keeps coming up again and again that customers complain that they cancel and we still auto renew them."[7] In response, she was advised in no uncertain terms by multiple Match.com employees that the resignation flow could be simplified and was confusing members.[8] Yet as MGI CEO, she left Match.com's illegal cancellation flow in place.

Additionally, the FTC's allegations are bolstered by Defendants' own organizational charts. These organizational charts depict a corporate structure that places MGI and its executives at the top position with control and authority over wholly owned subsidiaries and dating platforms including match.com and many other dating platforms.[9]

Moreover, the FTC's allegations are supported by MGI's "written consent" documents that Defendants produced to the FTC, which consistently depict that MGI is the sole managing

---

[6] *See* MATCHFTC766621.

[7] MATCHFTC679045; MATCHFTC543542.

[8] *See* MATCHFTC679045; MATCHFTC543542 ("There is no doubt that the resignation flow is extraneous and potentially confusing. We can definitely simplify[.]"); MATCHFTC543542.

[9] *See, e.g.,* MATCHFTC741291; MATCHFTC741374; MATCHFTC741581; MATCHFTC741674; MATCHFTC741704; MATCHFTC741812; MATCHFTC742150; MATCHFTC742236; MATCHFTC742346; MATCHFTC742475; MATCHFTC742671; MATCHFTC742786; MATCHFTC742894; MATCHFTC743002; MATCHFTC743114; MATCHFTC743221; MATCHFTC743359; MATCHFTC744434; MATCHFTC744484; MATCHFTC744635; MATCHFTC774682; MATCHFTC774683; MATCHFTC774684; MATCHFTC774686; MATCHFTC774687; MATCHFTC774688; MATCHFTC774691; MATCHFTC774692; MATCHFTC774694; MATCHFTC774701; MATCHFTC774702; MATCHFTC774703; MATCHFTC774704; MATCHFTC774705; MATCHFTC774706; MATCHFTC774707; MATCHFTC774708; MATCHFTC774709; MATCHFTC774710; MATCHFTC774711; MATCHFTC774712; MATCHFTC774714; MATCHFTC774715; MATCHFTC774716; MATCHFTC774717; MATCHFTC774718; MATCHFTC774719; MATCHFTC774720.

**App. 685**

member of MGLLC and, as such, has the authority to appoint and remove officers to executive level positions at Match Group, LLC, formerly known as Match.com, LLC.[10]

Further, the FTC's allegations are bolstered by Defendants' responses to the FTC's discovery requests and deposition testimony. In its responses to the FTC's Second Set of Interrogatories, MGI admitted that it created, among other structures, a "reporting structure" known as Match Group North America ("MGNA").[11] Deposition testimony confirms that MGI oversees and controls match.com and several other dating platforms through MGNA. In the MGI 30(b)(6) deposition, Sharmistha Dubey testified that "Match Group North America is an aggregation of a few operating companies that have their development teams, engineering teams, et cetera, based out of North America." Dubey also explained that "Match Group North America is the oversight role" through which she was "overseeing four different operating companies that were based in North America." Dubey also clarified that the operating companies included match.com, OkCupid, Plenty of Fish, and the Affinity products."[12]

Finally, the FTC's allegations are further supported by MGI's public representations concerning 's MGI's role in operating match.com. In one instance, MGI represented to the Ninth Circuit that "Match Group, Inc. ("Match") is a Dallas, Texas-based online dating service which

---

[10] *See, e.g.,* MATCHFTC777046; MATCHFTC777049; MATCHFTC777052; MATCHFTC777055; MATCHFTC777057; MATCHFTC777059; MATCHFTC777061; MATCHFTC777064; MATCHFTC777066; MATCHFTC777069; MATCHFTC777071; MATCHFTC777074; MATCHFTC777077.

[11] *See* MGI's Responses to FTC's Second Set of Interrogatories, Response to Interrogatory No. 11.

[12] *See* Match Group, Inc. 30(b)(6) Dep. 11-12, March, 3, 2023.

**App. 686**

operates dating web sites in over 50 countries. Originally founded in 1993, Match operates

www.match.com and mobile apps."[13]

**Interrogatory No. 9:**

Identify and Describe any and all evidence that any dating platform owned by MGI, other

than Match.com, ever engaged in the practices challenged in paragraphs 39 through 53 and/or

paragraphs 61 through 64 of the Complaint.

**Response:**

The FTC objects to this request as overbroad and unduly burdensome to the extent that it

seeks to require Plaintiff to identify and describe "any and all evidence" that "any dating

platform owned by MGI" engaged in the practices that relate to entire counts in this case. Such a

response would constitute an overbroad contention interrogatory.[14]

The FTC further objects to this request as premature. Such evidence is more easily

accessible by Defendants than the FTC, yet Defendants have failed to adequately answer, search

---

[13] *See* Brief for Match Group, Inc. as Amicus Curiae, *Epic Games, Inc., vs. Apple Inc*., Nos. 21-16506 & 21-16695 (9th Cir.) (Nov. 29, 2021).

[14] *See, e.g.*, *Uniloc 2017, LLC v. Google, LLC*, No. 2:18-cv-00496, 2020 U.S. Dist. LEXIS 81190 (E.D. Tex. May 8, 2020) (citing *Sol IP, LLC v. AT&T Mobility LLC*, 2:18-cv-00526, 2020 U.S. Dist. LEXIS 2945 (E.D. Tex. Jan. 6, 2020)) (holding that "a court may deny a motion to compel with respect to an overly broad contention interrogatory" and holding that the interrogatory at issue, which sought "all evidence" concerning the case, was overbroad); *Lewis v. Eye Care Surgery Ctr., Inc.*, No. CV 21-475-SDD-RLB, 2023 WL 3029239, at *5 (M.D. La. Apr. 20, 2023) ("As with any interrogatory, however, a contention interrogatory may be overly broad where it seeks 'each and every' single fact upon which a party bases its case."); *In & Out Welders, Inc. v. H & E Equip. Servs. Inc.*, No. 16-86, 2018 WL 4224856, at *3 (M.D. La. Sept. 5, 2018) (same); *Linde v. Arab Bank, PLC*, No. 04-2799, 2012 U.S. Dist. LEXIS 39518, 2012 WL 957970 (E.D.N.Y. Mar. 21, 2012) (noting that courts have "tended toward a middle ground, requiring parties to explain the factual bases for their contentions by providing the material facts upon which they will rely, but not a detailed and exhaustive listing of all of the evidence that will be offered"); *United States v. Louisiana*, No. 11-cv-470, 2015 U.S. Dist. LEXIS 168039, at *13 (M.D. La. Dec. 16, 2015) (noting that while "interrogatory may reasonably ask for the material

**App. 687**

for and produce responsive evidence related this topic on the basis that such a request is irrelevant, among other things. *See e.g.,* Match Group, Inc.'s Responses and Objections to the FTC's Second Set of Interrogatories, Response to Interrogatory Nos. 11 and 12 (objecting that the FTC's request on this issue is irrelevant and not proportional to the needs of this case and refusing to search for and produce evidence on this basis). Because Defendants have failed to fully respond and produce evidence on this topic, the FTC is unable to provide a complete answer and the FTC will address the numerous deficiencies in Defendant's responses to the FTC's discovery requests in a forthcoming deficiency letter. The FTC will amend its response, as permitted by the Federal Rules, if and when new testimony or documentary evidence is provided by Defendants responsive to this Interrogatory.

Although Defendants have failed to fully respond and produce evidence, the FTC responds as follows based on the information and documents in its possession. Below, the FTC has provided an extensive (but not exhaustive) list of evidence. Further, while the FTC is not obligated under the Federal Rules to identify and describe every conceivable piece of evidence supporting its allegations, specific examples are provided below.

First, in the MGI 30(b)(6) deposition, Sharmistha Dubey testified that MGI created Match Group North America, which oversaw four different operating companies, including match.com, OkCupid, Plenty of Fish, and the Affinity products.[15] Mandy Ginsberg (former CEO of MGI) confirmed that MGI oversaw and managed several dating platforms or operating companies by testifying in her deposition that "as MGI's CEO, I was responsible for the public

---

or principal facts which support a contention," it may be overbroad if "it seeks 'each and every' single fact upon which a party bases its case").

[15] *See* Match Group, Inc. 30(b)(6) Dep. 11-12, March, 3, 2023.

