**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | Case No. 3:19-cv-02281-K |
| vs. | ORAL ARGUMENT REQUESTED |
| MATCH GROUP, INC., a corporation, and MATCH GROUP, LLC, formerly known as MATCH.COM, LLC, a limited liability company, | |
| Defendants. | |

**DEFENDANTS MATCH GROUP, INC. AND MATCH GROUP, LLC'S RULE 702**
**<u>MOTION TO EXCLUDE DR. JENNIFER KING'S TESTIMONY</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 2

LEGAL STANDARD .................................................................................................... 5

ARGUMENT ................................................................................................................. 6

   I.   Dr. King's "Opinion" Is Not Based On Any Reliable Expert Methodology and
      Instead Is Nothing More than Her Own Unsupported Ipse Dixit ............................6

     A.  Dr. King Did Not Perform Any Usability Study or Empirical Assessment .............8

     B.  Dr. King Performed an Incomplete, Cherry-Picked Heuristic Analysis. ...............11

     C.  Dr. King Wholly Ignored Critical Factors That the FTC Testified Are
        Relevant to Determining Whether a Cancelation Flow is "Simple." .....................13

     D.  Dr. King's Competitor Comparison Analysis Is Irrelevant and Misleading ..........14

     E.  Dr. King's Analysis Is Connected to Her Conclusion Only Through Her
        Own Ipse Dixit ........................................................................................................17

  II.  The "Complaint Analysis" in Dr. King's Rebuttal Report Is Untimely,
       Irrelevant, and Unreliable, and Thus Inadmissible ...............................................18

     A.  Dr. King's "Complaint Analysis" Is Untimely and Thus Inadmissible .................18

       a.  Dr. King's Complaint Analysis Is Untimely .....................................................19

       b.  Untimely Opinions Are Inadmissible ...............................................................20

     B.  Dr. King's Complaint Analysis Is Irrelevant and Unreliable ...............................21

     CONCLUSION ......................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*,
No. A-14-CA-00847-SS, 2016 WL 6075566 (W.D. Tex. Apr. 22, 2016) .............................12

*Bennett v. PRC Public Sector, Inc.*,
931 F. Supp. 484 (S.D. Tex. 1996) ........................................................................................8

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996)......................................................................................................14

*Butler v. MBNA Tech. Inc.*,
No. 3-02-CV-1715-H, 2003 WL 22425028 (N.D. Tex. Oct. 23, 2003) ..................................15

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)........................................................................................................ *passim*

*De Boulle Diamond & Jewelry, Inc. v. Boulle, Ltd.*,
No. 3:12-CV-1462-L BF, 2014 WL 4413608 (N.D. Tex. Sept. 5, 2014)...............................25

*Familias Unidas Por La Educacion v. El Paso Indep. Sch. Dist.*,
No. EP-20-CV-170-DB, 2022 WL 2906505 (W.D. Tex. July 22, 2022) .........................19, 20

*FTC v. Simple Health Plans, LLC*,
No. 18-CV-62593, 2021 WL 810262 (S.D. Fla. Mar. 3, 2021)..............................................18

*Geiserman v. MacDonald*,
893 F.2d 787 (5th Cir. 1990) ..........................................................................................20, 21

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)...............................................................................................................17

*Graham v. Lewis*,
No. 3:21-CV-1274-D, 2023 WL 2700718 (N.D. Tex. Mar. 28, 2023)....................................20

*Guillory v. Dontar Ind. Inc.*,
95 F.3d 1320 (5th Cir. 1996) .......................................................................................8, 10, 11

*Guzman v. State Farm Lloyds*,
456 F. Supp. 3d 846 (S.D. Tex. 2020) ...................................................................................12

*Hennessey v. Sec'y of Dept. of Health & Hum. Servs.*,
No. 01-190V, 2009 WL 1709053 (Fed. Cl. May 29, 2009), *review denied,*
*decision aff'd,* 91 Fed. Cl. 126 (2010) ....................................................................................6

*Huss v. Gayden*,
    571 F.3d 442 (5th Cir. 2009) ............................................................................7

*Johnson v. Arkema, Inc.*,
    685 F.3d 452 (5th Cir. 2012) ............................................................................6

*Konrick v. Exxon Mobil Corp.*,
    No. CV 14-524, 2016 WL 439361 (E.D. La. Feb. 4, 2016), *aff'd*, 670 F. App'x
    222 (5th Cir. 2016)...........................................................................................12

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)...........................................................................................6

*Lackey v. Robert Bosch Tool Corp.*,
    No. 16-29-ART, 2017 WL 129891 (E.D. Ky. Jan. 12, 2017)................................10

*Mac Sales, Inc. v. E.I. du Pont de Nemours Co.*,
    24 F.3D 747 (5th Cir. 1994)..............................................................................13

*McClain v. Metabolife Int'l Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ........................................................................22

*Munoz v. Orr*,
    200 F.3d 291 (5th Cir. 2000) ............................................................................7

*Nebraska Plastics v. Holland Colors Americas, Inc.*,
    408 F.3d 410 (8th Cir. 2005) ......................................................................13, 14

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
    676 F.3d 521 (6th Cir. 2012) ............................................................................22

*Recif Res., LLC v. Juniper Capital Advisors, L.P.*,
    No. CV H-19-2953, 2020 WL 11025602 (S.D. Tex. Oct. 1, 2020).........................12

*Rhodes v. Bayer Healthcare Pharms., Inc.*,
    No. CIV.A. 10-1695, 2013 WL 1289050 (W.D. La. Mar. 26, 2013) .....................22

*Robroy Indus.-Tex., LLC v. Thomas & Betts Corp.*,
    No. 2:15-CV-512-WCB, 2017 WL 1319553 (E.D. Tex. Apr. 10, 2017) ................23

*Sandifer v. Hoyt Archery, Inc.*,
    907 F.3d 802 (5th Cir. 2018) ...................................................................6, 9, 18

*Shatkin v. McDonnell Douglas Corp.*,
    727 F.2d 202 (2d Cir. 1984)..............................................................................14

*Sierra Club, Lone Star Chapter v. Cedar Point Oil*,
    73 F.3d 546 (5th Cir. 1996) ..............................................................................19

*Stevens v. State Farm Lloyds*,
No. CIV.A. 302CV0404-K, 2003 WL 25676886 (N.D. Tex. Oct. 7, 2003) ...................10, 18

*United States v. West*,
22 F.3d 586 (5th Cir. 1994) ............................................................................24, 25

*Watkins v. Telsmith, Inc.*,
121 F.3d 984 (5th Cir. 1997) .........................................................................10

*Wells v. SmithKline Beecham Corp.*,
601 F.3d 375 (5th Cir. 2010) .........................................................................22

*Wheat v. Pfizer, Inc.*,
31 F.3d 340 (5th Cir. 1994) ...........................................................................8

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
395 F.3d 416 (7th Cir. 2005) .........................................................................23

