**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| vs. | Case No. 3:19-cv-02281-K |
| MATCH GROUP, INC., a corporation, and MATCH GROUP, LLC, formerly known as MATCH.COM, LLC, a limited liability company, | |
| Defendants. | |

**DEFENDANTS MATCH GROUP, INC. AND MATCH GROUP, LLC'S**
**RESPONSE TO PLAINTIFF FEDERAL TRADE COMMISSION'S *MOTION IN LIMINE*
TO EXCLUDE PROPOSED EXPERT TESTIMONY OF BRANDON WARD**

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 1

    A.  Mr. Ward's Four-Part Analysis .......................................................................... 2

    B.  The FTC's Expert's Partial Heuristic Analysis ................................................. 4

ARGUMENT ................................................................................................................... 5

  I.   Mr. Ward's Nearly 25 Years of Experience and Education More than Qualify Him to Offer His Usability Opinions in this Matter ............................................................ 5

    A.  Mr. Ward Has Significant Training and Experience in Usability ...................... 5

    B.  The FTC's Arguments to the Contrary Misunderstand the Facts and the Law ............... 6

    C.  Mr. Ward Need Not Have Experience Specifically with Cancelation Flows—Although He Does ........................................................................................................ 8

  II.  Mr. Ward's Multiple Analyses—All of Which Point to the Same Conclusion that Match.com's Cancelation Flow Is Simple—Are Relevant and Reliable ......................... 10

    A.  Mr. Ward's Heuristic Analysis Is Reliable ..................................................... 10

        1.   Mr. Ward Properly Applied a Heuristic Analysis .................................. 10

        2.   Mr. Ward Adequately Supported His Heuristic Analysis ...................... 11

          i.   Mr. Ward Cited Supporting Sources and Explained His Analysis ........................ 12

          ii.   Mr. Ward's Complementary Analyses Also Support His Heuristic Analysis ........ 13

        3.   Mr. Ward Analyzed All Versions of the Match.com Cancelation Flow ............... 14

    B.  Mr. Ward's Usability Study Is Reliable ......................................................... 15

        1.   The Survey Universe Corresponded to Match.com's Subscriber Base ................. 15

          i.   The Survey Universe Accurately Reflected the Internet Savviness of Online Daters .......................................................... 16

          ii.   The Age of Study Participants Accurately Reflected Match.com Age Demographics .......................................................... 17

        2.   The Stimulus Was the Exact Match.com Website at Issue .................... 19

        3.   The Study Produced Consistent Results ............................................... 21

    C.  Mr. Ward Accounts for Actual Match.com Subscribers' Use of the Flow ................. 23

CONCLUSION ............................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amstar Corp. v. Domino's Pizza, Inc.*,
615 F.2d 252 (5th Cir. 1980) ...................................................16

*Earl v. Boeing Co.*,
No. 4:19-cv-507, 2021 WL 3140545 (E.D. Tex. July 26, 2021)............................................22

*Equal Emp't Opportunity Comm'n v. Citizens Bank*,
No. C.A. 19-362WES, 2023 WL 2446319 (D.R.I. Mar. 10, 2023)..........................................14

*Hard-Mire Rest. Holdings v. JH Zidell PC*,
619 B.R. 165 (N.D. Tex. 2020)...................................................21

*Huss v. Gayden*,
571 F.3d 442 (5th Cir. 2009) ...................................................5

*Jaret Int'l, Inc. v. Promotion In Motion, Inc.*,
826 F. Supp. 69 (E.D.N.Y. 1993) ...................................................20

*Jim S. Adler, P.C. v. McNeil Consultants, LLC*,
Dkt. 171, No. 3:19-cv-2025-K-BN (N.D. Tex. July 27, 2023)....................................15, 19, 20

*K.S. v. Fremont Unified Sch. Dist.*,
679 F. Supp. 2d 1046 (N.D. Cal. 2009), *aff'd*, 426 F. App'x 536 (9th Cir. 2011) ...................................................14

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*,
452 F. Supp. 2d 772 (W.D. Mich. 2006), *aff'd*, 502 F.3d 504 (6th Cir. 2007).......................16

*Patton v. Metro. Lloyds Ins. Co. of Tex.*,
No. 5:21-CV-074-H, 2022 WL 2898946 (N.D. Tex. Feb. 14, 2022) ...............................21, 24

*Pengu Swim Sch. v. Blue Legend, LLC*,
No. 4:21-cv-1525, 2023 WL 2870405 (S.D. Tex. Apr. 8, 2023)...........................................15

*Ramos v. Home Depot, Inc.*,
No. 3:20-CV-1768-X, 2022 WL 615023 (N.D. Tex. March 1, 2022)....................................10

*Roman v. Western Mfg., Inc.*,
691 F.3d 686 (5th Cir. 2012) ...................................................9

*Scott Fetzer Co. v. House of Vacuums, Inc.*,
381 F.3d 477 (5th Cir. 2004) ...................................................15

*Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*,
    765 F. Supp. 2d 884 (S.D. Tex. 2011) ...................................................................16

*Simon Prop. Grp. L.P. v. mySimon, Inc.*,
    104 F. Supp. 2d 1033 (S.D. Ind. 2000) ................................................................20

*Smith v. Wal-Mart Stores, Inc.*,
    537 F. Supp. 2d 1302 (N.D. Ga. 2008) ................................................................16

*United States v. Hodge*,
    933 F.3d 468 (5th Cir. 2019) ..........................................................................11, 12

*United States v. Holy Land Found. For Relief Develop*,
    No. 3:04-cr-240-G, 2007 WL 2059722 (N.D. Tex. July 16, 2007) ........................8

*Viterbo v. Dow Chem. Co.*,
    826 F.2d 420 (5th Cir. 1987) ...............................................................................13

*Wellogix, Inc. v. Accenture, L.L.P.*,
    716 F.3d 867 (5th Cir. 2013) .................................................................................7

*Williams v. Manitowoc Cranes*,
    898 F.3d 607 (5th Cir. 2018) .................................................................................9

**Other Authorities**

Thomas McCarthy, *6 McCarthy on Trademarks and Unfair Competition* § 32:162
    (5th ed. 2019) ......................................................................................................16

**PRELIMINARY STATEMENT**

The FTC's Motion to exclude Brandon Ward's testimony is baseless. The FTC argues that a person whose job title is "Chief Experience Officer and Senior Director of User Experience" and who has completed over 100 usability projects (including usability studies), spoken at usability conferences, and teaches usability at Southern Methodist University is not qualified to offer a usability opinion. The FTC also complains about the way in which Mr. Ward performed his analyses, but most of the FTC's critiques are devoid of any support whatsoever, based on "facts" that appear nowhere in the record. And to the extent the FTC's critiques have any support, those complaints go, at best, to the weight of Mr. Ward's opinions, not their admissibility.

The real reason for the FTC's Motion is to distract from the fact that Mr. Ward did the analyses that the *FTC's* expert should have done, but failed to do, because those analyses demonstrate that Match.com's subscription cancelation flow is simple. In fact, each and every one of the four analyses that Mr. Ward performed demonstrated the simplicity of Match.com's cancelation flow. The FTC's Motion to exclude those analyses should be denied.

