**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                              Plaintiff,<br><br>          vs.<br><br>MATCH GROUP, INC., a corporation, and<br>MATCH GROUP, LLC, formerly known as<br>MATCH.COM, LLC, a limited liability<br>company,<br><br>                              Defendants. | Case No. 3:19-cv-02281-K |

**DEFENDANTS MATCH GROUP, INC. AND MATCH GROUP, LLC'S RESPONSE**
**TO PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION *IN LIMINE* TO**
**EXCLUDE EXPERT TESTIMONY OF JAMES LANGENFELD AS SET FORTH IN HIS**
**<u>REBUTTAL EXPERT REPORT TO DR. KING'S REBUTTAL REPORT</u>**

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT AND FACTUAL BACKGROUND ......................................... 1

ARGUMENT ................................................................................................................................ 2

    A.    Dr. Langenfeld's Rebuttal of Dr. King Is a Permissible Response to Dr. King's Untimely Complaint Analysis .................................................................................. 2

    B.    Dr. Langenfeld Is Qualified to Offer an Economic Critique of Dr. King's Purported Complaint Analysis .................................................................................................. 4

    C.    Dr. Langenfeld's Analysis of *the Same Customer Satisfaction Records* on Which Dr. King Relies Is Relevant and Supported ........................................................... 7

    D.    Dr. Langenfeld's Opinions Regarding Underreporting Bias and Negativity Bias are Methodologically Sound ........................................................................................ 10

        1.    The Sources on Which Dr. Langenfeld Relied Are Sufficiently Analogous .............. 10

        2.    Dr. Langenfeld Relied on Reliable and Peer-Reviewed Sources .............................. 12

        3.    Dr. Langenfeld's Opinion About Biases Is Intellectually Rigorous ......................... 13

    E.    Dr. Langenfeld's Rebuttal Contains Permissible Background and Context for His Opinions .................................................................................................................... 14

        1.    Dr. Langenfeld's Brief Background Description (Section V) Is Permissible ............. 14

        2.    Dr. Langenfeld's Brief Overview of the Preceding Expert Reports (Section VI, Paragraphs 19-21) Is Permissible ........................................................................... 16

    F.    Dr. King—Not Dr. Langenfeld—Opines About Consumers' State of Mind ................ 17

CONCLUSION ......................................................................................................................... 19

## __TABLE OF AUTHORITIES__

**Page(s)**

**Cases**

*CEATS, Inc. v. TicketNetwork, Inc.*,
No. 2:15-cv-01470-JRG-RSP, 2018 WL 453732 (E.D. Tex. Jan. 17, 2018) .........................10

*City of Gary v. Shafer*,
No. 2:07-cv-56-PRC, 2009 WL 1370997 (N.D. Ind. May 13, 2009)......................................3

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)............................................................................................................4, 17

*In re Fleming Cos. Contract Litig.*,
No. MDL-1351, 2000 WL 35612913 (W.D. Mo. Nov. 30, 2000) ...........................................3

*FTC v. Johnson*,
96 F. Supp. 3d 1110 (D. Nev. 2015)......................................................................................9

*FTC v. RagingBull.com, LLC*,
507 F. Supp. 3d 629 (D. Md. 2020) .......................................................................................9

*FTC v. Vyera Pharms., LLC*,
No. 20CV706 (DLC), 2021 WL 5279465 (S.D.N.Y. Nov. 12, 2021).....................................6

*Holcombe v. United States*,
516 F. Supp. 3d 660 (W.D. Tex. 2021)................................................................................11

*Huawei Techs. Co. v. Yiren Huang*,
No. 4:17-cv-00893, 2019 WL 2077821 (E.D. Tex. May 9, 2019) ........................................16

*La. Health Care Self Ins. Fund v. United States*,
No. CIV. A. 12-766-JJB, 2014 WL 3720526 (M.D. La. July 25, 2014) .............................3, 4

*Macy v. Whirlpool Corp.*,
613 F. App'x 340 (5th Cir. 2015) (per curiam) ....................................................................12

*United States ex rel. Mitchell v. CIT Bank, N.A.*,
No. 4:14-cv-00833, 2022 WL 1233651 (E.D. Tex. Apr. 26, 2022) ......................................14

*Norris v. Kawasaki Motors Corp, USA*,
No. CV H-16-2424, 2018 WL 3729572 (S.D. Tex. Aug. 6, 2018) .......................................13

*SEC v. Arcturus Corp.*,
912 F.3d 786 (5th Cir. 2019) ...............................................................................................10

*Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*,
   801 F.3d 512 (5th Cir. 2015) ........................................................................................9

**Other Authorities**

Federal Rule of Civil Procedure 26 ...........................................................................3, 4

Federal Rule of Civil Procedure 26(a)(2)(B)(i) ...........................................................14

Federal Rule of Civil Procedure 26(a)(2)(D)(ii) ............................................................3

*Nielsen Norman Group*, October 23, 2016,
   https://www.nngroup.com/articles/negativity-bias-ux/............................................11

Rozin, Paul, and Royzman, Edward B., "Negativity Bias, Negativity Dominance,
   and Contagion" ......................................................................................................11

## PRELIMINARY STATEMENT AND FACTUAL BACKGROUND

In FTC expert Dr. Jennifer King's rebuttal report, she purported to do a "complaint analysis," in which she claimed to analyze *certain* complaints submitted to Match.com and the FTC to summarize them and identify "themes." To rebut that analysis, Defendants retained Dr. James Langenfeld. Dr. Langenfeld's opinions eviscerate Dr. King's complaint analysis by providing important context that Dr. King ignored. Specifically, Dr. Langenfeld offered the following opinions.

