**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

FEDERAL TRADE COMMISSION,

                    Plaintiff,

    vs.

MATCH GROUP, INC., a corporation, and
MATCH GROUP, LLC, formerly known as
MATCH.COM, LLC, a limited liability
company,

                    Defendants.

Case No. 3:19-cv-02281-K

**DEFENDANTS MATCH GROUP, INC. AND MATCH GROUP, LLC'S**
**RESPONSE TO PLAINTIFF FEDERAL TRADE COMMISSION'S**
**MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY**
**OF JAMES LANGENFELD AND STRIKE**
**<u>PORTIONS OF HIS REBUTTAL EXPERT REPORT</u>**

## **<u>TABLE OF CONTENTS</u>**

Page

**PRELIMINARY STATEMENT** ................................................................................ 1

**FACTUAL BACKGROUND** .................................................................................... 2

    **A.** The FTC's Ever-Changing Consumer Harm Theories ................................. 2

    **B.** The Assumptions Built into the FTC's Current Consumer Harm Theory ............ 4

    **C.** Dr. Langenfeld's Analysis Testing Those Assumptions ............................... 6

**ARGUMENT** ....................................................................................................... 11

  **I.** **Dr. Langenfeld Will Rebut the FTC's Evidence Relating to Claimed Monetary Relief—Well Within His Expertise—Not Offer Liability or Legal Opinions** ........... 11

    **A.** **Dr. Langenfeld Will Opine About His Analysis of Consumer Behavior that Disproves Ms. Verdi's Monetary Relief Assumptions** ................................... 11

      **1.** Attacking the FTC's Causation Assumptions Is Not a Liability or Legal Opinion ............................................................................... 12

      **2.** Dr. Langenfeld's Opinion Is Within the Scope of His Economic Expertise ....... 15

    **B.** **Dr. Langenfeld's Analysis Critiques the FTC's Assumptions About When a Consumer Has Been Harmed** ......................................................... 17

    **C.** **Dr. Langenfeld Will Not Opine About Liability or Offer Legal Opinions** ............ 19

    **D.** **Dr. Langenfeld's Background Section Containing Depictions of the Cancelation Flow Presents the Factual Basis of His Opinion, Not Impermissible Narrative** .... 20

  **II.** **Dr. Langenfeld's Report Is a Proper Rebuttal to the FTC's Monetary Relief Model Because It Points Out and Defeats the FTC's Unspoken Assumptions** ................. 21

**CONCLUSION** ................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Charalambopoulos v. Grammar*,
   No. 3:15-cv-2424-D, 2017 WL 1094394 (N.D. Tex. Mar. 8, 2017) .......................................18

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)..........................................................................................6, 14, 18

*Estate of Davis v. City of N. Richland Hills*,
   No. 4:00-cv-438-Y, 2007 WL 628090 (N.D. Tex. Feb. 28, 2007).........................................18

*Fleischman v. Albany Med. Ctr.*,
   728 F. Supp. 2d 130 (N.D.N.Y. 2010) .................................................................................19

*FTC v. Figgie Int'l, Inc.*,
   994 F.2d 595 (9th Cir. 1993) ...........................................................................................1, 12

*FTC v. Noland*,
   No. CV-20-00047-PHX-DWL, 2023 WL 3372517 (D. Ariz. May 11, 2023) .......................10

*FTC v. Vyera Pharms., LLC*,
   No. 20cv706 (DLC), 2021 WL 5279465 (S.D.N.Y. Nov. 12, 2021)....................................16

*Fuller v. SunTrust Banks, Inc.*,
   No. 1:11-cv-784-ODE, 2019 WL 5448206 (N.D. Ga. Oct. 3, 2019) ....................................22

*Gibson Brands, Inc. v. Armadillo Distrib. Entrp., Inc.*,
   No. 4:19-cv-00358, 2021 WL 231764 (E.D. Tex. Jan. 22, 2021) ...................................22, 23

*Graystone Funding v. Network Funding*,
   598 F. Supp. 3d 1228 (D. Utah 2022).............................................................................13, 23

*Grove US LLC v. Sany Am. Inc.*,
   No. 13-c-677, 2019 WL 969814 (E.D. Wis. Feb. 28, 2019)...................................................13

*Holcombe v. United States*,
   516 F. Supp. 3d 660 (W.D. Tex. 2021)...........................................................................14, 15

*In re Intuniv Antitrust Litig.*,
   No. 1:16-cv-12396-ADB, 2020 WL 5995326 (D. Mass. Oct. 9, 2020) ................................19

*Jacked Up, LLC v. Sara Lee Corp.*,
   291 F. Supp. 3d 795 (N.D. Tex. 2018), *aff'd*, 2018 WL 2064126 (N.D. Tex.
   May 2, 2018)..........................................................................................................................2

i

*United States ex rel. Mitchell v. CIT Bank, N.A.*,
No. 4:14-cv-00833, 2022 WL 1233651 (E.D. Tex. Apr. 26, 2022) ......................................21

*Ohio St. Troopers Ass'n, Inc. v. Point Blank Enters., Inc.*,
No. 18-cv-63130, 2020 WL 1666763 (S.D. Fla. Apr. 3, 2020) ................................................22

*Ploss v. Kraft Foods Grp., Inc.*,
637 F. Supp. 3d 561 (N.D. Ill. 2022) ...................................................................................18

*Retractable Techs. Inc. v. Abbott Labs., Inc.*,
No. 5:05-cv-157, 2010 WL 11531436 (E.D. Tex. June 18, 2010) ..........................................18

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004)....................................................................................18

*United States ex rel. Ruscher v. Omnicare, Inc.*,
No. 4:08-cv-3396, 2015 WL 5178074 (S.D. Tex. Sept. 3, 2015), *aff'd,* 663 F.
App'x 368 (5th Cir. 2016) ...................................................................................................18

*Slicex, Inc. v. Aeroflex Colo. Springs, Inc.*,
No. 2:04-cv-615 TS, 2006 WL 1932344 (D. Utah July 11, 2006) ..........................................22

*In re Term Commodities Cotton Futures Litig.*,
No. 12-CV-5126 (ALC), 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020)................................18

*The Iams Co. v. Nutro Prods., Inc.*,
No. 3:00-cv-566, 2004 WL 5496244 (S.D. Ohio June 30, 2004)...........................................15

*Viterbo v. Dow Chem. Co.*,
826 F.2d 420 (5th Cir. 1987) ...............................................................................................15

## Statutes

15 U.S.C. § 57b(b) .........................................................................................................1, 12

## PRELIMINARY STATEMENT

Throughout this case, the FTC has struggled to articulate a theory of consumer harm, throwing around various monetary relief figures, none moored to any expert opinion. Most recently, the FTC's lawyers instructed an FTC data analyst to calculate alleged consumer harm by adding up revenue from subscribers that clicked "Manage Subscription" on the Match.com website but did not cancel their subscription before it renewed. The problem with the FTC's latest theory, though, is that it is premised on two fundamental assumptions: (1) every subscriber that clicked "Manage Subscription" intended to cancel, and (2) if the subscriber did not cancel after clicking "Manage Subscription," that failure was caused by the design of the cancelation flow, i.e., the lack of a "simple" cancelation mechanism, instead of any of the many other possible reasons that consumers did not undertake the cancelation.

