**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>   Plaintiff,<br><br>vs.<br><br>MATCH GROUP, INC., a corporation, and MATCH GROUP, LLC, formerly known as MATCH.COM, LLC, a limited liability company,<br><br>   Defendants. | Case No. 3:19-cv-02281-K |

**APPENDIX IN SUPPORT OF DEFENDANTS RESPONSE TO PLAINTIFF'S MOTION
*IN LIMINE* TO EXCLUDE EXPERT TESTIMONY OF JAMES LANGENFELD AND
STRIKE PORTIONS OF HIS REBUTTAL EXPERT REPORT**

Defendants, by and through their counsel, submit this Appendix in support of their Response to Plaintiff's Motion in Limine to Exclude Testimony of James Langenfeld and Strike portions of his rebuttal expert report.

| No. | Description | App. Page(s) |
|---|---|---|
| 1. | FTC's Initial Disclosures | APP 001-APP 020 |
| 2. | Plaintiff's Responses to Defendant's First Set of Interrogatories [Interr. No. 3] | APP 021-APP 024 |
| 3. | Plaintiff's First Amended Responses to Defendant's First Set of Interrogatories [Interr. No. 3] | APP 025-APP 030 |
| 4. | Oct. 24, 2022 Bikram Bandy Deposition Transcript Excerpts | APP 031-APP 033 |
| 5. | Plaintiff's Third Amended Responses to Defendant's First Set of Interrogatories [Interr. No. 3] | APP 034-APP 041 |
| 6. | Plaintiff's First Amended Initial Disclosures | APP 042-APP 062 |
| 7. | Plaintiff's Fourth Amended Responses to Defendant's First Set of Interrogatories [Interr. No. 3] | APP 063-APP 068 |
| 8. | Plaintiff's Fifth Amended Responses to Defendant's First Set of Interrogatories [Interr. No. 3] | APP 069-APP 073 |
| 9. | Kimbleann Verdi Deposition Transcript Excerpts | APP 074-APP 081 |

| No. | Description | App. Page(s) |
|---|---|---|
| 10. | James Langenfeld Deposition Transcript Excerpts | APP 082-APP 093 |
| 11. | June 26, 2023 Bikram Bandy Deposition Transcript Excerpts | APP 094-APP 098 |
| 12. | Kimbleann Verdi Report | APP 099-APP 104 |
| 13. | Jennifer King Deposition Transcript Excerpts | APP 105-APP 109 |

Dated: October 2, 2023

*/s/ Angela C. Zambrano*

Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: 214-981-3300
Fax: 214-981-3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310-595-9500
Fax: 310-595-9501

Benjamin M. Mundel (admitted *pro hac vice*)
bmundel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: 202-736-8000
Fax: 202-736-8711

*Attorneys for Match Group, Inc. and*
*Match Group, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2023, I caused a true and correct copy of the above and foregoing document, to be served on all counsel of record in accordance with the Federal Rules of Civil Procedure and this Court's CM/ECF filing system.

/s/ Angela C. Zambrano
Angela C. Zambrano

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 3:19-cv-02281-K |
| Plaintiff, | **PLAINTIFF'S INITIAL DISCLOSURES** |
| v. | |
| MATCH GROUP, INC., | |
| Defendant. | |

Plaintiff, the Federal Trade Commission ("FTC"), pursuant to Federal Rule of Civil Procedure 26(a)(1), and without waiving any privileges, makes the following initial disclosures:

1.      **The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment:**

a.   Defendant and its current and former principals, officers, directors, managers, employees, agents, and representatives, each of whom Defendant can more readily identify than Plaintiff, and each of whose addresses and telephone numbers Defendant likely has, including, but not limited to, the following:

| Name | Address | Telephone Number | Subject matter (non-exhaustive list) |
|---|---|---|---|
| Dushyant Saraph | Unknown | Unknown | Match.com website features/design; Match.com user interface and experience |

INITIAL DISCLOSURES

**APP 001**

| | | | |
|---|---|---|---|
| Marc Atwood | Unknown | Unknown | Match.com website features/design; Match.com user interface and experience; practices described in Counts III-V |
| Ossa Fisher | Unknown | Unknown | Marketing practices; consumer complaints; refunds; policies and procedures |
| Tom Cox | Unknown | Unknown | Ownership and control of Match.com; product analytics; policies and procedures |
| Kate Feller | Unknown | Unknown | Ownership and control of Match.com; customer complaints; policies and procedures; refunds; practices described in Counts III-V |
| Sharmistha Dubey | Unknown | Unknown | Ownership and control of Match.com; Match's policies and procedures; Match revenues; Match Guarantee; autorenewal practices; chargeback practices; resignation flow; practices described in Counts III-V |
| Sireesha Malireddy | Unknown | Unknown | Match.com website features/design; Match.com user |

PLAINTIFF'S INITIAL DISCLOSURES

2

| | | | |
|---|---|---|---|
| | | | interface and experience |
| Sushil Sharma | Unknown | Unknown | Ownership and control of Match.com; Match.com user interface and experience; resignation flow; Match Guarantee |
| Jeff Dawson | Unknown | Unknown | Ownership and control of Match.com; policies and procedures; customer complaints; refunds |
| Sydney Lam | Unknown | Unknown | Ownership and control of Match.com; Match.com user interface and experience; product design; product pricing; policies and procedures; autorenewal practices; membership resignation flow; consumer complaints; chargeback practices; refunds; practices described in Counts III-V |
| Brett Richards | Unknown | Unknown | Product/website design; user interface; user experience; consumer complaints; Match Guarantee; website analytics; practices |

PLAINTIFF'S INITIAL DISCLOSURES

| | | | |
|---|---|---|---|
| | | | described in Counts III-V |
| Poossenjeet Bhattacharya | Unknown | Unknown | Product design; user interface; user experience; consumer complaints; resignation flow; website analytics |
| Pushkar Deshmukh | Unknown | Unknown | Consumer complaints; product design; user interface |
| Adrian Ong | Unknown | Unknown | Ownership and control of Match.com; policies and procedures; customer complaints; customer service; payments and risk analysis; product marketing; chargeback practices; refunds; practices described in Counts III-V |
| Chris Haltiner | Unknown | Unknown | User interface; product design |
| Jim Talbott | Unknown | Unknown | Ownership and control of Match.com; Match Guarantee; fraud on Match.com platform; product design; user interface; autorenewal practices; membership resignation flow; practices described in Counts III-V. |

PLAINTIFF'S INITIAL DISCLOSURES

| | | | |
|---|---|---|---|
| Florian Hottier | Unknown | Unknown | Ownership and control of Match.com; Match Guarantee; policies and procedures; Match.com software design; product analytics; resignation flow; user interface; user experience; autorenewal process; practices described in Counts III-V |
| Jiten Vakharia | Unknown | Unknown | Ownership and control of Match.com; policies and procedures; Match.com software design; product analytics; user interface; user experience; resignation flow; autorenewal practices; practices described in Counts III-V |
| Casey Daniell | Unknown | Unknown | Configuration management and platform design; practices described in Counts III-V |
| Nazair Khan | | | Autorenewal practices; resignation flow; user interface and design; product design |
| Beth Wilson | Unknown | Unknown | Match Guarantee; customer service and complaints; Match Guarantee; |

PLAINTIFF'S INITIAL DISCLOSURES

5

| | | | |
|---|---|---|---|
| | | | policies and procedures; data analytics; Match's chargeback dispute practices; practices described in Counts III-V |
| Todd Carrico | | | application engineering; user interface and design; product analytics; practices described in Counts III-V |
| Pradeep Shetty | Unknown | Unknown | Policies and procedures; chargeback practices; consumer complaints; practices described in Counts III-V |
| Deen Ibrahim | Unknown | Unknown | Match.com website features/design; quality assurance; Match.com user interface and experience; practices described in Counts III-V. |
| Michele Watson | Unknown | Unknown | Ownership and control of Match.com; Match Guarantee; customer service; Match's chargeback dispute practices; consumer complaints; policies and procedures; practices described in Counts III-V |
| LaShonda Pero | Unknown | Unknown | Consumer complaints; policies and procedures; customer care; |

PLAINTIFF'S INITIAL DISCLOSURES

APP 006

| | | | |
|---|---|---|---|
| | | | employee training; Match guarantee; autorenewal practices; practices described in Counts III-V |
| Anastasia Burman | Unknown | Unknown | Match Guarantee; policies and procedures; customer care; consumer complaints; policies and procedures. |
| Kris Auderer | Unknown | Unknown | Ownership and control of Match.com; Match Guarantee; customer service; customer complaints; Match's chargeback dispute practices; autorenewal practices; resignation flow; policies and procedures; practices described in Counts III-V |
| Nikki Elliott | Unknown | Unknown | Product design; analytics; user interface |
| Angela Freeborn | Unknown | Unknown | Ownership and control of Match.com; sales and marketing |
| Melissa Clinchy | Unknown | Unknown | Ownership and control of Match.com; consumer complaints; policies and procedures; Match Guarantee; autorenewal practices; |

PLAINTIFF'S INITIAL DISCLOSURES

| | | | |
|---|---|---|---|
| | | | resignation flow; practices described in Counts III-V |
| Richard Leopold | Unknown | Unknown | User interface and design; product design |
| Bryan Jewell | Unknown | Unknown | Ownership and control of Match.com; policies and procedures; customer complaints; refunds; practices described in Counts III-V |
| Margaret Ochoa | Unknown | Unknown | Advertising and marketing; Match Guarantee |
| Giridar Tandriv | Unknown | Unknown | Match.com subscription figures; consumer complaints; practices described in Counts III-V |
| Jeff Rosenzweig | Unknown | Unknown | Ownership and control of Match.com; Match Guarantee; customer relationship management software; customer service; product features; website design; advertising and marketing; policies and procedures; Match Guarantee; practices described in Counts III-V |
| Shamika Naik | Unknown | Unknown | Platform communications |

PLAINTIFF'S INITIAL DISCLOSURES

APP 008

| Laurie Braddock | Unknown | Unknown | Ownership and control of Match.com; role of Match Group Inc. in operating Match.com; Match Guarantee; policies and procedures; consumer chargebacks; autorenewal policies; consumer refunds; consumer complaints; practices described in Counts III-V |
| Rachel Walzl | Unknown | Unknown | Resignation flow; user interface and design |
| Alexis Ferraro | Unknown | Unknown | Advertising and marketing; Match Guarantee |
| Krystal Roloff | Unknown | Unknown | Customer support; consumer complaints; Match Guarantee; chargeback practices; autorenewal practices; practices described in Counts III-V |
| Sam Yagan | Unknown | Unknown | Ownership and control of Match.com; Match Guarantee; autorenewal practices |
| Brittany Perez | Unknown | Unknown | Consumer complaints; policies and procedures |
| Shamika Naik | Unknown | Unknown | Product analytics |

PLAINTIFF'S INITIAL DISCLOSURES

APP 009

| | | | |
|---|---|---|---|
| Girdar Tandriv | Unknown | Unknown | Product analytics; user interface and design |
| Matthew Bartoe | Unknown | Unknown | Platform design; user interface and design; practices described in Counts III-V |
| Ian Purves | Unknown | Unknown | Product analytics; user interface and design; payments and risk; practices described in Counts III-V |
| Amarnath Thombre | Unknown | Unknown | Ownership and control of Match.com; policies and procedures; Match Guarantee; autorenewal practices; consumer complaints; practices described in Counts III-V |
| Andrew Hemmings | Unknown | Unknown | practices described in Counts III-V |
| Matt Knight | Unknown | Unknown | Consumer complaints; application engineering; user interface and design; practices described in Counts III-V |
| Tony Bowari | Unknown | Unknown | Platform design; practices described in Counts III-V |
| Jeff McLure | Unknown | Unknown | Application engineering; practices described in Counts III-V |
| Jennifer Hinkie | Unknown | Unknown | Data analytics; user interface |

PLAINTIFF'S INITIAL DISCLOSURES

| | | | |
|---|---|---|---|
| Mandy Ginsberg | Unknown | Unknown | Ownership and control of Match.com; resignation flow; Match Guarantee; consumer complaints; policies and procedures; chargeback practices; autorenewal practices; practices described in Counts III-V |
| Ivan Yong | Unknown | Unknown | Product design; user interface and design |
| Brett Williams | Unknown | Unknown | Match.com website features/design; application engineering; Match.com user interface and experience; consumer complaints; practices described in Counts III-V |
| Charles German | Unknown | Unknown | Ownership and control of Match.com; revenue from practices described in Counts III-V |
| Steven Bailey | Unknown | Unknown | Ownership and control of Match.com; revenue from practices described in Counts III-V; payments between Match Group Inc. subsidiaries; practices described in Counts III-V. |

PLAINTIFF'S INITIAL DISCLOSURES

APP 011

| | | | |
|---|---|---|---|
| Shonda Pero | Unknown | Unknown | Match Guarantee; customer service; policies and procedures; practices described in Counts III-V. |
| Atin Kulkarni | Unknown | Unknown | Match Guarantee; customer complaints; product analytics |
| Gary Snyder | Unknown | Unknown | Risk analysis; consumer complaints |
| Nikhil Nilakantan | Unknown | Unknown | Product design |
| Dinh Thi Bui | Unknown | Unknown | Resignation flow; autorenewal practices; product design; consumer complaints; user interface |
| Ramanand Reddi | Unknown | Unknown | Product design; user interface; product analytics; user interface and experience |
| Jeremy Ruggaber | Unknown | Unknown | Product design; user interface; consumer complaints; practices described in Counts III-V |
| Atin Kulkarni | Unknown | Unknown | Consumer complaints; Match Guarantee; policies and procedures |
| Rose Phommachanh | Unknown | Unknown | Consumer complaints; Match Guarantee; policies and procedures |
| Garland Frye | Unknown | Unknown | Software engineering; Match web/mobile apps; |

PLAINTIFF'S INITIAL DISCLOSURES

| | | | |
|---|---|---|---|
| | | | platform design; user interface |
| Christopher Conner | Unknown | Unknown | Software engineering; web/mobile apps; platform design; user interface |
| Greg Blatt | Unknown | Unknown | Ownership and control of Match.com; resignation flow; Match Guarantee; consumer complaints; policies and procedures; chargeback practices; autorenewal practices; practices described in Counts III-V |
| Leslie Sucur | Unknown | Unknown | Software engineering; web/mobile apps; platform design; user interface |
| Anna Schneider | Unknown | Unknown | Software engineering; web/mobile apps; user interface |
| Alicia Knight | Unknown | Unknown | Marketing and advertising; user interface and design |
| Anthony Fratiani | Unknown | Unknown | User interface and design |
| Cameron Bates | Unknown | Unknown | marketing analytics |
| Jessica Conant | Unknown | Unknown | Autorenewal practices; product development; marketing; practices described in Count III |
| Judy Li | Unknown | Unknown | Ownership and control of Match.com; |

PLAINTIFF'S INITIAL DISCLOSURES

13

| | | | |
|---|---|---|---|
| | | | Platform fraud; data analytics; platform troubleshooting |
| Stephanie Davis | Unknown | Unknown | Defect reporting; sales and reporting; fraud on platform |
| Francisco Bonilla | Unknown | Unknown | a/b testing; autorenewal practices; chargeback practices; cancellation flow; |
| Dan Badrian | Unknown | Unknown | a/b testing; data mining; user behavior |
| Jessica Johnson | Unknown | Unknown | a/b testing; marketing and advertising; fraud on platform |
| Thiago Costa | Unknown | Unknown | Fraud on platform; autorenewal practices; product development; marketing; practices described in Count III |
| John Rowan | Unknown | Unknown | Password reset issues; marketing emails |
| David Penton | Unknown | Unknown | Account access; account security |
| Vincent Galeraud | Unknown | Unknown | Ownership and control of Match.com; customer service; customer complaints; refunds; policies and procedures |
| Leah Mikulenka | Unknown | Unknown | Chargeback policies; consumer complaints; refunds; policies and procedures; |

PLAINTIFF'S INITIAL DISCLOSURES

14

| | | | Practices described in Count IV |
|---|---|---|---|

b.  Current and former principals, officers, directors, managers, employees, agents, and representatives of any third party that have implemented, executed, evaluated, tested, or created any advertising, marketing, or disclosures relating to Defendant's online dating service Match.com or other Match Group Inc. dating platforms, each of whom Defendant can more readily identify than plaintiff, and each of whose addresses and telephone numbers Defendant likely has, are likely to have information relating to the practices at issue in the complaint;

c.  Current and former principals, officers, directors, managers, employees, agents, and representatives of any third party that have evaluated, analyzed, responded to consumer communications or complaints on Defendant's behalf relating to Defendant's online dating service Match.com or other Match Group Inc. dating platforms, each of whom Defendant can more readily identify than plaintiff, and each of whose addresses and telephone numbers Defendant likely has, are likely to have information relating to the practices at issue in the complaint;

d.  Current and former principals, officers, directors, managers, employees, agents, and representatives of any third party that have implemented, executed, evaluated, tested, or created any billing practices, refund policies or procedures, chargeback policies or procedures, subscription model, or cancellation process relating to Defendant's online dating service Match.com or other Match Group Inc. dating platforms, each of whom Defendant can more readily identify than plaintiff, and each of whose addresses and

PLAINTIFF'S INITIAL DISCLOSURES

telephone numbers Defendant likely has, are likely to have information relating to the practices at issue in the complaint;

e.  Consumers who subscribed to Match.com and were affected by the practices at issue, including those whose complaints were collected in the FTC's Consumer Sentinel database and whose information will be provided upon entry of an appropriate protective order in this matter protecting their personally identifiable information.

f.  FTC investigators and employees, including investigator Brent McPeek, located at 1999 Bryan St., Ste. 2150, Dallas, Texas 75201, and who can be reached through FTC counsel.

The FTC identifies these individuals based on its investigation of this matter so far. The FTC reserves its right to supplement these disclosures should it learn of other individuals likely to have discoverable information on which it may rely to support its claims.

**2.     A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment:**

The FTC may use documents and information it obtains from Defendant in discovery in this case as well as the following documents currently in its possession, custody, or control to support its claims, all of which are located at 1999 Bryan St. Ste. 2150, Dallas, Texas 75201 or stored electronically on the FTC's server:

a.  Consumer complaints about Defendant;

b.  Consumer communications with Defendant;

c.  Documents related to consumer communications with Defendant;

PLAINTIFF'S INITIAL DISCLOSURES

16

    d.  Defendant's internal correspondence;

    e.  Defendant's internal analyses and policies regarding complaints, inquiries, compliance, advertising, and marketing;

    f.  Defendant's presentations about complaints, inquiries, compliance, advertising, and marketing;

    g.  Defendant's training materials and scripts about complaints, inquiries, compliance, and customer service;

    h.  Data and documents relating to the practices at issue in the complaint;

    i.  Screenshots, current and historical, of (i) Defendant's website, www.match.com, (ii) websites on which Defendant has advertised, and (iii) websites of other online platforms;

    j.  Documents that Defendant has filed with the Securities and Exchange Commission; and

    k.  Other documents and information Defendant produced to Plaintiff in response to Plaintiff's March 2017 Civil Investigative Demand to Defendant and other documents or information Defendant submitted to the Commission in connection with Plaintiff's investigation.

The FTC identifies these documents based on its investigation of this matter so far. The FTC reserves its right to supplement these disclosures should it learn of other documents likely to contain discoverable information on which it may rely to support its claims.

    **3.**    **A computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on**

PLAINTIFF'S INITIAL DISCLOSURES

**which each computation is based, including materials bearing on the nature and extent of injuries suffered:**

Section 19(b) of the FTC Act, 15 U.S.C. § 57b(b), authorizes the Commission to seek and the Court to award relief necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice. This includes the recission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation alleged in Count V. This monetary relief is in addition to injunctive relief on the remaining three counts (Counts III-V), which is authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

Based on information currently available, monetary relief in this case includes consumer injury associated with Defendant's failure to provide consumers a simple method of canceling its recurring charges, including all revenue associated with any attempted cancellation or any failure to provide a simple cancellation mechanism. This monetary relief also includes revenues generated by denying consumers refunds who sought a refund because they thought they already canceled their subscription to Match.com. Accordingly, the total estimated injury at this time for Count V is at least $8.7 million.

In addition to this monetary relief, civil penalties available in this action relate to Defendant's failure to provide a simple method of canceling its recurring charges. In calculating civil penalties relating to a rule violation, "each day of continuance of such failure shall be treated as a separate violation," and "[i]n determining the amount of such civil penalty, the court shall take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." 15 U.S.C. § 45(m)(1)(c). Computation of the scope of monetary relief will be based principally on

PLAINTIFF'S INITIAL DISCLOSURES

data associated with Defendant's responses to Plaintiff's March 2017 Civil Investigative

Demand, which is maintained in paper form in the FTC's offices at 1999 Bryan St. Ste. 2150,

Dallas, Texas 75201 or electronically on the FTC's server, and future discovery obtained from

Defendant.

      **4.**      **For inspection and copying as under Rule 34, any insurance agreement**

**under which an insurance business may be liable to satisfy all or part of a possible**

**judgment in the action or to indemnify or reimburse for payments made to satisfy the**

**judgment:**

      Plaintiff is not aware of any insurance agreement under which an insurance business may

be liable to satisfy all or part of a possible judgment in this action or to indemnify or reimburse

for payments made to satisfy a judgment.

Date: April 15, 2022

        */s/ REID TEPFER*
REID TEPFER
M. HASAN AIJAZ
MATTHEW WILSHIRE
SARAH ZUCKERMAN
Texas Bar No. 24079444 (Tepfer)
Virginia Bar No. 80073 (Aijaz)
California Bar No. 224328 (Wilshire)
New York Bar No. 5603832 (Zuckerman)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
T: (214) 979-9395 (Tepfer)
T: (214) 979-9386 (Aijaz)
T: (214) 979-9362 (Wilshire)
T: (214) 979-9376 (Zuckerman)
Email: rtepfer@ftc.gov; maijaz@ftc.gov;
mwilshire@ftc.gov; szuckerman@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

PLAINTIFF'S INITIAL DISCLOSURES

## CERTIFICATE OF SERVICE

I, REID TEPFER, certify that, on April 15, 2022, I served the foregoing Plaintiff's Initial Disclosures by email on the following counsel of record at the email address listed below:

Chad Hummel
Sidley Austin LLP
chummel@sidley.com

*Attorney for Defendant*
*Match Group, Inc.*

By: /s/ REID TEPFER

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 3:19-cv-02281-K |
|      Plaintiff, | **PLAINTIFF'S RESPONSES TO** |
| | **DEFENDANT'S FIRST SET OF** |
| v. | **INTERROGATORIES** |
| MATCH GROUP, INC., | |
|      Defendant. | |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and subject to the general and specific objections set forth below, Plaintiff, the Federal Trade Commission ("FTC") responds to Defendant Match Group Inc. ("Match" or "MGI")'s First Set of Interrogatories.

## I.  GENERAL OBJECTIONS

1. **Compound Interrogatories.** Plaintiff objects to interrogatories that contain discrete requests and therefore constitute compound interrogatories. Including subparts, no more than twenty-five interrogatories may be given without a leave of court. Fed. R. Civ. P. 33(a). "'[W]here the first question can be answered fully and completely without answering the second question, then the second question is totally independent of the first and not factually subsumed within it.'" *FTC v. Think All Pub LLC*, No. 4:07-CV-011, 2008 WL 687455, *1 (E.D. Tex. 2008).

2. **Blockbuster Interrogatories.** Plaintiff objects to Match's impermissible "blockbuster interrogatories" seeking *all* facts without regard for materiality, proportionality, time, and expense. A party cannot "indiscriminately hurl[] interrogatories at every conceivable detail and fact which may relate to a case." *Nieman v. Hale*, No. 3:12-CV-2433-L-BN,

1

Interrogatory to the extent that it seeks a description of changes needed to make the cancelation flow simple – this part of the Interrogatory is both a discrete request separate from the first part of the Interrogatory and is instead an impermissible attempt to join two interrogatories into one, and is also irrelevant as the FTC does not need to show what a simple mechanism would look like to establish that Match's flow was not simple.

