# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>Plaintiff, | Case No. 3:19-cv-02281-K |
| vs. | ORAL ARGUMENT REQUESTED |
| MATCH GROUP, INC., a corporation, and<br>MATCH GROUP, LLC, formerly known as<br>MATCH.COM, LLC, a limited liability<br>company, | |
| Defendants. | |

## DEFENDANTS MATCH GROUP, INC. AND MATCH GROUP, LLC'S RESPONSE
## BRIEF IN OPPOSITION TO THE FTC'S MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

I.   PRELIMINARY STATEMENT ................................................................................ 1

II.   STANDARD OF REVIEW ................................................................................... 7

III.   ARGUMENT AND AUTHORITIES .................................................................... 7

   A.   The FTC Is Not Entitled to Summary Judgment on Its Cancelation Claim (Count V) ...... 8

      1.   The FTC Did Not Provide Fair Notice of Its Novel Interpretation of "Simple Mechanisms" ................................................................................................... 8

      2.   Match.com Provides "Simple Mechanisms" to Cancel Wholly Apart from the Online Cancelation Flow at Issue in This Case ................................................ 14

      3.   The FTC Has Not Met Its Burden to Show that the Online Cancelation Flow Is Not Simple As a Matter of Law .............................................................................. 22

   B.   The FTC Is Not Entitled to Summary Judgment on Its Guarantee or Chargeback Policy Claims (Counts III and IV) .............................................................................. 46

      1.   The FTC Has Not Met Its Burden that There Is a Reasonable Likelihood of Future Violations ................................................................................................ 47

      2.   The FTC Has Not Met Its Burden that the Guarantee Violated the FTC Act ............. 51

      3.   The FTC Has Not Met Its Burden that the Chargeback Policy Violated the FTC Act. 61

   C.   The FTC Has Not Met Its Burden to Hold MGI Liable ................................................ 65

      1.   The FTC's Attempt to Create a Lower Standard for Itself Fails ................................. 65

      2.   MGI Does Not Own Match.com ................................................................................ 69

      3.   MGI Does Not Operate Match.com ........................................................................... 69

      4.   MGI Does Not Have the Authority to Control Match.com .......................................... 73

   D.   The FTC Has Not Met Its Burden on Its Requested Relief ............................................ 74

      1.   The FTC Has Not Met Its Burden for the Civil Penalties and Consumer Redress ....... 74

      2.   The FTC Has Not Met Its Burden on Its Proposed Injunction ..................................... 81

IV.   CONCLUSION ......................................................................................................... 85

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Home Prods. Corp. v. FTC*,
   695 F.2d 681 (3d Cir. 1982)...................................................55

*Country Tweeds, Inc. v. FTC*,
   326 F.2d 144 (2d Cir. 1964)...................................................84

*Davis v. HSBC Bank Nevada, N.A.*,
   691 F.3d 1152 (9th Cir. 2012) ...............................................64

*Dole Food Co. v. Patrickson*,
   538 U.S. 468 (2003)...............................................................69

*In re ECM BioFilms, Inc.*,
   No. 9358, 2015 FTC LEXIS 22 (FTC Jan. 28, 2015)............82

*EEOC v. Exxon Mobil Corp.*,
   No. 3:06-CV-1732-K, 2012 WL 6608755 (N.D. Tex. Dec. 19, 2012)
   (Kinkeade, J.), *aff'd in part,* 560 F. App'x 282 (5th Cir. 2014) ...............................................7

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012)...................................................8, 11, 13, 14

*Floersheim v. FTC*,
   411 F.2d 874 (9th Cir. 1969) .................................................55

*FTC v. Affordable Media*,
   179 F.3d 1228 (9th Cir. 1999) ...............................................51

*FTC v. Amazon.com, Inc.*,
   71 F. Supp. 3d 1158 (W.D. Wash. 2014)...............................61

*FTC v. Brown & Williamson Tobacco Corp.*,
   778 F.2d 35 (D.C. Cir. 1985) .................................................55

*FTC v. Cardiff*,
   No. CV-18-2104, 2020 WL 6540509 (C.D. Cal. Oct. 9, 2020)...............51, 53

*FTC v. Direct Benefits Grp., LLC*,
   No. 6:11-CV-1186-ORL-28, 2013 WL 3771322 (M.D. Fla. July 18, 2013)...........61

*FTC v. DIRECTV, Inc.*,
   No. 15-CV-01129, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018) ...................52, 53

*FTC v. EDebitPay, LLC,*
    695 F.3d 938 (9th Cir. 2012) ...............................................................55

*FTC v. Febre,*
    No. 94 C 3625, 1996 WL 396117 (N.D. Ill. July 2, 1996) .......................53

*FTC v. Gill,*
    71 F. Supp. 2d 1030 (C.D. Cal. 1999) ...................................................55

*FTC v. Health Formulas, LLC,*
    No. 2:14-CV-01649, 2015 WL 2130504 (D. Nev. May 6, 2015) ..................20, 21

*FTC v. IAB Mktg. Assocs., LP,*
    746 F.3d 1228 (11th Cir. 2014) ......................................................68, 69

*FTC v. Inc21.com Corp.,*
    745 F. Supp. 2d 975 (N.D. Cal. 2010), *aff'd,* 475 F. App'x 106 (9th Cir. 2012) ..................64

*FTC v. Johnson,*
    96 F. Supp. 3d 1110 (D. Nev. 2015) .....................................................62

*FTC v. Lake,*
    181 F. Supp. 3d 692 (C.D. Cal. 2016) ...................................................85

*FTC v. LeadClick Media LLC,*
    838 F.3d 158 (2d Cir. 2016)......................................................67, 68, 69, 70

*FTC v. Microsoft Corp.,*
    No. 23-cv-02880, 2023 U.S. Dist. LEXIS 119001 (N.D. Cal. July 10, 2023) ................50

*FTC v. Neora,*
    No. 3:20-cv-01979, Dkt. 347 (N.D. Tex. Sept. 28, 2023) ............................. *passim*

*FTC v. Neovi, Inc.,*
    604 F.3d 1150 (9th Cir. 2010) .............................................................61

*FTC v. Noland,*
    No. CV-20-00047-PHX-DWL, 2021 WL 5493443 (D. Ariz. Nov. 23, 2021)................77, 79

*FTC v. Noland,*
    No. CV-20-00047-PHX-DWL, 2023 WL 3372517 (D. Ariz. May 11, 2023) ................79

*FTC v. QT, Inc.,*
    448 F. Supp. 2d 908 (N.D. Ill. 2006) .....................................................55

*FTC v. RCG Advances, LLC,*
    No. 20-CV-4432, 2023 WL 6281138 (S.D.N.Y. Sept. 27, 2023)............................75

*FTC v. Roomster Corp.*,
    No. 22 CIV. 7389, 2023 WL 1438718 (S.D.N.Y. Feb. 1, 2023) .............................................51

*FTC v. Tate's Auto Ctr. of Winslow Inc.*,
    No. CV-18-08176, 2021 WL 410857 (D. Ariz. Feb. 5, 2021).................................................62

*FTC v. Walmart, Inc.*,
    No. 22 CV 3372, 2023 WL 2646741 (N.D. Ill. Mar. 27, 2023) ............................................64

*Hendricks v. Ford Motor Co.*,
    No. 4:12CV71, 2012 WL 4478308 (E.D. Tex. Sept. 27, 2012) ....................................... *passim*

*Independent Directory Corp. v. FTC*,
    188 F.2d 468 (2d Cir. 1951).....................................................................................................55

*Jerman v. Carlisle, McNellis, Rini, Kramer & Ulrich LPA*,
    559 U.S. 573 (2010)..................................................................................................................75

*Lawson v. Dallas Cnty., TX*,
    No. CA 3-95-CV-2614-R, 1998 WL 246642 (N.D. Tex. Mar. 24, 1998) .........................25, 26

*Marsh v. Zaazoom Sols., LLC*,
    No. C-11-05226, 2012 WL 952226 (N.D. Cal. Mar. 20, 2012) ..............................................21

*Masters Entmt. Grp. v. Aurich*,
    No. 3:18-CV-01314, 2022 WL 2137090 (M.D. Tenn. June 14, 2022) ...................................72

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ...............................................................................................36

*NB Gathering IX Pref, L.L.C. v. Nelson*,
    No. 3:20-CV-3491-K, 2022 WL 347610 (N.D. Tex. Feb. 4, 2022) (Kinkeade,
    J.)..................................................................................................................................................7

*Orkin Exterminating Co. v. FTC*,
    849 F.2d 1354 (11th Cir. 1988) ...............................................................................................64

*Riverside Mkt. Dev. v. Int'l Bldg. Prods.*,
    931 F.2d 327 (5th Cir. 1991) ...................................................................................................73

*S.E.C. v. Murphy*,
    626 F.2d 633 (9th Cir. 1980) ...................................................................................................51

*Shell Offshore, Inc. v. Tesla Offshore, LLC*
    No. CIV.A. 13-6278, 2015 WL 711796 (E.D. La. Feb. 18, 2015) ........................................72

*TransFirst Grp., Inc. v. Magliarditi*,
    237 F. Supp. 3d 444 (N.D. Tex. 2017) ....................................................................................15

*United My Funds, LLC v. Perera*,
No. 4:19-cv-0373, 2020 WL 1225042 (E.D. Tex. Mar. 12, 2020), ......................................72

*United States v. Bestfoods*,
524 U.S. 51 (1998) ...................................................................................5, 66, 70, 71

*United States v. Cornerstone Wealth Corp.*,
549 F. Supp. 2d 811 (N.D. Tex. 2008) ...............................................48, 50, 74

*United States v. Corps. for Character, L.C.*,
116 F. Supp. 3d 1258 (D. Utah 2015).................................................................75, 76

*United States v. Mississippi*,
No. 21-60772, 2023 WL 6138536 (5th Cir. Sept. 20, 2023) ...................................82

*United States v. MyLife.com, Inc.*,
567 F. Supp. 3d 1152 (C.D. Cal. 2021) ...........................................................20, 33

*In re Universal Health Servs., Inc., Derivative Litig.*,
No. CV 17-2187, 2019 WL 3886838 (E.D. Pa. Aug. 19, 2019)...............................................36

*In re Universal Seismic Assocs., Inc.*,
288 F.3d 205 (5th Cir. 2002) ...............................................................................15

*Via Vadis, LLC v. Amazon.com, Inc.*,
No. 1:14-CV-00813-LY, 2022 WL 174527 (W.D. Tex. Jan. 18, 2022)...............................25

**Statutes**

15 U.S.C. § 45 ......................................................................................................... *passim*

15 U.S.C. § 53(b) ...................................................................................................47

15 U.S.C. § 57b ...................................................................................................77, 81

15 U.S.C. § 8403(3) ............................................................................................. *passim*

28 U.S.C. § 2462 ...................................................................................................76

**Regulation**

16 CFR § 1.98 .........................................................................................................76

**Other Authorities**

Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed.
Reg. 60822-01 (announced Oct. 29, 2021; issued Nov. 4, 2021).....................................10, 11

FED. TR. COMM'N, *.com Disclosures, How to Make Effective Disclosures in Digital Advertising* (March 2013), 2013 WL 12481090, https://www.ftc.gov/system/files/documents/plain-language/bus41-dot-com-disclosures-information-about-online-advertising.pdf..........................................................54

FED. TR. COMM'N, *Bringing Dark Patterns to Light*, 2022 WL 4355435, https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf. ....................................................12

FED. TR. COMM'N, *FTC Open Commission Meeting- September 15, 2022*, https://www.ftc.gov/system/files/ftc_gov/pdf/ftc_open_commission_meeting_september_15_2022.pdf (last visited Oct. 16, 2023) ...............................................12

FED. TR. COMM'N, *FTC Report Shows Rise in Sophisticated Dark Patterns Designed to Trick and Trap Consumers* (Sept. 15, 2022), 2022 WL 4244965, https://www.ftc.gov/news-events/news/press-releases/2022/09/ftc-report-shows-rise-sophisticated-dark-patterns-designed-trick-trap-consumers.................................12

FED. TR. COMM'N, *FTC to Hold Virtual Workshop Exploring Digital "Dark Patterns"* (Feb. 24, 2021), 2021 WL 717222, https://www.ftc.gov/news-events/news/press-releases/2021/02/ftc-hold-virtual-workshop-exploring-digital-dark-patterns...................................................................................11

FED. TR. COMM'N, *FTC to Ramp up Enforcement against Illegal Dark Patterns that Trick or Trap Consumers into Subscriptions* (Oct. 28, 2021), 2021 WL 5002693, https://www.ftc.gov/news-events/news/press-releases/2021/10/ftc-ramp-enforcement-against-illegal-dark-patterns-trick-or-trap-consumers-subscriptions. ...................................................................................11

Notice of Proposed Rulemaking, Negative Option Rule, 88 Fed. Reg. 24716-01 (Apr. 24, 2023)...............................................................................10

Nielsen Norman Group, 10 Usability Heuristics for User Interface Design, last updated Nov. 15, 2020, https://www.nngroup.com/articles/ten-usability-heuristics/. ...................................................................................14

Statement by the Press Secretary, 12/29/2010, 2010 WL 5384575..............................20

S. Rep. 111-240, 2010 WL 3002003 ............................................................20

S. Rep. No. 93-1408, at 40 (1974) ..............................................................75

Pursuant to Rule 56 of the Federal Rules of Civil Procedure (the "Rules") and Local Civil Rule 56.5, Defendants Match Group, Inc. ("MGI") and Match Group, LLC ("MGL") respectfully submit this Response Brief in Opposition (the "Response") to the FTC's Motion for Summary Judgment (the "Motion"), Dkt. 199-1.[1]

## I. PRELIMINARY STATEMENT

The FTC's Motion confirms that Defendants' Motion for Summary Judgment, Dkt. 204, should be granted. As to the FTC's cancelation count, Count V, the FTC's Motion confirms that the agency failed to give fair notice of its new, novel interpretation of ROSCA's "simple mechanisms" requirement and that Match.com met the statutory requirement to provide "simple mechanisms" to cancel by providing four undisputedly simple mechanisms, other than the online cancelation flow that is at issue here. As to the other Counts III and IV (on the Guarantee and Chargeback Policy, defined below), the FTC's Motion also confirms that the conduct at issue ceased long ago, and there is not a shred of evidence that Match.com will re-start any of it. On these issues, there are no facts in dispute, and on these grounds alone, Defendants' Motion for Summary Judgment should be granted.

The FTC's Motion should also be denied on its own terms. The FTC does not present sufficient admissible[2] evidence to show that it is entitled to judgment as a matter of law on any count. Indeed, the evidence that FTC cites, even if it is admissible, is not sufficient to meet its burden of proof. As to Count V, the FTC does not have evidence showing that Match.com's online cancelation flow actually violates any existing standard. All the FTC presents is (inadmissible) expert testimony that the flow does not meet three heuristics that the FTC's expert cherry-picked

---

[1] Defendants have filed an Appendix in Support of the Response (the "Appendix"). The exhibits to the Appendix are referenced as "Defs. App. Ex.," and specific pages in the Appendix are referenced as "App."

[2] Defendants are filing an Objection to Plaintiff's Evidence and Motion to Strike.

and that some Match.com employees thought the flow could be made simpler. But none of this shows an actual violation of the law. As to the Guarantee and Chargeback Policy, the FTC does not even have expert testimony of any kind. In addition, fact witnesses testified that the Chargeback Policy was fair and reasonable and that the Guarantee was intended to help customers succeed on the website and was not material to consumers' purchasing decisions.

Thus, there are no genuine disputes as to any material fact—that is, any fact that justifies judgment in favor of Defendants, Dkt. 204. All of the facts necessary to grant Defendants' Motion for Summary Judgment are undisputed. But, if the Court disagrees, the evidence cited by the FTC is in vigorous dispute, which is another reason to deny the FTC's Motion. To prevail at summary judgment, the FTC must show that, after every single inference is drawn in Defendants' favor, there are no genuine disputes of fact that the FTC needs to prevail. The FTC comes nowhere close to meeting that heavy burden, as all of the "facts" that it claims are undisputed are actually hotly disputed. Thus, the FTC's Motion should be denied.

The only truly live issue in this case is whether Match.com provides "simple mechanisms" to cancel as required by ROSCA (Count V). The FTC's Motion asserts that Match.com does not because its online cancelation flow (1) is hard to find, (2) includes unnecessary steps, (3) has so-called dark patterns, and (4) violates three of Nielsen's 10 Usability Heuristics. But the FTC never provided any notice that those are the four requirements under ROSCA. They appear in no statute, final regulation, guidance, or case. Indeed, the FTC is now trying to hold Defendants liable for exactly what it expressly authorizes in guidance: the FTC's published guidance to industry expressly authorizes steps like surveys or save offers, but now the FTC is asserting that these are unnecessary steps in an online cancelation flow, and make the flow unlawful. It is a serious violation of Due Process to use a novel interpretation, unveiled for the first time in litigation, to

punish conduct that the agency's own published guidance expressly authorizes. The Due Process protections embodied in the Constitution do not permit federal agencies to extract $212 million from companies based upon vague, unclear, and inconsistent standards.

The FTC's Motion also confirms that Defendants provided other "simple mechanisms" to cancel beyond the online cancelation flow that is at issue. That should resolve Count V. ROSCA requires only that a company provide "simple mechanisms" to cancel. It does not require that every mechanism be simple—or that any mechanism has to be the simplest it can be. Nor does it prohibit a company from voluntarily offering an online cancelation mechanism, in addition to other simple mechanisms, even if that online mechanism is not simple. So, even if Match.com's online cancelation mechanism was not simple (and it is), the FTC's Motion confirms that Match.com provided at least four other methods to cancel, and the FTC presented no evidence that any of them were not simple. That again shows that summary judgment for Defendants is appropriate since Match.com provided at least four simple methods.

If the Court does not agree with any of these arguments, the FTC's Motion should still be denied. The FTC has not presented enough evidence—let alone undisputed evidence—sufficient to show that the online cancelation flow is not simple as a matter of law. The FTC relies most heavily on an expert that analyzed three heuristic factors and purported dark patterns. But this testimony is inadmissible, Dkt. 208, and even if it were not, it is not sufficient to prevail. Failing to meet the three factors does not mean that a flow is not simple. The same is true as to the expert's claim of "dark patterns." The FTC has admitted that so-called dark patterns, just like the "simple" requirement more generally, lack clarity, and that dark patterns are not necessarily unlawful or even relevant to a simplicity analysis. Nor do the FTC's citations to internal Match.com

communications show anything more than a handful of employees thought the flow could be made simpler. But ROSCA does not require the simplest mechanism, only a simple mechanism.

Finally, to the extent any question remained, Defendants have admissible evidence that creates a genuine dispute of material fact as to the FTC's claims. Specifically, in contrast to the FTC's expert, Defendants' expert testified that the online cancelation flow is simple based on an independent empirical usability study, a review of *all* of Nielsen's 10 Usability Heuristics, a comparison to other online subscription cancelation flows, and analysis of Match.com's actual user data. The FTC also relies on a few internal documents, but ignores all of the competing testimony from half a dozen employees who said the flow has always been simple. Finally, the FTC relies on its interpretation of Match.com data to argue that about half of the subscribers who "started" the online cancelation flow did not cancel, but the FTC has zero evidence that those subscribers ever intended to cancel (much less were prevented from canceling by the design of the flow). Moreover, Defendants' evidence shows that 95% of customers who started the flow actually canceled.

The FTC's arguments as to the Guarantee and Chargeback Policy in Counts III and IV fare no better. On these counts, the FTC's Motion similarly confirms why Defendants' Motion for Summary Judgment should be granted. The FTC's Motion confirms that none of this conduct is ongoing and cites zero evidence that Match.com has any plans to reinstate these policies (because there is none). Defendants have put forward overwhelming evidence that the conduct will never happen again, including a binding stipulation, deposition testimony, and documentary evidence. In a situation when a defendant did not have as much favorable evidence as Defendants have, Judge Lynn recently held that the FTC failed to carry its burden of showing that the defendant was

violating or about to violate the FTC Act. *FTC v. Neora*, No. 3:20-cv-01979, Dkt. 347 at 53 (N.D. Tex. Sept. 28, 2023).

Even on the merits, the FTC's Motion should be denied. While the FTC asserts that the Chargeback Policy was unfair, it does not have sufficient evidence to prevail at this stage. The FTC has no expert testimony. And there is substantial factual testimony that the Chargeback Policy was a reasonable policy to protect consumers, not harm them. It is also undisputed that consumers could avoid any supposed harm from the Chargeback Policy merely by (1) not submitting a false or fraudulent chargeback request, (2) reading Match.com's Terms of Use, or (3) merely contacting Customer Care to have their account reinstated. Further, there are facts in dispute as to the elements that the FTC must prove (although these elements are not necessary for Defendants to prevail). The FTC's Motion should likewise be denied as to its claim that the Guarantee was deceptive because the FTC does not have sufficient evidence to prevail. The terms of the Guarantee were completely disclosed, and the FTC challenges only whether that disclosure was adequate. But the FTC has no expert testimony. And the factual testimony about the Guarantee was that it was not deceptive but was instead intended to help customers succeed on the website and that it was not important to consumers' purchasing decisions.

The FTC's Motion as to MGI should also be denied for additional reasons. The FTC's argument that MGI is responsible for conduct of Match.com ignores the basic principles of corporate law, including the difference between a parent or holding company (like MGI), and a subsidiary that actually operates a platform (like MGL). The FTC's "evidence" allegedly implicating MGI is nothing more than normal corporate oversight, which the Supreme Court has held does not make a parent liable for conduct at a facility operated by a subsidiary. *See United States v. Bestfoods*, 524 U.S. 51, 69–72 (1998). Every single MGI executive to be deposed testified

that MGI does not operate Match.com, much less have any involvement with the challenged conduct. In fact, even the FTC's corporate representative had to admit that the FTC has no evidence that MGI was involved with the Guarantee, Chargeback Policy, or online cancelation flow.

Finally, the FTC has not met its burden to show that it is entitled to the relief it seeks (assuming that it could prevail on liability). As to civil penalties, there is no evidence that Defendants knew that they were violating ROSCA, or that a reasonable person in the same circumstances "would have known" that the conduct at issue violated ROSCA. Defendants have presented overwhelming testimony that there was no intent, and there could not be, given the vague and unclear guidance from the FTC. The FTC also has not attempted to establish any of the factors that courts consider when analyzing the amount of civil penalties. In addition, as to consumer redress, the FTC's evidence of purported consumer harm consists of a mathematical calculation done by an FTC employee based only upon instructions from the FTC's lawyers. The FTC has presented no evidence, let alone undisputed evidence, that this accurately captures "harm" caused by the online cancelation flow. Defendants have also introduced expert testimony disputing the FTC's calculation, which is a classic factual dispute.

Lastly, the FTC seeks a sweeping injunction with a number of provisions but makes no argument as to why any of the actual provisions are "narrowly tailored" or "reasonably related" to the conduct at issue in this case, let alone that the provisions are undisputedly so. That forfeiture alone is sufficient to deny the Motion. Moreover, there are at least genuine disputes of material fact as to the scope of the injunction. The FTC had to admit to Judge Ramirez last year that it lacked even a good-faith basis to include other dating sites in the complaint, which led the court to deny discovery into other dating sites. Yet the FTC's proposed injunction still seeks to enjoin

virtually every single dating site under the MGI umbrella, based solely on a permanently discontinued Guarantee and Chargeback Policy on Match.com.

