# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>Plaintiff,<br><br>vs.<br><br>MATCH GROUP, INC., a corporation, and<br>MATCH GROUP, LLC, formerly known as<br>MATCH.COM, LLC, a limited liability<br>company,<br><br>Defendants. | Case No. 3:19-cv-02281-K |

## DEFENDANT MATCH GROUP, INC. AND MATCH GROUP, LLC'S APPENDIX IN SUPPORT OF RESPONSE BRIEF IN OPPOSITION TO THE FTC'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rules 56.6 and 79.3, Defendants Match Group, Inc. and Match Group, LLC respectfully submit this Appendix in Support of their Response in Opposition to Plaintiff's Motion for Summary Judgment. Exhibits I, K, P-15, P-16, P-17, P-21, P-22, P-25, P-26, P-36, P-37, P-48, P-49, P-50, P-51, and S-2 will be filed under seal.[1]

| Ex. | Description | App. |
|---|---|---|
| | **Deposition Excerpts** | |
| A. | Bikram Bandy (FTC 30(b)(6)) Deposition Transcript (Oct. 24, 2022) | App. 1–8 |
| B. | Kristina Auderer Deposition Transcript (Nov. 18, 2022) | App. 9–29 |
| C. | Greg Blatt Deposition Transcript (Jan. 13, 2023) | App. 30–51 |
| D. | Michele Watson Deposition Transcript (Feb. 10, 2023) | App. 52–73 |
| E. | Melissa Clinchy Deposition Transcript (Feb. 16, 2023) | App. 74–88 |
| F. | Mandy Ginsberg Deposition Transcript (Feb. 23, 2023) | App. 89–104 |
| G. | Shar Dubey (MGI 30(b)(6)) Deposition Transcript (Mar. 3, 2023) | App. 105–128 |
| H. | Adrian Ong Deposition Transcript (Mar. 21, 2023) | App. 129–147 |
| I. | Dushyant Saraph (MGL 30(b)(6)) Deposition Transcript (Apr. 6, 2023) | App. 148–166 |
| J. | Dushyant Saraph (MGL 30(b)(6)) Deposition Transcript (June 22, 2023) | App. 167–198 |

[1] Per the Court's Orders at Dkt. 216 and 217, Defendants plan to file their sealing motion and supporting documents by December 15, 2023.

| Ex. | Description | App. |
|-----|-------------|------|
| K. | Bikram Bandy (FTC 30(b)(6)) Deposition Transcript (June 26, 2023) | App. 199–211 |
| L. | Brandon Ward (Defendants' Usability Expert) Deposition Transcript (July 13, 2023) | App. 212–219 |
| M. | Jennifer King (FTC's Usability Expert) Deposition Transcript (July 27, 2023) | App. 220–232 |
| N. | Kimbleann Verdi (FTC Analyst) Deposition Transcript (Aug. 10, 2023) | App. 233–238 |
| **Hearing Transcript** | | |
| O. | Transcript of Proceedings Before the Honorable Irma Carrillo Ramirez, United States Magistrate Judge on Nov. 1, 2022 (amended Nov. 8, 2022) | App. 239–298 |
| **Declarations** | | |
| P. | Declaration of Dushyant Saraph, with Exhibits<br>• Exhibit 1: MATCHFTC774622 (Terms of Use, Feb. 28, 2022)<br>• Exhibit 2: MATCHFTC774652 (Terms of Use, Feb. 8, 2021)<br>• Exhibit 3: MATCHFTC774600 (Terms of Use, Nov. 12, 2019)<br>• Exhibit 4: MATCHFTC774640 (Terms of Use, Apr. 18, 2019)<br>• Exhibit 5: MATCHFTC774614 (Terms of Use, Dec. 18, 2017)<br>• Exhibit 6: MATCHFTC774674 (Match.com trademark)<br>• Exhibit 7: MATCHFTC774676 (Match.com trademark)<br>• Exhibit 8: MATCHFTC774678 (Match.com trademark)<br>• Exhibit 9: MATCHFTC774680 (Match.com trademark)<br>• Exhibit 10: MATCHFTC774697 (Domain Match.com)<br>• Exhibit 11: MATCHFTC774727 (Match.com Apple app)<br>• Exhibit 12: MATCHFTC774728 (Match.com Apple app)<br>• Exhibit 13: MATCHFTC774729 (Match.com Google Play app)<br>• Exhibit 14: MATCHFTC777082 (Match.com Google Play app)<br>• Exhibit 15: MATCHFTC777046 (Written Consent of the Sole Member of Match.com, L.L.C., dated January 1, 2016)<br>• Exhibit 16: MATCHFTC777049 (Written Consent of the Sole Member of Match.com, L.L.C., dated November 1, 2016)<br>• Exhibit 17: MATCHFTC777055 (Written Consent of Sole Managing Member of Match Group, LLC, dated February 4, 2022)<br>• Exhibit 18: MATCHFTC774523 (Guarantee "Learn more")<br>• Exhibit 19:<br>  ○ MATCHFTC774536 (Guarantee Program Rules, excerpt #1)<br>  ○ MATCHFTC774568 (Guarantee Program Rules, excerpt #2)<br>  ○ MATCHFTC774563 (Guarantee Program Rules, excerpt #3)<br>• Exhibit 20:<br>  ○ MATCHFTC774538 (Guarantee Progress Page, excerpt #1)<br>  ○ MATCHFTC774527 (Guarantee Progress Page, excerpt #2)<br>• Exhibit 21: MATCHFTC834015 (Email, noting expecting no net impact to revenue from removal of Guarantee)<br>• Exhibit 22: MATCHFTC834288 (Email, noting "topline impact of the [G]uarantee is very small") | App. 299–679 |

| Ex. | Description | App. |
|---|---|---|
| | • Exhibit 23: MATCHFTC774521 (Email, "[Guarantee] is no longer available") | |
| | • Exhibit 24: MATCHFTC774522 (FAQ, Guarantee "was discontinued on 4/11/2019") | |
| | • Exhibit 25: MATCHFTC774593 (Document, Guarantee "no longer available") | |
| | • Exhibit 26: MATCHFTC471514 (Email, explaining a rationale for the Chargeback Policy) | |
| | • Exhibit 27: MATCHFTC774668 (Email example, cessation of Chargeback Policy) | |
| | • Exhibit 28: MATCHFTC774813 (Select Settings from Gear Icon) | |
| | • Exhibit 29: MATCHFTC774738 (Select "Manage subscription") | |
| | • Exhibit 30: MATCHFTC774742 (Enter Password and Complete reCaptcha) | |
| | • Exhibit 31: MATCHFTC774736 (Select "Cancel Subscription") | |
| | • Exhibit 32: MATCHFTC774745 (Answer or Skip Optional Survey) | |
| | • Exhibit 33: MATCHFTC774790 (Accept or Skip Save Offer) | |
| | • Exhibit 34: MATCHFTC774739 (Answer or Skip Optional NPS) | |
| | • Exhibit 35: MATCHFTC774734 (Cancelation Confirmation) | |
| | • Exhibit 36: MATCHFTC753946 (Email, Match.com using cancelation survey data) | |
| | • Exhibit 37: MATCHFTC777145 (Spreadsheet, Match.com using cancelation survey data) | |
| | • Exhibit 38: MATCHFTC846849 (Match.com Canceling FAQ) | |
| | • Exhibit 39: MATCHFTC846853 (Video of online cancelation flow that is embedded in Exhibit 38) | |
| | • Exhibit 40: MATCHFTC846848 (Match.com Cancelling FAQ) | |
| | • Exhibit 41: MATCHFTC672286 (Match.com previous FAQs) | |
| | • Exhibit 42: MATCHFTC672339 (Match.com previous FAQ) | |
| | • Exhibit 43: MATCHFTC672338 (Match.com previous FAQ) | |
| | • Exhibit 44: MATCHFTC672336 (Match.com previous FAQ) | |
| | • Exhibit 45: MATCHFTC774670 (Video of cancelation flow) | |
| | • Exhibit 46: MATCHFTC774651 (Video of cancelation flow) | |
| | • Exhibit 47: MATCHFTC774667 (Video of cancelation flow) | |
| | • Exhibit 48: MATCHFTC846468 (Clickthrough data) | |
| | • Exhibit 49: MATCHFTC774724 (Cancelations by method data) | |
| | • Exhibit 50: MATCHFTC744806 (Cancelation by mail example) | |
| | • Exhibit 51: MATCHFTC744801 (Cancelation by fax example) | |
| | • Exhibit 52: MATCHFTC846847 (Current Contact Us FAQ) | |
| | • Exhibit 53: MATCHFTC672345 (Previous Contact Us FAQ) | |
| | • Exhibit 54: MATCHFTC427066 (Spreadsheet with text of FAQs, including Contacting Customer Care FAQ) | |
| | • Exhibit 55: FTC's Original CID (dated Mar. 17, 2017) | |

| Ex. | Description | App. |
|---|---|---|
| | • Exhibit 56: Letter from Linda A. Goldstein to FTC (dated Aug. 6, 2019) | |
| Q. | Declaration of Jared Sine | App. 680–682 |
| R. | Declaration of Brandon Ward<br>• Exhibit 1: Expert Report of Brandon Ward Regarding Match.com's Online Subscription Cancelation Flow (dated January 13, 2023)<br>• Exhibit 2: Rebuttal of Dr. King's Report Regarding Match.com's Online Subscription Cancelation Flow (dated May 15, 2023) | App. 683–983 |
| S. | Declaration of James Langenfeld<br>• Exhibit 1: Rebuttal Expert Report to Dr. King's Rebuttal Report (dated June 14, 2023)<br>• Exhibit 2: Rebuttal Expert Report of James Langenfeld, Ph.D (dated Aug. 22, 2023) | App. 984–1141 |
| | **Stipulation** | |
| T. | Verified Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146 (dated Sept. 20, 2022) | App. 1142–1149 |
| | **Admissions** | |
| U. | FTC's Second Amended Responses to MGI's First Set of Requests for Admissions (dated Nov. 29, 2022) | App. 1150–1168 |
| | **Interrogatory Answers** | |
| V. | MGI's Second Amended Responses and Objections to FTC's First Set of Interrogatories (dated Jan. 14, 2023)[2] | App. 1169–1198 |
| W. | MGL's Second Amended Responses and Objections to FTC's First Set of Interrogatories (dated May 19, 2023)[3] | App. 1199–1253 |
| | **Miscellaneous** | |
| X. | Dr. Jennifer King's Notes: "Match brainstorming" | App. 1254–1270 |

[signature page to follow]

---

[2] MGI's First Amended Responses and Objections to FTC's First Set of Interrogatories (which are encompassed in **Ex. V**) were served on Sept. 14, 2022.
[3] MGL's original Responses and Objections to FTC's First Set of Interrogatories (which are encompassed in **Ex. W**) were served on Sept. 28, 2022.

Dated: October 16, 2023

*/s/ Angela C. Zambrano*

Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: 214-981-3300
Fax: 214-981-3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310-595-9500
Fax: 310-595-9501

Benjamin M. Mundel (admitted *pro hac vice*)
bmundel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: 202-736-8000
Fax: 202-736-8711

*Attorneys for Match Group, Inc. and
Match Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 16, 2023, I caused true and correct copies of the

foregoing to be served on all counsel of record in accordance with Federal Rules of Civil

Procedure and this Court's CM/ECF filing system.

Reid Abram Tepfer
rtepfer@ftc.gov
M. Hasan Aijaz
maijaz@ftc.gov
Matthew James Wilshire
mwilshire@ftc.gov
Sarah Zuckerman
szuckerman@ftc.gov
John R. O'Gorman
jogorman@ftc.gov
Erica Rollins Hilliard
ehilliard@ftc.gov
Jason C. Moon
jmoon@ftc.gov

<div style="text-align:right;">

*/s/ Angela C. Zambrano*
Angela C. Zambrano

</div>

# EXHIBIT A

```
 1                 UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF TEXAS

 2                      DALLAS DIVISION

 3

 4    FEDERAL TRADE COMMISSION,        :  Civil Action

 5            Plaintiff,               :  Case No. 3:19-cv-02281-K

 6        vs.                          :

 7    MATCH GROUP, INC., a corporation, :

      MATCH GROUP, LLC, formerly

 8    MATCH.COM, LLC, a Limited        :

      Liability Company,

 9                                     :

              Defendant.

10    _____/

11

12            Deposition of BIKRAM BANDY, taken on behalf of

13    Defendant, by Chad Hummel, of Sidley Austin, LLP, at 1501 K

14    Street, NW, Washington, D.C., commencing at 10:09 a.m., on

15    October 24, 2022, before Linda C. Marshall, RPR.

16

17    APPEARANCES:

18    FOR THE PLAINTIFF:    M. HASAN AIJAZ, Esquire

                            Federal Trade Commission

19

20

      FOR THE DEFENDANT:    CHAD HUMMEL, Esquire

21                          Sidley Austin, LLP

22

23

24

25

                                                    Page 1
```

1  Q   My question was, how was the 64,000 derived?
2      MR. AIJAZ:  Again, objection, relevancy to the
3  superceding response if it has been superceded.
4      THE WITNESS:  Okay.  I didn't delve too deeply into
5  this, but it is my understanding that this is based on the 8.7
6  million that we talked about in the initial disclosure, because
7  if you multiply 64,000 times 136, it's 8.7 million.  And it was
8  based on data that calculated the average subscription cost.  It
9  divided the -- so, it split the 8.7 million into 5 million and
10  3.7 million, 5 million being the un-refunded amounts from
11  consumers who complained that they thought they had canceled and
12  the 3.7 million was the time spent dealing with refunds.
13      So, it takes the 5 million, divides that by the average
14  subscription cost amount, which was, like, I want to say, $78 or
15  something that they derive from Match data.  That gives you
16  about 64,000 consumers.  And then they took the
17  64,000 consumers, divided the 3.7 million by that and that ends
18  up being 50 some dollars.  And you add the 78 to the 50 sum and
19  that gives you the 136.  So, in some sense it was -- those
20  figures were reverse-engineered from the $8.7 million figure we
21  talked about earlier from the initial disclosure.
22  BY MR. HUMMEL:
23  Q   The 64,000 harmed consumers and the $136 of average harm
24  per consumer were reverse-engineered from the 8.7 million?
25  A   That came from the original analysis I spoke about earlier

Page 90

1  when we were talking about the initial disclosure number.
2  Q   What is the time period applicable to restitution in this
3  case?  In other words, how far did it go back?
4  A   It would be three years from September 25th, 2019, so
5  September 25th, 2016.
6  Q   For MGI?
7  A   No, for all defendants.
8  Q   MGI wasn't sued until recently, right?
9  A   Our position is that the complaint would -- it would relate
10  back even as to MGL.
11  Q   Even though the FTC didn't sue MGL?
12  A   That's our position.
13  Q   Okay.  Now you're a lawyer advocating.
14      MR. AIJAZ:  Objection, argumentative.
15      THE WITNESS:  I'm just stating our position.
16  BY MR. HUMMEL:
17  Q   In other words, your position is restitution three years
18  back from September 25th, 2019?
19  A   Yes, three years back from that date.
20  Q   And how far back for civil penalties?
21  A   It would be five years from that date, so that would be
22  2014.
23  Q   And what is a violation for purposes of calculating civil
24  penalties in a ROSCA case like this?
25  A   Well, you know, it would be every consumer who tried to

Page 91

1  cancel but was unable to do so.
2  Q   Even though the flow didn't change?
3  A   The flow did change.
4  Q   Okay.  So, every iteration of the flow would be a separate
5  violation or every consumer that tried to cancel and couldn't?
6      MR. AIJAZ:  Objection, form.
7      THE WITNESS:  The latter.
8  BY MR. HUMMEL:
9  Q   The latter.  Is there any precedent for that, that you're
10  aware of, that a court has imposed a judgment for every consumer
11  who tried to cancel and couldn't using the same flow?
12      MR. AIJAZ:  Objection, outside the scope.
13      THE WITNESS:  It didn't come up in my preparation.  I
14  don't know one way or the other.
15  BY MR. HUMMEL:
16  Q   All right.  In your personal experience, ten years at the
17  FTC, has there ever been a litigating decision where it's every
18  consumer who tried to access a particular flow?
19  A   I don't know whether we have litigated decisions on that
20  particular point, but I do know that that is a position we have
21  taken and in settlements.
22  Q   I know that.
23      Okay.  Why don't we take our lunch break?  Let's go -- how
24  about 45 minutes?  Is that okay with you guys?
25      MR. AIJAZ:  That works.

Page 92

1      MR. HUMMEL:  So, it's ten to one now.  Why don't we
2  come back at 1:40?
3      MR. AIJAZ:  1:40?
4      MR. HUMMEL:  Is that okay with you?
5  (Recess taken at 12:51 p.m., and resuming at 1:48 p.m.)
6      THE VIDEOGRAPHER:  We're back on the record.  This is
7  media unit number four.  The time is 1:48 p.m.
8      EXAMINATION (Continuing)
9  BY MR. HUMMEL:
10  Q   Mr. Bandy, good afternoon.
11  A   Good afternoon.
12  Q   You understand you're still under oath?
13  A   I do.
14  Q   And you're still designee for the FTC for topics identified
15  in the notice?
16  A   Yes.
17  Q   Let's look at Exhibit 3, which is the Amended Complaint in
18  this case.  And I'll call your attention, please, to page 25,
19  which has listed count five, alleged failure to provide a simple
20  mechanism for consumers to stop recurring charges.  Do you see
21  that?
22  A   I do.
23  Q   Okay.  So, this is the ROSCA counter to the complaint
24  alleging a violation of section four of ROSCA, 15 U.S.C. 8403,
25  correct?

Page 93

24 (Pages 90 - 93)

**Page 94**

```
 1   A   Yes.
 2   Q   All right.  Do you see in paragraph 86, the complaint says,
 3   in numerous instances in connection with charging consumers for
 4   goods or services sold in transactions effected on the Internet
 5   through a negative option feature as described in paragraphs 54
 6   through 60 above.  Defendants have failed to provide simple
 7   mechanisms for a consumer to stop recurring charges for being
 8   placed the consumer's credit card, debit card, bank account or
 9   other financial account.  My question is this.  What does
10   numerous mean?  Does that mean numerous consumers can't do it?
11   A   Many, it means many, in many instances, in numerous --
12   many, lots.
13   Q   But numerous refers to consumers, not the number of
14   mechanisms?
15       MR. AIJAZ:  Objection, vague.
16       MR. HUMMEL:  Do you understand what I mean?  It just
17   says, in numerous instances.  Does that mean --
18       THE WITNESS:  Numerous defendants have failed to
19   provide a simple mechanism for a consumer to stop recurring
20   charges.
21   BY MR. HUMMEL:
22   Q   Right.  But the allegation here is that the online flow is
23   not simple, correct?
24       MR. AIJAZ:  Objection, misstates the testimony.
25       THE WITNESS:  The online -- yes, we allege that the,
```

**Page 95**

```
 1   the -- well, the online cancelation flow is not a simple
 2   mechanism.
 3   Q   Okay.  I'm going to use your phrase.  Online cancelation
 4   flow, okay.  Now, in the -- paragraph 86, it says, defendants
 5   have failed to provide simple mechanisms.  Again, referring to
 6   the online cancelation flow?  Can you tell me --
 7       MR. AIJAZ:  Objection, misstates the testimony.
 8   Sorry, I should have waited.
 9       MR. HUMMEL:  Thank you.
10   BY MR. HUMMEL:
11   Q   Can you tell me the mechanisms that Match does offer for
12   consumers to stop recurring charges?
13       MR. AIJAZ:  Objection, misstates the testimony.
14       THE WITNESS:  Again, I don't understand your question.
15   Is it referring to this paragraph or in general?
16   BY MR. HUMMEL:
17   Q   In general, what mechanisms does Match offer for consumers
18   to stop recurring charges?
19   A   So, it is my understanding that consumers can cancel their
20   Match auto-renew subscription through the online cancelation
21   flow by email, phone call to customer care, facsimile, mail and
22   online chat.  Yes.
23   Q   Is it the FTC's contention that email cancelation is not
24   simple?
```

**Page 96**

```
 1   A   It's not relevant for purposes of this count.
 2   Q   What about chat, same thing?
 3   A   Same thing.
 4   Q   Phone, same thing?
 5   A   Correct.
 6   Q   So, does this online cancelation mechanism apply only to
 7   those consumers who subscribed online?
 8   A   Yes.
 9   Q   Okay.  For purposes of the online cancelation flow, can you
10   describe what simple means?
11       MR. AIJAZ:  Objection, that's outside the scope of the
12   notice.
13       THE WITNESS:  Yes, a flow that is easy to find and
14   easy to use.
15   BY MR. HUMMEL:
16   Q   What does easy mean?
17   A   Not difficult.
18   Q   Would you agree with me that the ROSCA statute does not
19   define simple?
20   A   Yes.
21   Q   And when you say easy to find and easy to use, that is not
22   difficult.  That is for the reasonable consumer, right?
23       MR. AIJAZ:  Objection, form and calls for legal
24   conclusion.
25       THE WITNESS:  Yes.
```

**Page 97**

```
 1   BY MR. HUMMEL:
 2   Q   And you agree that ROSCA does not require an online
 3   cancelation mechanism, correct?
 4       MR. AIJAZ:  Objection, calls for legal conclusion,
 5   outside the scope of the notice.
 6       THE WITNESS:  It's not stated in the statute.  I agree
 7   with that.
 8   BY MR. HUMMEL:
 9   Q   And you would agree that Match.com offers an online method
10   to cancel subscriptions for subscribers who registered through
11   the website, correct?
12   A   There is a way for consumers who signed up online to cancel
13   online.
14   Q   Now, I want to explore some of the factors that might be
15   used to evaluate whether something is easy to use or not, or
16   easy to find, okay?
17   A   Okay.
18   Q   One would be time to completion.  Do you agree with that?
19   A   Sure.
20   Q   Okay.  And is there any objective standard against which
21   the FTC measures simplicity with respect to time of completion?
22       MR. AIJAZ:  Objection, outside the scope of the
23   notice.
24       THE WITNESS:  So, when you say objective, I just think
25   reasonable person standard.  So, it would be measured by a
```

25 (Pages 94 - 97)

1  reasonable person, their experience under the similar facts and
2  circumstances.
3  BY MR. HUMMEL:
4  Q   Okay.  So, does the FTC have in mind a maximum time that a
5  reasonable consumer or subscriber of Match.com could take to
6  cancel their subscription online?
7  A   No.
8  Q   Is that issue relevant in terms of evaluating simplicity,
9  in your view?
10       MR. AIJAZ:  Objection, form.
11       THE WITNESS:  Not really.
12 BY MR. HUMMEL:
13 Q   Okay.  What about the number of clicks it takes to complete
14 the transaction, the cancelation?
15       MR. AIJAZ:  Objection.
16       THE WITNESS:  I don't understand.
17 BY MR. HUMMEL:
18 Q   Is that issue relevant to whether or not -- the number of
19 clicks, is it relevant to whether or not a canceling mechanism
20 is simple or not?
21       MR. AIJAZ:  Objection as to scope.
22       THE WITNESS:  Could be sure.
23 BY MR. HUMMEL:
24 Q   And the question of whether or not a cancelation mechanism
25 is simple, online cancelation is simple, you'd also want to look
                                                        Page 98

1  at whether consumers can find the cancelation flow, correct?
2       MR. AIJAZ:  Objection, form and scope.
3       THE WITNESS:  Right, the first thing is easy to find,
4  right?
5  BY MR. HUMMEL:
6  Q   Easy to find?
7  A   So, if it's not easy to find, then it's not simple.
8  Q   How would you evaluate that, whether something is easy to
9  find?
10 A   I think it's an objective standard based on, you know, what
11 a reasonable consumer's experience on the website would be.
12 Q   What evidence would you look at?
13 A   We could just look at the website.
14 Q   So, facial review.
15       MR. AIJAZ:  Objection as to scope.
16       THE WITNESS:  Among other things.
17 BY MR. HUMMEL:
18 Q   What other things?
19 A   I don't know, but that's one thing you could look at.
20 Q   You could also study it, right?  You could ask a series of
21 consumers, hey, look at this website.  Where would you go to
22 find your subscription cancelation flow?
23 A   Sure, you could do that.  It's possible.
24 Q   And the FTC, to your knowledge, has not done that kind of
25 study?
                                                        Page 99

1       MR. AIJAZ:  Same objection.
2       THE WITNESS:  We have been over that repeatedly.  My
3  answer is still the same.
4  BY MR. HUMMEL:
5  Q   And whether or not the website contains -- or the
6  cancelation flow contains clear labels, understandable labels,
7  that is a factor that could be considered in determining whether
8  or not cancelation flow is simple, correct?
9       MR. AIJAZ:  Objection, vague and scope.
10       THE WITNESS:  I'm not sure what I understand -- what
11 you mean by clear labels.
12 BY MR. HUMMEL:
13 Q   Well, in the Match.com cancelation flow, I think you
14 described the steps that would be taken.  You first have to
15 click on the gear.  Then you click on "manage subscription".
16 Does the FTC contend that those links are not clear?
17       MR. AIJAZ:  Objection, misstates the testimony.
18       THE WITNESS:  I think that's more about difficulty in
19 finding the cancelation flow.  I think I'd use the term, clear
20 verbiage, clear wording.  And that -- when I said that, I was
21 more referring to things like the "before you go" language,
22 after the, you know, canceled subscription link, that that's not
23 clear.  When the "continue" button was on the save offer, that's
24 not clear.
25       Things that -- the wording that makes it ambiguous
                                                        Page 100

1  what the consumer -- like, how to cancel.  If you have consumers
2  who are, who are confused by -- if the language is confusing to
3  a reasonable consumer, then that would be a factor that would
4  make a mechanism simple.  It's essentially the cancelation
5  mechanism is something consumers can't use because it's
6  confusing.
7  BY MR. HUMMEL:
8  Q   Isn't it true that the only way to evaluate whether
9  something is confusing to a consumer is to do an empirical
10 study?
11 A   No.
12       MR. AIJAZ:  Objection, calls for legal conclusion.
13 BY MR. HUMMEL:
14 Q   Is one factor in assessing whether a cancelation flow is
15 simple or not its effectiveness?
16       MR. AIJAZ:  Objection, vague.
17       THE WITNESS:  Could be relevant.  Could be relevant.
18 BY MR. HUMMEL:
19 Q   In other words, the percentage of consumers who attempt to
20 cancel using a flow and succeed, that could be relevant?
21 A   Sure.
22 Q   What would be the -- if you know, the sort of objective
23 standard for whether or not any particular percentage of
24 effectiveness, as I just defined it, would constitute not
25 simple?
                                                        Page 101

                                            26 (Pages 98 - 101)

1  But, but I will accept your representation that this is an
2  accurate reprinting of the negative option policy statement.
3  Q   And a policy statement is not a rule, right?  It's a guide?
4      MR. AIJAZ:  Objection, calls for leading conclusion
5  outside the scope of the notice.
6      THE WITNESS:  I mean, policy statement is not a rule.
7  That's true.  I don't know whether I can -- I don't know whether
8  I would say it's a guide.  A policy statement is a policy
9  statement.
10 BY MR. HUMMEL:
11 Q   Okay.  So, are you aware of any -- if you look at page 14
12 of this enforcement policy statement regarding negative option
13 marketing, it has a section relating to cancelation.
14 A   Yes.
15 Q   And it starts, ROSCA requires negative option sellers to
16 provide a simple, reasonable means for consumers to cancel their
17 contracts.  See that?
18 A   I do.
19 Q   And this is a statement by the FTC, correct?
20 A   This is a statement by the commission.
21 Q   Right.  So, ROSCA does not in fact say, reasonable means.
22 All it says is simple, right?
23 A   I think that's right.  But, I mean, if you want to put
24 ROSCA, the statute in front of me so that I can -- yeah, I think
25 that's right.

Page 114

1  click a button, if you have to check a box to turn auto-renew
2  on, that's one click, one step.  But my understanding with Match
3  is that if you purchase a subscription, it automatically comes
4  initiated with the negative option feature.
5  Q   So, you don't consider the registration mechanism as part
6  of the subscription process?
7  A   No.
8  Q   I'm correct that you don't.  I don't want to do a double
9  negative again.
10     MR. AIJAZ:  Objection.
11     THE WITNESS:  So, why don't you ask the question
12 again?
13 BY MR. HUMMEL:
14 Q   Am I correct that the FTC doesn't consider the registration
15 process to be part of the subscription process for the negative
16 option?
17     MR. AIJAZ:  Objection, misstates the exhibit.
18     THE WITNESS:  You are correct.
19 BY MR. HUMMEL:
20 Q   Okay.  And then it says, going on, on page 14, for example,
21 to ensure compliance with the simple cancelation mechanism
22 requirement, negative option sellers should not subject
23 consumers to new offers or similar attempts to save a negative
24 option arrangement that impose unreasonable delays on consumers'
25 cancelation efforts.  Do you see that?

Page 116

1  Q   Then the FTC writes, in connection with its policy
2  statement, to meet this standard, negative option sellers should
3  provide cancelation mechanisms that are at least as easy to use
4  as the method the consumer used to initiate the negative option
5  feature.  Do you see that?
6  A   I do see that.
7  Q   Has the FTC analyzed whether the subscription mechanism to
8  subscribe to Match.com is easier or more difficult than the
9  cancelation mechanism?
10 A   Oh, it's much easier.
11 Q   Subscribing?
12 A   Yes.
13 Q   How many clicks does it take to subscribe?
14 A   Zero.
15 Q   Have you logged into Match.com and tried to sign up?
16 A   My understanding is when you sign up for a Match.com
17 account, if you choose to purchase a subscription, you have to
18 buy it with the negative option.  You can't not buy it without
19 it.  So, it's a zero click.  You buy a subscription, it comes
20 with the negative option.
21 Q   But that's not signing up.  You have to sign up for
22 Match.com.
23 A   It says, used to initiate the negative option feature.  So,
24 if you have a website where you can purchase one month but not
25 have AR on, auto-renew on, then you can maybe -- if you have to

Page 115

1  A   I do.
2  Q   And then, important footnote, while requests to consider an
3  offer or discount would not amount to unreasonable delay,
4  multiple requests for a consumer to listen to additional offers,
5  lengthy pitches or ignoring a consumer's request to decline
6  further offers could amount to an unreasonable delay.  Is it the
7  FTC's contention in this case that Match's surveys and save
8  offers constitute unreasonable delay?
9      MR. AIJAZ:  Objection, relevancy.
10     THE WITNESS:  Yes.
11 BY MR. HUMMEL:
12 Q   Do you know the average time that it takes for a consumer
13 to answer the survey or respond affirmatively or negatively to
14 the same offer?
15     MR. AIJAZ:  Objection, asked and answered.
16     THE WITNESS:  No.
17 BY MR. HUMMEL:
18 Q   So, what does unreasonable delay mean?
19 A   I mean, in this context, I'd say unnecessary.
20     MR. AIJAZ:  Objection, outside the scope of the
21 notice.
22 BY MR. HUMMEL:
23 Q   And it says, in addition -- I'm going up in the page again.
24 In addition, negative option sellers should provide their
25 cancelation mechanisms at least through the same medium, such as

Page 117

30 (Pages 114 - 117)

1 website or mobile application the consumer used to consent to
2 the negative option feature. Match.com does that, correct?
3 A   Yes, the online cancelation flow satisfies this.
4 Q   Right. And then it says, the negative option seller should
5 provide, at a minimum, the simple mechanism over the same
6 website or web-based application the consumer used to purchase
7 the negative option feature. Match.com complies with that
8 guidance too, correct?
9        MR. AIJAZ: Objection as to form.
10        THE WITNESS: For website, yes. I thought there was
11 some time period where consumers could only cancel on desktop,
12 but I could never quite figure all the details out of that. But
13 I think that's no longer the case. I think people can cancel on
14 a mobile browser now. Yeah, because that -- yeah, I think
15 that's right. So, subject to that, I think the answer is, yes.
16 BY MR. HUMMEL:
17 Q   To your knowledge, has the FTC ever litigated a case to
18 judgment in which it applied any specific standard for
19 simplicity?
20        MR. AIJAZ: Objection, scope and relevance.
21        THE WITNESS: I can't think of any litigated to
22 judgment.
23 BY MR. HUMMEL:
24 Q   Given the -- your view, your statement of what the FTC
25 believes is the subscription mechanism for the negative option

Page 118

1        MR. HUMMEL: I want to apologize. I just had a rapid
2 onset stomach problem and I don't think I can continue
3 physically. I literally need to be somewhere else. So, I would
4 request that the FCC agrees to adjourn, continue at a mutually
5 convenient date and time and I'll make it convenient for the
6 FTC. But I don't want anyone in the room to get this and I want
7 to do it effectively.
8        MR. TEPFER: Of course. Well, Chad, I was going to
9 say, I'm really sorry to hear you're not feeling well. I hope
10 you get better soon.
11        We're happy to suspend the deposition for today. I
12 just want to ask if we can get into agreement just because
13 Bikram spent so long preparing. He doesn't work on this all the
14 time, so his memory will fade. If we could reconvene within a
15 week and get the parties to do this over Zoom perhaps, as a Zoom
16 deposition, you know, we would appreciate agreement on that.
17 But I certainly understand, given your situation, you're not
18 able to continue.
19        MR. HUMMEL: No, I'm fine with that and I hope to be
20 able to reconvene as soon as I can fly back to L.A. and we can
21 do it by Zoom. I'm fine with that.
22        MR. AIJAZ: Okay.
23        MR. HUMMEL: I need client approval for that, but I
24 assume you're okay with it. Jeanette's okay with it too.
25        So, let's recess the deposition. Let's plan to do it,

Page 120

1 feature of the Match.com website, would anything other than a
2 single click to un-subscribe violate the negative option policy?
3        MR. AIJAZ: Objection as to scope and form.
4        THE WITNESS: Well, it depends. Like, in general or
5 as it relates to Match?
6        MR. HUMMEL: As it relates to -- in general?
7        THE WITNESS: Well, no. If you had a, if you had a
8 method that required many steps to initiate the negative option
9 feature, then the cancelation mechanism would be evaluated
10 against that for purposes of this statement.
11 BY MR. HUMMEL:
12 Q   To your knowledge, has the FTC ever promulgated any other
13 guidance than the negative option guidance that defines what
14 simple means for online cancelation mechanisms?
15        MR. AIJAZ: Objection, as to scope.
16        THE WITNESS: I don't think so, but I'm not certain.
17        MR. HUMMEL: Can we take a five-minute break and go
18 off the record?
19        THE WITNESS: All right.
20        THE VIDEOGRAPHER: We're going off the record. This
21 is media unit number four. The time is 2:24 p.m.
22        (Recess from 2:24 p.m. to 2:48 p.m.)
23        THE VIDEOGRAPHER: Back on the record. Beginning
24 media unit five. The time is 2:48 p.m.
25        EXAMINATION (Continuing)

Page 119

1 you know, Thursday or Friday of this week if you're available at
2 a reasonably convenient time. I don't think I have more than
3 two and a half hours left. Don't hold me to that because it
4 depends on the length of answers, but I'm about halfway done.
5        MR. AIJAZ: I mean, obviously as long as the lapse
6 time is still going to continue counting, it's the same
7 deposition. And I think it makes sense for you to tell us, you
8 know, when you get home, get some rest or whatever, when you'd
9 be ready. I think that makes the most sense.
10        MR. HUMMEL: Yeah.
11        THE WITNESS: So, Thursday and Friday are pretty good
12 for me right now. So, the sooner, the sooner that we can get it
13 on the calendar, the more gooder [ph] it will remain.
14        MR. HUMMEL: That's a good way to put it. Let's stop
15 there. Let's go off the record.
16        THE VIDEOGRAPHER: We're off the record at 2:50 p.m.
17 and this concludes this testimony given by Mr. Bandy.
18        (The matter concluded at 2:50 p.m.)
19
20
21
22
23
24
25

Page 121

31 (Pages 118 - 121)

APP 007

CERTIFICATE OF COURT REPORTER

1
2      I, Linda C. Marshall, certify that the foregoing is a
3   correct transcript from the record of proceedings in the
4   above-entitled matter.
5
6
7
8      Linda C. Marshall, RPR
       Official Court Reporter
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 122

---

1  Federal Trade Commission v. Match Group, Inc., Et Al.
2  Bikram Bandy 5535418
3          ACKNOWLEDGEMENT OF DEPONENT
4      I, Bikram Bandy, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  Bikram Bandy               Date
13  *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15      _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

Page 124

---

1  Federal Trade Commission v. Match Group, Inc., Et Al.
2  Bikram Bandy Job No. 5535418
3          E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Bikram Bandy               Date
25

Page 123

---

1  maijaz@ftc.gov
2              November 10, 2022
3  Federal Trade Commission v. Match Group, Inc., Et Al.
4  DEPOSITION OF: Bikram Bandy 5535418
5      The above-referenced witness transcript is
6  available for read and sign.
7      Within the applicable timeframe, the witness
8  should read the testimony to verify its accuracy. If
9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11      The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14      According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18          Yours,
19          Veritext Legal Solutions
20
21
22
23
24
25

Page 125

---

32 (Pages 122 - 125)

APP 008

# EXHIBIT B

APP 009

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF TEXAS
 3                    DALLAS DIVISION
 4  FEDERAL TRADE COMMISSION,    )
                                 )
 5            Plaintiff,         )
                                 )
 6      v.                       )  Case No.
                                 )  3:19-cv-02281-K
 7  MATCH GROUP, INC., a         )
    corporation, and MATCH       )
 8  GROUP, LLC, formerly known   )
    as MATCH.COM, LLC, a         )
 9  limited liability company,   )
                                 )
10            Defendants.        )
11
12  ***********************************************
13                  ORAL DEPOSITION OF
14                  KRISTINA AUDERER
15                  NOVEMBER 18, 2022
16  ***********************************************
17
18      On the 18th day of November, 2022, at 9:22 a.m.,
19  the oral deposition of the above-named witness was
20  taken at the instance of the Plaintiff, before
21  Michelle L. Munroe, Certified Shorthand Reporter in
22  and for the State of Texas, at the Hampton Inn &
23  Suites, 2813 E. President George Bush Highway, Plano,
24  Texas, pursuant to Notice and the agreement
25  hereinafter set forth.
```

Page 1

1    Q.   Just ask if you can confirm that that's
2 the subpoena that you received.
3    A.   Yes.
4    Q.   Okay.  Great.
5         MR. HUMMEL:  Did we mark it as an
6 exhibit number, Counsel?
7         MR. MOON:  A.
8         MR. HUMMEL:  A?
9         MR. MOON:  Wait, it shouldn't be A.
10 I'm sorry.  We're doing numbers.  My mistake.
11 Exhibit 1.
12        MR. HUMMEL:  Let's go off the record
13 for a second.
14        (Off-the-record discussion.)
15        (Exhibit 1 marked.)
16   Q.   Have you ever given a deposition before,
17 Ms. Auderer?
18   A.   No.
19   Q.   And let me tell you a few things that will
20 kind of help move things along today.  I do think it
21 will take most of the day today for your deposition.
22 We'll try to take breaks every hour.  If you feel
23 like you need a break other than once an hour,
24 please let me know, and I'll be happy to accommodate
25 that.

Page 6

1         We're going to take about an hour-long
2 lunch break.  Mr. Hummel has a function that he
3 needs to attend, and so we're going to try to do
4 that.
5         So if we do take a break, especially an
6 unscheduled break, there may be a question on the
7 table for you.  And I would like for you to just
8 answer the question and then you can have a break.
9    A.   Okay.
10   Q.   Is that agreeable?
11   A.   Yes.
12   Q.   Okay.  From time to time, the lawyers are
13 going to make an objection.  It's for the record.
14 There's not going to be a Court here.  There may be
15 some discussion between counsel.  The proper thing
16 to do there is just kind of let us say our piece and
17 then go ahead and answer the question.  At that
18 point, if you need me to repeat myself, I'll be
19 happy to do so.
20        It's very important to me that you
21 understand what I'm asking you.  And so if at any
22 point I ask you a question that you don't think you
23 understand, please let me know and I'll be happy to
24 repeat it or rephrase it for you.
25        Is that agreeable?

Page 7

1    A.   Yes.
2    Q.   Okay.  It's important for the purposes of
3 keeping a clean record that we try to, first of all,
4 keep our answers verbal instead of shaking or
5 nodding, so you're doing good so far.
6    A.   Okay.
7    Q.   That's something that trips people up.
8 It's helpful to help our court reporter get a good
9 record.
10        And then the other thing we need to try to
11 do is try not to talk over one another.  So I'm
12 going to work really hard to make sure that I let
13 you finish your answer before I interrupt with a
14 question and vice versa.
15   A.   Okay.
16   Q.   Is that agreeable?
17   A.   Yes.
18   Q.   Okay.  So my understanding is that you
19 previously worked for Match.com; is that correct?
20   A.   Yes.
21   Q.   Can you tell me over what time period you
22 worked for Match?
23   A.   2005 -- August 2005 until October 2016.
24   Q.   Okay.  It's my understanding that there
25 are several different corporate entities that are

Page 8

1 under the Match Group umbrella.
2         Do you know which corporate entity you
3 actually worked for?
4    A.   Match.com and -- it was Match.com at that
5 point.  And also that was my main role, but I was
6 technically over Chemistry and People Media.  And I
7 believe that's it.
8    Q.   Okay.  Those are other dating platforms?
9    A.   Yes.
10   Q.   Okay.  And you said Match.com.
11        Is there a corporate entity called
12 Match.com, LLC?
13   A.   There may have been at that point.  I know
14 it changed to Match Group maybe around that time
15 that I was there.  So...
16   Q.   That was going to be my next question.  It
17 was my understanding that there was an entity called
18 Match.com, LLC, that subsequently changed its name
19 to Match Group, LLC.
20   A.   Yes, sir.
21   Q.   Is that correct?
22   A.   Yes.
23   Q.   And is that the entity that you worked
24 for?
25   A.   Yes.

Page 9

3 (Pages 6 - 9)

1   Q.  Okay.  Did you ever work for any other
2  corporate entity within the Match framework?
3   A.  Can you clarify "corporate entity"?
4   Q.  Another -- like another incorporated or
5  another LLC.
6   A.  No.  Just -- the other sites were People
7  Media and Chemistry.com.
8   Q.  Okay.  Are those companies or are you
9  referring to just the platform?
10   A.  They are -- yes, just websites.
11   Q.  Do you know if those websites were run by
12  separate companies other than Match Group, LLC?
13   A.  They were not.
14   Q.  And the actual salary that you were paid,
15  were for you actually paid by Match.com, LLC?
16   A.  Yes.
17   Q.  Okay.  Go ahead.
18   A.  Actually, they were under the IAC umbrella
19  at one point.  I believe when they went public at a
20  certain point in time, then it maybe moved over to
21  being known as Match or Match Group.  I'm not
22  exactly sure of the timeline.
23   Q.  Okay.
24   A.  It's possible maybe my check said IAC.
25   Q.  Okay.  And I'm glad you brought that up.

Page 10

1  Just to clarify, for the purposes of my questions
2  today, I'm going to be focusing primarily on the
3  2013 time frame going forward.
4   A.  Okay.
5   Q.  So during that time period, do you think
6  you paid by Match Group, LLC?
7   A.  I believe so.
8       MR. HUMMEL:  Counsel, sorry to
9  interrupt.  We have a lawyer who wants to be allowed
10  into the Zoom.
11       MR. MOON:  I would like to get the
12  names of anybody that attends remotely also.  Does
13  she have the ability to announce who she is?
14       MR. HUMMEL:  I can do it.  Jeanette
15  Teckman has joined by Zoom.  She's in-house counsel
16  at Match.
17       MR. MOON:  Great.
18   Q.  So did you and your fellow employees ever
19  use the term "Match Group" amongst each other when
20  you were talking about company business?
21   A.  I don't recall.
22   Q.  Okay.  I'm trying to understand -- so, for
23  example, in an email if you guys are talking about
24  Match Group, I'm trying to figure out if you're
25  talking about Match Group, LLC, or you're talking

Page 11

1  about Match Group, Inc.
2       Do you know if -- can you make that
3  distinction?
4       MR. HUMMEL:  Foundation, vague.
5   Q.  You can answer.
6   A.  Primarily I would have -- anything I
7  referred to would have been just Match.com, the
8  website, whatever that may have been considered as a
9  company.  At that time, my interaction with any of
10  the other pieces of Match Group would have been very
11  small, maybe less than 5 percent of my time.
12   Q.  Okay.  I'm just trying to understand,
13  like, if -- that's okay.  We're going to get into
14  some emails that might clarify this.
15       Focusing on the 2013 to 2016 time frame,
16  can you give us just a brief overview of what your
17  job responsibilities were for Match?
18   A.  I can try to.  It has been a while, so the
19  time frames may not be exact, but I can try to
20  answer that.
21       I believe at that point I would have been
22  director of customer care operations.  I possibly
23  could have been a senior manager and then, you know,
24  ready to be promoted into that, but it would have
25  been either one of those two roles.

Page 12

1   Q.  Okay.  Is there a difference between those
2  two in terms of the responsibilities?
3   A.  Yes.  The director probably has more
4  responsibility, I would say.  It's considered a
5  promotion.  It would entail a lot of the same work
6  as the senior manager but then also other
7  responsibilities.  But at the same time, the
8  director could have senior managers reporting to
9  them, so some of the work might be delegated.  I'm
10  not sure how to better explain it.
11   Q.  That's okay.  I think that will work.
12       Both of those titles, would that primarily
13  be involved with interacting with Match customers
14  and handling complaints, that sort of thing?
15   A.  Yes.
16   Q.  Okay.  Who did you report to within the
17  company?
18   A.  At different times, different people.
19  Around 2013, is that the time frame you want me to
20  speak about?
21   Q.  Right.
22   A.  I probably had three different people I
23  reported to between 2013 and the time that I left in
24  2016.  Starting in 2013, it was probably, around
25  that time frame, Michele Watson.

Page 13

4 (Pages 10 - 13)

1    Q.   What was Ms. Watson's title?
2    A.   She was -- and a lot of people that I
3  worked with had a lot of different roles and
4  promotions and different things over different
5  times, so it's a lot to remember.
6         She at that point would have probably been
7  either senior director of customer care or she may
8  have been promoted to VP at that point.  I believe
9  she was at a VP level when she left.
10   Q.   Okay.  Would it be easier to talk -- so I
11 guess there's also other people we're about to talk
12 about.
13        Would it be easier to talk in terms of
14 function versus title or would that help at all?
15   A.   They basically all had a very similar
16 function.  It was just, you know, people that came
17 and went.
18   Q.   Uh-huh.
19   A.   It wasn't anything to do with my job
20 changing or different departments or anything like
21 that.
22   Q.   Okay.  So Michele Watson.  And who else,
23 in order?
24   A.   When she left -- and I don't know the, you
25 know, exact time frame -- Adrian Ong.

Page 14

1  things.  So that would have been the major purpose
2  of that.
3    Q.   What was the relationship between
4  Mr. Galeraud's company Meetic Corp. and Match --
5  Match Group, LLC, if you know?
6    A.   Can you clarify what you...
7    Q.   Was he -- was Meetic, is that a separate
8  company from Match Group, LLC?
9    A.   There was Match International at one point
10 that encompassed different countries and just a
11 Match.com site for that particular country.  And I
12 don't know if it was considered, you know, Match
13 Group or LLC.
14        Meetic was, I believe, maybe a site or
15 company that Match bought, so we were still kind of
16 all considered Match -- anything that they -- emails
17 they responded to or anything like that, I believe,
18 would be, you know, considered Match.  It wouldn't
19 be referred to as -- nothing I did was ever referred
20 to as Meetic, if that makes sense.
21   Q.   I think so.
22        So -- and so you mentioned a couple of
23 platforms; Chemistry, People Media.  We have talked
24 about Meetic.
25        Are there any other platforms that you --

Page 16

1    Q.   Okay.  And do you -- I hesitate to ask you
2  this, but do you know what his title was?
3    A.   Well, he was, I believe, VP over customer
4  care, and then billing and fraud were also combined
5  into his role at that time.
6    Q.   Okay.  And then who else?
7    A.   Vincent Galeraud.  He worked for Meetic.
8  And at that point, we kind of became a global
9  customer care department.  I don't know.  And he was
10 managing some international pieces as well as my
11 team, but I was still just North America.  I had the
12 same position.
13   Q.   Was there a reconsolidation of those
14 departments at one point so you kind of centralized
15 your customer care function?
16   A.   Yes.
17   Q.   Can you explain how that worked?
18   A.   I believe it was after the company went
19 public.  And in order to utilize the resources best
20 as far as call centers and things of that nature, we
21 ended up partnering or kind of consolidating with
22 some international sites.  And like I mentioned,
23 Chemistry and People Media were part of that --
24   Q.   Okay.
25   A.   -- and shared call center resources and

Page 15

1  let me back up.
2         So you guys -- your organization provided
3  customer support for Chemistry and for People Media?
4    A.   Yes.
5    Q.   Any other platforms?
6    A.   I feel like there was one but I can't
7  remember the name.
8    Q.   Okay.  Plenty of Fish?
9    A.   They did buy Plenty of Fish, but
10 nothing -- I don't know if you want me to give
11 additional information when I answer.  I'm trying
12 not to be verbose.
13   Q.   No, go ahead, please.
14   A.   Nothing at -- we didn't include any of
15 their customer care or do anything with that.  What
16 I worked with was the core group of Match, People
17 Media, Chemistry.  Like I said, I believe there was
18 one other site.  I didn't interact with
19 International.
20        Plenty of Fish, Tinder, OkCupid were other
21 sites that Match either obtained some way or were
22 sort of under their umbrella, but those were not in
23 the customer support group that I was in.  They had
24 their own employees.
25   Q.   OkCupid and Tinder were not under your

Page 17

5 (Pages 14 - 17)

1 that I remember working in that department.
2         Jennifer did move to another department,
3 so I believe during -- some point during the 2013 to
4 2016. But I know in the course of time that she and
5 I both worked there, this whole 12-year period, that
6 she did manage that and would be very knowledgeable
7 in all of those kinds of policies. I mean, I
8 remember even the person before her, but that's not
9 going to be -- it's going to be going way back.
10   Q.   What department are we talking about?
11   A.   Billing.
12   Q.   Okay. Now, if -- did your department,
13 customer care, ever receive complaints that were
14 specifically related to charge-backs?
15   A.   Meaning someone complaining about their
16 account and it had a charge-back on it or -- I'm not
17 sure what kind of complaint.
18   Q.   Well, people actually referencing
19 charge-backs in their complaints.
20   A.   Yes.
21   Q.   Would that be handled by your
22 department or would that be funneled out to somebody
23 else?
24   A.   It would probably have to be a joint
25 effort to try to determine what happened.

Page 142

1   Q.   Okay. So if a complaint came to you as we
2 were just talking about where the customer had
3 referenced a problem with charge-backs, is that
4 something that would be handled over email or
5 personal discussion?
6   A.   Meaning between the employees that were
7 going to work on it or with the customer?
8   Q.   With the customer.
9   A.   It could happen in a variety of ways.
10 Typically I would say email was the go-to for a lot
11 of things versus -- it was just less time consuming
12 than trying to call and make sure someone was
13 available. So generally I would say it could be
14 handled via email.
15   Q.   Do you remember ever receiving any
16 complaints in your department specifically on the
17 issue of users complaining that their account had
18 been blocked because there was -- when there was a
19 charge-back on it?
20   A.   I couldn't pinpoint specifics, but I know
21 that, you know, sometimes people do a charge-back if
22 they see a charge that they don't recognize, maybe be
23 the first time that they're auto renewed or
24 something and, you know, will just call their bank.
25         Or maybe, like, any other kind of

Page 143

1 situation where they see some charge and think that
2 that was not -- they should not have been billed,
3 they will, you know, may contact Match or their bank
4 first, one or the other, and then contact the other
5 one.
6         So it can get kind of tangled up as far
7 as, you know, your bank initiates a charge-back and
8 maybe they give you a temporary credit and, you
9 know, the company you're disputing with may block
10 you or do -- there may be something that happens
11 while those two are trying to resolve the situation,
12 the bank and Match, saying who is going to take the
13 hit for this or what are we going to do with it.
14   Q.   Right. Like, if you're considering giving
15 a refund, you would have to take into consideration
16 whether there's a charge-back and that sort of
17 stuff?
18   A.   Well, meaning more, like, maybe someone
19 claimed it was fraud and so they just contacted
20 their bank, I don't know what this charge is. And
21 then -- I don't remember exactly the processes, but
22 I know that it would be possible to talk to that
23 person in between and say, okay, well, this was your
24 Match.com charge. Oh my gosh, I'm so sorry. You
25 know, that kind of thing could happen.

Page 144

1         I don't remember any specific examples,
2 but I would say that kind of thing wasn't uncommon.
3   Q.   Okay. I'm going to go back to the issue a
4 little bit to talk about -- remember at the very
5 beginning we talked about Match Group, Inc., versus
6 Match Group, LLC?
7   A.   Yes.
8   Q.   I'm going to revisit that issue a little
9 bit for a few minutes.
10         You testified earlier that you worked for
11 Match.com, LLC, that subsequently became Match
12 Group, LLC, right?
13   A.   Yes. I may have worked for IAC, Match,
14 LLC, and Match Group in the course of the 11 years.
15 I don't really know.
16   Q.   Okay. Did you ever work specifically for
17 Match Group, Inc., to your knowledge?
18   A.   Nothing would have appeared different to
19 me that I'm aware of whether it was Match.com, LLC,
20 or Match Group. I don't know if that was just a
21 renaming, if that was something -- I feel like it's
22 when they went public, some things changed and they
23 took on some other sites and made this group of
24 sites.
25         But I don't -- I couldn't even tell you.

Page 145

37 (Pages 142 - 145)

1 I mean, I could go back and look at records or
2 something, my paycheck maybe, but I don't have a way
3 to -- it was never any different to me than to just
4 say I worked for Match.com.
5    Q.  Okay.  So I'm going to ask you some
6 questions, and what I'm trying -- I'm trying to
7 distinguish between employees who worked for Match
8 Group, Inc., versus employees that worked for Match
9 Group, LLC.
10      Is that something that you have a concept
11 of in your mind that there are employees who worked
12 for the Inc. and not the LLC?
13    A.  My understanding would be anybody who
14 worked for the LLC would be -- if we changed this
15 naming or, you know, this -- Match took on other
16 stuff, that would still be a part of it.  So you
17 would -- there would be no Match.com, LLC, separate
18 from this whole, like, Match Group thing.
19      It would have been something that was
20 already there and then there was Match Group.  They
21 wouldn't co-exist, to my knowledge, at the same time
22 unless Match Group didn't include Match.com, which
23 is very odd because the name is Match.  So I feel
24 like that would be the core company.
25      MR. HUMMEL:  I'm going to move to

Page 146

1 strike as speculative and no foundation and calls for
2 a legal conclusion.  You can try to lay a foundation;
3 but otherwise, I'll have a standing objection that
4 this -- given that answer, there's no foundation for
5 any of this.
6    Q.  Do you know if you had any interactions
7 with people who worked for Match Group, Inc., and
8 not Match.com, LLC?
9      MR. HUMMEL:  Same objections.
10    A.  I don't know that I'm going to be able to
11 help based on me not really remembering or ever
12 being aware of or understanding a difference in the
13 two.
14    Q.  Okay.  Did you know a person named Greg
15 Blatt when you worked at Match?
16    A.  Yes, I know who he is.
17    Q.  Was he there when you were there?
18    A.  Part of the time, yeah.
19    Q.  Do you remember when he started with
20 Match?
21    A.  No.
22    Q.  Okay.  And did you have any interactions
23 with Greg Blatt during the course of your work while
24 you were there?
25    A.  Not that I can remember other than maybe

Page 147

1 saying "hi" or something in the hall or at a company
2 function, but no conversations beyond that that I
3 would really recall.
4    Q.  Okay.  Did you ever see Mr. Blatt around
5 the office in Dallas?
6    A.  Yes.
7    Q.  Did you sometimes receive what you guys
8 refer to as executive-level escalations, complaints
9 that came in that had originated with a higher level
10 executive?
11    A.  Yes.
12    Q.  What is -- is that a term you guys use,
13 executive-level escalation?
14    A.  I mean, I don't know that there was an
15 official term for it, but, yes, anything that was
16 maybe from, like, a president, CEO, anybody that
17 was, like, an executive-level employee.  It could
18 go -- yeah.  Yes.
19    Q.  Okay.  Let me show you some examples and
20 we'll talk about them.
21    A.  Okay.
22    Q.  I'm going to show you what has been marked
23 as Exhibit 18.
24      (Exhibit 18 marked.)
25    A.  (Reviewed document.)

Page 148

1    Q.  Again, this is a super long thread, so
2 take your time to read it, but I'm going to be
3 focusing on the last couple of exchanges.
4    A.  Okay.  I mean, I have the gist of it
5 without reading the entire customer email, which was
6 the longest part.  Okay.
7    Q.  Okay.  So I want to -- let's look at the
8 exchange on 661137, January 10, 2013, where you are
9 emailing Michele Watson.
10    A.  Okay.
11    Q.  And it states, Thanks, Michele.  Just want
12 to clarify, are these guidelines only for
13 executive-level escalations or for all issues that
14 get to CCS.
15      Did I read that correctly?
16    A.  Yes.
17    Q.  Okay.  So you're using the "term
18 executive-level escalation" there, right?
19    A.  Yes.
20    Q.  And so what do you mean when you use that
21 term?
22    A.  I don't know if you need to know what the
23 CCS is in context of this, but that would have been
24 that customer care specialist group that reported up
25 through the people that reported to me.

Page 149

38 (Pages 146 - 149)

1  Q.  Okay.
2  A.  They would handle a variety of escalations
3  from, you know, people that called the call center
4  multiple times or somehow got escalated from there
5  as well as things like this where someone emails an
6  old email address or they guess an executive's email
7  address or somehow they get through to them, and,
8  you know, it would go through the chain.  It looks
9  like this went to my boss and then to me.
10  Q.  Okay.  Who was your boss at this point?
11  A.  Michele Watson.
12  Q.  Okay.  So this was a customer complaint
13  that -- let's see, on page 661143, a person by the
14  name Victoria V. is emailing a complaint to several
15  people there, right?
16  A.  It looks like she has tried to guess Mandy
17  Ginsberg's email address because she has
18  MandyGinsberg@match.com, MGinsberg, M.Ginsberg,
19  Mandy.Ginsberg.  So it appears she was trying to
20  contact Mandy.
21  Q.  She also does that with Mr. Blatt too?
22  A.  Oh, I'm sorry, yes, there's another
23  section down here where it was forwarded where she
24  did the same thing with Greg Blatt as well as trying
25  some different email addresses, ceo@iac and various

1  things like that.
2  Q.  So were there special procedures for
3  different from normal complaint-handling procedures
4  for executive escalations?
5  A.  Yeah, I would say it was rare that things
6  really got in an executive's hands.  So typically
7  those are just considered more sensitive or would
8  maybe want to be handled on a more individual basis
9  taking into account the entire history of the
10  customer and not just a strict policy that a
11  frontline agent might use.
12  Q.  Okay.  So how would those -- how would
13  those type complaints typically be routed through
14  the organization?
15      MR. HUMMEL:  Objection; vague,
16  overbroad.
17  A.  So complaints similar to this one that --
18  whether it got to Greg or Mandy or whoever at that
19  type of level, they would usually send it to the,
20  like, VP of customer care, which was Michele.  I
21  reported to her, so she sent it to me.
22      And one of my employees, we were looking
23  at it because that would be our job to, you know,
24  dig in and do the research about somebody specific,
25  not necessarily, like, a VP's job.  So she was

1  putting it in our hands to go get the specific
2  information and relay that to her of what happened.
3      And also how the CCS team, how the
4  agents -- the escalation agents you could call them,
5  their handling of it too in case there was a quality
6  issue or an agent mishandling or anything like that.
7  Q.  If they had had actual contact with a
8  frontline agent?
9  A.  Sometimes, yeah, someone would, and then
10  they would go ahead and not like what happened there
11  and then escalate or attempt to escalate to, you
12  know, a CEO or someone.
13  Q.  Okay.  And then if executive-level
14  escalation came to you, would you -- what was your
15  normal practice in terms of responding or -- not to
16  the customer but within the organization?  Would you
17  report back afterwards?
18  A.  Yes, definitely if I got something from --
19  you know, that generated from an executive level, I
20  would at least tell my boss, in this case, Michele,
21  what ended up happening or what I proposed.  There
22  might be cases where they said don't do anything yet
23  but let me know, you know, what is the status of
24  their account.
25      So I, you know, feel that I would always

1  follow up with wherever I got the escalation from,
2  so in this case, Michele.
3  Q.  Okay.  So then I want to look at your part
4  of the email chain, January 10, 2013, 3:52 p.m.,
5  where you're responding to Michele Watson.
6      Do you see where we are on the first page
7  there?
8  A.  Okay.  I wasn't on the first page.  Yes,
9  3:52 p.m. on January 10th?
10  Q.  Yes.
11  A.  Okay.
12  Q.  I want to focus on the sentence, We just
13  asked for some guidelines on how you wanted us to
14  handle the corporate-level escalations (to
15  Mandy/Greg/et cetera) since you disagree with their
16  judgment on a few recently.
17      Do you remember what you were referring to
18  there on disagreeing with their judgment?
19  A.  Yes.  I believe that -- from the context
20  of this email and, you know, remembering the team
21  that worked for me, this is something that looks
22  like either they would have handled something and
23  then it got escalated or maybe it got, you know,
24  escalated down, and maybe, you know, Michele could
25  have assigned it to them to work, you know.  It

1     And I probably mentioned that, yes, there
2  were documents and that, yes, I did remember more
3  from seeing those documents than I would have just
4  off the top of my head.
5     Q.  Sure.
6     And the FTC lawyers selected the documents
7  that they showed you; is that right?
8     A.  Yes.
9        MR. MOON:  Objection; speculation.
10    Q.  Well, is that what happened?
11    A.  I didn't select them.
12    Q.  Right.
13    A.  That's all I know.
14    Q.  And I didn't select them.  I wasn't on the
15 call.
16    A.  That's all I know.
17    Q.  So it's fair to assume, is it not, and
18 beyond speculative that the FTC lawyers selected the
19 documents they showed you?
20    A.  The documents were provided to me by the
21 FTC on the call that we -- that is in question.
22    Q.  Was there a screen share Zoom or
23 something?  How did you have the documents?
24    A.  Yes, there was a Zoom.
25    Q.  And a screen share?

Page 178

1     A.  Screen share during the Zoom, correct.
2     Q.  Okay.  At that point, did you have the
3  hard copy documents?
4     A.  No, sir.
5     Q.  Did you later get hard copy documents?
6     A.  No.
7     Q.  Okay.  So you never got a set of
8  documents?
9     A.  I got access to some documents online.  I
10 didn't have hard copies.
11    Q.  How was that done?
12    A.  Through an FTP.
13    Q.  Share site?
14    A.  Something like that where it's protected
15 and you click a link and you can access some things.
16 I don't know if share site would be the -- it's --
17 yeah.
18    Q.  Did you download them or did you look at
19 them online?
20    A.  I did not.  I just looked at them online.
21    Q.  Okay.  So I'm looking at your LinkedIn
22 profile.  I just want to ask you some questions
23 about that.
24    You were at Match.com 11 years, 3 months,
25 right?

Page 179

1     A.  That sounds accurate.
2     Q.  You started out as a manager in
3  operations; is that right?
4     A.  I started out -- I don't know far LinkedIn
5  goes back on work history.
6     Q.  2008.
7     A.  I started there in 2005.
8     Q.  Okay.  In 2008 to August 2010, you were
9  what's called a manager in operations.  And it says
10 you directed recurring in-person CSR focus groups to
11 identify unique opportunities for improving the
12 customer experience.
13    Does that sound right?
14    A.  That sounds right.
15    Q.  And then you were apparently promoted in
16 August of 2010 to senior manager operations; is that
17 right?
18    A.  That sounds right.
19    Q.  You had that job for a year and seven
20 months.  And in that job, it says you, quote,
21 Implemented live chat in-house, earned highest
22 customer satisfaction rate in any channel at greater
23 than 85 percent.
24    What does that mean?
25    A.  The live chat was -- I don't know how to

Page 180

1  describe it other than it's a chat back and forth.
2  Lots of companies have a live chat, help us.
3  There's a bubble or something and you can chat with
4  an agent.
5     In-house meant in the corporate office
6  where I worked.  At that point, it was not -- agents
7  and call centers weren't doing it.  It was in our
8  office.
9     And by -- trying to answer all the parts
10 of your question, regarding the customer
11 satisfaction of highest channel was chat
12 outperformed the satisfaction rates from phone or
13 email.
14    Q.  Got it.
15    And after you were a senior manager of
16 operations, you became from February 2012 through
17 October 2016, the rest of your time at Match,
18 director customer care?
19    A.  That sounds right.
20    Q.  Okay.  And it says you led customer care
21 for Match; is that true?
22    A.  I guess the word "led" could be vague, but
23 I was the director of that department.
24    Q.  Okay.  So at no time during this period of
25 time from 2008 through 2016 were you involved on a

Page 181

1 product team, right?
2    A.  I interfaced with them, I would say,
3 regularly.
4    Q.  But my point is you weren't on the product
5 team?
6    A.  No, sir.
7    Q.  You didn't develop the website, correct?
8    A.  No.
9    Q.  You didn't design the website, correct?
10    A.  No.
11    Q.  You didn't do studies into user
12 experiences on the website, correct?
13    A.  Correct.
14    Q.  And nor were you on the fraud team or the
15 antifraud team, correct?
16    A.  When I started, I was an escalation fraud
17 agent.  The teams kind of morphed over time, so it
18 wasn't maybe the exact same team that handled fraud
19 when I left.
20        I'm trying to think of -- as it grew,
21 things branched off, and so fraud kind of became its
22 own piece that wasn't in customer care anymore.  But
23 I did start working -- when I started working there,
24 I was on a team that handled fraud and abuse.
25    Q.  What was the fraud and abuse problem at

Page 182

1 Match, if you can describe it?
2    A.  It could have been -- it was a lot of
3 things, like I talked about earlier.  Abuse, like,
4 maybe inappropriate emails between each other or
5 other -- you know, all kinds of issues between
6 members.  It could also be someone claiming credit
7 card fraud or it could be, you know, like, a scammer
8 type of fraud.
9    Q.  And when you say a scammer type of fraud
10 on Match.com, what does that refer to?
11    A.  Meaning someone with fake pictures or
12 profile or someone that contacted them that was, you
13 know, an -- obviously not on the site for dating
14 purposes.  There would be a very specific pattern of
15 how a scammer would write and photos they would use
16 and things like that.
17    Q.  Did Match take the fraud problems
18 seriously, from your perspective?
19    A.  I feel like that's kind of an opinion
20 maybe that it's --
21    Q.  Well, you gave a lot of your opinions in
22 your testimony to the FTC.  What's your view?  Did
23 they care about it or not?
24    A.  Well, I can't say if they cared about it
25 or not.  What I can tell you are facts based on what

Page 183

1 happened while I worked there, which would be --
2 there were things put in place to catch scammers
3 before they were on the site.  Abuse was taken
4 seriously and other escalated issues.  There are
5 some things that they could have done to prevent
6 fraud or scammers that were not done.
7    Q.  Okay.  Let's talk for a minute about
8 Match.com generally.
9    A.  Okay.
10    Q.  What's the purpose -- what's the business
11 purpose of the website?
12    A.  I mean, I would say to -- it's an avenue
13 for people to meet in whatever capacity that might
14 lead to.
15    Q.  So in the context of the guarantee, for
16 example, meet someone special.
17    A.  Yes.
18    Q.  It's a dating site, right?
19    A.  Right.
20    Q.  So people post their profiles in the hopes
21 that they get seen and they can, in turn, see other
22 people of similar interests, et cetera, and maybe
23 they get together and actually form a relationship,
24 right?
25    A.  I think people are on there for all kinds

Page 184

1 of reasons, but I think that's what we hope they are
2 on there for.  I think there are unsavory reasons
3 someone could also be on there.
4    Q.  Of course.  But the company's purpose in
5 having the site itself is to get people together to
6 make connections.  Fair?
7    A.  I would say that's fair.
8    Q.  Okay.  And so ideally if the site works,
9 people will be on there for a limited period of
10 time, find someone, and leave --
11    A.  Correct.
12    Q.  -- right?
13        And so from your perspective, was there --
14 there was never any business purpose.  In fact, it
15 would be contrary to business purpose to keep people
16 on the site forever, right?  May make money, but
17 that wouldn't be successful.  Match.com wouldn't
18 work if that happened, right?
19    A.  I feel like most companies that are not
20 nonprofit are looking to make money, so I don't
21 think we can say their main goal is just flowers and
22 rainbows help people get together.
23    Q.  Totally agree.  I wasn't suggesting that.
24 Look, it's a paid subscription service for paying
25 subscribers.  They're making money.  But the idea is

Page 185

47 (Pages 182 - 185)

1 not that they stay on there forever.
2     The idea of the company is they meet and
3 they go off into the sunset and then they cancel,
4 right?
5     A.  I don't know if I would put it that way.
6     Q.  How would you put it?
7     A.  To offer a service for people to meet each
8 other or communicate for whatever reasons those
9 people may want to communicate and to make money
10 doing it.
11     Q.  Okay.
12     A.  I don't -- I don't think the outcome is
13 necessarily part of the business plan.
14     Q.  Understood.
15     The FTC counsel focused on the online
16 cancellation flow that Match had in place.
17     A.  Okay.
18     Q.  I'm going to talk to you about that in
19 some detail.
20     You're aware there were other ways that
21 consumers could cancel their subscriptions, right?
22     A.  Yes.  Yes.
23     Q.  You could cancel by email, right?
24     A.  Yeah, you could cancel by contacting
25 customer support in the ways that we offered.

Page 186

1     Q.  Email, chat, phone?
2     A.  Yes.  U.S. mail.
3     Q.  U.S. mail?
4     A.  Right.
5     Q.  We know it works.
6     And then for people who sign up on the
7 app, on the iPhone or the Android app, they had
8 their own subscription flow, and then you had to use
9 the Apple iPhone cancellation process to cancel
10 that, right?
11     A.  That's a piece that I'm a bit fuzzy on.  I
12 do understand in general that a company may have a
13 cancel policy and then you may have to do something
14 through Apple because you purchase -- or not
15 purchase but you got the app from them.
16     I don't -- I couldn't speak specifically
17 on how that works or the difference in who they're
18 cancelling with.
19     Q.  Do you happen to know how many clicks it
20 takes to cancel the subscription on the iPhone or
21 Android?
22     A.  I don't.
23     Q.  Okay.  Do you know if it's more or less
24 than what it takes to cancel online?
25     A.  I don't remember.  I feel like there may

Page 187

1 be some component that's with Apple or something or
2 with, you know, the Play Store, but I don't --
3     Q.  Okay.
4     A.  And I will just say, at the point that I
5 worked there, apps weren't like they are now where
6 it's, like, everything is an app.  It was, like, the
7 majority of the people were using the website.
8     Q.  Understood.
9     Let's talk about the website for a minute.
10     A.  Okay.
11     Q.  Did you ever do a study or hear about a
12 study of the percentage of consumers who attempted
13 to cancel on the online flow and were successful?
14     A.  Not that -- I mean, unless I was looking
15 at the data available to me and I subtracted the
16 people who were unsuccessful, which is what we
17 were -- that's what I had available to me, people
18 that were saying, hey, it didn't work.  I wouldn't
19 have anything available to me saying it did work.
20     Q.  Yeah, I'll focus on that in a minute.
21     A.  Okay.
22     Q.  My question is:  Did you ever see or were
23 you aware of data that showed the percentage of
24 people who entered the cancellation flow -- and by
25 that, I take it you mean after you get to the

Page 188

1 settings page, you click on the change or cancel
2 subscription -- when they click on that, how many
3 people successfully cancelled; in other words, the
4 effectiveness rate?
5     A.  The only thing I know is kind of the
6 opposite of the -- what you saw on some of the
7 documents, like the fallout rate, that's the only
8 thing I could compare it to.  I don't recall a study
9 where I saw, you know, the success of cancellation
10 was, like, the purpose of the presentation or
11 anything like that.  I just don't recall anything of
12 that sort.
13     Q.  Understood.
14     And just to be clear -- you were shown a
15 video by FTC counsel, right?
16     A.  Yes.
17     Q.  And assuming somebody wanted to change
18 their subscription, change the terms of their
19 subscription --
20     A.  Yes.
21     Q.  -- they would click on the gear, right,
22 which gets them to settings, right?
23     A.  Well, I mean, I could refer to this
24 because I don't remember all of the screens by
25 heart.  I do know you had to go there to cancel.

Page 189

48 (Pages 186 - 189)

1    Q.   How about the time to enter the NPS
2  question?
3    A.   I don't recall seeing that.
4    Q.   And by "NPS question," you know that's
5  the --
6    A.   Net promoter score.
7    Q.   Yeah, net promoter score.
8         MR. MOON:  I'm sorry, I didn't get
9  that.
10        MR. HUMMEL:  Net promoter score
11  question.
12    Q.   That's the rate you're -- how likely are
13  you to recommend Match to somebody else rated on a 1
14  to 10.
15         That's what's referred to in the industry
16  as a net promoter score question, right?
17    A.   Not just that industry.
18    Q.   Across all industries, right?
19    A.   Yes.
20    Q.   Is that correct?
21    A.   Yes.
22    Q.   So that's a common question that's asked,
23  net promoter score, right?
24    A.   Yes.
25    Q.   And companies use net promoter score for

1  all type of reasons relating to customer
2  satisfaction, right?
3    A.   I think they could use it for a variety of
4  reasons, whether it was customer satisfaction or
5  not.  I mean, it could maybe allude to other...
6    Q.   How did the Match.com -- how did Match.com
7  use the "reason why I cancelled" survey answers?
8    A.   The only thing I remember using it for
9  would be if you said you met someone, you shouldn't
10  be shown any kind of, like, offer for another
11  subscription or anything like that.  I don't think
12  they were ever used for anything -- they weren't
13  used for anything that was presented to me or to my
14  knowledge.
15    Q.   Now, did you ever -- one of the things we
16  have talked about is complaints.  And one of the
17  complaints you said was common -- or at least common
18  compared to other types of complaints was a consumer
19  contacted the Care group through whatever means and
20  said, I thought I cancelled, but I'm still being
21  charged, essentially, right?
22    A.   Yes, that sounds accurate.
23    Q.   Now, did customer care systematically go
24  back to check if that consumer ever even attempted
25  to enter the cancellation flow?

1    A.   I'm trying to think of how they would have
2  done that.
3    Q.   The question is not how; did they.
4    A.   I'm trying to refresh my own memory if I
5  can have just a minute.
6    Q.   Of course.
7    A.   I don't recall if there was a way for an
8  agent to know that.  You could know if someone used
9  the site after a certain date, which would be
10  contradictory to saying that you cancelled.
11    Q.   But, again, my question is:  Was there a
12  systemic way that Care agents would check to see if
13  that person, in fact, tried to cancel?
14    A.   Not that I remember.
15    Q.   Do you know whether or not there is a way
16  for Match to check to see if a consumer who claims,
17  claims they thought they cancelled but then got
18  charged, in fact, tried to cancel?
19    A.   I mean, based on the fallout data that we
20  had, someone somewhere had information on people who
21  got to that screen and then didn't complete all of
22  the steps.
23    Q.   When a consumer was calling to complain
24  they thought they cancelled but they're still being
25  billed, what did they want typically?

1         We talked about the alleged complaint,
2  what they're claiming happened.  What do they
3  typically want, in your experience?
4    A.   What do you mean what was the alleged
5  complaint?
6    Q.   The alleged complaint is that they tried
7  to cancel or they thought they cancelled.
8    A.   And what they really want?
9    Q.   And what they really wanted.  What did
10  they really want?
11        MR. MOON:  Objection; vague, calls for
12  speculation.
13    A.   I would think that they didn't want to be
14  billed.
15    Q.   And?
16    A.   That's my answer.
17    Q.   Not a refund?  They didn't want a refund?
18    A.   Well, I meant they wouldn't have wanted to
19  be billed to start with so...
20    Q.   Sure.
21    A.   At that point, yes, they didn't want to
22  spend that money.
23    Q.   They wanted money back, right?  How often
24  do you think it happened, if you know, that a
25  consumer simply forgot to cancel and then they

1 called up and said, I thought I cancelled, give me a
2 refund?
3     A.  I don't know numbers-wise, but I would say
4 that that's an understandable or common reason that
5 someone would call any company after being charged.
6     Q.  They just forgot and they're ashamed to
7 say they forgot.  They don't want to say that to the
8 care --
9     A.  I don't know that.
10     Q.  Let me finish my question.
11         Of course, but you were in Care for years.
12 And you were trained, were you not, to see through a
13 request for a refund, right?
14     A.  I don't know what you mean by "see
15 through" it.
16     Q.  Get to the real reason why they want a
17 refund.  You were trained for that, right?
18     A.  But the reason they wanted the refund
19 could be anything.  I mean, that's not -- our
20 concern would be that they don't want to use -- they
21 want the refund or they don't.  I can't speculate as
22 to why they need that money or want that money.
23     Q.  Fair enough.
24         But you can't today testify that somebody
25 who called care and said they thought they cancelled

Page 202

1 and wanted a refund, in fact, ever tried to cancel,
2 correct?
3     A.  I believe that data is available in the
4 system but not -- not that Care would have been
5 privy to, like, how I had to request someone to
6 provide it to me.
7     Q.  Right.
8         So when the FTC in this case -- I just
9 want to be really clear what's going on.
10     A.  Yeah.
11     Q.  When the FTC in this case gets into court
12 and they say, aha, a consumer called and they said,
13 I thought I cancelled or I tried to cancel, give me
14 a refund --
15     A.  Uh-huh.
16     Q.  -- you can't testify that that person
17 ever, in fact, attempted to cancel, correct?
18     A.  Me personally?
19     Q.  Yes.
20     A.  No.
21     Q.  Right.
22         And you can't, in fact, testify that there
23 was any flaw in the cancellation flow that caused
24 them to be unable to cancel such that they then
25 sought a refund, correct?

Page 203

1         MR. MOON:  Objection; vague,
2 foundation.
3     Q.  You can't make that causal connection,
4 right?
5     A.  What I was going to ask was by flaw, it
6 could be a technical issue or -- I mean, I would
7 want you to clarify that.
8     Q.  Sure.
9         You can't testify as to any link between
10 the cancellation flow and a consumer calling and
11 seeking a refund, correct?
12         MR. MOON:  Objection; vague,
13 foundation.
14     A.  I know that --
15         MR. HUMMEL:  I agree, there's no
16 foundation.  I'll stipulate that there's no
17 foundation.  That's my point.
18     A.  Well, I was going to say that in this
19 information, there is a bug alluded to in the cancel
20 process.  So at some point, there was some type of
21 bug.  That's all I can speak to.
22     Q.  Right.  Fair enough.
23         By the way, were you ever aware of a
24 systematic effort by Match to take people who, in
25 fact, cancelled and continue to charge them?

Page 204

1     A.  No.
2     Q.  Were you ever aware of a conversation
3 among you and/or senior executives, hey, let's
4 defraud consumers by making them think they
5 cancelled but then, in fact, continue to charge
6 them?
7     A.  No.
8     Q.  That would be outright fraud, right?
9     A.  I just didn't hear anybody say that.
10     Q.  With respect to the cancellation flow that
11 you talked about in emails -- I'm going to ask you
12 about those.
13     A.  Yes.
14     Q.  -- did you ever believe Match was doing
15 anything illegal?
16     A.  I didn't believe it was illegal or they
17 would have already been in trouble for it.  What is
18 a good customer experience or not could be
19 different.
20     Q.  Of course.  And the law doesn't require
21 that customer experiences be perfect.  I'm not --
22     A.  Right.
23     Q.  That's not a question.  I'm glad you
24 agreed with that.
25         But your efforts were to improve the

Page 205

52 (Pages 202 - 205)

1  customer experience, right?
2      A.   Yes.
3      Q.   And in one email, you even wrote, Let's
4  make the cancellation flow simpler.  Correct?
5      A.   Yes.
6      Q.   Now, let me go to a couple other
7  questions.
8          Did you ever compare or systematically
9  compare the relative simplicity of subscribing to
10 Match.com versus cancelling Match.com?
11         Do you see what I'm saying?
12     A.   I do see what you're saying.  I don't
13 remember ever comparing them.
14     Q.   That is the registration and the
15 subscription versus the cancellation.
16     A.   The registration and subscription would
17 have been different steps from each other.
18     Q.   Okay.
19     A.   Because the registration wouldn't involve
20 payment information or anything like that.  But say
21 we're talking about subscribing since we're talking
22 about refunds and all of that --
23     Q.   Yeah.
24     A.   -- compared to -- either way, I wouldn't
25 be able to say -- there are a number of steps in

Page 206

1  that process.
2      Q.   Go back, if you would, to that deck we
3  were looking at, the third page of Exhibit 8.
4          Just be precise for the record if you can,
5  where do you consider the cancellation flow to
6  start?
7          What click does the customer make to enter
8  the cancellation flow, from your perspective?
9      A.   Well, you could say the flow from the very
10 time I pull up the site, what are all the steps I
11 have to go through get to it.  But, I mean, the flow
12 is how you get to it.  So the settings icon is the
13 first thing that they would have to click.
14     Q.   Okay.  So then go to your suggested
15 change.  So in your suggested change on page 3, how
16 many clicks to cancel in your suggested change?
17     A.   On page 3, I just see --
18     Q.   Page 4.  Sorry.  Page 4.  It's the account
19 settings redesign.
20     A.   How many total clicks?
21     Q.   Yes.
22     A.   Well, there's one on the gear to bring up
23 something like this.
24     Q.   Uh-huh.
25     A.   And then cancellation would be two clicks.

Page 207

1  I don't think I provided a design or anything of
2  what would happen after that.
3      Q.   Right.
4          And you wouldn't -- did you have a view
5  about whether or not you would require a password in
6  light of the auto sign-in function and the fraud
7  possibility?
8      A.   I think given what I knew at that time, I
9  may have felt it was unnecessary to have it there.
10 I'm not saying there couldn't have been a business
11 reason.  But just looking at it from what made sense
12 to me and my expertise in working with customers
13 would have been, it wasn't necessarily necessary --
14 it wasn't necessary there because it was -- they
15 were -- they had to be logged in to get to that.
16     Q.   But you wouldn't dispute that there may
17 have been a legitimate business reason to have a
18 password wall there, correct?
19     A.   That's correct.
20     Q.   I take it your proposed redesign was never
21 implemented.  That was your testimony, right?
22     A.   Yes, not while I worked there.
23     Q.   And so to your knowledge, there was never
24 an A/B test to ascertain whether your redesign would
25 be simpler or better or more customer friendly than

Page 208

1  the actual site?
2      A.   Not that I ever had knowledge of.
3      Q.   Okay.  And I think I asked you this, but
4  you have no information you can provide today as to
5  how long it typically took consumers to complete the
6  survey that says why I'm cancelling, right?
7      A.   Time meaning actual time or number of
8  clicks?
9      Q.   Actual time.
10     A.   No.
11     Q.   And just to be clear, your goal -- look if
12 you would at the third page again with those red
13 numbers.
14     A.   Yes.
15     Q.   Your goal was to address the costs
16 associated with those items in making changes,
17 right?  In other words, less customer care interface
18 with consumers and thus reduce those red numbers,
19 right?
20     A.   My goal was to convince the company to
21 make the process -- to clean up the process, and
22 that would be one way I would do that by appealing
23 to cutting costs.
24     Q.   But it would be a cost-cutting measure,
25 right --

Page 209

53 (Pages 206 - 209)

1   A.  Yes.
2   Q.  -- in your view?
3       Okay.  And by "costs," you mean costs
4  associated with Care on those issues?
5   A.  Yes, specifically.
6   Q.  Now, you didn't -- during the -- prior to
7  the time and during the time you worked at Match,
8  you had no formal education in UX, right?
9   A.  Prior to the time and during the time?
10   Q.  Yeah, up until 2016.
11   A.  No.  I mean, I was a software developer
12  out of college.  That's what I went to school for.
13  As far as what we would consider like a UX or
14  graphical interface, nothing formal.
15   Q.  And you conducted or supervised no
16  usability studies on the Match.com website?
17   A.  I didn't conduct any, no.
18   Q.  Okay.  Let's talk about the guarantee for
19  a minute.
20   A.  Okay.
21   Q.  What was the guarantee?
22   A.  The guarantee was, to my recollection and
23  as we talked about earlier, by six months if you
24  don't meet someone or meet someone special, whatever
25  the wording might have been, in that six months,

1  that you would get an additional six months at no
2  charge.
3   Q.  And by "meet someone special," wasn't it
4  true that in claiming the guarantee, the consumer
5  subscriber decided how that was to be interpreted?
6   A.  Yes.
7   Q.  And it's true that Match.com didn't check
8  and verify what the user was claiming with respect
9  to claiming that guarantee?
10       In other words, Match didn't hover over
11  that user's shoulder in some way and say, oh, but
12  you did meet someone special and yet you're claiming
13  money back.
14       To your knowledge, did they ever do that?
15   A.  No, not to my knowledge.
16   Q.  In your view, was offering a six-month
17  guarantee in any way unfair?
18   A.  Not that I can think of.
19   Q.  All right.  I take it no one is paying you
20  for your testimony today?
21   A.  That's correct.
22   Q.  I'm not?
23   A.  No.
24   Q.  Match isn't?
25   A.  No.

1   Q.  FTC isn't?
2   A.  No.
3   Q.  Have you been promised anything?
4   A.  No.
5   Q.  So in connection with the save offer that
6  we talked about, any problem generally with
7  presenting a save offer to a consumer?
8       MR. MOON:  Objection; vague.
9   A.  Are you speaking about something similar
10  to the retention three months for the price of one
11  offer?
12   Q.  Yes.  Yes.
13   A.  And your question was is there...
14   Q.  Anything wrong with doing that.
15       MR. MOON:  Objection; vague.
16   A.  I don't ethically see anything wrong with
17  offering someone something to entice them to
18  continue using a product.
19   Q.  Regarding the survey, the reason why
20  you're leaving, would you agree that the amount of
21  people who would take the survey would drastically
22  fall if it was placed after the cancellation
23  confirmation?
24   A.  I think that would be safe to say that I
25  don't know for a fact.

1   Q.  Match had a frequently asked questions
2  page; is that correct?
3   A.  Yes.
4   Q.  And in those pages, there were discussions
5  about how to cancel?
6   A.  Yes.
7   Q.  There were links to the cancellation flow?
8   A.  I don't recall if there were links, but I
9  know there were instructions.
10   Q.  If a consumer wanted to learn how to
11  cancel, going to the FAQ page would be a good way to
12  learn how to do that, right?
13   A.  I believe so.
14   Q.  Now if a consumer called customer care and
15  said, I want to cancel my subscription, how would
16  the customer care agent handle that?
17   A.  They would try to make a retention offer
18  as well.
19   Q.  Okay.  And would they assist in the
20  cancellation?
21   A.  Yes.
22   Q.  Would they typically tell users that there
23  are numerous ways to contact Match to cancel; phone,
24  chat, email, et cetera?
25   A.  I don't know if they would tell them that

54 (Pages 210 - 213)

1 if they were just going to cancel.
2    Q.   They would just cancel?
3    A.   They would probe to find out why the
4 person wanted to cancel, offer an appropriate
5 retention attempt, not something oddball that would
6 make no sense.
7    Q.   Right.
8    A.   And then if the customer still wished to
9 cancel, they would cancel them.  I don't know what
10 instance they would tell them there are these ways
11 to do it unless a person said, What are the ways to
12 do this.
13    Q.   Could the customer care agent do the
14 cancellation?
15    A.   Yes.
16    Q.   And if a consumer said, I just want to
17 cancel, they would do that?
18    A.   They would probably try to give them a
19 retention attempt, but they would still take the
20 action the customer wanted --
21    Q.   You oversaw --
22    A.   -- apart from any agent error.
23    Q.   Understood.
24       And you oversaw those line agents?
25    A.   I oversaw at that point senior managers
Page 214

1 who had managers who had supervisors who had the
2 escalation agents in-house and then the -- I would
3 manage the operations of the vendors who employed
4 those frontline agents.
5    Q.   Did you ever --
6    A.   So they weren't Match employees.
7    Q.   I understand.
8       Did you ever give instructions that were
9 ultimately given to the care agents, Do not make a
10 save offer?
11    A.   No.  Only in a circumstance maybe where
12 someone said someone died or something very extreme
13 where it would be incredibly inappropriate or
14 insensitive to do that would be like an edge case.
15    Q.   Is it true that you are not a fraud
16 expert?
17    A.   I would say I have worked with it at
18 multiple places and know more about it than maybe
19 the average Joe on the street, but am I an expert,
20 no.
21    Q.   Was a cancellation request a common reason
22 for contacting customer care?
23    A.   Cancellation requests could be, when I
24 think of it, kind of coupled in with the after --
25 after the fact of I got charged, not just everybody
Page 215

1 calling to say, oh, yes, I want to cancel.  In my
2 mind, I kind of connect the two.  But, yes, that
3 together would be a large reason.
4    Q.   What were the circumstances under which
5 you left your employment at Match?
6    A.   I had been there for a long time, and I
7 had been in that role for quite a while.  There were
8 a lot of -- I'll try to put it in a nutshell.  We
9 had -- myself and a couple of the other top managers
10 on our team had worked very hard for the past three
11 years to stabilize the call center management, and I
12 don't know how much you know about that, but it's
13 very difficult to do, so it was quite an
14 accomplishment to get that stabilized as far as
15 attrition or call center management changing in and
16 out.
17       So we put in some hard work to make that
18 happen.  And after the company went public, it kind
19 of seemed like some of those things were undone.  I
20 don't want to get into why I think this was or
21 wasn't, but the circumstances were basically I
22 was -- I was dissatisfied with maybe not being heard
23 and they were also dissatisfied with me voicing my
24 opinion continually.
25    Q.   Were you terminated?
Page 216

1    A.   Not to my knowledge.  It was a mutual
2 discussion that I initiated.
3    Q.   Were you unhappy about leaving?
4    A.   I wished it didn't have to be that way,
5 but at that point, I knew the best thing was to
6 leave.
7    Q.   With whom at Match did you have the
8 conversations about leaving principally, if you
9 know?
10    A.   Well, the main conversation with Lisa
11 Johnston in HR.
12    Q.   Any manager to whom you reported?
13    A.   No one I reported to ever brought up any
14 conversations with me about not working there, about
15 being terminated or anything like that.
16    Q.   What about you, did you bring up with your
17 management that you thought you should leave?
18    A.   I don't -- I don't know that I brought up
19 I should leave, but I feel like I probably had
20 conversations of being dissatisfied or maybe around
21 things like this is -- maybe this is not a fit or if
22 things can't be this way, this may not be the best
23 place or, you know, I feel like I'm being pushed
24 out.  There might have been conversations like that.
25 Not where I was, you know, putting in a resignation
Page 217

55 (Pages 214 - 217)

1    A.   It says, Cancellation Process:  Difficult
2  and Dated at the top.  Yes, to the right, there's a
3  section called Cleaned Up.
4    Q.   Right.
5        And you don't have a password wall?
6    A.   Right.
7    Q.   And your survey is after the confirmation
8  page?
9    A.   That's correct.
10    Q.   So if you have a password wall --
11    A.   Okay.
12    Q.   And you don't have a save offer either,
13  right?
14    A.   Number 3.
15    Q.   Retention offer, right.
16        What about the NPS?
17    A.   I don't know if I included that in the
18  type of -- this had two pages of surveys, the second
19  one being the NPS, the existing process.  So I
20  didn't say what type of survey it would be --
21    Q.   Right.
22    A.   -- but whatever surveys would be shown
23  after.
24    Q.   Right.
25        So your proposal, just to be clear, has

Page 230

1  the surveys after the confirmation page and no
2  password wall?
3    A.   That's correct.
4    Q.   Okay.  And you can't opine about whether,
5  in fact, for perfectly legitimate business reasons
6  people rejected your proposal?
7    A.   Right.  I don't know that it was rejected.
8  I just know that nothing ever was -- nothing ever
9  came of it while I worked there.
10    Q.   Fair point.
11        And the reasons as to why nothing ever
12  came of it you're not entirely certain about, right?
13    A.   No.
14    Q.   Would you look please at Exhibit -- back
15  to Exhibit 7, the top email where you express your
16  passion.
17    A.   Give me just a moment.  Here it is.  Okay.
18  I have it.
19    Q.   Hi Shar -- it reads -- I'm pretty
20  passionate about this and, honestly, it has been the
21  same complaint for the past decade that I have been
22  with Match.
23        Do you see that?
24    A.   I do.
25    Q.   Is the complaint the same one that she's

Page 231

1  referencing in her email on February 18 at 6:38?
2    A.   She says that, Customers complain that
3  they cancel and we still auto renew them.
4    Q.   Right.
5    A.   So yes.
6    Q.   Okay.  Now if you could look at Exhibit 9.
7    A.   Okay.
8    Q.   I just have a question about the format of
9  Exhibit 9.
10    A.   Yes.
11    Q.   This is printed in what's called notes
12  pages, right?
13    A.   On this, I actually had -- I would have a
14  similar question looking at it.  I don't typically
15  use notes in PowerPoint.  I understand the feature
16  you're talking about.
17        To me, knowing the way that I just do
18  things in general, it looks like maybe I put
19  screenshots of the slides and then added some notes
20  and put it in a document but -- with the page
21  numbers.  I mean, I'm not -- I don't believe this is
22  the notes view from PowerPoint.
23    Q.   Don't think so?
24    A.   I don't think so.  I don't know but I...
25        MR. MOON:  I want to say we do have

Page 232

1  the native version of this available as an exhibit if
2  anybody wants to look at it.
3        MR. HUMMEL:  I have it too.  I just
4  want to show you in Exhibit Number -- let's mark 9A.
5        (Exhibit 9A marked.)
6    Q.   So my question is:  This is the same
7  PowerPoint, Exhibit 9A, but it doesn't have the
8  notes underneath, right?
9    A.   Let me just look.
10    Q.   Yeah, sure.
11    A.   (Reviewed document.)  It looks like the
12  same screenshot of this slide, the same graphic of
13  the slide from 9A.
14    Q.   Right.
15        And so I'm just -- can you testify as to
16  where the notes underneath Exhibit 9 came from or
17  who wrote them?
18    A.   What this looks like, to me -- again,
19  based on how I, in general, work and always have --
20  it doesn't look to me like it's notes from
21  PowerPoint; it looks to me like a Word document
22  where I have taken, you know, maybe a screenshot
23  from something I have already done or whatever and I
24  put it all in a Word document with notes underneath
25  it just typed in Word.

Page 233

59 (Pages 230 - 233)

1    That's my best guess as to why it looks
2  like this, but I could be wrong.  But that's --
3  that's what I lean towards.
4    And I'm not denying that I wrote these
5  notes.  That was, I think, your other question.
6  Q.  Can you testify that you did write them?
7  A.  I mean, on any of this, it could be forged
8  or something.  I can't, like -- it looks like
9  something that I would have done.  I'm not denying
10 that I did it.  I believe that I did it.
11 Q.  Will you look at Exhibit 12, please.
12 A.  Yes.  Okay.
13 Q.  So if you look at the first page, it says
14 Match Cancellation Process.
15 A.  Yes.
16 Q.  And it says, Current.  1, locate account
17 settings - difficult to find.
18 A.  Yes.
19 Q.  This was attached to an email in 2016.
20   As of 2016, you believe that the gear was
21 difficult to find?
22 A.  Probably.  I mean, I put that here.  I'm
23 also thinking of our audience.  It wouldn't be
24 necessarily people that were very used to -- very
25 web savvy.  A lot of people seemed like maybe Match
Page 234

1  was one of the only sites they used.  So taking that
2  into account, too.
3    And, again, I know it's hard to put
4  ourselves back at that time and think anybody could
5  ever not know what that gear was, but I know when
6  the gear first appeared, I did voice a concern about
7  it.
8    Whether you want to say it's difficult to
9  find or not, it's just not -- it's not something
10 that says, you know, a place where you might think
11 to go to cancel.  You could...
12 Q.  Got it.
13   Number 3 says, Enter password - already
14 entered upon login, 80 percent fallout rate.
15 A.  Correct.
16 Q.  Okay.  So that assumes that people had
17 their auto sign-in turned off?
18 A.  If that is what auto sign-in is, which it
19 sounds to me like it is.
20 Q.  Okay.  So Exhibit 14.
21 A.  Okay.
22 Q.  There's an email in the middle that you
23 were asked about.  I just want to confirm.
24 A.  Exhibit 14?
25 Q.  Exhibit 14 which is an email chain that
Page 235

1  involves you, Brett Richards, Melissa Clinchy, Kacey
2  Hammerberg.
3    Do you see that email in the middle?
4  A.  Yes.
5  Q.  Who was Brett Richards?
6  A.  He worked in product.  That's really all I
7  remember about him.
8  Q.  Who was Kacey Hammerberg?
9  A.  She was an agent in our office that worked
10 on the technical team that Melissa managed, so she
11 would be handling -- people could transfer from the
12 call center if someone needed a --
13 Q.  And you write in this email, We probably
14 just need to meet and go through the whole flow
15 again.
16   That's the cancellation flow you're
17 talking about?
18 A.  Let me re-read it.  (Reviewed document.)
19   Yes, I believe so.  I said yes.  I'm
20 sorry.
21 Q.  I was distracted.
22   Okay.  Did you -- you don't recall if you
23 ever had that meeting?
24 A.  The meeting with --
25 Q.  To go through the whole flow.
Page 236

1  A.  -- to go through the whole flow.
2    No, I don't remember.
3  Q.  Okay.  Then you wrote, I know Mandy is
4  open to changing it.
5    Who is Mandy?
6  A.  Mandy Ginsberg.
7  Q.  What was her position?
8  A.  At that point, she would have been a
9  president or CEO-type level.  I don't remember the
10 exact title.
11 Q.  How did you know she was open to changing
12 the flow?
13 A.  I don't know except that, you know, must
14 have been in a conversation or something that I had
15 with her at some point.
16 Q.  So it was your view if the changes were
17 subtle and made sense from a business perspective,
18 she was open to a change -- considering a change?
19   MR. MOON:  Objection; mischaracterizes
20 the witness's testimony.
21 A.  I don't know why I was indicating that
22 they would have to be subtle, but that -- except
23 that she would not be willing to revamp the process
24 but she might be open to small changes.  I don't
25 recall what those were or any of that, but that's my
Page 237

60 (Pages 234 - 237)

APP 026

1  understanding of what I'm seeing.
2     Q.  Right.
3         And so you wouldn't have written something
4  if it was untrue, right?
5     A.  No, I would not.
6     Q.  So you believe that Mandy, who was at the
7  president/CEO level, was open to changing the flow?
8     A.  At that time, yeah, I would have believed
9  that -- I would have had a reason to believe that.
10    Q.  And then Shar -- who is Shar?
11    A.  Shar was the VP of product.  Again, I
12 don't know these exact titles at the exact time, but
13 that's -- she would be a high-level position.
14    Q.  And she wanted to keep the password wall
15 and the retention offer.  That's what you knew about
16 her?
17    A.  Yes.
18    Q.  Okay.  Look at Exhibit Number 15.
19    A.  Okay.
20    Q.  This is an email from Melissa Clinchy if
21 you look at the one that starts the chain --
22    A.  Okay.
23    Q.  -- on May 6, 2016, right?
24    A.  Yes.
25    Q.  You didn't write this?

Page 238

1         Would you agree with me that it's true
2  that just because people are complaining about being
3  auto renewed doesn't mean that they're complaining
4  that the flow was not simple?
5     A.  I would say that's a fair statement.
6     Q.  Do you have any knowledge about whether or
7  not Match has discontinued the guarantee?
8     A.  I do not know.
9     Q.  Do you have any knowledge about whether or
10 not Match has changed its charge-back policy?
11    A.  I don't know.
12        MR. HUMMEL:  Okay.  Give me two
13 minutes off the record.
14        THE WITNESS:  Okay.
15        MR. HUMMEL:  I'm going to review my
16 notes.
17        (Off the record.)
18        MR. HUMMEL:  Okay.  Back on.  Just a
19 few more.
20    Q.  Exhibit 11.
21    A.  Okay.
22    Q.  So there's an email from Adrian Ong on
23 May 17, 2016.
24    A.  Yes.
25    Q.  If you look at the next page, Ong

Page 240

1     A.  No.
2     Q.  And this relates to a Lunch and Listen,
3  right?
4     A.  Yes.
5     Q.  And for this particular Lunch and Listen,
6  the main topic was the current cancel flow on the
7  site?
8     A.  Yes, that's what it says here.
9     Q.  It also references that, One of our
10 largest Care complaints are members who believe they
11 cancelled but who were charged a renewal.
12        Do you see that?
13    A.  I do.
14    Q.  Just -- you didn't write it, but I want,
15 given your prior testimony, to ask you this
16 question:  Is it your view that it would be more
17 accurate to say members who claim they believe they
18 cancelled and who were charged to renew?
19    A.  I'm not sure of the complete difference in
20 the wording, but you could say that, that people who
21 called saying that they thought they cancelled.
22    Q.  Right.
23    A.  What someone believes could be up for --
24 we didn't know what they said.
25    Q.  Fair.  We know what they said, right.

Page 239

1  writes -- that's a man, right, Adrian Ong?
2     A.  Yes.
3     Q.  I'd add that the "before you go" text is
4  misleading since that would suggest that the
5  cancellation process may be complete and the survey
6  is optional.
7         Do you see that?
8     A.  I do.
9     Q.  Do you know if that conclusion that he
10 made was based on any research that he had done
11 about whether consumers claimed they were confused
12 by that or is that just his opinion?  Do you know?
13    A.  He -- I don't know if he based it on
14 anything.  Reading this it sounds like he's not
15 quoting any numbers or anything like that.
16    Q.  If you could look at Exhibit Number 13.
17    A.  Okay.
18    Q.  If you turn to what is marked as Bates
19 page, which is the number at the bottom, 681013.
20    A.  Okay.
21    Q.  And there's an email from Jim Talbott to
22 you --
23    A.  Yes.
24    Q.  -- in which he writes --
25    A.  Oh, wait.

Page 241

61 (Pages 238 - 241)

1    Q.   -- Here is the output for the last resign
2 flow page users saw in sessions where I'm not
3 logging a resignation.
4        So this is follow-on data essentially,
5 right?
6    A.   One moment.  Yes.  I mean, it's not
7 referred to as that but...
8    Q.   Right.
9    A.   Okay.  Yes.
10   Q.   Then if you look at page 681008 -- that
11 previous data was from 2013.
12       1008 has data from 2016, correct?
13   A.   I believe that's the data from 2013 that I
14 was asking -- or that Melissa was providing as an
15 example of what we wanted.
16   Q.   Do you know if this data, either one, 2013
17 or 2016, includes nonsubscribers?
18   A.   Well, a nonsubscriber wouldn't really have
19 a reason for cancelling.
20   Q.   Do you know if it includes non-U.S. users?
21   A.   It would be the U.S. site.  I don't know
22 if it's possible someone in another country could be
23 using the U.S. site, but it would be data from that
24 website, from the U.S. website.
25   Q.   Let's talk about hack week.

Page 242

1 confer with counsel?
2        MR. HUMMEL:  Sure.
3        MR. MOON:  We're off the record.
4        (Recess taken 4:06 p.m. to 4:08 p.m.)
5        MR. MOON:  Back on the record.
6        I have no further questions, so we'll
7 reserve the remainder.
8        All right.  We're done.
9        (Off the record at 4:09 p.m.)
10       MR. MOON:  Ms. Auderer, you do have
11 the right under the federal rules to review the
12 transcript and sign and make any corrections that you
13 want to make on it.
14       So do you want to do that, get the
15 transcript to review?
16       THE WITNESS:  Yeah.  I don't really
17 want to read the whole thing.
18       MR. HUMMEL:  Let me put it this way:
19 You have the right under the rules to make sure that
20 your testimony is fully truthful and accurate, to
21 read it, make any changes to make it truthful and
22 accurate if you decide to do that, and sign it under
23 penalty of perjury.
24       Counsel, if she receives the depo and
25 we receive within 30 days no changes, no indication,

Page 244

1        What was the point of having a hack week?
2    A.   It was a chance for people who were not in
3 the departments who were directly responsible for
4 suggesting changes, putting them on a roadmap,
5 developing them to bring forward ideas or either new
6 features or improvements, enhancements that they
7 wanted to champion to the company.
8    Q.   Do you recall how many presentations were
9 made during a typical hack week?
10   A.   I want to say maybe 40-something.  I don't
11 know if they -- maybe those are the number of people
12 that submitted ideas.  I can't imagine having that
13 many in a couple hours, like, actually present.
14   Q.   Is it true that only the best idea was
15 picked?
16   A.   I don't know that any ideas were picked.
17 Well, maybe something was picked, but I don't -- I
18 don't -- there was no guarantee that that was going
19 to be implemented.  But it seems like there was some
20 kind of contest maybe.
21       MR. HUMMEL:  Give me 30 seconds to
22 confirm.
23       At this point, I don't have any
24 further questions.  Reserve.
25       MR. MOON:  May I have one minute to

Page 243

1 then either party may use a certified copy of this
2 deposition for any and all purposes in this
3 litigation.
4        Stipulated.
5        MR. MOON:  No, I don't think so.  I
6 mean, the Federal Rules require -- there are
7 restrictions on when people can use depositions.
8        MR. HUMMEL:  Let's go off the record.
9        (Off-the-record conversation.)
10       MR. HUMMEL:  Just to be clear, the
11 stipulation is that neither party needs to use an
12 original or certified copy in court.  But obviously
13 the Federal Rules of Evidence and the Rules of Civil
14 Procedure govern when and if the deposition
15 transcript can be used in court.
16       My point with you is when you receive
17 it -- and you can get a direct copy from the court
18 reporter -- you will have 30 days from the date of
19 receipt to make any changes and notify counsel, me or
20 the counsel for the FTC or Chelsea.
21       THE WITNESS:  Okay.  Everything I have
22 said was truthful.  I just -- and I'm not saying it
23 might not have been entered correctly, but I just
24 figured if I have the opportunity, that's, you
25 know...

Page 245

62 (Pages 242 - 245)

**Page 246**

1      MR. HUMMEL:  You have the right.

2      THE WITNESS:  Fine.  And then if I

3 just don't see anything, I don't have to do anything,

4 right?

5      MR. HUMMEL:  You can do nothing under

6 the stipulation, correct.

7      Off the record.

8      (Deposition concluded at 4:11 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 248**

1

2

3

4    _____

     (Signature of the Witness)

5

6

7

8 THE STATE OF _____

9 COUNTY OF _____

10

11    Subscribed and sworn to before me by the said

12 witness, KRISTINA AUDERER, on this the _____ day

13 of _____, 2022.

14

15

     _____

16    Notary Public in and for the

     State of _____

17    County of _____

18 My commission expires: _____

19

20

21

22

23

24

25   Job No. TX5571821

**Page 247**

1      DEPOSITION CHANGES

2 WITNESS: KRISTINA AUDERER

3 PAGE NO. LINE NO.   CHANGE   REASON FOR CHANGE

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

**Page 249**

1 STATE OF TEXAS   )

2 COUNTY OF DALLAS )

3    I, Michelle L. Munroe, Certified Shorthand

4 Reporter in and for the State of Texas, certify that

5 the foregoing deposition of KRISTINA AUDERER was

6 reported stenographically by me at the time and place

7 indicated, said witness having been placed under oath

8 by me, and that the deposition is a true record of

9 the testimony given by the witness;

10    That the amount of time used by each party at

11 the deposition is as follows:

     Mr. Moon   -   3 hours, 41 minutes

12    Mr. Hummel   -   1 hour, 46 minutes

13    I further certify that I am neither counsel for

14 nor related to any party in this cause and am not

15 financially interested in its outcome.

16    Given under my hand on this the 7th day

17 of December, 2022.

18

19

20

21    _Michelle L. Munroe_

     Michelle L. Munroe, CSR No. 6011

22    Commission expires 1-31-24

     Firm Registration #571

23    VERITEXT LEGAL SOLUTIONS

     300 Throckmorton Street, Suite 1600

24    Fort Worth, Texas  76102

     817.336.3042  telephone

25

63 (Pages 246 - 249)

# EXHIBIT C

APP 030

```
 1                    IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF TEXAS
 2                    DALLAS DIVISION

 3
                      CASE NO.  3:19-CV-02281-K
 4

 5
      FEDERAL TRADE COMMISSION,
 6
 7                    Plaintiff,

 8    vs.

 9
      MATCH GROUP, INC., a
10    corporation, and MATCH GROUP,
      LLC, formerly known as
11    MATCH.COM, LLC, a limited
      liability company,
12
13
                      Defendants.
14    _____/

15

16
                           1001 Brickell Bay Drive
17                         Miami, Florida
                           Friday, January 13, 2023
18                         9:00 a.m. to 1:08 p.m.
19

20
              VIDEOTAPED DEPOSITION OF GREG BLATT
21
22         Taken before Marlene Gutierrez, Notary
23    Public, State of Florida at Large, pursuant to Notice of
24    Taking Deposition filed in the above cause.
25                           - - - - - -
```

Page 1

1  New York when I did the deposition.  It was all by
2  Zoom, and I was not there.
3      Q   Are you currently employed by either Match
4  Group, Inc., or Match Group, LLC?
5      A   I am not.
6      Q   Are you currently in any agreement with either
7  Match Group, Inc., or Match Group, LLC?
8      A   You mean do I have any contractual relationship
9  with them?  No.
10     Q   Do you serve Match Group, Inc., or Match Group,
11  LLC, in any capacity?
12     A   No.
13     Q   Are you on the board of Match Group, Inc.?
14     A   No, no.
15     Q   Do you own any stocks or shares of Match Group,
16  Inc.?
17     A   I own -- I own stock in -- again, I am now --
18  whatever the parent company is.  I think it's Match
19  Group, Inc., yes, the publicly traded entity.
20     Q   Are you receiving or have you received any
21  compensation or benefits for your testimony today?
22     A   None.
23     Q   And do you expect to receive any compensation or
24  benefits for testifying today?
25     A   I do not.

Page 10

1      Q   So you've previously been employed by Match
2  Group, Inc.; that's correct?
3      A   Correct.
4      Q   All right.  What were the dates of employment?
5      A   Well, Match Group, Inc.  I -- the corporate's
6  structure changed a lot.  So you're very focused on
7  Match Group, Inc., and let me tell you what my jobs
8  were, but I can't tell you, sort of, like, I don't know
9  when Match Group, Inc., the entity you're referencing
10  necessarily was created.
11         So I was the CEO of Match.com from 2009 and
12  2010.  In 2010, I became CEO of IAC, which was the
13  ultimate parent company of Match.com, and its
14  subsidiaries and affiliates.  There was a group of
15  companies that were organized in various ways, and I
16  can't tell you exactly what they were and how they were
17  organized.  But, functionally, IAC was the parent
18  company to Match.
19         And in that capacity, I continued to run the
20  Match.com business from the parent company for a short
21  period of time.  After which, I was replaced with the
22  CEO of -- of -- of the Match Group businesses in 2012.
23  And then in 2014, I became executive chairman of Match
24  Group.  I think that was the time in which the entity
25  you're referring to as Match Group, Inc., was created,

Page 11

1  although I'm not sure.
2         I was executive chairman of Match Group in 2014
3  and 2015.  The end of 2015, I became CEO and executive
4  chairman of Match Group.  I served in that capacity in
5  2016 and 2017.  I also, during the 2017 period, served
6  as the CEO of the Tinder business which was one of
7  Match Group's subsidiaries.  And at the end of 2017, I
8  ceased to have a an employment relationship with Match
9  and its affiliates.
10     Q   So let's start with your role in 2014 as the
11  executive chairman of Match Group, Inc.
12     A   Okay.
13     Q   Could you describe your duties and
14  responsibilities?
15     A   I was the senior-most executive in that group of
16  companies.  There was a CEO who reported to me.  We --
17  he was basically responsible for the day-to-day
18  operations of the businesses, and I was responsible for
19  overseeing him in that work and search strategic
20  initiatives that were sort of big picture outside of
21  the day-to-day operations that were designed towards
22  both growth and ultimately taking the company public.
23     Q   And by "he," who are you referring to?
24     A   Sam Yagan was the CEO at that time.
25     Q   CEO of what?

Page 12

1      A   Of Match Group from 2000 and -- sometime in 2012
2  through 2015, I believe, he was the CEO of Match Group,
3  Inc.  So I had only one direct report, who was Sam
4  Yagan.  Sam Yagan had multiple direct reports who were
5  the senior executives throughout Match Group.
6      Q   Do you know who those direct reports were?
7      A   I could name some of them, but I couldn't name
8  all of them.
9      Q   Who are some of them?
10     A   Lisa Nelson was the head of HR.
11     Q   And just to clarify, of Match Group, Inc.?
12     A   Of Match Group, Inc.  Again, I believe so.
13  Ayesha Gilarde was the head of marketing for, not
14  necessarily Match Group, Inc. maybe for Match.com; I'm
15  not sure.  At some point she became for Match Group,
16  Inc., I believe, but at that time, I'm not sure.
17         Jeff Dawson was the head of finance for Match
18  Group, Inc.  And then there were other people at
19  various times, but I -- I wouldn't want to speculate on
20  who it was who.
21     Q   Did you meet with any of those executives at any
22  point in your role as the executive chairman of Match
23  Group, Inc.?
24     A   I did.
25     Q   On how many occasions?

Page 13

4 (Pages 10 - 13)

1   A   Multiple occasions.  Depending on -- again, I
2   would be involved in projects that were important, so
3   if there were other people, I wouldn't do these
4   projects alone.  I would do them with other executives
5   in the company.  You would do quarterly reviews and
6   annual reviews that would involve those people in sort
7   of confirming the plan for the next year, the growth
8   projectories, mostly allocation of capital, where we're
9   going to spend money, where do we expect to make money.
10  Again, all in preparation for ultimately going public
11  at the end of 2015.
12  Q   And were all those discussions related to
13  Match.com?
14  A   No, not at all.  I was very involved in Tinder.
15  I was involved in Meetic.  Again, it was a holding
16  company with lots of operating companies underneath it.
17  So some initiatives would apply to all the companies,
18  some would be specific to an existing business.  I
19  wouldn't get involved in day-to-day operations of any
20  of the businesses, but if there was -- if let's say,
21  Meetic, which was our European business, was going to
22  acquire a company, I would be involved in that because
23  that is a significant allocation of capital for --
24  outside the ordinary of the day-to-day business.
25      If they were planning on investing significantly

Page 14

1   in a major product overhaul, a major brand overhaul, et
2   cetera, I -- that would be presented to me, and I would
3   evaluate it, but I wouldn't really be involved in
4   preparing it, if that makes sense.  Sort of like --
5   sort of like functioning like a board of directors.
6   Like anything that would rise to a board level,
7   effectively came to me.
8   Q   And the executives that presented information to
9   you, related to the subsidiary entities, was Match.com
10  come up in any of those discussions?
11  A   Sure.  That was one of our -- that was one of
12  our bigger businesses, so -- it was one of our three or
13  four principle businesses, so yes.
14  Q   And what did you discuss specifically in regards
15  to Match.com?
16      MR. HUMMEL:  Objection.  Overbroad.  Vague.
17  Calls for a narrative.
18  You can answer if you understand the question.
19      THE WITNESS:  I can't answer about what
20  specifically I discussed.  I can -- I can tell you
21  that -- sorry.  I can't refer to specific
22  conversations because I don't remember.  But, for
23  instance, one of the things we talked about a lot
24  was -- was that Match was a historically desktop
25  business, meaning it was built on desktop computers.

Page 15

1   And during this time mobile phones were -- there was
2   a huge migration of users and people from using
3   their desktops to using mobile phones.  And one of
4   the big things that we were doing at Match at that
5   time was trying to figure out how to build a mobile
6   business, right, and how to effectively manage the
7   transition that was happening all around us, you
8   know, exogenous to Match just in terms of users.
9   And that was a very big focus, so there would be
10  lots of meetings about that.
11  There were meetings about reorganization of the
12  technical -- technological structure within the
13  business, the company generally, and a question of
14  whether to -- at the time, everything was located at
15  the existing businesses.  There was a big discussion
16  about whether or not we should centralize some core
17  back-end technology or not, so those conversations
18  would involve Match and would involve Tinder and
19  would involve everybody.  So those are the kinds of
20  things we talked about.
21  BY MS. ZUCKERMAN:
22  Q   In those meetings would you make suggestions as
23  to what should happen to Match.com?
24      MR. HUMMEL:  Objection.  Vague.  Overbroad.
25  Calls for a narrative.  You can answer.

Page 16

1       THE WITNESS:  I would imagine I made
2   suggestions about -- I mean, I had my ideas about
3   what we should do, and it would be part of the
4   discussion, yes.
5   BY MS. ZUCKERMAN:
6   Q   Do you remember what your ideas were?
7       MR. HUMMEL:  Same objection.
8       THE WITNESS:  I don't recall specific ideas I
9   had.  I knew that we had to figure out a way to do
10  mobile, and so I would react to, but I was not a
11  driver of that discussion.  For instance, things
12  would be presented to me, and I would react to them.
13  The technology centralization initiative was -- I
14  did a lot of listening.  I did not make a lot of
15  suggestions.
16  I think, you know, back in 2009 and 2010, when I ran
17  the Match.com business, you know there I would make
18  lots of suggestions and decisions were mine.
19  In my role as chairman of Match Group, I wasn't
20  typically, sort of, in the weeds enough to -- I
21  could evaluate things that were put in front of me,
22  and I could react to them, but I was rarely driving
23  the thought process because my time was spread
24  too -- over too wide a field to know enough to be
25  able to say, This is really what we should do, and

Page 17

5 (Pages 14 - 17)

1    this is the feature we should launch.  And I more
2    latched on to ideas that were presented that I
3    believed in and I would support then that I was sort
4    of generating ideas from scratch.
5    BY MS. ZUCKERMAN:
6        Q   So I want to take a step back.  When you were --
7    back in 2014, you became the executive chairman of
8    Match Group, Inc.; is that correct?
9        A   I think at the very end of '13, but, yes.
10       Q   Okay.  Were you hired into that position?
11       MR. HUMMEL:  Objection.  Vague.
12       THE WITNESS:  I'd been the CEO of IAC, the
13   parent company for three years, and I had, over my
14   14-year career at IAC and its affiliated companies,
15   I had lots of different jobs, so I don't know if I
16   was hired into it.  I was certainly hired into the
17   first job as general counsel.  After that, they were
18   discussions between me and the chairman, and we'd
19   agree that this is what I would do next.
20   BY MS. ZUCKERMAN:
21       Q   And who was the chairman at that time?
22       A   Barry Diller.
23       Q   And to be clear, he was the chairman of IAC?
24       A   Well, chairman and CEO of IAC until I became CEO
25   in 2010, at which point he became chairman.

                                                    Page 18

1        Q   Then, when you became the executive chairman of
2    Match Group, Inc., did your office change?
3        A   It did not.  Well, my office might have changed,
4    but my building did not change.  I was in the same
5    location.
6        Q   And do you know where the office for Match
7    Group, Inc., was located?
8        A   Again, I believe -- we had lots of offices.  I
9    believe, if you looked it up, the headquarters would've
10   been in Dallas.  I am not a hundred percent sure of
11   that, but I believe that -- that in our corporate
12   documents -- like, I don't know that that's a legal
13   thing, where your headquarters are, but I believe we
14   talked about our headquarters being in Dallas, but I
15   happen to be in New York.
16       So there was a presence in New York, too,
17   because I was the chairman and that's where my office
18   was.  But we had offices in LA.  We had offices in
19   Paris.  We had offices in lots of places.  But I
20   believe that -- I believe that Match Group, the holding
21   company, was -- was viewed as being headquartered in
22   Dallas.  By the way, at some point, I believe that may
23   have changed, but I'm not sure.
24       Q   What -- what is a holding company?
25       MR. HUMMEL:  Objection.  Legal conclusion.

                                                    Page 20

1        Q   Did you meet with anyone from Match.com before
2    you were in your position as the executive chairman of
3    Match Group, Inc.?
4        MR. HUMMEL:  Objection.  Vague.  Overbroad.
5        THE WITNESS:  As CEO of IAC, I had
6    responsibilities.  IAC was the holding company in
7    the same way Match Group is a holding company.  So,
8    in the same way Match Group had multiple businesses,
9    IAC had multiple businesses.  One of those
10   businesses was Match Group, so I met with Sam Yagan,
11   who was the CEO of Match Group, and, you know, one
12   step removed, I would from time to time meet with
13   people at Match, so whereas as chairman of Match
14   Group, you know, I might meet with the CEO of
15   Match.com, for instance, you know, ten times a
16   year -- I am making it up.  As CEO of IAC, I might
17   meet with them twice a year, when they're presenting
18   their plan, or that sort of thing.  Again, like a
19   board of directors, only one further step removed.
20   BY MS. ZUCKERMAN:
21       Q   When you were the CEO of IAC, where was your
22   office located?
23       A   555 West 18th Street.
24       Q   In New York City?
25       A   In New York City, yeah.  Sorry.

                                                    Page 19

1        You can answer if you understand.
2        THE WITNESS:  Well, I'll give you a non- --
3    I'll give you the answer the way I think about it.
4    I'm not sure this is the legal definition, but
5    holding companies are companies that generate their
6    revenue through subsidiaries.  So a company operates
7    its businesses -- a business whose all their revenue
8    is flow-through up from its subsidiaries is a
9    holding company because it doesn't actually have a
10   business of its own, it runs its businesses through
11   subsidiaries.
12   And I think I'd probably go further which is if --
13   if -- it also has to have multiple businesses.  So
14   if you had a subsidiary and then a single business
15   -- a company that owned one subsidiary that made all
16   its money through that subsidiary, I wouldn't call
17   that a holding company.  But if it had three
18   subsidiaries or maybe even two, whatever their
19   definition is, that ran discrete businesses, each of
20   which generate revenue that flow up to a single --
21   to a single corporate entity, I would call that a
22   holding company.
23   BY MS. ZUCKERMAN:
24       Q   Was Match.com a subsidiary of Match Group, Inc.?
25       A   Yes.

                                                    Page 21

                                                    6 (Pages 18 - 21)

1    MR. HUMMEL: Objection. Vague.
2    You can answer.
3    THE WITNESS: Sorry. Again, I don't -- the
4    reason I am so hesitant is because I've seen the
5    chart, and there's about a hundred different
6    entities that -- so Match.com, the business, was
7    operated out of a subsidiary of Match Group, Inc. I
8    can't tell you which subsidiary it was or how far
9    down the chain it was and whether it was the same
10   one my entire time there, but it was operated
11   through a subsidiary, yes.
12   BY MS. ZUCKERMAN:
13   Q   And as executive chairman of Match Group, Inc.,
14   would you have had the authority to make decisions,
15   business decisions, for Match.com?
16   MR. HUMMEL: Objection. Calls for legal
17   conclusion. Vague.
18   You can answer.
19   THE WITNESS: I think that I would think about
20   it a little differently which is, like a board of
21   directors, I had the power to hire or fire the CEO
22   of that business. Okay. So when you have that
23   power, you have a great deal of influence, right?
24   So if the CEO would come to me and say, This is what
25   I want to do. I want to buy this company. Right?

Page 22

1    BY MS. ZUCKERMAN:
2    Q   How were Match.com executives evaluated?
3    MR. HUMMEL: Objection. Vague. Overbroad.
4    And by the way, relevance. I am not going to
5    instruct at this point, but it's a very short leash
6    on this type of questioning.
7    You can answer.
8    THE WITNESS: They were evaluated based on
9    their performance. And their performance was
10   subjectively evaluated, so there were no formulas.
11   There were no -- anything else -- I mean, depending
12   on the position, the managers would evaluate their
13   performance based on how good a job they think they
14   did under the circumstances. Circumstances are
15   different. Objectives are different at different
16   times, so it was all discretionary subjective
17   evaluation.
18   BY MS. ZUCKERMAN:
19   Q   There were no performance metrics?
20   A   There were no performance metrics that tied into
21   any formula. So there's lots of performance metrics of
22   a business in evaluating a particular executive. In
23   year A, one might find these performance metrics
24   important and year B, you might find different ones
25   important.

Page 24

1    I effectively had the ability to say yes or no. If
2    they came and said, I want to launch this marketing
3    campaign and spend $40 million, I effectively had
4    the ability to say, Let's only do 30.
5    But I wasn't directing it. I didn't have the
6    technical legal authority to do that, I don't think.
7    If you look at it legally, I just had the ability to
8    say, I don't support that decision. And she would
9    presumably go ahead and take that into account.
10   Again, I think the best, not a precise analogy, but
11   the best analogy is like an involved board of
12   directors. It's an oversight position, but they
13   have authority to do the ultimate thing which gives
14   them sort of subsidiary authority to be very
15   persuasive.
16   MR. HUMMEL: Counsel, I'm sorry. I've got to
17   take a quick break. Can we go off the record?
18   MS. ZUCKERMAN: Sure.
19   MR. HUMMEL: Thanks.
20   THE VIDEOGRAPHER: Going off the video record.
21   The time is 9:27.
22   (A break was taken from 9:27 a.m. to
23   9:33 a.m.)
24   THE VIDEOGRAPHER: We're now back on the video
25   record. The time is 9:33.

Page 23

1    Q   Would the profitability of Match.com be one of
2    those factors that were considered?
3    MR. HUMMEL: Objection. Vague. That's the
4    last one, Counsel, or we'll go get a protective
5    order. It has nothing to do with this case.
6    MS. ZUCKERMAN: Chad, if you could keep your
7    objections in a concise and non-argumentative
8    manner, I would appreciate it.
9    THE WITNESS: Profitability was relevant, but
10   again, what the -- how one evaluated whether
11   profitability was good or bad would vary from year
12   to year based on the circumstances. So you
13   certainly looked at profitability. You looked at
14   revenue, but there was no, if this, then that. It
15   was much more subjective.
16   BY MS. ZUCKERMAN:
17   Q   If you, as the executive chairman of Match
18   Group, Inc., had a disagreement with a Match.com
19   executive, what would happen?
20   MR. HUMMEL: Objection. Vague. Overbroad.
21   Calls for a narrative.
22   THE WITNESS: We would discuss it.
23   BY MS. ZUCKERMAN:
24   Q   How so?
25   MR. HUMMEL: Objection. Vague. Overbroad.

Page 25

7 (Pages 22 - 25)

1  Calls far a narrative.
2      THE WITNESS:  I mean, we'd just discuss it.
3  Ideally, you try to -- each person would try to
4  persuade the other person to get aligned.  If that
5  didn't occur, 99 times out of a hundred, the Match
6  executive would get their way.  And my general view
7  was that the people there were hired to run the
8  business.  If we disagreed on things consistently,
9  then I would get a new leader.  But my job was not
10  to run the businesses, so I can think of maybe one
11  time in ten years that I overruled a business
12  executive on what they wanted to do on their
13  business.
14  BY MS. ZUCKERMAN:
15      Q  Do you remember which business executive that
16  was?
17      MR. HUMMEL:  Objection.  Can you give me a
18  proffer of relevance on that one, Counsel?  This has
19  to be discoverable under Rule 16, as you know.
20      MS. ZUCKERMAN:  This goes to his control and
21  authority as the Match Group, Inc., chairman.
22      MR. HUMMEL:  How is that relevant to any issue
23  in the case?
24      MS. ZUCKERMAN:  Your objection is noted.  If
25  you're going to instruct him not to answer, you can

Page 26

1  do that.
2      MR. HUMMEL:  Instruct you not to answer.
3  BY MS. ZUCKERMAN:
4      Q  Are you following --
5      MR. HUMMEL:  I am offering you -- you can give
6  me a proffer of relevance or discoverability, if you
7  want; otherwise, I instruct you not to answer.
8  BY MS. ZUCKERMAN:
9      Q  Mr. Blatt, are you following your counsel's
10  instructions?
11      A  I will follow the instructions of my counsel,
12  yes.
13      MR. HUMMEL:  I am offering you a chance to give
14  me a proffer of relevance to this case, Counsel.
15      And by the way, Counsel, you're entitled to ask
16  those questions of control with respect to the three
17  remaining issues in the case which has to do with
18  guarantee, as you know, the charge-back policy, and
19  the web flow.  Those are three issues in the case.
20  If you want to ask questions about control and
21  oversight with respect to those issues, fine.
22  Perfectly relevant and discoverable.  But generally
23  speaking, you ask a question about when he disagreed
24  with an executive and what the disagreement was
25  about and who it was, bears no relationship to this

Page 27

1  case.
2  BY MS. ZUCKERMAN:
3      Q  Mr. Blatt, have you ever been employed by Match
4  Group, LLC?
5      A  Again, I don't know who my technical employer
6  was and the specifics of what entity did what, so I
7  can't answer that question.  I know what my jobs were,
8  but I don't know who my technical employer was in the
9  different jobs I had over my many years at IAC.
10      Q  Did you sign employment contracts with your
11  employer throughout your time there?
12      A  I had employment contracts some of the time.  I
13  don't believe I had employment contracts all of the
14  time, but I don't remember who the counterparties were.
15      Q  Do you have a copy of your employment contracts?
16      A  I probably have a copy of some of them.  I don't
17  know that I have a copy of all of them.  Some of them
18  would be publicly filed, but I don't know.
19      Q  Of the ones that you have, do you know where
20  they are?
21      A  I certainly don't have paper copies of them.
22  They would be on my computer somewhere.  I don't have
23  -- I don't have paper copies.
24      Q  Would you be able to preserve those copies that
25  you have?

Page 28

1      A  What does that mean exactly?
2      Q  Keep them in your possession, not destroy them?
3      A  Yes, I would be able to do that.  Again, to the
4  extent that I have them.  I don't know what -- I am not
5  familiar with every document that I have on my computer
6  so -- but to the extent it's there, I will promise I
7  will not touch it.
8      Q  Mr. Blatt, did you ever have dual roles while
9  you were employed?
10      MR. HUMMEL:  Objection.  Vague.  Potentially
11  calls for legal conclusion.
12      THE WITNESS:  Yeah.  Could you -- could you be
13  more specific?  I'm not sure exactly what that
14  means.  I mean, CEO has lots of responsibilities and
15  lots of roles, so I'm not sure exactly what you
16  mean.
17  BY MS. ZUCKERMAN:
18      Q  If you could clarify the roles, all the roles
19  that you had as a CEO and executive chairman.
20      MR. HUMMEL:  Objection.  Vague.  Overbroad.
21  And asked and answered.
22      THE WITNESS:  I don't know how to
23  comprehensively describe what a CEO does.  A CEO
24  does a million different things.  They are
25  ultimately responsible for the performance of the

Page 29

8 (Pages 26 - 29)

1  used?
2      MR. HUMMEL: Foundation.
3      THE WITNESS: I don't know. I was not a chat
4  user, so I did not -- I know there were Slack
5  channels at various times and various businesses.
6  Whether there was an omnibus chat platform that
7  people used, I don't know.
8  BY MS. ZUCKERMAN:
9      Q  Was the Slack platform there for -- available
10  for use when you were the chairman of Match Group?
11     A  As I said, I am sure if I wanted to use Slack
12  someone would have enabled me to use Slack, but I don't
13  know who else was using Slack. And I never explored
14  it.
15     Q  Did you interact with employees or executives
16  who exclusivity worked on Match.com?
17     MR. HUMMEL: Can I have that read back, please.
18         (The requested portion of the record was
19         read back by the reporter as above
20         recorded.)
21     MR. HUMMEL: Objection. Vague. Overbroad.
22  You can answer if you understand the question.
23     THE WITNESS: In 2009 and 2010, quite a bit.
24  By 2014, when I became chairman of Match Group,
25  rarely. And by 2016, 2017, probably, virtually

Page 34

1  never.
2  BY MS. ZUCKERMAN:
3      Q  So around 2014, when you had rare interactions,
4  how would you communicate?
5      MR. HUMMEL: Communicate with?
6  BY MS. ZUCKERMAN:
7      Q  Communicate with Match.com employees or
8  executives?
9      A  It would generally be in the context of a
10  meeting where they were presenting something to me that
11  was organized, either as a new acquisition target or a
12  new annual plan. Again, it was rare that I would be in
13  meetings or communication with people who worked
14  exclusively on Match at that point.
15     Q  Would you communicate via email?
16     A  Again, as a focal point of my communications, it
17  was rarely -- I don't even remember the name of the
18  person who was running Match.com at that time. So I --
19  it was rare that -- I'm not saying I never did, but I
20  certainly didn't have like an ongoing email, you know,
21  dialogue with the person who ran Match.com. It is
22  possible that that person's boss would then forward
23  some email chain that was of big picture relevance, and
24  I might comment on. That person maybe copied on it,
25  but in general, by that point, I was dealing with

Page 35

1  people who exclusively were at Match.com very rarely.
2      Q  Did you report to anyone as the Match Group CEO?
3      A  I did. I reported to the Match Group board of
4  directors. Public company at that point, and I
5  reported to the board.
6      Q  Did Match Group, Inc., generate revenue?
7      A  Again, I can't speak specifically to the entity,
8  the name of the entity. The Match.com business
9  generated revenue in whatever subsidiary it was housed.
10  I don't know whether that was Match Group, Inc., or
11  not. I would have to look at a plan.
12     Q  As the Match Group, Inc., CEO and chairman, did
13  you have plans to increase the profitability of
14  Match.com?
15     A  Did I personally have plans to do it, or did the
16  company have plans to do it?
17     Q  Did you, as the Match Group, Inc., chairman and
18  CEO?
19     A  I approved annual plans for the business, and
20  some of them contemplated increasing profitability, and
21  some of them contemplated decreasing profitability, and
22  I would approve those plans after a long process. I
23  was not generally involved in developing those plans in
24  any detail. And I would not refer to them as my
25  personal plans, but I was presented plans, and I did

Page 36

1  approve them.
2      Q  What was the approval process?
3      MR. HUMMEL: Objection. You're asking about
4  the approval process for annual plans?
5      MS. ZUCKERMAN: For Match.com.
6      MR. HUMMEL: For the operating company? How in
7  the world is that discoverable in this case? And
8  it's vague. Overbroad. Again, you need a proffer,
9  Counsel, and you're way outside the bounds of what
10  is permissible.
11     MS. ZUCKERMAN: Are you instructing him not to
12  answer?
13     MR. HUMMEL: No. I am asking you for a proffer
14  of relevance. And if you're not going to do it, it
15  speaks volumes. Look, I am not going to argue with
16  you in this case, but let's not waste Mr. Blatt's
17  time with a lot of stuff that's never going to see
18  the light of day.
19     MS. ZUCKERMAN: This goes to the charge-back
20  policies, cancellation policies.
21     MR. HUMMEL: Ask him about that.
22     MS. ZUCKERMAN: We'll get there, Chad.
23     MR. HUMMEL: No, no, no. Get there. Because
24  you're taking a lot of time. You're going around
25  all kinds of avenues. You're talking about annual

Page 37

10 (Pages 34 - 37)

1    plans for profitability of a business.  Ask him

2    about charge-back guarantee and the cancellation

3    policy.  That's what this case is about.

4  BY MS. ZUCKERMAN:

5    Q  If there were Match.com policies that the

6  executives presented to you, would you have had the

7  authority to approve them?

8    MR. HUMMEL: Objection.  Vague.  Overbroad.

9  It's vague as to time, as to substance.  And it's,

10  as phrased, not discoverable.

11  But if you understand the question, you can answer.

12  And it calls for a legal conclusion, as well.

13    THE WITNESS:  I'm not sure I understand what

14  you mean by a policy put in front of me for

15  approval.  Can you be more specific?

16  BY MS. ZUCKERMAN:

17    Q  Were there any policies related to Match.com

18  ever presented to you?

19    MR. HUMMEL:  Vague.  Overbroad.

20    THE WITNESS:  After I stopped being -- after

21  2010, I have no recollection of anything that I

22  would consider a policy being put in front of me for

23  approval from Match.com.

24  BY MS. ZUCKERMAN:

25    Q  What about Match.com advertising?  Has that ever

1    Q  And you stated that you would provide feedback

2  when materials were presented to you.  Did you, in

3  fact, provide feedback and comments on Match.com

4  marketing materials?

5    A  I did provide feedback on certain Match.com

6  marketing materials, yes.  Certainly not all, but on

7  significant ones at that stage, mostly television.

8    Q  I am marking a document with the Bates label

9  Match FTC521397 as Exhibit Number 1.

10    I'll share a copy with you, Mr. Blatt?

11    (Plaintiff's Exhibit 1 was marked for

12    identification.)

13    MS. ZUCKERMAN:  And counsel, as well.

14    MR. HUMMEL:  Do you want to show him the marked

15  exhibit?  I don't -- don't take a look at the marked

16  exhibit.

17  BY MS. ZUCKERMAN:

18    Q  Okay.  This is a three-page document.

19    A  Uh-huh.

20    Q  Looking at the bottom of Page 3 that has the

21  Bates label Match FTC521399.  Mr. Blatt, do you see the

22  name there, Alexis Ferraro?

23    A  I do.

24    Q  Do you know this person?

25    A  I do.

1  been presented to you in any way?

2    MR. HUMMEL:  Ever?

3    THE WITNESS:  Can you -- can you define

4  advertising?  Like -- like -- you mean, like a

5  commercial that they wanted to run or an amount of

6  money they wanted to spend on advertising?  What --

7  what -- can you be more specific?

8  BY MS. ZUCKERMAN:

9    Q  Were Match.com commercials ever presented to you

10  for approval?

11    A  Yes.

12    Q  And if you --

13    A  Sorry.  Just to be clear, approval.  It was not

14  the case that they would go out, spend a lot of money,

15  make a commercial, and then run it, and say, Do you

16  approve of this commercial, and I would say yes or no;

17  that's not the way it worked.  But if there was a plan

18  that called for a meaningful amount of money to be

19  spent on a marketing campaign, then at various stages

20  along the way the campaign idea would be presented, and

21  not so much for approval but for feedback, and it would

22  go like that, but.  So marketing -- television

23  advertising was an area that I would see.  So I think a

24  better way to put it than that I approved it or

25  disapproved it.  I would see it.

1    Q  Who is it?

2    A  She was a person at Match.com who worked on the

3  television marketing.

4    Q  Did you interact with this person frequently?

5    MR. HUMMEL:  Objection.  Vague.

6    THE WITNESS:  At various points in my career, I

7  interacted with her more than less frequently, but,

8  yes, I knew her.  Less frequently the more time went

9  on.  A lot in 2009 and 2010; much less after that.

10  BY MS. ZUCKERMAN:

11    Q  How often after 2010 would you interact with her

12  in relation to Match.com marketing or advertising?

13    A  It would, like most of these things, it would be

14  in bursts.  So to the extent that there was a campaign

15  that was under development, I would talk to her a fair

16  amount; when there wasn't, I would talk to her rarely,

17  if at all.

18    Q  And looking at the first page of this exhibit,

19  in the middle, do you see your name there, Blatt, Greg?

20    A  I do.

21    Q  And the email address there, blatt@iac.com, is

22  that your email address?

23    A  As I said, I had at least two.  I had more than

24  two email addresses, but that was one of the principle

25  ones that I used.

1    Q   And you used it for work purposes?
2    A   I did.
3    Q   As far as you know, were you the only person
4  able to send and receive emails at that email address?
5    A   I am sure there were people in IT who could've
6  done it, if they had wanted to, but I have no reason to
7  believe that anyone did other than myself.
8    Q   Do you recognize this email exchange?
9    A   I do.
10   Q   And how do you recognize that?
11   A   I actually was shown this document.  So when I
12  said earlier that I thought I had only seen the
13  cancellation flow, seeing this document now reminds me
14  that I also was produced this document.
15   Q   Thank you for the clarification.  Looking at the
16  bottom of Page 1, you state, "Comments, Number one, get
17  rid of the fucking .com.  Number two, get rid of the
18  fucking .com.  Number three, get rid of the fucking
19  .com.  More to come."
20   A   Yes.
21   Q   Did I read that correctly?
22   A   I believe you did, yes.
23   Q   And you sent that email on Friday, April 11,
24  2014, at 11:00 a.m., to Alexis Ferraro and CME again;
25  is that correct?

Page 42

1    A   Yes, with two people copied.
2    Q   And those two people copied are Amarnath
3  Thrombre and Susan Tam, right?
4    A   More or less, yes.
5    Q   Who is Susan Tam?
6    A   She was the person, the most senior person, in
7  charge of creative work on Match.com television
8  campaigns.
9    Q   Who is Sam Yagan?
10   A   He was the CEO of Match Group.
11   Q   And at this point in time, what was your title?
12   A   Executive chairman of Match Group.
13   Q   And who is Amarnath Thrombre?
14   A   Amarnath Thrombre was -- I actually don't know
15  what his title was at this time.  He worked there.  He
16  was senior person who worked with me in a variety of
17  capacities at various times, and I don't know what his
18  role was at this specific time.
19   Q   Do you know what company he worked for?
20   A   I think he -- at this time, I actually don't.
21  He probably had responsibilities over multiple
22  companies, but I'm not sure.  I really don't remember.
23   Q   Going into the comments of the "Get rid of the
24  fucking Match.com" -- "get rid of the fucking .com"?
25   A   Yes.

Page 43

1    Q   What did you mean by that?
2    A   Well, this was -- again, I talked earlier about
3  the transition from desktop to mobile and that was a
4  big initiative of the company.  And companies like
5  Amazon, Expedia, and Google, and Yahoo had all dropped
6  the .com.  If you think way back, it used to be
7  Amazon.com, and then they stopped.  And people in our
8  company just couldn't get that in our heads.  So
9  anytime I saw a .com on anything, this was my response,
10  or something like it, to try and remind people that
11  we're supposed to be thinking in a new way.  And so
12  this is sort of like an inside joke, like it was still
13  showing Match.  On the commercials that I saw, I
14  imagine it still said Match.com, and I wanted it to
15  just say "Match."
16   Q   Why did you just want it to say Match?
17   A   Because when you go on a mobile phone, you're
18  usually using a native app, and so .com made us feel
19  old.  All the old -- all the sort of original on-line
20  brands had dropped .com to compete with all the new
21  mobile only brands that were coming up.  And this was
22  our internal culture of like trying to get people to
23  remember that they had to drop the .com.
24   Q   After you provided those comments, did you
25  follow up and make sure that they indeed dropped

Page 44

1  the .com?
2    A   I have no recollection of that.  I mean, over
3  time, I believe my campaign was successful, but I can't
4  tell you that I specifically followed up in this
5  instance or whether .com made it onto the ads or not.
6  I don't have any recollection.  And again, that was
7  Match Group directive to all the businesses that
8  everyone had to drop the .com from their names.
9    Q   What do you mean?
10   A   There was chemistry.com and there was Meetic.com
11  and there was OkCupid.com, and they're all supposed to
12  get rid of .com.
13       (Plaintiff's Exhibit 2 was marked for
14       identification.)
15  BY MS. ZUCKERMAN:
16   Q   Oh, I am now marking a document with Bates label
17  Match FTC379039 as Exhibit Number 2.  It's a two-page
18  document.  I'll hand it over to you Mr. Blatt.
19   A   Thank you.
20   Q   And copies to counsel.
21       Mr. Blatt, looking towards the middle the first
22  page of this document, do you see your email address
23  there?
24   A   I do.
25   Q   And again, that's blatt@iac.com.  That's your

Page 45

12 (Pages 42 - 45)

**APP 039**

1 have existed in certain narrow use cases, but it wasn't
2 prominent, so I don't know whether or when it was
3 discontinued completely, but it was certainly
4 de-emphasized.
5    Q   When you were with Match Group around 2014 as
6 the executive chairman and CEO, did you oversee any
7 aspect related to the Match guarantee program?
8    A   I was executive chairman at the time, and again,
9 I don't recall engaging with or commenting on or being
10 involved in the guarantee at any point in that time
11 period.
12    Q   Were there any metrics that you tracked related
13 to the Match guarantee program?
14    A   Again, it is possible that I saw something in
15 2009 and 2010, but I would be highly doubtful that I
16 did after that.  And I certainly have no recollection
17 of viewing anything relating to the guarantee.
18    Q   And around the time of 2014 and beyond, do you
19 know who oversaw the Match guarantee program?
20    A   Again, I am not even sure the extent to which it
21 existed or was used, so I certainly don't know whether
22 there was a person responsible for it.  I mean, it
23 existed in some hybrid of marketing and product, and to
24 the extent it was being employed in some way, it was
25 someone in those groups, but I don't know who.

Page 62

1 brought to my attention, but I have no recollection
2 of that being the case with the -- with the
3 guarantee.
4    Q   I am marking a document with Bates label Match
5 FTC661136 as Exhibit Number 5.
6       (Plaintiff's Exhibit 5 was marked for
7       identification.)
8 BY MS. ZUCKERMAN:
9    Q   And I am sharing that with Mr. Blatt and
10 counsel.
11       So this is a nine-page document, I'll give you a
12 few moments to review it, Mr. Blatt.
13    A   Sorry.  This is very long.  At what level of
14 detail do you want me to understand this before you --
15 do you want me to read it all, or is there something --
16 I am happy to, but...
17    Q   If you could, yeah, review --
18    A   Sure.
19    Q   -- the documents.
20    A   Just give me -- give me a couple of minutes.
21 Depending on your questions, I may refer to it again,
22 but I think I have the gist of it.
23    Q   If you could look at Page 8 of this exhibit,
24 Mr. Blatt, towards the bottom of that page.

Page 64

1    Q   Would that be under the purview of Match Group?
2    A   No, no.  That would be in the Match.com
3 operating business.
4    Q   Are you aware of any customer feedback related
5 to the Match guarantee program?
6    A   I'm not aware of any specific customer feedback,
7 no.
8    Q   Hypothetically, if you had been aware of
9 customer feedback that was negative against the Match
10 guarantee program, is there anything that you could've
11 done to address the consumers' issues?
12       MR. HUMMEL:  Objection.  Foundation.  Calls for
13 speculation.
14 You can answer.
15       THE WITNESS:  Being aware of the fact that
16 there was some negative feedback about something
17 alone would not -- there's, you know, we're touching
18 tens of millions, hundreds of millions of people.
19 It's very easy to issue a complaint.  People
20 complain about different things a lot.  Certainly,
21 to the extent that the customer care people and on
22 top of that the marketing people and the product
23 people and then the general manager, if we were
24 getting complaints at a level that raised issues, it
25 is conceivable that something like that could be

Page 63

1    A   Yeah.
2    Q   And it's from Victoria V.  Appears to be a
3 consumer or user of Match.com, right?
4    A   Yes.
5    Q   And in the "to" line there are several email
6 addresses.  The one being gregory.r.blatt@iac.com, and
7 there are several others.
8    A   Yes.
9    Q   Variations.  Were any of those your email
10 addresses?
11    A   I don't believe so.  I can't say for sure
12 that -- one of these may have existed, and it may have,
13 in fact, gotten to me.  But these were not emails that
14 I used, and so it's possible that IT set up variations
15 that I don't know about, but my primarily emails were
16 blatt@iac.com, and I think gregblatt --
17 greg.blatt@match.com, and then I had a Tinder address.
18 But none of these addresses are addresses that I am
19 familiar with.
20    Q   Do you recognize this email exchange?
21    A   No.
22    Q   So hypothetically, if Victoria V or any consumer
23 or user of Match.com had somehow sent you an email
24 directly --
25    A   That I received.

Page 65

17 (Pages 62 - 65)

1  Q  Correct. Yeah. Hypothetically. If you had
2  received it and the user was concerned about the Match
3  guarantee program, what would you have done?
4      MR. HUMMEL: Objection. Foundation.
5  Speculation.
6  You can answer.
7      THE WITNESS:  Certainly there were people who
8  from time to time got my email address and sent me
9  complaints about this and other businesses that I
10  ran when I was CEO of IAC, et cetera, common that
11  that happens.
12     In general, I would forward them directly to
13  customer service, although usually customer service
14  would be copied on them, as well.  Sometimes I would
15  do it without reading it, depending on what the
16  situation was.  Again, there's nothing special
17  about -- it wasn't like an escalation.  It was some
18  people happen to get my email address and some
19  people didn't, so it didn't make it a different
20  thing, and I wanted to put it into the regular
21  process.  And that's what I typically did.
22 BY MS. ZUCKERMAN:
23  Q  And by "customer service," what are you
24  referring to?  Is that a Match.com customer service
25  agency?

                                        Page 66

1  would send it, and then I would get some sort of
2  response saying, We've got it, and then I would
3  consider it on, understanding that if it was a special
4  import, it could ultimately bubble up, but I wasn't --
5  I didn't take it upon myself to become a vetter of
6  complaints just because someone randomly happened to
7  send it to me instead of to the customer service
8  people.
9  Q  If you had received a complaint related to the
10  Match guarantee program from a Match.com user, would
11  you have discussed it with other Match.com executives?
12     MR. HUMMEL: Objection. Vague. Overbroad.
13     THE WITNESS:  I -- I -- speculation, obviously,
14  but I'm highly doubtful that simply receiving a
15  complaint in an email about a product feature of
16  this nature would have made me -- I mean, I am
17  not -- it's not my job.  There are people whose job
18  it is to vet these complaints and follow up on them
19  and talk to the consumer and everything else, and I
20  wouldn't put myself in the middle of that.  It's
21  beyond a full-time job.  We have many people who do
22  that full-time because there's lots of them, so.
23 BY MS. ZUCKERMAN:
24  Q  Did anyone from the customer service department
25  raise these issues which ultimately was presented to

                                        Page 68

1  A  Again, it depends what business was.  And if the
2  complaint was about Match.com, I would send it to the
3  Match.com customer service people.  If the complaint
4  was about OkCupid, I would send it to the OkCupid
5  customer service people.  There were different groups.
6  Again, if at some point, I believe, it became something
7  of a shared service, but not until much later, and even
8  then, it was still predominantly done at the business
9  level.
10  Q  Would you follow up with any of the consumer
11  feedback or emails that you may have gotten?
12  A  I mean --
13     MR. HUMMEL: Objection. Overbroad. Vague.
14  You can answer.
15     THE WITNESS:  Would I respond to the person who
16  sent me the email?
17 BY MS. ZUCKERMAN:
18  Q  No.  Would you follow up with the customer
19  service department?
20  A  Unless there was some reason that -- unless
21  there was something in it that made me think this was
22  different in nature or kind, than the thousands of
23  emails that go to customer service on a regular basis,
24  I wouldn't have.  Meaning, my goal was to make sure it
25  got to customer service and got taken.  So usually I

                                        Page 67

1  you?
2  A  "These issues" meaning what?
3  Q  Related to the Match guarantee program?
4  A  I have no recollection of anyone raising
5  substantive issues about the Match guarantee issue with
6  me.  Sorry.  Relating complaints that we got or
7  anything of that nature.
8  Q  Do you recall receiving complaints related to
9  the cancellation procedure of Match.com?
10  A  I recall from time to time getting complaints
11  sent directly to me.  I don't recall any specific
12  complaint that I received about anything.  Meaning, I
13  know that I got them, but there's none that stick out
14  in my memory in specifics, that it was about X or Y.  I
15  generally forwarded them to the appropriate -- to the
16  appropriate people at the company.
17  Q  You forwarded it via email, right?
18  A  If I received it via email, I forwarded it via
19  email, yes.
20  Q  Did you receive complaints in other platforms?
21  A  I don't have any recollection of receiving it,
22  but it's conceivable that I received a letter or
23  something else and that I would've had the letter
24  forwarded.
25  Q  So as the Match Group executive chairman and

                                        Page 69

18 (Pages 66 - 69)

1 CEO, had you had any discussions related to the Match
2 guarantee program?
3    A   As I said, I remember discussing the program as
4 part of an overall discussion about the Match business
5 in 2009 and 2010, when it was both a more central thing
6 and when my job was to run the operating business of --
7 of -- well, co-run the operating business of Match.com.
8 By the time I came back in 2014 as executive chairman,
9 I have no recollection of any discussions about the
10 guarantee in any form, at any time.
11    Q   Are you aware of Match.com's policies related to
12 refunds?
13    A   I am aware that we had policies relating to
14 refunds.  But I'm not sure specifically what you're
15 referring to about my level of awareness.
16    Q   Were you involved in any way in drafting or
17 creating the policies?
18    A   There's certainly at some point in my time there
19 -- I don't remember when, I was party to discussions
20 about refunds, generally, and about, you know, the
21 challenges that customer service faces in terms of
22 sifting through legitimate refund complaints and
23 illegitimate refund complaints and the need to set
24 policy and everything else.  And I -- but I don't have
25 any specific recollection about it, meaning that I know

Page 70

1 that I talked about it at some point, but I don't
2 remember when that was, or what the specific issue was,
3 or what the outcome was, or anything like that.  I
4 just -- I know that we talked about it at some point.
5    Q   Did you provide feedback on how to approach
6 these particular issues related to refunds?
7       MR. HUMMEL:  Objection.  Vague.
8       THE WITNESS:  I participated in the
9 conversation.  I don't recall what I said or any
10 specific reaction that I had or when it was or who
11 it was with.  I just know that at some point in my
12 14 years we talked about refunds and that issue.
13 BY MS. ZUCKERMAN:
14    Q   Was this before when you were with Match.com in
15 2019 and 2010?
16    A   2009, 2010.
17    Q   Right.
18    A   I don't -- I can't say.  I do not recall when it
19 was.
20    Q   If -- do you recall where these meetings
21 would've taken place, in person or?
22    A   I don't recall.  I just know that I am familiar
23 with the issue.  That it was tough for -- in this
24 business in particular, we would get a lot of false
25 refund claims for a variety of reasons.  And they were

Page 71

1 trying very hard to figure out a way to make sure that
2 we were offering legitimate refunds and rejecting
3 illegitimate refunds, and that was hard.  I don't
4 recall what the policy was or whether it changed or who
5 I was talking to.  I just remember at some point this
6 coming up in, you know, context of just life.
7    Q   But you don't remember the time line of when it
8 came up?
9    A   I don't.  I can't place it.
10    Q   It would be between 2009 and 2018; is that
11 right?
12    A   Yes, it would, but I don't know when.
13    Q   Were you concerned about these issues related to
14 refunds?
15    A   I mean, if someone brought it to my attention, I
16 would engage in the conversation, but I wouldn't leave
17 the conversation concerned about refunds.  It was one
18 of many issues that the company was dealing all the
19 time.  It wasn't especially momentous issue as opposed
20 to others.  It was something we needed to do the best
21 we could to get it right.  We had people focused on it.
22 And I was satisfied that the right people were
23 sufficiently focused on it, and so I was not concerned
24 about it.
25    Q   Who were those people focused on this issue?

Page 72

1    A   Again, I can't speak at that moment, but it
2 would've been the customer care people at Match.com at
3 that time, the product people at Match.com at that
4 time, and the GM of business Match.com at that time.
5 So it's their job, again, sort of like the audit
6 committee presentation earlier, to the extent I was
7 involved in, it was brought to my attention as
8 something that someone either shot feedback on, advice
9 on, or to make me aware of it.  It's not something that
10 I would direct or -- or actively assert myself in.
11 It's not -- you know, it's -- there's hundreds of
12 issues like that and that's the job of the people that
13 run the business, not my job as CEO of Match Group.
14    Q   If you had a disagreement with employees or
15 executives who were engaged in refund issues, for
16 example, what could you have done?
17       MR. HUMMEL:  Objection.  Overbroad.  Vague.
18       THE WITNESS:  What could I have done, or what
19 did I generally do?
20 BY MS. ZUCKERMAN:
21    Q   What did you generally do?
22    A   In any issue that was brought to my attention,
23 again, in general, there were several issues that I
24 proactively managed.  Anything else would've been
25 reactive, meaning someone coming to me for my advice or

Page 73

19 (Pages 70 - 73)

1  again, it was we had a senior customer service person
2  who would then help the individual customer service
3  operations.  So you'd have an like an expert who was
4  more senior than any of the businesses could afford,
5  right?  You couldn't have that senior person on each of
6  these businesses.  They had their own teams.  They did
7  it, but we had a senior person who could help out and
8  advise.  But it was all directed, and the
9  responsibility for that service still was the CEO of
10  the particular business.  So Match.com would be
11  responsible for its own customer service even if it
12  utilized certain shared services from corporate, if
13  that makes sense.
14       Again, there was some marketing, mostly in terms
15  of just the process of buying AdWords on Google and
16  Facebook, that's like a highly technical process, and
17  we had a team that was really good at it, but the
18  inputs of how much to spend, what the creative was,
19  et cetera, all came from the businesses.  It was more
20  like an internal agency; instead of going outside, you
21  do it inside.  I am sure there were more at certain
22  times, but I can't remember any.  My answer is probably
23  not exhaustive, but it covers the bulk of it, I am
24  sure.
25       Q  What were all the ways that a Match.com user

Page 78

1  could cancel their subscription?
2       A  I have no idea.  I would not be able to answer
3  that question.
4       Q  Could they do it via website?
5       A  I am sure they can do it through a website,
6  yeah.
7       Q  You stated previously that you reviewed
8  materials related to the cancellation flow; is that
9  correct?
10       A  In my preparation for this?
11       Q  Yes.
12       A  I did.  I reviewed one cancellation flow.
13       Q  And what was -- what appeared on the document
14  that you reviewed?
15       MR. HUMMEL:  I am going to object.  We're
16  getting into attorney work product here.  You might
17  be able to phrase the question that doesn't infringe
18  on attorney work product.
19  BY MS. ZUCKERMAN:
20       Q  So I want to get into what you reviewed.  I
21  don't want to get into attorney-client, you know,
22  privilege-related matters.  And if you remember
23  reviewing certain things, could you describe what you
24  reviewed in relation to the cancellation flow?
25       MR. HUMMEL:  As phrased I am going to object.

Page 79

1  Attorney work product.  Instruct you not to answer.
2  There are ways to ask the question that don't
3  infringe on the work product and I've sent authority
4  to the FTC in this case.
5  BY MS. ZUCKERMAN:
6       Q  Do you know if the Match.com user could cancel
7  their subscription by calling Match.com via phone?
8       A  Let me be clear.  I do not know.  I assume that
9  at some point that was the case.  I don't know if it's
10  still the case, but I don't -- I'm not an expert.
11  Again, we had, I think, 55 different brands, each with
12  websites and mobile products, and I am not competent or
13  qualified to opine on -- exhaustively on how each of
14  these businesses or products could do all these things.
15  I really don't know.
16       So Match.com, in particular, I am sure at some
17  point you could make a phone call.  OkCupid, for
18  instance, I imagine you never could.  I just don't -- I
19  can't -- but I can't tell you at what time, whether
20  they still do.  It's not something I do.
21       Q  When you were employed by Match Group as the
22  chairman and CEO, were you aware of cancellation
23  procedures or policies that were in place for
24  Match.com?
25       A  I don't know what you mean by cancellation

Page 80

1  procedures or policies.  The meaning -- I know that you
2  can cancel your subscription, like with any other
3  cancellation prod- -- any other subscription service,
4  but I don't know what the cancellation policy would be.
5       Q  Do you know how a user might have cancelled
6  their subscription, a user of Match.com?
7       MR. HUMMEL:  Asked and answered.
8       THE WITNESS:  I mean, again, until I reviewed
9  something yesterday, I knew that it could be done,
10  but I wouldn't be able to tell you, like, what the
11  product flow was or anything, you know, or whether
12  it changed multiple -- you know, I don't know.  It
13  was not something I would've been involved in on a
14  regular basis.
15  BY MS. ZUCKERMAN:
16       Q  Were you aware of any data or metrics related to
17  Match.com's subscription cancellations?
18       A  In the metrics pack that I would get,
19  cancellations would be, if not explicitly listed which
20  I don't think they were, they were implicit in terms of
21  termination rates and other things.  It's not -- so I
22  would have some sense, directionally, I guess, of
23  whether they were going up or down, but I wouldn't be
24  able to cite them at any given time as something that I
25  knew.

Page 81

21 (Pages 78 - 81)

1   Q   You just mentioned "metrics packs."  Did you
2   receive metrics packs related to the Match guarantee
3   program?
4   A   No, not -- certainly not that I recall.
5   Q   What about metrics packs related to refunds; did
6   you receive...
7   A   No, I would not have -- again, metrics pack
8   meaning they're, you know, certain metrics that are
9   material to the business, knowing how many people are
10   subscribing to your business and how many people are
11   leaving your business, they're obviously two very
12   important things.  And so it would be inherent in the
13   numbers that I saw as opposed to the guarantee which
14   would be so subsumed within 37 other things that I
15   wouldn't know what was going on.
16   Q   Was it ever brought to your attention that the
17   Match.com subscription cancellation process should be
18   changed?
19   A   Not that I recall.
20   Q   If a consumer or user of Match.com raised an
21   issue related to cancellation to you directly, what
22   would you have done?
23   A   Like on the street, if they raised it to me
24   directly?
25   Q   If they emailed you, for example?

Page 82

1   A   I believe I have answered that question.  I
2   would have forwarded it on, perhaps not even reading
3   what it was about.  Possibly reading what it was about.
4   It would depend on the moment, but in general not -- in
5   general, I would forward it on to customer service to
6   deal with.
7   Q   Would you follow up on any of those matters?
8   A   Again, I believe I answered that question.
9   I -- unless there was something about it that made me
10   think it was different than the regular flow of
11   complaints, and the only thing that made it different
12   was this person happened to put me on the email as well
13   as somebody else, I would not follow up on it.  Again,
14   there would be no reason to treat that one differently
15   than the hundreds and thousands that come in otherwise
16   about any business that goes to customer service.
17   That's why you have a customer service team to deal
18   with those issues.
19   Q   And did the customer service team raise any of
20   these issues with you at any point?
21   A   Customer --
22   MR. HUMMEL:  Objection.  Vague, these issues.
23   THE WITNESS:  Customer service would not raise
24   an issue with me.  To the extent, as I said earlier,
25   that the nature or volume of complaints about a

Page 83

1   particular issue indicated a -- something that
2   needed to be evaluated, it would go to other people
3   long before it would make it to me.  It would go to
4   X, then go to Y, then go to Z, and then maybe it
5   would get to me.  I can't recall.  I can't say it
6   never happened, but I can't recall anything of this
7   nature bubbling up to me as a result of customer
8   complaints.
9   BY MS. ZUCKERMAN:
10   Q   Were you involved in any discussions on whether
11   the cancellation flow should be changed?
12   A   Again, I have no recollection of any discussion
13   about cancellation flows, and as a matter of course, it
14   would not be something that I would be engaged in
15   except under special circumstances after the 2009, 2010
16   period.
17   Q   What do you mean by "special circumstances"?
18   A   I mean, if it was something that -- that had
19   risen to the level of concern or animation that people
20   thought it required top-level approval, which, as I
21   said, was not ordinarily the case.
22   (Plaintiff's Exhibit 6 was marked for
23   identification.)
24   MS. ZUCKERMAN:  I am marking a document with
25   Bates label Match FTC771220 as Exhibit Number 6 and

Page 84

1   sharing it with Mr. Blatt and counsel.
2   BY MS. ZUCKERMAN:
3   Q   I am looking at the bottom of Page 3 of this
4   exhibit.
5   A   Can you just give me one more second, please.
6   Q   Of course.
7   A   This guy's name is Alpacino.  Did you see that?
8   His first name is Alpacino.  I never heard that before.
9   That's a cool name.  Okay.
10   Q   So on the third page it says, from Tyler W.
11   Brown, who appears to be a user of Match.com, right?
12   A   Yes.
13   Q   And it's an email dated July 12th, 2016, at 5:36
14   p.m.  It was sent to barry.diller@iac.com.  Who is
15   that?
16   A   He's the -- at the time was the chairman of IAC.
17   Q   And this email is also copying
18   greg.blatt@iac.com.  Were those one of your email
19   addresses?
20   A   I believe that was one of the secondary email
21   addresses that I had.
22   Q   Do you recognize or remember this email?
23   A   I do not.
24   Q   So I am looking at the last page of this
25   exhibit, and it appears that Mr. Brown states,

Page 85

22 (Pages 82 - 85)

APP 044

1    "Approximately one month ago I did try to cancel my
2    subscription online.  However, the process was not
3    intuitive and therefore gave up."  Did I read that
4    directly?
5        A  I'm sorry.  Where are you reading from?  I was
6    not trying to track your...
7        Q  From the third sentence there, "Approximately
8    one month ago, I did try to cancel my subscription
9    online.  However, the process was not intuitive and
10   therefore gave up."
11       A  Yes.
12       Q  And then a few lines down, "As a matter of fact,
13   two of your customer service reps confirmed that the
14   majority of the calls they receive either relate to
15   refunds or how to cancel subscriptions, parenthesis,
16   not intuitive, close parenthesis, online."  Did I read
17   that correctly?
18       A  Yes.
19       Q  I am looking at Page 3 again.  In the middle of
20   this page from Vincent Galeraud.
21       A  Yeah.
22       Q  Do you know who that is?
23       A  He -- he was from our Meetic business which is
24   from our European business, but I'm assuming he was
25   helping -- he was advising or involved in some way in
Page 86

1    the U.S. customer service operation.  I don't remember
2    exactly why, but that's why I think he's copied on it.
3        Q  Did he report to you?
4        A  He did not report to me, no.
5        Q  Looking at that email right below, Vincent
6    Galeraud, date July 13, 2016, at 2:51 a.m.  Sent to
7    Chris Auderer, LaShonda Pero, and Mandy Ginsberg,
8    copied in that email.  Do you know who Chris Auderer
9    is?
10       A  I believe she worked in customer care.  The name
11   is familiar.
12       Q  Do you know which company she worked at?
13       A  At Match, I believe.
14       Q  What about what Lashonda?
15       A  I don't remember that name.
16       Q  Okay.  I am reading, "Can please track down
17   these two agents who gave these information highlighted
18   in yellow by G.B.," question mark."  Did I read that
19   correctly?
20       A  You did.
21       Q  Is G.B. referring to you?
22       A  I assume so, yes.
23       Q  Those are your initials, right?
24       A  Yes.
25       Q  Why did you highlight a certain portion of
Page 87

1    Mr. Brown's email?
2        A  I have no recollection that I did, and I am
3    actually skeptical that I because I was not a
4    highlighter.  It's possible that they came highlighted,
5    or maybe Mr. Diller highlighted it and sent back to me,
6    but it would be very peculiar for me to highlight it.
7    It just wasn't a feature I used in my correspondence,
8    so I can't answer why he wrote that.  I don't think
9    I've ever seen this before because I think I was no
10   longer on the chain.
11       Q  Did you report to Mr. Diller?
12       A  No, not a this point.  I reported to the board
13   of directors.
14       Q  When did you -- what's the time line when you
15   did report to Mr. Diller?
16       A  Up until the company went public in November of
17   2015, I reported to Mr. Diller, I believe.
18       Q  Okay.  So looking at Page 3 again, it reads,
19   "DE" -- "DE, Blatt, Greg from blatt@iac.com."  That's
20   your email address, right?
21       A  Yes.
22       Q  And then under that it says, "Envoyeur"?
23       A  Yes.
24       Q  Mercredi 13?
25       A  Oui.
Page 88

1        Q  20160254?
2        A  Yeah.
3        Q  Vincent Galeraud with Mandy Ginsberg copied?
4        A  You can derive the fact he's French and that
5    he's in France is where he is based at this point.
6        Q  And you forwarded that email to Mr. Galeraud?
7        A  Yes, forward to him and copied Mandy.  Again, I
8    think Vincent ran customer care for Europe.  The person
9    who -- this is an example of like how we think about
10   things.  The senior person for Match customer care
11   left.  There was a vacancy.  We were exploring whether
12   to fill that vacancy or to have Vincent, sort of, help
13   out in both groups.  I think we ultimately didn't do
14   that.  But at this moment in time, he was sort of
15   chipping in to, sort of, be a resident expert for Match
16   while the rest of the infrastructure was there, but we
17   had lost the most senior customer care person.
18       Q  Who asked him to chip in to this role?
19       A  I would've had discussions with Mandy and with
20   Alex, who ran the Meetic business, and explored
21   whether -- this is part of what I did at Match Group,
22   is explore where we can get synergies among the
23   different operating businesses.  I would have -- I did
24   have conversations with both of them.  I don't remember
25   exactly how they went, but we certainly -- for some
Page 89

23 (Pages 86 - 89)

APP 045

1    A   He would've been CEO of -- of the Match Group of
2   businesses.  We hadn't created Match Group yet, but he
3   was responsible for our dating businesses.  I don't
4   know what his title was.  CEO of gaming, or CEO Match
5   businesses, or Match segment, or something like that.
6   And then when -- when -- the end of 2013, we created
7   Match Group as a formal entity, and then he was CEO of
8   that.
9    Q   You said "we created."  Who is "we"?
10    A   IAC created it.
11    Q   And then on the, sort of, middle of Page 2
12   there, from you, you sent an email on Monday,
13   April 22nd, 2013, at 9:03 p.m. to Michelle Watson,
14   Amarnath Thrombre, with Sam Yagan copied.  It appears
15   Sam Yagan has OkCupid in parenthesis next to his name,
16   correct?
17    A   Yeah, he -- he kept his -- he had been the CEO
18   of OkCupid before he was promoted to CEO of Match
19   Group, and he kept his email address because that was
20   where people knew to reach him.
21    Q   Okay.  And in that email, you state:  "I thought
22   we" -- with Adrian in parenthesis -- "were making
23   progress.  No?"  Question mark.
24       Did I read that correctly?
25    A   You did.

Page 122

1   again, Google fights a constant, and Facebook fights a
2   constant battle, and, you know, it's like hacking, you
3   know.  There's always people trying to get in, and
4   you're trying to keep them out.
5    Q   Was Adrian reporting to you --
6    A   No.
7    Q   -- regarding --
8    A   No.
9    Q   Was Sam Yagan reporting to you on Match.com
10   matters?
11    A   Sam Yagan reported to me on all matters relating
12   to our dating businesses, so on Match, on People Media,
13   on Meetic.  He was the CEO, and I was the CEO of IAC.
14       MR. MOON:  You want to do a lunch break?  We
15   talked about 45 minutes.
16   Will that work for you, Madam Court Reporter?
17   Okay.
18       MS. ZUCKERMAN:  Let's go off the record.
19       THE VIDEOGRAPHER:  All right.  Going off the
20   video record.  The time is 12:37.
21       (A break was taken from 12:37 p.m. to
22       12:48 p.m.)
23       THE VIDEOGRAPHER:  We're now back on the video
24   record.  The time is 12:49.  Media Number 4.
25       MS. ZUCKERMAN:  I will pass the witness at this

Page 124

1    Q   What did you mean by saying that?
2    A   You know, we were under constant attack from
3   fraudsters, spammers, et cetera, right?  And just like
4   if you go to your Gmail, right, it's got processes for
5   trying to filter out spam, right?  You've got a spam
6   filter.  Some of it gets through, right?  New spammers
7   come up with new ways; they adjust their algorithm,
8   their fight.  They're never a hundred percent able to
9   keep the spam out, right?  Same thing here.
10       So we would get surges of fraudsters trying to
11   get by our controls, right, and sometimes it would get
12   worse, and sometimes it would get better based on
13   whether they developed -- it's almost like a freaking
14   Omicron variance or COVID variance, like, sometimes
15   your defenses are good; sometimes they're not good.
16   You're always playing catch up because they're always
17   finding new ways.  This woman's complaint -- or this
18   man's complaint was that too many of the people she was
19   -- he was interacting with were fraudsters, and I was
20   expressing a belief that we've made significant
21   progress on that, and so I was frustrated that this
22   person had that experience.
23       And then I think Adrian goes on to explain that,
24   yes, we have, but then there's still lots who are
25   coming, and there was a constant battle.  The same way,

Page 123

1   time.
2       MR. HUMMEL:  Thank you.
3              CROSS-EXAMINATION
4   BY MR. HUMMEL:
5    Q   Mr. Blatt, good afternoon.  I have a few
6   questions for you.  My name is Chad Hummel, as you
7   know.  I represent the defendants in the case that has
8   been brought by the Federal Trade Commission.
9       During the course of your testimony this morning
10   there was a distinction that you drew, and I want to
11   get nomenclature very clear.  There is IAC and Match
12   Group, Inc., and at some point you referred to those as
13   holdings companies or corporate.  Do you understand on
14   one side of the ledger there's that.  Do you understand
15   that?
16    A   Yes.
17    Q   If in my questioning I refer to the holding
18   company, will you understand what I mean?
19    A   Unless there's confusion about whether you mean
20   IAC or Match Group, I will understand it, yes.
21    Q   Okay, good.  And sometimes I think you refer to
22   that as corporate versus the business?
23    A   Yes.
24    Q   I may -- you may refer to corporate, but if
25   we're referring to holding company, corporate, IAC,

Page 125

32 (Pages 122 - 125)

1  Match Group, Inc., we're talking about the holding
2  company entity?
3  A  Yes.
4  Q  Okay.  And on the other side of the ledger,
5  there was Match.com which I think you referred to at
6  times as the business or the operating entity.  Okay?
7  A  Yes.  Again, one clarification.
8  Q  Sure.
9  A  Whenever you throw Inc. or LLC at the back of
10 something, I have to protest because I don't remember
11 which is which.  When I talk about Match Group, I think
12 of Match Group as synonymous with corporate and the
13 holding company.  And I think of Match, Match.com, as
14 synonymous with the operating business or operating
15 company.  Once you start affixing the legal suffix at
16 the end, I don't know which is which.
17 Q  And is it correct to say that with respect to
18 your personal role, you worked at the operating company
19 level only from 2009 to 2010; is that right?
20 A  Correct.
21 Q  Okay.  On all other times you were at the
22 holding company or the corporate level, correct?
23 A  Correct.
24 Q  All right.  Now, with respect --
25 A  Sorry.  With the exception of when I was CEO of

Page 126

---

1  A  No.
2  Q  There was one complaint that they showed you
3  relating to the guarantee, as far as I know.  Did the
4  holding company address, to your knowledge, the
5  complaint with respect to the guarantee?
6  A  No.
7  Q  Is it correct to say that all issues relating to
8  the guarantee at Match.com from 2010 on, to the best of
9  your knowledge, was designed, implemented, and changed
10 if at all, including the level of disclosure to
11 consumers, that was handled at the operating company
12 level?
13 A  Yes.
14 Q  Okay.  Now, same with respect to the charge-back
15 policy.  To your knowledge, did the holding company
16 ever design the charge-back policy for Match.com?
17 A  To the extent of my understanding about the
18 charge-back policy, no.
19 Q  That would've been a -- an operating company
20 level issue, correct?
21 A  Yes.
22 Q  All right.  And again, I don't think you even
23 saw a single complaint about the charge-back policy in
24 all their questioning this morning, right?
25 A  I don't recall seeing one, no.

Page 128

---

1  Tinder, simultaneously with being at Match Group, where
2  I was the Tinder operating company not at the Match.com
3  operating company.
4  Q  Tinder is not involved in this case.
5  A  I understand.
6  Q  Let's just talk about Match.com.  The only time
7  you worked at the Match.com operating company level,
8  was 2009, 2010?
9  A  Correct.
10 Q  After that time, entirely holding company
11 corporate level?
12 A  Correct.
13 Q  All right.  Now, with respect to the discrete
14 issues that are involved in this case, the guarantee,
15 the charge-back policy, and the cancellation flow,
16 those are the three things I am going to ask you about.
17 Okay?
18 A  Okay.  Have we discussed the charge-back policy?
19 Q  I don't know, but it's an issue in the case, so
20 I want to ask you about it.  Let's focus on the
21 guarantee first, all right?  To your knowledge, did
22 you, at the holding company level, have any involvement
23 in the creation of the guarantee?
24 A  No.
25 Q  In the implementation of the guarantee?

Page 127

---

1  Q  All right.  Do you recall ever, in your capacity
2  at the holding company level, dealing with issues
3  relating to Match.com's charge-back policy?
4  A  I have no recollection of doing that.
5  Q  Do you have any personal knowledge -- I think
6  she asked you this question -- but do you have any
7  personal knowledge of when the guarantee was
8  discontinued?
9  A  I do not.  Again, I knew that in 2009, it ceased
10 to be prominent, and I don't know whether and to what
11 extent it was used after that.
12 Q  Did the holding company, to your knowledge, have
13 any role whatsoever in how the terms and conditions
14 with respect to the guarantee were disclosed on the
15 website?
16 A  No.
17 Q  To your knowledge, did the holding company have
18 any role whatsoever in determining how can consumers
19 who initiated a charge-back with respect -- with their
20 financial institution for a Match.com account were
21 treated?  Did the holding company have any involvement,
22 to your knowledge?
23 A  Not to my recollection or knowledge, no.
24 Q  That was entirely at the operating level?
25 A  Yes.

Page 129

33 (Pages 126 - 129)

**APP 047**

1  Q  Now, the -- do you know whether or not the
2  charge-back policy at Match.com was ever changed over
3  time?
4  A  I do not know.
5  Q  Do you know if the charge-back policy as
6  challenged in the Complaint in this case was ever
7  eliminated or discontinued?
8  A  I have been made aware in connection with this
9  deposition that something changed at some point, but
10  other than that, I have no knowledge of that, and I
11  don't know the specifics of what changes were made or
12  when they were made or anything else.
13  Q  When you were at the -- in charge at the holding
14  company level did the question of changing the
15  charge-back policy for Match.com ever come to your
16  attention, to your recollection?
17  A  Not to my recollection.
18  Q  All right.  Now, with respect to the web
19  cancellation flow, you understand, based on your review
20  of the allegations in this case, that the FTC is
21  contending that it was -- that the cancellation flow
22  online was not simple.  You have that basic
23  understanding, right?
24  A  I do.
25  Q  At the holding company level, did -- well strike

Page 130

1  morning one email exchange that related to your -- I
2  think it related to your desire to eliminate the use of
3  the .com and used some colorful language in connection
4  with that desire, right?
5  A  Yes.
6  Q  Maybe there's a suggestion that the FTC might
7  make in this case that somehow the holding company
8  approved ads or advertising for the -- for the
9  operating entity Match.com.  Is that true?  And if so,
10  or if not, can you explain when, if at all, did
11  advertising come to your attention at the holding
12  company level?
13      MS. ZUCKERMAN:  Objection to form.
14      THE WITNESS:  With respect to that particular
15  email, but that comment obviously really wasn't
16  about the advertising per se.  It was about the
17  presentation of the company's names across all of
18  Match Group.  So that was a Match Group-wide thing.
19  I did, however, as I said, one of the things that I
20  was involved in even at the Match Group level were
21  significant television marketing campaigns.  So to
22  the extent that a company was going to spend, you
23  know, many millions of dollars on brand marketing in
24  the -- specifically television, which is what we
25  did -- I would be involved.  Again, I don't think

Page 132

1  that.
2      Did you ever become aware that anyone at the
3  holding company level had any involvement whatsoever in
4  the design of the online cancellation flow?
5  A  I have no knowledge of that ever happening.
6  Q  Did you ever have any involvement in designing
7  the cancellation flow?
8  A  I didn't design anything.  No, I did not.
9  Q  Okay.  And I think, in all the documents, the
10  maybe more than million documents in the case, the FTC
11  today showed you one document, I think, that showed a
12  complaint about the online cancellation flow.  Did you
13  ever address, to your knowledge, ever, any consumer
14  complaints relating to Match.com cancellation flow?
15  A  No.  As I think I said earlier, I was aware that
16  cancellation/refund issue was one of the issues that
17  the company needed to deal with because of its ongoing
18  need to ferret out legitimate complaints or issues from
19  illegitimate ones due to -- and I knew that that
20  existed and it was something that was managed by
21  customer care and by product.  But it never came to my
22  attention as a discrete matter that required my
23  attention or anything else.  It was just one of the
24  hundreds of things that the company did.
25  Q  Now, FTC counsel in this case showed you this

Page 131

1  I -- I wouldn't call it a matter of approval; I
2  would call it involvement.  People didn't present
3  ads to me for approval; instead, I would review
4  things that people were working on and would give
5  feedback about whether we wanted to present the
6  company this way or that way.  And whether or not
7  that was the right amount of money or whether we
8  could afford to spend 40 million or 20 million on
9  the advertising, so it was -- it was probably the
10  area of operations that I was most involved in at
11  the holding company level because it's not
12  iterative, meaning if you go out and you develop a
13  marketing campaign, you've developed a marketing
14  campaign, you've spent millions of dollars and you
15  have to spend it.  So that's one area where I was
16  involved in.  Very different from the areas that
17  were raised in this case.
18  BY MR. HUMMEL:
19  Q  With respect to Match.com, which we'll call it
20  the operating entity for now, to your knowledge, at the
21  holding company level, did you or the other executives
22  at the holding company level get involved in approving
23  specific ad copy?
24  A  For television marketing?
25  Q  Generally speaking.

Page 133

34 (Pages 130 - 133)

1    A   Again, I wouldn't -- I wouldn't try and
2  distinguish between copy and not copy on television
3  ads.  We were involved in television ads.  That is an
4  area -- that is one of the few areas of the operating
5  companies that I was involved in.
6    Q   How about website design?
7    A   Very rarely.  Only if someone were -- you know,
8  from time to time people wanted to do controversial
9  campaigns, for instance, and they might come see, like,
10  are we okay with this risqué thing or this may cause
11  whatever.  So I would opine on that sort of thing, but
12  I didn't approve regular copy for online marketing.
13    Q   And what about the manner in which terms and
14  conditions were disclosed; was that ever addressed at
15  the holding company level?
16    A   No, not to my knowledge.
17    Q   To your knowledge, where was that addressed?
18    A   At the operating company.
19    Q   There were some questions asked about -- about
20  operating company executives, including you, overseeing
21  the business or the operating entity.  What do you mean
22  by "overseeing"?
23    A   Any time I use the word oversee, I like to think
24  of the board analogy, which is, it is not the
25  day-to-day operations of the company, it is approving

Page 134

1  significant -- significant actions or decisions that
2  can have significant impact on the company, usually in
3  the eyes of the people running the company, right?  So
4  again, if a company wants to do an acquisition or
5  meaningfully change the product in a particular way or
6  do something that would cause profitability to tank
7  because they're investing significant money or the
8  financial plan for the company, that's something that
9  would go to -- that would be part of oversight.
10    Also, oversight involves evaluating the
11  performance of the senior executive at the company.
12  And deciding whether they're doing a good job running
13  the day-to-day because you're not running it, right, so
14  your job is to approve that person.
15    And then it's to be a sounding board.  So
16  nothing prevented, in fact, it was encouraged for a CEO
17  at the operating company if they've got something that
18  they're wrestling with or something that they'd like
19  guidance on, they can obviously bring whatever they
20  wanted but that was at their discretion.
21    Q   Near the end of the deposition session with
22  FTC's lawyer, you mentioned a man named Sam Yagan, and
23  he's -- do you remember that?
24    A   I remember talking about Sam Yagan.
25    Q   Okay.  And I think the testimony was that

Page 135

1  somehow in some respect he reported on some issues with
2  respect to the business.  I think that's the word you
3  used.  Would that have been day-to-day operations or on
4  big ticket items?
5    A   Can you be more specific about what we're
6  talking about and when?
7    Q   I can, except it was one of the last exhibits
8  that was referenced.
9    A   I mean, there was a time when Sam Yagan ran
10  OkCupid, and he reported to me about things at OkCupid.
11  There was a time when he was CEO of Match Group, and I
12  was CEO of IAC, in that capacity, he was like -- and
13  again, when I was CEO of IAC, I had a number of direct
14  reports.  I had the CEO the Match businesses.  I had
15  the CEO of the search businesses, the CEO of the local
16  businesses, and they would report to me as I described,
17  like a board.
18    When I became executive chairman of Match Group
19  and Sam continued CEO of Match Group at the time, it
20  was a similar relationship.  And then at some point,
21  Sam also became CEO of Match.com, the operating
22  company, for again, less than a year, I believe.  But
23  in that capacity, he acted the same, which is he didn't
24  report to me on a different level of things than he
25  would have before.

Page 136

1    Q   Did he report to you on all dating sites and
2  businesses at some point?
3    A   Yes, from the time he became CEO of the Match
4  businesses and sometime in 2012 until the end of 2015.
5    Q   All right.  Now, FTC counsel showed you
6  Exhibit 7 which is a deck that was prepared, and it's
7  entitled "Not Just Another Broken Window - Account
8  Settings Redesign."  I think you testified you never
9  saw this before.
10    A   To the best of my recollection, I never saw it.
11    Q   It appears to be a one-person suggestion for a
12  redesign of the cancellation flow.  Did that issue, a
13  redesign of the cancellation flow, ever reach your
14  level, to your knowledge?
15    A   No, no.  And I only saw the page that wasn't
16  really redesign, but I take your word for it that
17  there's a redesign in there.
18    Q   Going back to Mr. Yagan.  To your knowledge, was
19  he ever reporting to you about the day-to-day
20  operations of any of the businesses, or is it more
21  macro level?
22    A   Always macro level.  He was that CEO of a
23  business.  They didn't report on the day-to-day things.
24  They were the end report on day-to-day operations.
25    Q   All right.  Let me show you what we marked as

Page 137

35 (Pages 134 - 137)

1  Exhibit 10 which was this email relating to the misuse
2  of someone's image from a Facebook page.  Do you recall
3  that?
4     A  I do.
5     Q  If you could look at the second page -- I'll
6  show you my copy, just to make it easy -- second page,
7  there is a -- do you see in the upper left-hand corner
8  of the second page there's an icon?  Do you recognize
9  what that is?
10    A  Gear box.
11    Q  Yeah, what does a gear box mean?
12    A  Gear box is the common settings, common settings
13  icon in sort of web taxonomy.  So you'd go there to
14  click to see your connection, your subscription, your
15  account, your customer service.  All of that sort of
16  stuff.  I would say most web businesses have that
17  nomenclature.
18    Q  When you say "common," what do you mean?  You
19  said it's a common icon?
20    A  As I said, this is Facebook.  I believe Match
21  used it; Apple uses it.  So it's a -- it's common, you
22  know, the web and apps run on iconography mostly
23  because you cannot overlay a website with lots of
24  words, right?  So it does -- there's an interaction, a
25  level of knowledge that's assumed when you come to

                                            Page 138

1  engage with certain web products, and this is a
2  well-known -- a well-known icon among some icons that
3  are less known.  Just like the magnifying glass tends
4  to mean search.
5     Q  You previously offered testimony under oath.  Do
6  you recall that, in a deposition and in a trial setting
7  in New York that you testified about?
8     A  Yes.
9     Q  Right?  One of the things you said at the trial
10  was the following.  I just want to see if you think
11  it's still true.  With respect to a question about IAC
12  and Match Group, you said, "I think it's important to
13  understand both IAC and Match Group then weren't
14  businesses in and of themselves.  They were holding
15  companies, and all their businesses were run through
16  subsidiaries.  So my job at CEO at IAC and then at
17  Match Group was mostly to manage CEOs of these smaller
18  businesses and to help them grow."
19       Is that your recollection, and is that true?
20    A  That's true.  I don't recall saying exactly
21  that, but that is true.
22    Q  The statement that I just read, which I'll rent
23  to you was given to you under oath.  Is that a true
24  statement?
25    A  Yes.

                                            Page 139

1     Q  All right.  I don't have anything further at
2  this point.  Pass the witness.
3           REDIRECT EXAMINATION
4  BY MS. ZUCKERMAN:
5     Q  Mr. Blatt, do you remember any specific
6  instances where you were involved with web design for
7  Match.com?
8     A  I imagine -- I don't recall any specific
9  instances, but I certainly -- there are times when
10  designs were presented to me for review, typically with
11  respect to some new significant consumer product
12  feature.  Again, in annual planning process, whatever,
13  if they were proposing, We're going to do this new
14  feature that brings video into the project or whatever,
15  it would be presented.  I don't have any recollection
16  of engaging in design work myself, but certainly
17  there were times when screenshots were presented to me.
18    Q  And you would provide feedback?
19    A  I would provide feedback on the presentation,
20  whether I provided feedback on a specific web design or
21  not is less likely than I provided feedback on an
22  overall concept that was being presented, but it's
23  possible.
24    Q  Do you remember any specific instances?
25    A  Relating to Match.com, I don't.

                                            Page 140

1       MS. ZUCKERMAN:  All right.  I don't have any
2  further questions.
3       MR. HUMMEL:  No follow up.  Thank you.
4       THE WITNESS:  Thank you.
5       THE VIDEOGRAPHER:  All right.  Let's go off the
6  video record.  The time is 1:08 p.m.
7       THE COURT REPORTER:  Anyone ordering?
8       MR. HUMMEL:  Standard time.
9       MR. MOON:  Standard project for us.  For FTC is
10  fine.
11  (The taking of the deposition was concluded.)
12  (Reading and signing waived.)
13
14
15
16
17
18
19
20
21
22
23
24
25

                                            Page 141

                           36 (Pages 138 - 141)

### CERTIFICATE OF OATH

1
2 STATE OF FLORIDA:
   : SS
3 COUNTY OF DADE:
4
5    I, Marlene Gutierrez, Shorthand Reporter and
6 Notary Public, State of Florida, certify that GREG
7 BLATT appeared before me via videoconference on the
8 13th of January, 2023, and was duly sworn.
9
10    WITNESS my hand and official seal this 25th day
11 of January, 2023.
12
13
14 *Marlene Gutierrez*
15 Marlene Gutierrez
16 Notary Public-State of Florida
17 My Commission #GG 126375
18 Expires: July 20, 2025
19
20
21
   Personally known_____
22
   Or Produced Identification_____
23
   Type of Identification Produced_____
24
25

Page 142

---

### REPORTER'S DEPOSITION CERTIFICATE

1
2
3 STATE OF FLORIDA:
   : SS
4 COUNTY OF DADE:
5
6    I, Marlene Gutierrez, Notary Public, certify
7 that I was authorized to and did stenographically
8 report the deposition of GREG BLATT; that a review of
9 the transcript was not requested; and that the
10 transcript is a true and complete record of my
11 stenographic notes.
12
13    I further certify that I am not a relative,
14 employee, attorney, or counsel of any of the parties,
15 parties' attorney, or counsel connected with the
16 action, nor financially interested in the action.
17
18    Dated this 25th day of January, 2023.
19
20 *Marlene Gutierrez*
21 MARLENE GUTIERREZ
22
23
24
25

Page 143

---

1 Federal Trade Commision v. Match Group, Inc., Et Al.
2 Greg Blatt (#5651530)
3    E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____    _____
24 Greg Blatt         Date
25

Page 144

---

1 Federal Trade Commision v. Match Group, Inc., Et Al.
2 Greg Blatt (#5651530)
3    ACKNOWLEDGEMENT OF DEPONENT
4    I, Greg Blatt, do hereby declare that I
5 have read the foregoing transcript, I have made any
6 corrections, additions, or changes I deemed necessary as
7 noted above to be appended hereto, and that the same is
8 a true, correct and complete transcript of the testimony
9 given by me.
10
11 _____    _____
12 Greg Blatt         Date
13 *If notary is required
14    SUBSCRIBED AND SWORN TO BEFORE ME THIS
15    _____ DAY OF _____, 20___.
16
17
18 _____
19 NOTARY PUBLIC
20
21
22
23
24
25

Page 145

Veritext Legal Solutions
800-336-4000

APP 051

# EXHIBIT D

```
1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS
2                        DALLAS DIVISION
        FEDERAL TRADE COMMISSION, )
3                 Plaintiff,     )
        v.                       )Case No. 3:19-cv-02281-K
4       MATCH GROUP, INC., a     )
        corporation, and         )
5       MATCH GROUP, LLC, formerly)
        known as MATCH.COM, LLC, a)
6       limited liability company,)
                  Defendants.    )
7
8                    ------------------------
                        ORAL DEPOSITION OF
9                       MICHELE WATSON
                        February 10, 2023
10                          Volume 1
                     ------------------------
11
12           ORAL DEPOSITION OF MICHELE WATSON, Volume 1,
13       produced as a witness at the instance of the Plaintiff,
14       and duly sworn, was taken in the above-styled and
15       numbered cause on the February 10, 2023, from 9:07 a.m.
16       to 4:40 p.m., before Dana Shapiro, CSR, in and for the
17       State of Illinois, reported by machine shorthand, at
18       501 Congress Avenue, Suite 150, Austin, Texas 78701,
19       pursuant to the Federal Rules of Civil Procedure and
20       any provisions stated on the record or attached hereto.
21
22
23
24
25
                                                    Page 1
```

1    A.    No.
2    Q.    You haven't taken any medication, for
3  example, that would affect your memory or your ability
4  to testify accurately or truthfully, have you?
5    A.    No.  Trying to take as much caffeine as
6  possible.
7    Q.    Sure.  Same here.  If you don't understand
8  my question, just let me know.  I can repeat it or
9  rephrase it or if I'm too quiet, let me know and I will
10  be happy to speak up.  Is that all right?
11    A.    Yes.
12    Q.    If you need to take a break at any point,
13  let me know and we can take a break.  I ask that you
14  answer the pending question and then we will take a
15  break.
16    A.    Okay.
17    Q.    Your lawyer may have already explained
18  this.  But Mr. Hummel may object periodically.  That
19  doesn't of course mean that you don't answer, it
20  just -- unless he instructs you not to.  We just let
21  him put his objection on the record, and then if you
22  are able to answer the question I ask that you do so.
23        I guess my first question is, did you
24  review any materials in preparation for today?
25    MR. HUMMEL:  Answer that yes or no.

Page 6

1    Q.    If you are able to answer according to his
2  instructions.
3    MR. HUMMEL:  Do you understand my point?  If you
4  looked at anything independently.
5    THE WITNESS:  I did not.
6    MR. TEPFER:  We will move on while reserving the
7  right to compel, if appropriate.
8  BY MR. TEPFER:
9    Q.    So I guess to start would you tell me where
10  you work.
11    A.    Now?
12    Q.    Yes.
13    A.    I'm retired.
14    Q.    You are retired.  Where was your last job?
15    A.    Indeed.com.
16    Q.    Before that where did you work?
17    A.    Walmart.com.
18    Q.    Before that?
19    A.    Match.com.
20    Q.    We'll obviously be talking a bit more about
21  that.  Do you at this time still have any relationship
22  with match.com?
23    A.    Define relationship.
24    Q.    Do you still have any business affiliation
25  with Match Group, Inc.?

Page 8

1    A.    Yes.
2    Q.    Are you able to identify what you reviewed
3  in preparation for today?
4    MR. HUMMEL:  You can answer that yes or no.
5  BY THE WITNESS:
6    A.    What was the question?
7  BY MR. TEPFER:
8    Q.    Are you able to identify what you reviewed?
9    A.    Yes.
10    Q.    Can you identify those documents or
11  materials that you reviewed?
12    MR. HUMMEL:  Objection, attorney work product,
13  attorney-client privilege.  I instruct you not to
14  answer that question.
15    MR. TEPFER:  Sure.
16  BY MR. TEPFER:
17    Q.    Just to clarify, I'm not asking
18  specifically documents that, you know, counsel may have
19  presented to you or communications that you had with
20  counsel, but just the specific documents that you may
21  have reviewed, are you able to identify those?
22    MR. HUMMEL:  If you reviewed anything other than
23  in connection with our preparation, you can answer the
24  question.  If not, I instruct you not to answer.
25  BY MR. TEPFER:

Page 7

1    A.    No.
2    Q.    But are you still, for example, friends
3  with individuals that you met while working at
4  match.com?
5    A.    Yes.
6    Q.    Do you keep in regular contact with them?
7    A.    With one of them.
8    Q.    Would you mind telling me who.
9    A.    Desiree Dulaney.
10    Q.    Great.  When you say you worked at Match,
11  are you able to tell me specifically the company that
12  you worked for?
13    A.    So it was match.com, and I also supported
14  the People Media Group, and chemistry.com.
15    Q.    In terms of the company that you worked
16  for, would that be Match Group, Inc. or another entity?
17    MR. HUMMEL:  Object to form, foundation.  You can
18  answer if you understand the question.
19    MR. TEPFER:  If I could rephrase.
20  BY MR. TEPFER:
21    Q.    Are you able to tell me, do you recall the
22  formal corporate name of the company that employed you
23  when you worked on match.com?
24    A.    No.
25    Q.    Do you recall who signed your checks or who

Page 9

3 (Pages 6 - 9)

1  issued those checks?
2      A.   No.
3      Q.   Are you familiar with a company called
4  Match Group, Inc.?
5      A.   Yes.
6      Q.   Are you familiar with a company called
7  Match.com, LLC?
8      A.   I don't remember.  I feel like I have seen
9  it, but I couldn't tell you anything different about
10  it.  It was always Match.com to me.
11     Q.   Okay.  Do you still -- do you happen to own
12  any Match Group, Inc. stocks?
13     A.   No.
14     Q.   Sorry.  Go ahead.
15     A.   Not that I'm aware of.
16     Q.   Are you aware that there are several
17  different companies under the Match Group, Inc.
18  umbrella?
19     A.   Yes.
20     Q.   Do you have an understanding or rather I
21  should say at the time that you worked there, did you
22  have an understanding of what companies operated under
23  each particular subsidiary at Match Group, Inc.?
24     A.   I wouldn't say I knew all of the companies,
25  but while I was there we made acquisitions.  So I was

Page 10

1  familiar when those acquisitions came on board.
2      Q.   I want to ask, when you worked for
3  Match.com was there a distinction in your mind between
4  the company Match Group, Inc. and these other
5  subsidiaries?
6      A.   Sure.
7      Q.   Would you mind explaining what that
8  distinction was.
9      A.   Well, I just know that I was responsible
10  for the Match.com brand versus I didn't support the
11  entire holding company because they had multiple
12  companies underneath them like Tinder, for example.  I
13  wasn't responsible for supporting Tinder.  I was
14  responsible for three properties that they ran under
15  their larger organization.
16     Q.   Just to confirm.  Those three properties
17  were Match.com, chemistry.com, and the People Media
18  brands?
19     A.   Yes.
20     Q.   Did you ever in your recollection perform
21  work for -- relating to any other dating platforms?
22     A.   Say that again.  Did I --
23     Q.   Do you recall ever performing work relating
24  to any other dating platforms other than those three
25  that we just discussed?

Page 11

1      A.   Performing work for, no.
2      Q.   Are you aware of individuals that were
3  employed only by Match Group, Inc. and not any other
4  subsidiary during your time there?
5      A.   I'm unsure.
6      Q.   Are you aware of any role that Match Group,
7  Inc. may have had in the operation of Match.com during
8  your time there?
9      MR. HUMMEL:  Objection, vague, overbroad,
10  foundation.  You can answer if you understand the
11  question.
12  BY THE WITNESS:
13     A.   I don't.
14  BY MR. TEPFER:
15     Q.   Just to -- sorry.  Were you finished?
16     A.   I'm done.
17     Q.   Sorry.  Just to confirm, when did you work
18  at Match.com?
19     A.   I started there in 2005 and left in 2014.
20     Q.   Do you happen to remember the months of
21  when you started and when you left?
22     A.   I believe it was November of 2005 and
23  February of 2014.
24     Q.   Did you have the same position during your
25  entire tenure at Match.com?

Page 12

1      A.   No.
2      Q.   What different positions did you have?
3      A.   So I'm not sure that I will get the title
4  exactly correct, but I was originally hired as the
5  director of international support.  So no domestic U.S.
6  operations for Match.com.  And then I was promoted to
7  senior director in that same role, and then I was
8  promoted to vice president of customer support that
9  included the U.S. domestic operation, and then I was
10  promoted later to senior vice president which included
11  Chemistry, and People Media, and Match.com.
12     Q.   Each of those positions I suppose were
13  those promotions?
14     A.   Uh-huh.
15     MR. HUMMEL:  You have to answer audibly.  Yes?
16     THE WITNESS:  Yes.
17     MR. TEPFER:  Thank you, Chad.
18  BY MR. TEPFER:
19     Q.   I'm assuming your responsibilities changed
20  with each position?
21     A.   Yes.
22     Q.   Would you be able to tell me what your
23  responsibilities were at each position.  And sorry.
24  Before we get into that, would you mind telling me if
25  you recall the dates of -- that you held each of those

Page 13

1 positions?
2     A.   I don't recall the specific dates so I'm
3 not -- I can't tell you.  I can speak in vague terms,
4 but I don't recall the specific dates of the
5 promotions.
6     Q.   Certainly.  Would you be able to provide a
7 general idea of when each of those promotions occurred?
8     A.   Sure.  So I believe within the first six
9 months of being there I was promoted to senior director
10 of international support.  So I was hired as director
11 of international support.  Was promoted I think it was
12 in around six months to senior director, and then I
13 know within the first three years I became vice
14 president.  So year and a half later I'm assuming I
15 became senior vice president.
16     Q.   So for the majority of your --
17     A.   I'm sorry.  Vice president.  Not senior
18 vice president.
19     Q.   Is there a difference between senior vice
20 president and vice president?
21     A.   Yes.  So I was vice president for five
22 years and then promoted to senior vice president
23 primarily due to tenure enroll than additional
24 responsibilities.  Honestly I cannot remember when I
25 took on Chemistry, and People Media.  If I took that on
Page 14

1 brought in the Right Now CRM System, implemented that
2 for tracking of contacts, reporting of contacts, and
3 historical documentation of contacts.  And I also
4 brought in a phone system that allowed us to be able to
5 do IBRs and transfer calls and things of that nature.
6     Q.   Would you mind explaining what the Right
7 Now CRM Software is.
8     A.   Sure.  It's a CRM system.  If you are
9 familiar with CRM, customer relationship management.
10 It's a tool that all frontline employees would use to
11 enter information after speaking with a frontline -- I
12 mean a front end consumer either via email or phone
13 call or later via chat.
14     Q.   Thank you.
15          (WHEREUPON, ERICA HILLIARD entered
16           the deposition proceedings.)
17     MR. TEPFER:  Can we go off the record real quick?
18     MR. HUMMEL:  Sure.
19     MS. HILLIARD:  Erica Hilliard with the Federal
20 Trade Commission.
21 BY MR. TEPFER:
22     Q.   Ms. Watson, could you tell me why you left
23 Match.com.
24     A.   Sure.  I was recruited by walmart.com to go
25 lead their eCommerce customer support operation that
Page 16

1 while I was vice president that feels right, but I
2 couldn't swear to it.
3     Q.   Would you be able to please tell me your
4 responsibilities at each of those positions to the best
5 of your recollection?
6     A.   Sure.  As the director of international
7 customer support I was responsible for providing user
8 support for all of the languages that we supported
9 outside of the United States and all of the countries
10 that we were doing business in.  So working with third
11 party companies to provide the level of support needed
12 for our end user community to contact customer care
13 with questions.  Also to review profiles, ensure
14 accuracy, and to provide feedback regarding the types
15 of contacts we were receiving.
16     Q.   And then for the other positions?
17     A.   So senior director was the same, that was
18 just a change in title with some additional money.
19 There was no change in responsibility.  And then when I
20 was promoted to vice president I was gifted the U.S.
21 operation as part of my responsibilities, which was
22 certainly their larger portion of the job as far as
23 volume.  And so I took on the customer support
24 requirements for the U.S. operation for our end users.  I
25 was also responsible for bringing in technology.  I
Page 15

1 was brand new.
2     Q.   I'm assuming you left on good terms with
3 Match?
4     A.   Uh-huh.
5     Q.   Who, if you recall, hired you to come work
6 at Match?
7     A.   Carl Leubsdorf.
8     Q.   Your positions at the company, were they
9 considered within the company to be executive level
10 positions?
11     A.   At the end of my tenure, yes.
12     Q.   Which positions were those that were
13 considered executive level positions?
14     A.   The senior vice president.
15     Q.   Do you recall who you reported to in your
16 position at senior vice president?
17     A.   The last person I reported to was Ahmerna
18 Sombray.
19     Q.   Mr. Sombray was your direct report; is that
20 correct?
21     A.   Yes.
22     Q.   Did you report to anyone else?
23     A.   While I was there I reported to Mandy
24 Ginsberg, Mike Perez.
25     Q.   Did you -- are you finished?
Page 17

1    A.  Yes.  I believe there are a couple of
2  others in there that were short-term, but those were
3  the major ones.
4    Q.  Do you recall what Ms. Ginsberg's title was
5  during the time that you reported to her?
6    A.  I do not.
7    Q.  What about Mr. Sombrey's?
8    A.  I believe he was chief operations officer.
9    Q.  Do you happen to know the company that they
10  were employed by at that time?
11    A.  No.
12    Q.  Did anyone report to you in your position
13  as senior vice president?
14    A.  Uh-huh.
15    MR. HUMMEL:  Is that yes?
16    THE WITNESS:  Yes.
17  BY MR. TEPFER:
18    Q.  That makes sense.  Was one of those
19  individuals Kristina Auderer?
20    A.  Yes.
21    Q.  Would you periodically have meetings with
22  additional executives at Match Group?
23    A.  Yes.
24    Q.  Do you recall the names of those
25  executives?

Page 18

1  the head of product to make the actual recommendations
2  as to why I felt like something needed to be changed.
3    Q.  Do you happen to recall at this time any
4  significant complaint trends that were recurring during
5  your time at Match?
6    MR. HUMMEL:  Object to form, vague.  You can
7  answer.
8  BY THE WITNESS:
9    A.  Yes.
10  BY MR. TEPFER:
11    Q.  Could you tell me some of those.
12    MR. HUMMEL:  Objection, overbroad, calls for
13  narrative.  You can answer.
14  BY THE WITNESS:
15    A.  I would say I wouldn't put them all in the
16  complaint category, but the types of contacts we
17  received, which we would continuously try to improve
18  the experience of our consumers.  So I'm not sure that
19  I'm willing to say that they are all complaints, but
20  they are all opportunities for us to refine the
21  processes.  So some were not understanding from a
22  consumer perspective that their account would auto
23  renew, and so they were calling for refunds, contacting
24  us for refunds.  That was our -- typically our highest
25  call volume request was a request for a refund because

Page 20

1    A.  No.
2    Q.  Would Greg Blatt have been one of those
3  individuals?
4    A.  Earlier on, yes.
5    Q.  Would Sam Yegan have been one of those
6  individuals?
7    A.  Earlier on, yes.
8    Q.  In your position as senior vice president,
9  was one of your responsibilities to track consumer
10  complaint trends?
11    A.  Yes.
12    Q.  Was one of your responsibilities to propose
13  changes to the Match platform to address potential
14  complaint trends?
15    A.  Definitely one of my responsibilities was
16  to make recommendations based upon the trends we were
17  seeing.
18    Q.  Would you periodically have meetings with
19  executives to discuss those customer complaint trends?
20    A.  Yes.
21    Q.  In those meetings would you make those
22  recommendations you referenced concerning the Match
23  platform to address consumer complaint trends?
24    A.  In those executive level meetings I would
25  show the trends, and then I would work directly with

Page 19

1  of being unaware of the auto renewal.
2    We would have end users contact us because
3  of the lack of responses they were receiving from other
4  end users.  So again, you could say it's a complaint,
5  but it's more feedback, you know, in what can we do to
6  help support those end consumers.
7  BY MR. TEPFER:
8    Q.  Do you recall if there was a recurring
9  issue of customers contacting Match relating to issues
10  with the six month guarantee?
11    MR. HUMMEL:  Could I have that read back, please.
12    (WHEREUPON, the record was read
13    as requested.)
14    MR. HUMMEL:  Objection, vague.  You can answer.
15  BY THE WITNESS:
16    A.  Did we receive contacts from end consumers
17  regarding the six month guarantee?  Yes.
18  BY MR. TEPFER:
19    Q.  Was that -- sorry.  Before we get into
20  that.  You referenced the head of product, I believe.
21  Would you mind telling me who that was.
22    A.  So my -- the interactions that I had in
23  trying to negotiate modifications to our website or
24  policy.  Clark Rothrack was the chief technology
25  officer.  And so if I needed to escalate a conversation

Page 21

6 (Pages 18 - 21)

1    I would involve him.  And then Shar Dubey was the head
2    of product.  And so if I needed to escalate a concern I
3    would talk to her.  But typically I would be talking
4    specifically with the product owners of that specific
5    function on the website, and then also with -- if it
6    was about our CRM system that I needed improvement --
7    not CRM system.  Well, yes, CRM system that I needed
8    improvements on it would be our contact that Clark had
9    given us to work through getting those fixes put in.  I
10   would only involve the executives if I felt like there
11   was something I couldn't get traction on that I thought
12   was really important.  C-L-A-R-K, R-O-T-H-R-O-C-K, Shar
13   Dubey, it's much longer S-H-A-R-M-I-S-T-A.
14        MS. GREAVES:  T-H-A.
15        THE WITNESS:  D-U-B-E-Y.
16        MR. KITCHENS:  D-U-B-E-Y is the last name.
17   BY MR. TEPFER:
18        Q.    Did you during your time at Match happen to
19   become familiar with an individual named Adrian Ong?
20        A.    Yes.
21        Q.    Do you recall what his title was?
22        A.    I do not.
23        Q.    It's A-D-R-I-A-N, O-N-G.
24              Do you happen to recall what Mr. Ong's
25   responsibilities were?

Page 22

1        A.    I do not.  I believe they changed many
2    times while I was there.
3        Q.    Did he have any involvement, to your
4    recollection, with product design?
5        MR. HUMMEL:  Foundation.  You can answer.
6    BY THE WITNESS:
7        A.    I'm unsure.
8    BY MR. TEPFER:
9        Q.    Do you recall any issues that you would
10   have gone to Mr. Ong for to discuss?
11       A.    I remember meeting with him, but I don't
12   remember what we would have discussed.
13       Q.    Did you happen to during your time at Match
14   become familiar with an individual name Vincent
15   Galeraud, G-A-L-E-R-A-U-D?
16       A.    No.
17       Q.    We discussed a little bit your position as
18   senior vice president and the responsibilities
19   associated with that.  We discussed complaint trends.
20   Did you also in this position were you also involved
21   with overseeing the response to dissatisfied customers
22   who have contacted Match?
23       MR. HUMMEL:  Objection, vague, foundation.  You
24   can answer.
25   BY THE WITNESS:

Page 23

1        A.    Can you repeat the question.
2    BY MR. TEPFER:
3        Q.    Do you recall if during your time at Match,
4    one of your responsibilities included overseeing
5    responses to consumer complaints?
6        MR. HUMMEL:  Same objections.
7    BY THE WITNESS:
8        A.    Yes.
9    BY MR. TEPFER:
10       Q.    Did you oversee those responses?
11       A.    By oversee, I was responsible for creating
12   the process and the technology structure around it, but
13   not specifically responding to the answers all of the
14   time.
15       Q.    Do you recall what that process was?
16       A.    We would have an escalation protocol if a
17   consumer was contacting us via one of our channels that
18   the consumer if they were displeased and wanted to be
19   escalated would go to the next person in line, and the
20   next person in line in order to try to solve their
21   issues.  We also had executive complaints that would
22   come in around -- would bypass the consumer support
23   group and would go maybe directly to one of the
24   executives.  Could have come directly to me, could have
25   come to any one of our executives.  If that's the case,

Page 24

1    they would forward to me I would typically forward to
2    one of the members of my leadership team to oversee a
3    response back to the consumer.
4        Q.    During your time at Match did you have
5    reason to become familiar with something called the six
6    month guarantee?
7        A.    Yes.
8        Q.    What's your recollection of what the six
9    month guarantee was?
10       A.    My recollection is if you purchased a six
11   month subscription and you did not find somebody
12   special within that six month period and you adhere to
13   other requirements of the guarantee, then we would gift
14   you a six month subscription for free.
15       Q.    And you referenced requirements of the
16   guarantee.  What did you mean by that?
17       A.    Meaning one was did you meet someone
18   special during that six months, the other is was your
19   profile visible during this entire time, so were you
20   findable on the website.  And I believe there was a
21   requirement for that you had to be engaging on the
22   website.  So sending out emails.  I don't remember.  I
23   believe there was a quantity requirement, but I don't
24   remember what that is.
25       Q.    When you reference meeting someone special,

Page 25

7 (Pages 22 - 25)

| | |
|---|---|
| 1 | upon research. |
| 2 | BY MR. TEPFER: |
| 3 | Q.   Would you mind explaining what you mean by |
| 4 | doing research. |
| 5 | A.   Sure.  So my team would be notified |
| 6 | typically by the consumer, I think it could have come |
| 7 | from our finance team our chargeback team, but I |
| 8 | believe the policy was the consumer would contact us, |
| 9 | and say, "I had this chargeback and I lost -- you have |
| 10 | kept my money and I want to be visible on the site." |
| 11 | So my team would do the research, working |
| 12 | with the chargeback team to make sure that this is |
| 13 | accurate, that we actually won the chargeback, and then |
| 14 | could make the account visible again for the person who |
| 15 | lost the chargeback. |
| 16 | Q.   How did -- do you recall who informed you |
| 17 | of what the Match.com chargeback policy was? |
| 18 | MR. HUMMEL:  Same objections.  You can answer. |
| 19 | BY THE WITNESS: |
| 20 | A.   Pradeep, P-R-A-D-E-E-P.  I don't remember |
| 21 | his last name. |
| 22 | BY MR. TEPFER: |
| 23 | Q.   Is his last name Shetty? |
| 24 | A.   Yes.  S-H-E-T-T-Y. |
| 25 | Q.   How did -- do you recall what Mr. Shetty's |

Page 30

| | |
|---|---|
| 1 | Q.   Yes, ma'am. |
| 2 | A.   I do not know. |
| 3 | Q.   Was it in Dallas? |
| 4 | A.   Yes. |
| 5 | Q.   Did Match Group executives also work in |
| 6 | that same office space? |
| 7 | A.   Yes. |
| 8 | Q.   Did individuals working on the other dating |
| 9 | platforms also work in that same office space? |
| 10 | MR. HUMMEL:  Foundation.  You can answer. |
| 11 | BY THE WITNESS: |
| 12 | A.   Some did. |
| 13 | BY MR. TEPFER: |
| 14 | Q.   How did you know that other -- that |
| 15 | individuals employed by other dating platforms worked |
| 16 | in that same office space? |
| 17 | A.   Because I would interact with them. |
| 18 | Q.   Do you recall of the individuals who you |
| 19 | interacted with the dating platforms that they worked |
| 20 | on? |
| 21 | A.   I know that Beth Wilson was leading product |
| 22 | I think for a time period on Chemistry.  I believe I |
| 23 | was interacting with her on Chemistry.com.  I believe |
| 24 | Adrian actually may have been working on the People |
| 25 | Media Group at some point.  Mandy at some point was |

Page 32

| | |
|---|---|
| 1 | position was? |
| 2 | A.   His title? |
| 3 | Q.   Yes. |
| 4 | A.   No. |
| 5 | Q.   During your time at Match, did you become |
| 6 | familiar with the different means by which a customer |
| 7 | is able to cancel their membership? |
| 8 | A.   Yes. |
| 9 | Q.   How did you have the opportunity to learn |
| 10 | that? |
| 11 | MR. HUMMEL:  By membership you mean subscription? |
| 12 | MR. TEPFER:  Yes.  Sorry. |
| 13 | MR. HUMMEL:  You can answer. |
| 14 | BY THE WITNESS: |
| 15 | A.   So it was my responsibility leading the |
| 16 | customer support organization to understand what the |
| 17 | user experience was like on our website.  I was also a |
| 18 | user of the website so I knew from my own personal |
| 19 | experience of using it how to cancel, and certainly |
| 20 | knew in my responsibility and role what the user |
| 21 | experience was like on the website. |
| 22 | BY MR. TEPFER: |
| 23 | Q.   When you worked at Match, where was your |
| 24 | office located at? |
| 25 | A.   The physical address? |

Page 31

| | |
|---|---|
| 1 | leading chemistry.com.  So just the different people |
| 2 | that I interacted with for meetings or direction. |
| 3 | Q.   Do you recall if anyone worked in that same |
| 4 | office space with responsibilities relating to the |
| 5 | dating platform OkCupid? |
| 6 | A.   I don't remember off the top of my head.  I |
| 7 | totally forgot about that platform. |
| 8 | Q.   What about the platform PlentyofFish? |
| 9 | MR. HUMMEL:  Foundation.  You can answer. |
| 10 | BY MR. TEPFER: |
| 11 | Q.   Sorry. |
| 12 | A.   Definitely nobody worked -- while I was |
| 13 | there I don't even think the acquisition had happened |
| 14 | yet for PlentyofFish.  So there was nobody in the |
| 15 | office with PlentyofFish. |
| 16 | Q.   What was your understanding of how your |
| 17 | performance was evaluated as senior vice president at |
| 18 | Match? |
| 19 | A.   I'm not sure exactly how to answer that. |
| 20 | Q.   Were there, for example, performance |
| 21 | metrics that you were aware of by which you were |
| 22 | evaluated? |
| 23 | A.   I would establish goals for my immediate |
| 24 | boss of what I wanted to accomplish like service level |
| 25 | agreements with my outsource partners, requirements for |

Page 33

9 (Pages 30 - 33)

APP 057

1   speed of answer and the different channels that I had,
2   staffing targets, meeting my budget, things of that
3   nature.
4       Q.    Did you in your position as senior vice
5   president collaborate with individuals with similar
6   positions at other dating platforms?
7       MR. HUMMEL:  Objection, vague.  You can answer.
8   BY THE WITNESS:
9       A.    Other dating platforms that were not owned
10  by Match?
11  BY MR. TEPFER:
12      Q.    Well, for example, other dating platform,
13  did you -- sorry.
14          As senior vice president, did you
15  collaborate with individuals with similar
16  responsibilities at other Match dating platforms on
17  which you did not personally perform work?
18      A.    Collaboration may be too detailed of a
19  word.  Did I have some conversations?  Yes.
20  Collaboration to me means that we actually worked
21  together and devised policies and practices and that
22  kind of thing.  I would say that's a no.  But did I
23  interact with them every now and again to maybe provide
24  knowledge, some direction about how I do things?  Yes.
25      Q.    Do you recall offhand specific individuals?

Page 34

1   Do you recall?
2       A.    No.
3       Q.    Do you recall offhand specific platforms?
4       A.    I remember we had a meet and greet when the
5   Tinder acquisition occurred, and so I met the
6   individuals from Tinder.  I don't remember directly
7   working with them on like what their policies were or
8   how to make modifications based upon how I was working,
9   but I remember meeting them and then we also did a
10  meeting in Quebec I believe with another acquisition,
11  and there was -- there was probably a little more
12  interaction with that one, but I don't recall the name
13  of the person.
14      Q.    In the course of doing your work at Match,
15  did you use any chat platforms to communicate with
16  other employees?
17      A.    I don't remember.
18      Q.    I understand it's been awhile.  Do you
19  recall if you ever used Slack, for example?
20      A.    I was not a Slack, user.  I don't believe I
21  used Slack at Match, but I feel like there had to be
22  some way that I was communicating with my folks besides
23  email, but I don't remember what technology it was.
24      Q.    You referenced that you in your personal
25  capacity used the Match.com platform.  Was that

Page 35

1   something that you personally had to pay for or was
2   that a perk of working at Match?
3       A.    That's a great question.  I don't remember.
4       Q.    Do you recall if you were, for example,
5   allowed, I guess, perhaps as a perk of the job allowed
6   to use other dating platforms owned by the Match Group,
7   Inc.?
8       A.    I believe I had an account on People Media
9   and on Chemistry as well partly as a user, but also as
10  the leader of the group to better understand what the
11  user experience was, but definitely as a dater.  But it
12  was very important obviously if I'm creating all of the
13  policies for and suggestions for improvements to the
14  site that I understand what a user experience is.
15      Q.    I want to shift gears and talk a bit more
16  about the Match guarantee we discussed a little bit
17  ago.  You referenced that if a customer qualified for
18  the Match guarantee by meeting certain conditions,
19  Match would gift them an additional six months; is that
20  correct?
21      A.    Correct.
22      Q.    Do you recall how a customer would go about
23  accepting the gift of the extra six months?
24      A.    So we had a system prompt for consumers to
25  access their tracker system on-line to see how they

Page 36

1   were doing throughout the six month period.  If they
2   were maintaining or obtaining the requirements on a
3   monthly basis.  And then there was a link for them to
4   redeem the six month guarantee on-line.
5       Q.    Aside from the link that you referenced,
6   are you aware of any other means by which a customer
7   could have accepted these extra six months?
8       A.    Certainly they could have contacted
9   customer support.
10      Q.    And was there a time period in which an
11  individual had to accept the gift of the extra six
12  months if they qualified for it?
13      MR. HUMMEL:  Objection, vague.  You can answer if
14  you understand his question.
15  BY THE WITNESS:
16      A.    So the policy the actual -- if I recall
17  correctly, the actual Match.com policy for redemption
18  was for the consumer to redeem the request for the six
19  months within seven days of expiration of their six
20  months subscription.  Then if they contacted customer
21  care because they didn't do it timely or there was a
22  question about whether they actually met the
23  requirements to get the free subscription, we would
24  have some leniency, some expectations that we would
25  make to give them the six months free.

Page 37

10 (Pages 34 - 37)

**Page 38**

1  Q.  Is it okay if when I reference the gift,
2  the extra six months, if I use the term guarantee
3  extension; does that make sense to you?
4  A.  Sure.  That's fine.
5  Q.  So you referenced to accept the guarantee
6  extension it had to be during the actual Match.com
7  policy was that it had to be in a seven day window,
8  correct?
9  A.  Correct.
10  Q.  Is that seven days before the end of the
11  customer's subscription or seven days after?
12  A.  I remember it being seven days post.
13  Q.  They had to do so on the Match.com tracker
14  site; is that correct?
15  A.  On our app, yes, on the website.
16  Q.  On the desktop website?
17  A.  I honestly can't remember whether you could
18  do it on the app or the website.  For sure the website
19  and potentially the app.  I don't know.
20  Q.  And if the customer missed that seven day
21  window to accept on the website, they would then have
22  to contact customer care?
23  A.  Yes.
24  Q.  Did you ever during your time at Match have
25  concerns about the prominence of that Match tracker

**Page 39**

1  guarantee tracker site?
2  MR. HUMMEL:  Well, objection, vague, misstates
3  testimony.  You can answer if you understand what he's
4  talking about.
5  BY THE WITNESS:
6  A.  Can you restate.
7  BY MR. TEPFER:
8  Q.  Sure.
9  During the time you worked at Match, did
10  you ever have concerns about the prominence of the
11  placement of the guarantee tracker on the Match.com
12  website?
13  MR. HUMMEL:  Objection, vague.
14  BY THE WITNESS:
15  A.  I don't know that I ever had any personal
16  concerns about it.  Whether it was something that I
17  received as far as number of consumers contacting us
18  about it, that may have made a list of the number of
19  consumers contacting us about that issue.  So I'm
20  not -- was I personally concerned?  I'm going to say
21  no.  Is it something that I possibly tracked and
22  reported on?  Potentially, yes.
23  Q.  To discuss those, you know, customer
24  contact tracking, in your position would you be
25  familiar with the most common customer complaints?

**Page 40**

1  A.  Yes.
2  Q.  Do you recall if one of the more common
3  customer complaints was that customers did not
4  understand the requirements of the six month guarantee?
5  A.  I would say for a small period of time of
6  my nine years of employment there for a small period of
7  time there was some concerns were saved from consumers
8  who had not received their six months free, that one of
9  the reasons why is because they did not fully
10  understand what they had to be responsible for.
11  Q.  In that time period that you're
12  referencing, do you recall about when that was?
13  A.  I understand it to be in 2013.
14  Q.  Did, to your recollection, Match receive
15  complaints of that nature before 2013?
16  MR. HUMMEL:  I'm going to object to the word
17  complaint as vague.  You can answer.
18  BY THE WITNESS:
19  A.  I don't recall.
20  BY MR. TEPFER:
21  Q.  Do you recall if after that 2013 time
22  period Match was contacted by customers concerning this
23  issue?
24  MR. HUMMEL:  Objecting, vague, this issue.  You
25  can answer.

**Page 41**

1  BY MR. TEPFER:
2  Q.  Sorry.  If I could clarify.
3  Do you recall if after 2013 Match was
4  contacted by customers concerning their claim of not
5  understanding the requirements of the Match guarantee?
6  A.  After 2013, I left in I believe it was
7  early February 2014 so I honestly don't remember what
8  happened in January.
9  Q.  Do you recall if during 2013 changes were
10  made to the Match guarantee to address these complaints
11  from consumers regarding the disclosure of the
12  requirements of the Match guarantee?
13  MR. HUMMEL:  Objection, vague, misstates the
14  testimony.  You can answer.
15  BY THE WITNESS:
16  A.  I don't recall.
17  BY MR. TEPFER:
18  Q.  Do you recall the time period in which
19  Match customer care would allow consumers to accept the
20  Match guarantee after missing that seven day window?
21  A.  So within customer care we made the policy
22  to allow a 30-day window from the seven day.  So we
23  would -- we extended that seven day as a courtesy for
24  30 days for consumers to reach out to request their
25  free six months.  If they qualified then we gave it to

11 (Pages 38 - 41)

**APP 059**

1    Q.   Was he -- was Mr. Shetty a direct report to
2  Mr. -- to Phil?
3    A.   I believe so.
4    Q.   You referenced accounts being hidden a
5  moment ago.  Would you mind just explaining what you
6  mean by accounts being hidden?
7    A.   Yes, I think it's the same thing you
8  reference when you said deactivated.  So hidden is not
9  visible to other consumers to be able to interact with
10 them as well as not being able to log in when you said
11 that I believe that's accurate as well.
12     MR. TEPFER:  Let the record reflect I'm now
13 handing the witness what's been marked Exhibit 12.
14 It's a two page document that included Match FTC 838839
15 and ending in 40 on the second page.
16          (WHEREUPON, a certain document was
17          marked Deposition Exhibit No. 12,
18          for identification, as of 2/10/23.)
19 BY THE WITNESS:
20     A.   Okay.
21 BY MR. TEPFER:
22     Q.   Would you mind explaining what this email
23 thread concerns?
24     MR. HUMMEL:  Objection, overbroad.  It's a lot of
25 topics.
                                              Page 138

1     MR. TEPFER:  Sure.
2  BY MR. TEPFER:
3    Q.   If you wouldn't mind, go ahead.
4    A.   Sure.  So starting with Beth just wanting
5  to know what's the process for giving members back
6  their access if they lost their dispute.  And so I'm
7  explaining what the process is on the CS side, if they
8  contact us, they've told us they've lost their dispute,
9  we go ahead and give them access to their account on
10 the day until when the subscription would have ended.
11 Pradeep comes back with a bunch of commentary around
12 chargebacks, and then Beth wanting to know what percent
13 are disputed.  And based upon the punctuation in
14 Pradeep's response, they are disputing 70 percent of
15 chargebacks which are not fraud related.  So I'm not
16 sure of 70 percent of total chargebacks or 70 percent
17 of the chargebacks that are not fraud related.  I don't
18 know which one he actually meant there.  70 percent of
19 something.
20     Q.   So am I correct in understanding that it
21 was represented to you that the one reason consumers
22 were not granted having their account access reinstated
23 after receiving a chargeback and losing was because
24 they had violated Match.com's terms of use?
25     MR. HUMMEL:  Speculation, foundation.
                                              Page 139

1  BY THE WITNESS:
2    A.   I don't know if it's the chicken or the
3  egg.
4  BY MR. TEPFER:
5    Q.   Sorry.  Would you explain what you mean by
6  that.
7    A.   Well, I think you are asking me is the
8  reason why we didn't reinstate their accounts because
9  the terms of use states that we don't have to or the
10 policy was we don't want to reinstate their accounts
11 because of the things that Pradeep says that the terms
12 of use were created to support that.  I don't know
13 which one came first.
14     Q.   I understand.
15          Are you aware of circumstances in which the
16 customer care department received complaints -- let me
17 start over.  Are you aware of circumstances in which
18 customer care was contacted by a Match.com subscriber
19 who stated that they had sought a chargeback, lost and
20 not been reinstated on the Match.com platform?
21     A.   Yes.
22     Q.   Do you recall about how often those sorts
23 of contacts occurred?
24     A.   No.
25     Q.   Do you recall the time period in which
                                              Page 140

1  Match.com received these sorts of contacts?
2    A.   No.
3    Q.   Would -- to your recollection, did
4  Match.com receive contacts from customers communicating
5  this concern in the 2013 to 2014 time period?
6    A.   You have shown me an email within the 2013
7  time frame where customer was complaining about that on
8  People Media.  So I'm assuming the answer is yes.
9    Q.   Mr. Shetty in his September 6 email states
10 that, "As a terms of use violation, these members are
11 not entitled to reinstatement.  If there are other
12 extenuating circumstances this would be a case by case
13 determination."
14          Do you recall who would make that case by
15 case determination that Mr. Shetty refers to?
16     A.   I know customer care would.  I don't know
17 if there were others that would make that decision, but
18 we would determine if there were extenuating
19 circumstances.
20     Q.   What -- do you recall what would qualify as
21 an extenuating circumstance?
22     A.   I only recall from what I have read in the
23 emails that you have sent me that we created a policy
24 that would allow based upon request that we would
25 reinstate the consumer if they lost.
                                              Page 141

36 (Pages 138 - 141)

1   Q.   Is it -- are you stating -- sorry.  I'm a
2  little confused.  You are stating that Match.com had a
3  policy for 2013 until the end of your tenure that in
4  fact if a customer lost the dispute, they were actually
5  granted access once more?
6   A.   Sure.  So in this Exhibit 12, September 5
7  response from me to Beth, I say when -- typically when
8  the member contacts us we have not heard back from the
9  bank and the money has not been added back to the
10  member's account so when they tell us they lost their
11  chargeback dispute and they want to access their
12  account again, we comp them the time they would have
13  had left from that day to the day they originally paid
14  for.
15       So that's if they contact customer care and
16  they tell us they lost their dispute, then we would
17  make their account visible again for them.  That's as
18  of September of 2013.
19   Q.   Then after you make that statement
20  Mr. Shetty responds stating, "As a terms of use
21  violation these members are not entitled to
22  reinstatement."
23       Do I have that correct?
24   A.   You do.  Then he says, "If there are other
25  extenuating circumstances, it would be a case by case

Page 142

1  determination.  The extenuating circumstances are if
2  one of those customers contacts customer care directly,
3  we reinstated them."
4   Q.   So an extenuating circumstance would simply
5  be contacting customer care?
6   A.   Yes.
7   Q.   You reference that others may have weighed
8  in on whether something qualifies as an extenuating
9  circumstance; is that correct?
10   A.   Yes, just because I don't know.  I'm not
11  saying that we are the only department.  I don't know
12  if there is other departments that would have weighed
13  in.  I can't speak to that.  I just know that my
14  department can make a policy for the extenuating
15  circumstances.
16   Q.   To be clear, in circumstances where an
17  individual does not contact customer care or where
18  there are not other extenuating circumstances, the
19  policy was such they would not automatically have their
20  account access reinstated; is that correct?
21   A.   That's my understanding from reading this
22  email.
23   Q.   Thank you.
24       In the circumstances that we just discussed
25  where a customer has established extenuating

Page 143

1  circumstances such that account access should be
2  reinstated and that request is granted, do you recall
3  if the customer would be granted or rather credited for
4  the time period in which that chargeback dispute was
5  pending?
6   A.   Based upon the answer that I wrote in this
7  email, we count them -- the time they would have had
8  left from that day that they contact us to the day they
9  originally paid for.  So that does not go back to the
10  date that they originally disputed the charge, but the
11  day that they're contacting us because -- yes.  We are
12  not giving them any time period post when their
13  subscription would typically end anyway.  We are not
14  adding time on.
15       (WHEREUPON, a certain document was
16       marked Deposition Exhibit No. 13,
17       for identification, as of 2/10/23.)
18   MR. TEPFER:  Let the record reflect I'm handing
19  the witness what's been marked as Exhibit 13.  It's a
20  multi-page document beginning with the Bates Match FTC
21  833378 and ending on Match FTC 833389.
22   BY MR. TEPFER:
23   Q.   This is a long one so if you wouldn't mind
24  just giving it a general look.  Ms. Watson, am I
25  correct that this is more of those customer care

Page 144

1  suggestions we have been talking about?
2   A.   Based upon the subject of this email,
3  weekly customer suggestions reported by care I would
4  assume so.
5   Q.   Is this the format of how folks on this
6  list would typically receive these weekly customer care
7  suggestions?
8   MR. HUMMEL:  Foundation, speculation.
9   BY MR. TEPFER:
10   Q.   I guess did you during your time at Match
11  receive these weekly customer care suggestions?
12   MR. HUMMEL:  Objection, vague.
13   BY THE WITNESS:
14   A.   Yes.
15   BY MR. TEPFER:
16   Q.   It's sent to undisclosed recipients at
17  custhelp.com.  Do you know what that email address is?
18   A.   I do not.
19   Q.   It's sent from
20  customercare@support.match.com.  Do you know who
21  manages that email address?
22   A.   I do not.
23   Q.   I wanted to ask you about at the end of --
24  towards the end right before Ms. Auderer's email
25  address there is an individual with the email address

Page 145

37 (Pages 142 - 145)

1    E.Sartin@meetic-corp.com, S-A-R-T-I-N, M-E-E-T-I-C.  Do
2    you know who is the owner of that email address?
3        A.    Elizabeth Sartin.
4        Q.    Who is Elizabeth Sartin?
5        A.    Product.
6        Q.    Do you have -- what's Meetic?
7        A.    Another dating app.
8        Q.    Do you know why -- do you have any idea why
9    she would be receiving this email?
10       A.    Well, Elizabeth was a U.S. employee, U.S.
11   product employee, and then she went to France to work
12   with Meetic.  And so I don't know if she was on this
13   because she was a U.S. employee before she went off on
14   this stint or she was on it simply because there was
15   some need for her to understand what's going on with
16   the Match.com app to be aware for whatever they did on
17   the Meetic app.  I don't know.
18       Q.    Did your department typically -- did your
19   department ever collaborate with folks at Meetic?
20       A.    Yes.
21       Q.    How often would that occur?
22       A.    Not that often.
23       Q.    What sorts of things would your department
24   collaborate with folks at Meetic?
25       A.    I remember meeting with the head of their

                                              Page 146

1    support operation a couple of times on trips, and would
2    share if there were questions about how we handled
3    certain things, certain policies or whatever.  I would
4    share what our policy is.
5        Q.    Do you recall who that person is?
6        A.    I don't.
7        Q.    When you say that she is still a U.S.
8    employee, do you just -- do you mean she's living in
9    the U.S.?
10       A.    No, she moved to France to Paris for what I
11   thought was a short-term assignment.  I don't know how
12   long she was there, couple years maybe.
13       Q.    So she still worked on Match.com things is
14   what you are saying?
15       A.    No, I think she was assigned for that
16   assignment to Meetic, but she had been on the U.S.
17   Match website for product.
18       Q.    So she went there as like a temporary
19   detail?
20       A.    Yes.
21       Q.    Was that in your experience a common
22   practice for certain employees at Match to be detailed
23   to other dating sites?
24       MR. HUMMEL:  Objection, vague as to the word
25   common.  You can answer.  And no foundation.

                                              Page 147

1    BY THE WITNESS:
2        A.    I was going to say it's not common.  I know
3    of two people who did it so out of the nine years that
4    I was there, so not common.
5    BY MR. TEPFER:
6        Q.    Who is the other person?
7        A.    Thought you might ask me that.  Bonilla is
8    her last name.
9        Q.    B-O-N-I-L-L-A?
10       A.    Uh-huh.  Her first name is escaping me
11   right now.  It may come to me.
12       MR. HUMMEL:  Her name is escaping me right now.
13       THE WITNESS:  It's a long name.
14       MR. HUMMEL:  That's a long name.
15   BY MR. TEPFER:
16       Q.    That took me longer than it took you.
17       A.    I'm used to smart ass.  I speak smart ass.
18       MR. HUMMEL:  You understood me.
19   BY MR. TEPFER:
20       Q.    Did folks who worked at Match typically use
21   the Match.com email address in your experience?
22       A.    It would depend which product they were
23   supporting.  So if they were supporting the Match.com
24   website, yes, typically that's my understanding.
25   Although I believe we had some fluidity between

                                              Page 148

1    especially on the product side when we would make
2    acquisitions to get some of our product people to
3    support the other products that we have acquired, and I
4    don't know if they changed their email address when
5    they did that.
6        Q.    When you worked at Match, did you have
7    reason to become familiar with the terms of use
8    document available on the Match.com website?
9        A.    Was I aware of terms of use?  Yes.  Would I
10   have to refer to it from time to time?  Yes.  Was I
11   familiar with it?  No.
12       Q.    Would you, for example, be able to
13   recognize the document if you saw it?
14       A.    Well, I know what term of use document
15   looks like, so yes.
16       Q.    Sure.  But -- well, might as well.
17       A.    I wouldn't be able to tell you what changes
18   there were to it or anything like that.  Are we done
19   with this?
20       Q.    Yes, ma'am.  This one is a little bit of a
21   wild card.
22            (WHEREUPON, a certain document was
23            marked Deposition Exhibit No. 14,
24            for identification, as of 2/10/23.)
25   BY MR. TEPFER:

                                              Page 149

                                    38 (Pages 146 - 149)

APP 062

1  rephrase it, please, counsel.
2  BY MR. TEPFER:
3      Q.   Sure.  I'm just -- we have talked a bit
4  about complaints that the customer care department has
5  received relating to the on-line cancellation flow,
6  correct?
7      A.   The suggestions.
8      Q.   When you mean suggestions, you are
9  referring to the survey?
10     A.   Yes, we were talking about the report,
11 right, that's where we saw the cancellation.  I thought
12 I cancelled.  So that comes from suggestions from a
13 survey that was received and suggestions that a
14 frontline agent decided to indicate in the Right Now
15 platform.
16     Q.   I believe in the email you also
17 characterize them as issues; is that correct?
18     A.   Sure.
19     Q.   The issues relating to the on-line cancel
20 flow, do you recall what those issues most commonly
21 were?
22     MR. HUMMEL:  Objection, vague, form.
23 BY THE WITNESS:
24     A.   I don't remember what all of the issues
25 were that we were contacted about that would have been

Page 154

1  research?
2      A.   Right.  So as we have discussed today that
3  whole suggestions report which again is a minuscule
4  number I think the cancellations I thought I cancelled
5  was maybe on average 50 or 60 people a month, which is
6  1 percent maybe of the volume that we would receive on
7  a monthly basis.  Of that group, as we escalate these
8  two the product team to say, you know, fraud was number
9  one.  People thinking that they cancelled I think was
10 number two or number three in some of those groups.  We
11 would send it to product and product would do their due
12 diligence and they could identify if a customer through
13 their flow within the website actually went through the
14 flow and where they dropped out.  So I had a point of
15 view that the way the buttons were placed the UI at the
16 very end of the cancellation process you could
17 reactivate your subscription without really recognizing
18 that you might be doing that.  It was post
19 cancellation, but there was still a button in that same
20 place that you could have clicked on.  So through
21 research the product team looked at that and said yes,
22 we have people going through and re-clicking on the
23 subscribe me again or I didn't want to cancel.  So they
24 resolved that user interface by changing the way it
25 looked, which resolved that problem.

Page 156

1  categorized issues with cancellation.  I know there was
2  a subset of people that said they thought they went
3  through the cancellation process, but I wouldn't know.
4  I don't recall what other issues they would have said
5  about the cancellation flow.
6  BY MR. TEPFER:
7      Q.   You referenced a subset of customers that
8  believed that they had gone through the cancellation
9  flow.  What is that recollection based on?
10     MR. HUMMEL:  Objection, misstates the testimony.
11 You can answer.
12 BY THE WITNESS:
13     A.   What is it based on that said I think
14 customers, one of their issues in the cancellation was
15 thinking that they did cancel?
16 BY MR. TEPFER:
17     Q.   Yes, ma'am.
18     A.   Because we determined that that was the
19 case.  That through research that there were customers
20 that went through the flow and actually turned their
21 subscription back on.
22     Q.   You said we there.  Is that the -- who are
23 you referring to?
24     A.   Customer care working with product.
25     Q.   You said we did research.  What kind of

Page 155

1      So I remember that that was a portion of
2  the people that complained that I thought I cancelled.
3  Because some of the people that think they cancelled
4  didn't cancel, didn't go through the process, went and
5  researched.  They didn't go through the process of
6  cancellation.  So some maybe thought "I did cancel"
7  when they didn't.  Others we could show that they went
8  through the cancellation process and where they may
9  have dropped out in the process.  The ones that went
10 all the way through and actually ended up reinstating
11 their subscription.
12     Q.   Just to make sure I understand.  In some
13 circumstances in which your department and the product
14 department researched these complaints in some of those
15 circumstances, the subscriber had gone through the
16 cancellation flow and got to the end and then clicked
17 to reinstate their subscription in fact?
18     A.   Yes.
19     Q.   And then in other circumstances they in
20 fact had not completed the subscription -- the
21 cancellation flow at all?
22     A.   Correct.
23     Q.   Do you recall the proportion of the context
24 relating to this issue where the individual had
25 accidentally re-subscribed?

Page 157

40 (Pages 154 - 157)

1    A.   No.
2    Q.   The same question for the number of folks
3 who I suppose drop out of the cancellation flow.  Do
4 you recall those percentages?
5    A.   No.
6    Q.   Did you ever review data relating to where
7 in the cancellation flow subscribers tended to drop
8 out?
9    A.   I don't remember.
10    Q.   Did you yourself have any concerns about
11 the usability of Match.com's desktop flow for Match
12 customers?
13    A.   I didn't have concerns with the flow.  I
14 was concerned that where the button was placed after
15 you finished the cancellation process where that was
16 placed that it could lead a consumer who is not reading
17 the screen who is not reading the buttons to
18 incorrectly select a button that would reinstate them.
19    Q.   Did you have similar concerns relating to
20 any other aspect of the cancellation flow?
21    A.   I don't recall.
22    MR. HUMMEL:  Counsel, when is a good time for a
23 break?  We have been going for an hour and a half.  I'm
24 confident she needs a break.
25    MR. TEPFER:  He wasn't looking at time.

Page 158

1    MR. HUMMEL:  We are at 4 hours, 30 minutes.  Off
2 the record.
3    (WHEREUPON, a recess was had.)
4    (WHEREUPON, the record was read
5    as requested.)
6 BY MR. TEPFER:
7    Q.   Do you recall customers ever expressing to
8 the customer care department their concerns that the
9 on-line cancellation flow was difficult for them to
10 find?
11    A.   Difficult to find?  I know we received
12 contacts from customers who couldn't find it, but I
13 can't tell you how many or if it was common.
14    Q.   Did you have concerns that the cancellation
15 process or cancellation flow was hard to find?
16    A.   That the flow was hard to find or just the
17 cancellation?
18    Q.   The on-line cancellation flow?
19    A.   Was hard to find?
20    Q.   Yes, ma'am.
21    A.   No.
22    Q.   Do you recall what the on-line cancellation
23 flow looked like at the time you worked at Match?
24    A.   I think so.
25    Q.   I want to discuss specifically what the

Page 159

1 cancellation flow looked like in the 2013 or 2014 time
2 period.  Do you recall whether it contained a survey of
3 any kind?
4    A.   Yes, I believe the NPS survey was part of
5 it.
6    Q.   Was that MPS?
7    A.   N net promoter score.
8    Q.   What in your understanding is a net
9 promoter score?
10    A.   It's whether you would refer Match.com to
11 your friends and family.
12    Q.   That survey information, did your
13 department use that survey information for any purpose?
14    A.   Did we use the survey information from the
15 cancellation flow for any purpose?  No.
16    Q.   Are you aware of other departments using
17 that survey information for any purpose?
18    A.   I do not know what they used it for, but I
19 remember finding out who was responsible for that
20 survey and getting some data initially, but I don't
21 know that they actually ever used it for guidance or I
22 have no idea.  It wasn't my department so I don't know
23 how they used it.
24    Q.   The individual you were referring to, do
25 you recall who that is?

Page 160

1    A.   It's a female name.  It's an Indian name.
2 I cannot come up with her name.
3    Q.   The survey results we have been talking
4 about today, the survey?
5    A.   Suggestions.
6    Q.   Yes, ma'am.  This survey in the on-line
7 cancellation flow the responses to that survey were not
8 included in those results, correct?
9    A.   That's correct.
10    Q.   Is it the case that customers who wanted to
11 cancel the recurring charge for their subscription had
12 to enter their password in order to enter the on-line
13 cancellation flow in your recollection?
14    A.   Correct.
15    Q.   Did customers ever complain about that
16 particular aspect of the on-line cancellation flow to
17 your recollection?
18    A.   I don't remember.
19    Q.   Did you ever discuss that particular aspect
20 of the on-line cancellation flow with anyone?
21    A.   About whether we should have the password
22 or whether it should be password protected, I don't
23 remember.
24    Q.   Did anyone ever express to you concerns
25 about the language in the on-line cancellation flow

Page 161

41 (Pages 158 - 161)

1  being confusing?
2      A.   Anyone as in a consumer?
3      Q.   Sure, consumer.
4      A.   I do not remember receiving any.  I
5  wouldn't be able to speak to if they did and how much
6  or it would have been all like tallied up within a
7  report.  I don't remember.
8      Q.   Did any of the Match.com employees in the
9  customer care department ever express to you concerns
10  about the language in the on-line cancellation form?
11     A.   I know Kris Auderer I know she had
12  suggestions on how to improve from her perspective, how
13  to change the flow to make it more user friendly, but I
14  don't know whether those ever got implemented.
15     Q.   Do you recall what those suggestions were?
16     A.   No.
17     Q.   Do you recall if you agreed with Kris
18  Auderer's opinion?
19     A.   I don't recall.
20     Q.   Aside from the concern that you referenced
21  where you get to the end of a cancellation flow and
22  there is a button to re-subscribe you referenced that
23  being a concern of yours during your time as senior
24  vice president; is that correct?
25     A.   The button?

Page 162

1      Q.   Yes, ma'am.
2      A.   The UI, yes.
3      Q.   But you don't recall any other concerns
4  that you had from your time as senior vice president?
5      A.   No, the button was something I was
6  particularly interested in because I'm the one that
7  personally tested it so I tested it a lot to see if
8  that would be regular user behavior.  And I felt like
9  it was something that I would have done because I
10  typically don't read.  I just kind of look at the
11  bottom where the button is placed.  If it's cancel,
12  cancel cancel I would hit it, and I was already in this
13  case passed the cancellation process so it already
14  cancelled, but the button there if I didn't read it,
15  which I didn't read it, I would have reinstated.  For
16  me it was I would have done it.  Then I believe
17  obviously other people would have done it so I felt
18  like it was important to pursue.  That's the reason why
19  I remember that one because it was important to me
20  because I tested it myself.
21     Q.   In your capacity as SVP of customer care,
22  was it your experience that customers often did not
23  read very closely the information in the on-line
24  cancellation flow?
25     A.   No.

Page 163

1      Q.   Would you mind elaborating?
2      A.   I'm just -- the reason why I say no is I
3  worked for so many eCommerce companies in my career now
4  and invariably consumers don't read.  Like we just
5  don't.  We get on a site, we think we know what it is.
6  We look for the big bright button and we pick it.  So
7  that's the way consumers are conditioned.  And so is it
8  unique to Match that maybe somebody didn't read a page,
9  no, that's not unique at all.  So I wouldn't say that
10  that's an issue that's like a Match.com resignation
11  issue.
12     Q.   I understand.  It's -- so am I correct you
13  are stating this is not -- that's typical consumer
14  behavior to not read very closely, but not something
15  that's unique to Match.com?
16     A.   Correct, which is why UI is so important.
17  Like it's so important to play with your user interface
18  to make sure that you are trying to direct consumers in
19  a way of bright shiny objects instead of words.  That's
20  what I have experience for all of the companies that I
21  have worked for that are eCommerce companies.  It's all
22  about continuously modifying and trying to find the
23  right feel for consumers to follow a path without them
24  having to read.
25     Q.   In your experience in these positions, has

Page 164

1  it been your experience that design choice can be as
2  important as the language used on the site?
3      A.   Absolutely.
4      Q.   In your experience in these positions, do
5  consumers tend to pay better attention to a button on a
6  website as opposed to a link on a website?
7      A.   Yes.
8      Q.   Do you recall what that opinion is based
9  on?
10     A.   Just years and years of helping support the
11  UI of many different websites a button is typically a
12  call to action, you want them to click on something so
13  you are creating a button.  A link is more informative.
14  You can clink on the link certainly, and it's going to
15  take you somewhere.  A button is usually the CTA.
16     Q.   CTA means call to action?
17     A.   Yes.
18     Q.   Is that like a technical term?
19     A.   CTA?
20     Q.   Yes, ma'am.  Or term in the industry?
21     A.   Yes, I guess.
22     Q.   Over the course of your career have you
23  become familiar with various cancellation flows?
24     A.   Yes.
25     Q.   Can you recall offhand other cancellation

Page 165

42 (Pages 162 - 165)

APP 065

1     A.   I don't recall.
2     Q.   Do you recall other instances in which you
3   requested this sort of session data from Jim Talbott?
4     A.   No.
5     Q.   Did Mr. Talbott commonly answer questions
6   about consumer behavior?
7     MR. HUMMEL:  Objection, foundation, calls for
8   speculation.
9   BY THE WITNESS:
10     A.   I don't know.
11   BY MR. TEPFER:
12     Q.   Did your department often reach out to
13   Mr. Talbott?
14     A.   I don't think so.
15     Q.   You reference here, "We are trying to
16   determine the level of interest we have been showing
17   the member resignation attempts, how far they go in the
18   resignation process to the front line agents in the
19   CSA."
20         Do you recall what was the result of this
21   inquiry?
22     A.   No.
23     Q.   The CSA?  What does CSA stand for?
24     A.   Customer support application.
25     Q.   You state, "We get a lot of complaints from

Page 190

1   members who tell us they canceled on-site and it didn't
2   work so I thought this might be a way to give the
3   agents more information to explain the members didn't
4   complete the resignation flow."
5         Do you see that?
6     A.   Yes.
7     Q.   What was this opinion based on?
8     A.   I have no idea.
9     Q.   Do you recall making any recommendations
10   concerning how to address those customer complaints?
11     A.   Can you restate the question.
12     Q.   Do you recall making any recommendations
13   concerning how to address those complaints?
14     A.   I remember the recommendation that I made
15   about changing the button, the call to action button.
16   Outside of that I don't remember.
17     Q.   What are sessions if you know?
18     A.   My understanding of a session is a user
19   interacting on a website page interacts on that page
20   creates a session of them engaging on that page.  It's
21   not a specific user ID component.  It's the number of
22   times that page was displayed.
23     Q.   Earlier we had discussed whether Match got
24   a lot of complaints from members who thought they had
25   cancelled on the website and in fact did not.  Based on

Page 191

1   reviewing this email now, is it your opinion that in
2   fact many Match.com customers believed that they had
3   cancelled, but in fact had not actually completed
4   resignation flow?
5     MR. HUMMEL:  Objection, vague.
6   BY THE WITNESS:
7     A.   Yes, I don't know.  Because I don't know
8   what I'm saying this in reference to like what data I'm
9   using.  And so if I say we got a lot of complaints it
10   could be a lot of complaints out of a subset like the
11   subscription -- not the subscription, but the
12   suggestion piece or it could be a lot of complaints out
13   of the overall volume that we received, which is the
14   CSA report.  So I don't know what my reference is here
15   in October of 2013 as to why I said we get a lot of
16   complaints from members who tell us they cancel on the
17   site and it didn't work.  I don't know what the point
18   of reference is.  I obviously wrote that, but I don't
19   remember the context of what that was around.
20     Q.   We have talked about a lot about the survey
21   and suggestion results.  Were there other sources that
22   you looked to to determine what Match customers were
23   providing feedback on?
24     A.   Absolutely.
25     Q.   What are those sources?

Page 192

1     A.   So we would do a monthly I think actually
2   weekly report from the collection of the tickets that
3   we created in the Right Now system, which is
4   documenting all of our phone calls, emails and chats
5   where ticket would be created and that was our
6   interaction, documentation of that interaction with the
7   consumer.  If it was an email it would be the actual
8   email receipt, email response.  If it was a phone call,
9   it was the frontline agent documenting that phone call.
10   If it was a chat, I can't remember, but I think the
11   chat manuscript was imported into the ticket.  So we
12   would have codings for all of those tickets that the
13   agent would be required to complete.  And so that
14   report is the one that would document like the 50, 60,
15   70,000 contacts a month.  That would document all of
16   those.
17     Q.   What was the name of that report, if you
18   recall?
19     A.   Weekly customer feedback report maybe.
20     Q.   Were there other sources of information
21   that you would consider?
22     MR. HUMMEL:  That's overbroad, vague.  You can
23   answer if you understand the question.
24   BY THE WITNESS:
25     A.   I don't recall.  I mean the one that we

Page 193

49 (Pages 190 - 193)

APP 066

1   used more directionally than anything was the one I
2   just referenced.
3      Q.   Regardless of the source that you
4   considered for making this statement, would you have
5   made this statement if you did not trust the source of
6   that information?
7      MR. HUMMEL:  Objection, incomplete hypothetical,
8   calls for speculation.  You can answer.
9   BY THE WITNESS:
10     A.   I would have made this statement based upon
11   information that I had with the assumption the
12   information I had was valid.  But again just to
13   restate, when I say we got a lot of complaints from
14   members, the a lot of complaints if I'm making that
15   statement based upon a lot of complaints from this
16   suggestion report, which is where we saw the complaint
17   for cancellation, that may be a lot for that report
18   because it's in the top five, but it wouldn't have even
19   been a blip on the screen for the larger report.  So
20   between 60 and 70, whatever that number was of
21   customers that would have shown up on the suggestion
22   report, wouldn't have even made like, you know,
23   probably the top 40 or 50 on the weekly summary of all
24   of the contacts that we received.  So that's the reason
25   why I say we get a lot of complaints.  That's all

Page 194

1   responsibilities to communicate to other departments
2   the nature of the customer feedback that your
3   department is receiving?
4      A.   Say that again.
5      MR. TEPFER:  Would you mind reading it back.
6   BY THE WITNESS:
7      A.   Yes.
8   BY MR. TEPFER:
9      Q.   Did you take measures to ensure that your
10   characterization of the communications that you
11   received from Match.com customers that you conveyed to
12   other departments was accurate?
13     A.   Yes.
14     Q.   Would you have communicated -- I guess
15   would you have communicated a characterization, if you
16   believed it to be inaccurate concerning, you know,
17   customer feedback?
18     MR. HUMMEL:  Overbroad, vague, improper,
19   incomplete hypothetical.  You can answer.
20   BY THE WITNESS:
21     A.   I would not.
22     MR. HUMMEL:  Do you mind if we take five?  We are
23   at 5, 44.
24      (WHEREUPON, a recess was had.)
25      (WHEREUPON, a certain document was

Page 196

1   relative to what I'm using as my source that justifies
2   a lot.
3   BY MR. TEPFER:
4      Q.   Would you agree that generally speaking,
5   Match in general during this time period received a lot
6   of complaints from members who stated they cancelled on
7   the site and it didn't work?
8      A.   No.
9      Q.   So can you think of any reason why you
10   would have made that statement if you do not believe
11   that?
12     A.   Based upon what I just told you.  So if my
13   source here by saying we get a lot of complaints from
14   members, if my source for saying that was I was using
15   the suggestion report where this ranked high as far as
16   a suggestion it's in the top five as a suggestion we
17   got a lot of complaints based upon this report, but
18   that's not a lot when you look at it in the broader
19   perspective of the total number of contacts that we
20   would receive in a month.  The 60 or whatever, 60 to 70
21   that it was showing for this specific topic on the
22   suggestion report the monthly suggestion report would
23   be nothing in comparison to the total volume of
24   contacts that we took for that month.
25     Q.   In your role as SVP, was it one of your

Page 195

1        marked Deposition Exhibit No. #,
2        for identification, as of 2/10/23.)
3     MR. TEPFER:  Let the record reflect I'm now
4   handing the witness what's been marked Exhibit No. 20
5   and it has a Bates stamp Match FTC 662511.
6   BY MR. TEPFER:
7      Q.   If you wouldn't mind taking a look at that.
8   I have sort of a general question about this text.  Is
9   that -- am I correct that this is like a chat that's
10   been copied and pasted into an email?
11     A.   I'm assuming so.
12     Q.   Did you happen to use a chat program during
13   the time period of this email February 2013 that you
14   can recall?
15     A.   Yes.
16     Q.   Do you recall what kind of chat program
17   that would be?
18     A.   I don't.  I know you asked previously about
19   Slack.  I don't think it was Slack, but I don't
20   remember what it was.
21     Q.   Did y'all use like MSN messenger or
22   anything like that?
23     A.   Maybe.
24     Q.   Do you recall if others at the company used
25   chat platforms?

Page 197

50 (Pages 194 - 197)

1    A.   Yes.
2    Q.   I guess similarly or more broadly speaking,
3  do you recall what those platforms were that were used
4  at the company?
5    A.   I believe Slack was used over on the
6  technology side with the developers, I believe, and
7  then I believe the rest of us used the same program,
8  but I don't remember what it was.
9    Q.   Do you know if Match had a wiki?
10    A.   Yes.  We had a wiki.
11    Q.   What is that?
12    A.   So I believe it's where the technology
13  folks would document stuff.  I know that my boss who
14  hired me, Carl Leubsdorf, who was on the technology
15  side he used to always reference the wiki.  "Is it in
16  the wiki?  Check the wiki."
17        So there was a whole bunch of stuff there.
18  And when I made our FAQs and used Right Now technology
19  platform to use the FAQ technology, I didn't have
20  anything in the wiki.  So it must have been the
21  reference tool to go look stuff up at some point, but
22  my team as far as I remember didn't use the wiki.  We
23  use the FAQ that we developed.
24    Q.   Did you ever review the wiki?
25    A.   I'm sure I did.

Page 198

1    Q.   Do you happen to recall if it contained any
2  information about, for example, the six month
3  guarantee?
4    A.   I don't remember.
5    Q.   What do you recall if it contained
6  information about chargeback policy or the cancellation
7  mechanism?
8    A.   I don't remember.
9    Q.   We looked at an email earlier that
10  included -- I forget his name, someone from the general
11  counsel's office.  Do you recall through this email?
12    A.   Curt.
13    Q.   Curt.  Thank you.  Do you recall what
14  company Curt worked for?
15    A.   No.
16    Q.   Did your customer care department regularly
17  meet with the legal department?
18    A.   No.
19    Q.   Do you recall if -- are you familiar with
20  Match.com, LLC?
21    A.   I think you asked me that when we first sat
22  down.
23    Q.   I'm sorry.
24    A.   I don't know.  Like I know that there were
25  differences.  There were the companies that I was

Page 199

1  representing and then there is the holding company, but
2  I couldn't tell you which one was which.
3    Q.   Perhaps a better question.  Was there one
4  legal department that folks from all of the dating
5  platforms would communicate with?
6        MR. HUMMEL:  Foundation.  Vague as to time.  You
7  can answer if you understand the question.
8  BY THE WITNESS:
9    A.   I don't know.
10  BY MR. TEPFER:
11    Q.   I wanted to ask.  You are here today with
12  your counsel Mr. Hummel, correct?
13    A.   Yes.
14    Q.   Are you personally the one paying those
15  legal fees to Mr. Hummel?
16    A.   No.
17    Q.   Has anybody else offered to pay those fees
18  on your behalf?
19    A.   I don't know.
20    Q.   Do you know who is paying your attorneys'
21  fees?
22    A.   Maybe the same people that have my
23  subpoena.  I don't know.
24    Q.   Have you -- when you say the same people
25  that have your subpoena, would you mind clarifying what

Page 200

1  you mean?
2    A.   That's me being a smart ass because I
3  didn't receive the subpoena.  So wherever the subpoena
4  is maybe that's the same people who are paying.  I
5  should say I don't recall receiving the subpoena.
6  Somebody may prove me wrong later.  I don't recall
7  receiving it.
8    Q.   Is it your understanding that Match would
9  be paying your attorneys' fees for your representation
10  in this deposition?
11    A.   I don't remember, but that makes sense
12  since I'm not paying.
13    Q.   Sure.
14        MR. TEPFER:  Chad, I wanted to ask for the emails
15  that we have discussed with -- sorry.
16  BY MR. TEPFER:
17    Q.   I guess one final question on that prior
18  topic.  Have you been offered anything in -- anything
19  else in exchange for your time here today?
20    A.   No.
21        MR. TEPFER:  Sorry, Chad.  To get back to what I
22  was going to ask.  The email exhibits that we have been
23  discussing here with Ms. Watson's email address, are
24  you willing to stipulate to the authenticity of those
25  to avoid the need to ask her to authenticate them in

Page 201

51 (Pages 198 - 201)

1 the interest of saving time?
2     MR. HUMMEL:  We can discuss that down the road.
3 I don't think you all have a problem with authenticity,
4 but I'm not prepared to stipulate today.
5     MR. TEPFER:  Do you want to take a short break
6 real quick here?  I think we are about --
7     MR. HUMMEL:  Sounds good.  I'm going to have 20
8 minutes maybe max.
9         (WHEREUPON, a recess was had.)
10     MR. TEPFER:  Chad, would you mind, the statement
11 you had referenced about stipulation if you wouldn't
12 mind.
13     MR. HUMMEL:  I'm not prepared to stipulate to
14 authenticity today without having thought through
15 things, but generally speaking if a document was
16 produced by Match in some context with the
17 investigation or litigation, you are not going to have
18 a problem with me on authentication as a basis for
19 objecting to a document.
20     MR. TEPFER:  Thanks.
21     MR. HUMMEL:  I'm not prepared to stipulate today.
22     MS. HILLIARD:  One question on that.
23     MR. HUMMEL:  Want to swear me?
24 BY MR. TEPFER:
25     Q.   I guess, Ms. Watson, are you aware of any
                                             Page 202

1     A.   Yes.
2     Q.   That was changed based on your
3 recommendation?
4     A.   Yes.
5     Q.   Am I correct that the only issue you recall
6 having with the Match cancellation flow and
7 confirmation was the placement of that button; is that
8 true?
9     A.   That's correct.
10     Q.   Now, let's talk about there was an email
11 that showed the pages at which consumers were dropping
12 out?
13     A.   Yes.
14     Q.   You didn't know what those codes meant that
15 the pages that they reached, is that correct, as you
16 sit here today?
17     A.   Correct.
18     Q.   Now, let's talk about the issue relating to
19 the chargeback policy and your recommendation that your
20 view was that accounts should be automatically
21 reinstated if Match prevailed in the chargeback
22 dispute?
23     A.   Correct.
24     Q.   Would that be true for fraudsters, in other
25 words, were there exceptions to that view?
                                             Page 204

1 circumstances where your email account was hacked or
2 anyone had unauthorized access to your email?
3     A.   No.
4     Q.   Thank you.
5     MR. TEPFER:  Again, pass the witness.
6         EXAMINATION
7 BY MR. HUMMEL:
8     Q.   I have a few questions, Ms. Watson.  Thank
9 you for your time today.  Can you just clarify for the
10 record what dates you were an SVP for Match.com, if you
11 recall?
12     A.   I don't recall exactly.
13     Q.   Was it towards the end of your tenure?
14     A.   Yes.
15     Q.   Now, you talked about in connection with
16 reactivation button that you had an issue with, was
17 that ultimately fixed?
18     A.   Yes.
19     Q.   During your tenure?
20     A.   Yes.
21     Q.   In 2013, the reactivate button at the -- on
22 the confirmation page was changed --
23     A.   Yes.
24     Q.   -- is that true?  It satisfied you that
25 that issue had been addressed?
                                             Page 203

1     A.   Of course.
2     Q.   Can you explain that a bit.
3     A.   Sure.  If an account was determined to be
4 fraud, obviously we would refund the credit card
5 immediately, close down the account.  But if these were
6 legitimate members who were using our site, but for
7 whatever reason felt like they didn't authorize this
8 charge to their credit card and lost that dispute since
9 they had paid Match for that subscription, it was my
10 opinion that they should be allowed to use the
11 remainder of their subscription once the decision had
12 been made in our favor.
13     Q.   Do you know why others disagreed that
14 consumers who had lost a chargeback dispute should be
15 put back automatically?
16     A.   Well, I think Pradeep -- this is just my
17 assumption.  My assumption was Pradeep had seen in his
18 job the worst of the worst, and considered almost
19 everybody gaming the system in some way.  And me being
20 on the other side of not seeing just the worst and
21 interacting with our customers on a much bigger scale,
22 understood that it's not all fraudsters and people
23 abusing the systems.  It could just be somebody who
24 forgot to turn off auto renewal, got billed, had used
25 the site for the first maybe month or something and
                                             Page 205

52 (Pages 202 - 205)

APP 069

1   then their dispute got resolved not in their favor, and
2   they didn't mean any harm to Match as an abuser. They
3   wanted to go ahead and use the rest of their
4   subscription since they paid for it.
5      MR. TEPFER: Objection, calls for speculation.
6   BY MR. HUMMEL:
7      Q. Do you know how, if at all, Match knew or
8   how Match was notified if it had prevailed in a
9   chargeback dispute?
10     MR. TEPFER: Objection, calls for speculation.
11   BY MR. HUMMEL:
12     Q. Do you understand the question?
13     A. I do. I'm not sure of the full process of
14   how they were notified.
15     Q. Throughout the questioning this morning and
16   afternoon by counsel for the Federal Trade Commission
17   you said several times that you were basing an answer
18   quote, based on this email it appears something. Does
19   that mean that you had -- you didn't have an
20   independent recollection, but were interpreting an
21   email that you were reading 10 years after the fact?
22     MR. TEPFER: Objection, leading.
23   BY THE WITNESS:
24     A. Correct.
25   BY MR. HUMMEL:

Page 206

1     Q. What did it mean when you said, based on
2   this email? He made an objection that it was leading.
3   So I want to give you an opportunity to clarify in your
4   own words what you mean by based on this email.
5     A. Yes. So when I say based on this email, it
6   means that I don't remember having the discussion or
7   writing the document, but if the document states that
8   then it obviously happened. I obviously said
9   something. So based on the email, yes, that happened.
10   Do I independently have remembrance of that occurring,
11   no.
12     Q. Let's look at Exhibit 1, which is the first
13   one in that stack I hope. Do you have that in front of
14   you?
15     A. Yes.
16     Q. All right. What's this page again?
17     A. This is the tracker or progress page for
18   the six month guarantee.
19     Q. What's your understanding of the reason why
20   Match provided this progress page as being available to
21   consumers?
22     A. As a courtesy to our consumers after point
23   of purchase so that they had some way to track their
24   progress.
25     MR. TEPFER: Objection, calls for speculation.

Page 207

1   BY MR. HUMMEL:
2     Q. Do you know why Match provided this
3   document or this -- sorry -- made this page available?
4     A. They made this page available so that our
5   six month guaranteed subscribers could track their
6   progress throughout the six month subscription.
7     Q. To your knowledge, were there other means
8   through which consumers could understand the
9   requirements for claiming this six month guarantee
10   other than the progress page?
11     A. Yes.
12     Q. What were those, if you recall?
13     A. Well, initially they were told via the
14   website upon purchase what the requirements were and
15   then they could get into their sent folder to see how
16   many emails they have sent out to different unique
17   contacts. They would know whether they had a photo op
18   or whether they had hidden their profile.
19     Q. Did anyone at Match ever tell you or, to
20   your knowledge, was it ever discussed within Match that
21   Match wanted to make it difficult for consumers to
22   redeem their guarantee?
23     A. No.
24     Q. Did anyone at Match ever tell you or did
25   you ever hear discussion regarding that Match was

Page 208

1   trying to deceive consumers into subscribing by
2   offering an illusory six month guarantee without
3   disclosing the terms?
4     A. No.
5     Q. Regarding the cancellation flow, did you
6   ever hear discussion at Match or, to your knowledge,
7   did anyone ever discuss with you that the cancellation
8   flow should be made difficult so the consumers couldn't
9   cancel?
10     A. No.
11     Q. There were a lot of -- some discussions
12   apparently initiated by Ms. Auderer regarding her
13   suggestions for improving the cancellation flow. To
14   your knowledge, were those ever rejected so that Match
15   could make it difficult for consumers to cancel?
16     MR. TEPFER: Objection, leading.
17   BY THE WITNESS:
18     A. Not to my knowledge.
19   BY MR. HUMMEL:
20     Q. With respect to the chargeback policy,
21   did -- were you ever privy to any discussions that the
22   chargeback policy was designed to unfairly cheat
23   consumers out of funds that they had paid to Match.com?
24     MR. TEPFER: Objection, leading.
25   BY THE WITNESS:

Page 209

53 (Pages 206 - 209)

1      A.   No.  In fact, it's just the opposite.  It's
2   in Match's best interest that they have active users on
3   the site making matches and improving interactions with
4   other members.  So there would be no advantage to the
5   actual usability of the site to prevent somebody from
6   using it.
7   BY MR. HUMMEL:
8      Q.   Could you please look at Exhibit 10.  Do
9   you have that in front of you?
10     A.   Yes.
11     Q.   This is a document where the questions
12  asked by FTC's counsel today seemed to suggest that
13  they are going to argue that there were 67 customer
14  suggestions relating to the guarantee redemption, at
15  least that is the gist of the questions, and that was
16  somehow a significant number.  Could you find on here,
17  maybe if you could look at page 3, how many suggestions
18  related to the cancellation process?  If you look at
19  maybe the second page of the chart.
20     A.   Yes.
21     Q.   How many were there?
22     A.   Three.
23     MR. TEPFER:  Objection, leading.
24  BY MR. HUMMEL:
25     Q.   As opposed to how many suggestions related

Page 210

1      Q.   Sure.  So when you said in your testimony
2   that you agreed with these suggestions, did that mean
3   you believed they needed to be implemented in order for
4   the guarantee not to be unfair in any way or that they
5   were just generally good suggestions?
6      A.   Good suggestions, helpful suggestions.
7      Q.   Let's look at Exhibit 4.  By the way, with
8   respect to the guarantee, could consumers contact
9   customer care and ask how their progress was going?
10     A.   Yes.
11     Q.   Customer care would be able to pull up the
12  answer?
13     A.   Yes.
14     Q.   Exhibit 4.  What's Exhibit 4 again, do you
15  know?
16     A.   Are you asking me?
17     Q.   Yes.
18     A.   This is on the first page what the progress
19  page looked like, and then on the second page is
20  following through when they went to redeem, do the
21  redemption to get the six month guarantee, the question
22  that they were asked did you meet anyone during your
23  six month program depending on how they answer the
24  question is what the user experience was.
25     Q.   Do you know what would happen if somebody

Page 212

1   to the guarantee redemption?
2      A.   67.
3      Q.   Now, let's look at Exhibit 3.  Tell me when
4   you have Exhibit 3 in front of you.
5      A.   I have it.
6      Q.   Okay.  So Exhibit 3 if you look at the
7   second page which were Kris Auderer's suggestions
8   relating to the guarantee?
9      A.   Yes.
10     Q.   These are suggestions one, two, three,
11  four.  I want to understand your testimony here.  When
12  you say you agreed with the suggestions, does that mean
13  you agree that those suggestions had to be implemented
14  or that it wasn't a bad suggestion?
15     MR. TEPFER:  Objection, leading.
16     MR. HUMMEL:  Well, to be clear it doesn't suggest
17  the answers, it gives her A or B, so it's not leading.
18  I could phrase it in a way that's leading, but that's
19  not leading.
20     MR. TEPFER:  Sorry.
21  BY MR. HUMMEL:
22     Q.   Do you understand the question?
23     A.   I believe.
24     Q.   What's the answer?
25     A.   Rephrase it.

Page 211

1   accidently hit they had met someone special and then
2   called to say they didn't mean to hit that button, if
3   you know?
4      A.   If they said they did meet somebody and
5   contacted us and said, "No, I'm sorry."  We'd give it
6   to them for free, sure.  I think you could hit the back
7   bar on your browser, go back and answer the correct
8   way.
9      Q.   Did you at any time think the six month
10  guarantee was unfair or deceptive in any way?
11     A.   No.
12     Q.   Do you think the guarantee should have been
13  invalid as a result of the prior placement of the
14  tracker link?  In other words, it was unfair because of
15  where that link was placed?
16     A.   No.
17     Q.   We saw some documents today, maybe only
18  one, that showed the consumers had on occasion claimed
19  to Match when they were requesting a refund that they
20  thought they had cancelled.  Do you remember that
21  document?
22     A.   Yes.
23     Q.   Does the fact that a consumer noted in a
24  communication to customer care that they wanted a
25  refund because they thought they had cancelled

Page 213

54 (Pages 210 - 213)

APP 071

**Page 214**

1  necessarily mean that the on-line cancellation flow was
2  not simple?
3      A.   No.
4      Q.   Why?
5      A.   Because they may not have even attempted to
6  cancel, they may have just thought they did.
7      Q.   One final line of questions.  Were you
8  aware of any situation in your time at Match, the
9  operating company, where the holding company, Match
10  Group, Inc., exercised control over the disclosure
11  relating to the guarantee?
12     A.   No.
13     Q.   Were you aware of any?
14     MR. TEPFER:  Objection.
15  BY MR. HUMMEL:
16     Q.   Any time where the holding company Match
17  Group, Inc. exercised control over the cancellation
18  flow --
19     MR. TEPFER:  Objection.
20  BY MR. HUMMEL:
21     Q.   -- on Match.com.
22     MR. TEPFER:  Objection, foundation.
23  BY MR. HUMMEL:
24     Q.   Were you ever aware of a situation where
25  the holding company exercised control or designed the

**Page 216**

1  going per code here, but I would request 30 days to
2  read make any changes to make the testimony fully
3  truthful and accurate, if that's necessary, and sign
4  under penalty of perjury.  If she doesn't make any
5  changes and we don't notify you within 30 days any copy
6  of this deposition can be used for any other purposes
7  in this litigation.  Is that okay?
8      MR. TEPFER:  That's just what the Federal Rules
9  provide.
10     MR. HUMMEL:  Basically.  I don't know how you are
11  handling custody of the original transcript.  That's
12  the only question.  You are emailing -- I'm asking the
13  court reporter.  You are emailing a PDF of the
14  transcript to me for review and signing; is that okay
15  with the court reporting service?  Let's stipulate they
16  can email me a PDF copy, and I will provide it to the
17  witness, within 30 days of my receipt she will provide
18  any changes and either sign or waive signing.
19     MR. TEPFER:  I think that's fine.  That's how we
20  typically --
21     MR. HUMMEL:  That should be right; is that okay?
22     MR. TEPFER:  Yes.
23     MR. HUMMEL:  Off the record.
24     (Deposition concluded at 4:40 p.m.)
25

**Page 215**

1  chargeback policy for Match.com?
2      MR. TEPFER:  Objection, foundation, and leading.
3  BY MR. HUMMEL:
4      Q.   That was no?
5      A.   No.
6      MR. HUMMEL:  Give me one minute off the record
7  and I will probably be done.
8          (WHEREUPON, a recess was had.)
9      MR. HUMMEL:  Back on the record.  I have no
10  further questions.
11         FURTHER EXAMINATION
12  BY MR. TEPFER:
13     Q.   Just a few questions here.  Do you recall
14  if during your time at Match.com Match ever ceased
15  providing refunds to customers who claimed that they
16  had been fraudulently charged or I guess had their
17  credit card stolen and fraudulently charged?
18     A.   That Match stopped refunding people who had
19  a fraudulent charge, no.
20     Q.   Yes --
21     MR. TEPFER:  No further questions at this time.
22  I'm not sure, Chad, if y'all would like to read or
23  waive.  Do you have a preference concerning --
24     MR. HUMMEL:  We definitely want to read and have
25  the opportunity to make changes, and I guess we are

**Page 217**

1          CHANGES AND SIGNATURE
2  MICHELE WATSON
3  February 10, 2023
4  PAGE/LINE      CHANGE          REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 Job No. TX5678402

55 (Pages 214 - 217)

```
 1        I, MICHELE WATSON, have read the foregoing
 2   deposition and hereby affix my signature that the same
 3   is true and correct, except as noted on the previous
 4   page.
 5
 6        _____
 7            MICHELE WATSON
 8   THE STATE OF _____)
 9   COUNTY OF _____)
10        Before me, _____, on this day
11   personally appeared MICHELE WATSON, known to me (or
12   proved to me under oath or through _____)
13   (description of identity card or other document) to be
14   the person whose name is subscribed to the foregoing
15   instrument and acknowledged to me that he executed the
16   same for the purposes and consideration therein
17   expressed.
18        Given under my hand and seal of office this _____
19   day of _____, 20_____.
20
21        _____
22        NOTARY PUBLIC IN AND FOR
23        THE STATE OF _____
24        COMMISSION EXPIRES: _____
25
```

Page 218

```
 1        I further certify that I am neither counsel for,
 2   related to, nor employed by any of the parties or
 3   attorneys in the action in which this proceeding was
 4   taken, and further that I am not financially or
 5   otherwise interested in the outcome of the action.
 6        Certified to by me this February 23, 2023.
 7
 8
 9        Dana Shapiro
10        Dana Shapiro, Illinois CSR 84-3597
         Expiration Date:  5/31/2023
         Firm Registration No. 571
11        Veritext Legal Solutions
         300 Throckmorton Street, Suite 1600
12        Fort Worth, Texas 76102
         Phone.817-336-3042
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 220

```
 1        IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF TEXAS
 2              DALLAS DIVISION
     FEDERAL TRADE COMMISSION, )
 3        Plaintiff,   )
     v.              )Case No. 3:19-cv-02281-K
 4   MATCH GROUP, INC., a    )
     corporation, and        )
 5   MATCH GROUP, LLC, formerly)
     known as MATCH.COM, LLC, a)
 6   limited liability company,)
          Defendants.   )
 7
 8
          REPORTER'S CERTIFICATION
 9          ORAL DEPOSITION OF
             MICHELE WATSON
10          February 10, 2023
11        I, Dana Shapiro, a Certified Shorthand Reporter,
12   hereby certify to the following:
13        That the witness, MICHELE WATSON, was duly sworn
14   by the officer and that the transcript of the oral
15   deposition is a true record of the testimony given by
16   the witness;
17        I further certify that pursuant to FRCP Rule
18   30(e)(1) that the signature of the deponent:
19   was requested by the deponent or a party before the
20   completion of the deposition and that the signature is
21   to be before any notary public and returned within 30
22   days from date of receipt of the transcript.  If
23   returned, the attached Changes and Signature Pages
24   contain any changes and reasons therefore;
25
```

Page 219

```
 1   COUNTY OF TRAVIS )
 2   STATE OF TEXAS   )
 3        I hereby certify that the witness was notified on
 4   _____, that the witness has 30 days
 5   after being notified by the officer that the transcript
 6   is available for review by the witness and if there are
 7   changes in the form or substance to be made, then the
 8   witness shall sign a statement reciting such changes
 9   and the reasons given by the witness for making them;
10        That the witness' signature was/was not returned
11   as of _____.
12        Subscribed and sworn to on this _____ day of
13   _____, 20____.
14
15        Dana Shapiro
16        Dana Shapiro, Illinois CSR 84-3597
         Expiration Date:  5/31/2023
         Firm Registration No. 571
17        Veritext Legal Solutions
         300 Throckmorton Street, Suite 1600
18        Fort Worth, Texas 76102
         Phone.817-336-3042
19
20
21
22
23
24
25
```

Page 221

56 (Pages 218 - 221)

# EXHIBIT E

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF TEXAS
 2                    DALLAS DIVISION
 3   FEDERAL TRADE COMMISSION,    §
                                  §   Case No. 3:19-cv-02281-K
 4        Plaintiff,              §
                                  §
 5        v.                      §
                                  §
 6   MATCH GROUP, INC., a         §
     corporation, and MATCH       §
 7   GROUP, LLC, formerly known   §
     as MATCH.COM, LLC, a         §
 8   limited liability company,   §
                                  §
 9        Defendants.             §
10   _____
11                   ORAL DEPOSITION OF
12                    MELISSA CLINCHY
13                    February 16, 2023
     _____
14           ORAL DEPOSITION OF MELISSA CLINCHY,
15   produced as a witness at the instance of the Plaintiff,
16   and duly sworn, taken in the above-styled and numbered
17   cause on February 16, 2023, from 9:10 a.m. to
18   4:57 p.m., before Joseph D. Hendrick, Certified
19   Shorthand Reporter in and for the State of Texas,
20   reported by machine shorthand, at the offices of Sidley
21   Austin LLP, 2021 McKinney Avenue, Suite 2000, Dallas,
22   Texas, pursuant to Notice and the Federal Rules of
23   Civil Procedure and any provisions stated on the record
24   or attached hereto.
25   Job No. 5651545
```

                                                    Page 1

1 times they don't remember what the question was and
2 I'll have to repeat it, I'm used to that so that's not
3 a problem.  Okay?
4     A.   Okay.
5     Q.   You're doing a good job so far, but it's
6 really important that you try to answer verbally rather
7 than shaking your head, nodding your head.  We don't
8 have a videographer here today and Joe needs to be able
9 to get a verbal response from you.  Is that agreeable?
10    A.   Yes.  Got it.
11    Q.   We also -- Mr. Hendrick is taking down
12 everything we're saying, and in order to get a clean
13 record we need to try not to interrupt each other and
14 so I'm going to try to not interrupt you while you are
15 answering and ask you to let me finish my question
16 before you start answering.  Okay?
17    A.   Sure.
18    Q.   All right.  Do you have a smartphone with
19 you today?
20    A.   It's in my bag in the other room.
21    Q.   Perfect.
22         Okay.  Have you prepared, have you reviewed
23 any documents in preparation for your testimony today?
24         MS. ZAMBRANO:  I am going to allow you to
25 answer that, but not disclose the contents of any

Page 10

1 document that you reviewed.
2     A.   Yes.
3         MR. MOON:  I don't think that that -- I
4 don't think the documents are privileged, what she's
5 seen.
6         MS. ZAMBRANO:  They are.  It's work
7 product.  I selected documents, that's work product.
8         MR. MOON:  I can see where I might not be
9 able to ask her what her counsel showed, but I don't
10 think what she reviewed would be privileged.
11        MS. ZAMBRANO:  You can ask her what she
12 reviewed, if anything, outside of her time with
13 counsel.  But, no, what she reviewed with counsel is
14 absolutely work product.
15        MR. MOON:  I don't agree with that, but I
16 am going to go ahead and -- well, I'll let you do your
17 instruction.
18 BY MR. MOON:
19    Q.   Can you tell me which documents you
20 reviewed in preparation for your deposition today?
21        MS. ZAMBRANO:  And I am going to object on
22 the basis of work product and privilege.  I am going to
23 instruct you not to answer that question.
24        THE WITNESS:  Okay.
25 BY MR. MOON:

Page 11

1     Q.   Okay.  Other than documents that were shown
2 to you or provided by counsel, did you review any other
3 documents?
4     A.   No.
5     Q.   Okay.  So my understanding is that you used
6 to be employed by the Match Group of companies; is that
7 right?
8         MS. ZAMBRANO:  Objection, form of that
9 question.
10    A.   I worked at match.com.
11 BY MR. MOON:
12    Q.   Okay.  Did you -- are you working with
13 match.com anymore?
14    A.   No.
15    Q.   When did you leave match.com?
16    A.   2018.
17    Q.   Okay.  Why did you leave match.com?
18    A.   I became a stay-at-home mom.
19    Q.   Do you remember what month it was that you
20 left in 2018?
21    A.   I went on maternity in January and did not
22 return, but my maternity leave went, I think, through
23 May.  But the last time I was in office working on
24 something was in January.
25    Q.   Okay.  That's helpful.  Thank you.

Page 12

1         And are you currently employed outside the
2 home?
3     A.   No.
4     Q.   So you are still a stay-at-home mom?
5     A.   Yes.
6     Q.   Do you have any current -- do you own
7 any -- any stock in any Match company?
8     A.   No.
9     Q.   Are you on -- do you have any type of
10 continuing contractual relationship with Match?
11    A.   No.
12    Q.   Are you receiving any compensation for
13 testifying here today?
14    A.   No.
15    Q.   Is Match -- is the company, to your
16 knowledge, paying for your attorney's fees on this
17 matter?
18    A.   I don't know.
19    Q.   Are you paying for your attorney's fees?
20    A.   No.
21    Q.   Okay.  So one thing that we will be talking
22 about a little bit today is the distinction between two
23 entities of Match Group Inc. and Match Group LLC, two
24 different companies, right?  So I wanted to kind of
25 start with you, do you understand the difference

Page 13

4 (Pages 10 - 13)

1 between those -- that there are, in fact, those two
2 different companies?
3     MS. ZAMBRANO:  Objection, form of the
4 question.
5     A.   No.
6 BY MR. MOON:
7     Q.   Did you -- in your employment with
8 match.com did you guys ever use the term "Match Group"
9 when you were talking about other employees?
10     A.   I don't --
11     MS. ZAMBRANO:  Objection, form of the
12 question.
13     A.   I don't recall.
14 BY MR. MOON:
15     Q.   You don't recall.  Okay.
16     Do you -- who -- when you got your paycheck
17 what was the company that was on your paycheck?
18     A.   I don't recall.
19     Q.   Okay.  Do you have any idea whether at any
20 point you were ever employed by two different Match
21 companies at the same time?
22     A.   I don't recall, no.  No.
23     Q.   That is you don't think you ever were?
24     A.   I don't recall.
25     Q.   Did you -- when you worked with Match --

Page 14

1 that position again?
2     A.   A corporate agent, but I don't remember the
3 exact title that I was hired on with.
4     Q.   So were you a level above sort of the
5 frontline customer service agents at that point?
6     A.   Yes.
7     Q.   You dealt with escalation-type scenarios?
8     A.   On phone calls, yes.
9     Q.   Okay.  So then how long did you hold that
10 position with Match?
11     A.   I don't recall.
12     Q.   Did you subsequently change jobs with
13 Match?
14     A.   Yes.
15     Q.   And what was the next thing that you did
16 for them?
17     A.   It was technical resolution supervisor was
18 my title.
19     Q.   Okay.  But you don't remember -- can you
20 give me a general idea when you think you might have
21 transitioned over to that position?
22     MS. ZAMBRANO:  Objection.  Form.  Lack of
23 foundation.
24     A.   I don't recall.
25 BY MR. MOON:

Page 16

1 well, when did you first start working with match.com?
2     A.   August of 2011.
3     Q.   Okay.  Did you sign an employment agreement
4 when you went to work for Match?
5     A.   I don't recall.
6     Q.   Okay.  So I want to run through -- so you
7 started in 2011 and you stopped working for Match in
8 2018.  Do I have that right?
9     A.   Yes.
10     Q.   Okay.  I'd like to kind of go over your
11 employment history with the company, just an idea of
12 the different roles you held with the company, and
13 we're going to try to move through it quickly, but
14 just -- let me just start and I'd like to kind of focus
15 on the 2013 time period going forward mostly.
16     But I'll go ahead and ask.  When you first
17 hired on with Match what was your position with Match?
18     A.   I don't know the exact title, but I was a
19 corporate agent.
20     Q.   What is that -- I mean, what are the job
21 duties associated with that?
22     A.   We would take escalated called from our
23 call center.  We would work all of the emails that came
24 into our queue, and we also worked chats.
25     Q.   Okay.  And, I'm sorry, what did you call

Page 15

1     Q.   Okay.  Would it have been before 2013?
2     MS. ZAMBRANO:  Same objection.
3     A.   Yes.
4 BY MR. MOON:
5     Q.   Okay.  So what did your -- what did your
6 job entail as technical resolution supervisor?
7     A.   I would review technical issues submitted
8 by our agents, and then I would escalate those to the
9 appropriate team.
10     Q.   Okay.  What -- can you give me some -- what
11 does it mean a technical issue escalated by an agent?
12     A.   If a member called in to our customer
13 support and gave information on the site not working as
14 they thought it was supposed to work, the agent would
15 escalate it to me, I would review it, and then if I
16 felt like it was a technical issue I would escalate it
17 to the appropriate teams.
18     Q.   Okay.  What were the most common technical
19 issues, if you recall, that agents would bring up to
20 you?
21     A.   I don't recall.
22     MS. ZAMBRANO:  Objection, form.  Vague --
23 vague.
24     A.   I don't recall.
25 BY MR. MOON:

Page 17

5 (Pages 14 - 17)

APP 077

1   Q.   All right.  So did you -- technical
2  resolution supervisor, did you hold any other positions
3  with match.com?
4    A.   Yes.
5    Q.   Okay.  What was the next thing that you did
6  for them?
7    A.   I don't recall.
8    Q.   You don't recall your title?
9    A.   I know the title that I ended with at
10  Match.  I don't recall that there was a title between
11  technical resolution supervisor and the title I ended
12  with at Match.
13    Q.   Okay.  Well, let me ask then, what title
14  did you end up with at Match?
15    A.   Manager of customer experience.
16    Q.   Did your job duties change between the time
17  that you were technical resolution supervisor and then
18  when you ultimately became manager of customer
19  experience?
20    A.   Yes.
21    Q.   Can you describe that for me?
22    A.   I don't recall my exact duties as an --
23  this was a list of things you did with technical
24  resolution supervisor and this was a list of things you
25  did as manager of customer experience.  I think the

Page 18

1  difference was I had people reporting to me, versus as
2  technical resolution supervisor, I don't think I had
3  people reporting to me.
4    Q.   Okay.  Are both of these titles within the
5  Customer Care department?
6    A.   Yes.
7    Q.   Okay.  And so is everything that you did
8  with Match sort of within the rubric of the Customer
9  Care department?
10    A.   Yes.
11    Q.   So manager of customer experience, did --
12  was there a reorg -- corporate reorganization while you
13  were there?
14         MS. ZAMBRANO: Objection.  Form.  Vague.
15  Corporate reorganization.
16    A.   I don't recall.
17  BY MR. MOON:
18    Q.   Okay.  Well, was manager of customer
19  experience, was that already a job that was in effect
20  when you took -- when you moved into that position?
21    A.   No.
22    Q.   So was that position created for you?
23         MS. ZAMBRANO: Objection.  Form.  Lack of
24  foundation.
25    A.   I don't know.

Page 19

1  BY MR. MOON:
2    Q.   Okay.  Okay.  This job, this position that
3  you held where you would work on technical issues,
4  review technical issues that were brought to you by
5  agents, did you continue to do that throughout the
6  remainder of your time at Match?
7    A.   Yes.
8    Q.   Okay.  Did Match provide you with an email
9  address to use in connection with your work?
10    A.   Yes.
11    Q.   What was your email address?  I have one I
12  can read to you, but I want to ask you first.
13    A.   It would have been melissaschaaf@match.com.
14  I'm not sure if there was a dot in there.  And then
15  once I got married it turned to
16  melissaclinchy@match.com.
17    Q.   Yeah, so I was meaning to ask you about
18  that.  So you -- for a while you worked with Match
19  under your maiden name which was Melissa Schaaf?
20    A.   Yes.
21    Q.   And then when you got married you worked
22  under Melissa Clinchy?
23    A.   Yes.
24    Q.   So I have an email here that's
25  melissa.clinchy@match.com.  Was that your email

Page 20

1  address?
2    A.   Yes.
3    Q.   Can you think of any other email addresses
4  that you used for your work with Match?
5    A.   No.
6    Q.   Okay.  As far as you -- I mean, so that was
7  the email that the company provided to you to use for
8  work purposes?
9    A.   Yes.
10    Q.   And to your knowledge did anybody else have
11  the ability to send or receive emails from this
12  address?
13    A.   No.
14    Q.   Okay.  So one of the issues of the case
15  is -- that we are going to spend quite a bit of time
16  today on is Match's desktop online cancellation
17  procedure.  Are you with me?
18    A.   Yes.
19    Q.   Okay.  Had you had reason over the years to
20  become familiar with the online cancellation -- desktop
21  online cancellation flow?
22    A.   Yes.
23    Q.   And why was that?  How was it that you
24  became acquainted with the flow?
25    A.   I think working in customer support it was

Page 21

6 (Pages 18 - 21)

1 really important to know how the site functioned in
2 every aspect to be able to help our members better.
3    Q.    Okay.  And were you involved in any of the
4 actual programming of the flow?
5    A.    No.
6    Q.    Were you ever involved in -- and I am going
7 to -- we're going to talk about -- I am going to ask
8 questions about whether or not you and other people
9 made suggestions about the flow, but for right now I
10 just want to ask the question, as the flow was
11 implemented did you -- did you have any involvement
12 designing the flow?
13    A.    No.
14    Q.    Who would have been over -- who would have
15 had that responsibility with Match?
16    A.    I don't --
17         MS. ZAMBRANO:  Objection.  Lack of
18 foundation.
19    A.    I don't recall.
20         MR. MOON:  I'm struggling to see how that
21 lacks foundation.
22         MS. ZAMBRANO:  You haven't established that
23 she has any duties or responsibilities in any technical
24 area so why she would know that is beyond me.
25 BY MR. MOON:

Page 22

1    Q.    If you don't know the answer you are
2 welcome to say so.
3         MS. ZAMBRANO:  And I am going to continue
4 making my objections.
5         MR. MOON:  Okay.  You made several
6 foundation --
7         MS. ZAMBRANO:  Been doing this a long time
8 so I'm very familiar with the law on foundation.
9         MR. MOON:  Well, I've been doing this for
10 25 years, so...
11         MS. ZAMBRANO:  Yep.  Twenty.
12 BY MR. MOON:
13    Q.    Okay.  I want to talk about the online
14 desktop cancellation flow.  Have you -- have you
15 assisted the -- I will represent to you that the
16 company has given us some copies, you know, videos
17 showing the flow.  Were you involved in collecting any
18 of that stuff?
19    A.    I don't recall.
20    Q.    Okay.  You don't recall if you ever
21 collected any videos for production to the FTC?
22    A.    Can you repeat that?
23    Q.    Sure.
24         Were you involved in compiling any of those
25 videos to produce in this litigation?

Page 23

1    A.    I don't recall, no.
2    Q.    Okay.  See I'm fine with that.  I'm not
3 mad.
4         Okay.  Let's see.  All right.  So I do want
5 to show you a video and kind of orient you to kind of
6 what we're talking about.  So let's see if I can see
7 this.  So this video goes by super fast so I'm going o
8 play it once and then I'm going to stop and then we're
9 going to kind of go step by step.  Okay?
10    A.    Okay.
11    Q.    So don't blink.  You'll miss it.
12         MS. ZAMBRANO:  Could you identify it for
13 the record here?
14         MR. MOON:  Yes, it's been produced as
15 MATCHFTC672309.
16         MS. ZAMBRANO:  Thank you.
17         If you can't see this for any reason let us
18 know.  We can rearrange.
19         THE WITNESS:  Okay.
20         MR. MOON:  Where's my bar here?  Oops.
21 Okay.  Sorry about that.  Sorry.  I'm having trouble
22 getting this one.  Here we go.
23 BY MR. MOON:
24    Q.    Are you ready?
25    A.    Yes.

Page 24

1         (Video played; no sound.)
2 BY MR. MOON:
3    Q.    Okay.  So now I just played it for you
4 quickly, now we're going to kind of slow down a little
5 bit.
6         Now I'm going to stop.  So is it okay if I
7 continue?  I'm just slowing it down so you can see it.
8    A.    Yes.
9    Q.    And do you want to just let me know when
10 you -- if you want to stop?
11    A.    Sure.
12    Q.    Okay.  Okay.  Did you get a chance to see
13 that?
14    A.    Yes.
15    Q.    Okay.  I understand that there's been
16 variations of the flow over the years - right? - but I
17 was just going to ask, do you recognize that as a
18 version of the flow online desktop flow that you are
19 familiar with?
20    A.    I don't recall exactly what it looked like
21 when I worked at Match so I don't -- I don't think I
22 can say.
23    Q.    Okay.  Well, let me -- so let me go through
24 it slowly, I'm going to ask you a few different things
25 about it.

Page 25

7 (Pages 22 - 25)

1      Okay.  Starting with the screen that we are
2  on right now, and just for the record, we are at the
3  time stamp of 1 second, what -- is this the screen that
4  a member sees where they can sort of manage, they can
5  see their likes and their emails and all that stuff?
6          MS. ZAMBRANO:  Objection.  Form of the
7  question.
8      A.   It looks like the home page.
9  BY MR. MOON:
10     Q.   Okay.  I was going to ask you is what is
11 Match's term for that page?
12     A.   I would have called it the home page.
13     Q.   Okay.  Does the member have to enter a
14 password to get onto this home page?
15     A.   You have to enter a password to log into
16 your account.
17     Q.   Is there a way that you can be logged in
18 without having to actually enter the password manually?
19     A.   I don't recall.
20     Q.   Okay.  Do you know if you have to enter a
21 password every time to access your home page?
22     A.   I don't recall.
23     Q.   Okay.  All right.  So I'm going to go ahead
24 and click it.  Okay.  So now we're at -- I apologize,
25 it was so quick.  So now we're 3 seconds in.

Page 26

1  we do have other evidence that around 2019 that the
2  name of that option was changed.  But you don't know
3  anything about that?
4          MS. ZAMBRANO:  Objection to the testimony.
5      A.   No.
6  BY MR. MOON:
7      Q.   So you wouldn't know why that was changed?
8          MS. ZAMBRANO:  Objection.  Calls for
9  speculation.
10     A.   No.
11 BY MR. MOON:
12     Q.   Okay.  Would you know if the company did
13 any type of testing about, you know, the usability of a
14 managed subscription versus a change/cancel
15 subscription option?
16     A.   No.
17     Q.   Okay.  All right.  I am going to click on
18 through here for a minute.
19          Okay.  So at 7 seconds, we -- did I just
20 show the operator clicking on manage subscription and
21 then a password page pops up?  Are you able to see
22 that?
23     A.   Yes.
24     Q.   Okay.  Do you know why Match required a
25 subscription -- the member to enter a password when

Page 28

1      Did I just -- did the operator of the video
2  just navigate to the settings page, account settings
3  page?
4      A.   Yes.
5      Q.   So what is being shown here at 3 seconds
6  into the video, would you -- your name for that would
7  be the account settings page or the settings page?
8      A.   Yes.
9      Q.   Okay.  So on that page, the member's
10 presented with several different options they can click
11 on there, right?
12     A.   Yes.
13     Q.   Okay.  And do you know which one of those
14 would get you to the cancellation flow?
15          MS. ZAMBRANO:  Can you see the screen?
16          THE WITNESS:  I might need my glasses.
17          MS. ZAMBRANO:  Okay.
18          THE WITNESS:  Sorry.
19          Manage subscription.
20 BY MR. MOON:
21     Q.   Okay.  Was there a time on the flow when
22 the manage subscription link was known as the
23 change/cancel subscription link?
24     A.   I don't recall.
25     Q.   Okay.  We have -- I will represent to you

Page 27

1  they accessed the manage subscription option?
2      A.   Yes, it's because on the manage
3  subscription page when I was at Match, there was credit
4  card information, financial information, and we had you
5  enter your password just to make sure that that
6  information was secure.
7      Q.   Okay.  You say "we."  Who is -- who did
8  you -- what is the basis for your knowledge for that
9  answer?
10     A.   That's how I was trained when I was coming
11 into the company.
12     Q.   Okay.  Do you remember specifically who
13 told you -- who gave you the reason that there is a
14 password entry requirement here?
15     A.   No, I don't recall.
16     Q.   All right.  Were you ever involved in any
17 discussions about whether or not a member should have
18 to enter a password here?
19     A.   I don't recall.
20     Q.   Did you ever hear anyone at the company
21 express the view that eliminating the password
22 requirement would result in too many cancellations?
23     A.   I don't recall.
24     Q.   Do you know if the company did any testing
25 to see what effect the password was having on the

Page 29

8 (Pages 26 - 29)

1  cancellation rates?
2      A.    I don't recall.
3      Q.    Do you recall any time since, say, 2014
4  where the user didn't have to enter a password to
5  access the manage subscription link?
6      A.    I don't recall.
7      Q.    Okay.  We're going to do another segment
8  here.
9           Okay.  So at 15 seconds, does -- did the
10  flow present the member with the option to click on
11  subscription status or cancel subscription?
12      A.    Yes, I see that.
13      Q.    Is that what you recall the flow being when
14  you worked there?
15      A.    I don't recall.
16      Q.    Okay.  Is your testimony about the -- are
17  you testifying just from what you see on the video, or
18  do you have independent recollection of how the flow
19  worked?
20      A.    No, just from what I'm seeing on the video.
21      Q.    So you don't have an independent
22  recollection of how the flow was structured?
23      A.    No, it's been - I don't know - what, seven
24  years, five years, seven years since I've worked there.
25  So, no.

Page 30

1      Q.    Okay.
2      A.    I don't recall.
3      Q.    So I played -- clicked on through to
4  18 seconds, and there's -- do you see that there is a
5  page with the caption, "Before you go, help us make
6  match.com better"; do you see that?
7      A.    I do see that on screen.
8      Q.    Do you remember this page from your work at
9  Match?
10      A.    No, I don't recall.
11           MR. MOON:  That's -- sorry.  This is why I
12  didn't want to be on WiFi.  I'm sorry.
13  BY MR. MOON:
14      Q.    Did you say you don't recall the "before
15  you go" page?
16      A.    Correct, I don't recall.
17      Q.    Okay.  So I clicked on through to a
18  time stamp 21 seconds, and does it -- screen appear to
19  show an offer to the member to get a discount on their
20  next renewal 50 percent?
21      A.    Yes, I'm seeing that.
22      Q.    Do you recall that from the flow?
23      A.    No, I don't recall.
24      Q.    Okay.  Do you recall the fact that there
25  was a -- I'm going to call it a save offer.  Do you

Page 31

1  recall the fact that there was a save offer in the
2  flow?
3      A.    Yes, I do.
4      Q.    Okay.  Can you tell, do you remember under
5  what circumstances a member would or would not see the
6  save offer flow?
7      A.    I don't recall.
8      Q.    Okay.  I am going to exit out of this one
9  and then we are going to play another video real quick.
10  Oh yes, that needs to be marked as an exhibit.
11           MR. MOON:  Well, Joe, so Exhibit 1 will be
12  the video that I provided in native form, which is
13  marked Bates label 672309.
14           (Marked Deposition Ex. 1)
15  BY MR. MOON:
16      Q.    Okay.  As I remember -- I've lost where
17  they are?
18           MS. ZAMBRANO:  DVD-RW drive.
19           MR. MOON:  Okay.
20           MS. ZAMBRANO:  There you go.
21  BY MR. MOON:
22      Q.    Okay.  So I am about to play a video marked
23  MATCHFTC199115.
24           MR. MOON:  Ask that that be marked in the
25  record as Exhibit 2.

Page 32

1           (Marked Deposition Ex. 2)
2  BY MR. MOON:
3      Q.    Okay.  I'm just going to run through this
4  real quick.
5           At 1 second we're on the home page again,
6  right?
7      A.    Yes, I see that.
8      Q.    Okay.
9           MS. ZAMBRANO:  Can we just correct the
10  record?  I'm sorry, I think you might have misread the
11  number.  19911 --
12           MS. BRAGG:  This is not that Bates.  We
13  just need to know what the right Bates number is.  I
14  think there's a typo in there somewhere.
15           MR. MOON:  Oh, really?  Okay.  Let's see.
16           Okay.  All these Bates numbers, I think I'm
17  developing late life dyslexia.  Maybe 1995115?
18           MS. ZAMBRANO:  Can we check that?
19           MS. BRAGG:  I think they're all six digits
20  but I'll check.
21           MR. MOON:  I'm pretty sure it's in the
22  100 series because it's one of the first ones produced.
23  I can find that for you.  I apologize.  I'll find those
24  if there's a typo.
25           MS. BRAGG:  Yes, there's seven digits.

Page 33

9 (Pages 30 - 33)

1 of customer experience, but, yes, the community
2 experience is what it was.
3   Q.   Okay.
4   A.   So that was the same thing, just to be
5 clear.
6   Q.   And then it's got a list of people in the
7 little diagram listed below you, right?
8   A.   Yes.
9   Q.   Are those people that reported to you?
10   A.   Yes.
11   Q.   Okay.  All right.  Let's flip now to the
12 internal page 31 of the document.
13       MS. ZAMBRANO:  Also not labeled, if you
14 would just identify the title for the record.
15       MR. MOON:  Right.  So it's got a larger
16 font, says FAQ Redesign in the upper left-hand corner.
17       And just for the record the page before
18 that in the document is labeled internal number 30 and
19 then the page after is 32.
20 BY MR. MOON,
21   Q.   Do you remember providing any content for
22 this presentation having to do with FAQ redesign?
23   A.   I don't remember doing this slide, but I do
24 remember that I worked on the FAQ redesign.
25   Q.   Okay.  So let me ask about some of the

Page 98

1 bullet points and what that's referring to.
2       Do you know what the bullet point "Moved
3 FAQs in-house" is referring to?
4   A.   Yes.
5   Q.   What was that?
6   A.   We had hosted our FAQs or our help section
7 within our customer support tool Oracle or RightNow.  I
8 don't remember the exact reason on how they were
9 charging us, but it was costing us money to host our
10 FAQs within Oracle.  So as a cost savings we worked to
11 move our FAQs into our internal customer support
12 application tool.
13   Q.   Okay.  So next bullet, "Estimated Savings
14 approximately 250K."
15       Did I read that correctly?
16   A.   Yes.
17   Q.   Do you know what that statement means?
18   A.   I believe that was the savings that we were
19 getting from not hosting it in Oracle anymore and
20 hosting it on our system.
21   Q.   Okay.  Next bullet point, "Reduced Contact
22 Volumes."
23       Do you know what that means?
24   A.   I know what reduced contact volumes means
25 in general.  I don't remember why we thought the FAQ

Page 99

1 redesign would reduce contact volumes.  I don't
2 remember.
3   Q.   Well, yeah, that was going to be my next
4 question.  So what does "reduced contact volumes" mean
5 to you?
6   A.   It just means that we didn't have as many
7 members contacting us.
8   Q.   Is that contacts through all means of
9 communication, or only a certain -- certain channel?
10   A.   No, it would include email, phone, and chat
11 channel.
12   Q.   Okay.  But you don't remember if there was
13 some feature of FAQs that resulted in reduced contact
14 volumes?
15   A.   I don't recall, no.
16   Q.   Do you remember working on the FAQs with
17 the intent of reducing your contact volumes?
18   A.   I remember working on the FAQ redesign and
19 it wouldn't be -- I mean, that seems like something we
20 would want it to do.  Any time you work on an FAQ you
21 want it to provide good solid information that helps
22 your members so they don't have to reach out to you.
23 So...
24   Q.   Were you sort of the lead on this project
25 to redesign FAQs?

Page 100

1   A.   Working with the development team to bring
2 it in-house, I was the lead.  I did not write the FAQs.
3 I believe that managing the FAQs, understanding how
4 many hits they got, which ones were being accessed by
5 the member, would have fallen over -- under me, but I
6 also really worked close with Training, and I don't
7 remember if it was Shonda in Training, but we worked
8 really close together on that, making sure that if
9 something changed on the site, it was updated.  But I
10 believe her team was responsible for actually writing
11 the copy of the FAQs, but I was -- so it was a joint --
12 I don't know -- joint effort.
13   Q.   Okay.
14       MS. ZAMBRANO:  We've been going about an
15 hour and 15 minutes.  Do you -- can you finish this
16 document in a reasonable time, are you okay to go a
17 little longer?
18       MR. MOON:  It's a long document, but I
19 think I can probably finish it in 15 minutes.
20       MS. ZAMBRANO:  Are you okay?
21       THE WITNESS:  I really need a bathroom
22 break, sorry.
23       MS. ZAMBRANO:  Okay.
24       MR. MOON:  Okay.
25       MS. ZAMBRANO:  All right.  Let's take a

Page 101

26 (Pages 98 - 101)

APP 081.1

1  break.
2        THE WITNESS:  Thank you.
3        (Break from 11:44 a.m. until 11:53 a.m.)
4  BY MR. MOON:
5     Q.   Okay.  Ms. Clinchy, we were looking at depo
6  Exhibit 10, right, Community Operations Update?
7     A.   Yes.
8     Q.   Okay.  And we're still on page 31.  We were
9  just talking about reduced contact volumes.  So I want
10  to go down a couple of more bullet points.
11        Under "Updated Look and Feel," you see
12  there's a sub bullet point, "Contact Us is more
13  subtle."
14        Do you see that?
15     A.   Yes, I see that.
16     Q.   Okay.  So what is do you know what "Contact
17  Us" is referring to there, that "Contact Us," is that a
18  link "Contact Us" link?
19     A.   I don't recall what we changed here, no.
20     Q.   Okay.  So -- but are you familiar -- I
21  mean, the term "Contact Us," was that a link on Match's
22  website?
23     A.   I mean, there was -- I don't know if this
24  is referring to the "Contact Us" and the FAQs, or if
25  you know on the footer of the website there was a help

Page 102

1  button that you could click.  So I can't say either way
2  which one that is, but those are the two "Contact Us,"
3  like how you would get to help that I know of.
4     Q.   Okay.  And then if you, if the -- then if
5  a -- okay.  Two different ones, I'm sorry.
6        You said the one about the footer.  What
7  was the one you described before that?
8     A.   Just like the -- you see these little
9  symbols on the page where it's like a little picture
10  and chat now, and that so that's the "Contact Us" that
11  I was referring to on the --
12     Q.   Okay.
13     A.   -- help page.
14     Q.   Then is that something that a member would
15  click on?
16     A.   The Chat Now and the Email Us would take
17  you to a form to contact Care.  I don't remember where
18  the phone took you to.
19     Q.   Do you -- during this time period do you
20  know how the steps a member would take to access -- to
21  get the actual phone number?
22     A.   I don't recall.
23     Q.   All right.  Do you recall during this FAQ
24  redesign process making changes to make the "Contact
25  Us" option less visible?

Page 103

1        MS. ZAMBRANO:  Objection, form.
2     A.   No, I don't recall.
3  BY MR. MOON:
4     Q.   Do you have any idea what "Contact Us is
5  more subtle" is referring to?
6     A.   I do remember that we were trying to make
7  it match the rest of the site.  So I think by more
8  subtle, it was not so chunky.  And also I just
9  remember -- that's a picture of me on the Chat Now and
10  I just -- we didn't like that picture.  So, for me, it
11  felt hokey, and so I think the "Contact Us is more
12  subtle" is referring to just bringing it up to the feel
13  of the website.
14     Q.   Do you remember any discussions around this
15  time about making the contact options less visible for
16  the purposes of reducing contacts with you guys?
17     A.   No, I don't, I don't recall that.
18     Q.   Okay.  Is that -- was that one of the
19  subject -- subjects of conversation from time to time,
20  just the fact about how much it costs to have an agent,
21  you know, respond to a contact?
22     A.   Yes, I mean I think all customer support
23  teams talk about that, that's just budget and what it
24  takes to handle a member but still provide good
25  customer support.

Page 104

1     Q.   Right.  That's one of the metrics that you
2  would look at in your department is, you know, what are
3  our customer care costs for the actual contacts we have
4  with people, right?
5        MS. ZAMBRANO:  Objection, form.
6  Mischaracterizes her testimony.
7     A.   Yes, I think we looked at cost of contact.
8  BY MR. MOON:
9     Q.   Okay.  Okay.  Let's go on to --
10     A.   But I will also say -- sorry, just thinking
11  about this and looking at this, I will say that one of
12  the goals, too, as a consumer was just making sure that
13  the member could help themselves - right? - if the --
14  no one wants to call into customer support, I don't
15  like calling customer support, and so when you talk
16  about like reduced contact volumes, there's also a --
17  you know, I want members to be able to help themselves
18  and not have to take that extra step of contacting us
19  because that's a hassle.  And however you look at it,
20  it's a hassle, and so the reduced contact volumes --
21  and we talked about cost and that's fine, but I also
22  think it's just providing that information where
23  members can help themselves.  You know, it's 11:30,
24  you're on the website -- you have a question, it's,
25  it's nice when you're able to find it, you read the

Page 105

27 (Pages 102 - 105)

1 help section, you're, like, okay, great, now I know, I
2 don't have to call anyone.
3      So I just want to -- sorry, that popped in
4 my head. I wanted to add that too.
5   Q.   I understand.
6   A.   Yes.
7   Q.   So I guess one question I have, are you
8 aware of any sort of design elements the company was
9 implementing to try to discourage actual contact and
10 steer your members toward, you know the self-help
11 options that you are talking about?
12   A.   I think those are two different -- I don't
13 think you can lump those together. There's -- we
14 always -- at least I can, speak for myself that I would
15 want a member to contact us if they had a question. If
16 they could not find it on our help section they
17 absolutely should call us, chat, email, get it figured
18 out. But yes, we wanted members to self-help
19 themselves. It would -- that's a good experience when
20 you go to a help section and you see the FAQ that you
21 want and you can help yourself. Like, no one wants
22 someone constantly helping them. You want to be
23 able -- most people want to be able to do it themselves
24 and find it and not have to deal with customer support.
25 So I think providing good self-help shouldn't be lumped
                                                    Page 106

1 in with we didn't want people to contact us. We just
2 wanted people to be able to access that whenever they
3 needed to access it and not have this extra step of,
4 I've got to chat, or I've got to make a phone call, or
5 I've got to send this email. I don't like doing any of
6 that. I worked in customer support and I don't like
7 contacting customer support.
8      So I think when you say, you know, reducing
9 contacts and, you know, we wanted to up self-help, I
10 think those don't go together. Like, I think -- I
11 think it's really -- you're not a good customer support
12 person if you don't have a good help section or you
13 don't want members to be able to self-help. If we
14 didn't want that we wouldn't have a help section, we'd
15 just make them call. So I don't think we would have
16 been doing our job well, if our -- if a lot of people
17 who came to the help section weren't able to figure out
18 what they were doing.
19   Q.   Is that true for the online cancellation
20 flow also, did -- were there -- did -- let me ask the
21 question this way.
22      Did Match design its website to encourage
23 people to use the online cancellation flow as opposed
24 to some other method of cancelling?
25      MS. ZAMBRANO: Objection, form.
                                                    Page 107

1   A.   You mean versus, like, making people call
2 to cancel?
3 BY MR. MOON:
4   Q.   Right.
5      MS. ZAMBRANO: Objection, form. Lack of
6 foundation on the design of the website.
7   A.   Sorry, can you repeat the question. I'm
8 just trying to understand.
9 BY MR. MOON:
10   Q.   Yeah. Did Match, to your knowledge, I
11 don't want you to testify to anything you don't know
12 about --
13   A.   Yeah, no, I know.
14   Q.   -- do any design elements intended to
15 encourage people to use the online desktop cancellation
16 flow as opposed to some other method of cancelling?
17      MS. ZAMBRANO: Same objection to lack of
18 foundation.
19   A.   I don't recall that.
20 BY MR. MOON:
21   Q.   Okay. Let's flip through to, this is also
22 unmarked, seems like all the pages I want to talk about
23 are unmarked, I don't know why that is.
24      But it's actually page 33. That BBB
25 Progress at the top. Are you with me?
                                                    Page 108

1   A.   Yes, that I see.
2   Q.   Okay. Was your -- at this time that you
3 were working with the customer experience position, was
4 part of your department's job handling BBB complaints?
5   A.   Yes, we did work on the BBB complaints.
6   Q.   And there's a reference to a backlog here,
7 right?
8   A.   Yes.
9   Q.   Do you know what this slide is talking
10 about, the backlog it's referring to?
11   A.   It was a -- a backlog of complaints from
12 the Better Business Bureau.
13   Q.   Okay. So at this time that this was
14 created, were you guys work trying to -- you had
15 evidently just finished the -- handling the Match
16 backlog?
17   A.   Yes, we were working on reestablishing our
18 status on the Better Business Bureau, and to do that we
19 had to work through all of the complaints that we had
20 not responded to.
21   Q.   Okay. And then, "Completed PM Backlog," is
22 that People Media?
23   A.   Yes.
24   Q.   Were you also handling complaints for
25 People Media?
                                                    Page 109

1  phone call.
2  BY MR. MOON:
3      Q.    Do you have a sense of how many, like,
4  request cancellation -- cancellation requests by mail
5  you guys would process like within a typical week?
6      A.    No, I couldn't say.
7      Q.    Do you recall something called the Match
8  Guarantee?
9      A.    Yes.
10     Q.    And how did you become familiar -- well,
11  tell me in your own words your understanding of what
12  the Match Guarantee was?
13     A.    The Match Guarantee was if you purchased a
14  6-month subscription with a guarantee on it, if you
15  fulfilled the requirements of the 6-month guarantee,
16  you would receive an additional 6 months on the site at
17  no cost.
18     Q.    Okay.  And how did -- how was it that you
19  became familiar with the Match Guarantee?
20     A.    When you are hired on to the customer
21  support team as an agent you were trained on the
22  website, so I would have been trained on what the Match
23  Guarantee was when I was hired on to the customer
24  support team and went through a training, you had to be
25  trained on the site and/or policies before you were

Page 182

1  allowed to interact with members.
2      Q.    Okay.  Did you have any job
3  responsibilities that related to the 6-month guarantee?
4      A.    I --
5          MS. ZAMBRANO:  Objection.  Vague.  Go
6  ahead.
7      A.    When I was an agent, I would assist members
8  with questions about the 6-month guarantee or the
9  concerns about the 6-month guarantee, and so in that
10  aspect, like, yes, I assisted members with the 6-month
11  guarantee.
12  BY MR. MOON:
13     Q.    Okay.  Are you familiar with conditions
14  that a member had to qualify in order to redeem the
15  Match Guarantee?
16     A.    Do you mean do I remember what you had to
17  do to get the 6-month guarantee?
18     Q.    Yes.
19     A.    I don't recall all of them.
20     Q.    You had to -- do you recall that you had to
21  put up a profile picture that was approved by Match?
22     A.    Yes, you did have to have a photo on your
23  account.
24     Q.    And that photo had to be approved by Match;
25  is that right?

Page 183

1          MS. ZAMBRANO:  Objection, form.
2      A.    Our photos went through -- do you mean
3  approved by, like, our photos went through moderation
4  to make sure that no one was uploading anything
5  inappropriate to the site.
6  BY MR. MOON:
7      Q.    Right.  You had to upload a profile that
8  made it through Match's content moderation policy.
9      A.    Yes, I -- it had to be an approved photo,
10  yes.
11     Q.    And you had to keep it up the entire time
12  during the 6-month subscription?
13     A.    I don't recall the rules around that.
14     Q.    Do you recall that you had to message five
15  people a month?
16     A.    Yes, five unique members a month, yes.
17     Q.    Okay.  And do you recall that there was
18  something called the Guarantee Tracker website or web
19  page I guess?
20     A.    Yes, I remember there was a guarantee
21  tracker.
22     Q.    And do you recall that you had to access
23  the customer tracker website and accept the renewal
24  within 7 days before expiration?
25     A.    I don't remember the guidelines around

Page 184

1  accepting the guarantee.  I don't -- I -- I don't
2  remember what it looks like.  Like, just sitting here
3  trying to think back, I don't remember what it looks
4  like.  I don't know.
5      Q.    Okay.  Do you recall Match, while you were
6  there did Match receive complaints from Match members
7  about the Match Guarantee?
8          MS. ZAMBRANO:  Objection, form.
9      A.    We received members contacting us about the
10  Match Guarantee, yes.
11  BY MR. MOON:
12     Q.    Do you remember the nature of the
13  complaints?
14         MS. ZAMBRANO:  Objection, form.
15     A.    I do know that if someone had met the
16  requirements and contacted us that we were able to
17  provide the Match Guarantee; our agents were able to
18  add the time on to their account.
19  BY MR. MOON:
20     Q.    Okay.  Do you recall whether people
21  complained to Match that they didn't understand the
22  requirements of the Match Guarantee?
23         MS. ZAMBRANO:  Objection, form.
24     A.    I don't -- I -- I'm sure that happened.  I
25  don't recall specific instances, but people contacted

Page 185

47 (Pages 182 - 185)

1  us all the time if they didn't understand a lot of
2  things about the website.  So I don't remember that
3  specifically, but I know that members contacted us
4  about the 6-month guarantee.
5  BY MR. MOON:
6      Q.   Do you remember members contacting Match
7  and claiming that they were entitled to the redemption
8  to the guarantee but were unable to redeem it?
9      A.   I know that members contacted us to --
10 about the 6-month guarantee or assisting them in
11 redeeming it.  Yes, I remember members contacting us
12 about it.
13     Q.   Okay.  Do you remember any members
14 complaining about the requirements of the Match
15 Guarantee?
16         MS. ZAMBRANO:  Objection, form.
17     A.   I do know members that contacted us about
18 the guarantee, and I do remember explaining that we had
19 requirements on the guarantee to encourage members
20 to -- not use the site correctly, but these
21 requirements helped members have a more successful time
22 on the website.
23 BY MR. MOON:
24     Q.   Okay.  And that was in the context of
25 responding to members who were asking questions with
                                              Page 186

1  your advantage.  The same with having a visible
2  profile.  How is anyone going to contact you if you
3  don't have a visible profile?
4         So I felt that the requirements were there
5  to help our members, and that's why I was working at
6  match.com.  I wanted to help our members be successful
7  on the site and I feel like those requirements helped
8  our members have a more successful experience.
9      Q.   Did you ever propose changes to the
10 requirements of the Match Guarantee?
11     A.   I don't recall doing that.
12     Q.   Did you ever propose any changes to how
13 consumers were made aware of the Match Guarantee
14 requirements?
15     A.   No, I don't recall that.
16     Q.   Did you ever propose any changes to how
17 consumers were to be made aware of how to redeem the
18 Match Guarantee?
19     A.   No, I don't recall that.
20     Q.   Do you know of anyone else proposing
21 changes to the requirements of the Match Guarantee?
22     A.   No, I don't recall that.
23         (Marked Deposition Ex. 18)
24 BY MR. MOON:
25     Q.   Okay.  I hand you what has been marked as
                                              Page 188

1  the requirements?
2      A.   Exactly.
3      Q.   Okay.  Do you ever remember handling any
4  complaints about the Match guarantee that you thought
5  were valid and the customer had a point about the Match
6  Guarantee?
7      A.   I mean I think all the member feedback was
8  valid at some point.  I don't think I necessarily
9  agreed with all of it, and I think it was important for
10 customer to -- customer support to provide information
11 on why we had that.  And I do remember an example I
12 would use is, if you go into a bar and you just put
13 your head down on a bar, no one's going to come talk to
14 you, right?  Like, you're the person with your head on
15 the bar.
16         But if you go into a bar and you are
17 chatting with people and you are interacting, you're
18 more likely to meet someone.  It's just common sense.
19 So when you have the Match Guarantee requirements, this
20 is just to encourage people to take the steps that they
21 might need to use the website successfully.
22         Someone might be shy about uploading a
23 photo, well, if you have the 6-month guarantee we know
24 that uploading a photo you are going to have better
25 success on the site so uploading a photo is only to
                                              Page 187

1  Deposition Exhibit 18.  This is 731717.
2      A.   Thank you.
3      Q.   Take a moment to review that one,
4  Ms. Clinchy.
5      A.   Okay.
6      Q.   Okay.  Do you recall this particular email
7  thread?
8      A.   No, I don't remember this email.
9      Q.   Do you know who McKay Hinckley was?
10     A.   Yes.
11     Q.   Okay.  What was McKay Hinckley's position?
12     A.   He was on the customer support team.  I see
13 here it says he was quality analyst.  I know he had
14 different roles within the customer support team when
15 he was there.
16     Q.   What does "customer support team" refer to?
17     A.   Like Community or, you know, the team that
18 we were on.
19     Q.   Oh, that's -- we're still talking about
20 your department?
21     A.   Yes.  Yes, yes, yes.
22     Q.   Okay.  Do you remember specifically what
23 his role was within your department?
24     A.   Here it says he was quality analyst, but I
25 do know that he was also a corporate -- he was an agent
                                              Page 189

48 (Pages 186 - 189)

1  at one time as well.
2     Q.   Okay.  And then Sydney Yensull, do you know
3  who that was?
4     A.   Yes.
5     Q.   And what is mister -- was that a man or a
6  woman?
7     A.   It's a woman.
8     Q.   Okay.  What was Ms. Yensull's position with
9  Match?
10    A.   She was within customer support.
11    Q.   Do you know what her specific role was
12 within customer support?
13    A.   I don't remember what her title was, but
14 she did report to me.
15    Q.   What was her job, what was her focus of her
16 duties as she worked for you?
17       MS. ZAMBRANO:  Objection, form.  Compound.
18    A.   I can't tell you what she was doing day to
19 day.  I'm sorry, I -- I don't -- I don't recall.
20 BY MR. MOON:
21    Q.   You have -- okay.  So Mr. Hinckley
22 writes, "Here is the list I sent Brett," correct?
23    A.   Yes, I see that.
24    Q.   Okay.  And then do you know which Brett he
25 is referring to there?
                                                Page 190

1       MS. ZAMBRANO:  Objection.  Calls for
2  speculation.
3     A.   No, I can't say.
4  BY MR. MOON:
5     Q.   Was there a Bret Williams who worked for
6  Match?
7     A.   Yes, but Bret Williams spelled his name
8  with one T.
9     Q.   Okay.  Was there a Brett Richards that
10 worked for Match?
11    A.   Yes, there was.
12    Q.   Was that a person --
13       MS. ZAMBRANO:  Excuse me.  Objection.
14 Calls for speculation.
15    A.   I can't say.  I don't remember.
16 BY MR. MOON:
17    Q.   Okay.  So go down to Mr. Hinckley's
18 signature tag line, it's got a North Central Expressway
19 address; is that right?
20    A.   I see that, yes.
21    Q.   Do you have an understanding of which
22 functions were within the Central Expressway address
23 versus the Douglas address?
24       MS. ZAMBRANO:  Objection, form of the
25 question.
                                                Page 191

1     A.   No, I just know that we moved to that
2  office, that match.com moved to that office.
3  BY MR. MOON:
4     Q.   Okay.  You moved there from Douglas?
5     A.   Yes.
6     Q.   Okay.  Do you know when that was?
7       MS. ZAMBRANO:  Objection.  Asked and
8  answered.
9     A.   Before September of 2017.  Like -- no, I
10 don't know when we moved there.
11 BY MR. MOON:
12    Q.   Okay.  So do you remember you testified you
13 don't remember this email exchange, right?
14    A.   No, I don't remember.
15    Q.   Do you remember that Mr. Hinckley, if
16 Mr. Hinckley in fact did send a list to Brett, somebody
17 named Brett, that includes the recommendation, "Make it
18 more clear that Match Guarantee has requirements and
19 that it requires an extra step to be redeemed"?
20    A.   No, I don't know.
21    Q.   Okay.  Any idea what he is referring to
22 when he says "extra step to be redeemed"?
23       MS. ZAMBRANO:  Objection.  Calls for
24 speculation.
25    A.   No, I -- I don't know.
                                                Page 192

1       (Marked Deposition Ex. 19)
2  BY MR. MOON:
3     Q.   Okay.  I'm handing you a document that's
4  been marked as Deposition Exhibit Number 19, Bates
5  labeled 789544.
6     A.   Okay.
7     Q.   Okay.  So this email -- is this email chain
8  about the issue of whether or not the confirmation
9  email that a subscriber -- I mean, I'm sorry.  A member
10 would receive would contain a link to the rules for the
11 6-month guarantee?
12       MS. ZAMBRANO:  Objection, form of the
13 question.
14    A.   So a lot of different things in the email.
15 BY MR. MOON:
16    Q.   That's okay, we can -- I can break it down,
17 that's fine, if you'd rather -- yeah, that's fine.  I'm
18 trying to save some time, but let's go through it so we
19 can know what we're doing here.
20       Okay.  So let's look, then, at page 789547
21 in the middle of the page, email from you to LaShonda
22 Pero October 21st, 2015.  Do you see that?
23    A.   Yes.
24    Q.   Okay.  And it says, "Here's what you get
25 when you buy a 6-month sub in CSA."
                                                Page 193

                                   49 (Pages 190 - 193)

1  recollection. I know there was a policy around it and
2  I'm sure there were rules that I followed, but I don't
3  remember those and I can't say.
4  BY MR. MOON:
5      Q.   Well, let me clean up the question then.
6  You used the term "blocked" so let me ask in that way.
7      The circumstances in which a customer's
8  account was blocked as you used the term after a
9  chargeback, you don't recall what the policy was in
10  terms of how they could get their account reinstated?
11     A.   No, I don't.
12         MR. MOON: All right. May I take a moment
13  to confer with counsel?
14         MS. ZAMBRANO: For sure, yes.
15         MR. MOON: I only need two minutes.
16         MS. ZAMBRANO: Sure. Okay.
17         (Break from 4:20 p.m. until 4:26 p.m.)
18  BY MR. MOON:
19     Q.   Ms. Clinchy, when you were preparing for
20  your deposition you testified that you met with
21  Ms. Zambrano, correct?
22     A.   Yes, I did.
23     Q.   Did you also meet with Mr. Kitchens over
24  here, Sam Kitchens?
25     A.   Yes, I did.

Page 218

1      Q.   And did you -- have you also met with
2  Jeanette Teckman in preparing for your deposition?
3      A.   I don't think she was -- I don't remember
4  her being -- like I said hi to her, but I don't
5  remember her being on the Zoom call for an extended
6  period of time or anything.
7      Q.   Do you have any plans to return to work for
8  Match?
9      A.   No.
10     Q.   Have there ever been any discussions about
11  the possibility of you returning to work for Match?
12     A.   No. When I left, they said if you ever
13  decide to come back let us know. But, no.
14     Q.   Okay. Since the time you left you've had
15  no further discussions with them about the possibility
16  of coming back?
17     A.   No.
18     Q.   Have you been provided any sort of -- I
19  asked you about compensation, right, you have not been
20  compensated for your testimony?
21     A.   No.
22         MR. MOON: Okay. That's all I have. I
23  pass the witness.
24         MS. ZAMBRANO: Okay. Thank you.
25         EXAMINATION

Page 219

1  BY MS. ZAMBRANO:
2      Q.   You have that stack of exhibits in front of
3  you, correct?
4      A.   Yes.
5      Q.   Okay. I am going to ask you to pull out
6  two of them, Exhibit 6 and Exhibit 11. I'm going to
7  ask you about 11 first. First, Exhibit 11.
8         Do you remember your testimony about
9  Exhibit 11, the Jira ticket?
10     A.   Yes.
11     Q.   Okay. Is -- let me start differently. In
12  Exhibit 11, are you asking someone to develop a cancel
13  flow for you?
14     A.   No, I'm not. This is a mock-up, so I was
15  asking someone just to put together some screenshots of
16  how this would look on the site, but it would not be
17  for an actual development for changes on the website.
18     Q.   Does that mean that you would -- they would
19  be creating a flow for you, or, like, artwork?
20     A.   It was artwork -- it was -- it was just
21  screenshots.
22         So before Match had a dedicated design team
23  if we had -- if customer support had suggestions on
24  features and what we want it to look like, we would
25  mock it up in Paint and it would look terrible and

Page 220

1  jenkity and not professional, and so this is a request
2  to have a mock-up so just a screenshot or a screen grab
3  of what is listed in the description, to make it look
4  better than what I could do in Paint.
5      Q.   All right. I'm going to ask you now about
6  your emails, and I'm not asking you about a particular
7  email now but we've looked at a number of emails today
8  that you have sent when you were working at Match
9  between 2011 and 2018 so roughly seven years.
10         How many emails did you send on a given
11  week, can you estimate that?
12     A.   At least hundreds. Maybe thousands. I was
13  emailing all day.
14     Q.   So hundreds or thousands a week and you
15  worked there for seven years?
16     A.   Yes.
17     Q.   And you have been shown a few emails about
18  the cancellation flow today, correct?
19     A.   Yes.
20     Q.   Speaking of the cancellation flow, now I'm
21  going to look at Exhibit 6. This is the exhibit that,
22  on page MATCHFTC681482, starts with an email from you
23  about a lunch and listen. Do you remember your
24  testimony about Exhibit 6?
25     A.   Yes.

Page 221

56 (Pages 218 - 221)

1    Q.    Okay.  And you referred to a friend, one of
2  your friends in this email.  Do you see that?
3    A.    Yes, I do.
4    Q.    Okay.  Who was your friend?
5    A.    Her name is Katy.  She was a former member
6  on the site, but it had been probably -- when is this
7  email, 2016?  So five years at least since she had been
8  single, and she was not the most technical-savvy person
9  that I had in my life.
10   Q.    Why did you pick Katy to go through the
11 flow?
12   A.    Because based on what we were trying to
13 show Product, I chose someone less technically savvy to
14 tell a story, that she was able to successfully cancel
15 and I really didn't want to ask anyone else to do it so
16 I just used it as a refresher to show the Product team
17 that this is what it looks like when someone who
18 doesn't work for Match goes through the cancel flow,
19 but she was able to do it successfully.
20   Q.    Did your friend have any difficulty
21 cancelling?
22   A.    I don't think she had any difficulty
23 cancelling.  She was able to do it in a reasonable
24 amount of time, and I remember I'm, like, okay, well,
25 this is just going to be a really good start to just

Page 222

1  refresh everyone on what the flow looks like.
2    Q.    With respect to the flow, you saw it today
3  in your deposition and you were familiar with it when
4  you worked at Match, correct?
5    A.    Yes.
6    Q.    Do you believe it was difficult to cancel
7  using the flow?
8    A.    No, I don't believe it was difficult.  I do
9  know that we got member feedback regarding
10 cancellation, and especially working for Kris it was
11 something that she would bring up every once in a
12 while.  And so I even said, okay, I don't think it's
13 difficult, but I am going to find some auto renewal
14 products and I'm going to go ahead and subscribe to
15 those and go through their cancellation flow and just
16 try to understand what an industry standard would look
17 like on something.
18        And I remember going to Weight Watchers, I
19 subscribed, I went in to cancel, I had to enter my
20 password on Weight Watchers to access the subscription
21 status, and I do remember that there were survey
22 questions that I had to enter to be able to
23 successfully cancel my subscription on Weight Watchers,
24 and I remember doing that, and then saying to myself
25 okay, so I feel like I've done enough on my part to

Page 223

1  assure myself that I don't believe that this is
2  difficult, even though my boss had brought it up to me
3  several times.
4    Q.    Do you think that Match's cancellation flow
5  is confusing?
6    A.    No.  I -- I don't think it's confusing.  I
7  did not think it was confusing.
8    Q.    I want to talk to you about chargebacks.
9  You mentioned -- we talked about if a customer had lost
10 a chargeback and there were some hypotheticals that
11 were posed to you.
12        My question is, if a customer lost a
13 chargeback and wanted to use their benefits, what would
14 that person need to do?
15   A.    They would need to contact our customer
16 support, but there was reasons why we would block an
17 account for a chargeback, and I talked about we were
18 worried about fraudulent activity on the site.  That
19 was one of the reasons why you could report a
20 chargeback.  We also -- this happened more often than
21 I -- I mean, we would have spouses call and try to gain
22 access to accounts that had a chargeback on it.  So we
23 were never able to determine if the wife saw it and
24 issued a chargeback or if that person was in a
25 relationship, which we do not want people in a

Page 224

1  relationship on the site, that degrades the member
2  experience for everyone and it also is a terms of use
3  violation.
4        So there were -- there were safeguards in
5  place with chargebacks not only to protect members from
6  fraudulent activity on their own account, but also to
7  make sure that the members on the site were also
8  protected from people who were not using the site the
9  way it was meant to be.
10       MS. ZAMBRANO:  Pass the witness.  Thank
11 you.
12            RE-EXAMINATION
13 BY MR. MOON:
14   Q.    So if -- we're talking about the Exhibit 6
15 and a lunch and listen from your recap May 6, 2016,
16 this Weight Watchers experiment that you did, when was
17 that?
18   A.    I can't say for sure if it was before or
19 after this lunch and listen, but I know that I went to
20 several websites and went through cancel flows just to
21 understand what other products that were similar to
22 ours and auto renewal products looked like.
23   Q.    Did you ever discuss this Weight Watcher
24 investigation that you did with anybody else in the
25 company?

Page 225

57 (Pages 222 - 225)

1    A.    I do remember talking to Kris about it.
2    Q.    Okay.  Did you talk to Adrian Ong about it?
3    A.    I don't recall talking to Adrian about it.
4    Q.    Did you talk to Michele Watson about it?
5    A.    I don't recall talking to Michele Watson
6    about it.
7    Q.    So I just want to make sure I understand
8    your testimony on the chargeback scenario.  You said if
9    they wanted to use their benefits they had to contact
10   customer support, is that right, if they were blocked
11   because of a chargeback?
12         MS. ZAMBRANO:  Objection, form.
13   A.    I mean if they were blocked because of a
14   chargeback, to gain any sort of access to their account
15   they would have to contact, contact us, and whether or
16   not we unblocked it is -- I -- I don't remember the
17   policy around that, but any account blocked you
18   wouldn't be able to do anything with your account until
19   you were -- contacted customer support and we actioned
20   that account.
21   BY MR. MOON:
22   Q.    Okay.  So, yeah, and previously you
23   testified you didn't remember what the policies were
24   around when they were going to be reinstated or not,
25   right?

Page 226

1    A.    I don't remember the policies around -- we
2    were talking about chargeback disputes, I don't
3    remember the policies around if credits were given,
4    what time period would have to pass after a chargeback
5    or a chargeback dispute before we unblocked it.  So I
6    don't remember those policies.
7          But I do know that if someone was in a
8    relationship on the site, that their account would stay
9    blocked.  Like if they were in a relationship and they
10   had created an account, they would stay blocked and
11   that was one of the reasons why we saw chargebacks
12   sometimes is that spouses would see a charge on a
13   credit card and they would dispute it because they
14   wouldn't know why there was a match.com account, and
15   because that person was in a relationship, their
16   account would stay blocked.  And so that was one of the
17   reasons why taking action on chargeback accounts were
18   important because not only does it protect the member
19   who has the account, it also protects the members who
20   are on the site and there to truly meet a single person
21   and start a relationship with them.
22   Q.    But you don't remember what would happen
23   regarding the suspended account if Match actually won
24   the chargeback?
25         MS. ZAMBRANO:  Objection.  Form.  Use of

Page 227

1    the word "suspended."
2    BY MR. MOON:
3    Q.    Blocked.  Let's use the word "blocked."
4    A.    I don't remember the policies around what
5    customer support was advised to do with a chargeback,
6    like with an account where it was -- like, a chargeback
7    and they contacted us and wanted to get back into their
8    account regarding a chargeback, if it was just a
9    chargeback.
10         But I'm saying that the accounts were
11   blocked for the safety of members on the site and for
12   the safety of the person who owned the account if it
13   was fraudulent activity.  Those were just two scenarios
14   that I recall about chargebacks.
15   Q.    But if a -- so if a customer loses a
16   chargeback, that means that the customer has paid for
17   the Match service; is that right?
18         MS. ZAMBRANO:  Objection, form.
19   A.    It means that the financial institution
20   decided that that charge was not fraudulent.
21   BY MR. MOON:
22   Q.    Right.  So the member does have to pay that
23   amount?
24         MS. ZAMBRANO:  Objection, form.
25   A.    Well, the member chose to pay that amount

Page 228

1    when they signed up for the site.
2    BY MR. MOON:
3    Q.    But I'm saying if the chargeback is
4    granted, that means that they do -- the charge is not
5    reversed, they do have to pay it?
6          MS. ZAMBRANO:  Yeah, objection, form.
7    Mischaracterizes the testimony and the process.
8    A.    They have paid for a subscription on the
9    site, correct.
10   BY MR. MOON:
11   Q.    So can you explain why you chose your
12   friend who wasn't tech savvy to do the video for you?
13   A.    You know, I was trying to tell a story,
14   right.  I reported to Kris Auderer.  This was obviously
15   a passion project for her.  She continually brought it
16   up to me, and the lunch and listens were directed --
17   not directed by her, but she helped contribute to what
18   she thought would be a good thing to talk about, and I
19   felt like having a friend who was not so technically
20   savvy try to go to the cancel, try to go through the
21   cancellation flow, would help prove Kris's point and
22   that was not successful, she was able to cancel
23   successfully, and it really didn't turn out how I meant
24   it to turn out.
25   Q.    Okay.  Because you meant you were expecting

Page 229

58 (Pages 226 - 229)

CHANGES AND SIGNATURE

1
2  WITNESS: MELISSA CLINCHY
3  DATE: February 16, 2023
4  Page/Line   Change          Reason
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 242

---

1       I, MELISSA CLINCHY, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5       _____
        MELISSA CLINCHY
6
7  STATE OF _____)
8  COUNTY OF _____)
9
10      Before me _____ on this day
11 personally appeared MELISSA CLINCHY, known to me (or
12 proved to me on the oath of _____ or
13 through _____ (description of identity card
14 or other document)) to be the person whose name is
15 subscribed to the foregoing instrument and acknowledged
16 to me that he executed the same for the purposes and
17 consideration therein expressed.
18      Given under my hand and seal of office this
19 _____ day of _____, _____.
20
21      _____
        Notary Public in and for the
22      State of _____
23
24
25  Job No. TX5651545

Page 243

---

REPORTER'S CERTIFICATION

1
2       DEPOSITION OF MELISSA CLINCHY
3          February 16, 2023
4       I, Joseph D. Hendrick, Notary Public and
5  Certified Shorthand Reporter in the State of Texas,
6  hereby certify to the following:
7       That the Witness, MELISSA CLINCHY, was duly
8  sworn by the officer and that the transcript of the
9  oral deposition is a true record of the testimony given
10 by the witness;
11      I further certify that pursuant to FRCP
12 Rule 30(f)(1) the signature of the deponent:
13      X     was requested by the deponent or
14 a party before the completion of the deposition and is
15 to be returned within 30 days from date of receipt of
16 the transcript;
17      _____ was not requested by the
18 deponent or a party before the completion of the
19 deposition;
20      I further certify that the amount of time
21 used by each party is as follows:
22      Jason Moon - 05:42:06
23      Angela Zambrano - 00:14:00
24      I further certify that I am neither counsel
25 for, related to, nor employed by any of the parties or

Page 244

---

1  attorneys in the action in which this proceeding was
2  taken;
3       Further, I am not a relative or employee of
4  any attorney of record, nor am I financially or
5  otherwise interested in the outcome of the action.
6       Subscribed and sworn to on this date:
7  March 2, 2023.
8
9
10
11
12
13
14
15
16  Joseph D. Hendrick, CSR #947
    Expiration Date: 04/30/2023
    Notary Comm. Exp. 01/13/23
17  Veritext Legal Solutions
    Firm Registration No. 571
18  300 Throckmorton Street, Ste. 1600
    Fort Worth, TX 76102
19  Telephone (800) 336-4000
20
21
22
23
24
25

Page 245

62 (Pages 242 - 245)

# EXHIBIT F

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION
 3    FEDERAL TRADE COMMISSION,    §
                                   §   Case No. 3:19-cv-02281-K
 4          Plaintiff,             §
                                   §
 5          v.                     §
                                   §
 6    MATCH GROUP, INC., a         §
      corporation and MATCH        §
 7    GROUP, LLC, formerly known   §
      as Match.com, LLC, a         §
 8    limited liability company,   §
                                   §
 9          Defendants.            §
      _____
10
                 ORAL AND VIDEOTAPED DEPOSITION OF
11
                          MANDY GINSBERG
12
                         February 23, 2023
13    _____
14              ORAL AND VIDEOTAPED DEPOSITION OF MANDY
15    GINSBERG, produced as a witness at the instance of the
16    Plaintiff, and duly sworn, taken in the above-styled
17    and numbered cause on February 23, 2023, from 9:09 a.m.
18    to 4:07 p.m., before Joseph D. Hendrick, Certified
19    Shorthand Reporter in and for the State of Texas,
20    reported by machine shorthand, at the offices of Sidley
21    Austin LLP, 2021 McKinney Avenue, Suite 2000, Dallas,
22    Texas, pursuant to Notice and the Federal Rules of
23    Civil Procedure and any provisions stated on the record
24    or attached hereto.
25    Job No. 5651550

                                          Page 1
```

1  right.
2      Q.   So at this point in time in 2017, was it
3  part of your job duties and responsibilities to have
4  someone deal with these sorts of issues?
5          MS. ZAMBRANO: Objection. Vague.
6      A.   Job duties people would reach out all the
7  time. I might get people even asking me questions
8  about other brands I wasn't responsible for on --
9  reached out to me on LinkedIn, that I might send over
10 to other brands to say, "Hey, take a look."
11 BY MS. ZUCKERMAN:
12     Q.   Which other brands?
13         MS. ZAMBRANO: Objection, form. Lack of
14 foundation.
15     A.   Yeah, I mean, it -- having people reach out
16 to me, whether it's friends or on LinkedIn or on
17 Facebook, would not be unusual at all.
18 BY MS. ZUCKERMAN:
19     Q.   Did Greg Blatt often reach out to you to
20 ask you to handle these types of issues?
21         MS. ZAMBRANO: Objection. Vague as to
22 "often."
23     A.   My recollection is this would have been
24 unique. He happened to know this person, but this --
25 there's not -- probably not a lot of these.

Page 62

1      A.   Yes.
2      Q.   What was your job title at this point in
3  time?
4      A.   Let me see the date. I'm trying to think.
5  I think -- I believe at this point -- end of '17, so I
6  was the CEO of Match Group, Inc.
7      Q.   What was Adrian Ong's job title at this
8  point in time?
9      A.   I'm not sure. My assumption is that he was
10 dealing with some sort of -- he had some sort of
11 customer care role.
12     Q.   At Match.com?
13         MS. ZAMBRANO: Objection, form.
14     A.   I don't know, because I see other people on
15 this thread, too, that were in the Affinity business;
16 so I'm not sure.
17 BY MS. ZUCKERMAN:
18     Q.   Who is Krystal Roloff?
19     A.   I can't remember. I remember the name from
20 reporting, but I don't remember.
21     Q.   What about Kristin Higgins, do you know
22 this person?
23     A.   No, I don't remember that person either.
24     Q.   Did you ask Adrian Ong to follow-up with
25 you after handling this issue?

Page 64

1          MS. ZUCKERMAN: I am marking MATCHFTC748736
2  as Deposition Exhibit Number 2.
3          (Marked Deposition Ex. 2)
4  BY MS. ZUCKERMAN:
5      Q.   Ms. Ginsberg, if you look at the first
6  page?
7          MS. ZAMBRANO: Just give her a minute to
8  review, please.
9          THE WITNESS: Yeah, just give me one quick
10 second.
11     A.   Okay.
12 BY MS. ZUCKERMAN:
13     Q.   If you look at the first page, do you see
14 your email address and name there towards the bottom of
15 the first page?
16     A.   Yes.
17     Q.   Okay. And on March 13, 2018, you forwarded
18 an email that you had received from a Match.com user
19 who is apparently disappointed in Match.com's
20 cancellation policy; is that correct?
21     A.   I read that here. Yes.
22     Q.   And you forwarded that email to Adrian Ong
23 and stated, "Sanjeev, I'm going to ask Adrian to follow
24 up with you."
25         Did I read that correctly?

Page 63

1      A.   Not that I recall. I just asked Adrian --
2  oh. With me? No. I asked Adrian to follow up with
3  you, meaning the customer that reached out.
4      Q.   Do you see at the top of the first page
5  Adrian Ong sent you an email on March 14th, 2018 and in
6  that email he says, "Taken care of"?
7          Do you see that?
8      A.   Yes.
9      Q.   Did you ask him to follow up with you after
10 he took care of this issue?
11     A.   I don't remember, but I can't imagine I
12 would.
13     Q.   Are you familiar with the Match guarantee
14 program?
15     A.   Yes.
16     Q.   Could you explain what it is?
17         MS. ZAMBRANO: Objection, form.
18     A.   The Match guarantee was a program we
19 launched, I mean, even I think before I was at
20 Match.com, that at the heart of it was really sort of
21 taking a step back, it was really encouraging people to
22 engage in the -- let me take -- sorry. Let me take
23 another step back.
24         The Match guarantee was really around
25 success, and so we felt that if people were on Match

Page 65

17 (Pages 62 - 65)

APP 091

1 for six months and engaged with the community, then if
2 they didn't find someone special then we should pay for
3 the next six months; so that was the concept, is that
4 we believed so much in our success that we would
5 guarantee that they would find it and if not we would
6 pay the next six months.
7 BY MS. ZUCKERMAN:
8    Q.   Who do you mean by "we"?
9        MS. ZAMBRANO:  Objection, form.  Go ahead.
10    A.   Well, I don't know.  We, I -- I -- but the
11 guarantee, I mean, I actually don't remember if it
12 was -- I think it was Match.com the brand that launched
13 that guarantee.  So the Match.com brand launched it
14 around -- focusing around customer success.
15 BY MS. ZUCKERMAN:
16    Q.   Were there any requirements for a user to
17 qualify for the Match guarantee program?
18        MS. ZAMBRANO:  Objection, form.  Lack of
19 foundation.
20    A.   I do not remember the specifics, but I
21 mean, there were kind of like a treadmill.  You're not
22 going to lose weight unless you -- get on a treadmill,
23 so there are things you have to do like get on the
24 treadmill once a week or once a day or whatever it is.
25        And so yes, I don't remember all the

Page 66

1 requirements but we had requirements because for
2 Match.com to say that you're going to find someone.
3 People had to have logged in and they have to
4 communicate, and so that that was part of the equation,
5 that Match.com wanted to encourage people to do the
6 right thing and if they did the right thing, meaning
7 engage in the community and having a profile and sort
8 of were a member, then they -- then they should find
9 someone special.
10 BY MS. ZUCKERMAN:
11    Q.   Did Match Group, Inc. oversee the Match
12 guarantee program in any way?
13        MS. ZAMBRANO:  Objection to the
14 term "oversee."
15    A.   I'm not sure I understand the question,
16 because Match.com's guarantee was so -- I mean, it
17 started so long ago.  So I'm not sure I understand the
18 question.
19 BY MS. ZUCKERMAN:
20    Q.   So when the Match guarantee program
21 started, were you the Match.com CEO over?
22    A.   No, I was not the Match.com CEO.
23    Q.   Do you know when the Match guarantee
24 program started, what year?
25    A.   I don't know when it started, and the only

Page 67

1 reason I remember it was before me is because when I
2 was interviewing for the job, Jim Safka mentioned it to
3 me and I remembered it.
4        And so that was - I don't know when it got
5 executed, but 2005, I know that he had sort of
6 mentioned it in a -- in my interview.
7    Q.   Do you know if there were any limitations
8 on a user's ability to redeem the free six months from
9 the guarantee program?
10        MS. ZAMBRANO:  Same objection to lack of
11 foundation and best evidence.
12    A.   I can't remember the details, but sort of I
13 mentioned Match.com brand was -- said come to -- join
14 Match.com, and I -- think it was -- there's a few
15 things you had to do, but I -- I remember it being very
16 minimum, like some people go in and send hundreds of
17 emails on these apps or websites.  This is like I don't
18 know an we'll a week or something like that.
19        And so if you do, in my mind, the bare
20 minimum, then you should find someone; and if you
21 don't, then Match.com will give you six months for
22 free.
23 BY MS. ZUCKERMAN:
24    Q.   Did you oversee any aspect of the guarantee
25 program?

Page 68

1        MS. ZAMBRANO:  Objection, form.  Vague as
2 to time, and also oversee, the term "oversee."
3    A.   So I do not remember launching it and I
4 don't remember all the pieces that were put in place
5 when it launched.  And so repeat the question again.
6 BY MS. ZUCKERMAN:
7    Q.   Did you oversee the Match guarantee program
8 when you were Match.com's CEO?
9    A.   I'm not sure oversee is -- there were so
10 many marketing initiatives and so that was one
11 marketing initiative, albeit, not the primary one when
12 I was running the programs.
13    Q.   Did you track metrics related to the Match
14 guarantee program?
15        MS. ZAMBRANO:  Objection.  Vague as to
16 time.
17    A.   I do not remember ever tracking metrics to
18 Match -- me personally to the Match guarantee,
19 although, this is a highly and data-driven business, so
20 I'm sure there was someone on the product team that was
21 looking at the metrics.
22 BY MS. ZUCKERMAN:
23    Q.   Is it only the product team that would be
24 responsible for looking at the metrics for the program?
25        MS. ZAMBRANO:  Objection.  Vague.

Page 69

18 (Pages 66 - 69)

1  Incomplete hypothetical.  Calls for speculation.
2      A.   You know, there -- I don't know.  Usually
3  on product metrics, product team would look at those
4  metrics for sure.
5  BY MS. ZUCKERMAN:
6      Q.   Would the product team report to you when
7  you were Match.com's CEO?
8          MS. ZAMBRANO:  Objection.  Incomplete
9  hypothetical.
10      A.   I do not believe the product team reported
11  in to me.  If I recall, when I was running Match.com --
12  it's been so long ago -- I don't remember, but I
13  believe the product team was reporting in to Shar
14  Dubey.
15  BY MS. ZUCKERMAN:
16      Q.   What was Shar Dubey's title when the
17  product team was reporting to due bay?
18      A.   I don't remember when she had different
19  titles, but at one point, she was chief product
20  officer, but I just don't remember the time frame.
21      Q.   And she was the chief product officer of
22  Match.com?
23          MS. ZAMBRANO:  Objection, form.  Lack of
24  foundation.
25      A.   I really can't remember because she was

Page 70

1  there for so long and had different titles at different
2  times.
3  BY MS. ZUCKERMAN:
4      Q.   Did Shar Dubey report to you when she was
5  overseeing the product department of Match.com?
6      A.   Yes, she was over -- she reported to me.
7      Q.   Did you two discuss the Match guarantee
8  program?
9      A.   I mean, there were so many initiatives on
10  product and marketing, I don't remember a specific
11  conversation, but my guess is we probably did, but we
12  probably discussed a lots of things.  I don't remember.
13      Q.   Were you aware of any user feedback related
14  to the Match guarantee program?
15          MS. ZAMBRANO:  Objection, form.  Vague.
16  Ambiguous.  User feedback.
17      A.   I'm not sure.  I -- I don't know if I
18  recall from those years ago the user feedback from the
19  guarantee.
20  BY MS. ZUCKERMAN:
21      Q.   Do you remember any complaints from
22  Match.com users related to the guarantee program?
23      A.   It's not something I remember distinctly.
24  I -- I mean, customer care I believe that we talked
25  about the guarantee, but we also talked about events

Page 71

1  and we talked about a lot of other things.  I don't
2  remember.
3      Q.   Did anyone ever raise any concerns related
4  to the Match guarantee program?
5          MS. ZAMBRANO:  Objection.  Vague as to "any
6  concerns" and vague as to time.
7      A.   I don't recall specific -- I think -- yeah,
8  I don't recall specific conversations we had.  I think
9  that -- yeah, I don't -- not specific conversations.
10  BY MS. ZUCKERMAN:
11      Q.   Were you concerned at all that the
12  percentage of redemption was too high?
13          MS. ZAMBRANO:  Objection, vague as to time,
14  and the "too high" is vague as well.
15          Go ahead.
16      A.   Yeah can you repeat the question one more
17  time?
18  BY MS. ZUCKERMAN:
19      Q.   Sure.
20      A.   And give me also a time frame so I
21  understand.
22      Q.   So when you were Match.com CEO, were you
23  ever concerned that the redemption rate was too high?
24      A.   I do not recall.  I do not recall.  But
25  what I will tell you is that this business is an

Page 72

1  unusual business because people leave because they have
2  success and they're our biggest marketing engine and
3  they tell their friends about it.  And so if people
4  find someone great, if they don't find one and stay for
5  six more months and have a higher shot, then great, but
6  we felt a lot about making sure that our customers
7  found satisfaction.
8      Q.   Earlier did you testify that users
9  performing the bare minimum requirements on the site
10  would -- that would be enough to meet the guarantee
11  program requirement?
12          MS. ZAMBRANO:  Objection.  Mischaracterizes
13  her testimony.
14      A.   I do not recall saying that.  I -- what I
15  thought was, if people are going to -- first of all,
16  lot of people did not sign up for the guarantee because
17  six months felt like a lot of time for people, which is
18  totally fine.  But a lot of people who signed up, you
19  can't just sign up -- in my mind you can't sign up and
20  do nothing.  You have to get on the treadmill, my
21  analogy.
22          And so as I recall that I thought that
23  gosh, if you can get people to send one email a week,
24  that feels like the bare minimum people should be
25  sending to be able to meet people because if you don't

Page 73

19 (Pages 70 - 73)

1    Q.    Of Match.com?

2    A.    Of Match.com.

3    Q.    Did Match test dropping the guarantee?

4    A.    I don't remember anything because, as you

5    see from this document, there are a million things

6    we're testing. It's sort of amazing to see how many

7    deals we tested. And so we were constantly testing.

8          This looks like -- I don't know if this is

9    from a week or a month, but looks like we are

10   constantly testing all sorts of things.

11   Q.    Was Match considering dropping the

12   guarantee program?

13         MS. ZAMBRANO: Objection, form. Asked and

14   answered. Calls for speculation.

15   A.    I do not remember. We tested deprecating

16   things, increasing, you know, marketing of things. It

17   really depended on what was going on at the time and

18   what was important.

19   BY MS. ZUCKERMAN:

20   Q.    What sort of result from testing would have

21   supported dropping the Match guarantee program?

22         MS. ZAMBRANO: Objection. Incomplete

23   hypothetical. Calls for speculation. There's no

24   foundation for this.

25   A.    Yeah, I have no idea.

Page 78

---

1    BY MS. ZUCKERMAN:

2    Q.    Do you know who Brett from the product team

3    reported to?

4    A.    I don't remember. He was very junior. I

5    don't remember who he reported to.

6    Q.    In 2013, what was your title at this point

7    in time?

8    A.    I believe I was CEO of Match.com.

9    Q.    At this point in time, to your knowledge,

10   the program was not dropped; is that correct?

11         MS. ZAMBRANO: Objection. Vague.

12   A.    Yeah, I -- I don't remember. I mean, I'm

13   one of, I don't know, 40 people on this email. I have

14   no recollection.

15   BY MS. ZUCKERMAN:

16   Q.    Is there someone at Match.com who would

17   have the authority to decide whether the Match

18   guarantee program would continue on or not?

19         MS. ZAMBRANO: Objection, form. Vague.

20   A.    The reason I'm pausing is we didn't think

21   about it that way. We would test lots of different

22   variables, like, for example, we launched events and we

23   tested events. We tested different features against

24   product. We tested different pricing. And so we'd

25   constantly be discussing what should be on the roadmap.

Page 79

---

1    BY MS. ZUCKERMAN:

2    Q.    Who do you mean by "we"?

3          MS. ZAMBRANO: Objection, form.

4    A.    I would say I meant we generically, but the

5    product team would constantly be thinking about what

6    would be on a list like this, and there was a lot of

7    details seems like from this report.

8    BY MS. ZUCKERMAN:

9    Q.    Does the product team regularly provide you

10   with these types of reports?

11         MS. ZAMBRANO: Excuse me. Objection.

12   Vague as to generally and "these types of reports."

13   Excuse me. "Regularly" and "these types of reports"

14   and as to time.

15   A.    This looks like a -- I don't know, a few

16   weeks in January, but there was lots and lots of

17   reports. I think my -- I think I might have gotten

18   thousands of emails a week, went through all sorts of

19   reports, especially cc'd on, which is looks like this

20   is one of probably many I got this week.

21   BY MS. ZUCKERMAN:

22   Q.    When you were at Match.com CEO, did you

23   read emails such as this one related to the Match

24   guarantee program?

25         MS. ZAMBRANO: Objection, form. Vague.

Page 80

---

1    Foundation.

2    A.    Yeah, I have no recollection. I mean,

3    there was a lot of people reporting to me a lot of

4    initiatives, so I got, I mean, hundreds of emails. I

5    don't know which ones I read.

6          MS. ZUCKERMAN: I am marking MATCHFTC766737

7    at Exhibit 4.

8          (Marked Deposition Ex. 4)

9    BY MS. ZUCKERMAN:

10   A.    Would you like me to read it?

11   Q.    Yes. Take a moment let me know when you

12   are ready.

13   A.    Okay.

14   Q.    I can. So if you look at the second page

15   of the exhibit, do you see your email address there

16   Mandy.Ginsberg at Match.com?

17   A.    Yes. Sorry. I was looking at the emails

18   that's here. Okay. Yes, I see it.

19   Q.    And there appears to be several other email

20   addresses with your name. Were those your email

21   addresses as well?

22   A.    No. But this is typical that we have

23   millions and millions of customers and customers would

24   do all sorts of things to try to reach us Facebook

25   LinkedIn Instagram and then trying every possible

Page 81

---

21 (Pages 78 - 81)

1 variation of emails, which it looks like Victoria V
2 did.
3     Q.   Okay.  So looking at page 2 still, it
4 appeared Victoria V had sent an email to Greg Blatt and
5 several other people and then the email states, "I have
6 been a Match customer since 2007 and I have never been
7 so dissatisfied with your company as I am right now.
8         I signed up for the 6-month guarantee
9 package on May 8th, 2012 and completed all the
10 requirements indicated to get six months free, yet
11 Match did not honor the 6-month guarantee and my credit
12 card was still charged another $137.97 on November 8,
13 2012."
14         Did I read that correctly?
15     A.   That's what I'm reading, too.
16     Q.   Okay.  And then if you look at the first
17 page, Ms. Ginsberg, do you see at the top of that page
18 Michele Watson sent you an email on January 3rd, 2013?
19     A.   Yes.
20     Q.   And this was in response to the 6-month
21 guarantee complaint, correct?
22     A.   Yes.
23     Q.   In this email Michele Watson says, "Done,
24 period."  Right?
25     A.   Yes.

Page 82

---

1 CEOs who never responded I'm just so happy they were
2 responding to customers that's pretty amazing, but I
3 don't remember this.  This is not surprising given, you
4 know, with millions and millions of customers people
5 would send emails from time to time.
6     Q.   Is it fair to say that you regularly
7 received complaints from users?
8         MS. ZAMBRANO:  Objection, form.
9     A.   I would say that lots of customers reached
10 out for lots of reasons including wedding invitations,
11 which I've been to.  So there was a lot of poor
12 suggestions, so.  But Match was a big brand, so this
13 was not surprising people would try to reach me ten
14 different ways or reach Greg Blatt 10 different ways.
15 BY MS. ZUCKERMAN:
16     Q.   And is it fair to say they would be -- or
17 try to reach you and did reach you with complaints
18 regarding Match.com?
19         MS. ZAMBRANO:  Objection, form.
20     A.   As I said, some were complaints, some were
21 thank you, some were, like, heartfelt emails saying we
22 changed their life.  We heard all gamut.
23 BY MS. ZUCKERMAN:
24     Q.   Okay.  Looking at page 1 still, towards the
25 middle, Michele Watson sent an email to the --

Page 84

---

1     Q.   Who was Michele Watson?
2     A.   At this time, Michele was running
3 customer -- well, VP, global customer care for
4 Match.com.  Says it right there.
5     Q.   Do you remember that to be true?
6     A.   Yes, she was heading up customer care for
7 Match.com.
8     Q.   And Michele Watson apparently sent you the
9 email to confirm that she completed the request in
10 responding to the Match user's complaint; is that
11 right?
12     A.   Correct.
13         MS. ZAMBRANO:  Excuse me.  Objection, form.
14     A.   Sorry.  Will you repeat the question.
15 BY MS. ZUCKERMAN:
16     Q.   Michele Watson, you know, sent you an email
17 to confirm that she completed the request of responding
18 to the Match user's complaint?
19         MS. ZAMBRANO:  Objection, form.
20     A.   Yeah, I -- she just forwarded on her email
21 to me and said done.
22 BY MS. ZUCKERMAN:
23     Q.   Do you remember asking her to follow up
24 with this consumer's complaint?
25     A.   No, but I -- I sent emails all the time to

Page 83

---

1 Victoria, the consumer, on January 3rd, 2013.  The
2 second paragraph, "Regarding the redemption of the
3 guarantee, we do have a requirement with the guarantee
4 that requires our members to either redeem the 6-month
5 offer online within seven days prior to subscription
6 expiration date or within 30 days after your expiration
7 date by contacting customer care directly."
8         Did I read that correctly?
9     A.   Yes.
10     Q.   Were you aware of this requirement?
11     A.   No, I don't remember the requirement.
12     Q.   Were you aware of this being an issue with
13 Match.com users?
14     A.   I don't remember this.
15     Q.   Did anyone discuss these issues with you?
16         MS. ZAMBRANO:  Objection, form.  Vague and
17 ambiguous "these issues."
18     A.   I don't recall.  There's a lot of things we
19 discussed and I just don't recall this being a big one.
20 BY MS. ZUCKERMAN:
21     Q.   What were some of the big issues that
22 people discussed with you?
23         MS. ZAMBRANO:  Objection, form.  Vague and
24 ambiguous and relevance to this case.
25         Ask a question that's relevant to this

Page 85

---

22 (Pages 82 - 85)

| | |
|---|---|
| 1 case. | 1    Q.  And what about Ayesha Gilarde? |
| 2    MS. BRAGG: Excuse me, Counsel. | 2    A.  Ayesha Gilarde that's okay. She was the |
| 3    MS. ZAMBRANO: We are going to keep it | 3 CMO. |
| 4 civil, but we're not going to delve into every big | 4    Q.  What is a CMO? |
| 5 issue that a CEO discussed with a public company. | 5    A.  At Match. The chief marketing officer of |
| 6    MS. ZUCKERMAN: Okay. Let's break it down. | 6 Match.com. |
| 7 BY MS. ZUCKERMAN: | 7    Q.  And you sent the email on October 21st, |
| 8    Q.  So is it fair to say that people didn't | 8 2016, right? |
| 9 discuss issues related to Match guarantee with you? | 9    A.  Yes. |
| 10    MS. ZAMBRANO: Objection, form. | 10    Q.  At this point in time, what was your job |
| 11    A.  I -- I don't remember. I mean, there's -- | 11 title? |
| 12 I don't remember the specifics. | 12    A.  I actually -- I don't remember. Let's see. |
| 13    (Marked Deposition Ex. 5) | 13 I believe I was, at this time in late '16, was the head |
| 14    MS. ZUCKERMAN: I am marking MATCHFTC365570 | 14 of Match North -- CEO of Match North America. |
| 15 as Exhibit Number 5. | 15    Q.  And as the head of Match North America, |
| 16    MS. ZAMBRANO: Hasan, you've spoken I think | 16 what were your duties and responsibilities? |
| 17 three times now in this deposition, and I think Sarah | 17    A.  All of the Match North America brands |
| 18 is taking the deposition; so I would ask that we | 18 reported to me. Those were the brands we talked about |
| 19 confine the questioning and comment to her, because | 19 before, Plenty of Fish, OKCupid, Match Affinity, Match |
| 20 you're not taking the deposition, as I understand it. | 20 and OKCupid, and I don't remember. I don't think Hinge |
| 21    MR. AIJAZ: I haven't spoken to the witness | 21 was part of -- I don't think I was responsible for |
| 22 once. | 22 Hinge at that point. |
| 23    MS. ZAMBRANO: She needs to be doing the | 23    Q.  Who did you report to? |
| 24 questioning and participating in the deposition. | 24    A.  I believe, although I can't -- I don't |
| 25    MS. BRAGG: I haven't asked a question. | 25 remember, but I believe I reported -- I believe I |
| Page 86 | Page 88 |

| | |
|---|---|
| 1    MS. ZAMBRANO: You are welcome to be here | 1 reported to Greg Blatt. I would have had to, yes, I |
| 2 unless you are being obstructive. | 2 believe I reported to Greg Blatt. |
| 3    A.  I just moved the microphone. Is it working | 3    Q.  Do you know what his job title was or which |
| 4 again? | 4 company he worked for at that time? |
| 5    THE VIDEOGRAPHER: Yes. | 5    MS. ZAMBRANO: Objection, form. Calls for |
| 6    THE WITNESS: Okay. | 6 speculation. |
| 7    A.  Okay. I read the last one. Do you want me | 7    A.  I don't remember, but I think at this time |
| 8 to keep reading? | 8 Greg Blatt was CEO of Match Group, but I don't |
| 9 BY MS. ZUCKERMAN: | 9 remember. |
| 10    Q.  Did you read the first page? | 10 BY MS. ZUCKERMAN: |
| 11    A.  No. | 11    Q.  By "Match Group" do you mean Match Group, |
| 12    Q.  If you will just read the first page and | 12 Inc.? |
| 13 the fifth page. | 13    A.  Match Group, Inc. I believe but I can't |
| 14    MS. ZAMBRANO: No, read as much as you need | 14 remember the timing. |
| 15 to. | 15    Q.  So on the first page of this exhibit, you |
| 16 BY MS. ZUCKERMAN: | 16 state, "Alexis, I think we should put some sort of |
| 17    Q.  Okay. So do you see on the top of page 1, | 17 language about the guarantee on all big entry points as |
| 18 you sent an email to Alexis Ferraro and copied an | 18 well as give consumers at some point the ability to |
| 19 Ayesha Gilarde? | 19 learn more." |
| 20    A.  Gilarde, yes. | 20    Did I read that correctly? |
| 21    Q.  Who is Alexis Farraro? | 21    A.  That looks like what I wrote to her. |
| 22    A.  Alexis Farraro, I don't know exactly what | 22    Q.  And what did you mean by "entry points"? |
| 23 she was doing then, but she was on the brand marketing | 23    A.  I don't know exactly but my guess is that |
| 24 team and she was -- looks like focused on Match.com | 24 where consumes entered our website or apps. |
| 25 here. | 25    Q.  Okay. And the subject of the email is the |
| Page 87 | Page 89 |

23 (Pages 86 - 89)

1    Q.   Do you know if changes were ever
2  implemented with respect to the phone number on the
3  site?
4         MS. ZAMBRANO:  Objection.  Lack of
5  foundation.  Calls for speculation.  Plus irrelevant,
6  lacks relevance.
7    A.   I don't remember specific changes, but this
8  demonstrates that we're constantly trying to figure out
9  ways to help the customers.
10 BY MS. ZUCKERMAN:
11   Q.   Do you remember who is in charge of
12 addressing these types of matters?
13        MS. ZAMBRANO:  Objection, vague as to time
14 and as to these types of matters.  Excuse me.
15        You can answer.
16   A.   I'm trying to remember.  In 2013,
17 I remember seeing Match.com, so, again, sort of as I
18 said, this is a real collaboration between exactly
19 customer care, product and design.
20 BY MS. ZUCKERMAN:
21   Q.   Were you ever involved in discussions about
22 where to place the phone number?
23   A.   No.  That was a level of minutiae that I
24 did not get involved in.
25   Q.   Do you see on the first page - one, two,

Page 186

three - four entries down on the left-hand side of the
1  it says 130131-002089?
2
3    A.   The one that says "good job Match"?
4    Q.   Where do you see "good job Match"?
5    A.   "Good job Match."  I'm looking at 001.
6    Q.   Do you see that - one, two, three - four
7  down?
8    A.   Oh.  Sorry.  I was looking at the fifth one
9  down.  Okay.  All right.  The one above that, Sue
10 Johnson?
11   Q.   Yes.  "It was a relief to be able to talk
12 with live persons since the email process did not work
13 in my case.  It would be helpful to not have had to
14 Google the number.  Remember if through no fault of
15 mine, I was locked out of my account, so couldn't see a
16 customer care number.  So it shouldn't be provided on
17 the error message when signing in fields."
18        Did I read that correctly?
19        MS. ZAMBRANO:  Objection.  I don't think
20 you did, actually.
21        MS. ZUCKERMAN:  Oh, which part did I not
22 read correctly?
23        MS. ZAMBRANO:  You said "shouldn't" versus
24 couldn't.
25        MS. BRAGG:  Where it says "should."

Page 187

1         MS. ZUCKERMAN:  The last sentence there?
2         MS. ZAMBRANO:  Yes.
3         MS. ZUCKERMAN:  Oh, couldn't.  So.  Let me
4  read it over.
5  BY MS. ZUCKERMAN:
6    Q.   "It was a relief to be able to talk with a
7  live person since the email process did not work in my
8  case.  It would be helpful to not have had to Google
9  the number.  Remember, through no fault of mine own, I
10 was locked out of my account, so couldn't see a
11 customer care number.  So it should be provided on the
12 error message when signing in fields."
13        Did I read that correctly?
14   A.   Yes.
15   Q.   So does that mean that someone had to be
16 logged in to see the phone number?
17   A.   I do not recall, but if our members are
18 customers who are paying us to access the customer care
19 representative, then my guess is it -- I don't know if
20 they have to be logged in, but that would be one way to
21 be able to help just our members versus prospective
22 members.  But I don't know.  But it looks like they
23 Googled it.
24   Q.   Do you know if Match ever considered
25 changing the website to make the phone number easier to

Page 188

1  find?
2         MS. ZAMBRANO:  Objection.  Lack of
3  foundation.  Calls for speculation.
4    A.   I don't know.  I would say that we were
5  constantly trying to figure out ways for customers to
6  interact with us.  At this point, it was mostly email,
7  phone number, but really people want to chat, I would
8  say fax less so, and so we were constantly looking for
9  ways that people could access and ask questions to the
10 company.  Phone was one way, but it was -- email was
11 the number one way until we replaced it with -- not
12 replaced, but used chat.
13 BY MS. ZUCKERMAN:
14   Q.   Do you remember if there is a cost
15 associated with having a live agent field a phone call?
16        MS. ZAMBRANO:  Objection, form.
17   A.   Do I remember if there is a cost for a
18 person to pick up the phone?  Well, my guess is that
19 there was a cost to have a person pick up the phone.
20 We just reviewed a document that demonstrated that
21 there was agents who picked up phones and there was
22 cost associated with it.
23 BY MS. ZUCKERMAN:
24   Q.   Do you recall a reduction in the telephone
25 customer care hours?

Page 189

48 (Pages 186 - 189)

1    MS. ZAMBRANO:  Objection, form.  Vague as
2  to time.
3    A.   Tell me -- one, I don't remember our
4  customer care hours, but what time are you referring
5  to?
6  BY MS. ZUCKERMAN:
7    Q.   In 2013.
8    A.   I don't know.  There was lots of discussion
9  around we had people from Hawaii all the way to New
10  York -- Maine, and so we were constantly trying to
11  figure out what's the -- how many hours and what's the
12  best way to create coverage for all those time zones.
13    Q.   What about from the time period between
14  2014 and 2020?
15    A.   Oh, I don't remember.
16    MS. ZAMBRANO:  Objection, form.
17    MS. ZUCKERMAN:  I have MATCHFTC3528101 that
18  I am marking as Exhibit 21.
19    (Marked Deposition Ex. 21)
20    A.   Okay.
21  BY MS. ZUCKERMAN:
22    Q.   Before we get into the exhibit, if an
23  employee at Match wanted to change a web page, the FAQ
24  page, for example, what's the process for doing so?
25    MS. ZAMBRANO:  Objection.  Incomplete

Page 190

1  hypothetical.  Vague as to time.
2    A.   I don't know where the -- how the FAQs were
3  updated or what code base FAQs sat in.  But in general,
4  if something had to be updated on the website, it would
5  be with the product team.
6  BY MS. ZUCKERMAN:
7    Q.   Would the product team need to get your
8  approval to update the FAQ page?
9    A.   No.
10    Q.   Okay.  So looking at Exhibit 21, this is an
11  email sent from Florian Hottier on Tuesday, May 30,
12  2017 to Sushil Sharma copying in Sydney Lam, subject,
13  "Regarding FAQs."
14    Did I read that correctly?
15    A.   Yes.
16    Q.   Who is Florian Hottier?
17    A.   Florian sat on the analytics team, I think
18  reported in to product, but I can't remember.
19    Q.   Okay.  And I'm looking at -- oh, was that
20  or, or and that he reported into product?
21    A.   I just don't remember if -- there were so
22  many businesses and there were so many structures
23  throughout my tenure and in 2017 I was overseeing so
24  many brands, and so some of those brands had analytics
25  reporting into product, some of the products had

Page 191

1  analytics reporting into finance.  I think those are
2  generally two areas.  And so I just don't remember
3  where analytics reported to, but Florian was on the
4  analytics team.
5    Q.   Looking at the bottom of this exhibit, you
6  sent an email on May 30, 2017, to Sushil Sharma and
7  Adrian Ong, subject "FAQs."
8    Did I read that correctly?
9    A.   Yes.
10    Q.   Okay.  You write, "Sushil, Adrian just
11  showed me new FAQs, which look great."
12    And then you included a link, right, which
13  appears to be to the FAQ page?
14    A.   That's what I'm reading as well.
15    Q.   And then you continue on, "It has rolled
16  100 percent.  Just want to make sure there are no
17  implications.  For example, is it easier for people to
18  cancel subscriptions if they find the link faster?"
19    Did I read that correctly?
20    A.   Yes.
21    Q.   And then the last sentence there, you
22  write, "My guess is that this won't have an impact on
23  customer metrics, only on customer ops metrics, but
24  wanted to make sure you knew."
25    Did I read that correctly?

Page 192

1    A.   Yes.
2    Q.   What did you mean in stating "just want to
3  make sure there are no implications; for example, is it
4  easier for people to cancel subscriptions since they
5  can find the link faster?"
6    A.   What people who don't run internet
7  businesses probably don't focus on as much is it is
8  rolled out a hundred percent, which we never do without
9  testing.
10    And so I'm looking at this and my guess is
11  if you show them FAQs, which I was very excited about,
12  I said look great, if you rolled it out a hundred
13  percent, I just wanted to I can make sure you looked a
14  at all the implications.
15    And so if he said it was rolled out 100
16  percent, I would never have sent this.  And so I said,
17  I just want to make sure there's no implications for
18  any other metrics, including cancel, but my guess is
19  this won't have an impact on customer metrics.
20    So I actually didn't think it would, but I
21  wanted them just to check everything because we should
22  always check everything.  So.
23    Q.   Did they follow-up with you?
24    A.   I'm just -- I don't remember this, but I'm
25  just looking at the email.  Sushil said thanks, and

Page 193

49 (Pages 190 - 193)

1   then he went and checked it and it looked like they
2   didn't seem to be concerned.
3       Q.   At this point in time, were you concerned
4   that the new FAQ's might lead to increased
5   cancellations?
6           MS. ZAMBRANO:  Objection.  Lack of
7   foundation.
8       A.   I don't know.  I mean, there could be lots
9   of things you could -- if it's rolled out a hundred
10  percent, there could be broken links.  So I just wanted
11  to be sure that things worked.  And I used one example.
12  But I think I was more surprised based on this that
13  it's rolled out a hundred percent.
14  BY MS. ZUCKERMAN:
15      Q.   Increased cancellations would mean lost
16  revenue, right?
17          MS. ZAMBRANO:  Objection, form.
18      A.   It could.  But it also -- I mean, increased
19  cancellations could also mean that you have higher
20  people -- higher amount of people who are having
21  success at Match.
22          And so if more people are having success
23  and leaving Match, that actually means that it might
24  not be great for people short term, but they go out and
25  tell their friends and that's sort of how the business

Page 194

1   generates a lot of word-of-mouth marketing.  So
2   cancellation rates are not always a bad thing.
3   BY MS. ZUCKERMAN:
4       Q.   Did you track the cancellation rates at
5   this point in time in 2017?
6       A.   I mean, I personally didn't, but I know
7   that there were teams that were looking at everything
8   from new people coming on board to people that were
9   leaving every day.
10      Q.   Did you meet with those teams that tracked
11  the cancellation rates?
12          MS. ZAMBRANO:  Objection, form.
13  Mischaracterizes the testimony.
14      A.   Yeah, I -- I wouldn't -- I wouldn't have
15  met every day with people that were tracking the -- I
16  might have met them and had lunch with them, but I
17  wouldn't have had those discussions at a granular
18  level.
19          I mean, every day half the people that came
20  to the website had come in the past and so we are
21  always tracking those metrics because we knew that in
22  that dynamic of an episodic dating business where
23  people get on the website, they date someone, they
24  break up, they come back.
25          People are constantly coming back to the

Page 195

1   website, so it's really important for us to understand
2   why people are cancelling and when they were coming
3   back.
4   BY MS. ZUCKERMAN:
5       Q.   Did you track any other metrics aside from
6   cancellation -- sorry.  Excuse me.
7           Do you remember if there were any other
8   metrics that were being tracked aside from resignation
9   rates?
10          MS. ZAMBRANO:  Objection.  Mischaracterizes
11  her testimony.
12      A.   I mean, I think we tracked a thousand
13  metrics a week, everything from like the number of new
14  people coming in to how much we actually paid on the
15  marketing front to, I mean, literally the -- I could
16  spend an hour and a half talking about every metric in
17  the business that we tracked.
18          MS. ZUCKERMAN:  Could we take a quick
19  five-minute break?
20          MS. ZAMBRANO:  Sure.
21          THE VIDEOGRAPHER:  We are off the record at
22  3:15 p.m.
23          (Break from 3:15 p.m. until 3:33 p.m.)
24          THE VIDEOGRAPHER:  We are on the record at
25  3:33 p.m.

Page 196

1   BY MS. ZUCKERMAN:
2       Q.   So I want to make sure I have the sequence
3   correct.
4           You first served as the CEO of Match.com,
5   then the Match Group North America, then Match Group,
6   Inc.; is that right?
7           MS. ZAMBRANO:  Objection, form of the
8   question.
9       A.   I'm not sure that's right because I think
10  in between Match.com and North America, I spent two and
11  a half, maybe three years at tutor.com and the
12  Princeton Review.
13  BY MS. ZUCKERMAN:
14      Q.   Did you have to interview for that role at
15  tutor.com?
16      A.   It -- I'm trying to remember.  It was a
17  company that IAC had acquired and it was a entrepreneur
18  that was really having a hard time scaling it, and I
19  was particularly passionate about education and my
20  daughter was in high school at the time.
21          So, as we discussed different options to
22  run the company, we talked about me taking over, and I
23  was excited about the role.  But I don't remember the
24  specifics, but it was a -- I spent some time helping
25  the CEO and when that was clear he was having a hard

Page 197

50 (Pages 194 - 197)

1  time scaling it, I became CEO.
2      Q.   Okay.  And then after the tutor.com, you
3  then went on to serve as the CEO of Match Group North
4  America; is that right?
5      A.   Yes, the CEO of Match Group North America,
6  yes.
7      Q.   How were you hired for that position?
8          MS. ZAMBRANO:  Objection, form.  Vague.
9      A.   I can't remember the details, but I
10 remember Greg Blatt - but I can't remember any other
11 board member - said that, "We were becoming a public
12 company, we have a lot of exciting opportunities and
13 growth, but I really would like for you to come back
14 because we've got -- given that we are a public company
15 and given we've got so much to do on our plate, I need
16 more bench strength, and so I want to talk to you about
17 coming back."
18     So we discussed it for several months and I
19 ultimately came back into the business.
20         MS. ZUCKERMAN:  I pass the witness.
21         MS. ZAMBRANO:  Okay.  Thank you.
22             EXAMINATION
23 BY MS. ZAMBRANO:
24     Q.   Ms. Ginsberg, I am going to ask you some
25 questions about your prior testimony today.

Page 198

1  inbox, I would forward them on to the appropriate
2  brand.
3      Q.   Why did you do that?
4      A.   Because I could have ignored them, but I
5  just feel like you shouldn't ignore customers and so I
6  forwarded them on to the brand that could respond to
7  those customers.
8      Q.   Okay.  I want to talk to you about the use
9  of the word "we" in the deposition today.  The FTC's
10 counsel has asked you a couple of times in particular
11 questions what you meant by "we."  But you have used
12 the term "we" several times during the deposition.  Do
13 you recall using that word today?
14     A.   I'm sure I used "we" and "I" lots of times,
15 yes.
16     Q.   When you have used the word "we" in this
17 deposition, have you always meant to be referring to
18 Match Group, Inc.?
19     A.   No.  I mean, as humans, we -- so I was the
20 captain of a soccer team, and so I wouldn't say I; I
21 would say "we."  So as part of a group or a family or
22 an organization, we'd say "we."  So, you know, I talk
23 in human talk, not legal talk, but I would refer to we
24 a lot of different ways throughout the day.
25     Q.   Okay.  So you haven't been testifying with

Page 200

1      I am going to start with the subject of the
2  customer contacts that you have seen a couple of
3  examples of before, and I think you have the stack of
4  exhibits in front of you.  I'm just going to give
5  you -- call out one was an example.
6      Okay.  Exhibit 2 is an example of a
7  customer contact that you received when you were at CEO
8  of Match Group North America, correct?
9      A.   Yes.
10     Q.   Okay.  And I think you were also shown
11 examples of customer contacts that you received at CEO
12 of Match Group, Inc.
13         Do you recall seeing some of those emails
14 today?
15     A.   Yes.
16     Q.   Okay.  Was it common for you in your role
17 as CEO of Match Group, Inc., to receive Match.com
18 customer complaints?
19     A.   Not common, but not -- not shocking, but it
20 wasn't common that people would reach out to me.
21     Q.   And was it your responsibility to handle
22 the Match.com contacts as the CEO of Match Group, Inc.?
23     A.   It was definitely not my responsibility and
24 I received emails from various customers from various
25 brands, and so if I saw them and noticed them in my

Page 199

1  respect to legal entities today?
2      A.   No.
3      Q.   Do you know if Match Group, Inc. -- let's
4  talk about Match Group, Inc. for a second.
5          Do you know if Match Group, Inc. had any
6  programmers, that entity?
7      A.   Match Group, Inc. had no programmers, no
8  engineers.
9      Q.   So when I -- so I'm going to ask you some
10 more questions again just on the Inc. entity.
11         Did Match Group, Inc. have any customer
12 care agents?
13     A.   No.  Zero.
14     Q.   What about designers?  Did Match Group,
15 Inc. have designers?
16     A.   No, there are no designers at Match Group,
17 Inc.
18     Q.   Okay.  I want to ask you about a couple of
19 parts of your testimony today.
20         One -- and I'm reading from the rough draft
21 today, and Joe has done an excellent job transcribing,
22 but I may get a word wrong or it may not be perfectly
23 transcribed; so I'll just read it the way it is in the
24 rough transcript.  Okay?
25         All right.  You were asked the following

Page 201

51 (Pages 198 - 201)

1    question:  Did you consider changing the Match.com
2    online cancellation flow?  And the word that was used
3    was "you."  Did you consider changing the Match.com
4    online cancellation flow?  And your answer was as
5    follows:  Like I said, this is one of those businesses
6    where we constantly iterating, changing, testing, you
7    know, sort of investigate new flows; so that's not
8    something I recall, but I would not be surprised if we
9    looked at all those flows.
10        What were you referring to as "we" in that
11   sentence?
12   A.    "We" would mean members of the team, but I
13   personally would never go in and make decisions about
14   the individual product lists.
15   Q.    So when you were at Match Group, Inc. as
16   CEO, was any part of your job responsibility to design
17   or maintain a cancellation flow for any brand?
18   A.    No.
19   Q.    And the same question regarding a
20   chargeback policy; did any part of your job
21   responsibilities relate to designing or maintaining a
22   policy relating to chargebacks?
23   A.    No.
24   Q.    And the Match.com guarantee that we have
25   talked about today and that you referred to as the

Page 202

1        Q.    Okay.  You were asked about a couple of
2    other exhibits that I am going to ask you about now.
3    First about Exhibit 19, if you would get that one in
4    front of you.  Do you remember being questioned about
5    Exhibit 19?
6        A.    Yes.  Earlier today I was.
7        Q.    Okay.  And, again, I'm looking at the rough
8    transcript, but in the rough transcript on page 165,
9    you had referred to consciously misleading figures in
10   Exhibit 19 and the FTC's counsel asked you what you
11   meant by that, and I'm going to read your response that
12   was taken down and then ask you a question about it.
13       You said, "I don't remember the specifics,
14   but I remember I was deeply offended because everyone
15   at the company knew that I had real integrity when it
16   came to running the business and really believed in
17   treating our customers right and the fact that we were
18   being litigated Match.com was being litigated based on
19   practices that I didn't agree with.  I felt like I had
20   to speak out because employees cared about the tone at
21   the top in their leaders and that was important to me."
22       That's the way that your answer was taken
23   down.  But I have a question about that phrase that you
24   used based on practices that I didn't agree with.
25       What were you referring to there?

Page 204

1    guarantee, was any part of your job responsibility when
2    you were MGI CEO to design or maintain or otherwise
3    deal with the Match.com guarantee?
4    A.    No.
5    Q.    Well, did Match dot -- excuse me.
6        Did Match Group, Inc. direct the brands on
7    decisions about things like this:  Cancellation flows,
8    guarantees, or chargebacks?
9        A.    The individual brands managed all aspects
10   of their business; marketing, product, analytics.  That
11   was their responsibility, not mine.
12   Q.    Well, were the brands managed collectively
13   as a unit?
14   A.    No.  Each -- each brand would operate
15   independently and in their financials meaning their P&L
16   their financials would rollup and we would report it to
17   the street, but the individual brands would manage
18   their businesses independently of the other brands.
19   Q.    Other than the financial reporting at the
20   public company level that you just testified about, was
21   there integration generally across functions of the
22   brands?
23   A.    There was not integration across all the
24   various brands.  The only exception was finance and
25   legal where we would coordinate across those brands.

Page 203

1        A.    I misspoke because clearly I feel strongly
2    about it.  I did not agree with the accusations that
3    were being lodged against Match.com.
4        Q.    In the litigation that was filed by the
5    FTC?
6        A.    In the litigation.  So I didn't agree with
7    the accusations.  I think I misspoke when I said
8    practices, but I meant accusations.
9        Q.    Now I want to ask you about an exhibit.
10   Let me show you 17, actually.  You were asked about a
11   few pages in this deck, and I understand that you don't
12   recall receiving the deck or communicating about the
13   deck.  Is that fair?
14       A.    Yes.
15   Q.    Okay.  But I do want to ask you about the
16   list of issues that were reported on page 25 of
17   Exhibit 17, and specifically the first one that says,
18   "Current, locate account settings, difficult to find."
19       So I think that's referring to the next
20   page in the deck, which is not numbered, but it's the
21   26th page.  Do you see where the heading says Account
22   Settings Page Confusing and Cluttered?
23       A.    I read that.
24   Q.    Okay.  Do you agree that the account
25   settings page that we are looking at was confusing and

Page 205

52 (Pages 202 - 205)

APP 101

1    cluttered?
2        A.    I don't agree.
3        Q.    Why not?
4        A.    Because "account settings" at the top
5    left-hand side is the very first thing you see, and
6    then every account setting is very clearly laid out
7    both on the top across and on the left-hand side; so
8    not only is it once but twice to make sure people see
9    it.
10       Q.    And then going back to the list of topics
11   on page 25, the third one says, "Enter password,
12   already entered on login."
13          Did you have any concerns about the fact
14   that the cancellation -- let me start again.
15          Do you have any concerns, as you sit here
16   today, that the Match.com cancellation flow required
17   the subscriber to enter the password?
18       A.    No.
19       Q.    Why not?
20       A.    Well, it says, "The information you are
21   about to view is private," so this is to make sure you
22   protect information from users and then very clear
23   "continue cancelation" button.
24       Q.    When you say "protect information from
25   users," what do you mean?

Page 206

1        A.    I mentioned before that as in order to make
2    sure -- I don't remember this flow, so I don't remember
3    the specifics, but the reason that we asked people for
4    information about user name or password is to make sure
5    that there are no bad architects entering this page, so
6    to make sure that they can't get in and access any
7    information including user information or other
8    information.
9        Q.    And then back to the list of topics, there
10   is a survey question that's referenced Number 6.  Do
11   you see that?
12       A.    Yes.
13       Q.    Okay.  Are you -- you just testified you're
14   not familiar with the Match.com flow per se, but do you
15   recall that the cancellation flow asked subscribers why
16   they were cancelling their membership?
17       A.    I don't remember the specifics of the flow,
18   but we have a very unique category in business that is
19   episodic, and so people leave because they're happy and
20   they might leave because they're not happy.  So they
21   leave because they found someone.
22          Well, we don't know why people are leaving,
23   and in order for us to understand why people leave and
24   how to improve the product either for other people in
25   the community or when and if they come back, it's

Page 207

1    important for us to understand success rates and who
2    was -- who were the people that actually found success.
3        Q.    And when you were the CEO of Match.com, did
4    you ever have any concerns about the Match.com
5    cancellation flow that you can recall as you sit here
6    today?
7        A.    I don't recall; although, I see the
8    "continue to cancel" button on each of these screens.
9            MS. ZAMBRANO:  One moment.
10   BY MS. ZAMBRANO:
11       Q.    Do you understand that the allegation of
12   the FTC in this case is that Match.com's cancellation
13   flow is not simple?
14       A.    Yes, I understand that.
15       Q.    Do you -- did you ever hear anyone at
16   Match.com when you were the CEO express that there was
17   an intent to make the cancellation flow not simple?
18       A.    There was never any intention to make a
19   cancellation flow not simple; in fact, we looked at all
20   the data that suggests high 90 percent of people had no
21   problem cancelling.
22       Q.    Do you recall any discussions when you were
23   the CEO of Match.com about making the product more
24   difficult to cancel?
25       A.    No.  We would not want to make the product

Page 208

1    difficult to cancel because at the end of the day, our
2    customers would either tell people about it or come
3    back themselves, and so if we made -- if customers were
4    unhappy leaving our site or app, they wouldn't come
5    back, and as I mentioned before, half the people that
6    come every day are past customers, and so it would not
7    make sense to make our customers unhappy or frustrated.
8            MS. ZAMBRANO:  Pass the witness.
9            RE-EXAMINATION
10   BY MS. ZUCKERMAN:
11       Q.    Ms. Ginsberg, could you please look at
12   Exhibit 2?
13          So in this exhibit, the email thread is
14   dated March 14, 2018, right?
15       A.    Yes.
16       Q.    At this point in time, you were the CEO of
17   Match Group, Inc.; is that correct?
18       A.    Yes.
19       Q.    Did you serve as the CEO of Match Group
20   North America at this point as well?
21       A.    '18, '19, I do not believe; so no, I do not
22   think so.
23       Q.    Do you know who served as the Match Group
24   North America CEO at this point in time?
25       A.    I believe it was Match -- so can you ask me

Page 209

53 (Pages 206 - 209)

1 the question again?
2     Q.   Sure.
3         Who was the CEO of Match Group North
4 America at this point in time?
5     A.   I don't remember the titles, but Amarnath
6 Thombre was over -- I actually don't know his title,
7 but he was over -- he was over the North America brands
8 with the exception of Tinder.
9     Q.   Do you know who served as the CEO of
10 Match.com around this time March 2018?
11     A.   I can't remember -- I can't remember
12 timing. But I believe it was Hasam Hosseini, but I
13 don't remember the timing.
14     Q.   Would you look at Exhibit 19, please?  So
15 you testified that you didn't agree with the
16 accusations that the FTC made against Match Group.  Why
17 not?
18     A.   So from what I remember and understand that
19 the FTC accused, which I think we go into detail that
20 they accused, for example, that we were -- I can't
21 remember the exact term, but we were okay having
22 fraudulent users in our community.  And that's not
23 true.  We would never have fraudulent users in our
24 community intentionally.
25        So I spent three sentences explaining how

Page 210

1 we fight it, why we fight it, because it is actually
2 not a benefit for us to have fraudulent users ever in
3 our community.
4     Q.   What about FTC's claims related to
5 chargebacks; did you agree with those accusations?
6     A.   I can't remember the details of -- of those
7 accusations.
8     Q.   What about the FTC's claims regarding the
9 online cancellation practices of Match.com; did you
10 agree with those accusations?
11     A.   I can't remember the details.
12     Q.   Would you look at Exhibit 17 please, page
13 25?
14     A.   I don't have page numbers.
15     Q.   So Exhibit 17 has page 24 and then the next
16 page should be page 25.
17     A.   Okay.
18     Q.   At the top it says "Match Cancellation
19 Process," right?
20     A.   Yes.
21     Q.   You just testified that the information
22 that users were about to view were private.  Where did
23 you get that?
24     A.   As I said --
25        MS. ZAMBRANO:  I am going to object to

Page 211

1 that.  I'm not quite sure that's what she testified to,
2 but the record will show.  Object to the extent it
3 mischaracterizes her testimony.
4     A.   I am referring to the slide which is
5 "Change/Cancel membership.  The information you are
6 about to view is private."
7        I'm reading it off the slide.
8 BY MS. ZUCKERMAN:
9     Q.   Which slide are you looking at?
10     A.   It's two slides back.  It's 25, 26, 27.  I
11 literally just read it off the slide.  I'm assuming
12 this is accurate and there's nothing inaccurate in your
13 slides.
14     Q.   Do you remember for a fact that the
15 information that the user was about to view is private?
16     A.   I don't remember.  But I -- I read it off
17 of here.
18     Q.   What about communications with other users?
19 Would a user have to enter a password to access those
20 communications?
21     A.   I believe so because that's sensitive
22 consumer information.
23     Q.   So a Match.com user had to enter his or her
24 password every time they wanted to communicate with
25 another user?

Page 212

1        MS. ZAMBRANO:  Objection.  Incomplete
2 hypothetical.  Calls for speculation on "every time."
3     A.   I don't remember the exact business risk,
4 but I hope that we would not let people communicate
5 with other users without logging in.
6 BY MS. ZUCKERMAN:
7     Q.   So every time that a Match.com user was
8 logging in to their account, did they have to enter
9 their password?
10        MS. ZAMBRANO:  Again, vague and ambiguous
11 on "Match.com user" and lacks foundation.
12     A.   I don't really know the specifics of the
13 flow, but you would not have been able to communicate
14 with the user without being in the system.
15 BY MS. ZUCKERMAN:
16     Q.   So when a Match.com user is logged into the
17 account and they access the account settings page to
18 cancel their membership, were they required to re-enter
19 their password?
20     A.   I don't remember the details of the flows
21 for the one brand.  I'm sorry.
22     Q.   You previously testified that we looked at
23 data of high 90 percent of people who had no trouble
24 cancelling.  Where did you get that information?
25     A.   I just always remember that as we looked at

Page 213

54 (Pages 210 - 213)

1      I, MANDY GINSBERG, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
         _____
         MANDY GINSBERG
6
7  STATE OF _____)
8  COUNTY OF _____)
9
10      Before me _____ on this day
11  personally appeared MANDY GINSBERG, known to me (or
12  proved to me on the oath of _____ or
13  through _____ (description of identity card
14  or other document)) to be the person whose name is
15  subscribed to the foregoing instrument and acknowledged
16  to me that he executed the same for the purposes and
17  consideration therein expressed.
18      Given under my hand and seal of office this
19  _____ day of _____, _____.
20
21
         _____
         Notary Public in and for the
22      State of _____
23
24
25
                                  Page 222

1  for, related to, nor employed by any of the parties or
2  attorneys in the action in which this proceeding was
3  taken;
4      Further, I am not a relative or employee of
5  any attorney of record, nor am I financially or
6  otherwise interested in the outcome of the action.
7      Subscribed and sworn to on this date:
8  March 13, 2023.
9
10
11
12
13
14
15
16
         _Joseph D. Hendrick_
17  Joseph D. Hendrick, CSR #947
      Expiration Date: 04/30/2023
      Notary Comm. Exp. 01/13/23
18  Veritext Legal Solutions
      Firm Registration No. 571
19  300 Throckmorton Street, Ste. 1600
      Fort Worth, TX  76102
20  Telephone (800) 336-4000
21
22
23
24
25
                                  Page 224

1      REPORTER'S CERTIFICATION
2      DEPOSITION OF MANDY GINSBERG
3      February 23, 2023
4      I, Joseph D. Hendrick, Notary Public and
5  Certified Shorthand Reporter in the State of Texas,
6  hereby certify to the following:
7      That the Witness, MANDY GINSBERG, was duly
8  sworn by the officer and that the transcript of the
9  oral deposition is a true record of the testimony given
10  by the witness;
11      I further certify that pursuant to FRCP
12  Rule 30(f)(1) the signature of the deponent:
13      X    was requested by the deponent or
14  a party before the completion of the deposition and is
15  to be returned within 30 days from date of receipt of
16  the transcript;
17      _____ was not requested by the
18  deponent or a party before the completion of the
19  deposition;
20      I further certify that the amount of time
21  used by each party is as follows:
22      Sarah Zuckerman - 04:45:47
23      Angela Zambrano - 00:17:32
24      All Other Counsel - 00:00:00
25      I further certify that I am neither counsel
                                  Page 223

1  Angela Zambrano
2  angela.zambrano@sidley.com
3      March 13, 2023
4  RE:  Federal Trade Commission v. Match Group, Inc., Et Al.
5    2/23/2023, Mandy Ginsberg (#5651550)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  errata-tx@veritext.com.
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19  If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22      Yours,
23      Veritext Legal Solutions
24
25
                                  Page 225

57 (Pages 222 - 225)

# EXHIBIT G

1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS
2                        DALLAS DIVISION
3    FEDERAL TRADE COMMISSION,    §
                                  §   Case No. 3:19-cv-02281-K
4        Plaintiff,               §
                                  §
5        v.                       §
                                  §
6    MATCH GROUP, INC., a         §
     corporation, and MATCH       §
7    GROUP, LLC, formerly known   §
     as MATCH.COM, LLC, a         §
8    limited liability company,   §
                                  §
9        Defendants.              §
     _____

10
                        ORAL DEPOSITION OF
11
                        SHARMISTHA DUBEY
12        as 30(b)(6) Representative of Match Group, Inc.,
13                        March 3, 2023
     _____

14
15
16
         ORAL DEPOSITION OF SHARMISTHA DUBEY as 30(b)(6)
17    Representative of Match Group, Inc., produced as a
      witness at the instance of the Plaintiff, and duly
18    sworn, taken in the above-styled and numbered cause on
      March 3, 2023, from 9:04 a.m. to 5:26 p.m., before
19    Joseph D. Hendrick, Certified Shorthand Reporter in and
      for the State of Texas, reported by machine shorthand,
20    at the offices of Sidley Austin LLP, 2021 McKinney
      Avenue, Suite 2000, Dallas, Texas, pursuant to Notice
21    and the Federal Rules of Civil Procedure and any
      provisions stated on the record or attached hereto.
22
23
24
25    Job No. 5651555

                                                    Page 1

1 on the board?
2    A.   I am a member of the board of directors who
3 oversees the public company.
4    Q.   And just for -- to make things a bit easier
5 today, instead of me saying, you know, "Defendant Match
6 Group, Inc.," over and over, is it okay if I say
7 Defendant MGI or MGI; will you know what I mean?
8    A.   Yes, MGI is fine.
9    Q.   And when I talk about defendant MG, LL --
10 or "Defendant Match Group, LLC," is it okay if I just
11 say MG LLC or Defendant MG LLC, will you know what I
12 mean?
13    A.   Sure.
14    Q.   Okay.  So, were you previously employed by
15 defendant MGI?
16    A.   Yes.
17    Q.   What time period?
18    A.   I want to be careful I answer the MGI
19 question.  I think MGI came into existence after we
20 went public to the best of my knowledge, so that would
21 have been 2016, end of 2015, early 2016 up until end of
22 May 2022.
23    Q.   And what was your position during that time
24 period at MGI?
25    A.   The first couple of years, 2016 and 2017, I

Page 10

1 products.
2    Q.   So when were you at -- in this position at
3 Match Group North America, what company was actually
4 your employer?
5         MR. MUNDEL:  We will object to the form.
6         Go ahead.
7    A.   I think there was Match Group, LLC, which
8 was the operating company that operated a few brands,
9 was probably the entity that paid my paycheck if that's
10 sort of your question.  And that was primarily designed
11 for efficiency and, you know, there was one benefits
12 and payroll processing group there that wrote out our
13 checks.
14 BY MR. TEPFER:
15    Q.   And to your knowledge, when you had this
16 position at Match Group North America, did you also
17 have a position at Match Group, Inc.?
18    A.   No.
19    Q.   And so when you had this position at Match
20 Group North America, my understanding is you believed
21 your paycheck was paid by Match Group, LLC; is that
22 correct?
23    A.   I believe so, yes.
24    Q.   And when you had this position at Match
25 Group North America and were being paid by Match Group,

Page 12

1 was actually president of Match Group North America.
2 And then in 2018 I became president of Match Group
3 overall.  And in 2020, early 2020, I became CEO of
4 Match Group.
5    Q.   And is that Match Group, Inc., when you say
6 Match Group?
7    A.   Correct, yes.
8    Q.   What's Match Group North America?
9    A.   Match Group North America is just an
10 aggregated -- aggregation of a few operating companies
11 that have their development teams, engineering teams,
12 et cetera, based out of North America.  So at that time
13 it was a few -- a handful of different businesses.
14    Q.   So when you say Match Group North America,
15 you are not referring to like a particular company, you
16 are referring to a group of companies?
17    A.   It is actually -- the Match Group North
18 America is just a -- the oversight role that I had was
19 overseeing four different operating companies that were
20 based in North America.
21    Q.   What are those four operating companies?
22    A.   Match.com, OKCupid, Overture is the
23 brand -- and it's easier for me to say the brands
24 because those are the consumer brands that everybody
25 knows them by -- Plenty of Fish, and the Affinity

Page 11

1 LLC, you oversaw, you said, OKCupid, Plenty of Fish,
2 Match.com, and was it Tinder also?
3    A.   No, not initially.  In 2017 I was asked to
4 wear an additional hat and become the COO of Tinder,
5 because we were going through a particular period in
6 the history and lifecycle of that company, and because
7 of my history, I was tapped to go help Tinder out.
8    Q.   And I apologize if I am asking you to
9 repeat yourself, but I think you -- there was a fourth
10 company you said, when you had this position at Match
11 Group, LLC, that you were overseeing.  Do you -- would
12 you mind reminding me of what the fourth one was?
13    A.   Yes.  It was an acquisition we had done
14 called People Media and they had a few brands that they
15 ran.
16    Q.   Okay.  Thank you.
17         So, in 2020 you became Match Group, Inc.
18 CEO; is that correct?
19    A.   That is correct.
20    Q.   And how long did you hold that position?
21    A.   About two-and-a-half years.
22    Q.   Okay.  And so you recently stepped down
23 from that position?
24    A.   End of May 2022.
25    Q.   Did you take a position elsewhere?

Page 13

4 (Pages 10 - 13)

1    A.    No.
2    Q.    Did you retire?
3    A.    Yes, I have transitioned to a different
4  chapter of my life which is mostly advisory.
5    Q.    Okay.  Was there a time when you were
6  simultaneously CEO of Match Group Inc. and Match Group,
7  LLC?
8    A.    It is possible that technically I was
9  designated the CEO of Match Group, LLC, but really the
10  way we operated, I was CEO of the public company, Match
11  Group, Inc., which is a holding company, of a bunch of
12  operating brands, and each of these operating brands
13  has a fairly autonomous product, engineering,
14  marketing, customer care, and a few other functions led
15  by a GM or CEO of that company.  So, that's how we
16  mostly operated is these operating brands have their
17  own groups, a separate platform, their own technology
18  stacks, they have their leader, and then all their
19  financials rolled out to the MGI level.
20    Q.    And when you were MGI CEO what were your
21  roles and responsibilities?
22    A.    Since M -- Match Group, Inc. was a public
23  company, some of the main responsibilities is reporting
24  out to the street, the investors, shareholders,
25  managing the board of directors, and also we did -- I

Page 14

1  did have the power to hire and fire the leaders of
2  these operating businesses.  But all the other
3  day-to-day of these operating businesses were handled
4  by the leaders that we had.
5    Q.    And during the time that you were -- was it
6  president of Match Group North America -- who did you
7  report to?
8    A.    I believe I reported to Mandy Ginsberg.
9    Q.    And who reported to you concerning the
10  different platforms?
11    A.    I can't remember who it was because all the
12  leaders of the companies reported into Mandy, and I
13  don't believe I had any particular direct, direct
14  employee, but Mandy and I worked together quite a bit
15  in solving these problems.
16         I probably had direct employees; I can't
17  remember who they were.
18    Q.    And who was the CEO of Match Group, Inc. at
19  the time that you were president of Match Group North
20  America?
21    A.    It was Greg Blatt.
22    Q.    And did you report to him concerning the
23  various plat -- or dating websites that you were
24  overseeing?
25    A.    Actually Mandy would, and she and I often

Page 15

1  did talk to him together.
2    Q.    And what sorts of things would you discuss
3  with Greg Blatt?
4         MR. MUNDEL:  Object to the form.  Time
5  period.  Vague.
6    A.    Yes, and again, look, you have to be
7  specific.  It depends on what we were talking about,
8  but if the -- if your question is largely around what
9  sort of information does an operating leader give to
10  the -- to the MGI CEO for instance, the types of things
11  I would say are an annual strategic plan and budget,
12  that would be something we would discuss.  We would
13  have monthly forecast check-ins where it was largely
14  around how these operating businesses or any of these
15  operating businesses were tracking relative to their
16  forecast, and if there were any major deviances against
17  what the plan was, why, and so on.  Those would be the
18  primary things that we would discuss.  And, of course,
19  there's ad hoc things that would emerge.
20         It's a big, complicated business.  If
21  something of -- you know, something major would come
22  up, that would be something we would discuss.
23  BY MR. TEPFER:
24    Q.    And can you think of any examples of some
25  of, I guess, major issues that you discussed with Greg

Page 16

1  Blatt during the time that you were president of Match
2  Group North America?
3    A.    I -- I can't remember specifics at that
4  time, but if you are getting to a similar sort of
5  set-up, when I was the MGI -- when I was the CEO of
6  Match Group, Inc., you know, things like the pandemic
7  and lockdown and shutdown, that would be something I
8  would -- because that happened during my tenure, that
9  was a big topic that I would discuss with the operating
10  leaders of those businesses.
11         There were -- there was a lot of -- 2020
12  was a challenging year relative to social justice
13  issues.  Post George Floyd, there was a lot of employee
14  activism in general, sort of issues with our employee
15  set in North America in particular.  Those would be
16  issues that I would discuss with the leaders of the
17  businesses who had U.S.-based employees, for instance.
18    Q.    What about, like, for example, major
19  advertising campaigns, is that something that in your
20  role as MGI CEO you would discuss with the brand
21  leaders?
22    A.    No, I wouldn't.
23    Q.    Would -- to your knowledge, did other Match
24  Group, Inc. CEOs discuss major advertising campaigns
25  with leaders?

Page 17

5 (Pages 14 - 17)

1    MR. MUNDEL:  Object.  You are asking her in
2  her corporate capacity or individual knowledge?
3    MR. TEPFER:  Oh.  That -- sorry.  That was
4  in corporate capacity.
5    MR. MUNDEL:  What topic is that on?
6    MR. TEPFER:  I think it's probably 5.
7    MR. MUNDEL:  You can answer.
8    A.   I'm not sure I can remember specifics, but
9  one of the things, just by virtue of us having been
10  with the business and have institutional knowledge of
11  particular areas, it wouldn't be unusual for one of the
12  operating brand leaders to tap into our expertise on a
13  consulting basis and, you know, for me marketing was
14  not my area of expertise, so that's not something
15  people would come to me very often unless there was a
16  big marketing spend that they want to put behind a
17  campaign that they may come to me to discuss.
18    But, you know, Greg Blatt was a -- he was a
19  very good writer, and he loved writing in general, like
20  scripts, et cetera, he's written script -- screenplays,
21  et cetera, so it's possible that, you know, some of
22  the marketing folks, while they were coming up with the
23  new campaign they would consult with him on a handful
24  of specific things.
25    But it's not our role and it's not humanly
Page 18

1  BY MR. TEPFER:
2    Q.   And as far as you know, you are the only
3  one that used that email address?
4    A.   Yes, Sharmistha.Dubey.  I am fairly unique.
5    MR. MUNDEL:  We looked for a second one and
6  couldn't find a second person with that name.
7    THE WITNESS:  Sharmistha Dubey, yes.
8    MR. MUNDEL:  It's probably safe.
9  BY MR. TEPFER:
10    Q.   So, in your positions at MGI and MG LLC,
11  did you have reason to become familiar with the MGI
12  corporate structure?
13    A.   If the question is while I was the CEO was
14  I familiar with it, no, that was having the -- that was
15  largely, you know, said -- the legal -- the lawyers
16  would be more familiar with it and I didn't really have
17  quite the need to be familiar with it, but, as
18  preparation for this deposition, I have done some
19  homework on it.
20    Q.   And are you familiar with the relationship
21  between MGI and MG LLC?
22    A.   I do.
23    Q.   And are you familiar with MGI's policies
24  and procedures relating to consumer chargebacks?
25    A.   MGI has a policy -- MGI does not have any
Page 20

1  possible for someone at the MGI CEO level to be
2  reviewing marketing campaigns across the brands.
3  BY MR. TEPFER:
4    Q.   What was your email address when you worked
5  at Match Group?
6    A.   So there was a -- over time, I've had many.
7  It started out as Match.com, because Matchgroup.com was
8  a very challenging where we had to go through a lot of
9  IT rigmarole to actually get that domain.  Eventually I
10  do think there was an email address that eventually
11  became Matchgroup.com.
12    I've had Gotinder.com during the time that
13  I was --
14    Q.   And what was the full email?
15    A.   I've had many different versions of it.
16  There were probably shortcuts too, but I would imagine
17  it's Sharmistha.Dubey at any of these domains.
18    Q.   Okay.  And so if there is an email address
19  with your name at Match.com for example, is it safe to
20  assume that that is your email address?
21    MR. MUNDEL:  Object.
22    You can answer if you know.
23    A.   In the documents, if you find something
24  that says Sharmistha.Dubey@Match.com, yes, that would
25  be me.
Page 19

1  policies related to consumer chargebacks.
2    Q.   Sorry.  To rephrase, are you familiar with
3  Match Group -- or sorry -- with Match.com's policies
4  and procedures with regard to consumer chargebacks?
5    MR. MUNDEL:  Object as beyond the scope.
6    You can answer in your personal capacity.
7    A.   Yeah, I'm sure they do, but I'm not
8  familiar with any specifics.
9  BY MR. TEPFER:
10    Q.   And similarly, are you familiar with
11  Match.com's cancellation procedures for consumer
12  subscriptions?
13    MR. MUNDEL:  Object as beyond the scope.
14    You can answer in your personal capacity.
15    A.   I am not familiar with the specifics.  I
16  know they have one, but I'm not familiar with the
17  specifics.
18  BY MR. TEPFER:
19    Q.   And similarly for refund policies at
20  Match.com, did you have reason to become familiar with
21  those during your time working for Match Group?
22    MR. MUNDEL:  I am going to object as beyond
23  the scope.
24    You can answer in your personal capacity.
25    And you are asking not whether she knows
Page 21

6 (Pages 18 - 21)

APP 109

1   team, with our lawyers, and one particular session with
2   the treasury, finance, accounting and tax.
3       Q.   And how many hours total would you estimate
4   that you spent in preparation for today's testimony?
5       A.   As I said, I think it is a better part of
6   three to four working days, full working days.
7       Q.   And are you receiving any benefits in
8   exchange for testifying today?
9       A.   I am not.
10       Q.   And so you're not being compensated for
11   your testimony?
12       A.   Absolutely not.
13       Q.   Do you own any MGI stock?
14       A.   I do.
15       Q.   How much?
16       A.   I --
17       MR. MUNDEL:  We would object.
18       A.   I -- I don't remember, but these were all
19   grants given to me when I was employed and I had an
20   actual role with the company.
21   BY MR. TEPFER:
22       Q.   And do you have any family members that
23   work for Match Group properties?
24       A.   No.
25       Q.   Is it -- so, Match.com, is that within

Page 26

1   Match Group, Inc.'s portfolio of brands; is that
2   correct?
3       A.   Match.com is one of the operating brands
4   that's part of the portfolio of companies that MGI
5   holds.
6       Q.   And would you agree that it's accurate to
7   say that Match Group, Inc. provides its customers
8   digital technologies through its portfolio companies?
9       MR. MUNDEL:  Object to the form.  Beyond
10   the scope.
11       You can answer in your personal capacity.
12       A.   I'm not sure what the question means.
13       MR. TEPFER:  If I could just clarify, I
14   believe -- you know, I certainly understand if, you
15   know, the objection's about beyond the scope, but I
16   believe she would -- you know, if she's able to
17   testify, I believe she would still need to testify in
18   her capacity as Match Group, Inc.'s corporate
19   representative, even if it's outside of the noticed
20   topics.  There's just not an obligation to have
21   prepared for topics outside of the noticed topics.
22       MR. MUNDEL:  I don't understand exactly
23   what you are saying, but if it's -- if you are asking
24   her a question beyond the scope of the noticed topics,
25   then she's not testifying on behalf of MGI.

Page 27

1       She's only been designated to speak on
2   behalf of -- on particular topics.  I mean, I haven't
3   instructed her not to answer --
4       MR. TEPFER:  Sure.
5       MR. MUNDEL:  -- but her testimony is not on
6   behalf of MGI.
7       MR. TEPFER:  I -- yeah, I have to disagree
8   on that particular -- I -- I understand if, you know,
9   it happens to be the case that, because this wasn't a
10   noticed topic she wasn't prepared to speak on it, but
11   she's still here today as a representative of MGI.
12       MR. MUNDEL:  What is your -- are you
13   suggesting that she can provide testimony on behalf of
14   MGI outside the scope of what you have noticed?
15       MR. TEPFER:  Yes.
16       MR. MUNDEL:  What is the basis for that?
17       MR. TEPFER:  I can provide a few cases.  So
18   the -- you know, the reasonable particularity
19   requirement of 30(b)(6), that's a minimum of what the
20   corporate designee has to prepare for.  It's not the
21   maximum of what I'm allowed to ask the corporate
22   designee concerning.
23       So, you know, that's what she has to
24   prepare for, it's not a limit on what the corporate
25   designee has to discuss.  And I can provide case cites

Page 28

1   if necessary on that point.
2       MR. MUNDEL:  Yes, please provide those case
3   points.
4       MR. TEPFER:  So Eng-Hatcher versus Sprint,
5   and that's number 07 Civ. 7350 2008 WL4104015, Southern
6   District New York, August 28th, 2008.
7       UniRAM Tech Inc. versus Monolithic Systems
8   Tech Inc., and that's 2007 WL915225, and that's the
9   Northern District of California, March 23rd, 2007.
10       McMahon versus Presidential Airlines, Inc.,
11   and that's 2006 WL535979.
12       MR. MUNDEL:  Can you give that number
13   again?
14       MR. TEPFER:  Sorry.  2006 WL5359797, and
15   that's Northern District California, August 25th, 2016.
16       But -- but, yes, in essence, my point is
17   simply that these noticed topics are the minimum of
18   what has to be prepared for, but not a limitation on
19   the corporate designee's testimony, and so I don't
20   believe it's appropriate to limit her testimony to
21   being in her personal capacity.
22       MR. MUNDEL:  So we disagree with that as a
23   legal proposition.
24       MR. TEPFER:  Okay.
25       MR. MUNDEL:  We're happy to read those

Page 29

8 (Pages 26 - 29)

APP 110

1  cases and read them for what they're worth.
2      But as a matter of continuing the
3  testimony, the witness has been designated only on
4  particular topics, not on other topics, so she is here
5  to testify about those topics as we have agreed to
6  revise them to be reasonable, and so we will continue
7  to object as beyond the scope for anything beyond
8  those --
9      MR. TEPFER:  Sure, I just wanted to explain
10  our position.
11      MR. MUNDEL:  Sure.
12  BY MR. TEPFER:
13      Q.   So generally speaking, what is Defendant
14  Match Group, Inc.?
15      A.   What is Match Group, Inc.?
16      Q.   Yes.
17      A.   Match Group, Inc., is a holding company
18  that is public -- its stock is publicly traded, and it
19  has a portfolio of operating companies that run a
20  number of dating and social connection brands, consumer
21  brands.
22      Q.   And when you say holding company, what do
23  you mean by that?
24      A.   It is a holding company that the businesses
25  are managed on the operating company levels, their
                                                    Page 30

1  financials are rolled up.  Match Group, Inc., is
2  responsible for reporting out the overall consolidated
3  financials, and so that's what it is.
4      Q.   And when you say the financials are rolled
5  up, what do you mean by that?
6      A.   It is the P&Ls of each of these operating
7  businesses are then consolidated in full, and then it's
8  reported out to the street on a quarterly basis.
9      Q.   Does Match Group, Inc., do any sort of
10  coordination between the different brands within its
11  portfolio?
12      MR. MUNDEL:  I am going to object to the
13  form and vague as to coordination.
14      A.   Yeah, I mean, you've got to be more
15  specific.
16      So clearly they, you know, just even in the
17  event of consolidating financials, they're obviously
18  having conversations with each of these operating
19  companies to understand what their P&L looks like -
20  right? - so that's -- if that's coordination, that's
21  coordination.
22      But you've got to give me more specifics
23  around your question.
24  BY MR. TEPFER:
25      Q.   And when did Match Group, Inc., go public?
                                                    Page 31

1      A.   I believe in Q4 of 2015.
2      Q.   And so MGI, Defendant MGI was previously
3  owned by IAC, Inc.; is that correct?
4      A.   I don't think MGI existed.  I couldn't tell
5  you what the -- what the entity was, but yes, IAC was
6  the public company, holding company, that owned these
7  assets.
8      Q.   And when -- when IAC owned those assets,
9  what was the company that operated Match.com?
10      MR. MUNDEL:  Object as beyond the scope.
11      A.   I won't get it right.  I didn't look back
12  and see the whole sort of chronology of what happened.
13  BY MR. TEPFER:
14      Q.   When was Match Group, Inc., spun off from
15  IAC, Inc.?
16      MR. MUNDEL:  Beyond the scope.
17      You can answer if you know.
18      A.   So as I said, it went public in fall of --
19  Q4 of 2015, so that is when it would have -- public
20  shareholders could buy stock in the company; however,
21  IAC remained a majority shareholder up until -- I won't
22  get the timeline right -- but 2020 I think, but
23  somebody should confirm that.
24  BY MR. TEPFER:
25      Q.   When was Match Group, LLC, created?
                                                    Page 32

1      MR. MUNDEL:  Object as beyond the scope.
2  The witness can answer in her personal capacity.
3      A.   I couldn't tell you actually.
4  BY MR. TEPFER:
5      Q.   Did the relationship between MGI and MG,
6  LLC, change in any way as a result of Match Group,
7  Inc., spinning off from IAC?
8      MR. MUNDEL:  Object as beyond the scope and
9  vague to relationship changing in any way.
10      A.   I'm not sure.  From an operate -- I'm not
11  sure if anything changed by name or, you know, some
12  legal technicalities, but nothing changed from a
13  day-to-day, the way we operated the business.
14  BY MR. TEPFER:
15      Q.   Does MGI currently play any role in
16  overseeing the operation of Match.com?
17      A.   As I said, MGI is a holding company that
18  does oversee the financial performance of all of its
19  operating businesses, and that would include Match.com.
20      Q.   And when you say overseeing the financial
21  performance of Match.com, does that include making
22  recommendations to improve the financial performance of
23  Match.com?
24      A.   Nobody at the MGI level has that much
25  knowledge of each of the underlying businesses to be
                                                    Page 33

9 (Pages 30 - 33)

APP 111

1   able to make that kind of recommendation, but yes, on a
2   high level, macro level, if let's say the G -- leader
3   of that -- of a business comes and tells us, "Well, I'm
4   gonna lose a bunch of money next year," then that's a
5   conversation I as an MGI CEO will have. "Mike, I'm not
6   sure we can afford to lose the money, so much money,
7   what can you do to cut some costs," and that would be
8   the level of conversation that would happen.
9       Q.   And has MGI's role in the operation of
10  Match.com changed over time, or is the role that you
11  are describing to me now the same that it's been over
12  the course of that relationship?
13          MR. MUNDEL:  Objection.  Vague.  Go ahead.
14      A.   It -- I mean, the only thing I can say is,
15  as far as I know, since MGI became a thing, it's always
16  operated that way.
17  BY MR. TEPFER:
18      Q.   Did -- was Match Group, LLC, previously
19  known as Match.com, LLC, to your knowledge?
20          MR. MUNDEL:  Can you just state those names
21  again?  I think --
22          MR. TEPFER:  Sure.
23  BY MR. TEPFER:
24      Q.   Did -- was -- was Defendant MG, LLC,
25  previously called Match.com, LLC?

Page 34

1   at the federal level and so on.
2       Q.   And so those companies, I guess Match Group
3   Holdings I, LLC, and Match Group Holdings II, LLC,
4   exist for tax purposes; is that correct?
5          MR. MUNDEL:  Objection.  Misstates
6   testimony.  Beyond the scope.
7          You can answer in your personal capacity.
8       A.   Yeah, it's not just tax, it's all -- I
9   think operational efficiency around financials.
10         MR. TEPFER:  And I just want to state for
11  the record, I do think that these questions concerning
12  the intermediary LLCs are fairly within the scope of
13  topic 1, which is -- concerns the relationship between
14  Match Group, Inc., and Match Group, LLC, those are the
15  intermediary companies of those two companies, part of
16  the relationship, but, again, just to reiterate our
17  position that, you know, we do believe she is test --
18  should be testifying in her corporate capacity, and,
19  you know, we will reserve the right to seek to compel,
20  you know, testimony on -- on that basis at a subsequent
21  time.
22         MR. MUNDEL:  Well, two things.  First, your
23  last question was whether a particular company was set
24  up for tax purposes alone.  There's absolutely no topic
25  on that, particularly when the entity that you were

Page 36

1          MR. MUNDEL:  Objection.  Beyond the scope.
2          You can answer in your personal capacity.
3       A.   I actually don't know.
4   BY MR. TEPFER:
5       Q.   Have you ever heard of Match.com, LLC?
6          MR. MUNDEL:  Same objection.
7       A.   Yeah.  I couldn't be sure.
8   BY MR. TEPFER:
9       Q.   Are you familiar with a company called
10  Match Group Holdings I, LLC?
11         MR. MUNDEL:  Beyond the scope.
12         You can answer in your personal capacity.
13      A.   Yes, I believe it is a level below MGI,
14  which is largely -- there is a Holdings Company I and a
15  Holdings Company II, and their -- their primary
16  function is to aggregate the financials and some
17  capital structures, and that came out of the spinoff of
18  IAC, to the best of my knowledge.
19  BY MR. TEPFER:
20      Q.   And so you said to aggregate financials.
21  What do you mean by that?
22      A.   Meaning, I think the cash is pooled at a
23  Holdings I level, if I remember right, the cash from
24  all of the operating businesses, because that's an
25  easier way to then roll up and report out and pay taxes

Page 35

1   asking about was not MGI or MGL, but a completely
2   different entity, and what the intent was for that.  So
3   that is far beyond any of the topics that you noticed,
4   number one.
5          Number two, as to your point about personal
6   capacity versus corporate capacity, we have not
7   instructed the witness not to answer, so this idea of
8   moving to compel strikes me as completely far-fetched.
9          But my very kind colleagues have looked at
10  the cases that you cited while I've been paying very
11  close attention to your questioning, and it's clear
12  from those cases that they don't support the FTC's
13  position here.
14         MR. TEPFER:  Sure.
15         MR. MUNDEL:  Nick Mahone versus
16  Presidential --
17         MR. TEPFER:  Well, if --
18         MR. MUNDEL:  Rina Moffitt -- I'm not
19  finished yet.
20         MR. TEPFER:  Sorry.  I know, but if -- I'm
21  happy to discuss this off the record, but it's getting
22  kind of lengthy, if we could -- I'm happy to talk off
23  the record, but I don't want to go into a case level
24  discussion while the clock's ticking --
25         MR. MUNDEL:  Well, you cited these cases

Page 37

10 (Pages 34 - 37)

1  difficult for somebody at the top to be able to keep a
2  handle on all of this. That's when we assigned leaders
3  to oversee some of these businesses by region.
4  BY MR. TEPFER:
5      Q.   And did that position exist in 2016?
6           MR. MUNDEL: Beyond the scope.
7      A.   The North America existed in 2016, yes.
8  BY MR. TEPFER:
9      Q.   And has that position existed since that
10 time up until the present?
11          MR. MUNDEL: Beyond the scope.
12     A.   I don't -- I believe at the latest, and I
13 couldn't speak to the specifics of this, it's just my
14 recollection, it no longer exists, but it existed for
15 some period of time.
16 BY MR. TEPFER:
17     Q.   And do you recall when that position ceased
18 to exist?
19     A.   It was after me, my time, and the new CEO
20 of MGI has been doing some reorganization.
21     Q.   So it -- it ceased to exist at some point
22 after 2022, or after --
23     A.   After May of 2022.
24     Q.   Thank you.
25          And the individual who serves in that role
                                                    Page 66

1  BY MR. TEPFER:
2      Q.   When you were the president of Match Group
3  North America, were you employed in that capacity by
4  Match Group, LLC?
5      A.   Again, I'm guessing yes, but it wasn't
6  something we paid too much attention to.
7      Q.   So how does MGI make money?
8      A.   I'm not sure I understand the question.
9      Q.   What is the source of Match Group, Inc.'s,
10 revenue?
11          MR. MUNDEL: Beyond the scope.
12     A.   As I said, Match Group, Inc., is simply a
13 holding company that reports out the roll-up of all the
14 financials of these operating companies. The operating
15 companies make money. There's no way that Match Group,
16 Inc., makes money, to the best of my knowledge.
17 BY MR. TEPFER:
18     Q.   So all of the revenue that Match Group,
19 Inc., receives comes from these operating companies
20 below it; is that correct?
21          MR. MUNDEL: Object. Beyond the scope.
22     A.   The revenues of these operating companies,
23 yes, gets rolled up to the MGI level.
24 BY MR. TEPFER:
25     Q.   How is it determined how much of the
                                                    Page 68

1  as president of Match Group North America, what company
2  employs them?
3           MR. MUNDEL: Are you asking currently?
4  BY MR. TEPFER:
5      Q.   As of May 2022.
6           MR. MUNDEL: I am going to object. Beyond
7  the scope of the noticed topics.
8           Go ahead.
9      A.   In May 2022, there was no president of
10 Match Group North America. There was a CEO of Match
11 Group North America only.
12 BY MR. TEPFER:
13     Q.   And who employed the CEO of Match Group
14 North America at that time?
15          MR. MUNDEL: Beyond the scope.
16     A.   I couldn't tell you definitively, but my
17 guess is Match Group, LLC.
18 BY MR. TEPFER:
19     Q.   And was the head of Match Group North
20 America from -- for the entirety of the existence of
21 that position, employed by Match Group, LLC?
22          MR. MUNDEL: Object as beyond the scope of
23 the noticed topics.
24     A.   I couldn't be sure. I couldn't tell you
25 for sure, but I would guess, yes.
                                                    Page 67

1  revenue of Match.com is rolled up to Match Group, Inc.?
2           MR. MUNDEL: Objection. Beyond the scope.
3  And form.
4      A.   I'm not sure I understand. All of it.
5  BY MR. TEPFER:
6      Q.   So all of the revenue that -- from
7  Match.com goes to Match Group, Inc.?
8           MR. MUNDEL: Objection. Beyond the scope,
9  and form.
10          I guess just to be clear, are you talking
11 in accounting purposes or a movement of cash? Because
12 I think that's what's causing the confusion here.
13 BY MR. TEPFER:
14     Q.   Are you confused about this?
15     A.   Yeah, I mean, I'm making an assumption that
16 it's all accounting.
17     Q.   Okay. So --
18     A.   And -- and so 100 percent of the revenue
19 will get account -- will roll up into the MGI
20 financials that is reported out to the street.
21     Q.   Okay. And so in terms of the actual cash
22 flow, does money flow from Match Group, LLC, to Match
23 Group, Inc.?
24          MR. MUNDEL: Objection. Vague. Time
25 period.
                                                    Page 69

                                            18 (Pages 66 - 69)

1    A.   I'm not sure how to answer that.  The way
2  this works, to the best of my knowledge, and, again,
3  this wasn't something I dealt with, it would have been
4  the accounting team that deals with it, but I -- you
5  know, the cash is obviously collected at the operating
6  company levels.  Many of the expenses are paid out
7  there.  Some expenses on behalf of these are paid up at
8  a corporate level, and then the net cash gets rolled up
9  into various -- from an accounting perspective, the net
10  cash would roll up at one of the holding level and then
11  reported out at the MGI level.
12  BY MR. TEPFER:
13    Q.   And so Match Group, Inc., you said, does
14  not itself make revenue.
15    A.   Correct.
16    Q.   But the company incurs expenses of course;
17  is that right?
18       MR. MUNDEL:  I am going to object as beyond
19  the scope, the expenses of Match Group, Inc.
20       Go ahead.
21    A.   Yeah, I -- I mean, there's -- I'm sure
22  there are some expense lines related to public
23  company -- company running like audits, et cetera,
24  which are handled at the corporate cost line.  But,
25  otherwise, most of our operating costs are at the

Page 70

1  operating cost line.
2  BY MR. TEPFER:
3    Q.   To the extent that Match Group, Inc., does
4  incur costs, those costs are paid using revenue derived
5  from, I guess, the operating companies beneath it?
6       MR. MUNDEL:  I am going to object to the
7  form of the question and also beyond the scope.  If you
8  understand it.
9    A.   I'm a little confused about what the
10  question is trying to answer, but this is the best
11  understanding I have:
12       Each of these operating companies makes
13  revenue, has expenses, they deal with it, most of it
14  themselves.  There are -- there's a corporate line and
15  some shared services.  Shared services generally get
16  allocated to these operating companies, but there is a
17  corporate cost line, and, yes, those checks and
18  expenses would be paid out of the cash, the rolled-up
19  aggregate cash from all of these operating businesses.
20  BY MR. TEPFER:
21    Q.   Thank you.
22       And so the -- for example, the MGI CEO, his
23  or her salary would be paid out of that same pool of
24  funds from the operating companies; is that correct?
25       MR. MUNDEL:  Object as beyond the scope and

Page 71

1  vague.
2    A.   The MGI CEO's salary cost sits in that
3  corporate line from an accounting perspective.
4  BY MR. TEPFER:
5    Q.   Does MCI play a role in the hiring of any
6  MG LLC employees?
7    A.   The CEO of M -- MGI, for instance, does
8  have the right to hire and fire the operating company
9  heads, leaders.
10    Q.   What about other employees?
11    A.   Generally any employee that's in those
12  operating companies, they are the -- the leader of that
13  operating company is responsible for hiring and firing
14  them.  Now, the -- there are some shared services which
15  a few of those leaders could be hired and fired, for
16  instance, by -- the CFO, for instance.  The CFO could
17  hire the head of treasury, which is a shared service.
18    Q.   And would you mind defining what a shared
19  service is?
20    A.   So, there are a few functions like legal,
21  accounting, tax, mostly those kinds of services which
22  are, you know, functionally similar and they are --
23  they don't make a difference to how the consumer views
24  the brand.  Everything that is consumer-facing is part
25  of the -- the operating team that runs those brands.

Page 72

1  So, product, engineering, marketing, design, analytics,
2  customer care, all of that sits independently, and they
3  are -- their sole job is to make sure they are running
4  a platform and a brand that works for the consumers
5  that they are trying to target.  And they run that
6  fairly autonomously, but something like tax or treasury
7  or accounting or legal is a function that sits at -- a
8  little bit at the higher level, and they have employees
9  that allocate their time onto these different brands,
10  so -- and all of that cost would get assign --
11  attributed from an accounting per -- purpose to that
12  particular brand, but there could be some corporate
13  level stuff that they have to deal with like paying of
14  federal tax, for instance, or managing the employee
15  stock purchase plan for instance.  Those are generally
16  housed at the corporate expense line.
17    Q.   So --
18    A.   But those are the people, like benefits,
19  stock plan management, a lot of accounting, tax, those
20  are shared services.
21    Q.   So shared services are things that are at
22  the corporate level, those sorts of services?
23       MR. MUNDEL:  Object as beyond the scope and
24  to the form.
25    A.   It -- it -- from an accounting perspective,

Page 73

19 (Pages 70 - 73)

1  those expenses hit the corporate line.
2  BY MR. TEPFER:
3     Q.   And so, for example, does MG, LLC, have its
4  own legal department?
5          MR. MUNDEL:  Beyond the scope.
6     A.   There is a shared service legal department.
7  There are lawyers that work on specific brands,
8  sometimes all of their work is on a particular brand,
9  sometimes they spend -- you know, they wear a hat and
10 they help Tinder or they wear a hat, they help someone
11 else, for instance.
12 BY MR. TEPFER:
13    Q.   So there are some attorneys that are
14 assigned to particular brands and some attorneys that
15 work for multiple brands?
16         MR. MUNDEL:  Object as beyond the scope.
17    A.   The -- it's -- all of the -- their times
18 are actually accounted for by some brand, they just
19 wear different hats and help and work on those
20 particular brands.
21 BY MR. TEPFER:
22    Q.   In terms of who the employer is, is that
23 Match Group, Inc., for those attorneys you are
24 referencing?
25         MR. MUNDEL:  Object as beyond the scope.

Page 74

1     A.   No.  I believe the corporate team, in terms
2  of getting their paychecks, just for ease, happens to
3  sit under Match Group, LLC, because a lot of them
4  happen to be in Dallas.
5  BY MR. TEPFER:
6     Q.   And where is Match Group, Inc.,
7  headquartered?
8          MR. MUNDEL:  Beyond the scope, but you can
9  answer if you know.
10    A.   I think our HQ is Dallas.  So I imagine it
11 is Dallas.
12 BY MR. TEPFER:
13    Q.   Does Match Group, Inc., have office space
14 in Dallas?
15         MR. MUNDEL:  Beyond the scope.
16    A.   I -- I don't believe so, but -- I don't
17 believe so.
18 BY MR. TEPFER:
19    Q.   Does any employee of Match Group, Inc.,
20 work in Dallas, to your knowledge?
21         MR. MUNDEL:  Beyond the scope.
22    A.   Probably one.
23 BY MR. TEPFER:
24    Q.   And who are you thinking of?
25    A.   Jared Sine, the general counsel.

Page 75

1     Q.   Where does Match Group, Inc., have office
2  space, if you know?
3          MR. MUNDEL:  Beyond the scope.
4     A.   I don't believe Match Group, Inc., has
5  office space.
6  BY MR. TEPFER:
7     Q.   Does Match Group, Inc., have employees?
8     A.   To the best of my knowledge, there are only
9  three employees of Match Group, Inc.
10    Q.   And has Match Group, Inc., ever had office
11 space that you know of?
12         MR. MUNDEL:  Beyond the scope.
13    A.   I don't believe so.
14 BY MR. TEPFER:
15    Q.   And who are those three employees, the
16 current MGI employees that you are referring to?
17    A.   Today, it would be Bernard Kim, who is the
18 CEO of MGI, Gary Swidler is the CFO, and Jared Sine
19 who is the general counsel, chief legal officer.
20    Q.   And the three individuals that you
21 mentioned, would you mind telling me where their
22 offices are located?
23         MR. MUNDEL:  Beyond the scope.
24         Go ahead.
25    A.   Bernard lives and works out of LA.  Gary

Page 76

1  lives and works out of New York.  And Jared lives and
2  works out of Dallas.
3  BY MR. TEPFER:
4     Q.   And the offices that they work from, are
5  those MG LLC offices?
6          MR. MUNDEL:  Beyond the scope.
7          You can answer in your personal capacity.
8     A.   Yeah, I don't -- I -- I can't tell you who
9  owns each of those different.  We have many, many
10 pieces of real estate leased or owned in many parts and
11 I couldn't tell you who owns them, but I don't believe
12 MGI owns anything.
13 BY MR. TEPFER:
14    Q.   You stated that the legal team is housed
15 in -- or strike that.
16         You stated, I believe, that MG LLC is the
17 actual employer for the attorneys that handle legal
18 representation for the Match Group properties; is that
19 correct?
20         MR. MUNDEL:  I am going to object as being
21 beyond the scope and also misstating the testimony.
22    A.   I said the shared service function of legal
23 and the lawyers get paid, their paychecks probably come
24 from Match Group, LLC, but their costs are all assigned
25 to the operating company or brand that they serve.

Page 77

20 (Pages 74 - 77)

1    Q.    But it doesn't actually operate at that
2  physical address; is that correct?
3         MR. MUNDEL:  Objection.  Beyond the scope.
4    A.    As I said, there's no operations at MGI
5  level.  So -- and the current three employees for
6  instance, they operate out of three different parts of
7  the country.
8  BY MR. TEPFER:
9    Q.    And those three parts of the country are
10  Los Angeles, Dallas, and New York?
11    A.    Correct.
12    Q.    Does -- do Match.com employees share office
13  space with employees of other dating platforms?
14         MR. MUNDEL:  Beyond the scope.
15    A.    Generally not, but there could be some
16  employees from other brands, if they are closer to
17  Dallas for instance, especially in this new remote
18  working paradigm that we have, they could have -- they
19  could come to the Dallas office and work, and, if there
20  is somebody who is getting a space out of Match.com's
21  office, then we use the -- that person's brand pays for
22  it, so it gets allocated out, that cost.
23  BY MR. TEPFER:
24    Q.    If the MGI CEO wants to replace the MG LLC
25  CEO does it need approval from anyone at MG LLC to do
                                                    Page 82

1    so?
2         MR. MUNDEL:  I am going to object as beyond
3  the scope and also incomplete hypothetical.
4    A.    As a practical matter, when I was CEO, if I
5  wanted to remove the Match.com CEO, I could do it
6  myself.  It's generally not great practice to just
7  solely do that.  I would talk to them -- I mean, there
8  has to be good reason.  I should discuss it with the
9  board, I should discuss it with other folks and make
10  that decision.  These are not easy decisions to make.
11  BY MR. TEPFER:
12    Q.    And looking at, you know, the general
13  practice between 2013 and the present, in the instance
14  where, you know, MG LLC is assessing its budget, is
15  there a cap beyond which MG LLC has to seek authority
16  from MGI to exceed?
17         MR. MUNDEL:  Object to the form, the
18  hypothetical, incomplete.
19    A.    That is not how we operate.  As I said,
20  once a year, every operating business comes up with
21  their plan, their strategy and their financial plan.
22  They -- we roll it out -- it is rolled up at the MGI
23  level because that is ultimately what gets -- has to --
24  you know, the performance against that plan is what
25  needs to be reported out to the street.
                                                    Page 83

1         If, along the way, one of the operating
2  businesses deviates meaningfully from the -- small
3  changes doesn't make a difference, but if it is
4  meaningful deviance against the plan, then that is
5  something that has to be brought up to the MGI because
6  that's what they have to manage, investors and
7  shareholders, for.
8  BY MR. TEPFER:
9    Q.    And when you say meaningful deviance, what
10  would constitute a meaningful deviance in your eyes?
11    A.    There's no defined thing.  It is more a --
12  you know, what -- let's say somebody came out with an
13  extra $10 million of marketing spend they want to do
14  that wasn't budgeted for.  That is not something that
15  will show up in the earnings beyond the expectation of
16  what the -- even the street expects, and so that is a
17  conversation that will have to happen, whether--
18    Q.    So -- oh, I'm sorry.
19    A.    Whether that's a thing to do or not.
20    Q.    And if for -- if MG -- if the CEO of MG LLC
21  had wanted to, for example, acquire another dating
22  platform as an acquisition, is that something that the
23  MG LLC CEO is obligated to get approval from the MGI
24  CEO for?
25         MR. MUNDEL:  Object as beyond the scope.
                                                    Page 84

1  Incomplete hypothetical.
2         Go ahead.
3    A.    As I said, these operating businesses
4  are -- we call them financial companies, their big job
5  is really to operate the company, the P&L that they are
6  in ownership of.  Mergers and acquisitions -- if they
7  wanted a piece of technology that they are acquiring,
8  then, you know, it does -- certainly they can go do
9  that.  That's not an issue.
10         If it's another large dating player, then
11  it's not the operating company, it will eventually be
12  managed at the MGI level if there is a big
13  mergers/acquisition target transaction that needs to
14  happen.
15  BY MR. TEPFER:
16    Q.    Does MGI offer MG LLC employees stock
17  options?
18         MR. MUNDEL:  Objection.  Beyond the scope.
19         Do you have a topic for that, Reid?
20         MR. TEPFER:  I think topic 1, although --
21         MR. MUNDEL:  Topic 1 says nothing about
22  stock options, so it's not that topic.  Do you have
23  another topic?
24         MR. TEPFER:  Not offhand.  I -- I don't
25  have it in front of me, but --
                                                    Page 85

                                    22 (Pages 82 - 85)

APP 116

1    MR. MUNDEL:  He marked it as Exhibit 1 to
2  the deposition.
3    MR. TEPFER:  Thanks.
4    MR. MUNDEL:  So do you have a topic?
5    MR. TEPFER:  No.  But I'm not going to
6  engage in providing topics for each question.  If you
7  want to make an objection you can go ahead and do so;
8  otherwise we need to go on.
9    MR. MUNDEL:  Yeah, we do object as beyond
10  the scope, but we also make a broader objection which
11  is we've been going a few hours now, and I would say
12  80 percent of the questions are beyond the scope of the
13  noticed topics, which is improper under Rule 30(b)(6).
14  So we are going to need to have the topics -- the
15  questions focused on the topics that are at hand.
16    MR. TEPFER:  We're not going to so limit
17  our questioning.
18    MR. MUNDEL:  Then you are not going to be
19  complying with Rule 30(b)(6).
20    MR. TEPFER:  We disagree.
21    If you wouldn't mind reading the question
22  back?
23    THE REPORTER:  Question:  "Does MGI offer
24  MG LLC employees stock options?"
25    MR. MUNDEL:  Maintain the objection to

Page 86

1  scope.
2    A.    To the best of my knowledge, that -- some
3  employees have the -- are granted equity and there
4  is -- one of the instruments that we have is the MDCH
5  stock, and it is granted, but it's all accounted for in
6  terms of expenses, et cetera, at these operating
7  company -- or wherever the -- at these operating
8  company levels, basically.
9  BY MR. TEPFER:
10    Q.    What about 401(k) plans, does MGI offer MG
11  LLC employees a 401(k) plan?
12    MR. MUNDEL:  I am going to object as beyond
13  the scope of the noticed topics.
14    You can answer in your individual capacity
15  if you know.
16    A.    And, again, this is complicated, because
17  401(k) is probably not applicable to international
18  employees, and so it is -- the 401(k) is, again,
19  administered at the corporate level.  I wouldn't know
20  any more details than that.
21  BY MR. TEPFER:
22    Q.    Are there any other benefits for MG LLC
23  employees that are administered by MGI?
24    MR. MUNDEL:  Object as beyond the scope and
25  to the form.

Page 87

1    A.    Again, the things like insurance is at a
2  corporate level.  I -- I'm sure there's others that I
3  can't think of.
4  BY MR. TEPFER:
5    Q.    And does MGI have the authority to veto MG
6  LLC management decisions?
7    MR. MUNDEL:  I am going to object as to
8  incomplete hypothetical, what management decisions and
9  what folks you are referring to, and beyond the scope
10  of the noticed topics.
11    Go ahead.  You can answer.
12    A.    As I said, the way we operate is we
13  delegate authority to the leaders of these operating
14  businesses and we trust them to -- we hopefully hire
15  the right kind of people and trust them to make
16  decisions related to that operating business and, you
17  know, the tool -- there is no tool for vetoing
18  anything, that's not how we operate.
19    If we generally find a leader to be not
20  making good decisions for the brand, we would fire
21  them.  That is a -- a more commonly used tool, and
22  there's no sort of veto process necessarily.
23  BY MR. TEPFER:
24    Q.    And on the topic of firing, does any other
25  entity aside from MGI have the authority to remove MG

Page 88

1  LLC executives?
2    MR. MUNDEL:  I am going to object.  When
3  you are asking about other entities beyond MGI that's
4  clearly beyond the scope of the noticed topics, and if
5  you are asking about legal authority, I object as
6  calling for a legal conclusion.
7    But go ahead.  You can answer to the extent
8  you know.
9    A.    Yeah, I -- legally, I -- I don't know what
10  who has.  But just the leaders of the business
11  generally are -- generally fall under the Match Group,
12  Inc., CEO's responsibility.
13  BY MR. TEPFER:
14    Q.    Do MGI and MG LLC have any joint bank
15  accounts?
16    MR. MUNDEL:  I am going to object as beyond
17  the scope when you ask about particular bank accounts.
18    You can answer if you know.
19    A.    I don't know all the details of bank
20  accounts, but I would say no.
21  BY MR. TEPFER:
22    Q.    And why would you say no?
23    A.    The only reason I'm saying this is they
24  were trying to explain to me in that one call that I
25  had with the finance folks, bank -- different levels at

Page 89

23 (Pages 86 - 89)

1   which banks' accounts sat, and it didn't -- I don't
2   remember catching anything that said there's a joint
3   bank account. The joint bank account term was not
4   something that I heard.
5       Q.   Are you aware if there are accounts where
6   both MGI and MG LLC employees are signatories?
7       MR. MUNDEL: Object as beyond the scope.
8       Go ahead.
9       A.   I don't know the answer to that.
10  BY MR. TEPFER:
11      Q.   Do you know the payment processor that is
12  used to process charges relating to Match.com?
13      MR. MUNDEL: I am going to -- what topic is
14  that, Reid?
15      MR. TEPFER: I -- I don't want to engage in
16  this. If you have an objection, if you believe it's
17  outside the scope, so state it.
18      MR. MUNDEL: I certainly think it's outside
19  the scope, but if I'm wrong I'd be happy to hear it if
20  there's any topic on payment processing. Is there one?
21      MR. TEPFER: I'm not going to engage in
22  back and forth on that.
23      MR. MUNDEL: We object as beyond the scope
24  of the noticed topics, and also wholly inappropriate
25  given this last hour of questioning.
                                              Page 90

1   BY MR. TEPFER:
2       Q.   You can answer.
3       A.   I don't know what payment processing they
4   are using now. And again, I'm -- I would imagine it
5   depends on the app and the platform. For instance, if
6   it's the iOS app, Apple does it, I would imagine fully.
7   For the other transactions I'm not sure who they use
8   now.
9       Q.   Does MG LLC maintain all the payment
10  processors that are used -- sorry.
11      Does MG LLC maintain all the merchant
12  accounts that are used for the processing of Match.com
13  charges for customers?
14      MR. MUNDEL: I am going to object again,
15  beyond the scope and vague, ill-defined question.
16      You can answer if you know.
17      A.   I haven't the vaguest idea.
18  BY MR. TEPFER:
19      Q.   Does -- do any MGI brands utilize shared
20  merchant accounts?
21      MR. MUNDEL: I am going to object as beyond
22  the scope. You are talking about, I think, things
23  beyond MGI and MGL, and also to the form of the
24  question.
25      Go ahead and answer if you understand it.
                                              Page 91

1       A.   I don't know, but I can't imagine them
2   having -- they're all separate, they run separate,
3   they're on different platforms, completely independent,
4   tech stacks, they -- all the code is written separately
5   for most of these brands so I don't know.
6   BY MR. TEPFER:
7       Q.   Do you know if charges have ever been
8   processed for Match.com customers on a merchant account
9   that was also used to process charges for customers of
10  other dating websites?
11      MR. MUNDEL: I am going to object, again,
12  as well beyond the scope of the noticed topics. If you
13  wanted a topic on that you should have noticed it.
14      You can answer in your individual capacity
15  if you know.
16      A.   I have no idea.
17  BY MR. TEPFER:
18      Q.   So is it accurate that between 2013 and
19  today there have been a number of individuals who had
20  positions simultaneously at MG LLC and MGI?
21      A.   I don't think that's accurate. As I said,
22  there's only three employees of MGI, the CEO, the CFO,
23  and the general counsel, and they generally - generally
24  - don't have any operating roles in the underlying
25  operating companies except in for entering times on to
                                              Page 92

1   special occasions, meaning, let's say they fired the
2   CEO of a brand and they are in the process of hiring a
3   new CEO, for that period of time they could step in and
4   wear an additional hat of being the CEO of that brand.
5   That can happen from time to time. But that's not
6   desired, it's not ideal, and not something we try -- we
7   try to avoid it for sure.
8       Q.   So is it the case that -- am I correct in
9   understanding that between, say, 2013 and the present,
10  if an individual was an executive at MGI, they would
11  not have played a role in the day-to-day operations of
12  Match.com?
13      MR. MUNDEL: I'm just going to object as to
14  the breadth of that question.
15      You can answer if you understand it.
16      A.   An MGI person generally would not have the
17  time to deal with Match.com day to day.
18  BY MR. TEPFER:
19      Q.   Between 2013 and the present, did MGI at
20  any point have a COO?
21      A.   I believe Gary got an additional title,
22  addition to his title, in addition to CFO as -- and COO
23  for a couple of years. I don't know how many years,
24  but he might have had an extension to his thing.
25      Q.   So in the circumstance where an individual
                                              Page 93

24 (Pages 90 - 93)

1  of in-the-weeds topics than other Match Group CEOs had
2  been during the time period between 2013 and the
3  present?
4      A.    Not necessarily.
5      Q.    So this is the type of information that
6  would be provided to any Match Group, Inc., CEO given
7  the significance of the impact on profit and loss; is
8  that correct?
9          MR. MUNDEL:  I am going to object as beyond
10  the scope and vague as to this type of information, and
11  it appears to be a hypothetical that's incomplete, so I
12  object on that ground too.
13      A.    So, again, I don't know what was presented
14  to Greg, I have no memory of it.
15          Again, I don't think Greg would comprehend
16  any of this type of level of detail, so my strong
17  assumption is it -- this was not what was provided.
18  What was told to him is that there is some changes
19  being made which may impact 3.3 million of EBITDA and
20  we'll let you know, and that would have been at the
21  level of conversation.
22          Obviously the operating leaders wanted to
23  have all the information in case somebody asks a
24  question in a meeting, but generally Greg wouldn't know
25  what to do with any of this, he wouldn't know how to

Page 162

1  solve it, how to do any of it.  But he ought to be made
2  aware that the -- already in January they're missing
3  forecasts by 3.3 million.
4  BY MR. TEPFER:
5      Q.    So if it was determined that eliminating
6  the six-month guarantee would cause a significant
7  deviation from the forecast, is that the type of thing
8  that would be brought to the attention of the Match
9  Group, Inc., CEO?
10          MR. MUNDEL:  Objection.  Beyond the scope.
11  Assumes facts and incomplete hypothetical.
12      A.    If you are asking me hypothetically
13  something changes and there's a big deviation, the
14  context by which they report up to MGI is yes, we're
15  going to see a big change, I don't know, millions of
16  dollars of change, usually don't get into a whole lot
17  of details.  The maximum you would know is MG -- it's
18  related to the MG guarantee, and that would be the end
19  of it.
20  BY MR. TEPFER:
21      Q.    Would Mr. Blatt have had authority, when
22  presented with this refund policy, to direct that
23  changes be made to the policy?
24          MR. MUNDEL:  I am going to object as beyond
25  the scope as to authority of Mr. Blatt.  Assuming

Page 163

1  facts.  And inconsistent with the testimony that he was
2  presented with some policy.
3          Go ahead.
4      A.    If I was in his position, the way I would
5  have operated was to tell them look, see what -- you
6  know, do the best -- do the best outcome for both the
7  consumer and the business, and it is what it is.  If it
8  can't be solved, it can't be solved.  But try and see
9  if you can offset in other ways or in other areas, I
10  mean, that is something that comes out of oversight of
11  financials.  Try to meet your plan.  If this is causing
12  a deficit, is there anything else that can drive a
13  little more revenue, maybe spend a little more
14  marketing dollars and drive additional traffic.  That's
15  a level of conversation that can happen.
16          But there is nobody at the Match Group,
17  Inc., level that has enough time or knowledge or
18  understanding to -- of something like MG -- the
19  six-month guarantee or cancellation flow to be able to
20  dictate anything, quite frankly.
21  BY MR. TEPFER:
22      Q.    So I guess my question's slightly
23  different.  For example, would -- you know, I
24  understand your position's that you would not have
25  engaged in that level of micromanagement, I guess is

Page 164

1  what you are saying; is that correct?
2          MR. MUNDEL:  I am going to --
3      A.    It's not micromanagement, it's not our
4  role.  Our role is to oversee financial performance,
5  not all the underlying things that drive financial
6  performance.
7  BY MR. TEPFER:
8      Q.    And so my question is, setting that aside,
9  speaking in terms of the authority of the Match Group,
10  Inc., CEO, would the Match Group, Inc., CEO have had
11  authority to, for example, direct changes concerning
12  the refund policy that he was presented?
13          MR. MUNDEL:  I am going to object as beyond
14  the scope as to authority, I am going to object as
15  asking for a legal conclusion, and I can't tell because
16  of the way the question was formed, it's either a
17  hypothetical or it misstates facts.
18      A.    Here's the thing.  That's not how we
19  operate.  I don't know how -- you know, when you're
20  sitting at such a distance from this kind of level of
21  detail, no good leader should ever dictate making
22  changes to any of this stuff.  It's just not something
23  you should do and nobody ever does.  A good leader
24  certainly wouldn't do that.  That's not how we
25  operated.  I would never do it.  I would be -- and of

Page 165

42 (Pages 162 - 165)

APP 119

1 course, you should ask Greg, but he -- this is not
2 something he would dictate because he doesn't know.
3 BY MR. TEPFER:
4    Q.   So you testified you don't remember this
5 particular meeting?
6    A.   I do not remember this meeting, no.
7    Q.   About how often did you meet with Greg
8 Blatt when he was MGI CEO?
9    A.   This seems to be the -- in the context of
10 the monthly forecasts, so this would be a monthly
11 thing.
12    Q.   Would you meet with him more than once a
13 month?
14    A.   You have to ask me the year because it
15 would depend on what my particular role was at the
16 time.
17    Q.   What role did you meet with him most
18 frequently in?
19    A.   The most I met with him was in 2017 because
20 I had two -- two different -- I was wearing two
21 different hats, if you remember. I was president of
22 Match Group North America and I was also the COO of
23 Tinder, and so he was the CEO of Tinder. So the most
24 interaction I've ever had with Greg Blatt was as the
25 Tinder COO to the Tinder CEO on all topics related to
Page 166

1 keeps coming up again and again that customers complain
2 they cancel and we still auto renew them."
3        Sorry.
4        Do you recall what refund policy situation
5 you are referring to here?
6        MR. MUNDEL:  Objecting as beyond the scope.
7        You can answer in your personal capacity.
8    A.   I don't remember details of any of this,
9 but I can infer, reading from this, it is generally
10 something I would do in that capacity.  If there is a
11 customer complaint, I would have folks investigate,
12 find out if there is a bug or a system problem or there
13 is any confusion in it, and I would have someone do a
14 deeper dive into it.
15 BY MR. TEPFER:
16    Q.   And it's -- is this the refund policy issue
17 that in the prior exhibit, Exhibit 12, was being
18 discussed with Mr. Blatt?
19        MR. MUNDEL:  Object as beyond the scope.
20 Assuming facts, "have a discussion with Mr. Blatt," and
21 also calls for speculation.
22    A.   I don't know for sure but doesn't sound
23 like it.  That sounds like something already done and
24 this is after that -- after that.
25 BY MR. TEPFER:
Page 168

1 Tinder.
2    Q.   So the product department at MG LLC does
3 not report to anyone at MGI; is that correct?
4    A.   There's no product department at MG LLC.
5 There are product department -- the product teams for
6 each operating brand or platform.  So Match.com has a
7 platform team. People Media -- sorry. Match.com has a
8 product team. People Media has a product team. And
9 they report to the GM or CEO of that business.
10        (Marked Deposition Ex. 13)
11        MR. TEPFER:  Let the record reflect I am
12 handing the witness what has been marked Exhibit 13.
13 It has a Bates number on the first page of
14 MATCHFTC543646.  It's a two-page document.
15 BY MR. TEPFER:
16    Q.   And if you could just take a moment and let
17 me know if this is something that you have reviewed.
18    A.   I believe I have reviewed this, some
19 version of this - maybe there's a few other strings in
20 it - as part of the prep.
21    Q.   Do you recall this discussion back in 2016?
22    A.   I do not.
23    Q.   So in your initial email on the second page
24 at the start of the thread, you state that "We've been
25 discussing the refund policy situation and 1 thing
Page 167

1    Q.   But you're unsure about that?
2    A.   Yeah, I don't remember much from that time.
3    Q.   Do you recall a recurring issue relating to
4 customers complaining that they cancel but still being
5 auto renewed by Match.com?
6        MR. MUNDEL:  I am going to object as beyond
7 the scope.
8        You can answer in your personal capacity.
9    A.   I have very little overall memory, not very
10 many specifics, I -- of getting such complaints every
11 once in a while.  Most of the time I remember it would
12 end up becoming no, they actually did -- you know,
13 never tried to cancel and they just complained that
14 they canceled, that was something I remember hearing
15 back then after we investigated every -- every one of
16 these complaints, but we would always -- I mean, if
17 ever we saw something that felt was an increased
18 complaint, we would investigate, have the teams look
19 into it, because there's a thing you have to understand
20 about our business.  There is two main ways that our
21 business operates, and it's been true from the
22 beginning to -- the history of this category up to
23 today.
24        The first is word of mouth.  Our entire
25 category has grown by people having success and saying
Page 169

43 (Pages 166 - 169)

1  good things and asking others to join these platforms.
2  So it's really important that we don't piss off
3  customers.
4        And the second big thing, the way our
5  business works, it's an episodic turn business and more
6  than half of our customers are returning customers.
7  They come back and they pay.  So, you know, it would
8  never make sense to be shortsighted about pissing them
9  off on their way.
10       So, by far, here's what I know:  Thousands
11 and thousands of people successfully canceled every
12 day, but we would get a handful of complaints, we would
13 investigate every one of those complaints.  Most of the
14 complaints were people had just forgotten to cancel,
15 but they kind of accused the company that oh, no, no,
16 no, I tried to cancel and it didn't stick, as often
17 happens, I -- I have done that to my WiFi subscription
18 on American Airlines, too, and then -- but most of the
19 time we would -- I mean, I -- this is not unusual for
20 me to say, I've heard a few people tell me this, please
21 make sure there is not a systemic issue here and
22 there's no confusion here.  And people would go, they
23 would look at it, and they would make the determination
24 no, it's largely working the way it should, it's not
25 confusing to most users, it is capturing the

*Page 170*

1  information that we absolutely need, and, you know,
2  either there is an opportunity for improvement or not,
3  but that is very standard to how we would operate.
4  BY MR. TEPFER:
5       Q.   In -- you referenced some investigation
6  that was being done concerning this type of issue; is
7  that correct?
8            MR. MUNDEL:  Misstates the testimony.
9       A.   That's not what I said.  I said, if you
10 look at -- I'm going by what's written here.  "Can
11 you" -- "can somebody take a closer look at it and see
12 what might be going on?"
13           So that is my direction to the product and
14 analytics team, to go dig into this and see if there is
15 either a systemic issue or is there some -- something
16 else going on here.
17 BY MR. TEPFER:
18      Q.   Did they report back to you on that?
19      A.   They probably would have in some form.  I
20 don't remember this particular instance.  But in that
21 capacity, when I would have asked them, they would
22 have, yes.
23      Q.   And -- but you don't recall the specific
24 results of this particular request where you asked them
25 to look into this issue?

*Page 171*

1       A.   Not the -- I have no memory of the
2  specifics of any of this, but as from what I remember
3  of how we operated, yes, somebody would come back to me
4  and say this is what we found.
5       Q.   And this recurring issue here, is that
6  something that you would report to Match Group, Inc.?
7            MR. MUNDEL:  I am going to object as to,
8  when you say recurring issue, what you are referring
9  to.
10           MR. TEPFER:  The one thing keeps coming up
11 again and again, is what I'm referring to.
12      A.   This is not something I would ever find it
13 necessary to report up to Match Group, Inc.
14 BY MR. TEPFER:
15      Q.   If making changes to the cancellation flow
16 were to -- were determined to significantly affect the
17 profits and loss that we've been discussing, is that
18 the type of thing that you would have reported to the
19 Match Group, Inc., CEO?
20           MR. MUNDEL:  Object as time period,
21 incomplete hypothetical.  Are you asking hypothetically
22 or if that ever occurred?
23           MR. TEPFER:  Well, I'm just asking if
24 that's the type of thing, you know, at this time
25 period.

*Page 172*

1            MR. MUNDEL:  So hypothetically if it
2  happened would it have been reported?
3            MR. TEPFER:  Yeah.
4            MR. MUNDEL:  I object to incomplete
5  hypothetical, beyond the scope.
6       A.   Here's how it would work:  If -- if
7  somebody came back, let's say, after this
8  hypothetically and say, you know, we're going to have
9  to change something, it may have some financial impact,
10 generally all the time that I was running, and almost I
11 can -- I can speak on behalf of most of the people
12 culturally that we had running these businesses who
13 always wanted to do right by the customer would say,
14 well, if it feels like the right thing to do, we have
15 to do this.  If it is a small hit, would never, ever go
16 up in any -- it wouldn't get -- it would get absorbed.
17           But most of the time, I would have
18 addressed it saying, okay, let's say if it's a
19 million-dollar hit, let's see what -- where we can get
20 another million-dollar positive upside that we can
21 accelerate or something in the road map, or we can
22 spend up in marketing, and it wouldn't change our
23 forecast and there was no reason for it to ever go up
24 to Match Group, Inc.
25 BY MR. TEPFER:

*Page 173*

44 (Pages 170 - 173)

1    Q.    What --
2    A.    And --
3    Q.    Sorry.
4    A.    And if it ended up in all of our
5    investigation in that particular narrow period of time
6    we were still going to see a meaningful multi-million
7    impact to forecast, then we would tell them look, we'll
8    get a missed forecast, some of the big -- you don't
9    have to know all of the details, but there are some
10   changes we're thinking that we're making for the
11   benefit of a -- of customer experience, which is the
12   right thing to do so we're going to have to bring it
13   down.  That's the normal operational conversations that
14   would happen.
15   Q.    You referenced a road map.  What's that?
16   A.    There is a thing called product roadmap
17   which is maintained by the product team at each
18   operating platform, our brand -- or business.  It is
19   the development work that is planned for some future
20   period of time, and it's completely different based on
21   the particular platform.  They have -- every
22   product/platform brand has its own product roadmap and
23   they revise it, they change it, they do their thing
24   with it at various periods.
25   Q.    And later in the thread it appears this

Page 174

1    email went to an individual named Poossenjeet
2    Bhattacharya.  Do you know Mr. Bhattacharya?
3    A.    I remember Poossen.  I think he was on the
4    analytics team for Match.com.
5    Q.    Are you aware -- so Melissa states in
6    the -- at the bottom of the first page, "I've looped in
7    Kris -- we've previously advocated to make the cancel
8    process simpler for our members to help prevent this
9    type of complaint."
10       Are you aware of any advocacy for changes
11   to the cancellation mechanism at around this time in
12   2016?
13       MR. MUNDEL:  I am going to object beyond
14   the scope, obviously, of the topics, right?  This
15   isn't -- you are not asking her on behalf of MGI, are
16   you?
17       MR. TEPFER:  I'm asking if she's aware of
18   this, and then I would like to know if this advocacy
19   was to anyone at Match Group, Inc.  I think that's
20   wholly appropriate.
21       MR. MUNDEL:  You are asking her for
22   awareness --
23       MR. TEPFER:  This particular question, yes,
24   I'm just asking if she recalls this.
25       MR. MUNDEL:  Personally.

Page 175

1        So do you personally recall any advocacy
2    about the cancel process?
3    A.    I don't remember any of the specifics of
4    this.
5    BY MR. TEPFER:
6    Q.    And this particular proposal was never
7    provided to Match Group, Inc.?
8        MR. MUNDEL:  I would object as to what you
9    are referring to when you say "this particular
10   proposal."  And then I am also going to object as
11   beyond the scope.
12   A.    I am assuming you are referring to this
13   paragraph by Kris?
14   BY MR. TEPFER:
15   Q.    No, sorry.  I'm referring to this last
16   sentence here on page 1.
17   A.    I don't know what she's talking about.  You
18   have to show me what this is.  I don't remember --
19   Q.    Sure.
20   A.    -- I don't even know that I -- I remembered
21   at that time what she was talking about.
22   Q.    Okay.
23   A.    Which is why I'm assuming Kris writes that
24   whole thing there.
25   Q.    And do you remember this email from

Page 176

1    Ms. Auderer?
2    A.    I do not remember this email from back in
3    the day, but I can see it now.
4    Q.    Do you recall forwarding this email to
5    Ms. Lam and Sushil Sharma?
6    A.    I don't remember it, but it would be a very
7    logical thing for me to do because they were on the
8    product team.  And I would say, look, I would tell them
9    to go see if there was any merit to what Kris was
10   asking.
11       Oh, and I do want to say none of this would
12   ever go up to MGI.  That was the question I didn't
13   answer.
14       (Marked Deposition Ex. 14)
15       MR. TEPFER:  I am now handing the witness
16   what's been marked -- well, I grabbed the wrong one.
17   Sorry.
18       Okay.  I am now handing the witness what's
19   been marked Exhibit 14, and it's a one-page document,
20   MATCHFTC543542.
21   BY MR. TEPFER:
22   Q.    If you will just take a moment.
23   A.    It sounds like it's all the same.  Do you
24   have the full thread so I know exactly?  Because I
25   don't remember the context.  So if you give me the full

Page 177

45 (Pages 174 - 177)

1      A.    I can't remember this.  I -- I'm not sure.
2  I don't remember.
3      Q.    What was Mr. Blatt's position at this time?
4      A.    This is what, January 2017?  He was MGI's
5  CEO as well as Tinder CEO.
6      Q.    And did Ms. Ginsberg have a position at MGI
7  at this time?
8      A.    In 2017?  No.
9      Q.    And what about Ayesha Gilard --
10      A.    No.  Gilarde.
11      Q.    I'm sorry.  Gilarde.
12            Ayesha Gilarde, did she have a position at
13  MGI at that time?
14      A.    Where are you seeing --
15      Q.    I'm sorry.  I'm on the very last page of
16  the document and I'm looking at the email addresses
17  here.
18      A.    Sorry.  Let me read this.
19      Q.    Sure.
20      A.    Okay.  No, Ayesha was Match.com CMO.
21      Q.    And what does CMO stand for?
22      A.    Chief marketing officer.
23      Q.    And did Mr. Thombre have an MGI position at
24  this time?
25      A.    I don't believe -- I'm pretty sure no.

Page 238

1      Q.    Ms. Ginsberg appears to have provided
2  something called Missed Connections scripts in this
3  first email.  Do you see that there?
4      A.    I do.
5      Q.    Do you know what Missed Connection scripts
6  are?
7            MR. MUNDEL:  Let me just ask.  Again, this
8  wasn't a topic for 30(b)(6) so are you asking her
9  whether MGI knows or whether she personally knows?
10            MR. TEPFER:  I'm just wanting to know about
11  Match Group Inc.'s role in Match.com's advertising, and
12  this appears to be Match Group Inc.'s CEO reviewing
13  scripts relating to Match.com advertising.
14            MR. MUNDEL:  So what's your question?  Does
15  MGI or does she know something?
16  BY MR. TEPFER:
17      Q.    Does MGI know what -- what these revised
18  Missed Connection scripts are?
19      A.    So generally the question is, does MGI do
20  reviews of marketing scripts?  The answer is no.  I
21  never once reviewed any brand's marketing campaign
22  script.
23            Is Greg looking at this?  This is one of
24  those exception scenarios where, because Greg is a
25  screenwriter, he has -- he's -- he sort of really likes

Page 239

1  that part.  Mandy is tapping into his -- his expertise
2  and making sure that she gets another point of view.
3            Now, Greg has -- doesn't have to, and
4  oftentimes I remember she would not hear from him and
5  they're like, okay, we're going to ship this out
6  without him chiming in on anything.  He doesn't have
7  to.
8            But because it was his particular area of
9  expertise and interest, Mandy specifically would go to
10  Greg on specifically the marketing, especially new --
11  new scripts.
12      Q.    Would Ms. Ginsberg regularly go to Greg on
13  marketing scripts like that?
14      A.    This doesn't happen often.  Has it
15  happened?  This might be the only campaign in -- we
16  might have done or maybe we did another one.  I can't
17  remember.  But it would have happened like once a year
18  kind of thing.
19      Q.    Do you recall if Mr. -- or did Mr. Blatt
20  provide feedback concerning these Missed Connection
21  scripts?
22            MR. MUNDEL:  Beyond the scope.
23            You can answer if you remember.
24      A.    I don't remember any of this specifics.  I
25  hope he did.  But I do remember the team getting

Page 240

1  frustrated that they would hear from him, he'd say yes,
2  I want to see it and then he won't respond, and they
3  keep bugging him.  Again, can you -- we're on a
4  deadline, can you do it, and then sometimes he would
5  and sometimes he's, like, just go ahead and I don't
6  have time to look through this.
7  BY MR. TEPFER:
8      Q.    So was it the case that Mr. Blatt was more
9  involved in the weeds, so to speak, concerning
10  Match.com advertising?
11            MR. MUNDEL:  I am going to object as to
12  scope, time period, and also vagueness as to "in the
13  weeds."
14      A.    Here's what you should know:  A new
15  marketing campaign is not in the weeds necessarily,
16  first of all.  Actually the way a guarantee or a rule
17  or a cancellation flow, et cetera, is, but generally
18  speaking, a Match Group, Inc., CEO does not get
19  involved because there are many brands doing many
20  different marketing campaigns over time.
21            There's a bit of history here.  Greg used
22  to run Match.com back in 2009 and so he has a
23  particular affinity for this brand, and he thinks he is
24  an expert at screenwriting, too, and, again, Mandy
25  valued his opinion.

Page 241

61 (Pages 238 - 241)

APP 123

1      My guess is whoever was running Match
2   before Mandy probably didn't go to him and that was
3   okay because it's not expected, but Mandy, specifically
4   for new marketing campaigns, did go to Greg from an
5   advisory -- as an advisor.  And honestly Greg didn't
6   have time in 2017, which is why often he would just --
7   he's, like, just go ahead, I don't have time to look at
8   it or sometimes he would just look at it sometimes and
9   give some high level opinion about it, but that was it.
10  BY MR. TEPFER:
11     Q.    And so you stated that Mr. Blatt had a
12  particular affinity for Match.com?
13     A.    Yes, because it's our first brand and he
14  was very close to it many years ago.
15     Q.    Did this result in Mr. Blatt paying
16  particular attention to Match.com over the other brands
17  during his time as Match Group Inc.'s CEO?
18         MR. MUNDEL:  Object as beyond the scope.
19         Go ahead.
20     A.    No, because he had no time.  He was also
21  the Tinder CEO in 2017 and that's where he was spending
22  most of his time.  In fact, he was not spending much
23  time on the non-Tinder portfolio.
24  BY MR. TEPFER:
25     Q.    Does Match Group, Inc., maintain any data

Page 242

1   flow?
2      Q.    For example, summaries of dropout rates at
3   particular pages?
4      A.    No.
5      Q.    Does Match Group, Inc., have access to such
6   data?
7      A.    Not directly.  They can certainly ask
8   someone if they were interested in it, curious about
9   it, but not directly.
10     Q.    And if a Match Group, Inc., employee was
11  interested to get that data, is there a particular
12  person at Match Group, LLC, they would contact
13  regarding that?
14         MR. MUNDEL:  Beyond the scope.
15         Go ahead.
16     A.    They would go to the GM or CEO of Match.com
17  and then that person would then go to whoever has
18  the -- some -- whoever's on the analytics side who has
19  the data, and that's how that data would flow.
20  BY MR. TEPFER:
21     Q.    Does Match Group, Inc., have knowledge
22  concerning where that data is stored?
23     A.    Absolutely not.
24     Q.    Or the format of that data?
25     A.    No way.  It's not humanly possible to know.

Page 244

1   relating to Match.com's online cancellation flow?
2      A.    Match Group, Inc., does not maintain any
3   data of any kind.
4      Q.    Has Match Group employees ever reviewed
5   such data?
6          MR. MUNDEL:  Beyond the scope.
7          Go ahead.
8      A.    What data?
9   BY MR. TEPFER:
10     Q.    Has Match Group employees ever reviewed
11  data relating to the online cancellation flow?
12         MR. MUNDEL:  Let me just be clear, Reid.
13  You know this is designated on a different top, right?
14         MR. TEPFER:  I thought 32 was the separate
15  topic.  I thought maybe it was 31.
16         MR. MUNDEL:  I'm sorry.
17         Go ahead.
18         MR. TEPFER:  No worries.
19         MR. MUNDEL:  You can ask the question
20  again.
21  BY MR. TEPFER:
22     Q.    Has Match Group, Inc. -- have Match Group,
23  Inc., employees ever reviewed data relating to
24  Match.com's online cancellation flow?
25     A.    What is data related to online cancellation

Page 243

1      Q.    Did Match Group, Inc., ever create
2   something called The Happiness Project?
3          MR. MUNDEL:  Beyond the scope.
4          You can answer if you know.
5      A.    Match Group, Inc., did not create anything.
6   And I don't remember all the details of it, but I think
7   Match.com had a happiness project at some point, and I
8   can't remember timing or specifics.
9          MR. TEPFER:  Do you mind if we take a short
10  break?
11         MR. MUNDEL:  Sure.
12         (Break from 4:51 p.m. until 5:12 p.m.)
13         MR. MUNDEL:  Ready to go back on?
14         THE REPORTER:  Back on.
15         MR. TEPFER:  Sure.  Pass the witness.
16         MR. MUNDEL:  Okay.  We just have a few
17  questions.
18         EXAMINATION
19  BY MR. MUNDEL:
20     Q.    Ms. Dubey, I want to talk a bit more about
21  Match Group, Inc., and Match Group, LLC, as well as
22  Match.com.
23         Let me first start with this question.  Did
24  Match Group, Inc., have any involvement with
25  Match.com's cancellation flow?

Page 245

62 (Pages 242 - 245)

**Page 246**

1   A.   No.

2   Q.   Did Match Group, Inc., have any involvement

3 with Match.com's guarantee?

4   A.   No.

5   Q.   Did Match Group, Inc., have any involvement

6 with Match.com's chargeback policy?

7   A.   No.

8   Q.   Why did Match Group, Inc., not have any

9 involvement in those three items?

10   A.   These are very detailed in-the-weeds level

11 of things that our operating businesses would know more

12 about and would make decisions around.

13   Q.   So who made the decisions about Match.com

14 cancel flow?

15   A.   It would be the Match.com product team, and

16 most likely would be at the product team, but they

17 could consult and get sort of the involvement of the GM

18 or CEO of Match.com.

19   Q.   And what about the guarantee, who made

20 decisions about Match.com's guarantee?

21   MR. TEPFER:  Objection, vague as to time.

22 BY MR. MUNDEL:

23   Q.   Go ahead.

24   A.   It -- it would -- whenever it was done, it

25 would be the Match.com marketing team primarily working

**Page 247**

1 with the product team, if there is a product component

2 to it, and with the final approval of the GM or CEO of

3 Match.com.

4   Q.   And who made the decisions about

5 Match.com's chargeback policy?

6   MR. TEPFER:  Objection.  Vague.

7   A.   Again, it would be the product team,

8 Match.com product team that could consult with other

9 teams within Match.com, for instance, the Customer Care

10 team, and it would be -- the highest it would go up to

11 is the GM or CEO of Match.com.

12 BY MR. MUNDEL:

13   Q.   Now, it's been alleged in this case that

14 Match.com's cancellation flow is not simple.  How do

15 you respond to that allegation?

16   A.   For anybody that's ever tried to build a

17 consumer business, especially a consumer digital

18 business, you have to know that you design for the most

19 optimum user experience and -- otherwise, users won't

20 use it, and the cancellation -- and that -- that's

21 universally true for every part of the experience, of

22 the site experience.

23   It's particularly true for the cancellation

24 flow because businesses like Match.com have two primary

25 ways, things about them?  One, their main avenue for

**Page 248**

1 growth and consumer adoption for that matter is word of

2 mouth.  So, somebody comes, has a good experience,

3 meets someone, goes and tells somebody else to join.

4 That has been the driving force of this category

5 creation in some ways.  I mean, people were not online

6 dating 25 years ago.

7   And the second big reason for this is more

8 than half of our business comes from returning users.

9 So, not only does it conflate with our fundamental

10 pieces and philosophies and principle of being consumer

11 friendly, which is something we -- we as in me when I

12 was in operating roles at Match.com or, quite frankly,

13 any executive that runs these various businesses

14 understands and tries to set the tone, but also it

15 doesn't make business sense.  Why would you want to

16 piss off your consumers on their way out, if more than

17 half of your business is by returning users?  So it

18 just would never make sense to do.

19   Q.   And while you were working at Match.com

20 were customers able to effectively cancel online?

21   MR. TEPFER:  Objection.  Leading.

22   A.   We had everyday thousands and thousands of

23 users successfully cancel their subscription.  Very,

24 very small handful of people would call in to complain.

25 A lot of times -- and we generally took every complaint

**Page 249**

1 seriously.  The Customer Care person dealing with it

2 would do the first level of investigation, oftentimes

3 it would be, you know, they had just forgotten, that

4 they sort of allege that they had canceled and we

5 forgot, we didn't take -- you know, it didn't stick,

6 which happens in the consumer world quite a bit.

7   But, you know, if there was ever any kind

8 of increase or anything coming, from time to time we

9 would have appropriate people -- we as in when I was in

10 the Match.com operating role -- we would have the

11 relevant teams, the product, the engineering teams, the

12 data analytics team, go investigate and make sure that

13 we haven't produced a systematic bug that was causing

14 problems or there wasn't something really that needed

15 to be changed.  And our teams -- again, I'm speaking

16 from experience at the times when I was directly

17 responsible for Match.com product -- we were always

18 solving for optimizing the experience for the largest

19 number of consumers.

20 BY MR. MUNDEL:

21   Q.   And while you were working on Match.com and

22 later Match Group, Inc., did you ever direct anybody to

23 make Match.com's cancellation flow more complicated?

24   A.   Never.  And as I said, that would be a very

25 dumb business decision.

63 (Pages 246 - 249)

1    Q.    And did you ever hear anyone else at the
2  company suggest that they should make the Match.com
3  cancellation flow more complicated?
4        MR. TEPFER:  Objection.  Leading.
5    A.    Never.
6  BY MR. MUNDEL:
7    Q.    If someone had proposed making the
8  Match.com cancellation flow more complicated, how would
9  you respond?
10   A.    As I said, it would -- first of all, it
11 goes against our fundamental principle of consumer
12 friendly applications, are the only way you drive
13 consumer business growth.
14       But, again, as I mentioned, those two
15 reasons, word of mouth and repeat customers, it would
16 be a dumb decision, dumb thing to do long-term for the
17 brand.
18   Q.    Now, have you heard of the phrase "tone
19 from the top"?
20   A.    Yes.
21   Q.    And what type of tone from the top did you
22 try to set, if any, while you were the CEO of Match
23 Group, Inc.?
24   A.    Both as in my -- during my tenure at Match
25 Group, Inc., and the decade-plus experience in various

Page 250

1  operating roles within the various brands, I took a lot
2  of pride in working for a mission-driven company.  We
3  woke up every day, every morning with a passion, and
4  mission to connect people, to find dates,
5  relationships, marriages.  It's the -- the outcome,
6  this ultimate outcome of connecting people was the
7  reason we did anything, and so to be -- quite frankly,
8  I'm super offended by many of the questions from the
9  day to even insinuate that we would intentionally try
10 to mislead the customer, consumer in any way.  I mean,
11 that is just so far from everything that I have spent
12 my entire -- my last 16-plus years running these
13 businesses in many different roles and capacities with
14 the utmost integrity, but most importantly to build
15 valuable consumer-facing products.
16       I hope I never have to sit and defend this
17 again, but I will say this, we -- when I started back
18 in 2006, only 3 percent of marriages happened online.
19 Today, it's close to 50 percent and that kind of
20 category -- and Match.com started it all, and to think
21 that you would have that level of consumer acceptance
22 of a brand-new way of doing something that's so
23 personal to everyone, which is meeting someone for the
24 rest of your life, that's just so preposterous I can't
25 even -- I'm sorry, I'm a little -- at the end of the

Page 251

1  day it -- it's -- it's insulting, quite frankly.
2  BY MR. MUNDEL:
3    Q.    Well, thank you for that, Ms. Dubey.
4        Let me just ask a few smaller points.
5  the Match Group North America president I think you
6  testified earlier that you were technically getting a
7  payroll stub from Match Group, LLC.  Do you recall
8  that at that time?
9    A.    Yes.
10   Q.    And who was actually paying for your salary
11 though at that time?
12   A.    So the way that worked for me, I think the
13 paychecks were signed by Match Group, LLC, but my cost,
14 my salary cost would get allocated to the business
15 where I spent time.  And at that time I was spending --
16 that particular year I was spending time on four
17 businesses, so my time and costs would get allocated to
18 those four businesses.
19   Q.    And during your testimony you also
20 mentioned that Match Group, Inc., has the right to
21 replace leaders of the operating brands.  Who are the
22 leaders, what positions were you referring to?
23   A.    It's generally the CEO or the GM of those
24 operating businesses.
25   Q.    And you also mentioned that sometimes in

Page 252

1  your role when you were the Match Group, Inc., CEO
2  folks would come to you and seek advice.  Do you
3  remember that testimony?
4    A.    Yes.  Yes.
5    Q.    And when they would seek your advice about
6  topics, did they do so in your formal CEO capacity or
7  was it something else?
8    A.    Oh, it was not at all because -- in my
9  formal Match Group, Inc., CEO capacity.  Most of the
10 time when I was asked for advice and to consult, it was
11 because of my institutional knowledge about this
12 category and this business and related to my expertise,
13 and often, almost every single time I would try to
14 qualify it, saying, look, this is -- back then we tried
15 this, this is what worked, this didn't work, maybe you
16 should think about it this way.  But, quite frankly,
17 I'm no longer close enough to what consumers are doing
18 today, or how people are using these platforms so you
19 should take what you can from this, but you have to
20 apply it based on your current knowledge and
21 understanding of the platforms as they exist today.
22 Because I had, by then, been too distanced and far
23 removed.
24   Q.    Based on that, when you gave this advice,
25 did you expect that it would be followed?

Page 253

64 (Pages 250 - 253)

APP 126

1    A.   Oh, no, I would, in fact, hope that nobody
2  ever took them literally and followed them.  I hope it
3  would inspire new ideas, it would maybe, you know,
4  motivate somebody to look at something they had perhaps
5  forgotten to look at or consider.  But no, it would be
6  the wrong thing to do.  I wasn't that good that I could
7  actually give specifics that they then could go and
8  implement.
9    Q.   Now, you also mentioned earlier that you
10 thought Match Group, Inc., was created in 2015, around
11 the time of the IPO; is that correct?
12   A.   You know, there was a -- what I'm -- I'm
13 not remembering exactly is at what point -- there was
14 definitely a structure akin to Match Group, Inc.,
15 prior, and there was a point in time when the name
16 changed, and I can't quite remember exactly when that
17 happened.
18   Q.   You also testified about an entity called
19 Match Group Apps LLC that counsel for the FTC showed
20 you on a document.  Do you recall that?
21   A.   I do.
22   Q.   And does Match Group Apps LLC have -- own
23 or run Match.com?
24   A.   You know, this is one of those guesses I
25 shouldn't have made because this is the first time I

Page 254

1              CHANGES AND SIGNATURE
2  WITNESS: SHARMISTHA DUBEY as 30(b)(6) Representative of
3  Match Group, Inc.
4  DATE: March 3, 2023
5  Page/Line   Change        Reason
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25   Job No. TX5651555

Page 256

1  actually saw that name and I just -- based on the name
2  I made an assumption.
3            But it turns out no, Match Group, LLC, owns
4  Match.com.
5            MR. MUNDEL:  Thank you.  Nothing further.
6            MR. TEPFER:  I don't have any questions for
7  re-direct.
8            I assume you'd like to read the transcript
9  and --
10           MR. MUNDEL:  Yes.
11           MR. MUNDEL:  Let's go off the record.
12           (Time noted: 5:26 p.m.)
13                 -o0o-
14
15
16
17
18
19
20
21
22
23
24
25

Page 255

1  _____
2       I, SHARMISTHA DUBEY as 30(b)(6)
3  Representative of Match Group, Inc., have read the
4  foregoing deposition and hereby affix my signature that
5  same is true and correct, except as noted above.
6
7            _____
8            SHARMISTHA DUBEY as 30(b)(6)
   Representative of Match Group, Inc.
9
10 STATE OF _____)
11 COUNTY OF _____)
12
13       Before me _____ on this day
14 personally appeared SHARMISTHA DUBEY as 30(b)(6)
15 Representative of Match Group, Inc., known to me (or
16 proved to me on the oath of _____ or
17 through _____ (description of identity card
18 or other document)) to be the person whose name is
19 subscribed to the foregoing instrument and acknowledged
20 to me that he executed the same for the purposes and
21 consideration therein expressed.
22       Given under my hand and seal of office this
23 _____ day of _____, _____.
24
25            _____
            Notary Public in and for the

Page 257

65 (Pages 254 - 257)

| | State of _____ | | Reid Tepfer - 05:55:21 |
|---|---|---|---|

**Page 258**

1  State of _____

25  Job No. TX5651555

Page 258

---

1  Reid Tepfer - 05:55:21
2  Sarah Zuckerman - 00:00:00
3  Benjamin M. Mundel - 00:17:35
4  Chelsea Priest - 00:00:00
5  I further certify that I am neither counsel
6  for, related to, nor employed by any of the parties or
7  attorneys in the action in which this proceeding was
8  taken;
9  Further, I am not a relative or employee of
10  any attorney of record, nor am I financially or
11  otherwise interested in the outcome of the action.
12  Subscribed and sworn to on this date:
13  March 17, 2023.
14
15
16
17
18
19
20
21
   Joseph D. Hendrick, CSR #947
22  Expiration Date: 04/30/2023
   Notary Comm. Exp. 01/13/23
23  Veritext Legal Solutions
   Firm Registration No. 571
24  300 Throckmorton Street, Ste. 1600
   Fort Worth, TX  76102
25  Telephone (800) 336-4000

Page 260

---

1  REPORTER'S CERTIFICATION
2  DEPOSITION OF SHARMISTHA DUBEY as 30(b)(6)
3  Representative of Match Group, Inc.
4  March 3, 2023
5  I, Joseph D. Hendrick, Notary Public and
6  Certified Shorthand Reporter in the State of Texas,
7  hereby certify to the following:
8  That the Witness, SHARMISTHA DUBEY as
9  30(b)(6) Representative of Match Group, Inc., was duly
10  sworn by the officer and that the transcript of the
11  oral deposition is a true record of the testimony given
12  by the witness;
13  I further certify that pursuant to FRCP
14  Rule 30(f)(1) the signature of the deponent:
15  __X__ was requested by the deponent or
16  a party before the completion of the deposition and is
17  to be returned within 30 days from date of receipt of
18  the transcript;
19  _____ was not requested by the
20  deponent or a party before the completion of the
21  deposition;
22  I further certify that the amount of time
23  used by each party is as follows:
24  //
25  //

Page 259

---

1  Benjamin M. Mundel
2  bmundel@sidley.com
3  March 17, 2023
4  RE:   Federal Trade Commision v. Match Group, Inc., Et Al.
5  3/3/2023, Sharmistha Dubey 30(b)(6) (#5651555)
6  The above-referenced transcript is available for
7  review.
8  Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12  The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  errata-tx@veritext.com.
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19  If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22  Yours,
23  Veritext Legal Solutions
24
25

Page 261

---

66 (Pages 258 - 261)

# EXHIBIT H

```
 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF TEXAS
 2                          DALLAS DIVISION
 3       FEDERAL TRADE COMMISSION    )
                                     )
 4          Plaintiff,               )
                                     )
 5       v.                          ) Case No.
                                     ) 3:19-cv-02281-K
 6       MATCH GROUP, INC., a        )
         corporation, and MATCH      )
 7       GROUP, LLC, formerly        )
         known as MATCH.COM, LLC,    )
 8       a limited liability         )
         company,                    )
 9                                   )
            Defendants.              )
10
11       ****************************************************
12                        ORAL DEPOSITION OF
13                           ADRIAN ONG
14                         MARCH 21, 2023
15       ****************************************************
16          ORAL DEPOSITION OF ADRIAN ONG, produced as a
17       witness at the instance of the Plaintiff, and duly
18       sworn, was taken in the above-styled and numbered
19       cause on the 21st day of March, 2023, from 10:08 a.m.
20       to  7:45 p.m., before Julie C. Brandt, RMR, CRR, and
21       CSR in and for the State of Texas, reported by machine
22       shorthand at Sidley Austin, LLP, 2021 McKinney Avenue,
23       Suite 2000, Dallas, Texas, pursuant to the Federal Rules
24       of Civil Procedure and the provisions stated on the
25       record or attached hereto.

                                                     Page 1
```

1    back to slide 5 in the second paragraph?
2        A.   Sorry, in the second paragraph?
3        Q.   Of his response.
4        A.   I'm sorry, he says what?  Oh, I'd get rid of
5    the --
6        Q.   Is that correct?
7        A.   Yes, that's what he says.
8        Q.   And then he goes on to make multiple other
9    changes and suggestions for your presentation?
10            MR. MUNDEL:  Form.
11       Q.   (BY MS. HILLIARD)  Is that correct?
12       A.   I mean, the success stats were just moved to a
13   different slide.
14       Q.   Is that the only change that he made in this
15   email, or did he make other changes as well?
16            Mr. Ong, I'll rephrase the question.
17       A.   Yeah.
18       Q.   When you sent your presentation to Mr. Blatt,
19   did Mr. Blatt suggest several changes to your
20   presentation?
21       A.   Yes.
22       Q.   And did you implement those changes?
23       A.   I don't recall what changes I actually ended
24   up making.
25       Q.   Was it currently -- was it typically your

Page 98

1    practice to submit your draft to the CEO and then reject
2    his suggested changes?
3            MR. MUNDEL:  Object to the form.
4        A.   I mean, I have -- I have provided feedback
5    that goes against what a CEO may suggest.
6        Q.   (BY MS. HILLIARD)  Okay.  And in this email
7    chain, did you provide any feedback that indicated that
8    you were going against the suggested changes?
9        A.   Not in this email.
10       Q.   In this email, didn't you say absolutely, I'm
11   working on it?
12       A.   To the question of whether or not I got it, I
13   got the email.
14       Q.   And his response was, when can I expect
15   something?
16       A.   Yes.
17       Q.   Is that correct?
18       A.   Yes.
19       Q.   And would you have responded and actually sent
20   it back to him?
21       A.   I'm sure I sent him something.  I don't -- I
22   mean, I can't see what I sent.  So --
23       Q.   Thank you.
24            MS. HILLIARD:  I am going to take a break
25   really quickly.

Page 99

1            (Break from 12:28 p.m. to 1:23 p.m.)
2        Q.   (BY MS. HILLIARD)  Okay.  Mr. Ong, we are back
3    on the record.  It is 1:23 p.m.  And I am going to show
4    you an exhibit that has been marked as No. 3.
5            (Exhibit 3 marked.)
6        Q.   (BY MS. HILLIARD)  This exhibit starts with
7    someone named Kris Auderer.  It is Bates number 680660.
8    It's a two-page email string.  Can you take a moment to
9    review this.
10           All right.  Mr. Ong, this exhibit starts with
11   someone named Kris Auderer, and she appears to be
12   emailing a PowerPoint presentation to you and some other
13   people on May the 17th, 2016.  Correct?
14       A.   Yes.
15       Q.   Okay.  Who is Kris Auderer?
16       A.   She was -- she held different roles, but I
17   think -- well, it says here at the time she was director
18   of customer care operations and projects.
19       Q.   For what company?
20       A.   It says here Match and People Media.
21       Q.   And at that point did you have oversight over
22   the customer care department?
23       A.   It's unclear.  The only reason why -- I'm not
24   sure.
25       Q.   Did Ms. Auderer report to you at the time that

Page 100

1    you did have that oversight?
2        A.   Yes, at one point.
3        Q.   Another person on this email is Vincent
4    Galeraud, G-A-L-E-R-A-U-D.
5        A.   Yes.
6        Q.   Are you familiar with that individual?
7        A.   Yes.
8        Q.   His email address is v.galeraud
9    @meetic-corp.com.  What is Meetic-Corp?
10       A.   It's one of our European companies.
11       Q.   When you say "our," to whom are you referring?
12       A.   Owned by the portfolio.
13       Q.   What portfolio?
14       A.   The Match Group portfolio.
15       Q.   Did Mr. Vincent --
16       A.   Yes.
17       Q.   -- have a role with Match's customer care
18   department at that time?
19       A.   I'm not sure.
20       Q.   At this time when this email is being sent,
21   Ms. Auderer says that it's for a conversation with
22   Mandy.  Correct?
23       A.   Yes.
24       Q.   And who was that person Mandy that she's
25   referring to?

Page 101

26 (Pages 98 - 101)

1    A.   Mandy Ginsberg.
2    Q.   And what was Ms. Ginsberg's position at the
3  time this email was sent?
4    A.   She was CEO.  I'm not sure of which company.
5    Q.   Okay.  And I want to give you another
6  attachment at this point.  It's going to be Plaintiff's
7  Exhibit 4.
8        (Exhibit 4 marked.)
9    Q.   (BY MS. HILLIARD)  I want you to look at this
10  attachment for a minute, and then we're going to go back
11  to the email chain.
12    A.   Okay.
13    Q.   This attachment is -- Exhibit 4 is Bates
14  number 746900.  It's a multi page document that's an
15  attachment to that email chain of Plaintiff's Exhibit 3.
16        MR. MUNDEL:  There's no Bates number on
17  this Exhibit 4, but are you representing that this was
18  attached to Exhibit 3?
19        MS. HILLIARD:  Yes.  It was attached to
20  Exhibit 3.  And the way it shows up in our system is the
21  Bates number 746900 from the documents you guys provided
22  to us.
23    Q.   (BY MS. HILLIARD)  Okay.  So now that you've
24  seen the email and the attachment, do you remember this
25  email chain?

Page 102

1    A.   Vaguely.
2    Q.   Do you remember reviewing the PowerPoint after
3  Ms. Auderer sent it to you?
4    A.   Sorry, what was your question?  Did I review
5  it?
6    Q.   Do you remember reviewing the PowerPoint after
7  Ms. Auderer sent it?
8    A.   Vaguely.
9    Q.   Now I want you to go back to Plaintiff's
10  Exhibit 3, the email chain.
11    A.   Okay.
12    Q.   So you responded to Ms. Auderer on 5/17/2016
13  at 2:02 p.m.  Correct?  It's at the bottom of the page.
14    A.   Yes.
15    Q.   And you're asking her if the member has to
16  click through on both survey questions before the
17  cancellation takes effect.  Correct?
18    A.   Yes.
19    Q.   Do you know the answer to that question at
20  this time?
21        MR. MUNDEL:  To what question?
22        MS. HILLIARD:  The question that he
23  asked.  At the time that he asked it, did he know the
24  answer to that question?
25    A.   Yes.

Page 103

1    Q.   (BY MS. HILLIARD)  And what was the answer?
2    A.   You do have to -- you do have to click on
3  both.
4    Q.   And next you asked whether they have to select
5  an answer.  Correct?
6    A.   Yes.
7    Q.   Do you know the answer to that question?
8        MR. MUNDEL:  Today or at the time?
9    Q.   (BY MS. HILLIARD)  At the time, sorry, that
10  you asked that.
11    A.   I don't recall.
12    Q.   Then you go on to say, quote, I'd add survey
13  is optional.  Do you see that?
14    A.   Yes.
15    Q.   Did you believe that statement at the time
16  that you wrote it?
17    A.   Yeah, I think that at the time that I wrote
18  it -- because we hadn't gone through -- I think this was
19  one of -- perhaps one of the first times I had gone
20  through the resignation process.  These screenshots were
21  relatively small, and so I guess on the page that I'm
22  referring to, there's like three screens on one page.
23  And so what caught my eye was the large heading.  And I
24  didn't read all the text, but I recall that when we
25  actually went through the flow, like we could actually

Page 104

1  see like what each page looked like, because these were
2  relatively small screenshots.  So at the time I think I
3  was making sort of a premature comment because I didn't
4  read all the small -- well, what seemed to be smaller
5  text because there's three screenshots on what would
6  normally be one screen, so --
7    Q.   When doing that, after reviewing that --
8  sorry.  Let me rephrase that question.
9        After reviewing the PowerPoint, you stated,
10  I'd add that the before you go text is misleading since
11  that would suggest that the cancellation process may be
12  completed and the survey is optional.  Was that your
13  statement?
14    A.   That was my statement, but, again, I was not
15  looking at the text below that that says if you cancel,
16  your last day of subscription, et cetera, et cetera.  So
17  I wasn't reading the text after that, so --
18    Q.   On the PowerPoint --
19    A.   Yes.
20    Q.   -- when it was a live PowerPoint and not
21  printed documents, the screens that appear on here,
22  didn't those screens come up one at a time?
23    A.   Not when we were going through the PowerPoint.
24  So my comments are referring to the PowerPoint when it
25  was attached in an email.

Page 105

27 (Pages 102 - 105)

APP 132

1    Q.   And this was a live PowerPoint document that
2    was attached to the email, like a PowerPoint, an active,
3    live PowerPoint?
4            MR. MUNDEL:  Object to the form.
5        A.   What do you mean by a live PowerPoint?
6        Q.   (BY MS. HILLIARD)  The document that was
7    attached to the email, when you opened it, did it open
8    in the software PowerPoint, or did it open as like a PDF
9    like this?
10       A.   I'm assuming it opened in a PowerPoint.
11       Q.   And are you familiar with how to use
12   PowerPoint?
13       A.   Yes.
14       Q.   Okay.  And are you familiar with the way in
15   which things are populated in PowerPoint?
16           MR. MUNDEL:  Object to the form, but --
17   "populated in PowerPoint."
18       A.   What do you mean?
19       Q.   (BY MS. HILLIARD)  Do you understand the
20   question?
21       A.   Not the populated part.
22       Q.   Are you familiar with how information appears
23   in PowerPoint?
24       A.   It depends on how it's presented.
25       Q.   Yes.  So when you're viewing a PowerPoint

*Page 106*

1    meet with Ms. Ginsberg?
2            MR. MUNDEL:  I would object, foundation.
3        A.   I don't -- I mean, I don't know if she
4    separately met with Mandy, but I would bring her into
5    meetings with myself and Mandy on occasion.
6        Q.   (BY MS. HILLIARD)  Do you know if Ms. Auderer
7    subsequently had the meeting with Ms. Ginsberg?
8        A.   I'm not sure if it was this specific meeting
9    but I do recall going through a meeting on this topic
10   with Kris and with Mandy, yeah.
11       Q.   And Kris and Mandy are Ms. Auderer and
12   Ms. Ginsberg?
13       A.   Correct.
14       Q.   Okay.
15       A.   Yes.
16       Q.   Do you prefer to call them Kris and Mandy?
17       A.   Either one's fine, yeah.
18       Q.   Were you present at the meeting with Kris and
19   Mandy?
20       A.   Again, I'm not sure if it was this specific
21   one, but I was present at one where we went over the
22   resignation process.
23       Q.   Did someone present a PowerPoint to Mandy at
24   this time?
25       A.   I think Kris did, yeah.

*Page 108*

1    presentation --
2        A.   Yes.
3        Q.   -- as opposed to a PDF of a PowerPoint
4    presentation, are you familiar with the distinctions
5    between like what a page looks like after everything has
6    appeared as opposed to when the information is being
7    presented?
8            MR. MUNDEL:  Object to the form.
9        A.   Sorry, I don't understand your question.
10       Q.   (BY MS. HILLIARD)  Let me go back to the first
11   email.
12       A.   Okay.
13       Q.   Ms. Auderer says in the first email that this
14   is for our conversation with Mandy.
15       A.   Yes.
16       Q.   Do you know what she's referring to there?
17           MR. MUNDEL:  Objection, foundation.
18       A.   I mean, based on this distribution list, we
19   had -- we had a regular meeting with Mandy to go over
20   just customer service metrics, anything we wanted to
21   bring up.  Like we had, I guess, a scheduled -- a
22   scheduled meeting in which we could sort of create our
23   own agenda, but most of the time we were going through
24   just metrics.
25       Q.   (BY MS. HILLIARD)  Did Ms. Auderer regularly

*Page 107*

1        Q.   Let's go back to the PowerPoint.
2        A.   Okay.
3        Q.   It's Exhibit 4.
4        A.   Okay.
5        Q.   Was this the PowerPoint that was presented to
6    Mandy, to your recollection?
7            MR. MUNDEL:  Objection, lacks foundation.
8        A.   I mean, probably some version of it.  I don't
9    know if this was what was the final presentation.
10       Q.   (BY MS. HILLIARD)  The edited version that was
11   presented to Mandy, would you have participated in the
12   editing?
13       A.   Not the editing.
14       Q.   Do you recall what, if any, edits were made
15   when you discussed whether this is a final version?
16       A.   No.
17       Q.   Did you approve the final form of the
18   PowerPoint before the meeting with Mandy?
19       A.   I'm sure I would have looked over it.
20       Q.   Did you express any disagreement with the
21   contents of this document before it was shown with
22   Mandy -- to Mandy?  Sorry.
23           MR. MUNDEL:  Objection, assumes facts,
24   misstates the testimony.
25       A.   I don't recall if I relayed any objections to

*Page 109*

28 (Pages 106 - 109)

1  item, I can comment on that.
2      Q.  Ms. Auderer -- the presentation -- let me
3  rephrase the question.
4          The presentation proposes that the survey
5  comes after the confirmation.
6          Did you agree with that?
7      MR. MUNDEL:  I'm going to -- I'm sorry,
8  can you read that question back?
9          (Requested testimony read."
10         "QUESTION:  The presentation proposes
11          that the survey comes after the
12          confirmation.
13          Did you agree with that?")
14     MR. MUNDEL:  Object to the form.
15     A.  I mean, again, Kris, Ms. Auderer is not a
16  product person and one thing that you do have to
17  consider is if it were to come after the confirmation,
18  then potentially would you fail to collect information
19  that was important, including the fact that people were
20  successful and -- you know, for Match at least, or at
21  least for a lot of the dating properties, you know,
22  people don't just cancel because they're sick of a
23  service or they don't want to watch the shows anymore,
24  things like that.  People also cancel due to success.
25  And so it's important to capture that information.  So

                                              Page 142

1  if you put that after confirmation, we may potentially
2  lose that information because people don't have to
3  complete it.  And, you know, it's common practice to
4  capture survey information like that.  Like if you want
5  to return something on Amazon or, you know, other
6  subscription -- similar subscription services.
7      Q.  (BY MS. HILLIARD)  Are you aware of whether
8  the company made any changes to the cancellation flow
9  after the -- what I've represented as the hack week
10  presentation?
11     A.  Do you know when the hack week presentation
12  was?
13     Q.  In 2015.
14     A.  It was in 2015.  No, I'm not sure.
15     Q.  Ms. Auderer left the company in 2016.
16  Correct?
17     A.  I don't recall what year she left.
18     Q.  What was your position when Ms. Auderer left?
19     A.  Oh, I don't recall what my exact position was
20  at the time.
21     Q.  Was Ms. Auderer your direct report?
22     A.  She was at one time.
23     Q.  Was she your direct report when she left the
24  company?
25     A.  I can't remember.

                                              Page 143

1      Q.  Do you remember whether anyone took over her
2  position?
3      A.  I don't know if her responsibilities were
4  shared out.  I mean, yeah, I don't recall if anyone
5  replaced her specific position, per se, or if her
6  responsibilities were just spread out.
7      Q.  Did your position change after she left?
8      A.  I mean, I went on to a shared service group
9  I'm not sure how long after.
10     Q.  Did you take over any part of Ms. Auderer's
11  responsibilities?
12     A.  No, not myself personally.
13     Q.  I am going show you a document that is
14  Exhibit 7.  It is Bates number 330643.
15         (Exhibit 7 marked.)
16     Q.  (BY MS. HILLIARD)  This is a string of emails
17  with a subject titled account question.
18         Do you recall this email thread?
19         So this email thread starts with a member
20  complaint to Mandy Ginsberg on December 1, 2016.  Is
21  that correct?
22     A.  Yes.
23     Q.  And it appears that the member is complaining
24  that he canceled the service but then got billed again.
25  Is that a fair assessment?

                                              Page 144

1      A.  Sorry, I'm just reading this.
2      Q.  I'm sorry, I did not hear you.
3      A.  I said I'm still reading the email.
4      Q.  Okay.  I'll start.  I will direct you to page
5  3, the first part of the email chain.  Have you gotten a
6  chance to read that part yet?
7      MR. MUNDEL:  The witness is going to read
8  the whole email, it seems like.  Let him go ahead and do
9  that.
10     Q.  (BY MS. HILLIARD)  Have you had an opportunity
11  to read the first part of the email chain --
12     A.  No, not yet.
13     Q.  -- on page 3?
14         Okay.  I will start off for you.  It's from a
15  Paul Watson (sic), and the email comes from December 1,
16  2016.
17     MR. MUNDEL:  I'm sorry.  I think he's
18  still reading.
19     Q.  (BY MS. HILLIARD)  Are you still reading this
20  email?
21     A.  Well, I am trying to listen to you --
22     Q.  I'm sorry.
23     A.  -- and then you keep --
24     Q.  I apologize.  Are you reading this email on
25  page 3 from Paul Watson?

                                              Page 145

                                    37 (Pages 142 - 145)

Page 146

1    A.  I am trying to --
2    Q.  Okay.
3    A.  -- unless you want to read it for me.
4    Q.  And I'm only referring to the email that's
5  five lines long from Paul Watson on Mandy Ginsberg -- to
6  Mandy Ginsberg.
7    A.  Yes, that's the one I'm reading.
8    Q.  Okay.
9    A.  Okay.
10    Q.  So it appears that this member is complaining
11  that he canceled the service, but then he was billed
12  again.  Is that correct?
13    A.  That's what he alleges, yes.
14    Q.  And this email appears to have come December
15  1, 2016, and it was written to Mandy Ginsberg?
16    A.  Yes.
17    Q.  And it appears that Ms. Ginsberg then
18  forwarded that email to you.  Is that correct?
19    A.  Yes.
20    Q.  And when she forwarded it to you, Ms. Ginsberg
21  says, can you respond to how to deal with these.  He should talk about how
22  to deal with these.  He should be a huge word of mouth
23  person and don't want to turn him into a detractor.  Is
24  that correct?
25    A.  Yes.

Page 147

1    Q.  And then you forward the email to Melissa
2  Clinchy.  Is that correct?  Can you see at the bottom of
3  page 2 --
4    A.  Yes.
5    Q.  -- where there's a reply to Mandy Ginsberg --
6  a reply to Melissa Clinchy --
7    A.  Yes.
8    Q.  -- and then copying Mandy Ginsberg.  Is that
9  from your email address?
10    A.  Yes.
11    Q.  Okay.  And you say, Melissa, can you look at
12  this one and circle back with me?
13    A.  Yes.
14    Q.  Then you say, Mandy, just want to let you
15  know, for now, Melissa and I are working together on
16  every escalation that has been coming in so we can
17  monitor how we're responding to these customers.  We've
18  already proactively made some changes with regards to
19  how we respond to ensure the customer is satisfied with
20  the outcome and that any questions or concerns are
21  handled.
22      Is that -- are those your words?
23    A.  Yes.
24      MR. MUNDEL:  You're going to kill the
25  court reporter.  She's already lost two fingers.

Page 148

1    Q.  (BY MS. HILLIARD)  Okay.  So it appears that
2  Melissa then researches the issue and reports back to
3  you.  Is that correct?
4    A.  Yes.
5    Q.  And then you then forward that report back to
6  Mandy ultimately.  Is that correct?
7    A.  Sorry.  I'm still reading Melissa's research.
8      Okay.  Sorry.  Your question was and then I
9  forwarded it to Mandy?
10      MS. HILLIARD:  Can you read him my
11  question, please?
12      (Requested testimony read:
13      "QUESTION:  And then you then forward
14      that report back to Mandy ultimately.
15      Is that correct?")
16    A.  Well, yes, Mandy got the details.
17    Q.  (BY MS. HILLIARD)  You write to Melissa and
18  Mandy, We're already aware that the cancellation flow is
19  too long and confusing for members.  Melissa is working
20  on identifying the top issues we need product to resolve
21  as an initiative.
22      Is that correct?  Did I read that correctly?
23    A.  Yes, you read that correctly.
24    Q.  And you said that the cancellation flow is too
25  long and confusing to Mandy Ginsberg.  You stated that

Page 149

1  Melissa is working on that.
2      Did you mean that Melissa was working on
3  issues with the cancellation flow?
4      MR. MUNDEL:  Object to the form.
5    A.  I don't know -- well, firstly, what I meant
6  was that we had received the feedback from customers who
7  had complained that the cancellation flow was too long
8  and confusing.  I don't know what I'm referring to with
9  regards to the top issues.  I don't know if that just
10  means that we were creating a feedback loop for product
11  in terms of a list of items that we may want changed,
12  but it doesn't specifically say anything about the
13  cancellation flow.
14    Q.  (BY MS. HILLIARD)  When you stated we're
15  already aware that the cancellation flow is too long and
16  confusing for members; Melissa is working on identifying
17  the top issues we need product to resolve as an
18  initiative, at that time did you plan to send those
19  issues over to product to update the cancellation flow?
20      MR. MUNDEL:  Object to the form.
21    A.  I don't know if it was related to the
22  cancellation flow.  I know I had sort of beefed up
23  Melissa's responsibilities to create a feedback loop to
24  share customer feedback with the product team and do a
25  more effective job of that as part of the customer

38 (Pages 146 - 149)

1  service team and just have a regular feedback loop. But
2  it doesn't say here anything about the cancellation
3  flow, I mean, specifically in terms of the top issues.
4      Q.  (BY MS. HILLIARD)  So were you in agreement
5  that there were issues with the cancellation flow at
6  this time?
7      A.  No.  Just I think my point here is that we had
8  already received that feedback.  It's -- you know, this
9  was December 2016.  So by that point I guess we had
10  already presented that information to Mandy, so it was a
11  topic that we had already brought up and discussed.
12      Q.  AND when you're telling Mandy that we're
13  already aware that the cancellation flow is too long and
14  confusing, did you make the statement after reviewing
15  the online cancellation flow?
16          MR. MUNDEL:  Object to the form.
17      A.  Yes, but the point is, was that we were
18  already aware of the issue since we had already brought
19  it to Mandy's attention in terms of feedback from
20  customers.
21      Q.  (BY MS. HILLIARD)  Did Melissa ever come up
22  with that list of issues to present it to product?
23      A.  I think she came up with a list of things to
24  present to product or feedback to product.  I think she
25  did that monthly.

Page 150

1      Q.  What were those issues?
2      A.  Just any customer feedback.  It was a way for
3  that product to listen and learn in terms of, you know,
4  what we were getting from customer feedback.  But,
5  again, that's just one piece of the pie in terms of this
6  is what customers are saying.  I don't think customer
7  service was doing a great job at giving feedback back to
8  product before.  So I was empowering Melissa to have
9  those conversations on a consistent basis.
10      Q.  When you say that you are aware that the
11  cancellation flow was too long and confusing for members
12  and that Melissa was working on identifying the top
13  issues, were those top issues ever identified to your
14  knowledge?
15          MR. MUNDEL:  Object to the form, asked
16  and answered.
17      A.  Again, I think Melissa put together a whole
18  slew of different feedback points to product.  So I'm
19  not -- I'm not -- my guess is -- I don't know if the
20  cancellation flow was included within that, again, or if
21  it was part of the existing presentation and discussion
22  we already had in place.
23      Q.  (BY MS. HILLIARD)  Do you know whether product
24  actually made any changes to the cancellation flow after
25  you reported to Mandy that you knew that it was too long

Page 151

1  and confusing for members?
2          MR. MUNDEL:  Objection, misstates his
3  testimony.
4      A.  Again, I wasn't saying that it was too long
5  and confusing, just that it was a known -- it was known
6  feedback that we had already brought up to Mandy.  But I
7  don't know if -- I don't know if the cancellation flow
8  changed.
9      Q.  (BY MS. HILLIARD)  Did you participate in any
10  conversations with product about your awareness that the
11  cancellation flow was too long and confusing for
12  members?
13          MR. MUNDEL:  Objection, form.
14      A.  I can't -- I can't recall if -- I can't recall
15  which meetings product -- which meetings product was
16  involved with.  Again, it wasn't my view that the
17  cancellation was -- flow was too long.  It was that
18  Mandy was already aware that we had brought this up as
19  feedback previously.
20      Q.  (BY MS. HILLIARD)  So after you reviewed the
21  cancellation flow and you made the statement to Mandy
22  that you are aware that the cancellation flow was too
23  long and confusing for members, and you said that you
24  were going to get back with product, do you recall
25  having any meetings with product about the cancellation

Page 152

1  flow specifically?
2          MR. MUNDEL:  I am just going to object to
3  the lead-up to the question as misstating the testimony
4  that's come before it.  But the question standing alone
5  is fine.
6      A.  Sorry, can you just repeat the question?
7          MS. HILLIARD:  Will you repeat the
8  question for him?
9          (Requested testimony read:
10          "QUESTION:  So after you reviewed the
11          cancellation flow and you made the
12          statement to Mandy that you are aware
13          that the cancellation flow was too long
14          and confusing for members, and you said
15          that you were going to get back with
16          product, do you recall having any
17          meetings with product about the
18          cancellation flow specifically?")
19      A.  I recall product was involved, not after
20  this -- I think some product folks were pulled into the
21  earlier conversations about the cancellation flow when
22  we presented it to Mandy earlier in 2016.  Again, this
23  feedback to product may not be related to the
24  cancellation flow.
25          MR. MUNDEL:  Should we take a quick break

Page 153

39 (Pages 150 - 153)

1 one thing, just to clarify.
2       Number two, as I told you, I moved into a
3 shared service role where I started taking on other
4 responsibilities, just partnerships and things like
5 that.  So I was -- I stepped away from having
6 responsibility for customer service at Match.com.  So it
7 just wasn't part of my purview.
8       Q.  (BY MS. HILLIARD)  I think we are up to
9 Exhibit 12.
10          (Exhibit 12 marked.)
11      Q.  (BY MS. HILLIARD)  You have been handed what's
12 marked as Exhibit 12 with Bates number 825508.  It is an
13 email thread.  I think the first email in the thread
14 begins on the second page, and the remaining pages are
15 chargeback rates for multiple --
16      A.  Okay.
17      Q.  -- entities and companies.
18          Do you recall this email thread?
19      A.  No.
20      Q.  The email thread begins from an email address
21 at reports@match.com.  What is that email address?
22      A.  It's just a -- it's an automated email that
23 just sends reports.
24      Q.  It appears that it's reporting Match and
25 People Media chargeback rates for August of 2015.  Is

Page 202

1 that correct?
2      A.  Yes.
3      Q.  Okay.  So you then email Kris Auderer and
4 Krystal Roloff, as well as cc'ing multiple individuals.
5 Is that correct?
6      A.  Yeah, I'm not -- yes.  I'm not sure if they
7 were already on the distribution for the report already.
8      Q.  I'm referring to your email.  Your email --
9      A.  Right.
10      Q.  -- is from you and it's to Kris and Krystal?
11      A.  Yes.
12      Q.  Okay.  When you email them, you start off by
13 saying to them, We need to grant all refund requests on
14 PM for tomorrow only.  Is that correct?
15      A.  Yes.
16      Q.  Is PM People Media?
17      A.  Yes.
18      Q.  Were you instructing them to grant all the
19 refund requests for People Media for the purpose of
20 bringing down the chargeback rates?
21      A.  Yes, I was telling them to grant refunds for
22 just through the end of the month.
23      Q.  Okay.  And then you request that someone named
24 Pradeep Shetty, S-H-E-T-T-Y, to please pull Verifi
25 August notifications and engage Ethoca to compare August

Page 203

1 notifications to overlap.  I want to understand the
2 overlap and count of additional notifications.  Is that
3 correct?
4      A.  Yes.
5      Q.  Who is Pradeep?
6      A.  Pradeep ran the billing operation, so the
7 monitoring of the chargebacks metrics.
8      Q.  And what are Verifi August notifications?
9      A.  For the month of August, there's a company
10 called Verifi that gives us sort of a feedback loop on
11 potential chargebacks.
12      Q.  And what is Ethoca?
13      A.  It's a similar service.
14      Q.  And then you go on to say, I'd like to discuss
15 the Cardinal for PM also.  Correct?
16      A.  Yes.
17      Q.  What is Cardinal?
18      A.  Cardinal was the implementation of 3D Secure
19 which was part of Visa and MasterCard to help sort of
20 prevent fraud.
21      Q.  You go on to say, We found this week that a
22 relatively low percentage of users who CB even contact
23 customer service in the first place so they need to
24 stop -- they need to look at stopping CB's at either the
25 point of CB (Verifi/Ethoca) on the front end (Cardinal

Page 204

1 or product changes - e.g., simplify turning off auto
2 renew or notifications for certain cohorts).
3          Did I read that correct, sort of correct?
4      A.  Yes.
5      Q.  What do you mean when you say we need to stop
6 CB's on the front end through Cardinal?
7      A.  If you implement 3D Secure, because there's
8 some additional fraud protection that is enabled that
9 helps verify that the user is actually making the
10 transaction, it can reduce -- it can reduce chargebacks.
11      Q.  What do you mean when you say "simplify
12 turning off auto renew"?
13      A.  I don't know what I meant at that specific
14 point in time, just because there's 40 odd different
15 websites here.
16      Q.  Are you expressing the possibility that
17 simplifying the cancellation flow in auto renew can help
18 with chargebacks?
19      A.  I don't know what I'm implying here.  Again,
20 notifications for certain cohorts doesn't really make
21 too much sense to me.
22      Q.  Did you ever pursue the action of simplifying
23 the flow in 2015 in order to help with chargebacks?
24          MR. MUNDEL:  Sorry.  Just objection to
25 the form.

Page 205

52 (Pages 202 - 205)

1    A.  Simplifying which flow?

2    Q.  (BY MS. HILLIARD)  The cancellation flow.

3    A.  I mean, I don't even recall what the People

4  Media cancellation flow looks like right now.  I think,

5  generally speaking, this cancellation flow -- I mean,

6  the cancellation flow had been the way it had been for

7  some time, I think.  People Media specifically had a lot

8  of issues related to fraud, and so the things we're

9  talking about are more fraud related than anything else.

10    Q.  During the time that you were involved with

11  customer care, was it common for customers to initiate

12  chargebacks because they thought they had canceled?

13         MR. MUNDEL:  Object to the form.

14    A.  They may allege that as part of the -- they

15  may allege that in some of the chargeback complaints,

16  but I think we disputed chargebacks and found that a

17  very high percentage of them actually did use the

18  product.

19    Q.  (BY MS. HILLIARD)  Was it a common allegation

20  during the chargebacks that customers alleged that they

21  thought they had canceled the service?

22         MR. MUNDEL:  Object to the form.

23    A.  I don't know what percentage they made up or

24  what the mix was.

25    Q.  (BY MS. HILLIARD)  Was it a common allegation

Page 206

---

1  that customers thought that they had canceled their

2  products?

3         MR. MUNDEL:  Object to the form.

4    A.  Again, I don't know what the -- I don't know

5  what the numbers were, but -- I don't know what the

6  numbers were, but in subscription businesses,

7  subscription businesses generally have a higher

8  percentage of chargebacks just because of the fact that

9  people forget to turn auto renew off and they forget

10  that they have subscriptions.

11    Q.  (BY MS. HILLIARD)  Would that have been the

12  reason that you suggested that simplify turning off auto

13  renew for certain cohorts?

14    A.  No.  Again, I don't know what the background

15  for that one is, but the majority of the recommendations

16  that I lead with are more fraud related or chargeback

17  process improvements.

18    Q.  I think we are at 13?  Are we at 13?

19    A.  Yes.

20         THE REPORTER:  Yes.

21         (Exhibit 13 marked.)

22    Q.  (BY MS. HILLIARD)  I would like you to take

23  time to review this email.

24    A.  Okay.

25    Q.  This email is sent to you at Match.com from

Page 207

---

1  someone, first name spelled A-N-U-S-H-A, last name

2  spelled R-A-M-A-N-U-J-A-M, from Visa.  Is that correct?

3    A.  Yes.

4    Q.  Was it part of your job responsibilities to

5  work with Visa?

6    A.  Pradeep would work with Visa.  I mean, I

7  don't -- I don't even recall who this person is.  This

8  may have been more of a sales pitch than anything else.

9    Q.  What about chargebacks?  Did you have

10  responsibility for handling issues that arose regarding

11  chargebacks?

12    A.  We were responsible for monitoring the metrics

13  and trying to -- trying to advise companies or, you

14  know, advise our companies or brands on how they could

15  improve their chargeback rates.

16    Q.  In the email she states, Ron also mentioned

17  your question around chargebacks and I wanted to take

18  this opportunity to provide some information and history

19  on the topic.  Is that correct?

20    A.  Yes, that's what it reads.

21    Q.  And she specifically mentions Pradeep Shetty.

22  Is that correct?

23    A.  Yes.

24    Q.  She states that, Visa also shared -- this is

25  hard for me to read -- sorry -- with Pradeep that it

Page 208

---

1  might be helpful to make the cancellation option

2  prominent, very on the site/app to enable cardholders to

3  terminate their subscriptions easily so as to help avoid

4  chargebacks raised by your legitimate customers.  Is

5  that correct?

6         MR. MUNDEL:  Are you saying is that what

7  the document says?

8         MS. HILLIARD:  Yes.

9    A.  Yes, that's what the document says.

10    Q.  (BY MS. HILLIARD)  Do you believe that that

11  suggestion was implemented?

12         MR. MUNDEL:  Objection, assumes facts.

13    A.  I don't know what changes were made and

14  what -- I don't know what changes were made after the

15  fact, but I don't -- I mean, I think Visa is not

16  responsible for our product, nor does it know any of

17  our -- nor does it have any analytics about how easy it

18  is to cancel auto renewal.  I think it's just they try

19  to state the obvious without truly understanding how

20  things work within the business.

21    Q.  (BY MS. HILLIARD)  In this email, this Visa

22  associate represents that Pradeep contacted Visa from

23  Match.com about a year and a half ago with a request to

24  review Visa rules for representing -- for representment

25  involving compelling evidence.  Is that what it states?

Page 209

53 (Pages 206 - 209)

**Page 210**

1  A.  Yes.
2  Q.  In parenthesis she says, especially in cases
3  where the customer claimed they canceled a recurring
4  charge, reason code 41.  Is that correct?
5  A.  Yes, that's what it reads.
6  Q.  She goes on at the end of that paragraph to
7  say, lastly, if you do see a chargeback with this code,
8  you always have the option of turning off the membership
9  for the customer since they claim that they did, in
10  fact, cancel the service.  Is that correct?
11  A.  Yes, that's what it reads.
12  Q.  To your knowledge, was this policy ever
13  implemented?
14  MR. MUNDEL:  Objection as to what policy.
15  Q.  (BY MS. HILLIARD) I'll rephrase that
16  question.
17  To your knowledge, was this suggestion from
18  Visa ever implemented?
19  A.  I'm not sure.  We're not in charge of what
20  happens.  We're not in charge of the code of the website
21  or what happens when we receive a chargeback.  We're
22  just responsible for monitoring the metrics, so I
23  wouldn't be the right person to ask.
24  Q.  At this time she said that she got your
25  information from someone because you stopped by a Visa

**Page 211**

1  booth last week at MRC and that person gave her your
2  contact information.  Is that true?
3  MR. MUNDEL:  I am going to object.  It's
4  unclear if you're asking is that what the document says
5  or --
6  Q.  (BY MS. HILLIARD) Is that what the document
7  says?
8  A.  Sorry, your question was?
9  Q.  My question is she stated that she got your
10  contact information because you were at the MRC the
11  week -- previous week and you connected with someone
12  named Ron who gave her your contact information.  Is
13  that --
14  A.  Yes.
15  Q.  -- what it says?
16  A.  Ron gave her my contact information, yes.
17  Q.  And she said that Ron mentioned that you had a
18  question about chargebacks to him.  Is that what she
19  represents?
20  A.  That's what she represents, yes.
21  Q.  She goes on to then provide you suggestions as
22  to how Match can reduce its chargebacks with Visa.  Is
23  that correct?
24  A.  Yes, I think -- I don't think they are founded
25  and I don't think she knows -- I don't think she knows

**Page 212**

1  how the website works or how easy it is for customers to
2  cancel their subscriptions.
3  Q.  Did you recommend any of the suggestions that
4  she provided here to anyone else?
5  A.  Not that I can recall.  Again, I think this
6  email was more of a sales email where -- because I
7  happened to speak to someone who works at the same
8  company as she does, she wanted to reach out.  She
9  wanted to reach out to me and talk about different
10  things such as omni-channel Tokenization Management
11  Service and different things like that, so --
12  Q.  Do you recall whether you ever met with her?
13  A.  No, I don't remember her at all, and I don't
14  remember Ron either.  And I'm not sure I stopped at
15  the Visa booth versus I was stopped at the Visa booth,
16  so --
17  (Exhibit 14 marked.)
18  MS. HILLIARD:  We're on 14.
19  Q.  (BY MS. HILLIARD)  We are handing you what's
20  marked Exhibit 14, Bates number 745297.  It is a series
21  of emails.  It seems a lot longer than it actually is.
22  A.  Okay.
23  Q.  If you notice, that most of it is some type of
24  coding, but we have to get the whole document before
25  you.  The very significant portion of it is emails.

**Page 213**

1  A.  Okay.
2  Q.  Do you remember this email exchange?
3  A.  No.
4  Q.  I'm going to try to summarize it for you.
5  A.  Sure.
6  Q.  It is Clinchy reporting to you an issue where
7  members see the cancellation page and receive a
8  cancellation email even though the cancellation did not
9  go through.  Is that a correct summary of this?
10  A.  Is that a correct summary of these pages?
11  Q.  This email exchange --
12  A.  Oh, this email.
13  Q.  -- the substantive portion of it.
14  A.  Sorry, could you repeat your summary of it?
15  MS. HILLIARD:  Will you repeat that for
16  him?
17  (Requested testimony read:
18  "QUESTION:  It is Clinchy reporting to
19  you an issue where members see the
20  cancellation page and receive a
21  cancellation email even though the
22  cancellation did not go through.  Is
23  that a correct summary of this?")
24  A.  I mean, it seems that the system timed out and
25  the member ended up seeing the cancellation page and

54 (Pages 210 - 213)

1  they got a cancellation email, but essentially it was a
2  system glitch.
3     Q.  (BY MS. HILLIARD)  That's a correct summary of
4  what this email that Melissa is reporting to you is?
5     A.  Yes.  Due to a system glitch, yes.
6     Q.  Melissa writes to you on May 12, 2017, Hi
7  Adrian, We've discovered an issue where the proc that
8  handles member cancellation sometimes times out and the
9  cancellation doesn't go through; however, the member
10  sees a cancellation page and gets the cancellation
11  email.  Is that correct?
12     A.  Yes, that's what it says in the email.
13     Q.  Okay.  She then says, I'm currently trying to
14  find out how many members this may have affected and who
15  we could've renewed incorrectly.  Is that correct?
16     A.  Yes, that's what the email states.
17     Q.  Did you ever figure out how many members that
18  glitch impacted?
19     A.  Not that I can recall.  Not that I can recall,
20  but if it's -- I mean, relative to the number of
21  cancellations we do, I mean -- I mean, I don't know what
22  that number is, but this could have been an internal
23  issue that just happened at a specific time when the
24  system was under load.
25     Q.  Melissa then goes on to say, I'm going to loop

Page 214

1  you into the thread, so you're aware of the volume and
2  resolution, but since we're under so much scrutiny for
3  billing after canceled from the BBB, do you want me to
4  loop in legal as well?
5        Is that what it says?
6     A.  That's what she wrote, yes.
7     Q.  Do you remember your response to that?
8     A.  No, I don't recall, but legal did end up --
9        MR. MUNDEL:  Let me just stop you there
10  if you're going to talk about legal.  I think maybe just
11  your response is at the top of the page, I think is what
12  the question is getting at.
13        THE WITNESS:  Oh, I see.
14     A.  Yeah, my point being that legal -- legal --
15        MR. MUNDEL:  Why don't you just read the
16  response that you had into the record instead of going
17  to the legal side.
18        THE WITNESS:  Sure.
19     A.  I said, Yes, please do.
20     Q.  (BY MS. HILLIARD)  When she says that, we're
21  under so much scrutiny for billing after canceled from
22  the BBB, is she referring to the fact that the Dallas
23  BBB had contacted Match about a pattern of cancellation
24  complaints at this time?
25        MR. MUNDEL:  Speculation.

Page 215

1     A.  I don't know what she was referring to.
2     Q.  (BY MS. HILLIARD)  Did you have any
3  interactions with the BBB in connection with complaints
4  in billing at this time period?
5     A.  2017?  I mean, I don't recall too much except
6  to the emails, the exhibits you're already shared with
7  me.
8     Q.  Did anyone who reported to you regularly
9  contact BBB at that time?
10     A.  So my team, I think it was people on Melissa's
11  team were trying to work the BBB queues, and at some
12  point it was handed over to legal.  They hired some
13  people on the legal side to handle the BBB inquiries.
14  And I don't know if that had occurred at this point.
15     Q.  Did you have any involvement in preparing a
16  response to the BBB?
17     A.  Not -- a response to the BBB?  To BBB
18  complaints or to the BBB?
19     Q.  The actual response that the company would
20  have made to the BBB.
21     A.  I don't recall being involved in that.
22     Q.  Did Match make any changes to its cancellation
23  procedure as a result of this scrutiny that she lists
24  here?
25     A.  Due to the BBB?

Page 216

1     Q.  Yes.
2     A.  I don't know what changes Match made at this
3  point.  Again, the volumes from the BBB were super low,
4  so --
5     Q.  I'm going to direct to you page 7452298.
6     A.  Okay.
7     Q.  It should be your second page.
8     A.  Yeah.
9     Q.  Okay.  It appears that they were asking people
10  to research a member who evidently received this
11  cancellation confirmation email even though his
12  cancellation did not go through.  Is that correct?
13        Melissa's email, it should be the fourth --
14  one, two -- third email on the page.  It's from Melissa
15  Clinchy.  It's sent on Thursday, May 11, 2017, at
16  4:32 p.m.
17     A.  Yes.
18     Q.  It's the second page of the document.
19     A.  I see that.  I'm just -- I want to see what
20  actually happened to the member.  Okay.  Yes.
21     Q.  And the determination was that the procedure
22  that marks the user had resigned and did not respond in
23  a timely manner, and so the cancellation was not
24  successful.  Is that correct?
25        MR. MUNDEL:  Object to the form.

Page 217

55 (Pages 214 - 217)

1   A.   Well, there really isn't a -- the procedures
2   are in the code.  And there really isn't -- I guess the
3   policies and the procedures are in the code, so that's
4   not an area that we -- my team was responsible for, just
5   monitoring the metrics and then just best practices on
6   how to get good chargeback rates, healthy chargeback
7   rates.
8       Q.   Do you recall the circumstances under which
9   Match would dispute a customer chargeback?
10      A.   I don't know if I know all of the scenarios.
11  But we would dispute it if there was evidence that the
12  customer utilized their subscription.
13      Q.   And you said that the policy was in -- the
14  procedures were in the code.  What do you mean by "in
15  the code"?
16      A.   Meaning we can't control -- when a customer
17  issues a chargeback, that is a relationship between
18  themselves and the bank, the issuing -- the bank that
19  issued the credit card.  When the chargeback actually
20  comes in and hits our system, that all happens from a
21  code perspective.  It's not -- a human doesn't touch
22  that.
23      Q.   You said "that all happens."  What is "that
24  all"?
25      A.   The recording of the chargeback, any processes

Page 254

1   beyond that point is in the code.  It's not something
2   that a human actions.
3       Q.   During the time you worked for Match, the
4   chargeback policy was such that when a customer saw a
5   chargeback against Match, the customer lost access to
6   their account.  Is that correct?
7       A.   I don't know if that changed, but at some
8   point that was the case.
9            MR. MUNDEL:  You're coming up on seven
10  hours here, so I think --
11           MS. HILLIARD:  We are wrapping up.
12      A.   Sorry, and I mean, the charge -- when someone
13  issues a chargeback, they're claiming that they did not
14  perform the transaction or they did not authorize the
15  transaction, so I guess that was how it was handled.
16      Q.   (BY MS. HILLIARD)  Did the code automatically
17  deactivate the account?
18      A.   I don't want to speculate, so I'm not sure.
19      Q.   Are you aware of whether the Match.com
20  employees had the ability to provide access to the
21  account after it's been deactivated?
22           MR. MUNDEL:  Form.
23      A.   I don't want to speculate, so I'm going to say
24  I'm not sure.
25      Q.   (BY MS. HILLIARD)  Are you aware that if Match

Page 255

1   prevailed on a chargeback dispute that Match did not
2   reactivate the consumer's account for the remaining time
3   of their subscription?
4            MR. MUNDEL:  Object, vague as to time
5   period.
6       A.   Sorry, could you repeat that?  They did not?
7            MS. HILLIARD:  Will you repeat the
8   question again, please?
9            (Requested testimony read:
10           QUESTION:  Are you aware that if Match
11           prevailed on a chargeback dispute that
12           Match did not reactivate the consumer's
13           account for the remaining time of their
14           subscription?")
15      A.   At what point?  At what point?  Are you asking
16  if that's the case today or if that was the case at any
17  point?
18      Q.   (BY MS. HILLIARD)  Was that the case during
19  any point of time during your tenure?
20      A.   I'm not 100 percent sure, but it sounds -- it
21  sounds right.  But we also had an issue with the
22  chargebacks taking up to three months to come in, and so
23  at that point in time, we wanted to know if the person
24  was in a relationship or anything like that.  Plus, they
25  also issued the chargeback themselves, meaning they

Page 256

1   claimed that, you know, they didn't make the
2   transaction.
3            MR. MUNDEL:  How many more questions do
4   you have?
5            MS. HILLIARD:  I'm not sure.  Give me a
6   second.  I'm processing something he just said.
7       Q.   (BY MS. HILLIARD)  When Match prevailed on a
8   chargeback dispute --
9       A.   Yes.
10      Q.   -- during your tenure at Match --
11      A.   Yes.
12      Q.   -- are you aware of whether the person's
13  account was still accessible after that happened?
14           MR. MUNDEL:  Objection, form.  Accessible
15  to who?
16      Q.   (BY MS. HILLIARD)  Adrian, I will rephrase the
17  question.
18      A.   Yeah.
19      Q.   Are you aware of whether that person will show
20  up as a visible user in search results?
21      A.   I am not sure.
22      Q.   Okay.  Are you aware of whether that person
23  could log into their account?
24      A.   I don't want to guess.  So, again, all of this
25  is contained within the code.  It's not an area that I

Page 257

65 (Pages 254 - 257)

APP 141

1   managed, so --
2       Q.   And the code that you keep referring to, is
3   that code maintained and written by people who work for
4   Match?
5       A.   That work for Match.com, yes.
6           MS. HILLIARD:  I think we're going to
7   finish up on that one.
8           MR. MUNDEL:  Okay.  Can we just have a
9   four-minute break?
10          MS. HILLIARD:  Yes.
11          (Break from 7:18 p.m. to 7:26 p.m.)
12              EXAMINATION
13  BY MR. MUNDEL:
14      Q.   Mr. Ong, I just have a few questions before we
15  wrap up.  Thank you for your patience.  You have in
16  front of you Exhibit 19, which is a document that
17  involved DSAT, D-S-A-T.  Do you remember that?
18      A.   Yes.
19      Q.   And is the intent of the DSAT to determine
20  satisfaction with the company's products or with the
21  customer service representative?
22      A.   With the customer service representative.
23      Q.   And how did the company use DSAT scores at
24  Match.com?
25      A.   Can you be more specific?

Page 258

1   did the company receive a significant number of
2   complaints saying that the cancellation flow was not
3   simple?
4       A.   No.
5       Q.   Compared to the size of your customer base in
6   Match.com, did you receive a significant number of
7   complaints saying that the six-month guarantee policy
8   was difficult to understand?
9       A.   No.
10      Q.   Take a look at Exhibit 7 that's in front of
11  you.  This is an email that counsel for the FTC showed
12  you earlier between you, Melissa Clinchy and Mandy
13  Ginsberg.  And counsel showed you the language that
14  said, We're already aware that cancellation flow is too
15  long and confusing for members.  Do you see that?
16      A.   Yes.
17      Q.   Can you explain just one more time what you
18  meant by that statement?
19      A.   That it had been received as feedback from
20  members.
21      Q.   And was that sentiment something that you
22  heard from a significant number of Match.com members?
23      A.   No.
24      Q.   And was it something that you believed in?
25      A.   No.

Page 260

1       Q.   Yeah.  Why were you collecting DSAT data on
2   your customer service reps?
3       A.   Just, I mean, we managed, you know, hundreds
4   of customer service reps, and we needed to see who was
5   performing, who was being customer friendly, who was
6   addressing the issues or questions that our customers
7   had.  So that's -- it's a metric we look at.
8       Q.   And when you look at the second page, there's
9   a chart here that shows the overall DSAT average based
10  upon the topic that was inquired about on the call.  Do
11  you see that?
12      A.   Yes.
13      Q.   And when you have the DSAT score, is that
14  intended to determine the satisfaction with the
15  underlying policy or with the representative at the call
16  center?
17      A.   The representative at the call center.
18      Q.   Okay.  And during your time when you were the
19  head of customer service, is it -- did your team track
20  the overall number of calls and inquiries you were
21  getting from customers?
22      A.   Yes.
23      Q.   And did you also categorize those by topics?
24      A.   Yes.
25      Q.   Compared to the size of your customer base,

Page 259

1       Q.   And did you have a chance to review the entire
2   cancellation flow at Match.com?
3       A.   At some point.  At some point, yes.
4       Q.   And did you also review data related to the
5   cancellation flow?
6       A.   Yes.
7       Q.   And what was your conclusion, if any, about
8   the simplicity or difficulty of the cancellation flow
9   from your review of the flow itself and the data?
10          MS. HILLIARD:  Objection to form,
11  compound.
12      A.   Holistically we looked at it, and the majority
13  of users found it easy to cancel and were able to do it
14  themselves, or they were able to contact us and we
15  helped them do it.
16      Q.   (BY MR. MUNDEL)  And that's an important
17  point.  Was the online cancel flow the only way
18  customers could cancel?
19      A.   No.  They could -- they could contact us, and
20  we could do it for them as well.
21      Q.   And did that happen with regularity at
22  Match.com?
23      A.   Yes.
24      Q.   Okay.  Let's look at Exhibit 3, another
25  document you saw earlier with counsel for the FTC.  And

Page 261

66 (Pages 258 - 261)

1  this is an email from you where you say, I'd add the
2  before you go text is misleading since that would
3  suggest that the cancellation process may be complete.
4  It's on the last page.  Do you see that last
5  line about "before you go"?
6     A.  Yes.
7     Q.  And when you sent this email on May 17, 2016,
8  were you actually looking at the cancellation flow text
9  that said before you go on Match.com?
10     A.  No.
11     Q.  Were you looking at some other document?
12     A.  Screenshots.
13     Q.  And were the screenshots the same size as the
14  Match.com cancellation flow?
15     A.  No.
16     Q.  Were they bigger?
17     A.  Significantly smaller.
18     Q.  And was some of the text impeded because of
19  the screenshots being on top of one another?
20     A.  Yes.
21     Q.  Did you have a chance to look at the entire
22  flow in context after you sent this email about the
23  before you go?
24     A.  Yes.
25     Q.  And what did you conclude about the text

Page 262

1  before you go?
2     A.  That there was clear text stating that there
3  were additional steps to be completed.
4     Q.  Okay.  Now I want to show you Exhibit 6 and
5  Exhibit 4.  These are PowerPoint presentations that
6  counsel for the FTC asked you about that involved some
7  questions about the cancellation flow and some potential
8  changes to it.  Do you see those documents?
9     A.  Yes.
10     Q.  And let me start with this.  During your time
11  at Match.com, were there questions internally raised
12  about possible changes to the cancellation flow?
13     A.  In terms of from customer feedback?
14     Q.  From people at the company suggesting should
15  we make this change or should we make that change?
16     A.  Yes.
17     Q.  And what was the philosophy that Match.com had
18  about considering those changes?
19        MS. HILLIARD:  Objection, form.
20     A.  Employees were open and encouraged to make
21  suggestions as they saw fit.
22     Q.  (BY MR. MUNDEL)  And did you encourage your
23  employees to do that?
24     A.  Yes.
25     Q.  And did you take those concerns to others in

Page 263

1  the business or questions to others in the business so
2  they could analyze whether the changes were appropriate?
3     A.  Yes.
4     Q.  Okay.  And did you take or did -- I guess let
5  me ask this.  Was the product team the team that's
6  responsible for the cancel flow?
7     A.  Yes.
8     Q.  And did the changes that are shown -- the
9  suggestions that are shown in Exhibit 4 and 6, were
10  those taken to the product team for consideration?
11     A.  Yes.
12     Q.  And what was the result of that consideration?
13     A.  They looked at it and ultimately with
14  additional data that -- I guess that my team had not
15  looked at saw that the majority of users were able to
16  cancel by themselves or cancel through the help of the
17  customer service team and that the flow was easy to
18  understand.
19     Q.  And did you agree with that conclusion?
20     A.  Yes.
21     Q.  Let's look at Exhibit 9.  Exhibit 9 is some
22  emails about the Better Business Bureau complaints.
23     A.  Okay.
24     Q.  Did Match.com track complaints to the Better
25  Business Bureau from customers?

Page 264

1     Let me ask a better question.  Did you from
2  time to time receive complaints through the Better
3  Business Bureau from customers?
4     A.  Yes.
5     Q.  Did the company ignore those complaints?
6     A.  No.
7     Q.  What did the company do?
8     A.  It worked through them.  It worked through
9  them and tried to respond to them.
10     Q.  And do you see here there's numbers of Better
11  Business Bureau complaints by category?
12     A.  Yes.
13     Q.  Okay.  And during your time at Match.com, were
14  the number of customers that filed complaints with the
15  Better Business Bureau significant or an insignificant
16  number?
17     A.  Insignificant.
18     Q.  I am going to show you, just take a look at
19  Exhibit 15.  Do you recall some questions from counsel
20  for the FTC about the idea of having a status bar on the
21  cancellation flow showing how far a customer was in that
22  process?
23     A.  Yes.
24     Q.  And do you recall a working website of that
25  task bar ever being created at Match.com?

Page 265

67 (Pages 262 - 265)

1    A.   No.
2    Q.   And did the company consider doing that?
3    A.   It was brought up to the product team.  I
4  wasn't part of that discussion, but it was brought up to
5  the product team.
6    Q.   And do you know why Match.com decided not to
7  put a task bar at the top of the cancellation flow?
8    A.   I don't know about the rationale for the task
9  bar specifically because there were other changes
10 suggested as well, but, again, I wasn't part of that
11 conversation.
12    Q.   Okay.  You testified a bit about the six-month
13 guarantee.  Do you recall that?
14    A.   Yes.
15    Q.   And I think you said you didn't understand the
16 details of how the guarantee worked.  Is that correct?
17    A.   Yes.
18    Q.   And why did you not understand those details?
19    A.   It just -- it wasn't a focus for me.  At the
20 time when I was running customer service, the percentage
21 of calls that were related to the six-month guarantee
22 and complaints related to that were not high.
23    Q.   And were there others on your team in customer
24 care that understood the six-month guarantee policies?
25    A.   Yes.

Page 266

---

1    Q.   Okay.  Let's talk about the complaint --
2  levels of complaints from customers just a bit more.
3  Was the level of customers that complained at Match.com
4  consistent or inconsistent with the FTC's allegations
5  that customers were deceived by the company?
6    A.   Inconsistent.
7    Q.   And did the company receive a significant
8  number of complaints from customers saying that it was
9  difficult for them to cancel?
10    A.   No, not relative to the -- to our volumes.
11    Q.   And did the company receive a significant
12 number of complaints from customers saying they were
13 confused by the cancellation process?
14    A.   No, not relative to their own volumes.
15    Q.   And if a customer called in and said they were
16 having difficulty with the online cancel process, what
17 would the company do for them?
18    A.   Cancel it for them.
19    Q.   How long would that take?
20    A.   Seconds.
21    Q.   Okay.  Did you ever do anything while you were
22 at Match.com to make it more difficult for a customer to
23 cancel?
24    A.   No.
25    Q.   Did you ever hear of anyone else doing that?

Page 267

---

1    A.   No.
2    Q.   Did you ever see somebody at Match.com making
3  it more difficult for a customer to cancel?
4    A.   No.
5    Q.   Last questions here.  In your role as the head
6  of customer care, you know the company did receive
7  questions about billing issues.  Is that correct?
8    A.   That's correct.
9    Q.   And does Match.com receive a different
10 proportion of calls about billing issues versus other
11 issues because of the type of business it's in?
12    A.   Yes.
13    Q.   Can you explain why that is to the Court?
14    A.   Yes.  If we -- because we're in the dating
15 space and it is a digital service -- if we were in a
16 different business, such as selling sneakers or selling
17 clothing, we would get a different mix of calls.  We
18 would get a whole bunch of calls about what sizes do you
19 have, what colors do you have, this product was too
20 small, I didn't receive my product at all.  But because
21 we are a digital service, it is -- they can't complain
22 about the product, per se, because the products are the
23 users.  And so it's just -- it's just a different mix
24 based on our service.
25    Q.   Thank you, Mr. Ong.  Last question.  Based on

Page 268

---

1  your 20 plus years at the company, do you think
2  Match.com treated its customers fairly?
3    A.   Yes.
4        MR. MUNDEL:  No further questions.  Thank
5  you.
6        MS. HILLIARD:  Very quickly --
7        MR. MUNDEL:  I think you're out of time.
8  You went over the seven hours, so --
9        MR. TEPFER:  Julie, do you know how long
10 we've been on?
11        THE REPORTER:  She's at 6:23.
12        MR. MUNDEL:  6:23?
13        THE REPORTER:  Yeah.
14        MR. MUNDEL:  Are you sure?
15        MS. HILLIARD:  I'm positive.
16        MR. MUNDEL:  Let's look at our numbers
17 here.
18        MS. HILLIARD:  I'm positive.  We took
19 some really long breaks, longer than we said.
20        MR. MUNDEL:  Let's go off the record to
21 add it up.
22        (Break from 7:39 p.m. to 7:39 p.m.)
23        FURTHER EXAMINATION
24 BY MS. HILLIARD:
25    Q.   I am going to direct you back to Exhibit 3.

Page 269

68 (Pages 266 - 269)

1  You were just answering a question about Exhibit 3.
2     A.  Sorry, I have them all jumbled over here.
3  They were in order, and now they're not.
4     Q.  I will give you mine.
5     A.  Okay.
6     Q.  Turn to the second page of it where you make
7  the statement referencing that the before you go
8  language is misleading.
9     A.  Yes.
10     Q.  Okay.  You were just asked questions, and you
11  stated to counsel that you gave that information before
12  actually reviewing the cancellation flow yourself?
13     A.  Yes, because it was presented to me in a
14  PowerPoint.
15     Q.  And then afterwards you went and reviewed the
16  cancellation flow?
17     A.  Yes, that's correct.
18     Q.  The date of that email is May of 2017.  I am
19  trying to remember from memory.  It's right here in
20  front of you.
21     A.  Yeah, 2016.
22     Q.  May of 2016?
23     A.  Yes.
24     Q.  Did you review it shortly afterwards?
25     A.  It was afterwards.  I can't recall if it was

Page 270

1  during the meeting, but it was after I had received the
2  PowerPoint.
3     Q.  Did you review it the next day, the next week?
4        MR. MUNDEL:  Asked and answered.
5     A.  I don't recall.
6     Q.  (BY MS. HILLIARD)  But you do -- it is your
7  position that you went and reviewed the cancellation
8  flow yourself and your position changed from what you
9  said in the email?
10     A.  Yes, that's correct.
11     Q.  Exhibit 7, you make the statement -- do you
12  have Exhibit 7 before you?
13     A.  Yes.
14     Q.  And you have the same statement counsel asked
15  you about.  We're already aware that the cancellation
16  flow is too long and confusing for members.  Melissa is
17  working on identifying the top --
18        (Reporter clarification.)
19     Q.  (BY MS. HILLIARD)  We are already aware the
20  cancellation flow is too long and confusing for members.
21  Melissa is working on identifying the top issues we need
22  product to resolve as an initiative.
23        You made that statement on December the 1st of
24  2016.  Is that correct?
25     A.  Yes.

Page 271

1     Q.  So after you reviewed the cancellation flow,
2  sometime after May 17, 2016, you were still representing
3  to Melissa Clinchy that you were aware that the
4  cancellation flow was too long and confusing for members
5  at that point?
6        MR. MUNDEL:  Misstates the testimony.
7     A.  I wasn't representing it to Melissa.  I was --
8  my comment was to Mandy and that we were already aware
9  of this topic because we had already presented this
10  information to her as part of that discussion.
11     Q.  (BY MS. HILLIARD)  Okay.  And you also told
12  Mandy that Melissa is working on identifying the top
13  issues we need product to resolve as an initiative at
14  that time.  Is that correct?
15     A.  I made that statement, but that doesn't
16  necessarily tie into the cancellation flow.
17     Q.  Counsel just asked you about Exhibit 4, the
18  Match Cancellation Process PowerPoint PDFs.
19     A.  Yes.
20     Q.  Counsel asked you if the suggestions that were
21  contained in that PDF PowerPoint were ultimately
22  presented to product.  Do you recall that question?
23     A.  Yes.
24     Q.  Okay.  And you told him that they were
25  presented to product.  Do you recall that line of

Page 272

1  questioning?
2     A.  Yes.
3     Q.  I'm just asking do you recall speaking to
4  that?
5     A.  Yes.
6     Q.  Okay.  And you said that product did an
7  analysis and product ultimately determined that these
8  suggestions were not necessary.  Is that your testimony?
9     A.  That the existing process was fine.
10     Q.  Yes.  You also testified that -- with counsel
11  that the suggestions that were made in Exhibit 6 were
12  reviewed by product as well.  Is that correct?  I'm only
13  asking you, is that your testimony to counsel?
14     A.  Yes.
15     Q.  Okay.
16     A.  On the hack-a-thon deck?
17     Q.  Yes.
18     A.  Yes, that's -- the hack-a-thon is something
19  that is reviewed by product.
20     Q.  I'm asking you, did you testify to counsel
21  that the information suggestions in Exhibit 6 were made
22  to product, and product made considerations of those
23  things?
24     A.  Yes.
25     Q.  And you testified that when product evaluated

Page 273

69 (Pages 270 - 273)

1  these suggestions, product determined that these
2  suggestions were not necessary.  Is that correct?
3     A.  I don't know if any changes were made
4  afterwards, but or within -- if there were any changes
5  made and during what timeline.
6     Q.  But it's your testimony that the information
7  contained in Exhibit 4 and Exhibit 6 were reviewed by
8  product?
9     A.  Yes.
10    Q.  And ultimately product made these reviews and
11 evaluated them and determined no changes were necessary?
12    A.  Yes, because they're the ultimate
13 decisionmakers on the flow.
14          MS. HILLIARD:  I have no further
15 questions.
16          MR. MUNDEL:  Off the record.
17          (Signature reserved.)
18          (Proceedings ended at 7:45 p.m.)
19
20
21
22
23
24
25
                                          Page 274

1  I, ADRIAN ONG, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5     _____
6          ADRIAN ONG
7
8  THE STATE OF _____)
9  COUNTY OF _____)
10    Before me, _____, on
11 this day personally appeared ADRIAN ONG, known to me (or
12 proved to me under oath or through
13 _____) (description of identity
14 card or other document) to be the person whose name is
15 subscribed to the foregoing instrument and acknowledged
16 to me that they executed the same for the purposes and
17 consideration therein expressed.
18    Given under my hand and seal of office this
19 _____ day of _____, _____.
20
21
22    _____
23    NOTARY PUBLIC IN AND FOR
24    THE STATE OF _____
25    COMMISSION EXPIRES: _____
                                          Page 276

1        CHANGES AND SIGNATURE
2  WITNESS NAME:  ADRIAN ONG
3  DATE OF DEPOSITION:  MARCH 21, 2023
4  PAGE  LINE    CHANGE      REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25   Job No. TX5806787
                                          Page 275

1        REPORTER'S CERTIFICATE
2     The undersigned Certified Shorthand Reporter
3  licensed in the State of Texas does hereby certify:
4     I am authorized to administer oaths or
5  affirmations, and prior to being examined, the witness
6  was duly administered an oath by me.
7     I am not a relative or employee or attorney or
8  counsel of any of the parties, nor am I a relative or
9  employee of such attorney or counsel, nor am I
10 financially interested in the outcome of this action.
11    I am the deposition officer who
12 stenographically recorded the testimony in the foregoing
13 deposition, and the foregoing transcript is a true
14 record of the testimony given by the witness.
15    Before completion of the deposition, review of
16 the transcript [X] was [ ] was not requested.  If
17 requested, any changes made by the deponent (and
18 provided to the reporter) during the period allowed are
19 appended hereto.
20    In witness whereof, I have subscribed my name
21 this 4th day of April, 2023.
22
23    *Julie C. Brandt*
24    Julie C. Brandt, CSR, RMR, CRR
25    TX CSR No. 4018, Exp. 10/31/23
                                          Page 277

70 (Pages 274 - 277)

```
 1   Benjamin M. Mundel
 2   bmundel@sidley.com
 3            April 4, 2023
 4   RE:   Federal Trade Commission v. Match Group Inc, Match
     Group, LLC And Match.Com LLC
 5   3/21/2023, Adrian Ong (#5806787)
 6    The above-referenced transcript is available for
 7   review.
 8    Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   errata-tx@veritext.com.
16
17    Return completed errata within 30 days from
18   receipt of testimony.
19    If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25
                                         Page 278
```

# EXHIBIT I

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT J

# In the Matter of:

# FTC v. Match Group, Inc., et al.

*June 22, 2023*
*Dushyant Saraph*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1

```
 1
 2            IN THE UNITED STATES DISTRICT COURT
 3                NORTHERN DISTRICT OF TEXAS
 4    ------------------------------------
 5    FEDERAL TRADE COMMISSION,
 6              Plaintiff,
 7              vs.              Index No.
                                3:19-CV-
 8    MATCH GROUP, INC, a corporation,  02281-K
      and MATCH GROUP, LLC, formerly
 9    known as MATCH.COM, LLC, a
      limited liability company,
10
              Defendants.
11    ------------------------------------
12
13
14        DEPOSITION OF DUSHYANT SARAPH
15            New York, New York
16            Thursday, June 22, 2023
17
18
19
20
21    Reported by:
      Jeremy Frank, MPM
22    JOB NO. 2172
23
24
25
```

2

```
 1
 2                    June 22, 2023
 3                    9:21 a.m.
 4
 5        Deposition of DUSHYANT SARAPH, held at
 6    the offices of Sidley Austin, 787 Seventh
 7    Avenue, New York, New York, pursuant to
 8    Notice, before Jeremy Frank, a Stenographic
 9    Court Reporter and Notary Public of the State
10    of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1   A P P E A R A N C E S:
 2
 3        FEDERAL TRADE COMMISSION
 4        Attorneys for Plaintiff
 5            1999 Bryan Street, Suite 2150
 6            Dallas, TX 75201
 7        BY:  REID TEPFER, ESQ.
 8            RTepfer@ftc.gov
 9            M. HASAN AIJAZ, ESQ.
10            Maijaz@ftc.gov
11            (214) 979-9350
12
13        SIDLEY AUSTIN LLP
14        Attorneys for Defendants
15            1501 K Street, N.W.
16            Washington, DC 20005
17        BY:  BEN MUNDEL, ESQ.
18            BMundel@sidley.com
19            (202) 736-8157
20
21        ALSO PRESENT:
22            SAMUEL KITCHENS, Esq.
23            ERICA HILLIARD
24            CHELSEA PRIEST
25            JEANETTE TECKMAN
```

4

```
 1                I N D E X
 2
 3   WITNESS          EXAMINATION          PAGE
 4   MR. SARAPH        MR. TEPFER            8
 5   MR. SARAPH        MR. MUNDEL          346
 6
 7                EXHIBITS
 8
 9   EXHIBIT      DESCRIPTION          PAGE
10   1            FTC 774671, video deemed
11                Marked                12
12   2            FTC 672329, video deemed
13                Marked                31
14   3            MATCHFTC 752776        38
15   4            MATCHFTC 782186        60
16   5            MATCHFTC 761906, video deemed
17                Marked                73
18   6            MATCHFTC 751483        89
19   7            MATCHFTC 751484        89
20   8            MATCHFTC 672309, video deemed
21                Marked                102
22   9            MATCHFTC 846944, Excel
23                Spreadsheet deemed marked  121
24
25                (Index continued)
```

1 (Pages 1 to 4)

Saraph

FTC v. Match Group, Inc., et al.                                               6/22/2023

---

17

1  managing their photos or adding more
2  photos to their dating profile.
3      Q. Is this discover page, is that
4  individualized to the particular user?
5      A. The profiles that the user would
6  be seeing on this page would be
7  customized to the user viewing the
8  page, however a lot of navigation
9  elements would be consistent regardless
10 of who is viewing the page.
11     Q. And how would a user navigate to
12 this discover page?
13     A. This is generally the default
14 landing page that you land on when you
15 come to Match.com.  If for whatever
16 reason it is not the page that you
17 landed on, you can click on discover at
18 the top.
19     Q. Thank you.
20     Does the user have to enter a
21 password to view the discover page?
22     A. It depends if the user had been
23 logged into Match.com or not.  If the
24 user was not logged into Match.com,
25 yes, they would have to enter their

---

18

1  password to login.
2      Q. And does the member have to
3  enter a password every time they visit
4  the discover page?
5      A. It depends on the status of the
6  user and what information we have from
7  a security perspective that can change
8  from time to time.  There are times the
9  user does not have to put in a
10 password, there are times the user does
11 have to put in a password.
12     Q. And as far as the time when they
13 do not have to enter a password, what
14 are those circumstances?
15     A. It could be that they were
16 logged in recently and we strongly
17 believe it's a secure login and we are
18 able to auto log them in, in that
19 scenario we would not request another
20 password for the user.
21     Q. On that topic could a user on
22 Match.com search for other user's
23 profile without entering the password
24 if they logged in recently?
25     A. Yes, if they are actively logged

---

19

1  in they can search for user profiles.
2      Q. Likewise can a user send
3  messages to other users?
4      A. Yes.
5      Q. Can they also respond to
6  messages from other users?
7      A. As long as they are logged in,
8  yes.
9      Q. And can they make changes to
10 their profile?
11     A. Not necessarily.
12     So it depends on what sort of
13 changes they are trying to make to
14 their profile.  If for example the user
15 is trying to make a change to their
16 e-mail address or their date of birth,
17 there is additional security features
18 that have been put in place for those
19 two criteria in particular.  The user
20 would have reach out to us because in
21 the past we have noticed those are
22 areas that can lead to fraudulent
23 activity and/or concerns for the
24 security of the user's profile.
25     Likewise with the cancellation

---

20

1  flow we will talk about, there are
2  certain elements of a profile that can
3  be changed without additional
4  information required.  If the user
5  wants to add additional notes, for
6  example, they can do that.
7      Q. So aside from, I think you
8  mentioned an e-mail address and date of
9  birth as particular aspects of the
10 profile that can't be changed without
11 reentry of a password, but it sounds
12 like most of the other options, aspects
13 of the profile can be changed without
14 reentry of a password so long as they
15 recently logged in?
16     MR. MUNDEL:  Objection to
17 form.
18     MR. TEPFER:  That was a long
19 question.
20 BY MR. TEPFER:
21     Q. Is it always true that the
22 reentry of a password is required for
23 changing the date of birth?
24     A. For date of birth and e-mail
25 address in particular it is even more

---

5 (Pages 17 to 20)

FTC v. Match Group, Inc., et al.

6/22/2023

21

1  secure than just a password.  You may
2  have to reach out to one of our team
3  members to be able to make those
4  changes.
5          MR. TEPFER:  Would you mind
6  reading back --
7      **Q. Actually, has it always, has**
8  **that always been the case that**
9  **additional security procedures were in**
10  **place for changing an e-mail address**
11  **and password?**
12      A. As far as I can recall security
13  features change over time over the
14  risks to the user and risks to the
15  product, various different elements
16  have always been secured in that
17  fashion.
18      **Q. And aside from e-mail address**
19  **and password can you think of any other**
20  **aspects of users profiles that they**
21  **would not be able to alter without**
22  **reentry of a password if they had**
23  **recently logged in?**
24      A. Not off the top of my head, no.
25      **Q. Can you identify any other**

22

1  **functions on Match.com where a user is**
2  **already logged in is required to**
3  **reenter their password to perform that**
4  **function?**
5          MR. MUNDEL:  Objection,
6  scope.
7      A. If you're trying to reset your
8  password, for example, that's one of
9  the flows that would require you to
10  sort of put in your password or update
11  your password.  There are, outside of
12  password there is various security
13  features that may kick in depending on
14  the user's status, they may have to
15  verify or validate what their phone
16  number is, for example, so again,
17  various security features based on what
18  the user's experience is.
19      **Q. And do you have to reenter to**
20  **add on to a subscription?**
21      A. You may have to add in a
22  password to access your subscription
23  status, that you used to be the case at
24  various points largely to be able to
25  change the tier of the subscription

23

1  that you're on because you are making
2  changes potentially to your billing
3  subscription.
4      **Q. I'm going to go ahead, one more**
5  **second here I think to this page.**
6          **Is this the account settings**
7  **page?**
8      A. This looks like the account
9  settings page, yes.
10      **Q. So as you mentioned to access**
11  **the account settings page you click on**
12  **the gear icon in the top right-hand**
13  **corner, and then there is the drop down**
14  **menu, you click onset.**
15          **Is that right?**
16      A. Yes, that's one way you can
17  access, there are other ways you can
18  access this page.
19      **Q. Would you mind describing the**
20  **other ways you can access account**
21  **settings.**
22      A. You go through help and look up
23  ways to make changes to your account,
24  for example, and the help FAQ would
25  have information that would largely

24

1  link you back into here as well.
2      **Q. So there is the gear icon and**
3  **you mentioned searching the FAQ page?**
4      A. Help FAQ.
5      **Q. Are there any other ways to**
6  **access account settings aside from the**
7  **help FAQ and the gear icon?**
8      A. There are, yes.
9          You can be chatting with one of
10  our customer services representatives,
11  they may provide you with a link to
12  this page and/or instructions to be
13  able to sort of access this page, so
14  there are multiple ways to reach this
15  page.
16      **Q. Aside from the gear icon, the**
17  **help FAQ and the perhaps a chat with a**
18  **Match.com customer service representa-**
19  **tive, can you think of any other ways**
20  **by which a member can access the**
21  **account settings page on Match.com?**
22      A. Yes.
23          So you may get an e-mail after
24  you have confirmed your subscription.
25  There is various points in your user

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**APP 171**

Sarah
Case 3:19-cv-02281-K   Document 239   Filed 10/16/23   Page 165 of 1058   PageID 12654
FTC v. Match Group, Inc., et al.
6/22/2023

25

1 life cycle you may get e-mails that
2 have a link that's a go to account
3 settings.  If you click on that link
4 you would be able to access the e-mail
5 is another way that you can get in.
6      Q. Can you think of it in other
7 ways?
8      A. Not off the top of my head.
9      Q. Suite manage subscription link
10 appears to be an option under the
11 manage account menu.
12      Is that correct?
13      A. Yes, that's what I see here.
14      Q. So is that a sub menu, the
15 manage account sub menu on the right?
16      A. Yes.
17      Q. So manage account appears to
18 already be selected when you visit
19 account settings.
20      Is that correct?
21      A. Yes, it looks like it is the
22 default selection when you land on
23 account settings.
24      Q. Is that always the case?
25      A. I think that's changed over

26

1 time.  Obviously we are always making
2 changes to account settings to make it
3 easier for the user to understand how
4 they can access their options.
5      In this case it looks like in
6 the version that you have here, the
7 default landing is pretty clear for the
8 types of things that you would want
9 quick access to as a user related to
10 your account.
11      Q. So has there ever been a time
12 period in which managed subscription
13 was not visible on the page when a user
14 visits account settings?
15      A. It is possible that was the
16 case, yes.
17      Q. Manage account is not selected
18 there on the left-hand side, is manage
19 subscription not visible to the user?
20      A. Manage subscription is a sub
21 item of your manage account so you
22 would have to click manage account.
23 You see all the option that you see on
24 the right side, but as we discussed
25 it's the default landing option every

27

1 time you go to account setting, this is
2 what you should see.
3      Q. And so the user did not have to
4 enter a password to visit this or
5 reenter a password to visit this page?
6      A. If a user is already logged in
7 and verified, the user would not have
8 to reenter a password.
9      Q. At the bottom it says verify
10 your account, do you know what it means
11 to verify your account?
12      A. Yes.
13      I believe the verify your
14 account here reflects the ability to
15 verify your account through a phone
16 number.  So if you want to secure an
17 account you can validate it with a
18 phone number, we will sent you a four
19 digit code and your account will be
20 verified with a real phone number.
21      Q. Do you need a password to do
22 that or reenter your password to do
23 that?
24      A. To verify your account?
25      Q. Yes.

28

1      A. You do not need to reenter your
2 password.
3      Q. And so if you click verify your
4 account you get to, you have the option
5 of entering your phone number for
6 purposes of linking your phone number
7 to the account.
8      Is that right?
9      A. That's correct.
10      And generally, we don't see any
11 malicious intent with someone trying to
12 verify their account the way we may see
13 malicious intent with someone who was
14 trying to change the name, e-mail,
15 subscription information for their
16 account.
17      Q. Okay.
18      So still 15 seconds in the flow,
19 under this version the user would have
20 to click that manage subscription
21 subscription link to continue with the
22 cancellation process if they intend to
23 cancel.
24      Is that right?
25      MR. MUNDEL:  Objection.

7 (Pages 25 to 28)

29

1    A. That's correct.
2    **Q. I guess to ask it another way,**
3    **what happens when you click on manage**
4    **subscription?**
5    A. We can go through the video, I
6    think it shows what happens.
7    **Q. I'm going to play through in**
8    **that case to 21, I'll try to. We are**
9    **at 21 seconds in the video.**
10   **(Video played)**
11   **Q. Would you mind describing what**
12   **this particular page is?**
13   A. This page is asking you to
14   supply your password so that you can
15   access your manage subscription
16   information.
17   **Q. Is it okay if I refer to this as**
18   **a password page is?**
19   A. Sure, yes.
20   **Q. At this point there hasn't been**
21   **any explicit reference to cancellation;**
22   **is that correct?**
23   A. I think it is pretty common
24   knowledge that if you are looking to
25   cancel being able to do so through

30

1    managing your subscription is pretty
2    well known sort of flow through
3    consumer technology products.
4    **Q. Sure.**
5    **But just to be clear, there**
6    **hasn't been, the word cancellation has**
7    **not been used?**
8    A. I have not seen the word
9    cancellation yet.
10   **Q. At some point before the version**
11   **we are discussing here there was some**
12   **different language used in the**
13   **cancellation process. Specifically**
14   **there was a phrase change/cancel**
15   **instead of manage subscriptions; is**
16   **that correct?**
17   A. Yes.
18   **Q. Do you recall what time period**
19   **that language was in use on Match.com?**
20   A. I don't remember the specific
21   dates.
22   MR. TEPFER: I'm going to
23   show another video here, if we
24   can mark this as Exhibit, I
25   believe Exhibit 2.

31

1    (Exhibit 2, MATCHFTC 672329,
2    video deemed marked, marked for
3    identification, as of this date.)
4    BY MR. TEPFER:
5    **Q. It is MATCHFTC 672329, I'm going**
6    **to start the video here, I'll play it**
7    **all the way through.**
8    **(Video played)**
9    **Q. We have watched Exhibit 2 all**
10   **the way through, it started with, to**
11   **describe the video it starts with a**
12   **profile of somebody named Natty.**
13   THE COURT REPORTER: Please
14   spell that.
15   MR. TEPFER: N-A-T-T-Y.
16   BY TEPFER:
17   **Q. I'm going to go if its okay to**
18   **15 in the video. I'll just pause here**
19   **to ask about this screen.**
20   **Would you mind describing what**
21   **you're looking at there?**
22   A. This looks like an older version
23   of the account settings page where
24   there is a top navigation and side
25   navigation. We have done an overhaul

32

1    of this page from a design perspective
2    since.
3    **Q. Are you familiar with the video**
4    **that you just saw?**
5    A. Yes.
6    **Q. Have you viewed it before today?**
7    A. Yes.
8    **Q. Do you know what time period the**
9    **cancellation flow we just watched was**
10   **in place on Match.com?**
11   A. I can't recall the exact dates.
12   **Q. Again just to ask at the bottom**
13   **it has a copyright date of 2019; does**
14   **that help at all?**
15   A. Again as I mentioned before that
16   copyright date changes so it may not be
17   in synch.
18   **Q. That's true.**
19   **In this version of the flow the**
20   **cancellation flow is found under a link**
21   **labeled change/cancel membership; is**
22   **that correct?**
23   A. Yes.
24   **Q. Unlike the version that we just**
25   **saw is it the case that this is a top**

8 (Pages 29 to 32)

Sarah
Case 3:19-cv-02281-K   Document 239   Filed 10/16/23   Page 167 of 1058   PageID 12656
FTC v. Match Group, Inc., et al.
6/22/2023

33

1  level option on the account settings
2  menu?
3  A. It is.
4  Q. It is not under a sub?
5  A. It's the default landing
6  experience as we saw with the prior
7  flow.
8  Q. And so I'm going to go just a
9  little bit ahead here, we're at 17
10  seconds here in the video.
11  Would you mind describing what
12  this page is?
13  A. It's a page to enter your
14  password.
15  Q. It's the password page again,
16  correct?
17  A. That's correct.
18  Q. And on this version of the
19  password page at the top it says
20  change/cancel membership.
21  Is that right?
22  A. Yes.
23  Q. That language is no longer in
24  the online cancellation flow; is that
25  correct?

34

1  MR. MUNDEL: Objection to
2  form.
3  Q. You can answer.
4  A. Yes.
5  Q. I'm going to play here through
6  to I think 25, second 25 in the video,
7  I'll just pause it here at 24 seconds
8  in the video.
9  (Video played)
10  Q. Would you mind describing what
11  this page is called.
12  A. This page is basically the
13  option to go to subscription status
14  where you would be able to view your
15  credit card information and your
16  subscription tier and make updates to
17  your billing information or your credit
18  card, and the cancel subscription page
19  which would allow you to cancel your
20  subscription.
21  Q. I don't have a great name for
22  this page, is it okay if I call it the
23  subscription status or cancel page?
24  A. Sure, yes.
25  Q. We discussed you don't recall

35

1  precisely when the change in the
2  language went from change cancel to
3  manage subscription, correct?
4  A. I can't recall the exact date,
5  no.
6  Q. Do you know if that change
7  cancel language was in use for multiple
8  years?
9  A. I can't recall exactly but I
10  assume yes.
11  Q. Let's see, do you why did Match
12  make the change in language from change
13  cancel to manage subscription?
14  A. We had looked at various
15  different consumer technology companies
16  at the time, and this language of
17  manage subscription was used by several
18  of them to manage everything associated
19  with your account in terms of subscrip-
20  tion status, cancellation, things that
21  were tied to your subscription.
22  And so given that we made that
23  change and had various other items as
24  you saw in other flow bucketed under
25  the manage account as well.

36

1  Q. Did Match.com, did MGLLC, sorry,
2  did MGLLC do any testing related to
3  that language change before imple-
4  menting that change?
5  A. I would have to refresh my
6  memory on that. Generally we may, we
7  do test all of the product changes,
8  direct changes in our product view, but
9  I would have to go back and check that.
10  Q. Does MGLLC typically test how
11  changes to the cancellation flow affect
12  resignation rates?
13  MR. MUNDEL: Objection to
14  form.
15  A. Resignation rates would be just
16  one of multiple metric you would look
17  at when you're making test changes on
18  the product. You're also looking to,
19  you're also looking at how clear those
20  changes are for the end user, and are
21  they able to complete the actions we
22  want them to complete, do they have
23  access to the things they need access
24  to, so there is various other metrics
25  that would be involved as well.

9 (Pages 33 to 36)

37

1      Q. To be clear, MGLLC does
2  typically test how changes to the
3  online cancellation flow effect
4  resignation rates?
5          MR. MUNDEL:  Objection to
6  form.
7      Q. To be clear, MGLLC does test how
8  changes to the online cancellation flow
9  affect user resignation rates relating
10  to the Match.com subscription?
11         MR. MUNDEL:  Objection to
12  form.
13     A. As I mentioned earlier it would
14  be one of multiple metrics we would
15  look at when we are doing testing.
16     Q. Sorry, I just wanted to clean up
17  the transcript there.
18         You don't recall specifically if
19  testing was done related to this
20  specific language change?
21     A. I would have to refresh my
22  memory on that, yes.
23     Q. Was there also a point in time
24  where instead of the manage subscrip-
25  tion language that's currently in

38

1  place, the language was manage/cancel
2  subscription?
3      A. It is possible, yes.
4      Q. Do you know when that version
5  was in place?
6      A. No.
7          MR. TEPFER:  Let the record
8  reflect I'm handing the witness
9  what will be marked as Exhibit 3.
10         (Exhibit 3, MATCHFTC 752776,
11  marked for identification, as of
12  this date.)
13  BY MR. TEPFER:
14     Q. It is MATCHFTC 752776.
15         Mr. Saraph, if you wouldn't mind
16  letting me know after you had a chance
17  to review.
18     A. Yes.
19     Q. Have you seen this document
20  before?
21     A. Might be the first time.
22     Q. Do you know who Jessica Johnson
23  is?
24     A. Jessica Johnson was an employee
25  on the product team at Match.com.

39

1      Q. Did she have any roles related
2  to the online cancellation flow at
3  Match.com?
4      A. During her time working on the
5  product she would have likely overseen
6  parts of this experience, yes.
7      Q. What is her current position?
8      A. She doesn't currently work on
9  the Match.com product.
10     Q. She's not with the company
11  anymore?
12     A. She's in a different role.
13     Q. I want to ask about Mr. Jayant
14  Dasari.
15     A. Mr. Dasari leads our analytics
16  team at Match.com.
17         THE COURT REPORTER:  Please
18  spell that.
19         MR. TEPFER:  J-A-Y-A-N-T
20  D-A-S-A-R-I.
21  BY MR. TEPFER:
22     Q. Sorry to ask, Ms. Johnson, was
23  she promoted to a different role
24  altogether?
25     A. She took a different role.

40

1      Q. Then you're listed last on this
2  e-mail, correct?
3      A. Yes.
4      Q. And then Mr. D-I-N-H T-H-I
5  B-U-I, would you mind telling me how to
6  pronounce his name?
7      A. Dinh Thi.
8      Q. Thank you.
9          What's Dinh Thi's role?
10     A. Dinh Thi during this time was
11  part of the analytics organizational
12  leadership.
13     Q. Thank you.
14         So this thread appears to be
15  related to testing a page called manage
16  account on the mobile version of the
17  settings page.
18         Is that correct?
19     A. That looks to be correct, yes.
20     Q. And what's the manage account
21  page?
22     A. Looks like a manage account,
23  basically a menu in settings that would
24  allow you to access things like the
25  ability to edit your name, edit your

10 (Pages 37 to 40)

FTC v. Match Group, Inc., et al.                                                                6/22/2023

---

73

1  that having a password requirement had
2  on cancellation rates?
3        MR. MUNDEL:  Objection to
4  form.
5        A. I'm not aware.
6        Q. We talked about the various
7  versions of the link on the account
8  settings page, manage subscription,
9  change/cancel membership, and manage/
10  cancel subscription, correct?
11       A. Yes.
12       Q. And has there ever been
13  different verbiage used for that
14  particular link that you are aware of?
15       MR. MUNDEL:  Objection to
16  form.
17       A. Not that I'm aware of.
18       MR. TEPFER:  I'm going to
19  show you another video here, this
20  is going to be Exhibit 5.
21       (Exhibit 5, MATCHFTC 761906,
22  video deemed marked, marked for
23  identification, as of this date.)
24  BY MR. TEPFER:
25       Q. And the Bates number is MATCHFTC

---

74

1  761906, I'll just let it go here.
2        (Video played)
3        Q. Sorry, that one was a little
4  longer.
5        Have you seen that version of
6  the flow before?
7        A. It looks like a dated version of
8  the website, but yes.
9        Q. By dated historical or in the
10  past?
11       A. Yes.
12       Q. And do you know what time period
13  it was in use?
14       A. Not specific dates.
15       Q. The fine print at the bottom
16  said 2016, that I'm guessing probably
17  doesn't help?
18       A. Doesn't help too much, no.
19       Q. Is it likely the case that was
20  not in place past 2016, the video was
21  not taken later than 2016?
22       A. I'm not aware, I don't know the
23  specifics.
24       Q. So on the topic of potential
25  problems relating to users and entering

---

75

1  their password on Match.com, are you
2  prepared to discuss that topic today,
3  topic 30?
4        A. Yes.
5        Q. Do you recall any specific
6  documents that you reviewed concerning
7  this topic in preparation for today?
8        A. Not that I recall.
9        Q. From September 2014 to the
10  present did Match from time to time
11  receive complaints that the password
12  functionality on Match.com was not
13  working?
14       A. We received lots of complaints
15  about various different things.  It is
16  possible that users had challenges
17  logging in, we received some complaints
18  around this.
19       Q. Do users get locked out of their
20  account when they attempt to enter
21  their password too many times?
22       A. Yes, that can happen.
23       Q. Is there a number?
24       A. Not that I know of.
25       Q. If a user made too many attempts

---

76

1  to access the manage subscription flow,
2  would they then be directed to a
3  password reset process?
4        A. I'm not aware but if the, I'm
5  not aware of that specific flow.
6        Q. If a user forgets their password
7  is there a reset mechanism?
8        A. There is, yes, a reset password.
9        Q. And did Match ever receive
10  complaints about issues relating to the
11  functionality of that reset process?
12       A. I'm not aware of specific
13  complaints.
14       Q. Are you aware of for the time
15  period of September 2014 to the present
16  if Match experienced any technical
17  problems with the password entry
18  process that lasted longer than a day?
19       A. Not that I'm aware of.  I mean,
20  obviously we could have had a bug or
21  some other technical issue.  We always
22  work to resolve those as quickly as
23  possible.  Obviously any issues with
24  people logging in is counter to how we
25  operate our product and our business.

---

19 (Pages 73 to 76)

Sarah
Case 3:19-cv-02281-K   Document 239   Filed 10/16/23   Page 170 of 1058   PageID 12659
FTC v. Match Group, Inc., et al.                                              6/22/2023

77

1   We want people to engage with our
2   product, we want them to be partici-
3   pating in the product so we are
4   incentivized as an organization to make
5   sure those flows are working correctly.
6       Q. I want to ask about, so we have
7   seen in for example, Exhibit 11, when a
8   user clicks manage subscription it
9   continues to the flow, they are
10  presented with a password page, right?
11      A. Yes.
12      Q. Sorry.
13      Why does Match require a
14  password to access the manage subscrip-
15  tion or cancel membership page?
16      A. Do you specifically mean why we
17  need a password to access the subscrip-
18  tion status/cancel page?
19      Q. Yes, sir.
20      A. As I mentioned, in the past
21  depending on the kind of risk level we
22  see to the business there is different
23  security features established for each
24  of the different criteria.  For e-mail,
25  for example, or changing your name

78

1   there is a level of security that we
2   need for being able to access your
3   subscription status or resignation
4   given that's access to banking
5   information as well as we don't want
6   any nefarious activity happening on
7   your account, should you walk away from
8   your computer, for example, it is
9   pretty reasonable to have that as
10  password secured.
11      Q. So specifically concerning the
12  cancellation portion of that flow,
13  would you mind explaining the justifi-
14  cation for the password as to that
15  portion?
16      A. You can walk away from your
17  Match.com product experience, someone
18  else could access your account start
19  resigning on your behalf or controlling
20  parts of the experience on your behalf
21  through that flow which wouldn't be
22  sort of something that you would want
23  which is someone controlling your
24  subscription.
25      So it is pretty normal for that

79

1   to be password protected.  Again the
2   security levels differ based on the
3   risk we see so yes, it is password for
4   that flow, but it is contact our agent
5   team for changing your e-mail and your
6   password, for example.
7       Q. If I'm understanding you --
8       A. Correction, not your password,
9   your age or date of birth, sorry.
10      Q. Sure.
11      If I'm understanding you
12  correctly, it sounds like that MGLLC
13  has determined that unauthorized
14  cancellation is a higher risk area?
15      MR. MUNDEL:  Objection to
16  form, scope.
17      A. We keep referring to MGLLC here.
18  I just want to be clear we are talking
19  about Match.com.  Everything that we
20  looked at here, the people making these
21  changes, the folks working on this are
22  working on the Match.com business, I'm
23  not aware of the rest of question.
24      Q. When we are talking about the
25  people working on the Match.com

80

1   business, where did they work?
2       MR. MUNDEL:  Objection to
3   form.
4       A. Could you clarify your question?
5       Q. Sure.
6       I'm just like trying to under-
7   stand who their employer is.  When you
8   say, you clarified we are talking about
9   people that work on Match.com, and my
10  understanding is those folks work at
11  MGLLC.
12      Is that not the case?
13      MR. MUNDEL:  Objection to
14  form, also beyond the scope.
15      A. I'm not aware.
16      Q. So to rephrase the question
17  here, is it the case that password
18  reentry is required for proceeding with
19  the online cancellation flow because
20  Match's concern for unauthorized
21  cancellations?
22      A. Unauthorized cancellations, yes.
23      Q. And has there been an issue with
24  that at any point that you're aware of?
25      A. I'm not aware.

20 (Pages 77 to 80)

81

1    Q. Would you, so at that page of
2    the subscription status or cancel
3    subscription page, what happens, what
4    is on the subscription status page?
5    You mentioned a few things, I want to
6    have a fuller understanding what that
7    page is.
8    MR. MUNDEL:  Objection to
9    form.
10   A. Would it be possible to bring up
11   that page here so we can refer to it?
12   Q. Yes, let me pull that up.  We
13   are at minute 25 in the exhibit here
14   and Bates 906.
15   Would you mind describing this
16   page.
17   A. Yes, this is the subscription
18   status/cancel subscription page we
19   mentioned.
20   Q. And so that subscription status
21   link, what does a viewer see when they
22   click on that?
23   A. So we have some copy here that
24   gives us a sense of what they'll expect
25   to see which is the ability to change

82

1    their subscription information which
2    includes the ability to update their
3    credit card and billing information and
4    seeing how much time is left on their
5    subscription.  My understanding is they
6    can also choose change the tier of
7    subscription that they are on.
8    Q. Was there ever a period of time
9    where someone could access subscription
10   status without password reentry?
11   A. In my preparation I was made
12   aware there were various stages where
13   password requirement might not be
14   necessary for subscription status, it
15   just depended what information was
16   behind that page and how secure we
17   needed that page to be.
18   Q. And do you know the time periods
19   during which password reentry was not
20   required?
21   A. I'm not aware.
22   Q. And was it for months, do you
23   know?
24   A. Not aware.
25   Q. If a user were to access that

83

1    page there is reference to credit card
2    information, correct?
3    A. Yes.
4    Q. Would a user who had access to
5    that page be able to get a full credit
6    card number from the subscription
7    status page?
8    A. I'm not aware of, security
9    features have changed over time.  It
10   was the norm maybe many years ago to
11   have the full credit card number, now
12   just the last four digits, for example.
13   So again the website and product
14   experience changed based on the level
15   of security features that are available
16   and the level of risk at any given
17   point in time.
18   Q. And has Match ever experienced
19   issues with persons getting unauth-
20   orized access to users' subscription
21   status page?
22   MR. MUNDEL:  Scope.
23   A. Not aware.
24   Q. So Match at one time had a
25   subscription status flow that was a top

84

1    level option on the account settings
2    page, correct?
3    A. Not aware.
4    Q. So let's see, I want to return
5    here to, we are at one minute and nine
6    seconds here in this video ending Bates
7    906, do you see there down at the
8    bottom left the words subscription
9    status?
10   A. Yes.
11   Q. Is that the same subscription
12   status link that is also under the
13   change/cancel membership flow?
14   A. I would only assume it takes you
15   to the same place, the copy here says
16   something very similar.
17   Q. Do you know if that particular
18   subscription status link required
19   password reentry when you clicked it?
20   A. Not aware, but if it is going to
21   the same place I assume that there
22   would be a password.
23   Q. Do you know the time period
24   there was a top level subscription
25   status on the account settings page?

21 (Pages 81 to 84)

FTC v. Match Group, Inc., et al.                                    6/22/2023

---

89

1       So again MATCHFTC 751483 is
2   going to be Exhibit 6, and ending
3   Bates 1484 is going to be Exhibit
4   7.
5       (Exhibit 6, MATCHFTC 751483,
6   marked for identification, as of
7   this date.)
8       (Exhibit 7, MATCHFTC 751484,
9   marked for identification, as of
10   this date.)
11   BY MR. TEPFER:
12       Q. Take a look at Exhibit 6 first,
13   let me know after you had a chance to
14   look at it.
15       A. I looked at it.
16       Q. Do you know what this exhibit
17   is?
18       A. Is it an e-mail.
19       Q. An e-mail to you; is that right?
20       A. An e-mail from me to someone.
21       Q. It appears that Shamika Naik
22   says, "Here you go to you."  Is that
23   right?
24       A. Yes.
25       THE COURT REPORTER:  Please

---

90

1   spell that.
2       MR. TEPFER: S-H-A-M-I-K-A
3   N-A-I-K sent you this e-mail.
4       THE COURT REPORTER:  Thank
5   you.
6   BY MR. TEPFER:
7       Q. This e-mail is from February
8   9th, 2018, correct?
9       A. Correct.
10       Q. It appears to include a Power-
11   Point with some screenshots of the
12   resignation flow; is that right?
13       A. Correct.
14       Q. I'll represent that Exhibit 7
15   here is the attached PowerPoint the
16   company produced to us.  Do you
17   remember receiving the e-mail in
18   Exhibit 6?
19       A. I don't recall 2018, long time
20   ago.
21       Q. Do you remember this PowerPoint
22   here, Exhibit 7?
23       A. I can go through it now but I
24   don't recall it from that time.
25       Q. No worries, if you wouldn't mind

---

91

1   taking a look and just letting me know
2   if you remember it.
3       A. Yes, this looks like the resig-
4   nation flow one desktop.
5       Q. I'll draw your attention to
6   slide five of the PowerPoint.
7       A. That's page five?
8       Q. Yes, sir, sorry.
9       A. Yes, I'm there.
10       Q. Here this is the survey page of
11   the cancellation.
12       Is that correct?
13       A. Yes.
14       Q. And cancellation flow, it
15   appears the user in this capture has
16   selected the option "very few profiles
17   pique my interest," correct?
18       A. Yes.
19       Q. And it appears there is a second
20   follow up question that is displaying
21   as a result of that selection; is that
22   correct?
23       A. Yes.
24       Q. The follow up question is, "How
25   could we have helped?"

---

92

1       A. Yes, it says, "We are sorry to
2   hear that, how can we have helped?"
3       Q. If you go to page seven of this
4   PowerPoint, it appears that if you
5   selected on the survey page the option,
6   "I didn't receive enough replies to
7   e-mails I sent out," you would be
8   presented with a follow up question,
9   "We are sorry to hear that, how many
10   people did you e-mail."
11       Is that right?
12       A. Yes.
13       Q. So skipping forward to page nine
14   in the PowerPoint, it looks like if you
15   click "I met someone," you're asked,
16   "Where did you two meet;" is that
17   right?
18       A. Yes.
19       Q. Is there also a version that
20   asks for the membership ID of the
21   person that you met if you state that
22   you met the person on Match.com?
23       A. I'm aware of a version that has
24   that, again it says optional in
25   brackets.

---

23 (Pages 89 to 92)

93

1  Q. So for the survey page you
2  don't, if I'm understanding
3  correctly, you don't have to answer the
4  question, you can click continue
5  cancel; is that right?
6  A. Correct, the whole question is
7  optional.
8  Q. Has that always been the case
9  you can click continue cancel since
10 2014?
11 A. That's always been the case as
12 far as I'm aware.
13 Q. Does the website inform
14 customers anywhere that they can click
15 continue cancellation without answering
16 a survey question?
17 A. That's pretty normal behavior
18 where the error is presented to a user
19 if they were not able to do something.
20 THE COURT REPORTER:  Did you
21 say error or arrow?
22 THE WITNESS:  Error.
23 THE COURT REPORTER:  Please
24 continue.
25 A. For example, if the user was to

94

1  click cancellation and continue, we are
2  not able to do that without answering
3  the question, they would have seen an
4  error at the top.  So generally in UX
5  design you assume the user always wants
6  to move forward and would be able to do
7  that here.
8  Q. So to be clear, there is no
9  explicit language that states that,
10 correct?
11 A. Correct, as I mentioned because
12 of the UX behaviors we believe that
13 consumers use product by.
14 Q. So the user would determine that
15 through trial and error, correct?
16 A. Trial and error just using any
17 other consumer technology product they
18 have used.
19 Q. And so why does Match.com
20 include the survey screen in the
21 cancellation flow?
22 A. There are significant sorts of
23 data we get from the user answering the
24 survey for how we can make our product
25 better.  This data is tracked and we do

95

1  have our product team look to see how
2  the experience can be made better.
3  Q. Why did Match.com decide to put
4  the survey question at this spot in the
5  cancellation flow?
6  A. The users obviously expressed
7  their interest to cancel their
8  subscription, so we would like to know
9  why they were perhaps unhappy or maybe
10 happy with their experience on Match.
11 So it seems intuitive to ask this as
12 part of the experience.  We also get
13 the highest number of answers as part
14 of this experience so we have the most
15 data to inform how we drive our product
16 direction forward.
17 Q. So if I am understanding you
18 correctly, you're stating at this point
19 the user has expressed the intent to
20 cancel.
21 Is that correct?
22 MR. MUNDEL:  Objection
23 scope, form, misstates the
24 testimony.
25 Q. Sorry, I guess to rephrase, am I

96

1  understanding you correctly that the
2  reason the survey page is placed here
3  is because Match.com understands the
4  user has expressed an intent to cancel?
5  MR. MUNDEL:  Same objec-
6  tions.
7  A. Yes, yes.
8  I mean, the user is going
9  through the resignation flow and has
10 expressed an interest to resign their
11 Match.com subscription.  And so, this
12 is a point in time where we can
13 understand why they are trying to do
14 that.
15 Q. But at this point, at this point
16 in the flow the cancellation is yet not
17 effective.
18 Is that right?
19 A. I think so.
20 The intent the user has given,
21 they clicked on cancel subscription is
22 to go through and cancel their
23 subscription so they are in that flow
24 basically from a mind state perspec-
25 tive.

**APP 180**

Sarah
Case 3:19-cv-02281-K   Document 239   Filed 10/16/23   Page 174 of 1058   PageID 12663
FTC v. Match Group, Inc., et al.                                                    6/22/2023

97

1   Q. Is there a reason the survey
2   isn't placed after the cancellation
3   confirmation is received?
4      A. There is a couple reasons.  One
5   is there are answers here that could
6   lead to us, for example, offering the
7   user a cheaper subscription.  If you
8   were to say I can't afford a subscrip-
9   tion we would say hey, can we offer you
10  something that's a cheaper price point
11  so you can continue your subscription.
12     Obviously if you cancel that we
13  wouldn't have that information to be
14  able to do that.  We also know that
15  once people cancel they are not going
16  to answer this question, this becomes
17  an afterthought.  So again given how
18  important it is in informing our
19  overall product strategy why people not
20  be happy with our experience, we would
21  like to get as many people to answer as
22  possible.
23     The last thing I'll say is the
24  whole thing is optional.  If you really
25  didn't want do to this you can click

98

1   continue cancellation and continue on.
2      Q. Did Match.com ever consider
3   moving the survey page until after the
4   cancellation was effective?
5      A. Not that I'm aware of.
6      Q. Are you familiar with a Match.
7   Com employee named Chris Auderer?
8      A. Yes, in my preparation I was
9   made aware.
10     Q. Did you review any proposals by
11  Chris Auderer concerning online
12  cancellation flow in your preparation
13  for your testimony?
14     A. Yes, I did.
15     Q. So Ms. Auderer proposed to the
16  company they move the survey question
17  until after the cancellation was
18  complete.
19     Is that correct?
20     A. I can't remember the specifics
21  of the recommendation that Ms. Auderer
22  made.
23        THE COURT REPORTER:  How do
24  you spell Auderer?
25        MR. MUNDEL:  A-U-D-E-R-E-R.

99

1         THE COURT REPORTER:  Thank
2   you.
3   BY MR. TEPFER:
4      Q. So you mentioned that the survey
5   is optional, correct?
6      A. Yes.
7      Q. Does the fact that not all users
8   complete the survey effect the quality
9   of the data that Match.com receives
10  from the survey?
11     A. We just need a large enough
12  sample size completion to be able to
13  gain insights from the data in terms of
14  how we can make our product better.
15     Q. So self selection doesn't effect
16  the quality of the data that Match.com
17  receives from the survey?
18     A. It should not.
19     Q. You mentioned that if it was
20  placed after the cancellation was
21  effective, less users would complete
22  the survey.
23     Is that right?
24     A. Yes, that's our belief.
25     Q. Why do you believe that's the

100

1   case?
2      A. Once the user has cancelled
3   their subscription they'll probably
4   exit the browser and not really pay
5   attention to our survey.  And given how
6   critical the survey is informing our
7   product direction, how we can make
8   product better, we would like more
9   people to answer it obviously.
10     Q. Has Match.com ever conducted an
11  AB test to determine what the effect on
12  cancellation rates is by including the
13  survey page?
14     A. Not that I'm aware of.
15     Again it is an optional page,
16  there's not a lot of friction from my
17  perspective.  A user can move through
18  this very easily, that's not the only
19  reason we have it in that spot.  I
20  mentioned earlier because some answers
21  to the questions could lead you to
22  receiving an offer, for example.
23     Q. You use the word friction, how
24  are you defining, what do you mean by
25  that?

25 (Pages 97 to 100)

Saraph
Case 3:19-cv-02281-K   Document 239   Filed 10/16/23   Page 175 of 1058   PageID 12664
FTC v. Match Group, Inc., et al.
6/22/2023

101

1    A. A user getting stuck on the
2    page, for example.  Our belief this is
3    a very simple flow, you see the survey,
4    you can move past it if you don't want
5    to answer it, you can hit continue
6    cancellation which is clearly stated on
7    the page, or you can answer and move
8    forward, you have the optionality.
9        Q. What are some of the things that
10   add friction, I suppose?
11       MR. MUNDEL:  Objection
12   scope, form.
13       A. A pretty vague question, depends
14   on the situation what we are talking
15   about.
16       Q. Has Match.com ever determined
17   whether any aspect of the online
18   cancellation flow added friction?
19       A. My understanding is that there
20   is not much friction in this flow given
21   that when a user starts canceling and
22   ends their cancellation, north of 90
23   percent of users are able to success-
24   fully do that.  We also don't see a lot
25   of complaints from their users that

103

1    I'll go back, I want to ask about at
2    22 seconds or 21 seconds rather, the
3    save offer page here.  In this version
4    of the flow the user skips the survey
5    page and they are presented with this
6    save offer.
7        Is that right?
8        A. Can you go back to see what they
9    did on the prior page to this?
10       Q. Yes, going back to we are now at
11   16 seconds.
12       A. Okay.
13       Q. And playing, pausing again at
14   21.
15       A. Okay.
16       (Video played)
17       Q. So my question again if the user
18   skips the survey page they are
19   presented with this save offer; is that
20   right?
21       A. In this flow, yes.
22       Q. They are getting here 50 percent
23   off six months; is that right?
24       A. Yes.
25       Q. There is another version that

102

1    they are not able to do that.
2        Q. Some users in the cancellation
3    flow you mentioned receive a retention
4    offer?
5        A. Yes.
6        Q. Also known as a save offer,
7    right?
8        A. Yes.
9        Q. And between 2014 and the present
10   were there versions of the online
11   cancellation flow that didn't include a
12   save offer?
13       A. Not that I'm aware of.
14       Q. I'm going to play MATCHFTC
15   672309.
16       MR. TEPFER:  If we can mark
17   this as Exhibit 8.
18       (Exhibit 8, MATCHFTC 672309,
19   video deemed marked, marked for
20   identification, as of this date.)
21   BY MR. TEPFER:
22       Q. This is starting with somebody
23   named Amber.
24       (Video played)
25       Q. We have seen the whole thing,

104

1    has three months for the price of one;
2    is that right?
3        A. That's possible.  There is
4    multiple different save offers as part
5    of the program.
6        Q. So in terms of visuals they are
7    all substantially the same.
8        Is that right?
9        A. That's correct.
10       Q. Going back now to that resig-
11   nation flow PowerPoint that was
12   exhibit, going back to MATCHFTC 751484,
13   that's Exhibit 7, if we can look at
14   page 16, please.
15       MR. MUNDEL:  We don't have
16   the Bates numbers on 7, we will
17   trust and hope that you got it
18   right.
19       MR. TEPFER:  Sorry.
20   BY MR. TEPFER:
21       Q. Let's see, looking at this page
22   16 on Exhibit 7, it says, "Save offers
23   governed by attached rules up at the
24   top."
25       Do you see that language?

FTC v. Match Group, Inc., et al.                                    6/22/2023

---

105

1       A. Yes.
2       Q. This one here offers three
3   months for the price of one as the save
4   offer; do you see that?
5       A. Yes.
6       Q. Then there is on the right some
7   annotation about the save offer rules;
8   is that right?
9       A. Yes.
10      Q. It states, "These are the save
11  offer rules as of January 2011."
12      A. Yes.
13      Q. Do you know if these save offer
14  rules were accurate at the time this
15  PowerPoint was sent in February 2018?
16      MR. MUNDEL:  I object, for
17  clarity are you saying is it
18  accurate as of 2018 or is it
19  accurate as of January 2011?
20      Q. 2018 because when these was sent
21  to you in 2018, it references 2011.  I
22  just want to know if these are still
23  the save offer rules that were in place
24  at that time?
25      MR. MUNDEL:  Objection,

---

106

1   beyond the scope.
2       A. I'm not aware.
3       Q. Are you familiar with the save
4   offer rules for this page?
5       MR. MUNDEL:  Objection to
6   form and scope.
7       A. I'm not aware of the specific
8   rules.
9       Q. Do you know what the save offer
10  rules are currently right now?
11      MR. MUNDEL:  Same objection,
12  beyond the scope.
13      A. Not aware.
14      Q. Do you know if they have changed
15  over time?
16      A. I'm not aware that they have
17  changed.
18      Q. So the save offer page does it
19  always come, if a user presented the
20  save offer page, does it always come
21  after a save offer page in the cancel-
22  lation flow?
23      A. Not aware, but in the two
24  examples that I have seen it always
25  comes right after that page, yes.

---

107

1       Q. And then after the save offer
2   page is, to play the video here, we are
3   presented with this page, start at the
4   top it says Tell us more, it asks how
5   likely someone is to recommend Match.
6   Com to a friend.
7       Do you have a name for this
8   page?
9       A. We can just call it the NPS
10  page.
11      (Video played)
12      Q. And I know the acronym NPS, I
13  forget what's it for again?
14      A. Net Promoter Score.
15      Q. All right.
16      If we can call this the NPS
17  page.  Are you aware of any version of
18  the online cancellation flow that
19  doesn't have the save offer page in
20  between the survey page and the NPS
21  page?
22      A. Not that I'm aware of in the
23  instance save offer is being presented.
24      Q. Let's see, sorry, to make sure
25  I'm clear, what are the instances in

---

108

1   which user is not presented a save
2   offer, do you recall?
3       A. I don't know the specific rules
4   but its not that every user is given a
5   save offer.
6       Q. Are most users presented a save
7   offer?
8       A. Not aware.
9       Q. Do you know if most responses to
10  the survey result in a save offer being
11  displayed?
12      A. Not aware.
13      Q. If we can go back now to
14  MATCHFTC 774671, again I believe this
15  is Exhibit 1.  We are back on Exhibit
16  1, I'll take us to the NPS page.  This
17  is second 44 in the video here.  The
18  user is given the option of rating how
19  likely it is they recommend Match.com
20  to a friend with a score of 0 to 10; is
21  that right?
22      A. Yes.
23      Q. The user does not have to
24  actually answer this to progress
25  through the flow.

---

27 (Pages 105 to 108)

FTC v. Match Group, Inc., et al.                                        6/22/2023

---

109

1    **Is that right?**
2    A. It is optional.
3    **Q. And has that always been the**
4    **case?**
5    A. As far as I'm aware, yes.
6    **Q. Same question, is there a reason**
7    **this was presented to the user before**
8    **the cancellation is confirmed?**
9    A. Can you repeat the question?
10   **Q. Sorry, is there a reason that**
11   **this NPS page comes before the**
12   **cancellation confirmation?**
13   A. Yes, the reason it comes before
14   is so we can get data on whether the
15   user is likely to recommend Match to a
16   friend, so how happy were they with
17   their product experience.  It also
18   lists the benefits that the user would
19   be losing as a result of cancellation
20   so they are aware these benefits would
21   no longer be available to them.  And
22   once a user is made aware of those they
23   can continue the cancellation and get
24   the confirmation page.
25   **Q. So given, you mentioned the**

---

110

1    **importance of the survey and the**
2    **information received from the survey**
3    **page.**
4    **Is that correct?**
5    A. Yes.
6    **Q. And given the importance of that**
7    **survey, why does Match.com make it**
8    **optional?**
9    A. The survey page why is it
10   optional?
11   **Q. Yes.**
12   A. Because we don't want to add
13   friction in the cancellation flow.  So
14   if a user doesn't want to answer the
15   survey and just cancel their subscrip-
16   tion, we want to make sure they are
17   able to do that in a very simple flow
18   with three pages, and you have
19   cancelled.
20   And of course we want the
21   information but the user might not want
22   to give it to us and just wants to
23   continue, we want to make sure they
24   were able to do that.
25   **Q. Would making a survey page add**

---

111

1    **friction, you're stating?**
2    MR. MUNDEL:  Would you say
3    the question again.
4    MR. TEPFER:  Sure.
5    BY MR. TEPFER:
6    **Q. Would it add friction to make**
7    **the survey page nonoptional?**
8    MR. MUNDEL:  Objection form,
9    scope.
10   A. If the user has to answer the
11   survey page, I would think yes, that's
12   not the best UX practice when they are
13   trying to get through a cancellation
14   flow.  I think it is better it is
15   optional to be able to continue on.
16   **Q. Why is that not best UX**
17   **practice?**
18   A. The user wants to continue
19   through and cancel their subscription,
20   and we are asking them to do something
21   that maybe they don't want to do.
22   **Q. And does requiring the entry**
23   **password add friction to the cancel-**
24   **lation process?**
25   A. The requirement to have a

---

112

1    password is part of security features
2    as we have discussed prior.  So I think
3    its serves a purpose in terms of making
4    sure that the user's account is
5    protected.
6    **Q. Sure, I understand Match.com is,**
7    **MGLLC taking the position it adds, has**
8    **a purpose?**
9    A. Yes.
10   **Q. But what I'm asking is a little**
11   **different, does it add friction to the**
12   **cancellation process?**
13   A. I'm not aware.
14   **Q. Continuing we are on ending**
15   **Bates 671 again, and this is Exhibit 1,**
16   **I am going to hit play here at second**
17   **44.**
18   **(Video played)**
19   **Q. So stopping here at second 51,**
20   **the user at this point, this screen is**
21   **the cancellation confirmation page?**
22   A. Yes.
23   **Q. Only once the user views this**
24   **page is the cancellation effective; is**
25   **that right?**

---

28 (Pages 109 to 112)

FTC v. Match Group, Inc., et al.                                                    6/22/2023

---

113

1    A. Yes.
2    Q. So we talked about whether there
3    were any other versions of flow up to
4    the subscription status or cancellation
5    option page, right; do you remember
6    that?
7    A. Yes.
8    Q. And I want to ask sort of the
9    same question about from that page
10   going forward whether there are any
11   versions of the online cancellation
12   flow that we haven't discussed here
13   today beginning from September 2014 to
14   the present of which you're aware?
15       MR. MUNDEL:  Objection to
16   form.
17   A. As far as I'm aware there have
18   not been material changes to the flow
19   from the cancellation page to the
20   confirmation page other than increasing
21   clarity and copy to say continue
22   cancellation, that was not always the
23   case, for example.
24   Q. So if you said there was a
25   change to add at the bottom the button

---

114

1    that says continue cancellation; is
2    that right?
3    A. That's not what I said.
4    Q. Sorry.
5    A. The button always existed, the
6    copy on the button was updated to say
7    continue cancellation to give the
8    utmost clarity to our users.
9    Q. So just to make sure we are
10   talking about the same thing, I am
11   going to go here to and we are back in
12   Exhibit 1, we are looking at second 33
13   in the video.  We are here on the
14   survey page, right?
15   A. Correct.
16   Q. So the copy you're referencing
17   on the second blue button says continue
18   cancellation at the bottom.
19   A. Correct, I can't recall if its
20   for this page that was made or a
21   different page, but that language was
22   updated.  It is from the perspective
23   that we want this process to be easy
24   for users and clear to our users.
25       The other thing I'll add is half

---

115

1    the users that cancel come back to our
2    product later, so we want them to have
3    a positive experience throughout the
4    process.
5    Q. Do you recall what the copy was
6    for that button before the change was
7    made?
8    A. I don't recall exactly.
9    Q. Do you recall approximately when
10   that copy was added to the button?
11   A. I don't recall.
12   Q. Was it in the past five years?
13   A. I would rather not speculate.
14   Q. In terms of discussing the
15   cancellation flow between 2014 and
16   present, has there ever been different
17   copy on the survey page that you are
18   aware of?
19   A. I'm not aware.
20   Q. Has there ever been any
21   different versions of the NPS page of
22   which you're aware?
23   A. I'm not aware.
24   Q. And looking at, we are here at
25   second 38 in the video, there was a

---

116

1    period of time in which the buttons at
2    the bottom, one was a link, one was a
3    blue button.
4    Is that the case?
5    A. Yes, I believe instead of
6    continue cancellation it was a link at
7    the time, this change was made to
8    continue cancellation.
9    Q. And do you recall when that
10   change took place?
11   A. I don't recall when that change
12   took place.  It was done again with
13   this consistent clarity from each page
14   to the next that so we can keep the
15   continued cancellation language.
16   Q. So did Match ever consider
17   implementing any changes to shorten the
18   length of the online cancellation flow
19   at any time between September 2014 and
20   the present?
21       MR. MUNDEL:  One second.
22       MR. TEPFER:  Sure.
23       MR. MUNDEL:  No objection.
24   A. Not that I'm aware of.
25   BY MR. TEPFER:

---

29 (Pages 113 to 116)

FTC v. Match Group, Inc., et al.                                    6/22/2023

---

201

1          What topic?
2          MR. TEPFER:  I think off the
3    top of my head I think it is 23.
4          MR. MUNDEL:  One second.
5          It is 25, beyond the scope
6    of 25.
7          MR. TEPFER:  I almost said
8    25.
9          MR. MUNDEL:  Objection,
10   beyond the scope.
11   A. I'm not aware.
12   BY MR. TEPFER:
13   **Q. On average how much time was**
14   **remaining on the subscription for those**
15   **who sought chargebacks and lost the**
16   **dispute?**
17         MR. MUNDEL:  Objection,
18   beyond the scope.
19   A. I'm not aware.
20   **Q. Has MGLLC ever attempted to**
21   **calculate to determine how much time on**
22   **average was remaining on the**
23   **subscription for those who sought**
24   **chargebacks and lost that dispute?**
25         MR. MUNDEL:  Still beyond

---

202

1    the scope.
2    A. I'm not aware.
3    **Q. I want to talk about the mobile**
4    **version of the online cancellation flow**
5    **for a minute.**
6         **Can you tell me all the means by**
7    **which a user at this time can cancel**
8    **their subscription on their smart**
9    **phone?**
10        MR. MUNDEL:  Beyond the
11   scope.
12   A. I mean, I can tell you a few
13   different ones including the ability to
14   the contact customer service team and
15   online cancellation and through e-mail
16   chat, via phone and so forth, those are
17   some examples.
18   **Q. And so you mentioned at this**
19   **moment that users can cancel by phone;**
20   **is that correct?**
21   A. Yes.
22        Just to clarify, folks can call
23   in to our phone line and be given step
24   by step instructions how to cancel.
25   For full cancellation they would have

---

203

1    to reach out to one of our agents, and
2    they could e-mail or chat, you would
3    use our on online cancellation flow.
4    **Q. If a user were to call Match's**
5    **customer care line they would receive**
6    **an automated message redirecting them**
7    **to the online cancellation flow; is**
8    **that correct?**
9    A. Step by step message dictating
10   how they can cancel using the existing
11   means that we have, chat, e-mail or the
12   online flow, correct.
13   **Q. And how long has that been the**
14   **case that when a user calls in they**
15   **have the automated message with those**
16   **instructions?**
17   A. It has been the case for several
18   months now.
19   **Q. And you mentioned cancellation**
20   **by e-mail, is that sending e-mail from**
21   **my Yahoo e-mail address or is that**
22   **something on Match.com's web page?**
23   A. It is sending an e-mail to our
24   customer agent team who can then
25   process the resignation for you.  There

---

204

1    is also obviously the ability to chat
2    with one of our agents through the
3    website as well.
4    **Q. And you mentioned users can call**
5    **Match's customer care to get those**
6    **instructions?**
7    A. Yes.
8    **Q. Does Match.com have that phone**
9    **number anywhere on their website?**
10        MR. MUNDEL:  Hold on one
11   second.  Beyond the scope, go
12   ahead.
13   A. I'm not aware where a user would
14   find that Match.com website right now.
15   I do know a user can Google the phone
16   number or if they have already the
17   phone number from prior contact with
18   us, they would call the phone number.
19   **Q. You say they can Google the**
20   **phone number, would the phone number on**
21   **Google be on a website other than**
22   **Match.com?**
23   A. I'm not aware.
24   **Q. So when you say Google the phone**
25   **number, where would they be getting it**

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

205

1    from on Google?
2          MR. MUNDEL: Objection,
3    beyond the scope.
4          A. I'm not aware.
5          Q. And you said they can send an
6    e-mail to cancel, right?
7          A. Yes.
8          Q. Is there a like a particular
9    e-mail address to which the e-mail
10   should be sent?
11         A. I'm not aware off the top of my
12   head what the specific e-mail address
13   is.
14         Q. But I guess what I'm saying is,
15   does Match.com have e-mail address on
16   the website that you can take that and
17   put into e-mail on a third-party e-mail
18   platform and send e-mail requesting
19   cancellation?
20         MR. MUNDEL: Beyond the
21   scope.
22         A. I'm not aware.
23         Q. When you talk about canceling by
24   e-mail what do you mean?
25         A. So chat is live chat, e-mail is

206

1    e-mailing one of our agent teams and
2    then responding asynchronoustically.
3    So while chat is a live chat with an
4    agent, e-mail is asynchronous going
5    back to the user.
6          Q. What I'm trying to ask is,
7    sometimes when you go to websites there
8    is a field where you can enter
9    information and submit it that way.
10   I'm trying to understand if when you
11   say e-mail, is that what you're
12   referring to?
13         MR. MUNDEL: Beyond the
14   scope.
15         A. I'm not aware.
16         Q. When you say e-mail are you
17   referring to a method of communication
18   on Match's platform?
19         MR. MUNDEL: Form.
20         A. I am referring to sort of,
21   sorry, let me clarify this, traditional
22   e-mail.
23         Q. Okay.
24         Then do you know during what
25   time period cancellation by e-mail has

207

1    been available to Match's customers?
2          A. I don't have specific dates but
3    as long as I have been at Match, I know
4    it has been available.
5          Q. And the same question for
6    cancellation by chat.
7          A. Again for as far as I am aware
8    for an extended period of time.
9          Q. And then there was a time period
10   folks could cancel by calling in and
11   talk to a live representative; is that
12   correct?
13         A. Correct.
14         Q. Do you know what time period
15   that was available?
16         A. Prior to the last few months,
17   that was would be the case.
18         Q. And can a user cancel by U.S.
19   mail?
20         A. I'm not, I am not aware if we
21   still support that.
22         Q. And can a user cancel by fax?
23         A. Again I'm not aware if we still
24   support that, but those were methods
25   that were supported at some point in

208

1    time.
2          MR. MUNDEL: Do people still
3    use fax?
4          MR. AIJAZ: Unfortunately.
5          MR. TEPFER: I have not done
6    so in probably a decade, but
7    someone somewhere must.
8          MR. MUNDEL: Can we take a
9    break whenever it is convenient?
10         MR. TEPFER: Absolutely.
11         Off the record.
12         (Whereupon, an off-the-
13   record discussion was held.)
14         (Time noted: 2:44 p.m.)
15         (Time noted: 3:04 p.m.)
16         MR. TEPFER: We are back on
17   the record.
18   BY MR. TEPFER:
19         Q. Do you have a clarification?
20         A. I have a clarification, I want
21   to clarify a couple things.
22         You asked about you U.S. mail
23   and fax as ways to cancel these
24   subscriptions. Whether a user faxes
25   us, by U.S. mail sends us a letter, we

FTC v. Match Group, Inc., et al.                                        6/22/2023

---

209

1  will still prosecute that cancellation,
2  even if its actively shown on our
3  website as a method.  If a user choose
4  to do it and reaches out through
5  methods and finds those methods, we
6  will always process those.
7          And you had a question about
8  e-mail and online forms, and we support
9  both, so you can do traditional e-mail
10  directly to our customer services
11  e-mail address.  And we also have a
12  submit a request form online where you
13  can put in your e-mail address, your
14  phone number your request, and we will
15  take care of it and respond to that
16  request once you submit it so I just
17  wanted to make sure that I added some
18  clarity to those topics.
19      Q. And so you said if however a
20  consumer gives that request, Match.com
21  will process the request, right?
22      A. Correct.
23      Q. And U.S. mail as a means of
24  cancellation is not advertised on the
25  Match.com website.

---

210

1          Is that right?
2      A. No, its probably the slowest way
3  you can cancel your subscription
4  alongside fax.  So the ones that we're
5  advertising are ways that are easiest
6  for the user, most efficient for the
7  user, would be the best experience for
8  them, chat and e-mail obviously those
9  traditional channels they are fast, so
10  those are the ones that we advertise
11  and self service through the help FAQ
12  or through the online cancellation flow
13  are a really easy way to cancel if you
14  choose to.
15      Q. So the ones that Match.com
16  advertises to the customers as a means
17  of cancellation are to be clear, online
18  cancellation flow, the chat, and
19  e-mail?
20      A. Yes.
21      Q. Okay.
22          Does Match.com have a mobile
23  browser optimized version of the online
24  cancellation flow available to its
25  customers?

---

211

1          MR. MUNDEL:  Beyond the
2  scope, form.
3      A. I'm not aware what you mean by
4  mobile optimized version.
5      Q. And like if a user were to go to
6  the online cancellation flow from their
7  smart phone would they be viewing the
8  same version of the online cancellation
9  flow that a user would view from their
10  desktop website?
11      A. The flow is the same, you can
12  access both from desktop and mobile
13  web.
14      Q. And has Match.com taken any
15  steps to optimize the viewing of the
16  online cancellation flow from a smart
17  phone?
18          MR. MUNDEL:  Beyond the
19  scope, objection to form.
20      A. I'm not aware but from my
21  understanding of what I looked, any of
22  our users on mobile web had a seamless
23  experience of being able to cancel.
24  Like desktop users it hasn't been an
25  area of focus.

---

212

1      Q. So Match.com has never taken any
2  steps to optimize for viewing on the
3  smart phone the online cancellation
4  flow?
5      A. Not that I'm aware of.
6      Q. So can you users cancel their
7  membership from the Match.com app?
8      A. So if you're on the Match IOS
9  app cancellations are processed through
10  Apple, and so the user would have to do
11  that through their subscription
12  management with their Apple account.
13      Q. What about with Android?
14      A. My understanding with Android is
15  that you can cancel similar to mobile
16  web.
17      Q. I believe that you stated that
18  at this time the online cancellation
19  flow from the mobile browser is
20  identical to the one from the desktop
21  website.
22          Is that correct?
23      A. That's correct.
24      Q. Has there ever been a time
25  period where the online cancellation

---

53 (Pages 209 to 212)

FTC v. Match Group, Inc., et al.                                6/22/2023

---

213

1   flow was optimized for viewing from a
2   smart phone?
3        MR. MUNDEL:  I object,
4   beyond the scope, also assumes
5   facts.
6        A. I'm not aware.
7        Again I will mention that
8   everything we have looked at mobile web
9   users are able to seamlessly cancel
10   through the cancellation flow, same as
11   desktop users, so this is not an area
12   of focus.
13        MR. TEPFER: I'll hand you
14   now this document which will be
15   Exhibit 17.
16        (Exhibit 17, Defendant Match
17   Group, LLC's Second Amended
18   Responses and Objections to
19   Plaintiff Federal Trade
20   Commission's First Set of
21   Interrogatories, marked for
22   identification, as of this date.)
23   BY MR. TEPFER:
24        Q. It is titled Defendant Match
25   Group, LLC's Second Amended Responses

---

214

1   and Objections to Plaintiff Federal
2   Trade Commission's First Set of
3   Interrogatories.
4        Mr. Saraph, I want to ask you
5   about the entire document but first I
6   want to ask have seen this document
7   before?
8        A. I believe I have seen this.
9        Q. So this is a set of interro-
10   gatory responses that MGLLC provided to
11   us.  I want to ask you about the
12   current responses as amended and also
13   the prior responses.
14        So --
15        MR. MUNDEL:  I don't know
16   exactly what you mean by current
17   and prior.
18        MR. TEPFER:  There have
19   been, this is the second amend
20   response so I'm going to ask
21   about the amended responses and
22   questions about the earlier
23   version of the responses as well.
24        A. Are both of those in this
25   document?

---

215

1        Q. Yes, sir.
2        A. Okay.
3        Q. So I want to direct you to the
4   answer to interrogatory 15 on page 44
5   of the document, this is the original
6   response.
7        Did you have any involvement in
8   preparing this response?
9        A. I'm not sure about this specific
10   response, but counsel --
11        MR. MUNDEL:  Hold on, are
12   you going to say that you saw
13   this before?
14        THE WITNESS:  Yes.
15        MR. MUNDEL:  Just say, I saw
16   this before.
17        A. I have seen it before.
18   BY MR. TEPFER:
19        Q. Interrogatory 15A asks to,
20   "Describe each method through which
21   consumers can cancel their subscrip-
22   tion.  For each such method describe in
23   detail, A, every instance in which
24   Match Group, LLC informed consumers of
25   or disclosed to consumers the avail-

---

216

1   ability of each method."
2        Did I read that correctly?
3        A. Yes.
4        Q. Look at the first full paragraph
5   on page 45, it says, if you wouldn't
6   mind reading it because it is kind
7   lengthy of through to continuing on
8   page 46, and through the paragraph that
9   says consumers may also find, read that
10   as well?
11        MR. MUNDEL:  Start at the
12   bottom of 44, you can see the
13   whole thing.
14        THE WITNESS:  Sure.
15        Should I read it out loud?
16        MR. TEPFER:  No, it is too
17   long.
18        A. Okay.
19   BY MR. TEPFER:
20        Q. Just to be clear, you read the
21   from the start of the response at the
22   bottom of 44 through to end of that
23   paragraph that ends, i.e. turn over
24   autorenewal.
25        Is that right?

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

APP 189

FTC v. Match Group, Inc., et al.                                                                          6/22/2023

---

237

1       A. I'm not aware, but if there is
2   an article where it makes sense to
3   include that, our teams would have
4   included it.
5       **Q. So you're stating you don't know**
6   **if Match customer cares contact**
7   **information is located in an article**
8   **aside from the contact us FAQ article?**
9       A. That's correct.
10      **Q. Aside from the FAQ articles is**
11  **Match's customer care contact informa-**
12  **tion located anywhere else on the**
13  **Match.com website that you know of?**
14      MR. MUNDEL:  Hold on one
15  second, beyond the scope.
16      A. I'm not fully aware but I do
17  know that it is likely in the footer of
18  our Match.com desktop website where we
19  have a contact us link there behind the
20  gear icon we have already discussed,
21  and I'm not aware of other methods, but
22  we have always done our best to make
23  that available to our users.
24      **Q. So besides those methods of**
25  **finding this contact information we**

---

238

1   **have discussed, there are not any other**
2   **methods of locating this information?**
3       MR. MUNDEL:  Object, beyond
4   the scope, I think vague as you
5   just discussed.  As long as
6   you're taking into account
7   everything he just said --
8       MR. TEPFER:  Yes, I guess
9   other than, thank you.
10  BY MR. TEPFER:
11      **Q. To rephrase, other than the**
12  **means that you discussed today for**
13  **finding this contact information, are**
14  **there any other ways to find this**
15  **Match.com customer care contact**
16  **information?**
17      MR. MUNDEL:  Scope and form.
18      A. There may be other ways.
19      When you're reporting a concern
20  about one of our users we may have a
21  link that allows you to report that or
22  talk to a customer service agent if you
23  need to.  Some of these hyperlinks are
24  included in e-mails at various points
25  in the user journey, and there are

---

239

1   other ways that a user can reach out to
2   us.
3       **Q. You say reporting a concern**
4   **about a user, what is it that you're**
5   **referencing?**
6       A. If you're viewing a user profile
7   you're able to go and let's say there
8   is something wrong with the profile you
9   think doesn't meet the terms of use of
10  Match, you want to report that user for
11  behavior or content or whatever may be,
12  you can report the user.  And depending
13  on what type of report it is, we may
14  have to reach out to a customer service
15  agent, and we may have an agent reach
16  out to you.
17      **Q. You said they may reach out to a**
18  **customer service agent; is that what**
19  **you just said?**
20      A. If you report a concern on a
21  user, its possible that reported
22  concern to follow up on any parts of
23  that concern, an agent may work with
24  you on that.
25      **Q. I see, thank you.**

---

240

1       **Again based on your review of**
2   **this interrogatory response, is that a**
3   **complete list of everywhere on the**
4   **website that provides instructions to a**
5   **user concerning how to cancel with the**
6   **online cancellation mechanism?**
7       MR. MUNDEL:  Beyond the
8   scope.
9       A. I'm not aware.
10      I think the ones that are
11  covered in this document do cover a
12  large share of the ways that users can
13  cancel on Match.
14      **Q. So I want to draw your attention**
15  **to the second amended response here on**
16  **page 48 of Exhibit 17.  It states,**
17  **"Match.com no longer operates a**
18  **customer care call center, instead**
19  **customers are encouraged to use**
20  **Match.com's self help options such as**
21  **the help/FAQ pages on Match.com or the**
22  **online cancellation flow or the contact**
23  **customer care via other methods such as**
24  **the customer care online chat or e-mail**
25  **address."**

---

60 (Pages 237 to 240)

241

1  **Did I read that correctly?**
2  A. Yes.
3  **Q. Do you know how many customers**
4  **have called in to Match.com since**
5  **Match.com removed the customer care**
6  **number from its website?**
7      MR. MUNDEL: One second,
8  topic?
9      MR. TEPFER: I think --
10      Would you mind reading back
11  the question?
12      (Whereupon the aforemen-
13  tioned testimony was read back by
14  the Court Reporter.)
15      MR. TEPFER: I guess C, 28C.
16      MR. MUNDEL: Objection,
17  scope.
18      A. I'm not aware of the specific
19  data.
20  **Q. Okay.**
21      **Would you agree that Match.com**
22  **prefers for users to use the online**
23  **process for resolving issues as opposed**
24  **to contacting the customer care**
25  **department?**

242

1      MR. MUNDEL: Beyond the
2  scope.
3      A. I don't have a specific
4  position. I think the user should use
5  what the user is most comfortable with.
6  We do know online cancellation flow is
7  very fast and efficient, we know many
8  of our users want to talk to a customer
9  care agent either through chat or
10  e-mail and that's available to them as
11  well. I would say it's a customer
12  preference, not one that I want to
13  comment on from a business perspective.
14      **Q. So in the second amended**
15  **response in Exhibit 17 it says that,**
16  **"Instead consumers are encouraged to**
17  **use Match.com's self help options."**
18      **Do you agree users are**
19  **encouraged to use self help options for**
20  **their cancellation process on Match.**
21  **Com?**
22      A. Yes.
23      **Q. Is it cheaper for Match.com to**
24  **have users use self help as opposed to**
25  **having a customer care representative**

243

1  **deal with the issue?**
2      MR. MUNDEL: Objection,
3  beyond the scope.
4      A. I'm not aware.
5      Obviously live agents are very
6  expensive to any business, and picking
7  up a phone number and calling someone
8  and having a conversation with them
9  takes a lot of time. It is not
10  necessarily the most efficient way to
11  cancel either. Whereas with an online
12  cancellation flow as we looked all day
13  today, it would be three steps to
14  cancel, so that to me looks like the
15  fastest way to do it.
16      **Q. So is it Match.com's preference**
17  **that users who wish to cancel use the**
18  **online cancellation flow as opposed to**
19  **contacting Match through the other**
20  **means available to them?**
21      MR. MUNDEL: Objection to
22  form, beyond the scope.
23      A. Again, from a business perspec-
24  tive we don't really have a preference,
25  it is the really user preference what

244

1  will resolve their request in the best
2  way. If they want to do it themselves
3  and search through online cancellation
4  flow, we encourage them to do that as
5  we do believe that to be the fastest
6  way to cancel.
7      The second fastest being through
8  chat, live agent, and the third being
9  e-mail. Again, it is user preferences,
10  users want to have different options,
11  and it depends on the individual.
12      **Q. So do you agree that Match.com**
13  **most prominently advertises to**
14  **customers its online cancellation flow**
15  **as the means of cancellation available**
16  **to customers?**
17      MR. MUNDEL: Objection,
18  beyond the scope.
19      A. I'm not aware.
20      I think through the conversation
21  we had today we have seen that the
22  online cancellation flow, the ability
23  to access chat, the ability to access
24  e-mail are all relatively easy to do.
25  I would think anyone looking to do

61 (Pages 241 to 244)

Case 3:19-cv-02281-K   Document 239   Filed 10/16/23   Page 185 of 1058   PageID 12674
Sarah
FTC v. Match Group, Inc., et al.                                              6/22/2023

245

1    those on our website can easily find
2    those, so I don't have a particular
3    view on this other than to say that the
4    user can find all of those options and
5    find them easily.
6        Q. And in terms of chat are you
7    aware of anywhere on the Match.com
8    website where customers are explicitly
9    informed chat can be used for purposes
10   of cancellation?
11       A. At least on the contact us
12   article that we looked at prior it
13   says, "If you would like to contact the
14   Match.com care team, we offer several
15   contact options including chat or text
16   with us between 8:00 a.m. and 5:00 p.m.
17   Central time."
18       Q. Would you mind giving the exact
19   number?
20       A. That's Exhibit 18.
21       MR. MUNDEL:  Look at Exhibit
22   21 too.
23       THE WITNESS:  Sure.
24       MR. MUNDEL:  You asked
25   currently, right?

247

1    account and secure that where we may
2    not be able to do that just through an
3    online option.
4        Q. If we can look at I guess this
5    is Exhibit 21 here.
6        A. Yes.
7        Q. Bates 851, it says, "If you need
8    help log into your account to chat or
9    text with us."
10       What does it mean text with the
11   customer care?
12       A. I'm not sure what that language
13   in particular is referencing to, but
14   chatting or texting back and forth with
15   a live agent.
16       Q. So I want to hand you --
17       MR. TEPFER:  Is it okay to
18   take a quick break?
19       MR. MUNDEL:  Yes.
20       MR. TEPFER:  Let's go off
21   the record.
22       (Whereupon, an off-the-
23   record discussion was held.)
24       (Time noted:  3:59 p.m.)
25       (Time noted:  4:13 p.m.)

246

1        MR. TEPFER:  Yes.
2        THE WITNESS:  Sorry.
3        A. Again with Exhibit 21 at the
4    bottom here it says, "Need help log
5    into your account to chat or text with
6    us between 8:00 a.m. and 6:00 p.m.
7    Central time Monday through Friday."
8    And by the time you get to that part of
9    the article we have already given you a
10   step by step instruction on every
11   single platform of how you can cancel
12   your subscription yourself including a
13   detailed video showing you how you can
14   do that, and a link to the manage
15   subscription section where you can use
16   our online cancellation flows.  So if
17   at that point you choose not to use our
18   self serve options, then of course you
19   can contact our chat team.
20       Q. To chat with customer service do
21   you have to reenter your password?
22       A. I'm not aware.
23       Again it is a little bit
24   different because a customer care agent
25   can validate various parts of your

248

1        MR. TEPFER:  Let's go back
2    on the record.
3    BY MR. TEPFER:
4        Q. So did Match.com ever make
5    design choices on the site that were
6    intended to steer users to use online
7    processes as opposed to contacting
8    customer care?
9        A. Not that I'm aware of.
10       Q. For example, did Match.com ever
11   make changes that were intended to make
12   the phone number for Match.com customer
13   care less prominent for its users?
14       MR. MUNDEL:  Objection,
15   scope.
16       A. I'm not aware historically but a
17   phone number currently doesn't exist
18   because of the changes that we have
19   made to our customer call centers.
20       Q. I guess the same question for
21   e-mail contact information, did Match
22   ever make changes to make that phone
23   number or that e-mail address less
24   prominent?
25       MR. MUNDEL:  Objection,

Saraph
Case 3:19-cv-02281-K   Document 239   Filed 10/16/23   Page 186 of 1058   PageID 12675
FTC v. Match Group, Inc., et al.                                              6/22/2023

249

1      scope.
2      A. I'm not aware of, in general
3  again we are trying to make it as easy
4  as possible for a user to be able to
5  reach out to us across multiple
6  different channels because ultimately
7  we are incentivized to keep our users
8  happy.  We know even of the ones who do
9  cancel, 50 percent of them come back,
10 so internally as a business its just
11 good business for you to make sure
12 these channels are available.
13     Q. So I want to talk about the
14 historical practice of customer care
15 phone operations.
16        Users until a few months ago had
17 the option of canceling by contacting
18 customer care by phone; is that
19 correct?
20     A. Yes.
21     Q. Did the live agent have parti-
22 cular business hours?
23        MR. MUNDEL:  Beyond the
24 scope.
25     A. I'm not aware what the specific

250

1  hours were.
2      Q. Do you know if the specific
3  hours were consistent from 2014 until
4  the option ceased being available a few
5  months ago?
6        MR. MUNDEL:  Same objection.
7      A. I'm not aware.
8      Q. Back when Match.com had live
9  care agents what would happen if a user
10 contacted the customer care line after
11 business hours?
12        MR. MUNDEL:  Beyond the
13 scope.
14     A. I'm not aware.
15     Q. Do you recall if there was a
16 voicemail option?
17        MR. MUNDEL:  Scope.
18     A. I'm not aware.
19     Q. If we can go back to the
20 interrogatory response in Exhibit 17 on
21 page 46.  In this second full paragraph
22 here you see there is language that
23 states:  "The contact us FAQ page
24 provided several options to contact
25 customer care including through chat or

251

1  e-mail, and a phone number may be
2  displayed if a consumer is logged into
3  the consumer's account when viewing
4  that FAQ page."
5        Did I read that correctly?
6      A. Sorry, where are you reading
7  again, a consumer may also find
8  information, from there?
9      Q. Yes, that's where I started.
10     A. Yes.
11     Q. Is it the case that only users
12 who were logged into their account saw
13 that phone number?
14        MR. MUNDEL:  Objection,
15 beyond the scope.
16     A. I'm not aware, generally
17 speaking a user needs to be logged in.
18     Q. And is there a business reason
19 that the customer care number would
20 only be available to users who are
21 logged in?
22        MR. MUNDEL:  Beyond the
23 scope.
24     A. I'm not aware of the specifics
25 there.

252

1      Q. Is it also true that the number
2  was only provided for paid subscribers
3  of Match.com on this FAQ page?
4      A. I'm not aware of that.
5      Q. So during the time period that
6  Match had live customer care agents who
7  could process cancellations, the phone
8  number was available on this contact us
9  FAQ page.
10        Is that right?
11     A. Correct.
12     Q. Can you think of anywhere else
13 on the Match.com page that number would
14 have been provided?
15     A. I'm not aware of specific places
16 for the phone number.
17     Q. And are you aware of instances
18 in which Match.com customers complained
19 to Match the phone number was hard to
20 find?
21        MR. MUNDEL:  Hold on one
22 second.
23        MR. TEPFER:  Sure.
24        MR. MUNDEL:  I don't think a
25 complaint about phone numbers is

63 (Pages 249 to 252)

Saraph

Case 3:19-cv-02281-K   Document 239   Filed 10/16/23   Page 187 of 1058   PageID 12676
FTC v. Match Group, Inc., et al.                                                                6/22/2023

341

1    arrow manage subscription and then in
2    brackets is Hinge, purchases bracket
3    OkCupid, then manage my account.
4        Do you see that?
5        A. Yes.
6        Q. So am I correct in understanding
7    that you were proposing changing the
8    manage/cancel subscription to be like
9    the language on Hinge and OkCupid and
10   this other proposed language?
11       MR. MUNDEL: Objection,
12   scope and form.
13       A. I'm not aware but I would say
14   there were some suggestion based on
15   looking at other consumer products that
16   we have later in these slides.
17       Q. And did Match ever do any data
18   analysis to determine the effect that
19   language change like this would have
20   had on cancellation rates to your
21   memory?
22       A. I'm not aware.
23       Q. Did the company make the change
24   from manage/cancel subscription to
25   manage subscription in the desktop

342

1    version of the online cancellation flow
2    based on the data in this PowerPoint on
3    slide three?
4        A. Not that I'm aware of.
5        I think that language changes
6    was made across mobile web and desktop
7    as well as their apps at some point.
8    Manage/cancel subscription is very long
9    and we wanted to simplify, that's one
10   of the reasons we were looking to other
11   consumer products.
12       We also believe we don't need to
13   advertise cancel as long as there is a
14   clear and easy way for a user to be
15   able to do so, which the average user
16   understands with manage subscription we
17   have achieved that.
18       Q. And then on 3/21 here under
19   launch dates and slide two it says,
20   "Desktop legal requests changes, minor
21   copy changes."
22       Do you know what that copy
23   change was at this time?
24       MR. MUNDEL: Let me just, we
25   are not going to, you see the

343

1    legal reference, we are not going
2    to claw that back right now, but
3    you're just asking about the
4    second thing about the minor copy
5    change?
6        MR. TEPFER: Yes, just the
7    copy changes that occurred on
8    that date.
9        MR. MUNDEL: Nothing legal
10   related.
11       Do you know what it means by
12   minor copy changes?
13       THE WITNESS: I'm not aware.
14   BY MR. TEPFER:
15       Q. I'll just look real quick and
16   see if there is anything.
17       Real quick going back to
18   password reentry, if a user has
19   recently logged in they don't need to
20   reenter their password to view messages
21   they have sent on the Match.com
22   platform, correct?
23       MR. MUNDEL: Objection, form
24   and scope.
25       A. As long as they are logged in to

344

1    the Match.com product?
2        Q. Yes, if they recently logged in
3    a user does not need to reenter their
4    password to view messages on the
5    platform?
6        A. Depends on the --
7        MR. MUNDEL: Same objection.
8        A. Depends on the definition of
9    recently logged in. That doesn't mean
10   they are active in the product right
11   now or that they recently logged in and
12   have had, are coming back to Match
13   later, which then based on various
14   rules they may have to input their
15   password again.
16       Q. But to be clear, they don't need
17   to reenter their password every time
18   they go to view their messages; is that
19   the case?
20       A. As long as they are currently
21   logged in and actively going to their
22   messages, they will not have to again
23   input a password.
24       Q. And you say that of those who
25   cancelled, 50 percent come back to

Sarah
Case 3:19-cv-02281-K   Document 239   Filed 10/16/23   Page 188 of 1058   PageID 12677
FTC v. Match Group, Inc., et al.                                              6/22/2023

345

1  Match.com.
2      Is that the case?
3      A. Yes, 50 percent of our business
4  is resubscribers, people who are
5  subscribers in our product in the past
6  and have cancelled and have resub-
7  scribed.
8      The reason that I mention that
9  is we are incentivized as a business to
10  ensure that they have a positive
11  product experience, including the
12  cancellation flow and including the
13  rest of their experience in the
14  product, and knowing that this is the
15  behavior of a dating app user.
16      Q. And what data is that based off
17  of?
18      A. This is business data that I
19  have looked at.
20      MR. TEPFER:  How much time
21  is left?
22      THE COURT REPORTER:  One
23  minute left.
24      MR. TEPFER:  I literally
25  just finished.

346

1      MR. MUNDEL:  Give us two
2  minutes, we will come back.
3      MR. TEPFER:  I pass the
4  witness.
5      Off the record.
6      (Whereupon, an off-the-
7  record discussion was held.)
8      (Time noted:  6:41 p.m.)
9      (Time noted:  6:48 p.m.)
10  EXAMINATION BY
11  MR. MUNDEL:
12      Q. Welcome back.
13      A. Thank you.
14      Q. Can you tell us what is your
15  current role at Match.com?
16      A. I'm the general manager of
17  Match.com.
18      Q. How long have you worked at
19  Match.com?
20      A. I have worked at the company
21  since 2015.
22      Q. For how long have you been
23  responsible for the cancellation flow
24  among other product responsibilities?
25      A. Probably since I took the vice

347

1  president of product role starting in
2  2018.
3      Q. Based upon your product
4  responsibilities did you review the
5  cancellation flows?
6      A. Yes, that would be part of my
7  responsibilities.
8      Q. Have you ever made any changes
9  to those flows to make it more
10  difficult for customers to cancel?
11      A. No, if anything, as we talked
12  about earlier, we are incentivized to
13  make sure the process is as easy as
14  possible.
15      I can point out two examples,
16  but one being our added clarity on
17  button copy to say continue cancel-
18  lation as part of the cancellation
19  flow.
20      And the second being imple-
21  menting a deep link experience on the
22  mobile website that made it even easier
23  and more clear to users on how they
24  would cancel.
25      Q. Have you come to a view whether

348

1  or not the cancellation flow Match.com
2  uses is simple?
3      A. It is simple, it is just a few
4  steps, and users can cancel success-
5  fully.
6      Q. Do you have data supporting that
7  view?
8      A. Yes.
9      Users start the cancellation
10  flow, close to 95 percent are able to
11  successfully cancel.  And not everyone
12  has the intent to do that, so that
13  shows that the flow is pretty straight-
14  forward.
15      Q. Does everyone who starts the
16  cancellation flow actually want to
17  cancel?
18      A. Not necessarily.
19      There could be users who start
20  the cancel flow just because they want
21  to take advantage of a save offer
22  knowing that they can get a better
23  price.  We know that's true with other
24  businesses as well, or they just poke
25  around and want to see what's behind

87 (Pages 345 to 348)

FTC v. Match Group, Inc., et al.                                    6/22/2023

349

1   some of the screens and they really
2   have no intent to cancel.
3       Q. We talked today about the survey
4   page and the NPS page; do you recall
5   that?
6       A. Yes.
7       Q. Are those pages in the cancel-
8   lation flow designed to make it
9   difficult for customers to cancel?
10      A. No.
11          All the pages we looked at are
12  optional, and users can continue
13  cancellation which is clearly listed at
14  the bottom on the button if they don't
15  want to interact with the survey page.
16  The survey is easy to respond to, and
17  we don't to try hold users back in any
18  which way.
19      Q. What about complaints, do you
20  get a significant number of complaints
21  about the cancellation flow?
22      A. No.
23      Q. Do you track complaints to the
24  company?
25      A. We do track complaints within

350

1   the company, not just for cancellation
2   flow related issues but just product
3   issues in general across our business.
4   This has not been a high priority area
5   just because there aren't users
6   complaining, we have multiple channels
7   where people can reach out to us.
8       Q. You talked about the optional
9   nature of the surveys.
10          Is there a user experience way
11  that you can indicate that a particular
12  choice is mandatory before you can
13  proceed down a web path?
14      A. Absolutely.
15          You might have copy that says
16  these fields are mandatory.  You might
17  have red asterisks which say to you to
18  have to fill out this field.  You might
19  have bolded or highlighted it in
20  different ways so it looks like it is
21  mandatory, or you might throw an error
22  to a user when they try to proceed to
23  ask them to fill out that information.
24  We don't do any of that for our survey
25  pages and our cancellation flow, all of

351

1   it is optional.
2       Q. We talked today about the
3   various methods that customers can use
4   to cancel including web, desktop,
5   mobile, app, fax, chat, calling.
6          Why has Match.com made all of
7   those avenues available for a customer
8   to cancel?
9       A. It goes back to make sure our
10  customers are happy.  It is easy, we
11  know if they leave us they are going to
12  come back, so we want them to have a
13  positive experience and be able to have
14  as many touch points for those who are
15  canceling.
16      Q. There seems to be some
17  suggestion from the FTC that Match.com
18  pushes customers to the online cancel
19  as opposed to other forms of cancel; is
20  that accurate?
21      A. No, we want the user to use what
22  they are most comfortable with using
23  for cancellation, and we want to
24  provide as many options as we can fit
25  within our operational budget in order

352

1   to be able to do that.
2       Q. Is it in fact true that for most
3   customers who do cancel, cancel online
4   through the self cancel flow?
5       A. Yes, most people just use our
6   self service online cancellation flow.
7       Q. Does that surprise you?
8       A. No, it is the easiest way and
9   most efficient way to cancel.  You can
10  do it yourself, it is three steps.
11  There is no, even the questions are
12  optional and you can be done.
13      Q. And does the fact that your
14  business is a web application-based
15  business tell you one way or the other
16  as to whether your customers are likely
17  to prefer canceling online by
18  themselves versus calling in?
19      A. I mean, being a web-based
20  consumer technology company obviously
21  our users are savvy with using the
22  internet, they use websites.
23          And so just through qualitative
24  research and obviously real data that
25  shows us the volume of cancellations,

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

APP 196

Saraph
Case 3:19-cv-02281-K   Document 239   Filed 10/16/23   Page 190 of 1058   PageID 12679
FTC v. Match Group, Inc., et al.                                            6/22/2023

353

1    those are happening on the online
2    cancellation flow.
3        **Q. We talked earlier today that**
4    **Match.com stopped having a call center;**
5    **do you recall that?**
6        A. Yes.
7        **Q. Did the cancellation flow or the**
8    **cancelling of subscriptions have**
9    **anything to do with that decision?**
10       A. No.
11       **Q. Were a significant number of**
12   **customers canceling over the phone when**
13   **you made the decision to close the call**
14   **center?**
15       A. A significant number of people
16   were not canceling over the phone.  The
17   cost to operate call centers are
18   astronomical.
19       So given the two, we created an
20   automated system by which our users can
21   use one of the other channels that are
22   available to them including the online
23   cancellation flow, e-mail or chat to
24   achieve the same thing.
25       **Q. We saw earlier today some**

354

1    **suggestions or thoughts from Chris**
2    **Auderer about the cancellation flow; do**
3    **you recall that?**
4        A. Yes.
5        **Q. Did the company implement some**
6    **of the thoughts or suggestions that she**
7    **had?**
8        A. Everyone is entitled to ideas
9    and suggestions, all employees
10   including myself.  That doesn't
11   necessarily mean they are good ideas,
12   it doesn't necessarily mean we are
13   going to prioritize them higher, it
14   doesn't necessarily mean we are going
15   to move forward with them.
16       **Q. Do you think the ideas she**
17   **proposed or raised about the cancel**
18   **flow were positive for customers?**
19       A. There is some interesting user
20   experience designs in the proposals
21   that I haven't seen before that I just
22   didn't think were the right direction
23   that Match should go.
24       I think the current flow is
25   really simple, it is intuitive, it is

355

1    in line with how other consumer
2    technology companies would approach
3    this, and so we want our users to have
4    an experience that is familiar to them
5    and they can easily use.
6        MR. MUNDEL:  Nothing further.
7        MR. TEPFER:  I have nothing
8    further.
9        Off the record.
10       (Whereupon, an off-the-
11   record discussion was held.)
12       (Time noted:  6:56 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

356

1            C A P T I O N
2
3        The deposition of DUSHYANT SARAPH, taken
4    in the matter, on the date, and at the time
5    and place set out on the title page hereof.
6
7        It was requested that the deposition be
8    taken by the reporter and that same be reduced
9    to typewritten form.
10
11       It was agreed by and between counsel and
12   the parties that the deponent will read and
13   sign the transcript of said deposition.
14
15
16
17
18
19
20
21
22
23
24
25

Saraph

Case 3:19-cv-02281-K   Document 239   Filed 10/16/23   Page 191 of 1058   PageID 12680
FTC v. Match Group, Inc., et al.                                                6/22/2023

357

C E R T I F I C A T E

1
2
3    STATE OF _____:
4    COUNTY/CITY OF_____:
5
6    Before me, this day, personally appeared
7    DUSHYANT SARAPH, who, being duly sworn, states
8    that the foregoing transcript of his
9    Deposition, taken in the matter, on the date,
10   and at the time and place set out on the title
11   page hereof, constitutes a true and accurate
12   transcript of said deposition.
13
14   _____
15         DUSHYANT SARAPH
16
17   SUBSCRIBED and SWORN to before me this
18   _____ day of _____, 2023, in the
19   jurisdiction aforesaid.
20
21
22
23   _____  _____
24   My Commission Expires      Notary Public
25

358

C E R T I F I C A T E

1
2    STATE OF NEW YORK    )
3                        : ss.
4    COUNTY OF NEW YORK  )
5
6        I, Jeremy Frank, a Notary Public within
7    and for the State of New York, do hereby
8    certify:
9        That DUSHYANT SARAPH, the witness whose
10   deposition is hereinbefore set forth, was duly
11   sworn by me and that such deposition is a true
12   record of the testimony given by the witness.
13       I further certify that I am not related
14   to any of the parties to this action by blood
15   or marriage, and that I am in no way
16   interested in the outcome of this matter.
17       IN WITNESS WHEREOF, I have hereby
18   set my hand on the 27th day of June, 2023.
19
20            s/Jeremy Frank
21            JEREMY FRANK, MPM
22
23
24
25

359

INSTRUCTIONS TO WITNESS

1
2
3        Please read your deposition over
4    carefully and make any necessary corrections.
5    You should state the reason in the appropriate
6    space on the errata sheet for any corrections
7    that are made.
8        After doing so, please sign the errata
9    sheet and date it.
10       You are signing same subject to the
11   changes you have noted on the errata sheet,
12   which will be attached to your deposition.  It
13   is imperative that you return the original
14   errata sheet to the deposing attorney within
15   thirty (30) days of receipt of the deposition
16   transcript by you.  If you fail to do so, the
17   deposition transcript may be deemed to be
18   accurate and may be used in court.
19
20
21
22
23
24
25

360

*** ERRATA SHEET ***

1
2
     NAME OF CASE: FTC VS. MATCH
3    DATE OF DEPOSITION:  June 22, 2023
     NAME OF WITNESS:  SARAPH
4    PAGE  LINE     FROM      TO
5    ____|____|_____|_____
6    ____|____|_____|_____
7    ____|____|_____|_____
8    ____|____|_____|_____
9    ____|____|_____|_____
10   ____|____|_____|_____
11   ____|____|_____|_____
12   ____|____|_____|_____
13   ____|____|_____|_____
14   ____|____|_____|_____
15   ____|____|_____|_____
16   ____|____|_____|_____
17
     _____
18         DUSHYANT SARAPH
19   Subscribed and sworn to before me
     this _____ day of _____, 2023.
20
     _____
21   JEREMY FRANK    My Commission Expires:
22
23
24
25

90 (Pages 357 to 360)

# EXHIBIT K

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT L

APP 212

# In the Matter of:

# FTC v. Match Group, Inc., et al.

*July 13, 2023*
*Brandon Ward*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

---

**1**

```
 1            IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION
 3    FEDERAL TRADE COMMISSION,     )
                                    )
 4        Plaintiff,                )
                                    )   CASE ACTION NO.
 5    v.                            )
                                    )   3:19-cv-02281-K
 6    MATCH GROUP, INC., a          )
      corporation, and MATCH        )
 7    GROUP, LLC, formerly known    )
      as MATCH.COM, LLC, a          )
 8    limited liability company,    )
                                    )
 9        Defendants.               )
10
11    -------------------------------------------
                    ORAL DEPOSITION OF
12
                     BRANDON WARD
13
                     JULY 13, 2023
14
      -------------------------------------------
15
16         ORAL DEPOSITION OF BRANDON WARD, produced as a
17    witness at the instance of the Plaintiff, and duly
18    sworn, was taken in the above-styled and numbered cause
19    on July 13, 2023, from 9:01 a.m. to 6:17 p.m. before
20    Brent Sturgess, CSR in and for the State of Texas,
21    reported by machine shorthand at the law offices of
22    Sidley Austin LLP, 2021 McKinney Avenue, Suite 2000,
23    Dallas, Texas, 75201, pursuant to Notice, the Federal
24    Rules of Civil Procedure and the provisions stated on
25    the record or attached hereto.
```

---

**2**

```
 1                    I N D E X
 2                                               PAGE
 3    Appearances.......................................  3
 4    BRANDON WARD
           Examination by Mr. Aijaz.................    4
 5         Examination by Mr. Hummel............... 333
 6    Signature and Changes............................ 334
      Reporter's Certificate........................... 336
 7
 8                     EXHIBITS
 9    NUMBER    DESCRIPTION                         PAGE
10    1         Expert Report of Brandon Ward Regarding
                Match.com's Online Subscription
11              Cancelation Flow, 01-13-23.........   7
12    2         Articles...........................  17
13    3         Nielsen Norman Group - Heuristic
                Evaluation Workbook................  55
14
15    4         Articles...........................  58
16
17    5         What is a Good Task Completion Rate?.....  73
18    6         Video.............................. 135
19    7         Customer Satisfactory Survey - July 2015. 173
20    8         Video............................. 213
21    9         2013 - Current..................... 244
22    10        Rebuttal of Dr. King's Report Regarding
                Match.com's Online Subscription
23              Cancelation Flow.................. 286
24    11        Matchweb - 4390................... 301
```

```
23
24    Note:  Exhibit Numbers 6 and 8 are videos that were
             produced by counsel and remained in the
25           possession of counsel.
```

---

**3**

```
 1                A P P E A R A N C E S
 2
 3    COUNSEL FOR THE PLAINTIFF:
 4       M. Hasan Aijaz, Esq.
         Reid Tepfer, Esq.
 5       UNITED STATES FEDERAL TRADE COMMISSION
         1999 Bryan Street, Suite 2150
 6       Dallas, Texas 75201
         214.979.9386
 7       maijaz@ftc.gov
         rtepfer@ftc.gov
 8
 9    COUNSEL FOR THE DEFENDANTS:
10       Chad S. Hummel, Esq.
         SIDLEY AUSTIN LLP
11       1999 Avenue of the Stars, 17th Floor
         Los Angeles, California  90067
12       310.595.9505
         chummel@sidley.com
13
         Angela C. Zambrano, Esq.
14       Chelsea Priest, Esq. (via Zoom)
         SIDLEY AUSTIN LLP
15       2021 McKinney Avenue, Suite 2000
         Dallas, Texas  75201
16       214.981.3300
         angela.zambrano@sidley.com
17       cpriest@sidley.com
18
19
20
21
22    Witness:  Brandon Ward
23    Also Present:  Samuel Kitchens
                     Katie Johnson (via Zoom)
24                   Jeanette Teckman (via Zoom)
25    Court Reporter:  Brent Sturgess, CSR
```

---

**4**

```
 1            THE REPORTER:  Mr. Ward, would you
 2    please raise your right hand and be sworn?
 3            THE WITNESS:  (Witness complies.)
 4            THE REPORTER:  Do you solemnly swear or
 5    affirm that the testimony you will give in this matter
 6    will be the truth, the whole truth and nothing but the
 7    truth so help you God?
 8            THE WITNESS:  Yes.
 9            THE REPORTER:  Thank you.
10            MR. AIJAZ:  All right.  Thank you.
11                    EXAMINATION
12      Q.    (By Mr. Aijaz)  Good morning.
13      A.    Good morning.
14            MR. AIJAZ:  My name is Hasan Aijaz.
15    I'm here representing the Federal Trade Commission.
16    With me is my colleague and friend, Reid Tepfer.  And,
17    Counsel, would you please identify yourself for the
18    record?
19            MR. HUMMEL:  Chad Hummel, Sidley
20    Austin, for defendants.
21            MR. AIJAZ:  And could we identify
22    anyone on Zoom?
23            MR. HUMMEL:  Sure.  You've got Chelsea
24    Priest, Sidley Austin, and then in-house you've got
25    Katie Johnson, and here with me is Samuel Kitchens.
```

---

                                                    1 (Pages 1 to 4)

5

1         MR. AIJAZ:  Thank you.
2         Q.  (By Mr. Aijaz)  So I'll be -- and could you
3    identify yourself for the record?
4         A.  Brandon Ward.
5         Q.  All right.  And you'll be testifying here
6    today in the FTC versus Match matter as an expert; is
7    that correct?
8         A.  That is correct.
9         Q.  So I'll be asking you a series of questions,
10   which you are under oath to provide full and complete
11   answers.  Please make sure that you understand any
12   question that I ask before you answer.
13        If you don't understand a question, do
14   you agree to ask for a clarification?
15        A.  Yes.
16        Q.  Okay.  And did you take an oath before we
17   started this morning?
18        A.  I did.
19        Q.  Do you understand that the oath requires you
20   to fully answer each quest -- question to the extent
21   you can, and that if you don't know how to answer a
22   question, if you're not sure of it, that you still
23   must answer the question to the extent that you can?
24        A.  Yes.
25        Q.  Okay.  So, as you can see, the court

6

1    reporter is recording everything that's said here.
2         And because he can only record our
3    words, could you please make sure to answer each
4    question with a verbal response?
5         A.  Yes.
6         Q.  And along those same lines, to make his job
7    easier, we'll both try to wait for the other person to
8    finish speaking before we either answer or ask a
9    question.
10        Do you agree to that?
11        A.  Yes.
12        Q.  Have you taken any medications that would
13   affect your ability to testify accurately or honestly?
14        A.  No.
15        Q.  Is there any other reasons that you would
16   not be able to testify accurately or honestly today?
17        A.  No.
18        Q.  And from time to time you may hear an
19   objection.  After the objection you should still
20   answer the question unless you've been instructed not
21   to answer.
22        Do you understand that?
23        A.  I understand.
24        Q.  You should feel free to ask for breaks if we
25   need it.

7

1         But do you agree to answer any pending
2    question before we take a break?
3         A.  Yes.
4         MR. AIJAZ:  Okay.  So the first thing
5    I'd like to do is introduce Exhibit A.
6         (Sotto voce between Mr. Aijaz and Mr. Tepfer.)
7         MR. AIJAZ:  Yeah, that would be great.
8         MR. TEPFER:  Here you go.
9         THE WITNESS:  Thank you.
10        (Exhibit Number 1 marked.)
11        MR. AIJAZ:  Or Exhibit 1 rather.  So 1
12   is that one.  You can keep this one.
13        MR. TEPFER:  Oh.
14        MR. AIJAZ:  And then I'll give this one
15   to the reporter.  Do you need a copy?  Or are you
16   going to use a copy of this?
17        THE REPORTER:  If you want to mark
18   something, I can put a sticker on it, and then you can
19   refer to it.
20        MR. AIJAZ:  Okay.
21        (Sotto voce between Mr. Aijaz and Mr. Tepfer.)
22        Q.  (By Mr. Aijaz)  Mr. Ward, would you mind
23   giving the exhibit to the court reporter just for
24   marking?
25        And then he'll return it to you.  And,

8

1    going forward, I'll pass it this way to get to you.
2         THE WITNESS:  Thanks.
3         THE REPORTER:  You're welcome.
4         Q.  (By Mr. Aijaz)  So you've just been handed
5    what's been labeled Exhibit 1 titled Expert Report of
6    Brandon Ward Regarding Match.com's Online Subscription
7    Cancelation Flow dated January 13th, 2023.
8         Do you recognize this?
9         A.  It appears to be the report that I
10   generated, yes.
11        Q.  And who drafted this report?
12        A.  I did.
13        Q.  Did anyone help you?
14        A.  Yes.
15        Q.  Who?
16        A.  Members of my UX team at Precocity.
17        Q.  And what are their names?
18        A.  That would be John Coomer, River King and
19   Jessi Harbor.
20        Q.  And that's spelled H-a-r-b-o-r?
21        A.  I believe so, yes.
22        Q.  How do you spell Jessi?
23        A.  J-e-s-s-i-e.
24        Q.  Okay.  For each of those people, could you
25   identify how they helped you?

2 (Pages 5 to 8)

FTC v. Match Group, Inc., et al.

7/13/2023

9

1      A.  Yes.  As part of my UX team at Precocity,
2  they helped me proofread, find any spelling/
3  grammatical errors.  They helped check and double-
4  check calculations.  They helped me to go through and
5  code results in the usability study, double-check
6  citations, things of that nature.
7      **Q.  Okay.  So did -- with respect to coding, did**
8  **they do the coding or did you do the coding?**
9      A.  They did most of the coding, yes.
10     **Q.  Did you double-check their coding work?**
11     A.  I looked through some of it, not all.
12     **Q.  Okay.  We might get back to that later.**
13          **And just for my understanding, was**
14  **Precocity retained or were you retained for -- to**
15  **create this report?**
16     A.  I'm not exactly sure how to answer that.  I
17  am the expert that was retained.  However, I am a
18  consultant for Precocity.  So Precocity, the agency,
19  was retained and they are being paid.  I'm a salaried
20  employee of Precocity, but I am the expert witness.
21  My name is on the report.  It's my report.
22     **Q.  Okay.  And so for the purposes of the report**
23  **and your involvement in this matter, what is the**
24  **expertise that you're bringing to bear?**
25     A.  So I have multiple undergrad degrees in --

10

1  in the arts coupled with a master's degree in
2  interactive media design coupled with 23 years of
3  experience programming, researching, doing information
4  architecture, user research, usability testing,
5  user experience design, user interface design and
6  front-end development.
7          Around 47,000 hours of work in the
8  field for hundreds of projects with about as many
9  clients.  I've written 25 or so articles, spoken at 18
10  various conferences.  I teach at SMU and UX in service
11  design.  I teach workshops.  I've attended workshops
12  as well, attended conferences, learned and -- and
13  taught there as well.
14     **Q.  Okay.  So on Page 4 in this Paragraph 8 of**
15  **your report, you wrote that "I was retained by Sidley**
16  **Austin LLP to use my expertise in website design and**
17  **user experience to evaluate and offer opinions about**
18  **Match.com's online subscription cancelation flow."**
19          **Focusing on those two areas, website**
20  **design and user experience, are those areas in which**
21  **you have expertise?**
22     A.  I do have expertise in those areas.
23     **Q.  Are there any other areas beyond these two**
24  **that you are using your expertise for this matter?**
25     A.  Yes.  The -- the craft of user experience

11

1  design is quite holistic.  It encompasses many things
2  from varied fields like cognitive psychology, graphic
3  design, research and -- and just quite an enumerable
4  number of fields.  This is a very high-level summary
5  of user experience design and -- and web design in
6  particular.
7          But service design, like I said,
8  information architecture, UI design, graphic design,
9  contextual inquiry, heuristics, frameworks.  It's
10  just -- the list goes on and on.
11     **Q.  So are you an expert in cognitive**
12  **psychology?**
13     A.  To some extent where it applies to
14  interactive media design.
15     **Q.  Do you have any degrees in cognitive**
16  **psychology?**
17     A.  Just my master's degree in -- in -- in
18  interactive media design that incorporated some
19  studies in cognitive psychology.
20     **Q.  Do you have a specific cognitive psychology**
21  **degree?**
22     A.  I do not.
23     **Q.  With respect to that, to that**
24  **master's degree you just mentioned, you said it was in**
25  **interactive media?**

12

1      A.  Interactive media design.
2      **Q.  Okay.  On Page 2, Paragraph 2 of your report**
3  **you say "I received my M.S. in telecommunications from**
4  **Indiana University, Bloomington."**
5      A.  Uh-huh.
6      **Q.  Is that the same degree you're referring to?**
7      A.  Yes.  I received my M.S. in
8  telecommunications from IU-Bloomington through the
9  master's in immersive mediated environments program.
10  That's the interactive media design program.
11     **Q.  Okay.  So the degree itself is a**
12  **telecommunications degree; is that right?**
13     A.  It's under that department.
14     **Q.  Which department?**
15     A.  My degree in interactive media design is
16  underneath the telecommunications department.
17     **Q.  Okay.  What is the title of the degree**
18  **itself?**
19          **Master's of science in?**
20     A.  I believe it's in telecommunications.  MIME
21  is what the program was called.  So everybody who went
22  through my program were considered -- MIMEsters was
23  the nickname.  But because MIME is so ambiguous, we --
24  we tend to just say the whole thing out loud.
25          And my shorthand for MIME, master's in

3 (Pages 9 to 12)

**APP 216**

FTC v. Match Group, Inc., et al.                                    7/13/2023

---

13

1    immersive mediated environments.  Because it
2    encompasses a lot of things, my particular program was
3    focused on interactive media design specifically.
4        Q.  Okay.  Are you a survey design expert?
5        A.  I would say, yes.
6        Q.  Okay.  And what's the basis for your
7    expertise in survey design?
8        A.  Through my 23 years of -- of experience
9    designing and researching websites, I have studied and
10   researched the practice of design, read articles and
11   books, followed examples and frameworks from some of
12   the masters, Jacob Nielsen, Jeff Sauro and -- and
13   their ilk to try to -- to hone my craft, to better
14   research the projects that I had been working on.
15       Q.  Do you have any education in survey design?
16       A.  As I said, my education comes from workshops
17   and from my -- my master's degree coupled with
18   attending conferences, reading books, attending
19   lectures and -- and learning online.
20       Q.  Okay.  What conferences did you attend
21   regarding survey design?
22       A.  It's tough to answer that question.  I've
23   attended a lot of conferences.  Some of the
24   conferences I've attended were IXDA, which is the
25   Interaction Design Association conference.

---

14

1            I've attended Service Design Network
2    conferences.  I've attended User Experience
3    Professionals Association conferences and spoke at
4    them as well.  I've attended a Big Design Conference
5    and Game Developers Conference and probably some more
6    that I can't think of right at this moment.
7        Q.  And all those were related to survey design?
8        A.  Aspects of them, yes.  Again, UX is -- is
9    many varied and -- and survey design, quant and qual
10   research is an aspect of it, and I've attended
11   workshops and -- and panels on that specifically.
12       Q.  Okay.  What specific workshops on survey
13   design did you attend?
14       A.  I can't recall specifically.  It's been over
15   the course of 23 years.
16       Q.  In your master's degree, do you recall any
17   specific coursework on survey design?
18       A.  No.  Again, that's also been about 23 years
19   almost.
20       Q.  Okay.
21       A.  I don't recall any specific ones, no.
22       Q.  Do you have any peer-reviewed publication
23   with respect to survey design?
24       A.  I have no peer-reviewed publication, but I
25   do publish fairly frequently on my blog.

---

15

1        Q.  Okay.  Any published books?
2        A.  I have not written any published books, but
3    I have assisted in the editing of a book, This Is
4    Service Design Doing.
5        Q.  Service Design Doing.  So I'll just go back
6    over two other areas of expertise and similar
7    questions.
8            So with respect to user experience, is
9    user experience synonymous with UX?
10       A.  I would say that, yes.
11       Q.  Okay.  And can you describe that area of
12   expertise, what it entails?
13       A.  I -- I can attempt.  It's -- it's a -- it's
14   a big field.  User experience design, in a nutshell,
15   encompasses understanding a problem, the research
16   investigation, digestion of a problem space, the
17   generation of insights regarding that problem in the
18   specific problem context, applying those insights
19   through design, research, testing, and then taking
20   your design and ideating them, and then, of course,
21   testing those again, applying that in development
22   even, and then, of course, looping back again.
23           At Precocity, in fact, we have a
24   shorthand for describing the process called IDEA,
25   insights, design, evaluate, apply.  The first part is

---

16

1    about understanding, like I said, unraveling the yarn
2    of the problem.  Design is the attempted solution of
3    the problem.  Evaluate, you test your hypothesis,
4    which was your design.  And then you apply it if you
5    think it was effective.
6            And then, of course, you continue to do
7    it over and over again.  There are a lot of other
8    factors that -- that I can speak to if you'd like to
9    go deeper.
10       Q.  When you first started your answer, you said
11   "user experience design".  So I just want to make sure
12   we're using the same terms.
13       A.  Sure.
14       Q.  So is user experience UX and user experience
15   design all -- are all those terms synonymous?
16       A.  To an extent.  So in my world, in fact, I
17   actually can in -- in some cases just say "experience
18   design" because it's a little more general.  Because
19   in my world I wear the hats of a UXR, a UX researcher,
20   a UXD, a UX designer, a UID, sometimes a UI designer,
21   an IAD, which is an information architect or -- and
22   design sometimes, and then there are others.  Service
23   design, SD.
24           And so all of those little acronyms,
25   they are all aspects of the overall experience of --

---

4 (Pages 13 to 16)

FTC v. Match Group, Inc., et al.

7/13/2023

333

```
1              How did you interpret potential
2    problems?
3         A.  I interpret that as to basically what I do
4    in the -- in the line of what I do in my work every
5    day, which is solve them, right, which is the creation
6    of new design to enhance or change something.  So,
7    again, that wasn't part of my assignment, to redesign
8    the flow.  So that's how I interpreted that.
9         Q.  Was it part of your assignment to suggest
10   ways to improve the flow or make it simpler?
11        A.  No.
12        Q.  Was it part of your assignment to solve what
13   you viewed as potential problems?
14        A.  No.
15             MR. HUMMEL:  Okay.  I don't have
16   anything further.
17             MR. AIJAZ:  All right.  We're done.
18   Thanks so much.
19             MR. HUMMEL:  All right.  Thank you,
20   guys.  Off the record.
21            (Deposition concluded:  6:17 p.m.)
22
23
24
25
```

334

```
1             CHANGES AND SIGNATURE
2          WITNESS NAME:  BRANDON WARD
3             DATE:  JULY 13, 2023
4       PAGE LINE    CHANGE         REASON
5       _____
6       _____
7       _____
8       _____
9       _____
10      _____
11      _____
12      _____
13      _____
14      _____
15      _____
16      _____
17      _____
18      _____
19      _____
20      _____
21      _____
22      _____
23      _____
24      _____
25      _____
```

335

```
1              I, BRANDON WARD, have read the foregoing
2    deposition and hereby affix my signature that same is
3    true and correct, except as noted above.
4
5
6                   _____
6                   BRANDON WARD
7    THE STATE OF _____)
8    COUNTY OF _____)
9
10             Before me, _____, on
11   this day personally appeared BRANDON WARD, known to me
12   (or proved to me under oath or through
13   _____) (description of identity card or
14   other document) to be the person whose name is
15   subscribed to the foregoing instrument and acknowledged
16   to me that they executed the same for the purposes and
17   consideration therein expressed.
18             Given under my hand and seal of office this
19   _____ day of _____, _____.
20
21
22
23
24                  _____
24                  NOTARY PUBLIC IN AND FOR
                    THE STATE OF _____
25                  COMMISSION EXPIRES:  _____
```

336

```
1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION
3    FEDERAL TRADE COMMISSION,   )
                                 )
4        Plaintiff,              )
                                 )     CASE ACTION NO.
5    v.                          )
                                 )     3:19-cv-02281-K
6    MATCH GROUP, INC., a        )
     corporation, and MATCH      )
7    GROUP, LLC, formerly known  )
     as MATCH.COM, LLC, a        )
8    limited liability company,  )
                                 )
9        Defendants.             )
10            REPORTER'S CERTIFICATION
11           DEPOSITION OF BRANDON WARD
12               JULY 13, 2023
13        I, Brent Sturgess, Certified Shorthand Reporter in
14   and for the State of Texas, hereby certify to the
15   following:
16        That the witness, BRANDON WARD, was duly sworn by
17   the officer and that the transcript of the oral
18   deposition is a true record of the testimony given by
19   the witness;
20        That the deposition transcript was submitted on
21   August 2, 2023 to the witness or to the attorney
22   for the witness for examination, signature and return to
23   me by August 22, 2023;
24        That the amount of time used by each party at the
25   deposition is as follows:
```

84 (Pages 333 to 336)

Ward

FTC v. Match Group, Inc., et al.

7/13/2023

337

1      M. Hasan Aijaz - 07 HOUR(S):03 MINUTE(S)
        Chad S. Hummel - 00 HOUR(S):01 MINUTE(S)

2

3      That pursuant to information given to the
4  deposition officer at the time said testimony was taken,
5  the following includes counsel for all parties of
6  record:
7      That $_____ is the deposition officer's
8  charges to M. Hasan Aijaz, for preparing the original
9  deposition transcript and any copies of exhibits;
10     I further certify that I am neither counsel for,
11  related to, nor employed by any of the parties or
12  attorneys in the action in which this proceeding was
13  taken, and further that I am not financially or
14  otherwise interested in the outcome of the action.
15     Certified to by me this 2nd day of
16  August, 2023.

17

18

19

20

21

22      s/Brent Sturgess
        Brent Sturgess, CSR No. 3557
23     Expiration Date:  12/31/23
        Five Star Court Reporting
24     1225 North Loop West, Suite 327
        Houston, Texas  77008
25     Phone:  512-672-8674

85 (Page 337)

# EXHIBIT M

1

2                   UNITED STATES DISTRICT COURT

3                 FOR THE DISTRICT OF TEXAS

4                        DALLAS DIVISION

5                          ---oOo---

6      FEDERAL TRADE COMMISSION,

7              Plaintiff,

8                   vs.            No. 3:19-cv-02281-K

9      MATCH GROUP, INC., a

       corporation, MATH GROUP, LLC,

10     formerly MATCH.COM, LLC, a

       Limited Liability Company,

11

                Defendants.

12     _____/

13

14

15

16                     DEPOSITION OF

17                  JENNIFER KING, PH.D.

                    ***CONFIDENTIAL***

18     _____

19              THURSDAY, JULY 27, 2023

20

21

22

23     REPORTED BY:  HOLLY THUMAN, CSR No. 6834, RMR, CRR

24     JOB NUMBER 6028094

25

                                              Page 1

1  in this case?
2      A. I have.
3      Q. And you have provided two separate expert
4  reports. Right?
5      A. A rebuttal -- yes, an expert and a rebuttal,
6  yes.
7      Q. Right. And as of the date of the initial
8  expert report, which we've marked as Exhibit 1, and
9  here are some copies --
10     A. Thank you.
11     Q. Here's the official version.
12     Do you need one?
13     MR. AIJAZ: If you have an extra. If you
14  don't --
15     MR. HUMMEL: I do.
16     MR. AIJAZ: Thank you.
17 BY MR. HUMMEL:
18     Q. Is Exhibit 1 a copy of the expert report you
19  submitted in this case on January 13, 2023?
20     A. Uh-huh.
21     Q. Is that yes?
22     A. Yes. Sorry.
23     Q. All right. And Exhibit 2.
24     Exhibit 2 is a copy of the rebuttal report you
25  prepared and submitted in this case?

Page 6

1      A. I have.
2      Q. You understand you're under oath?
3      A. Of course.
4      Q. Any reason you can't give your best testimony
5  here today?
6      A. No.
7      Q. One of the rules we have to follow is that I
8  will try my best to let you finish your answer --
9      A. Uh-huh.
10     Q. -- without interrupting you --
11     A. Sure.
12     Q. -- if you also allow me to finish my question
13  so that it's a clean question and answer for the court
14  reporter.
15     A. Of course.
16     Q. Okay. If there's a question that I ask you
17  that you don't understand, you have every right and
18  ability to ask me to clarify it or to tell me you don't
19  understand it.
20     A. Sure.
21     Q. If you go ahead and answer a question, the
22  trier of fact in this case, and we will argue, that you
23  understood the question and gave a complete and full
24  answer to my question.
25     Do you understand that?

Page 8

1      A. Yes, it is.
2      Q. How much time did you spend preparing the
3  initial expert report dated January 13, 2023?
4      A. I -- you know, I could, obviously, go back and
5  look at my hours to be precise, but I think around the
6  neighborhood of about 80 hours.
7      Q. And you were assisted by two people?
8      A. I was.
9      Q. Who are those folks?
10     A. Janiya Peters -- actually, sorry, three
11  people.
12     Two at the beginning -- sorry.
13     Two for the first report; three for the final
14  report. I --
15     Q. Let me -- talk to me about the two people --
16     (The reporter requested that people not speak
17     at once.)
18     THE WITNESS: Janiya Peters and
19  Caroline Sinders.
20 BY MR. HUMMEL:
21     Q. Okay. And how are they employed?
22     A. Janiya Peters is a Ph.D. candidate at
23  UC Berkeley, and Caroline Sinders is an independent
24  researcher based out of London.
25     Q. You've been deposed before?

Page 7

1      A. Yes, I do.
2      Q. Okay. So the two people that you referenced
3  that assisted you in your first report, what did they
4  do?
5      A. Both of them assisted me with the heuristic
6  analysis. I mean, they -- I, of course, am the expert.
7  I did the full and complete analysis, but they provided
8  me with their opinions as well.
9      Q. Do they provide those opinions in writing?
10     A. They may have taken notes on their end, but
11  generally, that was a collaborative process where we
12  would meet online and discuss, and I took notes.
13     Q. Did you rely on those notes in connection with
14  preparing your expert report?
15     A. The notes that I took?
16     Q. Yeah.
17     A. Yes.
18     Q. Did you rely on any notes that these other two
19  individuals took?
20     A. I don't believe I have seen their notes, but I
21  would need to double-check.
22     Q. Do you know what guides or handbooks or
23  workbooks they used, if any, in connection with their
24  doing parts or pieces of a heuristic analysis?
25     A. I don't believe they used any guide or

Page 9

3 (Pages 6 - 9)

1   workbooks.
2   Q.  How were they guided, if you know, in what to
3   look for in a heuristic analysis?
4   A.  Well, I mean, we were all familiar with
5   Nielsen's Ten Heuristics.  That's why I work with them.
6   Q.  And by "Nielsen's Ten Heuristics," can you
7   define what you mean?
8   A.  Jakob Nielsen's 10 Usability Heuristics.  I
9   don't have them memorized, but I'll be happy to read
10   them off if you have a copy of that article.
11   Q.  I do, and we'll talk about that later.
12   Do you know what the Nielsen Norman Group is?
13   A.  I sure do.
14   Q.  So what is it?
15   A.  So it's a consulting firm that was founded by
16   Jakob Nielsen and Professor Donald Norman.  I'm not
17   sure when; mid- or late '90s.
18   But Nielsen was a usability expert and
19   researcher, I believe, at Sun Microsystems.
20   Donald Norman's been a professor of cognitive
21   psych at UC San Diego, I think, for decades.
22   And so they formed a research and consulting
23   group during the first dot-com boom.
24   Q.  Do you consider the Nielsen Norman Group to
25   have authoritative expertise in the field of usability?

Page 10

1   A.  I do.
2   Q.  Can you tell me how much time each of the
3   individuals who worked on your heuristic analysis with
4   you spent analyzing Match.com cancellation web flows?
5   A.  I would have to look at my record.  I don't
6   remember off the top of my head.  Not as much as me,
7   but --
8   Q.  And how much did you spend doing your
9   heuristic analysis?
10   A.  I would have to go back to my records.  I
11   don't have a clear division of that piece versus the
12   writing piece versus, you know, everything else.
13   Q.  So, as you sit here today, you can't discern
14   between the amount of time you spent doing the analysis
15   versus the analysis -- excuse me, the heuristic study
16   versus the analysis versus the writing?
17   MR. AIJAZ:  Objection.  Misstates testimony.
18   THE WITNESS:  I mean, I can estimate for you.
19   BY MR. HUMMEL:
20   Q.  Please.
21   A.  Okay.  So I probably spent in the order of
22   5 to 10 hours working through the heuristic analysis.
23   I'm trying to remember how much time I spent writing.
24   There was a lot of writing.
25   And, I'm sorry, what was the other piece of it

Page 11

1   you were asking; heuristic analysis and --
2   Q.  How much time you actually spent looking at
3   the website versus how much time you spent doing the
4   heuristic analysis versus the writing.
5   A.  I mean, that's hard to say because you go back
6   and look at the website continuously as you're writing.
7   But, you know, as an independent task, looking
8   at the website, I'm going to guess in the magnitude of
9   5 to 10 hours.
10   Q.  Do you agree that the purpose of heuristic
11   analysis or a heuristic evaluation is to find usability
12   problems on an interface?
13   A.  Yes.
14   Q.  Okay.  And do you agree that a heuristic
15   evaluation is difficult for a single individual to do
16   because one person will never be able to find all the
17   usability problems on an interface?
18   A.  I disagree that it's difficult to do.  I think
19   you have to understand Nielsen's framing of what a
20   heuristic analysis is supposed to accomplish.
21   So it -- if I may, Nielsen developed this --
22   this method in order to give practitioners a way to
23   provide a -- a concise analysis without the need or
24   requirement to engage in user testing in order to spot
25   a handful of particular canonical usability issues.

Page 12

1   So it comes out of a tradition I would argue
2   he started called "discount usability."  This was back
3   in the early '90s, mid-1990s, and he was essentially
4   trying to develop this method in order to, I would say,
5   democratize, essentially, this practice to make it more
6   widespread.
7   So it is a way of identifying errors without
8   having to engage in user testing.
9   That said, it does not necessarily uncover all
10   errors, and user testing can also find different
11   errors.
12   Q.  You did not do a usability study.  Correct?
13   A.  I did not do a usability study.
14   Q.  Is it true, as Jakob Nielsen wrote in
15   November 1, 1994, in his article called "How to Conduct
16   a Heuristic Analysis," that the output from using the
17   heuristic evaluation method is a list of usability
18   problems in the interface with references to those
19   usability principles that were violated by the design
20   in each case in the opinion of the evaluator?
21   A.  Yeah.
22   MR. AIJAZ:  Objection.  Form.
23   THE WITNESS:  Sorry.
24   I mean, as you have read that definition, I --
25   yes, I agree with the way he has described it.

Page 13

4 (Pages 10 - 13)

1    MR. AIJAZ:  And, Chad, I just ask if you're
2    going to read long passages and ask her to agree or
3    disagree that you provide it to her so that she could
4    review it.
5        MR. HUMMEL:  Okay.  Noted.
6        Q.  Do you agree that the results of the
7    evaluation should be recorded either as written reports
8    from each evaluator, or by having the evaluators
9    verbalize their comments to an observer as they go
10   through the interface?
11       MR. AIJAZ:  Objection.  Form.
12       THE WITNESS:  I mean, yes.  As far as what
13   Nielsen has said, yeah.
14   BY MR. HUMMEL:
15       Q.  Your assignment in this case from the FTC was
16   twofold.  Correct?
17       A.  If you are referring to the two questions on
18   page 3 of my report, yes.  We -- it was -- well, I'll
19   allow you to ask me.
20       Q.  I am.
21       In your report, you write:
22       "The FTC asked me to evaluate Match.com's
23       cancellation flow based on the following
24       inquiries:  one, was Match.com's cancellation
25       flow easy to use; and, two, was Match.com's
Page 14

1    cancellation process easy to find?"
2        And I said "flow" in the first one.  It says
3    "process."  Right?
4        A.  Yes.
5        Q.  So were those the two inquiries that the FTC
6    asked you to examine?
7        A.  Yes.
8        Q.  And does "easy" mean simple?
9        MR. AIJAZ:  Objection.  Calls for a legal
10   conclusion.
11       THE WITNESS:  I assumed that "easy" was
12   another word for simple as I did this analysis.
13   BY MR. HUMMEL:
14       Q.  You used them synonymously?
15       A.  Yes.
16       Q.  Okay.  Do you -- do you understand the
17   allegations that the FTC has made in this case about
18   the Match.com online cancellation flow over time?
19       A.  I mean, I believe I do, but is there something
20   specific you are --
21       Q.  What's your understanding?
22       MR. AIJAZ:  Objection.  Vague.
23       THE WITNESS:  Well, I have certainly read the
24   complaint --
25
Page 15

1    BY MR. HUMMEL:
2        Q.  Okay.
3        A.  -- and it is my understanding that they
4    believe that the cancellation process was not simple to
5    use and that a number of consumers would have not been
6    able to complete it.
7        Q.  Okay.  So -- and do you understand that the
8    FTC alleges that the Match cancellation flow over time
9    has violated the Restore Online Shoppers Confidence
10   Act?
11       A.  I'm not a lawyer, but to the best of my
12   understanding of that, yes.
13       Q.  Have you read ROSCA?
14       A.  Yes.
15       Q.  What guidance does ROSCA give to companies in
16   the statute itself as to what the meaning of "simple"
17   is?
18       MR. AIJAZ:  Objection.  Calls for a legal
19   conclusion -- legal analysis, rather.
20       THE WITNESS:  I -- I mean, I'd like to look at
21   ROSCA again, but I don't recall.
22   BY MR. HUMMEL:
23       Q.  What guidance, if you know, has the FTC
24   publicly given to companies about how methods of
25   cancellation can comply with ROSCA's admonition that a
Page 16

1    cancellation flow be simple?
2        MR. AIJAZ:  Objection.  Scope.  It's outside
3    her area of expertise, and also, again, it calls for a
4    legal analysis.
5        THE WITNESS:  I am familiar with the FTC.com
6    disclosures and their guidance on negative -- negative
7    option continuity plans.
8        But I can't remember off the top of my head if
9    that specifically addresses cancellation as we've been
10   discussing it here.
11   BY MR. HUMMEL:
12       Q.  The second publication, Ms. King, that you
13   referenced does provide guidance on the meaning of
14   "simplicity."
15       A.  Okay.
16       Q.  And, basically, what it says is that the
17   cancellation flow has to be at least as easy to use as
18   the method used to subscribe.  Right?
19       A.  Yes.
20       MR. AIJAZ:  Objection.  Lacks foundation.
21   BY MR. HUMMEL:
22       Q.  What analysis did you do, if any, for your
23   initial report to compare the relative simplicity of
24   the methods consumers used to sign up for Match.com
25   versus the cancellation method?
Page 17

5 (Pages 14 - 17)

1    The NPS survey is that -- "How likely is it
2  you would recommend Match.com to a friend?"
3    Q. Yes.
4    A. All right. We're on the same page, literally,
5  now.
6    Q. Did you ever attempt to assess how long it
7  takes a consumer to answer that question on the 0 to 10
8  scale?
9    A. No, I did not.
10   Q. What percentage of the consumers on this flow
11 actually answered the open-ended question presented in
12 the survey, which is: "In your own words, how can you
13 make finding love easier?"
14   A. I was not given data on that point.
15   Q. But did you attempt to figure that out?
16   A. No, I did not.
17   Q. Did you attempt to figure out how long on
18 average consumers spent answering that open-ended
19 question?
20   A. How long consumers spent --
21   Q. Answering that open-ended question.
22   A. Oh. No, I did not.
23   Q. So the FTC in their guidance on cancellation
24 flows has a couple of things that they say.
25   One is, it should be no more -- it should be

Page 90

1  negative option marketing?
2    A. I haven't looked at it in the last few months,
3  so I don't remember that specifically. I'd need to
4  look at the document.
5    Q. So you don't recall whether one of the tests
6  the FTC has for assessing surveys or save offers in the
7  context of cancellation flows, whether it unreasonably
8  delays the process of canceling?
9    A. It doesn't -- that's not surprising to me, but
10 I am just saying I haven't looked at that document in
11 some time. So --
12   Q. And because you didn't measure the time it
13 takes an average consumer or consumers, generally, to
14 accomplish the surveys or to consider and either accept
15 or reject the save offer, you have no opinion about
16 whether those aspects of Match.com's cancellation flow
17 unreasonably delay the process of cancellation.
18 Correct?
19   MR. AIJAZ: Objection. Foundation. And form.
20   THE WITNESS: No. I think I disagree with the
21 way you phrased that.
22 BY MR. HUMMEL:
23   Q. Okay. How so?
24   A. I apologize. Can you please repeat the
25 question?

Page 92

1  no more difficult than it was to sign up generally.
2  Right?
3    We talked about that before.
4    MR. AIJAZ: Objection. Foundation. Misstates
5  the guidance and calls for legal analysis.
6  BY MR. HUMMEL:
7    Q. That's one of -- I'm just referring -- point
8  of reference. Right?
9    And the other thing they said -- do you
10 recall, generally, that topic --
11   A. Yes, proportionality.
12   Q. Yeah, yeah. Okay. Fine. That's a good way
13 to refer to it.
14   And you did nothing to assess proportionality.
15   We already talked about that. Correct?
16   A. Yes. We talked about that.
17   Q. And the other thing it says is, it's okay to
18 present a save offer or to have surveys so long as they
19 don't take an unreasonable -- so long as they don't
20 unreasonably delay the cancellation process.
21   Do you recall that language?
22   MR. AIJAZ: Objection. Foundation.
23   THE WITNESS: I'm sorry, from where again?
24 BY MR. HUMMEL:
25   Q. From the FTC guidance that you referenced on

Page 91

1    (Record read as follows:)
2    "QUESTION: And because you didn't measure the
3    time it takes an average consumer or
4    consumers, generally, to accomplish the
5    surveys or to consider and either accept or
6    reject the save offer, you have no opinion
7    about whether those aspects of Match.com's
8    cancellation flow unreasonably delay the
9    process of cancellation. Correct?")
10   THE WITNESS: Okay. No. I disagree with that
11 statement.
12   I mean, I certainly have opinions about
13 whether or not I believe it obstructed or caused, you
14 know, some additional work for the consumer.
15   You know, precisely the timing, no. That, I
16 do not have data on.
17 BY MR. HUMMEL:
18   Q. Do you know what percentage of consumers did
19 not complete the cancellation process because they
20 accepted a save offer?
21   A. I feel like I have seen that statistic in
22 either Langenfeld or Ward's rebuttal reports, but we'd
23 have to look at it precisely because I'm not sure.
24   But, again, I also don't -- I can't say with
25 confidence that I know exactly how those things are

Page 93

24 (Pages 90 - 93)

1  being measured.
2      So, of course, I would have questions about
3  the statistic itself, but I have seen a number included
4  in those reports.
5      Q. What prevented you from performing your own
6  usability study on any of the Match.com flows that you
7  analyzed?
8      MR. AIJAZ: Objection. Foundation.
9      THE WITNESS: Nothing prevented me from doing
10 it. I generally don't find it to be necessary if there
11 is supporting information that would -- that would add
12 context to my heuristic evaluation.
13 BY MR. HUMMEL:
14     Q. What evidence do you have that stores the
15 proposition or the assumption on your part that
16 consumers who reach the password page intend to cancel
17 their subscription?
18     A. Well, I think I need to look at the
19 screenshots in order to --
20     Do we have different screenshots beyond what's
21 in my report, or are we just going to refer to these
22 today?
23     Q. I have them. I have the screenshots for the
24 three flows you analyzed --
25     A. I mean, do we have -- because these are a

Page 94

1  little bit hard to read, and they're not in color.
2      MR. HUMMEL: Let's mark all of them.
3      Let's go off the record.
4      (Discussion off the record.)
5      (Deposition Exhibits 5, 6, and 7 were marked
6  for identification.)
7      MR. HUMMEL: All right. We took a break to
8  mark some exhibits which are the pages of the flows
9  that Dr. King elected to put in her report.
10     Q. The question remains the same, which is: What
11 evidence do you have that supports the proposition that
12 consumers who reach the password page intend to cancel
13 their subscription?
14     A. So I believe that there was some -- there has
15 been data provided on this point, but I didn't have it
16 when I was writing the report.
17     But I don't know if -- I don't know the status
18 of where that is in this larger discussion.
19     Q. So the answer is you don't know?
20     A. I didn't have that data specifically at the
21 time I wrote the report, but I have since -- although I
22 can't -- again, I don't know precisely -- I haven't
23 seen the spreadsheet, I don't know where the data has
24 been crunched, but it's been relayed to me that there
25 was some significant dropoff at that stage.

Page 95

1      And I believe, also, some of the consumer --
2  I'm sorry, not the consumer -- I believe some of the
3  company emails, documents, I reviewed, attest to the
4  fact that people hit that password page and found it to
5  be a stumbling block.
6      Q. What percentage of individuals who reached the
7  password page did not ultimately cancel because they
8  couldn't get past that password page?
9      A. That, I don't have data on.
10     Q. Okay. Was there anything you could have done
11 to investigate that question?
12     A. Well, again, if -- if we had had, I guess,
13 data on those points that tracked precisely to the
14 pages over the time period in which I was analyzing at
15 the time I was writing the report, that could have
16 potentially added some context.
17     Q. Is it your opinion that by having a password
18 page requirement, the cancellation flow is not simple?
19     MR. AIJAZ: Objection. Form.
20     THE WITNESS: No. I would restate that
21 myself.
22     I mean, it is one of multiple factors that, I
23 think, make the flow less simple, but it is not, like,
24 a single, determinative feedback or on its -- alone
25 that makes the flow less simple or easy.

Page 96

1  BY MR. HUMMEL:
2      Q. Now, in your report, you describe the
3  heuristic analysis in which you engaged. Right?
4      A. Yes.
5      Q. And you also described the -- what you believe
6  to have been dark patterns in the cancellation flow.
7  Correct?
8      A. Yes.
9      Q. Now, Nielsen has ten heuristics to utilize in
10 connection with evaluating user experience. Correct?
11     A. Ten. Yes, ten.
12     Q. And in your report, you describe violation of
13 only three heuristics; that is, starting on page 35:
14 "Visibility of System Status, Consistency and
15 Standards, Aesthetic and Minimalist Design." Correct?
16     A. Yes. Those were the three I had the greatest
17 concerns with.
18     Q. You didn't opine or offer any opinions about
19 the other seven heuristics in your report. Correct?
20     A. Right. I did not.
21     Q. And you did not comment on the -- let
22 me -- Nielsen's usability components, the five
23 usability components that he's published about.
24 Correct?
25     A. Correct.

Page 97

25 (Pages 94 - 97)

1    Q. So you didn't evaluate Heuristic Number 2,
2   which is the "Match between the system and the real
3   world." Correct?
4    A. Correct.
5    Q. And you didn't evaluate Heuristic Number 3,
6   which is "User control and freedom." Correct?
7    A. Well, actually, it's not that I didn't
8   evaluate them. I didn't find them relevant. Let's
9   make that clear.
10     It's not like I skipped them. I looked at all
11  ten, and I applied the ones I thought that the -- the
12  cancellation flow potentially violated.
13    Q. Right. So you didn't think it violated
14  Heuristic 2, which is "Match between the system and the
15  real world," because you didn't put that in your
16  report. Correct?
17    A. Correct.
18    Q. And you didn't think it violated Heuristic 3,
19  which is "User control and freedom." Correct?
20    A. Correct.
21    Q. And you didn't opine that the Match
22  cancellation flow violated Heuristic 5, which is "Error
23  prevention." Correct?
24    A. Correct.
25    Q. And you didn't opine that the Match

Page 98

1    Q. And you understand that the opinions that
2   you're going to be allowed to testify about at trial
3   are those that are contained in your report. Correct?
4    A. Correct.
5    MR. AIJAZ: Objection. Calls for a legal
6   conclusion and analysis and foundation.
7   BY MR. HUMMEL:
8    Q. That's your understanding. Right?
9    A. That's -- yes.
10    Q. Why was it that you didn't consider any of
11  Nielsen's usability components -- strike that.
12     Why is it that you didn't opine about any of
13  Nielsen's usability components in your expert report?
14    A. Those are components that, generally, are not
15  something I use in my work.
16    Q. Why?
17    A. They -- I just haven't seen them as relevant.
18    Q. So learnability, efficiency, memorability,
19  errors, and satisfaction are not relevant?
20    A. They are -- for the purposes of -- of my
21  analysis, no. I wasn't concerned with reviewing those
22  components.
23     Let's go back and talk about your expertise.
24    A. Sure.
25    Q. You hold yourself out as an information

Page 100

1   cancellation flow violated Heuristic 6, which is
2   "Recognition rather than recall." Correct?
3    A. Right.
4    Q. And you didn't opine that the Match
5   cancellation flow violated Heuristic 7, which is
6   "Flexibility and efficiency of use." Correct?
7    A. Correct.
8    Q. And you didn't opine that the Match
9   cancellation flow violated Heuristic Number 9, which is
10  "Help users recognize, diagnose, and recover from
11  errors." Correct?
12    A. Correct.
13    Q. And you didn't opine about -- you didn't opine
14  that Match's cancellation flow violated Heuristic
15  Number 10, "Help and documentation."
16     Do you see that?
17    A. I do.
18    Q. Is that true?
19    A. I did not include that.
20     Retrospectively, I might have included it the
21  more I considered questions around those help pages,
22  but -- but the --
23    Q. Right. But it's not in your report. Correct?
24     That's all I'm saying.
25    A. Right. It's not in my report.

Page 99

1   privacy expert. Correct?
2    A. Yes.
3    Q. This case doesn't involve information privacy.
4   Right?
5    A. That's true.
6    Q. Are you an expert in cognitive psychology?
7    A. I am an expert in some aspects of cognitive
8   psychology as they relate to HCI; but, no, I am not a
9   cognitive psychologist.
10    Q. Are you familiar with Shari Diamond's treatise
11  on appropriate consumer surveys?
12    A. No, I'm not.
13    Q. So I take it you didn't use any of her
14  criteria for assessing whether Mr. Ward's usability
15  study satisfied the criteria that Shari Diamond set
16  forth for such consumer empirical study.
17    MR. AIJAZ: Objection. Foundation.
18    THE WITNESS: I don't believe I've ever
19  covered her work in my survey research background.
20  BY MR. HUMMEL:
21    Q. What is survey bias?
22    A. I think that could have potentially several
23  answers.
24     Can you be more specific? I'm not sure where
25  you're -- what you mean precisely.

Page 101

26 (Pages 98 - 101)

APP 227

| | |
|---|---|
| 1      You believe there was a construct validity | 1   essentially, rate you as a -- as a participant.  So, I |
| 2   problem. | 2   mean, they can elect -- they could accept -- I'm |
| 3      Can you please succinctly state what the | 3   assuming because I have not used UserTesting.com -- but |
| 4   construct validity problem is -- I take it back. | 4   based on my experience with other platforms, you can |
| 5      Your construct validity is -- it was measuring | 5   accept the assignment. |
| 6   time to complete the task? | 6      You can then potentially walk away from it. |
| 7      A.  Yes. | 7   You could reject it.  You could not complete it, or you |
| 8      Q.  But it was also measuring an effectiveness | 8   could do it and do potentially a really poor job, in |
| 9   rate; how many people were able to complete the task. | 9   which case Mr. Ward may have potentially downgraded |
| 10  Right? | 10  them as participants. |
| 11     A.  I believe so. | 11     So, you know, they have an incentive to |
| 12     Q.  Is there -- | 12  perform well. |
| 13     A.  I believe he included that. | 13     Q.  Don't Match.com users, subscribers, in real |
| 14     Q.  Is there a construct validity problem with the | 14  life, have a monetary motivation to cancel if they want |
| 15  question of what percentage of survey participants were | 15  to do so? |
| 16  able to complete the task? | 16     A.  Presumably. |
| 17     A.  I mean, there's a constructibility issue with | 17     Q.  And aren't you highly motivated to cancel your |
| 18  the question of motivation around completing the task, | 18  subscription and Match.com if you want to avoid |
| 19  meaning that when you are being paid to complete a | 19  recurring payments? |
| 20  task, you're highly motivated to complete it. | 20     A.  If you can figure it out. |
| 21     So whether that represents actual Match user | 21     Q.  So, in real life, given the Match.com data, |
| 22  behavior in the wild, you know, if I'm getting paid -- | 22  what percentage of people are able to figure it out? |
| 23  I don't even know how much he paid his subjects, | 23     MR. AIJAZ:  Objection.  Vague. |
| 24  actually; let's say 30, 40 dollars, you know, for the | 24     THE WITNESS:  Again, I haven't seen consistent |
| 25  task -- I'm going to be highly motivated to do it as | 25  statistics, sorry, on this issue from the company. |
| Page 126 | Page 128 |
| 1   quickly as possible. | 1   BY MR. HUMMEL: |
| 2      And even if I encountered a flow that didn't | 2      Q.  So you have no opinion about that. |
| 3   potentially make sense to me, I would still be | 3      A.  No opinion -- I'm sorry, no opinion about -- |
| 4   extremely motivated to try to find my way through it. | 4      Q.  The percentage of consumers who attempt to |
| 5      Q.  All Internet panel survey participants are | 5   cancel who actually complete the job. |
| 6   paid.  Correct? | 6      A.  I haven't seen what I would consider a |
| 7      A.  I don't know that for a fact.  I mean, I | 7   reliable measurement of that in any of the evidence I |
| 8   assume most likely. | 8   have reviewed. |
| 9      Q.  Every one you have used -- you've used online | 9      Q.  What would you consider a reliable |
| 10  Internet panels to conduct survey research? | 10  measurement? |
| 11     A.  I haven't used UserTesting.com; but, yes.  I | 11     How would you do it? |
| 12  mean, any study I have conducted, I do pay people. | 12     MR. AIJAZ:  Objection.  Calls for speculation. |
| 13  Sure. | 13     THE WITNESS:  Well, I think we would probably |
| 14     Q.  And the survey participants were paid | 14  disagree where the cancellation process even begins, |
| 15  regardless of whether or not they were able to complete | 15  for one thing. |
| 16  the task.  Correct? | 16  BY MR. HUMMEL: |
| 17     MR. AIJAZ:  Objection.  Foundation. | 17     Q.  Where do you think it begins? |
| 18     THE WITNESS:  I mean, in my -- I mean, it | 18     A.  I argue that it begins from the moment you get |
| 19  depends on what you're saying. | 19  to -- well, hold on. |
| 20  BY MR. HUMMEL: | 20     I have a list of the steps.  Let me just refer |
| 21     Q.  Well, for example, Mr. Ward didn't instruct | 21  back to this. |
| 22  people, "Hey, if you complete this task, I'll pay you | 22     Okay.  My list of steps is on page 22 of my |
| 23  money.  If I don't, you failed, go home.  Have an | 23  expert report, and I start at Step 1, which is |
| 24  apple." | 24  identifying the settings link. |
| 25     A.  Well, but all those platforms are designed to, | 25     Q.  In other words, finding the gear icon. |
| Page 127 | Page 129 |

33 (Pages 126 - 129)

APP 228

1    A. Yes.

2    Q. So you think that people who click on the gear

3 icon intend to cancel?

4    A. No. Not everybody who clicks on the gear icon

5 intend to cancel.

6        But if you want to cancel, where -- you know,

7 you have to find a way to that portion of the site.

8    Q. Right. But what we're talking about,

9 Dr. King, is the percentage of people who intend to

10 cancel that can actually complete the task and cancel

11 their subscription.

12        How do you -- how do you ascertain somebody

13 who intends to cancel?

14        It's certainly not by clicking the gear icon.

15 Right?

16        In real life, I can't ascertain that by

17 clicking the gear icon.

18        MR. AIJAZ: Objection. Vague.

19 BY MR. HUMMEL:

20    Q. Am I correct?

21    A. Yes. At that point, I don't know.

22        If you click on the gear icon, you can click

23 on it for multiple reasons.

24    Q. Right.

25    A. It's simply the first step in the flow.

Page 130

1    Q. Absolutely right.

2        But I'm talking about how would you ascertain

3 intent to cancel because what we're trying to measure

4 here is, can consumers who are subscribers accomplish

5 the task, which is cancel?

6    A. All right.

7    Q. And you can't ascertain that by people who

8 click the gear icon. Is that true; can't start it

9 there?

10        MR. AIJAZ: Objection. Vague and scope.

11        THE WITNESS: So I would argue that you would

12 have to start once the consumer clicks on the

13 cancellation link.

14 BY MR. HUMMEL:

15    Q. So it's after "Manage subscription"?

16    A. Depending on what flow we're talking about.

17    Q. Not --

18    A. It varies. Right?

19    Q. Right.

20        So let's talk about the one where the link

21 says "Manage subscription."

22        Even there, you can't ascertain that a

23 consumer wants to cancel. Correct?

24    A. I'm sorry. 2016, it's changed in "Cancel

25 membership." Right?

Page 131

1        Is that what you're talking about?

2    Q. Yes. But later, it becomes "Manage

3 subscription," and the FTC has argued in the case that

4 somehow that's nefarious. It's a theory.

5        MR. AIJAZ: Objection.

6 BY MR. HUMMEL:

7    Q. But I'm asking you where you would start or

8 how you would evaluate the question of a consumer who

9 intends to cancel and who succeeds.

10        MR. AIJAZ: Objection. Misstates facts and

11 scope.

12        MR. HUMMEL: I'm glad it misstates facts

13 because that's a crazy contention you're making.

14    Q. Do you see the problem?

15        You can't look at the web flows and make that

16 determination.

17    A. No, I --

18    Q. Do you agree with me?

19    A. No.

20    Q. Well, I --

21        (The reporter requested that people not speak

22        at once.)

23        MR. AIJAZ: And objection. Vague.

24        I don't know what the pending question is.

25

Page 132

1 BY MR. HUMMEL:

2    Q. The pending question is: From the web flow,

3 just looking at the web flows themselves, how can you

4 ascertain for certain that a consumer who is

5 participating -- at what stage can you ascertain for

6 certain that a consumer is intending to cancel?

7        MR. AIJAZ: Objection. Scope.

8        THE WITNESS: I mean, the reason I am sitting

9 here, thinking about it, is that part of the question

10 is, how are they getting to this stage. Right?

11        You need to understand, you know, how it was

12 they were able to arrive here.

13 BY MR. HUMMEL:

14    Q. Right.

15    A. But from this point onward --

16    Q. What point? I'm sorry to interrupt you.

17    A. So I'm looking at 2016.

18    Q. Okay.

19    A. So Exhibit 5, 2016.

20    Q. All right.

21    A. So, you know, when you are looking at this

22 list, assuming you can identify the words "Cancel

23 membership," then if I were looking for data that

24 helped us understand whether I could track through the

25 process the cancellation numbers, I would likely start

Page 133

34 (Pages 130 - 133)

1 here because this is the only option I have on this
2 page that include the word "cancel," even though it is
3 bundled with another task.
4    Q. Which is "change"?
5    A. Which is "change."
6    Q. So you can't definitively say without looking
7 at data how many people who click on "Change/cancel
8 subscription" actually intend to cancel?
9    A. How many people.  No.  I cannot tell you
10 exactly how many people at this point.
11    Q. Okay.  What you can ascertain, though, is once
12 you get past the password page, there's a page that has
13 the option "Subscription status" or "Cancel
14 subscription."
15        Isn't it true that you can't know for sure
16 that a person is at least going into the cancellation
17 flow once they -- once they click that link "Cancel
18 subscription"?
19        And even for those people who cancel that,
20 some percentage might be just looking for a save option
21 because they know it's there.  Somebody's told them
22 it's there.  Right?
23    A. Okay.
24    Q. They get a better deal.
25        (The reporter requested that people not speak

*Page 134*

1        at once.)
2        MR. AIJAZ: I think you were going to
3 rephrase.  Right?
4 BY MR. HUMMEL:
5    Q. Isn't it true that even when you get to page 3
6 of Exhibit 5 --
7        There's no page numbers.
8    Q. It's the third page in Exhibit 5 --
9    A. Okay.
10    Q. -- which is the -- presents consumers with a
11 choice of subscription status or cancel subscription.
12        Isn't it true that there is even a population
13 of consumers who would click "Cancel subscription" who
14 might not actually intend to cancel?
15        MR. AIJAZ: Objection.  Calls for speculation.
16 No foundation.
17        THE WITNESS: Right.  I -- what -- why would I
18 speculate that?
19 BY MR. HUMMEL:
20    Q. It's not speculation.
21        There are some consumers who click "Cancel
22 subscription," are there not, who intend to accept a
23 save offer?
24        MR. AIJAZ: Objection.
25        THE WITNESS: How would you know --

*Page 135*

1        MR. AIJAZ:  No foundation.
2        THE WITNESS:  How would you know that existed
3 there?  How would a consumer know that that was behind
4 that link?  Where would you find that information?
5 BY MR. HUMMEL:
6    Q. Word of mouth?
7        You can look skeptically if you want, but it's
8 true.
9    A. To the point where --
10        MR. AIJAZ:  There's no pending question.
11 BY MR. HUMMEL:
12    Q. Are you testifying that once -- is it your
13 opinion that once a consumer clicks on the "Cancel
14 subscription" button, that they -- 100 percent of those
15 people intend to actually cancel their subscription?
16        MR. AIJAZ:  Objection.  Scope.
17        THE WITNESS:  If you get to this page and you
18 want to cancel -- I mean, it would be highly likely
19 that you have elected to go down this path.  There are
20 few other options here.
21        You know, 100 percent of all consumers that
22 get to this page?  Maybe not.
23        Maybe there are some who have come here by
24 accident.  They're clicking "Subscription status."
25 They could be just confused and not sure where they

*Page 136*

1 are.  I mean, there are multiple possibilities.
2 BY MR. HUMMEL:
3    Q. Okay.  So my question is this:  Isn't it true
4 that the only way to actually accurately measure
5 consumers who intend to cancel, whether they can find
6 the icon and then proceed to successfully complete the
7 task, is to do a usability study?
8        MR. AIJAZ:  Objection.  Calls for speculation.
9 Incomplete hypothetical.
10        THE WITNESS:  Can you please read that back?
11        (Record read as follows:
12        "QUESTION:  Okay.  So my question is this:
13        Isn't it true that the only way to actually
14        accurately measure consumers who intend to
15        cancel, whether they can find the icon and
16        then proceed to successfully complete the
17        task, is to do a usability study?")
18        MR. AIJAZ:  Same objection.
19        THE WITNESS:  No, I don't think that is the
20 only way.
21 BY MR. HUMMEL:
22    Q. Can you please, in your expert opinion, give
23 me another way?
24        MR. AIJAZ:  Objection.  Scope.
25        THE WITNESS:  To some extent, you might be

*Page 137*

35 (Pages 134 - 137)

1  able to gauge this through observation.
2  BY MR. HUMMEL:
3     Q. What does that mean?
4     A. I mean through observing through data.
5     Q. What data?
6        If -- let me just posit this, and then we'll
7  take a lunch break.
8        If you can't discern that a consumer wants to
9  cancel when they click the icon and you can't discern
10 that a consumer wants to cancel when they enter their
11 password and you can't discern that a consumer wants to
12 cancel, necessarily, 100 percent when they cancel --
13 when they click "Cancel subscription" on the next page,
14 how -- what data would you look at to find out a
15 consumer who intends to cancel can actually complete
16 it?
17       MR. AIJAZ:  Objection.  No foundation, and
18 it's an incomplete hypothetical.
19       THE WITNESS:  To the extent that you can track
20 user journeys through the interface, through
21 clickstream data, I am presuming, if that's -- I'm not
22 sure that's the right description -- then that would
23 give you at least some perception or some understanding
24 of the people who go from place to place to place in
25 terms of trying to understand successfully how people

Page 138

1  work through the flow.
2  BY MR. HUMMEL:
3     Q. And in conducting your initial analysis, you
4  did no such analysis of click-through data.  Correct?
5     A. I did not look at click-through data.
6        MR. HUMMEL:  Okay.  Let's take our lunch
7  break.
8        MR. AIJAZ:  All right.
9        (Lunch recess from 12:00 to 1:03 P.M.)
10          --o0o--
11          AFTERNOON SESSION
12       MR. HUMMEL:  Let's go back on the record.
13    Q. Dr. King, you understand you're still under
14 oath?
15    A. Yes.
16    Q. Any reason you can't continue to give full and
17 complete and accurate testimony?
18    A. No.
19    Q. In your rebuttal report, you undertook an
20 analysis of purported complaints.  Right?
21    A. Yes.
22    Q. One of the sources of the complaints was the
23 FTC's Sentinel database.  Correct?
24    A. Correct.
25    Q. What's your understanding of what's contained

Page 139

1  in the Sentinel database?
2     A. So, as I understand it, Sentinel is a large
3  database that gets complaints from multiple sources.  I
4  don't know if they're all government sources, but I
5  do -- it's my understanding that, in addition, people
6  who submit complaints to the FTC.  They may also come
7  from states' attorney generals.
8        I don't recall right now if they come from the
9  BBB, for example, but they may.
10       But I know it's a -- it's a catchall for a lot
11 of different sources.
12    Q. It's a repository of complaints.
13    A. Fair enough, yeah.
14    Q. How did you go about selecting the complaints
15 that you reviewed from the Sentinel database?
16    A. So we were provided with a file that, off the
17 top of my head, I don't remember how many thousands
18 were in there, but multiple thousands.
19       And -- hold on.  I want to find that page in
20 my report really quick to go through the process.
21    Q. So the "FTC Complaints" section of your
22 rebuttal start at page 38.
23    A. Thank you.  Right.
24       So based on my review of the Match complaints,
25 I put the text of those complaints through a program

Page 140

1  that demonstrated to me what were the most frequently
2  used keywords people discussed in those complaints, and
3  that's what you see on page 38.
4        So the most popular keywords that we looked at
5  were things like "confusing," "misleading," "auto
6  renewal."
7        So, then, we took those words and searched
8  the -- the file of complaints that we had.
9        And, as Mr. Langenfeld's report notes, the --
10 the file that I provided in my opinions to my rebuttal
11 had two extra complaints in it that weren't focused on
12 Match that I missed in terms of my copy -- I'm actually
13 in the process of verifying -- I'm concerned I copied
14 the wrong table out of my file.  So I'm in the process
15 of verifying that.  But I realize it contained two that
16 did not deal with Match.com directly.
17       But those were not referenced in this analysis
18 in my report.  I think it was a copy/paste error.
19    Q. Are the 30 FTC complaints listed in your
20 Appendix A the only complaints you reviewed from the
21 Sentinel database?
22    A. Well, and that's the other piece I'm trying
23 to --
24       When I put together the appendix, I think I
25 copied the wrong field because I know in here I note

Page 141

36 (Pages 138 - 141)

1        --oOo--
2        I declare under penalty of perjury that the
3   foregoing is true and correct.  Subscribed at
4   _____, California, this ____ day of
5   _____ 2023.
6
7        _____
8            JENNIFER KING, PH.D.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 234

1   M. Hasan Aijaz
2   maijaz@ftc.gov
3            August 10, 2023
4   RE:   Federal Trade Commision v. Match Group, Inc., Et Al.
5   7/27/2023, Dr. Jennifer King (#6028094)
6      The above-referenced transcript is available for
7   review.
8      Within the applicable timeframe, the witness should
9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   errata-tx@veritext.com.
16
17   Return completed errata within 30 days from
18   receipt of testimony.
19    If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 236

1        CERTIFICATE OF REPORTER
2        I, HOLLY THUMAN, a Certified Shorthand
3   Reporter, hereby certify that the witness in the
4   foregoing deposition was by me duly sworn to tell the
5   truth, the whole truth, and nothing but the truth in
6   the within-entitled cause; that said deposition was
7   taken down in shorthand by me, a disinterested person,
8   at the time and place therein stated; and that the
9   testimony of the said witness was thereafter reduced to
10   typewriting, by computer, under my direction and
11   supervision;
12        That before completion of the deposition,
13   review of the transcript [ X ] was [ ] was not
14   requested/offered.  If requested, any changes made by
15   the deponent (and provided to the reporter) during the
16   period allowed are appended hereto.
17        I further certify that I am not of counsel or
18   attorney for either or any of the parties to the said
19   deposition, nor in any way interested in the event of
20   this cause, and that I am not related to any of the
21   parties thereto.
22
23
24
25   HOLLY THUMAN, CSR No. 6834

Page 235

1   Federal Trade Commision v. Match Group, Inc., Et Al.
2   Dr. Jennifer King (#6028094)
3        E R R A T A  S H E E T
4   PAGE_____ LINE_____ CHANGE_____
5   _____
6   REASON_____
7   PAGE_____ LINE_____ CHANGE_____
8   _____
9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Dr. Jennifer King            Date
25

Page 237

60 (Pages 234 - 237)

# EXHIBIT N

```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF TEXAS
 3                      DALLAS DIVISION
 4
        FEDERAL TRADE COMMISSION,    )
 5                                   )
                   Plaintiff,        )
 6                                   )  Civil Action
           vs.                       )  No.
 7                                   )  3:19-cv-02281
        MATCH GROUP, INC., MATCH     )  -K
 8      GROUP, LLC, formerly known   )
        as MATCH.COM, LLC,           )
 9                                   )
                   Defendants.       )
10      -------------------------    )
11
                        CONFIDENTIAL
12
13                   Thursday, August 10, 2023
14                   10:06 a.m.
15
16
17              Remote Zoom Videotaped Deposition of
18      KIMBLEANN VERDI, held before Stacey L. Daywalt,
19      a Court Reporter and Notary Public of the
20      District of Columbia.
21
22
23
24
25
                                            Page 1
```

1    A.   Outside of the different areas of --
2 that I performed the calculations in, that's
3 all I can tell you.  I performed the
4 calculations in those areas.
5    Q.   Okay.  So were you -- when you
6 performed those calculations, were you
7 intending to calculate damages?
8         MR. MOON:  I'm going to object to
9 this line of questioning.
10         I mean, this is vague.  This is -- I
11 mean, what's tripping us up is the use of term
12 "damages."  We've got a clear disclosure of
13 what she's testifying to in terms of monetary
14 relief, so I just don't want us to get hung up
15 on the term "damages."
16         MS. PRIEST:  Okay.  Well, your
17 objection should be limited to form, not
18 speaking objections and suggesting to the
19 witness how to answer the questions.
20         I am using the term "damages"
21 because it's in the document that we're looking
22 at.  But I mean, I can ask -- I can rephrase
23 the question if the witness asks me to rephrase
24 the question, but you don't need to suggest
25 that to her.

Page 30

1         MR. MOON:  Okay.  I'm just trying
2 to -- I don't think we should be hung up on
3 this.
4         And of course we make disclosures in
5 the abundance of caution being conservative
6 even though it uses the term "damages," which
7 we're not seeking in this case, so I don't want
8 that to trip us up.
9         But my objection is form.
10         You can answer if you can, Kacy.
11         THE WITNESS:  Can you please repeat
12 the question.
13 BY MS. PRIEST:
14    Q.   Sure.
15         When you performed the calculations
16 that are contained in your -- the Exhibit 1 to
17 this deposition, were you trying to calculate
18 damages?
19    A.   When I performed the calculations
20 that are outlined on Exhibit 1, they were in
21 regards to civil penalties, consumer harm and
22 the cancellation rate.
23    Q.   And monetary relief.  Right?
24    A.   Monetary consumer harm.
25    Q.   Okay.  Going back to Exhibit 3, I'm

Page 31

1 going to scroll through Exhibit 3 for you to
2 review it.
3         And just let me know if you
4 recognize the content of Exhibit 3 even if
5 you've not seen this particular document.
6    A.   (Reviewing document.)
7         Well, can you please point to
8 specifically what you would like to reference
9 so I can read it if you're asking me to read
10 something.
11    Q.   Sure.
12         So let's start with on Page 3 of
13 Exhibit 3.
14         Do you see the five items here with
15 password wall and then a monetary value, and
16 then it continues for additional entries and
17 then monetary values?  Do you see that there?
18    A.   Yes, I can see the list of
19 monetary values that you pointed out.
20    Q.   Okay.  Are those values that you
21 calculated?
22    A.   You know, I'm not able to answer
23 that question without referencing Exhibit 1 and
24 going through my results that I have recorded
25 and provided to your team.

Page 32

1         I have not seen this document
2 before, and I just cannot -- I can't attest to
3 that.
4    Q.   Okay.  So you have no idea if the
5 monetary values identified in Exhibit 3 came
6 from you?
7    A.   No, I have not seen -- like I said,
8 I've not seen this document before and I do not
9 know where these numbers were derived from.
10         It's possible they came from the
11 calculations I did, but -- you know, I can
12 testify to the calculations I did and that's
13 it.
14    Q.   Okay.  You mentioned a minute ago
15 that you had, I think you said, recorded your
16 results.
17         Was that right?
18    A.   Yes, the results are recorded on
19 Exhibit 1 for each area of the calculations.
20    Q.   When you were doing your
21 calculations, did you create any spreadsheets?
22    A.   Yes, I created spreadsheets within
23 the -- yeah, I created spreadsheets for the
24 analysis.
25    Q.   Okay.  Do those spreadsheets contain

Page 33

9 (Pages 30 - 33)

1    formulas that you put into the spreadsheets?
2        A.   Yes, the spreadsheets contain
3    formulas.
4            MS. PRIEST: Mr. Moon, we're going
5    to request the production of those
6    spreadsheets.
7            MR. MOON: Okay.  We'll have to
8    review that.
9    BY MS. PRIEST:
10       Q.   When you were performing your
11   calculations, how did you decide which
12   calculations to perform?
13       A.   I was instructed by the case team to
14   perform the calculations.
15           And I also wanted to add that the
16   formulas -- from the previous question, the
17   formulas are written on Exhibit 1.
18           MS. PRIEST: I'm going to object to
19   that last part as nonresponsive.
20       Q.   Who on the case team gave you
21   instructions on what calculations to perform?
22       A.   I received instructions from
23   Mr. Aijaz and Mr. Moon.
24       Q.   Okay.  And did they tell you
25   specifically which columns of which

Page 34

1    spreadsheets to add or subtract?
2        A.   Yes, I was instructed as to which
3    columns specifically to add and subtract.
4        Q.   And then you just did the math based
5    on what the lawyers told you to do.  Right?
6        A.   I performed the mathematical
7    calculations based on the instructions I was
8    given by the case team.
9            Excuse me.  I would like to take a
10   break.
11           MS. PRIEST: Okay.  Sure.  We can do
12   that.
13           THE VIDEOGRAPHER: The time now is
14   10:53 a.m.  We're going off the record.
15           (Recess was taken from 10:53 a.m. to
16   11:05 a.m.)
17           THE VIDEOGRAPHER: The time now is
18   11:05 a.m.  We're going back on record.
19           Please proceed, Counsel.
20   BY MS. PRIEST:
21       Q.   When you were doing your
22   calculations, did you offer the case team any
23   of your own opinions about how to calculate the
24   different values you were instructed to
25   calculate?

Page 35

1        A.   No, I did not offer the case team
2    any of my own opinions regarding the
3    mathematical calculations I was instructed to
4    calculate.
5        Q.   Okay.  I want to pull Exhibit 1 back
6    up so we can look at it in more detail.  Feel
7    free to use either the screen or the hard copy
8    that you have in front of you, whichever's
9    easier for you to see.
10           So I want to start on Page 2 under
11   the Consumer Harm heading.
12           Do you see that?
13       A.   Yes, I see that.
14       Q.   Okay.  And are you offering the
15   opinion in this case that the amount of money
16   you calculated is a reasonable estimate of
17   consumer harm?
18       A.   At this time I am not offering the
19   opinion that the result I received on the
20   mathematical calculation represents a
21   consumer -- amount for consumer harm.  That is
22   not -- it's just a result I received from a
23   mathematical calculation.
24       Q.   Okay.  So if we go to the grand
25   total of the Monetary Consumer Harm on Page 4,

Page 36

1    do you see where it says $51,118,804.92?
2        A.   Yes, I see that.
3        Q.   So you're not offering the opinion
4    that that $51 million and change is a
5    reasonable estimate of consumer harm.  Right?
6        A.   I am not offering any opinions.  I
7    am -- that is just the result I received when I
8    calculated the grand total as I was instructed
9    to do.
10       Q.   Okay.  And you don't have any
11   opinion about whether monetary relief is
12   appropriate at all in this case.  Right?
13       A.   I do not have any opinions on
14   whether monetary relief is appropriate in this
15   case.
16           That is not my role.  That is the
17   role of the case team.
18       Q.   Okay.  I want to go back up to
19   Page 2 to help me understand exactly what you
20   did for your calculation.
21           So on Page 2, Item 2 near the bottom
22   where it says: "Instructed to calculate
23   monetary consumer harm based on."
24           Do you see that?
25       A.   Yes, I do.

Page 37

10 (Pages 34 - 37)

1    Q.   Okay.  And where it says "values
2    provided with the dates," those values were
3    provided by the case team.  Right?
4    A.   Yes, those values were provided by
5    the case team.
6    Q.   Then in subpart b where it says
7    "subtotal of each of the five different pages
8    per month of the resignation flow," those
9    instructions were also provided by the FTC's
10   lawyers.  Right?
11   A.   Yes, the instructions in Item b was
12   provided by the case team.
13   Q.   Okay.  And what is your
14   understanding of the five different pages of
15   the resignation flow?
16   A.   You know, my understanding of the
17   five pages is how they're fields in a
18   spreadsheet, and I used them to determine -- to
19   perform the mathematical calculations I was
20   instructed to do.
21   Q.   Okay.  Do you know what the five
22   different pages look like?
23   A.   I do not know what the five
24   different pages look like.
25   Q.   Okay.  And in your calculation you

Page 38

1    assumed that everyone that visited any of those
2    five pages intended to cancel.  Is that right?
3    A.   I did not make any assumptions in my
4    calculations.
5        I just performed the mathematical
6    calculations as I was instructed to do so by
7    the case team.
8    Q.   So the assumptions that the case
9    team provided you were that everyone that
10   visited any of the five pages of the
11   cancellation flow intended to cancel.  Right?
12   A.   I cannot speak to what the
13   assumptions of the case team are.
14       I was just instructed to perform the
15   calculations based on the information I was
16   given that's identified in Exhibit 1.
17   Q.   And the instructions you were given
18   was -- were to include all of the visits to all
19   of the five different pages of the resignation
20   flow.  Right?
21   A.   The instructions I was given was to
22   calculate the subtotal and the total for all
23   the five pages that are listed in that
24   spreadsheet.
25       And then the grand total.  Sorry.

Page 39

1    And the grand total.
2    Q.   And you have no idea whether every
3    one of the people that visited those pages
4    intended to cancel.  Right?
5    A.   I do not have information on what
6    those fields represent outside of a limited
7    knowledge based on what was needed for the
8    calculations.
9    Q.   Okay.  What limited knowledge did
10   you need for the calculations?
11   A.   Well, I was told -- I was instructed
12   to perform the calculations based on the
13   information they gave me and the formula, which
14   is the renewal cash plus the refunded cash plus
15   the chargeback cash.  And those are negative
16   numbers.
17       And I was also given -- I mean, I
18   was given explicit instructions on how to
19   perform the calculations.
20   Q.   So you don't know if the users
21   represented in those columns actually intended
22   to cancel.  Right?
23       MR. MOON:  I'm going to object,
24   asked and answered.
25       THE WITNESS:  Can you repeat the

Page 40

1    question, please.
2    BY MS. PRIEST:
3    Q.   You don't know if the users
4    represented in the columns that you added up
5    actually intended to cancel their Match.com
6    subscriptions.  Right?
7        MR. MOON:  Same objection.
8        THE WITNESS:  I calculated the
9    formulas.  I performed the mathematical
10   calculations as I was instructed to do.
11       And outside of the column names of
12   the different pages, that's all I am aware of.
13   BY MS. PRIEST:
14   Q.   Okay.  So it's a yes or no question.
15       Do you know if the users represented
16   in the columns that you added up actually
17   intended to cancel their Match.com
18   subscriptions?
19       MR. MOON:  Object to asked and
20   answered.
21       But Kacy, you can answer it if you
22   can.
23       THE WITNESS:  I can't -- all's I --
24   I cannot it answer yes or no.
25       That information, they're columns on

Page 41

11 (Pages 38 - 41)

| | |
|---|---|
| 1   2:11 p.m.) | 1  Jason Moon |
| 2       THE VIDEOGRAPHER:  The time now is | 2  jmoon@ftc.gov |
| 3   2:11 p.m.  We're going back on the record. | 3           August 24, 2023 |
| 4       Please proceed, Counsel. | 4  RE:   Federal Trade Commision v. Match Group, Inc., Et Al. |
| 5       MR. MOON:  FTC will reserve our | 5    8/10/2023, Kimbleann Verdi (#6042131) |
| 6   questions for the time of trial. | 6    The above-referenced transcript is available for |
| 7       Chelsea, I have been advised that | 7  review. |
| 8   Ms. Verdi would like an opportunity to read and | 8    Within the applicable timeframe, the witness should |
| 9   sign the transcript. | 9  read the testimony to verify its accuracy. If there are |
| 10       MS. PRIEST:  Okay. | 10  any changes, the witness should note those with the |
| 11       THE VIDEOGRAPHER:  The time now is | 11  reason, on the attached Errata Sheet. |
| 12   2:11 p.m.  This concludes today's testimony | 12    The witness should sign the Acknowledgment of |
| 13   given by Ms. Kim Verdi. | 13  Deponent and Errata and return to the deposing attorney. |
| 14       Thank you, ma'am.  Thank you, | 14  Copies should be sent to all counsel, and to Veritext at |
| 15   everyone. | 15  errata-tx@veritext.com. |
| 16       (Deposition adjourned at 2:11 p.m.) | 16  |
| 17  | 17   Return completed errata within 30 days from |
| 18  | 18  receipt of testimony. |
| 19  | 19    If the witness fails to do so within the time |
| 20  | 20  allotted, the transcript may be used as if signed. |
| 21  | 21  |
| 22  | 22        Yours, |
| 23  | 23        Veritext Legal Solutions |
| 24  | 24  |
| 25  | 25  |
| Page 102 | Page 104 |

| | |
|---|---|
| 1   District of Columbia, to wit: | 1  Federal Trade Commision v. Match Group, Inc., Et Al. |
| 2       I, Stacey L. Daywalt, a Notary | 2  Kimbleann Verdi (#6042131) |
| 3   Public of the District of Columbia, do hereby | 3        E R R A T A  S H E E T |
| 4   certify that the within-named witness remotely | 4  PAGE_____ LINE_____ CHANGE_____ |
| 5   appeared before me at the time and place herein | 5  _____ |
| 6   set out, and after having been duly sworn by | 6  REASON_____ |
| 7   me, according to law, was examined by Counsel. | 7  PAGE_____ LINE_____ CHANGE_____ |
| 8       I further certify that the | 8  _____ |
| 9   examination was recorded stenographically by me | 9  REASON_____ |
| 10   and this transcript is a true record of the | 10  PAGE_____ LINE_____ CHANGE_____ |
| 11   proceedings. | 11  _____ |
| 12       I further certify that I am not of | 12  REASON_____ |
| 13   counsel to any of the parties, nor an employee | 13  PAGE_____ LINE_____ CHANGE_____ |
| 14   of counsel, nor related to any of the parties, | 14  _____ |
| 15   nor in any way interested in the outcome of | 15  REASON_____ |
| 16   this action. | 16  PAGE_____ LINE_____ CHANGE_____ |
| 17       As witness my hand and Notarial Seal | 17  _____ |
| 18   this 24th day of August, 2023. | 18  REASON_____ |
| 19  | 19  PAGE_____ LINE_____ CHANGE_____ |
| 20  | 20  _____ |
| 21   _Stacey Daywalt_ | 21  REASON_____ |
| 22   Stacey L. Daywalt, Notary Public | 22  |
| 23   My Commission Expires:  4/14/2026 | 23  _____  _____ |
| 24  | 24  Kimbleann Verdi              Date |
| 25  | 25  |
| Page 103 | Page 105 |

27 (Pages 102 - 105)

APP 238

# EXHIBIT O

**Amended 11/08/2022**

1
2                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
3                              DALLAS DIVISION

    FEDERAL TRADE COMMISSION,   )   **Case No. 3:19-cv-02281-K**
4                               )
            Plaintiff,          )   Dallas, Texas
5                               )   November 1, 2022
    v.                          )   10:00 a.m.
6                               )
    MATCH GROUP, INC., et al.,  )   MOTIONS TO COMPEL
7                               )   [#133, #140]
            Defendants.         )
8   _____ )

9                        TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE IRMA CARRILLO RAMIREZ,
10                  UNITED STATES MAGISTRATE JUDGE.

11  APPEARANCES:

12  For the Plaintiff:          Reid Abram Tepfer
                                M. Hasan Aijaz
13                              FEDERAL TRADE COMMISSION
                                1999 Bryan Street, Suite 2150
14                              Dallas, TX  75201
                                (214) 979-9395
15
16  For the Defendants:         Angela C. Zambrano
                                Taylor Bragg
17                              Chelsea Priest
                                SIDLEY AUSTIN, LLP
18                              2021 McKinney Avenue, Suite 2000
                                Dallas, TX  75201
19                              (214) 981-3405

20  For the Defendants:         Chad S. Hummel
                                SIDLEY AUSTIN, LLP
21                              1999 Avenue of the Stars,
                                 17th Floor
22                              Los Angeles, CA  90067
                                (310) 595-9505
23
    For the Defendants:         Samuel Kitchens
24                              MATCH GROUP, INC.

25

```
 1   Recorded by:               Marie Gonzales
                                UNITED STATES DISTRICT COURT
 2                              1100 Commerce Street, Room 1452
                                Dallas, TX  75242-1003
 3                              (214) 753-2167

 4   Transcribed by:            Kathy Rehling
                                311 Paradise Cove
 5                              Shady Shores, TX  76208
                                (972) 786-3063
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25           Proceedings recorded by electronic sound recording;
                transcript produced by transcription service.
```

1            DALLAS, TEXAS - NOVEMBER 1, 2022 - 10:06 A.M.

2            THE CLERK:  All rise.

3            THE COURT:  Good morning.  Please be seated.  All

4    right.  We are here in the matter of Federal Trade Commission

5    versus Match Group, Inc., et al.  This is Civil Action 3:19-

6    cv-2281-K.  And before the Court this morning are three

7    different motions.  I am going to take a couple of them up

8    together.  I have set aside two hours for this hearing.  If we

9    go beyond that, we will need to reschedule.

10      If counsel would please make their appearances for the

11   record.

12            MR. TEPFER:  Good morning, Your Honor.  Reid Tepfer

13   and Hasan Aijaz for the FTC.

14            THE COURT:  I'm sorry.  Say your name again.

15            MR. TEPFER:  Reid Tepfer and Hasan Aijaz.

16            THE COURT:  Okay.

17            MS. ZAMBRANO:  Good morning, Your Honor.  Angela

18   Zambrano from Sidley Austin, here with my partner Chad Hummel

19   and our colleagues Taylor Bragg and Chelsea Priest, and our

20   client, Sam Kitchens.

21            THE COURT:  All right.  For purposes of our hearing

22   this morning, rather than have each side make a presentation

23   from the podium, as is customary in Federal Court, in order to

24   maintain -- continue to try to maintain some social

25   distancing, I'm going to ask you to remain at counsel table.

1      The masks muffle the sound a little bit, and the words.

2  The closer you are to the microphone, the better the recording

3  is, so please do move the microphones close to you and speak

4  up into them.

5      I have gone through your joint submissions over and over,

6  and I've got questions for both sides.  So, rather than have

7  you each make a presentation, I'm just going to jump straight

8  into the questioning, and then give you a chance to tell me

9  anything else that you would like for me to consider before

10  making my ruling.  I do intend to rule from the bench this

11  morning and then enter a short order memorializing my rulings.

12      All right.  Let's start with the FTC's motion to compel

13  production of documents and interrogatory responses from

14  Defendant Match Group.  This is Document 140.  And I've got

15  the joint submission here, which is Document 147.

16      All right.  So, just to be sure that I understand what's

17  at issue here -- who will be arguing on behalf of the

18  Defendants?

19          MS. ZAMBRANO:  I will, Your Honor.  Angela Zambrano.

20  Thank you.

21          THE COURT:  All right.  Ms. Zambrano, so MGI is a

22  holding company.  It is the parent company of the entities

23  that actually own and control the platforms on which these

24  dating websites are found?

25          MS. ZAMBRANO:  I think I got that right.  It is the

1    -- it is a holding company.  It owns multiple levels of

2    companies.  At a couple levels down is MGL, what we refer to

3    as MGL, and MGL then operates the Match.com platform.

4         THE COURT:  All right.  Are there companies between

5    MGI and MGL?

6         MS. ZAMBRANO:  Yes.  Two, Your Honor.

7         THE COURT:  All right.  This was not addressed in the

8    parties' joint submission.  My understanding of the case law,

9    the majority line of cases in this district is that the party

10   resisting discovery has the burden on its objections.  Any

11   issue with that?

12        MS. ZAMBRANO:  No, Your Honor.  I also noticed that

13   in preparing this morning, am prepared to meet it.

14        THE COURT:  All right.  In order to meet it, did MGI

15   present any affidavits or evidence in support of its

16   objections that I missed in the appendix?

17        MS. ZAMBRANO:  No, Your Honor, other than the sworn

18   stipulation that is before the Court.  I think we would

19   consider that evidence.

20        THE COURT:  Okay.

21        MS. ZAMBRANO:  Mainly because of the Rule 26

22   standard, you know, as with that -- with those things decided

23   -- well, not decided, but agreed to, we think that affects the

24   claims and defenses before the Court.

25        THE COURT:  All right.  But in other words, no -- no

1    affidavits regarding burdensomeness, hours, extrapolation of

2    how much time it would take to get this information?  Anything

3    like that?

4              MS. ZAMBRANO:  Not at this time, Your Honor.

5              THE COURT:  All right.  Okay.  At this point, there

6    has been no preliminary or permanent injunction entered on the

7    subject matter in the stipulation.  Is that correct?

8              MS. ZAMBRANO:  I'm going to answer your question, but

9    can you just allow me to elaborate a little bit?

10             THE COURT:  Well, can you answer my question first

11   and then elaborate?

12             MS. ZAMBRANO:  Yes.  There has not been, and we don't

13   know why.

14             THE COURT:  Okay.

15             MS. ZAMBRANO:  And the reason we don't understand

16   why, we learned a little bit last week when we took a

17   deposition of the FTC.  But we have agreed to the relief as

18   pled in the complaint with respect to the chargeback practice

19   and what we refer to as the guarantee.  We asked the FTC then

20   what remains, why don't we have an injunction, what is still

21   in dispute?  And they referred us to a stipulation that they

22   had submitted during mediation that contains relief that is

23   broader than Match.com.  It relates to other dating sites.

24             THE COURT:  Okay.

25             MS. ZAMBRANO:  So we don't understand why we don't

1    have an injunction.

2           THE COURT:  Okay.  Well, that wasn't my question.  My

3    question was whether there was one, in fact.

4           MS. ZAMBRANO:  Yeah.

5           THE COURT:  All right.  I did not see in the joint

6    submission a specific response to the FTC's citation of a

7    couple of cases, one from the Supreme Court, where injunctive

8    relief beyond just the product at issue was awarded.  And I'm

9    talking in particular about the, oh, where --

10           MS. ZAMBRANO:  The *Kraft Foods* and the --

11           THE COURT:  Well, the Supreme Court.

12           MS. ZAMBRANO:  -- *Colgate*?

13           THE COURT:  *Colgate-Palmolive* case.

14           MS. ZAMBRANO:  Yes, Your Honor.

15           THE COURT:  So, if I've got a Supreme Court case that

16    clearly allows injunctive relief beyond just the product pled

17    in the pleadings, then how is discovery regarding other

18    products that might have the same type of policies, I guess as

19    we'll call them -- the cancellation policy, the chargeback

20    policy, the guarantee policy -- why -- if I've got a Supreme

21    Court case cited by the FTC where the Court allowed relief

22    beyond what was pled and looked at a specific practice or type

23    of product, that was an injunction.  We're talking about

24    discovery.  Why is discovery not appropriate here?

25           MS. ZAMBRANO:  Your Honor, I read those cases

1  carefully.  I don't see them to stand for the proposition that

2  they can get relief beyond what was pled.  I believe they can

3  get relief beyond the particular product at issue.

4          THE COURT:  Okay.

5          MS. ZAMBRANO:  And here, they have not pled that,

6  which is important, because discovery, of course, comes from

7  complaints and defenses in the case and so forth.  So we

8  understand that that's the -- that's the other side -- that's

9  where they want to go, but they haven't started on a path that

10 would allow them to get discovery and obtain that relief.

11 That's my first answer.

12    The second answer is that's not a holding company case.

13 That is a case about a company that has multiple products.

14          THE COURT:  Uh-huh.

15          MS. ZAMBRANO:  And I'm thinking in particular about

16 the one with the cheese, but it's the razors as well, as I

17 understand it, is the *Colgate-Palmolive*.  Those are cases

18 about a company that has products.  MGI does not have

19 products.  They're asking for an extension of that case law

20 well beyond where it sits right now.

21          THE COURT:  Where is any of this addressed in the

22 joint submission?  That's actually where I started.  Where

23 does MGI specifically address this argument?

24          MS. ZAMBRANO:  I believe it's on Footnote 29 on Page

25 15.

1          THE COURT:  Footnote 29?  Okay.  So, Footnote 29 is

2    two cites, the *Colgate-Palmolive* and *Kraft*.  And it cites them

3    for the proposition that neither permitted discovery into or

4    injunctive relief relating to subsidiaries' products merely by

5    virtue of suing parent or holding.

6      You've pointed out that neither one of them was specific

7    to it.  What have you provided me to meet your burden that

8    discovery regarding the same type of practice at issue in this

9    lawsuit should not be allowed?

10         MS. ZAMBRANO:  Well, I think it's what the -- what

11   the FTC has provided, which is there aren't any allegations

12   relating to it.  I think they're asking you to take

13   allegations relating to one website and then assume a bunch of

14   things that would permit them to maybe someday get recovery,

15   but more importantly, to wade around into discovery.  And I

16   don't think that's even what's pled in front of you, Your

17   Honor.

18         THE COURT:  Okay.  Well, again, going back to the

19   party resisting discovery having the burden, how has MGI met

20   its burden to show that discovery regarding the same type of

21   practice at other websites should not be allowed?

22     I don't even have anything, any evidence or affidavit that

23   tells me that MGI doesn't have other websites or -- we'll

24   circle back to that a little bit later.

25         MS. ZAMBRANO:  Yeah.

 1          THE COURT:  But, again, with no evidence, how can I
 2   find that MGI has met its burden here?
 3          MS. ZAMBRANO:  Well, I think it's a matter of the
 4   rule, Rule -- of course, our basic rule, which we're trying to
 5   meet the burden under, is it related to the claims and
 6   defenses in the case and proportional?  And when they haven't
 7   alleged something at all, it was hard for me to imagine that
 8   we would need to deal with that by an affidavit, because they
 9   didn't even allege it.
10          THE COURT:  Okay.
11          MS. ZAMBRANO:  There's no allegations about what any
12   practices are.  First of all, there's no allegations that MGI
13   controls any website's behavior like this.
14          THE COURT:  Uh-huh.
15          MS. ZAMBRANO:  And second of all, there's not even
16   any allegations as to what other dating platforms do.  The
17   entire complaint is Match.com this, Match.com that.  Other
18   dating websites are mentioned once.
19          THE COURT:  Uh-huh.
20          MS. ZAMBRANO:  So, I guess, in terms of meeting a
21   burden, we would deal first with what was in the complaint,
22   and we don't see that they've even alleged something properly
23   against the -- against other dating -- relating to other
24   dating websites.
25        We think they're -- they're making a bunch of assumptions

1  that are way beyond this.

2      And Your Honor, it's no -- it's no accident here that, you

3  know, they've -- our amendment period has lapsed.  So there's

4  -- there's a reason that they're stretching this far and, you

5  know, trying to do this.  They -- our amendment period has

6  passed, and they don't have it.  They would have pointed to

7  you if they did.

8      So we didn't meet a burden on something that wasn't pled.

9  I think we still meet Rule 26, satisfy Rule 26, that when the

10  claims are not before the Court it can't be relevant or

11  proportional to what's at issue.

12      I would cite you to Page 22 and Page 23 of our materials,

13  which just, I said, I think just discuss our position in

14  general on this point.

15          THE COURT:  Doesn't that go to the second issue?  I'm

16  still on the first one.

17          MS. ZAMBRANO:  Yes, Your Honor.  They're a little bit

18  mixed up to me because of what they told us, the only thing

19  that's left is other websites.  But I understand.

20          THE COURT:  Okay.  Well, if I'm looking at this, if

21  the *Colgate-Palmolive* case went beyond the product that was

22  talked about in the pleadings, and the allegations here -- and

23  I understand, both sides are being masterful in their

24  arguments -- but this is somewhere in the middle, and I'm

25  having trouble figuring that out because nobody's really

1    telling me where the overlap is.

2        Yes, Rule 26 says claims and defenses.  But the claim is,

3    here, about a particular practice.  I've got a Supreme Court

4    case that goes beyond a particular product.  I've got nothing

5    that tells me that this discovery is not -- how it's not

6    proportional, other than, well, it's not pled so it's not

7    proportional.  I'm having a hard time understanding why this

8    discovery should not be allowed.

9            MS. ZAMBRANO:  I would note that the other Defendant

10   or the other entities themselves were served with third-party

11   subpoenas, and they made, as I understand it, objections

12   relating to burdensomeness and so forth.  We really, because

13   of, again, the allegations, we focused on proportion and

14   relevance.  But those objections, my understanding, were made.

15   The third parties, though, did want, these other entities, did

16   want guidance from Your Honor, first on this issue before they

17   delved further.

18           THE COURT:  Okay.  That's Motion 152.  Let's continue

19   to focus on 140 --

20           MS. ZAMBRANO:  Okay.

21           THE COURT:  -- and the first issue in the joint

22   submission.

23           MS. ZAMBRANO:  Okay.  Your Honor, if I could just

24   comment a little bit more on *Colgate-Palmolive*.

25           THE COURT:  Okay.

1              MS. ZAMBRANO:  I think the difference in this case is

2   MGI is a holding company, so there are no products to apply

3   the *Colgate-Palmolive* case to.  It's several layers below.

4   And, again, that's as -- they pled that, that it's a holding

5   company.

6       Now, they pled that there is involvement.  They didn't

7   plead alter ego, but they definitely pled that there was

8   control at different layers below.  But *Colgate-Palmolive*

9   would say that it's the product at, you know, at the product

10  level.  And MGI does not have products.  And so I think it's a

11  significant extension.

12      It's also not a case about discovery.  It's a case about

13  relief, of course.  And so you have to imagine at some time

14  before that, in the case as it played out, somebody made

15  allegations.  And there was allegations.  There was relevant

16  evidence about that.  They got into that.  And they were able

17  then to ask for this relief, to fashion the relief in the way

18  they did, and the Court sanctioned that.

19      That's not, as you point out, that's not what we have

20  here.  And so we think that it has to start with what has been

21  pled and what is before Your Honor.

22              THE COURT:  Right.  Okay.  So where in the brief,

23  other than Footnote 29, that basically one parenthetical,

24  that's the extent of your brief on this was a parent company,

25  there's no product?

1          MS. ZAMBRANO:  Give me just a moment, Your Honor.

2          THE COURT:  Okay.

3      (Pause.)

4          MS. ZAMBRANO:  I actually think there's a little bit

5  more on this issue, as we said later in the brief, relating to

6  just discovery relating to those entities.  I sort of think,

7  as the two issues, of, one, of discontinued practice, and two,

8  of other dating sites.  I kind of think, as most of our

9  argument was related to what I think -- I think we're thinking

10  of Issue 2.  So I think that's why we referred you to those

11  later pages.  Because in that case, in that argument, it's

12  really -- it's not about whether the practices are

13  discontinued.  It's relating to whether those entities'

14  documents are at issue.

15          THE COURT:  Okay.  Well, I'm going by the way that

16  the parties --

17          MS. ZAMBRANO:  Yes.

18          THE COURT:  -- divided up these issues.  So I didn't

19  choose this randomly.  This is how the parties differentiated

20  the issues.

21          MS. ZAMBRANO:  Yeah.  So, our position, though, I do

22  think, is between -- on Pages 20 through 26.  I'm going to

23  point you to anything in particular about the -- about the

24  entities, though, in just a moment.

25      Yeah.  I think the best place to sum up our argument, as I

1    tried to do just a moment ago, was on Page 24 and 25.  We

2    asked the FTC, I asked the FTC, in a meeting, to explain, why

3    do you need this discovery based on what we have before?  And

4    essentially this is why.  They have this following string of

5    hypotheticals.  If MGI controls Match.com, if MGI instructed

6    Match.com to engage in the conduct, if MGI also controls other

7    sites, and if those sites engage in conduct similar to that

8    challenged in the amended complaint.

9         And this is the part in particular that is not pled, Your

10   Honor.  There is no allegation relating to what's happening on

11   other sites.  In fact, the allegations are the opposite.  They

12   talk about the Match.com guarantee.  It's the Match.com terms

13   of use and the Match.com's chargeback practices.  So it's that

14   series of hypotheticals that we think causes, you know, that's

15   the heart of our argument, Your Honor.

16        THE COURT:  All right.  Well, I'm going to go back to

17   the issue, the first issue identified by the parties.  Is

18   there anything else on that specific issue?

19        MS. ZAMBRANO:  The only other thing I would say on

20   that, Your Honor, is I think it's rather confusing on the

21   discontinued practices, and that's why I answered that

22   question that way.

23        We -- we were sued for something.  We told them we weren't

24   doing that anymore.  We told the Court we weren't doing that

25   anymore.  The Court said, they've alleged enough to get past a

1  motion to dismiss.

2          THE COURT:  Right.

3          MS. ZAMBRANO:  So we said at that point, you know

4  what, hands up, you can have that.  We will commit to never

5  doing it again.  We're not doing it again.  We'll put it in

6  front of the Court.  We will live by that in an injunction.

7  And we don't understand why we're still -- we would have this

8  level of discovery over discontinued practices.

9          THE COURT:  Okay.

10         MS. ZAMBRANO:  That's the only other thing I would

11 say.

12         THE COURT:  And I think that's abundantly clear from

13 the filing.

14    All right.  Let me hear from the FTC on the first issue,

15 please.

16         MR. TEPFER:  Your Honor, if I could just correct a

17 couple of mischaracterizations of the record.  The verified

18 stipulation that Defendants are referring to, a so-called

19 verified stipulation, that's a -- that's a one-party document

20 that is denying one of the central issues in this case.  It's

21 been, you know, referred to as a stipulation, as an

22 injunction.  It's none of those things.  It's just a

23 declaration from the Defendants.  And it shouldn't shut down

24 discovery into whether what they're saying is true, just the

25 same way that if, you know, a defendant said in a deposition

they're not, you know, engaging in some sort of conduct.  We
don't shut down discovery at that moment.  We're allowed to
get discovery to see, is this true?  And, you know, if those
practices have temporarily been suspended, why were they
suspended?  Because that's relevant for the Court to
determine, are they likely to recur?

There's all kinds of factors that the Court should be able
to consider to determine whether injunctive relief is
appropriate.  We're of course willing to, you know, agree to
an injunction, but that's not what's before the Court.  What
we have here is a narrowly-drafted nonbinding denial,
essentially.

And just to address the issue of, you know, the *Palmolive*
case, the *Palmolive* case was about fencing in.  There weren't
allegations of wrongdoing on these other -- as to these other
products.  But the Court said, well, to make sure that we have
an effective remedy, so that this, you know, they can't just
change what they're doing and do it on a different product, we
need an injunction that's going to cover all of these other
products.  So of course there weren't allegations of
wrongdoing about those products.  It's just, you know, what
we're allowed to get discovery into to determine -- to fashion
an effective remedy.

And of course, the Court would want to consider whether
Defendants are engaging in this conduct on other platforms,

1  whether they've considered doing it.  All of that is relevant

2  both to the likelihood of recurrence -- if they're doing it on

3  other platforms, it's likely to recur -- and to the scope of

4  the injunction.  If they're, you know, doing it on other

5  platforms, then a narrowly-tailored injunction is improper

6  here.

7          THE COURT:  All right.  I want to be sure that I'm

8  specific about the objections that I'm ruling on with regard

9  to the first issue.  As I see from the joint submission, the

10 objections that MGI is relying on are overbreadth, undue

11 burden, and proportionality, for the first issue.

12         MS. ZAMBRANO:  Yes, Your Honor.

13         THE COURT:  Okay.  All right.  Well, given that

14 discovery is going to be broader than the amount of injunctive

15 relief allowed, I don't see -- I can't see here that MGI has

16 met its burden on these objections.  If the FTC is seeking

17 injunctive relief broader than what's being offered here,

18 obviously, there's still a live issue here.  The objections

19 are overruled.

20    Let's talk about other dating websites.  It looks like the

21 only objection I'm looking at is relevance.  And the argument

22 is that it's not relevant because the amended complaint is

23 limited to allegations concerning Match.com.  Is that

24 accurate?

25         MS. ZAMBRANO:  Yes, and not proportional, Your Honor.

 1    Overbroad as well.

 2              THE COURT:  Where is that?

 3              MS. ZAMBRANO:  I think it's on Page 20 and 21.  We're

 4    referring to it as a fishing expedition, Your Honor.

 5              THE COURT:  Okay.  So, "improper fishing expedition"

 6    equals overbreadth?

 7              MS. ZAMBRANO:  We do refer to proportionality or

 8    overly broad a couple times, too, I think, in a quick scan.

 9              THE COURT:  Tell me where.

10              MS. ZAMBRANO:  On Page 22.  The Federal Rules of

11    Civil Procedure make clear that discovery must be relevant to

12    the allegations in the complaint.  And then, parentheses, and

13    proportional to the needs of the case to be discoverable.

14              THE COURT:  Okay.  And, again, in the parentheticals.

15    I'm just trying to figure out where the argument is, --

16              MS. ZAMBRANO:  Yes.  Yes.

17              THE COURT:  -- where your support is.

18              MS. ZAMBRANO:  Well, on Page 25, there's also that

19    paragraph that says, Because the requested discovery about

20    other sites is not necessary, it is unnecessary and would be

21    disproportionate to the needs of the case.

22              THE COURT:  Okay.  All right.  And, so, again, no

23    affidavit or evidence on the proportionality.  This is simply

24    limited -- and it's simply, I don't mean that it's a simple

25    argument; I'm just saying basically your argument is the

1    allegations in the complaint are only about Match.com, and

2    that's the real substance for your objections on relevance and

3    overbreadth or proportionality or any other objections that

4    are here?

5          MS. ZAMBRANO:  It's the allegations.  It's the

6    request for relief.  They're only seeking relief against the

7    Defendants.  And the injunction is relating to the Defendants'

8    practices.  There's no -- guarantee is a Match.com practice.

9    The chargeback policy that's mentioned is a Match.com

10   practice.  They're not practices related to other entities.

11         THE COURT:  All right.  Let's -- give me a summary of

12   your argument.  I mean, I've looked at this.  I've looked at

13   your joint submission.  I've looked at your cases.  I'm

14   struggling -- I understand your argument.  I'm struggling,

15   though, with, again, how the Defendant has met its burden

16   here, because I think your cases are subject to being a

17   distinguished here.

18     *Murphy v. Deloitte*.  It's an ERISA case.  The Court looked

19   at whether the magistrate judge applied the correct standard.

20   And, you know, discovery typically isn't allowed in an ERISA

21   case.  I see that as --

22         MS. ZAMBRANO:  Yes.

23         THE COURT:  -- not really helpful here.

24     *Torch Liquidating* talked about the amendment of a

25   complaint.

1          In *Fraserside*, completely different issue again.  The

2     Court's looking at contacts with the jurisdiction for purposes

3     of personal jurisdiction.

4          So how does any of this show me why this is not

5     proportional or irrelevant, given *Colgate-Palmolive*?  That's

6     really what I was looking for, is tell me why, if the Supreme

7     Court can give -- can affirm relief beyond a specific product

8     pled in a complaint, then why discovery shouldn't be allowed

9     here.

10               MS. ZAMBRANO:  Because it also has to be related to a

11     particular practice in a complaint.

12               THE COURT:  Okay.

13               MS. ZAMBRANO:  A particular practice has to be

14     alleged.  And there is nothing about any other entity other

15     than the -- not entity, excuse me, platform -- other than

16     Match.com.  There's just not.  It's -- the other platforms are

17     -- it's a throwaway line in one paragraph in the complaint.

18     The entire complaint seeks relief against Match.com for

19     Match.com practices.

20          And so we don't think that those Supreme Court cases,

21     which are, again, sort of looking at the issue from the end,

22     not the beginning, they're saying, okay, if we had this

23     evidence in front of me, and there is a test, as I recall, in

24     the -- in the case law relating to whether you get that

25     injunction.  One is whether it's related to the other.  So,

1  for example, in the *Kraft* case, I believe they said, well,

2  cheese and the processed cheese and the Velveeta, it -- you're

3  going to have the same issue.  It's, do you have enough

4  calcium?  Okay?

5           THE COURT:  Uh-huh.

6           MS. ZAMBRANO:  There are no -- there are no practices

7  relating to the issue in this complaint that relate to another

8  website.  So, for example, they're not alleging that there's

9  -- in the *Kraft* case, it was the five percent calcium, and

10 that could be easily applied to other cheese.  Okay.  There's

11 no practice here that could be easily applied to another

12 website.  And that's no mistake.  It's because they were

13 focused on Match.com.

14    If you can't sue a holding company that owns a single

15 company over specific conduct, you know, you shouldn't be able

16 to, I should say this, sue a holding company at the top for

17 conduct of a particular -- on a particular website three

18 levels down, and then try to figure out all of the other

19 holding company's practices.  There has to be some Rule 11

20 allegation first.

21    And so if Your Honor -- if Your Honor needed evidence on

22 those things, we think that goes to -- beyond the pale of the

23 complaint.  But they are not related to these practices.

24 Those entities are not related at all to these practices.

25           THE COURT:  Okay.  Well, I'm going to do what I

```
 1   really don't like the parties to do, but it's just sort of to
 2   illustrate.  If I jump ahead to the related issue in Motion
 3   152, the Defendants are here in the context of a motion for
 4   protective order, as I understand it, for subpoenas issued to
 5   other companies.
 6           MS. ZAMBRANO:  Your Honor, I'm sorry to interrupt
 7   you.  We did not have that one on -- set for today's hearing.
 8   I apologize.  Is that on the docket?
 9           THE COURT:  152?
10           MS. ZAMBRANO:  No?  And I'm saying that in particular
11   because there's separate counsel that represents those
12   entities.  So I'm -- I think it's 133 and 140.
13           THE COURT:  Isn't 152 related?
14           MR. TEPFER:  Yes, Your Honor.
15           THE COURT:  I mean, it's the motion for protective
16   order -- hold on.
17           MS. ZAMBRANO:  Yeah, I -- I do think the -- a lot of
18   these arguments are -- are put in there, but we -- I don't
19   have those materials prepared for today, Your Honor.  I
20   apologize.
21           THE COURT:  Well, I did not catch that my electronic
22   order did not include it.  I intended to do that.  All right.
23           MR. TEPFER:  Your Honor, given the overlap, we're
24   happy to address it today if you'd like, but --
25           THE COURT:  Well, if I didn't, that's -- yeah.  I did
```

1    not set it for hearing.  I did not give the parties notice of

2    that.  I did not miss that the electronic order did not

3    include that one.

4           MS. ZAMBRANO:  And, again, I apologize, Your Honor.

5    I agree that -- yeah.

6           THE COURT:  That's my --

7           MS. ZAMBRANO:  Yeah.  Okay.

8           THE COURT:  That is on our end.  I did not double-

9    check that electronic order.

10      All right.  Well, let's go back to 140, then.  So, let's

11   get back to discovery regarding other dating websites.  If the

12   relief that can be granted goes beyond just the specific

13   product -- and I understand your arguments.  I truly am.  I

14   have worked very hard to try to understand them.  If discovery

15   is broader than what relief can be granted, why can't

16   discovery about similar practices on these other websites be

17   allowed?

18          MS. ZAMBRANO:  Because there had to be a good faith

19   allegation that anything like this was happening.  And I'm

20   trying very hard not to get into the merits, Your Honor,

21   because I don't think it's appropriate, but it's -- it's not

22   true, and so it's hard to prove a negative, but that's why

23   they didn't allege it.  So now we're getting into things that

24   we know are not true.  That's why they didn't file that

25   complaint.  It's a Match.com guarantee.

1              THE COURT:  Okay.

2              MS. ZAMBRANO:  It's a six-month subscription.  They

3     know that, it's public, that they don't have -- there's not a

4     six-month subscription on these other sites.  This is a

5     fishing expedition.  So they're working backwards.  My -- our

6     submission is that you have to work from the complaint.  And I

7     don't disagree that the law would, if they obtained discovery,

8     that they would be able to obtain relief consistent with those

9     cases.  But you have to make the allegation first under Rule

10    11.

11         And this is not a secret.  These things are -- these are

12    websites.  They're public websites.  They have public

13    practices.  And they haven't made the allegations.

14             THE COURT:  All right.  Let's hear from the FTC.

15             MR. TEPFER:  First, Your Honor, I just want to

16    address, the case law, Defendants have cited nothing that says

17    that there has to be an allegation in the complaint regarding

18    these other websites.  And to be clear, this wasn't, you know,

19    an end run around the amendment deadline.  This discovery was

20    served before the amendment deadline.

21         And these practices that we're discussing here, I believe

22    counsel referred to the *Kraft* decision, where, you know, the

23    issue could be applied to other cheeses or that sort of thing.

24    We have the same sort of situation here, where there's a bunch

25    of dating websites.  They're all substantially similar.

1   Different demographics or that sort of thing.  But they're all

2   very similar dating websites with identical chargeback

3   policies or substantially similar chargeback policies.  So

4   there is, you know, there is a, I guess, a broadly applicable

5   allegation there.

6        But to be clear, we did not have to mention those other

7   entities in the complaint.

8        And I also want to state that the FTC is entitled to

9   discovery not just on the likelihood of recurrence issue and

10  about the scope of injunctive relief, but also on Defendants'

11  affirmative defenses.  And there are two affirmative defenses

12  here that would entitle the FTC to this discovery.  It's sort

13  of the flipside of the coin, the overbroad injunction

14  affirmative defense and the mootness affirmative defense.  And

15  both of those are very relevant here and would entitle the FTC

16  to discovery on that basis.

17            THE COURT:  So, tell me where you talk about this

18  discovery going to those affirmative defenses in your joint

19  submission.

20            MR. TEPFER:  Sure.

21            THE COURT:  And, again, we're talking about Issue #2.

22            MR. TEPFER:  Yes, Your Honor.  And --

23       (Pause.)

24            MR. TEPFER:  Your Honor, I apologize, I don't see

25  that we use the phrase affirmative defense, but we do talk

1  about the likelihood of recurrence issue, which is intertwined

2  with that mootness defense.

3         THE COURT:  So in this case, recurrence equals

4  mootness?

5         MR. TEPFER:  It's --

6         THE COURT:  You all are making me work really hard to

7  read between the lines here.  It just, it's helpful if you

8  just tell me.

9         MR. TEPFER:  Yes, Your Honor.  The Court has to

10 consider whether, you know, conduct is likely to recur.  And

11 Defendants are arguing that essentially it's moot, that it's,

12 you know, not likely to recur because it's "permanently

13 discontinued."

14    And so from, you know, from my perspective, Your Honor,

15 those are really one and the same issue.

16        THE COURT:  Okay.  But you don't tell me that you see

17 them as one and the same issue in this?

18        MR. TEPFER:  No.  I apologize, Your Honor.

19        THE COURT:  Okay.  Or mention that it's an

20 affirmative defense that you're looking for discovery on?

21        MR. TEPFER:  No, Your Honor, we do not characterize

22 it that way.

23        THE COURT:  Okay.  All right.  I'm not trying to be

24 difficult here.  I really am trying to understand the parties'

25 positions so that I can give you the best ruling.  I'm hearing

1    some new things today that I did not quite hear or did not

2    read here in the joint submission.

3         All right.  So, back to discovery regarding other

4    websites.  You're saying you don't have to -- the FTC doesn't

5    have to plead that this practice is also available on other

6    websites that are --

7              MR. TEPFER:  No, Your Honor, because it's, you know,

8    to go back to that *Colgate-Palmolive*, you know, the Court is

9    entitled to discovery to determine what is the appropriate

10   scope of injunctive relief.  Should it be narrowly tailored,

11   limited to one of Defendants', you know, dozens of websites,

12   or should it be against the Defendant generally, without that

13   sort of restriction?

14        And that's, you know, and that's what we believe the

15   *Colgate-Palmolive* case stands for, that, you know, the Court

16   can assess whether a broader injunction is appropriate.  And

17   the Court is entitled to look and see, well, what -- what is

18   this Defendant currently engaged in?

19        One of the factors for determining that, of course, is,

20   you know, does their occupation present the ability to engage

21   in this type of conduct in the future?  That's, you know, it

22   makes it more likely to recur.  And if, you know, Defendants

23   are engaging in this same conduct in other websites, as

24   public-facing evidence suggests, then that suggests strongly

25   that the conduct is likely to recur.

1          THE COURT:  But if the conduct, just looking at it

2     from a due process standpoint, if the FTC is taking the

3     position that this similar -- there are similar policies or

4     similar conduct relating to other websites, why not include

5     that in the complaint?

6          MR. TEPFER:  Well, Your Honor, because we -- we have

7     a reason to think that this is something that should be

8     investigated.  It's not -- it's not apparent -- you know, I

9     want to be clear.  These chargeback policies are ambiguous.

10    And so, you know, it gives us concern, and that's why, you

11    know, that's why we want to determine definitively what

12    exactly is going on, because I think the Court is going to

13    want to know that when providing injunctive relief.

14        But we do not believe that there is, you know, an adequate

15    basis to include that in the complaint at this time.  Of

16    course, you know, if the evidence bears this out, as we

17    believe it might, we may seek leave to amend.  But -- but

18    there was not a basis -- or to include it before the amendment

19    deadline, Your Honor.

20         THE COURT:  Well, if the FTC -- if this is something

21    that needs to be investigated, doesn't the FTC have the

22    authority to do that?  You know, didn't you have an

23    investigation leading up to this lawsuit?

24         MR. TEPFER:  Well, Your Honor, we believe, given that

25    this is appropriately within the scope of injunctive relief,

we believe, you know, in the interests of judicial efficiency,
you know, the Court could simply determine, well, the
Defendant is doing this on one website.  It's -- it has broad
equitable authority to give -- to grant this type of equitable
relief.  And, you know, this is the same Defendant that we're
alleging is engaging in this same practice on other websites.
So, you know, we think it's proper to show the Court
discovery, saying, oh, if it's engaging in it on this website,
but a -- you know, the order should not be so limited to
Match.com and it should instead be a general order against
Match Group, Inc.

        MS. ZAMBRANO:  Your Honor, may I correct something?

        THE COURT:  If you'll give me just a second.

   (Pause.)

        MR. TEPFER:  And Your Honor, I also want to make the
point that, you know, it's relevant to the fact that, you
know, Match Group, Inc. has claimed that it does not operate
any website -- of these dating websites.  That's another
relevant issue here.  We believe the evidence shows that it
does, that it's, you know, it's perhaps technically a holding
company but plays a more active role in the operation of its,
you know, the many dating websites it owns.  And so we believe
the discovery is also relevant and proper for that reason.  I
just wanted to add that as well.

        THE COURT:  Sure.  But your statement that there's

1   not an adequate -- there was not an adequate basis to include

2   allegations regarding the same policies in other websites has

3   me really concerned.  You didn't say that in your joint

4   submission, --

5           MR. TEPFER:  Well, --

6           THE COURT:  -- but you said it today, and --

7           MR. TEPFER:  -- Your Honor, we -- because this is an

8   internal policy, we believed, looking at the chargeback

9   policies, it leaves open the possibility that they're engaging

10   in this same illegal conduct.  It's a very unusual chargeback

11   policy, but it is not explicit about, you know, the internal

12   aspect of what occurs when a consumer has made a chargeback

13   and lost.

14     So, you know, we would want to, you know, flesh out what

15   exactly is happening before, you know, including that sort of

16   allegation.

17     But we also don't believe that it's necessary to, you

18   know, add those allegations, given that this is properly

19   within the scope of injunctive relief and the Court can

20   consider these without having to make an explicit allegation

21   in the complaint.

22           THE COURT:  Well, you've kind of -- you've gone out

23   on a limb now.  You've gone beyond, right?  You're saying

24   there's not enough -- you hadn't -- you did not have enough

25   evidence to be able to include it in the complaint or an

1    allegation.  It needs to be investigated.  You've got the

2    power to investigate, but you haven't, despite an extensive

3    investigation before this lawsuit.  You're treading awfully

4    close to this fishing expedition that they were talking about.

5          MR. TEPFER:  Well, Your Honor, we -- based on public-

6    facing documents.  That's what really clued us in to this

7    particular issue.  And that's, you know, that's exactly what

8    discovery is for, to determine, well, we have a good faith

9    basis to seek discovery because it looks like, you know, this

10   same entity that operated Match.com and engaged in this

11   illegal chargeback policy has substantially similar policies.

12   But we can't know that without, you know, examining how

13   they're handling these chargebacks internally.  It's just not

14   something that we're able to assess.

15      And so it's proper to get discovery on those issues, both

16   to determine whether Defendants are engaging in this or have

17   engaged in it in the past, for, you know, the likelihood of

18   recurrence issue, and to determine whether the scope of the

19   injunction should be limited to Match.com, as Defendants would

20   like, or just against the Defendants generally.

21         THE COURT:  But if it's public-facing and that's a

22   basis for discovery but not enough to --

23         MR. TEPFER:  Sure.

24         THE COURT:  -- allege that you believe that the

25   practice may be also used on other websites, what's --

1          MR. TEPFER:  So, the -- the aspects of the policy are

2     public-facing, that they suspend -- so, essentially, if the

3     Defendants or, you know, some of their other dating websites,

4     if you seek a chargeback, they'll suspend your account, which

5     is -- and there is nothing that states that you will, you

6     know, that you will get account access back or how this is

7     handled.

8       I believe some of the websites may refer to, you know,

9     contacting customer care, if I recall correctly, but it

10    doesn't say what happens there.

11      And so what we need to understand is, you know, what does

12    happen.  Do you get your -- do you get your account access

13    back?  Because Match.com didn't provide that account access

14    back, and that's what we allege is illegal.  And we can't know

15    that without discovery into that issue.

16          THE COURT:  For the sake of argument, if you're

17    entitled to some discovery to determine whether that same

18    policy is applied by the Defendants on any other website,

19    isn't the scope of that discovery much more limited than what

20    you've asked for here?

21          MR. TEPFER:  I apologize, Your Honor.  Would you mind

22    repeating that?

23          THE COURT:  Sure.  If the point is to determine

24    whether this policy exists on any other website related to or

25    controlled by or owned by or -- and I know that's at issue;

1   going for purposes of this argument with what you seem to be

2   contending -- isn't what would be allowable to allow you to

3   determine that much more limited than what you've asked for?

4        MR. TEPFER:  I believe, Your Honor, we -- we did seek

5   -- I'm not sure if there are specific requests you're

6   referring to, but we did attempt to limit our discovery to the

7   types of issues that are alleged in the complaint, simply

8   because we believe, you know, the injunctive relief should --

9   although it shouldn't be narrowly tailored to just what's

10  alleged in the complaint, there should be some fencing-in, but

11  it needs to have some sort of relationship to what's in the

12  complaint.  And so the discovery that we requested, we did try

13  to tailor it to be related to what -- to the types of

14  practices in the complaint.

15       THE COURT:  Right.  But you've identified specific

16  websites that you want discovery about, as opposed to asking

17  whether these same types of policies that were used at

18  Match.com were used at any of the Defendants' other

19  subsidiaries, as opposed to asking about specific

20  subsidiaries.

21       MR. TEPFER:  Oh, Your Honor, we did, in the

22  discovery, limit it to particular subsidiaries that we were

23  aware had these, you know, had the chargeback practice that we

24  were -- that we wanted to learn more about.  And the, you

25  know, not to take us off topic, but the subpoenas were to the

1    entities that we had, you know, those same sort of basis to

2    believe that we had found external policies that raised these

3    same issues.

4       So it wasn't just a fishing expedition to all of

5    Defendants' websites.  You know, they have 50-something

6    websites.  We only sent it to a few or concerning a few, like

7    maybe I think it was three that we knew had the policy.

8             THE COURT:  Let me see if I can make my question more

9    specific.  If you are seeking to determine whether the

10   Defendant had the same policy that's alleged -- that you

11   allege it had with regard to Match.com, recognizing that you

12   contend it's not your policy, isn't the type of discovery that

13   would be warranted to allow you to make that determination

14   much more narrow than what you've asked for?

15      In other words, isn't the discovery to ask the Defendant

16   whether it has the same policy at others, as opposed to asking

17   about the specific entities --

18             MR. TEPFER:  Oh, --

19             THE COURT:  - that you believe also have the same --

20             MR. TEPFER:  -- of course.

21             THE COURT:  -- policies?

22             MR. TEPFER:  And I apologize for misunderstanding.  I

23   believe I understand your question.  What's relevant is -- in

24   this situation is not just whether they have the policy, but,

25   for instance, if they have stopped this policy, why did they

1  stop?  Did they stop because, for example, they got a lot of

2  consumer complaints and realized that this was improper, or

3  did they stop because, you know, they -- the FTC sued the

4  parent company?

5       You know, again, it gets to the likelihood of recurrence

6  issue.  You know, if this policy has been suspended, why was

7  it suspended?  So there's the broader factors, which I believe

8  are in that *Black* case cited, are all relevant.

9            THE COURT:  Okay.  Now, you've -- you've confused me.

10  I thought we were talking about discovery relating to other

11  websites.

12            MR. TEPFER:  Yes, Your Honor.

13            THE COURT:  All right.  What I'm trying to understand

14  here is, if you don't have enough evidence to be able to

15  allege in the complaint that you believe the chargeback,

16  cancellation, and what was the other one?

17            MR. TEPFER:  The Match guarantee, Your Honor?

18            THE COURT:  Yes.  The guarantee.  All right.  If you

19  don't have enough evidence to make a good faith allegation in

20  the complaint that these three policies are being used by the

21  Defendant on other websites, at best isn't the discovery that

22  you're -- that would be warranted to ask the Defendant whether

23  it had these same types of policies on other websites, as

24  opposed to asking about these specific other websites?

25            MR. TEPFER:  Well, Your Honor, I believe -- I believe

1  the discovery would be broader because we're entitled to know

2  whether they have these same policies, but also relevant is

3  just generally does Match Group, Inc., you know, play an

4  active role in operating these other websites?  Because, you

5  know, also at issue, as I mentioned, one of the factors for

6  determining whether, you know, injunctive relief is

7  appropriate is are they going to have the opportunity to do

8  this again?

9      And so, you know, if we get an injunction against

10 Match.com, but Match Group, Inc. is actually, you know, doing

11 this on OkCupid and all those other things, then the Court is

12 going to want to know -- or, that, you know, the Court's going

13 to want to know that Match Group, Inc. is actually actively

14 involved in operating these websites, too.

15         THE COURT:  Okay.  Let me -- let me -- you keep going

16 off into other things.

17         MR. TEPFER:  I'm sorry, Your Honor.

18         THE COURT:  And so I'm obviously asking bad

19 questions.  If you think MGI is using these policies on other

20 websites, you're asking about these other -- you're asking

21 about OkCupid and specific websites.  You're not asking

22 Defendant, do you use these same policies on any other

23 websites, and if so, which ones?  You're going straight to

24 these specific websites.

25         MR. TEPFER:  Yes.

1          THE COURT:  And I'm saying, if you don't have enough

2     to plead in your complaint, then if I'm looking at a

3     proportionality analysis, which Judge Horan's opinions make

4     very clear the Court has a responsibility to look at it, too,

5     --

6          MR. TEPFER:  Yes, Your Honor.

7          THE COURT:  -- isn't the starting point to ask the

8     Defendant if it does in fact have these and to ask those

9     questions before allowing discovery straight into those

10    websites, given that you don't even have enough to allege it

11    in your complaint?

12         MR. TEPFER:  Well, Your Honor, I believe the approach

13    that we took actually limits the Defendants' burden, because,

14    you know, we limit -- we took a look at the websites and went

15    to the ones that we have a good faith basis to believe there's

16    a real question here.

17         If we were to ask Defendants, you know, examine all 50-

18    something of your websites, even ones that we know don't have

19    that chargeback policy, that's unduly burdensome for them.  So

20    we are trying to narrow the scope of just saying, just look at

21    a few of these, because we believe that, you know, if the

22    Court sees this occurring on, you know, three of them, we

23    don't need to show 50.

24         And so that -- the whole purpose of limiting it to those

25    specific websites was to make sure it wasn't a fishing

1    expedition and that we were limiting the Defendants' burden to

2    the extent possible while still proving our case.

3              THE COURT:  Isn't the concept of a fishing expedition

4    to look for evidence in support of a new claim?  And you've

5    just told me you didn't have enough evidence to be able to

6    plead that in the complaint, that this went beyond just

7    Match.com.

8              MR. TEPFER:  So, --

9              THE COURT:  Why isn't that more properly the subject

10   of a separate investigation, then?

11             MR. TEPFER:  Because, Your Honor, this is the -- this

12   really gets back to both the likelihood of recurrence issue,

13   because it matters in this case for showing that the conduct

14   is likely to recur.  If we're not allowed to get discovery

15   into this issue, say just hypothetically that Defendants have

16   stopped this practice on Match.com but they're doing it on all

17   these other websites.  Well, Defendants, you know, say under

18   oath, we're not doing this on Match.com anymore, and so the

19   Court says, well, we have nothing to worry about, no

20   injunction is necessary, but in truth an injunction was

21   appropriate because it was occurring on these other websites.

22   So it's appropriate for that.

23        And then it's also appropriate for this case because the

24   Court needs to consider the scope of the injunction.  So, you

25   know, rather than having the FTC file, if, you know, there's

1   50-something websites, having the FTC do 50 investigations and

2   50 separate lawsuits, the FTC is able to get, you know, an

3   appropriate injunction based off the Court's, you know,

4   equitable authority that goes to the Defendant generally.  So

5   that's why we believe this is properly within the scope of

6   this case.

7           THE COURT:  If it was properly within the scope of

8   this case, then why wasn't it included in the investigation?

9           MR. TEPFER:  Well, Your Honor, because, you know,

10  that I believe would expand the burden both of the FTC and the

11  Defendants.  You know, rather than sending, you know, CIDs and

12  making them produce as to 50 websites, the FTC's burden is to

13  show, you know, that these are illegal practices and that they

14  can be applied widely on the various different websites.  Just

15  like in the *Kraft* case, you know, you don't have to

16  investigate all of the different cheeses and have separate

17  investigations for Swiss and Cheddar, you just have to show

18  they're doing something bad as to, you know, as to this

19  product.  It can be easily applied on all these other

20  different products.

21      And so -- and that's simply what we're trying to establish

22  in the least burdensome way possible, that we have a bad

23  practice that Defendants may be engaging in and could easily

24  engage in on different platforms.

25          THE COURT:  Okay.  All right.  Ms. Zambrano?

1          MS. ZAMBRANO:  I do have a couple clarifications to

2    that.

3      Your Honor, as you know very well, we have something

4    called "upon information and belief" pleading.  They didn't

5    even plead any of this upon information and belief.  They are

6    public websites.

7      I heard him say just a moment ago that they knew about

8    certain charge policies and they didn't know about -- they

9    knew of about certain charge policies.  They didn't make

10   allegations relating to any other -- any other website.

11     I think Your Honor has sufficiently covered the they-

12   could-have-investigated point, so I won't hit that.

13     I would say, though, that the representation regarding the

14   amount -- regarding the amendment deadlines was not right.

15   The amendment deadline was May 13th.  And this discovery was

16   served June 3rd.  They did not plead these allegations.

17     Lastly, I would say, Your Honor, if you -- on Request #25,

18   it's in Joint Appendix 169, this is an example of the

19   overbroad discovery that Your Honor was alluding to relating

20   to these other practices.  I'll let you get there and then

21   I'll start talking about it.

22          THE COURT:  All right.  So we're talking Document 141

23   at what page?

24          MS. ZAMBRANO:  No, I'm sorry, I think it's Document

25   148, J Appendix 169.  So it's -- it's Request #25, Your Honor.

1              THE COURT:  Oh, I'm sorry.  148.  All right.  Okay.

2     And it's Page 169?

3              MS. ZAMBRANO:  Yes, Your Honor.

4              THE COURT:  Using the number at the top or the number

5     at the bottom?

6              MS. ZAMBRANO:  Let me -- at the bottom.  The bottom

7     right.  Correct?  Yeah.  The app cite at the bottom right.

8     Yeah.

9              THE COURT:  All right.

10             MS. ZAMBRANO:  So this is the particular request at

11    issue.  And your question that you posed -- again, I'm not

12    agreeing that they even get discovery relating to other sites'

13    practices, for the many reasons.  But your question was right

14    on.  Here, they have all communications relating to, and you

15    see that there's customer chargebacks and you see that there's

16    other things that are referred to customers.  Well, customers,

17    they define as -- and this is also Docket 148, but it's at J

18    Appendix 206 and 207, this is how customers are defined -- and

19    it's broad.  I think this is in their interrogatories.  They

20    use the same definition.  But they know how to list other

21    websites, and they do in their definition of customers.  They

22    say, Any individual or individuals who have maintained an

23    account on any website owned or operated by the Company,

24    including Match.com, OkCupid, Plenty of Fish, and Tinder.  And

25    they go on.

1      So that's exactly -- what you said was exactly right.

2 This discovery is in no way tailored to the injunction request

3 that they are now trying to pin this on.  This is a fishing

4 expedition.  It's a perfect example of one.

5      There are a number of other requests, Your Honor, that go

6 to all practices and policies relating to other websites, all

7 advertisements, all surveys, all summaries relating to

8 customers.  And customers, when it's used in their discovery

9 requests, relates to all of these other websites that do not

10 relate to the complaint.

11      Your Honor, I think you hit the nail on the head.  If they

12 didn't have the amount of evidence needed to plead something,

13 why would we have discovery relating to those issues?  They

14 had that burden and they didn't meet that burden.  They're

15 free to ask the District Court to amend their complaint again.

16 We think it should be denied.  But that's their remedy, not to

17 try to back-door it in this way, when they have admitted today

18 that they have nothing that would satisfy Rule 11 to make

19 those allegations.

20           THE COURT:  All right.  Anything else from the FTC?

21           MR. TEPFER:  Simply to note that, you know, I want to

22 again contest the suggestion that we have an obligation to

23 have, you know, made any sort of allegations against these

24 other entities.  That's -- you know, what we're seeking

25 discovery concerning is the equitable relief that we believe

 1   we're entitled to, and that's not something that has to be

 2   pled in the complaint, or even if, you know, even if we had

 3   definitive proof of this and even if there wasn't, you know,

 4   an amendment deadline.  That's just not something that needs

 5   to be in the complaint, as Defendants seem to suggest.

 6          THE COURT:  Then what's the purpose of notice

 7   pleading?

 8          MR. TEPFER:  Well, Your Honor, you know, I understand

 9   that issue, but it's about the injunction.  So, you know,

10   Defendants are aware of the injunction that we're seeking.

11   They're aware of the practices at issue.  It's the same

12   Defendant.

13      And just like in the Supreme Court case, you know, those

14   weren't allegations about other products, but the Court is

15   allowed to consider those other products, even without

16   mentioning them in the complaint.

17          THE COURT:  Okay.  All right.  I understand your

18   point.  But I am putting a finer distinction on this.  I

19   questioned aggressively on the *Colgate-Palmolive* case.  But

20   the key here for me is that that case is about using the same

21   practice for other products.  You've gone straight into other

22   websites.  You've gone straight into the other products, in

23   other words, without ever having provided the link in your

24   complaint or through the discovery you're asking about whether

25   the practice that's at issue in this lawsuit exists on other

1   websites.  That's where you start.  You don't go directly to

2   other websites, especially when you've just told me today that

3   you didn't have an adequate basis to include it in the

4   complaint.

5        I'm not talking about pleading against the other websites.

6   I'm talking about an allegation that this practice that is at

7   issue with regard to Match.com also exists or may exist with

8   regard to other websites.  If you can't even make that

9   allegation in your complaint, then the extent of the discovery

10  you're requesting regarding other websites is a fishing

11  expedition.

12       So what you've asked for is way too broad for what you've

13  pled.  The focus is the practice, and this isn't even tailored

14  to a practice that may or may not exist on other websites.

15  You've gone straight into asking for discovery from other

16  websites about the practice.

17       So, I'm granting your motion as to the first issue, but

18  I'm denying the motion as to the second issue.  I'm sustaining

19  the relevance objection, --

20            MR. TEPFER:  And --

21            THE COURT:  -- pretty much based on what you told me

22  today.

23            MR. TEPFER:  And Your Honor, just to make sure I

24  understand, are you ruling that we are entitled to discovery

25  concerning whether those, you know, same practices in the

1  complaint are occurring on any websites but not as to specific

2  websites or as to broader issues?

3      THE COURT:  You still have a couple of months left on

4  discovery.  I'm not going to tell you or give you an advisory

5  opinion as to what discovery you should ask for.  When the

6  disputes arise, and I suspect they will, I'll address it at

7  that time.  But where we are today, I have pointed out what

8  you haven't asked for, I've pointed out that you've gone

9  directly to the source without ever having made that first

10  connection that this practice does in fact apply.  And given

11  where we are in the timing of this case, I am not prepared to

12  say one way or the other.

13      MR. TEPFER:  Yes, Your Honor.  If I could address one

14  issue.  You know, you referenced granting as to the first, the

15  first issue on our motion to compel.  And we appreciate that

16  finding.  But I wanted to raise, if I may, you know, the issue

17  of we served these requests, you know, about five months ago,

18  and we have depositions coming up, and we have the concern

19  that -- whether we're even going to be able to use this

20  discovery for these depositions.  You know, the Defendants

21  withheld discovery on two of the three FTC counts.  So we have

22  -- you know, these are very basic requests that haven't

23  received any discovery on.

24     We had previously filed a motion for a continuance, which

25  was denied without prejudice on the basis that it concerned

 1   the issues that were being decided here today.  And you know,

 2   I just wanted to ask if the Court can make a finding on that

 3   issue, simply because we plan to seek again, you know, based

 4   on the Court's finding, a motion for a continuance.  We have a

 5   -- you know, it is relatively urgent.  You know, we have an

 6   expert deadline in like three days, and Defendants are

 7   attempting to prevent us from even continuing on with these

 8   depositions.  But we really want to be able to use this

 9   evidence in our depositions.

10          THE COURT:  Okay.  This is Judge Kinkeade's case.

11   Judge Kinkeade has specifically referred three discovery

12   motions to me.

13          MR. TEPFER:  Yes, Your Honor.

14          THE COURT:  So the scope of my authority extends only

15   to these three discovery motions.  To the extent you need to

16   go back to him for any other relief, you are free to do that.

17   My authority extends to ruling on the objections and whether

18   discovery should be produced and when.

19      So you raise a good point.  I would have covered it at the

20   end.  But I typically allow 21 days for a party to produce its

21   responses.  So when I grant --

22          MS. ZAMBRANO:  Your Honor?

23          THE COURT:  Yes?

24          MS. ZAMBRANO:  I'm sorry to interrupt you.  I do have

25   a question about the relief that's actually been granted on

```
 1    #1.

 2              THE COURT:  Uh-huh.

 3              MS. ZAMBRANO:  And it's going to affect what you're

 4    about ready to say in terms of the timing.

 5              THE COURT:  Okay.

 6              MS. ZAMBRANO:  Could I -- could I ask my question on

 7    clarification?

 8              THE COURT:  Sure.  Certainly.

 9              MS. ZAMBRANO:  Okay.  The joint submission had the

10    first issue being whether MGI may refuse to engage in

11    discovery simply because it conducts the conduct -- excuse me,

12    it contends the conduct has been previously discontinued.

13    Okay.  Permanently discontinued.  Excuse me.  So my question

14    to you is, most of our discussion on that related to -- on

15    that issue related to what was happening on other websites,

16    because, again, it's not happening on Match.com.  So could you

17    clarify:  Is your ruling that we cannot -- we cannot -- we

18    should just produce discovery relating to current practices,

19    if any, for the entities in the case, or could you just help

20    me with that a little bit, please?

21              THE COURT:  Well, as I understand it, the discovery

22    was related to the entities in the case.

23              MS. ZAMBRANO:  Yes, Your Honor.  Yes.

24              THE COURT:  And I cannot give relief that wasn't

25    asked for.  So I'm -- I am looking at the issue as the parties
```

phrased it.  And I understand you disagree with the phrasing.
Your -- the issue seems to be whether there should be
discovery allowed on whether this practice exists or when it
stopped.  I'm not going to get into the specifics of each
discovery request.  If we need to go through them one by one
like we did in the 70-page joint submission that we're about
to get to, we do.  That's not what you gave me.

The issue as the parties presented was whether there
should be any discovery on these policies, given the filing,
where the Defendant stipulated to not doing this.

I agree with the FTC that the fact that you've said you
won't do it anymore is not necessarily binding and should not
preclude further discovery without any litigation-ending or
dispositive order from the Court.  The Court hasn't ruled on
it.

Their point is, we still get to look at whether it could
continue, whether it could reoccur.  So to the extent that
there's discovery relating to those practices, it's a live
issue still.  Yes, you filed a, quote, stipulation that says
the Defendants won't do this anymore, but they're entitled to
have discovery on whether you will or you won't or how that
would work.

MS. ZAMBRANO:  And so my question is, does that mean
for nine years, or does that mean as the -- as it present --
as the conduct presently exists?

 1          THE COURT:  You've -- I don't see anything in here

 2   about limiting it to -- you reference going back almost 10

 3   years.

 4          MS. ZAMBRANO:  Yes.  That's part of the overbreadth.

 5   Yeah.

 6          THE COURT:  Right.

 7          MS. ZAMBRANO:  Yeah.

 8          THE COURT:  That's overruled as well.

 9      There -- there's reference in here to documents -- if the

10   practice ceased, based on the representation, in 2019, you go

11   back four years, five years, that's 2014.  There is an

12   argument here that some of the documents were from 2013.

13   That's only going back one year.  So going back to 2013, I

14   think is appropriate.  So any -- to the extent that there's an

15   objection on going beyond 2013, or going back to 2013, that's

16   overruled.

17          MS. ZAMBRANO:  Okay.  So, for example, the one we

18   just looked at, Request #25.  It is, we should be searching

19   our systems for all communications for nine and a half years

20   relating to a guarantee?

21      And I'm asking because there is a specific period in time

22   that the practice changed.  It was in '19.  And we informed

23   them of that.  This suit was filed after '19.  So we think the

24   relevant time period obviously would be after that, not to go

25   back before the suit was even filed.  And I'm just, I'm just

1    making sure that I understand Your Honor's ruling.

2            THE COURT:  Discovery is allowed from prior to when

3    the suit was filed routinely.

4        If the argument is that this goes to whether this could

5    reoccur, and I'm looking at your briefing in the joint

6    submission, we're making more specific arguments today than

7    were made in the joint submission.  I've spent a lot of time

8    with this.  I understand that you're unhappy with the 10 years

9    of discovery.

10           MS. ZAMBRANO:  I've really been trying to avoid doing

11   the one by one, but it is relevant on each of these requests

12   what is -- what -- how does that relate to this could occur

13   again?  I mean, they asked for all of our minutes related to

14   the chargeback.  Is there any -- all policies and procedures

15   from 2013.  How is that relevant to whether something is going

16   to happen again?  That's my point.

17           THE COURT:  Sure.

18           MS. ZAMBRANO:  If we should interpret them with that

19   guidance, we can do that.  And we will meet and confer and

20   won't bother Your Honor with that today.

21           THE COURT:  It's not that you're bothering me.  I

22   tried very hard to make sure I was prepared on the issues you

23   presented to me.  And to do that, I looked at what you told me

24   the issues were in the joint submission.  I don't see in the

25   joint submission where we're getting into the all -- I see

1  that there's a general issue about the time scope.  There's

2  argument here about some of the documents going back to 2013.

3  That's only a year beyond the five years before the lawsuit

4  was filed.  So if you've got specific objections about the

5  scope, I did not see that that's what I would be ruling on

6  today.

7            MS. ZAMBRANO:  Give me just one minute.

8        (Pause.)

9            THE COURT:  Maybe I'm being obtuse.  Maybe I didn't

10  read it right.  But I'm looking at what I thought the issues

11  were based on how you presented them.

12       (Pause.)

13            MS. ZAMBRANO:  Well, I think it is on Page 7, and it

14  is wrapped up into the time issue.  Despite all this, the FTC

15  served extraordinarily broad and burdensome discovery requests

16  -- we obviously made a lot of burdensome objections in the

17  discovery that was attached -- seeking information about long

18  and permanently discontinued practices, claiming that they

19  need it because it relates to an injunction.

20       The only live issue in the case is about whether we are

21  about ready to continue.  That's the FTC Act.  That's what the

22  judge decided.  And so the discovery should be tailored, Your

23  Honor, to the factors that the Court cited, the *Cornerstone*

24  factors.  It's not tailored at all as to whether we are about

25  ready to continue.  It's just all communications.

1                 MR. TEPFER:  Your Honor?

2                 MS. ZAMBRANO:  All policies.  All visual contact that

3       we have showed to customers relating to a guarantee that we

4       quit doing three and a half years ago.

5           This is incredibly burdensome, as we said in the

6       stipulation.  Or in the joint submission, excuse me.

7                 THE COURT:  You've said extraordinarily broad and

8       burdensome discovery requests.  That is not sufficient to

9       specifically identify how these are broad and burdensome.  I

10      don't have an affidavit.  I don't have any evidence.  This is

11      exactly --

12                MS. ZAMBRANO:  Can we submit --

13                THE COURT:  No.

14                MS. ZAMBRANO:  --an affidavit, Your Honor?

15                THE COURT:  I'm here to rule on it today.

16                MS. ZAMBRANO:  Okay.

17                THE COURT:  This is -- we have a joint submission.

18      We're here.  I'm ready to rule on this.  I'm ruling on what

19      was presented.

20          If you look at the case law, and Judge Horan has got

21      several opinions, and I'll cite you one, but just a party has

22      the burden to show why the discovery is broad and burdensome,

23      and you're raising arguments today that I did not see here in

24      your joint submission.

25          So, as far as the objection on the time scope, it's

1   overruled.  I was prepared to overrule that.  If you want to

2   get into the all, that's not in here.

3        MS. ZAMBRANO:  Well, I think it is in here in this

4   regard.  I'm looking at the next paragraph, too.  What we're

5   saying is if you're asking for all, it's inherently overbroad

6   if it's relating to communications that happened for

7   discontinued practices.  So there is a line in the sand in

8   April of 2019.  That was when the practices were discontinued.

9   If they're looking at whether we are about ready to do it

10  again, it should go from that -- that's the relevant slash --

11  it's not quite a time argument.  It's really a relevance

12  argument.

13        THE COURT:  And I disagree with that for the reasons

14  that I've already explained.  There is a representation on

15  file that it won't happen anymore.  I understand you're trying

16  to focus on that.  But there --

17        MS. ZAMBRANO:  Could I show you one more thing, Your

18  Honor?  And this is out, but I'll make the representation.  We

19  asked the FTC last week, what is it that's beyond what we have

20  agreed to in the stipulation?  It's not just a we're not doing

21  it.  Is that we are committing to not do it.

22        THE COURT:  Uh-huh.

23        MS. ZAMBRANO:  And so we think it's as close as you

24  can like judicially admit an injunction, a permanent

25  injunction, as you possibly can.  I mean, I don't know how to

1   judicially admit one any more than that.

2       So we said, what is it that you want more than this?  And

3   what they said was, We want it to apply to other websites.  So

4   that is the only thing that is still at issue.  There's

5   nothing at issue -- they -- we asked them, under oath, what is

6   at issue relating to the guarantee that we haven't given you?

7           MR. TEPFER:  That mischaracterizes the testimony.

8   I'd be happy to --

9           MS. ZAMBRANO:  I have the sworn testimony, Your

10  Honor.

11          THE COURT:  Okay.  Let's -- you know what, what you

12  all discussed during your attempts to settle or resolve this,

13  it didn't get resolved.  We're here in the context of a motion

14  to compel.  You've presented a specific issue.  I've given you

15  a ruling on the issue as I see it, how you've presented it.  I

16  certainly understand the arguments you're making today, but I

17  went by what you put in the joint submission as being the

18  issues.

19      I am allowing discovery despite this representation or

20  stipulation, whatever you want to call it.  I don't think that

21  that is, in and of itself, enough to say there should not be

22  any discovery.  I don't believe the Defendant has met its

23  burden to show that further discovery shouldn't be held on

24  this issue or how far back it should go based on the briefing

25  before me.

1      So I am overruling that objection.  I'm allowing the

2  discovery as it's identified in Issue #1.  Going back 10

3  years.

4      Was there anything you needed to add to that?

5           MR. TEPFER:  No, Your Honor.

6           THE COURT:  Okay.  All right.  So we've got 30

7  minutes left for the big one.  I have to set your other one

8  anyway.  Let's get our calendars out.  Are the parties

9  available next Tuesday at 10:00 o'clock to hear 133 and 152?

10           MS. ZAMBRANO:  I'm sorry, Your Honor.  Next Tuesday

11  at 10:00 o'clock?

12           THE COURT:  Yes.  October --

13           MS. ZAMBRANO:  Okay.

14           THE COURT:  November 8th.

15           MS. ZAMBRANO:  Okay.  Just give me one minute to get

16  my electronic calendar open.

17           THE COURT:  Sure.

18           MR. HUMMEL:  May I have permission to take my mask

19  off so my --

20           THE COURT:  Yes.

21           MR. HUMMEL:  -- iPhone Face ID will recognize me?

22           THE COURT:  Yes.  Absolutely.

23           MR. HUMMEL:  Thank you.

24           MR. TEPFER:  Your Honor, that works for the FTC.

25           MS. ZAMBRANO:  Your Honor, I apologize.  It does not

1    for -- no, I think we can move something back.  We'll move

2    something back.  Yes, Your Honor.  And this is for the other

3    motion, Your Honor?

4            THE COURT:  I'm going -- for the other two motions.

5    We're obviously not even going to get past the first issue on

6    133, your motion to compel.  So I'm going to go ahead and set

7    those.  We can start earlier.  We can start at 9:00 o'clock on

8    the 8th.  So we'll cover 152 and 133.

9            MR. TEPFER:  And Your Honor, you said that was at

10   9:00 a.m.?

11           THE COURT:  I'm going to set it for 9:00.  If it took

12   us an hour and a half to get through 27 pages, I'm not hopeful

13   for 20 -- 70 and the other 30.  That's a hundred.

14       All right.  I will issue an order today memorializing my

15   ruling on 140.  So, Ms. Zambrano, you are available next

16   Tuesday, then, at 9:00?

17           MS. ZAMBRANO:  I am, Your Honor.  I just want to

18   confirm.  My partner, Mr. Hummel, from LA is actually going to

19   handle that one, so I want to confirm.  He might have other

20   remarks.  Go ahead.

21           MR. HUMMEL:  Love coming to Dallas.  I'll be here.

22           THE COURT:  Okay.  Well, then we will see you next

23   Tuesday at 9:00 o'clock.  I'll issue an electronic order that

24   resets that motion, Motion #133, plus 152.

25           MR. HUMMEL:  Thank you, Your Honor.

1          THE COURT:  All right.  Thank you.  We are adjourned.

2          MS. ZAMBRANO:  Thank you, Your Honor.

3          THE CLERK:  All rise.

4      (Proceedings concluded at 11:28 a.m.)

5                      --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19                    CERTIFICATE

20     I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
21 above-entitled matter.

22 **/s/ Kathy Rehling**                    **11/03/2022**

23 **/s/ Kathy Rehling**          **As Amended 11/08/2022**

24 _____     _____
Kathy Rehling, CETD-444                  Date
25 Certified Electronic Court Transcriber

1

                              INDEX

PROCEEDINGS                                                        3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

     Plaintiff Federal Trade Commission's Motion    18/44/50/53
     to Compel Production of Documents and
     Interrogatory Responses from Defendant Match
     Group, Inc. (#140)

     Match Group, Inc.'s Motion to Compel Discovery       57
     Responses and Production of Documents from Federal
     Trade Commission (#133) - *Continued to 11/08/2022
     at 9:00 a.m.*

END OF PROCEEDINGS                                                58

INDEX                                                            59

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         E R R A T A

               Index Page 59 Amended to Indicate

                 Rulings Pertain to ECF #140

                and that ECF #133 is Continued

# EXHIBIT P

APP 299

DocuSign Envelope ID: 7C86608F-7566-4DFC-A3DE-79D8DB9F31C3

## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>Plaintiff,<br><br>vs.<br><br>MATCH GROUP, INC., a corporation, and<br>MATCH GROUP, LLC, formerly known as<br>MATCH.COM, LLC, a limited liability<br>company,<br><br>Defendants. | Case No. 3:19-cv-02281-K |

## <u>SUPPLEMENTAL DECLARATION OF DUSHYANT SARAPH</u>

I, Dushyant Saraph, declare as follows:

1.      I serve as the General Manager of Match, for Match Group, LLC, formerly named Match.com, LLC ("MGL").

2.      I am over the age of 18 and competent to make this Declaration. The statements contained in this Declaration are based on my personal knowledge, as well as on the information made available to me in my official capacity as General Manager, including business records with respect to Match.com. If called and sworn as a witness, I would and could testify competently to the matters set forth herein.

### <u>The Match.com Practices at Issue in the Amended Complaint</u>

3.      I understand that the FTC challenges three Match.com practices in the First Amended Complaint for Permanent Injunction, Monetary Relief, Civil Penalties, and Other Relief against Match Group, Inc. and MGL, Dkt. 116 (the "Amended Complaint"): a discontinued Match.com guarantee (the "Guarantee"), a discontinued Match.com chargeback policy (the "Chargeback Policy"), and the Match.com online cancelation flow.

### <u>MGL Ownership, Operation, and Control of Match.com</u>

4.      MGL owns, operates, and controls Match.com.

5.      MGL is the sole entity that created, implemented, disclosed the terms of, and ultimately permanently discontinued the Guarantee.

6.      MGL is the sole entity that designed, implemented, and ultimately permanently discontinued the Chargeback Policy.

**APP 300**

DocuSign Envelope ID: 7C86608F-7566-4DFC-A3DE-79D8DB9F31C3

7.      MGL is the sole entity that designed, maintained, and currently maintains the online cancelation flow.

### *Match.com Terms of Use*

8.      **Exhibit 1** is a true and correct copy of the current Match.com Terms of Use dated February 28, 2022, which is Bates-stamped MATCHFTC774622.

9.      **Exhibit 2** is a true and correct copy of previous Match.com Terms of Use dated February 8, 2021, which is Bates-stamped MATCHFTC774652.

10.     **Exhibit 3** is a true and correct copy of previous Match.com Terms of Use dated November 12, 2019, which is Bates-stamped MATCHFTC774600.

11.     **Exhibit 4** is a true and correct copy of previous Match.com Terms of Use dated April 18, 2019, which is Bates-stamped MATCHFTC774640.

12.     **Exhibit 5** is a true and correct copy of previous Match.com Terms of Use dated December 18, 2017, which is Bates-stamped MATCHFTC774614

13.     **Exhibits 1–5** are business records. They were made at or near the time by—or from information transmitted by—someone with knowledge at Match.com. They were kept in the course of a regularly conducted activity of Match.com, and making the records was a regular practice of that activity.

### *Match.com Trademarks*

14.     I understand that records of Match.com trademarks are available via the United States Patent and Trademark Office's Trademark Electronic Search System ("TESS"), and such records can be downloaded via the following website: https://tmsearch.uspto.gov/. On or about October 5, 2022, records of Match.com's trademarks were downloaded from the TESS, as reflected in **Exhibits 6–9**.

15.     **Exhibit 6** is a true and correct copy of a record of a Match.com trademark, which is Bates-stamped MATCHFTC774674.

16.     **Exhibit 7** is a true and correct copy of a record of a Match.com trademark, which is Bates-stamped MATCHFTC774676.

17.     **Exhibit 8** is a true and correct copy of a record of a Match.com trademark, which is Bates-stamped MATCHFTC774678.

18.     **Exhibit 9** is a true and correct copy of a record of a Match.com trademark, which is Bates-stamped MATCHFTC774680.

### *Match.com Domain*

19.     I understand that records of registration data for domain names are available via ICANN, and those records can be downloaded via the following website: https://lookup.icann.org/en. On or about October 12, 2022, registration data for the "match.com" domain was downloaded from ICANN, as reflected in **Exhibit 10**.

20.     **Exhibit 10** is a true and correct copy of registration data for the "match.com" domain, which is Bates-stamped MATCHFTC774697.

### *Match.com App on Apple and Google Play Stores*

21.     I understand that app records are available via the Apple and Google Play app store websites, which are available at https://apps.apple.com/us/app/ and https://play.google.com/store/apps, along with the phone apps themselves. On or about October 13, 2022, and October 24, 2022, records of the Match.com app on the Apple and Google Play stores were downloaded from the desktop websites and phone apps, as reflected in **Exhibits 11–14**.

22.     **Exhibit 11** is a true and correct copy of a record of the Match.com app on the Apple store, which is Bates-stamped MATCHFTC774727.

23.     **Exhibit 12** is a true and correct copy of a record the Match.com app on the Apple store, which is Bates-stamped MATCHFTC774728.

24.     **Exhibit 13** is a true and correct copy of a record of the Match.com app on the Google Play store, which is Bates-stamped MATCHFTC774729.

25.     **Exhibit 14** is a true and correct copy of a record of the Match.com app on the Google Play store, which is Bates-stamped MATCHFTC777082.

### *MGL Written Consent Documents*

26.     **Exhibit 15** is a true and correct copy of the Written Consent of the Sole Member of Match.com, L.L.C., dated January 1, 2016, which is Bates-stamped MATCHFTC777046.

27.     **Exhibit 16** is a true and correct copy of the Written Consent of the Sole Member of Match.com, L.L.C., dated November 1, 2016, which is Bates-stamped MATCHFTC777049.

28.     **Exhibit 17** is a true and correct copy of the Written Consent of Sole Managing Member of Match Group, LLC, dated February 4, 2022, which is Bates-stamped MATCHFTC777055.

29.     **Exhibits 15–17** are business records. They were made at or near the time by—or from information transmitted by—someone with knowledge at Match.com. They were kept in the course of a regularly conducted activity of Match.com, and making the records was a regular practice of that activity.

## The Guarantee

### *How the Guarantee Was Offered*

30.     When consumers viewed subscription plans offered on Match.com, they were presented with a graphic that offered subscription plans of varying lengths.

31.     Next to the six-month subscription option, an icon stated "Match* Guarantee."

32.     Hovering over the icon opened a text balloon that stated, "If you haven't found someone special within 6 months, we'll give you an extra 6 months FREE" and was followed by a hyperlink labeled, "Learn more."

> a.   **Exhibit 18** is a true and correct copy of the icon with the "Learn more" link, which is Bates-stamped MATCHFTC774523.

> b.   **Exhibit 18** is a business record. It was made at or near the time by—or from information transmitted by—someone with knowledge at Match.com. It was kept in the course of a regularly conducted activity of Match.com, and making the record was a regular practice of that activity.

33.     The price of a six-month subscription did not change based on whether a customer purchased the subscription with or without the Guarantee.

### *The Guarantee Program Rules*

34.     Clicking on the "Learn more" hyperlink took consumers to a webpage where the complete terms of the Guarantee were presented (the "Program Rules").

35.     **Exhibit 19** is a true and correct copy of the Program Rules. It is comprised of documents Bates-stamped MATCHFTC774536, MATCHFTC774568, and MATCHFTC774563.

36.     **Exhibit 19** is a business record. It was made at or near the time by—or from information transmitted by—someone with knowledge at Match.com. It was kept in the course of a regularly conducted activity of Match.com, and making the record was a regular practice of that activity.

### *The Guarantee Progress Page*

37.     As identified in the Program Rules, to assist consumers in tracking their progress toward the Guarantee, Match.com designed a webpage specifically dedicated to displaying consumers' status toward meeting the Guarantee requirements: the "Progress Page."

38.     Subscribers could track their Guarantee progress during their six-month Guarantee-eligible subscription by visiting the Progress Page.

39.     **Exhibit 20** is a true and correct copy of the Progress Page. It is comprised of documents Bates-stamped MATCHFTC774538 and MATCHFTC774527.

40.     **Exhibit 20** is a business record. It was made at or near the time by—or from information transmitted by—someone with knowledge at Match.com. It was kept in the course of a regularly conducted activity of Match.com, and making the record was a regular practice of that activity.

### *The Guarantee Banner*

41.     In addition, all of Match.com's webpages displayed a "Guarantee" hyperlink along a bottom banner.

42.     If subscribers who were participating in the Guarantee program clicked that link, they were taken to their Progress Page.

43.     Consumers who were not participating in the Guarantee program were taken to the Program Rules.

### *How the Guarantee Could Be Redeemed*

44.     The Guarantee was redeemable directly on the Match.com platform through the Progress Page.

45.     During the last seven days of the Guarantee-eligible subscription, when subscribers visited the Progress Page, they were prompted to indicate whether or not they had met someone.

46.     If they had taken all of the Guarantee-required actions and indicated that they had not met someone during the Guarantee-eligible subscription period, Match.com would automatically provide the subscriber with complimentary access to Match.com for the following six-month period subscription, i.e., a Guarantee Extension.

47.     Subscribers could also contact Match.com Customer Care to redeem the Guarantee.

48.     Subscribers could contact Customer Care even after the seven-day period to get the Guarantee Extension.

49.     Match.com sometimes made exceptions to the requirements in the Program Rules.

50.     The seven-day period to redeem the Guarantee, like all other terms, was disclosed in the Program Rules.

### *Permanent Discontinuation of the Guarantee*

51.     Match.com permanently discontinued the Guarantee in April 2019.

52.     Before the Guarantee was removed in April 2019, testing on or about February 28, 2019, to Match 18, 2019, revealed that there was no revenue implication associated with the Guarantee. There were emails documenting that such testing took place and the conclusion that was reached from such testing, as reflected in **Exhibits 21–22**.

DocuSign Envelope ID: 7C86608F-7566-4DFC-A3DE-79D8DB9F31C3

a. **Exhibit 21** is a true and correct copy of an email, which is Bates-stamped MATCHFTC834015. It is an email thread with subject line, "RE: LTV Impact Match Guarantee Removal." The top thread is dated March 7, 2019, and is from Dinh Thi Bui (DinhThi.Bui@match.com) to Dan Badrian (Dan.Badrian@match.com), Ramanand Reddi (Ramanand.Reddi@match.com), Chad Peoples (Chad.Peoples@match.com), and me (Dushyant.Saraph@match.com), copying Eric Kone (eric.kone@match.com) and Jayant Dasari (Jayant.Dasari@match.com).

b. **Exhibit 22** is a true and correct copy of an email, which is Bates-stamped MATCHFTC834288. It is an email thread with subject line, "RE: 6M Guarantee Forecast." The top thread is dated March 18, 2019, and is from Dan Badrian (Dan.Badrian@match.com) to Eric Kone (eric.kone@match.com), copying Dinh Thi Bui (DinhThi.Bui@match.com), Jayant Dasari (Jayant.Dasari@match.com), Ramanand Reddi (Ramanand.Reddi@match.com), Bret Williams (bret.williams@match.com), and me (Dushyant.Saraph@match.com).

c. **Exhibits 21–22** are business records. They were made at or near the time by— or from information transmitted by—someone with knowledge at Match.com. They were kept in the course of a regularly conducted activity of Match.com, and making the records was a regular practice of that activity.

53.    There are documents confirming that MGL stopped offering the Guarantee, as reflected in **Exhibits 23–25**.

a. **Exhibit 23** is a true and correct copy of an email, which is Bates-stamped MATCHFTC774521. It is an email thread with subject line, "Match Update: 6 Month Guarantee No Longer Available," and dated April 15, 2019. It is from Anastasia Burman (anastasia.burman@match.com) to Terrance Thomas (Terrance.Thomas@match.com), DL_Match_Support (DL_Match_Support@telusinternational.com), MatchDomesticSynergiesServices (match.domestic@synergiesservices.com), matchops@ballenamedia.com, Community Operations Support (commops-support@match.com), Community Operations Training (commops-training@match.com), Community Operations Quality (commops-qa@match.com), Community Operations Management (commops-mgmt@match.com), Community Operations Escalations (commops-escalations@match.com), Community Operations Pilot (commops-pilot@match.com), copying Laurie Braddock (Laurie.Braddock@match.com) and Sarah Meade (Sarah.Meade@match.com).

b. **Exhibit 24** is a true and correct copy of a FAQ page, which is Bates-stamped MATCHFTC774522. The file name is, "Guarantee removed 4-11-19 FAQ.jpg," and the metadata is dated October 23, 2019.

DocuSign Envelope ID: 7C86608F-7566-4DFC-A3DE-79D8DB9F31C3

    c. **Exhibit 25** is a true and correct copy of a document, which is Bates-stamped MATCHFTC774593. It is a training document titled, "Credit, Refund and 6MG Guidelines," and dated September 10, 2019. The file name is, "Credit Refund and 6MG Guidelines 9.12.19 TIG AND.docx," and the author is Kristin Higgins.

    d. **Exhibits 23–25** are business records. They were made at or near the time by—or from information transmitted by—someone with knowledge at Match.com. They were kept in the course of a regularly conducted activity of Match.com, and making the records was a regular practice of that activity.

54.    Even if Match.com wanted to reinstate the Guarantee, which it does not, there would be substantial cost to do so. It would also not be easy to reinstate the Guarantee.

### The Chargeback Policy

#### *Explanation of the Permanently Discontinued Chargeback Policy*

55.    The Chargeback Policy (which was discontinued in March 2019) was as follows.

56.    If a user initiated a chargeback of Match.com's subscription charges, the user's subscription was suspended.

57.    The rationale for the policy was that the user had indicated that he or she was disputing the charge for Match.com's services, and no longer wished to appear on the site.

58.    If the user prevailed on the chargeback (i.e., the user proved to the satisfaction of the financial institution that the charge was not authorized), the charge was reversed, and no further action was required by the user or taken by Match.com—meaning the user's subscription remained suspended, and the user remained not visible on the Match.com site.

59.    If the dispute was resolved in Match.com's favor (i.e., the financial institution concluded that the user had in fact authorized the charge, although the user claimed that he or she did not), a user's subscription would not be automatically reactivated unless the user requested reactivation.

60.    The rationale for the policy was that the user had—by disputing the charge— indicated to Match.com that the user no longer wanted to be on the Match.com service and/or had never even signed up for the Match.com account.

#### *Disclosure and Consumer Agreement of the Chargeback Policy*

61.    The Chargeback Policy was disclosed in the Match.com Terms of Use. *See* **Exhibit 5** (Match.com's then-applicable Terms of Use).

62.    When purchasing a subscription, each customer explicitly agreed to be bound by the Terms of Use.

DocuSign Envelope ID: 7C86608F-7566-4DFC-A3DE-79D8DB9F31C3

63.     The Terms of Use could be referenced after purchase by clicking on the "Terms of Use" link at the bottom banner of Match.com webpages.

### How the Chargeback Policy Protected the Match.com Ecosystem

64.     The Chargeback Policy helped protect the Match.com ecosystem.

65.     Subscribers who initiated a billing dispute were clearly indicating that they no longer wished to appear on Match.com—and many claimed that they never even signed up for a Match.com account.

66.     In some cases (e.g., if the consumer is in a serious relationship), maintaining their profiles on Match.com could cause significant embarrassment or harm.

67.     In addition, Match.com aims to provide users with a vibrant and engaged online dating community, which means not displaying subscribers who indicated that they did not want to be on the Match.com website (unless the user indicated interest in rejoining the site, at which point Match.com would restore the user's account).

### How the Chargeback Policy Addressed Consumer Abuse of Match.com

68.     The Chargeback Policy addressed consumer abuse of Match.com.

69.     Match.com is regularly faced with situations when a subscriber pays for a subscription, uses it extensively, and then submits a chargeback to their financial institution (such as a credit card company) to attempt to get the Match.com subscription for free.

70.     Match.com has to incur costs to defend against chargebacks, and such costs ultimately must be passed onto subscribers.

71.     The Chargeback Policy prevented consumers from re-joining the platform if the user's financial institution concluded that the user had authorized the charge, although the user claimed, by initiating the chargeback, that he or she did not (unless the user indicated interest in rejoining the site, at which point Match.com would restore the user's account).

72.     This rationale was discussed via email, as reflected in **Exhibit 26**.

73.     **Exhibit 26** is a true and correct copy of an email, which is Bates-stamped MATCHFTC471514. It is an email thread with subject line, "RE: Chargeback dispute question." The top email is dated April 26, 2013, and is from Michele Watson (michele.watson@match.com) to Pradeep Shetty (Pradeep.Shetty@match.com), copying Phil Eigenmann (Phil.Eigenmann@match.com) and Curt Anderson (Curt.Anderson@match.com).

74.     **Exhibit 26** is a business record. It was made at or near the time by—or from information transmitted by—someone with knowledge at Match.com. It was kept in the course of a regularly conducted activity of Match.com, and making the record was a regular practice of that activity.

### *How the Mechanisms at Match.com Have Changed*

75.    When the Chargeback Policy was instituted, Match.com did not have the mechanisms it has today.

76.    For example, Match.com had to manually log in to a payment processing portal to see the outcome of a chargeback dispute (i.e., whether Match.com won or lost), whereas that process is now automated.

77.    It was burdensome to repeatedly check the portal for users who had initiated a chargeback.

78.    Match.com also did not have the mechanisms it has now to trigger emails notifying users that their accounts have been reactivated (and, in any event, the user's financial institution presumably notified the user of the outcome of the dispute).

### *Permanent Discontinuation of the Chargeback Policy*

79.    Match.com permanently discontinued the Chargeback Policy in March 2019.

80.    There are documents confirming that MGL stopped using the Chargeback Policy. For example, Match.com now sends emails notifying users that their accounts have been reinstated, as reflected in **Exhibit 27**.

81.    **Exhibit 27** is a true and correct copy of an email, which is Bates-stamped MATCHFTC774668. It is an email with subject line, "QA - Information about your Match account." The email is dated October 7, 2021 and is from Match (Match mailer@QA.connect.match.com) to cpqateam@gmail.com.

82.    **Exhibit 27** is a business record. It was made at or near the time by—or from information transmitted by—someone with knowledge at Match.com. It was kept in the course of a regularly conducted activity of Match.com, and making the record was a regular practice of that activity.

83.    Even if Match.com wanted to reinstate the Chargeback Policy, which it does not, there would be substantial cost to do so. It would also not be easy to reinstate the Chargeback Policy.

### <u>Cancelation</u>

### *Match.com's Online Cancelation Flow*

84.    One way to get to the online cancelation flow is as follows:

a.   Select Settings from Gear Icon



b.   Select "Manage subscription"



c.   Enter Password and Complete reCaptcha



d.   **Exhibits 28–30** are true and correct copies of these pages, which are Bates-stamped       MATCHFTC774813,       MATCHFTC774738,       and       MATCHFTC774742.

e.  **Exhibits 28–30** are business records. They were made at or near the time by— or from information transmitted by—someone with knowledge at Match.com. They were kept in the course of a regularly conducted activity of Match.com, and making the records was a regular practice of that activity.

85.    Canceling a Match.com subscription via the online cancelation flow takes, at most, three or four steps, depending on whether a consumer is presented with a save offer (i.e., an offer to renew at a lower price rather than cancel).

a.  Step 1: Select "Cancel Subscription"



b.  Step 2: Answer or Skip Optional Survey



c.   Step 3 (Offered Only to Some Users): Accept or Skip Save Offer



d.   Step 4: Answer or Skip Optional Net Promoter Score



e.   Cancelation Confirmation



DocuSign Envelope ID: 7C86608F-7566-4DFC-A3DE-79D8DB9F31C3

f. **Exhibits 31–35** are true and correct copies of these pages, which are Bates-stamped MATCHFTC774736, MATCHFTC774745, MATCHFTC774790, MATCHFTC774739, and MATCHFTC774734.

g. **Exhibits 31–35** are business records. They were made at or near the time by— or from information transmitted by—someone with knowledge at Match.com. They were kept in the course of a regularly conducted activity of Match.com, and making the records was a regular practice of that activity.

### *Importance for Match.com, as a Dating Site, to Know Why Subscribers Are Looking to Cancel*

86.     In the online cancelation flow, consumers are asked why they are looking to cancel and how likely they would be to recommend Match.com to a friend (known as a net promoter score).

87.     It is important for Match.com's business to know why subscribers are looking to cancel and if they had a positive or negative experience on the site.

88.     Match.com regularly uses the information received in these cancelation surveys to better understand consumer behavior and improve the site (e.g., if the user reports a bug on the site or a bad experience with another user). Examples are reflected in **Exhibits 36–37**.

a. **Exhibit 36** is a true and correct copy of an email, which is Bates-stamped MATCHFTC753946. It is an email thread with subject line, "RE: Slowing Down the Dating Experience." The top email is dated September 8, 2021, and is from Jim Talbott (jim.talbott@match.com), to Jayant Dasari (jayant.dasari@match.com), Chad Peoples (Chad.Peoples@match.com), and me (Dushyant.Saraph@match.com), copying Varun Jayasimha Banagere (varun.jayasimha@match.com), Maria Flavia Bosseljon (maria.costa@match.com), and Brett Beattie (Brett.Beattie@match.com).

b. **Exhibit 37** is a true and correct copy of a spreadsheet, which is Bates-stamped MATCHFTC777145. It was created on December 2, 2021. The author was Jim Talbott, and it has the file name, "2021-12-02.ResignationSurveySummaryLast180Days.xlsx."

89.     It is also important for Match.com to know if the consumer is looking to cancel because Match.com succeeded at helping the user find a permanent match.

### *Importance of Save Offers*

90.     Some consumers are also given one save offer, in which they are given an opportunity to renew at a discounted price, instead of canceling.

91.     The save offer benefits consumers by saving them money on a Match.com subscription.

DocuSign Envelope ID: 7C86608F-7566-4DFC-A3DE-79D8DB9F31C3

*Match.com FAQs Offered*

92.     Match.com offers FAQs to provide consumers with the answers they need. Match.com offers its consumers FAQs to illustrate how to cancel via the online cancelation flow.

93.     **Exhibit 38** is a true and correct copy of the most recent "Canceling" FAQ that Match.com offers, which is Bates-stamped MATCHFTC846849. It is also currently available at https://help.match.com/hc/en-us/articles/6077124196891-Canceling. The FAQ includes a direct link to the online cancelation flow, in addition to a step-by-step "How to Cancel Auto Renewal" video on how to cancel a subscription through the online cancelation flow. I understand that this has been available since approximately April 2023. **Exhibit 39** is a true and correct copy of the step-by-step video, which is Bates-stamped MATCHFTC846853.

94.     **Exhibit 40** is a true and correct copy of the previous "Cancelling" FAQ that Match.com offered, which is Bates-stamped MATCHFTC846848. This FAQ also included a direct link to the online cancelation flow. I understand that this was available from approximately June 2022 to April 2013.

a.   The produced version of this FAQ is difficult to read. The following language appears at the end of the "Cancelling" FAQ:



95.     Prior to that, I understand that numerous other cancelation-related FAQs were offered at various times since at least 2014. **Exhibits 41–44** are true and correct copies of these other FAQs, which are Bates-stamped MATCHFTC672286, MATCHFTC672339, MATCHFTC672338, and MATCHFTC672336.

96.     **Exhibits 38–44** are business records. They were made at or near the time by—or from information transmitted by—someone with knowledge at Match.com. They were kept in the course of a regularly conducted activity of Match.com, and making the records was a regular practice of that activity.

97.     If Match.com were trying to make it difficult for subscribers to cancel, it would not offer these resources.

98.     Match.com relies heavily on repeat-customers, so Match.com has no incentive to provide them with a negative cancelation experience.

99.     Some consumers who do not cancel their Match.com subscription are still not charged for the subscription due to canceling their credit card.

### *Videos of the Online Cancelation Flow*

100.     **Exhibits 45–47** are true and correct copies of videos of the online cancelation flow, which are Bates-stamped MATCHFTC774670, MATCHFTC774651, and MATCHFTC774667.

101.     **Exhibits 45–47** are business records. They were made at or near the time by—or from information transmitted by—someone with knowledge at Match.com. They were kept in the course of a regularly conducted activity of Match.com, and making the records was a regular practice of that activity.

### *Clickthrough Data*

102.     **Exhibit 48** is a true and correct copy of a spreadsheet with clickthrough data, which is Bates-stamped MATCHFTC846468. The spreadsheet fairly and accurately summarizes the voluminous data that Match.com keeps in the ordinary course of its business.

    a.  This data shows that 95% of Match.com subscribers that enter the online cancelation flow successfully cancel or take a save offer (i.e., decide to renew rather than cancel) before being charged a renewal.

    b.  This number is calculated by dividing the sum of Columns E (reflecting the number of subscribers who canceled through the online cancelation flow before their next renewal) and G (reflecting the number of subscribers who accepted a save offer), by the sum of Column C (reflecting the number of subscribers entering the flow). The result is .9546, or 95.46%, meaning over 95% of subscribers that enter the flow successfully cancel through the flow or accept a save offer prior to their next renewal.

103.     I understand that the FTC filed a Motion for Summary Judgment on September 11, 2023. As part of the FTC's Motion for Summary Judgment, the FTC relies on documents that discuss clickthrough data, including Exhibits 134–35 and 137–38, located at App. 1444–56, 1458–59, 1469–80, 1482–84, (along with Exhibit 136 at App. 1462, which is attached to Exhibit 145, located at App. 1613) in the FTC's Appendix in Support of Motion for Summary Judgment. The clickthrough data reflected in those emails does not accurately depict the clickthrough data of the Match.com online cancelation flow by subscribers in the United States for three reasons:

    a.  First, the clickthrough data reflected in those documents includes non-subscribers.

DocuSign Envelope ID: 7C86608F-7566-4DFC-A3DE-79D8DB9F31C3

  b. Second, the clickthrough data reflected in those documents includes non-U.S. Match.com users.

  c. Third, the clickthrough data reflected in those emails contains "session-level" information, rather than "subscriber-level" information. This means that the data measures the share of "sessions" in which a subscriber clicked "Manage subscription" and canceled their subscription. Measuring by "sessions" is in contrast to measuring by "subscriber." If, for any reason, a subscriber did not cancel their subscription in such a session, their session would be counted against the overall cancelation rate, regardless of whether that subscriber successfully canceled in a later session.

### *Other Cancelation Methods that Match.com Offers*

  104. In addition to the online cancelation flow, Match.com subscribers can cancel their subscription through internet chat, email, standard mail, fax, and (until recently) phone.

### *Data Showing the Number of Cancelations Via the Online Cancelation Flow and Other Methods that Match.com Offers*

  105. **Exhibit 49** is a true and correct copy of a spreadsheet that shows the number of cancelations, as of October 2022, via the online cancelation flow, internet chat, email, and phone since 2013, in addition to cancelations by Match.com Customer Care, for which the method of cancelation was not identified. **Exhibit 49** is Bates-stamped MATCHFTC774724. The spreadsheet fairly and accurately summarizes the voluminous data that Match.com keeps in the ordinary course of its business. Match.com does not separately record cancelations by standard mail and fax. This data shows that there were at least the following number of cancelations since 2013, as of October 2022:

| METHOD | CANCELATIONS |
|---|---|
| Online cancelation flow | 15,914,587 |
| Internet chat | 123,421 |
| Email | 119,722 |
| Phone | 1,027,815 |
| Cancelations by Match.com Customer Care, method not identified | 550,512[1] |

  106. Although Match.com does not separately record cancelations by standard mail or fax, examples of consumers using those methods to cancel their subscriptions are attached as follows:

---

[1] This is calculated by adding 548,944 (Care Cancellation, No Ticket) and 1,568 (Source Was Not Specified in Care Ticket) in **Exhibit 49**.

a. **Exhibit 50** is a true and correct copy of an example of a cancelation by mail, which is Bates-stamped MATCHFTC744806.

b. **Exhibit 51** is a true and correct copy of an example of a cancelation by fax, which is Bates-stamped MATCHFTC744801.

c. **Exhibits 50–51** are business records. They were made at or near the time by—or from information transmitted by—someone with knowledge at Match.com. They were kept in the course of a regularly conducted activity of Match.com, and making the records was a regular practice of that activity.

107.    The chat method, email method, and phone number have been identified and available on Match.com FAQ pages.

a. **Exhibit 52** is a true and correct copy of the current Contact Us FAQ page, which is Bates-stamped MATCHFTC846847.

    i.  I understand this has been available since approximately April 2023.

b. **Exhibit 53** is a true and correct copy of a previous Contact Us FAQ page, which is Bates-stamped MATCHFTC672345.

    i.  I understand this was available from approximately August 2022 to April 2023.

c. **Exhibit 54** is a true and correct copy of a spreadsheet, which is Bates-stamped MATCHFTC427066. The file name is "All Answers Public1.xlsx," the author is Anastasia Burman, and it was created on January 3, 2017.

    i.  The spreadsheet has the text of previous FAQs, including a previous Contacting Customer Care FAQ. I understand this was available as of approximately 2017.

d. **Exhibits 52–54** are business records. They were made at or near the time by—or from information transmitted by—someone with knowledge at Match.com. They were kept in the course of a regularly conducted activity of Match.com, and making the records was a regular practice of that activity.

108.    The mailing address and fax number can be found in the Match.com Terms of Use. *See* **Exhibits 1–5**.

## Miscellaneous

### *Former Employee Title*

109.    I understand that Adrian Ong is a former MGL employee. I understand he was Senior Vice President, Operations for Match.com.

*CID*

110.    I understand that, on March 17, 2017, the FTC served a Civil Investigative Demand ("CID") on MGI. **Exhibit 55** is a true and correct copy of the CID that MGI received.

111.    I understand that, on August 6, 2019, counsel for MGI sent a letter to the FTC that confirmed the discontinuation of the Guarantee and Chargeback Policy and that Match.com had "no plans or intentions ever to reinstitute any of these practices." **Exhibit 56** is a true and correct copy of that letter.

      a.    **Exhibit 56** is a business record. It was made at or near the time by—or from information transmitted by—someone with knowledge at Match.com. It was kept in the course of a regularly conducted activity of Match.com, and making the record was a regular practice of that activity.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 16, 2023.          Signature: _Dushyant Saraph_  _____

# EXHIBIT 1

## Match.com Terms of Use Agreement

*Effective on 2022-02-28*

California subscribers: You may cancel your subscription, without penalty or obligation, at any time prior to midnight of the third business day following the date you subscribed. If you subscribed using an External Service (e.g., Apple ID, Google Play), you must cancel through your External Service, as set forth in more detail in Section 8a. If you subscribed through your Apple ID, refunds are handled by Apple, not Match. You can request a refund from Apple through your Apple ID account on your phone or at https://getsupport.apple.com. All other users may request a refund by contacting Match Customer Service by clicking here, or by mailing or delivering a signed and dated notice that states that you, the buyer, are canceling this agreement, or words of similar effect. Please also include your name and the email address, phone number, or other unique identifier you used to sign up for your account.

This notice shall be sent to: Match, Attn: Cancellations, P.O. Box 25472, Dallas, Texas 75225, USA. The Company's business is conducted, in part, at 8750 N. Central Expressway, Suite 1400, Dallas, TX 75205. You may have these Terms of Use ("Terms") emailed to you by sending a letter to Terms Inquiries, P.O. Box 25472, Dallas, Texas 75225, USA. In accordance with Cal. Civ. Code §1789.3, you may report complaints to the Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs by contacting them in writing at Consumer Information Division, 1625 North Market Blvd., Suite N112 Sacramento, CA 95834, or by telephone at (800) 952- 5210.

*We have included brief summaries at the beginning of each section to make it easier for you to read and understand this agreement. The summaries do not replace the text of each section, and you should still read each section in its entirety.*

## 1. INTRODUCTION

*By accessing or using Match's Services, you agree to be bound by this Terms of Use Agreement (the "Terms" or "Agreement"), including our Privacy Policy, Cookie Policy, Community Guidelines, and Safety Tips, so it is important that you read this Agreement and these policies and procedures carefully before you create an account.*

PLEASE CAREFULLY REVIEW THE DISPUTE RESOLUTION PROVISIONS IN SECTION 15 BELOW. THESE GOVERN THE MANNER IN WHICH CLAIMS WILL BE ADDRESSED BETWEEN YOU AND MATCH. THESE PROVISIONS INCLUDE A MANDATORY PRE-ARBITRATION INFORMAL DISPUTE RESOLUTION PROCESS, AN ARBITRATION AGREEMENT, SMALL CLAIMS COURT ELECTION, CLASS ACTION WAIVER, ADDITIONAL PROCEDURES FOR MASS ARBITRATION FILINGS, AND JURY TRIAL WAIVER THAT AFFECT YOUR RIGHTS. IN ARBITRATION, THERE IS TYPICALLY LESS DISCOVERY AND APPELLATE REVIEW THAN IN COURT.

*We may update these Terms from time to time, so check this page regularly for updates.*

Welcome to Match, operated by Match Group, LLC, in the case of users originating from within the United States and Canada, and operated by Match.com Global Services Limited, in the case of users originating from outside of the United States and Canada. As used in this Agreement, the terms "Match," "us," "we," the "Company", and "our" shall refer to Match Group, LLC and/or Match.com Global Services Limited, as appropriate. Together you and Match may be referred to as the "Parties" or separately as "Party."

By accessing or using our Services on Match.com (the "Website"), the Match mobile application (the "App"), or any other platforms or services Match may offer (collectively, the "Service" or our "Services"), you agree to, and are bound by, this Agreement. This Agreement applies to anyone who accesses or uses our Services, regardless of registration or subscription status.

Your access and use of our Services is also subject to the Privacy Policy, Cookie Policy, Community Guidelines, and Safety Tips and any terms disclosed and agreed to by you when you purchase additional features, products, or services from Match ("Additional Terms Upon Purchase"), which are incorporated into this Agreement by reference. If you do not wish to be bound by this Agreement, do not access or use our Services.

We reserve the right to modify, amend, or change the Terms at any time. Notice of any material change will be posted on this page with an updated effective date. In certain circumstances, we may notify you of a change to the Terms via email or other means; however, you are responsible for regularly checking this page for any changes. Your continued access or use of our Services constitutes our ongoing consent to any changes, and as a result, you will be legally bound by the updated Terms. If you do not accept a change to the Terms, you must stop accessing or using our Services immediately.

MATCHFTC774622

# 2. ACCOUNT ELIGIBILITY; YOUR RESPONSIBILITIES

*Before you create an account on Match, make sure you are eligible to use our Services. This Section also details what you can and can't do when using the Services, as well as the rights you grant Match.*

**You are not authorized to create an account or use the Services unless all of the following are true, and by using our Services, you represent and warrant that:**

1. You are at least 18 years old;

2. You are legally qualified to enter a binding contract with Match;

3. You are single or separated from your spouse;

4. You are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country;

5. You are not on any list of individuals prohibited from conducting business with the United States;

6. You are not prohibited by law from using our Services;

7. You have not committed, been convicted of, or pled no contest to a felony or indictable offense (or crime of similar severity), a sex crime, or any crime involving violence or a threat of violence, unless you have received clemency for a non-violent crime and we have determined that you are not likely to pose a threat to other users of our Services;

8. You are not required to register as a sex offender with any state, federal or local sex offender registry;

9. You do not have more than one account on our Services; and

10. You have not previously been removed from our Services or our affiliates' services by us or our affiliates, unless you have our express written permission to create a new account.

If at any time you cease to meet these requirements, all authorization to access our Services or systems is automatically revoked, and you must immediately delete your account.

**You agree to:**

- Comply with these Terms, and check this page from time to time to ensure you are aware of any changes;

- Comply with all applicable laws, including without limitation, privacy laws, intellectual property laws, anti- spam laws, and regulatory requirements;

- Use the latest version of the Website and/or App;

- Treat other users in a courteous and respectful manner, both on and off our Services;

- Be respectful when communicating with any of our customer care representatives or other employees;

- Review the Safety Tips;

- Maintain a strong password and take reasonable measures to protect the security of your login information.

**You agree that you will not:**

- Misrepresent your identity, age, current or previous positions, qualifications, or affiliations with a person or entity;

- Use the Services in a way that damages the Services or prevents their use by other users;

- Use our Services in a way to interfere with, disrupt or negatively affect the platform, the servers, or our Services' networks;

- Use our Services for any harmful, illegal, or nefarious purpose;

- Harass, bully, stalk, intimidate, assault, defame, harm or otherwise mistreat any person;

- Post or share Prohibited Content (see below);

- Solicit passwords for any purpose, or personal identifying information for commercial or unlawful purposes from other users or disseminate another person's personal information without his or her permission;

- Solicit money or other items of value from another user, whether as a gift, loan, or form of compensation;

MATCHFTC774623

- Use another user's account;

- Use our Services in relation to fraud, a pyramid scheme, or other similar practice; or

- Violate the terms of the license granted to you by Match (see Section 6 below).

- Disclose private or proprietary information that you do not have the right to disclose;

- Copy, modify, transmit, distribute, or create any derivative works from, any Member Content or Our Content, or any copyrighted material, images, trademarks, trade names, service marks, or other intellectual property, content or proprietary information accessible through our Services without Match prior written consent;

- Express or imply that any statements you make are endorsed by Match;

- Use any robot, crawler, site search/retrieval application, proxy or other manual or automatic device, method or process to access, retrieve, index, "data mine," or in any way reproduce or circumvent the navigational structure or presentation of our Services or its contents;

- Upload viruses or other malicious code or otherwise compromise the security of our Services;

- Forge headers or otherwise manipulate identifiers to disguise the origin of any information transmitted to or through our Services;

- "Frame" or "mirror" any part of our Services without Match prior written authorization;

- Use meta tags or code or other devices containing any reference to Match or the platform (or any trademark, trade name, service mark, logo or slogan of Match) to direct any person to any other website for any purpose;

- Modify, adapt, sublicense, translate, sell, reverse engineer, decipher, decompile or otherwise disassemble any portion of our Services, or cause others to do so;

- Use or develop any third-party applications that interact with our Services or Member Content or information without our written consent;

- Use, access, or publish the Match application programming interface without our written consent;

- Probe, scan or test the vulnerability of our Services or any system or network;

- Encourage, promote, or agree to engage in any activity that violates these Terms; or

- Create a new account after we suspend or terminate your account, unless you receive our express permission.

The license granted to you under these Terms and any authorization to access the Services is automatically revoked in the event that you do any of the above.

**Prohibited Content—Match prohibits uploading or sharing content that:**

- Is likely to be deemed offensive or to harass, upset, embarrass, alarm or annoy any other person;

- Is obscene, pornographic, violent or otherwise may offend human dignity, or contains nudity;

- Is abusive, insulting or threatening, discriminatory or that promotes or encourages racism, sexism, hatred or bigotry;

- Encourages or facilitates any illegal activity including, without limitation, terrorism, inciting racial hatred or the submission of which in itself constitutes committing a criminal offense;

- Is defamatory, libelous, or untrue;

- Relates to commercial activities (including, without limitation, sales, competitions, promotions, and advertising, solicitation for services, "sugar daddy" or "sugar baby" relationships, links to other websites or premium line telephone numbers);

- Involves the transmission of "junk" mail or "spam";

- Contains any spyware, adware, viruses, corrupt files, worm programs or other malicious code designed to interrupt, damage or limit the functionality of or disrupt any software, hardware, telecommunications, networks, servers or other equipment, Trojan horse or any other material designed to damage, interfere with, wrongly intercept or expropriate any data or personal information whether from Match or otherwise;

- Infringes upon any third party's rights (including, without limitation, intellectual property rights and privacy rights);

- Was not written by you or was automatically generated, unless expressly authorized by Match;

MATCHFTC774624

- includes the image or likeness of another person without that person's consent (or, in the case of a minor, the minor's parent or guardian), or is an image or likeness of a minor unaccompanied by the minor's parent or guardian;

- is inconsistent with the intended use of the Services; or

- May harm the reputation of Match or its affiliates.

The uploading or sharing of content that violates these Terms ("Prohibited Content") may result in the immediate suspension or termination of your account.

## 3. CONTENT

*It is important that you understand your rights and responsibilities with regard to the content on our Services, including any content you provide or post. You are expressly prohibited from posting inappropriate content.*

While using our Services, you will have access to: (i) content that you upload or provide while using our Services ("Your Content"); (ii) content that other users upload or provide while using our Services ("Member Content"); and (iii) content that Match provides on and through our Services ("Our Content"). In this agreement, "content" includes, without limitation, all text, images, video, audio, or other material on our Services, including information on users' profiles and in direct messages between users.

## 3A. YOUR CONTENT

*You are responsible for Your Content. Don't share anything that you wouldn't want others to see, that would violate this Agreement, or that may expose you or us to legal liability.*

You are solely responsible and liable for Your Content, and, therefore, you agree to indemnify, defend, release, and hold us harmless from any claims made in connection with Your Content.

You represent and warrant to us that the information you provide to us or any other user is accurate, including any information submitted through Facebook or other third-party sources (if applicable), and that you will update your account information as necessary to ensure its accuracy.

The content included on your individual profile should be relevant to the intended use of our Services. You may not display any personal contact or banking information, whether in relation to you or any other person (for example, names, home addresses or postcodes, telephone numbers, email addresses, URLs, credit/debit card or other banking details). If you choose to reveal any personal information about yourself to other users, you do so at your own risk. We encourage you to use caution in disclosing any personal information online.

Your individual profile will be visible to other people around the world, so be sure that you are comfortable sharing Your Content before you post. You acknowledge and agree that Your Content may be viewed by other users, and, notwithstanding these Terms, other users may share Your Content with third parties. By uploading Your Content, you represent and warrant to us that you have all necessary rights and licenses to do so and automatically grant us a license to use Your Content as provided under Section 7 below.

You understand and agree that we may monitor or review Your Content, and we have the right to remove, delete, edit, limit, or block or prevent access to any of Your Content at any time in our sole discretion. Furthermore, you understand agree that we have no obligation to display or review Your Content.

## 3B. MEMBER CONTENT

*While you will have access to Member Content, it is not yours and you may not copy or use Member Content for any purpose except as contemplated by these Terms.*

Other users will also share content on our Services. Member Content belongs to the user who posted the content and is stored on our servers and displayed at the direction of that user.

You do not have any rights in relation to Member Content, and, unless expressly authorized by Match, you may only use Member Content to the extent that your use is consistent with our Services' purpose of allowing users to communicate with and meet one another. You may not copy the Member Content or use Member Content for commercial purposes, to spam, to harass, or to make unlawful threats. We reserve the right to terminate your account if you misuse Member Content.

## 3C. OUR CONTENT

MATCHFTC774625

Match owns all other Content on our Services.

Any other text, content, graphics, user interfaces, trademarks, logos, sounds, artwork, images, and other intellectual property appearing on our Services is owned, controlled or licensed by us and protected by copyright, trademark and other intellectual property law rights. All rights, title, and interest in and to Our Content remains with us at all times.

We grant you a limited license to access and use Our Content as provided under Section 6 below, and we reserve all other rights.

## 4. INAPPROPRIATE CONTENT AND MISCONDUCT; REPORTING

*Match does not tolerate inappropriate content or behavior on our Services.*

We are committed to maintaining a positive and respectful Match community, and we do not tolerate any inappropriate content or misconduct, whether on or off of the Services (including, but not limited to, on services operated by our affiliates). We encourage you to report any inappropriate Member Content or misconduct by other users. You can report a user directly through the "Report a Concern" link on a user's profile or at the bottom of every email. You may also email Match Customer Service by clicking here.

As set forth in our Privacy Policy, we may share data between our affiliates for the safety and security of our users and may take necessary actions if we believe you have violated these Terms, including banning you from our Services and/or our affiliates' services (such as Tinder, OkCupid, Plenty of Fish, Meetic, BlackPeopleMeet, LoveScout24, OurTime, Pairs, ParPerfeito, and Twoo; for more details, click here), and/or preventing you from creating new accounts. You understand and agree that we may not share information with you regarding your account if doing so would potentially impair the safety or privacy of our other users.

Member Content is subject to the terms and conditions of Sections 512(c) and/or 512(d) of the Digital Millennium Copyright Act 1998. To submit a complaint regarding Member Content that may constitute intellectual property infringement, see Section 12 (Digital Millennium Copyright Act) below.

## 5. PRIVACY

*Privacy is important to us. We have a separate policy about it that you should read.*

For information about how Match and its affiliates collect, use, and share your personal data, please read our Privacy Policy. By using our Services, you agree that we may use your personal data in accordance with our Privacy Policy.

## 6. RIGHTS YOU ARE GRANTED BY MATCH

*Match grants you the right to use and enjoy our Services, subject to these Terms.*

For as long as you comply with these Terms, Match grants you a personal, worldwide, royalty-free, non-assignable, non-exclusive, revocable, and non-sublicensable license to access and use our Services for purposes as intended by Match and permitted by these Terms and applicable laws. This license and any authorization to access the Service are automatically revoked in the event that you fail to comply with these Terms.

## 7. RIGHTS YOU GRANT MATCH

*You own all of the content you provide to Match, but you also grant us the right to use Your Content as provided in this Agreement.*

By creating an account, you grant to Match a worldwide, perpetual, transferable, sub-licensable, royalty-free right and license to host, store, use, copy, display, reproduce, adapt, edit, publish, translate, modify, reformat, incorporate into other works, advertise, distribute and otherwise make available to the general public Your Content, including any information you authorize us to access from Facebook or other third-party sources (if applicable), in whole or in part, and in any way and in any format or medium currently known or developed in the future. Match's license to Your Content shall be non-exclusive, except that Match's license shall be exclusive with respect to derivative works created through use of our Services. For example, Match would have an exclusive license to screenshots of our Services that include Your Content.

In addition, so that Match can prevent the use of Your Content outside of our Services, you authorize Match to act on your behalf with respect to infringing uses of Your Content taken from our Services by other users or third parties. This expressly includes the authority, but not the obligation, to send notices pursuant to 17 U.S.C. § 512(c)(3) (i.e., DMCA Takedown Notices) on your behalf if Your Content is

MATCHFTC774626

taken and stored in third-party services outside of our control, such as if Your Content is copied, reposted, or otherwise used by other users or third parties. Match's license to Your Content is subject to your rights under applicable law (for example, laws regarding personal data protection to the extent the content contains personal information as defined by those laws).

In consideration for Match allowing you to use our Services, you agree that we, our affiliates, and our third-party partners may place advertising on our Services. By submitting suggestions or feedback to Match regarding our Services, you agree that Match may use and share such feedback for any purpose without compensating you.

You agree that Match may access, preserve, and disclose your account information, including Your Content, if required to do so by law or upon a good faith belief that such access, preservation, or disclosure is reasonably necessary to: (i) comply with legal process; (ii) enforce these Terms; (iii) respond to claims that any content violates the rights of third parties; (iv) respond to your requests for customer service; or (v) protect the rights, property or personal safety of the Company or any other person.

## 8. PURCHASES AND AUTOMATICALLY RENEWING SUBSCRIPTIONS

*You will have the opportunity to purchase products and services from Match. If you purchase a subscription, it will automatically renew—and you will be charged—until you cancel.*

Match may offer products and services for purchase through iTunes, Google Play or other external services authorized by Match (each, an "External Service," and any purchases made thereon, an "External Service Purchase"). Match may also offer products and services for purchase via credit card or other payment processors on the Website or inside the App ("Internal Purchases"). If you purchase a subscription, it will automatically renew until you cancel, in accordance with the terms disclosed to you at the time of purchase, as further described below. If you cancel your subscription, you will continue to have access to your subscription benefits until the end of your subscription period, at which point it will expire.

Because our Services may be utilized without a subscription, canceling your subscription does not remove your profile from our Services. If you wish to fully terminate your membership, you must terminate your membership as set forth in Section 9.

Match operates a global business, and our pricing varies by a number of factors. We frequently offer promotional rates - which can vary based on region, length of subscription, bundle size and more. We also regularly test new features and payment options.

## 8A. EXTERNAL SERVICE PURCHASES AND SUBSCRIPTIONS

*External Service Purchases, including subscriptions, may be processed through the External Service, in which case those purchases must be managed through your External Service Account. Subscriptions automatically renew until you cancel.*

When making a purchase on the Service, you may have the option to pay through an External Service, such as with your Apple ID or Google Play account ("your External Service Account"), and your External Service Account will be charged for the purchase in accordance with the terms disclosed to you at the time of purchase and the general terms applicable to your External Service Account. Some External Services may charge you sales tax, depending on where you live, which may change from time to time.

If your External Service Purchase includes an automatically renewing subscription, your External Service Account will continue to be periodically charged for the subscription until you cancel. After your initial subscription commitment period, and again after any subsequent subscription period, the subscription will automatically continue for the price and time period you agreed to when subscribing.

*To cancel a subscription*: If you do not want your subscription to renew automatically, or if you want to change or terminate your subscription, you must log in to your External Service Account and follow instructions to manage or cancel your subscription, even if you have otherwise deleted your account with us or if you have deleted the App from your device. For example, if you subscribed using your Apple ID, cancellation is handled by Apple, not Match. To cancel a purchase made with your Apple ID, go to Settings > iTunes & App Stores > [click on your Apple ID] > View Apple ID > Subscriptions, then find your Match subscription and follow the instructions to cancel. You can also request assistance at https://getsupport.apple.com. Similarly, if you subscribed on Google Play, cancellation is handled by Google. To cancel a purchase made through Google Play, launch the Google Play app on your mobile device and go to Menu > My Apps > Subscriptions, then find your Match subscription and follow the instructions to cancel. You can also request assistance at https://play.google.com. If you cancel a subscription, you may continue to use the cancelled service until the end of your then-current subscription term. The subscription will not be renewed when your then-current term expires.

If you initiate a chargeback or otherwise reverse a payment made with your External Service Account, Match may terminate your account immediately in its sole discretion, on the basis that you have determined that you do not want a Match subscription. In the event that your chargeback or other payment reversal is overturned, please contact Customer Care. Match will retain all funds charged to your External Service Account until you cancel your subscription through your External Service Account. Certain users may be entitled to request a refund. See Section 8d below for more information.

MATCHFTC774627

## 8B. INTERNAL PURCHASES AND SUBSCRIPTIONS

*Internal Purchases, including subscriptions, are processed using the Payment Method you provide on the Website or App. Subscriptions automatically renew until you cancel.*

If you make an Internal Purchase, you agree to pay the prices displayed to you for the Services you've selected as well as any sales or similar taxes that may be imposed on your payments (and as may change from time to time), and you authorize Match to charge the payment method you provide (your "Payment Method"). Match may correct any billing errors or mistakes even if we have already requested or received payment. If you initiate a chargeback or otherwise reverse a payment made with your Payment Method, Match may terminate your account immediately in its sole discretion, on the basis that you have determined that you do not want a Match subscription. In the event that your chargeback or other payment reversal is overturned, please contact Customer Care.

If your Internal Purchase includes an automatically renewing subscription, your Payment Method will continue to be periodically charged for the subscription until you cancel. After your initial subscription commitment period, and again after any subsequent subscription period, your subscription will automatically continue for the price and time period you agreed to when subscribing, until you cancel.

To cancel a subscription, log in to the Website or App and go to the Settings tool. If you cancel a subscription, you may continue to use the cancelled service until the end of your then-current subscription term. The subscription will not be renewed when your then-current term expires.

You may edit your Payment Method information by using the Settings tool. If a payment is not successfully processed, due to expiration, insufficient funds, or otherwise, you remain responsible for any uncollected amounts and authorize us to continue billing the Payment Method, as it may be updated. This may result in a change to your payment billing dates.

In addition, you authorize us to obtain updated or replacement expiration dates and card numbers for your credit or debit card as provided by your credit or debit card issuer. The terms of your payment will be based on your Payment Method and may be determined by agreements between you and the financial institution, credit card issuer, or other provider of your chosen Payment Method. Certain users may be entitled to request a refund. See Section 8d below for more information.

## 8C. VIRTUAL ITEMS

*Virtual items are non-refundable and subject to certain conditions.*

From time to time, you may have the opportunity to purchase a limited, personal, non-transferable, non-sublicensable, revocable license to use or access special limited-use features such as "Boost" ("Virtual Item(s)") from Match. You may only purchase Virtual Items from us or our authorized partners through our Services. Virtual Items represent a limited license right governed by this Agreement, and, except as otherwise prohibited by applicable law, no title or ownership in or to Virtual Items is being transferred or assigned to you. This Agreement should not be construed as a sale of any rights in Virtual Items.

Any Virtual Item balance shown in your account does not constitute a real-world balance or reflect any stored value, but instead constitutes a measurement of the extent of your license. Virtual Items do not incur fees for non-use; however, the license granted to you in Virtual Items will terminate in accordance with the terms of this Agreement, on the earlier of when Match ceases providing our Services, or your account is otherwise closed or terminated.

Match, in its sole discretion, reserves the right to charge fees for the right to access or use Virtual Items and/or may distribute Virtual Items with or without charge. Match may manage, regulate, control, modify, or eliminate Virtual Items at any time, including taking actions that may impact the perceived value or purchase price, if applicable, of any Virtual Items. Match shall have no liability to you or any third party in the event that Match exercises any such rights. The transfer of Virtual Items is prohibited, and you shall not sell, redeem, or otherwise transfer Virtual Items to any person or entity. Virtual Items may only be redeemed through our Services.

ALL PURCHASES AND REDEMPTIONS OF VIRTUAL ITEMS MADE THROUGH OUR SERVICES ARE FINAL AND NON-REFUNDABLE. YOU ACKNOWLEDGE THAT MATCH IS NOT REQUIRED TO PROVIDE A REFUND FOR ANY REASON, AND THAT YOU WILL NOT RECEIVE MONEY OR OTHER COMPENSATION FOR UNUSED VIRTUAL ITEMS WHEN AN ACCOUNT IS CLOSED, WHETHER SUCH CLOSURE WAS VOLUNTARY OR INVOLUNTARY.

## 8D. REFUNDS

*Generally, all purchases are nonrefundable. Special terms apply in Arizona, California, Colorado, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio, Rhode Island, and Wisconsin.*

MATCHFTC774628

Generally, purchases are final and non-refundable, and there are no refunds or credits for partially used periods, except if the laws applicable in your jurisdiction provide for refunds.

For subscribers residing in Arizona, California, Colorado, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio, Rhode Island, and Wisconsin:

**Your Right to Cancel—You may cancel your subscription, without penalty or obligation, at any time prior to midnight of the third business day following the date you subscribed.** In the event that you die before the end of your subscription period, your estate shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your death. In the event that you become disabled (such that you are unable to use our Services) before the end of your subscription period, you shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your disability by providing the Company notice in the same manner as you request a refund as described below.

Purchases of Virtual Items are FINAL AND NON-REFUNDABLE.

If any of the above apply to you and you subscribed using your Apple ID, your refund requests are handled by Apple, not Match. To request a refund, please contact your External Service directly; for example using your Apple device, go to Settings > iTunes & App Stores > [click on your Apple ID] > View Apple ID > Purchase History. Find the transaction and select "Report a Problem." You can also request a refund at https://getsupport.apple.com. For any other purchase, please contact Match Customer Service with your order number (see your confirmation email) by mailing or delivering a signed and dated notice which states that you, the buyer, are canceling this Agreement, or words of similar effect. Please also include the email address or telephone number associated with your account along with your order number. This notice shall be sent to: Match, Attn: Cancellations, P.O. Box 25472, Dallas, Texas 75225, USA (California and Ohio users may also email us by clicking here or send a facsimile to 214-853-4309).

## 8E. INSTALLMENT PLAN CONDITIONS

*If you agree to make a purchase pursuant to the installment plan option, your purchase will be subject to these additional terms and conditions, including around eligibility, payment, and cancellation.*

By selecting the option to pay in four payments and clicking subscribe, in addition to the terms set forth above, you agree to the following additional terms that will govern your installment plan purchase:

1. *Eligibility.* To be eligible, you must be a Match member in good standing residing in the United States of America. This offer may not be available to every customer and may not be available for all Services Match offers. Match will not use a consumer credit report to determine your eligibility for this Agreement.

2. *Payment.* You authorize Match to charge the Payment Method selected on a periodic basis (as determined when you register). You will be charged the full price of the qualifying product you selected spread equally over one initial payment due at the time of purchase and three subsequent payments (provided, however, that if the full price is not evenly divisible by four, your final payment amount may be smaller). The three subsequent payments will be charged in the increments you selected as part of your subscription plan. No interest or finance charges apply to this installment plan purchase. Any interest, finance charges or fees assessed by the issuer of your Payment Method may still apply. You are personally responsible for any applicable state, federal or other taxes that may be associated with your purchase of Services unless noted otherwise.

   You can choose to prepay your next schedule payment or the full remaining balance at any time by contacting Customer Care.

3. *Match's right to Terminate.* If Match is not able to charge any payment to your Payment Method, Match reserves the right to pursue any remedy that is available to it, including the right to suspend or terminate your Match subscription and/or Match account. You agree that Match and its affiliates have no liability related to the exercise of these remedies.

4. *Cancellation Policy.* Except as otherwise set forth herein, your subscription purchased through your installment plan will continue until terminated, cancelled, or not renewed by you or Match, as further described in this Agreement. If not terminated, cancelled, or not renewed, your Membership will continue to renew with installment payments, until you cancel or change your payment options, via your Account Settings. If you cancel a subscription, you may continue to use the cancelled service until the end of your then-current subscription term. The subscription will not be renewed when your then-current term expires. If you cancel your subscription prior to completing all payments due, unless otherwise required by applicable law, the remaining balance of the subscription will remain due and payable pursuant to the installment payment schedule you agreed to.

## 9. ACCOUNT TERMINATION

*If you no longer wish to use our Services, or if we terminate your account for any reason, here's what you need to know.*

MATCHFTC774629

You can cancel your account at any time by logging into the Website or App, going to "Settings" (the gear/profile icon in the top right corner), and following the instructions to cancel your membership. **However, you will need to cancel / manage any External Service Purchases through your External Service Account (e.g., iTunes, Google Play) to avoid additional billing.**

Match reserves the right to investigate and, if appropriate, suspend or terminate your account without a refund if Match believes that you have violated these Terms, misused our Services, or behaved in a way that Match regards as inappropriate or unlawful, on or off our Services. We reserve the right to make use of any personal, technological, legal, or other means available to enforce the Terms, at any time without liability and without the obligation to give you prior notice, including, but not limited to, preventing you from accessing the Services.

If your account is terminated by you or by Match for any reason, these Terms continue and remain enforceable between you and Match, and you will not be entitled to any refund for purchases made. Your information will be maintained and deleted in accordance with our Privacy Policy.

10. NO CRIMINAL BACKGROUND OR IDENTITY VERIFICATION CHECKS

*Match does not conduct criminal background or identity verification checks on its users. Use your best judgment when interacting with others and review our Safety Tips.*

**YOU UNDERSTAND THAT MATCH DOES NOT CONDUCT CRIMINAL BACKGROUND OR IDENTITY VERIFICATION CHECKS ON ITS USERS OR OTHERWISE INQUIRE INTO THE BACKGROUND OF ITS USERS.** MATCH MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE CONDUCT, IDENTITY, INTENTIONS, LEGITIMACY, OR VERACITY OF USERS. MATCH RESERVES THE RIGHT TO CONDUCT—AND YOU AUTHORIZE MATCH TO CONDUCT—ANY CRIMINAL BACKGROUND CHECK OR OTHER SCREENINGS (SUCH AS SEX OFFENDER REGISTER SEARCHES) AT ANY TIME USING AVAILABLE PUBLIC RECORDS, AND YOU AGREE THAT ANY INFORMATION YOU PROVIDE MAY BE USED FOR THAT PURPOSE. IF THE COMPANY DECIDES TO CONDUCT ANY SCREENING THROUGH A CONSUMER REPORTING AGENCY, YOU HEREBY AUTHORIZE THE COMPANY TO OBTAIN AND USE A CONSUMER REPORT ABOUT YOU TO DETERMINE YOUR ELIGIBILITY UNDER THESE TERMS.

YOU ARE SOLELY RESPONSIBLE FOR YOUR INTERACTIONS WITH OTHER USERS. SEX OFFENDER SCREENINGS AND OTHER TOOLS DO NOT GUARANTEE YOUR SAFETY AND ARE NOT A SUBSTITUTE FOR FOLLOWING THE SAFETY TIPS AND OTHER SENSIBLE SAFETY PRECAUTIONS. ALWAYS USE YOUR BEST JUDGMENT AND TAKE APPROPRIATE SAFETY PRECAUTIONS WHEN COMMUNICATING WITH OR MEETING NEW PEOPLE. COMMUNICATIONS RECEIVED THROUGH THE SERVICE, INCLUDING AUTOMATIC NOTIFICATIONS SENT BY MATCH, MAY RESULT FROM USERS ENGAGING WITH THE SERVICE FOR IMPROPER PURPOSES, INCLUDING FRAUD, ABUSE, HARASSMENT, OR OTHER SUCH IMPROPER BEHAVIOR.

Though Match strives to encourage a respectful user experience, it is not responsible for the conduct of any user on or off the Service. You agree to use caution in all interactions with other users, particularly if you decide to communicate off the Service or meet in person.

## 11. DISCLAIMER

*Match's Services are provided "as is" and we do not make, and cannot make, any representations about the content or features of our Services.*

MATCH PROVIDES OUR SERVICES ON AN "AS IS" AND "AS AVAILABLE" BASIS AND TO THE EXTENT PERMITTED BY APPLICABLE LAW, GRANTS NO WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE WITH RESPECT TO OUR SERVICES (INCLUDING ALL CONTENT CONTAINED THEREIN), INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF SATISFACTORY QUALITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. MATCH DOES NOT REPRESENT OR WARRANT THAT (A) OUR SERVICES WILL BE UNINTERRUPTED, SECURE, OR ERROR FREE, (B) ANY DEFECTS OR ERRORS IN OUR SERVICES WILL BE DISCOVERED OR CORRECTED, OR (C) THAT ANY CONTENT OR INFORMATION YOU OBTAIN ON OR THROUGH OUR SERVICES WILL BE ACCURATE OR APPROPRIATE FOR YOUR PURPOSES. FURTHERMORE, MATCH MAKES NO GUARANTEES AS TO THE NUMBER OF ACTIVE USERS AT ANY TIME; USERS' ABILITY OR DESIRE TO COMMUNICATE WITH OR MEET YOU, OR THE ULTIMATE COMPATIBILITY WITH OR CONDUCT BY USERS YOU MEET THROUGH THE SERVICES.

MATCH ASSUMES NO RESPONSIBILITY FOR ANY CONTENT THAT YOU OR ANOTHER USER OR THIRD PARTY POSTS, SENDS, OR RECEIVES THROUGH OUR SERVICES; NOR DOES MATCH ASSUME ANY RESPONSIBILITY FOR THE IDENTITY, INTENTIONS, LEGITIMACY, OR VERACITY OF ANY USERS WITH WHOM YOU MAY COMMUNICATE WITH THROUGH MATCH. ANY MATERIAL DOWNLOADED OR OTHERWISE OBTAINED THROUGH THE USE OF OUR SERVICES IS ACCESSED AT YOUR OWN DISCRETION AND RISK. MATCH IS NOT RESPONSIBLE FOR ANY DAMAGE TO YOUR COMPUTER HARDWARE, COMPUTER SOFTWARE, OR OTHER EQUIPMENT OR TECHNOLOGY INCLUDING, BUT WITHOUT LIMITATION, DAMAGE FROM ANY SECURITY BREACH OR FROM ANY VIRUS, BUGS, TAMPERING, HACKING, FRAUD, ERROR, OMISSION, INTERRUPTION,

MATCHFTC774630

DEFECTIVE TRANSMISSION OR TRANSMISSION, COMPUTER LINE OR NETWORK FAILURE, OR ANY OTHER TECHNICAL OR OTHER DISRUPTION OR MALFUNCTION.

## 12. DIGITAL MILLENNIUM COPYRIGHT ACT

***We take copyright infringement very seriously. We ask you to help us to ensure we address it promptly and effectively.***

Match has adopted the following policy towards copyright infringement in accordance with the Digital Millennium Copyright Act (the "DMCA"). If you believe any Member Content or Our Content infringes upon your intellectual property rights, please submit a notification alleging such infringement ("DMCA Takedown Notice") including the following:

1. A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;

2. Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works;

3. Identification of the material claimed to be infringing or to be the subject of infringing activity and that is to be removed or access disabled and information reasonably sufficient to permit the service provider to locate the material;

4. Information reasonably sufficient to permit the service provider to contact you, such as an address, telephone number, and, if available, an electronic mail;

5. A statement that you have a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law; and

6. A statement that, under penalty of perjury, the information in the notification is accurate and you are authorized to act on behalf of the owner of the exclusive right that is allegedly infringed.

Any DMCA Takedown Notices should be sent to copyright@match.com, by phone to 214-576-3272 or via mail to the following address: Copyright Compliance Department c/o Match Group Legal, 8750 N. Central Expressway, Dallas, Texas 75231.

Match will terminate the accounts of repeat infringers.

## 13. ADS AND THIRD-PARTY CONTENT

***Like many subscription-based services, there are ads on our websites.***

Our Services may contain advertisements and promotions offered by third parties and links to other websites or resources. Match may also provide non-commercial links or references to third parties within its content. Match is not responsible for the availability (or lack of availability) of any external websites or resources or their content. Furthermore, Match is not responsible for, and does not endorse, any products or services that may be offered by third-party websites or resources. If you choose to interact with the third parties made available through our Services, such party's terms will govern their relationship with you. Match is not responsible or liable for such third parties' terms or actions.

## 14. LIMITATION OF LIABILITY

***Match's liability is limited to the maximum extent allowed by applicable law.***

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL MATCH, ITS AFFILIATES, EMPLOYEES, LICENSORS, OR SERVICE PROVIDERS BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL, PUNITIVE, FIXED, OR ENHANCED DAMAGES, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM: (I) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES; (II) THE CONDUCT OR CONTENT OF ANY USERS OR THIRD PARTIES ON OR THROUGH ANY OF OUR AFFILIATES' SERVICES OR IN CONNECTION WITH THE SERVICES; OR (III) ANY UNAUTHORIZED ACCESS, USE, OR ALTERATION OF YOUR CONTENT, EVEN IF MATCH HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL MATCH'S AGGREGATE LIABILITY TO YOU FOR ALL CLAIMS RELATING TO THE SERVICES EXCEED THE AMOUNT PAID, IF ANY, BY YOU TO MATCH FOR THE SERVICES DURING THE TWENTY-FOUR (24) MONTH PERIOD IMMEDIATELY PRECEDING THE DATE THAT YOU FIRST FILE A LAWSUIT, ARBITRATION OR ANY OTHER LEGAL PROCEEDING AGAINST MATCH, WHETHER STATUTORY, IN LAW OR IN EQUITY, IN ANY TRIBUNAL. THE DAMAGES LIMITATION SET FORTH IN THE IMMEDIATELY PRECEDING SENTENCE APPLIES (I) REGARDLESS OF THE GROUND UPON WHICH LIABILITY IS BASED (WHETHER DEFAULT,

CONTRACT, TORT, STATUTORY, OR OTHERWISE) (ii) ANY SPECIFIC KIND, AMOUNT, OR TYPE OF DAMAGES OR RIGHTS, REMEDIES, OR OBLIGATIONS, AND (iii) WITH RESPECT TO ALL EVENTS, THE SERVICE, AND THIS AGREEMENT.

THE LIMITATION OF LIABILITY PROVISIONS SET FORTH IN THIS SECTION 14 SHALL APPLY EVEN IF YOUR REMEDIES UNDER THIS AGREEMENT FAIL WITH RESPECT TO THEIR ESSENTIAL PURPOSE.

SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES, SO SOME OR ALL OF THE EXCLUSIONS AND LIMITATIONS IN THIS SECTION MAY NOT APPLY TO YOU.

## 15. DISPUTE RESOLUTION SECTION

*In the unlikely event that we have a legal dispute, here is how the Parties agree to proceed, except where prohibited by applicable law.*

Any Subsection in this Dispute Resolution Section that is prohibited by law shall not apply to the users residing in that jurisdiction, including Subsections 15b, 15c, 15d, and 15e, which shall not apply to users residing within the European Union, European Economic Area, the United Kingdom, or Switzerland.

## 15A. INFORMAL DISPUTE RESOLUTION PROCESS

If you are dissatisfied with our Services for any reason, please contact Match Customer Service first so we can try to resolve your concerns without the need of outside assistance. If you choose to pursue a dispute, claim or controversy against Match, these terms will apply. For purposes of this Dispute Resolution Process and Arbitration Procedures set forth in Section 15, "Match" shall include our affiliates, employees, licensors, and service providers.

Match values its relationship with you and appreciates the mutual benefit realized from informally resolving Disputes (as defined below). Before formally pursuing a Dispute in arbitration or small claims court, you agree to first send a detailed notice ("Notice") to Match Group Legal, P.O. Box 25458, Dallas, Texas 75225, USA. If Match has a Dispute with you, Match agrees to first send a Notice to you at your most recent email address on file with us, or if no email address is on file, other contact information associated with your account. Your Notice must contain all of the following information: (1) your full name; (2) information that enables Match to identify your account, including a picture or screenshot of your profile, your address, mobile phone number, email address, and date of birth you used to register your account if any; and (3) a detailed description of your Dispute, including the nature and factual basis of your claim(s) and the relief you are seeking with a corresponding calculation of your alleged damages (if any). You must personally sign this Notice for it to be effective. Match's Notice must likewise set forth a detailed description of its Dispute, which shall include the nature and factual basis of its claim(s) and the relief it is seeking, with a corresponding calculation of our damages (if any). You and Match agree to then negotiate in good faith in an effort to resolve the Dispute. As part of these good faith negotiations, if Match requests a telephone conference with you to discuss your Dispute, you agree to personally participate, with your attorney if you're represented by counsel. Likewise, if you request a telephone conference to discuss Match's Dispute with you, Match agrees to have one representative participate. This informal process should lead to a resolution of the Dispute. However, if the Dispute is not resolved within 60 days after receipt of a fully completed Notice and the Parties have not otherwise mutually agreed to an extension of this informal dispute resolution time period, you or Match may initiate an arbitration (subject to a Party's right to elect small claims court as provided below).

Completion of this informal dispute resolution is a condition precedent to filing any demand for arbitration or small claims court action. Failure to do so is a breach of this Agreement. The statute of limitations and any filing fee deadlines will be tolled while you and Match engage in this informal dispute resolution process. Unless prohibited by applicable law, the arbitration provider, National Arbitration and Mediation ("NAM"), shall not accept or administer any demand for arbitration and shall administratively close any arbitration unless the Party bringing such demand for arbitration can certify in writing that the terms and conditions of this informal dispute resolution process were fully satisfied. A court of competent jurisdiction shall have authority to enforce this provision and to enjoin any arbitration proceeding or small claims court action.

## 15B. INDIVIDUAL RELIEF: CLASS ACTION AND JURY TRIAL WAIVER

TO THE FULLEST ALLOWABLE BY LAW, YOU AND MATCH EACH WAIVE THE RIGHT TO A JURY TRIAL AND THE RIGHT TO LITIGATE DISPUTES IN COURT IN FAVOR OF INDIVIDUAL ARBITRATION (EXCEPT FOR SMALL CLAIMS COURT AS PROVIDED ABOVE). YOU AND MATCH EACH WAIVE THE RIGHT TO FILE OR PARTICIPATE IN A CLASS ACTION AGAINST THE OTHER OR OTHERWISE TO SEEK RELIEF ON A CLASS BASIS, INCLUDING ANY CURRENTLY PENDING ACTIONS AGAINST MATCH. TO THE FULLEST ALLOWABLE BY LAW, THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED OR LITIGATED ON A CLASS, COLLECTIVE, REPRESENTATIVE, CONSOLIDATED, OR PRIVATE ATTORNEY GENERAL BASIS. THE ARBITRATOR CAN AWARD THE SAME RELIEF AVAILABLE IN COURT PROVIDED THAT THE ARBITRATOR MAY ONLY AWARD FINAL RELIEF (INCLUDING INJUNCTIVE OR DECLARATORY RELIEF) IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE FINAL RELIEF WARRANTED BY

MATCHFTC774632

ANYONE WHO IS NOT A PARTY TO THE ARBITRATION ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL BASIS. IF A COURT DETERMINES THAT ANY OF THESE PROHIBITIONS IN THIS PARAGRAPH ARE UNENFORCEABLE AS TO A PARTICULAR CLAIM OR REQUEST FOR RELIEF (SUCH AS A REQUEST FOR PUBLIC INJUNCTIVE RELIEF), AND ALL APPEALS OF THAT DECISION ARE EXHAUSTED OR THE DECISION IS OTHERWISE FINAL, THEN YOU AND MATCH AGREE THAT THAT PARTICULAR CLAIM OR REQUEST FOR RELIEF SHALL PROCEED IN COURT BUT SHALL BE STAYED PENDING INDIVIDUAL ARBITRATION OF THE REMAINING CLAIMS FOR RELIEF THAT YOU HAVE BROUGHT. IF THIS SPECIFIC PARAGRAPH IS FOUND TO BE UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION PROVISION (EXCEPT FOR THE JURY TRIAL WAIVER AND THE INFORMAL DISPUTE RESOLUTION PROCESS) SHALL BE NULL AND VOID. THIS PARAGRAPH IS AN ESSENTIAL PART OF THIS ARBITRATION AGREEMENT.

## 15C. DISPUTE RESOLUTION THROUGH ARBITRATION OR SMALL CLAIMS COURT

Any dispute, claim, or controversy between you and Match (that is not resolved informally by Match Customer Service or as provided under subsection 15a above) that arises from or relates in any way to this Agreement (including any alleged breach of this Agreement), the Services, or our relationship with you (collectively, "Dispute"), shall be exclusively resolved through BINDING INDIVIDUAL ARBITRATION except as specifically provided otherwise in this Dispute Resolution Section. "Dispute" as used in this Agreement shall have the broadest possible meaning and include claims that arose before the existence of this or any prior Agreement and claims that arise during the term of this Agreement or after the termination of this Agreement. Notwithstanding the foregoing, either you or Match may elect to have an individual claim heard in small claims court. If the request to proceed in small claims court is made after an arbitration has been initiated but before an arbitrator has been appointed, such arbitration shall be administratively closed. Any controversy over the small claims court's jurisdiction shall be determined by the small claims court. All other issues (except as otherwise provided herein) are exclusively for the Arbitrator to decide, including but not limited to scope and enforceability of this Dispute Resolution Section, as well as any request to proceed in small claims court that is made after an arbitrator has been appointed. If you or Match challenges the small claims court election in your Dispute, and a court of competent jurisdiction determines that the small claims court election is unenforceable, then such election shall be severed from this Agreement as to your Dispute. However, such court determination shall not be considered or deemed binding with respect to Match's other contracting parties.

Any court proceeding to enforce this Dispute Resolution Section 15, including any proceeding to confirm, modify, or vacate an arbitration award, must be commenced in accordance with Section 17. In the event Dispute Resolution Section 15 is for any reason held to be unenforceable, any litigation against Match (except for small claims court actions) may be commenced only in the federal or state courts located in Dallas County, Texas. You hereby irrevocably consent to those courts' exercise of personal jurisdiction over you for such purposes and waive any claim that such courts constitute an inconvenient forum.

## 15D. INDIVIDUAL ARBITRATION AND MASS ARBITRATION PROTOCOLS

This subsection 15d applies to Disputes that are submitted to NAM after fully completing the informal Notice and Dispute resolution process described in subsection 15a above and when no small claims court election is made by either Party. Any arbitration between you and Match shall be administered by NAM in accordance with NAM's operative Comprehensive Dispute Resolution Rules and Procedures (the "NAM Rules") in effect at the time any demand for arbitration is filed with NAM, as modified by this Dispute Resolution Section 15. For a copy of the NAM Rules, please visit https://www.namadr.com/resources/rules-fees-forms or contact NAM at NAM's National Processing Center at 990 Stewart Avenue, 1st Floor, Garden City, NY 11530 and email address commercial@namadr.com. If NAM is unable or unwilling to perform its duties under this Agreement, the parties shall mutually agree on an alternative administrator that will replace NAM and assume NAM's role consistent with this Agreement. If the parties are unable to agree, they will petition a court of competent jurisdiction to appoint an administrator that will assume NAM's duties under this Agreement.

The Parties agree that the following procedures will apply to any Arbitrations initiated under this Dispute Resolution Section:

1. **Commencing an Arbitration** – To initiate an arbitration, you or Match shall send to NAM a demand for arbitration ("Demand for Arbitration") that describes the claim(s) and request for relief in detail, consistent with the requirements in this Agreement and NAM Rules. If you send a Demand for Arbitration, you shall also send it to Match at Match Group Legal, P.O. Box 25458, Dallas, Texas 75225, USA, within 10 days of delivery of the Demand for Arbitration to NAM. If Match sends a Demand for Arbitration, we will send it to your mailing address on file with us within the same 10-day period. If your mailing address is unavailable, we will send it to your email address on file, or if no email address is on file, other contact information associated with your account. The arbitration provider shall not accept or administer any demand for arbitration and shall administratively close any such demand for arbitration that fails to certify in writing that the Party meets the requirements of Dispute Resolution Section 15 or if either Party elects small claims court as set forth above.

2. **Fees** – The payment of all fees shall be governed by the NAM Rules, except to the extent that the case is a part of a Mass Filing (as defined below) or the NAM fees and costs (including Arbitrator fees) paid by either Party are reallocated upon order of the Arbitrator following a determination that (a) either Party breached Section 15 of this Agreement, (b) such reallocation is called for under this Agreement, or (c) reallocation is otherwise permitted under applicable law. Upon a showing to Match of your financial hardship we will consider a good faith request made by you to pay your portion of the applicable consumer

parties to the filing that extent is commenced, ensuring that arbitration acts to complement court actions as a forum for the adjudication of disputes. If Match initiates an arbitration against you, we shall pay all fees.

3. **The Arbitrator** – The arbitration shall be conducted by a single, neutral (the "Claim Arbitrator"), as assisted by any Process Arbitrator appointed under NAM Rules. (The term "Arbitrator" applies to both the Claim Arbitrator and the Process Arbitrator). If a hearing is elected by either Party, the Arbitrator shall be in or close to the location in which you reside. The Arbitrator is bound by and shall adhere to this Agreement. In the event NAM Rules conflict with this Agreement, the terms of this Agreement shall control. If the Arbitrator determines that strict application of any term of Section 15 of this Agreement (except for the small claims election, which shall be determined by the small claims court) would result in a fundamentally unfair arbitration (the "Unfair Term"), then the Arbitrator shall have authority to modify the Unfair Term to the extent necessary to ensure a fundamentally fair arbitration that is consistent with the Terms of Use (the "Modified Term"). In determining the substance of a Modified Term, the Arbitrator shall select a term that comes closest to expressing the intention of the Unfair Term.

4. **Dispositive Motions** – The Parties agree that the Claim Arbitrator shall have the authority to consider dispositive motions without an oral evidentiary hearing. Dispositive motions may be requested under the following circumstances: (a) within 30 days after the Claim Arbitrator's appointment, a Party may request to file a dispositive motion based upon the pleadings; and (b) no later than 30 days prior to the evidentiary hearing, a Party may request to file a dispositive motion for summary judgment based upon the Parties' pleadings and the evidence submitted.

5. **Discovery** –Each Party may (a) serve up to five requests for relevant, non-privileged documents from the other Party; and (b) request that the other Party provide verified responses to no more than 5 relevant interrogatories (including subparts). Unless both Parties agree otherwise, no other forms of discovery (including depositions) may be utilized. Any such discovery requests must be served on the other Party within 21 days after the Claim Arbitrator's appointment. The responding Party shall provide the requesting Party with all responsive, non-privileged documents, responses signed by the Party themselves to the requested interrogatories, and/or any objections to the requests within 30 days after receipt of the requests, or, in the event of an objection to any discovery request, 30 days after the Claim Arbitrator resolves the dispute. In the event either Party requests that the Claim Arbitrator consider a dispositive motion on the pleadings, such written discovery response deadlines shall be extended until 30 days following the Claim Arbitrator's final decision on such dispositive motion. Any disputes about discovery or requests for extensions shall be submitted promptly to the Claim Arbitrator for resolution. In ruling on any discovery dispute or extension request, the Claim Arbitrator shall take into consideration the nature, amount, and scope of the underlying arbitration claim, the cost and other effort that would be involved in providing the requested discovery, the case schedule, and whether the requested discovery is necessary for the adequate preparation of a claim or defense.

6. **Confidentiality** – Upon either Party's request, the Arbitrator will issue an order requiring that confidential information of either Party disclosed during the arbitration (whether in documents or orally) may not be used or disclosed except in connection with the arbitration or a proceeding to enforce the arbitration award and that any permitted court filing of confidential information must be done under seal.

7. **Arbitration Hearing** – You and Match are entitled to a fair evidentiary hearing (i.e. trial) before the Claim Arbitrator. Arbitration proceedings are usually simpler, less costly, and more streamlined than trials and other judicial proceedings. The Parties agree to waive all oral hearings and instead submit all disputes to the Claim Arbitrator for an award based on written submissions and other evidence as the Parties may agree, unless a Party requests an oral hearing within 10 days after the Respondent files a response. If an oral evidentiary hearing is requested, both Parties must be personally present at the hearing, regardless of whether either Party has retained counsel. Both Parties must personally attend the hearing. Either Party's failure to personally attend the hearing, without a continuance ordered by the Claim Arbitrator for good cause, will result in a default judgment taken against that Party.

8. **Arbitration Award** – Regardless of the format of the arbitration, the Claim Arbitrator shall provide a reasoned decision, in writing within 30 days after the hearing or, if no hearing is held, within 30 days after any rebuttal or supplemental statements are due. The decision must clearly specify the relief, if any, awarded and contain a brief statement of the reasons for the award. The arbitration award is binding only between you and Match and will not have any preclusive effect in another arbitration or proceeding that involves a different Party. The Claim Arbitrator may, however, choose to consider rulings from other arbitrations involving a different Party. The Arbitrator may award fees and costs as provided by the NAM Rules or to the extent such fees and costs could be awarded in court. This includes but is not limited to the ability of the Arbitrator to award fees and costs if the Arbitrator determines that a claim or defense is frivolous or was brought for an improper purpose, for the purpose of harassment, or in bad faith.

9. **Offer of Settlement** – The Respondent may, but is not obligated to, make a written settlement offer to the opposing Party any time before the evidentiary hearing or, if a dispositive motion is permitted, prior to the dispositive motion being granted. The amount or terms of any settlement offer may not be disclosed to the Claim Arbitrator until after the Claim Arbitrator issues an award on the claim. If the award is issued in the opposing Party's favor and is less than the Respondent's settlement offer or if the award is in the Respondent's favor, the opposing Party must pay the Respondent's costs incurred after the offer was made, including any attorney's fees. If any applicable statute or caselaw prohibits the flipping of costs incurred in the arbitration, then the offer in this provision shall serve to cease the accumulation of any costs that claimant may be entitled to for the cause of action under which it is suing.

MATCHFTC774634

10. Mass Filing. If 25 or more Demands for Arbitration are filed relating to the same or similar subject matter and are asserted against Match or related parties by the same or coordinated counsel or entities ("Mass Filing"), consistent with the definition and criteria of Mass Filings set forth in the NAM's Mass Filing Supplemental Dispute Resolution Rules and Procedures ("NAM's Mass Filing Rules", available at https://www.namadr.com/resources/rules-fees-forms/"), the additional protocols set forth below shall apply.

   i. If you or your counsel file a Demand for Arbitration that fits within the definition of Mass Filing referred to above, then you agree that your Demand for Arbitration shall be subject to the additional protocols set forth in this Mass Filing subsection. You also acknowledge that the adjudication of your Dispute might be delayed and that any applicable statute of limitations shall be tolled from the time at which the first cases are chosen to proceed until your case is chosen for a bellwether proceeding.

   ii. NAM's Mass Filing Rules shall apply if your Dispute is deemed by NAM, in its sole discretion pursuant to its Rules and this Dispute Resolution Section, to be part of a Mass Filing. Such election for NAM's Mass Filing Rules and related fee schedule must be made by either you or Match in writing and submitted to NAM and all Parties.

   iii. **Bellwether Proceedings. Bellwether proceedings are encouraged by courts and arbitration administrators when there are multiple disputes involving similar claims against the same or related parties. Counsel for the Mass Filings claimants (including you) and counsel for Match shall each select 15 Demands for Arbitration (30 total), and no more than 30 arbitrations shall be filed, processed, adjudicated, or pending at the same time, with each of the 30 individual arbitrations presided over by a different Claim Arbitrator, in a first set of bellwether proceedings. During this time, no other Demands for arbitration that are part of the Mass Filings may be filed, processed, adjudicated, or pending. If the Parties are unable to resolve the remaining Demands for Arbitration after the first set of bellwether proceedings are arbitrated or otherwise resolved, then counsel for the Claimants and counsel for Match shall each select an additional 15 Demands for Arbitration (30) total to be filed, processed, and adjudicated as individual arbitrations, with each of the 30 arbitrations presided over by a different Claim Arbitrator, in a second set of bellwether proceedings. During this time, no other Demands for Arbitration that are part of the Mass Filings may be filed, processed, or adjudicated. This staged process of bellwether proceedings, with each set including 30 Demands for Arbitration adjudicated on an individual basis, shall continue until each Demand included in the Mass Filings (including your Demand for Arbitration) is adjudicated or otherwise resolved. Fees associated with a Demand for Arbitration included in the Mass Filings, including fees owed by Match and the claimants (including you), shall only be due after your Demand for Arbitration is chosen as part of a set of bellwether proceedings and therefore properly designated for filing, processing, and adjudication. Any applicable statute of limitations shall be tolled beginning when you initiate the informal dispute resolution process set forth in subsection 15a of the Agreement, and if the first Mass Filings' Demands for Arbitration are chosen for the initial set of bellwether proceedings have been filed, your claims will remain tolled until your Demand for Arbitration is decided, withdrawn, or is settled. A court of competent jurisdiction located in a venue allowed under Section 17 of the Agreement shall have the power to enforce this subsection.**

   iv. You and Match agree that we each value the integrity and efficiency of the arbitration and small claims court process and wish to employ the process for the fair resolution of genuine and sincere disputes between us. You and Match acknowledge and agree to act in good faith to ensure the fair resolution of genuine and sincere Disputes. The Parties further agree that application of these Mass Filings procedures have been reasonably designed to result in an efficient and fair adjudication of such cases.

## 15E. FUTURE CHANGES AND RETROACTIVE APPLICATION

This Dispute Resolution Section 15 applies to all Disputes between the Parties, including for any claims that accrued against you or Match prior to the time of your consent to this Agreement and to any claims that accrue against you or Match after your consent to this Agreement. Notwithstanding any provision in this Agreement to the contrary, you may elect to opt out of the retroactive application of this Dispute Resolution Section 15 as to claims that have accrued against you or against Match prior to the time of your consent to this Agreement. You may opt out by sending us written notice, within 30 days of the time you consent to this Agreement, to the following email address: optout@match.com. Please do not direct any customer support inquiries optout@match.com, as they will not be addressed; such inquiries should be directed to customer support. You must include information sufficient to identify your account(s), such as the email address or phone number associated with your account(s), and should include a statement that you are opting out of the retroactive application of this Dispute Resolution Section 15. Please note: if you opt out of the retroactive application of this Dispute Resolution Section 15, you will still be subject to and bound by any Dispute Resolution Sections and Arbitration Procedures you previously agreed to, including any arbitration provisions, class action waivers, and retroactive application sections. Also, regardless of whether you opt out of the retroactive application of these changes, the Parties will resolve any claims that accrue against you or Match after your consent to this Agreement in accordance with this Dispute Resolution Section.

## 16. GOVERNING LAW

*Texas law and the Federal Arbitration Act will apply to any Dispute (except where prohibited by law).*

MATCHFTC774635

To the fullest extent allowable by law, this Agreement and its conduct of laws rules, shall apply to any dispute arising out of or relating to this Agreement or our Services. Notwithstanding the foregoing, the Dispute Resolution Process set forth in Section 15 shall be governed by the Federal Arbitration Act.

## 17. VENUE/FORUM SELECTION

*To the fullest extent allowable by law, any claims that are not arbitrated for any reason must be litigated in Dallas County, Texas (except for claims filed in small claims court).*

Except where prohibited by law and except for claims that are heard in a small claims court as set forth in Section 15, any claims arising out of or relating to this Agreement, to our Services, or to your relationship with Match that for whatever reason are not required to be arbitrated or filed in small claims court, will be litigated exclusively in the federal or state courts located in Dallas County, Texas, U.S.A. You and Match consent to the exercise of personal jurisdiction of courts in the State of Texas and waive any claim that such courts constitute an inconvenient forum.

## 18. INDEMNITY BY YOU

*You agree to indemnify Match if a claim is made against Match due to your actions.*

You agree, to the extent permitted under applicable law, to indemnify, defend, and hold harmless Match, our affiliates, and their and our respective officers, directors, agents, and employees from and against any and all complaints, demands, claims, damages, losses, costs, liabilities, and expenses, including attorney's fees, due to, arising out of, or relating in any way to your access to or use of our Services, your Content, your conduct toward other users, or your breach of this Agreement.

## 19. ACCEPTANCE OF TERMS

*By using our Services, you accept the Terms of this Agreement.*

By using our Services, whether through a mobile device, mobile application, or computer, you agree to be bound by (i) these Terms, which we may amend from time to time, (ii) our Privacy Policy, Cookie Policy, Community Guidelines, and Safety Tips, and (iii) any Additional Terms Upon Purchase. If you do not accept and agree to be bound by all of the terms of this Agreement, you are not entitled to use our Services.

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the entities or persons referred to any require.

## 20. ENTIRE AGREEMENT

*This Agreement supersedes any previous agreements or representations.*

These Terms, with the Privacy Policy, Cookie Policy, Community Guidelines, and Safety Tips, and any Additional Terms Upon Purchase, contain the entire agreement between you and Match regarding the use of our Services. The Terms supersede all previous agreements, representations, and arrangements between us, written or oral. If any provision of these Terms is held invalid, illegal, or otherwise unenforceable, the remainder of the Terms shall continue in full force and effect. The failure of the Company to exercise or enforce any right or provision of these Terms shall not constitute a waiver of such right or provision. You agree that your Match account is non-transferable and all of your rights to your account and its content terminate upon your death, unless otherwise provided by law. Any rights and licenses granted hereunder may not be transferred or assigned by you but may be assigned by us without restriction. No agency, partnership, joint venture, fiduciary or other special relationship or employment is created as a result of these Terms, and you may not make any representations on behalf of or bind Match in any manner.

## 21. SPECIAL STATE TERMS

*Special terms apply in Arizona, California, Colorado, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio, Rhode Island, and Wisconsin*

For subscribers residing in New York:

MATCHFTC774636

- The Services are not guarantees any functioning materials—rather, the functionality of the Services is such that a subscriber can view as many profiles as he/she would like;

- Upon notice in writing and delivered to Match Group Legal, P.O. Box 25472, Dallas, Texas 75225, USA, subscribers may place their subscription on hold for up to one year;

- How your information is used and how you may access your information is set forth in our Privacy Policy;

- You may review the New York Dating Service Consumer Bill of Rights here; For subscribers residing in North Carolina:

- You may review the North Carolina Buyer's Rights here.

For subscribers residing in Illinois, New York, North Carolina, and Ohio :

- Our Services are widely available in the United States—if you believe that you have moved outside a location where we provide the Services, please contact us in writing delivered to Match Group Legal, P.O. Box 25472, Dallas, Texas 75225, USA, and we will work with you to provide alternative services or a refund.

For subscribers residing in Arizona, California, Colorado, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio, Rhode Island, and Wisconsin:

Your Right to Cancel—You may cancel your subscription, without penalty or obligation, at any time prior to midnight of the third business day following the date you subscribed. In the event that you die before the end of your subscription period, your estate shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your death. In the event that you become disabled (such that you are unable to use our Services) before the end of your subscription period, you shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your disability by providing the Company notice in the same manner as you request a refund as described above in Section 8.

MATCHFTC774637

# EXHIBIT 2

## Match.com Terms of Use Agreement

*Effective on 2021-02-08*

California subscribers: You may cancel your subscription, without penalty or obligation, at any time prior to midnight of the third business day following the date you subscribed. If you subscribed using an External Service (e.g., Apple ID, Google Play), you must cancel through your External Service, as set forth in more detail in Section 8a. If you subscribed through your Apple ID, refunds are handled by Apple/Google, not Match. You can request a refund from Apple through your Apple ID account on your phone or at https://getsupport.apple.com. All other users may request a refund by contacting Match Customer Service at by clicking here, or by mailing or delivering a signed and dated notice that states that you, the buyer, are canceling this agreement, or words of similar effect. Please also include your name and the email address, phone number, or other unique identifier you used to sign up for your account. This notice shall be sent to: Match, Attn: Cancellations, P.O. Box 25472, Dallas, Texas 75225, USA. The Company's business is conducted, in part, at 8750 N. Central Expressway, Suite 1400, Dallas, TX 75205. You may have these terms of use e-mailed to you by sending a letter to Terms Inquiries, P.O. Box 25472, Dallas, Texas 75225, USA. In accordance with Cal. Civ. Code §1789.3, you may report complaints to the Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs by contacting them in writing at Consumer Information Division, 1625 North Market Blvd., Suite N112 Sacramento, CA 95834, or by telephone at (800) 952-5210.

*We have included brief summaries at the beginning of each section to make it easier for you to read and understand this agreement. The summaries do not replace the text of each section, and you should still read each section in its entirety.*

## 1. INTRODUCTION

*By accessing or using Match's services, you agree to be bound by these terms, including our Privacy and Cookie Policies, so it is important that you read this agreement carefully before you create an account. We may update the terms from time to time, so you should check this page regularly for updates.*

Welcome to Match, operated by Match Group, LLC, in the case of users originating from within the United States and Canada, and operated by Match.com Global Services Limited, in the case of users originating from outside of the United States and Canada. As used in this Agreement, the terms "Match," "us," "we," the "Company", and "our" shall refer to Match Group, LLC and/or Match.com Global Services Limited, as appropriate.

By accessing or using our Services on match.com (the "Website"), the Match mobile application (the "App"), or any other platforms or services Match may offer (collectively, the "Service" or our "Services"), you agree to, and are bound by, these Terms of Use (the "Terms" or "Agreement"). This Agreement applies to anyone who accesses or uses our Services, regardless of registration or subscription status.

Your use of our Services is also subject to the Privacy Policy, Cookie Policy, and any terms disclosed and agreed to by you when you purchase additional features, products, or services from Match ("Additional Terms Upon Purchase"), which are incorporated into this Agreement by reference. If you do not wish to be bound by this Agreement, do not use our Services.

We reserve the right to modify, amend, or change the Terms at any time. Notice of any material change will be posted on this page with an updated effective date. In certain circumstances, we may notify you of a change to the Terms via email or other means, as appropriate under the circumstances; however, you are responsible for regularly checking this page for notice of any changes. We agree that future changes will not be retroactive without your consent. Your continued use of our Services constitutes your acceptance of any change, and you will be legally bound by the updated Terms. If you do not accept a change to the terms, you should stop using our Services immediately.

## 2. ACCOUNT ELIGIBILITY; YOUR RESPONSIBILITIES

4814-4121-3910.2

MATCHFTC774652

*Before you create an account on Match, make sure you are eligible to use our Services. This Section also details what you can and can't do when using the Services, as well as the rights you grant Match.*

**By using our Services, you represent and warrant that:**

1. You are at least 18 years old;

2. You are legally qualified to enter a binding contract with Match;

3. You are single or separated from your spouse;

4. You are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country;

5. You are not on any list of individuals prohibited from conducting business with the United States;

6. You are not prohibited by law from using our services;

7. You have not have been convicted of or pled no contest to a felony or indictable offense (or crime of similar severity), a sex crime, or any crime involving violence;

8. You are not required to register as a sex offender with any state, federal or local sex offender registry;

9. You do not have more than one account on our Services; and

10. You have not previously been removed from our Services by us, unless you have our express written permission to create a new account.

If at any time you cease to meet these requirements, you must immediately delete your account.

**You agree to:**

- Comply with these Terms, and check this page from time to time to ensure you are aware of any change;

- Comply with all applicable laws, including without limitation, privacy laws, intellectual property laws, anti-spam laws, and regulatory requirements;

- Use the latest version of the Website and/or App;

- Treat other users in a courteous and respectful manner, both on and off our Services;

- Be respectful when communicating with any of our customer care representatives or other employees;

- Review the Safety Tips;

- Maintain a strong password and take reasonable measures to protect the security of your login information.

**You agree that you will not:**

- Misrepresent your identity, age, current or previous positions, qualifications, or affiliations with a person or entity;

- Use the Services in a way that damages the Services or prevents their use by other users;

- Use our Services in a way to interfere with, disrupt or negatively affect the platform, the servers, or our Services' networks;

- Use our Services for any harmful, illegal, or nefarious purpose;

- Harass, bully, stalk, intimidate, assault, defame, harm or otherwise mistreat any person;

MATCHFTC774653

- Post or share Prohibited Content (see below);

- Solicit passwords for any purpose, or personal identifying information for commercial or unlawful purposes from other users or disseminate another person's personal information without his or her permission;

- Solicit money or other items of value from another user, whether as a gift, loan, or form of compensation;

- Use another user's account;

- Use our Services in relation to fraud, a pyramid scheme, or other similar practice; or

- Violate the terms of the license granted to you by Match (see Section 6 below).

- Disclose private or proprietary information that you do not have the right to disclose;

- Copy, modify, transmit, distribute, or create any derivative works from, any Member Content or Our Content, or any copyrighted material, images, trademarks, trade names, service marks, or other intellectual property, content or proprietary information accessible through our Services without Match's prior written consent;

- Express or imply that any statements you make are endorsed by Match;

- Use any robot, crawler, site search/retrieval application, proxy or other manual or automatic device, method or process to access, retrieve, index, "data mine," or in any way reproduce or circumvent the navigational structure or presentation of our Services or its contents;

- Upload viruses or other malicious code or otherwise compromise the security of our Services;

- Forge headers or otherwise manipulate identifiers to disguise the origin of any information transmitted to or through our Services;

- "Frame" or "mirror" any part of our Services without Match's prior written authorization;

- Use meta tags or code or other devices containing any reference to Match or the platform (or any trademark, trade name, service mark, logo or slogan of Match) to direct any person to any other website for any purpose;

- Modify, adapt, sublicense, translate, sell, reverse engineer, decipher, decompile or otherwise disassemble any portion of our Services, or cause others to do so;

- Use or develop any third-party applications that interact with our Services or Member Content or information without our written consent;

- Use, access, or publish the Match application programming interface without our written consent;

- Probe, scan or test the vulnerability of our Services or any system or network; or

- Encourage, promote, or agree to engage in any activity that violates these Terms.

**Prohibited Content—Match prohibits uploading or sharing content that:**

- Is likely to be deemed offensive or to harass, upset, embarrass, alarm or annoy any other person;

- Is obscene, pornographic, violent or otherwise may offend human dignity, or contains nudity;

- Is abusive, insulting or threatening, discriminatory or that promotes or encourages racism, sexism, hatred or bigotry;

- Encourages or facilitates any illegal activity including, without limitation, terrorism, inciting racial hatred or the submission of which in itself constitutes committing a criminal offense;

- Is defamatory, libelous, or untrue;

MATCHFTC774654

- Relates to commercial activities (including, without limitation, sales, competitions, promotions, and advertising, solicitation for services, "sugar daddy" or "sugar baby" relationships, links to other websites or premium line telephone numbers);

- Involves the transmission of "junk" mail or "spam";

- Contains any spyware, adware, viruses, corrupt files, worm programs or other malicious code designed to interrupt, damage or limit the functionality of or disrupt any software, hardware, telecommunications, networks, servers or other equipment, Trojan horse or any other material designed to damage, interfere with, wrongly intercept or expropriate any data or personal information whether from Match or otherwise;

- Infringes upon any third party's rights (including, without limitation, intellectual property rights and privacy rights);

- Was not written by you or was automatically generated, unless expressly authorized by Match;

- Includes the image or likeness of another person without that person's consent (or in the case of a minor, the minor's parent or guardian), or is an image or likeness or a minor unaccompanied by the minor's parent or guardian;

- Is inconsistent with the intended use of the Services; or

- May harm the reputation of Match or its affiliates.

The uploading or sharing of content that violates these terms ("Prohibited Content") may result in the immediate suspension or termination of your account.

## 3. CONTENT

***It is important that you understand your rights and responsibilities with regard to the content on our Services, including any content you provide or post. You are expressly prohibited from posting inappropriate content.***

While using our Services, you will have access to: (i) content that you upload or provide while using our Services ("Your Content"); (ii) content that other users upload or provide while using our Services ("Member Content"); and (iii) content that Match provides on and through our Services ("Our Content"). In this agreement, "content" includes, without limitation, all text, images, video, audio, or other material on our Services, including information on users' profiles and in direct messages between users.

## 3a. YOUR CONTENT

***You are responsible for Your Content. Don't share anything that you wouldn't want others to see, that would violate this Agreement, or that may expose you or us to legal liability.***

You are solely responsible and liable for Your Content, and, therefore, you agree to indemnify, defend, release, and hold us harmless from any claims made in connection with Your Content.

You represent and warrant to us that the information you provide to us or any other user is accurate, including any information submitted through Facebook or other third-party sources (if applicable), and that you will update your account information as necessary to ensure its accuracy.

The content included on your individual profile should be relevant to the intended use of our Services. You may not display any personal contact or banking information, whether in relation to you or any other person (for example, names, home addresses or postcodes, telephone numbers, email addresses, URLs, credit/debit card or other banking details). If you choose to reveal any personal information about yourself to other users, you do so at your own risk. We encourage you to use caution in disclosing any personal information online.

MATCHFTC774655

Your individual profile will be visible to other people around the world, so be sure that you are comfortable sharing Your Content before you post. You acknowledge and agree that Your Content may be viewed by other users, and, notwithstanding these Terms, other users may share Your Content with third parties. By uploading Your Content, you represent and warrant to us that you have all necessary rights and licenses to do so and automatically grant us a license to use Your Content as provided under Section 7 below.

You understand and agree that we may monitor or review Your Content, and we have the right to remove, delete, edit, limit, or block or prevent access to any of Your Content at any time in our sole discretion. Furthermore, you understand agree that we have no obligation to display or review Your Content.

## 3b. MEMBER CONTENT

*While you will have access to Member Content, it is not yours and you may not copy or use Member Content for any purpose except as contemplated by these Terms.*

Other users will also share content on our Services. Member Content belongs to the user who posted the content and is stored on our servers and displayed at the direction of that user.

You do not have any rights in relation to Member Content, and you may only use Member Content to the extent that your use is consistent with our Services' purpose of allowing use to communicate with and meet one another. You may not copy the Member Content or use Member Content for commercial purposes, to spam, to harass, or to make unlawful threats. We reserve the right to terminate your account if you misuse Member Content.

## 3c. OUR CONTENT

*Match owns all other content on our Services.*

Any other text, content, graphics, user interfaces, trademarks, logos, sounds, artwork, images, and other intellectual property appearing on our Services is owned, controlled or licensed by us and protected by copyright, trademark and other intellectual property law rights. All rights, title, and interest in and to Our Content remains with us at all times.

We grant you a limited license to access and use Our Content as provided under Section 6 below, and we reserve all other rights.

## 4. INAPPROPRIATE CONTENT AND MISCONDUCT; REPORTING

*Match does not tolerate inappropriate content or behavior on our Services.*

We are committed to maintaining a positive and respectful Match community, and we do not tolerate any inappropriate content or misconduct, whether on or off of the Services. We encourage you to report any inappropriate Member Content or misconduct by other users. You can report a user directly through the "Report a Concern" link on a user's profile or at the bottom of every email. You may also email Match Customer Service by clicking here.

Member Content is subject to the terms and conditions of Sections 512(c) and/or 512(d) of the Digital Millennium Copyright Act 1998. To submit a complaint regarding Member Content that may constitute intellectual property infringement, see Section 12 (Digital Millennium Copyright Act) below.

## 5. PRIVACY

*Privacy is important to us. We have a separate policy about it that you should read.*

For information about how Match and its affiliates collect, use, and share your personal data, please read our Privacy Policy . By using our Services, you agree that we may use your personal data in accordance with our Privacy Policy .

4814-4121-3910.2

MATCHFTC774656

## 6. RIGHTS YOU ARE GRANTED BY MATCH

*Match grants you the right to use and enjoy our Services, subject to these Terms.*

For as long as you comply with these Terms, Match grants you a personal, worldwide, royalty-free, non-assignable, non-exclusive, revocable, and non-sublicensable license to access and use our Services for purposes as intended by Match and permitted by these Terms and applicable laws.

## 7. RIGHTS YOU GRANT MATCH

*You own all of the content you provide to Match, but you also grant us the right to use Your Content as provided in this Agreement.*

By creating an account, you grant to Match a worldwide, perpetual, transferable, sub-licensable, royalty-free right and license to host, store, use, copy, display, reproduce, adapt, edit, publish, translate, modify, and distribute Your Content, including any information you authorize us to access from Facebook or other third-party source (if applicable), in whole or in part, and in any format or medium currently known or developed in the future. Match's license to Your Content shall be non-exclusive, except that Match's license shall be exclusive with respect to derivative works created through use of our Services. For example, Match would have an exclusive license to screenshots of our Services that include Your Content.

In addition, so that Match can prevent the use of Your Content outside of our Services, you authorize Match to act on your behalf with respect to infringing uses of Your Content taken from our Services by other users or third parties. This expressly includes the authority, but not the obligation, to send notices pursuant to 17 U.S.C. § 512(c)(3) (i.e., DMCA Takedown Notices) on your behalf if Your Content is taken and used by third parties outside of our Services. Match is not obligated to take any action with regard to use of Your Content by other users or third parties. Match's license to Your Content is subject to your rights under applicable law (for example, laws regarding personal data protection to the extent the content contains personal information as defined by those laws).

In consideration for Match allowing you to use our Services, you agree that we, our affiliates, and our third-party partners may place advertising on our Services. By submitting suggestions or feedback to Match regarding our Services, you agree that Match may use and share such feedback for any purpose without compensating you.

You agree that Match may access, preserve, and disclose your account information, including Your Content, if required to do so by law or upon a good faith belief that such access, preservation, or disclosure is reasonably necessary to: (i) comply with legal process; (ii) enforce these Terms; (iii) respond to claims that any content violates the rights of third parties; (iv) respond to your requests for customer service; or (v) protect the rights, property or personal safety of the Company or any other person.

## 8. PURCHASES AND AUTOMATICALLY RENEWING SUBSCRIPTIONS

*You will have the opportunity to purchase products and services from Match. If you purchase a subscription, it will automatically renew—and you will be charged—until you cancel.*

Match may offer products and services for purchase through iTunes, Google Play or other external services authorized by Match (each, an "External Service," and any purchases made thereon, an "External Service Purchase"). Match may also offer products and services for purchase via credit card or other payment processors on the Website or inside the App ("Internal Purchases"). If you purchase a subscription, it will automatically renew until you cancel, in accordance with the terms disclosed to you at the time of purchase, as further described below. If you cancel your subscription, you will continue to have access to your subscription benefits until the end of your subscription period, at which point it will expire.

Because our Services may be utilized without a subscription, canceling your subscription does not remove your profile from our Services. If you wish to fully terminate your membership, you must terminate your membership as set forth in Section 9.

4814-4121-3910.2

## 8a. EXTERNAL SERVICE PURCHASES AND SUBSCRIPTIONS

*External Service Purchases, including subscriptions, may be processed through the External Service, in which case those purchases must be managed through your External Service Account. Subscriptions automatically renew until you cancel.*

When making a purchase on the Service, you may have the option to pay through an External Service, such as with your Apple ID or Google account ("your External Service Account"), and your External Service Account will be charged for the purchase in accordance with the terms disclosed to you at the time of purchase and the general terms applicable to your External Service Account. Some External Services may charge you sales tax, depending on where you live, which may change from time to time.

If your External Service Purchase includes an automatically renewing subscription, your External Service Account will continue to be periodically charged for the subscription until you cancel. After your initial subscription commitment period, and again after any subsequent subscription period, the subscription will automatically continue for the price and time period you agreed to when subscribing.

To cancel a subscription: If you do not want your subscription to renew automatically, or if you want to change or terminate your subscription, you must log in to your External Service Account and follow instructions to manage or cancel your subscription, even if you have otherwise deleted your account with us or if you have deleted the App from your device. For example, if you subscribed using your Apple ID, cancellation is handled by Apple, not Match. To cancel a purchase made with your Apple ID, go to Settings > iTunes & App Stores > [click on your Apple ID] > View Apple ID > Subscriptions, then find your Match subscription and follow the instructions to cancel. You can also request assistance at https://getsupport.apple.com. Similarly, if you subscribed on Google Play, cancellation is handled by Google. To cancel a purchase made through Google Play, launch the Google Play app on your mobile device and go to Menu > My Apps > Subscriptions, then find your Match subscription and follow the instructions to cancel. You can also request assistance at https://play.google.com. If you cancel a subscription, you may continue to use the cancelled service until the end of your then-current subscription term. The subscription will not be renewed when your then-current term expires.

If you initiate a chargeback or otherwise reverse a payment made with your External Service Account, Match may terminate your account immediately in its sole discretion, on the basis that you have determined that you do not want a Match subscription. In the event that your chargeback or other payment reversal is overturned, please contact Customer Care. Match will retain all funds charged to your External Service Account until you cancel your subscription through your External Service Account. Certain users may be entitled to request a refund. See Section 8d below for more information.

## 8b. INTERNAL PURCHASES AND SUBSCRIPTIONS

*Internal Purchases, including subscriptions, are processed using the Payment Method you provide on the Website or App. Subscriptions automatically renew until you cancel.*

If you make an Internal Purchase, you agree to pay the prices displayed to you for the Services you've selected as well as any sales or similar taxes that may be imposed on your payments (and as may change from time to time), and you authorize Match to charge the payment method you provide (your "Payment Method"). Match may correct any billing errors or mistakes even if we have already requested or received payment. If you initiate a chargeback or otherwise reverse a payment made with your Payment Method, Match may terminate your account immediately in its sole discretion, on the basis that you have determined that you do not want a Match subscription. In the event that your chargeback or other payment reversal is overturned, please contact Customer Care.

If your Internal Purchase includes an automatically renewing subscription, your Payment Method will continue to be periodically charged for the subscription until you cancel. After your initial subscription commitment period, and again after any subsequent subscription period, your subscription will automatically continue for the price and time period you agreed to when subscribing, until you cancel.

MATCHFTC774658

To cancel a subscription, log in to the Website and go to the Settings tool. If you cancel a subscription, you may continue to use the cancelled service until the end of your then-current subscription term. The subscription will not be renewed when your then-current term expires.

You may edit your Payment Method information by using the Settings tool. If a payment is not successfully processed, due to expiration, insufficient funds, or otherwise, you remain responsible for any uncollected amounts and authorize us to continue billing the Payment Method, as it may be updated. This may result in a change to your payment billing dates.

In addition, you authorize us to obtain updated or replacement expiration dates and card numbers for your credit or debit card as provided by your credit or debit card issuer. The terms of your payment will be based on your Payment Method and may be determined by agreements between you and the financial institution, credit card issuer, or other provider of your chosen Payment Method. Certain users may be entitled to request a refund. See Section 8d below for more information.

## 8c. VIRTUAL ITEMS

*Virtual items are non-refundable and subject to certain conditions.*

From time to time, you may have the opportunity purchase a limited, personal, non-transferable, non-sublicensable, revocable license to use or access special limited-use features such as "Boost" ("Virtual Item(s)") from Match. You may only purchase Virtual Items from us or our authorized partners through our Services. Virtual Items represent a limited license right governed by this Agreement, and, except as otherwise prohibited by applicable law, no title or ownership in or to Virtual Items is being transferred or assigned to you. This Agreement should not be construed as a sale of any rights in Virtual Items.

Any Virtual Item balance shown in your account does not constitute a real-world balance or reflect any stored value, but instead constitutes a measurement of the extent of your license. Virtual Items do not incur fees for non-use; however, the license granted to you in Virtual Items will terminate in accordance with the terms of this Agreement, on the earlier of when Match ceases providing our Services, or your account is otherwise closed or terminated.

Match, in its sole discretion, reserves the right to charge fees for the right to access or use Virtual Items and/or may distribute Virtual Items with or without charge. Match may manage, regulate, control, modify, or eliminate Virtual Items at any time, including taking actions that may impact the perceived value or purchase price, if applicable, of any Virtual Items. Match shall have no liability to you or any third party in the event that Match exercises any such rights. The transfer of Virtual Items is prohibited, and you shall not sell, redeem, or otherwise transfer Virtual Items to any person or entity. Virtual Items may only be redeemed through our Services.

ALL PURCHASES AND REDEMPTIONS OF VIRTUAL ITEMS MADE THROUGH OUR SERVICES ARE FINAL AND NON-REFUNDABLE. YOU ACKNOWLEDGE THAT MATCH IS NOT REQUIRED TO PROVIDE A REFUND FOR ANY REASON, AND THAT YOU WILL NOT RECEIVE MONEY OR OTHER COMPENSATION FOR UNUSED VIRTUAL ITEMS WHEN AN ACCOUNT IS CLOSED, WHETHER SUCH CLOSURE WAS VOLUNTARY OR INVOLUNTARY.

## 8d. REFUNDS

*Generally, all purchases are nonrefundable. Special terms apply in Arizona, California, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio, Rhode Island, and Wisconsin.*

Generally, all purchases are final and nonrefundable, and there are no refunds or credits for partially used periods, except if the laws applicable in your jurisdiction provide for refunds.

For subscribers residing in Arizona, California, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio, Rhode Island, and Wisconsin:

4814-4121-3910.2

MATCHFTC774659

**Your Right to Cancel—You may cancel your subscription, without penalty or obligation, at any time prior to midnight of the third business day following the date you subscribed.** In the event that you die before the end of your subscription period, your estate shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your death. In the event that you become disabled (such that you are unable to use our Services) before the end of your subscription period, you shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your disability by providing the company notice in the same manner as you request a refund as described below.

Purchases of Virtual Items are FINAL AND NON-REFUNDABLE.

If any of the above apply to you and you subscribed using your Apple ID, your refund requests are handled by Apple, not Match. To request a refund, please contact your External Service directly; for example using your Apple device, go to Settings > iTunes & App Stores > [click on your Apple ID] > View Apple ID > Purchase History. Find the transaction and select "Report a Problem." You can also request a refund at https://getsupport.apple.com. For any other purchase, please contact Match Customer Service with your order number (see your confirmation email) by mailing or delivering a signed and dated notice which states that you, the buyer, are canceling this agreement, or words of similar effect. Please also include the email address or telephone number associated with your account along with your order number. This notice shall be sent to: Match, Attn: Cancellations, P.O. Box 25472, Dallas, Texas 75225, USA (California and Ohio users may also email us by clicking here or send a facsimile to 214-853-4309).

## 8e. INSTALLMENT PLAN CONDITIONS

*If you agree to make a purchase pursuant to the installment plan option, your purchase will be subject to these additional terms and conditions, including around eligibility, payment, and cancellation.*

By selecting the option to pay in four payments and clicking subscribe, in addition to the terms set forth above, you agree to the following additional terms that will govern your installment plan purchase:

1. *Eligibility.* To be eligible, you must be a Match member in good standing residing in the United States of America. This offer may not be available to every customer and may not be available for all Services Match offers. Match will not use a consumer credit report to determine your eligibility for this Agreement.

2. *Payment.* You authorize Match to charge the Payment Method selected on a periodic basis (as determined when you register). You will be charged the full price of the qualifying product you selected spread equally over one initial payment due at the time of purchase and three subsequent payments (provided, however, that if the full price is not evenly divisible by four, your final payment amount may be smaller).The three subsequent payments will be charged in the increments you selected as part of your subscription plan purchase. No interest or finance charges apply to this installment plan purchase. Any interest, finance charges or fees assessed by the issuer of your Payment Method may still apply. You are personally responsible for any applicable state, federal or other taxes that may be associated with your purchase of Services unless noted otherwise.

   You can choose to prepay your next schedule payment or the full remaining balance at any time by contacting Customer Care.

3. *Match's right to Terminate.* If Match is not able to charge any payment to your Payment Method, Match reserves the right to pursue any remedy that is available to it, including the right to suspend or terminate your Match subscription and/or Match account. You agree that Match and its affiliates have no liability related to the exercise of these remedies.

4. *Cancellation Policy.* Except as otherwise set forth herein, your subscription purchased through your installment plan will continue until terminated, cancelled, or not renewed by you or Match, as further described in this Agreement. If not terminated, cancelled, or not renewed, your Membership will continue to renew with installment payments, until you cancel or change your payment options, via your Account Settings. If you cancel a subscription, you may continue to use the cancelled service until the end of your then-current subscription term. The subscription will not be renewed when your then-current term expires. If you cancel your subscription prior to completing all payments due, unless otherwise required by applicable law, the remaining balance of the subscription will remain due and payable pursuant to the installment payment schedule you agreed to.

MATCHFTC774660

## 9. ACCOUNT TERMINATION

*If you no longer wish to use our Services, or if we terminate your account for any reason, here's what you need to know.*

You can delete your account at any time by logging into the Website, going to "Settings" (the gear/pencil icon in the top right corner), and following the instructions to cancel your membership. **However, you will need to cancel / manage any External Service Purchases through your External Service Account (e.g., iTunes, Google Play) to avoid additional billing.**

Match reserves the right to investigate and, if appropriate, suspend or terminate your account without a refund if you have violated these Terms, misused our Services, or behaved in a way that Match regards as inappropriate or unlawful, on or off our Services. We reserve the right to make use of any personal, technological, legal, or other means available to enforce the Terms, at any time without liability and without the obligation to give you prior notice, including, but not limited to, preventing you from accessing the Services.

If your account is terminated by you or by Match for any reason, these Terms continue and remain enforceable between you and Match, and you will not be entitled to any refund for purchases made. Your information will be maintained and deleted in accordance with our Privacy Policy.

## 10. NO CRIMINAL BACKGROUND OR IDENTITY VERIFICATION CHECKS

*Match does not conduct criminal background or identity verification checks on its users. Use your best judgment when interacting with others and check out our Safety Tips.*

YOU UNDERSTAND THAT MATCH DOES NOT CONDUCT CRIMINAL BACKGROUND OR IDENTITY VERIFICATION CHECKS ON ITS USERS OR OTHERWISE INQUIRE INTO THE BACKGROUND OF ITS USERS. MATCH MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE CONDUCT, IDENTITY, INTENTIONS, LEGITIMACY, OR VERACITY OF USERS. MATCH RESERVES THE RIGHT TO CONDUCT—AND YOU AUTHORIZE MATCH TO CONDUCT—ANY CRIMINAL BACKGROUND CHECK OR OTHER SCREENINGS (SUCH AS SEX OFFENDER REGISTER SEARCHES) AT ANY TIME USING AVAILABLE PUBLIC RECORDS, AND YOU AGREE THAT ANY INFORMATION YOU PROVIDE MAY BE USED FOR THAT PURPOSE. IF THE COMPANY DECIDES TO CONDUCT ANY SCREENING THROUGH A CONSUMER REPORTING AGENCY, YOU HEREBY AUTHORIZE THE COMPANY TO OBTAIN AND USE A CONSUMER REPORT ABOUT YOU TO DETERMINE YOUR ELIGIBILITY UNDER THESE TERMS.

YOU ARE SOLELY RESPONSIBLE FOR YOUR INTERACTIONS WITH OTHER USERS. SEX OFFENDER SCREENINGS AND OTHER TOOLS DO NOT GUARANTEE YOUR SAFETY AND ARE NOT A SUBSTITUTE FOR FOLLOWING THE SAFETY TIPS AND OTHER SENSIBLE SAFETY PRECAUTIONS. ALWAYS USE YOUR BEST JUDGMENT AND TAKE APPROPRIATE SAFETY PRECAUTIONS WHEN COMMUNICATING WITH OR MEETING NEW PEOPLE. COMMUNICATIONS RECEIVED THROUGH THE SERVICE, INCLUDING AUTOMATIC NOTIFICATIONS SENT BY MATCH, MAY RESULT FROM USERS ENGAGING WITH THE SERVICE FOR IMPROPER PURPOSES, INCLUDING FRAUD, ABUSE, HARASSMENT, OR OTHER SUCH IMPROPER BEHAVIOR.

Though Match strives to encourage a respectful user experience, it is not responsible for the conduct of any user on or off the Service. You agree to use caution in all interactions with other users, particularly if you decide to communicate off the Service or meet in person.

## 11. DISCLAIMER

*Match's Services are provided "as is" and we do not make, and cannot make, any representations about the content or features of our Services.*

MATCH PROVIDES OUR SERVICES ON AN "AS IS" AND "AS AVAILABLE" BASIS AND TO THE EXTENT PERMITTED BY APPLICABLE LAW, GRANTS NO WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED,

STATUTORY OR OTHERWISE WITH RESPECT TO OUR SERVICES (INCLUDING ALL CONTENT CONTAINED THEREIN), INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF SATISFACTORY QUALITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. MATCH DOES NOT REPRESENT OR WARRANT THAT (A) OUR SERVICES WILL BE UNINTERRUPTED, SECURE, OR ERROR FREE, (B) ANY DEFECTS OR ERRORS IN OUR SERVICES WILL BE CORRECTED, OR (C) THAT ANY CONTENT OR INFORMATION YOU OBTAIN ON OR THROUGH OUR SERVICES WILL BE ACCURATE. FURTHERMORE, MATCH MAKES NO GUARANTEES AS TO THE NUMBER OF ACTIVE USERS AT ANY TIME; USERS' ABILITY OR DESIRE TO COMMUNICATE WITH OR MEET YOU, OR THE ULTIMATE COMPATIBILITY WITH OR CONDUCT BY USERS YOU MEET THROUGH THE SERVICES.

MATCH TAKES NO RESPONSIBILITY FOR ANY CONTENT THAT YOU OR ANOTHER USER OR THIRD PARTY POSTS, SENDS, OR RECEIVES THROUGH OUR SERVICES NOR DOES MATCH TAKE ANY RESPONSIBILITY FOR THE IDENTITY, INTENTIONS, LEGITIMACY, OR VERACITY OF ANY USERS WITH WHOM YOU MAY COMMUNICATION THROUGH MATCH. ANY MATERIAL DOWNLOADED OR OTHERWISE OBTAINED THROUGH THE USE OF OUR SERVICES IS ACCESSED AT YOUR OWN DISCRETION AND RISK. MATCH IS NOT RESPONSIBLE FOR ANY DAMAGE TO YOUR COMPUTER HARDWARE, COMPUTER SOFTWARE, OR OTHER EQUIPMENT OR TECHNOLOGY INCLUDING, BUT WITHOUT LIMITATION, DAMAGE FROM ANY SECURITY BREACH OR FROM ANY VIRUS, BUGS, TAMPERING, FRAUD, ERROR, OMISSION, INTERRUPTION, DEFECT, DELAY IN OPERATION OR TRANSMISSION, COMPUTER LINE OR NETWORK FAILURE, OR ANY OTHER TECHNICAL OR OTHER MALFUNCTION.

## 12. DIGITAL MILLENNIUM COPYRIGHT ACT

*We take copyright infringement very seriously. We ask you to help us to ensure we address it promptly and effectively.*

Match has adopted the following policy towards copyright infringement in accordance with the Digital Millennium Copyright Act (the "DMCA"). If you believe any Member Content or Our Content infringes upon your intellectual property rights, please submit a notification alleging such infringement ("DMCA Takedown Notice") including the following:

1. A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;

2. Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works;

3. Identification of the material claimed to be infringing or to be the subject of infringing activity and that is to be removed or access disabled and information reasonably sufficient to permit the service provider to locate the material;

4. Information reasonably sufficient to permit the service provider to contact you, such as an address, telephone number, and, if available, an electronic mail;

5. A statement that you have a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law; and

6. A statement that, under penalty of perjury, the information in the notification is accurate and you are authorized to act on behalf of the owner of the exclusive right that is allegedly infringed.

Any DMCA Takedown Notices should be sent to copyright@match.com, by phone to 214-576-3272 or via mail to the following address: Copyright Compliance Department c/o Match Group Legal, 8750 N. Central Expressway, Dallas, Texas 75231.

Match will terminate the accounts of repeat infringers.

## 13. ADS AND THIRD-PARTY CONTENT

*Like many subscription-based services, there are ads on our websites.*

4814-4121-3910.2

MATCHFTC774662

Our Services may contain advertisements and promotions offered by third parties and links to other websites or resources. Match may also provide non-commercial links or references to third parties within its content. Match is not responsible for the availability (or lack of availability) of any external websites or resources or their content. Furthermore, Match is not responsible for, and does not endorse, any products or services that may be offered by third-party websites or resources. If you choose to interact with the third parties made available through our Services, such party's terms will govern their relationship with you. Match is not responsible or liable for such third parties' terms or actions.

## 14. LIMITATION OF LIABILITY.

*Match's liability is limited to the maximum extent by applicable law.*

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL MATCH, ITS AFFILIATES, EMPLOYEES, LICENSORS, OR SERVICE PROVIDERS BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM: (I) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES, (II) THE CONDUCT OR CONTENT OF OTHER USERS OR THIRD PARTIES ON, THROUGH, OR FOLLOWING USE OF THE SERVICES; OR (III) UNAUTHORIZED ACCESS, USE, OR ALTERATION OF YOUR CONTENT, EVEN IF MATCH HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL MATCH'S AGGREGATE LIABILITY TO YOU FOR ALL CLAIMS RELATING TO THE SERVICES EXCEED THE AMOUNT PAID, IF ANY, BY YOU TO MATCH FOR THE SERVICES WHILE YOU HAVE AN ACCOUNT.

THE LIMITATION OF LIABILITY PROVISIONS SET FORTH IN THIS SECTION 14 SHALL APPLY EVEN IF YOUR REMEDIES UNDER THIS AGREEMENT FAIL WITH RESPECT TO THEIR ESSENTIAL PURPOSE.

SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES, SO SOME OR ALL OF THE EXCLUSIONS AND LIMITATIONS IN THIS SECTION MAY NOT APPLY TO YOU.

## 15. DISPUTE RESOLUTION

*In the unlikely event that we have a legal dispute, here is what you need to know.*

If you are dissatisfied with our Services for any reason, please contact Match Customer Service first so that we can try to resolve your concerns without the need of outside assistance. If you choose to pursue a claim against Match, these terms will apply.

### 15a. ARBITRATION, CLASS-ACTION WAIVER, AND JURY WAIVER

*If you pursue a legal claim against Match, you agree to arbitration (with limited exceptions).*

1. The exclusive means of resolving any dispute or claim arising out of or relating to this Agreement (including any alleged breach thereof) or our Services shall be BINDING ARBITRATION administered by JAMS under the JAMS Streamlined Arbitration Rules & Procedures, except as modified by our Arbitration Procedures. The one exception to the exclusivity of arbitration is that either party has the right to bring an individual claim against the other in a small-claims court of competent jurisdiction, or, if filed in arbitration, the responding party may request that the dispute proceed in small claims court if the party's claim is within the jurisdiction of the small claims court. If the responding party requests to proceed in small claims court before the appointment of the arbitrator, the arbitration shall be administratively closed, and if requested after the appointment of the arbitrator, the arbitrator shall determine if the dispute should be decided in arbitration or if the arbitration should be administratively closed and decided in small claims court. Whether you choose arbitration or small-claims court, you may not under any circumstances commence or maintain against the Company any class action, class arbitration, or other representative action or proceeding.

4814-4121-3910.2

2. By using our Services in any manner, you agree to the above arbitration agreement. In doing so, YOU GIVE UP YOUR RIGHT TO GO TO COURT to assert or defend any claims between you and the Company (except for matters that may be taken to small-claims court). YOU ALSO GIVE UP YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION OR OTHER CLASS PROCEEDING. Your rights will be determined by a NEUTRAL ARBITRATOR, NOT A JUDGE OR JURY, and the arbitrator shall determine all issues regarding the arbitrability of the dispute. You are entitled to a fair hearing before the arbitrator. The arbitrator can grant any relief that a court can, but you should note that arbitration proceedings are usually simpler and more streamlined than trials and other judicial proceedings. Decisions by the arbitrator are enforceable in court and may be overturned by a court only for very limited reasons. For details on the arbitration process, see our Arbitration Procedures.

3. Any proceeding to enforce this arbitration agreement, including any proceeding to confirm, modify, or vacate an arbitration award, may be commenced in any court of competent jurisdiction. In the event that this arbitration agreement is for any reason held to be unenforceable, any litigation against the Company (except for small-claims court actions) may be commenced only in the federal or state courts located in Dallas County, Texas. You hereby irrevocably consent to the jurisdiction of those courts for such purposes.

## 15b. GOVERNING LAW

*Texas law and the Federal Arbitration Act will apply if there is a dispute (except where prohibited by law).*

Except where our arbitration agreement is prohibited by law, the laws of Texas, U.S.A., excluding Texas's conflict of laws rules, will apply to any disputes arising out of or relating to this Agreement or our Services. Notwithstanding the foregoing, the Arbitration Agreement in Section 15a above shall be governed by the Federal Arbitration Act. For the avoidance of doubt, the choice of Texas governing law shall not supersede any mandatory consumer protection legislation in such jurisdictions.

## 15c. VENUE

*Any claims that are not submitted to arbitration for any reason must be litigated in Dallas County, Texas (except for claims brought in small claims court, or where prohibited by law).*

Except for claims that may be properly brought in a small claims court of competent jurisdiction in the county or other jurisdiction in which you reside or in Dallas County, Texas, all claims arising out of or relating to this Agreement, to our Services, or to your relationship with Match that for whatever reason are not submitted to arbitration will be litigated exclusively in the federal or state courts of Dallas County, Texas, U.S.A. You and Match consent to the exercise of personal jurisdiction of courts in the State of Texas and waive any claim that such courts constitute an inconvenient forum.

## 16. INDEMNITY BY YOU

*You agree to indemnify Match if a claim is made against Match due to your actions.*

You agree, to the extent permitted under applicable law, to indemnify, defend, and hold harmless Match, our affiliates, and their and our respective officers, directors, agents, and employees from and against any and all complaints, demands, claims, damages, losses, costs, liabilities, and expenses, including attorney's fees, due to, arising out of, or relating in any way to your access to or use of our Services, Your Content, Your conduct toward other users, or your breach of this Agreement.

## 17. ACCEPTANCE OF TERMS

*By using our Services, you accept the Terms of this Agreement.*

By using our Services, whether through a mobile device, mobile application, or computer, you agree to be bound by (i) these Terms, which we may amend from time to time, (ii) our Privacy Policy and Cookie Policy, and (iii) any

Additional Terms Upon Purchase. If you do not accept and agree to be bound by all of the terms of this Agreement, please do not use our Services.

The section headings and summaries contained herein are inserted for convenience only and shall not be considered in interpreting any term or provision hereof. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the entities or persons referred to any require. Any word both capitalized and uncapitalized will be deemed to have the same meaning.

## 18. ENTIRE AGREEMENT

*This Agreement supersedes any previous agreements or representations.*

These Terms, with the Privacy Policy, Cookie Policy, and any Additional Terms Upon Purchase, contain the entire agreement between you and Match regarding the use of our Services. The Terms supersede all previous agreements, representations, and arrangements between us, written or oral. If any provision of these Terms is held invalid, illegal, or otherwise unenforceable, the remainder of the Terms shall continue in full force and effect. The failure of the Company to exercise or enforce any right or provision of these Terms shall not constitute a waiver of such right or provision. You agree that your Match account is non-transferable and all of your rights to your account and its content terminate upon your death, unless otherwise provided by law. Any rights and licenses granted hereunder, may not be transferred or assigned by you, but may be assigned by us without restriction. No agency, partnership, joint venture, fiduciary or other special relationship or employment is created as a result of these Terms, and you may not make any representations on behalf of or bind Match in any manner.

## 19. SPECIAL STATE TERMS

*Special terms apply in Arizona, California, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio, Rhode Island, Wisconsin*

For subscribers residing in New York:

* The Services do not guarantee any number of "referrals"—rather, the functionality of the Services is such that the subscriber can view as many profiles as he/she would like;

* Upon notice in writing and delivered to Match Group Legal, P.O. Box 25472, Dallas, Texas 75225, USA, subscribers may place their subscription on hold for up to one year;

* How your information is used and how you may access your information is set forth in our Privacy Policy;

* You may review the New York Dating Service Consumer Bill of Rights here;

For subscribers residing in North Carolina:

* You may review the North Carolina Buyer's Rights here.

For subscribers residing in Illinois, New York, North Carolina, and Ohio :

* Our Services are widely available in the United States—if you believe that you have moved outside a location where we provide the Services, please contact us in writing delivered to Match Group Legal, P.O. Box 25472, Dallas, Texas 75225, USA. and we will work with you to provide alternative services or a refund.

For subscribers residing in Arizona, California, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio, Rhode Island, and Wisconsin:

MATCHFTC774665

**Your Right to Cancel—You may cancel your subscription, without penalty or obligation, at any time prior to midnight of the third business day following the date you subscribed.** In the event that you die before the end of your subscription period, your estate shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your death. In the event that you become disabled (such that you are unable to use our Services) before the end of your subscription period, you shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your disability by providing the company notice in the same manner as you request a refund as described above in Section 8.

**APP 350**

MATCHFTC774666

# EXHIBIT 3

## Match.com Terms of Use Agreement

*Effective on 2019-11-12*

California subscribers: You may cancel your subscription, without penalty or obligation, at any time prior to midnight of the third business day following the date you subscribed. If you subscribed using an External Service (e.g., Apple ID, Google Play), you must cancel through your External Service, as set forth in more detail in Section 8a. If you subscribed through your Apple ID, refunds are handled by Apple/Google, not Match. You can request a refund from Apple through your Apple ID account on your phone or at https://getsupport.apple.com. All other users may request a refund by contacting Match Customer Service at by clicking here, or by mailing or delivering a signed and dated notice that states that you, the buyer, are canceling this agreement, or words of similar effect. Please also include your name and the email address, phone number, or other unique identifier you used to sign up for your account. This notice shall be sent to: Match, Attn: Cancellations, P.O. Box 25472, Dallas, Texas 75225, USA. The Company's business is conducted, in part, at 8750 N. Central Expressway, Suite 1400, Dallas, TX 75205. You may have these terms of use e-mailed to you by sending a letter to Terms Inquiries, P.O. Box 25472, Dallas, Texas 75225, USA. In accordance with Cal. Civ. Code §1789.3, you may report complaints to the Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs by contacting them in writing at Consumer Information Division, 1625 North Market Blvd., Suite N112 Sacramento, CA 95834, or by telephone at (800) 952-5210.

*We have included brief summaries at the beginning of each section to make it easier for you to read and understand this agreement. The summaries do not replace the text of each section, and you should still read each section in its entirety.*

## 1. INTRODUCTION

*By accessing or using Match's services, you agree to be bound by these terms, including our Privacy and Cookie Policies, so it is important that you read this agreement carefully before you create an account. We may update the terms from time to time, so you should check this page regularly for updates.*

Welcome to Match, operated by Match Group, LLC, in the case of users originating from within the United States and Canada, and Match.com Global Services Limited, in the case of users originating from outside of the United States and Canada. As used in this Agreement, the terms "Match," "us," "we," the "Company", and "our" shall refer to Match Group, LLC and/or Match.com Global Services Limited, as appropriate.

By accessing or using our Services on match.com (the "Website"), the Match mobile application (the "App"), or any other platforms or services Match may offer (collectively, the "Service" or our "Services"), you agree to, and are bound by, these Terms of Use (the "Terms" or "Agreement"). This Agreement applies to anyone who accesses or uses our Services, regardless of registration or subscription status.

Your use of our Services is also subject to the Privacy Policy, Cookie Policy, and any terms disclosed and agreed to by you when you purchase additional features, products, or services from Match ("Additional Terms Upon Purchase"), which are incorporated into this Agreement by reference. If you do not wish to be bound by this Agreement, do not use our Services.

We reserve the right to modify, amend, or change the Terms at any time. Notice of any material change will be posted on this page with an updated effective date. In certain circumstances, we may notify you of a change to the Terms via email or other means, as appropriate under the circumstances; however, you are responsible for regularly checking this page for notice of any changes. We agree that future changes will not be retroactive without your consent. Your continued use of our Services constitutes your acceptance of any change, and you will be legally bound by the updated Terms. If you do not accept a change to the terms, you should stop using our Services immediately.

## 2. ACCOUNT ELIGIBILITY; YOUR RESPONSIBILITIES

MATCHFTC774600

*Before you create an account on Match, make sure you are eligible to use our Services. This Section also details what you can and can't do when using the Services, as well as the rights you grant Match.*

**By using our Services, you represent and warrant that:**

1. You are at least 18 years old;

2. You are legally qualified to enter a binding contract with Match;

3. You are single or separated from your spouse;

4. You are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country;

5. You are not on any list of individuals prohibited from conducting business with the United States;

6. You are not prohibited by law from using our services;

7. You have not have been convicted of or pled no contest to a felony or indictable offense (or crime of similar severity), a sex crime, or any crime involving violence;

8. You are not required to register as a sex offender with any state, federal or local sex offender registry;

9. You do not have more than one account on our Services; and

10. You have not previously been removed from our Services by us, unless you have our express written permission to create a new account.

If at any time you cease to meet these requirements, you must immediately delete your account.

**You agree to:**

- Comply with these Terms, and check this page from time to time to ensure you are aware of any change;

- Comply with all applicable laws, including without limitation, privacy laws, intellectual property laws, anti-spam laws, and regulatory requirements;

- Use the latest version of the Website and/or App;

- Treat other users in a courteous and respectful manner, both on and off our Services;

- Be respectful when communicating with any of our customer care representatives or other employees;

- Review the Safety Tips;

- Maintain a strong password and take reasonable measures to protect the security of your login information.

**You agree that you will not:**

- Misrepresent your identity, age, current or previous positions, qualifications, or affiliations with a person or entity;

- Use the Services in a way that damages the Services or prevents their use by other users;

- Use our Services in a way to interfere with, disrupt or negatively affect the platform, the servers, or our Services' networks;

- Use our Services for any harmful, illegal, or nefarious purpose;

- Harass, bully, stalk, intimidate, assault, defame, harm or otherwise mistreat any person;

MATCHFTC774601

- Post or share Prohibited Content (see below);

- Solicit passwords for any purpose, personal identifying information for commercial or unlawful purposes from other users or disseminate another person's personal information without his or her permission;

- Solicit money or other items of value from another user, whether as a gift, loan, or form of compensation;

- Use another user's account;

- Use our Services in relation to fraud, a pyramid scheme, or other similar practice; or

- Violate the terms of the license granted to you by Match (see Section 6 below).

- Disclose private or proprietary information that you do not have the right to disclose;

- Copy, modify, transmit, distribute, or create any derivative works from, any Member Content or Our Content, or any copyrighted material, images, trademarks, trade names, service marks, or other intellectual property, content or proprietary information accessible through our Services without Match's prior written consent;

- Express or imply that any statements you make are endorsed by Match;

- Use any robot, crawler, site search/retrieval application, proxy or other manual or automatic device, method or process to access, retrieve, index, "data mine," or in any way reproduce or circumvent the navigational structure or presentation of our Services or its contents;

- Upload viruses or other malicious code or otherwise compromise the security of our Services;

- Forge headers or otherwise manipulate identifiers to disguise the origin of any information transmitted to or through our Services;

- "Frame" or "mirror" any part of our Services without Match's prior written authorization;

- Use meta tags or code or other devices containing any reference to Match or the platform (or any trademark, trade name, service mark, logo or slogan of Match) to direct any person to any other website for any purpose;

- Modify, adapt, sublicense, translate, sell, reverse engineer, decipher, decompile or otherwise disassemble any portion of our Services, or cause others to do so;

- Use or develop any third-party applications that interact with our Services or Member Content or information without our written consent;

- Use, access, or publish the Match application programming interface without our written consent;

- Probe, scan or test the vulnerability of our Services or any system or network; or

- Encourage, promote, or agree to engage in any activity that violates these Terms.

**Prohibited Content—Match prohibits uploading or sharing content that:**

- Is likely to be deemed offensive or to harass, upset, embarrass, alarm or annoy any other person;

- Is obscene, pornographic, violent or otherwise may offend human dignity, or contains nudity;

- Is abusive, insulting or threatening, discriminatory or that promotes or encourages racism, sexism, hatred or bigotry;

- Encourages or facilitates any illegal activity including, without limitation, terrorism, inciting racial hatred or the submission of which in itself constitutes committing a criminal offense;

- Is defamatory, libelous, or untrue;

MATCHFTC774602

- Relates to commercial activities (including, without limitation, sales, competitions, promotions, and advertising, solicitation for services, "sugar daddy" or "sugar baby" relationships, links to other websites or premium line telephone numbers);

- Involves the transmission of "junk" mail or "spam";

- Contains any spyware, adware, viruses, corrupt files, worm programs or other malicious code designed to interrupt, damage or limit the functionality of or disrupt any software, hardware, telecommunications, networks, servers or other equipment, Trojan horse or any other material designed to damage, interfere with, wrongly intercept or expropriate any data or personal information whether from Match or otherwise;

- Infringes upon any third party's rights (including, without limitation, intellectual property rights and privacy rights);

- Was not written by you or was automatically generated, unless expressly authorized by Match;

- Includes the image or likeness of another person without that person's consent (or in the case of a minor, the minor's parent or guardian), or is an image or likeness or a minor unaccompanied by the minor's parent or guardian;

- Is inconsistent with the intended use of the Services; or

- May harm the reputation of Match or its affiliates.

The uploading or sharing of content that violates these terms ("Prohibited Content") may result in the immediate suspension or termination of your account.

## 3. CONTENT

***It is important that you understand your rights and responsibilities with regard to the content on our Services, including any content you provide or post. You are expressly prohibited from posting inappropriate content.***

While using our Services, you will have access to: (i) content that you upload or provide while using our Services ("Your Content"); (ii) content that other users upload or provide while using our Services ("Member Content"); and (iii) content that Match provides on and through our Services ("Our Content"). In this agreement, "content" includes, without limitation, all text, images, video, audio, or other material on our Services, including information on users' profiles and in direct messages between users.

## 3a. YOUR CONTENT

***You are responsible for Your Content. Don't share anything that you wouldn't want others to see, that would violate this Agreement, or that may expose you or us to legal liability.***

You are solely responsible and liable for Your Content, and, therefore, you agree to indemnify, defend, release, and hold us harmless from any claims made in connection with Your Content.

You represent and warrant to us that the information you provide to us or any other user is accurate, including any information submitted through Facebook or other third-party sources (if applicable), and that you will update your account information as necessary to ensure its accuracy.

The content included on your individual profile should be relevant to the intended use of our Services. You may not display any personal contact or banking information, whether in relation to you or any other person (for example, names, home addresses or postcodes, telephone numbers, email addresses, URLs, credit/debit card or other banking details). If you choose to reveal any personal information about yourself to other users, you do so at your own risk. We encourage you to use caution in disclosing any personal information online.

MATCHFTC774603

Your individual profile will be visible to other people around the world, so be sure that you are comfortable sharing Your Content before you post. You acknowledge and agree that Your Content may be viewed by other users, and, notwithstanding these Terms, other users may share Your Content with third parties. By uploading Your Content, you represent and warrant to us that you have all necessary rights and licenses to do so and automatically grant us a license to use Your Content as provided under Section 7 below.

You understand and agree that we may monitor or review Your Content, and we have the right to remove, delete, edit, limit, or block or prevent access to any of Your Content at any time in our sole discretion. Furthermore, you understand agree that we have no obligation to display or review Your Content.

## 3b. MEMBER CONTENT

*While you will have access to Member Content, it is not yours and you may not copy or use Member Content for any purpose except as contemplated by these Terms.*

Other users will also share content on our Services. Member Content belongs to the user who posted the content and is stored on our servers and displayed at the direction of that user.

You do not have any rights in relation to Member Content, and you may only use Member Content to the extent that your use is consistent with our Services' purpose of allowing use to communicate with and meet one another. You may not copy the Member Content or use Member Content for commercial purposes, to spam, to harass, or to make unlawful threats. We reserve the right to terminate your account if you misuse Member Content.

## 3c. OUR CONTENT

*Match owns all other content on our Services.*

Any other text, content, graphics, user interfaces, trademarks, logos, sounds, artwork, images, and other intellectual property appearing on our Services is owned, controlled or licensed by us and protected by copyright, trademark and other intellectual property law rights. All rights, title, and interest in and to Our Content remains with us at all times.

We grant you a limited license to access and use Our Content as provided under Section 6 below, and we reserve all other rights.

## 4. INAPPROPRIATE CONTENT AND MISCONDUCT; REPORTING

*Match does not tolerate inappropriate content or behavior on our Services.*

We are committed to maintaining a positive and respectful Match community, and we do not tolerate any inappropriate content or misconduct, whether on or off the Services. We encourage you to report any inappropriate Member Content or misconduct by other users. You can report a user directly through the "Report a Concern" link on a user's profile or at the bottom of every email. You may also email Match Customer Service by clicking here.

Member Content is subject to the terms and conditions of Sections 512(c) and/or 512(d) of the Digital Millennium Copyright Act 1998. To submit a complaint regarding Member Content that may constitute intellectual property infringement, see Section 12 (Digital Millennium Copyright Act) below.

## 5. PRIVACY

*Privacy is important to us. We have a separate policy about it that you should read.*

For information about how Match and its affiliates collect, use, and share your personal data, please read our Privacy Policy . By using our Services, you agree that we may use your personal data in accordance with our Privacy Policy .

MATCHFTC774604

## 6. RIGHTS YOU ARE GRANTED BY MATCH

***Match grants you the right to use and enjoy our Services, subject to these Terms.***

For as long as you comply with these Terms, Match grants you a personal, worldwide, royalty-free, non-assignable, non-exclusive, revocable, and non-sublicensable license to access and use our Services for purposes as intended by Match and permitted by these Terms and applicable laws.

## 7. RIGHTS YOU GRANT MATCH

***You own all of the content you provide to Match, but you also grant us the right to use Your Content as provided in this Agreement.***

By creating an account, you grant to Match a worldwide, perpetual, transferable, sub-licensable, royalty-free right and license to host, store, use, copy, display, reproduce, adapt, edit, publish, translate, modify, and distribute Your Content, including any information you authorize us to access from Facebook or other third-party source (if applicable), in whole or in part, and in any format or medium currently known or developed in the future. Match's license to Your Content shall be non-exclusive, except that Match's license shall be exclusive with respect to derivative works created through use of our Services. For example, Match would have an exclusive license to screenshots of our Services that include Your Content.

In addition, so that Match can prevent the use of Your Content outside of our Services, you authorize Match to act on your behalf with respect to infringing uses of Your Content taken from our Services by other users or third parties. This expressly includes the authority, but not the obligation, to send notices pursuant to 17 U.S.C. § 512(c)(3) (i.e., DMCA Takedown Notices) on your behalf if Your Content is taken and used by third parties outside of our Services. Match is not obligated to take any action with regard to use of Your Content by other users or third parties. Match's license to Your Content is subject to your rights under applicable law (for example, laws regarding personal data protection to the extent the content contains personal information as defined by those laws).

In consideration for Match allowing you to use our Services, you agree that we, our affiliates, and our third-party partners may place advertising on our Services. By submitting suggestions or feedback to Match regarding our Services, you agree that Match may use and share such feedback for any purpose without compensating you.

You agree that Match may access, preserve, and disclose your account information, including Your Content, if required to do so by law or upon a good faith belief that such access, preservation, or disclosure is reasonably necessary to: (i) comply with legal process; (ii) enforce these Terms; (iii) respond to claims that any content violates the rights of third parties; (iv) respond to your requests for customer service; or (v) protect the rights, property or personal safety of the Company or any other person.

## 8. PURCHASES AND AUTOMATICALLY RENEWING SUBSCRIPTIONS

***You will have the opportunity to purchase products and services from Match. If you purchase a subscription, it will automatically renew—and you will be charged—until you cancel.***

Match may offer products and services for purchase through iTunes, Google Play or other external services authorized by Match (each, an "External Service," and any purchases made thereon, an "External Service Purchase"). Match may also offer products and services for purchase via credit card or other payment processors on the Website or inside the App ("Internal Purchases"). If you purchase a subscription, it will automatically renew until you cancel, in accordance with the terms disclosed to you at the time of purchase, as further described below. If you cancel your subscription, you will continue to have access to your subscription benefits until the end of your subscription period, at which point it will expire.

Because our Services may be utilized without a subscription, canceling your subscription does not remove your profile from our Services. If you wish to fully terminate your membership, you must terminate your membership as set forth in Section 9.

MATCHFTC774605

## 8a. EXTERNAL SERVICE PURCHASES AND SUBSCRIPTIONS

*External Service Purchases, including subscriptions, may be processed through the External Service, in which case those purchases must be managed through your External Service Account. Subscriptions automatically renew until you cancel.*

When making a purchase on the Service, you may have the option to pay through an External Service, such as with your Apple ID or Google account ("your External Service Account"), and your External Service Account will be charged for the purchase in accordance with the terms disclosed to you at the time of purchase and the general terms applicable to your External Service Account. Some External Services may charge you sales tax, depending on where you live, which may change from time to time.

If your External Service Purchase includes an automatically renewing subscription, your External Service Account will continue to be periodically charged for the subscription until you cancel. After your initial subscription commitment period, and again after any subsequent subscription period, the subscription will automatically continue for the price and time period you agreed to when subscribing.

To cancel a subscription: If you do not want your subscription to renew automatically, or if you want to change or terminate your subscription, you must log in to your External Service Account and follow instructions to manage or cancel your subscription, even if you have otherwise deleted your account with us or if you have deleted the App from your device. For example, if you subscribed using your Apple ID, cancellation is handled by Apple, not Match. To cancel a purchase made with your Apple ID, go to Settings > iTunes & App Stores > [click on your Apple ID] > View Apple ID > Subscriptions, then find your Match subscription and follow the instructions to cancel. You can also request assistance at https://getsupport.apple.com. Similarly, if you subscribed on Google Play, cancellation is handled by Google. To cancel a purchase made through Google Play, launch the Google Play app on your mobile device and go to Menu > My Apps > Subscriptions, then find your Match subscription and follow the instructions to cancel. You can also request assistance at https://play.google.com. If you cancel a subscription, you may continue to use the cancelled service until the end of your then-current subscription term. The subscription will not be renewed when your then-current term expires.

If you initiate a chargeback or otherwise reverse a payment made with your External Service Account, Match may terminate your account immediately in its sole discretion, on the basis that you have determined that you do not want a Match subscription. In the event that your chargeback or other payment reversal is overturned, please contact Customer Care. Match will retain all funds charged to your External Service Account until you cancel your subscription through your External Service Account. Certain users may be entitled to request a refund. See Section 8d below for more information.

## 8b. INTERNAL PURCHASES AND SUBSCRIPTIONS

*Internal Purchases, including subscriptions, are processed using the Payment Method you provide on the Website or App. Subscriptions automatically renew until you cancel.*

If you make an Internal Purchase, you agree to pay the prices displayed to you for the Services you've selected as well as any sales or similar taxes that may be imposed on your payments (and as may change from time to time), and you authorize Match to charge the payment method you provide (your "Payment Method"). Match may correct any billing errors or mistakes even if we have already requested or received payment. If you initiate a chargeback or otherwise reverse a payment made with your Payment Method, Match may terminate your account immediately in its sole discretion, on the basis that you have determined that you do not want a Match subscription. In the event that your chargeback or other payment reversal is overturned, please contact Customer Care.

If your Internal Purchase includes an automatically renewing subscription, your Payment Method will continue to be periodically charged for the subscription until you cancel. After your initial subscription commitment period, and again after any subsequent subscription period, your subscription will automatically continue for the price and time period you agreed to when subscribing, until you cancel.

MATCHFTC774606

To cancel a subscription, log in to the Website and go to the Settings tool. If you cancel a subscription, you may continue to use the cancelled service until the end of your then-current subscription term. The subscription will not be renewed when your then-current term expires.

You may edit your Payment Method information by using the Settings tool. If a payment is not successfully processed, due to expiration, insufficient funds, or otherwise, you remain responsible for any uncollected amounts and authorize us to continue billing the Payment Method, as it may be updated. This may result in a change to your payment billing dates.

In addition, you authorize us to obtain updated or replacement expiration dates and card numbers for your credit or debit card as provided by your credit or debit card issuer. The terms of your payment will be based on your Payment Method and may be determined by agreements between you and the financial institution, credit card issuer, or other provider of your chosen Payment Method. Certain users may be entitled to request a refund. See Section 8d below for more information.

## 8c. VIRTUAL ITEMS

*Virtual items are non-refundable and subject to certain conditions.*

From time to time, you may have the opportunity purchase a limited, personal, non-transferable, non-sublicensable, revocable license to use or access special limited-use features such as "Boost" ("Virtual Item(s)") from Match. You may only purchase Virtual Items from us or our authorized partners through our Services. Virtual Items represent a limited license right governed by this Agreement and, except as otherwise prohibited by applicable law, no title or ownership in or to Virtual Items is being transferred or assigned to you. This Agreement should not be construed as a sale of any rights in Virtual Items.

Any Virtual Item balance shown in your account does not constitute a real-world balance or reflect any stored value, but instead constitutes a measurement of the extent of your license. Virtual Items do not incur fees for non-use; however, the license granted to you in Virtual Items will terminate in accordance with the terms of this Agreement, on the earlier of when Match ceases providing our Services, or your account is otherwise closed or terminated.

Match, in its sole discretion, reserves the right to charge fees for the right to access or use Virtual Items and/or may distribute Virtual Items with or without charge. Match may manage, regulate, control, modify, or eliminate Virtual Items at any time, including taking actions that may impact the perceived value or purchase price, if applicable, of any Virtual Items. Match shall have no liability to you or any third party in the event that Match exercises any such rights. The transfer of Virtual Items is prohibited, and you shall not sell, redeem, or otherwise transfer Virtual Items to any person or entity. Virtual Items may only be redeemed through our Services.

ALL PURCHASES AND REDEMPTIONS OF VIRTUAL ITEMS MADE THROUGH OUR SERVICES ARE FINAL AND NON-REFUNDABLE. YOU ACKNOWLEDGE THAT MATCH IS NOT REQUIRED TO PROVIDE A REFUND FOR ANY REASON, AND THAT YOU WILL NOT RECEIVE MONEY OR OTHER COMPENSATION FOR UNUSED VIRTUAL ITEMS WHEN AN ACCOUNT IS CLOSED, WHETHER SUCH CLOSURE WAS VOLUNTARY OR INVOLUNTARY.

## 8d. REFUNDS

*Generally, all purchases are nonrefundable. Special terms apply in Arizona, California, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio, Rhode Island, and Wisconsin.*

Generally, all purchases are final and nonrefundable, and there are no refunds or credits for partially used periods, except if the laws applicable in your jurisdiction provide for refunds.

For subscribers residing in Arizona, California, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio, Rhode Island, and Wisconsin:

MATCHFTC774607

**Your Right to Cancel—You may cancel your subscription, without penalty or obligation, at any time prior to midnight of the third business day following the date you subscribed.** In the event that you die before the end of your subscription period, your estate shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your death. In the event that you become disabled (such that you are unable to use our Services) before the end of your subscription period, you shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your disability by providing the company notice in the same manner as you request a refund as described below.

Purchases of Virtual Items are FINAL AND NON-REFUNDABLE.

If any of the above apply to you and you subscribed using your Apple ID, your refund requests are handled by Apple, not Match. To request a refund, please contact your External Service directly; for example using your Apple device, go to Settings > iTunes & App Stores > [click on your Apple ID] > View Apple ID > Purchase History. Find the transaction and select "Report a Problem." You can also request a refund at https://getsupport.apple.com. For any other purchase, please contact Match Customer Service with your order number (see your confirmation email) by mailing or delivering a signed and dated notice which states that you, the buyer, are canceling this agreement, or words of similar effect. Please also include the email address or telephone number associated with your account along with your order number. This notice shall be sent to: Match, Attn: Cancellations, P.O. Box 25472, Dallas, Texas 75225, USA (California and Ohio users may also email us by clicking here or send a facsimile to 214-853-4309).

## 9. ACCOUNT TERMINATION

*If you no longer wish to use our Services, or if we terminate your account for any reason, here's what you need to know.*

You can delete your account at any time by logging into the Website, going to "Settings" (the gear/pencil icon in the top right corner), and following the instructions to cancel your membership. **However, you will need to cancel / manage any External Service Purchases through your External Service Account (e.g., iTunes, Google Play) to avoid additional billing.**

Match reserves the right to investigate and, if appropriate, suspend or terminate your account without a refund if you have violated these Terms, misused our Services, or behaved in a way that Match regards as inappropriate or unlawful, on or off our Services. We reserve the right to make use of any personal, technological, legal, or other means available to enforce the Terms, at any time without liability and without the obligation to give you prior notice, including, but not limited to, preventing you from accessing the Services.

If your account is terminated by you or by Match for any reason, these Terms continue and remain enforceable between you and Match, and you will not be entitled to any refund for purchases made. Your information will be maintained and deleted in accordance with our Privacy Policy.

## 10. NO CRIMINAL BACKGROUND OR IDENTITY VERIFICATION CHECKS

*Match does not conduct criminal background or identity verification checks on its users. Use your best judgment when interacting with others and check out our Safety Tips.*

YOU UNDERSTAND THAT MATCH DOES NOT CONDUCT CRIMINAL BACKGROUND OR IDENTITY VERIFICATION CHECKS ON ITS USERS OR OTHERWISE INQUIRE INTO THE BACKGROUND OF ITS USERS. MATCH MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE CONDUCT, IDENTITY, INTENTIONS, LEGITIMACY, OR VERACITY OF USERS. MATCH RESERVES THE RIGHT TO CONDUCT—AND YOU AUTHORIZE MATCH TO CONDUCT—ANY CRIMINAL BACKGROUND CHECK OR OTHER SCREENINGS (SUCH AS SEX OFFENDER REGISTER SEARCHES) AT ANY TIME USING AVAILABLE PUBLIC RECORDS, AND YOU AGREE THAT ANY INFORMATION YOU PROVIDE MAY BE USED FOR THAT PURPOSE. IF THE COMPANY DECIDES TO CONDUCT ANY SCREENING THROUGH A CONSUMER REPORTING AGENCY, YOU HEREBY AUTHORIZE THE COMPANY TO OBTAIN AND USE A CONSUMER REPORT ABOUT YOU TO DETERMINE YOUR ELIGIBILITY UNDER THESE TERMS.

MATCHFTC774608

**YOU ARE SOLELY RESPONSIBLE FOR YOUR INTERACTIONS WITH OTHER USERS.** SEX OFFENDER SCREENINGS AND OTHER TOOLS DO NOT GUARANTEE YOUR SAFETY AND ARE NOT A SUBSTITUTE FOR FOLLOWING THE SAFETY TIPS AND OTHER SENSIBLE SAFETY PRECAUTIONS. ALWAYS USE YOUR BEST JUDGMENT AND TAKE APPROPRIATE SAFETY PRECAUTIONS WHEN COMMUNICATING WITH OR MEETING NEW PEOPLE. COMMUNICATIONS RECEIVED THROUGH THE SERVICE, INCLUDING AUTOMATIC NOTIFICATIONS SENT BY MATCH, MAY RESULT FROM USERS ENGAGING WITH THE SERVICE FOR IMPROPER PURPOSES, INCLUDING FRAUD, ABUSE, HARASSMENT, OR OTHER SUCH IMPROPER BEHAVIOR.

Though Match strives to encourage a respectful user experience, it is not responsible for the conduct of any user on or off the Service. You agree to use caution in all interactions with other users, particularly if you decide to communicate off the Service or meet in person.

## 11. DISCLAIMER

*Match's Services are provided "as is" and we do not make, and cannot make, any representations about the content or features of our Services.*

MATCH PROVIDES OUR SERVICES ON AN "AS IS" AND "AS AVAILABLE" BASIS AND TO THE EXTENT PERMITTED BY APPLICABLE LAW, GRANTS NO WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE WITH RESPECT TO OUR SERVICES (INCLUDING ALL CONTENT CONTAINED THEREIN), INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF SATISFACTORY QUALITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. MATCH DOES NOT REPRESENT OR WARRANT THAT (A) OUR SERVICES WILL BE UNINTERRUPTED, SECURE, OR ERROR FREE, (B) ANY DEFECTS OR ERRORS IN OUR SERVICES WILL BE CORRECTED, OR (C) THAT ANY CONTENT OR INFORMATION YOU OBTAIN ON OR THROUGH OUR SERVICES WILL BE ACCURATE. FURTHERMORE, MATCH MAKES NO GUARANTEES AS TO THE NUMBER OF ACTIVE USERS AT ANY TIME; USERS' ABILITY OR DESIRE TO COMMUNICATE WITH OR MEET YOU, OR THE ULTIMATE COMPATIBILITY WITH OR CONDUCT BY USERS YOU MEET THROUGH THE SERVICES.

MATCH TAKES NO RESPONSIBILITY FOR ANY CONTENT THAT YOU OR ANOTHER USER OR THIRD PARTY POSTS, SENDS, OR RECEIVES THROUGH OUR SERVICES NOR DOES MATCH TAKE ANY RESPONSIBILITY FOR THE IDENTITY, INTENTIONS, LEGITIMACY, OR VERACITY OF ANY USERS WITH WHOM YOU MAY COMMUNICATION THROUGH MATCH. ANY MATERIAL DOWNLOADED OR OTHERWISE OBTAINED THROUGH THE USE OF OUR SERVICES IS ACCESSED AT YOUR OWN DISCRETION AND RISK. MATCH IS NOT RESPONSIBLE FOR ANY DAMAGE TO YOUR COMPUTER HARDWARE, COMPUTER SOFTWARE, OR OTHER EQUIPMENT OR TECHNOLOGY INCLUDING, BUT WITHOUT LIMITATION, DAMAGE FROM ANY SECURITY BREACH OR FROM ANY VIRUS, BUGS, TAMPERING, FRAUD, ERROR, OMISSION, INTERRUPTION, DEFECT, DELAY IN OPERATION OR TRANSMISSION, COMPUTER LINE OR NETWORK FAILURE, OR ANY OTHER TECHNICAL OR OTHER MALFUNCTION.

## 12. DIGITAL MILLENNIUM COPYRIGHT ACT

*We take copyright infringement very seriously. We ask you to help us to ensure we address it promptly and effectively.*

Match has adopted the following policy towards copyright infringement in accordance with the Digital Millennium Copyright Act (the "DMCA"). If you believe any Member Content or Our Content infringes upon your intellectual property rights, please submit a notification alleging such infringement ("DMCA Takedown Notice") including the following:

1. A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;

2. Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works;

MATCHFTC774609

3. Identification of the material claimed to be infringing or to be the subject of infringing activity and that is to be removed or access disabled and information reasonably sufficient to permit the service provider to locate the material;

4. Information reasonably sufficient to permit the service provider to contact you, such as an address, telephone number, and, if available, an electronic mail;

5. A statement that you have a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law; and

6. A statement that, under penalty of perjury, the information in the notification is accurate and you are authorized to act on behalf of the owner of the exclusive right that is allegedly infringed.

Any DMCA Takedown Notices should be sent to copyright@match.com, by phone to 214-576-3272 or via mail to the following address: Copyright Compliance Department c/o Match Group Legal, 8750 N. Central Expressway, Dallas, Texas 75231.

Match will terminate the accounts of repeat infringers.

## 13. ADS AND THIRD-PARTY CONTENT

*Like many subscription-based services, there are ads on our websites.*

Our Services may contain advertisements and promotions offered by third parties and links to other websites or resources. Match may also provide non-commercial links or references to third parties within its content. Match is not responsible for the availability (or lack of availability) of any external websites or resources or their content. Furthermore, Match is not responsible for, and does not endorse, any products or services that may be offered by third-party websites or resources. If you choose to interact with the third parties made available through our Services, such party's terms will govern their relationship with you. Match is not responsible or liable for such third parties' terms or actions.

## 14. LIMITATION OF LIABILITY.

*Match's liability is limited to the maximum extent by applicable law.*

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL MATCH, ITS AFFILIATES, EMPLOYEES, LICENSORS, OR SERVICE PROVIDERS BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM: (I) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES, (II) THE CONDUCT OR CONTENT OF OTHER USERS OR THIRD PARTIES ON, THROUGH, OR FOLLOWING USE OF THE SERVICES; OR (III) UNAUTHORIZED ACCESS, USE, OR ALTERATION OF YOUR CONTENT, EVEN IF MATCH HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL MATCH'S AGGREGATE LIABILITY TO YOU FOR ALL CLAIMS RELATING TO THE SERVICES EXCEED THE AMOUNT PAID, IF ANY, BY YOU TO MATCH FOR THE SERVICES WHILE YOU HAVE AN ACCOUNT.

THE LIMITATION OF LIABILITY PROVISIONS SET FORTH IN THIS SECTION 14 SHALL APPLY EVEN IF YOUR REMEDIES UNDER THIS AGREEMENT FAIL WITH RESPECT TO THEIR ESSENTIAL PURPOSE.

SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES, SO SOME OR ALL OF THE EXCLUSIONS AND LIMITATIONS IN THIS SECTION MAY NOT APPLY TO YOU.

## 15. DISPUTE RESOLUTION

*In the unlikely event that we have a legal dispute, here is what you need to know.*

MATCHFTC774610

If you are dissatisfied with our Services for any reason, please contact Match Customer Service first so that we can try to resolve your concerns without the need of outside assistance. If you choose to pursue a claim against Match, these terms will apply.

*15a. ARBITRATION, CLASS-ACTION WAIVER, AND JURY WAIVER*

***If you pursue a legal claim against Match, you agree to arbitration (with limited exceptions).***

1.  The exclusive means of resolving any dispute or claim arising out of or relating to this Agreement (including any alleged breach thereof) or our Services shall be BINDING ARBITRATION administered by JAMS under the JAMS Streamlined Arbitration Rules & Procedures, except as modified by our Arbitration Procedures. The one exception to the exclusivity of arbitration is that either party has the right to bring an individual claim against the other in a small-claims court of competent jurisdiction, or, if filed in arbitration, the responding party may request that the dispute proceed in small claims court if the party's claim is within the jurisdiction of the small claims court. If the responding party requests to proceed in small claims court before the appointment of the arbitrator, the arbitration shall be administratively closed, and if requested after the appointment of the arbitrator, the arbitrator shall determine if the dispute should be decided in arbitration or if the arbitration should be administratively closed and decided in small claims court. Whether you choose arbitration or small-claims court, you may not under any circumstances commence or maintain against the Company any class action, class arbitration, or other representative action or proceeding.

2.  By using our Services in any manner, you agree to the above arbitration agreement. In doing so, YOU GIVE UP YOUR RIGHT TO GO TO COURT to assert or defend any claims between you and the Company (except for matters that may be taken to small-claims court). YOU ALSO GIVE UP YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION OR OTHER CLASS PROCEEDING. Your rights will be determined by a NEUTRAL ARBITRATOR, NOT A JUDGE OR JURY, and the arbitrator shall determine all issues regarding the arbitrability of the dispute. You are entitled to a fair hearing before the arbitrator. The arbitrator can grant any relief that a court can, but you should note that arbitration proceedings are usually simpler and more streamlined than trials and other judicial proceedings. Decisions by the arbitrator are enforceable in court and may be overturned by a court only for very limited reasons. For details on the arbitration process, see our Arbitration Procedures.

3.  Any proceeding to enforce this arbitration agreement, including any proceeding to confirm, modify, or vacate an arbitration award, may be commenced in any court of competent jurisdiction. In the event that this arbitration agreement is for any reason held to be unenforceable, any litigation against the Company (except for small-claims court actions) may be commenced only in the federal or state courts located in Dallas County, Texas. You hereby irrevocably consent to the jurisdiction of those courts for such purposes.

## 15b. GOVERNING LAW

***Texas law and the Federal Arbitration Act will apply if there is a dispute (except where prohibited by law).***

Except where our arbitration agreement is prohibited by law, the laws of Texas, U.S.A., excluding Texas's conflict of laws rules, will apply to any disputes arising out of or relating to this Agreement or our Services. Notwithstanding the foregoing, the Arbitration Agreement in Section 15a above shall be governed by the Federal Arbitration Act. For the avoidance of doubt, the choice of Texas governing law shall not supersede any mandatory consumer protection legislation in such jurisdictions.

## 15c. VENUE

***Any claims that are not submitted to arbitration for any reason must be litigated in Dallas County, Texas (except for claims brought in small claims court, or where prohibited by law).***

Except for claims that may be properly brought in a small claims court of competent jurisdiction in the county or other jurisdiction in which you reside or in Dallas County, Texas, all claims arising out of or relating to this Agreement, to our Services, or to your relationship with Match that for whatever reason are not submitted to arbitration will be

MATCHFTC774611

litigated exclusively in the federal or state courts of Dallas County, Texas, U.S.A. You and Match consent to the exercise of personal jurisdiction of courts in the State of Texas and waive any claim that such courts constitute an inconvenient forum.

## 16. INDEMNITY BY YOU

**You agree to indemnify Match if a claim is made against Match due to your actions.**

You agree, to the extent permitted under applicable law, to indemnify, defend, and hold harmless Match, our affiliates, and their and our respective officers, directors, agents, and employees from and against any and all complaints, demands, claims, damages, losses, costs, liabilities, and expenses, including attorney's fees, due to, arising out of, or relating in any way to your access to or use of our Services, Your Content, Your conduct toward other users, or your breach of this Agreement.

## 17. ACCEPTANCE OF TERMS

**By using our Services, you accept the Terms of this Agreement.**

By using our Services, whether through a mobile device, mobile application, or computer, you agree to be bound by (i) these Terms, which we may amend from time to time, (ii) our Privacy Policy and Cookie Policy, and (iii) any Additional Terms Upon Purchase. If you do not accept and agree to be bound by all of the terms of this Agreement, please do not use our Services.

The section headings and summaries contained herein are inserted for convenience only and shall not be considered in interpreting any term or provision hereof. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the entities or persons referred to any require. Any word both capitalized and uncapitalized will be deemed to have the same meaning.

## 18. ENTIRE AGREEMENT

**This Agreement supersedes any previous agreements or representations.**

These Terms, with the Privacy Policy, Cookie Policy, and any Additional Terms Upon Purchase, contain the entire agreement between you and Match regarding the use of our Services. The Terms supersede all previous agreements, representations, and arrangements between us, written or oral. If any provision of these Terms is held invalid, illegal, or otherwise unenforceable, the remainder of the Terms shall continue in full force and effect. The failure of the Company to exercise or enforce any right or provision of these Terms shall not constitute a waiver of such right or provision. You agree that your Match account is non-transferable and all of your rights to your account and its content terminate upon your death, unless otherwise provided by law. Any rights and licenses granted hereunder, may not be transferred or assigned by you, but may be assigned by us without restriction. No agency, partnership, joint venture, fiduciary or other special relationship or employment is created as a result of these Terms, and you may not make any representations on behalf of or bind Match in any manner.

## 19. SPECIAL STATE TERMS

**Special terms apply in Arizona, California, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio, Rhode Island, Wisconsin**

For subscribers residing in New York:

- The Services do not guarantee any number of "referrals"—rather, the functionality of the Services is such that the subscriber can view as many profiles as he/she would like;

MATCHFTC774612

- Upon notice in writing and delivered to Match Group Legal, P.O. Box 25472, Dallas, Texas 75225, USA, subscribers may place their subscription on hold for up to one year;

- How your information is used and how you may access your information is set forth in our Privacy Policy;

- You may review the New York Dating Service Consumer Bill of Rights here;

For subscribers residing in North Carolina:

- You may review the North Carolina Buyer's Rights here.

For subscribers residing in Illinois, New York, North Carolina, and Ohio :

- Our Services are widely available in the United States—if you believe that you have moved outside a location where we provide the Services, please contact us in writing delivered to Match Group Legal, P.O. Box 25472, Dallas, Texas 75225, USA, and we will work with you to provide alternative services or a refund.

For subscribers residing in Arizona, California, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio, Rhode Island, and Wisconsin:

**Your Right to Cancel—You may cancel your subscription, without penalty or obligation, at any time prior to midnight of the third business day following the date you subscribed.** In the event that you die before the end of your subscription period, your estate shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your death. In the event that you become disabled (such that you are unable to use our Services) before the end of your subscription period, you shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your disability by providing the company notice in the same manner as you request a refund as described above in Section 8.

MATCHFTC774613

# EXHIBIT 4

## Match.com Terms of Use Agreement

California subscribers: You may cancel your subscription, without penalty or obligation, at any time prior to midnight of the third business day following the date you subscribed. If you subscribed using an External Service (e.g., Apple ID, Google Play), you must cancel through your External Service, as set forth in more detail in Section 8a. If you subscribed through your Apple ID, refunds are handled by Apple/Google, not Match. You can request a refund from Apple through your Apple ID account on your phone or at https://getsupport.apple.com. All other users may request a refund by contacting Match Customer Service at by clicking here, or by mailing or delivering a signed and dated notice that states that you, the buyer, are canceling this agreement, or words of similar effect. Please also include your name and the email address, phone number, or other unique identifier you used to sign up for your account. This notice shall be sent to: Match, Attn: Cancellations, P.O. Box 25472, Dallas, Texas 75225, USA. The Company's business is conducted, in part, at 8750 N. Central Expressway, Suite 1400, Dallas, TX 75205. You may have these terms of use e-mailed to you by sending a letter to Terms Inquiries, P.O. Box 25472, Dallas, Texas 75225, USA. In accordance with Cal. Civ. Code §1789.3, you may report complaints to the Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs by contacting them in writing at Consumer Information Division, 1625 North Market Blvd., Suite N112 Sacramento, CA 95834, or by telephone at (800) 952-5210.

*We have included brief summaries at the beginning of each section to make it easier for you to read and understand this agreement. The summaries do not replace the text of each section, and you should still read each section in its entirety.*

## 1. INTRODUCTION

*By accessing or using Match's services, you agree to be bound by these terms, including our **Privacy** and **Cookie** Policies, so it is important that you read this agreement carefully before you create an account. We may update the terms from time to time, so you should check this page regularly for updates.*

Welcome to Match, operated by Match Group, LLC, in the case of users originating from within the United States and Canada, and Match.com Global Services Limited, in the case of users originating from outside of the United States and Canada. As used in this Agreement, the terms "Match," "us," "we", the "Company", and "our" shall refer to Match Group, LLC and/or Match.com Global Services Limited, as appropriate.

By accessing or using our Services on match.com (the "Website"), the Match mobile application (the "App"), or any other platforms or services Match may offer (collectively, the "Service" or our "Services"), you agree to, and are bound by, these Terms of Use (the "Terms" or "Agreement"). This Agreement applies to anyone who accesses or uses our Services, regardless of registration or subscription status.

Your use of our Services is also subject to the Privacy Policy, Cookie Policy, and any terms disclosed and agreed to by you when you purchase additional features, products, or services from Match ("Additional Terms Upon Purchase"), which are incorporated into this Agreement by reference. If you do not wish to be bound by this Agreement, do not use our Services.

We reserve the right to modify, amend, or change the Terms at any time. Notice of any material change will be posted on this page with an updated effective date. In certain circumstances, we may notify you of a change to the Terms via email or other means, as appropriate under the circumstances; however, you are responsible for regularly checking this page for notice of any changes. We agree that future changes will not be retroactive without your consent. Your continued use of our Services constitutes your acceptance of any change, and you will be legally bound by the updated Terms. If you do not accept a change to the terms, you should stop using our Services immediately.

## 2. ACCOUNT ELIGIBILITY; YOUR RESPONSIBILITIES

*Before you create an account on Match, make sure you are eligible to use our Services. This Section also details what you can and can't do when using the Services, as well as the rights you grant Match.*

By using our Services, you represent and warrant that:

1. You are at least 18 years old;

2. You are legally qualified to enter a binding contract with Match;

3. You are single or separated from your spouse;

4. You are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country;

5. You are not on any list of individuals prohibited from conducting business with the United States:

6. You are not prohibited by law from using our services;

MATCHFTC774640

7. You have not have been convicted of or pled no contest to a felony or indictable offense (or crime of similar severity), a sex crime, or any crime in

8. You are not required to register as a sex offender with any state, federal or local sex offender registry;

9. You do not have more than one account on our Services; and

10. You have not previously been removed from our Services by us, unless you have our express written permission to create a new account.

If at any time you cease to meet these requirements, you must immediately delete your account.

**You agree to:**

- Comply with these Terms, and check this page from time to time to ensure you are aware of any change;

- Comply with all applicable laws, including without limitation, privacy laws, intellectual property laws, anti-spam laws, and regulatory requirements;

- Use the latest version of the Website and/or App;

- Treat other users in a courteous and respectful manner, both on and off our Services;

- Be respectful when communicating with any of our customer care representatives or other employees;

- Review the Safety Tips;

- Maintain a strong password and take reasonable measures to protect the security of your login information.

**You agree that you will not:**

- Misrepresent your identity, age, current or previous positions, qualifications, or affiliations with a person or entity;

- Use the Services in a way that damages the Services or prevents their use by other users;

- Use our Services in a way to interfere with, disrupt or negatively affect the platform, the servers, or our Services' networks;

- Use our Services for any harmful, illegal, or nefarious purpose;

- Harass, bully, stalk, intimidate, assault, defame, harm or otherwise mistreat any person;

- Post or share Prohibited Content (see below);

- Solicit passwords for any purpose, or personal identifying information for commercial or unlawful purposes from other users or disseminate another person's personal information without his or her permission;

- Solicit money or other items of value from another user, whether as a gift, loan, or form of compensation;

- Use another user's account;

- Use our Services in relation to fraud, a pyramid scheme, or other similar practice; or

- Violate the terms of the license granted to you by Match (see Section 6 below),

- Disclose private or proprietary information that you do not have the right to disclose;

- Copy, modify, transmit, distribute, or create any derivative works from, any Member Content or Our Content, or any copyrighted material, images, trademarks, trade names, service marks, or other intellectual property, content or proprietary information accessible through our Services without Match's prior written consent;

- Express or imply that any statements you make are endorsed by Match;

- Use any robot, crawler, site search/retrieval application, proxy or other manual or automatic device, method or process to access, retrieve, index, "data mine," or in any way reproduce or circumvent the navigational structure or presentation of our Services or its contents;

- Upload viruses or other malicious code or otherwise compromise the security of our Services;

- Forge headers or otherwise manipulate identifiers to disguise the origin of any information transmitted to or through our Services;

- "Frame" or "mirror" any part of our Services without Match's prior written authorization;

- Use meta tags or code or other devices containing any reference to Match or the platform (or any trademark, trade name, service mark, logo or slogan of Match) to direct any person to any other website for any purpose;

- Modify, adapt, sublicense, translate, sell, reverse engineer, decipher, decompile or otherwise disassemble any portion of our Services, or cause others to do so;

MATCHFTC774641

- Use or develop any third-party applications that interact with our Services or Member Content or information without our written consent;

- Use, access, or publish the Match application programming interface without our written consent;

- Probe, scan or test the vulnerability of our Services or any system or network; or

- Encourage, promote, or agree to engage in any activity that violates these Terms.

**Prohibited Content—Match prohibits uploading or sharing content that:**

- Is likely to be deemed offensive or to harass, upset, embarrass, alarm or annoy any other person;

- Is obscene, pornographic, violent or otherwise may offend human dignity, or contains nudity;

- Is abusive, insulting or threatening, discriminatory or that promotes or encourages racism, sexism, hatred or bigotry;

- Encourages or facilitates any illegal activity including, without limitation, terrorism, inciting racial hatred or the submission of which in itself constitutes committing a criminal offense;

- Is defamatory, libelous, or untrue;

- Relates to commercial activities (including, without limitation, sales, competitions, promotions, and advertising, solicitation for services, "sugar daddy" or "sugar baby" relationships, links to other websites or premium line telephone numbers);

- Involves the transmission of "junk" mail or "spam";

- Contains any spyware, adware, viruses, corrupt files, worm programs or other malicious code designed to interrupt, damage or limit the functionality of or disrupt any software, hardware, telecommunications, networks, servers or other equipment, Trojan horse or any other material designed to damage, interfere with, wrongly intercept or expropriate any data or personal information whether from Match or otherwise;

- Infringes upon any third party's rights (including, without limitation, intellectual property rights and privacy rights);

- Was not written by you or was automatically generated, unless expressly authorized by Match;

- Includes the image or likeness of another person without that person's consent (or in the case of a minor, the minor's parent or guardian), or is an image or likeness or a minor unaccompanied by the minor's parent or guardian;

- Is inconsistent with the intended use of the Services; or

- May harm the reputation of Match or its affiliates.

The uploading or sharing of content that violates these terms ("Prohibited Content") may result in the immediate suspension or termination of your account.

# 3. CONTENT

*It is important that you understand your rights and responsibilities with regard to the content on our Services, including any content you provide or post. You are expressly prohibited from posting inappropriate content.*

While using our Services, you will have access to: (i) content that you upload or provide while using our Services ("Your Content"); (ii) content that other users upload or provide while using our Services ("Member Content"); and (iii) content that Match provides on and through our Services ("Our Content"). In this agreement, "content" includes, without limitation, all text, images, video, audio, or other material on our Services, including information on users' profiles and in direct messages between users.

## 3a. YOUR CONTENT

*You are responsible for Your Content. Don't share anything that you wouldn't want others to see, that would violate this Agreement, or that may expose you or us to legal liability.*

You are solely responsible and liable for Your Content, and, therefore, you agree to indemnify, defend, release, and hold us harmless from any claims made in connection with Your Content.

You represent and warrant to us that the information you provide to us or any other user is accurate, including any information submitted through Facebook or other third-party sources (if applicable), and that you will update your account information as necessary to ensure its accuracy.

The content included on your individual profile should be relevant to the intended use of our Services. You may not display any personal contact or banking information, whether in relation to you or any other person (for example, names, home addresses or postcodes, telephone numbers, email

**APP 369**

MATCHFTC774642

addresses, URLs, credit/debit card or other banking details). If you choose to reveal any personal information about yourself to other users, you do so at your own risk.

Your individual profile will be visible to other people around the world, so be sure that you are comfortable sharing Your Content before you post. You acknowledge and agree that Your Content may be viewed by other users, and, notwithstanding these Terms, other users may share Your Content with third parties. By uploading Your Content, you represent and warrant to us that you have all necessary rights and licenses to do so and automatically grant us a license to use Your Content as provided under Section 7 below.

You understand and agree that we may monitor or review Your Content, and we have the right to remove, delete, edit, limit, or block or prevent access to any of Your Content at any time in our sole discretion. Furthermore, you understand agree that we have no obligation to display or review Your Content.

## 3b. MEMBER CONTENT

*While you will have access to Member Content, it is not yours and you may not copy or use Member Content for any purpose except as contemplated by these Terms.*

Other users will also share content on our Services. Member Content belongs to the user who posted the content and is stored on our servers and displayed at the direction of that user.

You do not have any rights in relation to Member Content, and you may only use Member Content to the extent that your use is consistent with our Services' purpose of allowing use to communicate with and meet one another. You may not copy the Member Content or use Member Content for commercial purposes, to spam, to harass, or to make unlawful threats. We reserve the right to terminate your account if you misuse Member Content.

## 3c. OUR CONTENT

*Match owns all other content on our Services.*

Any other text, content, graphics, user interfaces, trademarks, logos, sounds, artwork, images, and other intellectual property appearing on our Services is owned, controlled or licensed by us and protected by copyright, trademark and other intellectual property law rights. All rights, title, and interest in and to Our Content remains with us at all times.

We grant you a limited license to access and use Our Content as provided under Section 6 below, and we reserve all other rights.

## 4. INAPPROPRIATE CONTENT AND MISCONDUCT; REPORTING

*Match does not tolerate inappropriate content or behavior on our Services.*

We are committed to maintaining a positive and respectful Match community, and we do not tolerate any inappropriate content or misconduct, whether on or off of the Services. We encourage you to report any inappropriate Member Content or misconduct by other users. You can report a user directly through the "Report a Concern" link on a user's profile or at the bottom of every email. You may also email Match Customer Service by clicking here.

Member Content is subject to the terms and conditions of Sections 512(c) and/or 512(d) of the Digital Millennium Copyright Act 1998. To submit a complaint regarding Member Content that may constitute intellectual property infringement, see Section 12 (Digital Millennium Copyright Act) below.

## 5. PRIVACY

*Privacy is important to us. We have a separate policy about it that you should read.*

For information about how Match and its affiliates collect, use, and share your personal data, please read our Privacy Policy . By using our Services, you agree that we may use your personal data in accordance with our Privacy Policy .

## 6. RIGHTS YOU ARE GRANTED BY MATCH

*Match grants you the right to use and enjoy our Services, subject to these Terms.*

## 7. RIGHTS YOU GRANT MATCH

*You own all of the content you provide to Match, but you also grant us the right to use Your Content as provided in this Agreement.*

MATCHFTC774643

By creating an account, you grant to Match a worldwide, perpetual, transferable, sub-licensable, royalty-free right and license to host, store, use, copy, display, reproduce, save, modify, create derivative works, perform, and distribute Your Content on our Services solely for the purposes of operating, developing, providing, and using our Services. Nothing in these Terms shall restrict other legal rights Match may have to Your Content, for example under other licenses. We reserve the right to remove or edit Your Content for any reason, including Content that we believe violates these Terms or our policies. Match does not acquire any ownership right or license to any of Your Content from Facebook or other third-party source (if applicable), in whole or in part, and in any format or medium currently known or developed in the future. Match's license to Your Content shall be non-exclusive, except that Match's license shall be exclusive with respect to derivative works created through use of our Services. For example, Match would have an exclusive license to screenshots of our Services that include Your Content.

In addition, so that Match can prevent the use of Your Content outside of our Services, you authorize Match to act on your behalf with respect to infringing uses of Your Content taken from our Services by other users or third parties. This expressly includes the authority, but not the obligation, to send notices pursuant to 17 U.S.C. § 512(c)(3) (i.e., DMCA Takedown Notices) on your behalf if Your Content is taken and used by third parties outside of our Services. Match is not obligated to take any action with regard to use of Your Content by other users or third parties. Match's license to Your Content is subject to your rights under applicable law (for example, laws regarding personal data protection to the extent the content contains personal information as defined by those laws).

In consideration for Match allowing you to use our Services, you agree that we, our affiliates, and our third-party partners may place advertising on our Services. By submitting suggestions or feedback to Match regarding our Services, you agree that Match may use and share such feedback for any purpose without compensating you.

You agree that Match may access, preserve, and disclose your account information, including Your Content, if required to do so by law or upon a good faith belief that such access, preservation, or disclosure is reasonably necessary to: (i) comply with legal process; (ii) enforce these Terms; (iii) respond to claims that any content violates the rights of third parties; (iv) respond to your requests for customer service; or (v) protect the rights, property or personal safety of the Company or any other person.

## 8. PURCHASES AND AUTOMATICALLY RENEWING SUBSCRIPTIONS

*You will have the opportunity to purchase products and services from Match. If you purchase a subscription, it will automatically renew—and you will be charged—until you cancel.*

Match may offer products and services for purchase through iTunes, Google Play or other external services authorized by Match (each, an "External Service," and any purchases made thereon, an "External Service Purchase"). Match may also offer products and services for purchase via credit card or other payment processors on the Website or inside the App ("Internal Purchases"). If you purchase a subscription, it will automatically renew until you cancel, in accordance with the terms disclosed to you at the time of purchase, as further described below. If you cancel your subscription, you will continue to have access to your subscription benefits until the end of your subscription period, at which point it will expire.

Because our Services may be utilized without a subscription, canceling your subscription does not remove your profile from our Services. If you wish to fully terminate your membership, you must terminate your membership as set forth in Section 9.

## 8a. EXTERNAL SERVICE PURCHASES AND SUBSCRIPTIONS

*External Service Purchases, including subscriptions, may be processed through the External Service, in which case those purchases must be managed through your External Service Account. Subscriptions automatically renew until you cancel.*

When making a purchase on the Service, you may have the option to pay through an External Service, such as with your Apple ID or Google account ("your External Service Account"), and your External Service Account will be charged for the purchase in accordance with the terms disclosed to you at the time of purchase and the general terms applicable to your External Service Account. Some External Services may charge you sales tax, depending on where you live, which may change from time to time.

If your External Service Purchase includes an automatically renewing subscription, your External Service Account will continue to be periodically charged for the subscription until you cancel. After your initial subscription commitment period, and again after any subsequent subscription period, the subscription will automatically continue for the price and time period you agreed to when subscribing.

To cancel a subscription: If you do not want your subscription to renew automatically, or if you want to change or terminate your subscription, you must log in to your External Service Account and follow instructions to manage or cancel your subscription, even if you have otherwise deleted your account with us or if you have deleted the App from your device. For example, if you subscribed using your Apple ID, cancellation is handled by Apple, not Match. To cancel a purchase made with your Apple ID, go to Settings > iTunes & App Stores > [click on your Apple ID] > View Apple ID > Subscriptions, then find your Match subscription and follow the instructions to cancel. You can also request assistance at https://getsupport.apple.com. Similarly, if you subscribed on Google Play, cancellation is handled by Google. To cancel a purchase made through Google Play, launch the Google Play app on your mobile device and go to Menu > My Apps > Subscriptions, then find your Match subscription and follow the instructions to cancel. You can also request assistance at https://play.google.com. If you cancel a subscription, you may continue to use the cancelled service until the end of your then-current subscription term. The subscription will not be renewed when your then-current term expires.

If you initiate a chargeback or otherwise reverse a payment made with your External Service Account, Match may terminate your account immediately in its sole discretion, on the basis that you have determined that you do not want a Match subscription. In the event that your chargeback or other

payment reversal is overturned, please contact Customer Care. Match will retain all funds charged to your External Service Account until you cancel your subscription.

## 8b. INTERNAL PURCHASES AND SUBSCRIPTIONS

*Internal Purchases, including subscriptions, are processed using the Payment Method you provide on the Website or App. Subscriptions automatically renew until you cancel.*

If you make an Internal Purchase, you agree to pay the prices displayed to you for the Services you've selected as well as any sales or similar taxes that may be imposed on your payments (and as may change from time to time), and you authorize Match to charge the payment method you provide (your "Payment Method"). Match may correct any billing errors or mistakes even if we have already requested or received payment. If you initiate a chargeback or otherwise reverse a payment made with your Payment Method, Match may terminate your account immediately in its sole discretion, on the basis that you have determined that you do not want a Match subscription. In the event that your chargeback or other payment reversal is overturned, please contact Customer Care.

If your Internal Purchase includes an automatically renewing subscription, your Payment Method will continue to be periodically charged for the subscription until you cancel. After your initial subscription commitment period, and again after any subsequent subscription period, your subscription will automatically continue for the price and time period you agreed to when subscribing, until you cancel.

To cancel a subscription, log in to the Website and go to the Settings tool. If you cancel a subscription, you may continue to use the cancelled service until the end of your then-current subscription term. The subscription will not be renewed when your then-current term expires.

You may edit your Payment Method information by using the Settings tool. If a payment is not successfully processed, due to expiration, insufficient funds, or otherwise, you remain responsible for any uncollected amounts and authorize us to continue billing the Payment Method, as it may be updated. This may result in a change to your payment billing dates.

In addition, you authorize us to obtain updated or replacement expiration dates and card numbers for your credit or debit card as provided by your credit or debit card issuer. The terms of your payment will be based on your Payment Method and may be determined by agreements between you and the financial institution, credit card issuer, or other provider of your chosen Payment Method. Certain users may be entitled to request a refund. See Section 8d below for more information.

## 8c. VIRTUAL ITEMS

*Virtual items are non-refundable and subject to certain conditions.*

From time to time, you may have the opportunity purchase a limited, personal, non-transferable, non-sublicensable, revocable license to use or access special limited-use features such as "Boost" ("Virtual Item(s)") from Match. You may only purchase Virtual Items from us or our authorized partners through our Services. Virtual Items represent a limited license right governed by this Agreement, and, except as otherwise prohibited by applicable law, no title or ownership in or to Virtual Items is being transferred or assigned to you. This Agreement should not be construed as a sale of any rights in Virtual Items.

Any Virtual Item balance shown in your account does not constitute a real-world balance or reflect any stored value, but instead constitutes a measurement of the extent of your license. Virtual Items do not incur fees for non-use; however, the license granted to you in Virtual Items will terminate in accordance with the terms of this Agreement, on the earlier of when Match ceases providing our Services, or your account is otherwise closed or terminated.

Match, in its sole discretion, reserves the right to charge fees for the right to access or use Virtual Items and/or may distribute Virtual Items with or without charge. Match may manage, regulate, control, modify, or eliminate Virtual Items at any time, including taking actions that may impact the perceived value or purchase price, if applicable, of any Virtual Items. Match shall have no liability to you or any third party in the event that Match exercises any such rights. The transfer of Virtual Items is prohibited, and you shall not sell, redeem, or otherwise transfer Virtual Items to any person or entity. Virtual Items may only be redeemed through our Services.

ALL PURCHASES AND REDEMPTIONS OF VIRTUAL ITEMS MADE THROUGH OUR SERVICES ARE FINAL AND NON-REFUNDABLE. YOU ACKNOWLEDGE THAT MATCH IS NOT REQUIRED TO PROVIDE A REFUND FOR ANY REASON, AND THAT YOU WILL NOT RECEIVE MONEY OR OTHER COMPENSATION FOR UNUSED VIRTUAL ITEMS WHEN AN ACCOUNT IS CLOSED, WHETHER SUCH CLOSURE WAS VOLUNTARY OR INVOLUNTARY.

## 8d. REFUNDS

*Generally, all purchases are nonrefundable. Special terms apply in Arizona, California, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio, Rhode Island, and Wisconsin.*

MATCHFTC774645

Generally, all purchases are final and nonrefundable, and there are no refunds or credits for partially used periods, except if the laws applicable in your jurisdiction provide for refunds.

For subscribers residing in Arizona, California, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio, Rhode Island, and Wisconsin:

**Your Right to Cancel—You may cancel your subscription, without penalty or obligation, at any time prior to midnight of the third business day following the date you subscribed.** In the event that you die before the end of your subscription period, your estate shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your death. In the event that you become disabled (such that you are unable to use our Services) before the end of your subscription period, you shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your disability by providing the company notice in the same manner as you request a refund as described below.

Purchases of Virtual Items are FINAL AND NON-REFUNDABLE.

If any of the above apply to you and you subscribed using your Apple ID, your refund requests are handled by Apple, not Match. To request a refund, please contact your External Service directly; for example using your Apple device, go to Settings > iTunes & App Stores > [click on your Apple ID] > View Apple ID > Purchase History. Find the transaction and select "Report a Problem." You can also request a refund at https://getsupport.apple.com. For any other purchase, please contact Match Customer Service with your order number (see your confirmation email) by mailing or delivering a signed and dated notice which states that you, the buyer, are canceling this agreement, or words of similar effect. Please also include the email address or telephone number associated with your account along with your order number. This notice shall be sent to: Match, Attn: Cancellations, P.O. Box 25472, Dallas, Texas 75225, USA (California and Ohio users may also email us by clicking here or send a facsimile to 214-853-4309).

## 9. ACCOUNT TERMINATION

*If you no longer wish to use our Services, or if we terminate your account for any reason, here's what you need to know.*

You can delete your account at any time by logging into the Website, going to "Settings" (the gear/pencil icon in the top right corner), and following the instructions to cancel your membership. **However, you will need to cancel / manage any External Service Purchases through your External Service Account (e.g., iTunes, Google Play) to avoid additional billing.**

Match reserves the right to investigate and, if appropriate, suspend or terminate your account without a refund if you have violated these Terms, misused our Services, or behaved in a way that Match regards as inappropriate or unlawful, on or off our Services. We reserve the right to make use of any personal, technological, legal, or other means available to enforce the Terms, at any time without liability and without the obligation to give you prior notice, including, but not limited to, preventing you from accessing the Services.

If your account is terminated by you or by Match for any reason, these Terms continue and remain enforceable between you and Match, and you will not be entitled to any refund for purchases made. Your information will be maintained and deleted in accordance with our Privacy Policy.

## 10. NO CRIMINAL BACKGROUND OR IDENTITY VERIFICATION CHECKS

*Match does not conduct criminal background or identity verification checks on its users. Use your best judgment when interacting with others and check out our Safety Tips.*

**YOU UNDERSTAND THAT MATCH DOES NOT CONDUCT CRIMINAL BACKGROUND OR IDENTITY VERIFICATION CHECKS ON ITS USERS OR OTHERWISE INQUIRE INTO THE BACKGROUND OF ITS USERS.** MATCH MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE CONDUCT, IDENTITY, INTENTIONS, LEGITIMACY, OR VERACITY OF USERS. MATCH RESERVES THE RIGHT TO CONDUCT—AND YOU AUTHORIZE MATCH TO CONDUCT—ANY CRIMINAL BACKGROUND CHECK OR OTHER SCREENINGS (SUCH AS SEX OFFENDER REGISTER SEARCHES) AT ANY TIME USING AVAILABLE PUBLIC RECORDS, AND YOU AGREE THAT ANY INFORMATION YOU PROVIDE MAY BE USED FOR THAT PURPOSE. IF THE COMPANY DECIDES TO CONDUCT ANY SCREENING THROUGH A CONSUMER REPORTING AGENCY, YOU HEREBY AUTHORIZE THE COMPANY TO OBTAIN AND USE A CONSUMER REPORT ABOUT YOU TO DETERMINE YOUR ELIGIBILITY UNDER THESE TERMS.

**YOU ARE SOLELY RESPONSIBLE FOR YOUR INTERACTIONS WITH OTHER USERS.** SEX OFFENDER SCREENINGS AND OTHER TOOLS DO NOT GUARANTEE YOUR SAFETY AND ARE NOT A SUBSTITUTE FOR FOLLOWING THE SAFETY TIPS AND OTHER SENSIBLE SAFETY PRECAUTIONS. ALWAYS USE YOUR BEST JUDGMENT AND TAKE APPROPRIATE SAFETY PRECAUTIONS WHEN COMMUNICATING WITH OR MEETING NEW PEOPLE. COMMUNICATIONS RECEIVED THROUGH THE SERVICE, INCLUDING AUTOMATIC NOTIFICATIONS SENT BY MATCH, MAY RESULT FROM USERS ENGAGING WITH THE SERVICE FOR IMPROPER PURPOSES, INCLUDING FRAUD, ABUSE, HARASSMENT, OR OTHER SUCH IMPROPER BEHAVIOR.

Though Match strives to encourage a respectful user experience, it is not responsible for the conduct of any user on or off the Service. You agree to use caution in all interactions with other users, particularly if you decide to communicate off the Service or meet in person.

MATCHFTC774646

## 11. DISCLAIMER

*Match's Services are provided "as is" and we do not make, and cannot make, any representations about the content or features of our Services.*

MATCH PROVIDES OUR SERVICES ON AN "AS IS" AND "AS AVAILABLE" BASIS AND TO THE EXTENT PERMITTED BY APPLICABLE LAW, GRANTS NO WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE WITH RESPECT TO OUR SERVICES (INCLUDING ALL CONTENT CONTAINED THEREIN), INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF SATISFACTORY QUALITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. MATCH DOES NOT REPRESENT OR WARRANT THAT (A) OUR SERVICES WILL BE UNINTERRUPTED, SECURE, OR ERROR FREE, (B) ANY DEFECTS OR ERRORS IN OUR SERVICES WILL BE CORRECTED, OR (C) THAT ANY CONTENT OR INFORMATION YOU OBTAIN ON OR THROUGH OUR SERVICES WILL BE ACCURATE. FURTHERMORE, MATCH MAKES NO GUARANTEES AS TO THE NUMBER OF ACTIVE USERS AT ANY TIME; USERS' ABILITY OR DESIRE TO COMMUNICATE WITH OR MEET YOU, OR THE ULTIMATE COMPATIBILITY WITH OR CONDUCT BY USERS YOU MEET THROUGH THE SERVICES.

MATCH TAKES NO RESPONSIBILITY FOR ANY CONTENT THAT YOU OR ANOTHER USER OR THIRD PARTY POSTS, SENDS, OR RECEIVES THROUGH OUR SERVICES NOR DOES MATCH TAKE ANY RESPONSIBILITY FOR THE IDENTITY, INTENTIONS, LEGITIMACY, OR VERACITY OF ANY USERS WITH WHOM YOU MAY COMMUNICATION THROUGH MATCH. ANY MATERIAL DOWNLOADED OR OTHERWISE OBTAINED THROUGH THE USE OF OUR SERVICES IS ACCESSED AT YOUR OWN DISCRETION AND RISK. MATCH IS NOT RESPONSIBLE FOR ANY DAMAGE TO YOUR COMPUTER HARDWARE, COMPUTER SOFTWARE, OR OTHER EQUIPMENT OR TECHNOLOGY INCLUDING, BUT WITHOUT LIMITATION, DAMAGE FROM ANY SECURITY BREACH OR FROM ANY VIRUS, BUGS, TAMPERING, FRAUD, ERROR, OMISSION, INTERRUPTION, DEFECT, DELAY IN OPERATION OR TRANSMISSION, COMPUTER LINE OR NETWORK FAILURE, OR ANY OTHER TECHNICAL OR OTHER MALFUNCTION.

## 12. DIGITAL MILLENNIUM COPYRIGHT ACT

*We take copyright infringement very seriously. We ask you to help us to ensure we address it promptly and effectively.*

Match has adopted the following policy towards copyright infringement in accordance with the Digital Millennium Copyright Act (the "DMCA"). If you believe any Member Content or Our Content infringes upon your intellectual property rights, please submit a notification alleging such infringement ("DMCA Takedown Notice") including the following:

1. A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;
2. Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works;
3. Identification of the material claimed to be infringing or to be the subject of infringing activity and that is to be removed or access disabled and information reasonably sufficient to permit the service provider to locate the material;
4. Information reasonably sufficient to permit the service provider to contact you, such as an address, telephone number, and, if available, an electronic mail;
5. A statement that you have a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law; and
6. A statement that, under penalty of perjury, the information in the notification is accurate and you are authorized to act on behalf of the owner of the exclusive right that is allegedly infringed.

Any DMCA Takedown Notices should be sent to copyright@match.com, by phone to 214-576-3272 or via mail to the following address: Copyright Compliance Department c/o Match Group Legal, 8750 N. Central Expressway, Dallas, Texas 75231.

Match will terminate the accounts of repeat infringers.

## 13. ADS AND THIRD-PARTY CONTENT

*Like many subscription-based services, there are ads on our websites.*

Our Services may contain advertisements and promotions offered by third parties and links to other websites or resources. Match may also provide non-commercial links or references to third parties within its content. Match is not responsible for the availability (or lack of availability) of any external websites or resources or their content. Furthermore, Match is not responsible for, and does not endorse, any products or services that may be offered by third-party websites or resources. If you choose to interact with the third parties made available through our Services, such party's terms will govern their relationship with you. Match is not responsible or liable for such third parties' terms or actions.

**APP 374**

MATCHFTC774647

# 14. LIMITATION OF LIABILITY.

*Match's liability is limited to the maximum extent by applicable law.*

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL MATCH, ITS AFFILIATES, EMPLOYEES, LICENSORS, OR SERVICE PROVIDERS BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM: (I) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES, (II) THE CONDUCT OR CONTENT OF OTHER USERS OR THIRD PARTIES ON, THROUGH, OR FOLLOWING USE OF THE SERVICES; OR (III) UNAUTHORIZED ACCESS, USE, OR ALTERATION OF YOUR CONTENT, EVEN IF MATCH HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL MATCH'S AGGREGATE LIABILITY TO YOU FOR ALL CLAIMS RELATING TO THE SERVICES EXCEED THE AMOUNT PAID, IF ANY, BY YOU TO MATCH FOR THE SERVICES WHILE YOU HAVE AN ACCOUNT.

THE LIMITATION OF LIABILITY PROVISIONS SET FORTH IN THIS SECTION 14 SHALL APPLY EVEN IF YOUR REMEDIES UNDER THIS AGREEMENT FAIL WITH RESPECT TO THEIR ESSENTIAL PURPOSE.

SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES, SO SOME OR ALL OF THE EXCLUSIONS AND LIMITATIONS IN THIS SECTION MAY NOT APPLY TO YOU.

## 15. DISPUTE RESOLUTION

*In the unlikely event that we have a legal dispute, here is what you need to know.*

If you are dissatisfied with our Services for any reason, please contact Match Customer Service first so that we can try to resolve your concerns without the need of outside assistance. If you choose to pursue a claim against Match, these terms will apply.

### 15a. ARBITRATION, CLASS-ACTION WAIVER, AND JURY WAIVER

*If you pursue a legal claim against Match, you agree to arbitration (with limited exceptions).*

1. The exclusive means of resolving any dispute or claim arising out of or relating to this Agreement (including any alleged breach thereof) or our Services shall be BINDING ARBITRATION administered by JAMS under the JAMS Streamlined Arbitration Rules & Procedures, except as modified by our Arbitration Procedures. The one exception to the exclusivity of arbitration is that either party has the right to bring an individual claim against the other in a small-claims court of competent jurisdiction, or, if filed in arbitration, the responding party may request that the dispute proceed in small claims court if the party's claim is within the jurisdiction of the small claims court. If the responding party requests to proceed in small claims court before the appointment of the arbitrator, the arbitration shall be administratively closed, and if requested after the appointment of the arbitrator, the arbitrator shall determine if the dispute should be decided in arbitration or if the arbitration should be administratively closed and decided in small claims court. Whether you choose arbitration or small-claims court, you may not under any circumstances commence or maintain against the Company any class action, class arbitration, or other representative action or proceeding.

2. By using our Services in any manner, you agree to the above arbitration agreement. In doing so, YOU GIVE UP YOUR RIGHT TO GO TO COURT to assert or defend any claims between you and the Company (except for matters that may be taken to small-claims court). YOU ALSO GIVE UP YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION OR OTHER CLASS PROCEEDING. Your rights will be determined by a NEUTRAL ARBITRATOR, NOT A JUDGE OR JURY, and the arbitrator shall determine all issues regarding the arbitrability of the dispute. You are entitled to a fair hearing before the arbitrator. The arbitrator can grant any relief that a court can, but you should note that arbitration proceedings are usually simpler and more streamlined than trials and other judicial proceedings. Decisions by the arbitrator are enforceable in court and may be overturned by a court only for very limited reasons. For details on the arbitration process, see our Arbitration Procedures.

3. Any proceeding to enforce this arbitration agreement, including any proceeding to confirm, modify, or vacate an arbitration award, may be commenced in any court of competent jurisdiction. In the event that this arbitration agreement is for any reason held to be unenforceable, any litigation against the Company (except for small-claims court actions) may be commenced only in the federal or state courts located in Dallas County, Texas. You hereby irrevocably consent to the jurisdiction of those courts for such purposes.

## 15b. GOVERNING LAW

*Texas law and the Federal Arbitration Act will apply if there is a dispute (except where prohibited by law).*

Except where our arbitration agreement is prohibited by law, the laws of Texas, U.S.A., excluding Texas's conflict of laws rules, will apply to any disputes arising out of or relating to this Agreement or our Services. Notwithstanding the foregoing, the Arbitration Agreement in Section 15a above shall be governed by the Federal Arbitration Act. For the avoidance of doubt, the choice of Texas governing law shall not supersede any mandatory consumer protection legislation in such jurisdictions.

MATCHFTC774648

## 15c. VENUE

*Any claims that are not submitted to arbitration for any reason must be litigated in Dallas County, Texas (except for claims brought in small claims court, or where prohibited by law).*

Except for claims that may be properly brought in a small claims court of competent jurisdiction in the county or other jurisdiction in which you reside or in Dallas County, Texas, all claims arising out of or relating to this Agreement, to our Services, or to your relationship with Match that for whatever reason are not submitted to arbitration will be litigated exclusively in the federal or state courts of Dallas County, Texas, U.S.A. You and Match consent to the exercise of personal jurisdiction of courts in the State of Texas and waive any claim that such courts constitute an inconvenient forum.

## 16. INDEMNITY BY YOU

*You agree to indemnify Match if a claim is made against Match due to your actions.*

You agree, to the extent permitted under applicable law, to indemnify, defend, and hold harmless Match, our affiliates, and their and our respective officers, directors, agents, and employees from and against any and all complaints, demands, claims, damages, losses, costs, liabilities, and expenses, including attorney's fees, due to, arising out of, or relating in any way to your access to or use of our Services, Your Content, Your conduct toward other users, or your breach of this Agreement.

## 17. ACCEPTANCE OF TERMS

*By using our Services, you accept the Terms of this Agreement.*

By using our Services, whether through a mobile device, mobile application, or computer, you agree to be bound by (i) these Terms, which we may amend from time to time, (ii) our Privacy Policy and Cookie Policy, and (iii) any Additional Terms Upon Purchase. If you do not accept and agree to be bound by all of the terms of this Agreement, please do not use our Services.

The section headings and summaries contained herein are inserted for convenience only and shall not be considered in interpreting any term or provision hereof. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the entities or persons referred to any require. Any word both capitalized and uncapitalized will be deemed to have the same meaning.

## 18. ENTIRE AGREEMENT

*This Agreement supersedes any previous agreements or representations.*

These Terms, with the Privacy Policy, Cookie Policy, and any Additional Terms Upon Purchase, contain the entire agreement between you and Match regarding the use of our Services. The Terms supersede all previous agreements, representations, and arrangements between us, written or oral. If any provision of these Terms is held invalid, illegal, or otherwise unenforceable, the remainder of the Terms shall continue in full force and effect. The failure of the Company to exercise or enforce any right or provision of these Terms shall not constitute a waiver of such right or provision. You agree that your Match account is non-transferable and all of your rights to your account and its content terminate upon your death, unless otherwise provided by law. Any rights and licenses granted hereunder, may not be transferred or assigned by you, but may be assigned by us without restriction. No agency, partnership, joint venture, fiduciary or other special relationship or employment is created as a result of these Terms, and you may not make any representations on behalf of or bind Match in any manner.

## 19. SPECIAL STATE TERMS

*Special terms apply in Arizona, California, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio, Rhode Island, Wisconsin*

For subscribers residing in New York:

- The Services do not guarantee any number of "referrals"—rather, the functionality of the Services is such that the subscriber can view as many profiles as he/she would like;
- Upon notice in writing and delivered to Match Group Legal, P.O. Box 25472, Dallas, Texas 75225, USA, subscribers may place their subscription on hold for up to one year;
- How your information is used and how you may access your information is set forth in our Privacy Policy;
- You may review the New York Dating Service Consumer Bill of Rights here;

For subscribers residing in North Carolina:

- You may review the North Carolina Buyer's Rights here.

For subscribers residing in Illinois, New York, North Carolina, and Ohio :

- Our Services are widely available in the United States—if you believe that you have moved outside a location where we provide the Services, please contact us in writing delivered to Match Group Legal, P.O. Box 25472, Dallas, Texas 75225, USA, and we will work with you to provide alternative services or a refund.

For subscribers residing in Arizona, California, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio, Rhode Island, and Wisconsin:

**Your Right to Cancel—You may cancel your subscription, without penalty or obligation, at any time prior to midnight of the third business day following the date you subscribed.** In the event that you die before the end of your subscription period, your estate shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your death. In the event that you become disabled (such that you are unable to use our Services) before the end of your subscription period, you shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your disability by providing the company notice in the same manner as you request a refund as described above in Section 8.

MATCHFTC774650

# EXHIBIT 5

# Match.com Terms of Use Agreement

**Special notice to California users:** You, the buyer, may cancel this agreement, without penalty or obligation, at any time prior to midnight of the third business day following the original date of this contract, excluding Sundays and holidays. To cancel this agreement, mail or deliver a signed and dated notice which states that you, the buyer, are canceling this agreement, or words of similar effect, or you may email us by clicking here. This notice shall be sent to: Match.com, Attn: Cancellations, P.O. Box 25472, Dallas, Texas 75225, USA. For additional state specific information, please see Paragraph 24 below.

Welcome to Match.com, the service for single adults to meet each other online, operated by Match Group, LLC, in the case of users originating from within the United States and Canada, and Match.com Global Services Limited, in the case of users originating from outside of the United States and Canada (each the "**Company**" or "**Match.com**").

By accessing the Match.com or Chemistry.com website, including through a mobile application, (the "**Website**") you agree to be bound by these Terms of Use (this "**Agreement**"), whether or not you register as a member of Match.com. If you wish to become a member and make use of the Match.com service (the "**Service**"), please read these Terms of Use. The term "Website" is deemed to refer to using of the Service by means of a computer, a mobile device or a mobile application.

You should also read the Match.com Privacy Policy, which is incorporated by reference into this Agreement and available on the Website. If you do not accept and agree to be bound by all of the terms of this Agreement, including the Match.com Privacy Policy, do not use the Website or the Service. Please contact us with any questions regarding this Agreement.

1. **Acceptance of Terms of Use Agreement.**

   a. This Agreement is an electronic contract that establishes the legally binding terms you must accept to use the Website and to become a "Member." For purposes of this Agreement, the term "**Member**" means a person who provides information to the Company on the Website or to participate in the Service in any manner, whether such person uses the Service as a free member or a subscriber. You acknowledge and agree that Members of Match.com or Chemistry.com may be part an online community that includes other websites owned by the Company or its affiliates. Therefore, profiles on the Website may be viewable on other such websites and paying subscribers of one website may be able to communicate with other paying subscribers on all websites. This Agreement includes the Company's (i) Privacy Policy, (ii) our Dating Safety Tips published on the Website and (iii) terms disclosed and agreed to by you if you become a subscriber or if you purchase or accept additional features, products or services we offer on the Website, such as state-specific terms and terms governing features, billing, free trials, discounts and promotions.

   b. By accessing the Website or using the Service, you accept this Agreement and agree to the terms, conditions and notices contained or referenced herein and consent to have this Agreement and all notices provided to you in electronic form. Please print a copy of this Agreement for your records. To receive a non-electronic copy of this Agreement, please Contact Us or send a letter and self-addressed stamped envelope with sufficient postage to: Match.com, P.O. Box 25458, Dallas, Texas 75225. This Agreement may be modified by the Company from time to time, such modifications to be effective upon posting by the Company on the Website.

   c. By using the Service, you consent to receive this Agreement in electronic form by using the Service. To withdraw this consent, you must cease using the Service and terminate your account.

2. **Eligibility.**
   You must be at least 18 years of age to access and use the Service. You must also be single or separated from your spouse to use the Service. Any use of the Service is void where prohibited. By accessing and using the Website, you represent and warrant that you have the right, authority and capacity to enter into this Agreement and to abide by all of the terms and conditions of this Agreement. If you become a Member, you represent and warrant that you have never been convicted of or pled no contest to a felony, a sex crime, or any crime involving violence, and that you are not required to register as a sex offender with any government entity. Using the Service may be prohibited or restricted in certain countries. If you use the Service from outside of the United States, you are responsible for complying with the laws and regulations of the territory from which you access or use the Website or Service.

3. **Membership and Subscription.**
   You may register as a Member at no cost. As a Member, you may use some, but not all, of the features and services available within the Service. To access or use additional features and services, including the ability to communicate with other Members that are subscribers, you must become a paying subscriber to the Service. The subscription policies that are disclosed to you when you subscribe to the Service are a part of this Agreement. Absent special offers, you acknowledge and agree that if you are (i) not a subscriber, you will not be able to use all the features and services available within the Service, including communicating with other Members, and (ii) a subscriber, non-subscribing Members will not be able to use the Service to communicate with you. A Member profile (both subscribers and non-subscribers) may remain posted on the Website even if that Member is not actively using the Service. You acknowledge that although a Member's profile may be viewed, you may not (even as a subscriber) be able to use the Service to communicate with that Member if he or she is not then actively using the Service.

4. **Term and Termination.**

MATCHFTC774614

a. This Agreement will remain in full force and effect while you use the Service and/or are a Member.

b. You may change or cancel your membership at any time, for any reason, by following the instructions on the "change/ cancel membership" or similar page on your "Account Settings" page. You may change or cancel your subscription at any time online by following the instructions on the "Subscription" page on your "Account Settings" page. You may also cancel your membership by sending the Company written notice of cancellation to Match.com, P.O. Box 25472, Dallas, Texas 75225 or by email notice of cancellation to Customer Care. If you cancel your membership via the Website, we may ask you to provide a reason for your cancellation. If you cancel your subscription, the Company requires a reasonable amount of time to process the action. If you cancel a subscription, you will enjoy subscription benefits until the end of your then-current subscription commitment, following which your subscription benefits will expire. However, in no event will you be eligible for a refund of any portion of the subscription fees paid for the then-current subscription commitment. If you paid for your subscription using a multi-payment option, you must make all payments even if you cancel your subscription prior to the end of your then existing subscription commitment period.

c. Canceling a subscription does not automatically cancel your membership. If you are a subscriber and you cancel your subscription but not your membership, unless you elect to hide your profile, you will continue to be a Member in the Service and others may view your profile. If you hide your profile, other Members will not be able to view your profile until you "unhide" your profile. If you cancel your membership, your profile will be removed, and other Members will not be able to view your profile. You will be able to use your current registration information to "unhide" your profile and reactivate your membership for one year. A Member can hide his or her profile or cancel his or her membership and remove their profile at any time by following the instructions contained on the "Account Settings" page on the Website.

d. The Company may terminate or suspend your subscription and/or membership in the Service at any time without notice if the Company believes that you have breached this Agreement, including, but not limited to, by using the Website and Service for non-personal use, engaging in prohibited or inappropriate communications or activities, and any breach of your representations and warranties. Upon such termination or suspension, you will not be entitled to any refund of unused subscription fees and, if applicable, all unpaid subscription amounts and other fees you owe will immediately be due. The Company is not required to disclose, and may be prohibited by law from disclosing, the reason for the termination or suspension of your account.

e. After your membership or subscription is terminated for any reason, all terms of this Agreement survive such termination, and continue in full force and effect, except for any terms that by their nature expire or are fully satisfied.

## 5. Non-commercial Use by Members.

The Website and Service is for personal use only. Members may not use the Service in connection with any commercial endeavors, such as (i) advertising or soliciting any user to buy or sell any products or services not offered by the Company, (ii) soliciting others to attend parties or other social functions, or networking, for commercial purposes, (iii) attempting to solicit or raise money for any purpose, or (iv) attempting to solicit users to visit a third-party site. Users of the Website may not use any information obtained from the Service to contact, advertise to, solicit, or sell to any other user without his or her prior explicit consent. Organizations, companies, and/or businesses may not use the Service or the Website for any purpose. The Company may investigate and take any available legal action in response to illegal and/or unauthorized uses of the Website, including collecting usernames and/or email addresses of members by electronic or other means for the purpose of sending unsolicited email and unauthorized framing of or linking to the Website.

## 6. Account Security.

You are responsible for maintaining the confidentiality of the username and password you designate during the registration process, and you are solely responsible for all activities that occur under your username and password. You agree to immediately notify the Company of any disclosure or unauthorized use of your username or password or any other breach of security, and ensure that you log out from your account at the end of each session.

## 7. Your Interactions with Other Members.

a. YOU ARE SOLELY RESPONSIBLE FOR YOUR INTERACTIONS WITH OTHER MEMBERS. YOU UNDERSTAND THAT THE COMPANY CURRENTLY DOES NOT CONDUCT CRIMINAL BACKGROUND CHECKS OR SCREENINGS ON ITS MEMBERS. THE COMPANY ALSO DOES NOT INQUIRE INTO THE BACKGROUNDS OF ALL OF ITS MEMBERS OR ATTEMPT TO VERIFY THE STATEMENTS OF ITS MEMBERS. THE COMPANY MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE CONDUCT OF MEMBERS OR THEIR COMPATIBILITY WITH ANY CURRENT OR FUTURE MEMBERS. THE COMPANY RESERVES THE RIGHT TO CONDUCT ANY CRIMINAL BACKGROUND CHECK OR OTHER SCREENINGS (SUCH AS SEX OFFENDER REGISTER SEARCHES), AT ANY TIME AND USING AVAILABLE PUBLIC RECORDS.

b. The Company is not responsible for the conduct of any Member. As noted in and without limiting Sections 16 and 18 below, in no event shall the Company, its affiliates or its partners be liable (directly or indirectly) for any losses or damages whatsoever, whether direct, indirect, general, special, compensatory, consequential, and/or incidental, arising out of or relating to the conduct of you or anyone else in connection with the use of the Website or Service including, without limitation, death, bodily injury, emotional distress, and/or any other damages resulting from communications or meetings with other Members or persons you meet through the Service. You agree to take all necessary precautions in all interactions with other Members, particularly if you decide to communicate off the Website or meet in person, or if you decide to send money to another Member. In addition, you agree to review and follow the Company's Dating Safety Tips, located on the Website, prior to using the Service. You understand that the Company makes no guarantees, either express or implied, regarding your ultimate compatibility with individuals you meet through the Service. You should not provide your financial information (for example, your credit card or bank account information), or wire or otherwise send money, to other Members.

## 8. Proprietary Rights.

MATCHFTC774615

The Company owns and retains all proprietary rights in the Website and the Service, and in all content, trademarks, trade names, service marks and other intellectual property rights related thereto. The Website contains the copyrighted material, trademarks, and other proprietary information of the Company and its licensors. You agree to not copy, modify, transmit, create any derivative works from, make use of, or reproduce in any way any copyrighted material, trademarks, trade names, service marks, or other intellectual property or proprietary information accessible on the Website or through the Service, without first obtaining the prior written consent of the Company or, if such property is not owned by the Company, the owner of such intellectual property or proprietary rights. You agree to not remove, obscure or otherwise alter any proprietary notices appearing on any content, including copyright, trademark and other intellectual property notices.

9. **Content Posted by You on the Website.**

   a. You are solely responsible for the content and information that you post, upload, publish, link to, transmit, record, display or otherwise make available (hereinafter, "**post**") on the Service or transmit to other Members, including emails, videos (including streaming videos), photographs, voice notes, recordings or profile text, whether publicly posted or privately transmitted (collectively, "**Content**"). You may not post on the Website or as part of the Service, or transmit to the Company or any other Member (either on or off the Website), any offensive, inaccurate, abusive, obscene, profane, sexually oriented, threatening, intimidating, harassing, rude, vulgar, derogatory, sexist, defamatory, insulting, racially offensive, or illegal material, or any material that infringes or violates another person's rights (including intellectual property rights, and rights of privacy and publicity). You represent and warrant that all information that you submit upon registration is accurate and truthful and that you will promptly update any information provided by you that subsequently becomes inaccurate, misleading or false.

   b. You understand and agree that the Company may, but is not obligated to, monitor or review any Content you post on the Website or as part of a Service. The Company may delete any Content, in whole or in part, that in the sole judgment of the Company violates this Agreement or may harm the reputation of the Website or the Company. The Company may restrict the number of emails which a Member may send to other Members in any 24-hour period to a number which we deem appropriate in our sole discretion.

   c. By posting Content on the Website or as part of the Service, you automatically grant to the Company, its affiliates, licensees and successors, an irrevocable, perpetual, non-exclusive, fully paid-up, worldwide right and license to (i) use, copy, store, perform, display, reproduce, record, play, adapt, modify and distribute the Content, (ii) prepare derivative works of the Content or incorporate the Content into other works, and (iii) grant and authorize sublicenses of the foregoing in any media now known or hereafter created. You represent and warrant that any posting and use of your Content by the Company will not infringe or violate the rights of any third party.

   d. In addition to the types of Content described in Section 9(a) above, the following is a partial list of the kind of Content that is prohibited on the Website or as part of the Service. You may not post, upload, display or otherwise make available Content (either on or off the Website) that:

      a. constitutes or promotes racism, bigotry, hatred or physical harm of any kind against any group or individual;

      b. constitutes or advocates for harassment or intimidation of another person;

      c. requests money from, or is intended to otherwise defraud, other users of the Website or Service;

      d. involves the transmission of "junk mail," "chain letters," or unsolicited mass mailing or "spamming" (or "spimming", "phishing", "trolling" or similar activities);

      e. promotes information that is false or misleading, or promotes illegal activities or conduct that is defamatory, libelous or otherwise objectionable;

      f. promotes an illegal or unauthorized copy of another person's copyrighted work, such as providing pirated computer programs or links to them, providing information to circumvent manufacture-installed copy-protect devices, or providing pirated images, audio or video, or links to pirated images, audio or video files;

      g. contains video, audio photographs, or images of another person without his or her permission (or in the case of a minor, the minor's legal guardian);

      h. contains restricted or password only access pages, or hidden pages or images (those not linked to or from another accessible page);

      i. provides material that exploits people in a sexual, violent or other illegal manner, or solicits personal information from anyone under the age of 18;

      j. provides instructional information about illegal activities such as making or buying illegal weapons or drugs, violating someone's privacy, or providing, disseminating or creating computer viruses;

      k. contains viruses, time bombs, trojan horses, cancelbots, worms or other harmful, or disruptive codes, components or devices;

      l. impersonates, or otherwise misrepresents affiliation, connection or association with, any person or entity;

      m. provides information or data you do not have a right to make available under law or under contractual or fiduciary relationships (such as inside information, proprietary and confidential information);

      n. disrupts the normal flow of dialogue, causes a screen to "scroll" faster than other users are able to type, or otherwise negatively affects other users' ability to engage in real time exchanges;

MATCHFTC774616

o. solicits passwords or personal identifying information for commercial or unlawful purposes from other users or

p. publicizes or promotes commercial activities and/or sales without our prior written consent such as contests, sweepstakes, barter, advertising, and pyramid schemes.

The Company reserves the right, in its sole discretion, to investigate and take appropriate legal action against anyone who violates this provision, including removing the offending communication from the Website or Service and terminating or suspending the membership of such violators.

e. Your use of the Website and Service, including all Content you post through the Service, must comply with all applicable laws and regulations. You agree that the Company may access, preserve and disclose your account information and Content if required to do so by law or in a good faith belief that such access, preservation or disclosure is reasonably necessary, such as to: (i) comply with legal process; (ii) enforce this Agreement; (iii) respond to claims that any Content violates the rights of third parties; (iv) respond to your requests for customer service or allow you to use the Website in the future; or (v) protect the rights, property or personal safety of the Company or any other person.

f. You may not post any telephone numbers, street addresses, last names, URLs or email addresses in areas of your Member profile that may be viewed by other Members. You agree that any Content you place on the Website to be viewed by other Members may be viewed by any person visiting the Website or participating in the Service.

10. **Prohibited Activities.**
The Company reserves the right to investigate and/or TERMINATE your membership if you have misused the Service or behaved in a way the Company regards as inappropriate or unlawful, including actions or communications that occur off the Website. The following, in addition to the actions prohibited in Section 9(d) above, is a partial list of the type of actions that you may not engage in with respect to the Service. You will not:

- impersonate any person or entity, or misrepresent facts about any person or entity.

- solicit money, goods, or other property from any Members.

- post any Content or act in any manner that is prohibited by Section 9.

- "stalk", abuse, use profanity, send sexually oriented communication, threaten, intimidate, act in a rude, vulgar, sexist, or derogatory manner, defame, insult, make racially offensive statements, publish illegal material, or otherwise harass any person.

- express or imply that any statements you make are endorsed by the Company without our specific prior written consent.

- ask or use Members to conceal the identity, source, or destination of any illegally gained money or products.

- use any robot, spider, site search/retrieval application, or other manual or automatic device or process to retrieve, index, "data mine", or in any way reproduce or circumvent the navigational structure or presentation of the Website, Service or its contents.

- collect usernames and/or email addresses of members by electronic or other means for the purpose of sending unsolicited email or unauthorized framing of or linking to the Website.

- interfere with or disrupt the Service or the Website or the servers or networks connected to the Service or the Website.

- email or otherwise transmit any material that contains software viruses or any other computer code, files or programs designed to interrupt, destroy or limit the functionality of any computer software or hardware or telecommunications equipment.

- forge headers or otherwise manipulate identifiers in order to disguise the origin of any information transmitted to or through the Website or Service (either directly or indirectly through use of third party software).

- "frame" or "mirror" any part of the Service or the Website, without the Company's prior written authorization.

- use meta tags or code or other devices containing any reference to the Company, the Website or the Service (or any trademark, trade name, service mark, logo or slogan of the Company) to direct any person to any other website for any purpose.

- modify, adapt, sublicense, translate, sell, reverse engineer, decipher, decompile or otherwise disassemble any portion of the Service or the Website or any software used on or for the Service or the Website, or cause others to do so.

- post, use, transmit or distribute, directly or indirectly, (e.g. screen scrape) in any manner or media any content or information obtained from the Website or the Service other than solely in connection with your use of the Service in accordance with this Agreement.

11. **Customer Service.**
The Company provides assistance and guidance through its customer care representatives. When communicating with our customer care representatives (whether over the telephone, or via email or letter), you agree to not be abusive, obscene, profane, offensive, sexist, threatening, harassing, racially offensive, or to not otherwise behave inappropriately. Telephone calls between you and our customer care representatives may be recorded for quality assurance purposes, and by calling or communicating with our representatives you agree that your call may be recorded. If we feel that your behavior towards any of our customer care representatives or other employees is at any time threatening or offensive, we reserve the right to immediately terminate your membership and you will not be entitled to any refund of unused subscription fees.

**APP 382**

MATCHFTC774617

12. **Subscriptions; Charges on Your Billing Account.**

a. The Company bills you through an online account (your "**Billing Account**") for use of the Service. You agree to pay the Company all charges at the prices you agreed to for any use of the Service by you or other persons (including your agents) using your Billing Account, and you authorize the Company to charge your chosen payment provider (your "**Payment Method**") for the Service. You agree to make payment using that selected Payment Method. The Company may correct any billing errors or mistakes that it makes even if it has already requested or received payment. This Section 12 includes any agreements you made with the Company on the Website when becoming a Member or subscribing to the Service. The terms of your payment will be based on your Payment Method and may be determined by agreements between you and the financial institution, credit card issuer or other provider of your chosen Payment Method. If you initiate a chargeback or otherwise reverse a payment made with your Payment Method, the Company may in its discretion terminate your account immediately. If the Company successfully disputes the reversal, and the reversed funds are returned, you are not entitled to a refund or to have your account or subscription reinstated.

b. Your subscription will continue indefinitely until cancelled by you. After your initial subscription commitment period, and again after any subsequent subscription period, your subscription will automatically continue for an additional equivalent period, at the price you agreed to when subscribing. You agree that your account will be subject to this automatic renewal feature. If you do not wish your account to renew automatically, or if you want to change or terminate your subscription, please log in and go to "Account Settings" on the Website and follow the directions contained therein. If you cancel your subscription, you may use your subscription until the end of your then-current subscription term; your subscription will not be renewed after your then-current term expires. However, you won't be eligible for a prorated refund of any portion of the subscription fee paid for the then-current subscription period. By subscribing, you authorize the Company to charge your Payment Method now and again at the beginning of any subsequent subscription period. You also authorize the Company to charge you for any sales or similar taxes that may be imposed on your subscription payments. Upon the renewal of your subscription, if the Company does not receive payment from your Payment Method provider, you agree to pay all amounts due on your Billing Account upon demand and/or you agree that the Company may either terminate or suspend your subscription and continue to attempt to charge your Payment Method provider until payment is received (upon receipt of payment, your account will be activated and for purposes of automatic renewal, your new subscription commitment period will begin as of the day payment was received).

c. You must provide current, complete and accurate information for your Billing Account. You must promptly update all information to keep your Billing Account current, complete and accurate (such as a change in billing address, card number or expiration date), and you must promptly notify the Company if your Payment Method is canceled (including if you lose your card or it is stolen), or if you become aware of a potential breach of security (such as an unauthorized disclosure or use of your name or password). Changes to such information can be made at "Account Settings" on the Website. If you fail to provide the Company any of the foregoing information, you agree that you are responsible for fees accrued under your Billing Account. In addition, you authorize us to obtain updated or replacement expiration dates and card numbers for you credit or debit card as provided by your credit or debit card issuer. You also authorize us to update your Payment Method to include any credit or debit card or other payment method provided by you to purchase any feature or service throughout your use of the Website or Service when automatically renewing your account, as set forth in Section 12(b).

13. **Modifications to Service.**
The Company reserves the right at any time to modify or discontinue, temporarily or permanently, the Website or the Service (or any part thereof) with or without notice. You agree that the Company shall not be liable to you or to any third party for any modification, suspension or discontinuance of the Service. To protect the integrity of the Website or the Service, the Company reserves the right at any time in its sole discretion to block users from certain IP addresses from accessing the Website or Service.

14. **Copyright Policy; Notice and Procedure for Making Claims of Copyright Infringement.**
You may not post, distribute, or reproduce in any way any copyrighted material, trademarks, or other proprietary information without obtaining the prior written consent of the owner of such proprietary rights. Without limiting the foregoing, if you believe that your work has been copied and posted on the Service in a way that constitutes copyright infringement, please provide our Copyright Agent with the following information:

- an electronic or physical signature of the person authorized to act on behalf of the owner of the copyright interest;
- a description of the copyrighted work that you claim has been infringed;
- a description of where the material that you claim is infringing is located on the Website (and such description must be reasonably sufficient to enable the Company to find the alleged infringing material, such as a url);
- your address, telephone number and email address;
- a written statement by you that you have a good faith belief that the disputed use is not authorized by the copyright owner, its agent, or the law; and
- a statement by you, made under penalty of perjury, that the above information in your notice is accurate and that you are the copyright owner or authorized to act on the copyright owner's behalf.

Notice of claims of copyright infringement should be provided to the Company's Copyright Agent at copyright@match.com or the following address:

MATCHFTC774618

Match.com
Corporate Solutions Department
8750 North Central Expressway, Suite 1400
Dallas, Texas 75231
(214) 576-3272

The Company will terminate the accounts of repeat infringers.

15. **Communications and Test Profiles.**
When you become a Member, you agree and consent to receive email messages from us. These emails may be transactional or relationship communications relating to the Service, such as administrative notices and service announcements or changes, or emails containing commercial offers, promotions or special offers from us or third party partners. Please see the Company's Privacy Policy for more information regarding these communications. From time to time, employees of the Company (or its parent or affiliated companies) may create test dating profiles for the purpose of testing the functionality of our Service and website processes to improve service quality for our Members. Telephone calls between you and our customer care representatives may be recorded for quality assurance purposes.

16. **Disclaimers.**

a. You acknowledge and agree that neither the Company nor its affiliates and third party partners are responsible for and shall not have any liability, directly or indirectly, for any loss or damage, including personal injury or death, as a result of or alleged to be the result of (i) any incorrect or inaccurate Content posted on the Website or provided in connection with the Service, whether caused by Members or any of the equipment or programming associated with or utilized in the Website or Service; (ii) the timeliness, deletion or removal, incorrect delivery or failure to store any Content, communications or personalization settings; (iii) the conduct, whether online or offline, of any Member; (iv) any error, omission or defect in, interruption, deletion, alteration, delay in operation or transmission, theft or destruction of, or unauthorized access to, any user or Member communications; or (v) any problems, failure or technical malfunction of any telephone network or lines, computer online systems, servers or providers, computer equipment, software, failure of email or players on account of technical problems or traffic congestion on the Internet or at any website or combination thereof, including injury or damage to Members or to any other person's computer related to or resulting from participating or downloading materials in connection with the Internet and/or in connection with the Service. **TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW, THE COMPANY PROVIDES THE WEBSITE AND THE SERVICE ON AN "AS IS" AND "AS AVAILABLE" BASIS AND GRANTS NO WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE WITH RESPECT TO THE SERVICE OR THE WEBSITE (INCLUDING ALL CONTENT CONTAINED THEREIN), INCLUDING (WITHOUT LIMITATION) ANY IMPLIED WARRANTIES OF SATISFACTORY QUALITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. THE COMPANY DOES NOT REPRESENT OR WARRANT THAT THE WEBSITE OR SERVICE WILL BE UNINTERRUPTED OR ERROR FREE, SECURE OR THAT ANY DEFECTS OR ERRORS ON THE WEBSITE OR IN THE SERVICE WILL BE CORRECTED.**

b. ANY MATERIAL DOWNLOADED OR OTHERWISE OBTAINED THROUGH THE USE OF THE SERVICE OR WEBSITE IS ACCESSED AT YOUR OWN DISCRETION AND RISK, AND YOU WILL BE SOLELY RESPONSIBLE FOR AND HEREBY WAIVE ANY AND ALL CLAIMS AND CAUSES OF ACTION WITH RESPECT TO ANY DAMAGE TO YOUR COMPUTER SYSTEM, INTERNET ACCESS, DOWNLOAD OR DISPLAY DEVICE, OR LOSS OR CORRUPTION OF DATA THAT RESULTS OR MAY RESULT FROM THE DOWNLOAD OF ANY SUCH MATERIAL. IF YOU DO NOT ACCEPT THIS LIMITATION OF LIABILITY, YOU ARE NOT AUTHORIZED TO DOWNLOAD OR OBTAIN ANY MATERIAL THROUGH THE SERVICE OR WEBSITE.

c. From time to time, the Company may make third party opinions, advice, statements, offers, or other third party information or content available on the Website and/or through the Service. All third party content is the responsibility of the respective authors thereof and should not necessarily be relied upon. Such third party authors are solely responsible for such content. THE COMPANY DOES NOT: (I) GUARANTEE THE ACCURACY, COMPLETENESS, OR USEFULNESS OF ANY THIRD PARTY CONTENT ON THE WEBSITE OR PROVIDED THROUGH THE SERVICE, OR (II) ADOPT, ENDORSE OR ACCEPT RESPONSIBILITY FOR THE ACCURACY OR RELIABILITY OF ANY OPINION, ADVICE, OR STATEMENT MADE BY ANY PARTY THAT APPEARS ON THE WEBSITE OR SERVICE. UNDER NO CIRCUMSTANCES WILL THE COMPANY OR ITS AFFILIATES BE RESPONSIBLE OR LIABLE FOR ANY LOSS OR DAMAGE RESULTING FROM YOUR RELIANCE ON INFORMATION OR OTHER CONTENT POSTED ON THE WEBSITE OR SERVICE, OR TRANSMITTED TO OR BY ANY MEMBERS.

d. In addition to the preceding paragraph and other provisions of this Agreement, any advice that may be posted on the Website or through the Service is for informational and entertainment purposes only and is not intended to replace or substitute for any professional financial, medical, legal, or other advice. The Company makes no representations or warranties and expressly disclaims any and all liability concerning any treatment, action by, or effect on any person following the information offered or provided within or through the Website or Service. If you have specific concerns or a situation arises in which you require professional or medical advice, you should consult with an appropriately trained and qualified specialist.

17. **Links.**
The Website may contain, and the Service or third parties may provide, advertisements and promotions offered by third parties and links to other web sites or resources. You acknowledge and agree that the Company is not responsible for the availability of such external websites or resources, and does not endorse and is not responsible or liable for any content, information, statements, advertising, goods or services, or other materials on or available from such websites or resources. Your correspondence or business dealings with, or participation in promotions of, third parties found on or through the Website or Service, including payment and delivery of related goods or services, and any

**APP 384**

MATCHFTC774619

other terms, conditions, warranties or representations associated with such dealings, are solely between you and such third party. You further agree that the Company will not be responsible or liable, directly or indirectly, for any damage or loss caused or alleged to be caused by or in connection with the use of, or reliance upon, any such content, information, statements, advertising, goods or services or other materials available on or through any such website or resource.

18. **Limitation on Liability.**
TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, IN NO EVENT WILL THE COMPANY, ITS AFFILIATES, BUSINESS PARTNERS, LICENSORS OR SERVICE PROVIDERS BE LIABLE TO YOU OR ANY THIRD PERSON FOR ANY INDIRECT, RELIANCE, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OR CORRUPTION OF DATA OR PROGRAMS, SERVICE INTERRUPTIONS AND PROCUREMENT OF SUBSTITUTE SERVICES, EVEN IF THE COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE COMPANY'S LIABILITY TO YOU FOR ANY CAUSE WHATSOEVER, AND REGARDLESS OF THE FORM OF THE ACTION, WILL AT ALL TIMES BE LIMITED TO THE AMOUNT PAID, IF ANY, BY YOU TO THE COMPANY FOR THE SERVICE DURING THE TERM OF MEMBERSHIP. YOU AGREE THAT REGARDLESS OF ANY STATUTE OR LAW TO THE CONTRARY, ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR RELATED TO USE OF THE WEBSITE OR SERVICE OR THE TERMS OF THIS AGREEMENT MUST BE FILED WITHIN ONE YEAR AFTER SUCH CLAIM OR CAUSE OF ACTION AROSE OR BE FOREVER BARRED.

19. **Arbitration and Governing Law.**

   a. The exclusive means of resolving any dispute or claim arising out of or relating to this Agreement (including any alleged breach thereof), the Service, or the Website shall be **BINDING ARBITRATION** administered by the American Arbitration Association under the Consumer Arbitration Rules. The one exception to the exclusivity of arbitration is that you have the right to bring an individual claim against the Company in a small-claims court of competent jurisdiction. But whether you choose arbitration or small-claims court, you may not under any circumstances commence or maintain against the Company any class action, class arbitration, or other representative action or proceeding.

   b. By using the Website or the Service in any manner, you agree to the above arbitration agreement. In doing so, **YOU GIVE UP YOUR RIGHT TO GO TO COURT** to assert or defend any claims between you and the Company (except for matters that may be taken to small-claims court). **YOU ALSO GIVE UP YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION OR OTHER CLASS PROCEEDING.** Your rights will be determined by a **NEUTRAL ARBITRATOR, NOT A JUDGE OR JURY**, and the arbitrator shall determine all issues regarding the arbitrability of the dispute. You are entitled to a fair hearing before the arbitrator. The arbitrator can grant any relief that a court can, but you should note that arbitration proceedings are usually simpler and more streamlined than trials and other judicial proceedings. Decisions by the arbitrator are enforceable in court and may be overturned by a court only for very limited reasons. For details on the arbitration process, see our Arbitration Procedures.

   c. Any proceeding to enforce this arbitration agreement, including any proceeding to confirm, modify, or vacate an arbitration award, may be commenced in any court of competent jurisdiction. In the event that this arbitration agreement is for any reason held to be unenforceable, any litigation against the Company (except for small-claims court actions) may be commenced only in the federal or state courts located in Dallas County, Texas. You hereby irrevocably consent to the jurisdiction of those courts for such purposes.

   d. This Agreement, and any dispute between you and the Company, shall be governed by the laws of the state of Texas without regard to principles of conflicts of law, provided that this arbitration agreement shall be governed by the Federal Arbitration Act.

20. **Indemnity by You.**
You agree to indemnify and hold the Company, its subsidiaries, and affiliates, and its and their officers, agents, partners and employees, harmless from any loss, liability, claim, or demand, including reasonable attorney's fees, made by any third party due to or arising out of your breach of or failure to comply with this Agreement (including any breach of your representations and warranties contained herein), any postings or Content you post on the Website or as a result of the Service, and the violation of any law or regulation by you. The Company reserves the right to assume the exclusive defense and control of any matter otherwise subject to indemnification by you, in which event you will fully cooperate with the Company in connection therewith.

21. **Notice.**
The Company may provide you with notices, including those regarding changes to this Agreement, using any reasonable means now known or hereafter developed, including by email, regular mail, SMS, MMS, text message or postings on the Website. Such notices may not be received if you violate this Agreement by accessing the Service in an unauthorized manner. You agree that you are deemed to have received any and all notices that would have been delivered had you accessed the Service in an authorized manner.

22. **Entire Agreement; Other.**
This Agreement, with the Privacy Policy and any specific guidelines or rules that are separately posted for particular services or offers on the Website, contains the entire agreement between you and the Company regarding the use of the Website and/or the Service. If any provision of this Agreement is held invalid, the remainder of this Agreement shall continue in full force and effect. The failure of the Company to exercise or enforce any right or provision of this Agreement shall not constitute a waiver of such right or provision. You agree that your online account is non-transferable and all of your rights to your profile or contents within your account terminate upon your death. No agency, partnership, joint venture or employment is created as a result of this Agreement and you may not make any representations or bind the Company in any manner.

23. **Amendment.**
This Agreement is subject to change by the Company at any time. If you are a non-subscribing Member at the time of any change, the revised terms will be effective upon posting on the Website and your use of the Service after such posting will constitute acceptance by you of the revised Agreement. If you are a subscribing Member at the time of any change, the then-existing Agreement will continue to govern

your membership until such time that you renew your subscription as contemplated by Section 12. If you continue your subscription, your renewal use of the Service after your termination will constitute acceptance by you of the Agreement.

24. **Special State Terms.**
The following provisions are added to this Agreement for subscribers residing in Arizona, California, Connecticut, Illinois, Iowa, Minnesota, New York, North Carolina, Ohio and Wisconsin:

**You, the buyer, may cancel this agreement, without penalty or obligation, at any time prior to midnight of the third business day following the original date of this contract, excluding Sundays and holidays. To cancel this agreement, mail or deliver a signed and dated notice which states that you, the buyer, are canceling this agreement, or words of similar effect. This notice shall be sent to: Match.com, Attn: Cancellations, P.O. Box 25472, Dallas, Texas 75225, USA (in addition, California and Ohio users may email us by clicking here or send a facsimile to 214-853-4309). Please include your match.com username and email address in any correspondence or your refund may be delayed. If you cancel, Match.com will return, within ten days of the date on which you give notice of cancellation, any payments you have made. If you send or deliver the notice to cancel your subscription agreement within such three day period, we will refund the full amount of your subscription.**

**In the event that you die before the end of your subscription period, your estate shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your death. In the event that you become disabled (such that you are unable to use the services of Match.com) before the end of your subscription period, you shall be entitled to a refund of that portion of any payment you had made for your subscription which is allocable to the period after your disability by providing the company notice at the same address as listed above.**

Please Contact Us with any questions regarding this agreement. Match.com is a trademark of Match Group, LLC

MATCHFTC774621

# EXHIBIT 6


United States Patent and Trademark Office
Case 3:23-cv-00114 and Trademark Office Filed 10/16/23 Page 369 of 1058 PageID 12858

Home | Site Index | Search | FAQ | Glossary | Contacts | eBusiness | eBiz alerts | News

**Trademarks > Trademark Electronic Search System (TESS)**

*TESS was last updated on Wed Oct 5 03:32:24 EDT 2022*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At: _____   OR   Jump   to record: _____   **Record 73 out of 114**

TSDR | ASSIGN Status | TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | M |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: Computer application software for use with mobile devices, namely, software for the purpose of accessing online dating services. FIRST USE: 20121207. FIRST USE IN COMMERCE: 20121207 |
| | IC 045. US 100 101. G & S: Dating services; Internet based social networking, introduction, and dating services. FIRST USE: 20140416. FIRST USE IN COMMERCE: 20140416 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 02.11.01 - Hearts excluding hearts as carriers or depicted on playing cards |
| **Serial Number** | 86286887 |
| **Filing Date** | May 20, 2014 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | October 21, 2014 |
| **Registration Number** | 4666846 |
| **Registration Date** | January 6, 2015 |
| **Owner** | (REGISTRANT) Match.com, L.L.C. LIMITED LIABILITY COMPANY DELAWARE P.O. Box 25458 Dallas TEXAS 75225 |
| | (LAST LISTED OWNER) **MATCH GROUP, LLC** LIMITED LIABILITY COMPANY DELAWARE P.O. BOX 25458 DALLAS TEXAS 75225 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Jonathan D. Reichman, Esq. |

**Description of Mark** Color is not claimed as a feature of the mark. The mark consists of a lowercase letter 'm' with a heart above it and to the right.

**Type of Mark** TRADEMARK. SERVICE MARK

**Register** PRINCIPAL

**Affidavit Text** SECT 15. SECT 8 (6-YR).

**Live/Dead Indicator** LIVE



| HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# EXHIBIT 7


## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Oct 5 03:32:24 EDT 2022*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC
PREV DOC | NEXT DOC | LAST DOC

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At: [          ] OR Jump to record: [          ]   **Record 69 out of 114**

TSDR | ASSIGN Status | TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | MATCH |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: Computer application software for use with mobile devices, namely, software for the purpose of accessing online dating services. FIRST USE: 20140423. FIRST USE IN COMMERCE: 20140423 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 02.11.12 - Hearts as depicted on playing cards |
| **Serial Number** | 86286888 |
| **Filing Date** | May 20, 2014 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | October 21, 2014 |
| **Registration Number** | 4666847 |
| **Registration Date** | January 6, 2015 |
| **Owner** | (REGISTRANT) Match.com, L.L.C. LIMITED LIABILITY COMPANY DELAWARE P.O. Box 25458 Dallas TEXAS 75225 |
| | (LAST LISTED OWNER) **MATCH GROUP, LLC** LIMITED LIABILITY COMPANY DELAWARE P.O. BOX 25458 DALLAS TEXAS 75225 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Benjamin Setnick |
| **Prior Registrations** | 2088545;2640223;3518254;AND OTHERS |
| **Description** | Color is not claimed as a feature of the mark. The mark consists of the word "match" in lowercase letters with a heart above it |

**of Mark**    and to the right.

**Type of Mark**    TRADEMARK

**Register**    PRINCIPAL

**Affidavit Text**    SECT 15. SECT 8 (6-YR).

**Live/Dead Indicator**    LIVE

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

| HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# EXHIBIT 8

**Trademarks** > **Trademark Electronic Search System (TESS)**

*TESS was last updated on Wed Oct 5 03:32:24 EDT 2022*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC |
| PREV DOC | NEXT DOC | LAST DOC |

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At: _____ OR Jump to record: _____ **Record 88 out of 114**

TSDR | ASSIGN Status | TTAB Status *( Use the "Back" button of the Internet Browser to return to TESS)*

# MATCH.COM

| | |
|---|---|
| **Word Mark** | MATCH.COM |
| **Goods and Services** | IC 045. US 100 101. G & S: Dating services; Internet based social networking, introduction, and dating services. FIRST USE: 19950310. FIRST USE IN COMMERCE: 19950310 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 85215707 |
| **Filing Date** | January 12, 2011 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | May 27, 2014 |
| **Registration Number** | 4582447 |
| **Registration Date** | August 12, 2014 |
| **Owner** | (REGISTRANT) Match.com, LLC LIMITED LIABILITY COMPANY DELAWARE P.O. Box 25458 Dallas TEXAS 75225 |
| | (LAST LISTED OWNER) **MATCH GROUP, LLC** LIMITED LIABILITY COMPANY DELAWARE P.O. BOX 25458 DALLAS TEXAS 75225 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Jonathan D. Reichman, Esq. |
| **Prior Registrations** | 3323423;3518165;3518254;AND OTHERS |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC

PREV DOC | NEXT DOC | LAST DOC

Case 3:11-cv-2281-K   Document 239   Filed 10/16/23   Page 376 of 1058   PageID 12865

**APP 395**

MATCHFTC774679

# EXHIBIT 9


**Trademarks > Trademark Electronic Search System (TESS)**

*TESS was last updated on Wed Oct 5 03:32:24 EDT 2022*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC
PREV DOC | NEXT DOC | LAST DOC

Logout  Please logout when you are done to release system resources allocated for you.

Start **List At:** ____  OR  Jump **to record:** ____    **Record 114 out of 114**

TSDR | ASSIGN Status | TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*

# Typed Drawing

| | |
|---|---|
| **Word Mark** | MATCH.COM |
| **Goods and Services** | IC 042. US 100 101. G & S: computer services, namely, providing information regarding, and in the nature of, on-line dating and introduction services. FIRST USE: 19950310. FIRST USE IN COMMERCE: 19950310 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 74670969 |
| **Filing Date** | May 8, 1995 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | May 27, 1997 |
| **Registration Number** | 2088545 |
| **Registration Date** | August 19, 1997 |
| **Owner** | (REGISTRANT) Electric Classifieds, Inc. CORPORATION CALIFORNIA 340 Brannan Street Suite 102 San Francisco CALIFORNIA 941071233 |
| | (LAST LISTED OWNER) **MATCH GROUP, LLC** LIMITED LIABILITY COMPANY DELAWARE P.O. BOX 25458 DALLAS TEXAS 75225 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | William M. Merone |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). SECTION 8(10-YR) 20170809. |
| **Renewal** | 2ND RENEWAL 20170809 |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC
PREV DOC | NEXT DOC | LAST DOC

**APP 398**

MATCHFTC774681

# EXHIBIT 10

**I C A N N** | L O O K U P (/en)

# Registration data lookup tool

Enter a domain name or an Internet number resource (IP Network or ASN)        Frequently Asked Questions (FAQ) (/en/faq)

match.com

Lookup

By submitting any personal data, I acknowledge and agree that the personal data submitted by me will be processed in accordance with the ICANN Privacy Policy (https://www.icann.org/privacy/policy), and agree to abide by the website Terms of Service (https://www.icann.org/privacy/tos) and the registration data lookup tool Terms of Use (unsafe:javascript:void(0)).

## Domain Information

**Name:** MATCH.COM

**Registry Domain ID:** 3405486_DOMAIN_COM-VRSN

**Domain Status:**
clientDeleteProhibited (https://icann.org/epp#clientDeleteProhibited)
clientTransferProhibited (https://icann.org/epp#clientTransferProhibited)
clientUpdateProhibited (https://icann.org/epp#clientUpdateProhibited)

**Nameservers:**
DNS1.P01.NSONE.NET
DNS2.P01.NSONE.NET
DNS3.P01.NSONE.NET
DNS4.P01.NSONE.NET

## Dates

**Registry Expiration:** 2023-06-01 04:00:00 UTC

**Updated:** 2022-04-30 09:17:01 UTC

**Created:** 1998-06-02 04:00:00 UTC

## Contact Information

MATCHFTC774697

## Administrative:

**Mailing Address:** TX, US

***Redacted for privacy:***
*some of the data in this object has been removed.*

## Registrant:

**Organization:** Match Group, LLC

**Mailing Address:** TX, US

***Redacted for privacy:***
*some of the data in this object has been removed.*

## Technical:

**Mailing Address:** TX, US

***Redacted for privacy:***
*some of the data in this object has been removed.*

# Registrar Information

**Name:** MarkMonitor Inc.

**IANA ID:** 292

**Abuse contact email:** abusecomplaints@markmonitor.com

**Abuse contact phone:** +1.2086851750

# DNSSEC Information

**Delegation Signed:** Unsigned

# Authoritative Servers

MATCHFTC774698

**Registry Server URL:** https://rdap.verisign.com/com/v1/domain/match.com (https://rdap.verisign.com/com/v1/domain/match.com)

**Last updated from Registry RDAP DB:** 2022-10-12 14:51:22 UTC

**Registrar Server URL:** https://rdap.markmonitor.com/rdap/domain/MATCH.COM (https://rdap.markmonitor.com/rdap/domain/MATCH.COM)

**Last updated from Registrar RDAP DB:** 2022-10-12 10:51:20 UTC

# Notices and Remarks

## Remarks:

**REDACTED FOR PRIVACY**

Some of the data in this object has been removed.

## Notices:

**Terms of Use**

By submitting an RDAP query, you agree that you will use this data only for
lawful purposes and that, under no circumstances will you use this data to:
(1) allow, enable, or otherwise support the transmission by email, telephone,
or facsimile of mass, unsolicited, commercial advertising, or spam; or
(2) enable high volume, automated, or electronic processes that send queries,
data, or email to MarkMonitor (or its systems) or the domain name contacts (or
its systems).
MarkMonitor reserves the right to modify these terms at any time.
By submitting this query, you agree to abide by this policy.
MarkMonitor Domain Management(TM)
Protecting companies and consumers in a digital world.
Visit MarkMonitor at https://www.markmonitor.com
Contact us at +1.8007459229
In Europe, at +44.02032062220

https://www.markmonitor.com/legal/domain-management-terms-and-conditions (https://www.markmonitor.com/legal/domain-management-terms-and-conditions)

**Status Codes**

For more information on domain status codes, please visit https://icann.org/epp.

https://icann.org/epp (https://icann.org/epp)

**RDDS Inaccuracy Complaint Form**

URL of the ICANN RDDS Inaccuracy Complaint Form: https://www.icann.org/wicf

**APP 402**

MATCHFTC774699



Youtube
(https://www.youtube.com/icannnews)

Twitter (https://www.twitter.com/icann)

Linkedin
(https://www.linkedin.com/company/icann)

Flickr
(https://www.flickr.com/photos/icann)

Facebook
(https://www.facebook.com/icannorg)

Newletters
(https://www.icann.org/resources/pages/global-newsletter-2018)

Community Wiki
(https://community.icann.org/)

ICANN Blog
(https://www.icann.org/news/blog)

© Internet Corporation for Assigned Names and Numbers. Privacy Policy (https://www.icann.org/privacy/policy)  Terms of Service (https://www.icann.org/privacy/tos)  Cookies Policy (https://www.icann.org/privacy/cookies)

# EXHIBIT 11



## App Store Preview

This app is available only on the App Store for iPhone and Apple Watch.



### Match: Dating & Relationships  [17+]

Chat, Date, Meet & Find Love

Match Group, LLC

#60 in Social Networking

★★★★★ 2.8 • 114.4K Ratings

Free · Offers In-App Purchases

---

## Screenshots   iPhone   Apple Watch









---

Welcome to Match. Here, being real beats playing it cool. Knowing who you are and what you want is always a priority. And not settling for anything less isn't a bad thing. Some call it picky, but we say more power to you. Backed by 25 years of experience and real-life dating experts, our app lets you date like an adult – from matching to meeting in person.

MATCHFTC774727

# EXHIBIT 12

**APP 406**

5:28



🔲 ⬜  iPhone and Apple Watch Apps   ⌄

Welcome to Match. Here, being real beats playing it cool. Knowing who you are and what you want is always a **more**

Match Group, LLC
Developer

Today    Games    Apps    Arcade    Search



# EXHIBIT 13



Google Play

Games          Apps          Movies & TV          Books          Kids



# Match Dating: Chat, Date, Meet

**Match.com LLC**

In-app purchases

| 3.3★ | 10M+ | M |
|------|------|---|
| 133K reviews | Downloads | Mature 17+ ⓘ |

**Install**

🔖 Add to wishlist






## About this app                                                                →

Welcome to Match. Here, being real beats playing it cool. Knowing who you are and what you want is always a priority. And not settling for anything less isn't a bad thing. Some call it picky, but we say more power to you. Backed by 25 years of experience and real-life dating experts, our app lets you date like an adult – from matching to meeting in person.

Match, chat, date and meet with singles nearby and find love.

...

**Updated on**

Sep 29, 2022

# EXHIBIT 14



> Google Play

Games    **Apps**    Movies & TV    Books    Kids





## Match Group, LLC

Match is here to help singles find the kind of relationship they're looking for.



### Match Dating: Chat, Date, Meet
**Match Group, LLC**
In-app purchases

| **3.3★** | **10M+** | **M** |
|---|---|---|
| 134K reviews | Downloads | Mature 17+ ⓘ |

**Install**

**APP 411**
MATCHFTC777082

# EXHIBIT 15

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT 16

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT 17

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT 18



MATCHFTC774523

# EXHIBIT 19

APP 425



match

## We believe you will find someone special at Match.

It works so well, we guarantee it. That's why we've created the I Met Someone GUARANTEE. If you don't find someone special within 6 months, we'll give you an additional 6 months free. How the Match.com Guarantee works:

**1** Sign up now for a 6-month subscription.

If you don't find someone special during your initial 6-month subscription, we will give you an additional 6 months at no additional cost to you to continue your search.

**You'll love your time with us We guarantee it.**

**2** During your 6-month subscription, you must:

- Create a truthful Match.com profile with a primary photo and keep it visible to the public.

- Respond to, or initiate email communication with at least 5 unique Match.com members each month through the Match.com service.

- Comply with all of the Match.com Guarantee Program rules below.

I Met Someone GUARANTEE (formerly "Make Love Happen Guarantee") Program Rules

MATCHFTC774536

We know you'll meet tons of great people during your 6-month subscription with us. But, if you don't find someone special during that time, we'll give you an ADDITIONAL 6 months to continue your search. Check out the rules below, then get out there and start connecting today!

- Under the I Met Someone GUARANTEE Program, (the "Guarantee Program" or the "Program") if you don't find someone special during a qualifying six-month paid subscription to the Match.com service, we'll give you an additional six-month subscription (the "Guarantee Extension") to the Match.com service at no additional expense. See Match.com Terms of Use for details regarding the Match.com service and use of the Match.com website.

- The Guarantee Program is available for a limited time only, and open to anyone not currently participating in the Program. Additionally, to be eligible for the Program and the Guarantee Extension, you must:

- (1) Comply at all times with the Match.com Terms of Use. By using the Match.com website and participating in the Program, you agree to be bound by the Match.com Terms of Use.

- (2) Pay in full the applicable rate for a **six-month subscription** to the Match.com service (the "Guarantee Program Subscription"). The Guarantee Program Subscription consists of five consecutive 30-day periods followed by a final period of 33 days, all of which are referred to as a "Month" in these Program rules. If you are enjoying the benefits of a free trial of the Match.com service, your Guarantee Program Subscription will not begin until your free trial period ends.

- (3) Use your Guarantee Program Subscription to **create a profile with a primary photo**. Your profile and primary photo must be approved by Match.com within the first seven days of your Guarantee Program Subscription in order for you to be eligible for the Guarantee Program. Details on approval of profile and primary photo available at FAQ and How It Works.

- (4) **Keep your profile with primary photo visible at all times** during your Guarantee Program Subscription.

- (5) **Communicate** during your Guarantee Program Subscription with other Match.com subscribers with whom you have not previously communicated during your Guarantee Program Subscription ("Unique Match.com Subscribers").

- (6) **Send a "Qualifying Email" to a minimum of five other Unique Match.com Subscribers each Month during your Guarantee Program Subscription.** A "Qualifying Email" may be either one you send to a Unique Match.com Subscriber who has not yet emailed you or an email response you send to a Unique Match.com Subscriber who has emailed you. A "Qualifying Email" must be an email sent through the Match.com service and does not include any other method of communicating (such as Match.com winks, MatchPhone™, Match.com Instant Messaging or emails sent outside of the Match.com system).

**APP 427**

MATCHFTC774568

- Progress toward eligibility for the Guarantee Extension may be determined at any time during a Guarantee Program Subscription by visiting the progress page associated with such Guarantee Program Subscription (the "Guarantee Program Progress Page"). If, during the last seven days of a Guarantee Program Subscription, you are eligible for a Guarantee Extension (and have not met that "special someone"), you may accept the Guarantee Extension by affirming on the Guarantee Program Progress Page that you have not met someone special during your Guarantee Program Subscription. Please see the Match.com Guarantee FAQ for further information. You may also contact Customer Care with any questions related to the Match.com service or the Program. Match.com alone will make all decisions under these Program rules regarding Program policies, including but not limited to Program and Guarantee Extension eligibility.

- Customers eligible to receive a Guarantee Extension will not receive a refund, money or any other thing of value as a substitute for the Guarantee Extension. The Guarantee Extension may only be used by the purchaser of the Guarantee Program Subscription, and the Guarantee Extension may not be sold or transferred in any way.

- Guarantee Program Subscriptions which do not result in a Guarantee Extension (due to ineligibility of the subscriber or failure of the subscriber to accept the Guarantee Extension) will automatically be continued for successive six-month subscription periods at the subscription rate in effect at the time of continuation. See Match.com Terms of Use for details regarding Match.com subscriptions and charges on your billing account.

- The Match.com Terms of Use and the Match.com Guarantee Program Rules are subject to change by Match.com at any time, effective upon posting on the Match.com website, and your use of the Match.com service and your initial or continued participation in the Match.com Guarantee Program after such posting will constitute acceptance by you of such changes. Match.com reserves all rights to modify, suspend or cancel the Program at any time and without notice.

- Program rules last updated January 24th, 2008.

MATCHFTC774563

# EXHIBIT 20

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)



MATCHFTC774538



How you're pacing with the match GUARANTEE:



APP 431

MATCHFTC774527

# EXHIBIT 21

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT 22

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT 23

**From:**   Anastasia Burman [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=3CB1E3395BFF4456AA63211D0D3EE775-ANASTASIA B]
**Sent:**   4/15/2019 10:19:50 AM
**To:**   Terrance Thomas [/o=ExchangeLabs/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=a941e3c9d3ab4f3686ffb74731be56d4-Terrance Th]; 'DL_Match_Support'
[DL_Match_Support@telusinternational.com]; MatchDomesticSynergiesServices [/o=ExchangeLabs/ou=Exchange
Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a594a78cf3484723a581b581a8296680-
MatchDomest]; matchops@ballenamedia.com; Community Operations Support [/o=ExchangeLabs/ou=Exchange
Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=171d3f31a28343b5bd5b450fb18418a7-Match Custo];
Community Operations Training [/o=ExchangeLabs/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=8a26f1e6f4584f8bb93998b818294f7f-Customer Su]; Community Operations
Quality [/o=ExchangeLabs/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=7d0412db501a42dc8d231e0d50cfebfa-Community O]; Community
Operations Management [/o=ExchangeLabs/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=222193c76d4c4bef9ce65e241d0bc0ba-Customer Su]; Community
Operations Escalations [/o=ExchangeLabs/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=548d5275915949acbc1e4ca0bdbd7535-Community O]; Community
Operations Pilot [/o=ExchangeLabs/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=4cda4b0c13b04a1e959fc5b327540fd1-Community O]
**CC:**   Laurie Braddock [/o=ExchangeLabs/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=2cf0ae69281a49ae8430e9005a76230e-Laurie Brad]; Sarah Meade
[/o=ExchangeLabs/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=71807a64e9f344be91d5394c537b2026-Sarah Meade]
**Subject:**   Match Update: 6 Month Guarantee No Longer Available

All,

The following has been added to Daily Updates in RNT.

### 6 Month Guarantee No Longer Available (April 15, 2019)

Effective immediately, the 6MG is no longer available for purchase on any platform and should not be offered when
subscribing a member.

Agents should continue assisting members who have previously purchased the 6MG with guarantee tracking and
redemption.

Let us know if you have any questions.

Thanks,

**Anastasia Burman**
Manager, Training & Development
Match & Match Affinity

8750 N. Central Expwy. Ste 1400 | Dallas, Texas 75231
469.850.8453



# EXHIBIT 24

# match❤community

| Guarantee | | Search |

E.g. "reset password" or "cookies"



**Account Settings**



**Billing & Subscription**



**Member Communication**



**Paid Features & Power-Ups**



**Profile & Photos**



**Searching & Matching**



**Technical Issues**



**Contact Us**

### What happened to the Match Guarantee?

The Match Guarantee program was discontinued on 4/11/2019. Any new subscription purchases after that date will not include the Match Guarantee.

If you bought a new 6-month subscription through the Match site before 4/11/2019, then you can take advantage of the Match Guarantee one last time. Simply go to your Progress Page to track how you're doing and redeem the Guarantee at the end of your subscription term.

Even without the Match Guarantee, we still know you'll meet plenty of great people during your time on Match, and we want to give you all the tools you need to find someone special! That's why we updated our subscription bundles to include more features for an even better experience.

When you're purchasing a new subscription, make sure you review all the options to find the package that fits your needs. You can always contact us by phone or chat if you need help understanding the options or making a purchase.

MATCHFTC774522

# EXHIBIT 25

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT 26

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT 27

APP 457

**From:** Match [mailer@QA.connect.match.com]
**Sent:** 10/7/2021 3:31:48 AM
**To:** cpqateam@gmail.com
**Subject:** QA - Information about your Match account



Dear Bill,

You recently initiated a chargeback related to your subscription. While your account was deactivated for a period of time it has now been reactivated and you have been credited with whatever time was remaining on your subscription at the time of your chargeback request. Your profile is currently hidden. In order to unhide your profile, take the steps below depending on whether you are accessing your account on desktop, the Match app, or Mobile Web. Your subscription will end on 01/01/2022 and will not autorenew.

For Desktop

Access the profile edit screen by clicking your primary photo icon on the main site menu (at the top of the screen). Next, look at the top right-hand side of the profile edit screen to see your current visibility in bold text. Then click the circle next to "Anyone can see you" to make your profile visible.

For App

Access the profile edit screen by tapping on the profile icon on the bottom right of your screen. Next, look at the top right-hand side of the screen and tap the gear icon. (Note for iPhone users: Tap Profile Visibility at the top of the menu that appears on the next screen). Then click the circle next to "Visible" so that anyone can see you on the Match site.

For Mobile Web

Access the profile edit screen by tapping on the profile icon on the bottom right of your screen. Next, look at the top of the screen to see your current visibility in bold text. Then click the blue text that says "Control who sees your profile." On the screen that appears, you can click the circle next to "Anyone can see you" to make your profile visible.

CONFIDENTIAL – FTC v. MATCH, Case No. 3:19-cv-02281-K

**To keep your account secure, please do not forward this email. Forwarding could give others access to your account.**

Match P.O. Box 25472
Dallas, TX 75225

**Get the Match app**

Please do not reply to this email. Replies will not be received.

If you have a question, or need assistance, please contact Customer Care.

CONFIDENTIAL – FTC v. MATCH, Case No. 3:19-cv-02281-K

# EXHIBIT 28

APP 460








**Recommended**


Top Picks



## Izzie-vawppaht 

27 · Dallas, TX

Currently separated

5' 5" (165 cm)

Athletic/Fit

Yes, and they sometimes live at home

I enjoy quirky scrabble events and ponds. I'm looking for a cool lizard.

 Skip      1       Like

Add 3 clear-face photos  more attention.

Manage photos →

Pick 3 more Topics that show 
off the real you

Manage Topics →

**Private Mode**

Only be seen by members you like
or message.

Choose who sees you →







About Match         Terms of Use          Community Guidelines       Blog                 Cookie Settings
Help/FAQs           Your Privacy           Safety Tips               Advertise            Intellectual Property
Careers             Cookie Policy          Media Room               Success Stories

© Copyright 2022 Match Group, LLC

APP 461

MATCHFTC774813

# EXHIBIT 29

      
## Account settings

| Manage account | **Manage account** |
|---|---|
| Visibility | Edit name |
| Blocked profiles | Edit email |
| Removed profiles | Edit password |
| Email notifications | Edit age |
| Mobile push notifications | Manage subscription |
| Site notifications | |
| Verify your account | |

About Match
Help/FAQs
Careers

Terms of Use
Your Privacy
Cookie Policy

Community Guidelines
Safety Tips
Media Room

Blog
Advertise
Success Stories

Cookie Settings
Intellectual Property

m.

© Copyright 2022 Match Group, LLC

**APP 463**

MATCHFTC774738

# EXHIBIT 30

APP 464



MATCHFTC774742

# EXHIBIT 31

APP 466








**Choose one of the options below to continue.**

Subscription Status

Check or change your subscription info here. Update your credit card and billing info. Or, just see how much time you have left on your subscription.

Cancel Subscription

Cancel your subscription with Match.com. You will not be able to send or receive emails after your subscription expires, but you can still look as much as you'd like.

Back to home

**About Match**
Accessibility Help
Terms of Use
Your Privacy
Ad Choices
Careers
Cookie Policy

**Online Dating Safety Tips**
Dating Articles and Advice
Success Stories

**Help/FAQs**
Contact Us
Site Map
Match International
Media Room

Mobile
Gift Subscriptions

**Advertise on Match**


© Copyright 2022 Match Group, LLC. web2-2g1f-+-

EXHIBIT 32



Before you go, help us make Match.com better.

If you cancel, your last day of subscription will be 10/5/2022 and you will not be billed for any additional time.

What is the primary reason that you are looking to cancel your
subscription with Match.com?

○ I had too much going on and did not have time to date
○ I didn't click with the matches I met in person
○ Not many people of interest initiated contact with me
○ I didn't receive enough replies to emails I sent out
○ I can't afford a subscription right now
○ Very few profiles piqued my interest
○ I met someone
● Other



About Match
Accessibility Help
Terms of Use
Your Privacy
Ad Choices
Careers
Cookie Policy

Online Dating Safety Tips
Dating Articles and Advice
Success Stories

Help/FAQs
Contact Us
Site Map
Match International
Media Room

 Mobile
Gift Subscriptions

Advertise on Match

© Copyright 2022 Match Group, LLC wds2-1q1f-p-

MATCHFTC774745

# EXHIBIT 33



James, sometimes finding love takes time. We truly believe you can find someone special on Match.com. After all, more relationships begin at Match.com than at any other site.

Give us another shot and we'll give you

50% off your next renewal

You have nothing to lose. You won't be charged the discounted price ($51.14, including tax) until your next renewal date. At the end of your discounted 6 months, your subscription will automatically renew for the same package length at the **non-discounted price ($102.27, including tax)** until you cancel, at any time, via your Account Settings page. By pressing the button below, you authorize us to charge your card upon each renewal. Learn More

Any add-ons that are a part of your subscription will renew at full price.

These members gave it another chance. Now, they're a Match.com success couple!

GET 50% OFF 6 MONTHS     CONTINUE CANCELLATION

Not sure? Think about it and decide any time before the renewal date. Search Now »

About Match
Accessibility Help
Terms of Use
Your Privacy
Ad Choices
Careers
Cookie Policy

Online Dating Safety Tips
Dating Articles and Advice
Success Stories

Help/FAQs
Contact Us
Site Map
Match International
Media Room

Mobile
Gift Subscriptions

Advertise on Match

© Copyright 2022 Match Group, LLC wda2-2q1f-r-

# EXHIBIT 34

**APP 472**

       

events

December 31, 2022 | Anf Test 516 Venue

VIEW ALL EVENTS

## Tell us more.

One last step. How likely would it be for you to recommend Match.com to a friend?

◄ Not Likely        Very Likely ►

| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |

**If you cancel now, you will lose these benefits once your subscription ends:**

- You won't know who's viewed your profile
- No more sending and responding to emails
- **You risk losing your** current monthly rate

[Back to home] [Continue Cancellation]

**About Match**
Accessibility Help
Terms of Use
Your Privacy
Ad Choices
Careers
Cookie Policy

**Online Dating Safety Tips**
Dating Articles and Advice
Success Stories

**Help/FAQs**
Contact Us
Site Map
Match International
Media Room

Mobile
Gift Subscriptions

**Advertise on Match**

© Copyright 2022 Match Group, LLC. vda2-2a16-s-

MATCHFTC774739

# EXHIBIT 35

## Your subscription has been cancelled.

Your confirmation number is James.20229303210496.

You do not have to do anything further to complete your subscription cancellation.

The last day of your subscription will be 10/5/2022. Use your last 6 days to contact any new members on Match.com. You never know when you're going to find the one!

You will receive an email confirming your cancellation and containing pertinent information soon.

Reactivate my subscription    Hide profile / deactivate my account

**About Match**
Accessibility Help
Terms of Use
Your Privacy
Ad Choices
Careers
Cookie Policy

**Online Dating Safety Tips**
Dating Articles and Advice
Success Stories

**Help/FAQs**
Contact Us
Site Map
Match International
Media Room

Mobile
Gift Subscriptions

**Advertise on Match**

© Copyright 2022 Match Group, LLC v-6a2-2q3f-a-

APP 475
MATCHFTC774734

# EXHIBIT 36

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT 37

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT 38

APP 489

# Canceling

### Canceling a Subscription

If you don't have a paid subscription (or if you have already turned off your auto-renewal), you can cancel your membership by visiting the Manage Subscription section on your Account Settings page.

When you cancel your membership, we immediately Hide your profile and photos from other members. Should you wish to rejoin the Match community, all you have to do is sign in and reactivate your account.

Your information will be retained in accordance with our Privacy Policy.

If you want to cancel your subscription (turn off auto-renewal), please click here. Or watch the video below for step-by-step instructions on how to cancel your subscription from your desktop.

How to Cancel Auto Renewal

01:06

### Canceling Additional Features

If you purchased additional features for your subscription (like Private Mode or matchPhone, for example), you can cancel those additional features without cancelling your basic subscription.

To cancel an additional feature, simply follow these steps.

### iOS app - Canceling or Turning Off Auto-Renewal:

If you purchased a Match subscription through the iOS App, any cancellations will have to be done through Apple directly.

Follow these steps to turn off your auto-renewal on your iPhone:

1. Launch the App store on your iPhone
2. Tap on the Profile icon on the top right of the app store
3. Tap on Subscriptions
4. Tap on "Cancel Subscription" in red at the bottom of the screen
5. Tap on "Confirm" on the pop-up to save your changes.

If you would like further information or assistance, please contact Apple directly by clicking <u>Here</u>.

## On the Match app

1. Log in to your Match account, and tap on the "Profile" icon at the bottom of the screen.
2. Tap on the gear icon at the top of the page.
3. Tap on "Manage Account."
4. Tap on "Manage Subscription"
5. Enter your Password
6. Tap on "Subscription Status."
7. Locate the additional feature you want to cancel, and tap on the "Deactivate" link to the right of that feature.
8. If you're prompted to confirm that you want to cancel, tap on Yes.

## On the Desktop site:

1. Log in to your Match account, and click on the gear icon in the navigation bar at the top of the screen.
2. Click on "Manage Subscription."
3. Enter your Password
4. Click on "Subscription Status."
5. Locate the additional feature you want to cancel, and click on the "Deactivate" link to the right of that feature.
6. If you're prompted to confirm that you want to cancel, click on Yes.

## On the Mobile Site:

1. Log in to your Match account, and tap on the "Profile" icon at the bottom of the screen.
2. Tap on the gear icon at the top of the page
3. Tap on "Manage Account"

MATCHFTC846850

4. Tap on "Manage Subscription."

5. Tap on "Subscription Status."

6. Locate the additional feature you want to cancel, and tap on the "Deactivate" link to the right of that feature.

7. If you're prompted to confirm that you want to cancel, tap on Yes.

You will still be able to use the additional feature until the End Date shown on the Subscription Status page. That particular feature simply won't renew with the rest of your subscription package on your next renewal date.

After you cancel an additional feature, you'll notice the Deactivate link changes to say Reactivate instead. If you want to add that feature back to your subscription, simply click on the Reactivate link.

Please keep in mind that this will not cancel your basic subscription package. These steps will only cancel the subscription add-ons.

## Canceling a Free Trial

If you currently have a free trial and you want to make sure you're not charged at the end of the trial period, you'll need to resign your subscription. To do this, simply visit the Manage Subscription section on your Account Settings page.

For your security, you'll need to re-enter your password as part of this process. Then follow the directions to resign your trial subscription. This process includes several steps, so make sure you fully complete the process before exiting the site.

You can always contact our Customer Care team if you need help. We can check your current subscription status and assist you with resigning your trial subscription.

Please keep in mind that resigning a free trial will immediately end your subscription benefits. If you want to turn your free trial back on after you've resigned it, you can usually do so from the same Manage Subscription page linked above, as long as your trial period hasn't ended yet. If you do this, you'll also be turning the auto-renewal back on, which means you will be charged at the end of the trial period.

**Need Help?** Log into your account to chat or text with us between 8 am and 6 pm Central Time. Monday through Friday.

MATCHFTC846851

Was this article helpful?

Yes   No

m♥

MATCHFTC846852

# EXHIBIT 39

## MATCHFTC846853 (VIDEO EMBEDDED IN FAQ IN EX. 38, MATCHFTC846849)

## PROVIDED IN NATIVE FORMAT

# EXHIBIT 40

## Cancelling

### Cancelling a Subscription

If you don't have a paid subscription (or if you have already turned off your auto-renewal, you can cancel your membership by visiting the Manage Subscription section on your Account Settings page.

When you cancel your membership, we immediately Hide your profile and photos from other members. Should you wish to rejoin the Match community, all you have to do is sign in and reactivate your account.

Your information will be retained in accordance with our Privacy Policy.

If you want to cancel your subscription (turn off auto-renewal), please click here.

### Cancelling Additional Features

If you purchased additional features for your subscription (like Private Mode or matchPhone, for example), you can cancel those additional features without cancelling your basic subscription.

To cancel an additional feature, simply follow these steps.

### iOS app- Cancelling or Turning Off Auto-Renewal

If you purchased a Match subscription through the iOS App, any cancellations will have to be done through Apple directly.

Follow these steps to turn off your auto-renewal on your iPhone:

1. Launch the App store on your iPhone
2. Tap on the Profile icon on the top right of the app store
3. Tap on Subscriptions
4. Tap on "Cancel Subscription" in red at the bottom of the screen
5. Tap on "Confirm" on the pop-up to save your changes.

If you would like further information or assistance, please contact Apple directly by clicking Here.

### On the Match app

1. Log in to your Match account, and tap on the "Profile" icon at the bottom of the screen.
2. Tap on the gear icon at the top of the page.
3. Tap on "Manage Account".
4. Tap on "Manage Subscription".
5. Enter your Password
6. Tap on "Subscription Status"
7. Locate the additional feature you want to cancel, and tap on the "Deactivate" link to the right of that feature.
8. If you're prompted to confirm that you want to cancel, tap on Yes.

### On the Desktop Site:

1. Log in to your Match account, and click on the gear icon in the navigation bar at the top of the screen.
2. Click on "Manage Subscription."
3. Enter your Password
4. Click on "Subscription Status."
5. Locate the additional feature you want to cancel, and click on the "Deactivate" link to the right of that feature.
6. If you're prompted to confirm that you want to cancel, click on Yes.

### On the Mobile Site:

1. Log in to your Match account, and tap on the "Profile" icon at the bottom of the screen.
2. Tap on the gear icon at the top of the page
3. Tap on "Manage Account".
4. Tap on "Manage Subscription".
5. Tap on "Subscription Status."
6. Locate the additional feature you want to cancel, and tap on the "Deactivate" link to the right of that feature.
7. If you're prompted to confirm that you want to cancel, tap on Yes.

You will still be able to use the additional feature until the End Date shown on the Subscription Status page. That particular feature simply won't renew with the rest of your subscription package on your next renewal date.

After you cancel an additional feature, you'll notice the Deactivate link changes to say Reactivate instead. If you want to add that feature back to your subscription, simply click on the Reactivate link.

Please keep in mind that this will not cancel your basic subscription package. These steps will only cancel the subscription add-ons.

### Cancelling a Free Trial

If you currently have a free trial and you want to make sure you're not charged at the end of the trial period, you'll need to resign your subscription. To do this, simply visit the Manage Subscription section on your Account Settings page

For your security, you'll need to re-enter your password as part of this process. Then follow the directions to resign your trial subscription. This process includes several steps, so make sure you fully complete the process before exiting the site.

You can always contact our Customer Care team if you need help. We can check your current subscription status and assist you with resigning your trial subscription.

Please keep in mind that resigning a free trial will immediately end your subscription benefits. If you want to turn your free trial back on after you've resigned it, you can usually do so from the same Manage Subscription page linked above, as long as your trial period hasn't ended yet. If you do this, you'll also be turning the auto-renewal back on, which means you will be charged at the end of the trial period.

**Need Help?** Log into your account to chat or text with us between 8 am and 8 pm Central Time, Monday through Friday.

Was this article helpful?

 Yes   No

MATCHFTC846848

# EXHIBIT 41

## 11/11/2014

### Canceling, Resigning, Deleting, On-Hold, etc.

**How do I cancel, resign, delete, or put my account on hold?**

We're sorry to hear that you are interested in resigning your subscription or canceling your account. We hope that it's because you met someone!

Suspending a Subscription/On Hold
Currently, suspending your subscription or putting it on hold for a few months isn't a feature we provide. If you need to take a break, though, we offer the option for you to hide your profile until you are ready to use the site again (your subscription will still renew or end on the same date).

Canceling
If you are wanting to cancel, please take into consideration that once your subscription term expires, you won't have access to all the great features that you've become accustomed to, like sending and receiving messages, seeing who's viewed your profile and more!

The way this works is different depending on whether you're currently a paid subscriber or whether you use a free membership account.

**From the Mobile Site**

- Click here if you're a current paid subscriber and want to resign/cancel your subscription
- Click here if you have a free membership account you would like to cancel or delete it

## 05/07/2015

### How to Deactivate (Delete) your subscription

Have you met someone? Need to take a break? You can deactivate your account and return to the site within 180 days of deletion.

To deactivate your account, you must first cancel your subscription. Click the gear icon from the header and then select **Settings** from the drop-down menu. On the Account Settings screen, click the **Change/Cancel Membership** link. This process includes several steps, so before exiting the site, make sure you see a confirmation page that includes today's date and your username. On the confirmation screen, click the **Hide Profile/Deactivate My Account** link to delete your account.

Once you complete the deactivation steps, your profile will be inaccessible to anyone except you (if you choose to reactivate it). After completing the process you will receive two emails. The first is your cancellation confirmation and the second is your deactivation confirmation, which indicates both requests are complete.

## 05/27/2015

### How to turn off automatic billing or cancel your subscription?

Auto-Renewal on your mind? You can stop automatic billing while continuing to use the features you've already paid for until your current subscription expires.

To stop automatic billing, click the **gear icon** located in the header and then select **Settings** from the drop-down menu. On the Account Settings screen, click **Change/Cancel Membership**. This process includes several steps, so before exiting the site, make sure you see a confirmation page that includes today's date and your username. After completing the process, you will receive an email confirmation that contains the same details and indicates the request is complete.

## 06/02/2015

### iOS app: How Do I Turn Off My Auto Renewal or Cancel?

Follow these steps to turn off your auto renewal on your iPhone:

1. Launch the **Settings** app on your iPhone
2. Tap on **iTunes & App Store**
3. Tap on your **Apple ID** at the top of the screen
4. Tap **View Apple ID** from the pop-up menu
5. When prompted, enter your password, and then tap **OK**
6. Under Subscriptions, tap **Manage**
7. Tap the name of the subscription that you want to modify
8. Turn the auto-renewal option to **Off**
9. Tap **Turn off** on the pop-up to save your changes

If you would like further information or assistance, please contact Apple directly at: http://www.apple.com/support/itunes.

MATCHFTC672286

## 11/03/2015

### Canceling Additional Features

**How do I cancel additional features?**

You have the ability to cancel an additional feature at any time.  To do this, you must access the full site and then follow the steps below:

1. Click the three-line navigation link
2. Select **Setting & Help** and then tap **Go to full site**
3. On the full site, tap the **gear icon** in the top navigation bar
4. Tap on **Subscription Status** (for security purposes you may be asked to re-enter your password)
5. Tap the **Deactivate** link to the right of the service you wish to cancel
6. If asked if you are sure you wish to cancel, click on **Yes**

After canceling, you'll notice the **Deactivate** link will change to read **Reactivate**.  If you wish to add the cancelled service back to your subscription simply click the **Reactivate** link.

You will still be able to utilize the additional feature(s) you cancelled until the end date shown on the **Subscription Status** page.

## 09/27/2016

### Billed by Apple and Match.com

*This answer only applies to members who purchased a subscription through our iPhone app with an iTunes login

If you subscribed via our iPhone app and you notice charges from both Apple and full site, this is likely due to a temporary lapse in the mobile app subscription. To cancel the in-app purchase, please contact Apple at: http://www.apple.com/support/itunes

### Canceling Additional Features

**How do I cancel additional features?**

You have the ability to cancel an additional feature at any time. To do so you must sign into a desktop computer or access the full site from our mobile application.

Accessing the full site from the mobile application

1. Type www.match.com into your browser
2. Tap the **three-line** icon in the upper left corner of your device
3. Scroll down to **Help & Setting**
4. Tap the **Go to full site** link

Once on the full site, you must complete the following steps:

1. Tap on the **gear icon** in the top navigation bar.
2. Tap **Settings** from the drop-down menu
3. Tap on **Subscription Status** (for security purposes you may be asked to re-enter your password).
4. Tap the **Deactivate** link to the right of the service you wish to cancel.
5. If asked if you are sure you wish to cancel, tap on **Yes**.

After cancelling, you'll notice the **Deactivate** link will change to read **Reactivate**. If you wish to add the cancelled service back to your subscription simply click the **Reactivate** link.

You will still be able to utilize the additional feature(s) you cancelled until the end date shown on the **Subscription Status** page.

## 01/10/2017

### Checking My Renewal or End Date

**How do I check my subscription status?**

To check the date your subscription is scheduled to renew or lapse, you'll need to access the full website rather than the Android app. Once logged in on the full site, click on the **gear icon** in the top navigation bar, and click on **Subscription Status** (if you don't have an active subscription, this link will not appear).  Your subscription End Date and Renewal Status information will be displayed on this page.

- Click here for information about adding additional features or upgrading your subscription term
- Click here for information on how to cancel or resign your account
- Click here for information about auto-renewal
- Click here for information about redeeming our Match.com Guarantee

If you have paid for a subscription, but the **Subscription Status** link does not appear, make sure that you are signed into the right account. You might also want to verify with your financial institution that your payment was processed.

MATCHFTC672287

## Canceling Additional Features

#### How do I cancel additional features?

Although you have the ability to cancel an additional feature at any time, you'll need to do so from the full Match website, rather than from the Android app or mobi.

Once you've logged in on the full site, simply follow these steps:

1. Click on the gear icon in the top navigation bar.
2. Click on Subscription Status (for security purposes you may be asked to re-enter your password).
3. Click the "Deactivate" link to the right of the service you wish to cancel. If asked if you are sure you wish to cancel, click on Yes.

After canceling, you'll notice the Deactivate link will change to read Reactivate. If you wish to add the cancelled service back to your subscription simply click the Reactivate link.

You will still be able to utilize the additional feature(s) you cancelled until the end date shown on the Subscription Status page.

## 02/01/2017

### Canceling a Free Membership

#### How do I cancel a free membership account?

Cancelling
If you don't have a paid subscription, you can cancel your membership on the full website by visiting the Change/Cancel Membership page in your Account Settings (the gear icon). If you cancel your membership, we immediately hide your profile and photos from other members. Should you wish to rejoin the Match community, all you have to do is sign in and reactivate your account.

Deleting
If, for example, you've found a great match and want to make sure your profile information is taken down from our site completely, you can accomplish this by following the directions above to cancel your account. Your information is stored in our database for historical and legal purposes only.

- Click here for how to cancel if you're a paid subscriber

## 04/01/2017

### Canceling Additional Features

#### How do I cancel additional features?

You have the ability to cancel an additional feature at any time. To do this, please sign into your account and follow these steps:

1. Click on the **gear icon** in the top navigation bar.
2. Click on **Settings.**
3. Click on **Subscription** (for security purposes you may be asked to re-enter your password).
4. Click the "Deactivate" link to the right of the service you wish to cancel.
5. If asked if you are sure you wish to cancel, click on **Yes**.

After canceling, you'll notice the **Deactivate** link will change to read **Reactivate**. If you wish to add the cancelled service back to your subscription simply click the **Reactivate** link.

You will still be able to utilize the additional feature(s) you cancelled until the end date shown on the **Subscription** page.

## 04/03/2017

### Checking My Renewal or End Date

#### How do I check my subscription status?

To check the date your subscription is scheduled to renew or lapse, click on the **gear icon** in the top navigation bar, click **Settings** and then click on **Subscription Status** (if you don't have an active subscription, this link will not appear). Your subscription End Date and Renewal Status information will be displayed on this page.

- Click here for information about adding additional features or upgrading your subscription term
- Click here for information on how to cancel or resign your account
- Click here for information about auto-renewal
- Click here for information about redeeming our Match.com Guarantee

If you have paid for a subscription, but the **Subscription Status** link does not appear, make sure that you are signed into the right account. You might also want to verify with your financial institution that your payment was processed.

MATCHFTC672288

## In-App Purchase Subscription Changes

*This answer only applies to members who purchased a subscription through our iPhone app with an iTunes login

Purchasing a subscription through the iPhone app allows you to easily gain subscriber benefits right from your mobile phone. The transaction is made by Apple using your iTunes account. For this reason, we are unable to make changes to the billing for any reason, including:

- Purchase was made on wrong account
- Wrong subscription term purchased
- Canceling Recurring payments
- Changing method of payment

For assistance with these or any other billing change, please contact Apple at: http://www.apple.com/support/itunes

# 09/18/2017

## Canceling, Resigning, Deleting, On-Hold, etc.

**How do I cancel, resign, delete, or put my account on hold?**

We're sorry to hear that you are interested in resigning your subscription or canceling your account. We hope that it's because you met someone!

Suspending a Subscription/On Hold
Currently, suspending your subscription or putting it on hold for a few months isn't a feature we provide. If you need to take a break, though, we offer the option for you to hide your profile until you are ready to use the site again (your subscription will still renew or end on the same data).

Canceling
If you are wanting to cancel, please take into consideration that once your subscription term expires, you won't have access to all the great features that you've become accustomed to, like sending and receiving messages, seeing who's viewed your profile and more!

The way this works is different depending on whether you're currently a paid subscriber or whether you use a free membership account.

If you are subscribed to Match via Apple's iTunes store, you will need to cancel through the App Store, or you may contact Apple using the following link: http://www.apple.com/support/itunes

# 06/28/2018

## Canceling a Membership

**How do I cancel, resign, or delete my account?**

If you don't have a paid subscription or have turned off your auto-renewal, you can cancel your membership by visiting the Change/Cancel Membership page in your Account Settings (the gear icon). If you cancel your membership, we immediately hide your profile and photos from other members. Should you wish to rejoin the Match community, all you have to do is sign in and reactivate your account.

Your information will be retained in accordance with our Privacy Policy.

If you're attempting to cancel your subscription - please click here.

## How to Cancel a Free Trial

If you currently have a free trial and you want to make sure you're not charged at the end of the trial period, you'll need to resign your subscription. To do this, please visit the Change/Cancel Membership page under your Account Settings (the gear icon).

For your security, you'll need to re-enter your password as part of this process. Then follow the directions to resign your trial subscription. This process includes several steps, so make sure you fully complete the process before exiting the site.

Keep in mind that resigning a free trial will immediately end your subscription benefits. If you want to turn your free trial back on after you've resigned it, you can do so at the same Change/Cancel Membership page linked above, as long as your trial period hasn't ended yet. Please note that you'll also be turning the auto-renewal back on, so you will be charged at the end of the trial period.

You can check the status of your subscription, including renewal date, subscription amount, and subscription plan at any time by clicking here.

MATCHFTC672289

# EXHIBIT 42

**APP 502**

# match community

cancel        Search

E.g. "reset password" or "cookies"


**Account Settings**


**Billing & Subscription**


**Member Communication**


**Paid Features & Power-Ups**


**Profile & Photos**


**Searching & Matching**


**Technical Issues**


**Contact Us**

## Canceling a Membership

### Canceling

If you don't have a paid subscription or have turned off your auto-renewal, you can cancel your membership by visiting the Change/Cancel Membership page in your Account Settings (the gear icon). If you cancel your membership, we immediately hide your profile and photos from other members. Should you wish to rejoin the Match community, all you have to do is sign in and reactivate your account.

### Deleting

If, for example, you've found a great match and want to make sure your profile information is taken down from our site completely, you can accomplish this by following the directions above to cancel your account. Your information is stored in our database for historical and legal purposes only.

**Was this answer helpful?**

  

Return to FAQ Home

MATCHFTC672339

# Exhibit 43

# match♥community

| cancel | Search |
|---|---|

E.g. "reset password" or "cookies"


**Account Settings**


**Billing & Subscription**


**Member Communication**


**Paid Features & Power-Ups**

Profile & Photos

Searching & Matching


**Technical Issues**


**Contact Us**

## Canceling a Membership

### Canceling

If you don't have a paid subscription or have turned off your auto-renewal, you can cancel your membership by visiting the Change/Cancel Membership page in your Account Settings (the gear icon). If you cancel your membership, we immediately hide your profile and photos from other members. Should you wish to rejoin the Match community, all you have to do is sign in and reactivate your account.

Please know your information will be stored in our database for historical and legal purposes only.

If you're attempting to cancel your subscription - please click here.

# EXHIBIT 44

APP 506

match

Discover    Search    Likes    Inbox    Events

Subscribe

The Beginning.

See Who's Viewed Your Profile   GO »

## match❤community

| cancel | | Search |

      

Account Settings     Billing & Subscription     Member Communication     Paid Features & Power-Ups     Profile & Photos     Searching & Matching     Technical Issues     Contact Us

### Turning off Auto-Renewal

**Turning off auto-renewal**

If you currently have a paid subscription and you want to make sure you're not charged at the end of your term, you'll need to turn off your auto-renewal. To do this, simply visit the Manage Subscription section on your Account Settings page.

Click the "Cancel Subscription" link. For your security, you'll need to re-enter your password as part of this process. (Trouble signing in? Click here.)

Next, choose a cancellation reason and click "Continue Cancellation" to proceed. This process includes several steps; before exiting the site, make sure you see a confirmation page that includes today's date and your username.

When you see the confirmation page, you'll know that you successfully turned off auto-renewal. You will also receive an automated email to confirm that auto-renewal has been turned off for your subscription.

If you don't see a confirmation page or if you don't receive the automated email about your cancellation, maybe you didn't complete the cancellation process successfully. You can always contact our Customer Care team if you need help. We can check your current subscription status and assist you with turning off auto-renewal.

**After you turn off auto-renewal**

After you turn off your auto-renewal, you can still sign in to your Match account and use your subscriber benefits. You'll be able to receive and respond to Messages from other members through the rest of your subscription period.

Once your subscription term ends, you won't be able to receive and respond to Messages anymore, but you'll still be able to sign in to your account. Your profile and photos will remain visible, unless you choose to manually Hide them. You'll be able to enjoy the free member benefits, like searching for matches and sending Likes to other members.

We'll also continue to send you email notifications as long as you want to receive them and as long as your profile remains active. If you don't want to receive emails, you can turn them off from the Email Preferences section on your Account Settings page.

**Removing your account**

If you simply want to Hide your profile so it's not visible to other members, click here for instructions.

If you want to remove your account from the site, click here.

**Suspending a Subscription**

Currently, suspending your subscription or putting it on hold for a few months isn't a feature we provide. If you need to take a break, you can Hide your profile until you're ready to use the site again. (When your profile is Hidden, your subscription will still renew or end on the same date. Hiding your profile does not affect your subscription.)

**iOS App**

For more information on cancelling a subscription through iTunes, click here.

**Was this answer helpful?**

Yes     No

  Return to FAQ Home

Online Dating Safety Tips D        ating Tips and Advice P        rivacy Policy T        erms of Use

About Match.com
Terms of Use**
Your Privacy
Ad Choices
Careers
Cookie Policy

Online Dating Safety Tips
Dating Articles and Advice
Success Stories
Dating Tips

Help/FAQs
Contact Us
Site Map
Match International
Media Room

Mobile
Gift Subscriptions

Advertise on Match.com
Become an Affiliate
Promotions & Sponsorships
Business Development



MATCHFTC672336

'* Our Terms of Use Agreement was revised 2019/12/12.

(t) Copyright 2020 Match Group, LLC w.db3-610f-s-

MATCHFTC672337

# EXHIBIT 45

## MATCHFTC774670 (VIDEO OF ONLINE CANCELATION FLOW)

## PROVIDED IN NATIVE FORMAT

# EXHIBIT 46

## MATCHFTC774651
## (VIDEO OF ONLINE
## CANCELATION FLOW)

## PROVIDED IN
## NATIVE FORMAT

# EXHIBIT 47

## MATCHFTC774667
## (VIDEO OF ONLINE CANCELATION FLOW)

## PROVIDED IN
## NATIVE FORMAT

# EXHIBIT 48

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT 49

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT 50

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT 51

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT 52

# Does Customer Support have a phone number?

Match does not have a customer support phone number, but you can log into your account to chat with our team between 8 am- and 6 pm Monday - Friday. Or if you would like to send us an email, please click here

Please be aware that there are fake customer support numbers posted on various websites, none of which are affiliated with Match.

Match.com is the only place we will share updates and we will never ask for your login credentials.

Was this article helpful?

Yes    No



MATCHFTC846847

# EXHIBIT 53

APP 567



# EXHIBIT 54

Document Produced In Native Format

**APP 570**

FOIA Confidential

MATCHFTC427066

| Answer ID | Summary | Answer |
|---|---|---|
| 1116 | Searching for / Viewing your own profile | To see your profile the way others do:<br><br>1. From your home page, tap the three line icon in the upper left corner of the screen<br>2. Tap My Profile<br>3. Tap View My Profile |
| 1254 | Resetting Your Profile Counter | You can reset your Profile Counter to zero at any time, as many times as you want. It's a great way to gauge how much more attention your profile receives every time you replace your photos, update your text, or make other changes.<br><br>You can reset you Profile Counter by clicking on Reset to 0 beneath the counter on your Home page.<br><br><script language="JavaScript" type="text/javascript" xml:space="preserve"><br>//<![CDATA[<br><!--<br>function displayDiv(div){<br>  var group_name = "group_" + div;<br>  var img_name = "img_" + div;<br><br>  if (document.getElementById(group_name).style.display == "none"){<br>    document.getElementById(group_name).style.display = "inline";<br>    document.getElementById(img_name).src = "http://match.custhelp.com/rnt/rnw/img/enduser/minus.gif";<br>  }else{<br>    document.getElementById(group_name).style.display = "none";<br>    document.getElementById(img_name).src = "http://match.custhelp.com/rnt/rnw/img/enduser/plus.gif";<br>  }<br>}<br>--><br>//]]><br></script><br><br><br>Click &lt;rn:answer_xref target="_new" contents="here" answer_id="1255" /&gt; for more information about the Profile Counter<br><br>If a member views anothers member's profile more than once, their profile will only be listed one time. The counter will count each view. |
| 1253 | New Profile Design - Adding & Editing Photos - Captions | Since we implemented our &lt;rn:answer_xref answer_id="1250" contents="new profile design" target="_new" /&gt;, your photos are now set up in a gallery view with a scroll bar at the top. You can have one (1) primary photo with twenty-five (25) additional photos. To upload additional photos, follow the steps below.<br><br>Click on Browse above the photo viewer.<br>Locate the photo file on your computer.<br>Click on Open.<br>Click on Upload Photo to submit the photo for approval<br><br><br>Once the photo has been approved, it will appear on your public Profile. To remove a photo from your Profile, click on Remove Photo in the upper right corner of the photo being viewed.<br><br>Primary/Secondary Status<br>Under each photo you will see a status. There are three statuses: Designated as Primary Photo, Additional Photo Only, and Designate as Primary. Photos that are marked as Designate as Primary will have a check box next to them and can be changed to be the profile's primary photo.<br><br>Captions<br>You can now add/edit captions on your photos. To do so:<br><br>Click on Profile in the top navigation bar<br>Click on Photos<br>Click on the photo you'd like to add a caption to or click the "pencil" icon<br>Enter a fun description of your photo in the text box underneath, and click on Submit for Approval<br><br>Captions can be no longer than 140 characters in length and must be submitted for approval. Once they are approved, they will appear on your public profile with the photo.<br><br>Removing Captions<br>Most likely, you'll have some photos with captions, and some without. Once the caption feature is added to a photo, the caption can be modified, but the caption feature can't be completely removed. If you'd like the photo to be a non-caption photo again, you'll need to delete the photo and add it back without a caption. Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="1123" contents="here" target="_new" /&gt; for instructions.<br><br>Members have the ability to import photos from Facebook. Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="1041" contents="here" target="_new" /&gt; to view the import process. |

| Answer ID | Summary | Answer |
|---|---|---|
| 1638 | Profile Comments | One great way to start a conversation with a new match is to comment on something they say in their profile. When you're reading their profile, click on the highlighter icon in the top-right of the text area. You'll then be able to highlight portions of their profile, and a pop-up will prompt you to enter your comment.<br><br>Don't worry, your comments are only visible to that member. |
| 1642 | Daily Matches with a Purple/Pink Highlight | In your Daily Matches, you may find that some of your matches appear with a light violet highlight. The reason is that these matches are "Singled Out" matches, rather than normal Daily Matches. Since our algorithms show these as particularly good matches, we make them stand out a little. |
| 384 | Receiving Instant Messages when Offline | No. If you're offline, you will not be available to be contacted via IM on Match. However, anyone who wishes to contact you will most likely send you an email. |
| 1235 | Who's Favorited Me - Explained | Our "Who's Favorited Me" feature allows you to see who has shown interest in you and opens the door for that first connection. This tool is a benefit of a current, paid subscription.<br><br>To access the "Who's Favorited Me" page, simply click on Favorites on the left side of the full site home page. You can also see updates to this list in your "What's New" area on the same page.<br><br>If a member favorited you over 180 days ago, you be automatically removed from his or her Favorites list and the member will no longer appear in your "Who's Favorited Me" list.<br><br>Click &lt;rn:answer_xref answer_id="1218" contents="here" target="_new" /&gt; for more information on sorting options for this tool<br>Click &lt;rn:answer_xref answer_id="1169" contents="here" target="_new" /&gt; for information on what happens with Favorites and Favoriting when your profile is hidden <br>Click &lt;rn:answer_xref answer_id="1218" contents="here" target="_new" /&gt; for more information on Favorites |
| 668 | Who's Viewed or Favorited My Profile - Sorting Options | The following sort options are available for reviewing both "Who's Viewed Me" and "Who's Favorited Me":<br><br>Most recent view - sorts based on who viewed your profile most recently<br>Activity date - sorts by the date when each match was last online (most recent at the top)<br>Age - sorts youngest to oldest<br>Photos counts - sorts based on profiles with the most photos<br>Username - sorts by username, in alphabetical order (numbers come before letters)<br><br>You can also remove results on your list by clicking on the X in the top-right corner of their profile. If you remove a member from either of theses lists, the member will no longer show up in your search results.<br>Click &lt;rn:answer_xref answer_id="104" contents="here" target="_new" /&gt; for more information on our "Who's Viewed Me" tool<br>Click &lt;rn:answer_xref answer_id="669" contents="here" target="_new" /&gt; for more information on our "Who's Favorited Me" tool |
| 1120 | Who's Viewed Me - Explained | Our "Who's Viewed Me" feature is a handy tool that lets you know who has viewed your profile. Since they've taken a step to show some interest, it opens the door to make that first connection.<br><br>This feature is available to all paid subscribers, so others will be able to see when you've viewed them, too, although there's no indication of how many times or exactly when.<br><br>On the Android app, to see you has viewed your profile, simply tap the three line icon in the upper left corner of the screen and tap Views<br>To access your "Who's Viewed Me" page on the full Match.com website, simply click on Viewed Me on the left side of the Home page. You can also see updates to this list in your "What's New!" box on the same page.<br><br>After 180 days, profiles are dropped from this list. |
| 1320 | No Interest | When a member has responded with a formal "Not Interested" to a email of yours, they'll appear in your Connections as "No Interest." If you like, you can click on the "X" in the top-right corner of the box to remove them from your Connections. |
| 1114 | Price and Subscription Package Options | The Cost<br>To compare the relative costs of purchasing these packages from the Android app, simply click on Messages from your home screen. You won't have to enter any financial information until you're ready.<br>If you're not a member yet, don't worry. Since prices can vary and are subject to change, we just need a little information so we can show you the rates currently available to you. Click on Join for Free, and the single-screen sign-up process can easily be completed in less than a minute (you don't have to complete your full profile before clicking on Subscribe Now to get the rates).<br><br>Package Options<br>When you're ready to start enjoying the benefits of full subscription, we're pleased to offer you subscription packages that span twelve months, six months, three months, or one month. Each option includes all of our standard subscription benefits. Although our rates page highlights the monthly average for each of the options (to help you compare the relative costs of the packages), your subscription package is charged in full when you subscribe. If you would like to be charged on a monthly basis, simply choose the one-month package.<br><br>For more information about subscription benefits, click here. |

| Answer ID | Summary | Answer |
|---|---|---|

**1220  My Profile Isn't Appearing/Updating**

If your profile is not reflecting the information you entered, there are a variety of possible explanations:

Your profile is appearing normally for everyone else, and will appear normally for you once you refresh your system cookies
Your profile is hidden
You haven't completed your profile
You tried to complete your profile, but took more than 45 minutes on a screen and experienced a session time-out
You tried to complete your profile, but it was not approved

More information on each of the above situations:

Cookies
Sometimes when you're checking on profile updates you have made, your computer will simply display the old information stored in system cookies. If you'll refresh your cookies, the problem will go away!

Hidden Profile
On the full website, click your primary photo thumbnail in the top navigation bar, and then Settings to check whether your profile is currently set to "Visible." If it is not, your profile will not appear in search results.
Incomplete Profile
You'll know your profile isn't complete or hasn't been approved if you click your primary photo thumbnail in the top navigation bar of the full site and it takes you straight to the blue screen where you input your profile information.
Session Time-Out
If the "About Me &amp; Who I'm Looking For" section is blank (there is a 200 character minimum), but you tried to submit it previously, you may have experienced a session time-out (after 45 minutes the session on this page times out and if you try to save after 45 minutes, you will lose your information).

Profile Not Approved
If you get the blue profile screen but your text is appearing normally in the "About Me &amp; Who I'm Looking For" section, chances are that your profile has not been approved. Click here to see our profile guidelines.

Contact Us
If you're pretty sure your profile is acceptable by these standards, or if you're still not sure why your profile isn't displaying right, please contact us.

**1168  The Way Your Photos Appear**

Your main photo is the most visible aspect of your profile, and it appears everywhere your profile displays, including in email messages, search results, and full-profile views.

Because the actual display size of your primary photo in search results isn't very big, we display a smaller section of your photo in these screens that is meant to highlight your face. We don't do any stretching, squeezing, or color edits, though. Your full photo just-as-uploaded appears in your full profile view.

If you would like a photo cropped, you will need to do that before you upload it. For instructions on how to crop a photo we suggest doing a search on the internet for "how to crop a photo". There are literally hundreds of applications and methods for cropping.

To rearrange your photos from the full website, click on your primary photo thumbnail in the top navigation bar, click on Photos, and click and drag the photos you see. The first four photos in the top row will appear on your main profile page.

If you don't like how a photo of yours appears on our site, we've made it really easy to delete or replace photos.

**670  matchPhone - Adding it**

*This feature is not available to members outside of the continental United States.

If you meet all the &lt;rn:answer_xref answer_id="60" contents="requirements" target="_parent" /&gt;, you can add matchPhone either by initiating a matchPhone call (Talk &amp; Text) from a member's profile or by using the Phonebook link on your Home page. This will walk you through the process of subscribing to and paying for matchPhone.

Signing up for this service includes verifying your phone number and whether your phone is text-enabled. This is only done once, unless you change your number on file (via matchPhone Account Settings). The verification process includes a quick automated call to your phone, so have it on-hand when you are setting up your matchPhone phone settings.

Click &lt;rn:answer_xref answer_id="527" contents="here" target="_parent" /&gt; for information about matchPhone

**1563  Hidden Profiles - Explained**

There may be times, like when you start a new relationship, that you'll want to remove your profile from being visible to other members. Since that's why you're here in the first place, we make this as easy as flipping a switch. Of course, anytime your profile is hidden, it will not be displayed in search results. Since this reduces your chances of finding a match, we recommend only hiding your profile when you are taking a break or have met someone you are interested in.
From the App
To hide your profile, simply tap the three line icon in the upper left corner of the screen then on Settings. From the Settings screen you can adjust the visibility of your profile.
From the Mobile Site
To hide your profile, simply tap the three line icon in the upper left corner of the screen then on Help and Settings. From the Settings screen you can adjust the visibility of your profile.

| Answer ID | Summary | Answer |
|---|---|---|
| 209 | matchPhone and Privacy | *This feature is not available to members outside of English-speaking North America<br> <br>The whole idea behind matchPhone is to allow you to connect with your match by phone without sharing your phone number. In order to accomplish this, we hide the personal phone numbers of both parties before connecting the call. Since this information is never shared, your phone number remains private. As an additional precaution, we use our matchPhone voicemail system rather than forwarding calls to your personal voicemail in case you have identifying information in your voicemail message.<br><br>Click &lt;rm:answer_xref answer_id="527" contents="here" target="_parent" /&gt; for information about matchPhone |
| 1592 | Singled Out - Explained | About Singled Out Matches<br>Every now and then, we find someone who really stands out as someone we think you'll have a connection with. We single out this match for your consideration. Rating your Singled Out matches works the same as rating any of your other Daily Matches.<br><br>How We Find Them<br>To find these matches, we take into consideration everything you've told us about yourself and who you're looking for, and we learn from actions you take on the site. We put all this information together, and every once in a while someone comes along who seems to fit you better than the rest. These are the people we single out for you. We may not get it exactly right every time, but the more active you are on the site, the closer we'll get to finding a great match for you.<br><br>Frequency<br>Because these are matches we have especially high confidence in, we may not single someone out for you every day. But make the most of each one! As with your Mutual Matches or Daily Matches, they won't know you've received them as a match: you'll need to take the initiative to reach out and let them know.<br><br>If over time you find you aren't receiving many, or any, of these kinds of matches, it could be that your search criteria is too limiting. Making tiny tweaks (like adding just a few miles to the area you're willing to look for matches) can give great results. We also learn from everything you do on the site, so doing something as simple as sending a wink or rating your Daily Matches can help teach us how to find a great match for you. |
| 2149 | Provide Feedback on our Mobile Site | No Value |
| 2150 | Provide Feedback on our Mobile Site | No Value |
| 1489 | Improving Matching Results | Every member goes through the dilemma of how picky to be with matching preferences. The broader your criteria, the more matches you'll get, but the narrower your criteria, the greater chance you'll like the ones you receive!<br><br>We recommend adjusting your criteria over time to find the right balance. You can do this by signing into your account on the full website and following these steps:<br><br>Tap the three line icon in the upper left corner of the screen<br>Tap Settings &amp; Help from the menu options<br>Tap Go to full site<br>Click on your primary photo thumbnail in the top navigation menu<br>Click the Edit pencil icon to the right of the section you wish to change<br>Make any necessary updates updates and click Apply<br><br>  |
| 1492 | Changing a Primary Photo | If you'd like to replace your current primary photo, you will need to access the full site from your handset. From the Home screen, tap the three line icon located in the upper left corner of the screen. Tap Settings &amp; Help from the menu options and then tap Go to full site. On the full site, tap your profile thumbnail on the main menu and then tap Photos from the drop down list. All photos marked as Make this My Primary Photo may be selected as your primary photo replacement. The photo automatically is placed as your primary photo. |
| 1494 | Editing or Removing Photos | If you'd like to replace your current primary photo, you will need to access the full site from your handset. From the Home screen, tap the three line icon located in the upper left side of your handset. Tap Settings &amp; Help from the menu options and then tap Go to full site.<br>On the full site, tap your profile thumbnail on the main menu and then tap Photos from the drop down list. Tap the photo you would like to delete and then tap the X located in upper right corner of the photo. To complete the request, you must tap Yes, delete on the confirmation screen. |
| 1532 | Retrieving Forgotten Sign In Information | If you don't remember your password, simply click the Forgot Password link on the Member Sign In page and enter the email address used on your account. We will then email you a password reset link that will allow you to start over. Remember the link is only active for 24 hours. |
| 1543 | Checking My Renewal or End Date | Unfortunately, there is not a way to check your subscription status from the Match mobile site. To view your subscription status, you will need to access the full website. This can either be done through your PC or by clicking the Go to Full Site link through your Account Settings on the mobile site.<br>To check the date your subscription is scheduled to renew or lapse on the full website, click on the gear icon in the top navigation bar, and click on Subscription Status (if you don't have an active subscription, this link will not appear). Your subscription End Date and Renewal Status information displays on this page.<br>If you have paid for a subscription, but the Subscription Status link does not appear, make sure that you are signed into the right account. You might also want to verify with your financial institution that your payment was processed. |

| Answer ID | Summary | Answer |
|---|---|---|
| 1565 | Search Results - View | Each entry in your search results will include the member's username, age, location, activity status, and the number of photos they have added. Tap a member that interests you to view the profile. Please note that doing so will cause you to appear on the member's Who's Viewed Me list. |
| | | From the Mobile Site |
| | | To refine your search, tap Filter in the top-right corner of the screen. You'll see options for editing your search criteria. Tap Save to display results with your new selections. |
| 1578 | Canceling, Resigning, Deleting, On-Hold, etc. | We're sorry to hear that you are interested in resigning your subscription or canceling your account. We hope that it's because you met someone! Suspending a Subscription/On HoldCurrently, suspending your subscription or putting it on hold for a few months isn't a feature we provide. If you need to take a break, though, we offer the option for you to hide your profile until you are ready to use the site again (your subscription will still renew or end on the date date). |
| | | CancelingIf you are wanting to cancel, please take into consideration that once your subscription term expires, you won't have access to all the great features that you've become accustomed to, like sending and receiving messages, seeing who's viewed your profile and more! |
| | | The way this works is different depending on whether you're currently a paid subscriber or whether you use a free membership account. From the Mobile Site |
| | | Click here if you're a current paid subscriber and want to resign/cancel your subscription Click here if you have a free membership account you would like to cancel or delete it |
| 1580 | Removing Profiles From Search Results | As you explore our dating community, you're bound to find some members you can cross off your list. That's no problem. If you're a current subscriber, you're welcome to remove these members from view. |
| | | How to Do It Anywhere you see that member profile, you can remove him/her from view by scrolling to the bottom of the profile and then tapping the Remove from Search button. They will no longer show in your search results or in your other lists. And, of course, they won't know that you took this action. |
| | | Un-doing ItIf you'd like to see the list of those you've removed, you can return to the removed profile and then tap Restore to Search if you decide you want to give a member another chance. |
| | | You are able to remove up to 10,000 profiles. In the event, you are trying to remove additional profiles, you will receive an error. To correct the issue, you must access the full site from your handset or from a desktop computer so you may restore profiles on your current removed list. |
| 1593 | My Profile Isn't Appearing/Updating | If your profile is not reflecting the information you entered, there are a variety of possible explanations: |
| | | Your profile is appearing normally for everyone else, and will appear normally for you once you refresh your system cookies Your profile is hidden You haven't completed your profile You tried to complete your profile, but took more than 45 minutes on a screen and experienced a session time-out You tried to complete your profile, but it was not approved |
| | | More information on the above situations: |
| | | Hidden Profile |
| | | From the mobile site, tap the three line navigation link and then select Settings &amp; Help from the drop down menu. One the Setting screen, you can verify if your profile is currently visible. Contact Us If you're pretty sure your profile is acceptable based on our guidelines, or if you're still not sure why your profile isn't displaying correctly, please contact us. |
| 1598 | Connections - Explained | Connections on your Navigation list is a benefit of your paid subscription that provides a single view of Match members you've interacted with. Members you interact with on the site will be added as a Connection, whether they email or wink at you, if you get in contact with them, or even if you simply add them to your Favorites list. This will help you easily keep track of how recently you've been in contact and the last action taken with the potential match. Please note that members contacted solely through IM will not appear as Connections. From the Mobile Site To view your Connections, tap the three line navigation link and then select Connections from the drop down menu. All of your Connections will be displayed. |

| Answer ID | Summary | Answer |
|---|---|---|
| 1599 | Filtered Mail - Explained | What is Filtered Mail?<br><br>Filtered Mail is a feature that allows you to clear your inbox of messages from members with certain "deal-breaker" characteristics.<br><br>For example, if you would not consider corresponding with a member from outside of your state, you can set up a filter that will send any messages from these members into a separate folder. Filtered Mail on MobileOur mobile site respects the email filters you created on the Match full site. However, they do not support updating or changing filters at this time. Feel free to access the full site from your phone's browser so you can make the necessary updates.<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="1965" contents="here" target="_self" /&gt; to review the steps for accessing the full site.<br>Setting Up Filters<br>Once you access the full site, you must tap Messages from the main menu.  You can then setup as many as seven filters by tapping the Settings link next to the Filtered Mail folder in your Inbox.  We will then prompt you to enter the profile criteria you would like to set with filters.  Remember, the filters you select will exclude all member profiles that include that criteria, no matter how well you match in other areas.  So you'll want to use these filters carefully. <br>To remove filters, simply return to your Filtered Mail settings on the full site and then select the filters you wish to remove. |
| 1615 | Captions - Explained | At this time, adding or editing photo captions is not available through the mobile site. Please access the full site from your mobile phone or a desktop computer to add or edit captions on any of your photos<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_self" contents="here" answer_id="1965" /&gt; to review the steps for accessing the mobile site. |
| 1617 | Hiding My Profile or Making it Visible | As a member of Match, you have the ability to hide your profile from view at any time, for any reason.<br><br>Adjusting Visibility<br>To adjust your visibility on your iPhone, tap the three line navigation link and then select Settings &amp; Help from the drop down list.  Toggle the  Visibility indicator as needed. |
| 1619 | Hidden Profile - Who's Viewed Me Implications | If you view another member's profile while your profile is hidden, our system still registers that you were there. So once you are unhidden, your profile will appear in their Who's Viewed Me (Views) section. But not until then.<br><br>You may notice that your profile counter continues to increase in number while your profile is hidden. This happens when members who may know your username try (unsuccessfully) to look at your profile.<br><br>Click &lt;rn:answer_xref target="_new" contents="here" answer_id="472" /&gt; for more information on hidden profiles. |
| 1621 | Favorites - Hidden Profiles | For free members, a profile will remain in your Favorites list for 180 days or until you decide to remove it.<br>Paid subscriber Favorites lists will not be purged automatically, but profiles can be manually deleted at any time from the app or from the full site on your phone's browser or a desktop computer. However, if a member on your list decides to hide their profile on the site, the full profile will no longer be available to view. |
| 1624 | Who's Favorited Me - Explained | Our Who's Favorited Me (Faves) feature allows you to see who has shown interest in you and opens the door for that first connection. This tool is a benefit of a current, paid subscription.<br><br>To access who has Favorited you, complete the following steps:<br><br>Tap the three line navigation link<br>Select Connections from the drop down list and then tap Faves<br>Toggle between Faved Me (Members who have you listed as their Favorites) and My Faves (Members you have favorited)<br><br>If a free member favorited you over 180 days ago and your account is also in free member mode, you will be automatically removed from the member's Favorites list.  The member will no longer appear in your "Who's Favorited Me" list the next time you subscribe.<br><br>Click &lt;rn:answer_xref answer_id="1482" contents="here" /&gt; for information on what happens with Favorites and Favoriting when your profile is hidden <br>Click &lt;rn:answer_xref answer_id="1577" contents="here" /&gt; for more information on Favorites |
| 196 | Business Development Opportunities | Send us an email at business.development2@match.com. |

| Answer ID | Summary | Answer |
|---|---|---|
| 543 | Removing Profiles From Search Results | As you explore our dating community, you're bound to find some members you can cross off your list. That's no problem. If you're a current subscriber, you're welcome to remove these members from view.<br><br>How to Do It<br>Anywhere you see that member, you can remove him/her from view by clicking on the "X" in the corner of their profile (when it appears in lists) or by clicking on the Block from search link in their profile. They will no longer show in your search results or in your other lists. And, of course, they won't know that you took this action.<br><br>Un-doing It If you'd like to see the list of those you've removed, you can access your Removed Profiles by clicking the link on the left side of your "Home" page. If you decide you want to give a member another chance, you're welcome to select the member you want to see again and click on the Show button.  <br><br>You'll also need to visit this page to clean up this list if you've been with us for a little while and happen to reach our current limit of 10,000 profiles you can remove. Removed profiles that have been on your list for longer than one year will automatically be deleted from your list. However, you can add them to your list again at any time.<br><br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_self" contents="here" answer_id="665" /&gt;  if you are asking about how to block certain members from viewing your profile. |
| 666 | Favorites - Hidden Profiles | A profile will remain in your Favorites list for 180 days or until you decide to delete it. However, if at any time the member decides to hide their profile on the site, the full profile will no longer be available to view.<br><br>If you would like to remove a profile in "hidden" status from your Favorites list, simply visit your Favorites page and click the X in the top-right corner of the member you would like to remove.<br><br>Click &lt;rn:answer_xref target="_new" contents="here" answer_id="537" /&gt; for more information on Favorites |
| 662 | Hiding My Profile or Making it Visible | As a member of Match, you have the ability to hide your profile from view at any time, for any reason.<br><br>Adjusting Visibility<br>To adjust your visibility, hover over your primary photo thumbnail in the top navigation bar, and select Settings in the menu. On this page, you can set your profile status to "Visible" or "Hidden."<br><br>Click &lt;rn:answer_xref answer_id="472" contents="here" target="_new" /&gt; for more information on hidden profiles. |
| 527 | matchPhone - Explained | *This feature is not available to members outside of English-speaking North America<br>About matchPhone<br>matchPhone is a premium feature that offers an easy, completely anonymous alternative to conventional phone calling, enabling you to talk or text on your phone with any of your matchPhone connections. To enable this to happen, matchPhone generates a new, unique phone number for both you and your potential match. Once established, either member may initiate calls using these numbers. Any call to your matchPhone number is then forwarded right to your phone. Your auto-generated matchPhone number is the only number that will appear on the other member's caller ID.<br><br>Click &lt;rn:answer_xref target="_self" contents="here" answer_id="60" /&gt; to see what you'll need in order to use this service<br>Click &lt;rn:answer_xref target="_self" contents="here" answer_id="670" /&gt; for instructions on how to sign up for matchPhone<br>Click &lt;rn:answer_xref target="_self" contents="here" answer_id="671" /&gt; for information about how it works once you're a matchPhone user<br>Click &lt;rn:answer_xref target="_self" contents="here" answer_id="209" /&gt; for more on how matchPhone keeps your information safe<br>Click &lt;rn:answer_xref target="_self" contents="here" answer_id="250" /&gt; for instructions on how to change the phone number matchPhone sends calls to |
| 2216 | How to Switch to Threaded Messaging | You can change the way you view your messages on the Mobi site by tapping your conversation list.<br>Then tap Conversation View and you will be able to view your communication as threaded messages. |
| 2203 | Forgot Password | If you are unable to remember your password, tap the Forgot Password link on the member sign in screen. Type your registered email address and we will send you a password reset link that allows you up to 24 hours to reset your password.<br>If you miss the grace period, you must submit the request again. |
| 2201 | How to Sign In | To sign into the Match application, you must enter your registered email address and password. If you have forgotten your password, tap the Forgot Password link and then enter your email address.<br><br>We will send you a password reset link to your registered email address. The reset password link expires after 24 hours. |

| Answer ID | Summary | Answer |
|---|---|---|
| 2205 | How to Add a Photo | Whether you're a new member or simply want a fresh look, uploading photos can be done quickly and easily.<br>To add a photo, tap the three line icon at the upper left hand corner of your screen to open the navigation display and then tap the My Profile icon. On the My Profile screen, tap the Add Photos button.<br>A pop-up appears allowing you to add new photos by tapping either the camera so you may take a new picture, or by tapping the gallery so you may add existing photos.<br>Once you have selected a photo to upload, there will be an optional section to add a caption. You can add the caption immediately or return to the photo at a later time.<br>Be sure to tap the Send for Approval button so the photos are sent to Match for review. |
| 2206 | How to Delete a Photo | If you'd like to edit a photo you have posted on your profile, first tap the three line icon located at the upper left hand corner of your screen to open the navigation display and then tap the My Profile icon.<br>On the next screen, tap the Manage Photos button and then locate and tap the photo you would like to delete.<br>You must then tap the three bullet icon located in the bottom right-hand corner of your screen and then tap the Delete This Photo button.<br>A pop-up appears confirming you would like to delete the photo. If you are sure you would like to delete that particular photo, continue by tapping the Delete button. |
| 2207 | How to Add a Caption | In order to edit a photo's caption, first tap the three line icon located at the upper left hand corner of your screen to open the navigation display and then tap the My Profile icon.<br>On the next screen, tap the Manage Photos button and then locate and tap the photo you would like to caption.<br>You must then tap the three bullet icon located at the bottom right-hand corner of your screen. Tap the Add Caption button, which opens and allows you to add text.<br>To complete the request, make sure you tap the Submit button. |
| 2208 | How to Delete a Caption | In order to delete a photo's caption, tap the photo you would like to remove the caption from and then tap the three bullet icon located at the bottom right-hand corner of your screen.<br>Tap the Delete Caption button, which opens and allows you to click the Delete button to complete the request. |
| 2175 | How to hide your profile from a member who was visible after purchasing Private Mode | If you are currently appearing visible to another match after purchasing Private Mode and you wish to appear hidden to him/her, you must block them from communicating with you.<br> <br>Blocking prevents the match from being able to further communicate with you on the site.  However, it does not prevent them from responding to emails previously received from you.<br> <br>Blocks are initiated immediately and we never notify the other member of this change. |
| 2176 | What type of communication unblocks Private Mode? | To appear visible for a potential match, you must communicate or show interest in one of the following ways:<br>·         Add the profile as a Favorite<br>·         Accepting an Event invite<br>·         Chatting  via Instant Messenger<br>·         Game Night or matchPhone initiation<br>·         Like or Like &amp; Comment on their photo or DateSpark Idea<br>·         Sending or Listening to a Voicemail<br>·         Rating a member via Daily Matches<br>·         Responding to a Match Me (Put me In) request<br>·         Send the member an email<br>·         Send a Wink<br>Once the communication is sent you will be visible so the member may respond. |
| 2178 | What happens if I look at someone's profile while in Private Mode but choose to not auto-renew when the current subscription expires? | If you visit a profile while in Private Mode but choose to discontinue the service at a later time, you will appear within the Who's Viewed Me list once your profile is visible.  If you are concerned with appearing on the Who's Viewed Me list, we recommend you purchase Undercover.<br> <br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_blank" contents="here" answer_id="1884" /&gt; to read more about Undercover. |
| 2179 | Can I purchase renewable add-ons when my subscription is billed through the Apple iTunes store? | Unfortunately, you are unable to purchase Private Mode if your subscription was bought in the Apple iTunes store.  If you would like to enjoy this feature you must wait until the current subscription expires and then purchase via the Match website.   While subscribing on the Match website, you will have the ability to purchase Private Mode for the duration of your subscription. |
| 2181 | Subscription Add-Ons | To complement your Match subscription, we offer several add-on features that may enhance your site experience:<br>·         Email Read Notification<br>·         Highlighted Profile<br>·         First Impressions<br>·         matchPhone<br>·         Private Mode<br>·         Reply for Free<br>You can add the features during your initial subscription purchase or any time after the subscription processes for a prorated fee.   The features will auto-renew along with the subscription for the length of the selected package.<br>Unfortunately, these features are not available for member's who subscribe to Match via the Apple iTunes store.<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_blank" contents="here" answer_id="11" /&gt; to read more about Email Read Notification<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_blank" contents="here" answer_id="354" /&gt; to read more about Highlighted Profile<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_blank" contents="here" answer_id="351" /&gt; to read more about First Impressions<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_blank" contents="here" answer_id="671" /&gt;to read more about matchPhone<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_blank" contents="here" answer_id="2167" /&gt; to read more about Private Mode<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_blank" contents="here" answer_id="2130" /&gt; to read more about Reply for Free<br>  |

| Answer ID | Summary | Answer |
|---|---|---|
| 2192 | How do I use the Starbuck's locator within my Invitation? | We've made the planning process easier by allowing you to locate a Starbucks directly from your invitation.  To find locations near you, click the Find a Starbucks Near You button in the invitation and then enter the desire zip code.<br>Keep in mind, the locator only searches one zip code at a time.  If you are trying to find the best location for both parties, a separate search will need to be performed for each member's zip code. |
| 23 | Online Dating Safety Tips | When meeting new people online or otherwise, of course you should always take steps to protect yourself. To help, we provide Online Dating Safety Tips we strongly encourage that you review and live by. Included in these tips are the following:<br><br>Information to help you avoid fraud, including online scams<br>Practical tips on guarding your privacy and anonymity until you feel comfortable<br>Precautions to take when meeting offline for the first time<br>Special considerations when arranging long-distance meetings<br><br>In addition, we'd like to point out another great resource. Because of the threat online scams pose, the U.S. Federal Trade Commission has released its own suggestions on how users of online dating sites can protect themselves. We strongly recommend reviewing this information here.<br><br>If you believe you have encountered someone using our site for inappropriate purposes, click &lt;rn:answer_xref answer_id="120" contents="here" target="_new" /&gt;. |
| 1171 | Online Dating Safety Tips | When meeting new people online or otherwise, of course you should always take steps to protect yourself. To help, we have provided Online Dating Safety Tips we strongly encourage that you review and live by. Included in these tips are the following:<br><br>Information to help you avoid fraud, including online scams<br>Practical tips on guarding your privacy and anonymity until you feel comfortable<br>Precautions to take when meeting offline for the first time<br>Special considerations when arranging long-distance meetings<br><br>In addition, we'd like to point out another great resource. Because of the threat online scams pose, the U.S. Federal Trade Commission has released its own suggestions on how users of online dating sites can protect themselves. We strongly recommend reviewing this information here.<br><br>If you believe you have encountered someone using our site for inappropriate purposes, click &lt;rn:answer_xref target="_new" contents="here" answer_id="120" /&gt;.<br>  |
| 2240 | How to change my location (city, state and/or zip code) | Moved or Traveling to a different location? You can change/update your city, state or zip code at any time.<br><br>Click the gear icon and then select Settings from the drop-down menu. On the Account Settings screen, click the Location link. and enter your new location. Click Continue to complete the request and start receiving new matches in your new location. |
| 2239 | How to Deactivate (Delete) your subscription | Have you met someone? Need to take a break? You can deactivate your account and return to the site within 180 days of deletion.<br>To deactivate your account, you must first cancel your subscription. Click the gear icon from the header and then select Settings from the drop-down menu. On the Account Settings screen, click the Change/Cancel Membership link. This process includes several steps, before exiting the site, make sure you see a confirmation page that includes today's date and your username. On the confirmation screen, click the Hide Profile/Deactivate My Account link to delete your account.<br>Once you complete the deactivation steps, your profile will be inaccessible to anyone except you (if you choose to reactivate it). After completing the process you will receive two emails. The first is your cancellation confirmation and the second is your deactivation confirmation, which indicates both requests are complete. |
| 2241 | How to access your account status | Not sure when your subscription ends? Want to determine if you are currently subscribed? You can determine your status in a number of ways.<br>1. If you are seeing the Subscribe button or the subscription rate card, you are currently a free member.<br>2. If the button does not appear, you currently have a paid subscription. To check the time remaining, click the gear icon in the header and select Settings from the drop-down menu. On the Account Settings screen, click the Subscription Status link. Details about your subscription package and premium services will be displayed.<br>You can also make changes on this screen by clicking the applicable links. For example, you can update your credit card information, add new features or upgrade your current package for your next subscription term. |
| 2248 | Help! I need assistance updating my Account Settings. | Frequently Asked Questions<br> <br>&lt;rn:answer_xref style="FONT-SIZE: 10pt; TEXT-INDENT: 0in" answer_id="2241" contents="How can I access my account status?" target="_blank" /&gt;<br>&lt;rn:answer_xref style="FONT-SIZE: 10pt; FONT-FAMILY: Verdana; TEXT-INDENT: 0in" answer_id="2240" contents="How can I change my location (city, state and/or zip code)?" target="_blank" /&gt;<br>&lt;rn:answer_xref style="FONT-SIZE: 10pt; FONT-FAMILY: Verdana; TEXT-INDENT: 0in" answer_id="2239" contents="How do I deactivate (delete) my subscription?" target="_blank" /&gt;<br>&lt;rn:answer_xref style="FONT-FAMILY: Verdana; TEXT-INDENT: 0in" answer_id="2238" contents="How do I turn off automatic billing or cancel my subscription?" target="_blank" /&gt;<br>&lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="2242" contents="How do I update my email notifications?" target="_blank" /&gt; |

| Answer ID | Summary | Answer |
|---|---|---|
| 2245 | How to reset my password | Want to change your password?  It's simple to do from our Account Settings screen.<br><br>Click the gear icon located in the header and then select Settings from the drop-down menu. On the Account Settings screen, click the Sign Up Information link.  Enter your date of birth and current password then click enter.  On the next page, click the Change Sign Up Info button and type your new password into the field that currently contains asterisks (***).<br><br>Your request is not complete until you click the Continue button which sends a password reset confirmation email to your registered email account. |
| 2247 | I had to use an old email address to get logged in, can I change it? | New email address? Or just prefer to use a different email address? No worries, we've got you covered.<br><br>Click the gear icon located in the header and then select Settings from the drop-down menu. On the Account Settings screen, click the Sign Up Information link. Enter your date of birth and current password then click enter. On the next page, click the Change Sign Up Info button and then type your new email address into the field that contains your old address. This may require you to type into a field that contains asterisks (***).<br><br>Your request is not complete until you click the Continue button which sends a confirmation email to your registered email account. |
| 2249 | Help!  I need assistance with signing into my account. | Frequently Asked Questions<br> <br>&lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="Forgot your password?" answer_id="2244" target="_blank" /&gt;<br>&lt;rn:answer_xref style="FONT-SIZE: 10pt; FONT-WEIGHT: normal; TEXT-INDENT: 0in" contents="How to reset my password?" answer_id="2245" target="_blank" /&gt;<br>&lt;rn:answer_xref style="FONT-SIZE: 10pt; FONT-WEIGHT: normal; TEXT-INDENT: 0in" contents="My reset link doesn't work, what now?" answer_id="2246" target="_blank" /&gt;<br>&lt;rn:answer_xref style="FONT-SIZE: 10pt; FONT-WEIGHT: normal; TEXT-INDENT: 0in" contents="I had to use an old email address to get logged in, can I change it?" answer_id="2247" target="_blank" /&gt; |
| 2250 | How to hide/unhide my profile? | Not sure how to hide or unhide your profile? No problem. We can help!<br>Click your photo thumbnail in the header and then select Settings from the drop-down menu. On the Profile Visibility screen, click the Visible (to unhide) or Hidden (to hide) radio buttons. Your profile visibility adjusts immediately, so make sure you are ready for the change! |
| 2251 | Can others see me when I'm hidden? | Recently updated your profile visibility to hidden? Not sure if others can see your profile? We've got the answers!<br>When you hide your profile, it's no longer visible on the site, will no longer appear in search results and will not be accessible to previous connections on the site.<br>However, if you previously communicated with another member via email, they will be able to reply to you from their external email client. |
| 2252 | What is Private Mode? | Are you a private person? Do you like the idea of being seen by only those members who interest you? If so, Private Mode is for you.<br>This feature allows you to search and view profiles in complete privacy. If you find a match, reach out to him/her by Winking, Favoriting, etc., which makes your profile visible to them.<br>Private mode may be added to any current paid subscription, however, it may not be purchased as a standalone. |
| 2238 | How to turn off automatic billing or cancel your subscription? | Auto-Renewal on your mind? You can stop automatic billing while continuing to use the features you've already paid for until your current subscription expires.<br><br>To stop automatic billing, click the gear icon located in the header and then select Settings from the drop-down menu. On the Account Settings screen, click Change/Cancel Membership. This process includes several steps, so before exiting the site, make sure you see a confirmation page that includes today's date and your username. After completing the process, you will receive an email confirmation that contains the same details and indicates the request is complete. |
| 1635 | About Me - Explained | The most important factors to remember in the About Me section of your profile:<br><br>There is a 200 character minimum.<br>If your profile is appearing in the About Me section, but is not displaying for other members to see chances are that your profile has not been approved. We may reject profiles that contain any of the following:<br><br>Abusive language of any kind, including profanity, vulgarity, racism, illegal activity, etc.<br>Any direct contact information, including email addresses, URLs, instant messenger IDs, phone numbers, full names, addresses, etc.<br>Unauthorized use of copyrighted or trademarked material<br>Business or political advertisements or solicitations<br>Languages other than English or Spanish<br>Material that exploits or solicits personal information from individuals under the age of 18<br>Overt solicitation for sex or descriptions of sexual activity, anatomy, etc.<br>Solicitation of multiple or additional partners<br><br>Match.com does not accept content from:<br><br>Incarcerated individuals<br>Individuals under the age of 18<br><br>You can check to see if your profile is rejected by tapping the navigation symbol in the upper left hand corner and then tapping My Profile. The status of your profile will appear underneath your username to the right of your Primary Photo |
| 2253 | Help!  I need assistance hiding or unhiding my profile. | Frequently Asked Questions<br> <br>&lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="2250" contents="How to hide/unhide my profile?" target="_blank" /&gt;<br>&lt;rn:answer_xref style="FONT-SIZE: 10pt; FONT-WEIGHT: normal; TEXT-INDENT: 0in" answer_id="2251" contents="Can others see me when I'm hidden?" target="_blank" /&gt;<br>&lt;rn:answer_xref style="FONT-SIZE: 10pt; FONT-WEIGHT: normal; TEXT-INDENT: 0in" answer_id="2252" contents="What is Private Mode?" target="_blank" /&gt; |

| Answer ID | Summary | Answer |
|---|---|---|
| 1574 | Daily Matches - Rating my matches | Our Daily Matches system is unique in that it takes your feedback and improves over time. This is why we have made it a requirement that you must rate your Daily Matches each day in order to receive new Daily Matches the next day (matches will update 23 hours after the rating occurs). Your profile also needs to be visible before you can rate your matches.<br><br>Rating Yes<br>If you say that Yes, you're interested, we'll send a message to the member you're interested in to let them know they caught your attention. If you'd like, you can access all the members who've sparked your interest in the Yes section of your Daily Matches. Just remember, though, that matches are removed from all Daily Matches lists after they've been there 180 days.<br><br>Rating No<br>If you're not interested, it's not a problem. We'll simply remove that member from your Daily Matches, and they won't show up again in the matches we serve you (and they'll never know you weren't interested). Do be careful, though. If you inadvertently select the No rating on a member's profile, the rating cannot be changed after it is submitted.<br><br>Singled OutOn any day where you receive a Singled Out match, you'll need to rate it before you can continue rating the rest of your Daily Matches. New matches will not appear until after you have rated your Singled Out match. |
| 2261 | iOS app: How Do I Turn Off My Auto Renewal or Cancel? | Follow these steps to turn off your auto renewal on your iPhone:<br>1. Launch the Settings app on your iPhone<br>2. Tap on iTunes &amp; App Store<br>3. Tap on your Apple ID at the top of the screen<br>4. Tap View Apple ID from the pop-up menu<br>5. When prompted, enter your password, and then tap OK<br>6. Under Subscriptions, tap Manage<br>7. Tap the name of the subscription that you want to modify<br>8. Turn the auto-renewal option to Off<br>9. Tap Turn off on the pop-up to save your changes<br>If you would like further information or assistance, please contact Apple directly at: http://www.apple.com/support/itunes. |
| 1281 | "No Thanks" versus Block from Search | "Block from Search," which appears on every profile page, removes the person from appearing in your searches, but does not communicate to the sender that you are not interested. "No Thanks" is a link that appears on all emails you receive on the Match site. If you click on it, it sends a brief "not interested" response to the sender, but does not necessarily remove them from searches. Please note that this link is not included on notification emails for winks, likes, etc. If you'd like the sender of an email to no longer appear on your Connections page, click on the x next to their profile to remove them. |
| 1133 | Updating Credit/Debit Card Information | If the account number you used to subscribe with us is no longer valid, you'll want to update your information to make sure your subscription will renew properly. Since this information doesn't appear on the Match Andoid app. you'll need to update your billing information on the full website. To do this, just log in on your computer, go to "Billing Information" in your account options, select the "Subscription Status" link, and then select the "Update" link next to the Active Credit Card number. |
| 1854 | We're Glad We Could Help! | We're happy that the FAQs we suggested answered your question. As you requested, your question has NOT been submitted to our Customer Care team. If you clicked the "Yes, I'm Good" button in error, you can still seek further assistance using one of the links below:<br><br>Click Here to go back to our Help section<br><br>Click Here to go back to the Match Home Page |

| Answer ID | Summary | Answer |
|---|---|---|
| 1118 | Technical issues - clearing cache/cookies | Clearing your browser's cache and cookies can resolve most browser related issues on our site. Included below are instructions for the most common browsers used on our site:<br> <br>To clear your cookies on your Android device (default browser):<br><br>Open your browser<br>Tap on the menu button on your device and choose Settings (you may first need to choose More)<br>Scroll down if necessary and tap on Clear all cookie data<br>Tap on OK<br><br>Internet Explorer 11:<br><br>Navigate away from Match<br>Click on the gear icon in the top right corner<br>Click on Internet Options<br>Make sure you're on the "General" tab<br>Under "Browsing History," click on Delete...<br>Check the checkboxes for "Temporary Internet Files" and "Cookies," and make sure "Preserve Favorite Website Data" is unchecked<br>Click on Delete<br><br>Firefox:<br><br>Navigate away from Match<br>Click on the Firefox button at the top of the screen<br>Hover over "History" and click on Clear Recent History...<br>Click on the dropdown for "Time range to clear" and select Everything<br>Click on the down arrow next to "Details" and make sure "Cookies" and "Cache" are selected<br>Click on Clear Now, and close the Clear Recent History window<br><br>Safari:<br><br>Navigate away from Match<br>Under the "Safari" menu, select Reset Safari<br>Check Remove all cookies and Empty the cache<br>Click Reset<br><br>Chrome: |
| 1264 | Terms and Privacy | Please review the policies described in our Terms of Use, our Privacy Policy and our Dating and Safety Tips. |
| 1483 | Text Alerts - How They Work | *This feature is not available to members outside of English North America<br>If you want to be notified whenever someone sends you a new email or Wink, just opt to receive SMS alerts on your mobile phone. It's easy to enable/disable text alerts or update the phone number listed.  Just follow the steps below:<br>Manging Text Alerts<br><br>Tap the three line icon in the upper left corner of the handset<br>Tap Settings &amp; Help  from the menu options<br>Tap Manage text alerts<br>Tap the Yes (enabled) or No (disabled) toggle to change update the alerts received<br>Tap the pencil icon when updating your mobile number<br>Tap Save to complete the updates<br><br>Match does not charge for text alerts. Your carriers standard message and date rates still apply. |
| 1229 | Signing In | To sign into Match, go to http://www.match.com and enter your registered email address, along with your password. If you have forgotten your password, click here and enter your email address. An email with your sign-in information will be sent to that email address.<br><br>In some situations, you also have the option of linking your Match sign-in to your Facebook account. Click here for more information. |
| 1128 | Searching for Members with Photos | To search from the Match Android app for members who only have photos:<br><br>Tap on the Search button on your device (on the device, not on the screen)<br>Tap on the filter icon on the right of the screen<br>Ensure the "Photos Only" button is green<br><br>From the full website, simply check the box next to "With Photos" on the search form. Your results will only include members who fit your search criteria and have photos on their profile. |

| Answer ID | Summary | Answer |
|---|---|---|
| 1526 | Searching for Members with Photos | To search for member's with photo, complete the following steps:<br><br>Tap the three line navigation link<br>Select Search from the drop down menu<br>Tap Go Search and then the Filter button<br>Ensure the Photos Only toggle is set to Yes.  If not, swipe left to right to update the setting<br>If necessary, tap Save to ensure the update is complete |
| 1147 | Removing Profiles From Search Results | As you explore our dating community, you're bound to find some members you can cross off your list. That's no problem. If you're a current subscriber, you're welcome to remove these members so you no longer see them.<br><br>On the Android App<br>When searching on the Android app, you can remove a member from your search results by tapping their profile picture and the three dot icon in the top right corner. Then, tap Remove from Search to remove the member.<br><br>On the Full Match Website<br>From the full Match.com website, you can remove a member from search by clicking on the "x" icon in the corner of their profile (when it appears in lists) or by clicking on the Block from Search link in their profile. They will no longer show in your search results or in your other lists. And, of course, they won't know that you took this action.<br><br>Un-doing It<br>If you'd like to see a member in search results again, visit their profile. On the Android app, click on Restore to Search. If you're on the full website, it'll be Unblock from Search.<br><br>If you've been with us for a little while and happen to reach our current profile removal limit of 10,000, you may wish to visit the "Removed Profiles" page, which can be found on the full website (not available on the Android app). From the Home page see the bottom left side, click Removed Profiles. From there you can select the usernames you'd like to appear in search results again, and click on Show. You can also use the "Select All" feature to make all removed profiles visible again. |
| 1129 | Quick Search - Explained | On Match, search can be as simple or customized as you want to make it, and if you're looking for speed and convenience, there's no better tool than Quick Search.<br><br>From the home screen on the Match Android app, you can perform a search simply by tapping on the Search button on your device.<br>On the full Match website, our [Quick] Search option appears on the bottm right of the your Home page, and the left side of the Search page. Both allow you to quickly enter some general criteria, and have your results within seconds. Keep in mind that for the criteria not visible in the Quick Search box, your search will default to the settings used in your most recent search. You can change these settings by clicking the Custom Search tab to access the Search page. |
| 1237 | Profiles on Match - Explained | Your profile is your best tool for making a good first impression on potential matches. We strongly encourage that you complete a thoughtful profile and make it visible so you can start hearing from people! As you're building your profile or looking at others', you're bound to run into some questions. Refer to the list below for some of the most frequent issues we address on the subject.<br><br>Basic features and functions:<br><br>Click here for information on creating a profile<br>Click here for approval guidelines<br>Click here for instructions on how to edit an existing profile<br>Click here for answers to your questions relating to hidden profiles<br>Click here for how to see who has viewed your profile, or whether others see when you view theirs<br>Click here for information about ProfilePro<br>Click here for information about your Profile Counter<br>Click here for information about highlighted profiles<br>Click here if your question relates to photos<br><br>More information and troubleshooting:<br><br>Click here if a profile you're trying to view is "unavailable"<br>Click here if you'd like to delete your profile<br>Click here if your profile appears to be losing text you've entered<br>Click here for information about profile completion requirements<br>Click here for the ins and outs of searching for your own profile<br>Click here for information about the "New" label on some profiles<br>Click here if it looks like your profile is not appearing<br>Click here for an explanation of "Online Now" and "Active Within"<br>Click here if you'd like to control who sees your profile and photos<br><br> <br>MatchPhone allows members to text, talk and leave voice messages while maintaining their anonymity. Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="1244" contents="here" target="_new" /&gt; for information about MatchPhone. |

| Answer ID | Summary | Answer |
|---|---|---|
| 1146 | Profile Creation | About Your Profile |

The Match profile process is fun and simple. It contains questions about who you are, where you're from, the things that interest you, your lifestyle, and your background and values. It also asks you about your ideal match. All of this information helps form a great image of who you are and who you're looking for. Not only does this help potential matches understand you better, it also helps us provide you with better matches through our unique matching tools.

Creating Your ProfileWhen you open the Match App and are not logged in, you'll be prompted to create a new account. Simply walk through the questionairre, and your profile will be set up as soon as your information is reviewed and approved.
On the Full Match Website
If you're on the full Match website, just sign in and click on your primary photo thumbnail at the top of any page and start answering the questions. The profile survey is also where you can add a photo to your profile, which can get you up to 15 times more attention. Finally, whenever you're finished providing the information, just hit the Send for approval button.

It only takes a few minutes, but if you don't have time, you can save portions of the profile and come back to them. Just keep in mind that nothing gets posted until your entire profile is complete, including the "In My Own Words" section. And be careful when working on written sections - if you're writing for more than 45 minutes, you risk a session time-out in which your data could be lost. If you're going to be writing for a while, it might be best to do your typing in another application, then copy and paste it onto the profile form.

Making it Good
Remember, no one likes a boring profile. Have some fun with it. Be creative!

If you want some good ideas for what to include in your personal description, view our Sample Topics to help you decide what to write about. And if you're really serious about making your profile the best it can be, our Profile Pro consulting service can help you make it a winner in no time.

Approval Process
Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="here" answer_id="1082" /&gt; for profile guidelines, and the timeline in which you can expect your profile to be reviewed.

Editing Your Profile
You can edit your profile whenever you want. Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="here" answer_id="1215" /&gt; for instructions on updating your profile data. Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="here" answer_id="1149" /&gt; for information on updating vital information like your username, password, email address, birthdate, or location.

 

| 1255 | Profile Counter | Every time any Match member views your profile, whether they have a visible profile or not, we add that to your profile view counter. You can find the profile counter on the Home page of your account. The counter is displayed underneath your photo and will read "Viewed __ Times".

Click here for an explanation of why this number may differ from what you see in your "Who's Viewed Me" feature
Click here to learn why your Profile Counter may register views even when your profile is hidden |

| 359 | Profile Counter | Every time any Match member views your profile, whether they have a visible profile or not, we add that to your profile view counter. You can find the profile counter on the Home page of your account. The counter is displayed underneath your photo and will read "Viewed __ Times".

Click &lt;rn:answer_xref target="_new" contents="here" answer_id="151" /&gt; for information on resetting your Profile Counter.
Click &lt;rn:answer_xref target="_new" contents="here" answer_id="145" /&gt; for an explanation of why this number may differ from what you see in your "Who's Viewed Me" feature
Click &lt;rn:answer_xref target="_new" contents="here" answer_id="664" /&gt; to learn why your Profile Counter may register views even when your profile is hidden |

| 80 | Privacy and Location Searching | Match is committed to protecting your privacy, whether you access Match from a desktop computer or from a mobile phone. If you use one of our mobile apps that includes our location search feature, we will not make your exact location available to other members. Please review the terms of Match's Privacy Policy for further information. |

| 1236 | Photos on Match | Photos are really a big deal, and we strongly encourage you to post a number of them. As you're adding photos or just using the site, we recognize that you may run into some questions. Refer to the list below for some of the most frequent issues we address on the subject.

Click here for information on the benefits of posting a photo
Click here for instructions on adding photos
Click here for instructions on editing and removing photos
Click here for our photo-posting guidelines
Click here for some of our photo tips
Click here if your photo was approved as secondary-only
Click here for information on the way your photo appears on our site
Click here for instructions on changing which photo appears as your primary photo
Click here for information on controlling who sees your profile and photos
Click here if your photo isn't appearing in search results
Click here for instructions on searching for members with photos

Members can have up to 26 photos on their profile.
Photos captions follow the same approval process as profiles. |

| Answer ID | Summary | Answer |
|---|---|---|
| 1637 | Photo Likes and Comments | From the Mobile Site<br>On the Match mobile site, when you see a photo that interests you, you can let the member know by giving a Photo Like. When you're viewing a photo, tap the thumbs up icon in the bottom right corner of the image.<br>If you'd like to comment on a photo, tap on the word bubble icon in the bottom right corner. You'll be able to type and send the comment from the pop-up screen that appears if you have a current Match.com subscription.<br>From the App<br>On the Match app, when you see a photo that interests you, you can let the member know by giving a Photo Like. When you're viewing a photo, tap the thumbs up icon in the bottom right corner of the image.<br><br>Unfortunately, you are not able to comment on a photo from the app. However, you are able to comment on a photo from our mobile site. Please access the mobile site from your handset or the full website from a desktop computer.<br>*Note: If you tapped "Like" by accident, there is no way to "unlike" or take it back. The good news is that you may have made someone's day by liking his/her photo! |
| 1252 | New Profile Design - Editing Your Profile | Editing your profile just got easier! To edit your profile, tap the three line icon in the upper left corner of the handset, tap My Profile, and tap Edit My Profile. The experience is very similar to editing your profile on the Match site.<br><br>Let's take a look at what you can do on the My Profile page.<br><br>Edit My Profile<br>This section allows you to edit information about you, your potential match, and your profile text.<br><br>Edit Communities<br>This section allows you to select a community that you are passionate about. Who knows - your match might be passionate about it too!<br><br>View My Profile<br>This section allows you to see what your profile looks like to others who pay you a visit.<br><br>Account Settings<br>This section allows you to change your visibility, find help topics, go to the full site, and sign out of our mobile site. |
| 406 | Profile - "New" Meaning | This feature helps you spot members who have recently joined Match. The "New" label stays on the profile for five days. |
| 1152 | Member Spotlight - Explained | Opening the door for a member spotlight could potentially result in a lot of great exposure for your profile. Spotlighted members may appear for specific purposes on Match or partnering sites. For example, you may have noticed advertisements with member photos on other websites we partner with such as Facebook or Classmates.com.<br><br>Profiles opted into the member spotlight can also be crawled by search engines like Google or Ask.com, and may appear in search results. Of course, what comes up in search results is only what you have made public in your profile, so it doesn't include any identifying information other than your photo.<br><br>Don't get this program confused with our premium Highlighted Profile feature we offer that results in added attention in normal areas of the site. Our Member Spotlight is a free service, but only a few of the members who have requested consideration actually appear in our ads and other spotlighted areas (we only have so many opportunities).<br><br>Of course, you'll want to consider your comfort level with the high-degree of visibility the Member Spotlight could potentially afford. It could result in a photo of yours being viewable by a large audience outside of our member community. Please know, however, that no matter where your profile may appear, personal information such as your name and contact information remains confidential.<br><br>To be considered for the Member Spotlight, you'll need to adjust your settings on the full Match website, not the Android app. Once logged in on the full website, just click on Profile in the top navigation bar, click on Settings, and select "On" in the Member Spotlight section. Be certain your profile is visible and your main photo is a clear, attractive shot of you alone.<br><br>To opt out, just select "Off" on the same page. |
| 1305 | Android App - Setting it up | *This feature is not available to members outside of English North America<br>With the Match.com Android application, you can access most of your favorite Match.com features on your Android device. You can search for matches in your area, wink at them, and communicate with them (requires a paid subscription). You can also add and view your Favorites and see who's viewed your profile (also requires a paid subscription). Plus, you can be notified immediately when other members communicate with you.<br><br>What do I need in order to start using the Match.com Android application?You will need an Android device running OS version 1.5 or above (to locate your OS version, go to 'Settings' &gt; 'About phone' &gt; 'Firmware version'), a data plan that gets you on the Internet, and enough memory to download the app. If all of that is in place, you can download the Match.com Android application and start using it right away.<br><br>How do I download the application?If your phone is supported, go to http://m.match.com on your Android device, and you'll be prompted to download the application.<br><br>You can also visit the Android Market and search for "Match.com" to find and download the application.<br><br>My Phone/Model isn't supportedWe also have applications for other smartphone platforms, as well as browser-based access to Match.com supported on all mobile phones with Internet access. Visit http://match.com/mobile to learn more. You can also access Match.com by going to http://m.match.com on your device's browser and tapping on the Continue to matchMobile link at the bottom of the page. |

| Answer ID | Summary | Answer |
|---|---|---|
| 1306 | Android App - Using It | *This feature is not available to members outside of English North America |

With the Match.com Android application, you can access most of your favorite Match features on your Android device. You can search for matches in your area, wink at them, and communicate with them (requires a paid subscription). You can also add and see your Favorites, as well as who's viewed your profile (also requires a paid subscription). Plus, you can also be notified immediately when other members communicate with you.

I installed the application on my Android. What do I do next?If you already have an account with Match or are a current subscriber, simply open the app and sign in. If you're new to Match.com, you'll be prompted to create a new account.

How much does it cost to use the Match.com Android application?The Match.com Android application is free to download and use. Most features, including the ability to wink at and search for other members, do not require a paid subscription. However, in order to communicate with other Match members as well as see who's viewed your profile, you will need to have a paid subscription.

How do I upload a photo?For instructions on how to upload a photo, click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="532" contents="here" target="_new" /&gt;. There's a section that specifically addresses adding photos using the Android App.

How does the location-search feature work?The location-search feature uses the GPS on your Android to determine your location. Your exact position will never be revealed to other Match.com members. The feature uses your location to deliver matches to you that are in your general area and can be turned off in your Search Basic Settings.

I have some feedback. Who should I contact?Please email your app-related feedback or feature requests (please, no support questions) to android.app@match.com.

The Match.com app is no longer available for the iPad and iPhone.

| 1488 | matchMobile versus Text Alerts | *This feature is not available to members outside of English North America |

matchMobile is the version of Match that displays in mobile browsers. Text Alerts are text messages sent by Match to notify you when you have winks or emails. We do not charge for either service, but your carrier's standard text-messaging rates and data plan fees still apply. Contact your carrier for details on those rates.

| 2258 | Are you affiliated with uDate? | |

uDate.com is a dating tool we use to help you find the perfect dating site for your needs.
Once you register with uDate, and answer a few questions, you'll be redirected to the Match Group site that has the most potential of finding your perfect match.
On the selected site, you can enhance your profile and immediately begin searching for your ideal match.
It's free to sign up through uDate, however, you must be an upgraded member to enjoy premium features like email, and live chat.
If you get logged out, or aren't able to finish editing your profile, just log back into the site we chose for you with your registered email address - the information you entered is saved there.

| 2202 | Auto Sign In Feature | |

Match's auto sign-in feature allows us to recognize you each time you visit our application which your need to enter your password with each visit.

If you close the application while you're signed in, you will be automatically signed in the next time you open the application.  

To disable auto sign-in, simply log out of the application before exiting your session.

| Answer ID | Summary | Answer |
|---|---|---|
| 568 | Match BlackBerry Application - Getting Started | *This feature is not available to members outside of English speaking North America<br>&#160:<br>Download the applicationIf your phone model is &lt;rn:answer_xref title="supported" target="_self" contents="supported" answer_id="567" /&gt:, there are two ways to download the Match BlackBerry app. First, you can go to http://www.match.com on your BlackBerry browser, where you'll be prompted to download the application. Or, you can visit BB App World installed on your device, search for Match.com, and select Download.<br><br>Register or sign inIf you're already registered with Match &#160:or have registered in the past, you can use your registered email address and password to sign in to the Match&#160:BlackBerry application. If you're new to Match, you'll be prompted&#160:to register and create a new account. To increase your chances of success on Match, remember to upload your photos and complete your profile, using either the BlackBerry application or the full website.<br><br>Uploading photosIf your BlackBerry has a camera, you can easily upload photos that you take on your phone. Select My Profile and click on Upload Photos. This will prompt your BlackBerry to open your camera feature. Just snap a photo of yourself and upload it to your profile. This feature will also allow you to use any existing photos on your BlackBerry. Our Customer Care department will process your photo(s) and send you a confirmation email.<br><br>Approving the&#160:location-search feature<br>The location-search feature uses the GPS (or other positioning technology) on your BlackBerry to determine your location. Your exact position will never be revealed to other Match members. This&#160:feature simply uses your location to deliver matches to you that are in your area. Depending on the permission levels on your BlackBerry, after you sign in the app might ask for permission to use your current location. If you don't agree, we'll just base your location on&#160:the zip code entered during registration. You can also adjust this feature in your device "Settings" page.<br><br>Adjust security settings (if necessary)Due to security settings imposed by either your company (if you're using a company-issued BlackBerry) or by your carrier, you may be required to respond to multiple security permission prompts each time you start the application. Often these settings cannot be modified by you the user. In such cases, please contact your IT department or your carrier's customer support department to change the security settings to work around this issue. We are unable to change these settings for you.<br><br>Contact Us<br>Please email your questions, feedback or feature requests to blackberry.app@match.com (no support inqueries please). |
| 1643 | Likes Page | Instructions for accessing your likes are slightly different depending on how you are accessing Match from your iPhone.<br>From the Mobile Site<br>To access all your likes from the mobile website, tap More located in the lower corner of your screen. Tap Likes to see a list of members whose photos you've liked with quick links to view the member's profile.<br>From the App<br>To access all of your likes from the app, tap the navigation menu in the upper left corner of the screen. Tap Connections and then tap Likes to see the list of members whose photos you've liked with quick links to view member's profile |
| 1121 | Improving Matching Results | Every member goes through the dilemma of how picky to be with matching preferences. The broader your criteria, the more matches you'll get, but the narrower your criteria, the greater chance you'll like the ones you receive!<br><br>We recommend adjusting your criteria over time to find the right balance.  You can do this by signing into your account and following these steps:<br><br>On the Android app:<br><br>Tap the Me icon on the bottom right of the navigation bar<br>Tap View next to Profile Completed<br>Tap the pencil icon<br>One by one, choose the sections you'd like to edit, and make your changes<br>In each section, tap  Save (or tap the X at the top of the floating page) when you're done<br><br>From the full Match website:<br><br>Click on your primary photo thumbnail in the top navigation bar next to the gear icon<br>Click on Edit in the section to the right of your photos<br>Make any necessary updates, and click Apply to save the changes.<br><br>An easy way to broaden your criteria is to make small changes to your age, height, or location preferences, or to adjust whether certain elements are "Nice to Have" or "Must Have." These small changes can often have big results.<br><br>My matches aren't following my stated preferences<br>Click here for more information if your matches aren't following your preferences. |

| Answer ID | Summary | Answer |
|---|---|---|
| 1317 | How to Subscribe + Payment Options | We'd be delighted to have you as part of our subscriber community! |

To subscribe, you'll need to sign up for a free account (if you haven't already done so), then sign in and click on the Subscribe button on the home page. The screen will direct you to choose from our subscription packages, and then will walk you through the billing process.

We currently accept payment by credit card or PayPal. You can also pay by mail using a check or money order.

Credit Card
Match happily accepts:

American Express
Discover
JCB
MasterCard
Visa
Diners Club

Prepaid Credit Card
We do accept prepaid cards on our site. The card issuer, however, may require that you register the card on their website first. Information and instructions on how to register your prepaid card should be listed on the back of the card itself.

Most gift cards and pre-paid cards require you to activate them first.

If the gift card has enough money on it when it is time to renew, the subscription will renew successfully. If there is not enough money on the card at the time of renewal, the renewal will not be processed. To avoid a lapse in your service, you may wish to subscribe with a card from which your account can be automatically renewed.

Mail a Check or Money Order
To request a subscription with a physical check or money order, please make your check or money order payable to Match (drawn on US funds only) and include your username, email address, and whether you'd like a three- or six-month subscription package.

IMPORTANT: We do not currently accept payments by mail (physical checks or money orders) for one-month subscriptions, premium services, or promotional rates/discounted offers.  

When paying by mail, send your payment to the following address (mail delivery and processing time may take up to 14 days):

Attn: Billing
Match 

| 1476 | How to Subscribe + Payment Options | We'd be delighted to have you as part of our subscriber community! |

To subscribe, you'll need to sign up for a free account (if you haven't already done so), then sign in and click on the Subscribe button at the top of the screen. The screen will direct you to choose from our subscription packages, and then will walk you through the billing process.

We currently accept payment by credit card or PayPal (*PayPal is not available to members outside of English North America.) You can also pay by mail using a check or money order.

Credit Card
Match happily accepts:

American Express
Discover
JCB
MasterCard
Visa
Diners Club

Prepaid Credit Card
We do accept prepaid cards on our site. The card issuer, however, may require that you register the card on their website first. Information and instructions on how to register your prepaid card should be listed on the back of the card itself.

Most gift cards and pre-paid cards require you to activate them first.

If the gift card has enough money on it when it is time to renew, the subscription will renew successfully. If there is not enough money on the card at the time of renewal, the renewal will not be processed. To avoid a lapse in your service, you may wish to subscribe with a card from which your account can be automatically renewed.

Mail a Check or Money Order
To request a subscription with a physical check or money order, please make your check or money order payable to Match (drawn on US funds only) and include your username, email address, and whether you'd like a three- or six-month subscription package.

IMPORTANT: We do not currently accept payments by mail (physical checks or money orders) for one-month subscriptions, premium services, or promotional rates/discounted offers.  

When paying by mail, send your payment to the following address (mail delivery and processing time may take up to 14 days):

Attn: Billing
Match

| Answer ID | Summary | Answer |
|---|---|---|
| 2224 | How do you add a Verification Badge? | Want to let other members know that you are who you say you are, while still remaining anonymous? It's easy with a Verification Badge!<br>Add a Verification Badge<br>1. Log into the Match site<br>2. Hover over the Primary Photo thumbnail in the upper right corner of the screen<br>3. Select View/Edit from the drop-down menu<br>4. On the Profile Edit screen, scroll to Verifications and then click Edit.<br>5. Click the Verify button.<br>6. Enter the corresponding information, and then click Verify Now.<br>Each badge is unique and requires separate steps for verification.<br>Hide a Verification badge<br>1. Hover over the Primary Photo thumbnail in the upper right corner of the screen<br>2. Select View/Edit from the drop-down menu<br>3. Scroll to Verifications on the Profile Edit screen, click Edit and then click Hide<br>If you decide you want to unhide your badge simply click the Show button<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="2223" contents="here" target="_blank" /&gt; to read more about Verification Badges. |
| 1183 | Hiding My Profile or Making it Visible | As a member of Match, you have the ability to hide your profile from view at any time, for any reason.<br><br>Adjusting VisibilityTo adjust your visibility on your Match Android app, navigate to the app's home screen, tap on the menu button on your device, choose Settings, and check or uncheck the box next to Profile is Visible.<br>On the full Match website<br>To adjust your visibility from the full Match website,  hover over your primary photo thumbnail in the top navigation bar, and select Settings in the menu. On this page, you can set your profile status to "Visible" or "Hidden."<br><br>Click here for more information on hidden profiles. |
| 1212 | Hidden Profiles - Explained | There may be times, like when you start a new relationship, that you'll want to remove your profile from being visible to other members. Since that's why you're here in the first place, we make this as easy as flipping a switch. Of course, anytime your profile is hidden, it will not be displayed in search results. Since this reduces your chances of finding a match, we recommend only hiding your profile when you are taking a break or have met someone you are interested in.<br><br>As a member of Match, you have the ability to hide your profile from view at any time, for any reason. Click on the links below for more information about the ins and outs of hidden profiles.<br><br>Click here for instructions on how to adjust your visibility<br>Click here for information on communicating with a hidden profile<br>Click here for information on how our "Who's Viewed Me" feature deals with hidden profiles<br>Click here for information on selective visibility<br>Click here for information about cancelling your account (hiding your profile does not suspend your subscription or cancel your account) |
| 1447 | Game Night | What is Game Night?<br>Game Night is a fun feature available on certain nights in certain areas. You choose who you want to play with, and we provide a fun selection of games with a chat sidebar to help break the ice and spark conversation.<br><br>How do I know when it's happening?<br>If a Game Night is coming to your area, you'll get an email a few days ahead of time, and we'll include reminders on your Match home page. Games can be played 8-10 pm local time on scheduled nights. If you log in during that time, we'll give you the option to either join Game Night or continue on to the site like normal.<br><br>How does it work?<br>Once you log in and indicate that you want to go to Game Night instead of the normal Match.com experience, you'll be taken to the Games Lobby. Since you can only play games with others who are participating in Game Night, we'll give you a list of people who could potentially play in your Recommendations list. If you get more invitations than you can handle at once, you can see a list of them in your Invitations list. And in your More Matches list, you'll see sublists of those you've already played with, those you've labeled as "Maybe Later," those who have accepted your invitations and are "Waiting to Play" as soon as you're ready, and those you have pending invitations to.<br><br>After Game Night<br>After Game Night, we'll email you a summary of your Game Night activity so you can get in touch with those you enjoyed interacting with. And, if you're a paid subscriber, members you played games with will appear in your Connections on your Match.com home page. |

| Answer ID | Summary | Answer |
|---|---|---|

1586 Changing Username, Password, Email Address, etc.

To update your account settings, you must complete the following steps:

Tap the three line navigation link and select Settings &amp; Help from the drop down menu.  On the Settings screen, tap Go to full site.  Once on the full site, tap the gear located in the top right corner of the screen and select Account Settings. You can update the following information any time by tapping the Sign Up Information page under your Account Settings (you will be prompted to re-enter your current password for verification):

Username
Password
Email
Gender
Birthdate (we use your birthdate to figure out the age your profile displays)
Location (City, State, Zip Code)
Gender Seeking

If you would like to update your profile and matching information, tap your profile thumbnail located in the top right corner of the screen.

Trouble Updating an Email Address
When updating your account information, remember that an email address can only be associated with one Match account. If your new email address is not being accepted, it may be linked to an account you set up in the past. Click on this link and enter the email address in question, and we'll send you information about this account.

Trouble With Password
If you are having trouble signing in, please click here.

Changing Your Username
When you update your username, all of the members you have contacted or maintain connections with will be provided with your updated username. When past emails or connections are reviewed, the new username will appear in place of the previous one.

For clarification purposes, you may need to remind certain members of your old username if you have not been in contact in a while. However, if your profile and photos are still the same, most members will quickly figure out the changed username.

351 First Impressions

First Impressions is a premium service that ensures your profile is included in the first round of emailed matches sent to the newest members of Match in your area.
For more information about First Impressions, sign in to your account, and:

Click on the gear icon in the top navigation bar :
Click on Subscription Status
Click on Subscribe to additional Match Services

To add the First Impressions premium service, you must first be an active Match subscriber. You can also choose to include this feature when you subscribe to a new package.

 

1137 First Impressions

First Impressions is a premium service that ensures your profile is included in the first round of emailed matches sent to the newest members of Match in your area.
This feature can be added as part of a subsciption package, or it can be added later. Since premium features aren't available to add on the Match Android app, you'll need to log into our full website to add First Impressions to an existing subscription.

From the full Match website:

Click on the gear icon in the top navigation bar :
Click on Subscription Status
Click on Subscribe to additional Match Services

 

| Answer ID | Summary | Answer |
|---|---|---|
| 1149 | Changing Username, Password, Email Address, etc. | You can update the following information any time on the full  website (not available on the Android app): |

Username
Password
Email
Gender
Birthdate (we use your birthdate to figure out the age your profile displays)
Location (City, State, Zip Code)
Gender Seeking

If you would like to update your profile and matching information, please click here.

To locate and edit information on the list above, simply log in on the full  website and follow these steps:

Click on the gear icon on the navigation bar at the top of the screen
Click on Sign Up Information (for your protection you may be required to re-enter your password)
Click on the Change Sign-up Info button
Make your updates and click on Continue

Trouble Updating an Email Address
When updating your account information, remember that an email address can only be associated with one Match account. If your new email address is not being accepted, it may be linked to an account you set up in the past. Click on this link and enter the email address in question, and we'll send you information about this account.

Trouble With Password
If you are having trouble signing in, please click here.

Changing Your Username
When you update your username, all of the members you have contacted or maintain connects with will be provided with your updated username. When past emails or connections are reviewed, the new username will appear in place.

For clarification purposes, you may need to remind certain members of your old username if you have not been in contact in a while. However, if your profile and photos are still the same, most members will quickly figure out the changed username.

| 1193 | Favorites - Hidden Profiles | A profile will remain in your Favorites list for 180 days or until you decide to delete it. However, if at any time the member decides to hide their profile on the site, the full profile will no longer be available to view. |

On the Match Android app
To remove a favorite from your list on the Match Android app:

From the Home screen, tap Menu and choose My Favorites
Tap on the down arrow next the the member you want to remove from your list and choose Delete

On the full Match website
If you're on the full website, to remove a member from your favorites list, hover over Connections at the top of your screen and choose My Favorites from the drop-down menu. Select the profile you'd like to delete by checking the box in the top-left corner and click on the Delete button.

Click here for more information on Favorites

| 1139 | Checking My Renewal or End Date | To check the date your subscription is scheduled to renew or lapse, you'll need to access the full website rather than the Android app or mobile site. Once logged in on the full site, click on the gear icon in the top navigation bar, and click on Subscription Status (if you don't have an active subscription, this link will not appear).  Your subscription End Date and Renewal Status information will be displayed on this page. |

Click here for information about adding additional features or upgrading your subscription term
Click here for information on how to cancel or resign your account
Click here for information about auto-renewal
Click here for information about redeeming our Match.com Guarantee

If you have paid for a subscription, but the Subscription Status link does not appear, make sure that you are signed into the right account. You might also want to verify with your financial institution that your payment was processed.

| Answer ID | Summary | Answer |
|---|---|---|

**1204  Favorites - Adding/Removing a Favorite**

On the Android app
To add a Favorite from the Match Android app, simply tap on Add to Favorites on the member's profile.

To remove a favorite from your list:

From the Home screen, tap on Menu and choose My Favorites
Tap on the down arrow next the the member you want to remove from your list and choose Delete

On the full website
To add a Favorite to your list on the full Match website, simply visit the member's profile and click on the "Favorite him/her" link on the left side of the page.  Remember, there is a maximum of 200 Favorites that can be saved, so you'll need to remove a match to open up a place on your list if it's already full.  In your search results, you can also add members to your Favorites by clicking the star button that appears next to a member's photo. When you favorite another member, they will be notified, and your profile will appear on their "Who's Favorited Me" list.

If you'd like to remove a favorite from your list, click on My Favorites on the left side of your home screen page, select the member you'd like to delete, and click on the Delete button. Favorites will be automatically removed from your list after 180 days.

Click here for information on what happens when a Favorite hides their profile
Click here for more information on Favorites

**344  Considerations When Sharing a Computer With Others**

If multiple people use your computer, be aware that enabling the Match or Facebook auto sign in features could allow them access to your  account. To turn off auto sign in, click the gear icon and then click the Auto Sign In link. Select Off and click Go to disable this feature. Also, you should consider disabling your Facebook auto sign in feature if you've linked it to your account.

**301  Custom Search - Explained**

Although we offer great matching features, such as Mutual Match and our Daily Matches, we understand that sometimes there's no replacement for a straightforward, customizable search.

Performing a Search
To perform a custom search, go to the Search page. The page will automatically populate results using the search parameters identified in your profile settings. There are a number of available search categories, so we help you keep your search organized by showing the current settings on the left side of the screen. To edit your search criteria, click the orange "edit" link next to the appropriate section. Make your selections and click Apply to modify your results.

At the bottom of the screen, you can further refine your search by entering keywords or adding Interests, Background/Values and Lifestyle selections. Just click each heading to display all available options.  

How to Save a SearchSaving a search is easy. Simply click on the "Save Search" link below your search criteria, enter a name for your search and click Save Search. To perform a saved search later, locate the "Saved searches" box near the top of the Search page and use the dropdown menu to select the search you'd like to perform. This dropdown also appears in the Saved Searches box on the Home page.

Adding Saved Searches to Emailed Matches
You can have up to three saved searches sent to you regularly through Match.com by Mail. Simply check the E-mail me my matches box when saving your search. You can have up to three saved searches sent to you through Match.com by Mail.

**1126  Custom Search - Explained**

Although we offer great matching features like Mutual Match and our Daily Matches, we understand that sometimes there's no replacement for a straightforward, customizable search.

On the Android AppFrom your home screen on the  Android app, you can perform a search simply by tapping on your device's Search button (on the device, not on the screen).

Results will display based on your default preferences. You can change those preferences by tapping on the filter in the top-right of the screen.

Although the app will save your preferences as the default for future searches, you'll need to access the full Match.com website to create multiple Saved Searches.
On the full website
To perform a custom search, go to the Search page. The page will automatically populate results using the search parameters identified in your profile settings. There are a number of available search categories, so we help you keep your search organized by showing the current settings on the left side of the screen. To edit your search criteria, click the orange "edit" link next to the appropriate section. Make your selections and click Apply to modify your results.

At the bottom of the screen, you can further refine your search by entering keywords or adding Interests, Background/Values and Lifestyle selections. Just click each heading to display all available options.

**1141  Email - Sending**

Once you have subscribed, you are free to email any of our members. To send an email to a potential match, visit their profile and tap on Email Him/Her.
Some members have the option of sending Match email directly from their offsite email account. Click here for more information about how to do that.

Click here for more information about emailing on Match

| Answer ID | Summary | Answer |
|---|---|---|
| 1301 | Daily Matches - Rating my matches | Our Daily Matches system is unique in that it takes your feedback and improves over time. This is why we have made it a requirement that you must rate your Daily Matches each day in order to receive new Daily Matches the next day. Your profile also needs to be visible before you can rate your matches. |

Rating "Yes"
If you say that "Yes," you're interested, we'll send a message to the member you're interested in to let them know they caught your attention. If you'd like, you can access all the members who've sparked your interest in the "You're Interested" section of your Daily Matches. Just remember, though, that matches are removed from all Daily Matches lists after they've been there 180 days.

Rating "Maybe"
If you're not sure about a Daily Match just yet, select "Maybe" and we'll save them for you to check out again later. Find them in the "Your Maybes" section of your Daily Matches.

We are currently testing a new Daily Matches design that does not include a "Maybe" button. Feel free to send us your feedback regarding this change: we always appreciate hearing from you!

Rating "No"
And if you're just not interested, it's not a problem. We'll simply remove that member from your Daily Matches, and they won't show up again in the matches we serve you (and they'll never know you weren't interested). Do be careful, though. If you inadvertently select the "No" rating on a member's profile, the rating cannot be changed after it is submitted.

Singled OutOn any day where you receive a "Singled Out" match, you'll need to rate it before you can continue rating the rest of your Daily Matches. New matches will not appear on the site until after you have rated the "Singled Out" match as well as ALL your other Daily Matches. Matches will update 23 hours after the rating occurs.

 

If the member states their Daily Matches do not respect their preferences click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_new" contents="here" answer_id="932" /&gt; for additional information.

| 1308 | Not Receiving Notifications On-Site | The success of Match is built around communication between members. For that reason, we try not to clutter your on-site inbox with our messages to you. Instead, when we need to update you about new email, winks, and "They're Interested," notifications, we send those messages to you at your off-site email address.

If you're not receiving these notifications, double-check the following:

Make sure in your account settings that we have the right email address on file for you.
Check your email preferences to see if you're signed up to receive notifications.
Check with your email provider to see whether your notifications are being blocked or diverted to a Spam folder. |

| 2177 | Do I show in search results/can I be found by other members/show in daily matches after purchasing Private Mode? | After turning Private Mode on, your profile is automatically hidden from all members except members that you have communicated (winked, emailed, etc.) with in the past.  This includes all search results and Daily Matches. |
| 1130 | Searching for a Specific Member | Username Search helps you to search for members by using their Match username.  To search for a specific username from the Match.com Android app: |

From the Home screen, tap on the search button on your device (on your device, not on the screen)
Tap on the filter icon in the top-right corner
Tap on "Other Search Options"
Enter the username you're interested in and tap on Search

 To do the same thing on the full website:

Go to the Search page by clicking the Search link
Enter the username of the member that you're looking for
Click on Go.

If Username Search isn't finding the member you're searching for, it's possible that they've changed their username. You can perform a seach based on the information you know. Otherwise, they've probably hidden their profile or cancelled their account. Either way, our privacy policies prevent us from revealing anything about their situation or contacting them on your behalf.

| 2246 | My reset link doesn't work, what now? | Password reset button not working? Has it been longer than 24 hours since you submitted a request to reset your password?
If so, you will need to start the password reset process again. If not, did the email appear in your Junk or Spam folder? Try to move it to your Inbox or copy and paste the link into your browser, then start the process again.
Still not working? Feel free to chat with our Customer Support team Monday thru Friday 8 AM to 5 PM Central Time. If your issue occurs after normal business hours, just send us an email and we will gladly assist you with this issue. |

| Answer ID | Summary | Answer |
|---|---|---|
| 2242 | How to update your email notifications | Are you receiving more or less email notifications than expected? Would you like to verify your email settings? You can easily adjust your settings and start seeing results in 7-10 days.<br>To access your Account Settings click the gear icon in the header and select Settings from the drop-down menu. On the Account Settings screen, click Email Preferences. Your email settings are divided into three sections:<br>- Match.com by Mail: Automatically sends you matches based on your email preferences. You can set your preferences to receive emailed matches every day, three times a week or just once a week. In addition, you can view and edit your Saved Searches from this page.<br>- Notifications from Interested Members: You may be notified each time someone expresses interest by Winking, Favoriting, etc. If you do not want to receive these notices, you can deselect the appropriate check boxes. Don't worry, you can still access this information at any time when you are signed into your account.<br>- Tips, Events &amp; Offers: Allows you to stay in the know regarding all Match updates, Match Events, etc. You can deselect any check box for offers that are not of interest to you. Think twice before unchecking the offer boxes: you might receive a sweet deal just when you least expect it!<br>If you change your email preferences, don't forget to click the Update button to submit your requests. |
| 2180 | One-time Purchases Offered | After purchasing your subscription,  we offer several one-time use add-on features that may enhance your site experience:<br><br>Profile Pro provides professional writing services for members who seek help finding the right words for their profiles. Each purchaser is assigned a professional writer who works to create an amazing profile each time. <br>Match Me allows you to be featured in the Daily Match results of another member.<br>Match events are activities held in local areas where you are invited to meet other Match members face-to-face. Events are very popular, so we recommend you purchase a ticket quickly if you see an event that interests you.<br>Top Spot helps you stand out from the crowd so your profile gets more views! Your Top Spot purchase moves your profile to the top 6 search results when members run a search for someone like you.<br>Undercover allows you to view and Favorite profiles for 24 hours without your matches being notified. This feature is not available in all areas.<br><br>Each feature has an upfront purchase fee that is non-refundable.  If you purchased your subscription via the Apple iTunes store, you must access the full or mobile and provide a credit or debit card for billing.<br> <br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="402" contents="here" target="_blank" /&gt; to read more about ProfilePro<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="2128" contents="here" target="_blank" /&gt; to read more about Match Me<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="1422" contents="here" target="_blank" /&gt; to read more about Match events<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="1834" contents="here" target="_self" /&gt;to read more about Top Spot<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="1884" contents="here" target="_blank" /&gt; to read more about Undercover |
| 1622 | Favorites - Adding / Removing a Favorite | To add a Favorite from the Match mobile site, simply tap Fave on the member's profile.<br><br>Currently, there's not a way to remove a Favorite from the mobile site. If you'd like to remove a favorite from your list, you will need to access the full site from the mobile site or from a desktop computer. Once on the full site, visit your Favorites page and click the X in the top right corner of the member profile you'd like to delete.<br>If your account is in free member mode, your Favorites will be removed automatically after 180 days.<br><br>Click &lt;rn:answer_xref answer_id="1621" contents="here" /&gt; for information on what happens when a Favorite hides their profile<br>Click &lt;rn:answer_xref answer_id="1577" contents="here" /&gt; for more information on Favorites |
| 1221 | Email - Sending & Receiving Offsite | Email is the heart and soul of how people connect on Match, so in an attempt to make it as convenient as possible, we've provided ways for you to send and receive messages directly from your personal email account without even having to sign in to our site!<br><br>Receiving Messages<br>When a new message is sent to you on Match, we'll let you know via the email address you registered with us. If you'd like to see the full message, please login to the Match site.<br><br>If you'd like to get text alerts about messages sent to you, please click here to learn how to set this up.<br><br>Click here for more information about emailing on Match |

| Answer ID | Summary | Answer |
|---|---|---|
| 1115 | Email Read Notification Feature | Email Read Notification is a great feature you can add for a small fee. It alerts you when a Match email you sent gets opened, no matter whether it was sent while signed into the site, or if you used our offsite emailing process.  |

How do I add this service to my subscription?
Premium features like Email Read Notification can only be added to your existing subscription from the full Match website. It cannot be added from the Android app.

If you don't have a subscription yet, simply subscribe, and there will be an option add this feature to your package. To add Email Read Notification to an existing subscription, sign in to the full Match website and follow these steps:

Click on the gear icon in the top navigation bar
Click on Subscription Status
Click on Subscribe To Additional Match Services
Follow the prompts to add Email Read Notification to your current subscription

How do I know if my messages have been read?
If you already have Email Read Notification, to see on the Android App whether your messages have been read, tap on your emails from your home page and tap on your Sent folder. Each email you've sent will either display the date it was read, or will show as "Not Yet Read."

Will other Match members know when I have opened a message from them?
If you receive an email from another Match subscriber who has purchased Email Read Notification, they will be notified of the date you opened the email. The Email Read Notification status is available on-site in the subscriber's Sent folder for 180 days.

I received a response to an email that I sent, but Email Read Notification is showing the message as "Not Yet Read."
In a few cases, for off-site email (i.e. Hotmail, MSN, AOL, Gmail, Yahoo! email), the recipient of the email must have images and HTML enabled on their email client in order for Email Read Notification to function properly. If the recipient of the email has text-only set for their email client, then the subscriber sending the email will not receive a "read" receipt from Email Read Notification.

Click here for more information about emailing on Match

| 1257 | Winks - Explained | What is a wink? |

A wink is a casual flirtation on Match.  It is a simple way for another member to "break the ice" and let you know that they liked your profile.  Once you've posted your free profile, you can wink at members from your Match.com Android app by tapping on the Wink for FREE button on their profiles (the same button appears on the full site as well). All members, regardless of subscription status, can send a wink, as long as their profile is visible. 

How does it work?
Each time someone winks at you, we send you a message to let you know. If there's some mutual interest, you might want to wink back. Next step? Send an email!

You can wink up to 50 different members each day (or every 24 hours), although you can only wink at each user once during a 30-day timeframe. We don't limit the number of people who can wink at you. Once you send a wink you can't "unwink" or retract it.

Managing your winks
To find the list of your winks from the last 180 days, visit your Home page and click on Winks from your inbox. Only the last 200 winks will appear.

On the full website, to delete a wink, simply click on the "x" in top-right corner of the wink box. 

If you don't want to receive winks, you can turn off the notifications you receive in your email, although there's currently no feature to stop receiving winks altogether. To turn off notifications, adjust your preferences on the Email Preferences page. To get there, just click on the Account link in the top menu bar, and click on Email Preferences on the screen that appears.
 

| 1471 | Same-Sex Dating | Absolutely. When you register, we ask if you are a man or woman, and then whether you're looking for a man or woman. Just fill in the appropriate fields, and you're on your way. |

 

| Answer ID | Summary | Answer |
|---|---|---|
| 1312 | "Singles in America" Study | Q: What is the Singles in America study? |

Q: What is the Singles in America study?
A: The Singles in America study is the most comprehensive study of the single population. It looks at singles' behaviors, attitudes, feelings and activities across gender, age, ethnicity and sexual orientation.

Q: How do you know this is the most comprehensive study?
A: Match worked with a team of researchers to identify all academic literature and studies conducted on singles. There is no question that our study is the most comprehensive and all-inclusive study of its kind that has been conducted in recent history.

Q: Why did Match undertake this study?
A: Match serves the single American and we do everything we can to ensure that we understand exactly who our customers are and how they are evolving. But with 74 million singles in North America, we wanted to take a more thorough, academic approach to learning who this massive population is and what the macro-trends are in dating, relationships, marriage, etc. This study was designed to capture the broadest set of insights possible about singles in America today.

Q: How was the study carried out?
A: Match works with an independent research firm to conduct the study, in which 5,000 single Americans take an online questionnaire each year. The study included singles ages 21 and up, who were asked more than 100 questions.

Q: What will Match do with the results?
A: With the guidance of our Scientific Advisory Board led by Dr. Helen Fisher, we have examined the results and released them publicly with the hope that it will spur further academic study of these "forgotten" Americans, create a benchmark from which we can continue to track the changing beliefs and behaviors of singles over time and provide Americans with a new understanding of the single people in their lives. Match will conduct further study based on the results and will look at ways that these learnings can inform our product development.

Q: What role did the Scientific Advisory Board play in the study?
A: The scientific advisory board lent their expertise in many crucial areas - anthropology, biology, evolutionary studies, etc., to help develop the study and analyze the results. The results have also been published in numerous academic articles to help spread the research about single Americans.

Q: What did you learn from the study? What were the major findings?
A: There are a number of major revelations in the study each year ranging from what it looks like to be single today, fundamental misunderstandings about men and women, and much more. You can find more details and insights about the results at www.singlesinamerica.com.
Q: Did the study include gay and lesbian singles?
A: Yes, the study is inclusive of gay, lesbian and bisexual singles.

Q: Is this an annual study?
A: Yes, this is an annual study.

Q: Will you do further research based on the findings?
A: Yes, the findings from this study were vast and there are endless possibilities for further study. We plan to use the results as a basis for determining what areas of single life deserve a closer look.

| 1521 | Free Membership vs. Subscription | Free Membership: What You Get |

Free Membership: What You Get
Join for free and you can enjoy access to the largest online dating community there is! As a free member,  you'll be able to create a profile, post photos, conduct searches, send and receive winks, and benefit from our unique matching systems that sift through all the choices and deliver potential matches direct to you! Plus, you can also cruise the site and access your account from our mobile site or from our apps.

Membership: How to Do It
To join for free please follow these steps:

Click on this link to visit the sign-in page.
Click on the Join For Free link below the sign-in box.
Fill out the online registration form and click on the Continue button.
You are ready to fill out your profile and get started on your search for a match!

Subscription: What You Get
Subscribing to Match gives you access to a growing set of tools–on our main site, mobile site, or any of our apps–that will help you find the relationship you want and deserve. As a subscriber, you can:

Receive and reply to messages from other Match subscribers 
Send messages to Match members you are interested in
See who has viewed or favorited (fave'd) your profile
Connect faster with IM
Keep track of all open Connections in one place – including those you've sent Winks to
Remove members you're not interested in from your search results in order to make room for other possibilities

Subscription: How to Do It
To subscribe, you'll need to sign up for a free account (if you haven't already done so), sign in and click on the Subscribe button at the top of the screen. The screen will direct you to choose from our &lt;rn:answer_xref title="subscription packages" answer_id="7" contents="subscription packages" target="_blank" /&gt; and then will walk you through the billing process.

Free Trial
A free trial is a great benefit that allows you for a few days to enjoy the full range of subscription benefits. Click &lt;rn:answer_xref title="here" answer_id="3" contents="here" target="_blank" /&gt; for more information on free trial promotions.

**Answer ID** | **Summary** | **Answer**

1125  Free Membership vs. Subscription

Free Membership: What You Get
Join for free and you can enjoy access to the largest online dating community there is! As a free member, you'll be able to create a profile, post photos, conduct searches, send and receive winks, and benefit from our unique matching systems that sift through all the choices and deliver potential matches direct to you! Plus, you can also cruise the site and access your account from our mobile site or from our apps.

Membership: How to Do ItOpening the Match app without being logged in, you'll be prompted to register for a new account. Simply fill in the requested information, and your new account will be created. You can also sign up from the full Match website:

Go to the Match.com sign-in page.
Click on the Join For Free link below the sign-in box.
Fill out the online registration form and click on the Continue button.
You are ready to fill out your profile and get started on your search for a match!

Subscription: What You Get
Subscribing to Match gives you access to a growing set of tools--on our main site, mobile site, or any of our apps--that will help you find the relationship you want and deserve. As a subscriber, you can:

Receive and reply to messages from other Match subscribers 
Send messages to Match members you are interested in
See who has viewed or favorited (fave'd) your profile
Keep track of all open Connections in one place – including those you've sent Winks to
Remove members you're not interested in from your search results in order to make room for other possibilities

Subscription: How to Do It
To pay for a new subscription on the Match Android app:

Click on Subscribe Now from your home screen under the "Email" heading
Choose your package and follow the directions on the screen to complete your subscription

To subscribe using the full Match website, sign in and click on the Subscribe button at the top of the screen. The screen will direct you to choose from our subscription packages and then will walk you through the billing process.

Free Trial
A free trial is a great benefit that allows you to enjoy the full range of subscription benefits for a few days. Click here for more information on free trial promotions.

2210  Top Spot Explained

Top Spot helps you to get more views by making sure your profile is included in the top 6 results of members looking for someone like you! You'll be featured there for 30 minutes.  If the number of Top Spot results totals more than the 6 available spots, the site will randomly pick the profiles to be promoted in the search results.

When you're ready to be featured, you can purchase Top Spot for $2.99. Your session will start as soon as your purchase is confirmed - so make sure you're ready for some attention right away!

During your session, you'll see a Top Spot Dashboard just below your site main Menu. This will count down your session and show you photos of members who have you featured in their search results.

After your Top Spot session, you'll receive an activity summary via email. The summary displays the number of times your profile appeared in searches and shows some of the matches who saw you.

If you'd like to be featured again, there is no limit on how many Top Spot sessions you can purchase. However, each 30-minute session must end before you can buy another. You can purchase again by clicking the "Go Again" link in the summary email or by tapping the three-line navigation icon in the upper right corner of the application. Scroll down to Top Spot and then tap the Go Again button. Please Note: You will not see yourself in search results if you run a search with criteria matching your profile settings. This is because we never show you your own profile as a match. But don't worry, your Top Spot purchase ensures that other members running the search are seeing you at the top of their results!

**Answer ID**    **Summary**

1113  What is a free trial?

**Answer**

Receiving a Free Trial
A free trial is a great way to test out our subscription benefits while you're thinking about purchasing a subscription. It allows you to use subscriber-only benefits for free, for a few days.

Free trial offers come periodically via email promotions sent to your personal email address (i.e., Gmail, Yahoo, Hotmail, etc.). So if you're interested, make sure you're being notified of Match promotions. If you're on an Android device, you can opt in or out of email promotions when you visit our full website and use the instructions below.
 

Click on the gear icon in the navigation bar at the top of the screen.
Click on the Email Preferences link.
Ensure that you're signed up to receive Special Offers from Match

Redeeming a Free Trial
When you receive a free trial offer in your off-site email inbox, the message will include instructions for how to redeem it. In the process of setting up your free trial, you'll be asked for payment information, and you'll need to choose a paid subscription package that will automatically begin at the end of your free trial. But don't worry, this is just a convenient way to start your full subscription if you want to. If you decide you don't want to be charged, simply cancel your subscription before the free trial period ends.

I'm not eligible
If you've recently enjoyed a free trial, or you're tired of waiting for a promotion, just go ahead and subscribe! We're pretty sure you're going to like Match.    

To subscribe, click on the Subscribe on your home screen. The subscription screens will guide you from there.
 

1467  What is a free trial?

Receiving a Free Trial
A free trial is a great way to test out our subscription benefits while you're thinking about purchasing a subscription. It allows you to use subscriber-only benefits for free, for a few days.

Free trial offers come periodically via email promotions sent to your personal email address (i.e., Gmail, Yahoo, Hotmail, etc.). So if you're interested, make sure you're being notified of Match promotions by accessing the full site and then checking your email preferences:

Tap the three line icon in the upper left corner of the screen
Tap Settings &amp; Help from the menu options
Tap Go to full site
Tap on the gear icon in the navigation bar at the top of the screen
Tap on the Email Preferences link.
Ensure that you're signed up to receive Special Offers from Match

Redeeming a Free Trial
When you receive a free trial offer in your off-site email inbox, the message will include instructions for how to redeem it. In the process of setting up your free trial, you'll be asked for payment information, and you'll need to choose a paid subscription package that will automatically begin at the end of your free trial. But don't worry, this is just a convenient way to start your full subscription if you want to. If you decide you don't want to be charged, simply &lt;rm:answer_xref answer_id="634" contents="cancel" target="_blank" /&gt; your subscription before the free trial period ends.

I'm not eligible
If you've recently enjoyed a free trial, or you're tired of waiting for a promotion, just go ahead and subscribe! We're pretty sure you're going to like Match.  

To subscribe, access the full site and then tap on the Subscribe button at the top of the screen. The subscription screens will guide you from there.
 

| Answer ID | Summary | Answer |
|---|---|---|
| 1208 | Changing Your Age | We calculate your age from the birthdate you entered in your account settings.  If there is a problem with the way  your age is displaying, you can update your information on the full  website (not available on the Android app) by accessing the Sign Up Information page under your Account Settings. You will be prompted to re-enter your current password for verification.<br><br>To locate and fix your birthdate and age, simply follow these steps from the full website:<br><br>Sign in with your username and password<br>Click on the gear icon on the navigation bar at the top of the screen<br>Click on Sign Up Information (for your protection you may be required to re-enter your password)<br>Click on the Change Sign-up Info button<br>Make your updates and click on Continue<br><br><br>Click here to learn how to update other important account information.<br><br><br>Agents can also view and update this information in CSA.  When the member's account is pulled up, click the Edit Info link.  Agents can update all fields except the Password field. |
| 1628 | Changing Your Age | We calculate your age from the birthdate you entered in your account settings. If there is a problem with the way your age is displaying, you'll need to access the mobile site or full site from a computer. To update your birthdate using the Match mobile site, tap the three line navigation link.  Select Settings &amp; Help from the drop down list and then tap Go to full site.  Once on the home screen, tap the gear icon in the top right corner and then select Settings from the menu options. Locate Sign Up Information and then follow the steps for updating your information. |
| 1632 | How to Sign Out | To sign out of your Match account, please tap  three-line navigation link and then select Settings &amp; Help from the drop down list.  On the Setting screen, tap Sign Out located at the bottom of the screen.  |
| 2204 | How to Sign Out | To sign out of the application, tap the three-line navigation icon in the top right hand corner of the screen, and then tap Sign Out located in the drop down menu. |
| 2211 | Top Spot Multi-Packs - Remaining Sessions | If you've tried Top Spot and found it to be successful, we encourage you to purchase 5 or 10 sessions at a time. The more sessions you purchase the deeper your discount. You can track your Top Spot sessions by tapping the three-line navigation icon in the upper right corner of the application.  Scroll down to Top Spot and you will see the Go Again button with the number of remaining sessions in parentheses.   <br> All multipack purchases expire 90 days after purchasing and are non-refundable. |
| 1535 | Automatic Sign-in | Match auto sign-in feature allows us to recognize you each time you visit our site – eliminating the need to enter your password with each visit.<br><br>There are two ways to enable/disable the Auto Sign-In feature when you visit the Match site:<br><br>You can turn the feature on or off at any time by visiting the Auto Sign In page under your Account Settings. Set your preference and click on Go.<br>If you select the "Remember Me" check box on the sign in page, it will also turn on auto sign-in. After you sign out, you can turn auto sign-in off by clicking on Turn off auto sign in below the sign-in area.<br><br>Please note: If multiple people use your computer, the auto sign-in feature will allow others to access your Match account.  |
| 1132 | Automatic Sign-in | Match's auto sign-in feature allows us to recognize you each time you visit our site – eliminating the need to enter your password with each visit.<br><br>If you close the Match Android app while you're signed in, the app will automatically sign you back in the next time you open the app. To disable auto sign-in, simply log out of your account before closing the app.<br>Full Match Website<br>There are two ways to enable/disable the Auto Sign-In feature when you visit the full Match website:<br><br>You can turn the feature on or off at any time by visiting the Auto Sign-In page under your Account Settings. Set your preference and click on Go.<br>If you select the "Remember Me" check box on the sign in page, it will also turn on auto sign-in. After you sign out, you can turn auto sign-in off by clicking on Turn off auto sign in below the sign-in area.<br><br>Please note: If multiple people use your computer or device, the auto sign-in feature will allow others to access your Match account.  |

| Answer ID | Summary | Answer |
|---|---|---|
| 1198 | Sign In Information No Longer Works | If we're not recognizing the email address and password you're entering, there are a couple of possibilities as to what might be going on: |
| | | You might be entering the wrong email address or password. At least it doesn't hurt to check. Go to the Forgot Password page and enter the email address you've associated with your Match account, and we'll immediately send you a password reset email. If your email address isn't recognized, check any other addresses you have to make sure your account hasn't been associated with one of those. |
| | | We may need to get involved to help you resolve the situation. Contact us, and we'll see what we can figure out. To help us locate your account, make sure to include in your message your full name, email address, username, and Zip code, along with a description of what happens when you try to sign in, including any error messages. |
| 1546 | Sign In Information No Longer Works | If we're not recognizing the sign in information you're entering, there are a couple of possibilities as to what might be going on. |
| | | You might be entering the wrong email address or password. At least it doesn't hurt to check. Tap the Forgot Password link located on the Sign In screen and then enter the email address you've associated with your Match account, and we'll immediately send you a password reset link so you may start again. If your email address isn't recognized, check any other addresses you have to make sure your account hasn't been associated with one of those. |
| | |        Please note the password reset link is activate for 24 hours only. |
| | | We may need to get involved to help you resolve the situation. Contact us, and we'll see what we can figure out. To help us locate your account, make sure to include in your message your full name, email address, username, and Zip code, along with a description of what happens when you try to sign in, including any error messages. |
| 1143 | Canceling Additional Features | Although you have the ability to cancel an additional feature at any time, you'll need to do so from the full Match website, rather than from the Android app or mobi. |
| | | Once you've logged in on the full site, simply follow these steps: |
| | | Click on the gear icon in the top navigation bar.<br>Click on Subscription Status (for security purposes you may be asked to re-enter your password).<br>Click the "Deactivate" link to the right of the service you wish to cancel.<br>If asked if you are sure you wish to cancel, click on Yes. |
| | | After canceling, you'll notice the Deactivate link will change to read Reactivate.  If you wish to add the cancelled service back to your subscription simply click the Reactivate link. |
| | | You will still be able to utilize the additional feature(s) you cancelled until the end date shown on the Subscription Status page. |
| 1551 | Canceling Additional Features | You have the ability to cancel an additional feature at any time.  To do this, you must access the full site and then follow the steps below: |
| | | Click the three-line navigation link<br>Select Setting &amp; Help and then tap Go to full site<br>On the full site, tap the gear icon in the top navigation bar<br>Tap on Subscription Status (for security purposes you may be asked to re-enter your password)<br>Tap the Deactivate link to the right of the service you wish to cancel<br>If asked if you are sure you wish to cancel, click on Yes |
| | | After canceling, you'll notice the Deactivate link will change to read Reactivate.  If you wish to add the cancelled service back to your subscription simply click the Reactivate link. |
| | | You will still be able to utilize the additional feature(s) you cancelled until the end date shown on the Subscription Status page.   |
| | |   |
| 1124 | Blocking and Unblocking | Blocking and unblocking from contactYou can block another member from communicating with you by clicking on the Block from Contact link on their profile.  To unblock, visit their profile and click on Unblock from Contact. |
| | | Currently, you can only block up to 125 members from contacting you. If you need to add more after that, you'll want to visit your blocking page on the full Match website (not available on the Android app) and clear out some of the older names. |
| | | Reporting a concern<br>If a member you wish to block from contacting you has acted inappropriately, we also recommend that you let us know about it Reporting a Concern. |
| | | Can someone I've blocked still see my profile?<br>When you block a member from contacting you, they will not be notified that anything has happened. They will still be able to view your profile and try to send you messages, but you will be able to continue your search for someone special without receiving any messages they send. We don't currently have a feature that allows you to selectively block other members from seeing your profile. |
| | | Removing a profile from search resultsIn addition to blocking other members from sending you messages, you might also want to remove their profiles from appearing in your search results. For more information on how to do this, click here. <br>  |

| Answer ID | Summary | Answer |
|---|---|---|
| 1511 | Blocking and Unblocking | Blocking and unblocking from contact |

You can block another member from communicating with you by tapping on the Block from Contact link at the bottom of their profile.
If you need to unblock someone you've previously blocked, simply tap on Unblock from Contact on the member's profile.

Currently, you can only block up to 125 members from contacting you. If you need to add more after that, you'll want to unblock some of the older members you had previously blocked.

Can someone I've blocked still see my profile?
When you block a member from contacting you, they will not be notified that anything has happened. They will still be able to view your profile and try to send you messages, but you will be able to continue your search for someone special without receiving any messages they send. We don't currently have a feature that allows you to selectively block other members from seeing your profile.

Removing a profile from search resultsIn addition to blocking other members from sending you messages, you might also want to remove their profile from appearing in your search results. To remove someone from your search results tap Remove From Search at the bottom of the member's profile.

| 421 | Contacting Customer Care | If you'd like to contact the Match Customer Care team, we offer these contact options: |

 

Chat: Fast, easy, the best way to get immediate help! You can chat with us online 8am to 5pm central time Monday through Friday by clicking Chat Now

 
Email: Submit your question via our Contact Us web form, and one of our Customer Care Representatives will respond to your inquiry via email within 48 hours.

Phone support is a premium service available to our paid, logged in, subscribing members located in the United States. Non-English speaking Canada members and all members located outside of North America can contact us here.

<? if strtolower(getUrlParm("src_domain")) == "www.match.com" ?>
Phone:  $CarePhoneNo - We're available Monday through Friday from 8am - 5pm central time.
 
To expedite your call please have your member ID ready.
 
 
<? endif ?>

| 1508 | Email History | |

From the home screen, tap the three line icon and then tap Messages from the menu options.   There you'll be able to access your folders to get a history of what has been sent and received.
 
Emails Older Than 180 Days
Since email correspondence is only kept in Match records for 180 days, this method won't work for correspondence older than that.

| 1178 | Email History | If you'd like to see who you've emailed in the last 180 days, there are a couple of ways go about it.  |

The first is simply to click on Messages in the top navigation bar. There, you'll be able to access your "Inbox" and "Sent" folders to get a history of what has been sent and received.

Your second indication that you've recently emailed a member is on their profile, where, if there's been correspondence, the "Our History" link will contain a list of all of your correspondence in the last 180 days. 

Emails Older Than 180 Days
Since email correspondence is only kept in Match records for 180 days, these methods won't work for correspondence older than that. For information on how to save copies of emails older than 180 days, click &lt;rn:answer_xref answer_id="1243" contents="here" target="_top" /&gt;.

Click &lt;rn:answer_xref answer_id="1219" contents="here" target="_new" /&gt; for more information about emailing on Match

1219 Relinked to 564

| Answer ID | Summary | Answer |
|---|---|---|
| 134 | Editing or Removing Photos | **Editing a Photo**<br>If you'd like to edit a photo you have posted on your profile, simply make changes to the original on your computer, delete the one on your profile, and upload the new one.<br><br>**Deleting a Photo**<br>To delete a photo, click on your primary photo thumbnail in the top navigation bar, and click on Photos. Click the X button in the top-right corner to delete it.<br><br>**Replacing a Photo**To replace a photo, delete it and add a new one. For instructions on adding a new photo, click &lt;rn:answer_xref style="FONT-SIZE: 10pt; FONT-FAMILY: Verdana" target="_new" contents="here" answer_id="532" /&gt;.<br><br><br>We have other options that can help you with your photos!<br><br>**Clear your Cache**<br>If a photo appears in your profile even after you've deleted it, chances are you may need to clear your cache/cookies. For instructions on how to clear your cache/cookies, click &lt;rn:answer_xref style="FONT-SIZE: 10pt; FONT-FAMILY: Verdana" target="_new" contents="here" answer_id="49" /&gt;.<br><br>**Change your Primary Photo**<br>Have a photo you think makes a stronger impression? Click &lt;rn:answer_xref style="FONT-SIZE: 10pt; FONT-FAMILY: Verdana" contents="here" answer_id="126" /&gt; to learn how to change your primary photo.<br><br>**Match's Primary Photo Philosophy**<br>For information about how we decide which photos can be used as your Primary Photo, click &lt;rn:answer_xref style="FONT-SIZE: 10pt; FONT-FAMILY: Verdana" target="_new" contents="here" answer_id="124" /&gt;.<br><br><div align="right">126 Archiv:Relinked 126 to 1122</div> |
| 2281 | Pay by Visa Checkout | Visa Checkout is a safe, simple and easy way to make purchases on line. It eliminates the need to carry your personal credit cards on your person at all times.<br><br>To use Visa checkout, please follow these steps:<br><br>1. After accessing your Match account, click the Subscribe button located on the Home screen header.<br>2. Select a package and then click the Continue button.<br>3. From the payment information screen, select Visa Checkout from the payment options.<br>4. Scroll down and agree to terms and conditions by clicking the Visa Checkout button.<br>5. Follow prompts to sign into your existing Visa Checkout account or set-up a new one.<br>6. Select the preferred Visa on file and then click the Pay button.<br><br>A confirmation will appear on the screen advising the payment was successful. This indicates the subscription is now active on the site. |
| 2282 | Synapse Removal | The Synapse feature has been removed and is no longer available on the site. We invite you to utilize some of our other Search options.<br>Here are some of the Top Searches on the site:<br><br>Click &lt;rn:answer_xref style="COLOR: #14375a: TEXT-INDENT: 0in" target="_blank" contents="here" answer_id="550" /&gt; to Search for someone who matches your criteria and you match theirs.<br>Click &lt;rn:answer_xref style="FONT-WEIGHT: bold; COLOR: #14375a: TEXT-INDENT: 0in" target="_blank" contents="here" answer_id="551" /&gt; to Search for someone who is looking for someone just like you.<br>Click &lt;rn:answer_xref style="FONT-WEIGHT: bold; COLOR: #14375a: TEXT-INDENT: 0in" target="_blank" contents="here" answer_id="302" /&gt; to Search for someone who is currently Online Now or Available to Chat.<br><br>Play around and try a variety of searches. You never know where you'll find your perfect match! |
| 2294 | Match Events - Explained | Match Events are activities held in local areas where you are invited to meet other members face-to-face.<br>Match Events are a low-pressure, fun way to mingle with other members in your area. We're facilitating various events and icebreaker activities at events around the country, so keep an eye out for details in your event description. Overall, we aim to provide a fun environment where it's easy to cross the room and start a conversation.<br>If you attend an activity-based event, your experience will tend to be more guided and facilitated.<br><br>You will be informed of events in your area by a personal invitation via email, along with a notification on our website. Our events fill up quickly, so if you receive an invitation, please RSVP quickly to ensure a reserved spot! |
| 2295 | Match Events - Invitation | If you are invited to attend an event, you will be notified via email, website notification or mobile web. We can't promise that every member will be able to attend an event. The number of events can vary per month in a given market and we do not have events in all areas.<br>Invitees are selected based on geographic location, along with other age and gender preferences for the specific event.<br>You can see if an event is in your area by clicking the Events tab at the top of any Match page on your computer. You can also view events scheduled in other cities by clicking Change City at the top of your events page. |

| Answer ID | Summary | Answer |
|---|---|---|

**2296** Match Events - Cost

How much do Match Events cost?

The cost associated with each event varies by event type. Please see the event details page for information on pricing.

What is included in the cost for happy hour events?

In most cases, drinks or food will not be provided at happy hours; however, check your event details for any specials provided for that particular event. You'll enjoy an exclusive space and the great company of other members like you.
For activity-based events, if food and drinks are included, it will be shown on the event invitation.

**2299** Match Events - Cancel

What happens if I need to cancel my RSVP?
All paid event tickets are non-refundable.

What happens if an event is canceled?

In the case where we need to cancel an event, all members who RSVP'd would be notified via email and through the website. If a cost is associated with the event, refunds will be issued right away, but it may take 5-7 days for the funds to be returned to your financial institution.
It's always smart to check the event page the day of your event to make sure there are no changes made to the event. If it has been canceled it will say This event has been cancelled and refunded.

**2300** Host a Match Event

If you are a vendor and would like to host an event, visit http://www.match.com/hostevent/ and fill out the form. If you are a member, you can also access the form from the events main page. The events team will review your information and reach out to you if interested.

**2301** Attending a Match Event

What should I wear?

First, you'll want to keep in mind the nature of the event, what you'll be doing, the weather, etc. In general, you can think of most events as smart casual. Some members come straight from work, while others may be in jeans, slacks or a casual dress. We encourage you to wear something you feel comfortable in given the type of event.

Where should I park for the event?

If you have questions about parking at the event, you should visit the event page for more information. If you still have questions or concerns, please check the venue's website or contact them directly.

How can I see who else is going?
While you cannot see attendees before the event, we publish a list of all the attendees on the site once the event has ended.
To see the event attendees, go to the Events link located in the Match site header and look for your Past Events at the bottom of the page.
On the page, you will be asked to indicate whether or not you attended the event and to fill out a brief survey. Once complete, you will see the attendee information for each event you attended.

If I meet someone at an event that I'd like to keep communicating with, how should I go about providing my contact information?
We encourage you to treat Match events like any other social situation. If you prefer to keep your personal information private for the time being, just share your username on Match instead!
Will security be provided at the local events?
Match does not provide additional security aside from what is already provided by the venue. We remind our members to keep the Match Dating and Safety Tips in mind for any type of social encounter. Please be sure to report any safety concerns to the event host and venue staff.

How much of my information does Match share with event partners?

Match respects your privacy. Your first name, last name initial, gender, and whether or not you are a member or guest are the only pieces of information we provide Match event partners. This information is used for check-in purposes only.

**2303** Activity Status Icon - iPhone

The Activity Icon identifies a member's activity level on the site. You will be able to view this icon from a member's profile or from the Search page.

The following activity status may appear on a profile when viewing from the iPhone App.

Online Now: green dot
Active within 24 hours: orange clock
Active within 24 hours - 3 weeks: empty clock
Active beyond 3 weeks: no icon

&lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="Online Now &amp;amp; Active Within Explained" answer_id="24" /&gt;

| Answer ID | Summary | Answer |
|---|---|---|
| 2304 | Match IQ - Explained | Match IQ provides more insight into members that peak your interest and provides you with some Pro Tips and Tricks for online dating.<br><br>When you are ready, you can purchase Match IQ for $1.99. Your session will start as soon as your purchase is confirmed and will last 24 hours. To start getting insight, open the profile of a member you are interested in and select the Match IQ bubble.<br><br>You can view the time remaining in your session on the Match IQ bubble. |
| 2306 | Report a Vulnerability or Security Issue | At Match we take security and privacy very seriously and investigate all reported vulnerabilities.<br>If you are a security researcher and you believe you have found a security issue, click here and e-mail the details of your findings.<br>Please provide any supporting material (proof-of-concept code, tool output, etc.) that would be useful in helping us understand the nature and severity of the vulnerability. We will then respond to you, acknowledging receipt of the report, and outline the next steps in the process. |
| 2372 | Match Events - MatchUps Host | MatchUps are member-created and member-hosted events, focused on bringing like-minded singles together over shared interests!<br><br>MatchUps Host Requirements<br><br>As a MatchUp host, you must meet the following requirements:<br><br><br>You are a Match Subscriber<br>Your profile is active and visible<br>You are Facebook-verified on your profile<br>You will not and cannot profit from the gathering in any way (no club promoters, no venue owners, etc.)<br>You will have the best interests of the entire group in mind from beginning to end<br>As the host, you agree to communicate with other members without bias from beginning to end<br>You will allow your profile to be highlighted on the MatchUp promo page for your event and have a profile photo visible<br><br>I'm interested in hosting a MatchUp. Where do I send my idea?<br><br>If you would like to host a MatchUp event, you can access the form on the MatchUps tab in the Events section of the Match site. The Match Events team reviews each submission before choosing concepts to promote on the website. We will reach out to you with any questions.<br><br>How are hosts selected?<br><br>All MatchUps hosts are selected by the Match Events team. If you meet all of the requirements and have a good MatchUps idea, the team will reach out in a timely manner. For most MatchUps we usually require a few weeks of promotion on the site to gather enough RSVPs for a good event, so keep that in mind when submitting your idea and potential event date(s).<br><br>Is a host responsible for copy/descriptions/photos for the MatchUp?<br><br>You will include basic event details on your MatchUp submission form. If the MatchUp is approved, the host should provide a photo and/or additional information about the MatchUp, if requested.<br><br>What are MatchUp Host Responsibilities?<br><br>All hosts must follow through with their MatchUp event concept while following all of the necessary host requirements outlined in the host submission form.<br><br>Can the host select who is invited to their MatchUp?<br><br>The host can select a suggested age range and the type of MatchUp, but the host cannot accept or reject attendees. Invitees are targeted based on geographic location, age range and gender preferences for the specific MatchUp. |
| 324 | How do I stop or start receiving emails from Match? | Have a Match Profile?<br>To get to the Email Preferences screen:<br>    1. Sign into your Match account<br>    2. Click the gear icon<br>    3. Select Email Preferences<br><br>From this screen, you can update the frequency of your Match.com by Mail matches, the content of those emails, and what notifications and/or special offers you'd like to receive. Just click on Update when you're finished.<br>Please note, if you choose to Stop All Emails you will no longer receive any email communication from Match: this includes our password reset requests.  If you need your password reset please contact our customer care team.<br>Don't have a Match Profile?<br>Simply click the "Unsubscribe" link at the bottom of the original email you received and follow the steps. You will be removed from our email lists.<br>(You will be unsubscribed immediately. Please allow a few days for all promotional emails to stop) |

| Answer ID | Summary | Answer |
|---|---|---|
| 2298 | Match Events - RSVP | Do I have to RSVP before attending a Match event? |
| | | Yes. Due to our need to adhere to capacity constraints at each venue, you must RSVP to attend an event. In addition, if you are planning on bringing friends, you must have a friend ticket for them. If you are eligible to attend an event, follow the prompts through your invitation to RSVP. |
| | | What happens if the event is saying it is full? |
| | | If the event is showing full, we are unable to assist you with an RSVP as we are limited to the capacity available at the venue. |
| | | However, you should keep checking back. Many times, additional spots may be opened once we achieve an even balance of men and women. We post new events all the time and popular events are often ones we repeat in the future. |
| 2297 | Match Events -  Friends | Most of the time, you'll be able to invite a limited number of friends (the number varies depending on the venue), although invites may become limited as the reservations fill up. Friends don't have to be Match members, and you'll be prompted to pay for and reserve tickets for yourself and any friends you choose to invite when you RSVP. |
| | | Pricing for paid events is determined by the venue and may be different for men vs. women. You just need to indicate how many friends of each gender will be attending. If an event is not sold out and you have not purchased the maximum number of friend tickets, you may purchase additional friend tickets after you've purchased your own. |
| 2371 | Match Events - MatchUps | MatchUps are member-created and member-hosted events, focused on bringing like-minded singles together over shared interests! All MatchUps take place in a public location. |
| | | Invitation |
| | | If you are invited to attend a MatchUp, you will be notified via email or website notification. The number of MatchUp events can vary per month and are currently available in San Francisco. You can see if something is available in your area by clicking the "MatchUps" tab in the Events section of the Match site. |
| | | Invitees are selected based on geographic location, age range and gender preferences for the specific MatchUp. |
| | | Cost |
| | | The cost associated with each MatchUp varies. Please see the MatchUp event details page for information on pricing and purchasing a ticket. |
| | | Friends |
| | | Most of the time, you'll be able to invite a limited number of friends (the number varies depending on the venue), although spots may become limited as the reservations fill up. Friends don't have to be Match members. You'll be prompted to reserve tickets for yourself and any friends when you RSVP. |
| | | If a MatchUp is not sold out and you have not reserved the maximum number of friend tickets, you may reserve additional guest tickets after you've reserved your own. |
| | | RSVP |
| | | Due to the need to adhere to capacity constraints at each MatchUp event, you must RSVP to attend. In addition, if you are planning on bringing friends, you must have a ticket for them as well. |
| | | Once you RSVP for a MatchUp, there is no way to cancel your reservation. If you have purchased a ticket or RSVP on a third-party site, you will need to contact that site for information on canceling and refunds. There is no guarantee of a refund to the host or attendees, as we are unable to control any purchases made outside of Match. |
| | | Steps after signing up |
| | | You should receive an email confirmation shortly after signing up, and if anything changes, you will receive an email update from Match. Check the MatchUps event page for any specific information you should consider before the event (what to bring, wear, etc.) and have a great time! |
| | | MatchUp Event Full |
| | | If the MatchUp is showing full, we are unable to assist you with an RSVP as we are limited to the capacity available at the venue or for the particular activity. Keep checking back. Many times, additional spots may be opened once we achieve an even balance of men and women. |
| | | What to Wear |
| 2302 | Match Event - After the Event | If I meet someone at an event that I'd like to keep communicating with, how should I go about providing my contact information? |
| | | We encourage you to treat Match events like any other social situation. If you prefer to keep your personal information private for the time being, just share your username on Match instead! |
| | | Also, you can view the profiles of members who attended after the event is over on the Past Events page. To view this page, click the Events link in the Match header and look for your past events at the bottom of the page. |
| | | Why don't I see a specific member's profile on the Past Events page? |
| | | If you notice a profile of an attendee is missing from the Past Events page, it could either be because that member has chosen to hide their profile or they were a friend of another Match member. If they are a member, once they choose to make it visible again, it will appear on this page. |

| Answer ID | Summary | Answer |
|---|---|---|
| 2395 | Pay with Amazon | **Pay with Amazon**<br>Would you like to pay for your Match subscription without providing us with your credit card information? Try Pay with Amazon.<br>What is Pay with Amazon?<br>Pay with Amazon is a simple and easy way to make purchases online without giving merchants your credit card number.<br>Instructions<br>To use this feature to purchase your Match subscription do the following:<br>1. Access your Match account<br>2. Click the Subscribe button on the home page<br>3. Select your desired subscription package, and click Continue<br>4. Select the Pay with Amazon tab<br>5. Click the Pay with Amazon button to continue the purchase<br>6. Login to Amazon.com through the Match secure server screen pop<br>7. Click Okay to share your name and email address<br>8. Select your desired method of payment from the listed credit cards on your Amazon account<br>9. Click Subscribe Now<br><br>Subsequent Purchase Benefits<br><br>Once you've used Pay with Amazon to subscribe with Match, you can use our 1-click payment option to purchase services to enhance your subscription, like Top Spot or Email Notifications. |
| 47 | Terms and Privacy | Please review the policies described in our Terms of Use, our Privacy Policy and our Dating and Safety Tips. |
| 96 | Phone Number Privacy | Privacy is our primary concern at Match, and because we respect your privacy, we would never reveal your number to anyone, nor use it for unsolicited marketing purposes. Your number will be used only to provide you with the service you've requested. |
| 120 | Reporting Inappropriate Behavior | At Match, we're serious about maintaining the integrity of our member community so you can have the best possible experience on our site.<br><br>As a supplement to our own efforts, we've streamlined the process for members like you to report any suspicious activity they see. Simply click on the Report a Concern link, which can be found on every member profile and at the bottom of every email.<br><br>When you report a concern, it is completely anonymous. We never share your information with anyone else, and no members will ever know who reported the concern.<br><br>Once you click on the link, you have the option to select one of the available reasons. Depending on the reason selected, we may require you to submit text with your report describing what you have seen or experienced.<br><br>Using the Report a Concern link bypasses our normal customer care team and sends your report directly to the people who handle these types of issues. Because of privacy policies, we aren't able to talk about the actions that may result, but this really is the fastest way to make sure that action is taken.<br><br>Here are some examples of when you are encouraged to report another member:<br><br>If a member requests money<br>If a member tries to sell you merchandise or services<br>If a member tries to offer you a job or another "unique opportunity," especially in another country<br>If a member's profile text or email claims they are not actually in the location their profile states (e.g., they are really in Russia or Nigeria)<br>If a member's profile just does not add up (e.g., the photo doesn't match the information)<br>If a member sends you harassing or offensive emails<br>If you know a member is actually married (and not separated) or is a minor<br>If you see an inappropriate profile or photos on the site, or if you receive inappropriate photos via email or text message<br>If a member behaves inappropriately during or after meeting in person<br>If a member violates any other Match policy |
| 137 | Uploading Additional Photos but no Main Photo | If the first photo you upload meets the guidelines for a primary photo, it will be designated as your main photo. It's important to upload a primary photo first for others to see in search results. If none of the photos you upload meet the guidelines, they will be designated as secondary photos. Feel free to add up to 25 secondary photos to your profile, but we highly recommend you upload your primary photo first. |

| Answer ID | Summary | Answer |
|---|---|---|
| 140 | Tips for Photos | Lots of these photo tips and more can be found under our &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="532" contents="Picking a Great Photo" /&gt; page:<br><br>Your Primary Photo<br><br>DO use a good headshot or a shot of your head and shoulders<br>DO smile<br>DO use a recent photo<br>DO make it a photo of just you<br>DON'T wear sunglasses or a hat<br><br>Your Secondary Photos<br><br>DO show yourself in your element<br>DO feel free to post a photo of your favorite things (eg: your garden, travel shots, pets, etc.)<br>DO let us see your favorite people<br>DON'T submit photos of your kids without you<br>DON'T use copyrighted material or images of celebrities  |
| 248 | Reporting an Inappropriate IM | If someone sends you an inappropriate IM after you've initiated a conversation, report the user by clicking the "Report a concern" link on the Match IM window. |
| 400 | Chemistry - Affiliation | *This feature is not available to members outside of English North America<br>While we are affiliated with Chemistry, each offers a slightly different type of service.  Since they are different websites you may register the same email address and username (if it has not already been used by someone) on each.<br><br>Please know that a membership with either Match or Chemistry does not necessarily mean you have a membership with both.  We currently do not offer discount rates or joint subscriptions across the sites.<br><br>To find out detail on how Match works please click on the following link:<br>http://www.match.com/howitworks/index.aspx<br><br>For detail on how Chemistry works please click on the following link:<br>http://www.chemistry.com/tour/tour.aspx |
| 410 | Session Timing Out | Here at Match, we're serious about security, so we include a "session time-out" feature that automatically signs you out if you've been on the same screen for more than 45 minutes. This ensures that if you sign in and later get up and walk away from your computer another person won't be able to sit down and access your account.<br><br>This requires a level of caution, though, when you're filling in your profile text or typing an email on the site because a session time-out could result in your hard work being lost. When working on profile text, you might want to compose in a word processing application where you can save your progress, then copy and paste the result into the Match text box you're working on. |
| 413 | Match.com by Mail - Photos Not Appearing | Match.com by Mail email messages are delivered in HTML format with all images included. Please check your email preferences to make sure your email provider is not blocking HTML content in your emails. Also, please check these settings to make sure that they are not blocking images from appearing. |
| 419 | Blank IM's & Emails | If you are using a pop-up blocker, toolbar, or anti-virus software, this could be interfering with your Match email or instant messenger display.  Please check the privacy settings on your anti-virus program and/or inquire with the technical assistance of that particular software company, or with your Internet Service Provider.  <br><br>Is your IM window blank? With the IM window open, hold down the CTRL key and hit the F5 button on your keyboard at the same time to fully refresh the page. If this does not resolve the issue, you should log out, log back in, and open a new IM window to try this step again.<br><br>Please know the site runs most optimally with the newer versions of most of the major browsers. Click &lt;rn:answer_xref answer_id="326" contents="here" target="_new" /&gt; for specific recommendations. If you are using a browser version older than these you may wish to update your browser to the latest version.<br><br>To help alleviate the difficulties you are experiencing, you may need to delete your temporary Internet files and cookies.  Click &lt;rn:answer_xref answer_id="49" contents="here" target="_new" /&gt; for instructions.<br><br>If you are still experiencing difficulties after deleting temporary Internet files and cookies from your computer system, you may wish to contact your anti-virus software company (i.e. McAfee, Norton, etc.).  They should be able to help you specify Match as a trusted website on your anti-virus software. |
| 426 | Media Room | Click here to contact Match Public Relations. |

| Answer ID | Summary | Answer |
|---|---|---|
| 430 | Accepting Cookies in Internet Explorer, Safari and on an iPhone or iPad | For optimal site performance, we recommend that cookies are enabled in your browser. To enable cookies in Internet Explorer, Safari or on your iPhone or iPad, follow the steps below. |

Internet Explorer 11 Users:
1. Select the cog wheel in the upper right hand corner of your browser
2. Select "Internet Options"
3. Select the "Privacy" tab
4. Select "Advanced"
5. Check "Override Automatic Cookie Handling"
6. Click "OK"
7. Click "OK" once more

Safari Users:
1. Select "Safari" at the top of your screen
2. Go to "Preferences"
3. Select "Privacy"
4. Under "Block Cookies" select "Never"

iPhone or iPad:
1. Open your Settings app
2. Select "Safari"
3. Select "Block Cookies"
4. Select "Never"

| 472 | Hidden Profiles - Explained | There may be times, like when you start a new relationship, that you'll want to remove your profile from being visible to other members. Of course, anytime your profile is hidden, it will not be displayed in search results. Since this reduces your chances of finding a match, we recommend only hiding your profile when you are taking a break or have met someone you are interested in. |

As a member of Match, you have the ability to hide your profile from view at any time, for any reason. Click on the links below for more information about the ins and outs of hidden profiles.

 

Click &lt;rn:answer_xref answer_id="662" contents="here" target="_parent" /&gt; for instructions on how to adjust your visibility
Click &lt;rn:answer_xref answer_id="663" contents="here" target="_parent" /&gt; for information on communicating with a hidden profile
Click &lt;rn:answer_xref answer_id="664" contents="here" target="_parent" /&gt; for information on how our "Who's Viewed Me" feature deals with hidden profiles
Click &lt;rn:answer_xref answer_id="665" contents="here" target="_parent" /&gt; for information on selective visibility
Click &lt;rn:answer_xref answer_id="539" contents="here" target="_parent" /&gt; for information about cancelling your account (hiding your profile does not suspend your subscription or cancel your account) 

| 486 | Search Results - View | Each entry in your search results will include the member's username, age, location, number of photos, and activity status. Your results will also include the Save button to add a profile to your Favorites list. Quick view allows you to see a condensed version of a potential match's profile. Subscribers will also have the option to send an email directly from this window. Please note that using this feature could cause you to appear on the member's Who's Viewed Me list. To view the full profile of a member that piques your interest, click the username link. |

On the left side of your search results, you'll see options for editing, refining or saving your search. Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_new" contents="here" answer_id="301" /&gt; for more information on how to use those tools.

Web Only

| 524 | Do my matches receive me as well? | Members don't know when they have been sent to you as a match and won't automatically receive you as a match at the same time. This is because all of the matching we do on our site is member-specific, meaning that our evaluation process to find your matches happens separately from our process to find matches for other members. |

Of course, with some features like Mutual Match that take both your criteria into account, there's a good chance that a match of yours will eventually receive you as a match, too.

| 525 | Match International Sites | Match has sites in countries all over the world. To visit one of our international sites, please tap our Match International link. |

To get help relating to any of these sites, simply click on the appropriate country and click on Help at the bottom of the site's homepage.

If you happen to be a U.S. Match member but are traveling out of the country, make sure to type in http://us.match.com to ensure that you aren't directed to the local Match site for the country you are visiting.

| Answer ID | Summary | Answer |
|---|---|---|
| 590 | Android App - Using It | *This feature is not available to members outside of English-speaking North America<br> <br>With the Match Android application, you can access most of your favorite Match features on your Android device. You can search for matches in your area, wink at them, and communicate with them (requires a paid subscription). You can also add and see your Favorites, as well as who's viewed your profile (also requires a paid subscription). Plus, you can also be notified immediately when other members communicate with you.<br><br>I installed the application on my Android. What do I do next?If you already have an account with Match or are a current subscriber, simply open the app and sign in. If you're new to Match, you'll be prompted to create a new account.<br><br>How much does it cost to use the Match Android application?The Match Android application is free to download and use. Most features, including the ability to wink at and search for other members, do not require a paid subscription. However, in order to communicate with other Match members, as well as see who's viewed your profile, you will need to have a paid subscription.<br><br>How does the location search feature work?The location search feature uses the GPS on your Android to determine your location. Your exact position will never be revealed to other Match members. The feature uses your location to deliver matches to you that are in your general area and can be turned off in your Search Basic Settings.<br><br>I have some feedback. Who should I contact?Please email your app-related feedback or feature requests (please, no support questions) to android.app@match.com. |
| 591 | Canceling/Resigning a Paid Subscription | Resigning<br>If you currently have a paid subscription and want to make sure you're not charged at the end of your term, you'll need to resign your subscription. To do this, please visit the Change/Cancel Membership page under your Account Settings (the gear icon).<br><br>For your security, you'll need to re-enter your password as part of this process.<br><br>Trouble signing in? &lt;m:answer_xref target="_self" contents="Click here" answer_id="420" /&gt;<br>Next, click the Cancel Subscription link. You'll be asked to choose a cancellation reason and click Continue Cancellation to proceed. After you resign your subscription, you can still sign in, and you'll be able to receive and respond to email messages through the rest of your subscription period. Once your subscription term ends, you'll lose those benefits, but your profile and photos will remain visible (unless you choose to hide them in your visibility settings. As a free member you will continue to enjoy free membership benefits, such as search and the ability to send and receive winks.<br><br>We'll also continue to send you Mutual Matches as long as you want to receive them - and as long as your profile remains active. If you no longer wish to receive Match.com by Mail, just turn it off under the Match.com by Mail page in your Account Settings<br><br>Deleting<br>If, for example, you've found a great match and want to make sure your information is taken down from our site completely, you can accomplish this by following the directions above to resign and hide your profile. Your information is stored in our database for historical and legal purposes only.<br><br>Suspending a Subscription<br>Currently, suspending your subscription or putting it on hold for a few months isn't a feature we provide. If you need to take a break we offer the option for you to hide your profile until you are ready to use the site again (your subscription will still renew or end on the same date). |
| 588 | iPhone App - Features | Features<br>With the Match iPhone application, you can access many of the same great features that are available on the full website. You can:<br><br>Search for matches in your area<br>Send and view winks and email<br>View your Matches, Connections, Favorites, Likes and everyone who's viewed your profile<br>Snap photos using your iPhone camera and upload them to your profile<br>Edit your profile<br>Modify your account settings<br>Purchase a subscription<br><br>The newest version of our app includes two new features, Stream and Mixer. Stream allows you to view fun photos of locals and easily send a Photo Like or message to the member. The matches you see under Mixer are members we think might be of interest to you. There are not formal matches - they're loosely based on your matching criteria, but not 100%. You can swipe to the right to send a Photo Like, or you can choose to do nothing by clicking the X at the bottom of the screen. We will provide 50 matches for you to view every day.<br>Please email your questions, feedback or feature requests to iphone.app@match.com.<br><br>&#160: |

| Answer ID | Summary | Answer |
|---|---|---|
| 592 | Canceling a Free Membership | **Cancelling**<br>If you don't have a paid subscription, you can cancel your membership on the full website by visiting the Change/Cancel Membership page in your Account Settings (the gear icon). If you cancel your membership, we immediately hide your profile and photos from other members. Should you wish to rejoin the Match community, all you have to do is sign in and reactivate your account.<br><br>**Deleting**<br>If, for example, you've found a great match and want to make sure your profile information is taken down from our site completely, you can accomplish this by following the directions above to cancel your account. Your information is stored in our database for historical and legal purposes only.<br><br>Click &lt;rn:answer_xref target="_new" contents="here" answer_id="591" /&gt; for how to cancel if you're a paid subscriber |
| 595 | The Privacy of Your Personal Information | We take appropriate security measures (including physical, electronic and procedural measures) to help safeguard your personal information from unauthorized access and disclosure. We want you to feel confident using our website to transact business. However, no system can be completely secure. Therefore, although we take steps to secure your information, we do not promise and you should not expect that your personal information, searches, or other communications will always remain secure. Users should also take care with how they handle and disclose their personal and should avoid sending personal information through insecure email. Please refer to the Federal Trade Commission's website at http://www.ftc.gov/bcp/menus/consumer/data.shtm for information about how to protect yourself against identity theft.<br><br>To read the entire Privacy Policy of Match, please click here.<br><br>Our Privacy Policy applies to all of our Web site visitors in the United States and Canada. It covers the personal information visitors provide to us on this Web site. It also applies to information we may collect from you through our customer service representatives (telephone and online), or other means (such as your response to mailing offers or mailed sweepstakes entries). If you are visiting our website from outside the United States, please be aware that your information may be transferred to, stored, and processed in the United States where our servers are located and our central database is operated. By using our services, you understand that your information may be transferred to our facilities and those third parties with whom we share it as described in this privacy policy. |
| 596 | Connections - Explained | The Connections tab on your home page is a benefit of your paid subscription that provides a single view of Match members you've interacted with. Members you interact with on the site will be added as a Connection, whether they email, like or wink at you, if you get in contact with them, or even if you simply add them to your Favorites list. This will help you easily keep track of how recently you've been in contact and the last action taken with the potential match.  <br><br>To help you manage this feature, we've provided a variety of options to allow you to filter and sort your connections. Options will appear in the "Sort" or "Show" dropdowns, depending on what actions you have taken recently.<br><br>We'll also let you know when it's your turn to make a move. At the top of your Connections tab, we'll display members who have taken action on your profile under a "They're Waiting!" heading. You can email these members directly from this section.<br><br>You must be a subscriber to see your Connections page. Once you've subscribed, your Connections will immediately be visible on your Home page. Not a subscriber yet? Subscribe today! |
| 615 | Filtered Mail - Explained | **What is Filtered Mail?**<br>Filtered Mail is a feature that allows you to clear your inbox of messages from members with certain "deal-breaker" characteristics.<br><br>For example, if you would not consider corresponding with a member from outside of your area, you can set up a filter that will send any messages from these members into a separate folder.<br><br>**Setting up filters**<br>You can set up as many as seven filters by clicking on Settings next to the "Filtered Mail" folder in your Inbox. You can then enter the profile criteria you would like to filter from your inbox. Remember, any filter you check will exclude all member profiles that include that criteria, no matter how well you match in other areas. So you'll want to only use these filters carefully. To remove filters, simply return to your Filtered Mail settings and then uncheck the filters you wish to remove.<br><br>Ins and OutsFiltered emails are automatically moved to your Filtered Mail folder, but otherwise, they aren't treated any different from normal emails. You can still read and reply to them if you wish, and they are still deleted after 180 days.<br><br>Since these messages will never appear in your Inbox, you may wish to check your Filtered Mail folder periodically to make sure you're really excluding only the members you wish to exclude.<br><br>Also, keep in mind that since this is a feature intended to screen members who you aren't interested in corresponding with, sending a message or reply to a member will automatically exclude them from being filtered in the future.<br><br>Although this feature does not currently allow you to filter out messages from specific members, you can stop another member from contacting you by &lt;rn:answer_xref title="blocking" answer_id="221" contents="blocking" target="_top" anchor="blocking" /&gt; them. |

| Answer ID | Summary | Answer |
|---|---|---|
| 617 | Not Receiving Notification Emails On-Site | The success of Match is built around communication between members. For that reason, we try not to clutter your on-site inbox with our messages to you. Instead, when we need to update you about new email, winks, "They're Interested," and even "No Thanks" notifications, we send those messages to you at your off-site email address. |

If you're not receiving these notifications, double-check the following:

Make sure in your account settings that we have the right email address on file for you.
Check your email preferences to see if you're signed up to receive notifications.
Check with your email provider to see whether your notifications are being blocked or diverted to a Spam folder. GMail users should check the Social and Promotions tab of your inbox, too.

| 621 | Email - Sending & Receiving Offsite | Email is the heart and soul of how people connect on Match, so in an attempt to make it as convenient as possible, we've provided ways for you to receive messages directly from your personal email account without even having to sign in to our site! |

Receiving Messages
When a new message is sent to you on Match, we'll let you know via the email address you registered with us. If you'd like to see the full message, please login to the Match site.
Sending Offsite Emails
Currently there is no way for you to send offsite emails using your Match email. 

If you'd like to get text alerts about messages sent to you, please click here to learn how to set this up.

| 634 | How to Cancel a Free Trial | ```
<script language="JavaScript" type="text/javascript" xml:space="preserve">
//<![CDATA[
<!--
function displayDiv(div){
  var group_name = "group_" + div;
  var img_name = "img_" + div;

  if (document.getElementById(group_name).style.display == "none"){
    document.getElementById(group_name).style.display = "block";
    document.getElementById(group_name).parentNode.style.width = "95%";
    document.getElementById(img_name).src = "http://match.custhelp.com/rnt/rnw/img/enduser/minus.gif";
  }else{
    document.getElementById(group_name).style.display = "none";
    document.getElementById(group_name).parentNode.style.width = "200px";
    document.getElementById(img_name).src = "http://match.custhelp.com/rnt/rnw/img/enduser/plus.gif";
  }
}
//-->
//]]>
</script> 
``` |

If you currently have a free trial and want to make sure you're not charged at the end of your time, you'll need to resign your subscription. To do this, please visit the Change/Cancel Membership page under your Account Settings (the gear icon).

For your security, you'll need to re-enter your password as part of this process. Then follow the directions to resign your trial.

Keep in mind that resigning a free trial will immediately end your subscription benefits. If after resigning you want to turn your free trial (and potential for auto-renewal) back on, you can do so at the same "Change/Cancel Membership" page linked to above, as long as your trial period hasn't ended.

| 636 | Chemistry - Receiving Emails | *This feature is not available to members outside of North America - English Only |

When you set up your profile on Match, you may have been given the option to automatically use your Match details to create a free Chemistry account. If you checked the box for this option, an email was sent to you from Chemistry with instructions on how to complete your registration with them.

Of course, if you want to receive full paid subscription benefits on Chemistry, you'll have to purchase a subscription there. We are not currently offering joint subscriptions for both sites.

If you have questions or need to make changes to your Chemistry account, click here.

For more information about our relationship with Chemistry, click &lt;rn:answer_xref answer_id="400" contents="here" target="_self" /&gt;.

| Answer ID | Summary | Answer |
|---|---|---|
| 644 | Fake Winks and Emails | Match does not send members misleading communications, including notifications, emails, or winks. However, sometimes you'll receive a message from a Match member, only to receive a "Profile Not Found" error when you try to look at their profile. Or you'll be notified that you've received a wink, only to find that it's disappeared once you sign in. In both of these cases, the member who contacted you has, for whatever reason, hidden their profile or may no longer have a valid account with us. |
| | | Click &lt;rn:answer_xref answer_id="407" contents="here" target="_top" /&gt;for more information about why a profile might be unavailable |
| | | Click &lt;rn:answer_xref answer_id="564" contents="here" target="_new" /&gt; for more information about emailing on Match |
| 645 | Controlling Who Sees Your Profile and Photos | Although you're free to adjust your profile visibility whenever you'd like, we don't currently have a feature that allows you to selectively hide or make your profile visible to specific members. |
| | | For more information about how to hide or show your profile, click &lt;rn:answer_xref target="_self" contents="here" answer_id="662" /&gt;. |
| 647 | Not Receiving Daily Matches | You'll get a new set of Daily Matches around 23 hours after you've rated your last set of Daily Matches. Make sure to rate all of your matches! Not only will it trigger the new search for qualified matches, it helps us generate even better matches for you next time. |
| | | The number of matches you receive may be different each day. If you see fewer than you were expecting, don't be discouraged! New members sign up daily, so rate your matches and check back tomorrow to see if we've found more for you. Or, try updating your profile information and preferences to increase your likelihood of getting more matches. For example, even small changes – like increasing age ranges by as little as one year, or regional preferences by as little as five miles – can really broaden your options.  <br>Daily Matches not changing?You must rate your Daily Matches each day in order to receive new Daily Matches the next day. |
| | | For more information about our Daily Matches, click &lt;rn:answer_xref target="_self" contents="here" answer_id="529" /&gt;. |
| 650 | Double Billing | When you subscribe or your subscription renews, you may see one or more "extra" transactions pending on your account as a result of authorization attempts made to your card. Whether these authorization attempts appear depend on your financial institution's policies, and they should automatically drop off your statement once the real transaction has completed. Your financial institution can also confirm that no other actual charges have been made to your account once your subscription transaction is complete. |
| | | If you see more than one posted transaction within a short period of time, please contact us using the options displayed on the right side of your screen so we can assist you. |
| 2424 | Webinars - Explained | Match Webinars are your go-to source for expert dating tips, guidance and encouragement. Delivered to you via online presentation, you can attend from anywhere you can connect to the web. Join us as we bring you top dating experts and coaches to support your dating success with Match and beyond. |
| 2426 | Webinars - Recording | A webinar recording link will be sent to the email address attached to your Match account approximately 24 - 48 hours after the live webinar event. The recording will be available for 30 days after it is emailed. |
| 2425 | Webinars - Registration | Within 2 business days of registering on Match, we'll send additional instructions to the email attached to your Match account (check your spam folder). |
| | | In this email you will receive a URL link that directs you to register on the third-party webinar platform. You will not have to pay again, but you must complete this step in order to access the webinar. |
| | | Please note, all Webinars are hosted online, not in-person. After completing your registration, you will be able to join the live event at the start date and time noted on the event page. The start time is based on the time zone selected on your account. |
| 2048 | Canceling, Resigning, Deleting, On-Hold, etc. | We're sorry to hear that you are interested in resigning your subscription or canceling your account. We hope that it's because you met someone! Suspending a Subscription/On HoldCurrently, suspending your subscription or putting it on hold for a few months isn't a feature we provide. If you need to take a break, though, we offer the option for you to hide your profile until you are ready to use the site again (your subscription will still renew or end on the same date). |
| | | CancellingIf you are wanting to cancel, please take into consideration that once your subscription term expires, you won't have access to all the great features that you've become accustomed to, like sending and receiving messages, seeing who's viewed your profile and more! |
| | | The way this works is different depending on whether you're currently a paid subscriber or whether you use a free membership account. |
| | | If you are subscribed to Match via Apple's iTunes store, you will need to cancel through the App Store, or you may contact Apple using the following link: http://www.apple.com/support/itunes |

| Answer ID | Summary | Answer |
|---|---|---|
| 2049 | Removing Profiles From Search Results | As you explore our dating community, you're bound to find some members you can cross off your list. That's no problem. If you're a current subscriber, you're welcome to remove these members from view. |

How to Do It
Anywhere you see that member's profile, you can remove him/her from view by scrolling to the bottom of the profile and then tap the Remove from Search button. They will no longer show in your search results or in your other lists. And, of course, they won't know that you took this action.

Un-doing ItIf you'd like to see the list of those you've removed, you can return to the removed profile and then tap the Restore to Search button if you decide you want to give a member another chance.

You are able to remove up to 10,000 profiles. In the event, you are trying to remove additional profiles, you will receive an error. To correct the issue, you must access the full site from your handset or from a desktop computer so you may restore profiles on your current removed list.

| 2070 | Streaming Explained | Streaming uses your mobile provider's location services to find matches near you. In order to ensure you are receiving matches in your current location, make sure your location services are turned on. |

If you prefer not to use the location services, we will continue to provide matches for you using your current profile default location.

| 2071 | Discover Explained | Discover is the landing page for the Match application. Two menu options, Streaming and Mixing, allow you to interact with other members once you've logged into the app. |

For more information on Streaming, &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="1938" contents="click here" /&gt;.
For more information on Mixing, &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="1939" contents="click here" /&gt;.

| 2096 | How to Sign Out | |

To sign out of your Match account, simply tap the three-line navigation icon in the top left corner and then tap Help &amp; Settings. Once you reach this screen, tap Sign Out in the top right corner.

| 2098 | Changing Your Age | We calculate your age from the birthdate you entered in your account settings. If there is a problem with the way your age is displaying, you'll need to access the mobile site or full site from a desktop computer. |

To update your birthdate using the Match mobile site, type www.match.com into your browser. Tap the three line navigation icon and then select Help &amp; Settings from the menu options.  From the Settings screen, tap Go to full site.
On the full site, tap the gear icon in the top right corner and then select Settings from the menu options. Locate Sign Up Information and then follow the steps for updating your information.

| 2099 | Who's Favorited (Fave'd) Me - Explained | Our Favorited (Fave'd) Me feature allows you to see who has shown interest in you and opens the door for that first connection. This tool is a benefit of a current, paid subscription. |

Instructions for accessing your Fave'd Me list are:

Tap the three line navigation menu
Select Connections from the menu options
Tap Faves
You can toggle between your Fave'd Me and My Faves list on this screen.

If a free member favorited you over 180 days ago and your account is also in free member mode, you will be automatically removed from the member's Favorites list. The member will no longer appear in your "Who's Favorited Me" list the next time you subscribe.

Click &lt;rn:answer_xref answer_id="1482" contents="here" /&gt;for information on what happens with Favorites and Favoriting when your profile is hidden
Click &lt;rn:answer_xref answer_id="1577" contents="here" /&gt; for more information on Favorites

| 2100 | Favorites - Adding / Removing a Favorite | To add a Favorite from the Match iPhone app, simply tap Add to Favorites or Favorite on the member's profile. |

Currently, there's not a way to remove a Favorite from the iPhone app. If you'd like to remove a favorite from your list, you will need to access the full site from the mobile site or from a desktop computer.
Once on the full site, visit your Favorites page and click the X in the top right corner of the member profile you'd like to delete.
If your account is in free member mode, your Favorites will be removed automatically after 180 days.

Click &lt;rn:answer_xref contents="here" answer_id="1621" /&gt;for information on what happens when a Favorite hides their profile
Click &lt;rn:answer_xref contents="here" answer_id="1577" /&gt; for more information on Favorites

| 2101 | Favorites - Hidden Profiles | For free members, a profile will remain in your Favorites list for 180 days or until you decide to remove it. |

Paid subscriber Favorites lists will not be purged automatically, but profiles can be manually deleted at any time from the app or from the full site on your phone's browser or a desktop computer. However, if a member on your list decides to hide their profile on the site, the full profile will no longer be available to view.

| 2105 | Hiding My Profile or Making it Visible | As a member of Match, you have the ability to hide your profile from view at any time, for any reason. |

Adjusting Visibility
To adjust your visibility on your iPhone, tap the three line icon in the top left corner of the home screen. Tap Help &amp; Settings from the menu options and then slide the Visibility indicator left or right to choose your profile visibility.

| Answer ID | Summary | Answer |
|---|---|---|
| 2107 | Captions - Explained | At this time, adding or editing photo captions is not available through the iPhone app or through the mobile site. Please access the full site from your mobile phone or a desktop computer to add or edit captions on any of your photos<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_self" contents="here" answer_id="1965" /&gt;to review the steps for accessing the full site. |
| 2115 | Filtered Mail - Explained | What is Filtered Mail?<br>Filtered Mail is a feature that allows you to clear your inbox of messages from members with certain deal-breaker characteristics.<br><br>For example, if you would not consider corresponding with a member from outside of your state, you can set up a filter that will send any messages from these members into a separate folder. Filtered Mail on MobileOur iPhone app respects the email filters you created on the Match full site. However, they do not support updating or changing filters at this time. Feel free to access the full site from your phone's browser so you can make the necessary updates.<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="1965" contents="here" target="_self" /&gt; to review the steps for accessing the full site.<br>Setting Up Filters<br>Once you access the full site, you must tap Messages from the main menu. From there you can set up as many as seven filters by clicking on Settings next to the Filtered Mail folder in your Inbox. We will then prompt you to enter the profile criteria you would like to set up filters for. Remember, any filter you check will exclude all member profiles that include that criterion, no matter how well you match in other areas. So you'll want to use these filters carefully. To remove filters, simply return to your Filtered Mail settings and then uncheck the filters you wish to remove.<br><br>  |
| 2116 | Connections - Explained | Connections on your Navigation list is a benefit of your paid subscription that provides a single view of Match members you've interacted with. Members you interact with will be added as a Connection, whether they email or wink at you, if you get in contact with them, or even if you simply add them to your Favorites list. This will help you easily keep track of how recently you've been in contact and the last action taken with the potential match.<br>To view your Connections, tap Connections from the navigation list. The Connections list will have an option to view all connections and the ability to view your connections for each communication channel: Faves, Likes, Interested, and Winks. To view your Connections for each channel, tap on the desired category and the results will be displayed.<br>**Not all full site Connections are visible via the app.<br>  |
| 2118 | My Profile Isn't Appearing/Updating | If your profile is not reflecting the information you entered, there are a variety of possible explanations:<br><br>Your profile is appearing normally for everyone else, and will appear normally for you once you refresh your system cookies<br>Your profile is hidden<br>You haven't completed your profile<br>You tried to complete your profile, but took more than 45 minutes on a screen and experienced a session time-out<br>You tried to complete your profile, but it was not approved<br><br>More information on the above situations:<br><br>Hidden Profile<br>To verify if your profile is hidden, tap the three line icon. Select Settings &amp; Help from the navigation list. Once there, you can verify if your profile is currently visible.<br>Contact Us<br>If you're pretty sure your profile is acceptable based on our guidelines, or if you're still not sure why your profile isn't displaying correctly, please contact us. |
| 2119 | Singled Out - Explained | About Singled Out Matches<br>Every now and then, we find someone who really stands out as someone we think you'll have a connection with. We single out this match for your consideration. Rating your Singled Out matches works the same as rating any of your other Daily Matches. Since it's the first of your matches, you'll need to rate it before you can continue rating the rest of your Daily Matches.<br><br>How We Find Them<br>To find these matches, we take into consideration everything you've told us about yourself and who you're looking for, and we learn from actions you take on the site. We put all this information together, and every once in a while someone comes along who seems to fit you better than the rest. These are the people we single out for you. We may not get it exactly right every time, but the more active you are on the site, the closer we'll get to finding a great match for you.<br><br>Frequency<br>Because these are matches we have especially high confidence in, we may not single someone out for you every day. But make the most of each one! As with your  Daily Matches, they won't know you've received them as a match: you'll need to take the initiative to reach out and let them know.<br><br>If over time you find you aren't receiving many, or any, of these kinds of matches, it could be that your search criteria is too limiting. Making tiny tweaks (like adding just a few miles to the area you're willing to look for matches) can give great results. We also learn from everything you do on the site, so doing something as simple as sending a wink or rating your Daily Matches can help teach us how to find a great match for you. |

| Answer ID | Summary | Answer |
|---|---|---|
| 2121 | Changing Username, Password, Email Address, etc. | Unfortunately, you are unable to update these account settings from the Match application. To update your setting, please access the mobile site (www.match.com) from your device or the full website from a computer to verify and/or update the information.<br>Mobile Website <br><br>Type www.match.com into your browser<br>Tap the three-line icon in the upper left corner of your screen <br>Tap Help &amp; Settings, then select Go to Full Site<br><br>Full Site (Desktop)<br><br>Tap the gear icon located in the upper right corner of your screen <br>Tap Settings from the drop-down menu<br>Select Sign Up Information from the menu options<br><br>  |
| 1870 | Available to Chat Communication Bar | The Communication bar is designed to help you start conversations right now! You'll be provided with up to 20 online members available to IM or email. Just click the Chat icon in the top navigation bar to get started from any page.<br>This section will expand automatically when you navigate to the Home page. You can hide this feature by clicking the Available to Chat heading.<br>Matches within 50 miles of your zip code will be displayed first, and you may see a section with matches up to 250 miles from you at the bottom of your list. If you see someone interesting, hover over their photo to see a condensed version of their profile. Subscribers can use the "Chat Now" or "Email Now" buttons to start a conversation. To see the full version of the profile, click on the member's username. |
| 1932 | In-App Purchase Pricing | *This answer only applies to members who purchased a subscription through our iPhone app with an iTunes login<br>If you subscribed to Match directly from your iPhone app, you may have noticed a lower subscription price was presented to you on the full website or via a promotional offer. Subscriptions purchased via the iPhone app automatically include our Email Read Notification Feature, which causes the price to be slightly higher than the basic subscriptions offered on our website.<br><br>Additionally, purchases made through the app are not eligible for Match promotional offers because the billing is managed by Apple. If you wish to use a promotion in the future or purchase a basic subscription package, you may do so directly from our website after your current subscription expires. |
| 1933 | Match Guarantee for In-App Purchases | *This answer only applies to members who purchased a subscription through our iPhone app with an iTunes login<br>The Match Guarantee, which offers &lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="6 months free" answer_id="1570" /&gt; if you don't find a match, is available on all 6-month subscriptions sold on our website or by a Care representative. Because Apple handles the billing for accounts sold through our iPhone app, we are unable to credit free time if the requirements are met. This means that 6-month subscriptions purchased via the iPhone app do not include the Guarantee.<br><br>If you'd like to benefit from the Guarantee, you may allow your current subscription to expire and subscribe to a 6-month package directly on our website.<br><br>If you have questions regarding your current billing, pleas contact Apple at: http://www.apple.com/support/itunes |
| 1934 | Billed by Apple and Match.com | *This answer only applies to members who purchased a subscription through our iPhone app with an iTunes login<br><br>If you subscribed via our iPhone app and you notice charges from both Apple and full site, this is likely due to a temporary lapse in the mobile app subscription. To cancel the in-app purchase, please contact Apple at: http://www.apple.com/support/itunes |
| 1935 | Add-Ons for In-App Purchases | To complement your Match subscription, we offer several add-on features.<br><br><br>Stir events are activities held in local areas where you are invited to meet other Match.com members face-to-face. Events are very popular, so we recommend you purchase a ticket quickly if you see an event that interests you.<br><br><br>Top Spot helps you stand out from the crowd so your profile gets more views! Your Top Spot purchase moves your profile to the top 6 search results when members run a search for someone like you.<br><br><br>Undercover allows you to view and Favorite profiles for 24 hours without your matches being notified. This feature is not available in all areas.<br><br><br>These features are not available for in-app purchase via iTunes. To add them to your account, navigate to our mobile full site and provide a credit or debit card for billing. The purchase is a one-time charge, so you don't have to worry about continuous billing.<br><br>Unfortunately, the Highlighted Profile, First Impressions and matchPhone premium subscription features are not available for in-app purchase. If you'd like to purchase a subscription that includes them, you may allow your current subscription to expire and subscribe again directly on our website. |

| Answer ID | Summary | Answer |
|---|---|---|
| 1936 | In-App Purchase Explained | Match has joined forces with Apple so interested members can subscribe directly from their iPhones. This purchase is done via the Match app with your iTunes account, and your subscription and billing information will be managed by Apple. In-app purchase is only available on the latest version of our iPhone app, which requires iOS 7 to download. |
| | | If you're seeing an error stating, "You're currently subscribed to this," &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_parent" contents="click here" answer_id="1930" /&gt;. |
| | | For questions related to your in-app purchase billing, &lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="click here" answer_id="1931" /&gt;. |
| | | For more information on in-app pricing, &lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="click here" answer_id="1932" /&gt;. |
| | | For information about the Match Guarantee, &lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="click here" answer_id="1933" /&gt;. |
| | | For information on available add-ons, &lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="click here" answer_id="1935" /&gt;. |
| | | If you've been billed by both Apple and Match, &lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="click here" answer_id="1934" /&gt;. |
| 1938 | Summary Explained |   |
| | | The Summary screen allows you to review matches selected by Match for you as well as access popular features such as Email, Winks and Who's Viewed Me.  |
| 1939 | Mixing Explained | *This feature is only available on the latest version of our iPhone app, which requires iOS 7 to download |
| | | The matches you see under Mixing are members we think might be of interest to you. There are not formal matches - they're loosely based on your matching criteria, but not 100%. |
| | | You can swipe to the right of the photo that appears to send a Photo Like, or you can choose to do nothing by clicking the X at the bottom of the screen. |
| | | We will provide 50 matches for you to view every day. |
| 1941 | Navigation Settings | *This feature is only available on the latest version of our iPhone app, which requires iOS 7 to download |
| | | In the top left corner of the iPhone application, you will see the navigation settings icon. When tapped, the navigation menu appears with the following options: |
| | | Daily Matches |
| | | Interested |
| | | Top Spot |
| | | Events |
| | | Settings |
| | | Each menu option will have numbered indicators to advise you of the new connections since your last login. Feel free to adjust your profile or account settings from this screen by tapping the corresponding options. |
| 1942 | Email Conversations | *This feature is only available on the latest version of our iPhone app, which requires iOS 7 to download |
| | | Your traditional email inbox is titled Messages in this application. When tapped, a list of profiles for matches you are emailing with appear. |
| | | To read the conversation, tap the profile picture to display the &lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="email thread" answer_id="1943" /&gt;. |
| | | To return back to the list of profiles within Conversations, tap the Arrow at the top of the page. |
| 1943 | Email Threading | *This feature is only available on the latest version of our iPhone app, which requires iOS 7 to download |
| | | Email threading allows you to see the original email message and any responses in the order they were sent and received. |
| | | The date and time of the email appears, as well as a read receipt for messages you sent to the match. |
| | | As an added bonus, we will also include the email conversation in the message screen when you are replying to an email. |
| | | There is no way to remove the email threading feature because it is an original component of our app. But we hope it helps you quickly reference your previous conversations with your match so you'll always have something to say. |
| 1944 | Email – Filters (Archived) | *This feature is only available on the latest version of our iPhone app, which requires iOS 7 to download |
| | | Our new application respects the email filters you created on the Match site. However, the application does not support updating or changing filters at this time. |
| | | Feel free to access the Full Site from the application so you can make the necessary updates. |
| 1948 | Inappropriate Behavior | If you would like to report inappropriate member behavior, please scroll to the bottom of the member profile in question and then tap the Report button. Fill out the report and then tap Submit to complete the request. |
| | | Please know Match will investigate the matter and then take appropriate actions based on our findings. |

| Answer ID | Summary | Answer |
|---|---|---|
| 1965 | Accessing the Match.com Full Site | To access the full site from our mobile site (www.match.com), complete the following steps:<br>1. Tap the three line icon in the upper left side of the handset<br>2. Select Settings & Help from the menu options<br>3. From the Settings page, tap Go to full site |
| 1977 | What is a free trial? | Receiving a Free TrialA free trial is a great way to test out our subscription benefits while you're thinking about purchasing a subscription. It allows you to use subscriber-only benefits for free, for a few days.<br><br>Free trial offers come periodically via email promotions sent to your personal email address (i.e., Gmail, Yahoo, Hotmail, etc.). So if you're interested, make sure you're being notified of Match promotions by following these steps on the full website:<br><br>Click on the gear icon in the navigation bar at the top of the screen.<br>Click on the Email Preferences link.<br>Ensure that you're signed up to receive Special Offers from Match<br><br>Redeeming a Free Trial<br>When you receive a free trial offer in your off-site email inbox, the message will include instructions for how to redeem it. In the process of setting up your free trial, you'll be asked for payment information, and you'll need to choose a paid subscription package that will automatically begin at the end of your free trial. But don't worry, this is just a convenient way to start your full subscription if you want to. If you decide you don't want to be charged, simply &lt;rn:answer_xref answer_id="634" contents="cancel" target="_parent" /&gt;your subscription before the free trial period ends.<br><br>I'm not eligible<br>If you've recently enjoyed a free trial, or you're tired of waiting for a promotion, just go ahead and subscribe! We're pretty sure you're going to like Match.<br><br>To subscribe, click on the Subscribe at the top of the screen. The subscription screens will guide you from there. |
| 1979 | Same-Sex Dating | Absolutely. When you register, we ask if you are a man or woman, and then whether you're looking for a man or woman. Just fill in the appropriate fields, and you're on your way. |
| 1988 | How to Subscribe + Payment Options |  <br>We'd be delighted to have you as part of our subscriber community!<br><br>To subscribe, you'll need to sign up for a free account (if you haven't already done so).  Attempt communication with another member by tapping Messages located within the three line icon main menu. The screen will direct you to choose from our subscription packages, and then will walk you through the billing process.<br><br>We currently accept payment by credit card or PayPal (*PayPal is not available to members outside of English North America.) You can also pay by mail using a check or money order.<br><br>Credit Card<br>Match happily accepts:<br><br>American Express<br>Discover<br>JCB<br>MasterCard<br>Visa<br>Diners Club<br><br><br>Prepaid Credit Card<br>We do accept prepaid cards on our site. The card issuer, however, may require that you register the card on their website first. Information and instructions on how to register your prepaid card should be listed on the back of the card itself.<br><br>Most gift cards and pre-paid cards require you to activate them first.<br><br>If the gift card has enough money on it when it is time to renew, the subscription will renew successfully. If there is not enough money on the card at the time of renewal, the renewal will not be processed. To avoid a lapse in your service, you may wish to subscribe with a card from which your account can be automatically renewed.<br><br>Mail a Check or Money Order<br>To request a subscription with a physical check or money order, please make your check or money order payable to Match(drawn on US funds only) and include your username, email address, and whether you'd like a three- or six-month subscription package.<br><br>IMPORTANT: We do not currently accept payments by mail (physical checks or money orders) for one-month subscriptions, premium services, or promotional rates/discounted offers.<br><br>When paying by mail, send your payment to the following address (mail delivery and processing time may take up to 14 days):<br><br>Attn: Billing<br>Match |

| Answer ID | Summary | Answer |
|---|---|---|

**1991** Text Alerts - How They Work

*This feature is no longer available
If you want to be notified whenever someone sends you a new email or Wink, just opt to receive SMS alerts on your mobile phone. It's easy to enable/disable text alerts or update the phone number listed.

While signed into your account tap the three line icon and then tap Settings &amp; Help from the menu options.  Tap Text Alerts and then use your finger toggle from left to right.  Blue indicates the feature is turned on.
To update your mobile phone number, you must access the full site from the mobile site (www.Match.com) or a desktop computer.

**1994** matchMobile versus Text Alerts

*This feature is not available to members outside of English North America
matchMobile is the version of Match that displays in mobile browsers. Text Alerts are text messages sent by Match to notify you when you have winks or emails. We do not charge for either service, but your carrier's standard text-messaging rates and data plan fees still apply. Contact your carrier for details on those rates.

**1995** Improving Matching Results

Every member goes through the dilemma of how picky to be with matching preferences. The broader your criteria, the more matches you'll get, but the narrower your criteria, the greater chance you'll like the ones you receive!

We recommend adjusting your criteria over time to find the right balance. You can do this by adjusting the matching criteria set on your profile:

Tap the three line icon in the upper right corner of your handset
Tap Edit Profile and then make updates to the About Him/Her section

 

**1997** Changing a Primary Photo

If you'd like to replace your current primary photo, simply tap Me from the bottom navigation ba.  In the screen that appears, tap Manage Photos and then locate the photo you would like to make your primary by swiping left to right.
Tap the gear in the lower right corner of your screen and a pop-up menu appears with your photo options. Tap Make Primary Photo and then tap Ok on the Success screen to complete the request.

**1999** Editing or Removing Photos

If you'd like to edit a photo you have posted on your profile, simply tap Me from the bottom navigation bar. In the screen that appears, tap Manage Photos and then locate the photo you would like to delete by swiping left to right.
Tap the gear in the lower right corner of your screen and a pop-up menu appears with your photo options. Tap Delete this Photo and then tap Ok on the Success screen to complete the request.
 
 
 

**2008** Email History

If you'd like to see who you've emailed in the last 180 days, simply tap Messages from the bottom navigation bar. There, you'll be able to access your Conversations folders to get a history of what has been sent and received.
Emails Older Than 180 Days
Since email correspondence is only kept in Match records for 180 days, these methods won't work for correspondence older than that.

**2009** Blocking and Unblocking

Blocking and unblocking from contact
You can block another member from communicating with you by tapping on the Block  button at the bottom of their profile.
If you need to unblock someone you've previously blocked, simply tap on Unblock on the member's profile.

Currently, you can only block up to 2,000 members from contacting you. If you need to add more after that, you'll want to unblock some of the older members you had previously blocked.

Can someone I've blocked still see my profile?
When you block a member from contacting you, they will not be notified that anything has happened. They will still be able to view your profile and try to send you messages, but you will be able to continue your search for someone special without receiving any messages they send. We don't currently have a feature that allows you to selectively block other members from seeing your profile.

Removing a profile from search resultsIn addition to blocking other members from sending you messages, you might also want to remove their profile from appearing in your search results. To remove someone from your search results, tap Remove at the bottom of the member's profile.

| Answer ID | Summary | Answer |
|---|---|---|
| 2017 | Free Membership vs. Subscription | Free Membership: What You Get<br><br>Join for free and you can enjoy access to the largest online dating site there is! As a free member, you'll be able to create a profile, post photos, conduct searches, send and receive winks, and benefit from our unique matching systems that sift through all the choices and deliver potential matches direct to your inbox! Plus, you can also cruise the site and access your account from our mobile site or from our apps.<br><br>Membership: How to Do It<br>To join for free please follow these steps:<br><br>Tap on this link to visit the sign-in page.<br>Tap on the Join For Free link below the sign-in box.<br>Fill out the online registration form and tap on the Continue button.<br>You are ready to fill out your profile and get started on your search for a match!<br><br>Subscription: What You Get<br>Subscribing to Match gives you access to a growing set of tools--on our main site, mobile site, or any of our apps--that will help you find the relationship you want and deserve. As a subscriber, you can:<br><br>Receive and reply to messages from other Match subscribers<br>Send messages to Match members you are interested in<br>See who has viewed or favorited your profile<br>Connect faster with IM<br>Keep track of all open Connections in one place – including those you've sent Winks to<br>Remove members you're not interested in from your search results in order to make room for other possibilities<br><br>Subscription: How to Do It<br>To subscribe, you'll need to sign up for a free account (if you haven't already done so), then sign in and then attempt to communicate which redirects you to the subscription screen. The screen will direct you to choose from our &lt;rn:answer_xref title="subscription packages" answer_id="7" contents="subscription packages" target="_blank" /&gt;and then walk you through the billing process.<br><br>Free Trial<br>A free trial is a great benefit that allows you to enjoy the full range of subscription benefits for a few days . Click &lt;rn:answer_xref title="here" answer_id="3" contents="here" target="_blank" /&gt;for more information on free trial promotions. |
| 2020 | Searching for Members with Photos | To search for only members who have photos:<br><br>Tap Discover on the bottom navigation bar.<br>Tap on the filter icon in the top-right corner of the screen<br>Ensure the Photos Only toggle is blue which indicates its activated<br>Tap Search in the top left corner to view the updated results |
| 2022 | Automatic Sign-in | Match's auto sign-in feature allows us to recognize you each time you visit our app – eliminating the need to request your username and password with each visit.  You can turn the feature on or off at any time by making sure you sign out after each session. <br>To do so, tap the three-line icon located in the upper left corner of your screen.  Tap Settings from the navigation menu and then tap Sign Out located in the upper-right corner of the screen.<br><br>  |
| 2025 | Sign In Information No Longer Works | If we're not recognizing the sign in information you're entering, there are a couple of possibilities as to what might be going on.<br><br>You might be entering the wrong email address or password. At least it doesn't hurt to check. Tap the Forgot Password link located on the Sign In screen and then enter the email address you've associated with your Match account, and we'll immediately send a password reset email.  If your email address isn't recognized, check any other addresses you have to make sure your account hasn't been associated with one of those.<br><br> <br><br>We may need to get involved to help you resolve the situation. Contact us, and we'll see what we can figure out. To help us locate your account, make sure to include in your message your full name, email address, username, and Zip code, along with a description of what happens when you try to sign in, including any error messages. |

| Answer ID | Summary | Answer |
|---|---|---|
| 2029 | Canceling Additional Features | You have the ability to cancel an additional feature at any time. To do so you must sign into a desktop computer or access the full site from our mobile application.<br>Accessing the full site from the mobile application<br><br>Type www.match.com into your browser<br>Tap the three-line icon in the upper left corner of your device<br>Scroll down to Settings <br>Tap the Go to full site link<br><br>Once on the full site, you must complete the following steps:<!--stopindex--><br><br>Tap on the gear icon in the top navigation bar.<br>Tap Settings from the drop-down menu<br>Tap on Subscription Status (for security purposes you may be asked to re-enter your password).<br>Tap the Deactivate link to the right of the service you wish to cancel.<br>If asked if you are sure you wish to cancel, tap on Yes.<br><br><br>After canceling, you'll notice the Deactivate link will change to read Reactivate. If you wish to add the cancelled service back to your subscription simply click the Reactivate link.<br><br>You will still be able to utilize the additional feature(s) you cancelled until the end date shown on the Subscription Status page. |
| 2036 | Hidden Profiles - Explained | There may be times, like when you start a new relationship, that you'll want to remove your profile from being visible to other members. Since that's why you're here in the first place, we make this as easy as flipping a switch. Of course, anytime your profile is hidden, it will not be displayed in search results. Since this reduces your chances of finding a match, we recommend only hiding your profile when you are taking a break or have met someone you are interested in.<br>To hide your profile, simply tap on the Settings option on the Navigation list. From the Settings screen you can adjust the visibility of your profile. |
| 2038 | Search Results - View | Each entry in your search results will include the member's username, age, location, and activity status. Tap a member that interests you to view the profile. Please note that doing so will cause you to appear on the member's Who's Viewed Me list.<br>To refine your search, tap the Filter icon in the top-right corner of the screen. You'll see options for editing your search criteria. Once you have selected your desired filters, tap Search in top left corner to view the updated results. |
| 2044 | Daily Matches - Rating my matches | Our Daily Matches system is unique in that it takes your feedback and improves over time. This is why we have made it a requirement that you must rate your Daily Matches each day in order to receive new Daily Matches the next day (matches will update 23 hours after the rating occurs). Your profile also needs to be visible before you can rate your matches.<br><br>Rating Yes<br>If you say that Yes (check mark), you're interested, we'll send a message to the member you're interested in to let them know they caught your attention. If you'd like, you can access all the members who've sparked your interest in the Yes section of your Daily Matches. Just remember, though, that matches are removed from all Daily Matches lists after they've been there 180 days.<br><br><br>Rating No<br>If you're not interested, it's not a problem. We'll simply remove that member from your Daily Matches, and they won't show up again in the matches we serve you (and they'll never know you weren't interested). Do be careful, though. If you inadvertently select the No (x mark)rating on a member's profile, the rating cannot be changed after it is submitted.<br><br>Singled OutOn any day where you receive a Singled Out match, you'll need to rate it before you can continue rating the rest of your Daily Matches. New matches will not appear until after you have rated your Singled Out match. |
| 2168 | Private Mode – Current Subscription with Guarantee | Private Mode does not work with the 6-Month Guarantee. This feature hides your profile from visibility on the site, which breaks one of the requirements for receiving the additional 6 months free with the Match Guarantee. |
| 2169 | Private Mode – Account Settings | You can easily manage your Account Settings for Private Mode at any time. To update your settings, complete the steps below:<br><br>1. Click your primary photo thumbnail in the upper right corner of any screen<br>2. Click Settings from the drop down menu<br>3. Locate the Setting you would like for your profile: Visible, Private Mode or Hidden<br>4. Click the applicable radio button and your profile will assume that state immediately<br><br><br>Remember, if you are currently subscribed to the Match Guarantee, changing your profile to Private Mode or Hidden disqualifies you from receiving the additional 6 months for free. |

| Answer ID | Summary | Answer |
|---|---|---|
| 2170 | How to make your profile visible to others with Private Mode | Existing Match – Make Visible<br>If you have communicated (Favorited, Winked, etc.) with another member prior to purchasing Private Mode, you will already be visible to them when the feature is activated.  You can continue to communicate with that person business as usual.<br>New Match – Make Visible<br>In order to appear visible to a potential match while in Private Mode, you must communicate with the member.  Once any form of communication is sent, the member will immediately be able to view your profile and communicate with you. You can verify that you are visible by viewing the potential match's profile after your communication has been sent, and it should state He/She Can See You under their primary photo.<br> <br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_blank" contents="here" answer_id="2176" /&gt; to read the ways to communicate and unlock Private Mode<br>  |
| 3 | What is a free trial? | Receiving a Free Trial<br>A free trial is a great way to test out our subscription benefits while you're thinking about purchasing a subscription. It allows you to use subscriber-only benefits for free for a few days.<br><br>Free trial offers come periodically via email promotions sent to your personal email address (i.e., Gmail, Yahoo, Hotmail, etc.). So if you're interested, make sure you're being notified of Match promotions by following these steps:<br><br>Click on  the gear icon in the navigation bar at the top of the screen.<br>Click on the Email Preferences link.<br>Ensure that you're signed up to receive Special Offers from Match.<br><br><br>Redeeming a Free Trial<br>When you receive a free trial offer in your off-site email, the message will include instructions for redeeming it. You'll be asked to choose a paid subscription package and to provide payment information so you can automatically keep your subscriber benefits after your trial is over. If you decide you don't want to be charged, simply &lt;rn:answer_xref target="_blank" /&gt; your subscription before the free trial period ends.<br><br>I'm not eligible<br>If you've recently enjoyed a free trial, or you're tired of waiting for a promotion, just go ahead and subscribe! We're pretty sure you're going to like Match.  <br><br>To subscribe, click on the Subscribe at the top of the screen. The subscription screens will guide you from there.<br>  |
| 7 | Price and Subscription Package Options | The Cost<br>To compare the relative costs of purchasing these packages, simply sign in and click on the Subscribe button at the top of the screen, and the prices will come right up.  If you are a former subscriber, we may show your previous subscription package and payment method as the default selections. Click Edit or Change Payment Method to choose a different subscription term or method of payment.<br><br>If you're not a member yet, don't worry. Since prices can vary and are subject to change, we just need a little information so we can show you the rates currently available to you. Click on Join for Free, and the single-screen sign-up process can easily be completed in less than a minute (you don't have to complete your full profile before clicking on Subscribe at the top to get the rates).<br><br>Package Options<br>When you're ready to start enjoying the benefits of full subscription, we're pleased to offer you subscription packages that span twelve, six months, three months, or one month. Each option includes all of our standard subscription benefits. Although our rates page highlights the monthly or weekly average for each of the options (to help you compare the relative costs of the packages), your subscription package is charged in full when you subscribe.  If you would like to be charged on a monthly basis, simply choose the one-month package.<br><br>For more information about subscription benefits, click &lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="here" answer_id="273" /&gt;. |

**Answer ID**   **Summary**                                                **Answer**

11   Email Read Notification Feature                              Email Read Notification is a great feature you can add to a basic subscription for a small fee. It alerts you when a Match email you sent gets opened, whether it was sent while signed into the site or if you used our &lt;rn:answer_xref answer_id="621" contents="offsite emailing process" target="_top" /&gt;. If you purchased a bundled subscription plan, this feature was included in your subscription price.

How do I add this service to my subscription?
If you don't have a subscription yet, simply subscribe, and there will be an option to select a package with this feature. To add Email Read Notification to an existing subscription, sign in and follow these steps:

Click on the gear icon in the top navigation bar
Click on Account Settings
Click on Subscription Status
Click on Choose and addition subscription package
Follow the prompts to add the feature to your current subscription

How do I know if my messages have been read?
Once you've added it to your subscription, you can easily see if your email messages have been read. Click on Messages in the top navigation bar, then click on the "Sent" link. The right-hand column of your sent email list will show whether or not an email has been read. Once you have purchased Email Read Notification, all email will display the date they were opened.

Will other Match members know when I have opened a message from them?
If you receive an email from another Match subscriber who has purchased Email Read Notification, they will be notified of the date you opened the email. The Email Read Notification status is available on-site in the subscriber's Sent folder for 180 days.

I received a response to an email that I sent, but Email Read Notification is showing the message as "Not Yet Read."
In a few cases, for off-site email (i.e. Hotmail, MSN, AOL, Gmail, Yahoo! email), the recipient of the email must have images and HTML enabled on their email client in order for Email Read Notification to function properly. If the recipient of the email has text-only set for their email client, then the subscriber sending the email will not receive a "read" receipt from Email Read Notification.

Click &lt;rn:answer_xref answer_id="564" contents="here" target="_new" /&gt; for more information about emailing on Match

14   Dating Advice                                                We want to make sure you have the tools to make your time on Match safe and enjoyable. To help you, we've provided some helpful links at the bottom of every screen:

Our Online Dating Safety Tips are a great place to start. They give you important guidelines to help you protect yourself. They also provide some practical guidance on issues like meeting people offline for the first time.

Click on Dating Articles and Advice to go to Happen Magazine, where you'll find great articles, quizzes, columns, and more about issues of interest to the Match community.

How Online Dating Works gets you started on Match with information about your profile, searching features, matching features, and how to communicate with other members.

We recommend that you regularly take inspiration from our Success Stories. These are real people happily sharing their stories about how Match helped them find love. There's no better way to stay motivated in your search.

21   Same Sex Dating                                              Absolutely. When you register, we ask your gender and whether you're looking for a man or woman. Just fill in the appropriate fields, and you're on your way.

29   Searching for / Viewing your own profile                     If you would like to see the way your profile appears to other members, it's easy to do. Simply click on your primary photo thumbnail in the top navigation bar and click on "Your public profile view" on the left side of the screen. The way your profile appears in the resulting screen mirrors the way it will appear to other members. However. if your profile is hidden, it won't appear at all. 

If you'd like to go a step further and see how your profile appears in search results, you'll need to sign out first. Your profile will not appear if you are logged in to your account. Then, click on Search in the top navigation bar and edit your criteria so the settings are appropriate for someone seeking a match like you. Also, you'll want to select fairly narrow criteria so that you don't have too many profiles to sort through.
After the results appear, use the drop-down menu to sort your results by usernames. This will sort the profiles into alphabetical order and make it easier to locate your profile.

34   Match Company Background                                     Check out the About Match and Media Room links at the bottom of any page.

| Answer ID | Summary | Answer |
|---|---|---|

41  How to Subscribe + Payment Options

 
We'd be delighted to have you as part of our subscriber community!

To subscribe, you'll need to sign up for a free account (if you haven't already done so), then sign in and click on the Subscribe button at the top of the screen. The screen will direct you to choose from our subscription packages and then walks you through the billing process.

We currently accept payment by credit card or PayPal (*PayPal is not available to members outside of English-speaking North America). You can also pay by mail using a check or money order. Additional methods of payment include Visa Checkout and Masterpass.

Credit Card
Match happily accepts:

American Express
Discover
Diners Club 
JCB 
MasterCard 
Visa

Prepaid Credit Card
We do accept prepaid cards on our site. The card issuer, however, may require that you register the card on their website first. Information and instructions on how to register your prepaid card should be listed on the back of the card itself.

Most gift cards and pre-paid cards require you to activate them first.

If the gift card has enough money on it when it is time to renew, the subscription will renew successfully. If there is not enough money on the card at the time of renewal, the renewal will not be processed. To avoid a lapse in your service, you may wish to subscribe with a debit or credit card so your account can be automatically renewed.

Mail a Check or Money Order
To request a subscription with a physical check or money order, please make your check or money order payable to Match (drawn on U.S. funds only) and include your username, email address, and whether you'd like a three or six-month subscription package.

IMPORTANT: We do not currently accept payments by mail (physical checks or money orders) for one-month subscriptions, premium services, or promotional rates/discounted offers.  

When paying by mail, send your payment to the following address (mail delivery and processing time may take up to 14 business days):

Attn: Billing

42  Upgrading or adding to a subscription

Adding a Subscription
If, for example, you have a one-month subscription and want to add a six-month term with our Match Guarantee, you don't have to resign your account and wait for your benefits to expire. Simply add a new subscription to your account. To do this online, please sign in to your account on the full website and follow these steps:

Click on the gear icon in the navigation bar at the top of the screen
Click on Settings
Click on Subscription Status
Click on Choose an additional subscription package
Select a subscription package
Click on Continue
Enter any payment information that may be requested
Click on Subscribe

Your account will be charged immediately, and your new subscription period will begin once your current subscription period ends.

Upgrading a Subscription
If, on the other hand, you would like to upgrade your current subscription by adding premium features, you can do this online by following these steps:

Click on the gear icon on the navigation bar at the top of the screen
Click on Settings
Click on Subscription Status
Click on Subscribe to additional Match services
Select the features you want to add
Click on Continue
Enter any payment information that may be requested
Click on Subscribe

| Answer ID | Summary | Answer |
|---|---|---|
| 46 | Submitting Suggestions | Yes, your feedback is valuable to Match! To submit your suggestion, please contact us by clicking here and selecting the Suggestions category. <br>   |
| 49 | Technical issues - clearing cache/cookies | Clearing your browser's cache and cookies can resolve most browser related issues on our site. Included below are instructions for the most common browsers used on our site: <br>   <br> Internet Explorer 11: <br><br> Navigate away from Match <br> Click on the gear icon in the top right corner <br> Click on Internet Options <br> Make sure you're on the "General" tab <br> Under "Browsing History," click on Delete... <br> Check the checkboxes for "Temporary Internet Files" and "Cookies," and make sure "Preserve Favorite Website Data" is unchecked <br> Click on Delete <br><br> Firefox: <br><br> Navigate away from Match <br> Click on the Firefox button at the top of the screen <br> Hover over "History" and click on Clear Recent History... <br> Click on the dropdown for "Time range to clear" and select Everything <br> Click on the down arrow next to "Details" and make sure "Cookies" and "Cache" are selected <br> Click on Clear Now, and close the Clear Recent History window <br><br> Safari: <br><br> Navigate away from Match <br> Under the "Safari" menu, select Reset Safari <br> Check Remove all cookies and Empty the cache  <br> Click Reset <br><br> Chrome: |
| 104 | Who's Viewed Me - Explained | Our "Who's Viewed Me" feature is a handy tool that lets you know who has viewed your profile. Since they've taken a step to check out your profile, it opens the door to make that first connection. <br><br> This feature is available to all paid subscribers, so others will be able to see when you've viewed them too. However, there's no indication of how many times or the exact time your profile was viewed. <br><br> To access your "Who's Viewed Me" page, simply click on Viewed Me on the left side of the Home page. You can also see updates to this list in the "What's New!" section on the home page. After 180 days, profiles are dropped from this list. <br><br> For more on this feature, click on one of the following links: <br><br> Click &lt;rn:answer_xref target="_new" contents="here" answer_id="668" /&gt; for instructions on how to remove or sort the profiles you see <br> Click &lt;rn:answer_xref target="_new" contents="here" answer_id="359" /&gt; for information about your profile counter <br> Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_new" contents="here" answer_id="145" /&gt; for information on why your profile counter may be higher than the number of profiles in "Who's Viewed Me" <br> Click &lt;rn:answer_xref target="_new" contents="here" answer_id="664" /&gt; for information on how this feature works when your profile is hidden <br> Click &lt;rn:answer_xref target="_new" contents="here" answer_id="324" /&gt; for instructions on how to turn off email notification of when your profile is viewed |

| Answer ID | Summary | Answer |
|---|---|---|
| 116 | Improving Matching Results | Every member goes through the dilemma of how picky to be with matching preferences. The broader your criteria, the more matches you'll get, but the narrower your criteria, the greater chance you'll like the ones you receive!

We recommend adjusting your criteria over time to find the right balance. You can do this by signing into your account and following these steps:

Click on your primary photo thumbnail in the top navigation bar
Click the Edit pencil icon to the right of the section you wish to change
Make any necessary updates and click Apply

An easy way to broaden your criteria is to make small changes to your age, height, or location preferences, or to adjust whether certain elements about your match are "Nice to Have" or "Must Have." These small changes can often have big results.

My matches aren't following my stated preferences
Click &lt;rn:answer_xref target="_top" contents="here" answer_id="653" /&gt; for more information if your matches aren't following your preferences. |
| 143 | Email Address Cannot Be Used | Email addresses can only be associated with one Match account. If you get a registration error saying that the email address you've entered cannot be used, it's because it's already attached to an existing account. Enter your email address here so we can remind you about your account information.  

Once you have successfully accessed your account, you can update any of your information. Click &lt;rn:answer_xref answer_id="555" contents="here" target="_parent" /&gt; for instructions. |
| 272 | Emails Not Coming To Offsite Email Address | You should receive notification each time you receive an email. If that's not happening, consider the following:

Service delays are common with email providers. If you've recently seen the email appear in your Match account, it's possible that your offsite copy simply hasn't landed yet.

Your service provider may have certain filters or spam-blocking software installed. Click here for instructions on how to make sure your Match.com emails don't get blocked.

It's possible that your Match account is linked to a different email address from the one you're checking. Notifications will be sent to the email registered on your Match account.

Your notifications from interested members may be turned off. Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="2242" contents="here" /&gt; for instructions on how to see if Notifications from Interested Members is turned on. 

Click &lt;rn:answer_xref answer_id="564" contents="here" target="_parent" /&gt; for more information about emailing on Match |

| Answer ID | Summary | Answer |
|---|---|---|
| 273 | Free Membership vs. Subscription | **Free Membership: What You Get**<br><br>Join for free and you can enjoy access to the largest online dating site there is! As a free member, you'll be able to create a profile, post photos, conduct searches, send and receive winks, and benefit from our unique matching systems that sift through all the choices and deliver potential matches direct to you! Plus, you can also cruise the site and access your account from our mobile site or from our apps.<br><br>**Membership: How to Do It**<br>To join for free please follow these steps:<br><br>Click on this link to visit the sign-in page.<br>Click on the Join For Free link below the sign-in box.<br>Fill out the online registration form and click on the Continue button.<br>You are ready to fill out your profile and get started on your search for a match!<br><br>**Subscription: What You Get**<br>Subscribing to Match gives you access to a growing set of tools - on our main site, mobile site, or any of our smartphone apps – that will help you find the relationship you want and deserve. As a subscriber, you can:<br><br>Receive and reply to messages from other Match subscribers <br>Send messages to Match members you are interested in<br>See who has viewed or favorited your profile<br>Connect faster with IM<br>Keep track of all open Connections in one place – including those you've sent Winks and Likes to<br>Remove members you're not interested in from your search results in order to make room for other possibilities<br>Attend Match Events to meet other Match members face-to-face <br><br>**Subscription: How to Do It**<br>To subscribe, you'll need to sign up for a free account (if you haven't already done so) and then sign in and click on the Subscribe button at the top of the screen. The screen will direct you to choose from our &lt;rn:answer_xref title="subscription packages" answer_id="7" contents="subscription packages" target="_self" /&gt; and will walk you through the billing process.<br><br>**Free Trial**<br>A free trial is a great benefit that allows you a few days to enjoy the full range of subscription benefits. Click &lt;rn:answer_xref title="here" answer_id="3" contents="here" target="_self" /&gt; for more information on free trial promotions. |
| 281 | Reactivating a Paid Subscription | If you've resigned your subscription and your subscription term has not expired, you'll see a "Reactivate" button in the top navigation bar. Click on this button to reactivate your subscription. If your renewal date has passed, this button won't appear and you can access your subscription benefits again by resubscribing. |
| 283 | Sign-up Errors | Try to sign up here. Remember when signing up that an email address can only be used with one Match account. Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="143" contents="here" /&gt; for more information. |
| 302 | Searching for Online Members | After choosing your search criteria, check the box next to Online Now on the search form. Your results will include only members who fit your search criteria and who are currently online or have been active within the last hour. |
| 303 | Searching for Members with Photos | After choosing your search criteria, check the box next to With Photos on the search form. Your results will include only members who fit your search criteria and have photos on their profile. You can also indicate that you only want to see matches with photos in your profile settings. If you have done this, your default search will have the With Photos box selected automatically. To update this setting, click your primary photo thumbnail and click the pencil icon next to your seeking information at the top of the About section. Check the "Only show matches with photos" box and click the "Apply" button. |
| 330 | Automatic Sign-in | Match's auto sign-in feature allows us to recognize you each time you visit our site, eliminating the need to enter your email address and password with each visit.<br><br>There are two ways to enable/disable the Auto Sign-In feature when you visit the Match site:<br><br>You can turn the feature on or off at any time by visiting the Auto Sign In page under your Account Settings. Set your preference and click on Go.<br>If the "Keep Me Signed In" check box on the sign-in page is checked, it will also turn on auto sign in. After you sign out, you can turn auto sign-in off by unchecking this box.<br><br>Please note: If multiple people use your computer, the auto sign-in feature will allow others to access your Match account.  |
| 348 | Updating Credit/Debit Card Information | If the account number you used to subscribe with us is no longer valid, or if you'd like to use a different method of payment for future billings, you'll want to update your information to make sure your subscription will renew properly. To do this, just go to Account Settings, select the "Subscription Status" link, and then select the "Change Payment Method" link under the payment details on file. |

| Answer ID | Summary | Answer |
|---|---|---|
| 362 | Checking My Renewal or End Date | To check the date your subscription is scheduled to renew or lapse, click on the gear icon in the top navigation bar, click Settings and then click on Subscription Status (if you don't have an active subscription, this link will not appear). Your subscription End Date and Renewal Status information will be displayed on this page.

Click &lt;rn:answer_xref title="here" anchor="here" target="_new" contents="here" answer_id="42" /&gt; for information about adding additional features or upgrading your subscription term
Click &lt;rn:answer_xref title="here" anchor="here" target="_new" contents="here" answer_id="539" /&gt; for information on how to cancel or resign your account
Click &lt;rn:answer_xref title="here" anchor="here" target="_new" contents="here" answer_id="260" /&gt; for information about auto-renewal
Click &lt;rn:answer_xref title="here" anchor="here" target="_new" contents="here" answer_id="515" /&gt;  for information about redeeming our Match.com Guarantee

If you have paid for a subscription, but the Subscription Status link does not appear, make sure that you are signed into the right account. You might also want to verify with your financial institution that your payment was processed. |
| 551 | Reverse Matching - Explained | Reverse Match is a fun feature we offer that returns matches who are looking for someone just like you. So no matter how they fit into your preferences, you'll know that you fit their preferences very well.

To see your Reverse Matches, just go to the Search page and click on Reverse Match.

Reverse Match is based on your profile. So, the more specifically you describe yourself in your profile data, the more accurate your Reverse Matches will be. |
| 768 | Profiles on Match - Explained | Your profile is your best tool for making a good first impression on potential matches. We strongly encourage you to complete a thoughtful profile and make it visible so you can start hearing from matches! As you're building your profile or looking at others, you're bound to run into some questions. Refer to the list below for some of the most frequent issues we address on the subject.

Basic features and functions:

Click &lt;rn:answer_xref target="_self" contents="here" answer_id="541" /&gt; for information on creating a profile
Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_self" contents="here" answer_id="1082" /&gt; for approval guidelines
Click &lt;rn:answer_xref target="_self" contents="here" answer_id="946" /&gt; for instructions on how to edit an existing profile
Click &lt;rn:answer_xref target="_self" contents="here" answer_id="472" /&gt; for answers to your questions relating to hidden profiles
Click &lt;rn:answer_xref target="_self" contents="here" answer_id="104" /&gt; for how to see who has viewed your profile, or whether others see when you view theirs
Click &lt;rn:answer_xref target="_self" contents="here" answer_id="402" /&gt; for information about ProfilePro
Click &lt;rn:answer_xref target="_self" contents="here" answer_id="359" /&gt; for information about your Profile Counter
Click &lt;rn:answer_xref target="_self" contents="here" answer_id="354" /&gt; for information about highlighted profiles
Click &lt;rn:answer_xref target="_self" contents="here" answer_id="730" /&gt; if your question relates to photos


More information and troubleshooting:

Click &lt;rn:answer_xref target="_self" contents="here" answer_id="407" /&gt; if a profile you're trying to view is "unavailable"
Click &lt;rn:answer_xref target="_self" contents="here" answer_id="539" /&gt; if you'd like to delete your profile
Click &lt;rn:answer_xref target="_self" contents="here" answer_id="410" /&gt; if your profile appears to be losing text you've entered
Click &lt;rn:answer_xref target="_self" contents="here" answer_id="156" /&gt; for information about profile completion requirements
Click &lt;rn:answer_xref target="_self" contents="here" answer_id="29" /&gt; for the ins and outs of searching for your own profile
Click &lt;rn:answer_xref target="_self" contents="here" answer_id="406" /&gt; for information about the "New" label on some profiles
Click &lt;rn:answer_xref target="_self" contents="here" answer_id="579" /&gt; if it looks like your profile is not appearing
Click &lt;rn:answer_xref target="_self" contents="here" answer_id="24" /&gt; for an explanation of "Online Now" and "Active Within"
Click &lt;rn:answer_xref target="_self" contents="here" answer_id="645" /&gt; if you'd like to control who sees your profile and photos |
| 1667 | Who Do You Like | The Who Do You Like section features members we think might interest you based on what you're looking for.

If you see someone you like in this section, click their photo, and we'll let them know you liked it.  Don't like the matches, click Skip to go to the next pair of photos.  Once you've liked several photos in the set, you will see more information from the profiles you like and have the option to email your potential matches.  If you are unsure about liking a particular match, click the Username link to read the member's profile before you take action.

Once action is taken or you refresh the current session, reviewed photos are not saved anywhere on the site. |
| 1866 | Removing Community Badges from Your Profile | To remove Community badges that are currently displayed on your profile:

1. Log into the Match site and hover over your primary photo thumbnail at the top right of your screen. Select View/Edit in the drop-down menu.
2. Scroll to the bottom of the screen and click the pencil icon to edit Communities.
3. To remove a Community, simply click the Remove button below any badge. |
| 2128 | Match Me | This feature allows members to pay an additional fee so they are placed in the Daily Match results of another member.  You may only be matched with another member who shares the same or similar profile interests.
In addition, the feature only allows you to be matched with a specific member every 30 days. |

| Answer ID | Summary | Answer |
|-----------|---------|--------|
| 2131 | Reply for Free - Purchase | At the top of your screen, click the Powerup button. You will be directed to the Add-on screen where you must select the Add button below Guarantee Anyone Can Reply to Your Emails.<br>Or if you are currently creating an email, simply click the Guarantee They will Read it button located at the bottom of the message field.<br>This takes you to the payment screen for processing and a confirmation is provided on the screen.<br>Don't worry if you are in the middle of your subscription, we will prorate the feature based on the time remaining on your account. |
| 2155 | American Heart Assoication | Starting in September 2014, Match began a partnership with the American Heart Association (AHA). Match has learned through our relationship and marketing survey findings that being in a relationship is beneficial to your overall health. Therefore, we wanted to partner with an association that supports a healthy heart.<br> <br>You can show your support of the AHA by adding their badge to your current profile. To add the badge, access your Profile and then locate the Communities section. Click the Edit link and then locate the AHA badge. To ensure you have added the badge, make sure you click the Apply button. |
| 33 | Search Sorting Options | For your convenience, we've provided a number of ways to sort the results when you search for matches.<br><br>- Match picks - sorts your results based on your search criteria and what we know about you<br>- Activity Date - sorts by the date when each match was last online, communicated with another member, or checked their matches (most recent at the top)<br>- Newest First - shows the members that have joined Match from most recent to least recent<br>- Age - sorts youngest to oldest<br>- Photo counts - sorts based on profiles with the most photos<br>- Username - sorts by username, in alphabetical order (numbers come before letters)<br>- Distance -sorts closest to farthest from the zip code or city you indicated<br>- Mutual Match - sorts based on compatibility using our &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="550" contents="Mutual Match" target="_self" /&gt; criteria<br>- Reverse Match - sorts based on compatibility using our &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="551" contents="Reverse Match" target="_self" /&gt; criteria<br><br>You can adjust your sorting options in the top-right corner of the search results. |
| 13 | matchMobile - Explained | MatchMobile is Match's conveniently formatted mobile device. The features available will depend on the type of device you are using.<br><br>Accessing matchMobile<br>Accessing the site via matchMobile is free. If you have a mobile device equipped with an Internet browser, you can access the mobile site by navigating to www.match.com. We'll detect the type of device you're using and reformat the screen and functionality for your device. You can also go straight to m.match.com.<br><br>Features<br>Although features will vary depending on the device you are using, matchMobile allows you to access most of your site benefits. For example, you can sign up for a new account if necessary, search and browse profiles, view and rate your matches, and send and view Winks and messages (sending and viewing messages requires a paid subscription).<br><br>Please note that, depending on your device, you may not be able to access all site features or account settings via matchMobile. |
| 45 | Affiliate Programs | Learn about or join our program on the Become an Affiliate link at the bottom of any page. |
| 2223 | What are the Verification Badges? | Verifications are badges that build trust with other members in the Match community. Badges let other members know that your contact information is accurate once you verify your email, phone number or social media accounts.<br>We assure that verifying your badges will not cause Match to post to your social media accounts nor will we share your personal contact information, it simply lets other member know we've verified that you are who you say you are - and that can go a long way in the world of online dating.<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="here" answer_id="2224" /&gt; for a step by step guide on how to add your badges.<br> <br> <br>  |
| 399 | Email - Sending | Once you have subscribed, you are free to email any of our members. There are several options for composing new emails:<br><br><br>You can respond to emails you've already received by clicking on Reply Now while viewing any of your messages.<br>To compose a new email from your inbox, click on Compose Email in the left-side navigation and type in the username of one of your Connections.<br>You can click on Email her/him from any profile page.<br>You can choose a connection from the left-side navigation of your Match inbox to send an email to.<br>If a connection is not visible in your left-side navigation, you can click on See all, then click on the photo of any connection available on your Connections page.<br><br><br>Some members may have the option of sending Match email directly from your offsite email account. Click &lt;rn:answer_xref target="_new" contents="here" answer_id="621" /&gt; for more information about how to do that.<br><br><br>Click &lt;rn:answer_xref target="_new" contents="here" answer_id="564" /&gt; for more information about emailing on Match<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="here" answer_id="2130" /&gt; for information about our Reply for Free feature |

| Answer ID | Summary | Answer |
|---|---|---|
| 402 | What is Profile Pro? | Want to make a great impression? Our team of expert writers will overhaul your profile in only a few days. Go ahead: get yourself noticed and increase your chance at romance! |

Ready to get started?
1. Log into your Match account
2. Click the Entice Him/Her banner in the bottom left hand corner of the screen
3. Enter your payment information, and then click Buy Now
4. You'll receive an introductory email and survey from one of our writers. They'll get started on your profile as soon as you reply.
Please note certain features may only be available for purchase using the full site. 
Also, once your survey responses are submitted, you will NOT receive a confirmation from us unless we have additional questions for you. Additional replies will reset the time and date submitted on your ticket, which could delay your writer getting in touch with you in a timely manner. Thank you for your patience.
Haven't received your questionnaire?
Here's a few things you can try:
· Check your bulk, junk, and spam folder (tabs for Gmail users).
· Add our site to your trusted list of Websites. (Contact your email provider for help).
· Have more than one email address? Make sure you check all of them just in case it was routed to a different address.

Need more help?
       · Questions or concerns about the profile you received? Reply directly to the email you received from your writer.
       · Need help uploading your new profile? Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="here" answer_id="946" /&gt; to review the profile upload steps

$ProfilePro
 

| 405 | Canceling Additional Features | You have the ability to cancel an additional feature at any time. To do this, please sign into your account and follow these steps: |

Click on the gear icon in the top navigation bar.
Click on Settings.
Click on Subscription (for security purposes you may be asked to re-enter your password).
Click the "Deactivate" link to the right of the service you wish to cancel.
If asked if you are sure you wish to cancel, click on Yes.

After canceling, you'll notice the Deactivate link will change to read Reactivate.  If you wish to add the cancelled service back to your subscription simply click the Reactivate link.

You will still be able to utilize the additional feature(s) you cancelled until the end date shown on the Subscription page.  

 

| 414 | Increasing My Responses | If you're not getting the responses you are hoping for, consider the following: |

If you don't have a photo, add one. This is the fastest and easiest thing you can do to increase your responses. Statistics prove that profiles with photos are up to 15 times more likely to receive attention than profiles without.

If you're not receiving any responses at all, be sure you're checking for responses at the email address you gave us when you signed up. It could be that your responses are simply landing at a different email address. If you are looking at the right address, also check whether you might have a Spam filter that's catching your Match messages. Check with your email provider about how to add Match as a trusted sender.

We recommend making a lot of initial contact attempts. It may also help to expand your search criteria in order to find more prospective matches. Be sure and take advantage of the custom search features of the site and experiment with different search parameters.

Match has a profile consulting service called ProfilePro. Our experts are standing by to provide you with expert writing assistance, tips to improve your profile, and professional photo help.  Letting us guide you through creating a profile can really help get you noticed and boost your chances for romance.

| Answer ID | Summary | Answer |
|---|---|---|

**420** Unable to Sign In

If you are receiving an error message when attempting to sign in or use your password to make changes to your account settings, please review the following troubleshooting tips to help get you on your way:

Email Address/Password Issue
Hopefully, this is a simple matter of entering the right email address and password. If your password auto-populates for you, try typing the password in manually. If that doesn't work, click here to enter your registered email address and  we will send you a password reset email.  

Blocked &amp; Refunded
We take security very seriously at Match. Unfortunately, this means that sometimes honest members are mistakenly blocked and/or refunded. If you're a paid subscriber, check your financial account to see if we've returned your subscription charge. If a mistake has been made on our part, please contact us immediately so we can make it right.

Some other possibilities:

If you reset your password using the Forgot Password form but are still unable to sign in, make sure you're accessing the U.S. sign-in page by navigating to http://us.match.com.
If your email address is not recognized in the Forgot Password field, make sure you are entering the email address associated with your Match account. If you have multiple Match accounts, make sure you enter the right one.
If you're sure you have the right email address, and it's not being accepted, there may be a larger issue to address. Contact us, and we'll get it taken care of as quickly as possible.
If you are copying and pasting your password into the password field, be sure you did not copy a blank space before or after the password.

Still Not Working - Contact Us
It was worth a shot. If we haven't been able to resolve your situation with the information above, please contact us. To help us find your account, make sure to include in your message your full name, email address, username, and ZIP code, along with a description of what happens when you try to sign in, including any error messages.
 

**643** Sending an Email Address or Link

In order to guard against those who may try to use our site in dishonest ways, Match automatically replaces an offsite email address in the very first email sent to any given member by a new contact with an "@talkmatch.com" email address (i.e., JaneDoe@talkmatch.com).

Similarly, any url or link included in an initial email to another member is removed.

Once that initial contact has been made, and the member has responded, we don't modify any future correspondence.

Click &lt;rn:answer_xref target="_top" contents="here" answer_id="564" /&gt; for more information about emailing on Match.

**646** No Response to Emails

There are several reasons why you may not be getting responses to emails that you have sent to a particular member:

Not all members check their email on a frequent basis
Some members choose not to respond to all contacts, although Match encourages everyone to reply to all messages received
Not all members are subscribers. Only paying subscribers, or recipients of the Reply for Free feature, can reply to emails they receive.

Non-paying members do receive notification of new emails received, so they have the option at that time to purchase a subscription to read the emails. We also offer free trials on a regular basis where non-paying members can read and send emails during the trial period.

If you would like to see if an email that you have sent has been read by the receiving party, you can add the "Email Read Notification" premium service to your subscription. Click &lt;rn:answer_xref answer_id="11" contents="here" target="_top" /&gt; to learn more about Email Read Notification.

Click &lt;rn:answer_xref answer_id="414" contents="here" target="_top" /&gt; for some suggestions on how to increase your responses
Click &lt;rn:answer_xref answer_id="564" contents="here" target="_new" /&gt; for more information about emailing on Match  

**648** Messaging Free Members

Messaging is the heart and soul of how people connect on Match, and it starts with a paid subscription. This creates a more secure environment and helps ensure that those you're communicating with are as serious in their search as you are.

Our non-paying members do receive notification of new messages received, and often when they see interest being shown towards them, they subscribe so they can read and respond to those messages. We also offer free trials on a regular basis so non-paying members can read and send replies to their messages for a brief period of time.

Although our paying vs. non-paying members are not differentiated on the site, we do offer a premium service called "Message Read Notification," which allows paid members to see who has opened and read the messages they've sent. Members who are not active subscribers will only appear to receive messages, but they will always show the status of "unread" to the sender.

The Reply for Free feature allows free members to reply to paid subscriber emails. The paid subscriber assumes the cost as this requires an additional Add-On purchase

To learn more about Message Read Notification, click &lt;rn:answer_xref answer_id="11" contents="here" target="_top" /&gt;.

To learn more about Reply for Free, click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="2130" contents="here" /&gt;.

| Answer ID | Summary | Answer |
|---|---|---|
| 1215 | Editing or Updating a Profile | **From the Android app**<br>To update your profile from the Match Android app,<br><br>From the home screen, tap on the 3-line icon :<br>Tap on Edit Profile<br>One by one, choose the sections you'd like to edit, and make your changes<br>In each section, tap on Save when you're done<br><br>**From the full website**<br>If you'd like to edit your profile from the full Match website, simply click on your primary photo thumbnail in the top navigation bar. Scroll down to navigate through the profile sections. To edit fields, either click on Edit next to the name of the field, or, if it's a text field, simply click in the text entry box. For some sections, you'll need to choose "Must Have" or "Nice to Have" in the My Date portion. Click on Save or Submit for Approval (depending on the section) when you're done.<br><br>If you're editing a field that has to be sent for approval, it may take an hour or two before it's approved and posted to the site.  Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="1630" contents="here" /&gt; for information on updating vital information like your username, password, email address, birthdate, or location.<br><br>**Visibility**<br>When you're editing your profile, we assume it's because you want people to see your updates. For this reason, your profile will automatically become visible after it is edited. If you do not want it to become visible, click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="662" contents="here" /&gt; for instructions on how to hide your profile from view. |
| 1931 | In-App Purchase Subscription Changes | *This answer only applies to members who purchased a subscription through our iPhone app with an iTunes login<br>Purchasing a subscription through the iPhone app allows you to easily gain subscriber benefits right from your mobile phone. The transaction is made by Apple using your iTunes account. For this reason, we are unable to make changes to the billing for any reason, including:<br><br>Purchase was made on wrong account<br>Wrong subscription term purchased<br>Canceling Recurring payments<br>Changing method of payment<br><br> <br>For assistance with these or any other billing change, please contact Apple at: http://www.apple.com/support/itunes |
| 998 | Photo Likes and Comments | On Match, when you see a photo that interests you, you can let the member know by giving a Photo Like. When you're viewing a photo, click the thumbs up icon in the top-right corner of the image.<br><br>As a benefit of your paid subscription, you can also comment on photos. If you'd like to leave a photo comment, simply click on the image or choose the Photos tab on the member's profile. You can type your comment in the box directly below the photo and click Send to let the member know your thoughts. Photo Comments are a great way to break the ice and start a conversation. They are not visible to other Match.com members viewing the profile.<br><br>*Note: If you clicked "Like" by accident, there is no way to "unlike" or take it back. The good news is that you may have made someone's day by liking his/her photo!<br><br>Accessing Your LikesTo access all of your Photo Likes, hover over "Connections" at the top of the page and click on Likes. You can see all of the members whose photos you've "liked," and subscribers can view Photo Likes they've received. To switch between the two views, click the Likes Received and Likes Sent radio buttons in the top-left corner of the page. You can even sort your likes by Most Recent, Activity Date, Age, Photo Count or Username.<br><br>Photo Likes in Who Do You Like SectionThe Who Do You Like section of the home page features member profile photos that you can "Like" or "Skip." These Photo Likes will appear on your Likes page.  |

APP 631

**Answer ID** | **Summary** | **Answer**

980 In My Own Words - Explained

The most important factors to remember in the "In my own words" section of your profile are:

There is a 200 character minimum.
You have 45 minutes to work on your profile. You may experience a &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="410" contents="session time-out" /&gt; after 45 minutes. If the session on the profile page times out and you try to submit after 45 minutes, you will lose your information.

Solution: Work on your profile in a separate document, then copy and paste it into the text box to submit it for review.

If your profile has not been approved, you will see a notification at the top of the profile edit screen, as well as receive an offsite email from us. We may reject profiles that contain any of the following:

Abusive language of any kind, including profanity, vulgarity, racism, illegal activity, etc.
Any direct contact information, including email addresses, URLs, instant messenger IDs, phone numbers, addresses, etc.
Unauthorized use of copyrighted or trademarked material
Business or political advertisements or solicitations
Languages other than English or Spanish
Material that exploits or solicits personal information from individuals under the age of 18
Overt solicitation for sex or descriptions of sexual activity, anatomy, etc.
Solicitation of multiple or additional partners

Match does not accept content from:

Incarcerated individuals
Individuals under the age of 18

Having Trouble Editing this section?If you're trying to edit this section, and buttons aren't responding or changes aren't "sticking", we've found that some of these issues can be resolved by refreshing the page (F5 on your keyboard).

2229 Can't Save Email Drafts

Want to create the perfect email before you send it to your match?

A great way to save a copy of your message is by writing the message using your computer or devices word processor, and then copying and pasting it onto the site.

&lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="399" contents="Click" /&gt; here for instructions on sending emails.
&lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="23" contents="Click" /&gt; here for a list of online dating tips.

2167 Private Mode Explained

 
Private Mode is a Match feature that allows you to display your profile to individuals you have previously communicated with or potential matches selected by you. When reviewing profiles you will see the message, He/She Can See You or He/She Can't See You. You can then decide if you would like to continue or to change visibility settings for the potential match.

Private Mode may be purchased during the initial subscription process or later at a prorated price. Private Mode may not be combined with the 6-Month Guarantee and will void Guarantee redemption if added and activated during a current Guarantee subscription.

Private Mode works on our mobile site and mobile apps, but you must access the full website to turn up your visibility settings.

Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="2169" contents="here" /&gt;for more information on turning Private Mode off and on :
Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="2170" contents="here" /&gt;for more information on making yourself visible to others while in Private Mode

 
 

| Answer ID | Summary | Answer |
|---|---|---|

827 Changing Your Age

We calculate your age from the birthdate you entered in your account settings. If there is a problem with the way your age is displaying, you can update your information by accessing the Sign Up Information page under your Account Settings. You will be prompted to re-enter your current password for verification.

Remember, being truthful, accurate, and current is the best way to ensure a good start in a new relationship.

To locate and fix your birthdate and age, simply follow these steps:

Sign in with your username and password
Click on the gear icon on the navigation bar at the top of the screen
Click on Settings
Click on Sign Up Information (for your protection you may be required to re-enter the birth date entered on your account and your password)
Click on the Change Sign-up Info button
Make your updates and click on Continue

Click &lt;rn:answer_xref answer_id="555" contents="here" target="_self" /&gt; to learn how to update other important account information.

1145 Adding photos

Whether you're a new member or simply want a fresh look, uploading photos can be done quickly and easily. There are a number of ways to go about adding a photo to your profile. All are easy. Click here for guidelines, including rules for file size and type.
To add a new photo from your Match Android app:

From the app's home screen, tap on the menu button at the bottom of the screen and choose My Profile
Choose Upload a Photo
Choose Upload More Photos
Either select a photo from your gallery or take a new one

If the photo isn't on your device, there are other ways to upload it:

Option 1: Upload your photo to your profile from your desktop computer. To upload photos:

Sign in to Match using your username or email address and password.
Click on your primary photo thumbnail in the top navigation bar
Click on Photos
Click on Choose Photo, and navigate to and select the photo you'd like to add: your upload will begin automatically

If your photos are approved they will be posted. It shouldn't take more than an hour or two for your photo to appear on your profile. Be sure to crop your photos the way you'd like them before uploading.

Option 2: Import from Facebook using your computer. To import photos already posted on your Facebook account:

Sign in to Match using your username or email address and password.
Click on your primary photo thumbnail in the top navigation bar
Click on Photos
Click on Import from Facebook: you may be asked to enter your Facebook username and password if it's your first time using this feature
Select the photos you wish to upload from your Facebook albums: to remove a selected photo, click the X in the top-right corner
Click Import Photos

If your photos are approved they will be posted. It shouldn't take more than an hour or two for your photo to appear on your profile. Be sure to crop your photos the way you'd like them before uploading.

Option 3: Email your photo to us. We'll do the work for you and post your photos free. Here's how:

| Answer ID | Summary | Answer |
|---|---|---|
| 653 | Matches Not Following Preferences | When we email your matches to you, we do our best to provide qualified Mutual Matches based on the criteria you give us: however, it happens sometimes that on a given day, there aren't any new matches that fit the bill exactly. In these cases, we may send "Members We Selected For You" that still may be of interest to you even though they are outside of one or more of your preferences, such as age or location.<br><br>I only want matches that strictly adhere to my preferences<br>We send Match.com by Mail to you as often as you specify in your mailing preferences. And by default, when there aren't new Mutual Matches based on your preferences, we'll send you member profiles under the heading "Members We've Selected For You" that come as close as possible. But maybe you're OK with fewer, more specific matches and don't want the broader selections on the days there aren't any more specific matches to send you. That's fine, too. Simply scale back the amount of emailed matches we send you each week. To do this:<br><br>Hover over the gear icon in the top navigation bar<br>Click on Email Preferences :<br>Adjust your preference for Match.com by Mail frequency<br>Click on Update at the bottom<br><br>Click &lt;rn:answer_xref answer_id="550" contents="here" target="_top" /&gt; for more information on Mutual Matches<br>Click &lt;rn:answer_xref answer_id="547" contents="here" target="_top" /&gt; for more information about Match.com by Mail |
| 651 | Signing In | To sign into Match, go to http://www.match.com and enter your registered email address, along with your password. If you have forgotten your password, click here and enter your email address. An email with instructions on how to reset your password will be sent to that email address. |
| 1024 | Importing Photos From Facebook | *This feature is not available to members outside of English speaking North America<br><br>Importing Photos From Facebook<br><br>We're happy to provide the option to import photos directly from Facebook into Match.<br>To import your photos:<br><br>Click on your primary photo thumbnail in the top navigation bar<br>Click on Photos<br>Click on the Import From Facebook button<br>Follow the instructions to log into your Facebook account<br>Grant the necessary permissions if you haven't done so before<br>Select the folder you want to choose photos from and click on the photos you want to import<br>Click on Import Photos<br><br>Photos imported from Facebook will be reviewed and must adhere to the same guidelines as those uploaded any other way. Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="138" contents="here" target="_new" /&gt; for those guidelines.<br><br>Keep in mind, your Match profile can have up to 26 photos. For photos with captions, the caption will be submitted for approval as well and will display with your photo if it is approved. Captions greater than 140 characters will not be imported.<br><br>Also, be aware that photos in Facebook albums that are set to be visible only to you cannot be imported.<br><br>Will my Facebook friends see that I'm on Match?<br>We understand that your privacy is important to you, so neither of the actions mentioned above will result in showing your Match profile to your Facebook friends or posting anything to your timeline without your knowledge. |
| 665 | Hidden Profile - Selective Visibility | Match now offers a paid feature called Private Mode that allows you to selectively hide or make your profile visible to specific members.  If Private Mode is available in your location, you will see the option when you access your Profile Settings screen. <br><br>Click &lt;rn:answer_xref target="_new" contents="here" answer_id="472" /&gt; for more information on hidden profiles. |
| 2262 | Mariah Carey's Profile | Mariah Carey debuted her profile on Match, along with the new video for her latest single Infinity. Members can access Mariah's Match profile, which her girlfriends helped set up, to learn more about what she's looking for in a potential match. The profile will provide links to her latest video and other promotional items throughout Mariah's time on the site. Please note, videos may only be viewed when accessing the full site. |

| Answer ID | Summary | Answer |
|---|---|---|

**659 Phishing Scam Emails**

We've become aware that some members are receiving emails asking for "confirmation" of their usernames and passwords. These are nothing more than phishing scams attempting to collect members' sign-in information. Remember, Match will never send emails asking for personal or account information, and certainly not for financial information.

Suspicious emails can be forwarded to customercare@support.match.com. Be sure to include the word "phishing" in the subject line. While we won't respond to each submission, we do thank you for letting us know when you see fraudulent emails like these. If you need a response, contact us here.

If you responded to a phishing email with your sign-in information, sign into your account immediately and change your password. Click &lt;rn:answer_xref answer_id="555" target="_new" contents="here" /&gt; for instructions.

If your sign-in information no longer works, contact us immediately.

Examples
The following are just a few examples of the phishing emails we've seen:

**1570 Guarantee - How it works**

*This subscription package is only available when subscribing via the mobile or full site.
We know you'll meet tons of great people during your 6-month subscription with us. But, if you don't find someone special during that time, we'll give you an ADDITIONAL 6-months free to continue your search.

The guarantee is included only on 6-month subscription packages and gives you access to all subscriber benefits. During your 6-month subscription, you must:

Create a truthful Match profile with a primary photo and keep it visible to the public 100% of the time during your 6-month subscription term.
Respond to or initiate email communication with at least 5-unique Match members each month through the Match service.
Comply with all of the Match Guarantee Program rules.

NOTE: A unique member is one which you have not previously emailed. A "Qualifying Email" must be an email sent through the Match service and does not include any other method of communicating (such as Match winks, matchPhone™, instant messages, or emails sent outside of the Match system.)

If you have not met someone special after six months and have followed all the program rules, you will qualify for the Guarantee extension at no additional expense to you.

If you did not meet all the program requirements to qualify for the Guarantee extension, your 6-month subscription will automatically renew like any other subscription, unless it is resigned before the renewal date.

You can track your progress during your 6-month subscription by viewing your Progress Page. For more information about the Progress Page, click &lt;rn:answer_xref title="here" target="_blank" contents="here" answer_id="513" /&gt;.

**515 Guarantee - Redeeming your free time**

During the last seven days of your initial 6-Month Guarantee subscription, you can go to the 6-Month Guarantee Progress page to answer a question related to your eligibility status and potentially redeem your free six months. If you qualify, your free time will be added. If you did not qualify, check your status section for red exclamation points, which will indicate the reason. If you're not eligible, your six-month subscription will automatically renew like any other subscription, unless it is resigned before the renewal date.

If you qualify for your free six months, you may still be billed for the renewal of any premium features that have been added to your subscription.

**2041 Guarantee - How it works**

*This subscription package is only available when subscribing via the mobile or full site.
We know you'll meet tons of great people during your 6-month subscription with us. But, if you don't find someone special during that time, we'll give you an ADDITIONAL 6-months free to continue your search.

The guarantee is included only on 6-month subscription packages and gives you access to all subscriber benefits. During your 6-month subscription, you must:

Create a truthful Match profile with a primary photo and keep it visible to the public 100% of the time during your 6-month subscription term.
Respond to or initiate email communication with at least 5-unique Match members each month through the Match service.
Comply with all of the Match Guarantee Program rules.

NOTE: A unique member is one which you have not previously emailed. A Qualifying Email must be an email sent through the Match service and does not include any other method of communicating (such as Match winks, matchPhone™, instant messages, or emails sent outside of the Match system.)

If you have not met someone special after six months and have followed all the program rules, you will qualify for the Guarantee extension at no additional expense to you.

If you did not meet all the program requirements to qualify for the Guarantee extension, your 6-month subscription will automatically renew like any other subscription, unless it is resigned before the renewal date.

You can track your progress during your 6-month subscription by viewing your Progress Page. For more information about the Progress Page, click &lt;rn:answer_xref title="here" target="_blank" contents="here" answer_id="513" /&gt;.

| Answer ID | Summary | Answer |
|---|---|---|
| 513 | Guarantee - Tracking your progress | The Match.com 6-Month Guarantee Progress Page will tell you whether you are meeting the requirements to redeem the Guarantee free time. You can get to this page from your home screen by clicking on 6 Month Guarantee on the left side of the screen (this link won't appear if you aren't currently on a 6-month subscription). |
| | | Red warning signs will indicate if you need to take action: for example, if you haven't initiated or responded to enough emails, kept your profile visible, or posted a primary photo. If you are meeting all the requirements, green check marks are displayed in both the current and previous month's sections. |
| | | If you have already received your free six months, the Progress Page will no longer be available to you. |
| 141 | Guarantee - Why there are requirements | Our Match Guarantee program is about helping you find someone special. Our requirements for this program are simply meant to walk you through the steps that our experience and statistics have found to be the most effective. If you follow these basic requirements, we guarantee that you'll find someone special, or we'll be happy to extend your time for another six months! |
| | | For official rules and details, you can access our program rules page. |
| | |   |
| 2244 | Forgot your password? | Can't get signed in? Having password confusion? No worries, we can help you get signed into your account within a few minutes. |
| | | Click the Forgot Password link and then enter your registered email address. After clicking the Send Email button, you will receive a password reset link. You will have 24 hours to update your password or you will need to complete the steps again. |
| | | Remember, your new password must be a combination of numbers, letters and special characters such as _ :) : / ]*!@ [ . Passwords must contain at least 2 characters, and no more than 16. |
| 24 | "Online Now" and "Active Within" Explanation | The "Online Now/Active Within" status field indicates how recently a member has used various Match services. This status field is updated under these circumstances: |
| | | The member has signed into Match |
| | | The member has accessed their Match.com by Mail messages in their registered email address |
| | | The member has sent or replied to Match.com messages from their registered email address |
| | | Generally speaking, if "Online Now" is indicated, the member has performed one of the actions above within the last hour. "Active Within" displays the time since the member has used one of the services in hours, days or weeks. |
| | | Since all of our members benefit from knowing how recently other members have been active on Match, we do not currently have a feature that enables you to turn this status field off. |
| | |   |
| 51 | Favorites - When Your Profile is Hidden | When your profile is hidden, you will no longer appear on other members' "Who's Favorited Me" lists until you unhide your profile. |
| | | If you add a member to your Favorites list while your profile is hidden, our system still registers that you have favorited them. While your profile is still hidden, you will not appear in their "Who's Favorited Me" list, but you will automatically show up there once you unhide your profile. |
| | | Click &lt;rn:answer_xref target="_new" contents="here" answer_id="537" /&gt; for more information on Favorites |
| 60 | matchPhone - Requirements | Adding matchPhone |
| | | In order to sign up for matchPhone and begin sending talk requests, you need to have an active account with a current paid subscription. And naturally, our members want to know a little bit about someone before they talk to them on the phone, so we currently require that you have a completed profile before you send a matchPhone request. |
| | | Receiving a matchPhone Request |
| | | In order to receive a request from a matchPhone user, all you need is a paid subscription. It isn't required that you pay extra in order to respond to a matchPhone request. But you will need the add-on to your subscription if you want to initiate any matchPhone conversations yourself. |
| | | Phone Requirements |
| | | Almost any phone line, mobile or otherwise, will work for matchPhone, as long as it has a Caller ID function. The exception is that some office lines cannot be used because the caller ID associated with them is the main office line, and matchPhone must be able to recognize your personal number in order to properly connect you. |
| | | SMS Requirements |
| | | To send and receive SMS messages through matchPhone, your registered phone number should be a mobile phone. We do not charge extra for SMS messaging, but your carrier's standard text-messaging rates apply. Contact your carrier for details on those rates. |
| | | Location Requirement |
| | | Currently, matchPhone is not available to Match.com members in Alaska, Hawaii, or Canada. |
| | | Click &lt;rn:answer_xref answer_id="527" contents="here" target="_self" /&gt; for more information about matchPhone |
| | | Click &lt;rn:answer_xref answer_id="670" contents="here" target="_self" /&gt; for instructions on how to sign up for matchPhone |

| Answer ID | Summary | Answer |
|---|---|---|
| 132 | Benefits of Having a Photo | In a nutshell, guys are 14 times more likely to look at a profile with a photo, and women are 8.5 times more likely to check out your profile if you have a photo. Additionally, members with photos get up to 15 times more attention than those without. You do the math!! &lt;rn:answer_xref style="TEXT-INDENT: 0in" contents="Add your photo today!" answer_id="532" /&gt; |
| 136 | Photo Not Showing Up in Search Results | Your photo may not appear in the search results if it is still pending approval, or it couldn't be approved. Visit your photos page to see if your photo is still pending. If your uploaded photo is no longer there, it couldn't be approved for use on the site. If it couldn't be approved you should have received an email with a more detailed explanation on why the photo wasn't approved. |

Please make sure the photos you submit follow these guidelines:

Your photo cannot contain any information that could potentially identify who you are (license plate, email or web address, phone number, etc).
Nude, obscene, sexual or otherwise offensive photos will not be posted.
Copyrighted material will not be posted.
Minors alone in photos (without an adult included) will not be approved.
Image files must be received in an approved format and should be less than 5 MB.
The ideal pixel dimensions should be at least 300 x 400. (To determine pixel dimensions and image format, right click on your photo and view the properties of the image.)
We accept the following image formats: jpg, bmp, gif, tiff, wmf, png, ico, emf, exif.  However, we convert all images to jpg to be viewed by all browsers. 

 Still have questions? See more photo dos and don'ts.

| 138 | Guidelines For Posting a Photo | Good photos can really make your profile stand out, so we strongly encourage you to post a number of them. However, we have to reserve the right to crop or reject photos as needed to keep a clean, attractive, and appropriate atmosphere on the site. Once your photos are approved they will appear on the site. |

Here are some things they'll have to reject for:

Nudity, sheer/see-through clothing, sexuality
Drawings, caricatures or other illustrations
Copyrighted images
Identifying information (ie: license plates, email or web addresses, visible street address numbers, etc.)
Illegal acts or violence
Minors alone in photos (without an adult included)

Also keep in mind the following:

You must appear in the primary photo
Potentially offensive photos will not be posted
Image files must be received in an approved format (jpg, bmp, gif) and should be larger than 100k and less than 5MB
The ideal pixel dimensions are at least 300 x 400. (To determine pixel dimensions and image format, right click on your photo and view the properties of the image.)

Guidelines For Captions:

No obscene, profane, or offensive words or statements 
No references to illegal activity
No captions that are merely gibberish

Still have questions? See more photo dos and don'ts.
 

| 139 | The Way Your Photos Appear | Your main photo is the most visible aspect of your profile, and it appears everywhere your profile displays, including in email messages, search results, and full profile views. |

Cropping
Because the actual display size of your primary photo in search results isn't very big, we display a smaller section of your photo in these screens that is meant to highlight your face. We don't do any stretching, squeezing, or color edits, though. Your full photo just-as-uploaded appears in your full profile view.

If you would like a photo cropped, you will need to do that before you upload it. For instructions on how to crop a photo, we suggest doing a search on the internet for "how to crop a photo." There are literally hundreds of applications and methods for cropping.

Display &amp; Rearranging
Up to 25 additional photos are shown on the "Photos" tab of your profile. They are also visible in a carousel view when members hover over your main photo. To rearrange the order of your photos, click on your primary photo thumbnail in the top navigation bar, click on Photos, and click Re-Order Photos. You can then click and drag the photos you see in the pop-up window. Click Apply Changes to save the new order.

Updating
If you don't like how a photo of yours appears on our site, we've made it really easy to &lt;rn:answer_xref title="delete or replace photos" answer_id="134" contents="delete or replace photos" target="_blank" /&gt;.

APP 637

| Answer ID | Summary | Answer |
|---|---|---|
| 147 | Favorites - Appearing with a different username | A member can make a change to their username at any time. When this happens, the member will continue to appear on your Favorites and other lists, but their profile will reflect the new username. |
| | | If you see a change in username that is accompanied by any kind of suspicious behavior (like a change in gender or a new profile photo with a different person in it), please let us know about it by clicking on the Report a Concern link on the member's profile. |
| | | Click &lt;:rn:answer_xref answer_id="537" contents="here" target="_new" /&gt; for more information on Favorites |
| 156 | Profile Completion Requirements | You can still do searches without a profile or completed profile; however, you need a completed and approved profile to appear in search results and for other members to find you.   |
| 184 | Daily Matches - The "They're Interested" List | Congratulations! These members saw you in their Daily Matches and expressed interest in you! Take a glance through this list of members. If you see someone who catches your attention, send an email. Since they are already interested, chances are good you'll get a great response. |
| | | I can't find it |
| | | In order for the "They're Interested" link to appear on the Daily Matches tab, another member will have to click on the check mark when your profile is presented to them through the Daily Matches. If you don't see this list, please don't let this discourage you from continuing to show interest in other members. We would also encourage you to continue to send a lot of first contact emails. Sometimes people can be a little shy about making the first contact. We will automatically send you an email notification when a member says "Yes" to your profile. |
| | | Email Notification |
| | | When you get an email saying that someone is interested in you from Daily Matches, it means that the member clicked the check mark to indicate that they are interested in you. They will appear in your "They're Interested" list on your Daily Matches tab. |
| | | Why can't I see who it was? |
| | | "They're Interested" is one of the benefits of a paid subscription. Subscribe to find out who's interested! |
| 207 | Email History | If you'd like to see who you've emailed in the last 180 days, there are a few of ways to go about it.  |
| | | The first is simply to click on Messages in the top navigation bar. There, you'll be able to access your "Inbox" and "Sent" folders to get a history of what has been sent and received. |
| | | Your second indication that you've recently emailed a member is on their profile, where, if there's been correspondence, the "Our History" tab will contain a list of all of your correspondence in the last 180 days.  |
| | | Also, members who you've exchanged email with will display on the &lt;:rn:answer_xref style="TEXT-INDENT: 0in" target="_top" contents="Connections" answer_id="596" /&gt; tab of your homepage. You can choose email connections in the "Show" dropdown menu to display only those members who have emailed you or whom you've sent emails to. |
| | | Emails Older Than 180 Days |
| | | Since email correspondence is only kept in Match records for 180 days, these methods won't work for correspondence older than that. For information on how to save copies of emails older than 180 days, click &lt;:rn:answer_xref target="_top" contents="here" answer_id="254" /&gt;. |
| | | Click &lt;:rn:answer_xref target="_new" contents="here" answer_id="564" /&gt; for more information about emailing on Match |
| 211 | When you are not interested | Every email you receive from another member includes a small Say "No, thanks" link at the bottom you can use to gently break it to them that you're not interested. We'll send them a message stating that they may not be the best fit for you. That way, the sender knows why you're not interested and can move on to other potential matches that are more suitable. |
| | | If you're looking for the Say "No, thanks" link, you can find it in emails sent from the member. It doesn't appear in emails you're sending out. The "No, Thanks" link is not available on &lt;:rn:answer_xref style="TEXT-INDENT: 0in" answer_id="2130" contents="Reply for Free" /&gt; emails. |
| | | Click &lt;:rn:answer_xref answer_id="564" contents="here" target="_new" /&gt; for more information about emailing on Match |

| Answer ID | Summary | Answer |
|---|---|---|
| 234 | Meeting Offline Advice | A first meeting with any new love interest can be exciting, and most first meetings are perfectly safe. But it's always smart to take basic precautions. Always trust your instincts, and be sure to keep the following guidelines in mind:<br><br>DO meet in public<br>ALWAYS arrange to rendezvous in a populated, public place. NEVER meet in a private home (or in a hotel room) or in a remote location.<br><br>DO tell a friend<br>Tell at least one friend or family member you are meeting, where you are going and when you expect to return. Let your date know the meeting is not a secret.<br><br>Tip: Contact your friend before and after the date or ask your friend to contact you at a predetermined time.<br><br>DO stay sober<br>Refrain from drinking excessively, as it could impair your ability to make good decisions and may put you at risk.<br><br>Tip: Stick to non-alcoholic drinks when meeting someone for the first time.<br><br>DON'T leave home without your mobile phone<br>If you have a mobile phone, take it with you on dates. Most cell phones can be used to call 911.<br><br>Tip: Make sure 911 services are available in your area. If not, know your emergency number.<br><br>DON'T ask the other person to pick you up<br>Get yourself to and from the date, even if you have to have a friend drive you or take a taxi.<br><br>DON'T leave personal belongings (purses, wallets) or drinks unattended<br>Don't risk having your personal information stolen. The same goes for your drink — don't risk having it tampered with.<br><br>Tip: If you must leave your drink unattended to go to the restroom, order another when you return.<br><br>DON'T succumb to the temptation to take first dates to your home (or to go to his/her home)<br>Stay in a public place, even if you are pressured. If you feel pressured, end the meeting and leave at once. |
| 240 | Must Be Visible to Wink | You must have a visible profile before you send a wink to someone in order for the recipient of the wink to know who is flirting with them. They can't return the interest if they can't see who is winking at them!<br>  |
| 245 | "No Thanks" versus Block from Search | Block from Search. which appears on every profile page, removes the person from appearing in your searches, but does not communicate to the sender that you are not interested. Say "No, Thanks" is a link that appears on all emails you receive on the Match site. If you click on it, it sends a brief "not interested" response to the sender, but does not necessarily remove them from searches. Please note that this link is not included on notification emails for winks, likes, etc. If you'd like the sender of an email to no longer appear on your Connections page, click on the x next to their profile to remove them.<br><br>  |
| 250 | matchPhone - Changing Your Phone Number | *This feature is not available to members outside of English-speaking North America<br>You can change your matchPhone phone number at any time, and it won't disrupt your current connections. For example, if you're expecting a call from someone you're particularly interested in, you may choose to direct matchPhone to your home number in the morning, to your work number during the day, and to a friend's landline in the evening. Just be certain to change the number listed prior to each phone call.<br><br>To change the phone number associated with matchPhone:<br><br>Click on the gear icon in the top navigation bar<br>Click on the matchPhone link<br>Enter or edit the phone number where you would like to receive calls and follow the verification steps<br><br><br>Click &lt;rn:answer_xref target="_self" contents="here" answer_id="527" /&gt; for more information about matchPhone |

| Answer ID | Summary | Answer |
|---|---|---|
| 254 | Organizing, Saving, and Recovering Emails | Your FoldersYour Match emails fall into three different categories: those you've received, sent, or deleted (trash). To access any of these folders directly, just click on them. When you open a new, unread email, you'll be able to reply to it or delete it. Your replies appear in the "Sent" folder. If you delete an email and want to restore it, open the "Trash" folder, click on the email and click on Restore Email. However, emails between you both will be available in Our History on the member's profile for up to 180 days if not deleted sooner. |

All emails, regardless of which folder they are in, expire after 180 days and will no longer appear.
You also have the option to save a screenshot of the emails by clicking "ctrl" and "prtscrn" on your computer and pasting the image into a word processor or program like MSPaint. Some smartphones may also have an option that allows you to save screenshots, so please check with your phone service provider for instructions on using this feature if available.

Recovering Email
Unfortunately, emails that have already been deleted from our site because they are more than 180 days old are unrecoverable.

**There is no way to "unsend," recall, or retract an email once it is sent.

Click &lt;rn:answer_xref target="_self" contents="here" answer_id="207" /&gt; for tips on how to review your history with a specific member
Click &lt;rn:answer_xref target="_self" contents="here" answer_id="564" /&gt; for more information about emailing on Match  

| 260 | Subscription Was Automatically Renewed | So you're happily emailing along with someone you're discovering to be a really great match, when, without warning, your subscription expires! No one wants that. Uninterrupted access to the millions of potential matches on Match is very important to our subscribers; therefore, all subscriptions paid by credit card, debit card,  or PayPal (*PayPal is not available outside of English -speaking North America) are automatically renewed at the end of the subscription period. And, as a bonus, if this year's rate is higher than what you're currently paying, auto-renewal keeps you at the rate you signed up with (sorry, special promotional rates don't carry over past the first subscription period). |

For information on turning off auto-renewal, click &lt;rn:answer_xref title="here" answer_id="591" contents="here" target="_blank" /&gt;.

Hopefully, auto-renewal doesn't come as a surprise. It's in our "Terms of Use" document (under the Automatic Renewal heading) that each subscriber agrees to. But we also try to make sure it's clear during the subscription process, even if you don't take the time with the legal documents.

| 310 | Quick Search - Explained | On Match, searching can be as simple or customized as you want to make it. If you're looking for speed and convenience, there's no better tool than Quick Search. Quick Search appears on the right side of your home page and allows you to quickly enter some general criteria and have your results within seconds. |

Keep in mind that for the criteria not visible in the Quick Search box, your search will default to the settings used in your most recent search. You can change these settings by clicking the Custom Search tab to access the Search page.
 

| 318 | Searching for a Specific Member | Username Search allows you to search for members by using their Match username.  To complete a search by username: |

Go to the Search page by clicking the Search link
Enter the username of the member that you're looking for under the Username Search heading
Click on Search

If Username Search isn't finding the member you're searching for, it's possible that they've changed their username. You can perform a &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_new" contents="custom search" answer_id="301" /&gt; based on the information you know. Otherwise, they've probably hidden their profile or cancelled their account. Either way, our privacy policies prevent us from revealing anything about their situation or contacting them on your behalf.

| 323 | Searching on Match | Custom search enables you to find members who meet your criteria. When you open the search page, your search will default to the preferences you've specified in your profile. If you want to be more specific, you can &lt;rn:answer_xref title="customize" answer_id="301" contents="customize" target="_parent" /&gt; your search by editing the age and location and by adding attributes for appearance, interests, background/values, lifestyle, keywords and interests. |

Also, check out our Search page, where you can perform:

&lt;rn:answer_xref title="Mutual Match" answer_id="550" contents="Mutual Match" target="_parent" /&gt; search
&lt;rn:answer_xref title="Reverse Match" answer_id="551" contents="Reverse Match" target="_parent" /&gt; search
Search for members who are currently &lt;rn:answer_xref title="Online" answer_id="302" contents="Online" target="_parent" /&gt; or available to chat
&lt;rn:answer_xref title="Saved Searches" answer_id="552" contents="Saved Searches" target="_parent" /&gt; 
Search for specific &lt;rn:answer_xref title="usernames" answer_id="318" contents="usernames" target="_parent" /&gt;

Play around and try a variety of searches. You never know where you'll find your perfect match! 

| Answer ID | Summary | Answer |
|---|---|---|
| 326 | Recommended Browsers | We recommend accessing Match from any of the following browsers. Click on the links for instructions on how to upgrade your browser.<br><br>Windows-based computers:<br><br>Internet Explorer 10 <br>Firefox <br>Chrome <br><br>Mac OS X computers:<br><br>Safari 6   |
| 336 | Username Cannot Match Email Address | Your username is a word or phrase that you select. Your username should not in any way make it possible to contact you outside the Match community, which is why it cannot be your email address. This ensures that your anonymity is protected until you decide to reveal it. You will log into Match with your registered email address and password. |
| 354 | Highlighted Profile - Green | A great way for existing members to draw extra attention is by using our Highlighted Profile add-on feature. This feature puts a green highlight around a member's profile and primary photo to make them more prominent in search results.<br><br>For more information about highlighting your profile, sign in to your account on the full website and:<br><br>Click on the gear icon in the top navigation bar <br>Click on Subscription Status<br>Click on Subscribe to additional Match Services<br><br>To add a highlighted profile, you must first be an active Match subscriber. You can also choose to include this feature when you subscribe to a new package. |
| 378 | Stopping IMs from a Subscriber | You have a couple of choices:<br><br>You can turn your IM presence off for everyone. To do so, hover over the gear icon in the top navigation bar, click on Settings and then choose Instant Messenger, and set "IM is:" to "Off." You will then want to click on Go to save your changes. With your IM presence off, you can still initiate IMs, but other members won't be able to initiate them with you.<br>For the member in question, you can click the Block Contact link that appears both on the IM window and on their profile. This will block all kinds of contact from that particular member, but you'll still be able to send and receive IMs with others. Please note that you will have to log out and sign in to Match again for your communication block to take effect. If you change your mind later, you can always unblock them. Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="221" contents="here" target="_new" /&gt; for more information. |
| 395 | Sign In Information No Longer Works | If we're not recognizing the email address and password you're entering, there are a couple of possibilities as to what might be going on:<br><br>You might be entering the wrong email address or password. At least it doesn't hurt to check. Go to the Forgot Password page and enter the email address you've associated with your Match account, and we'll immediately send you information on how to reset your password. If your email address isn't recognized, check any other addresses you have to make sure your account hasn't been associated with one of those.<br>We may need to get involved to help you resolve the situation. &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_new" contents="Contact us" answer_id="421" /&gt;, and we'll see what we can figure out. To help us locate your account, make sure to include in your message your full name, email address, username, and Zip code, along with a description of what happens when you try to sign in, including any error messages. |
| 398 | IM Now - Chat | If you have Instant Messaging enabled on your account, you're not just "Online Now" when you're signed in, you're available to chat! That's why when potential matches conduct a search and see your profile come up, we replace the normal "Online Now" text with a link to "IM Now!"<br><br>If you do not want your status to be shown as "IM Now" you can easily disable your IM feature by following these steps while signed into your account:<br><br>1. Click the gear icon in the top navigation bar<br>2. Click on Instant Messenger<br>3. Select the "Off" option under "Turn On/Off Instant Messaging"<br>4. Click on Go<br><br>"IM Now" is in black<br>This text appears in black, with no link to send an IM, usually when the person is in the process of closing their screen and becoming unavailable just as our search system checks their status. You can verify that this is the case by opening the member's profile and seeing that they are not currently available.<br>  |

sent a mail to check latest brower versions

| Answer ID | Summary | Answer |
|---|---|---|
| | 407 Profile Unavailable | A member's profile is unavailable<br>If you click on another member's profile and receive a message that the profile is unavailable, it is usually because they have chosen to take a break to pursue a relationship, or for other reasons have chosen to hide their profile.<br><br>Occasionally members are removed suddenly due to security violations that result in their removal from the site. Unfortunately, the member may have an opportunity to send a few winks or messages out first, but we've gotten better at catching these situations very quickly.<br><br>Did they block me?No. If someone decides you just aren't their type, they have the option to remove your profile from appearing in their searches or even block you from contacting them, but these actions don't stop their profile from appearing.<br><br>My profile isn't available<br>If it appears that your own profile is not appearing, please click on this &lt;rn:answer_xref title="link" target="_blank" contents="link" answer_id="579" /&gt;. |
| | 409 Billing all at once | All Match subscription packages are billed as one charge for the entire amount of the package. You may notice that the monthly rate is shown for comparison. To see the full amount that will be billed, please see the "Review Your Subscription" section on the payment screen.<br>We do offer a one month subscription package if you want to only pay month-to-month. However, for the best deal, our 3- and 6-month packages are at a much lower monthly rate than paying month-to-month.<br>To see our current subscription rates and packages simply click the "Subscribe" button in the top navigation bar on any Match web page. |
| | 480 Username Requirements | A username is a required component of your profile. It's a word or phrase that you select that will be visible to other users as a form of identification on the site.<br><br>Your username must meet the following guidelines for approval:<br><br>Must be in English or Spanish<br>Cannot contain more than nine numbers<br>Can only contain letters, numbers or the "underscore" character<br>Do not include detailed personal information (i.e.: street address, contact information, date of birth, etc.) to help protect your online anonymity<br>Do not include any language which could be considered defamatory or offensive in any way (i.e.: sexually explicit, promotes racism, references to inflicting bodily harm to yourself or others, etc.)<br><br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_new" contents="here" answer_id="555" /&gt; for instructions on how to update your username. |
| | 494 Reactivating an Account | If you attempt to sign in after your account has been canceled, you will be taken to a screen that asks if you would like to reactivate your account. Reactivating will simply give you access to your free membership benefits and will not cause your account to be charged. In the reactivation screen, you are able to choose whether you would like your profile to become visible on the site again or remain hidden from view. |
| | 501 Daily Matches and Your Stated Preferences | The whole concept behind Daily Matches is that it's behavior-based rather than sticking strictly to your stated preferences. That's what makes them so exciting! While our Mutual Match feature relies heavily on the preferences you indicate in your profile, our Daily Matches algorithm learns with each new set of matches you rate.<br><br>Sometimes this does result in selections that don't strictly match your stated preferences, but the best way to improve those results is to consistently rate each new round you receive. This should help our system learn over time what kind of matches your prefer.<br><br>Remember, you must rate your Daily Matches each day in order to receive new and different Daily Matches the next day.<br><br>The Daily Matches do take some of your preferences into account:<br><br>They follow your preferences of: smoking, drinking, faith, ethnicity, and if your match has kids<br>They use a slightly broadened range for your age, height, and distance preferences<br><br>You'll get new Daily Matches around 23 hours after rating your last set of Daily Matches. Click &lt;rn:answer_xref target="_top" contents="here" answer_id="529" /&gt; for more information on our Daily Matches process. |

APP 642

| Answer ID | Summary | Answer |
|---|---|---|

**537** Favorites - Explained

Your Favorites are the names and profiles of up to 200 of the members you like most. We intend your "My Favorites" list to be an easy reference from which you can quickly locate and contact the members you don't want to lose track of. Remember, if you already have 200 saved but want to add a new Favorite, you'll need to remove a match to open up a place on your list. Favorites will be automatically removed from your list 180 days after you add them, so be sure to communicate with potential matches on your list before then if you are still interested in them.
The ability to add Favorites is a free benefit for all members.

To find your list of Favorites, hover over the Connections menu at the top of the screen and click My Favorites in the drop-down menu.

For more information about Favorites, click on one of the links below:

Click &lt;rn:answer_xref answer_id="667" contents="here" target="_new" /&gt; for information on adding and deleting Favorites
Click &lt;rn:answer_xref answer_id="666" contents="here" target="_new" /&gt; for information on what happens when one of your Favorites hides their profile 
Click &lt;rn:answer_xref answer_id="51" contents="here" target="_new" /&gt; for information on what happens with Favorites and Favoriting when your profile is hidden 
Click &lt;rn:answer_xref answer_id="147" contents="here" target="_new" /&gt; for an explanation of why a Favorite's username or other information might suddenly change
Click &lt;rn:answer_xref answer_id="669" contents="here" target="_new" /&gt; for information about our "Who's Favorited Me" tool

**544** Winks - Explained

What is a wink?
A wink is a casual flirtation on Match. It is a simple way for another member to "break the ice" and let you know that they liked your profile. Once you've posted your free profile, you can wink at members you like by clicking on either the Wink for Free button on their profiles or the winking-face icon on their thumbnail profiles in various areas of the site. All members, regardless of subscription status, can send a wink, as long as their profile is visible. 

How does it work?
Each time someone winks at you, we send you a message to let you know. If there's some mutual interest, you might want to wink back. Next step? Send an email!

You can wink up to 50 different members each day (or every 24 hours), but you can only wink at each user once during a 30-day timeframe. We don't limit the number of people who can wink at you. Once you send a wink you can't "unwink" or retract it.

Managing your winks
To find the list of your winks from the last 180 days, visit your Home page and click on Winks on the left side of the page. Only the last 200 winks will appear.

If you don't want to receive winks, you can turn off the notifications you receive in your email, although there's currently no feature to stop receiving winks altogether. To turn off notifications, adjust your preferences on the Email Preferences page. To get there, just click on the gear icon in the top menu bar, and click Email Preferences on the screen that appears.

 

**547** Match.com by Mail - Explained

What is it?
With Match.com by Mail, we do all the work for you. Instead of making you sign in to find matches, we'll send them directly to your email inbox!

How it Works
Once your profile is complete (and unless you opt out), we'll begin sending your Mutual Matches right to the email address you registered with. You let us know how often. Match.com by Mail is available weekly, every 3 days, or daily. You can update your settings in the Match.com by Mail section of your Email Preferences.

Adding Custom Searches
At any time, you can easily add custom searches to the matches we send you. To do this, just go through the usual steps to perform a custom search. Once your search preferences are set, click on the Save Search link. In the options box that pops up, give the search a name, check the box for "E-mail me my matches," and click on Save Search.

My Results Don't Match My Preferences!
Sorry about that. The idea is that we want to send you a fresh set of matches in every email. These are usually your Mutual Matches. But depending on how broad/narrow your preferences are and how often we send your matches to you, we may not always have new Mutual Matches for you each time. When this happens, our systems automatically broaden some of the criteria, such as location or age, and send you matches as close as possible to your preferences under the heading "Members We Selected for You" (since they're not technically "matches").

I'm Not Receiving My Matches!
You might want to visit your Email Preferences page under Account Settings and make sure you've selected how often you want to receive your matches. If that doesn't fix the problem, it also might help to check your email provider to ensure they don't block messages sent to you by Match or its members.

Opting Out
If you don't want to receive Match.com by Mail, you can update your preferences in the Match.com by Mail section of your Email Preferences page.

| Answer ID | Summary | Answer |
|---|---|---|

**550**  Mutual Matches - Explained

**What are Mutual Matches?**
Mutual Match is one of the best ways we have of pairing you up with other members we think you might be interested in. This feature sifts through our impressive database of members (we are the largest dating site out there) to identify those who not only match your criteria, but whose criteria also look an awful lot like you! 

**Where can I find them?**
To find your Mutual Matches, just go to the Search page and click on Mutual Match. If you have asked for matches to be sent to your personal email address, Mutual Matches can also be found in those messages. Depending on how broad/narrow your preferences are and how often we send your matches to you, we may not always have new Mutual Matches each time we email you.

**Percent Match**
Your matches, whether in your Mutual Matches, in Match.com by Mail, or in Custom Search results, display a percent value that represents how well you match with the member in question based on our Mutual Match algorithm. It's the same percentage value the member sees if they view your profile. Search results that aren't a high value match don't include this value.

**I'm getting too many/too few matches**
Mutual Match is based on your profile, so try to strike the right balance in how you define your ideal date. If your criteria is too narrow, you may not get as many results as you'd like. If it's too broad, you'll get some matches that don't quite pique your interest. We suggest that you edit your profile as needed to find your happy medium.  After you make changes, your Mutual Matches page will update the next time you sign in. 

**552**  Saved Search - Explained

**About Saved Searches**
If you like the results you get in a search, we recommend saving the search to perform again later. With thousands of new members joining each day, we think you'll find the ability to perform the same search again and again to be a handy feature.

**How to Save a Search**
Saving a search is easy. Simply click on the "Save Search" link from the Custom Search page after you've entered your desired criteria. You can even have these matches sent to you through Match.com by Mail by checking the box for "E-mail me my matches" when you name your search. You can have up to three saved searches sent to you through Match.com by Mail.

**Performing a Saved Search**
If you have previously created a Saved Search, you can perform a search using that criteria at any time. From the Search page, simply locate the Saved searches box above your results and use the dropdown menu to select the search you'd like to perform. This dropdown also appears in the Saved Searches box on the home page.

**Managing Saved Searches**
You may have up to 25 saved searches at any given time. If you need to make changes, you can edit or delete your saved searches. Just choose "edit" in the Saved searches menu on the Search page. You can edit which of your saved searches are sent to your inbox by accessing the Match.com by Mail section of your Email Preferences page.

**555**  Changing Username, Password, Email Address, etc.

You can update the following information any time by accessing the Sign Up Information page under your Account Settings (the gear icon). You will be prompted to re-enter your birth date and current password for verification.

Username
Password
Email
Gender
Birthdate (we use your birthdate to figure out the age your profile displays)
Location (City, State, Zip Code)
Gender Seeking

Updating your location in this area will only change the location displayed on your profile. If you would like to update your profile and the location of the matches we send you, please click here.

To locate and edit information on the list above, simply follow these steps:

Sign in with your email address and password
Click on the gear icon link on the navigation bar at the top of the screen
Click on Sign Up Information (for your protection you may be required to re-enter your password)
Click on the Change Sign-up Info button
Make your updates and click on Continue

**Trouble Updating an Email Address**
When updating your account information, remember that an email address can only be associated with one Match account. If your new email address is not being accepted, it may be linked to an account you set up in the past. Click on this link and enter the email address in question, and we'll send you information about this account.

**Trouble With Password**
If you are having trouble signing in, please click here.

**Changing Your Username**
When you update your username, all of the members you have contacted or maintain connections with will be provided with your updated username. When past emails or connections are reviewed, the new username will appear.

For clarification purposes, you may need to remind certain members of your old username if you have not been in contact in a while. However, if your profile and photos are still the same, most

| Answer ID | Summary | Answer |
|---|---|---|
| 564 | Emailing on Match | Email is the heart and soul of how people connect on Match. We work on the back-end to match you with others every way we can think of, but nothing happens until someone sends an email! |

Since email is so central to the service we provide on Match, there are many facets to it. Click on any of the links below to learn more about how it works, or to get your questions answered.

General Explanations:

Click &lt;rn:answer_xref answer_id="277" contents="here" target="_new" /&gt; to learn how you can read emails you receive
Click &lt;rn:answer_xref answer_id="399" contents="here" target="_new" /&gt; for instructions on how to send email on Match
Click &lt;rn:answer_xref answer_id="11" contents="here" /&gt; for information about Email Read Notification
Click &lt;rn:answer_xref answer_id="254" contents="here" target="_new" /&gt; for information on saving, organizing, and recovering your emails
Click &lt;rn:answer_xref answer_id="23" contents="here" /&gt; for helpful emailing tips
Click &lt;rn:answer_xref answer_id="211" contents="here" target="_new" /&gt; for information about our polite "No, Thanks" function

More information and troubleshooting:

Click &lt;rn:answer_xref answer_id="621" contents="here" target="_new" /&gt; for instructions on sending and receiving messages right from your personal email address
Click &lt;rn:answer_xref answer_id="646" contents="here" target="_new" /&gt; if you are not receiving email responses
Click &lt;rn:answer_xref answer_id="272" contents="here" target="_new" /&gt; if you are not receiving email copies and notifications at your personal email account
Click &lt;rn:answer_xref answer_id="643" contents="here" target="_new" /&gt; for why your email address may be stripped out of emails you send
Click &lt;rn:answer_xref answer_id="511" contents="here" target="_new" /&gt; for instructions on how to send an attachment
Click &lt;rn:answer_xref answer_id="644" contents="here" target="_new" /&gt; if you feel you have received fake winks or emails

| 571 | Success Stories | Success happens every day on Match, so we've set up a site where successful members can post their stories. In addition to providing a venue where these people can share the happiness they've found, this is a great place for current members to go for advice and encouragement. |

If you have had a Match success story you would like to share, click here to sign in with your email address and password: then start sharing your success story. Signing in tells us who you are, which means there is less information we'll need to ask you for.

Your success story will be posted on the Match success site. If you choose to allow your story to be used for promotional purposes, we may feature parts of your story on the Match dating site, on our affiliate sites, in promotional email messages, or other promotions.

We currently only allow one photo to be featured.

To update or remove your story, please contact us for assistance.

| 637 | What's New Newsfeed - Explained | On the home page of your Match account, you'll find a tab labeled What's New. This tab is meant to give you a quick newsfeed view of the most recent activities on your account. Items that appear on your What's New tab include: |

New Emails, Winks, Likes and matchPhone call requests
Notifications that your profile has been viewed, when you have favorited other members, and when members make you a Favorite
Messages that your Favorites have updated their profiles and that your profile and photo updates have been approved

If you have more that 15 items in your newsfeed, you can click Load More to load previous items.

If I view someone's profile more than once, do I appear multiple times on their newsfeed?
No, a view from you will only appear once on their newsfeed. What does happen is that if you view the member's profile again, the notification that you've viewed their profile will jump to the top of the newsfeed.

| 987 | Cannot Edit Profile | If you are having trouble editing your profile, there are a variety of possible explanations: |

Your profile is appearing normally for everyone else, and will appear normally for you once you refresh your system cookies
Your profile is hidden
You haven't completed your profile
You tried to complete your profile, but took more than 45 minutes on a screen and experienced a session time-out
You tried to complete your profile, but it was not approved

Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="579" contents="here" target="_new" /&gt; for more explanation of each of the scenarios above.

| Answer ID | Summary | Answer | |
|---|---|---|---|
| 1030 | Filming a First Date | If you've seen Match ad spots on TV lately, you know that our members will sometimes let us record their first dates, which allows us to share the fun and excitement of those dates as part of our commercials.<br><br>To set up these dates, we periodically contact some of our members to find a few who would be interested in having us do some filming. If you receive a message from our marketing department, simply reply to it with the requested information if you are interested.<br><br>In addition to asking for a recent photo of you, the email will request your full name and phone number since members don't provide this information as part of the registration process. We will not ask for your username, and no Match representative will ever ask you for your password. We will certainly not ask you for any financial information. Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_parent" contents="here" answer_id="659" /&gt; for information on spotting phishing scams.<br><br>If you'd like to participate in this program, be sure you've opted in for our Member Spotlight program. Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_parent" contents="here" answer_id="556" /&gt; for more information and instructions.<br><br>Unfortunately, with a membership community as large as ours, we only have a small number of opportunities. | I don't think this is still needed. |
| 1097 | Reactivating or Returning to Match | We're glad to have you back on the site!<br><br>Although you may have canceled your account, it is likely still available to you, and the email address attached to it won't be available for use on a new account.<br><br>The easiest course of action would be to simply sign in and update your information.<br><br>Reactivating<br>Depending on how your account was closed, you may be taken to a screen that asks if you would like to reactivate your account. Reactivating will simply give you access to your free membership benefits and will not cause your account to be charged. In the reactivation screen, you are able to choose whether you would like your profile to become visible on the site again or remain hidden from view.<br><br>Updating your profile<br>Once you've logged in, click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_self" contents="here" answer_id="946" /&gt; for instructions on how to update your profile. Please keep in mind that editing the text portion of your profile will automatically make it visible on our site.<br><br>Unhiding your profile<br>Once your profile is up-to-date, you're ready to go public again. Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_self" contents="here" answer_id="662" /&gt; for instructions on how to unhide your profile.<br><br>Can't Remember Login<br>If you have forgotten your password, click here and we will send the reset password link to you personal email.<br><br>Can't Sign In<br>If you receive your password by email but are still unable to sign in, click &lt;rn:answer_xref style="TEXT-INDENT: 0in" target="_self" contents="here" answer_id="420" /&gt; for some possible solutions. | |
| 1122 | Changing a Primary Photo | If you'd like to replace your current primary photo, simply click on your primary photo thumbnail in the top navigation bar of the full website, and click on Photos. In the screen that comes up, photos that can be designated as your primary photo will have a Make this my Primary Photo button below them. Click the button to designate the photo as primary. If a photo does have an Additional photo only indicator, it has been approved for use as a secondary photo only. | |
| 1131 | Emails and Notifications - Turning Off | At any time you can change the frequency in which you receive emails from Match for the following types of mailings:<br><br>Match.com by Mail<br>Special Offers and Promotions from Match<br>Additional Services and Offers from our Partners<br>Who liked your photos?<br>Who winked at you today?<br>Who made you a favorite?<br><br>These settings aren't located on the Match Android app, but you can adjust your email preferences when you access the full site.<br>From your computer:<br><br>Sign into your Match account<br>Click the Account link<br>Select Email Preferences | |
| 1250 | New Profile Design - Overview | We've updated our site to provide an enhanced profile experience for our members. These features are designed to improve the layout and usability of profiles on the site. They improve the way your profile looks and make it easier to both edit your profile, and add or edit your photos.<br><br>Click &lt;rn:answer_xref target="_new" contents="here" answer_id="1252" /&gt; for more information about the new process for editing your profile<br>Click &lt;rn:answer_xref target="_new" contents="here" answer_id="1253" /&gt; for more information about the new process for adding/editing your photos<br><br> <br>Members can have up to 26 photos on their profile and have the ability to add captions to their photos. | this can be removed |

| Answer ID | Summary | Answer |
|---|---|---|
| 1777 | LivingSocial Deal |  <br><br>If you've purchased the LivingSocial deal for a 1-month subscription, instructions for redeeming the deal will appear on your voucher. To access your voucher, log in to LivingSocial and click the My Vouchers link in the top right corner. Your Match voucher will include a link to a special site just for you. Once there, you will be instructed to login or create your Match account. Please know that to redeem this offer, you will need to follow these steps from a personal computer rather than the Match app.<br><br>We ask that you provide a debit or credit card when you redeem your LivingSocial deal. Don't worry: we will not charge your card at that time, but depending on your financial institution, you may see a $1.00 pending charge from Match. This is just an authorization charge, and it will disappear within 3 days. To avoid an interruption in service, your subscription will be automatically renewed at the end of your first month. |
| 1834 | What is Top Spot? | Top Spot helps you stand out from the crowd so your profile gets more views! Your Top Spot purchase moves your profile to the top 6 search results when members run a search for someone like you.<br><br>You will see a Top Spot option when you hover over your primary photo tumbnail at the top of your screen. Select this link, and you will be guided through the steps to complete your purchase. Each Top Spot purchase begins as soon as your payment is confirmed.<br>During your session, you'll see a Top Spot Dashboard just below your Main Menu on the site. This will count down the time remaining in your session and show you photos of members who have seen you featured in their search results. You'll also receive an activity summary via email once your session has expired. The summary displays the number of times your profile appeared in searches and shows some of the matches who saw you.<br>You will not be able to make additional Top Spot purchases while you are in an active session. However, there is no limit on the number of Top Spot purchases you can make. Just wait until your current session has expired before placing another order.<br><br>Please Note: You will not see yourself in search results if you run a search with criteria matching your profile settings. This is because we never show you your own profile as a match. But don't worry: your Top Spot purchase ensures that other members running the search are seeing you at the top of their results! |
| 1865 | Adding Communities to Your Profile | To add Community badges to your profile, you must complete the following steps:<br>1. Log into the Match site and hover over your primary photo thumbnail in the upper right corner of your screen<br>2. Select View/Edit from the drop down menu<br>3. Scroll to the bottom of the screen and locate Communities<br>4. Click the pencil icon and Community you would like to add<br>5. A drop-down menu featuring the badge displays, click the checkbox to add the Community<br>6. Once you've added badges for all the Communities you would like to display, click Apply to save your selections |
| 1884 | Undercover - Explained | Undercover allows you to view and Favorite profiles for 24 hours without your matches being notified.<br><br>When you're ready to go Undercover, click the Go Undercover button on the Home and Search screens, or select Undercover from your profile main menu. The next screen will walk you through the steps to complete your purchase. The prices and times can vary slightly, so please check to see what promotions are available today.<br><br>Once you've successfully purchased Undercover, you'll receive a confirmation message, along with a confirmation email, to your registered email address. A black bar will display at the top of every page during your session to show the time remaining.<br>When you Favorite a match during your Undercover session, the Favorite icon will turn and remain black. If you want to let your match know you've made them a Favorite, you'll need to Favorite them again once your session has expired. This will turn the icon from black to green, and it could lead your match to make the next move.<br><br>Please note you will not show up on the Who's Viewed Me list of anyone you view while Undercover. But if you decide you do want a potential match to know you've viewed their profile, you'll need to look at it again once your session has expired. |
| 1930 | Currently Subscribed In-App Purchase Error | *This answer only applies to members purchasing a subscription through our iPhone app with an iTunes login<br>If you're seeing an error stating, "You're currently subscribed to this," when trying to subscribe through the iPhone app, you may have already purchased a subscription via your iTunes login and your mobile device. If you have a second Match account, you can log into the app using that information and verify your billing in iTunes to complete your purchase.<br><br>If you do not have another Match account, we suggest you contact Apple: http://www.apple.com/support/itunes |
| 2260 | Marriage Equality | Communities are a great way to show other members your interests and to quickly see if you and a potential match have any interests in common.<br>For the last 20 years, Match has been committed to helping people -- all people -- find love. The addition of the marriage equality badge to Match further demonstrates Match's support of marriage equality. If a Match member would also like to show their support for the cause, they can add the marriage equality badge to their own profile in the profile edit portion of the site, as well as search for other singles that have added the badge.<br><br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="1865" contents="here" /&gt; for instructions on adding community badges<br>Click &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="1866" contents="here" /&gt; for instructions on removing community badges |

found typo, already corrected it on-site

| Answer ID | Summary | Answer |
|---|---|---|

**403**  Gift Subscriptions

*This feature is not available to members outside of English-speaking North America

If you'd like to purchase a gift subscription, please contact one of our Customer Support Specialists at 1-888-838-9045.  We are available 8 a.m. to 5 p.m. Central time, Monday through Friday, and are happy to assist. Gift subscriptions last for three months and do not auto-renew.

The receiver of a gift subscription can redeem it at the following link:  http://www.match.com/gsub/redeem.aspx.

If the receiver already has a registered email address and password on Match, the gift subscription may be applied to their current account.  

If the receiver already has a paid subscription, the current subscription needs to be resigned to prevent it from auto-renewing (benefits will still continue through the end of the paid subscription). The gift subscription can then be stacked on top of the current one, essentially adding three months to the time the receiver was already enjoying.

To continue with subscriber benefits after the gift subscription expires, the receiver will need to re-subscribe.
 

 
 

**529**  Daily Matches - Explained

Our Daily Matches feature uses a unique set of algorithms to provide a quick and easy way for you to review qualified matches based loosely on your preferences and on your ratings of the matches we send you. All you have to do is check them every day and let us know if they sparked your interest. We'll send an introduction email to the matches you're interested in, letting them know they caught your attention. If none of your matches pique your interest, that's okay, too. We'll learn from your choices and continue to serve you better daily matches. You can access your Daily Matches through the link on the top navigation bar.

In order to receive new Daily Matches you must rate the Daily Matches you receive each day.

Daily Matches are only available for viewing if your profile is visible.

See the following list if you have more questions about the Daily Matches:

Click &lt;rn:answer_xref answer_id="528" contents="here" target="_parent" /&gt; for Rating my Daily Matches
Click &lt;rn:answer_xref answer_id="647" contents="here" target="_parent" /&gt; for I'm not receiving my Daily Matches.
Click &lt;rn:answer_xref answer_id="501" contents="here" target="_parent" /&gt; if you're concerned about the quality of your matches.
Click &lt;rn:answer_xref answer_id="524" contents="here" target="_parent" /&gt; for When I receive a match, do they receive me, too?

**964**  How to Sign Out

To sign out of your Match account, simply move your cursor over the gear icon in the top navigation bar, and click on Sign Out in the dropdown menu that appears.
If you are using a shared or public computer (example: At the Library, at a school, or public computer anywhere) we always suggest clearing the cookies on the computer you have used before walking away. &lt;rn:answer_xref title="Click here to learn how to clear the cookies" answer_id="49" contents="Click here to learn how to clear the cookies" target="_new" /&gt;.

**1268**  Photo approved as secondary-only

For a number of good reasons, we ask that your Primary photo include a good, unobscured shot of your face that's big enough for potential matches to see you clearly.

If your photo is perfectly fine in every other way, we simply approve it as a secondary, or additional, photo.  These photos can be seen in your profile view, but can't be set as the main photo that appears in search results.
 

* Always check the members photos within the CSA to validate if could be a primary or primary capable photo. There are times when the photo has been set to secondary in error.

**1864**  Communities - Explained

Communities are a great way to show other members your interests and to quickly see if you and a potential match have any interests in common.

Community badges will appear at the bottom of the profile for members who have selected them. Hover over the badge to display its description. If you and your potential match are in the same Community, the In Common indicator will display. Subscribers will see a text box to send a note about your shared interests. You'll see an option to add the badge to your profile under any additional badges, which makes it easy to join the Community if it applies to you.

Because this is a new feature, we currently only offer Communities for the American Heart Association, Major League Baseball, Starbucks, Marriage Equality and Mensa.  But don't worry: we will be adding many more Communities soon.

For instructions on adding a community badge to your profile, &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="1865" contents="click here" /&gt;.
To remove your community badges, &lt;rn:answer_xref style="TEXT-INDENT: 0in" answer_id="1866" contents="click here" /&gt;.

 
 

# EXHIBIT 55

United States of America
Federal Trade Commission

RECEIVED MAR 1 7 2017

## CIVIL INVESTIGATIVE DEMAND

1. TO

Match Group, Inc.
8750 North Central Expressway
Suite 1400
Dallas, TX 75231

This demand is issued pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action as described in Item 3.

2. ACTION REQUIRED

[x] You are required to appear and testify.

| LOCATION OF HEARING | YOUR APPEARANCE WILL BE BEFORE |
|---|---|
| Federal Trade Commission Southwest Region 1999 Bryan Street, Suite 2150 Dallas, Texas, 75201 | Zachary A. Keller or other duly designated person. |
| | DATE AND TIME OF HEARING OR DEPOSITION |

[x] You are required to produce all documents described in the attached schedule that are in your possession, custody, or control, and to make them available at your address indicated above for inspection and copying or reproduction at the date and time specified below.

[x] You are required to answer the interrogatories or provide the written report described on the attached schedule. Answer each interrogatory or report separately and fully in writing. Submit your answers or report to the Records Custodian named in Item 4 on or before the date specified below.

[ ] You are required to produce the tangible things described on the attached schedule. Produce such things to the Records Custodian named in Item 4 on or before the date specified below.

DATE AND TIME THE DOCUMENTS, ANSWERS TO INTERROGATORIES, REPORTS, AND/OR TANGIBLE THINGS MUST BE AVAILABLE

APR 1 3 2017

3. SUBJECT OF INVESTIGATION

See attached resolution.

| 4. RECORDS CUSTODIAN/DEPUTY RECORDS CUSTODIAN | 5. COMMISSION COUNSEL |
|---|---|
| James E. Elliott/Brent McPeek Federal Trade Commission Southwest Region 1999 Bryan Street, Suite 2150 Dallas, Texas 75201 | Zachary A. Keller Federal Trade Commission Southwest Region 1999 Bryan Street, Suite 2150 Dallas, Texas 75201  Phone (214) 979-9382 |

| DATE ISSUED | COMMISSIONER'S SIGNATURE |
|---|---|
| March 14, 2017 | *well Mc* |

### INSTRUCTIONS AND NOTICES

The delivery of this demand to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply. The production of documents or the submission of answers and report in response to this demand must be made under a sworn certificate, in the form printed on the second page of this demand, by the person to whom this demand is directed or, if not a natural person, by a person or persons having knowledge of the facts and circumstances of such production or responsible for answering each interrogatory or report question. This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

### PETITION TO LIMIT OR QUASH

The Commission's Rules of Practice require that any petition to limit or quash this demand be filed within 20 days after service, or, if the return date is less than 20 days after service, prior to the return date. The original and twelve copies of the petition must be filed with the Secretary of the Federal Trade Commission, and one copy should be sent to the Commission Counsel named in Item 5.

### YOUR RIGHTS TO REGULATORY ENFORCEMENT FAIRNESS

The FTC has a longstanding commitment to a fair regulatory enforcement environment. If you are a small business (under Small Business Administration standards), you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

The FTC strictly forbids retaliatory acts by its employees, and you will not be penalized for expressing a concern about these activities.

### TRAVEL EXPENSES

Use the enclosed travel voucher to claim compensation to which you are entitled as a witness for the Commission. The completed travel voucher and this demand should be presented to Commission Counsel for payment. If you are permanently or temporarily living somewhere other than the address on this demand and it would require excessive travel for you to appear, you must get prior approval from Commission Counsel.

A copy of the Commission's Rules of Practice is available online at http://bit.ly/FTCRulesofPractice. Paper copies are available upon request.

FTC Form **144**  (rev 12/15)

**APP 650**

## Form of Certificate of Compliance*

I/We do certify that all of the documents, information and tangible things required by the attached Civil Investigative Demand which are in the possession, custody, control, or knowledge of the person to whom the demand is directed have been submitted to a custodian named herein.

If a document or tangible thing responsive to this Civil Investigative Demand has not been submitted, the objections to its submission and the reasons for the objection have been stated.

If an interrogatory or a portion of the request has not been fully answered or a portion of the report has not been completed, the objections to its submission and the reasons for the objections have been stated.

Signature _____

Title _____

Sworn to before me this day

_____   _____

_____
Notary Public

_____

*In the event that more than one person is responsible for complying with this demand, the certificate shall identify the documents for which each certifying individual was responsible.  In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:            Edith Ramirez, Chairwoman
                          Maureen K. Ohlhausen
                          Terrell McSweeny

RESOLUTION DIRECTING USE OF COMPULSORY PROCESS IN NON-PUBLIC
INVESTIGATION OF UNNAMED PERSONS, PARTNERSHIPS OR CORPORATIONS
ENGAGED IN THE DECEPTIVE OR UNFAIR USE OF E-MAIL, METATAGS,
COMPUTER CODE OR PROGRAMS, OR DECEPTIVE OR UNFAIR PRACTICES
INVOLVING INTERNET-RELATED GOODS OR SERVICES

File No. 9923259

Nature and Scope of Investigation:

To determine whether unnamed persons, partnerships or corporations have been or are engaged in the deceptive or unfair use of e-mail, metatags, computer code or programs, or deceptive or unfair practices involving Internet-related goods or services, in violation of Sections 5 or 12 of the Federal Trade Commission Act, 15 U.S.C. §§ 45, 52, as amended. The investigation is also to determine whether Commission action to obtain equitable monetary relief for injury to consumers or others would be in the public interest.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation for a period not to exceed five years from the date of issuance of this resolution. The expiration of this five-year period shall not limit or terminate the investigation or the legal effect of any compulsory process issued during the five-year period. The Federal Trade Commission specifically authorizes the filing or continuation of actions to enforce any such compulsory process after the expiration of the five-year period.

Authority to Conduct Investigation:

Sections 6, 9, 10, and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50, and 57b-1, as amended; FTC Procedures and Rules of Practice, 16 C.F.R. Part 1.1 et seq. and supplements thereto.

By direction of the Commission.

Donald S. Clark
Secretary

Issued: August 1, 2016

CIVIL INVESTIGATIVE DEMAND
SCHEDULE FOR PRODUCTION OF DOCUMENTS AND ANSWERS
TO WRITTEN INTERROGATORIES

## I.   DEFINITIONS

As used in this Civil Investigative Demand, the following definitions shall apply:

A.     "**Advertisement**" or "**Advertising**" or "**Ad**" means any written or verbal statement, illustration, or depiction that promotes the sale of a good or service or is designed to increase consumer interest in a brand, good, or service. Advertising media include, but are not limited to, packaging and labeling; promotional materials; print; television; radio; and internet, social media, and other digital content.

B.     "**And**," as well as "**Or**," shall be construed both conjunctively and disjunctively, as necessary, in order to bring within the scope of any specification in this Schedule All information that otherwise might be construed to be outside the scope of the specification.

C.     "**Any**" shall be construed to include "**All**," and "**All**" shall be construed to include the word "**Any**."

D.     "**Chargeback**" shall mean a transaction that is returned as a financial liability to an acquirer by a card issuer, usually because of a disputed transaction. The acquirer may then return or "charge back" the transaction to the merchant.

E.     "**CID**" shall mean the Civil Investigative Demand, including the attached Resolution and this Schedule, and including the Definitions, Instructions, and Specifications.

F.     "**Company**" shall mean **Match Group, Inc.,** its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and All directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing, **but only to the extent that these persons and entities operate Match.com**.  The term shall include any descriptor used by **Match Group, Inc.** in its business practices.

G.     "**Customer(s)**" shall mean any Person using Match.com who maintains an account, whether he or she pays for services or not.

H.     "**Document**" shall mean the complete original and any non-identical copy (whether different from the original because of notations on the copy or otherwise), regardless of origin or location, of any written, typed, printed, transcribed, filmed, punched, or graphic matter of every type and description, however prepared, produced, disseminated or made, including but not limited to any advertisement, book, pamphlet, periodical, contract, correspondence, file, invoice, memorandum, note, telegram, report, record, handwritten note, working paper, routing slip, chart, graph, paper, index, map, tabulation, manual, guide, outline, script, abstract, history, calendar, diary, agenda, minute, code book, or label. "**Document**" shall

**also include All documents, materials, and information, including Electronically Stored Information, within the meaning of the Federal Rules of Civil Procedure.**

I.      **"Each"** shall be construed to include **"Every,"** and **"Every"** shall be construed to include **"Each."**

J.      **"Electronically Stored Information" or "ESI"** shall mean the complete original and any non-identical copy (whether different from the original because of notations, different metadata, or otherwise), regardless of origin or location, of any writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations stored in any electronic medium from which information can be obtained either directly or, if necessary, after translation by you into a reasonably usable form. This includes, but is not limited to, electronic mail, instant messaging, videoconferencing, and other electronic correspondence (whether active, archived, or in a deleted items folder), word processing files, spreadsheets, databases, and video and sound recordings, whether stored on: cards; magnetic or electronic tapes; disks; computer hard drives, network shares or servers, or other drives; cloud-based platforms; cell phones, PDAs, computer tablets, or other mobile devices; or other storage media.

K.      **"FTC"** or **"Commission"** shall mean the Federal Trade Commission.

L.      **"Identify"** or **"the Identity of"** shall be construed to require identification of (a) natural persons by name, title, present business affiliation, present business address, email address, and telephone number, or if a present business affiliation or present business address is not known, the last known business and home addresses; and (b) businesses or other organizations by name, address, identities of natural persons who are officers, directors or managers of the business or organization, and contact persons, where applicable.

M.      **"Match.com"** shall mean the dating platform available at www.match.com.

N.      **"Person(s)"** means any natural person, corporate entity, partnership, association, joint venture, governmental entity, trust, or any other organization or entity engaged in commerce.

O.      **"Referring to"** or **"Relating to"** shall mean discussing, describing, reflecting, containing, analyzing, studying, reporting, commenting on, evidencing, constituting, setting forth, considering, recommending, concerning, or pertaining to, in whole or in part.

P.      **"Guarantee"** shall mean any Company offer to provide free subscription services for Customers who fulfill certain criteria during their initial subscription period.

Q.      **"Test Profile(s)"** shall mean any user profile, account, or other representation maintained on the Match.com platform that was created by or at the instruction of the Company. "Test Profile" shall include but not be limited to any "test dating profiles" as described in Section 15 ("Communications and Test Profiles") of Match.com's Terms of Use Agreement.

R.      **"You"** and **"Your"** shall mean the person or entity to whom this CID is issued and includes the "Company."

**APP 654**

## II.   INSTRUCTIONS

A.   **Sharing of Information:**  The Commission often makes its files available to other civil and criminal federal, state, local, or foreign law enforcement agencies. The Commission may make information supplied by you available to such agencies where appropriate pursuant to the Federal Trade Commission Act and 16 C.F.R. § 4.11 (c) and (j). Information you provide may be used in any federal, state, or foreign civil or criminal proceeding by the Commission or other agencies.

B.   **Meet and Confer:**  You must contact **Zachary A. Keller** at **(214) 979-9382** as soon as possible to schedule a meeting (telephonic or in person) to be held within fourteen (14) days after receipt of this CID, or before the deadline for filing a petition to quash, whichever is first, in order to discuss compliance and to address and attempt to resolve all issues, including issues relating to protected status and the form and manner in which claims of protected status will be asserted, and the submission of ESI and other electronic productions as described in these Instructions. Pursuant to 16 C.F.R. § 2.7(k), you must make available personnel with the knowledge necessary for resolution of the issues relevant to compliance with this CID, including but not limited to personnel with knowledge about your information or records management systems, relevant materials such as organizational charts, and samples of material required to be produced. If any issues relate to ESI, you must make available a person familiar with your ESI systems and methods of retrieval.

C.   **Applicable Time Period:**  Unless otherwise directed in the specifications, the applicable time period for the request shall be from **January 1, 2013, until the date of full and complete compliance with this CID**.

D.   **Claims of Privilege:**  If any material called for by this CID is withheld based on a claim of privilege, work product protection, or statutory exemption, or any similar claim (*see* 16 C.F.R. § 2.7(a)(4)), the claim must be asserted no later than the return date of this CID. In addition, pursuant to 16 C.F.R. § 2.11(a)(1), submit, together with the claim, a detailed log of the items withheld. The information in the log shall be of sufficient detail to enable the Commission staff to assess the validity of the claim for each document, including attachments, without disclosing the protected information. Submit the log in a searchable electronic format, and, for each document, including attachments, provide:

  1.   Document control number(s);

  2.   The full title (if the withheld material is a document) and the full file name (if the withheld material is in electronic form);

  3.   A description of the material withheld (for example, a letter, memorandum, or email), including any attachments;

  4.   The date the material was created;

5.   The date the material was sent to each recipient (if different from the date the material was created);

6.   The email addresses, if any, or other electronic contact information to the extent used in the document, from which and to which each document was sent;

7.   The names, titles, business addresses, email addresses or other electronic contact information, and relevant affiliations of all authors;

8.   The names, titles, business addresses, email addresses or other electronic contact information, and relevant affiliations of all recipients of the material;

9.   The names, titles, business addresses, email addresses or other electronic contact information, and relevant affiliations of all persons copied on the material;

10.  The factual basis supporting the claim that the material is protected; and

11.  Any other pertinent information necessary to support the assertion of protected status by operation of law.

16 C.F.R. § 2.11(a)(1)(i)-(xi).

In the log, identify by an asterisk each attorney who is an author, recipient, or person copied on the material. The titles, business addresses, email addresses, and relevant affiliations of all authors, recipients, and persons copied on the material may be provided in a legend appended to the log. However, provide in the log the information required by Instruction D.6. 16 C.F.R. § 2.11(a)(2). The lead attorney or attorney responsible for supervising the review of the material and who made the determination to assert the claim of protected status must attest to the log. 16 C.F.R. § 2.11(a)(1).

If only some portion of any responsive material is privileged, all non-privileged portions of the material must be submitted. Otherwise, produce all responsive information and material without redaction. 16 C.F.R. § 2.11(c). The failure to provide information sufficient to support a claim of protected status may result in denial of the claim. 16 C.F.R. § 2.11(a)(1).

E.   **Document Retention:** You shall retain all documentary materials used in the preparation of responses to the specifications of this CID. The Commission may require the submission of additional documents at a later time during this investigation. **Accordingly, you should suspend any routine procedures for document destruction and take other measures to prevent the destruction of documents** that are in any way relevant to this investigation during its pendency, irrespective of whether you believe such documents are protected from discovery by privilege or otherwise. *See* 15 U.S.C. § 50; *see also* 18 U.S.C. §§ 1505, 1519.

F.   **Petitions to Limit or Quash:** Any petition to limit or quash this CID must be filed with the Secretary of the Commission no later than twenty (20) days after service of the CID, or, if the return date is less than twenty (20) days after service, prior to the return date. Such petition shall

APP 656

set forth all assertions of protected status or other factual and legal objections to the CID, including all appropriate arguments, affidavits, and other supporting documentation. 16 C.F.R. § 2.10(a)(1). Such petition shall not exceed 5,000 words as set forth in 16 C.F.R. § 2.10(a)(1) and must include the signed separate statement of counsel required by 16 C.F.R. § 2.10(a)(2). **The Commission will not consider petitions to quash or limit absent a pre-filing meet and confer session with Commission staff and, absent extraordinary circumstances, will consider only issues raised during the meet and confer process. 16 C.F.R. § 2.7(k);** *see also* **§ 2.11(b).**

G.      **Modification of Specifications:**  If you believe that the scope of the required search or response for any specification can be narrowed consistent with the Commission's need for documents or information, you are encouraged to discuss such possible modifications, including any modifications of definitions and instructions, with **Zachary A. Keller** at **(214) 979-9382.** All such modifications must be agreed to in writing by the Bureau Director, or a Deputy Bureau Director, Associate Director, Regional Director, or Assistant Regional Director. 16 C.F.R. § 2.7(l).

H.      **Certification:**  A responsible corporate officer shall certify that the response to this CID is complete. This certification shall be made in the form set out on the back of the CID form, or by a declaration under penalty of perjury as provided by 28 U.S.C. § 1746.

I.       **Scope of Search:** This CID covers documents and information in your possession or under your actual or constructive custody or control including, but not limited to, documents and information in the possession, custody, or control of your attorneys, accountants, directors, officers, employees, the controlling shareholder, and other agents and consultants, whether or not such documents and information were received from or disseminated to any person or entity.

J.       **Document Production:**  You shall produce the documentary material by making all responsive documents available for inspection and copying at your principal place of business. Alternatively, you may elect to send all responsive documents to **James E. Elliott, Federal Trade Commission, 1999 Bryan Street Suite 2150, Dallas, Texas 75201**. Because postal delivery to the Commission is subject to delay due to heightened security precautions, please use a courier service such as Federal Express or UPS. Notice of your intended method of production shall be given by email or telephone to **Zachary A. Keller** at **(214) 979-9382** or **zkeller@ftc.gov** at least five days prior to the return date.

K.      **Document Identification:**  Documents that may be responsive to more than one specification of this CID need not be submitted more than once; however, your response should indicate, for each document submitted, each specification to which the document is responsive. If any documents responsive to this CID have been previously supplied to the Commission, you may comply with this CID by identifying the document(s) previously provided and the date of submission. Documents should be produced in the order in which they appear in your files or as electronically stored and without being manipulated or otherwise rearranged; if documents are removed from their original folders, binders, covers, containers, or electronic source in order to be produced, then the documents shall be identified in a manner so as to clearly specify the folder, binder, cover, container, or electronic media or file paths from which such documents

came. In addition, number all documents in your submission with a unique identifier, and indicate the total number of documents in your submission.

L.    **Production of Copies:**  Unless otherwise stated, legible photocopies (or electronically rendered images or digital copies of native electronic files) may be submitted in lieu of original documents, provided that the originals are retained in their state at the time of receipt of this CID.  Further, copies of originals may be submitted in lieu of originals only if they are true, correct, and complete copies of the original documents; provided, however, that submission of a copy shall constitute a waiver of any claim as to the authenticity of the copy should it be necessary to introduce such copy into evidence in any Commission proceeding or court of law; and provided further that you shall retain the original documents and produce them to Commission staff upon request.  Copies of marketing materials and advertisements shall be produced in color, and copies of other materials shall be produced in color if necessary to interpret them or render them intelligible.

M.    **Electronic Submission of Documents:**  See the attached "Federal Trade Commission, Bureau of Consumer Protection Concordance/Relativity Production Requirements," which details all requirements for submission of information, generally requiring that files be produced in native form and specifying the metadata to be produced.  As noted in the attachment, some items require discussion with the FTC counsel **prior to** production, which can be part of the general "Meet and Confer" described above.  If you would like to arrange a separate discussion involving persons specifically familiar with your electronically stored information (ESI) systems and methods of retrieval, make those arrangements with FTC counsel when scheduling the general meet and confer discussion.

N.    **Sensitive Personally Identifiable Information:**  If any material called for by these requests contains sensitive personally identifiable information or sensitive health information of any individual, please contact us before sending those materials to discuss whether it would be appropriate to redact the sensitive information.  If that information will not be redacted, contact us to discuss encrypting any electronic copies of such material with encryption software such as SecureZip and provide the encryption key in a separate communication.

        For purposes of these requests, sensitive personally identifiable information includes: an individual's Social Security number alone; or an individual's name or address or phone number in combination with one or more of the following: date of birth; Social Security number; driver's license number or other state identification number or a foreign country equivalent; passport number; financial account number; credit card number; or debit card number.  Sensitive health information includes medical records and other individually identifiable health information relating to the past, present, or future physical or mental health or conditions of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

O.    **Information Identification:**  Each specification and subspecification of this CID shall be answered separately and fully in writing under oath.  All information submitted shall be clearly and precisely identified as to the specification(s) or subspecification(s) to which it is responsive.

APP 658

P.      **Certification of Records of Regularly Conducted Activity:**  Attached is a Certification of Records of Regularly Conducted Activity, which may reduce the need to subpoena the Company to testify at future proceedings in order to establish the admissibility of documents produced in response to this CID.  You are asked to execute this Certification and provide it with your response.

## III.    INTERROGATORIES

Unless otherwise instructed, provide the following information for the Applicable Time Period, as set forth in Instruction II.C.  If You are not able to fully respond to any Interrogatory, explain why You are not able to fully respond.

### Corporate Information

1.      Identify Each subsidiary of Match Group, Inc. that contributes to Match.com's business operations and state or describe the following Relating to Each Identified subsidiary:

  a. State of incorporation;
  b. Role in Match.com's business operations; and
  c. Identity of All Persons who:
     i.    Are officers or directors;
     ii.   Own more than 10% of the subsidiary's shareholding equity;
     iii.  Own more than 10% of the subsidiary's voting rights; and
     iv.   Exercise control over the entity and are not Identified in Interrogatories 1c(i)-(iii).

2.      For Each website owned or managed by the Company that contributes to Match.com's business operations, state the following:

  a. URL of the website;
  b. Date that the website first became operational and, if applicable, the date that it ceased operating;
  c. Description of the type of activity, function, or offering available through the website;
  d. Description of the target audience, including, but not limited to, age and gender categories; and
  e. Whether any information accessed, collected, or maintained by the Company from Customers is shared with other Persons and, if so, identify the purpose for the sharing of such information.

3.      State the following information on a quarterly basis:

  a. Revenue generated by Match.com;
  b. Number of Match.com accounts whose owner is not paying for services;
  c. Number of Match.com accounts whose owner is paying for services; and
  d. Number of Test Profiles on Match.com.

APP 659

4.      Identify All current and former employees or other Persons working for or affiliated with the Company that managed, supervised, enforced, or helped create the policies for its Advertising and business practices, including the following:

    a.  The creation of subscription packages and other means of pricing and selling Match.com's services;
    b.  Promotional offerings;
    c.  Marketing or Advertising plans, marketing reports, business studies, and creative strategies;
    d.  Account cancellation procedures;
    e.  Customer support services;
    f.  Terminating or suspending accounts as a result of a Customer Chargeback;
    g.  Creation of Test Profiles; and
    h.  Use of Test Profiles.

### Customer Service and Subscription Services

5.      State the Company's quarterly revenues that are generated by recurring subscriptions, both in terms of U.S. Dollars and as a percentage of the Company's total revenues.

6.      Describe Each offer the Company has made that provides any form of discount, free trial period, or Guarantee, including:

    a.  The terms and conditions of the offer;
    b.  Whether the offer included a negative option plan; and
    c.  The dates during which the offer was available to Customers.

7.      On a quarterly basis, state or describe:

    a.  The number of free trial offers accepted by Customers;
    b.  Of the accepted free trial offers stated in Interrogatory 7a, how many trial offers resulted in an automatically renewed subscription; and
    c.  Of the renewed subscriptions stated in Interrogatory 7b, how many subscriptions were subsequently renewed for at least one additional period.

8.      On a quarterly basis, state or describe:

    a.  The number of Customers who purchased a six-month package that is subject to a Guarantee offer;
    b.  The number of Customers who have attempted to redeem a free subscription period under a Guarantee;
    c.  The number of Customers who have been granted a free subscription period under a Guarantee;
    d.  Of the Customers stated in Interrogatory 8a, how many six-month packages were renewed for a paying six-month term after the initial six-month term expired; and
    e.  Of the subscriptions stated in Interrogatory 8d, how many subscriptions were renewed for an additional period after the first two six-month terms.

APP 660

9.      State whether the Company has taken action to terminate or suspend the account of any Customer who has instituted a Chargeback. If so, state:

   a.  On a quarterly basis, the number of Customer Chargebacks;
   b.  On a quarterly basis, the number of Customers who sought Chargebacks and whose accounts were:
       i.   Suspended; and
       ii.  Terminated.
   c.  On a quarterly basis, the average length of time that a Customer account was suspended due to a Chargeback after the Chargeback was resolved.

### Test Profiles

10.     For any Test Profile that has appeared on Match.com, state the following:

   a.  Username and any unique internal identifier;
   b.  Profile's gender;
   c.  Date the profile was created;
   d.  Website(s) on which the profile can be accessed;
   e.  The Identity of the Person whose photo was used for the Test Profile;
   f.  Number of Customers contacted and the type of contact made on a quarterly basis, including but not limited to winks, favorites, direct messages, or the Company providing a list of potential partners to a Customer that includes such Test Profile;
   g.  Of the Customers stated in the response to Interrogatory 10f, the number of Customers that were not paying Customers to Match.com at the time of contact; and
   h.  Of the Customers stated in the response to Interrogatory 10g, the number of Customers that became paying Customers after the time of the Test Profile's initial contact.

11.     State the following:

   a.  The percentage of All non-paying Customers who were both contacted by a Test Profile and converted a non-paying account into a paying account after a Test Profile's initial contact; and
   b.  The percentage of All non-paying Customers who were both never contacted by a Test Profile and converted a non-paying account into a paying account.

12.     To the extent that the Company contacts Customers by using Test Profiles, state the number of Customers that are contacted on a quarterly basis by Test Profiles in terms of the following demographic groupings:

   a.  Age:
       i.    18-31
       ii.   32-45
       iii.  46-65
       iv.   66+

APP 661

    b.  Gender:
       i.    Male
       ii.   Female
    c.  Subscription Status:
       i.    Paying Customer
       ii.   Non-Paying Customer

13.     Describe the results of All internal research, report, data evaluation, third-party consultation, in-house presentation, or any other form of investigation Relating to:

    a.  Test Profiles;
    b.  How the Company uses Test Profiles;
    c.  Demographic information Relating to whom Test Profiles should contact; and
    d.  How to monetize the use of Test Profiles (for example, by attracting non-paying Customers to become paying Customers).

**Policies, Practices, and Consumer Interaction**

14.     Describe the Company's policies and practices Relating to the following:

    a.  Free trial offers, including:
       i.    Terms and conditions;
       ii.   Cancellation provisions; and
       iii.  Timing requirements Relating to when Customers must cancel their free trial offer to avoid being billed for a recurring subscription.
    b.  Guarantees, including:
       i.    Terms and conditions;
       ii.   The Company's monitoring of Customers' compliance with the terms and conditions;
       iii.  The Company's reasons for creating Each of the Guarantee's compliance requirements; and
       iv.  All timing requirements Relating to redeeming a Guarantee.
    c.  Recurring subscriptions not related to free trial offers or Guarantees, including:
       i.    Terms and conditions; and
       ii.   Whether the Customer's account is charged prior to the expiration of its current subscription period and when such charge is made.
    d.  Customer support services, including:
       i.    The mediums the Company uses to communicate with its customers (e.g., phone, email);
       ii.   The hours of operation for such services;
       iii.  The average hold time for Customers attempting to contact the Company by telephone;
       iv.  Any feature of the support services that advises Customers that their attempt to contact the Company is unsuccessful and that they should therefore try again at a later date;

APP 662

      v.     The average response time for Customers attempting to contact the Company by email; and

      vi.    How the Company monitors its customer support services.

  e.  Account cancellation, including:

      i.     Any material limitations on when a Customer may cancel an account;

      ii.    The mediums through which Customers may cancel accounts; and

      iii.   How the Company confirms account cancellation to its Customers..

  f.  Customer Chargebacks, including:

      i.     Policies that define how long a Customer's account should be terminated or suspended;

      ii.    Whether and how a suspension due to a Chargeback affects the status of the recurring subscription attached to the Customer's account; and

      iii.   Whether the duration of the suspension due to a Chargeback counts against the Customer's current subscription period.

  g.  Creating and using Test Profiles, including:

      i.     Why the Company makes use of Test Profiles;

      ii.    Where Test Profile content originated;

      iii.   Whether and to what extent Customer-generated content is utilized in Test Profiles;

      iv.   Whether and how the Company secures the consent of Customers whose account content is utilized in Test Profiles; and

      v.    Whether Customers may opt-out of Match.com's use of Customer information for Test Profiles.

15.    Describe the Company's notifications and other disclosures to Customers Relating to the following:

  a.  Free trial offers;

  b.  Guarantees, including;

      i.     Notifications prior to the Company charging a Customer's account for a successive subscription when that Customer has attempted to comply with the Guarantees;

      ii.    Notifications Relating to Customers' compliance status; and

      iii.   Notifications Relating to upcoming compliance criteria.

  c.  Renewal of service packages not related to free trial offers or Guarantees;

  d.  Account cancellation;

  e.  The consequences of bringing a Chargeback against the Company; and

  f.  Use of Test Profiles, including:

      i.     Disclosures made within the Test Profile itself;

      ii.    Disclosures contained in communications made by the Test Profile; and

      iii.   Any other form of disclosure or signal whereby Customers can distinguish Test Profiles from Customer profiles.

APP 663

16.    For Each Advertisement Relating to free trial offers or Guarantees, state or describe:

    a. Whether such Ad relates to free trial offers, Guarantees, or both;
    b. Terms and conditions that are depicted in the Ad;
    c. Beginning and ending dates of dissemination; and
    d. For Each Ad, state the following:
        i.    Date and time the Ad was disseminated;
        ii.   Locations the Ad was disseminated; and
        iii.  Approximate number of persons who received or viewed the Ad.

17.    Describe All Customer complaints, including stating the date of the complaint, the Identity of the Customer, and how the complaint was resolved, Relating to the following:

    a. Free trial offers;
    b. Guarantees;
    c. Recurring subscription packages not related to free trial offers or Guarantees;
    d. Customers who claim to have canceled their accounts yet have been charged for additional service periods;
    e. Availability of customer support services;
    f. Customers who have had their services terminated after unsuccessfully disputing a charge; and
    g. Alleged use of Test Profiles.

## IV.    DOCUMENT REQUESTS

Unless otherwise instructed, produce the following Documents for the Applicable Time Period, as set forth in Instruction II.C. Where Documents responsive to any specification below are stored in magnetic or electronic form, produce such Documents in media as set forth in Instruction II.M.

### Corporate Information

1.    Documents sufficient to Identify the Persons responsible for creating, implementing, or enforcing the Company's policies and practices Relating to Advertising, marketing, implementing, and pricing for:

    a. Free trial offers;
    b. Guarantees;
    c. Recurring subscription packages not related to free trial offers or Guarantees;
    d. Account cancellation;
    e. Customer services practices;
    f. Chargebacks; and
    g. Test Profiles.

2.    A copy of Each organizational chart and personnel directory for the Company, including email addresses.

APP 664

<u>Customer Service and Subscription Services</u>

3.    A copy of the following:

    a.  Relating to free trial offers:
        i.    All Advertisements;
        ii.   All marketing or Advertising plans;
        iii.  All registration pages; and
        iv.  All consumer research reports.

    b.  Relating to Guarantees:
        i.    All Advertisements;
        ii.   All marketing or Advertising plans;
        iii.  All registration pages; and
        iv.  All consumer research reports.
    c.  Relating to All service packages that do not include free trial offers or Guarantees:
        i.    All Advertisements;
        ii.   All marketing or Advertising plans;
        iii.  All registration pages; and
        iv.  All consumer research reports.

4.    All Documents related to any internal research, report, data evaluation, third-party consultation, in-house presentation, or any other form of investigation Relating to how negative option features should be disclosed in any offer or Advertisement made by the Company.

5.    Documents sufficient to show the billing records and payment history of the following:

    a.  Customers enumerated in Interrogatory 9b(i);
    b.  Customers enumerated in Interrogatory 9b(ii);
    c.  Customers enumerated in Interrogatory 10(h);
    d.  Customers Identified in Interrogatory 17a;
    e.  Customers Identified in Interrogatory 17b;
    f.  Customers Identified in Interrogatory 17c;
    g.  Customers Identified in Interrogatory 17d;
    h.  Customers Identified in Interrogatory 17e; and
    i.  Customers Identified in Interrogatory 17f.

<u>Test Profiles</u>

6.    All Documents related to any internal research, report, data evaluation, third-party consultation, in-house presentation, or any other form of investigation Relating to Test Profiles, including the following:

    a.  How the Company uses Test Profiles;
    b.  Demographic information Relating to whom Test Profiles should contact; and

APP 665

    c. How to monetize the use of Test Profiles (for example, by attracting non-paying Customers to become paying Customers).

7.      A copy of the following Documents Relating to Test Profiles:

    a. All Advertisements disclosing their use;
    b. All marketing or Advertising plans; and
    c. All offer pages and registration pages disclosing their use.

**Policies, Practices, and Consumer Interaction**

8.      Documents sufficient to show the Company's policies and practices, including but not limited to any internal correspondence Relating to the creation or modification of such policies and practices, regarding the following:

    a. Free trial offers;
    b. Guarantees;
    c. Recurring subscription plans not related to free trial offers or Guarantees;
    d. Customer support services, including:
        i. The operations of any call center involved, whether managed by the Company or via third-party contractor;
        ii. Handbooks, call scripts, and related materials; and
        iii. Formal or informal memoranda Relating to hours of operation, availability to customers, and customer interaction.
    e. Account cancellation, including how, when, and where Customers may cancel subscriptions and how such cancellation is confirmed;
    f. Customers instituting Chargebacks; and
    g. Creating and using Test Profiles.

9.      Documents sufficient to show the Company's notifications and other disclosures, including but not limited to internal correspondence Relating to the creation or modification of such notifications and other disclosures, regarding the following:

    a. Free trial offers;
    b. Guarantees, including:
        i. Notifications prior to the Company charging a Customer's account for a successive six-month subscription when that Customer has attempted to comply with the Guarantees;
        ii. Notifications Relating to Customers' compliance status; and
        iii. Notifications Relating to upcoming compliance criteria.
    c. Recurring subscription plans not related to free trial offers or Guarantees;
    d. Account cancellation;
    e. Customer Chargebacks, including:
        i. The status of Customer accounts;
        ii. The impact any suspension of their account has on their recurring subscription; and

APP 666

      iii.    Whether the duration of the suspension counts against the Customer's current subscription period.

f.   The Company's use of Test Profiles.

10.    All Documents Relating to Customer complaints, including but not limited to internal correspondence Relating to resolving such complaints, regarding the following:

a.  Free trial offers;
b.  Guarantees;
c.  Recurring subscriptions but not related to free trial offers or Guarantees;
d.  Customers who claim to have canceled their accounts yet have been charged for additional service periods;
e.  Availability of customer support services;
f.  Customer Chargebacks;
g.  Any alleged or real failure to provide a Customer access to his or her account; and
h.  Any alleged or real use of Test Profiles by the Company.

11.    All Documents Relating to any communications between the Company (or any affiliated person or entity) and any local, state, or federal government or industry regulatory body, including but not limited to the National Advertising Divisions of the Council of Better Business Bureaus or the Electronic Retailing Self-Regulation Program, concerning Advertising Relating to Match.com.

## V.    REQUEST FOR ORAL TESTIMONY OF CORPORATE DESIGNEE

The Company is required to designate and make available one or more officers, directors, or managing agents, or others who consent to testify on its behalf. Unless a single individual is designated, the Company must designate in advance and in writing the matters on which Each designee will testify. The person(s) designated must testify about information known or reasonably available to the Company and their testimony shall be binding upon it. 16 C.F.R. § 2.7(h).

The person(s) designated must be prepared to provide testimony Relating to the following topics:

1.    His or her background, education, and work experience, including his or her work at the Company and Relating to any matters addressed in Sections III or IV of this CID.

2.    The Company's answers to the interrogatories in Section III of this CID, and documents the Company produced in response to the requests in Section IV of this CID.

3.    The Company's organizational and management structure, including Each division and the Person(s) responsible for managing Each division.

4.    The Identity of the Persons responsible for creating, implementing, or enforcing the Company's policies and procedures Relating to Advertising, marketing, customer service, and pricing, and the nature of such person's responsibilities.

5.      Each option available to a Customer who has demanded a refund, has been subject to an alleged or real unauthorized charge, has been subject to a termination or suspension of her account, or has instituted a Chargeback against the Company.

6.      All terms and conditions Relating to Customers' use of Match.com.

7.      The training materials and any other Communications provided to the Company's customer service representatives or other employees Relating to any matters addressed in Sections III or IV of this CID.

8.      The Company's policies and procedures, including their creation, implementation, and enforcement, Relating to any matters addressed in Interrogatory 14 of this CID, above, including, but not limited to:

   a.  The Identity of any Person who created, implemented, or enforced the Company's policies and procedures;
   b.  How the policies and procedures were drafted and approved by the Company;
   c.  How the policies and procedures were implemented across the organization;
   d.  How and by whom the policies and procedures are enforced;
   e.  Billing and cancellation practices;
   f.  The method by which the Company conducts audits of compliance with its policies and procedures;
   g.  The method by which the Company trains its employees about the policies and procedures; and
   h.  Any incentives or compensation provided to employees based upon the Company's denying refunds or reversing Chargeback demands by Customers.

9.      The number and nature of complaints that the Company received from a Customer, directly or indirectly, Relating to any matters addressed in Document Request 10 of this CID, and the Company's responses.

10.     Any investigations, legal actions, dispute resolution proceedings, and administrative actions Relating to any matters addressed in Document Request 11 of this CID.

11.     The Company's compliance with the Document Retention requirements set forth in Instruction II.E. and the date that such compliance went into effect.

   **NOTE: This CID is issued in conformance with Section 2703 of Title 18 of the United States Code (the Electronic Communications Privacy Act) and seeks only to obtain information permitted by that section. To the extent that you believe you are a provider of Electronic Communications Service or Remote Computing Service to a customer or subscriber about whom this CID seeks information: (1) do not divulge a record or information pertaining to such customer or subscriber or the content of such customer's or subscriber's communications; and (2) provide an explanation and All supporting Documents as to why you believe you are a provider**

**APP 668**

of electronic communication services or remote computing services and why producing such information or Documents is prohibited by ECPA. To the extent you provide services other than electronic communications services or remote computing services to Person(s) Identified herein, you should answer the interrogatories and produce the demanded Documents regarding such services in full. If you have any questions, please contact FTC staff attorney Zachary A. Keller at (214) 979-9382 before providing responsive documents or information.

## Federal Trade Commission, Bureau of Consumer Protection
## Concordance/Relativity Production Requirements

Submit all documents according to the instructions below.  Some instructions require discussion with FTC counsel prior to production, which can be part of a general "Meet and Confer" between the parties or a separate discussion involving persons specifically familiar with your electronically stored information (ESI) systems and methods of retrieval.

### Production Format

1. Submit Concordance load-ready electronic productions with:

   a. an Opticon image load file (OPT) containing a line for every image file in the production, and

   b. a Concordance delimited data load file (DAT) containing a line for every document in the production, with bates references, metadata fields, and native file links where applicable.

2. ESI – Documents stored in electronic format in the ordinary course of business shall be submitted in the following electronic format:

   a. Microsoft Excel, Access, and PowerPoint – Submit in native format with extracted text and metadata.  Data compilations in Excel spreadsheets or in delimited text formats must contain all underlying data unredacted with all underlying formulas and algorithims intact.

   b. Discuss production of other spreadsheet, database, presentation, and multimedia formats, instant messages, CRM, and proprietary applications with FTC counsel prior to submission.

   c. Submit all ESI other than that described above in native electronic format with extracted text or Optical Character Recognition (OCR) and all related metadata, and with corresponding image renderings as converted to Group IV, 300 DPI, single-page Tagged Image File Format (TIFF) or as color JPEG images (where color is necessary to interpret the contents or render them intelligible).

   d. Each electronic file should be assigned a unique document identification (DocID) or bates number.

3. Hard copy – Documents stored in hard copy in the ordinary course of business must be scanned and submitted as 300 DPI individual single page TIFFs (or color JPGs when necessary to interpret documents or render them intelligible), with corresponding document-level OCR text and with logical document determination clearly rendered in an accompanying load file.  Each page shall be endorsed with a DocID or bates number.

4. Extracted Text/OCR – Submit text as document-level text files, named for the beginning

A-1

APP 670

DocID or bates number, and organized into a folder separate from images. BCP cannot accept Unicode text files and will request replacement files if received.

5. Document Identification – Each document must have a unique DocId or bates number, consisting of a prefix and a consistent number of numerals to prevent issues with image display, using leading zeros where necessary. Do not use a space to separate the prefix from numbers.

6. Family Relationships – Regardless of the form of production, preserve the parent/child relationship by:
   a. producing attachments as separate documents and numbering them consecutively to the parent email, and
   b. including a reference to all attachments.

7. Deduplication and Email Threading – You must have FTC counsel approval to utilize any de-duplication or email threading software or services.

8. Password Protected Files – Remove passwords prior to production. If password removal is not possible, provide a cross reference file including original filename, production filename, and the respective password.

## Production Metadata

9. For each document electronically submitted to the FTC, include the following metadata fields in a standard ASCII delimited data load file. The following charts describe the required metadata for hard copy scanned documents, email, email attachments, and native files. Alongside each piece of information, include a corresponding field name for the delimited data load file.

   a. Hard Copy Scanned Documents

| Document Info / Metadata | Description | Concordance Field Name |
|---|---|---|
| Beginning Bates number | The beginning bates number for the document | BEGBATES |
| Ending Bates number | The ending bates number for the document | ENDBATES |
| Page Count | The total number of pages in the document | PGCOUNT |
| Custodian | Mailbox where the email resided | CUSTODIAN |

   b. Email

| Document Info / Metadata | Description | Concordance Field Name |
|---|---|---|
| Beginning Bates number | The beginning bates number for the document | BEGBATES |

APP 671

| Ending Bates number | The ending bates number for the document | ENDBATES |
|---|---|---|
| Page Count | The total number of pages in the document | PGCOUNT |
| Custodian | Mailbox where the email resided | CUSTODIAN |
| To | Recipient(s) of the email | RECIPIENT |
| From | The person who authored the email | FROM |
| CC | Person(s) copied on the email | CC |
| BCC | Person(s) blind copied on the email | BCC |
| Date Sent | Date the email was sent | DATESENT |
| Time Sent | Time the email was sent | TIMESENT |
| Subject | Subject line of email | SUBJECT |
| Date Received | Date the email was received | DATERCVD |
| Time Received | Time the email was received | TIMERCVD |
| Child records (attachments) | The beginning bates number(s) of attachments delimited by comma | ATTACHMENTID |
| Location or "Path" | Location of email in personal folders/Deleted Items/Sent Items | FILEPATH |
| Message ID | MS Outlook Message ID or similar number in other message systems | MESSAGEID |

c.  Email Attachments

| Document Info / Metadata | Description | Concordance Field Name |
|---|---|---|
| Beginning Bates number | The beginning bates number for the document | BEGBATES |
| Ending Bates number | The ending bates number for the document | ENDBATES |
| Page Count | The total number of pages in the document | PGCOUNT |
| Custodian | The name of the original custodian of the file | CUSTODIAN |
| Parent Record | Beginning bates number of parent email | PARENTID |
| Creation Date | The date attachment was saved at the location on the electronic media for the first time | CREATEDATE |
| Creation Time | The time the attachment was saved at the location on the electronic media for the first time | CREATETIME |
| Modified Date | The date/time the attachment was last changed, and then saved | MODDATE |
| Modified Time | The time the attachment was last changed, and then saved | MODTIME |
| Last Accessed Date | The time the attachment was last opened, scanned, or even "touched" by a user or software activity | LASTACCDATE |

A-3

APP 672

| Last Accessed Time | The time the attachment was last opened, scanned, or even "touched" by a user or software activity | LASTACCTIME |
|---|---|---|
| Size | The amount of space the file takes up on the electronic media. Usually recorded in kilobytes, however may be reported in single bytes | FILESIZE |
| File Name | The name of the attachment including the extension denoting the application in which the file was created | FILENAME |
| Native link | Relative path of submitted native files such as Excel spreadsheets | NATIVELINK |
| Hash | The SHA (Secure Hash Algorithm) or MD5 (Message Digest) hash for the original native file if available | HASH |

### d. Native Files

| Document Info / Metadata | Description | Concordance Field Name |
|---|---|---|
| Beginning Bates number | The beginning bates number for the document | BEGBATES |
| Ending Bates number | The ending bates number for the document | ENDBATES |
| Page Count | The total number of pages in the document | PGCOUNT |
| Custodian | The name of the original custodian of the file | CUSTODIAN |
| Creation Date | The date attachment was saved at the location on the electronic media for the first time | CREATEDATE |
| Creation Time | The time the attachment was saved at the location on the electronic media for the first time | CREATETIME |
| Modified Date | The date/time the attachment was last changed, and then saved | MODDATE |
| Modified Time | The time the attachment was last changed, and then saved | MODTIME |
| Last Accessed Date | The time the attachment was last opened, scanned, or even "touched" by a user or software activity | LASTACCDATE |
| Last Accessed Time | The time the attachment was last opened, scanned, or even "touched" by a user or software activity | LASTACCTIME |
| Size | The amount of space the file takes up on the electronic media. Usually recorded in kilobytes | FILESIZE |
| File Name | The name of the file including the extension denoting the application in which the file was created | FILENAME |
| Native link | Relative path of submitted native files | NATIVELINK |
| Hash | The SHA (Secure Hash Algorithm) or MD5 Hash for the original native file if available | HASH |

A-4

10. Use these delimiters in delimited data load files:

| Description | Symbol | ASCII Character |
|---|---|---|
| Field Separator | < | 20 |
| Quote Character | Þ | 254 |
| Multi Entry delimiter | ® | 174 |
| \<Return\> Value in data | ~ | 126 |

11. Submit date and time data in separate fields so Concordance can load it.

### Production Media and Submission

12. Prior to production, scan all media and data contained therein for viruses and confirm the media and data is virus free.

13. For productions smaller than 50 GB, the FTC can accept electronic file transfer via FTC-hosted secure file transfer protocol.  Contact the FTC to request this option.  The FTC cannot accept files via Dropbox, Google Drive, or other third-party file transfer sites.

14. Use the least amount of media necessary for productions.  Acceptable media formats are optical discs (CD, DVD), flash drives, and hard drives.  Format all media for use with Windows 7.

15. Data encryption tools may be employed to protect privileged or other personal or private information.  Discuss encryption formats with the FTC prior to production.  Provide encryption passwords in advance of delivery, under separate cover.

16. Postal delivery to the FTC is subject to delay due to heightened security precautions.  Mark the exterior of all packages containing electronic media sent through the U.S. Postal Service or other delivery services as follows:

MAGNETIC MEDIA – DO NOT X-RAY
MAY BE OPENED FOR POSTAL INSPECTION.

17. Provide a production transmittal letter with all productions that includes:

    a.  Production volume name (e.g., Volume 1),
    b.  Date of production,
    c.  The numeric DocID number range of all documents included in the production,
    d.  List of custodians and the DocID number range for each,
    e.  Total number of records and all underlying images, emails, and associated attachments, native files, and databases in the production;
    f.  List of load file fields in the order in which they are organized in the data file.

A-5

## CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITY
### Pursuant to 28 U.S.C. § 1746

1.    I, _____, have personal knowledge of the facts set forth below and am competent to testify as follows:

2.    I have authority to certify the authenticity of the records produced by **Match Group, Inc.** and attached hereto.

3.    The documents produced and attached hereto by **Match Group, Inc.** are originals or true copies of records of regularly conducted activity that:

    a)    Were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

    b)    Were kept in the course of the regularly conducted activity of **Match Group, Inc.**; and

    c)    Were made by the regularly conducted activity as a regular practice of **Match Group, Inc.**

I certify under penalty of perjury that the foregoing is true and correct.

Executed on _____, 2017.

_____
Signature



**After printing this label**:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# EXHIBIT 56

# BakerHostetler

**Baker&Hostetler** LLP

45 Rockefeller Plaza
New York, NY 10111

T 212.589.4200
F 212.589.4201
www.bakerlaw.com

Linda A. Goldstein
direct dial: 212.589.4206
lgoldstein@bakerlaw.com

August 6, 2019

**VIA E-MAIL (ZKELLER@FTC.GOV)**

Zachary A. Keller, Esq.
Federal Trade Commission
Southwest Region
1999 Bryan Street, Suite 2150
Dallas, TX 75201

*Re:    FTC / Match*

Dear Zach:

Match and the FTC have repeatedly discussed the FTC's concerns about certain of Match's practices. In addition, you have provided Match with a draft Complaint that details the FTC's legal theories as to why the FTC believes Match's practices are unlawful. While we have denied any wrongdoing related to the FTC's proposed claims and will continue to do so until the investigation either closes or the claims are dismissed, as you know, our business has changed over the time period of this investigation. This letter is to leave absolutely no doubt regarding Match's current and future practices.

In short, Match does <u>not</u> engage in any of the following practices in the FTC's draft Complaint, nor does it have any plans or intentions to do so in the future:

- Send notifications ("PTRs") associated with communications from any subscriber account then under fraud review to any non-subscriber as alleged in Count I;

- Allow communications from any subscriber account then under fraud review to reach any non-subscriber (or, for that matter, recent subscribers, which Match has never done) as alleged in Count II;

- Offer a "guarantee" program that allows consumers who meet certain terms and conditions to extend their subscriptions without cost as alleged in Count III,

Atlanta   Chicago   Cincinnati   Cleveland   Columbus   Costa Mesa   Denver
Houston   Los Angeles   New York   Orlando   Philadelphia   Seattle   Washington, DC

**APP 678**

Zachary A. Keller, Esq.
August 6, 2019
Page 2

without clearly and conspicuously disclosing the full terms and conditions of the guarantee program;

- Bar consumers who have unsuccessfully disputed charges through their financial institutions, including preventing them from using paid Match.com subscription services as alleged in Count IV.

Moreover, Match has no plans or intentions ever to reinstitute any of these practices.

If the FTC chooses to pursue legal action against Match, it cannot plead any facts in good faith inconsistent with the foregoing, including but not limited to alleging that Match is violating, or is about to violate, the FTC Act with respect to any of the discontinued practices described above.

Sincerely,

Linda A. Goldstein

# EXHIBIT Q

**APP 680**

DocuSign Envelope ID: B40A291C-19FF-4A69-93BB-C97D43F0DD54

**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>Plaintiff,<br><br>vs.<br><br>MATCH GROUP, INC., a corporation, and<br>MATCH GROUP, LLC, formerly known as<br>MATCH.COM, LLC, a limited liability<br>company,<br><br>Defendants. | Case No. 3:19-cv-02281-K |

**DECLARATION OF JARED SINE IN SUPPORT OF
DEFENDANTS MATCH GROUP, INC. AND MATCH GROUP, LLC'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

I, Jared Sine, declare as follows:

1.      I serve as Chief Business Affairs and Legal Officer; Secretary for Match Group, Inc. ("MGI") and Chief Business Affairs and Legal Officer; Secretary for Match Group, LLC ("MGL").

2.      I am over the age of 18 and competent to make this Declaration. The statements contained in this Declaration are based on my personal knowledge. If called and sworn as a witness, I would and could testify competently to the matters set forth herein.

3.      On September 20, 2022, I executed a Verification in Support of MGI and MGL's Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146 (the "Verified Stipulation").

4.      The Verified Stipulation confirmed the permanent discontinuation of the Guarantee in April 2019 and the Chargeback Policy in March 2019, as defined in that Verified Stipulation.

5.      The facts and statements contained within the Verified Stipulation are still true and correct today.

6.      The Verified Stipulation is a binding commitment that Match.com will not reinstate the Guarantee or the Chargeback Policy.

[signature page to follow]

**APP 681**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 11, 2023.          Signature: _____

# EXHIBIT R

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>Plaintiff,<br><br>vs.<br><br>MATCH GROUP, INC., a corporation, and<br>MATCH GROUP, LLC, formerly known as<br>MATCH.COM, LLC, a limited liability<br>company,<br><br>Defendants. | Case No. 3:19-cv-02281-K |

## <u>DECLARATION OF BRANDON WARD</u>

I, Brandon Ward, declare as follows:

1.      I have been designated as an expert witness in this action on behalf of Defendants Match Group, Inc. and Match Group, LLC.

2.      I am over the age of 18 and competent to make this Declaration. The statements contained in this Declaration are based on my personal knowledge.

3.      I prepared the Expert Report of Brandon Ward Regarding Match.com's Online Subscription Cancelation Flow that was served on Plaintiff Federal Trade Commission on January 13, 2023. A true and correct copy is attached hereto and incorporated herein as **Exhibit 1**. The contents of **Exhibit 1** are true and correct to the best of my knowledge. If called and sworn as a witness, I would and could testify competently to the matters set forth in **Exhibit 1**.

4.      I prepared the Rebuttal of Dr. King's Report Regarding Match.com's Online Subscription Cancelation Flow that was served on Plaintiff Federal Trade Commission on May 15, 2023. A true and correct copy is attached hereto and incorporated herein as **Exhibit 2**. The contents of **Exhibit 2** are true and correct to the best of my knowledge. If called and sworn as a witness, I would and could testify competently to the matters set forth in **Exhibit 2**.

[signature page to follow]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 13, 2023.                    Signature: 

# EXHIBIT 1



Expert Report of Brandon Ward Regarding

Match.com's Online Subscription Cancelation Flow

January 13, 2023



APP 687

I. QUALIFICATIONS

1. I am the Chief Experience Officer (CXO) and Senior Director of User Experience at Precocity, LLC, located in Dallas, TX. I am also the Chief Experience Officer for iMpact Utah in Lindon, UT. I am an instructor for the Continuing and Professional Education (CAPE) program at Southern Methodist University in Dallas, TX, where I teach principles and practices of user experience (known in the industry as "UX") and service design relating to websites, online flows, and other research and design-related activities.

2. I received my M.S. in Telecommunications from Indiana University, Bloomington through the Masters in Immersive Mediated Environments program in 2004. My focus of study was interactive media design, including sound and music. I received multiple B.A.s in Vocal Performance, Music Theory and Composition, and Theatre from the College of Idaho where I graduated Cum Laude in 2000.

3. I am the co-founder of the Dallas chapter of the Service Design Network. I speak professionally at conferences around the United States on topics of design and user experience. From 2000 to the present, I have served as a designer and design leader both in-house and with agencies. A true and correct copy of my Curriculum Vitae (CV) is attached as Appendix A.

4. I am an independent consultant on several matters regarding usability and experience design through Precocity, LLC, and Nonlinear Media, LLC. A list of representative clients is attached as Appendix B.

5. I have written numerous articles and delivered numerous talks (listed on my website brandonebward.com), in addition to many expert analyses and usability reports, and I have expertise in website information architecture, usability, and design.

6. I have conducted usability and user research studies on several occasions in the past, including:

CONFIDENTIAL—FTC v. MATCH.COM

2 of 238

a. **Toyota**—I led the introduction of usability testing of digital products/projects at Toyota Motors North America (TMNA) and Toyota Connected (TC). From 2017 to 2020, I led the research and testing for Toyota's next-generation in-dash navigation and entertainment systems. My team and I spent hundreds of hours in moderated tests with users using functional prototypes to gather user feedback, sentiment analysis, and usability metrics around Toyota's in-dash software. We introduced usability testing more broadly to Toyota, revolutionizing how they think about and build software products.

b. **US Air Force**—I led the research and study of officer training programs, technology, and methodology at the Sheppard Air Force base in Wichita Falls, TX. My team and I observed and interviewed students, teachers, and staff in and out of the classroom. We reviewed current hard and software platforms, tools, assets, and applications. We presented our findings and recommendations to the base commanding officers.

c. **Love's Travel Stops**—I led the research team in the production of a comprehensive journey map and service blueprint for Love's tire care and mechanics' service. We performed live intercepts at Love's travel stops of Love's customers (primarily truck drivers) and performed onsite one-on-one interviews to understand their experiences, thoughts, feelings, and actions when engaged with Love's services. We then went onsite to Love's headquarters and performed onsite one-on-one interviews with Love's staff to understand the back-of-house experiences, thoughts, feelings, actions, and technologies when engaged with Love's customers using their services. Over 70 interviews were conducted, analyzed, and mapped. We presented our findings to the Love's executive leadership team including hundreds of recommendations that could improve their staff and customer experiences.

---

CONFIDENTIAL—FTC v. MATCH.COM

7. For my work on this case, I am being compensated at my customary rate of $275 per hour. I was assisted in this assignment by my team at Precocity, LLC. Their billing rates are $200 per hour. Neither my compensation nor that of Precocity, LLC is dependent upon my opinions or the outcome of this usability study or case.

## II. ASSIGNMENT

8. I was retained by Sidley Austin LLP to use my expertise in website design and user experience to evaluate and offer opinions about Match.com's online subscription cancelation flow. I understand that, in this case, the Federal Trade Commission (FTC) has alleged that Match.com's online cancelation flow is not a "simple" method for Match.com subscribers to cancel recurring payment subscription services. I was not asked to opine on other methods Match.com offers for subscribers to cancel and I offer no opinions about those other methods. My assignment was to assess whether Match.com's online subscription cancelation flow is, in fact, "not simple," as the phrase may be understood within the scientific field of user experience and website usability, and mindful of the published FTC guidance about the meaning of that phrase.

## III. APPROACH AND METHODOLOGY

9. The Restore Online Shoppers' Confidence Act (ROSCA) nowhere defines the term "simple." I am informed by counsel for Match there are no reported decisions by the courts that provide parameters for assessing whether an online cancelation flow satisfies ROSCA's basic requirement. The FTC itself has offered little public guidance on this subject. In its "Enforcement Policy Statement Regarding Negative Option Marketing" (released in 2021), the FTC has stated that to meet the simplicity standard, "negative option sellers should provide cancelation mechanisms that are at least as easy to use as the method the

CONFIDENTIAL—FTC v. MATCH.COM

consumer used to initiate the negative option feature," and that negative option sellers "should not subject consumers to new offers or similar attempts to save the negative option arrangement that impose unreasonable delays on consumers' cancelation efforts." But the FTC's enforcement policy further explains that "[w]hile a request to consider an offer or discount would not amount to an unreasonable delay, multiple requests for a consumer to listen to additional offers, lengthy pitches, or ignoring a consumer's request to decline further offers could amount to an unreasonable delay." In a separate statement, Commissioner Phillips noted this guidance "explains how the Commission interprets" the term "simple," permitting "a cancelation mechanism that is as easy to accomplish as signing up, whilst preserving the opportunity for a business to make an offer to induce a consumer to stay."

10. With this guidance in mind, I set out to assess the Match.com cancelation flow against this stated standard. I used methodologies commonly accepted in the user experience field to evaluate: (a) whether the flow is consistent with, or better than, industry standards for online cancelation flows; (b) whether subscribers can effectively accomplish the objective of the flow; (c) whether any save offers or surveys embedded in the Match.com flow cause unreasonable delay in a subscriber's cancelation effort; and (d) whether any aspect of the flow appeared designed to cause subscribers undue or unreasonable difficulty in canceling.

11. Experts in the field of usability generally do not use the standard of "simple." Rather, we use the standards of "clear" (meaning can the flow be understood by reasonable users) and "effective" (meaning is the flow designed in a reasonable way that users can accomplish the task without undue burden).  For the purposes of my study and conclusions contained in this Report and as I may testify, the phrases "clear and effective" and "simple" can be used interchangeably.

---

CONFIDENTIAL—FTC v. MATCH.COM

12. In performing this assignment, I used the same methodologies I use in my expert consulting and academic work.

13. First, I conducted what is commonly referred to as a "heuristic" analysis of Match.com's online cancelation flow on a desktop/laptop computer and assessed whether the flow was usable and simple, based on standard principles of web usability and design.

14. To conduct this heuristic analysis, I relied on two standards commonly used in the field of website usability: Jakob Nielsen's Ten Heuristics of Usability and Nielsen Norman Group's Five Quality Components. Nielsen's usability heuristics and quality components are used to evaluate "how easy user interfaces are to use." ("Usability 101: Introduction to Usability" n.d.) These Nielsen heuristics are the gold standard in evaluating web usability and design. Next, I used Nielsen's five quality components. These quality components are similarly used to identify whether an interface is usable and simple ("Usability 101: Introduction to Usability" n.d.).

15. Second, I evaluated the Match.com cancelation flow against standard and best practices for website design.

16. Third, I designed and conducted an empirical usability study, which tested whether the Match.com cancelation flow is clear and effective. This empirical study instructed potential Match.com subscribers to sign up for a Match.com subscription which had a negative option feature and then cancel the subscription using Match.com's online cancelation flow. I analyzed whether participants were able to successfully cancel, how long it took them to cancel, and their perceptions of the simplicity or difficulty of the cancelation process.

17. Finally, I analyzed Match.com subscriber data to identify whether subscribers were able to cancel and determine if they had difficulty doing so. This included an analysis of and conclusions regarding (a) the percentage of Match.com subscribers who successfully canceled subscriptions, having demonstrably

CONFIDENTIAL—FTC v. MATCH.COM

acted in a manner indicating a desire to potentially cancel; and (b) the time it took to cancel. I analyzed whether this real-world data was consistent with my heuristic analysis and usability study results.

18. I have reported the opinions I have reached from these analyses and the reasons and bases for my opinions in this report and appendices.

## IV. SUMMARY OF OPINIONS

19. In my professional, expert opinion, the Match.com online cancelation flow is clear and effective. It can be accessed using industry-standard icons, has clear labels, and follows a logical, short path to a conclusion. It is easy to complete. The first thing I did when I was retained for this case was to subscribe to Match.com and then try to cancel my subscription online. I expected, based on the FTC's allegations, that this cancelation process would be difficult, time-consuming, and/or confusing. But this was not what I found. Instead, I found Match.com's cancelation process is standard for subscription cancelation processes with which I am, in my professional capacity, familiar. Indeed, the processes used are similar to many online subscription cancelation processes across industries and areas. I identified nothing unusual, unique, or difficult with this process.

20. As explained in Section VI, from my heuristic analysis, I concluded Match.com's cancelation flow meets the applicable Nielsen usability (and simplicity) heuristics, and it satisfies Nielsen's 5 quality components of usability. Thus, the Match.com online cancelation process meets generally accepted standards of usability in the field and contains features common to other subscription websites.

21. In Section VII, I describe the results of the empirical usability study. This study shows:

- **Objectively, it was easy for participants to cancel**

  - **91.5%** of participants who signed up were able to cancel successfully via the online cancelation flow. Any score above 80% in a study like this would demonstrate usability and

CONFIDENTIAL—FTC v. MATCH.COM

simplicity. Match.com's score, which was above 90%, proves its cancelation process is simple and easy to use.

- ○ It took participants an average of **74 seconds** to cancel online on Match.com. This length of time is reasonable for a cancelation task, again indicating the cancelation process is simple and easy to use.

- **Participants were able to cancel more easily than they were able to sign up**

  - ○ Participants were able to cancel much faster than they were able to sign up – average cancelation was **16.3% of the time** it took to sign up or **6.1 times faster.**

- **Subjectively, participants believed cancelation was simple (and simpler than signing up)**

  - ○ **84.7%** of participants thought canceling was at least as simple as signing up

  - ○ **88.3%** of participants thought canceling was simple or were at least neutral as to the simplicity/difficulty

- **Match.com received an "A Grade" on a System Usability Score (81.6), which makes it among the top 10% of all websites in terms of usability.**

22. Third, my analysis of Match.com's actual user data indicates the cancelation process is simple and is consistent with the results from my usability study: Specifically:

- Match.com's subscriber data shows that over 95% of subscribers who clicked "Cancel Subscription" either took a save offer (i.e., decided to renew rather than cancel) or successfully canceled via the online cancelation flow. The remaining 5% could certainly have changed their minds about

**APP 694**

cancelation midstream or may have never intended to cancel, so this "success rate" is conservative.

**A 95% success rate indicates the cancelation process is simple and easy to use.**

- Match.com's subscriber data shows the median time for subscribers to complete cancelation, from the time they select "Cancel Subscription," is, on average, 44 seconds—more than 4 times faster than the average time it takes to complete only the Match.com subscription purchase process (excluding registration time, even though registration is necessary before purchasing a subscription, making this analysis conservative). The speed with which subscribers can complete the cancelation process, and the fact that the cancelation process is quicker than the subscription process, is more evidence that Match.com's online cancelation process is simple.

## V. BACKGROUND ON THE CANCELATION PROCESS

23. In this Section, I describe the Match.com online cancelation flow and comment on its components from a website design and usability perspective.

24. There are (at least) two ways for Match.com subscribers to arrive at the online cancelation flow.[1]

25. The first way to reach the online cancelation flow is from the Match.com "Home Page." Each page/step to cancel from the Home Page is described in more detail below:

**Home Page**

26. If a Match.com subscriber is on the Home Page and wishes to cancel, it is easy for the subscriber to find the beginning of the online cancelation process.

---

[1] This report and my analysis are limited to Match.com's online cancelation flow. I understand that Match.com offers other methods of cancelation, but I have not assessed those other methods because my expertise is in website usability and design.

---

CONFIDENTIAL—FTC v. MATCH.COM

27. The first thing a subscriber has to do, from any page, is to click the settings icon (the gear icon) on the upper right-hand side of the screen and then click "settings."

28. Many companies similarly put online cancelation flows on their settings pages. Thus, consumers are likely to expect the cancelation flow to be found on that page. Similarly, it is common to put the link to the settings page at the top right of the home page and to use a "gear" icon to indicate settings. Both are best practices, at least since 1995 as demonstrated in the Windows 95 menu in Figure 0 below.

29. Listed below are several websites that similarly place access to the cancelation flow on the settings page:

   i.    LinkedIn—Subscription information is in Settings, which is at the top of the page, the third option from the right.

   ii.    WorldatWork—The profile, which includes membership status, is on the right side of the navigation.

   iii.    Canva.com—The settings icon is the third icon from the right in the navigation menu. Subscription information is within the settings.

   iv.    Dropbox.com—The profile icon is in the upper right corner of the screen. Subscription status is nestled under settings and plan in the dropdown.

   v.    NYTimes.com—The account is in the upper right-hand corner of the page, and subscription information is within the Account dropdown.

   vi.    Netflix—Profile is in the upper right-hand corner of the page, and Account information (including subscription information) is within the dropdown.

30. Match.com uses a gear icon for subscribers to access the Settings page. As described in more detail below, a gear icon is commonly used to represent Settings and has been since at least 1995, as observed in Windows 95 and potentially earlier. Some examples include other subscription and profile sites, such as Patreon, Facebook, YouTube, Google apps, Yahoo mail, iPhone, Android, and many others.

---

CONFIDENTIAL—FTC v. MATCH.COM

**APP 696**

**Figure 0—Gear Settings Icon 1995**



CONFIDENTIAL—FTC v. MATCH.COM

**APP 697**

**Figure 1—Home Page**



CONFIDENTIAL—FTC v. MATCH.COM

**Account Settings Page**

31. Once a subscriber selects Settings, Match.com takes the subscriber to the "Manage Account" section of the Settings menu by default.[2] To cancel from that screen, the subscriber must select "Manage subscription," one of the five options on the "Manage Account" page.

32. It is obvious for any subscriber that wants to cancel their subscription that "Manage subscription" is the option to click. Match.com does not hide or obfuscate the Manage subscription link. Rather it has the same prominence as any other settings the subscriber may want to access. The location of the Manage subscription link (within Account Settings) makes sense and is not concealed or distracted from by other, more prominent user interface features or calls to action asking the subscriber to take any particular action.[3]

---

[2] In previous versions of the Settings page, "Manage Subscription" was located on the lefthand side of the page rather than as a submenu within the "Manage Account" section. "Manage Subscription" remained visible on the page at which a subscriber arrived after selecting Settings. This change does not affect my usability opinion.

[3] I understand the layout of and language on the Settings page has varied somewhat since September 2014. For example, the language to navigate to the Subscription Management page has changed from "Change/Cancel Membership" to "Manage/Cancel Subscription" to "Manage Subscription." From a usability perspective, all of these options are acceptable alternatives, and in each version, a subscriber likely will recognize that canceling a subscription is a type of management, especially because the cancelation flow is unlikely to be located within any of the other Settings options. To the extent there is any confusion, a subscriber can visit the Help page, which, as described below, contains a "Canceling" article that links the subscriber to the flow, without navigating through the Settings options.

CONFIDENTIAL—FTC v. MATCH.COM

**Figure 2—Account Settings**



CONFIDENTIAL—FTC v. MATCH.COM

33. Once a subscriber clicks on "Manage subscription", they are prompted: "To continue, please supply your password." It is clear that if the subscriber wants to continue to cancel, they must enter their password and complete the reCAPTCHA (to prove the subscriber is not a robot).

34. I observed that reauthentication was only required once per log-in session. As far as I could ascertain sessions don't expire as long as the subscriber has accepted the appropriate cookies and doesn't log out. Meaning a subscriber could navigate away from the cancelation flow, then return later within the same session without having to reauthenticate. This reauthentication is common for platforms dealing with sensitive and financial data. Microsoft Windows 10 defaults to this setting. When an Apple macOS system is encrypted (called FileVault), it too requires the user to reauthenticate when booting up.

35. It is reasonable for Match.com to protect unauthorized or compromised system access to a user's billing and account information. Similar security checks can be found across many websites, as described in more detail below, particularly if a customer is attempting to reach personal account or billing information or make changes to their subscription. Facebook, a site with roughly 2.9 billion monthly users (Dean 2022) recommends reauthentication to their application developers as a method to circumvent hacking and loss of private data. "Re-authentication enables your app to confirm a person's identity even if it was verified previously. Facebook Login lets your app ask a person to re-enter their Facebook password at any time. You can use this to prevent cases where a user leaves a device logged in or where a third-party hijacks someone's session with your app." (Facebook n.d.) These checks ensure that only an authorized user can make changes to a subscription. This measure also helps to ensure that the subscriber doesn't make the change by accident, an issue that can arise when major changes can be effected with only one or two clicks.

CONFIDENTIAL—FTC v. MATCH.COM

36. Should a subscriber forget their password, a standard Forgot Password flow is provided, as depicted in

Appendix F. I used this flow and it is virtually the same as every website requiring login, including every

website I've ever designed.

**Figure 3—Reauthorization**



CONFIDENTIAL—FTC v. MATCH.COM

37. Once the subscriber completes the security check, they reach the Manage Subscription screen. This screen only has two options: Subscription Status and Cancel Subscription. It is common to group Cancel Subscription with other Manage Subscription options, such as checking Subscription Status. Both options are clickable links (as shown by their blue color), which makes the title stand out. As indicated by research on the spotted pattern of screen reading,[4] the subscriber is likely to notice Subscription Status, Cancel Subscription, and Back to Home before reading any of the text.

38. Both of the links use plain, descriptive language, which makes the meaning of a link or button (i.e., what will happen if a user clicks on it) clear. If a subscriber wants to know what their subscription status is, they can click that button. But if a subscriber wants to cancel, they can click the "Cancel Subscription" button. Match.com could hardly make it more clear or simple to cancel.

---

[4] Spotted Patterns are typically used when particular text is designed to stand out, and when the items that stand out resemble a word the user looks for to accomplish the current task. Thus, a user can accomplish the task without reading all of the text on the page if desired or can go back and read the text for additional information if necessary. "Text Scanning Patterns: Eyetracking Evidence." August 25, 2019. https://www.nngroup.com/articles/text-scanning-patterns-eyetracking/.

CONFIDENTIAL—FTC v. MATCH.COM

**Figure 4—Manage Subscription**



CONFIDENTIAL—FTC v. MATCH.COM

39. After the subscriber clicks Cancel Subscription, they have entered the cancelation flow. The language on the first page makes clear the subscriber has not yet completed the cancelation process. The heading is "Before you go" (implying the subscriber has not yet "left"), tells the subscriber the last day of their subscription "*if* [they] cancel," and presents an optional survey question, asking the subscriber why they "***are looking*** to cancel" their subscription. (emphasis added). The survey has multiple choice options indicated by radio buttons.[5] Depending on which option (if any) the subscriber chooses, they may be presented with up to two additional follow-up questions on the same screen, although subscribers may be presented only with the single question on this page.

40. Below the question(s) are two buttons: Back to Home or Continue Cancelation. These two options have the same color and are in the same font. Both buttons also appear to be automatically sized based on the width of the text, with equal padding between the text and the edge of the button. Each of the buttons has a label that is clear and descriptive (either Back to Home or Continue Cancelation). If a subscriber wants to continue to cancel they can click the "Continue Cancelation" button.

41. The language throughout the page (including "Before you go," asking why the subscriber is "looking to cancel," and identifying the last day of subscription "if you cancel") and the "Continue Cancelation" option make it clear that the cancelation has not yet been completed. The survey question itself is important from a business perspective because it gives Match.com important information about its subscribers' experiences and whether improvements can or should be made. A brief survey such as this is quite common to encounter during the cancelation process. Companies often like to gather feedback

---

[5] Radio buttons are common tools that allow a user to select one item out of a set of predefined options, meaning the user need not type or engage beyond a simple click.

at various stages to improve their members' experience, and a subscriber wishing to move through the process quickly could simply select answers as fast as possible (or not select answers at all) and move on within moments. Additionally, surveys asking for cancelation reasons are particularly important for websites like Match.com, where a subscriber might cancel because the service worked perfectly for them (by allowing them to find a match), or because the service worked poorly. It is helpful for a service like Match.com to have that information so it can make any necessary changes to improve the service. Presenting the survey after confirming the cancelation would likely decrease response rates and therefore make it more difficult for Match.com to improve its services for consumers.

CONFIDENTIAL—FTC v. MATCH.COM

**Figure 5—Question 1**



CONFIDENTIAL—FTC v. MATCH.COM

21 of 238

**Save Offer Page**

42. Depending on a variety of factors (such as the reason for cancelation and subscription history), a subscriber may be presented with a "save offer" after the first survey page. A "save offer" is an offer to renew the subscription (rather than cancel it) at a discounted price (e.g., 50% off the next renewal, or 3 months for the price of 1). Save offers are common in subscription service cancelation flows and are beneficial to consumers because they allow consumers to continue the service at a discounted rate if they desire to do so. Although the precise language has varied from September 2014 to the present, generally, the page presents the offer and then gives the subscriber two options: accepting the offer or continuing with the cancelation. Depending on the version of the flow, to decline the offer, the subscriber selects either "No thanks, I want to resign", "Continue", or "Continue Cancelation." The current version uses the "Continue Cancelation" verbiage. In each version, the choice is clear: accept the save offer by clicking the button describing the offer (e.g., "Get 3 More Months") or click the other button, declining the offer.

CONFIDENTIAL—FTC v. MATCH.COM

**Figure 6—Save Offer**[6]



───────────────
[6] MATCHFTC774790

CONFIDENTIAL—FTC v. MATCH.COM

43. The final screen before cancelation confirmation is a survey page with the heading "Tell us more," asking the subscriber how likely they are to recommend Match.com to a friend (i.e., a Net Promoter Score survey, a common survey to gauge customer satisfaction).[7] The page also lists some of the benefits that the subscriber will lose by canceling ("If you cancel now, you will lose these benefits once your subscription ends...."). Reminding subscribers of benefits they will lose if they cancel is common on other subscription websites (e.g., Amazon Prime, LinkedIn).

44. Just like the first survey page, the second survey page contains two buttons: Back to Home and Continue Cancelation. Also just as with the first survey page, the language and the buttons on this page make it clear that the cancelation has not yet been completed, as the page warns "*If* you cancel now," you **will** lose benefits (emphasis added), and the subscriber is given the option to "***Continue*** Cancelation." (emphasis added). Additionally, the current version of the flow warns that this page is "One last step," making clear that there is still more to be done. A brief survey such as this is, again, quite common to encounter during the cancelation process and serves a business function. A subscriber wishing to move through the process quickly could simply select answers as fast as possible (or not select answers at all) and move on within moments.

45. There are a few important things to note about these surveys and potential save offers. First, they are quick and simple to complete (3 questions can be done in 10 seconds). Thus, they do not amount to an "unreasonable delay" that would be prohibited under the FTC guidance. Nor does Match.com use these

---

[7] I understand that before some point in 2017, this page also contained a text box asking subscribers to answer the following question: "In your own words, how can we make finding love easier?" MATCHFTC672298. Entering text in the box was optional (just as answering any of the other survey questions is optional), and generally, it is beneficial to allow users to express opinions about the website. In my opinion, including the text box did not have an adverse impact on the cancelation flow's usability or simplicity.

CONFIDENTIAL—FTC v. MATCH.COM

surveys to confuse people into thinking they have canceled when they have not canceled. As explained above, Match.com uses clear language and buttons indicating to subscribers that they have not yet canceled until they have completed these surveys and questions. As described above, answers to these types of survey questions are particularly important for a service like Match.com, where cancelation does not necessarily reflect unhappiness with the service.

**Figure 7—Question 2**



**Confirmation Page**

46. The final screen in the cancelation flow is a cancelation confirmation page informing the subscriber the cancelation was successful and is now complete. The page states in prominent text near the top of the screen the cancelation is complete. The additional text provides more detail about what the subscriber can expect now they have canceled. It is common to provide a confirmation screen and sometimes a confirmation number as the final step of the cancelation process, so it is reasonable that a subscriber will understand they have successfully canceled if and only if they reach this page. Subscribers also receive an email confirming the cancelation, which is also customary when a subscriber has successfully canceled.

CONFIDENTIAL—FTC v. MATCH.COM

**Figure 8—Confirmation**



47. Overall, Match.com's cancelation process is easy to follow and use. At each step, it is clear what the subscriber must do to cancel online.

48. Match.com provides other ways to reach the cancelation page as well, for example, through the Help/FAQ page. The steps to cancel via this avenue, starting from the Home page, are described below:

1. Access the Help/FAQs page, either by selecting the "Help/FAQs" link at the bottom of nearly every Match.com page (including the Home page), by selecting "Help" within the Settings dropdown menu, or even by conducting an Internet search (e.g., via Google) for "Match.com help." A link to the Help/FAQs page is commonly located in the footer of a website, such as:

    1. LinkedIn – A "Help Center" link is near the bottom righthand corner of the Home page.

    2. Netflix – A "Help Center" link is along the bottom of the Home page

    3. NYTimes.com – A "Help" link is along the bottom of each page

2. The Help/FAQs page can be used in one of two ways: (1) using the search box, or (2) filtering by topic.

    i. If the subscriber chooses to use the search box, they can search for "Cancel" (among other terms listed below) in the search box text entry field, which is prominently displayed in the middle of the screen. When a subscriber begins typing these terms the search box suggests related topics, e.g., "cancel" gets you "Canceling," and I found at least twelve various phrases that could get you to the same cancelation-related content. Alternatively, a subscriber can type "cancel" or a variation thereof and click the magnifying glass (a typical icon to represent "search") to run the search. The first search result is for a "Canceling" article, described in more detail below. These are the words/phrases I found that lead to the cancelation-related content:

1. Cancel

2. Cancellation

3. End

4. Manage

5. Manage account

6. Manage subscription

7. Auto renewal

8. Membership

9. Deactivate

10. Free trial

11. Turn off

12. Subscription Status

ii. If the subscriber chooses to filter by Help topic, they can select the "Manage My Subscription" help option on the Help/FAQs page, which is the topic most likely to contain information about canceling subscriptions. After choosing that filter, the page shows six articles, plus an option to "See all 7 articles." After the subscriber selects "See all 7 articles," the cancelation article option is displayed, which the subscriber can click to go to the relevant article.

3. Both of the paths described above, which are depicted in Appendix G, take the subscriber to the "Canceling" article that describes how to cancel a subscription and other various Match.com features, using a variety of methods. The first sentence of the article contains a "Manage Subscription" link that takes the subscriber to the same page as would clicking "Manage Subscription" from the Settings page, such that the subscriber is taken directly to

CONFIDENTIAL—FTC v. MATCH.COM

reauthentication page (Figure 3 above). The Manage Subscription link in the Canceling article stands out as a link because it is underlined and the cursor turns into a hand when hovered over the link text.

4. The remainder of the cancelation flow from this point is identical to the flow if the subscriber enters via the Settings method described above.

49. A video of the cancelation process is being provided as Appendix J of this Report.

50. I also compared Match.com's cancelation process to the cancelation process for other major subscription websites. As indicated by the results of my usability study described in the next Section, most consumers have had other online subscription services and thus are familiar with standard cancelation processes. As the chart below shows, many of the features of Match.com's cancelation process are standard and used on many other websites.

CONFIDENTIAL—FTC v. MATCH.COM

| | One-Step To Cancel | Cancel @ Account | Instructions in Help | Survey included | Retention Prompt Observed[8] | Reauthentication Required | 5+ Steps to Cancel |
|---|---|---|---|---|---|---|---|
| **Match.com** | No | Yes | Yes | Yes | Yes | Yes | Yes |
| **Amazon Prime** | No | Yes | Yes | Yes | Yes | No | Yes |
| **Apple iCloud** | No | Yes | Yes | No | Yes | Yes | Yes |
| **Disney+** | No | Yes | Yes | Yes | Yes | No | Yes |
| **eHarmony** | No | Yes | Yes | Yes | No | Yes | Yes |
| **Intuit Quickbooks** | No | Yes | Yes | Yes | No | No | Yes |
| **LastPass** | No | Yes | Yes | No | No | No | No |
| **LinkedIn Premium** | No | Yes | Yes | Yes | Yes | No | Yes |
| **Netflix** | No | Yes | Yes | Yes | No | No | No |
| **New York Times** | No | Yes | No | Yes | Yes | No | Yes |
| **Spotify** | No | Yes | Yes | Yes | Yes | No | Yes |

Screen captures for these flows are provided in Appendix I.

---

[8] Based on my observations. May depend on the subscriber and the circumstances.

CONFIDENTIAL—FTC v. MATCH.COM

## VI. HEURISTIC ANALYSIS

51. This Section describes the heuristic analysis I conducted. I first identify each heuristic (in bold and quotes) and then analyze whether Match.com's cancelation process meets that heuristic.

### A. Heuristic 1: Visibility of system status

**"The system should always keep users informed about what is going on, through appropriate feedback within reasonable time."**

52. Match.com's cancelation flow satisfies this heuristic. As indicated in the screenshots and page descriptions above, at each step of the cancelation process, from the Settings screen, through to the end of the cancelation process, Match.com uses titles and text that clearly and succinctly describe what page the subscriber is on and what the subscriber is expected to do to proceed to the next step. The labels are clear and concise and use ordinary syntax.

53. I understand the FTC alleges the cancelation flow contains "misleading text" that causes subscribers to "think the cancelation is complete." FTC's First Amended Responses to MGI Interrogatory No. 2. I disagree that any of the text that the FTC identifies is misleading:

1. The FTC first contends the "Before you go" heading on the first survey page makes subscribers believe the cancelation is complete. I disagree. In my opinion, "before you go" indicates that the subscriber has not yet canceled. In other words, "before you go" means "before you cancel." In addition, linguistically, the phrase "Before you go" doesn't imply the completion of any task. In every use of the phrase "Before you go...", the context is clear that you haven't yet gone, meaning, you're still here. Other context on the same page reinforces the cancelation is not yet

CONFIDENTIAL—FTC v. MATCH.COM

complete. The first words after the "before you go" heading read "If you cancel...". (See Figure 5). Additionally, the survey question asks why "you are looking to cancel," not "why did you cancel." This clearly indicates the subscriber has not yet canceled. Additionally, the navigation buttons on the page—one of which is "Continue cancelation"—indicate the subscriber still must take additional steps to cancel. Thus, I have no concerns from a usability perspective about Match.com's use of the "Before you go" heading.

2. The FTC next claims that "until recently," the save offer was confusing because it was unclear which button a subscriber should push if they want to decline the offer and continue cancelation. Again, I disagree. In all versions of the save offer page (which is only displayed to a subset of canceling subscribers), the two options are clear (either as a button or a hyperlink). One option clearly entails accepting the offer (usually by repeating the offer), and the other option clearly entails declining the offer. What is more, even if a subscriber were confused by the save offer, it is highly unlikely the subscriber was confused about *whether* they canceled.

3. I conclude that through clear language and buttons, Match.com does not deceive subscribers into thinking they canceled before they effectively cancel.

### B.   Heuristic 2: Match between system and the real world

**"The system should speak the users' language, with words, phrases, and concepts familiar to the user, rather than system-oriented terms. Follow real-world conventions, making information appear in a natural and logical order."**

CONFIDENTIAL—FTC v. MATCH.COM

54. I have concluded that this heuristic is satisfied. As explained below, Match.com's cancelation flow is written in plain and easy-to-understand English, at a 6th-grade reading level. The flow follows a natural and logical progression to cancelation, which is consistent with many web cancelation processes.

55. To analyze this heuristic, I used the Flesch Reading Ease Score (FRES) and a Flesch-Kincaid Grade Level Score (FKGLS), which are good measures for understandability and readability. (Character Calculator n.d.)

56. "The Flesch reading score is measured on a scale of 0 to 100, with 100 being the easiest to read. A lower score suggests that the language is hard to understand and may be suitable for only professionals." (Character Calculator n.d.)

57. "The Flesch-Kincaid grade level is a scale used to measure the readability level of books. It indicates the number of years of education needed to understand a text." (Character Calculator n.d.)

58. Based upon these scores, the language used in the Match.com cancelation flow has an average FRES of 71.1, which is "Fairly easy to read" and an average FKGLS of 6.06, which is "Easy to Read". These scores put the Match.com cancelation flow at a 6th-grade reading level. These scores indicate the flow meets Nielsen's criteria for heuristic 2, as well as ease of readability for adults.

59. Additionally, the information architecture, or how the content of the site is structured, makes logical sense and matches traditional user mental models for how and where items are located. In this case, canceling your subscription is available on the "Settings" page, which is a common and logical place to include information about account management (and has been for some time). See the chart above identifying other commonly used websites in which cancelation is done through the account settings page. On the Settings page, a subscriber finds the Manage Subscription button, which is a logical place

---

CONFIDENTIAL—FTC v. MATCH.COM

for the cancel options. Once there, the subscriber finds the Cancel [your] Subscription option, which is straightforward and clear.

60. Upon selecting that option, the subscriber is presented with a survey question asking why he or she is canceling. If the subscriber chooses to answer the question, it's just a click of a radio button, or the subscriber can skip the question entirely. The subscriber may also choose to answer or skip the following survey question (a Net Promoter Score survey). At that point, Match.com displays a confirmation screen that the subscriber has successfully canceled. If the subscriber is shown a save offer, that is also a single page (between the two survey pages) requiring only a single click to accept or decline. This matches the organization and flows one might expect from other systems on the web.

C.   Heuristic 3: User control and freedom

**"Users often choose system functions by mistake and will need a clearly marked "emergency exit" to leave the unwanted state without having to go through an extended dialogue. Support undo and redo."**

61. Based on my review, I conclude this heuristic is satisfied. Match.com provides at least two distinct paths into the cancelation flow—the first flow is through the Settings page, the second via the Help page. Whether a subscriber knows to go to Settings to manage their settings or they're not sure and they use the Help flow (which contains at least thirteen different routes to the "Canceling" article (twelve searches, one FAQ item) describing how to cancel and linking to the flow, as explained above), subscribers have ample entry points to find what they're looking for.

62. The Settings page also provides a clear entry point into the cancelation flow. Every iteration of the Settings page has presented the button to reach the cancelation flow (whether "Manage Subscription" or otherwise) on the first page that the subscriber sees. In the current version, there are eight options

CONFIDENTIAL—FTC v. MATCH.COM

under Settings. In my testing, as well as in the usability study, Manage Account is the default menu, meaning the Manage Subscription sub-selection is immediately visible. The other seven menu options have no connection to the subscription in any way, though each of those options has as many as nine sub-options or even entire flows (e.g., Account Verification) under them. Manage Account has only five sub-options, each distinct, focused, and clearly labeled. If a subscriber wants to cancel, "manage subscription" is the clear and only choice to proceed (see Figure 9 below). This is true even though none of the options contain the word "Cancel."

CONFIDENTIAL—FTC v. MATCH.COM

**Figure 9—Account Settings**



63. There are only two options under Manage subscription: Subscription Status and Cancel Subscription.

Both are clearly labeled and supported with a descriptive paragraph.

CONFIDENTIAL—FTC v. MATCH.COM

**Figure 10—Manage Subscription**



64. As subscribers navigate the Match.com website, if they make a mistake or go down an improper path, it is easy to continue exploring or retrace their steps using the browser back button or resetting to their home page to try again.

65. Once a subscriber finds the cancelation flow, there is a large button clearly and specifically labeled "Back to home" to help them reset should they get lost or decide to stop.

66. Likewise, should the subscriber prefer to continue, there is a large button clearly and specifically labeled "Continue Cancelation" to help them continue the cancelation process.

67. Both Back and Continue buttons are always enabled (as indicated by their solid blue color, used with other solid and bold colors elsewhere on the site), versus grayed-out or disabled buttons (as indicated by lighter or washed-out colors, and even a ban icon indicating it's not a clickable item). These facts are displayed in the figures below.

CONFIDENTIAL—FTC v. MATCH.COM

38 of 238

Figure 11—Match.com Disabled Button Example



CONFIDENTIAL—FTC v. MATCH.COM

**Figure 12—Enabled Button Example**



D.    Heuristic 4: Consistency and standards

**"Users should not have to wonder whether different words, situations, or actions mean the same thing.**

**Follow platform conventions."**

CONFIDENTIAL—FTC v. MATCH.COM

68. The Match.com cancelation flow satisfies this heuristic because it uses consistent and well-understood language, images, and procedures. The location of all controls, both in the primary navigation at the top of the screen and the subsequent page-level navigation controls all follow established patterns of usability and clarity. If a Match.com subscriber has used any other websites requiring login and profile management, they're probably already familiar with the locations and patterns Match.com uses in its cancelation flow because they are all standard and generally accepted (and have been for years), as described in more detail above.

69. The primary way subscribers reach the cancelation flow is through the Settings page. I understand that the FTC has objected to the gear icon as the image for the settings menu. But the gear icon for the Settings menu is a standard and acceptable image. The Settings menu is indicated with the gear icon, which is a type of Toolbox navigation. (Kalbach 2007) The gear icon, like Match.com's other images, is commonplace and found on millions of websites and apps across the web, so subscribers are likely to understand that the gear icon signifies Settings. As mentioned before, the gear icon has been used for Settings as early as 1995 in Windows 95, and countless systems and sites since. Some examples of systems and websites that use the gear icon for settings are:

1. Apple macOS (desktop)

2. Apple iOS (mobile)

3. Microsoft Windows

4. Microsoft Office 365

5. Amazon

6. Gmail

7. YouTube

CONFIDENTIAL—FTC v. MATCH.COM

8. Reddit

9. Twitter

70. A Google Image search for "settings icon" returns almost exclusively the gear icon, which is by far the

most used icon for settings. This is depicted in Figure 13 below.

Figure 13—Search results for "settings icon" on images.google.com 11.2.2022



CONFIDENTIAL—FTC v. MATCH.COM

71. Even the design system established by the United States government in 2015 at www.digital.gov

recommends using a gear icon for settings. (U.S. Web Design System n.d.). This is shown in Figure 14

below.

**Figure 14—Digital.gov search result for settings icon**



72. Once a subscriber enters the cancelation flow from the Settings (or Help) page, the navigation buttons are standard. Match.com includes "Back to home" and "Continue Cancelation" buttons placed in their standard locations at the bottom left of the content area of these functional pages. The buttons are not hidden or obfuscated. They are large, easily visible, and the text can be clearly read. Their use of taking you home, or continuing cancelation, is consistent with their labels and standard navigation conventions.

73. Finally, any paid subscription service needs to understand why a subscriber might choose to cancel. That information is particularly important for services like Match.com because cancelation does not necessarily mean that the subscriber is unhappy with the service, so the reason is important to know so that Match.com knows how to react. For example, a subscriber may choose to cancel because Match.com helped them find their new partner—in which case the Match.com service performed well— or perhaps they couldn't find anyone—in which case Match.com might want to improve the service. Both are important to know, and generally, subscribers want the service providers to know if the platform worked for them or not. (Gingiss 2019). Match.com includes a simple, optional survey to ask subscribers why they are canceling. The subscriber doesn't have to answer these simple questions, but it's not a large request to ask for clarity regarding the reasons for the cancelation or satisfaction with the service.

E.    Heuristic 5: Error prevention

**"Even better than good error messages is a careful design which prevents a problem from occurring in the first place. Either eliminate error-prone conditions or check for them and present users with a confirmation option before they commit to the action."**

74. Match.com's cancelation flow is designed in a way that eliminates common errors and includes steps to help make sure a subscriber does not commit to an irreversible action by error. Of course, no system is perfect for every user, so this is not to say a system needs to have a 100% success rate at all times for every person in order to be "simple." That would constitute an unreasonable and likely impossible requirement.

75. The focused flow and clear navigation controls have only two options "Back to home" or "Continue Cancelation," which help prevent errors at every step.

76. When the subscriber is prompted for optional additional feedback regarding their experience, the options are presented in single-selection-only controls called radio buttons, meaning the subscriber need not type or engage beyond a simple click. This helps minimize errors. Even when selecting an option that prompts the subscriber with one or two follow-up questions, these are also presented with radio buttons. Still, each is optional and is not a required step to continue canceling. The subscriber can merely skip the question and click Continue Cancelation.

77. To simplify and clarify things, Match.com also breaks the cancelation process into several steps. This is a useful design pattern used to minimize errors by helping ensure only subscribers that truly want to cancel, actually do cancel. If Match.com used a "one-click" cancelation feature, that would likely be far more prone to erroneous cancelations and would be a poor design choice. Cancelation of a subscription is sometimes difficult to reverse, and it is, therefore, reasonable to break the cancelation process into a small number of simplified steps to minimize errors.

CONFIDENTIAL—FTC v. MATCH.COM

F.        Heuristic 6: Recognition rather than recall

**"Minimize the user's memory load by making objects, actions, and options visible. The user should not have to remember information from one part of the dialogue to another. Instructions for use of the system should be visible or easily retrievable whenever appropriate."**

78.  Match.com's cancelation flow satisfies this heuristic. Each action and object are clearly visible. Match.com does not require the subscriber to remember information from one section to the other. Match.com includes clear and obvious instructions throughout.

79. As subscribers begin the cancelation flow, clarity of language and clear, obvious labels lead them down the path. And again, when subscribers are prompted for optional additional feedback regarding their experience, the options are presented in single-selection-only controls called radio buttons, meaning the subscribers need not type or engage beyond a simple click.

80. The text and headings on each screen are clear and discrete, indicating to subscribers what they are doing, and the consequences of moving forward along either path.

G.        Heuristic 7: Flexibility and efficiency of use:

**"Accelerators—unseen by the novice user—may often speed up the interaction for the expert user such that the system can cater to both inexperienced and experienced users. Allow users to tailor frequent actions."**

81. This heuristic is satisfied two-fold. First, novice users like myself as well as 91.5% of our tested novice users in the study were able to cancel successfully. Having done it the first time with little to no experience with the website is a key indicator of good usability. If novice users can find and accomplish

the task at least once, the chances of being able to replicate it again and again approaches the near 100% success range historically. In the case of Match.com, should people cancel then resubscribe, it's clear from the usability test data they would then be much more likely able to cancel on subsequent attempts.

### H.    Heuristic 8: Aesthetic and minimalist design

**"Dialogues should not contain information which is irrelevant or rarely needed. Every extra unit of information in a dialogue competes with the relevant units of information and diminishes their relative visibility."**

82. Based on my review of the cancelation flow, I did not identify any irrelevant or unnecessary information. Each piece of information provided to the subscriber was clear, relatively concise, and easy to understand.

83. Once the subscriber has entered the Manage Subscription page, the options and paths become clear, limited, and obvious. Besides standard banners, header, and footer navigation, the subscriber's focus is entirely on the page content with its navigation options to either manage their subscription or cancel it.

84. As the subscriber proceeds to cancel, minor additional instructions and clarifying content are introduced as gates to ensure the subscriber is aware of what they're doing and the consequences (see Heuristic 5, Error Prevention). The subscriber is prompted with optional feedback questions in simple, plain radio button forms, with clear calls to action to either return home or continue canceling. Heuristic 8 is satisfied.

---

CONFIDENTIAL—FTC v. MATCH.COM

I.      Heuristic 9: Help users recognize, diagnose, and recover from errors

**"Error messages should be expressed in plain language (no codes), precisely indicate the problem, and constructively suggest a solution."**

85. I did not see any error messages in the cancelation flow either through my testing or through the empirical tests that I describe below. Thus, there was no opportunity for any error message to be in codes.

86.  Match.com makes it easy for a consumer to recover from any error, by returning home and beginning again, or using the back button in the browser.

J.      Heuristic 10: Help and documentation

**"Even though it is better if the system can be used without documentation, it may be necessary to provide help and documentation. Any such information should be easy to search, focused on the user's task, list concrete steps to be carried out, and not be too large."**

87. Match.com satisfies this heuristic as it provides documentation and instruction on how subscribers can cancel. As described earlier, subscribers may enter the cancelation flow by directly navigating to their Settings page, or through the Help page. Help is available from the gear menu where the user also found Settings, or from the footer on virtually every page, as shown in, for example, Figures 1-8 above.

CONFIDENTIAL—FTC v. MATCH.COM

88. If subscribers choose Help, there are at least thirteen paths that lead directly to detailed instructions on how to cancel. Those instructions are provided in Section V above. Images for this flow are included in Appendix G.

## K.   Conclusion: Nielsen's 10 Heuristics

89. In conclusion, for the reasons explained above, Match.com's cancelation flow satisfies all 10 heuristics. Based upon this analysis, in my expert opinion, the flow meets best practices for web usability and simplicity.

## L.   Nielsen's Usability Components

90. I next analyzed whether Match.com's cancelation flow meets the five quality components of usability defined by Nielsen: learnability, efficiency, memorability, errors, and satisfaction. As explained below, I conclude that Match.com's cancelation process satisfies each of these five quality components or is inapplicable.

## M.   Learnability

91. The cancelation flow is simple and easy to use, as described above. From my experience in usability and design, it should not require any learning to use. Even so, Match.com provides learning opportunities. First, the format, color, and approach for the cancelation are similar to what Match.com uses for sign-up and generally throughout the site. Thus, subscribers will learn by using the website how to approach cancelation. Plus, the Help documentation provides additional opportunities for subscribers to learn how

to cancel. Overall, the information architecture (how the information is combined hierarchically in relation to other information) is standard and follows common, established paradigms.

N.    Efficiency

92. The Match.com cancelation process is efficient. Because it includes a limited amount of information during each step of the process, the information is quickly scannable, not even requiring full reading or comprehension before moving to the next step. Common keywords like "subscription", "cancel", and "continue" are all present and in clear, legible text. This makes the scanning of each page quick, allowing the subscriber to efficiently move on to the next step.

93. In addition, there are not many steps to cancel and as explained below, subscribers can cancel quite quickly, typically in less than 2 minutes. That is efficient.

O.    Memorability

94. Even though memorability would not necessarily be a requirement for this process, as subscribers don't often perform cancelation tasks many times repeatedly in a short time frame, the core elements of Match.com's flow are easily retainable due to their straightforward nature, and the small number of steps. I canceled several times to test memorability. While the first time took me 3 minutes to cancel (longer than it would normally have taken me as I was also recording and carefully noting my observations, whole-screen overviews, and overall experience), my subsequent cancelation attempts only took about 30 seconds. This shows that the process is memorable.

2.   There are also memory advantages because the cancelation process is like the sign-up process. What subscribers learned from the sign-up syntax and scheme will help subscribers cancel easily.

CONFIDENTIAL—FTC v. MATCH.COM

P.      Errors

95. There are limited places for errors in the cancelation flow. The first place a subscriber might encounter
an error is not being able to find the beginning of the cancelation flow. In this case, there are two major
places subscribers can start, Settings or Help. Both are straightforward and clear about where to go
next. The language of Settings includes an option "Manage subscription" (on the screens I tested on, it
was located dead center of the screen and the first text to catch my eye due to its placement at the
end.) It was the first place a subscriber is likely to look for anything regarding subscriptions, including
canceling. Upon review of the other options, it is even more obvious that "Manage subscription" is the
correct beginning to the flow, as the other options have nothing to do with cancelation.

96. If a subscriber chooses to search for the cancelation feature via Help, the process is also
straightforward. Whether they choose to search for "cancel" and select its auto-complete prompt, or
choose one of at least twelve different search terms resulting in cancelation-related content and click
Search, or select the "Manage My Subscription" Help topic, the subsequent screens direct and guide
them to the same "Manage subscription" feature to help them begin canceling.

97. Once a subscriber selects "Manage subscription," the flow to cancelation completion is straightforward
and clear. The only place a subscriber could potentially err is in forgetting their own password (which
they had used to log in initially, they might even have stored in a password manager that automatically
fills in the password, or they can retrieve via the simple Forgot Password flow), or choosing the option
"Subscription Status" instead of the only other option, "Cancel Subscription." The likelihood of
committing errors on that screen is extremely low. After that, the flow doesn't fork. The subscriber can
end the process by clicking a "Back to home" button or simply continue by clicking the large, blue
"Continue Cancelation" button. The only other option the subscriber has is choosing a save offer, if

CONFIDENTIAL—FTC v. MATCH.COM

presented with one, but as described above, the options on the save offer page are clear and

straightforward, and a subscriber is unlikely to be confused.

98. On the follow-up question screens, there is no text indicating at this stage that the subscriber's

subscription has been canceled, only instructions regarding when the last day of the subscription will be

*if* the subscriber cancels, and a warning that the subscriber will continue to be billed according to the

subscription agreement. Both on this step and the subsequent second question, there is no indication

the cancelation is complete yet, and the large blue button reads "Continue Cancelation" indicating there

is more to follow, making errors unlikely at this stage.

99. Only when a subscriber successfully finishes the cancelation process does the large text at the top read

"Your subscription has been canceled." If a subscriber skips that header and reads the content below, it

begins with the text "Your confirmation number..." and "You do not have to do anything further..." Thus,

all three separate lines of text confirm to the subscriber that they've successfully canceled their

subscription. Additionally, the subscriber receives an email confirmation of cancelation, which is

common. The failure to see a confirmation page or receive a confirmation email should indicate to the

subscriber that the cancelation may not have been completed.

100.     In summary, even if subscribers were to experience a navigation error, they're easily recoverable,

and any errors would continue to redirect them back to the proper cancelation path.

## Q.    Satisfaction

101.      Overall, the cancelation flow meets the requirements of satisfaction. The language, fonts, layout,

and overall aesthetics are clear, legible, and obvious. I found no issues with any of these characteristics.

---

CONFIDENTIAL—FTC v. MATCH.COM

\*      \*      \*

102.     Based on the foregoing heuristic analysis, in my expert opinion, the Match.com online cancelation flow is simple, i.e., clear and effective.

103.     Although my above analysis focused primarily on the current version of Match.com's online cancelation flow, I understand that there have been some changes to various Match.com pages since September 2014. Those pages are no longer on Match.com's live website, but I reviewed videos and/or screenshots of past versions of those pages. Reviewing those versions does not change my opinion that all versions of Match.com's online cancelation flow since at least September 2014 have been simple.

CONFIDENTIAL—FTC v. MATCH.COM

## VII. USABILITY STUDY SUMMARY

104.       To test the results of the heuristic analysis described above, I designed and conducted an empirical study of actual consumers who are within the applicable universe of potential Match.com subscribers. The objective of this study was to empirically test whether Match.com's cancelation process was simple or not. The full study methodology is provided in Appendix C, and the raw data is provided in Appendix H. I briefly describe the study methodology and then report on the results below.

**Study Methodology**

105.       I used the web platform UserTesting.com to host the study and recruit participants from its panel. The basic design of the study was simple. UserTesting.com recruited a cohort of representative potential users of Match.com. I asked the participants to sign up for a Match.com subscription. I then asked the participants to cancel their Match.com subscription. For this study, I used Match.com's actual live website, so it was a real test for what subscribers actually see and do under real-world conditions.

106.       I then analyzed several objective criteria to determine whether the cancelation process was simple:

1.  What percent of participants who signed up were able to cancel? If the process were simple, I would expect that a significant percentage of subscribers (more than 80%) would be able to complete the task of cancelation.

2.  How long does it take for participants to cancel? If the process were simple, I would expect that canceling would not take more than a few minutes.

CONFIDENTIAL—FTC v. MATCH.COM

**APP 741**

3. Does it take longer for participants to sign up for a subscription (including both registration and completing the purchase process) or to cancel their subscription? If the process were simple, I would expect that it would take more time to sign up than to cancel.

107.     I also sought to analyze whether participants subjectively perceived the cancelation process to be simple. To conduct this analysis, after the participants attempted to sign up and after they attempted to cancel, I asked them to rate the task on a standard 1-5 scale of simplicity/difficulty.

1. How do participants perceive the cancelation process? If it were simple, I would expect most respondents to rate the process as simple.

2. How does the signup process compare to the cancelation process in perceived difficulty? If the cancelation process were simpler, I would expect more participants to say so.

**Study Participants**

108.     UserTesting.com recruited 233 participants. 69 were screened out because they were unable to sign up for a Match.com subscription. The reason for the 69 failures was the limitations of the study parameters. To minimize potential fraudulent use of our virtual credit cards, we had to limit the credit limit on each card to $50. This meant participants were required to select a very specific subscription type and payment option (all carefully described in their task instructions). If participants failed to select the appropriate options, they were unable to subscribe, and failing to subscribe meant these participants were unable to even attempt the second task of canceling due to their accounts not having an active subscription. They were then excluded from the final study counts as anyone who failed to subscribe would not be a potential candidate for canceling a subscription. All results and charts in this report therefore are from a total participant count of 164. The charts below show the age and demographic

CONFIDENTIAL—FTC v. MATCH.COM

breakdown of the study participants. This was designed to closely track Match.com's actual customer

demographic distribution.





CONFIDENTIAL—FTC v. MATCH.COM

**APP 743**





109.      One challenge of this study was that I needed to provide a credit card so participants could sign

up on Match.com without using their own cards. To do this, I provided participants with access to a

virtual credit card set up by my firm, Precocity, that could be used to subscribe to the live Match.com

CONFIDENTIAL—FTC v. MATCH.COM

site. By using real money on the real website with first-time Match.com users, we were able to see first-hand how real users might perform in their attempts to subscribe and cancel. At the same time, because the participants did not use their own money, they arguably had less of an incentive to ensure they successfully canceled. So if anything, my usability study is conservative, as the percentage of people able to successfully cancel if their own money is at stake may be larger than that reflected in my usability study.

**Confidence Interval and Statistical Analysis**

110.      A confidence interval level refers to the long-term success rate of the method. It indicates how often this type of interval will capture the parameter of interest. You've probably heard surveys and polls say things like "This number is accurate plus or minus 1%". That margin of error is derived from the confidence interval. A specific confidence interval gives a range of plausible values for the parameter of interest. A 90% confidence level is the benchmark commonly used for user experience design usability tests. However, for this study, I used a higher and stricter 95% confidence level so I would have greater certainty of the results found.

## A.      Summary of Results

111.      Overall, this study demonstrated the Match.com cancelation process is simple. Canceling on Match.com is as simple or simpler than comparable subscription sites and it is simpler for subscribers to cancel than it is for them to sign up. The high rates of successful cancelation, above-average SUS scores, and participant feedback all indicate that the Match.com online cancelation process is simple. The quantitative highlights are:

- **91.5%** of participants who signed up were able to cancel successfully

---

CONFIDENTIAL—FTC v. MATCH.COM

- It took participants an average of **74 seconds** to cancel on Match.com

- Participants were able to cancel much faster than they were able to sign up—Average Cancelation was **16.3% of the time** it took to sign up, or **6.1 times faster**

- **84.7%** of participants thought canceling was at least as simple as signing up

- **88.3%** of participants thought canceling was simple or were at least neutral as to the simplicity/difficulty

- Match.com received an "A Grade" on a System Usability Score (**81.6**), which makes it among the top 10% of all websites in terms of usability

B.    Cancel Success Rates

112.        Overall, 91.5% of participants that subscribed were able to cancel. If the cancelation process were not simple, we would see a far lower success rate on this task. A study conducted by Dr. Sauro of 1189 tasks taken from 115 usability tests from 3472 users indicates "...the average task-completion rate is 78%". (Sauro 2011b) This means the cancelation task completion rate of 91.5% is better than 71.8% of all usability tasks on average and is only .5% shy of being in the top quartile. The figures below provide this data.

CONFIDENTIAL—FTC v. MATCH.COM



| Total Completion Lower Limit | Total Completion | Total Completion Upper Limit | Incompletion |
|---|---|---|---|
| 86.1% | 91.5% | 94.9% | 8.5% |

**Time To Complete Each Task**

113.      I next analyzed how long it took the participants to complete the subscription task and the cancelation task. There was a notable and statistically significant difference in task time between subscribing and canceling. It took participants on average just over one minute (median task time of 74 seconds) to cancel their subscriptions. The relatively short time it took participants to cancel suggests they made few (if any) "errors" they had to recover from by backtracking, and instead likely were able to proceed directly and quickly through the cancelation flow.

---

CONFIDENTIAL—FTC v. MATCH.COM

114.        It took participants much longer to subscribe—a median of 453 seconds. For task time, it is

common practice to use median rather than mean, the common understanding of an average, to

estimate the center of the population. Thus, participants could cancel in just 16.3% of the average task

time it took to subscribe. Participants were on average able to cancel in 83.7% less time than it took to

subscribe. The figures below summarize this data.



| Subscribing | | |
| --- | --- | --- |
| Task Time Lower Limit | Median Task Time | Task Time Upper Limit |
| 400 sec | 453 sec | 484 sec |
| Canceling | | |
| Task Time Lower Limit | Median Task Time | Task Time Upper Limit |
| 64 sec | 74 sec | 81 sec |

### C.    System Usability Scale (SUS) Scores

115.    After each testing session, participants were asked a series of questions that are part of the System Usability Scale (SUS) survey.

116.    According to the government website usability.gov, the SUS "provides a 'quick and dirty', reliable tool for measuring the usability." The SUS "consists of a 10-item questionnaire with five response options for respondents; from Strongly agree to Strongly disagree. Originally created by John Brooke in 1986, it allows you to evaluate a wide variety of products and services, including hardware, software, mobile devices, websites and applications."

---

117.     As usabilty.gov explains "SUS has become an industry standard, with references in over 1300

articles and publications."

118.     Based on research by Jeff Sauro, Ph.D., a SUS score above 68 would be considered above

average, and anything below 68 is below average. A score of 80.3 would place a product in the top 10%

and is the point at which it becomes more likely that a user will recommend the website to a friend. For

this reason, 80.3 is the goal of a strong website. (Sauro 2011a)

119.     The chart below provides the recommended way to interpret SUS scores.

MEANING OF SUS SCORES/RELATED ADJECTIVES (Lewis and Sauro 2018)

| Grade | SUS Score | Percentile Range | Adjective |
|-------|-----------|------------------|-----------|
| A+ | 84.1—100 | 96—100 | Best Imaginable |
| A | 80.8—84.0 | 90—95 | |
| A- | 78.9—80.7 | 85—89 | Excellent |
| B+ | 77.2—78.8 | 80—84 | |
| B | 74.1—77.1 | 70—79 | Good |
| B- | 72.6—74.0 | 65—69 | |
| C+ | 71.1—72.5 | 60—64 | |
| C | 65.0—71.0 | 41—59 | Average |

CONFIDENTIAL—FTC v. MATCH.COM

**APP 750**

| C- | 62.7—64.9 | 35—40 | |
| D | 51.7—62.6 | 15—34 | Poor |
| F | 0—51.6 | 0—14 | Worst Imaginable |

120.      The results of the SUS questions for Match.com was **81.6**. This is an **A rating**, and very strong. It puts Match.com's signup and cancelation flow among the top 10% of all websites in terms of usability.

**Average SUS Score Across All Participants:**

| Lower Limit | Average SUS Score* | Upper Limit |
|---|---|---|
| A- (79.0) | A (81.6) | A+ (84.2) |

D.   Qualitative Questions

121.      In addition to the objective criteria, I also asked several qualitative questions so I could determine user perception of the simplicity/difficulty of cancelation. This section is split into three categories: Introductory Questions, Task Questions, and Closing Questions.

E.   Introductory Questions

122.      **Intro Question 1:** Have you previously signed up for a paid subscription online? If so, please indicate which online subscription you have signed up for below. If the service is not listed, select "Other." If you have *not* signed up for a subscription online before, select "None."

CONFIDENTIAL—FTC v. MATCH.COM

123.        The figure below shows the results of this question. Most participants had signed up for another web-based subscription service, with Amazon Prime and Netflix being the most common.



Other subscription sites or types of online subscriptions mentioned include:

- Tinder
- Food plans
- Audible
- YouTube TV/YouTube Premium
- Clothing
- Hulu

- Disney+
- HBO Max
- Costco
- Fitness
- Charities
- Crunchyroll

CONFIDENTIAL—FTC v. MATCH.COM

- Sports Channels
- Patreon
- Peacock
- Other dating sites
- Adobe

- Shudder
- SlingTV
- Paramount+
- Gaming subscriptions

F.   Task Questions

**Subscription Comparison**

124.   After the participant completed signing up for Match.com, we asked them to compare the Match.com subscription experience to their other subscription experiences. Here is the question:

125.   **Task Question 1:** How did your experience subscribing to Match.com compare to your subscription experience for *other* online products or services you have subscribed to?

1.   Match.com subscription was much more difficult

2.   Match.com subscription was slightly more difficult

3.   About the same in terms of simplicity/difficulty

4.   Match.com subscription was slightly simpler

5.   Match.com subscription was much simpler

126.   As the figure below shows, participants reported that signing up for Match.com was about the same in terms of simplicity as signing up for other subscription services. With a margin of error of .14 at 95% confidence, we can be quite confident that users feel that the Match.com subscription process is about as simple as any of the other subscription sites with which they are familiar.

CONFIDENTIAL—FTC v. MATCH.COM

67 of 238



127.    This next section covers the **Single Ease Question** (SEQ) asked for each of the two tasks (sign up and cancelation). This is a standard question to ask after a task during a usability study to gauge the participant's perception of the ease/difficulty of that task. The participant provides an answer on a 5-point scale ranging in difficulty/simplicity. These data can then be analyzed statistically for comparison or benchmarking purposes.

**Subscription Single Ease Question**                    **Cancelation Single Ease Question**

1. How would you best describe the                    2. How would you best describe the

   **subscription** process on Match.com?                  **cancelation** process on Match.com?

   1. Very Difficult                                       1. Very Difficult

   2. Difficult                                            2. Difficult

   3. Neither Difficult or Simple                          3. Neither Difficult or Simple

   4. Simple                                               4. Simple

   5. Very Simple                                          5. Very Simple

128.    As the results below show, both subscribing and canceling were rated to be at about a 4, which is

"simple" in this case. The difference between the two scores was found to be from 0 to 0.26 at 95%

confidence in and, therefore, not statistically significantly different (p=.392).



129.     In total, 88.3% of participants rated the cancelation process as very simple, simple, or neutral in terms of simplicity.

## G.   Closing Questions

**Subscription vs Cancelation Comparison**

130.     We then asked participants to compare their experience signing up to their experience canceling.

131.     **Closing Question 1:** How did your experience **subscribing** to Match.com compare to your experience **canceling** your Match.com subscription?

1. Canceling was much more difficult than subscribing

2. Canceling was slightly more difficult than subscribing

3. Canceling and subscribing were about the same in terms of simplicity/difficulty

4. Canceling was slightly simpler than subscribing

5. Canceling was much simpler than subscribing

132.     Overall, as the results below show, participants rated the cancelation process as slightly simpler than the subscription process. Although both were rated as simple, the participants reported cancelation was slightly simpler still. Moreover, 84.7% of responses were a 3 or higher. Meaning nearly 85% of participants rated the cancelation process as simple as, or simpler than, the subscription process.



## VIII.   ANALYSIS OF MATCH.COM SUBSCRIBER DATA

133.       I also analyzed Match.com's actual subscriber data to determine whether Match.com had data to show whether subscribers could easily cancel on its website. My analysis of this data confirms Match.com's online cancelation flow is simple. The data is also consistent with the results from my usability study described above.

**Cancelation Success Rate**

134.       I calculated the percentage of subscribers that successfully cancel through the online cancelation flow or accept a save offer, out of the total number of subscribers that enter the flow (defined as clicking the "Cancel Subscription" button that leads to the first survey page).[9] Using that approach, from January 2013 through December 2022, over 95% of subscribers who entered the flow either canceled

---

[9] I consider this the appropriate page at which to treat a subscriber as entering the cancelation flow because the subscriber could have visited all previous pages for non-cancelation reasons. For example, the subscriber could have visited the Account Settings page to change their account password or manage email notifications. Or the subscriber could have visited the "Manage subscription" page to view subscription status.

CONFIDENTIAL—FTC v. MATCH.COM

through the flow or accepted a save offer before their next renewal.[10] In my experience and expert opinion, that high of a "success rate" indicates a simple and easy-to-use process.

135.    My analysis is conservative because the subscribers who entered the flow but did not ultimately cancel do not necessarily represent "failed" cancelation attempts. There could be many reasons a subscriber who entered the flow did not complete the cancelation. For example, a subscriber may have entered the cancelation flow with no intent to cancel but hoping to trigger a "save offer" to obtain a discounted renewal. If the subscriber was never presented with and therefore never accepted a save offer, that subscriber would be counted as a "failed" cancelation in the analysis above, even though the subscriber never intended to cancel. Alternatively, a subscriber may have entered the flow with the intent to cancel but changed their mind for a variety of reasons. Perhaps the subscriber reviewed the list of benefits he or she would lose by canceling (presented on the second survey page) and decided not to cancel. Or the subscriber was merely browsing the site to see what the cancelation process entails if and when the subscriber might want to cancel at some point in the future, with no present intent to cancel. Or a subscriber intended to cancel but was interrupted by some other event entirely unrelated to the cancelation flow (someone at the door, a telephone call, etc.). But because those subscribers did not cancel, they would all be treated as "failed" cancelations in the analysis above, thereby artificially decreasing the "success rate." Thus, it is likely that the number of subscribers (if any) that were truly "unable" to cancel is far less than the 5% suggested by the analysis above, further bolstering my opinion that the high success rate suggests a simple and easy-to-use process.

---

[10] MATCHFTC846468. This number is calculated by dividing the sum of Columns E (reflecting the number of subscribers who canceled through the flow before their next renewal) and G (reflecting the number of subscribers who accepted a save offer), by the sum of Column C (reflecting the number of subscribers entering the flow). The result is .9546, or 95.46%, meaning over 95% of subscribers that enter the flow successfully cancel through the flow or accept a save offer prior to their next renewal.

CONFIDENTIAL—FTC v. MATCH.COM

**Average Time to Cancel**

136.     In addition to the above, I also analyzed the median time it takes actual subscribers to complete the online cancelation flow. From January 2013 through October 2022, the median time from clicking "Cancel Subscription" to completing the cancelation was approximately 44 seconds, with a range of 36 seconds to 76 seconds.[11] In my experience and expert opinion, a cancelation process that has an average median time to complete of only 44 seconds is simple and easy to use. That number indicates subscribers can quickly and efficiently move through the pages.[12]

137.     As in the usability study, I also compared the median time to cancel to the median time to successfully complete the subscription purchase process (excluding the time it takes to register for an account, which is a necessary step before purchasing a subscription). Although it would be reasonable to include both registration and subscription in the comparison to the cancelation flow—which is what I did in my usability study described above—because both are necessary steps before a consumer can actually purchase a subscription, I understand that Match.com does not track the amount of time that it takes a user to complete the registration process, so that data is unavailable. As a result, I took a conservative approach here and compared only the payment process completion time to the cancelation flow completion time. As indicated by the length of time it took participants in the usability study to sign up for a Match.com subscription (including both registration and subscription), the registration process is relatively lengthy as compared to the subscription payment process. A video of the entire registration and subscription process is available at Appendix K.

---

[11] MATCHFTC777081. This number is the average of the monthly median time to cancel values in Column C.

[12] The average median time from the password entry page to cancelation confirmation (represented in Column D of the same spreadsheet) is approximately 94 seconds, which is understandable given the time it takes to enter a password and potentially complete a reCAPTCHA, if presented with one. Inclusion of those pages in the median time to cancel does not change my opinion.

CONFIDENTIAL—FTC v. MATCH.COM

138.     From January 2013 through August 2022, the average median time from the first payment page click in a session to a successful subscription purchase was approximately 175 seconds—over four times longer than the average median time to cancel.[13] This indicates to me the cancelation process is at least as simple as—and likely simpler than—the purchase process.

DATED: January 13, 2023

Brandon E.B. Ward

---

[13] MATCHFTC774721. This number is the average of the monthly median time to successful purchase in Column C.

CONFIDENTIAL—FTC v. MATCH.COM

# APPENDICES

## A Curriculum Vitae

**BRANDON E.B. WARD — CXO, EXPERIENCE DESIGN LEADER/SPEAKER/EDUCATOR**

[brandonebward.com](brandonebward.com) • [brandonward@precocityllc.com](brandonward@precocityllc.com)

I seek executive design leadership opportunities where the people using the product are at the heart of the business.

My career has included designing experiences, leading, speaking, teaching, writing, and directing; creating and developing unique, award-winning, and usable software, mobile apps, websites, and AR/VR experiences.

I hold a master's degree in Interactive Media Design and 3 Bachelor's degrees in Music and Theatre.

**SKILLS**

**LEADERSHIP**       Team building, Mentoring, Management, Product, Scrum, Speaking, Teaching

**DESIGN**              UX/UI/Service, Web, Sound, Instructional, Graphic, Product

**PRODUCTION**     Software, Web, Mobile, Graphic, Audio, Video

**LANGUAGES**       English, Cebuano, Hiligaynon, Tagalog

**EXPERIENCE**

**PRECOCITY** – Chief Experience Officer (CXO), Senior Director of User Experience     2016 - Present

I lead the UX efforts both internally and as a consultant. I work closely with the executive team to define Precocity's UX practice, methods, tools, ethos, and culture. As a consultant, I execute these philosophies and practices for a variety of clients, from research and testing to UX/UI design, to audio and video production. I was in charge of sourcing, interviewing, and hiring consultants and executives, as well as mentoring the UX/UI teams. I coordinate with the heads of the Data Science and Engineering departments to align our visions to ensure a cohesive, comprehensive, data-driven design offering.

- Designed, led, and executed Toyota's first usability research initiatives across their in-car and mobile software experiences, helping change how Toyota approaches software projects globally
- Worked closely with the executive team to attract, pitch, and land new business, write proposals, and statements of work
- Authored and designed Precocity's branded design process IDEA
- Authored, designed, and built Precocity's branded redesign process and tool EVO
- Represented Precocity at various conferences, networking, building new client relationships
- Consulted with small, medium, and Fortune 10 clients – Research, Information Architecture, UX/UI/Graphic Design, Rapid Prototyping, Usability Testing, Design Studio, Planning, Brainstorming, and Workshops

**SERVICE DESIGN NETWORK** - DALLAS – Founder & Host      2018 - Present

Co-founded this meetup, in-person and virtual. Grew to 1785 members in 2 years.

**IMPACT UTAH** – Chief Experience Officer (CXO)          2015 - Present

I help drive the service, experience, and brand design of iMpact Utah, and its holding companies. We offer best-in-class management consulting across a variety of industries.

---

CONFIDENTIAL—FTC v. MATCH.COM

76 of 238

**SOUTHERN METHODIST UNIVERSITY** – Instructor     2015 - Present

I teach User Experience Design, and Service Design as part of CAPE's design/development certificate programs.

**IMPROVING ENTERPRISES** – Senior Experience Designer      2013 - 2015

As a senior consultant for Improving Enterprises, I represented Improving's UX and Design interests for select clients. I worked both on-site and remotely with them, investigating their current and future products and services. I conducted user research and usability tests and designed wireframes, prototypes, and mockups based on that research. I worked closely with leadership across all teams, including the C-suite, both client-side and within Improving.

- Worked closely with executives, product ownership, and development to ensure quality and correct results
- Major point of contact between client executives and Improving Enterprises
- Conducted user research and usability tests for both new and redesigned projects
- Lead tool and process training
- Spoke at industry conferences
- Hosted user groups and meetings on behalf of Improving Enterprises

**STUDIOGOOD** – Director of UX/UI     2013

Lead the company in a shift from social to digital agency and establish user experience as a core practice. Along with the leads from development and account management, I lead the development and implementation of a new responsive workflow process to build efficiencies while producing responsive

CONFIDENTIAL—FTC v. MATCH.COM

websites, microsites, and Facebook tabs. Some projects required concept-to-execution turnaround in as little as 5 days.

- Helped establish a new responsive, agile design/development process for producing responsive websites.
- Lead brainstorming sessions for idea generation for client pitches, and social and marketing strategies
- Interviewed and counseled every person in the company as to what was wrong and how we could fix it - instituted changes to help with major issues, and morale.
- Coordinator for design and development teams, ensuring team parity during the lifetime of the project.
- Designed social graphics, posts, and media for major brands.
- Designed responsive websites, Facebook Tabs, and microsites (wireframe, UI, layout, graphics, icons)
- Established regular brown-bag meetings where members of the team could share new ideas and skills with the rest of the company
- Built and established usage of a central company Wiki, taught teams how to use it

**TRIGEO/SOLARWINDS** – Director of UX/UI, Lead/Senior Developer  2009 - 2013

I lead the front-end team in the design and implementation of all features and fixes, including front-end development. At TriGeo, I helped completely redesign and launch our most successful product release ever (from UX to icons, to GUI, to packaging) leading to a record year for the company and a key factor in the company's acquisition in 2011 by SolarWinds for $35 Million.

- Hired, built, and lead a new UX/UI Team of 6 developers and designers
- Designed and developed interaction flow, icons, color schemes, and palettes, dynamic dashboards, custom search, and query interfaces, reporting tools, labels, packaging, marketing materials, and more.
- Oversaw rebranded and updated product for release just 1 month after acquisition

CONFIDENTIAL—FTC v. MATCH.COM

- Wrote many custom components, and established coding best practices and standards.

**BRAINBOX ENTERTAINMENT** – Senior Designer & Flex Developer    2008 - 2009

Contracted to bridge the gap between design and development for a new online customer-facing sporting platform (kronum.com). Helped lead the project in terms of development, scope, communication, art preparation, skinning, themes, and more.

**DELVE NETWORKS** – Senior UX & UI Designer 2008

UX/UI Designer for the front and back-end applications of this startup focused on video search. Quickly learned new skills to take on additional design implementation development roles to augment the team.

**MEDIAPRO** – Development Coordinator, UI Designer/Developer        2005 – 2007

Contracted as Flash developer quickly brought on full-time to multiple projects for graphic design, video and audio consultation, and voice-over talent. Soon advanced to full-time development coordinator. Trained 2 new developers and oversaw their progress. Highly sought-after designer/developer for internal projects for clients like American Express and Microsoft.

**STAFFING TOOLS** – Director of Production        2000 – 2004

UI design, MM Director, and Flash development of training and testing for digital design tools

**TALKS**

- UX Without the U is Your X
- Ethics Ex Machina: Designing the Future with a Conscience
- In Case of Emergency, Break Taboo

CONFIDENTIAL—FTC v. MATCH.COM

- The Triforce of UX: How to Hire a Great UX Designer

- Service Design: Your Next Career Move

- Designing a Great Experience: The ROI of UX

- Project Operation: Improving complex systems w/out killing the patient

- UX As a Service: 5 Strategies to Elevate Design Thinking in Your Organization

**EDUCATION**

**Master of Science in Interactive Media**

Indiana University, Bloomington // 2004

Taught Video Production and Non-linear Video Editing 101

**B.A., multiple degrees in Vocal Performance, Music Theory and Composition and Theatre**

Dean's List, Cum Laude

College of Idaho, Caldwell // 2000

CONFIDENTIAL—FTC v. MATCH.COM

## B Select Representative Client List

- American Heart Association
- American Express
- Axway
- Be The Match Foundation
- Boeing
- CDC Small Business Finance
- Deloitte
- DFW International Airport
- Equinox Gyms
- HKS
- Johns Hopkins Medicine
- Love's
- Mars Chocolate

- Microsoft
- Milestone Home Service Company
- Nasdaq
- Neiman Marcus
- Nokia
- PartyCity
- Populous Financial Group
- RoboKind
- ServiceKing/Crash Champions
- Toyota
- United States Air Force
- Verizon
- YPO

# C Match.com Subscription Cancelation Usability Study Test Plan

## Study Objective

The objective of this study is to assess whether the web cancelation flow on Match.com is simple.

## Research Design

To assess whether Match.com's cancelation flow is simple, I have designed a study that will primarily do two things. First, it will collect primary data on whether Match.com's web cancelation flow is simple. Second, it will collect consumer impression data showing whether consumers believe Match.com's cancelation flow is simple or not.

The study will have the following research design:

- A random sample of 150-200 participants.

- Each respondent will be asked to go to Match.com and become a subscriber. They will then be asked to cancel that subscription.

- Technology platform UserTesting.com will be used to record and monitor each participant's process of subscribing to Match.com and canceling their subscription. More details on the qualifications and experience of UserTesting.com are included in Exhibit 5.

- Participants will be provided with a virtual credit card to pay for their subscriptions.

- Participants will complete the tasks remotely via the UserTesting.com platform and they will not be moderated live.

- Each participant will be asked to complete a short survey questionnaire that will seek data on whether participants felt like the cancelation flow was simple or not.

CONFIDENTIAL—FTC v. MATCH.COM

- I have designed the study to collect data on both the subscription and cancelation process so I can analyze whether the cancelation process is at least as simple as the subscription process. In this way, the subscription process is acting as a control for the study.
- Each participant will be blinded to the purpose and sponsor of the study.
- I will use best practices in usability testing and study design throughout the study.

## Universe & Sample

The universe for this study includes all potential Match.com users in the U.S. between 2014-present.

UserTesting.com will recruit a random sample of single male and female participants between the ages of 18 and 70 with internet connections who have never been Match.com subscribers and are currently single.

The participants will be recruited to match the gender and age characteristics of Match.com's customer base to the greatest extent possible. The ex ante recruitment goals are the following:

|  | 18-29 | 30-39 | 40-49 | 50-59 | 60-70 | Total |
|---|---|---|---|---|---|---|
| **Female Recruits** | 24 | 28 | 25 | 16 | 7 | 100 |
| **Male Recruits** | 26 | 28 | 25 | 15 | 6 | 100 |

Before being instructed to complete any task or enter the main survey questionnaire, we will use a short screening questionnaire to collect demographic data and confirm eligibility for the study. The screener questionnaire is included in Exhibit 1.

Each participant will be blinded to the purpose and sponsor of the study.

CONFIDENTIAL—FTC v. MATCH.COM

## Training

The participants, already trained in testing via the UserTesting.com platform, will receive an overview of the usability test details via written instructions at the beginning of their study experience. That training material is attached as Exhibit 2.

## Procedure

Each participant will be seated at their computer (desktop or laptop) in their environment.

Participants will first complete a screener questionnaire to confirm their eligibility for the study.

Participants will then be provided with instructions on what the first task is.

> Task 1—As efficiently as you can, subscribe for a paid Premium Three-Month subscription to Match.com.

> Task 2—Cancel your subscription.

The instructions will encourage the participants to complete each task in one sitting and to do so in the most timely and efficient manner. The platform will record the screen so we will have a record of each step a participant takes for each task. The platform will also time how long it takes the participant to complete each task.

The participants will then be asked to answer a short questionnaire after they complete (or fail to complete) Task 1 or Task 2. If a respondent fails to complete Task 1, they will not be eligible to complete Task 2. The participants will be asked to provide honest opinions regarding their experiences with tasks 1 and 2.

Standard and Objective Measures to Assess Simplicity

We will use the following objective usability measures to assess the simplicity of the Match.com cancelation flow.

## Task Completion

We will assess whether participants successfully completed each task by viewing their video to see if they've landed on the correct screen. We can compare the successful completion rates between Tasks 1 (subscription) and Task 2 (cancelation). If the cancelation process is simple, we'd expect a high task completion rate for Task 2. If the cancelation process is not simple, we'd expect a low task completion rate for Task 2. To see how success/failure will be calculated see the coding rubric in Exhibit 3.

## Time To Complete Task

The time to complete each scenario will be recorded and analyzed. We will compare the time to complete Task 1 (subscription) vs. Task 2 (cancelation).

Subjective Evaluations

We will use a standard questionnaire to assess how participants perceived the subscription and cancelation process. After each participant completes a task, they will be asked to answer the following questions.

The tasks and questions are identical for all participants in the study. See Exhibit 4.

## SUS Survey (System Usability Scale)

The following rating scale will be used to categorize the results from the SUS surveys.

CONFIDENTIAL—FTC v. MATCH.COM

85 of 238

Though participant scores are 0-100, these are not percentages and should be considered only in terms of their percentile ranking. Based on research by Jeff Sauro, Ph.D., a SUS score above 68 would be considered above average, and anything below 68 is below average. A score of 80.3 would place a product in the top 10% and is the point at which it becomes more likely that a user will recommend it to a friend. For this reason, it is set as the base goal. (Sauro 2011a)

MEANING OF SUS SCORES/RELATED ADJECTIVES (Lewis and Sauro 2018)

| Grade | SUS Score | Percentile Range | Adjective |
|---|---|---|---|
| A+ | 84.1—100 | 96—100 | Best Imaginable |
| A | 80.8—84.0 | 90—95 | |
| A- | 78.9—80.7 | 85—89 | Excellent |
| B+ | 77.2—78.8 | 80—84 | |
| B | 74.1—77.1 | 70—79 | Good |
| B- | 72.6—74.0 | 65—69 | |
| C+ | 71.1—72.5 | 60—64 | |
| C | 65.0—71.0 | 41—59 | Average |
| C- | 62.7—64.9 | 35—40 | |
| D | 51.7—62.6 | 15—34 | Poor |
| F | 0—51.6 | 0—14 | Worst Imaginable |

## Reporting Results

An integrated report will be provided with the results of this study.

## Ethics

All persons involved with the usability test are required to adhere to the following ethical guidelines:

CONFIDENTIAL—FTC v. MATCH.COM

- Minimal risk to participants and staff
- Participant's data is kept confidential
- Participants may withdraw at any time

## Test Plan Appendix

### Exhibit 1—Screener

1. Are you single?
   a. Yes. [Accept]
   b. No. [Reject]
   c. It's complicated. [Reject]

2. Have you ever used the Match.com service before?
   a. Yes. [Reject]
   b. No. [Accept]

3. Are you comfortable using a real email address for this study? It will not be used for marketing or sales purposes.
   a. Yes. [Accept]
   b. No. [Reject]

4. Are you comfortable using your real cell phone number for this study? It will not be used for marketing or sales purposes.
   a. Yes. [Accept]
   b. No. [Reject]

### Exhibit 2—Introduction

You have decided to sign up for an online dating subscription on Match.com.

---

CONFIDENTIAL—FTC v. MATCH.COM

87 of 238

**APP 773**

- Please proceed as if you were completing each of these tasks in real life.

- Please complete each task as efficiently and effectively as you can.

- Please mute your microphone. There is no need to talk or think aloud as you go.

- Please complete this study in one sitting.

- If you wear glasses or contacts please wear them during this study.

## Exhibit 3—Coding Rubric

We will use the following objective usability measures to assess the results of the Match.com study.

## Task Completion

At the time of reported completion, we will assess whether participants successfully completed each task.

**Task 1: Subscribe**

If a participant completes this task they will see this summary screen upon submission of their payment information:





This should be tagged as #Completed_Subscription

If they didn't get to this screen during subscription, it is #paymentfailed.

**Task 2: Cancel**

If a participant completes this task, they will see this summary screen upon canceling their subscription:



This should be tagged as #unsubscribesuccess

If they didn't get to this screen during subscription no tagging for this task is necessary. Tag as #nounsubscribe if the screen was not reached.

## Time To Complete Task

The time to complete each task is tracked by the UserTesting.com platform. We'll look at each of the two tasks we're measuring, Subscription and Cancelation, and record the time it took participants to complete them.

## Exhibit 4—Tasks & Questions

### Question 1

Please enter the email address you'll be using to perform your tasks today.

**Note**: You must use the same email address for all tasks involved in this study, and it must be a real email address. We will not use this email for marketing or sales purposes, only to validate the tasks in this study.

[Written response]

**Question 2**

Have you previously signed up for a paid subscription online? If so, please indicate which online subscription you have signed up for below. If the service is not listed, select "Other."

**Question 3**

If you have *not* signed up for a subscription online before, select "None."

[Multiple choice: Netflix, LinkedIn, Cable TV, Amazon Prime, Spotify, Pandora, Apple Subscriptions, Google Subscriptions, Intuit products (e.g. Quicken, QuickBooks etc.), Other, None]

**Question 4**

If you marked **Other** on the previous question, please write which other paid subscriptions you've signed up for in the past. Otherwise, please type NA. [Written response]

**Setup 1**

The next step is to obtain test credit card information that you'll use later in the study. To access this information, in the next step when the page opens, use the username **precocity** and the password [**redacted**]. Both username and password are case-sensitive.

**Note**: This task is only for obtaining your test credit card information. Later, when you are asked questions about your experience with the Match.com website, do **not** include this task in your responses.

Once the test page fully loads move on to the next step.

**Setup 2**

**Please read carefully:**

---

CONFIDENTIAL—FTC v. MATCH.COM

This page allows you to retrieve the test credit card information you will need later in the study. You will need to enter your email address, then copy all the credit card information you see and store it somewhere you can retrieve it when prompted later.

Once you have copied and stored the credit card information somewhere safe, move on to the next step.

To access the credit card information page, use the username **precocity** and the password [**redacted**]. Both username and password are case-sensitive.

**Note:** This task is only for obtaining your test credit card information. Later, when you are asked questions about your experience with the Match.com website, do **not** include this task in your responses.

   **<User clicks a button that launches Match.com>**

Once the test page fully loads move on to the next step.

   **Task 1**

As efficiently as you can, subscribe for a paid **Premium Three-Month** subscription to Match.com.

- Use your **actual** zip code during sign-up (to prevent getting flagged as fraud)
- Use a real-sounding name (*not* John/Jane Doe etc., to prevent getting flagged as fraud)
- Use the test credit card info you stored at the beginning of the study. When you enter the CC information, use the zip code associated with the credit card
- If prompted for any add-ons **skip them**
- Choose to pay in **4 payments** (NOT in full today)
- Choose the Premium Three-Month option

   **Post Task 1 Question 1**

How would you best describe the **subscription** process on Match.com?

[Multiple choice: Very Difficult, Difficult, Neither Difficult or Simple, Simple, Very Simple]

**Post Task 1 Question 2**

How did your experience subscribing to Match.com compare to your subscription experience for *other* online products or services you have subscribed to?

[Multiple choice: Match.com subscription was much simpler, Match.com subscription was slightly simpler, About the same in terms of simplicity/difficulty, Match.com subscription was slightly more difficult, Match.com subscription was much more difficult, Not Applicable]

**Task 2 Setup**

If prompted to verify your account with a text message please do so. We will not use your phone number outside of this study.

**<User clicks a button that reloads Match.com>**

Once the page fully loads, move on to the next step.

**Task 2**

Cancel your subscription.

**Post Task 2 Question 1**

How would you best describe the **cancelation** process on Match.com?

[Multiple choice: Very Difficult, Difficult, Neither Difficult or Simple, Simple, Very Simple]

**Post Task 2 Question 2**

How did your experience *subscribing* to Match.com compare to your experience *canceling* your Match.com subscription?

[Multiple choice: Canceling was much simpler than subscribing, Canceling was slightly simpler than subscribing, Canceling and subscribing were about the same in terms of simplicity/difficulty, Canceling was slightly more difficult than subscribing, Canceling was much more difficult than subscribing]

**Post Study SUS Survey**

For each of the following questions, please rate your experience **subscribing and canceling** on Match.com on a scale from 1 to 5, where 1 means you **Strongly Disagree**, and 5 means you **Strongly Agree** with the statement.

1. I think I would like to use the Match.com website frequently. [5-point Rating scale: Strongly disagree to Strongly agree]

2. I found the Match.com website unnecessarily complex. [5-point Rating scale: Strongly disagree to Strongly agree]

3. I thought the Match.com website was easy to use. [5-point Rating scale: Strongly disagree to Strongly agree]

4. I think that I would need the support of a technical person to be able to use the Match.com website. [5-point Rating scale: Strongly disagree to Strongly agree]

5. I found the various functions on the Match.com website were well integrated. [5-point Rating scale: Strongly disagree to Strongly agree]

6. I thought there was too much inconsistency on the Match.com website. [5-point Rating scale: Strongly disagree to Strongly agree]

7. I would imagine that most people would learn to use the Match.com website very quickly. [5-point Rating scale: Strongly disagree to Strongly agree]

8. I found the Match.com website very cumbersome to use. [5-point Rating scale: Strongly disagree to Strongly agree]

9. I felt very confident using the Match.com website. [5-point Rating scale: Strongly disagree to Strongly agree]

10. I needed to learn a lot of things before I could get going with the Match.com website. [5-point Rating scale: Strongly disagree to Strongly agree]

**Pre-Tests**

Before running the study against the full battery of participants we ran two pre-tests. This helped us identify any problems with the way the study was configured and any errors in the tasks or questions. The issues identified which were subsequently changed for the main ones described above are described below.

**Pre-Test One**

The first pre-test did not limit the recruitment to the United States.

During this pre-test, made changes to the way the instructions worked in User Testing to make it more clear for participants. Task 4 was originally as follows:

> This new test page will allow you to retrieve the test credit card information you will need to complete the following task. Once you can access the credit card information, move on to the next step. To access the test page, use the username **precocity** and the password **[redacted]**. Both username and password are case-sensitive.
>
> **Note**: This task is not a part of the study. It gives you the tools necessary to complete the tasks in this study.

CONFIDENTIAL—FTC v. MATCH.COM

Because of how tabs are launched and the instructions presented, in the original format participants weren't able to understand the tasks because the instructions disappeared. They also seemed confused about whether to report on the retrieval of the credit card information as part of their overall responses regarding the Match.com website. Task 4 was changed to:

> The next step is to obtain test credit card information that you'll use later in the study. To access this information, in the next step when the page opens, use the username **precocity** and the password [redacted]. Both username and password are case-sensitive.
>
> **Note:** This task is only for obtaining your test credit card information. Later, when you are asked questions about your experience with the Match.com website, do **not** include this task in your responses.

I then made the credit card website launch after they'd read the instructions instead of before. This necessitated an additional task following the original Task 4:

> Once the test page fully loads move on to the next step.

Now that the credit card page was loaded, I then reiterated the instructions on how to retrieve the CC information necessary for the subsequent task.

> **Please read carefully:**
>
> This page allows you to retrieve the test credit card information you will need later in the study. You will need to enter your email address, then copy all the credit card information you see and store it somewhere you can retrieve it when prompted later.
>
> Once you have copied and stored the credit card information somewhere safe, move on to the next step.

---

To access the credit card information page, use the username **precocity** and the password **[redacted]**. Both username and password are case-sensitive.

**Note:** This task is only for obtaining your test credit card information. Later, when you are asked questions about your experience with the Match.com website, do **not** include this task in your responses.

Next, I observed participants not following instructions correctly preventing them from being able to complete the task of subscribing (for example selecting a plan or payment option that cost more than the virtual credit card would allow). Original Task 6 was changed from:

As efficiently as you can, subscribe for a **Premium Three-Month** subscription to Match.com.

- If prompted for any add-ons **skip them**
- Choose to pay in **4 payments** (NOT in full today)
- Use the credit card info you were given in the other tab at the beginning of the study

To:

As efficiently as you can, subscribe for a paid **Premium Three-Month** subscription to Match.com.

- Use the test credit card info you stored at the beginning of the study
- If prompted for any add-ons **skip them**
- Choose to pay in **4 payments** (NOT in full today)
- Choose the Premium Three-Month option

Next, I italicized the word "other" in the subscription follow-up question two and added the option "Not Applicable" (in case they'd previously answered they didn't subscribe to other services). It was:

How did your experience subscribing to Match.com compare to your subscription experience for other online products or services you have subscribed to?

[Multiple choice: Match.com subscription was much simpler, Match.com subscription was slightly simpler, About the same in terms of simplicity/difficulty, Match.com subscription was slightly more difficult, Match.com subscription was much more difficult]

And Became:

How did your experience subscribing to Match.com compare to your subscription experience for *other* online products or services you have subscribed to?

[Multiple choice: Match.com subscription was much simpler, Match.com subscription was slightly simpler, About the same in terms of simplicity/difficulty, Match.com subscription was slightly more difficult, Match.com subscription was much more difficult, Not Applicable]

I also added the "Not Applicable" response option to the final post-cancel task follow-up question.

**Pre-Test 2**

The second pre-test showed people still struggling with the specifics of getting subscribed under the test conditions. I also observed some people getting flagged as fraudulent by Match.com due to a mismatch in their Zip codes vs their IP addresses as well as fake names. I added additional instructions to the subscription task, Task 6 in Pre-Test 1, which was now Task 8. It was:

As efficiently as you can, subscribe for a paid **Premium Three-Month** subscription to Match.com.

- Use the test credit card info you stored at the beginning of the study

- If prompted for any add-ons **skip them**

- Choose to pay in **4 payments** (NOT in full today)

- Choose the Premium Three-Month option

And became:

As efficiently as you can, subscribe for a paid **Premium Three-Month** subscription to Match.com.

- Use your **actual** zip code during sign-up (to prevent getting flagged as fraud)

- Use a real-sounding name (*not* John/Jane Doe etc., to prevent getting flagged as fraud)

- Use the test credit card info you stored at the beginning of the study. When you enter the CC information, use the zip code associated with the credit card

- If prompted for any add-ons **skip them**

- Choose to pay in **4 payments** (NOT in full today)

- Choose the Premium Three-Month option

I next observed some unnecessary and potentially confusing instructions surrounding the cancelation task. It originally read (Pre-test 2, Task 11)

Complete the steps necessary to preview your dashboard, then log out of your Match.com account. If prompted to verify your account with a text message please do so. We will not use your phone number outside of this study.

I didn't think the log-out/login steps were helping or necessary, so Task 11 became:

If prompted to verify your account with a text message please do so. We will not use your phone number outside of this study.

I then added another task in the platform to relaunch/reload the Match.com website (Task 12)

Once the page fully loads, move on to the next step.

What was the original Task 12

Log back into your Match.com account and cancel your subscription.

Was simplified to (now Task 13)

Cancel your subscription.

I finally discovered that SUS survey question 9 had been missing from pre-tests 1 and 2, and added it in for the real studies:

I felt very confident using the Match.com website.

[5-point Rating scale: Strongly disagree to Strongly agree]

Exhibit 5— UserTesting.com Bonafides

We chose to use UserTesting.com for our platform as it is one of the most popular and recommended platforms for user and usability testing in the world. ("UserTesting Pricing, Alternatives & More 2022 - Capterra" n.d.)

When it comes to recruiting and testing websites and applications, UserTesting.com powers half of the top brands in the world and is considered to be the world's leading human insight platform. ("About UserTesting" n.d.)

"The UserTesting Human Insight Platform taps into our global network of real people and generates video-based recorded experiences, so anyone in an organization can directly ask questions, hear what users say, see what they mean, and understand what it's actually like to be a customer." ("UserTesting Rethinks the One-Way Mirror Concept for a Remote, Virtual Usability Lab" n.d.)

CONFIDENTIAL—FTC v. MATCH.COM

## D Usability Study Screenshots





CONFIDENTIAL—FTC v. MATCH.COM

102 of 238



CONFIDENTIAL—FTC v. MATCH.COM









CONFIDENTIAL—FTC v. MATCH.COM

107 of 238



CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM









CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM

115 of 238











CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM

121 of 238





CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM

124 of 238



CONFIDENTIAL—FTC v. MATCH.COM

125 of 238



CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM

127 of 238



CONFIDENTIAL—FTC v. MATCH.COM





CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM

# E Bibliography & Materials Considered

"About UserTesting." n.d. Accessed November 4, 2022. https://www. UserTesting.com/company/about-us.

Character Calculator. n.d. "Flesch Kincaid Calculator - Flesch Reading Ease Score." Accessed October 21, 2022. https://charactercalculator.com/flesch-reading-ease/.

Dean, Brian. 2022. "How Many People Use Facebook In 2022?" May 1, 2022. https://backlinko.com/facebook-users.

Facebook. n.d. "Re-Authentication." Meta for Developers. Accessed November 3, 2022. https://developers.facebook.com/docs/facebook-login/guides/advanced/re-authentication.

Federal Trade Commission. Nov. 4, 2021. "Enforcement Policy Statement Regarding Negative Option Marketing." 86 Fed. Reg. 60822.

Gingiss, Dan. 2019. "Consumers Are More Willing To Share Positive Experiences Than Negative Ones." Forbes. April 10, 2019. https://www.forbes.com/sites/dangingiss/2019/04/10/consumers-are-more-willing-to-share-positive-experiences-than-negative-ones/?sh=7c72a4206a49.

Kalbach, James. 2007. *Designing Web Navigation: Optimizing the User Experience*. 1st ed. Beijing: O'Reilly Media.

Lewis, James R, and Jeff Sauro. 2018. "Item Benchmarks for the System Usability Scale," May.

Nielsen, Jakob. n.d. "10 Usability Heuristics for User Interface Design." Nielsen Norman Group. Accessed October 17, 2022. https://www.nngroup.com/articles/ten-usability-heuristics/.

Pernice, Kara. 2019. "Text Scanning Patterns: Eyetracking Evidence." Nielsen Norman Group. August 25, 2019. https://www.nngroup.com/articles/text-scanning-patterns-eyetracking/.

Sauro, Jeff. 2011a. "Measuring Usability with the System Usability Scale (SUS) – MeasuringU." January 2, 2011. https://measuringu.com/sus/.

———. 2011b. "What Is A Good Task-Completion Rate? – MeasuringU." March 21, 2011. https://measuringu.com/task-completion/.

U.S. Web Design System. n.d. "Icon ." Accessed November 1, 2022. https://designsystem.digital.gov/components/icon/.

"Usability 101: Introduction to Usability." n.d. Accessed October 17, 2022. https://www.nngroup.com/articles/usability-101-introduction-to-usability/.

"UserTesting Pricing, Alternatives & More 2022 - Capterra." n.d. Accessed November 4, 2022. https://www.capterra.com/p/173755/UserTesting/.

"UserTesting Rethinks the One-Way Mirror Concept for a Remote, Virtual Usability Lab." n.d. Accessed November 4, 2022. https://www. UserTesting.com/company/newsroom/press-releases/usertesting-rethinks-one-way-mirror-concept-remote-virtual.

FTC's First Amended Responses to MGI Interrogatories
F01-MG-0052356
MATCHFTC672290-672329
MATCHFTC774651
MATCHFTC774670

MATCHFTC774671
MATCHFTC774721
MATCHFTC774730
MATCHFTC774732
MATCHFTC774734
MATCHFTC774736
MATCHFTC774738
MATCHFTC774741-42
MATCHFTC774745-55
MATCHFTC774760
MATCHFTC774763-64
MATCHFTC774775
MATCHFTC774790-91
MATCHFTC774796
MATCHFTC774804
MATCHFTC774809
MATCHFTC774813
MATCHFTC777081
MATCHFTC777080
MATCHFTC846468
MATCHFTC846469

## F Forgot Password Flow

**Figure 15—Forgot Password**



**Figure 16—Password Reset Email**



**Figure 17—New Password Creation**



**Figure 18—Sign In Prompt**



## G Help Screenshots

**Figure 19—Help**



**Figure 20—Help-Manage My Subscription**

**Figure 21—Help-Manage My Subscription-All 7 Articles**



CONFIDENTIAL—FTC v. MATCH.COM

**Figure 22—Help-Canceling**



CONFIDENTIAL—FTC v. MATCH.COM

**Figure 23—Help-Search**



**Figure 24—Help-Search-Results**



## H Usability Study Raw Data

The raw data with PII removed in Excel format is available at Appendix L.

# I Other Services Cancelation Screenshots

## Amazon Prime



CONFIDENTIAL—FTC v. MATCH.COM

144 of 238





CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM

148 of 238



CONFIDENTIAL—FTC v. MATCH.COM

149 of 238



CONFIDENTIAL—FTC v. MATCH.COM



river, we're sorry to see you go. Please confirm the cancellation of your membership.

You could also consider the following:

**Remind Me Later**
Remind me 3 days before my free trial ends

**Keep My Membership**
You will continue enjoying all the benefits of Prime.
View everything included in Prime.

**Pause your Prime membership:**

⚠️ **Items tied to your Prime membership will be affected if you pause your membership.**

1. By pausing, you will no longer be eligible for your unclaimed Prime exclusive offers. Click here to see your offers.

**Pause on January 18, 2023**
Your benefits access will continue until January 18, 2023. After that date, your billing and benefits will be paused, and you will no longer be charged for your Prime membership. Use the quick-resume function anytime to regain access to your Prime benefits. Learn More.

**Cancel your Prime membership:**

⚠️ **Items tied to your Prime membership will be affected if you cancel your membership.**

1. By cancelling, you will no longer be eligible for your unclaimed Prime exclusive offers.

**Cancel Membership**
Your membership will end after the free trial expires on January 18, 2023.

Amazon Prime Terms and Conditions

CONFIDENTIAL—FTC v. MATCH.COM

151 of 238



CONFIDENTIAL—FTC v. MATCH.COM

152 of 238









CONFIDENTIAL—FTC v. MATCH.COM

154 of 238



CONFIDENTIAL—FTC v. MATCH.COM

Apple iCloud





CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM

158 of 238



CONFIDENTIAL—FTC v. MATCH.COM

159 of 238



CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM

161 of 238



CONFIDENTIAL—FTC v. MATCH.COM

162 of 238



CONFIDENTIAL—FTC v. MATCH.COM

163 of 238





CONFIDENTIAL—FTC v. MATCH.COM

165 of 238



CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM

167 of 238



CONFIDENTIAL—FTC v. MATCH.COM

168 of 238



# Downgrade or cancel your iCloud+ plan

If you have more iCloud storage than you need, you can downgrade or cancel your iCloud+ plan.

> Before you downgrade or cancel your iCloud+ plan, first download or remove content that exceeds your new storage amount. To make sure that you don't lose any information, learn how to copy what you store in iCloud.

- How to downgrade or cancel your iCloud+ plan on your iPhone, iPad, or iPod touch ⌄
- How to downgrade or cancel your iCloud+ plan on your Mac ⌄
- How to downgrade or cancel your iCloud+ plan on your Windows PC ⌄

---

CONFIDENTIAL—FTC v. MATCH.COM

169 of 238



**How to downgrade or cancel your iCloud+ plan on your iPhone, iPad, or iPod touch**

1. Open the Settings app.
2. Tap your name.
3. Tap iCloud.
4. Tap Manage Account Storage or Manage Storage.

5. Tap Change Storage Plan.

6. Tap Downgrade Options and enter your Apple ID password.

7. Choose a different plan:
   - To downgrade your plan, choose a new storage amount.
   - To cancel iCloud+, choose the free 5GB plan or choose None.

8. Tap Done. If you can't tap Done, make sure that you're signed in with the same Apple ID that you use for your iCloud+ plan. You can also try following these steps on a different device. If you still need help, contact Apple Support.

If you downgrade or cancel your iCloud+ plan, the change takes effect after your current subscription billing period ends.

**How to downgrade or cancel your iCloud+ plan on your Mac**

1. Choose Apple menu  > System Settings. In macOS Monterey or earlier, choose

CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM

Disney+





CONFIDENTIAL—FTC v. MATCH.COM

173 of 238



CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM

175 of 238





CONFIDENTIAL—FTC v. MATCH.COM





CONFIDENTIAL—FTC v. MATCH.COM





### Canceling Disney+

Disney+ subscribers have the ability to cancel or switch their subscription at any time. Please keep in mind that canceling your Disney+ subscription will not delete your Disney+ account or the Disney account you use for other products and experiences from The Walt Disney Company, if applicable.

Select the scenario below that best applies for more information:

- I want to cancel my Disney+ subscription
- I subscribe to the Disney Bundle and want to cancel
- I canceled and want to restart my Disney+ subscription
- I want to delete my Disney+ account

#### Cancel my Disney+ subscription

If you're billed directly by Disney+ and would like to cancel your subscription (steps may vary for subscribers billed through a third-party):

1. Log in to your Disney+ account through a computer or mobile browser
2. Select your Profile
3. Select **Account**
4. Select your Disney+ subscription under **Subscription**
5. Select **Cancel Subscription**
6. Select **Cancel Subscription**

You'll continue to have access to Disney+ until the end of your current billing cycle but will not be charged moving forward. We do not refund or credit for partially used billing periods.

**Third-Party Billing**

If you signed up for Disney+ through a third party, the steps to cancel your subscription may vary. Navigate to your third-party's help center or contact them to learn more.

BACK TO TOP

SUGGESTED ARTICLES

Updating payment information

Billing partnerships on Disney+

Deleting my Disney+ account

Payment methods for Disney+

Why does Disney+ need my birthdate and gender?

CONFIDENTIAL—FTC v. MATCH.COM

eHarmony



APP 868



CONFIDENTIAL—FTC v. MATCH.COM



**Manage profile**

**Your subscription: 3-month plan**

Purchased Dec 19, 2022 (Pacific Time)

If you cancel automatic renewal of your subscription, your Premium Membership will terminate at the end of your current subscription term. Your profile will still be available and visible, but you will not be able to respond to match communications, send messages to other members, view match photos or access old match messages. If you plan to continue communicating with your existing matches offline, keep in mind that you will not continue to benefit from eharmony's secure and anonymous service.

To keep the benefits of a Premium Membership, your subscription will automatically renew on for the term specified in your order confirmation. You can cancel automatic renewal at any time before the last day of your current subscription term.

The new subscription period you have selected will begin at the end of your current subscription period.

Please **click here** if you wish to cancel automatic renewal of your current subscription.

---

**Manage profile**

**Personal data**

**Notification options**

**SMS Verification**

About us · Terms & conditions · Privacy policy · Help · Safety · Affiliates

CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM

185 of 238



CONFIDENTIAL—FTC v. MATCH.COM

186 of 238



CONFIDENTIAL—FTC v. MATCH.COM

187 of 238



**HOW CAN WE HELP YOU?**

Enter your question

**HOW DO I CANCEL MY SUBSCRIPTION?**

You can turn off your account's automatic renewal feature and by doing so, your subscription will expire at the end of its term. Keep in mind that once your subscription expires, you will lose the ability to read and write custom messages with matches and view their photos. So, before turning it off, we ask that you consider giving our unique process the opportunity and time to work for you.

For subscriptions purchased on the web, turn the automatic renewal off by following the steps below:

1. Log into your account
2. Click on the down-arrow next to your portrait at the top of the screen to open the dropdown menu
3. Click the "Data & settings' link
4. Click on "Amend subscription"
5. Enter your password for verification
6. Read through the details about canceling your auto-renewal and click the link at the bottom of the page to begin the cancellation process. This button will only turn off the automatic renewal feature - your current subscription will still run its full term. (IF YOU HAVE REMAINING PAYMENTS, YOU WILL STILL BE CHARGED THOSE PAYMENTS.)
7. Go through to the confirmation page

For subscriptions purchased through iTunes (Apple)

Apple does not provide developers with direct access to manage subscriptions purchased through iTunes. All subscriptions purchased through Apple must be managed through your iTunes subscription settings. We recommend reaching out to Apple directly if you need assistance with updating your renewal.

For subscriptions purchased through the Google Play App (Android)

Important: When you uninstall the app, your subscription won't cancel.

1. Open the Google Play app
2. At the top right, tap the profile icon.
3. Tap Payments & subscriptions > Subscriptions.
4. Select the subscription you want to cancel.
5. Tap Cancel subscription.
6. Follow the instructions.

Our Customer Care team can also be reached Monday - Friday, between the hours of 8:30 AM - 5:00 PM Pacific

CONFIDENTIAL—FTC v. MATCH.COM

188 of 238

## Intuit Quickbooks









I believe the survey would've shown here based on the text in the image. However, it seems a bug prevented it from loading.

CONFIDENTIAL—FTC v. MATCH.COM

191 of 238





CONFIDENTIAL—FTC v. MATCH.COM

192 of 238



LastPass









CONFIDENTIAL—FTC v. MATCH.COM

195 of 238





CONFIDENTIAL—FTC v. MATCH.COM





CONFIDENTIAL—FTC v. MATCH.COM

198 of 238

LinkedIn Premium



CONFIDENTIAL—FTC v. MATCH.COM

199 of 238



CONFIDENTIAL—FTC v. MATCH.COM

200 of 238





CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM





CONFIDENTIAL—FTC v. MATCH.COM

205 of 238



CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM

207 of 238









CONFIDENTIAL—FTC v. MATCH.COM

211 of 238

Netflix









CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM

215 of 238

New York Times







The New York Times

13:29

| **Account** |

Subscription overview

Billing history

Email and settings

❷ Help

# Good afternoon.

You've supported independent journalism since 2022.

## Your profile

**Account number**
204370646

**Email address**                                    Update
riverking@precocityllc.com

**Password**                                          Create
None

**Connected accounts**                               Manage
Google

## Your subscriptions

**News**

~~$17~~ $4 every 4 weeks

Access to reporting, investigation and
analysis, online and in The New York
Times app.

**Manage subscription**

**Change subscription**

CONFIDENTIAL—FTC v. MATCH.COM

218 of 238

**APP 904**

## The New York Times

`13:40`

## Subscription benefits

What's included:

₸ <u>News</u> - Original reporting, investigation and analysis.

You also receive:

- <u>Subscriber-only newsletters</u> - Exclusive inbox access to topical reporting, opinion perspectives and expert guidance.

- <u>Gift articles</u> - 10 articles per month to give to anyone, including non-subscribers.

- <u>Times store</u> - 15% off select items with code "NYTSUB" at checkout.

**Account**

**Subscription overview**

**Billing history**

**Email and settings**

❓ Help

## Manage subscription

### Change your subscription
Adjust what Times digital products you have access to.                    ›

### Get newspaper delivery
Learn more about having the newspaper delivered to your home. Home Delivery includes unlimited access to all Times digital products.        ›

### Pause your subscription
You won't be charged while your subscription is paused and you can resume it at any time.                    ›

### Cancel your subscription                    ›

CONFIDENTIAL—FTC v. MATCH.COM



The New York Times

`13:43`

## Subscription benefits

Account

**Subscription overview**

Billing history

Email and settings

⑦ Help

What's included:

₹ <u>News</u> - Original reporting, investigation and analysis.

You also receive:

- <u>Subscriber-only newsletters</u> - Exclusive inbox access to topical reporting, opinion perspectives and expert guidance.

- <u>Gift articles</u> - 10 articles per month to give to anyone, including non-subscribers.

- <u>Times store</u> - 15% off select items with code "NYTSUB" at checkout.

## Manage subscription

**Change your subscription**

Adjust what Times digital products you have access to.                    ⟩

**Get newspaper delivery**

Learn more about having the newspaper delivered to your home. Home   ⟩
Delivery includes unlimited access to all Times digital products.

**Pause your subscription**

You won't be charged while your subscription is paused and you can        ⟩
resume it at any time.

**Cancel your subscription**                                              ⟩

## The New York Times

Step 1 of 4

# Please tell us why you'd like to cancel your News subscription.

**Reason**

Select reason for cancellation                           ⌄

Is there more you'd like to tell us? We'll use your feedback to improve.

**Feedback** (optional)

400 characters left

**Return to my account**          **Continue**

CONFIDENTIAL—FTC v. MATCH.COM

221 of 238

**APP 907**

# The New York Times

# You've supported journalism that fueled conversations around the world.



## Airstrikes Gone Wrong

Read the Times article that revealed hidden casualties in thousands of American military airstrikes and won the 2022 Pulitzer Prize for International Reporting.



## The 36 Questions That Lead to Love

Answer 36 questions explored in our Modern Love column that might accelerate intimacy between strangers, then watch a few couples test it out.



## The Latecomer's Guide to Crypto

Crypto is a lot of things - including terribly explained. See how we've cleared it up for you.



## Sheet-Pan Every-thing

Discover 20 often surprising, always delicious recipes for the most versatile pan in your kitchen.

Return to my account          Continue to cancel

# The New York Times

Step 3 of 4

# Continue your subscription at the current rate, and keep your Times access.

**Current subscription**

## News

$1 a week
Billed as $4 every 4 weeks

**Available offers**

○  Yes, I want to keep my subscription at the current rate.

$1 a week for another year
Billed as $4 every 4 weeks until December 18, 2023



○  No thanks, just cancel my News subscription.

[ Return to my account ]   [ Confirm ]

## The New York Times

Step 3 of 4

# Continue your subscription at the current rate, and keep your Times access.

**Current subscription**

## News

**$1 a week**
Billed as $4 every 4 weeks

**Available offers**

○  Yes, I want to keep my subscription at the current rate.

**$1 a week for another year**
Billed as $4 every 4 weeks until December 18, 2023

◉  No thanks, just cancel my News subscription.

**BILLING INFORMATION**
When you cancel, we will stop charging your account the following billing cycle. Each billing cycle is 4 weeks. Your access will continue until the end of your current billing cycle.

Return to my account    **Confirm**

## The New York Times

Step 4 of 4

# You've canceled your News subscription.

You'll continue to have access until the end of your current billing cycle
on January 16, 2023. After this, you can reactivate your subscription at any time.

We've sent a confirmation email to **riverking@precocityllc.com**.

**Return to my account**

———

Help us improve. <u>Tell us about this experience.</u>

CONFIDENTIAL—FTC v. MATCH.COM





CONFIDENTIAL—FTC v. MATCH.COM



Spotify



CONFIDENTIAL—FTC v. MATCH.COM



CONFIDENTIAL—FTC v. MATCH.COM

230 of 238



CONFIDENTIAL—FTC v. MATCH.COM

231 of 238



CONFIDENTIAL—FTC v. MATCH.COM

232 of 238



CONFIDENTIAL—FTC v. MATCH.COM

233 of 238



CONFIDENTIAL—FTC v. MATCH.COM

234 of 238



CONFIDENTIAL—FTC v. MATCH.COM

235 of 238



CONFIDENTIAL—FTC v. MATCH.COM

236 of 238



CONFIDENTIAL—FTC v. MATCH.COM

237 of 238



CONFIDENTIAL—FTC v. MATCH.COM

238 of 238

# EXHIBIT 2



# Rebuttal of Dr. King's Report Regarding Match.com's Online Subscription Cancelation Flow

May 15, 2023



APP 926

# I. ASSIGNMENT

1. I was retained by Sidley Austin LLP on behalf of Defendants Match Group, Inc. and Match Group, LLC in this matter. In this report, I have been asked to review, evaluate, and respond, if appropriate, to the opinions offered in the report in this case by Dr. Jennifer King on behalf of the FTC. In this report, I assess the methodology used by Dr. King in her purported heuristic evaluation of the usability of Match.com's online cancelation flow and her conclusions derived from that evaluation.

# II. QUALIFICATIONS

2. My qualifications are described in my opening report in this matter, dated January 13, 2023.

# III. SUMMARY OF DR. KING'S METHOD & CONCLUSIONS

3. In her report, Dr. King explains she was asked by the FTC to evaluate Match.com's cancelation flow based on the following inquiries:

   a. Was Match.com's cancelation process easy to use?
   b. Was Match.com's cancelation process easy to find?

4. Dr. King conducted no empirical research to support her conclusions. Dr. King conducted no objective analysis.

5. Instead, Dr. King used what she says was a heuristic evaluation-only approach to assess the cancelation flow on Match.com's website, which involved only a visual review of the Match.com flows conducted by viewing (i) recordings of the Match.com website as it appeared between 2016 and 2022, and (ii) screenshots from around the same periods. She also reviewed a few internal Match.com communications. It does not appear that Dr. King ever interacted with a live version of the website

CONFIDENTIAL

**APP 927**

herself. Nor did she interact with, interview, or study the actual behavior of any Match.com subscribers or

potential Match.com subscribers. Had she done so, she likely would have evaluated things quite

differently and may have been better able to recognize the ease and simplicity of the flow.

6.  Dr. King identified factors for evaluation, compared representations of the Match.com cancelation flow to

these factors, and made observations about each factor to inform her conclusions for the two assigned

questions. The factors Dr. King applied to the Match.com cancelation flow include Placement and

Prominence, Appearance, User Flow Architecture, System Status and Feedback, Terminology/Content

Strategy, Readability, Friction, and Dark Patterns. Dr. King opines that these factors are "most relevant to

a usability inspection of disclosures or other information communicated to users by an interface,"[1] but it is

unclear how or why Dr. King selected these particular factors as most relevant.

7.  Dr. King formed conclusions about the Match.com cancelation flow for three of ten of Nielsen's Usability

Heuristics[2] by discussing screenshots and articulating her observations about each factor. She supported

some conclusions by citing usability guidelines, definitions of various dark patterns, and the Nielsen

Norman Group Guidelines. She supported other conclusions with her experience as an academic in the

Human-Computer Interface (HCI) field, her knowledge of the relevant research and publications, and her

personal perceptions of the material.

8.  Dr. King concluded the Match.com cancelation flow was not simple or easy to do or find. However, she

offers no evidence or supporting data that support that opinion. Furthermore, Dr. King's heuristic

conclusions are based on an evaluation that has significant limitations, includes no supporting data for her

---

[1] Page 12
[2] https://www.nngroup.com/articles/ten-usability-heuristics/

CONFIDENTIAL

conclusions, may have been biased by her work with dark patterns, and includes several factual

inaccuracies giving rise to a range of interpretations, which I explain below.

## IV. SUMMARY OF REBUTTAL TO DR. KING'S REPORT

9.  Dr. King's analysis and opinions are unsupported and unreliable. In fact, the objective evidence

    affirmatively contradicts Dr. King's opinions. Dr. King's analysis suffers from several fatal flaws that

    render it unreliable.

10. First, Dr. King conducted no empirical study or test to determine how customers actually used or

    interacted with Match.com's cancelation flow. No expert opinion is as reliable as an empirical study, like

    the one I conducted. Dr. King's report is replete with speculation about what users *might* believe or

    experience, without any supporting evidence.

11. Opinions on whether a task is easy or simple to find and do must be tested using a standard usability

    testing methodology, based on sufficient and reliable evidence, and protected from contradictory

    interpretations to be reliable. Any heuristic or expert analysis must be bolstered by such objective

    evidence.

12. Second, Dr. King did not conduct a proper heuristic or usability analysis. Indeed, she did not even actually

    use Match.com's cancelation flow. One cannot offer even a personal opinion on how the cancelation

    process works or how simple it is, without using it. That is why I personally went through the cancelation

    flow several times. Dr. King did not at all. Instead, she relied on videos or screenshots, but that is simply

    not how actual customers see and use the flow, nor a reliable way to experience something for oneself.

    Had she actually experienced the flow for herself, she likely would have evaluated things quite differently

    and may have been better able to recognize the ease and simplicity of the flow.

CONFIDENTIAL

13. Third, Dr. King used only a subset of the factors necessary for a heuristic analysis. She cherrypicked factors that (she thought) supported her view while ignoring the other factors. An objective analysis looks at all of the factors in the literature (as I did) and applies them to the facts without bias.

14. Setting aside methodology, Dr. King also errs substantively in conducting her analysis. Several of her descriptions of the site are factually inaccurate (perhaps due to her lack of firsthand use of the site), and even where she correctly describes a component of the site, her heuristic analysis is myopic and ignores important context that is relevant to a user's use of the site and therefore usability.

15. Finally, and perhaps most importantly, the results of my usability study (as described in my opening report) and Match.com's actual subscriber data disprove much of Dr. King's speculation about how subscribers experience Match.com's cancelation flow. Even if Dr. King personally believes that the Match.com cancelation flow is not simple or contains confusing "dark patterns," actual Match.com users and usability study participants have spoken and disagree.

# V. ASSESSMENT OF DR. KING'S METHODOLOGY

## I.   Dr. King Provides No Empirical Evidence or Objective Analysis

16. The most fundamental problem with Dr. King's analysis is that she does not offer any empirical evidence or objective analysis for her conclusions. Instead, Dr. King looked at a few screenshots and videos of Match.com's cancelation flow and provided her subjective opinion on it. Dr. King then repeatedly speculates about what users "may," "might," or "could" experience, without any objective evidence of what users actually experienced to support her claims. The only way to truly know how users respond to the cancelation flow is to test it. That is why we have the field of usability testing and research. Even the most esteemed expert cannot tell you how ordinary users will respond to a user interface or cancelation flow. "User interfaces and human behavior are both so complex that the interaction between the two does not lend itself to pure guesses based on personal opinion. You need data to learn what works, what

CONFIDENTIAL

doesn't work, and what users really need. Can't guess. Don't do it. You can't learn UX from within your own echo chamber."[3] That is why I tested empirically, with actual consumers, whether Match.com's cancelation flow is simple or not. That empirical data showed that:

    a. **98.78% successfully found Manage Subscription**, the entry point to canceling

    b. **91.5% successfully canceled,** with an average time of **74 seconds**, on average **6.1 times faster** than subscribing, making it even easier than the sign-up process (i.e., creating an account and subscribing)

    c. Match.com received an **"A Grade" (81.6)** on the System Usability Scale

    d. **88.3% of participants thought canceling was simple** or were at least neutral as to the simplicity/difficulty

    e. **84.7%** of participants thought canceling was **at least as simple as signing up**

17. This empirical and objective data from real consumers is far more persuasive than any subjective heuristic analysis done by an expert witness hired by a party.

18. Indeed, a purely subjective approach is not reliable. Dr. King herself cites[4] an article that points out the dangers of relying solely on heuristic analyses, including the risk of bias and the risk of uncovering low-severity problems. This article describes how only doing a heuristic analysis "...can cause disadvantages such as the *risk of bias* and the risk to uncover *low-severity* problems that aren't big problems at all (false positives). Another problem is that we don't consider the context of the user when we do usability inspection [expert analysis] methods...For that reason, it's always a good idea (especially because we are the advocates for our users and hence "User Experience" professionals) to bring the real user to the table from time to time, see what they do, see where they struggle, and hear what they have to say instead of

---

[3] https://www.nngroup.com/articles/user-exposure-goals/
[4] Page 10

CONFIDENTIAL

only relying on quick usability inspection methods."[5] Dr. King failed to "bring the real user to the table" in her analysis.

19. Similarly, Dr. King's citation of Usability.gov likewise identifies the disadvantages of a heuristics-only analysis. The article explains how heuristic analyses can provide value when used *together with* other testing methods, but expressly warns that "[a] heuristic evaluation should not replace usability testing."[6] Usability.gov also recognizes that a heuristic evaluation "may identify more minor issues and fewer major issues." And, recognizing that personal bias may affect results, the article recommends using "multiple experts and aggregat[ing] their results." Dr. King did none of this. She, therefore, failed to comply with the U.S. government's own guidelines.

20. Given Dr. King's area of study and focus on dark patterns, Dr. King may be particularly prone to or biased toward "uncover[ing] low-severity problems" that are more relevant to her work, but less likely to impact an actual subscriber's use of the site.

21. In short, Dr. King's expert report is based only on her personal opinions as a "dark pattern" researcher and not based on rigorous research methods. Thus, Dr. King's opinion cannot be relied upon as an accurate representation of reality for millions of Match.com subscribers.

## II.   Dr. King's Analysis Is Unreliable

22. The second fundamental flaw with Dr. King's report is that she did not conduct a valid heuristic usability analysis. The whole point of a heuristic analysis is to analyze the user interface by using it yourself, then apply your expertise to identify potential problems that you had or observed. This requires an expert to actually engage with the user interface. Here, that means to cancel a paid Match.com subscription. For me

---

[5] https://modus.trimble.com/news/2021-04-15-usability-inspection-methods/ (emphasis added)
[6] https://www.usability.gov/how-to-and-tools/methods/heuristic-evaluation.html

CONFIDENTIAL

to conduct my heuristic analysis I signed up and went through the subscription cancelation process many different times.

23. Dr. King, on the other hand, did not actually use the Match.com cancelation flow even once. Dr. King attempts to offer an opinion on the usability and simplicity of the cancelation flow having never used it. This violates a cardinal principle of what we as usability experts do. Instead, Dr. King relied only on static screenshots and videos prepared for her showing others walking through the flow (not actual customers, or usability participants). That is simply not a reliable methodology to conduct an analysis and it violates the very underpinnings of a proper usability and heuristic analysis. "If the users have not actually tried to use the designs, they'll base their comments on surface features. Such input often contrasts strongly with feedback based on real use."[7]

24. In addition, Dr. King also relies on several "internal company documents discussing the cancellation flow."[8] Dr. King is apparently referring to internal Match.com emails repeating what customers claimed were concerns about cancelation from subscribers who had reached out to Match.com. But Dr. King's analysis here is neither objective nor reliable. She did not rely on a balanced collection of documents. Instead, she relied only on feedback from a group of people that is inherently self-selecting and leads to biased results because it is not feedback from a fair representation of all subscribers. As recognized by a leading authority on user design, "[u]sers often make requests for changes to user interfaces that might work for them but would have a negative impact on the majority of the users in your target market."[9] Dr. King ignores, for example, the millions of subscribers who were able to successfully cancel their Match.com subscription via the online cancelation flow, focusing instead on the small percentage of

---

[7] https://www.nngroup.com/articles/first-rule-of-usability-dont-listen-to-users/
[8] Page 8
[9] https://www.uxmatters.com/mt/archives/2011/03/the-dangers-of-design-by-user.php

CONFIDENTIAL

users who **alleged** difficulty with cancelation, regardless of whether they actually attempted online cancelation.

25. Next, the usability guidelines on which Dr. King relies are, at most, best practice rules of thumb; they are not "fixed rules" or mandatory requirements.[10] Guidelines are not "rigid standards that can form the basis of a contract or lawsuit."[11] Put differently, even a website that does not satisfy all of the usability guidelines may still be "easy" or "simple," especially because guidelines may require adaptation depending on the type of website (e.g., informational versus e-commerce).[11] Yet Dr. King never explains how she translates the alleged "violation of usability heuristics" she finds into the conclusion that Match.com's cancelation flow is not easy to find or easy to use.

26.  Similarly, Dr. King claims to have identified several "dark patterns" in Match.com's cancelation flow, but she does not explain at what point a dark pattern (or dark patterns) makes a website not easy to use. It is unclear what standard Dr. King is using to determine if or how any purported dark pattern translates into "not easy to use" or "not simple." She also doesn't identify how common the alleged dark patterns she claims to have found on Match.com are on other sites. I do not mean to say commonality is a defense against the use of a dark pattern; rather, a common pattern found across many experiences across the web decreases the risk of consumer confusion if consumers are familiar with the pattern. Indeed, Dr. King herself notes "[i]t's the subversion of users' expectations with respect to these common design patterns that creates confusion, manipulation, and deception (*i.e.*, dark patterns)."[12] Dr. King also does not indicate

---

[10] Michael O'Leavitt and Ben Schneiderman, "Foreword," Research-Based Web Design & Usability Guidelines, 2006, p. xix, available at https://www.usability.gov/sites/default/files/documents/guidelines_book.pdf
[11] Michael O'Leavitt and Ben Schneiderman, "Foreword," Research-Based Web Design & Usability Guidelines, 2006, p. iii, available at https://www.usability.gov/sites/default/files/documents/guidelines_book.pdf
[12] Page 21

CONFIDENTIAL

how many dark patterns, or what combination of them, would push an experience over the line from "easy" to "not easy."

27. In fact, it is unclear what standard Dr. King used to determine what is "easy." She does not provide any criteria for determining the point at which something becomes "not easy." In contrast, the data and conclusions presented in my opening report are based on a combination of my own experience and analysis, as someone who has worked directly in this field and actually designed websites and apps, as well as research-based data from usability study participants, the results of which clearly show that Match.com's cancelation flow is easy and simple to use.

28. As another problem, Dr. King evaluated in her report only three of Nielsen's ten usability heuristics (and claims that Match.com's cancelation process does not satisfy any of them).[13] Dr. King does not explain how she selected these heuristics and why she ignored others. By omitting usability principles, there is a risk of incomplete and erroneous analyses of users' true and actual perceptions of the cancelation flow.

29. In my opening report, by contrast, I evaluated all ten of Nielsen's usability heuristics, plus Nielsen's 5 quality components of usability, and concluded that Match.com's cancelation flow satisfied all of them.

30. Based on the flaws in Dr. King's heuristic analysis, her methodology is not reliable.

# VI. ASSESSMENT OF DR. KING'S CONCLUSIONS REGARDING THE USABILITY OF MATCH.COM'S CANCELATION FLOW

31. In this Part of my rebuttal report, I respond to Dr. King's analysis of the usability of Match.com's online cancelation flow. I begin with a section responding to Dr. King's characterization of particular pages of the

---

[13] I disagree with Dr. King's conclusion that Match.com's cancelation flow does not satisfy the three heuristics that Dr. King addresses. I address that disagreement below in Part VI.II.

CONFIDENTIAL

flow. I then address Dr. King's version of a Nielsen usability heuristics analysis, and then her "dark patterns" analysis.

# I.     Response to Dr. King's Opinions About Particular Pages of the Match.com Cancelation Flow

32. Dr. King criticizes a few pages in the Match.com cancelation flow for a variety of reasons. Before addressing the details of Dr. King's purported heuristic and dark pattern analyses, I respond to Dr. King's comments about some of the particular pages in Match.com's cancelation flow.

**Reauthentication Page[14]**

33. Dr. King argues reauthentication (i.e., requiring entry of a password) in order to manage a customer's subscription information (including updating payment/subscription information, or canceling payment/subscription) is an unnecessary step and therefore makes the flow not easy. However, she fails to cite any evidence, literature, or other experts to support this claim. In fact, although she claims that "literature from computer security experts and practitioners" supports her conclusions that the reauthentication page is unnecessary, she does not identify the literature on which she claims to be relying. I thoroughly covered why reauthentication at this stage does not detract from the simplicity of the cancelation process in my opening report. Here, I respond to Dr. King's specific comments regarding reauthentication.

---

[14] As explained in my opening report, Page 15, I do not consider the reauthentication page part of the "cancelation flow," because a user could visit that page for reasons entirely unrelated to cancelation (such as checking a subscription status). Moreover, no reasonable user could legitimately believe that they had successfully canceled by getting only to the reauthentication page (but not completing it). Thus, the reauthentication page arguably is irrelevant to any analysis of the "cancelation flow." Nevertheless, I respond to Dr. King's opinions about that page.

CONFIDENTIAL

34. Dr. King claims that "the password screen was arbitrarily placed in the cancellation flow,"[15] and that reauthentication "...introduces delay into the process, which can vary by user and the complexity of the password reset process...," speculating that "...resetting a password could introduce significant delays..."[16] I've already addressed the issue of reauthentication and password reset in my opening report; specifically, reauthentication is a reasonable and widely used security measure. The two paths of action found under Manage Subscription—Subscription Status, where customers can view their credit card information and/or update it, and Cancel Subscription, where customers can choose to cancel—are danger zones. Accidental editing via casual browsing of one or the other can lead to a cessation of services. Requiring reauthentication at this point is consistent with Nielsen's heuristic of Error Prevention. Furthermore, an additional layer of security protecting the customer's information is reasonable. Match.com witnesses have testified that the reason for the reauthentication page was to protect security, not to put up an arbitrary roadblock to cancelation.[17]  Indeed, I have become aware that the FTC has brought cases over failure to adequately protect consumer data privacy.[18] A password reauthentication screen protects consumer privacy and is something I would expect the FTC to support, not object to.

35. Furthermore, entering a password is not burdensome. It is relatively simple for a subscriber to enter their password (either from memory or using a password manager), or even to reset their password if they have forgotten it. Dr. King offers no evidence to the contrary, other than speculating that "among less sophisticated users the process of resetting a password could introduce significant delays." Yet Dr. King does nothing to define "less sophisticated users," what portion of Match.com's subscribers such users

---

[15] Page 5

[16] Page 42

[17] Clinchy Dep. 28:19-29:6, 61:21-62:9; Ginsberg Dep. 206:10-207:8; Dubey Dep. 210:3-10.

[18] *See, e.g., In re Chegg, Inc.*, FTC File No. 2023151; *In re Drizly, LLC*, FTC File No. 2023185; *In re Residual Pumpkin Entity, LLC*, FTC File No. 1923209; https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement.

CONFIDENTIAL

constitute, what portion of users would need to reset their password, or explain what amount of time a "significant" delay is.

36. Dr. King then later suggests that the location of the reauthentication page is not arbitrary, but instead was *intentionally* placed in the flow to create an obstacle to cancelation. She states: "The arbitrary placement of a password authentication mechanism at this specific point, and not at other points on the website where sensitive information could be accessed and changed without the account holder's knowledge, suggests that the password authentication was placed at this point as an obstacle for users to access the cancellation flow."[19] Dr. King's criticism that the placement was both arbitrary and also intentional shows that she is making inconsistent claims based on speculation and not actual evidence.

37. In any event, Dr. King cites no actual evidence that the reauthentication page was placed in the flow to obstruct cancelation attempts. The basis for Dr. King's opinion appears to be (1) that a password is unnecessary to "access other account settings that posed a greater risk directly to the user if they were compromised, such as editing one's name, email address, and password"; (2) speculation by a Match.com employee, based on inaccurate data, that "the majority of members drop out" at the reauthentication page; and (3) the fact that reauthentication in the cancelation flow is required only once per session. None of these bases support Dr. King's conclusion.

38. First, Dr. King is wrong that there is anything inconsistent about when Match.com requires a password. To begin, Dr. King is factually incorrect when she states that a password is unnecessary to change a password. Setting a new password requires entering the subscriber's current password first, as depicted below.

---

[19] Page 37

CONFIDENTIAL



*Figure 1 - Match.com New Password*

39. Match.com uses even greater security controls when a user wants to change an email address, as compared to cancel a subscription. Although Dr. King is correct that a password is not required, changing an email address more than 90 days after signing up requires contacting Customer Care, as depicted below. This is also true for changing other profile information, such as age. In other words, requiring password reauthentication in the cancelation flow is *less* burdensome and time-consuming than alternative ways in which Match.com protects other areas of the user's profile.

CONFIDENTIAL

In order to help keep your account secure, you may be asked to do the following:

- Enter your current date of birth and password.
- Contact us if you signed up more than 90 days ago and want to update your email address or date of birth.

### Updating an Email Address

When updating your account information, remember that an email address can only be associated with one Match account. If your new email address is not being accepted, it may be linked to an account you created in the past.

*Figure 2 - Match.com Help for changing birthdate or email*

## Manage account details

Change your basic account information.

**Name**

Brandon 🖉

**Email**

b*********d@precocityllc.com 🖉

**Age**

46 years old 🖉

To update your age, contact Customer Care.

**Password**

******** 🖉

*Figure 3 - Match.com Edit Password*

40. Although, indeed, a password isn't required to edit a subscriber's name, Dr. King does not explain how editing a name "pose[s] a greater risk directly to the user." There is little to no risk involved in editing a

CONFIDENTIAL

**APP 940**

display name. A user may want to change their display name for any number of reasons (e.g., from their legal name to a nickname, such as "Joseph" to "Joe," or to a new name to conform with chosen gender identity), so it makes sense that Match.com would not want to insert a security control there, whereas it would for a cancelation. For that reason, it is common for websites to allow changes to display names without requiring password entry. In my research, I couldn't find a single example that required reauthentication to change a display name, including Google, LinkedIn, Venmo, Amazon, Slack, Microsoft, and more.



*Figure 4 - Google account name change*

41. Next, Dr. King relies on Match.com employee communications in which one employee claimed that "the majority of members drop out when asked to re-enter their password."[20] However, that data is misleading

---

[20] Page 54

CONFIDENTIAL

and inaccurate in numerous ways. First, those numbers are based on the number of sessions rather than the number of subscribers, so because a subscriber could have multiple sessions (e.g., a single subscriber that enters the flow five times would be counted five times in the session data), it does not accurately reflect how many subscribers actually "drop out" at each page. Second, it appears the Match.com employees were attempting to determine, *of the subscribers who did not resign in a particular session*, at what point in the flow did those subscribers "drop out." That analysis excludes the vast majority of subscribers that successfully resigned. Third, it contained various users who could not have been attempting to cancel their subscriptions because they did not have a subscription (i.e., were free registrants), because free registrants see some of the same pages when deleting their accounts. Fourth, it also contained multiple non-U.S. users, which I understand are not relevant to this matter. Finally, another portion of users contained in that data had already resigned their subscriptions before entering the resignation flow, so they also cannot have been attempting to resign their subscriptions.[21]

42. The flaws in the data on which Dr. King relied are obvious in light of the more complete set of subscriber-level data produced in this litigation. We know that 13,900,434[22] of 15,200,226[23] subscribers that clicked "Manage Subscription" (91.45%) also clicked "Cancel Subscription" (i.e., were able to successfully enter their password and reach the Cancel Subscription page). That means, *at most*, no more than 8.55% of

---

[21] Call with J. Talbott
[22] Sum of column C in MATCHFTC846468
[23] Sum of column C in MATCHFTC846469

CONFIDENTIAL

subscribers "dropped out" at the reauthorization screen. These numbers illustrate that in no world are

"...the majority of users [dropping] out when asked to re-enter their password..."[24]

43. And even that data likely overstates the "dropout rate" because it is impossible to know for certain why

users visited a particular page and whether they intended to cancel when they did so (or why they failed

to cancel if they did not). For example, of the 8.55% of subscribers mentioned above who "dropped out" at

the reauthorization screen, at least some of those subscribers likely intended to visit the "Subscription

Status" page, rather than the cancelation flow, which is also accessible after entering a password. Except

in the case of a situation like my usability study where the subscribers were told that their explicit goal

was to cancel, it's impossible to know why someone visited the reauthentication page. The first time we

can know with any level of likelihood a person intends to cancel is when they click "Cancel Subscription"

after the reauthentication page, and even then, they may just be exploring (for example, a user who does

not intend to cancel, but wants to see if a save offer is presented).

44. Dr. King is correct that some studies have shown that requiring a password can lead to abandonment.

However, the studies Dr. King cites regarding the friction of "sign-in or verification points"[25] all involve

areas where the user does not have anything at stake, like online engagement, checkout, making

---

[24] I understand both subscriber-level data and session-level data have been produced in this litigation. I rely on subscriber-level data for the Match.com statistics described in this report because the context of multiple sessions is unknowable and unlikely to have much impact on the question of simplicity or ease of use. In the case of the reauthorization page, it's also unlikely the prompt was so confusing or burdensome that it forced a subscriber intending to cancel to "drop out" of the cancelation flow during one session but not another. Moreover, it's important to note that even the session-level data does not support the claim that "the majority of users" drop out when asked to enter their password, as Dr. King claims. For example, from January 2013 through near the end of March 2023, 31,417,912 sessions reached the password page (i.e., clicked Manage Subscription). 57.58% of those sessions (18,088,887) reached the first survey page so they must have successfully entered a password and clicked Cancel Subscription. See MATCHFTC846518. Furthermore, 88.77% (16,056,670) of those sessions (those who clicked "Cancel Subscription") resulted in a cancelation. See MATCHFTC846516. For the sessions that did not result in a cancelation, we can only guess the cause. The subscriber may have successfully entered a password but did not cancel for a variety of reasons, such as visiting the Subscription Status page rather than clicking "Cancel Subscription" to enter the cancelation flow, or they were simply exploring, or they were interrupted by something entirely unrelated to the design of the flow (such as someone at the door, the phone ringing, a baby crying, etc.).

[25] Page 52

CONFIDENTIAL

purchases, etc.—precisely the opposite of what the customer is doing while canceling a Match.com subscription—and are therefore irrelevant to this case. In those cases, if the user gets frustrated and abandons their effort, they keep their money. In this case, if the user abandons their effort, their subscription continues. The scenarios are polar opposites and likely result in different abandonment rates. In fact, we know the abandonment rate is lower for Match.com's cancelation flow than in the studies that Dr. King cites, as evidenced by my usability study and Match.com's data described in my opening report.

45.  Finally, Dr. King claims that the fact that reauthentication is required only once per session somehow proves that reauthentication was not "a choice motivated by security concerns." But the security concerns implicated by not requiring reauthentication *at all* and requiring reauthentication once per session are much different. By requiring reauthentication only once per session, Match.com is striking a balance between security and maximizing ease of access in light of security concerns. Attempting to strike that balance does not prove that there are no security concerns at all. Moreover, ironically, requiring reauthentication every time the user selects "Manage Subscription" would create *more* of the friction about which Dr. King complains.

**Manage Subscription Page**

46. Dr. King criticizes the Manage Subscription page for "mixing of links and buttons." However, it is quite common for websites to mix links and buttons (see Figure 5 below for an example), so doing so is unlikely to cause any confusion. The use of links and buttons on the Manage Subscription page is particularly unlikely to confuse. Nothing is distracting on the page, and there are clearly only three paths to choose from: Back (indicated by the solid state button); check subscription status (indicated by hyperlink); or cancel subscription (indicated by hyperlink). The hyperlinks are obviously clickable: they appear in blue text, and when a user hovers over them, the text is underlined, and the cursor turns into a hand. All three of the options are titular (i.e., they describe what happens if the user clicks them). Moreover, as explained

CONFIDENTIAL

in my opening report, the design of this page is consistent with the Spotted Pattern of screen reading, making it easy for a subscriber to identify quickly and easily what to click to take the action the subscriber desires.



*Figure 5 - LinkedIn.com Demographic edit section*

**Survey Questions**

47. Dr. King next criticizes the inclusion of survey questions in the cancelation flow on a few bases, including that the survey violates the aesthetics heuristic, creates "obstruction," causes "forced action," and constitutes "hidden information" (because the questions are not expressly labeled as optional). I disagree with Dr. King's opinions, as the survey questions in Match.com's cancelation flow are standard best practices and do not cause the flow to be not easy or simple.

48. Although Dr. King claims that survey questions are "pepper[ed]" throughout the flow, there are only a few optional survey questions in a wizard format, meaning for clarity and improved usability, the questions are split across pages, with only one question appearing at a time. Dr. King objects that the survey

CONFIDENTIAL

questions are "...spread over two disconnected pages...,"[26] suggesting it would be an improvement to put all questions on a single page. However, separating questions is a best practice among popular survey tools such as SurveyMonkey, Typeform, and Jotform. "Displaying one question at a time is the fastest and easiest way to conduct a survey. This method improves the user experience, which increases the likelihood that a respondent will continue until they reach the end of the survey."[27] Dr. King's inferred recommendation would actually increase friction and likely act against the customer's best interest in this regard.

49. Dr. King also objects to the use of survey questions in the flow at all. But the survey questions are important because good user and customer experience design mean continuously gathering feedback to understand the real reasons why users do what they do, particularly for a business like Match.com where a user may be canceling because of a good experience (e.g., they found a match) or a bad experience (e.g., they disliked their potential matches). Improving the experience for current, new, and returning customers, in the case of cancelation, means understanding why users are leaving so the business knows how it is performing and what, if any, improvements need to be made, much like how a retailer may ask why a customer is returning an item. Surveys are an important part of improving retention and having data for usability experts to look at to improve changes elsewhere on the site. Companies like ProsperStack built their business around helping companies keep their users retained and happy. ProsperStack recommends (1) having users answer some survey questions to understand the why behind their cancelation (ProsperStack recommends fewer than six questions, which Match.com does), and (2)

---

[26] Page 5
[27] https://www.jotform.com/blog/one-at-a-time-question-on-survey-form/

CONFIDENTIAL

presenting the questions with a retention offer.[28] Match.com witnesses have testified to the importance of the survey questions in the cancelation flow.[29]

50. In fact, the Match.com cancelation survey is consistent with the very standards and articles that Dr. King cites. Dr. King argues that surveys should be optional, users should not be forced to fill out a survey to unsubscribe, and that they should be "very short, one-question surveys."[30] Match.com's flow fits this description. The survey questions are optional, a user need not answer them to unsubscribe, and the optional questions asked are very short, with one question asked at a time, across two pages, just as the authorities that Dr. King cites recommend. Although Dr. King claims that the optional questions waste user time and increase cognitive load, Dr. King never quantifies this speculation, nor does she have any data to support that speculation. The fact is that the questions are optional and can be skipped in under two seconds (and even if users choose to answer the questions, the time spent is minimal).

51. Although Dr. King acknowledges that the survey questions are optional, she criticizes the flow for not including an explicit indication that the questions are optional. She even suggests adding another question asking users if they would like to complete a survey.[31] However, as I point out in my opening report, there is no need for an explicit indication that the survey is optional because the UI signifies and indicates the user may continue at each step; nothing is ever disabled barring or preventing the user from skipping. Additional instructions that the single interaction point on the page (i.e., the radio buttons) is optional could add noise and distraction. Including more words (such as instructions that the survey is optional)

---

[28] https://prosperstack.com/blog/craft-effective-cancellation-flow/
[29] Clinchy Dep. 62:10-63:9; Ginsberg Dep. 207:13-208:2.
[30] Page 39
[31] Pages 18, 44

CONFIDENTIAL

"increas[es] [the user's] cognitive load by having them commit it to their working memory. In other words, you're making it harder for them to do their task."[32]

52. Moreover, industry recommended best practice is to "...mark all the *required* fields."[32] (emphasis added) Marking optional fields as optional, by contrast, is "not obligatory." Since no fields are required in the Match.com cancelation survey, no fields are marked, the next button is enabled (i.e., not greyed out), and users are free to skip everything if they choose.

53. Dr. King nevertheless claims that users might believe that the survey is required because the survey uses radio buttons, and "...radio buttons are typically presented as an element that must be filled out and selected before moving forward in the user flow."[33] Dr. King offers no citation or evidence to support this dubious claim, nor could I find any support. There is nothing inherent about using radio buttons in forms, surveys, or questions that hints or suggests to users that they are required to answer. Rather, radio buttons are used to signify the user should select only a single option.

54. Dr. King next speculates that, because some of the survey responses generate a follow-up question, users *may* experience "dread" that *could* cause them to abandon cancelation. This opinion is not supported by evidence, or logic, particularly when abandoning the flow would cause the customer to continue paying for a service. Nor is it supported by actual evidence from my usability study and Match.com's actual data, both of which show that nearly everyone that begins the flow completes it and they are not compelled to abandon it due to any "dread." It is implausible that a few optional survey questions create such a sense of "dread" that users are willing to abandon the flow entirely and therefore continue paying for a subscription if they truly wanted to cancel.

---

[32] https://www.nngroup.com/articles/required-fields/
[33] Page 42

CONFIDENTIAL

55. Dr. King also takes issue with the optional open text response field that appeared in a previous version of the flow. She opines that the field "would also have posed a challenge for users,"[34] because some users could have interpreted the character count *maximum* as a word count *minimum*.[34] Dr. King offers no support for any of this speculation, nor am I aware of any such support. In any event, that field no longer exists in the current version of the flow.

56. Ultimately, Dr. King proposes an alternate design of presenting the optional survey questions after the cancelation confirmation. While the questions could be placed just about anywhere in the flow, having them where they currently are in the flow does not make the flow *not* simple, and this is supported by the data described in my opening report. Moreover, placing the questions before cancelation confirmation very likely results in higher response rates, which benefits users by allowing Match.com to assess whether improvements to its site are helpful or necessary based on user feedback.

**Retention/Save Offer Page**

57. Finally, Dr. King criticizes the retention/save offer page that is presented to a subset of users, primarily because this page is inconsistent with the other pages of the flow. I understand the FTC has admitted that including a save offer in a cancelation flow does not make the flow *not* simple,[35] so the inclusion of a save offer alone cannot be a basis for Dr. King's opinions. Dr. King's real complaint seems to be the design of the save offer page, not its inclusion in the flow. Dr. King complains that the retention page uses a "different stylesheet," different language, and a different tone compared to other parts of the flow and that a previous version of the retention page mixed links with buttons.

---

[34] Page 43
[35] FTC Second Am. Resp. to Request for Admission No. 33

CONFIDENTIAL

58. Although the retention offer page does appear to be "…using a different stylesheet to render the buttons…,"[36] I disagree with Dr. King's speculation that "…users may have been confused…" by the different stylesheet. Dr. King cites no evidence from actual data or users that any subscriber has actually been confused by the use of a different "stylesheet," much less that using a different stylesheet makes the flow not simple or easy.

59. The retention page's use of slightly different language in some iterations (e.g., using "resign" rather than "cancel") is unlikely to confuse users, particularly given the context. In fact, usability itself, as defined by the International Standards Organization (ISO) is "the extent to which the product can be used by specified users to achieve specified goals with effectiveness, efficiency, and satisfaction *in a specified context of use.*"[37] While Dr. King looks at each feature or word choice myopically, an actual user would review the page in its larger context, considering its various elements. For example, Dr. King speculates that a user may not know what "resign" means. However, the context makes the meaning clear. The subscriber is given two options: accept the save offer (e.g., "Get 3 More Months") or continue canceling ("No thanks, I want to resign"). There is nothing unclear about which option a subscriber should select if they want to cancel, even if a previous iteration of the retention page used the word "resign" rather than "cancel." Similarly, even in the version of the retention page that replaced "No thanks, I want to resign" with "Continue" (which has since been replaced by "Continue Cancellation"), the context is clear. Dr. King suggests that the use of "Continue" "…creates confusion as to what task is being continued."[38] But given the context of a strictly linear cancelation flow where the user has only two options ("Get 3 More Months" or "Continue"), there's little room for ambiguity.

---

[36] Page 36
[37] https://www.semanticscholar.org/paper/Usability-Evaluation-Scholtz/8deccec5ace9235878e6aab06c3cd54f7b33a2ce (emphasis added)
[38] Page 51

CONFIDENTIAL

60. Additionally, any inconsistency in tone or language is likely to be irrelevant to users. As cited in my opening report as well as by Dr. King, studies show that "Users won't read your text thoroughly in a word-by-word manner. Exhaustive reading is rare...Yes, some people will read more, but most won't."[39] Any subscribers interested in canceling likely will scan, click continue, and be done quickly (as indicated by the usability study results, which show an average completion time of only 74 seconds, and actual user data, which shows an average completion time of only 44 seconds), so the subscribers are unlikely to be reading closely enough to notice any language or tone inconsistencies, much less be confused by them.

61. The version of the retention page that mixed links with buttons also was unlikely to have confused users. As noted above, mixing links and buttons is not unusual, and all clickable items (whether buttons or links) were clearly indicated as clickable (e.g., by being rendered in blue text and underlined to indicate a hyperlink). The clickable items were labeled to indicate what each clickable item did (e.g., accept the save offer or continue cancelation).

62. Dr. King also accuses the retention page of using "confirmshaming" language, as follows: "[Username], sometimes finding love takes time. We truly believe you can find someone special on Match.com. After all, more relationships begin at Match.com than any other website. Give us another shot and we'll give you ____ off your renewal."[40] But she offers no explanation or evidence supporting her conclusion, and it is entirely unclear what standard Dr. King is using to evaluate whether something "shames" the user. In my expert opinion, I see no evidence of confirmshaming in this language, nor has Dr. King conducted any empirical analysis of users to evaluate their reaction to such language. Some better examples of confirmshaming are found on Dr. King's dark patterns tip line, like on bestproducts.com, to opt out of their

---

[39] https://www.nngroup.com/articles/f-shaped-pattern-reading-web-content-discovered/
[40] Page 50

CONFIDENTIAL

notifications they give you two choices "Heck yea" or "Nope, I'm Rich."[41] Another is from DuoLingo trying to get you to engage with its service, it shows a picture of a crying bird. The text reads "Language bird is crying. Learn Italian today or he will eat a poison [sic] loaf of bread."[42] An example of confirmshaming language in this context for Match.com might be something like "Are you sure you want to stay single forever?" or "Fine. Stay home with your cats drinking boxed wine." or "Don't go! Quitters never win!" But Match.com's language is considerate, polite, and hopeful, and presents facts and an incentive to stay. There is no guilt or shame in this language.

63. Dr. King also criticizes Match.com for presenting a couple's success story in the retention offer, claiming that it "…is questionable as a user may be canceling their subscription for any number of reasons, including having established a 'successful' relationship."[43] Ironically, that is exactly why the survey questions are valuable—so Match.com knows if presenting a save offer makes sense (such as if the subscriber is canceling for cost reasons), or not (such as if the subscriber is canceling because they met someone). There is nothing inappropriate or shameful about presenting a success story in an attempt to encourage subscribers to continue to try to find their own success on the site.

64. Overall, although the style of the retention page is somewhat different from other pages in the cancelation flow, that does not make the overall flow unusable, much less indicate that the flow is not easy or simple.

---

[41] https://darkpatternstipline.org/sightings/confirmshaming-tumblr-com/
[42] https://blog.mobiversal.com/dark-patterns-or-how-ux-exploits-the-user-confirmshaming.html
[43] Page 50

CONFIDENTIAL

65. In fact, actual Match.com analytics proves the point. Of the 13,900,434[44] subscribers that entered the cancelation flow from 2013 through 2022, 12,994,428 successfully resigned online,[45] and another 275,353 took a save offer.[46] This is a cancelation "success" and retention rate of 95.46%, meaning only 4.54% of subscribers did not cancel after entering the flow (either because they never intended to cancel, could not cancel, or chose not to cancel).[47] As described in my opening report, it is impossible to know what portion of these remaining 4.54% of subscribers intended to cancel but did not. Some may have been just exploring. Some may have been trying to trigger a save offer. Or some may have entered the flow with the intention to cancel but simply changed their mind. It is not uncommon for a subscriber to change their mind even after canceling. For example, Match.com data shows that from January 2013 through December 2022, 334,594 subscribers successfully canceled but then later reactivated their subscription before it expired and renewed for another term,[48] so it is reasonable to expect that some subscribers who entered the flow with the expectation of canceling may have changed their minds before completing the cancelation. In short, these statistics do not show any defect in the cancelation flow. To the contrary, they constitute a clear story of success from a usability perspective.

## II.    Dr. King's Version of a Nielsen Usability Heuristics Analysis Is Flawed

66. I disagree with the substance of Dr. King's conclusions regarding usability heuristics and their application to Match.com's online cancelation flow. Dr. King opines that Match.com violates three "principles of

---

[44] Sum of column C in MATCHFTC846468
[45] Sum of column E in MATCHFTC846468. This does not account for subscribers who entered the online cancelation flow but resigned via an alternative method or whose subscriptions ultimately were not renewed for a different reason (e.g., billing failure).
[46] Sum of column G in MATCHFTC846468
[47] Even using session-level data rather than subscriber-level data, approximately 85% of sessions that hit the cancelation flow result in a cancelation within that session, not accounting for any save offer takers. *See* MATCHFTC846518 (sum of column F divided by sum of column D).
[48] MATCHFTC846512 (sum of column C)

CONFIDENTIAL

website usability . . . in a manner that *could* lead to customer confusion" (although Dr. King cites no evidence that these designs *have* led to customer confusion).[49] I disagree with Dr. King's conclusions regarding each of these usability principles, as described in more detail below.

**Visibility of System Status**: "The design should always keep users informed about what is going on, through appropriate feedback within a reasonable amount of time."[50]

67. Dr. King opines that Match.com violates this usability principle due to "a lack of consistent signaling to the user each step in the cancellation process and her present place within those steps." In particular, Dr. King criticizes the "elimination of breadcrumbs" from the 2022 version of the cancelation flow and the "lack of labeling of steps."

68. First, Dr. King's emphasis on the use of breadcrumbs as a design pattern is misguided. To begin, what Dr. King apparently refers to as "breadcrumbs" are actually navigation, sub-navigation, and page titles. Dr. King correctly defines "breadcrumbs" as "a list of links representing the current page and its 'ancestors' (parent page, grandparent page, and so on), typically going all the way back to the site homepage."[51] In other words, breadcrumbs identify the pages that a user may have visited (though not necessarily visited) to get to the current page.

---

[49] Page 35 (emphasis added).
[50] https://www.nngroup.com/articles/ten-usability-heuristics/
[51] Page 21 n.42 (quoting https://www.nngroup.com/articles/breadcrumbs/).

CONFIDENTIAL



*Figure 6 - REI.com*



*Figure 7 - Yelp.com*

69. Navigation, sub-navigation, and page titles, by contrast, may indicate the user's current location and allow the user to navigate to other pages (though not necessarily the current page's "ancestors"). The examples above illustrate sub-navigation and how it differs from breadcrumbs.

70. Previous versions (see example below) of the Match.com cancelation flow used sub-navigation to indicate the user's location and allow them to navigate to other settings pages (supporting the usability heuristic of

CONFIDENTIAL

system status). No version of the Match.com cancelation flow that I have reviewed contains

"breadcrumbs."[52] Thus, Match.com never "eliminated" breadcrumbs.



*Figure 8 – Screenshot of MATCHFTC672297.mp4 including sub-navigation, but no breadcrumbs*

71. In the 2022 version of the cancelation flow, the sub-navigation menu does not appear. However, the

elimination of the sub-navigation menu did not impact usability. Each page of the flow continued to have a

clear title or header (as described in my opening report), continuing to provide the user with a clear

indication of their location, and included additional navigational buttons to return to the settings page (in

addition to the ever-present settings gear that could return the user to the account settings page).

Breadcrumbs and sub-navigation menus are primarily used to facilitate navigation, and their presence

---

[52] The fact that Dr. King seems to have misidentified a sub-navigation menu as breadcrumbs calls into question her familiarity with the site and/or her expertise.

CONFIDENTIAL

would not serve a purpose in the cancelation process. The only relevant information for someone who wants to cancel would be the page name, which is already prominently displayed. Moreover, the absence of breadcrumbs and sub-navigation menus throughout the rest of the Match.com experience would make it inconsistent and unnecessary to suddenly introduce them during the cancelation process.

72. Second, Dr. King states "All versions [of the flow] lack a simple, clear label (e.g., "Step 3 of 5," "Page 4 of 6") indicating to users precisely where they are in the process…"[53] However, Dr. King cites no support for her apparent claim that a flow must have numerical labels to be simple, particularly where (as here) the flow is not lengthy. Once a user has declared a possible intention to cancel (by clicking "Cancel Subscription") there are only two steps: Optional Question 1 and Optional Question 2 (except in the case of users presented with a retention screen, in which case the step total is three).[54] After the optional survey questions, the user reaches the cancelation confirmation screen. The trick with labeling steps is to figure out when and where such design is warranted. Based on the cancelation flows I reviewed as indicated in my opening report,[55] labeling steps in a cancelation flow is rare.[56] As Jennifer Tidwell says in her book *Designing Interfaces*, "It's silly to have a 2-step wizard, and a 15-step wizard is tedious."[57]

73. What is more, a numerical step label is unnecessary given that there are three areas of information indicating system status on both optional question steps, including (1) the main title, (2) the text content, and (3) the button labels, as described in my opening report. In fact, Dr. King admits that the "Continue

---

[53] Page 36

[54] Moreover, because the flow is not the same length for all users (as some see the retention screen and others do not), it would not make sense to number the pages because even Match.com does not know how many pages a subscriber will see when the subscriber first enters the flow. If anything, numbering the pages in light of this uncertainty would be more likely to confuse users than provide clarity. For example, stating "Page 1 of 2" could confuse users who are shown a retention offer (and therefore see three pages), whereas stating "Page 1 of 3" could confuse users who are not shown that offer (and therefore see two pages).

[55] *See* Expert Report of Brandon Ward at 31 and App'x I.

[56] Only the *New York Times*'s cancelation flow numbered steps (of which there were four). Amazon's flow has what appears to be a progress bar, but not a numerical indicator.

[57] https://faculty.washington.edu/farkas/HCDE%20407-2013/Tidwell-DesignPatternOnWizards.pdf

CONFIDENTIAL

Cancellation" button (which appears on all pages of the flow in the current version) is a "signal" to the user

regarding their location in the flow. The fact that additional labeling *could* be added doesn't mean there

isn't sufficient labeling as-is and doesn't indicate that the Match.com cancelation flow violates the

visibility of system status heuristic, as Dr. King contends.

**Consistency and Standards: "**Users should not have to wonder whether different words, situations, or actions

mean the same thing. Follow platform and industry conventions."[58]

74. Dr. King claims that Match.com's cancelation flow violates the consistency and standards heuristic in

three primary ways—(1) the retention offer page using a different stylesheet; (2) the "mixing of links and

buttons" on some pages; and (3) password authentication—thus rendering the cancelation flow not easy

or simple. I disagree with Dr. King's conclusion.

75. First, although the retention offer page does appear to be "...using a different stylesheet to render the

buttons...,"[59] I disagree with Dr. King's speculation that "...users may have been confused..." by the

different stylesheet, as described above. Dr. King cites no evidence from actual data or users. In any event,

the consistency heuristic is primarily functionally focused, not aesthetically, meaning any inconsistency in

the CSS or look and feel, is unlikely to actually cause consumer confusion (and Dr. King has no actual

evidence to the contrary).

76. Second, the "mixing of links and buttons" does not violate the consistency and standards heuristic. As

noted above, this is common and unlikely to cause confusion.

77. Finally, Dr. King claims that "[t]he arbitrary placement of a password authentication mechanism" in the

cancelation flow "suggests that the password authentication was placed at this point as an obstacle for

---

[58] https://www.nngroup.com/articles/ten-usability-heuristics/
[59] Page 36

CONFIDENTIAL

users to access the cancellation flow." That theory is pure speculation, without any citation to any evidence suggesting that the password authentication mechanism is intended to be a roadblock. Moreover, requiring users to reauthenticate before accessing private information has nothing to do with ensuring that users do "not have to wonder whether different words, situations, or actions mean the same thing"—the definition of the consistency heuristic. Thus, the existence of the password authentication mechanism has no bearing on this heuristic.

78. Overall, the flow as a whole has a consistent design. Once subscribers choose "Cancel Subscription" the flow is consistent and clear: Keep clicking continue until you see the confirmation screen. For most people, this means clicking the "Continue Cancellation" button twice. For some, it also includes the retention screen. With the exception of previous versions of the retention screen, the buttons are always in the exact same order, the exact same style, and the exact same location relative to the content. Additionally, engaging with any of the content is consistently optional and customers can just click continue. And while the retention screen may not be completely consistent with the other pages in the flow, the retention screen doesn't violate standard web design principles in general, as described above.

79. Ultimately, Dr. King's conclusions regarding the consistency heuristic and its alleged impact on the usability of Match.com's cancelation flow are all speculative, non-specific, and unsupported by any evidence. Data from Match.com analytics, by contrast, indicates this heuristic was not violated given that 95.46% of users were able to either cancel or successfully take a save offer.

**Aesthetic and Minimalist Design:** "Interfaces should not contain information that is irrelevant or rarely needed. Every extra unit of information in an interface competes with the relevant units of information and diminishes their relative visibility."[60]

---

[60] https://www.nngroup.com/articles/ten-usability-heuristics/

CONFIDENTIAL

80. Dr. King argues the cancelation process violates this heuristic by "inserting extraneous, unnecessary steps, making it far longer than necessary and subjecting its users to excess interactions that increase their cognitive load..."[61] In particular, Dr. King criticizes the two (optional) survey questions and the retention offer presented to a subset of subscribers.

81. Dr. King has misunderstood and misused this heuristic. The heuristic is about aesthetic design principles, i.e., the look, the feel, or the content of a screen. "...it's about making sure you're keeping the content and visual design focused on the essentials. Ensure that the visual elements of the interface support the user's primary goals."[60] This heuristic has nothing to do with length or cognitive load. I've addressed in my opening report how Match.com's cancelation flow satisfies this heuristic (as properly interpreted) in many ways. While aesthetic preferences are highly subjective, from a user experience point of view the Match.com cancelation flow is relatively clean and simple, only including information and controls that subscribers require to make informed choices, as explained in my opening report.

82. Even assuming that length and cognitive load were relevant to this heuristic, I disagree with Dr. King's conclusions. Dr. King calls the process "lengthy," but it is unclear how she defines "lengthy." As described in my opening report, the cancelation flow is not, in fact, "lengthy" by any objective measure.

     i.    The average time it took usability study participants to cancel, starting from the login screen to completion, was 74 seconds.

    ii.    Based on usability study data, participants were on average able to cancel in 83.7% less time than it took to create an account and subscribe.

---

[61] Page 38

CONFIDENTIAL

iii.  Actual Match.com subscriber data shows that it takes on average 44 seconds to complete the cancelation flow—four times faster than the time it takes users to merely subscribe (i.e., enter payment information, not including the time it takes to create an account).

iv.  As explained in my opening report, many other sites require at least 5 steps to cancel (steps, not clicks; actual clicks are higher), meaning Match.com's flow is consistent and unremarkable (not "lengthy") among its peers in this category.[62]

v.  At least four independent studies from reputable sources have concluded "…the number of necessary clicks affects neither user satisfaction, nor success rate…fewer clicks don't make users happier and aren't necessarily perceived as faster. What really counts here is ease of navigation, the constant scent of information along the user's path. If you don't make the user think about the clicks, they won't mind having a few extra clicks."[63] The length of a process is largely irrelevant provided the steps in that process are clear and concise. Breaking the survey into two questions for instance helps reduce cognitive load on the user, making it easier and faster for them to respond or skip than if everything was all presented on a single page at the same time. Shorter does not mean simpler.

83. Even if Match.com were to shorten the flow, it is unlikely that shortening an already-short process would have any significant effect on the flow's usability. The fact that a flow theoretically *can* be made shorter does not mean that the existing version is not easy or simple. Dr. King does not explain why she apparently believes otherwise. Rather, Dr. King seems to be trying to determine how to make the

---

[62] *See* Expert Report of Brandon Ward at 31.
[63] https://uxmyths.com/post/654026581/myth-all-pages-should-be-accessible-in-3-clicks

CONFIDENTIAL

cancelation flow "simplest," and not trying to determine what would be sufficient to make it merely

"simple."

84. Dr. King does not even address the seven other Nielsen factors, presumably because they are clearly met.

The fact it is undisputed Match.com's cancelation flow meets the majority of the Nielsen factors even in

Dr. King's estimation shows the cancelation process is simple (even if Dr. King were right about the other

three factors, which she is not).

## III.    Dr. King's "Dark Patterns" Analysis Is Flawed

85. In addition to some of the Nielsen usability heuristics, Dr. King claims to have analyzed several "dark

patterns" she allegedly found in Match.com's online cancelation flow. Although I agree with Dr. King that

"dark patterns"—meaning "user interfaces whose designers knowingly confuse users, make it difficult for

users to express their actual preferences, or manipulate users into taking certain actions"[64]—are

undesirable, I did not find any evidence of deceptive, manipulative, tricky, coercive, etc. practices in the

Match.com cancelation flow that would make the cancelation flow not simple, nor prevent subscribers

from confidently canceling their subscription. I address the specific alleged dark patterns discussed in Dr.

King's report below.

**Obstruction:** "Making a process more difficult than it needs to be, with the intent of dissuading certain

action(s)"[65]

---

[64] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3431205
[65] https://www.nngroup.com/articles/ten-usability-heuristics/

CONFIDENTIAL

86. Dr. King concludes "Obstruction was used throughout the entire cancellation process…,"[66] pointing specifically to password reauthentication, the two optional survey questions, and "inconsistent design." Dr. King's conclusions regarding obstruction are not valid.

87. First, Dr. King appears to assume that an "obstruction" dark pattern exists any time "a process [is] more difficult than it needs to be." If that were correct, however, then any design other than *the absolute simplest and most straightforward* design would be a dark pattern. By that definition, nearly every website would be using an obstruction dark pattern. That cannot be so since there are multiple ways to create a simple and usable website. Instead, an obstruction dark pattern exists only if the obstruction is inserted "with the intent of dissuading certain action(s)." Yet Dr. King points to no evidence (other than her own speculation) that the *intent* of the password reauthentication page, the survey questions, or the design choices were to dissuade cancelation. Moreover, Dr. King entirely ignores that "[o]bstruction often manifests as a *major* barrier to a particular task that the user may want to accomplish."[67] None of the alleged "obstructions" that Dr. King identified are a major barrier, nor does Dr. King cite any evidence that they are. Each of the alleged obstructions can be overcome within seconds and is clearly labeled.

88. Second, Dr. King incorrectly suggests that Match.com uses a form of obstruction called the "Roach Motel" where "…the design makes it very easy for you to get into a certain situation, but then makes it hard for you to get out of it (e.g., a subscription)."[68] To begin, it is unclear how Dr. King reaches this conclusion because neither the text of Dr. King's report itself nor the sources cited in it suggest that she has ever so much as viewed screenshots or videos of Match.com's registration or subscription flow, much less experienced it herself. By contrast, I personally experienced the registration and subscription flow many

---

[66] Page 40
[67] https://darkpatterns.uxp2.com/patterns-2/obstruction/ (emphasis added)
[68] Page 17

CONFIDENTIAL

times, as did the usability study participants. The facts and data show Match.com is the opposite of a Roach Motel. Namely, my usability study showed that study participants took a median of 453 seconds to subscribe (i.e., create an account and choose a subscription), whereas it took a median of only 74 seconds to cancel. Actual user data available from Match.com confirms that to be true; completing only the Match.com subscription purchase process (i.e., excluding registration time) takes, on average, 175 seconds to purchase a subscription, whereas it took actual users an average of 44 seconds to cancel. Moreover, the account creation process and subscription process each involve far more steps and choices than the cancelation flow. Setting up a profile involves eleven required steps and twenty-nine additional optional steps. Then the subscription process involves eleven optional steps and seven different payment plans to choose from, all of which offer various payment options. Thus, it is objectively harder to subscribe than to cancel, as shown by the usability study and actual user data. In no way can Match.com be considered a "Roach Motel."

89. In fact, the example of a "Roach Motel" that Dr. King offers reveals the flaw in her logic as applied to Match.com. The livenation.com example—with obscured and inverted controls tricking the user into accidentally subscribing to Rolling Stone magazine, then requiring the user to physically mail a form within a restricted timeframe if they want to cancel—is a classic dark pattern. Match.com's cancelation flow does none of that. As evidenced above and in my opening report, Match.com's flow is literally the opposite, where subscribing requires considerably more effort than canceling. Dr. King would have known this if she had seen or experienced the Match.com subscription process.

90. Third, examining the examples of "obstruction" that Dr. King points to reveals that they are not actually obstructions at all. I addressed in my opening report and above the purpose that reauthentication and the survey questions serve—i.e., protecting security and providing valuable business information that is used to improve user experience.

CONFIDENTIAL

91. Regardless, these elements don't prevent people from canceling and don't make the process not simple. Data from my usability study and Match.com's own user data demonstrate that these steps add little to no friction to the process, and the (minimal) time required and success rates support this conclusion.

**Forced Action:** A design pattern "...requiring the user to perform a certain action to access (or continue to access) certain functionality."[69] Note this isn't necessarily a nefarious dark pattern in and of itself. A good example of forced action is a locked car. You are forced to present a matching key and unlock it before entering and then again to start and drive the vehicle.

92. Dr. King asserts reauthentication and the optional surveys are negative forced actions claiming "...there is weak, or zero, justification for the user to take the action; the point is to make the action egregious or laborious enough to disincentivize the user to complete their task."[70] As stated in my opening report and above, the argument is unsupported and not applicable here. There is nothing "egregious or laborious" about entering a password or asking optional survey questions, both of which have legitimate business purposes.

93. The definitive refutation of any dark pattern here is the results of the usability study, in which study participants overwhelmingly stated cancelation is simple, and even simpler than subscribing. The participants' cancelation success rate also supports that conclusion, as does Match.com's own data, showing that nearly all subscribers that click "Cancel Subscription" successfully cancel. This data shows that neither the password reauthentication page nor the optional surveys are "egregious or laborious enough to disincentivize the user to complete" the cancelation flow. It simply means the flow is secure and thorough.

---

[69] https://www.nngroup.com/articles/ten-usability-heuristics/
[70] Page 42

CONFIDENTIAL

**Hidden Information:** "options or actions relevant to the user but not made immediately or readily accessible."[71]

94. Dr. King states "Match.com frequently hides or fails to disclose relevant information to users...I observed at least two examples of hidden information..."[72] The two examples Dr. King states are the optional surveys not being explicitly labeled as optional, and the findability of the cancelation process itself.[73]

95. I've already addressed the discoverability of the optional survey questions above. In short, there is nothing "hidden" about the survey questions being optional, nor does Match.com "[r]epresent[] the optional surveys are required," as Dr. King claims. The fact that the optionality could be *more* obvious (such as using a "Skip" text button) does not make the current information "hidden." Further, even if the survey questions were mandatory, they would still be simple.

96. Dr. King then speculates that some of the language in the cancelation flow, such as "Before you go, help us make Match.com better" or "Tell us more," may have led "some users to believe the survey is compulsory or necessary for cancellation."[74] Yet she never explains how or why that language might suggest a requirement, nor does she support her speculation with any empirical data. If anything, as explained in my opening report, the language is clear, particularly in the larger design context.

97. Regarding the findability of the cancelation process itself, that issue is addressed in my opening report. Here, I will address specific elements of Dr. King's report. I disagree with Dr. King that "...finding the means to cancel on the website was not a simple task."[74] The information architecture ("IA") of the location of the cancelation flow is clear and representative of standard practices across the web and other

---

[71] https://www.nngroup.com/articles/ten-usability-heuristics/
[72] Page 18
[73] It is unclear how Dr. King concludes only two examples are "frequent."
[74] Page 44

41 of 58

CONFIDENTIAL

**APP 966**

large websites. Additionally, I (unlike Dr. King) actually used the website rather than being shown videos or screenshots, so it is unclear how Dr. King can opine on the findability of the cancelation flow when she apparently has never attempted to do so herself. Dr. King claims, for example, that finding the flow under Settings "...required exploration by users to encounter the Account Settings option"[74] but again offers no supporting evidence of this claim. She did not identify any users or what "exploration" they were "required" to do.

98. Dr. King's description of how to find the cancelation flow is also factually inaccurate. Dr. King begins by stating she is only aware of "...a single pathway to start the process..."[74] (though she later admits that the process is available under Help as well, as the "...help page also directs the user to the online process..."[75]). She then incorrectly claims that the Help pages "buried information" about cancelation, ignoring that subscribers can use the Help page search box to search at least *a dozen* different cancelation-related terms that will take the subscriber to the cancelation help page that leads subscribers ***directly*** to the flow, as described in my opening report.

99. Dr. King then claims that having "a single pathway" to start the process means that "failure rates could be high *if* users did not discover it." To begin, Dr. King is incorrect that there is only a "single pathway" to start the process; as described above and in my opening report, subscribers can reach the cancelation flow in a variety of different ways. Additionally, with few exceptions, it's common to only have one path to accomplish a task on the web and in software. There may be multiple paths to begin executing a task (e.g., a button, a menu option, a key command, etc.), but only a single way to do that task (e.g., all three options launch the same, singular flow). This is basic software design. As documented in my opening report, I located two direct paths to cancelation (direct, and via Help), while within Help, in addition to clicking to

---

[75] Page 45

CONFIDENTIAL

the correct article, I found at least twelve additional paths to get to the Help article via searches, totaling at least *fourteen* separate pathways customers could potentially take to get to the Manage Subscription screen to begin canceling. There is nothing "hidden" about the cancelation flow.

100.    Dr. King concludes "The discoverability of the cancellation process is buried under indirect settings…"[76] and she states "…the use of the term "settings" in the drop-down menu is ambiguous…"[77] hinting this "ambiguity" leads to difficulty finding the flow. There is no evidence the flow is buried anywhere, nor that getting there requires some complex "indirect" navigation. Of the ten other services I reviewed 100% of them began the path to cancelation in the same place as Match.com: Account/Settings. Of the two other services Dr. King reviewed (Coffee Meets Bagel, and Facebook Dating (which does not offer subscriptions)), 100% of those too began the path to cancelation on the Account/Settings page.[78] In fact, in Dr. King's own suggested redesign, she also places the cancelation flow in the Account/Settings page.[79] Clearly, this is the best practice, and not ambiguous, buried, or indirect at all.

101.    Dr. King continues "…on the Account Settings page, there is no mention of cancellation…"[77] Upon review of the available options, it's clear there is only one logical place a customer could go to cancel, and the data in my opening report confirms this. It's worth noting that in some versions of the site before the 2022 version (see MATCHFTC761906.mp4), the word cancel was included in the label, but it's doubtful the removal of that word had much if any effect on the success rate of cancelations, as the success rate after removing it continues to be very high (91.5% in my study, and even higher in Match.com data).

102.    Moreover, Dr. King's speculation about whether subscribers *might* have found it difficult to find the cancelation flow for any of the various reasons she lists is not only unsupported but is also

---

[76] Page 4
[77] Page 44
[78] Page 64
[79] Page 58

CONFIDENTIAL

unnecessary. Empirical data proves that such speculation is incorrect. The usability study data shows that **98.78% of participants (162 of 164) were able to locate the Manage Subscription page** and continue with their cancelation process, disproving Dr. King's hypothesis that subscribers intending to cancel had difficulty finding the flow.

**Content Strategy:** "Content strategy and copywriting refer to the actual language and word choices within a software application (app) or product."[80]

103.     Dr. King claims that Match.com's "content strategy and copywriting...contributed to user confusion within the cancellation flow."[81] But Dr. King again offers no data to support that assertion. Without evidence, this is mere conjecture. Moreover, as discussed in more detail below, the specific items that Dr. King identifies as inconsistent or confusing are not.

104.     **Inconsistent Language:** First, Dr. King asserts that "...Match.com used inconsistent language throughout the cancellation process..."[82] The only "inconsistencies" she identifies, however, are on a single page of the flow (the retention offer page, which only a subset of subscribers see), not "throughout" the flow. Moreover, Dr. King never explains how "switching from third person to first person," for example, would make a subscriber confused about whether they had successfully completed cancelation. As described above, "inconsistent language" on a single page is unlikely to cause any confusion, particularly in context. The fact that Dr. King might have chosen different words or phrases does not mean that the current version is not simple, nor is there any evidence to support that assumption. Inconsistency in language or content does not equate to something being difficult to find or do, and Dr. King's report does

---

[80] https://www.nngroup.com/articles/ten-usability-heuristics/
[81] Page 45
[82] Page 46

CONFIDENTIAL

not show otherwise. The data, by contrast, indicates that the flow is both easy and simple to find and complete, as evidenced by the high success rate in my usability study (91.4%) and from Match.com's data.

105.     **Confirmshaming:** "...the act of guilting the user into opting in to [sic] something. The option to decline is worded in such a way as to shame the user into compliance."[83] and "...using language and emotion (shame) to steer users away from making a certain choice."[84]

106.     Dr. King concludes the retention offer used confirmshaming with its language and presenting a couple's success story. As described above, I disagree that there is anything "shaming" about the retention page.

107.     **Confusing Terminology:** Dr. King next states that Match.com uses confusing terminology.

108.     First, she claims that the retention page's past use of "resignation" (rather than cancelation) or a "Continue" button (rather than "Continue Cancellation" button) created confusion. However, she fails to identify any actual users or evidence to support these claims. As described above, this language is clear in context. In any event, the "resign" link on the retention page was changed to a "Continue" button in 2018, and the "Continue" button was changed to a "Continue Cancellation" button in 2019. So to the extent "resign" or "Continue" was confusing (they were not), that confusion has been eliminated.

109.     Dr. King next claims that the "Before you go" headline may have "misled some users to believe that this was the final step in the cancellation process." As explained in my opening report, I disagree. The headline on its own is clear that the subscriber has not yet completed cancelation (because the subscriber has not yet "gone"), a conclusion that is reinforced by other language on that page, as elaborated on in my

---

[83] Page 48
[84] Page 49

CONFIDENTIAL

**APP 970**

opening report. That interpretation is consistent with data from my usability study and Match.com's data, which shows nearly all subscribers advanced past this page and successfully canceled.

# VII.  RESPONSE TO DR. KING'S PROPOSED ALTERNATIVE DESIGN

110.    Dr. King concludes her report by putting her heuristic analysis into "perspective" based on "company documents" and "competitor practices," and then proposing an alternative design. There are two problems with this. First, her proposed alternative design is not simpler or better than Match.com's existing flow. Second, even if it were, that would mean nothing. Every website or process could theoretically be simpler. But that does not mean the existing process is not already simple.

111.    First, Dr. King cites a handful of documents in which Match.com employees proposed re-designs of the cancelation flow or suggested critiques of the flow based on alleged consumer complaints. Dr. King claims that the "existence of customer complaints" supports her opinion that Match.com's flow is not simple. The fact that complaints exist, however, is not proof that a site is not usable. It is impossible to design a site that satisfies every user.[85] Dr. King does no empirical analysis to show that a significant percentage of customers actually complained about the cancelation flow, and certainly, none showing that a meaningful number complained that it was not simple. Additionally, Dr. King is misconstruing some of those company documents. For example, one witness testified that when she referred to "complaints," she meant "an internal word for members calling," not necessarily complaining about the cancelation flow being not simple.[86]

---

[85] https://www.linkedin.com/pulse/idea-you-can-design-everyone-myth-rekha-bhavsar/
[86] Clinchy Dep. 75:4-19; *see also* Auderer Dep. 240:1-5.

CONFIDENTIAL

112.     Moreover, Dr. King apparently did not review any actual customer complaints to understand what exactly the customers were complaining about—as none are in the data cited in her report. Instead, she appears to have relied on unverified second or third-hand mentions of some number of customer complaints by former Match.com employees. Even those employees admit to not having enough data to substantiate their assumptions stating "...I can dig up some data if needed."[87] Furthermore, in reality, complaints about the online cancelation flow are a small minority of Match.com's customer care contacts, according to a former Vice President of Customer Support at Match.com.[88]

113.     What is more, good UX design does not rely on anecdotes from customer complaints; it relies on data. And the actual data in this case—both from Match.com's actual user data and my usability study—demonstrates that the vast majority of subscribers can successfully cancel their subscriptions via the online flow, regardless of what some former Match.com employees may have speculated.

114.     Dr. King next compares Match.com's online cancelation flow to "competitor practices," but the other sites on which Dr. King relies are not comparable. Dr. King does not explain how she chose the "competitors" to which to compare Match.com's online cancelation flow. As explained in my opening report, I examined numerous other subscription sites and came to a different conclusion, as I found that the elements of Match.com's cancelation flow are common across other sites. The fact that Dr. King found two examples of other (non-comparable) sites that do not have all the same elements as Match.com's cancelation flow does not prove that Match.com's flow is not simple.

---

[87] MATCHFTC320168

[88] *See* Watson Dep. 156:2-7 (explaining that "I thought I cancelled" contacts were on average 50-60 people per month, "which is 1 percent maybe of the volume that we would receive on a monthly basis"); 195:4-8 ("Q. Would you agree that generally speaking, Match in general during this time period received a lot of complaints from members who stated they cancelled on the site and it didn't work? A. No.").

CONFIDENTIAL

115.　　　What is more, the "competitors" that Dr. King chose are not comparable to Match.com in varying ways, making Dr. King's comparison unhelpful.

116.　　　**Facebook Dating** is a completely free service, meaning there is no paid "subscription" to cancel, and it is available only via an app (not on a desktop computer or mobile web). Because Facebook Dating is entirely free,[89] what Dr. King appears to be describing is deleting an entire account, rather than ending a paid subscription. It makes sense that a flow to cancel a paid subscription is different from a flow to delete a free account (e.g., because the latter doesn't have financial implications). For example, it is not surprising that Facebook Dating's flow does not include a save offer (i.e., offering a discounted subscription), because the service is already free so there is nothing to discount. Moreover, Facebook Dating is a minor part of Facebook's overall service, meaning collecting feedback from users about why they are deleting their dating accounts is less important because it affects a much smaller subset of Facebook's overall users and business (as deleting a Facebook Dating account does not delete the user's entire Facebook account). The very purpose of Match.com, by contrast, is to help users find a match, so it is far more important for Match.com to know whether its subscribers are satisfied and therefore whether it needs to make adjustments to improve the experience for its remaining subscribers.

117.　　　**CoffeeMeetsBagel** is also not comparable to Match.com. Like Facebook Dating, CoffeeMeetsBagel also is available only on an app (not on a desktop computer or mobile web). Importantly, that means that all billing and subscription cancelations are managed through the Apple App Store or Google Play, depending on the user's device.[90] Again, what Dr. King appears to be describing in her report is deleting

---

[89] Rather than selling subscriptions, Facebook makes much of its revenue through targeted advertising, which has led to consumer privacy issues resulting in FTC action and a $5 billion penalty. https://www.ftc.gov/news-events/news/press-releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions-facebook. It strikes me as odd that Dr. King relies on such a company as a good example, its irrelevance notwithstanding.

[90] https://coffeemeetsbagel.zendesk.com/hc/en-us/articles/1500002587001-How-do-I-turn-off-auto-renewal-or-cancel-my-subscription-

CONFIDENTIAL

a user's free *account*, not canceling a paid subscription. As noted above, there are good reasons for those flows to be different and also explains why the "delete account" flow does not contain a save offer (because there is no discount to offer on an already-free account).

118.    Even the comparison itself is not comparable. Throughout her report, Dr. King describes and opines about the *desktop* version of Match.com's cancelation flow (i.e., the version a user would see if they used a laptop or desktop computer to visit Match.com). Yet Dr. King admits in a footnote that the "competitor flow" reviews "...were conducted on the mobile versions of these services."[91] Usability considerations can be very different in the desktop versus mobile context, so comparing flows across services in those two different contexts makes little sense. "When you test a mobile product with users, you need to examine that product in the right context because the mobile environment isn't the same as the traditional desktop environment."[92] Moreover, it is unclear whether Dr. King experienced these "competitor flows" herself or is relying on screenshots and videos taken by others, as she is with the Match.com flow. If the former, it is unfair to compare actual experience to screenshots and videos (and begs the question why Dr. King was willing to experience the "competitor flows" herself, but not Match.com's flow). If the latter, her heuristic analysis of the "competitor flows" suffers from the same deficiencies as her analysis of the Match.com flow.

119.    Moreover, putting aside the lack of comparability, Dr. King identifies "friction" even in these "competitor" flows, but it is unclear what point Dr. King is trying to make. If the point is that the "competitor" flows are "easy" and "simple" to use and find (unlike Match.com's, according to Dr. King), then even "easy" and "simple" flows have friction, according to Dr. King's characterizations. But Dr. King never explains what standard she is using to determine at what point a flow crosses the line from "easy"

---

[91] Page 62, footnote 99
[92] https://www.interaction-design.org/literature/article/mobile-usability-research-the-important-differences-from-the-desktop

CONFIDENTIAL

and "simple" to not. For example, how much friction is too much? Dr. King never says. If the point is that the competitor flows *also* are not easy or simple because they also use friction, however, then it is unclear what value there is in comparing Match.com to those sites (or whether ***any*** flow other than the easiest or simplest would ever meet Dr. King's exacting standards).

120.     In any event, the fact that shorter flows exist on other (non-comparable) sites, or that other flows have fewer alleged friction points or dark patterns, does not mean that Match.com's cancelation flow is not easy or simple. There are many ways for a flow to be easy or simple, without the flow being the easiest or the simplest. Thus, Dr. King's comparison to competitor flows is not helpful in determining whether Match.com's flow is easy or simple, other than acknowledging that these alleged "frictions" are common and therefore unlikely to mislead or confuse users.

121.     Finally, Dr. King's proposed "condensed" flow of three steps—(1) click settings, (2) click cancel, (3) click confirm—would be highly unusual in comparison with the same flows on comparably large websites, and could introduce accidental cancelations, malicious or prank cancelations, and other errors and issues not covered here. In my review of ten other large websites with subscription services, I found that eight required five or more steps to cancel, eight included a survey, seven included an observed retention prompt, and three included reauthorization to proceed.[93] Match.com's process is not unusual, overlong, or in need of a major overhaul as Dr. King suggests. It is standard and therefore should be familiar to subscribers. Dr. King might believe her proposed version to be simpler than Match.com's current flow, but Dr. King never explains why a flow other than her proposed "condensed" flow is not "simple."

---

[93] *See* Expert Report of Brandon Ward at 31.

CONFIDENTIAL

**APP 975**

122.        Moreover, although Dr. King touts that her proposed re-design involves fewer steps, as discussed above and in my opening report, the number of steps in a process is not an indicator of simplicity. Sometimes more steps mean less friction and improved usability.

123.        Additionally, this kind of design exploration ignores the complexities of designing websites for businesses (especially large e-Commerce websites), including necessary trade-offs. For example, a cancelation flow without a password reauthentication page might involve fewer steps, but a higher risk of unintentional or fraudulent cancelations. Or putting "Cancel Account" directly within Settings might decrease the number of steps but result in more options on the Settings page, making the Settings page overall less usable. Or removing the retention offer page might make the flow shorter, but it removes an opportunity for subscribers who want a continued subscription at a decreased price to take that offer, ultimately decreasing consumer good. Anyone can "armchair" redesign anything they want, but Dr. King has no evidence her proposed alternative would be any more or less simple than the current or past iterations, nor any evidence as to why similar proposals were not implemented at Match.com. It's all conjecture without evidence. All evidence to date indicates Match.com's flow is simple and easy to find and execute.

# VIII. CONCLUSION

## I.   Summary of key rebuttal points

124.        Dr. King's report is unreliable due to several limitations and flaws in her methodology.

125.        First, Dr. King relied solely on an analysis of screenshots and videos and did not attempt the process herself or observe any substantial group of objective users. As a result, her conclusions about user experience are based on speculation and lack supporting data or evidence.

CONFIDENTIAL

126.      Second, Dr. King's analysis fails to account for the context of why users are trying to cancel and

ignored key factors relevant to the process. Without any external, objective input or insight into her

process, her conclusions are mere speculation.

127.      Third, Dr. King relies heavily on a small set of usability heuristics that are open to interpretation

and subject to diverging from real-world user experience. She also provides no objective justification for

her choices of which standards or guidelines to apply and which to ignore.

128.      Finally, her report contains some factually inaccurate analyses leading her to misapply some

heuristics and come to erroneous conclusions.

129.      Overall, Dr. King's report is unreliable as an objective report on reality and does not provide a

valid basis for the conclusion on the findability and ease of use of the cancelation process on Match.com.

## II.   Summary of my position

130.      As stated in my opening report, in my professional opinion, the Match.com online cancelation

process is simple, clear, and efficient. It is accessible through common icons, with clear labeling and a

logical, brief path. My analysis shows it meets Nielsen's usability and simplicity heuristics and the 5 quality

components of usability.

131.      The results of my empirical usability study showed that, of participants tasked with subscribing

then canceling on Match.com, **98.78% successfully found Manage Subscription**, the entry point to

canceling, **91.5% successfully canceled** with an average time of **74 seconds**, on average **6.1 times faster**

than subscribing, making it even easier than the signup process. Match.com received an **"A Grade" (81.6)**

on the System Usability Scale. Additionally, actual Match.com user data also supports this, with a **95%**

**success rate** and a median cancelation time of **44 seconds**, which is quite a bit quicker than the

subscription process.

132.      The study participants agree that Match.com's cancelation flow is simple:

CONFIDENTIAL

**APP 977**

    a.  **88.3% of participants thought canceling was simple** or were at least neutral as to the simplicity/difficulty.

    b.  **84.7%** of participants thought canceling was **at least as simple as signing up.**

133.    With respect to Dr. King's initial query, the data indicate, and I must therefore conclude:

    a.  Was Match.com's cancelation process easy to use? **Yes**.

    b.  Was Match.com's cancelation process easy to find? **Yes**.

DATED: May 15, 2023

Brandon E.B. Ward

CONFIDENTIAL

EXHIBIT A

## Curriculum Vitae of Brandon E.B. Ward

**BRANDON E.B. WARD — CXO, EXPERIENCE DESIGN LEADER/SPEAKER/EDUCATOR**

brandonebward.com • brandonward@precocityllc.com

I seek executive design leadership opportunities where the people using the product are at the heart of the business.

My career has included designing experiences, leading, speaking, teaching, writing, and directing; creating and developing unique, award-winning, and usable software, mobile apps, websites, and AR/VR experiences.

I hold a master's degree in Interactive Media Design and 3 Bachelor's degrees in Music and Theatre.

## SKILLS

**LEADERSHIP**      Team building, Mentoring, Management, Product, Scrum, Speaking, Teaching

**DESIGN**      UX/UI/Service, Web, Sound, Instructional, Graphic, Product

**PRODUCTION**      Software, Web, Mobile, Graphic, Audio, Video

**LANGUAGES**      English, Cebuano, Hiligaynon, Tagalog

## EXPERIENCE

**PRECOCITY** – Chief Experience Officer (CXO), Senior Director of User Experience      2016 - Present

I lead the UX efforts both internally and as a consultant. I work closely with the executive team to define Precocity's UX practice, methods, tools, ethos, and culture. As a consultant, I execute these philosophies and practices for a variety of clients, from research and testing to UX/UI design to audio and video production. I was in charge of sourcing, interviewing, and hiring consultants and executives, as well as mentoring the UX/UI teams. I coordinate with the heads of the Data Science and Engineering departments to align our visions to ensure a cohesive, comprehensive, data-driven design offering.

- Designed, led, and executed Toyota's first usability research initiatives across their in-car and mobile software experiences, helping change how Toyota approaches software projects globally

CONFIDENTIAL

- Worked closely with the executive team to attract, pitch, and land new business, write proposals, and statements of work

- Authored and designed Precocity's branded design process IDEA

- Authored, designed, and built Precocity's branded redesign process and tool EVO

- Represented Precocity at various conferences, networking, building new client relationships

- Consulted with small, medium, and Fortune 10 clients – Research, Information Architecture, UX/UI/Graphic Design, Rapid Prototyping, Usability Testing, Design Studio, Planning, Brainstorming, and Workshops

**SERVICE DESIGN NETWORK** - DALLAS – Founder & Host        2018 - Present

Co-founded this meetup, in-person and virtual. Grew to 1785 members in 2 years.

**IMPACT UTAH** – Chief Experience Officer (CXO)        2015 - 2023

I helped drive the service, experience, and brand design of iMpact Utah, and its holding companies. We offer best-in-class management consulting across a variety of industries.

**SOUTHERN METHODIST UNIVERSITY** – Instructor      2015 - Present

I teach User Experience Design, and Service Design as part of CAPE's design/development certificate programs.

**IMPROVING ENTERPRISES** – Senior Experience Designer        2013 - 2015

As a senior consultant for Improving Enterprises, I represented Improving's UX and Design interests for select clients. I worked both on-site and remotely with them, investigating their current and future products and services. I conducted user research and usability tests and designed wireframes, prototypes, and mockups based on that research. I worked closely with leadership across all teams, including the C-suite, both client-side and within Improving.

- Worked closely with executives, product ownership, and development to ensure quality and correct results

- Major point of contact between client executives and Improving Enterprises

- Conducted user research and usability tests for both new and redesigned projects

CONFIDENTIAL

- Lead tool and process training

- Spoke at industry conferences

- Hosted user groups and meetings on behalf of Improving Enterprises

**STUDIOGOOD** – Director of UX/UI        2013

Lead the company in a shift from social to a digital agency and establish user experience as a core practice. Along with the leads from development and account management, I lead the development and implementation of a new responsive workflow process to build efficiencies while producing responsive websites, microsites, and Facebook tabs. Some projects required concept-to-execution turnaround in as little as 5 days.

- Helped establish a new responsive, agile design/development process for producing responsive websites.

- Lead brainstorming sessions for idea generation for client pitches, and social and marketing strategies

- Interviewed and counseled every person in the company as to what was wrong and how we could fix it - instituted changes to help with major issues, and morale.

- Coordinator for design and development teams, ensuring team parity during the lifetime of the project.

- Designed social graphics, posts, and media for major brands.

- Designed responsive websites, Facebook Tabs, and microsites (wireframe, UI, layout, graphics, icons)

- Established regular brown-bag meetings where members of the team could share new ideas and skills with the rest of the company

- Built and established usage of a central company Wiki, taught teams how to use it

**TRIGEO/SOLARWINDS** – Director of UX/UI, Lead/Senior Developer  2009 - 2013

I lead the front-end team in the design and implementation of all features and fixes, including front-end development. At TriGeo, I helped completely redesign and launch our most successful product release ever (from UX to icons, to GUI, to packaging) leading to a record year for the company and a key factor in the company's acquisition in 2011 by SolarWinds for $35 Million.

- Hired, built, and lead a new UX/UI Team of 6 developers and designers

56 of 58

CONFIDENTIAL

**APP 981**

- Designed and developed interaction flow, icons, color schemes, and palettes, dynamic dashboards, custom search, and query interfaces, reporting tools, labels, packaging, marketing materials, and more.

- Oversaw rebranded and updated product for release just 1 month after acquisition

- Wrote many custom components, and established coding best practices and standards.

**BRAINBOX ENTERTAINMENT** – Senior Designer & Flex Developer      2008 - 2009

Contracted to bridge the gap between design and development for a new online customer-facing sporting platform (kronum.com). Helped lead the project in terms of development, scope, communication, art preparation, skinning, themes, and more.

**DELVE NETWORKS** – Senior UX & UI Designer 2008

UX/UI Designer for the front and back-end applications of this startup focused on video search. Quickly learned new skills to take on additional design implementation development roles to augment the team.

**MEDIAPRO** – Development Coordinator, UI Designer/Developer         2005 – 2007

Contracted as Flash developer and quickly brought on full-time to multiple projects for graphic design, video and audio consultation, and voice-over talent. Soon advanced to full-time development coordinator. Trained 2 new developers and oversaw their progress. Highly sought-after designer/developer for internal projects for clients like American Express and Microsoft.

**STAFFING TOOLS** – Director of Production        2000 – 2004

UI design, MM Director, and Flash development of training and testing for digital design tools

## TALKS

- UX Without the U is Your X

- Ethics Ex Machina: Designing the Future with a Conscience

- In Case of Emergency, Break Taboo

- The Triforce of UX: How to Hire a Great UX Designer

- Service Design: Your Next Career Move

- Designing a Great Experience: The ROI of UX

CONFIDENTIAL

- Project Operation: Improving complex systems w/out killing the patient

- UX As a Service: 5 Strategies to Elevate Design Thinking in Your Organization

## EDUCATION

**Master of Science in Interactive Media**

Indiana University, Bloomington // 2004

Taught Video Production and Non-linear Video Editing 101

**B.A., multiple degrees in Vocal Performance, Music Theory and Composition and Theatre**

Dean's List, Cum Laude

College of Idaho, Caldwell // 2000

CONFIDENTIAL

**APP 983**

# EXHIBIT S

**APP 984**

### THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

FEDERAL TRADE COMMISSION,
Plaintiff,

vs.

MATCH GROUP, INC., a corporation, and
MATCH GROUP, LLC, formerly known as
MATCH.COM, LLC, a limited liability
company,

Defendants.

Case No. 3:19-cv-02281-K

## <u>DECLARATION OF JAMES LANGENFELD</u>

I, James Langenfeld, declare as follows:

1.      I have been designated as an expert witness in this action on behalf of Defendants Match Group, Inc. and Match Group, LLC.

2.      I am over the age of 18 and competent to make this Declaration. The statements contained in this Declaration are based on my personal knowledge.

3.      I prepared the Rebuttal Expert Report to Dr. King's Rebuttal Report that was served on Plaintiff Federal Trade Commission on June 14, 2023. A true and correct copy is attached hereto and incorporated herein as **Exhibit 1**. The contents of **Exhibit 1** are true and correct to the best of my knowledge. If called and sworn as a witness, I would and could testify competently to the matters set forth in **Exhibit 1**.

4.      I prepared the Rebuttal Expert Report of James Langenfeld, Ph.D, that was served on Plaintiff Federal Trade Commission on August 22, 2023. A true and correct copy is attached hereto and incorporated herein as **Exhibit 2**. The contents of **Exhibit 2** are true and correct to the best of my knowledge. If called and sworn as a witness, I would and could testify competently to the matters set forth in **Exhibit 2**.

[signature page to follow]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2023.                     Signature: _____

# EXHIBIT 1

CONFIDENTIAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

MATCH GROUP, INC.,

     Defendant.

Case No. 3:19-cv-02281

**Rebuttal Expert Report to Dr. King's Rebuttal Report**

**James Langenfeld, Ph.D.**

**June 14, 2023**

CONFIDENTIAL

## Table of Contents

I.    QUALIFICATIONS .................................................................................1

II.    NATURE OF DISPUTE ......................................................................2

III.    ASSIGNMENT ...................................................................................2

IV.    SUMMARY OF OPINIONS ...............................................................3

V.    BACKGROUND .................................................................................4
     A. Match Group and Match.com .........................................................4
     B. Match.com's Cancelation Process ...................................................5

VI.    OVERVIEW OF KING AND WARD REPORTS .................................13

VII.    DR. KING'S ANALYSIS OF COMMENTS REPRESENTS A VERY SMALL AND POTENTIALLY BIASED SET OF MATCH.COM USERS...............16
     A. The Comments Considered by Dr. King Are Not Representative of a Typical User's Experience.......................................................17
     B. The Number of Comments Considered by Dr. King Represent a Very Small and Biased Fraction of Match.com Users Entering the Cancelation Process, Users Completing the Cancelation Process, and Users Whose Subscriptions Were Renewed .................................................17
     C. The Comments Considered by Dr. King Represent a Very Small Fraction of Users' Interactions with Match.com's Customer Service Team ...........................................19
     D. Bias in Dr. King's Small Sample ...................................................19

VIII.    DR. KING'S CATEGORIZATION OF COMMENTS IS UNRELIABLE AND LIKELY BIASED...21
     A. The Categorization Summary Tables in Dr. King's Report Lack Replicability and Verifiability.........................................................21
     B. A Significant Share of Commenting Users Were Very Satisfied, Somewhat Satisfied, or Neither Satisfied Nor Dissatisfied ...........................................23

IX.    MANY OF THE COMMENTERS ANALYZED BY DR. KING DID NOT ACTUALLY EXPERIENCE THE CANCELATION PROCESS OR THEY SUCCESSFULLY CANCELED ........24

X.    DR. KING'S CONCERNS REGARDING OLDER USERS ARE SPECULATIVE AND INACCURATE..............................................................26

CONFIDENTIAL

## I.   QUALIFICATIONS

1. My name is James Langenfeld and I am a Managing Director at Berkeley Research Group (BRG), an economic consulting firm specializing in applied microeconomics, analysis of damages in contract disputes, mass torts, antitrust, intellectual property, labor, and financial analysis. I am also the Co-Editor of the journal *Research in Law and Economics*.

2. For almost ten years, I held a variety of positions at the Federal Trade Commission ("FTC") involving antitrust, consumer protection, regulatory impact, and equitable relief matters. These positions included Director for Antitrust in the FTC's Bureau of Economics, Deputy Director of Economic Policy Analysis, Associate Director for Special Projects, and Economic Advisor to a Commissioner and to the Director of the Bureau of Consumer Protection. In all these positions, I was involved in investigations, analyses, and policy recommendations. I received the SES Meritorious Service Award, the FTC Distinguished Service Award, and was an Honoree at the Department of Justice's Celebration of the Twentieth Anniversary of the 1982 Merger Guidelines.

3. As a consulting economist, I have testified as an economics expert in federal and state courts in many cases, and I have testified and written reports on a variety of economic topics, including consumer protection, contract disputes, and the quantification of damages. These matters have involved a variety of industries and clients, including digital platforms.

4. As an Adjunct Professor, I have taught courses in Law and Economics, which include the economics of quantifying damages in contract disputes using analytic and statistical methodologies. I have also published many scholarly writings on various economic issues, including estimation of damages and econometric analyses.

5. I received a Ph.D. in economics from Washington University in St. Louis and an A.B. from Georgetown University in Washington D.C. My areas of specialization include economic analysis of the operation of platforms and estimation of damages.

APP 990

CONFIDENTIAL

6. I am a member of several professional societies and am Co-Chair of the Economics Committee of the Antitrust Section of the American Bar Association. A copy of my curriculum vitae, which summarizes my experience, is attached as Exhibit 1.

7. BRG bills $800 per hour for my time.

## II.   NATURE OF DISPUTE

8. This matter involves a complaint by the U.S. Federal Trade Commission ("FTC") against Match Group, Inc. and Match Group, LLC ("Defendants").[1] The FTC alleges that Defendants engaged in deceptive or unfair practices on Match.com since at least 2013,[2] including alleged illegal practices related to a "confusing and cumbersome cancelation process that causes consumers to believe they have canceled their subscriptions when they have not."[3] The FTC seeks an injunction, monetary relief, monetary civil penalties, and potentially other relief.[4]

## III.   ASSIGNMENT

9. Counsel for Defendants has asked me to respond to a rebuttal expert report provided by Dr. Jennifer King on behalf of the FTC on May 15, 2023. In this report, Dr. King criticizes work by Defendants' usability expert, Mr. Brandon Ward, and questions some of his arguments about usability research practices.[5] In particular, Dr. King criticizes Mr. Ward for not examining customer comments about Match.com's cancelation flow.[6] I understand that Dr. King introduces her own analysis of customer comments for the first time.[7] Counsel for Defendants has asked me to review and critique this new analysis.

10. In the course of conducting my analysis, I and members of my staff reviewed relevant data, various legal filings, and publicly available information. The documents and data I have reviewed and relied upon are the type of materials reasonably relied upon by experts

---

[1] *See* First Amended Complaint for Permanent Injunction, Monetary Relief, Civil Penalties, and Other Relief, Case No. 3:19-cv-02281, July 18, 2022 (hereafter, "*Complaint*").

[2] *Complaint*, ¶ 3.

[3] *Complaint*, ¶ 3.

[4] *Complaint*, ¶ 89.

[5] Rebuttal Report of Dr. Jennifer King, May 15, 2023, Sections 1 and 2.

[6] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 3 and Sections 2 and 5.

[7] Rebuttal Report of Dr. Jennifer King, May 15, 2023, Section 5.

CONFIDENTIAL

in my field in forming their opinions and inferences regarding the economic structure of firms and costs. These materials are listed in Exhibit 2 and/or denoted within this report. Should additional information, data, or reports be produced subsequent to my report, I reserve the right to consider such information in finalizing my opinions and may modify or expand my analyses if appropriate.

## IV.   SUMMARY OF OPINIONS

11. Dr. King's opinions regarding consumer comments are not representative of Match.com users' views of Match.com's cancelation process. Her review does not reflect the experience of the 2.9 million users who completed the cancelation process from 2016 to early 2018 (the period of the comments she reviews), nor the vast majority of the 96,390 users who did not complete the cancelation process. She only considers the portion of the users who had comments.

12. Research indicates commenters do not represent the views of most users, and are more likely to have extreme negative views. This literature warns about the likely bias in these complaints, making them not representative of the population of users and highlighting the unreliability of Dr. King's conclusions.

13. Dr. King only analyzes a subset of the experiences of the most unsatisfied consumers, and does not consider the experiences of the vast majority of users who did not leave a comment. In particular, the biased comments sampled by Dr. King account for only 0.021% of the subscribers who entered Match.com's cancelation process (i.e., viewed the First Survey page); 0.022% of the subscribers who successfully completed Match.com's online cancelation process; and 0.662% of subscribers who renewed after entering the cancelation process without completing it (all of whom Dr. King in effect assumes intended to cancel). Dr. King's analysis effectively ignores the over 99% of subscribers who used the cancelation process but did not have a comment in the file that she reviewed. In addition, the comments reviewed by Dr. King represent only a small portion of users' interactions with Match.com's customer service team. This small selection of biased user comments cannot be extrapolated to the overall experience of Match.com users.

14. Dr. King's categorization of comments is inconsistent, erroneous, and misleading. Dr. King has used what appears to be arbitrary and subjective criteria for her classifications. At least some of Dr. King's classifications of comments appear incorrect, and many are vague about their exact concerns. Even within this unreliable data, a substantial portion of commenting users were either Very Satisfied, Somewhat Satisfied, or Neither Satisfied Nor Dissatisfied with Match.com's service, as reported in the very spreadsheets that Dr. King cites reflecting the comments.

15. Dr. King relies on subscriber comments to investigate whether the Match.com "online cancellation flow is simple." However, Dr. King never attempted to evaluate the actual experience of users who commented. Match.com data that tracks the actual experience of the commenters contradicts Dr. King's conclusions. First, a significant share of the commenting users, 43.2%, did not enter the online cancelation process at all. If they did not attempt to use the cancelation process, presumably it was not the cause of their complaint and cannot be a basis for concluding the cancelation process was not simple. Second, of the remaining 56.8% of users who entered the online cancelation process, nearly 90% of them, were able to successfully cancel their Match.com subscriptions. This is inconsistent with concluding that subscribers were unable to cancel due to Match.com's process. In total, the vast majority of commenting users, 93.7%, either did not experience the cancelation process or successfully completed it.

16. Dr. King has no reliable basis for apparently claiming that older individuals were particularly harmed by Match.com's cancelation process.

## V.   BACKGROUND

### A.      Match Group and Match.com

17. Match.com is an online dating site.[8] Match Group, LLC owns and operates the site.[9] Match Group, Inc. is the holding company.[10]

---

[8] http://www.match.com.
[9] Match Group, LLC, "Our Company," https://mtch.com/ourcompany.
[10] Match Group, Inc., 2022 Form 10-K, p. 1.

### B.      Match.com's Cancelation Process[11]

18. The FTC's allegations focus on the steps in Match.com's cancelation process, how those steps appeared to a subscriber, and how subscribers' interactions with the cancelation process were tracked in Match.com's data. The following eight figures display steps leading up to and including Match.com's current cancelation process, and I understand that Match.com has tracked the number of subscribers that reached each of these steps.[12]

---

[11] I understand that Defendants have provided an expert report by Brandon Ward, an expert in "website design and user experience," that describes Match.com's cancelation process in detail. Expert Report of Brandon Ward Regarding Match.com's Online Subscription Cancelation Flow, January 13, 2023, ¶ 8. I have taken into consideration both his work and my own independent analysis of relevant economic information and data.

[12] The screenshots are the same as those in Mr. Ward's report. I understand there is some disagreement about where the cancelation process begins. To be conservative, in depicting the cancelation process in Figures 1-8, I assume the FTC's view that the cancelation process begins with the clicking of "Manage Subscription" (or its predecessor link) on the Account Setting screen, which then directs the user to a password page, but this assumption should not be taken as my agreement with treating that page as the appropriate place at which the process begins. While the steps depicted are of Match.com's current cancelation process, I understand that this process has undergone changes since September 2014. Regarding prior versions of the cancelation process, Mr. Ward's report stated "Those pages are no longer on Match.com's live website, but I reviewed videos and/or screenshots of past versions of those pages. Reviewing those versions does not change my opinion that all versions of Match.com's online cancelation flow since at least September 2014 have been simple." Expert Report of Brandon Ward Regarding Match.com's Online Subscription Cancelation Flow, January 13, 2023, ¶ 103.

**APP 994**

CONFIDENTIAL

**Figure 1**

**Home Page**



**APP 995**

CONFIDENTIAL

**Figure 2**

**Account Settings**



APP 996

CONFIDENTIAL

**Figure 3**

**Reauthorization/Password Wall**



APP 997

CONFIDENTIAL

**Figure 4**

**Manage Subscription**



APP 998

CONFIDENTIAL

**Figure 5**

**Question One/First Survey Page**



APP 999

CONFIDENTIAL

**Figure 6**

**Save Offer[13]**



---

[13] I understand that the save offer page is presented to only some users.

APP 1000

CONFIDENTIAL

**Figure 7**

**Question Two**



APP 1001

CONFIDENTIAL

**Figure 8**

**Confirmation**



## VI.   OVERVIEW OF KING AND WARD REPORTS

19. The FTC produced an initial expert report from Dr. Jennifer King, who concluded that Match.com's cancelation process was "not easy or simple to use," and "not easy for users to locate."[14] She elaborated, "The result of these problems was to make it difficult, if not impossible, for many Match.com users to cancel their subscriptions using the online cancellation process, with many believing that they had canceled their subscriptions when in fact, they had not, thus accruing additional charges."[15]

20. Defendants provided an expert report from Brandon Ward, an expert in "website design and user experience."[16] Mr. Ward concluded "the Match.com online cancelation process meets generally accepted standards of usability in the field and contains features common

---

[14] Expert Report of Dr. Jennifer King, January 13, 2023, p. 4.
[15] Expert Report of Dr. Jennifer King, January 13, 2023, p. 65.
[16] Expert Report of Brandon Ward Regarding Match.com's Online Subscription Cancelation Flow, January 13, 2023, ¶ 8.

to other subscription websites."[17] In addition, Mr. Ward studied how a sample of potential Match.com users were able to successfully navigate the sign-up and cancelation processes and evaluated Match.com's subscriber data to determine how frequently subscribers successfully canceled subscriptions.[18] He concludes that study participants canceled easily, in particular canceling more easily than signing up, and participants believed cancelation was simple.[19] Finally, he reviewed subscriber data, and he found that the cancelation process was simple, consistent with what he found from his usability study.[20]

21. Dr. King provided a rebuttal report on May 15, 2023.[21] In her Rebuttal Report, Dr. King criticizes Mr. Ward's heuristic analysis, and offers opinions about some of his conclusions about usability research practices.[22] She criticizes his study involving a sample of participants selected to use Match.com's cancelation flow.[23] Finally, and as she states, "importantly," she criticizes Mr. Ward for failing to examine customer comments about Match.com's cancelation flow.[24] Section 5 of her rebuttal report introduces her own analysis of customer comments.[25]

22. I focus my rebuttal to Dr. King on Section 5 of Dr. King's Rebuttal Report. Dr. King states that:[26]

> Comments, complaints, or questions from a company's customers provides an organic source of information about their experience with a product or service. They reveal a customer-centric perspective of a product or service's primary challenges and problems. In this way, they are an excellent complement to a heuristic analysis as they provide "raw" feedback directly from customers that may both highlight issues identified by the heuristic analysis as well as raise other customer concerns. [footnote omitted]

---

[17] Expert Report of Brandon Ward Regarding Match.com's Online Subscription Cancelation Flow, January 13, 2023, ¶ 20.
[18] Expert Report of Brandon Ward Regarding Match.com's Online Subscription Cancelation Flow, January 13, 2023, ¶¶ 16-17.
[19] Expert Report of Brandon Ward Regarding Match.com's Online Subscription Cancelation Flow, January 13, 2023, ¶ 21.
[20] Expert Report of Brandon Ward Regarding Match.com's Online Subscription Cancelation Flow, January 13, 2023, ¶ 22.
[21] Mr. Ward also provided a rebuttal report on May 15, 2023. Mr. Ward states that Dr. King "conducted no empirical research to support her conclusions" and no "objective analysis," and merely relied on screenshots and company communications. Rebuttal of Dr. King's Report Regarding Match.com's Online Subscription Cancelation Flow, May 15, 2023, ¶¶ 4-5.
[22] Rebuttal Report of Dr. Jennifer King, May 15, 2023, Sections 1 and 2.
[23] Rebuttal Report of Dr. Jennifer King, May 15, 2023, Sections 3 and 4.
[24] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 3 and Sections 2 and 5.
[25] Rebuttal Report of Dr. Jennifer King, May 15, 2023, Section 5.
[26] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 22.

23. Dr. King limited her review of comments submitted to Match.com to those from 2016 to early 2018 under a category Match.com's customer service team described as "difficult cancel process."[27] Dr. King states this category accounted for approximately 6% of comments in the "Billing/Cancel" category in 2016,[28] which is a small portion of all comments and 2% of all the comments included in the spreadsheets that Dr. King analyzed.[29] From this subset of comments, Dr. King randomly selected 28% of the comments (638 total comments), which she states constitutes a representative sample of comments.[30]

24. After having selected a subset of comments, Dr. King categorized each comment as showing "Confusion with the Cancellation Process," concerns with "Cancellation Policy," or "Other," for comments that did not fit into the first two categories.[31] She further subclassified the comments as "Unable to Cancel," "Believed Had Canceled," "Auto Renewal Issues," "Multiple Steps," "Delete Personal Data," "Password Issues," or "Other."[32] Dr. King finds that about 75% of the limited set of comments that she reviewed showed "user confusion about cancelation."[33] Dr. King then provides what she calls "examples of relevant comments."[34]

25. Next, Dr. King provides a subsection called "Older Customers," stating: [35]

> One notable element of the Match.com comments dataset is that it contained customer email addresses, and as I reviewed them I observed what looked to be an unusual number of email addresses that suggested an older aged customer base. ... this group is of particular concern because, being less experienced with online services than younger users, they are a group particularly vulnerable to dark patterns and complex and confusing user interface design.

---

[27] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 23. That time period limitation raises other questions about whether her "analysis" can be truly representative of Match.com users.
[28] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 23. In 2016, the "difficult cancel process" category contained 1,314 submissions, and the entire Billing/Cancel category contained 23,371 complaints, so "difficult cancel process" was 6% of this total. In 2017 and 2018, "difficult cancel process" accounted for 3.3% and 2.2% of "Billing/Cancel", respectively. Overall, for 2016-2018, "difficult cancel process" accounted for 4.2% of "Billing/Cancel".
[29] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 23; MATCHFTC772558, MATCHFTC776595, MATCHFTC776596 (2,341 comments in the "difficult cancel process" category divided by 109,377 total comments equals 2.14%, see workpapers to this report).
[30] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 25.
[31] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 26.
[32] Rebuttal Report of Dr. Jennifer King, May 15, 2023, pp. 26-27.
[33] Rebuttal Report of Dr. Jennifer King, May 15, 2023, pp. 28-29.
[34] Rebuttal Report of Dr. Jennifer King, May 15, 2023, pp. 30-35.
[35] Rebuttal Report of Dr. Jennifer King, May 15, 2023, pp. 35-38.

CONFIDENTIAL

26. Dr. King also describes her review of "roughly fifty" complaints from the FTC's Sentinel database, which she "identified by keyword search based on concerns directly raised in the Match.com complaints discussed above: 'confusing,' 'misleading,' 'auto renewal,' 'password,' 'steps' (in reference to the steps required to complete cancellation)."[36]

27. Overall, Dr. King concludes:[37]

> In summary, the Match.com customer comments and complaints to the FTC provide a rich and in-depth look into the first-hand experience of actual Match.com customers' experience with the cancellation process. Unlike Ward's sunny assessment of the cancellation flow, these comments illustrate the confusion and frustration customers experienced with the cancellation flow. Further, they demonstrate with great deal and precision the usability flaws inherent in the flow …

## VII.   DR. KING'S ANALYSIS OF COMMENTS REPRESENTS A VERY SMALL AND POTENTIALLY BIASED SET OF MATCH.COM USERS

28. Dr. King concludes "[t]he customer comments are pertinent in that they provide insight from actual users of Match.com about the central issue of whether Match.com's online cancellation flow is simple."[38] However, Dr. King's analysis of user comments does not answer the question of whether Match.com's online cancelation flow is "simple." Instead, as I describe in the following subsections, Dr. King samples comments from a very small fraction of Match.com subscribers who, by virtue of leaving a comment at all, are more likely to have felt extremely negative about their experience. Dr. King also in effect assumes as true each of the assertions made in the comments, but there is objective evidence that a large percentage of these comments are inconsistent with the documented experiences of the commenters. If Dr. King truly wanted to generate "insight from actual users of Match.com about the central issue of whether Match.com's online cancellation flow is simple," she would have attempted to evaluate (by survey or otherwise) the experiences of a representative sample of the millions of subscribers who entered and completed the cancelation process, as well as the tiny minority of users who did not complete it. Dr. King makes no attempt to do that, or even to get an unbiased sample of

---

[36] Rebuttal Report of Dr. Jennifer King, May 15, 2023, pp. 38-39.
[37] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 41.
[38] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 3.

the full 96,390 subscribers who entered the cancelation process (using clicking "cancel subscription"/reaching the First Survey Page as the start of the cancelation process) from 2016 to early 2018 but then renewed.[39]

### A.    The Comments Considered by Dr. King Are Not Representative of a Typical User's Experience

29. Dr. King states that her analysis of user comments "demonstrate[s] with great deal and precision [sic] the usability flaws inherent in the flow."[40] Analyzing a miniscule number of a specific type of user comments does not yield a "precise" representation of Match.com users' experience. During the January 1, 2016 to March 1, 2018 period covered by comments reviewed by Dr. King, over 3 **million** subscribers entered the cancelation process, about 2.9 million subscribers completed the online cancelation process, yet only about 96,000 subscribers started the cancelation process, did not complete it, and had their subscriptions renewed.[41] Additionally, over 125,000 subscribers resigned via Match.com's customer service team.[42] An appropriate review of users' experience would place the appropriate weight on this 97.4% of subscribers who successfully canceled via the online process or the customer service team.[43]

### B.    The Number of Comments Considered by Dr. King Represent a Very Small and Biased Fraction of Match.com Users Entering the Cancelation Process, Users Completing the Cancelation Process, and Users Whose Subscriptions Were Renewed

30. As mentioned above, Dr. King states "the Match.com customer comments and complaints to the FTC provide a rich and in-depth look into the first-hand experience of actual Match.com customers' experience with the cancellation process."[44] This statement is misleading in that it appears to imply that one can draw broad and unbiased conclusions about users' experiences from the small fraction of users whose comments Dr. King reviewed and in effect assumed were reliable. Specifically, the comments reviewed by

---

[39] As noted above, I understand there is disagreement about where the cancelation flow "begins."
[40] Rebuttal Report of Dr. Jennifer King, May 15, 2023, pp. 41-42.
[41] MATCHFTC846468.
[42] MATCHFTC846468.
[43] MATCHFTC846468. Specifically, 93.2% canceled via the online process, and 4.2% canceled via the customer service team.
[44] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 41.

Dr. King account for only a very small percentage of the total users who entered the cancelation process, completed the cancelation process, or who entered the cancelation process and had their subscriptions renewed. As discussed below in Section VII.D, research shows that this small sample is in all likelihood biased because only consumers with extremely negative views take the time to comment, and do not represent the experiences of (in this case) the majority of users or users who enter the cancelation flow.

31. Dr. King reviewed 638 user comments covering January 1, 2016 to March 1, 2018. During that same time period, over 3 **million** subscribers entered the cancelation process, about 2.9 **million** subscribers completed the online cancelation process, and about 96,000 subscribers started the cancelation process, did not complete it, and had their subscriptions renewed.[45] Thus, the comments reviewed by Dr. King accounted for only 0.021% of subscribers who entered the cancelation process, about 0.022% of subscribers whom she in effect assumed they completed the online cancelation process, and about 0.662% of subscribers who started the cancelation process, did not complete it, and had their subscriptions renewed. In other words, the comments reviewed by Dr. King accounted for about 1 in 4,800 subscribers who entered the cancelation process, about 1 in 4,500 subscribers who completed the online cancelation process, and about 1 in 150 subscribers who started the cancelation process, did not complete it, and had their subscriptions renewed.[46] Dr. King's analysis effectively ignores the over 99.9% of subscribers who used the cancelation process but did not have a comment in the file that she reviewed.

32. The number of FTC Sentinel comments that Dr. King reviewed is even smaller. Dr. King says she reviewed "roughly fifty" complaints from the FTC's Sentinel database.[47] Dr. King lists 30 such comments in her Appendix A and 13 in her rebuttal report,[48] so it is

---

[45] MATCHFTC846468. This statement is not intended to imply that the 96,000 subscribers that entered the cancelation process intended to complete it or were unable to do so because the process was not simple. There are many reasons that a subscriber could start the cancelation process but not finish it, such as they changed their mind, never intended to cancel but were just exploring, were attempting to generate a save offer, were interrupted during the process, etc.

[46] Even if the 638 comments reviewed by Dr. King were not a biased representation of the approximately 96,390 subscribers that entered the cancelation process but renewed, they would not account for a statistically representative sample of subscribers, such as what Dr. King attempts to create in selecting random comments from the total number of comments she received. If Dr. King sought to review a sufficient number of comments to represent the 96,390 subscribers, she would have had to review nearly double the number of comments, to 1,178. *See* workpapers to this report.

[47] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 38.

[48] Rebuttal Report of Dr. Jennifer King, May 15, 2023, pp. 38-41 and Appendix A.

unclear how many she actually reviewed. However many she reviewed, they account for under 0.01% of subscribers who entered or completed the cancelation process.

### C.     The Comments Considered by Dr. King Represent a Very Small Fraction of Users' Interactions with Match.com's Customer Service Team

33. While the comments reviewed by Dr. King account for a tiny fraction of Match.com users, they also represent only a small portion of users' interactions with Match.com's customer service team. As Dr. King states, the "difficult cancel process" classification of comments that she reviewed only accounted for 6% of the 23,371 comments in the Billing/Cancel category in 2016.[49] After analyzing the comment totals from the three Excel files reviewed by Dr. King, it is clear that the category related to difficulty in canceling accounts represents a fraction of the overall comments submitted to Match.com. Specifically, the comments falling under the general category of Billing/Cancel examined by Dr. King account for about half of the recorded interactions between Match.com and its users in these excel sheets.[50] More importantly, the subset of comments categorized as "difficult cancel process" amounts to only 2% of the total comments produced.[51] Clearly, the "difficult cancel process" category does not dominate users' interactions with Match.com customer service, so Dr. King's focus on this small slice of comments greatly exaggerates the degree to which users may have struggled with the process.

### D.     Bias in Dr. King's Small Sample

34. As discussed above, the small sample of comments Dr. King chose to review does not include the vast majority of Match.com users, and is likely unrepresentative. Moreover, there are reasons to believe these comments, to the extent they are accurately classified, are also likely to be biased and imply more dissatisfaction than users typically experience.

---

[49] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 23. In 2016, the "difficult cancel process" category contained 1,314 submissions, and the entire Billing/Cancel category contained 23,371 complaints; "difficult cancel process" was therefore 6% of this total. In 2017 and 2018, "difficult cancel process" accounted for 3.3% and 2.2% of "Billing/Cancel", respectively. Overall, for 2016-2018, "difficult cancel process" accounted for 4.2% of "Billing/Cancel".

[50] MATCHFTC772558, MATCHFTC776595, MATCHFTC776596.

[51] MATCHFTC772558, MATCHFTC776595, MATCHFTC776596. Dr. King's analysis suggests a degree of data cleaning to address duplicate entries. However, I have refrained from conducting similar cleaning procedures as the disparities in numbers are not significant enough to impact the proportions. Additionally, the specific details of Dr. King's data cleaning process have not been explicitly outlined in her report or accompanying documentation.

CONFIDENTIAL

35. "Underreporting bias" refers to the self-selection bias in online product reviews. Consumers with extreme experiences, whether positive or negative, are more likely to write reviews than the vast majority of users.[52] Underreporting bias arises because "not all customers write online product reviews due to the time and effort needed."[53] Statistics show that only a small fraction of people who purchase a product on platforms like Amazon (e.g. 1 out of 1000 book purchasers)[54] or view a video on YouTube.com (1.6 percent)[55] actually write a review or comment. This bias can distort the perception of "true" product quality when relying on the average of received comments, since the opinions of the vast majority of purchasers or users go unreported.

36. In addition, there is typically a negativity bias, which is a tendency of people to pay more attention to and give more weight to negative experiences compared to neutral or positive experiences.[56] Research supports the existence of this bias,[57] indicating that negative events or experiences have a stronger impact on behavior than positive events of equal intensity. According to the Nielsen Normal Group, leaders in research-based user experience, this bias is prevalent in the field of user experience.[58] Within the context of consumer comments, negativity bias manifests as consumers expressing and emphasizing negative experiences, opinions, or feedback more prominently than positive ones in their online reviews or comments. This bias can lead to a disproportionate

---

[52] Hu, N., Pavlou, P. A., and Zhang, J., "On self-selection biases in online product reviews," *MIS Quarterly*, *41*(2), 2017, 449-475 at pp. 450 and 453.

[53] Hu, N., Pavlou, P. A., and Zhang, J., "On self-selection biases in online product reviews," *MIS Quarterly*, *41*(2), 2017, 449-475 at p. 453.

[54] Levitt, Steven D., "Why Do People Post Reviews on Amazon?" Freakonomics, July 22, 2005, https://freakonomics.com/2005/07/why-do-people-post-reviews-on-amazon/.

[55] Hu, N., Pavlou, P. A., and Zhang, J., "On self-selection biases in online product reviews," *MIS Quarterly*, *41*(2), 2017, 449-475 at p. 453.

[56] Hood, Christopher, "Credit claiming, blame avoidance, and negativity bias," in *The Blame Game: Spin, bureaucracy and self-preservation in government,* Princeton University 1-23, 2013, at p. 9. ("Negativity bias denotes a commonly observed cognitive tendency for more attention to be paid to negative than to positive information".) See also Kahneman, Daniel and Amos Tversky, "Prospect theory: An analysis of decision under risk." *Econometrica* 47.2, 1979, 263-291. In this seminal paper, Kahneman and Tversky found that negative events or losses have a more profound impact on individuals' emotional and cognitive responses than positive events or gains of equal magnitude.

[57] Ito, Tiffany A., Jeff T. Larsen, N. Kyle Smith, and John T. Cacioppo, "Negative information weighs more heavily on the brain: the negativity bias in evaluative categorizations," *Journal of Personality and Social Psychology* 75(4), 1998, 887–900; Schupp, Harald T., Arne Öhman, Markus Junghöfer, Almut I. Weike, Jessica Stockburger, and Alfons O. Hamm, "The facilitated processing of threatening faces: an ERP analysis," *Emotion* 4(2), 2004, 189–200; Rozin, Paul, and Royzman, Edward B., "Negativity Bias, Negativity Dominance, and Contagion," *Personality and Social Psychology Review 5(4)*, 2001, 296-320.

[58] Loranger, Hoa, "The Negativity Bias in User Experience," Nielsen Norman Group, October 23, 2016, https://www.nngroup.com/articles/negativity-bias-ux/.

**APP 1009**

representation of negative sentiments and potentially influence the perception of a product, service, or brand.[59] This bias may be exacerbated by other factors, such as the desire to obtain a refund or obtain other value in compensation.

37. Therefore, when interpreting negative user comments for platforms like Match.com, it is important to recognize both underreporting and negativity biases, since they can exacerbate a perception of the difficulty in the cancelation process and are not representative of overall user experiences, which further undermines the reliability of Dr. King's review of the comments.


## VIII.  DR. KING'S CATEGORIZATION OF COMMENTS IS UNRELIABLE AND LIKELY BIASED

### A.     The Categorization Summary Tables in Dr. King's Report Lack Replicability and Verifiability

38. Dr. King categorizes her sample of 638 comments under different thematic categories.[60] Upon examining Dr. King's categorization methodology, it becomes evident that there is no established system in place, making it challenging to replicate her approach. She makes sweeping generalizations without providing specific details about her process, such as the criteria used for categorization, or the iterative steps involved. She states that she "developed an iterative coding scheme by which to categorize the types of comments, which I revised and added to as I reviewed the entire set of 638 entries."[61] However, she does not provide any documentation of a "coding scheme" or include the codes used in her analysis in her report's backup. In effect, her approach appears to be based on her subjective reading of the comments, and not on a systematic approach to classification.

39. Due to a lack of systematic objective criterion behind Dr. King's categorization, many comments appear to be misclassified. Moreover, many of the customer comments appear to be vague and could be interpreted in various ways. Without consistent systematic criteria, Dr. King's classifications reflect her subjective interpretation of the comments.

---

[59] Loranger, Hoa, "The Negativity Bias in User Experience," Nielsen Norman Group, October 23, 2016, https://www.nngroup.com/articles/negativity-bias-ux/.
[60] Rebuttal Report of Dr. Jennifer King, May 15, 2023, Table 2 and Table 3.
[61] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 25.

CONFIDENTIAL

40. This absence of documentation significantly hampers my ability to verify and replicate Dr. King's findings. It also raises concerns about whether her methodology, if applied to the wider population, would yield consistent results with those summarized in her Tables 2 and 3. In fact, while reviewing a few comments and their categorization, I identified a number of instances of apparently subjective and incorrect categorizations based on her stated criteria. For instance, certain comments were labeled as "cancellation confusion" despite the lack of clarity regarding whether customers experienced any actual confusion. These include:

   a. "I would like my membership cancelled."[62]

   b. "member is having a hard time logging in to change AR settings"[63]

41. Similarly, comments that Dr. King classified as "Policy Concern" are not always about policies:

   a. "Cancel my account"[64]

   b. "I had intended to cancel my subscription on January 19th, but submitted the wrong information."[65]

42. Also, members facing difficulties with profile deletion were erroneously categorized under "cancellation confusion" or "unable to cancel."

   a. "i forgot about this and i can seem to remove or delete my ad! why is it so duffcult to remove yourself? match was at all helpful!"[66]

   b. "the agent's emails were very friendly. however, though i don't think it was her fault, match.com could not or would not permanently delete my account, so that i could re-create it without having to use a different email address. with all of the trouble i encountered with re-activating that old account, simply deleting it permanently was, in my opinion, a small request which match.com should have been able to honor. but, i really do appreciate the agent's friendliness in our correspondence. other than this

---

[62] King Appendix A, Sheet '2016 categorized', Reference # 160704-001914.
[63] King Appendix A, Sheet '2018 categorized', Reference # 180111-000577.
[64] King Appendix A, Sheet '2016 categorized', Reference # 160816-003161.
[65] King Appendix A, Sheet '2018 categorized', Reference # 180215-002767.
[66] King Appendix A, Sheet '2016 categorized', Reference # 161126-001877.

trouble, match.com is a good site with useful options. in closing, i would also like to ask that match.com make their site fully accessible to screen reader users (i.e. users who are blind). it's mostly accessible right now (thanks), but if you guys can make it fully accessible, blind people will appreciate it! thanks match.com!"[67]

   c.  "I want my site taken down. Keep my payment, but take my site down now."[68]

43. In her analysis of a few dozen FTC complaints,[69] Dr. King includes comments that (1) do not even relate to Match.com or (2) that are not about cancelation at all (e.g., the concern is about account deletion rather than canceling a subscription). These include:

   a.  "According to their website, Tinder specifically states, You may terminate your account at any time, for any reason, by following the instructions in Settings in the Service;. However, when I follow these instructions, and I select cancel, it says its canceled but still continues to withdraw money…"[70]

   b.  "I used the service thru June 2018. I tried to find a phone number or email address to POF.com on the POF.com website to cancel my account. I could NOT find one. …"[71]

   c.  "I asked them to DELETE my account, they said they HID my account."[72]

### B.   A Significant Share of Commenting Users Were Very Satisfied, Somewhat Satisfied, or Neither Satisfied Nor Dissatisfied

44. Despite the unrepresentative and potentially biased nature of the data analyzed by Dr. King, a considerable proportion of the commenting users expressed positive or neutral opinions regarding Match.com. Specifically, among the respondents, approximately 22 percent reported being satisfied (either "very satisfied" or "somewhat satisfied"), and

---

[67] King Appendix A, Sheet '2016 categorized', Reference # 160625-001511.

[68] King Appendix A, Sheet '2016 categorized', Reference # 160623-001707.

[69] Dr. King claims in her Rebuttal Report that she "reviewed roughly fifty complaints from 2016 onward" from the FTC's Sentinel database (Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 38). However, it is unclear exactly which complaints she reviewed, as her Appendix A contains only about 30 entries in the "FTC Complaints" tab, and the body of her report cites other complaints.

[70] King Appendix A, Sheet 'FTC Complaints', Reference # 8750091589162.

[71] King Appendix A, Sheet 'FTC Complaints', Reference # 8750091547699. "POF.com" refers to the brand "Plenty of Fish" which I understand is neither owned nor operated by Match Group, LLC.

[72] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 40, quoting Reference # 8750091428628.

about 9 percent provided a neutral response, indicating neither satisfaction nor dissatisfaction with Match.com.[73]

## IX.   MANY OF THE COMMENTERS ANALYZED BY DR. KING DID NOT ACTUALLY EXPERIENCE THE CANCELATION PROCESS OR THEY SUCCESSFULLY CANCELED

45. Despite Dr. King's reliance on subscriber comments to investigate whether the Match.com "online cancellation flow is simple," Dr. King never attempted to evaluate the actual experience of users who commented. Performing such an analysis shows that the actual experience of many of these subscribers on Match.com is inconsistent with the subscribers' comments and therefore undercuts Dr. King's conclusions that are based on the accuracy of the comments.

46. Match.com provided me with data showing the Match.com activities of subscribers included in Dr. King's comments analysis during the subscriptions in which the comments were left. First, a significant share of the commenting users, **43.2%, did not enter the cancelation process at all**, which undercuts conclusions related to these users about whether the process was simple. These users would not have even seen the password wall that, according to the FTC, begins the cancelation process. Second, of the remaining 56.8% of users that entered the online cancelation process, nearly 90% of them (50.5% of the total commenting users) were able to successfully cancel their Match.com subscriptions. This is inconsistent with concluding that subscribers were unable to cancel due to Match.com's process. In total, the vast majority of commenting users, 93.7%, either did not experience the cancelation process or successfully completed it. These percentages are similar whether looking at all of the comments in Dr. King's analysis or just those chosen in her random sample.

---

[73] *See* workpapers to this report.

**APP 1013**

**Table 1**

**Match.com Activities of Commenting Subscribers**

| All Users in Dr. King's Analysis | [A] | [B] | [A] + [B] |
|---|---|---|---|
| Total Comments | Percent of Comments for which User did not Enter the Resign Flow | Percent of Comments for which User Successfully Resigned | Total |
| 2067 | 43.2% | 50.5% | 93.7% |

| Users Randomly Selected by Dr. King for Further Analysis | | | |
|---|---|---|---|
| Total Comments | Percent of Comments for which User did not Enter the Resign Flow | Percent of Comments for which User Successfully Resigned | Total |
| 592 | 42.6% | 51.5% | 93.7% |

*Sources: Match Data Files (King_Appendix_A.xlsx and MATCHFTC846946)*
Notes:
 [1] The "Reference" field in Dr. King's Appendix A is used to identify users in the Match data.
 [2] Users who did not enter the resign flow did not view the Password Wall, which begins the cancelation process according to the FTC.
 [3] Dr. King's Appendix A includes more comments than shown here because; (1) Match.com was not able to find the activity record for all comments and (2) not all comments were associated with a Match.com user ID.

47. Dr. King cites 12 quotes from FTC complaints in the Sentinel database to support her opinion that "Match.com consistently assessed customers unauthorized charges for services they did not desire, charged them after they had canceled or believed they had canceled, and failed to provide adequate customer support to remedy these issues."[74] However, Dr. King merely takes the complaints at face value and presumably assumes that they are an accurate representation of users' experiences with the cancelation flow. Actual usage data, however, is inconsistent with at least some of these complaints, making the complaints an unreliable basis on which to form an opinion. For example, user 207168767 claimed to have attempted cancelation "several months ago,"[75] but their usage history reveals that they entered the cancelation process for the first time only days prior to posting the complaint on the BBB on 9/27/2016—and after their subscription already had renewed.[76] The usage data does not show any attempt to cancel prior to the renewal data, contrary to what the user claimed in the complaint to the BBB. Once the user entered the flow, they were able to cancel within just minutes. Thus, the complaint is inconsistent with actual usage data and undercuts the reliability of her opinion.

---

[74] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 38.
[75] F01-MG-0028502.xlsx, Originator Reference Number: 8750091388697.
[76] F01-MG-0028502.xlsx, Originator Reference Number: 8750091388697; MATCHFTC846947.

48. Similarly, Dr. King claims that "[c]ustomers reported a variety of issues relating to the password requirement in cancellation."[77] But usage data suggests that—contrary to Dr. King's statement—at least some of these complaints could not have been about the password requirement in the cancelation flow, but instead were about general password resetting issues. For example, user 166089332 wrote to the BBB that "Match.com the website has alot of password reset errors" and that the user had been "locked out of the site for months." Dr. King uses this complaint to support her opinion that "password reset errors occur at cancellation."[78] Usage data, however, shows that the user at issue had never visited the cancelation flow prior to the BBB complaint, so the user could not have been complaining about "password reset errors" in the cancelation flow.[79]

## X.    DR. KING'S CONCERNS REGARDING OLDER USERS ARE SPECULATIVE AND INACCURATE

49. Dr. King appears to be particularly concerned that older users would be unable to complete Match.com's cancelation process. In her review of the user comments, she states that there are "an unusual number of email addresses that suggested an older aged customer base, most notably emails originating from AOL.com and Hotmail.com [footnote omitted] email services."[80] Dr. King does not specify what she considers an "unusual" number of email addresses. She does state that 34.6% of customers in the complaints she reviewed had "legacy email service," by which she appears to mean non-Gmail services that were popular in the early years of the internet with individuals from Generation X (born 1980, today age 42) or older.[81] Dr. King does not specify whether this 34.6% figure is the number she finds unusual, or why she finds it unusual. Dr. King does not provide any basis for why 34.6% of comments coming from "legacy email services" is unusually high. Without concrete support for claims that older users are

---

[77] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 41.
[78] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 41.
[79] F01-MG-0028502.xlsx, Originator Reference Number: 8750091369006; MATCHFTC846947.
[80] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 35.
[81] Rebuttal Report of Dr. Jennifer King, May 15, 2023, pp. 35-36. In reviewing her materials, she specifically appears to mean Yahoo.com, Hotmail.com, AOL.com, and MSN.com as legacy email services.

overrepresented in the data, her apparent view that this segment has been particularly affected by Match.com's cancelation process is speculative.

50. I reviewed data from the U.S. Census Bureau regarding the age and marital status of individuals in the U.S.[82] The data show that there are approximately 253 million individuals in the U.S. aged 18 or older. Of these individuals, about 126 million were not married with a spouse present (i.e., they were single).[83] Of these single individuals, about 43% were age 45 or higher (i.e. Generation X or older).[84] Thus, older individuals make up a greater proportion of single individuals than legacy email service users do of all email service users in the data Dr. King reviewed. Dr. King states "over 37% of current users [of match.com] are aged 50+,"[85] which does not suggest older individuals account for an "unusual" number of the comments reviewed, since this group accounts for almost 43% of that population according to the Census Bureau.

51. Relatedly, an apparent implication of Dr. King's claims regarding older users is that Match.com targets an older demographic. While data show that Match.com is more popular with older users than mobile-based dating applications like Tinder, the data also show that Match.com users represent a diverse cross-section of ages. For example, a survey in 2018 by Morning Consult asked U.S. individuals about their favorite dating app.[86] Among users who stated a preference other than "None", Match.com was the only service that garnered more than 10% of responses for each age group. It was the most popular service amongst ages 30-44, 45-54, and 55-64, and the third most popular service among ages 18-29 and 65+. In contrast, other services much more clearly target older individuals. For example, only 8% of 18-29 year olds chose eHarmony, while this service was chosen by 25% and 33% of individuals aged 55-64 and 65+, respectively. A "religious based dating app" like Christian Mingle was selected by 4% of respondents

---

[82] U.S. Census Bureau, "Table A1. Marital Status of People 15 Years and Over, by Age, Sex, and Personal Earnings: 2021," America's Families and Living Arrangements: 2021, https://www.census.gov/data/tables/2021/demo/families/cps-2021.html.
[83] These include married with spouse absent, widowed, divorced, separated, and never married.
[84] *See* workpapers to this report.
[85] Rebuttal Report of Dr. Jennifer King, May 15, 2023, p. 13.
[86] Morning Consult National Tracking Poll #180111, page 49, http://www.statista.com/statistics/809450/us-users-favorite-dating-websites-apps-age-group/.

CONFIDENTIAL

aged 18-29 and 5% of those 30-44, but was chosen by 17%, 14%, and 33% of those aged 45-54, 55-64, and 65+, respectively.[87]

52. As a result, Dr. King has no basis for apparently claiming that older individuals were disproportionately harmed by Match.com's cancelation process.


James Langenfeld, Ph. D.

June 14, 2023

---

[87] *See* workpapers to this report.

**APP 1017**

# Exhibit 1

**BRG**

**JAMES LANGENFELD**
BERKELEY RESEARCH GROUP, LLC
1800 M Street NW Second Floor | Washington, DC 20036

Direct: 312.909.0668
JLangenfeld@thinkbrg.com

**EDUCATION**

Ph.D., WASHINGTON UNIVERSITY, Economics, 1983

A.B., GEORGETOWN UNIVERSITY, English & Economics, 1971

**PRESENT POSITIONS**

Berkeley Research Group, June 2021 – present
Managing Director

**PROFESSIONAL  EXPERIENCE**

Ankura, August 2018 – June 2021
Senior Managing Director

Johns Hopkins University, May 2017 – 2019
Adjunct Professor

Navigant Economics, July 2010 – August 2018
Managing Director and Head of Antitrust & Applied Economics

Loyola University Chicago, School of Law, 2002 – 2018
Adjunct Professor

LECG, LLC, September 1995 – June 2010
Director

LEXECON INC., January 1994 - August 1995
Vice President

BUREAU OF ECONOMICS, FEDERAL TRADE COMMISSION, 1988-1993
Director for Antitrust

BUREAU OF ECONOMICS, FEDERAL TRADE COMMISSION, 1987-1988
Deputy Director of Economic Policy Analysis, Associate Director for Special Projects

ECONOMICS STAFF, GENERAL MOTORS CORPORATION, 1985-1987
Senior Economist

COMMISSIONER,  FEDERAL  TRADE  COMMISSION,  1984-1985
Economic Advisor

BUREAUS OF COMPETITION AND CONSUMER PROTECTION,
FEDERAL TRADE COMMISSION, 1982-1984
Assistant to the Director

BUREAU OF ECONOMICS, FEDERAL TRADE COMMISSION, 1979-1982
Economist

UNIVERSITY OF MISSOURI, St. Louis, MO, 1978-1979
Instructor

CONFERENCE ON EDUCATION, 1977
Consultant

CENTER FOR THE STUDY OF AMERICAN BUSINESS, ECONOMICS DEPT.,
WASHINGTON UNIVERSITY, 1973-1977
Researcher

UNIVERSITY  COLLEGE,  WASHINGTON  UNIVERSITY,  1974-1976
<u>Instructor</u>

SECTION OF MARKET DEVELOPMENT, AMTRAK, 1972-1973
<u>Statistical Analyst</u>

BUREAU OF ECONOMICS, INTERSTATE COMMERCE COMMISSION, 1971-1972
<u>Economist</u>

## REFEREE

*Antitrust Bulletin*

*Antitrust Law Journal*

*Economic Inquiry*

*Global Competition Review*

*International Journal of the Economics of Business*

*Journal of Industrial Economics*

*Review of Industrial Organization*

*Stanford Journal of Complex Litigation*

## PROFESSIONAL  ACTIVITIES

Co-Chair, ABA Section of Antitrust Law's Economics Committee

Advisory Board, American Antitrust Institute

Advisory Board, The Capitol Forum

American Economic Association

Editorial Board, *International Journal of the Economics of Business*

Editor-in-Chief, *Research in Law and Economics*

Liaison, American Bar Association Section of Litigation, Class Actions and Derivative Suits Committee

Member, American Bar Association Antitrust, Healthcare, Intellectual Property and Litigation Sections

U.S. Advisory Board, Institute for Consumer Antitrust Studies

## AWARDS

Washington University in St. Louis Distinguished Alumni Award, 2018

Adolph G. Abramson Scroll for an outstanding article in *Business Economics,* 2005

Listed in Global Competition Review's *The Handbook of Competition Economists,* 2005-2018 and the Economist section of *An International Who's Who of Competition Lawyers*, 1997-2018

Honoree, Celebration of the Twentieth Anniversary of the 1982 Merger Guidelines, Department of Justice, June 10, 2002

FTC Distinguished Service Award, 1993

SES Meritorious Service Award, 1992

## DISSERTATION

Federal Automobile Regulations, 1983

**BRG**

**PAPERS AND PUBLICATIONS**

1) "The Economics of Class Certification: Olean Wholesale Grocery v. Bumble Bee Foods," with Chris Ring Langenfeld, prepared for the American Bar Association Antitrust Section's 2023 Spring Meeting, February 2, 2023.

2) "United States - Economist's Perspective: Class actions – litigation, policy and latest developments," with Robin Cantor, Jeffrey Klenk, and Chris Ring, Global Competition Review, December 2, 2022.

3) "The Economics of Class Certification: Olean Wholesale Grocery v. Bumble Bee Foods (with Christopher Ring), American Bar Association Antitrust Law Section, Economics Committee Newsletter, November 3, 2022.  Available at https://www.americanbar.org/groups/antitrust_law/resources/newsletters/economics-class-   certification-olean-v-bumble-bee/.

4) "The American Innovation and Choice Online Act (S.2992): Insights from Economics Regarding Self-Preferencing and Non-Discrimination" (with Christopher Ring and Lucia Castiblanco), American Bar Association Antirust Law Section, Economics Committee Newsletter, March 23, 2022. Available at https://www.americanbar.org/groups/antitrust_law/publications/newsletters/american-innovation-choice-online-act/.

5) "With Big Tech Bracing for Antitrust Legislation, Here's What You Need to Know about the Economics of Digital Platforms" (with Chris Ring), *ThinkSet*, March 2, 2022, https://thinksetmag.com/insights/ts-big-tech-antitrust-legislation-digital.

6) "A Step Forward or Backward: The Court's Application of Geographic Market Definition Principles in *FTC et al. v. Thomas Jefferson University and Albert Einstein Healthcare*", (with David Eisenstadt), *CPI Antitrust Chronicle*, May 11, 2021. Available at https://www.competitionpolicyinternational.com/a-step-forward-or-backward-the- courts-application-of-geographic-market-definition-principles-in-ftc-et-al-v-thomas- jefferson-university-and-albert-einstein-healthcare/.

7) "Regulating digital platforms: interoperability and data portability" (with Chris Ring and Samuel Clark), The New US Antitrust Administration, *Concurrences,* January 2021, 44-
51. Available at https://www.concurrences.com/fr/revue/issues/no-1-2021/dossier/the-new-us-antitrust-administration.

8) "Analysis of Literature on Technology and Alternative Workforce Arrangements", prepared for the Coalition for Workforce Innovation, filed with comments to the U.S. Department of Labor, Wage and Hour Division, regarding independent contractor status under the Fair Labor Standards Act: Notice of Proposed Rulemaking and Request for Comments, October 26, 2020.

9) "Price Gouging in the Time of COVID-19 (with Chris Ring and Luke Gelber), *ABA Economics Committee Newsletter,* Summer 2020, 1-7.

10) "How COVID-19 Applies To Weakened Competitor M&A Defense (with Chris Ring), *Law360* June 2, 2020. Available at https://www.law360.com/articles/1278639/how-covid-19-applies-to-weakened-competitor-m-a-defense

11) "Prevention or Cure? Damages in Private Antitrust Claims in the US and the EU", Global Competition Litigation Review, Volume 13, January 1, 2020.

12) "Does Crime Pay? Cartel Fines and Damages", *ABA Economics Committee Newsletter*, Vol 19, No. 2, Spring 2018, 41-46.

13) "Reply to Connor and Lande on Cartel Overcharges", *International Journal of the Economics of Business*, Vol. 24, Iss. 3, September 19, 2017, 339-343.

14) "The Empirical Basis for Antitrust: Cartels, Mergers, and Remedies", *International Journal of the Economics of Business*, Vol. 24, Iss. 2, January 27, 2017, 233-250.

15) "The Need to Revise the U.S. Non-Horizontal Merger Guidelines", *Concurrences*, No.

4, 2016, 51-58. Available at http://ssrn.com/abstract=2877780.

16) *Antitrust Law and Economics of Product Distribution*, 2nd ed. (ALEPD 2nd), co-editor (with Quentin Wittrock and Theodore Banks), American Bar Association, 2016.

17) "Economics Tools Used in Merger Control," 7th ed. (with S Murthy Kambhampaty), *The Merger Control Review*, Law Business Research, July 2016, 10-29.

18) "Hicks-Marshall Conditions and Defining Antitrust Markets for Intermediate Goods," (with Jonathan T. Tomlin, David A. Weiskopf and Georgi Giozov), *Research in Law and Economics*, Vol. 27, November 23, 2015, 67-90.

19) "Bayer or Walgreen's? The Relationship of Premium and Value Brands in the United States," (with Wenqing Li and Sophie Yang), in *Brands, Competition Law and IP*, Deven Desai, Ioannis Lianos and Spencer Waller (eds.), 2015, 25-47.

20) "Economics Tools Used in Merger Control," 6th ed. (with S Murthy Kambhampaty), *The Merger Control Review*, Law Business Research, July 2015, 3-19.

21) "The Role of the Economic Expert in Damages Analyses," (with Robert Kneuper), *Expert Witnesses*, American Bar Association Section of Litigation, October 6, 2014.

22) "Antitrust Economics: Analysis of Alleged Illegal Tying," (with Raleigh Richards), *The Colorado Lawyer*, Vol. 43, No. 10, October 2014, 27-32.

23) "Asymmetric Price Increase in Critical Loss Analysis: Surreply to Daljord, Sørgard, and Thomassen," (with Wenqing Li), *Journal of Competition Law & Economics*, Vol. 10, No. 3, August 2014, 769-772.

24) "The Role of Economics in Truncated Rule of Reason Analysis," (with David Eisenstadt), *Antitrust*, Vol. 28, No. 3, July 2014.

25) "Experts and Expert Depositions in Class Actions," (with Daniel Barsky), *Class Actions & Derivative Suits*, American Bar Association Section of Litigation, June 3, 2014.

26) "The Law and Economics of Class Actions: Yesterday, Today, and Tomorrow," (with Raleigh Richards), *Research in Law and Economics*, Vol. 26, May 2014, 1-9. Also appears in *Economic Perspectives on Today's Business Challenges,* May 2014, 33-39.

27) "*FTC v. Actavis*: Courts Bring Economics Back to Reverse Payment Cases," (with Sophie Yang), *Economic Perspectives on Today's Business Challenges,* May 2014, 40-43.

28) "Chapter 12: Using Econometrics to Estimate Damages," (with Wenqing Li, Greg Leonard, and John Morris), in *Econometrics: Legal, Practical and Technical Issues*, Charles Biggio and Lawrence Wu (eds.), ABA Section of Antitrust Law, 2nd ed., March 2014.

29) "Asymmetric Price Increase in Critical Loss Analysis: A Reply to Daljord, Sørgard, and Thomassen," (with Wenqing Li), *Journal of Competition Law & Economics*, Vol. 10, No. 2, February 2014, 495-503.

30) "Evaluating the Size of 'Reverse Payments' in Light of the Supreme Court's Decision in *FTC v. Actavis*," *Competition Policy International Antitrust Chronicle*, Vol. 2, September 2013.

31) "State Aid and Supply-Side Geographic Market Definition" (with Christopher Alexander), *European State Aid Law Quarterly*, Vol. 2, 2013, 362-370.

32) "Commissioner Joshua Wright on Dynamic Competition and Innovation," *Antitrust Source* 12, No. 4, April 2013, 78-82.

33) "Overview of Antitrust Economics in the United States," (with Stephan Levy), *The Handbook of Competition Economics*, 2013, 121-123.

34) "Economic Analysis of Allegations in Cigarette Litigations and the Impact of FTC Regulation," (with Brad Noffsker), *Research in Law and Economics*, Vol. 25, 2013, 129- 233.

35) "Chapter 8:  Economic Experts," (with Gregory G. Wrobel and Michael J. Waters), in *Private Enforcement of Antitrust Law in the United States*, ed. Albert A. Foer, et al. (Northampton, MA:  Edward Elgar, 2012), 395-443.

36) Review of *Market Power Handbook: Law and Economic Foundations*, 2nd edition,

ABA Section of Antitrust Law, *Word Competition Law and Economics Review*, Vol. 35, No. 4, December 2012, 711-713.

37) "Chapter 2: Manufacturing Input Markets," (with William Nye, Louis Silvia, and Jonathan Tomlin) in ABA Section of Antitrust Law, *Market Definition in Antitrust: Theory and Case Studies*, 2012, 49-89.

38) "Overview of Antitrust Economics in the United States," (with Stephan Levy), *The Handbook of Competition Economics*, 2012, 115-116.

39) "The Potential Role of Civil Antitrust Damage Analysis in Determining Financial Penalties in Criminal Antitrust Cases," (with Robert Kneuper), *George Mason Law Review*, Vol. 18, No. 4, Summer 2011, 953-986.

40) "Troubleshooting ACO Antitrust Enforcement," *Law360*, (with Tracey Klein), August 22, 2011. Available at http://www.law360.com/articles/263798/troubleshooting-aco-antitrust-enforcement

41) "*Daubert* and Other Gatekeeping Challenges of Antitrust Experts: Appendix," (with Christopher Alexander), *Antitrust Source* 10, No. 6, August 2011, 21-28.

42) "*Daubert* and Other Gatekeeping Challenges of Antitrust Experts," (with Christopher Alexander) *Antitrust* 25, No. 3, Summer 2011, 21-28.

43) "Comment regarding the Proposed Policy Statement regarding Accountable Care Organizations (ACOs) participating in the Medicare Shared Savings Program (MSSP)", (with Tracey Klein), May 31, 2011.

44) "Upward Pricing Pressure Analysis Under the 2010 Horizontal Merger Guidelines," *Antitrust* 25, Fall 2010, No. 1, 21-27.

45) "2010 Horizontal Merger Guidelines: Changes in Policy, Transparency, & Predictability," *CPI Antitrust Chronicle* 2, October 28, 2010. Available at https://www.competitionpolicyinternational.com/2010-horizontal-merger-guidelines-changes-in-policy-transparency-predictability/

46) "Chapter 6: Econometrics and Regression Analysis," (with Wenqing Li, Greg Leonard and John Morris), *Proving Antitrust Damages: Legal and Economic Issues,* ABA Section of Antitrust Law, 2nd ed., 2010.

47) "Daubert and Other Gatekeeping Challenges of Antitrust Economists," (with Chris Alexander), AAI Working Paper #08-06, March 10, 2010. Available at http://ssrn.com/abstract=1337081

48) "Revising the Merger Guidelines," *GCP,* Release 1, December 2009.

49) "Is GM the New Amtrak?" *The Daily Beast*, June 5, 2009. Available at http://www.thedailybeast.com/blogs-and-stories/2009-06-05/is-gm-the-new-amtrak/

50) "Non-Horizontal Merger Guidelines in the United States and the European Commission: Time for The United States to Catch Up?," *George Mason Law Review*, Vol. 16, No. 4, Summer 2009, 851-884.

51) "Needed Revisions of the Non-Horizontal Merger Guidelines," *The Threshold*, Vol. 9, No. 2, Spring 2009, 30-39.

52) "Supplemental LECG Report Regarding Proposed Highmark/IBC Consolidation," (with Rob Kneuper), January 30, 2009. Available at http://www.ins.state.pa.us/ins/lib/ins/highmark-ibc/1768.pdf

53) "LECG Report to the Pennsylvania Insurance Department Regarding Proposed Highmark/IBC Consolidation" (with Robert Kneuper), September 10, 2008. Available at http://www.ins.state.pa.us/ins/lib/ins/highmark-ibc/1355.pdf

54) "The Potential Impact of *Twombly* on Antitrust Class Actions," (with Wendy Bloom) *GCP*, Release 2, June 2008.

55) "Natural Experiments," (with Mary Coleman), *Issues in Competition Law and Policy,* ABA Section of Antitrust Law, Vol. 1, 2008, 743-772.

**BRG**

56) "Price Discrimination and the Cruise Line Industry: Implications for Market Definition, Competition, and Consumer Welfare," (with Wenqing Li), *International Journal of the Economics of Business*, Vol. 15, Issue 1, February 2008, 1-25.

57) "Q&A: James Langenfeld on Using Econometrics to Estimate Damages," *LECG Library*, January 2008.

58) "The Future of US Federal Antitrust Enforcement: Learning From Past and Current Influences," (with Daniel R. Shulman), *The Sedona Conference Journal*, Vol. 8, Fall 2007, 1-15.

59) "Refining the *Matsushita* Standard and The Role Economics Can Play", (with James Morsch), *Loyola University Chicago Law Journal*, Vol. 38, No. 3, Spring 2007, 507-512.

60) "The Economics of High Tech Antitrust," (with Anne Layne-Farrar and Jorge Padilla), *Global Competition Review*, Vol. 10, Issue 4, April 2007, 35-38.

61) "Book review of Michael Whinston's *Lectures on Antitrust Economics*," *World Competition Law and Economics Review*, Vol. 30, March 2007, 174-175.

62) "The FTC's Study of Pharmacy Benefits Managers," (with Robert Maness), *Antitrust Health Care Chronicle*, Vol. 19, No. 4, January 2006, 23-29.

63) "The Benefits of Free Trade to U.S. Consumers," (with James Nieberding), *Business Economics,* Vol. 40, July 2005, 41-51.

64) "Economic Analyses of Patent Settlement Agreements: The Implementation of Specific Economic Tests, the Evaluation of Dynamic Efficiency, and the Scope of Patent Rights," (with Wenqing Li), *University of San Francisco Law Review,* Vol. 39, Issue 1, Fall 2004, 57-80.

65) "Federal Trade Commission Horizontal Restraint Cases: An Update," (with Louis Silvia),
*The Antitrust Bulletin,* Vol. XLIX, No.3, Fall 2004, 521-591.

66) "How the 'Other Half' Lives: FTC Non-Merger Antitrust Enforcement," *The Antitrust Bulletin*, Vol. XLIX, No. 3, Fall 2004, 457-469.

67) "Competition, Consumer Awareness, and Distribution in the Contact Lens Industry," (with Robert Maness), June 24, 2004.

68) "Elzinga-Hogarty Tests and Alternative Approaches for Market Share Calculations in Hospital Markets," (with H.E. Frech III and R. Forrest McCluer), *Antitrust Law Journal*, Vol. 71, No. 3, 2004, 921-947.

69) "The Cost of PBM "Self-Dealing" Under a Medicare Prescription Drug Benefit," (with Robert Maness), September 2003.

70) "Economic Literature on Price Discrimination and its Application to the Uniform Pricing of Gasoline," (with Wenqing Li and George Schink), *International Journal of the Economics of Business,* Vol. 10, No. 2, July 2003, 179-193.

71) "Intellectual Property and Agreements to Settle Patent Disputes: The Case of Partial Settlement Agreement with Payments from Branded to Generic Drug Manufacturers," (with Wenqing Li), *Antitrust Law Journal,* Vol. 70, Issue 3, Spring 2003, 777-818.

72) "The Impact of Increases in Health Costs on Employment-Based Health Spending, the Number of Uninsured, Employment, and Wages for the United States and Each State 20003 – 2007," (with Richard Shin), prepared for the American Association of Health Plans, January 13, 2003.

73) "Oregon's Measure 23 Could Increase State Health Care Expenditures by 30% in 2005," (with Richard Shin), prepared for the American Association of Health Plans, October 9, 2002.

74) "Estimates of Private Employment-Based Insurance Spending In the United States and by State (and the District of Columbia) 2003-2007," (with Richard Shin), prepared for the American Association of Health Plans, September 24, 2002.

75) "Intellectual Property and Antitrust: Steps Toward Striking a Balance," *Case Western Reserve Law Review,* Vol. 52, No. 1, Fall 2001, 91-110.

76) "The Perfect Caper? Private Damages and The Microsoft Case," *The George Washington Law Review,* Vol. 69, No. 5/6, October/December 2001, 902-914.

77) "Oil Pipelines' Effects on Refined Products Prices," (with Mary Coleman and George Schink), presented Federal Trade Commission conference, *Factors that Affect Prices of Refined Petroleum Products,* August 2, 2001.

78) "The Use and Misuse of Critical Loss Analysis," (with Wenqing Li), *LECG Perspectives,*
Vol. 2, No. 3, July 2001.

79) "Critical Loss Analysis in Evaluating Mergers," (with Wenqing Li), *Antitrust Bulletin,* Summer 2001, 299-337.

80) "Has Microsoft Committed the Perfect Caper?" (with Robert H. Lande), *FTC Watch,* No. 564, April 16, 2001, 11-13.

81) "Skepticism Overdone:  Managed Care and Costs," (with H.E. Frech III), *Health Affairs,* November/December 2000, Vol. 19, No. 6, 305.

82) "Challenges to Managed Care Practices in Healthcare And Their Potential Effects," (with Michaelyn Corbett), *LECG Perspectives,* Vol. 1, No. 4, October 2000, 1-4.

83) "The Economics of Geographic Market Definition in the Sutter Health/Summit Merger," (with Wenqing Li), *Antitrust Health Care Chronicle,* Vol. 14, No. 3*,* Fall 2000, 11-12.

84) "Competition in U.S. Healthcare and Its Future," (with Michaelyn Corbett), *Global Competition Review*, Vol. 3, No. 4, August-September 2000, 29-30.

85) "Lost Profits from Patent Infringement:  The Simulation Approach," (with Gregory J. Werden and Luke M. Froeb), *International Journal of the Economics of Business*, Vol. 7, No. 2, 2000, 213-227.

86) "The Impact of Antitrust Exemptions for Health Care Professionals on Health Care Costs," (with H.E. Frech III), Monograph, Prepared for the American Association of Health Plans, June 2000.

87) "Quantitative Techniques in Competition Analysis," (with Tom Hoehn, Melori Meschi and Len Waverman), *Global Competition Review*, Vol. 2, No. 5, October-November 1999, 27-28.

88) "Quantitative Techniques in Competition Analysis," (with Tom Hoehn, Melori Meschi and Len Waverman), prepared for the U.K. Office of Fair Trading, October 1999.

89) "Recent Trends in Merger Enforcement in the United States: The Increasing Impact of Economic Analysis," (with Robert H. Lande), *Comparative Law*, Vol. 15, 1998, 73-96.

90) "The Use of Customer Complaints in Antitrust Analysis," *Government Antitrust Litigation Advisory*, July 1998, 1-5.

91) "Antitrust Analysis and Remedies in High-Tech Industries," (with Mary Coleman), *Global Competition Review*, Vol. 1, No. 3, June/July 1998, 42-43.

92) ABA Antitrust Section, 1997 *Annual Review of Antitrust Law Developments* (1998) (Contributor).

93) "Programming Concerns in German Pay-TV," (with Steve Wildman and William Wagener), *The Global Competition Review*, Vol. 1, No. 2, April/May 1998, 47.

94) "The Triumph and Failure of the U.S. Merger Guidelines in Litigation*," The Global Competition Review*, Issue 1, December 1997/January 1998, 36-37.

95) "Cash Machines: Fee Disclosure and Competition v. Regulation," (with Alan Frankel), *The Global Competition Review*, August/September 1997, 31-32.

96) "Sea-Change or Submarkets? Federal Trade Commission v. Staples, Inc. and Office Depot, Inc.," (with Alan Frankel), *The Global Competition Review*, June/July 1997, 29-30.

97) "Antitrust and Intellectual Property: Landing on Patent Avenue in the Game of Monopoly," (with James Gould), *IDEA - The Journal of Law and Technology*, Vol. 37, No. 3, 1997, 449-89.

98) "From Surrogates to Stories:  The Evolution of Federal Merger Policy," (with Robert Lande), *Antitrust*, Vol. 37, No. 3, Spring 1997, 5-9.

99) "The Merger Guidelines As Applied," in Malcolm Coate and Andrew Kleit (eds.), *The Economics of the Antitrust Process*, 1996, 41-64.

100) *Proving Antitrust Damages*, Section of Antitrust Law, American Bar Association, William Page (ed.), (co-author), 1996, 41-64.

101) "Antitrust and Agreements Among Health Care Providers:  'The Messenger Model,' Efficiencies, and Non-Exclusive Contracts," (with Richard Higgins), Southern Economic Association Meetings, New Orleans, LA, November 19, 1995.

102) "Competition Policy and Privatization During the Transition of Central and Eastern Europe to a Market Economy: An Organizational Perspective," (with Dennis Yao), in H. Thomas, D. O'Neal and J. Kelly (eds.), *Strategic Renaissance and Business Transformation*, 1995, 33-55.

103) "Competition Policy and Privatization in a Transition Economy:  An Organizational Perspective," (with Dennis Yao), in H.J. Blommestein and B. Steunenberg (eds.) *Government and Markets*, 1994, 195-218.

104) "Economic Theories of the Potential Anticompetitive Impact of Physician Owned Joint Ventures," (with Michael Black), *Antitrust Bulletin*, Summer 1994, 385-414.

105) "Entry Under the Merger Guidelines, 1982-1992," (with Malcolm Coate), *Antitrust Bulletin*, Fall 1993, 557-592.

106) "The Federal Trade Commission's Horizontal Restraint Cases: An Economic Perspective," (with Louis Silvia), *Antitrust Law Journal*, Spring 1993, 653-697.

107) "Frontiers in Monopolization," (with Michael Black), in John Clark and Mary Lou Steptoe (eds.), *The Antitrust Division and the FTC Speak on Current Developments in Federal Antitrust Enforcement*, 1992 (New York:  Practicing Law Institute), Chapter 26, 647-662.

108) "Efficiencies in U.S. Merger Analysis," (with Timothy Deyak), *International Merger Law*, No. 25, September 1992.

109) "Chapter 19:  Analysis of Nonprice Horizontal Restraints," (with Louis Silvia and Terry Winslow), in Von Kalinowski (ed.), *Antitrust Counseling and Litigation Techniques,* (New York:  Matthew Bender, 1992), 19-1 – 19-57.

110) "Liberal Trade and Antitrust in Developing Nations," (with Roger Boner), *Regulation*, Spring 1992, 5-6.

111) "Hospital Mergers:  Do U.S. Antitrust Agencies Follow the Government Guidelines?" (with Paul Pautler), *International Merger Law*, February 1992.

112) "Analyzing Agreements Among Competitors:  What Does the Future Hold?" (with John Morris), *Antitrust Bulletin*, Fall 1991, 651-679.

113) "Is Competition Policy the Last Thing Central and Eastern Europe Need?" (with Marsha

Blitzer), *American University Journal of International Law and Policy*, Vol. 6, No. 3, Spring 1991, 347-398.

114) "In Defense of Antitrust" (with John Morris), *Regulation*, Spring 1991, 2-4.

115) "Antitrust Enforcement: The Gray Area of Agreements Among Competitors," *ATRS Report*, Spring 1991, 3-20.

116) "Economic Analysis in Health Care Antitrust," (with M. Vita, P. Pautler, and L. Miller), *The Journal of Contemporary Health Law and Policy*, Vol. 7, Spring 1991, 73-116.

117) "The FTC in the 1980's," (with David Scheffman), *Industrial Organization Review*, Summer 1990, 79-98.

118) "Comment on Baker, 'Identifying Cartel Policing Under Short-Term Uncertainty'," *Journal of Law and Economics*, Vol. 32, No. 2, October 1989, S77-S82.

119) "Innovation and U.S. Competition Policy," (with David Scheffman), *Antitrust Bulletin*, Spring 1989, 1-63. Also published in *Aussenwirtschaft,* 43, Jahrang 1988, 45-95.

120) "The Use of Customer Complaints in Antitrust Analysis," (with Steve Stockum*), ATRS Report*, Spring 1989, 3-13.

121) "Regulatory Reform: the Right Way and the Wrong Way," (with Thomas Walton), in Roger Meiners and Bruce Yandle (eds.), *Regulation and the Reagan Era: Politics, Bureaucracy and the Public Interest*, 1989, 41-71.

122) "Attorney Advertising and Competition at the Bar," (with Terry Calvani and Gordon Shuford), *Vanderbilt Law Review*, Vol. 41, May 1988, 761-788.

123) "How Can Guidelines Reduce the Uncertainties of Antitrust Enforcement?," *Antitrust Bulletin*, Fall 1987, 643-659.

124) "Settlement vs. Litigation in Antitrust Enforcement," (with Robert Rogowsky), in Mackay, Miller, and Yandle (eds.), *The Federal Trade Commission: The Political Economy of Regulation*, 1987, 205-219.

125) "Evolution or Revolution--What is the Future of Antitrust?" (with David Scheffman), *Antitrust Bulletin*, Summer 1986, 287-300.

126) "The Impact of Antitrust Guidelines on Business," *Contemporary Policy Issues*, July 1986, 22-29.

127) "The Effect of Warranties: A Comment," in Ippolito and Scheffman (eds.), *Empirical Approaches to Consumer Protection Economics* (Washington, D.C.: F.T.C., 1986), 105-107.

128) "CAFE Estimation Errors and Their Causes," (with Richard Schneider), presented at the Western Economic Association Meetings, San Francisco, July 1986.

129) "Financial Deregulation and Geographic Market Delineation: An Application of the Justice Guidelines to Banking," (with Joseph McKenzie), *Antitrust Bulletin*, Fall 1985, 695-712.

130) "An Overview of the Current Debate on Resale Price Maintenance," (with Terry Calvani), *Contemporary Policy Issues*, Spring 1985, 1-8.

131) "The Failing Industry Merger Defense: A Market Alternative to MITI," presented at the Southern Economic Association Meetings in Atlanta, Georgia, November 1984.

132) "Antitrust Enforcement and the Oil Industry: Mergers in an Industry of Giants," presented at the National Association of Attorneys General Oil Merger Seminar, Denver, Colorado, April 24-25, 1984.

133) "An Economic Analysis of the Law of Evidence Applied to the Subjective and Objective tests in an Entrapment Defense," (with Richard Higgins), presented at the International Atlantic Economic Conference in San Juan, Puerto Rico, March 1984.

134) "The Costs and Benefits of Automobile Emissions Controls and Safety Regulations," Working Paper of the Center for the Study of American Business, Washington University in St. Louis, October 1983, Revised January 1984.

135) "Federal Automobile Regulations," presented at the Industrial Organization Society Meetings in San Francisco, California, December 1983.

136) "Comment of the Staff of the F.T.C. on Certain Motor Vehicle and Certain Chassis and

Bodies Therefore, before the U.S. International Trade Commission, TA-201-44," (co-authored), October 1980.

137) "Demand Effects of Automobile Regulations," presented at the Econometric Society Meetings in Atlanta, Georgia, December 1979.

138) "The New Wave of Regulation:  An Appraisal," The Alternative: *An American Spectator*, March 1976.

139) "Motor Carriers of Passengers," ICC Annual Report to Congress, 1972.

140) "Empirical Findings on Self Esteem:  A Selected Survey," Appendix to P.S.L. Office of Education contract, 1971.

141) Assisted Murray L. Weidenbaum on Government Mandated Price Increases (AEI: 1975), "Private Advisors and Government Policymaking," *Policy Analysis*, Winter 1975, and "The Advantages of Credit on the Personal Income Tax," *George Washington Law Review*, March 1974.


While at the FTC, contributed to the U.S. Department of Justice and Federal Trade Commission 1992 Horizontal Merger Guidelines and the 1993 Statements of Enforcement Policy Relating to Health Care and Antitrust.

**RECENT EXPERT TESTIMONIAL AND RELATED EXPERIENCE**

Dr. Langenfeld has made many presentations and submitted reports to the Federal Trade Commission, the Department of Justice, various state agencies such as the Pennsylvania Insurance Department, the Department of Defense, the European Commission, and the Canadian Bureau of Competition Policy since leaving the FTC.  These presentations involved a number of industries, including petroleum, healthcare, pharmaceuticals, medical devices, insurance, chemicals, construction equipment, computers, communications, defense, aerospace, food processing, baking, automobiles and trucks, and a large variety of consumer and industrial products.  They covered economic analyses of mergers, monopolistic practices, collusion, consumer protection, and government regulation.  He also often presents at conferences and seminars, covering a wide variety of economic, policy, damages, and strategic planning topics.

In addition to these presentations, Dr. Langenfeld has extensive experience testifying in federal and state courts, as well as before the European Commission.  This formal testimonial and related experience covers antitrust, damages, class certification, intellectual property relating to patents and trade secrets, taxation regulation, and economic policy. Dr. Langenfeld's testimonial experience includes the following matters:

1) Deposition of James Langenfeld, Ph.D in <u>Intermodal Motor Carriers Conference, American Trucking Associations, Inc., v. Ocean Carrier Equipment Management Association, Inc., et al.,</u> Docket No. 20-14, United States Federal Maritime Commission, April 1, 2022.

2) Testimony of James Langenfeld, Ph.D in <u>Bellin Memorial Hospital, INC., v. Kinsey & Kinsey, Inc., Brad Kinsey, and Brian M. Thome,</u> Case No. 18-cv-348, State of Wisconsin Circuit Court Brown County, November 16, 2021.

3) Deposition of James Langenfeld, Ph.D in <u>Honey Bum, LLC, v. Fashion Nova, INC, Richard D. Saghian,</u> Case No.: 20-CV-11233, in the United States District Court of the Central District of California Western Division – Los Angeles, November 3, 2021.

4) Deposition of James Langenfeld, Ph.D. in <u>Emergency Services of Oklahoma, PC, Oklahoma Emergency Services, PC, Emergency Physicians of Mid-America P.C., and South Central Emergency Services, PC, v. Aenta Health Inc., Aenta Health Insurance Company, and Aetna Life Insurance Company,</u> Case No. 5:17-cv-00600-PRW, in the United States District Court for the Wester District of Oklahoma, October 14, 2021.

5) Arbitration Testimony of James Langenfeld, Ph. D. in <u>US Worldmeds, LLC., v. Piramal Pharma Solutions, INC.,</u> Case No. 01-20-0000-5191, American Arbitration Association, May 11-12, 2021.

6) Deposition of James Langenfeld, Ph.D. in <u>US Worldmeds, LLC v. Piramal Pharma Solitons, INC.,</u> Case No. 01-20-0000-5191, American Arbitration Association, March 12, 2021.

7) Deposition of James Langenfeld, Ph.D. in <u>Bellin Memorial Hospital, INC., v. Kinsey & Kinsey, Inc., Brad Kinsey, and Brian M. Thome.,</u> Case No. 18-cv-348, State of Wisconsin Circuit Court Brown County, September 21, 2020.

8) Trial Testimony of James Langenfeld, Ph.D. in <u>Ashraf O. Hamideh, an individual, Pouya Abdolrasoul, an individual, all in their representative capacity on behalf of themselves and other current and former employees, Plaintiffs vs. Wells Fargo Bank, N.A.,</u> Case No. 37-2017-00045253-CU-OE-CTL, in the Superior Court of the State of California County of San Diego, February 20, 2020.

**APP 1028**

**BRG**

9) Deposition of James Langenfeld, Ph.D. in <u>re Bearings Cases</u>, Case No. 12-MD-02311, in the United States District Court, Eastern District of Michigan, Southern Division, November 15, 2019.

10) Deposition of James Langenfeld Ph.D in <u>Barbara Ruotolo, Edward Williams, and Chris Kalhoon, v. Lyft, Inc.</u>, Case Nos. AAA 01-18-0003-9788, 01-18-0003-9792, 01-18-0003-9782, American Arbitration Association, August 22, 2019.

**Exhibit 2**
**Materials Considered**

| Legal Documents |
| --- |
| Expert Report of Brandon Ward Regarding Match.com's Online Subscription Cancelation Flow, January 13, 2023 |
| Expert Report of Dr. Jennifer King, January 13, 2023 |
| First Amended Complaint for Permanent Injunction, Monetary Relief, Civil Penalties, and Other Refief, Case No. 3:19-cv-02281, July 18, 2022. |
| Plaintiff's Second Amended Initial Disclosure, May 19, 2023 |
| Plaintiff's Third Amended Responses to Defendants' First Set of Interrogatories, May 19, 2023 |
| Plaintiff's Third Amended Responses to Defendants' First Set of Interrogatories, November 29, 2022 |
| Rebuttal of Dr. King's Report Regarding Match.com's Online Subscription Cancelation Flow, May 15, 2023 |
| Rebuttal Report of Dr. Jennifer King, May 15, 2023 |

| Public Materials |
| --- |
| American Economic Association, "What is economics?" https://www.aeaweb.org/resources/students/what-is-economics. Dwivedi, D.N., "Microeconomics: Theory & Applications," 2006 |
| Department of Health and Human Services, RAT-STATS 2010 User Guide, Version 1, https://oig.hhs.gov/documents/rat-stats/835/UserGuide2010_04js.pdf |
| Federal Register, Vol. 88, No. 78, April 24, 2023, pp. 24716-24739, https://www.federalregister.gov/documents/2023/04/24/2023-07035/negative-option-rule |
| Friedman, D. D., "Law's order: What economics has to do with law and why it matters," Princeton University Press, 2000 |
| Hong, Yongmiao, "Probability and Statistics for Economists," World Scientific Publishing Company, 2017 |
| Hood, Christopher, "Credit claiming, blame avoidance, and negativity bias," in The Blame Game: Spin, bureaucracy and self-preservation in government, Princeton University 1-23, 2013 http://www.match.com |
| Hu, N., Pavlou, P. A., and Zhang, J., "On self-selection biases in online product reviews," MIS quarterly, 41(2), 2017, 449-475 |
| Ito, Tiffany A., Jeff T. Larsen, N. Kyle Smith, and John T. Cacioppo, "Negative information weighs more heavily on the brain: the negativity bias in evaluative categorizations," Journal of Personality and Social Psychology 75(4), 1998, 887–900. |
| Kahneman, Daniel and Amos Tversky, "Prospect theory: An analysis of decision under risk." Econometrica 47.2, 1979, 363-391 |
| Kaye, David H. and David A Freedman, "Reference Guide on Statistics," Reference Manual on Scientific Evidence: Third Edition, National Academy of Sciences, 2011 |
| Levitt, Steven D., "Why Do People Post Reviews on Amazon?," Freakonomics, July 22, 2005, https://freakonomics.com/2005/07/why-do-people-post-reviews-on-amazon/ |
| Loranger, Hoa, "The Negativity Bias in User Experience," Nielsen Norman Group, October 23, 2016, https://www.nngroup.com/articles/negativity-bias-ux/. |
| Match Group, Inc., 2022 Form 10-K |
| Match Group, LLC, "Our Company," https://mtch.com/ourcompany |
| Morning Consult National National Tracking Poll #180111, page 49, http://www.statista.com/statistics/809450/us-users-favorite-dating-websites-apps-age-group/ |

APP 1030

Pappalardo, J.K., "Economics of Consumer Protection: Contributions and Challenges in Estimating Consumer Injury and Evaluating Consumer Protection Policy," Journal of Consumer Policy (2022) 45:201–238

Rozin, Paul, and Royzman, Edward B., "Negativity Bias, Negativity Dominance, and Contagion," Personality and Social Psychology Review 5(4), 2001, 296-320.

Runge, J., Wentzel, D., Huh, J.Y., and Change, A., "Dark patterns in online services: a motivating study and agenda for future research," Marketing Letters, 2023, 34:155-160

Sauro, Jeff, 2011, "What Is A Good Task-Completion Rate? – MeasuringU." March 21, 2011, https://measuringu.com/task-completion/

Sauro, Jeff, and James Lewis, "Quantifying the User Experience: Practical Statistics for User Research," 2nd Edition, 2016

Schupp, Harald T., Arne Öhman, Markus Junghöfer, Almut I. Weike, Jessica Stockburger, and Alfons O. Hamm, "The facilitated processing of threatening faces: an ERP analysis," Emotion 4(2), 2004, 189–200

U.S. Census Bureau, "Table A1. Marital Status of People 15 Years and Over, by Age, Sex, and Personal Earnings: 2021," America's Families and Living Arrangements: 2021, https://www.census.gov/data/tables/2021/demo/families/cps-2021.html

**Interviews**

Jim Talbott, Web Analyst, Match.com, February 13, 2023, February 28, 2023, March 10, 2023, April 10, 2023, May 31, 2023, and June 13, 2023.

**Bates Numbered Materials**

F01-MG-0028502

MATCHFTC551250

MATCHFTC561431

MATCHFTC772558

MATCHFTC772558

MATCHFTC773498

MATCHFTC774721

MATCHFTC774726

MATCHFTC776031

MATCHFTC776595

MATCHFTC776595

MATCHFTC776596

MATCHFTC776596

MATCHFTC777080

MATCHFTC777081

MATCHFTC846468

MATCHFTC846469

MATCHFTC846509

MATCHFTC846510

MATCHFTC846511

MATCHFTC846512

MATCHFTC846513

MATCHFTC846515

MATCHFTC846516

MATCHFTC846517

MATCHFTC846518

MATCHFTC846519

MATCHFTC846536

CONFIDENTIAL

| MATCHFTC846946 |
| MATCHFTC846947 |

APP 1032

# EXHIBIT 2

(Filed Under Seal Pursuant to Protective
Order Regarding Confidential Materials)

# EXHIBIT T

APP 1142

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>             Plaintiff,<br><br>  vs.<br><br>MATCH GROUP, INC., a corporation, and<br>MATCH GROUP, LLC, formerly known as<br>MATCH.COM, LLC, a limited liability<br>company,<br><br>             Defendants. | Case No. 3:19-cv-02281-K |

## MATCH GROUP, INC. AND MATCH GROUP, LLC'S NOTICE OF VERIFIED STIPULATION REGARDING PERMANENTLY DISCONTINUED PRACTICES ON MATCH.COM

PLEASE TAKE NOTICE that Defendants Match Group, Inc. and Match Group, LLC (the "Match Defendants"), by and through their undersigned counsel, hereby file the attached verified Stipulation Regarding Permanently Discontinued Practices on Match.com.

Dated: September 20, 2022

Respectfully submitted,

/s/ Angela C. Zambrano
Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Fax: 214.981.3400

APP 1143

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310.595.9500
Fax: 310.595.9501

*Attorneys for Match Group, Inc. and Match Group, LLC*

## CERTIFICATE OF SERVICE

On September 20, 2022, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on counsel by a manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/  Angela C. Zambrano*
Angela C. Zambrano

**APP 1144**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

FEDERAL TRADE COMMISSION,

                Plaintiff,

    vs.

MATCH GROUP, INC., a corporation, and
MATCH GROUP, LLC, formerly known as
MATCH.COM, LLC, a limited liability
company,

                Defendants.

Case No. 3:19-cv-02281-K

---

## MATCH GROUP, INC. AND MATCH GROUP, LLC'S STIPULATION REGARDING PERMANENTLY DISCONTINUED PRACTICES ON MATCH.COM

Defendants Match Group, Inc. ("MGI") and Match Group, LLC ("MGL," and together with MGI, the "Match Defendants") file this Stipulation Regarding Permanently Discontinued Practices on Match.com (the "Stipulation").

This Stipulation addresses the Permanently Discontinued Practices (defined below) at issue in Plaintiff Federal Trade Commission's ("FTC")'s First Amended Complaint for Permanent Injunction, Monetary Relief, Civil Penalties, and Other Relief, Dkt. 116 (the "Amended Complaint"). More specifically, this Stipulation confirms the ***permanent*** discontinuation of the Match.com guarantee at issue in Count III of the Amended Complaint (the "Match.com Guarantee") and the ***permanent*** discontinuation of the Match.com chargeback policy at issue in Count IV of the Amended Complaint in which the FTC alleges that, "when [the Match Defendants] prevailed in a billing dispute, [the Match Defendants] often failed to provide consumers access to their Match.com accounts or to the subscription services that the consumers paid for" and instead

**APP 1145**

"terminated the consumers' accounts and deleted their profiles"[1] (the "Chargeback Policy," and together with the Match.com Guarantee, the "Permanently Discontinued Practices").

With this Stipulation, the Match Defendants confirm, through their authorized signatory's verification, attached hereto and incorporated herein as Exhibit A, that, with respect to the alleged conduct described in Counts III and IV of the Amended Complaint, which the FTC has contended violated the FTC Act, that the Match Defendants are not "violating, or about to violate" the FTC Act.

Accordingly, the Match Defendants hereby stipulate and agree as follows:

1. MGI could never, and would never, engage in any conduct related to the Permanently Discontinued Practices, as MGI does not own or operate Match.com or any other dating site. Despite this, MGI agrees to never direct MGL to engage in any conduct related to the Permanently Discontinued Practices as may be within its rights as the indirect owner of MGL.

2. MGL, as the owner and operator of Match.com, has control over Match.com and, prior to their ceasing, had control over the Permanently Discontinued Practices.

3. Match.com, by and through its owner and operator, MGL, permanently discontinued the Match.com Guarantee in April 2019.

4. Match.com, by and through its owner and operator, MGL, does not currently offer the Match.com Guarantee.

5. Match.com, by and through its owner and operator, MGL, commits to never reinstate the Match.com Guarantee.

---

[1] Am. Compl. ¶ 62.

APP 1146

6. Match.com, by and through its owner and operator, MGL, discontinued the Chargeback Policy in March 2019.

7. Match.com, by and through its owner and operator, MGL, does not currently maintain the Chargeback Policy. For the avoidance of doubt, if MGL prevails in a chargeback billing dispute with a consumer (the "Consumer"), MGL does not fail to provide the Consumer access to the Consumer's Match.com account or to the subscription service(s) that the Consumer paid for, nor does it terminate the Consumer's account or delete the Consumer's profile because of the chargeback billing dispute in which MGL prevailed.

8. Match.com, by and through its owner and operator, MGL, commits to never reinstate the Chargeback Policy. For the avoidance of doubt, if MGL prevails in a chargeback billing dispute with the Consumer, MGL commits that it will not fail to provide the Consumer access to the Consumer's Match.com account or to the subscription service(s) that the Consumer paid for, nor will it terminate the Consumer's account or delete the Consumer's profile because of the chargeback billing dispute in which MGL prevailed.

This Stipulation shall serve as a binding and sincere commitment by the Match Defendants to never again engage in the Permanently Discontinued Practices.

# EXHIBIT A

DocuSign Envelope ID: 15083F0C-D04C-41D7-B777-9D6CBCA2AF20

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>  vs.<br><br>MATCH GROUP, INC., a corporation, and<br>MATCH GROUP, LLC, formerly known as<br>MATCH.COM, LLC, a limited liability<br>company,<br><br>    Defendants. | Case No. 3:19-cv-02281-K |

**VERIFICATION OF JARED SINE IN SUPPORT OF MATCH GROUP, INC. AND
MATCH GROUP, LLC'S STIPULATION REGARDING PERMANENTLY
<u>DISCONTINUED PRACTICES ON MATCH.COM</u>**

I, Jared Sine, serve as Chief Business Affairs and Legal Officer; Secretary for Match Group, Inc. ("MGI") and Chief Business Affairs and Legal Officer; Secretary for Match Group, LLC ("MGL"). I have reviewed MGI and MGL's Stipulation Regarding Permanently Discontinued Practices on Match.com (the "Stipulation"). I verify under penalty of perjury that the facts and statements contained within the Stipulation are true and correct, and that the Stipulation is intended by MGI and MGL to represent a binding commitment.

Dated: Sep 20, 2022

Signed: _____
DocuSigned by:
231F13F93A7D477...

# EXHIBIT U

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 3:19-cv-02281-K |
| Plaintiff, | **PLAINTIFF'S SECOND AMENDED RESPONSES TO DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSIONS** |
| v. | |
| MATCH GROUP, INC., | |
| Defendant. | |

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, and subject to the general and specific objections set forth below, Plaintiff, the Federal Trade Commission ("FTC") responds to Defendant Match Group Inc. ("Match" or "MGI")'s First Set of Requests for Admissions.

## I.    GENERAL OBJECTIONS

1. **Lack of Waiver; Right to Modify.** The following responses are made without waiving any objections raised by the FTC in this proceeding or any objections the FTC may have with respect to the subsequent use of these answers. The FTC specifically reserves the right, at any time, upon proper showing, to revise, correct or clarify the following responses.

2. **Right to Supplement.** The FTC reserves the right to supplement and will supplement these responses as required under Fed. R. Civ. P. 26(e) if additional responsive information becomes available.

3. **Attorney Client Privilege, Deliberative Process Privilege, and Attorney Work Product Doctrine.** Plaintiff generally objects to Match's Requests to Plaintiff insofar as

APP 1151

these seek, directly or indirectly, information subject to the attorney client privilege,

deliberative process privilege or work product doctrine.

4. **Scope of Discovery.** Plaintiff objects to Match's Requests to the extent that the

instructions and definitions attempt to impose upon the Plaintiff obligations greater than

those required by the Federal Rules of Civil Procedure.

## II.    OBJECTIONS AND RESPONSES

**REQUEST FOR ADMISSION NO. 1:**
Admit that the Match.com Guarantee challenged in Your Complaint ceased by at least mid-2019.

**ANSWER**
Plaintiff denies to the extent that the request is asking whether the conduct is permanently ceased. Plaintiff admits that Match.com suspended its offering of the Match.com Guarantee at that time, has not offered it during the pendency of this litigation, and has represented that its cessation is permanent. Plaintiff contends that the evidence strongly suggests that Defendants' representation that the conduct has permanently ceased is not credible, however. Defendants continued to offer their deceptive Guarantee long after it was the subject of a federal investigation despite customer complaints. Defendants suspended offering the Guarantee only on the eve of the filing of this lawsuit as clear litigation posturing and have never acknowledged that this practice was deceptive or illegal. The FTC further notes that we have yet to receive discovery on this issue from MGI, although MGI has been compelled to produce it.

**REQUEST FOR ADMISSION NO. 2:**
Admit that the Match.com Guarantee challenged in Your Complaint was permanently discontinued in April 2019, as articulated in Exhibit A.

**ANSWER**
Plaintiff denies. The evidence strongly suggests that Defendants' representation that the conduct has "permanently ceased" is not credible. Defendants continued to offer their deceptive Guarantee for years after it was the subject of a federal investigation despite customer complaints. Defendants suspended offering the Guarantee only on the eve of the filing of this lawsuit as clear litigation posturing and have never acknowledged that this practice was deceptive or illegal. The FTC further notes that we have yet to receive discovery on this issue from MGI, although MGI has been compelled to produce it.

**REQUEST FOR ADMISSION NO. 3:**
Admit that the Match.com Guarantee challenged in Your Complaint has not been offered since April 2019.

**ANSWER**

Plaintiff admits but notes that Defendants continued to offer their deceptive Guarantee for years after it was the subject of a federal investigation despite countless customer complaints. Defendants suspended offering the Guarantee only on the eve of the filing of this lawsuit as clear litigation posturing and have never acknowledged this practice was deceptive or illegal. The FTC further notes that we have yet to receive discovery on this issue from MGI, although MGI has been compelled to produce it.

**REQUEST FOR ADMISSION NO. 4:**
Admit that the Match.com chargeback policy challenged in Your Complaint ceased by at least mid-2019.

**ANSWER**
Plaintiff denies to the extent that the request is asking whether the conduct is permanently ceased. Plaintiff admits that Match.com modified its chargeback policy at that time and that Defendants have represented that it has permanently ceased this practice. Plaintiff contends that the evidence strongly suggests that Defendants' representation that it has permanently ceased this practice is not credible, however. Defendants continued to engage in this conduct long after it was the subject of a federal investigation despite customer complaints. Defendants suspended this practice only on the eve of the filing of this lawsuit as clear litigation posturing and have never acknowledged this practice was unfair or illegal. Plaintiff further notes it does not have sufficient evidence concerning what Defendants' chargeback policy was between March 2019 and the date when Match Group, LLC provided its interrogatory responses identifying Match.com's current policy, as contradictory evidence exists concerning this issue. The FTC further notes that we have yet to receive discovery on this issue from MGI, although MGI has been compelled to produce it.

**REQUEST FOR ADMISSION NO. 5:**
Admit that the Match.com chargeback policy challenged in Your Complaint was permanently discontinued in March 2019, as articulated in Exhibit A.

**ANSWER**
Plaintiff denies. The evidence strongly suggests that Defendants' representation that the conduct has "permanently ceased" is not credible. Defendants continued this unfair practice long after it was the subject of a federal investigation despite customer complaints. Defendants suspended this practice only on the eve of the filing of this lawsuit as clear litigation posturing and have never acknowledged this practice was unfair or illegal. Plaintiff further notes it does not have sufficient evidence concerning what Defendants' chargeback policy was between March 2019 and the date when Match Group, LLC provided its interrogatory responses identifying Match.com's current policy, as contradictory evidence exists concerning this issue.

**REQUEST FOR ADMISSION NO. 6:**
Admit that the Match.com chargeback policy challenged in Your Complaint has not been in effect since March 2019.

**ANSWER**

Plaintiff admits that the precise policy challenged in the FTC's Amended complaint was suspended in around March 2019. Plaintiff further notes it does not have sufficient evidence concerning what Defendants' chargeback policy was between March 2019 and the date when Match Group, LLC provided its interrogatory responses identifying Match.com's current policy, as contradictory evidence exists concerning this issue.

**REQUEST FOR ADMISSION NO. 7:**
Admit that, as of the deadline for your response to this Request, Your investigation has failed to reveal any evidence of plans by Match.com to reinstate the Match.com Guarantee.

**ANSWER**
To the extent "plans" is meant to refer to explicit statements concerning specific future actions that MGI intends to take concerning the Match.com Guarantee as outlined in internal or nonpublic documents, Plaintiff admits that it does not currently have evidence of "plans" to reinstate the Match.com Guarantee. In fact, Plaintiff could not have such evidence, as Defendants improperly withheld production of nearly all evidence relating to the Match.com Guarantee, and are now only doing so after being compelled by the Court to produce it.

To the extent this request concerns whether Plaintiff has evidence establishing likelihood of recurrence regarding Defendants' illegal practices, which is the standard for issuing an injunction in this matter, Plaintiff denies. *See* Dkt. 86 (citing to standards related to likelihood of recurrence and reasonable expectation of continued violations absent restraint). Plaintiff has evidence, as described in the FTC's Response to Defendant's Interrogatory No. 1, that Match's conduct is likely to recur because it knowingly deceived its consumers for years through the means described in the complaint, profited off that deception, and only claimed to have suspended its unlawful practices on the eve of litigation after having been under investigation for this same practice for approximately two years.

The FTC further notes that we have yet to receive discovery on this issue from MGI, although MGI has been compelled to produce it.

**REQUEST FOR ADMISSION NO. 8:**
Admit that, as of the deadline for your response to this Request, Your investigation has failed to reveal any evidence of plans by Match.com to reinstate the Match.com chargeback policy challenged in Your Complaint.

**ANSWER**
 To the extent "plans" is meant to refer to explicit statements concerning specific future actions MGI intends to take concerning its chargeback policy as outlined in internal or nonpublic documents, Plaintiff admits that it does not currently have evidence of "plans" to reinstate this policy.

To the extent this request concerns whether Plaintiff has evidence establishing likelihood of recurrence regarding Defendants' illegal practices, which is the standard for issuing an injunction in this matter, Plaintiff denies. *See* Dkt. 86 (citing to standards related to likelihood of recurrence and reasonable expectation of continued violations absent restraint). Plaintiff has evidence, as

described in the FTC's Response to Defendant's Interrogatory No. 1, that Match's conduct is likely to recur because it knowingly deceived its consumers for years through the means described in the complaint, profited off that deception, and only claimed to have suspended its unlawful practices on the eve of litigation after having been under investigation for this same practice for approximately two years.

The FTC further notes that we have yet to receive discovery on this issue from MGI, although MGI has been compelled to produce it.

**REQUEST FOR ADMISSION NO. 9:**
Admit that You were informed by letter dated August 6, 2019, that Match.com would not reinstate the Match.com Guarantee challenged in Your Complaint.

**ANSWER**
Plaintiff objects to this Request as it is not relevant to any claim or defense in this matter. The Court has already ruled on Match's motion to dismiss and sided with Plaintiff in its argument that the complaint contained allegations sufficient to allege the likelihood of recurrence.

Subject to and without waiving the foregoing objections, Plaintiff denies that Match made a commitment in a letter sent on August 6, 2019, that it would not reinstitute the challenged Guarantee. Plaintiff admits that after Match received a draft complaint, knew of the impending enforcement action, and just one month before this action was filed, Match's counsel sent a letter to Zachary A. Keller, then counsel for the FTC, stating that Match had "no plans or intentions ever to reinstitute" various practices, but Match did not make a commitment to never reinstitute those practices—the letter only described its "plans or intentions" at the time of the letter and failed to include any commitments about future actions. Moreover, the claims in the letter are not credible as they were offered on the eve of litigation and appeared to be in support of a legal strategy to evade liability for deceiving consumers.

**REQUEST FOR ADMISSION NO. 10:**
Admit that You were informed by letter dated May 20, 2022, that Match.com would not reinstate the Match.com Guarantee challenged in Your Complaint.

**ANSWER**
Plaintiff objects to this Request as it is not relevant to any claim or defense in this matter. The Court has already ruled on Match's motion to dismiss and sided with Plaintiff in its argument that the complaint contained allegations sufficient to allege the likelihood of recurrence.

Subject to and without waiving the foregoing objections, Plaintiff denies that Match made a commitment in a letter sent on May 20, 2022, that it would not reinstitute the challenged Guarantee. Plaintiff admits that Match's counsel sent a letter to Reid Tepfer stating that Match had no "plans or intentions" to reinstitute various practices, but Match did not make a commitment to never reinstitute those practices—the letter only described its "plans and intentions" at the time of the letter and failed to include any commitments about future actions. Moreover, the claims in the letter are not credible as they were offered during litigation and appeared to be in support of a legal strategy to avoid liability for deceiving consumers.

**REQUEST FOR ADMISSION NO. 11:**

Admit that You were informed by letter dated August 6, 2019, that Match.com would not reinstate the Match.com chargeback policy at issue in Your Complaint.

**ANSWER**

Plaintiff objects to this Request as it is not relevant to any claim or defense in this matter. The Court has already ruled on Match's motion to dismiss and sided with Plaintiff in its argument that the complaint contained allegations sufficient to allege the likelihood of recurrence.

Subject to and without waiving the foregoing objections, Plaintiff denies that Match made a commitment in a letter sent on August 6, 2019, that it would not reinstitute the challenged Guarantee. Plaintiff admits that after Match received a draft complaint, knew of the impending enforcement action, and just one month before this action was filed, Match's counsel sent a letter to Zachary A. Keller, then counsel for the FTC, stating that Match had "no plans or intentions ever to reinstitute" various practices, but Match did not make a commitment to never reinstitute those practices—the letter only described its "plans or intentions" at the time of the letter and failed to include any commitments about future actions. Moreover, the claims in the letter are not credible as they were offered on the eve of litigation and appeared to be in support of a legal strategy to evade liability for deceiving consumers.

**REQUEST FOR ADMISSION NO. 12:**

Admit that You were informed by letter dated May 20, 2022, that Match.com would not reinstate the Match.com chargeback policy at issue in Your Complaint.

**ANSWER**

Plaintiff objects to this Request as it is not relevant to any claim or defense in this matter. The Court has already ruled on Match's motion to dismiss and sided with Plaintiff in its argument that the complaint contained allegations sufficient to allege the likelihood of recurrence.

Subject to and without waiving the foregoing objections, Plaintiff denies that Match made a commitment in a letter sent on May 20, 2022, that it would not reinstitute the challenged Guarantee. Plaintiff admits that Match's counsel sent a letter to Reid Tepfer stating that Match had no "plans or intentions" to reinstitute various practices, but Match did not make a commitment to never reinstitute those practices—the letter only described its "plans and intentions" at the time of the letter and failed to include any commitments about future actions. Moreover, the claims in the letter are not credible as they were offered during litigation and appeared to be in support of a legal strategy to avoid liability for deceiving consumers.

**REQUEST FOR ADMISSION NO. 13:**

Admit that users are able to cancel their Match.com subscription via online chat.

**ANSWER**

Plaintiff admits that Match.com has a chat feature that Match.com subscribers have used to cancel and that Defendants have represented that their policy and practice is to accept cancellations via this method.

**REQUEST FOR ADMISSION NO. 14:**
Admit that, at all times relevant to Count V in Your Complaint, users were able to cancel their Match.com subscription via online chat.

**ANSWER**
Plaintiff does not have adequate information to admit or deny whether Defendants accepted cancellations via online chat for the entire relevant period for Count V, which covers from September 2014 to the present. Plaintiff admits that Match.com has had a chat feature that Match.com subscribers have used to cancel for the majority of this period, however, and that Defendants have represented that their policy and practice has been to accept cancellations via this method for the entire relevant time period.

**REQUEST FOR ADMISSION NO. 15:**
Admit that canceling a Match.com subscription via online chat is simple.

**ANSWER**
Plaintiff objects to this Request as it calls for a legal conclusion as to whether a cancelation method is "simple."  Subject to the foregoing objection, Plaintiff denies.

**REQUEST FOR ADMISSION NO. 16:**
Admit that, at all times relevant to Count V in Your Complaint, canceling a Match.com subscription via online chat has been simple.

**ANSWER**
Plaintiff objects to this Request as it calls for a legal conclusion as to whether a cancelation method is "simple." Subject to the foregoing objection, Plaintiff denies.

**REQUEST FOR ADMISSION NO. 17:**
Admit that users are able to cancel their Match.com subscription via telephone.

**ANSWER**
 Plaintiff admits that Defendants maintains a customer service number that Match.com subscribers have used to cancel their Match.com account and that their policy and practice is to accept cancellations via this method.

**REQUEST FOR ADMISSION NO. 18:**
Admit that, at all times relevant to Count V in Your Complaint, users were able to cancel their Match.com subscription via telephone.

**ANSWER**
Plaintiff does not have adequate information to admit or deny whether Defendants accepted cancellations via this method for the entire relevant period for Count V, which covers from September 2014 to the present. Plaintiff admits that Match.com has had a telephone number that

Match.com subscribers have used to cancel for the majority of this period, however, and that Defendants have represented that their policy and practice has been to accept cancellations via this method for the entire relevant time period.

**REQUEST FOR ADMISSION NO. 19:**

Admit that canceling a Match.com subscription via telephone is simple.

**ANSWER**

Plaintiff objects to this Request as it calls for a legal conclusion as to whether a cancelation method is "simple." Subject to the foregoing objection, Plaintiff denies.

**REQUEST FOR ADMISSION NO. 20:**

Admit that, at all times relevant to Count V in Your Complaint, canceling a Match.com subscription via telephone has been simple.

**ANSWER**

Plaintiff objects to this Request as it calls for a legal conclusion as to whether a cancelation method is "simple." Subject to the foregoing objection, Plaintiff denies.

**REQUEST FOR ADMISSION NO. 21:**

Admit that users are able to cancel their Match.com subscription via mail.

**ANSWER**

Plaintiff admits that a few consumers have cancelled their Match.com subscription by mailing a letter to Defendants and that Defendants have represented that their policy and practice is to accept cancellations via this method.

**REQUEST FOR ADMISSION NO. 22:**

Admit that, at all times relevant to Count V in Your Complaint, users were able to cancel their Match.com subscription via mail.

**ANSWER**

Plaintiff does not have adequate information to admit or deny whether Defendants accepted cancellations via this method for the entire relevant period for Count V, which covers from September 2014 to the present. Plaintiff admits that Match.com has had a mailing address that Match.com subscribers have used to cancel during this period, however, and that Defendants have represented that their policy and practice has been to accept cancellations via this method for the entire relevant time period.

**REQUEST FOR ADMISSION NO. 23:**

Admit that canceling a Match.com subscription via mail is simple.

**ANSWER**

Plaintiff objects to this Request as it calls for a legal conclusion as to whether a cancelation method is "simple." Subject to the foregoing objection, Plaintiff denies.

**REQUEST FOR ADMISSION NO. 24:**

Admit that, at all times relevant to Count V in Your Complaint, canceling a Match.com subscription via mail has been simple.

**ANSWER**
Plaintiff objects to this Request as it calls for a legal conclusion as to whether a cancelation method is "simple." Subject to the foregoing objection, Plaintiff denies.

**REQUEST FOR ADMISSION NO. 25:**
Admit that users are able to cancel their Match.com subscription via fax.

**ANSWER**
Plaintiff admits that Defendants maintain a fax number that a few users have cancelled their subscription by fax.

**REQUEST FOR ADMISSION NO. 26:**
Admit that, at all times relevant to Count V in Your Complaint, users were able to cancel their Match.com subscription via fax.

**ANSWER**
Plaintiff does not have adequate information to admit or deny whether Defendants accepted cancellations via this method for the entire relevant period for Count V, which covers from September 2014 to the present. However, Plaintiff admits that Match.com has maintained a fax number for the majority of this period, that some subset of users have been permitted to cancel via fax, that an extremely limited number of Match.com subscribers have in fact cancelled by fax, and that Defendants have represented that their policy and practice has been to accept cancellations via this method for the entire relevant time period.

**REQUEST FOR ADMISSION NO. 27:**
Admit that canceling a Match.com subscription via fax is simple.

**ANSWER**
Plaintiff objects to this Request as it calls for a legal conclusion as to whether a cancelation method is "simple." Subject to the foregoing objection, Plaintiff denies.

**REQUEST FOR ADMISSION NO. 28:**
Admit that, at all times relevant to Count V in Your Complaint, canceling a Match.com subscription via fax has been simple.

**ANSWER**
Plaintiff objects to this Request as it calls for a legal conclusion as to whether a cancelation method is "simple." Subject to the foregoing objection, Plaintiff denies.

**REQUEST FOR ADMISSION NO. 29:**
Admit that users are able to cancel their Match.com subscription via e-mail.

**ANSWER**
Plaintiff admits that Match.com has an email feature that few Match.com subscribers have used to cancel and that Defendants have represented that their policy and practice is to accept cancellations via this method.

**REQUEST FOR ADMISSION NO. 30:**
Admit that, at all times relevant to Count V in Your Complaint, users were able to cancel their Match.com subscription via e-mail.

**ANSWER**
Plaintiff does not have adequate information to admit or deny whether Defendants accepted cancellations via this method for the entire relevant period for Count V, which covers from September 2014 to the present. However, Plaintiff admits that Match.com has maintained an email address for customers for the majority of this time period, that a limited number of users have cancelled via this method, and that Defendants have represented that their policy and practice has been to accept cancellations via this method for the entire relevant time period.

**REQUEST FOR ADMISSION NO. 31:**
Admit that canceling a Match.com subscription via e-mail is simple.

**ANSWER**
Plaintiff objects to this Request as it calls for a legal conclusion as to whether a cancelation method is "simple." Subject to the foregoing objection, Plaintiff denies.

**REQUEST FOR ADMISSION NO. 32:**
Admit that, at all times relevant to Count V in Your Complaint, canceling a Match.com subscription via e-mail has been simple.

**ANSWER**
Plaintiff objects to this Request as it calls for a legal conclusion as to whether a cancelation method is "simple." Subject to the foregoing objection, Plaintiff denies.

**REQUEST FOR ADMISSION NO. 33:**
Admit that a cancelation method can be simple even if it includes a save offer (meaning an offer to continue a subscription at a discount).

**ANSWER**
Plaintiff admits that it is theoretically possible for a simple cancellation mechanism to include a save offer. However, it is likewise possible that a save offer could render a cancellation mechanism not simple under ROSCA and Section 5 of the FTC Act by, for example, causing confusion or unreasonable delay. The FTC contends that whether a cancellation mechanism is simple or not is a fact-intensive inquiry and depends on the totality of the circumstances.

To the extent this Request is intended to refer to Match.com's online cancelation mechanism, Plaintiff denies. Match.com's online cancellation mechanism does not merely include a save offer.

**REQUEST FOR ADMISSION NO. 34**
Admit that a cancelation method can be simple if it includes a save offer (meaning an offer to continue a subscription at a discount) but the subscriber is not required to answer the question.

**ANSWER**
Plaintiff admits that it is theoretically possible for a simple cancellation mechanism to include a save offer. However, it is likewise possible that a save offer could render a cancellation mechanism not simple under Section 5 and ROSCA by, for example, causing confusion or unreasonable delay. Whether a cancellation mechanism is simple or not is a fact-intensive inquiry and depends on the totality of the circumstances.

To the extent this Request is intended to refer to Match.com's online cancelation mechanism, Plaintiff denies. Match.com's online cancellation mechanism does not merely include a save offer, and the consumer is required to either accept or decline the offer.

**REQUEST FOR ADMISSION NO. 35:**
Admit that a cancelation method can be simple even if it asks a subscriber why they are canceling.

**ANSWER**
Plaintiff denies that it is possible for a simple cancellation mechanism to include a question concerning why a customer is cancelling their subscription. This same information could be solicited without imposing undue delay by merely asking after cancellation is effective.

**REQUEST FOR ADMISSION NO. 36:**
Admit that a cancelation method can be simple if it asks a subscriber why they are canceling but the subscriber is not required to answer the question.

**ANSWER**
Plaintiff denies that it is possible for a simple cancellation mechanism to include a question concerning why a customer is cancelling their subscription. This same information could be solicited without imposing undue delay by merely asking after cancellation is effective.

**REQUEST FOR ADMISSION NO. 37:**
Admit that a cancelation method can be simple even if it asks a subscriber whether they would recommend the service.

**ANSWER**
Plaintiff denies that it is possible for a simple cancellation mechanism to include a single question concerning whether a customer would recommend that service, as this imposes undue delay. This same information could be solicited without imposing undue delay by merely asking after cancellation is effective.

**REQUEST FOR ADMISSION NO. 38:**
Admit that a cancelation method can be simple if it asks a subscriber whether they would recommend the service but the subscriber is not required to answer the question.

**ANSWER**
 Plaintiff denies that it is possible for a simple cancellation mechanism to include a question concerning why a customer is cancelling their subscription. This same information could be solicited without imposing undue delay by merely asking after cancellation is effective.

**REQUEST FOR ADMISSION NO. 39:**
Admit that You never explained what could be done to improve the Online Cancelation Flow at issue in Your Complaint.

**ANSWER**
Plaintiff objects to the Request as irrelevant because the Plaintiff has no obligation to provide the legal advice implied in the Request.

Subject to and without waiving the foregoing objections, Plaintiff denies. The FTC's complaint and discovery responses detail specific failures of Match's cancelation flow, all of which could be modified or removed to improve the cancelation flow. *See* Complaint at ¶¶ 54-57.

**REQUEST FOR ADMISSION NO. 40:**
Admit that the Online Cancelation Flow can be completed within 30 seconds.

**ANSWER**
The FTC admits that videos produced by Defendants show that it is physically possible for an individual to complete the version of Online Cancelation Flow contained in that video within the timeframe specified above, provided they are already familiar with the Online Cancelation Flow and its location on the Match.com website. The FTC admits the same concerning Match.com's current Online Cancellation Flow based on the FTC's review of the current version of Match.com's Online Cancellation Flow.

The FTC denies, however, that such an experience is representative of the typical Match.com customer experience. Most consumers would need to read the account settings menu and the prompts in the Online Cancellation Flow to successfully navigate the flow. Consumers would also need to recall and successfully input their password. As discussed in the FTC's Third Amended Response to Interrogatory No. 2, these prompts contain confusing language, including language that suggests that consumers have successfully cancelled when in fact they have not. As a result, while it is physically possible for an individual to complete the Online Cancellation Flow within the time period specified above, many fail to successfully complete it within this time or at all. The FTC further denies that the fact that it is physically possible for an individual to complete the Online Cancellation Flow within that timeframe renders the Online Cancellation Flow simple, given the myriad problems with the Online Cancellation Flow, as discussed in the FTC's Third Amended Response to Interrogatory No. 2.

**REQUEST FOR ADMISSION NO. 41:**
Admit that the Online Cancelation Flow can be completed within 60 seconds.

**ANSWER**
The FTC admits that videos produced by Defendants show that it is physically possible for an individual to complete the version of Online Cancelation Flow contained in that video within the timeframe specified above, provided they are already familiar with the Online Cancelation Flow and its location on the Match.com website. The FTC admits the same concerning Match.com's current Online Cancellation Flow based on the FTC's review of the current version of Match.com's Online Cancellation Flow.

The FTC denies, however, that such an experience is representative of the typical Match.com customer experience. Most consumers would need to read the account settings menu and the prompts in the Online Cancellation Flow. Consumers would also need to recall and successfully input their password.  As discussed in the FTC's Third Amended Response to Interrogatory No. 2, these prompts contain confusing language, including language that suggests that consumers have successfully cancelled when in fact they have not. As a result, while it is physically possible for an individual to complete the Online Cancellation Flow within the time period specified above, many fail to successfully complete it within this time or at all. The FTC further denies that the fact that it is physically possible for an individual to complete the Online Cancellation Flow within that timeframe renders the Online Cancellation Flow simple, given the myriad problems with the Online Cancellation Flow, as discussed in the FTC's Third Amended Response to Interrogatory No. 2.

**REQUEST FOR ADMISSION NO. 42:**
Admit that the Online Cancelation Flow can be completed within 90 seconds.

**ANSWER**
The FTC admits that videos produced by Defendants show that it is physically possible for an individual to complete the version of Online Cancelation Flow contained in that video within the timeframe specified above, provided they are already familiar with the Online Cancelation Flow and its location on the Match.com website. The FTC admits the same concerning Match.com's current Online Cancellation Flow based on the FTC's review of the current version of Match.com's Online Cancellation Flow.

The FTC denies, however, that such an experience is representative of the typical Match.com customer experience. Most consumers would need to read the account settings menu and the prompts in the Online Cancellation Flow. Consumers would also need to recall and successfully input their password.  As discussed in the FTC's Third Amended Response to Interrogatory No. 2, these prompts contain confusing language, including language that suggests that consumers have successfully cancelled when in fact they have not. As a result, while it is physically possible for an individual to complete the Online Cancellation Flow within the time period specified above, many fail to successfully complete it within this time or at all. The FTC further denies that the fact that it is physically possible for an individual to complete the Online Cancellation Flow within that timeframe renders the Online Cancellation Flow simple, given the myriad

problems with the Online Cancellation Flow, as discussed in the FTC's Third Amended Response to Interrogatory No. 2.

**REQUEST FOR ADMISSION NO. 43:**
Admit that the Online Cancelation Flow can be completed within 120 seconds.

**ANSWER**
The FTC admits that videos produced by Defendants show that it is possible for an individual to complete the version of Online Cancelation Flow contained in that video within the timeframe specified above, provided they are already familiar with the Online Cancelation Flow and its location on the Match.com website. The FTC admits the same concerning Match.com's current Online Cancellation Flow based on the FTC's review of the current version of Match.com's Online Cancellation Flow.

The FTC denies, however, that such an experience is representative of the typical Match.com customer experience. Most consumers would need to read the account settings menu and the prompts in the Online Cancellation Flow. Consumers would also need to recall and successfully input their password.  As discussed in the FTC's Third Amended Response to Interrogatory No. 2, these prompts contain confusing language, including language that suggests that consumers have successfully cancelled when in fact they have not. As a result, while it is physically possible for an individual to complete the Online Cancellation Flow within the time period specified above, many fail to successfully complete it within this time or at all. The FTC further denies that the fact that it is physically possible for an individual to complete the Online Cancellation Flow within that timeframe renders the Online Cancellation Flow simple, given the myriad problems with the Online Cancellation Flow, as discussed in the FTC's Third Amended Response to Interrogatory No. 2.

**REQUEST FOR ADMISSION NO. 44:**
Admit that You did not review the Online Cancelation Flow in any form other than the screenshots of the Online Cancelation Flow included in Your Complaint before You sued Match Group, Inc.

**ANSWER**
Plaintiff objects to this Request as it seeks privileged information, the form of the Online Cancelation Flow is vague, ambiguous, unintelligible, and because it is duplicative. Plaintiff also objects because the requested information is not relevant to any claim or defense in this matter and is not reasonably calculated to lead to discoverable evidence.

**REQUEST FOR ADMISSION NO. 45:**
Admit that You reviewed only the screenshots included in the Complaint of the Online Cancelation Flow, as opposed to any other form of the Online Cancelation Flow, before You sued Match Group, Inc.

**ANSWER**
Plaintiff objects to this Request as it seeks privileged information, form of the Online Cancelation Flow is vague, ambiguous, unintelligible, and because it is duplicative.

Plaintiff also objects because the requested information is not relevant to any claim or defense in this matter and is not reasonably calculated to lead to discoverable evidence.

**REQUEST FOR ADMISSION NO. 46:**
Admit that, on average, 86% of Match.com's free trial members successfully canceled their subscription before being billed.

**ANSWER**
Plaintiff objects to this Request because the information sought is already in Match's possession, custody, or control, and Plaintiff's only access to that data comes from Match's summary representations. Moreover, Plaintiff objects to Match's request because free trial users were frequently fraudulent users that used Match's platform to monetize fraud.

Subject to and without waiving the foregoing objections, Plaintiff is unable to admit or deny this statement, as Plaintiff is not in possession of the data this request refers. Plaintiff admits that Match has represented that 86% of its free trial members successfully canceled their subscription before being billed. However, Plaintiff is unable to independently verify the truth or falsity of this claim.

**REQUEST FOR ADMISSION NO. 47:**
Admit that, on average, a large percentage of Match.com's free trial members successfully canceled their subscription before being billed.

**ANSWER**
Plaintiff objects to this Request as "a large percentage" is vague and ambiguous. Plaintiff also objects to the Request because the information sought is already in Match's possession, custody, or control. Subject to these objections, the FTC can neither admit nor deny because it does not have sufficient information to know the success rate of free trial users attempting to cancel their subscription.

**REQUEST FOR ADMISSION NO. 48:**
Admit that, on average, 89% of Match.com's subscribers successfully canceled their subscription within 24 hours of initiating cancelation.

**ANSWER**
Plaintiff objects to this Request as "initiating cancelation" is vague and ambiguous. Plaintiff also objects to the Request because the information sought is already in Match's possession, custody, or control. Plaintiff admits that Match has represented that on average, 89% of Match.com's subscribers successfully canceled their subscription within 24 hours of initiating cancelation.

Subject to and without waiving the foregoing, the FTC can neither admit nor deny because it does not have sufficient information to know the success rate within 24 hours of Match.com users attempting to cancel their subscription.

**REQUEST FOR ADMISSION NO. 49:**

APP 1165

Admit that, on average, a large percentage of Match.com's subscribers successfully canceled their subscription within 24 hours of initiating cancelation.

**ANSWER**

Plaintiff objects to this Request as "a large percentage" and "initiating cancelation" are vague and ambiguous. Plaintiff also objects to the Request because the information sought is already in Match's possession, custody, or control. Subject to and without waiving the foregoing objections, the FTC can neither admit nor deny because it does not have sufficient information to know the success rate within 24 hours of Match.com users attempting to cancel their subscription.

**REQUEST FOR ADMISSION NO. 50:**

Admit that, of the percentage of Match.com subscribers that do not successfully cancel their subscription within 24 hours of initiating cancelation, some percentage of Match.com subscribers take advantage of a save offer (meaning an offer to continue a subscription at a discount).

**ANSWER**

Plaintiff objects to this Request as "some percentage" is vague, ambiguous, and unintelligible, and "initiating cancelation" is vague and ambiguous. Plaintiff also objects to the Request because the information sought is in Match's possession, custody, or control. Plaintiff admits that Match has represented that of the percentage of Match.com subscribers that do not successfully cancel their subscription within 24 hours of initiating cancelation, some percentage of Match.com subscribers take advantage of a save offer (meaning an offer to continue a subscription at a discount).

Subject to and without waiving the foregoing, the FTC can neither admit nor deny because it does not have sufficient information to know what percentage, if any, of Match.com users who attempt to cancel accept Match.com's save offer.

Date: November 29, 2022            _/s/ Reid Tepfer_
                                   REID TEPFER
                                   M. HASAN AIJAZ
                                   SARAH ZUCKERMAN (admitted pro hac vice)
                                   JOHN R. O'GORMAN (admitted pro hac vice)
                                   ERICA ROLLINS HILLIARD
                                   Texas Bar No. 24079444 (Tepfer)
                                   Virginia Bar No. 80073 (Aijaz)
                                   New York Bar No. 5603832 (Zuckerman)
                                   Texas Bar No. 2421292 (O'Gorman)
                                   Mississippi Bar No. 104244 (Hilliard)
                                   Federal Trade Commission
                                   1999 Bryan Street, Suite 2150
                                   Dallas, Texas 75201
                                   T: (214) 979-9395 (Tepfer)

16

T: (214) 979-9386 (Aijaz)
T: (214) 979-9376 (Zuckerman)
T: (214) 979-9382 (O'Gorman)
T: (214) 979-9379 (Hilliard)
Email: rtepfer@ftc.gov;
maijaz@ftc.gov;
szuckerman@ftc.gov;
jogorman@ftc.gov;
ehilliard@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

**APP 1167**

## CERTIFICATE OF SERVICE

I, REID TEPFER, certify that, on November 29, 2022, I served the foregoing Plaintiff's Responses to Defendant's First set of Interrogatories by email on the following counsel of record at the email address listed below:

Angela C. Zambrano
angela.zambrano@sidley.com
Chad Hummel
chummel@sidley.com
Sidley Austin LLP

*Attorneys for Defendant*
*Match Group, Inc.*

By: /s/ REID TEPFER

# EXHIBIT V

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| vs. | Case No. 3:19-cv-02281-K |
| MATCH GROUP, INC., a corporation, | |
| Defendant. | |

**DEFENDANT MATCH GROUP, INC'S SECOND AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF FEDERAL TRADE COMMISSION'S FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Rules") Defendant Match Group, Inc. ("Match"), by and through its undersigned counsel, amends its objections and responses (the "Second Amended Responses")[1] to Plaintiff Federal Trade Commission's ("Plaintiff" or "FTC") First Set of Interrogatories (each an "Interrogatory" and, collectively, the "Interrogatories") as follows:

## I.      GENERAL OBJECTIONS

1.      <u>Irrelevant</u>. Match objects to each and every Interrogatory to the extent that it purports to seek information that is irrelevant to Plaintiff's claims and is not reasonably calculated to lead to the discovery of admissible evidence. In particular, Match objects to each and every

---

[1] The following defined terms are used in these Second Amended Responses:

(1) The Match.com guarantee at issue in Count III of the Amended Complaint (defined below) is the "Guarantee."

(2) The Match.com chargeback policy at issue in Count IV of the Amended Complaint is the "Chargeback Policy."

(3) The Order that Magistrate Judge Ramirez issued on November 1, 2022 (Dkt. 164), overruling Match Group, Inc.'s objections at issue in Disputed Issue #1 of the FTC's Amended Joint Submission regarding whether Match Group, Inc. may refuse to engage in discovery simply because Match Group, Inc. contends that the conduct at issue in Counts III and IV has been permanently discontinued (Dkt. 149 at 2) is the "November 1 Order."

(4) Match Group, LLC, which is the entity that owns and operates Match.com, is "MGL."

(5) Match Group, Inc. is "MGI."

Interrogatory to the extent that it seeks information relevant only to the claims that were dismissed in the Court's March 24, 2022 Order on Match's Motion to Dismiss (the "Dismissed Claims").[2] For the avoidance of doubt, Match will not withhold information merely because it is related to the Dismissed Claims, if such information is otherwise responsive to the Interrogatories related to non-dismissed claims. Match further objects to each and every Interrogatory to the extent that it seeks documents or information from an entity or dating site not named in the present litigation in any operative pleading, including but not limited to OKCupid, Plenty of Fish, and Tinder. These responses are being provided solely by Match Group, Inc. based on information within its possession, custody and control.

2.      <u>Undue Burden</u>. Match objects to each and every Interrogatory to the extent that it seeks to impose obligations beyond what is required under the Rules or Local Rules or is unduly burdensome. Accordingly, Match objects to each and every Interrogatory where the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

3.      <u>Overbroad</u>. Match objects to each and every Interrogatory to the extent that it seeks information that is beyond the scope of Plaintiff's claims, including, but not limited to, documents and information related to Plaintiff's Dismissed Claims, and documents and information related to entities or dating sites that are not yet party to, or otherwise related to, this litigation, such as OKCupid, Plenty of Fish, and Tinder. Match further objects to each and every Interrogatory to the extent that it seeks documents and information that are not within Match's possession, custody, or

---

[2] ECF No. 86 (dismissing Counts I & II of FTC's Original Complaint, filed on September 25, 2019, at ECF No. 1, due to Match's affirmative defense of CDA § 230 immunity). The FTC amended its Original Complaint on July 19, 2022, ECF No. 116. All references herein to the Complaint refer to the operative Complaint.

control, including by seeking documents and information from and related to entities that are not named as parties to this litigation.

4.      <u>Privilege</u>. Match objects to each and every Interrogatory to the extent it seeks documents or information that is subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity from discovery (including, without limitation, all communications with, or work product of, any outside attorney) (collectively, "Privileged Information"). Any inadvertent disclosure of Privileged Information by Match shall not constitute a waiver of any applicable privilege, doctrine, or immunity.

5.      <u>Vagueness and Ambiguity</u>. Match objects to each and every Interrogatory to the extent that such Interrogatory is so vague, ambiguous, or confusing as not to be susceptible to a reasoned interpretation or response. In the absence of clear instructions or definitions associated with terms that are too vague, ambiguous, or confusing, Match will give the terms used in the Interrogatory a reasonable interpretation.

6.      <u>Accessibility</u>. Match objects to each and every Interrogatory to the extent that it seeks information that is not reasonably accessible in the ordinary course of business.

7.      <u>Cumulative Interrogatories and Availability of Information Elsewhere</u>. Match objects to each and every Interrogatory that is cumulative, duplicative of, or to which documents or information already are in the possession, custody, or control of Plaintiff, or have been or could be obtained from another source that is equally available to Plaintiff or is more convenient, less burdensome, or less expensive. In particular, Match objects to each and every Interrogatory insofar as it seeks documents or information already obtained by Plaintiff during the FTC's prior investigation in connection with the Civil Investigative Demand served on Match in 2017 (the "2017 CID"). For the avoidance of doubt, Match will comply with the ESI Order, which provides,

"The parties need not re-produce in discovery documents that were already produced to the FTC in response to the FTC's CID. Instead, the parties will refer to the bates number of the relevant documents." ECF No. 132 at 4.

8.      <u>Lack of Possession, Custody, or Control</u>. Match objects to each Interrogatory to the extent it does not appear to be addressed to Match and seeks information that is necessarily outside Match's knowledge.

9.      <u>Legal Conclusions</u>. Match objects to each and every Interrogatory to the extent that it requires Match to draw legal conclusions.

10.     <u>Reservation of Right to Supplement</u>. Given the stage of the litigation, Match has not completed its investigation of the facts or law relating to this action, and discovery in this matter is ongoing. Accordingly, consistent with the Rules, these responses and objections are made without prejudice to, and are not a waiver of, Match's right to amend, correct, or supplement these responses, and are subject to Match's right to produce evidence of any subsequently discovered facts, or additional facts, information, or documents that may exist. Match provides these responses in good faith after reasonable inquiry and based on information that it knows or can readily obtain.

11.     <u>No Waiver</u>. By responding to these Interrogatories, Match does not concede the relevancy of an Interrogatory, nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to a particular Interrogatory does not mean that it is probative of any particular issue in this case. Match expressly reserves its right to assert any and all objections to the admissibility of any responses into evidence at any hearing or trial of this proceeding, or in any other actions or proceedings, on any and all grounds, including, but not limited to, competency, relevancy, materiality, privilege, confidentiality, hearsay, or admissibility as evidence for any other purpose. Moreover, the right to object on any

ground to the use of the responses or information provided, in any aspect of this or any other court action, arbitration, or judicial or administrative proceeding or investigation, is reserved.

## II.     SPECIFIC OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.     Match specifically objects to the Interrogatories' Instructions and Definitions to the extent they purport to impose obligations on Match that exceed those imposed by the Rules and the Local Rules. In responding to these Interrogatories, Match will follow the requirements set forth in the Rules and the Local Rules.

2.     Match specifically objects to the definitions of "Match," the "Company," and "You" because they are vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines these term as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." This definition necessarily and inappropriately includes attorneys and other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Match objects to Plaintiff's definitions of "Match," the "Company," and "You" as defined to "include any descriptor used by Match in its business practice," again encompassing other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. In responding to these Interrogatories, Match will construe the terms "Match," the "Company," and "You" to refer only to Match Group, Inc.

3.     Match specifically objects to the definitions of "and" and "or" and because they are ambiguous and confusing. Match will interpret these terms to have their plain, ordinary, and common sense meaning. Match further objects to these definitions to the extent they purport to impose obligations on Match that exceed those imposed by the Rules. Match objects to the

definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case and exceedingly burdensome. In responding to these Interrogatories, Match will comply with the Rules and the Local Rules.

4.      Match specifically objects to the definition of "any" as ambiguous and confusing. Match will interpret this term to have its plain, ordinary, and common sense meaning. Match further objects to this definition to the extent it purports to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of this term as overly broad, unduly burdensome, and oppressive to the extent it purports to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, Match will comply with the Rules and the Local Rules.

5.      Match specifically objects to the definitions of "Customer" and "Customers" as overbroad, unduly burdensome, and oppressive, insofar as they purport to cover individual(s) "who have maintained an account on *any website* owned or operated by the Company, including OKCupid, Plenty of Fish, and Tinder," which Match does not actually own or operate, and which encompasses websites and entities that are not party to, or otherwise related to, the present litigation. Match further objects that the definitions of "Customer" and "Customers" are thus not tailored to the allegations in the complaint, not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence. In responding to these Interrogatories, Match will construe the terms "Customer" and "Customers" to refer only to Customer(s) of Match.com.

6.      Match objects to the definition of "Document" as overly broad and unduly burdensome. Match further objects to this definition to the extent it refers to items outside of

Match's possession, custody, or control, particularly through its use of the phrases "regardless of origin or location" and "however and by whomever prepared, produced, disseminated, or made." Match further objects to this definition to the extent it refers to items in Plaintiff's possession, custody, or control, or to items that have been or could be obtained from another source that is equally available to Plaintiff or is more convenient, less burdensome, or less expensive. Match further objects to this definition to the extent it purports to impose obligations on Match that exceed those required by the Rules. In responding to these Interrogatories, Match will interpret the word "Document" to have its plain, ordinary, and common sense meaning and will comply with the Rules.

7.      Match specifically objects to the definition of "each" as ambiguous and confusing. Match will interpret this term to have its plain, ordinary, and common sense meaning. Match further objects to this definition to the extent it purports to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of this term as overly broad, unduly burdensome, and oppressive to the extent it purports to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, Match will comply with the Rules and the Local Rules.

8.      Match specifically objects to the definitions of "Identity" and "the identity of" and because they are ambiguous and confusing. Match will interpret these terms to have their plain, ordinary, and common sense meaning. Match further objects to these definitions to the extent they purport to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor

proportional to the needs of the case. In responding to these Interrogatories, Match will comply with the Rules and the Local Rules.

9.      Match specifically objects to the definition of "Match Group, LLC" as vague, ambiguous, confusing, and overbroad.

10.      Match objects to the definition of "OKCupid," because it is overbroad, ambiguous, and confusing. Match further objects to the definition of "OKCupid" as irrelevant, since OKCupid is not referenced in the operative Complaint, and thus any Interrogatory relying on the definition of "OKCupid" is not proportional to the needs of the case and is unduly burdensome.

11.      Match objects to the definition of "Plenty of Fish," because it is overbroad, ambiguous, and confusing. Match further objects to the definition of "Plenty of Fish" as irrelevant, since Plenty of Fish is not even referenced in the Complaint, and thus any Interrogatory relying on the definition of "Plenty of Fish" is not proportional to the needs of the case and is unduly burdensome.

12.      Match specifically objects to the definitions of "referring to" and "relating to" and because they are ambiguous and confusing. Match will interpret these terms to have their plain, ordinary, and common sense meaning. Match further objects to these definitions to the extent they purport to impose obligations on Match that exceed those imposed by the Rules. Match objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, Match will comply with the Rules and the Local Rules.

13.      Match specifically objects to the definition of "Subscriber" as overbroad, unduly burdensome, and oppressive, insofar as it purports to cover a "Subscriber" to "any website owned

or operated by" Match, which would necessarily encompass websites and entities that are not party to, or otherwise related to, the present litigation. Match further objects that the definition of "Subscriber" is thus not tailored to the allegations in the complaint and not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence. In responding to these Interrogatories, Match will construe the term "Subscriber" to refer only to Subscribers to Match.com.

14.     Match objects to the definition of "Tinder," because it is overbroad, ambiguous, and confusing. Match further objects to the definition of "Tinder" as irrelevant, since Tinder is not even referenced in the Complaint, and thus any Interrogatory relying on the definition of "Tinder" is not proportional to the needs of the case and is unduly burdensome.

15.     The foregoing general objections and specific objections to the instructions and definitions provided by Plaintiff shall be fully incorporated by reference into each of the below specific objections to the Interrogatories.

## III.     SPECIFIC OBJECTIONS AND RESPONSES TO THE INTERROGATORIES

**INTERROGATORY NO. 1:** Identify, including by job title, place of employment, and dates of service, all persons that Match consulted with while preparing its response to the 2017 CID, Plaintiff's First Set of Interrogatories, Plaintiff's First Requests for Production, Plaintiff's First Request for Admission, or any other submission or presentation the Company sent to the FTC. For each such person, state the 2017 CID request, discovery request, interrogatory, or other submission or presentation for which the person answered or otherwise assisted in answering.

**RESPONSE:** Match objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee" or maintained a "Chargeback" policy. Match.com has permanently discontinued the "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," and Match has repeatedly told the FTC this orally and in writing. Match is

prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects to this Interrogatory because, by asking for the identity of all persons that Match "consulted with" in responding to the FTC's CID or discovery requests, it seeks documents or information that is subject to the attorney-client privilege and work-product doctrine. The FTC is not entitled to know the identity of every individual with whom Match's attorneys consulted.

**SECOND AMENDED RESPONSE:** Based on the November 1 Order, MGI responds that it is not withholding documents or information due to the permanent discontinuation of the Guarantee or Chargeback Policy in Counts III and IV, but MGI cannot respond with the identity of all persons that MGI "consulted with" in responding to the FTC's CID or discovery requests because such information is subject to the attorney-client privilege and work-product doctrine.

**INTERROGATORY NO. 2:** Describe any criteria Match uses or has used to determine whether to grant a Customer's request for a refund relating to PTR Ads, fraud or alleged fraud, Match Guarantees, consumer's belief that they had already canceled their subscription, or his or her claimed lack of knowledge about recurring charges.

**RESPONSE:** Match objects to this Interrogatory because "PTR Ads" is vague and undefined, and to the extent this Interrogatory seeks Privileged Information. Match further objects to this

Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee." Match.com has permanently discontinued the "Match Guarantee" and related practices, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects to this Interrogatory as irrelevant, overly broad, unduly burdensome, and disproportionate to the needs of the case, in that it seeks information that is beyond the scope of Plaintiff's Complaint, because Count I and II relating to PTR Ads and fraud or alleged fraud were dismissed with prejudice by the Court on March 24, 2022. *See* ECF No. 86 ("The Court [] grants Defendant Match Group, Inc.'s Motion to Dismiss Counts I and II because Match is entitled to immunity under 47 U.S.C. § 230 of the Communications Decency Act, thus those claims are barred and dismissed with prejudice."). Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single

questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

Subject to and without waiving the foregoing objections, Match responds as follows: Match Group, Inc. does not use any criteria to determine whether to grant a Match.com Customer's request for a refund relating to a consumer's belief that they had already canceled their subscription, or his or her claimed lack of knowledge about recurring charges because Match Group, Inc. does not own or operate Match.com. Match expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**SECOND AMENDED RESPONSE:** Based on the November 1 Order, MGI responds that MGI does not use any criteria to determine whether to grant a Match.com customer's request for a refund relating to the Guarantee because MGI does not own or operate Match.com. This Interrogatory will be answered by MGL in response to Interrogatory No. 3 that the FTC served on MGL.

**INTERROGATORY NO. 3:** Identify and describe in complete detail the full basis for each affirmative defense You have asserted in Your Answer, including but not limited to every fact and document that supports, contradicts, refutes, or rebuts that particular affirmative defense, and every witness who may have information or testimony relevant to that particular defense.

**RESPONSE:** Match objects to this Interrogatory because "relevant" is vague and undefined and to the extent this Interrogatory seeks Privileged Information. Match further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee" or maintained a Chargeback policy. Match.com has permanently discontinued the "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation

in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects that this Interrogatory is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "You" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." Plaintiff's definition of "You" necessarily and inappropriately includes other entities or dating sites that are not relevant to the claims or allegations in the Complaint. Match also objects to this Interrogatory as premature and to the extent it seeks to require Match to marshal all of its evidence before trial. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules. Match also objects to this Interrogatory to the extent it seeks to require Match to provide information that is not in its possession, custody, or control, or that is already in Plaintiff's possession, custody, or control.

Subject to and without waiving the foregoing objections, Match responds as follows:

First Affirmative Defense (Failure to State a Claim): Match asserts FTC's Complaint fails to state a claim, including because the Complaint names the wrong entity. Since March 2017, when the FTC served Match Group, Inc. with the Civil Investigative Demand ("CID"), Match has repeatedly informed the FTC that Match Group, Inc. is in fact a separate holding company, and Match Group, LLC (formerly named Match.com, LLC) actually owns and operates Match.com. For example, Match stated in its May 15, 2017 Interrogatory Responses to the FTC's CID that Match.com, LLC is the general operating company that operates Match.com. Delaware Secretary of State records show that Match.com, LLC filed a certificate of amendment on September 12, 2017, changing its name from Match.com, LLC to Match Group, LLC. Match continued to raise these concerns in a December 16, 2018 White Paper and in negotiating a potential Consent Order with the FTC. Additionally, shortly after the Complaint was served, counsel for Match emailed the FTC to again inform it that Match Group, Inc. was incorrectly named as a defendant in the lawsuit and should be voluntarily dismissed. *See* Dkt. 21 at 35. Counsel for the FTC acknowledged the email but declined to voluntarily dismiss the Complaint against Match Group, Inc. *See id.* at 37.

The Complaint fails to state a claim for the additional reason that the Guarantee and Chargeback policy at issue in the Complaint were discontinued prior to the FTC filing suit, and there are no plans to resume those practices, as the FTC is aware from multiple communications. Thus, both Match Group, Inc. and Match.com are not violating, nor are they about to violate, the FTC Act.

Second Affirmative Defense (Compliance with Applicable Law): The Complaint's Count V fails as Match did not violate Section 4 of ROSCA, 15 U.S.C. § 8403. As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged

in the practices at issue in the Complaint. Rather, at all times with respect to Count V, Match.com complied with all applicable laws and acted reasonably and in good faith. As a preliminary matter, even assuming that the online cancelation flow at issue in Count V is not simple (although it is), the plain language of ROSCA requires only "simple mechanisms" for cancelation, and ROSCA does not provide that every cancelation method must be simple. Count V fails because Match.com offers several other cancelation methods in full compliance with ROSCA, including simple methods to cancel by phone, fax, email, internet chat, or standard mail, and the FTC challenges only the online cancelation method. Thus, even if the FTC were correct (which it is not) that the online cancelation flow is not simple, the existence of other unchallenged methods of cancelation defeats the FTC's claim.

Count V also fails because the Match.com online cancelation flow is not complicated or in any material way different from numerous other online subscription cancelation mechanisms. It is essentially industry standard. Consumers in fact readily canceled using the Match.com online cancelation flow, as reflected by data proving that subscribers have no difficulty canceling via the online cancelation flow, which can be completed in less than one minute. Based on data reviewed during the FTC's pre-suit investigation, on average, 89% of Match.com subscribers who initiated an online cancelation request successfully canceled their subscription within the same day.

Third Affirmative Defense (Good Faith Belief and Conduct): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. Match.com's subscription cancelation flow was designed and implemented to be simple and readily accessible to users.

Fourth Affirmative Defense (Requested Relief Contrary to Public Policy): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged

in the practices at issue in the Complaint. The FTC's requested relief with respect to Count V is contrary to the public interest because Match.com's online cancelation flow is intended to benefit consumers by protecting their privacy (by requiring them to insert their passwords prior to accessing private account information, such as billing), offering them discounted rates, and allowing Match.com to understand how to better serve them.

Fifth Affirmative Defense (Alleged Failure to Clearly and Conspicuously Disclose Not Material): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. Any alleged failure by Match.com to clearly and conspicuously disclose some requirements of the guarantee practice was not material because most consumers who did not qualify for the guarantee failed to satisfy the requirements that were unquestionably adequately disclosed (i.e., the requirements in the numbered and bullet-pointed list in the Program Rules). So even had other requirements been *more* clearly and conspicuously disclosed (or waived), most users would not have been eligible for a guarantee regardless.

Sixth Affirmative Defense (Mootness): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. As to Count III, Match asserts the FTC's claim for injunctive relief is moot under applicable law. The FTC admits in its Complaint that this guarantee practice at issue in Count III ceased in mid-2019 (but it was actually permanently discontinued in April 2019). Match asserts Count IV is also moot, because, as the FTC admits in its Complaint, Match.com's chargeback practice ceased in mid-2019 (but it was actually permanently discontinued in March 2019). Count IV's claim for injunctive relief is therefore also moot. There is nothing to enjoin because the challenged practices have been discontinued.

Seventh Affirmative Defense (Overbroad Injunction): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. The FTC's requested injunction with respect to Count III and the "guarantee" practice is overbroad and not specifically tailored to the violations alleged in the Complaint. The FTC's requested injunction with respect to Count IV and the chargeback policy is overbroad and not specifically tailored to the violations alleged in the Complaint. Finally, the FTC's requested injunction is overbroad and not specifically tailored to the violations alleged in the Complaint. In particular, the FTC's requested injunction is overbroad not only because the Complaint fails to allege all necessary facts, but also because the FTC attempts to apply such injunction to Match Group, Inc., which does not own or operate Match.com, and to brands other than Match.com that are not implicated by the Complaint.

Eighth Affirmative Defense (Mitigation): As a preliminary matter, Match Group, Inc. does not own or operate Match.com and thus could not have engaged in the practices at issue in the Complaint. With respect to Count V, the FTC has not offered any reliable methodology for quantifying alleged consumer harm, and any restitution amount would be subject to mitigation to the extent that consumers received refunds or utilized the services on the renewed subscription.

Ninth Affirmative Defense (Reservation of Other Affirmative Defenses): Match lacks sufficient information regarding the facts and evidence alleged and is therefore unable to ascertain at this time any additional affirmative defenses which Match may have. Therefore, Match expressly reserves the right to amend its Answer to assert such other affirmative defenses as may become apparent subsequent to the filing of its Answer, whether in discovery, at trial, or otherwise.

Match expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**FIRST AMENDED RESPONSE:** For the avoidance of doubt, the Match Guarantee and Chargeback practices challenged in the Complaint were permanently discontinued in April 2019 and March 2019, respectively, and Match.com will not reinstitute those practices.

**INTERROGATORY NO. 4:** Identify any tests, reports, A/B testing, Customer surveys, usability tests, focus groups, or other user experience studies, whether formal or informal, You have conducted related to:

      a.      Match Guarantees;

      b.      Chargebacks; and

      c.      means of subscription renewal or cancellation.

Your response to this Interrogatory should include descriptions of the types of usability studies, beta studies, and surveys that the response covers. In addition, please provide Your response in machine-readable format, for example, in a .csv or spreadsheet file format.

**RESPONSE:** Match objects to this Interrogatory because "tests," "reports," "A/B testing," "surveys," "usability tests," "focus groups," "user experience studies," "formal," and "informal" are vague and undefined, and to the extent this Interrogatory seeks Privileged Information. Match further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee" or maintained a Chargeback policy. Match.com has permanently discontinued the "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has

also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects that this Interrogatory is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "You" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." Plaintiff's definition of "You" necessarily and inappropriately includes other entities or dating sites that are not relevant to the claims or allegations in the Complaint. Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

Subject to and without waiving the foregoing objections, Match responds with respect to subpart (c) as follows: pursuant to Federal Rule of Civil Procedure 33(d), Match directs the FTC to any documents that will be produced in response to the FTC's RFP No. 26. Match expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**SECOND AMENDED RESPONSE:** Based on the November 1 Order, MGI responds with respect to subparts (a) and (b) as follows: pursuant to Federal Rule of Civil Procedure 33(d), MGI

directs the FTC to any documents produced in response to the FTC's RFP No. 26 to MGI or to the

FTC's RFP No. 33 to MGL.

**INTERROGATORY NO. 5:** On a monthly basis, state:

    a.      the number of Match.com subscriptions subject to the Guarantee sold;

    b.      the number of Guarantee Extensions that Match provided Customers;

    c.      the number of Customer inquiries regarding the automatic renewal of subscriptions subject to the Match Guarantee;

    d.      the number of refund requests Customers submitted to Match relating to Match Guarantees and the dollar amount of these requested refunds; and

    e.      the number of refunds Match granted relating to Match Guarantees and the amount of money refunded relating to Match Guarantees.

**RESPONSE:** Match objects to this Interrogatory because "subscriptions" and "inquires" are

vague and undefined and to the extent this Interrogatory seeks Privileged Information. Match

further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to

either party's claims or defenses and is not proportional to the needs of the case. Match further

objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of

"Match Guarantee" or maintained a Chargeback policy. Match.com has permanently discontinued

the "Match Guarantee" and related practices, and Match has repeatedly told the FTC this orally

and in writing.  Match is prepared to enter a binding stipulation in a form acceptable to the Court

that Match could never and would never, and Match.com would never, engage in the conduct

challenged in Counts III and IV in the Complaint, to which this discovery solely relates. The FTC

has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the

question of whether any injunctive relief should be issued that addresses this alleged conduct is

moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim

by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these

reasons, discovery into the questions of what occurred or whether the alleged conduct related to

the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Match further objects that this Interrogatory is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Match" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." Plaintiff's definition of "Match" necessarily and inappropriately includes other entities or dating sites that are not relevant to the claims or allegations in the Complaint. Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

**SECOND AMENDED RESPONSE:** Based on the November 1 Order, MGI responds that, before the Guarantee was permanently discontinued, MGI did not provide any Guarantee Extension to customers or issue refunds relating to the Guarantee because MGI does not own or operate Match.com. This Interrogatory will be answered by MGL in response to Interrogatory No. 8 that the FTC served on MGL. As provided by MGL in response to Interrogatory No. 8, that Interrogatory will be answered pursuant to Rule 33(d) by producing a document containing data responsive to the Interrogatory. Once produced, the document will be identified by Bates number.

**INTERROGATORY NO. 6:** State all limitations on Customers' rights to redeem a Match Guarantee or receive a Guarantee Extension and all actions consumers had to complete to redeem a Match Guarantee or receive a Guarantee Extension. For each such limitation or action Identify:

    a.    the date such limitation was implemented and/or eliminated;

    b.    all advertisements, notices, disclosures, or other notifications where Match disclosed the need to complete that action; and

    c.    The number of consumers whose request for a Guarantee Extension were denied due to that limitation or for failing to complete that particular action.

**RESPONSE:** Match objects to this Interrogatory because "rights to redeem," "that limitation," and "that particular action" are vague and undefined and to the extent this Interrogatory seeks Privileged Information. Match further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever offered any kind of "Match Guarantee." Match.com has permanently discontinued the "Match Guarantee" and related practices, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint, to which this discovery solely relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

**SECOND AMENDED RESPONSE:** Based on the November 1 Order, MGI responds that, before the Guarantee was permanently discontinued, MGI did not make any disclosures regarding the Guarantee because MGI does not own or operate Match.com. MGI directs the FTC to MGL's responses to duplicative Interrogatory Nos. 9 and 11 that the FTC served on MGL.

**INTERROGATORY NO. 7:** Describe all of Match's policies relating to Customer Chargebacks, including regarding:

    a.    the circumstances in which Match will dispute a Customer Chargeback;

    b.    denying Customer account access due to a Chargeback request;

    c.    deleting or reinstating accounts of consumers who unsuccessfully attempt a Chargeback and when such deletions or reinstatements are effective; and

    d.    the effective dates of the policies.

**RESPONSE:** Match objects to the extent this Interrogatory seeks Privileged Information. Match further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to either party's claims or defenses and is not proportional to the needs of the case. Match further objects to this Interrogatory insofar as it suggests that Match Group, Inc. ever had any policy relating to a Chargeback—or offered any kind of "Match Guarantee" or maintained a Chargeback policy. Match.com has permanently discontinued "Chargebacks" and related practices, and Match has repeatedly told the FTC this orally and in writing. Match is prepared to enter a binding stipulation in a form acceptable to the Court that Match could never and would never, and Match.com would never, engage in the conduct challenged in Counts III and IV in the Complaint,

to which this discovery solely relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The Court has also dismissed with prejudice any claim by the FTC for monetary relief based on the conduct at issue in this Interrogatory. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass.

Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules. Match also objects to this Interrogatory to the extent it seeks to require Match to provide information that is not in its possession, custody, or control, or that is already in Plaintiff's possession, custody, or control.

**SECOND AMENDED RESPONSE:** Based on the November 1 Order, MGI responds that MGI does not have any Match.com chargeback policies because MGI does not own or operate Match.com. This Interrogatory will be answered by MGL in response to Interrogatory No. 12 that the FTC served on MGL.

**INTERROGATORY NO. 8:** On a monthly basis, state:

a. the number of Customer communications Match received regarding account cancellation or cancellation processes;

b. the number of refund requests made by Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

c. the dollar value of the refund requests made by Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

d. the number of refunds Match provided to Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

e. the dollar value of the refunds provided to Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

f. the amount charged to Customers who had requested a refund on the basis that they believed they had cancelled and had this request denied by Match; and

g. the amount charged to Customers who had requested a refund on the basis that they were unaware of Match's recurring charge and had this request denied by Match.

**RESPONSE:** Match objects to this Interrogatory because "communications," "account cancellation or cancellation processes," "attempted," "believed," and "claimed," are vague and undefined and to the extent this Interrogatory seeks Privileged Information. Match further objects that this Interrogatory is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Match" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." Plaintiff's definition of "Match" necessarily and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "Match," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules. Match also objects to this Interrogatory to the extent it seeks to require Match to provide information that is not in its possession, custody, or

control, or that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, Match does not concede the relevancy of this Interrogatory nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case.

Subject to and without waiving the foregoing objections, Match responds as follows: Match Group, Inc. has not received any Customer communications or refund requests because Match Group, Inc. does not own or operate Match.com (or any other dating site).

Match expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 9:** Describe each method through which consumers could cancel their subscriptions. For each such method, describe in detail:

    a.      how Match informed or disclosed to consumers the availability of each method;

    b.      each step that consumers would have to take in order to successfully cancel;

    c.      each representation that Match would make to consumers at each step in the cancellation process; and

    d.      by month, how many Customers attempted to cancel via that particular method;

    e.      by month, how many Customers successfully canceled via that particular method.

**RESPONSE:** Match objects to this Interrogatory because "attempted" is vague and undefined and to the extent this Interrogatory seeks Privileged Information. Match further objects that this Interrogatory is vague, ambiguous, confusing, irrelevant, not proportional to the needs of the case, and overly burdensome in that Plaintiff defines "Match" as including "Match Group, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing." Plaintiff's definition of "Match" necessarily

and inappropriately includes other entities that are not relevant to the claims or allegations in the Complaint. Furthermore, Plaintiff's definition of "Match," which is defined to "include any descriptor used by Match in its business practice," encompasses other entities and dating sites that are not relevant to this matter, including, but not limited to, OKCupid, Plenty of Fish, and Tinder. Additionally, Match objects to this Interrogatory as it includes more than one single discrete question, and incorporates definitions that further imbed a series of subpart questions, ultimately violating the Rules that limit each party to 25 single questions, including subparts. Match also objects to this Interrogatory as premature and to the extent it seeks to require Match to marshal all of its evidence before trial. Match further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules. Match also objects to this Interrogatory to the extent it seeks to require Match to provide information that is not in its possession, custody, or control, or that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, Match does not concede the relevancy of this Interrogatory nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case.

Subject to and without waiving the foregoing objections, Match responds as follows: Match Group, Inc. does not inform, disclose to, or make representations to Match.com subscribers, because Match Group, Inc. does not own or operate Match.com (or any other dating site). Therefore, Match Group, Inc. does not have the cancelation data requested by this Interrogatory.

Match expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

Dated: January 12, 2023

*/s/ Angela C. Zambrano*
Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Fax: 214.981.3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310.595.9500
Fax: 310.595.9501

*Attorneys for Match Group, Inc. and*
*Match Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the above and forgoing document

was served on all counsel of record via e-mail as outlined below on January 12, 2023.

Reid Abram Tepfer
rtepfer@ftc.gov
M Hasan Aijaz
maijaz@ftc.gov
Matthew James Wilshire
mwilshire@ftc.gov
Sarah Zuckerman
szuckerman@ftc.gov
John R. O'Gorman
jogorman@ftc.gov
Erica Rollins Hilliard
ehilliard@ftc.gov

*/s/  Angela C. Zambrano*
Angela C. Zambrano

# EXHIBIT W

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>      Plaintiff,<br><br> vs.<br><br>MATCH GROUP, INC., a corporation, and MATCH GROUP, LLC, formerly known as MATCH.COM, LLC, a limited liability company,<br><br>      Defendants. | Case No. 3:19-cv-02281-K |

## DEFENDANT MATCH GROUP, LLC'S SECOND AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF FEDERAL TRADE COMMISSION'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Rules") Defendant Match Group, LLC ("MGL"), by and through its undersigned counsel, amends its objections and responses (the "Second Amended Responses") to Plaintiff Federal Trade Commission ("Plaintiff" or "FTC") First Set of Interrogatories to MGL (each an "Interrogatory" and, collectively, the "Interrogatories")[1] as follows:

---

[1] MGL amended its objections and responses to the Interrogatories on January 12, 2023 (the "First Amended Responses"). The following defined terms are used in the First Amended Responses:

(1) The Match.com guarantee at issue in Count III of the Amended Complaint (defined below) is the "Guarantee."

(2) The Match.com chargeback policy at issue in Count IV of the Amended Complaint is the "Chargeback Policy."

(3) The Order that Magistrate Judge Ramirez issued on November 1, 2022 (Dkt. 164), overruling MGI's (defined below) objections at issue in Disputed Issue #1 of the FTC's Amended Joint Submission regarding whether MGI may refuse to engage in discovery simply because MGI contends that the conduct at issue in Counts III and IV has been permanently discontinued (Dkt. 149 at 2) is the "November 1 Order."

(4) The FTC and MGL's agreement reached on October 18, 2022, that "[t]o the extent that MGL makes the same objections that MGI made (e.g., relevance/burden with regard to Counts III and IV) and the Court decides those issues, . . . both sides will be bound by the Court's decision on those overlapping issues" is the "Counts III and IV Agreement."

MATCH GROUP, LLC'S SECOND AMENDED OBJECTIONS AND RESPONSES
TO PLAINTIFF'S FIRST SET OF INTERROGATORIES      1

APP 1200

# I.  GENERAL OBJECTIONS

1.    <u>Irrelevant</u>. MGL objects to each and every Interrogatory to the extent that it purports to seek information that is irrelevant to Plaintiff's claims and is not reasonably calculated to lead to the discovery of admissible evidence. In particular, MGL objects to each and every Interrogatory to the extent that it seeks information relevant only to the claims that were dismissed in the Court's August 24, 2022 Order on MGL's Motion to Dismiss (the "Dismissed Claims").[2] For the avoidance of doubt, MGL will not withhold any information merely because it is related to the Dismissed Claims, if such information is otherwise responsive to the Interrogatories related to non-dismissed claims. MGL further objects to each and every Interrogatory to the extent that it seeks documents or information from an entity or dating site not named in the present litigation, including but not limited to Tinder. MGL objects to Plaintiff's use of the discovery process to conduct a fishing expedition into dating sites that are not at issue in this lawsuit.

2.    <u>Undue Burden</u>. MGL objects to each and every Interrogatory to the extent that it seeks to impose obligations beyond what is required under the Rules or Local Rules or is unduly burdensome. Accordingly, MGL objects to each and every Interrogatory where the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

3.    <u>Overbroad</u>. MGL objects to each and every Interrogatory to the extent that it seeks information that is beyond the scope of Plaintiff's claims, including, but not limited to, documents and information related only to Plaintiff's Dismissed Claims, and documents and information

---

[2] Dkt. 129 (dismissing Counts I & II of FTC's First Amended Complaint for Permanent Injunction, Monetary Relief, Civil Penalties, and Other Relief, filed on July 19, 2022 at Dkt. 116 (the "Amended Complaint"), due to MGL's CDA § 230 immunity).

related to entities or dating sites that are not party to, or otherwise related to, this litigation, such as Tinder. MGL will only respond with respect to Match.com. MGL further objects to each and every Interrogatory to the extent that it seeks documents and information that are not within MGL's possession, custody, or control, including by seeking documents and information from and related to entities that are not named as parties to this litigation.

4.      Privilege. MGL objects to each and every Interrogatory to the extent it seeks documents or information subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity from discovery (including, without limitation, all communications with, or work product of, any outside attorney) (collectively, "Privileged Information"). Any inadvertent disclosure of Privileged Information by MGL shall not constitute a waiver of any applicable privilege, doctrine, or immunity.

5.      Vagueness and Ambiguity. MGL objects to each and every Interrogatory to the extent that such Interrogatory is so vague, ambiguous, or confusing as not to be susceptible to a reasoned interpretation or response. In the absence of clear instructions or definitions associated with terms that are too vague, ambiguous, or confusing, MGL will give the terms used in the Interrogatory a reasonable interpretation.

6.      Accessibility. MGL objects to each and every Interrogatory to the extent that it seeks information that is not reasonably accessible in the ordinary course of business.

7.      Cumulative Interrogatories and Availability of Information Elsewhere. MGL objects to each and every Interrogatory that is cumulative, duplicative of, or to which documents or information already are in the possession, custody, or control of Plaintiff, or have been or could be obtained from another source that is equally available to Plaintiff or is more convenient, less burdensome, or less expensive. In particular, MGL objects to each and every Interrogatory insofar

as it seeks documents or information already obtained by Plaintiff during the FTC's prior investigation in connection with the Civil Investigative Demand in 2017 (the "2017 CID") and documents or information produced by Match Group, Inc. ("MGI") during the course of this litigation. For the avoidance of doubt, MGL will comply with the ESI Order, which provides, "The parties need not re-produce in discovery documents that were already produced to the FTC in response to the FTC's CID. Instead, the parties will refer to the bates number of the relevant documents." Dkt. 132 at 4.

8.     <u>Lack of Possession, Custody, or Control</u>. MGL objects to each Interrogatory to the extent it does not appear to be addressed to MGL and seeks information that is necessarily outside MGL's knowledge.

9.     <u>Legal Conclusions</u>. MGL objects to each and every Interrogatory to the extent that it requires MGL to draw legal conclusions.

10.     <u>Reservation of Right to Supplement</u>. Given the stage of the litigation, MGL has not completed its investigation of the facts or law relating to this action, and discovery in this matter is ongoing. Accordingly, consistent with the Rules, these responses and objections are made without prejudice to, and are not a waiver of, MGL's right to amend, correct, or supplement these responses, and are subject to MGL's right to produce evidence of any subsequently discovered facts, or additional facts, information, or documents that may exist. MGL provides these responses in good faith after reasonable inquiry and based on information that it knows or can readily obtain.

11.     <u>No Waiver</u>. By responding to these Interrogatories, MGL does not concede the relevancy of an Interrogatory nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to a particular Interrogatory does not mean that it is probative of any particular issue in this case. MGL expressly reserves its

right to assert any and all objections to the admissibility of any responses into evidence at any hearing or trial of this proceeding, or in any other actions or proceedings, on any and all grounds, including, but not limited to, competency, relevancy, materiality, privilege, confidentiality, hearsay, or admissibility as evidence for any other purpose. Moreover, the right to object on any ground to the use of the responses or information provided, in any aspect of this or any other court action, arbitration, or judicial or administrative proceeding or investigation, is reserved.

## II.  SPECIFIC OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.      MGL specifically objects to the Interrogatories' Instructions and Definitions to the extent they purport to impose obligations on MGL that exceed those imposed by the Rules and the Local Rules. In responding to these Interrogatories, MGL will follow the requirements set forth in the Rules and the Local Rules.

2.      MGL specifically objects to the definitions of "Match Group[,] LLC," "Company, and "You" as vague, ambiguous, confusing, and overbroad because the definition includes "assumed names, prior names, and predecessor entities, including Match.com, LLC," and MGL is not sure what the FTC means by "assumed names, prior names, or predecessor entities" (other than Match.com, LLC). MGL further objects to this definition to the extent it encompasses any website other than Match.com, which is the only dating site at issue in the Amended Complaint. Additionally, MGL objects because the correct name of the entity named as a defendant in this litigation is Match Group, LLC, not Match Group LLC.

3.      MGL specifically objects to the definition of "Match Group[,] Inc[.]" because the correct name of the entity named as a defendant in this litigation is Match Group, Inc., not Match Group Inc.

4.     MGL specifically objects to the definitions of "and" and "or" and because they are ambiguous and confusing. MGL will interpret these terms to have their plain, ordinary, and common sense meaning. MGL further objects to these definitions to the extent they purport to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case and exceedingly burdensome. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

5.     MGL specifically objects to the definition of "any" as ambiguous and confusing. MGL will interpret this term to have its plain, ordinary, and common sense meaning. MGL further objects to this definition to the extent it purports to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of this term as overly broad, unduly burdensome, and oppressive to the extent it purports to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

6.     MGL specifically objects to the definitions of "Customer" and "Customers" as overbroad, unduly burdensome, and oppressive, insofar as they purport to cover individual(s) "who have maintained an account on *any website* owned or operated by" MGL, including "Tinder," which encompasses websites that are not related to the present litigation. MGL further objects that the definitions of "Customer" and "Customers" are thus not tailored to the allegations in the Amended Complaint, not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence. In responding to these Interrogatories, MGL will construe the terms "Customer" and "Customers" to refer only to Customer(s) of Match.com.

7.     MGL objects to the definition of "Document" as overly broad and unduly burdensome. MGL further objects to this definition to the extent it refers to items outside of MGL's possession, custody, or control, particularly through its use of the phrases "regardless of origin or location" and "however and by whomever prepared, produced, disseminated, or made." MGL further objects to this definition to the extent it refers to items in Plaintiff's possession, custody, or control, or to items that have been or could be obtained from another source that is equally available to Plaintiff or is more convenient, less burdensome, or less expensive. MGL further objects to this definition to the extent it purports to impose obligations on MGL that exceed those required by the Rules. In responding to these Interrogatories, MGL will interpret the word "Document" to have its plain, ordinary, and common sense meaning and will comply with the Rules.

8.     MGL specifically objects to the definition of "each" as ambiguous and confusing. MGL will interpret this term to have its plain, ordinary, and common sense meaning. MGL further objects to this definition to the extent it purports to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of this term as overly broad, unduly burdensome, and oppressive to the extent it purports to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

9.     MGL specifically objects to the definitions of "Identify" and "the identity of" because they are ambiguous and confusing. MGL will interpret these terms to have their plain, ordinary, and common sense meaning. MGL further objects to these definitions to the extent they purport to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they

purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

10.     MGL specifically objects to the definitions of "referring to" and "relating to" and because they are ambiguous and confusing. MGL will interpret these terms to have their plain, ordinary, and common sense meaning. MGL further objects to these definitions to the extent they purport to impose obligations on MGL that exceed those imposed by the Rules. MGL objects to the definition of these terms as overly broad, unduly burdensome, and oppressive to the extent they purport to require information that is neither relevant to any party's claim or defense nor proportional to the needs of the case. In responding to these Interrogatories, MGL will comply with the Rules and the Local Rules.

11.     MGL specifically objects to the definition of "Subscriber" as overbroad, unduly burdensome, and oppressive, insofar as it purports to cover a "Subscriber" to "any website owned or operated by" MGL, which would necessarily encompass websites that are not related to the present litigation. MGL further objects that the definition of "Subscriber" is thus not tailored to the allegations in the Amended Complaint and not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence. In responding to these Interrogatories, MGL will construe the term "Subscriber" to refer only to Subscribers to Match.com.

12.     MGL objects to the definition of "Tinder" because it is overbroad, ambiguous, and confusing. MGL further objects to the definition of "Tinder" as irrelevant, since Tinder is not even referenced in the Amended Complaint, and thus any Request relying on the definition of "Tinder" is not proportional to the needs of the case and is unduly burdensome.

13.     The foregoing general objections and specific objections to the instructions and definitions provided by Plaintiff shall be fully incorporated by reference into each of the below specific objections to the Interrogatories.

## I.  SPECIFIC OBJECTIONS AND RESPONSES TO THE INTERROGATORIES

**INTERROGATORY NO. 1:** Identify any current or former Match Group[,] LLC employee that has ever had a position at Match Group[,] Inc[.], the time period in which the employee held that position at Match Group[,] Inc[.], the time period of the employee's employment at Match Group[,] LLC, and all responsibilities that individual has held at Match Group[,] Inc[.] and Match Group[,] LLC.

**RESPONSE:** MGL objects to this Interrogatory because "responsibilities" is vague and undefined. MGL objects to this Interrogatory as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Amended Complaint, by seeking discovery of extensive information regarding "any current and former Match Group[,] LLC employee" regardless of their relevance to the claims in the Amended Complaint. MGL will only respond with respect to employees that may have, or had, a role in Match.com's cancellation processes or directly reports to anyone who is responsible or has a role in the cancellation process. MGL further objects to the extent that the requested information is already in Plaintiff's possession, custody, or control. Finally, MGL further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

Subject to and without waiving the foregoing objections, MGL responds as follows:

As of January 1, 2013, Sharmistha Dubey was employed at MGL, until April 2013, and then was employed again from December 2015 until May 2022. Ms. Dubey, while being an MGL employee, also had an engagement agreement with MGI from August 8, 2018 to May 2, 2022. The responsibilities Ms. Dubey held at MGI were President, from January 2018 to March 2020, and CEO, from March 2020 until May 2022. Ms. Dubey also currently serves as a Board Member of

MGI, a role she has held since September 2019. The responsibilities Ms. Dubey held at MGL were Chief Product Officer, as of January 2013 until April 2013, President of Match Group NA, from December 2015 to December 2017, Chief Operating Officer of Tinder, from July 2017 to December 2017,[3] President, from January 2018 to March 2020, and CEO from March 2020 until May 2022.

As of January 1, 2013, Mandy Ginsberg was employed at MGL until April 2013, and then was employed again from December 2015 until January 2020. Ms. Ginsberg, while being an MGL employee, also had an engagement agreement with MGI from December 5, 2017 to March 1, 2020. The responsibilities Ms. Ginsberg held at MGI was CEO, from December 2017 to March 2020. Ms. Ginsberg also served as a Board Member of MGI from December 2017 to March 2020. The responsibilities Ms. Ginsberg held at MGL were CEO of Match.com, as of January 2013 until April 2013, CEO of Match Group NA, from December 2015 to December 2017, and CEO, from January 2018 to March 2020.

From January 2016 until December 2017, Gregory Blatt was employed at MGL. Mr. Blatt, while being an MGL employee, also had an engagement agreement with MGI from April 27, 2016 to December 5, 2017. The responsibilities Mr. Blatt held at MGI was Executive Chairman, from December 2013 to January 2016, and Chairman & CEO, from January 2016 to December 2017. Following MGI's Initial Public Offering in November 2015, Mr. Blatt also served as a Board Member of MGI from November 2015 to August 2018. The responsibilities Mr. Blatt held at MGL were CEO & President from January 2016 to December 2017.

---

[3] Ms. Dubey served as COO of Tinder starting in January 2017, when it was owned and operated by Tinder, Inc., a separate entity from MGL. Pursuant to a July 2017 merger, Tinder, Inc.'s assets and liabilities were acquired by Match Group, LLC.

As of January 1, 2013, Sam Yagan was employed at MGL until December 2015. The responsibilities Mr. Yagan held at MGI was CEO, as of January 2013 to December 2015. Mr. Yagan also served as a Board Member of MGI from December 2015 to September 2019. The responsibility Mr. Yagan held at MGL was CEO from April 2013 to December 2015.

As of January 1, 2013, and continuing until today, Amarnath Thombre has been employed at MGL. The responsibilities Mr. Thombre has held at MGI has been Chief Strategy Officer, as of January 2013 to December 2017, and CEO of Match Group Americas, from January 2018 to present. The responsibilities Mr. Thombre has held at MGL has been Chief Strategy Officer, as of January 2013 to December 2017, and VP & CEO of Match Group Americas, from January 2018 to present.

As of May 3, 2022, and continuing until today, Bernard Kim has been employed at MGL. Mr. Kim, while being an MGL employee, also has an engagement agreement with MGI as of May 3, 2022. The responsibilities Mr. Kim holds at MGI is CEO, and at MGL is CEO. Mr. Kim also currently serves as a Board Member of MGI, a role he has held since May 2022.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**FIRST AMENDED RESPONSE:**  In addition to the roles and responsibilities of Sam Yagan included above, Mr. Yagan was also employed at MGL as the General Manager of Match.com from March 2015 until March 2016.

Amarnath Thombre was employed at MGL until January 8, 2023. The responsibilities Mr. Thombre held at MGI as CEO of Match Group Americas ended January 8, 2023. The responsibilities Mr. Thombre held at MGL as VP & CEO of Match Group Americas ended January 8, 2023.

Furthermore, based on the November 1 Order and the Counts III and IV Agreement, MGL responds with respect to employees that had a role in the Guarantee or Chargeback Policy, or directly reported to anyone who was responsible or had a role in the Guarantee or Chargeback Policy: Ms. Dubey, Ms. Ginsberg, Mr. Blatt, Mr. Yagan, and Mr. Thombre.

**INTERROGATORY NO. 2:** Identify any contractual agreements that have ever existed between Match Group[,] Inc[.] and Match Group, LLC and state in detail the nature of those contractual agreements, the dates of their execution, and the terms of those agreements, and state on a month by month basis any payments made by or between Match Group[,] Inc[.] and Match Group[,] LLC as a result of any such contractual agreement.

**RESPONSE:** MGL objects to this Interrogatory as irrelevant, overbroad, and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Amended Complaint, by seeking exceedingly broad discovery regarding "any contractual agreements that have ever existed" between MGI and MGL, the detailed nature of those contractual agreements, the dates of their execution, the terms of those agreements, and a month-by-month statement of "any payments" made by or between MGI and MGL as a result of any such contractual agreement—regardless of any relevance to the claims in the Amended Complaint. MGL will respond only with respect to contractual agreements between MGI and MGL relating to Match.com's cancellation mechanisms. MGL further objects to the applicable time period for this Interrogatory as vague, ambiguous, and confusing because it seeks "*any* contractual agreements that have *ever* existed," which implies an unlimited time period aside from any relevance to the claims in the Amended Complaint. Likewise, MGL objects to the extent that the requested information already is in Plaintiff's possession, custody, or control, or is publicly available. Additionally, MGL objects to this Interrogatory as vague, ambiguous, and confusing in that it is not clear what the FTC means by the separate requirements it lists to "state in detail the nature of those contract agreements" and "the terms of those agreements." Moreover, MGL objects

to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as two of interrogatories against the 25 interrogatory limit.

Subject to and without waiving the foregoing objections, MGL responds as follows: There are no contractual agreements between MGI and MGL regarding Match.com's cancellation mechanisms.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 3:** Describe any criteria Match Group[,] LLC uses or has used to determine whether to grant a Customer's request for a refund relating to Ads, fraud or alleged fraud, Match Guarantees, consumer's belief that they had already canceled their subscription, or his or her claimed lack of knowledge about recurring charges.

**RESPONSE:** MGL objects to this Interrogatory as vague and confusing because this Interrogatory uses the defined term "Customer" before using the undefined term "consumer," and it is unclear whether the FTC intends for the terms to have the same meaning or different meanings. MGL further objects to this Interrogatory as overly broad and not proportional to the needs of the case because it purports to seek information beyond the scope of Plaintiff's claims in the Amended Complaint, as detailed below. Any information related to "fraud or alleged fraud" relates solely to Counts I and II, which the Court dismissed with prejudice on August 24, 2022. *See* Dkt. 129. Moreover, MGL objects to this Interrogatory because Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur.

Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as five of interrogatories against the 25 interrogatory limit. MGL further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules. Finally, MGL objects to this Interrogatory to the extent the information is already in Plaintiff's possession, custody, or control. MGL will respond solely as to the criteria used to determine whether to grant a Customer's request for a refund relating to the Customer's belief that they had already cancelled their subscription or his or her claimed lack of knowledge about recurring charges.

Subject to and without waiving the foregoing objections, MGL responds as follows: pursuant to Federal Rule of Civil Procedure 33(d), MGL directs the FTC to documents produced by MGI at MATCHFTC740484, MATCHFTC740485, MATCHFTC740487, MATCHFTC740492, MATCHFTC740500, MATCHFTC740502, MATCHFTC740507, MATCHFTC740509, MATCHFTC740514, MATCHFTC740519, MATCHFTC740527, MATCHFTC740532, MATCHFTC740535, MATCHFTC740536, MATCHFTC740542, MATCHFTC740548, MATCHFTC740549, MATCHFTC740551, MATCHFTC740553, MATCHFTC740555, MATCHFTC740561, MATCHFTC740564, MATCHFTC740570, MATCHFTC740578, MATCHFTC740586, MATCHFTC740587, MATCHFTC740619, MATCHFTC740684, MATCHFTC740687, MATCHFTC740690, MATCHFTC740693,

MATCHFTC740700, MATCHFTC740865, MATCHFTC740929, MATCHFTC740967, MATCHFTC740989, MATCHFTC741061, MATCHFTC741062, MATCHFTC741063, and MATCHFTC741158.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**FIRST AMENDED RESPONSE:** Based on the November 1 Order and the Counts III and IV Agreement, MGL directs the FTC to documents produced at MATCHFTC741158, MATCHFTC741063, MATCHFTC740989, MATCHFTC740967, MATCHFTC740937, MATCHFTC740929, MATCHFTC740865, MATCHFTC740803, MATCHFTC740651, MATCHFTC740619, MATCHFTC740587, MATCHFTC740578, MATCHFTC740570, MATCHFTC740555, MATCHFTC740542, MATCHFTC740536, MATCHFTC740527, MATCHFTC740514, MATCHFTC810928, MATCHFTC810933, MATCHFTC810934, MATCHFTC810986, MATCHFTC810988, MATCHFTC811088, MATCHFTC811144, MATCHFTC846462, MATCHFTC846464, and MATCHFTC846466.

**INTERROGATORY NO. 4:** Describe in complete detail the basis for your contention that Match.com is wholly owned by Match Group[,] LLC or operated exclusively by Match Group[,] LLC.

**RESPONSE:** MGL objects to this Interrogatory as vague and confusing because "wholly owned" and "operated exclusively" are vague and undefined. MGL also objects to this Interrogatory to the extent it seeks Privileged Information. MGL further objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control. MGL further objects to this Interrogatory as overly broad and unduly burdensome to the extent that it requires MGL to describe "in complete detail" the basis for its contentions. Additionally, MGL objects to this Interrogatory to the extent it calls for a legal conclusion.

Subject to and without waiving the foregoing objections, MGL responds as follows:

The basis for our contention that Match.com is owned and operated by MGL, is that MGL is the general operating company that owns and operates Match.com, as evidenced by numerous documents produced during the CID and this litigation showing MGL employees operating and controlling Match.com. Likewise, the Match.com Terms of Use provide that Match.com is operated by Match Group, LLC. Additionally, MGL is the entity that is the registrant, administrative, and technical contact for the domain Match.com, and MGL is the owner of the Match.com trademark.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 5:** Describe in complete detail any role that Match Group[,] Inc[.] or its employees have ever had relating to the operation or advertisement of Match.com, any action Match Group[,] Inc. or its employees have ever taken relating to the operation or marketing of Match.com, or any report that Match Group[,] LLC has ever made to Match Group[,] Inc[.] concerning the operation or advertisement of Match.com, including relating to the following topics:

     a.    Match.com's terms and conditions;

     b.    Polices or procedures related to the Match Guarantee;

     c.    Match.com's refund policies and procedures; and

     d.    Policies and procedures related to Match.com's cancellation mechanisms or the disclosure or advertisement of cancellation mechanisms.

**RESPONSE:** MGL objects to this Interrogatory as vague and confusing because it is unclear whether the Plaintiff is referring only to actions MGI's employees have taken in their role as an employee of or on behalf of MGI or actions an MGI employee has taken in their role as an employee of or on behalf of another entity that they may be employed by. MGL interprets this Interrogatory as referring to actions an employee of MGI has taken in their role as an MGI employee. MGL objects to "role," "report," "terms and conditions," and "policies or procedures" as vague and undefined, as MGL is not sure what Plaintiff means by such references. MGL will

give those terms their plain and ordinary meanings, and MGL will interpret "report," as it is used in this Interrogatory, to mean that the person receiving the communication from MGL on behalf of MGI was acting in his or her capacity as an MGI officer at the time of the communication. MGL further objects to this Interrogatory as extraordinarily broad and not proportional to the needs of the case because Plaintiff in this Interrogatory purports to seek "complete detail" about information far beyond the scope of Plaintiff's claims in the Amended Complaint, by seeking discovery of extensive information regarding "*any* role" MGI or its employees "*ever* had," "*any* action . . . *ever* taken," and "*any* report . . . *ever* made." MGL also objects to this Interrogatory because it improperly demands that MGL respond as to the knowledge of persons and/or entities other than MGL, namely MGI, as it seeks information regarding the actions and roles of MGI and its employees. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as four of interrogatories against the 25 interrogatory limit.

Moreover, Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. MGL also objects to the extent that this Interrogatory

suggests Match.com "cancellation mechanisms" are advertised and to the extent it suggests MGI operates Match.com. MGL will only respond with respect to subpart (d).

Subject to and without waiving the foregoing objections, MGL responds as follows:

Neither MGI nor its employees acting in their capacities as MGI employees has ever had any role or taken any action regarding the policies and procedures related to the design of Match.com's cancellation mechanisms or the disclosure or advertisement of cancellation mechanisms, as MGL is responsible for the policies and procedures related to Match.com's cancellation mechanisms and any disclosure of cancellation mechanisms. With respect to reports MGL has made to MGI related to Match.com's cancellation mechanisms or the disclosure of cancellation mechanisms, pursuant to Rule 33(d), MGL directs the FTC to any documents that may be produced by MGI responsive to Request for Production No. 2 in the FTC's First Set of Requests for Production to MGI.

**INTERROGATORY NO. 6**: Identify and describe in complete detail the full basis for each affirmative defense You have asserted in Your Answer, including but not limited to every fact and document that supports, contradicts, refutes, or rebuts that particular affirmative defense, and every witness who may have information or testimony relevant to that particular defense.

**RESPONSE:** MGL objects to this Interrogatory because "relevant" is vague and undefined because MGL and the FTC may have different understandings of what is "relevant" in this case. MGL also objects to the extent this Interrogatory seeks Privileged Information. MGL also objects to this Interrogatory as premature and to the extent it seeks to require MGL to marshal all of its evidence before trial. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is not in its possession, custody, or control, or that is already in Plaintiff's possession, custody, or control. To that end, MGL directs the FTC to MGL's Initial Disclosures, served on August 22, 2022, in which MGL provided the name of individuals likely to have discoverable information, along with the subjects of that information, that MGL may use

to support its claims or defenses. Lastly, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as ten interrogatories against the 25 interrogatory limit. *See White v. Cinemark USA, Inc.*, No. 04CV0397 GEB CMK, 2005 WL 3881658, at *3 (E.D. Cal. Mar. 28, 2005)(holding that "each affirmative defense should be treated as a separate interrogatory, since each defense may be both factually and logically different").

Subject to and without waiving the foregoing objections, MGL responds as follows:

First Affirmative Defense (Failure to State a Claim): The Amended Complaint fails to state a claim for the reason that the Guarantee and Chargeback policy at issue in Counts III and IV of the Amended Complaint were permanently discontinued prior to the FTC filing suit, and those practices have never and will never be reinstated, as the FTC is aware from multiple communications, along with the Notice of Stipulation Regarding Permanently Discontinued Practices on Match.com, recently filed on September 20, 2022, at Dkt. 146. Thus, neither MGL nor Match.com are violating, nor are they about to violate, the FTC Act.

Second Affirmative Defense (Compliance with Applicable Law): The Amended Complaint's Count V fails as MGL did not violate Section 4 of ROSCA, 15 U.S.C. § 8403. Rather, at all times with respect to Count V, Match.com complied with all applicable laws and acted reasonably and in good faith. As a preliminary matter, even assuming that the online cancellation flow at issue in Count V is not simple (although it is), the plain language of ROSCA requires only "simple mechanisms" for cancellation, and ROSCA does not provide that every cancellation method must be simple. Count V fails because Match.com offers several other cancellation methods in full compliance with ROSCA, including simple methods to cancel by phone, fax, email, internet chat, or standard mail. *See infra* Resp. to Interr. No. 15 (explaining multiple

cancellation mechanisms and citing documents related to same). And the FTC challenges only the online cancellation method. Thus, even if the FTC were correct (which it is not) that the online cancellation flow is not simple, the existence of other unchallenged methods of cancellation defeats the FTC's claim.

Count V also fails because the Match.com online cancellation flow is not complicated or in any material way different from numerous other online subscription cancellation mechanisms. It is essentially industry standard. Consumers in fact readily canceled using the Match.com online cancellation flow, as reflected by data proving that subscribers have no difficulty canceling via the online cancellation flow, which can be completed in less than one minute. *See infra* Resp. to Interr. No. 15 (explaining multiple cancellation mechanisms and citing documents related to same). Based on data reviewed during the FTC's pre-suit investigation, on average, 89% of Match.com subscribers who initiated an online cancellation request successfully canceled their subscription within the same day.

Third Affirmative Defense (Good Faith Belief and Conduct): Match.com's online cancellation flow was designed and implemented to be simple and readily accessible to users. *See infra* Resp. to Interr. No. 15 (explaining online cancellation flow and citing documents and videos related to same).

Fourth Affirmative Defense (Requested Relief Contrary to Public Policy): The FTC's requested relief with respect to Count V is contrary to the public interest because Match.com's online cancellation flow is intended to benefit consumers by protecting their privacy (by requiring them to insert their passwords prior to accessing private account information, such as billing), offering them discounted rates, and allowing Match.com to understand how to better serve them.

*See infra* Resp. to Interr. No. 15 (explaining online cancellation flow and citing documents and videos related to same).

Fifth Affirmative Defense (Alleged Failure to Clearly and Conspicuously Disclose Not Material): Any alleged failure by Match.com to clearly and conspicuously disclose some requirements of the Guarantee practice was not material because most consumers who did not qualify for the Guarantee failed to satisfy the requirements that were unquestionably adequately disclosed (i.e., the requirements in the numbered and bullet-pointed list in the Program Rules). So even had other requirements been *more* clearly and conspicuously disclosed (or waived), most users would not have been eligible for a Guarantee regardless.

Sixth Affirmative Defense (Mootness): As to Count III, MGL asserts the FTC's claim for injunctive relief is moot under applicable law. The FTC admits in its Amended Complaint that this Guarantee practice at issue in Count III ceased in mid-2019 (but it was actually permanently discontinued in April 2019). MGL asserts Count IV is also moot, because, as the FTC admits in its Amended Complaint, Match.com's chargeback practice ceased in mid-2019 (but it was actually permanently discontinued in March 2019). Count IV's claim for injunctive relief is therefore also moot. There is nothing to enjoin because the challenged practices have been permanently discontinued, and MGL will not reinstitute those practices. *See, e.g.*, Notice of Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146.

Seventh Affirmative Defense (Overbroad Injunction): The FTC's requested injunction with respect to Count III and the "Guarantee" practice is overbroad and not specifically tailored to the violations alleged in the Amended Complaint. The FTC's requested injunction with respect to Count IV and the chargeback policy is overbroad and not specifically tailored to the violations alleged in the Amended Complaint. Finally, the FTC's requested injunction is overbroad and not

specifically tailored to the violations alleged in the Amended Complaint. In particular, the FTC's requested injunction is overbroad not only because the Amended Complaint fails to allege all necessary facts, but also because the FTC attempts to apply such injunction to brands other than Match.com that are not implicated by the Amended Complaint.

Eighth Affirmative Defense (Mitigation): With respect to Count V, the FTC has not offered any reliable methodology for quantifying alleged consumer harm, and any restitution amount would be subject to mitigation to the extent that consumers received refunds or utilized the services on the renewed subscription.

Ninth Affirmative Defense (Statute of Limitations): The FTC's claims are barred in part by the statute of limitations, including, but not limited, to the extent that the FTC seeks civil penalties, monetary relief, or redress for purported violations that occurred outside of the applicable statute of limitations.

Tenth Affirmative Defense (Reservation of Other Affirmative Defenses): MGL lacks sufficient information regarding the facts and evidence alleged and is therefore unable to ascertain at this time any additional affirmative defenses which MGL may have. Therefore, MGL expressly reserves the right to amend its Answer to assert such other affirmative defenses as may become apparent subsequent to the filing of its Answer, whether in discovery, at trial, or otherwise.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**SECOND AMENDED RESPONSE:** Match.com no longer operates a Customer Care call center. Instead, consumers are encouraged to use Match.com self-help options (such as the Help/FAQ pages on Match.com or the online cancellation flow), or to contact Customer Care via other methods, such as the Customer Care online chat or email address. Match.com does not currently include a Customer Care phone number on its website. Consumers that contact Match.com's Customer Care phone number are provided with an automated recording. That recording provides consumers with help regarding various topics, including providing instructions on how to cancel their Match.com subscription via the online cancellation flow. Consumers are also informed that they may receive personalized support through the Customer Care online chat or email address. Each segment of the automated phone recording has been produced at MATCHFTC846840–MATCHFTC846846. While a consumer may no longer cancel a Match.com subscription by calling the Match.com Customer Care phone number and talking to a live agent, the consumer may still cancel a Match.com subscription via numerous other methods, including the online cancellation flow, online chat, email, U.S. mail, and fax. *See infra* Resp. to Interr. No. 15.

**INTERROGATORY NO. 7:** Identify any tests, reports, A/B testing, Customer surveys, usability tests, focus groups, or other user experience studies, whether formal or informal, related to:

    a.     Match Guarantees;

    b.     Chargebacks related to Match.com subscriptions; and

    c.     Means and ease of subscription renewal or cancellation for Match.com subscriptions.

Your response to this Interrogatory should include descriptions of the types of usability studies, beta studies, and surveys that the response covers. In addition, please provide Your response in machine-readable format, for example, in a .csv or spreadsheet file format.

**RESPONSE**: MGL objects to this Interrogatory because "tests," "reports," "A/B testing,"

"Customer surveys," "usability tests," "focus groups," "other user experience studies," "formal,"

"informal," "usability studies," "beta studies," and "surveys" are vague and undefined, and to the extent this Interrogatory seeks Privileged Information. MGL also objects to this Interrogatory to the extent the request to "provide [the] response in machine-readable format" imposes obligations on MGL that exceed those imposed by the Rules or the ESI Order. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, as well as all practices related to "Chargebacks," and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Counts III and IV in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" or "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as three interrogatories against the 25 interrogatory limit. MGL further objects to this Interrogatory to the extent it purports to impose a burden beyond what is required by the Rules and Local Rules.

Subject to and without waiving the foregoing objections, MGL responds with respect to subpart (c) as follows: pursuant to Federal Rule of Civil Procedure 33(d), MGL directs the FTC to documents produced in response to the FTC's RFP No. 26 to MGI.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**FIRST AMENDED RESPONSE**: Based on the November 1 Order and the Counts III and IV Agreement, MGL responds with respect to subparts (a) and (b) as follows: pursuant to Federal Rule of Civil Procedure 33(d), MGL directs the FTC to documents produced in response to the FTC's RFP No. 26 to MGI or to the FTC's RFP No. 33 to MGL.

**INTERROGATORY NO. 8:** On a monthly basis, state:

  a.   the number of Match.com subscriptions subject to the Guarantee sold;

  b.   the number of Guarantee Extensions that Match Group[,] LLC provided Customers;

  c.   the number of Customer inquiries regarding the automatic renewal of subscriptions subject to the Match Guarantee;

  d.   the number of refund requests Customers submitted to Match Group[,] LLC relating to Match Guarantees and the dollar amount of these requested refunds; and

  e.   the number of refunds Match Group[,] LLC granted relating to Match Guarantees and the amount of money refunded relating to Match Guarantees.

**RESPONSE:** MGL objects to this Interrogatory because "subscriptions" and "inquiries" are vague and undefined and to the extent this Interrogatory seeks Privileged Information. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons,

discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as five interrogatories against the 25 interrogatory limit.

Subject to and without waiving the foregoing objections, MGL responds that it permanently discontinued the Guarantee in April 2019. It has not offered the Guarantee since that date, and it will not reinstitute the Guarantee in the future.

**FIRST AMENDED RESPONSE:** Based on the November 1 Order and the Counts III and IV Agreement, MGL responds as follows: pursuant to Rule 33(d), MGL directs the FTC to a document that will be produced containing data responsive to the Interrogatory. Once produced, MGL will identify the document by Bates number.

**INTERROGATORY NO. 9:** State all limitations on Customers' rights to redeem a Match Guarantee or receive a Guarantee Extension and all actions consumers had to complete to redeem a Match Guarantee or receive a Guarantee Extension. For each such limitation or action Identify:

   a.   the date such limitation was implemented and/or eliminated; and

   b.   all advertisements, notices, disclosures, or other notifications where Match disclosed the need to complete that action.

**RESPONSE:** MGL objects to this Interrogatory because "rights to redeem" and "Match" are vague and undefined and to the extent this Interrogatory seeks Privileged Information. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding

Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as two interrogatories against the 25 interrogatory limit.

Subject to and without waiving the foregoing objections, MGL responds that it permanently discontinued the Guarantee in April 2019. It has not offered the Guarantee since that date, and it will not reinstitute the Guarantee in the future.

**FIRST AMENDED RESPONSE:** Based on the November 1 Order and the Counts III and IV Agreement, MGL responds as follows: from January 1, 2013 (the beginning of the applicable time period, as specified in the Interrogatories) until April 2019, when the Guarantee was permanently discontinued, all requirements for consumers to redeem the Guarantee or receive a Guarantee Extension are detailed below. A more detailed explanation of how the requirements to redeem the Guarantee were clearly and conspicuously disclosed is below. *See infra* Resp. to Interr. No. 10.

Before the Guarantee was permanently discontinued in April 2019, there were three reasonable and clearly disclosed requirements for the Guarantee. To qualify, a new subscriber had to (1) post an approved profile within seven days of activating the subscriber's membership; (2) communicate with at least five unique Match.com members each month; and (3) if eligible,

redeem the Guarantee sometime during the last seven days of the initial six-month subscription. These requirements were disclosed in order of occurrence. Clicking on a "Learn more" hyperlink took a user to the below box with graphics that highlight the need to create and post a profile and communicate with at least five unique Match.com members each month. This is shown below. *See* MATCHFTC774536;



Below this box, the full Guarantee requirements appeared in 13 clearly bulleted points with space between each bullet, many of which were either requirements of using the site in the first place (such as obeying the terms of use) or basic best practices for its use (such as creating a profile with a photograph). The Program Rules are reproduced below. *See* MATCHFTC774568; MATCHFTC774563.

We know you'll meet tons of great people during your 6-month subscription with us. But, if you don't find someone special during that time, we'll give you an ADDITIONAL 6 months to continue your search. Check out the rules below, then get out there and start connecting today!

- Under the I Met Someone GUARANTEE Program, (the "Guarantee Program" or the "Program") if you don't find someone special during a qualifying six-month paid subscription to the Match.com service, we'll give you an additional six-month subscription (the "Guarantee Extension") to the Match.com service at no additional expense. See Match.com Terms of Use for details regarding the Match.com service and use of the Match.com website.

- The Guarantee Program is available for a limited time only, and open to anyone not currently participating in the Program. Additionally, to be eligible for the Program and the Guarantee Extension, you must

- (1) Comply at all times with the Match.com Terms of Use. By using the Match.com website and participating in the Program, you agree to be bound by the Match.com Terms of Use.

- (2) Pay in full the applicable rate for a **six-month subscription** to the Match.com service (the "Guarantee Program Subscription") The Guarantee Program Subscription consists of five consecutive 30-day periods followed by a final period of 33 days, all of which are referred to as a "Month" in these Program rules. If you are enjoying the benefits of a free trial of the Match.com service, your Guarantee Program Subscription will not begin until your free trial period ends.

- (3) Use your Guarantee Program Subscription to **create a profile with a primary photo**. Your profile and primary photo must be approved by Match.com within the first seven days of your Guarantee Program Subscription in order for you to be eligible for the Guarantee Program. Details on approval of profile and primary photo available at FAQ and How It Works.

- (4) **Keep your profile with primary photo visible at all times** during your Guarantee Program Subscription

- (5) **Communicate** during your Guarantee Program Subscription with other Match.com subscribers with whom you have not previously communicated during your Guarantee Program Subscription ("Unique Match.com Subscribers").

- (6) Send a "Qualifying Email" to a minimum of five other Unique Match.com Subscribers each Month during your Guarantee **Program Subscription.** A "Qualifying Email" may be either one you send to a Unique Match.com Subscriber who has not yet emailed you or an email response you send to a Unique Match.com Subscriber who has emailed you. A "Qualifying Email" must be an email sent through the Match.com service and does not include any other method of communicating (such as Match.com winks, MatchPhone™, Match.com Instant Messaging or emails sent outside of the Match.com system).

- Progress toward eligibility for the Guarantee Extension may be determined at any time during a Guarantee Program Subscription by visiting the progress page associated with such Guarantee Program Subscription (the "Guarantee Program Progress Page"). If, during the last seven days of a Guarantee Program Subscription, you are eligible for a Guarantee Extension (and have not met that "special someone"), you may accept the Guarantee Extension by affirming on the Guarantee Program Progress Page that you have not met someone special during your Guarantee Program Subscription. Please see the Match.com Guarantee FAQ for further information. You may also contact Customer Care with any questions related to the Match.com service or the Program. Match.com alone will make all decisions under these Program rules regarding Program policies, including but not limited to Program and Guarantee Extension eligibility.

- Customers eligible to receive a Guarantee Extension will not receive a refund, money or any other thing of value as a substitute for the Guarantee Extension. The Guarantee Extension may only be used by the purchaser of the Guarantee Program Subscription, and the Guarantee Extension may not be sold or transferred in any way.

- Guarantee Program Subscriptions which do not result in a Guarantee Extension (due to ineligibility of the subscriber or failure of the subscriber to accept the Guarantee Extension) will automatically be continued for successive six-month subscription periods at the subscription rate in effect at the time of continuation. See Match.com Terms of Use for details regarding Match.com subscriptions and charges on your billing account

- The Match.com Terms of Use and the Match.com Guarantee Program Rules are subject to change by Match.com at any time, effective upon posting on the Match.com website, and your use of the Match.com service and your initial or continued participation in the Match.com Guarantee Program after such posting will constitute acceptance by you of such changes. Match.com reserves all rights to modify, suspend or cancel the Program at any time and without notice.

- Program rules last updated January 24th, 2008

The requirements above were repeated in the bullet points. Information on how to redeem the Guarantee at the end of the six-month subscription appeared as the ninth bullet point. Notably, because MGL recognized that certain users might have needed to refresh their understanding of how the Guarantee worked, all of Match.com's webpages displayed a "Guarantee" hyperlink, which could take the subscriber to this information, as they near the end of their six-month subscription.

In April 2019, the Guarantee was permanently discontinued.

**INTERROGATORY NO. 10:** Describe in complete detail the basis for your contention that the terms of the Match Guarantees were adequately disclosed.

**RESPONSE:** MGL objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Subject to and without waiving the foregoing objections, MGL responds that it permanently discontinued the Guarantee in April 2019. It has not offered the Guarantee since that date, and it will not reinstitute the Guarantee in the future.

**FIRST AMENDED RESPONSE:** Based on the November 1 Order and the Counts III and IV Agreement, MGL responds as follows: the Guarantee was permanently discontinued in April 2019. Even when the Guarantee was offered, the terms of the Guarantee were clearly and conspicuously disclosed, as detailed below.

When consumers viewed subscription plans offered on Match.com, they were presented with a graphic chart that offered three multi-month subscription plans of varying lengths. Next to

the six-month subscription option, a prominent and colorful icon stated "Match* Guarantee." Clicking the icon opened a text balloon with text explaining the general nature of the Guarantee and inviting consumers to click on a hyperlink labeled "Learn more" to see the full details of the Guarantee. This is reproduced below. *See* MATCHFTC774523.



Clicking on the "Learn more" hyperlink took consumers to a webpage where the complete terms of the Guarantee were presented.

    In addition, all of Match.com's webpages displayed a "Guarantee" hyperlink along a bottom banner, and consumers who clicked on this hyperlink were taken directly to a page with additional information about Match.com subscriptions and the Guarantee. This page also provided another copy of the full "Program Rules." This is reproduced below. *See* MATCHFTC774536; MATCHFTC774568; MATCHFTC774563.



I Met Someone GUARANTEE (formerly "Make Love Happen Guarantee") Program Rules

We know you'll meet tons of great people during your 6-month subscription with us. But, if you don't find someone special during that time, we'll give you an ADDITIONAL 6 months to continue your search. Check out the rules below, then get out there and start connecting today!

- Under the I Met Someone GUARANTEE Program, (the "Guarantee Program" or the "Program") if you don't find someone special during a qualifying six-month paid subscription to the Match.com service, we'll give you an additional six-month subscription (the "Guarantee Extension") to the Match.com service at no additional expense. See Match.com Terms of Use for details regarding the Match.com service and use of the Match.com website.

- The Guarantee Program is available for a limited time only, and open to anyone not currently participating in the Program. Additionally, to be eligible for the Program and the Guarantee Extension, you must

- (1) Comply at all times with the Match.com Terms of Use. By using the Match.com website and participating in the Program, you agree to be bound by the Match.com Terms of Use.

- (2) Pay in full the applicable rate for a six-month subscription to the Match.com service (the "Guarantee Program Subscription") The Guarantee Program Subscription consists of five consecutive 30-day periods followed by a final period of 33 days, all of which are referred to as a "Month" in these Program rules. If you are enjoying the benefits of a free trial of the Match.com service, your Guarantee Program Subscription will not begin until your free trial period ends.

- (3) Use your Guarantee Program Subscription to create a profile with a primary photo. Your profile and primary photo must be approved by Match.com within the first seven days of your Guarantee Program Subscription in order for you to be eligible for the Guarantee Program. Details on approval of profile and primary photo available at FAQ and How It Works.

- (4) Keep your profile with primary photo visible at all times during your Guarantee Program Subscription

- (5) Communicate during your Guarantee Program Subscription with other Match.com subscribers with whom you have not previously communicated during your Guarantee Program Subscription ("Unique Match.com Subscribers")

- (6) Send a "Qualifying Email" to a minimum of five other Unique Match.com Subscribers each Month during your Guarantee Program Subscription. A "Qualifying Email" may be either one you send to a Unique Match.com Subscriber who has not yet emailed you or an email response you send to a Unique Match.com Subscriber who has emailed you. A "Qualifying Email" must be an email sent through the Match.com service and does not include any other method of communicating (such as Match.com winks, MatchPhone™, Match.com Instant Messaging or emails sent outside of the Match.com system).

- Progress toward eligibility for the Guarantee Extension may be determined at any time during a Guarantee Program Subscription by visiting the progress page associated with such Guarantee Program Subscription (the "Guarantee Program Progress Page"). If, during the last seven days of a Guarantee Program Subscription, you are eligible for a Guarantee Extension (and have not met that "special someone"), you may accept the Guarantee Extension by affirming on the Guarantee Program Progress Page that you have not met someone special during your Guarantee Program Subscription. Please see the Match.com Guarantee FAQ for further information. You may also contact Customer Care with any questions related to the Match.com service or the Program. Match.com alone will make all decisions under these Program rules regarding Program policies, including but not limited to Program and Guarantee Extension eligibility.

- Customers eligible to receive a Guarantee Extension will not receive a refund, money or any other thing of value as a substitute for the Guarantee Extension. The Guarantee Extension may only be used by the purchaser of the Guarantee Program Subscription, and the Guarantee Extension may not be sold or transferred in any way.

- Guarantee Program Subscriptions which do not result in a Guarantee Extension (due to ineligibility of the subscriber or failure of the subscriber to accept the Guarantee Extension) will automatically be continued for successive six-month subscription periods at the subscription rate in effect at the time of continuation. See Match.com Terms of Use for details regarding Match.com subscriptions and charges on your billing account.

- The Match.com Terms of Use and the Match.com Guarantee Program Rules are subject to change by Match.com at any time, effective upon posting on the Match.com website, and your use of the Match.com service and your initial or continued participation in the Match.com Guarantee Program after such posting will constitute acceptance by you of such changes. Match.com reserves all rights to modify, suspend or cancel the Program at any time and without notice.

- Program rules last updated January 24th, 2008.

As shown above, the Program Rules page disclosed the Guarantee requirements that consumers were required to satisfy during a six-month subscription in clear, easy to read text, and in easily understandable language. The information was also presented in separate bulleted paragraphs with space between the paragraphs, making the page easy for consumers to read. Match.com further emphasized the primary actions that each subscriber had to take to become eligible for the Guarantee by using a bolded font.

As identified in the Program Rules, to assist consumers in tracking their progress toward the Guarantee, Match.com designed a webpage specifically dedicated to displaying consumers' status toward meeting the Guarantee requirements: the "Progress Page." Subscribers could track their Guarantee progress at all times during their six-month Guarantee-eligible subscription by visiting the Progress Page. The Progress Page is reproduced below. *See* MATCHFTC774538; MATCHFTC774527.



The Guarantee was designed to be easily redeemable directly on the Match.com platform through the Progress Page. During the last seven days of the Guarantee-eligible subscription, when subscribers visited the Progress Page, they were prompted to indicate whether or not they had met someone. If they had not met someone, subscribers could directly affirm that fact on the Progress Page. If they had taken all of the Guarantee-required actions and affirmed that they had not met someone during the Guarantee-eligible subscription period, Match.com would automatically

provide the subscriber with complimentary access to Match.com for the following six-month period subscription, i.e., a Guarantee Extension. Subscribers could also contact Match.com Customer Care directly during the last seven days of the Guarantee-eligible subscription period to redeem the Guarantee.

**INTERROGATORY NO. 11:** Identify the number of consumers whose request for a Guarantee Extension were denied due to that limitation or for failing to complete that particular action.

**RESPONSE:** MGL objects to this Interrogatory because "that limitation" and "that particular action" are vague and undefined and to the extent this Interrogatory seeks Privileged Information. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued the "Match Guarantee" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count III in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to the "Match Guarantee" violated the FTC Act are impermissibly burdensome and calculated to harass.

Subject to and without waiving the foregoing objections, MGL responds that it permanently discontinued the Guarantee in April 2019. It has not offered the Guarantee since that date, and it will not reinstitute the Guarantee in the future.

**FIRST AMENDED RESPONSE**: Based on the November 1 Order and the Counts III and IV Agreement, MGL responds as follows: the terms "that limitation" and "that particular action" are so vague and undefined that MGL does not understand the information that the FTC is seeking with this Interrogatory. MGL invites the FTC to serve a more precise interrogatory or to otherwise explain to MGL the information that the FTC seeks with this Interrogatory.

**INTERROGATORY NO. 12:** Describe all of Match's policies relating to Customer Chargebacks, including regarding:

    a.    the circumstances in which Match Group[,] LLC will dispute a Customer Chargeback;

    b.    denying Customer account access due to a Chargeback request;

    c.    deleting or reinstating accounts of consumers who unsuccessfully attempt a Chargeback and when such deletions or reinstatements are effective; and

    d.    the effective dates of the policies.

**RESPONSE:** MGL objects to this Interrogatory because "Match" is undefined, and it is unclear what the FTC means by "Match," given the FTC's history and positions taken in this litigation. MGL further objects to this Interrogatory because "denying Customer account access due to a Chargeback request" is vague and confusing; MGL will interpret that subpart of the Interrogatory to mean users that had active subscriptions and were not refunded. MGL also objects to the extent this Interrogatory seeks Privileged Information. MGL further objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued "Chargebacks" and related practices, and MGL has repeatedly told the FTC this orally and in writing. MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count IV in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus,

the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass. Furthermore, the circumstances in which MGL decides to dispute a chargeback are irrelevant, as they are unrelated to the conduct challenged in the Amended Complaint (conduct *after* a chargeback dispute has been resolved). Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as four interrogatories against the 25 interrogatory limit. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control.

Subject to and without waiving the foregoing objections, MGL responds as follows: in March 2019, Match.com, by and through its owner and operator, MGL, discontinued the chargeback policy challenged in the Amended Complaint. It has not implemented the challenged chargeback policy since that date, and it will not reinstitute the challenged chargeback policy in the future. MGL's current chargeback policy is as follows: When a user with an active subscription initiates a chargeback, MGL hides that user's profile (because that user has indicated that he or she no longer wishes to appear on the site), and disables the user's account login (because the user is disputing payment for the service that MGL provides). If MGL disputes the chargeback and prevails, and has not already refunded the user, then MGL re-enables the user's account login, restores the amount of subscription time the user had remaining at the time the account was disabled, and sends the user an email notifying the user that his or her account has been reactivated and containing instructions about how to un-hide his or her profile. For the avoidance of doubt, if

MGL prevails in a chargeback billing dispute with a consumer, MGL does not fail to provide the Consumer access to the consumer's Match.com account or to the subscription service(s) that the consumer paid for, nor does it terminate the consumer's account or delete the consumer's profile because of the chargeback billing dispute in which MGL prevailed.

**FIRST AMENDED RESPONSE**: Based on the November 1 Order and the Counts III and IV Agreement, MGL responds as follows: since July 2013, MGL has disputed chargebacks if it has reason to believe that the chargebacks were frivolous or fraudulent. *See, e.g.*, MGI Resp. to FTC's Suppl. Written Questions, dated June 8, 2018, at 28-29 (providing percentage of chargebacks successfully disputed on monthly basis from Jan. 1, 2013 (though Match.com did not start disputing chargebacks until July 2013) to Apr. 1, 2018).

Before the Chargeback Policy was permanently discontinued in March 2019, if a user initiated a chargeback of Match.com's subscription charges, the user's subscription was suspended because the user had indicated that he or she was disputing the charge for Match.com's services, and no longer wished to appear on the site. If the user prevailed, the charge was reversed, and no further action was required by the user or taken by MGL. If the dispute was resolved in MGL's favor, a user's subscription would not be automatically reactivated for the time that remained until the user requested that the user's account be reactivated, due to MGL's understanding that the user no longer wanted the Match.com service. However, MGL's policy was to reactivate the account and provide a credit for lost time in the event of such contact by a user.

**INTERROGATORY NO. 13:** Describe in complete detail the basis for your contentions that:

    a.    Match.com's Chargeback policy was a reasonable policy designed to protect consumers;

    b.    That Match.com's Chargeback policy was employed to address wrongful Chargeback requests; and

    c.    That subscribers disputing subscription charges were "de facto indicating" that they no longer desired access to their accounts.

**RESPONSE:** MGL objects to this Interrogatory on the grounds that it seeks discovery that is not relevant to any party's claims or defenses and is not proportional to the needs of the case. Match.com has permanently discontinued "Chargebacks" and related practices, and MGL has repeatedly told the FTC this orally and in writing MGL has filed in this Court a sworn Stipulation Regarding Permanently Discontinued Practices on Match.com, Dkt. 146, that provides that MGL and Match.com will never again engage in the conduct challenged in Count IV in the Amended Complaint, to which this discovery relates. The FTC has identified no evidence that the challenged conduct is about to, or is likely to, recur. Thus, the question of whether any injunctive relief should be issued that addresses this alleged conduct is moot and does not ever need to be litigated. The FTC has not alleged that MGL's current chargeback policy (described in response to Interrogatory No. 12) is unreasonable or in violation of the law. For these reasons, discovery into the questions of what occurred or whether the alleged conduct related to "Chargebacks" violated the FTC Act are impermissibly burdensome and calculated to harass. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as three interrogatories against the 25 interrogatory limit.

Subject to and without waiving the foregoing objections, MGL responds as follows: MGL discontinued the chargeback policy challenged in the Amended Complaint in March 2019. It has not implemented the challenged chargeback policy since that date, and it will not reinstitute the challenged chargeback policy in the future.

**FIRST AMENDED RESPONSE:** Based on the November 1 Order and the Counts III and IV Agreement, MGL responds as follows: the Chargeback Policy was permanently discontinued in March 2019. Even when the Chargeback Policy did exist, the Chargeback Policy was used to

address wrongful chargeback requests. When subscribers started a chargeback, it indicated to MGL that they no longer desired access to their accounts.

First, the Chargeback Policy was intended to comply with a consumer's obvious directive to no longer be on the Match.com platform. Prior to the permanent discontinuation of the Chargeback Policy, when a consumer initiated a chargeback through the consumer's financial institution, the consumer's subscription was suspended because the consumer had indicated that he or she was disputing the charge for Match.com's services, and no longer wished to appear on the site. If MGL disputed the chargeback and the dispute was resolved in MGL's favor, the consumer was able to request that the consumer's account be reactivated. MGL's policy was to reactivate the account and provide a credit for lost time in the event of such contact by a consumer; however, the consumer's account was not automatically reactivated due to MGL's understanding that the consumer no longer wanted to be on the Match.com platform.

In other words, if the consumer initiated a dispute of Match.com's subscription charges, the consumer was indicating that the consumer no longer wanted the Match.com subscription service. By initiating a chargeback, the consumer was indicating that the consumer had not authorized the charge in which access to the Match.com subscription at issue had been purchased. According to the FTC's own guidance, consumers can dispute a credit card for "unauthorized charges."[4] Additionally, in some cases (for example, if the consumer was in a serious relationship), maintaining the consumer's profile on Match.com could cause significant embarrassment or harm for the consumer. Conversely, if the consumer did in fact want to be on the Match.com platform, it was MGL's policy to reactivate the consumer's account and provide a credit to the consumer for lost time in the event the consumer contacted Match.com. These terms were clearly and

---

[4] https://consumer.ftc.gov/articles/using-credit-cards-disputing-charges

conspicuously set forth in the Match.com Terms of Use Agreement effective at the time of the Chargeback Policy. *See* MATCHFTC774614.

Second, the Chargeback Policy was also a reasonable policy designed to protect consumers because it served as a deterrent to consumers filing frivolous or costly billing disputes with Match.com, as such costs would ultimately have to be passed onto subscribers. More specifically, Match.com must defend against an unusually high number of frivolous (and likely fraudulent) billing disputes, which is shown by Match.com's greater than average win rate in billing disputes. *See, e.g.*, MGI Resp. to FTC's Suppl. Written Questions, dated June 8, 2018, at 28-29 (providing percentage of chargebacks successfully disputed on monthly basis from Jan. 1, 2013 (though Match.com did not start disputing chargebacks until July 2013) to Apr. 1, 2018). Match.com's costs in defending billing disputes are substantial, and such costs must ultimately be passed onto subscribers. Thus, the Chargeback Policy served as a deterrent to consumers filing illegitimate billing disputes, which is another reason the Chargeback Policy was a reasonable policy designed to benefit consumers.

**INTERROGATORY NO. 14:** On a monthly basis, state:

    a.    the number of Customer communications Match Group[,] LLC received regarding account cancellation or cancellation processes;

    b.    the number of refund requests made by Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

    c.    the dollar value of the refund requests made by Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

    d.    the number of refunds Match provided to Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

    e.    the dollar value of the refunds provided to Customers who claimed they believed they already canceled their subscriptions or who attempted to cancel;

    f.    the amount charged to Customers who had requested a refund on the basis that they believed they had cancelled and had this request denied by Match Group[,] LLC; and

g.    the amount charged to Customers who had requested a refund on the basis that they were unaware of Match Group[,] LLC's recurring charge and had this request denied by Match Group[,] LLC.

**RESPONSE:** MGL objects to this Interrogatory because "Match" is undefined, and it is unclear what the FTC means by "Match," given the FTC's history and positions taken in this litigation. MGL will respond only as to Match.com, the only dating site relevant in this action. MGL further objects to this Interrogatory because "Customer communications," "account cancellation or cancellation processes," "attempted," "believed," and "claimed," are vague and undefined. In particular, MGL objects that it would be impossible to provide the "the number of Customer communications Match Group[,] LLC received regarding account cancellation or cancellation processes," as requested in subpart (a), so MGL will provide the number of Customers who cancelled their subscriptions. MGL also objects that it is impossible to identify Customers who "attempted to cancel," so MGL will respond to subparts (b), (d), and (e) only as to "Customers who claimed they believed they already canceled their subscriptions." MGL further objects that subpart (c) is vague and incalculable because, although MGL is able to ascertain which Customers requested and received a refund, MGL is not able to provide the amount of the refund that each Customer sought from MGL, which could be different from the amount of the refund that the Customer actually received from MGL. MGL also objects that subpart (f) is confusing and impossible to calculate, as MGL does not understand what information the FTC seeks in this subpart, and MGL is not able to interpret the subpart in such a way that it could provide any other information than what MGL is already providing for the other subparts. MGL further objects to this entire Interrogatory as overly broad and unduly burdensome, particularly as it relates to subpart (g), as recurring charges (in the absence of a request to cancel) are not relevant to any party's claim or defense. MGL also objects that each subpart seeks information beyond the scope of the

applicable statute of limitations period for any purported right of the FTC to monetary relief or redress against MGL, so MGL will provide information for the period beginning three years before the FTC filed the Amended Complaint and named MGL as a defendant. *See* Am. Compl., Dkt. 116 (filing Amended Complaint and naming MGL as defendant on July 19, 2022).

MGL also objects to this Interrogatory to the extent this Interrogatory seeks Privileged Information. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL will treat this as seven interrogatories against the 25-interrogatory limit. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, MGL does not concede the relevancy of this Interrogatory nor the relevancy or admissibility of any information provided in response thereto. That information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case.

Subject to and without waiving the foregoing objections, MGL responds as follows:

Pursuant to Rule 33(d), MGL directs the FTC to documents that will be produced by MGL containing data responsive to the Interrogatory. Once produced, MGL will identify those documents by Bates number.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

**INTERROGATORY NO. 15:** Describe each method through which consumers could cancel their subscriptions. For each such method, describe in detail:

> a.  every instance in which Match Group[,] LLC informed consumers of or disclosed to consumers the availability of each method;
>
> b.  each step that consumers would have to take in order to successfully cancel their Match.com subscription; and
>
> c.  each representation that Match has made to consumers at each step in the cancellation process.

**RESPONSE:** MGL objects to this Interrogatory because "Match" is undefined, and it is unclear what the FTC means by "Match," given the FTC's history and positions taken in this litigation; MGL will interpret "Match" to mean MGL. MGL also objects that this Interrogatory is vague and ambiguous because it does not identify what subscriptions are at issue. MGL will interpret this Interrogatory to ask about Mach.com subscription. MGL further objects that subparts (b) and (c) of this Interrogatory are vague and undefined because the differences between what the FTC seeks within each subpart are not clear. MGL also objects to the extent this Interrogatory seeks Privileged Information. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, MGL does not concede the relevancy of this Interrogatory nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case.

Subject to and without waiving the foregoing objections, MGL responds as follows:

Match.com offers multiple simple mechanisms for consumers to cancel their subscriptions, including by the Match.com online cancellation flow, online chat, telephone, email, U.S. mail, and

**APP 1243**

fax. Match.com discloses these simple cancellation mechanisms throughout the registration process and Match.com, including in Match.com Frequently Asked Questions ("FAQ") pages. Consumers frequently and successfully use such mechanisms to cancel their subscriptions. *See, e.g.*, *infra* Resp. to Interr. No. 16.

Match.com discloses how to cancel a subscription throughout the registration process on the first page of the subscription flow, the billing page before the consumer subscribes, and the subscription confirmation page if the consumer subscribes. Before consumers select a subscription plan or provide billing information, consumers have access to a "Billing—Continuous Service" screen, which provides, "To change or cancel your subscription at any time, click the 'Account' link on the upper-right corner of the website and follow the directions. You can also change or cancel your subscription by contacting our Customer Care team as directed on the website."

Before consumers subscribe, Match.com again informs consumers of the cancellation mechanisms on the billing page with a disclosure above the "Subscribe Now" button. The disclosure provides that consumers can "cancel via the Account Settings page." A hyperlink with the words "Learn More" also appears in blue text near the "Subscribe Now" button, and "Learn More" again leads to the "Billing—Continuous Service" screen that describes the cancellation mechanisms in greater detail. In addition, immediately to the left of the "Subscribe Now" button is a hyperlink to the Match.com Terms of Use in blue text. The Terms of Use[5] provide in red text, "If you purchase a subscription, it will automatically renew until you cancel, in accordance with the terms disclosed to you at the time of purchase, as described below." The Terms of Use further provide a mailing address and fax number to send cancellation notices, which consumers have recently utilized to cancel their subscriptions. *See, e.g.*, MATCHFTC744797 (cancelling via U.S.

---

[5] https://cp.match.com/en-us/resources/TermsOfUse_02_28_22.pdf

mail); MATCHFTC744802 (same); MATCHFTC744806 (same); MATCHFTC744810 (same); MATCHFTC744801 (cancelling via fax).

Following payment of a subscription, consumers are directed to a subscription confirmation page, which provides, "To cancel, you may visit your Account Settings at any time." The words "Account Settings" are a hyperlink in blue text that directs consumers to the Account Settings page for cancellation through the online cancellation flow, described in more detail below.

Consumers may also find information about how to contact Customer Care or otherwise cancel a subscription by visiting various Match.com FAQ pages. The "Contact Us" FAQ page[6] provides several options to contact Customer Care, including through chat or email, and a phone number may be displayed if the consumer is logged into the consumer's account when viewing that FAQ page. The "Cancelling" FAQ page,[7] which may be found by merely searching "cancel" on the FAQ page, describes how to cancel a subscription (i.e., turn off auto-renewal).

The simple steps to cancel through each cancellation mechanism are outlined below:

**Online Cancellation Flow.** A consumer may cancel a Match.com subscription by utilizing the online cancellation flow, which easily can be completed in less than one minute. *See, e.g.*, MATCHFTC672322-MATCHFTC672329 (videos of Match.com online cancellation flow).[8] From the "Account Settings" page, the consumer clicks "Manage subscription" (which is in the "Manage account" group), inserts the consumer's password and completes a reCaptcha (to ensure that a consumer's billing data remains secure), and then clicks "Cancel Subscription." The consumer is asked a few optional survey questions; the consumer may answer the survey questions or may simply click "Continue Cancellation." The consumer then reaches a cancellation

---

[6] https://help.match.com/hc/en-us/articles/6140024199195-Contact-Us
[7] https://help.match.com/hc/en-us/articles/6077124196891-Cancelling
[8] In early 2019, "Change/Cancel Membership" was changed to "Manage subscription," a Captcha was added to the password page, and "No thanks, I want to resign" was changed to "Continue Cancellation."

confirmation page, which provides (1) a confirmation number, (2) that the consumer does not have to do anything further to complete the subscription cancellation, (3) the last day of the consumer's subscription, and (4) that the consumer will receive an email confirming the cancellation.

**Online Chat.** A consumer may cancel a Match.com subscription by sending the consumer's cancellation request via chat to Match.com Customer Care. The chat mechanism can be found on the Customer Care Contact Us FAQ page. Customer Care will then process the request.

**Telephone.** A consumer may cancel a Match.com subscription by calling the Match.com Customer Care phone number, 800-926-2824, and stating the consumer's request to cancel the consumer's subscription. The phone number has been generally available on the FAQ pages. Customer Care will then process the request.

**Email.** A consumer may cancel a Match.com subscription by emailing the consumer's cancellation request to Match.com Customer Care. The email mechanism can be found on the Customer Care Contact Us FAQ page. Customer Care will then process the request. Customer Care has offshore agents that respond to e-mails after hours and during weekends.

**U.S. Mail.** A consumer may cancel a subscription by mailing the consumer's cancellation to Match, Attn: Cancellations, P.O. Box 25472, Dallas, Texas 75225. The address can be found in the Match.com Terms of Use. The request should state that the consumer is cancelling the agreement, or words of similar effect, and include the consumer's name and email address, phone number, or other unique identifier used to sign up for the account so that Match.com can identify the appropriate account. Customer Care will then process the request.

**Fax.** A consumer may cancel a Match.com subscription by sending a fax with the consumer's request to cancel the consumer's subscription to 214-853-4309. The fax number can

be found in the Match.com Terms of Use. The request should state that the consumer is cancelling the agreement, or words of similar effect, and include the consumer's name and email address, phone number, or other unique identifier used to sign up for the account so that Match.com can identify the appropriate account. Customer Care will then process the request.

**SECOND AMENDED RESPONSE:** Match.com no longer operates a Customer Care call center. Instead, consumers are encouraged to use Match.com self-help options (such as the Help/FAQ pages on Match.com or the online cancellation flow), or to contact Customer Care via other methods, such as the Customer Care online chat or email address. Match.com does not currently include a Customer Care phone number on its website. Consumers that contact Match.com's Customer Care phone number are provided with an automated recording. That recording provides consumers with help regarding various topics, including providing instructions on how to cancel their Match.com subscription via the online cancellation flow. Consumers are also informed that they may receive personalized support through the Customer Care online chat or email address. Each segment of the automated phone recording has been produced at MATCHFTC846840–MATCHFTC846846. While a consumer may no longer cancel a Match.com subscription by calling the Match.com Customer Care phone number and talking to a live agent, the consumer may still cancel a Match.com subscription via numerous other methods, including the online cancellation flow, online chat, email, U.S. mail, and fax.

Additionally, the "Contact Us" FAQ page cited in footnote 6, as it existed at the time MGL served its First Amended Responses, was produced at MATCHFTC672345. The link is dynamic, so the website has since changed. The link cited in footnote 6, as it exists at the time of the Second Amended Responses, is titled "Does Customer Support have a phone number?" and was produced at MATCHFTC846847.

The "Cancelling" FAQ page cited in footnote 7, as it existed at the time MGL served its First Amended Responses, was produced at MATCHFTC846848. The link is dynamic, so the website has since changed. The link cited in footnote 7, as it exists at the time of the Second Amended Responses, is titled "Canceling" and was produced at MATCHFTC846849. The "How to Cancel Auto Renewal" video embedded within that "Canceling" FAQ page was produced at MATCHFTC846853.

**INTERROGATORY NO. 16:** State on a month by month basis the number of consumers that have cancelled a Match.com subscription by the following mechanisms:

   a.    fax;
   b.    online chat;
   c.    telephone;
   d.    U.S. mail;
   e.    Match.com's cancellation flow; and
   f.    Any other method.

**RESPONSE:** MGL objects to this Interrogatory to the extent this Interrogatory seeks Privileged Information. Additionally, MGL objects to this Interrogatory as it includes more than one single discrete question ultimately violating the Rules that limit each party to 25 single questions, including subparts. MGL also objects to this Interrogatory to the extent it seeks to require MGL to provide information that is already in Plaintiff's possession, custody, or control. By responding to this Interrogatory, MGL does not concede the relevancy of this Interrogatory nor the relevancy or admissibility of any information provided in response thereto. The fact that information is provided in response to this Interrogatory does not mean that it is probative of any particular issue in this case. MGL further objects to this Interrogatory as overly broad and unduly burdensome to the extent that it requests information that is not reasonably available to MGL, particularly insofar as Plaintiff is demanding almost ten years' worth of data, from 2013-present. MGL also objects that

each subpart seeks information beyond the scope of the applicable statute of limitations period for any purported right of the FTC to monetary relief or redress against MGL, so MGL will provide information for the period beginning three years before the FTC filed the Amended Complaint and named MGL as a defendant. *See* Am. Compl., Dkt. 116 (filing Amended Complaint and naming MGL as defendant on July 19, 2022). MGL sometimes does not have data about the method by which a consumer canceled his or her subscription. MGL will respond to the best of its knowledge and ability.

Subject to and without waiving the foregoing objections, MGL responds as follows:

Pursuant to Rule 33(d), MGL directs the FTC to documents that will be produced by MGL containing data responsive to the Interrogatory. Once produced, MGL will identify those documents by Bates number.

MGL expressly reserves the right to supplement or amend this response, as discovery and document production is ongoing.

[signature page to follow]

Dated: May 19, 2023

/s/  Angela C. Zambrano
Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Fax: 214.981.3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310.595.9500
Fax: 310.595.9501

*Attorneys for Match Group, Inc. and
Match Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the above and forgoing document

was served on all counsel of record via e-mail as outlined below on May 19, 2023.

Reid Abram Tepfer
rtepfer@ftc.gov
M Hasan Aijaz
maijaz@ftc.gov
Matthew James Wilshire
mwilshire@ftc.gov
Sarah Zuckerman
szuckerman@ftc.gov
John R. O'Gorman
jogorman@ftc.gov
Erica Rollins Hilliard
ehilliard@ftc.gov

/s/  *Angela C. Zambrano*
Angela C. Zambrano

DocuSign Envelope ID: 83A3EC98-88ED-4777-8C52-14D7750BD298

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                  Plaintiff,<br><br>   vs.<br><br>MATCH GROUP, INC., a corporation, and<br>MATCH GROUP, LLC, formerly known as<br>MATCH.COM, LLC, a limited liability<br>company,<br><br>                Defendants. | Case No. 3:19-cv-02281-K |

**DUSHYANT SARAPH'S VERIFICATION OF MATCH GROUP, LLC'S**
**SECOND AMENDED RESPONSES TO PLAINTIFF FEDERAL TRADE**
**COMMISSION'S FIRST SET OF INTERROGATORIES**

I, Dushyant Saraph, state that I am the General Manager of Match and Match Verticals, for Match Group, LLC ("MGL"). I provide this verification of MGL's Second Amended Responses to Plaintiff Federal Trade Commission's First Set of Interrogatories (the "Responses"). I further state that the Responses have been prepared by counsel for MGL in consultation with me and others with knowledge of the matters involved; that the facts are based upon the business records of MGL, with which I have general familiarity; and that, to the best of my knowledge and belief, all of the facts stated therein are true and correct in all material respects with the understanding that MGL is continuing to research its Responses and reserves the right to supplement its Responses as authorized by the Federal Rules of Civil Procedure and any other applicable law.

I verify under penalty of perjury that the foregoing is true and correct in all material respects.

DocuSign Envelope ID: 83A3EC98-88ED-4777-8C52-14D7750BD298

Dated: May 19, 2023 _____

Respectfully submitted,

DocuSigned by:

*Dushyant Saraph*
_____
Dushyant Saraph

# EXHIBIT X

Cancellation flow:

Adds unnecessary friction
Requires a password to manage subscription
Even on a free account, you get this password barrier:



BUT! Clicking manage subscription appears to be the only thing that brings up the password window. Clicking any other option (including delete!) doesn't give you a password request. (Instead, with Delete you get a bunch of guiltshaming steps.)

TODO: map out flow w/no extra steps
TODO: map out flow including the upsell step
TODO: calculate max number of steps in existing flow
TODO: find references for quantifying friction/when adding additional steps or hurdles to an online flow translates to lost customers
- Nielsen/Norman
- Surveys - things you have to fill out
- Radio buttons - effect of that
- Is a cancellation flow the best place to offer a survey? (could we standardize the process for post-cancellation surveys, for example?) - forcing users to do it as part of the cancellation process is inappropriate
- Password friction
- Review Match.com cancellation steps:
  https://help.match.com/hc/en-us/articles/6077124196891-Cancelling - note that they don't provide detailed steps for canceling an account, but have very detailed steps for canceling additional features
- Sign-up for Match 3 day free trial?
  https://www.match.com/cpx/en-us/landing/search/208264-free-trial/

Survey questions are optional

**Which dark patterns are at play here?**

1. **Obstruction** (Making a process more difficult than it needs to be, with the intent of dissuading certain action(s).) – specifically, roach motel (can't cancel). The insertion of excessive/unneeded steps into the cancellation flow is obstruction. (https://darkpatterns.uxp2.com/ & https://webtransparency.cs.princeton.edu/dark-patterns/ )

2. **Forced action** (Requiring the user to perform a certain action to access (or continue to access) certain functionality.) – the survey questions (despite being "optional") are a form of forced action - giving the user the impression that they are required. The user would have to take the time to experiment in order to ascertain that they aren't necessary. Password prompt might be classifiable as forced action.

3. Misdirection? (Using visuals, language, or emotion to steer users toward or away from making a particular choice.) – this might be a question of analyzing language, placement of links, etc. carefully

   a. The language used might encourage users to fill out the survey, even though it's optional. Exs: "Tell us more." "Before you go, help us make Match.com better." These statements lead users to believe they *must* divulge their experience before canceling. A more honest way for Match to present itself would be  "Would you like to take a survey?" making it clear that it is optional.

   

   b. In some cases, I can see the "1000 characters remaining field" being a deterrent. Users might click back to the survey questions, change their answers in hopes of not getting this open ended text field.

   c. "Lose the benefits," "you risk losing," "you won't know." Canceling the service is framed as a **loss** rather than a plain option. A more neutral way might be, "If you cancel now, you will lose access to: who's viewed your profile, email communications, our current monthly rate." also "resign" is a loaded word!

   

JP: These are some of the initial dps identified from the report and documents. If any are beyond the scope of what we're mapping, let me know and I'll strike it.

- Bait and Switch: Nonsubscribers receive emails indicating a Match.com user has expressed interest in him or her ('bait'). Upon buying a subscription to Match.com new subscribers learn the account that reached out to them was fraudulent or 'unavailable' for viewing ('switch').

- Trick Questions: The Guarantee Program Subscription indicates that users are eligible for a Guarantee Extension (free six-month subscription) if they have not met their "special someone." In obtaining the extension, users are asked, "Did you meet anyone during your 6-month guarantee program?" This question is misleading, asking users if they have met *anyone* during their subscription period rather than if they have met their "special someone." The terminology change from the service agreement to the eligibility question tricks users into answering in a way that excludes them from being eligible for the Guarantee Extension.

- Roach Motel: Brignull describes the "roach motel" as when "the design makes it very easy for you to get into a certain situation, but then makes it hard for you to get out of it (e.g. a subscription)."[1] Match.com attracts users to their subscription services with Guarantee Extensions and emails from "interested" users. But, canceling a subscription proves lengthy, including the provision of a password and survey answers. The cancellation process can often exceed *six* page clicks. Users routinely get billed after they believed they canceled their subscription.

- Hidden Information: Match.com frequently hides or fails to disclose relevant information to users. For example, the survey form during the cancellation flow is actually optional: it is possible for users to click through the flow and cancel without providing answers. However, this fact is *never stated* during the cancellation flow, nor are users asked if they want to complete a survey. Moreover, statements such as "Tell us more." and "Before you go, help us make Match.com better" lead users to believe the survey is compulsory. Other important eligibility requirements are embedded in unnumbered paragraphs in the Guarantee Program rules, including the presence of a progress page.

---

[1] Brignull, *supra.*

- Forced Continuity: This "negative option renewal" prolongs users' service with Match.com after their initial subscription: subscribers are charged automatically for a subsequent term unless they explicitly cancel the subscription. Subsequently, "this pattern takes advantage of users' failure to check up on service expiration dates, either for a free trial or for a limited-time use of a paid service, by **assuming** upon service expiration that the user either wants to continue the paid service…and charges the user."[2]

**Total number of steps to cancel**
2016:
1. Select settings
2. Select Change/Cancel membership from account settings page
3. Enter password on password screen
4. Page 1 of cancellation flow: Click "Cancel Subscription" from subscription menu options
5.

**Notes from Wroblewski, Web Form Design: Filling in the Blanks**

"To keep people focused on completing a form, you also should consider which Web site elements help illuminate a clear path to completion and which elements distract from it."
"Removing interface elements not directly related to completing a form helps keep people on task and removes paths to abandonment." (Ch. 3)

Best practices (Ch. 3):
Make sure that you illuminate a clear path to completion through a form by using clear scan lines and effective visual pacing that comfortably takes people from start to finish.
For mission-critical forms like check-out or registration, remove distractions and any links or content that may lead to form abandonment.

Ch. 10: Unnecessary Inputs
- Discussion of removing questions that can apply to the survey questions
"Any question you ask people requires them to parse it, formulate a response, and then input their answer in the affordance you have provided on the form. Being vigilant about every question you ask allows you to remove questions that are not absolutely necessary, or can be asked at a better time or place, or can be inferred automatically."

**Research on password friction:**

https://uxdesign.cc/15-rules-of-user-sign-in-experience-ae9011d04ee3

---

[2] Gray, *supra* at 6.

"Unless your site holds sensitive information, allow persistent logins. This is especially true for ecommerce sites. Persistent logins allow the user to experience the site and the actions they've taken. You are a UX criminal if you auto-logout users after a certain time. Sessions may expire, but let the users actions (like items added to cart), remain. You can restrict access to personal information with a password prompt, outside of session expiry. Amazon does this beautifully by keeping you partially logged in and asking for authentication only when you need to access personal information." - useful for making the argument that the "personal info" they are restricting access to is inconsistent both internally compared to other parts of the account, as well as comparatively across other companies

https://www.beyondidentity.com/blog/password-resets-and-the-consumer-journey
- "Half of respondents were likely to leave a site if required to sign-in with a password."
- Includes online dating in their summary of sites where users have to reset passwords

https://www.mcclatchydc.com/news/nation-world/national/article156635539.html
Forgot your password? You have too many and stores are losing business over it By Tim Johnson tjohnson@mcclatchydc.com Updated June 16, 2017 7:03 PM
- Baymard says it sees an 18.75 percent abandonment rate due to reset email issues.

https://baymard.com/research/checkout-usability
- During testing, receiving the **password-reset email** was an especially problematic step, with many participants becoming frustrated and abandoning their task when password emails were delayed or caught in spam filters, or when they had separate issues with signing in to their email account in the first place.
- Indeed, our testing revealed that, in practice, restrictive-password requirements carry serious checkout UX — and, thus, conversion rate — consequences. Some sites during our testing, saw up to 18% abandonment rates among all their existing account users, as these users tried to sign into their existing accounts but couldn't due to forgotten passwords (and ended up abandoning during the password reset process).

- https://www.spiceworks.com/marketing/ecommerce/news/58-consumers-abandon-shopping-carts-due-to-log-in-frustrations-survey-finds/
  - The survey that polled 1,000 consumers in the U.S. revealed that 58% of consumers have abandoned carts and stopped their purchases due to difficulty signing in. Consumers canceled these transactions because they could not remember their password or were being forced to create a new account and password to make the purchase.
  - Note that I can't find the details on this survey, so cite with caution.

**Friction, interaction cost, cognitive load:**
https://www.nngroup.com/articles/pain-points/

https://www.nngroup.com/articles/interaction-cost-definition/
https://www.nngroup.com/articles/minimize-cognitive-load/


From mathur's paper 'what makes a dark pattern dark':
https://arxiv.org/pdf/2101.04843.pdf

2.3.1 Asymmetric. Asymmetric dark patterns impose unequal burdens on the choices available to the user. The choices that benefit the service are feature prominently while the options that benefit the user are typically tucked away behind several clicks or are obscured from view by varying the style and position of the choice. Asymmetric dark patterns are particularly common in consent interfaces. For instance, the Trick Questions dark pattern can impose a cognitive burden on choices that withhold consent by using confusing language and double negatives. The Confirmshaming dark pattern can use emotion to burden choices, associating guilt with certain choices and not others. Privacy Zuckering burdens choices with user interface friction, hiding privacy-respecting settings behind obscure menus.

The concern about the cognitive burden of an interface has not been cited an explicit normative concern in the dark patterns literature. If the concern is raised, it is in the context of specific dark patterns such as Nagging, Hard to Cancel, and Hidden Legalese Stipulations (and other information overloading dark patterns). As one example, in the context of cookie consent dialogs, Soe et al. [47] argue that cookie consent dialogs without a negative option to deny consent "also introduce additional cognitive burden on the user." Figure 2 shows once instance of a cookie consent dialog with a hard to exercise deny option

The regulatory objectives perspective on dark patterns is more instrumental then normative—the most forceful normative arguments for implementing regulatory objectives are typically the normative arguments for those objectives, rather than compliance with regulation in the abstract. This perspective does not inherently advance a normative argument about why we should care financial losses, privacy harms, or cognitive burdens, beyond noting whether the law directs us to care about those values. This perspective does come with a significant advantage, though: fashioning regulation into measurable metrics for empirical research is usually much easier than adapting normative principles to research.

Evaluation. The regulatory objectives perspective on dark patterns is more instrumental then normative—the most forceful normative arguments for implementing regulatory objectives are typically the normative arguments for those objectives, rather than compliance with regulation in the abstract. This perspective does not inherently advance a normative argument about why we should care financial losses, privacy harms, or cognitive burdens, beyond noting whether the law directs us to care about those values. This perspective does come with a significant advantage, though: fashioning regulation

into measurable metrics for empirical research is usually much easier than adapting normative principles to research.

**Caro's paper:**

https://www.gmfus.org/sites/default/files/Sinders%2520-%2520Design%2520and%2520Information%2520Policy%2520Goals.pdf

- Don Norman's 1988 Design of Everyday Things helped popularize the term "User-Centered Design."3 His six design principles have since become foundational in the product design space.4 They are:
  - Visibility, referring to how apparent functions are. The more visible functions within a product, the more likely it is for a user to be able to figure out what to do next.
  - Feedback, creating information about an action and what was accomplished.
  - Constraints, referring to how to restrict or select what kinds of interactions a user can do at any particular moment within a product.
  - Mapping, referring to the relationship between users, controls, and the effects of controls in the world. Almost all products have a relationship between controls and effects, be it a light switch, an e-commerce platform, a car, or a flashlight.
  - Consistency, referring to designing interfaces or design choices that have similar operations, interactions, and elements for specific tasks. For example, consistency can be a back button and a forward button placed in the same place throughout a digital experience.
  - Affordance, referring to the attributes of products and how those attributes guide or allow users to know how to use the object. A computer mouse invites touching with buttons but is also constrained to fit into one's hand.5
- Burying choices within multiple steps. Some labels responsive to regulatory requirements are designed to secure consent in ad tracking but are hard to find. For example, some website labels designed to comply with the European Union's General Data Protection Regulation (GDPR) hide "reject" buttons underneath multiple steps.22
- Confusion within sign-up and unsubscribe features. This can be seen in sign-up flows on websites where the user intends to sign up for one subscription but is tricked into signing up for multiple subscriptions and/or products.23
- Design can subvert or thwart policy intentions. If we look to Norman's principles for guidance in building a product, then design should clearly represent how a product functions, with user feedback, clear constraints as to what a product can do, and consistency across interfaces. Dark patterns serve as opposite examples of such principles at work, causing confusion and inconsistency in interfaces, while often not accurately presenting what a product or design is capable of. The

unsatisfactory implementation history of recent regulations offers examples of how dark patterns can subvert policy

Could we use 'ease of use' to help prove that the survey didn't read as optional?
https://www.interaction-design.org/literature/topics/ease-of-use

**Apple iOS/Design Guidelines for canceling an account:**
https://developer.apple.com/design/human-interface-guidelines/patterns/managing-accounts

If you help people create an account within your app or game, you must also help them delete it, not just deactivate it. In addition to following the guidelines below, be sure to understand and comply with your region's legal requirements related to account deletion and the right to be forgotten.

IMPORTANT

If legal requirements compel your app to maintain accounts or information — such as digital health records — or to follow a specific account-deletion process, clearly describe the situation so people can understand the information or accounts you must maintain and the process you must follow.

Provide a clear way to initiate account deletion within your app or game. If people can't perform account deletion within your app, you must provide a direct link to the webpage on which people can do so. Make the link easy to discover — for example, don't bury it in your Privacy Policy or Terms of Service pages.

DEVELOPER NOTE

If people used Sign in with Apple to create an account within your app, you revoke the associated tokens when they delete their account. See Revoke tokens.

Provide a consistent account-deletion experience whether people perform it within your app or game or on the website. For example, avoid making one version of the deletion flow longer or more complicated than the other. Consider letting people schedule account deletion to occur in the future. People can appreciate the opportunity to use their remaining services or wait until their

subscription auto-renews before deleting their account. If you offer a way to schedule account deletion, offer an option for immediate deletion as well.

Tell people when account deletion will complete, and notify them when it's finished. Because it can sometimes take a while to fully delete an account, it's essential to keep people informed about the status of the deletion process so they know what to expect.

If you support in-app purchases, help people understand how billing and cancellation work when they delete their account. For example, you might need to help people understand the following scenarios:

- Billing for an auto-renewable subscription continues through Apple until people cancel the subscription, regardless of whether they delete their account.
- After they delete their account, people need to cancel their subscription or request a refund.

In addition to helping people understand these scenarios, provide information that describes how to cancel subscriptions and manage purchases. For guidance, see Helping people manage their subscriptions and Providing help with In-App Purchases.


**Survey Best Practices**
https://www.surveymonkey.co.uk/mp/survey-guidelines/
This suggests emailing ppl info about the survey and the survey:
https://help.surveymonkey.com/en/surveymonkey/policy/data-collection-privacy/

**All unsubscribe survey stuff Caro could find**
- https://www.campaignmonitor.com/blog/email-marketing/find-out-reasons-for-unsubscribing-with-a-quick-exit-survey/
  - This is for newsletters, fyi (their suggestions)
  - This suggests an optional survey
  - "The quality of your unsubscribe email page can make a difference in increasing subscriber retention rates. The takeaway is not to think of an unsubscribe email message as an unsubscribe exit strategy, but rather a method to improve your content for future customers."
  - All of their email unsubscribe survey examples are ONE interstitial and one question! Just one!

- https://ux.stackexchange.com/questions/17054/should-survey-for-canceling-subscription-be-before-or-after-the-subscription-is
  - One answer suggests a single set of radio dial questions with the un-subscribe (so one question)
    - "If a user goes to the trouble of unsubscribing from something, they *really want to*, and are having some sort of negative experience that they want to alleviate. To retain as much goodwill as possible with the customer, **let them do what they want** -- cancel. To gather a bit of data before they leave, such as the answer to "Why?" then present them with a single set of radio buttons with predetermined answers, and one optional textarea to say more. The act of submitting the form both saves the data point and allows them to complete the action they want to perform. If you really need/want to ask more than one question, then in my experience the most successful response rates are when the questions are presented after the action. Again, this allows the user to complete what it is that *they* wanted to do; a very clear response on the resulting page that their action is complete, and then a clear (brief) appeal to provide feedback, is more likely to produce results than an up-front action blocker."
  - While this is from 2019, a follow up example shows Facebook's delete account option which is just one question
- https://community.hubspot.com/t5/Tips-Tricks-Best-Practices/Implement-unsubscribe-survey-when-someone-unsubscribes/td-p/681735
  - This Q&A with hubspot suggests one question as well as why unsubscribe
- https://www.mailerlite.com/blog/unsubscribe-survey-know-why-your-readers-leave
  - Also suggests using a single question for the unsubscribe survey
- https://mailchimp.com/en-gb/help/edit-or-remove-the-unsubscribe-reason-survey/
  - Mailchimp also shows just 1 question
- https://www.termsfeed.com/blog/unsubscribe-best-practices/
  - This says to let users unsubscribe quickly (but they mean actually unsubscribe users in under 10 days- this isnt about the survey)
  - But the survey example they show from Nordstroms shows the survey being called optional
  - And they suggestion making an optional, short survey
- https://medium.com/@the_manifest/9-tips-for-compelling-email-unsubscribe-pages-e2e8cae01c8f
  - This says don't require the survey, make it optional (but the example they use doesn't show that it's optional)
  - "If your reader is at work or otherwise short on time, requiring them to read through a long list of choices in a survey/poll can chase them away. If you want to collect information on why people unsubscribe from your list, try adding a simple and polite survey on your unsubscribe confirmation page. But, don't force readers to answer questions in order to unsubscribe."

- https://www.litmus.com/blog/the-dos-and-donts-of-unsubscribes/
  - This also says "**Don't**: Make people fill out a survey *before* they've unsubscribed"

Examples of other experts calling or highlighting the visual dark patterns in the Match.com user flow as dark patterns:
- Yahoo Unsubscribe:



https://darkpatterns.uxp2.com/pattern/yahoo-confusing-unsubscribe/
- Unclear terms of subscription- Adobe-
  https://darkpatternstipline.org/sightings/unclear-terms-of-subscription/

- Harper's Bazaar cookie banner example:



2.2. Harper's Bazaar's GDPR interstitial, May 2, 2020.

https://www.gmfus.org/sites/default/files/Sinders%2520-%2520Design%2520and%2520Information%2520Policy%2520Goals.pdf

- Is this relevant?
  - https://dl.acm.org/doi/pdf/10.1145/3411764.3445779
  - 2.1.1 Design choices that impact user behavior. In 2019, Utz et al. [96] conducted a field study on more than 80,000 German participants. Using a shopping website, they measured how the design of consent banners influence the behaviour of people acceptance or denial of consent. They found that small UI design decisions (such as changing the position of the notice from top to bottom of the screen) substantially impacts whether and how people interact with cookie consent notices. One of their experiments indicated that dark patterns strategies such as interface interference (highlighting "Accept" button in a binary choice with "Decline"), and pre-selected choices for different uses of cookies has a strong impact on whether the users accept the third-party cookies. In their 2020 study, Nouwens et al. [76] performed a study on the impact of various design choices relating to consent notices, user interface nudges and the level of granularity of options. They scraped the design and text of the five most popular CMPs on top 10,000 websites in the UK, looking for the presence of three features: 1) if the consent was given in an explicit or implicit form; 2) whether the ease of acceptance was the same as rejection—by checking whether accept is the same

widget (on the same hierarchy) as reject; and 3) if the banner contained pre-ticked boxes, considered as noncompliant under the GDPR [44, Recital 32]. In their results, they found less than 12% of the websites they analyzed to be compliant with EU law. In their second experiment, they ran a user study on 40 participants, looking at the effect of 8 specific design on users' consent choices. They recorded an increase of 22 percentage points in given consent when the "Reject all" button was removed from the first page, and "hidden" at least two clicks away from this first page. Finally, they found a decrease of 8 to 20 percentage points when the control options are placed on the first page



Figure 7: Flowchart describing the forms of manipulation we observed in our dataset in relation to the consent task flow, legal consent requirements, and dark patterns strategies.

○

Online dating dark patterns (from academic literature and online resources):
- This online website about dark patterns has a comment about Match.com from 2013
  - https://90percentofeverything.com/2013/07/23/the-slippery-slope/index.html
- This is all about matching expectations but nothing on dating
  - https://www.system-concepts.com/insights/persuasive-design-vs-dark-patterns/
- This mentions an FTC and match.com case as an example of dark patterns…"Despite the overall similarity of the distributions in Figure 1, it does give us our first hints of differences across the modalities. First, the app modality produced the longest tail, with apps like Match Dating and Wish containing 18 and 17 dark patterns respectively.

Second, the service in our corpus with the fewest dark patterns overall (USPS Mobile) only contained one pattern in the app modality and none in the two browser modalities, which contributes to the browser modalities starting at 0."

- ○ https://www.ftc.gov/system/files/ftc_gov/pdf/PrivacyCon-2022-Gunawan-Pradeep-Choffnes-Hartzog-Wilson-A-Comparative-Study-of-Dark-Patterns-Across-Mobile-and-Web-Modalities.pdf
- And from the jackson sun mentioning Match.com
  - ○ https://eu.jacksonsun.com/story/news/2022/04/15/ftc-cracks-down-dark-patterns/7324985001/
- From ACM on match.com
  - ○ https://cacm.acm.org/magazines/2020/9/246937-dark-patterns/abstract
- Mention the adobe.com example here as similar to match.com?
  - ○ https://pacscenter.stanford.edu/wp-content/uploads/2021/07/I-Obscura-Zine.pdf
- Match.com's dark pattern mentioned as a joke here in 2016
  - ○ https://medium.com/@thelonelyrobot/dark-patterns-9748f2b08a95
- First two examples are what Match.com are doing
  - ○ https://www.makeuseof.com/tag/what-are-dark-patterns/

Slightly out of scope but helpful framing stuff [

It is crucial to differentiate between friction that supports mindfulness in users and friction that hinders or holds users hostage within a flow. Friction designed to increase user mindfulness appears in the form of interventions, such as keeping a food diary or photographing meals during one's fitness journey [ ]; challenges or sites of skill enhancement for video game players [ ]; and user-controlled goal; and user-set boundaries for work communications [ ]. These pauses are carefully placed in their interactions to promote users' growth, skill attainment, and quality of life. In these instances, users are provided the tools to breach pauses and control the pace of interaction, aligning them closer to their goals or values. On the other hand, friction that deters users from clearly defined goals (e.g. making a purchase, revoking subscription) leaves the users disempowered, especially when they have little control over when these obstacles are introduced. It is this deterrent friction that is of concern in Match.com's cancellation flow.

- Bait and Switch: Nonsubscribers receive emails indicating a Match.com user has expressed interest in him or her ('bait'). Upon buying a subscription to Match.com new subscribers learn the account that reached out to them was fraudulent or 'unavailable' for viewing ('switch').
- Trick Questions: The Guarantee Program Subscription indicates that users are eligible for a Guarantee Extension (free six-month subscription) if they have not met their "special someone." In obtaining the extension, users are asked, "Did you meet anyone during your 6-month guarantee program?" This question is misleading, asking users if they have met *anyone* during their subscription period rather than if they have met their "special someone." The terminology change from the service agreement to the eligibility question tricks users into answering in a way that excludes them from being eligible for the Guarantee Extension.

]