**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>Plaintiff,<br><br>vs.<br><br>MATCH GROUP, INC., a corporation, and<br>MATCH GROUP, LLC, formerly known as<br>MATCH.COM, LLC, a limited liability<br>company,<br><br>Defendants. | Case No. 3:19-cv-02281-K<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANTS MATCH GROUP, INC. AND MATCH GROUP, LLC'S OBJECTION TO PLAINTIFF'S EVIDENCE AND MOTION TO STRIKE**

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................... 1

II.    STANDARD OF REVIEW ................................................................................. 1

III.   OBJECTIONS .................................................................................................... 1

       A.   Defendants object to the following exhibits as inadmissible hearsay ........................... 1

            1.   Customer complaints to Match.com and related characterizations are hearsay. .... 2

            2.   BBB Complaints are hearsay. ............................................................. 4

            3.   Out-of-court statements contained in emails are inadmissible hearsay. ................ 5

       B.   Defendants object to the following exhibits as not supporting the proposition asserted,
            and therefore irrelevant. ....................................................................... 6

       C.   Defendants object to the following exhibits as inadmissible expert testimony. ............. 18

       D.   Defendants object to the following exhibits as not properly before the Court and
            improperly cumulative. ......................................................................... 18

IV.    CONCLUSION ................................................................................................ 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alzuraqi v. Grp. 1 Auto., Inc.*,
    921 F. Supp. 2d 648 (N.D. Tex. 2013) .........................................................................4

*Bellard v. Gautreaux*,
    675 F.3d 454 (5th Cir. 2012) ......................................................................................1

*Smith ex rel. Estate of Smith v. United States*,
    391 F.3d 621 (5th Cir. 2004) ....................................................................................18

*Hendricks v. Ford Motor Co.*,
    No. 4:12CV71, 2012 WL 4478308 (E.D. Tex. Sept. 27, 2012) ............................2, 4

*Malacara v. Garber*,
    353 F.3d 393 (5th Cir. 2003) ....................................................................................19

*Mary Kay, Inc. v. Weber*,
    601 F. Supp. 2d 839 (N.D. Tex. 2009) .......................................................................4

*Morrison v. Dallas Cnty. Cmty. Coll. Dist.*,
    No. CIV.A. 3:05CV1821-L, 2007 WL 2140581 (N.D. Tex. July 26, 2007),
    *aff'd sub nom. Morrison v. Dallas Cnty. Cmty. Coll.*, 273 F. App'x 407 (5th
    Cir. 2008) ................................................................................................................19

*Nissan Motor Co., v. Armstrong*,
    145 S.W.3d 131 (Tex. 2004)......................................................................................4

*Rock v. Huffco Gas & Oil Co.*,
    922 F.2d 272 (5th Cir.1991) ......................................................................................2

*United States v. Shah*,
    No. 21-10292, 2023 WL 6385685 (5th Cir. Oct. 2, 2023) .................................5, 18

*Williams v. Remington Arms Company, Inc.*,
    No. 3:05-CV-1383-D, 2008 WL 222496 (N.D. Tex. Jan. 28, 2008)..........................4

**Other Authorities**

Fed. R. Civ. P. 56(c) .......................................................................................................1

Fed. R. Civ. P. 401 .........................................................................................................6

Fed. R. Evid. 702 ..........................................................................................................18

Fed. R. Evid. 801(c) ..........................................................................................................1

Fed. R. Evid. 804 .............................................................................................................2

Fed. R. Evid. 803(6) ......................................................................................................2, 4

Fed. R. Evid 807 ............................................................................................................2, 5

Pursuant to Rule 56(c)(2) of the Federal Rules of Civil Procedure (the "Rules"), Defendants Match Group, Inc. ("MGI") and Match Group, LLC ("MGL") respectfully file these objections to Plaintiff's evidence attached as exhibits to the FTC's Motion for Summary Judgment (the "Motion") and move to strike as specified below.

## I.    INTRODUCTION

The FTC has submitted approximately 4,694 pages of "Exhibits" with its Motion. Most if not all of the Exhibits submitted by the FTC in support of its Motion are inadmissible for a number of reasons. They are not relevant to Plaintiff's claims and are rife with inadmissible hearsay. Additionally, several of the exhibits submitted in support of its Motion are not referenced in any way in the opposition, requiring Defendants and the Court to speculate regarding the argument or claim the Exhibits support. Because the FTC's Exhibits do not constitute admissible evidence, much less competent summary judgment evidence, Defendants asks the Court to sustain their objections and strike these Exhibits from the summary judgment record.

## II.    STANDARD OF REVIEW

"In a motion for summary judgment, the evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial." *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (finding inadmissible hearsay cannot support summary judgement motion). Under Rule 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c).

