**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>Plaintiff,<br><br>vs.<br><br>MATCH GROUP, INC., a corporation, and<br>MATCH GROUP, LLC, formerly known as<br>MATCH.COM, LLC, a limited liability<br>company,<br><br>Defendants. | Case No. 3:19-cv-02281-K<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANTS MATCH GROUP, INC. AND MATCH GROUP, LLC'S**
**REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

### TABLE OF CONTENTS

I.    SUMMARY OF REPLY ARGUMENT ............................................................................. 1

II.   ARGUMENT AND AUTHORITIES ........................................................................... 5

   A.  The Court Should Grant Defendants Summary Judgment on Count V ............................. 5

     1.   Defendants Lack Fair Notice of the FTC's Novel Interpretation of ROSCA's "Simple Mechanisms" Requirement ................................................................. 5

     2.   There Is No Genuine Dispute of Material Fact that Match.com Provides Simple Cancelation Mechanisms ...................................................................... 11

     3.   At a Minimum, Defendants Are Entitled to Summary Judgment on the FTC's Claims for Civil Penalties Because There Is No Scienter ...................................................... 18

     4.   The FTC's Civil Penalties and Consumer Redress Claims Against MGL Are Barred in Part by the Statute of Limitations ........................................................... 20

   B.  The Court Should Grant Defendants Summary Judgment on Counts III–IV .................. 22

     1.   Long-Discontinued Conduct Cannot Be the Basis for the FTC's Requested Injunctive Relief ................................................................................ 22

     2.   A Reasonable Factfinder Could Not Conclude that Defendants Violated the Law in Counts III and IV .................................................................... 28

   C.  The Court Should Separately Grant MGI Summary Judgment on All Counts ................ 37

III.  CONCLUSION .................................................................................................. 38

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Al-Dahir v. FBI*,
    454 F. App'x 238 (5th Cir. 2011) ..........................................................................20

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013).................................................................................................23

*Anderson v. Albany*,
    321 F.2d 649 (5th Cir. 1963) .................................................................................24

*Associated Dry Goods Corp. v. NLRB*,
    455 F. Supp. 802 (S.D.N.Y. 1978)........................................................................15

*Baldwin County Welcome Ctr. v. Brown*
    466 U.S. 147 (1984)..............................................................................................20

*Barrow v. Greenville Indep. Sch. Dist.*,
    No. 3:00-cv-0913, 2005 U.S. Dist. LEXIS 20150 (N.D. Tex. Mar. 10, 2005)..........9

*Berry v. CitiMortgage, Inc.*,
    No. 4:14-cv-459, 2015 WL 4484170 (E.D. Tex. July 22, 2015)............................23

*Campbell v. City of San Antonio*,
    43 F.3d 973 (5th Cir. 1995) ...................................................................................26

*Carr v. United States*,
    560 U.S. 438 (2010)...............................................................................................33

*Cypress v. Newport News Gen. & Nonsectarian Hospital Ass'n*,
    375 F.2d 648 (4th Cir. 1967) .................................................................................24

*Dallas Gay Alliance, Inc. v. Dallas County Hospital District*,
    719 F. Supp. 1380 (N.D. Tex. 1989) ....................................................................25

*Exxon Mobil Corp. v. Mnuchin*,
    430 F. Supp. 3d 220 (N.D. Tex. 2019) ...................................................................8

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)................................................................................................6

*First Colony Life Ins. Co. v. LFC Resol. Payment Fund, Ltd.*
    83 F. Supp. 2d 767 (N.D. Tex. 1999) ....................................................................25

*Food & Water Watch, Inc. v. United States Env't Prot. Agency*,
    291 F. Supp. 3d 1033 (N.D. Cal. 2017) ...................................................................15

*Frakes v. Masden*,
    No. H.-14-1753, 2015 WL 1637893 (S.D. Tex. Apr. 13, 2015)..................................23

*Fresh v. Entm't U.S.A. of Tenn., Inc.*,
    340 F. Supp. 2d 851 (W.D. Tenn. 2003).....................................................................9

*Friends of the Earth, Inc. v Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)...................................................................................................25

*FTC v. Brown & Williamson Tobacco Corp.*,
    778 F.2d 35 (D.C. Cir. 1985).....................................................................................31

*FTC v. BunZai Media Group, Inc.*,
    No. 2:15-cv-4527 (C.D. Cal. June 16, 2015) ..............................................................6

*FTC v. Cyberspace.Com LLC*,
    453 F.3d 1196 (9th Cir. 2006) ...................................................................................29

*FTC v. DIRECTV, Inc.*,
    No. 15-cv-01129, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018) ....................13, 29

*FTC v. Health Formulas, LLC*,
    No. 2:14-cv-01649, 2015 WL 2130504 (D. Nev. May 6, 2015) ........................6, 16

*FTC v. IAB Mktg. Assocs., LP*,
    746 F.3d 1228 (11th Cir. 2014) .................................................................................38

*FTC v. LeadClick Media, LLC*,
    838 F.3d 158 (2d Cir. 2016).......................................................................................37

*FTC v. Neora*,
    No. 3:20-cv-01979, Dkt. 347 (N.D. Tex. Sept. 28, 2023). ...........................3, 14, 26

*FTC v. Sage Seminars*,
    No. 95-cv-2854, 1995 WL 798938 (N.D. Cal. Nov. 2, 1995) ..................................24

*FTC v. Southwest Sunsites, Inc.*,
    665 F.2d 711 (5th Cir. 1982) .....................................................................................28

*FTC v. Traffic Jam Events, LLC*,
    No. 20-1740, 2020 WL 3490434 (E.D. La. June 26, 2020)........................................27

*FTC v. Wyndham Worldwide Corp.*,
    799 F.3d 236 (3d Cir. 2015).....................................................................................6, 7

*In re Google Litig.*,
No. C-08-03172 RMW, 2011 WL 8603085 (N.D. Cal. Aug. 31, 2011) ...............................15

*Hall v. Bd. of Sch. Comm'rs of Conecuh Cnty.*,
656 F.2d 999 (5th Cir. Unit B 1981)...................................................................................24

*Hancock v. Securitas Sec. Servs., USA, Inc.*,
No. 20-cv-00785, 2021 U.S. Dist. LEXIS 127055 (W.D. Tex. July 7, 2021).........................9

*Indep. Directory Corp. v. FTC*,
188 F.2d 468 (2d Cir. 1951).............................................................................................31

*InterMed Res. TN, LLC v. Green Earth Techs. LLC*,
No. 3:20-cv-01112, 2022 WL 4486402 (M.D. Tenn. Sep. 27, 2022)....................................10

*In re Intuit, Inc.*,
Initial Decision and Order, FTC Docket No. 9408 (Sept. 6, 2023) ........................................24

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
567 U.S. 298 (2012)........................................................................................................24

*Krupski v. Costa Crociere S.A.*,
560 U.S. 538 (2010).........................................................................................................21

*Madsen v. Bank of Am., N.A.*,
No. 3:12-CV-0896-G, 2013 WL 821970 (N.D. Tex. Mar. 6, 2013).......................................11

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ........................................................................................19

*Mitts v. Sikorsky Aircraft Corp.*,
No. H-10-5164, 2012 WL 12893657 (S.D. Tex. June 26, 2012)...........................................21

*New Hampshire v. Maine*,
532 U.S. 742 (2001)........................................................................................................24

*Normore v. Dallas Indep. Sch. Dist.*,
No. 3:18-CV-02506-E, -- F. Supp. 3d --, 2023 WL 3937785 (N.D. Tex. Jun. 9,
2023) ............................................................................................................................37

*Pasco ex rel. Pasco v. Knoblauch*,
566 F.3d 572 (5th Cir. 2009) ............................................................................................11

*S. Track & Pump, Inc. v. Terex Corp.*,
No. 08-543-LPS, 2013 WL 5461615 (D. Del. Sept. 30, 2013), *rev'd on other
grounds*, 618 F. App'x 99 (3d Cir. 2015) .................................................................................9

*SCM Corp. v. FTC*,
    565 F.2d 807 (2d Cir. 1977).................................................................26

*SEC v. Gunn*,
    No. 3:08-cv-1013-G, 2010 WL 3359465 (N.D. Tex. Aug. 25, 2010) ....................................27

*Sec'y of Labor v. Burger King Corp.*,
    955 F.2d 681 (11th Cir. 1992) ..............................................24

*Singh v. Att'y Gen. of United States*,
    12 F.4th 262 (3d Cir. 2021) ................................................33

*Spring St. Partners-IV, L.P. v. Lam*,
    730 F.3d 427 (5th Cir. 2013) ...............................................35

*Taylor v. HD & Assocs., LLC*,
    45 F.4th 833 (5th Cir. 2022) ..........................................9, 10

*Thomason v. Metro. Life Ins. Co.*,
    165 F. Supp. 3d 512 (N.D. Tex. 2016), *aff'd*, 703 F. App'x 247 (5th Cir. 2017)..17, 30, 31, 33

*Thomson Consumer Elecs., Inc. v. Innovatron, S.A.*,
    43 F. Supp. 2d 26 (D.D.C. 1999) ..........................................15

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001)..........................................................20

*TRW, Inc. v. FTC*,
    647 F.2d 942 (9th Cir. 1981) ..............................................26

*United States v. ACB Sales & Serv., Inc.*,
    590 F. Supp. 561 (D. Ariz. 1984) ........................................19

*United States v. Bestfoods*,
    524 U.S. 51 (1998)....................................................37, 38

*United States v. Cornerstone Wealth Corp.*,
    549 F. Supp. 2d 811 (N.D. Tex. 2008) ..........................18, 25, 26, 27

*United States v. MyLife.com, Inc.*,
    567 F. Supp. 3d 1152 (C.D. Cal. 2021) ................................6, 16

*In re Universal Health Servs., Inc., Derivative Litig.*,
    No. CV 17-2187, 2019 WL 3886838 (E.D. Pa. Aug. 19, 2019)............................19

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ..................................19

*Vuoncino v. Forterra Inc.*,
   Dkt. 188, No. 3:21-cv-01046-K (N.D. Tex. Apr. 11, 2022) ............................................21, 22

*Woodfield v. Bowman*,
   193 F.3d 354 (5th Cir. 1999) .................................................................................................9

**Statutes**

15 U.S.C. § 45 .....................................................................................7, 16, 19, 32, 33, 35

15 U.S.C. § 53(b) .................................................................................................................25

**Other Authorities**

156 Cong. Rec. S3983-07, 2010 WL 1992981 .................................................................15

156 Cong. Rec. S8305-05, 2010 WL 4861287 .................................................................16

156 Cong. Rec. S8305-02, 2010 WL 4861284. .................................................................16

86 Fed. Reg. 60822-01 ........................................................................................................11

S. Rep. 111-240, 2010 WL 3002003 .................................................................................16

Statement by the Press Secretary, 2010 WL 5384575 .................................................16

Advanced Notice of Proposed Rulemaking, Rule Concerning the Use of
   Prenotification Negative Option Plans, 84 Fed. Reg. 52393-01 (Oct. 2, 2019) .......................7

Noah J. Phillips, Dissenting Statement of Commissioner Noah Joshua Phillips, *In
   the Matter of MoviePass, Inc.*, Commission File No. 1923000 (June 7, 2021),
   2021 WL 10282906 .................................................................................................4

Christine S. Wilson, Dissenting Statement of Commissioner Christine S. Wilson,
   Notice of Proposed Rulemaking, Negative Option Rule (Mar. 23, 2023), 2023
   WL 2674286 .................................................................................................4

Notice of Proposed Rulemaking, Negative Option Rule, 88 Fed. Reg. 24716-01
   (Apr. 24, 2023) .................................................................................................3, 7

FED. TR. COMM., .com Disclosures, How to Make Effective Disclosures in Digital
   Advertising, 2013 WL 12481090 (Mar. 2013). .....................................................31

FED. TR. COMM'N, *Bringing Dark Patterns to Light*, 2022 WL 4355435 (Sept. 14,
   2022) .................................................................................................12

NERDWALLET, *What Is a Chargeback? Definition, How to Dispute* (Oct. 23,
   2023), https://www.nerdwallet.com/article/small-business/chargeback.................................34

# I.     SUMMARY OF REPLY ARGUMENT[1]

The FTC's Response confirms that Defendants should be granted summary judgment on all remaining counts. Rather than show that there are genuine disputes of material fact as to any claim, the FTC's brief severely miscites the law, ignores entirely each of the relevant criteria identified by the FTC's Rule 30(b)(6) designee for assessing whether an online cancelation flow is "simple" within the meaning of ROSCA, tortures the meanings and import of a few internal Match.com documents and data, and ultimately seeks to apply a novel and completely unprecedented legal standard that was unveiled for the first time ever in this litigation.[2]

The only live issue in this case is whether Match.com provides simple mechanisms for subscribers to cancel recurring charges. Summary judgment is required on this ROSCA Count because the FTC has never, anywhere provided any notice—much less constitutionally fair notice—of the standard it seeks to apply to the Match.com online cancelation flow. Only in the summary judgment context in this matter does the FTC argue that Match.com's online cancelation flow was not simple because it (1) allegedly is hard to find (although there is no empirical evidence of that); (2) includes unnecessary steps (although there is no evidence that such steps cause unreasonable delay); (3) has so-called dark patterns (an inherently vague phrase that is nowhere alleged in the Complaint or defined in discovery responses); and (4) potentially violates three usability heuristics (out of at least ten published criteria) according to the FTC's captive academic. *See* Dkt. 199-1 at 54–62. Those four factors appear nowhere in the statute (which merely says "simple" and does not define it). Nor do those elements appear in any FTC guidance provided prior to or after the filing of the Complaint. Neither are these factors enumerated in the Complaint

---

[1] Defendants have filed an Appendix in Support of their Motion, Dkt. 206, and an Appendix in Support of this Reply. The exhibits are referenced as "Defs. App. Ex." and specific pages are referenced as "App."

