THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>Plaintiff,<br><br>vs.<br><br>MATCH GROUP, INC., a corporation, and MATCH GROUP, LLC, formerly known as MATCH.COM, LLC, a limited liability company,<br><br>Defendants. | Case No. 3:19-cv-02281-K<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANTS MATCH GROUP, INC. AND MATCH GROUP, LLC'S OBJECTIONS
TO PLAINTIFF'S EVIDENCE AND MOTION TO STRIKE**

Pursuant to Rule 56(c)(2) of the Federal Rules of Civil Procedure, Defendants Match Group, Inc. and Match Group, LLC respectfully file these objections to the FTC's evidence attached as exhibits, Dkt. 246-2, to the FTC's Reply in Support of Its Motion for Summary Judgment, Dkt. 246-1 (the "Reply"), and move to strike as specified below.[1]

### I.   INTRODUCTION

Defendants move to strike inadmissible and improper exhibits submitted by the FTC in support of its Reply. These documents are not relevant to the FTC's assertions or are hearsay. Because the FTC's exhibits do not constitute admissible evidence, much less competent summary judgment evidence, Defendants object and move to strike these exhibits from the summary judgment record.

---

[1] References to "Defs. App. Ex." are to Defendants' Appendix in Support of their Response Brief in Opposition to the FTC's Motion for Summary Judgment, Dkt. 239. References to "Pl. App. Ex." are to the Appendix to the FTC's Reply Brief in Support of Its Motion for Summary Judgment, Dkt. 246-2.

## II. STANDARD OF REVIEW

"To defeat summary judgment, the nonmovant must produce competent summary judgment evidence." *Lusk v. Dallas Cnty. Sheriff's Dep't*, No. CIV.A. 3:00-CV-0662L, 2002 WL 31757706, at *5 (N.D. Tex. Nov. 29, 2002); *Buffin v. Bowles*, No. CIV.3:99-CV-1386-H, 2000 WL 575216, at *2 (N.D. Tex. May 11, 2000) ("Evidence must be admissible to be considered at summary judgment stage."); *see Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (finding inadmissible hearsay cannot support summary judgment motion). Under Rule 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c).

Evidentiary objections to summary judgment evidence may be raised through objections and a motion to strike. *See, e.g.*, *Corbett v. Texas Tech Univ. Health Scis. Ctr.*, No. 5:21-CV-281-H, 2023 WL 4424269, at *11 (N.D. Tex. July 10, 2023) (sustaining objections to summary judgment evidence); Def.'s Objs. to Pl.'s Evid. & Mot. to Strike, *Corbett v. Texas Tech Univ. Health Scis. Ctr.*, No. 5:21-CV-281-H (N.D. Tex. Dec. 12, 2022), ECF No. 27 (objecting to summary judgment evidence through "Objections to Plaintiff's Evidence and Motion to Strike"); *Robinson v. City of Garland, Texas*, No. 3:10-CV-2496-M, 2016 WL 7396048, at *3 (N.D. Tex. Aug. 17, 2016) (sustaining in part objections to summary judgment evidence); Def. City of Garland's Objs. to Pl.'s Summ. J. Evid., *Robinson v. City of Garland, Texas*, No. 3:10-CV-2496-M (N.D. Tex. Mar. 11, 2016), ECF No. 168 (filing "Objections to Plaintiff's Summary Judgment Evidence and Motion to Strike").

## III. OBJECTIONS

### A. Defendants object to the following exhibits as inadmissible hearsay.

A statement is hearsay if it is one that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter

asserted in the statement." Fed. R. Evid. 801(c). Hearsay is admissible only if the proponent of the evidence shows that it falls within one of the hearsay exceptions enumerated in Federal Rules of Evidence 803, 804, and 807. While a statement must be offered to prove the truth of the matter asserted to come within the hearsay prohibition, a party ***cannot*** circumvent such rule "by arguing that the hearsay is offered not to show the truth of the matters asserted but rather to show the opposing party's knowledge of the truth of the matters asserted." *Hendricks v. Ford Motor Co.*, No. 4:12CV71, 2012 WL 4478308, at *1 (E.D. Tex. Sept. 27, 2012).

### 1. Customer complaints to Match.com and related characterizations are hearsay.

As numerous courts have held, there can be "no question" that customer complaints, when offered to establish the truth of the matter complained about, are hearsay. *Hendricks*, 2012 WL 4478308, at *1 ("Customer complaints in a company's files are out-of-court statements. If they are offered to prove the truth of the matter asserted—that the incidents complained of in the report occurred as reported—they are hearsay and are inadmissible.").

