# EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FEDERAL TRADE COMISSION, | CASE NO. 2:23-cv-00932-JHC |
| Plaintiff, | ORDER |
| v. | |
| AMAZON.COM, INC; NEIL LINDSAY, individually and as an officer of Amazon.com, Inc.; RUSSELL GRANDINETTI, individually and as an officer of Amazon.com, Inc.; JAMIL GHANI, individually and as an officer of Amazon.com, Inc., | |
| Defendants. | |

**I**

**INTRODUCTION**

This matter comes before Court on Defendants' motions to dismiss.  Dkt. # 83, 84.

The Federal Trade Commission (FTC) sued Amazon and three Amazon executives (Individual Defendants), alleging that they violated Section 5(a) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45(a), and Section 4 of the Restore Online Shoppers' Confidence Act (ROSCA), 15 U.S.C. § 8403.  Dkt. # 67 at 1–2, ¶ 1.  The FTC alleges that

Amazon tricked, coerced, and manipulated consumers into subscribing to Amazon Prime by failing to disclose the material terms of the subscription clearly and conspicuously and by failing to obtain the consumers' informed consent before enrolling them.  Dkt. # 67 at 2, ¶ 2.  The FTC also alleges that Amazon did not provide simple mechanisms for these subscribers to cancel their Prime memberships.  *Id.* at 3, ¶ 7.

In its motion, Amazon argues that the Prime enrollment processes do not violate ROSCA or the FTC Act.  Dkt. # 84 at 2.  It says that Amazon clearly and conspicuously disclosed all material terms because the placement and font of the material terms were like disclosures in California Automatic Renewal Law (ARL) cases in which other courts determined that the disclosures were clear and conspicuous.  It also says that Amazon obtained consumers' express informed consent to enroll in Prime by having them click a button to demonstrate their agreement to the Prime terms.  *Id.*  And it says that the Prime cancellation process was simple because a reasonable user could navigate the cancellation process.  *Id.*

In their motion, the Individual Defendants first argue that because there is no underlying corporate violation, the Amended Complaint fails to state a claim as to them.  Dkt. # 83 at 9.  They argue in the alternative that the Amended Complaint fails to state a claim against any of the Individual Defendants as to Prime's cancellation process.  *Id.* at 9–10.  In addition, Defendant Grandinetti argues that the Amended Complaint fails to state a claim against him at all as the allegations do not satisfy the standard for individual liability.  *Id.* at 10.

All Defendants argue that the Amended Complaint violates their due process rights.  Dkt. # 84 at 11; Dkt. # 83 at 10.  Last, they argue that civil penalties are unavailable because neither Amazon nor the Individual Defendants knew about the ROSCA violations.  Dkt. # 84 at 12; Dkt. # 83 at 11.

ORDER - 2

Because this matter comes before the Court on Rule 12(b)(6) motions to dismiss, the Court must accept as true the allegations in the Amended Complaint and must view them in the light most favorable to the FTC.  For the reasons discussed below, the Court DENIES the motions.

## II

### BACKGROUND[1]

Amazon operates a service called Prime that gives subscribers various products and services, including "expedited 'free' delivery of merchandise from Amazon's vast online marketplace, streaming content, and grocery delivery."  Dkt. # 67 at 5, ¶ 13.  Prime costs $14.99 per month or $139 per year.  *Id.* at 9, ¶ 29.  "[O]ne of Amazon's primary business goals—and the primary business goal of Prime—is increasing subscriber numbers" and the company measures the "Prime Organization's performance based on the number of subscribers."  *Id.* at 9, ¶¶ 32, 33.

A.      Prime Enrollment and Cancellation Flows

There are various ways during the product purchase checkout process that individuals can sign up for Amazon Prime.  *Id.* at 10, ¶ 34.  The Amended Complaint focuses on Prime subscriptions through Amazon's marketplace checkout process and through Prime Video, Amazon's movie and TV streaming service.  *Id.* at 10, ¶ 34; *id.* 39, ¶ 108.

During the marketplace checkout process, Amazon offers customers at least one opportunity to subscribe to Prime (also known as an "upsell").  *Id.* at 10, ¶ 36.  The Amended Complaint describes various Prime upsells during the checkout process and includes screen shots of different iterations of the upsells over the years on desktop computers and mobile devices.  *See id.* at 11–39, ¶¶ 34–107; Dkt. # 67-1 to 15, Attachments A–O.  The Amended Complaint also

---

[1]  Because this order addresses motions to dismiss, the background facts are based on the FTC's allegations.

ORDER - 3

describes Prime upsells through Amazon's Prime Video, which is included as a benefit of a Prime, but which consumers can also access though a separate, cheaper subscription.  Dkt. # 67 at 39–46, ¶¶ 108–26, Dkt. # 67-16, 21–22, Attachments P, U, and V.  At this stage of the litigation, the Court need not consider whether each of the Prime upsells described in the Amended Complaint violates ROSCA and the FTC Act.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007) ("[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.").  Thus, this order examines only one of the Prime upsells described in the Amended Complaint—the Universal Prime Decision Page (UPDP).  *See* Dkt. # 67-2, Attachment B.

The UPDP "interrupts consumers' online shopping experience by appearing before the page that consumers seek to access in the first place."  Dkt. # 67 at 10, ¶ 36.  "Although the UPDP has changed over time, it generally interrupts consumers' online shopping experience by presenting them with a prominent button to enroll in Prime and a comparatively inconspicuous link to decline. Consumers cannot avoid the UPDP."  *Id.* at 11, ¶ 38.  Below is an image of a version of the UPDP that the FTC attached to its Amended Complaint:

Dkt. # 67-2, Attachment B.

To move beyond the UPDP page, customers must "select either the button [to enroll in Prime] or the link [to decline] to proceed to checkout." Dkt. # 67 at 11, ¶ 38. The text on the button and the link have changed over time. *See* Dkt. # 67-1, 2, 4 and 5, Attachments A, B, D, E.[2] In the examples provided by the FTC, the orange button states: "Get FREE Two-Day Shipping," Attachment A; "Get FREE Two-Day Delivery," Attachment B; "Start my 30-Day FREE Trial," Attachment D; and "Get FREE Prime Delivery with Prime," Attachment E. In the examples, the orange button is placed above a gray box that states: "Enjoy Prime FREE for 30 days," Attachments A, B; and E; and "No commitments. Cancel anytime," Attachment D. In the examples, the blue hyperlinked text to the left of the orange button states: "No thanks, I do not want fast, free shipping," Attachment A; "No thanks, I do not want fast, FREE delivery,"

---

[2] Attachment C lists the price in Canadian dollars and contains disclosures specific to residents of Quebec, which facts are irrelevant to the Court's analysis under the FTC Act and ROSCA.

ORDER - 5

Attachment B; "Continue without the Amazon Prime benefits," Attachment C; or "No thanks,"

Attachments D and E.

By clicking on the orange button on the UPDP described in the Amended Complaint, the customer was instantly enrolled in Prime without a confirmation page, even if the customer did not place their order through Amazon's marketplace.  Dkt. # 67 at 12, ¶ 40.  The FTC asserts that "[t]he contrast between an orange 'double-stacked' button to enroll in Prime and a blue link to decline prioritizes the enrollment option over the decline option and creates a visual imbalance." *Id.* at 12, ¶ 42.

In small print below the orange button and blue hyperlink, the UPDP examples in the Amended Complaint contained some variation of language disclosing the price and that the subscription automatically renews.  For example, in Attachment A, it says:

> By signing up, you agree to Amazon Prime Terms and authorize us to charge your default payment method or another payment method on file after your 30-day free trial.  **Your Amazon Prime membership continues until cancelled.  If you do not wish to continue for $12.99/month + any taxes, you may cancel any time by visiting Your Account**.

(emphasis in original).

The UPDP pages also included language such as "we're giving you a 30-day FREE Trial of Prime."  Dkt. # 67-2, 4, Attachments B & D; *see* Dkt. # 67-5, Attachment E ("We're giving you Prime FREE for 30 days.").  Some pages included language such as "why pay for shipping? Save $6.09 with FREE Two-Day Shipping on this order."  Dkt. # 67-1, Attachment A.

Prime's cancellation process, called the "Iliad Flow," is the online method for cancelling a Prime membership.  Dkt. # 67 at 47, ¶ 127; *see* Dkt. # 67-17, Attachment Q.  The only other way to cancel was by contacting customer service.  Dkt. # 67 at 47, ¶ 127.  "The Iliad Flow required consumers intending to cancel to navigate a four-page, six-click, fifteen-option cancellation process."  *Id.* ¶ 128.  Customers had to locate the "End Membership" link to even

begin cancelling their membership, which was difficult to find.  *Id.* ¶ 131.  Below is an image of the Prime Central page where consumers could locate the "End Membership" button, the first step in the Iliad Flow:



Dkt. # 67-17, Attachment Q, at 3.

Once customers located and clicked the "End Membership" button, they were taken to a page that showed how much they had used the Prime benefits in the past 12 months and presented three yellow buttons: "Remind Me Later;" "Continue to Cancel;" and "Keep my Benefits."  *Id.* at 4.  Below is an image of the first page of the Iliad flow:

ORDER - 7

1

2

3

4

5

6

7

8

9

10

11

12



13    *Id.*

14          If the customer clicked "Continue to Cancel," they were taken to a second page that

15    encouraged them to save money by switching to an annual billing plan instead of a monthly

16    billing plan and presented three yellow buttons: "Remind Me Later;" "Continue to Cancel;" and

17    "Keep My Membership."  *Id.* at 5.  Below is an image of the second page of the Iliad Flow:

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12



13

*Id.*

14        If the customer clicked "Continue to Cancel," they were taken to a third page that said,

15 "We're sorry to see you go. Please confirm the cancellation of your membership."  This page

16 offered five options, with the option to "End Now" at the very bottom of the page.  *Id.* at 6.  The

17 FTC alleges that the customer had to "scroll down" to view the actual cancellation button on the

18 last page.  Dkt. # 67 at 57, ¶ 160.  Below is an image of the third page of the Iliad Flow:

19

20

21

22

23

24

ORDER - 9

Dkt. # 67-17, Attachment Q, at 6.

