# EXHIBIT 1

2024 WL 1237047
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

FEDERAL TRADE COMMISSION, Plaintiff,
v.
ZAAPPAAZ, LLC, et al., Defendants.

Civil Action No. 4:20-CV-02717
|
Signed March 21, 2024
|
Entered March 22, 2024

**Attorneys and Law Firms**

Adrienne Janine Lighten, Anne Collesano, Michelle Schaefer, Federal Trade Commission, Washington, DC, for Plaintiff.

Jillian Marie Scherrer, Ernest W. Boyd, Jr., Butch Boyd Law Firm PC, Houston, TX, Michael Joshua Blanchard, Brylak & Associates, San Antonio, TX, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE

*1 Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court's Findings of Fact and Conclusions of Law are set forth below.

### I. BACKGROUND

Plaintiff Federal Trade Commission ("FTC") originally filed this case in August of 2020 pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57(b); and the Mail, Internet, or Telephone Order Merchandise Rule ("MITOR"), 16 C.F.R. Part 435. Compl. ¶ 1, ECF No. 1. The FTC's Complaint alleged that Defendants Zaappaaz, LLC and Azim Makanojiya violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) and MITOR, 16 C.F.R. Part 435. *Id.*

On June 9, 2023, Magistrate Judge Dena Hanovice Palermo issued a Report and Recommendation ("R&R"), which addressed the parties' Motions for Summary Judgment. *See* ECF No. 117. On August 3, 2023, the Court adopted Judge Palermo's R&R in full, which thereby granted the FTC's Motion for Summary Judgment as to liability and denied it as to damages, and denied Defendants' Motion for Partial Summary Judgment. ECF No. 126. Subsequently, the FTC filed, and the Court granted, a Rule 56(g) Motion to Deem Facts Established and Narrow the Issues for Trial. ECF Nos. 129, 132.

In their Joint Pretrial Order and at the pretrial conference, parties communicated to the Court that they disagreed as to which matters remained at issue for trial. *See* Minute Entry dated 12/13/2023; *see also* ECF No. 144 at 2 (Joint Pretrial Order noting that parties agreed on the remaining issues concerning injunctive relief, but disagreed as to the remaining issues concerning monetary relief). The Court ordered additional briefing, and then issued an Order clarifying the issues for trial. ECF No. 153. In that Order, the Court clarified that the FTC had established consumer injury and that $12,241,035.69 was necessary to redress the injury of consumers who never received their orders. *Id.* The Court further clarified that the issues remaining for trial were (1) whether Defendants' occupation, failure to recognize their wrongdoing, and failure to make assurances against repetition weighed in favor of injunctive relief; and (2) whether the FTC could show by a preponderance of evidence if some amount of monetary relief—less than full refunds—was necessary to redress the injury of consumers who received late delivered orders. *Id.*

On December 18, 2023, the Court commenced a bench trial. Over the course of the one-day trial, the Court received exhibits and heard sworn testimony. Having considered the evidence, testimony, oral arguments presented during the trial, post-trial filings, and the applicable law, the Court sets forth the following Findings of Fact and Conclusions of Law.

### II. LEGAL STANDARD

Federal Rule of Civil Procedure 52(a)(1) provides that, "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions ... may appear in an opinion or a memorandum of decision filed by the court." FED. R. CIV. P. 52(a)(1). In articulating findings of fact, Rule 52(a) "exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness." *Cent. Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (quoting *Burma Navigation Corp. v. Reliant Seahorse M/V*, 99 F.3d 652,

656 (5th Cir. 1996)). Instead, the rule is satisfied where the findings present the reviewer with "a clear understanding of the basis for the decision." *Id.* In accordance with Rule 52(a)(1), the Court now sets forth its Findings of Fact followed by its Conclusions of Law.[1]

[1] Any Finding of Fact that should be a Conclusion of Law shall be deemed such, and any Conclusion of Law that should be a Finding of Fact shall be deemed such.

### III. FINDINGS OF FACT

#### A. Background

 **\*2** 1. Defendant Zaappaaz is a Texas corporation formed in 2008. ECF No. 129-1 [2] ¶ 2.

2. Defendant Makanojiya founded, owns, and operates the company. *Id.* at ¶ 3; Dec. 18, 2023 Trial Transcript ("Trial Tr.") at 17:10–15.

3. Until March 2020, Zaappaaz primarily marketed and sold consumer promotional goods, such as wristbands, lanyards, keychains, and can coolers. Trial Tr. at 25:10–13; 26:1–4; ECF No. 129-1 at ¶ 4.

4. Zaappaaz sold these goods through its websites: www.Wrist-band.com, WBpromotion.com, and CustomLanyard.net. Although each of these websites has a different domain name, they are identical. ECF No. 129-1 ¶ 5.

