## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> MATCH GROUP, INC., a corporation, MATCH GROUP, LLC, formerly known as MATCH.COM, LLC, a limited liability company, <br><br> Defendants. | Case No. 3:19-cv-02281-K |

## PLAINTIFF FEDERAL TRADE COMMISSION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Federal Rule of Civil Procedure 52, Local Civil Rule 52.1, and the Court's scheduling order (Doc. 178), Plaintiff Federal Trade Commission ("FTC") respectfully submits the following Proposed Findings of Fact and Conclusions of Law. Any finding of fact that is more appropriately considered a conclusion of law, or vice versa, should be treated as such.

## I.      PROPOSED GENERAL FINDINGS OF FACT

### A.  The Parties

1.      The FTC is an agency of the United States government created by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 41 *et seq.*

2.      The FTC enforces Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits unfair or deceptive acts or practices in or affecting commerce.

3.      The FTC also enforces the Restore Online Shoppers Confidence Act ("ROSCA"), 15 U.S.C. § 8401 *et seq.*, which establishes certain requirements for negative option marketing on the Internet.

4.      Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC, through its own attorneys, to enjoin violations of the FTC Act as well as other statutes enforced by the FTC, including ROSCA.

5.      Defendant Match Group, Inc. ("MGI") is a Delaware corporation with its principal place of business in Dallas, Texas.

6.      MGI is a publicly traded company.

7.      Defendant Match Group LLC, formerly known as Match.com LLC and now renamed as Tinder LLC ("MGLLC"), is a Delaware limited liability corporation with its principal place of business in Dallas, Texas. (PLT 380, at pg.6; PLT 122, at pg.6; PLT 16, at pg.6).  As of June 1, 2024, MGLLC had officially changed its name to Tinder LLC.  (PLT 419).

8.      MGI is the parent corporation and sole member of MGLLC. (PLT 237, at pg.1; PLT 234, at pg.1; PLT 235, at pg.1, PLT 236, at pg.1)

9.      MGLLC is a wholly owned subsidiary of MGI. (PLT 371, at pg.3, PLT 370, at pg. 3, PLT 379, at pg.19).

10.     MGLLC operated "Match.com," an online dating platform, as well as other similar online dating platforms, from at least 2016 until 2023.

**B.  Match.com's business model**

11.     Match.com is an online dating platform that advertises its services throughout the United States via online and television advertisements and other means.

12.     Match.com has customers throughout the United States.

13.     Customers can use the Match platform to search for and communicate with potential romantic partners.

14.     Match.com offers a free-trial subscription as well as paid subscriptions of varying lengths.

15.     Subscribers may sign up for Match.com's services online.

16.     The majority of Match.com subscriptions renew automatically at the expiration of the subscription term unless subscribers take affirmative steps to cancel.

## II.    PROPOSED GENERAL CONCLUSIONS OF LAW

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

18.     This Court has personal jurisdiction over Defendants.

19.     Venue in the United States District Court for the Northern District of Texas is proper pursuant to 15 U.S.C. § 53(b) and 28 U.S.C. § 1391(b)(1), (b)(2), and (c)(2).

20.     Defendants' activities are in or affecting commerce as "commerce" is defined in Section 4 of the FTC Act, 15 US.C. § 44.

## III.     PROPOSED FINDINGS OF FACT – COUNT III

### A.  The Match Guarantee

21.     Between 2005 and April 2019 (Deposition of Dushyant Saraph (4/6/23), at 14:13-21; PLT 381, at pg. 19), Match.com used a promotion called the "Six Month Guarantee," "Make Love Happen Guarantee," "Match Guarantee," or simply, "the Guarantee" (collectively, hereinafter, the "Guarantee") to market its online dating services. (PLT 375; PLT 89).

22.     The Guarantee promised that customers who signed up for a six-month subscription but did not "meet someone special" in the first six months would receive an additional six months for free (termed a "Guarantee Extension" on Match.com). (PLT 4, at pg.1; PLT 300, at 0:21).

23.     Match.com prominently advertised the Guarantee through various mediums.

24.     Match.com advertised the Guarantee on its website, including on the "rate cards" (online subscription package menus) consumers must use to purchase a subscription on Match.com:



PLT 6, at pg.1.

25.    There was little variation in the rate cards over time, other than changes to the price and discount percentages. (Deposition of Dushyant Saraph (4/6/23), at 25:6-17, 20-23, 25).

26.    Match.com also promoted the Guarantee through third-party sites, the radio, a television campaign, and sponsored search engine results. (PLT 15, at pg. 1; PLT 377; PLT 89).

27.    Through all of these methods, Match.com consistently promised it would provide an additional six months for free to consumers who did not meet a romantic partner during their initial six months, presenting the Guarantee as a simple satisfaction guarantee.

28.    Match.com's sponsored search results on Google.com stated "It Works So Well— We Guarantee It" and further referred to the "I Met Someone Guarantee," stating "We Believe You Will Find Someone Special at Match!" (PLT 15).

29.    Match.com's television ads invited consumers to "Join Match and sign up for the 'I met someone guarantee.'" (PLT 300; PLT 301; PLT 302).

4

30.     Though the television ads made a vague reference to "terms and conditions," the reference was mentioned only in fine print that appeared momentarily at the bottom of the screen. (PLT 300 at :21; PLT 301; PLT 302 at :20)

**B. Disclosure of the Match Guarantee conditions**

31.      In reality, the Guarantee had several conditions, which were inadequately disclosed.

32.     Potential customers could discover these conditions only by going to a "Program Rules Page" or manually searching for information on Match.com's support page. (Deposition of Dushyant Saraph (4/6/23), at 70:15-23).

33.     Going to the "Program Rules Page" or manually searching for information on Match.com's support page required leaving the subscription purchase flow to visit separate web pages.

34.     The requirements for the Guarantee, as stated on the Program Rules page, included the following:

a.  Create a profile with a "primary photo," which had to be approved by Match.com, within the first seven days of the beginning of the subscription. Customers had to keep the profile and photo visible at all times during the subscription period;

b.  Send a "qualifying email" to a minimum of five other unique Match.com subscribers (meaning subscribers with whom the customer had not previously communicated) each month during the subscription period; and

c.  Access a "Guarantee Program Progress Page" and affirm that the customer had not met "someone special" and was therefore eligible for a free extension. This affirmation had to occur within the last seven days of the subscription.

5

(PLT 6).

35.     The terms of the Guarantee and the Program Rules Page were consistent from at least 2013 through 2019. (PLT 377 n.10; Deposition of Dushyant Saraph (4/6/23), at 44:25-45:6).

36.     To get to the Program Rules Page from the purchase flow to view these requirements before purchasing a subscription, consumers had to hover their cursor over the "match GUARANTEE" logo on the Match.com rate card, which displayed the prices for Match.com's various subscriptions. (PLT 6).

37.     This would cause a text box to appear:



38.     The text box did not disclose all of the requirements of the Guarantee; a consumer had to click "Learn More" to access additional information on a separate webpage.

39.     Alternatively, a consumer would have had to locate the Match Frequently Asked Questions (FAQ) page and then search for information about the Guarantee (Deposition of Dushyant Saraph (4/6/2023), at 74:13-76:20; PLT 377) or search for the Program Rules page on Match.com. (Deposition of Dushyant Saraph (4/6/2023), at 39:11-40:15).

40.     Locating the FAQs or the Program Rules page on Match.com would have required leaving the purchase flow.

41.     Clicking the "Learn More" hyperlink would take the consumer to the Program Rules Page. (PLT 6, PLT 377).

42.     The Program Rules page presented a graphic at the top which purported to summarize two of the Guarantee's requirements—the requirement of a truthful profile with a visible primary photo and the requirement to initiate email communication with at least 5 unique Match.com customers each month:



PLT 6.

43.      To see the full specifications for these requirements, or to see additional requirements, consumers had to scroll down to an imposing block of fine print text that described the Guarantee's eligibility rules in greater detail and included additional requirements. (PLT 6).

44.     The fine print text page began with six numbered requirements that describe some—but not all—of the requirements to qualify.

45.     The numbered requirements were followed by several bullets of additional limitations.

46.     Instructions for redemption of the Guarantee Extension were provided only below the six numbered requirements.

47.     As Match.com personnel themselves noted, "reading the 6MG rules page feels like reading fine print (hard to read)." (PLT 265).

48.     The fine print text appeared as follows:

**I Met Someone GUARANTEE (formerly "Make Love Happen Guarantee") Program Rules**

We know you'll meet tons of great people during your 6-month subscription with us. But, if you don't find someone special during that time, we'll give you an ADDITIONAL 6 months to continue your search. Check out the rules below, then get out there and start connecting today!

- Under the I Met Someone GUARANTEE Program, (the "Guarantee Program" or the "Program") if you don't find someone special during a qualifying six-month paid subscription to the Match.com service, we'll give you an additional six-month subscription (the "Guarantee Extension") to the Match.com service at no additional expense. See Match.com Terms of Use for details regarding the Match.com service and use of the Match.com website.
- The Guarantee Program is available for a limited time only, and open to anyone not currently participating in the Program. Additionally, to be eligible for the Program and the Guarantee Extension, you must:
- (1) Comply at all times with the Match.com Terms of Use. By using the Match.com website and participating in the Program, you agree to be bound by the Match.com Terms of Use.
- (2) Pay in full the applicable rate for a **six-month subscription** to the Match.com service (the "Guarantee Program Subscription"). The Guarantee Program Subscription consists of five consecutive 30-day periods followed by a final period of 33 days, all of which are referred to as a "Month" in these Program rules. If you are enjoying the benefits of a free trial of the Match.com service, your Guarantee Program Subscription will not begin until your free trial period ends.
- (3) Use your Guarantee Program Subscription to **create a profile with a primary photo**. Your profile and primary photo must be approved by Match.com within the first seven days of your Guarantee Program Subscription in order for you to be eligible for the Guarantee Program. Details on approval of profile and primary photo available at FAQ and How it Works.
- (4) **Keep your profile** with primary photo visible at all times during your Guarantee Program Subscription.
- (5) **Communicate** during your Guarantee Program Subscription with other Match.com subscribers with whom you have not previously communicated during your Guarantee Program Subscription ("Unique Match.com Subscribers").
- (6) Send a **"Qualifying Email"** to a minimum of five other Match.com Subscribers each Month during your Guarantee Program Subscription. A "Qualifying Email" may be either one you send to a Unique Match.com Subscriber who has not yet emailed you or an email response you send to a Unique Match.com Subscriber who has emailed you. A "Qualifying Email" must be an email sent through the Match.com service and does not include any other method of communicating (such as Match.com winks, MatchPhone™, Match.com Instant Messaging or emails sent outside of the Match.com system).
- Progress toward eligibility for the Guarantee Extension may be determined at any time during a Guarantee Program Subscription by visiting the progress page associated with such Guarantee Program Subscription (the "Guarantee Program Progress Page"). If, during the last seven days of a Guarantee Program Subscription, you are eligible for a Guarantee Extension (and have not met that "special someone"), you may accept the Guarantee Extension by affirming on the Guarantee Program Progress Page that you have not met someone special during your Guarantee Program Subscription. Please see the Match.com Guarantee FAQ for further information. You may also contact Customer Care with any questions related to the Match.com service or the Program. Match.com alone will make all decisions under these Program rules regarding Program policies, including but not limited to Program and Guarantee Extension eligibility.
- Customers eligible to receive a Guarantee Extension will not receive a refund, money or any other thing of value as a substitute for the Guarantee Extension. The Guarantee Extension may only be used by the purchaser of the Guarantee Program Subscription, and the Guarantee Extension may not be sold or transferred in any way.
- Guarantee Program Subscriptions which do not result in a Guarantee Extension (due to ineligibility of the subscriber or failure of the subscriber to accept the Guarantee Extension) will automatically be continued for successive six-month subscription periods at the subscription rate in effect at the time of continuation. See Match.com Terms of Use for details regarding Match.com subscriptions and charges on your billing account.
- The Match.com Terms of Use and the Match.com Guarantee Program Rules are subject to change by Match.com at any time, effective upon posting on the Match.com website, and your use of the Match.com service and your initial or continued participation in the Match.com Guarantee Program after such posting will constitute acceptance by you of such changes. Match.com reserves all rights to modify, suspend or cancel the Program at any time and without notice.
- Program rules last updated January 24th, 2008.

(PLT 6).

49.     Few consumers viewed the Guarantee's requirements. Match employees pulled data from November 2013 to analyze the functionality of the Guarantee. The data showed that,

for that month, of the 24,806 six-month plan subscribers who logged in to Match.com, only 3,271 viewed "Any Guarantee Page." (PLT 53).

50.     Not only were the Guarantee requirements hard to locate, they were burdensome and nonintuitive.

51.     Customers were required to email five subscribers who they had never communicated with each month. For purposes of this requirement, months were calculated not based on the calendar month but rather starting on the date the subscription was purchased. (Deposition of Dushyant Saraph (4/6/23), at 58:10-59:3).

52.     Match strictly enforced the requirement that users keep their profile photo up at all times for the entire six months; users who removed their profile photo at any point, even momentarily, was automatically disqualified. (PLT 6; PLT 67; Deposition of Michele Watson (2/10/23), at 49:18-50:6; Deposition of Dushyant Saraph (4/6/23), at 49:14-19).

53.     Further, the profile and primary photo had to be submitted and approved within the first seven days of the subscription. (PLT 6).

54.     To assess their progress toward a Guarantee Extension, consumers needed to visit the Guarantee Program Progress Page. (PLT 382, at pg.34-35; PLT 6).

55.     Match.com buried the existence and purpose of this Progress Page in one of the many bullets on its Program Rules Page that follow the six numbered requirements and among several paragraphs regarding the Guarantee on their customer support search page. (PLT 6).

56.     Although the Progress Page could also be accessed by clicking the green "Guarantee" hyperlink in the footer on Match.com, the purpose of this hyperlink was disclosed only on the Program Rules Page or through the search function on the customer support page. (Deposition of Dushyant Saraph (4/6/23), at 75:3-76:20, PLT 299).