**App. 688**

company and spent most of my time really running the—well, managing the CEOs who were running the different brands… the CEOs or GMs that reported up to me were… Plenty of Fish, Match.com, OkCupid, PAIRS in Japan. There's a lot of them… Hinge… We had really dozens of brands."[16] Second, internal correspondence reflects that executives and employees at Plenty of Fish, Tinder, and OkCupid were engaged in several discussions with employees working directly for Match.com on issues related to the FTC's claims in this case.[17] Indeed, in a June 2017 email thread, the Vice President of Revenue Optimization at Plenty of Fish requests help from Defendants by asking, for example, "is there anyone on your end that's got some experience with disputing Chargebacks? We're hoping to find someone that can help us dispute our CBs in a very quick time frame…" to which Defendants respond by providing a "sample chargeback dispute document that we discussed back in March" and offering to walk Plenty of Fish customer care team through the chargeback process.[18]

**Interrogatory No. 10:**

Identify and Describe any and all factual bases and evidence supporting the FTC's contention that MGI is in any way directly or indirectly liable for the conduct complained of in Counts III, IV, and V of the Complaint.

---

[16] *See* Mandy Ginsberg Dep. 17, February 23, 2023.

[17] *See e.g.*, MATCHFTC600954; MATCHFTC601016; MATCHFTC601018; MATCHFTC819805; MATCHFTC825389; MATCHFTC826503; MATCHFTC827594; MATCHFTC828941; MATCHFTC830483; MATCHFTC825306; MATCHFTC749007; MATCHFTC826866; MATCHFTC827028; MATCHFTC827608; MATCHFTC827846; MATCHFTC827919; MATCHFTC828124; MATCHFTC828557; MATCHFTC828757; MATCHFTC828817; MATCHFTC826682; MATCHFTC822812; MATCHFTC827563.

[18] *See* MATCHFTC830483.

**App. 689**

**Response:**

The FTC objects to this request as overbroad and unduly burdensome to the extent that it seeks to require Plaintiff to identify and describe "any and all factual bases and evidence" supporting Counts III, IV, and V in this case. Such a request would constitute an overbroad contention interrogatory.[19] The FTC also objects to this Request insofar as it seeks the identification and description of documents that were prepared in anticipation of litigation or for trial by or for Plaintiff or its representative. FED. R. CIV. P. 26(b)(3)(A).

The FTC will reasonably identify evidence supporting its allegations concerning or relating to MGI's liability in the Counts alleged in this case. Below, the FTC has provided an extensive (but not exhaustive) list of evidence. Further, while the FTC is not obligated under the Federal Rules to identify and describe every conceivable piece of evidence supporting its allegations, specific examples are provided below.

The FTC further objects to this request as premature. Such evidence is more easily accessible by Defendants than the FTC, yet Defendants have failed to adequately answer, search

---

[19] *See, e.g.*, *Uniloc 2017, LLC v. Google, LLC*, No. 2:18-cv-00496, 2020 U.S. Dist. LEXIS 81190 (E.D. Tex. May 8, 2020) (citing *Sol IP, LLC v. AT&T Mobility LLC*, 2:18-cv-00526, 2020 U.S. Dist. LEXIS 2945 (E.D. Tex. Jan. 6, 2020)) (holding that "a court may deny a motion to compel with respect to an overly broad contention interrogatory" and holding that the interrogatory at issue, which sought "all evidence" concerning the case, was overbroad); *Lewis v. Eye Care Surgery Ctr., Inc.*, No. CV 21-475-SDD-RLB, 2023 WL 3029239, at *5 (M.D. La. Apr. 20, 2023) ("As with any interrogatory, however, a contention interrogatory may be overly broad where it seeks 'each and every' single fact upon which a party bases its case."); *In & Out Welders, Inc. v. H & E Equip. Servs. Inc.*, No. 16-86, 2018 WL 4224856, at *3 (M.D. La. Sept. 5, 2018) (same); *Linde v. Arab Bank, PLC*, No. 04-2799, 2012 U.S. Dist. LEXIS 39518, 2012 WL 957970 (E.D.N.Y. Mar. 21, 2012) (noting that courts have "tended toward a middle ground, requiring parties to explain the factual bases for their contentions by providing the material facts upon which they will rely, but not a detailed and exhaustive listing of all of the evidence that will be offered"); *United States v. Louisiana*, No. 11-cv-470, 2015 U.S. Dist. LEXIS 168039, at *13 (M.D. La. Dec. 16, 2015) (noting that while "interrogatory may reasonably ask for the material or principal facts which support a contention," it may be overbroad if "it seeks 'each and every' single fact upon which a party bases its case").

**App. 690**

for and produce responsive evidence related this topic on the basis that such a request is irrelevant, among other things. *See e.g.,* Match Group, Inc.'s Responses and Objections to the FTC's Second Set of Interrogatories, Response to Interrogatory Nos. 11 and 12 (objecting that the FTC's request on this issue is irrelevant and not proportional to the needs of this case and refusing to search for and produce evidence on this basis). Because Defendants have failed to fully respond and produce evidence on this topic, the FTC is unable to provide a complete answer and the FTC will address the numerous deficiencies in Defendants' responses to the FTC's discovery requests in a forthcoming deficiency letter. The FTC will amend its response, as permitted by the Federal Rules, if and when new testimony or documentary evidence is provided by Defendants responsive to this Interrogatory.

Although Defendants have failed to fully respond and produce evidence, the FTC responds as follows based on the information and documents in its possession. Below, the FTC has provided an extensive (but not exhaustive) list of evidence. Further, while the FTC is not obligated under the Federal Rules to identify and describe every conceivable piece of evidence supporting its allegations, specific examples are provided below.

The FTC's claims are supported by Defendants' internal correspondence, which demonstrate that several MGLLC employees working directly for Match.com, including those who subsequently became MGI executives, were involved in operating Match.com and knew its subscribers were confused by the Match Guarantee requirements and redemption process, were being harmed by Match.com's Chargeback Policy, and were failing to complete the online cancellation flow as they intended.[20]

---

[20] *See e.g.*, MATCHFTC380042; MATCHFTC748121; MATCHFTC748471; MATCHFTC748736; MATCHFTC_Sample0000307; MATCHFTC519878; MATCHFTC519936; MATCHFTC536801; MATCHFTC537085; MATCHFTC545967;

**App. 691**

The FTC's allegations are further supported by numerous consumer complaints, including those previously identified in response to MGI's prior discovery requests and produced on August 25, 2022.[21] Consumers made these complaints to the FTC, the Better Business Bureau, various law enforcement agencies, and Defendants themselves. These complaints highlight the insufficiency of Defendants' disclosures concerning the Match Guarantee, including Match.com's failure to adequately disclose the many limitations on qualifying for a Guarantee Extension, the existence of a Match Guarantee "Progress Page," and the requirement that users act affirmatively to redeem the guarantee offer within a specific seven-day window.

---

MATCHFTC561205; MATCHFTC601018; MATCHFTC601119; MATCHFTC601377;
MATCHFTC603392; MATCHFTC603553; MATCHFTC000843; MATCHFTC675343;
MATCHFTC680620; MATCHFTC298594; MATCHFTC365570; MATCHFTC387821;
MATCHFTC405364; MATCHFTC433153; MATCHFTC_Sample0001921;
MATCHFTC517210; MATCHFTC519936; MATCHFTC521397; MATCHFTC528101;
MATCHFTC536801; MATCHFTC557155; MATCHFTC601035; MATCHFTC601438;
MATCHFTC650110; MATCHFTC650287; MATCHFTC654132; MATCHFTC745343;
MATCHFTC748484; MATCHFTC752309; MATCHFTC766621; MATCHFTC816240;
MATCHFTC816333; MATCHFTC821066; MATCHFTC822812; MATCHFTC825479;
MATCHFTC825936; MATCHFTC825959; MATCHFTC826492; MATCHFTC826869;
MATCHFTC827057; MATCHFTC519918; MATCHFTC568737; MATCHFTC344243;
MATCHFTC801010; MATCHFTC419106; MATCHFTC415890; MATCHFTC467915;
MATCHFTC451515; MATCHFTC786749; MATCHFTC707349; MATCHFTC419111;
MATCHFTC417553; MATCHFTC731717; MATCHFTC700484; MATCHFTC329585;
MATCHFTC846210; MATCHFTC416286; MATCHFTC717261; MATCHFTC452091;
MATCHFTC644116; MATCHFTC647238; MATCHFTC835693; MATCHFTC661136;
MATCHFTC822812; MATCHFTC833443; MATCHFTC471469; MATCHFTC469164;
MATCHFTC766737; MATCHFTC731875; MATCHFTC766453; MATCHFTC749741;
MATCHFTC760881; MATCHFTC800116; MATCHFTC416276; MATCHFTC785890;
MATCHFTC839891; MATCHFTC521299; MATCHFTC452092; MATCHFTC644115;
MATCHFTC672601; MATCHFTC729476; MATCHFTC647239.

[21] *See e.g.*, MATCHFTC668518; MATCHFTC668524; MATCHFTC729479;
MATCHFTC732530; MATCHFTC770946; MATCHFTC774871; MATCHFTC783719.

Lastly, the FTC's allegations are supported by the evidence cited in its Response to Interrogatory No. 8, above.