**Statutes**

Fed. R. Civ. P. 26(a)(2)(B) .............................................................................19

Fed. R. Civ. P. 26(a)(2)(D)(ii) ........................................................................19

Fed. R. Civ. P. 37(c)(1) ................................................................................20

Fed. R. Evid. 702 ...................................................................................6, 18

Fed. R. Evid. 702(a) .............................................................................16, 24

Fed. R. Evid. 703 ...................................................................................23

## PRELIMINARY STATEMENT

The Federal Trade Commission alleges in this case that Match.com's online subscription cancelation flow is not "simple" and, for that reason, Defendants violated the Restore Online Shoppers' Confidence Act ("ROSCA").[1] To attempt to support this allegation, the FTC retained Dr. Jennifer King to use her self-professed expertise in human-computer interaction and "dark patterns" to evaluate whether Match.com's cancelation flow is "easy to use" and "easy to find." The opinions she proffered, however, should be excluded as completely unreliable under *Daubert* and its progeny. They are based solely on her own *ipse dixit* views and not on any scientific application of an accepted computer interface evaluation methodology. As Dr. King admitted in her deposition, in completing her assignment, she did not perform any of the tests or evaluations that an expert in website usability, computer interface user experience, or consumer behavior would do to obtain reliable answers to the questions posed by the FTC.

- She did not conduct any empirical usability study, even though the authoritative sources cited by Dr. King herself unambiguously state that the type of evaluation Dr. King did "should not replace usability testing," and that such analysis ***must be paired with an empirical usability study*** to produce reliable conclusions about a website, App. at 409.[2]

- She did not evaluate any of the empirical data produced in discovery of how *actual* Match.com subscribers behaved in the flow in canceling their subscriptions—including completion rates and average time to completion—but instead merely speculated about how such users might experience the flow.

- She performed only a *partial* heuristic analysis, which requires evaluating a webflow against ten well-accepted principles (or heuristics). But instead of evaluating all ten heuristics, Dr. King cherry-picked only the three that she believes the Match.com flow violates. Moreover, heuristic analyses are designed to identify usability problems in a user interface design, not answer the relevant question here, which is whether Match.com's online subscription cancelation flow is "simple," not whether it could be improved.

---

[1] The FTC does not challenge as "not simple" any of the other multiple ways that Match.com subscribers can cancel their subscriptions, including chat, e-mail, and mail.

[2] Dr. King testified that she had previously performed over 30 such usability studies and could not explain why the FTC did not ask her to do one in this matter. App. at 428. The fact that the FTC did not require her to perform such a study is telling.

- She did not evaluate any of the factors that the FTC itself has admitted under oath are relevant in assessing whether a cancelation flow is "simple:" (i) whether cancelation is as easy or time-consuming as subscribing, (ii) the average time to complete the flow, (iii) cancelation success rates or "effectiveness," and (iv) whether certain steps in the process (e.g., save offers or surveys) cause "unreasonable delay."

- She did not compare the Match.com cancelation flow with other desktop subscription cancelation flows (i.e., other cancelation flows subject to ROSCA).

- Indeed, she did not actually use the Match.com cancelation flow herself at all, but only reviewed a few static screenshots and videos of the flow provided to her by the FTC.

After Defendants timely served the expert report of Brandon Ward, an expert in computer interface design and usability, who did perform a reliable and detailed usability study, Dr. King attempted to bolster her conclusions with a brand-new analysis of purported consumer complaints about the flow.[3] This analysis did not "rebut" anything in the Ward Report and should be excluded as untimely. But, even if accepted as timely served, as explained herein, that analysis does nothing more than establish that an infinitesimal fraction of Match.com subscribers at one time expressed concern about the flow. Dr. King's "analysis" has its own fatal flaws, including that she failed to consider the reliability or validity of any of the purported complaints, which are hearsay, or even examine whether the complainants actually interacted with the online cancelation flow.

For these reasons, as detailed herein, Dr. King's opinions are based solely on her own subjective views, are entirely unsupported by reliable studies, and are not tethered to the facts or evidence in this case, so must be excluded.

## FACTUAL BACKGROUND

In this lawsuit, the FTC alleges that Match.com's online desktop subscription cancelation flow is not a "simple" method for Match.com subscribers to cancel recurring payment subscription services in violation of the Restore Online Shoppers' Confidence Act ("ROSCA"). To support its

---

[3] Defendants served a rebuttal report of economist James Langenfeld, Ph.D., which eviscerates the probative value of Dr. King's assessment of the complaints. *See generally* App. at 256–301.

contentions, the FTC retained Dr. Jennifer King, a purported human-computer interaction expert in dark patterns,[4] to opine regarding the simplicity of Match.com's desktop cancelation flow. As explained herein, Dr. King's report should be excluded in its entirety.

On January 13, 2023, the FTC served Dr. King's opening report. *See* App. at 2–75. Dr. King purported to evaluate whether Match.com's cancelation flow was "easy to use" and "easy to find." App. at 4. Despite submitting an opinion regarding the cancelation flow, Dr. King never actually used the flow herself; instead, she reviewed only videos and screenshots taken by others. App. at 423. Based on these videos and screenshots, Dr. King conducted a partial "heuristic evaluation" of the cancelation flow. A heuristic evaluation involves an evaluator examining an interface (in this case, Match.com's cancelation flow) and judging its compliance with ten recognized principles (or heuristics). But Dr. King did not examine all ten usability heuristics; rather, she chose only the three that she thought the flow "potentially violated." App. at 441. Based on her partial heuristic analysis using only screenshots and videos, Dr. King then concluded that Match.com's cancelation flow "was not easy or simple to use" and "was not easy for users to locate." App. at 5. Dr. King reviewed a handful of "company documents" cherry-picked by FTC counsel (out of the hundreds of thousands produced in this case) discussing complaints about or possible improvements to the cancelation flow. App. at 60.[5] Dr. King then concluded her report by comparing Match.com's **desktop** website **subscription** cancelation flow to two other dating services' **app-based** (i.e., mobile device-based) **account deletion** flows. App. at 63–65; 245–246.

---

[4] According to Dr. King, "human-computer interaction" is "the study of how humans engage with computer interfaces." App. at 9. "Dark patterns" are "design features that deceive, coerce, or manipulate users into making choices that are either not what users intended, or not in their best interests." App. at 15.

[5] To be clear, the issue in this case is *not* whether the Match.com cancelation flow could be "simpler" or "easier," only whether it is "simple." Viewed through this lens, the internal Match.com documents that suggest changes to the flow are probative only of the fact that a few Match.com employees thought that the website could be improved. Tellingly, the authors of the documents on which the FTC most extensively relies have testified unequivocally that they did not believe that the flow ever violated any law. App. at 464.