**FACTUAL BACKGROUND**

Defendants' expert, Brandon Ward, is a website usability expert that has been in the industry for nearly 25 years. His expertise has been acknowledged by others in the industry, as he has worked on over 100 usability projects, has spoken at multiple conferences, and is an instructor in Southern Methodist University's ("SMU's") User Experience Design Certificate program. Mot. App. at 77. Defendants' counsel retained him in this case to use his "expertise in website design and user experience to evaluate and offer opinions about Match.com's online subscription cancelation flow." Rpt. ¶ 8 (Mot. App. at 4).

Mr. Ward's assignment "was to assess whether Match.com's online cancelation flow is, in fact, 'not simple," as the FTC alleges. Rpt. ¶ 8 (Mot. App. at 4); *see also* App. at 7 ("My assignment was to investigate the cancellation flow, to help find whether or not it was simple."). Defendants did not tell Mr. Ward what conclusions to reach or what tools to use to do so. Instead, they asked him to use whatever tools and analyses he thought appropriate to complete his assignment. Mr. Ward "used methodologies commonly accepted in the user experience field," and which he "use[s] in [his] expert consulting and academic work." Rpt. ¶¶ 10, 12 (Mot. App. at 5, 6). Mr. Ward's sole goal was to "investigate the cancellation flow, to help find whether or not it was simple." App. at 7. Mr. Ward chose to use multiple tools and methodologies to ensure that his opinion was not solely based on his personal views and not skewed by any particular analysis. *See* Rpt. ¶¶ 12-18 (Mot. App. at 6-7). Specifically, his analysis consisted of four parts.

**A. Mr. Ward's Four-Part Analysis**

Mr. Ward started with a heuristic analysis, which involves evaluating a webflow against ten well-accepted principles (or heuristics) established by Jakob Nielsen, a leader in the usability field, to assess the flow's usability.[1] Mr. Ward supplemented the ten usability heuristics with Nielsen Norman Group's "Five Quality Components," another set of factors "used to identify whether an interface is usable and simple." Rpt. ¶ 14 (Mot. App. at 6). Across 22 pages of analysis (not including his background description of the flow), Mr. Ward explained his heuristic analysis and concluded that Match.com's cancelation flow is consistent with each of the fifteen usability heuristics and components. Rpt. ¶¶ 51-103 (Mot. App. at 32-54).

Mindful that the literature in the field warns that heuristic analysis is only as good as what a usability test can support and "should not replace usability testing," App. at 23, Mr. Ward then

---

[1] As explained in more detail below, the FTC's expert, Dr. Jennifer King, also did a heuristic analysis, but using only cherry-picked heuristics that she claims support the FTC's position.

conducted an empirical usability study to evaluate whether participants "were able to successfully cancel, how long it took them to cancel, and their perceptions of the simplicity or difficulty of the cancelation process." Rpt. ¶ 16 (Mot. App. at 6). Mr. Ward used a well-known user testing platform, UserTesting.com, to recruit participants and matched the demographics of the participants to Match.com subscriber demographics. Rpt. ¶ 108 (Mot. App. at 56-57). He then asked those participants to sign-up for a Match.com subscription, then cancel their subscription. The results of the study showed that 91.5% of participants successfully canceled, taking a median of 74 seconds to do so (a far shorter amount of time than signing up).[2] Rpt. ¶ 111 (Mot. App. at 59-60). Furthermore, 88.3% of participants thought canceling was simple or were at least neutral as to simplicity/difficulty, and 84.7% of participants thought canceling was at least as simple as signing up. Rpt. ¶ 111 (Mot. App. at 59-60). Mr. Ward also asked the usability study participants to answer the System Usability Scale ("SUS") survey questions, which, according to usability.gov, is a "reliable tool for measuring the usability" of a system. Rpt. ¶ 116 (Mot. App. at 63). Based on those responses, Match.com's sign-up and cancelation flows received an "A Grade," putting "it among the top 10% of all websites in terms of usability." Rpt. ¶ 111 (Mot. App. at 59-60).

Mr. Ward did not stop there. He then analyzed Match.com actual subscriber data to confirm whether Match.com's subscribers were able to cancel and the time it took them to do so. Rpt. ¶ 17 (Mot. App. at 6-7). Again, Mr. Ward found that the vast majority of people (95%) who entered the cancelation flow either successfully canceled or took a save offer, and generally took less than a minute to do so (again, far faster than subscribing). Rpt. ¶ 134 (Mot. App. at 71-72).

Finally, Mr. Ward compared Match.com's online cancelation flow to other online subscription cancelation flows to evaluate whether Match.com's flow reflected standard and best

---

[2] FTC guidance suggests that comparing sign-up to cancelation is one way in which to assess simplicity. App. at 57.

practices for website design, since users are unlikely to find a flow to be "not simple" if it uses design patterns with which they are familiar. Rpt. ¶ 15 (Mot. App. at 6). He found that "many of the features of Match.com's cancelation process are standard and used on many other websites." Rpt. ¶ 50 (Mot. App. at 30). As a result, those features are likely familiar to users and unlikely to cause a user to find Match.com's cancelation flow "not simple." *See* Rpt. ¶ 50 (Mot. App. at 30).

Each and every one of these analyses led Mr. Ward to the same conclusion: Match.com's subscription cancelation flow is clear and effective—i.e., "simple"—by any reasonable usability standard. And because all of these analyses pointed in the same direction, Mr. Ward could be confident that his conclusions are correct, strengthened by convergent validity.

### B. The FTC's Expert's Partial Heuristic Analysis

Notably, Mr. Ward's multi-faceted and neutral approach was far different than the incomplete and biased approach taken by the FTC's expert, Dr. Jennifer King. Rather than approaching the question with the neutrality of an unbiased expert and identifying methodologies to help her reach a conclusion, Dr. King began the project already convinced that Match.com's subscription cancelation flow was not simple. Her notes, produced after her deposition, show that she "brainstorm[ed]"[3] ways to "help prove" her conclusion that Match.com's cancelation flow is not simple. App. at 187-202. In other words, rather than going where the evidence led her (as Mr. Ward did), Dr. King set out to find the evidence that would lead her to the conclusion that she (and the FTC) desired. That is the *opposite* of the scientific method. Her blinkered approach to this case involved performing only a *partial* analysis to support her predetermined conclusion, along with reviewing cherry-picked, biased documents. *See* Dkt. 208. Dr. King's approach to this case explains why. Had she done any other analysis (such as a usability study or review of actual

---

[3] The filename of the document, as produced to Defendants, is "Match brainstorming."

Match.com subscriber data, as Mr. Ward did), it would have undercut the result she was determined to reach.[4]

To disguise Dr. King's failure to do any real analysis—and apparently taking to heart the adage that "the best defense is a good offense"—the FTC criticizes Mr. Ward for doing the work that Dr. King chose not to do. The Court should deny the FTC's groundless Motion to exclude Mr. Ward's opinions, for the reasons explained below.