***First,*** Dr. King's complaint analysis is not an accurate reflection of reality for most Match.com subscribers, because those who complained make up only a tiny percentage of Match.com subscribers (only 0.021% of subscribers who entered Match.com's online cancelation flow, and an even smaller percentage of total Match.com subscribers), and are more likely to have extreme negative views that make them not representative of most other users. Rpt. ¶¶ 12, 28, 30 (Mot. App. at 8, 21-23).

***Second,*** Dr. King's comment categorization is inconsistent, erroneous, and misleading. Several of the comments are facially inconsistent with how Dr. King categorized them. For example, Dr. King categorized complaints about *other dating sites* as complaints about Match.com. Rpt. ¶ 43 (Mot. App. at 28). She also ignored that many of the commenters reported positive or at least neutral satisfaction in the very complaint records that she claims to have analyzed and then summarized for the fact-finder. Rpt. ¶ 44 (Mot. App. at 28-29).

***Third,*** actual Match.com usage data is inconsistent with the conclusions that Dr. King draws based on the selective, limited comments she reviewed. In particular, usage data shows that 43.2% of the subscribers purportedly complaining to Match.com about the cancelation flow *had never entered the cancelation flow*. Rpt. ¶ 46 (Mot. App. at 29). Contrary to Dr. King's assertion, these complaints cannot "provide[] an organic source of information about [a subscriber's]

experience with a product or service," King Rebuttal Rpt. at 22 (Mot. App. at 69), when the subscriber never actually experienced the flow so cannot be a "source of information" about it at all. Furthermore, although Dr. King classified 53% of the comments she reviewed as "unable to cancel," King Rebuttal Rpt. at 28 (Mot. App. at 75), nearly 90% of the commenters that entered the flow successfully canceled. Rpt. ¶ 46 (Mot. App. at 29).

Faced with a rebuttal that destroys Dr. King's complaint analysis, the FTC seeks to exclude Dr. Langenfeld's opinions, largely on grounds that either mischaracterize Dr. Langenfeld's opinion or accuse Dr. Langenfeld of things that *Dr. King* did (such as serving an untimely report, or opining about consumers' state of mind). The FTC even goes so far as to claim that Dr. Langenfeld's testimony about the *same* complaint records that Dr. King reviewed is irrelevant and inadmissible. The truth is that the FTC wants to exclude Dr. Langenfeld's testimony because it exposes Dr. King's testimony as nothing but a reverse-engineered fiction to get the FTC's desired (but false) result. The FTC's criticisms are baseless. The Court should deny the FTC's motion in its entirety.

## ARGUMENT

### A.    Dr. Langenfeld's Rebuttal of Dr. King Is a Permissible Response to Dr. King's Untimely Complaint Analysis

The FTC begins its brief by claiming that Dr. Langenfeld's rebuttal of Dr. King was untimely, but the attempt is only half-hearted—perhaps because the FTC recognizes that Dr. Langenfeld's rebuttal was in response to the FTC's own untimely disclosure of Dr. King's complaint analysis that Dr. Langenfeld critiques. If the Court excludes Dr. King's complaint analysis as untimely (as it should, *see* Dkt. 208), then the FTC's Motion regarding Dr. Langenfeld will be moot, because the rebuttal's sole purpose was to respond to Dr. King's untimely complaint

analysis. But if the Court allows Dr. King's complaint analysis, it should allow Dr. Langenfeld's rebuttal of that analysis.

To begin, the FTC is wrong to suggest that all courts prohibit sur-rebuttals without leave. In fact, courts are split on whether sur-rebuttals are permissible without first seeking leave of court, as even the FTC's own authorities acknowledge. *La. Health Care Self Ins. Fund v. United States*, No. CIV. A. 12-766-JJB, 2014 WL 3720526, at *1 (M.D. La. July 25, 2014) (noting that "the law is split on this issue"); *see, e.g.*, *City of Gary v. Shafer*, No. 2:07-cv-56-PRC, 2009 WL 1370997, at *6 (N.D. Ind. May 13, 2009) ("The Court finds that Rule 26 does not preclude Defendants from having 30 days within which to file a sur-rebuttal report."); *In re Fleming Cos. Contract Litig.*, No. MDL-1351, 2000 WL 35612913, at *1 (W.D. Mo. Nov. 30, 2000) (agreeing that Rule 26 permits sur-rebuttal reports). The text of Federal Rule of Civil Procedure 26(a)(2)(D)(ii) suggests that such reports are permissible. The Rule allows service of an expert report that "is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure." It does not distinguish between rebuttals and sur-rebuttals. And the ability to serve sur-rebuttals is particularly important where, as here, the opposing party (impermissibly) introduces brand new opinions and analysis in a rebuttal report. *See* Dkt. 208.