These faulty assumptions are critical. If a subscriber never intended to cancel, they did not suffer any "consumer harm" by not canceling. And if the subscriber did not cancel for a reason that had nothing to do with the simplicity (or not) of the cancelation flow—such as changing their mind, getting interrupted by a phone call or a child, etc.—then any "harm" was not caused by the quality of the cancelation flow, and therefore the FTC is not entitled to consumer redress. *See* 15 U.S.C. § 57b(b) (stating that the FTC can collect "such relief as the court finds necessary to redress injury to consumers . . . *resulting from* the [ROSCA] violation" (emphasis added)); *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993) ("It follows, therefore, that there may be no redress without proof of injury *caused by those practices*." (emphasis added)).

Despite the importance of these assumptions, the FTC did *nothing* to evaluate whether those assumptions had any basis in fact. But Defendants' expert, Dr. James Langenfeld, did. He performed a variety of analyses of consumer behavior to assess whether subscribers' conduct was consistent with the FTC's assumptions and found that they were not. Each of Dr. Langenfeld's

analyses goes directly to the heart of whether the FTC's assumptions are justifiable (they are not). This is precisely the type of monetary relief rebuttal allowed by the Federal Rules.

The FTC nevertheless moves to exclude Dr. Langenfeld's opinion. Each argument fails:

- Dr. Langenfeld will not opine on liability or legal issues; rather, his analyses of consumer behavior tests the assumptions underlying the FTC's monetary relief model are consistent with data (they are not)

- Dr. Langenfeld will not opine about consumers' state of mind; rather, he will analyze consumer behavior to assess whether that behavior is consistent with the FTC's speculation that those consumers were harmed (it is not)

- Attacking the assumptions underlying the FTC's monetary relief model are properly within the scope of a rebuttal report

The Court should deny the FTC's Motion.

## FACTUAL BACKGROUND

The FTC has been unable to settle on a consumer harm theory during this litigation, having swung wildly between theories, none supported by any analysis from an outside expert. The lack of an expert supporting the FTC's theory may be because, for an expert to rely on assumptions, the "assumptions must have some factual basis in the record and an underlying rationale." *Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 806 (N.D. Tex. 2018), *aff'd*, 2018 WL 2064126 (N.D. Tex. May 2, 2018). No such factual basis exists here (as Dr. Langenfeld's analysis shows, explained more detail below), so the FTC took the unusual step of attempting to prove consumer harm without an expert, instead relying on FTC lawyer arguments and assumptions.

### A. The FTC's Ever-Changing Consumer Harm Theories

Partly because of the lack of any factual basis for the FTC's assumptions about consumer harm, the FTC's theory has been a moving target. The FTC first calculated consumer harm during this litigation to be $8.7 million (a surprise to Defendants). *See* App. at 18 (Initial Disclosures). When asked in an interrogatory how the FTC calculated its alleged consumer harm, however, the

2

FTC refused to explain and insisted that it did not have the data necessary to calculate that information (despite having calculated the number for its initial disclosures). App. at 23 (Original Resp. to Interr. No. 3); App. at 26-27 (First Am. Resp. to Interr. No. 3).[1] When the FTC's corporate representative was deposed, he explained that the FTC had calculated the $8.7 million based on the number of people that complained to Match.com that they thought they had canceled, plus subscribers' "lost time" for dealing with cancelation. App. at 32. By that time, however, the FTC was not willing to defend their claim for "lost time" damages and had abandoned it. *Id*.

The FTC subsequently disclosed a new model, in which the FTC presented a "lower bound" and an "upper bound" of alleged consumer harm. *See* App. at 36-38 (Third Am. Resp. to Interr. No. 3). This time, the FTC based its calculations on the number of subscribers that "dropped out" at various pages of the Match.com cancelation flow. The flow (according to the FTC's current theory) consists of up to five pages: (1) the password page, which the subscriber sees after clicking "Manage Subscription" on the Account Settings page;[2] (2) the "Manage Subscription" page at which the subscriber chooses between "Subscription Status" and "Cancel Subscription"; (3) the first survey page, which asks the subscriber why they are looking to cancel and is optional; (4) a save offer page (only sometimes presented), offering the subscriber a discounted renewal if they choose to stay; and (5) a "net promoter score" survey, which asks the subscriber whether they would recommend Match.com, also optional. Rpt. ¶ 22 (Mot. App. 15-22). For the lower-bound, which the FTC calculated to be $14.7 million, the FTC counted as harmed only those subscribers that "dropped out" after reaching the first survey page. For the upper-bound, which the FTC

---

[1] Defendants had to move to compel the FTC to disclose its methodology. Dkt. 174 (Order on Mot. to Compel).

[2] The wording of the relevant link on the Account Settings page varied somewhat during the period for which the FTC is seeking consumer redress, but for the sake of simplicity, this brief refers only to "Manage Subscription," the current label.

calculated to be $100.7 million, the FTC counted as harmed subscribers that "dropped out" after reaching the "Manage Subscription" page.

Defendants were hopeful to get more detail about the FTC's alleged consumer harm on the deadline for serving expert reports, January 13, 2023, but the FTC served no such thing (perhaps because the FTC could not convince any independent expert to sign off on its baseless assumptions and still seemed unable to come to ground on a theory).[3] When Defendants asked the FTC how it planned to introduce evidence to support its demand for consumer redress, the FTC said that it would do so through a data analyst. The parties then negotiated deadlines for the disclosure of that opinion and Defendants' rebuttal. *See* Mot. App. at 132. After multiple delays by the FTC, *see* Mot. App. at 131-33, on May 25, 2023, the FTC finally disclosed its latest consumer harm model. App. at 64-67 (Fourth Am. Resp. to Interr. No. 3). The FTC again calculated alleged consumer harm based on "drop outs" from the cancelation flow, but this time included in its alleged harm calculation any subscriber that did not cancel after clicking "Manage Subscription" (i.e., earlier than in its previous calculations) App. at 65. This time, the FTC's alleged harm added up to $68.6 million, although the FTC said it would "reduce its calculation of monetary relief" if Defendants produced additional information. App. at 66 & n.6. After Defendants produced the requested information, the FTC reduced its calculation in some (but not all) of the ways it had promised, resulting in the FTC's current demand for $51.1 million in consumer redress. App. at 72 (Fifth Am. Resp. to Interr. No. 3).