Subject to and without waiving the foregoing objections, Match's own executives have described its cancelation method as confusing, burdensome, cumbersome, hard to find, tedious, convoluted and that they knew consumers were getting billed after they had thought they canceled their subscriptions. *See* Compl. ¶ 53-59. Match's own internal documents flagged the problems with its cancelation process, including that it was hard to find, took many clicks, was difficult to understand, and had been that way for at least 10 years. *Id.* Match's cancelation flow also had misleading text in the middle of the cancelation flow that states "Before you go" above a survey – misleading consumers into thinking the cancelation is complete and the survey is optional, when in fact consumers needed to continue past the survey to actually cancel. Match has had a flawed password reset mechanism that also prevented consumers from simply canceling their account if they had forgotten their password. Consumers have complained consistently about Match's misleading cancelation process to the company, and it was aware of and agreed that the process was misleading, but it decided not to fix the cancelation process, instead keeping it as a profit center. To the extent Match produces responsive documents and answers in discovery, the FTC may supplement this answer.

**INTERROGATORY NO. 3:** Identify and Describe the harm to consumers that You contend resulted from the alleged lack of a simple online cancelation method, Including how the damages caused by that harm were calculated, the number of users that You believe were unable to cancel

APP 022

their subscription as a result of the alleged lack of a simple cancelation method, and the amount of harm/damages per user.

**ANSWER:**

The FTC objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and premature as it asks for information that will be obtained during discovery from documents that are in Match's possession and is therefore inconsistent with the Court's scheduling order. No part of this response should be interpreted or construed as a limit on the materials or arguments the FTC will present at trial.

Subject to and without waiving the foregoing objections, the FTC responds that consumers were harmed by, among other things, being billed for unwanted recurring subscriptions, costs imposed on consumers by time spent rectifying failed cancelation attempts, and by failing to receive refunds when being billed after they thought they had already canceled. The number of consumers harmed by Match's ROSCA violation is approximately 64,000, with each harmed by an average amount of $136. The number of harmed consumers, the types of harm, and amount of harm per user will be further revised as the case proceeds and as the FTC obtains additional discovery.

**INTERROGATORY NO. 4:** State whether You contend that the Match.com methods of cancelation other than the Online Cancelation Flow (Including online chat, telephone, mail, and fax) are not simple, and explain why You contend each method is simple or not simple, Including a description of all facts supporting Your contentions.

**ANSWER:**

The FTC alleges in Count V that "Defendants have failed to provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account." This contention is not limited to any particular method of cancelation, but to the service as a whole. To the extent that this Interrogatory

Notwithstanding the foregoing, Match's responses to the FTC's CID described various policies of Match, which Match defined as Match Group Inc., in operating Match.com. For example, Match stated that: Match.com was the primary top-level URL contributing to Match's business operations; Match maintained several URLs that directed users to Match.com; and Match had policies and practices relating to Test profiles and free trials. Match has also stated in a filing with the Ninth Circuit that it operates match.com, and email records show Match's senior executives and CEO directing day-to-day activities and business practices and receiving reports about those activities and practices.

The FTC may supplement this answer to the extent it obtains additional responsive documents from Match or Match Group, LLC.

Date: August 8, 2022

*/s/ M. HASAN AIJAZ*
REID TEPFER
M. HASAN AIJAZ
SARAH ZUCKERMAN (admitted pro hac vice)
JOHN R. O'GORMAN (admitted pro hac vice)
ERICA ROLLINS HILLIARD
Texas Bar No. 24079444 (Tepfer)
Virginia Bar No. 80073 (Aijaz)
New York Bar No. 5603832 (Zuckerman)
Texas Bar No. 2421292 (O'Gorman)
Mississippi Bar No. 104244 (Hilliard)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
T: (214) 979-9395 (Tepfer)
T: (214) 979-9386 (Aijaz)
T: (214) 979-9376 (Zuckerman)
T: (214) 979-9382 (O'Gorman)
T: (214) 979-9379 (Hilliard)
Email: rtepfer@ftc.gov;
maijaz@ftc.gov;
szuckerman@ftc.gov;
jogorman@ftc.gov;
ehilliard@ftc.gov

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 3:19-cv-02281-K |
| Plaintiff, | **PLAINTIFF'S FIRST AMENDED** |
| | **RESPONSES TO DEFENDANT'S** |
| v. | **FIRST SET OF INTERROGATORIES** |
| MATCH GROUP, INC., | |
| Defendant. | |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and subject to the general and specific objections set forth below, Plaintiff, the Federal Trade Commission ("FTC") responds to Defendant Match Group Inc. ("Match" or "MGI")'s First Set of Interrogatories.

## I.    GENERAL OBJECTIONS

1.  **Compound Interrogatories.** Plaintiff objects to interrogatories that contain discrete requests and therefore constitute compound interrogatories. Including subparts, no more than twenty-five interrogatories may be given without a leave of court. Fed. R. Civ. P. 33(a). "'[W]here the first question can be answered fully and completely without answering the second question, then the second question is totally independent of the first and not factually subsumed within it.'" *FTC v. Think All Pub LLC*, No. 4:07-CV-011, 2008 WL 687455, *1 (E.D. Tex. 2008).

2.  **Blockbuster Interrogatories.** Plaintiff objects to Match's impermissible "blockbuster interrogatories" seeking *all* facts without regard for materiality, proportionality, time, and expense. A party cannot "indiscriminately hurl[] interrogatories at every conceivable detail and fact which may relate to a case." *Nieman v. Hale*, No. 3:12-CV-2433-L-BN,

1

that the cancellation flow was hard to find on the Match.com website, took too many clicks to complete, was difficult to understand, left consumers mistakenly believing that they had completed the cancellation process by presenting seemingly optional questions that were not in fact optional, had a password wall that blocked members from cancelling, and had been that way for at least 10 years. *Id.* Match's cancelation flow also had misleading text in the middle of the cancelation flow that states "Before you go" above a survey – misleading consumers into thinking the cancelation is complete and the survey is optional, when in fact consumers needed to continue past the survey to actually cancel. MATCHFTC604757. Match has had a flawed password reset mechanism that also prevented consumers from simply canceling their account if they had forgotten their password. MATCHFTC465940, MATCHFTC752185. Consumers have complained consistently about Match's misleading cancelation process to the company, and it was aware of and agreed that the process was misleading, but it decided not to fix the cancelation process, instead keeping it as a profit center. MATCHFTC312903, MATCHFTC313402, MATCHFTC320168, MATCHFTC336923, MATCHFTC369268, MATCHFTC519412. To the extent Match produces responsive documents and answers in discovery, the FTC may supplement this answer.

**INTERROGATORY NO. 3:** Identify and Describe the harm to consumers that You contend resulted from the alleged lack of a simple online cancelation method, Including how the damages caused by that harm were calculated, the number of users that You believe were unable to cancel their subscription as a result of the alleged lack of a simple cancelation method, and the amount of harm/damages per user.

**ANSWER:**

The FTC objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and premature as it asks for information that will be obtained during discovery from documents that are in Match's possession and is therefore inconsistent with the Court's

10

scheduling order. No part of this response should be interpreted or construed as a limit on the materials or arguments the FTC will present at trial.

As you acknowledged in our August 24 conference on MGI's Motion to Compel, the FTC is not currently in a position to provide specific calculations because, among other things, it lacks the updated data regarding Count V requested in its June 3, 2022 First Set of Requests for Production of Documents.

Match's failure to provide simple cancelation mechanisms caused consumers to be unable to cancel their subscription or led them to incorrectly believe they had cancelled their subscription when they in fact had not. This harmed consumers by causing unwanted and unauthorized charges. Match's failure to provide simple mechanisms also caused damages to consumers who had to contact Match to cancel their subscription or seek a refund because their cancellation attempt was unsuccessful. The harm related to such contact and seeking a refund is the value of these consumers' lost time.

The number of users who were unable to cancel their subscription as a result of Match's failure to provide simple cancelation mechanisms will be determined by, among other things, documents and records in Match's possession that the FTC has requested through discovery, including website usage records, billing records, and complaint data.[1] Similarly, the amount of harm and damages per user will be calculated using, among other things, data and records in

---

[1] The FTC's contention is that all consumers who were unable to cancel their subscription were harmed, not merely consumers who complained to Match.

Match's possession that the FTC has requested in its discovery, including website usage records, billing records, and complaint data.[2]

The relevant time period for this calculation begins with the earliest period permitted by the statute up to and including the present day. 15 U.S.C § 57b.

**INTERROGATORY NO. 4:** State whether You contend that the Match.com methods of cancelation other than the Online Cancelation Flow (Including online chat, telephone, mail, and fax) are not simple, and explain why You contend each method is simple or not simple, Including a description of all facts supporting Your contentions.

**ANSWER:**

The FTC alleges in Count V that "Defendants have failed to provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account." This contention is not limited to any particular method of cancelation, but to the service as a whole. To the extent that this Interrogatory requests further information, FTC objects on the grounds that it is overbroad, vague, unduly burdensome, and not proportional to the needs of the case. The FTC also objects to the Request to the extent it implies that every method of cancelation must not be simple in order for a company to violate ROSCA. The FTC further objects to this Interrogatory on the grounds that it is premature as it asks for information that will be obtained during discovery from documents that are in Match's possession and is therefore inconsistent with the Court's scheduling order. No part of this response should be interpreted or construed as a limit on the materials or arguments the FTC will present at trial.

---

[2] The estimates of the number of consumers harmed and per consumer harm in the FTC's initial response to this interrogatory was based on incomplete data and was intended to estimate for mediation or settlement purposes the amount of harm at issue.

**ANSWER:**

The FTC responds that this interrogatory seeks irrelevant information as the FTC does not need to show what a simple mechanism would look like to establish that Match's flow was not simple. Moreover, because there are any number of Online Cancelation Flows that MGI could offer that would be simple, it is simply not feasible for the FTC to provide a description of every possible Online Cancelation Flow MGI could offer that is simple. The FTC contends that an adequately disclosed one-click cancellation process would be simple. The FTC has also provided guidance that cancellation mechanism for negative option plans should be "at least as easy to use as the method the consumer used to initiate the negative option feature." *See* 86 Fed. Reg. 60822.

Furthermore, the changes to the Online Cancelation Flow that the FTC would find acceptable in a settlement is subject to the attorney client privilege and deliberative process privilege and the work product doctrine and is not the proper subject of an interrogatory. Last, the FTC has already described, repeatedly and in detail, specific problems with Online Cancelation Flow, problems that MGI has been aware of and could remedy. *See* Answers to Nos. 1, 2, 5, and 7.The FTC may supplement this answer to the extent it obtains additional responsive documents from Match or Match Group, LLC.

Date: September 7, 2022          */s/ M. HASAN AIJAZ*
                                 REID TEPFER
                                 M. HASAN AIJAZ
                                 SARAH ZUCKERMAN (admitted pro hac vice)
                                 JOHN R. O'GORMAN (admitted pro hac vice)
                                 ERICA ROLLINS HILLIARD
                                 Texas Bar No. 24079444 (Tepfer)
                                 Virginia Bar No. 80073 (Aijaz)
                                 New York Bar No. 5603832 (Zuckerman)
                                 Texas Bar No. 2421292 (O'Gorman)
                                 Mississippi Bar No. 104244 (Hilliard)
                                 Federal Trade Commission
                                 1999 Bryan Street, Suite 2150

18

Dallas, Texas 75201
T: (214) 979-9395 (Tepfer)
T: (214) 979-9386 (Aijaz)
T: (214) 979-9376 (Zuckerman)
T: (214) 979-9382 (O'Gorman)
T: (214) 979-9379 (Hilliard)
Email: rtepfer@ftc.gov;
maijaz@ftc.gov;
szuckerman@ftc.gov;
jogorman@ftc.gov;
ehilliard@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

```
 1                    UNITED STATES DISTRICT COURT

                     FOR THE DISTRICT OF TEXAS

 2                        DALLAS DIVISION

 3

 4     FEDERAL TRADE COMMISSION,        :  Civil Action

 5            Plaintiff,                :  Case No. 3:19-cv-02281-K

 6        vs.                           :

 7     MATCH GROUP, INC., a corporation, :

       MATCH GROUP, LLC, formerly

 8     MATCH.COM, LLC, a Limited        :

       Liability Company,

 9                                      :

              Defendant.

10     _____/

11

12            Deposition of BIKRAM BANDY, taken on behalf of

13     Defendant, by Chad Hummel, of Sidley Austin, LLP, at 1501 K

14     Street, NW, Washington, D.C., commencing at 10:09 a.m., on

15     October 24, 2022, before Linda C. Marshall, RPR.

16

17     APPEARANCES:

18     FOR THE PLAINTIFF:    M. HASAN AIJAZ, Esquire

                             Federal Trade Commission

19

20

       FOR THE DEFENDANT:    CHAD HUMMEL, Esquire

21                           Sidley Austin, LLP

22

23

24

25

                                                    Page 1
```

**Page 54**

1  A  I don't remember how many emails I saw.

2  Q  More than one?

3  A  I'm not sure. I think so. But you seem to be very certain

4  that there's only one. So, I mean, you know, I can't -- I'm,

5  I'm trying to remember a lot, but I can't remember how many

6  emails of that particular vintage I saw.

7  Q  That's fair. Certainly no more than a dozen, right?

8      MR. AIJAZ: Objection, asked and answered.

9      THE WITNESS: I don't know.

10  BY MR. HUMMEL:

11  Q  All right. Now, in terms of -- second category would be

12  the value of the time spent by consumers who thought they had

13  canceled and were trying to get a refund. Is that right?

14  A  Yes.

15  Q  How would the FTC quantify that in a nonspeculative way?

16  A  Well, first, as we noted in the second amended response to

17  interrogatories, we're not seeking the lost time portion of it

18  anymore.

19  Q  Okay. Fair enough. So, in these initial disclosures,

20  let's move on. I asked you for all revenue associated with

21  attempted cancellation. And I guess my question is, that would

22  be revenue earned from auto-renewals when the consumer claimed

23  they had thought they canceled?

24  A  Or attempted to cancel.

25  Q  How would you -- oh, that would be the abandoned flow. So,

**Page 55**

1  it's both the complaint and the abandonment statistics that

2  you'd want to see?

3  A  Yes.

4      MR. AIJAZ: Objection to the extent this relates to

5  discovery disputes.

6      MR. HUMMEL: I don't understand that objection, but

7  it's fine.

8      MR. AIJAZ: I'm all right.

9  BY MR. HUMMEL:

10  Q  In calculating that number for attempted cancelations, how

11  would you try to disaggregate the consumers who deliberately

12  exited the cancelation flow?

13  A  I'm not sure exactly how we would do it, but -- because we

14  just would have to look at what, what we could discern from the

15  data that we have.

16  Q  And, and what data do you need, still, in order to quantify

17  or attempt to quantify restitution?

18      MR. AIJAZ: Objection, outside the scope of the notice

19  as related to the discovery disputes.

20      THE WITNESS: I think we would need -- we'd like

21  website usage data, particularly on the canceled flow pages.

22  Data on the complaints of people who called to Match to seek a

23  refund because they thought they were auto-renewed when they

24  thought they canceled. Data on refunds that were given to

25  consumers and data on chargebacks. Data on subscription cost,

**Page 56**

1  what subscriptions people had. Data on save offer acceptance.

2  That would be useful. There's probably other factors of data

3  that I'm not thinking about, but those are some things I can

4  think about. Those are the things that come to mind that would

5  be helpful.

6  BY MR. HUMMEL:

7  Q  If you continue on page 18 of the initial disclosure,

8  Exhibit 2, the FTC writes, this monetary relief also includes

9  revenues generated by denying consumers refunds who sought a

10  refund because they thought they already canceled their

11  subscription to Match.com. Do you see that?

12  A  Mm-hmm.

13  Q  At best, what the FTC can say is, isn't this true, that

14  this is for consumers who claim they thought they already

15  canceled?

16  A  It is based on the complaint. That's right.

17  Q  And then you say, the FTC says, accordingly at this time,

18  which was April 15th, 2022, the estimated injury for Count Five

19  is at least $8.7 million. That's a restitution amount. How is

20  that amount calculated, if you know?

21  A  So, 3.7 million of that was the lost time amount that we're

22  no longer seeking. And so, 5 million of that was the amounts

23  paid by consumers who thought they had canceled but were

24  auto-renewed.

25  Q  Five million even?

**Page 57**

1  A  It was a rough estimate.

2  Q  Sounds rough.

3  A  But I don't know. I don't know if the number had -- was,

4  like, a little over or under 5 million, but it was close to

5  5 million. And also, in terms of preparing for my testimony

6  today, it's a lot easier for me to remember round numbers than

7  it is for me to remember things with decimal points. So, so,

8  with that 5 million, it was based -- it was used -- it was

9  developed using the "thought they canceled" complaint data,

10  which we had from the CID response, which I think went up to May

11  of 2018 and went back to January of 2013. And it was the

12  month -- and that was the -- that's the driver of that.

13      And then there was some analysis done to determine how many

14  consumers didn't get a refund. Then there was some analysis

15  done to deal with consumers who got a partial refund under

16  Match's policy at the time. And the math got complicated, but

17  there was some waiting because of different refund amounts. It

18  depended on the subscriptions. But that was high-level

19  explanation of where that 5 million figure came from.

20  Q  Have you ever been a Match member, subscriber?

21  A  No.

22      MR. AIJAZ: Objection as to relevance.

23  BY MR. HUMMEL:

24  Q  Were you presently with the -- strike that. Were you

25  present with the FTC investigator when he performed the

15 (Pages 54 - 57)

CERTIFICATE OF COURT REPORTER

1
2    I, Linda C. Marshall, certify that the foregoing is a
3    correct transcript from the record of proceedings in the
4    above-entitled matter.
5
6
7
8    Linda C. Marshall, RPR
     Official Court Reporter
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 122

---

1    Federal Trade Commission v. Match Group, Inc., Et Al.
2    Bikram Bandy 5535418
3          ACKNOWLEDGEMENT OF DEPONENT
4    I, Bikram Bandy, do hereby declare that I
5    have read the foregoing transcript, I have made any
6    corrections, additions, or changes I deemed necessary as
7    noted above to be appended hereto, and that the same is
8    a true, correct and complete transcript of the testimony
9    given by me.
10
11   _____   _____
12   Bikram Bandy              Date
13   *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18   _____
19   NOTARY PUBLIC
20
21
22
23
24
25

Page 124

---

1    Federal Trade Commission v. Match Group, Inc., Et Al.
2    Bikram Bandy Job No. 5535418
3        E R R A T A  S H E E T
4    PAGE_____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Bikram Bandy              Date
25

Page 123

---

1    maijaz@ftc.gov
2          November 10, 2022
3    Federal Trade Commission v. Match Group, Inc., Et Al.
4    DEPOSITION OF: Bikram Bandy 5535418
5        The above-referenced witness transcript is
6    available for read and sign.
7        Within the applicable timeframe, the witness
8    should read the testimony to verify its accuracy. If
9    there are any changes, the witness should note those
10   on the attached Errata Sheet.
11       The witness should sign and notarize the
12   attached Errata pages and return to Veritext at
13   errata-tx@veritext.com.
14       According to applicable rules or agreements, if
15   the witness fails to do so within the time allotted,
16   a certified copy of the transcript may be used as if
17   signed.
18            Yours,
19            Veritext Legal Solutions
20
21
22
23
24
25

Page 125

32 (Pages 122 - 125)

(Filed Under Seal Pursuant to Protective Order Regarding Confidential Materials)

APP 034-041

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 3:19-cv-02281-K |
| Plaintiff, | **PLAINTIFF'S FIRST AMENDED** |
| v. | **INITIAL DISCLOSURES** |
| MATCH GROUP, INC., a corporation, and | |
| MATCH GROUP, LLC, formerly known as MATCH.COM, LLC, a limited liability company, | |
| Defendants. | |

      Plaintiff, the Federal Trade Commission ("FTC"), pursuant to Federal Rule of Civil Procedure 26(a)(1), and without waiving any privileges, makes the following initial disclosures:

      **1.**    **The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment:**

    a.   Defendants and their current and former principals, officers, directors, managers, employees, agents, and representatives, each of whom Defendants can more readily identify than Plaintiff, and each of whose addresses and telephone numbers Defendants likely have, including, but not limited to, the following:

| Name | Address | Telephone Number | Subject matter (non-exhaustive list) |
|---|---|---|---|
| Dushyant Saraph | Unknown | Unknown | Match.com website features/design; |

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

1

|  | | | Match.com user interface and experience |
|---|---|---|---|
| Marc Atwood | Unknown | Unknown | Match.com website features/design; Match.com user interface and experience; practices described in Counts III-V |
| Ossa Fisher | Unknown | Unknown | Marketing practices; consumer complaints; refunds; policies and procedures |
| Tom Cox | Unknown | Unknown | Ownership and control of Match.com; product analytics; policies and procedures |
| Kate Feller | Unknown | Unknown | Ownership and control of Match.com; customer complaints; policies and procedures; refunds; practices described in Counts III-V |
| Sharmistha Dubey | Unknown | Unknown | Ownership and control of Match.com; Match's policies and procedures; Match revenues; Match Guarantee; autorenewal practices; chargeback practices; resignation flow; practices described in Counts III-V |

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

APP 043

| | | | |
|---|---|---|---|
| Sireesha Malireddy | Unknown | Unknown | Match.com website features/design; Match.com user interface and experience |
| Sushil Sharma | Unknown | Unknown | Ownership and control of Match.com; Match.com user interface and experience; resignation flow; Match Guarantee |
| Jeff Dawson | Unknown | Unknown | Ownership and control of Match.com; policies and procedures; customer complaints; refunds |
| Sydney Lam | Unknown | Unknown | Ownership and control of Match.com; Match.com user interface and experience; product design; product pricing; policies and procedures; autorenewal practices; membership resignation flow; consumer complaints; chargeback practices; refunds; practices described in Counts III-V |
| Brett Richards | Unknown | Unknown | Product/website design; user interface; user experience; consumer complaints; Match |

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

| | | | |
|---|---|---|---|
| | | | Guarantee; website analytics; practices described in Counts III-V |
| Poossenjeet Bhattacharya | Unknown | Unknown | Product design; user interface; user experience; consumer complaints; resignation flow; website analytics |
| Pushkar Deshmukh | Unknown | Unknown | Consumer complaints; product design; user interface |
| Adrian Ong | Unknown | Unknown | Ownership and control of Match.com; policies and procedures; customer complaints; customer service; payments and risk analysis; product marketing; chargeback practices; refunds; practices described in Counts III-V |
| Chris Haltiner | Unknown | Unknown | User interface; product design |
| Jim Talbott | Unknown | Unknown | Ownership and control of Match.com; Match Guarantee; fraud on Match.com platform; product design; user interface; autorenewal practices; membership resignation flow; |

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

APP 045

| | | | |
|---|---|---|---|
| | | | practices described in Counts III-V. |
| Florian Hottier | Unknown | Unknown | Ownership and control of Match.com; Match Guarantee; policies and procedures; Match.com software design; product analytics; resignation flow; user interface; user experience; autorenewal process; practices described in Counts III-V |
| Jiten Vakharia | Unknown | Unknown | Ownership and control of Match.com; policies and procedures; Match.com software design; product analytics; user interface; user experience; resignation flow; autorenewal practices; practices described in Counts III-V |
| Casey Daniell | Unknown | Unknown | Configuration management and platform design; practices described in Counts III-V |
| Nazair Khan | | | Autorenewal practices; resignation flow; user interface and design; product design |
| Beth Wilson | Unknown | Unknown | Match Guarantee; customer service |