For all of these reasons, Defendants' Motion for Summary Judgment (Dkt. 204) should be granted, and the FTC's Motion for Summary Judgment should be denied.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" "if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *EEOC v. Exxon Mobil Corp.*, No. 3:06-CV-1732-K, 2012 WL 6608755, at *5 (N.D. Tex. Dec. 19, 2012) (Kinkeade, J.), *aff'd in part,* 560 F. App'x 282 (5th Cir. 2014) (quoting *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009)).

"All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant, and all disputed facts resolved in favor of the nonmovant." *Exxon Mobil Corp.*, 2012 WL 6608755, at *5. In addition, "[i]f the moving party will have the burden of proof on a claim," as the FTC does here, "the party must establish beyond peradventure all of the essential elements of the claim." *NB Gathering IX Pref, L.L.C. v. Nelson*, No. 3:20-CV-3491-K, 2022 WL 347610, at *1 (N.D. Tex. Feb. 4, 2022) (Kinkeade, J.) (internal quotation marks omitted) (citing *Eguchi v. Kelly*, No. 3:16-CV-1286-D, 2017 WL 2902667, at *1 (N.D. Tex. July 7, 2017)). "The beyond peradventure standard is heavy." *Id.* (internal quotation marks omitted).

## III.  ARGUMENT AND AUTHORITIES

The Response proceeds in four parts. Section A addresses the FTC's cancelation claim (Count V). Section B addresses the FTC's Guarantee and Chargeback Policy claims (Counts III and IV). Section C addresses the FTC's claims as to MGI, the holding company. Section D addresses the FTC's requested relief.

## A. The FTC Is Not Entitled to Summary Judgment on Its Cancelation Claim (Count V)

The FTC's Motion should be denied as to Count V for three separate reasons. First, the FTC's Motion confirms that the agency failed to provide Defendants with constitutionally required notice of the FTC's new and novel interpretation of ROSCA's "simple mechanisms" requirement. Second, the FTC's Motion confirms that Match.com provides "simple mechanisms" to cancel because it provides at least four simple methods (other than the online cancelation flow at issue in this case). The FTC's Motion confirms the FTC has no evidence that these other methods are not simple. Third, the FTC has not met its burden of showing that it is entitled to judgment as a matter of law. For each of these independent reasons, the FTC's Motion on Count V should be denied.

### 1. The FTC Did Not Provide Fair Notice of Its Novel Interpretation of "Simple Mechanisms"

As explained in Defendants' Motion for Summary Judgment,[3] the FTC cannot prevail on Count V unless Defendants were "provide[d] . . . fair notice of what is prohibited" under ROSCA so that Defendants could "know what [was] required of them." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (explaining statute violates due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement"); *see* Dkt. 204 (Section IV.A.1).

The FTC now argues that Defendants are liable under ROSCA because the Match.com online cancelation flow allegedly (1) "is hard to find," (2) "includes several unnecessary steps," (3) has "dark patterns," and (4) violates three of Nielsen's ten usability heuristics. *See* Mot. at 54–62. These requirements are novel and unprecedented under ROSCA. The FTC has never provided

---

[3] Defendants incorporate by reference their Motion for Summary Judgment. Dkt. 204.

notice to Defendants (or any company) that these are the elements of "simple mechanisms." Thus, the standard now articulated in the Motion is unconstitutional as applied here.

### a.     The FTC Has Never Provided Notice of These New Requirements

ROSCA requires "simple mechanisms for a consumer to stop recurring charges." 15 U.S.C. § 8403(3). Neither the statute nor any regulation imposes the four requirements that the FTC attempts to impose here. In fact, no statute or regulation says where a cancelation flow must be located, how many steps can be included, that dark patterns are prohibited, or that any usability heuristics must be followed. Similarly, there has never been any litigated case that imposes these requirements or gives notice of them. *See, e.g.*, Defs. App. Ex. A at App. 7 (Bandy Dep. Tr. (Oct. 24, 2022) 118:17–22). The FTC does not cite a single case in its Motion where a court analyzed an online cancelation flow at all, let alone imposed the four requirements that the FTC's Motion attempts to impose here. *See* Mot. at 61 & n.321, 62 & nn.329–31. In the three cases the FTC cites, two are about phone cancelation methods and one is not about a cancelation method at all. *See infra* Section III.A.2. Simply put, no action by the FTC or any court has ever provided notice of these four new requirements. The lack of fair notice actually requires the court to grant summary judgment *to Defendants*.

### b.     The Novel Requirements Are Inconsistent With FTC Guidance

Even worse, the FTC's four new requirements are inconsistent with the limited guidance the FTC previously provided to industry (although that guidance also was issued *years* after the FTC even brought this case).[4] Here, the FTC claims that Match.com's online cancelation flow has "unnecessary steps"—specifically, optional short surveys and an occasional save offer. The FTC asserts that these "unnecessary steps" render the online cancelation flow not simple and thus

---

[4] This is set forth in more detail in Defendants' Motion for Summary Judgment, Dkt. 204 (Section IV.A.1.b).

illegal. But two years *after* the FTC brought this case, the FTC issued an Enforcement Policy Statement Regarding Negative Option Marketing (the "Policy Statement"), which expressly authorizes these purportedly "unnecessary" steps. *See* 86 Fed. Reg. 60822-01 (announced Oct. 29, 2021; issued Nov. 4, 2021).

That Policy Statement (which the FTC did not mention in its Motion) explicitly allows "new offers or similar attempts to save the negative option arrangement" so long as those offers or attempts do not "impose unreasonable delays on consumers' cancellation efforts." 86 Fed. Reg. 60826. The Policy Statement goes even farther, explaining that "a request to consider an offer or discount would not amount to an unreasonable delay." 86 Fed. Reg. 60826 n.48. Only "multiple requests for a consumer to listen to additional offers, lengthy pitches, or ignoring a consumer's request to decline further offers"—*none of which exist in Match.com's online cancelation flow*— "could amount to an unreasonable delay." *Id.* The Policy Statement thus authorizes exactly what the FTC's Motion contends is undisputedly unlawful. There can be no more serious Due Process violation than to attempt to punish a company for following the agency's own guidance.

The only FTC statement that suggests that companies cannot include "unnecessary steps" like a survey or save offer is in the FTC's recently promulgated Notice of Proposed Rulemaking. *See* Notice of Proposed Rulemaking, Negative Option Rule, 88 Fed. Reg. 24716-01 (Apr. 24, 2023). Specifically, the FTC stated only this year that it was considering a *future* rule that would require companies to provide a mechanism to "immediately halt any recurring charges." *Id.* The FTC said this new "proposed provision would ***effectively prohibit***" businesses from "creat[ing] ***unnecessary*** . . . obstacles in the cancellation process." *Id.* (emphasis added). But this proposed

rule has not yet been promulgated, and the FTC cannot impose this ***yet-to-be-promulgated rule*** retroactively on Match.com—that is a clear Due Process violation.[5] *See Fox*, 567 U.S. at 258.

### c. The FTC Did Not Give Notice of the "Dark Patterns" Prohibition

"Dark patterns" as a term is vague, unclear, and not sufficient to show a violation of ROSCA. The FTC held a workshop on April 29, 2021 (well after this case was ongoing), to figure out the meaning of the term.[6] Following that workshop, the FTC announced in a press release that it had "issued a new enforcement policy statement warning companies against deploying illegal dark patterns that trick or trap consumers into subscription services."[7] That referenced policy statement is the Policy Statement discussed above, but it did not even use the term "dark patterns." *See* 86 Fed. Reg. 60822-01.

Fast forward to 2022, the FTC still had not adequately defined dark patterns so that regulated businesses could avoid them. On September 15, 2022, the FTC held an open meeting during which the FTC voted on whether to issue a staff report titled, "Bringing Dark Patterns to Light."[8] The FTC's own Commissioner Noah Phillips admitted that the term is vague and does not help business identify practices that are illegal:

> To start, **I just don't think the term dark pattern is very helpful, at least with respect to giving clarity about the law**. It reduces rather than adds clarity for consumers, for businesses, and even for us, law enforcers. We all might agree on some practices that qualify, but there's very little agreement on the full scope of what is in and what is out of the category of dark pattern. So the term succeeds in

---

[5] The FTC has admitted in other briefing in this case that it would be improper to apply a rule that has not been promulgated. Dkt. 201-2 at 7.

[6] FED. TR. COMM'N, *FTC to Hold Virtual Workshop Exploring Digital "Dark Patterns"* (Feb. 24, 2021), 2021 WL 717222, https://www.ftc.gov/news-events/news/press-releases/2021/02/ftc-hold-virtual-workshop-exploring-digital-dark-patterns ("The FTC workshop will bring together researchers, legal experts, consumer advocates, and industry professionals to examine what dark patterns are and how they might affect consumers and the marketplace.").

[7] FED. TR. COMM'N, *FTC to Ramp up Enforcement against Illegal Dark Patterns that Trick or Trap Consumers into Subscriptions* (Oct. 28, 2021), 2021 WL 5002693, https://www.ftc.gov/news-events/news/press-releases/2021/10/ftc-ramp-enforcement-against-illegal-dark-patterns-trick-or-trap-consumers-subscriptions.

[8] FED. TR. COMM'N, *Open Commission Meeting - September 15, 2022*, https://www.ftc.gov/news-events/events/2022/09/open-commission-meeting-september-15-2022 (last visited Oct. 16, 2023).

painting an ominous picture of the practices it is used to describe, but **it fails in helping businesses and consumers identify those practices that are illegal, and to me, that's what really matters.**

. . .

**I'm concerned at the commission's recent tendency to use pejoratives to refer to a wide array of practices, only some of which are illegal**, so calling conduct a dark pattern or commercial surveillance is not a replacement for the legal and factual analysis required in order for us to show that a practice is deceptive or unfair, and **it does little to add clarity** for enforcers, or the public, or again, **for the businesses who are trying to follow the law and get things right**.[9]

That same day (again, nearly three years after the FTC brought this case), the FTC released the staff report titled, "Bringing Dark Patterns to Light."[10] Even that report recognizes that not all "dark patterns" are unlawful.[11]

Thus, the FTC has not provided fair notice that a cancelation flow must not contain these so-called "dark patterns."[12] While the FTC asserts that Match.com's online cancelation flow is illegal because it contains "dark patterns," there is *no* prohibition on dark patterns in the text of ROSCA. There was also no guidance on dark patterns prior to the conduct at issue in this case. Indeed, the FTC did not even use the term "dark patterns" until *years* after the FTC filed this case on September 25, 2019, Dkt. 1. Defendants could not possibly have notice of a prohibition on "dark patterns" in cancelation flows when the FTC had not even used the term, and even the FTC

---

[9] FED. TR. COMM'N, *FTC Open Commission Meeting- September 15, 2022*, https://www.ftc.gov/system/files/ftc_gov/pdf/ftc_open_commission_meeting_september_15_2022.pdf (last visited Oct. 16, 2023) (emphasis added).

[10] FED. TR. COMM'N, *FTC Report Shows Rise in Sophisticated Dark Patterns Designed to Trick and Trap Consumers* (Sept. 15, 2022), 2022 WL 4244965, https://www.ftc.gov/news-events/news/press-releases/2022/09/ftc-report-shows-rise-sophisticated-dark-patterns-designed-trick-trap-consumers.

[11] FED. TR. COMM'N, *Bringing Dark Patterns to Light* at 34 n.6, 2022 WL 4355435, https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf.

[12] Defendants deny that the online cancelation flow contained any dark patterns. As discussed below, Defendants' independent usability expert "did not find any evidence of deceptive, manipulative, tricky, coercive, etc. practices in the Match.com cancelation flow that would make the cancelation flow not simple, nor prevent subscribers from confidently canceling their subscription." Defs. App. Ex. R-2 at App. 962 (Rpt. ¶ 85). *See infra* Section III.A.3.h.

admits that the term dark pattern does not have clarity for businesses and law enforcers. *Fox*, 567

U.S. at 253. That violates Due Process.

### d.      The FTC Did Not Give Notice of the Heuristic Factors

The FTC also has not provided fair notice that a cancelation flow is illegal if it violates so-

called "usability heuristics," much less the three cherry-picked heuristics that the FTC's usability

expert, Dr. Jennifer King, claimed Match.com's online cancelation flow violated. As background,

a heuristic analysis typically involves an evaluator examining an interface and judging its

compliance with certain principles (or heuristics). *See generally* Defs. App. Ex. M at App. 223,

226 (King Dep. Tr. 10:2–5, 97:9–11 (admitting there are ten heuristics in Nielsen's usability

framework)). Dr. King evaluated just three of Nielsen's 10 Usability Heuristics—the three factors

that she believed Match.com's online cancelation flow violates. Defs. App. Ex. M at App. 226

(King Dep. Tr. 97:2–17).[13] Thus, this was not an unbiased exercise, by any stretch. The FTC now

claims that the online cancelation flow is *illegal* because it violated these three factors. This alone

illustrates the FTC's "arbitrary" and "discriminatory enforcement" of ROSCA's "simple

mechanisms" requirement against Defendants. *See Fox*, 567 U.S. at 253. No law, regulation,

guidance, or case requires compliance with any of the factors.

Those three factors are: (1) visibility of system status (meaning "design should always keep

users informed about what is going on, through appropriate feedback within a reasonable amount

of time"), (2) consistency and standards (meaning "users should not have to wonder whether

different words, situations, or actions mean the same thing"), and (3) aesthetic and minimalist

---

[13] Dr. King's notes show that, rather than doing an independent, objective analysis, Dr. King backed into a conclusion that she had already reached. Those notes do not show Dr. King comparing Match.com's cancelation flow against *any* of Nielsen's 10 Usability Heuristics. *See* Defs. App. Ex. X at App. 1255–70. Instead, they show Dr. King "brainstorming" ways to "prove" that Match.com's cancelation flow is not simple. *Id.* For example, rather than asking *if* dark patterns are at play, Dr. King began with the presumption that Match.com's cancelation flow uses dark patterns, and asked "***Which*** dark patterns are at play here?" *Id.* at App. 1256 (emphasis added); *see also id.* at App. 1262 ("Could we use 'ease of use' to help prove that the survey didn't read as optional?").

design (meaning "[i]nterfaces should not contain information that is irrelevant or rarely needed").[14]
*See* Pl. App. Ex. 251 at App. 3058–61. Defendants could never have known that they could be subject to hundreds of millions of dollars in liability if the Match.com online cancelation flow allegedly violated this cherry-picked subset of usability heuristics. *See Fox*, 567 U.S. at 253, 258. That is a Due Process violation.

For these reasons, the FTC's Motion confirms that it is attempting to impose a novel and unprecedented interpretation of ROSCA's "simple mechanisms" requirement; therefore, Defendants' Motion for Summary Judgment should be granted, *see* Dkt. 204 (Section IV.A.1), and the FTC's Motion should be denied.

### 2. Match.com Provides "Simple Mechanisms" to Cancel Wholly Apart from the Online Cancelation Flow at Issue in This Case

The FTC's Motion on Count V independently fails because the FTC concedes that Match.com has offered at least four methods for consumers to cancel their subscriptions, apart from the online cancelation flow,[15] and presents no evidence that these mechanisms are not simple.

---

[14] The other seven factors are (1) match between system and the real world (meaning "design should speak the users' language"); (2) user control and freedom (meaning "users often perform actions by mistake," so "[t]hey need a clearly marked 'emergency exit' to leave the unwanted action without having to go through an extended process"); (3) error prevention (meaning "[e]ither eliminate error-prone conditions, or check for them and present users with a confirmation option before they commit to the action"); (4) recognition rather than recall (meaning "[m]inimize the user's memory load by making elements, actions, and options visible"); (5) flexibility and efficiency of use (meaning "shortcuts—hidden from novice users—may speed up the interaction for the expert user so that the design can cater to both inexperienced and experienced users"); (6) help users recognize, diagnose, and recover from errors (meaning "[e]rror messages should be expressed in plain language (no error codes), precisely indicate the problem, and constructively suggest a solution"); and (7) help and documentation (meaning "[i]t's best if the system doesn't need any additional explanation," but "it may be necessary to provide documentation to help users understand how to complete their tasks"). Nielsen Norman Group, 10 Usability Heuristics for User Interface Design, last updated Nov. 15, 2020, https://www.nngroup.com/articles/ten-usability-heuristics/.

[15] When MGI raised this argument in its Motion to Dismiss, Dkt. 20 at 27–28, the Court held that it could "look[] only to the allegations contained in the Complaint; argument or evidence of other cancellation methods Match might offer but which are not alleged in the Complaint are not properly considered by the Court on the Motion to Dismiss." Dkt. 86 at 12. Now that discovery has been complete, the issue is ripe for the Court's review to determine if the FTC has presented admissible evidence showing that Match.com has failed to provide other simple mechanisms to cancel beyond the online cancelation flow.

*See* Mot. at 37–38, 61–62.[16]

The plain language of ROSCA requires only "simple mechanisms" for cancelation. 15 U.S.C. § 8403(3); *see, e.g.*, *In re Universal Seismic Assocs., Inc.*, 288 F.3d 205, 207 (5th Cir. 2002) (explaining courts should look to "plain language"); *TransFirst Grp., Inc. v. Magliarditi*, 237 F. Supp. 3d 444, 457 (N.D. Tex. 2017) ("No court should engage in judicial overreaching to interpret and 'write in' a limitation . . . that is repugnant to the statute's clearly stated text."). The statute does not require that *every* cancelation method offered be simple, nor does it prohibit non-simple methods of cancelation (so long as there are "simple mechanisms"). The statute does not prohibit companies from voluntarily providing an additional cancelation method, even if that method does not meet the simple cancelation requirement.[17] ROSCA does not even require an online cancelation mechanism at all.[18]

The FTC's Motion on Count V should be denied because the undisputed evidence shows that Match.com provides other "simple mechanisms" to cancel, beyond the online cancelation flow. Indeed, the FTC admits in the Motion that Match.com "permitted consumers to cancel through other means." *See* Mot. at 37; *see also* Defs. App. Ex. U at App. 1156–60 (FTC's 2d Am. Resps. to MGI's 1st Reqs. for Admiss. No. 13 (admitting that "Match.com has a chat feature that Match.com subscribers have used to cancel"), No. 17 (admitting that Match.com "maintains a customer service number that Match.com subscribers have used to cancel"), No. 21 (admitting that "consumers have cancelled their Match.com subscription by mailing a letter to Defendants"), No.

---

[16] The FTC's complete lack of evidence is not surprising considering the FTC's 30(b)(6) witness testified that the email, chat, and phone methods are "not relevant." Defs. App. Ex. A at App. 4 (Bandy Dep. Tr. (Oct. 24, 2022) 95:24–96:5 ("Q. Is it the FTC's contention that email cancelation is not simple? A. It's not relevant for purposes of this count. Q. What about chat, same thing? A. Same thing. Q. Phone, same thing? A. Correct.")).

[17] The FTC's interpretation would disincentivize companies from offering additional cancelation methods for fear that a single "non-simple" method would make them liable.

[18] Defs. App. Ex. A at App. 4 (Bandy Dep. Tr. (Oct. 24, 2022) 97:2–7 ("Q. And you agree that ROSCA does not require an online cancelation mechanism, correct? . . . [A.] It's not stated in the statute. I agree with that.")).

25 (admitting that "users have cancelled their subscription by fax"), No. 29 (admitting that "Match.com has an email feature that [] Match.com subscribers have used to cancel")). Indeed, there is substantial evidence that, at all relevant times, Match.com has offered four or five methods (not including the online cancelation flow) for consumers to cancel their subscriptions. *See* Defs. App. Ex. P at App. 315 (Decl. ¶ 104).

**Online Chat.** There is evidence that consumers may cancel a Match.com subscription by sending a cancelation request via online chat to Match.com Customer Care. Defs. App. Ex. W at App. 1246 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 15 at 47). Customer Care will then process the request. *Id.*

**Email.** There is evidence that consumers may cancel a Match.com subscription by emailing a request to Match.com Customer Care. Defs. App. Ex. W at App. 1246 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 15 at 47). This can be done through traditional email or through an online form on Match.com's website. Defs. App. Ex. J at App. 187–88 (Saraph Dep. Tr. (June 22, 2023) 208:19–209:18). Customer Care will then process the request. Defs. App. Ex. W at App. 1246 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 15 at 47). Customer Care also has agents that respond to emails after hours and during weekends. *Id.*

**Phone.** There is evidence that consumers could cancel a Match.com subscription by calling the Match.com Customer Care phone number. Defs. App. Ex. W at App. 1246 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 15 at 47). Customer Care would then process the request. *Id.*

**Mail.** There is evidence that customers may cancel a Match.com subscription by sending a request through standard U.S. mail to Match.com at P.O. Box 25472, Dallas, Texas 75225. Defs.

App. Ex. W at App. 1246 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 15 at 47). Customer Care will then process the request. *Id.*

**Fax.** There is evidence that consumers may cancel a Match.com subscription by sending a fax with a request to cancel to Match.com. Defs. App. Ex. W at App. 1246 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 15 at 47). Customer Care will then process the request. *Id.*

The FTC's response is to argue that these other cancelation methods are (i) poorly disclosed and (ii) seldom used. *See* Mot. at 37, 61–62. These are legally irrelevant because ROSCA does not require any form of disclosure for a cancel option nor does it require that the option be often used. But even if those factors were relevant, they at most show facts in dispute, rendering summary judgment in favor of the FTC improper.

As to the disclosure of these methods, the statute does not require that companies "advertise" or disclose these methods in any way. *See generally* 15 U.S.C. § 8403(3); *cf.* Mot. at 37. Contrary to the FTC's Motion, there is nothing in the statute, guidance, or caselaw that requires a company to "prominently state . . . that consumers can cancel via these methods," *see* Mot. at 37. Thus, those supposed facts provide no basis to deny Defendants' Motion for Summary Judgment. But even if there were a requirement to "advertise" these cancelation methods, there is evidence that Match.com did so, surely enough to create a dispute of fact as to the FTC's argument:

**Online Chat.** The chat method is identified on the Customer Care Contact Us FAQ page. *See* Defs. App. Ex. P-52 at App. 566 (current Contact Us FAQ); Defs. App. Ex. P-53 at App. 688 (previous Contact Us FAQ). The chat method is also identified in the FAQs that the FTC misleadingly represents direct only to the online cancelation flow, Mot. at 37 & n.167. *See* Defs. App. Ex. P-38 at App. 492 ("Need Help? Log into your account to chat or text with us[.]"); Defs. App. Ex. P-40 at App. 496 (same).

**Email.** The email method is identified in the Customer Care Contact Us FAQ page. *See* Defs. App. Ex. P-52 at App. 566 (current Contact Us FAQ); Defs. App. Ex. P-53 at App. 568 (previous Contact Us FAQ).

**Phone.** The phone number was available on the Match.com FAQ pages. *See, e.g.*, Defs. App. Ex. P at App. 313 (Decl. ¶ 94 ("If you still have questions or need additional assistance, you can speak to one of our agents by calling 800-926-2824.")); Defs. App. Ex. P-54 at App. 601 (spreadsheet with text of Contacting Customer Care FAQ).