## III.    OBJECTIONS

### A.    Defendants object to the following exhibits as inadmissible hearsay.

A statement is hearsay if it is one that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is admissible only if the proponent of the

1

evidence shows that it falls within one of the hearsay exceptions enumerated in Federal Rules of Evidence 803, 804, and 807. *See* Fed. R. Evid 803, 804, 807. While a statement must be offered to prove the truth of the matter asserted to come within the hearsay rule, a party ***cannot*** circumvent such rule "by arguing that the hearsay is offered not to show the truth of the matters asserted but rather to show the opposing party's knowledge of the truth of the matters asserted." *Hendricks v. Ford Motor Co.*, No. 4:12CV71, 2012 WL 4478308, at *1 (E.D. Tex. Sept. 27, 2012).

1.    **Customer complaints to Match.com and related characterizations are hearsay.**

As numerous courts have held, there can be "no question" that customer complaints, when offered to establish the truth of the matter complained about, are hearsay. *Hendricks*, 2012 WL 4478308, at *1 ("Customer complaints in a company's files are out-of-court statements. If they are offered to prove the truth of the matter asserted—that the incidents complained of in the report occurred as reported—they are hearsay and are inadmissible.").

In the FTC's Motion, it cites customer complaints as alleged proof that Defendants violated Counts III, IV, and V. This is for the truth of the matter asserted, and precisely what the hearsay rule prohibits. The FTC likewise cites many exhibits containing characterizations of those customer complaints, which are likewise hearsay. *See Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 281 (5th Cir.1991) (finding that statements contained in a report made by defendant's agent were not party admissions when the statements were documenting plaintiff's account of the events with no indications that the defendants adopted the version of the facts as recorded). The following exhibits contain inadmissible hearsay complaints:

| FTC's App. Ex. No. | Document Identification | App. Page | Location in Brief |
|---|---|---|---|
| 6 | MATCHFTC330643 | APP-0019 | 2 n.8; 29 n.120; 32 n.136 |
| 29 | MATCHFTC003317 | APP-0243 | 48 n.234 |

| 33 | MATCHFTC568737 | APP-0261 | 10 n.37; 13 n.52; 49 n.238; 51 n.257 |
|---|---|---|---|
| 39 | MATCHFTC786749 | APP-0293 | 11 n.44; 15 n.62 |
| 40 | MATCHFTC452091 | APP-0297 | 11 n.46 |
| 43 | MATCHFTC344243 | APP-0440 | 12 n.48; 15 n.64; 15 n.65 |
| 46 | MATCHFTC416276 | APP-0456 | 14 n.61; 29 n.122 |
| 52 | MATCHFTC729476 | APP-0469 | 14 n.61; 15 n.62; 15 n.65 |
| 53 | MATCHFTC733919 | APP-0473 | 14 n.61 |
| 54 | MATCHFTC745317 | APP-0475 | 14 n.61; 31 n.132 |
| 57 | MATCHFTC828805 | APP-0481 | 14 n.61 |
| 58 | MATCHFTC731875 | APP-0489 | 15 n.63 |
| 59 | MATCHFTC766737 | APP-0491 | 15 n.63 |
| 60 | MATCHFTC417553 | APP-0495 | 15 n.64 |
| 61 | MATCHFTC717261 | APP-0499 | 15 n.64 |
| 62 | MATCHFTC731717 | APP-0506 | 15 n.64 |
| 64 | MATCHFTC835693 | APP-0535 | 14 n.61; 15 n.64; 45 n.224 |
| 65 | MATCHFTC344166 | APP-0540 | 15 n.62; 15 n.65; 15 n.66; 16 n.69; 29 n.122 |
| 66 | MATCHFTC415890 | APP-0546 | 15 n.65 |
| 71 | MATCHFTC452091 | APP-0629 | 16 n.70; 16 n.71 |
| 123 | MATCHFTC669157 | APP-1357 | 22 n.101 |
| 130 | MATCHFTC669602 | APP-1407 | 29 n.120 |
| 131 | MATCHFTC782023 | APP-1410 | 29 n.120 |
| 132 | MATCHFTC601397 | APP-1412 | 29 n.122 |
| 138 | MATCHFTC782259 | APP-1481 | 29 n.124 |
| 141 | MATCHFTC471469 | APP-1546 | 30 n.127 |
| 150 | MATCHFTC427453 | APP-1655 | 31 n.130 |
| 201 | MATCHFTC748736 | APP-2045 | 45 n.222 |
| 206 | MATCHFTC601035 | APP-2060 | 43 n.208 |
| 212 | MATCHFTC427209 | APP-2190 | 45 n.219 |
| 214 | MATCHFTC746470 | APP-2246 | 45 n.219 |
| 217 | MATCHFTC749816 | APP-2256 | 45 n.222 |
| 218 | MATCHFTC766453 | APP-2272 | 45 n.222 |
| 219 | MATCHFTC766456 | APP-2276 | 45 n.222 |
| 220 | MATCHFTC467929 | APP-2278 | 48 n.234 |
| 221 | MATCHFTC771218 | APP-2285 | 48 n.234 |
| 222 | MATCHFTC771248 | APP-2287 | 48 n.234 |