[2] Defendants are filing an Objection to Plaintiff's Evidence and Motion to Strike.

or articulated in response to written discovery requests propounded to the FTC seeking articulation of the standards that should be applied to the Match.com online cancelation flow. The FTC's Response does not and cannot point to a single piece of evidence showing that it provided notice of this test to Defendants. It violates due process for the FTC to unveil a new four-part legal standard for the first time in litigation and to apply it retroactively.

The FTC's Response also simply does not address that the FTC's case ignores many of the factors that the FTC's Rule 30(b)(6) designee testified were relevant on the question of simple.

- The FTC's designee conceded that one factor to consider when analyzing whether a mechanism is simple is the "time to complet[e]" the flow. Defs. App. Ex. 1 at App. 11 (Bandy Dep. Tr. (Oct. 24, 2022) 97:18–19). But he could not say how long was too long. *See id*. at App. 7–8 (Bandy Dep. Tr. (Oct. 24, 2022) 21:21–22:11). And the FTC does not say (or have any evidence) that Match.com's flow took too long.

- The FTC's designee also testified that "the number of clicks, is [] relevant to whether or not a canceling mechanism is simple." *Id*. at App. 12 (Bandy Dep. Tr. (Oct. 24, 2022) 98:13–22). Yet again, the FTC refused to testify as to how many clicks was too many. *See id*. at App. 7–8 (Bandy Dep. Tr. (Oct. 24, 2022) 21:21–22:4). Again, the FTC has no empirical evidence that Match.com's flow had "too many" clicks.

- Finally, the FTC's designee testified that "effectiveness" is yet another factor relevant to whether a cancelation flow is simple. *Id*. at App. 12 (Bandy Dep. Tr. (Oct. 24, 2022) 101:14–21). But, again, the FTC refused to testify as to how effective an online cancelation flow must be. *Id*. at App. 12–13 (Bandy Dep. Tr. (Oct. 24, 2022) 101:22–102:4 (testifying that "there's [no] set percentage amount," as "you'd have to look at it based on the data that you had, the facts and circumstances")).

The FTC's articulation of relevant factors combined with its failure to apply those factors in this case justify summary judgment on due process grounds.

Despite an express representation to the contrary in the FTC's briefing, there is not a single judicial opinion that has ever analyzed whether an online cancelation flow is "simple," and the FTC certainly cannot cite one that adopts the four factors it proposed here. The FTC should concede this fact. Instead, the FTC's Response misleadingly claims that courts have analyzed the

2

question presented here. This is false. None of the cases the FTC cites actually analyze or address whether an online cancelation flow is simple. *See* Resp. at 29 n.146.

Faced with this complete failure of proof of fair notice, the FTC is left with a handful of internal documents where Match.com employees discuss possible **improvements** to the cancelation flow. These documents come nowhere close to helping the FTC meet its burden. Not a single document states that the flow was not "simple" or that anyone at Match.com thought it was illegal. Companies should debate improvements to their processes, which regulators should support and incentivize, not use against the company in litigation.

Finally, if there were any doubt as to whether the FTC provided notice, the FTC's own recent public pronouncements about "simple" resolve it. The FTC has admitted **just this year** that "ROSCA lacks specificity about cancellation procedures" and the FTC has not provided "**guidance about what is simple**." Notice of Proposed Rulemaking, Negative Option Rule, 88 Fed. Reg. 24716-01 (Apr. 24, 2023). The FTC's Response fails to address these dispositive concessions.

Beyond the defective ROSCA Count, Defendants should also be granted summary judgment on Counts III and IV. The record is crystal clear that all of the conduct at issue in these counts ceased years ago, and there is not a single shred of evidence from which a reasonable factfinder could conclude that this conduct will ever recur. Out of nearly 300,000 documents, 11 depositions, and hundreds of pages of written discovery responses, the FTC still cannot identify a single scrap of evidence that Defendants have any plans, intention, or incentive to reinstate the permanently discontinued Guarantee and Chargeback Policy. As Judge Lynn recently held in *FTC v. Neora*, past conduct is not a sufficient basis on which to grant an injunction. No. 3:20-cv-01979, Dkt. 347 at 48–51 (N.D. Tex. Sept. 28, 2023).

Counts III and IV fail on the merits too. As to the Guarantee, the FTC's claim is that Match.com's disclosures were made via hyperlink and were not "clear and conspicuous"—even though the disclosures were consistent with the FTC's Dot Com Disclosure Guidelines and the FTC has offered no empirical evidence that the disclosures were not seen and understood. In any event, the adequacy of disclosure is a question that requires empirical evidence to survive summary judgment, and the FTC has none. On the Chargeback Policy, the FTC must show that the conduct is not only unfair but that it is not reasonably avoidable. When all the customer had to do to avoid the alleged harm was refrain from submitting a false or fraudulent chargeback (or contact Match.com to have the account reinstated), that is by definition avoidable.

At bottom, this case should finally be put behind Defendants. Match.com is the original online dating platform. It has helped millions of people find love and enter committed relationships. It has done so by tirelessly creating a service that people love and by keeping its customers happy for the long term, not by deceiving them. The FTC would have the Court believe that Match.com is a fly-by-night scam company. But if that were true, Match.com would not still be around, nearly 30 years later. If Match.com's policies were as the FTC portrayed them, it certainly would not be the case that half of canceling subscribers later return to Match.com.[3] The evidence confirms that Defendants have not violated the law, and Defendants are entitled to summary judgment on all remaining counts. It is frivolous investigations and lawsuits like this that have led even the FTC's own former commissioners to criticize the FTC's ROSCA overreach.[4]

---

[3] Defs. App. Ex. 69 at App. 1202 (Ginsberg Dep. Tr. 208:22–209:7 ("[H]alf the people that come every day are past customers, and so it would not make sense to make our customers unhappy or frustrated.")).

[4] Christine S. Wilson, Dissenting Statement of Commissioner Christine S. Wilson, Notice of Proposed Rulemaking, Negative Option Rule (Mar. 23, 2023), 2023 WL 2674286, at *1; Noah J. Phillips, Dissenting Statement of Commissioner Noah Joshua Phillips, *In the Matter of MoviePass, Inc.*, Commission File No. 1923000 (June 7, 2021), 2021 WL 10282906, at *3.

## II.      ARGUMENT AND AUTHORITIES

### A.      The Court Should Grant Defendants Summary Judgment on Count V

#### 1.      Defendants Lack Fair Notice of the FTC's Novel Interpretation of ROSCA's "Simple Mechanisms" Requirement

The FTC failed to give fair notice of the standard the FTC is attempting to impose here. The FTC asserts that Match.com's online cancelation flow is not "simple" because it allegedly is hard to find, includes unnecessary steps, has so-called dark patterns, and violates three cherry-picked usability heuristics. *See* Dkt. 199-1 at 54–62. But these requirements appear nowhere in the statute. No court has ever adopted this meaning of the "simple mechanisms" requirement. The FTC has never issued any guidance or policy statement reciting those requirements. Indeed, the FTC cannot point to a single shred of paper or speech where anyone at the FTC has ever uttered those requirements before filing this lawsuit. That is the very definition of a due process problem. As set forth below, the FTC responds with misdirection and ignores critical flaws with its case.

##### a.      The FTC Misconstrues Defendants' Arguments and Miscites the Law

First, the FTC argues that "a defendant 'who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" Resp. at 27 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010)). That may be true, but it is irrelevant here. Match.com's conduct was not "clearly proscribed." Indeed, the FTC cannot point to any statute, regulation, policy statement, press release, speech, tweet, or any piece of paper that clearly proscribes the conduct. Moreover, Defendants are not complaining about "vagueness of the law as applied to the conduct of others." They are complaining about the vagueness of the law applied *to them*, by the FTC here. The FTC has no response to this argument.[5]

---

[5] The FTC argues that the civil penalties "scienter requirement supports a lesser 'fair notice' standard," Resp. at 26 & n.126. But the FTC cannot avoid constitutionally required fair notice by demanding hundreds of millions in penalties.

Second, the FTC claims that "[c]ourts routinely uphold statutes that use general language like the word 'simple.'" Resp. at 28. But Defendants are not facially attacking "simple." Rather, they are challenging the FTC's novel and unprecedented interpretation advanced here.[6]

Third, the FTC baldly contends that "[o]ther courts *have* assessed whether cancellation mechanisms are 'simple' under ROSCA," which provided adequate notice to Defendants of the FTC's interpretation. Resp. at 29 & n.146. But that is an outright misrepresentation to this Court by the FTC—an assertion Defendants do not make lightly. The cases the FTC cites nowhere analyze whether an online cancelation flow is simple under ROSCA, and certainly do not give Defendants fair notice of the standard that the FTC seeks to apply here. *United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152, 1169 & n.6 (C.D. Cal. 2021), analyzes whether a ***phone cancelation*** method is simple, as the company did not offer an online cancelation flow. The TRO Order in *FTC v. BunZai Media Group, Inc.*, No. 2:15-cv-4527 (C.D. Cal. June 16, 2015), does not analyze any cancelation mechanism at all.[7] And *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649, 2015 WL 2130504, at *1, *3, *16 (D. Nev. May 6, 2015), discusses a ***phone cancelation*** method, not the features of an online cancelation flow.

Fourth, the FTC claims that even if Defendants lacked fair notice before, "Defendants have been on notice of the FTC's position about Match.com's violation of ROSCA" since the FTC began its investigation. Resp. at 31. But there must be "fair notice" of the standard to be applied "*prior* to the [conduct] in question." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 258 (2012) (emphasis added).[8]

---

[6] The cases the FTC cites do not analyze whether a litigant had fair notice of a term or if it was void for vagueness. The Supreme Court just generally interpreted terms (none of which were "simple"). *See* Resp. at 28 & nn.140–43.

[7] The underlying complaint mentions only cancelation by phone and says nothing about online cancelation. Complaint, *FTC v. BunZai Media Group, Inc.*, No. 2:15-cv-4527 (C.D. Cal. June 16, 2015), Dkt. 3.

[8] The FTC relies heavily on *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015). That case addressed a challenge to the FTC's "unfairness" authority under §§ 45(a) and 45(n) (not ROSCA). *Id.* at 259. Unlike here, the defendant did "not meaningfully argue that the statute itself fail[ed] fair notice principles." *Id.* at 255. Instead, the

**b.      The FTC Does Not Meaningfully Address Its Admissions that There Is Insufficient Guidance About What Is "Simple"**

The FTC has repeatedly conceded that ROSCA's "simple" standard is not well defined. Mot. at 2, 34–35; *see, e.g.*, Advanced Notice of Proposed Rulemaking, Rule Concerning the Use of Prenotification Negative Option Plans, 84 Fed. Reg. 52393-01 (Oct. 2, 2019) ("ROSCA lacks specificity about cancellation procedures"); Notice of Proposed Rulemaking, Negative Option Rule, 88 Fed. Reg. 24716-01 (Apr. 24, 2023) ("ROSCA *lacks specificity* about cancellation procedures and the placement, content, and timing of cancellation-related disclosures. Instead, the statute requires marketers to provide 'simple mechanisms' for the consumer to stop recurring charges *without guidance about what is simple*." (emphases added)). It is only in a new *proposed* rule that the FTC has suggested that it may require—in the future—that companies provide a one-click cancelation method without any save offers or surveys. Mot. at 35; *see also* Notice of Proposed Rulemaking, Negative Option Rule, 88 Fed. Reg. 24716-01 (Apr. 24, 2023).