In the FTC's Reply, it cites customer complaints as alleged proof that Defendants are liable for Count V. This is for the truth of the matter asserted, and precisely what the hearsay rule prohibits. The FTC likewise cites exhibits containing characterizations of those customer complaints, which are likewise hearsay. *See Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 281 (5th Cir. 1991) (finding that statements contained in a report made by defendant's agent were not party admissions when the statements were documenting plaintiff's account of the events with no indication that the defendants adopted the version of the facts as recorded).

Nor are any of the complaints admissible under any of the exceptions to the hearsay rule. Customer complaints are not business records. *See* Fed. R. Evid. 803(6). Even assuming the FTC could establish that the documents it seeks to introduce were made "at or near the time" of the

3

complained-of activity and can overcome the indicia of untrustworthiness, *id.*, complaints submitted by customers, whether orally or in writing, categorically are not business records because all persons involved in the process must be acting in the regular course of business. *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 850 (N.D. Tex. 2009) ("It is the authors of these e-mails who must have been acting in the course of a regularly conducted business activity when they made their complaints."); *Williams v. Remington Arms Company, Inc.*, No. 3:05-CV-1383-D, 2008 WL 222496 at *9–10 (N.D. Tex. Jan. 28, 2008) (holding that customer complaints are hearsay and do not qualify as records of regularly conducted activity under Rule 803(6) because the complaints are not made by persons acting in the course of a regularly conducted business activity). Therefore, courts have consistently held that even "when the business record contains information from an outsider, the business records exception does not by itself permit the admission of the business record; rather, the outsider's statement must fall within another hearsay exception." *Hendricks*, 2012 WL 4478308, at *1 (citing *Wilson v. Zapata Off–Shore Co.*, 939 F.2d 260, 271 (5th Cir. 1991)); *Alzuraqi v. Grp. 1 Auto., Inc.*, 921 F. Supp. 2d 648, 671 (N.D. Tex. 2013) ("However, if the source of the information is an outsider, as in the facts before us, Rule 803(6) does not, by itself, permit the admission of the business record.").

Moreover, as courts have recognized and as common sense shows, customers who complain have many reasons to complain other than to accurately report their experience. A customer might complain, for example, in hopes of getting a refund. *See Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 139 (Tex. 2004) ("Complaint letters in a manufacturer's files may be true, but they also may be accusatory and selfserving; they are rarely under oath and never subject to cross-examination."). And even where customers accurately report what they believe occurred—for example, that they believe they were wrongfully charged—that does not make it so;

4

rather, to determine the truth of the matter would require examining the specifics of what a customer was told and the circumstances of the customer's account. Thus, it is impossible for the FTC to make the high showing of reliability necessary to admit these complaints under Rule 807.

The following exhibits contain inadmissible hearsay complaints:

| FTC's App. Ex. No. | Document Identification | App. Page | Location in Brief |
|---|---|---|---|
| Pl. App. Ex. 313[2] | MATCHFTC848120: Presentation, "User Sentiment 2020," Aug. 10, 2020 | App. 4915–52 | 5 n.9; 7 n.15; 15 n.81 |
| Pl. App. Ex. 314 | MATCHFTC847349: Email, "FW: Top 10 Care feature request," Jan. 6, 2020 | App. 4954–56 | 5 nn.10–12; 15 nn.82–83 |

**B. Defendants object to the following exhibits as not supporting the proposition asserted, and therefore irrelevant.**

Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Here, the FTC has misleadingly cited documents that do not support the fact for which the evidence is asserted; and, for this reason, these exhibits should be struck:

| FTC's Evidence | FTC's Representations | Why the Evidence Does Not Support the Representations |
|---|---|---|
| Pl. App. Ex. 311 at App. 4910 (email); Pl. App. Ex. 315 at App. 4958 (attachment) | "To be clear, Defendants acted intentionally. Indeed, soon after this action was filed, Match.com personnel succinctly summarized Defendants' strategy to discourage cancellations: 'making it harder to cancel with small changes.'" Reply at 3–4 & n.2 (citing Pl. App. Ex. 311 at App. 4910). | The email and attachment the FTC cites do not support the FTC's represented propositions that "Defendants acted intentionally," had a "strategy to discourage cancellations," "engaged in an intentional and concerted effort to make cancelling difficult for their customers," or "discussed changes that increased consumers' failure rate approvingly and even explicitly solicited changes to combat an increase in consumers' cancellations." |

---

[2] The transmittal email is Pl. App. Ex. 312 at App. 4912–13.