B.      Defendants' Actions & Knowledge

        "Nonconsensual Enrollment is both so widespread and well-understood at Amazon that
the company's internal documents are littered with references to 'accidental' signups."  Dkt. # 67
at 61, ¶ 179.  "Prime Organization designers and researchers referred to the design changes
necessary to stop Nonconsensual Enrollment as 'clarity' improvements."  *Id.* at 62, ¶ 183.   There
was tension within Amazon's organization because "clarity improvements reduced subscriptions
and, therefore, profit."  *Id.*

        "Amazon has known since at least 2016 that its Prime checkout enrollment flow contains
design elements that trick people into signing up."  *Id.* at 63, ¶ 185.  And each time "Amazon

ORDER - 10

clarified the Prime enrollment process . . . subscriptions did fall." *Id.* at 64, ¶ 187. "In a meeting with Amazon designers, Defendant Lindsay," Vice-President and later Senior Vice-President—and the executive "with the most responsibility for the Prime subscription program[,]" *id.* at 5, ¶ 14—"was asked about Amazon's use of dark patterns during the Prime enrollment process," *id.* at 63, ¶ 184. "Lindsay explained that once consumers become Prime members—even unknowingly—they will see what a great program it is and remain members, so Amazon is 'okay' with the situation." *Id.* "Accordingly, Amazon declined to remove problematic design elements from its checkout enrollment flow." *Id.*

At a meeting in 2018 about the clarity of Prime enrollment flows, "Prime Organization representatives opposed changes that would reduce subscription numbers because Amazon evaluates Prime's performance substantially based on subscription numbers." *Id.* at 66–67, ¶ 199. In contrast, leadership from the Shopping Design Organization, which lacks the authority over the Prime enrollment flows, "favored changes designed to reduce Nonconsensual Enrollment because Amazon evaluated Shipping Design based partly on how many customer 'frustrations' it eliminates." *Id.*

In 2019, after the Prime organization refused to make changes discussed at the 2018 meeting, the issue was "escalated" to Defendant Grandinetti, a Senior Vice-President who oversaw the Prime subscription program. *Id.* at 67, ¶ 202; *id.* at 6, ¶ 19. A memorandum prepared for the meeting "explained that the checkout enrollment flow confused some consumers about whether they were enrolling and made it difficult for them to understand Prime's price and auto-renew feature." *Id.* at 68, ¶ 205. Defendant Grandinetti "vetoed any changes that would reduce enrollment." *Id.* at 69, ¶ 208. "He directed the Prime Organization to improve the checkout enrollment flow as much as it could—but only 'while not hurting signups.'" *Id.*

"Consequently, Amazon continued to use the designs that caused Nonconsensual Enrollment." *Id.*

In 2020, a group within the Prime organization again took up the issue of clarity within Prime sign-up flows. *Id.* at 70, ¶ 214. Through this initiative, "the Prime Organization fixed several key problems with the UPDP in the United States including: (a) changing the 'decline' option from a link to a 'No thanks' button; (b) making Prime's price visible outside the terms and conditions; and (c) re-labelling the enrollment button with wording that included 'Prime' or 'Free Trial.'" *Id.* But the changes caused Prime to lose subscribers, so Defendant Ghani, Vice-President of Prime's subscription program, and Defendant Lindsay decided to "rollback" the changes. *Id.* at 70–71, ¶¶ 216–17; *id.* at 8, ¶ 24.

In 2021, in response to regulatory pressure, Defendant Lindsay wrote to Defendant Ghani in an email, "[G]iven how hot this topic is in the press lately, and the risk of regulatory action in some countries, I [*sic*] wondering how you might thread the needle . . . between making it easy to join, easy not to mistakenly join and not unduly difficult to unsubscribe[.]" *Id.* at 73, ¶ 222. During this time, Lindsay and Ghani also considered whether to simplify the cancellation method to one click but rejected that option. *Id.* at 74, ¶ 225.

In 2023, the FTC brought this lawsuit. Defendants move to dismiss.

### III

### RULE 12(b)(6) STANDARDS

On a Rule 12(b)(6) motion to dismiss, a court must take the allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At the pleading stage, a plaintiff must allege facts that plausibly support their claim for relief. *Id.* "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550

U.S. at 563; *see also Snell v. G4S Secure Sols. (USA) Inc.*, 424 F. Supp. 3d 892, 904 (E.D. Cal. 2019) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." (internal citation and quotation omitted)); *Fairhaven Health, LLC v. BioOrigyn, LLC*, No. 2:19-CV-01860-RAJ, 2021 WL 5987023, at *4 (W.D. Wash. Dec. 17, 2021) (same).  In considering such a motion, a court may also consider "documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice."  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

## IV

### DISCUSSION

Count I of the Amended Complaint alleges that Amazon violated Section 5 of the FTC Act by charging consumers for Amazon Prime "without their express informed consent."  Dkt. # 67 at 87, ¶ 263.  Section 5(a) of the FTC Act bans "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).

Counts II–IV allege that Amazon violated each of the three provisions of Section 4 of ROSCA.  Dkt. # 67 at 89–90, ¶ 272–80. Section 4 of ROSCA states that:

> It shall be unlawful for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a *negative option feature* (as defined in the Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal Regulations), unless the person—
>
> (1) provides text that *clearly and conspicuously discloses all material terms* of the transaction before obtaining the consumer's billing information;
>
> (2) obtains a consumer's *express informed consent* before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction; and

(3) provides *simple mechanisms for a consumer to stop recurring charges* from being placed on the consumer's credit card, debit card, bank account, or other financial account.

15 U.S.C. § 8403 (emphasis added).

A "negative option feature" is, "in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 CFR § 310.2(w). The FTC alleges that "Defendants have created and manage several negative option features . . . including Prime." Dkt. # 67 at 88, ¶ 269. Amazon does not contest that its Prime automatic renewal and free trials qualify as negative option features.

A violation of ROSCA is a "a violation of a rule under section 18 of the [FTC Act, 15 U.S.C. § 57a,] regarding unfair or deceptive acts or practices." 15 U.S.C. § 8404(a). Section 18 of the FTC Act states that a violation of any rule promulgated under Section 18 "shall constitute an unfair or deceptive act or practice in violation of" Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). 15 U.S.C. § 57a(d)(3). Thus, a violation of ROSCA is a violation of Section 5(a) of the FTC Act.

Defendants argue that the Amended Complaint fails to state a claim under ROSCA and the FTC Act because the Prime enrollment and cancellation flows "clearly and conspicuously disclose all material terms," obtain "express informed consent" before enrolling consumers in Prime, and provide "simple mechanisms for" consumers to cancel Prime. Dkt. # 84 at 8.[3]

---

[3] Defendants mention the FTC's allegations about Prime Video fleetingly in a footnote. Dkt. # 84 at 22 n.9. They say that the allegations about Prime Video's enrollment flow fail for the same reasons that the other allegations about the enrollment flows fail. The Court rejects this underdeveloped argument for the same reasons that it rejects Defendants' other arguments about Prime enrollment through the Amazon checkout process. *See infra* Section IV.A and B.

1    The Individual Defendants argue that the Amended Complaint fails to state a claim for

2    individual liability under ROSCA because the FTC's complaint does not allege sufficient facts to

3    state a claim that any of the Individual Defendants participated in or controlled Prime's

4    cancellation flows.  Dkt. # 83 at 15–16.  Defendant Grandinetti argues that the Amended

5    Complaint fails to allege that he participated in any of the alleged ROSCA and FTC Act

6    violations.  Dkt. # 83 at 16–17.

7    Defendants also argue that this lawsuit violates their due process rights because the

8    FTC's theory of the case is "unconstitutionally vague," and they were not provided "fair notice"

9    of the agency interpretation of ROSCA.  Dkt. # 84 at 11, Dkt. # 83 at 18–21.  Defendants also

10   argue that even if they violated ROSCA, civil penalties are unavailable because the Amended

11   Complaint fails to plausibly allege that Defendants knew that their conduct violated ROSCA and

12   the FTC Act.  Dkt. # 84 at 12; Dkt. # 83 at 21–23.

A.   Whether Prime Enrollment and Cancellation Flows Violated ROSCA and the FTC Act

      Amazon says that Prime's enrollment flows "objectively satisfy ROSCA's plain text."

Dkt. # 84 at 10.  Amazon argues that the exhibits attached to the Amended Complaint

demonstrating the enrollment flows show that Amazon clearly and conspicuously disclosed the

material terms of the negative option features, and obtained consumers' express informed

consent.  Dkt. # 84 at 13.

      1.     Clear and conspicuous disclosure of all material terms

      Under ROSCA, Amazon must "provide[] text that clearly and conspicuously discloses all

material terms of the transaction before obtaining the consumer's billing information" when

signing up consumers for Prime free trials that automatically convert into paid Prime

memberships.  *See* 15 U.S.C. § 8403(1).

ROSCA does not define "clearly and conspicuously" and only a few federal district courts have examined what clear and conspicuous means under ROSCA.  *See FTC v. Credit Bureau Ctr., LLC*, 325 F. Supp. 3d 852, 863 (N.D. Ill. 2018), *aff'd in part, vacated in part on other grounds,* 937 F.3d 764 (7th Cir. 2019), and *amended on other grounds,* No. 17 C 194, 2021 WL 4146884 (N.D. Ill. Sept. 13, 2021) (one of the few ROSCA cases, noting that the statute does not define "clearly and conspicuously" and then looking to other statutes that use the term "clear and conspicuous," such as the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681, *et seq.*).  Thus, not only does this order examine ROSCA caselaw, it also looks to cases concerning state laws with similar terms and caselaw defining similar terms in other federal statutes.  *See Gilberg v. California Check Cashing Stores, LLC*, 913 F.3d 1169, 1176 (9th Cir. 2019) ("Like other circuits, we 'draw upon the wealth of [Uniform Commercial Code (UCC)] and [Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq*,] case law in determining the meaning of "clear and conspicuous" under the FCRA.'" (quoting *Cole v. U.S. Cap.*, 389 F.3d 719, 730 (7th Cir. 2004))); *Barrer v. Chase Bank USA, N.A.*, 566 F.3d 883, 891–92 (9th Cir. 2009) (noting that while TILA does not define clear and conspicuous, "[t]he same standard for clarity and conspicuousness also appears in other areas of commercial law, which matters because '[w]hen a federal statute leaves terms undefined or otherwise has a 'gap,' we often borrow from state law in creating a federal common law rule'" (quoting *Am. Gen. Fin., Inc. v. Basset (In re Bassett)*, 285 F.3d 882, 884–85 (9th Cir. 2002)).