5. Zaappaaz's primary supplier was Chandler Liu, a vendor based in China. Mr. Liu packaged Zaappaaz's products and drop-shipped them directly to its customers. Zaappaaz had similar drop-ship relationships with other vendors, including Yaoli, USKY, USB, and Skyee. *Id.* at ¶ 6.

6. When customers ordered products from one of Zaappaaz's websites, it recorded the order number, order date, delivery date, shipping days, and the ordered product. *Id.* at ¶ 7.

7. After customers ordered a product from Zaappaaz, Mr. Liu received the order information and fulfilled the customer's order. *Id.* at ¶ 8.

8. After shipping the product, Mr. Liu provided Zaappaaz with the tracking number. *Id.* at ¶ 9.

[2] On October 25, 2023, the Court deemed all facts in ECF No. 129-1 as established for trial. ECF No. 132.

#### B. Defendants' selling and shipping of PPE

9. Zaappaaz began selling personal protective equipment ("PPE") in March 2020, after the City of Sugar Land reached out to them requesting masks. *Id.* at ¶ 10; Trial Tr. 25:12–26:8.

10. Zaappaaz sourced PPE through Mr. Liu, a broker named Yaoli, and a supplier in Malaysia. ECF No. 129-1 at ¶ 11.

11. Prior to confirming their purchase of PPE from Zaappaaz, customers were provided the products' shipping time, production time, and promised delivery date. *Id.* at ¶ 12.

12. After confirming their purchase, customers received an email from Zaappaaz with that same information. *Id.* at ¶ 13.

13. Thereafter, when orders were assigned tracking numbers, Zaappaaz sent a second email to customers with their order's tracking number. *Id.* at ¶ 14.

#### C. Defendants' struggles to timely fill PPE orders

14. By April 2020, Zaappaaz experienced issues filling PPE orders in a timely manner. *Id.* at ¶ 18.

15. These problems are reflected in the increase in consumer complaints against Zaappaaz from zero in January 2020 to 820 in April 2020. *Id.* at ¶ 19.

16. New restrictions in China affected Zaappaaz's ability to acquire PPE and deliver it to consumers. *Id.* at ¶ 20; *see* Trial Tr. at 22:2–6.

17. Furthermore, on April 1, 2020, FedEx announced weight limitations on the amount customers could ship per day. ECF No. 129-1 ¶ 21.

18. These combined changes prevented Zaappaaz from drop-shipping PPE from its vendors in China and Asia directly to consumers in the United States and required it to change its operations. *Id.* at ¶ 22.

19. Consequently, Zaappaaz shipped inventory to its warehouse in Sugar Land, Texas. Zaappaaz then filled

orders itself and shipped the PPE from its warehouse to consumers in the United States. *Id.* at ¶ 23.

**\*3** 20. However, because of shipping restrictions in place for three or four weeks during April, Zaappaaz could send only one shipment at a time to its Texas warehouse. *Id.* at ¶ 24.

21. To circumvent these restrictions, Zaappaaz shipped items from China to various addresses in the area and then transported those packages to its Texas warehouse. *Id.* at ¶ 25.

22. Once these restrictions were lifted in late April, Zaappaaz shipped its inventory from China directly to its warehouse. *Id.* at ¶ 26.

23. Zaappaaz employees, including Defendant Makanojiya, ran long shifts in Zaappaaz's warehouse to attempt to fulfill orders. Trial Tr. 25:6–9.

24. However, Zaappaaz failed to timely deliver PPE to a large portion of its customers. *Id.* at ¶ 1. Further, Zaappaaz failed to notify them of the anticipated delay after their orders were placed or provide them with an option to cancel their orders. *Id.*

**D. Defendants' communications with consumers**

25. Zaappaaz advertised its PPE as in stock and provided rush and same day shipment options. For example, on its websites, Zaappaaz stated the following: "GUARANTEED TO SHIP TODAY," "IN STOCK – SHIPS SAME DAY," "ALL PRODUCTS IN STOCK READY TO SHIP." *Id.* at ¶ 15.

26. Through email, Zaappaaz also communicated the following: "ALL OF THESE PRODUCTS ARE FULLY IN STOCK, READY TO SHIP SAME DAY AND DELIVER IN 24 HOURS." *Id.* at ¶ 16.

27. Zaappaaz's shipping claims were expressly made to consumers on its websites, in emails, and in advertising. *Id.* at ¶ 54.

28. Zaappaaz's representations that products would be shipped the same day, would be delivered within 24 hours, and would arrive on particular dates, affected its customers' decisions to purchase PPE from Zaappaaz. *Id.* at ¶ 55.