57.     The Progress Page was unavailable on mobile browser for much of the time Match.com offered the Guarantee. (Deposition of Dushyant Saraph (4/6/2023), at 288:15-23).

58.     If consumers managed to complete the Guarantee's onerous conditions, Defendants did not provide those consumers the Guarantee Extension automatically. Rather, Match.com required that those consumers apply for the Guarantee Extension during the last seven days of their subscription. To do so, consumers had to find and successfully navigate an inconspicuous "redemption flow." (PLT 378 at pg. 9).

59.     The link to the redemption flow appeared only on the Guarantee Progress Page and only during this limited redemption window. (PLT 6 at pg. 11, PLT 299).

60.     Even if a customer found the redemption flow during this limited window, the flow itself was confusing.

61.     The redemption flow began with a misleading question, asking whether customers had "met someone" on the site—as opposed to whether they "met someone *special*," which was how the Guarantee was elsewhere described and advertised. (PLT 6 at pg. 14, PLT 18 at pg. 70). Consumers therefore might answer "yes" when they had not found a romantic partner.

62.     If the customer answered that they had met someone, they were disqualified from receiving the Guarantee Extension.

63.     Match.com's Customer Care personnel noted that this question in the flow was "obviously misunderstood" and "misinterpreted" by customers. (PLT 36 at pg. 3; PLT 61; Deposition of Michele Watson (2/10/23), at 68:8-15).

64.     If the customer stated that they had not met someone, they were then asked a second question that inquired whether they would like the Guarantee Extension.

65.    Yet if the subscriber stated they did *not* want the free service, their subscription was not canceled. Instead, the consumer would just be charged for a renewal of the six-month subscription. (PLT 17 at pg. 65-67).

66.    Many customers who managed to meet all of the conditions *still* paid for an additional subscription despite having earned a free one.

67.    Company data for the month of November 2013 shows that 1,458 users met the Guarantee's inadequately disclosed requirements that month and also viewed the Guarantee Progress Page. Of these consumers, 1,190 paid for a subscription renewal despite being eligible to receive it for free. (PLT 52).

68.    According to one set of data provided by Defendants, between 2013 and 2019, 2,257,947 customers purchased a plan offering the Guarantee. Of those, only 167,476 customers satisfied the undisclosed requirements and, of those, only 67,789 "took the free time." (PLT 297). *See also* Deposition of Dushyant Saraph (4/6/23), at 317:23-318:20 ("I think, as a percentage of the users that met the guarantee eligibility requirements, what we saw today was somewhere between 25 and 50 percent of users extend their free time.").

69.    According to a different set of data provided by Defendants, between 2013 and the first half of 2017, of 2,717,793 consumers who purchased a subscription that was subject to the Guarantee, only 33,987 consumers actually received a Guarantee Extension and redeemed it. (PLT 376 at pg. 7) (response to Interrogatory No. 8).

70.    Beth Wilson, Match.com's Vice President of Product, noted in 2013 that it was "pretty sad to see how few people actually qualify at the end of their term." (PLT 52).

71.    If a customer failed to complete the flow during the seven-day window, they would need to contact the Customer Care department to request the free extension. However,

11

customers had a limited time period to avail themselves of this option. Customers had only 30 days to contact Match.com Customer Care to request the free extension, with some possible limited exceptions. (PLT 378 at pg. 9; (Deposition of Michele Watson (2/10/23), at 41:18-42:5). This 30-day window to contact Customer Care was not disclosed anywhere on the Match.com website.

72.    Match.com's policy was to enforce the Guarantee requirements strictly.

73.    While for some periods of time Match.com would sometimes provide customers the Guarantee Extension even though they had missed a requirement for a month, Match eventually adopted a strict no refund policy, other than for members who had missed the seven-day window for redemption. (PLT 17 at pg. 69) (In Match training manual: "If the member missed a requirement no exception will be made."); PLT 256; PLT 52; PLT 384 at pg. 51).

**C.  Consumer complaints about the Match Guarantee.**

74.    Match.com frequently received complaints from consumers about the Guarantee.

75.    Consumers lodged these complaints with third parties, such as the Better Business Bureau ("BBB"), and the company itself.

76.    In 2013, Beth Wilson observed that the Guarantee was "old and clunky" and "receives a ton of customer complaints." (PLT 53 at pg. 2).

77.    A Match employee also noted that "Guarantee Redemption" was the third most common complaint received in April 2013, with 33% of those complaints specifically relating to the redemption process. (PLT 46 at pg. 2).

78.    Other documents such as PLT 159, PLT 163, PLT 179, PLT 257, at pg. 3, PLT 283, and PLT 92 confirm that the Guarantee and its redemption process were top complaint generators for the platform.

79.     Consumers complained that they were not aware of the requirements. *See e.g.* PLT 349; 347; 343; 350; 340 (BBB complaints); PLT 216 (database of internal complaints).

80.     Consumers also complained that they did not understand the redemption process. *See, e.g.,* PLT 346; 341; 342; 344.

81.     Customers even complained directly to Defendants' top-level executives about their trouble qualifying for and claiming the Guarantee Extension. For example, a customer complained directly to MGI CEO Greg Blatt about not being aware of the Guarantee's email requirement. PLT 162; *see also* PLT 212 at pg. 2-3.

**D.  Employee concerns about the Match Guarantee.**

82.     Match employees also acknowledged specific problems with the Guarantee's requirements and its redemption process.

83.     In 2013, Match executive Michele Watson observed that "we need to fix the tracker [Guarantee Progress Page] display on the site. It's very poorly placed and the redemption flow is very poor as well. Members miss the opportunity to redeem, even if they're eligible and end up having to call Care." (PLT 103).

84.     The same executive stated in a separate email that there were "areas that I think need to be addressed" to "assist with the complaints members have about the [Guarantee] redemption process[.]" One area she specifically identified was that "[t]he portion of the site that shows the status throughout the guarantee period is not obvious – we'd recommend increasing the visibility." (PLT 61).

85.     Beth Wilson noted in 2013 that "Right now, the messaging and functionality for 6-mo [*i.e.*, the Six Month Guarantee] is quite poor." (PLT 53 at pg. 2).

13

86.     Also in 2013, a Customer Care director noted that some users were not aware of the requirements, or were unaware of their progress toward the requirements, or were unaware of or confused about how to redeem. (PLT 36 at pg. 2).

87.     In 2014, the same director noted that "the site redemption process really needs to be cleaned up because so many members don't understand how to get their 6 months free[.]" (PLT 257).

88.     This same director noted in a PowerPoint presentation that "the progress page is misleading" and that the current flow "causes confusion." (PLT 157 at pg. 60-65).

89.      In 2017, employees discussed "feedback observations" from consumers to the effect that the company needed to make it clearer that the Guarantee had requirements and consumers needed to take an extra step to redeem the Guarantee Extension. (PLT 161).

90.     Match employees made a number of suggestions concerning how to notify consumers of the Guarantee's requirements and make it easier to redeem the Guarantee Extension, including: (1) sending a welcome email at the beginning of the subscription to explain the requirements and email reminders to redeem (PLT 36 at pg. 2; PLT 157 at pg. 60-65); (2) clarifying the wording (PLT 61; PLT 36 at pg. 2); (3) "surface some of the important details in the fine print at the top of the [Guarantee Rules] page (PLT 265); (4) improving the visibility of the requirement tracking (PLT 61); and (5) improving the redemption flow (PLT 257; 50; 36 at pg. 4; 157 at pg. 60-65).

91.     None of these proposals were ever implemented.

92.     Though aware of these problems with the Guarantee since at least 2013, Match.com personnel never addressed them, in part because "the guarantee overhaul would be a huge project." (PLT 36 at pg. 4).

93.     In 2013, Beth Wilson expressed concerns about whether improving the "messaging and visibility" of the Guarantee would be "meaningfully negative from a revenue perspective." (PLT 53 at pg. 2).

94.     Also in 2013, Match.com tested an automated email to customers who qualified for the Guarantee notifying them that the Guarantee redemption flow was now accessible. (PLT 290).

95.     The test showed that the email reminder was effective; many consumers clicked on the email and redeemed the Guarantee. (PLT 291).

96.     Nevertheless, Match.com discontinued the test due because it resulted in "sub [*i.e.,* subscription] and revenue loss" and never implemented the change. (PLT 285 at pg. 3).

**E.  Match.com's long-standing offering and marketing of the Guarantee.**

97.     The Guarantee was an important incentive to consumers, inducing them to subscribe to Match.com, as illustrated by the fact that when Match.com employees tested removing the Guarantee, the results "negatively impacted package mix." (PLT 51). Match executive Michele Watson characterized the test as "a loser" and urged that the company to fix the progress tracker and redemption process. (PLT 103).

98.     Match.com continued the Guarantee until April 2019, well after it had received a Civil Investigative Demand from the FTC in March 2017 and shortly before the FTC filed this lawsuit in September 2019. *See* PLT 382 at pgs. 26-30, Response No. 9 (admitting that Match.com did not discontinue its Guarantee Program until April 2019); PLT 376 (March 2017 Civil Investigative Demand to Match Group, Inc. inquiring about the practices alleged in this action); Doc 1).

99.    Match.com had not decided to cease offering the Guarantee program before receiving the FTC's Civil Investigative Demand. (PLT 384 at pgs. 36-37, at Nos. 206, 207).

100.    While Defendants claim that they tested the results of dropping the Guarantee in April 2019 and found that it did not impact revenue, this testimony is not credible. It is contradicted by prior testing, and this new test, which occurred during the pendency of the FTC's investigation, occurred after nearly a decade and a half of marketing the Guarantee to consumers.

101.    Nothing would prevent Defendants from reinstituting the Guarantee Program or similar practices on Match.com or any of their other dating platforms. *See* Deposition of Dushyant Saraph (4/6/23), at 312:8-13 and 313:11-16 (MGLLC corporate representative acknowledges that, other than a proffered "stipulation," nothing would prevent Match.com from resuming the practices at issue in Counts III and IV).

## III.    PROPOSED CONCLUSIONS OF LAW – COUNT III

102.    An act or practice is deceptive under the FTC Act if, "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994);**Error! Bookmark not defined.** *see also United States v. Commer. Recovery Sys.*, 179 F. Supp. 3d 728, 734 (E.D. Tex. 2016).

103.    To show that a representation is likely to mislead consumers, the FTC need only prove that the representation had a "tendency to deceive." *Trans World Accts v. FTC*, 594 F.2d 212, 214 (5th Cir. 1979).

104.    If a representation is widely disseminated, the FTC is entitled to a presumption that all consumers who purchased the product relied on the representation. *See FTC v. Commerce*

16

*Planet, Inc.*, 815 F.3d 593, 604 (9th Cir. 2016) (citing *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605-606 (9th Cir. 1993)).

105.    Because Match.com widely disseminated representations about the Match Guarantee, the Court presumes that all consumers who purchased subscriptions that were subject to the Guarantee relied on representations about the Guarantee.

106.    In the context of a "guarantee," stating a guarantee or refund promise without clearly disclosing applicable preconditions or restrictions is a deceptive practice. *See FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1012 (N.D. Ind. 2000) (representation that defendants would provide a full unconditional guarantee, without providing disclosure of refund conditions, was deceptive); *FTC v. Cardiff*, No. 18-cv-2104, 2020 U.S. Dist. LEXIS 210930, at *247 (C.D. Cal. Oct. 9, 2020) (defendants' advertisement of "lifetime money-back guarantees" without disclosing refund polices and conditions was deceptive); *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 950 (N.D. Ill. 2006) (finding a guarantee offer deceptive in part because the 10-day guarantee offered on defendant's website differed from the 30-day guarantee advertised in an infomercial and was disclosed only behind a "click here for details" hyperlink); *see also FTC v. Febre*, No. 94 C 3625, 1996 U.S. Dist. LEXIS 9487, at *12-13 (N.D. Ill. July 2, 1996) (stating generally "[t]he failure to disclose material facts that could affect consumers' decisions, *i.e.*, the conditions for obtaining refunds, the conditions and costs associated with participating in a program and the true nature of the services or product offered, can be a deceptive practice").

### A.    Without adequate disclosures, Match.com's representations about the Guarantee conveyed that the only condition of the Guarantee was that the consumer had not met "someone special."

107.    When assessing the nature of a claim conveyed by an advertisement, courts are to consider the overall "net impression" of the representations. *See FTC v. E.M.A. Nationwide, Inc.*,

17

767 F.3d 611, 631 (6th Cir. 2014) (applying "net impression" analysis when assessing Defendants' representations that they were affiliated with consumers' creditors or the government); *FTC v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012) (upholding a finding that the use of an "ambiguous phrase" and failure to "clearly and conspicuously disclose a material attribute" of the defendant's online credit offering created a "net impression" that "misled consumers" and therefore violated a consent order with FTC); *Am. Home Prods. Corp. v. FTC*, 695 F.2d 681, 687 (3d Cir. 1982) (quoting *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976)) ("'[T]he tendency of the advertising to deceive must be judged by viewing it as a whole' . . . . The impression created by the advertising, not its literal truth or falsity, is the desideratum.").

108.    The Court concludes that because Match.com did not adequately disclose the terms of the Guarantee, it represented to consumers that the Guarantee was a simple guarantee with only one condition—meeting "someone special."

109.    Consumers could reasonably interpret these representations to mean that Match.com would provide them an additional six months if they did not succeed in finding a romantic partner on their website during their initial six-month subscription.

110.    The truth, however, was that Match.com imposed several important restrictions on users' ability to qualify for and redeem the Guarantee.

111.    Accordingly, without adequate disclosure of the conditions of the Guarantee, the representations concerning the Guarantee were deceptive.

**B.  Match.com failed to disclose adequately the conditions of the Match Guarantee.**

112.    Match.com did not adequately disclose the restrictions on the Guarantee. Consumers could navigate through the purchase of the membership without viewing these restrictions on the Match Guarantee.