Date: May 19, 2023

*/s/ REID TEPFER*
REID TEPFER
M. HASAN AIJAZ
SARAH ZUCKERMAN (admitted pro hac vice)
JOHN R. O'GORMAN (admitted pro hac vice)
ERICA ROLLINS HILLIARD
JASON C. MOON
Texas Bar No. 24079444 (Tepfer)
Virginia Bar No. 80073 (Aijaz)
New York Bar No. 5603832 (Zuckerman)
Texas Bar No. 2421292 (O'Gorman)
Mississippi Bar No. 104244 (Hilliard)
Texas Bar No. 24001188 (Moon)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
T: (214) 979-9395 (Tepfer)
T: (214) 979-9386 (Aijaz)
T: (214) 979-9362 (Wilshire)
T: (214) 979-9376 (Zuckerman)
T: (214) 979-9382 (O'Gorman)
T: (214) 979-9379 (Hilliard)
T: (214) 979-9378 (Moon)
Email: rtepfer@ftc.gov;
maijaz@ftc.gov;
mwilshire@ftc.gov;
szuckerman@ftc.gov;
jogorman@ftc.gov;
ehilliard@ftc.gov;
jmoon@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

**App. 693**

## CERTIFICATE OF SERVICE

I, REID TEPFER, certify that, on May 19, 2023, I served the foregoing Plaintiff's Responses to Defendant Match Group Inc.'s Second Set of Interrogatories by email on the following counsel of record at the email address listed below:

Angela C. Zambrano
angela.zambrano@sidley.com

Chad Hummel
chummel@sidley.com
Sidley Austin LLP

*Attorneys for Defendant*
*Match Group, Inc.*
*And Match Group LLC*

By: /s/ REID TEPFER

**App. 694**

# EXHIBIT 56

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 3:19-cv-02281-K |
| Plaintiff, | **PLAINTIFF'S FOURTH AMENDED RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES** |
| v. | |
| MATCH GROUP, INC., a corporation, and | |
| MATCH GROUP, LLC, formerly known as MATCH.COM, LLC, a limited liability company, | |
| Defendants. | |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and subject to the general and specific objections set forth below, Plaintiff, the Federal Trade Commission ("FTC") responds to Defendant Match Group Inc.'s ("Match" or "MGI") First Set of Interrogatories.

## I.    GENERAL OBJECTIONS

1. **Compound Interrogatories.** Plaintiff objects to interrogatories that contain discrete requests and therefore constitute compound interrogatories. Including subparts, no more than twenty-five interrogatories may be given without a leave of court. Fed. R. Civ. P. 33(a). "'[W]here the first question can be answered fully and completely without answering the second question, then the second question is totally independent of the first and not factually subsumed within it.'" *FTC v. Think All Pub LLC*, No. 4:07-CV-011, 2008 WL 687455, *1 (E.D. Tex. 2008).

2. **Blockbuster Interrogatories.** Plaintiff objects to Match's impermissible "blockbuster interrogatories" seeking *all* facts without regard for materiality, proportionality, time, and

1

**App. 696**

expense. A party cannot "indiscriminately hurl[] interrogatories at every conceivable detail and fact which may relate to a case." *Nieman v. Hale*, No. 3:12-CV-2433-L-BN, 2013 WL 6814789, at *11 (N.D. Tex. Dec. 26, 2013) (quoting *Grynberg v. Total S.A., Inc.*, No. 3–cv–1280, 2006 WL 1186836, at *5–*7 (D. Colo. May 3, 2006)). Blockbuster interrogatories "ask not merely for material or principal facts. They seek 'each and every fact' supporting the allegations of plaintiff, no matter how insignificant or minor." *Hilt v. SFC Inc.*, 170 F.R.D. 182, 186 (D. Kan. 1997).

3. **Lack of Waiver; Right to Modify.** The following responses are made without waiving any objections raised by the FTC in this proceeding or any objections the FTC may have with respect to the subsequent use of these answers. The FTC specifically reserves: (a) the right to challenge authenticity or admissibility of documents referred to in the interrogatory responses; (b) the right to object on any and all proper grounds, at any time to other discovery procedures involving or relating to the subject matter of interrogatories answered herein; and (c) the right, at any time, upon proper showing, to revise, correct or clarify the following responses.

4. **Right to Supplement.** The FTC reserves the right to supplement and will supplement these responses as required under Fed. R. Civ. P. 26(e) if additional responsive information becomes available.

5. **Attorney Client Privilege, Deliberative Process Privilege, and Attorney Work Product Doctrine.** Plaintiff generally objects to Match's requests to Plaintiff insofar as these seek, directly or indirectly, information subject to the attorney client privilege, deliberative process privilege or work product doctrine.

**App. 697**

6. **Scope of Discovery.** Plaintiff objects to Match's Interrogatories to the extent that the instructions and definitions attempt to impose upon the Plaintiff obligations greater than those required by the Federal Rules of Civil Procedure.

## II.  OBJECTIONS AND RESPONSES

**INTERROGATORY NO. 1:** Identify and Describe the basis for Your belief that Match Group, Inc. "is about to violate" the FTC Act, Including a statement of all facts and evidence that You believe give rise to a fair inference of a reasonable expectation of continued violations absent restraint.

**ANSWER:**

The FTC responds that it has already disclosed to Defendants the basis for Plaintiff's belief that a reasonable expectation exists that Defendants would violate the law absent restraint, allegations this Court found sufficient to reject Match's contrary motion to dismiss arguments. *See* Dkts 1, 20, 27, and 86. First, there is no evidence that Match's cancellation practices, which the FTC alleges violates ROSCA, have changed in any meaningful way since the beginning of the FTC's investigation of Match.com and thus Defendants have been, are currently, and will continue, to violate the law unless placed under order. Second, to the extent Defendants have discontinued other practices, even if Defendants were not currently violating the law, which they are, past conduct can indicate "that there is a reasonable likelihood of further violations." *SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978).

Specifically, in deciding whether to issue an injunction, courts in the Fifth Circuit look at a number of factors, including: the egregiousness of the defendant's actions; the isolated or recurrent nature of the infraction; the degree of scienter involved; the sincerity of the defendant's assurances against future violations; the defendant's recognition of the wrongful nature of his conduct; and whether the defendant's occupation presents opportunities for future violations. *See id.* Each of these factors support the issuance of an injunction here. Defendants engaged in

3

egregious, recurring conduct with the scienter of knowing it was earning money at their customer's expense, as described in paragraphs ¶¶ 3, 23, 29-37, 50, 57-59, 64 of the complaint.

Defendants have yet to offer credible assurances against future violations. Defendants continued their illegal conduct for years despite numerous consumer complaints and notice from the Better Business Bureau that their practices were deceptive. Defendants even continued them during a federal investigation into these same practices. Defendants suspended their illegal activities only on the eve of the filing of this lawsuit. Moreover, Defendants have vigorously denied that any of their practices were deceptive, unfair, or illegal. Defendants have not taken any action to bind themselves from engaging in the challenged practices in the future. Recently, Defendants filed a so-called "stipulation" stating that it "shall serve as a binding and sincere commitment by the Defendants to never again engage in the Permanently Discontinued Practices." Dkt. 146 at 1-3. Defendants are the only party to this stipulation, which merely denies the FTC's allegations. This "stipulation" is nonbinding, unenforceable, ambiguously drafted, and overly narrow. Defendants could easily reinstitute the challenged practices and the FTC would be left without recourse. Moreover, Defendants could make minor changes to these practices and not contradict these representations. Moreover, this stipulation appears to have been filed merely as a means of avoiding the FTC's discovery requests. In short, Defendants have never admitted or acknowledged the challenged practices were unlawful, and instead has only claimed that it stopped and would not reengage in those practices when it benefitted them and have done so in a manner with no obvious enforcement mechanism.

Match's ability to engage in this conduct on this platform and the dozens of other platforms it owns and controls, would allow it to easily resume and expand any of the practices challenged in the complaint. *See* Compl. ¶¶ 10-15, 64; *see also* Dkt. 27 at 6-7.