Despite purporting to have extensive experience in user testing, Dr. King did not conduct an empirical study or perform any user testing, such as asking a random sample of people to use the cancelation flow and evaluating their experience. App. at 428, 440. Nor did she analyze the factors that the FTC testified in Rule 30(b)(6) depositions are relevant to determining whether a flow is simple, such as effectiveness rate (percentage of subscribers that successfully cancel) or time to completion (the time it takes to complete the flow). App. at 424, 425, 430–431, 449. She also did not initially conduct a complaint analysis. In short, Dr. King's opening report rested on Dr. King's personal, uninformed observations about the Match.com desktop subscription cancelation flow (and how it compared to two app-based account deletion flows that had nothing to do with auto-renewing paid subscriptions).

By contrast, on January 13, 2023, Defendants served the expert report of Brandon Ward. *See* App. at 77–150. Mr. Ward also conducted a heuristic analysis (utilizing *all ten* established criteria, as well as an additional five usability components). *Id.* Mr. Ward analyzed Match.com's actual subscriber data (including factors that the FTC agrees are relevant to simplicity, such as effectiveness rate), and, as required by the authoritative sources on which Dr. King herself relied, he conducted an empirical usability study to ascertain whether Match.com's cancelation flow is clear and effective. App. at 82. In the usability study, Mr. Ward asked a universe of 164 persons of a demographic corresponding to potential Match.com subscribers to sign-up for and then cancel a Match.com subscription. App. at 132. Mr. Ward evaluated whether each study participant successfully canceled (the overwhelming majority did) and how each participant rated the cancelation flow on various metrics (most rated it favorably). App. at 135–136. Like Dr. King, Mr. Ward also compared Match.com's cancelation flow to other flows, but unlike Dr. King, he compared Match.com's flow to other *desktop* subscription cancelation flows that would be subject

to ROSCA as well (not app-based account deletion flows). App. at 107. Mr. Ward explained that each of his analyses indicated that Match.com's cancelation flow was clear and effective—which is how experts in the website usability field best interpret the word "simple." App. at 81, 83.

On May 15, 2023, the FTC served Dr. King's rebuttal report. *See* App. at 152–196. The final section consisted of a new "Customer Comment Review" (or "complaint analysis") in which Dr. King purported to identify "themes" across a sample of consumer complaints about Match.com. App. at 174–194. Dr. King did not reveal any particular methodology she used to classify the complaints, other than an unspecified (and partially "retrospective[]") "coding scheme" based on her personal interpretation of each complaint. App. at 178–179. Nor did Dr. King do anything to verify that the complaints had any basis in reality; she simply assumed they were true. And, even though Dr. King's analysis was far from a statistically representative sample of Match.com users (she reviewed fewer than 700 complaints, out of literally millions of Match.com subscribers), she cloaked her stated opinion in statistics, claiming to have identified a "representative sample" of certain complaints "at a 95% confidence level with a confidence interval of +/-5%." App. at 177. She then presented alleged percentages of how often a particular "theme," such as "cancellation confusion," appeared in the cherry-picked complaints. Dr. King also used her new complaint analysis to (wrongly) opine that older users were more heavily burdened by Match.com's alleged ROSCA violation. App. at 36–39. Although Dr. King characterized her complaint analysis as a "rebuttal" to Mr. Ward's report, that is simply not true. Mr. Ward's report contained no analysis of customer complaints. Her analysis was thus untimely.

## LEGAL STANDARD

An expert witness may offer opinion testimony only if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony

is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Trial courts have a gatekeeping responsibility to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). This "gatekeeping obligation" applies to all types of expert testimony, not just "scientific" testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The offering expert testimony "must prove by a preponderance of the evidence that the testimony is reliable." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). This "reliability prong" requires that "expert opinion be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *Id.* In other words, an opinion is reliable only if the expert "employ[s] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Sandifer v. Hoyt Archery, Inc.*, 907 F.3d 802, 808 (5th Cir. 2018).

## ARGUMENT

### I.   Dr. King's "Opinion" Is Not Based On Any Reliable Expert Methodology and Instead Is Nothing More than Her Own Unsupported Ipse Dixit

The entirety of Dr. King's "analysis" boils down to Dr. King's ***partial*** heuristic analysis of the Match.com cancelation flow in which Dr. King offers her personal opinions about her individual experience observing depictions of the flow, despite her not using it, and then speculates about how actual Match.com users ***might*** have experienced the flow. Dr. King's "methodology"— to the extent she has one—appears contrived to achieve a particular result. This is particularly true given her purported area of expertise in "dark patterns," which makes her prone to identifying alleged "dark patterns" even where they do not exist. To use an aphorism, "if your only tool is a hammer, everything looks like a nail." *Hennessey v. Sec'y of Dept. of Health & Hum. Servs.*, No. 01-190V, 2009 WL 1709053, at *44 (Fed. Cl. May 29, 2009), *review denied, decision aff'd,* 91

Fed. Cl. 126 (2010) (using *Daubert* framework to evaluate expert testimony); *see also Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) ("Dr. Benz began his analysis with the assumption that Kelly's promotion system discriminated against Hispanic males, an indicator that he lacked the necessary objectivity to make his analyses credible.").

Dr. King claims to have performed a heuristic analysis, but she only used the three (out of ten) heuristics that she believes the Match.com cancelation flow violates.[6] She did not conduct any usability testing or empirical analysis, despite her own sources instructing that a heuristic analysis *must* be supported by usability testing (Defendants' expert did, and found that empirical data from a usability study and Match.com's own records proved the flow's simplicity). Unlike Defendants' expert, she did not evaluate ***any*** of the factors that the FTC itself says are relevant to assessing the simplicity of a cancelation flow. She purported to conduct a "competitor analysis," but rather performed an apples to oranges comparison of Match.com's flow for canceling a subscription on a desktop website to flows for ***deleting a free account*** on a mobile device app.

Based on this cherry-picked analysis, Dr. King concluded that Match.com's cancelation flow is not easy to use or find, despite not having used or found the flow herself. Reaching that conclusion requires an analytical leap that Dr. King does not explain with anything other than her own say-so. This is not the type of scientific, replicable analysis permissible under *Daubert*. *See Huss v. Gayden*, 571 F.3d 442, 460 (5th Cir. 2009) ("Courts must be arbiters of truth, not junk science and guesswork."). To the contrary, Dr. King's failure to utilize a reliable website usability methodology supported by sufficient facts and data renders her opinion inadmissible.

---

[6] Dr. King evaluated only (1) visibility of system status; (2) consistency and standards; and (3) aesthetic and minimalist design. She did not report any evaluation of (1) match between system and the real world; (2) user control and freedom; (3) error prevention; (4) recognition rather than recall; (5) flexibility and efficiency of use; (6) help users recognize, diagnose, and recover from errors; and (7) help and documentation. App. at 36–40.

7

## A. Dr. King Did Not Perform Any Usability Study or Empirical Assessment

Dr. King's conclusions based on a partial heuristic analysis are completely undermined by her failure to support her opinion with any empirical data or testing, despite her own "authoritative" sources in the field stating that empirical support is necessary to render a usability opinion. For expert testimony to be admissible, "the trial court must ultimately conclude that those opinions 'rest[] upon a reasonable foundation' and are more than subjective belief or unsupported speculations." *Guillory v. Dontar Ind. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996). "Key to this [*Daubert*] test is whether the expert's hypothesis can be and has been tested." *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir. 1994).