## ARGUMENT

### I. Mr. Ward's Nearly 25 Years of Experience and Education More than Qualify Him to Offer His Usability Opinions in this Matter

The FTC begins its argument by asserting that Mr. Ward is not qualified to offer his opinions. This challenge is frivolous, as the work he did in this case is precisely what he has done for a living for over two decades. "Experts qualified by 'knowledge, skill, experience, training or education' may present opinion testimony to the jury." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting Fed. R. Evid. 702). Mr. Ward easily meets this standard.

### A. Mr. Ward Has Significant Training and Experience in Usability

Mr. Ward is the Chief Experience Officer and Senior Director of User Experience at Precocity, LLC. Rpt. ¶ 1 (Mot. App. at 2). Precocity is a consultancy focused on, among other things, user experience ("UX") research and design—i.e., the precise issue in dispute in this case.[5] Mr. Ward has a M.S. in Telecommunications from Indiana University-Bloomington's Immersive Mediated Environments program, also known as the interactive media design program. Rpt. ¶ 2 (Mot. App. at 2); App. at 3. The program "focuses on the synergy of practical skills and study

---

[4] Dr. King's litigation consulting and expert work has been "almost exclusively for the Federal Trade Commission, state-level attorneys general, and other public clients." App. at 203. In fact, she apparently has never done *any* kind of consulting for nonacademic corporate clients. App. at 207 (testifying that she has never been paid by a nonacademic corporate client to do a heuristic analysis or facilitate a usability study). Thus, Dr. King has a vested interest in keeping the FTC happy by backing up the FTC's allegations, no matter how thin or nonexistent the evidence.

[5] https://precocityllc.com/

needed to successfully create, evaluate and critique new media environments of all sorts,"[6] and includes, for example, workshops presented by Oracle's principal usability engineer.[7]

Consistent with his education and training, Mr. Ward has worked in the field of website usability for nearly 25 years. Rpt. ¶ 3 (Mot. App. at 2) ("From 2000 to the present, I have served as a designer and design leader both in-house and with agencies."). In that role, he has worked on over 100 usability projects, performing usability and user research studies (just as he did in this case). *See* Rpt. ¶ 6 (Mot. App. at 2-3); App. at 3. He has also designed and studied websites—including websites with online cancelation flows.[8] App. at 5.

He has used his expertise to train others in the field as well. He is an instructor for the Continuing and Professional Education program at SMU, where he teaches "principles and practices of user experience . . . and service design relating to websites, online flows, and other research and design-related activities." Rpt. ¶ 1 (Mot. App. at 2). SMU touts the User Experience Design Certificate, for which Mr. Ward teaches, as the place to "[l]earn the tools, techniques and principles of UX Design from industry experts," including Mr. Ward.[9] He also has spoken at and attended various conferences related to usability. *See* App. at 4 (identifying Interaction Design Association, Service Design Network, User Experience Professionals Association, Big Design, and Game Developers as examples of conferences that he has spoken at or attended).

### B. The FTC's Arguments to the Contrary Misunderstand the Facts and the Law

Despite the fact that private sector clients, conference organizers, and SMU recognize Mr. Ward as an expert in the usability field, the FTC nevertheless challenges his qualifications to opine

---

[6] App. at 375.
[7] App. at 376-80.
[8] One example of a website offering online subscriptions and a cancelation flow that Mr. Ward worked on, which he mentioned in his report, is WorldatWork.org. *See* Rpt. ¶ 29 (Mot. App. at 10); App. at 11.
[9] App. at 384.

about usability. The FTC's main critique is that Mr. Ward allegedly "has no academic education in usability and experience design." Mot. at 6. First, that is not true. As Mr. Ward explained at his deposition, his Masters in Immersive Mediated Environments focused on interactive media design, including training on survey design and cognitive psychology. App. at 3, 4. As usability.gov explains, interaction design is an aspect of usability.[10] This education (in combination with his experience) was sufficient for SMU to hire Mr. Ward to *teach* usability. *See* Rpt. ¶ 1 (Mot. App. at 2). Thus, the FTC is wrong about Mr. Ward's alleged lack of formal education in usability.

Second, even if Mr. Ward had no formal training, neither Rule 702 nor *Daubert* require that experts have formal education in the relevant field; experience is sufficient. *See* Fed. R. Evid. 702 advisory committee's note ("[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."); *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881-82 (5th Cir. 2013) (holding that expert's computer science background and self-taught knowledge were sufficient qualifications for expert to testify about software programming). Mr. Ward has relevant experience in spades, as described above. He has far more than just "some experience," as the FTC suggests. Mot. at 6. Rather, he has spent "[a]round 47,000 hours of work in the field for hundreds of projects with about as many clients." App. at 3. The FTC's claim that Mr. Ward "has only ever analyzed two desktop websites in his 23 years of experience," Mot. at 7, is entirely unsupported and inaccurate. The deposition testimony that the FTC cites for that proposition (Mot. App. at 246:15-21) says nothing of the sort (a common occurrence in the FTC's briefing in this matter).[11] In fact, Mr. Ward's career has included "creating and developing unique, award-

---

[10] App. at 385.

[11] The FTC's claim that "Mr. Ward did not even understand the concept of a confidence interval of a median," Mot. at 7, is similarly puzzling. The testimony that the FTC cites (Mot. App. at 260.1:2-260.6:17) demonstrates Mr. Ward *explaining* a confidence level and how it interacts with a confidence interval, not any inability to understand the concept.

winning, and usable software, mobile apps, websites, and AR/VR experiences." Mot. App. at 75.

Nor does Mr. Ward claim that his expertise comes solely "from reading unspecified 'books,'" as

the FTC claims. Mot. at 6. Mr. Ward pointed to his Master's degree, conferences, and lectures as

the basis for his expertise.[12] App. at 4. He has authored approximately 25 articles and spoken at

18 conferences. App. at 3. The FTC complains that these were not "scientific articles or peer

reviewed work," Mot. at 7, but lack of peer review "does not discount [an expert's] expertise and

specialized knowledge in his field." *United States v. Holy Land Found. For Relief Develop*, No.

3:04-cr-240-G, 2007 WL 2059722, at *8 (N.D. Tex. July 16, 2007) ("That the prior writings of

Levitt may not have been subject to pre-publication peer review is not an issue as it relates to his

qualifications as an expert. Levitt's professional experience and education alone may be sufficient

to evidence his field of expertise."). Furthermore, Mr. Ward explained in his report precisely how

he applied his experience and training—such as Nielsen's usability heuristics—in this matter, and

how those frameworks supported his opinions (as explained in more detail below). This is far more

than "[m]ere vague familiarity with the opinions of another expert." Mot. at 6-7.