There is no dispute that Dr. Langenfeld's sur-rebuttal is intended solely to contradict or rebut Dr. King's complaint analysis contained in her *rebuttal* report, nor is there any dispute that Dr. Langenfeld's sur-rebuttal was served within 30 days of Dr. King's complaint analysis. Thus,

the plain language of Rule 26 permitted Dr. Langenfeld's rebuttal to Dr. King's new complaint analysis.[1]

Even if it did not, "the decision of whether to allow a party to present evidence in rebuttal or surrebuttal is generally committed to the trial court's discretion." *La. Health Care Self Ins. Fund*, 2014 WL 3720526, at *2. There is no serious question here that if the Court allows Dr. King's untimely complaint analysis, it should also allow Dr. Langenfeld's rebuttal to that analysis. Indeed, permitting Dr. King's complaint analysis while excluding Dr. Langenfeld's rebuttal of it would only increase the prejudice to Defendants of Dr. King's untimeliness. *See* Dkt. 208 (arguing that Dr. King's untimely complaint analysis caused Defendants prejudice). The FTC, by contrast, has not identified any prejudice resulting from the timing of Dr. Langenfeld's sur-rebuttal, nor could it. *See La. Health Care Self Ins. Fund*, 2014 WL 3720526, at *2 (denying motion to strike sur-rebuttal in part because "Plaintiff has not indicated any prejudice that will result from allowing Defendant's sur-rebuttal"). The FTC had the opportunity to depose Dr. Langenfeld after submission of his sur-rebuttal report, and he "'was questioned extensively' about the sur-rebuttal." *Id.* Thus, the Court can easily reject the FTC's argument that it "should not even consider" Dr. Langenfeld's rebuttal to Dr. King's complaint analysis.

### B.    Dr. Langenfeld Is Qualified to Offer an Economic Critique of Dr. King's Purported Complaint Analysis

The FTC claims that Dr. Langenfeld is "not qualified to opine on the completeness of Dr. King's HCI [(human-computer interaction)] analysis or on what information is appropriate to consider in such an analysis," Mot. at 5, but this argument misconstrues Dr. Langenfeld's opinion.

---

[1] Tellingly, the first time that the FTC raised this purported prohibition on sur-rebuttals was in its Motion. The FTC said nothing to Defendants about this issue in the approximately three months between service of Dr. Langenfeld's rebuttal and filing of the FTC's Motion, nor did the FTC raise this issue during the parties' meet and confer concerning *Daubert* motions.

Dr. Langenfeld is not opining about the "completeness" of any HCI analysis or what an appropriate user experience evaluation entails. His testimony is limited to the field in which he is an expert—economics. He uses that economic expertise to present statistics that the factfinder will find helpful in evaluating Dr. King's complaint analysis (*regardless* of whether that analysis is a "complete" HCI analysis or user evaluation). For example, Dr. Langenfeld analyzes subscriber numbers and usage data to demonstrate that (1) the complaints that Dr. King reviewed make up only 0.021% of subscribers who entered Match.com's online cancelation flow, (2) 43.2% of the subscribers that complained to Match.com purportedly about the cancelation flow never saw the flow, and (3) another 50.5% successfully canceled notwithstanding their complaints. Rpt. ¶ 46 (Mot. App. at 29).

He is not opining about whether an "HCI" or "user experience" evaluation should have included these statistics, as the FTC wrongly suggests. *See* Mot. at 6. Rather, he tests Dr. King's hypothesis that these complaints provide "incontrovertible, first-hand evidence that the cancellation flow as neither simple nor easy for many customers to use." King Rebuttal Rpt. at 43 (Mot. App. at 90). And he does so by testing whether the complaints that Dr. King reviewed are *actually* representative of Match.com subscribers experience (they are not). That is not an HCI or user experience opinion that would require Dr. Langenfeld to have expertise in those fields just because the underlying subject-matter involves complaints about a website cancelation flow.[2]

---

[2] In fact, the FTC itself implicitly acknowledges that economists are qualified to opine about complaint analysis, as the FTC's brief cites an article about complaints written by a former FTC economist. *See* Mot. at 9 n.33 (citing Keith B. Anderson, *To Whom Do Victims of Mass-Market Consumer Fraud Complain?*, available at SSRN: https://ssrn.com/abstract=3852323 (May 2020)). The article also is not peer-reviewed, despite the FTC's criticism of Dr. Langenfeld for citing a non-peer-reviewed source.

The specific opinions that the FTC criticizes prove the point. The FTC highlights the following opinions as its best examples of Dr. Langenfeld purportedly opining outside the scope of his expertise:

- "However, Dr. King's analysis of user comments does not answer the question of whether Match.com's online cancellation flow is 'simple.'" Rpt. ¶ 28 (Mot. App. at 21).

- "An appropriate review of users' experience would place the appropriate weight on this 97.4% of subscribers who successfully cancelled via the online process or the customer service team." Rpt. ¶ 47 (Mot. App. at 30).

- "Actual usage data, however, is inconsistent with at least some of these complaints, making the complaints an unreliable basis on which to from an opinion." Rpt. ¶¶ 14, 44 (Mot. App. at 9, 28-29).

These opinions state nothing other than that if you ask a behavioral economist (like Dr. Langenfeld) to test Dr. King's hypothesis, the economist would (1) look at more than Dr. King's analysis of a subset of user comments, (2) take into account the percentage of people who successfully canceled, and (3) examine actual usage data to ensure that the complaints were a reliable basis on which to opine. Those opinions are well within Dr. Langenfeld's scope of expertise as a behavioral economist. *See FTC v. Vyera Pharms., LLC*, No. 20CV706 (DLC), 2021 WL 5279465, at *6 (S.D.N.Y. Nov. 12, 2021) (holding that an economist is qualified to "offer[] observations about consumer behavior").