### B.  The Assumptions Built into the FTC's Current Consumer Harm Theory

The FTC plans to offer these calculations at trial via FTC data analyst Kimbleann Verdi. However, Ms. Verdi did nothing other than "perform[] the mathematical calculations based on the

---

[3] Indeed, several months later, the FTC served Amended Initial Disclosures that were back to claiming that the FTC's "total estimated injury at this time for Count V is at least $8.7 million." App. at 59 (First Am. Initial Disclosures).

instructions [she] was given by the" FTC lawyers. App. at 78; *see also* App.. at 77 (explaining that her role was to "perform mathematical calculations"); App. at 78 ("I was instructed by the case team to perform the calculations."). In fact, Ms. Verdi was not even "aware of what feature of Match is at issue." App. at 76. The FTC's lawyers told Ms. Verdi "which columns specifically to add and subtract." App. at. 78. Ms. Verdi "did not offer the case team any of [her] own opinions regarding the mathematical calculations [she] was instructed to calculate." App. at 78. She neither "ma[d]e any assumptions," App. at 79, nor did she "do any assessment into intentions of what users were doing." App. at 80. Rather, she simply "performed the mathematical calculations as [she] was instructed to do so by the case team." App. at 79.

Of course, that does not mean that there were not any assumptions built into the calculations that the FTC's lawyers instructed Ms. Verdi to perform. The FTC admitted in an interrogatory response describing its consumer harm allegations that it contends that anyone who clicked "Manage Subscription" but failed to cancel "did not cancel their subscription because of Defendants' failure to offer simple mechanisms to cancel," although it identifies no basis for that bold assumption.[4] App. at 65 (Fourth Am. Resp. to Interr. No. 3 at 14). And the FTC's corporate representative testified at his deposition that "it's a reasonable assumption that people that go through the cancellation flow intended to cancel. And if they didn't cancel, it was because something thwarted them – the design of the flow thwarted them from doing that." App. at 97; *see also* App. at 96 ("[I]t's a reasonable assumption that if someone clicks on a link that says Cancel, that they intended to cancel."). In other words, the FTC admitted that it assumes that (1) ***everyone***

---

[4] There are a number of reasons that someone might click "Manage Subscription" but not cancel that have nothing to do with the flow. For example, a subscriber might click "Manage Subscription" to reach the Subscription Status page, rather than the cancelation flow. A subscriber might just be exploring, and not intending to cancel. And even a subscriber that intended to cancel may have changed their mind or been interrupted by something entirely separate from the cancelation flow (such as a phone call or someone at the door).

that clicked "Manage Subscription" intended to cancel (rather than simply wanted to explore the site or check subscription status), and (2) if they did not, it was because of the cancelation flow's alleged lack of simplicity (rather than because they changed their mind or were interrupted, for example).

The FTC's corporate representative also admitted that the FTC had done no surveys or other empirical studies to test those assumptions, however. *See* App. at 96. He even acknowledged that the FTC had "consider[ed] that there might be other reasons that someone might abandon the – the flow," but had not conducted further analysis because "it didn't seem like any of those reasons were particularly plausible or material" *in the FTC's view*. App. at 97.[5]

### C.  Dr. Langenfeld's Analysis Testing Those Assumptions

Dr. Langenfeld did the analysis that the FTC and its data analyst failed to do: to test, empirically, by analyzing customer behavior whether the FTC's assumptions are correct (they are not). "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified . . . ." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993) (internal quotation omitted). That is precisely what Dr. Langenfeld did. Because the FTC's "arguments are based on assumptions that have not been tested against observed subscriber behavior," Dr. Langenfeld did that testing and found that his "economic analyses demonstrate that

---

[5] Tellingly, in the FTC corporate representative's first deposition in October 2022, he implicitly acknowledged that subscribers might exit the flow for reasons other than being "thwarted" by the design of the flow. When asked how the FTC would "try to disaggregate the consumers who deliberately exited the cancelation flow," the deponent did not deny that such consumers existed, but instead said "I'm not sure exactly how we would do it, but – because we just would have to look at what, what we could discern from the data that we have." App. at 32. The FTC apparently never figured out how to disaggregate those consumers, as the FTC's current consumer harm model makes no such adjustment.

these assumptions are likely not supported by actual subscriber behavior." Rpt. ¶ 13 (Mot. App. 9-10). Dr. Langenfeld did a number of analyses of consumer behavior to test the FTC's assumptions.[6]

Dr. Langenfeld began by calculating what percentage of subscribers that begin the cancelation flow successfully cancel, and found that only 2.4% of subscribers that clicked "Cancel Subscription" did not cancel and were charged for a renewal. Rpt. ¶ 42 (Mot. App. at 30). This analysis played into his rebuttal of Ms. Verdi's calculations in three ways. First, the effectiveness rate allowed him to identify "the upper bound for subscribers that could theoretically have been harmed," Rpt. ¶ 42 (Mot. App. at 30), since someone who canceled was not harmed. Second, the effectiveness rate is relevant to the FTC's assumption that any failures to cancel were caused by the design of the flow, rather than something else. As Dr. Langenfeld put it, "[i]f subscribers found Match.com's cancelation flow not to be simple as the FTC claims, then one would expect to see a high percentage of those attempting to cancel to be unsuccessful." Rpt. ¶ 37 (Mot. App. at 28). In other words, as Dr. Langenfeld testified, "if there was some reason associated with the resignation flow, simplicity or not, you wouldn't expect to see a high cancellation rate." App. at 89.

Third, Ms. Verdi, whom Dr. Langenfeld was charged with rebutting, included an effectiveness rate calculation, App. at 103-104, so Dr. Langenfeld corrected the errors in Ms. Verdi's calculations.[7] Rpt. ¶¶ 43-48 (Mot. App. at 30-32).Next, Dr. Langenfeld compared cancelation data to sign-up data, including rates of successful cancelation versus sign-up, the time

---

[6] The FTC suggests that the fact that Dr. Langenfeld's report is longer than the FTC's data analyst's "description of calculations" is somehow evidence that Dr. Langenfeld's report is not a rebuttal. *See* Mot. at 1. Not so. Dr. Langenfeld's report is longer than the data analyst's because Dr. Langenfeld did the work that the FTC's data analyst *should have done*, but did not do, to test the assumptions built into the FTC's model. As described in the argument section below, this is permissible rebuttal.