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

| | | | |
|---|---|---|---|
| | | | and complaints; Match Guarantee; policies and procedures; data analytics; Match's chargeback dispute practices; practices described in Counts III-V |
| Todd Carrico | | | application engineering; user interface and design; product analytics; practices described in Counts III-V |
| Pradeep Shetty | Unknown | Unknown | Policies and procedures; chargeback practices; consumer complaints; practices described in Counts III-V |
| Deen Ibrahim | Unknown | Unknown | Match.com website features/design; quality assurance; Match.com user interface and experience; practices described in Counts III-V. |
| Michele Watson | Unknown | Unknown | Ownership and control of Match.com; Match Guarantee; customer service; Match's chargeback dispute practices; consumer complaints; policies and procedures; practices described in Counts III-V |
| LaShonda Pero | Unknown | Unknown | Consumer complaints; policies |

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

6

| | | | |
|---|---|---|---|
| | | | and procedures; customer care; employee training; Match guarantee; autorenewal practices; practices described in Counts III-V |
| Anastasia Burman | Unknown | Unknown | Match Guarantee; policies and procedures; customer care; consumer complaints; policies and procedures. |
| Kris Auderer | Unknown | Unknown | Ownership and control of Match.com; Match Guarantee; customer service; customer complaints; Match's chargeback dispute practices; autorenewal practices; resignation flow; policies and procedures; practices described in Counts III-V |
| Nikki Elliott | Unknown | Unknown | Product design; analytics; user interface |
| Angela Freeborn | Unknown | Unknown | Ownership and control of Match.com; sales and marketing |
| Melissa Clinchy | Unknown | Unknown | Ownership and control of Match.com; consumer complaints; policies and procedures; Match Guarantee; |

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

APP 048

| | | | |
|---|---|---|---|
| | | | autorenewal practices; resignation flow; practices described in Counts III-V |
| Richard Leopold | Unknown | Unknown | User interface and design; product design |
| Bryan Jewell | Unknown | Unknown | Ownership and control of Match.com; policies and procedures; customer complaints; refunds; practices described in Counts III-V |
| Margaret Ochoa | Unknown | Unknown | Advertising and marketing; Match Guarantee |
| Giridar Tandriv | Unknown | Unknown | Match.com subscription figures; consumer complaints; practices described in Counts III-V |
| Jeff Rosenzweig | Unknown | Unknown | Ownership and control of Match.com; Match Guarantee; customer relationship management software; customer service; product features; website design; advertising and marketing; policies and procedures; Match Guarantee; practices described in Counts III-V |

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

APP 049

| Shamika Naik | Unknown | Unknown | Platform communications |
|---|---|---|---|
| Laurie Braddock | Unknown | Unknown | Ownership and control of Match.com; role of Match Group Inc. in operating Match.com; Match Guarantee; policies and procedures; consumer chargebacks; autorenewal policies; consumer refunds; consumer complaints; practices described in Counts III-V |
| Rachel Walzl | Unknown | Unknown | Resignation flow; user interface and design |
| Alexis Ferraro | Unknown | Unknown | Advertising and marketing; Match Guarantee |
| Krystal Roloff | Unknown | Unknown | Customer support; consumer complaints; Match Guarantee; chargeback practices; autorenewal practices; practices described in Counts III-V |
| Sam Yagan | Unknown | Unknown | Ownership and control of Match.com; Match Guarantee; autorenewal practices |
| Brittany Perez | Unknown | Unknown | Consumer complaints; policies and procedures |
| Shamika Naik | Unknown | Unknown | Product analytics |

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

| | | | |
|---|---|---|---|
| Girdar Tandriv | Unknown | Unknown | Product analytics; user interface and design |
| Matthew Bartoe | Unknown | Unknown | Platform design; user interface and design; practices described in Counts III-V |
| Ian Purves | Unknown | Unknown | Product analytics; user interface and design; payments and risk; practices described in Counts III-V |
| Amarnath Thombre | Unknown | Unknown | Ownership and control of Match.com; policies and procedures; Match Guarantee; autorenewal practices; consumer complaints; practices described in Counts III-V |
| Andrew Hemmings | Unknown | Unknown | practices described in Counts III-V |
| Matt Knight | Unknown | Unknown | Consumer complaints; application engineering; user interface and design; practices described in Counts III-V |
| Tony Bowari | Unknown | Unknown | Platform design; practices described in Counts III-V |
| Jeff McLure | Unknown | Unknown | Application engineering; practices described in Counts III-V |
| Jennifer Hinkie | Unknown | Unknown | Data analytics; user interface |

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

APP 051

| | | | |
|---|---|---|---|
| Mandy Ginsberg | Unknown | Unknown | Ownership and control of Match.com; resignation flow; Match Guarantee; consumer complaints; policies and procedures; chargeback practices; autorenewal practices; practices described in Counts III-V |
| Ivan Yong | Unknown | Unknown | Product design; user interface and design |
| Brett Williams | Unknown | Unknown | Match.com website features/design; application engineering; Match.com user interface and experience; consumer complaints; practices described in Counts III-V |
| Charles German | Unknown | Unknown | Ownership and control of Match.com; revenue from practices described in Counts III-V |
| Steven Bailey | Unknown | Unknown | Ownership and control of Match.com; revenue from practices described in Counts III-V; payments between Match Group Inc. subsidiaries; practices described in Counts III-V. |

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

| | | | |
|---|---|---|---|
| Shonda Pero | Unknown | Unknown | Match Guarantee; customer service; policies and procedures; practices described in Counts III-V. |
| Atin Kulkarni | Unknown | Unknown | Match Guarantee; customer complaints; product analytics |
| Gary Snyder | Unknown | Unknown | Risk analysis; consumer complaints |
| Nikhil Nilakantan | Unknown | Unknown | Product design |
| Dinh Thi Bui | Unknown | Unknown | Resignation flow; autorenewal practices; product design; consumer complaints; user interface |
| Ramanand Reddi | Unknown | Unknown | Product design; user interface; product analytics; user interface and experience |
| Jeremy Ruggaber | Unknown | Unknown | Product design; user interface; consumer complaints; practices described in Counts III-V |
| Atin Kulkarni | Unknown | Unknown | Consumer complaints; Match Guarantee; policies and procedures |
| Rose Phommachanh | Unknown | Unknown | Consumer complaints; Match Guarantee; policies and procedures |
| Garland Frye | Unknown | Unknown | Software engineering; Match web/mobile apps; |

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

APP 053

| | | | |
|---|---|---|---|
| | | | platform design; user interface |
| Christopher Conner | Unknown | Unknown | Software engineering; web/mobile apps; platform design; user interface |
| Greg Blatt | Unknown | Unknown | Ownership and control of Match.com; resignation flow; Match Guarantee; consumer complaints; policies and procedures; chargeback practices; autorenewal practices; practices described in Counts III-V |
| Leslie Sucur | Unknown | Unknown | Software engineering; web/mobile apps; platform design; user interface |
| Anna Schneider | Unknown | Unknown | Software engineering; web/mobile apps; user interface |
| Alicia Knight | Unknown | Unknown | Marketing and advertising; user interface and design |
| Anthony Fratiani | Unknown | Unknown | User interface and design |
| Cameron Bates | Unknown | Unknown | marketing analytics |
| Jessica Conant | Unknown | Unknown | Autorenewal practices; product development; marketing; practices described in Count III |
| Judy Li | Unknown | Unknown | Ownership and control of Match.com; |

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

| | | | |
|---|---|---|---|
| | | | Platform fraud; data analytics; platform troubleshooting |
| Stephanie Davis | Unknown | Unknown | Defect reporting; sales and reporting; fraud on platform |
| Francisco Bonilla | Unknown | Unknown | a/b testing; autorenewal practices; chargeback practices; cancellation flow; |
| Dan Badrian | Unknown | Unknown | a/b testing; data mining; user behavior |
| Jessica Johnson | Unknown | Unknown | a/b testing; marketing and advertising; fraud on platform |
| Thiago Costa | Unknown | Unknown | Fraud on platform; autorenewal practices; product development; marketing; practices described in Count III |
| John Rowan | Unknown | Unknown | Password reset issues; marketing emails |
| David Penton | Unknown | Unknown | Account access; account security |
| Vincent Galeraud | Unknown | Unknown | Ownership and control of Match.com; customer service; customer complaints; refunds; policies and procedures |
| Leah Mikulenka | Unknown | Unknown | Chargeback policies; consumer complaints; refunds; policies and procedures; |

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

APP 055

|  |  |  | Practices described in Count IV |
|---|---|---|---|

b.  Current and former principals, officers, directors, managers, employees, agents, and representatives of any third party that have implemented, executed, evaluated, tested, or created any advertising, marketing, or disclosures relating to Defendants' online dating service Match.com or other Match Group Inc. dating platforms, each of whom Defendants can more readily identify than plaintiff, and each of whose addresses and telephone numbers Defendants likely have, are likely to have information relating to the practices at issue in the complaint;

c.  Current and former principals, officers, directors, managers, employees, agents, and representatives of any third party that have evaluated, analyzed, responded to consumer communications or complaints on Defendants' behalf relating to Defendants' online dating service Match.com or other Match Group Inc. dating platforms, each of whom Defendants can more readily identify than plaintiff, and each of whose addresses and telephone numbers Defendants likely have, are likely to have information relating to the practices at issue in the complaint;

d.  Current and former principals, officers, directors, managers, employees, agents, and representatives of any third party that have implemented, executed, evaluated, tested, or created any billing practices, refund policies or procedures, chargeback policies or procedures, subscription model, or cancellation process relating to Defendants' online dating service Match.com or other Match Group Inc. dating platforms, each of whom Defendants can more readily identify than plaintiff, and each of whose addresses and

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

telephone numbers Defendants likely have, are likely to have information relating to the practices at issue in the complaint;

e.   Consumers who subscribed to Match.com and were affected by the practices at issue, including those whose complaints were collected in the FTC's Consumer Sentinel database and whose information will be provided upon entry of an appropriate protective order in this matter protecting their personally identifiable information.

f.   FTC investigators and employees, including investigator Brent McPeek, located at 1999 Bryan St., Ste. 2150, Dallas, Texas 75201, and investigators formerly employed by the FTC, including Matthew Thacker and Taelor Hardesty, who can be reached through FTC counsel.

The FTC identifies these individuals based on its investigation of this matter so far. The FTC reserves its right to supplement these disclosures should it learn of other individuals likely to have discoverable information on which it may rely to support its claims.

**2.      A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment:**

The FTC may use documents and information it obtains from Defendants in discovery in this case as well as the following documents currently in its possession, custody, or control to support its claims, all of which are located at 1999 Bryan St. Ste. 2150, Dallas, Texas 75201 or stored electronically on the FTC's server:

a.   Consumer complaints about Defendants;

b.   Consumer communications with Defendants;

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

16

c.  Documents related to consumer communications with Defendants;

d.  Defendants' internal correspondence;

e.  Defendants' internal analyses and policies regarding complaints, inquiries, compliance, advertising, and marketing;

f.  Defendants' presentations about complaints, inquiries, compliance, advertising, and marketing;

g.  Defendants' training materials and scripts about complaints, inquiries, compliance, and customer service;

h.  Data and documents relating to the practices at issue in the complaint;

i.  Screenshots, current and historical, of (i) Defendants' website, www.match.com, (ii) websites on which Defendants have advertised, and (iii) websites of other online platforms;

j.  Documents that Defendants have filed with the Securities and Exchange Commission; and

k.  Other documents and information Defendants produced to Plaintiff in response to Plaintiff's March 2017 Civil Investigative Demand to Defendant and other documents or information Defendants submitted to the Commission in connection with Plaintiff's investigation.

The FTC identifies these documents based on its investigation of this matter so far. The FTC reserves its right to supplement these disclosures should it learn of other documents likely to contain discoverable information on which it may rely to support its claims.

**3.  A computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the**

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

**documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered:**

Section 19(b) of the FTC Act, 15 U.S.C. § 57b(b), authorizes the Commission to seek and the Court to award relief necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice. This includes the recission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation alleged in Count V. This monetary relief is in addition to injunctive relief on the remaining three counts (Counts III-V), which is authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

Based on information currently available, monetary relief in this case includes consumer injury associated with Defendant's failure to provide consumers a simple method of canceling its recurring charges, including all revenue associated with any attempted cancellation or any failure to provide a simple cancellation mechanism. This monetary relief also includes revenues generated by denying consumers refunds who sought a refund because they thought they already canceled their subscription to Match.com. Accordingly, the total estimated injury at this time for Count V is at least $8.7 million.

In addition to this monetary relief, civil penalties available in this action relate to Defendant's failure to provide a simple method of canceling its recurring charges. In calculating civil penalties relating to a rule violation, "each day of continuance of such failure shall be treated as a separate violation," and "[i]n determining the amount of such civil penalty, the court shall take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." 15

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

U.S.C. § 45(m)(1)(c). Computation of the scope of monetary relief will be based principally on data associated with Defendant's responses to Plaintiff's March 2017 Civil Investigative Demand, which is maintained in paper form in the FTC's offices at 1999 Bryan St. Ste. 2150, Dallas, Texas 75201 or electronically on the FTC's server, and future discovery obtained from Defendant.

> **4.      For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment:**

Plaintiff is not aware of any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in this action or to indemnify or reimburse for payments made to satisfy a judgment.

Date: April 28, 2023

*/s/ REID TEPFER*
REID TEPFER
M. HASAN AIJAZ
SARAH ZUCKERMAN
JOHN R. O'GORMAN
ERICA ROLLINS HILLIARD
JASON C. MOON
Texas Bar No. 24079444 (Tepfer)
Virginia Bar No. 80073 (Aijaz)
New York Bar No. 5603832 (Zuckerman)
Texas Bar No. 2421292 (O'Gorman)
Mississippi Bar No. 104244 (Hilliard)
Texas Bar No. 24001188 (Moon)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
T: (214) 979-9395 (Tepfer)
T: (214) 979-9386 (Aijaz)
T: (214) 979-9376 (Zuckerman)
T: (214) 979-9382 (O'Gorman)
T: (214) 979-9379 (Hilliard)

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

T: (214) 979-9378 (Moon)
Email: rtepfer@ftc.gov; maijaz@ftc.gov;
szuckerman@ftc.gov;jogorman@ftc.gov;
ehilliard@ftc.gov; jmoon@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

PLAINTIFF'S FIRST AMENDED INITIAL DISCLOSURES

20

## CERTIFICATE OF SERVICE

I, M. Hasan Aijaz, certify that, on April 28, 2023, I served the foregoing Plaintiff's First

Amended Initial Disclosures by email on the following counsel of record at the email addresses

listed below:

chummel@sidley.com
tbragg@sidley.com
bmundel@sidley.com
cpriest@sidley.com
angela.zambrano@sidley.com

*Attorneys for Defendants*
*Match Group, Inc. and Match Group, LLC*

By: /s/ M. Hasan Aijaz

<div align="center">

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

</div>

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>     Plaintiff,<br><br>v.<br><br>MATCH GROUP, INC., a corporation, and<br><br>MATCH GROUP, LLC, formerly known as MATCH.COM, LLC, a limited liability company,<br><br>     Defendants. | Case No. 3:19-cv-02281-K<br><br>**PLAINTIFF'S FOURTH AMENDED RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES** |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and subject to the general and specific objections set forth below, Plaintiff, the Federal Trade Commission ("FTC") responds to Defendant Match Group Inc.'s ("Match" or "MGI") First Set of Interrogatories.

<div align="center">

## I.   GENERAL OBJECTIONS

</div>

1. **Compound Interrogatories.** Plaintiff objects to interrogatories that contain discrete requests and therefore constitute compound interrogatories. Including subparts, no more than twenty-five interrogatories may be given without a leave of court. Fed. R. Civ. P. 33(a). "'[W]here the first question can be answered fully and completely without answering the second question, then the second question is totally independent of the first and not factually subsumed within it.'" *FTC v. Think All Pub LLC*, No. 4:07-CV-011, 2008 WL 687455, *1 (E.D. Tex. 2008).

2. **Blockbuster Interrogatories.** Plaintiff objects to Match's impermissible "blockbuster interrogatories" seeking *all* facts without regard for materiality, proportionality, time, and

<div align="center">

1

</div>

caught violating the Act, respondents must expect some fencing in."); *FTC v. Ruberoid Co.*, 343

U.S. 470, 473 (1952) (holding that the FTC "cannot be required to confine its road block to the

narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the

prohibited goal, so that its order may not be by-passed with impunity."); *Kraft, Inc. v. FTC*, 970

F.2d 311, 326 (7th Cir. 1992) (describing factors used to assess appropriateness of "fencing-in"

relief) (citations omitted). The FTC directs Defendants to **Attachment A**, which is a proposed

order containing the precise injunctive relief the FTC seeks.

The FTC may supplement this answer as permitted by the Federal Rules. No part of this

response should be interpreted or construed as a limit on the materials or arguments the FTC will

present at trial.

**INTERROGATORY NO. 3:** Identify and Describe the harm to consumers that You contend
resulted from the alleged lack of a simple online cancellation method, Including how the
damages caused by that harm were calculated, the number of users that You believe were unable
to cancel their subscription as a result of the alleged lack of a simple cancellation method, and
the amount of harm/damages per user.

**ANSWER:**

As you acknowledged in our August 24, 2022 conference on MGI's Motion to Compel,

the FTC's calculations are dependent on Defendants providing accurate and reliable billing and

click-through data regarding users who attempted to cancel their subscription. Moreover, the

produced data is current only through December 2022, and the harm is ongoing.[2]

Match's failure to provide simple cancelation mechanisms caused users to unsuccessfully

attempt to cancel their subscription or led them to believe they had cancelled their subscription

---

[2] The FTC notes that this interrogatory has an implicit, and incorrect, assumption that the FTC is
seeking monetary relief for all users who were unable to cancel their subscription because of
Defendants' failure to provide simple cancellation mechanisms. Specifically, the interrogatory
requests that the FTC state "the number of users that You believe were unable to cancel their

13

when they in fact had not. This harmed users by causing unwanted and unauthorized charges after their attempt to cancel their subscription. Users were also harmed by the time lost seeking refunds, disputing charges with their financial institutions, and in using non-simple mechanisms to cancel, although the FTC has not included this harm in its calculation.

In response to the FTC's request for data regarding individual attempts by users to cancel, Defendants have produced the data in MATCHFTC846469. According to that data, since October 2016, 7,701,958 users have entered the cancellation flow to cancel their subscription, as shown by the number of users that visited the webpage associated with pagecode 189 on the match.com website. Of those users, 122,235 accepted a save offer and 6,154,160 successfully cancelled their subscription using the online flow. The FTC contends that the remaining 1,425,563 users did not cancel their subscription because of Defendants' failure to offer simple mechanisms to cancel.[3]

The relevant time period for the consumer injury calculation begins October 2016 and continues to the present day. *See* 15 U.S.C § 57b. The FTC estimates that the total monetary harm attributable to Defendants' failure to provide simple cancellation mechanisms as of

---

subscription as a result of the alleged lack of a simple cancelation method." However, not all such users are included in the monetary relief calculations. For example, the calculation does not include users that Match did not charge autorenewal fees (because they later successfully cancelled or for any other reason) or who have already recouped the charged fees, through refunds or chargebacks.

[3] These users have been harmed by Defendants' failure to offer simple mechanisms to cancel their subscription, including through direct financial loss of autorenewal fees, time lost seeking refunds, disputing charges with their financial institutions, and in using non-simple mechanisms to cancel. Some were able to recoup some or all of their direct financial loss of autorenewal fees through refunds and chargebacks. Others were able to avoid direct financial loss by cancelling their subscriptions before renewal through a mechanism other than the online flow or because they were not charged a renewal fee because their credit cards had expired. While the FTC is seeking monetary relief only for those users who suffered direct financial harm, the FTC is seeking injunctive relief that would prevent harm to all of Defendants' users.

December 2022 is $68,607,100.43.[4] The FTC calculates this amount based on the billing data produced in MATCHFTC846516 by totaling the amounts of money Defendants collected from users who exited the cancellation flow and subtracting the amounts that individuals recouped through refunds and chargebacks.

This data also specifies how many users exited the cancellation flow on each particular page of Match.com's online cancellation flow and then identifies the amount of revenue (calculated by autorenewal fees minus refunds and chargebacks) that Defendants later collected from those users through unauthorized renewal fees. The harm on a per-page basis is attributable as follows:[5]

Password Wall:           $25,228,818.20

Post-Password Wall:  $33,051,378.49[6]

First Survey Page:     $3,887,455.88

Save Offer:                 $4,936,682.55

Second Survey:          $1,502,765.31

The FTC is currently unable to provide an estimate of harm per user because Defendants have failed to produce information necessary for such an assessment. Specifically, although

---

[4] The FTC's initial response to this interrogatory included estimates based on incomplete data and intended for mediation or settlement purposes of the amount of harm at issue. After meeting and conferring with counsel for Defendants, Defendants provided updated data, which has allowed the FTC to amend its response herein with a more accurate estimate.

[5] Tens of thousands of individuals did not effectively cancel their membership despite having viewed the cancellation confirmation page. *See* MATCHFTC846519. The FTC has not received updated dollar values of the amount that Defendants collected from these users, and the FTC reserves the right to include these amounts in its calculation of user harm.

[6] Users are presented with two hyperlinks on this page, one that continues the cancellation process and another that sends users to a subscription status page. The FTC has requested, but Defendants have not produced, data related to users that click on the "subscription status"

Defendants have produced a total volume of refunds, they have not shown how many users received total refunds or were fully compensated through chargebacks or a combination of chargebacks and refunds. Without this data, the FTC does not have a denominator—the number of users—with which to calculate harm per user.

**INTERROGATORY NO. 4:** State whether You contend that the Match.com methods of cancellation other than the Online Cancellation Flow (Including online chat, telephone, mail, and fax) are not simple, and explain why You contend each method is simple or not simple, Including a description of all facts supporting Your contentions.

**ANSWER:**

The FTC alleges in Count V that "Defendants have failed to provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account." This contention is not limited to any particular method of cancellation, but to the service as a whole. To the extent that this Interrogatory requests further information, FTC objects on the grounds that it is overbroad, vague, unduly burdensome, and not proportional to the needs of the case. The FTC also objects to the Request to the extent it implies that every method of cancellation must not be simple in order for a company to violate ROSCA. The FTC further objects to this Interrogatory on the grounds that it

---

hyperlink. The FTC is willing, and has informed Defendants, that—if Defendants produce the necessary data—it would reduce its calculation of monetary relief by the amount of autorenewal fees net of refunds and chargebacks attributable to users that clicked on the "subscription status" link.

Similarly, if Defendants were to produce this data, the FTC would reduce its estimate of harm attributable to the net autorenewal fees attributable to the Password Wall page by the proportion of users that clicked the "subscription status" link on the Post-Password Wall page. For example, if X% of users that visited the Post-Password Wall page clicked on the hyperlink, the FTC would exclude the net autorenewal fees of those X% of users from its estimate of monetary harm and would also reduce its estimate of harm attributable to the Password Wall page by X%. The FTC reserves the right to update its calculations related to these pages if and when Defendants produce this requested data.

APP 067

MATCHFTC_Sample0000985, MATCHFTC537085, MATCHFTC406132,

MATCHFTC397577, MATCHFTC404741, MATCHFTC521509, MATCHFTC405364,

MATCHFTC298594, MATCHFTC601035, MATCHFTC766621,

MATCHFTC_Sample0000307, MATCHFTC643460,  MATCHFTC603553, (email records of

MGI executives involved in and directing business operations).