**Mail.** The mailing address is made available on the Match.com Terms of Use. Defs. App. Ex. W at App. 1246 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 15 at 47); Defs. App. Ex. P at App. 316 (Decl. ¶ 108); *see, e.g.*, Defs. App. Ex. P-1 at App. 319, 326 (current Match.com Terms of Use).

**Fax.** The fax number is available on Match.com Terms of Use. Defs. App. Ex.W at App. 1246–47 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 15 at 47–48); Defs. App. Ex. P at App. 316 (Decl. ¶ 108); *see, e.g.*, Defs. App. Ex. P-1 at App. 326 (current Match.com Terms of Use).

As to the FTC's second point that these other mechanisms were "seldom-utilized," Mot. at 61, that is also legally irrelevant. The statute does not impose any minimum use requirement on a cancel mechanism. The FTC cites nothing in the language of the statute or any regulation to suggest there is such a requirement. But even if usage of the cancelation methods were required, there is significant evidence that these methods are actually used, which creates a factual dispute on the FTC's Motion:

**Online Chat.** At least 123,421 customers canceled via chat since 2013. Defs. App. Ex. P at App. 315 (Decl. ¶ 105).[19]

**Email.** At least 119,722 customers canceled via email since 2013. Defs. App. Ex. P at App. 315 (Decl. ¶ 105).

**Phone.** At least 1,027,815 customers canceled via phone since 2013. Defs. App. Ex. P at App. 315 (Decl. ¶ 105).[20]

**Mail and Fax.** Match.com does not separately record the number of cancelations by standard mail or fax, but examples of consumers using the mail and fax methods to cancel have been produced. *See, e.g.*, Defs. App. Ex. P at App. 315–16 (Decl. ¶¶ 105–06).

In a final Hail Mary, the FTC argues that all of these other simple methods are not sufficient to satisfy ROSCA because it would be "contrary to congressional intent for a company to be able to comply with ROSCA by making its favored cancellation mechanism [not simple] while providing one simple cancellation mechanism that consumers were typically unaware of and rarely used." Mot. at 61–62. This is factually false—Match.com has not offered just one other "rarely used" cancelation method. Rather, Match.com has offered *five* other cancelation methods that *over a million* consumers have used, aside from the online cancelation flow. Defs. App. Ex. P at App. 315 (Decl. ¶¶ 104–05).[21] But the FTC's argument is also invalid as a matter of law. The FTC needs

---

[19] The FTC cites a former Match.com employee's characterization that chat cancelations were "not common," *see* Mot. at 37 n.170, but that employee left the company in February 2014. Defs. App. Ex. D at App. 55 (Watson Dep. Tr. 12:17–23). The actual Match.com data, which shows that hundreds of thousands of consumers have canceled via chat from 2013 to October 2022, speaks for itself. Defs. App. Ex. P at App. 315 (Decl. ¶ 105).

[20] If customers call the Match.com Customer Care phone number now, they are provided with an automated recording. Defs. App. Ex. W at App. 1247 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 15 at 48). That recording provides consumers with help regarding various topics, including providing instructions on how to cancel their Match.com subscription via the online cancellation flow. *Id.* Consumers are also informed that they may receive personalized support through the Customer Care online chat or email address. *Id.*

[21] These other methods show the extent that Match.com went to ensure that users who indeed wanted to cancel could cancel. Match.com did not have to offer all of these methods, but it did. Moreover, even if the other cancelation methods were not used as frequently as the online cancelation flow, that shows that the online cancelation flow was overwhelmingly successful.

19

to show that Match.com violated *the statute*, not the FTC's uncited perspective on congressional intent. ROSCA requires only that Match.com provide "simple mechanisms" to cancel; it does not require that it make its "favored" method or online cancelation flow simple. It also does not violate congressional intent for Match.com to provide an additional cancelation mechanism—even if it were not simple—beyond the mechanisms required by the statute. Congress merely wanted consumers to have "simple, convenient ways to cancel"[22] and for companies to meet "minimum requirements."[23] Having failed to prove that the other four methods were not simple, the FTC fails to meet its burden. Thus, the FTC's Motion should be denied as to Count V.

The cases the FTC cites do not state otherwise. *See* Mot. at 62 nn.329–31. In *United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152, 1169 (C.D. Cal. 2021), the defendant could not rely on an email method to cancel because "email requests for cancellation often received an automated response directing the individual to contact Customer Care by phone." *Id.* at 1159, 1169 & n.6. By contrast, Customer Care processes the cancelation requests that it receives and does not direct individuals to use different methods to cancel.[24] *See id.*; Defs. App. Ex. W at App. 1246 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 15 at 47).

The FTC represents that in *FTC v. Health Formulas, LLC*, No. 2:14-CV-01649, 2015 WL 2130504, at *16 (D. Nev. May 6, 2015), the court "[held] that the defendants had failed to provide

---

[22] S. Rep. 111-240, 2010 WL 3002003, at *3–4 ("Section 3(c) would establish rules under which Internet retailers may periodically charge consumers for goods or services until the consumer cancels the arrangement ('negative option feature'). It would prohibit a seller from charging a consumer through a negative option feature unless: . . . 3) the seller provides the consumer simple, convenient ways to cancel the negative option plan.").

[23] Statement by the Press Secretary, 12/29/2010, 2010 WL 5384575 ("On Wednesday, December 29, 2010, the President signed into law: . . . the 'Restore Online Shoppers' Confidence Act,' which protects online consumers . . . by: (3) requiring companies that use 'negative options' (i.e., require consumers to take an affirmative action to reject goods or services) to meet certain minimum requirements.").

[24] As noted above, *see supra* n.20, Match.com no longer offers live Customer Care phone support, for cancelation or otherwise. When it did offer live Customer Care phone support, representatives would process cancelation requests. Now, if a customer calls the legacy Customer Care phone number, there is an automated recording to benefit customers—i.e., provide customers with information about how to cancel via the online cancelation flow and receive personalized support through Customer Care online chat or email. *See* Defs. App. Ex. W at App. 1246–47 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 15 at 47–48).

'simple' cancellation mechanisms because these mechanisms were not adequately disclosed." Mot. at 62 n.330. That is incorrect. The court actually found that the FTC had merely "provided evidence" sufficient for a preliminary injunction that the defendants "[did] not provide simple mechanisms" when "the [single] mechanism" (phone) was "not stated on Defendants' product order pages or in confirmation emails giving the details of each online transaction." *Id.* at *1, *3, *16; *see* Am. Compl. ¶ 109, *FTC v. Health Formulas, LLC*, No. 2:14-CV-01649 (D. Nev. Feb. 5, 2015), Dkt. 114 ("Defendants require consumers to call a separate and different number to cancel each and every product that they upsell to the consumer."). Match.com does nothing of the sort. Unlike *Health Formulas*, Match.com has never "require[d] [that] consumers [] call a separate and different number to cancel each and every product." *See* Am. Compl. ¶ 109, *FTC v. Health Formulas, LLC*, No. 2:14-CV-01649 (D. Nev. Feb. 5, 2015), Dkt. 114. Instead, Match.com has given consumers at least *four* options to cancel, aside from the online cancelation flow; has informed consumers of each of these methods, as set forth above; and has seen the empirical success of the other methods, as they have resulted in well over a million cancelations.

Lastly, the FTC cites *Marsh v. Zaazoom Sols., LLC*, No. C-11-05226, 2012 WL 952226, at *8 (N.D. Cal. Mar. 20, 2012), for the proposition that "'ROSCA [] requires full disclosure and transparency to consumers,' including that online sellers must provide simple cancellation mechanisms." Mot. at 62 & n.331. But that case was not even about a cancelation mechanism. *Marsh*, 2012 WL 952226, at *2, *4, *8 (finding ROSCA did not preempt claims that defendants "operate[d] an internet scam in which remotely-created checks" were "created to pay for monthly membership fees for coupon services using [p]laintiffs' personal and banking information entered on websites for the purpose of obtaining payday loans").[25]

---

[25] Moreover, the language the FTC cherry-picks does not appear to reference ROSCA's "simple mechanisms" requirement. *See Zaazoom*, 2012 WL 952226, at *8 ("With respect to ROSCA, the premise of the statute is simple—

For these reasons, the FTC's Motion confirms that Match.com offers "simple mechanisms" to cancel, wholly apart from the Match.com online cancelation flow; therefore, Defendants' Motion for Summary Judgment should be granted. *See* Dkt. 204 (Section IV.A.2.b). If the Court disagrees, at a minimum, however, there are disputes as to the specific facts that the FTC asserts are undisputed. While all of these are irrelevant to Defendants' Motion for Summary Judgment, they are an independent basis to deny the FTC's Motion on Count V.

### 3. The FTC Has Not Met Its Burden to Show that the Online Cancelation Flow Is Not Simple As a Matter of Law

To prevail on its Motion, the FTC must show that there is not a single material fact in dispute as to whether Match.com's online cancelation flow is simple. But the FTC has not presented sufficient evidence to show that it is entitled to judgment as a matter of law, and for each of the facts that the FTC says it needs to prove, there are mountains showing the opposite.

***First***, the FTC presents expert testimony. But this testimony does not prove that the flow is not simple under the existing legal framework. And there is competing expert testimony on the simplicity of the online cancelation flow. The FTC's expert says the online cancelation flow is not simple. Defendants' expert says it is. This alone is basis to deny the FTC's Motion.

***Second***, the FTC relies on a few documents that suggest the online cancelation flow could be made even more simple. But that is not sufficient as a matter of law because the law does not require the most simple mechanism. And there is significant factual testimony from Defendants' witnesses that uniformly states that the online cancelation flow is simple.

---

it requires **transparency** by post-transaction third-party sellers where the consumers are in the process of completing a transaction with an initial merchant. In essence, before a consumer is charged, third-party sellers must **disclose** to the consumer that 'the post-transaction third party seller is not affiliated with the initial merchant.' . . . **ROSCA merely requires full disclosure and transparency to consumers**." (emphasis added)). Even if it were relevant, Match.com has disclosed, and been transparent with consumers about, the *five* other options that it has offered for them to cancel (aside from the online cancelation flow). Further proof of Match.com's transparency is that these other cancelation methods have resulted in well over a million cancelations, as set forth above.

*Third*, the FTC relies on Match.com's data as evidence that the online cancelation flow is not simple. But that data does not actually show anything about the simplicity of the flow. Properly interpreted, it actually shows that most customers who start the process to cancel complete it. But even if they did not, deciding not to cancel says nothing about the simplicity or complexity of the flow. The FTC's interpretation of that data is heavily disputed, as it relies on unjustified assumptions. Match.com's employees and experts explained that Match.com's data shows that the online cancelation flow is effective and simple.

*Fourth*, the FTC asserts that it takes a long time for customers to cancel and that the online cancelation flow has eight steps and requires that users interact with a save offer and multi-question, multi-page survey. But that is simply untrue. Videos of the online cancelation flow demonstrate that it can be completed in less than a minute. Evidence also shows that the flow actually contains only three or four steps, depending on whether a consumer is presented with a save offer (i.e., an offer to renew at a lower price rather than cancel), and that the save offer, short survey, and net promoter score ("NPS") can all be skipped.

*Fifth*, the FTC relies on customer complaints to argue that the online cancelation flow is not simple. But the complaints are inadmissible hearsay, and even if they were considered, there are disputes as to the number of customers that complained about non-simple cancelation, what those complaints mean, and whether those complaints show that the flow is not simple.

*Sixth*, the FTC asserts that the online cancelation flow is not simple because it is hard to find within Account Settings. But a number of witnesses testified that the online cancelation flow is not hard to find and is consistent with other websites. Moreover, wholly aside from the Account Settings path, there is also evidence of other paths to navigate to the online cancelation flow.

**Seventh**, the FTC asserts that the online cancelation flow is not simple because it has unnecessary steps. As a matter of law, this argument does not entitle the FTC to summary judgment. Existing FTC guidance expressly authorizes so-called "unnecessary" steps. The FTC is attempting to impose a novel legal standard on Match.com—that the online cancelation flow is not "simple" essentially because it takes more than one or two computer clicks to cancel a subscription. In any event, there are also genuine disputes of material fact as to how these steps work.

**Eighth**, the FTC asserts that the online cancelation flow is not simple because there are so-called dark patterns and alleged usability heuristic violations. Again, as a matter of law, this argument does not entitle the FTC to summary judgment. The FTC provided zero notice to Defendants (or any company) that an online cancelation flow cannot contain these so-called "dark patterns"—the FTC did not even hold its workshop to discuss and understand the meaning of "dark patterns" until years after it brought this case. The FTC also has not provided fair notice that a cancelation flow is illegal if it violates any usability heuristics *at all*, much less the three cherry-picked factors that its usability expert claimed the flow violates. The FTC's claim that the flow has dark patterns is also hotly disputed.

For all of these reasons, the FTC's Motion should be denied as to Count V.

### a.   The FTC's Expert Testimony Is Insufficient As a Matter of Law and Is Disputed

The FTC's expert, Dr. King, opined that Match.com's online cancelation flow was not "easy to use" or "easy to find," based on purported "dark patterns" and her partial analysis of usability heuristics. *See* Pl. App. Ex. 251 at App. 3027; Mot. at 60. But this testimony is not admissible and therefore cannot help the FTC satisfy its burden. Dkt. 208. Even if the testimony were admissible, it does not show a violation. ROSCA does not require that any particular heuristics be met, let alone three cherry-picked by the expert. Nor does it prohibit so-called dark

patterns, which the FTC admits are not all illegal. Thus, at most, the expert shows ways the flow could be made more simple, not ways that it fails to meet the simple requirement in the law.

If the testimony could be used to meet the FTC's burden, it is hotly disputed. It is well established that competing expert testimony creates factual disputes rendering summary judgment improper. *Lawson v. Dallas Cnty., TX*, No. CA 3-95-CV-2614-R, 1998 WL 246642, at *10 (N.D. Tex. Mar. 24, 1998) (explaining "battle of the experts . . . involves credibility issues that are best left for the fact finder"); *see Via Vadis, LLC v. Amazon.com, Inc.*, No. 1:14-CV-00813-LY, 2022 WL 174527, at *8 (W.D. Tex. Jan. 18, 2022), *report and recommendation adopted*, No. 1:14-CV-813-LY, 2022 WL 5571525 (W.D. Tex. Feb. 7, 2022) (explaining "battle of the experts" renders summary judgment improper).

Here, Defendants have competing expert testimony that the flow is simple. Usability expert, Brandon Ward, who has been in the industry for nearly 25 years, is the Chief Experience Officer and Senior Director of User Experience at Precocity, LLC, located in Dallas, Texas. Defs. App. Ex. R-1 at App. 688 (Rpt. ¶ 1). He has worked on over 100 usability projects, has spoken at multiple usability conferences, and is an instructor in Southern Methodist University's User Experience Design Certificate program. Defs. App. Ex. R-1 at App. 688–89 (Rpt. ¶¶ 1–6); Defs. App. Ex. L at App. 216 (Ward Dep. Tr. 9:22–10:13). Mr. Ward testified that the online cancelation flow is "clear and effective" based on his independent usability study, evaluation of empirical Match.com user data, comparison to other online subscription cancelation flows, and own analysis of the flow. Defs. App. Ex. R-1 at App. 693–95 (Rpt. ¶¶ 19–22). This is a quintessential "battle of the experts" that "involves credibility issues that are best left for the fact finder." *See Lawson*, 1998 WL 246642, at *10. For this reason alone, the FTC's Motion should be denied as to Count V.

#### b.    The FTC's Cited Employee Testimony Does Not Meet Its Burden

The FTC relies heavily on documents and emails from a former Customer Care Match.com employee, Kris Auderer.[26] For example, the FTC relies on her documents suggesting that improvements can be made to the online cancelation flow and that the flow can be "confusing." *See, e.g.*, Mot. at 22 & n.98, 28, 54, 62.[27] But again this is not the legal standard. The law does not require the simplest flow, and while the FTC has other statutes that apply a "confusing" standard, ROSCA does not.

In any event, the testimony and documents are in serious dispute. Nearly all current and former Match.com employees overwhelmingly testified in deposition that the online cancelation flow was clear, simple, and easy to use:

- Dushyant Saraph, the General Manager of Match.com and also MGL's 30(b)(6) designee, testified that the online cancelation flow "is simple, it is just a few steps, and users can cancel successfully." Defs. App. Ex. J at App. 195 (Saraph Dep. Tr. (June 22, 2023) 346:14–17, 347:25–348:14 ("Q. Do you have data supporting that view? A. Yes. Users start the cancellation flow, close to 95% are able to successfully cancel. And not everyone has the intent to do that, so that shows that the flow is pretty straightforward.")). He further testified that he has never made any changes to the online cancelation flow to make it more difficult for customers to cancel, and "if anything, . . . we are incentivized to make sure the

---

[26] *See, e.g.*, Pl. App. Ex. 5 at App. 17; Pl. App. Ex. 12 at App. 38 (same email thread); Pl. App. Ex. 157 at App. 1681 (same email thread); Pl. App. Ex. 118 at App. 1330–42 (PowerPoint attached to Ex. 5); Pl. App. Ex. 68 at App. 563–66 (similar version of PowerPoint); Pl. App. Ex. 142 at App. 1554–59 (similar PowerPoint).

[27] The FTC also relies on her proposed changes to the online cancelation flow. But Ms. Auderer admittedly was not on the Product team and did not develop or design the website. Defs. App. Ex. B at App. 18 (Auderer Dep. Tr. 182:4–13). The FTC represents that she was "ignored" or "rejected." Mot. at 35. Not so. Deposition testimony shows that her proposal was just not the "right direction" for Match.com to go, as "the current flow is really simple, [and] it is intuitive." Defs. App. Ex. J at App. 197 (Saraph Dep. Tr. (June 22, 2023) 353:25–355:5).

process is as easy as possible." Defs. App. Ex. J at App. 195 (Saraph Dep. Tr. (June 22, 2023) 347:8–24).

- Shar Dubey, former Chief Product Officer of MGL and former President and CEO of MGI,[28] testified that "[every day] thousands and thousands of users successfully cancel their subscription." Defs. App. Ex. G at App. 125 (Dubey Dep. Tr. 248:19–249:19). She further testified that she "never" directed anybody to make Match.com's online cancelation flow more complicated, as "that would be a very dumb business decision." Defs. App. Ex. G at App. 125 (Dubey Dep. Tr. 249:21–25). And if someone had proposed making the online cancelation flow more complicated, she would have responded that "it goes against our fundamental principle of consumer friendly applications[] are the only way you drive consumer business growth," and "it would be a dumb decision, dumb thing to do long-term for the brand." Defs. App. Ex. G at App. 126 (Dubey Dep. Tr. 250:7–17).

- Mandy Ginsberg, former CEO of MGI and former CEO of Match.com,[29] testified that "[t]here was never any intention to make a cancellation flow not simple; in fact, we looked at all the data that suggests high 90 percent of people had no problem cancelling." Defs. App. Ex. F at App. 102 (Ginsberg Dep. Tr. 208:15–21). She further testified that Match.com "would not want to make the product difficult to cancel because at the end of the day, our customers would either tell people about it or come back themselves, and so . . . if customers were unhappy leaving our site or app, they wouldn't come back, and . . . half the people that come every day are past customers, and so it would not make sense to make our customers unhappy or frustrated." Defs. App. Ex. F at App. 102 (Ginsberg Dep. Tr. 208:22–209:7).

---

[28] Defs. App. Ex. W at App. 1208–09 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 1 at 9–10).
[29] Defs. App. Ex. W at App. 1209 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 1 at 10).

- Michele Watson, former Senior Vice President of Customer Care at Match.com (and Ms. Auderer's boss),[30] testified that she never discussed with anyone that the online cancelation flow should be made difficult so that customers could not cancel. Defs. App. Ex. D at App. 55, 70 (Watson Dep. Tr. 12:24–13:11, 209:5–10). She further testified that she had only one issue with the cancelation flow, which was changed based on her recommendation during her time at Match.com. Defs. App. Ex. D at App. 69 (Watson Dep. Tr. 203:15–204:9).

- Melissa Clinchy, former Manager of Customer Experience within Customer Care at Match.com, testified that she "[did not] believe [the online cancelation flow] was difficult" or "confusing." Defs. App. Ex. E at App. 78, 86 (Clinchy Dep. Tr. 18:13–15, 223:6–224:3, 224:4–7).

- Adrian Ong, former Senior Vice President, Operations for Match.com,[31] testified that "the majority of users found it easy to cancel and were able to do it themselves, or they were able to contact us and we helped them do it." Defs. App. Ex. H at App. 142 (Ong Dep. Tr. 261:7–15).

This testimony shows that the FTC's representation that "Defendants' employees knew [the online cancelation flow] was flawed" and "intentionally designed it to be difficult to complete,"[32] is false and obviously in dispute. Mot. at 31–35. As further contrary evidence, Match.com offers FAQs to provide consumers with the answers they need, including how to cancel via the online cancelation flow. Defs. App. Ex. P at App. 313 (Decl. ¶¶ 92–95). This includes a

---

[30] Defs. App. Ex. D at App. 56.1 (Watson Dep. Tr. 18:12–20).
[31] Defs. App. Ex. P at App. 316 (Decl. ¶ 109).
[32] Moreover, ROSCA requires "simple mechanisms," not the "simplest" mechanisms. Thus, even if, for valid business reasons, a change was made that could make cancelation slightly less simple in theory, that change does not mean that the mechanism is not still simple.

video with step-by-step instructions on how to cancel via the online cancelation flow and FAQs with a direct link to the online cancelation flow. Defs. App. Ex. P at App. 313 (Decl. ¶ 93).[33] If Match.com were trying to make it difficult for subscribers to cancel, it would not offer these FAQ and video resources. Defs. App. Ex. P at App. 314 (Decl. ¶ 97). At the very least, this evidence creates a genuine dispute of material fact.

Indeed, even the interpretation of specific documents the FTC cites are in dispute. The FTC cites a number of documents and emails from current and former employees. The FTC claims that these emails show employees "openly discussing the many problems plaguing" the online cancelation flow. Mot. at 31–32. But as set forth above, the deposition witnesses overwhelmingly testified that they did *not* believe the flow was illegal and did *not* design the flow to be difficult, as "that would be a very dumb business decision." Defs. App. Ex. G at App. 125 (Dubey Dep. Tr. 249:21–25). Moreover, the FTC's position would effectively cause companies to face liability for discussing potential improvements. And just because a company discusses potential improvements does not mean that a mechanism is not "simple" already.

The FTC's representations of internal emails are also wrong and in dispute. For example, the FTC suggests that Ms. Dubey "critique[d]" the online cancelation flow. *See* Mot. at 32. She did not. In the email the FTC references, Ms. Dubey asked about "the refund policy situation" because "customers complain[ed] that they [had] cancel[ed] and we still auto renew[ed] them." Pl. App. Ex. 157 at App. 1682. Ms. Dubey explained in deposition that "[t]housands and thousands of people successfully canceled every day, but we would get a handful of complaints . . . . Most of the complaints were people [who] had just forgotten to cancel, but they kind of accused the

---

[33] The video is also publicly available at https://help.match.com/hc/en-us/articles/6077124196891-Canceling.

company that oh, no, no, no, I tried to cancel and it didn't stick." Defs. App. Ex. G at App. 120–21 (Dubey Dep. Tr. 169:3–171:3).