### 2.      BBB Complaints are hearsay.

The FTC submitted over 100 pages of inadmissible hearsay in the form of complaints made to the Better Business Bureau (BBB). *See* Pl. App. 4522. The complaints are not admissible under any of the exceptions to the hearsay rule. Customer complaints are not business records. *See* Fed. R. 803(6). Even assuming the FTC could establish that the documents it seeks to introduce were made "at or near the time" of the complained-of activity and can overcome the indicia of untrustworthiness, *id.*, complaints submitted by customers, whether orally or in writing, categorically are not business records because all persons involved in the process must be acting in the regular course of business. *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 850 (N.D. Tex. 2009) ("It is the authors of these e-mails who must have been acting in the course of a regularly conducted business activity when they made their complaints."); *Williams v. Remington Arms Company, Inc.*, No. 3:05-CV-1383-D, 2008 WL 222496 at *9-10 (N.D. Tex. Jan. 28, 2008) (holding that customer complaints are hearsay and do not qualify as records of regularly conducted activity under Rule 803(6) because the complaints are not made by persons acting in the course of a regularly conducted business activity). Therefore, courts have consistently held that even "when the business record contains information from an outsider, the business records exception does not by itself permit the admission of the business record; rather, the outsider's statement must fall within another hearsay exception." *Hendricks*, 2012 WL 4478308, at *1 (citing *Wilson v. Zapata Off–Shore Co.*, 939 F.2d 260, 271 (5th Cir. 1991)); *Alzuraqi v. Grp. 1 Auto., Inc.*, 921 F. Supp. 2d 648, 671 (N.D. Tex. 2013) ("However, if the source of the information is an outsider, as in the facts before us, Rule 803(6) does not, by itself, permit the admission of the business record.").

Moreover, as courts have recognized and as common sense shows, customers who complain have many reasons to complain other than to accurately report their experience. A customer might complain, for example, in hopes of getting a refund. *See Nissan Motor Co., v.*

*Armstrong*, 145 S.W.3d 131, 139 (Tex. 2004) ("Complaint letters in a manufacturer's files may be true, but they also may be accusatory and selfserving; they are rarely under oath and never subject to cross-examination."). And even where customers accurately report what they believe occurred—for example, that they believe they were wrongfully charged—that does not make it so; rather, to determine the truth of the matter would require examining the specifics of what a customer was told and the circumstances of the customer's account. Thus, it is impossible for the FTC to make the high showing of reliability necessary to admit these complaints under Rule 807. The following exhibits should be excluded as inadmissible hearsay:

| FTC's App. Ex. No. | Document Identification | App. Page | Location in Brief |
|---|---|---|---|
| 264 | Declaration of David Beasley, BBB[1] | APP-4530 | 6 n.26; 14 n.61; 20 n.91; 25 n.113; 28 n.119; 29 n.120; 29 n.121; 30 n.127; 31 n.130; 56 n.287; 56 n.287; 58 n.305; 63 n.337 |

### 3.   Out-of-court statements contained in emails are inadmissible hearsay.

The FTC further relies on inadmissible hearsay in the form of emails from third parties. *See United States v. Shah*, No. 21-10292, 2023 WL 6385685, at *22 (5th Cir. Oct. 2, 2023) (affirming statements made in email were hearsay). This type of out-of-court statement contained within an email are textbook examples of hearsay. The following exhibits are inadmissible hearsay:

| FTC's App. Ex. No. | Document Identification | App. Page | Location in Brief |
|---|---|---|---|
| 29 | MATCHFTC003317 | APP-0243 | 48 n.234 |
| 75 | MATCHFTC313570 | APP-0642 | 17 n.73 |
| 78 | MATCHFTC359317 | APP-0705 | 17 n.73 |
| 79 | MATCHFTC365179 | APP-0714 | 17 n.73 |

---

[1] The declaration is followed by 140 pages of purported BBB complaints.

| 81 | MATCHFTC701453 | APP-0725 | NOT CITED |
| 87 | MATCHFTC816248 | APP-0903 | 17 n.76; 19 n.82; 31 n.133 |
| 88 | MATCHFTC825323 | APP-0905 | 17 n.76 |
| 102 | MATCHFTC064246 | APP-1077 | 17 n.73 |
| 267 | MATCHFTC825327 | APP-4689 | 17 n.76 |