The FTC's Response does not address its admission that there is not sufficient guidance, even to this day, about what is "simple." The FTC argues that "the Court need not address whether ROSCA imposes a 'click to cancel' requirement," Resp. at 19, and that ROSCA's "general language is appropriate and commonplace," which "is not altered by the FTC's statements in support of its proposed 'click to cancel' rule," *id.* at 28–29. But the FTC's efforts to put a specific standard in place is relevant to the question of whether the Defendants have had fair notice. And

---

defendant argued a standard that did not apply—that "it was entitled to 'ascertainable certainty' of the FTC's interpretation of what specific cybersecurity practices are required by § 45(a)," which is the standard that applies only when a court reviews an agency adjudication. *Id.* at 252–54. Here, Defendants do not argue that they are entitled to "ascertainable certainty"—they argue that the statute itself fails fair notice principles, as applied to them, and that they are entitled to fair notice of the standard on which the FTC seeks to hold them liable. The court in *Wyndham* ultimately found that the defendant had fair notice of the meaning of § 45(a). *Id.* The court reasoned that § 45(n) was not "so vague as to be no rule or standard at all" because the statute delineates three requirements for unfairness (unlike "simple" in ROSCA). *Id.* at 255. The court also found it persuasive that the FTC had issued relevant guidance in 2007, before the conduct at issue. *Id.* at 240, 256. Here, by contrast, the FTC had issued no prior guidance.

the law in this Circuit is that "an agency's decision to later clarify the language at issue to be 'at least some support' that the language lacked clarity at the time of an alleged violation." *Exxon Mobil Corp. v. Mnuchin*, 430 F. Supp. 3d 220, 233 (N.D. Tex. 2019) (quoting *Emp. Sols. Staffing Grp. II, L.L.C. v. Off. of Chief Admin. Hearing Officer*, 833 F.3d 480, 488 (5th Cir. 2016)).[9]

The FTC's 30(b)(6) witness—its Chief Litigation Counsel[10]—confirmed that the definition of "simple" that the FTC is trying to apply is novel and unprecedented. He conceded that there are a number of factors that are relevant to whether an online flow is "simple," but he could not articulate how any of those standards should be applied. For example, he testified that the number of clicks could be relevant, but the number of clicks that is too many "depends on the circumstances." Defs. App. Ex. 1 at App. 7–8, 12 (Bandy Dep. Tr. (Oct. 24, 2022) 21:21–22:4, 98:13–22). He also said that time to completion is a factor, but how long is too long "depends." Defs. App. Ex. 1 at App. 7–8, 11–12 (Bandy Dep. Tr. (Oct. 24, 2022) 21:21–22:11, 97:20–98:2). Rather than address the merits of these party admissions, the FTC asks the Court to ignore them "because ROSCA's 'simple cancellation mechanisms' requirement is not ambiguous or vague." Resp. at 30. That position assumes away the problem. The FTC's "standard" is so vague that the FTC's Rule 30(b)(6) designee could not articulate a clear definition of it. The FTC cannot avoid its own binding admissions of lack of clarity by simply asserting that the standard is clear.

### c.    Defendants Did Not Waive Their Vagueness Argument

Because Defendants' vagueness argument is fatal to the FTC's claims, the FTC attempts to avoid that argument by claiming that Defendants waived it by not listing it as an affirmative

---

[9] Although *Exxon* applies an "ascertainable certainty" standard, not applicable here, the *Exxon* court explained that vagueness and fair notice are related and that cases about either are persuasive authority. 430 F. Supp. 3d at 236 ("[C]ases involving void-for-vagueness challenges based on a lack of fair notice are persuasive here.").
[10] Defs. App. Ex. 64 at App. 1165 (Bandy Dep. Tr. (Oct. 24, 2022) 4:25–5:2).

defense. Resp. at 24–25. But the FTC, again, is wrong on the law. Vagueness is not an affirmative defense that must be pled, and even if it were, waiver requires prejudice that does not exist here.

### (i)        Vagueness Is Not an Affirmative Defense

The FTC's Response does nothing to prove that a constitutional vagueness challenge is, in fact, an affirmative defense that must be pled in an answer. *See* Resp. at 24–25. The FTC does not cite a single case holding that a vagueness defense is an affirmative defense, much less holding that a party waived such an argument by failing to plead it.[11] That is because vagueness is not an affirmative defense. "Federal Rule of Civil Procedure 8(c) does not require a defendant to affirmatively plead a defense of constitutional due process in its answer." *Fresh v. Entm't U.S.A. of Tenn., Inc.*, 340 F. Supp. 2d 851, 858 (W.D. Tenn. 2003).[12]

As the FTC's own authorities recognize, an affirmative defense "concern[s] allegations outside of the plaintiff's prima facie case that the defendant therefore cannot raise by a simple denial in the answer." *Barrow v. Greenville Indep. Sch. Dist.*, No. 3:00-cv-0913, 2005 U.S. Dist. LEXIS 20150, at *2 (N.D. Tex. Mar. 10, 2005) (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1271, at 585 (3d ed. 2004)). Defendants' argument that ROSCA's use of "simple" is so vague that the FTC gave no fair notice of the definition it attempts to apply in this case does not "concern[] a matter outside [of the FTC's] prima facie case." *Id.* To the contrary, the definition of "simple" is at the heart of the FTC's affirmative case, because it is

---

[11] Indeed, the cases the FTC cites involved "affirmative defenses" far different than vagueness. *Barrow v. Greenville Indep. Sch. Dist.*, No. 3:00-cv-0913, 2005 U.S. Dist. LEXIS 20150, at *2 (N.D. Tex. Mar. 10, 2005) (exercise of right to educate children in private school materially and substantially impedes the operation or effectiveness of the state's educational program); *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999) (failure to obtain insurer consent to settle); *Taylor v. HD & Assocs., LLC*, 45 F.4th 833, 838–39 (5th Cir. 2022) (bona fide commission exemption to the Fair Labor Standards Act); *Hancock v. Securitas Sec. Servs., USA, Inc.*, No. 20-cv-00785, 2021 U.S. Dist. LEXIS 127055, at *10 (W.D. Tex. July 7, 2021) (failure to exhaust administrative remedies).

[12] *See S. Track & Pump, Inc. v. Terex Corp.*, No. 08-543-LPS, 2013 WL 5461615, at *2 (D. Del. Sept. 30, 2013) (rejecting argument that defendant waived a constitutional challenge by failing to plead it because "Plaintiff cites no binding authority for the proposition that a constitutional challenge to a statute is waived under Rule 8(c) if not pled as an affirmative defense in the answer"), *rev'd on other grounds*, 618 F. App'x 99 (3d Cir. 2015).

the FTC's burden to show that Match.com does not provide "simple" cancelation mechanisms, as defined by ROSCA. Thus, Defendants had no need to plead their vagueness argument.

### (ii)    Waiver Does Not Apply Regardless, Because There Is No Prejudice to the FTC

Even if vagueness is an affirmative defense that should be pled (it is not), failure to plead does not mean the argument is waived. "[A] technical failure to comply precisely with Rule 8(c) is not fatal. A defendant does not waive a defense if it was raised at a pragmatically sufficient time and did not prejudice the plaintiff in its ability to respond." *Taylor*, 45 F.4th at 838 (quoting *LSREF2 Baron, L.L.C. v. Tauch*, 751 F.3d 394, 398 (5th Cir. 2014)).

Here, the FTC does not even attempt to show prejudice. *See* Resp. at 24–25. Nor could it, given there is no conceivable prejudice. The meaning of "simple" has "been an inherent part of this case from the start." *InterMed Res. TN, LLC v. Green Earth Techs. LLC*, No. 3:20-cv-01112, 2022 WL 4486402, at *5 (M.D. Tenn. Sep. 27, 2022). Defendants repeatedly made clear that the meaning of "simple" was at issue and specifically raised due process problems with the FTC's case since at least October 2022.[13] Dkt. 133 at 11 (arguing the FTC's refusal to define "simple" raised "serious constitutional concerns"); Defs. App. Ex. 77 at App. 1265, 1269–70, 1313 (Hr'g Tr. (Nov. 8, 2022) 7 ("If it's vague, then the statute is vague, and we've got a real constitutional problem, which we may anyway."), *id.* at 11–12, 55)). The FTC also "has not identified any necessary discovery that it would have pursued if it had been expressly informed that the [vagueness] doctrine would be at issue, nor does the record reveal any reason to assume that any such discovery would have been necessary." *InterMed*, 2022 WL 4486402, at *5. Discovery about the meaning of "simple" was taken at length through written discovery and depositions. *See, e.g.*,

---

[13] This was early in the case—about seven months after the Court issued its Memorandum Opinion and Order on MGI's Motion to Dismiss, Dkt. 86; well before discovery closed on July 28, 2023, Dkt. 178; and less than two months after Defendants filed their live answers, Dkt. 122, 139.

Defs. App. Ex. 56 at App. 703 (MGI Interrog. No. 2); Defs. App. Ex. 65 at App. 1171 (Bandy Dep. Tr. (Oct. 31, 2022) 196:3–11).

In short, there is no serious question that the FTC was on notice of Defendants' due process argument, and there has been no prejudice in allowing Defendants to continue to assert this argument at summary judgment. Therefore, there is no waiver. *See, e.g.*, *Madsen v. Bank of Am., N.A.*, No. 3:12-CV-0896-G, 2013 WL 821970, at *3 (N.D. Tex. Mar. 6, 2013) (holding affirmative defense first raised at summary judgment was not waived because it was well before trial and plaintiff had opportunity to respond); *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 577–78 (5th Cir. 2009) (collecting cases in which the court found no waiver due to lack of prejudice).

> **2.      There Is No Genuine Dispute of Material Fact that Match.com Provides Simple Cancelation Mechanisms**
>
> **a.      The Online Cancelation Flow Is Simple as a Matter of Law**
>
> **(i)      Match.com Satisfied All of the Guidance Regarding the Definition of "Simple"**

Defendants explained in their opening brief that Match.com's online cancelation flow meets the guidance in the Policy Statement (although it was issued years after this case was filed), and thus the flow is "simple" as a matter of law. Mot. at 37–39. The FTC concedes that Match.com meets all of the guidance except that the online cancelation flow should be "at least as easy to use as the method the consumer used to initiate the negative option feature." 86 Fed. Reg. 60822-01, 60826; *see* Resp. at 22–24. But that is wrong too, because the FTC compares the cancelation process not to the full sign-up process, but instead to the *last click* of the sign-up process, *see* Mot. at 26–27. The Court should not accept this gamesmanship in reading the FTC's own guidance.

Specifically, the FTC contends that (1) "[i]t would be an absurd result to read ROSCA as authorizing an unnecessarily complicated cancellation mechanism just because a defendant made their sign-up process harder," and (2) "the Policy Statement does not state that cancelling must be

11

as easy as creating a profile and subscribing to the site." Resp. at 23. But there is no evidence that Match.com made its sign-up process harder just so it could create an "unnecessarily complicated cancellation mechanism" (nor would it make sense for Match.com to do so, since its business model depends on people signing up and purchasing a subscription), so the FTC's argument is a red herring. As to the FTC's suggestion that the steps to create a profile and subscribe to the site should be excluded, there is no basis for this in the guidance itself. Those are necessary steps to subscribe, and the guidance directs companies to take into account the steps needed to sign up. Just last year, the FTC advised that the language means that "negative option sellers should provide cancellation mechanisms that are at least as easy to use as the method the consumer used **to buy the product or sign up for the service**."[14] Match.com's registration and subscription process unquestionably is the method a consumer uses "to buy the product or sign up for the service."

Even if the Court were to consider only the subscription process (and not account creation), the cancelation flow would still be "at least as easy to use" as the subscription process, which takes a *minimum* of 12 clicks. Defs. App. Ex. 59 at App. 1084–86. The cancelation flow takes a *maximum* of 12 clicks (using the most conservative estimate that the FTC uses). *Id.* Thus, Match.com's cancelation process satisfies the FTC's guidance and is simple as a matter of law.