5

| FTC's Evidence | FTC's Representations | Why the Evidence Does Not Support the Representations |
|---|---|---|
| | "The emails included in this production[3] leave no doubt that Defendants engaged in an intentional and concerted effort to make cancelling difficult for their customers. For example, Defendants' production includes an email from December 2019—after this litigation had already commenced—in which Match.com personnel stated, 'we spent mid-may [sic] through July making it harder to cancel with small changes.'" Reply at 4–5 & n.6 (citing Pl. App. Ex. 311 at App. 4910). "This Match employee attached to his email a chart identifying five different ways that Match.com had made it 'harder to cancel' shortly before, and with full knowledge of, the FTC's lawsuit." Reply at 5 & n.7 (citing Pl. App. Ex. 315 at App. 4958).<br><br>"These employees discussed changes that increased consumers' failure rate approvingly and even explicitly solicited changes to combat an increase in consumers' cancellations: . . . Jon Caine (Sr. Manager, Software Engineering - Webb [sic] App): Stated in a December 2019 email that 'we spent mid-may [sic] through July making it harder to cancel with small changes.'" Reply at 11 & n.51 (citing Pl. App. Ex. 311 at App. 4910). "Caine attached a document identifying five ways that Match.com had made it 'harder to cancel' right before the FTC filed suit." Reply at | Reply at 3–5, 11; see Reply at 13, 35, 47.<br><br>Jon Caine, the Match.com employee who sent the email, was not on the Match.com team that makes decisions about changes to the Match.com site, including the cancelation flow. The FTC admits that Mr. Caine worked in software engineering for the web app. See Reply at 11. Thus, he did not know why changes were made to the site and certainly could not know the purpose of the changes. Any comments about the intent of any changes to the site are pure speculation.<br><br>Moreover, evidence from those with knowledge shows there was no intent to make cancelation difficult. See, e.g., Defs. App. Ex. J at App. 195 (Saraph Dep. Tr. (June 22, 2023) 347:8–24 (Dushyant Saraph, Match.com's General Manager and MGL's 30(b)(6), designee testifying that he has never made any changes to the online cancelation flow to make it more difficult for customers to cancel, and "if anything, . . . we are incentivized to make sure the process is as easy as possible")); Defs. App. Ex. G at App. 125 (Dubey Dep. Tr. 249:21–25) (Shar Dubey, MGL's former Chief Product Officer and MGI's former President and CEO, testifying that she "never" directed anybody to make Match.com's online cancelation flow more complicated, |

---

[3] As soon as Defendants learned about them, Defendants informed the FTC about the existence of responsive documents that had not previously been collected due to a technological glitch related to communications between two document platforms. Pl. App. Ex. 323 at App. 4993. Defendants offered not to oppose an extension of the briefing deadlines so that the FTC would have the opportunity to consider these documents before submitting more briefing, but the FTC declined. *Id.*

| FTC's Evidence | FTC's Representations | Why the Evidence Does Not Support the Representations |
|---|---|---|
| | 11 & n.52 (citing Pl. App. Ex. 315 at App. 4958).<br><br>"Time and again, Defendants discussed 'making it harder to cancel with small changes' and acted accordingly." Reply at 13 & n.69 (citing Pl. App. Ex. 311 at App. 4910).<br><br>"The Court should likewise award monetary relief to redress consumers who were harmed by Defendants' conscious decision to 'mak[e] it harder to cancel with small changes.'" Reply at 35 & n.178 (citing Pl. App. Ex. 311 at App. 4910; Pl. App. Ex. 315 at App. 4958).<br><br>"More egregiously, Defendants responded to actual notice of their violations by making the cancellation flow worse. Shortly before this lawsuit, an employee admitted that 'we spent mid-may [sic] through July making it harder to cancel with small changes' and outlined a timeline of five changes Match.com made in those months that, in his own words, made it 'harder to cancel.'" Reply at 47 & n.229 (citing Pl. App. Ex. 311 at App. 4910; Pl. App. Ex. 315 at App. 4958). | as "that would be a very dumb business decision"); Defs. App. Ex. F at App. 102 (Ginsberg Dep. Tr. 208:15–21) (Mandy Ginsberg, MGI's former CEO and Match.com's former CEO, testifying that "[t]here was never any intention to make a cancellation flow not simple"); Defs. App. Ex. D at App. 55, 70 (Watson Dep. Tr. 12:24–13:11, 209:5–10) (Michele Watson, Match.com's former Senior Vice President of Customer Care, testifying that she never discussed with anyone that the online cancelation flow should be made difficult so that customers could not cancel).<br><br>In addition, the chart attached to Mr. Caine's email does not show that any of the changes to the site actually made cancelation "harder" for anyone, much less those who wanted to cancel. As an initial matter, the chart shows cancelation rates within three days of subscription, not overall cancelation rates. *See* Pl. App. Ex. 315 at App. 4958 ("Sum of % cancelin3"). In addition, many of the changes are not about Match.com's online desktop cancelation, which is at issue in Count V, and instead are about the Match.com app or mobile site. Moreover, in many instances, the chart shows that the cancelation rate *increased* after a change that the FTC claims made it "harder to cancel." *See, e.g.*, Pl. App. Ex. 315 at App. 4958 (increase after MATCHWEB-4301, MATCHWEB-4446, and MATCHWEB-4467 entries). And where there was a decrease in cancelation rate, it began prior to the alleged change. *See, e.g.*, *id.* |