State ARLs and ROSCA regulate similar behavior, although some state ARLs define "clear and conspicuous."  *See, e.g.*, Cal. Bus. & Prof. Code § 17602(a)(1) ("It is unlawful for any business that makes an automatic renewal offer or continuous service offer to a consumer in this state to do any of the following: (1) Fail to present the automatic renewal offer terms or continuous service offer terms in a *clear and conspicuous* manner before the subscription or

purchasing agreement is fulfilled and in visual proximity . . . to the request for consent to the offer." (emphasis added)); Cal. Bus. & Prof. Code § 17601(c) ("'Clear and conspicuous' or 'clearly and conspicuously' means in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language."). Further, because ROSCA is incorporated into the FTC Act and a violation of ROSCA is an unfair or deceptive act or practice under Section 5(a) of the FTC Act, the Court also looks to FTC Act caselaw.  15 U.S.C. § 8404(a); 15 U.S.C. § 57a(d)(3).

The FCRA and TILA both have a "clear and conspicuous disclosure" requirement.  *See Gilberg*, 913 F.3d at 1176.  "Clear means 'reasonably understandable'" and "[c]onspicuous means 'readily noticeable to the consumer.'" *Id.* (quoting *Rubio v. Capital One Bank*, 613 F.3d 1195, 1200 (9th Cir. 2010)).  "Under the Uniform Commercial Code, a term is considered conspicuous when it is 'so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it.'"  *Barrer*, 566 F.3d at 892 (quoting U.C.C. § 1–201(b)(10)).

The parties assert that a reasonable consumer standard applies.  Dkt. # 84 at 14; Dkt. # 125 at 10.  The reasonable consumer standard derives from state contract formation cases.  *See Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516 (9th Cir. 2023) (contract formation case holding that the material terms of the contract were clear and conspicuously disclosed because "a reasonable user would have seen the notice and been able to locate the Terms"); *see also Ebner v. Fresh*, Inc., 838 F.3d 958, 965 (9th Cir. 2016) (holding that, under California's Unfair Competition Law (UCL) and Consumer Legal Remedies Act (CLRA), "the reasonable consumer standard requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled"); *Walkingeagle v.*

*Google LLC*, No. 3:22-CV-00763-MO, 2023 WL 3981334, at *3 (D. Or. June 12, 2023)

(assessing whether Oregon Automatic Renewal Law (ARL) disclosures were clear and

conspicuous through a "through the reasonable consumer prism").  The reasonable consumer

standard also appears in FTC Act Section 5 caselaw, which holds that a material representation is

deceptive if it "is likely to mislead consumers acting reasonably under the circumstances."  *FTC*

*v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (quoting *FTC v. Gill*, 265 F.3d 944, 950 (9th

Cir. 2001)).[4]

      Under ROSCA, "the analysis of the disclosure is necessarily contextual, meaning that the

Court must consider the text, whatever size it is, in relation to the other elements on the page."

*FTC v. Credit Bureau Ctr., LLC*, 325 F. Supp. 3d at 863 (ROSCA case).  Further, "other courts

have routinely noted that that [*sic*] a disclosure in small type is unlikely to be clear or

conspicuous when accompanied by type that is larger, bolded, or italicized."  *Id.* (citing *Murray*

*v. New Cingular Wireless Servs., Inc.*, 523 F.3d 719, 725 (7th Cir. 2008); *Cole v. U.S. Cap.*, 389

F.3d at 730; *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649-RFB-GWF, 2015 WL 2130504,

at *17 (D. Nev. May 6, 2015) (ROSCA Case)).  But in the context of TILA, the Ninth Circuit

---

[4] Amazon says that the Court should not consider the information in the Amended Complaint regarding internal discussions and actions about the "clarity" of the Prime enrollment flow and how many Prime subscribers mistakenly enroll in Prime in determining whether the material disclosures are clear and conspicuous.  Dkt. # 84 at 22–23.  It also says that the FTC must prove that a "significant minority of reasonable customers" were misled.  *Id.* at 22.  The Amended Complaint mentions Amazon's September 2020 estimate of the number of Prime subscribers who were unaware they had an account.  Dkt. # 67 at 2, ¶ 3.  Amazon argues that when compared to the total number of Prime subscribers, its September 2020 estimate is a low percentage of the total, and thus not a significant minority.  Dkt. # 84 at 23.  The FTC counters that the September 2020 estimate by Amazon does not include all customers who did not consent when they enrolled in Prime.  Dkt. # 125 at 36.  "In fact, Amazon's strategy was to convert nonconsensual enrollees into willing Prime members."  *Id.*  Further, the FTC says that Amazon's estimated percentage is not accurate because the base number represents all Prime members, while the FTC's claim does not encompass all Prime members—only members who signed up through the challenged enrollment flows.  *Id.*  As discussed below, the material disclosures in the UPDP on their face were not clear and conspicuous.  *Supra* Section IV.A.1.  Thus, the Court need not consider whether a "significant minority" of consumers were deceived to determine that the FTC stated claims under ROSCA.

noted that "[n]o particular kind of formatting is magical" when determining whether a disclosure is clear and conspicuous.  *Barrer*, 566 F.3d at 892; *see also In re Bassett*, 285 F.3d at 886 ("Formatting does matter, but conspicuousness ultimately turns on the likelihood that a reasonable person would actually see a term in an agreement.").

In *Oberstein*, a California state law contract formation case, the Ninth Circuit considered whether the plaintiffs agreed to Live Nation and Ticketmaster's arbitration clause located in its Terms of Use when they purchased concert tickets.  60 F.4th at 509.  In analyzing whether plaintiffs had "actual or constructive notice of the agreement," the court emphasized that the context of the transaction matters and distinguished between a consumer who "contemplate[s] some sort of continuing relationship" and one who is "merely attempting to start a free trial."  *Id.* at 512–13, 516–17 (quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 480, 289 Cal. Rptr. 3d 1, 29 (Cal. Ct. App. 2021)); *see also Keebaugh v. Warner Bros. Ent. Inc.*, __ F.4th __, No. 22-55982, 2024 WL 1819651, at *6 (9th Cir. Apr. 26, 2024) ("To determine whether notice is sufficient under the [California] ARL . . . 'the full context of the transaction is critical,' because transactions in which 'a consumer [is] signing up for an ongoing account,' makes it 'reasonable to expect that the typical consumer in that type of transaction contemplates entering into a continuing, forward-looking relationship.'" (quoting *Sellers*, 73 Cal. App. 5th at 471, 477, 289 Cal. Rptr. 3d at 22, 26); *see also Sellers*, 73 Cal. App. 5th at 480, 289 Cal. Rptr. 3d at 29 ("[A] consumer on the JustAnswer website is not asked to 'sign up' for an account but is instead invited to 'Start my trial.'").  The *Oberstein* court noted that when a consumer is attempting to start a free trial, especially when it is offered as a gift, it is much "less likely that [the consumer] would 'scrutin[ize] the page for small text outside the payment box or at the bottom of the screen linking them to 26 pages of contractual terms.'"  60 F.4th at 516.

The Ninth Circuit recently clarified that in determining whether the terms and conditions of a website were conspicuous enough that a consumer is bound to a website's terms—i.e., whether a contract was formed—courts must consider both the "context of the transaction" and the "the visual aspects of the notice." *Keebaugh*, 2024 WL 1819651, at *9. In *Keebaugh*, the court emphasized that in cases involving auto-renewal, like *Sellers*, the context is even more important. *Id.*

a.      Clear and conspicuous as a question of law

Amazon argues that whether a material term is "clearly and conspicuously disclosed" is a question of law, and "courts routinely dismiss cases like this on the pleadings" by examining exhibits of the webpages in which material disclosures were made. Dkt. # 84 at 13. Amazon provides examples of disclosures in the state ARL context that courts have determined are facially clear and conspicuous.

A court may grant a motion to dismiss, like the one here, based on its own examination of exhibits to a complaint when the material disclosures are plainly "clear and conspicuous." *See Hall v. Time, Inc.*, 857 Fed. Appx. 385, 386 (9th Cir. 2021) (upholding district court's dismissal of claim under California's ARL based on the court's examination of the ARL disclosures at issue in the case). But a court's determination as to whether a disclosure is clear and conspicuous to a reasonable consumer is far from routine, as Amazon suggests. In *Williams v. Gerber Products Co.*, for example, in the context of claims of unfair and deceptive practices under California's UCL and CLRA, applying a reasonable consumer standard, the Ninth Circuit held that it would grant motions to dismiss only in "rare situation[s]." 552 F.3d 934, 939 (9th Cir. 2008). The court recognized that dismissal was proper when, from the court's examination of the advertising, "it was not necessary to evaluate additional evidence regarding whether the advertising was deceptive, since the advertisement itself made it impossible for the plaintiff to

prove that a reasonable consumer was likely to be deceived" given the number of times the

relevant disclosures were made.  *Id.*  The Ninth Circuit reversed the district court's ruling that, as

a matter of law, a reasonable consumer would not be deceived by the packaging, observing that a

reasonable customer could be misled by the representations on the front of a box where the

truthful disclosures were listed "in small print on the side of the box."  *Id.*; *see also Organic*

*Consumers Ass'n v. Sanderson Farms, Inc.*, 284 F. Supp. 3d 1005, 1014 (N.D. Cal. 2018)

("Whether a business practice is deceptive is generally a question of fact that requires weighing

of evidence from both sides.  For that reason, courts grant motions to dismiss under the

reasonable consumer test only in rare situations in which the facts alleged in the complaint

'compel the conclusion as a matter of law that consumers are not likely to be deceived.'"

(internal citation omitted) (quoting *Chapman v. Skype Inc*., 220 Cal. App. 4th 217, 226–27, 162

Cal. Rptr. 3d 864, 872 (2013))).

   Here, the Amended Complaint includes screenshots of various Amazon Prime sign-up

and cancellation flows.  *See* Dkt. # 67, Exhibits A–O.  Amazon argues that these webpages show

that it complied with ROSCA.  Dkt. # 84 at 8.  But when it is possible that a reasonable

consumer would not find disclosures of the material terms clear and conspicuous, the Court

cannot determine as a matter of law that Plaintiff failed to state a claim on this basis.  *See*

*Williams*, 552 F.3d at 939.

     b.  Analyzing the disclosure of the material terms

   The FTC argues that three material terms were not clearly and conspicuously disclosed in

the Prime enrollment process: (1) that the free trial automatically converted into a paid

subscription; (2) the monthly cost of Prime after the free trial ended; and (3) that consumers were

enrolling in Prime at all.  Dkt. # 125 at 11.  Defendants do not dispute that these terms were

1  material.  Dkt. # 125 at 11 n.3.[5]  In arguing that the material terms were not clearly and

2  conspicuously disclosed, the FTC highlights that (1) the context in which Amazon discloses the

3  terms through the product-checkout process made "it unlikely consumers would look for, find,

4  and understand the relevance of those terms;" (2) the "disclosures [were] generally in small print,

5  below (sometimes far below) the relevant enrollment button, and overshadowed by the pages'

6  marketing text and graphics;" and (3) Amazon displayed the terms "after obtaining consumers'

7  billing information."[6]  Dkt. # 125 at 11–12.