29. Despite these representations, Zaappaaz did not ship within the advertised time frames. *Id.* at ¶ 30.

30. From March to December 2020, over 50,000 PPE orders—59.5% of the total during that timeframe—were shipped late. *Id.* at ¶ 31.

31. Zaappaaz made representations to consumers that, if they were unsatisfied with its products, they would receive a refund. Despite these representations, Zaappaaz denied customers refunds. *Id.* at ¶ 57–58.

32. Mr. Makanojiya testified that Zaappaaz did not contact individual customers regarding late shipments. Therefore, Zaappaaz could not have complied with the refund-or-consent requirement of 16 C.F.R. § 435.2(b)(1). *Id.* at ¶ 46.

33. Zaappaaz also promised customers that they would be refunded expedited shipping costs for late PPE but failed to do so. *Id.* at ¶ 59.

34. Zaappaaz also represented to consumers that they were purchasing one set of goods but would substitute different goods without notice. *Id.* at ¶ 64.

35. The FTC has demonstrated that Zaappaaz made widely disseminated misleading claims regarding its PPE to consumers on its website, emails, and advertising. *Id.* at ¶ 73.

36. Defendants' MITOR and FTC Act violations continued despite the filing of the FTC's lawsuit against them on August 4, 2020. Compl., ECF No. 1; ECF No. 129-1 ¶ 31.

37. Defendants' MITOR and FTC Act violations continued through December 2020, despite the Court's issuance of a stipulated preliminary injunction on August 8, 2020, which prohibited such behavior. Stipulated Preliminary Injunction Order with Other Equitable Relief, ECF No. 22; ECF No. 129-1 ¶ 31.

**E. Defendants' knowledge about shipping challenges**

**\*4** 38. In March 2020, Zaappaaz recognized that the pandemic had "slowed down" its production and disrupted its supply chain. ECF No. 129-1 ¶ 17.

39. In addition, Zaappaaz was aware of supply chain issues affecting its ability to fulfill customers' orders beginning at least as early as March 2020. *Id.* at ¶ 33.

40. Zaappaaz concedes this but contends that it "anticipated China would lift the restrictions quickly." *Id.* at ¶ 34.

41. However, that PPE was available from its vendors in China does not mean that Zaappaaz had PPE in stock. To the contrary, Zaappaaz's *suppliers* had PPE in stock. The advantage of Zaappaaz's drop-shipping business model is that, as the seller, it does not need to maintain inventory. *Id.* at ¶ 35. Instead, its vendors directly supply the goods. *Id.*

42. Challenges in getting items from China to Zaappaaz's customers in the United States caused "shortages of products that [it] could fulfill." *Id.* at ¶ 36.

43. Zaappaaz did not have a reasonable basis to believe that it could timely ship PPE to consumers. Zaappaaz suffered from severe logistical issues that prevented it from shipping PPE to consumers. *Id.* at ¶ 53.

44. The Court finds that Mr. Makanojiya had authority to control Zaappaaz and had knowledge of the wrongful acts and practices and should be held responsible individually. *Id.* at ¶ 68.

45. The evidence shows that Mr. Makanojiya had the authority to control Zaappaaz's unlawful activities. It is undisputed that, as he testified, Mr. Makanojiya was the CEO, controlled Zaappaaz, and that all its employees and agents reported to him. *Id.* at ¶ 69; Trial Tr. at 17:14-15.

46. Furthermore, Mr. Makanojiya was aware of the severe issues Zaappaaz experienced delivering PPE to its customers. ECF 129-1 ¶ 70.

47. Mr. Makanojiya was not only aware of the logistical issues affecting Zaappaaz's ability to ship PPE, but he was also aware of customers' complaints regarding Zaappaaz's misrepresentations regarding shipping and delivery, refunds, and providing customers the correct items they ordered. *Id.* at ¶ 71.

**F. Defendants' response to shipping challenges**

48. Defendants did not have a MITOR policy in place at the time this case was filed. Trial Tr. at 5:1–6:7 (designation of Aug. 11, 2021 Azim Makanojiya Dep. Tr. 99:22–100:15, ECF No. 100-22).

49. As of August 2021, Defendants still did not have a written refund policy. Trial Tr. at 5:23–6:7 (designation of Aug. 11, 2021 Azim Makanojiya Dep. Tr. 169:7–20, ECF No. 100-22).

50. Zaappaaz did not keep complete records. In fact, Zaappaaz lacked tracking numbers for 6.2% of its PPE orders during the relevant timeframe. ECF No. 129-1 ¶ 40.