113.    Even true disclosures may not be effective to remedy a deceptive claim if the disclosures are hidden in fine print or on separate webpages. *See e.g. FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200-1201 (9th Cir. 2006) (fine print disclosure on back of "invoice" clarifying that consumers who deposited check would constitute agreement to pay monthly fee for Internet did not correct net impression that check was a refund); *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 42-43 (D.C. Cir. 1985) (affirming a ruling that an ad is deceptive despite "fine print in the corner of the advertisement truthfully explain[ing]" and clarifying more prominent representations because consumers would be unlikely to read the disclosure); *Independent Directory Corp. v. FTC*, 188 F.2d 468 (2d Cir. 1951) (affirming the Commission's order, which found a solicitation deceptive despite fine-print disclosure); *Floersheim v. FTC*, 411 F.2d 874, 877-878 (9th Cir. 1969) (finding a solicitation created the deceptive impression that it was from the government because of the repetition of the words "Washington D.C." even though the forms contained a small-print disclaimer informing recipients that such was not the case); *see also FTC v. QT, Inc.*, 448 F. Supp. 2d at 950 (discussed *supra*).

114.    Match.com's "Learn More" hyperlink took consumers to a page with information that was an essential part of the claim itself.

115.    While the conditions of the Guarantee were complex and a full recitation may have cluttered the advertisement, Match.com could have included summaries of the requirements

that would have clarified that the Guarantee had more conditions than simply not meeting someone "special."

116.    Instead, Match.com put all of the key terms behind a hyperlink on a separate webpage outside of the purchase flow and said nothing in the main purchase flow that would have alerted consumers of the existence of any requirements.

117.    Further, the "Learn More" verbiage failed to convey the importance, nature, and relevance of the information it led to or inform consumers that it led to a disclosure or additional terms.

118.    Match.com's Program Rules Page also failed to make scrolling unnecessary to find the disclosure and contained no cues to encourage consumers to scroll through the disclosure.

119.    Nor was the disclosure placed close to the central claim.

120.    Instead, Defendants simply referred the consumers somewhere else to learn important information about the Guarantee.

121.    The Court concludes, based on its own review of the representations and disclosures, that the disclosures were not sufficient to correct the false impression that the Guarantee had only one condition—meeting someone "special." The Guarantee advertising created the false impression that Mach users who did not meet someone "special" would get six free months.

122.    Because the advertisements explicitly stated, or at a minimum, conspicuously implied a simple guarantee, extrinsic evidence as to consumers' impressions is not necessary. *FTC v. Nat. Urological Grp*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008) (observing that if an advertisement "explicitly states or clearly and conspicuously implies a claim, the court need not

look to extrinsic evidence to ascertain whether the advertisement made the claim"); *see also FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1068 (C.D. Cal. 2012), *affirmed in part*, *vacated in part and remanded on other grounds*, 815 F.3d 593 (9th Cir. 2016) (noting that a "facial examination" "sufficiently demonstrate[d]" that the marketing was misleading to a reasonable consumer, but also discussing extrinsic evidence).

123.    Nevertheless, this conclusion is supported by extrinsic information. The company's own data shows that many consumers never viewed the disclosure pages.

124.    The company's data further shows that only a small minority of consumers who were eligible for the Guarantee actually redeemed it.

125.    Further, as described by consumers themselves as well as Match.com's own employees, consumers frequently complained that they were not aware of the requirements.

126.    The Court therefore concludes, in light of the inadequate disclosures, that Match.com's representations concerning the Guarantee were likely to mislead consumers acting reasonably.

127.    The Court further concludes that the fact that Match.com was providing refunds during certain periods of time under certain circumstances does not constitute a defense to violations of the FTC Act. *See Montgomery Ward & Co. v. FTC*, 379 F.2d 666 (7th Cir. 1967) (holding that a company's general policy of a money-back guarantee is not a defense to deceptive advertising, because such a defense would "make the false advertising prohibitions of the Act a nullity. Anything might then be advertised as long as unsatisfied customers were returned their money").

### C. Match.com's representations concerning the Match Guarantee were material.

128.    A representation is material if is "likely to affect the consumer's conduct or decision with regard to a product or service." *In re Cliffdale and Assocs., Inc.*, 103 F.T.C. 110 (1984); *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 299 (D. Mass. 2008). Express claims are presumed material. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994). Similarly, "deliberately-made implied claims, used to induce the purchase of a particular product" are material. *FTC v. Windward Mktg.*, No. 1:96-CV-615-FMH, 1997 U.S. Dist. LEXIS 17114, at *28 (N.D. Ga. Sept. 30, 1997). And "any representations concerning the price of a product or service are presumptively material." *Id.*

129.    Match.com's Guarantee claims were express or, at a minimum, deliberately implied. They also concerned price, specifically whether consumers would receive six months of free service or be charged as much as $127 for that service. Further, Match.com's testing of the Guarantee, which found that dropping it "negatively affected package mix" and was "a loser," provides additional evidence that the Guarantee was material to consumers' purchasing decisions. Accordingly, the Court concludes that the Guarantee claim was material to consumers' decision to purchase the subscription.

### D. Match.com's representations regarding the Guarantee violated the FTC Act.

130.  Since Defendants' representations concerning the Guarantee were deceptive and material to consumers, they violated 15 U.S.C. § 45(a).

## IV.    PROPOSED FINDINGS OF FACT – COUNT IV

131.    Match.com customers filed hundreds of thousands of credit card disputes or "chargebacks" against the Company. (PLT 303).

132.    According to Defendants' internal analysis, the majority of these chargebacks were related to unwanted autorenewals and only a small number were related to fraud. (PLT 59 at pg. 2, PLT 106 at pgs. 2, 9, 10).

133.    Defendants had a practice of disputing all Match.com chargebacks regardless of their merit. (PLT 255 at pg. 2; PLT 267; Deposition of Dushyant Saraph (4/6/23), at 218:13-219:3; PLT 39; PLT 239 at pg. 34).

134.    Match.com lost most chargebacks (PLT 303) but prevailed on some, and when Match.com prevailed, the customer had to pay the charges.

135.    Match.com adopted a policy that automatically suspended customers' account access if they sought chargebacks.

136.    If customers lost the dispute and had their chargeback reversed, Match.com did not automatically restore the customer's account access. (PLT 70 at pg. 2; PLT 378 at pg. 13; PLT 377 at pg. 7; PLT 381 at pg. 37-38; Deposition of Dushyant Saraph (4/6/23), at 205:15-207:25). Defendants thereby kept customers' money but did not provide the account access that consumers had paid for.

137.    This policy was in place from at least 2013 until April 2019, when Match.com changed the policy to automatically reinstate customer access in response to the FTC's investigation and impending lawsuit concerning these practices. (PLT 70 at pg. 2; PLT 378 at pg. 13; Deposition of Dushyant Saraph (4/6/23), at 209:3-22; PLT 381 at pg. 21). *See also* PLT 322 (FTC provides draft complaint to counsel for Defendants in October 2018).

138.    Other dating platforms owned or controlled by MGI had similar chargeback policies. (PLT 26 (PlentyOfFish); PLT 267 (Chemistry.com)).

139.    Match.com buried this policy deep within its Terms of Use, where it stated that if Match.com "successfully disputes the reversal [of charges], and the reversed funds are returned, you are not entitled to a refund or to have your account or subscription reinstated." (PLT 7 at pg. 5; PLT 9 at pg. 9; PLT 10 at pg. 3; PLT 11 at pg. 3; PLT 12 at pg. 3; PLT 54).

140.    Defendants contend that the intent of the policy was to protect the online dating ecosystem by removing users who did not want to be on the platform. However, an email by Match's "Director of Financial Systems" suggests that the true purpose of the policy was to punish users who had initiated chargebacks.[1]

141.    Defendants have contended that they restored access to the few consumers who knew to request it. Few customers did; the Court notes that Match.com's Terms of Use explicitly stated that consumers were not entitled to have their accounts reinstated if they lost a chargeback dispute. (PLT 7 at pg. 5; PLT 9 at pg. 9; PLT 10 at pg. 3; PLT 11 at pg. 3; PLT 12 at pg. 3; PLT 54).

142.    Even in the limited circumstances where Match.com reinstated an account for customers who had their chargeback reversed, the Company's policy was merely to credit any remaining time, not past time. (PLT 30; PLT 260 at pg. 2; PLT 268 at pg. 2; PLT 239 at pg. 34; PLT 240 at pg. 38; PLT 241 at pg. 38).

143.    Accordingly, Match.com often did not compensate customers for the 60-day period during which their chargeback dispute was pending and during which their account was suspended, but instead made consumers forfeit this time.

---

[1] *See* PLT 288 at pg. 3 ("It seems to me that the member tried to abuse the system and get our services for free, and HER bank stopped her from doing so. We incurred a chargeback fee, the chargeback affected our threshold calculation, and we had to expend resources to gather necessary documentation to dispute the chargeback . . . In my opinion, we should limit access to these folks who are trying to abuse the system in this manner. While there may be some rare instances, where we could permit further access, it would have to be assessed on a case-by-case basis.").

144.    In 2013, a Match.com executive expressed concerns about the effect of the policy on customers:

> Will you please give me some background on where the new dispute of chargeback process is coming from? It seems to me that (on Match), if we win the dispute, the system should automatically unblock the member's account and send them an email based upon the funds being released. It will make it a much smoother process for our members if we can just tell them that as soon as the funds are released back to Match.com, they will receive an email and their accounts will be visible. I don't want to ask them to continue to contact us to find out.

(PLT 70 at pg. 2). *See also* Deposition of Michele Watson (2/10/23) at 127:23-129:23 (same executive had concerns about the policy and expressed those concerns to others in the company).

145.    Defendants' data shows that between 2013 and 2018, Match.com automatically suspended upon chargeback 55,296 accounts for which it ultimately prevailed in the chargeback.

146.     Of these, Match.com eventually reinstated only 2,036 accounts, or 3.7 percent. (PLT 303).

147.    Additionally, internal analysis showed that approximately 60 percent of chargebacks occurred within one month of the disputed charge and 82 percent of chargebacks occur within the first two months of the charge. (PLT 100 at pg. 2.)

148.    Thus, it is likely that many consumers had substantial time remaining on their memberships when Match.com suspended their pre-paid access.

149.    Nothing prevents Defendants from reinstituting the chargeback policy. *See* Deposition of Dushyant Saraph (4/6/23), at 312:8-13 and 313:11-16.

## V.    PROPOSED CONCLUSIONS OF LAW – COUNT IV

150.    In addition to prohibiting deception, the FTC Act prohibits "unfair" practices. *See* 15 U.S.C. § 45(a).

151.    Congress intentionally made unfairness a "flexible concept with evolving content[—]one whose development was intentionally left to the Commission." *See FTC v. Walmart Inc.*, No. 22-cv-3372, 2023 U.S. Dist. LEXIS 51445, *35-36 (N.D. Ill., Mar. 27, 2023).

152.    An act or practice is "unfair" under the FTC Act if it (1) causes or is likely to cause substantial injury to consumers (2) that consumers could not reasonably avoid and (3) the injury is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

153.    Consumers have a legal right to dispute charges with their financial institution if they believe those charges are unauthorized or fraudulent.  *See* 15 U.S.C. § 1666, *et seq* (establishing a right for consumers to dispute charges, including billing errors, unauthorized transactions, defective or missing goods, or fraudulent charges).

### A.  Match.com's chargeback policy caused substantial injury to consumers.

154.    Match.com's chargeback policy was likely to cause and did cause substantial injury to consumers. The company caused this injury by keeping its customers' money but then barring them from accessing the services they had already paid for.

155.    While the company claims to have been willing to reinstate these accounts upon request, it did not restore access for over 96 percent of these consumers during the time period the policy was in place.

156.    Even if more consumers had requested and received restored access, this practice would still have caused substantial injury. For consumers who had their account access restored, Match.com did not provide credit for the 60-day period that consumers' accounts were suspended while the dispute was pending, costing them a portion of their membership.

157.    Moreover, while some consumers may have eventually convinced Match.com to restore their paid-for access, this does not change the fact that the injury has already occurred.

**B.  Consumers could not reasonably avoid the injury.**

158.    Consumers could not reasonably avoid the harm caused by Match.com's chargeback policy.

159.    Harm is avoidable only "[i]f consumers had a free and informed choice in the matter. . . ." *Walmart, Inc.*, 2023 U.S. Dist. LEXIS 51445 at *46 (citing 1980 FTC Unfairness Policy Statement); *see also Orkin Exterminating Co., Inc.* v. FTC, 849 F.2d 1354, 1365 (11th Cir. 1988) (quoting *FTC v. Orkin Exterminating Co.*, 108 F.T.C. 263, 1986 WL 722153, at *8 (1986)) ("Consumers may act to avoid injury before it occurs if they have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end.").

160.    Match.com's customers had no "free and informed choice" because Match.com did not adequately disclose its policy. Instead, Match.com buried its chargeback policy in its Terms of Use and disclosed it nowhere else. There was no reason for consumers to scour Match's fine print when they were merely exercising their right to seek chargebacks.

161.    Defendants have contended that users could have avoided the harm by not submitting "fraudulent chargebacks." However, most users submitted chargebacks because of unexpected autorenewals, not because of an intent to defraud the company. Defendants' own employees concluded that issues with autorenewal, not fraud, were the main drivers of chargebacks. Consumers were reasonably entitled to exercise their chargeback rights under those circumstances, and, if they lost, they were entitled to access the services for which they paid.

162.    Defendants have further contended that users could have avoided the harm by contacting Match.com's Customer Care department. However, contacting the Customer Care department would not avoid the harm of being locked out of a paid-for account.  Rather, contacting Customer Care would, at most, partly remedy that harm. Moreover, Defendants did not tell consumers they could get their accounts reinstated by contacting Customer Care, and in fact Defendants' Terms of Use stated that consumers were not entitled to have their accounts reinstated if they lost a chargeback dispute.

**C. The harm to consumers was not outweighed by benefits to consumers or competition.**

163.    The injury to consumers caused by Match.com's chargeback policy was not outweighed by countervailing benefits to consumers or competition. Consumers received no benefit from being denied services that they have paid for, nor is competition furthered by denying consumers paid-for services.