4

Defendants knew that their problems were longstanding, affected all five counts described in the complaint, and failed to correct their wrongdoing. Defendants' employees noted long-standing problems with the guarantee, including that the tracker was flawed, that it had a poor redemption flow, and that even eligible consumers missed redeeming the guarantee. *See* MATCHFTC344243, MATCHFTC415890, MATCHFTC452091, MATCHFTC467915, MATCHFTC469164, MATCHFTC521299, MATCHFTC568737, MATCHFTC644115, MATCHFTC647443 (internal correspondence describing problems with the guarantee). The numbers perfectly illustrate the egregiousness of Match's practices, of more than 2.5 million subscriptions sold that were subject to the guarantee, not even 2 percent of subscribers redeemed the guarantee whereas close to half were billed for at least one additional subscription period. *See* Match's May 30, 2017, letter to the FTC. Because Defendants only suspended this practice when under federal investigation without admitting wrongdoing, despite knowing the long-standing and widespread harm caused by their practices, Defendants are likely to engage in the same or similar wrongdoing, including the institution of a similar guarantee, unless under order. Likewise, Defendants egregiously kept their consumers' money while removing paid-for services of those consumers who initiated a chargeback that Defendants successfully challenged. *See* Match's MATCHFTC429717, MATCHFTC313570, MATCHFTC312357; MATCHFTC420258; MATCHFTC352332. Match's chargeback behavior is "likely to recur," in part, because it has never stopped—it appears Match Group, Inc. may be continuing to engage in similar practices across its other dating websites, including PlentyOfFish, Tinder, and OkCupid. *See* F01-MG-0028770- F01-MG-0028773 (terms of use of MGI's dating platforms).

Last, Match's ROSCA practices are as egregious as the rest. Match's own records characterize the online cancellation process as confusing, misleading, in need of repair, hard to

5

**App. 700**

find, and tedious. *See* MATCHFTC669602, MATCHFTC669157, MATCHFTC667211,

MATCHFTC646192, MATCHFTC604834, MATCHFTC604757, MATCHFTC601548,

MATCHFTC601397, MATCHFTC579050, MATCHFTC568900, MATCHFTC467915,

MATCHFTC545351, MATCHFTC543666, MATCHFTC543542, MATCHFTC529047,

MATCHFTC528098, MATCHFTC519412, MATCHFTC499728, MATCHFTC495267,

MATCHFTC494559, MATCHFTC491446, MATCHFTC485296, MATCHFTC485041,

MATCHFTC477153, MATCHFTC473469, MATCHFTC464887, MATCHFTC571491,

MATCHFTC429717, MATCHFTC417536, MATCHFTC417535, MATCHFTC406132,

MATCHFTC405364, MATCHFTC371904, MATCHFTC369268, MATCHFTC336923,

MATCHFTC320168, MATCHFTC313402, MATCHFTC312903, MATCHFTC306318,

MATFTC545351, MATCHFTC713047, MATCHFTC471469 (internal correspondence and

documents identifying problems with cancellation flow). Defendants designed and refused to fix

a misleading cancellation process that, for at least ten years, allowed consumers to think they had

canceled their subscriptions when, in fact, they had just been duped by the cancellation process.

The evidence cited above shows that Defendants are currently violating the law, have done so

knowingly, and will continue to do so absent restraint. The FTC also refers MGI to the FTC's

responses to Interrogatories 2 through 7.

     Defendants' longstanding practice of knowingly engaging in egregious business

practices, coupled with their failure to even acknowledge their wrongdoing, support an

injunction in this matter.

     Finally, Plaintiff notes that some of the illegal conduct that MGI has represented has

ceased may in fact be ongoing on Match.com or MGI's other dating sites. Specifically,

Match.com's chargeback policies may have violated the law as alleged in Count IV until

**App. 701**

recently.[1] Moreover, MGI's other dating sites provide include similar terms buried in their terms of use documents, although these sites are silent as to whether consumers even have the option to get their account reinstated through customer service. In sum, any changes appear to not have remedied MGI's law violations, and MGI's other dating sites likewise may have illegal chargeback policies. At a bare minimum, these policies, which are central to Count IV, and the ambiguity concerning how MGI's dating sites are implementing them provide the FTC a good-faith basis to seek further information in discovery.

While MGI claims it has permanently discontinued the conduct alleged in Counts III and IV, these claims are not credible. First, despite knowing for years that these practices caused consumer harm, MGI only represented that it stopped engaging in those practices while under federal investigation and in the face of impending litigation, and it has repeated their claims to delay producing relevant documents and information in discovery. These claims also have no binding effect and do not prevent MGI from engaging in conduct that it has never acknowledged was wrong. Moreover, and as described above specifically with respect to MGI's chargeback practices, publicly available evidence calls into question whether MGI has ceased this unfair practice on other websites. Lastly, Defendants have continued their illegal cancellation practices to this day, further establishing that their suspension of the conduct alleged in Counts III and IV was mere litigation posturing, rather than a response their customers' complaints.

---

[1] Although Defendants have represented that Match.com automatically reinstates a subscribers account when they lose their chargeback dispute and has done so since 2019, this statement is at odds with the website's current terms of use. Its publicly available terms and conditions currently state: "If you initiate a chargeback or otherwise reverse a payment made with your External Service Account, Match may terminate your account immediately in its sole discretion, on the basis that you have determined that you do not want a Match subscription. In the event that your chargeback or other payment reversal is overturned, please contact Customer Care." See Match.com's Terms of Use Agreement (Sept. 1, 2022), https://www.match.com/registration/membagr.aspx. In other words, consumers do not have their account access reinstated automatically—they must contact customer care, something a customer would not know without combing through Match.com's lengthy terms of use document. Even then, these terms do not make clear what, if anything, customer care would do to resolve the issue.

**App. 702**

No part of this response should be interpreted or construed as a limit on the materials or arguments the FTC will present at trial. The FTC reserves the right to amend or supplement this answer as permitted by the federal rules, in particular after Defendant produces the discovery the Court has compelled.

**INTERROGATORY NO. 2:** Identify and Describe all features of Match.com's Online Cancellation Flow that You contend make the Online Cancellation Flow not "simple," as that term is used in ROSCA, 15 U.S.C. § 8403, Including a description of what changes You contend would be necessary to make the Online Cancellation Flow simple.

**ANSWER:**

The FTC responds that Defendants' own executives have described their cancellation method as confusing, burdensome, cumbersome, hard to find, tedious, convoluted and that they knew consumers were getting billed after they had thought they canceled their subscriptions. *See* Compl. ¶ 53-59; *see also* MATCHFTC312903,  MATCHFTC313402,  MATCHFTC320168, MATCHFTC336923,  MATCHFTC369268,  MATCHFTC371904,  MATCHFTC405364, MATCHFTC406132,  MATCHFTC417535,  MATCHFTC417536,  MATCHFTC429717, MATCHFTC464887,  MATCHFTC467915,  MATCHFTC473469,  MATCHFTC477153, MATCHFTC485041,  MATCHFTC485296,  MATCHFTC491446,  MATCHFTC494559, MATCHFTC495267,  MATCHFTC499728,  MATCHFTC519412,  MATCHFTC528098, MATCHFTC529047,  MATCHFTC543542,  MATCHFTC543666,  MATCHFTC545351, MATCHFTC568900,  MATCHFTC571491,  MATCHFTC579050,  MATCHFTC601397, MATCHFTC601548,  MATCHFTC604757,  MATCHFTC604834,  MATCHFTC646192, MATCHFTC667211,  MATCHFTC669157, MATCHFTC669602, MATCHFTC728586 (internal correspondence demonstrating knowledge of problems with cancellation flow and of consumer complaints related to the flawed process); *see also* MATCH491446. The FTC contends such characterizations by Defendants' own employees are accurate. Match's own

**App. 703**

internal documents identified the problems with their cancellation process, including that the cancellation flow was hard to find on the Match.com website, took too many clicks to complete, was difficult to understand, left consumers mistakenly believing that they had completed the cancellation process by presenting a survey that appeared to signal the end of the cancellation process when it fact it had to be clicked through, had a password wall that blocked members from cancelling, and had been that way for at least 10 years. *Id.*

Again, the FTC contends these are accurate criticisms. Currently, to navigate to Defendants' online cancellation flow, customers must click on a small gear icon on the home page, click "Manage Subscription," enter their password, and then enter and successfully complete the misleading cancellation flow. Although Defendants include information about cancellation on Match.com's FAQ page, they have taken steps to make this information difficult to locate. *See* https://help.match.com/hc/en-us/categories/6140419857819-Manage-My-Subscription (displaying six articles but requiring that consumers click "See all 7 articles" to see the seventh, which concerns cancellation).

Match's cancellation flow also had misleading text in the middle of the cancellation flow that states "Before you go" above a survey—misleading consumers into thinking the cancellation is complete, when in fact consumers needed to continue past the survey to actually cancel. MATCHFTC604757. Until recently, Match.com often included a confusing save offer in their cancellation process, which included a button only for accepting the save offer and a link for declining. Instead of including a "continue cancellation" button, as on other screens, this version of the same offer included a button that merely said "continue," which made unclear whether the consumer would be continuing with the cancellation or the offer. Moreover, Match.com has had a flawed password reset mechanism that also prevented consumers from simply canceling their

9

account if they had forgotten their password. MATCHFTC465940, MATCHFTC752185. Unsurprisingly, evidence shows that a significant percentage of consumers who enter the cancellation flow dropout at the password-entry prompt. Consumers have complained consistently about Match's misleading cancellation process to the company, and it was aware of and agreed that the process was misleading, but it decided not to fix the cancellation process, instead keeping it as a profit center. MATCHFTC312903, MATCHFTC313402, MATCHFTC320168, MATCHFTC336923, MATCHFTC369268, MATCHFTC519412.