Here, there is no doubt that Dr. King's hypothesis (which she substitutes for a conclusion) that the Match.com cancelation flow is not easy to find or use *can* be tested. Usability "can be measured, tested and analyzed" through user testing. *See Bennett v. PRC Public Sector, Inc.*, 931 F. Supp. 484, 496 (S.D. Tex. 1996). So "[f]or this analysis to be scientifically valid (and thus legally reliable), the proper methodology is to analyze" those relevant facts and data. *Id.* (excluding expert opinion where industry sources cited explained what a complete analysis entailed, but the expert had not done portions of that analysis).

In fact, the authoritative sources that Dr. King herself cites state that "heuristic evaluations cannot replace user research. . . . To design good experiences, you'll still need to test with actual users." App. at 304. The federal government's own usability website—usability.gov, on which Dr. King also relies—likewise warns that "heuristic evaluation should not replace usability testing." App. at 409. The Nielsen Norman Group—which Dr. King agrees provides an "authoritative guide to how to conduct a heuristic evaluation," App. at 427—emphasizes the necessity of conducting user testing in conjunction with heuristic analyses, explaining: "just because a design choice violates a heuristic, that does not necessarily mean it's a problem that needs to be fixed—it depends

on the particular context and the available alternatives." App. at 313. The Nielsen Norman Group further instructs that "heuristic evaluations are not a replacement for user research. We still need to observe our users as they are using our products to fully understand design problems." *Id*. For this reason, Dr. King's partial heuristic analysis, unaccompanied by user testing, is useless and not consistent with the "level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Sandifer*, 907 F.3d at 80.

And Dr. King has no excuse at all for failing to conduct any testing other than the FTC did not authorize or instruct her to do so. App. at 426, 428. She claimed during her deposition that she has performed at least thirty usability studies throughout her career, and she admitted that "nothing" prevented her from conducting a usability study in this case. App. at 428, 440. In fact, she did no empirical analysis of *any* part of Match.com's cancelation flow. Nor did she analyze any empirical data regarding *actual* Match.com subscribers' interactions with the flow, which show that nearly 95% of Match.com subscribers that enter the cancelation flow successfully cancel using the flow prior to their subscription renewal date. App. at 426, 431, 447.

Instead, Dr. King (after looking solely at around 5 videos and screenshots of the flow, and not using it herself) offered only speculative opinions about how subscribers *might* have experienced Match.com's cancelation flow. For example, Dr. King opines in her report that using the word "resign" instead of "cancel" on a single page of the flow *might* have confused subscribers, but she admitted during her deposition that it was "unclear" how subscribers would interpret the terms, and she did not conduct any empirical testing to ascertain whether subscribers were, in fact, confused. App. at 38; 451–452. She likewise did not conduct any type of empirical analysis to test her "concerns" (based solely on her **ipse dixit**) that other parts of the flow might have caused confusion. App. 432–433. Dr. King also opined that Match.com's cancelation flow is "not easy to

find," but she never studied whether consumers actually had difficulty finding the cancelation flow, nor how many consumers that attempted to find the flow were unable to do so. App. at 426. In fact, *she herself* never attempted to find the flow, as she reviewed only screenshots and videos that the FTC provided to her. App. at 423; *Stevens v. State Farm Lloyds*, No. CIV.A. 302CV0404-K, 2003 WL 25676886, at *2 (N.D. Tex. Oct. 7, 2003) (Kinkeade, J.) (holding that expert's testimony was "neither reliable nor relevant" and "his factual foundation . . . virtually nonexistent" because he "never even entered Plaintiffs' home . . . , and did not perform the tests he asserts the [defendant's] investigator should have"). These opinions are solely Dr. King's "subjective belief[s] [and] unsupported speculations," and are therefore inadmissible. *Guillory*, 95 F.3d at 1331.

In short, Dr. King could have and needed to empirically test her hypotheses about how consumers react to or experience Match.com's cancelation flow (like Defendants' expert did). But she did not.[7] Instead, Dr. King offers only her own individual conjecture based on her personal beliefs about how a user *might* experience Match.com's cancelation flow, and alleged problems that *might* exist in the flow (even though the relevant standard is whether the flow is "simple," not whether it is perfect). In effect, Dr. King claims that, because she is a "human-computer interaction" expert, App. at 434, "she knows how humans react to" website design. *Lackey v. Robert Bosch Tool Corp.*, No. 16-29-ART, 2017 WL 129891, at *7 (E.D. Ky. Jan. 12, 2017) (excluding parts of human-factors expert's opinion because the expert "ran no tests" and (wrongly) claimed to "bridge the analytical gaps in her opinions because, as a human-factors expert, she knows how humans react to safety warnings"). But a "proper methodology" requires "more than just conceptualizing possibilities," as Dr. King does here. *Watkins v. Telsmith, Inc.*, 121 F.3d 984,

---

[7] Ironically, Dr. King admitted that determining whether changing the cancelation flow would actually improve it "would have required conducting a user test." App. at 436. Yet, Dr. King did no such testing before rendering her opinion that Match.com's existing cancelation flow (and its predecessors) are not easy to use.

992 (5th Cir. 1997) ("The district court appropriately noted the lack of testing of any of the proposed alternatives."); *see also Guillory*, 95 F.3d at 1331. This personal speculation—which Dr. King could have tested, but chose not to—is not admissible expert testimony. Because Dr. King failed to do any empirical analysis, despite the literature in the field instructing that such empirical analysis is necessary, her opinion must be excluded.

### B.  Dr. King Performed an Incomplete, Cherry-Picked Heuristic Analysis.

Rather than conducting any empirical analysis, Dr. King claims to have performed a heuristic analysis of Match.com's cancelation flow,[8] based solely on videos and screenshots rather than her own use of the flow. App at 423. Dr. King's decision to conduct her analysis based only on screenshots and videos alone is a departure from industry standards and cause for exclusion. As Mr. Ward explained, "[t]hat is simply not a reliable methodology to conduct an analysis and it violates the very underpinnings of a proper usability and heuristic analysis." App. at 205; *see also* App. at 318 (Nielsen Norman Group article stating that input based solely on designs, i.e., screenshots, "often contrasts strongly with feedback based on real use"). Moreover, because heuristic evaluations are used to identify potential "problems," App. at 421, they cannot, alone, answer whether a flow is easy to use or "simple." The relevant question is whether Match.com's flow is "simple," not whether it could be made simpler by solving purported problems.

Worse, Dr. King performed only a ***partial*** analysis, as she analyzed just ***three*** of the ***ten*** usability heuristics typically included in a heuristic evaluation. App. at 12 (describing Nielsen's ten usability heuristics as "the most fundamental usability principles"). She admittedly chose those three heuristics based on whether they supported her opinion, disregarding the seven that are inconsistent with her opinion that Match.com's flow is not easy to use or find. App. at 440–441.