### C.  Mr. Ward Need Not Have Experience Specifically with Cancelation Flows— Although He Does

The FTC attempts to write off Mr. Ward's significant experience by (wrongly) claiming

that his "experience does not relate to website cancellation flows." Mot. at 6; *see also id.* at 7

(criticizing Mr. Ward for not remembering previously doing a heuristic analysis of a cancelation

flow). To begin, the FTC's suggestion that Mr. Ward's experience "counts" only if it dealt with

---

[12] The FTC's claim that Mr. Ward "could not remember a single workshop or course he claims to base his expertise on," Mot. at 7, is misleading. First, at the portion of the deposition testimony that the FTC cites, the FTC asked Mr. Ward what conferences he had attended "regarding survey design" specifically (not usability generally). Mot. App. at 244:20-21. Second, the FTC omits from its citation the portion of Mr. Ward's answer in which he identified numerous conferences (including IXDA, Service Design Network, User Experience Professionals Association, Big Design Conference, and Game Developers Conference) and confirmed that aspects of them were related to survey design. Mot. App. at 244:22-245:11. That Mr. Ward could not recall the name of a specific workshop he has attended over his 23-year career is solely a distraction.

cancelation flows specifically is incorrect. The Fifth Circuit has rejected such arguments on multiple occasions. In *Williams v. Manitowoc Cranes*, 898 F.3d 607 (5th Cir. 2018), for example, one party argued that the expert was not qualified to opine about safety warnings for a crawler crane because, although the expert had "experience with drafting warnings for particular components of cranes and small-scale cranes," he did not have experience with "crawler-crane warnings." *Id.* at 624. The court rejected that argument, reasoning that such a "conception of expertise could turn the expert-qualification process into a 'battle of labels' where expertise is defined so narrowly that qualified experts are irrationally excluded from testifying." *Id.* at 625; *see also Roman v. Western Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012) (rejecting argument that mechanical engineer and material scientist were not qualified to opine about stucco pumps "because stucco is not their trade," as that argument defined expertise too narrowly). Similarly here, the relevant question is whether Mr. Ward is a website usability expert (he is), not how much experience he has with online cancelation flows specifically.

Regardless, Mr. Ward's extensive experience in the usability field *includes* experience with websites containing cancelation flows. App. at 5 ("I've designed websites that have those things [an online cancelation flow] and we've studied them . . . ."); Rpt. ¶ 29 (Mot. App. at 10) & App. at 11 (identifying WorldatWork as an example). So the FTC's challenge to Mr. Ward's qualifications is groundless.

*     *     *

In short, the FTC's claim that "none of Mr. Ward's work on this case grew naturally out of his professional experience," Mot. at 7, lacks any basis. The work that Mr. Ward did on this case is exactly the type of work that he does in his professional life. *See* Rpt. ¶ 12 (Mot. App. at 6) ("In performing this assignment, I used the same methodologies I use in my expert consulting and

9

academic work."); App. at 8 (explaining that performing a heuristic analysis is "a regular part of [his] job"). Mr. Ward is more than qualified to offer his opinions in this matter.

## II. Mr. Ward's Multiple Analyses—All of Which Point to the Same Conclusion that Match.com's Cancelation Flow Is Simple—Are Relevant and Reliable

### A. Mr. Ward's Heuristic Analysis Is Reliable

The FTC attacks Mr. Ward's heuristic analysis as unsupported and unreliable. This attack is somewhat ironic, as the FTC's expert, Dr. King, did *far* less analysis than Mr. Ward (as explained in Defendants' pending *Daubert* motion related to Dr. King, Dkt. 208), yet the FTC contends that Dr. King's inferior analysis is relevant and reliable. In fact, Dr. King performed only a *partial* heuristic analysis, analyzing only three of the ten traditional usability heuristics (selected based on which heuristics Dr. King believed Match.com's cancelation flow violated, App. at 208). Mr. Ward, by contrast, applied all ten of the traditional usability heuristics *plus* an additional five usability components. Although the FTC takes issue with whether the heuristic analysis is adequately sourced, "the Fifth Circuit has noted that as a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility." *Ramos v. Home Depot, Inc.*, No. 3:20-CV-1768-X, 2022 WL 615023, at *3 (N.D. Tex. March 1, 2022) (cleaned up). As explained below, Mr. Ward's analysis was more than adequately supported.

### 1. Mr. Ward Properly Applied a Heuristic Analysis

The FTC argues that Mr. Ward "deliberately misapplied" Nielsen's heuristic analysis because he did not "identify usability problems" in the Match.com cancelation flow, and, according to the FTC, a heuristic analysis "almost always identifies a list of usability problems." Mot. at 12. But the FTC's description of a heuristic analysis and its output is inaccurate. As Mr. Ward explained, Nielsen describes a heuristic analysis as "the formulation of ideas in the

investigation of or the solution to a problem." App. at 8. Here, the "problem" that Mr. Ward was asked to address was "is the cancellation flow simple." App. at 9. To do that, Mr. Ward used a "heuristic analysis [that] followed the Nielsen Norman Group example of heuristic analysis flow in the investigation of that question." App. at 9. Moreover, it is not unusual for Mr. Ward's clients to ask him to assess "the current state of things" rather than identify possible "problems." *See* App. at 6, 10. In other words, the heuristic analysis that Mr. Ward did in this case is precisely the type he has done for clients outside of litigation.

That Dr. King disagrees and purports to have found "issues with the flow" when conducting her *partial* heuristic analysis, Mot. at 12-13, is not a reason to exclude Mr. Ward's opinion. The fact that the FTC and its expert attempt to prove alleged lack of simplicity by relying on a method (heuristic analysis) that purportedly "almost always identifies a list of usability problems," Mot. at 12, is telling in and of itself. Additionally, Dr. King's notes—which the FTC begrudgingly and belatedly produced—show that Dr. King and her team "brainstorm[ed]" ways to "help prove" her conclusion that Match.com's cancelation flow is not simple. App. at 187-202. In other words, the FTC and its expert did not approach the question as an unbiased observer, as Mr. Ward did, but rather began with preconceived notions and a "test" that the FTC claims is all but guaranteed to identify "problems." In any event, even if Dr. King's opinion were reliable (and it is not, *see* Dkt. 208), "this does not necessarily mean that contradictory expert testimony is unreliable." *United States v. Hodge*, 933 F.3d 468, 477 (5th Cir. 2019).

## 2. Mr. Ward Adequately Supported His Heuristic Analysis

The FTC next complains that Mr. Ward does not cite enough sources throughout his heuristic analysis. This argument is absurd, and the FTC's own expert report proves why.