The FTC's suggestion that only an expert in HCI or user experience can rebut Dr. King's opinions is wrong. *See* Mot. at 7 & n.23 (arguing that Mr. Ward "could have opined on this point"). Dr. Langenfeld need not be an expert in HCI or user evaluation to test Dr. King's hypothesis by analyzing consumer behavior.[3] An expert in one field (such as economics) can rebut opinions in a

---

[3] HCI or user evaluation experts do not have a monopoly on deciding whether a flow is "simple" under ROSCA. If the FTC believes that they do, that is yet another way in which ROSCA is unconstitutionally vague as applied to Defendants in this case, thus warranting judgment in Defendants' favor for the reasons explained in Defendants' motion for summary judgment. Dkt. 203.

different field (such as HCI) by pointing out flaws that are within the first expert's field of expertise. For example, in *Gibson Brands v. Armadillo Distribution Enterprises*, one party argued that the opposing party's expert was "unqualified to testify 'on the validity of Gibson's Consumer Survey' because [the expert] has no experience with consumer surveys." No. 4:19-cv-358, 2021 WL 231752, at *2 (E.D. Tex. Jan. 22, 2021). The court agreed that the expert "may be unqualified to testify on methodology or statistical analysis," but pointed out that the expert "did not do that." *Id.* Instead, he testified about things within the scope of his expertise as someone who had spent "decades in the music industry and ha[d] been retained to discuss the brand recognition of Gibson guitars," not the ins and outs of survey methodology. *Id.* Because the expert "testified based on his 'knowledge, skill, experience, training, or education'"—even though he was rebutting an expert in a different field—the court permitted his testimony. *Id.* (quoting Fed. R. Evid. 702).

Similarly here, Dr. Langenfeld's opinion is based on his knowledge, skill, experience, training, and education as an economist about statistical facts that will cause the fact-finder to question whether Dr. King's complaint analysis presents a complete picture (it does not). The Court should therefore reject the FTC's argument that Dr. Langenfeld is not qualified to offer his opinions about statistics and usage data.

C.   **Dr. Langenfeld's Analysis of *the Same Customer Satisfaction Records* on Which Dr. King Relies Is Relevant and Supported**

The FTC next argues that Dr. Langenfeld's analysis of the *same complaint records* that Dr. King analyzed is irrelevant—apparently on the theory that when Dr. King analyzes the portion of those records that the FTC believes are critical of Match.com, it is relevant, but when Dr. Langenfeld points out the portions of the same records that are complimentary to Match.com, it is irrelevant. This argument is absurd.

The Match.com complaint files that Dr. King analyzed contain a field for "survey rating." In fact, Dr. King included the "Suggestion Type (or survey rating)" column in Appendix A to her report, as depicted below:



Nevertheless, Dr. King appears to have entirely ignored this portion of the records while conducting her "complaint analysis," as her report is silent on these survey ratings. Dr. Langenfeld analyzed those ratings, however, and found that 31% of even the complaining subscribers expressed positive or neutral feelings in the survey. Rpt. ¶ 44 (Mot. App. at 28-29). In other words, Dr. Langenfeld's analysis shows that the *same customer complaint records that Dr. King* claims "provide incontrovertible, first-hand evidence that the cancellation flow as neither simple nor easy for many customers to use, resulting in failed cancellations and customer frustration," King Rebuttal Rpt. at 43 (Mot. App. at 90), actually show that a substantial portion of those customers reported a positive or neutral experience. If these consumers were actually so confused by Match.com's cancelation flow, as Dr. King contends, it beggars belief that they would turn around and report that they had a positive or at least neutral experience. Thus, the satisfaction ratings call into question Dr. King's conclusions.

Incredibly, the FTC nevertheless argues that Dr. Langenfeld's rebuttal does not "assist in understanding the qualitative review of complaints presented in Dr. King's report." Mot. at 10. It is difficult to understand how that can be so. If Dr. King gets to opine that the customer complaints "reveal a customer-centric perspective" and "provide 'raw' feedback directly from customers," King Rebuttal Rpt. at 22 (Mot. App. at 69), then Defendants must be able to present evidence that a substantial portion of these users reported positive or neutral opinions *in the very files that Dr. King analyzed*. The FTC cannot seriously contend that the text of a customer complaint and Dr.

King's analysis of it are relevant to show alleged customer difficulty with the cancelation flow, but Dr. Langenfeld pointing out that *the same documents* show that consumers were satisfied is somehow irrelevant.

To be clear, the point is not that the existence of satisfied consumers somehow immunizes Match.com from liability. *Contra* Mot. at 9 & n.31.[4] The point is that Dr. Langenfeld's analysis of the customer satisfaction scores contained in the *very files that Dr. King analyzed* provides necessary context for Dr. King's opinion. Analysis that rebuts and questions the credibility of Dr. King's complaint analysis is clearly relevant. At a minimum, it "assist[s] the trier of fact to understand or determine" the reliability and credibility of Dr. King's complaint analysis, which is the standard for relevancy. *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 529 (5th Cir. 2015).