[7] The FTC originally represented to Defendants that Ms. Verdi would testify only about monetary relief, so the parties negotiated a deadline for Defendants' monetary relief rebuttal. *See* Mot. App. at 132. The FTC belatedly disclosed that Ms. Verdi also intends to testify about cancelation rates. *Id*. To the extent that the Court allows Ms. Verdi to testify about cancelation rates, it should also allow Dr. Langenfeld's rebuttal, as the parties' intent was always that Defendants would have an opportunity to rebut the FTC data analyst's testimony.

it takes to cancel versus sign-up, and the number of pages and clicks it takes to cancel versus sign-up. Rpt. ¶¶ 49-61 (Mot. App. at 33-39). Again, this analysis informed Dr. Langenfeld's opinion regarding whether the data supports or contradicts the hypothesis (assumption) that the design of the cancelation flow—rather than some other factor—caused subscribers to leave the flow without canceling. *See* App. at 90. (explaining that this comparison "was one of the general analyses I did to see if there was a reason to presume, as the FTC does, . . . whether those people should be assumed to have canceled because of something to do with the cancellation flow"). If the cancelation flow's design was preventing subscribers from canceling, Dr. Langenfeld explained, "then one would expect the cancelation rate for subscribers canceling their subscription to be lower compared to relevant benchmarks, such as the success rate in signing up for a subscription." Rpt. ¶ 49 (Mot. App. at 33). Dr. Langenfeld found that cancelation compared favorably to sign-up on all of these metrics. *See* Rpt. ¶¶ 49-61 (Mot. App. at 33-39).

Then, Dr. Langenfeld examined subscriber data to evaluate whether the subscribers for which the FTC is seeking consumer harm had successfully canceled in the past.[8] Rpt. ¶¶ 62-63 (Mot. App. at 40-41). The design of the flow is unlikely to have been the reason that someone did not cancel if that person had successfully canceled in the past, as the person had already demonstrated an ability to cancel if they wished to do so. *See* Rpt. ¶¶ 62-63 (Mot. App. at 40-41). Thus, this evidence of subscriber conduct informed Dr. Langenfeld's opinion about whether the FTC's assumptions about which subscribers were "harmed" were supported by data. Rpt. ¶ 63 (Mot. App. at 40-41).

---

[8] As the FTC acknowledges, changes to the cancelation flow have been minimal, *see* Dkt. 199-1 at 36 (describing the "few changes to the flow"), so if a subscriber that successfully canceled in the past did not cancel after entering the cancelation flow during a subsequent subscription, that failure to cancel likely was not due to the design of the flow.

Dr. Langenfeld then analyzed Match.com usage data to understand whether subscribers that clicked "Manage Subscription" but did not cancel continued using their benefits, and whether they acted similarly to subscribers that clicked "Manage Subscription" and successfully canceled. If the usage patterns were similar, that would be consistent with the two groups having similar intent to cancel. *See* Rpt. ¶ 69 (Mot. App. at 44) ("If after visiting a cancelation flow page, subscribers who renewed their subscription are active in similar ways as those who successfully canceled, then the data would be consistent with the former group of subscribers intending to cancel."). If the usage patterns were different, however, that would be consistent with the two groups being different in some way (such as in their intent to cancel). Moreover, actual use after entering the cancelation flow is powerful evidence that the subscriber did not intend to cancel, but rather intended to continue with their subscription.

After examining the data, Dr. Langenfeld found that "non-cancelers" continued using Match.com subscriber services at a higher rate than cancelers, "which is inconsistent with the former group of subscribers intending to cancel and being harmed by being unable to do so." *See* Rpt. ¶¶ 67, 69 (Mot. App. at 42-44); *see also* Rpt. ¶ 78 (Mot. App. at 48) ("These statistical analyses confirm that, controlling for other influences on Match.com activity, subscribers who renewed after visiting a cancelation flow page stay statistically significantly more active[9] on Match.com after visiting the cancelation flow page compared with subscribers who cancel. This is consistent with subscribers visiting a cancelation flow page not intending to cancel, and it is inconsistent with the FTC's allegations that Match.com's cancelation flow is not simple and therefore harms subscribers.").

---

[9] Dr. Langenfeld defined "more active" to mean more use of Match.com subscriber benefits, not free features. Specifically, he used sending emails to another Match.com user (which only subscribers are allowed to do) to indicate relevant activity. Rpt. ¶ 75 (Mot. App. at 47).

Finally, Dr. Langenfeld used these insights to "adjust [the FTC's consumer harm calculations] for some of the FTC's assumptions that are not supported by subscriber behavior." Rpt. ¶ 79 (Mot. App. at 49). As Dr. Langenfeld described it, these adjustments "identif[y] a group where based on the economic analysis it's unlikely that the reason that they did not cancel was – had nothing to do with the flow," and therefore were not harmed by the alleged ROSCA violation. App. at 92. First, Dr. Langenfeld removed from the FTC's consumer harm calculation those subscribers that had "dropped out" of the cancelation flow prior to clicking "Cancel Subscription," because he had "seen no analysis showing subscribers" leaving the flow prior to that point "intended to cancel their subscriptions." Rpt. ¶ 88(a) (Mot. App. at 53). To the contrary, his "analysis of consumer behavior" described in the preceding sections was consistent with the theory that subscribers often visit the cancelation flow without any intention to cancel. *Id.*

Second, Dr. Langenfeld removed from the FTC's consumer harm calculation subscribers that used a subscriber-only feature after they renewed, "since such subscribers received the service for which they paid and therefore were not injured." Rpt. ¶ 88(b) (Mot. App. at 53). By including those subscribers in its consumer harm calculation, the FTC's model "suffers from a fundamental flaw that renders it unreasonable on its face—it assumes that [the subscriber benefits] automatically cease[] to have any value, such that there is no need to provide an offset for the value of the product received." *FTC v. Noland*, No. CV-20-00047-PHX-DWL, 2023 WL 3372517, at *53 (D. Ariz. May 11, 2023). Dr. Langenfeld corrected that error by removing those subscribers from the consumer harm calculation.

Third, Dr. Langenfeld removed from the FTC's consumer harm calculation Match.com resubscribers, "who, by definition, have successfully canceled their Match.com subscriptions in the past," and therefore are unlikely to have been "thwarted" by the design of the flow as the FTC

assumes. Rpt. ¶ 88(c) (Mot. App. at 53). Ultimately, in light of these adjustments, Dr. Langenfeld will opine that consumer harm should be, at most, $7 million, although even this amount likely overstates actual consumer harm given his analysis that calls the FTC's causation assumptions into doubt.[10] Rpt. ¶ 88 (Mot. App. at 53).

*     *     *

In short, Dr. Langenfeld's analysis revealed significant flaws in the FTC's consumer harm theory. Rather than engaging with those critiques, however, the FTC mischaracterizes those opinions and seeks to exclude Dr. Langenfeld's analysis. The Court should reject the FTC's attempt to exclude the analysis that proves exactly why the FTC's groundless assumptions are incorrect.

**ARGUMENT**

## I.   Dr. Langenfeld Will Rebut the FTC's Evidence Relating to Claimed Monetary Relief—Well Within His Expertise—Not Offer Liability or Legal Opinions

Dr. Langenfeld's rebuttal falls squarely within the heartland of permissible opinions. He analyzes consumer behavior that destroys the assumptions underlying the FTC's monetary relief model. He is not offering any liability or legal opinions, as he (and Defendants' counsel) repeatedly told the FTC before they filed this Motion. The Court should reject the FTC's argument to the contrary.