Date: May 25, 2023                              */s/ REID TEPFER*
                                                REID TEPFER
                                                M. HASAN AIJAZ
                                                SARAH ZUCKERMAN (admitted pro hac vice)
                                                JOHN R. O'GORMAN (admitted pro hac vice)
                                                ERICA ROLLINS HILLIARD
                                                JASON C. MOON
                                                Texas Bar No. 24079444 (Tepfer)
                                                Virginia Bar No. 80073 (Aijaz)
                                                New York Bar No. 5603832 (Zuckerman)
                                                Texas Bar No. 2421292 (O'Gorman)
                                                Mississippi Bar No. 104244 (Hilliard)
                                                Texas Bar No. 24001188 (Moon)
                                                Federal Trade Commission
                                                1999 Bryan Street, Suite 2150
                                                Dallas, Texas 75201
                                                T: (214) 979-9395 (Tepfer)
                                                T: (214) 979-9386 (Aijaz)
                                                T: (214) 979-9376 (Zuckerman)
                                                T: (214) 979-9382 (O'Gorman)
                                                T: (214) 979-9379 (Hilliard)
                                                T: (214) 979-9378 (Moon)
                                                Email: rtepfer@ftc.gov; maijaz@ftc.gov;
                                                szuckerman@ftc.gov; jogorman@ftc.gov;
                                                ehilliard@ftc.gov; jmoon@ftc.gov

                                                Attorneys for Plaintiff
                                                FEDERAL TRADE COMMISSION

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 3:19-cv-02281-K |
| Plaintiff, | **PLAINTIFF'S FIFTH AMENDED RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES** |
| v. | |
| MATCH GROUP, INC., a corporation, and | |
| MATCH GROUP, LLC, formerly known as MATCH.COM, LLC, a limited liability company, | |
| Defendants. | |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and subject to the general and specific objections set forth below, Plaintiff, the Federal Trade Commission ("FTC") submits this amended response to Defendant Match Group Inc.'s ("Match" or "MGI") First Set of Interrogatories.

## I.    GENERAL OBJECTIONS

1.  **Compound Interrogatories.** Plaintiff objects to interrogatories that contain discrete requests and therefore constitute compound interrogatories. Including subparts, no more than twenty-five interrogatories may be given without a leave of court. Fed. R. Civ. P. 33(a). "'[W]here the first question can be answered fully and completely without answering the second question, then the second question is totally independent of the first

5. **Attorney Client Privilege, Deliberative Process Privilege, and Attorney Work Product Doctrine.** Plaintiff generally objects to Match's requests to Plaintiff insofar as these seek, directly or indirectly, information subject to the attorney client privilege, deliberative process privilege or work product doctrine.

6. **Scope of Discovery.** Plaintiff objects to Match's Interrogatories to the extent that the instructions and definitions attempt to impose upon the Plaintiff obligations greater than those required by the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 3:** Identify and Describe the harm to consumers that You contend resulted from the alleged lack of a simple online cancellation method, Including how the damages caused by that harm were calculated, the number of users that You believe were unable to cancel their subscription as a result of the alleged lack of a simple cancellation method, and the amount of harm/damages per user.

**ANSWER:**

As you acknowledged in our August 24, 2022 conference on MGI's Motion to Compel, the FTC's calculations are dependent on Defendants providing accurate and reliable billing and click-through data regarding users who attempted to cancel their subscription. Moreover, the produced data is current only through December 2022, and the harm is ongoing.[2]

Match's failure to provide simple cancelation mechanisms caused users to unsuccessfully attempt to cancel their subscription or led them to believe they had cancelled their subscription

---

[2] The FTC notes that this interrogatory has an implicit, and incorrect, assumption that the FTC is seeking monetary relief for all users who were unable to cancel their subscription because of Defendants' failure to provide simple cancellation mechanisms. Specifically, the interrogatory requests that the FTC state "the number of users that You believe were unable to cancel their subscription as a result of the alleged lack of a simple cancelation method." However, not all such users are included in the monetary relief calculations. For example, the calculation does not include users that Match did not charge autorenewal fees (because they later successfully cancelled or for any other reason) or who have already recouped the charged fees, through refunds or chargebacks.

when they in fact had not. This harmed users by causing unwanted and unauthorized charges after their attempt to cancel their subscription. Users were also harmed by the time lost seeking refunds, disputing charges with their financial institutions, and in using non-simple mechanisms to cancel, although the FTC has not included this harm in its calculation.

In response to the FTC's request for data regarding individual attempts by users to cancel, Defendants have produced the data in MATCHFTC846469. According to that data, since October 2016, 7,701,958 users have entered the cancellation flow to cancel their subscription, as shown by the number of users that visited the webpage associated with pagecode 189 on the match.com website. Of those users, 122,235 accepted a save offer and 6,154,160 successfully cancelled their subscription using the online flow. The FTC contends that the remaining 1,425,563 users did not cancel their subscription because of Defendants' failure to offer simple mechanisms to cancel.[3]

The relevant time period for the consumer injury calculation begins October 2016 and continues to the present day. *See* 15 U.S.C § 57b. The FTC estimates that the total monetary harm attributable to Defendants' failure to provide simple cancellation mechanisms as of

---

[3] These users have been harmed by Defendants' failure to offer simple mechanisms to cancel their subscription, including through direct financial loss of autorenewal fees, time lost seeking refunds, disputing charges with their financial institutions, and in using non-simple mechanisms to cancel. Some were able to recoup some or all of their direct financial loss of autorenewal fees through refunds and chargebacks. Others were able to avoid direct financial loss by cancelling their subscriptions before renewal through a mechanism other than the online flow or because they were not charged a renewal fee because their credit cards had expired. In addition to the users represented in this calculation, other users were harmed because, for example, they took multiple attempts to cancel and only cancelled at their final attempt. While the FTC is seeking monetary relief only for those users who suffered direct financial harm, the FTC is seeking injunctive relief that would prevent harm to all of Defendants' users.

December 2022 is $51,118,804.92.[4] The FTC calculates this amount based on the billing data produced in MATCHFTC846511 by totaling the amounts of money Defendants collected from users who exited the cancellation flow, subtracting the amounts that individuals recouped through refunds and chargebacks, and applying a deduction to account for users who clicked on the "subscription status" option, as further described below.

This data also specifies how many users exited the cancellation flow on each particular page of Match.com's online cancellation flow and then identifies the amount of revenue (calculated by autorenewal fees minus refunds and chargebacks) that Defendants later collected from those users through unauthorized renewal fees. The harm on a per-page basis is attributable as follows:

Password Wall:          $25,228,818.20

Post-Password Wall:     $15,563,082.98 [6]

First Survey Page:      $3,887,455.88

Save Offer:             $4,936,682.55

Second Survey:          $1,502,765.31

The FTC is currently unable to provide an estimate of harm per user because Defendants have failed to produce information necessary for such an assessment. Specifically, although

---

[4] The FTC's initial response to this interrogatory included estimates based on incomplete data and intended for mediation or settlement purposes of the amount of harm at issue. After meeting and conferring with counsel for Defendants, Defendants provided updated data, which has allowed the FTC to amend its response herein with a more accurate estimate.

[6] Users are presented with two hyperlinks on this page, one that continues the cancellation process and another that sends users to a "subscription status" page. The FTC reduced its calculation of monetary relief by the amount of autorenewal fees net of refunds and chargebacks attributable to users that clicked on the "subscription status" link. Specifically, FTC took the number of users that only clicked "subscription status," divided that number by the number of users that exited the cancelation flow on this page to derive a percentage, multiplied that

Defendants have produced a total volume of refunds, they have not shown how many users received total refunds or were fully compensated through chargebacks or a combination of chargebacks and refunds. Without this data, the FTC does not have a denominator—the number of users—with which to calculate harm per user.

Date: July 27, 2023

*/s/ Jason C. Moon*
REID TEPFER
M. HASAN AIJAZ
SARAH ZUCKERMAN (admitted pro hac vice)
JOHN R. O'GORMAN (admitted pro hac vice)
ERICA ROLLINS HILLIARD
JASON C. MOON
Texas Bar No. 24079444 (Tepfer)
Virginia Bar No. 80073 (Aijaz)
New York Bar No. 5603832 (Zuckerman)
Texas Bar No. 2421292 (O'Gorman)
Mississippi Bar No. 104244 (Hilliard)
Texas Bar No. 24001188 (Moon)
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
T: (214) 979-9395 (Tepfer)
T: (214) 979-9386 (Aijaz)
T: (214) 979-9376 (Zuckerman)
T: (214) 979-9382 (O'Gorman)
T: (214) 979-9379 (Hilliard)
T: (214) 979-9378 (Moon)
Email: rtepfer@ftc.gov; maijaz@ftc.gov;
szuckerman@ftc.gov; jogorman@ftc.gov;
ehilliard@ftc.gov; jmoon@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

---

percentage by the net cash that Match collected from users exiting the cancelation flow in this page, and then subtracted that amount from the estimate of harm.

```
1              IN THE UNITED STATES DISTRICT COURT
2              FOR THE NORTHERN DISTRICT OF TEXAS
3                      DALLAS DIVISION
4
      FEDERAL TRADE COMMISSION,     )
5                                   )
                 Plaintiff,         )
6                                   )  Civil Action
          vs.                       )  No.
7                                   )  3:19-cv-02281
      MATCH GROUP, INC., MATCH      )  -K
8     GROUP, LLC, formerly known    )
      as MATCH.COM, LLC,            )
9                                   )
                 Defendants.        )
10    --------------------------    )
11
                       CONFIDENTIAL
12
13                  Thursday, August 10, 2023
14                  10:06 a.m.
15
16
17          Remote Zoom Videotaped Deposition of
18    KIMBLEANN VERDI, held before Stacey L. Daywalt,
19    a Court Reporter and Notary Public of the
20    District of Columbia.
21
22
23
24
25
                                              Page 1
```

A P P E A R A N C E S:

(All appearances via remote Zoom)

Attorneys for Plaintiff:

FEDERAL TRADE COMMISSION
BY: JASON C. MOON, ESQ.
REID ABRAM TEPFER, ESQ.
M. HASAN AIJAZ, ESQ.
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9350
jmoon@ftc.gov

Attorneys for Defendants:

SIDLEY AUSTIN LLP
BY: CHELSEA A. PRIEST, ESQ.
2021 McKinney Avenue Suite 2000
Dallas, Texas 75201
(214) 981-3476
cpriest@sidley.com

ALSO PRESENT:

SAMUEL KITCHENS,
Match in-house counsel
SAM FRANCIS, Videographer



--------------------I N D E X------------------


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| KIMBLEANN VERDI | BY MS. PRIEST | 7 |


--------------------EXHIBITS-------------------


| EXHIBITS | PAGE | LINE |
|---|---|---|
| Exhibit 1 Amended Verdi Calculation Notes | 19 | 23 |
| Exhibit 2 Plaintiff's Third Amended Initial Disclosures | 24 | 9 |
| Exhibit 3 Plaintiff's Fourth Amended Initial Disclosures | 28 | 6 |
| Exhibit 4 Spreadsheet MATCHFTC846944 | 43 | 18 |
| Exhibit 5 Spreadsheet MATCHFTC846945 | 55 | 10 |
| Exhibit 6 Spreadsheet MATCHFTC864469 | 80 | 13 |
| Exhibit 7 Spreadsheet MATCHFTC846948 | 85 | 4 |

| INFORMATION REQUESTED | PAGE | LINE |
|---|---|---|
| Spreadsheets | 34 | 4 |




INSTRUCTION NOT TO ANSWER


| PAGE | LINE |
|---|---|
| 16 | 22 |
| 18 | 15 |




THE VIDEOGRAPHER: Good morning, everyone. We're going on the record at 10:06 a.m. on August 10, 2023.

Please note that this deposition is being conducted virtually. Quality of recording depends on the quality of the camera and Internet connection of participants. What is seen from the witness and heard on screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video recorded deposition of Ms. Kim Verdi taken in the matter of Federal Trade Commission versus Match Group, Inc., et al. filed in the United States District Court for the Northern District of Texas, Dallas Division, Case No. 3:19-cv-02281-K.

This deposition is being conducted remotely using virtual technology. My name is Sam Francis representing Veritext Legal Solutions, and I'm the videographer.

The court reporter today is Ms. Stacey Daywalt from the firm Veritext Legal Solutions.

CONFIDENTIAL

| | |
|---|---|
| 1  Q.  Okay.  Did you review the FTC's | 1  to the flow.  But it's -- that's it. |
| 2  complaint in this case? | 2  Q.  Okay.  And do you know what appears |
| 3  A.  No, I -- no, I did not review the | 3  on each of the screens that are represented in |
| 4  FTC's complaint in this case. | 4  the columns of the spreadsheets you're relying |
| 5  Q.  Did you review any videos of the | 5  on? |
| 6  cancellation flow? | 6  A.  I do not know what appears on the |
| 7  A.  I did not review any videos of the | 7  screens from the columns that I'm relying on. |
| 8  cancellation flow. | 8  Q.  Okay.  Let's mark Exhibit 2. |
| 9  Q.  Did you review any of the expert | 9  (Exhibit 2, Plaintiff's Third |
| 10  reports that have been submitted in this case? | 10  Amended Initial Disclosures, marked for |
| 11  A.  I did not review any of the expert | 11  identification.) |
| 12  reports from this case. | 12  Q.  Are you able to see Exhibit 2 on |
| 13  Q.  Did you speak to any of the experts | 13  your screen? |
| 14  that have been designated in this case? | 14  A.  Yes.  Just give me a second. |
| 15  A.  I did not speak to any of the | 15  I can see a letterhead, the heading |
| 16  experts that have been designated in this case. | 16  of a legal document. |
| 17  Q.  Did you communicate in any other way | 17  Q.  Okay.  And do you see it's titled |
| 18  with any of the experts that have been | 18  Plaintiff's Third Amended Initial Disclosures? |
| 19  designated in this case? | 19  A.  Yes, I can see that it's titled |
| 20  A.  I did not communicate in any other | 20  Plaintiff's Third Amended Initial Disclosures. |
| 21  way with the other experts or other expert -- | 21  Q.  I'll go to Page 21 of this |
| 22  or the experts that have been designated in | 22  Exhibit 2. |
| 23  this case. | 23  And do you see on this page in the |
| 24  Q.  What's your understanding of what | 24  Subpart g where it says:  "FTC senior data |
| 25  this case is about? | 25  analyst KimbleAnn C. Verdi, with knowledge of |
| Page 22 | Page 24 |

| | |
|---|---|
| 1  A.  My understanding of what this case | 1  the calculations used to generate the FTC's," |
| 2  is about is looking at consumer harm, potential | 2  and there's a list of items? |
| 3  consumer harm, caused by Match. | 3  A.  I can see on the screen item g with |
| 4  Q.  Is it your understanding that | 4  sub items 1, 2 and 3 that you just read. |
| 5  there's any particular feature of Match that is | 5  Q.  Okay.  And Item 1 is:  "Calculation |
| 6  at issue? | 6  of civil penalties."  Right? |
| 7  A.  You know, I am not aware of what | 7  A.  Yes, Item 1 displayed on the screen |
| 8  feature of Match is at issue. | 8  is:  "Calculation of civil penalties." |
| 9  I am just aware of the | 9  Q.  And Item 2 is:  "Estimates of |
| 10  calculations I've done are related to the | 10  consumer harm and number of harmed users." |
| 11  resignation flow or -- I'm done.  Sorry. | 11  Right? |
| 12  Q.  Okay.  And do you have any | 12  A.  Yes, Item 2 displayed on the screen |
| 13  understanding about what particular pieces of | 13  is:  "Estimates of consumer harm and number of |
| 14  the resignation flow are at issue? | 14  harmed users." |
| 15  A.  I only have an understanding of | 15  Q.  Then No. 3 is:  Numerical |
| 16  what's included on the documents I reviewed for | 16  calculations of other data and data |
| 17  calculations. | 17  compilations produced by defendants related to |
| 18  Q.  Okay.  So you don't have any | 18  matters in this case, including cancellation |
| 19  understanding of which screens, which | 19  success rates.  Right? |
| 20  particular screens, in the resignation flow the | 20  A.  Yes, the third item on the screen |
| 21  FTC alleges are causing consumer harm.  Right? | 21  reads:  "Numerical calculations of other data |
| 22  A.  I have an understanding of the | 22  and data compilations produced by defendants |
| 23  columns that are represented in the | 23  related to matters in this case, including |
| 24  calculations of the ones that -- some of them, | 24  cancellation success rates." |
| 25  what they mean to the calculation and relative | 25  Q.  Do you intend to testify about any |
| Page 23 | Page 25 |

7 (Pages 22 - 25)

Page 26

1    data or data compilations other than
2    cancellation success rates, consumer harm or
3    calculation of civil penalties?
4         A.   My understanding is I'm here to
5    testify regarding the calculations I performed
6    on the Bates numbers I had referenced
7    previously.
8         Q.   And those calculations are limited
9    to civil penalties, consumer harm and
10   cancellation success rates.  Right?
11        A.   Yes, those calculations are limited
12   to civil penalties, consumer harm and
13   cancellation success rates as noted on the
14   deposition notes or the amended -- I don't
15   remember the name of Exhibit 1 -- as identified
16   on Exhibit 1.
17        Q.   Okay.  So these initial disclosures
18   at Exhibit 2 accurately reflect what you intend
19   to testify about.  Right?
20        MR. MOON:  I'm going to object to --
21   I'm going to object to that as asking for
22   mental impressions of counsel, strategy of
23   counsel and so forth.
24        I mean, we've exchanged
25   correspondence on this.  You've accurately

Page 27

1    summarized the calculations she's done so far.
2    We may ask her to do additional calculations in
3    the future.
4         So I don't think it's proper to ask
5    her what she intends to testify to.
6         MS. PRIEST:  Well, I'm entitled to
7    know what she intends to testify to.  That's
8    the purpose of a deposition.
9         So this isn't a situation where you
10   can surprise or do trial by ambush by coming up
11   with something later.
12   BY MS. PRIEST:
13        Q.   So I'm asking:  Based on what you
14   intend to testify to right now, is this an
15   accurate summary of what you intend to testify
16   to?
17        A.   I'm here to testify about the
18   information and the calculations that are
19   identified on Exhibit 1.
20        I have not seen this document
21   before, and I'm -- that's -- I'm here to
22   testify, and the information I'm here to
23   testify on is in Exhibit 1.
24        Q.   Okay.  Is there any additional work
25   or calculations you plan to do other than

Page 28

1    what's presented in Exhibit 1?
2         A.   At this time I have not been asked
3    to do any further calculations in this matter.
4         Q.   Okay.  We can put Exhibit 2 away.
5         I'm going to pull up Exhibit 3.
6         (Exhibit 3, Plaintiff's Fourth
7    Amended Initial Disclosures, marked for
8    identification.)
9         Q.   Are you able to see Exhibit 3,
10   Plaintiff's Fourth Amended Initial Disclosures,
11   on your screen?
12        A.   Yes, I can see Plaintiff's Fourth
13   Amended Initial Disclosures, the heading, on my
14   screen.
15        Q.   Okay.  Let me zoom out so you can
16   see a little bit more.
17        Have you previously seen Plaintiff's
18   Fourth Amended Initial Disclosures?
19        A.   I have not previously seen
20   Plaintiff's Fourth Amended Disclosures.
21        Q.   And well, let me ask you:  Have you
22   seen any version of plaintiff's initial
23   disclosures?
24        A.   I have not seen any version of
25   plaintiff's initial disclosures.

Page 29

1         Q.   And looking on Page 1, do you see
2    the bold heading where it says:  "A computation
3    of each category of damages claimed by the
4    disclosing party"?
5         A.   I need you to zoom in a little more,
6    please.
7         Q.   Sure.  (Complying.)
8         A.   Could you please repeat the
9    question.
10        Q.   Do you see the bold heading on
11   Page 1 where it says:  "A computation of each
12   category of damages claimed by the disclosing
13   party"?
14        A.   I can see the heading in bold under
15   Item 1:  "A computation of each category of
16   damages claimed by the disclosing party."
17        Q.   Okay.  And part of your role in this
18   case is to calculate those damages.  Right?
19        A.   My role in this case is to
20   calculate -- is to perform the mathematical
21   calculations that are outlined in explicit
22   detail in the Exhibit 1.
23        Q.   Okay.  And some of those
24   calculations are to calculate damages that the
25   FTC is claiming.  Right?

1    formulas that you put into the spreadsheets?
2        A.   Yes, the spreadsheets contain
3    formulas.
4            MS. PRIEST: Mr. Moon, we're going
5    to request the production of those
6    spreadsheets.
7            MR. MOON: Okay.  We'll have to
8    review that.
9    BY MS. PRIEST:
10       Q.   When you were performing your
11   calculations, how did you decide which
12   calculations to perform?
13       A.   I was instructed by the case team to
14   perform the calculations.
15           And I also wanted to add that the
16   formulas -- from the previous question, the
17   formulas are written on Exhibit 1.
18           MS. PRIEST: I'm going to object to
19   that last part as nonresponsive.
20       Q.   Who on the case team gave you
21   instructions on what calculations to perform?
22       A.   I received instructions from
23   Mr. Aijaz and Mr. Moon.
24       Q.   Okay.  And did they tell you
25   specifically which columns of which

Page 34

1    spreadsheets to add or subtract?
2        A.   Yes, I was instructed as to which
3    columns specifically to add and subtract.
4        Q.   And then you just did the math based
5    on what the lawyers told you to do.  Right?
6        A.   I performed the mathematical
7    calculations based on the instructions I was
8    given by the case team.
9            Excuse me.  I would like to take a
10   break.
11           MS. PRIEST: Okay.  Sure.  We can do
12   that.
13           THE VIDEOGRAPHER: The time now is
14   10:53 a.m.  We're going off the record.
15           (Recess was taken from 10:53 a.m. to
16   11:05 a.m.)
17           THE VIDEOGRAPHER: The time now is
18   11:05 a.m.  We're going back on record.
19           Please proceed, Counsel.
20   BY MS. PRIEST:
21       Q.   When you were doing your
22   calculations, did you offer the case team any
23   of your own opinions about how to calculate the
24   different values you were instructed to
25   calculate?

Page 35

1        A.   No, I did not offer the case team
2    any of my own opinions regarding the
3    mathematical calculations I was instructed to
4    calculate.
5        Q.   Okay.  I want to pull Exhibit 1 back
6    up so we can look at it in more detail.  Feel
7    free to use either the screen or the hard copy
8    that you have in front of you, whichever's
9    easier for you to see.
10           So I want to start on Page 2 under
11   the Consumer Harm heading.
12           Do you see that?
13       A.   Yes, I see that.
14       Q.   Okay.  And are you offering the
15   opinion in this case that the amount of money
16   you calculated is a reasonable estimate of
17   consumer harm?
18       A.   At this time I am not offering the
19   opinion that the result I received on the
20   mathematical calculation represents a
21   consumer -- amount for consumer harm.  That is
22   not -- it's just a result I received from a
23   mathematical calculation.
24       Q.   Okay.  So if we go to the grand
25   total of the Monetary Consumer Harm on Page 4,

Page 36

1    do you see where it says $51,118,804.92?
2        A.   Yes, I see that.
3        Q.   So you're not offering the opinion
4    that that $51 million and change is a
5    reasonable estimate of consumer harm.  Right?
6        A.   I am not offering any opinions.  I
7    am -- that is just the result I received when I
8    calculated the grand total as I was instructed
9    to do.
10       Q.   Okay.  And you don't have any
11   opinion about whether monetary relief is
12   appropriate at all in this case.  Right?
13       A.   I do not have any opinions on
14   whether monetary relief is appropriate in this
15   case.
16           That is not my role.  That is the
17   role of the case team.
18       Q.   Okay.  I want to go back up to
19   Page 2 to help me understand exactly what you
20   did for your calculation.
21           So on Page 2, Item 2 near the bottom
22   where it says: "Instructed to calculate
23   monetary consumer harm based on."
24           Do you see that?
25       A.   Yes, I do.