The FTC also misrepresents that Mr. Ong "characterize[d] the cancellation process as . . . 'too long.'" Mot. at 32 n.136 (citing Pl. App. Ex. 6 at App. 20). He explained in deposition that he meant that he had only "received the feedback" from some customers, not that he believed it to be true. Defs. App. Ex. H at App. 135 (Ong Dep. Tr. 148:17–149:13).[34] For all of these facts that the FTC claims are not in dispute, there is substantial dispute and admissible factual testimony undermining everything the FTC says. The FTC's Motion should be denied as to Count V.

### c.   Actual Customer Cancelation Data Shows that the Flow Is Simple, Not Complex

The FTC repeatedly asserts, as an undisputed fact, that the online cancelation flow is not simple because "almost half of the time Match.com customers enter the cancellation flow, they do not complete it." Mot. at 28; *see* Mot. at 29 & n.123 (reaching a 56% cancelation rate). But this statement is not true. Defendants presented evidence that 95% of actual Match.com subscribers that **enter** the online cancelation flow *successfully* cancel or take a save offer (i.e., decide to renew rather than cancel). Defs. App. Ex. R-1 at App. 694–95 (Rpt. ¶ 22).[35]

Certainly, the FTC does not have sufficient evidence to support its claim that 56% of customers "enter the cancellation flow" but "do not complete it." Mot. at 28. First, Defendants' expert, Dr. Langenfeld, explains that the FTC begins the online cancelation flow when a subscriber

---

[34] The FTC also cites emails from individuals not deposed in this case, when it is not clear what their knowledge of the online cancelation flow was or what exactly they were referring to as "confusing." *See* Mot. at 32 & n.138 (citing Pl. App. Ex. 8–11); Mot. at 1–2 & n.6, 43 & n.210, 44 & n.217, 54, 72 & n.380 (citing Pl. App. Ex. 4 at App. 14). Summary judgment is not the place to make those inferences against Defendants.

[35] *See* Defs. App. Ex. P & P-48 at App. 314, 513–19. This number is calculated by dividing the sum of Columns E (reflecting the number of subscribers who canceled through the online cancelation flow before their next renewal) and G (reflecting the number of subscribers who accepted a save offer), by the sum of Column C (reflecting the number of subscribers entering the flow). The result is .9546, or 95.46%, meaning over 95% of subscribers that enter the flow successfully cancel through the flow or accept a save offer prior to their next renewal.

clicks on the "Manage subscription" link on the Account Settings page instead of when customers click "Cancel Subscription." Defs. App. Ex. S-2 at App. 1042–43, 1061 (Rpt. ¶ 18, 44). The FTC assumes (without evidence) that all customers who click "Manage subscription" intend to cancel when there are many reasons that they could have clicked "Manage subscription" without canceling. *See* Defs. App. Ex. S-2 at App. 1055–58 (Rpt. ¶¶ 30–36); *see supra* Section III.D.1.b(ii). By starting the calculation at this earlier stage, the FTC overstates[36] how many customers actually start but do not finish canceling.[37]

Second, Dr. Langenfeld explains that the FTC measures the share of "sessions" in which a subscriber clicked "Manage subscription" and canceled their subscription, instead of measuring by "subscriber." *See* Defs. App. Ex. S-2 at App. 1061 (Rpt. ¶ 45). This assumption overstates the FTC's drop-out rate. That is because, if (for any reason) a subscriber did not cancel their subscription in such a session, their session would be counted against the overall cancelation rate, regardless of whether that subscriber successfully canceled in a later session. *See id.* There are numerous reasons why such an assumption is unwarranted. *See supra* Section III.D.1.b(ii).

Third, while the FTC attempts to account for subscribers who clicked "Subscription Status" instead of "Cancel Subscription" after visiting the "Manage subscription" page, the FTC does so for only part of the relevant time period. *See* Defs. App. Ex. S-2 at App. 1061 (Rpt. ¶ 46). For example, the FTC calculates cancelation rates using data going back to October 2016, or alternatively October 2014, but accounts only for users clicking "Subscription Status" back to

---

[36] The FTC's own usability expert, Dr. King, acknowledged as much. Defs. App. Ex. M at App. 229–30 (King Dep. Tr. 130:2–5, 134:6–10, 136:12–137:1).

[37] The FTC also does not subtract from the cancelation rate calculation denominator any portion of sessions in which "Manage subscription" was clicked but the subscriber did not enter their password and proceed to the "Manage subscription" page. *See* Defs. App. Ex. S-2 at App. 1062 (Rpt. ¶ 48). Effectively, the FTC's cancelation rate calculations assume that subscribers in all of these sessions intended to cancel. *Id.* However, it is more likely that at least some portion of these subscribers would have clicked "Subscription Status" rather than "Cancel Subscription." *Id.* Neglecting to perform this subtraction once again serves to understate the calculated cancelation rate. *Id.*

March 2019. *Id.* This artificially depresses the calculated cancelation rate. *Id.*[38] For these reasons, while the FTC may think its calculation is better than Match.com's expert analysis from Dr. Langenfeld and Mr. Ward, it is not.

The FTC doubles down on its errors by misinterpreting old Match.com documents and suggesting that they similarly show a high drop-out rate. *See* Mot. at 29–30, 60 & nn.124, 132 (citing Pl. App. Ex. 134–38, 145 at App. 1443–84, 1613). But the documents are based on back-of-the-envelope, unreliable data pulls that do not accurately reflect Match.com's subscription cancelation rate. For example, they include non-subscribers, non-U.S. Match.com users, and session-level (rather than subscriber-level) information. Defs. App. Ex. P at App. 314–15 (Decl. ¶ 103). The FTC also misleadingly extracts language from an internal presentation for the incorrect proposition that users "abandon" cancelation "37-56%" of the time. *See* Mot. at 30, 60 & nn.125–26, 320 (citing Pl. App. Ex. 124, 140 at App. 1362–72, 1545). The FTC assumes, without any evidence, that the referenced "abandons" actually intended to cancel, when expert analysis from Dr. Langenfeld suggests otherwise, and all inferences have to be made against the FTC at this stage. Defs. App. Ex. S-2 at App. 1055–58 (Rpt. ¶¶ 30–36 (explaining different usage patterns between cancelers and non-cancelers)). Even the presentation admits that most of the "abandons" happen immediately after the subscription purchase, *see* Pl. App. Ex. 124 at App. 1364, which means that the "abandons" are likely consumers merely exploring the website, rather than those intending to cancel. *See* Defs. App. Ex. S-2 at App. 1055–58, 1083 (Rpt. ¶¶ 30–36, 88).[39]

---

[38] Dr. Langenfeld relatedly explains that, if "Cancel Subscription" was clicked in addition to "Subscription Status," the FTC does not exclude the session and effectively assumes the intent of the subscriber was to cancel their subscription. *See* Defs. App. Ex. S-2 at App. 1062 (Rpt. ¶ 47). It is likely that a substantial number of subscribers were just exploring the Match.com website rather than intending to cancel when clicking both links on the "Manage subscription" page. *Id.* The number of subscribers that click both links is greater than the number of subscribers who click Subscription Status alone. *Id.* Again, the FTC's omission serves to understate the calculated cancelation rate.

[39] The case the FTC cites, *MyLife*, does not stand for the proposition that the FTC represents, Mot. at 61 & n.321. That case was not about an online cancelation mechanism, and the court did not discuss any clickthrough data. Rather, the "abandonment rate" referred "to the percentage of callers that hang up before reaching a call agent" (which averaged

> **d.** **The Length of Time to Cancel and Number of Clicks Does Not Help the FTC Meet Its Burden**

The FTC also asserts that it takes a long time for customers to cancel, Mot. at 23–28, and states that it is undisputed that the online cancelation flow "contains eight steps," "involves more than six clicks," and "requires that the user interact with . . . a save offer [and a] multi-question, multi-page survey," Mot. at 23. But that is not correct.

First, videos of the online cancelation flow demonstrate that it can be completed in less than a minute. *See* Def. App. Ex. P-39, P-45–P-47 at App. 494, 509–11. The FTC cites screenshots, with time stamps, of one of those videos (Pl. App. Ex. 120 at App. 1349) in its Motion. *See* Mot. at 23–27. The time stamps indicate that it takes only 28 seconds for a subscriber to get from "Manage subscription" to complete the online cancelation flow. *See* Mot. at 24–27. This is similar to Match.com subscriber data, which shows that it takes on average 44 seconds to complete the online cancelation flow. Defs. App. Ex. R-2 at App. 960–61 (Rpt. ¶ 82). The speed at which customers can cancel actually supports Defendants' position, not the FTC's.

Second, the FTC is wrong that there are eight steps in the online cancelation flow. In fact, evidence shows that the actual online cancelation flow actually contains only three or four steps, depending on whether a consumer is presented with a save offer (i.e., an offer to renew at a lower price rather than cancel)—(1) select "Cancel Subscription," (2) answer or skip the optional survey, (3) answer or skip the save offer (which only some consumers are shown), and (4) answer or skip the optional NPS. *See* Defs. App. Ex. P-31 at App. 467; Defs. App. Ex. P-32 at App. 469; Defs. App. Ex. P-33 at App. 471; Defs. App. Ex. P-34 at App. 473; Defs. App. Ex. J at App. 180, 183–

---

7.1% during the relevant time period and reached as high as 29% and over 50% at times). *See MyLife*, 567 F. Supp. 3d at 1160 & n.3, 1169. And in any event, Match.com's data shows that less than 5% of actual Match.com subscribers that entered the online cancelation flow did not successfully cancel or take a save offer (i.e., decide to renew rather than cancel) before being charged a renewal. Defs. App. Ex. R-1 at App. 694–95 (Rpt. ¶ 22).

84 (Saraph Dep. Tr. (June 22, 2023) 93:1–7 (explaining survey optional); 108:23–109:2 (explaining NPS optional)). Given that only some consumers are given a save offer, which can be skipped, and there is no "multi-question, multi-page survey" (only a short survey and NPS, both of which can be skipped), the FTC cannot meet its burden by falsely claiming that consumers are "*require[d]*" to interact with a save offer and "multi-question, multi-page survey," Mot. at 23 (emphasis added).

### e.  The FTC Has Not Presented Sufficient Evidence on the Level and Significance of Customer Complaints

The FTC also argues that complaints from Match.com customers show that the online cancelation flow is not simple. Mot. at 29 & nn.120–22 (citing Pl. App. Ex. 6, 46, 65, 129–33, 157, 243, 264). These customer complaints are inadmissible hearsay and should not be considered at summary judgment. *See, e.g.*, *Hendricks v. Ford Motor Co.*, No. 4:12CV71, 2012 WL 4478308, at *2 (E.D. Tex. Sept. 27, 2012) (holding customer complaints were inadmissible hearsay).

Even if the handful of complaints were considered, they do not show that the flow was not simple. The FTC claims that "[c]onsumers complained repeatedly that they were frustrated by Match.com's online cancellation mechanism or believed that they had canceled yet were autorenewed," and that "these concerns ranked among Match.com's top complaints year after year." Mot. at 29. Contrary evidence shows that complaints about cancelation were a small percentage of complaints that Match.com received. *See* Defs. App. Ex. D at App. 67 (Watson Dep. Tr. 195:4–8 ("Q. Would you agree that generally speaking Match in general during this time period received a lot of complaints from members who stated they cancelled on the site and it didn't work? A. No.")); Defs. App. Ex. J at App. 196 (Saraph Dep. Tr. (June 22, 2023) 349:19–350:7 (testifying Match.com does not get a significant number of complaints about the cancelation flow,

which "has not been a high priority area just because there aren't users complaining, we have multiple channels where people can reach out to us")).

In addition, Defendants' expert, Dr. Langenfeld, confirmed that almost half of the commenters in Dr. King's complaint analysis never entered the online cancelation flow. Defs. App. Ex. S-1 at App. 1013–14 (Rpt. ¶ 46). Dr. Langenfeld also testified that underreporting and negativity biases can "exacerbate a perception of difficulty in the cancelation process." Defs. App. Ex. S-1 at App. 1010 (Rpt. ¶ 37).[40] Thus, at a minimum, this evidence creates genuine disputes of material fact as to the amount, relevance, and reliability of customer complaints.

Moreover, complaints from customers who claimed that they "thought" they had canceled, but were auto-renewed, have no causal connection to whether the online cancelation flow is simple (as those customers were just seeking a refund). Former Customer Care employees that were deposed in this case agree. For example, Ms. Watson testified accordingly:

> Q. Does the fact that a consumer noted in a communication to customer care that they wanted a refund because they thought they had cancelled necessarily mean that the on-line cancellation flow was not simple?
>
> A. No.
>
> Q. Why?
>
> A. Because they may not have even attempted to cancel, they may have just thought they did.

Defs. App. Ex. D at App. 71–72 (Watson Dep. Tr. 213:23–214:6); *see* Defs. App. Ex. B at App. 21, 27 (Auderer Dep. Tr. 202:23–203:6 (admitting Customer Care would not have known whether customers who called and said they thought they canceled in fact ever tried to cancel), 239:25–

---

[40] "Underreporting bias," which "refers to the self-selection bias in online product reviews," means that "[c]onsumers with extreme experiences, whether positive or negative, are more likely to write reviews than the vast majority of users." Defs. App. Ex. S-1 at App. 1009 (Rpt. ¶ 35). In addition, "negativity bias" "is a tendency of people to pay more attention to and give more weight to negative experiences compared to neutral or positive experiences." Defs. App. Ex. S-1 at App. 1009–10 (Rpt. ¶ 36).

240:5 (admitting just because customers complain about being auto-renewed does not mean that they are complaining that the flow was not simple), 204:23–7 (admitting aware of no effort by Match.com to charge anyone who had, in fact, canceled)).

The FTC doubles down on its assertion by arguing that "Defendants received notice from the BBB" that the online cancelation flow was flawed.[41] Mot. at 31. To begin, Defendants plainly did not "receive[] [any such] notice from the BBB," Mot. at 31 & n.130, and the evidence on which the FTC relies is inadmissible hearsay and misconstrued for the reasons explained above. The FTC cannot rely on characterizations of purported customer complaints made to the BBB (Ex. 150 at App. 1656–57, Ex. 153 at App. 1669, Pl. App. Ex. 149 at App. 1640) or the BBB complaints themselves (Pl. App. Ex. 264 at App. 4535–4664).[42] *See, e.g.*, *Hendricks*, 2012 WL 4478308, at *1 ("A party cannot circumvent the hearsay rules, however, by arguing that the hearsay is offered not to show the truth of the matters asserted but rather to show the opposing party's knowledge of the truth of the matters asserted.").[43] Moreover, complaints are unavoidable—no company can please everyone, and that is not the standard. For these reasons, the FTC's reliance on customer complaints cannot support summary judgment.

---

[41] The FTC also claims that the mere existence of the FTC's investigation put Defendants on notice that the online cancelation flow was flawed. Mot. at 31 & n.131. As a matter of law, the mere existence of an investigation proves nothing. *See, e.g.*, *In re Universal Health Servs., Inc., Derivative Litig.*, No. CV 17-2187, 2019 WL 3886838, at *37 (E.D. Pa. Aug. 19, 2019) (holding "the fact that the government opened an investigation into [a company] for potential violations of [a federal law] does not mean that the company actually violated the [law]"); *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) (explaining "announcement of an investigation reveals just that—an investigation—and nothing more").

[42] The other emails the FTC cites about the BBB show that Match.com took very seriously and prioritized remedying the exceptionally rare instances when a technical glitch caused a handful of consumers to be billed after they had actually canceled. *See* Mot. at 31 n.130 (citing Pl. App. Ex. 151 at App. 1660, Ex. 152 at App. 1663–67).

[43] The FTC also claims that Visa notified Defendants of concerns about cancelation. Mot. at 31 & n.133. This is textbook inadmissible double hearsay—the FTC relies on an email from a Visa employee who noted a statement that a different unidentified Visa employee had apparently made to a different Match.com employee. Pl. App. Ex. 87 at App. 904. In addition, the inferences the FTC asks the Court to draw from the email are unreasonable. When asked about that email, the Match.com employee who received it (Mr. Ong) testified that he thought this was "more of a sales email" and that Visa had just "tr[ied] to state the obvious without truly understanding how things work within the business" or "how easy it is for customers to cancel their subscriptions." Defs. App. H at App. 138–39 (Ong Dep. Tr. 209:10–212:11).

36

**f.      The Online Cancelation Flow Is Not Hard to Find**

The FTC asserts that the online cancelation flow is not simple because it is hard to find. Mot. at 55. But evidence shows that the FTC has not met its burden to prove this as a matter of law. First, a number of witnesses testified that the online cancelation flow is *not* hard to find:

- Mr. Saraph (the General Manager of Match.com) testified that the online cancelation flow is easy to find, just like every other method that Match.com offers for its subscribers to cancel. Defs. App. Ex. J at App. 191–92 (Saraph Dep. Tr. (June 22, 2023) 244:12–245:5 (explaining online cancelation flow, along with other methods, are "easy to do" and "anyone looking to do those on our website can easily find those")). Mr. Saraph further explained that the "Manage subscription" language is consistent with other websites. Defs. App. Ex. J at App. 174 (Saraph Dep. Tr. (June 22, 2023) 35:11–25 (explaining "[w]e had looked at various different consumer technology companies at the time, and this language of manage subscription was used by several of them to manage everything associated with your account in terms of subscription status, cancellation, things that were tied to your subscription")).

- Ms. Watson (former Senior Vice President of Customer Care at Match.com) testified that she did not think that the online cancelation flow was hard to find. Defs. App. Ex. D at App. 55, 64 (Watson Dep. Tr. 12:24–13:11, 159:14–21 ("Q. Did you have concerns that the cancellation process or cancellation flow was hard to find? A. That the flow was hard to find or just the cancellation? Q. The on-line cancellation flow? A. Was hard to find? Q. Yes, ma'am. A. No.")).

- Ms. Ginsberg (former CEO of MGI and former CEO of Match.com) testified that the Account Settings page, which is one way to navigate to the online cancelation flow, is

clear. Defs. App. Ex. F at App. 101–02 (Ginsberg Dep. Tr. 205:15–206:9 ("Q. Okay. Do you agree that the account settings page that we are looking at was confusing and cluttered? A. I don't agree. Q. Why not? A. Because 'account settings' at the top left-hand side is the very first thing you see, and then every account setting is very clearly laid out both on the top across and on the left-hand side; so not only is it once but twice to make sure people see it.")).

Second, the FTC claims that the online cancelation flow is hard to find because "consumers *must* click a gear icon in the upper righthand corner of the home screen and select 'settings' from the three options displayed on the dropdown menu" and that "consumers *must* select a hyperlink labeled 'Manage subscription.'" Mot. at 23 (emphasis added). But even if that were hard to find (and it is not and is commonly used by other websites), that is not the only way to get to the online cancelation flow, and the FTC has no evidence that the other paths to the flow are hard to find. Consumers may also select the direct link to the online cancelation flow in the Match.com FAQs, which directs consumers to enter their password before clicking "Cancel Subscription." Defs. App. Ex. P at App. 313 (Decl. ¶¶ 93–94); Defs. App. Ex. R-1 at App. 714–16 (Rpt. ¶ 48). The FAQs may be found by merely searching "cancel" on the Match.com FAQ page.[44] Defs. App. Ex. W at App. 1245 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 15 at 46). Defendants' usability expert, Mr. Ward, actually identified at least *12* different ways to search in the Help section to find the relevant FAQ and online cancelation flow. Defs. App. Ex. R-2 at App. 967–98 (Rpt. ¶ 99). Consumers may also request a link to the flow from chatting with Customer Care or receive a link to Account Settings through a subscription confirmation email. Defs. App. Ex. J at App. 171–72 (Saraph Dep. Tr. (June 22, 2023) 23:10–25:5).

---

[44] The FTC merely speculates that "other pathways" to the flow "are no more obvious for users" because "consumers must manually search the FAQ page for the cancellation article," Mot. at 55 n.276.

The FTC relies on Dr. King to claim that "the term 'settings' is 'ambiguous and require[s] exploration' to determine that it leads to Match.com's account settings page." *See* Mot. at 55, 60 & nn.276–77, 319 (citing Pl. App. Ex. 251 at App. 3027, 3067). But Mr. Ward testified that, of the ten flows for other companies that he reviewed, "100% of them began the path to cancelation in the same place as Match.com: Account/Settings," and of the two that the FTC's expert reviewed, "100% of those began the path to cancelation at the Account/Settings page," which demonstrates that it is "the best practice, and not ambiguous, buried, or indirect at all." Defs. App. Ex. R-2 at App. 968 (Rpt. ¶ 100). Further, Dr. King's "speculation about whether subscribers *might* have found it difficult to find the cancelation flow . . . is not only unsupported but is also unnecessary" because empirical data proves that her speculation is incorrect—98.78% of participants in Mr. Ward's usability study were able to locate the Manage Subscription page. Defs. App. Ex. R-2 at App. 972 (Rpt. ¶ 112) (emphasis in original).

The FTC's reliance on a former employee's (Ms. Auderer's) characterization of Account Settings (not the online cancelation flow) as "hard to locate" in an internal PowerPoint (Pl. App. Ex. 118 at App. 1331–34) is misleading and misconstrued. *See* Mot. at 22 & n.98. The PowerPoint indicates that Ms. Auderer thought the "[c]urrent account settings page [was] hard to locate," Pl. App. Ex. 118 at App. 1331–32, meaning she thought the Account Settings behind a gear icon were difficult to find (a claim the FTC has dropped)—not that she thought the online cancelation flow was difficult to find based on the FTC's claim here that the Account Settings page does not currently say "cancel." In fact, the PowerPoint slides indicate that the Account Settings page did say "cancel" then. *Id.*; *see* Defs. App. Ex. B at App. 26 (Auderer Dep. Tr. 234:16–235:11 (same former employee admitting "it's hard to put ourselves back at that time and think anybody could ever not know what that gear was, but I know when the gear first happened, I did voice a concern

about it")). The FTC's citation to Ms. Auderer's characterization of unidentified customer complaints as "Too difficult / Hard to find" is similarly flawed and also inadmissible hearsay. Mot. at 22 & n.101 (Pl. App. Ex. 123 at App. 1358). *See, e.g.*, *Hendricks*, 2012 WL 4478308, at *2 (holding customer complaints were inadmissible hearsay).