### B. Defendants object to the following exhibits as not supporting the proposition asserted, and therefore irrelevant.

Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Civ. P. 401. Here, the FTC has cited documents that do not support the fact for which the evidence is asserted and for this reason these exhibits should be struck:

| FTC's Evidence[2] | FTC's Representation | Why the Evidence Does Not Support the Representation |
|---|---|---|
| Pl. App. Ex. 121 at App. 1351–54; Pl. App. Ex. 178 at App. 1839 | "Indeed, Match.com's FAQs and other aspects of the site directed consumers to use its online cancellation mechanisms, not these alternative means of cancellation." Mot. at 37 & n.167. | The FAQs actually also identify the chat and phone methods. *See* Pl. App. Ex. 121 at App. 1353 ("Need Help? Log into your account to chat or text with us[.]"); Pl. App. Ex. 178 at App. 1839 (same); *see also* Pl. App. Ex. 178 at App. 1839 ("If you still have questions or need additional assistance, you can speak to one of our agents by calling 800-926-2824."). |
| Pl. App. Ex. 122 at App. 1356; Pl. App. Ex. 255 at App. 4312:22 – App. 4313.1:15 | "[M]ost common means of cancellation was online flow; cancellation by fax, mail, and chat were not common." Mot. at 37 n.170. | The FTC cites a former Match.com employee's characterization that chat cancelations were "not common," but that employee left the company in February 2014. |
| Pl. App. Ex. 255 at App. 4224:22–4225:6 | "Employees who advocated for change went ignored or | The FTC characterizes Ms. Auderer's proposal as |

[2] Defendants cite the FTC's Appendix in support of its Motion to Summary Judgment as "Pl. App." Defendants have not filed a separate appendix in support of their Objections and Motion to Strike, but rather cite to Defendants' Appendix in Support of their Response in Opposition to Plaintiff's Motion for Summary Judgment as "Defs. App."

| | | |
|---|---|---|
| | their proposals rejected." Mot. at 35. | "ignored" or "rejected," but deposition testimony shows that her proposal was just not the "right direction" for Match.com to go, as "the current flow is really simple, [and] it is intuitive." Defs. App. Ex. J at App. 197 (Saraph Dep. Tr. (June 22, 2023) 353:25–355:5). |
| Pl. App. Ex. 157 at App. 1682 | "Among other critiques, these employees characterize the cancellation process as 'too hard to locate,' 'too long,' 'a mess,' and 'very convoluted and confusing.' For example, Sharmistha Dubey, MGLLC executive, President of Match Group North America, and future CEO of Defendant MGI, admitted in 2016 that Match.com's customers complain "again and again . . . that they cancel and we still auto renew them." Mot. at 32. | The FTC cites Ms. Dubey as an "example" of employee "critiques" of the online cancellation flow. But the email does not contain a critique of the cancellation flow and has no bearing on whether or not the cancellation flow is simple. In the email the FTC references, Ms. Dubey asked about "the refund policy situation" because "customers complain[ed] that they [had] cancel[ed] and we still auto renew[ed] them." Ms. Dubey explained in deposition that "[t]housands and thousands of people successfully canceled every day, but we would get a handful of complaints . . . . Most of the complaints were people [who] had just forgotten to cancel, but they kind of accused the company that oh, no, no, no, I tried to cancel and it didn't stick." Defs. App. Ex. G at App. 120–21 (Dubey Dep. Tr. 169:3–171:3). A person complaining they canceled but were renewed does not mean the person went through the online cancellation flow or that it was not simple. |

| | | |
|---|---|---|
| Pl. App. Ex. 6 at App. 20 | "Among other critiques, these employees characterize the cancellation process as 'too hard to locate,' 'too long,' 'a mess,' and 'very convoluted and confusing.'" Mot. at 32. | The FTC cites an email from Mr. Ong to support the proposition that he "characterized the cancellation process" as "too long," but Mr. Ong explained in deposition that he meant that he had only "received that feedback" from some customers, not that he believed it to be true. Defs. App. Ex. H at App. 135 (Ong Dep. Tr. 148:17–149:13). |
| Pl. App. Ex. 8 at App. 29; Pl. App. Ex. 9 at App. 32; Pl. App. Ex. 10 at App. 34; Pl. App. Ex. 11 at App. 36; Pl. App. Ex. 4 at App. 14 | "Among other critiques, these employees characterize the cancellation process as 'too hard to locate,' 'too long,' 'a mess,' and 'very convoluted and confusing.'" Mot. at 32. | The FTC cites emails from individuals not deposed in this case, and it is not clear what their knowledge of the online cancelation flow was or what exactly they were referring to as "confusing." |
| Pl. App. Ex. 134–38, 145 at App. 1443–84, 1613 | "Internal records show that Match.com employees analyzed the company's clickthrough data and found a significant percentage of consumers failed to complete it." Mot at 29. | These emails are based on back-of-the-envelope, unreliable data pulls that do not accurately reflect Match.com's subscription cancelation rate. For example, they include non-subscribers, non-U.S. Match.com users, and session-level (rather than subscriber-level) information, which means that the numbers include users who were counted two, three, or many more times. |
| Pl. App. Ex. 124, 140 at App. 1362–72, 1545 | "Match.com concluded that "37-56% of users who enter the resign flow end up abandoning before completing their resignation." Mot. at 30; *see* Mot at 60 nn. 320. | The FTC assumes, without any evidence, that the referenced "abandons" actually intended to cancel, when common sense and expert analysis from Dr. Langenfeld suggests otherwise, and all inferences have to be made against the FTC at this stage. The cited presentation also shows that most of the "abandons" happen immediately after the subscription purchase, *see* Pl. |