### (ii)   None of the Documents Cited by the FTC Create a Genuine Dispute of Material Fact

Without any evidence that Match.com's cancelation flow conflicts with the FTC's guidance—and in the face of objective, empirical evidence to the contrary, given that over 95% of Match.com subscribers that enter the cancelation flow successfully cancel or take a save offer, that 91.5% of study participants successfully canceled through the flow, and that the average time to cancel (around a minute or less) is far shorter than the average time to subscribe, *see* Mot. at 36—

---

[14] FED. TR. COMM'N, *Bringing Dark Patterns to Light*, 2022 WL 4355435 (Sept. 14, 2022) (emphasis added).

the FTC's Response relies on misconstrued documents and baseless assumptions. None creates a genuine dispute of material fact.

First, the FTC cites documents discussing potential improvements to the flow, but the FTC ignores testimony about what those documents actually meant, including that witnesses never thought the flow was illegal.[15] The FTC has not identified a single document or any testimony saying Match.com's online cancelation flow is illegal or shows knowledge of illegality. The FTC is essentially trying to interpret ROSCA to require the "simplest" cancelation mechanism, rather than a "simple" mechanism like the statute requires. But "investment of substantial resources in analyzing its operations, candidly identifying areas for improvement, and following through on a number of improvements does not support a . . . violat[ion of] the FTC Act." *FTC v. DIRECTV, Inc.*, No. 15-cv-01129, 2018 WL 3911196, at *18 (N.D. Cal. Aug. 16, 2018).

Second, the FTC points to a handful of customer complaints (inadmissible hearsay) and takes them out of context. Resp. at 5 & n.12. Complaints from customers who claimed that they "thought" they had canceled, but were auto-renewed, have no causal connection to whether the cancelation flow is simple, as those customers were motivated to claim that they attempted to cancel even when they had not, in hopes of receiving a refund.[16] The FTC also ignores that all companies receive complaints—they do not mean that the company is engaged in illegal conduct.

---

[15] For example, the FTC cites an email in which Ms. Dubey asked about "customers complain[ing] that they [had] cancel[ed] and we still auto renew[ed] them." Pl. App. Ex. 157 at App. 1682. Ms. Dubey explained that "[m]ost of the complaints were people [who] had just forgotten to cancel, but they kind of accused the company that oh, no, no, no, I tried to cancel and it didn't stick." Defs. App. Ex. 70 at App. 1208–09 (Dubey Dep. Tr. 169:3–171:3).

[16] *See, e.g.*, Defs. App. Ex. 67 at App. 1190–91 (Watson Dep. Tr. 213:23–214:6 (testifying that the fact that a consumer noted in a communication to Customer Care that they wanted a refund because they thought they had canceled does not mean that the online cancelation flow was not simple "[b]ecause they may not have even attempted to cancel")). Defendants' expert, Dr. Langenfeld, confirmed that almost half of the commenters in Dr. King's complaint analysis never entered the online cancelation flow. Defs. App. Ex. 80-1 at App. 1751 (Rpt. ¶ 46).

Third, the FTC claims that "approximately half of [Match.com's] customers' cancellation attempts" are unsuccessful, Resp. at 7, but the FTC makes assumptions not backed by evidence.[17] The FTC assumes that *every time* someone "abandoned" the cancelation flow after clicking "Manage Subscription" (or its predecessors), that person intended to cancel, but was "thwarted" by the Match.com cancelation flow. *See, e.g.*, Defs. App. Ex. 74 at App. 1241 (Bandy Dep. Tr. (June 26, 2023) 56:2–7). The FTC has no basis for this assumption. The only evidence in the record suggests the opposite—consumers that clicked "Manage Subscription" but did *not* cancel used Match.com subscriber benefits statistically significantly more often than consumers that clicked "Manage Subscription" but canceled. *See* Defs. App. Ex. 59 at App. 1075 (Rpt. ¶ 36(e)). That data is inconsistent with the former group intending to cancel. *See id.*[18] And many of the "non-cancelers" continued to use subscriber benefits after their renewal. *Id.* at App. 1058, 1074–75, 1100 (Rpt. ¶¶ 17, 36(e), 88(b)). Even the FTC's expert, Dr. King, admitted that not everyone who clicked "Manage Subscription" intended to cancel. *See* Defs. App. Ex. 76 at App. 1255 (King Dep. Tr. 134:6–10, 136:12–137:1). The FTC itself also acknowledged "that there might be other reasons that someone might abandon" the flow, other than the alleged lack of simplicity, but the FTC did not conduct further analysis because "it didn't seem like any of those reasons were particularly plausible or material" ***in the FTC's view***. Defs. App. Ex. 74 at App. 1241 (Bandy Dep. Tr. (June 26, 2023) 56:18–57:8). Baseless assumptions do not create a genuine dispute of material fact.[19]

---

[17] *See Neora*, No. 3:20-cv-01979, Dkt. 347 at 19 n.81, 32 ("[T]here are certain assumptions in [the FTC's data analyst's] calculations that the [c]ourt determines renders these calculations less reliable.").
[18] For example, subscribers may have been interested in generally managing their account when they clicked "Manage Subscription" or were otherwise exploring the site. *See* Defs. App. Ex. 59 at App. 1072–73, 1100 (Rpt. ¶¶ 31, 88(b)). They may have been trying to trigger a save offer. *Id.* Or they may have not canceled due to countless reasons that have nothing to do with the design of the online cancelation flow, such as being interrupted by an email, text, phone call, or visit, or an equipment malfunction (e.g., power failure, internet outage). *See id.* at App. 1073–74 (Rpt. ¶ 33 & n.30).
[19] The documents on which the FTC relies also contain unreliable, ad hoc data that is inconsistent with complete data that was collected and verified in response to interrogatories, and therefore do not accurately reflect Match.com's

###### b. **Match.com Offers Multiple Unchallenged Methods to Cancel**

Defendants explained in their opening brief that, regardless of the simplicity of Match.com's online cancelation flow, they cannot be liable for violating ROSCA because Match.com provides at least two (and in fact, many more) alternative cancelation methods that are undisputedly simple, and ROSCA does not require that *every* cancelation method be simple. Mot. at 39–42. The FTC does not dispute the fact of Match.com's alternative cancelation mechanisms, but reads language into ROSCA that does not exist. The FTC's Response therefore does not change the fact that summary judgment should be rendered in Defendants' favor.

###### (i) **The FTC's Uncited Characterization of the Text and Purpose of ROSCA Is Incorrect**

First, the FTC argues that Defendants' interpretation is inconsistent with "the text and purpose of [ROSCA]" and that Defendants ask the Court to read ROSCA "to mean only '*some* simple mechanisms." Resp. at 31–32. But Defendants are asking the Court to read the plain text of the statute, nothing more and nothing less. It is *the FTC* that reads words into the statute by requiring *all* mechanisms be simple. But on issues of statutory interpretation, the plain text controls. And the plain text is clear. A plural term like "simple mechanisms" requires more than one, not all.[20] Thus, "simple mechanisms" does not mean *all* simple mechanisms.[21]

---

subscription cancelation rate. For example, the data includes non-subscribers, non-U.S. Match.com users, and session-level (rather than subscriber-level) information. Defs. App. Ex. 79 at App. 1356–57 (Saraph Supp. Decl. ¶ 103).

[20] *See, e.g., Food & Water Watch, Inc. v. United States Env't Prot. Agency*, 291 F. Supp. 3d 1033, 1046 (N.D. Cal. 2017) ("The use of the plural word 'conditions' does not mean . . . every single condition of use."); *In re Google Litig.*, No. C-08-03172 RMW, 2011 WL 8603085, at *8 (N.D. Cal. Aug. 31, 2011) ("The fact that the term is plural is not enough to require the inclusion of every single object"); *Thomson Consumer Elecs., Inc. v. Innovatron, S.A.*, 43 F. Supp. 2d 26, 32 (D.D.C. 1999) ("[P]lural form indicates more than one but does not necessarily mean all" (internal quotation marks omitted)); *Associated Dry Goods Corp. v. NLRB*, 455 F. Supp. 802, 813 (S.D.N.Y. 1978) ("However, the use of the plural, "proceedingS," does not lead to the conclusion that Congress intended that the term include All future proceedings.").

[21] The legislative history confirms this interpretation is correct, as Congress did not intend to require that *every* cancelation method be simple. The first draft of the bill that became ROSCA would have required a simple process available via the Internet *and* telephone, the second draft would have required a simple process available via the Internet *or* e-mail, and the final draft required just "simple mechanisms." 156 Cong. Rec. S3983-07, 2010 WL 1992981 (first draft); 156 Cong. Rec. S8305-05, 2010 WL 4861287 (second draft); S8305-02, 2010 WL 4861284

> **(ii)    Defendants Provided Multiple Simple Mechanisms to Cancel as a Matter of Law**

The FTC argues that the Court should ignore Match.com's alternative cancelation mechanisms, writing limitations into ROSCA—that a cancelation mechanism must be adequately disclosed and often used to be simple, and that Match.com's alternative mechanisms are allegedly neither. *See* Resp. at 31–33. The FTC does not indicate what level of disclosure or usage would be required—because neither is actually required by law. *See* 15 U.S.C. § 8403(3).[22]

Even if ROSCA contained such requirements, the FTC fails to explain how the other five cancelation methods possibly could have been "hidden" from consumers, Resp. at 33, when they resulted in well over a million cancelations. *See* Mot. at 6–7. Moreover, the FTC's representations about the five other cancelation methods that Match.com has offered are riddled with omissions, half-truths, and misrepresentations. *See* Resp. at 10–12, 32.

**First**, the FTC ignores its own admissions that Match.com has offered five methods for customers to cancel their subscriptions, aside from the online cancelation flow. Mot. at 41.

**Second**, the FTC ignores its own 30(b)(6) witness's binding deposition testimony that the FTC challenges only Match.com's online cancelation flow as not simple. Mot. at 7 & n.7.

**Third**, the FTC misrepresents MGL's 30(b)(6) deposition testimony by claiming that the witness testified that Match.com disclosed only two alternative cancelation mechanisms. Resp. at

---

(final draft). Congress merely wanted consumers to have "simple, convenient ways to cancel," S. Rep. 111-240, 2010 WL 3002003, at *3–4, and for companies to meet "minimum requirements," Statement by the Press Secretary, 2010 WL 5384575, not require that *all* cancelation methods, or any particular cancelation method, be simple. Otherwise, a company could provide ten simple methods to cancel, but if the company tried to offer one more method that the FTC thought was not simple enough, the company could be liable under ROSCA, whereas the company could avoid the risk of liability by *not* offering the eleventh method to cancel. In that way, the FTC's interpretation, which discourages companies from offering additional cancelation alternatives, is inconsistent with ROSCA's purpose.

[22] Nor does the FTC cite any case that imposes disclosure and usage requirements like the FTC attempts to impose here. In *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649, 2015 WL 2130504, at *16 (D. Nev. May 6, 2015), the court granted a preliminary injunction where the single cancelation mechanism (by phone) was "not stated on Defendants' product order pages or in confirmation emails." *Id.* at *1, *3, *16. In *United States v. MyLife.com, Inc.*, there was no real alternative cancelation method, because "email requests for cancellation often" directed the subscriber to cancel by phone. 567 F. Supp. 3d 1152, 1159, 1169 & n.6 (C.D. Cal. 2021).

32; *see* Resp. at 10. Not so. The witness identified all five of Match.com's other cancelation methods. Defs. App. Ex. 73 at App. 1233–35 (Saraph Dep. Tr. (June 22, 2023) 202:3–17, 206:23–207:17, 208:19–210:20). The witness said only that Match.com "advertises" (not discloses) the chat and email methods because they are the "easiest" and "most efficient" for consumers and provide the fastest and "best experience" to cancel (aside from the online cancelation flow). *Id.* And even if "advertising" a cancelation method were required, Match.com's chat and email methods alone would constitute "simple mechanisms" to defeat Count V as a matter of law.