| FTC's Evidence | FTC's Representations | Why the Evidence Does Not Support the Representations |
|---|---|---|
| | | (decreases after COREWEB-14137 and COREWEB-14851 began prior to change). Overall, the variations in the 2019 cancelation rates appear more seasonal (generally tracking changes in 2018 cancelation rates) than caused by any changes to the site, and ultimately the cancelation rate in 2019 was *higher* than the cancelation rate in 2018 (prior to the alleged changes). *Id.* If anything, this chart is the *opposite* of evidence that changes to the site made cancelation harder.[4] *See id.* |
| Pl. App. Ex. 316 at App. 4960–65 | "This new evidence shows that the recipient of this chart shared the chart with Match.com's CEO and General Manager when discussing why cancellations had decreased during this time period." Reply at 5 & n.8 (citing Pl. App. Ex. 316 at App. 4960). | The recipient of the chart did not share it "when discussing why cancellations had *decreased* during this time period." Reply at 5 (emphasis added). Instead, the recipient of the chart shared it when discussing why cancelations had *increased*. Pl. App. Ex. 316 at App. 4960 ("[W]e are seeing an *increase* YOY and from June to Dec '19 . . . . It looks like there is a June *increase* that eased off a bit and a late September *increase*. Did anything prop then?" (emphasis added)). |
| Pl. App. Ex. 318 at App. 4972–74 | "[E]ven Defendants' own General Manager understood that its survey, save offer, and other extraneous steps were 'friction point[s]' that could be used to frustrate cancellation attempts." Reply at 16 & n.91 (citing Pl. App. Ex. 318 at App. 4972). | Mr. Saraph did not state that "extraneous steps . . . could be used to frustrate cancellation attempts," as the FTC represents. Reply at 16. Instead, Mr. Saraph asked the individuals conducting an analysis of cancelation rates if there was a page in the cancelation flow that they were not accounting for in their analysis, which might explain some of the results they |

---

[4] Moreover, even if the FTC's representations about intent were true, they are legally irrelevant for an additional reason: ROSCA requires "simple mechanisms," not the "simplest" mechanism, and says nothing about intent. 15 U.S.C. § 8403(3). Thus, even if a change could make cancelation slightly less simple in theory, it does not mean that the mechanism is not simple.

| FTC's Evidence | FTC's Representations | Why the Evidence Does Not Support the Representations |
|---|---|---|
| | | were seeing. *See* Pl. App. Ex. 318 at App. 4972–74. He was not suggesting that the elements contained in the cancelation flow were themselves "friction point[s]," much less intended to be so. *See id.* |

## IV. CONCLUSION

For these reasons, the Court should strike the above exhibits from the summary judgment record as inadmissible evidence.

[signature page to follow]

| | |
|---|---|
| Dated: December 11, 2023 | */s/ Angela C. Zambrano* |

Angela C. Zambrano
State Bar No. 24003157
angela.zambrano@sidley.com
Chelsea A. Priest
State Bar No. 24102375
cpriest@sidley.com
Tayler G. Bragg
State Bar No. 24109943
tbragg@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: 214-981-3300
Fax: 214-981-3400

Chad S. Hummel (admitted *pro hac vice*)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310-595-9500
Fax: 310-595-9501

Benjamin M. Mundel (admitted *pro hac vice*)
bmundel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: 202-736-8000
Fax: 202-736-8711

*Attorneys for Match Group, Inc. and Match Group, LLC*

**CERTIFICATE OF CONFERENCE**

On Friday, December 8, 2023, counsel for Defendants, Tayler G. Bragg, emailed counsel for the FTC regarding whether the FTC opposes the relief requested in this Motion. On Monday, December 11, 2023, counsel for the FTC, Reid Tepfer, confirmed that the FTC opposes the relief requested in the Motion.

*/s/ Angela C. Zambrano*
Angela C. Zambrano

**CERTIFICATE OF SERVICE**

I hereby certify that on December 11, 2023, I caused true and correct copies of the foregoing to be served on all counsel of record in accordance with Federal Rules of Civil Procedure and this Court's CM/ECF filing system.

Reid Abram Tepfer
rtepfer@ftc.gov
M. Hasan Aijaz
maijaz@ftc.gov
Matthew James Wilshire
mwilshire@ftc.gov
Sarah Zuckerman
szuckerman@ftc.gov
John R. O'Gorman
jogorman@ftc.gov
Erica Rollins Hilliard
ehilliard@ftc.gov
Jason C. Moon
jmoon@ftc.gov
Nicole Conte
nconte@ftc.gov

*/s/ Angela C. Zambrano*
Angela C. Zambrano