8                          (1)      Context of disclosures

9          In addressing the "relevant context," the FTC argues that the Court must consider that

10  Amazon embedded the Prime enrollment flow in its product checkout process, which "made it

11  unlikely many ordinary customers would notice Amazon had enrolled them in a Prime free trial

12  or that the Prime free trial automatically converted to a paid membership after 30 days."  Dkt. #

13  125 at 13.  The FTC argues that because the Prime upsells appeared in the context of online

14  shopping, often when consumers were choosing shipping options, and because many of the

15  upsells were framed as a "gift," the disclosures were not clear enough.  *Id.*  The FTC argues that

16  because Amazon placed Prime enrollment within the marketplace checkout process when

17  consumers purchase products, this made "it unlikely consumers would look for, find, and

18  understand the relevance of those terms."  Dkt. # 125 at 11–12.

19

20          [5] In its reply, Amazon argues only that "Prime's monthly price and auto-renewal terms" were
clearly and conspicuously disclosed.  Dkt. # 131 at 10.  It addresses the third material term—that
21  consumers were signing up for Prime at all—in the section on informed consent.  Dkt. # 131 at 20.  But
this section of the order addresses that argument because Amazon does not contest its materiality.  *Supra*
22  Section IV.A.1.
          [6] The FTC also argues that the material terms are not clear and conspicuous because Amazon
23  collected data which showed "that many consumers did not notice and understand Prime's disclosures of
material terms."  Dkt. # 125 at 11–12.  Amazon argues that allegations in the complaint about customers'
24  data regarding sign-up and retention, are irrelevant to whether the disclosures were clear and conspicuous.
Dkt. # 84 at 19.  Given the Court's conclusions herein, it need not reach this question.

ORDER - 22

For example, during the checkout process for a purchase through Amazon's online marketplace, the UPDP offered customers a 30-day free trial of Amazon Prime to get 2-day free shipping.  Dkt. # 67-2, Attachment B.  If customers clicked on the orange button, the Prime free trial started automatically, even if customers did not complete their purchase.  Dkt. # 67 at 12, ¶ 40.  With the offer of Amazon Prime for the purpose of free shipping, reasonable consumers could assume that they would not proceed with signing up for Prime unless they also placed their order.  Further, in the UPDP there is a disparity in the visual presentation and the text of the two options in the UPDP: one option is a bright orange button with text that says, for example, "Get FREE Two-Day Delivery," while the other is less conspicuous, blue hyperlinked text that says, for example, "No thanks, I do not want fast, FREE delivery."  Dkt. # 67-2, Attachment B.  Within this context, a reasonable consumer could believe that they did not have a choice and the only path to move past the page to continue checking out was to click the prominent orange button, which registered them for Prime immediately.  *See* Dkt. # 67 at 12, ¶ 40.  Further, the text of the two options in the UPDP could lead a reasonable consumer to believe that the buttons are only related to shipping speed, and not a Prime membership.

(2)     Visual aspects of disclosures

The UPDP screen shots attached to the complaint contain text stating the price of Prime after the free trial and the auto-renewal terms.  *See* Dkt. # 67-1, 2, 4 and 5, Attachments A, B, D, and E.  The question is whether that text is clear and conspicuous to a reasonable consumer.  Amazon argues that other "courts dismiss cases involving less conspicuous disclosures" in state ARL cases.  Dkt. # 131 at 12.  Amazon points to various ways that the price of Prime after the free trial and the auto-renewal feature are disclosed to illustrate they are "clear and conspicuous."  Dkt. # 84 at 19.  Amazon claims that (1) the disclosures of these two terms were "on the same page where users click to enroll in Prime;" (2) "the price and auto-renewal terms are located

ORDER - 23

'directly on top of or below each [enrollment] button;'" (3) the terms are "'in regular sized, bold font' against a white backdrop, making them easily viewable to the 'reasonable customer;'" (4) the terms are "often" disclosed multiple times; (5) the auto-renewal and price are disclosed in the hyperlinked terms and conditions;  (6) the text of the disclosures is "simple and plainly readable." *Id.*  Amazon argues that the form and style of its disclosures of the price and auto-renewal feature align with practices that the FTC encourages in its guidance documents.  *Id.*

The Court must view these disclosures through the lens of a reasonable consumer "merely attempting to start a free trial" or accepting a "gift" offer, rather than a consumer who "contemplate[s] some sort of continuing relationship" because some of the UPDP pages include language such as "we're giving you a 30-day FREE Trial of Prime."  Dkt. # 67-2, 4, Attachments B & D; *see* Dkt. # 67-5, Attachment E ("We're giving you Prime FREE for 30 days."); *Oberstein*, 60 F.4th at 516.

Here, a reasonable consumer seeking to complete a purchase on Amazon's marketplace could miss the small print at the bottom of the page in Attachment A or B.  Even though the price of Prime and the fact that the subscription automatically renewed were bolded, the disclosures were in smaller text at the bottom of the page in black and white while larger and/or colorful text at the top of the page told consumers that they were receiving the gift of a free trial, saving money on the cost of shipping, and receiving faster delivery for "FREE."  Dkt. # 67-1, Attachment A; *see also* Dkt. # 67-2, Attachment B (same).  Given this discrepancy in size, location, and color, within the context consumers were presented with the UPDP, the Court cannot conclude as a matter of law that the disclosures would be clear and conspicuous to any reasonable consumer.

Amazon argues that the Court should follow *Viveros v. Audible, Inc.*, No. C23-0925JLR, 2023 WL 6960281, at *1 (W.D. Wash. Oct. 20, 2023), in which the district court dismissed a

California CLRA and ARL case based on almost "identical disclosures." Dkt. # 131 at 12.  In

*Viveros*, the plaintiffs alleged that Amazon's subsidiary Audible violated the California ARL

when plaintiffs signed up for 30-day free Audible trials, which automatically converted to paid

memberships.  *Viveros*, 2023 WL 6960281, at *1.  The court determined that the price and that

the subscription auto-renewed at the end of the free trial were clearly and conspicuously

disclosed because the relevant information "appear[ed] in the only underlined text on Audible's

enrollment page" and "[s]everal disclosures are reiterated in a box in the upper left of the 'Check

Out' page, including the amount of each monthly charge, that the charges begin after 30 days."

*Id.* at *7.

But the disclosures in *Viveros* differ from the disclosures in the UPDP in significant

ways.  First, the disclosures in *Viveros* appeared on a page that prompted the customer to add a

credit card and other billing information.  *See* Dkt. # 131 at 13 (screen shot from complaint in

*Viveros*).  Here, the UPDP is separate from the billing page and consumers are not prompted to

enter or confirm their billing information before they are subscribed to Prime.  Dkt. # 67 at 12, ¶

40.  Second, in *Viveros* the enrollment was not paired with another shopping experience, so

consumers would not be in a position to view the disclosures unless they were contemplating a

relationship with Audible and a reasonable consumer would be more likely to notice the terms in

small print at the bottom of the page.  2023 WL 6960281, at *7.  Here, the Prime upsells

occurred while the consumer was attempting to make a purchase on Amazon's marketplace, not

start a Prime free trial.  Dkt # 67 at 11, ¶ 38.  Third, in *Viveros* the disclosures appeared above

the button that plaintiffs had to click to start the Audible free trial.  Dkt. # 131 at 13.  In this case,

the disclosures appeared below the button.  Dkt. # 67-1, Attachment A; Dkt. # 67-2, Attachment

B.

Thus, the Court cannot conclude that the disclosures of the price and auto-renewal feature in the UPDP would be clear and conspicuous to any reasonable consumer, given the context in which the disclosures were made along with the size, color, and location of the text disclosing the terms.

### c.    Collecting billing information prior to disclosing the material terms

Amazon argues that "[*b*]*efore* the customers were enrolled in Prime, Amazon disclosed Prime's terms, gave the customer an opportunity to confirm or change their billing information, and the customer had to click a button to enroll." Dkt. # 131 at 20 (emphasis in original). But in at least one enrollment flow, for customers who already had a Amazon.com account (and not a Prime membership), the UPDP collected their billing information first and did not allow the customers to change or confirm their billing information. *See* Dkt. # 67 at 12–13 (describing how customers who already have Amazon.com accounts are enrolled in Prime from the UPDP even if they do not complete check out for the product purchase). Amazon argues that "[t]he FTC's contrary interpretation would unnecessarily require customers to re-enter their billing information even if they had already chosen to save that information to make future transactions more convenient" and "[s]tatutory interpretations which would produce absurd results are to be avoided." Dkt. # 131 at 20 (quoting *Arizona State Bd. For Charter Sch. V. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006)). But the Court cannot ignore the plain language of ROSCA, which requires that billing information be collected after the disclosures, not before. Nothing in ROSCA says that companies such as Amazon may not give consumers the option to autofill the billing information already on file or simply to provide billing information after the disclosures, but ROSCA requires that consumers be given that choice *after* the disclosures.

2.      Express informed consent

Amazon argues that the FTC's complaint fails to state a claim under Section 4 of ROSCA, 15 U.S.C. § 8403(2), and the Section 5 of the FTC Act, 15 U.S.C. § 45, because the screen shots from the Prime enrollment flows show that Amazon obtained consumers' "express informed consent" before enrolling them in Prime.  Dkt. # 84 at 21; *id.* at 21 n.8.  In its motion to dismiss, Amazon analyzes Counts I and III together because "while Count I nominally arises under Section 5 of the FTC Act, it incorporates ROSCA's substantive "express informed consent" standard. . . . The FTC Act claim (Count I) therefore cannot survive independent of Count III (ROSCA)."  Dkt. # 84 at 21 n.8.  The Court agrees and analyzes these two counts together.

In ROSCA cases, courts have found that when the material terms are not clearly and conspicuously disclosed, "these inadequate disclosures constitute evidence that Defendants often do not obtain consumers' express informed consent before charging their cards or accounts." *FTC v. Health Formulas, LLC*, 2015 WL 2130504, at *16.  Thus, the failure to disclose material terms clearly and conspicuously—namely, the failure to disclose that consumers were even signing up for Prime in the first place—means that Amazon did not receive consumers' "express informed consent."