51. Zaappaaz also did not have shipment or delivery information for 4.6% of its PPE orders. *Id.* at ¶ 41.

52. Furthermore, Zaappaaz did not produce any documentary evidence supporting the existence of systems and procedures in response to the FTC's discovery requests. *Id.* at ¶ 42.

53. Where a seller fails to maintain records relating to the refund-or-consent requirement of MITOR, it creates a rebuttable presumption that the seller failed to comply with the requirement. 16 C.F.R. § 435.2(b)(1). Zaappaaz produced no such Merchandise Rule notices in response to the FTC's document requests. Because Zaappaaz produced no records relating to its compliance, it is presumed to have failed to comply with the requirement. *Id.* at ¶ 45.

**\*5** 54. Zaappaaz offers no evidence that it cancelled any late orders and provided refunds without a prior request, thus creating a rebuttable presumption that it failed to comply with the requirement. Zaappaaz also did not produce any documentary evidence showing that it did so in response to the FTC's document requests. *Id.* at ¶ 48.

55. Defendants have not offered any evidence of recordkeeping systems they have implemented to remedy these problems. *See generally* Trial Tr.

56. Rather than recognize their wrongful conduct, Defendants have contested liability and placed blame on the pandemic, third-party carriers, and customs blockages in China throughout this litigation. Trial Tr. at 21:7–22:13; 24:1–23; *see also* ECF No. 29 ¶¶ 33– 36; Defendants' Response to Plaintiff's Motion for Summary Judgment, Motion for Leave to Extend Deadline for Response, and Motion to Exclude the Testimony of Rufus Jenkins, ECF No. 108. They also continue to assert they had a reasonable basis for their same-day

shipping claims even though the Court ruled they did not. Trial Tr. at 22:10–13.

57. Even when expressing last-minute remorse for Defendants' actions, Mr. Makanojiya continued to blame worldwide supply chain and logistical issues beyond Zaappaaz's control for those failures. Trial Tr. at 21:7–22:13; 24:1–23; 26:15–20; 30:15–32:10.

**G. Defendants' continued sale of consumer goods**

58. Zaappaaz markets and sells goods to consumers throughout the United States. Trial Tr. at 17:16–20; 18:3–11; 18:18–23; 19:3–8; 19:13–18; 20:23–21:2; Compl. ¶ 11; Defendants' Answer ¶ 11, ECF No. 29.

59. Zaappaaz is still in business and continues to sell products on six of its websites: www.Wrist-band.com, CustomLanyard.net, customballoonnow.com, custombuttonsnow.com, customtattoonow.com, and wristband.today.com. Trial Tr. at 17:16–20; 18:3–11; 18:18–23; 19:3–8; 19:13–18; 20:23–21:2.

60. Sales from these websites require Defendants and their agents to ship goods to consumers, including goods from China. Trial Tr. at 17:21–18:2; 18:12–17; 18:24–19:2; 19:9–12; 19:19–22; 21:3–6.

61. Mr. Makanojiya operates other businesses that sell and ship consumer goods. Minute Entry dated 12/13/2023 (noting that "Parties stipulated that Mr. Makanojiya operates other businesses that sell and ship consumer goods").

62. Mr. Makanojiya testified Defendants do not currently sell PPE but plan to offer PPE in the future "if there's a call for it." Trial Tr. at 28:1–8.

**H. Consumer harm from Defendants' shipping failures**

63. Zaappaaz's net revenue from undelivered and unrefunded PPE orders was $12,241,035.69. ECF No. 132 at 2; ECF No. 153 at 2.

64. Zaappaaz's net revenue from late-delivered and unrefunded shipments of PPE orders was $25,308,436.45: the difference between the total of never-delivered and late-delivered unrefunded orders ($37,549,472.14) and the total of never-delivered and unrefunded orders ($12,241,035.69). ECF No. 132 at 2; ECF No. 153 at 2.

**IV. CONCLUSIONS OF LAW**[3]

[3] To the extent that any conclusions of law recited herein are inconsistent with the Court's legal conclusions set forth in its adoption of Judge Palermo's R&R, ECF No. 126 (adopting ECF No. 117), and Order clarifying the issues for trial, ECF No. 153, the Court exercises its discretion to reconsider a non-final, non-appealable partial summary judgment order, *see U.S. Bank Nat. Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 427–29 (5th Cir. 2014), *as revised* (Sept. 2, 2014).

**\*6** 1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

2. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

3. The FTC seeks monetary relief pursuant to Section 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 57b, and the Mail, Internet, or Telephone Order Merchandise Rule ("MITOR"), 16 C.F.R. Part 435.