## VI.    PROPOSED FINDINGS OF FACT – COUNT V

**A. Match.com's cancellation mechanisms**

164.    In order to avoid being charged for an automatically renewing term, Match customers must take affirmative steps to cancel their subscriptions.

165.    Match.com's primary method for cancellation is an online "cancellation flow." Match directs its customers to use this cancellation method, and customers use this method the most. When contacted at its "Customer Care" department by chat, email, fax or mail with a request to cancel, Match accepts cancellation requests thought these channels. But Match has never told consumers that these are methods through which they could cancel.

166.    Match executives eliminated phone as a means to contact the Company in 2022 or 2023. (PLT 382 at pgs. 48-49, Second Amd. Response No. 15; PLT 305; Deposition of Dushyant Saraph (6/22/23), at 249:16-20.) Accordingly, customers can no longer cancel by phone.

167.    The website's FAQs and other aspects of the site that address cancellation direct consumers to cancel online. (PLT 306; PLT 307).

168.    While the Match.com website informs customers of how to contact Customer Care by email and chat (and previously, telephone), it does not state that customers could use these contact methods to cancel. (Deposition of Dushyant Saraph (6/22/23), at 210:4-20; PLT 305; PLT 306).

169.    Also, at times, Match personnel worked to make the Customer Care contact information less prominent on the website. (PLT 273).

170.    Match.com does not identify fax or mail as a means of cancellation on its website, outside of fine print in some versions of its Terms of Use. (Deposition of Dushyant Saraph (6/22/23), at 209:23-210:20).

171.    Company records show that the number of cancellations via the online cancellation flow dwarfed the number of cancellations by other methods. (PLT 232) (Phone cancellations for 2013 through October of 2022 totaled 15,914,587 versus 1,027,815 by telephone, the second most user-initiated method); *see also* Deposition of Michele Watson (2/10/23), at 151:22-152:15 (most common means of cancellation was online flow; cancellation by fax, mail, and chat were not common).

**B.  The online cancellation flow**

172.    Match.com's online cancellation flow has remained substantially similar between 2014 and the present with some notable exceptions discussed below.

173.    The cancellation process requires as many as eight steps.

174.    To begin the process, subscribers must first click a gear icon in the upper righthand corner of their home screen and select "settings" from the three options displayed on the dropdown menu. This takes users to their account settings page.

175.    The following is a screenshot of this step as it existed in a 2022 version of the flow:



PLT 228 at :15.

176.   Next, consumers must select the hyperlink labeled "Manage subscription," from the "Manage account" submenu.

177.    Neither the home screen nor the account settings page contains any reference to cancellation.

178.   The "Manage subscription" hyperlink takes users to a "password wall" screen that requires them to log in—even if they are already logged in. (Deposition of Dushyant Saraph (6/22/23), at 68:20-70:2).

179.   The password wall in recent versions of the flow displays as follows:



PLT 228 at :26.

180.   After users have re-entered their password and indicated that they are "not a robot," they must typically complete a "reCaptcha" test to confirm they are a human user. *See, e.g.*, PLT 132 at 0:10-0:22; Deposition of Dushyant Saraph (6/22/23), at 68:20-70:2.

181.    Next, users are presented with a page with two hyperlinks, one labeled "Subscription Status" and another "Cancel Subscription," followed by a more prominent blue button labeled "Back to home," which removes the user from the cancellation flow. (Deposition of Dushyant Saraph (6/22/23), at 70:3-7).

182.    Recent versions of this page appears as follows:



PLT 228 at :31.

183.    To continue, a user must select the second hyperlink labeled "Cancel Subscription."

184.    Users are then redirected to a screen with a survey question with the heading: "Before you go, help us make Match better." (Deposition of Dushyant Saraph (6/22/23), at 87:12-19).

185.    Recent versions of the "Before You Go" page appear as follows:



(PLT 228 at 0:34).

186.    One Match executive noted that "the 'Before you go' text is misleading since that would suggest that the cancellation process may be complete and the survey is optional." (PLT 143).

187.    Further, the Customer Care department believed "Before You Go" page might lead customers to think the cancellation process was finished when it was not and had received complaints from consumers concerning this issue. (Deposition of Kristina Auderer (11/18/22), at 95:1-23); *see also* PLT 83 at pg. 3 (noting that a complaining consumer "did hit the resign page but he didn't complete the survey. We've heard complaints about that before."); PLT 364 at pgs. 1-2).

188.    Contrary to the page heading's suggestion, the cancellation process is *not* complete upon viewing this page. If a user exits the flow at this point, their cancellation attempt will be ineffective—even though they had just clicked a prompt labeled "Cancel Subscription."

189.    In more recent versions of the flow, users do not have to answer the survey question in order to proceed with cancellation, but they must click past the survey to cancel. (Deposition of Dushyant Saraph (6/22/23), at 93:1-12).

190.    At times before 2019, the survey was mandatory. *See* PLT 319 (stating in 2019 that the "[s]urvey now optional during cancellation").

191.    However, if consumers do answer the survey question, depending on which answer they provide, an additional survey question may be appear.

192.     For example, at times, if a user clicked on "I can't afford a subscription," a question popped up that asked the user to select whether they could afford a subscription at a lower price or just "can't spend money on dating right now."



(PLT 227 at :32).

193.    At times, if a user selected "I met someone," the website asked whether the user

met the person on Match.com or elsewhere:



(PLT 225 at :27).

194.    If the user answered "on Match.com" a prompt appeared asking for the other

person's user ID.

195.    After the first survey page, many users are presented with a "save offer" page.

(Deposition of Dushyant Saraph (6/22/23), at 102:2-13; PLT 196 at pg. 16; PLT 228 at 0:39).

196.    This page offers a discounted renewal rate in attempt to dissuade the customer from cancelling. An example is shown below:



(PLT 228 at :39).

197.    After consumers click past the save offer, they are presented with another survey screen. At the bottom of the screen are two links, one that takes the consumer out of the cancellation flow and another that, at last, makes the cancellation attempt effective:



(PLT 228 at :44).

198.    In total, Match.com's cancellation process, from the home screen to completion, requires that a user navigate through as many as eight pages, as illustrated in the slide below from an internal PowerPoint (which does not include the retention offer or confirmation page):



(PLT 224).

**C.  The online flow is difficult to find.**

199.    Match.com's online desktop cancellation flow is difficult to find.

200.    A user looking for a way to cancel from the home page has to know to click on the gear icon on the home page and select "settings" from the dropdown menu.

201.    Alternatively, a user would have to search Match.com for relevant FAQs that would then provide a link to the cancellation flow.

202.    The FTC retained Dr. Jennifer King to examine Match.com's online cancellation flow. Dr. King has a Ph.D. in Information Management and Systems and extensive experience in

the field of Human-Computer Interaction, including research, publications, and litigation consulting.

203.    Dr. King is well qualified to serve as an expert witness in this matter, her methodology is reliable, and her findings are probative on the issue of whether Match.com's online cancellation flow constitutes a "simple mechanism."

204.    As noted by Dr. King, the term "settings" is ambiguous.

205.    Users must know to then select "manage subscription" and enter the password.

206.    In recent versions of the flow, these pages do not include any verbiage or graphics to let users know they are in the cancellation flow. Only after entering their password are users be presented with the "cancel subscription" option—several steps into the cancellation flow.

207.    Match.com made changes to the flow in 2019 that made it harder for users to find the flow and know that they were in it.

208.    Prior to 2019, the link on the account settings page that led to the cancellation flow was labeled "Change/Cancel subscription" and included accompanying text explaining the functions of that link. (PLT 134 at 0:14) (prior version of cancellation flow with 2019 copyright date).

209.    Around 2019, Match.com changed the label for the cancellation flow to "Manage/Cancel Subscription" for a short transitional period. Then, Match.com changed the label to the current verbiage of "Manage Subscription." (PLT 381 at pg. 46, n. 8; PLT 248; Deposition of Dushyant Saraph (6/22/23), at 30:10-17; PLT 202).

210.    Match.com also removed the text explaining that the link could be used to cancel. *Cf* PLT 134 at 0:15 (2019 version) *and* PLT 228 at 0:15 (most recent version). With these changes, the account settings page no longer included any reference to cancellation.

211.    Match.com also removed the "Change/Cancel Membership" verbiage from the heading of the account settings page, as well as the "breadcrumbs" (subnavigation links that show users where they are on the website) at the top of the page. *Cf.* PLT 134 at 0:15 (2019 version) *and* PLT 228 at 0:15 (most recent version).

212.    This change, as noted by Dr. King, made it more difficult for users to know where they were in the cancellation process—or whether they were in the cancellation flow at all.

**D.  The online flow is difficult to use.**

213.    Match.com's requirement that users enter their password to access the cancellation flow even if they were already logged in contributes to the difficulty of the cancellation flow.

214.    While Defendants contend that the password requirement is necessary to protect sensitive information or functions, the Court finds this argument not credible.

215.    Defendants could have easily uncoupled any sensitive information from the cancellation flow and protected that information with a password re-entry requirement.

216.     For example, while current versions of the flow have a function called "subscription status" behind the password wall with the cancellation flow, previously the website had a separate flow on the account settings page for "subscription status." (PLT 326 at pg. 33; PLT 206 at 1:09; *see also* PLT 384 at pg. 5).

217.    Any sensitive information within the "subscription status" flow could have been uncoupled from the cancellation flow and protected with a password.

218.    Further, for some period of time, the "subscription status" flow was not protected by a password re-entry requirement at all. (Deposition of Dushyant Saraph (6/22/23), 82:8-17; PLT 384 at pgs. 5-6, Response No. 165; PLT 13 at pg. 6).

219.    As long as users check a "Keep Me Signed In" box on a website, they remain logged in to their account until they manually sign out. (PLT 407). Users who are auto-logged in can perform many functions on the website, such as searching profiles, sending and replying to messages, and making certain profile changes without re-entering their password. (Deposition of Dushyant Saraph (6/22/23), at 18:2-19:8).

220.    The cancellation flow is not so sensitive that it requires a separate password wall. Adding it created the likelihood that consumers would have trouble with their passwords or have to go through a "forgot password" flow (e.g. consumer complaint, at PLT 368 at pgs. 1-2). This is made more likely by the fact that users are typically auto-logged in and rarely need their password.

221.    This problem is compounded by the fact that Match.com at various times had a "bad forgot password flow" (PLT 64) with occasional login and password reset glitches (PLT 201 at pg. 9; PLT 33 at pg. 4; PLT 250), which further complicated consumers' ability to log in and cancel their membership. *See also* PLT 317 at pg. 16 (in user sentiment survey presentation, bullet point that "Password reset does not work").

222.    The "Before You Go" verbiage users encounter after clicking on "cancel subscription" is confusing.

223.    The "Before You Go" verbiage tends to mislead users into misunderstanding that the cancellation process is complete when they arrive at that screen, particularly since they have just clicked "cancel subscription."

224.    The survey on the "Before You Go" page, which depending on input leads to follow-up questions, poses an unnecessary additional burden on users.

225.    Defendants could have asked the survey question post-cancellation.

226.    A former Match.com executive testified that her understanding was that the purpose of putting the survey before cancellation confirmation was so that Match.com would have a "captive audience." (Deposition of Michele Watson (2/10/23) at 184:16-185:15).

227.    While the survey is currently optional, it does not state that it is optional, and the formatting of the survey tends to lead users to believe that they must complete it in order to proceed.

228.    Dr. King observes that the use of radio buttons, which often signal a mandatory action, together with the follow-up questions, tend to signal to the user that the survey is mandatory.

229.    The retention offer poses an additional step for users who receive it and further contribute to the complexity of the flow.

230.    As noted by Dr. King, the retention offer uses different formatting from the rest of the flow and looks more like an advertisement than an additional step in the flow, which tends to confuse users into thinking that the cancellation is complete.

231.    Like the "Before You Go" page, the "Tell Us More" page creates an unnecessary, additional step in the cancellation.

232.    While users are not required to provide a rating, the page does not inform them of this.

233.    Defendants could have sought the information solicited by the "Tell Us More" page post-cancellation.

234.    The cancellation flow does not employ any graphic or verbiage such as a progress bar, "step 1 of 4," to notify users what step of the flow they are in.

235.    As a result, users are likely to drop out of the flow before completion.

236.    The flow also does not use "skip" buttons, which would help alert users that they are not finished canceling and would notify them of any optional aspects.

237.    The Court agrees with Dr. King that the cancellation flow, which incorporates multiple steps that do not relate to cancellation, is much longer than necessary and unnecessarily increases the "cognitive load" experienced by consumers.

238.    The Court further agrees that the flow uses confusing terminology and inconsistent design, making it difficult to complete and tending to make consumers believe they had canceled when they had not.

239.    The Court has considered the testimony provided by Brandon Ward, Defendants' retained expert, as to the cancellation flow.

240.    Both experts performed a "heuristic" analysis of the cancellation flow.

241.    The Court finds Dr. King's heuristic analysis more credible, taking into consideration her expertise, methodology, and the level of support she provided for her assertions.

242.    Further, the Court has considered Mr. Ward's usability study but views it as not reliable because of methodological flaws.

243.    For example, Mr. Ward used UserTesting.com to find participants. Many UserTesting.com participants complete usability tests on a regular basis, and more than half of the study participants identified themselves as "advanced internet users." As such, these users were likely significantly more skilled at Internet usage than the typical Match.com subscriber. They were also significantly younger, as the median age of Match subscribers during the relevant time frame was over 50 and the median age of the study participants was 36.5. Mr. Ward also refused to use any study participants over the age of 70.

244.    Mr. Ward's study also used primed participants by asking them to complete the tasks "efficiently and effectively as possible," which was likely to skew the results.

245.  Mr. Ward's study flow also did not include a save offer.  As a result, the study was not reasonably representative of the actual users' experience.