In fact, instead of correcting these issues after they were brought to their attention, Defendants made the cancellation process more difficult. Approximately four months before the filing of the FTC's complaint (and despite knowing they were under investigation for their cancellation practices), Defendants deleted the word "cancel" from the account settings menu entirely. As a result, since approximately May 2019, customers who attempt to cancel do not even see the word "cancel" until after the password entry screen, which is several steps into the cancellation process and which, as noted above, prevents many consumers from completing the cancellation flow. Evidence suggests that this process was intentionally made more difficult for consumers. Defendants have attempted to increase "performance" of the cancellation flow, which they defined as lessening the number of consumers who consumers successfully complete it. *See* MATCHFTC47908.

Next, the FTC responds to provide "a description of what changes You contend would be necessary to make the Online Cancellation Flow simple." Although there are many ways by which MGI could design a simple cancellation method, taking the steps below would conform with the Commission's guidance on how to do so.

As an initial matter, Defendants would have to address each of the problems outlined above. This would include:

- Providing a clear and prominent link to cancel subscriptions in locations where subscribers would expect to find it clearly labeling the link as cancellation;

- Eliminating the use of misleading language, including language that falsely suggests that subscribers have cancelled when they have not yet done so, and instead using language that clearly indicates to consumers how to complete any cancellation mechanism;

- Eliminating user interfaces that trick or manipulate consumers into abandoning the cancellation flow;

- Eliminating the requirement that subscribers re-enter their passwords to cancel; and

- Minimizing the number of steps necessary to cancel.

In addition, although ROSCA does not require specific features to comply with the law, the Defendants could ensure their cancellation method is simple by following FTC guidance. In the FTC's Negative Option Policy Statement, which provides guidance to online marketers concerning cancellation mechanism for negative option plans, the Commission states that a cancellation mechanism should be "at least as easy to use as the method the consumer used to initiate the negative option feature." See 86 Fed. Reg. 60822. In the case of Match.com, this would include an adequately disclosed one-click cancellation mechanism without any requirement that the user navigate past save offers or survey pages before completing cancellation.

Further, as the FTC testified in its 30(b)(6) deposition, for a cancellation mechanism to be considered "simple" under the law, it must be "easy to find and easy to use." Defendants' cancellation mechanism is currently neither. Providing a prominent link to cancel, and allowing

**App. 706**

one-click cancellation would provide a method that is easy to locate and use, provided that the Defendants did not employ any tactics, such as the survey page discussed above, that would frustrate or confuse subscribers. Indeed, in its Second Amended Responses to Defendant's First Set of Interrogatories the FTC provided Defendants a concrete example of a simple-cancellation mechanism they could implement if they so choose: an adequately disclosed one-click cancellation process.

Finally, Defendants must cease their intentional efforts to make their online cancellation mechanism more difficult for consumers to complete. Defendants have tested various versions of their cancellation flow and the effect changes have on cancellation rates. However, Defendants' tests are not to determine which version is most frequently successfully completed by consumers. Rather, Defendants have attempted to get "better performance" of the cancellation flow, which they define as fewer consumers successfully completing it. See MATCHFTC47908. Simply put, the evidence shows Defendants could create a simple cancellation mechanism if they were so inclined. While this does not concern a specific feature, by actively seeking to frustrate their customers' intent to cancellation, Defendants all but ensure that their online cancellation mechanism will not be simple

For purposes of clarity, the FTC is seeking injunctive relief that goes beyond what is strictly required to comply with ROSCA. Such relief is appropriate, as Defendants should not be allowed to do the bare minimum required by ROSCA given their long history of knowingly violating that law. Such "fencing-in" relief has been expressly upheld by the Supreme Court and is within the Court's authority. *See FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) (citations and quotation marks omitted) ("The Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. Having been

**App. 707**

caught violating the Act, respondents must expect some fencing in."); *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952) (holding that the FTC "cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity."); *Kraft, Inc. v. FTC*, 970 F.2d 311, 326 (7th Cir. 1992) (describing factors used to assess appropriateness of "fencing-in" relief) (citations omitted). The FTC directs Defendants to **Attachment A**, which is a proposed order containing the precise injunctive relief the FTC seeks.

The FTC may supplement this answer as permitted by the Federal Rules. No part of this response should be interpreted or construed as a limit on the materials or arguments the FTC will present at trial.

**INTERROGATORY NO. 3:** Identify and Describe the harm to consumers that You contend resulted from the alleged lack of a simple online cancellation method, Including how the damages caused by that harm were calculated, the number of users that You believe were unable to cancel their subscription as a result of the alleged lack of a simple cancellation method, and the amount of harm/damages per user.

**ANSWER:**

As you acknowledged in our August 24, 2022 conference on MGI's Motion to Compel, the FTC's calculations are dependent on Defendants providing accurate and reliable billing and click-through data regarding users who attempted to cancel their subscription. Moreover, the produced data is current only through December 2022, and the harm is ongoing.[2]

Match's failure to provide simple cancelation mechanisms caused users to unsuccessfully attempt to cancel their subscription or led them to believe they had cancelled their subscription

---

[2] The FTC notes that this interrogatory has an implicit, and incorrect, assumption that the FTC is seeking monetary relief for all users who were unable to cancel their subscription because of Defendants' failure to provide simple cancellation mechanisms. Specifically, the interrogatory requests that the FTC state "the number of users that You believe were unable to cancel their

13

when they in fact had not. This harmed users by causing unwanted and unauthorized charges after their attempt to cancel their subscription. Users were also harmed by the time lost seeking refunds, disputing charges with their financial institutions, and in using non-simple mechanisms to cancel, although the FTC has not included this harm in its calculation.

In response to the FTC's request for data regarding individual attempts by users to cancel, Defendants have produced the data in MATCHFTC846469. According to that data, since October 2016, 7,701,958 users have entered the cancellation flow to cancel their subscription, as shown by the number of users that visited the webpage associated with pagecode 189 on the match.com website. Of those users, 122,235 accepted a save offer and 6,154,160 successfully cancelled their subscription using the online flow. The FTC contends that the remaining 1,425,563 users did not cancel their subscription because of Defendants' failure to offer simple mechanisms to cancel.[3]

The relevant time period for the consumer injury calculation begins October 2016 and continues to the present day. *See* 15 U.S.C § 57b. The FTC estimates that the total monetary harm attributable to Defendants' failure to provide simple cancellation mechanisms as of

---

subscription as a result of the alleged lack of a simple cancelation method." However, not all such users are included in the monetary relief calculations. For example, the calculation does not include users that Match did not charge autorenewal fees (because they later successfully cancelled or for any other reason) or who have already recouped the charged fees, through refunds or chargebacks.

[3] These users have been harmed by Defendants' failure to offer simple mechanisms to cancel their subscription, including through direct financial loss of autorenewal fees, time lost seeking refunds, disputing charges with their financial institutions, and in using non-simple mechanisms to cancel. Some were able to recoup some or all of their direct financial loss of autorenewal fees through refunds and chargebacks. Others were able to avoid direct financial loss by cancelling their subscriptions before renewal through a mechanism other than the online flow or because they were not charged a renewal fee because their credit cards had expired. While the FTC is seeking monetary relief only for those users who suffered direct financial harm, the FTC is seeking injunctive relief that would prevent harm to all of Defendants' users.

**App. 709**

December 2022 is $68,607,100.43.[4] The FTC calculates this amount based on the billing data produced in MATCHFTC846516 by totaling the amounts of money Defendants collected from users who exited the cancellation flow and subtracting the amounts that individuals recouped through refunds and chargebacks.

This data also specifies how many users exited the cancellation flow on each particular page of Match.com's online cancellation flow and then identifies the amount of revenue (calculated by autorenewal fees minus refunds and chargebacks) that Defendants later collected from those users through unauthorized renewal fees. The harm on a per-page basis is attributable as follows:[5]

| | |
|---|---|
| Password Wall: | $25,228,818.20 |
| Post-Password Wall: | $33,051,378.49[6] |
| First Survey Page: | $3,887,455.88 |
| Save Offer: | $4,936,682.55 |
| Second Survey: | $1,502,765.31 |

The FTC is currently unable to provide an estimate of harm per user because Defendants have failed to produce information necessary for such an assessment. Specifically, although

---

[4] The FTC's initial response to this interrogatory included estimates based on incomplete data and intended for mediation or settlement purposes of the amount of harm at issue. After meeting and conferring with counsel for Defendants, Defendants provided updated data, which has allowed the FTC to amend its response herein with a more accurate estimate.