---

[8] As described above, a heuristic evaluation typically involves an evaluator examining an interface and judging its compliance with ten recognized principles (or heuristics).

Courts forbid this type of cherry-picked analysis designed to support a pre-conceived expert opinion. "An expert may not disregard without cause facts which are unfavorable to [her] opinion." *Guzman v. State Farm Lloyds*, 456 F. Supp. 3d 846, 853 (S.D. Tex. 2020). "[S]uch a selective use of facts fails to satisfy the scientific method and *Daubert*, and it thus fails to 'assist the trier of fact.'" *Recif Res., LLC v. Juniper Capital Advisors, L.P.*, No. CV H-19-2953, 2020 WL 11025602, at *9 (S.D. Tex. Oct. 1, 2020) (internal quotation marks and citation omitted). Courts regularly exclude expert opinions that consider only the facts favorable to the expert's opinion, while ignoring unfavorable facts. *E.g.*, *id.* at *9 (excluding expert opinion where the expert "without explanation failed to consider substantial and especially significant information that was inconsistent with his Opinion"); *360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, No. A-14-CA-00847-SS, 2016 WL 6075566, *4 (W.D. Tex. Apr. 22, 2016) (excluding expert opinion because "[e]xperts cannot ignore relevant evidence by cherry-picking the facts which conform to a desired outcome." ); *Konrick v. Exxon Mobil Corp.*, No. CV 14-524, 2016 WL 439361, at *10 (E.D. La. Feb. 4, 2016), *aff'd*, 670 F. App'x 222 (5th Cir. 2016) (excluding expert opinion, in part because the expert "cite[d] studies selectively, highlighting only data that supports his position in a way that undermines the reliability of his methodology" because it "suggest[ed] a methodology driven by an attempt to achieve a particular result").

Here, unlike Defendants' expert, and rather than conducting a complete heuristic analysis by evaluating all ten heuristics, Dr. King cherry-picked only the heuristics that she believed to be violated. Dr. King admitted at her deposition that she chose those three heuristics because "[t]hose were the three [she] had the greatest concerns with." App. at 440; *see also id.* at 441 ("I applied the ones I thought that the – the cancellation flow potentially violated."). She chose not to opine about the other seven heuristics. In other words, instead of conducting a complete heuristic analysis

12

with the goal of evaluating whether Match.com's cancelation flow was "simple" or not, Dr. King cherry-picked the heuristics that she believed would support her pre-existing opinion that the flow is not simple. Because Dr. King chose to ignore the heuristics that were unfavorable to her opinion that Match.com's cancelation flow is not simple, her opinion should be excluded.

### C.  Dr. King Wholly Ignored Critical Factors That the FTC Testified Are Relevant to Determining Whether a Cancelation Flow is "Simple."

Dr. King simply ignored and apparently chose not to evaluate the key factors that the FTC testified are relevant to assessing the simplicity of a cancelation flow. Dr. King's failure to assess those factors renders her opinions inadmissible. *See Nebraska Plastics v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416 (8th Cir. 2005) ("An expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported."); *see also Mac Sales, Inc. v. E.I. du Pont de Nemours Co.*, 24 F.3D 747, 752 (5th Cir. 1994) (affirming exclusion of expert testimony due to lack of adequate foundation because the expert had done no research on relevant factors).

When the FTC was asked what factors are relevant to assessing the simplicity of a cancelation flow, its corporate representative testified that such factors include (1) the time it takes to complete the flow, (2) the number of clicks it takes to complete the process, (3) the ability to locate the flow, and (4) the effectiveness of the flow (i.e., the completion rate).[9] App. at 414, 415. The FTC's public guidance on ROSCA compliance, which it issued *after* filing this lawsuit, also instructs that cancelation flows should be at least as easy to use as the subscription method, thereby contemplating a comparison between the sign-up and cancelation flows. App. at 338.

Dr. King did not evaluate a *single* one of these factors. She did not evaluate the average time it takes a subscriber to cancel using the flow. App. at 424. She did not evaluate the number

---

[9] The FTC had not disclosed these factors prior to the October 2022 deposition, nor are they found in any official guidance from the FTC. The FTC's failure to give Defendants fair notice of the FTC's interpretation of ROSCA gives rise to a due process violation, as discussed in Defendants' concurrently filed Motion for Summary Judgment.

of clicks it takes to complete the flow. *Id.* She did not conduct any empirical analysis of what portion of subscribers attempt to find the flow but are unable to do so. App. at 425. She did not evaluate the effectiveness of the flow—that is, the percentage of subscribers who were able to successfully cancel their subscription. App. at 430–431. And she did not evaluate Match.com's sign-up process *at all*, much less compare it to the cancelation flow. App. at 449. Nor did Dr. King offer any excuse for her failure to consider these factors. Presumably, she failed to analyze them because they demonstrate the simplicity of Match.com's cancelation flow, as Defendants' expert found when he evaluated them. App. at 108–126.[10] This is another example of Dr. King cherry-picking what she considers to avoid anything contrary to her predetermined opinion. Because of her failure to consider the factors that the FTC itself considers relevant, Dr. King's conclusion "is fundamentally unsupported" and therefore inadmissible. *Nebraska Plastics*, 408 F.3d at 416; *see also Daubert*, 509 U.S. at 597 (Trial courts are assigned a gatekeeping responsibility to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.").

### D.  Dr. King's Competitor Comparison Analysis Is Irrelevant and Misleading

Dr. King's so-called "competitor analysis" also does not support her conclusions and should be excluded as irrelevant and misleading because it is "an 'apples and oranges' comparison [that] simply cannot withstand scrutiny." *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984). Expert testimony is inadmissible when—as here—it is "in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996); *see also Shatkin*, 727 F.2d at 208 (affirming exclusion of expert testimony that compared "apples and oranges" by comparing a discounted present value figure to an undiscounted present value figure).

---

[10] Defendants' expert found that the average time to complete the cancelation flow is less than a minute, that the cancelation flow effectiveness rate of approximately 95% compares favorably with other task completion rates, and that the sign-up process takes 4-6 times as long as the cancelation flow. App. at 84, 85, 149.

Allowing such testimony risks "creat[ing] [a] misleading impression," which is why courts exclude it. *Butler v. MBNA Tech. Inc.,* No. 3-02-CV-1715-H, 2003 WL 22425028, at \*4 (N.D. Tex. Oct. 23, 2003) (excluding testimony that "creates the misleading impression that plaintiff's lost wages are appropriately referenced to a group of workers who are not similarly situated").