###### i.   Mr. Ward Cited Supporting Sources and Explained His Analysis

Mr. Ward cites multiple sources, which the FTC entirely ignores, throughout his heuristic analysis.[13] Mr. Ward spent pages describing the cancelation flow in detail, comparing it to other websites, and citing supporting sources. *See* Rpt. ¶¶ 26-101 (Mot. App. at 9-53). He then applied Nielsen's usability heuristics and usability components to the flow that he had described in detail. *See id.* The FTC contends that Mr. Ward "fail[ed] to provide any detailed analysis" for his conclusions, but the FTC's example of Mr. Ward's opinion regarding the "Aesthetic and Minimalist Design" heuristic proves the point. Mot. at 13. The FTC misleadingly suggests that the entirety of Mr. Ward's analysis is the two sentences quoted in the FTC's brief. *See* Mot. at 13 ("Based on my review of the cancelation flow, I did not identify any irrelevant or unnecessary information. Each piece of information provided to the subscriber was clear, relatively concise, and easy to understand." (cleaned up)). Yet the FTC ignores both (1) Mr. Ward's detailed review of the flow that preceded his application of this aesthetic, and (2) the paragraphs *immediately following* the one that FTC cited and that provide precisely the "detailed analysis" that the FTC claims is lacking. *See* Rpt. ¶¶ 83-84 (Mot. App. at 48) (describing parts of the cancelation flow and their clarity). As another example of the depth of Mr. Ward's analysis, in analyzing one heuristic assessing whether the flow "speak[s] the users' language," Mr. Ward used the Flesch Reading Ease Score and a Flesch-Kincaid Grade Level Score to assess understandability and readability. Rpt. ¶ 55 (Mot. App. at 34). This is far more than personal opinion based on *ipse dixit*.

Moreover, the FTC accuses Mr. Ward of doing something that *Dr. King* did. At the same time that the FTC accuses of Mr. Ward not citing enough sources (which is false, as explained above), Dr. King cited *zero* sources for two of the three heuristics she reviewed in her partial

---

[13] *See, e.g.*, Rpt. ¶¶ 55, 69, 70, 71, 73 (Mot. App. at 34, 42-45); *see also* Mot. App. at 132-133 (Bibliography).

analysis. *See* App. at 142-144. In fact, at one point, the FTC complains that Mr. Ward "inserts an unsupported quote presumably defining the [aesthetics] Heuristic." Mot. at 13. The quotation that the FTC complains about is *nearly identical* to the quotation defining the same heuristic in Dr. King's report. *Compare* Mot. App. at 48 (Ward Rpt.), *with* App. at 144-145.[14] Moreover, *Dr. King also did not cite a source for the quotation in her report. See* App. at 144-145. Thus, the lack of citation is not evidence of inadequate support; rather, it is evidence that Mr. Ward relies on well-known principles and heuristics where the source is obvious to experts in the field.

The FTC also complains that Mr. Ward did not "prove the framework or guidelines" for applying Nielsen's Usability Components, and "fails to provide any support for his analysis's conclusion" under those components. Mot. at 3, 14. Again, the FTC ignores that Mr. Ward cited "Usability 101: Introduction to Usability," which describes Nielsen's Usability Components. Rpt. ¶ 14 (Mot. App. at 6); App. at 182-83 (defining Nielsen's Usability Components). Moreover, he describes his conclusions and the justifications for them in detail, particularly in light of the extensive description of the cancelation flow that preceded application of the usability components. This is more than enough to overcome the FTC's objection. *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [factfinder's] consideration.").

### ii.   Mr. Ward's Complementary Analyses Also Support His Heuristic Analysis

What is more, the other analyses that Mr. Ward performed—such as his usability study, analysis of Match.com subscriber data, and comparison to other subscription cancelation flows—

---

[14] The quotation comes from a source cited in Mr. Ward's bibliography, *see* Mot. App. at 48, and is well known in the usability industry, as shown by the fact that Dr. King used essentially the same quotation, also without a direct citation.

lend support to his heuristic analysis. Indeed, heuristic analyses are supposed to be supported by user research rather than stand alone. *See* App. at 21 (explaining that he "insisted that we did a usability study" because "heuristic analyses are just opinions"); App. at 23 (explaining that heuristic analysis "should not replace usability testing"). That is why Mr. Ward performed multiple analyses, so that his opinion in this case—unlike Dr. King's—was not merely a statement of unsupported, personal opinion. And when Mr. Ward performed all of these analyses, they provided support for one another because they all pointed in the same direction—simplicity. App. at 12 ("[T]he overarching result of my heuristic analysis, the data Match provided, the usability study, the compara – comparative analysis, the convergence of the data all lead to the conclusion that it is simple."). Although each opinion of Mr. Ward's analyses is independently reliable—as explained in further detail throughout this brief—their mutually reinforcing nature lends further support to Mr. Ward's opinions. *K.S. v. Fremont Unified Sch. Dist.*, 679 F. Supp. 2d 1046, 1052 (N.D. Cal. 2009) ("convergent validity" is a method that "involve[s] studying all available sources to see if they all pointed to the same conclusion"), *aff'd,* 426 F. App'x 536 (9th Cir. 2011); *Equal Emp't Opportunity Comm'n v. Citizens Bank*, No. C.A. 19-362WES, 2023 WL 2446319, at *5 (D.R.I. Mar. 10, 2023) ("convergent validity" is a "multi-source approach" in which an expert evaluates one set of data in conjunction with other data). The Court should reject the FTC's arguments that Mr. Ward's analysis is somehow unsupported.

### 3.  Mr. Ward Analyzed All Versions of the Match.com Cancelation Flow

Finally, the FTC claims that "Mr. Ward only reviewed the most recent version of the cancellation flow." Mot. at 14. He explained in his opening report that he had "reviewed videos and/or screenshots of past versions" of the flow, and that the changes that had occurred did not affect his usability opinion. Rpt. ¶ 103 (Mot. App. at 54); *see also id.* ¶¶ 31-32 nn.2-3 (Mot. App. at 13), ¶ 42 (Mot. App. at 22), ¶ 53(2) (Mot. App. at 33) (describing specific changes from past

versions of the flow and explaining that those changes did not impact his usability opinion). He reiterated that at his deposition that "in [his heuristic analysis], [he] did look at the changes"; he analyzed whether those changes were "dramatic enough, drastic enough to change any of the opinions that [he] had formulated, and [he] found that they did not." App. at 20-21. There is therefore no basis for the FTC's argument that Mr. Ward should not be allowed to opine about prior iterations of the Match.com cancelation flow.[15]

### B.  Mr. Ward's Usability Study Is Reliable

The FTC contends that Mr. Ward's usability study should be excluded because of purported methodological flaws. But alleged "methodological flaws in a survey bear on the weight the survey should receive, not the survey's admissibility." *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 488 (5th Cir. 2004). "Only when serious flaws in a survey will make any reliance on that survey unreasonable and no reasonable jury could view the proffered survey as evidence . . . should the survey be discounted entirely." *Jim S. Adler, P.C. v. McNeil Consultants, LLC*, Dkt. 171, No. 3:19-cv-2025-K-BN (N.D. Tex. July 27, 2023) (cleaned up). There are no flaws in Mr. Ward's usability study, much less "serious flaws" that would render the study inadmissible.

### 1.  The Survey Universe Corresponded to Match.com's Subscriber Base

The FTC first complains that the survey universe was biased because the participants had more advanced internet skills and were younger, on average, than actual Match.com subscribers. The FTC is factually wrong, but even if it were not, "arguments that surveys 'failed to survey the proper universe' affect weight," not admissibility. *Pengu Swim Sch. v. Blue Legend, LLC*, No.