As for the FTC's claim that the survey responses contained in the complaint records are irrelevant because Dr. Langenfeld "does not even know the question that was asked" in the survey, Mot. at 10, that is another mischaracterization. Dr. Langenfeld testified only that he could not "recall" that particular piece of information during the deposition. App. at 6. In any event, the relevance of the survey response is obvious from its context—contained in the very complaint records that Dr. King analyzed.[5]

---

[4] At best, some of the cases cited by the FTC stand for the proposition that evidence of satisfied customers does not *disprove* evidence of unsatisfied customers. But that is not what Dr. Langenfeld did here—he did not go out and find a separate group of satisfied customers to rebut Dr. King's analysis of unsatisfied customers, which was the situation in the cases that the FTC cites. *See FTC v. RagingBull.com, LLC*, 507 F. Supp. 3d 629, 634 (D. Md. 2020) (finding that evidence of satisfied customers "does not negate" evidence that other customers "were misled or deceived"); *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1119 (D. Nev. 2015) (explaining that "[t]he FTC is not required to show that all consumers were deceived . . . ."). Rather, he analyzed the same customers that Dr. King did, using the same files that Dr. King did, to provide appropriate context about the same consumers, and showing that many of those same consumers (not different ones) were actually satisfied.

[5] The fact that satisfaction survey ratings appeared on the face of the complaints that Dr. King claimed to analyze but Dr. King ignored those satisfaction ratings is reason enough that those ratings are relevant. The question to which the customers were responding only further emphasizes the relevance: whether the customer was satisfied with the customer service interaction in which Dr. King claims the customer complained about the cancelation flow. App. at 9.

Finally, the FTC claims, without explanation, that Dr. Langenfeld's analysis somehow "exceed[s] the scope of rebuttal." Mot. at 9-10. The FTC does not explain this assertion, which is reason alone for the Court to reject that argument. *See SEC v. Arcturus Corp.*, 912 F.3d 786, 793 n.4 (5th Cir. 2019) (holding that one-sentence assertion with no support or explanatory argument is waived). But even if the Court were to consider the argument, pointing out that Dr. King ignored satisfaction survey responses that appeared on the face of the complaints that she reviewed for her complaint analysis falls squarely within the heartland of the appropriate scope of rebuttal because it explains and counteracts Dr. King's analysis. *See CEATS, Inc. v. TicketNetwork, Inc.*, No. 2:15-cv-01470-JRG-RSP, 2018 WL 453732, at *3 (E.D. Tex. Jan. 17, 2018) (explaining that "[a] 'rebuttal' report explains, repeals, counteracts, or disproves evidence of the adverse party's initial report").

### D.   Dr. Langenfeld's Opinions Regarding Underreporting Bias and Negativity Bias are Methodologically Sound

The FTC criticizes Dr. Langenfeld's opinions that the well-known underreporting bias and negativity bias skewed Dr. King's complaint analysis, because the FTC contends that the sources on which Dr. Langenfeld relied are not sufficient. In doing so, the FTC ignores much of the literature on which Dr. Langenfeld relies and mischaracterizes how analogous that literature is to the facts of this case.

#### 1.   The Sources on Which Dr. Langenfeld Relied Are Sufficiently Analogous

To render his opinion that the complaints on which Dr. King relied are likely affected by underreporting and negativity bias, Dr. Langenfeld relied primarily on eight sources: five peer-reviewed articles, one chapter in a book published by Princeton University Press, one article published by the Nielsen Norman Group (which the FTC's usability expert agreed has "authoritative expertise in the field of usability," App. at 45), and one *Freakonomics* article cited

in a peer-reviewed article.[6] The FTC complains, however, that this literature involves only "research regarding biases that is unrelated to customer complaints submitted to a company's customer service department or to a governmental agency," but instead focuses on online product reviews. Mot. at 11. However, the FTC never explains how or why that difference affects the relevant biases (it does not).

"Experts may base their opinions on inferences properly drawn from scientific facts. Indeed, 'trained experts commonly extrapolate from existing data,' so long as they 'explain how and why' they have extrapolated the data." *Holcombe v. United States*, 516 F. Supp. 3d 660, 677 (W.D. Tex. 2021) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144-46 (1997)). Exclusion is warranted only "if the studies that [the expert] relies on are 'so dissimilar to the facts presented' that [the expert's] opinions cannot be 'sufficiently supported' by the studies." *Id.* at 675 (quoting *Joiner*, 522 U.S. at 144-45). Based on the literature that Dr. Langenfeld reviewed, and his expertise in this area, his opinions regarding underreporting and negativity bias are not so drastically dissimilar from the literature cited that they lack sufficient support.