### A.   Dr. Langenfeld Will Opine About His Analysis of Consumer Behavior that Disproves Ms. Verdi's Monetary Relief Assumptions

Dr. Langenfeld used his expertise as a behavioral economist to analyze consumer behavior to test the assumptions underlying Ms. Verdi's consumer harm calculations are consistent with

---

[10] Dr. Langenfeld did not analyze and correct every possible flaw in the FTC's monetary relief calculation, so his opinion in no way supports a monetary relief award of $7 million. That remaining $7 million still rests on the FTC's unsupported assumptions.

actual data (they are not). App. at 87 ("I do a lot of analyses to check the assumptions that are built into the calculations of restitution here. . . . That's the purpose of this report. Once again, I'm not – I'm not giving an opinion on liability here."). These analyses are directly relevant to the FTC's consumer harm calculations because they attack the causation assumptions underlying those calculations.

### 1. Attacking the FTC's Causation Assumptions Is Not a Liability or Legal Opinion

As noted above, the FTC is entitled to consumer redress for the alleged ROSCA violation only to the extent that consumers were harmed by the alleged ROSCA violation. *See* 15 U.S.C. § 57b(b) (stating that the FTC can collect "such relief as the court finds necessary to redress injury to consumers . . . *resulting from* the [ROSCA] violation" (emphasis added)); *Figgie Int'l, Inc.*, 994 F.2d at 605 ("It follows, therefore, that there may be no redress without proof of injury *caused by those practices*." (emphasis added)). Here, that means that the FTC must prove that a subscriber intended to cancel but was unable to do so because of the lack of a simple cancelation mechanism. But the FTC's data analyst did no work to confirm whether any subscriber intended to cancel, much less whether the subscriber's attempt to cancel was "thwarted" by the design of the cancelation flow; rather, she simply performed the mathematical calculations that the FTC's lawyers told her to perform. App. at 78. Nor did the FTC, separate from its data analyst, do any analysis to confirm its assumptions. App. at 96 (admitting that the FTC had not conducted any empirical studies or surveys).

Attacking the FTC's assumptions about causation is squarely within the scope of a monetary relief rebuttal, not a liability opinion. In *Interra International v. Al Khafaji*, for example, a party moved to exclude an expert's opinion, arguing that "the 'heart of [the expert's] testimony' is a criticism of [the opposing expert's] assumptions regarding causation, not [the opposing

expert's] calculation of Plaintiff's damages." No. 1:16-CV-1523-MHC, 2020 WL 10727982, at *6 (N.D. Ga. Sept. 18, 2020). The court rejected that argument, explaining that "it may be permissible to utilize a rebuttal expert to rebut assumptions of another expert." *Id.* (quoting *Ohio St. Troopers Ass'n, Inc. v. Point Blank Enters., Inc.*, No. 18-cv-63130, 2020 WL 1666763, at *9 (S.D. Fla. Apr. 3, 2020)); *see Grove US LLC v. Sany Am. Inc.*, No. 13-c-677, 2019 WL 969814, at *8 (E.D. Wis. Feb. 28, 2019) (rejecting argument that expert offered "improper opinions on causation and that [he] was not qualified to make them," because the expert's "opinions and testimony rebut the analysis and conclusions of plaintiff's expert"); *see also* 2 Robert L. Dunn, Recovery of Damages for Lost Profits, § 9.3 at 742-43 (5th ed. 1998) (economists "are equipped with the analytical skills required to do a competent analysis of such questions as . . . [w]as the loss caused by the defendant's conduct?").[11]

Similarly here, Dr. Langefeld's analyses inform whether the FTC's causation assumptions are supportable (they are not). For example, the FTC complains about Dr. Langenfeld's opinion that subscribers successfully canceling in the past is inconsistent with Match.com's cancelation flow being ineffective. *See* Mot. at 5. The FTC first argues that Dr. Langenfeld "neither cites any authoritative texts or applies any expert methodology to back up that opinion, Mot. at 5, but ignores the analysis immediately preceding the paragraph that the FTC cites, in which Dr. Langenfeld analyzed Match.com subscriber data and found that 51% of subscribers that clicked "Cancel

---

[11] The FTC cites *Graystone Funding v. Network Funding*, 598 F. Supp. 3d 1228 (D. Utah 2022), for the proposition that courts "exclude[e] damages expert testimony regarding causation." Mot. at 6 n.19. But the FTC overreads *Graystone*. In that case, the court did not allow the expert to "testify to his opinion that there is an insufficient causal nexus between Defendants' alleged wrongful conduct and Graystone's alleged damages, as such testimony comes impermissibly close to 'usurping the province of the jury by telling it what result should be reached.'" *Graystone Funding,* 598 F. Supp. at 1248. But the court *allowed* the expert to "testify to the assumptions underlying [the opposing expert's] analysis—including [the] assumption that Defendants' conduct caused the damages that [the opposing expert] calculated." *Id.* In other words, the expert could not testify that, in his opinion, the plaintiff had not established causation, but he could testify that the assumptions on which the plaintiff's expert based his causation opinion were inconsistent with facts and data, as Dr. Langenfeld does here.

Subscription" but subsequently renewed (and therefore are included in the FTC's consumer harm calculations) had previously canceled a Match.com subscription. Rpt. ¶ 62 (Mot. App. at 40). Dr. Langenfeld expanded on that analysis in the following paragraph, explaining that a subscriber that successfully canceled in the past "demonstrated an ability to use Match.com's cancelation flow, so the fact that they did not complete the flow in one particular instance does not indicate that they intended to complete the flow" but were unable to do so because of the design of the flow, contrary to the FTC's assumptions. Rpt. ¶ 63 (Mot. App. at 40-41). Additionally, the fact that so many subscribers resubscribed is inconsistent with the FTC's assumption that Match.com is causing harm to consumers. *Id.* Put simply, Dr. Langenfeld did plenty of analysis. If the FTC disagrees with that analysis, it is free to cross-examine him at trial. "Vigorous cross-examination" and "presentation of contrary evidence"—not exclusion—are the proper ways to attack an opinion with which a party disagrees. *See Daubert*, 509 U.S. at 596.

The FTC also contends that this opinion "does not comport with common sense," because people can sometimes do difficult things, like climb Mount Everest.[12] Mot. at 5. This argument, however, "confus[es] admissibility with sufficiency, and sufficiency with certainty" by "essentially arguing that each item of expert testimony is unreliable insofar as it fails to conclusively prove [Defendants'] theory of causation." *Holcombe v. United States*, 516 F. Supp. 3d 660, 675 (W.D. Tex. 2021). "But, of course, this is not the standard for admissibility . . . . It is not the Court's role, in the context of a *Daubert* motion, to judge the conclusions that an expert's analysis generates; the ultimate arbiter of disputes between conflicting opinions is the trier of fact."