Page 37

10 (Pages 34 - 37)

1    Q.   Okay.  And where it says "values
2  provided with the dates," those values were
3  provided by the case team.  Right?
4    A.   Yes, those values were provided by
5  the case team.
6    Q.    Then in subpart b where it says
7  "subtotal of each of the five different pages
8  per month of the resignation flow," those
9  instructions were also provided by the FTC's
10  lawyers.  Right?
11    A.   Yes, the instructions in Item b was
12  provided by the case team.
13    Q.   Okay.  And what is your
14  understanding of the five different pages of
15  the resignation flow?
16    A.    You know, my understanding of the
17  five pages is how they're fields in a
18  spreadsheet, and I used them to determine -- to
19  perform the mathematical calculations I was
20  instructed to do.
21    Q.   Okay.  Do you know what the five
22  different pages look like?
23    A.   I do not know what the five
24  different pages look like.
25    Q.   Okay.  And in your calculation you

Page 38

And the grand total.
2    Q.    And you have no idea whether every
3  one of the people that visited those pages
4  intended to cancel.  Right?
5    A.   I do not have information on what
6  those fields represent outside of a limited
7  knowledge based on what was needed for the
8  calculations.
9    Q.   Okay.  What limited knowledge did
10  you need for the calculations?
11    A.   Well, I was told -- I was instructed
12  to perform the calculations based on the
13  information they gave me and the formula, which
14  is the renewal cash plus the refunded cash plus
15  the chargeback cash.  And those are negative
16  numbers.
17         And I was also given -- I mean, I
18  was given explicit instructions on how to
19  perform the calculations.
20    Q.    So you don't know if the users
21  represented in those columns actually intended
22  to cancel.  Right?
23         MR. MOON:  I'm going to object,
24  asked and answered.
25         THE WITNESS:  Can you repeat the

Page 40

1  assumed that everyone that visited any of those
2  five pages intended to cancel.  Is that right?
3    A.   I did not make any assumptions in my
4  calculations.
5         I just performed the mathematical
6  calculations as I was instructed to do so by
7  the case team.
8    Q.    So the assumptions that the case
9  team provided you were that everyone that
10  visited any of the five pages of the
11  cancellation flow intended to cancel.  Right?
12    A.   I cannot speak to what the
13  assumptions of the case team are.
14         I was just instructed to perform the
15  calculations based on the information I was
16  given that's identified in Exhibit 1.
17    Q.    And the instructions you were given
18  was -- were to include all of the visits to all
19  of the five different pages of the resignation
20  flow.  Right?
21    A.   The instructions I was given was to
22  calculate the subtotal and the total for all
23  the five pages that are listed in that
24  spreadsheet.
25         And then the grand total.  Sorry.

Page 39

question, please.
2  BY MS. PRIEST:
3    Q.    You don't know if the users
4  represented in the columns that you added up
5  actually intended to cancel their Match.com
6  subscriptions.  Right?
7         MR. MOON:  Same objection.
8         THE WITNESS:  I calculated the
9  formulas.  I performed the mathematical
10  calculations as I was instructed to do.
11         And outside of the column names of
12  the different pages, that's all I am aware of.
13  BY MS. PRIEST:
14    Q.    Okay.  So it's a yes or no question.
15         Do you know if the users represented
16  in the columns that you added up actually
17  intended to cancel their Match.com
18  subscriptions?
19         MR. MOON:  Object to asked and
20  answered.
21         But Kacy, you can answer it if you
22  can.
23         THE WITNESS:  I can't -- all's I --
24  I cannot it answer yes or no.
25         That information, they're columns on

Page 41

11 (Pages 38 - 41)

1    Q.   Okay.  Let's talk about your
2  cancellation rate opinion.
3        THE WITNESS:  Excuse me.  Could we
4  please take a break before we go into that.
5        MS. PRIEST:  Sure.
6        THE WITNESS:  I think maybe just ten
7  minutes.
8        Would that work?
9        MS. PRIEST:  That's fine with me.
10        THE WITNESS:  All right.  Thank you.
11        THE VIDEOGRAPHER:  The time now is
12  1:37 p.m.  we're going off the record.
13        (Recess was taken from 1:37 p.m.
14  1:50 p.m.)
15        THE VIDEOGRAPHER:  The time now is
16  1:50 p.m.  We're going back on the record.
17        Please proceed, Counsel.
18  BY MS. PRIEST:
19    Q.   So I want to talk about your
20  Cancellation Rate section on Exhibit 1 starting
21  on Page -- the bottom of Page 4.
22        Do you see that heading?
23    A.   I see it on my printout in front of
24  me, but I don't see that the exhibit is shared
25  on the screen.

Page 94

1  formula, and I calculated the cancellation rate
2  based on the columns and the data in the
3  spreadsheets.
4    Q.   Okay.  So your cancellation rate
5  could include people who never intended to
6  cancel.  Right?
7    A.   I don't know.
8        I didn't make that assessment.
9    Q.   Okay.  And for this calculation you
10  did two alternatives -- two alternative
11  starting dates, I should say.  Is that right?
12    A.   Yes, I was provided two
13  alternative -- two different start dates for
14  the calculations.
15    Q.   Okay.  One in October of 2016, one
16  in October of 2014.  Right?
17    A.   Yes, those are the two start dates I
18  was given.
19    Q.   And then as with your monetary harm
20  calculation, you removed certain users that
21  clicked subscription status but only for a
22  period beginning on March 2019.  Correct?
23    A.   Yeah, the dates -- the filtering
24  criteria I was given for the dates for the
25  MATCHFTC846945 were the same March 2019 to

Page 96

1    Q.   Give me one minute to try to share
2  the exhibit.
3        Can you see it now?
4    A.   Yes, I can see it now.
5    Q.   Okay.  What is your Cancellation
6  Rate section intended to measure?
7    A.   Well, it's a cancellation rate based
8  on a formula I was provided and values I was
9  provided for that calculation and start and end
10  dates for that calculation.
11    Q.   Do you believe that the cancellation
12  rate you calculate measures the percentage of
13  Match.com subscribers who cancelled as a share
14  of the number of users who intended to cancel?
15    A.   Could you please repeat the
16  question.
17    Q.   Do you believe that the cancellation
18  rate you calculate measures the percentage of
19  Match.com subscribers who cancelled their
20  subscription as a share of the number of
21  subscribers who intended to cancel their
22  subscription?
23    A.   So I did not do any assessment into
24  intentions of what users were doing.
25        I was given the cancellation

Page 95

1  March 2023 as the other calculation.
2    Q.   Okay.  And for using this
3  cancellation rate -- give me one second.  All
4  right.  Let me start that over.
5        In performing this calculation or
6  cancellation rate calculation, you used session
7  data.  Correct?
8    A.   Yes, I believe the Match documents,
9  the Bates numbers I relied on, were session
10  data.
11    Q.   And some of the other data that
12  we've looked at today is subscriber level data
13  rather than session level data.  Right?
14    A.   I only know of that to be monetary
15  data versus session data.
16        Outside of that, I don't know --
17  (reviewing document.)
18        Yeah, can you repeat the question,
19  please.
20    Q.   Sure.
21        Some of the data that we've looked
22  at today is subscriber level data rather than
23  session level data.  Right?
24    A.   I -- the other data that I used was
25  aggregated monetary data.

Page 97

25 (Pages 94 - 97)

1  2:11 p.m.)
2      THE VIDEOGRAPHER:  The time now is
3  2:11 p.m.  We're going back on the record.
4      Please proceed, Counsel.
5      MR. MOON:  FTC will reserve our
6  questions for the time of trial.
7      Chelsea, I have been advised that
8  Ms. Verdi would like an opportunity to read and
9  sign the transcript.
10     MS. PRIEST:  Okay.
11     THE VIDEOGRAPHER:  The time now is
12  2:11 p.m.  This concludes today's testimony
13  given by Ms. Kim Verdi.
14     Thank you, ma'am.  Thank you,
15  everyone.
16     (Deposition adjourned at 2:11 p.m.)
17
18
19
20
21
22
23
24
25

Page 102

1  Jason Moon
2  jmoon@ftc.gov
3          August 24, 2023
4  RE:   Federal Trade Commision v. Match Group, Inc., Et Al.
5    8/10/2023, Kimbleann Verdi (#6042131)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  errata-tx@veritext.com.
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 104

1  District of Columbia, to wit:
2      I, Stacey L. Daywalt, a Notary
3  Public of the District of Columbia, do hereby
4  certify that the within-named witness remotely
5  appeared before me at the time and place herein
6  set out, and after having been duly sworn by
7  me, according to law, was examined by Counsel.
8      I further certify that the
9  examination was recorded stenographically by me
10  and this transcript is a true record of the
11  proceedings.
12      I further certify that I am not of
13  counsel to any of the parties, nor an employee
14  of counsel, nor related to any of the parties,
15  nor in any way interested in the outcome of
16  this action.
17      As witness my hand and Notarial Seal
18  this 24th day of August, 2023.
19
20
21
22  Stacey L. Daywalt, Notary Public
23  My Commission Expires:  4/14/2026
24
25

Page 103

1  Federal Trade Commision v. Match Group, Inc., Et Al.
2  Kimbleann Verdi (#6042131)
3      E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Kimbleann Verdi              Date
25

Page 105

27 (Pages 102 - 105)

APP 081

```
1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF TEXAS
2                      DALLAS DIVISION
3     FEDERAL TRADE COMMISSION,    )
                                   )
4              Plaintiff,          )
                                   )
5              vs.                 )
                                   ) Case No.
6     MATCH GROUP, INC., a         ) 3:19-cv-02281-K
      corporation, and MATCH       )
7     GROUP, LLC, formerly known   )
      as MATCH.COM, LLC, a limited )
8     liability company,           )
                                   )
9              Defendants.         )
      _____)
10
11
12
13
14              REMOTE ORAL DEPOSITION OF
15               JAMES LANGENFELD, PH.D.
16                AUGUST 31, 2023
17                 9:04 a.m. CDT
18
19
20            Witness Appearing From:
21               Washington, D.C.
22
23
24      Conducted Remotely Via Videoconference
25
                                          Page 1
```

APP 082

REMOTE APPEARANCES

ON BEHALF OF THE PLAINTIFF:
   MR. M. HASAN AIJAZ
   MR. JASON MOON
   FEDERAL TRADE COMMISSION
   1999 Bryan Street
   Suite 2150
   Dallas, Texas 75201
   Phone: (214) 979-9386
   Fax: (214) 953-3079
   maijaz@ftc.gov
   jmoon@ftc.gov

ON BEHALF OF THE DEFENDANTS:
   (Present with the witness)
   MS. CHELSEA A. PRIEST
   SIDLEY AUSTIN LLP
   2021 McKinney Avenue
   Suite 2000
   Dallas, Texas 75201
   Phone: (214) 981-3300
   Fax: (214) 981-3400
   cpriest@sidley.com

ALSO PRESENT:
   Mr. Samuel Kitchens - Counsel, Match Group, LLC
   Ms. Jeanette Teckman - Counsel, Match Group, LLC
   Dr. Jennifer King - Plaintiff's Expert

Page 2

---

INDEX
                                              Page
Appearances                                      2
JAMES LANGENFELD, PH.D.
   Examination By Mr. Aijaz            6, 292
   Examination By Ms. Priest               286
Changes and Signature                          299
Reporter's Certificate                         301

EXHIBITS
No.   Description                          Page
Exhibit 1 ...................................   5
   Deposition Notice

Exhibit 2 ...................................  18
   6/14/23 Rebuttal Expert Report to Dr. King's
   Rebuttal Report

Exhibit 3 ...................................  77
   IT Ticket
   MATCHFTC782108
   Confidential

Exhibit 4 ................................... 128
   Article entitled "The FTC in the 1980s" by
   Langenfeld and Scheffman

Exhibit 5 ................................... 134
   8/22/23 Rebuttal Expert Report of
   James Langenfeld, Ph.D.

Exhibit 6 ................................... 189
   Article entitled "10 Things to Know About
   Completion Rates" by Sauro

Exhibit 7 ................................... 193
   Article entitled "The High Cost of Task Failure
   on Websites" by Sauro

Page 3

---

Reporter's Note:
   Quotation marks are used for clarity and do
   not necessarily reflect a direct quote.

Page 4

---

PROCEEDINGS
   (Exhibit 1 marked)
   THE REPORTER:  This is the deposition of
Dr. James Langenfeld, taken in the matter of Federal
Trade Commission v. Match Group, Inc., filed in the
United States District Court, Northern District of
Texas, Dallas Division, Case No. 3:19-cv-02281-K.
Today's date is August 31, 2023.  The time is
9:04 a.m.
   My name is Karen Shelton, and I am
reporting this deposition remotely from Fort Worth,
Texas.  The witness is located in Washington, D.C.
   Counsel, please state your appearances,
beginning with the noticing attorney.
   MR. AIJAZ:  My name is Hasan Aijaz with
the FTC.
   MR. MOON:  My name is Jason Moon with the
FTC.  I've got my audio off so we don't have
feedback.  I'm on a separate computer.
   MS. PRIEST:  Chelsea Priest with Sidley
Austin on behalf of defendants.
   (The witness was sworn by the reporter.)
   MR. AIJAZ:  All right.  Thank you.
///
///
///

Page 5

2 (Pages 2 - 5)

1 certainly looked at that information over time. I
2 just don't -- it's not explicitly in my report.
3     Q.  Did you speak to Mr. Ward at all?
4     A.  No.
5     Q.  So Dr. King wrote that, "Consumer
6 comments, complaints, or questions can, quote,
7 reveal a consumer centric perspective of a product
8 or service's primary challenges and problems.  In
9 this way, they're an excellent complement to a
10 heuristic analysis as they provide raw feedback from
11 consumers that may both highlight issues identified
12 by the heuristic analysis as well as raise other
13 customer concerns."
14         Do you agree with that statement?
15     A.  I agree with the statement in the sense
16 that one might consider them.  Do I think that that
17 statement is true as reflected by the vast majority
18 in this case of customer experiences and their
19 actual behavior?  I guess I would not agree with it
20 in that regard.  To the extent that she wants to
21 generalize it beyond the narrow samples she's looked
22 at, my analysis suggests that that's not
23 appropriate.
24     Q.  Okay.  On page 17 -- this will be
25 paragraph 29 -- there's a subheading titled, "The
Page 58

1     Q.  Sure.  I'll rephrase it.  Is it simple --
2 strike that.
3         Is it possible to cancel a subscription
4 using a mechanism that is not simple?
5     MS. PRIEST:  Same objections.
6     A.  I mean, in this case "simple" is
7 presum- -- I'm not offering an opinion on liability
8 here, whether this is a simple or not process.
9         Is something difficult but you canceled
10 anyway, is I think your question.  And, you know, as
11 an economist, I have to look at what people actually
12 do.  And if they're actually successful, it
13 obviously wasn't so overly complicated they couldn't
14 do it.
15         Was it simple?  I don't know what -- I
16 don't have an opinion on the exact legal definition
17 of that.  But typically when you look at someone's
18 behavior the way economists do, most people,
19 certainly in this case over 90 percent, who got
20 online were able to cancel.  That's a very high
21 number.  That suggests that, you know, more than
22 nine out of ten people were able to cancel.
23         If there's evidence that -- I mean, that's
24 pretty much it.  I'll let -- I'll let other people
25 spar over the exact definition of the word "simple"
Page 60

1 comments considered by Dr. King are not
2 representative of a typical user's experience,"
3 correct?
4     A.  That is correct.
5     Q.  So you understand that at issue in this
6 litigation is whether Match offered simple
7 mechanisms to cancel a subscription, correct?
8     A.  That's my understanding, yes.
9     Q.  And does your report specifically focus on
10 the online cancellation mechanism?
11     MS. PRIEST:  Objection, vague.
12     A.  It depends.  If I'm looking at -- it
13 depends on what I'm looking at here.  Some of the
14 analyses focused just on the online.  Some of them
15 include resignations through the consumer -- through
16 the consumer service at Match.
17     Q.  So again, with the context that the
18 question is whether or not Match offered simple
19 mechanisms to cancel, don't you agree that someone
20 can cancel a subscription even if that mechanism is
21 not simple?
22     MS. PRIEST:  Objection, argumentative and
23 speculative.
24     A.  Can we read back that question?  I'm not
25 sure I caught it correctly.
Page 59

1 there.
2     Q.  So there's no connection between the
3 cancellation rate and the simplicity of a process
4 that you're aware of, correct?
5     A.  I'm sorry.
6     MS. PRIEST:  Objection, vague.
7     A.  Yeah, I'm not sure if I heard the full
8 question.
9     Q.  Sure.  Let me put it another way.
10         We were talking about this -- right now
11 you mentioned the cancellation rate, nine out of
12 ten, is that right, roughly?
13     A.  More than that, about 95 percent, but yes.
14     Q.  So would that cancellation rate increase
15 or decrease when considering -- let me scratch that
16 question.  All right?
17         If a user has hundreds of dollars at stake
18 if they don't complete a task, they're more likely
19 to preserve through even a difficult online
20 cancellation mechanism, correct?
21     MS. PRIEST:  Objection, speculative.
22     A.  Yeah, I -- as a general matter, obviously
23 it's not a one-to-one, but if you had a ton of money
24 at stake, then presumably you'd be willing to put
25 more, if you're asking rationally, put more effort
Page 61

16 (Pages 58 - 61)

1  MR. AIJAZ:  This is a good time for a
2  break.  How much time -- we'll go off the record.
3       (Recess from 12:33 to 1:18)
4  MR. AIJAZ:  We'll be back on the record.
5       (Exhibit 5 marked)
6  BY MR. AIJAZ:
7  Q.  We're going to introduce Exhibit, I
8  believe, No. 5 now.  It'll be loaded into the -- it
9  is loaded into the platform.  And Dr. Langenfeld, if
10  you could just take a look and confirm that this is
11  your report dated August 22nd, 2023.
12  A.  Exhibit 5, right?
13  Q.  5, correct.
14  A.  Okay.  Without going through every single
15  page, this appears to be the second report that I
16  submitted in this matter.
17  Q.  Thank you.  As with the other ones, feel
18  free to use whichever version is easier for you.
19  A.  Thank you.
20  Q.  You're welcome.  So your assignment in
21  this matter, you described it on page 2.  Sorry.
22  Let me rephrase that.  Your assignment for the
23  second report, it's described on page 2, paragraph
24  9, correct?
25  A.  Actually, it's -- yes, it starts on --

Page 134

1  related to that allegation.
2       And to do that, you have to be able to,
3  assuming liability with the purpose of -- for the
4  purpose of calculating consumer injury, for that
5  purpose you have to be able to identify the people
6  and how much would have been adversely affected.
7  And you do a causation analysis as I've done here.
8  You look to find out whether there are certain
9  groups that the evidence, the economic evidence
10  indicates they're unlikely to have been affected by
11  what's alleged to have been wrong here.
12       So you have to draw a line from what is
13  being alleged, what the bad acts are, and what the
14  actual impact is.  So that sort of causation
15  analysis is typical, like I said, in damages and
16  returning money to customers in a case such as this.
17  Q.  And when you wrote "reasonably
18  approximates potential consumer harm," I wanted to
19  focus on the reasonable approximation part of that.
20       Is there a standard that you used in
21  assessing reasonable approximation?
22  A.  Well, what I did in this analysis is I did
23  a variety -- this report, I did a variety of
24  analyses to identify restitution here.  And where
25  there were assumptions, and I believe these are

Page 136

1  yes, it starts on there and carries over to 3.
2  <mark>Q.  And specifically you were asked or the</mark>
3  <mark>statement is, "Counsel for defendants has asked me</mark>
4  <mark>to assess whether the relief request reasonably</mark>
5  <mark>approximates potential consumer harm associated with</mark>
6  <mark>Match.com's online cancellation flow, assuming</mark>
7  <mark>defendants are found liable in this matter."</mark>
8  <mark>     Is that correct?</mark>
9  <mark>A.  That is correct.  You read that correctly.</mark>
10  Q.  Was that the extent of your assignment for
11  this second report?
12  A.  Yes, in the sense that I was asked to not
13  only do a quantification but also to do a causation
14  analysis which is typically done in damages and
15  consumer redress type cases.
16  Q.  So let's break those two apart.  The
17  quantification, does that refer to the amount of
18  potential monetary harm?
19  A.  Yes, it does.
20  Q.  And what do you mean by "the causation
21  analysis"?
22  A.  Well, there's an allegation in this
23  specific case about the resignation process not
24  being simple.  The question is, okay, what do we
25  know or who or how much money can we identify is

Page 135

1  assumptions that the FTC has made here about the
2  impact of this or that, and I've tested those
3  assumptions and I find that the actual data's
4  inconsistent with them, that I would remove those
5  particular people and their -- and the money that
6  they had in renewals from the calculation of
7  restitution.
8  Q.  What I'm trying to get at is -- and we can
9  proceed by analogy.  When you discuss potential
10  different methodologies in calculating the
11  cancellation rate, you said, well -- I believe you
12  said something along the lines that even if a
13  certain group was included or excluded, it wouldn't
14  change the number significantly or enough to really
15  affect your opinion.
16       My question here is, you know, this
17  reasonable approximation analysis you did, how
18  close to the actual number does something have to be
19  to reasonably approximate it?
20  MS. PRIEST:  Objection, vague.  Misstates
21  the testimony.  Calls for a legal conclusion.
22  A.  From my point of view, as I've done in
23  this report, identify things that are inconsistent
24  with the allegation in this case about the
25  simplicity of the cancellation flow.  I've taken

Page 137

35 (Pages 134 - 137)

1  apart from the online cancellation flow?
2      MS. PRIEST: Objection, vague.
3      A.  It depends where you're looking at it.  If
4  we're looking at whether someone was -- deserves
5  restitution and is injured, which is what this
6  report -- all the, you know, the analyses point to,
7  we would want to include people who successfully
8  resigned through customer service because they
9  didn't -- they didn't renew.  So for the purpose of
10  this report, I think it's useful -- it's important
11  to keep those people in.
12      Once again, I'm not -- I'm not offering an
13  opinion on liability here.
14      Q.  You looked at cancellation rates as part
15  of your analysis, correct?
16      MS. PRIEST: Objection, vague.
17      A.  If you're talking about I believe it's
18  Section -- I want to make sure I know which part
19  you're talking about.  Yeah, this would be Roman
20  numeral 10, page 27.  Is that what you're talking
21  about?
22      Q.  Just generally -- this was a setup
23  question.  You looked at cancellation rates, right?
24      A.  In that section, yeah.
25      Q.  Okay.  Did you compare cancellation rates

Page 158

1  of first-time subscribers versus resubscribers?
2      MS. PRIEST: Objection, vague.
3      A.  I didn't do an explicit analysis of that.
4  You mean -- I'm sorry.  Say that again?  Maybe I did
5  do it.  Would you repeat the question?  I beg your
6  pardon.
7      Q.  No worries.  Did you compare the
8  cancellation rates of first-time subscribers versus
9  resubscribers?
10      MS. PRIEST: Objection, vague.
11      MR. AIJAZ: Sorry.  What's vague about the
12  question?
13      MS. PRIEST: What do you mean by
14  "cancellation rate"?  As you said earlier in the
15  deposition, there are multiple different ways in
16  which cancellation rates have been calculated and
17  why it's a cancellation rate versus not.
18      MR. AIJAZ: Thank you.
19      Q.  So, Dr. Langenfeld, did you compare
20  cancellation rates of first-time subscribers versus
21  resubscribers?
22      MS. PRIEST: Objection, vague.
23      A.  I analyzed the actions of resubscribers to
24  see whether they reupped.  I have to go back and
25  look through my backup.  I don't remember whether we

Page 159

1  calculated that specific number or not.  I just
2  don't remember.
3      Q.  Okay.  Are you an expert in survey design?
4      A.  I've used surveys many times, but I
5  have -- and have had input into survey design, but I
6  don't believe that I've actually testified as an
7  expert on survey design.
8      Q.  Do you have expertise in survey design?
9  You know, have you had -- published articles on
10  survey design?
11      A.  I don't have articles on that, but clearly
12  I've used surveys from time to time in my analysis.
13  And in terms of the nature of the specific question,
14  some things like that, I've had input into it, but I
15  have not -- I don't advertise myself as someone who
16  will put together a survey.  But like I said, I've
17  frequently had input into it when the results of the
18  survey would be interesting for other parts of my
19  analysis.
20      Q.  On page 8 of this report, footnote 11,
21  this is similar to a footnote we looked at earlier.
22      A.  Give me a second to get there.
23      Q.  Yeah.
24      A.  Yes.
25      Q.  You write -- actually I think you quote