### g.   The FTC's Claim that the Online Cancelation Flow Has Unnecessary Steps Is Legally Irrelevant and Disputed

The FTC asserts that the online cancelation flow is not simple because there are unnecessary steps. Mot. at 55–57. As a matter of law, this argument does not entitle the FTC to summary judgment. *See supra* Section III.A.1.b. There is no requirement that an online cancelation flow cannot have unnecessary steps. Indeed, existing FTC guidance expressly authorizes these unnecessary steps. The FTC is attempting to impose an unprecedented and entirely novel legal standard on Match.com—that Match.com's online cancelation flow is not "simple" essentially because it takes more than one or two computer clicks to cancel a subscription.[45] *See* Mot. at 55–57. In any event, there is also evidence showing that those steps are not illegal:

Password Requirement. The FTC relies on Dr. King to argue that the "password wall" after consumers click "Manage subscription" is "arbitrarily placed." *See* Mot. at 56 & n.285 (citing Pl. App. Ex. 251 at App. 3064). But Mr. Ward testified that there is no "arbitrary placement" because the two paths found under "Manage subscription," ("Subscription Status, where customers can view their credit card information and/or update it, and Cancel Subscription, where customers can choose to cancel") are "danger zones," where additional security is warranted and appropriate. Defs. App. Ex. R-2 at App. 937 (Rpt. ¶ 34). Fact witnesses further testified that the password page

---

[45] The FTC represents that MGL "has acknowledged that it could have created a one-or-two click cancellation process." Mot. at 56. MGL testified in no such way. The deposition witness (Mr. Saraph) acknowledged that a former employee (Ms. Clinchy) had proposed artwork for a cancelation flow—not that MGL could or should adopt it. *See* Pl. App. Ex. 253 at App. 3771–72.

was not arbitrarily placed, but there for personal information security. *See* Defs. App. Ex. J at App. 177 (Saraph Dep. Tr. (June 22, 2023) 77:12–78:10); Defs. App. Ex. E at App. 80 (Clinchy Dep. Tr. 28:24–29:6).[46]

Optional Survey and NPS. The FTC also relies on Dr. King to argue that it would have been "industry best practice" for the optional survey and NPS to come after the cancelation confirmation. *See* Mot. at 57. As a matter of law, this argument fails because the FTC is required to show that the online cancelation flow is not "simple"—not that it does not meet "industry best practice." Indeed, this argument shows exactly what is wrong with the FTC's entire case: it is attempting to impose its view on the best or simplest cancelation flow, not to enforce the law as written. In any event, the FTC's claims as to "best practice" are not supported by the evidence.

The FTC contends that "Defendants have attempted to excuse adding these unnecessary steps by claiming that they view cancelling consumers as a captive audience from which they can extract marketing information" and, in reliance on Dr. King, that the optional survey and NPS "waste[] users' time and increase their cognitive load." Mot. at 57. But there is contrary evidence from fact and expert witnesses that placing the optional survey and NPS where they are in fact benefits consumers. Indeed, Match.com does not place the survey or NPS after the cancelation confirmation because the answers that consumers give could lead Match.com to offer a discounted subscription instead of canceling. *See* Defs. App. Ex. J at App. 181 (Saraph Dep. Tr. (June 22, 2023) 97:1–98:1). In addition, Match.com regularly uses the information received in these

---

[46] The FTC also asserts that Match.com had a "bad forgot password flow." Mot. at 56 & n.288. But the FTC quotes from an email that is not about cancelation. *See* Mot. at 56 & n.288 (citing Pl. App. Ex. 227 at App. 2370). The FTC did not ask about that one-off line when the FTC deposed the witness who wrote it (Ms. Dubey). And, in any event, the email is sent on October 26, 2016, which is during the time when Match.com was actively resolving password issues. *Cf.* Pl. App. Ex. 228 at App. 2382–90 (resolving password issues from October 19, 2016 to December 1, 2016). Indeed, emails the FTC cites during that time period (*see* Mot. at 56 & nn.285–88, 57 & nn.289–90, 61 & n.326) show Match.com's efforts to *improve* the password flow by, for example, promptly fixing bugs (as any good company would do). *See* Pl. App. Ex. 228–31, 235.

cancelation surveys to better understand consumer behavior and improve the site for subscribers (e.g., if the user reports a bug on the site or a bad experience with another user). Defs. App. Ex. P at App. 312 (Decl. ¶ 88); *see also* Defs. App. Ex. R-1 at App. 941–42 (Rpt. ¶ 41) ("Presenting the survey after confirming the cancelation would likely decrease response rates and therefore make it more difficult for Match.com to improve its services for consumers.")).[47]

There is also empirical, objective evidence that the optional survey and NPS do not make the flow *not* simple. Mr. Ward testified that, "[w]hile the questions could be placed just about anywhere in the flow, having them where they currently are in the flow does not make the flow *not* simple," Defs. App. Ex. R-2 at App. 949 (Rpt. ¶ 56 (emphasis in original)), as shown by data establishing that over 95% of Match.com subscribers that enter the online cancelation flow successfully cancel or take a save offer, and 91.5% of study participants in the usability test successfully canceled through the online cancelation flow. Defs. App. Ex. R-1 at App. 693–95 (Rpt. ¶¶ 21–22).

### h.    The FTC's Claim that the Online Cancelation Flow Has "Dark Patterns" and Violates Usability Heuristics Is Disputed

The FTC asserts that the online cancelation flow is not simple because there are so-called dark patterns and alleged usability heuristic violations. *See* Mot. at 57–60. As a matter of law, this argument does not entitle the FTC to summary judgment. The FTC provided zero notice to Defendants (or any company) that an online cancelation flow cannot contain dark patterns, whatever that means—the FTC did not even hold its workshop to discuss and understand the meaning of "dark patterns" until years after it brought this case. *See supra* Section III.A.1.c. The FTC also has not provided fair notice that a cancelation flow is illegal if it violates any usability

---

[47] It is important for Match.com to know if the consumer is looking to cancel because they are unhappy with Match.com or because the website succeeded at helping the user find a permanent match. Defs. App. Ex. P at App. 312 (Decl. ¶¶ 87, 89).

heuristics *at all*, much less the three cherry-picked factors that its usability expert, Dr. King, claimed the flow violates. *See supra* Section III.A.1.d. In any event, there are also genuine disputes of material fact on the FTC's assertion.

The FTC relies on Dr. King to claim that the online cancelation flow "caused substantial confusion for many consumers" by employing so-called "dark patterns." Mot. at 57–58 & n.297–98 (citing Pl. App. Ex. 251 at App. 3037, 3058). But Mr. Ward "did not find any evidence of deceptive, manipulative, tricky, coercive, etc. practices in the Match.com cancelation flow that would make the cancelation flow not simple, nor prevent subscribers from confidently canceling their subscription." Defs. App. Ex. R-2 at App. 962 (Rpt. ¶ 85).

As an example of an alleged dark pattern, the FTC relies on Dr. King for its claim that language previously used in one of the save offer buttons ("Continue" instead of the current "Continue Cancellation") "created ambiguity for users about what exactly clicking the button would 'Continue': cancelling the subscription or accepting the save offer." Mot. at 58–59 & nn.306–07 (citing Pl. App. Ex. 251 at App. 3070, 3074). But Mr. Ward testified to the contrary: "an actual user would review the page in its larger context, considering its various elements." Defs. App. Ex. R-2 at App. 950 (Rpt. ¶ 59). And the context made the options clear, either accept the save offer (e.g., "Get 3 More Months") or continue canceling ("Continue"). *Id.* "[G]iven the context of a strictly linear cancelation flow where the user has only two options ('Get 3 More Months' or 'Continue')," there is "little room for ambiguity." *Id.*

The FTC also relies on Dr. King for its claim that the "Before you go" language in the survey "falsely suggests that consumers have successfully completed the cancellation process." Mot. at 58 & n.305 (citing Pl. App. Ex. 251 at App. 3067); *see* Mot. at 25. But Mr. Ward testified that the "Before you go" heading is not confusing because the headline on its own is clear that the

43

subscriber has not yet completed cancelation (because the subscriber has not yet "gone"), and that conclusion is reinforced by other language on that page (e.g., asking why the subscriber is "looking to cancel," and identifying the last day of subscription "if you cancel"), in addition to the "Continue Cancellation" option. Defs. App. Ex. R-2 at App. 970–71 (Rpt. ¶ 109); Defs. App. Ex. R-1 at App. 705–07 (Rpt. ¶¶ 39–41).[48]

As another example of a purported dark pattern, the FTC relies on Dr. King to claim that the online cancelation flow "had an inconsistent design that made it 'difficult for users to understand where they are in the process and what steps are required in order to complete it.'" Mot. at 59 & n.308 (quoting Pl. App. Ex. 251 at App. 3064). In particular, the FTC argues that the save offer (which is explicitly permitted by the FTC's Policy Statement) "appears to be an advertisement inserted into the cancellation process," and consumers previously "had to select the 'No thanks, I want to resign' link, while bypassing the more prominent button to accept the save offer." Mot. at 59 & nn.309–12. But neither the FTC nor Dr. King cites any actual data that "any subscriber has actually been confused" by purported inconsistent design, nor that it "makes the flow not simple or easy." Defs. App. Ex. R-2 at App. 950 (Rpt. ¶ 58). And Mr. Ward testified that, for the same reasons that the "Continue" button was not unclear, the "No thanks, I want to resign" link[49] was also not unclear—an actual user would review the page in its larger context, considering its various elements, and the context made the options clear, either accept the save offer (e.g., "Get

---

[48] The FTC repeatedly cites an internal email (Mot. at 25 & n.113, 55, 58 & n.305) for the proposition that the "Before you go" language is misleading (Pl. App. Ex. 128 at App. 1402–03). But the employee who made that comment (Mr. Ong) testified that "Before you go" is "clear text stating that there were additional steps to be completed." Defs. App. Ex. H at App. 142–43 (Ong Dep. Tr. 261:24–263:3). He explained in his deposition that, at the time, he "was not looking at the text below [Before you go] that says if you cancel, your last day of subscription, et cetera, et cetera" because he was looking only at screenshots that were "[s]ignificantly smaller" than the actual online cancelation flow, and some of the text was impeded due to the screenshots being on top of one another. Defs. App. Ex. H at App. 132, 142–43 (Ong Dep. Tr. 105:7–19, 261:24–263:3).

[49] Contrary to the FTC's assertion that the change in terminology from "cancel" to "resign" was inconsistent, Mot. at 59 n.312, Mr. Ward testified that it "is unlikely to confuse users, particularly given the context." Defs. App. Ex. R-2 at App. 950 (Rpt. ¶ 59).

3 More Months") or continue canceling ("No thanks, I want to resign"). Defs. App. Ex. R-2 at App. 950 (Rpt. ¶ 59).

The FTC also argues that the online cancelation flow is not simple because it should have a "progress bar" or "skip" buttons to indicate optional aspects of the flow. Mot. at 59. Again, this fails as a matter of law because the FTC is required to prove that the flow is illegal—not that it could be improved or different. And there is, yet again, expert testimony that the flow does not fail to meet the "simple" standard because a progress bar or skip buttons are not present. Mr. Ward testified that "labeling steps in a cancelation flow is rare," and "a numerical step label is unnecessary given that there are three areas of information indicating" where the user is on the "optional question steps, including (1) the main title, (2) the text content, and (3) the button labels." Defs. App. Ex. R-2 at App. 957–58 (Rpt. ¶¶ 72–73). In addition, "industry recommended best practice is to mark all the *required* fields," and "no fields are required in the Match.com cancelation survey, no fields are marked, the next button is enabled (i.e., not greyed out), and users are free to skip everything if they choose." Defs. App. Ex. R-2 at App. 948 (Rpt. ¶ 52 (emphasis in original and internal quotation marks omitted)).

In sum, the FTC retained Dr. King to "brainstorm"[50] problems with Match.com's online cancelation flow. But anyone can scour a website, nitpick it, and come up with alleged improvements. That is not the purpose of ROSCA, which is for companies to provide "simple, convenient ways to cancel"[51] and meet "minimum requirements."[52] *See* 15 U.S.C. § 8403(3). And Match.com provided "simple mechanisms"—in four undisputed ways, *see supra* Section III.A.2—

---

[50] *See* Defs. App. Ex. X at App. 1255–70.
[51] *See supra* n.22.
[52] *See supra* n.23.

and also in its online cancelation flow. One of the best ways to see the simplicity of the flow is simply to watch a video of it. *See* Def. App. Ex. P-39, P-45–P-47 at App. 494, 509–11.

* * *

For these reasons, the evidence shows that the Court should grant Defendants' Motion for Summary Judgment, Dkt. 204. Even if the Court does not do so, it should still deny the FTC's Motion, which would require the Court to find as a matter of law that Match.com did not provide "simple mechanisms." At the very least, there are facts in dispute that should preclude summary judgment for the FTC.

## B. The FTC Is Not Entitled to Summary Judgment on Its Guarantee or Chargeback Policy Claims (Counts III and IV)

The Court previously ruled that the FTC can seek only injunctive relief for the Guarantee and Chargeback Policy in Counts III and IV, respectively. *See* Dkt. 86 at 12–13. Both the Guarantee[53] and Chargeback Policy[54] were permanently discontinued well before the FTC filed this lawsuit. Thus, the FTC is seeking to enjoin conduct that is not ongoing. The FTC's Motion on these two claims should be denied for two reasons. First, there is no evidence that Defendants are "violating, or . . . about to violate" the FTC Act or whether such a violation is likely to recur. Second, the FTC does not have sufficient evidence to show that those two policies were "deceptive" or "unfair" under the FTC Act.[55]

---

[53] The "Guarantee" refers to the subject of the FTC's Count III. In Count III, the FTC alleges that Match.com failed to adequately disclose the material terms and conditions of a "guarantee" that Match.com permanently discontinued over four years ago in April 2019. Am. Compl. ¶¶ 3, 39–53, 75–77; *see* Defs. App. Ex. P at App. 303–06 (Decl. ¶¶ 30–54).

[54] The "Chargeback Policy" refers to the subject of the FTC's Count IV. In Count IV, the FTC alleges that a Match.com chargeback policy, which was also permanently discontinued over four years ago in March 2019, unfairly denied subscribers access to paid-for services if the subscribers disputed credit card charges and lost the dispute. Am. Compl. ¶¶ 3, 61–65, 78–80; *see* Defs. App. Ex. P at App. 306–08 (Decl. ¶¶ 55–83).

[55] Defendants argued in their Motion for Summary Judgment that Counts III and IV are moot because the Guarantee and Chargeback Policy could not reasonably be expected to recur. Dkt. 204 (Section IV.B.1). That is an additional basis to deny the FTC's Motion as to Counts III and IV.

1.    **The FTC Has Not Met Its Burden that There Is a Reasonable Likelihood of Future Violations**

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). Under Section 13(b) of the FTC Act, "after proper proof, the court may issue a permanent injunction" if a company is "violating, or . . . about to violate, any provision of law enforced" by the FTC. 15 U.S.C. § 53(b). Section 13(b) "focuses upon relief that is prospective, not retrospective." *FTC v. Neora*, No. 3:20-cv-01979, Dkt. 347 at 24 (N.D. Tex. Sept. 28, 2023) (Lynn, J.) (quoting *AMG Capital Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1348 (2021)). The FTC does not argue that Defendants are currently using any guarantee or chargeback policy that violates the law, Am. Compl. ¶ 3, and the FTC does not have any evidence that the Guarantee or Chargeback Policy is likely to recur. Thus, the Court should deny the FTC's Motion and grant Defendants' Motion for Summary Judgment, *see* Dkt. 204 (Section IV.B.1–IV.B.2.a).

Because the FTC is seeking an injunction, it must show that Defendants' alleged misconduct is likely to recur in the future. Courts in this Circuit use a multi-factor test to determine whether to issue an injunction based on past violations of the law. *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 822 (N.D. Tex. 2008) (Fitzwater, J.). In analyzing the factors, the "critical question" and "ultimate test" is "whether defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *Cornerstone*, 549 F. Supp. 2d at 816 (quoting *SEC v. Blatt*, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978)). "[A]lthough proof of past violations can be relevant to determine whether an actor 'is violating, or is about to violate' the FTC Act, for purposes of awarding injunctive relief, the probative value of [] older [] statements decreases in light of other evidence presented . . . that [a company] has updated and revised its policies[.]" *FTC v. Neora*, No. 3:20-cv-01979, Dkt. 347 at 49 (N.D. Tex. Sept. 28, 2023). Judge Lynn's recent decision completely denying the FTC's request for an injunction is instructive. For

example, in *Neora*, the FTC "[sought] an order preventing [d]efendants from claiming that their products cure, treat, or prevent human disease," and Judge Lynn found "[t]here [was] no evidence before the [c]ourt that [d]efendants are currently making such claims, or are likely to do so in the future" and denied the FTC's request for an injunction. *FTC v. Neora*, No. 3:20-cv-01979, Dkt. 347 at 53 (N.D. Tex. Sept. 28, 2023).

Similar to *Neora*, Match.com is not currently doing any of the complained-of conduct, nor is there any evidence that it likely will in the future. In fact, the evidence on the critical factor— whether there is a reasonable likelihood of future violations—is clear that the Guarantee and Chargeback Policy will *not recur*. There is an overwhelming mountain of evidence that Defendants permanently discontinued this conduct and committed not to reinstate the Guarantee or Chargeback Policy ever again in the future. Indeed, Match.com permanently discontinued the Guarantee and the Chargeback Policy approximately four and a half years ago in April 2019 and March 2019, respectively, well before the FTC filed this case on September 25, 2019. *See* Defs. App. Ex. T at App. 1145–49 (Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146 (the "Verified Stipulation") ¶¶ 3, 6). There is also substantial evidence that Defendants will never engage in that conduct again:

- On August 6, 2019, before the FTC sued, MGI's counsel sent a letter to the FTC that confirmed the discontinuation of the Guarantee and Chargeback Policy and that Match.com had "no plans or intentions ever to reinstitute any of these practices." Defs. App. Ex. P-56 at App. 679.

- Throughout discovery, MGI and MGL represented to the FTC in verified interrogatory responses that the Guarantee and Chargeback Policy had been permanently discontinued and that Match.com would not reinstitute those practices. Defs. App. Ex. V at App. 1187

(MGI's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 3); Defs. App. Ex. W at App. 1225, 1229, 1237 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. Nos. 8, 10, 12). MGL also described the current Match.com chargeback policy in a verified interrogatory response. Defs. App. Ex. W at App. 1236–37 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 12).

- On September 20, 2022, MGI and MGL filed the Verified Stipulation to "serve as a binding and sincere commitment by [MGI and MGL] to never again engage" in the Guarantee or Chargeback Policy. *See* Defs. App. Ex. T at App. 1147.

- Defendants produced documents in discovery further demonstrating that the Guarantee and Chargeback Policy have been permanently discontinued. *See* Defs. App. Ex. P-23 at App. 440 (training email dated April 15, 2019, providing, "Effective immediately, the [Guarantee] is no longer available" and "should not be offered when subscribing a member"); Defs. App. Ex. P-24 at App. 442 (FAQ providing Guarantee "was discontinued on 4/11/2019"); Defs. App. Ex. P-25 at App. 448 (training document noting Guarantee was "no longer available"); Defs. App. Ex. P-27 at App. 458–59 (example of email sent to Match.com users who initiate chargeback dispute and lose, confirming cessation of Chargeback Policy and existence of current chargeback policy that Defendants explained to FTC in verified interrogatory response).[56]

---

[56] Defs. App. Ex. W at App. 1236 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 12) ("MGL's current chargeback policy is as follows: When a user with an active subscription initiates a chargeback, MGL hides that user's profile (because that user has indicated that he or she no longer wishes to appear on the site), and disables the user's account login (because the user is disputing payment for the service that MGL provides). If MGL disputes the chargeback and prevails, and has not already refunded the user, then MGL re-enables the user's account login, restores the amount of subscription time the user had remaining at the time the account was disabled, and sends the user an email notifying the user that his or her account has been reactivated and containing instructions about how to un-hide his or her profile.").

- Deposition testimony also confirmed that the conduct has ceased and will not recur. Mr. Saraph (the General Manager of Match.com and also MGL's 30(b)(6) designee) testified that the practices had ceased and that filings before the Court would "prevent [Match.com]" from reinstituting the Guarantee or Chargeback Policy. *See* Defs. App. Ex. I at App. 164 (Saraph Dep. Tr. (Apr. 6, 2023) 311:24–312:7, 312:23–313:6); *see also* Defs. App. Ex. I at App. 151, 157–58 (Saraph Dep. Tr. (Apr. 6, 2023) 17:10–16, 209:23–211:8 (confirming permanent discontinuance)).

- In connection with Defendants' Motion for Summary Judgment, Dkt. 204, to make clear for the Court that MGI and MGL had not changed their position, Defendants submitted yet another declaration confirming that the Guarantee and Chargeback Policy have been permanently discontinued, and there are no plans to reinstate them. Defs. App. Ex. Q at App. 681–82 (Decl. ¶¶ 3–6).

The FTC has literally not presented a single shred of competing evidence. Even if it did, it could only at most create a dispute of material fact "that there is a reasonable likelihood of further violations in the future," which would still require denying the FTC's Motion. *Cornerstone*, 549 F. Supp. 2d at 816; *cf. FTC v. Microsoft Corp.*, No. 23-cv-02880, 2023 U.S. Dist. LEXIS 119001, at *48 (N.D. Cal. July 10, 2023) (denying injunction when "the FTC ha[d] not identified a single document which contradict[ed] [the defendant's] publicly-stated commitment" and finding the "public commitment" and "the absence of any documents contradicting those words" "strongly suggest[ed]" that the conduct the FTC was attempting to enjoin would "probably not" happen). Because there is no evidence that the conduct in Counts III and IV will recur (and at most there could only be a dispute on this point), the FTC's Motion should be denied.

The cases the FTC cites further illustrate the FTC's baseless argument. *See* Mot. at 65 & nn.345–47. In one, the referenced affidavit is nothing like the Verified Stipulation (and other mountain of evidence of permanent cessation)—an individual defendant in a securities case declared that he would "abide by the law in the future," not that any conduct that he had admitted having engaged in had ceased. *See S.E.C. v. Murphy*, 626 F.2d 633, 656 & n.27 (9th Cir. 1980). In others, the conduct had not actually ceased. For example, the defendants argued, "to the extent any allegedly improper conduct continues, [they were] willing to stipulate to the injunctive relief sought by the FTC," and the court reasoned that they could not "moot the case or destroy the FTC's standing by offering a stipulation to a permanent injunction **if any illegal conduct is ongoing**." *FTC v. Roomster Corp.*, No. 22 CIV. 7389, 2023 WL 1438718, at *4, *8 (S.D.N.Y. Feb. 1, 2023) (emphasis added); *see FTC v. Cardiff*, No. CV-18-2104, 2020 WL 6540509, at *12 (C.D. Cal. Oct. 9, 2020) (explaining evidence showed that conduct had not in fact ceased). In another, the defendant had done "nothing" to show that the wrongful activities would not recur. *See FTC v. Affordable Media*, 179 F.3d 1228, 1238 (9th Cir. 1999).

## 2.     The FTC Has Not Met Its Burden that the Guarantee Violated the FTC Act

In addition, the FTC's arguments fail on the merits. To show that the Guarantee is deceptive at the summary judgment stage, the FTC must show that there is no genuine dispute of material fact that "(1) there is a representation, omission, or practice; (2) that is likely to mislead consumers acting reasonably under the circumstances; and (3) the representation, omission, or practice is material." *FTC v. DIRECTV, Inc.*, No. 15-CV-01129, 2018 WL 3911196, at *5 (N.D. Cal. Aug. 16, 2018) (internal quotation marks omitted). The FTC has not met that heavy burden.