| | | App. Ex. 124 at App. 1364, which means that the "abandons" are likely consumers merely exploring the website, rather than those intending to cancel. |
| --- | --- | --- |
| Pl. App. Ex. 87 at App. 904 | "Even Visa notified Defendants of concerns about Match.com's cancellation process on multiple occasions and suggested that they consider making the cancellation process more user friendly." Mot. at 31. | The email does not "notify" Match of "concerns about Match.com's cancellation process," but rather is a routine sales email generally noting that a prominent cancellation method may reduce chargebacks. There is no indication that Visa reviewed or was otherwise weighing in on Match.com's current process, or that it needed to be "more user friendly." When asked about that email, the Match.com employee who received it (Mr. Ong) testified that he thought this was "more of a sales email" and that Visa had just "tr[ied] to state the obvious without truly understanding how things work within the business" or "how easy it is for customers to cancel their subscriptions." Defs. App. Ex. H at App. 138–39 (Ong Dep. Tr. 209:10–212:11). |
| Pl. App. Ex. 118 at App. 1331–34 | "Match.com has for years employed an online cancellation process that is 'hard to find, tedious, and confusing.'" Mot. at 22. | The PowerPoint indicates that Ms. Auderer thought the "[c]urrent account settings page [was] hard to locate," Pl. App. Ex. 118 at App. 1331–32, meaning she thought the Account Settings behind a gear icon were difficult to find (a claim the FTC has dropped)—not that she thought the online cancelation flow was difficult to find based on the FTC's claim here that the Account |

| | | |
|---|---|---|
| | | Settings page does not currently say "cancel." In fact, the PowerPoint slides indicate that the Account Settings page did say "cancel" then. *Id.*; *see* Defs. App. Ex. B at App. 26 (same former employee admitting "it's hard to put ourselves back at that time and think anybody could ever not know what that gear was, but I know when the gear first happened, I did voice a concern about it").[3] |
| Pl. App. Ex. 253 at App. 3771–72 | "Indeed, MGLLC has acknowledged that it could have created a one-or-two click cancellation process . . . ." Mot. at 56. | MGL testified in no such way. The deposition witness (Mr. Saraph) acknowledged that a former employee (Ms. Clinchy) had proposed artwork for a cancelation flow—not that MGL could or should adopt it. *See* Pl. App. Ex. 253 at App. 3771–72. Additionally, ROSCA requires only that a company provide "simple mechanisms" to cancel. It does not require that every mechanism be simple—or that any mechanism has to be the simplest it can be. |
| Pl. App. Ex. 227 at App. 2370 | "This problem is compounded by the fact that Match.com at various times had a 'bad forgot password flow.'" Mot. at 56. | The FTC quotes from an email that is not about cancelation. Rather, the email involved a site-wide issue that was preventing users from logging in to use the website, among other things. And, in any event, the email is sent on October 27, 2016, which is during the time when Match.com was actively resolving these password issues. *Cf.* Pl. App. Ex. 228 at App. 2382–90 (resolving |

---

[3] The gear icon has been ubiquitous since at least 1995. Defs. App. Ex. R at App. 696.

| | | |
|---|---|---|
| | | password issues from October 19, 2016 to December 1, 2016). |
| Pl. App. Ex. 128 at App. 1402–03 | "One Match executive noted that "the 'Before you go' text is misleading since that would suggest that the cancellation process may be complete and the survey is optional." Mot. at 25. See also Mot. at 55, 58. | The employee who made that comment (Mr. Ong) ) testified that "Before you go" is "clear text stating that there were additional steps to be completed." Defs. App. Ex. H at App. 142–43 (Ong Dep. Tr. 261:24–263:3). He explained in his deposition that, at the time, he "was not looking at the text below [Before you go] that says if you cancel, your last day of subscription, et cetera, et cetera" because he was looking only at screenshots that were "[s]ignificantly smaller" than the actual online cancelation flow, and some of the text was impeded due to the screenshots being on top of one another. Defs. App. Ex. H at App. 132, 142–43 (Ong Dep. Tr. 105:7–19, 261:24–263:3). |
| Pl. App. Ex. 33 at App. 261 | "Both the incredible volume of consumer Complaints, and Defendants' internal testing, underscore the materiality of Match's claim of a "Guarantee" that proved illusory." Mot. at 51. | Match's "internal testing" actually revealed that "there was no revenue implication associated with the Match.com [G]uarantee," Defs. App. Ex. I at App. 151 (Saraph Dep. Tr. (Apr. 6, 2023) 14:2–12), meaning that the Guarantee was not driving consumers' purchasing decisions. Defendants produced documents in discovery that confirmed the testing that took place and the conclusion reached. *See* Defs. App. Ex. P-21 at App. 433–34 (expecting no net impact to revenue from removal of Guarantee); Defs. |