*Fourth*, the FTC is incorrect that Match.com "provided no indication consumers could use [other mechanisms] to [cancel]" and that its "FAQ concerning cancelling [] directs customers to use its [] online cancellation flow."[23] Resp. at 32. *See, e.g.*, Defs. App. Ex. 79 at App. 1355, 1534, 1538 (Saraph Supp. Decl. ¶¶ 93–94 & Ex. 38, 40). The chat and email methods are identified on the Customer Care Contact Us FAQ page. Defs. App. Ex. 79 at App. 1358, 1608, 1610 (Saraph Supp. Decl. ¶ 107 & Ex. 52–53). The phone number was also available on other Match.com FAQ pages. Defs. App. Ex. 79 at App. 1358, 1643 (Saraph Supp. Decl. ¶ 107 & Ex. 54).[24] And the mailing address and fax number are in the Match.com Terms of Use. Defs. App. Ex. 44 at App. 352 (Saraph Decl. ¶ 64).

*Fifth*, the FTC cites no evidence for its assertion that "almost no customers have ever cancelled a Match.com subscription by mail or fax." Resp. at 10–11. While Match.com does not separately record the number of cancelations by mail or fax, the FTC cannot survive summary judgment by assuming that must mean those methods are never used. *See Thomason v. Metro. Life*

---

[23] Ironically, the FTC claims that Match.com's online cancelation flow is not easy to find, then complains that the FAQ page links consumers to the online cancelation flow (thereby helping consumers to find the flow). *See* Defs. App. Ex. 44 at App. 351 (Saraph Decl. ¶¶ 54–55); *supra* Section II.A.2.a.

[24] The FTC incorrectly claims that "Defendants took steps to make the 'Contact Us [information] more subtle." Resp. at 10 & n.42, 32 n.161. The witness who sent the PowerPoint with that language testified that Match.com was just "trying to make [the language] match the rest of the site." Defs. App. Ex. 68 at App. 1196 (Clinchy Dep. Tr. 104:4–17).

*Ins. Co.*, 165 F. Supp. 3d 512, 516 (N.D. Tex. 2016), *aff'd,* 703 F. App'x 247 (5th Cir. 2017) ("[C]onclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment." (internal quotation marks and citation omitted)). This is especially so when Defendants pointed to *actual evidence* of their use. Defs. App. Ex. 44 at App. 352, 419–22, 424.

For these reasons, and as set forth in Defendants' opening brief, there can be no genuine dispute of material fact that Match.com provides "simple mechanisms" to cancel apart from Match.com's online cancelation flow at issue in Count V, thus defeating the FTC's ROSCA claim.

### 3.     At a Minimum, Defendants Are Entitled to Summary Judgment on the FTC's Claims for Civil Penalties Because There Is No Scienter

As Defendants explained in their opening brief, to obtain civil penalties, the FTC must show that Defendants acted "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 822 (N.D. Tex. 2008). The evidence shows that Defendants could not have knowingly violated ROSCA as a matter of law because the standard the FTC seeks to impose here did not exist until after the FTC brought this case. Mot. at 42–43; *see* Mot. at 22–35. The FTC responds that "an intentionally difficult cancellation mechanism could not possibly comply" with ROSCA and that the FTC and BBB put Defendants on notice of the alleged violation. Resp. at 45. Both arguments lack merit.

### a.     Defendants Could Not Have Knowingly Violated ROSCA

The FTC does not argue that Defendants had notice of the "simple mechanisms" standard to which the FTC seeks to hold Defendants liable in this case. Resp. at 45. Instead, the FTC contends that "an intentionally difficult cancellation mechanism could not possibly comply" with

ROSCA. Resp. at 45.[25] But this argument fails as a matter of law. ROSCA requires "simple mechanisms," not the "simplest" mechanism. 15 U.S.C. § 8403(3). Thus, even if a change could make cancelation slightly less simple in theory, it does not mean that the mechanism is not simple.

Instead of relying on objective data (which demonstrates the flow's simplicity, Mot. at 36), the FTC claims that emails discussing ways to improve the online cancelation flow and customer complaints somehow mean that Defendants knew they were violating ROSCA. Resp. at 45. But as noted above, those documents are not even evidence of illegality, much less *knowledge* of illegality. *See supra* Section II.A.2.a(ii); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 815 (N.D. Cal. 2019) ("[C]ustomer complaints do not give rise to a strong inference of scienter."). The FTC's arguments do not change that Defendants could not have knowingly violated the standard the FTC seeks to impose because it did not exist until after the FTC brought this case.

### b.    The FTC's Investigation and Lawsuit Do Not Meet the FTC's Burden

The FTC argues in the alternative that, "[e]ven if Defendants had initially held the [] belief that ROSCA allowed such a practice, they were put on notice by the BBB and the FTC's CID, proposed complaint, and subsequent lawsuit that their specific cancellation practices were not simple and violated the law." Resp. at 45. But an investigation (especially a scattershot one, such as the FTC pursued here) does not prove that a company actually violated the law, much less that a company *knew* or should have known that it was violating the law.[26] Moreover, the mere existence of a lawsuit by the FTC to obtain civil penalties cannot meet the FTC's burden to prove that a company had the statutorily required scienter to be liable for civil penalties. *See* 15 U.S.C.

---

[25] In the only case the FTC cites, "[t]he defendants [had] not argued that [the scienter] element pose[d] an obstacle to their liability" for civil penalties. *United States v. ACB Sales & Serv., Inc.*, 590 F. Supp. 561, 575 n.11 (D. Ariz. 1984).
[26] *E.g.*, *In re Universal Health Servs., Inc., Derivative Litig.*, No. CV 17-2187, 2019 WL 3886838, at *37 (E.D. Pa. Aug. 19, 2019) ("[T]he fact that the government opened an investigation . . . for potential violations of [a federal law] does not mean that the company actually violated the [law]"); *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) (explaining "announcement of an investigation reveals just that—an investigation—and nothing more").

§ 45(m)(1)(A). Otherwise, the FTC would automatically meet its burden in every case just by bringing a lawsuit. Such an absurd result would render the statutory scienter requirement superfluous. *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotations omitted)). At best, the FTC's investigation proves only that the *FTC believes* that Match.com's online cancelation flow violates the law, not that the flow actually is illegal, much less that Defendants *knew* the flow was illegal. That is particularly true here, where the FTC's claim against Defendants has been a moving target. *See* Mot. at 22–35. If the FTC cannot even tell Defendants what a "simple" flow would look like, *see* Mot. at 24 & n.19, Defendants cannot have intentionally violated ROSCA.

### 4.   The FTC's Civil Penalties and Consumer Redress Claims Against MGL Are Barred in Part by the Statute of Limitations

Defendants' opening brief established that the Court should bar the FTC from seeking relief from MGL outside of the statutes of limitations applicable from the date that the FTC brought claims against MGL. The FTC does not dispute (nor could it) the date on which the FTC joined MGL, nor does it dispute that it is seeking relief from MGL outside of the statutes of limitations applied to that date. The FTC has "the burden to demonstrate that an amended complaint relates back under Rule 15(c)" to an earlier date. *Al-Dahir v. FBI*, 454 F. App'x 238, 242 (5th Cir. 2011).

The FTC's Response does nothing to carry its burden. The FTC does not attempt to distinguish any of the cases that Defendants cited. *See* Mot. at 44 n.41. Nor does the FTC cite a single case applying Rule 15.[27] Instead of focusing on the legal standard, the FTC blames

---

[27] *Baldwin County Welcome Ctr. v. Brown*, involved neither Rule 15 nor a newly added defendant, because there was never "an original pleading that could be rehabilitated by invoking Rule 15(c)." 466 U.S. 147, 149 n.3 (1984).

Defendants for the FTC's failure to join MGL sooner. But the FTC does not connect its assertions to any legal doctrine, so it is unclear how the FTC thinks they justify the belated joinder of MGL.

Moreover, the FTC's retelling of the facts is inaccurate. The FTC has been aware of MGL's role in the operation of Match.com years before filing suit. On May 15, 2017, in the *very first interrogatory responses* during the CID, Defendants identified "Match.com, LLC" as "the general operating company that operates Match.com." Pl. App. Ex. 242 at App. 2582.[28] Additionally, Match.com's Terms of Use, which the FTC quoted in its Original Complaint, Dkt. 1 ¶ 62, state that MGL operates Match.com. Defs. App. Ex. 25–28, 44-M at App. 240, 249, 264, 276, 426.

When the FTC nevertheless sued MGI instead of MGL, Defendants' counsel quickly reminded the FTC that they had "repeatedly told the FTC" that "Match.com is owned and operated by Match Group, LLC and not by Match Group, Inc." and that "none of the activities challenged by the Complaint were performed by Match Group, Inc." Dkt. 21 at App. 029. In response—and contrary to the tale that the FTC now spins—the FTC did not express surprise or confusion about MGL's involvement. *See* Dkt. 21 at App. 030. Rather, the FTC decided to do nothing at that time, and waited *nearly three years* to add MGL as a defendant.

"[M]aking a deliberate choice to sue one party instead of another while fully understanding the factual and legal differences between the two parties is the antithesis of making a mistake concerning the proper party's identity" under Rule 15(c). *Krupski v. Costa Crociere S.A.*, 560 U.S. 538, 549 (2010); *see also Mitts v. Sikorsky Aircraft Corp.*, No. H-10-5164, 2012 WL 12893657, at *4 (S.D. Tex. June 26, 2012) ("[A] conscious choice to sue one party over another is not a mistake and does not constitute the basis for relation back."). For example, in *Vuoncino v. Forterra Inc.*, the plaintiff moved for leave to amend its complaint to add two affiliates of the existing

---

[28] Match.com, LLC later changed its name to Match Group, LLC—a fact that is publicly available in corporate filings and was produced to the FTC, not hidden. Defs. App. Ex. 78 at App. 1339 (MATCHFTC672167).

defendants. Defendants opposed, including because amendment was futile as the statute of limitations had lapsed, and the amendment did not relate back to the original complaint given the plaintiff's choice to omit certain corporate affiliates from its original filing, despite knowledge of them. Opp. to Pl.'s Mot. to File Second Am. Compl., *Vuoncino v. Forterra Inc.*, Dkt. 188, No. 3:21-cv-01046-K (N.D. Tex. Apr. 11, 2022). This Court denied the motion to amend. Dkt. 194, No. 3:21-cv-01046-K (N.D. Tex. Apr. 11, 2022). So, too, here, the FTC had knowledge of MGL but chose to omit it from its original Complaint.[29]

The FTC has not carried its burden to show that relation back is appropriate here, where it made a strategic choice to *not* pursue claims against MGL for years. The Court should limit any relief against MGL to the limitations period calculated from the date the FTC joined MGL.

**B.     The Court Should Grant Defendants Summary Judgment on Counts III–IV**

**1.     Long-Discontinued Conduct Cannot Be the Basis for the FTC's Requested Injunctive Relief**

Defendants moved for summary judgment on Counts III and IV because the undisputed evidence shows that the challenged conduct was permanently discontinued and will never be reinstated, so there is no basis for the FTC's requested relief. *See* Mot. at 12–14. The FTC's Response confirms that there is no dispute that the Guarantee and Chargeback Policy were discontinued over four years ago. The FTC admitted as much in its Complaint. Orig. Compl. ¶ 3; Am. Compl. ¶ 3. Nor has the FTC adduced any admissible evidence that Defendants will engage in similar conduct in the future. Defendants produced nearly 300,000 documents and hundreds of pages of discovery responses, and the FTC took eleven depositions, yet the FTC has not a single shred of evidence that the Guarantee or Chargeback Policy will be reinstated at any point in the

---

[29] As explained in Defendants' opening brief, the FTC deliberately chose to sue MGI because the FTC wants injunctive relief against dating sites other than Match.com. Mot. at 58; *see infra* Section II.C.

future. To the contrary, the *only* evidence in the record regarding the future of the Guarantee and Chargeback Policy is that they will *never* be reinstated, as shown by a verified stipulation and sworn interrogatory responses, documents, and deposition testimony. *See* Mot. at 12–14 & nn.13–15. Summary judgment should be granted in Defendants' favor.[30]

### a. Counts III and IV Are Moot Because the Guarantee and Chargeback Policy Could Not Reasonably Be Expected to Recur

Rather than engaging with Defendants' facts proving permanent discontinuance, the FTC spends most of its argument harping on the standard for mootness, claiming that voluntary cessation is not enough. But when "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," the case is not only moot, but more importantly, no injunction may be issued. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

The FTC's sole argument that the conduct could recur is that, notwithstanding Defendants' repeated commitments, the alleged violations were "yearslong" and "egregious." Resp. at 39. But there was never any violation at all, much less an egregious one. *See infra* Section II.B.2. And regardless of whether a violation ever occurred, Defendants have repeatedly sworn that the complained-of conduct has ceased and will never be reinstated. Defs. App. Ex. 51 at App. 539 (MGI's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. No. 3); Defs. App. Ex. 52 at App. 577, 588–89 (MGL's 2d Am. Resps. and Objs. to FTC's 1st Interrogs. Nos. 8, 12). The FTC has *zero*