Even if the material terms were clearly and conspicuously disclosed, at least some of the Prime sign-up flows failed to obtain consumers express informed consent.  As to what constitutes "express informed consent," both parties cite non-ROSCA cases on contract formation in online transactions.  Dkt. # 84 at 21 (citing *Oberstein*, 60 F.4th at 515–16 (granting defendant's motion to compel, holding that a contract was created under California law)); Dkt. # 125 at 30 (citing *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (denying defendant's motion to compel, holding that no contract was created under California

ORDER - 27

law)).  "To form a contract . . . there must be actual or constructive notice of the agreement and the parties must manifest mutual assent."  *Oberstein*, 60 F.4th at 512–13 (citing *Berman*, 30 F.4th at 857).  "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement."  *Id.* at 515 (quoting *Berman*, 30 F.4th at 857).  Further, the Court assesses Section 5 violations under a reasonable consumer standard and applies that standard here in determining whether reasonable consumers would know that by pressing a button they were consenting to become a Prime member and to the material terms of the negative option feature.  *See FTC. v. Stefanchik*, 559 F.3d at 928.

In *Berman*, the Ninth Circuit held that a website user did not consent to the terms and conditions of the site by clicking a green "continue" button.  *Id.*  While the

> webpages stated, "I understand and agree to the <u>Terms & Conditions</u>," [] they did not indicate to the user what action would constitute assent to those terms and conditions.  Likewise, the text of the button itself gave no indication that it would bind plaintiffs to a set of terms and conditions.

*Id.* at 858 (emphasis in original).  The court noted, however, that the "notice defect could easily have been remedied by including language such as, 'By clicking the Continue >> button, you agree to the <u>Terms & Conditions</u>.'"  *Id.*

ROSCA requires "express informed consent."  15 U.S.C. § 8403(2).  "A website that fails to provide a consumer any information about a service cannot obtain a consumer's express *informed* consent to purchase that service."  *FTC v. Credit Bureau Ctr., LLC*, 325 F. Supp. 3d at 863 (ROSCA case) (emphasis added).

Amazon argues that by affirmatively clicking the orange button in the UPDP a consumer expressly consented to enroll in an auto-renewing free trial of Prime.  Dkt. # 84 at 21.  Amazon further argues that consumers were informed when they clicked the button because (1) "on every

page where this button appears, consumers are informed that clicking the button will enroll them in Prime and/or begin a free trial period"; (2) "[n]early every action button itself includes the words "Prime" and/or "Free Trial"; and (3) "users can click that button only after viewing the disclosures discussed above and after being informed that '[b]y signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions,' or words to that effect." *Id.*

In the UPDP at Attachment B, the orange button says: "Get FREE Two-Day Delivery"; and under the button, in the gray box, it says: "Enjoy Prime FREE for 30 days."  Dkt. # 67-2, Attachment B at 2.  The terms below say, "By signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions and authorize us to charge your credit card ([credit card number]) or another available credit card on file after your 30-day free trial. **Your Amazon Prime membership continues until cancelled.  If you do not wish to continue for $12.99/month plus any applicable taxes, you may cancel anytime by visiting Your Account and adjusting membership settings**." *Id.* (emphasis in original).  But unlike in cases with similar terms, such as *Walkingeagle v. Google LLC*, 2023 WL 3981334, and *Viveros v. Audible*, 2023 WL 6960281, the button does not make it clear that by clicking "Get FREE Two-Day Delivery," the customer completed the sign-up process with no additional steps.  *See* Dkt. # 67 at 12, ¶ 40.  Thus, a reasonable consumer may not know that by clicking the orange button in the UPDP, they were consenting to sign up for an auto-renewing Prime subscription.

Further, in the UPDP, a reasonable consumer could be led to believe that the only way to proceed to check out was to click the orange button that enrolled the consumer in Prime because of the visual discrepancy between the two options in the UPDP.  *See Lee v. Intelius Inc.*, 737 F.3d 1254, 1259 (9th Cir. 2013) (noting that there was no mutual assent to an online contract and

arbitration agreement, in part, where the button to decline the offer was grey while the button to accept was large and yellow).

Viewing the Amended Complaint in the light most favorable to the FTC, the Court cannot grant the motions to dismiss on either the "clear and conspicuous" disclosure issue or the "express informed consent" issue.

3.      Whether Prime cancellation flow violated ROSCA

ROSCA requires that a company selling goods and services through negative option features "provide[] simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account."  15 U.S.C. § 8403(3).  ROSCA does not define "simple mechanisms."

In *FTC v. Cardiff*, in an order granting a permanent injunction and equitable relief under ROSCA, the court specified that, to comply with ROSCA, the defendant needed to provide cancellation methods that were "not [] difficult, costly, confusing, or time consuming, and must be at least as simple as the mechanism the consumer used to initiate the Charge(s)."  No. ED 5:18-CV-02104-SJO-PLAx, 2019 WL 9143561, at *10 (C.D. Cal. May 16, 2019); *see also FTC v. Health Formulas, LLC*, 2015 WL 2130504, at *16 ("[T]he FTC has provided evidence that Defendants do not provide simple mechanisms for consumers to stop recurring charges, as the mechanism is not stated on Defendants' product order pages or in confirmation emails giving the details of each online transaction.").

In *United States v. MyLife.com, Inc.*, the court determined that MyLife's cancellation process violated ROSCA because consumers could cancel only via phone.  567 F. Supp. 3d 1152, 1169 (C.D. Cal. 2021).  "When a customer finally reached an agent to cancel, the customer was confronted with a six-part 'retention' sales script aimed at convincing the customer not to cancel.  No reasonable factfinder could find this mechanism 'simple.'"  *Id.*

ORDER - 30

Likewise, here, the FTC alleges that Amazon's Iliad Flow online cancellation process required consumers to click six times and go through four screens, seeking to entice consumers not to cancel the subscription, or merely pause the subscription, before the consumer could finally cancel Prime.  Dkt. # 67 at 47, 50, ¶ 128, 141; Dkt. # 67-17, Attachment Q.[7]  The FTC alleges that "Amazon required customer service representatives to encourage customers seeking to cancel [via phone] to do so via the Iliad Flow."  Dkt. # 67 at 48, ¶ 134.  The Iliad Flow—four screens and six clicks that consumers must go through to effectively cancel their Prime memberships—was significantly more complicated than the Prime sign-up process discussed above.  Further, at multiple points during the Iliad Flow, consumers were presented with alternatives to cancelling, such as  options to "Remind" the consumer to cancel the membership at a different time and an option to "Pause" their Prime membership instead of cancelling.  Dkt. # 67-17, Attachment Q.  On the final page of the Iliad Flow, the consumer needed to scroll down past various other options before they could see the "End Now" button that would allow them to complete the cancellation.  Dkt. # 67 at 56, ¶ 158.  All these features complicated the cancellation process.

Amazon, on the other hand, says that its two methods for cancelling Prime—via phone or online—are simple.  Dkt. # 84 at 23.  Amazon's argument relies on *Walkingeagle v. Google LLC*, 2023 WL 3981334, at *5.  There, the court determined that YouTube did not violate Oregon's ARL, which requires companies operating automatically renewing subscription services to send acknowledgment emails that provide the consumer with a "cost-effective, timely and easy-to-use mechanism for cancellation."  2023 WL 3981334, at *5.  The court determined that YouTube

---

[7] The FTC also alleges that the flow is not simple because a reasonable customer could have trouble locating the button to begin the cancellation process in the first place.  Dkt. # 67 at 47, ¶ 131.  Because the Court determines that the cancellation methods, as alleged, violate ROSCA on other grounds, it need not rule on this issue here.

complied with the Oregon law because it provided links to its cancellation page in the

acknowledgment emails.  *Id.*  The court did not examine the complexity of the actual

cancellation process once the consumer clicked on the link, so this case does not support

Amazon's position.

Again, viewing the Amended Complaint in the light most favorable to the FTC, the Court

cannot dismiss the claim that Amazon's "Iliad Flow" cancellation method was not a "simple

mechanism."

B.      Whether the FTC States ROSCA Claims Against the Individual Defendants

The Individual Defendants first argue that the claims against them should be dismissed

because there is no underlying corporate liability.  Dkt. # 83 at 14.  For the reasons discussed

above, the Court rejects that argument.  *Supra* Section IV.A.

Second, these Defendants argue that the FTC fails to plead individual liability under

ROSCA as to Count IV (regarding Amazon's Prime cancellation flow), contending that the

Amended Complaint "does not allege any facts showing [the Individual Defendants']

involvement in, much less direct participation in or control over, Prime's cancellation flows."

Dkt. # 83 at 15.  Third, Defendant Grandinetti argues that the Amended Complaint does not

sufficiently claim liability as to him under any of the four counts because it does not allege his

"direct participation in the design of the Prime flows, which are not even alleged to have then

been in his purview."  Dkt. # 83 at 15.

1.      Whether Rule 9(b)'s heightened pleading standard applies

Defendants argue that the heightened pleading standard for fraud under Federal Rule of

Civil Procedure 9(b) applies "[b]ecause the claims against the Individuals sound in fraud."  Dkt.

# 83 at 13–14.  Rule 9(b) applies even when fraud is not explicitly an element of the claim if the

plaintiff alleges a "unified course of fraudulent conduct and rel[ies] entirely on that course of

conduct as the basis of a claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).  In such cases "the claim is said to be 'grounded in fraud' or to 'sound in fraud.'"  *Id.*  But "where fraud is not an essential element of a claim, only allegations ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b)."  *Id.* at 1105.