4. The FTC seeks injunctive relief pursuant to Section 13 of the FTC Act, 15 U.S.C. § 53(b).

**A. Corporate and individual liability**

5. As the Court previously ruled, Zaappaaz violated MITOR and the FTC Act by, among other things, failing to timely deliver PPE to a large portion of its customers and notify those customers of the anticipated delay after their orders were placed or provide them with an option to cancel their orders. ECF No. 117 at 2–3; ECF No. 126.

6. As the Court previously ruled, Defendant Makanojiya is personally liable for Zaappaaz's MITOR and FTC Act violations. ECF No. 117 at 33–35; ECF No. 126.

**B. Injunctive relief is appropriate**

7. Section 13(b) of the FTC Act provides the FTC may obtain permanent injunctions for violations of "any provision of law enforced by the [FTC]." 15 U.S.C.

§ 53(b); *see also FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 717–18 (5th Cir. 1982); *FTC v. Kennedy*, 574 F. Supp. 2d 714, 719 (S.D. Tex. 2008); *US v. Cornerstone Wealth Corp., Inc.*, 549 F. Supp. 2d 811, 816 (N.D. Tex. 2008); *FTC v. Sec. Rare Coin & Bullion Corp.*, 1989 WL 134002, at *19 (D. Minn. Sep. 11, 1989), *aff'd*, 931 F.2d 1312 (8th Cir. 1991); *FTC v. Kitco of Nev. Inc.*, 612 F. Supp. 1282, 1296–97 (D. Minn. 1985); *see also FTC v. USA Fin., LLC*, 415 F. App'x 970, 975 (11th Cir. 2011).

8. The Court considers six factors to determine whether to issue, and the scope of, an injunction: "[1] the egregiousness of the defendant's actions, [2] the isolated or recurrent nature of the infraction, [3] the degree of scienter involved, [4] the sincerity of the defendant's assurances against future violations, [5] the defendant's recognition of the wrongful nature of his conduct, and [6] the likelihood that the defendant's occupation will present opportunities for future violations." *Cornerstone Wealth*, 549 F. Supp. 2d at 816 (quoting *SEC v. Blatt*, 583 F.2d 1325, 1334 n. 29 (5th Cir. 1978)).

9. All six factors weigh in favor of injunctive relief.

10. First, Defendants' actions were egregious. Defendants took advantage of consumers' desperation to quickly obtain scarce PPE at the onset of the global pandemic with false promises of fast, risk-free PPE deliveries when speed of delivery was of the essence to consumers. Specifically, Defendants knowingly disseminated false advertising about shipping times and then failed to ship most PPE orders on time, if at all. Findings of Fact ("FOF") ¶¶ 25–30, 43. They also consistently misled consumers by aggressively marketing guaranteed delivery dates and "in stock" PPE despite struggling to source and ship the products. *Id.* at ¶¶ 25–30, 38–43. As the court previously found, these representations were material to purchasing decisions because they related to the timing of the customers' receipt of the products. ECF No. 117 at 31. After luring consumers into a sale, Defendants failed to offer consumers an option to consent to a delay in shipping or to cancel the order for a prompt refund. FOF ¶¶ 31–32. Moreover, Defendants routinely denied refunds to those consumers who asked for them because of late shipments. *Id.* Tellingly, Defendants' illegal conduct did not end when the FTC filed its lawsuit against them in August 2020, and even continued despite the Court's issuance of a stipulated preliminary injunction on August 8, 2020, prohibiting Defendants from violating MITOR and making misrepresentations in the sale of PPE. *See id.* at ¶¶ 36–37, 48.

**\*7** 11. Second, as the Court previously found, Zaappaaz's violations were not isolated. ECF No. 117 at 42. Defendants' illegal actions continued for months and impacted over 50,000 PPE orders. *Id.* at ¶ 26. The repeated nature of Defendants' violations is important, because where, as here, Defendants' violations were "predicated upon systematic wrongdoing, rather than isolated occurrences, a court should be more willing to enjoin future conduct." *FTC v. Gill*, 71 F. Supp. 2d 1030, 1047 (C.D. Cal. 1999) (quoting *Commodity Futures Trading Comm'n v. Co Petro Mktg. Grp., Inc.*, 502 F. Supp. 806, 818 (C.D. Cal. 1980), *aff'd*, 680 F.2d 573 (9th Cir. 1982)).

12. Third, as the Court previously found, Defendants acted with "a high degree of scienter." They "knew [they] had significant logistical issues acquiring and shipping PPE but continued to advertise that [they] could deliver PPE to customers within ... advertised timeframes." ECF No. 117 at 42; FOF ¶¶ 38–43, 46–47.