**E.  Consumers frequently complained about the cancellation flow.**

246.    Consumers frequently complained that they were frustrated by Match.com's online cancellation mechanism or believed that they had canceled yet were nevertheless autorenewed. (PLT 242 (spreadsheet of thousands of consumers whose cancellation reason is "thought already canceled"); PLT 126; PLT 127 (5,258 consumers in complaint category of "thought already canceled" in first half of 2013)); *see also* BBB complaints at PLT 361; PLT 360; PLT 364; PLT 367; PLT 368; PLT 369; PLT 362; PLT 366; PLT 365; PLT 363; and PLT 358.

247.    Complaints about the cancellation flow itself have ranked among Match.com's top complaints since 2013. (PLT 314 (in January 2020, "highest volume feedback items" included "cancel flow confusion."); PLT 57; PLT 36; PLT 46).

248.    Company employees acknowledged receiving complaints about the process. (PLT 49 ("Currently the flow is very convoluted and confusing. We get a LOT of customer care complaints about it; PLT 25 at pg. 12 ("We get a lot of complaints from members who tell us they cancelled on site and it didn't work . .[.]")).

249.    Company employees also acknowledged that many of the complaints they received related to consumers who thought they had cancelled but were autorenewed. *See, e.g.*, PLT 273 at pg. 34; PLT 57; PLT 179 (analyzing BBB complaints).

250.    In 2016, a Match Customer Care executive wrote:

One of our largest Care Complaints are members who believe they
cancelled, but were then charged a renewal (we've had over 1k
complaints so far in 2016). We believe that we can make this
process easier for our members who are already wanting to cancel
(they've made it to the flow) but get stuck on survey pages,
retention offers, etc and believe they cancelled.

(PLT 63 at pg. 3).

251.    The future CEO of Match Group Inc. acknowledged in 2016 that Match.com

customers complain "again and again . . . that they cancel and we still auto renew them." (PLT

139 at pg. 2).

### F. Defendants' employees acknowledged that the cancellation flow was difficult to find and use.

252.    Since as far back as 2013, Defendants' employees have acknowledged that the

cancellation flow is difficult to find and use.

253.    In 2014, a high-level Match Group, Inc. executive acknowledged to other

executives that Match.com put its customers "through the [w]ringer if you want to cancel your

subscription or get a refund." (PLT 211).

254.    Other employees variously described the flow as "too hard to locate" (PLT 78)

(Director of Customer Care Kristina Auderer in 2016), "really, really terrible" (PLT 139)

(Auderer in 2016), "too long" (PLT 34) (executive Adrian Ong in 2016), and "very convoluted

and confusing." (PLT 49) (Director of Product Sydney Lam in 2013). *See also* PLT 41; PLT 97;

PLT 92; PLT 95; PLT 317 at pg. 21 (in user sentiment survey presentation, employees list

"Cancelled Subscription but still getting charged/easy way to turn off Auto renew" as "Key

Takeaway").

255. In 2015, one Match.com manager, explaining why senior management "would not

reduce the resign [*i.e.*, cancellation] steps," stated "It's a not a bug. It's a feature." He also noted

that the Senior Vice President of Customer Service had 'complained about it for years." (PLT 83 at pg. 2).

256.    In a 2016 PowerPoint presentation to company executives, the then-Director of Customer Care characterized the cancellation flow as "difficult and dated" and noted that the location in Account Settings was "difficult to find." She proposed a shortened flow with no password entry requirement, with the survey placed after cancellation confirmation. (PLT 79).

257.    In another presentation transmitted to executives in 2016, this same Director characterized the flow as "hard to find, tedious, and confusing." She noted that members "often think they've cancelled when they have not and end up with unwanted renewals" and that "the current process takes over 6 clicks." (PLT 78; PLT 139; PLT 80); *see also* PLT 158 (same executive proposes in 2014 to put the cancellation before the survey).

258.    In a contemporaneous email exchange, this same Director informed the future CEO of Defendant MGI:

> [H]onestly it's been the same complaint for the past decade that I've been with Match . . . It takes up to 7 or 8 clicks to complete the flow to turn off [autorenewal . . .] if you can even figure out how to do it. . . . . The main thing is it's too hard to locate – it's in account settings . . . , the verbiage is inconsistent, and it takes multiple clicks to complete the process, plus the retention offer is misleading[.]

(PLT 139).

259.    Also in 2016, a senior finance analyst sent a PowerPoint to numerous executives, including the future CEO of Defendant MGI, describing the account settings page as "difficult to find" and "confusing & cluttered," the cancellation link on account settings as having "unclear verbiage," the retention offer as "confusing," and the entire cancellation flow as "difficult & dated." (PLT 184; PLT 185 at pgs. 25-26).

201.    In connection with a 2017 "Community Operations Update," Match employees prepared a PowerPoint proposing changes to the cancellation flow, including "Clearer/Concise wording," "reduce[d] steps," and a progress bar at the top to prevent consumers from mistakenly believing they had completed the flow. (PLT 273 at pgs. 35-39; PLT 272; PLT 72; PLT 249). These changes were never implemented.

261.    In 2018, a Match executive circulated a PowerPoint listing "Frustration with auto-renewal and the refund policy" as a "Pain Point" and proposing "easier resign flow." (PLT 197; PLT 198 at pgs. 24, 31).

262.    In 2015 or 2016, the Visa Network recommended that Match.consider making the cancellation option more prominent on the site so that customers could "terminate their subscription easily" would help reduce Match.com's "chargebacks raised by your legitimate customers." (PLT 269).

263.    Despite years of Match employees and others expressing concerns about the cancellation flow and proposing changes to address these myriad issues, Defendants did not make any changes to address the concerns. *See, e.g.*, PLT 29 (observing that redesign of the resign flow "Has not been prioritized on the roadmap by the powers that be.").

264.    Several documents show that Match employees viewed improving the cancellation flow as likely to negatively affect revenue because it could result in more cancellations.

265.    For example, in 2019, Match personnel conducted an A/B test that added a step to the mobile cancellation flow and described the resulting drop in cancellations as "encouraging" and "very promising." (PLT 312 at pgs. 1-5).

266.    In 2016, Match executive Sydney Lam acknowledged that there could be "some potential negative to cleaning the flow up." (PLT 266).

267.    In 2020, Director of Analytics and Data Science Jayant Dasari hypothesized that "manage subscription being more accessible in the new format led to a higher cancellation rate" and advised that he "[w]ill implement a solution"). (PLT 254); *see also* PLT 207 at pg. 2 (reference to prior code adding "intended friction"); PLT 253; PLT 202 at pgs. 1-3.

268.    In 2017, future MGI CEO Mandy Ginsberg, when discussing potential changes to the FAQ portion of the website, said she "want[ed] to make sure there are no implications (for example is it easier for people to cancel subscription since they find the link faster)." (PLT 91).

269.    In an internal presentation titled "Resignation Flow Updates," Match.com employees admitted that "we know" that "Users are easily interrupted/distractible in the early stages of the flow" and identified as a "Key Takeaway[]" that "Early on easy to interrupt – we can distract them[.]" (PLT 238 at pg. 4).

270.    A work ticket from 2019 shows a Match.com employee ordering changes to the website relating to the cancellation process, explaining that "[d]ue to a huge increase in sub [*i.e.*, subscription] cancellations this year, we would like to change the copy in the help section of the settings page from 'Manage/Cancel Subscription' to 'Manage subscription'." (PLT 248; PLT 247; PLT 251, 246).

271.    In December 2019, Match's Senior Director of Software Engineering for Web Apps and Billing observed that Match had "spent mid-may [sic] through July making it harder to cancel with small changes" and observed that cancellation trends seemed to "correlate well with product changes till early August." (PLT 318); *see also* PLT 319; PLT 321 (accompanying chart detailing cancellation trends and website changes or tests that made it "harder to cancel").

**G.  Defendants' records show that many consumers failed to successfully complete their resignation session**.

272.   Defendants' records show that most users who entered the cancellation flow failed to complete it within the same online session.

273.   Defendants' data shows that, from October 2014 to October 2024, of the users who entered the cancellation flow (defined as clicking on the "manage subscription" link from the account settings page) minus users who subsequently accepted a retention offer or clicked on "subscription status" (evidencing an intent to do something other than cancel),[2] only 56% completed the cancellation flow within the same online session.

274.   Defendants contend that a proper cancellation rate calculation would include only users who clicked on "cancel subscription" after getting past the password wall. However, using this methodology would remove all users who intended to cancel but were blocked by password problems. The FTC's methodology of making a deduction for users who clicked on "subscription status" rather than "cancel subscription" after the password wall is a more reliable method of accounting for users who accessed the "manage subscription" flow but did not intend to cancel.

275.   Defendants also contend that a proper cancellation rate calculation should be based on "subscriber" rather than "session," meaning that a user who ultimately was able to cancel would be considered a success even if the user failed to cancel in multiple times in prior "sessions."

276.   The Court finds that the "session" method is a more reliable method of assessing the difficulty of the online cancellation flow—and in fact this is the same method used internally by Match to assess the cancellation flow. The fact that a user was eventually able to cancel,

---

[2] The FTC applied this deduction only from March 2019 to March 2023 because of valid concerns about data quality before that time.

regardless of the number of potential attempts, is less probative on the issue of cancellation difficulty.

277.    Regardless of the exact percentage of failed cancellations, the data shows that a substantial number of users struggled with the cancellation flow. It therefore tends to show that the flow was difficult and not simple.

278.    Defendants' employees would occasionally pull samples of consumer click-through data for various purposes and found that many users were dropping out before reaching the cancellation confirmation page.[3]

279.    The discussion above has focused on the desktop flow. However, Defendants' mobile cancellation flow was largely identical to the desktop cancellation flow and was therefore similarly not simple. (Deposition of Dushyant Saraph (6/22/23), at 212:17-23 and 333:21-334:24).

280.    Moreover, for years consumers "c[ould] only resign via desktop" site. (PLT 97; PLT 40 at pg. 25).

281.    Until recently, the cancellation flow was not optimized for viewing on mobile browser, which likely made it even more difficult to use the cancellation flow on a mobile browser. *See* Deposition of Dushyant Saraph (6/22/23), at 212:1-5.

**H.  Monetary injury**

282.    The original complaint against Match Group, Inc. as the sole Defendant was filed on September 25, 2019. (Doc 1).

283.    The FTC filed an amended complaint naming Match Group, LLC as a second Defendant on July 19, 2022. (Doc. 116).

---

[3] *See, e.g.* PLT 208; PLT 125; PLT 25 at pg. 10; PLT 184; PLT 208 at pg. 4; PLT 244 at pg. 3. These employees used "session" data rather than "user" data for these purposes.

284.    On the date of the filing of the original complaint, Match Group, Inc. was aware of the filing and was aware that the complaint included allegations regarding the Match.com platform specifically. (PLT 293).

285.    Match.com's difficult cancellation flow caused many consumers to fail to cancel successfully and incur monetary injury in the form of unwanted autorenewal charges.

286.    The Court finds the FTC data analyst's calculations of this monetary injury to be persuasive.

287.    Based on data provided by the Defendants, the FTC data analyst analyzed the total amount of autorenewal fees charged to users who accessed the resignation flow (defined as clicking on the "manage subscription" link) between October 2016 and November 2024 and did not cancel or take the retention offer.

288.    The data analyst deducted refunds and chargebacks, then applied a discount to account for users who clicked only on "subscription status" (as opposed to "cancel subscription"), evidencing that they did not intend to cancel.

289.    The FTC analyst determined the appropriate discount amount by calculating on a monthly basis from March 2019 to November 2024 the percentage of users who only clicked on "subscription status," then applied that percentage to reduce the total amount of monthly autorenewal charges for the corresponding months between March 2019 and December 2022.

290.    The analyst applied this deduction only from March 2019 forward because the data for "subscription status" clickers before March 2019 was unreliable.

291.    Applying this methodology, the data analyst arrived at a total of $56,085,269.

292.    As with the "cancellation rate" calculation, Defendants contend, through their retained expert Dr. James Langenfeld, that a proper measure of consumer injury would include

only users who clicked on "cancel subscription," not all users who clicked on "manage subscription."

293.  The Court finds that expert testimony is not necessary to interpret the clickthrough data, and that in fact any inferences regarding consumers' state of mind based on the clickthrough data is not within Dr. Langenfeld's expertise.

294.  The Court finds that using Defendants' methodology would substantially undercount injury by excluding all users who accessed "manage subscription" intending to cancel but were blocked by the password wall. As established by the testimony of FTC expert Dr. King and Match's own internal emails, the password wall was a significant impediment to cancellation and therefore should not be excluded from the injury calculation.

295.  The FTC's deduction for users who clicked "subscription status" is a more reliable methodology for accounting for users who accessed the flow but did not intend to cancel.

296.  Defendants further contend that consumer injury should be reduced to account for users who subsequently used subscription-only features after they were auto-renewed.

297.  The Court finds this methodology not reliable, because, once they were auto-renewed, users who previously attempted to cancel were entitled to take advantage of services they did not want but had paid for.

298.  Defendants further contend that consumer injury should be reduced to account for users who had successfully canceled in the past, under the theory that such users knew how to cancel and so must have exited the flow for reasons other than the difficulty of the flow.

299.  Defendants have not shown that such users would have previously experienced the online cancellation flow (versus other methods). As such, this proposition is based on pure speculation and is unreliable.

## VII.    PROPOSED CONCLUSIONS OF LAW – COUNT V

### A.  Defendants received "fair notice" of the requirements of ROSCA.

300.    ROSCA requires that sellers provide purchasers with "simple mechanisms for a consumer to stop recurring charges . . [.]" 15 U.S.C. § 8403.

301.     Defendants contend that the FTC is barred by the Due Process Clause from bringing an action for violation of this section because the agency did not provide "fair notice" of its interpretation of ROSCA as advanced in this case.

302.    The standard in the Fifth Circuit for fair notice for a general economic statute is described in *Ford Motor Company v. Texas Department of Transportation*, which states that an economic regulation will be invalidated "only if it commands compliance in terms 'so vague and indefinite as really to be no rule or standard at all or if it is substantially incomprehensible.'" *See* 264 F.3d 493, 507 (5th Cir. 2001). Stated another way, to be unenforceable, a statute must be vague "not in the sense that it requires a person to conform to an imprecise, but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Id*. at 508.