[5] Tens of thousands of individuals did not effectively cancel their membership despite having viewed the cancellation confirmation page. *See* MATCHFTC846519. The FTC has not received updated dollar values of the amount that Defendants collected from these users, and the FTC reserves the right to include these amounts in its calculation of user harm.

[6] Users are presented with two hyperlinks on this page, one that continues the cancellation process and another that sends users to a subscription status page. The FTC has requested, but Defendants have not produced, data related to users that click on the "subscription status"

**App. 710**

Defendants have produced a total volume of refunds, they have not shown how many users received total refunds or were fully compensated through chargebacks or a combination of chargebacks and refunds. Without this data, the FTC does not have a denominator—the number of users—with which to calculate harm per user.

**INTERROGATORY NO. 4:** State whether You contend that the Match.com methods of cancellation other than the Online Cancellation Flow (Including online chat, telephone, mail, and fax) are not simple, and explain why You contend each method is simple or not simple, Including a description of all facts supporting Your contentions.

**ANSWER:**

The FTC alleges in Count V that "Defendants have failed to provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account."  This contention is not limited to any particular method of cancellation, but to the service as a whole.  To the extent that this Interrogatory requests further information, FTC objects on the grounds that it is overbroad, vague, unduly burdensome, and not proportional to the needs of the case. The FTC also objects to the Request to the extent it implies that every method of cancellation must not be simple in order for a company to violate ROSCA. The FTC further objects to this Interrogatory on the grounds that it

---

hyperlink. The FTC is willing, and has informed Defendants, that—if Defendants produce the necessary data—it would reduce its calculation of monetary relief by the amount of autorenewal fees net of refunds and chargebacks attributable to users that clicked on the "subscription status" link.

Similarly, if Defendants were to produce this data, the FTC would reduce its estimate of harm attributable to the net autorenewal fees attributable to the Password Wall page by the proportion of users that clicked the "subscription status" link on the Post-Password Wall page. For example, if X% of users that visited the Post-Password Wall page clicked on the hyperlink, the FTC would exclude the net autorenewal fees of those X% of users from its estimate of monetary harm and would also reduce its estimate of harm attributable to the Password Wall page by X%. The FTC reserves the right to update its calculations related to these pages if and when Defendants produce this requested data.

**App. 711**

is premature as it asks for information that will be obtained during discovery from documents that are in Match's possession and is therefore inconsistent with the Court's scheduling order. No part of this response should be interpreted or construed as a limit on the materials or arguments the FTC will present at trial.

The FTC responds that Defendants failed to adequately inform users about these alternative cancellation methods, which made them hard to find or utilize and not simple. This is evidenced by the lack of prominent advertising or disclosure of these alternative cancellation methods on Match.com's website and by how few subscribers used these methods. Moreover, Defendants actively took measures to remove their customer service phone number from their website, and their FAQs concerning cancellation no longer reference this cancellation method or provide this phone number. *See* MATCHFTC774724, MATCHFTC708041; https://help.match.com/hc/en-us/articles/6077124196891-Cancelling. As for chat, Match.com's FAQ concerning cancellation mentions Match.com's chat feature only at the end of the page and even then does not make clear that this feature may be used to cancel. It instead suggests that it should be used if consumers are unable to cancel via the methods described earlier in the article. *See* https://help.match.com/hc/en-us/articles/6077124196891-Cancelling (last visited: 11/18/22) ("Need Help? Log into your account to chat or text with us between 8 am and 6 pm Central Time. Monday through Friday.") (emphasis in original). In fact, Match.com's current "Contact Us" page does not list telephone as an option. *See* https://help.match.com/hc/en-us/articles/6140024199195-Contact-Us (last accessed: 11/18/22). Moreover, Match.com's FAQ concerning cancellation mentions only at the end of their lengthy explanation of how to cancel— in a small, grayed out font, rendering it difficult to read or find—that users who "still have questions or need additional assistance" can call their customer care number.

https://help.match.com/hc/en-us/articles/6077124196891-Cancelling. The evidence shows that, in recent years, Match.com has experienced a significant reduction in the number of cancellation requests it has received via phone, which is almost certainly attributable to Defendants' efforts to remove the customer care number from their website. Further, Defendants have identified only a handful of customers that have ever cancelled via fax or mail, which is unsurprising given that this information is buried on Match's website. Defendants' mailing address is buried in their terms of use document, and this document does not clearly state that subscribers (other than California subscribers) may cancel by mail. *See* https://www.match.com/registration/membagr.aspx (last accessed: 11/18/22). Likewise, Defendants' fax number is buried in their terms of use document, and this document appears to place limitations on which users are permitted to cancel via fax. *See* https://www.match.com/registration/membagr.aspx (last accessed 11/18/22) (stating only that "California and Ohio users may also email us by clicking here or send a facsimile to 214-853-4309").

To the extent Defendants produces responsive documents and answers in discovery or the FTC uncovers additional relevant facts, the FTC may supplement this answer.

**INTERROGATORY NO. 5:** Identify and Describe the features that You contend make a cancellation method simple (or not), Including (but not limited to) all factors You consider in that analysis and the weight that You give each of those factors.

**ANSWER:**

The FTC objects to this Interrogatory because it is a Blockbuster Interrogatory, as discussed in General Objection 2, above. The Interrogatory is also irrelevant because it asks about cancellation methods that are not at issue in this case and is therefore not reasonably

18

calculated to lead to the discovery of relevant evidence. The FTC also objects to this Interrogatory because it is duplicative of Interrogatories 2 and 4.

The FTC further objects to this Interrogatory on the grounds that it is premature as it asks for information that will be obtained during discovery from documents that are in Match's possession and is therefore inconsistent with the Court's scheduling order. No part of this response should be interpreted or construed as a limit on the materials or arguments the FTC will present at trial.

Notwithstanding the foregoing, the FTC refers to its November 4, 2021 Enforcement Policy Statement Regarding Negative Option Marketing. *See* 86 Fed. Reg. 60822. In addition, the FTC refers to its answers for Interrogatories 1, 2 and 4, and documents the FTC produced with document identifiers, F01-MG-0028678 through F01-MG-0028696, which are complaints alleging that the respective defendants failed to have simple cancellation mechanisms. To the extent Defendant seeks to understand why their own cancellation mechanism is not simple, the FTC refers to Interrogatory Response 2 and the documents cited therein. The FTC reserves the right to amend or supplement this answer, in particular after Defendant produces any requested discovery it is currently withholding.

**INTERROGATORY NO. 6:** Identify and Describe in what way(s) You contend that Match.com's Online Cancellation Flow is not as simple as subscribing to Match.com via the Match.com website, Including by comparing the two processes.

**ANSWER:**

The FTC objects to this Interrogatory because it is a Blockbuster Interrogatory, as discussed in General Objection 2, above. The FTC also objects to this Interrogatory as it is overbroad, vague, unduly burdensome, and not proportional to the needs of the case.

19

**App. 714**

The FTC further objects to this Interrogatory on the grounds that it is premature as it asks for information that will be obtained during discovery from documents that are in Match's possession and is therefore inconsistent with the Court's scheduling order. No part of this response should be interpreted or construed as a limit on the materials or arguments the FTC will present at trial.

The FTC responds that Match's internal documents characterize their cancellation as burdensome, cumbersome, hard to find, tedious, convoluted and that they knew consumers were getting billed after they had thought they canceled their subscriptions. *See* MATCHFTC669602, MATCHFTC669157, MATCHFTC667211, MATCHFTC646192, MATCHFTC604834, MATCHFTC604757, MATCHFTC601548, MATCHFTC601397, MATCHFTC579050, MATCHFTC568900, MATCHFTC467915, MATCHFTC545351, MATCHFTC543666, MATCHFTC543542, MATCHFTC529047, MATCHFTC528098, MATCHFTC519412, MATCHFTC499728, MATCHFTC495267, MATCHFTC494559, MATCHFTC491446, MATCHFTC485296, MATCHFTC485041, MATCHFTC477153, MATCHFTC473469, MATCHFTC464887, MATCHFTC571491, MATCHFTC429717, MATCHFTC417536, MATCHFTC417535, MATCHFTC406132, MATCHFTC405364, MATCHFTC371904, MATCHFTC369268, MATCHFTC336923, MATCHFTC320168, MATCHFTC313402, MATCHFTC312903, MATCHFTC306318 (internal correspondence showing knowledge of consumer complaints and issues with cancellation process). There is not similar evidence that Match's sign-up process is burdensome, cumbersome, hard to find, tedious or that consumers believed they had signed up for a subscription service when they had not. Match's own internal documents flagged the problems with their cancellation process, including that it was hard to find and was difficult to understand, but there is no similar evidence that consumers had

20

**App. 715**

difficulty understanding, finding, or completing the sign-up process. *See e.g.*,

MATCHFTC473469, MATCHFTC491446, MATCHFTC669157, MATCHFTC669602 (internal

correspondence document issues with cancellation process). Moreover, Match.com presents an

offer to consumers that would abandon the cancellation process if selected, but it does not

present an offer to consumers to abandon the subscription process. Match's signup process has

no misleading text that suggests the signup process is complete, whereas Match's cancellation

process has misleading text in the middle of the cancellation flow that states "Before you go"

above a survey – misleading consumers into thinking the cancellation is complete and they may

navigate away from the page, when in fact the survey must be clicked through for the

cancellation to be effective.