Dr. King claims to have examined the cancelation flows of two of Match.com's "competitors," Facebook Dating and Coffee Meets Bagel, to evaluate how Match.com's cancelation flow compares to other flows. *See* App. at 63. However, Dr. King compared the *mobile app* versions of Facebook Dating and Coffee Meets Bagel's flows (that is, something you can only use on specialized application on a mobile device) to Match.com's *desktop* flow (that is, something you would use on a computer, on a website).[11] App. at 63. Dr. King has repeatedly acknowledged that context—and especially mobile vs. desktop context—is relevant to usability, and she cited a number of sources in her reports stating that same proposition. App at 22, 428, 456. Dr. King even testified during her deposition that "iOS will have different rules in terms of how you interact with users than, you know, a browser-based web experience." App. at 457. Yet her "competitor" analysis ignores entirely the distinction between a mobile app flow and a desktop flow.

Not only is the pair of "competitors" not appropriate, but the "cancelation" flows she compared also were truly apples and oranges. This case is about whether canceling a negative option (auto-renewing paid subscription) contract is "simple." Yet Dr. King compared free *account* deletion flows on Facebook Dating and Coffee Meets Bagel, which have nothing to do with auto-renewing paid subscriptions, to Match.com's *paid subscription* cancelation flow. *See* App. at 245–246, 445. Match.com offers both free accounts and paid subscriptions, so there is both an account deletion flow and a paid subscription cancelation flow on Match.com, but Dr. King analyzed only

---

[11] Dr. King was not asked to review any Match.com cancelation method on a mobile device, nor is she offering any opinions on that topic. App. at 23, 432.

the latter. *See* App. at 23 ("[T]he evidence that I have been provided reflects users who had subscribed accounts (rather than customers with free accounts), meaning that there may be steps or menu items that are different for free/non-subscribed users . . . ."). Yet when she compared Match.com to alleged "competitors," she analyzed only the competitors' *account deletion* flows.[12]

Despite her insistence that context matters, Dr. King never explains how deleting a free account on a mobile app is at all relevant to canceling a subscription on a desktop website. It is not, given the vastly different contexts. For example, because free account deletion does not implicate risk disclosure or misuse of financial information, security concerns might be lessened, reducing the need for extra password protection. App. at 245–246. Additionally, free account deletion flows do not include "save offers" (i.e., offering a discounted subscription) because the service is already free, so there is nothing to discount. *Id*. Nor is there as much need to survey consumers about their decision to leave the service given the different business models between a subscription service (like Match.com) and a free service that makes money off of advertising (like Facebook). *Id*. In short, it is unsurprising that free account deletion flows differ from Match.com's paid subscription cancelation flow, not evidence that Match.com's flow is an outlier amongst relevant comparators (it is not). Dr. King ignores these critical contextual differences.

Given the fundamental differences between the flows she compared, Dr. King's "comparison" is not relevant or helpful. *See* Fed. R. Evid. 702(a) (requiring that expert testimony "help the trier of fact"). To the contrary, it is affirmatively misleading and thus should be excluded.

---

[12] In sharp contrast, Defendants' expert, Brandon Ward, compared Match.com's desktop online subscription cancelation flow to other desktop online subscription cancelation flows, including another online dating website, and found that Match.com's flow compared favorably to the others, as "many of the features of Match.com's cancelation process are standard and used on many other websites." App. at 106. This analysis is obviously relevant to show the features of cancelation flows that are industry standard and thus familiar to users.

### E.  Dr. King's Analysis Is Connected to Her Conclusion Only Through Her Own Ipse Dixit

Based on the (limited) analysis that Dr. King performed, she concluded that Match.com's cancelation flow is "not easy or simple to use" and "not easy for users to locate." App. at 5. Even aside from the flaws in Dr. King's analysis described above, her conclusion is inadmissible for the additional reason that it is linked to her analysis only through her own *ipse dixit*. A court may exclude expert testimony if "there is simply too great an analytical gap between the data and the opinion proffered," as "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Although Dr. King claims to have identified heuristic violations and "dark patterns" in Match.com's cancelation flow, she never explains how that analysis translates into her conclusion that the flow is not easy to use or find. The mere existence of heuristic violations or dark patterns is not the problem. Dr. King admitted in both her report and at her deposition that a heuristic violation does not necessarily render a flow confusing. *See, e.g.*, App. at 36 ("[A]ny single [heuristic violation] in isolation may not have been enough to cause substantial confusion . . . ."); *id.* at 443–444 ("[T]here isn't a numeric threshold that you have to meet to say, this is not usable and this is usable with a heuristic analysis."). But it is unclear where the tipping point is at whereby heuristic violations or dark patterns render a flow not simple. When asked, Dr. King could not or would not say. *See id*. Instead, she claimed that "[i]t depends." *Id.* Her conclusion that the alleged heuristic violations and dark patterns that she purports to have identified in Match.com's cancelation flow render the flow not easy to use or find is inadmissible *ipse dixit*.

\*     \*     \*

Any of the above errors, standing alone, justifies exclusion. But together, they form

precisely the type of unreliable expert opinion that *Daubert* and Federal Rule of Evidence 702 exclude. *Daubert* requires that an expert "employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Sandifer*, 907 F.3d at 80. But Dr. King applied no such rigor here—consistently ignoring all of the tests and analyses that experts in the field would typically do, such as usability studies, and evaluating only the factors that she believes support her preconceived opinion as a purported dark patterns expert. The FTC itself has successfully moved for exclusion of an expert's opinion where "the opinions were based upon speculation rather than available data or empirical research," the expert "ignore[d] relevant areas of inquiry that would contradict his opinion," and the opinion was "disconnected from the facts of th[e] case." *FTC v. Simple Health Plans, LLC*, No. 18-CV-62593, 2021 WL 810262, at *6 (S.D. Fla. Mar. 3, 2021). The same standard applies to the FTC's experts. "Such inconclusive data and a lack of testing cannot support [Dr. King's] conclusion" that Match.com's online subscription cancelation flow is not easy to find or use. *Stevens v. State Farm Lloyds*, 2003 WL 25676886, at *2 (N.D. Tex. Oct. 7, 2003) (Kinkeade, J.). The "disparity between data and conclusions is the sort of impermissible 'analytical gap' between the data and the opinion proffered" that requires exclusion. *Id.* For those reasons, the Court should exclude Dr. King's opening report in its entirety.

## II. The "Complaint Analysis" in Dr. King's Rebuttal Report Is Untimely, Irrelevant, and Unreliable, and Thus Inadmissible

### A. Dr. King's "Complaint Analysis" Is Untimely and Thus Inadmissible

The deadline for opening expert reports in this case was January 13, 2023. Dr. King did not offer any complaint analysis in her opening report. In her rebuttal report served months later,[13] however, Dr. King offered a brand new "complaint analysis" in which she purports to conduct a qualitative analysis of certain complaints to "complement" her partial heuristic analysis. App. at

---

[13] Rebuttal reports were served on May 15, 2023, per the parties' agreement.

174. Based on that analysis, Dr. King categorized a selection of the complaints by "theme," then summarized those "themes" and presented examples. App. at 180–187. In addition, based on her analysis of the complaints, Dr. King offered a new opinion that the "burden" of Match.com's cancelation flow "was most likely to fall upon older users." App. at 187–190, 195.