---

[15] To the extent that the FTC's objection is that Mr. Ward reviewed only screenshots or videos of past versions, rather than interacting with these past versions as he did the current, live website, that criticism applies to the entirety of Dr. King's report, since she reviewed *only* screenshots and videos. *See* Dkt. 208 at 3.

4:21-cv-1525, 2023 WL 2870405, at *6 (S.D. Tex. Apr. 8, 2023) (quoting *In re Scotts EZ Seed Litig.*, No. 12-cv-4727 (VB), 2017 WL 3396433, at *8 (S.D.N.Y. Aug. 8, 2017)); *Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*, 765 F. Supp. 2d 884, 892-93 (S.D. Tex. 2011) ("[A]n imperfect universe is not fatal to the surveys' admissibility."); Thomas McCarthy, *6 McCarthy on Trademarks and Unfair Competition* § 32:162 (5th ed. 2019) ("Even if a survey does not target what the court considers to be the optimal universe, the results may be so compelling that it still supports the factual finding for which it was intended . . . . In most cases, the selection of an inappropriate universe will lessen the weight of the resulting survey data, not result in its admissibility."). Indeed, even the cases that the FTC cites stand only for the proposition that criticism of the survey universe goes to weight, not admissibility.[16]

### i. The Survey Universe Accurately Reflected the Internet Savviness of Online Daters

As to internet savviness, the FTC claims that the study participants—recruited through UserTesting.com, a well-known usability testing platform—"may be more internet savvy than the general public." Mot. at 9. But the relevant question is how UserTesting.com participants compare to Match.com subscribers—who have chosen to participate in online dating and presumably have interacted with the Match.com website and are therefore, if anything, more familiar with it than usability study participants seeing Match.com's website for the first time, *see* App. at 17—that would potentially use Match.com's online cancelation flow, not the general public. *See* S.

---

[16] The FTC incorrectly claims that the court in *Leelanau* "exclud[ed] a survey." Mot. at 8 n.35. To the contrary, the court "conclude[d] that the better course is to admit the survey and to consider any flaws in assigning weight in the likelihood of confusion analysis." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 786 (W.D. Mich. 2006), *aff'd*, 502 F.3d 504 (6th Cir. 2007); *see also Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1334 (N.D. Ga. 2008) ("[T]he Court concludes that the better option is to admit the survey evidence and to consider the survey's flaws in determining the evidentiary weight to assign the survey in the likelihood of confusion analysis."); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980) (explaining that "several defects in the survey . . . significantly reduce[d] its probative value," and therefore "the results of the survey must . . . be discounted," but saying nothing about exclusion).

Diamond, Reference Manual on Scientific Evidence, at 376 (App. at 227) ("The target population consists of all elements . . . whose characteristics or perceptions the survey is intended to represent."). Mr. Ward explained at his deposition that he believed the UserTesting.com participants were an appropriate universe to draw from because "match.com services would attract people who are at least moderately comfortable or more with accessing and performing activities online because it is an online service." App. at 16.

### ii. The Age of Study Participants Accurately Reflected Match.com Age Demographics

As to the purported age differential between the study participants and Match.com subscribers, Mr. Ward matched the participants to Match.com's subscriber demographics, based on a report reflecting the demographics of all Match.com subscribers for 2012-2022. App. at 13 ("So we found the – the demographic breakdown of match.com users between 2012 and 2022, and then we sought to recruit the same demographic breakdown of users, and we got fairly close."); *id.* at App. at 14 ("The charts below show the age and demographic breakdown of the study participants. This was designed to closely track match.com's actual customer demographic distribution."). That data shows that more than half of Match.com's subscribers are 39 or younger. App. at 275 (Ward Dep. Ex. 9); App. at 18. Mr. Ward's testing sample closely matched those demographics. App. at 15 ("Our [demographic recruiting] results weren't – weren't a perfect match, but they were relatively close.").

The FTC ignores the actual demographic data that Mr. Ward relied on and instead points to different demographics based on a *sample* of Match.com users that completed a survey in 2015, and uses that snapshot to claim that the median Match.com subscriber was over 50. Mot. at 9. That claim is incorrect, based on the more fulsome data on which Mr. Ward relied, and based on the

17

document itself.[17] Regardless, the Court need not resolve which set of demographics to believe at this point. "When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. [Rule 702] is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702 advisory committee's note.

The FTC also falsely claims that Mr. Ward "cut off the top age of his subject pool at age 70 without any providing any [sic] justification as to why." Mot. at 9. The FTC asked Mr. Ward about this at his deposition, and Mr. Ward explained that it was a "usertesting.com constriction." App. at 19.[18] But as with other facts that the FTC does not like, the FTC ignored Mr. Ward's explanation and instead misrepresented his study. In any event, Match.com's demographic data shows that less than 2% of Match.com subscribers are over 70, App. at 275 (Ward Dep. Ex. 9), so the fact that the usability study included only one such participant does not make it unreliable. And the FTC's claim that only 16 of the 164 participants were aged 45 or older, Mot. at 9, is just plain wrong. In fact, *35* of the 164 participants (over 21%) were aged 45 or older. App. at 276 (Ward Rpt. Appendix L, Session Details tab, Row 13). Finally, if the FTC thinks it is important to make a "distinction between the age breakdown of those who successfully cancelled," Mot. at 10, the FTC has the raw results of the usability study to be able to do that and cross-examine Mr. Ward with the results if it wishes. But that Mr. Ward did not do the precise analysis that the FTC prefers—and that the FTC's expert could have done, but did not bother to do—is not justification to exclude Mr. Ward's opinion.

---

[17] The survey asked users to identify their "preferred" (not exclusive) "platform for accessing Match"—either website or app. App. at 279. The FTC cited only the median age of those respondents that chose website, ignoring those who preferred the app (who skewed younger).

[18] "It was the fixed cutoff of usertesting.com. Their participants either don't record age after 70 or they don't have people over 70. It's one of the two. I can't remember which. But recruiting – basically you can recruit 55 and up." App. at 19.

### 2.   The Stimulus Was the Exact Match.com Website at Issue

The FTC next criticizes Mr. Ward for conducting a usability test only on the current iteration of the cancelation flow—rather than past, minimally different versions—claiming that the study "did not mirror market conditions." Mot. at 10. This argument is absurd. Mr. Ward used the live version of Match.com's website—rather than a replica or past versions of it—precisely to ensure that the stimulus accurately reflected what Match.com subscribers experienced. To be admissible, the survey need only "roughly simulat[e] marketplace conditions." *Adler*, Dkt. 171, No. 3:19-cv-2025-K-BN. Mr. Ward did far better than that by using the *actual* Match.com cancelation flow. Thus, the usability study is obviously relevant to the current version of the flow—for which the FTC is seeking monetary relief due to alleged consumer harm and an injunction—at a minimum.