First, underreporting and negativity biases are well-known economic concepts that have been found in a variety of contexts, as reflected in the sources on which Dr. Langenfeld relied. One of those sources describes negativity bias as "a very general principle, a principles that holds

---

[6] Hu, N., Pavlou, P. A., and Zhang, J., "On self-selection biases in online product reviews," *MIS Quarterly*, *41*(2), 2017; Kahneman, Daniel and Amos Tversky, "Prospect theory: An analysis of decision under risk." *Econometrica* 47.2, 1979; Ito, Tiffany A., Jeff T. Larsen, N. Kyle Smith, and John T. Cacioppo (1998), "Negative Information Weighs More Heavily on the Brain: The Negativity Bias in Evaluative Categorizations," *Journal of Personality and Social Psychology*; Schupp, Harald T., Arne Öhman, Markus Junghöfer, Almut I. Weike, Jessica Stockburger, and Alfons O. Hamm, "The facilitated processing of threatening faces: an ERP analysis," *Emotion* 4(2), 2004, 189–200; Rozin, Paul, and Royzman, Edward B., "Negativity Bias, Negativity Dominance, and Contagion," *Personality and Social Psychology Review 5(4)*, 2001, 296-320; Hood, Christopher, "Credit claiming, blame avoidance, and negativity bias," in *The Blame Game: Spin, bureaucracy and self-preservation in government*, Princeton University 1-23, 2013; Loranger, Hoa, "The Negativity Bias in User Experience," *Nielsen Norman Group*, October 23, 2016, https://www.nngroup.com/articles/negativity-bias-ux/; Levitt, Steven D., "Why Do People Post Reviews on Amazon?" *Freakonomics*, July 22, 2005, https://freakonomics.com/2005/07/why-do-people-post-reviews-on-amazon/.

across a wide range of domains." App. at 12. Another source reported on the existence of negativity bias specifically in the context of user experience. App. at 37 (explaining how "negativity bias manifest[s] on the web," and noting that "[i]n usability studies, it is common for participants to say nothing when the UI works according to their expectations. . . . But when the interaction doesn't match their expectations, they become critical and remember the incident for a long time.").

Second, the records that Dr. King reviewed are more analogous to online product reviews than the FTC suggests. The FTC (and Dr. King) seem to have a fundamental misunderstanding of what these records reflect. They are responses to surveys that subscribers receive after contacting Match.com; they are not records of all contacts with Customer Care. *See* App. at 8-9. Thus, they are analogous to optional product reviews, such that it is reasonable for Dr. Langenfeld to rely on research from the online product review context to support his conclusions about the likely biases affecting the records that Dr. King analyzed. The FTC offers no reason to think that the online product review context is so different than the records that Dr. King reviewed. To the contrary, whether in the context of public reviews or private complaints, both avenues involve consumers articulating their experiences and grievances related to a company's products or services, so it is reasonable to believe that the same biases apply to both. Thus, this is not a context in which the studies relied upon did "not present facts analogous to those presented by this case." *Macy v. Whirlpool Corp.*, 613 F. App'x 340, 343 (5th Cir. 2015) (per curiam).

### 2. Dr. Langenfeld Relied on Reliable and Peer-Reviewed Sources

The FTC also contends that Dr. Langenfeld "bases opinions upon articles that are not peer reviewed." Mot. at 13. But the FTC attacks on that basis only *one* of the eight sources on which Dr. Langenfeld relied for his opinion related to biases—a *Freakonomics* article by Steven Levitt. There is no requirement that experts may *only* cite peer-reviewed articles, much less any authority

for the proposition that citing a single non-peer-reviewed article renders the expert's entire opinion unreliable. *See Norris v. Kawasaki Motors Corp, USA*, No. CV H-16-2424, 2018 WL 3729572, at *3 (S.D. Tex. Aug. 6, 2018) ("Publications and peer review can assist in assessing the reliability of an expert's opinion, but the absence of an expert's reliance on published treatises or journals does not render his testimony per se unreliable." (internal quotations omitted)). So even if that single *Freakonomics* article were an unreliable basis for Dr. Langenfeld's opinion for whatever reason (it is not, as explained below), his opinion would still stand based on the other (peer-reviewed) sources that he cited.

What is more, the *Freakonomics* article that the FTC criticizes has its own indicia of reliability that justify Dr. Langenfeld's partial reliance on it. The article is authored by Steven Levitt, a well-known economist and University of Chicago Professor. He is also the co-author of *New York Times* bestseller *Freakonomics*. The article on which Dr. Langenfeld relied was posted on the *Freakonomics* website. Additionally, that same *Freakonomics* article was cited in the peer-reviewed article in *MIS Quarterly* on which Dr. Langenfeld relies. *See* Mot. App. at 94 (excerpt from Hu et al. article). If the citation is good enough for *MIS Quarterly*'s peer reviewers, it is not the FTC's place to second-guess Dr. Langenfeld's reliance on the same source.

### 3.   Dr. Langenfeld's Opinion About Biases Is Intellectually Rigorous

As indicated by the description of Dr. Langenfeld's opinion above, his conclusions are based on more than just his own say-so. His opinion is based on his review of articles cited in his report, confirming the existence of these biases. *See* Rpt. ¶ 36 (Mot. App. at 25-26); App. at 3-4. This is sufficient for Dr. Langenfeld to be able to tell the factfinder about the existence of these biases and their impact on basing any opinion purely on complaints—similar to what Dr. Langenfeld has been allowed to do in other cases. *See* App. at 4-5 ("I've been allowed to testify as to what the [negativity bias] research is, as in this case, as part of a more general issue."). Tellingly,

although the FTC now criticizes Dr. Langenfeld's report as lacking "intellectual rigor," when Defendants asked Dr. King whether she had "any questions or concerns about" Dr. Langenfeld's analysis, her only "concern" was that "he's an economist," so she was skeptical of his qualification to evaluate qualitative research. App. at 46. Dr. King—who the FTC considers to be an expert on complaint analysis—had no substantive criticisms of Dr. Langenfeld's analysis. The FTC's newfound, attorney-led argument should be rejected.