---

[12] This argument is another example of the FTC's double standard. The FTC argues that the fact that someone completed a task does not make the task simple, because people can do difficult things. At the same time, the FTC argues that the fact that someone did *not* complete a task (Match.com's cancelation flow) means that the task is difficult. *See* Dkt. 199-1 at 29-30 (pointing to alleged dropout rate data as evidence that the cancelation flow is not simple). Of course, just as it is true that people sometimes complete a difficult task, it is also true that people sometimes fail a simple task. So if Dr. Langenfeld's opinion "does not comport with common sense," nor does the FTC's liability theory.

*Id.* In other words, this analysis need not definitively prove that resubscribers were not harmed, but it is certainly one piece of the puzzle about which Dr. Langenfeld can opine based on his analysis of Match.com subscriber data. The point is that if a subscriber was able to do something once, they are more likely to be able to do it again if they want to do so; and if they do not complete the task on a subsequent attempt, it is probative of whether that failure to complete was because of the design of the flow.[13]

The FTC next complains about Dr. Langenfeld's comparison of the cancelation flow to the sign-up flow. *See* Mot. at 5-6. The FTC's assertion that Dr. Langenfeld "supplies no methodology" is just plain wrong. Mot. at 5. Dr. Langenfeld describes in detail the methodology he used to calculation completion rates using Match.com data, time-to-completion using Match.com data and data from Brandon Ward's usability study, and page/click counts described in the body of his report and laid out in even more detail in Exhibit 3 to the report. Rpt. ¶¶ 40, 49-50, 55-58 (Mot. App. at 29, 33, 35-37). In any event, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

### 2. Dr. Langenfeld's Opinion Is Within the Scope of His Economic Expertise

Dr. Langenfeld is not offering a liability opinion from a usability expert. Nor does his analysis require him to be a usability or "HCI" expert. Analysis of consumer behavior—which is what Dr. Langenfeld does here—is directly within Dr. Langenfeld's wheelhouse as an economist.

---

[13] The FTC attempts to smear Dr. Langenfeld by citing a nearly 20-year-old opinion from a district court outside of this circuit in which Dr. Langenfeld's opinions were excluded in an entirely different context. Ironically, the reasons that Dr. Langenfeld's opinions were excluded in that case—failure to test hypotheses and lack of foundation for assumptions—apply to the FTC's data analyst, not Dr. Langenfeld, in this case. *See The Iams Co. v. Nutro Prods., Inc.*, No. 3:00-cv-566, 2004 WL 5496244, at *3-5 (S.D. Ohio June 30, 2004). Here, Dr. Langenfeld, unlike the FTC, tested hypotheses using multiple analyses.

*See, e.g.*, *FTC v. Vyera Pharms., LLC*, No. 20cv706 (DLC), 2021 WL 5279465, at *6 (S.D.N.Y. Nov. 12, 2021) (denying motion to strike portions of economist's opinion on the ground that the economist was not an expert in state laws and generic substitution programs, because he was offering his testimony "as an economist offering observations about consumer behavior," within the scope of his expertise).[14]

The comparisons that Dr. Langenfeld draws inform his opinion as to the FTC's assumptions contained in its monetary relief model. As Dr. Langenfeld testified, the comparison between cancelation and sign-up "was one of the general analyses [he] did to see if there was a reason to presume, as the FTC does, . . . whether those people should be assumed to have not canceled because of something to do with the cancellation flow." App. at 90; *see also* App. at 91 ("It tells me sort of on a basic level that it shouldn't necessarily be – the way the FTC's calculated its restitution shouldn't – is overbroad because it sweeps in a variety of people who it hasn't been shown actually renewed because they were unable to cancel."). The fact that the cancelation flow is more straightforward than the sign-up flow as measured by various data metrics—such as completion rates, time to completion, and number of pages and clicks—is more evidence that the design of the cancelation flow is unlikely to be the cause of subscribers failing to complete the flow. *See* App. at 91 ("[O]nce again, I'm not offering an opinion as to whether there's a simple process here or not, but these type of things mean that you have to step forward and do additional calculations to pull out some of the restitution calculations that the FTC has put forward minus Ms. Verdi's calculations.").

\*     \*     \*

---

[14] Indeed, the FTC's own briefing cites an article about consumer behavior written by a former FTC economist, reflecting the FTC's knowledge that economists are qualified to analyze consumer behavior. *See* Dkt. 200-2 at 9 n.33 (citing Keith B. Anderson, To Whom Do Victims of Mass-Market Consumer Fraud Complain?, available at SSRN: https://ssrn.com/abstract=3852323 (May 2020)).

In short, Dr. Langenfeld is merely testing the FTC's causation assumptions, as the FTC itself could and should have done. That some of that analysis may also be relevant to liability (even though that is not why Dr. Langenfeld performed the analysis, nor how Dr. Langenfeld uses it) does not make it impermissible for Dr. Langenfeld to use those analyses to critique the FTC's assumption that everyone who entered the flow but did not cancel failed to do so because of the design of the flow.

### B.  Dr. Langenfeld's Analysis Critiques the FTC's Assumptions About When a Consumer Has Been Harmed

The FTC attacks Dr. Langenfeld on the basis that he purportedly opines about consumers' state of mind. *See* Mot. at 7-9. But it is the FTC that makes assumptions about consumer intent by assuming that every subscriber that clicked "Manage Subscription" but did not cancel both (1) intended to cancel, and (2) was prevented from doing so by the alleged lack of a simple cancelation mechanism, and therefore was harmed. *See* App. at 97 ("[I]t's a reasonable assumption that people that go through the cancellation flow intended to cancel. And if they didn't cancel, it was because something thwarted them – the design of the flow thwarted them from doing that.").

Dr. Langenfeld merely points out that there are alternative explanations that the FTC did not consider. One explanation is that the subscriber intended to cancel but was prevented from doing so by the design of the flow, but alternative explanations also exist. Rpt. ¶ 19 (Mot. App. at 13). Even the FTC's corporate representative and usability expert acknowledge as much. Bandy App. at 97; App. at 107, App. at 108. The FTC deemed those alternative explanations not worth investigating, App. at 97-98, but Dr. Langenfeld analyzed the data reflecting subscriber conduct to test whether they are consistent with the FTC's assumptions (that subscribers intended to cancel but were prevented from doing so by the lack of a simple cancelation flow), or not. In other words, Dr. Langenfeld set up a hypothesis consistent with the FTC's assumptions, then analyzed

consumer behavior to test that hypothesis—exactly what *Daubert* requires. *See Daubert*, 509 U.S. at 593 ("Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified . . . ." (internal quotation omitted)).