Page 160

1  Dr. -- Mr. Ward's report that he says, "All versions
2  of Match.com's online cancellation flow since at
3  least September 2014 have been simple."
4      Do you see that?
5      A.  I recall it, but I don't see it yet.  Let
6  me -- is this -- is this -- which footnote are we
7  talking about?
8      Q.  Footnote 11.  It's the last sentence if
9  you exclude the citation.
10      A.  Okay.  I'm quoting from Mr. Ward's report
11  there.  If your question is am I quoting from
12  Mr. Ward's report for the last two sentences,
13  excluding the reference, I am quoting from his
14  report there.
15      Q.  Okay.  Is that an assumption that you
16  relied upon in your report or in your opinions?
17      MS. PRIEST: Objection, vague.
18      A.  Well, you know, it -- certainly not in my
19  entire report, just referring to what we discussed
20  in this footnote dealing with the change from --
21  dealing with either to manage subscription from --
22  was "manage/cancel subscription."  I've got it in
23  here someplace, the specific words that were used in
24  earlier versions.
25      So that's part of it.  I mean, and then as

Page 161

41 (Pages 158 - 161)

1    So for the purpose of this report, that
2 person would -- should not be counted. This person
3 should be counted but shouldn't be -- but the
4 session should not be counted.
5    Q.  So you're saying anything that's not
6 related to monetary relief is not in your report?
7    A.  Well --
8       MS. PRIEST:  Objection.  Misstates
9 testimony, vague.
10    A.  Yeah, I mean, I do a lot of analyses to
11 check the assumptions that are built into the
12 calculations of restitution here.  So they all
13 relate to that one way or the other.  That's the
14 purpose of this report.  Once again, I'm not -- I'm
15 not giving an opinion on liability here.
16    Q.  Okay.  So just for purposes of looking at
17 what the cancellation rate on an attempt basis is,
18 putting aside monetary relief, just looking at how
19 many attempts resulted in a successful cancellation,
20 would you use session data or user-level data?
21       MS. PRIEST:  Objection, vague,
22 speculative.
23    A.  Yeah, I mean, that was not what I was
24 asked to do in either of these reports.  So I
25 don't -- you know, you're asking something that's

Page 178

1 outside of my scope of analysis here.
2    Q.  Well, the reason I ask is, you know, these
3 interruptions you talk about, aren't they accounted
4 for when you're looking at user-level data?  So, in
5 other words, to be precise, if someone has started a
6 cancellation flow and gets interrupted for any of
7 these reasons, as long as they go back the next day,
8 the next week and cancel before the renewal hits,
9 these interruptions would have no effect, correct?
10       MS. PRIEST:  Objection, vague,
11 speculative, argumentative.
12    A.  Well, we're not talking about them hitting
13 the cancel flow here.  You're talking about them
14 getting on the level earlier before the password.
15 And, you know, in that case, assuming that they all,
16 as your damage calculations do, assuming that with
17 some adjustments all of those people were damaged
18 where all those people deserve restitution, that's
19 where the issue here is, I believe.  Those people at
20 that level, you know, if they successfully canceled,
21 they successfully canceled, hit "cancel" and did it
22 later.  Those people would be under consideration
23 for restitution.
24       The people who have these other things,
25 they change their mind and all that other business,

Page 179

1 even up at that level, those people, you guys are
2 assuming all did it because of the -- stopped at
3 that higher level because of the complicated
4 cancellation flow.  And I'm saying that's a very
5 strong assumption which I don't see an analysis
6 showing that.  And these are just examples of the
7 type of things that could happen at that level.
8    Q.  Well, these things could happen during any
9 part of the flow, right?
10    A.  It's true.
11       MS. PRIEST:  Objection, vague,
12 speculative.
13    A.  It's true.  Some of these things could.
14 But it depends on, you know, the timing and a bunch
15 of other things, which I think you'd have to be more
16 specific about your question, I think, in that
17 situation.
18    Q.  So what I'm saying is, okay, let's just
19 look at the people who -- if someone was -- got to
20 the password wall page and then it was at that
21 specific moment that they were interrupted by an
22 outside event, my point is they could go back and
23 continue the cancellation process before renewal and
24 they would not be included in the FTC's monetary
25 harm calculation, correct?

Page 180

1       MS. PRIEST:  Objection, vague,
2 speculative.
3    A.  The FTC takes out people who did not
4 auto-renew, if that's your question.
5    Q.  Yeah.  So this doesn't impact the FTC's
6 monetary relief calculation, does it, because people
7 could have gone back and canceled?
8       MS. PRIEST:  Objection, speculative,
9 vague, argumentative.
10    A.  I sure don't understand that.
11    Q.  Okay.  So you talk a little bit about task
12 completion rate, right?  This is in Section 9 of the
13 report starting on page 22.
14    A.  I'll go to Section 9 of the report.  I'm
15 there at Section 9.
16    Q.  Okay.  And you say, "Research in the user
17 experience field" -- are you an expert in the user
18 experience field?
19       MS. PRIEST:  Objection, vague, asked and
20 answered.
21    A.  I have made use of user experience, but I
22 have not done the type of analyses that, for
23 example, Mr. Ward has done here, at least in the
24 early parts with the heuristic analysis.
25    Q.  Have you published anything in the user

Page 181

46 (Pages 178 - 181)

1 experience field?
2      MS. PRIEST:  Objection, vague, asked and
3 answered.
4      A.  Yeah, I think user experience is a part of
5 some of the economic analyses that I do.  But have I
6 published something specifically on user experience
7 as the key?  The answer's no.
8      Q.  Okay.  So you write that -- briefly, you
9 cite Jeff Sauro a couple of times.  Do you see that?
10      A.  I do.  You're right.
11      Q.  Is he considered an expert in the field of
12 user experience?
13      MS. PRIEST:  Objection, outside the scope,
14 vague.
15      A.  Yeah, I'm not in a position to qualify
16 people as experts.  That's more of a legal issue, I
17 think, sometimes.  He's someone who has written and
18 people rely upon in the area.
19      Q.  So how do you know that he's reliable
20 enough to cite in your report?
21      A.  I looked at other -- I've looked at the
22 literature generally, and this is one in particular
23 that Mr. Ward flags and it does seem to be one that
24 people, even Dr. King, pays attention to.
25      Q.  So you're relying on Mr. Ward and
Page 182

1 overwhelming majority of subscribers entering the
2 cancellation flow successfully canceled their
3 subscriptions" have to do with the simplicity or
4 lack of simplicity of the flow?
5      MS. PRIEST:  Objection to the extent it
6 calls for a legal conclusion, vague.
7      A.  Yeah, I can't offer the legal conclusion.
8 I can say that this is the type of analysis that --
9 I describe it here, how many people actually
10 effectively resign out of the people who hit "cancel
11 subscription," things along those lines.
12      I -- you know, Mr. Ward does a
13 calculation.  I do calculations also that are
14 similar.  It's the type of thing that assuming that
15 the Sauro standard, rating standard is reasonable,
16 I'm comparing numbers, something that economists do
17 all the time.
18      Q.  But how does this relate to -- if this
19 report is about monetary relief, how does this
20 relate to monetary relief?
21      MS. PRIEST:  Objection, vague.
22      A.  There -- we've talked about -- we've
23 talked about why I believe in a number of instances
24 the numbers, certainly some numbers that you
25 speculated about of people who would -- who could
Page 184

1 Dr. King's expertise for the purposes of
2 establishing Mr. Sauro's reliability?
3      MS. PRIEST:  Objection, vague.  Misstates
4 the testimony.
5      A.  Yeah, I mean, it's, generally speaking,
6 what I see in the literature and both of them have
7 looked at.  And that's -- I guess that's the basis.
8 Those are the bases.
9      Q.  So on -- sorry.  We're going to have to
10 turn back for a second.  Paragraph 34, where it says
11 that, "User experience research does not define
12 100 percent completion as indicative of an effective
13 process."  Do you see that?
14      A.  I see that.
15      Q.  At issue here is not whether there's an
16 effective process but whether the process is simple.
17 Isn't that correct?
18      MS. PRIEST:  Objection.  Calls for a legal
19 conclusion.
20      A.  Once again, I can't offer an opinion on --
21 I'm not offering an opinion on liability.  I'm
22 definitely not offering opinion on what the legal
23 implications of "simple" is.
24      Q.  Okay.  So what is the analysis, you know,
25 that starts in Section 9 stating that "The
Page 183

1 have done something different, you've talked about
2 that.
3      One of the things that I do here is to see
4 these sort of general tests, to see whether that
5 speculation in general is supported by the data.
6 And in these -- in the next section, I believe, I
7 talk about tasks that make me believe that these --
8 the speculative explanations that you have thrown
9 out about people being misled by the simplicity or
10 the lack of simplicity of the cancellation flow
11 don't amount to -- you're making over- --
12 overgenerous for the purpose of consumer injury and
13 restitution in making overgenerous assumptions.  At
14 least the calculations that are presented that
15 Ms. Verdi does are overgeneralizing what the damages
16 should be.
17      Q.  Well, don't you write on page -- paragraph
18 37, "If subscribers found Match.com's cancellation
19 flow not to be simple, as the FTC claims, then one
20 would expect to see a high percentage of those
21 attempting to cancel to be unsuccessful"?
22      So, in fact, you are talking about the
23 simplicity of the flow and cancellation rates being
24 connected, aren't you?
25      MS. PRIEST:  Objection, mischaracterizes
Page 185

47 (Pages 182 - 185)

1  the evidence, argumentative.
2      A.  I'm talking about the analysis here and
3  I'm talking about the FTC's allegations here.  I'm
4  not -- I'm not trying to put a legal description on
5  "simple" here, and that should be clear.  If I've
6  been loose in my language, I shouldn't have been.
7      Q.  But you're saying that a flow that is not
8  simple would have a low cancellation rate, aren't
9  you?
10     MS. PRIEST:  Objection, vague, misstates
11 the testimony.
12     A.  I'm saying what I say here, which is, if
13 it were overly complex or it was the cause of people
14 not canceling, you would expect to see a high
15 percentage of those who attempted to cancel failed
16 to cancel.  That's what I'm saying here.  And I'm
17 doing the test to see if that's true or not.
18     Q.  Okay.  So you're not testifying -- you
19 don't have an opinion on whether or not a
20 cancellation rate is indicative of the simplicity of
21 the flow?
22     MS. PRIEST:  Objection, vague.  Objection
23 to the extent it calls for a legal conclusion.
24     A.  I'm saying if it were true that there
25 was -- that people were basically resubscribing

Page 186

1  in evidence.
2      A.  Yeah, I don't recall one way or the other.
3      Q.  So, in other words, how many days did the
4  users have to complete the tasks that are the basis
5  of Jeff Sauro's 78 percent?
6      MS. PRIEST:  Objection, vague.  Assumes
7  facts not in evidence.
8      A.  Yeah, I just don't recall.
9      Q.  It was a single attempt, wasn't it,
10 because these are usability studies conducted in one
11 session?
12     MS. PRIEST:  Objection, vague, assumes
13 facts not in evidence.
14     A.  That may be.  I don't know that for a
15 fact.
16     Q.  Okay.  So let's just assume that's a fact.
17 Is that comparable to looking at a completion rate
18 that occurs, you know, between whenever they start
19 the flow all the way through however many days,
20 weeks, or months to the end of the subscription
21 period?
22     MS. PRIEST:  Objection, vague and
23 speculative.
24     A.  If you're doing what I'm doing here, which
25 is analyzing the restitution, then you want to look

Page 188

1  because of the cancellation flow, then you would
2  expect to see a high percentage of those people, you
3  would expect to see a high percentage of those
4  canceling unsuccessfully.  That's what I'm saying.
5      Q.  And that does not address the question of
6  simplicity.  Is that correct?
7      A.  What it doesn't do is it doesn't offer an
8  opinion on liability, on simplicity or not
9  simplicity.  What I'm looking at is consumer
10 behavior.  And if there was some reason associated
11 with the resignation flow, simplicity or not, you
12 wouldn't expect to see a high cancellation rate,
13 which is in fact what we do have here, a very high
14 cancellation rate.
15     Q.  So in here you write that Jeff Sauro wrote
16 the average task completion rate is 78 percent,
17 right?
18     A.  I'm sorry.  Where are we?  I think that's
19 correct, but where have you moved on to?
20     Q.  Paragraph 38 on page 22.
21     A.  All right.  Oh, yes.  The bottom of that
22 page.  You're right.
23     Q.  Are you aware that he's referring to first
24 attempt?
25     MS. PRIEST:  Objection.  Assumes facts not

Page 187

1  through the whole thing.  If they successfully
2  resigned wherever they resigned, they resigned and
3  they didn't end up paying money.  Like I said, I'm
4  not offering this as a proof related to an opinion
5  on liability or not.
6      Q.  The FTC is not seeking money for consumers
7  who actually canceled, are we?
8      MS. PRIEST:  Objection, vague.
9      A.  I don't believe they are.  But to find out
10 whether the people that they claim are owed money
11 because of the cancellation flow, those are
12 relevant -- that's relevant information to raise, in
13 my opinion as an economist.
14     (Exhibit 6 marked)
15     Q.  So we want to introduce Exhibit 6, which
16 is an article by Jeff Sauro titled "10 Things to
17 Know About Completion Rates."  It should already be
18 in the system.
19     A.  Okay.  Let me see if I can figure it out
20 this time.  All right.  This is, yes, Exhibit 6?
21     Q.  Yes, sir.  In it, he writes that, "Around
22 14 percent of users" --
23     MS. PRIEST:  Hold on.
24     MR. AIJAZ:  Go ahead.
25     MS. PRIEST:  Hasan, he's still getting it

Page 189

48 (Pages 186 - 189)

1  stopping point, that would be fine.  But it's up to
2  you.  We can do it now or we can do it at a more
3  convenient stopping point if you're in the middle of
4  a set of questions.
5      Q.  This is a -- this is a fine point.  We'll
6  pause right here.  A short break, five minutes?
7      A.  Yeah, that would be fine.
8      Q.  All right.  See you in five.
9      A.  Thank you.
10          (Recess from 3:18 to 3:31)
11          MR. AIJAZ:  We'll go back on record.
12  BY MR. AIJAZ:
13      Q.  All right.  Section 10 of your report
14  that's on page 27.
15      A.  Yes, I'm there.
16      Q.  And here you're comparing the rates of
17  successful cancellation to rates of successful
18  sign-up, correct?
19      A.  I'm doing that, yes.
20      Q.  Did you calculate any amount of monetary
21  harm using this analysis?
22          MS. PRIEST:  Objection, vague.
23      A.  This analysis was looking at our response
24  in particular to some benchmarks to find out whether
25  there should be a presumption that the cancellation

Page 210

flow has had an adverse effect on people being able
2  to resign.  And basically what I'm using here is I'm
3  taking an FTC benchmark to put in context the
4  adjustments I eventually make.
5      Q.  You came up with a -- we're not going to
6  get into the specifics right now, but toward the end
7  of your report you do assume -- you said assuming
8  liability, you come up with a calculation of
9  monetary relief, correct?
10      A.  That is correct.  Well, not monetary, just
11  restitution.  I don't -- I don't address any fines
12  or anything like that.
13      Q.  Okay.  How did your work in Section 10,
14  "Rates of Successful Cancellation Exceed Rates of
15  Successful Sign-up," factor into your calculation of
16  potential restitution assuming liability?
17          MS. PRIEST:  Objection, vague.
18      A.  It was one of the general analyses I did
19  to see if there was a reason to presume, as the FTC
20  does, at the higher level of the cancellation flow
21  whether there should -- whether those people should
22  be assumed to have canceled because of something to
23  do with the cancellation flow.  And basically this
24  is an analysis that looks at how successful they
25  were compared to what is an FTC benchmark, which is

Page 211

1  the sign-up.
2      Q.  Could Mr. Ward have done this analysis?
3      A.  I'm sorry?
4          MS. PRIEST:  Objection, vague,
5  speculative.
6      A.  I'm sorry.  I didn't catch the question.
7      Q.  Could Mr. Ward have done this analysis?
8          MS. PRIEST:  Objection, vague,
9  speculative, outside the scope.
10      A.  Yeah, I don't -- I wouldn't speculate as
11  to what Mr. Ward could or could not do.
12      Q.  In paragraph 50 --
13      A.  Yes?
14      Q.  It spans pages 27 and 28.
15      A.  It does.
16      Q.  And you say -- is it correct that you say,
17  on average, about 40 percent of users with a free
18  account that hit a payment page converted to a paid
19  account within 90 days?
20      A.  Yes, converting from a free account to a
21  paid account on average is 40 point -- I talk about
22  the variation over time, but yes.
23      Q.  And what steps did this group of users
24  have to do to convert from the free account to a
25  paid account?

Page 212

1      A.  They had to go through several steps to
2  provide information about payment, basically, and
3  sign on.
4      Q.  Would you mind providing me the specific
5  steps they had to take?
6          MS. PRIEST:  Objection, vague, asked and
7  answered.
8      A.  Yeah, I think it's -- I mean, it's
9  described, I believe, in the next section where I
10  look at the steps that they take.  I don't think I
11  put them -- I don't think I put them here.  But you
12  can go through -- you know, you can go through the
13  pages and do it.  That's what my -- that's what
14  Dheeraj did at my direction which I reviewed.
15      Q.  So again, 40 percent or only 40 percent of
16  free subscribers after hitting a paid -- payment
17  page converted to a paid account within 90 days,
18  correct, on average?
19      A.  Yeah.  Well, 40.56 percent, but yes,
20  40 percent is a rough number.
21      Q.  Do you think that low rate is attributable
22  to the difficulty of the -- of a flow and converting
23  to a paid account?
24          MS. PRIEST:  Objection, vague,
25  speculative.

Page 213

54 (Pages 210 - 213)

1    A.   Yes, I don't have an opinion on that.  I'm
2  just trying to use the benchmark that the FTC has
3  put forward.
4    Q.   So you don't have evidence that that
5  failure is attributable to a difficult flow rather
6  than a decision not to enroll because, for example,
7  the price was too high, correct?
8       MS. PRIEST:  Objection, vague,
9  speculative.
10    A.   Yeah, this is what they did.  The data
11  doesn't let me split out whether in their mind it
12  was the dollar value or the difficulty.  This is
13  just a simple calculation based on the FT- -- one
14  way to measure the FTC's proposed rule.
15    Q.   Okay.  And Section 11 compares the number
16  of steps and time complete and compares that between
17  canceling and signing up, right?
18    A.   Oh, yes, Roman 11 does that, yes.  You're
19  right.  I'm sorry.  I misheard you.
20    Q.   No worries.  Okay.  What -- did this
21  factor into your calculation of restitution assuming
22  liability?
23       MS. PRIEST:  Objection, vague.
24    A.   I mean, it is a -- it is a set of
25  fundamental analyses that lead me to conclude that

*Page 214*

1  people who -- that the adjustments I make when I do
2  the analysis later on are justified.  It tells me
3  sort of on a basic level that it shouldn't
4  necessarily be -- the way the FTC's calculated its
5  restitution shouldn't -- is overbroad because it
6  sweeps in a variety of people who it hasn't been
7  shown actually renewed because they were unable to
8  cancel.
9    Q.   And how does it show that?
10    A.   It shows that -- it shows that based on
11  FTC benchmarks, these particular -- that the
12  procedures here and in the next section are
13  consistent with that type of policy.
14       Whether -- I'm not -- once again, I'm not
15  offering an opinion as to whether there's a simple
16  process here or not, but these type of things mean
17  that you have to step forward and do additional
18  calculations to pull out some of the restitution
19  calculations that the FTC has put forward minus
20  Ms. Verdi's calculations.
21    Q.   On paragraph 55, which is page 29 and it
22  goes on to page 30, you cite Mr. Ward's report
23  showing that participants of his study took an
24  average of 74 seconds to cancel a subscription,
25  correct?

*Page 215*

1    A.   I'm just reporting what he did there, yes.
2    Q.   Are you aware that he created a 95 percent
3  confidence interval of the median time to cancel
4  based on the results of his usability study?
5       MS. PRIEST:  Objection, outside the scope.
6    A.   I looked through his calculations.  He may
7  have done a confidence interval.  I don't recall off
8  the top of my head.
9    Q.   Would it surprise you to learn that the
10  confidence interval he constructed for the median
11  time to cancel based on his usability study was
12  shorter than the median time to cancel based on
13  Match's actual population data?
14       MS. PRIEST:  Objection, outside the scope,
15  assumes facts not in evidence.
16    A.   Yeah, I've not seen that analysis.
17    Q.   Okay.  You have been qualified as an
18  expert on the basis of your experience with
19  statistics, right?
20    A.   That's part of my expertise, that's
21  correct.
22    Q.   Okay.  What does it tell you about a
23  sample where the confidence, 95 percent confidence
24  interval, that parameter doesn't capture the actual
25  population parameter?

*Page 216*

1       MS. PRIEST:  Objection, vague,
2  speculative, outside the scope.
3    A.   Yeah, I mean, that's a very general
4  question.  And it's -- obviously you have to look at
5  the specifics.  If you're asking me to assume that a
6  sample is clearly not representative of a larger
7  sample such as the opinions I gave about Dr. King's
8  analysis in my first report, then you should be
9  careful to make sure it's representative.  It
10  depends on the specifics.
11       And obviously I spent a lot of time on the
12  specifics in my first report, in my opinions there.
13  I just -- I just don't know what you're -- I'd have
14  to see the specifics to have an opinion on any
15  particular calculation.
16    Q.   Okay.  And you think Dr. King's sample is
17  unreliable because it doesn't Match with the
18  population parameters, correct?
19       MS. PRIEST:  Objection, vague, misstates
20  the testimony.
21    A.   I say in her instance, what she has
22  selected in terms of the number of customer -- the
23  subset of consumer interactions is not
24  representative of the population of people who use
25  Match.com.  That's definitely my opinion.