### a.      The FTC Has Not Shown that the Guarantee Was Likely to Mislead Reasonable Consumers

The FTC does not present sufficient evidence to show that the Guarantee was deceptive as a matter of law. To begin, the FTC does not have any expert testimony or survey evidence showing that reasonable consumers were likely to be deceived. In fact, the FTC has no objective evidence of any kind showing a likelihood of confusion. Instead, the evidence shows that there was no violation.

### (i)      The Complete Terms of the Guarantee Were Disclosed

In the Amended Complaint, the FTC admits that the requirements of the Guarantee were disclosed, and the issue is whether those requirements are adequately disclosed. *See, e.g.*, Am. Compl. ¶ 3 ("[U]ntil mid-2019, Defendants guaranteed certain consumers a free six-month subscription renewal if they failed to 'meet someone special' but failed to disclose the requirements of its 'guarantee **adequately**." (emphasis added)). Thus, this is not a case of an alleged affirmatively false or deceptive statement, or even a material omission. Rather, it is a case of an alleged insufficient disclosure that purportedly creates a false impression in the minds of consumers. In cases like this, empirical evidence is required to prove that the admittedly present disclosure is insufficient. *See DIRECTV*, 2018 WL 3911196, at *6. Here, the FTC did not designate an expert witness to testify that the disclosure of the terms was too small or not understandable by a reasonable consumer, let alone an expert that did any empirical or objective analysis on the issue. Defs. App. Ex. K at App. 206 (Bandy Dep. Tr. (June 26, 2023) 186:6–187:8). The FTC, therefore, is asking this Court to conduct a facial review and determine that there is no question that the Guarantee is deceptive, even with the present disclosures. But at this stage, every inference has to be made in favor of Defendants; thus, the Court should not conclude simply based upon a review

of the disclosures themselves that they are insufficient. *See, e.g.*, *DIRECTV*, 2018 WL 3911196, at *9 (finding disclosures were adequate *after bench trial*).

That might explain why the FTC attempts to pivot in the Motion and argues that Defendants "failed to disclose" the requirements of the Guarantee and that Defendants "were silent" about the requirements. Mot. at 47. But this is factually false. The evidence shows that the complete terms of the Guarantee were disclosed with a "Learn more" hyperlink. Defs. App. Ex. P at App. 303 (Decl. ¶ 34).[57] Indeed, when consumers viewed subscription plans, they were presented with a graphic that offered subscription plans of varying lengths. Defs. App. Ex. P at App. 303 (Decl. ¶ 30). Next to the six-month subscription option, an icon stated "Match* Guarantee." Defs. App. Ex. P at App. 303 (Decl. ¶ 31). Hovering over the icon opened a text balloon that stated, "If you haven't found someone special within 6 months, we'll give you an extra 6 months FREE" and was followed by a hyperlink labeled, "Learn more," as shown below. Defs. App. Ex. P at App.303 (Decl. ¶ 32). Clicking on the "Learn more" hyperlink took consumers to a webpage where the complete terms of the Guarantee were presented (the "Program Rules"). Defs. App. Ex. P at App. 303 (Decl. ¶ 34); *see also* Defs. App. Ex. P at App. 303, 426–28 (Decl. ¶ 35 & Ex. P-19 (identifying the Program Rules)).[58]

---

[57] The FTC represents that "[c]ourts have held similar hidden limitations to be deceptive." Mot. at 48 & n.237. That is incorrect. The cases the FTC cites involve an omission of material terms rather than alleged inadequate disclosure. *See FTC v. Cardiff*, No. CV 18-2104, 2020 WL 6540509, at *8 (C.D. Cal Oct. 9, 2020) (involving an omission of material terms when defendants "denied refunds to consumers based on refund policies and conditions that had never been disclosed to consumers"); *FTC v. Febre*, No. 94 C 3625, 1996 WL 396117, at *4 (N.D. Ill. July 2, 1996) (regarding an omission of terms).

[58] In addition, all of Match.com's webpages displayed a lime green "Guarantee" hyperlink along a bottom banner; if subscribers who were participating in the Guarantee program clicked that link, they were taken to the Progress Page, and consumers who were not participating in the Guarantee program were taken to the Program Rules. Defs. App. Ex. P at App. 304 (Decl. ¶¶ 41–43).



**(ii)**   **The "Learn More" Link Complies with FTC Guidance**

The FTC claims that the "hidden disclosures also clearly run afoul of FTC guidance" because the Program Rules are disclosed with a hyperlink. Mot. at 50. But the FTC cherry-picks the guidance that it cites from the FTC's Dot Com Disclosures.[59] *Id.* & nn.243–47. The Dot Com Disclosures actually permit disclosing terms like the Program Rules behind a hyperlink. The Dot Com Disclosures state that "if the details [] are too complex to describe adjacent to the [] claim, those details may be provided by using a hyperlink." Dot Com Disclosures at 10; *see* Dot Com Disclosures at A-7 (providing an example and noting that the details were "likely . . . too complex to appear adjacent to the [] claim, and thus can be placed behind a properly labeled hyperlink"). There is evidence that the Program Rules would be "too complex to describe adjacent to the [] claim" that "If you haven't found someone special within 6 months, we'll give you an extra 6 months FREE," because they would not fit in the white space where the "Learn more" link is. Dot Com Disclosures at 10; *compare* Defs. App. Ex. P-19 at App. 426–28 (Program Rules), *with* Defs. App. Ex. P-18 at App. 424 (Icon with "Learn More" link). Thus, the Dot Com Disclosures permit

---

[59] FED. TR. COMM'N, *.com Disclosures, How to Make Effective Disclosures in Digital Advertising* (March 2013), 2013 WL 12481090, https://www.ftc.gov/system/files/documents/plain-language/bus41-dot-com-disclosures-information-about-online-advertising.pdf.

"those details [to] be provided using a hyperlink," which immediately follows the claim in blue, the typical color of a hyperlink. Dot Com Disclosures at 10.[60]

### (iii)   The Progress Page Was Intended to Help Customers Track Their Progress Toward the Guarantee

The FTC also contends that the Progress Page "was flawed and likewise inadequately disclosed to consumers." Mot. at 49. But the evidence shows that the Progress Page did not contain any additional requirements for the Guarantee, so there was no need to "adequately disclose" it. Defs. App. Ex. P at App. 303 (Decl. ¶¶ 37–39). The complete terms of the Guarantee were presented in the Program Rules. Defs. App. Ex. P at App. 303 (Decl. ¶ 34). By contrast, the Progress Page was intended to assist consumers in tracking their progress toward the Guarantee; Match.com specifically dedicated the webpage to display consumers' status toward meeting the Guarantee requirements. Defs. App. Ex. P at App. 303 (Decl. ¶ 37). This was intended to benefit consumers. *See* Defs. App. Ex. D at App. 70 (Watson Dep. Tr. 207:19–24 ("Q. What's your

---

[60] The FTC claims that "[c]ourts have consistently held that the FTC Act prohibits hiding material limitations in fine print or on separate web pages." Mot. at 49 & n.240. The cases the FTC cites do not support its Motion. Only one case the FTC cites is a summary judgment decision, and the facts of that case are nothing like this one. The case involved false representations, including one in which a defendant admitted to broadcasting there was "literally . . . nothing a consumer can possibly have on a credit report that we cannot remove" but then later included a disclaimer in a contract "that they never guaranteed anything to anyone, and that they never represented that the removal of negative information would be permanent." *FTC v. Gill*, 71 F. Supp. 2d 1030, 1043–44 (C.D. Cal. 1999). The other non-summary judgment cases are also factually distinct. *See FTC v. EDebitPay, LLC*, 695 F.3d 938, 941 (9th Cir. 2012) (involving a defendant that marketed an online shopping club membership and advertised "in large, bold font, 'Get an Immediate Guaranteed $10,000 Credit Line*'" above a large "APPLY NOW" button, without mentioning "membership" or "shopping club," and only at the "bottom of the e-mails, and in very small font," did the defendants disclose that the credit line could be used only at the online store); *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 39–40, 42–43 (D.C. Cir. 1985) (involving a "virtually illegible" disclaimer about the amount of tar in cigarettes); *Am. Home Prods. Corp. v. FTC*, 695 F.2d 681, 683, 691 (3d Cir. 1982) (involving advertisements that never disclosed the presence of aspirin in a pain relieving drug that the company claimed to have a unique pain-killing formula and superior effectiveness); *Floersheim v. FTC*, 411 F.2d 874, 875–77 (9th Cir. 1969) (involving a debt collection form that appeared to come from the government and disclosed only in "small type" that it was actually from a creditor); *Independent Directory Corp. v. FTC*, 188 F.2d 468, 469–70 (2d Cir. 1951) (involving a solicitation that appeared to be a request to renew an existing advertisement but was instead a request to purchase a new advertisement, when the disclaimer was not sufficiently "eye arresting" to reveal its "true nature"); *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 912, 949–50 (N.D. Ill. 2006) (involving a company that widely advertised a 30-day refund policy for a bracelet that purported to make pain go away but then disclosed only a 10-day refund policy behind a link that was "in small font and lower caps" compared to the representation).

understanding of the reason why Match provided this progress page as being available to consumers? A. As a courtesy to our consumers after point of purchase so that they had some way to track their progress.")).[61] The evidence also shows that consumers could check their progress themselves without the Progress Page. *See* Defs. App. Ex. D at App. 70 (Watson Dep. Tr. 208:7–18 (testifying consumers "could get into their sent folder to see how many emails they have sent out to different unique contacts" and "[t]hey would know whether they had a photo [u]p or whether they had hidden their profile")).

### (iv)   Customers Could Redeem the Guarantee through Customer Care, Which Made Exceptions to the Requirements

The FTC also claims that "Defendants' poorly disclosed and misleading redemption process" made redemptions difficult or impossible. Mot. at 50–51. But this is not correct. One way to redeem the Guarantee was directly on the Match.com platform through the Progress Page. Defs. App. Ex. P at App. 304 (Decl. ¶¶ 44–46). Consumers could also avoid the online redemption process altogether and contact Customer Care instead to redeem the Guarantee. Defs. App. Ex. P at App. 304 (Decl. ¶ 47); *see* Defs. App. Ex. D at App. 58 (Watson Dep. Tr. 37:5–9 ("Q. Aside from the link that you referenced, are you aware of any other means by which a customer could have accepted these extra six months? A. Certainly they could have contacted customer support.")). In addition, the evidence shows that Customer Care made exceptions both to the seven-day period to redeem the Guarantee Extension (which was disclosed in the Program Rules) and to the requirements to receive the Guarantee Extension in the Program Rules. Defs. App. Ex. P at App. 304 (Decl. ¶¶ 48–50). Thus, Match.com not only fully disclosed all of the Program Rules

---

[61] Thus, the Progress Page was not required by law, but Match.com merely went above and beyond to provide it to help its customers. That the FTC now claims that it "was flawed and likewise inadequately disclosed to consumers," Mot. at 49, shows that no good deed will go unpunished when it comes to the FTC.

and created a Progress Page for consumers to track and redeem the Guarantee (although not required by law), Match.com also allowed Customer Care to make many exceptions if consumers did not meet the requirements.

> **(v)     There Is No Causal Connection Between the Number of Customers that Redeemed the Guarantee and Whether the Terms of the Guarantee Were Adequately Disclosed**

The FTC also argues that reasonable consumers would be misled because only a small percentage of customers redeemed the Guarantee. Mot. at 49. But that proves nothing about whether consumers were misled by the alleged inadequate disclosure. There could be many reasons (other than the alleged inadequate disclosure) that a user did not redeem the Guarantee. For example, users could have purchased a six-month subscription without even knowing about the Guarantee. Or the Guarantee could have been unimportant to the user,[62] so the user was unconcerned about meeting the Guarantee requirements. Or a user could have been fully aware of the requirements but failed to satisfy them (like a dieter that does not stick to a meal plan, despite best efforts). At summary judgment, all reasonable inferences must be viewed in the light most favorable to Defendants; thus, the fact that someone was eligible but did not redeem the Guarantee does not show as a matter of law that the consumer was deceived.

> **(vi)    The FTC Lacks Evidence that Consumers Were Misled, But Even If a Small Number Were, That Is Legally Insufficient**

The FTC has no admissible evidence that any consumers were actually misled because of alleged inadequate disclosures. *See* Mot. at 50 & n.248. Instead, the FTC relies on characterizations of customer complaints (which are inadmissible hearsay) and customer complaints themselves (also inadmissible hearsay). *See* Mot. at 14 & n.61. *See, e.g.*, *Hendricks*, 2012 WL 4478308, at *2

---

[62] For example, just because a consumer has a coupon and does not use it does not mean that the coupon was deceptive.

(holding customer complaints were inadmissible hearsay). The customers could simply have been complaining because they wanted a refund and learned about the Guarantee after they purchased their subscription.

Moreover, Match.com witnesses uniformly testified in deposition that they did not think the Guarantee was confusing, deceptive, or unfair. Ms. Watson (former Senior Vice President of Customer Care at Match.com) testified that no one at Match.com ever told her, and she never heard discussion, that Match.com was trying to deceive consumers into subscribing by offering an illusory Guarantee without disclosing the terms. Defs. App. Ex. D at App. 70 (Watson Dep. Tr. 208:24–209:4). She further testified that no one ever told her, and to her knowledge it was never discussed within Match.com, that Match.com wanted to make it difficult for consumers to redeem their Guarantee. Defs. App. Ex. D at App. 70 (Watson Dep. Tr. 208:19–23). Ms. Auderer (former Director of Customer Care Operations at Match.com) testified that she could not think of any way that offering the Guarantee was unfair. Defs. App. Ex. B at App. 12, 23 (Auderer Dep. Tr. 12:12–25, 211:16–18).

And in fact, the witnesses agreed that the requirements (e.g., uploading a photo so that others can see you or having a visible profile so that others can contact you) for the Guarantee were intended to help Match.com's members be successful on the site. Ms. Ginsberg (former CEO of MGI and former CEO of Match.com) testified that the requirements for the Guarantee were to encourage subscribers to "engage in the community" and improve their chances of finding someone special. Defs. App. Ex. F at App. 92 (Ginsberg Dep. Tr. 66:16–67:9). Ms. Clinchy (former Manager of Customer Experience within Customer Care at Match.com) testified that the requirements for the Guarantee were "just to encourage people to take the steps that they might need to use the website successfully." Defs. App. Ex. E at App. 83 (Clinchy Dep. Tr. 187:3–188:8).

She further testified, "So I felt that the requirements were there to help our members, and that's why I was working at [M]atch.com. I wanted to help our members be successful on the site." *Id.*

Even if a very small number of consumers were actually misled by the Guarantee, that evidence would be "stale" and insufficient to justify an injunction, since the Guarantee was permanently discontinued over four years ago. *See FTC v. Neora*, No. 3:20-cv-01979, Dkt. 347 at 48–50 (N.D. Tex. Sept. 28, 2023) (explaining court "agree[d] with the FTC that some of its examples . . . are problematic and misleading," but "the FTC primarily relie[d] on evidence that is . . . somewhat stale in light of other evidence reflective of [the company's] recent operational practices," which the court found "significant" and concluded that an injunction was not justified); *see supra* Section III.B.1.

Because the FTC has not shown a likelihood to mislead as a matter of law, the FTC's Motion should be denied as to Count III.

**b.      The FTC Has Not Shown that the Guarantee Was Material to Consumers**

The second element of deception is materiality. A representation is material only if it is "likely to affect [consumers'] choice of, or conduct regarding, a product." *FTC v. Neora*, No. 3:20-cv-01979, Dkt. 347 at 46 (N.D. Tex. Sept. 28, 2023) (quoting *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006)). The FTC has not met its burden to show that the Guarantee was material.

Here, the FTC claims that the Guarantee was material because it was "express" and "concerned price," along with the "incredible volume of consumer complaints" and Match.com "internal testing." Mot. at 51. But the actual evidence shows that the Guarantee was not material because it was not important to consumers' purchasing decisions. Most notably, when the Guarantee was removed in April 2019, Match.com testing revealed that "there was no revenue

59

implication associated with the Match.com [G]uarantee," Defs. App. Ex. I at App. 151 (Saraph Dep. Tr. (Apr. 6, 2023) 14:2–12), meaning that the Guarantee was not driving consumers' purchasing decisions. Defendants produced documents in discovery that confirmed the testing that took place and the conclusion reached. *See* Defs. App. Ex. P-21 at App. 433–34 (expecting no net impact to revenue from removal of Guarantee); Defs. App. Ex. P-22 at App. 436–38 (noting "topline impact of the [G]uarantee is very small").

The FTC also argues that the Guarantee was material because of the "incredible volume of consumer complaints." Mot. at 51. There is contrary evidence that the volume of customer complaints about the Guarantee was "very small" compared to Match.com's customer base. Defs. App. Ex. I at App. 154 (Saraph Dep. Tr. (Apr. 6, 2023) 90:19–91:7 ("Q. Generally speaking, did Match.com receive complaints from customers that misunderstood the eligibility requirements of the Match guarantee? A. In general, it's possible that that happened. From my understanding, even if it did, it would be a very small number of users given, you know, the number of users who had the six-month guarantee in the first place as a percentage of our total user base which is, you know, anywhere from two and a half to four million users at this time.")); *see* Defs. App. Ex. H at App. 142 (Ong Dep. Tr. 260:5–9 ("Q. Compared to the size of your customer base in Match.com, did you receive a significant number of complaints saying that the six-month guarantee policy was difficult to understand? A. No."), 266:15–22 (testifying "when I was running customer service, the percentage of calls that were related to the six-month guarantee and complaints related to that were not high")).[63]

The FTC also argues that the Guarantee was material because it "concerned price." Mot. at 51. But the evidence shows that the Guarantee did not concern price because the price of a six-

---

[63] The customer complaints themselves are inadmissible hearsay. *See, e.g.*, *Hendricks*, 2012 WL 4478308, at *2.

month subscription did not change based on whether a customer purchased it with or without the Guarantee. *See, e.g.*, Defs. App. Ex. I at App. 151 (Saraph Dep. Tr. (Apr. 6, 2023) 16:9–15); Defs. App. Ex. P at App. 303 (Decl. ¶ 33).

Because the FTC has not shown materiality as a matter of law, the FTC's Motion should be denied as to Count III.

### 3.   The FTC Has Not Met Its Burden that the Chargeback Policy Violated the FTC Act

To show that the Chargeback Policy is unfair, the FTC must show that there is no genuine dispute of material fact that the Chargeback Policy "[1] causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. §§ 45(a), 45(n); *see* Mot. at 52–54.[64] The FTC has not met that heavy burden.

### a.   The Chargeback Policy Did Not Cause Substantial Injury

The FTC fails to meet its burden that the Chargeback Policy caused substantial injury as a matter of law.[65] The only way a consumer would ever be subject to the Chargeback Policy is if the consumer actually submitted a false or fraudulent chargeback request and the consumer's *own* financial institution determined that it was false or fraudulent. Defs. App. Ex. P at App. 306 (Decl. ¶¶ 55–60). As a result, they would not be *automatically* enrolled back into the Match.com ecosystem and simply had to contact Match.com Customer Care if they wanted their account

---

[64] The three requirements in Section 5(n) are written as negative limitations on the FTC's authority, rather than as an exhaustive list of elements. *See* 15 U.S.C. § 45(n) ("The Commission shall have no authority under this section or section 57a of this title to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.").

[65] None of the cases the FTC cites support its argument that the Chargeback Policy "causes or is likely to cause substantial injury." *See* Mot. at 53 & n.265. They found that the ability to seek a refund, which is not at issue, did not render injury reasonably avoidable (the next requirement). *See FTC v. Amazon.com, Inc.*, 71 F. Supp. 3d 1158, 1166–67 (W.D. Wash. 2014); *FTC v. Direct Benefits Grp., LLC*, No. 6:11-CV-1186-ORL-28, 2013 WL 3771322, at *14 (M.D. Fla. July 18, 2013); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010).

reinstated. Defs. App. Ex. P at App. 306 (Decl. ¶ 59).[66] The FTC speculates (*see* Mot. at 52–53) that consumers were harmed because they could not access a platform that they claimed that they did not agree to pay for or want. *See* Defs. App. Ex. P at App. 306–07 (Decl. ¶¶ 55–60, 65–66). That is no harm at all, certainly not substantial harm. *See FTC v. Johnson*, 96 F. Supp. 3d 1110, 1151–52 (D. Nev. 2015) (denying summary judgment for FTC on unfairness claim when FTC alleged that billing from forced trial memberships was unfair because, "[i]f consumers using those sites understood they were receiving the trial memberships, then any charges associated with those sites could not be fairly considered as part of the substantial injury").[67]

### b.      The Alleged Harm Was Reasonably Avoidable

The FTC also has not met its burden to show the alleged harm was not reasonably avoidable, the second unfairness requirement. *See* Mot. at 53–54.

First, the only way a consumer could be harmed under the FTC's theory in Count IV is if the consumer submitted a false or fraudulent chargeback request that was *rejected* by the consumer's own financial institution. Defs. App. Ex. P at App. 306 (Decl. ¶¶ 55–60). It was easy for any consumer to avoid this harm—not submit a false or fraudulent chargeback request to a financial institution. *Cf. FTC v. Tate's Auto Ctr. of Winslow Inc.*, No. CV-18-08176, 2021 WL 410857, at *2–3 (D. Ariz. Feb. 5, 2021) (affirming denial of summary judgment for FTC and noting that, when allegation was that defendants inaccurately reported consumer financial

---

[66] The FTC claims that "Match.com required that customers convince Match.com customer care that 'extenuating circumstances' justified restoring the account access." Mot. at 20–21. That is factually false. Deposition testimony confirmed that the so-called extenuating circumstances simply meant contacting Customer Care. Defs. App. Ex. D at App. 61 (Watson Dep. Tr. 143:4–6 ("Q. So an extenuating circumstance would simply be contacting customer care? A. Yes.")).

[67] The FTC asserts, "Because Match.com engaged in unlawful business practices, it often exceeded financial institutions' chargeback thresholds," Mot. at 17–19. That is not relevant and plainly disputed. There is contrary evidence that the nature of Match.com as an online dating service differentiates the business and billing issues that it faces, not because it was doing anything unfair or unlawful. Defs. App. Ex. H at App. 144 (Ong Dep. Tr. 268:9–24).

information to financial companies, "[i]f some consumers were aware that their information was inaccurately reported to financing companies, then they . . . could reasonably avoid the practice").

Second, any harm could reasonably be avoided by reaching out to Match.com Customer Care to have an account reinstated. If consumers lost a chargeback dispute and still wanted access to their account, all they had to do was ask for it. Defs. App. Ex. P at App. 306 (Decl. ¶ 59); Defs. App. Ex. I at App. 157–58 (Saraph Dep. Tr. (Apr. 6, 2023) 209:23–210:13). There were legitimate reasons to require customers to contact Customer Care—by initiating a chargeback of Match.com's subscription, they were clearly indicating that they no longer wished to appear on Match.com (and many claimed that they never even signed up for a Match.com account). Defs. App. Ex. P at App. 307 (Decl. ¶ 65). In some cases (e.g., if the consumer was in a serious relationship), maintaining their profiles on Match.com could cause significant embarrassment or harm. Defs. App. Ex. P at App. 307 (Decl. ¶ 66). It therefore made sense to have customers contact Customer Care to be reinstated. But clearly customers could avoid the harm of not being on Match.com by simply contacting Customer Care and asking to have their account reinstated.