| | | |
|---|---|---|
| | | App. Ex. P-22 at App. 436–38 (noting the "topline impact of the [G]uarantee is very small"). |
| Pl. App. Exs. 52-57; Pl. App. Ex. 264 at App. 4573, App. 4564-65, App. 4547, App. 4561, App. 4541, App. 4576-77, App. 4538, App. 4535, App. 4569, App. 4581-82, App. 4557, App. 4544, App. 4553 | "Both the incredible volume of consumer Complaints, and Defendants' internal testing, underscore the materiality of Match's claim of a "Guarantee" that proved illusory." Mot. at 51. | The FTC's evidence showing a handful of customer complaints does not support the contention that were "an incredible volume of consumer Complaints" related to the 6-Month Guarantee. There is contrary evidence that the volume of customer complaints about the Guarantee was "very small" compared to Match.com's customer base. Defs. App. Ex. I at App. 154 (Saraph Dep. Tr. (Apr. 6, 2023) 90:19–91:7 ("Q. Generally speaking, did Match.com receive complaints from customers that misunderstood the eligibility requirements of the Match guarantee? A. In general, it's possible that that happened. From my understanding, even if it did, it would be a very small number of users given, you know, the number of users who had the six-month guarantee in the first place as a percentage of our total user base which is, you know, anywhere from two and a half to four million users at this time."); *see* Defs. App. Ex. H at App. 142 (Ong Dep. Tr. 260:5–9 ("Q. Compared to the size of your customer base in Match.com, did you receive a significant number of complaints saying that the six-month guarantee policy was difficult to understand? A. No."), 266:15–22 (testifying |

12

| | | "when I was running customer service, the percentage of calls that were related to the six-month guarantee and complaints related to that were not high"). |
|---|---|---|
| Pl. App. Ex. 111 at App. 1248 | "Match.com required that customers convince Match.com customer care that 'extenuating circumstances' justified restoring the account access they had already paid for." Mot. at 20-21. | The FTC cited an organization chart to support this contention, which is unrelated to the factual assertion.[4] |
| Pl. App. Ex. 215 at App. 2252 | "And [Mandy Ginsberg] actively participated in Match.com's ROSCA violations." Mot. at 45. | The cited evidence merely shows Ginsberg asked if a change to Match.com's FAQs section that had recently been implemented would have any "implications." When asked at her deposition about this, Ms. Ginsberg explained that she did not think there would be an impact on customer metrics, but wanted to check "all the implications" because "we should always check everything." Defs. App. Ex. F at App. 98 (Ginsberg Dep. Tr. 193:2–22). Contrary to the FTC's insinuations, there was nothing special about cancelation rates, nor does the FTC have any proof that Ms. Ginsberg demanded that the change be undone due to implications for the cancelation rate. And when asked if she ever heard anyone at Match.com express an intent to make the online cancelation flow not simple, she |

---

[4] We assume the FTC meant to cite Pl. App. Ex. 109. Even if the FTC had cited the document it intended to cite, it still does not support the statement because deposition testimony confirmed that the so-called extenuating circumstances simply meant contacting Customer Care. Watson Dep. Tr. 143:4–6 ("Q. So an extenuating circumstance would simply be contacting customer care? A. Yes.").

| | | |
|---|---|---|
| | | responded: "There was never any intention to make a cancellation flow not simple, in fact, we looked at all the data that suggests high 90 percent of people had no problem cancelling." Defs. App. Ex. F at App. 102 (Ginsberg Dep. Tr. 208:15–21); *see also id.* at App. 102 (208:22–209:7). That is the opposite of participating in a ROSCA violation. |
| Pl. App. Exs. 214 & 212 | "Additionally, Greg Blatt, MGI's former CEO and Executive Chairman, received directly from Match users, numerous complaints relating to the Match Guarantee and autorenewal, which he forwarded to various MGNA and Match.com employees." Mot. at 44-45. | Evidence of two complaints does not support the assertion that Mr. Blatt received "numerous complaints." Rather, MGI executives testified that such complaints were rare. Defs. App. Ex. G at App. 120–21 (Dubey Dep. Tr. 169:3–171: 3 (explaining that she has "very little overall memory" of "[g]etting such complaints every once in a while" and that they "would get a handful of complaints"); *id.* at 248:19–249:6 ("Very, very small handful of people would call in to complain."); Defs. App. Ex. F at App. 100 (Ginsberg Dep. Tr. 199:16–20) (testifying that it "wasn't common that people would reach out" to her with complaints). Additionally, that Blatt forwarded a handful of complaints is in no way evidence of MGI's involvement. The FTC seems to suggest that Blatt should have merely ignored any complaints, rather than forward them to the appropriate people. However, |