---

[30] The FTC contends that the Court has "rejected" this argument "multiple times." Resp. at 39–40. Not so. MGI made a similar discontinuance argument in its Motion to Dismiss and in opposition to the FTC's Motion to Compel discovery on Counts III and IV. But the standards applied to motions to dismiss, motions to compel, and motions for summary judgment are far different. *See Frakes v. Masden*, No. H.-14-1753, 2015 WL 1637893, at *2 n.1 (S.D. Tex. Apr. 13, 2015) ("The standards for motions to dismiss and for motions for summary judgment are entirely different."); *Berry v. CitiMortgage, Inc.*, No. 4:14-cv-459, 2015 WL 4484170, at *4 (E.D. Tex. July 22, 2015) (rejecting argument that the summary judgment motion "repeats arguments 'rejected' by the Court in its ruling on Defendant's motion to dismiss," because "a different standard applies to Defendant's motion for summary judgment than the standard applied to Defendant's motion to dismiss"). That the FTC sufficiently *alleged* that Defendants "are violating, or about to violate" the FTC Act for purposes of a Motion to Dismiss and to obtain discovery does not excuse the FTC from presenting *evidence* to support those assertions at summary judgment. The FTC has failed to do so.

evidence that calls Defendants' veracity into question. It nevertheless speculates that Defendants could reinstate the Guarantee or Chargeback Policy (or something close to them) as soon as this case is over, but there is not a shred of evidence to support that speculation either. The FTC has no evidence of any such plans—because there are none. And even if Defendants attempted to reinstate the challenged conduct, the FTC could enforce Defendants' verified stipulation committing to never reinstate those policies.[31] Merely name calling about past conduct cannot prove a likelihood of recurrence.

The cases that the FTC cites are distinguishable. None involved a filed, verified stipulation, swearing that the alleged misconduct will never be reinstated, as exists here. In many of the cases, the conduct had not actually been discontinued.[32] Many of the cases also involved discontinuance right before trial or in the midst of appeal, suggesting that the party was attempting to evade review.[33] Here, the Guarantee and Chargeback Policy were permanently discontinued months before the FTC filed this lawsuit.[34] And some of the cases that the FTC cites *support* Defendants' argument. In *Dallas Gay Alliance, Inc. v. Dallas County Hospital District*, the court held that the

---

[31] *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." (internal quotation marks and citation omitted)).

[32] *FTC v. Sage Seminars*, No. 95-cv-2854, 1995 WL 798938, at *6 (N.D. Cal. Nov. 2, 1995) (evidence that the alleged misconduct was ongoing, executive had publicly represented that he had no intention of changing conduct, and the only evidence that the misconduct had ended was a self-serving declaration); *Sec'y of Labor v. Burger King Corp.*, 955 F.2d 681, 684–85 (11th Cir. 1992) (evidence that violations had continued to occur after past promises to cease misconduct, indicating that the defendant was unable to ensure discontinuance); *Anderson v. Albany*, 321 F.2d 649, 656 (5th Cir. 1963) (defendant claimed challenged ordinances were not enforced, but "[t]he denials [were] not consistent with the actual facts"); *In re Intuit, Inc.*, Initial Decision and Order, FTC Docket No. 9408 (Sept. 6, 2023) ("[T]he facts do not demonstrate either that Respondent has voluntarily ceased all the conduct found to be unlawful herein or that the State Settlement will prevent Respondent from engaging in such unlawful conduct in the future.").

[33] *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307–08 (2012) (alleged misconduct ceased only after the Supreme Court granted certiorari); *Hall v. Bd. of Sch. Comm'rs of Conecuh Cnty.*, 656 F.2d 999, 1000 (5th Cir. Unit B 1981) (Superintendent was aware that the activity was unconstitutional, but announced discontinuance only the day before trial); *Cypress v. Newport News Gen. & Nonsectarian Hospital Ass'n*, 375 F.2d 648, 656 (4th Cir. 1967) (alleged misconduct discontinued a few weeks before the case was heard on appeal, after five years of litigation).

[34] Defendants knew that the FTC had commenced an investigation, but that is not evidence of wrongdoing. *See supra* Section II.A.3. Defendants should receive credit, not criticism, for discontinuing the challenged policies.

defendant's "bona fide and expressed intent" to eliminate a waiting list for a particular medical treatment (the challenged conduct) mooted the plaintiffs' claims. 719 F. Supp. 1380, 1387 (N.D. Tex. 1989). That was true even though the challenged conduct had been discontinued for less than a year, the defendant had not sworn to never reinstate the conduct, and the defendant's director admitted that, although he did "not plan to reinstitute the waiting list or to limit the availability" of the treatment at issue, he "could not guarantee infinite resources." *Id.* Defendants' commitment in this case is far stronger than the facts that supported mootness in *Dallas Gay Alliance*.

The FTC's attempts to distinguish authorities cited in Defendants' opening brief fail. In each of those cases, the defendant had committed, in one way or another, not to reinstate the challenged conduct, and there was no evidence to doubt that commitment. The alleged factual distinctions that the FTC now emphasizes played no apparent role in the courts' opinions.[35] Here, as in the cases on which Defendants relied and many others, Defendants discontinued the challenged conduct and committed to never reinstate it, and the FTC has no evidence to call that commitment into doubt. The Court should find the FTC's claims moot.

> **b.** **There Is No Evidence of a Reasonable Likelihood of Future Violations Warranting Injunctive Relief**

Even if Counts III and IV are not moot (they are), to obtain the injunctive relief that it seeks, the FTC must show that Defendants "are violating, or about to violate" the FTC Act. 15 U.S.C. § 53(b). The "critical question" is "whether defendant's past conduct indicates that there is a reasonable likelihood" of future violations. *Cornerstone*, 549 F. Supp. 2d at 816; *see* Dkt. 86 at

---

[35] The FTC mischaracterizes some of the cases. In *Friends of the Earth, Inc. v Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000), the Court did not reject the party's mootness argument. *Contra* Resp. at 41–42. The Court left mootness "open for consideration on remand." *Id.* at 193–94. And although the FTC describes *First Colony Life Ins. Co. v. LFC Resol. Payment Fund, Ltd.*, as involving "a one-time event," rather than ongoing conduct, Resp. at 42, the contract at issue required ongoing payments under an annuity contract. 83 F. Supp. 2d 767, 768 (N.D. Tex. 1999).

11–12. The FTC agrees that this is the standard. *See* Resp. at 39.[36] As it is the FTC's burden to show that it is entitled to the injunctive relief that it seeks, the FTC must come forward with evidence that indicates a reasonable likelihood of future violations. *See TRW, Inc. v. FTC*, 647 F.2d 942, 954 (9th Cir. 1981).[37] Because it cannot, judgment in Defendants' favor is warranted.

*FTC v. Neora* is instructive. There, Judge Lynn held that an injunction under the FTC Act "requires proof that Defendants are violating or are about to violate the Act." No. 3:20-cv-01979, Dkt. 347 at 2. And as to that question, "[t]he fact that the FTC relies primarily on older examples of alleged misrepresentations is significant." *Id.* at 49. "[A]lthough proof of past violations can be relevant to whether an actor 'is violating, or is about to violate' the FTC Act," Judge Lynn said, "the probative value of [older conduct] decreases in light of other evidence . . . indicating that [the defendant] has updated and revised its policies." *Id.* In that case, the defendant had "updated and revised its policies" and disclaimers (although not discontinued the program entirely). *Id.* On that record, Judge Lynn held that "the *Cornerstone Wealth* factors do not justify issuing an injunction based on Defendants' past violations of the law." *Id.* at 50. Because there was "insufficient evidence that [Defendants] are making or recently made extensive and routine misrepresentations," Judge Lynn found the FTC's requested injunction "unnecessary." *Id.* at 51.

Similarly here, the FTC has no evidence that Defendants are engaging or recently engaged in the challenged policies (which were permanently discontinued more than four years ago), much

---

[36] The FTC claims that "violating, or about to violate" is merely "a pleading standard" that was resolved in the dismissal briefing, not "the FTC's evidentiary burden" to prove at summary judgment. Resp. at 39 n.196. That argument misunderstands pleading standards. A plaintiff must plead the elements that are "necessary to sustain a recovery . . . at trial." *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) (quoting 5 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1216 at 156–59). Regardless, the parties agree that the relevant question is whether "there is a reasonable likelihood of further violations," which can be informed by *Cornerstone*.
[37] That makes this argument distinct from mootness. The FTC "bears the burden of showing the need for injunctive relief. *TRW*, 647 F.2d at 954; *SCM Corp. v. FTC*, 565 F.2d 807, 812 (2d Cir. 1977) ("dismissing a case for mootness and denying a request for injunctive relief" are "two concepts [that] are analytically distinguishable," such that "a court could find that a case is not moot and yet deny injunctive relief").

less in an "extensive and routine" way. If anything, an injunction is even more "unnecessary" here than in *Neora* given that the challenged conduct here was discontinued entirely, whereas in *Neora* the defendant simply amended its disclosures.[38]

*FTC v. Traffic Jam Events, LLC*, where the court denied the FTC's request for injunctive relief, also supports Defendants' argument. The FTC attempts to minimize the case as involving a "one-time promotional mailer," Resp. at 43, but it fails to mention that the court characterized the defendant's conduct as egregious, that the same defendant had been the subject of three prior consent judgments related to misleading mailers,[39] that the defendant acted with scienter, and that the defendant remained in the same business such that opportunities for future violations were possible. No. 20-1740, 2020 WL 3490434, at *6–9 (E.D. La. June 26, 2020). The court also credited the defendant's assurances against future violations, however (even though the defendant did not admit that the past conduct was unlawful). *Id.* at *7–8. Overall, the court found that "three [*Cornerstone*] factors weigh in favor of the FTC and three factors weigh in favor of Defendants," and held that "injunctive relief is not warranted." *Id.* at *9. In fact, the court described the FTC's motion as "an overreach by the FTC of its authority to seek injunctive relief." *Id.*

Similarly here, Defendants have repeatedly made a sincere commitment to never reinstate the challenged policies. The FTC has no evidence to the contrary. The Court should stop the FTC's overreach and instead grant Defendants' Motion because injunctive relief is not warranted.[40]

---

[38] The FTC tries to distinguish *Neora* on the basis that Defendants "refused to recognize any of their law violations or provide credible justifications for them." Resp. at 43 n.217. But the mere fact that a defendant "does not admit fault . . . does not, standing alone, suggest that the defendant is likely to commit another violation." *SEC v. Gunn*, No. 3:08-cv-1013-G, 2010 WL 3359465, at *5 (N.D. Tex. Aug. 25, 2010).

[39] The court found that the three prior consent judgment were unrelated to the facts at issue in *Traffic Jam* only because the *Traffic Jam* mailers involved representations related to COVID relief, while the other mailers involved offers to win prizes. No. 20-1740, 2020 WL 3490434, at *7 (E.D. La. June 26, 2020).

[40] Cases in which courts have granted injunctive relief are far different. In *Cornerstone*, the defendants were "fully aware" that their conduct violated the law and "express provision[s]" of two prior court orders. 549 F. Supp. 2d at 819–20. Here, Defendants have not violated any prior court order (much less knowingly), and any alleged violation is far from clear. *See infra* Section II.B.2. In *FTC v. Southwest Sunsites, Inc.*, the defendants were selling land with "no

###### 2.   A Reasonable Factfinder Could Not Conclude that Defendants Violated the Law in Counts III and IV

###### a.   The FTC Does Not Have Sufficient Evidence to Create a Triable Issue that the Guarantee Violated the FTC Act

The Court should also grant Defendants summary judgment on Count III because the FTC has insufficient evidence that the Guarantee violated the FTC Act. The FTC's claim essentially boils down to a complaint that Match.com disclosed terms and conditions through a hyperlink, but such disclosure is permitted by FTC guidance, and the FTC has no evidence that such disclosure was inadequate here. The FTC's Response does not show otherwise.