In some cases, district courts in the Ninth Circuit have found that Rule 9(b) applies to violations of Section 5 of the FTC Act where the FTC alleged that the defendant violated the Act by deceiving consumers with misleading or false statements.  *See, e.g*, *FTC v. D-Link Sys., Inc.*, No. 3:17-CV-00039-JD, 2017 WL 4150873, at *1–2 (N.D. Cal. Sept. 19, 2017) (holding that Rule 9(b) applied to FTC's deception claim under Section 5(a) of the FTC Act regarding *misleading* statements made by a company to consumers, but declining to determine whether it applied to the "unfair" claim under the Act, noting that "there is little flavor of fraud in the[] elements" of an "unfair" practice as defined by the FTC Act);  *see also REX - Real Est. Exch. Inc. v. Zillow Inc.*, No. C21-312 TSZ, 2021 WL 3930694, at *8 (W.D. Wash. Sept. 2, 2021) (finding that while the complaint never used the word "fraud,"  Rule 9(b) applied because the complaint alleged that the defendants "*knowingly*" acted "'as part of a *common plan or scheme* to confuse, mislead, *and deceive* consumers' and that such actions were '*deliberately calculated* to confuse and/or *deceive*'" (emphasis in original)); *23andMe, Inc. v. Ancestry.com DNA, LLC*, 356 F. Supp. 3d 889, 908 (N.D. Cal. 2018) (finding that Rule 9(b) applies to Lanham Act claims when alleged that "the defendant engaged in a knowing and intentional misrepresentation").

The FTC responds that Rule 9(b) does not apply to Claim IV because "[t]he FTC's cancellation claim . . . focuses primarily on the difficulty of the Iliad Flow, rather than relying on 'intentional and ongoing misrepresentations.'"  Dkt. # 125 at 46.  But in discussing the cancellation process, the FTC alleges that the complexity of the cancellation process "resulted from Amazon's . . . *manipulative* design elements that *trick* users into making decisions they

would not otherwise have made." Dkt. # 67 at 4, ¶ 8 (emphasis added). These allegations may

very well sound in fraud, however because the Amended Complaint meets the heightened

pleading standard (as discussed below), the Court need not determine whether Rule 9(b) applies.

*See FTC v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d 1067, 1076 n.3 (N.D. Cal. 2018) (determining

that "resolution of the instant motion does not require the Court to decide which rule applies

because . . . the allegations here satisfy both the general and heightened pleading standards. The

Court therefore assumes without deciding that the heightened pleading standard of Rule 9(b)

governs").

 As to Claims I–III for Defendant Grandinetti, the FTC makes a fleeting argument that

Rule 9(b) does not apply but borders on conceding that it likely does apply. Dkt. # 125 at 49

n.29 ("Because Counts I-III rely in part on Amazon's failure to clearly and conspicuously

disclose material information, they more closely resemble the type of FTC deception cases in

which Ninth Circuit district courts are split on the applicability of Rule 9(b). While Rule 9(b)

should not apply, the Amended Complaint satisfies either pleading standard."). The Court need

not decide whether the heightened pleading standard applies because the Amended Complaint

meets the standard. *See FTC v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d at 1076 n.3.

 2. Applying Rule 9(b)

 Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and

other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "To

comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of

the particular misconduct which is alleged to constitute the fraud charged so that they can defend

against the charge and not just deny that they have done anything wrong." *In re Finjan*

*Holdings, Inc.*, 58 F.4th 1048, 1057 (9th Cir. 2023) (quoting *Bly-Magee v. California*, 236 F.3d

1014, 1019 (9th Cir. 2001)).  In other words, the complaint must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004).

To plead individual liability under the FTC Act, the FTC "must prove, first, corporate misrepresentations and, second, an officer's knowledge of and authority to control whatever acts led to the corporate misconduct." *FTC v. Benning*, No. C 09-03814 RS, 2010 WL 2605178, at *4 (N.D. Cal. June 28, 2010).  While Rule 9(b) applies to the underlying corporate violation of the FTC Act, it does not apply to the "knowledge of and authority to control" element required for individual liability. *Id.* ("By its own terms, Rule 9(b) does not mandate that a plaintiff plead knowledge with particularity.  Moreover, if the precise fraudulent acts and practices are outlined with particularity, pleading an individual's 'authority to control' with 'particularity' would not advance the notice purpose behind Rule 9(b).  'Authority to control' does not necessarily contemplate participation in the underlying fraud and the notice pleading requirements of Rule 8(a)(2) adequately govern this element."); *see also Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) ("Instances of corporate fraud may also make it difficult to attribute particular fraudulent conduct to each defendant as an individual.  To overcome such difficulties in cases of corporate fraud, the allegations should include the misrepresentations themselves with particularity and, *where possible*, the roles of the individual defendants in the misrepresentations." (emphasis added)).  Thus, while the FTC must plead the corporate violations with particularity if Rule 9(b) applied, it need not "plead each individual's role in Defendants' misconduct with particularity." Dkt. # 125 at 47 n.26.

Here, Defendants do not argue that the FTC failed to plead sufficient facts under Rule 9(b) for the underlying corporate violation of ROSCA and the FTC Act.  Further, although the

1    FTC need not allege the specific details of the Individual Defendants' authority to control, it did

2    allege sufficient details about the control that each had over the Prime organization.

3           As to the allegations of the individuals' roles, Defendants argue that the Amended

4    Complaint does not meet the Rule 9(b) heightened pleading standard because it "lump[s]

5    multiple defendants together" rather than differentiating.  Dkt. # 83 at 15.   The FTC concedes

6    that the Amended Complaint "lumps" the Individual Defendants together.  Dkt. # 125 at 47 n.26.

7    The FTC argues that the Amended Complaint "'differentiate[s] [its] allegations' by 'identify[ing]

8    the role of each defendant'" and pleads sufficient facts about the details of the fraud.  Dkt. # 125

9    at 47 n.27 (quoting *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir.

10   2016)).

11          Rule 9(b) requires "plaintiffs to differentiate their allegations when suing more than one

12   defendant and inform each defendant separately of the allegations surrounding his alleged

13   participation in the fraud."  *United States v. United Healthcare Ins. Co*., 848 F.3d at 1184.  But

14   "[t]here is no flaw in a pleading, [] where collective allegations are used to describe the actions

15   of multiple defendants who are alleged to have engaged in precisely the same conduct."  *Id.*

16          Here, even if Rule 9(b) applies to the FTC's allegations about Prime's cancellation

17   process, the FTC provided "particular details of the scheme" and identified each individual's role

18   within the company, along with some specific actions that each individual took regarding the

19   alleged ROSCA violations.  *See* Dkt. # 67 at 5–9, ¶¶ 14–27; *id.* at 58–60, ¶¶ 164–176; *id.* at 63, ¶

20   184; *id.* at 64, ¶ 188; *id.* at 66, ¶ 199; *id.* at 67, ¶ 200; *id.* at 68–69, ¶ 203– 208; *id.* at 69–71, ¶¶

21   210–217; *id.* at 73–73, ¶¶ 220–225.

22          3.      Individual Defendants' participation in or authority to control Iliad Flow

23          Individuals are personally liable for corporate violations of the FTC Act if the individual

24   "participated directly in, or had the authority to control, the unlawful acts or practices at issue."

*FTC v. Com. Planet, Inc.*, 815 F.3d 593, 600 (9th Cir. 2016), *abrogated on other grounds by AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021).[8]   An individual's "assumption of the role of president of [a corporation] and her authority to sign documents on behalf of the corporation demonstrate that she had the requisite control over the corporation."  *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d at 1170; *see also FTC v. World Media Brokers Inc.*, No. 02 C 6985, 2004 WL 432475, at *8 (N.D. Ill. Mar. 2, 2004), *aff'd sub nom. FTC v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005) ("This authority may be shown by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." (internal quotation and citation omitted)); *FTC v. Loewen*, No. C12-1207 MJP, 2013 WL 5816420, at *7 (W.D. Wash. Oct. 29, 2013) ("Loewen had authority to control his companies' telemarketing practices even if he did not exercise it.").

The Individual Defendants argue that the Amended Complaint fails to allege that they had "direct participation in or control over, Prime's cancellation flows" or "[a]ny meaningful role in the Prime cancellation flows, either by creating those flows, modifying them, or directing others to do so."  Dkt. # 83 at 15.  They say, "The only purported basis for individual liability under Count IV is a generic allegation—repeated in substantially identical form as to each Individual—that the Individuals 'oversaw . . . Amazon employees who studied the Iliad Flow, including the complications it presented to subscribers attempting to cancel, and who developed simpler alternatives, which [the Individuals] did not implement.'"  Dkt. # 83 at 15.  This argument overlooks the control that the Amended Complaint alleges each of the Individual Defendants had over the Prime organization as a whole, which includes the Iliad cancellation

---

[8] The FTC correctly notes that the second element of the commonly articulated test, "actual knowledge of material misrepresentations," is required only when the FTC is seeking civil penalties.  *See FTC. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997). This order addresses below Amazon's argument about actual knowledge.  *Infra* Section IV.D.

flow.  The Amended Complaint alleges that each of the Individual Defendants held positions of

authority within the Prime organization, which operated the Iliad Flow.  Specifically, the

Amended Complaint alleges that:

- Defendant Grandinetti was a Senior Vice President at Amazon who oversaw the Amazon Prime subscription program, including the sign-up process and the cancellation process.  Dkt. # 67 at 6, ¶ 19.  He was a "member of Amazon's S-Team, which runs the entire company and reports directly to the CEO."  *Id.*

- Defendant "Lindsay was the Amazon executive with the most responsibility for the Prime subscription program, which he managed as an Amazon Vice-President and Senior Vice-President.  During this period, Lindsay joined Amazon's S-Team, which runs the entire company and reports directly to the CEO."  *Id.* at 5, ¶ 14.

- Defendant Ghani oversaw "Prime's subscription program as a Vice-President."  *Id.* at 8, ¶ 24.  He had "authority over the Prime enrollment and cancellation process."  *Id.*

The Individual Defendants argue that the Amended Complaint merely alleges that they

are executives at Amazon, and that "is insufficient to plead individual liability."  Dkt. # 83 at 16.

The FTC counters that it "need not establish sole authority to control to prevail against an

individual defendant."  Dkt. # 125 at 47.  The Court agrees.

In *FTC v. Swish Marketing*, the court dismissed the FTC's claim against the CEO of a

corporation because the complaint merely alleged that "Benning's status as CEO, standing alone,

plausibly demonstrates his control over the company."  No. C 09-03814 RS, 2010 WL 653486,

at *5 (N.D. Cal. Feb. 22, 2010).  On the other hand, in *FTC v. American Financial Benefits

Center*, the court determined that the FTC's complaint sufficiently stated a claim under the FTC

Act against an individual when the complaint alleged that the individual, Frere, was the founder,

CEO and "sole director of each entity since its incorporation."  324 F. Supp. 3d at 1080–81.