13. Fourth, Defendants failed to offer assurances against future violations. Defendants had no MITOR policy in place when the FTC filed its lawsuit in August 2020. FOF ¶ 48. Tellingly, a year into the lawsuit, they still had not implemented a MITOR policy. *Id.* at ¶ 49. Indeed, they had no recordkeeping system in place, failed to maintain shipment and delivery information, and lacked any documentation necessary to monitor compliance with MITOR, including records relating to cancelling any late orders and providing refunds without a prior request. *Id.* at ¶¶ 48–52. Defendants' failure to keep even these basic records demonstrates they could not have followed through on any assurances against future MITOR or FTC Act violations, even if they had made any such assurances. Notably, there is no evidence that Defendants currently have a MITOR policy in place.

14. Fifth, Defendants refused to recognize the wrongful nature of their conduct despite their last minute "remorse." Rather than take responsibility for their wrongful conduct, Defendants instead placed the blame

on the pandemic, third-party carriers, and customs blockages in China—refusing to acknowledge that they could have simply stopped misleading consumers about their shipping dates. *Id.* at ¶¶ 56–57. Moreover, Mr. Makanojiya's uncorroborated testimony that there were few consumer complaints and that Defendants resolved each complaint is negated by the fact that consumers paid $12,241,035.69 for PPE but received nothing in return. Trial Tr. at 26:17–27:25; FOF ¶ 63. In any event, "[f]ailing to complain is not the equivalent to satisfaction." *FTC v. On Point Global LLC*, 2021 WL 6497592 (S.D. Fla. Nov. 15, 2021).

15. Finally, Defendants' occupations present ample opportunities for future violations of Section 5 and MITOR. Zaappaaz is still in business and continues to sell products online. FOF ¶ 59. Mr. Makanojiya owns several other businesses that also sell products online. *Id.* at ¶ 61. While his businesses do not currently sell PPE, Mr. Makanojiya admitted that Zaappaaz plans to sell PPE in the future if a need for it arises. *Id.* at ¶ 62. To be sure, the pandemic is no longer at its height, and PPE is more widely available than it was in mid-2020. Undoubtedly, however, there is still a demand for same-day shipping of consumer goods. Defendants, thus, can continue to violate both MITOR and Section 5. Indeed, Defendants did just that during the pendency of this case by continuing their unlawful conduct, even after the Court entered a preliminary injunction. *Id.* at ¶ 37.

**\*8**  16. A thorough examination of the factors, therefore, demonstrates that an injunction, including compliance monitoring measures, is necessary to protect consumers against future violations of the FTC Act and MITOR.

17. The Court concludes that a ban preventing Defendants from advertising or selling protective goods and services is necessary. See *FTC v. QYK Brands*, 2022 WL 1090257, at \*10 (C.D. Cal. April 6, 2022) (finding a PPE ban was warranted for MITOR violations because "Defendants have exhibited a high degree of scienter, and this factor weighs in favor of finding that wrongdoing is likely to recur"). [4] This relief is especially appropriate considering that Mr. Makanojiya testified he will sell PPE again if a need for it arises.

18. Because of Defendants' egregious conduct, and the fact that their illegal shipping claims practices are readily transferrable to the sale of their non-PPE products (e.g., promotional products), the Court concludes that injunctive relief prohibiting misrepresentations involving the sale of any product, not simply against misrepresentations regarding shipping of PPE during a pandemic, is also necessary. *FTC v. Colgate-Palmolive*, 380 U.S. 374, 395 (1965) (injunctive relief "is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past," as party "caught violating the Act ... 'must expect some fencing in' " (quoting *Fed. Trade Comm'n v. Nat'l Lead Co.*, 352 U.S. 419, 431 (1957))); *see also Fed. Trade Comm'n v. Digital Altitude, LLC*, No. LACV1800729JAKMRWX, 2019 WL 1976453, at \*11 (C.D. Cal. Mar. 6, 2019) (collecting cases, explaining that "[i]njunctions in FTC enforcement actions ... regularly include broad restrictions on conduct similar to those set forth in the proposed judgment").

19. For the same reasons, the Court concludes it is appropriate to require Defendants to comply with MITOR; maintain proper shipping and refund records; and not mislead consumers about shipping and delivery times, refund policies, and the nature of the product they ordered.

20. The Court also finds compliance monitoring measures, common in FTC matters, are necessary and narrowly tailored to help ensure Defendants' compliance with the injunctive relief. *See US v. Commercial Recovery Sys., Inc.*, 2016 WL 9244671, at \*4 (E.D. Tex. Apr. 18, 2016); *Digital Altitude*, 2019 WL 1976453 at \*12 (concluding that compliance monitoring was necessary because " '[c]omplete justice' would not be accomplished if [the defendant] were able to evade the scrutiny of the FTC and resume the same or similar fraudulent activities"). These provisions are required to allow the FTC to effectively monitor Defendants' business activities and take appropriate enforcement action in the future, if necessary.