303.    The Court also finds the reasoning of the Third Circuit as stated *in FTC v. Wyndham Worldwide Corporation* helpful in analyzing the level of "fair notice" to which parties are entitled regarding an agency's interpretation of a statute or regulation.

304.    In that case, the Third Circuit distinguished between (1) cases in which an agency "administers a statute without any special authority to create new rights or obligations," such that courts "retain the primary responsibility for interpreting the statute"; (2) cases in which "the agency is primarily responsible for interpreting the statute because the courts must defer to any reasonable construction it adopts"; and (3) cases in which the agency "interprets the meaning of

its own regulation." *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 251-52 (3rd Cir. 2015).

305.     For the second and third categories, courts have held that parties are entitled to know with "ascertainable certainty" what conduct is legally required by the statute, which could include the agency's interpretation. *See id.* In cases in the first category, by contrast, the issue is whether the parties have fair notice that their "conduct could fall within the meaning of the statute," and the standard is whether the rule at issue is "so vague as to be 'no rule or standard at all.'" *See id.* at 255 (quoting *CMR Dn.N. Corp. v. City of Phila.*, 703 F.3d 612, 632 (3rd Cir. 2013)).

306.     ROSCA is a general civil statute enacted by Congress, not a regulation. Further, the FTC has not argued that this Court must defer to the FTC's interpretation of the statute. Accordingly, this Court retains "primary responsibility" for interpreting the statute, and this case falls into the first category discussed in *Wyndham Worldwide Corp.* The proper standard, as clarified in *Wyndham Worldwide Corp* as well as in *Ford Motor Company v. Texas Department of Transportation*, is whether Defendants had fair notice that their conduct could fall within the meaning of the statute, and the "no rule or standard at all" principle applies.

307.     Defendants had fair notice of the requirements of ROSCA from the language of the statute itself. "[A]s long as the company can reasonably foresee that a court could construe its conduct as falling within the meaning of the statute," it receives all the fair notice to which it is entitled. *Wyndham Worldwide Corp.*, 799 F.3d at 256. The term "simple" is a common English language word with a common-sense meaning. Defendants could have reasonably anticipated that their intentionally complex cancellation flow would not be considered "simple" as that term is commonly used.

308.    The term "simple" is not "so vague and indefinite as really to be no rule or standard at all," nor is it "substantially incomprehensible.'" It is similar to other terms used in federal statutes that are regularly enforced by courts, including "unfair" under the FTC Act,[4] or public utility and common carrier regulatory statutes that require that companies offer "just and reasonable" rates and terms of service.[5] Further, other federal courts have applied the "simple mechanisms" standard without issue.[6]

309.    Since the statutory language itself provides sufficient notice, Defendants are not entitled to advance notice of the FTC's interpretation of "simple" as argued in this case. *See Wyndham Worldwide Corp*, 799 F.3d at 253-54 (emphasis in original) ("The relevant question is not whether Wyndham had fair notice of the FTC's *interpretation* of the statute, but whether Wyndham had fair notice of what the *statute itself* requires.").

310.    The court in *FTC v Amazon.com, Inc.* considered and rejected arguments that were very similar to Defendants' arguments here.  735 F. Supp. 3d 1297 (W.D. Wash. May 28, 2004) (order on motion to dismiss). While the defendants in that case did not challenge ROSCA itself as vague, they argued that "the FTC's 'dark patterns' argument is an unconstitutionally vague interpretation of ROSCA." *Id*. at 1329. The court rejected the argument, stating that

---

[4] *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239-40 (1972) (noting that Congress "explicitly considered, and rejected, the notion that it reduce the ambiguity of the phrase 'unfair methods of competition' . . . by enumerating the particular practices to which it was intended to apply"); *see also* S. Rep. No. 63-597, at 13 ("The committee gave careful consideration to the question as to whether it would attempt to define the many and variable unfair practices which prevail in commerce . . . . It concluded that . . . there were too many unfair practices to define, and after writing 20 of them into the law it would be quite possible to invent others."); *FTC v. Bunte Bros.*, 312 U.S. 349, 353 (1941) (noting that "unfairness" is a "flexible concept with evolving content").

[5] *See, e.g.*, *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 477 (2002); *Permian Basin Area Rate Cases*, 390 U.S. 747, 755 n.8 (1968).

[6] *See United States v. MyLife.com*, 567 F. Supp. 3d 1152, 1169 (C.D. Cal. 2021) (granting summary judgment after concluding that the defendant had failed to provide simple mechanisms); *FTC v. BunZai Media Group, Inc.*, 2:15-cv-4527 (C.D. Cal. 2015) (granting an *ex parte* temporary restraining order after finding that "[t]here is good cause to believe Defendants have violated ROSCA by . . . failing to provide a simple mechanism"); *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649, 2015 WL 2130504, at *16 (D. Nev. May 6, 2015) (granting a preliminary injunction based on finding that defendants had failed to "provide simple mechanisms").

"[d]efendants offer no legal authority, and the Court cannot find any, to support their assertion that the vagueness doctrine applies to an agency's litigation strategy." *Id.*

311.  Similarly, Amazon argued that the FTC did not provide "fair notice" of its "dark pattern" theory of ROSCA. *Id*. The court distinguished the cases cited by Amazon as involving instances where a court or agency had previously interpreted the statutes at issue and "the regulated parties relied on those interpretations." *Id*. at 1329-30 (distinguishing *FCC v Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) and *United States v. AMC Ent., Inc.*, 549 F.3d 760, 770 (9th Cir. 2008)). In rejecting Amazon's argument, the court noted that "[h]ere, there are no controlling regulations or policy statements that reflect an official, prior interpretation of ROSCA," and that "this case does not upset settled expectations about what disclosures and cancellation processes are required for automatically renewing subscriptions." *Id.* at 1330. Accordingly, the court applied *Wyndham Worldwide Corp.*'s, principle that, in the absence of a prior FTC rule or adjudication, the defendants were entitled only to fair notice of the statute itself. *Id.*

312.     The principles articulated in *Wyndham Worldwide Corp* and *Amazon.com, Inc.* apply here. The FTC's litigation strategy to prove a ROSCA violation in this case is not unconstitutionally vague, nor are Defendants entitled to "fair notice" of it. ROSCA itself provides all the fair notice to which Defendants are entitled.

313.     Nevertheless, the Court finds that the FTC forwarded a draft complaint to Match Group, Inc. in October 2018 that was specific enough to provide "fair notice" of the FTC's interpretation of "simple mechanism." (PLT 322). Accordingly, even assuming *arguendo* that Defendants had a "fair notice" defense at one point, it would not apply to conduct after the receipt of the draft complaint.

**B. Defendants' online cancellation mechanism was not "simple."**

314.    Section 4 of ROSCA, 15 U.S.C. § 8403, imposes certain requirements before sellers can charge consumers for goods or services "sold in a transaction effected on the Internet through a negative option feature." The statute incorporates by reference the Telemarketing Sales Rule's definition of "negative option feature," as follows:

> **Negative option feature** means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer.

16 C.F.R. § 310.2(w).

315.    Match.com's enrollment of consumers into a paid subscription constitutes "a transaction effected on the Internet." The platform's auto-renewing subscriptions meet the definition of a "negative option feature" because Match interprets its subscribers' failure to cancel their subscription as acceptance of an offer for a new subscription term. Therefore, 15 U.S.C. § 8403 applies.

316.    15 U.S.C. § 8403 requires that sellers provide purchasers with "simple mechanisms for a consumer to stop recurring charges[.]"

317.    For the reasons stated in its Findings of Fact on Count V, the Court concludes that Match.com's online cancellation method is not a "simple mechanism[]" to stop recurring charges for purposes of ROSCA and has not been since at least 2014.

318.    Further, the Court concludes that the possibility that some consumers may request cancellation through other channels does not excuse Defendants' failure to ensure that the cancellation method they directed consumers to use was "simple." This is particularly true when, as in this case, the alternate points of contact and the fact that consumers could use them to

57

cancel were not well-disclosed. *See FTC v. Health Formulas, LLC*, No. 2:14-cv-01649, 2015 WL 2130504, at *16 (D. Nev. May 6, 2015) (holding that the FTC was likely to succeed on the merits of its ROSCA cancellation allegation because cancellation mechanism was not adequately disclosed). To hold otherwise would be to hold that companies are permitted to steer consumers to difficult cancellation procedures and place the burden on consumers to seek out and find any other point of contact at which a company accepts cancellation requests, no matter how obscure. This is contrary to Congressional intent.[7]

### C. Refund of Money

319.    Section 19 of the FTC Act authorizes the FTC to bring an action in federal district court for violations of "any rule under this subchapter respecting unfair or deceptive acts or practices." *See* 15 U.S.C. § 57-b(a)(1).

320.    Per 15 U.S.C § 8404(a), a violation of ROSCA is enforceable under 15 U.S.C. § 57-b(a)(1).

321.    Section 19 further authorizes the Court to "grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice . . [.]" *See* 15 U.S.C. § 57-b(b). Such relief can include "the refund of money."

322.    Section 19 also provides that "no action may be brought by the Commission under this section more than 3 years after the rule violation[.]" *Id.*

323.    Federal Rule of Civil Procedure 15(c) provides as follows:

    (c) Relation Back of Amendments.

---

[7] *See, e.g.*, Speech of Hon. Zachary T. Space of Ohio, 156 Cong. Rec. E2165-02 (Dec. 15, 2010) (ROSCA requires businesses to "provide easy ways to opt out of any agreement or subscription service, empowering consumers to control their enrollment").

(1) *When an Amendment Relates Back*. An amendment to a pleading relates back to the date of the original pleading when:

(A) the law that provides the applicable statute of limitations allows relation back;

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction or occurrence set out-or attempted to be set out-in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i)   Received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii)  Knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

324.    In considering whether the complaint against Match Group, LLC relates back to the complaint against Match Group, Inc. for purposes of 15 U.S.C. § 57-b(d), the Court concludes that Rule 15(c)(1)(B) is satisfied in that the amended complaint asserts claims against Match Group, LLC that arose out of the conduct, transaction, or occurrence set out in the original complaint.

325.    The Court further concludes that within the time period provided by Rule 4(m), Match Group, LLC received notice of the action such that it was not prejudiced in defending on the merits.

326.    By September 25, 2019, Match Group LLC was in possession of sufficient facts to formulate its position that the FTC had sued Match Group, Inc. by mistake and that the proper party was Match Group, LLC.

327.    Defendants contend that the FTC did not exercise proper diligence in naming Match Group, LLC after it knew or should have known that Match Group, LLC was the proper party.

328.    However, the U.S. Supreme Court has stated that "the Rule plainly sets forth an exclusive list of requirements for relation back, and the plaintiff's diligence is not among them." *See Krupski v. Costa Crociere S. p. A*, 560 U.S. 538, 539-40 (2010). Further, the information that the plaintiff had at the original time of filing is relevant "only if it bears on the defendant's understanding of whether the plaintiff made a mistake regarding the proper party's identity." *Id.*

329.    The Court concludes that the Rule 15(c)(1) factors are satisfied, and the amended complaint "relates back" to the original complaint date of September 25, 2019, for purposes of 15 U.S.C. § 57-b(d).

330.    Accordingly, the FTC can recover refunds for autorenewal charges that occurred from September 25, 2016, to the date of this Order.

331.    The Court concludes that $56,085,269 is a reasonable approximation of the amount of autorenewal fees incurred between October 2016 and November 2024 that should be refunded to consumers because of Defendants' violations of ROSCA. *See United States v. MyLife.com*, 567 F. Supp. 3d 1152, 1171 (C.D. Cal. 2021) (finding that $15.8 million was "reasonable approximation" of monies obtained from ROSCA violation and ordering refund).

332.    For reasons discussed below, both Defendants are liable for this amount.

**D.  Civil Penalties**

333.    The FTC Act authorizes the FTC to seek civil penalties against parties who violate "any rule under this subchapter respecting unfair or deceptive practices . . . with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is

unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A). ROSCA is such a "rule." *See* 15 U.S.C § 8404(b).

334.    The Court may award as much as $53,088 per violation. 15 U.S.C. § 45(m)(1)(A); 16 C.F.R. § 1.98.

335.    In the case of a continuing violation of a rule, "each day of continuance of such failure shall be treated as a separate violation [.]" 15 U.S.C. § 45(m)(1)(C).

336.    In considering the amount of the civil penalty, courts should take into account (1) the degree of capability; (2) any history of prior such conduct; (3) ability to pay; (4) effect on ability to do business; and (5) such other matters as justice may require. *Id.*

337.    Claims for civil penalties are governed by a five-year statute of limitations. 28 U.S.C. § 2462.

338.    For reasons previously discussed, the Court finds that the FTC's amended complaint adding Match Group, LLC as a defendant relates back to the date of the original complaint for purposes of the statute limitations. Accordingly, the Court may grant civil penalties against both Match Group, Inc. and Match Group, LLC for violations dating back to September 25, 2014.

339.    Defendants' violations of ROSCA were knowing and intentional and therefore committed with the knowledge required by 15 U.S.C. § 45(m)(1)(A).

340.    Because of Defendants' well-documented, high degree of knowledge that the online cancellation flow was difficult to find and use, it is fair to imply that Defendants had knowledge based on objective circumstances that Match.com's cancellation procedures did not satisfy ROSCA's "simple mechanisms" requirement.

341.    As to the amount of the civil penalty, the Court has considered the relevant factors specified in 15 U.S.C. § 45(m)(1)(C), which states that the Court "shall take into account the degree of culpability, any history of such prior conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." 15 U.S.C. § 45(m)(1)(C).

342.    Defendants knew since at least 2013 that the cancellation flow was difficult and was harming consumers. Yet they refused to correct the issues and in fact made changes to the flow to make it worse, intentionally harming consumers who were seeking to cancel. These facts show a high "degree of culpability" and support a large civil penalty.

343.    Even Defendants' conduct outside the statute of limitations shows the need for a large civil penalty to deter future misconduct.