**INTERROGATORY NO. 7:** Identify and Describe the basis for Your allegation that Match
Group, Inc. owns, operates, and controls Match.com, as stated in Your Complaint, Including a
statement of all facts and evidence that You believe support this allegation. If You have no basis
or evidence, You should so state.

**ANSWER:**

The FTC objects to this Interrogatory because it is a Blockbuster Interrogatory, as

discussed in General Objection 2, above. The FTC also objects to this Interrogatory to the extent

it seeks information that is in Match's possession and readily available to Match.

The FTC further objects to this Interrogatory on the grounds that it is premature as it asks

for information that will be obtained during discovery from documents that are in Match's

possession and is therefore inconsistent with the Court's scheduling order. No part of this

response should be interpreted or construed as a limit on the materials or arguments the FTC will

present at trial.

Notwithstanding the foregoing, MGI's responses to the FTC's CID described various

policies of "Match," which Match defined as Match Group Inc., in operating Match.com. For

**App. 716**

example, MGI stated that: Match.com was the primary top-level URL contributing to Match's business operations; Match maintained several URLs that directed users to Match.com; and Match had policies and practices relating to Test profiles and free trials. MGI has also stated in a filing with the Ninth Circuit that it operates match.com, and email records show Match's senior executives and CEO directing day-to-day activities and business practices and receiving reports about those activities and practices. *See Epic Games, Inc. v. Apple, Inc.*, Nos. 21-16506 & 21-16695, Doc. 8-1 (9th Cir. Nov. 29, 2021) ("**Match Group, Inc. ('Match')** is a Dallas, Texas-based online dating service which operates dating web sites in over 50 countries. Originally founded in 1993, **Match operates www.match.com** and mobile apps.") (emphasis added); *see also* MATCHFTC_Sample0000985, MATCHFTC_Sample0001021, MATCHFTC311263, MATCHFTC312700, MATCHFTC313402, MATCHFTC320168, MATCHFTC327460, MATCHFTC327972, MATCHFTC363737, MATCHFTC369127, MATCHFTC369348, MATCHFTC374137, MATCHFTC3800042, MATCHFTC380007, MATCHFTC403971, MATCHFTC404348, MATCHFTC404416, MATCHFTC405364, MATCHFTC405557, MATCHFTC406132, MATCHFTC408480, MATCHFTC409673, MATCHFTC415715, MATCHFTC426352, MATCHFTC427699, MATCHFTC428352, MATCHFTC429944, MATCHFTC431584, MATCHFTC439155, MATCHFTC445763, MATCHFTC465940, MATCHFTC474080, MATCHFTC485374, MATCHFTC485530, MATCHFTC497411, MATCHFTC519878, MATCHFTC519918, MATCHFTC521397, MATCHFTC525771, MATCHFTC543726, MATCHFTC549410, MATCHFTC559522, MATCHFTC560758, MATCHFTC581504, MATCHFTC593415, MATCHFTC600883, MATCHFTC601662, MATCHFTC604735, MATCHFTC605578, MATCHFTC610845, MATCHFTC624330, MATCHFTC624809, MATCHFTC634792, MATCHFTC557155,

MATCHFTC_Sample0000985, MATCHFTC537085, MATCHFTC406132,

MATCHFTC397577, MATCHFTC404741, MATCHFTC521509, MATCHFTC405364,

MATCHFTC298594, MATCHFTC601035, MATCHFTC766621,

MATCHFTC_Sample0000307, MATCHFTC643460,  MATCHFTC603553, (email records of

MGI executives involved in and directing business operations).

Date: May 25, 2023

*/s/ REID TEPFER*
REID TEPFER
M. HASAN AIJAZ
SARAH ZUCKERMAN (admitted pro hac vice)
JOHN R. O'GORMAN (admitted pro hac vice)
ERICA ROLLINS HILLIARD
JASON C. MOON
Texas Bar No. 24079444 (Tepfer)
Virginia Bar No. 80073 (Aijaz)
New York Bar No. 5603832 (Zuckerman)
Texas Bar No. 2421292 (O'Gorman)
Mississippi Bar No. 104244 (Hilliard)
Texas Bar No. 24001188 (Moon)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
T: (214) 979-9395 (Tepfer)
T: (214) 979-9386 (Aijaz)
T: (214) 979-9376 (Zuckerman)
T: (214) 979-9382 (O'Gorman)
T: (214) 979-9379 (Hilliard)
T: (214) 979-9378 (Moon)
Email: rtepfer@ftc.gov; maijaz@ftc.gov;
szuckerman@ftc.gov; jogorman@ftc.gov;
ehilliard@ftc.gov; jmoon@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

**App. 718**

**CERTIFICATE OF SERVICE**

I, M. Hasan Aijaz, certify that, on May 25, 2023, I served the foregoing Plaintiff's Fourth

Amended Responses to Defendant's First Set of Interrogatories by email on the following

counsel of record at the email address listed below:

Angela C. Zambrano
angela.zambrano@sidley.com
Chad Hummel
chummel@sidley.com

Sidley Austin LLP

*Attorneys for Defendants*
*Match Group, Inc. and Match Group, LLC*


By: /s/ M. Hasan Aijaz

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 3:19-cv-02281-K |
| Plaintiff, | **STIPULATED ORDER FOR** |
| v. | **PERMANENT INJUNCTION,** **MONETARY RELIEF, CIVIL** **PENALTY JUDGMENT, AND** |
| MATCH GROUP, INC., a corporation; and | **OTHER RELIEF** |
| MATCH GROUP, LLC, formerly known as MATCH.COM, LLC, a limited liability company, | |
| Defendants. | |

Plaintiff, the Federal Trade Commission ("FTC"), filed its Complaint for Permanent Injunction and Other Equitable Relief ("Complaint") in this matter, pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b and Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404. The Commission and Defendants stipulate to the entry of this Stipulated Order for Permanent Injunction, Monetary Relief, Civil Penalties, and Other Relief ("Order") to resolve all matters in dispute in this action between them.

**THEREFORE, IT IS ORDERED** as follows:

<u>**FINDINGS**</u>

1.      This Court has jurisdiction over this matter.

2.      The Complaint charges that Defendants participated in deceptive and unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 4 of ROSCA, 15 U.S.C. § 8403, in connection with Defendants' marketing and sale of online dating services.

1

3.      Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Order. Only for purposes of this action, Defendants admit the facts necessary to establish jurisdiction.

4.      Defendants waive any claim they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agrees to bear their own costs and attorney fees.

5.      Defendants waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## **DEFINITIONS**

For the purpose of this Order, the following definitions apply:

A.  "**Billing Information**" means any data that enables any person to access a customer's account, such as a credit card, checking, savings, share or similar account, utility bill, mortgage loan account, or debit card.

B.  "**Charge**," "**Charged**," or "**Charging**" means any attempt to collect money or other consideration from a consumer, including but not limited to causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account, telephone bill, or other account.

C.  "**Clear(ly) and Conspicuous(ly)**" means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.  In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible

2

means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2. A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3. An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4. In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5. The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6. The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7. The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8. When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

3

D. "**Defendants**" means Match Group, Inc., Match Group, LLC, and their successors and assigns.

E. "**Negative Option Feature**" means, in an offer or agreement to sell or provide any good or service, a provision under which the consumer's silence or failure to take an affirmative action to reject a good or service or to cancel the agreement is interpreted by the seller or provider as acceptance or continuing acceptance of the offer or agreement.

F. "**Person**" or "**Persons**" means any natural person, organization, or other entity, including, but not limited to, a corporation, partnership, proprietorship, association, cooperative, or any other group or combination acting as an entity.