### a.   Dr. King's Complaint Analysis Is Untimely

Opening reports must contain "a *complete* statement of *all* opinions the witness will express." Fed. R. Civ. P. 26(a)(2)(B) (emphases added). Dr. King admits that she did not put her complaint analysis in her opening report because she "did not have time" to meet the earlier deadline. App. at 437. And so she shoehorned the analysis into a rebuttal report. But rebuttal opinions are permissible only to the extent they are "intended *solely to contradict or rebut* evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii) (emphasis added). They "are not intended to provide an extension of the deadline by which a party must" disclose its expert's opinions. *Sierra Club, Lone Star Chapter v. Cedar Point Oil*, 73 F.3d 546, 571 (5th Cir. 1996). Putting "entirely new analysis" in a rebuttal report "run[s] afoul of Rule 26 and the scheduling order." *Familias Unidas Por La Educacion v. El Paso Indep. Sch. Dist.,* No. EP-20-CV-170-DB, 2022 WL 2906505, at *5 (W.D. Tex. July 22, 2022).

Dr. King's complaint analysis and the opinions based on it (such as that older users are more likely to be affected by Match.com's alleged ROSCA violation) are entirely new. The analysis does not rebut anything in Mr. Ward's report, as Mr. Ward's opinion had nothing to do with customer complaints (much less older users specifically). *See generally* App. at 76–150. In fact, Dr. King herself criticized Mr. Ward for "neglecting to examine customer comments to the company" in his opening report (even though *she did not analyze customer complaints in her opening report either*), proving in Dr. King's own words that her complaint analysis is not a true

rebuttal. App. at 155. Instead, Dr. King's new analysis is an attempt to bolster the partial heuristic analysis in Dr. King's opening report, App. at 174, and should have been disclosed at that time.

### b.  Untimely Opinions Are Inadmissible

The FTC's untimeliness results in exclusion. *See* Fed. R. Civ. P. 37(c)(1). The FTC can avoid exclusion only by "proving that the failure to disclose was substantially justified or harmless." *Familias*, 2022 WL 2906505, at *5. To make that assessment, the Court considers four factors: (1) the reason for the failure to properly disclose; (2) the importance of the disclosure; (3) the potential prejudice in allowing the disclosure; and (4) the availability of a continuance to cure such prejudice. *See Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990).

The FTC cannot carry its burden here. The analysis was untimely simply because Dr. King ran out of time before the deadline for her opening report—far from any substantial justification. App. at 437. Nor can the FTC establish that Dr. King's complaint analysis is important, as it apparently was not important enough to include in Dr. King's opening report. *See, e.g.*, *Familias*, 2022 WL 2906505, at *6 ("[T]he non-importance of the analyses is shown by the fact that they weren't performed in the first two opportunities [the expert] had to perform them."). It is offered only to prove the unsurprising proposition that some consumers complained. *See* App. at 437 ("[I]t offers firsthand opinions from actual customers . . . ."). Moreover, the complaint analysis is not important for the additional reason that expert testimony is not necessary for the fact-finder to read and understand customer complaints (to the extent they are admissible). *See Graham v. Lewis*, No. 3:21-CV-1274-D, 2023 WL 2700718, at *2 (N.D. Tex. Mar. 28, 2023) (denying motion to allow late disclosure of expert witness in part because the testimony would be unimportant, as "[t]he facts related to these conclusions are such that the jury does not need the aid of an expert to understand and evaluate them"). The belated disclosure also caused Defendants undue cost and delay. Exclusion is proper even where the opposing party "could have conducted new discovery

and redeposed witnesses under a continuance in response to the untimely designation," as allowing such opinions would "result[] in additional delay and increase[] the expense of defending the lawsuit." *Geiserman*, 893 F.2d at 792. Additionally, and perhaps more importantly, "a continuance would not deter future dilatory behavior, nor serve to enforce local rules or court imposed scheduling orders." *Id.*

What is more, the complaint analysis itself is deeply flawed, as discussed in more detail below. This is not the type of new opinion for which the FTC can show that its untimeliness was substantially justified or harmless. The Court should exclude Dr. King's untimely complaint analysis, which represents a flagrant disregard for the Court's deadlines and the parties' resources.

### B.  Dr. King's Complaint Analysis Is Irrelevant and Unreliable

Even if Dr. King's complaint analysis were timely (it is not), it is irrelevant and unreliable, and therefore inadmissible. The comments from subscribers that Dr. King evaluated represent only a tiny fraction of Match.com users over the relevant time period—some 638 "complaints" submitted to Match.com, compared to the literally millions of subscribers who were perfectly happy with Match.com's services and were able to complete the cancelation flow successfully. App. at 275–276. Dr. King narrowed her review even further by reviewing only complaints that had been tagged in the "difficult cancel process" subcategory of the "Billing/Cancel" category. Dr. King admitted in her report that complaints tagged with "difficult cancel process" made up only approximately 6% of total complaints in 2016 (and therefore an even smaller portion of overall complaints). App. at 175.[14] Dr. King also reviewed "roughly fifty complaints" in the FTC's

---

[14] Dr. King also reviewed complaints submitted in 2017 and part of 2018. "Difficult cancel process" made up an even smaller portion of Billing/Cancel complaints in those time periods (3.3% and 2.2%, respectively). App. at 175.

Sentinel database, which she chose by using a keyword search.[15] App. at 190. The fact that she could find only approximately fifty complaints over the 7-year period she reviewed—fewer than 10 complaints per year—is telling. Moreover, all of the complaints that Dr. King reviewed came from a small, self-selecting portion of Match.com users (those that were unhappy enough to reach out to complain). As Mr. Ward explained, relying only on "feedback from a group of people that is inherently self-selecting"—as Dr. King did—is "neither objective nor reliable" and "leads to biased results." App. at 205. Worse, she then assumed that all of the complaints were accurate, despite evidence to the contrary, as described in more detail below. And then she presented her analysis as if it were representative. This testimony is inadmissible for multiple reasons.

First, unquestioning reliance on anecdotal data, such as customer complaints, leads to unreliable—and thus inadmissible—results. "Uncontrolled anecdotal information offers one of the least reliable sources to justify opinions . . . ." *McClain v. Metabolife Int'l Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005); *see Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 379-80 (5th Cir. 2010) (finding that testimony based on "anecdotal evidence" is not reliable under *Daubert*); *Rhodes v. Bayer Healthcare Pharms., Inc.*, No. CIV.A. 10-1695, 2013 WL 1289050, at *5 (W.D. La. Mar. 26, 2013) ("Dr. Hamilton's reliance on adverse event reports is also unimpressive, as such reports do not demonstrate the requisite degree of reliability demanded by *Daubert*."); *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) ("Red flags that caution against certifying an expert include reliance on anecdotal evidence, . . . lack of testing, and subjectivity."). The customer complaints on which Dr. King relies are self-reported anecdotes, precisely the type of unreliable source that does not provide a sufficient basis for an expert opinion.