The FTC complains that the cancelation flow has changed, such that the study using only the current version is irrelevant. But changes have been minimal, as even the FTC admits. *See* Dkt. 199-1 at 36 (describing the "few changes to the flow"). For example, every version of the cancelation flow has been located within Account Settings (accessed via a gear icon), required entering a password for security purposes, contained one survey page asking the subscriber why they are looking to cancel, and contained a net promoter score survey. The changes largely involved minor wording or aesthetic changes, such as changing "resign" to "cancel," swapping links for buttons, or removing unnecessary and distracting wording and subnavigation links. Mr. Ward analyzed those past versions and concluded that the changes did not impact his usability opinion. Rpt. ¶ 103 (Mot. App. at 54); *see also id.* ¶¶ 31-32 nn.2-3 (Mot. App. at 13), ¶ 42 (Mot. App. at 22), ¶ 53(2) (Mot. App. at 33) (explaining that specific changes from past versions of the flow did not change his usability opinion); App. at 20-21 (explaining that he conducted a heuristic analysis of past versions of the flow and also reviewed empirical Match.com data covering past

versions of the flow, all of which were consistent with the results of his usability study). Thus, the usability study performed on the current version of the flow is relevant to past versions.

In any event, the FTC contends that Match.com's online cancelation flow has gotten worse over the years. Dkt. 199-1 (arguing in motion for summary judgment that Match.com made its flow worse during the pendency of this litigation). So to the extent that the current version that appeared in the usability study differs in any significant way from past versions (it does not), that makes Mr. Ward's study more conservative *in the FTC's favor*. It certainly is not a basis to exclude Mr. Ward's entire usability study, as the FTC argues.

The cases that the FTC cites are not to the contrary. In both cases, the surveys did not accurately reflect actual market conditions because the experts had removed or redacted information from the stimulus. *See Jaret Int'l, Inc. v. Promotion In Motion, Inc.*, 826 F. Supp. 69, 73-74 (E.D.N.Y. 1993) (the expert used "redacted package panels" that removed parts of the trademarks at issue, which led the court to observe that "the survey technique of removing portions of [the marks] is suspect").[19] Indeed, even the FTC admits that the flaw in *Simon Property* was "product information left out of a survey." Mot. at 10-11; *see Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1042-43 (S.D. Ind. 2000) ("[T]he consumer viewing search results will see much more than the domain names of the responsive sites."). Mr. Ward did no such thing. He did not redact or remove *anything* from Match.com's cancelation flow. At best, the FTC's arguments go to the weight the factfinder should give the usability study, but they do not render the study inadmissible. *See Adler*, Dkt. 171, No. 3:19-cv-2025-K-BN.

---

[19] The court in *Jaret* also criticized the survey's universe because the expert conducted the survey in a mall where one of the competing products was not sold, "thereby minimizing the probability that a fair sampling" would result. 826 F. Supp. at 73. As explained above, Mr. Ward's usability study has no such problem here, as the study participants adequately reflected Match.com's subscriber base.

### 3. The Study Produced Consistent Results

Finally, the FTC criticizes Mr. Ward's usability study for purportedly producing inconsistent results. But *Daubert* inquiries are focused on the expert's methodology, not results. *See Patton v. Metro. Lloyds Ins. Co. of Tex.*, No. 5:21-CV-074-H, 2022 WL 2898946, at *3 (N.D. Tex. Feb. 14, 2022) ("In conducting the reliability analysis, a court focuses on the reasonableness of the expert's approach regarding the matter to which his testimony is relevant and not on the conclusions generated by the expert's methodology."). The FTC does not cite a single case for the proposition that a study should be excluded because of its results. *See* Mot. at 11-12 (citing no cases for this argument). The Court should reject the FTC's argument for this reason alone. *See Hard-Mire Rest. Holdings v. JH Zidell PC*, 619 B.R. 165, 172 (N.D. Tex. 2020) (holding argument was waived because the party "failed to cite any authority in support of its arguments").

Even if the Court considers the argument, the alleged "unexplained inconsistencies" do not exist. First, the FTC claims that "some survey takers were coded as having cancelled but the data indicated that they were able to do so without spending any time in the flow." Mot. at 11. The "evidence" that the FTC cites for the existence of this alleged inconsistency is FTC counsel's *question* asking *if* Mr. Ward is aware of that occurring. Mr. Ward responded that he is "not aware of that" occurring. Mot. App. at 262.1:13-22. That is not evidence. In fact, the raw data from the usability study shows that time on cancelation task is filled in for every participant that canceled. App. __ (Ward Appendix L, Task Time Tab, Row 85). This is another example of the FTC playing fast and loose with its assertions about what the "evidence" shows.

Second, the FTC complains that Mr. Ward "instructed the participants to complete the tasks as 'efficiently and effectively as possible' thereby priming the participants." Mot. at 11. There is no "unexplained inconsistency." Additionally, that instruction reflects what a subscriber intending to cancel would seek to do, so it appropriately reflects the real world. Regardless, priming concerns

"go[] to the weight of an expert's opinion, not its admissibility." *Earl v. Boeing Co.*, No. 4:19-cv-507, 2021 WL 3140545, at *6 (E.D. Tex. July 26, 2021) (cleaned up) (quoting *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 372 (N.D. Cal. 2018)).

Third, the FTC complains that the study excluded people who were unable to complete the subscription task. Mot. at 11. Far from being "unexplained," Mr. Ward explained both in his report and his deposition that these participants were unable to complete the subscription task because of payment failures[20] or being blocked by Match.com's fraud protocols.[21] *See* Rpt. ¶ 108 (Mot. App. at 56-57). And because they could not subscribe, they obviously could not cancel. *Id.* There is nothing "unexplained" or "inconsistent" about excluding such people from the results of a usability test of a cancelation flow that those participants never saw. What is more, excluding such participants accurately reflects real-world conditions, where someone who was unable to subscribe to Match.com would not be using Match.com's cancelation flow.

Finally, the FTC complains that "SUS survey results also included participants who rated the process as simple, yet some of those same individuals failed to successfully cancel." Mot. at 11. The FTC again has no evidence for this assertion. The deposition testimony it cites says only that the data collected from participants who did not complete the cancelation task are included in Mr. Ward's report. Mot. App. at 259:3-8. It says nothing about how those individuals rated the simplicity of the flow. Moreover, even if the FTC's assertion were true, the FTC does not explain

---

[20] Mr. Ward provided the participants with credit card numbers with a $50 limit. The instructions told the participants to select a particular subscription package, to keep the charge under $50, but if a participant nevertheless chose a package that cost more than $50, they would have failed the subscription task because the charge would have been rejected. *See* Rpt. ¶ 108 (Mot. App. at 56-57).

[21] To protect subscribers, Match.com fraud protocols flag or block potentially fraudulent accounts, which Match.com identifies based on a variety of factors, many of which are collected during the subscription process. For example, if the subscriber uses an obviously fake name ("John Doe") or enters a zip code different from the one from which they are visiting the site (as indicated by IP addresses), Match.com may block the subscription as potential fraud. *See* Mot. App. at 98 (noting that in the pre-test, Mr. Ward observed some participants get flagged as fraudulent).

how such responses would call into question Mr. Ward's methodology and render his opinion inadmissible. It would not. The FTC's criticisms go, at best, to the weight to be given the opinion.