### E.   Dr. Langenfeld's Rebuttal Contains Permissible Background and Context for His Opinions

The FTC next contends that certain "Background" and "Overview" paragraphs of Dr. Langenfeld's report are irrelevant and inadmissible narrative. Not so. As their titles suggest, these sections provide a high-level background and overview to contextualize Dr. Langenfeld's opinions. Experts are permitted to include this type of summary of the factual basis for their conclusions. *See, e.g.*, *United States ex rel. Mitchell v. CIT Bank, N.A.*, No. 4:14-cv-00833, 2022 WL 1233651, at *7 (E.D. Tex. Apr. 26, 2022) ("[I]t is entirely permissible for an expert to explain that these were the facts that form the basis of his expert opinion." (cleaned up) (quoting *Huawei Techs. Co. v. Yiren Huang*, No. 4:17-cv-00893, 2019 WL 2077821, at *8 (E.D. Tex. May 9, 2019)). Indeed, Rule 26(a)(2)(B)(i) *requires* experts to disclose the "complete" basis for their opinions, including background facts. *See id.*

#### 1.   Dr. Langenfeld's Brief Background Description (Section V) Is Permissible

The FTC attacks Dr. Langenfeld's Background section (Section V), which consists of two paragraphs briefly describing Match.com and its cancelation process and eight screenshots of Match.com webpages. The FTC claims that Dr. Langenfeld's summary of Match.com's cancelation process is "extraneous," but ignores that the summary is necessary to give context to his subsequent opinions regarding usage of the Match.com cancelation process. After all, without

having described what Match.com is ("an online dating site," Rpt. ¶ 17 (Mot. App. at 9)), and depicted its cancelation process, Rpt. ¶ 18 (Mot. App. at 10), how could Dr. Langenfeld have opined about subscribers' usage of that process?[7] The FTC's argument that Dr. Langenfeld apparently is not allowed to testify about screenshots of the pages reflected in the usage data he reviewed is frivolous.

The FTC argues that Dr. Langenfeld's summary of the cancelation process is inadmissible because it is "far from a neutral summary of background facts." Mot. at 16. Yet the body of the section that the FTC moves to exclude on this ground consists of a single paragraph that provides context (replicated below), followed by eight screenshots of Match.com webpages, with no editing or commentary whatsoever.

> **B.      Match.com's Cancelation Process[11]**
>
> 18. The FTC's allegations focus on the steps in Match.com's cancelation process, how those steps appeared to a subscriber, and how subscribers' interactions with the cancelation process were tracked in Match.com's data. The following eight figures display steps leading up to and including Match.com's current cancelation process, and I understand that Match.com has tracked the number of subscribers that reached each of these steps.[12]

The FTC seems to think that Dr. Langenfeld's summary is not neutral because, in a footnote, Dr. Langenfeld explained that for purposes of depicting the flow he *assumes the FTC's view* about where the cancelation process begins, then states that he is not offering any opinion

---

[7] If Dr. Langenfeld had not described the Match.com cancelation flow, the FTC almost surely would have complained that Dr. Langenfeld lacked an adequate basis to opine about subscriber usage of a flow that the FTC would say Dr. Langenfeld knew nothing about. That would be consistent with the FTC's pattern of criticizing Defendants' experts no matter what they do. For example, the FTC criticizes Dr. Langenfeld because serving as an expert provides more than half of his income. Mot. at 1. Then the FTC criticizes Defendants' other expert, Brandon Ward, because prior to this case he had never been an expert in litigation. Dkt. 205-2.

about where the flow begins (because, as the FTC notes, he is not an expert in website design, HCI, or user experience). *See* Mot. at 16. The FTC argues that by assuming the FTC's view but disavowing having an opinion one way or the other about its accuracy, Dr. Langenfeld is somehow "allud[ing] to any opinion on the cancellation flow or where it begins." Mot. at 16. On the contrary, he does the *opposite* by taking no sides on that question.

In short, Dr. Langenfeld is not offering any opinion about the cancelation flow or where it starts, but he must be allowed to give adequate background and context for his opinion so he can explain to the factfinder what analysis he did.

### 2. Dr. Langenfeld's Brief Overview of the Preceding Expert Reports (Section VI, Paragraphs 19-21) Is Permissible

In paragraphs 19-21, Dr. Langenfeld finishes laying out the context for his report by briefly describing the reports that Mr. Ward and Dr. King previously submitted. Prior to Dr. Langenfeld's rebuttal report, the parties had exchanged opening and rebuttal reports from Mr. Ward and Dr. King, but Dr. King's untimely inclusion of a complaint analysis in her rebuttal prompted the need for Dr. Langenfeld's rebuttal. *See supra* at pp. 1-3. Dr. Langenfeld does not offer his own opinion on those reports in the paragraphs at issue, but merely describes their findings to set the stage for his own analysis. Laying this type of foundation is permissible. *See, e.g.*, *Huawei*, 2019 WL 2077821, at *8 (denying motion to strike "Case Background" section of report because the expert used it to present "background facts that form the basis and reasons for [the expert's] report," not offer opinions).[8]

---

[8] None of the cases that the FTC cites (Mot. at 15 n.55) involves an analogous situation in which the expert was discussing background facts only to identify the bases for his opinions. Rather, each of the cases that the FTC cites involved an expert attempting to offer an *opinion* about the background facts or factual narrative that the expert was trying to construct. Dr. Langenfeld does no such thing here.