Such testimony is permissible. "[W]hile 'experts are not permitted to testify to an actor's state of mind, an expert can testify to whether a given practice is consistent with a given state of mind," and "whether a given state of mind is consistent with a given practice." *In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126 (ALC), 2020 WL 5849142, at *14 (S.D.N.Y. Sept. 30, 2020) (cleaned up) (quoting *U.S. Commodity Futures Trading Comm'n v. Wilson*, No. 13-CV-7884, 2016 WL 7229056, at *8 (S.D.N.Y. Sept. 30, 2016)). That is what Dr. Langenfeld does here, as the FTC notes: he "determine[s] if the observed behavioral evidence is consistent or inconsistent" with an intent to cancel. Mot. at 7 (quoting Rpt. ¶ 29 (Mot. App. at 24)). It cannot be that the FTC gets to make assumptions about consumer intent, but Defendants cannot rebut those assumptions with expert analysis showing those assumptions to be incorrect.

The cases that the FTC cites are not to the contrary because they involved experts who were directly opining about intent, not opining about whether conduct was consistent or inconsistent with a particular state of mind (i.e., opining about whether consumer behavior supports or contradicts a hypothesis).[15] Here, Dr. Langenfeld testifies about conduct, not state of

---

[15] *Charalambopoulos v. Grammer*, No. 3:15-cv-2424-D, 2017 WL 1094394, at *12 (N.D. Tex. Mar. 8, 2017) (excluding expert testimony that "the grand jury had significant concerns about Grammer's credibility, that the grand jury concluded that Grammer's testimony lacked credibility, [and] that the grand jury returned a no bill because it found that there was no probable cause"); *United States ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-cv-3396, 2015 WL 5178074, at *10-11 (S.D. Tex. Sept. 3, 2015) (excluding expert testimony that "Omnicare intentionally did not collect from certain SNFs as an inducement"), *aff'd*, 663 F. App'x 368 (5th Cir. 2016); *Estate of Davis v. City of N. Richland Hills*, No. 4:00-cv-438-Y, 2007 WL 628090, at *3 (N.D. Tex. Feb. 28, 2007) (excluding expert testimony that an officer "was startled and fired on impulse" because it was "better classified as argument to the jury as to what conclusion they should draw"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546-47 (S.D.N.Y. 2004) (excluding expert testimony about why a party made certain decisions); *Retractable Techs. Inc. v. Abbott Labs., Inc.*, No. 5:05-cv-157, 2010 WL 11531436, at *6 (E.D. Tex. June 18, 2010) (excluding expert testimony about "what Abbott believed at the time the NMDA was executed"); *Ploss v. Kraft Foods Grp., Inc.*, 637 F. Supp. 3d 561, 575-76 (N.D. Ill. 2022) (excluding expert testimony about the opposing party "knew" or "deliberately and willfully" did, but

mind or intent. *See, e.g.*, Rpt. ¶ 29 (Mot. App. at 24-25) ("[A]n economic evaluation of the FTC's monetary relief model can determine if the behavioral evidence is consistent or inconsistent with the FTC's assumptions about consumer injury . . . ."); Rpt. ¶ 91 (Mot. App. at 54) ("This use after renewal is consistent with a desire to remain active on Match.com instead of canceling.").

The FTC criticizes Dr. Langenfeld's refusal to opine that any particular individual or percentage of individuals entered the flow but did not intend to cancel, Mot. at 7-8, but that proves the point that Dr. Langenfeld will testify about: one cannot presume that any particular individual had a particular intent. Dr. Langenfeld cannot calculate the exact "portion of subscribers" that left the flow for various reasons, Mot. at 7-8, precisely *because* Dr. Langenfeld is not opining about any particular consumer's state of mind. Instead, he analyzes subscriber conduct as a whole and opines about whether that conduct is consistent (or not) with the FTC's assumptions about consumer intent. The FTC is correct that consumer intent is "reserved for the factfinder," Mot. at 9, but Dr. Langenfeld—unlike the FTC—will provide the factfinder with actual data analysis and evidence that the factfinder can use to reach those conclusions, rather than just baseless assumptions that the FTC offers.

### C. Dr. Langenfeld Will Not Opine About Liability or Offer Legal Opinions

Dr. Langenfeld will not opine about liability. He indicated in his report that his analysis "assum[es] that the Defendants are found liable." Rpt. ¶ 9 (Mot. App. at 9). He then repeatedly confirmed in his deposition that he is "not offering an opinion on liability." App. at 86; *see also* App. at 88 ("I'm not offering an opinion on liability. I'm definitely not offering opinion on what

---

admitting "assessment of the objective information available to him"); *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 168 (N.D.N.Y. 2010) (excluding expert testimony about "what information Defendants considered and the weight that information played," but permitting testimony about his "economic analysis"); *In re Intuniv Antitrust Litig.*, No. 1:16-cv-12396-ADB, 2020 WL 5995326, at *21 (D. Mass. Oct. 9, 2020) (excluding expert testimony about "what the company intended" because it was based on the company's own records rather than "any economic analysis").

the legal implications of 'simple' is."); App. at 84 ("I'm not offering an opinion on liability here, whether this is a simple or not process."). And as the FTC acknowledges in its certificate of conference, Defendants' counsel assured the FTC during the parties' meet and confer that Dr. Langenfeld will not opine about liability.[16] Mot. at 15.

The FTC nevertheless argues that Dr. Langenfeld's analysis of the cancelation flow suggests that he is offering a liability opinion, *see* Mot. at 5-6, but he is not. As described above, his analysis of the cancelation flow informs his opinions about Ms. Verdi's consumer harm assumptions. The FTC also complains about Dr. Langenfeld's discussion of a proposed FTC rule to suggest that Dr. Langenfeld is somehow offering a legal opinion by analyzing the proposed rule and its "effect on this case." Mot. at 7. Again, he is not. Dr. Langenfeld's point in referring to the FTC's proposed rule is to identify a benchmark for what type of cancelation flow would cause consumer harm by being "not simple," thereby informing his consumer harm rebuttal.[17] His point is not that Match.com's cancelation flow complies with the FTC's proposed rule (although it does, Dkt. 204). His point is that a cancelation flow that is consistent with guidance on that issue— whether it comes from the FTC or industry groups—is unlikely to have caused significant consumer harm by preventing subscribers from canceling. *See* Rpt. ¶¶ 52-61 (Mot. App. at 34-38).