*Page 217*

55 (Pages 214 - 217)

1    A.  Yeah, I mean, there are lots of ways to
2  look at that.  But yes, if they did something once,
3  then the chances are they know how to do it, so -- a
4  second time.
5    Q.  Well, what I mean to say is if the
6  assumption is that Match is liable -- let's be
7  precise in that.  If the assumption is that the
8  online cancellation flow was not simple, then why
9  would you subtract out users who did a difficult
10  thing for failing to do that difficult thing again?
11    A.  Well, first of all, I'm only making the
12  assumption for the purpose of calculating
13  restitution here.  I'm not offering a liability
14  opinion.  But there is -- the vast majority of
15  people successfully -- successfully resigned.  Why
16  you would presume based on that that it is a
17  difficult process is an assumption that basically
18  goes against the data.  Most everybody can do it,
19  then the economic analysis would be most people can
20  do it.  If most people can do it, does that make it
21  extremely difficult or specific?
22    The issue isn't can we speculate about it
23  being difficult for some people the first time and
24  difficult for some people the second time.  You can
25  speculate about that, but I don't see evidence that
                                        Page 278

1  does that analysis or shows it.  And the fact that
2  the other analyses that I do show that the vast
3  majority of people are -- can successfully cancel
4  undermines the assumption that you're making that
5  there's a large group of people in the box that
6  you're creating there.
7    Q.  So I just want to be clear here.  I'm not
8  trying to box you into adopting an assumption that
9  goes directly counter to, you know, your client's
10  case, but I'm saying this exercise is for the
11  monetary -- I forget what you're calling it --
12  restitution, the restitution analysis --
13    A.  Restitution.
14    Q.  -- is then under the assumption that Match
15  is or would be or is, whatever, would be found
16  liable, right?  That's the starting point for this
17  particular exercise.  I know you're not adopting it,
18  but for the purposes of this restitution analysis
19  exercise, the starting point is at assuming they're
20  liable, correct?
21    A.  For some group of people, that would be
22  true, to be damaged by it.  What I do is I pull
23  people out of -- in restitution calculations -- out,
24  because the basic economic analysis is consistent
25  with those people, even assuming there was some
                                        Page 279

1  difficulties, those people were not harmed.
2    If the person got their money back, you
3  can argue about lots of other things, but if they
4  got their money back or if they successfully
5  canceled, then they simply -- they weren't -- they
6  weren't damaged and they shouldn't be given money
7  back in restitution.
8    So all of these analyses, these three
9  analyses that I do simply identifies a group where
10  based on the economic analysis it's unlikely that
11  the reason that they did not cancel was -- had
12  anything to do with the flow.  There were other
13  reasons that were there.  And that's the type of
14  analysis I do.  I do the basic economic analysis,
15  raising questions about the reliability of what the
16  FTC's found.
17    Q.  It just sounds like the analysis, the
18  assumption that they're found liable, would require
19  the assumption that the flow is not simple.
20  Correct?
21    A.  No.
22    MS. PRIEST:  Objection to the extent it
23  calls for a legal conclusion.
24    A.  It's -- first of all, I'm not offering a
25  legal conclusion.  I've said that dozens of times
                                        Page 280

1  and I'm still not.  No.  The analysis I've done has
2  identified a group of people who resubscribed, and
3  we have -- I've eliminated groups which are unlikely
4  to have been -- had anything to do with the
5  difficulty of cancellation.
6    What remains in the calculation, and it's
7  a positive number, are the instances, are the
8  people -- is the dollar value of those renewals that
9  I can't explain for the other three reasons.  And
10  that's -- and so I'm assuming that what's left,
11  what's left is probably not -- is probably too big.
12  It's too many -- there are other reasons why people
13  didn't go through the cancellation flow the entire
14  way, but I can't quantify those.  I've quantified
15  the ones that I can.
16    Q.  Okay.  So for this group of
17  resubscribers, is your assumption that anyone who's
18  completed a cancellation process is able to complete
19  it again?
20    MS. PRIEST:  Objection, vague, incomplete
21  hypothetical.
22    A.  I'm assuming that if people -- if people
23  had resubscribed before, my calculation removes them
24  under the assumption that they -- that we have
25  strong evidence that if they didn't resubscribe,
                                        Page 281

71 (Pages 278 - 281)

1  contains any changes and the reasons therefor;
2  ___ was not requested by the deponent or a
3  party before the completion of the deposition.
4       I further certify that I am neither
5  counsel for, related to, nor employed by any of the
6  parties in or counsel to this action, nor am I
7  financially or otherwise interested in the outcome
8  of this action.
9       Certified to me this 8th day of
10 September, 2023.
11
12
13       *Karen L Shelton*
         Karen L. Shelton, CSR, RDR, CRR
14       TX CSR 7050 Exp: 10/31/23
         Veritext Legal Solutions
15       Firm No. 571
         300 Throckmorton Street
16       Suite 1600
         Fort Worth, Texas 76102
17       (817) 336-3042  (800) 336-4000
18
19
20
21
22
23
24
25
                                      Page 302

1  cpriest@sidley.com
2              September 8, 2023
3  RE: Federal Trade Commission v. Match Group, Inc., Et Al.
4  DEPOSITION OF: James Langenfeld , Ph.D. (# 6079281)
5      The above-referenced witness transcript is
6  available for read and sign.
7      Within the applicable timeframe, the witness
8  should read the testimony to verify its accuracy. If
9  there are any changes, the witness should note those
10 on the attached Errata Sheet.
11     The witness should sign and notarize the
12 attached Errata pages and return to Veritext at
13 errata-tx@veritext.com.
14     According to applicable rules or agreements, if
15 the witness fails to do so within the time allotted,
16 a certified copy of the transcript may be used as if
17 signed.
18             Yours,
19             Veritext Legal Solutions
20
21
22
23
24
25
                                      Page 303

77 (Pages 302 - 303)

```
 1                UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION
 3
       --------------------------------X
 4     FEDERAL TRADE COMMISSION,         )
                                         )
 5              Plaintiff,               )
                                         )  Case No.
 6     vs.                               )
                                         )  3:19-cv-02281-K
 7     MATCH GROUP, INC. a corporation,  )
       and MATCH GROUP, LLC, formerly    )
 8     known as MATCH.COM, LLC, a        )
       limited liability company,        )
 9                                       )
                Defendants.              )
10     --------------------------------X
11
12
13
14        30(B)(6) VIDEOTAPED DEPOSITION OF BIKRAM BANDY
15            Monday, June 26, 2023; 11:10 a.m. EDT
16
17
18
       Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR,
19     CLR, RSA, NYRCR, NYACR, CA CSR 14409, NJ CCR
       30XI00244600, NJ CRT 30XR00019500, Washington State
20     CSR 23005926, Oregon CSR 230105, TN CSR 998, Remote
       Counsel Reporter, LiveLitigation Authorized Reporter,
21     Notary Public
22     Job No. 5957247
```

                                              Page 1

APP 094

CONFIDENTIAL

| | |
|---|---|
| 1   Videotaped Deposition of BIKRAM BANDY, held | 1   --oOo-- |
| 2   at law offices of Sidley Austin LLP, 1501 K Street, | 2   INDEX OF EXAMINATION |
| 3   Northwest, Washington, D.C. 20005, before | 3   BIKRAM BANDY |
| 4   Cindy L. Sebo, Registered Merit Court Reporter, | 4   Federal Trade Commission v. Match Group |
| 5   Certified Real-Time Reporter, Registered Professional | 5   Monday, June 26, 2023 |
| 6   Reporter, Certified Shorthand Reporter, Certified | 6   --oOo-- |
| 7   Court Reporter, Certified LiveNote Reporter, | 7 |
| 8   Real-Time Systems Administrator, California Shorthand | 8   EXAMINATION BY                     PAGE |
| 9   Reporter 14409, New Jersey Certified Court Reporter | 9   Mr. Hummel                  9, 82 |
| 10   30XI00244600, New Jersey Certified Realtime Reporter | 10   Mr. Aijaz                    201 |
| 11   30XR00019500, New York Realtime Certified Reporter, | 11 |
| 12   New York Association Certified Reporter, Washington | 12 |
| 13   State CSR 23005926, Oregon CSR 230105, Tennessee CSR | 13 |
| 14   998, Remote Counsel Reporter, LiveLitigation | 14 |
| 15   Authorized Reporter and Notary Public, beginning at | 15 |
| 16   approximately 11:10 a.m. EDT, when were present on | 16   CERTIFICATE OF REPORTER                  206 |
| 17   behalf of the respective parties: | 17   INSTRUCTIONS TO WITNESS              207 |
| 18 | 18   ERRATA                        208 |
| 19 | 19   ACKNOWLEDGMENT OF WITNESS                210 |
| 20 | 20 |
| 21 | 21 |
| 22                                    Page 2 | 22                                    Page 4 |

| | |
|---|---|
| 1   A P P E A R A N C E S : | 1   --oOo-- |
| 2   Attorneys for Plaintiff: | 2   INDEX TO EXHIBITS |
| 3   FEDERAL TRADE COMMISSION | 3   BIKRAM BANDY |
| 4   M. HASAN AIJAZ, ESQUIRE | 4   Federal Trade Commission vs. Match Group |
| 5   1999 Bryan Street, Suite 2150 | 5   Monday, June 26, 2023 |
| 6   Dallas, Texas 75201 | 6   --oOo-- |
| 7   214.979.9350 | 7   (Exhibits Provided Electronically to Reporter.) |
| 8   maijaz@ftc.gov | 8   FTC DEPOSITION |
|     | 9   EXHIBIT NUMBER      DESCRIPTION              PAGE |
| 9   Attorneys for Defendants: | |
| 10  SIDLEY AUSTIN LLP | 10  Exhibit 1   Notice of Deposition of Plaintiff |
| 11  CHAD S. HUMMEL, ESQUIRE | 11             Federal Trade Commission          7 |
| 12  1999 Avenue of the Stars 17th Floor | 12  Exhibit 2   Notice of Deposition of Plaintiff |
| 13  Los Angeles, California 90067 | 13             Federal Trade Commission          7 |
| 14  310.595.9505 | 14 |
| 15  chummel@sidley.com | 15  Exhibit 3   Plaintiff's Fourth Amended |
| 16  -and- | 16             Responses to Defendant's First |
| 17  CHELSEA A. PRIEST, ESQUIRE | 17             Set of Interrogatories          13 |
| 18  2021 McKinney Avenue, Suite 2000 | 18  Exhibit 4   E-mail string              36 |
| 19  Dallas, Texas 75201 | 19 |
| 20  214.981.3476 | 20  Exhibit 5   Plaintiff's Third Amended |
| 21  cpriest@sidley.com | 21             Initial Disclosures          60 |
| 22  ALSO PRESENT:  ORSON BRAITHWAITE, Videographer | 22 |
|                                    Page 3 |                                    Page 5 |

2 (Pages 2 - 5)

Veritext Legal Solutions
800-336-4000

APP 095

| | |
|---|---|
| 1 had the word "cancel" in it.  I don't | 1 BY MR. HUMMEL: |
| 2 remember the exact language, but "cancel" | 2 Q.    Let me be, then, more precise. |
| 3 was in the title of the option, and it was | 3 Does the FTC have any survey of |
| 4 also in the description of what -- what that | 4 consumers who reached that page to confirm your |
| 5 option would do. | 5 assumption? |
| 6 So prior to May 20-- 2019, if | 6 MR. AIJAZ:  Objection: vague. |
| 7 people got to the password page, they clicked | 7 THE WITNESS:  So -- |
| 8 on a link that had the word "cancel" in it | 8 BY MR. HUMMEL: |
| 9 and was described as -- as a -- as a way | 9 Q.    Yes or no?  It's a yes-or-no |
| 10 where you could go to cancel your | 10 question. |
| 11 subscription. | 11 A.    I believe, based on what I've been |
| 12 After May 2019, the -- the -- | 12 told during my prep, that the FTC does not have |
| 13 Match changed it to Manage Subscriptions, so | 13 any surveys or studies done prior to the |
| 14 they made it harder to figure out that that's | 14 initiation of this litigation. |
| 15 where you needed to go to -- to cancel the | 15 Q.    What about after?  Is there any |
| 16 subscription.  But, nonetheless, that would | 16 empirical evidence of what consumers thought, |
| 17 be the place where people would go to cancel | 17 believed or intended when they reached Page Code |
| 18 their subscription. | 18 189? |
| 19 BY MR. HUMMEL: | 19 MR. AIJAZ:  So let me first just |
| 20 Q.    And -- and we're talking past each | 20 -- I think it would -- because this -- this |
| 21 other.  Let me -- let me be more precise. | 21 overlaps with Topic 6, which was the subject |
| 22 Does the FTC have any empirical | 22 of lots of -- when you talk about studies, |
| Page 22 | Page 24 |

| | |
|---|---|
| 1 evidence -- consumer survey, subscriber survey, | 1 there's lots of negotiations between the |
| 2 interviews with users -- that when they got to | 2 parties. |
| 3 Page 189, they, in fact, intended to cancel, as | 3 And so I don't know if you want to |
| 4 opposed to merely visiting Page 189? | 4 introduce that as -- as an exhibit to show |
| 5 MR. AIJAZ:  Objection: form and | 5 what was actually agreed to and not agreed to |
| 6 ambiguous; assumes facts not in evidence. | 6 be part of this deposition. |
| 7 BY MR. HUMMEL: | 7 MR. HUMMEL:  That's fine. |
| 8 Q.    Do you see my point? | 8 BY MR. HUMMEL: |
| 9 A.    I don't. | 9 Q.    I'm asking you if you have any |
| 10 Q.    Okay.  So it's possible, is it not, | 10 knowledge -- it's a very clear question, in my |
| 11 that a subscriber could simply click on Settings, | 11 view -- |
| 12 click on Cancel, get to the password wall but not | 12 A.    I -- |
| 13 intend to cancel, right? | 13 Q.    -- are you aware -- |
| 14 MR. AIJAZ:  Objection: calls for | 14 A.    -- I'm giving you an answer. |
| 15 speculation. | 15 Q.    -- so you're not aware of any?  So |
| 16 THE WITNESS:  It seems a little | 16 the answer is no? |
| 17 far-fetched.  If -- if a consumer clicks on | 17 A.    I gave you -- what I -- my answer |
| 18 a link that says Cancel, that they're just | 18 was what it was. |
| 19 looking around?  Like, I think it's a | 19 Q.    Okay.  I'll reask. |
| 20 reasonable assumption that if someone clicks | 20 Has the FTC interviewed a single |
| 21 on a link that says Cancel, that they | 21 subscriber that said, When I got to Page 189, I |
| 22 intended to cancel. | 22 intended to cancel?  Is there going to be |
| Page 23 | Page 25 |

7 (Pages 22 - 25)

1    MR. AIJAZ:  It's irrelevant.
2    BY MR. HUMMEL:
3    Q.    Okay.  Did you speak with her in
4    connection with preparing for your testimony on
5    Topic 2?
6    MR. AIJAZ:  Objection: asked and
7    answered.
8    MR. HUMMEL:  Okay.
9    THE WITNESS:  I did not speak with
10   her.
11   BY MR. HUMMEL:
12   Q.    Right.  Okay.  Thanks.
13   In preparation for your deposition
14   today, did you review any consumer complaints or
15   purported complaints relating to the Match cancel
16   -- online cancellation flow?
17   MR. AIJAZ:  Objection: scope.
18   THE WITNESS:  I don't think I
19   looked at them for preparation today.  I --
20   I looked at them in preparation for my prior
21   testimony, but I didn't need -- I didn't --
22   it didn't -- I didn't feel the need to go

Page 54

1    back and have to look at them again.
2    BY MR. HUMMEL:
3    Q.    Okay.  In connection with the FTC's
4    calculation of purported consumer harm that we
5    just discussed -- and in -- in particular, its
6    response to Interrogatory Number 2 -- excuse me --
7    Interrogatory Number 3, Topic 2 -- has the FTC
8    investigated whether there are other reasons for
9    abandonment of an attempt to cancel other than
10   that the -- that the online cancel- --
11   cancellation flow was allegedly not simple?
12   MR. AIJAZ:  Objection: form; vague
13   and scope.
14   THE WITNESS:  Yeah.  I recall we
15   talked about this last time, and you were
16   giving me hypotheticals about why someone
17   might abandon.  And I -- like, the doorbell
18   rang, or something like that, and I said,
19   you know, it's -- anything's possible.
20   But, you know, it seems like if
21   someone is going to the cancellation flow,
22   that they have an intent to cancel.  So

Page 55

1    theoretically possible, but I -- I don't
2    think it's -- you know, I think it's a
3    reasonable assumption that people that go
4    through the cancellation flow intended to
5    cancel.  And if they didn't cancel, it was
6    because something thwarted them -- the design
7    of the flow thwarted them from doing that.
8    MR. HUMMEL:  Do you mind reading
9    the question back?
10   CERTIFIED STENOGRAPHER:  Sure.
11   - - -
12   (Whereupon, the certified
13   stenographer read back the
14   pertinent part of the record.)
15   - - -
16   MR. AIJAZ:  Same objections.
17   BY MR. HUMMEL:
18   Q.    I don't think you answered my
19   question.
20   The question was:  Has the FTC
21   investigated, not whether you think it's a
22   reasonable assumption or not.

Page 56

1    A.    I would say that -- yeah, the FTC
2    considered, like, why someone would abandon, but I
3    don't know, like, what you mean -- like, I don't
4    know -- like, investigated -- I mean, do we
5    consider that there might be other reasons why
6    someone might abandon the -- the flow?  I'm sure
7    we did, but it didn't seem like any of those
8    reasons were particularly plausible or material.
9    Q.    What did the FTC do to investigate
10   whether there were other reasons for abandonment,
11   as opposed to the -- other than the cancellation
12   flow?
13   MR. AIJAZ:  Objection: vague and
14   scope.
15   THE WITNESS:  Look, I think we
16   talked about this before, but, you know, one
17   of the things we did in our investigation is
18   we looked at the consumer complaints.  And
19   the consumer complaints were telling a
20   story, and that story seemed to be
21   consistent with what our common-sense
22   observation of what the cancellation flow

Page 57

15 (Pages 54 - 57)

CONFIDENTIAL

1    was.
2        And so, you know, I -- I don't
3    think we were focused on investigating the
4    absence.  So we were investigating whatever
5    the facts indicated.  We looked at the
6    cancellation flow, we looked at the consumer
7    complaints, and that's what we investigated.
8        BY MR. HUMMEL:
9    Q.    So, to be clear, the FTC's
10   investigation was limited to a common-sense
11   evaluation by the FTC and an evaluation of
12   purported consumer complaints?
13       MR. AIJAZ:  Objection: misstates
14   testimony; vague.
15       THE WITNESS:  Yeah -- yeah, I --
16   I -- I don't -- I think that's -- that's too
17   limiting.  I mean, I can't -- I'm not
18   prepared and able to talk about every single
19   step that the Agency took in its
20   investigation.  Those are just two factors
21   that they looked at.
22       Were there other things that they

Page 58

1    looked at?  Possibly.  But I -- you know, I
2    can't -- I'm not here to detail, like, every
3    single investigative step that -- that the
4    Agency took.  I can't do that.  My memory is
5    not that good.
6        BY MR. HUMMEL:
7    Q.    Did the FTC conduct any surveys of
8    consumers who failed to -- strike that.
9        Did the FTC conduct any surveys of
10   consumers who did not ultimately complete the
11   cancellation flow but, rather, abandoned it to
12   determine why the abandonment took place?
13   A.    This is going --
14       MR. AIJAZ:  Same objection
15   regarding scope.
16       THE WITNESS:  -- this is going to
17   sound familiar.  I'm not aware of any
18   studies or surveys that the Agency did prior
19   to the initiation of this litigation -- or
20   I -- no.  Strike that.
21       I'm not aware that -- or no.
22       The Agency did not do any studies

Page 59

1    or surveys prior to the initiation of this
2    litigation.
3        BY MR. HUMMEL:
4    Q.    If you can look, please, at --
5        MR. HUMMEL:  I know.
6        What's it -- Exhibit 5 is next?
7        THE WITNESS:  Done with 3?
8        BY MR. HUMMEL:
9    Q.    Done for now.
10       MR. HUMMEL:  Exhibit 5.
11       THE WITNESS:  Thank you.
12       MR. AIJAZ:  You guys got to get
13   narrower tables.
14       THE WITNESS:  Which one?
15       CERTIFIED STENOGRAPHER:  Three,
16   please.
17       --oOo--
18       (FTC Deposition Exhibit Number 5,
19       Plaintiff's Third Amended Initial
20       Disclosures, marked for
21       identification, as of this date.)
22       --oOo--

Page 60

1        BY MR. HUMMEL:
2    Q.    Exhibit 5 are the Plaintiff's Third
3    Amended Initial Disclosures in the case.
4        Have you reviewed this document in
5    connection with your preparation for testimony
6    here today?
7    A.    So, actually, I have not.  I looked
8    at the second amended --
9    Q.    Okay.
10   A.    -- I -- I -- well, I -- I -- maybe
11   -- maybe I did -- maybe I did.  I -- I'm pretty
12   sure what I looked at was second amended, and I
13   didn't review the entirety of it.  I -- I believe
14   I only reviewed the provision.
15       Let me take a look and see if it's
16   -- I don't think it's going to be different from
17   what I looked at it for.
18   Q.    What I'm going to ask you about
19   begins on Page 25 through 26, related to civil
20   penalties.
21       (Whereupon, the witness reviews the
22       material provided.)

Page 61

16 (Pages 58 - 61)

C E R T I F I C A T E

1  I, Cindy L. Sebo, Nationally Certified Court

2  Reporter herein, do hereby certify that the foregoing

3  deposition of BIKRAM BANDY was taken before me

4  pursuant to notice at the time and place indicated;

5  that said witness duly swore to tell the truth, the

6  whole truth and nothing but the truth under penalties

7  of perjury; that said testimony of the witness was

8  correctly recorded to the best of my abilities in

9  machine shorthand, thereafter transcribed under my

10  supervision with computer-aided transcription; that

11  the deposition is a true and accurate record of the

12  testimony given by the witness; that I am neither

13  counsel, nor kin to any party in said action, nor

14  interested in the outcome; and that a copy of this

15  transcript obtained from a source other than the

16  court reporting firm, including an adversary or

17  co-counsel in the matter, is uncertified and may not

18  be used at trial. Jul _____ 2023

19  _____

     Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR, CLR,

20  RSA, NYRCR, NYACR, CA CSR 14409, NJ CCR

     30XI00244600, NJ CRT 30XR00019500, Washington

21  CSR 23005926, Oregon State 230105, Tennessee

     CSR 998, Remote Counsel Reporter,

22  LiveLitigation Authorized Reporter, Notary

     Public

                                            Page 206

---

1  Hasan Aijaz

2  maijaz@ftc.gov

3          July 11, 2023

4  RE:   Federal Trade Commision v. Match Group, Inc., Et Al.

5  6/26/2023, Bikram Bandy , 30 b6 (#5957247)

6     The above-referenced transcript is available for

7  review.

8     Within the applicable timeframe, the witness should

9  read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12     The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  errata-tx@veritext.com.

16

17   Return completed errata within 30 days from

18  receipt of testimony.

19   If the witness fails to do so within the time

20  allotted, the transcript may be used as if signed.

21

22          Yours,

23          Veritext Legal Solutions

24

25

                                            Page 207

---

1  Federal Trade Commision v. Match Group, Inc., Et Al.

2  Bikram Bandy , 30 b6 (#5957247)

3       E R R A T A   S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____   _____

24  Bikram Bandy  , 30 b6              Date

25

                                            Page 208

---

1  Federal Trade Commision v. Match Group, Inc., Et Al.

2  Bikram Bandy  , 30 b6 (#5957247)

3     ACKNOWLEDGEMENT OF DEPONENT

4     I, Bikram Bandy , 30 b6, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____   _____

12  Bikram Bandy  , 30 b6              Date

13  *If notary is required

14       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15       _____ DAY OF _____, 20___.

16

17

18       _____

19       NOTARY PUBLIC

20

21

22

23

24

25

                                            Page 209

53 (Pages 206 - 209)

APP 098.1

## Bates Numbers
1. MATCHFTC846944
   a. InSessionOrFiftySecondsPostResignMetrics
   b. Aggregated session data related to resignation flow.
2. MATCHFTC846511
   a. MATCHFTC846511 Resign Path Cash by Drop Off Point Starting with Manage Subscription Page.xlsx
   b. Aggregated Monetary data.
3. MATCHFTC846469
   a. MATCHFTC846469 Resign Flow Counting from Manage Subscription Login Page.xlsx
   b. Aggregated subscription data.
4. MATCHFTC846948
   a. Resign Flow Sessions For US Subs Where Subscription Not Previously Resigned.
   b. Aggregated subscription data.
5. MATCHFTC846945
   a. Monthly Sessions Going To Subscription Status Page.
   b. Aggregated subscription data.

## Civil Penalties

**Civil Penalty Calculation based on # of Days**
1. Instructed to calculate the civil penalty based on
   a. Formula: # of days * $ amount per violation
   b. Values provided:
      i. Start date: 9/26/2014.
      ii. End Date: 7/28/2023
      iii. Amount per violation $50,120
2. Steps
   a. Calculations for End Date of 7/28/2023
      i. Calculated the number of days by subtracting 7/28/2023 from 9/26/2014 for a total of 3227 days.
      ii. Calculated the civil penalty by multiplying 3227 * 50,120.
      iii. Result civil penalty of $161,737,240.