Third, the FTC argues that customers did not have a "free and informed choice" because the Chargeback Policy was not adequately disclosed. Mot. at 53. But Match.com disclosed the Chargeback Policy in the Terms of Use. *See, e.g.*, Defs. App. Ex. P-5 at App. 383 ("If you initiate a chargeback . . . , the Company may . . . terminate your account immediately. If the Company successfully disputes the reversal, and the reversed funds are returned, you are not entitled to a refund or to have your account or subscription reinstated."). When purchasing a subscription, each customer explicitly agreed to be bound by the Terms of Use, which were available prior to purchase and could be referenced after purchase by clicking on the link at the bottom banner of Match.com webpages. Defs. App. Ex. P at App. 306–07 (Decl. ¶¶ 61–63). The Terms of Use are

exactly where customers would expect to find them, and they could read them or reach out to Match.com Customer Care with any questions. *See Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (affirming finding that injury was reasonably avoidable because advertisement "contained the disclaimer, 'other restrictions may apply,' which would have motivated a reasonable consumer to consult the terms and conditions").

The cases the FTC cites are inapposite. Unlike in those cases, Match.com customers agreed to the Chargeback Policy. *See FTC v. Walmart, Inc.*, No. 22 CV 3372, 2023 WL 2646741, at *19 (N.D. Ill. Mar. 27, 2023) (explaining injury was not reasonably avoidable because "victims of fraud . . . were not making fully informed choices"); *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988) (affirming finding that "[a]nticipatory avoidance through consumer choice was impossible" because contracts gave "no indication that the company would raise the renewal fees"); *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1004 (N.D. Cal. 2010), *aff'd,* 475 F. App'x 106 (9th Cir. 2012) (explaining, because customers "never agreed to purchase defendants' products in the first place," they "had no reason to scrutinize their telephone bills for defendants' fraudulent charges").

### c.      Any Harm Was Outweighed by Benefits to Consumers

Finally, the FTC has not met its burden that any alleged harm was not outweighed by countervailing benefits to consumers. *See* Mot. at 54. The FTC argues that the Chargeback Policy was "intended merely to punish consumers." *Id.* But there is evidence that the policy was actually put in place to benefit consumers. First, subscribers who initiated a billing dispute were clearly indicating that they no longer wished to appear on Match.com—and many claimed that they never even signed up for a Match.com account. Defs. App. Ex. P at App. 307 (Decl. ¶ 65); *see* Defs. App. Ex. I at App. 158 (Saraph Dep. Tr. (Apr. 6, 2023) 212:15–213:13). Having those customers off the platform (not interacting with unsuspecting subscribers) was a benefit, not a harm. Second,

and relatedly, in some cases (e.g., if the consumer is in a serious relationship), maintaining their profiles on Match.com could cause significant embarrassment or harm to the subscriber. Defs. App. Ex. P at App. 307 (Decl. ¶ 66); *see* Defs. App. Ex. I at App. 161 (Saraph Dep. Tr. (Apr. 6, 2023) 292:23–293:19). Third, Match.com aims to provide users with a vibrant, safe, and engaged online dating community, which means not displaying subscribers who had committed fraud and not including those that indicated that they did not want to be on the Match.com website (unless the user indicated interest in rejoining the site, at which point Match.com would restore the user's account). Defs. App. Ex. P at App. 307 (Decl. ¶ 67); *see* Defs. App. Ex. I at App. 157–58, 161 (Saraph Dep. Tr. (Apr. 6, 2023) 209:23–210:13, 292:5–18, 292:23–293:19).

On each of the three unfairness requirements, the FTC has not met its burden of proof. The FTC's Motion should be denied as to Count IV.

## C.    The FTC Has Not Met Its Burden to Hold MGI Liable

The FTC argues that MGI is liable for the alleged misconduct of MGL because MGI "own[s], operate[s], and [has] authority to control Match.com." Mot. at 65. This is false. Because MGI does not own, operate, or control Match.com, it cannot be liable for any alleged misconduct on that site. At a minimum, the factual statements by the FTC are disputed, which makes summary judgment in the FTC's favor unwarranted.[68]

### 1.    The FTC's Attempt to Create a Lower Standard for Itself Fails

Because it cannot show that MGI actually had any involvement in the alleged misconduct, the FTC argues that a lower standard applies. It claims that MGI is liable even if it was "not involved in the daily operations of Match.com," if the FTC can prove that MGI acted "with

---

[68] The FTC claims that "MGI is not absolved of liability simply because [MGL] also played a role in Match.com's operations." Mot. at 66. But MGI is not attempting to "absolve[]" itself of liability because MGL "also played a role in Match.com's operations." Mot. at 66. MGI is not liable because it never played a role in Match.com's operations.

knowledge of [Match.com's] deception" and had "the authority to control the deceptive practice," but allowed it to proceed. Mot. at 67 (quoting *FTC v. LeadClick Media LLC*, 838 F.3d 158, 170 (2d Cir. 2016)). The FTC claims it met that standard here. But the FTC is wrong on both the law and the facts.

First, the FTC is wrong on the law. If the standard were as low as the FTC claims, it would run headlong into the Supreme Court's decision in *Bestfoods*, which makes clear that parent companies cannot be held liable for their subsidiaries' conduct, "unless the corporate veil may be pierced," which the FTC does not even allege here. 524 U.S. at 55. Normal corporate oversight and the authority to control a subsidiary is not enough to establish liability. *Id.* at 61–63. Holding otherwise would turn corporate principles of separate ownership on their head, rendering all parent companies effectively strictly liable for any subsidiary's misconduct. This Court need go no farther to deny the FTC's Motion against MGI.

Second, even if the FTC were correct about the legal standard, it is wrong on the facts. The FTC cannot show that MGI had (1) "knowledge of deception" and (2) "authority to control the deceptive practice." The FTC's only evidence of MGI's alleged "knowledge of Match.com's illegal conduct" is that MGI executives occasionally received customer complaints, either when they were MGI executives or when they had MGL positions before taking an MGI position.[69] *See*

---

[69] The FTC also claims that Ms. Ginsberg "actively participated in Match.com's ROSCA violation," Mot. at 45, but the FTC's only evidence for that bold assertion is that Ms. Ginsberg asked if a change to Match.com's FAQs section that had recently been implemented would have any "implications." Mot. at 45 n.223 (citing Pl. App. Ex. 215 at App. 2252). When asked at her deposition about this, Ms. Ginsberg explained that she did not think there would be an impact on customer metrics, but wanted to check "all the implications" because "we should always check everything." Defs. App. Ex. F at App. 98 (Ginsberg Dep. Tr. 193:2–22). Contrary to the FTC's insinuations, there was nothing special about cancelation rates, nor does the FTC have any proof that Ms. Ginsberg demanded that the change be undone due to implications for the cancelation rate. And when asked if she ever heard anyone at Match.com express an intent to make the online cancelation flow not simple, she responded: "There was never any intention to make a cancellation flow not simple; in fact, we looked at all the data that suggests high 90 percent of people had no problem cancelling." Defs. App. Ex. F at App. 102 (Ginsberg Dep. Tr. 208:15–21); *see also* Defs. App. Ex. F at App. 102 (Ginsberg Dep. Tr. 208:22–209:7). That is the opposite of participating in a ROSCA violation.

Mot. at 44–46. But it cannot be that receiving complaints constitutes knowledge of deceptive conduct, or *every* parent company effectively would be strictly liable the moment one person complained.[70] It is not unusual for parent company executives—particularly executives of publicly traded corporations like MGI—to occasionally receive complaints from customers (and then forward those complaints to the operating company to be handled). *See* Defs. App. Ex. C at App. 41, 44 (Blatt Dep. Tr. 69:8–16, 82:20–83:6); Defs. App. Ex. F at App. 95 (Ginsberg Dep. Tr. 84:6–14). Moreover, receiving a complaint is not evidence of deceptive conduct. This is particularly true here given that MGI's corporate representative testified that Match.com would investigate complaints, and "[m]ost of the complaints were people had just forgotten to cancel, but they kind of accused the company that oh, no, no, no, I tried to cancel and it didn't stick." Defs. App. Ex. G at App. 121 (Dubey Dep. Tr. 170:10–17). Defendants' expert, Dr. Langenfeld, confirmed that almost half of the commenters in Dr. King's complaint analysis never entered the online cancelation flow, Defs. App. Ex. S-1 at App. 1013–14 (Rpt. ¶ 46), so cannot have been complaining about being deceived by it. In these circumstances, MGI cannot be charged with knowledge of "deceptive conduct" merely because a few people sent emails complaining.

Nor can the FTC show that MGI had "authority to control the deceptive practice." The FTC again tries to lessen its burden by suggesting that it need only prove authority to control *Match.com*. But even the case that the FTC cites shows that the parent company must have authority to control *the deceptive practice* in particular. *LeadClick*, 838 F.3d at 170. As described below, the FTC has, at most, evidence that MGI has the authority to appoint MGL executives, but

---

[70] The FTC claims that Mr. Blatt received "numerous complaints," but cites only two. Mot. at 45 & n.219. In reality, MGI executives testified that such complaints were rare. Defs. App. Ex. G at App. 120–21, 125 (Dubey Dep. Tr. 169:3–171:3 (explaining that she has "very little overall memory" of "getting such complaints every once in a while" and that they "would get a handful of complaints"), 248:19–249:6 ("Very, very small handful of people would call in to complain.")); Defs. App. Ex. F at App. 100 (Ginsberg Dep. Tr. 199:16–20 (testifying that it "wasn't common that people would reach out" to her with complaints)).

it has no evidence that MGI has the authority to control day-to-day operations, much less those involving the Guarantee, Chargeback Policy, or online cancelation flow.

Analysis of the case on which the FTC relies demonstrates that the FTC's attempt to hold MGI liable under this theory is misplaced. In *LeadClick*, the issue was not whether a parent could be held liable for its subsidiary's conduct. In fact, the FTC did not even *attempt* to hold the parent liable, and instead sought recovery from the parent (CLI) only as a relief defendant in possession of the subsidiary's property. *LeadClick*, 838 F.3d at 177–79. The FTC lost that argument. *Id.* If the parent in that case could not even be a proper relief defendant, it is hard to see how it could have been directly liable. The issue in *LeadClick* was whether a company that bought and sold ad space could be liable for the deceptive ads that its customers created. The Second Circuit held that the answer in that case was yes, because the company (a) "knew that fake news sites were common in the affiliate marketing industry and that some of its affiliates were using fake news sites," (b) "approved of the use of these sites," and (c) "provided affiliates with content to use on their fake news pages."[71] *LeadClick*, 838 F.3d at 164. Thus, the defendant was directly involved in disseminating the deceptive materials (it was literally the middleman that connected the ad creators to websites where the ads could be published), and the defendant's "awareness [of the deceptive conduct] extended beyond general knowledge." *Id.* The court explained that the defendant's "liability arises from its own deceptive practices: directly participating in the deceptive scheme by recruiting, managing, and paying a network of affiliates to generate consumer traffic through the use of deceptive advertising and allowing the use of deceptive advertising where it had the authority to control the affiliates participating in its network." *Id.* at 172.[72]

---

[71] *LeadClick* uses "affiliates" to mean the equivalent of "business partners" or "contracting counterparties," not in the sense of affiliates that are members of the same corporate family.

[72] *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228 (11th Cir. 2014), involves only the issuance of a preliminary injunction, not an ultimate liability finding. Moreover, in that case, the defendants "received a report from IAB's chief

Here, the FTC has no such evidence. As explained below, MGI is not involved in Match.com's operation, much less the specific alleged misconduct related to the Guarantee, Chargeback Policy, or online cancelation flow, unlike the defendant in *LeadClick*. Even under the FTC's lowered standard, the FTC's claims against MGI fail (or, at a minimum, present fact issues that must be resolved at trial).

### 2. MGI Does Not Own Match.com

MGI does not "own" Match.com; instead, MGL owns Match.com, as explained in Defendants' Motion for Summary Judgment.[73] The FTC's evidence shows only, at best, that MGI indirectly owns MGL,[74] which the FTC then asserts means that "MGI owns Match.com through its wholly owned subsidiary." Mot. at 39. That is not how corporate law works. "A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003).

### 3. MGI Does Not Operate Match.com

MGI also does not "operate" Match.com. Every former MGI executive testified that MGI does not operate Match.com. *See* Defs. App. Ex. G at App. 108, 111, 117, 125 (Dubey Dep. Tr. 14:20–15:4, 30:13–31:3, 88:5–22, 246:8–12); Defs. App. Ex. F at App. 101 (Ginsberg Dep. Tr.

---

compliance officer" warning that the telemarketers "misrepresented the nature of IAB's products." *Id.* at 1233. No such knowledge of misrepresentations exists here. Additionally, that case involved individual executives (not a parent company), and the court described "authority to control" as "active involvement in business affairs and the making of corporate policy." *Id.* (internal quotation marks omitted). MGI's involvement as a corporate parent is much more limited, as described below.

[73] Dkt. 204 at 19; Defs. App. Ex. P at App. 300–01 (Decl. ¶¶ 4–7); Defs. App. Ex. W at App. 1214–15 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 4). The Match.com Terms of Use state that MGL operates Match.com. Defs. App. Ex. P-1 at App. 319; Defs. App. Ex. P-2 at App. 336; Defs. App. Ex. P-3 at App. 352; Defs. App. Ex. P-4 at App. 367; Defs. App. Ex. P-5 at App. 379. MGL is also the entity that owns the Match.com trademarks (Defs. App. Ex. P-6 at App. 388–89; Defs. App. Ex. P-7 at App. 391–92; Defs. App. Ex. P-8 at App. 394–95; Defs. App. Ex. P-9 at App. 397–98); is the contact for the domain Match.com (Defs. App. Ex. P-10 at App. 400–03); and owns the Match.com app on the Apple and Google Play stores (Defs. App. Ex. P-11 at App. 405; Defs. App. Ex. P-12 at App. 407; Defs. App. Ex. P-13 at App. 409; Defs. App. Ex. P-14 at App. 411).

[74] Although the FTC claims, Mot. at 39, that "MGI is the sole managing member of" MGL, that has not been true for several years. As the FTC acknowledges, Mot. at 40 n.189, MGL is "three levels beneath MGI." Pl. App. Ex. 194 at App. 2020. Match Group Holdings II, LLC is MGL's current sole managing member. *See, e.g.*, Defs. App. Ex. P-17 at App. 421–22 (identifying Match Group Holdings II, LLC as the sole managing member of MGL).

203:6–25); Defs. App. Ex. C at App. 33, 35, 49 (Blatt Dep. Tr. 14:12–15:7, 22:3–11, 134:19–135:20). All of the evidence that the FTC points to is normal corporate oversight of a subsidiary by a parent. "Activities that . . . are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." *Bestfoods*, 524 U.S. at 72 (internal quotation omitted).

The FTC first points to MGI's creation of the Match Group North America ("MGNA") "reporting structure" as evidence of something devious. *See* Mot. at 40–42, 66–67. But "monitoring of the subsidiary's performance" is precisely what parent companies do. *Bestfoods*, 524 U.S. at 72. And when a parent company (like MGI) has multiple subsidiaries, there is nothing nefarious about creating a reporting structure to monitor multiple subsidiaries through a single path. Indeed, the FTC's own authorities confirm that related entities often "consolidate some or all of their back-office functions . . . into a single office" through a "shared services program." *LeadClick*, 838 F.3d at 166. Consolidating financial reporting and monitoring through a single position (like MGNA) is not unusual. The FTC cites no evidence or caselaw to the contrary.

The FTC next points to examples of what it says shows "MGI executives" being "intimately involved in the day-to-day business of Match.com." Mot. at 43. The evidence shows no such thing. To begin, in many instances, the "MGI executive" that the FTC points to also holds a position at MGL. "[D]irectors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *Bestfoods*, 524 U.S. at 69 (internal quotation marks omitted). In those instances, "courts generally presume 'that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary," so "it cannot be enough to establish liability here

that dual officers and directors made policy decisions and supervised activities." *Bestfoods*, 524 U.S. at 69–70 (internal quotation marks omitted). Thus, while the FTC asserts, without citation, that MGI executives that simultaneously held MGL positions were "plainly acting in their capacity as MGI executives when operating Match.com," Mot. at 43 n.206, black letter case law states that the *opposite* is true.

Here, many of the communications that the FTC cites as evidence that MGI executives were "operating" Match.com can be explained by the fact that Mr. Blatt, Mr. Sine, and Mr. Swidler held MGL positions at the time. *See* Defs. App. Ex. P-16 at App. 417; Defs. App. Ex. P-15 at App. 413. Thus, they were functioning in their roles as MGL executives, not MGI executives, when operating Match.com.

In addition, the evidence the FTC cites shows nothing other than normal parent-subsidiary oversight, including "supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures." *Bestfoods*, 524 U.S. at 72. For example, the FTC claims that Mr. Blatt, former MGI CEO, "often weighed in on Match.com advertising." Mot. at 43 & n.207. In fact, Mr. Blatt testified that he was involved only with "significant television marketing campaigns," where the "company was going to spend, you know, many millions of dollars on brand marketing." Defs. App. Ex. C at App. 48 (Blatt Dep. Tr. 132:6–133:17); *see also* Defs. App. Ex. C at App. 38 (Blatt Dep. Tr. 39:9–25 (explaining that he would be involved "if there was a plan that called for a meaningful amount of money to be spent on a marketing campaign")). He certainly did not testify that he did so "often" (and the FTC tellingly does not cite his testimony on this point, despite having asked Mr. Blatt about it at his deposition). It is normal for parent companies to weigh in before a subsidiary makes a significant investment, which is precisely what Mr. Blatt did. Similarly, Mr. Ramachandran's observation about how various of MGI's

subsidiaries' platforms compare to one another is not "operating" Match.com; in fact, the email is about MGI's "Portfolio Strategy," Pl. App. Ex. 4 at App. 14, not day-to-day operations.

Lacking any actual evidence of MGI's operation of Match.com (because none exists), the FTC resorts to speculation and inferences. But speculation is not appropriate at summary judgment, and inferences must be drawn in Defendants' favor, not the FTC's. The FTC argues that MGI has "consistently represented" that it "operates Match.com." Mot. at 43–44. False. MGI has occasionally represented that it "provide[s]" dating products or "operate[s] a portfolio of brands." Mot. at 43. While people "sometimes use terms inexactly and without legal technicalities in mind," *Masters Entmt. Grp. v. Aurich*, No. 3:18-CV-01314, 2022 WL 2137090, at *17 (M.D. Tenn. June 14, 2022), "[b]efore attaching legal consequences to that characterization," courts "must be more precise and apply" the relevant legal definition. *Shell Offshore, Inc. v. Tesla Offshore, L.L.C.*, No. CIV.A. 13-6278, 2015 WL 711796, at *2 (E.D. La. Feb. 18, 2015). As explained above, the FTC has no evidence of MGI's "operation" of Match.com.[75]

The FTC also argues that because some former employees purportedly did not know the difference between MGI and MGL,[76] that somehow means that MGI was operating Match.com. Mot. at 41. Not so. Two of the employees that the FTC cites never had any position at MGI, so would have no reason to know the difference between MGI and MGL.[77] The third, MGI's former

---

[75] MGI responded to the CID on behalf of MGL, because the CID was addressed to MGI and specifically included MGI's subsidiaries (to the extent they operate Match.com). *See e.g.*, Defs. App. Ex. P-55 at App. 653. MGI, as MGL's parent, arguably had possession, custody, or control of MGL's documents, *see, e.g.*, *United My Funds, LLC v. Perera*, No. 4:19-cv-0373, 2020 WL 1225042, at *8 (E.D. Tex. Mar. 12, 2020), and MGI was trying to cooperate with the FTC by promptly providing the FTC with the information it requested. The FTC's attempt to use MGI's cooperation *against* MGI will only disincentive cooperation by other companies in future investigations.

[76] Oddly, the FTC characterizes the distinction between MGI and MGL as a "firewall," even though no one has ever characterized it that way. Again, that is not how parents and subsidiaries work. Far from there being a "firewall" between a parent and a subsidiary, parents are *supposed* to receive information from and monitor their subsidiaries.

[77] That is precisely why Defendants objected to the FTC's questioning as speculative and lacking foundation, *see* Defs. App. Ex. B at App. 15 (Auderer Dep. Tr. 146:25–147:5), but the FTC omitted that portion of the transcript from its appendix.

CEO, testified that he knew the difference between the holding company and the operating company and their responsibilities, but he could not remember (five years after he left the company entirely) which was the "Inc." and which was the "LLC." Defs. App. Ex. C at App. 47 (Blatt Dep. Tr. 126:9–16). In fact, all three of these employees left the company many years ago, so the fact that they could not remember the difference between "Inc." and "LLC" (particularly given the number of name changes and restructuring that have occurred in the interim) is unsurprising, not evidence of MGI's operation of Match.com.

Moreover, even if it were true that MGI operated parts of Match.com (and it does not), it does not show that MGI was involved in the alleged misconduct at issue. None of the FTC's evidence shows any MGI executive participating in decisions about the Guarantee, Match.com's Chargeback Policy, or Match.com's online cancelation flow. And every single MGI executive to be deposed testified that MGI had nothing to do with those issues. *See* Defs. App. Ex. C at App. 47–48 (Blatt Dep. Tr. 127:19–131:24); Defs. App. Ex. F at App. 101 (Ginsberg Dep. Tr. 202:15–203:4); Defs. App. Ex. G at App. 124–25 (Dubey Dep. Tr. 245:20–247:11). In fact, the FTC's corporate representative admitted that the FTC has no evidence of such involvement. Defs. App. Ex. K at App. 207, 209 (Bandy Dep. Tr. (June 26, 2023) 190:4–191:6, 198:14–199:16, 199:17–200:17). That is reason alone that MGI is not liable, such that granting judgment in the FTC's favor against MGI would be improper. *See Riverside Mkt. Dev. v. Int'l Bldg. Prods.*, 931 F.2d 327, 330 (5th Cir. 1991) (explaining that individuals cannot hide behind the corporate shield only if "they themselves actually participate in the wrongful conduct").

### 4.    MGI Does Not Have the Authority to Control Match.com

Finally, MGI does not have the "authority to control" Match.com. When repeatedly asked at their depositions whether MGI had the authority to control Match.com, MGI's former executives testified that they had the authority to hire or fire a subsidiary's *executives*, but did not state that

they had any authority beyond that. Defs. App. Ex. G at App. 114 (Dubey Dep. Tr. 72:5–17); Defs. App. Ex. C at App. 35 (Blatt Dep. Tr. 22:13–23:15). Indeed, the FTC's only alleged evidence of MGI's authority to control is exactly that—MGI appointed MGL executives, and those executives occasionally reported to MGI about the subsidiary's performance.[78] This is precisely what parent companies do, not evidence of misconduct.

### D.   The FTC Has Not Met Its Burden on Its Requested Relief

Because the FTC has not met its burden on liability for Counts III, IV, or V, the FTC is not entitled to civil penalties, consumer redress, or injunctive relief. *See* Mot. at 65–73. Even if the FTC had met its burden as to liability, it has not as to any remedy.

### 1.   The FTC Has Not Met Its Burden for the Civil Penalties and Consumer Redress

Even if the FTC could prove liability (and it cannot), the FTC has not met its burden of proof on its claims for civil penalties or consumer redress. *See* Mot. at 70–73.