| | | if that were the case here, the FTC would likely use that as evidence of MGI being a bad actor. |
|---|---|---|
| Pl. App. Ex. 188 at App. 1935; Pl. App. Ex. 185 at App. 1923; Pl. App. Ex. 186 at App. 1927; Pl. App. Ex. 187 at App. 1931 | "Defendant MGI is the sole managing member of Defendant MGLLC." Mot. at 39. | The cited documents go back as far as 2013, and do not contain any evidence of MGI's current status and do not support an assertion that MGI is currently the sole managing member of Defendant MGL. Rather, and as the FTC acknowledges, Mot. at 40 n.189, MGL is "three levels beneath MGI." Pl. App. Ex. 194 at App. 2020. Match Group Holdings II, LLC is MGL's current sole managing member. *See, e.g.*, Defs. App. Ex. P-17 at App. 421–22 (identifying Match Group Holdings II, LLC as the sole managing member of MGL). |
| Pl. App. Ex. 204 at App. 2055-57; Pl. App. Ex. 202 at App. 2049-50; Pl. App. Ex. 203 at App. 2052-53; Pl. App. Ex. 192 at App. 2011-212; Pl. App. Ex. 205 at App. 2059; Pl. App. Ex. 206 at App. 2061; Pl. App. Ex. 207 at App. 2065; Pl. App. Ex. 4 at App. 14 | "MGI executives were also often intimately involved in the day-to-day business of Match.com. For example, Greg Blatt, former MGI CEO, often weighed in on Match.com advertising. For example, Greg Blatt, former MGI CEO, often weighed in on Match.com advertising. Jared Sine, MGI's General Counsel, was involved in analysis of "the types (and related volumes" of Match.com's consumer complaints, as well as the approval of Match.com's autorenewal policies. And Gary Swidler, MGI's COO and CFO, weighed in on Match.com's refund policy." Mot at 43. | In most instances, the "MGI executive" that the FTC points to also holds a position at MGL. Mr. Blatt testified that he was involved only with "significant television marketing campaigns," where the "company was going to spend, you know, many millions of dollars on brand marketing." Defs. App. Ex. C at App. 48 (Blatt Dep. Tr. 132:6–133:17); *see also* Defs. App. Ex. C at App. 38 (Blatt Dep. Tr. 39:9–25 (explaining that he would be involved "if there was a plan that called for a meaningful amount of money to be spent on a marketing campaign"). He certainly did not testify that he did so "often" (and the FTC tellingly |

| | | |
|---|---|---|
| | | does not cite his testimony on this point, despite having asked Mr. Blatt about it at his deposition). Similarly, Mr. Ramachandran's observation about how various of MGI's subsidiaries' platforms compare to one another is not "operating" Match.com; in fact, the email is about MGI's "Portfolio Strategy," Pl. App. Ex. 4 at App. 14, not day-to-day operations. |
| Pl. App. Ex. 260 at App. 4302; Pl. App. Ex. 256 at App. 4251; Pl. App. Ex. 255 at App. 4236-37 | "Indeed, the corporate distinction between MGLLC and MGI was meaningless to most employees. Even the companies' various executives did not know of or understand the purported firewall between the companies." Mot. at 41. | Michele Watson and Kristina Auderer never held a position at MGI so they have no reason to know the difference between the MGI and MGL, and this is not evidence that the corporate distinction was meaningless. MGI's former CEO, testified that he knew the difference between the holding company and the operating company and their responsibilities, but he could not remember (five years after he left the company entirely) which was the "Inc." and which was the "LLC." Defs. App. Ex. C at App. 47 (Blatt Dep. Tr. 126:9–16). In fact, all three of these employees left the company many years ago, so the fact that they could not remember the difference between "Inc." and "LLC" (particularly given the number of name changes and restructuring that have occurred in the interim) is unsurprising, not evidence of MGI's operation of Match.com. |

| | | |
|---|---|---|
| Pl. App. Ex. 254 at App. 3879, 3959, 3947, Pl. App. Ex. 256 at App. 4247 | "MGI's 30(b)(6) representative and three successive former CEOs also stated that MGI's CEO could hire and fire the employees who operated Match.com." Mot. at 40. | In reality, MGI's authority is limited to hiring or firing "the operating company heads, leaders." Defs. App. Ex. G at App. 114 (Dubey Dep. Tr. 72:5–9). When asked about authority to hire or fire other employees, Ms. Dubey testified that "the leader of that operating company," not MGI, "is responsible for hiring and firing them" (aside from certain shared services not linked to a particular operating company). Defs. App. Ex. G at App. 114 (Dubey Dep. Tr. 72:10–14). |
| Pl. App. Ex. 149 at App. 1637.1 | "[D]iscussing an 'FAQ Redesign' that made the 'Contact Us [information] more subtle'" Mot. at 37 n.167. | The FTC failed to admit that the employee who transmitted said PowerPoint actually testified in deposition contrary to the inferences the FTC asks the Court to draw: "Q. Do you have any idea what 'Contact Us is more subtle' is referring to? A. I do remember that we were trying to make it match the rest of the site. So I think by more subtle, it was not so chunky. And also I just remember -- that's a picture of me on the Chat Now and I just -- we didn't like that picture. So, for me, it felt hokey, and so I think the 'Contact Us is more subtle' is referring to just bringing it up to the feel of the website. Q. Do you remember any discussions around this time about making the contact options less visible for the purposes of reducing contacts with you guys? A. No, I don't, I don't recall that." Defs. App. |