###### (i)   The FTC Misrepresents Count III in an Attempt to Cure Its Lack of Empirical Evidence

As Defendants explained in their opening brief, a claim based on an alleged failure to *adequately* disclose (rather than an alleged false statement or material omission) requires empirical evidence, and the FTC's failure to obtain any empirical evidence is fatal to the FTC's Count III.[41] Mot. at 50. The FTC argues that empirical evidence is unnecessary because "Defendants' own employees were able to conclude Match.com's claims were deceptive based on the exact same evidence." Resp. at 33. That is a gross overstatement of the two emails the FTC cites, which are not about whether the requirements of the Guarantee were adequately disclosed. In one email, a former employee discusses the "messaging and functionality" of the Guarantee (not whether its requirements were adequately disclosed), and that employee admitted that she lacked any

---

economically feasible commercial application" and "no resale value." 665 F.2d 711, 715 (5th Cir. 1982). Although there was "no promotional or sales campaign" ongoing, land "sales on-site [were] continuing." *Id.* at 723.

[41] Because it cannot satisfy the standard for the claim that it brought, the FTC's Response tries to change the applicable standard by misrepresenting that Count III is about a "false" statement. *See, e.g.*, Resp. at 3 (The "disclosures . . . do not cure Defendants' false representations."); *id.* at 35 ("[A]ccurate information . . . will likely not remedy a false headline[.]"). But nowhere in the Amended Complaint does the FTC allege that Count III is about a false statement. *See* Dkt. 116, Am. Compl. The FTC also does not argue in its Motion for Summary Judgment that Count III is about a false claim. *See* Dkt. 199-1. Count III alleges only that the material terms of the Guarantee were not adequately disclosed to consumers. Am. Compl. ¶ 3 (alleging that Defendants "failed to disclose the requirements of its 'guarantee' **adequately**" (emphasis added)); *id.* ¶¶ 39–53, 75–77.

empirical evidence about the Guarantee. Pl. App. Ex. 2 at App. 7. In the other, the FTC cites a former employee's[42] speculation (backed by no evidence) that some consumers did not know that the requirements existed, not whether the requirements were adequately disclosed. Pl. App. Ex. 43 at App. 442 ("I **think** people fall into these categories[.]" (emphasis added)). Neither is sufficient to meet the FTC's burden to show that a reasonable factfinder could find the practice deceptive.

The FTC then tries to distinguish *FTC v. DIRECTV, Inc. See* Resp. at 34 & n.173. But this case is just like *DIRECTV*, where the FTC failed to meet its burden to prove that "critical details of [] an offer were not disclosed prominently enough" because "the FTC failed to establish that there was any misleading 'net impression,'" based on a facial review and extrinsic evidence, which (among other things) lacked "copy testing or other empirical testing of how consumers perceive[d] [the] advertisements." No. 15-CV-01129, 2018 WL 3911196, at *5, *11–12 (N.D. Cal. Aug. 16, 2018). Here, the FTC does not even attempt to put forward any empirical evidence, so the FTC likewise cannot meet its burden that the admittedly present disclosure is insufficient.[43]

### (ii)   The FTC Lacks Evidence that the Guarantee Was Material to Any Purchase Decision

Aside from the lack of empirical evidence, the FTC lacks sufficient evidence for a factfinder to conclude that the Guarantee was material. As explained in Defendants' opening brief, the FTC has no evidence of the percentage of consumers who purchased a six-month Match.com subscription and knew or cared about the Guarantee. The evidence suggests the contrary—that many users did *not* care about the Guarantee, such that the Guarantee was not material to their

---

[42] That former employee testified that she could not think of any way that offering the Guarantee was unfair. Defs. App. Ex. 66 at App. 1177, 1180 (Auderer Dep. Tr. 12:12–25, 211:16–18). In addition, her boss testified that no one at Match.com ever told her, and she never heard discussion, that Match.com was trying to deceive consumers into subscribing by offering an illusory Guarantee without disclosing the terms, or trying to make it difficult for consumers to redeem their Guarantee. Defs. App. Ex. 67 at App. 1186, 1189 (Watson Dep. Tr. 18:12–20, 208:19–209:4).

[43] The FTC cites *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196 (9th Cir. 2006). But in that case, no party argued, and therefore the court had no occasion to discuss, the impact of any lack of empirical evidence as is the case here.

purchasing decision. Mot. at 50–51. In response, the FTC claims that "Defendants point to no evidence supporting this claim," Resp. at 36, but the FTC is verifiably wrong. Defendants identified significant evidence indicating that many users did *not* care about the Guarantee. Mot. at 51 & n.45 (citing Defs. App. Ex. 7 at App. 82 (Saraph Dep. Tr. (Apr. 6, 2023) 14:2–12); Defs. App. Ex. 40 at App. 334 (expecting no net impact to revenue from removal of Guarantee); Defs. App. Ex. 41 at App. 337 (noting "topline impact of the [G]uarantee is very small")).[44] In any event, the FTC (not Defendants) bears the burden of proof. The FTC attempts to carry that burden only by asserting that "many customers unquestionably were interested in the Guarantee," but the FTC cites **zero** evidence for that proposition. Resp. at 36–37. A statement without a citation is not sufficient to survive summary judgment. *See, e.g.*, *Thomason*, 165 F. Supp. 3d at 516 (explaining "conclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment" (internal quotation marks and citation omitted)).

Faced with this lack of evidence, the FTC relies on a "presumption" of materiality, Resp. at 36, but any presumption is rebutted by actual evidence. The FTC claims that "Defendants' own internal testing showed that these claims were material," Resp. at 36, but the FTC relies on emails that contain no testing results or analysis and merely allude to unidentified testing. *See* Pl. App. Ex. 33 at App. 262; Pl. App. Ex. 266 at App. 4688. The FTC doubles down by claiming that "complaint data likewise confirms these claims were material to customers." Resp. at 36. However, the FTC cites no evidence, but the actual evidence shows that the volume of customer complaints about the Guarantee was "very small" compared to Match.com's customer base.[45]

---

[44] The FTC also argues that Defendants "have offered no evidence to rebut th[e] presumption" of materiality "other than self-serving conjecture." Resp. at 36. Deposition testimony under oath about Match.com testing and contemporaneous emails analyzing that testing are not self-serving conjecture.

[45] Defs. App. Ex. 72 at App. 1223 (Saraph Dep. Tr. (Apr. 6, 2023) 90:19–91:7 (noting that it is "possible" that Match.com received complaints from customers that misunderstood the Guarantee requirements, but any such complaints "would be a very small number of users")); Defs. App. Ex. 71 at App. 1215, 1217 (Ong Dep. Tr. 260:5–9 ("Q. Compared to the size of your customer base in Match.com, did you receive a significant number of complaints

### (iii)   The FTC Lacks Evidence that the Program Rules Were Not Adequately Disclosed

Summary judgment is also proper because the FTC has no evidence of the percentage of consumers who were misled because they did not know the material terms of the Guarantee or empirical evidence of the percentage (if any) of consumers who qualified for the Guarantee but did not claim it because of the alleged inadequate disclosure. Mot. at 50. Instead of coming forward with any such evidence in its Response, the FTC asserts that "Defendants' hidden disclaimers do not remedy the deceptive 'net impression' of Match.com's representations." Resp. at 34. Aside from the fact that the disclosures were not "hidden" (they were accessible through the "Learn more" link), *see* Mot. at 14, 50, the FTC cites **zero** evidence for that proposition. *See, e.g.*, *Thomason*, 165 F. Supp. 3d at 516 (explaining "conclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment" (internal quotation marks and citation omitted)). The FTC likens the Program Rules behind the "Learn more" link to "fine print" disclosures, but the FTC cites no case like this one. Resp. at 34 n.174, 35 n.175.[46]

The FTC then resorts to claiming that "Defendants' disclosures were ineffective because they were not clear and conspicuous." Resp. at 35. But the FTC's "clear and conspicuous" guidance can be found in the FTC's non-binding Dot Com Disclosures.[47] Once again, the FTC is attempting to impose a standard on Defendants that does not exist in the law. In any event, the "Learn more" link complies with the Dot Com Disclosures, which permit disclosing terms like the Program Rules behind a hyperlink "if the details [] are too complex to describe adjacent to the []

---

saying that the six-month guarantee policy was difficult to understand? A. No."), 266:15–22 ("[W]hen I was running customer service, the percentage of calls that were related to the six-month guarantee and complaints related to that were not high")).

[46] *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 39–40, 42–43 (D.C. Cir. 1985) ("virtually illegible" disclaimer); *Indep. Directory Corp. v. FTC*, 188 F.2d 468, 469–70 (2d Cir. 1951) (solicitation that appeared to be a request to renew an existing advertisement but was instead a request to purchase a new advertisement).

[47] FED. TR. COMM., .com Disclosures, How to Make Effective Disclosures in Digital Advertising, 2013 WL 12481090 (Mar. 2013).

claim." Dot Com Disclosures at 10; *see id.* at A-7. The Guarantee Program Rules would be "too complex to describe adjacent to the [] claim" that "If you haven't found someone special within 6 months, we'll give you an extra 6 months FREE," because they would not fit in the white space where the "Learn more" link is. Dot Com Disclosures at 10; *compare* Defs. App. Ex. 44-B at App. 357–58 (Program Rules), *with* Defs. App. Ex. 44-A at App. 355 (Icon with "Learn more" link). Thus, the Dot Com Disclosures permit "those details [to] be provided using a hyperlink," which immediately follows the claim in blue, the typical color of a hyperlink. Dot Com Disclosures at 10. For these reasons, the FTC lacks sufficient evidence to create a triable issue that the Guarantee violated the FTC Act.

### b.      The FTC Does Not Have Sufficient Evidence to Create a Triable Issue that the Chargeback Policy Violated the FTC Act

The Court should grant Defendants summary judgment on Count IV because the FTC has insufficient evidence that the Chargeback Policy was unfair in violation of the FTC Act. The FTC's Response does nothing to change this conclusion. There was nothing unfair about the Chargeback Policy, which merely removed from Match.com users that had submitted fraudulent chargeback requests, unless and until the user told Match.com he or she wanted their access restored.

### (i)      The FTC Has Insufficient Evidence that the Chargeback Policy Causes or Is Likely to Cause Substantial Injury

As to the first requirement, the FTC cannot establish that the Chargeback Policy "causes or is likely to cause substantial injury," 15 U.S.C. § 45(n),[48] because the only supposed harm from

---

[48] 15 U.S.C. § 45 is also known as Section 5 of the FTC Act. That Congress wrote Section 5(n) in the present tense ("causes or is likely to cause") is further reason to grant Defendants' Motion, because Section 5(n) does not cover past, discontinued conduct, such as the Chargeback Policy. The FTC argues that *FTC v. Shire ViroPharma, Inc.*, "expressly rejected the idea that Section 5 of the FTC Act does not 'prohibit[] past conduct,'" Resp. at 38 (quoting 917 F.3d 147, 156 (3d Cir. 2019)), but *Shire* involved Section 13(b), not Section 5, and to the extent that *Shire* discussed Section 5 at all, it addressed Section 5(b), not Section 5(n). *See* 917 F.3d at 150, 155. Section 5(b) uses the past tense, permitting the FTC to initiate administrative proceedings if it has reason to believe that a target "*has been* or is using any unfair method." 15 U.S.C. § 45(b) (emphasis added). Thus, *Shire* was correct that Section 5*(b)* covers past conduct, but it said nothing about Section 5*(n)*.

the Chargeback Policy is that consumers could not access a platform that they (falsely) claimed that they did not agree to pay for or want, which is no harm at all. Mot. at 53. In response, the FTC asserts that an "attempt to accommodate consumers' wishes" does not "justif[y] both keeping the customers [sic] money and denying them the account access they have paid for," Resp. at 37–38, but "conclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment." *See, e.g.*, *Thomason*, 165 F. Supp. 3d at 516 (internal quotation marks and citation omitted). The FTC's characterization of the Chargeback Policy is also not accurate. *See* Mot. at 16. If the user wanted access to Match.com, Match.com did not deny account access, but instead reactivated the user's account upon request. *Id.*

### (ii) The FTC Has Insufficient Evidence that the Chargeback Policy Was Not Reasonably Avoidable by Consumers

As to the second requirement, the FTC cannot establish that the Chargeback Policy was "not reasonably avoidable by consumers themselves." 15 U.S.C. § 45(n). Defendants set forth in their opening brief three separate reasons why any harm was reasonably avoidable as a matter of law. Mot. at 53. The FTC's Response confirms that summary judgment should be granted.