Here, the Amended Complaint alleges more than just each Individual Defendants' title as

Vice President or Senior Vice President.  As in *FTC v. American Financial Benefits Center*, the

Amended Complaint also alleges that the Individual Defendants had actual supervisory control over the Prime organization.  Dkt. # 67 at 5–6, ¶¶ 14–18 (Lindsay); *id.* at 6–8, ¶¶ 19–23 (Grandinetti); *id.* at 8–9, ¶¶ 24–27 (Ghani).  Specifically, the Amended Complaint alleges that each Individual Defendant reviewed various reports about Prime and made decisions or participated in decisions regarding Prime.  *Id.* at 5–6, ¶¶ 16–17 (Lindsay); *id.* at 7, ¶¶ 20–22 (Grandinetti); *id.* at 8–9, ¶¶ 25–26 (Ghani).  Further, because the cancellation process is part of the Prime organization, the FTC's allegations about the individuals' authority over the Prime enrollment flows paired with the allegations about their title within the company suffice to allege control over Prime cancellation.  *See id.*  Thus, the Amended Complaint sufficiently alleges that all three Individual Defendants had authority over Prime, including over the cancellation process.  Further, the Amended Complaint alleges that all three "assum[ed] the duties of a corporate officer."  *See FTC v. World Media Brokers Inc.*, 2004 WL 432475, at *8.  Thus, the Amended Complaint contains sufficient allegations, under Rule 9(b), that each of the Individual Defendants had sufficient control over Prime's cancellation flows to state a claim for relief.

4.  Counts I–III against Grandinetti

Defendant Grandinetti argues that the Amended Complaint fails to allege that he had sufficient control or authority over any aspect of Prime's enrollment.  Dkt. # 83 at 16.

The Amended Complaint alleges:

- In 2019, Defendant Grandinetti had "authority" over the Prime Organization and the Shopping Design Organization.  Dkt. # 67 at 67, ¶ 202.

  When these two organizations could not agree on whether to implement changes in the design of the Amazon Prime sign-up flows to increase clarity and transparency, the disagreement was "escalated" to Defendant Grandinetti to resolve.  *Id.*

- In that escalation, Defendant Grandinetti received a report explaining that "customers sign up [for Prime] without knowing they did."  Dkt. # 67 at 68, ¶ 205.  "Among other things, the memorandum explained that the checkout

ORDER - 39

enrollment flow confused some customers about whether they were enrolling and made it difficult for them to understand Prime's price and auto-renewal feature." *Id.*

- "Eventually, [Defendant] Grandinetti vetoed any changes that would reduce enrollment.  He directed the Prime Organization to improve the checkout enrollment flow as much as it could—but only 'while not hurting signups.'"  Dkt. # 67 at 69, ¶ 208.  Consequently, the changes to increase clarity were not made because they would reduce short term enrollment in Prime.  *Id.*

These allegations more than suffice to show that Defendant Grandinetti "had the authority to control" Amazon Prime enrollment flows.

Defendant Grandinetti also appears to argue that he did not have control over the Prime organization during the relevant period.  Dkt. # 83 at 16 n.4.  But the Amended Complaint alleges that Grandinetti had authority to control and participate in the "acts and practices set forth in [the] Amended Complaint" "[f]rom at least January 1, 2018 through the present."  Dkt. # 67 at 7, ¶ 20.

C.     Whether the FTC's Lawsuit Violates Defendants' Due Process Rights

Defendants argue that this ROSCA enforcement action violates their due process rights for two reasons.  Dkt. # 84 at 27, Dkt. # 83 at 19.  First, Defendants argue that the standard that the FTC seeks to apply here on "dark patterns" is unconstitutionally vague.  Dkt. # 84 at 27.  Second, Defendants argue that "the FTC's sudden attempt to impose new legal obligations through litigation—after the FTC admitted its interpretation of the current legal framework does not provide clarity—violates the due process 'principle of fair warning.'"  *Id.* at 27–28 (quoting *Karem v. Trump*, 960 F.3d 656, 666 (D.C. Cir. 2020)).

1.     Vagueness

Amazon argues that the FTC's "dark patterns" theory is an unconstitutionally vague interpretation of ROSCA.  Dkt # 84 at 28.  The FTC responds that the vagueness doctrine applies only when a statute or regulation is challenged as vague, and here "Defendants do not argue that

the *FTC Act or ROSCA* are 'vague.'" Dkt. # 125 at 51 (emphasis in original).  Amazon concedes

that ROSCA is not vague. Dkt. # 131 at 29.  It argues that it is challenging "ROSCA's

constitutionality as interpreted and applied by the FTC," and due process "prohibits the FTC

from enforcing vague or unprecedented *interpretations* of ROSCA." *Id.* at 26 (emphasis added).

Amazon asks the Court to determine that the FTC's litigation strategy here is unconstitutionally

vague.  But the doctrine does not apply to an agency enforcement action.  *See F.C.C. v. Fox

Television Stations, Inc.* (*Fox II*), 567 U.S. 239, 253 (2012) ("A conviction or punishment fails to

comply with due process if the *statute* or *regulation* under which it is obtained 'fails to provide a

person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it

authorizes or encourages seriously discriminatory enforcement.'" (emphasis added)).

Defendants offer no legal authority, and the Court cannot find any, to support their assertion that

the vagueness doctrine applies to an agency's litigation strategy.  Thus, the Court concludes that

the vagueness doctrine does not apply here.

    2.    Fair notice doctrine

    Amazon also argues that the FTC's claims violate its due process rights because the FTC

did not provide "fair notice" of its "dark pattern" theory of ROSCA.  Dkt. # 84 at 31.  The

Individual Defendants argue that "they did not have fair warning that the ordinary performance

of their jobs could subject them to personal liability."  Dkt. # 83 at 20.

    "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that

a person receive fair notice not only of the conduct that will subject him to punishment, but also

of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore*, 517 U.S.

559, 574 (1996).  Importantly, "[t]he strict constitutional safeguards afforded to criminal

defendants are not applicable to civil cases, but the basic protection against 'judgments without

notice' afforded by the Due Process Clause is implicated by civil *penalties.*" *Id.* at 574 n.22

(emphasis in original) (internal citations omitted).  Fair notice concerns arise when an agency explicitly changes its official interpretation of a statute and a regulated party relied on the prior interpretation.  *See Fox II*, 567 U.S. at 254; *United States v. AMC Ent., Inc.*, 549 F.3d 760, 770 (9th Cir. 2008); *see also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 251–52 (3d Cir. 2015) ("A higher standard of fair notice applies" when a court defers to an agency's interpretation of a statute or regulation, "because agencies engage in interpretation differently than courts").

In *Fox II*, the Supreme Court held that the FCC did not provide fair notice to television broadcasters when it changed its official policy interpreting the rules on expletives in public broadcasts, and then sought to apply the new interpretation retroactively.  567 U.S. at 254.  There, the court held that because the FCC changed its position on what types of expletives were allowed in public broadcasts, the cable companies did not have "fair notice" of the Agency's interpretation of the statute when the broadcasts at issue happened.  *Id.*

In *AMC Entertainment*, the Ninth Circuit held that AMC did not have fair notice of what was required under the American with Disabilities Act (ADA) when it built its movie theaters because there was a circuit split on the interpretation of the ADA for movie theaters and the government did not clarify its position on the interpretation of the statute until after the theaters were built.  549 F.3d at 770 (holding that the government has an obligation "to fashion coherent regulations that put citizens of 'ordinary intelligence' on notice as to what the law requires of them").

In both *Fox II* and *AMC Entertainment*, the court or the agency interpreted the statutes at issue and the regulated parties relied on those interpretations.  On the other hand, in *FTC v. Wyndham*, the Third Circuit held that the FTC's regulatory action under Section 5 of the FTC Act did not violate Plaintiff's right to fair notice because there was no prior FTC rule or

1   adjudication on the issue.  799 F.3d at 252.  The court held that individuals are only entitled to

2   "notice of the meaning of the statute and not to the agency's interpretation of the statute."  *Id.*  at

3   255.  "The relevant question is not whether [Defendants] had fair notice of the *FTC*'s

4   *interpretation* of the statute, but whether [Defendants] had fair notice of what the *statute itself*

5   requires."  *Id.* at 253–54 (emphasis in original).

6        Thus, when there is no prior interpretation, courts have not found a due process violation.

7   *See Karem*, 960 F.3d at 667 ("Far from 'clarifying the law and applying that clarification to past

8   behavior,' then, the suspension effectuated an 'unpredictable break[ ] with prior' policy and

9   practice." (internal citations omitted)).  Further, "a mere lack of clarity in the law does not make

10  it manifestly unjust to apply a subsequent clarification of that law to past conduct."  *Qwest Servs.*

11  *Corp. v. F.C.C.*, 509 F.3d 531, 540 (D.C. Cir. 2007).  "Clarifications . . . must presuppose a *lack*

12  of antecedent clarity.  They stand in contrast to rulings that upset settled expectations—

13  expectations on which a party might reasonably place reliance."  *Id.*

14       Here, there are no controlling regulations or policy statements that reflect an official,

15  prior interpretation of ROSCA, which the FTC changed in more recent regulatory guidance on

16  "dark patterns."  Thus, this case differs from cases in which courts have determined that parties

17  lacked "fair notice" of an agency interpretation of a statute when the official interpretation

18  changed.  Further, although there are few cases in which courts have interpreted ROSCA, there is

19  plenty of caselaw interpreting similar provisions of other statutes—both state and federal.  As

20  discussed above, the Court's analysis under ROSCA is informed by the Court's examination of

21  other state and federal laws with similar terms and which regulate similar behavior.  Thus, this

22  case does not upset settled expectations about what disclosures and cancellation processes are

23  required for automatically renewing subscriptions.

24

Defendants argue that the FTC singled them out "for an 'unprecedented sanction.'"  Dkt. # 83 at 20 (quoting *Karem*, 960 F.3d at 664–65).  Defendants say that the FTC only recently started prosecuting companies for using "dark patterns" under ROSCA, even though the "basic negative-option marketing practices that it now attacks as unlawful have long been a mainstay of many lawful industries."[9]  Dkt. # 84 at 33.  Defendants argue that the FTC is attempting to enact new standards to interpret ROSCA, and "litigation is not a permissible way for an agency to enact new standards."  Dkt. # 84 at 33.

But an agency does not waive its right to enforce a statute when it has declined to do so in the past.  *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d at 255.  That the FTC has not brought civil actions against all individuals who the Defendants argue engage in similar practices does not mean that this enforcement action violates the individual defendants' rights to due process.  Granted, there is a bit of ROSCA caselaw to guide the Court; but also, the FTC's arguments, and the Court's analysis, relies on a plethora of state and federal caselaw in interpreting the terms of ROSCA.  Despite how the FTC chooses to label its theory of the case, the Court merely evaluates whether the allegations state a claim under the language of ROSCA and the FTC Act.