21. The terms of the FTC's Proposed Order (ECF No. 157-3) setting forth requirements for acknowledging receipt, compliance reporting, recordkeeping, and compliance monitoring are similar to provisions in injunctions that courts have entered in other FTC enforcement actions. *See Digital Altitude*, 2019 WL 1976453, at \*11 (collecting cases).

22. The FTC is **ORDERED** to file a proposed judgment consistent with the Court's Findings of Fact and Conclusions of Law no later than March 27, 2024.

The Court shall enter appropriate injunctive relief after reviewing the revised proposed judgment.

4   Numerous courts have ordered bans against defendants in cases involving Section 13(b) of the FTC Act. *See, e.g., FTC v. DiscountMetalBrokers,* 2017 WL 4442998, at *6 (C.D. Cal. Oct. 4, 2017); *FTC v. Lalonde,* 545 F. App'x 825, 841-42 (11th Cir. 2013); *FTC v. Real Wealth,* 2011 WL 1930401, at *4 (W.D. Mo. May 17, 2011); *Cornerstone Wealth.,* 549 F. Supp. 2d at 820–21; *Sec. Rare Coin & Bullion.,* 1989 WL 134002, at *17–19; *Kitco of Nev. Inv.,* 612 F. Supp. at 1298.

### C. Consumers suffered $37,549,472.14 in monetary injury

**\*9**  23. As the Court previously ruled, $12,241,035.69 (i.e., full refunds) is necessary to compensate consumers who paid for PPE but received nothing. ECF No. 153 at 2–3.

24. Further, as the Court previously ruled, injury is established as to consumers who received late-shipped PPE. ECF No. 117 at 37–38; ECF No. 153 at 1–2. In particular, the Court held that the FTC established a presumption that each consumer who purchased Defendants' PPE did so in reliance on Defendants' false shipping claims, and Defendants failed to rebut that presumption. ECF No. 117 at 37-38; ECF No. 153 at 1.

25. Well-settled law recognizes that "injury to a consumer occurs at the instant of a seller's misrepresentations, which taint the consumer's subsequent purchasing decisions." *FTC v. BlueHippo Funding, LLC,* 762 F.3d 238, 244 (2d Cir. 2014); accord *FTC v. Figgie Int'l, Inc.,* 994 F.2d 595, 606 (9th Cir. 1993); *Sec. Rare Coin & Bullion,* 931 F.2d at 1316; *McGregor v. Chierico,* 206 F.3d 1378, 1388 (11th Cir. 2000).

26. The Court previously concluded that full refunds were not necessary to compensate consumers who paid for PPE and received their shipment late. ECF No. 153 at 3. However, upon further review of the facts and applicable law, the Court now reconsiders and revises its earlier conclusion. *See Verizon Commc'ns, Inc,* 761 F.3d at 427–29 (noting district courts' considerable discretion to reconsider non-final, non-appealable partial summary judgment orders).

27. The injury inflicted when consumers rely on a material, pre-purchase misrepresentation is the consumer's loss of the chance to avoid the purchase entirely. Thus, full refunds are "necessary to redress [that] injury," 15 U.S.C. § 57b(b), regardless of any value consumers later received from the product. *Figgie,* 994 F.2d at 606–07 (awarding full refunds); *QYK Brands,* 2022 WL 1090257, at 7–9 (awarding full refunds—i.e., net revenue—for late-shipped goods under Rule 19 for MITOR violations); *FTC v. Am. Screening,* 2022 WL 2752750, at *10–12 (E.D. Mo. July 14, 2022) (same); *FTC v. Romero,* 658 F. Supp. 3d 1129, 1141 (M.D. Fla. 2023) (same).

28. The Ninth Circuit laid out the reasoning underlying this principle in *Figgie*, using a hypothetical situation of merchant who sold rhinestones but dishonestly told consumers that they were diamonds. 994 F.2d at 606. The *Figgie* court explained that "[c]ustomers who purchased rhinestones sold as diamonds should have the opportunity to get all of their money back," as opposed to only "the difference between what they paid and a fair price for rhinestones." *Id.* This result is sensible, the Ninth Circuit explained, because "the seller's misrepresentations tainted the customers' purchasing decisions. If they had been told the truth, perhaps they would not have bought rhinestones at all or only some." *Id.* Ultimately, "[t]he fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds or to refunds for each detector that is not useful to them." *Id.*

29. Here, too, customers who purchased PPE from Zaappaaz expecting same-day shipping, but who received their orders late, are entitled to full refunds because Zaappaaz's false statements tainted their purchasing decisions. Particularly given the widespread need for immediate delivery of PPE in March through December 2020, if customers had been told the truth about Zaappaaz's shipping timelines, they may not have purchased PPE from Zaappaaz. Moreover, when their shipment from Zaappaaz did not arrive within the expected 24-hour time period, customers may have purchased PPE from a different supplier, such that their

order from Zaappaaz had little value to them once it finally arrived.