344.    Defendants' long history of using the violative flow relates to the "history of prior such conduct" and supports a large civil penalty.

345.    The Court concludes a civil penalty of $200,672,640 should be assessed. This number is a per diem calculation based on the statutory maximum per day civil penalty of $53,088 multiplied by the number of days between September 26, 2014 and January 31,2025, or 3,780 days.

346.    The Court finds that both Defendants have the independent ability to pay the civil penalty amount ordered by the Court, and that doing so will not affect Defendants' ability to do business.

347.    For reasons discussed below, Defendants are jointly and severally liable for this amount.

## VIII.  PROPOSED FINDINGS OF FACT – MATCH GROUP, INC.'S AUTHORITY TO CONTROL MATCH.COM AND KNOWLEDGE OF ITS UNLAWFUL BUSINESS PRACTICES.

### A.  Match Group, Inc.'s Authority to Control Match.com.

348.    In October 2023, Match Group, Inc.("MGI") formed a new subsidiary, Match Group Americas, LLC ("MGALLC"). (PLT 448 at pg. 2; PLT 420). MGALLC is now the primary operating subsidiary for the Match.com website. As noted above, Match Group LLC ("MGLLC") has been renamed "Tinder LLC." (PLT 419 at pg. 3). It is no longer the primary operating subsidiary for Match.com.

349.    The Court finds that at all times relevant to this action, MGI has had the authority to control the Match.com platform through its control of MGALLC and MGLLC.

350.    MGI has stated in public documents that it owns and operates dozens of dating services, including Match.com. (PLT 335, at pg. 8; PLT 336 at pg. 3; PLT 334 at pg. 1; PLT 330 at pg. 2; PLT 329 at pg. 2).

351.    Match.com is "operated out of a subsidiary of MGI." (Deposition of Greg Blatt (1/13/23), at 22:3-11).

352.    Prior to the reorganization, MGLLC had admitted in its Answer that it operated Match.com. (PLT 371 at pg. 2).

353.    Prior to the reorganization, both MGI and MGLLC had owned Match.com. (PLT 382 at pg. 15-16; PLT 375 at pg. 4; Deposition of Sharmistha Dubey (3/3/23), at 254:22-255:4).

354.    MGI has authority and influence over MGLLC, Match.com, and other dating services it owns. (PLT 380 at pg. 10).

355.    MGI is placed above MGLLC, MGALLC, and other dating services in the corporate hierarchy and organizational chart. (PLT 230).

356.    MGI's CEO could hire and fire the employees who operated Match.com. (Deposition of Sharmistha Dubey (3/3/23), at 14:20-15:4, 94:8-14, 82:24-83:11; Deposition of Greg Blatt (1/13/23), at 22:13-22).

357.    Match.com employees regularly reported to MGI about Match.com's business. (PLT 114 at pg. 1; PLT 383 at pg. 4-5; PLT 383 at pg. 6-7).

358.    MGI played a significant role in operating Match.com through the unincorporated subsidiary entities that it created and managed, such as Match Group North America, and through the direct involvement of its employees in Match.com's business. (Deposition of Mandy Ginsberg (2/23/23), at 33:15-34:7).

359.    Prior to the reorganization, MGI exercised its authority to control MGLLC and Match.com through Match Group North America ("MGNA"), which oversaw Match.com's operations and several other dating services including OkCupid, PlentyOfFish, and PeopleMedia. (Deposition of Sharmistha Dubey (3/3/23), at 11:14-12:1), several of which were owned by MGI but not MGLLC. (PLT 231 at pg. 1).

360.    Prior to the reorganization, MGI's executives were placed at the top of the MGNA structure (PLT 3 at pg. 1) and as such, the CEO of MGNA reported to the CEO of MGI. (Deposition of Greg Blatt (1/13/23), at 90:15-20.

361.    MGI also had authority to hire and fire individuals with positions at MGNA.

362.     For example, in 2015, MGI appointed Mandy Ginsberg as CEO of MGNA and it appointed Shar Dubey as President of MGNA. (PLT 330; PLT 385 at pg. 16-18).

363.    These MGNA executives were responsible for overseeing Match.com's operations and reported up to MGI. (PLT 385 at pg. 16-17; PLT 385 at pg. 17-18; PLT 74; PLT 116).

364.    MGNA executives were also responsible for overseeing other dating platforms under MGI's ownership, such as Tinder.

365.    For instance, Shar Dubey, MGNA President, reviewed and discussed the "FAQ 2.0" project with Tinder employees and directed Adrian Ong, VP of Operations, to assist Tinder employees. (PLT 107).

366.    The CEOs of several dating platforms, including Match.com, reported up to MGNA. (Deposition of Mandy Ginsberg (2/23/23), at 88:17-20).

367.    The top executive of MGNA was responsible for a number of brands in North America, including Match.com, Match Affinity, OkCupid, Hinge, and Plenty of Fish.

368.    These five brands reported to MGNA, and the head of MGNA reported to the CEO of MGI. (Deposition of Mandy Ginsberg (2/23/23), at 33:21-34:7 and 88:15-19.

369.    MGI executives were directly involved in the day-to-day business of Match.com.

370.    Greg Blatt, former MGI Chairman and CEO, often weighed in on Match.com advertising, including by commenting on Match.com montages (PLT 90), directly requesting to review and provide feedback on Match.com's "Missed Connections" scripts (PLT 2), and providing suggestions regarding Match.com advertising and PR. (PLT 85).

371.    Jared Sine, MGI's former General Counsel, was involved in analysis of "the types and related volumes" of Match.com's consumer complaints, as well as the approval of Match.com's autorenewal policies. (PLT 23; PLT 108 at pg. 1).

372.    Gary Swidler, MGI's COO and CFO, weighed in on Match.com's refund policy. (PLT 113).

373.    Navin Ramachandran, MGI's former COO, provided feedback concerning Match.com's cancellation process and refund policy, while comparing it to other MGI platforms. (PLT 1).

374.    Sharmistha Dubey, then President of MGNA, sought the approval of MGI's CEO to stop purging credit card data for Match.com customers. (PLT 94).

375.    Dubey referred an employee to Jared Sine, Chief Legal Officer of MGI, for approval concerning autorenewal policies. (PLT 108 at pg. 1).

376.    In recent years, MGI has formed within its structure a business unit known as "Evergreen and Emerging" ("E&E"). E&E includes within its umbrella "Evergreen" brands Match, Meetic, Plenty of Fish, and OkCupid, as well as "Emerging" brands such as Chispa, BLK, Archer, the League, Salams, Upward, and Yuzu. (PLT 442, at pg. 9; PLT 441, at pg. 6).

377.    The E&E unit is working to "eliminate redundancies and consolidate platforms" across these brands.  (PLT 442, at pg. 9).

378.    E&E's "CEO," Hessam Hosseini has stated that E&E has created "shared teams" in areas such as marketing and Customer Care and is "unifying our tech" by creating a "shared platform" and merging Match.com and Meetic into a "single cohesive product." (PLT 444, at 3:20-4:10).

379.    MGI has stated that E&E's "shared teams" approach "allows E&E to 'build features once and deploy them everywhere.'" (PLT 443 at pg 3).

380.    MGI stated in a recent SEC 10-K filing that "we also work to apply a centralized discipline and share best practices across our brands. . [.]" (PLT 404 at pg. 6).

381.    MGI therefore directly operates Match.com and other websites through E&E.

**B.  MGI's Knowledge of Match.com's Unlawful Business Practices.**

382.    The Court finds MGI had knowledge of Match.com's unlawful business practices.

383.    Navin Ramachandran, MGI's former COO, stated that Match.com puts its customers "through the [w]ringer" whenever they want to cancel or get a refund." (PLT 211 at pg. 1).

384.    Greg Blatt, MGI's former Chairman and CEO, received directly from Match.com users numerous complaints relating to the Match Guarantee and autorenewal, which he forwarded to various MGNA and Match.com employees (PLT 181; PLT 56 at pg. 1-3).

385.    MGI promoted several MGLLC employees to leadership positions at MGI after these employees had learned of or directly participated in Match.com's unlawful business practices.

386.    For example, Mandy Ginsberg became CEO of MGI in January 2018 after serving as CEO of MGNA and as an executive of MGLLC. Prior to becoming CEO of MGI, Ginsberg was aware of consumer complaints concerning the Match.com cancellation flow and the Match Guarantee. (PLT 209).

387.    Ginsberg met with Match.com employees on a weekly basis to discuss consumer complaints about Match.com. (Deposition of Kristina Auderer (11/18/2022), at 25:1-26:15).

388.    Match.com employees provided Ginsberg with emails and reports, which contained survey comments, suggestions, and list of customer feedback from Match.com members. (PLT 144).

389.    In response to proposed changes to Match.com's FAQ section relating to cancellation, Ginsberg advised she "want[ed] to make sure there are no implications (for example is it easier for people to cancel subscription since they find the link faster)" (PLT 73).

390.    Three successive MGI CEOs maintained awareness of consumer complaints about Match.com's unlawful conduct (PLT 56 at pg. 1-3; PLT 181; PLT 144; PLT 34 at pg. 1-3; PLT 78).

391.    Despite having full authority to take necessary corrective action, MGI did not halt Match.com's illegal conduct.

## IX.    PROPOSED CONCLUSIONS OF LAW – MGI AND MGLLC ARE BOTH LIABLE FOR FTC ACT AND ROSCA VIOLATIONS.

392.    The Court concludes that Defendant MGLLC is liable for its illegal conduct, as MGLLC admits that it has owned and operated Match.com. *See United States v. Bestfoods*, 524 U.S. 51, 64-66 (1998).

393.    The Court concludes that Defendant MGI is also liable, as the facts establish that MGI owned Match.com, had unquestionable authority to control the website, and in fact did operate Match.com, including through MGNA, the so-called "reporting structure" it created and managed.

394.    MGI is not absolved of liability simply because MGLLC also played a role in Match.com's operations. Caselaw makes clear that a defendant may be liable even if it is not "solely responsible" for the alleged conduct because "a deceptive scheme violating the FTC Act may have more than one perpetrator." *See FTC v. LeadClick Media, LLC*, 838 F.3d 158, 168-69 (2d Cir. 2016) (concluding, in alignment with both the Ninth and Eleventh Circuits, "that a defendant may be liable for deceptive content even if it was not solely responsible for a deceptive scheme").

395.    Through MGI's role in managing and operating Match.com through MGNA and through MGI executives' roles in the day-to-day operations of Match.com, the Court concludes that MGI is liable for its own actions in operating Match.com. *See Bestfoods*, 524 U.S. at 64-66.

396.    In the alternative, even if MGI was not involved in the daily operations of

Match.com, it would still be liable because a corporate entity "acting with knowledge of

deception who either directly participates in that deception or has the authority to control the

deceptive practices of another, but allows the deception to proceed, engages, through its own

actions, in a deceptive act or practice that causes harm to consumer." *See LeadClick Media, LLC*,

838 F.3d at 170 (emphasis in original); *see also FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228,

1232-33 (11th Cir. 2014) (holding defendants liable for the misrepresentations of third-party

telemarketers where they had the authority to require them to cease making the

misrepresentations but did not do so).

## X.    PROPOSED CONCLUSIONS OF LAW – INJUNCTIVE RELIEF

397.    As this Court has held, injunctive relief in an FTC action is warranted to stop

ongoing conduct and where past conduct establishes "that there is a reasonable likelihood of

further violations." Doc. 86; *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)

(noting that absent injunctive relief the defendant would be "free to return to his old ways").

398.    When determining whether to enter an injunction in a government enforcement

case where defendants have purportedly ceased their violations, courts apply a non-exhaustive

set of factors set out by the Fifth Circuit in *SEC v. Blatt*, including: (1) the egregiousness of the

defendant's actions; (2) the isolated or recurrent nature of the infraction; (3) the degree of

scienter involved; (4) the sincerity of the defendant's assurances against future violations; (5) the

defendant's recognition of the wrongful nature of his conduct; and (6) whether the defendant's

occupation presents opportunities for future violations. *United States v. Cornerstone Wealth

Corp.*, 549 F. Supp. 2d 811, 816 (N.D. Tex. 2008) (quoting *SEC v. Blatt*, 583 F.2d 1325, 1334

n.29 (5th Cir. 1978)).

399.    The Court concludes that the *Blatt* factors are satisfied in this case as to Count III and IV, and there is a reasonable likelihood that Defendants will resume or continue the violative practices described above.

400.    As to "egregiousness" and "degree of scienter," the Court finds that Defendants continued their deceptive promotion of the Match Guarantee despite complaints from consumers and warnings from their own employees that customers were unable to find, understand, or comply with the restrictions.

401.    Further, the evidence that Defendants tested a procedure to notify users by email when they were eligible to redeem the Guarantee but discontinued it due to revenue loss illustrates that Defendants' employees prioritized revenue over the customer experience and complying with the FTC Act.

402.    Similarly, Defendants persisted with their unfair chargeback policy despite their own employee's concerns that the policy was unfair.

403.    As to "isolated or recurrent," the Court finds that the deceptive Guarantee and unfair chargeback policies were integral to Defendants' business model. Defendants engaged in both practices for years, with Defendants beginning to market their deceptive Guarantee in approximately 2005 and implementing their unfair chargeback policy in approximately 2013.

404.    Defendants applied the violative practices systematically and continuously well after receiving notice of the FTC's investigation, ceasing only shortly before the filing of this lawsuit.

405.    As to "the sincerity of the defendant's assurances against future violations," the Court has considered the "stipulation" proffered by Defendants in the form of a declaration,

which Defendants contend "shall serve as a binding and sincere commitment by the Defendants to never again engage in the Permanently Discontinued Practices."

406.    The continuing and egregious nature of Defendants' conduct, together with the circumstances of the stipulation, support the conclusion that it is nothing more than a litigation tactic, not a sincere assurance that Defendants will not resume the conduct.[8]

407.    The proffered stipulation further has no enforcement mechanism that would allow the Court or the FTC to enforce its provisions.