## <u>ORDER</u>

### I. PROHIBITION AGAINST MISREPRESENTATIONS

**IT IS ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, in connection with the advertising, marketing, promoting, offering for sale, or selling of any online dating services:

A. Any material restrictions, limitations, or conditions to purchase, receive, or use the online dating services, or to receive any discount, "guarantee," or special offer;

B. Any cost to the consumer to purchase, receive, use, or return the initial good or service;

4

C.     That the consumer will not be Charged for any good or service;

D.     That a good or service is offered on a "guarantee," "free," "trial," "sample," "bonus," "gift," "no obligation," "discounted" basis, or words of similar import, denoting or implying the absence of an obligation on the part of the recipient of the offer to affirmatively act in order to avoid Charges, including where a Charge will be assessed pursuant to the offer unless the consumer takes affirmative steps to prevent or stop such a Charge;

E.     That the consumer can obtain a good or service for a processing, service, shipping, handling, or administrative fee with no further obligation;

F.     The purpose(s) for which the consumer's Billing Information will be used;

G.     The date by which the consumer will incur any obligation or be Charged unless the consumer takes an affirmative action on a Negative Option Feature;

H.     That a transaction has been authorized by the consumer;

I.     Any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy for the good or service;

J.     Any other material fact; and

K.     In connection with promoting or offering for sale any good or service with a Negative Option Feature, any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy for the good or service. Compliance with this Section is separate from, and in addition to, the disclosures required in Sections II and III, *infra*.

5

## II. REQUIRED DISCLOSURES

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, offering for sale, or selling of any online dating services, are permanently restrained and enjoined from:

A. Failing to Clearly and Conspicuously disclose that consumers registering for a six-month "guarantee" must, to the extent applicable, (a) secure and maintain a public profile with a primary photo approved by Defendants within the first seven days of purchase, (b) message five unique subscribers per month, and (c) use Defendants' progress page to redeem the free six months during the final week of the initial six-month subscription period;

B. Failing to Clearly and Conspicuously disclose any material restrictions, limitations, or conditions to purchase, receive, or use the online dating services, or to receive any discount, "guarantee," or special offer; and

C. In connection with promoting or offering for sale any good or service with a Negative Option Feature obtaining Billing Information from a consumer, without first disclosing Clearly and Conspicuously, the simple cancellation mechanism to stop all recurring Charges, as required by Section III.

## III. SIMPLE MECHANISM TO CANCEL NEGATIVE OPTION FEATURE

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or

Att. A
**App. 725**

offering for sale any good or service with a Negative Option Feature, are permanently restrained and enjoined from:

A. Failing to provide a simple mechanism for the consumer to: (1) avoid being Charged, or Charged an increased amount, for a good or service and (2) immediately stop any recurring Charge. Such mechanism must:

   a. Be easy to find;

   b. Be easy to use to stop such Charge;

   c. Not require the consumer to take any action that is objectively unnecessary to cancel

including using a Dark Pattern. A "Dark Pattern" refers to a user interface that has the effect of impeding consumers' expression of preference, manipulating consumers into taking certain action or otherwise subverting consumers' choice;

B. If any consumers entered into the agreement to purchase a good or service including a Negative Option Feature over the Internet or a mobile phone application, failing to provide the mechanism through the same website, email address or other application.

C. If any consumers entered into the agreement to purchase a good or service including a Negative Option Feature through an oral offer or acceptance, failing to provide such mechanisms through the use of a telephone number and a postal address.

## IV. PROHIBITED BUSINESS ACTIVITIES

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the

Att. A
**App. 726**

advertising, marketing, promoting, offering for sale, or selling of any online dating service, are permanently restrained and enjoined from:

A.  Retaliating, threatening to take, or taking any adverse action against any consumer who files, or threatens to file, a billing dispute with their financial institutions or with any law enforcement or consumer protection agency by denying such consumers access to and use of paid-for goods or services; *provided, however*, that nothing herein shall be deemed to preclude Defendants from suspending a consumer's service during the pendency of a billing dispute or from suspending or terminating a consumer's service if a refund has been issued.

B.  Violating the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401-05, a copy of which is attached.

## V. JUDGMENT FOR MONETARY RELIEF

**IT IS FURTHER ORDERED** that:

A.  Judgment in the amount of XX Million Dollars ($XX,000,000) is entered in favor of the Commission against Defendants, as monetary relief.

B.  Defendants are ordered to pay to the Commission XX Million Dollars ($XX,000,000), which, as Defendants stipulate, their undersigned counsel holds in escrow for no purpose other than payment to the Commission. Such payment must be made within 7 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

## VI. JUDGMENT FOR CIVIL PENALTY

A.  Judgment in the amount of XX Million Dollars ($XX,000,000) is entered in favor of the Commission against Defendants, as a civil penalty.

B.   Defendants are ordered to pay to the Commission XX Million Dollars ($XX,000,000), which, as Defendants stipulate, their undersigned counsel holds in escrow for no purpose other than payment to the Commission. Such payment must be made within 7 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

## VII. ADDITIONAL MONETARY PROVISIONS

**IT IS FURTHER ORDERED** that:

A.  Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

B.  The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

C.  The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D.  Defendants acknowledge that their Taxpayer Identification Numbers (Employer Identification Numbers), which Defendants must submit to the Commission, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

E.  All money received by the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for consumer relief,

Att. A
**App. 728**

such as redress and any attendant expenses for the administration of any redress fund. If a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after such redress is completed, the Commission may apply any remaining money for such related relief (including consumer information remedies) as it determines to be reasonably related to Defendants' practices alleged in the Complaint. Any money not used for relief is to be deposited to the U.S. Treasury as an additional civil penalty.  Defendants have no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

## VIII. CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, are permanently restrained and enjoined from directly or indirectly failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress. If a representative of the Commission requests in writing any information related to redress, Defendants must provide it, in the form prescribed by the Commission, within 14 days.

## IX. ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that Defendants obtain acknowledgments of receipt of this Order:

A. Each Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

Att. A
**App. 729**

B. For 20 years after entry of this Order, each Defendant must deliver a copy of this Order to: (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting. Delivery must occur within 7 days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C. From each individual or entity to which a Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## X. COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that Defendants make timely submissions to the Commission:

A. One year after entry of this Order, each Defendant must submit a compliance report, sworn under penalty of perjury. Each Defendant must:

1. Identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Defendant;

2. Identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

3. Describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales;

11

4.   Describe in detail whether and how that Defendant is in compliance with each Section of this Order; and

5.   Provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.   For 20 years after entry of this Order, each Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following, each Defendant must report any change in:

1.   Any designated point of contact; or

2.   The structure of any Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.   Each Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D.   Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.   Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or

12

sent by overnight courier (not the U.S. Postal Service) to: Associate Director for

Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600

Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: FTC

v. Match Group, Inc. and Match Group, LLC.

## XI. RECORDKEEPING

**IT IS FURTHER ORDERED** that Defendants must create certain records for 10 years

after entry of the Order, and retain each such record for 5 years. Specifically, Defendants, in

connection with advertising, marketing, or promoting any online dating services, must create and

retain the following records:

A.   Accounting records showing the revenues from all goods or services sold;

B.   Personnel records showing, for each person providing services, whether as an
     employee or otherwise, that person's: name; addresses; telephone numbers; job title
     or position; dates of service; and (if applicable) the reason for termination;

C.   Records of all consumer complaints and refund requests, whether received directly or
     indirectly, such as through a third party, and any response;

D.   All records necessary to demonstrate full compliance with each provision of this
     Order, including all submissions to the Commission; and

E.   A copy of each unique advertisement or other marketing material featuring a negative
     option plan.

Att. A

**App. 732**

## XII. COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Defendants' compliance with this Order:

A. Within 14 days of receipt of a written request from a representative of the Commission, each Defendant must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B. For matters concerning this Order, the Commission is authorized to communicate directly with each Defendant. Defendant must permit representatives of the Commission to interview any employee or other person affiliated with any Defendant who has agreed to such an interview. The person interviewed may have counsel present.

C. The Commission may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## XIII. RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

**SO ORDERED**, this _____ day of _____, 20__.

_____
UNITED STATES DISTRICT JUDGE

**[Remainder of Page Intentionally Left Blank]**

15

**SO STIPULATED AND AGREED:**

**FOR PLAINTIFF:**

_____     Date: _____
REID TEPFER
M. HASAN AIJAZ
MATTHEW WILSHIRE
SARAH ZUCKERMAN (admitted *pro hac vice*)
JOHN R. O'GORMAN (admitted *pro hac vice*)
ERICA ROLLINS HILLIARD
JASON C. MOON
Texas Bar No. 24079444 (Tepfer)
Virginia Bar No. 80073 (Aijaz)
California Bar No. 224328 (Wilshire)
New York Bar No. 5603832 (Zuckerman)
Texas Bar No. 2421292 (O'Gorman)
Mississippi Bar No. 104244 (Hilliard)
Texas Bar No. 24001188 (Moon)
Federal Trade Commission
1999 Bryan St. Ste. 2150
Dallas, Texas 75201

**FOR DEFENDANTS:**

_____     Date: _____
[NAME]
As an officer of MATCH GROUP, INC.

_____     Date: _____
Chad S. Hummel
As counsel for MATCH GROUP, INC.

_____     Date: _____
[NAME]
As an officer of MATCH GROUP, LLC.

_____     Date: _____
Chad S. Hummel
As counsel for MATCH GROUP, LLC.

Att. A
**App. 735**