---

[15] It is unclear exactly how many FTC database complaints Dr. King reviewed. At one point in her report she says it was "roughly fifty." App. at 190. At another point she says it was "66 complaints." *Id.* But the Appendix to her report identifies only 30. Dr. King could not explain this discrepancy at her deposition, other than to speculate that she perhaps "copied the wrong field," an error she has never corrected. *See* App. at 447–448.

That is particularly true here, where Dr. King did nothing to verify the complaints were accurate, yet evidence shows that they were not. Dr. King assumed that consumers accurately reported their experiences with the online cancelation flow, and relies on those complaints to conclude that consumers suffered from "cancellation confusion." App. at 178. Yet usage analysis shows that 43.2% of the people that Dr. King claims complained to Match.com about the cancelation flow *never actually experienced the cancelation flow*. App. at 282. Someone that never saw the flow cannot have been confused by it, contrary to Dr. King's conclusions.[16]

Second, because Dr. King uncritically relies on and repeats purported customer complaints, her complaint analysis parrots inadmissible hearsay and "simply . . . summarize[s] the evidence proffered by the party that hired [her]." *Robroy Indus.-Tex., LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512-WCB, 2017 WL 1319553, at *9 (E.D. Tex. Apr. 10, 2017). Such testimony is inadmissible. "Rule 703 'was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.'" *Id.* (quoting *Factory Mut. Ins. Co. v. Alon USA LP*, 705 F.3d 518, 524 (5th Cir. 2013)). By offering her complaint analysis, Dr. King has effectively become the mouthpiece for the customers who submitted those complaints, none of whom will be presented at trial and subject to cross-examination. Parroting hearsay is impermissible, so Dr. King's complaint analysis should be excluded for this reason as well.

Third, Dr. King's complaint classification is not replicable. To satisfy *Daubert*, "[s]omeone else using the same data and methods must be able to replicate the result." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). That is impossible here, because Dr.

---

[16] Because some of these consumers are contacting Match.com to request a refund, they may have an economic interest in exaggerating their experience with the flow in the hopes of increasing the likelihood of a refund. In light of the economic interest, Dr. King's unquestioning reliance on these complaints is particularly unreasonable.

King's complaint analysis involved only Dr. King "creat[ing] thematic categories after viewing multiple customer comments on a similar topic" while she "reviewed the comments and retrospectively." App. at 179. She does not explain what she considered a "similar topic," which topics (if any) she excluded, or how the topics changed when she did her "retrospective[]" analysis, presumably because the analysis was based on Dr. King's subjective reading of the comments, not any kind of systematic, replicable approach. Partly for that reason, Defendants' expert was not able to replicate Dr. King's results. App. at 280. Additionally, to the extent her approach could be replicated, Dr. King appears to have made serious mistakes. For example, Dr. King included some complaints that were not about Match.com *at all* (which Dr. King attempted to explain away at her deposition as a potential copy-paste error, though she has never corrected it). App. at 447. And Dr. King classified one comment that said simply "I would like my membership cancelled" as indicating "Cancellation Confusion" and "Unable to Cancel," even though the comment does not indicate confusion, much less an inability to cancel.[17] App. at 280. These mistakes demonstrate the importance of replicability, particularly in these circumstances, yet Dr. King's lack of any objective methodology—instead relying on her subjective reading of the complaints—makes that replicability impossible. For that reason, her complaint analysis should be excluded.

Finally, Dr. King's complaint analysis is irrelevant, because it proves nothing more than that some people may have complained, often about an experience that they never had. To be admissible, the expert's testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see United States v. West*, 22 F.3d 586, 599 (5th Cir. 1994) (affirming exclusion of expert testimony because "the typical juror is qualified to determine intelligently and to the best degree possible" the issues on which the experts opined).

---

[17] Contacting customer care is one of the multiple methods by which subscribers can cancel their subscriptions, so it is not surprising that a commenter might make that request of customer care.

The complaints that came from someone who never experienced the flow—which represent 43.2% of the complaints to Match.com that Dr. King analyzed—are irrelevant because they can say nothing about the Match.com flow. But even complaints from those who experienced the flow do not prove whether Match.com's cancelation flow is "simple," nor does the fact-finder need an expert's help to interpret those complaints to the extent they are relevant. The fact that some people—which represent less than 0.021% of Match.com's subscribers, App. at 261—purportedly complained about the flow does not show that the flow is not simple. It is no surprise that it is impossible to please everyone. As in her opening report, Dr. King does not explain what standard she is using to determine that complaints indicate the flow is not simple or easy.

In short, Dr. King offers no expertise, beyond parroting (and attempting to categorize) complaints. The fact-finder is perfectly capable of reading and analyzing complaints (to the extent they are admissible), without Dr. King's subjective gloss on them. *See West*, 22 F.3d at 599; *De Boulle Diamond & Jewelry, Inc. v. Boulle, Ltd.*, No. 3:12-CV-1462-L BF, 2014 WL 4413608, at *4 (N.D. Tex. Sept. 5, 2014) (excluding expert testimony regarding whether two marks were confusingly similar because, although the expert "has extensive experience with and knowledge of luxury retail markets, he does not rely on any specialized knowledge in forming his opinions," and the "jury is fully capable of considering the same evidence, provided it is admitted at trial, and making its own determination regarding any similarities"). Because Dr. King's complaint analysis invades the factfinder's role—apparently as a backdoor way to attempt to introduce inadmissible and unreliable hearsay complaints—the complaint analysis should be excluded.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant this Motion and exclude Dr. King's opinions in their entirety.

Dated: September 11, 2023

*/s/ Angela C. Zambrano*

Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: 214-981-3300
Fax: 214-981-3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310-595-9500
Fax: 310-595-9501

Benjamin M. Mundel (admitted *pro hac vice*)
bmundel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: 202-736-8000
Fax: 202-736-8711

*Attorneys for Match Group, Inc. and*
*Match Group, LLC*

## **CERTIFICATE OF CONFERENCE**

On September 8, 2023, a conference was held with counsel for the FTC about the substance of this Motion but the parties were unable to reach agreement.

*/s/ Chelsea A. Priest*
Chelsea A. Priest

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 11, 2023, I caused true and correct copies of the foregoing Unopposed Motion for Leave to File Under Seal, to be served on all counsel of record in accordance with Federal Rules of Civil Procedure and this Court's CM/ECF filing system.

Reid Abram Tepfer
rtepfer@ftc.gov
M. Hasan Aijaz
maijaz@ftc.gov
Matthew James Wilshire
mwilshire@ftc.gov
Sarah Zuckerman
szuckerman@ftc.gov
John R. O'Gorman
jogorman@ftc.gov
Erica Rollins Hilliard
ehilliard@ftc.gov
Jason C. Moon
jmoon@ftc.gov

*/s/ Angela C. Zambrano*
Angela C. Zambrano