### C.  Mr. Ward Accounts for Actual Match.com Subscribers' Use of the Flow

Consistent with the FTC's kitchen-sink approach, the FTC next criticizes Mr. Ward for "failing to account for descriptions of the flow from actual Match subscribers." Mot. at 14 (capitalization and bolding altered). The FTC ignores, however, that Mr. Ward reviewed actual Match.com subscriber data that showed that over 95% of subscribers that entered the flow successfully canceled via the flow or took a save offer. Rpt. ¶ 134 (Mot. App. at 71-72). Additionally, subscribers were able to cancel quickly, taking a median of 44 seconds. Rpt. ¶ 136 (Mot. App. at 73). Mr. Ward explained that he does not review consumer complaints very often in his work because complaints are only "part of that whole picture." App. at 6. Moreover, he criticized Dr. King's reliance on complaints, as they "lead[] to biased results because [they are] not feedback from a fair representation of all subscribers." Rebuttal Rpt. ¶ 24 (App. at 320).[22] In other words, rather than doing as Dr. King did and reviewing only records reflecting a biased, miniscule subset of Match.com's subscribers, Mr. Ward reviewed data reflecting *all* subscribers' interactions with the cancelation flow. So contrary to the FTC's assertion that Mr. Ward did not "examin[e] Match subscribers' actual experiences," Mot. at 15, he did precisely that.

Moreover, as explained above, his opinion was based on not just his personal opinion (informed by nearly 25 years of experience) and Match.com's actual subscriber data, but also his usability study and comparison to other subscription cancelation flows, all of which pointed to the same conclusion—that Match.com's cancelation flow is simple. *See* Rpt. ¶¶ 13-22 (Mot. App. at

---

[22] Additionally, Dr. Langenfeld's usage data analysis, which shows that many of the complaining subscribers that Dr. King analyzed *never saw the flow* or were able to cancel calls into doubt whether any reliance on complaints is reasonable. Langenfeld Rebuttal Rpt. ¶ 47 (Dkt. 200-3, Mot. App. at 30).

6-8). In fact, Mr. Ward agrees with Dr. King that "using one's personal opinion violates one of the cardinal rules of user experience: 'you are not the user.'" Mot. at 15 (quoting APP-000291). But it is Dr. King—not Mr. Ward—that violates that rule by relying solely on a personal opinion.

The remainder of the FTC's arguments regarding customer complaints appear to be an attack on Mr. Ward's conclusions, not his methodology. *See Patton*, 2022 WL 2898946, at *3 ("In conducting the reliability analysis, a court focuses on the reasonableness of the expert's approach regarding the matter to which his testimony is relevant and not on the conclusions generated by the expert's methodology."). The FTC's arguments are thus, at best, fodder for cross-examination, not a *Daubert* motion. In any event, the arguments themselves are baseless.

First, the FTC's argument that clickthrough data "shows that barely half of sessions that begin the cancellation flow complete it," Mot. at 15, is misleading. Mr. Ward analyzed Match.com's clickthrough data and concluded that 95% of subscribers that enter the cancelation flow successfully canceled, and his usability study showed that 91.5% of participants successfully canceled. Rpt. ¶¶ 8-9 (Mot. App. at 4-5).[23]

Second, Match.com's "internal records" do not show otherwise. Mr. Ward analyzed the comprehensive clickthrough data produced during this litigation. Instead of relying on that data, which has been cited in sworn interrogatories, the FTC relies on "internal records" based on back-of-the-envelope data pulls that do not accurately reflect Match.com's subscription cancelation rate via the online flow. For example, as Defendants told the FTC during discovery, the ad hoc data

---

[23] The FTC's "effectiveness rate" estimate differs from Mr. Ward because the parties disagree about where the cancelation flow "starts" (i.e., when a user clicks "Manage Subscription" on the Account Settings page, as the FTC contends, or when a user clicks "Cancel Subscription" on a subsequent page, as Defendants contend), and whether to rely on session-level data (where a single subscriber is "counted" multiple times), as the FTC contends, or subscriber-level data (where a single subscriber is counted once), as Defendants contend. Mr. Ward explained in his opening report that as a usability expert, he believes it is more appropriate to start at the "Cancel Subscription" click, because the subscriber could have visited all previous pages for a reason other than cancelation. Rpt. ¶ 134 & n.9 (Mot. App. at 71-72). Making that correction alone increases the "effectiveness rate" from the FTC's claimed 56% to approximately 85% based on session-level data. Rebuttal Rpt. ¶ 65 n.47 (App. at 340).

pulls included non-subscribers and non-U.S. users. Additionally, much of the data failed to account for the fact that some cancelations via the online flow were logged by the system shortly after a session ended, even though the subscriber canceled during the session, artificially inflating the "fallout" rate.[24] That Mr. Ward relied on the reliable, comprehensive data produced in response to interrogatories and verified under oath, rather than the ad hoc, unreliable data pulls from short snapshots in time many years ago that the FTC points to does not make his opinion inadmissible.

Finally, Mr. Ward did not "fail[] to account for actual Match.com data about the speed at which users completed the cancellation flow." Mot. at 16. He considered such evidence. *See* Rpt. ¶ 136 & n.12 (Mot. App. at 73). The FTC complains that the median time to cancelation in Mr. Ward's usability study does not perfectly match the median time to cancelation reflected in Match.com's subscriber data, but ignores differences in methodology. For example, because Mr. Ward had the cancelation task time for all participants, the median time in the usability study is a pure median of all participants. *See* Rpt. ¶ 113 (Mot. App. at 61). Because the Match.com data on cancelation time was aggregated by month, however, Mr. Ward reported the average of the monthly median. *See* Rpt. ¶ 136 & nn.11-12 (Mot. App. at 73). Furthermore, no study is perfect, nor does a 95% confidence level suggest perfection. In any event, any difference is the proper subject of cross-examination at trial, not grounds to exclude.

## CONCLUSION

For the foregoing reasons, the Court should deny the FTC's Motion and allow Mr. Ward's opinions at trial.

---

[24] *See* App. at 373 (explaining that clickthrough data pulled during this litigation reflects sessions where the user resigned during a session but the logging happened shortly thereafter).

Dated: October 2, 2023 /s/ Angela C. Zambrano
Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: 214-981-3300
Fax: 214-981-3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310-595-9500
Fax: 310-595-9501

Benjamin M. Mundel (admitted *pro hac vice*)
bmundel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: 202-736-8000
Fax: 202-736-8711

*Attorneys for Match Group, Inc. and*
*Match Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 2, 2023, I caused a true and correct copy of the above and foregoing document, to be served on all counsel of record in accordance with the Federal Rules of Civil Procedure and this Court's CM/ECF filing system.

<u>/s/ Angela C. Zambrano</u>
Angela C. Zambrano

27