### F.      Dr. King—Not Dr. Langenfeld—Opines About Consumers' State of Mind

Finally, the FTC argues that Dr. Langenfeld improperly opines about consumers' state of mind. He does not. It is the FTC whose expert report is rife with speculation about consumers' state of mind.[9] Dr. Langenfeld offers opinions about consumers' *conduct*, e.g., whether the consumer ever experienced Match.com's cancelation flow, or not, based on Match.com usage records. *See* Rpt. ¶¶ 47-48 (Mot. App. at 30-31). Testing hypotheses by analyzing consumer behavior is precisely what *Daubert* requires. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993) ("Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified . . . ." (internal citation omitted)).

Dr. Langenfeld observes that complaints about the flow from someone who has never seen or experienced the flow are "an unreliable basis on which to form an opinion." Rpt. ¶ 47 (Mot. App. at 30). Logically, someone cannot complain about something that they have never seen. As a result, Dr. Langenfeld opines that, as an economist, he would not consider complaints from people who have never experienced the flow to "be a basis for concluding the cancelation process was not simple," which is inconsistent with Dr. King's hypothesis. Rpt. ¶ 15 (Mot. App. at 9). That has nothing to do with the customer's state of mind (i.e., *why* they are complaining about something that they have never seen).[10]

---

[9] *See, e.g.*, App. at 82 ("the cancellation process caused substantial confusion for many consumers"; "I expect that some customers found the cancellation flow frustrating"); App. at 84 ("some users may have become confused"; "the use of a text link and the 'resign' language undoubtedly caused substantial confusion to consumers"); App. at 90 (speculating that the "dread of possibly spawning more and more questions" could have created a disincentive for subscribers to complete the flow); App. at 97 (claiming that Match.com used "confirmshaming" and "inconsistent language which in turn can add to user confusion"); App. at 98 (speculating about what "some users may have believed").

[10] In fact, a consumer's state of mind arguably is irrelevant for purposes of Dr. Langenfeld's usage analysis. If the empirical evidence shows that a person did not experience the flow, any complaint that person submitted about the flow is irrelevant, regardless of that person's state of mind and whether they believed they had experienced the flow.

In fact, *nowhere* in the specific paragraphs that the FTC claims contain improper opinions about consumers' state of mind or intent (Mot. at 18) does Dr. Langenfeld opine about those matters.

- Paragraph 45 points out that Dr. King relied on subscriber comments but "never attempted to evaluate the actual experience of users who commented." Mot. App. at 29. This is a fact (which Dr. King admitted at her deposition, App. at 46), and says nothing about a consumer's state of mind.

- Paragraph 46 reports on Dr. Langenfeld's analysis of usage data of subscribers who complained to Match.com and were included in Dr. King's complaint analysis, which showed that 43.2% of the subscribers never entered the cancelation process at all, and 50.5% were able to successfully cancel. Mot. App. at 29. These are facts about usage data, not Dr. Langenfeld's opinions about a consumer's state of mind.

- Paragraph 47 similarly reports on Dr. Langenfeld's analysis of usage data of subscribers with complaints in the FTC's Sentinel database, which again showed that Dr. King was relying on complaints from people that had never experienced the flow. Mot. App. at 30. Again, these are facts about usage data, not Dr. Langenfeld's opinions about a consumer's state of mind.

- Paragraph 15 summarizes the findings described in paragraphs 45-47.

Ironically, the only part of these paragraphs that refers to consumers' state of mind is quotations from *Dr. King's* report, where she claims that "Match.com consistently assessed customers unauthorized charges for services they *did not desire*, charged them after they had canceled or *believed they had canceled*, and failed to provide adequate customer support to remedy these issues." Rpt. ¶ 47 (Mot. App. at 30) (emphases added) (quoting Dr. King's Rebuttal Rpt. at 38). Thus, it is Dr. King—not Dr. Langenfeld—that offers opinions about consumers' state of mind—i.e., what they "desire[d]" or "believed." All of the cases that the FTC cites about excluding expert testimony regarding state of mind are therefore beside the point for purposes of Dr. Langenfeld's opinion, since he offers no such opinion. Dr. Langenfeld merely reported on the results of his analysis of usage data. That analysis eviscerates Dr. King's reliance on those

consumers' complaints, but it does not make the analysis inadmissible. Being harmful to the FTC's case is not the standard for inadmissibility.

## CONCLUSION

For the foregoing reasons, the Court should deny the FTC's Motion in its entirety.

Dated: October 2, 2023

/s/ *Angela C. Zambrano*

Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: 214-981-3300
Fax: 214-981-3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310-595-9500
Fax: 310-595-9501

Benjamin M. Mundel (admitted *pro hac vice*)
bmundel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: 202-736-8000
Fax: 202-736-8711

*Attorneys for Match Group, Inc. and*
*Match Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 2, 2023, I caused a true and correct copy of the above and foregoing document, to be served on all counsel of record in accordance with the Federal Rules of Civil Procedure and this Court's CM/ECF filing system.

*/s/ Angela C. Zambrano*
Angela C. Zambrano

20