### D.  Dr. Langenfeld's Background Section Containing Depictions of the Cancelation Flow Presents the Factual Basis of His Opinion, Not Impermissible Narrative

The FTC next argues that the Background section of Dr. Langenfeld's report—which describes the facts on which Dr. Langenfeld based his opinion, i.e., depictions of the cancelation flow—is improper. Experts are allowed (in fact, required) to disclose the factual bases of their

---

[16] As Defendants' counsel explained during the meet and confer, that is not to say that the analysis that Dr. Langenfeld does is not relevant to liability. It is, and Defendants may use that analysis to dispute liability at trial. But Dr. Langenfeld will not testify that Defendants are not liable or that the flow is "simple" within the meaning of ROSCA.
[17] Due to the dearth of any guidance on the meaning of "simple," as described in more detail in Defendants' pending Motion for Summary Judgment, Dkt. 204, Dr. Langenfeld relied on the few sources available that provide any direction whatsoever.

opinions. *See, e.g.*, *United States ex rel. Mitchell v. CIT Bank, N.A.*, No. 4:14-cv-00833, 2022 WL 1233651 (E.D. Tex. Apr. 26, 2022) ("[I]t is entirely permissible for an expert to explain that these were the facts that form the basis of his expert opinion." (cleaned up) (quoting *Huawei Techs. Co. v. Yiren Huang*, No. 4:17-cv-00893, 2019 WL 2077821, at *8 (E.D. Tex. May 9, 2019)). Dr. Langenfeld's Background section does precisely that, as explained in more detail in Defendants' concurrently filed response to the FTC's motion to exclude Dr. Langenfeld's rebuttal of Dr. King, which contains a similar Background section. Dr. Langenfeld will not opine about Match.com's corporate structure or the design of the cancelation flow. He will simply provide context for his opinions. After all, if he opines about consumer harm allegedly stemming from the cancelation flow, he has to be able to demonstrate that he knows what "the cancelation flow" is.

For the reasons explained in more detail in the concurrently filed response to the FTC's motion to exclude Dr. Langenfeld's rebuttal of Dr. King, the short context that Dr. Langenfeld gives is permissible.

## II. Dr. Langenfeld's Report Is a Proper Rebuttal to the FTC's Monetary Relief Model Because It Points Out and Defeats the FTC's Unspoken Assumptions

The FTC next argues that Dr. Langenfeld's report exceeds the proper scope of rebuttal. Not so. Dr. Langenfeld will offer opinions rebutting the FTC's monetary relief calculations by undermining the assumptions built into those calculations—not liability opinions, legal opinions, or opinions about consumer state of mind—as described above.

This is precisely the type of opinion that "repels, counteracts, or disproves evidence of the adverse party's initial report." Mot. at 11 (quoting *Gibson Brands, Inc. v. Armadillo Distrib. Entrp., Inc.*, No. 4:19-cv-00358, 2021 WL 231764, at *1 (E.D. Tex. Jan. 22, 2021)). Even the FTC's own authorities confirm that a report that criticizes an opposing expert's methodology and challenges the validity of the opposing expert's overall conclusions "counteracts" and "disproves

21

evidence of the adverse party's initial report" and is thus a rebuttal. *Gibson Brands*, 2021 WL 231764, at *1. Dr. Langenfeld's report easily meets the standard of being a proper rebuttal.

First, the parties agree that Dr. Langenfeld's report purports to rebut the FTC's monetary relief calculations assuming that Defendants are found liable. Mot. at 12.

Second, Dr. Langenfeld will opine on the same subject matter as the FTC's calculations. The FTC argues that Dr. Langenfeld goes "well beyond the scope of the FTC's calculations," Mot. at 12, but a rebuttal expert is not limited to criticizing whether the FTC did the math correctly, as the FTC suggests. Instead, rebuttal experts can rebut an opposing expert by pointing out things that the opposing expert did not do, or criticizing the assumptions that the opposing expert made. *See, e.g.*, *Ohio State Troopers Ass'n*, 2020 WL 1666763, at *9 ("Other courts have found that it may be permissible to utilize a rebuttal expert to rebut assumptions of another expert."); *Slicex, Inc. v. Aeroflex Colo. Springs, Inc.*, No. 2:04-cv-615 TS, 2006 WL 1932344, at *3 (D. Utah July 11, 2006) ("[T]he Court finds that Wagner has specialized knowledge and that he may be allowed to testify as a rebuttal expert witness in order to rebut the methodology and the assumptions used by Plaintiff's expert."); *Fuller v. SunTrust Banks, Inc.*, No. 1:11-cv-784-ODE, 2019 WL 5448206, at *22 (N.D. Ga. Oct. 3, 2019) (denying motion to exclude rebuttal opinion as outside the scope of appropriate rebuttal where defendants argued that the rebuttal "was a proper critique of assumptions and supplied information upon which [the opposing expert] operating in making his damages calculations").

That is precisely what Dr. Langenfeld did here. He examined Ms. Verdi's calculations, identified the assumptions that she made, and then performed the data analysis that Ms. Verdi should have performed to determine whether those assumptions had any basis in fact. *See Interra Int'l*, 2020 WL 10727982, at *6 (rejecting argument that expert exceeded the scope of rebuttal "by

challenging the assumptions made in" the opposing expert's report, including assumptions regarding causation); *Graystone Funding*, 598 F. Supp. 3d at 1247 ("[T]he identification of a damages expert's assumptions is a legitimate function for a rebuttal expert witness."); *Gibson Brands*, 2021 WL 231764, at *3 ("In fact, offering a different, purportedly better methodology is a proper way to rebut the methodology of someone else. . . . Because Barone corrected perceived errors in Ericksen's survey with the goal of responding to and rebutting his findings, Barone's survey is within the same subject matter scope." (quoting *TCL*)).

Third, Dr. Langenfeld's rebuttal is intended solely to contradict or rebut the FTC's monetary relief calculation, as it critiques the assumptions underlying Ms. Verdi's calculations and corrects at least some of those assumptions. The FTC's only argument in response is that the rebuttal "obviously seeks to advance new arguments and opinions that do not rebut Ms. Verdi's calculations," Mot. at 12, but the FTC does not explain what those new arguments or opinions are.[18] The FTC even goes so far as to say that the rebuttal "argues for alternative theories of liability, and against Defendants' liability generally," but does not identify these "alternative theories of liability," Mot. at 12, and ignores that Dr. Langenfeld's report confirms that he assumes Defendants are liable (as he testified at his deposition). Rpt. at ¶ 9 (Mot. App. at 8-9); App. at 85. Thus, the FTC's hysteria about Dr. Langenfeld's purported "alternative theories of liability" is groundless bluster.

## CONCLUSION

For the foregoing reasons, the Court should deny the FTC's Motion in its entirety.

---

[18] To the extent that the FTC means to refer to Dr. Langenfeld's purported "liability" and "legal" opinions, those opinions and analyses are not liability or legal opinions, as explained above, but rather inform Dr. Langenfeld's opinion about the proper measure of consumer harm—the topic of his rebuttal of Ms. Verdi.

Dated: October 2, 2023

*/s/ Angela C. Zambrano*

Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: 214-981-3300
Fax: 214-981-3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310-595-9500
Fax: 310-595-9501

Benjamin M. Mundel (admitted *pro hac vice*)
bmundel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: 202-736-8000
Fax: 202-736-8711

*Attorneys for Match Group, Inc. and
Match Group, LLC*

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 2, 2023, I caused a true and correct copy of the above and foregoing document, to be served on all counsel of record in accordance with the Federal Rules of Civil Procedure and this Court's CM/ECF filing system.

*/s/ Angela C. Zambrano*
Angela C. Zambrano