**Civil Penalty Calculation based on Total # of Sessions**
1. Documents relied on:
   a. MATCHFTC846948 Resign Flow Sessions For US Subs Where Subscription Not Previously Resigned.
   b. MATCHFTC846945 Monthly Sessions Going To Subscription Status Page.
2. Instructed to calculate the civil penalty based on
   a. Formula: # of sessions * $ amount per violation



EXHIBIT

1

APP 099

b. Values provided:
  iv. Amount per violation $50,120
  v. Start date: October 2014
  vi. End date: March 2023 (end of data set)
3. Instructed to calculate # of total sessions based on
  a. Formula: 948 Column D - 945 Column F
  b. 948 Column D 'sessionsviewingloginpage'
  c. 945 Column F 'sessionsviewing password verification page and Subscription Status'
    i. Start date: March 2019
    ii. End date: March 2023 (end of data set)
4. Steps
  a. Filtered data set on MATCHFTC846948 the sheet labeled "Sheet1" to include only entries from October 2014 to March 2023 using column A labeled 'date_part' for the year and column B labeled 'date_part' for the month.
  b. Calculated the Total for 948 Column D by summing up all values in the column on the filtered data.
    i. Result: 24,168,654 total sessions viewing login page.
  c. Filtered data set on MATCHFTC846945 the sheet labeled "Data" to include only entries from March 2019 to March 2023 using column A labeled 'Year for the year and column B labeled 'Month' for the month.
  d. Calculated the Total for 945 Column F by summing up all values in the column on the filtered data.
    i. Result: 2,250,987 total sessions viewing password verification page and Subscription Status
  e. Calculated the total number of sessions by subtracting the total for 945 Column F from 948 Column D
    i. Result: 21,917,667
  f. Calculated the civil penalty by multiplying 21,917,667 * 50,120.
    ii. Result civil penalty of: $ $1,098,513,470,040.

## Consumer Harm

**Monetary Consumer Harm**
1. Documents relied on:
  a. MATCHFTC846511 Resign Path Cash by Drop Off Point Starting with Manage Subscription Page.xlsx.
  b. MATCHFTC846945 Monthly Sessions Going To Subscription Status Page.
  c. MATCHFTC846944 InSessionOrFiftySecondsPostResignMetrics
2. Instructed to calculate Monetary Consumer Harm based on
  a. Values provided:
    i. Start Date: October 2016
    ii. End Date: December 2022 (end of data set)
  b. Subtotal of each of the 5 different pages per month of the resignation flow
    i. Formula 1: RenewalCash + RefundedCash + ChargedBackCash
       (NOTE: RefundedCash & ChargedBackCash are negative numbers)

    c. Subtotal for each of subtotals per month for the 5 pages.

    d. Percentage of users who landed on page for password verification and subscription status per month for ManageSubscriptionLoginSuccess page.

        i. Start Date: March 2019

        ii. End Date:  Mach 2023

        iii. Formula: 945 Column F / 944 Column O.

        iv. 945 Column F: 'sessionsviewing password verification page and Subscription Status'

        v. 944 Column O: 'sessionsgettingonlyasdeepasmanageorcancelsubscriptionpagewhere userdidnotresignortakesaveofferinsessionoffiveminutespostsession'

    e. Subtotal for ManageSubscriptionLoginSuccess page minus percentage of users who landed on page for password verification and subscription status.

    f. Total for all Subtotals per month.

    g. Overall Grand Total – summing up all the Totals for the 5 pages.

3. Steps

    a. Filtered data set on the MATCHFTC846511 sheet labeled "Sheet1" to include only entries from October 2016 to December 2022 using column A labeled 'year' for the year and column B labeled 'month' for the month.

    b. Filtered data set on the MATCHFTC846944 sheet labeled "data" to include only entries from March 2019 to December 2022 using column B labeled 'date_part' for the year and column C labeled 'date_part' for the month.

    c. Filtered data set on the MATCHFTC846945 sheet labeled "Data" to include only entries from March 2019 to December 2022 using column A labeled 'Year' for the year and column B labeled 'Month' for the month.

    d. Calculated Subtotal and Total for all 5 pages listed.

        i. ManageSubscriptionLoginPage

            1. Calculated subtotal by summing columns C+H+M for each row.

            2. Calculated total of subtotal by summing all subtotals per month: $25,228,818.20

        ii. Calculated percentage of users who landed on page for password verification and subscription status per month by dividing 945 Column F by 944 Column O.

        iii. ManageSubscriptionLoginSuccessPage

            1. Calculated subtotal by adding columns D+I+N for each row.

            2. Calculated $ Total per month for ManageSubscriptionLoginSuccess page by subtracting % calculated in step ii. from one and multiplying the result by subtotal from step iii.1. (1-%)*(subtotal).

            3. Calculated total of subtotal by summing all subtotals per month: $15,563,082.98

        iv. FirstSurveyPage

            1. Calculated subtotal by adding columns E+J+O for each row.

            2. Calculated total of subtotal by summing all subtotals per month: $3,887,455.88

        v. SaveOfferPage

1. Calculated subtotal by adding columns F+K+P for each row.
2. Calculated total of subtotal by summing all subtotals per month: $4,936,682.55

    vi.    SecondSurveyPage

1. Calculated subtotal by adding columns G+L+Q for each row.
2. Calculated total of subtotal by summing all subtotals per month: $1,502,765.31

e. Calculated Grand Total by summing up all the Totals for each of the 5 pages: $51,118,804.92.

**Number of Harmed Users**

1. Relied on document MATCHFTC846469 Resign Flow Counting from Manage Subscription Login Page.xlsx
2. Instructed to calculate Number of Harm Users based on
   a. Values provided:
      i. Start Date October 2016
      ii. End Date: end of data set December 2022
   b. Formula: Number of Harmed Users = Column C - (Column E) - (Column G)
      i. Column C 'Subscriptions Hitting Manage Subscription Login Page'
      ii. Column E 'User Resigned via Online Flow before Next Renewal after Hitting the Manage Subscription Login Page'
      iii. Column G: 'User Took Save Offer before Next Renewal after Hitting the Manage Subscription Login Page'
3. Steps
   a. Harmed User Calculations:
      i. Filtered data set on the sheet labeled "data" to include only entries from October 2016 to December 2022 using column A labeled 'yr' for the year and column B labeled 'mnth' for the month.
      ii. Calculated the Total for Column C by summing up all values in the column on the filtered data.
      iii. Result: 7,701,958
      iv. Calculated the Total for Column E 'by summing up all values in the column on the filtered data.
      v. Result: 6,154,160
      vi. Calculated the Total for Column G by summing up all values in the column on the filtered data.
      vii. Result: 122,235
   b. Calculated the number of harmed users by subtracting the total of column E and the total of Column G from the total of column C.
      i. Result: 1,425,563.

**<u>Cancellation Rate</u>**

1. Documents relied on
   a. MATCHFTC846944 InSessionOrFiftySecondsPostResignMetrics

      b.  MATCHFTC846948 Resign Flow Sessions For US Subs Where Subscription Not Previously Resigned.

      c.  MATCHFTC846945 Monthly Sessions Going To Subscription Status Page.

2.  ~~Instructed to calculate Monetary Consumer~~

3.  Instructed to calculate Cancellation Rate based on

    a.  Values provided:
- i.  Start Date October 2016
- ii.  Start Date October 2014
- iii.  End Date: March 2023 (end of data set)

    b.  Formula: Cancellation Rate = 944 Column F / (948 Column D – 944 Column H- 945 Column F)
- i.  944 Column F 'sessionsresignedonlineinsessionorfiveminutespost'
- ii.  948 Column D 'sessionshittingresignflow'
- iii.  944 Column H 'sessionsofuserswhotooksaveofferinsessionorfiveminutespost'
- iv.  945 Column F 'sessionsviewing password verification page and Subscription Status'
  1. Start Date March 2019
  2. End Date: March 2023 (end of data set)

4.  Steps

    a.  Filtered data set on MATCHFTC846944 the sheet labeled "data" to include only entries from October 2016 to March 2023 using column B labeled 'date_part' for the year and column C labeled 'date_part' for the month.

    b.  Filtered data set on MATCHFTC846948 the sheet labeled "Sheet1 to include only entries from October 2016 to March 2023 using column A labeled 'date_part' for the year and column B labeled 'date_part' for the month.

    c.  Filtered data set on MATCHFTC846945 the sheet labeled "Data" to include only entries from March 2019 to March 2023 using column A labeled 'Year' for the year and column B labeled 'Month' for the month.

    d.  Calculated the Column Totals
- i.  Calculated the Total for 948 Column D by summing up all values in the column on the filtered data.
  1. Result: 18,124,539 sessions.
- ii.  Calculated the Total for 944 Column F by summing up all values in the column on the filtered data.
  1. Result: 8,477,477 sessions.
- iii.  Calculated the Total for 944 Column H by summing up all values in the column on the filtered data.
  1. Result: 1 119,474 sessions.
- iv.  Calculated the Total for 945 Column F by summing up all values in the column on the filtered data.
  1. Result: 2,250,987 sessions.

e. Filtered data set on MATCHFTC846944 the sheet labeled "data" to include only entries from October 2014 to March 2023 using column B labeled 'date_part' for the year and column C labeled 'date_part' for the month.

f. Filtered data set on MATCHFTC846948 the sheet labeled "data" to include only entries from October 2014 to March 2023 using column B labeled 'date_part' for the year and column C labeled 'date_part' for the month.

g. Calculated the Column Totals

    i. Calculated the Total for 948 Column D by summing up all values in the column on the filtered data.

        1. Result: 24,168,654 sessions.

    ii. Calculated the Total for 944 Column F by summing up all values in the column on the filtered data.

        1. Result: 12,135,217 sessions.

    iii. Calculated the Total for 944 Column H by summing up all values in the column on the filtered data.

        1. Result: 183,791 sessions.

    iv. Calculated the Total for 945 Column F by summing up all values in the column on the filtered data.

        1. Result: 2,250,987 sessions.

h. Calculated the cancellation rate by dividing the total of 944 Column F by the total of subtracting the totals of 944 Column H and 945 Column F from the total of 948 column D.

    i. Result: Start Date October 2016 53.81%

    ii. Result: Start Date October 2014 55.84%

CONFIDENTIAL

```
 1
 2                UNITED STATES DISTRICT COURT
 3                FOR THE DISTRICT OF TEXAS
 4                     DALLAS DIVISION
 5                        ---oOo---
 6    FEDERAL TRADE COMMISSION,
 7              Plaintiff,
 8                  vs.           No. 3:19-cv-02281-K
 9    MATCH GROUP, INC., a
      corporation, MATH GROUP, LLC,
10    formerly MATCH.COM, LLC, a
      Limited Liability Company,
11
              Defendants.
12    _____/
13
14
15
16                   DEPOSITION OF
17                JENNIFER KING, PH.D.
                   ***CONFIDENTIAL***
18    _____
19              THURSDAY, JULY 27, 2023
20
21
22
23    REPORTED BY:  HOLLY THUMAN, CSR No. 6834, RMR, CRR
24    JOB NUMBER 6028094
25
```

                                        Page 1

```
 1              --oOo--
 2      Videotaped deposition of JENNIFER KING, PH.D.,
 3  taken by the Defendant, at SIDLEY AUSTIN LLP, 555
 4  California Street, San Francisco California 94104,
 5  commencing at 9:02 A.M., on THURSDAY, JULY 27, 2023,
 6  before me, HOLLY THUMAN, CSR, RMR, CRR.
 7              --oOo--
 8          APPEARANCES
 9  FOR THE PLAINTIFF:
10      U.S. FEDERAL TRADE COMMISSION
            1999 Bryan Street, Suite 2150
11      Dallas, Texas 75201
            By:  M. HASAN AIJAZ, Attorney at Law
12          MAijaz@ftc.gov
13  FOR DEFENDANT:
14      SIDLEY AUSTIN LLP
            1999 Avenue of the Stars, 17th Floor
15      Los Angeles, California 90067
            By:  CHAD S. HUMMEL, Attorney at Law
16          CHummel@sidley.com
17      SIDLEY AUSTIN
            2021 McKinney Avenue, Suite 2000
18      Dallas, Texas 75201
            By:  CHELSEA A. PRIEST, Attorney at Law
19          CPriest@sidley.com
20  ALSO PRESENT:
21      JEANETTE TECKMAN, In-house counsel, Match.com
22      SAMUEL KITCHENS, Match.com (Remote)
23      BRANDON WARD, Precocity (Remote)
24
25
                                              Page 2
```

```
 1  (Exhibits, cont'd)
 2  Exhibit 11   Printout of web page from        214
                public.govdelivery.com
 3
 4              --oOo--
 5  INSTRUCTIONS TO WITNESS/REQUESTS TO MARK TRANSCRIPT
 6              PAGE   LINE
 7  Instruction not to answer   42     12
 8  Instruction not to answer   66     21
 9              --oOo--
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 4
```

```
 1          I N D E X
 2      INDEX OF EXAMINATIONS
 3  EXAMINATION BY:                   PAGE
 4  MR. HUMMEL                     5
 5  MR. AIJAZ                    228
 6              --oOo--
 7      EXHIBITS MARKED FOR IDENTIFICATION
 8  NO.     DESCRIPTION          PAGE
 9  Exhibit 1   Expert Report of Dr. Jennifer     5
            King
10
    Exhibit 2   Rebuttal Report of Dr. Jennifer    5
11          King
12  Exhibit 3   Neilsen Norman Group document,    34
            "How to Conduct a Heuristic
13          Evaluation"
14  Exhibit 4   Neilsen Norman Group Heuristic    44
            Evaluation Workbook
15
    Exhibit 5   2016 Flow Figures - King Report    95
16
    Exhibit 6   2019 Flow Figures - King Report    95
17
    Exhibit 7   2022 Flow Figures - King Report    95
18
    Exhibit 8   Expert Report of Brandon Ward    112
19          Regarding Match.com's Online
            Subscription Cancelation Flow,
20          January 13, 2023
21  Exhibit 9   Screenshot headed on the first    184
            page at the top "Dating"
22
    Exhibit 10   Screenshot headed at top of    195
23          first page "Suggested"
24
25  (Cont'd)
                                              Page 3
```

```
 1          THURSDAY, JULY 27, 2023
 2              9:02 A.M.
 3              --oOo--
 4          JENNIFER KING, PH.D.,
 5      _____
 6  called as a witness, having been first duly
 7  sworn, was examined and testified as follows:
 8              --oOo---
 9          EXAMINATION BY MR. HUMMEL
10      (Deposition Exhibits 1 and 2 were marked for
11      identification.)
12  BY MR. HUMMEL:
13      Q.  Good morning.
14      A.  Good morning.
15      Q.  My name is Chad Hummel.  I represent Match,
16  the defendants in this case.
17          You understand you're under oath?
18      A.  I do.
19      Q.  And you are providing expert testimony in this
20  case?
21      A.  I am.
22      Q.  And you're being paid by the Federal Trade
23  Commission for that testimony.  Correct?
24      A.  I am.
25      Q.  Okay.  And you formed some opinions, have you,
                                              Page 5
```

                                              2 (Pages 2 - 5)

1    A. Yes.
2    Q. So you think that people who click on the gear
3  icon intend to cancel?
4    A. No. Not everybody who clicks on the gear icon
5  intend to cancel.
6      But if you want to cancel, where -- you know,
7  you have to find a way to that portion of the site.
8    Q. Right. But what we're talking about,
9  Dr. King, is the percentage of people who intend to
10  cancel that can actually complete the task and cancel
11  their subscription.
12      How do you -- how do you ascertain somebody
13  who intends to cancel?
14      It's certainly not by clicking the gear icon.
15  Right?
16      In real life, I can't ascertain that by
17  clicking the gear icon.
18      MR. AIJAZ: Objection. Vague.
19  BY MR. HUMMEL:
20    Q. Am I correct?
21    A. Yes. At that point, I don't know.
22      If you click on the gear icon, you can click
23  on it for multiple reasons.
24    Q. Right.
25    A. It's simply the first step in the flow.

Page 130

1    Q. Absolutely right.
2      But I'm talking about how would you ascertain
3  intent to cancel because what we're trying to measure
4  here is, can consumers who are subscribers accomplish
5  the task, which is cancel?
6    A. All right.
7    Q. And you can't ascertain that by people who
8  click the gear icon. Is that true; can't start it
9  there?
10      MR. AIJAZ: Objection. Vague and scope.
11      THE WITNESS: So I would argue that you would
12  have to start once the consumer clicks on the
13  cancellation link.
14  BY MR. HUMMEL:
15    Q. So it's after "Manage subscription"?
16    A. Depending on what flow we're talking about.
17    Q. Not --
18    A. It varies. Right?
19    Q. Right.
20      So let's talk about the one where the link
21  says "Manage subscription."
22      Even there, you can't ascertain that a
23  consumer wants to cancel. Correct?
24    A. I'm sorry. 2016, it's changed in "Cancel
25  membership." Right?

Page 131

1      Is that what you're talking about?
2    Q. Yes. But later, it becomes "Manage
3  subscription," and the FTC has argued in the case that
4  somehow that's nefarious. It's a theory.
5      MR. AIJAZ: Objection.
6  BY MR. HUMMEL:
7    Q. But I'm asking you where you would start or
8  how you would evaluate the question of a consumer who
9  intends to cancel and who succeeds.
10      MR. AIJAZ: Objection. Misstates facts and
11  scope.
12      MR. HUMMEL: I'm glad it misstates facts
13  because that's a crazy contention you're making.
14    Q. Do you see the problem?
15      You can't look at the web flows and make that
16  determination.
17    A. No, I --
18    Q. Do you agree with me?
19    A. No.
20    Q. Well, I --
21      (The reporter requested that people not speak
22      at once.)
23      MR. AIJAZ: And objection. Vague.
24      I don't know what the pending question is.
25

Page 132

1  BY MR. HUMMEL:
2    Q. The pending question is: From the web flow,
3  just looking at the web flows themselves, how can you
4  ascertain for certain that a consumer who is
5  participating -- at what stage can you ascertain for
6  certain that a consumer is intending to cancel?
7      MR. AIJAZ: Objection. Scope.
8      THE WITNESS: I mean, the reason I am sitting
9  here, thinking about it, is that part of the question
10  is, how are they getting to this stage. Right?
11      You need to understand, you know, how it was
12  they were able to arrive here.
13  BY MR. HUMMEL:
14    Q. Right.
15    A. But from this point onward --
16    Q. What point? I'm sorry to interrupt you.
17    A. So I'm looking at 2016.
18    Q. Okay.
19    A. So Exhibit 5, 2016.
20    Q. All right.
21    A. So, you know, when you are looking at this
22  list, assuming you can identify the words "Cancel
23  membership," then if I were looking for data that
24  helped us understand whether I could track through the
25  process the cancellation numbers, I would likely start

Page 133

34 (Pages 130 - 133)

**Page 134**

1 here because this is the only option I have on this
2 page that include the word "cancel," even though it is
3 bundled with another task.
4     Q. Which is "change"?
5     A. Which is "change."
6     Q. So you can't definitively say without looking
7 at data how many people who click on "Change/cancel
8 subscription" actually intend to cancel?
9     A. How many people. No. I cannot tell you
10 exactly how many people at this point.
11     Q. Okay. What you can ascertain, though, is once
12 you get past the password page, there's a page that has
13 the option "Subscription status" or "Cancel
14 subscription."
15     Isn't it true that you can't know for sure
16 that a person is at least going into the cancellation
17 flow once they -- once they click that link "Cancel
18 subscription"?
19     And even for those people who cancel that,
20 some percentage might be just looking for a save option
21 because they know it's there. Somebody's told them
22 it's there. Right?
23     A. Okay.
24     Q. They get a better deal.
25     (The reporter requested that people not speak

**Page 135**

1     at once.)
2     MR. AIJAZ: I think you were going to
3 rephrase. Right?
4 BY MR. HUMMEL:
5     Q. Isn't it true that even when you get to page 3
6 of Exhibit 5 --
7     A. There's no page numbers.
8     Q. It's the third page in Exhibit 5 --
9     A. Okay.
10     Q. -- which is the -- presents consumers with a
11 choice of subscription status or cancel subscription.
12     Isn't it true that there is even a population
13 of consumers who would click "Cancel subscription" who
14 might not actually intend to cancel?
15     MR. AIJAZ: Objection. Calls for speculation.
16 No foundation.
17     THE WITNESS: Right. I -- what -- why would I
18 speculate that?
19 BY MR. HUMMEL:
20     Q. It's not speculation.
21     There are some consumers who click "Cancel
22 subscription," are there not, who intend to accept a
23 save offer?
24     MR. AIJAZ: Objection.
25     THE WITNESS: How would you know --

**Page 136**

1     MR. AIJAZ: No foundation.
2     THE WITNESS: How would you know that existed
3 there? How would a consumer know that that was behind
4 that link? Where would you find that information?
5 BY MR. HUMMEL:
6     Q. Word of mouth?
7     You can look skeptically if you want, but it's
8 true.
9     A. To the point where --
10     MR. AIJAZ: There's no pending question.
11 BY MR. HUMMEL:
12     Q. Are you testifying that once -- is it your
13 opinion that once a consumer clicks on the "Cancel
14 subscription" button, that they -- 100 percent of those
15 people intend to actually cancel their subscription?
16     MR. AIJAZ: Objection. Scope.
17     THE WITNESS: If you get to this page and you
18 want to cancel -- I mean, it would be highly likely
19 that you have elected to go down this path. There are
20 few other options here.
21     You know, 100 percent of all consumers that
22 get to this page? Maybe not.
23     Maybe there are some who have come here by
24 accident. They're clicking "Subscription status."
25     They could be just confused and not sure where they

**Page 137**

1 are. I mean, there are multiple possibilities.
2 BY MR. HUMMEL:
3     Q. Okay. So my question is this: Isn't it true
4 that the only way to actually accurately measure
5 consumers who intend to cancel, whether they can find
6 the icon and then proceed to successfully complete the
7 task, is to do a usability study?
8     MR. AIJAZ: Objection. Calls for speculation.
9 Incomplete hypothetical.
10     THE WITNESS: Can you please read that back?
11     (Record read as follows:
12     "QUESTION: Okay. So my question is this:
13     Isn't it true that the only way to actually
14     accurately measure consumers who intend to
15     cancel, whether they can find the icon and
16     then proceed to successfully complete the
17     task, is to do a usability study?")
18     MR. AIJAZ: Same objection.
19     THE WITNESS: No, I don't think that is the
20 only way.
21 BY MR. HUMMEL:
22     Q. Can you please, in your expert opinion, give
23 me another way?
24     MR. AIJAZ: Objection. Scope.
25     THE WITNESS: To some extent, you might be

35 (Pages 134 - 137)

**Page 234**

```
 1              --o0o--
 2       I declare under penalty of perjury that the
 3   foregoing is true and correct.  Subscribed at
 4   _____, California, this ____ day of
 5   _____ 2023.
 6
 7       _____
 8            JENNIFER KING, PH.D.
 9
10
```

**Page 236**

```
 1   M. Hasan Aijaz
 2   maijaz@ftc.gov
 3              August 10, 2023
 4   RE:   Federal Trade Commision v. Match Group, Inc., Et Al.
 5   7/27/2023, Dr. Jennifer King (#6028094)
 6      The above-referenced transcript is available for
 7   review.
 8       Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   errata-tx@veritext.com.
16
17    Return completed errata within 30 days from
18   receipt of testimony.
19    If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22         Yours,
23         Veritext Legal Solutions
24
25
```

**Page 235**

```
 1        CERTIFICATE OF REPORTER
 2       I, HOLLY THUMAN, a Certified Shorthand
 3   Reporter, hereby certify that the witness in the
 4   foregoing deposition was by me duly sworn to tell the
 5   truth, the whole truth, and nothing but the truth in
 6   the within-entitled cause; that said deposition was
 7   taken down in shorthand by me, a disinterested person,
 8   at the time and place therein stated; and that the
 9   testimony of the said witness was thereafter reduced to
10   typewriting, by computer, under my direction and
11   supervision;
12       That before completion of the deposition,
13   review of the transcript [X ] was [ ] was not
14   requested/offered.  If requested, any changes made by
15   the deponent (and provided to the reporter) during the
16   period allowed are appended hereto.
17       I further certify that I am not of counsel or
18   attorney for either or any of the parties to the said
19   deposition, nor in any way interested in the event of
20   this cause, and that I am not related to any of the
21   parties thereto.
22
23   [signature: Holly Thuman]
24
25   HOLLY THUMAN, CSR No. 6834
```

**Page 237**

```
 1   Federal Trade Commision v. Match Group, Inc., Et Al.
 2   Dr. Jennifer King (#6028094)
 3        E R R A T A   S H E E T
 4   PAGE_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Dr. Jennifer King           Date
25
```