### a.   The FTC Has Not Met Its Burden on Civil Penalties

The FTC has not met its burden to show that it is entitled to $161,737,240 in civil penalties as a matter of law. Under 15 U.S.C. § 45(m)(1)(A), the FTC can obtain civil penalties only if it shows that Defendants violated ROSCA *and* did so "***with actual knowledge or knowledge fairly implied on the basis of objective circumstances* that such act is unfair or deceptive and is prohibited by such rule**." *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 822 (N.D. Tex. 2008) (Fitzwater, J.) ("[B]efore . . . conduct can serve as the basis for imposing a civil penalty under § 5(m)(1)(A), the government must prove that the violations were committed

---

[78] The FTC claims that MGI could "hire and fire the employees who operated Match.com," Mot. at 40, implying that authority extends to any Match.com employee. In reality, MGI's authority is limited to hiring or firing "the operating company heads, leaders." Defs. App. Ex. G at App. 114 (Dubey Dep. Tr. 72:5–9). When asked about authority to hire or fire other employees, Ms. Dubey testified that "the leader of that operating company," not MGI, "is responsible for hiring and firing them" (aside from certain shared services not linked to a particular operating company). Defs. App. Ex. G at App. 114 (Dubey Dep. Tr. 72:10–14).

knowingly or with knowledge fairly implied based on objective circumstances.") (emphasis added). "In determining whether knowledge . . . may be fairly implied" for purposes of this civil penalties provision, Congress "intended that the courts hold a defendant responsible" only if "a reasonable and prudent man under the circumstances *would have known*" both (1) "of the existence of the rule," and (2) "that the act or practice was in violation of its provisions." S. Rep. No. 93-1408, at 40 (1974) (emphasis added). The Supreme Court has observed that Section 5(m)(1)(A)'s "actual knowledge or knowledge fairly implied" language "explicitly" provides a "mistake-of-law defense." *Jerman v. Carlisle, McNellis, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583–84 (2010) (distinguishing Section 5(m)(1)(A) of the FTC Act, which "explicitly" provides for a "mistake-of-law defense," in holding there was no such defense under the Fair Debt Collection Practices Act).

Assuming that Defendants did violate ROSCA (and they did not), the FTC has no evidence that Defendants *knew* they were violating ROSCA, or that a reasonable person in the same circumstances "would have known" that the conduct at issue violated ROSCA. *See United States v. Corps. for Character, L.C.*, 116 F. Supp. 3d 1258, 1275 (D. Utah 2015) (denying summary judgment as to civil penalties and reserving issue of intent for trial). The FTC does not cite a single defense witness who testified that Match.com's online cancelation flow was not simple or that anybody knew that the flow violated ROSCA.[79] Indeed, the company witnesses overwhelmingly testified to the exact opposite. *See supra* Section III.A.3.b (bulleted list of deposition testimony). This overwhelming evidence, at a minimum, creates a genuine dispute of material fact as to intent, which is a "quintessential question of fact for a factfinder." *See FTC v. RCG Advances, LLC*, No.

---

[79] Again, the FTC seems to confuse the standard under ROSCA as being "as simple as possible" instead of "simple." 15 U.S.C. § 8403(3). A cancelation mechanism may be made harder as an unintentional consequence of a legitimate business change or process, but that does not mean that the mechanism violates the law (so long as it remains "simple").

20-CV-4432, 2023 WL 6281138, at *13 (S.D.N.Y. Sept. 27, 2023) (denying summary judgment as to civil penalties because "quintessential question of fact for a factfinder"); *United States v. Corps. for Character, L.C.*, 116 F. Supp. 3d 1258, 1275 (D. Utah 2015) (denying summary judgment as to civil penalties and reserving issue of intent for trial).

Finally, even if the FTC had met its burden to show that civil penalties are warranted, it has not established the number of violations and the amount of the penalty per violation. Courts use a multi-factor, fact-intensive test to determine the amount of a civil penalty, which can range from $0 to $51,120 per violation. 15 U.S.C. § 45(m)(1)(C) ("In determining the amount of such a civil penalty, the court shall take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require."); 16 CFR § 1.98 (identifying maximum of $51,120).

The FTC argues that there are 3,227 violations, based on no expert or other testimony. The FTC's lawyers simply instructed a data analyst to calculate the number of days between September 26, 2014, and July 28, 2023. *See* Pl. App. Ex. 261 at App. 4335. The FTC further seeks $51,120 per violation, with no testimony as to why this figure is appropriate. The FTC cannot simply obtain the maximum amount of civil penalties without any factual analysis or argument that it is correct. As to both the number of violations and the factors that related to the amount of the penalty, the FTC has not met its burden.[80] At a minimum, there are facts in dispute on the FTC's claim for civil penalties.

---

[80] The FTC is incorrect that the statute of limitations permits civil penalties against MGL for the time period beginning September 2014. *See* Mot. at 72–73 n.385. Defendants set forth in their Motion for Summary Judgment that any award of civil penalties against MGL must be limited to alleged violations that occurred after July 19, 2017, under 28 U.S.C. § 2462. *See* Dkt. 204 (Section IV.A.4).

b.        **The FTC Has Not Met Its Burden on Consumer Redress**

The FTC has also not met its burden to show that there is no genuine dispute of material fact as to the amount of consumer redress it seeks: $51,118,804.92. The FTC's Motion should be denied as to consumer redress because (1) Defendants' expert has shown that the FTC's calculations are baseless (even assuming liability), and (2) the FTC has not shown that consumers actually were injured due to the design of the online cancelation flow. *See* Mot at 70–71.

The law is clear that consumer redress must be limited to relief "*necessary* to redress injury to consumers . . . *resulting from* the [ROSCA] violation." 15 U.S.C. § 57b(b) (emphasis added). It is well established that "there may be no redress without proof of injury," and "the relief must be necessary to redress the injury." *FTC v. Noland*, No. CV-20-00047-PHX-DWL, 2021 WL 5493443, at *4 (D. Ariz. Nov. 23, 2021) (quoting *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993)). Courts routinely deny summary judgment as to consumer redress when there is no "proof of injury." *Id.* at *4 (denying summary judgment for FTC as to consumer redress when FTC's methodology went "beyond redressing injury to consumers and provide[d] a potential windfall to consumers").

(i)        **The FTC's Request For Consumer Redress Is Not Supported By The Evidence**

Here, the FTC has no expert or other testimony calculating the amount of actual harm to consumers. Instead, all the FTC has is a data analyst, Ms. KimbleAnn Verdi, who did a calculation that she was instructed to do by the FTC's trial counsel. *See* Pl. App. Ex. 261 at App. 4330–33. Ms. Verdi did the following calculation: (1) added the amount of money Match.com collected through renewals from consumers from the time period after the consumers clicked "Manage subscription" (or similar language that was previously used in Match.com's Account Settings page); (2) subtracted any refunds these subscribers received from Match.com as well as

chargebacks they received from their payment processors; and (3) applied a deduction to account for subscribers who clicked on the "Subscription Status" option (instead of "Cancel Subscription"), for only a *portion* of the time period over which the FTC calculates restitution. *See* Pl. App. Ex. 261 at App. 4330–33; Defs. App. Ex. S-2 at App. 1080 (Rpt. ¶¶ 81 & n.96, 82). Based on Ms. Verdi's calculation, the FTC argues that the Court should award $51,118,804.92 in consumer redress. But the FTC cannot obtain this amount as a matter of law.

First, the FTC does not have any actual evidence that this is the correct amount in consumer redress. The FTC data analyst who did this calculation specifically testified in deposition that she was *not* testifying that this calculation was the appropriate amount of consumer harm. Defs. App. Ex. N at App. 236 (Verdi Dep. Tr. 36:14–23 ("Q. Okay. And are you offering the opinion in this case that the amount of money you calculated is a reasonable estimate of consumer harm? A. At this time I am not offering the opinion that the result I received on the mathematical calculation represents a consumer -- amount for consumer harm. That is not -- it's just a result I received from a mathematical calculation.")).

Even if the FTC had some evidence that it was the correct number, Ms. Verdi's calculations are not accurate. Defendants have an expert on restitution and consumer redress, Dr. Langenfeld. He formerly held a variety of positions at the FTC for almost 10 years.[81] Dr. Langenfeld performed a variety of analyses to assess whether Ms. Verdi reasonably calculated consumer redress. He testified that she did not because the FTC's consumer injury calculations are inflated for four primary reasons. First and foremost, the FTC begins the online cancelation flow at "Manage subscription" instead of "Cancel Subscriptions" and includes any subscriber that clicked Manage

---

[81] Those positions were Director for Antitrust in the FTC's Bureau of Economics, Deputy Director of Economic Policy Analysis, Associate Director for Special Projects, and Economic Advisor to a Commissioner and to the Director of the Bureau of Consumer Protection. Defs. App. Ex. S-2 at App. 1037 (Rpt. ¶ 2).

Subscription. *See* Defs. App. Ex. S-2 at App. 1083 (Rpt. ¶ 87). The FTC assumes that every customer who clicked "Manage subscription" intended to cancel, but there is evidence to the contrary, as explained further below. This battle between Dr. Langenfeld and Ms. Verdi is sufficient to deny summary judgment.

Second, the FTC's subtraction of subscribers who clicked "Subscription Status" is incomplete. *See* Defs. App. Ex. S-2 at App. 1080–81 (Rpt. ¶ 83). For example, Ms. Verdi calculates consumer injury using data going back to October 2016, but accounts for subscribers clicking "Subscription Status" only back to March 2019. *Id.* Thus, while the FTC says that it applies a deduction to its alleged consumer injury for subscribers who clicked the "Subscription Status" option, it makes no such adjustment for October 2016 to February 2019. *Id.* The FTC also does not adjust for subscribers that did not enter their password at the password page after clicking "Manage subscription" but may have intended to click "Subscription Status." *Id.*

Third, the FTC's calculation includes subscribers that used a subscriber-only feature after they renewed, even though such subscribers received the service for which they paid and therefore were not injured. *See* Defs. App. Ex. S-2 at App. 1083 (Rpt. ¶ 88(b)). By including those subscribers in its consumer harm calculation, the FTC's model "suffers from a fundamental flaw that renders it unreasonable on its face—it assumes that [the subscriber benefits] automatically cease[] to have any value, such that there is no need to provide an offset for the value of the product received." *FTC v. Noland*, No. CV-20-00047-PHX-DWL, 2023 WL 3372517, at *53 (D. Ariz. May 11, 2023); *see Noland*, 2021 WL 5493443, at *4. In other words, these subscribers received and used the benefits for which they paid, so were not harmed.

Fourth, Ms. Verdi's calculation includes Match.com resubscribers, "who, by definition, have successfully canceled their Match.com subscriptions in the past," and therefore are unlikely

to have been thwarted by the design of the flow. Defs. App. Ex. S-2 at App. 1083 (Rpt. ¶ 88(c)). Thus, the FTC has not met its burden as to consumer redress.

### (ii)      The FTC's Data Analyst Relied On Incorrect Assumptions

The FTC's data analyst's calculations also fail because she made incorrect assumptions, based upon instructions by FTC trial counsel. *See FTC v. Neora*, No. 3:20-cv-01979, Dkt. 347 at 19 n.81, 32 (N.D. Tex. Sept. 28, 2023) (finding "there are certain assumptions in [the FTC's data analyst's] calculations that the [c]ourt determines renders these calculations less reliable" and generally finding the FTC's assumptions were "not supported by evidence").

For example, the FTC was incorrect to assume that every customer who clicked "Manage subscription" intended to cancel, as opposed to some other task under "Manage subscription."[82] The FTC has no evidence to support that assumption, and there is contrary evidence. *See* Defs. App. Ex. S-2 at App. 1055–58 (Rpt. ¶¶ 30–36). Dr. Langenfeld analyzed Match.com usage data and found that consumers that clicked "Manage subscription" but did *not* cancel used Match.com subscriber benefits statistically significantly more often than consumers that clicked "Manage subscription" but did cancel. *See* Defs. App. Ex. S-2 at App. 1058 (Rpt. ¶ 36(e)). That data is inconsistent with the former group intending to cancel. *See* Defs. App. Ex. S-2 at App. 1058 (Rpt. ¶ 36(e)). For example, many subscribers may have been interested in generally managing their account when they clicked "Manage subscription." *See* Defs. App. Ex. S-2 at App. 1055–56 (Rpt. ¶ 31). Even if a subscriber is thinking of canceling, the subscriber may not have definitely decided to leave when they click "Manage subscription" (or even "Cancel Subscription"). *Id.* For example,

---

[82] The FTC's own usability expert, Dr. King, acknowledged this. Defs. App. Ex. M at App. 229–30 (King Dep. Tr. 130:2–5, 134:6–10, 136:12–137:1). The FTC's corporate representative acknowledged that the FTC had "consider[ed] that there might be other reasons that someone might abandon the -- the flow," but had not conducted further analysis because "it didn't seem like any of those reasons were particularly plausible or material" *in the FTC's view*. Defs. App. Ex. K at App. 202–03 (Bandy Dep. Tr. (June 26, 2023) 55:3–56:7, 56:18–58:7).

they may have been trying to trigger a save offer. *Id.* And even subscribers who navigate past the save offer may suspect that a better savings offer might appear later in the online cancelation flow. *Id.* All of these inferences must be made in Defendants' favor at this stage, not the FTC's.

Nor is there any evidence or reason to assume that everyone who even wanted to cancel was unable to do so because of the design of the online cancelation flow. Indeed, again there is contrary evidence. Subscribers may not have ultimately canceled their subscription due to countless reasons that have nothing to do with the design of the online cancelation flow—they could have received an email, text, or phone call; had their internet connectivity interrupted or suffered an equipment malfunction (e.g., power failure, internet outage); been interrupted by a child, other family member, friend, roommate, co-worker, or visitor at the door; or otherwise distracted by another project (e.g., cooking dinner) or something otherwise urgent and unexpected. *See* Defs. App. Ex. S-2 at App. 1056–57 (Rpt. ¶ 33 & n.30).[83]

For these reasons, the FTC has not met its summary judgment burden regarding the amount of consumer redress. At a minimum, there are facts in dispute on the FTC's claim for consumer redress. The FTC's Motion should be denied.[84]

### 2.    The FTC Has Not Met Its Burden on Its Proposed Injunction

The FTC has not made the necessary showing that it is entitled to each and every provision of its proposed injunction as a matter of law. *See* Mot. at 65–69; Dkt. 198-1 (FTC's Proposed Order for Permanent Injunction, Monetary Relief, Civil Penalty Judgment, and Other Relief). In addition to the likelihood of recurrence arguments made above, the FTC has the burden to show

---

[83] The FTC acknowledged that these were possibilities, but instead of investigating them, just assumed that only the design of the flow "thwarted" attempts to cancel. Defs. App. Ex. K at App. 202–03 (Bandy Dep. Tr. (June 26, 2023) 55:3–56:7, 56:18–58:7).

[84] The FTC is incorrect that the statute of limitations permits consumer redress against MGL for the time period beginning September or October 2016. *See* Mot. at 71. Defendants set forth in their Motion for Summary Judgment that any consumer redress against MGL must be limited to alleged injuries that occurred after July 19, 2019, under 15 U.S.C. § 57b(d). *See* Dkt. 204 (Section IV.A.4).

that the injunction it seeks is "narrowly tailored" and "reasonably related" to any unlawful practices found to exist—and at summary judgment, that there is no genuine dispute of material fact on these points. *See United States v. Mississippi*, No. 21-60772, 2023 WL 6138536, at *9 (5th Cir. Sept. 20, 2023) ("Injunctions must be narrowly tailored within the context of the substantive law at issue to address the specific relief sought." (quoting *E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021)); *In re ECM BioFilms, Inc.*, No. 9358, 2015 FTC LEXIS 22, at *633–34 (FTC Jan. 28, 2015) (rejecting injunctive provision when "not sufficiently similar or related to" claims found to be deceptive).

Here, the FTC seeks a sweeping injunction with a number of provisions. *See* Dkt. 198-1. The FTC makes no argument as to why any of the actual provisions are "narrowly tailored" or "reasonably related" to the conduct at issue in this case, let alone that the provisions are undisputedly so. This is forfeiture and justifies denying the Motion. The FTC's decision to not even try to defend the injunction as narrowly tailored or reasonably related to the conduct at issue was for good reason—there is absolutely no evidence that it is. The FTC has not put forward any expert or fact testimony that a single one of the provisions it seeks is needed, let alone that they all are. In its Motion, the FTC argues only that the injunction should apply to both Defendants and should not be limited to Match.com, *see* Mot. at 65–69, despite no legal or factual basis. *See supra* III.C. But the FTC says nothing about all of the substantive terms.

At a minimum, there are genuine disputes of material fact on the FTC's claim that the injunction should apply to both Defendants and should not be limited to Match.com. *See supra* Section III.C. The FTC also has no basis to enjoin dating platforms other than Match.com. The FTC argues that relief should extend to all of the websites related to MGI or MGL (however indirectly) rather than just Match.com, asserting that "Defendants have shown a propensity to

engage in the same illegal conduct on different websites." Mot. at 68. This is false. This entire

case, from its inception, has been about conduct on Match.com. *See generally* Am. Compl., Dkt.

116 (alleging misconduct on Match.com, not any other website). In fact, when pressed at a

discovery hearing last year, the FTC had to admit that it lacked even a good-faith basis to include

other dating sites in the complaint. Defs. App. Ex. O at App. 268–70 (Am. Hearing Tr. (Nov. 1,

2022) 29:1–31:4). Despite claiming that it "may seek leave to amend," *id.*, the FTC never did so.

A motion for summary judgment is not the time to expand the case to other dating sites when it

has been limited to Match.com for years.

Moreover, whether a policy is "unfair," and therefore violates the FTC Act, is a fact-

intensive inquiry. *See generally* 15 U.S.C. § 45(n). No such inquiry related to *any* other websites

has been conducted in this case. The most that the FTC can say is that it "appear[s]" that other

sites "have had" (apparently at some undetermined point in time) "similar" (but apparently not

identical) "chargeback policies." *See* Mot. at 17 n.73. The FTC relies on the same Terms of Use

that it pointed to during the discovery dispute. *See* Dkt. 147 at 16 n.33. Yet the FTC previously

told Judge Ramirez that those policies were an insufficient basis on which to allege a violation

even on information and belief because the "chargeback policies are ambiguous." Defs. App. Ex.

O at App. 268–70 (Am. Hearing Tr. (Nov. 1, 2022) 29:1–31:4). Yet the FTC now asks the Court

to issue an injunction based on those same "ambiguous" policies.[85]

What is more, the FTC's evidence of "a propensity to engage in illegal conduct on different

websites," Mot. at 68, is limited entirely to chargeback policies. The FTC offers precisely zero

---

[85] The FTC's reference to an email allegedly describing Plenty of Fish's alleged chargeback policy is irrelevant because, although the email claims that Plenty of Fish deletes and bans users that submit chargebacks, that is not the component of Match.com's former Chargeback Policy that the FTC challenges as unfair. Rather, the alleged unfairness is deleting and banning users who submit chargebacks *while* disputing the same chargebacks and not automatically reinstating the account if Match.com succeeds. *See* Dkt. 116 at ¶ 63 (complaining about Match.com's conduct "when Defendants prevailed in a billing dispute"). The FTC has no evidence of whether Plenty of Fish disputes chargebacks, much less how Plenty of Fish treats accounts where the chargeback is reversed.

evidence of purported violations related to a guarantee or cancelation mechanisms on any other website related to Defendants, even though that is exactly the type of evidence that is publicly available if it exists. Yet the FTC has not so much as alleged that any other website related to Defendants offers a deceptive guarantee or violates ROSCA. The FTC's silence speaks volumes. The FTC cannot use its failure to pursue claims related to other sites to speculate about *potential* violations, in service of getting a backdoor injunction on those other sites through this case which, from its inception, has been focused on Match.com.

The FTC's proposed injunction is also overbroad, particularly because the Guarantee and Chargeback Policy have been permanently discontinued and will never be reinstituted. *See, e.g.*, *Country Tweeds, Inc. v. FTC*, 326 F.2d 144, 149 (2d Cir. 1964) ("[P]etitioners in this case have ceased to engage in the advertising practice which prompted the order, and voluntarily did so well before the Commission filed its complaint. [Cessation] of the offending activity, with the likelihood that the petitioner will not again resume it or a related activity, has been one factor which courts have considered in limiting broad Commission orders."). The FTC's proposed injunction would cover virtually every aspect of Match.com's business. For example, one provision of the FTC's proposed injunction would require that Defendants, in connection with the "**selling of any online dating services**," make clear and conspicuous disclosures regarding "any material restrictions, limitations, or conditions to purchase, receive, or **use the online dating services**, or to receive any discount, 'guarantee,' or special offer." Dkt. 198-1 at 6 (Section II.B) (emphasis added). Thus, the FTC seeks an injunction over the "use [of] the online dating services" (i.e., **everything**), despite challenging only a permanently discontinued Guarantee and Chargeback Policy.

The FTC's proposed injunction would also impose a series of compliance obligations on Defendants that go beyond the needs of the case. For example, one provision would require a compliance report one year from the judgment, as well as updates to the FTC *for 20 years*, including within 14 days of any change in "[t]he structure of any Defendant or any entity that Defendant has any ownership interest . . . including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to the [o]rder." Dkt. 198-1 at 12 (Section X.B). MGI is a holding company of numerous, indirect subsidiaries. *See, e.g.*, Pl. App. Ex. 194 at App. 2020. Such a requirement is needless and unduly burdensome. And courts regularly reject provisions like this as "troublingly overbroad." *See, e.g.*, *FTC v. Lake*, 181 F. Supp. 3d 692, 704 (C.D. Cal. 2016) (rejecting provisions in the FTC's proposed injunction as "troublingly overbroad" because the FTC sought to require the defendant to "submit a 'compliance report' to the FTC one year from the judgment, as well as update the FTC with certain information for 20 years," and the court did "not wish to be in the business of refereeing compliance obligations the FTC would like to impose on [the defendant]").

The FTC's Motion as to its requested relief should be denied.

## IV.    CONCLUSION

For these reasons, the Court should deny the FTC's Motion in its entirety.

Dated: October 16, 2023

*/s/ Angela C. Zambrano*

Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: 214-981-3300
Fax: 214-981-3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310-595-9500
Fax: 310-595-9501

Benjamin M. Mundel (admitted *pro hac vice*)
bmundel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: 202-736-8000
Fax: 202-736-8711

*Attorneys for Match Group, Inc. and
Match Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 16, 2023, I caused true and correct copies of the foregoing to be served on all counsel of record in accordance with Federal Rules of Civil Procedure and this Court's CM/ECF filing system.

Reid Abram Tepfer
rtepfer@ftc.gov
M. Hasan Aijaz
maijaz@ftc.gov
Matthew James Wilshire
mwilshire@ftc.gov
Sarah Zuckerman
szuckerman@ftc.gov
John R. O'Gorman
jogorman@ftc.gov
Erica Rollins Hilliard
ehilliard@ftc.gov
Jason C. Moon
jmoon@ftc.gov

*/s/ Angela C. Zambrano*
Angela C. Zambrano