| | | Ex. E. at App. 81.2 (Clinchy Dep. Tr. 104:4-17). |
|---|---|---|
| Pl. App. Ex. 126 at App. 1398 at 0:14; Pl. App. 175 at App. 1803-09; Pl. App. Ex. 161 at App. 1696; Pl. App. Ex. 120 at App. 1349 at 0:22; Pl. App. Ex. 253 at App. 3533:10-3533:17; Pl. App. Ex. 162 at App. 1699-705 | Match.com employees changed the hyperlink language to the less clear language "Manage Subscription" language for the express purpose of addressing "a huge increase in sub [i.e., subscription] cancellations this year[.]" Mot. at 36. | The change was to be consistent with the market. *See* Defs. App. Ex. J at App. 174 (Saraph Dep. Tr. (June 22, 2023) 35:11-25) (explaining change was because "had looked at various different consumer technology companies at the time, and this language of manage subscription was used by several of them to manage everything associated with your account"). |

**C.      Defendants object to the following exhibits as inadmissible expert testimony.**

An expert witness may offer opinion testimony only if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. As explained in detail in Defendants' Motion to Exclude Dr. Jennifer King Testimony, Dkt. 208 (fully incorporated herein), Dr. King's report is irrelevant and unreliable and should therefore be stricken from the record. Additionally, Dr. Jennifer King's Testimony should be stricken as containing improper legal conclusions. *United States v. Shah*, No. 21-10292, 2023 WL 6385685, at *22 (5th Cir. Oct. 2, 2023) (affirming statements made in email were hearsay).

**D.      Defendants object to the following exhibits as not properly before the Court and improperly cumulative.**

Defendants object to all evidence submitted in the FTC's Appendix that is not referenced in Plaintiff's Response because this evidence is not properly before the Court. *Smith ex rel. Estate*

*of Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004); *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (holding where a party includes evidence appendix but "fails even to refer to it, . . . that evidence is not properly before the district court."). Rather than take the time to correctly sort, authenticate, and lay a foundation for its summary judgment evidence, the FTC attached an unwieldy 4,694 pages with hundreds of exhibits, some of which it did not bother to cite in its substantive briefing. Courts frown upon this type of mass submission, as it unnecessarily burdens the record and consumes scarce judicial resources." *Morrison v. Dallas Cnty. Cmty. Coll. Dist.*, No. CIV.A. 3:05CV1821-L, 2007 WL 2140581, at *1 (N.D. Tex. July 26, 2007), *aff'd sub nom. Morrison v. Dallas Cnty. Cmty. Coll.*, 273 F. App'x 407 (5th Cir. 2008). The Court should therefore strike the evidence not properly put before it.

| FTC's App. Ex. No. | Document Identification | App. Page | Location in Brief |
|---|---|---|---|
| 81 | MATCHFTC701453 | APP-0725 | Not cited |
| 148 | MATCHFTC681835 | APP-1630 | Not cited |

## IV.    CONCLUSION

For these reasons, the Court should strike the above exhibits from the summary judgment record as inadmissible evidence.

Dated: October 17, 2023

*/s/ Angela C. Zambrano*

Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: 214-981-3300
Fax: 214-981-3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310-595-9500
Fax: 310-595-9501

Benjamin M. Mundel (admitted *pro hac vice*)
bmundel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: 202-736-8000
Fax: 202-736-8711

*Attorneys for Match Group, Inc. and
Match Group, LLC*

## CERTIFICATE OF CONFERENCE

On October 16, 2023, counsel for Defendants, Tayler G. Bragg, sent an email to counsel for the FTC, John R. O'Gorman, Reid A. Tepfer, Jason C. Moon, M. Hasan Aijaz, Sarah Zuckerman, Erica R. Hilliard, and Nicole Conte regarding whether the FTC opposes the relief requested in this Motion. Reid A. Tepfer initially indicated the FTC would like the opportunity to confer, but the FTC did not respond to Defendants' two subsequent communications sent on October 16, 2023, and October 17, 2023, in which Defendants stated they would assume the FTC opposed the Motion if it did not respond.

*/s/ Angela C. Zambrano*
Angela C. Zambrano

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2023, I caused true and correct copies of the foregoing to be served on all counsel of record in accordance with Federal Rules of Civil Procedure and this Court's CM/ECF filing system.

Reid Abram Tepfer
rtepfer@ftc.gov
M. Hasan Aijaz
maijaz@ftc.gov
Matthew James Wilshire
mwilshire@ftc.gov
Sarah Zuckerman
szuckerman@ftc.gov
John R. O'Gorman
jogorman@ftc.gov
Erica Rollins Hilliard
ehilliard@ftc.gov
Jason C. Moon
jmoon@ftc.gov

*/s/ Angela C. Zambrano*
Angela C. Zambrano

21