First, any harm was reasonably avoidable because a consumer could be "harmed" only by submitting a fraudulent chargeback request that the consumer's own financial institution rejected. Mot. at 53. The consumer could avoid the harm simply by not submitting a fraudulent chargeback. The FTC responds that "Defendants contest *all* customer chargebacks regardless of merit—not just those they believe to be false or fraudulent." Resp. at 14. But which chargebacks Match.com

---

What is more, the fact that Section 5(b) uses past tense while Section 5(n) uses present tense is more evidence that the tense choice was intentional and the Court should give it meaning. *See Singh v. Att'y Gen. of United States*, 12 F.4th 262, 273 (3d Cir. 2021) (explaining that "Congress's choice of a different verb tense in a parallel deportation provision" "lends further support" to the court's conclusion because "different words suggest differing meanings").

The FTC attempts to distinguish the facts of *Carr v. United States*, 560 U.S. 438 (2010), but it cannot dispute the Supreme Court's statutory interpretation guidance: courts "frequently look[] to Congress' choice of verb tense to ascertain a statute's temporal reach," and "the present tense generally does not include the past." *Id.* at 448. Nothing about that guidance was limited to the facts of *Carr*.

disputes is irrelevant, because the FTC challenges the Chargeback Policy only as to consumers that *lost* chargeback disputes (i.e., those that the consumer's own financial institution rejected). *See, e.g.*, Am. Compl. ¶ 3 ("[U]ntil mid-2019, **when consumers disputed charges** . . . **and lose the dispute**, Defendants denied consumers access to paid-for services" (emphasis added)).

The FTC also argues that "Defendants have pointed to no evidence to support the unlikely proposition that the only chargebacks they won were false or fraudulent." Resp. at 14. But that is by definition the only time Defendants win a chargeback dispute. A chargeback occurs when a consumer disputes a charge on the grounds that it was allegedly not authorized. *See* Defs. App. Ex. 44 at App. 348 (Saraph Decl. ¶¶ 29–30). The business can dispute the chargeback (i.e., provide evidence that the charge was authorized). The financial institution then decides in favor of the user or the business.[49] If the charge was not authorized, the user prevails. Defs. App. Ex. 44 at App. 348 (Saraph Decl. ¶ 31). The business wins when it proves that the charge was authorized, meaning the chargeback claiming otherwise was fraudulent. Defs. App. Ex. 44 at App. 349 (Saraph Decl. ¶ 32).  These are the chargeback disputes that Count IV challenges. *See, e.g.*, Am. Compl. ¶ 3.

Second, any harm was reasonably avoidable because Match.com clearly disclosed the Chargeback Policy in its Terms of Use. Mot. at 53. The FTC claims that "Defendants did not adequately disclose" the policy, but does not explain how. Resp. at 37. Match.com's Terms of Use clearly stated that "If you initiate a chargeback . . . , the Company may . . . terminate your account immediately," and that "If the Company successfully disputes the reversal, and the reversed funds

---

[49] *See, e.g.*, NERDWALLET, *What Is a Chargeback? Definition, How to Dispute* (Oct. 23, 2023), https://www.nerdwallet.com/article/small-business/chargeback.

are returned, you are not entitled to a refund or to have your account or subscription reinstated." Defs. App. Ex. 25 at App. 244.[50]

Third, any harm was reasonably avoidable because Match.com restored users' accounts if they asked to rejoin the site. Mot. at 53. The FTC also does not respond to this argument. *See generally* Resp. at 13–15, 37–38. Thus, as shown above, any harm was reasonably avoidable.

### (iii)     The FTC Has Insufficient Evidence that Any Harm Was Not Outweighed by Benefits to Consumers

As to the third requirement, whether any harm was outweighed by countervailing benefits to consumers, 15 U.S.C. § 45(n), Defendants set forth in their opening brief the legitimate reasons for the Chargeback Policy, which had nothing to do with punishing customers. Mot. at 16–18.[51]

First, the Chargeback Policy helped protect the Match.com ecosystem because subscribers who initiated a billing dispute were clearly indicating that they no longer wished to appear on Match.com—many claimed that they never even signed up for a Match.com account. Mot. at 16–17. The FTC responds that "[a] billing dispute, however, means no such thing," and speculates that "customers may simply have not intended to pay for the premium version." Resp. at 15. Tellingly, the FTC cites no law or evidence to support that conclusion, so it cannot meet the FTC's summary judgment burden. And if any user did wish to appear on Match.com, all they had to do

---

[50] When purchasing a subscription, each customer explicitly agreed to be bound by the Terms of Use, which were available prior to purchase and could be referenced after purchase by clicking on the link in the bottom banner of Match.com webpages. Defs. App. Ex. 79 at App. 1348–49 (Saraph Supp. Decl. ¶¶ 61–63).

[51] The FTC contends that "Defendants cite only a single piece of evidence—a self-serving and conclusory declaration" for the "rationales for the Chargeback Policy, none of which were ever memorialized and, and [sic] all of which are contradicted by the actual evidence." Resp. at 13–14. This is factually false and legally baseless. Defendants cited the declaration, deposition testimony, *and* documentary evidence. Mot. at 16–18. Plus, "there is nothing wrong with self-serving affidavits and declarations, provided they are supported by the facts in the record." *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 442 (5th Cir. 2013) (quoting Moore's Federal Practice § 56.94[3], at 56–225 (3d ed. 2013)).

was ask for Match.com to restore the account. *See* Defs. App. Ex. 7 at App. 84–85 (Saraph Dep. Tr. (Apr. 6, 2023) 209:23–210:13).[52]

Second, the Chargeback Policy addressed consumer abuse of Match.com because Match.com is regularly faced with situations when a subscriber pays for a subscription, uses it extensively, then submits a chargeback to attempt to get the Match.com subscription for free. Mot. at 17. The FTC claims that this rationale is "new" and not "supported by contemporaneous evidence." Resp. at 14. But this is demonstrably false. Indeed, Defendants cited an email example in which a Match.com member "was renewed on 12/22/2022 for 6 months," "used it extensively till 2/16/2013, and then charged the transaction back." Defs. App. Ex. 24 at App. 235.

Third, when the Chargeback Policy was instituted, Match.com did not have the mechanisms it has today. Mot. at 18. Match.com had to manually access a payment processing portal to see the outcome of a chargeback dispute (i.e., whether Match.com won or lost), whereas that process is now automated. Mot. at 18. The FTC again claims that this "new" rationale is not "supported by contemporaneous evidence," Resp. at 14, but the FTC is wrong again. For example, in a 2013 email, a Match.com employee explained, "[T]o determine the outcome of a specific chargeback, we have to login to the chargeback console and get the details on a specific chargeback . . . . There isn't an automated process for this." Defs. App. Ex. 24 at App. 234.

In short, Match.com had legitimate reasons for the Chargeback Policy, which was to benefit customers, not punish them. Thus, there is no genuine dispute that any harm from the Chargeback Policy was outweighed by countervailing benefits to consumers.

---

[52] Match.com's current policy "ultimately achieved something very similar to what we were doing before" regarding ecosystem protection by automatically restoring accounts but hiding the profile, while instructing users how to un-hide their profiles if they wished to do so. Defs. App. Ex. 72 at App. 1226 (Saraph Dep. Tr. (Apr. 6, 2023) 251:14–252:10).

**C.      The Court Should Separately Grant MGI Summary Judgment on All Counts**

Defendants' opening brief demonstrated that the FTC does not have sufficient evidence for a reasonable factfinder to conclude that MGI is liable for any of the alleged misconduct. Dkt. 204 at 54–57. In response, the FTC asserts that "MGI is liable for Match.com's law violations because it owned the site, had authority to control it, and was aware of its illegal conduct," but merely "refers the Court to the FTC's MSJ" for its argument and alleged evidence. Resp. at 44 & n.223. Such incorporation by reference is improper and does not warrant the Court's consideration. *See Normore v. Dallas Indep. Sch. Dist.*, No. 3:18-CV-02506-E, -- F. Supp. 3d --, 2023 WL 3937785, at *31 (N.D. Tex. Jun. 9, 2023) (declining to consider evidence or argument from other briefing that the plaintiff attempted to incorporate by reference).[53] Even if the Court were to consider the FTC's incorporation by reference, however, the FTC is wrong on both the facts and the law.

The FTC's "evidence" allegedly implicating MGI is nothing more than normal corporate oversight, which the Supreme Court has held does not make a parent liable for conduct at a facility operated by a subsidiary. *See United States v. Bestfoods*, 524 U.S. 51, 69–72 (1998). The FTC argues that MGI is nevertheless liable because MGI had "[(1)] knowledge of the illegal practices and [(2)] the authority to stop it," Resp. at 44. But if the standard were as low as the FTC suggests (it is not), it would make the Supreme Court's decision in *Bestfoods* a nullity, rendering all parent companies effectively strictly liable for any subsidiary's misconduct. Moreover, the FTC's evidence of MGI's alleged knowledge consists of nothing more than a handful of customer complaints that were sent to a few MGI executives. That is not knowledge of deceptive or illegal conduct.[54] Additionally, the FTC's lone evidence of MGI's authority to control is that MGI

---

[53] To the extent that the Court considers the FTC's incorporation by reference of its Motion for Summary Judgment, Defendants' complete response to the FTC's argument on this point is at Dkt. 238 at 65–74.

[54] In the cases that the FTC cites, the defendant had knowledge of the deception, not just complaints. *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 170 (2d Cir. 2016) (requiring "knowledge of the deception" and "authority to control the

appointed MGL executives, and those executives occasionally reported to MGI about Match.com's performance. That evidence does not establish authority to control sufficient to render MGI liable.[55] *See Bestfoods*, 524 U.S. at 69–72.

## III.   CONCLUSION

For these reasons, Defendants respectfully request that the Court grant the Motion in its entirety and dismiss Counts III, IV, and V with prejudice.

[signature page to follow]

---

deceptive content"); *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1233 (11th Cir. 2014) (defendants received "a report from IAB's chief compliance officer that sales representatives had" made misrepresentations to customers).

[55] As explained in Defendants' opening brief, the FTC's sole apparent reason for keeping MGI in the case is that the FTC wants injunctive relief against dating sites other than Match.com. Dkt. 204 at 58. The FTC does not deny that this is its goal; to the contrary, it argues that it is entitled to such relief. *See* Resp. at 43–44. It is not. The FTC has no evidence of any alleged misconduct on other dating platforms. In fact, as Defendants pointed out in their opening brief, Dkt. 204, at 58, when pressed at a discovery hearing last year, the FTC had to admit to Magistrate Judge Ramirez that it lacked even a good-faith basis to include allegations about other dating sites in the complaint. Defs. App. Ex. 11 at App. 171–73 (Am. Hr'g Tr. (Nov. 1, 2022) 29:1–31:4). The FTC's response is entirely silent on its admission to Judge Ramirez. Worse, as supposed evidence that other sites "have engaged in this illegal conduct," the FTC points to some of the *same* evidence that the FTC previously told Judge Ramirez was not "an adequate basis" on which to plead that other dating platforms were violating the FTC Act. *Compare* Defs. App. Ex. 11 at App. 171–73 (Am. Hr'g Tr. (Nov. 1, 2022) 29:1–31:4) (stating that the "chargeback policies are ambiguous"), *with* Resp. at 17 & n.93, 44 & n.222 (pointing to those policies as supposed evidence of illegal conduct). And even if these documents were evidence of alleged misconduct (they are not), the documents do not show any *MGI* involvement, and therefore do not create a genuine dispute of material fact.

Dated: November 6, 2023

*/s/ Angela C. Zambrano*

Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: 214-981-3300
Fax: 214-981-3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310-595-9500
Fax: 310-595-9501

Benjamin M. Mundel (admitted *pro hac vice*)
bmundel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: 202-736-8000
Fax: 202-736-8711

*Attorneys for Match Group, Inc. and
Match Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 6, 2023, I caused true and correct copies of the foregoing to be served on all counsel of record in accordance with Federal Rules of Civil Procedure and this Court's CM/ECF filing system.

Reid Abram Tepfer
rtepfer@ftc.gov
M. Hasan Aijaz
maijaz@ftc.gov
Matthew James Wilshire
mwilshire@ftc.gov
Sarah Zuckerman
szuckerman@ftc.gov
John R. O'Gorman
jogorman@ftc.gov
Erica Rollins Hilliard
ehilliard@ftc.gov
Jason C. Moon
jmoon@ftc.gov
Nicole Conte
nconte@ftc.gov

*/s/ Angela C. Zambrano*
Angela C. Zambrano

40