Defendants point to the FTC's notice of proposed rulemaking for its forthcoming ROSCA regulations as evidence that the FTC's theory of the case and interpretation of ROSCA

---

[9] Amazon characterizes the FTC's use of the term "dark patterns" as the announcement of a new strategy for enforcing ROSCA.  The Amended Complaint alleges that "Amazon used manipulative, coercive, or deceptive user-interface designs known as 'dark patterns' to trick consumers into enrolling in automatically-renewing Prime subscriptions."  Dkt. # 67 at 2, ¶ 2.  While the term "dark pattern" has been used in legal scholarship and the media to refer to certain practices used by companies such as Amazon when enrolling consumers in auto-renewing subscription programs such as Prime, ROSCA does not use the term.  Further, the FTC has no official policy on "dark patterns" and, as Amazon points out, the FTC's dark pattern regulations are not yet finalized.  Amazon calls the FTC's "dark pattern" theory of its case a "vague gloss on an otherwise clear statute."  Dkt. # 84 at 31.  The FTC has not promulgated an official policy or regulation on its interpretation of ROSCA.

1    is unclear.  Dkt. # 84 at 31–32.  The Individual Defendants also argue because the FTC is

2    working on promulgating regulations under ROSCA, it has effectively admitted that the statute is

3    vague.  Dkt. # 83 at 20–21.  But Defendants cite no case that supports this position.  And, as

4    mentioned above, Defendants have said that ROSCA is "facially clear."   Dkt. # 131 at 29.

5           Last, Amazon argues that this lawsuit "implicates the right to free speech."  Dkt. # 84 at

6    28.  It then argues in a footnote that "the FTC's 'dark patterns' theory raises serious questions

7    under the First Amendment. . . . The Complaint reveals that under the banner of prohibiting 'dark

8    patterns,' the FTC actually seeks to restrict the content and manner of companies'

9    communications with customers—even when those communications are not false or deceptive."

10   *Id.* at 28 n.15.  The FTC argues that Amazon has waived this argument because it is not fully

11   developed.  Dkt. # 125 at 54 n.31.  The Court agrees.

12          Whether the application of ROSCA here implicates Amazon's First Amendment rights

13   by limiting speech, or even compelling speech, is not a simple question.  Courts regularly

14   "refuse[] to address claims that were only 'argue[d] in passing.'"  *Christian Legal Soc. Chapter*

15   *of Univ. of California v. Wu*, 626 F.3d 483, 487 (9th Cir. 2010).  Thus, the Court does not

16   address this argument, which has not been fully briefed.

17          3.      Rule of lenity

18          The Individual Defendants also argue that the rule of lenity applies to the Individual

19   Defendants.  The Ninth Circuit applies the rule of lenity to criminal statutes.  *See United States v.*

20   *Shill*, 740 F.3d 1347, 1354–55 (9th Cir. 2014).  In *Bittner v. United States*, in a plurality decision,

21   Justice Gorsuch, joined only by Justice Jackson, applied the rule of lenity to civil penalties.  598

22   U.S. 85, 101 (2023).

23          Because the Ninth Circuit has stated that the rule of lenity only applies to criminal

24   statutes, the Court declines to apply it here.  *United States v. Millis*, 621 F.3d 914, 916–17 (9th

Cir. 2010) ("[T]he rule of lenity 'requires courts to limit the reach of criminal statutes to the clear import of their text and construe any ambiguity against the government.'" (internal citations omitted)).  Further, the rule of lenity applies only when a statute is ambiguous.  *Id.*  Because Defendants concede that ROSCA is clear and unambiguous, the rule of lenity would not apply anyway.  *See United States v. Shill*, 740 F.3d at 1354–55 ("Because the rule of lenity applies only where the meaning of a statute is genuinely uncertain, and because we conclude that § 2422(b) is not ambiguous, the rule is not applicable here.").

D.      Whether Civil Penalties are Available

Defendants argue that civil penalties are unavailable because the FTC failed to allege that they had actual knowledge of the ROSCA and FTC Act violations.  Dkt. # 84 at 34; Dkt. # 83 at 21–22.

The FTC Act authorizes the FTC to "commence a civil action to recover a civil penalty in a district court of the United States against any person, partnership, or corporation which violates any rule under this subchapter respecting unfair or deceptive acts or practices . . . with *actual knowledge* or *knowledge fairly implied on the basis of objective circumstances* that such act is unfair or deceptive and is prohibited by such rule."  15 U.S.C. § 45(m)(1)(A) (emphasis added); 15 U.S.C. § 8404(b) ("Any person who violates [ROSCA] . . . shall be subject to the penalties and entitled to the privileges and immunities provided in the Federal Trade Commission Act as though all applicable terms and provisions of the Federal Trade Commission Act were incorporated in and made part of this chapter.").

"Whether a defendant has violated a rule with actual or implied knowledge is based on objective factors.  A defendant is responsible where a reasonable person under the circumstances would have known of the existence of the provision and that the action charged violated that provision."  *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996) (citing S.

Rep. No. 93-1408, at 40 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 7755, 7772).  Further,

"[c]ircumstantial evidence regarding the individual's 'degree of participation in business affairs

is probative of knowledge.'" *FTC v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d at 1080 (quoting

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 574 (7th Cir. 1989), *overruled on other grounds by*

*FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 785 (7th Cir. 2019)).

Defendants argue that actual knowledge of the "existence of the rule" is required, and

ignorance of the law may serve as a defense.  Dkt. # 83 at 22.  In *Jerman v. Carlisle, McNellie,*

*Rini, Kramer & Ulrich LPA*, the Supreme Court suggested, without deciding, that the FTC Act

contains a mistake of law defense.  559 U.S. 573, 584–85 (2010).  The Ninth Circuit has never

considered this issue, but the Seventh Circuit noted that the FTC Act "includes a variation on an

ignorance-of-the-law defense; a business can be liable only if it either knew that the act was

unlawful or if it should have known the act was unlawful ('knowledge fairly implied')."  *United*

*States v. Dish Network L.L.C.*, 954 F.3d 970, 978 (7th Cir. 2020).[10]  But on a motion to dismiss

"the [c]ourt need not decide whether Defendants had actual knowledge of the [applicable law];

rather, Plaintiff need only plausibly state Defendants had knowledge or were on notice that the

[applicable law] applied to survive a motion to dismiss."  *United States v. Stratics Networks Inc.*,

No. 23-CV-0313-BAS-KSC, 2024 WL 966380, at *9 (S.D. Cal. Mar. 6, 2024).  Thus, even if

Defendants claim that they did not have actual knowledge of the law, the FTC can bring a claim

for civil penalties by alleging constructive knowledge—that a "reasonable person under the

---

[10] In *Jerman*, 559 U.S. at 584, the Supreme Court held that there was no mistake of law defense in the Fair Debt Collection Practices Act, distinguishing it from the FTC Act, which requires "actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule," 15 U.S.C. § 45(m)(1)(A). "Given the absence of similar language in § 1692k(c), it is a fair inference that Congress chose to permit injured consumers to recover actual damages, costs, fees, and modest statutory damages for 'intentional' conduct, including violations resulting from mistaken interpretation of the FDCPA, while reserving the more onerous penalties of the FTC Act for debt collectors whose intentional actions also reflected 'knowledge fairly implied on the basis of objective circumstances' that the conduct was prohibited." *Jerman*, 559 U.S. at 583–84.

circumstances would have known of the existence of the provision." *Nat'l Fin. Servs., Inc.*, 98 F.3d at 139.

Here, the Amended Complaint alleges that Amazon knew that a percentage of consumers accidentally signed up for Prime, Dkt. # 67 at 60, ¶ 177, and that a percentage of those consumers were charged for multiple months before they cancelled their memberships, *id.* at 62, ¶ 181. The Amended Complaint alleges that Amazon identified and implemented changes that increased "clarity"; but Amazon later rolled back these changes because they reduced the number of new Prime subscribers. *Id.* at 70–71, ¶ 216. The Amended Complaint alleges that Amazon knew that "accidental signups" for Prime creates "customer friction." *Id.* at 69, ¶ 209. The Amended Complaint also alleges that Amazon received an internal report showing that "customers had trouble finding the ingress to the Iliad Flow and prematurely abandoned the Iliad Flow under the incorrect assumption they had completed cancellation of their Prime subscription." *Id.* at 71, ¶ 218. Further, a reasonable company in Amazon's position—"one of the world's largest retailers" running a subscription service that offers auto-renewing subscriptions—would be aware that state and federal laws, including ROSCA, regulate negative option marketing and require that material terms be clearly and conspicuously disclosed and that they must obtain express informed consent before charging consumers. Dkt. # 67 at 4, ¶ 12. Viewing the Amended Complaint in the light most favorable to the FTC, the Court concludes that the allegations sufficiently indicate that Amazon had actual or constructive knowledge that its Prime sign-up and cancellation flows were misleading consumers. *See FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1141 (9th Cir. 2010) (holding that defendants had actual or implied knowledge of their FTC Act violations because, in relevant part, they received many complaints from consumers).

1    As to the Individual Defendants, the Amended Complaint alleges that all three had a

2  "high degree of participation" in Amazon's Prime organization business, which is "probative of

3  knowledge." *FTC v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d at 1080.  All three received memos

4  and correspondence on the problems with accidental Prime sign-ups and consumer confusion

5  caused by the Iliad flow and directed decisions around the design of the enrollment and

6  cancellation flows.  Dkt. # 67 at 6, ¶ 17 (Lindsay); *id.* at 7, ¶ 22 (Grandinetti); *id.* at 8, ¶ 26

7  (Ghani).  Further, a reasonable executive overseeing a large subscription service that offers auto-

8  renewing subscriptions would know that there are state and federal regulatory requirements for

9  auto-renewal offers.  Thus, the Court concludes that the Amended Complaint sufficiently alleges

10  that the Individual Defendants had actual or constructive knowledge of the requirements of

11  ROSCA and that the Prime sign-up and cancellations flows were misleading to consumers.

12                                      **V**

13                                 **CONCLUSION**

14    For the reasons stated above, the Court DENIES Defendants' motions to dismiss.

15  Dated this 28th day of May, 2024.

16

17                                 John H. Chun
                                   United States District Judge

18

19

20

21

22

23

24

ORDER - 49