*10 30. Awarding full refunds to consumers who paid for late-shipped goods does not impermissibly provide a windfall to consumers. This case is distinguishable from the facts, and consistent with the reasoning, of *Fed. Trade Comm'n v. Noland*—one of the few district courts to deny customers full refunds for late-shipped goods. No. CV-20-00047-PHX-DWL, 2021 WL 5493443, at *4 (D. Ariz. Nov. 23, 2021) (pre-trial decision); 672 F. Supp. 3d 721, 793 (D. Ariz. 2023) (post-trial decision). Here, unlike in *Noland*, Defendants' misconduct was not limited to shipping delays, but also included "pre-purchase misrepresentations about whether the products were in stock and would be shipped quickly." *Noland*, 672 F. Supp. 3d at 793 (describing the facts of *QYK Brands*, 2022 WL 1090257, in order to distinguish from facts in *Noland*). In its post-trial decision, the *Noland* court explained that in cases where "Defendants' deception induced the sale in the first place," full refunds are appropriate, whereas in cases where violations "arose only *after* the contract was consummated," full refunds risk inappropriately providing a windfall to some customers. *Id.* (quoting *QYK Brands*, 2022 WL 3138761 at *8–*9). The facts in this case align with the first-described scenario; thus, full refunds are appropriate.

31. The total unrefunded amount consumers paid for late-shipped goods was $25,308,436.45. FOF ¶¶ 64. Therefore, $25,308,436.45 is necessary to compensate consumers who received late-shipped goods.

32. Moreover, MITOR requires refunds of these purchases. Specifically, companies that will not ship on time must seek consumers' consent to late shipment or to offer a refund. 16 CFR 435.2(b)(1). If "the seller fails to offer the option prescribed in paragraph (b)(1) of this section and has not shipped the merchandise within the applicable time set forth in paragraph (a)(1) of this section," the seller must consider the order cancelled and make a "prompt refund." 16 CFR 435.2(c)(5). Defendants in this case never offered consumers the option of obtaining a refund or consenting to delay. FOF ¶¶ 31–33. Thus, all such orders were cancelled by operation of law, entitling consumers to full refunds. Any shipments of goods after cancellation, thereafter, were gifts under the law that consumers had no obligation to pay for or return. 39 U.S.C. § 3009(b).

33. The FTC, therefore, is entitled to an award of total relief in the amount of $37,549,472.14. This includes the total owed to two groups of consumers: consumers who paid for products they never received ($12,241,035.69), and consumers who relied on Defendants' false shipping and refund promises but instead received late-shipped goods ($25,308,436.45).

34. The Court acknowledges that some customers who received late orders may have been satisfied with their PPE orders. And, the Court notes that the FTC Act prohibits punitive damage awards. *See* 15 U.S.C. § 57b(b) (authorizing "the refund of money" but noting that "nothing in this [statute] is intended to authorize the imposition of any exemplary or punitive damages"). In light of these considerations, the Court shall implement a redress plan applicable to the refunds for consumers who received late-shipped goods (i.e., the amount totaling $25,308,436.45). The refunds owed to customers who never received their order (i.e., the amount totaling $12,241,035.69) shall not be subject to this redress plan—those customers shall receive refunds without having to seek them out, as there is no concern that customers who never received the goods they ordered were satisfied with what they received from Defendants.

35. The FTC shall hold the sum of Defendants' revenue from late-shipped orders ($25,308,436.45) in an escrow account. Defendants' customers may seek refunds directly from the FTC. Funds must be returned to Defendants, less the FTC's costs to administer the refund process, if they remain unclaimed 120 days after consumers are notified. *See QYK Brands*, 2022 WL 1090257, at *9 (implementing similar plan under similar circumstances); *Am. Screening*, 2022 WL 2752750, at *12 (same); *Figgie*, 994 F.2d at 605 (same).

### V. CONCLUSION

*11 36. In sum, the Court concludes that injunctive relief is appropriate, and that the FTC is entitled to an award of total relief in the amount of $37,549,472.14.

37. The FTC's Motion in Limine (ECF No. 140) is **DENIED AS MOOT**.

38. The FTC is **ORDERED** to file a revised proposed judgment consistent with this order no later than **Wednesday, March 27, 2024**.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 1237047

---

End of Document © 2024 Thomson Reuters. No claim to original U.S. Government Works.