408.    The proffered stipulation is also overly narrow. Unlike a Court order, it applies only to Defendants rather than to those in active concert or participation with them. *See* FED. R. CIV. P. 65(d). And it applies only to Match.com. Defendants could change their business structure, as they have done during this litigation, change the name of their website, conduct the same practices on a different online platform or make minor changes to the practices that are described.

409.    As described below, the Court concludes that injunctive relief that applies to all platforms and is not limited to the specific conduct alleged in the Complaint but rather addresses similar potential misconduct is necessary and appropriate to prevent future violations of the FTC Act and ROSCA.

---

[8] *See, e.g.*, *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012); *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001) ("[A] party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior."); *Donovan v. Cunningham*, 716 F.2d 1455, 1461 (5th Cir. 1983) ("It is well-settled that, in a suit for injunctive relief, the voluntary cessation of allegedly illegal conduct does not moot the controversy arising from the challenged activity. . . 'because the defendant is free to return to his old ways.'"); *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173 (11th Cir. 2007) (rejecting mootness by voluntary cessation because the challenged actions "w[ere] the result of a years-long policy" that was "enforced on multiple occasions" and because cessation was not "motivated by a genuine change of heart" but rather "timed to anticipate suit"); *Sec'y of Labor v. Burger King Corp.*, 955 F.2d 681, 684 (11th Cir. 1992) ("five-year history of violations" cut against finding of mootness); *See FTC v. Sage Seminars*, No. 95-cv-2854, 1995 WL 798938, at *5-6 (N.D. Cal. Nov. 2, 1995 (noting "defendants' claimed cessation of conduct occurred only *after* defendants learned that the FTC had commenced an investigation . . . [so] any cessation on the part of defendants can hardly be considered 'voluntary'") (emphasis in original).

410.     As to Defendants' opportunity to continue to engage in the conduct, nothing would prevent Defendants from resuming the practices at issue in Counts III and IV. Defendants continue to operate Match.com, as well as several other substantially similar dating platforms, and could reinstate the practices on any one of those platforms.

411.     Turning to the ROSCA violation, Defendants continue to use an online cancellation flow that violates ROSCA and have not acknowledged any wrongdoing. The Court concludes that an injunction is necessary to stop the ROSCA violation.

412.     MGI's transfer of the Match.com platform from MGLLC to a new entity, Match Group Americas, LLC demonstrates the need for an injunction against MGI, not just its subsidiaries. Further, it does not affect the need for an injunction against MGLLC, which continues to operate dating platforms. Neither MGLLC nor MGI can evade injunctive relief by transferring MGLLC's violative conduct to a different entity under the same corporate umbrella.

413.     The Court has the authority to grant "fencing-in" relief—injunctive relief that exceeds the precise scope of the practices alleged in the FTC's complaint.[9]

414.     The Court concludes that it is necessary to do so in this case to prevent future violations of the FTC Act and ROSCA. The Court further concludes that the injunction should apply to both Defendants and should not be limited to the business practices of the Match.com. Accordingly, the Court enjoins the Defendants and enters judgment as follows:

---

[9] *Kraft, Inc. v. FTC*, 970 F.2d 311, 325-26 (7th Cir. 1992) (holding that FTC cease and desist order requiring defendants to base future nutrient claims on reliable scientific evidence was reasonably necessary to prevent deception); *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952) (upholding injunctive provisions related to price differentials and stating "[i]f the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity."); *FTC v. Think Achievement*, 144 F. Supp. 2d 1013, 1017-18 (N.D. Ind. 2000) (upholding fencing-in provisions and stating "[a] federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past.") (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132 (1969)).

I.      Definitions

415.    The following definitions apply for purposes of injunctive provisions:

A.  "**Billing Information**" means any data that enables any person to access a customer's account, such as a credit card, checking, savings, share or similar account, utility bill, mortgage loan account, or debit card.

B.  "**Charge**," "**Charged**," or "**Charging**" means any attempt to collect money or other consideration from a consumer, including but not limited to causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account, telephone bill, or other account.

C.  "**Clear(ly) and Conspicuous(ly)**" means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

    1.  In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

    2.  A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3. An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4. In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5. The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6. The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7. The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8. When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

D. "**Defendants**" means Match Group, Inc., Match Group, LLC, and their successors and assigns, and shall include Tinder, LLC and Match Group Americas, LLC.

E. "**Negative Option Feature**" means, in an offer or agreement to sell or provide any good or service, a provision under which the consumer's silence or failure to take an affirmative action to reject a good or service or to cancel the agreement is interpreted by the seller or provider as acceptance or continuing acceptance of the offer or agreement.

F.  "**Person**" or "**Persons**" means any natural person, organization, or other entity, including, but not limited to, a corporation, partnership, proprietorship, association, cooperative, or any other group or combination acting as an entity.

## II.    Prohibition Against Misrepresentations

416.    IT IS ORDERED that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, in connection with the advertising, marketing, promoting, offering for sale, or selling of any online dating services:

A.  Any material restrictions, limitations, or conditions to purchase, receive, or use the online dating services, or to receive any discount, "guarantee," or special offer;

B.  Any cost to the consumer to purchase, receive, use, or return the initial good or service;

C.  That the consumer will not be Charged for any good or service;

D.  That a good or service is offered on a "guarantee," "free," "trial," "sample," "bonus," "gift," "no obligation," "discounted" basis, or words of similar import, denoting or implying the absence of an obligation on the part of the recipient of the offer to affirmatively act in order to avoid Charges, including where a Charge will be assessed pursuant to the offer unless the consumer takes affirmative steps to prevent or stop such a Charge;

E.  That the consumer can obtain a good or service for a processing, service, shipping, handling, or administrative fee with no further obligation;

F.  The purpose(s) for which the consumer's Billing Information will be used;

G.  The date by which the consumer will incur any obligation or be Charged unless the consumer takes an affirmative action on a Negative Option Feature;

H.  That a transaction has been authorized by the consumer;

I.  Any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy for the good or service;

J.  Any other material fact; and

K.  In connection with promoting or offering for sale any good or service with a Negative Option Feature, any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy for the good or service. Compliance with this Section is separate from, and in addition to, the disclosures required in Sections III and IV, *infra*.

## III.    Required Disclosures

417.    IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, offering for sale, or selling of any online dating services, are permanently restrained and enjoined from:

A.  Failing to Clearly and Conspicuously disclose that consumers registering for a six-month "guarantee" must, to the extent applicable, (a) secure and maintain a public profile with a primary photo approved by Defendants within the first seven days of purchase, (b) message five unique subscribers per month, and (c) use Defendants'

76

progress page to redeem the free six months during the final week of the initial six-month subscription period;

B.  Failing to Clearly and Conspicuously disclose any material restrictions, limitations, or conditions to purchase, receive, or use the online dating services, or to receive any discount, "guarantee," or special offer; and

C.  In connection with promoting or offering for sale any good or service with a Negative Option Feature obtaining Billing Information from a consumer, without first disclosing Clearly and Conspicuously, the simple cancellation mechanism to stop all recurring Charges, as required by Section IV.

**IV.**    <u>Simple Mechanism to Cancel Negative Option Feature</u>

418.    IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any good or service with a Negative Option Feature, are permanently restrained and enjoined from:

A.  Failing to provide a simple mechanism for the consumer to: (1) avoid being Charged, or Charged an increased amount, for a good or service and (2) immediately stop any recurring Charge. Such mechanism must:

1.  Be easy to find;

2.  Be easy to use to stop such Charge;

3.  Not require the consumer to take any action that is objectively unnecessary to cancel

including using a Dark Pattern. A "Dark Pattern" refers to a user interface that has the effect of impeding consumers' expression of preference, manipulating consumers into taking certain action or otherwise subverting consumers' choice;

B. If any consumers entered into the agreement to purchase a good or service including a Negative Option Feature over the Internet or a mobile phone application, failing to provide the mechanism through the same website, email address or other application.

C. If any consumers entered into the agreement to purchase a good or service including a Negative Option Feature through an oral offer or acceptance, failing to provide such mechanisms through the use of a telephone number and a postal address.

## V.    Prohibited Business Activities

419.    IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any good or service with a Negative Option Feature, are permanently restrained and enjoined from:

A. Retaliating, threatening to take, or taking any adverse action against any consumer who files, or threatens to file, a billing dispute with their financial institutions or with any law enforcement or consumer protection agency by denying such consumers access to and use of paid-for goods or services; *provided, however*, that nothing herein shall be deemed to preclude Defendants from suspending a consumer's service during the pendency of a billing dispute or from suspending or terminating a consumer's service if a refund has been issued.

B. Violating the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401-05, a copy of which is attached.

### VI.    Judgment for Monetary Relief

420.    IT IS FURTHER ORDERED that:

A. Judgment in the amount of fifty-six million, eighty-five thousand, two hundred sixty-nine dollars ($56,085,269) is entered in favor of the Commission against Defendants, jointly and severally, as monetary relief pursuant to 15 § U.S.C. 57-b(b).

B. Defendants are ordered to pay to the Commission fifty-six million, eighty-five thousand, two hundred sixty-nine dollars ($56,085,269). Such payment must be made within 7 days of entry of this Order by electronic fund transfer.

### VII.    Judgment for Civil Penalty

421.    IT IS FURTHER ORDERED that:

A. Judgment in the amount of two hundred million, six hundred seventy-two thousand, six hundred forty dollars $200,672,640 is entered in favor of the Commission against Defendants, jointly and severally, as a civil penalty.

B.  Defendants are ordered to pay to the Commission $200,672,640. Such payment must be made within 7 days of entry of this Order by electronic fund transfer.

### VIII.    Additional Monetary Provision

422.    IT IS FURTHER ORDERED that:

A. Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

B. The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a

proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

C.  The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D.  Defendants acknowledge that their Taxpayer Identification Numbers (Employer Identification Numbers), which Defendants must submit to the Commission, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

E.  All money received by the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for consumer relief, such as redress and any attendant expenses for the administration of any redress fund. If a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after such redress is completed, the Commission may apply any remaining money for such related relief (including consumer information remedies) as it determines to be reasonably related to Defendants' practices alleged in the Complaint. Any money not used for relief is to be deposited to the U.S. Treasury as an additional civil penalty. Defendants have no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

### IX.    Customer Information

423.    IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, are permanently restrained and enjoined from directly or indirectly failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress. If a representative of the Commission requests in writing any information related to redress, Defendants must provide it, in the form prescribed by the Commission, within 14 days.

### X.    Order Acknowledgment

424.    IT IS FURTHER ORDERED that Defendants obtain acknowledgments of receipt of this Order:

A.  Each Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.  For 20 years after entry of this Order, each Defendant must deliver a copy of this Order to: (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting. Delivery must occur within 7 days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C. From each individual or entity to which a Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

**XI.**    Compliance Reporting

425.    IT IS FURTHER ORDERED that Defendants make timely submissions to the Commission:

A. One year after entry of this Order, each Defendant must submit a compliance report, sworn under penalty of perjury. Each Defendant must:

1. Identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Defendant;

2. Identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

3. Describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales;

4. Describe in detail whether and how that Defendant is in compliance with each Section of this Order; and

5. Provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B. For 20 years after entry of this Order, each Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following, each Defendant must report any change in:

1. Any designated point of contact; or

2. The structure of any Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C. Each Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D. Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E. Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: FTC v. Match Group, Inc. and Match Group, LLC.

**XII.** Recordkeeping

426. IT IS FURTHER ORDERED that Defendants must create certain records for 10 years after entry of the Order, and retain each such record for 5 years. Specifically, Defendants,

in connection with advertising, marketing, or promoting any online dating services, must create and retain the following records:

A. Accounting records showing the revenues from all goods or services sold;

B. Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C. Records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response;

D. All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

E. A copy of each unique advertisement or other marketing material featuring a negative option plan.

### XIII.    Compliance Monitoring

427.    IT IS FURTHER ORDERED that, for the purpose of monitoring Defendants' compliance with this Order:

A. Within 14 days of receipt of a written request from a representative of the Commission, each Defendant must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed

by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B. For matters concerning this Order, the Commission is authorized to communicate directly with each Defendant. Defendant must permit representatives of the Commission to interview any employee or other person affiliated with any Defendant who has agreed to such an interview. The person interviewed may have counsel present.

C. The Commission may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## XIV.   Retention of Jurisdiction

428.    IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.


May 12, 2025                              */s/ Jason C. Moon*
                                          REID TEPFER
                                          M. HASAN AIJAZ
                                          SARAH ZUCKERMAN (admitted *pro hac vice*)
                                          ERICA R. HILLIARD
                                          JASON C. MOON
                                          NICOLE G. H. CONTE (admitted *pro hac vice*)
                                          TAMMY CHUNG (admitted *pro hac vice*)
                                          Texas Bar No. 24079444 (Tepfer)
                                          Virginia Bar No. 80073 (Aijaz)
                                          New York Bar No. 5603832 (Zuckerman)
                                          Mississippi Bar No. 104244 (Hilliard)
                                          Texas Bar No. 24001188 (Moon)
                                          Virginia Bar No. 91552 (Conte)
                                          New York Bar No. 5745476 (Chung)
                                          Federal Trade Commission

1999 Bryan St. Ste. 2150
Dallas, Texas 75201
T: (214) 979-9395 (Tepfer)
T: (214) 979-9386 (Aijaz)
T: (214) 979-9376 (Zuckerman)
T: (214) 979-9379 (Hilliard)
T: (214) 979-9378 (Moon)
T: (202) 285-0062 (Conte)
T: (202) 676-7541 (Chung)
F: (214) 953-3079
Email: rtepfer@ftc.gov;
maijaz@ftc.gov;
szuckerman@ftc.gov;
ehilliard@ftc.gov;
jmoon@ftc.gov;
nconte@ftc.gov;
tchung@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## CERTIFICATE OF SERVICE

On May 12, 2025, I filed the foregoing document with the clerk of court for the U.S.

District Court, Northern District of Texas. I hereby certify that I have served the document on

counsel by a manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Jason C. Moon*
Jason C. Moon

86