# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

FEDERAL TRADE COMMISSION,

      Plaintiff,

 v.

MATCH GROUP, INC., a corporation,
MATCH GROUP, LLC, formerly known as
MATCH.COM, LLC, a limited liability
company,

      Defendants.

Case No. 3:19-cv-02281-K

**PLAINTIFF FEDERAL TRADE COMMISSION'S TRIAL BRIEF**

**FILED UNDER SEAL**

1

# TABLE OF CONTENTS

I.    Introduction ................................................................................................................ 6

II.    Issues for Trial ......................................................................................................... 8

   A.    Count III: the "Match Guarantee." ................................................................... 8

      1.    Match.com advertised a deceptive "Guarantee" with onerous hidden terms. ................ 8

      2.    Match.com's deceptive "Guarantee" is a straightforward violation of Section 5 of the FTC Act. ....................................................................................................................... 13

   B.    Count IV: Match.com's Chargeback Policy. .................................................... 16

      1.    Match.com's Chargeback Policy denied consumers paid-for services. ........................ 16

      2.    Match.com's Chargeback Policy violated the FTC Act. ............................................. 17

   C.    Count V: Match.com's intentionally difficult cancellation flow. ..................... 18

      1.    Match.com's cancellation flow thwarted consumers' attempts to cancel. ..................... 18

      2.    Defendants designed Match.com's cancellation flow to be difficult. ............................ 21

   D.    Defendants are liable for these law violations and must be enjoined to prevent similar law violations. ...................................................................................................... 22

      1.    Both MGI and MGLLC are liable. ........................................................................... 22

      2.    Injunctive relief is necessary and appropriate because Defendants' misconduct is likely to recur without it. ............................................................................................................ 24

      3.    The injunction should cover all of Defendants' future conduct, not just on one of their many dating sites. ....................................................................................................... 25

   E.    Defendants are liable for monetary relief for their ROSCA violations. ........................... 28

      1.    The Court should order Defendants to redress consumers harmed by Defendants' illegal cancellation mechanism ....................................................................................... 28

      2.    The Court should impose substantial civil penalties to deter Defendants from continuing to flaunt the law. ......................................................................................... 28

III.    Conclusion .............................................................................................................. 31

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Albany*, 321 F.2d 649 (5th Cir. 1963) ........................................................................ 26

*Carter Prods., Inc. v. FTC*, 323 F.2d 523 (5th Cir. 1963) ............................................................ 27

*Dallas Gay Alliance, Inc. v. Dallas County Hospital Dist.*, 719 F.Supp 1380 (N.D. Tex. 1989) 26

*ECM BioFilms, Inc. v. FTC*, 851 F.3d 599 (6th Cir. 2017) ............................................................ 14

*Floersheim v. FTC*, 411 F.2d 874 (9th Cir. 1969) ........................................................................ 14

*Freedom From Religion Found. v. Abbott*, 955 F.3d 417 (5th Cir. 2020) .................................... 26

*FTC v. Amazon.com, Inc.*, 735 F. Supp. 3d 1297 (W.D. Wash. 2024) .................................... 19, 31

*FTC v. Bronson Partners*, LLC, 564 F. Supp. 2d 119 (D. Conn. 2008) ...................................... 16

*FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35 (D.C. Cir. 1985) .............................. 14

*FTC v. Cardiff*, No. 18-cv-2104, 2020 U.S. Dist. LEXIS 210930 (C.D. Cal. Oct. 9, 2020) ........ 15

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965) .................................................................... 27

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006) ...................................................... 14

*FTC v. Direct Mktg. Concepts, Inc.*, 569 F.Supp. 2d 285 (D. Mass. 2008) ................................ 15

*FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997) ................................................................................ 29

*FTC v. Febre*, No. 94 C 3625, 1996 U.S. Dist. LEXIS 9487 (N.D. Ill. July 2, 1996) ................ 15

*FTC v. Five-Star Auto Club*, 97 F.Supp. 2d 502 (S.D.N.Y. 2000) .............................................. 17

*FTC v. Freecom Communications, Inc.*, 401 F.3d 1192 (10th Cir. 2005) .................................... 16

*FTC v. Int'l Comp. Concepts*, No. 5:94-cv-1678, 1995 WL 767810 (N.D. Ohio Oct. 24, 1995) 14

*FTC v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016) ...................................................... 23

*FTC v. Lights of America, Inc.*, No. 10-cv-01333, 2013 WL 5230681 (C.D. Cal. Sept. 17, 2013)

................................................................................................................................................ 16

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994)...................................................... 13

*FTC v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. 2006)...................................................... 15

*FTC v. QYK Brands LLC*, No. SACV 20-1431, 2022 WL 3138761 (C.D. Cal. April 6, 2022)... 29

*FTC v. Ruberoid Co.*, 343 U.S. 470 (1952) ........................................................................ 26

*FTC v. Sage Seminars*, No. 95-cv-2854, 1995 WL 798938 (N.D. Cal. Nov. 2, 1995) ............... 25

*FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312 (8th Cir. 1991).......................... 29

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993 (N.D. Ind. 2000) .................................. 15

*FTC v. Windward Mktg.*, No. 1:96-CV-615-FMH, 1997 U.S. Dist. LEXIS 17114 (N.D. Ga. Sept. 30, 1997)............................................................................................................. 16

*FTC v. Zaappaaz, LLC*, 4:20-CV-02717, 2024 WL 1237047 (S.D. Tex. Mar. 22, 2024) ..... 26, 27

*In re Cliffdale and Assocs., Inc.*, 103 F.T.C. 110 (1984) ...................................................... 15

*In re Removatron Int'l Corp.*, 111 F.T.C. 206 (1988) ...................................................... 16

*ITT Continental Baking Co. v. FTC*, 532 F.2d 207 (2d Cir. 1976).......................................... 27

*Krupski v. Costa Crociere S. p. A*, 560 U.S. 538 (2010) ...................................................... 29

*Niresk Indus., Inc. v. FTC*, 278 F. 2d 337 (7th Cir. 1960) .................................................. 27

*Niresk Indus., Inc. v. FTC*, 364 U.S. 883 (1960) ................................................................ 27

*Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354 (11th Cir. 1988) .................................. 18

*Removatron Int'l. Corp. v. FTC*, 884 F.2d 1489 (1st Cir. 1989)............................................ 16

*SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978)........................................................................ 24, 25

*SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215 (D.C. Cir. 1989).................................. 29

*Spell v. Edwards*, 962 F.3d 175 (5th Cir. 2020) .................................................................. 26

*Trans World Accounts, Inc. v. FTC*, 594 F.2d 212 (9th Cir. 1979) ........................................ 27

*United States v. Commer. Recovery Sys.*, 179 F. Supp. 3d 728 (E.D. Tex. Apr. 7, 2016) ........... 13

*United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811 (N.D. Tex. 2008)................... 24

*United States v. MyLife.com, Inc.*, 567 F.Supp.3d 1152 (C.D. Cal. 2021) ............................ 19, 29

*Walmart, Inc.*, 2023 U.S. Dist. LEXIS 51445 (citing 1980 FTC Unfairness Policy Statement).. 18

**Statutes**

15 U.S.C. § 45(a)(1) ................................................................................................. 12

15 U.S.C. § 45(m)(1)(A) ........................................................................................... 29

15 U.S.C. § 45(m)(1)(C) ...................................................................................... 29, 30

15 U.S.C. § 45(n) ..................................................................................................... 16

15 U.S.C. § 57b(b) ................................................................................................... 28

15 U.S.C. § 57b(d) ................................................................................................... 29

**Rules**

Fed. R. Civ. P. 15(c)(1)(B) ...................................................................................... 28

## I.    Introduction

Defendants Match Group, Inc. ("MGI") and Match Group, LLC, n/k/a Tinder, LLC ("MGLLC"),[1] have owned and operated dozens of dating websites, including Match.com. For years, Defendants have deployed deceptive, unfair, and illegal tactics to charge customers for subscriptions they did not want or could not use. First, Match.com "guarantee[d]" that if consumers did not "meet someone special" on their site, Match.com would give them another six months for free. But the guarantee's hidden limitations made it nearly impossible for consumers to qualify, resulting in what Match.com personnel described as a "ton of complaints" from deceived consumers. Match.com's Vice President of Product remarked, "it's pretty sad to see how few people actually qualify at the end of their term!" The Director of Consumer Insight responded: "[w]e have some very strict rules in place. I was shocked it was so many." Indeed, less than two percent of customers who purchased eligible subscriptions received the guaranteed free six months.

Second, Defendants created a difficult and confusing online cancellation flow designed to trap consumers in an endless loop of recurring charges. As MGI's former Chief Operating Officer candidly explained, Match.com puts customers "through the [w]ringer if you want to cancel your subscription or get a refund." Other employees variously described the flow as "too hard to locate," "too long," "very convoluted and confusing," and "really, really terrible." Defendants knew that Match.com did not have and "need[s an] easy way to stop autorenewal," just as the FTC alleged.

Defendants design the flow to make it difficult to cancel a Match.com subscription. "It's not a bug. It's a feature," admitted one Match.com manager explaining why Match.com's senior

---

[1] In May 2024, Defendant Match Group, LLC changed its name to Tinder, LLC.

management "would not reduce the [number of] resign steps" for the cancellation flow. Soon after this action was filed, Match.com personnel succinctly summarized Defendants' strategy to discourage cancellations in an internal communication: **"making it harder to cancel with small changes."** Defendants have used this onerous cancellation process to bill hundreds of thousands of consumers for millions in unauthorized renewals.

Lastly, Defendants have punished customers who dared to ask for their money back through their financial institutions by denying them the services they paid for. If customers requested a chargeback and lost the dispute, Match.com kept the customers' money while keeping their accounts deactivated. Defendants imposed this unfair policy over the objections of their own head of customer service.

Defendants' deceptive guarantee, unfair chargeback policy, and unnecessarily difficult cancellation flow have violated Section 5 of the FTC Act and the Restore Online Shoppers' Confidence Act ("ROSCA"). The Court can and should remedy Defendants' egregious law violations by ordering Defendants to pay back consumers' unwanted subscription payments caused by their confusing and difficult cancellation flow, pay civil penalties for their intentional ROSCA violations, and permanently cease their misconduct.

To be effective, the Court must enjoin both Defendants and all of their platforms—not just Match.com. Both Defendants operated Match.com and numerous similar dating platforms. Each presents an opportunity to engage in the same law violations as soon as the Court's spotlight fades. This risk is not just theoretical: Defendants appear to have engaged in at least one of the illegal business practices at issue across multiple dating sites. Accordingly, the FTC asks that the Court hold Defendants' accountable and protect consumers by putting a final and effective end to Defendants' deceptive, unfair, and illegal conduct.

## II.    Issues for Trial

As explained below, Defendants violated the FTC Act through Match.com's deceptive "Guarantee" marketing and unfair chargeback policy and ROSCA through Match.com's cancellation flow, which they designed to be hard to find and difficult to complete. Both Defendants are liable for these violations, as both Defendants own, control, and operate Match.com, and their executives and employees had knowledge of the illegal practices. Moreover, because Defendants had no intention of suspending those practices before the FTC's investigation, the Court should enjoin their illegal conduct at issue in all three counts. And because the same employees and executives operate multiple substantially similar websites and Defendants have recently consolidated corporate control over those websites, the Court should enjoin their practices on all dating platforms that they operated. To compensate consumers for their losses and deter Defendants from future violations, the Court should award $56,085,269 in consumer redress and impose the maximum civil penalties of $200,672,640. Absent such relief, Defendants will view this lawsuit as simply the cost of doing business.

### A.  Count III: the "Match Guarantee."

#### 1.  Match.com advertised a deceptive "Guarantee" with onerous hidden terms.

From 2005 until shortly before this lawsuit, Defendants widely marketed a deceptive "Guarantee," also termed the "Match Guarantee" or the "Make Love Happen Guarantee." Match.com guaranteed that "If you haven't found someone special within 6 months, we'll give you an extra 6 months FREE." Match.com promoted the Guarantee on the radio, through a televised advertising campaign, and in sponsored search engine results:

**Match.com®: Free Trial - Official Match.com® Promotion**
[Ad] www.match.com/FreeTrial ▾
3 **Day** Free **Trial**. See Free Pics Now
Services: Personalized Matches, Send Winks, Like Photos, Add Favorites
Types: Single Women, Single Men, Gay Dating, Lesbian Dating, Christian Dating

**6 Months Guarantee**
It Works So Well - We Guarantee It!
Create Your Free Profile Today.

**See Who's Online Now**
Join Millions of Members on Match
The Leading Dating Website.

**I Met Someone Guarantee**
We Believe You Will Find
Someone Special at Match!

**Local Single Men**
Get to Know Singles Near You
Browse Pics & Profiles for Free

Consumers who purchased a six-month subscription on Match.com's desktop website would see a rate card like that below, which explicitly refers to the Guarantee:



The Guarantee had several inadequately disclosed requirements, ensuring few consumers would receive the promised extra six months of service. Subscribers had to message five unique subscribers—that is, users with whom the consumer had never communicated before—per month. And Match.com calculated this requirement based not on calendar months but rather the date the subscription was purchased, leading to confusing deadlines for messaging other users.

9

Match.com also required users to upload an approved photo within seven days of purchase, and users to keep their photo up at all times for the entire six months. A user who removed their profile photo at any point—even momentarily—was automatically disqualified from the Guarantee program.

Additionally, Match.com required that qualifying customers affirmatively accept the Guarantee Extension by finding and navigating an inconspicuous Redemption Flow.[2] This Guarantee Extension Redemption Flow was difficult to find on the website. It appeared, without notice, for only seven days on the Guarantee Progress Page.[3] It was also confusing. The flow began with a misleading question, asking customers whether they had "met someone" on the site—as opposed to whether they "met someone special," which was how the Guarantee was elsewhere described and advertised. Confused consumers who answered "yes" despite not having found a romantic partner were disqualified from receiving the Guarantee Extension. Instead, those consumers would be autorenewed, though the flow did not indicate this. If a consumer stated they had not met someone, they were asked a second question inquiring whether they wanted the Guarantee Extension. Yet if the subscriber stated they did *not* want the free service, their subscription was not cancelled. Instead, unless that consumer affirmatively cancelled, he or she would be charged for another six-month subscription—the same service they

---

[2] If a customer failed to complete the flow during that seven-day window, they would need to contact customer care to request the Guarantee Extension. However, Defendants gave customers only thirty days to make this request—a limitation disclosed nowhere on the site. Match.com's Senior VP of Global Customer Care, explained that Customer Care implemented this 30-day policy because "it's ridiculous to think a member will notice it [*i.e.*, the redemption flow link] and redeem it online during that short timeframe [*i.e.*, the 7-day window][.]"

[3] Even if a customer found the Redemption Flow during this limited window, the flow itself was confusing, with poorly worded questions, and unnecessarily long. Match.com's future Senior VP of Global Customer Care described the flow as "very poor" and admitted that "[m]embers miss the opportunity to redeem, even if they're eligible and end up having to call Care."

had just declined for free. Due to this difficult redemption process, many customers paid for a subscription renewal that should have been free.

Consumers did not know the Guarantee's limitations because Defendants omitted the Guarantee's terms and conditions from Match.com's purchase flow. Instead, Defendants hid the Guarantee's burdensome and nonintuitive limitations on separate, poorly disclosed webpages. To find the Program Rules Page before purchasing the subscription, consumers would first need to hover their cursor over the "match GUARANTEE" logo on the Match.com rate card, which displayed the prices for Match.com's various subscriptions. This caused a text box to appear with the following text:



This popup failed to signal to consumers that several requirements limited the Guarantee. On the contrary, it reinforced the false impression that consumers would get six months free if they simply failed to meet "someone special" on the site. To find the hidden requirements of the purported Guarantee, consumers would need to click the "Learn More" link.[4] That link redirected consumers to a different page of the website, the Program Rules Page.

The Program Rules Page presented an infographic that purported to summarize the Guarantee's requirements. But beneath this graphic was an imposing block of fine print text that

---

[4] Alternatively, consumers would have needed to locate Match.com's FAQ page and then searched for additional information concerning the Guarantee and followed the accompanying prompts.

described the Guarantee's eligibility rules in greater detail and included additional requirements to redeem the Guarantee Extension. Consumers would have needed to read past the six numbered requirements to the first bullet to learn how to redeem the Guarantee Extension. As Match.com personnel admitted internally, "[r]eading the 6MG rules page feels like reading fine print (hard to read)."

**I Met Someone GUARANTEE (formerly "Make Love Happen Guarantee") Program Rules**

We know you'll meet tons of great people during your 6-month subscription with us. But, if you don't find someone special during that time, we'll give you an ADDITIONAL 6 months to continue your search. Check out the rules below, then get out there and start connecting today!

- Under the I Met Someone GUARANTEE Program, (the "Guarantee Program" or the "Program") if you don't find someone special during a qualifying six-month paid subscription to the Match.com service, we'll give you an additional six-month subscription (the "Guarantee Extension") to the Match.com service at no additional expense. See Match.com Terms of Use for details regarding the Match.com service and use of the Match.com website.
- The Guarantee Program is available for a limited time only, and open to anyone not currently participating in the Program. Additionally, to be eligible for the Program and the Guarantee Extension, you must:
- (1) Comply at all times with the Match.com Terms of Use. By using the Match.com website and participating in the Program, you agree to be bound by the Match.com Terms of Use.
- (2) Pay in full the applicable rate for a **six-month subscription** to the Match.com service (the "Guarantee Program Subscription"). The Guarantee Program Subscription consists of five consecutive 30-day periods followed by a final period of 33 days, all of which are referred to as a "Month" in these Program rules. If you are enjoying the benefits of a free trial of the Match.com service, your Guarantee Program Subscription will not begin until your free trial period ends.
- (3) Use your Guarantee Program Subscription to **create a profile with a primary photo**. Your profile and primary photo must be approved by Match.com within the first seven days of your Guarantee Program Subscription in order for you to be eligible for the Guarantee Program. Details on approval of profile and primary photo available at FAQ and How It Works.
- (4) **Keep your profile with primary photo visible at all times** during your Guarantee Program Subscription.
- (5) **Communicate** during your Guarantee Program Subscription with other Match.com subscribers with whom you have not previously communicated during your Guarantee Program Subscription ("Unique Match.com Subscribers").
- (6) Send a **"Qualifying Email" to a minimum of five other Match.com Subscribers each Month during your Guarantee Program Subscription.** A "Qualifying Email" may be either one you send to a Unique Match.com Subscriber who has not yet emailed you or an email response you send to a Unique Match.com Subscriber who has emailed you. A "Qualifying Email" must be an email sent through the Match.com service and does not include any other method of communicating (such as Match.com winks, MatchPhone™, Match.com instant Messaging or emails sent outside of the Match.com system).
- Progress toward eligibility for the Guarantee Extension may be determined at any time during a Guarantee Program Subscription by visiting the progress page associated with such Guarantee Program Subscription (the "Guarantee Program Progress Page"). If, during the last seven days of a Guarantee Program Subscription, you are eligible for a Guarantee Extension (and have not met that "special someone"), you may accept the Guarantee Extension by affirming on the Guarantee Program Progress Page that you have not met someone special during your Guarantee Program Subscription. Please see the Match.com Guarantee FAQ for further information. You may also contact Customer Care with any questions related to the Match.com service or the Program. Match.com alone will make all decisions under these Program rules regarding Program policies, including but not limited to Program and Guarantee Extension eligibility.
- Customers eligible to receive a Guarantee Extension will not receive a refund, money or any other thing of value as a substitute for the Guarantee Extension. The Guarantee Extension may only be used by the purchaser of the Guarantee Program Subscription, and the Guarantee Extension may not be sold or transferred in any way.
- Guarantee Program Subscriptions which do not result in a Guarantee Extension (due to ineligibility of the subscriber or failure of the subscriber to accept the Guarantee Extension) will automatically be continued for successive six-month subscription periods at the subscription rate in effect at the time of continuation. See Match.com Terms of Use for details regarding Match.com subscriptions and charges on your billing account.
- The Match.com Terms of Use and the Match.com Guarantee Program Rules are subject to change by Match.com at any time, effective upon posting on the Match.com website, and your use of the Match.com service and your initial or continued participation in the Match.com Guarantee Program after such posting will constitute acceptance by you of such changes. Match.com reserves all rights to modify, suspend or cancel the Program at any time and without notice.
- Program rules last updated January 24th, 2008.

Millions of consumers were harmed by Match.com's deceptive "Guarantee." Given Defendants' hidden limitations, few consumers received the promised extra six months. For example, Match.com sold about 2.7 million subscriptions between 2013 and 2016 subject to the

Guarantee, but only 33,987 of those consumers received Guarantee Extensions. In total, less than two percent of customers during this period ever received the Guarantee Extension. Meanwhile, Defendants billed one million consumers for an additional 6-month subscription that Match.com had promised to give them for free.

Consumers were confused by Match.com's Guarantee and its hidden requirements. Defendants knew that the Guarantee's problems was a top customer complaint, and Match.com personnel frequently discussed these issues. But Defendants let profitability dictate whether they would follow the law. For example, Match.com personnel admitted that "the messaging and functionality for 6-mo [*i.e.*, the Six Month Guarantee/Match Guarantee] is quite poor." But this executive wanted to know first "[i]f we were to improve the messaging and visibility to the customer, especially to those eligible to redeem," whether this would be "meaningfully negative from a revenue perspective." Match.com employees discussed, and even tested, successful ways of addressing these known problems but did not implement them. Defendants rejected one fix—despite testing demonstrating its success—after the results showed it would result in "sub [*i.e.,* subscription] and revenue loss."

### 2. Match.com's deceptive "Guarantee" is a straightforward violation of Section 5 of the FTC Act.

Match.com's "Guarantee" violated the FTC Act's prohibition on "deceptive acts or practices."[5] An act or practice is deceptive under the FTC Act if, "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."[6]

---

[5] 15 U.S.C. § 45(a)(1).

[6] *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994); *see also United States v. Commer. Recovery Sys.*, 179 F. Supp. 3d 728, 734 (E.D. Tex. 2016).

13

Defendants widely promoted their "Guarantee." They made the guarantee the subject of a televised advertising campaign, for example. And Defendants put the Guarantee claims in unavoidable spots in the purchase flow. Indeed, customers had to view these representations on Match.com to purchase the Six-Month subscription. The guarantee was also likely to mislead reasonable consumers. Defendants represented that they would provide customers "six months free" if customers failed to "meet someone special." These representations, made without adequately disclosing the Guarantee's onerous conditions, gave consumers the inaccurate "net impression" that Match.com offered a simple satisfaction guarantee: if they failed to meet anyone "special," they would get another six months.

Hidden disclosures are inadequate to remedy a deceptive net impression.[7] It is "the overall net impression that counts. Fine print or ineffective disclaimers do not change the message conveyed if the overall net impression is different."[8] Defendants' deceptive "Guarantee" was likely to mislead "at least a significant minority of reasonable consumers."[9] Courts have found other similar guarantees to be deceptive where the marketer offered a guarantee or made a refund promise without clearly disclosing limitations or required steps.[10] For

---

[7] *See, e.g. FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200-1201 (9th Cir. 2006) (fine print disclosure on back of "invoice" clarifying that consumers who deposited check would constitute agreement to pay monthly fee for Internet did not correct net impression that check was a refund); *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 42-43 (D.C. Cir. 1985) (affirming a ruling that an ad is deceptive despite "fine print in the corner of the advertisement truthfully explain[ing]" and clarifying more prominent representations because consumers would be unlikely to read the disclosure); *Floersheim v. FTC*, 411 F.2d 874, 876-78 (9th Cir. 1969) (finding a solicitation created the deceptive impression that it was from the government because of the repetition of the words "Washington D.C." even though the forms contained a small print disclaimer informing recipients that such was not the case).

[8] *FTC v. Int'l Comp. Concepts*, No. 5:94-cv-1678, 1995 WL 767810, at *3 (N.D. Ohio Oct. 24, 1995) (citation omitted).

[9] *See ECM BioFilms, Inc. v. FTC*, 851 F.3d 599, 610-11 (6th Cir. 2017) (holding, in the context of allegations that certain claims were misleading, that a representation is considered misleading "if at least a significant minority of reasonable consumers would be likely to take away the misleading claim") (cleaned up).

[10] *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1012 (N.D. Ind. 2000) (representation that defendants would provide a full unconditional guarantee, without disclosing refund conditions, was deceptive); *FTC v. Cardiff*,

example, in *FTC v. QT, Inc.*, the court concluded that the defendants' satisfaction guarantee was deceptive after the defendants similarly hid the true terms of the guarantee. There, the defendants had hidden the guarantee's terms behind a "small font" hyperlink labeled "click here for details," which "appeared less prominently next to the phrase 'SATISFACTION GUARANTEED!'"[11]

Last, Defendants' representations concerning the Guarantee were material.[12] Both the volume of consumer complaints and Defendants' internal testing showing the power of the claim demonstrate that consumers found guarantee material. Indeed, Defendants heavily relied on the guarantee to convince consumers to join Match.com. And express claims are presumed material,[13] as are "deliberately-made implied claims, used to induce the purchase of a particular product."[14] Further, "any representations concerning the price of a product or service are presumptively material."[15] Defendants' claim concerned whether consumers would receive six

---

No. 18-cv-2104, 2020 U.S. Dist. LEXIS 210930, at *247 (C.D. Cal. Oct. 9, 2020) (defendants' advertisement of "lifetime money-back guarantees" without disclosing refund polices and conditions was deceptive); *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 950 (N.D. Ill. 2006) (finding a guarantee offer deceptive in part because the 10-day guarantee offered on defendant's website differed from the 30-day guarantee advertised in an infomercial and was disclosed only behind a "click here for details" hyperlink); *see also FTC v. Febre*, No. 94 C 3625, 1996 U.S. Dist. LEXIS 9487, at *12-13 (N.D. Ill. July 2, 1996) (stating generally that "[t]he failure to disclose material facts that could affect consumers' decisions, *i.e.*, the conditions for obtaining refunds, the conditions and costs associated with participating in a program and the true nature of the services or product offered, can be a deceptive practice").

[11] 448 F. Supp. 2d at 950.

[12] A representation is material if is "likely to affect the consumer's conduct or decision with regard to a product or service." FTC Policy Statement on Deception (1984), *available at* https://www.ftc.gov/legal-library/browse/ftc-policy-statement-regarding-advertising-substantiation; *In re Cliffdale and Assocs., Inc.*, 103 F.T.C. 110 (1984); *FTC v. Direct Mktg. Concepts, Inc.*, 569 F.Supp. 2d 285, 299 (D. Mass. 2008).

[13] *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994); *FTC v. Freecom Communications, Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005) (holding that express income claims "are material and likely to mislead consumers because such misrepresentations strike at the heart of a consumer's purchasing decision"); *FTC v. Lights of America, Inc.*, No. 10-cv-01333, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) (holding that claims about the watts and lifetime of the LED light bulbs were per se material because they were express, and "that even if they were implied claims, they were material because the claims relate to the efficacy of the product").

[14] *FTC v. Windward Mktg.*, No. 1:96-CV-615-FMH, 1997 U.S. Dist. LEXIS 17114, at *28 (N.D. Ga. Sept. 30, 1997); *FTC v. Bronson Partners*, LLC, 564 F. Supp. 2d 119, 135 (D. Conn. 2008) (noting that an implied claim where the advertiser intended to make the claim was presumed to be material).

[15] *Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114, at *28 (citing *In re Removatron Int'l Corp.*, 111 F.T.C. 206, 309 (1988), *aff'd*, 884 F.2d 1489 (1st Cir. 1989)).

15

months of free service or be charged as much as $127 for that same service. Of course, such representations were material to Match.com's customers.

During trial, we anticipate that Defendants will not provide any evidence showing that the guarantee did not deceive consumers. Instead, they will likely advance several irrelevant or speculative arguments for why their misrepresentations did not matter. First, Defendants will likely claim that the Guarantee's limitations were simply intended to drive site engagement. But even if that claim were true (and the evidence makes plain it is not), that would not excuse Defendants from their legal obligation to disclose the material terms and conditions of their "Guarantee" before inducing consumers to purchase their product. Next, Defendants attempt to excuse their deceptive "Guarantee" by speculating that perhaps some consumers did not know or care about their widely advertised Guarantee. Even if true, it does not change that undoubtedly at least some consumers were interested in the "Guarantee," as Defendants' testing and consumer complaints show. Moreover, as noted above, the law provides that representations like Defendants' should be presumed material.[16]

## B. Count IV: Match.com's Chargeback Policy.

### 1. Match.com's Chargeback Policy denied consumers paid-for services.

As Defendants have admitted, for years Match.com employed a punitive chargeback policy that denied customers paid-for services if they exercised their right to seek a chargeback. Under that policy, Defendants took customers' money and then, if customers sought a chargeback through their financial institution, denied those customers the access for which they

---

[16] *See supra* n.13; *see also FTC v. Five-Star Auto Club*, 97 F.Supp. 2d 502, 530 (S.D.N.Y. 2000) (concluding that the FTC does not need to show "that every consumer actually relied upon the misrepresentation to prevail")

had paid. Internal email records show that, above all, Match.com instituted its chargeback policy to punish customers who dared to ask for their money back.

## 2. Match.com's Chargeback Policy violated the FTC Act.

Match.com's chargeback policy violated a fundamental tenet of fairness: if you pay for a service, you should actually receive it.

Under the FTC Act, an act or practice is unfair if it (1) causes or is likely to cause substantial injury; (2) is not outweighed by countervailing benefits to consumers or competition; and (3) is not reasonably avoidable by consumers themselves.[17] Match.com's chargeback policy caused substantial injury, just as Defendants intended. Over 55,000 consumers lost account access when they had months remaining on their membership and did not receive a refund or reinstatement. And while Defendants claim to have been willing to reinstate these accounts upon request, they did not restore access for over 96% of them.[18] This harm was not reasonably avoidable. Harm is avoidable only "[i]f consumers had a free and informed choice in the matter. . . ."[19] But Match.com's customers had no "free and informed choice" because Match.com did not adequately disclose its policy. Instead, Match.com buried its punitive chargeback policy in its Terms of Use and disclosed it nowhere else. Finally, the injury was not outweighed by benefits to competition or consumers. Contrary to Defendants' claims, the contemporaneous evidence in this case establishes that this policy was intended to punish consumers for exercising their right

---

[17] 15 U.S.C. § 45(n).

[18] Even if more consumers had requested and received restored access, this practice would still be unfair. This is because Defendants did not credit the few consumers who had their account access restored for the 60-day suspension.

[19] *Walmart, Inc.*, 2023 U.S. Dist. LEXIS 51445 at *46 (citing 1980 FTC Unfairness Policy Statement); *see also Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988) (quoting *FTC v. Orkin Exterminating Co.*, 108 F.T.C. 263, 1986 WL 722153, at *8 (1986)) ("Consumers may act to avoid injury before it occurs if they have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end.").

to seek a chargeback. Moreover, consumers receive no benefit from being denied services that they have paid for, nor is competition furthered by denying consumers paid-for services out of spite.

### C. Count V: Match.com's intentionally difficult cancellation flow.

#### 1. Match.com's cancellation flow thwarted consumers' attempts to cancel.

Defendants direct consumers who wish to cancel to Match.com's difficult to find and difficult to use cancellation flow.[20] A facial review of the cancellation flow, Defendants' internal communications, Match.com's complaint data, website clickthrough data, and expert analysis all show that Defendants use the flow to illegally discourage and frustrate users' attempts to cancel.

Match.com's online cancellation flow is, in the words of its Director of Customer Care, "hard to find, tedious, and confusing." It requires as many as *twelve* clicks and consists of eight separate pages.[21] To access it, consumers must find the account settings page, know to select "Manage subscription" from the "Manage account" submenu, and then re-enter a password, even if they are already logged in. It includes a multi-question, multi-page survey and, quite often, a save offer. Internal data and correspondence show that nearly half of cancellation attempts are unsuccessful.[22] Match.com personnel, in a candid internal presentation, concluded that the flow's

---

[20] Defendants have attempted to sidestep this issue by noting that there are other ways to contact Match.com. But Defendants did not disclose that consumers could cancel via these alternate points of contact. Unsurprisingly, few customers ever have.

[21] *Cf. FTC v. Amazon.com, Inc.*, 735 F. Supp. 3d 1297, 1322-23 (W.D. Wash. 2024) (concluding the FTC had adequately pled a violation of the Restore Online Shoppers' Confidence Act concerning Amazon's online cancellation flow, which "required consumers to click six times and go through four screens").

[22] Since this litigation commenced, Defendants have offered multiple manufactured statistics purporting to show a high success rate for their cancel flow. Defendants have separately touted *three* different success rates—84%, 89%, and, most recently, 95%. Defendants' ever-changing statistics are clearly self-serving and unreliable. They were inflated by dropping essential steps from the cancel flow and are contradicted by the company's internal pre-litigation calculations. Defendants further distort their statistics by calculating the success rate on a per-user, as opposed to a per-session, basis. Such an approach discounts all of consumers' failed cancellation attempts if they eventually manage to successfully cancel.

18

failure rate was as high as 56%. Defendants' clickthrough data reflects a similarly high failure rate.[23]

Defendants have speculated—without evidence—that the millions of consumers who failed to complete the cancellation flow had been "exploring the website" or perhaps had heard "someone at their door." But the evidence suggests exactly the opposite: numerous consumer complaints and internal acknowledgement by Defendants' employees reflect that the cancellation flow's difficulty prevented people from successfully cancelling.

Defendants know Match.com's cancellation flow is, in an employee's own words, "really, really terrible"—and has been for years. Indeed, it was an open secret at the company. On this topic, Defendants' employees' emails, which span multiple years and departments, speak for themselves:

- o **Kris Auderer (Director of Care Operations):**
  - Cancellation "is a huge source of complaint – and always has been. . . . If you haven't walked through the process on the site, you should check it out. It's really, really terrible."
  - Auderer further advised the future MGI CEO: "[H]onestly it's been the same complaint for the past decade that I've been with Match . . . It takes up to 7 or 8 clicks to complete the flow to turn off [autorenewal] . . . if you can even figure out how to do it. . . . . The main thing is it's too hard to locate – it's in account settings . . . , the verbiage is inconsistent, and it takes multiple clicks to complete the process, plus the retention offer is misleading[.]").

- o **Navin Ramachandran (former COO):** Stated that Match.com puts its customers "through the [w]ringer if you want to cancel your subscription or get a refund" and for this reason among others "if I was single and living in NYC, I would not use Match."

---

[23] This abandonment rate is many times worse than was the case for another cancellation mechanism that was recently held to not be simple. *See United States v. MyLife.com, Inc.*, 567 F.Supp.3d 1152, 1160, and 1169 (C.D. Cal. 2021) (granting summary judgment and holding that the defendants' telephone cancellation mechanism was not "simple" as required by ROSCA despite it having an "average 'abandonment' rate during the relevant time period [of] only 7.1%"). Further, the abandonment rate in *MyLife.com, Inc.*, is better than the failure rates Defendants claimed in their interrogatory response and their letter to the BBB. There, Defendants claimed an 89% and 84% success rate within 24 hours, respectively.

- **Sharmistha Dubey (MGI CEO and President of Match Group North America):** "We've been discussing the refund policy situation and 1 thing keeps coming up again and again that customers complain that they cancel and we still auto renew them."

- **Adrian Ong (VP of Consumer Confidence & Customer Support):** "We are already aware that the cancellation flow is too long and confusing."

- **Michele Watson (SVP of Global Customer Care):** "We get a lot of complaints from members who tell us they cancelled on site and it didn't work[.]"

- **Sydney Lam (Director, Product):** "We need to take a look at our resignation flow . . . . Currently the flow is very convoluted and confusing. We get A LOT of customer care complaints about it. I want to see if there's a way to clean up the flow, yet optimize it so we can try to save as many people from resigning as possible. If we can plug the hole where people are leaving the site, it can help with our PMC goals."

- **Melissa Clinchy (Supervisor, Technical Resolutions – Customer Support and Manager, Community Experience):** "One of our largest Care Complaints are members who believe they cancelled, but were then charged a renewal (we've had over 1k complaints so far in 2016). We believe that we can make this process easier for our members who are already wanting to cancel (they've made it to the flow) but get stuck on survey pages, retention offers, etc and believe they cancelled."

- **Brett Richards (Manager, Product):** Stated that fixing the problems with the cancellation flow had "not been prioritized on the roadmap by the powers that be."

- **Bret Williams (Director of Application Engineering):** "Many times the users think once they click 'resign' that they are done. They're not, they have to click through the nag screens. Michele [Watson, former Senior VP of Customer Care] complained about this for years but Product [Division] would not reduce the resign steps. It's not a bug. It's a feature."

- **Rachel Walzl (Manager, Product):** In response to Bret Williams stating that the flaws with the cancellation flow were "not a bug" but a "feature," Walzl stated "[t]he Site team is aware of this 'feature.'"

- **Bryan Jewell (VP, Business Operation):** "Cancellation process" is "very confusing and is likely causing the high care call volume and chargeback rates."

- **Jamie Giannini (Associate Designer, Games):** "I think we should definitely re-think resignation flow. It's confusing . . . ."

- **Kate Feller (Sr. Analyst, Finance):** Sent a PowerPoint to numerous high-level executives, including future MGI CEO Mandy Ginsberg, which described the account settings page as "difficult to find" and "confusing & cluttered," the cancellation link on

account settings as having "unclear verbiage," the retention offer as "confusing," and the entire cancellation flow as "difficult & dated[.]"

### 2. Defendants designed Match.com's cancellation flow to be difficult.

Defendants never fixed these problems because they were part of the design—"a feature" rather than "a bug." To frustrate customers' cancellation attempts, Match.com personnel took care to ensure its cancellation flow would be difficult, confusing, and hard to find. Employees discussed changes that increased consumers' failure rate approvingly—and even explicitly soliciting changes to combat an increase in consumers' cancellations:

- o **Jon Caine (Sr. Manager, Software Engineering - Webb App):** Stated in a December 2019 email that "we spent mid-may [sic] through July making it harder to cancel with small changes." Caine attached a document identifying *six* different ways that Match.com had made it "harder to cancel" right before the FTC filed suit and included data to support his conclusions.

- o **Jayant Dasari (Director of Analytics and Data Science):** Discussed a test where the test "seems to be performing better" than the current version of the site and "show[ed] improvement" because cancellation was "6.5% lower."

- o **Dinh Thi Bui (Vice President, Analytics):** Described this same tested change to the "Manage Account" page as providing "encouraging" data after it decreased cancellations.

- o **Chad Peoples (Sr. Manager, Finance):** Described the results of the tested change to the "Manage Account" page discussed above as "[v]ery promising so far."

- o **Jessica Johnson (Sr. Manager, Product - CRM & Email):** Analyzed the results of the above tests, which assessed two different ways of hiding the "Manage subscription" link from consumers. She observed that both were effective in causing a "drop in cancellations" [*i.e.*, fewer consumers were cancelling], and then recommended implementing the deceptive features to make cancellation even more difficult.

- o **Mandy Ginsberg (future MGI CEO):** Stated, concerning a change to the website, that she "want[ed] to make sure there are no implications (for example is it easier for people to cancel subscription since they find the link faster)."

- o **Rajitha Koppisetty (Match.com personnel):** Stated, in a work order for a "Copy Change in Settings," that "[d]ue to a huge increase in sub [*i.e.*, subscription] cancellations this year, we would like to change the copy in the help section of the settings page from 'Manage/Cancel Subscription' to 'Manage subscription'." In other words, Koppisetty directed other personnel to change language on the Account Settings page to remove

reference to cancellation and thereby obscure where the cancellation flow is located to combat a "huge increase in . . . cancellations."

o **Giridhar Tandri (SVP of Engineering):** Informed both the CEO and General Manager of Match.com that the results of a tested change to the cancellation flow show that the changes were "adding the intended friction."

Time and again, Defendants discussed "making it harder to cancel with small changes" and acted accordingly. These employees admitted that "we know" that "[u]sers are easily interrupted/distractible in the early stages of the flow" and identified as a "Key Takeaway[]" that "[e]arly on [consumers are] easy to interrupt – we can distract them[.]" These employees worked to retain customers not by improving Match.com's product but by stopping customers from cancelling through confusion and frustration.

### D. Defendants are liable for these law violations and must be enjoined to prevent similar law violations.

#### 1. Both MGI and MGLLC are liable.

Defendant MGLLC admitted that it has owned, operated, and controlled Match.com.[24] It is therefore liable for its law violations. Defendant MGI has made a late attempt to evade liability by pinning responsibility for Match.com on MGLLC. This is contradicted both by the evidence, which shows MGI had authority to control Match.com and was involved in its day-to-day activities, and by Defendant MGI's own representations, including in response to the FTC's Civil Investigative Demand.

---

[24] As noted above, Defendants recently engaged in corporate consolidation and restructuring. Around this time, MGLLC was renamed Tinder, LLC, and ownership of Match.com was transferred to another subsidiary of Defendant MGI. These recent developments are immaterial to Defendants' liability or the appropriateness of an injunction. Defendant MGI continues to own Match.com and related subsidiaries. And Defendant MGLLC engaged in the alleged misconduct for well over a decade. MGLLC could easily continue these practices with other platforms, and Match.com could be returned to this subsidiary just as easily as it was moved away. As for monetary relief, both Defendants remain liable for their knowing ROSCA violations.

The purpose of the FTC Act's corporate liability standard is to impose liability upon the company or companies that are responsible for, and could have prevented, the law violation at issue. A defendant "acting with knowledge of deception who either directly participates in that deception or has the authority to control the deceptive practice of another, but allows the deception to proceed, engages, *through its own actions*, in a deceptive act or practice that causes harm to consumers."[25]

MGI is liable for its own actions. First, MGI played a role in managing and operating Match.com through "Match Group North America," a purported "reporting structure" that was not a legal entity. Following a recent restructuring, MGI executives continue to oversee Match.com, now with an MGI executive explicitly tasked with managing Match.com along with several other of the company's so-called "Evergreen and Emerging Brands." Second, MGI executives have played a role in the day-to-day operations of Match.com and unquestionably had knowledge of its illegal practices, having in multiple instances participated in it themselves. For example, before becoming MGI's CEO, Mandy Ginsberg participated in Match.com's ROSCA violations.[26] Likewise, future MGI CEO Shar Dubey admitted that "1 thing keeps coming up again and again that customers complain that they cancel and we still auto renew them." Despite possessing both the knowledge and ability to halt Match.com's illegal practices, MGI's executives allowed them to continue.

This evidence is consistent with Defendant MGI's own repeated representations that it operates Match.com. MGI made these representations to the public, investors, the federal

---

[25] *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 170 (2d Cir. 2016) (emphasis in original).

[26] For example, when discussing changes to Match.com's FAQs section relating to cancellation in 2017, Ginsberg advised she "want[ed] to make sure there are no implications (for example is it easier for people to cancel subscription since they find the link faster)."

judiciary, and a federal agency. The Court should disregard MGI's late about-face concerning its role in Match.com's operations, which is contrary to the evidence.

### 2. Injunctive relief is necessary and appropriate because Defendants' misconduct is likely to recur without it.

Defendants' law violations were deliberate, egregious, and long-running, and their misconduct is likely to recur absent strong injunctive relief. The Court has authority to enjoin Defendants to prevent this future harm.

Fifth Circuit law provides that the Court may award injunctive relief where past conduct establishes "that there is a reasonable likelihood of further violations."[27] When deciding whether to issue an injunction for past violations, courts should consider factors including (1) the egregiousness of the defendant's actions; (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved; (4) the sincerity of the defendant's assurances against future violations; (5) the defendant's recognition of the wrongful nature of his conduct; and (6) whether the defendant's occupation presents opportunities for future violations).[28]

All of these factors weigh in favor of injunctive relief here. Defendants engaged in egregious, continuous misconduct for years through which they knowingly harmed their customers. These deceptive and unlawful practices, which constituted central aspects of their business model, harmed hundreds of thousands of consumers and caused millions in losses. Defendants' employees openly discussed the illegal conduct. Time and again, Match.com chose profits over compliance. It did so despite countless consumer complaints, chargebacks, notices from the BBB and Visa, international media coverage, a lawsuit by the Santa Cruz County

---

[27] *See SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978); *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 816 (N.D. Tex. 2008).

[28] *Id.*

District Attorney, and an investigation by the FTC (followed by this federal lawsuit on the same subject). Defendants operate dozens of dating sites, including Match.com, and would be well positioned to continue violating the law if not subject to an order. Their knowing conduct shows they have no qualms about doing so when profitable.

Importantly, Defendants did not suspend their FTC Act violations (Counts III and IV) voluntarily but instead did so after the FTC notified them of its impending lawsuit.[29] Defendant MGLLC has admitted it had no intention of stopping these practices before it received the FTC's Civil Investigative Demand. And nothing would prevent Defendants from reinstituting them.[30] Even if Defendants did not engage this same misconduct again on Match.com, they could easily institute such policies on the many other dating sites they control.[31]

### 3. The injunction should cover all of Defendants' future conduct, not just on one of their many dating sites.

The injunctive relief the FTC requests[32] is both standard and justified by the facts of this case and would apply to match.com and other dating websites or platforms that Defendants

---

[29] *See FTC v. Sage Seminars*, No. 95-cv-2854, 1995 WL 798938 (N.D. Cal. Nov. 2, 1995) (noting "defendants' claimed cessation of conduct occurred only *after* defendants learned that the FTC had commenced an investigation . . . [so] any cessation on the part of defendants can hardly be considered 'voluntary'") (emphasis in original).

[30] *See, e.g., FTC v. Zaappaaz, LLC*, No. 4:20-CV-02717, 2024 WL 1237047, at *5 (S.D. Tex. Mar. 22, 2024) (noting that, although the defendants ceased the practices at issue, the company was "still in business" and continuing to "sell[] goods to consumers throughout the United States," which weighed in favor of injunctive relief).

[31] This analysis is not changed by Defendants' post-litigation assurances of reformation, including a so-called "stipulation" that they have previously put before the Court. "Even when the defendant's actions are accompanied by assurances of future good conduct, the controversy is not moot 'unless the defendant meets a heavy burden to show its change of heart is permanent and that the defendant will not return to its old ways.'" *Dallas Gay Alliance, Inc. v. Dallas County Hospital Dist.*, 719 F.Supp 1380, 1385 (N.D. Tex. 1989); *see also Anderson v. Albany*, 321 F.2d 649, 657 (5th Cir. 1963) (noting that, concerning the passage of an ordinance, "[w]hat has been adopted can be repealed, and what has been repealed can be re-adopted. We conclude, therefore, that the plaintiffs are entitled to have their injunction"). Accordingly, "[t]o show that such a change of heart is not mere litigation posturing, a defendant asserting mootness must demonstrate 'that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020) (quoting *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 425 (5th Cir. 2020)).  This is because "the courts are suspicious that the defendant's dominant motivation is to deliberately moot the controversy and evade judicial review of its conduct." *Dallas Gay Alliance, Inc.*, 719 F.Supp. at 1380.

[32] *See* Doc. 198-1 (FTC's Proposed Order for Permanent Injunction, Monetary Relief, Civil Penalty Judgment, and Other Relief).

operate. Courts routinely impose substantially similar injunctive relief in FTC cases. This is because "the Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past."[33] Further, the Court need not limit its injunction to a particular product—or, for that matter, website.[34] The Fifth Circuit has held that the Commission may "frame its order broadly enough to prohibit [defendants'] use of identical illegal practices for any purpose, or in conjunction with the sale of any and all products."[35] Courts have upheld FTC orders with injunctions that cover all products a company markets or all products in a broad category, based on law violations relating to only a single product or group of products.[36] Such  injunctive relief is "needed to prevent similar and related violations from occurring in the future."[37]

The Court can and should issue an injunction that applies to all of Defendants' dating sites to prevent Defendants from violating the law in the future through their *dozens* of substantially similar dating sites. If the Court were to limit its order to a single site, Match.com, Defendants could easily circumvent the Court's order by shifting these same illegal practices to its other dating sites.

This standard injunctive relief is especially appropriate here given that the same individuals who operate Match.com also operate multiple other dating sites. In fact, Defendants

---

[33] *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952).

[34] *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 394 (1965) (upholding order applying injunctive provisions to "any product [respondents] advertise").

[35] *Carter Prods., Inc. v. FTC*, 323 F.2d 523, 533 (5th Cir. 1963), (quoting *Niresk Indus., Inc. v. FTC*, 278 F. 2d 337, 342-43 (7th Cir. 1960), *cert. denied*, 364 U.S. 883 (1960)); *see also Zaappazz*, No. 2024 WL 1237047 at *8 (concluding that "injunctive relief prohibiting misrepresentations involving the sale of any product," as opposed to merely those relating to the claims or product at issue, was appropriate).

[36] *See, e.g.*, *ITT Continental Baking Co. v. FTC*, 532 F.2d 207, 222-23 (2d Cir. 1976).

[37] *See Trans World Accts., Inc. v. FTC*, 594 F.2d 212, 215 (9th Cir. 1979); *Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114, at *43.

have recently engaged in widespread corporate consolidation further blurring the purported lines between Defendants' dating sites and subsidiaries. Specifically, MGI has formed within its structure a business unit known as "Evergreen and Emerging" Brands ("E&E"). E&E includes within its umbrella several well established dating sites (so-called "Evergreen" brands Match, Meetic, Plenty of Fish, and OkCupid) and newer sites (the "Emerging" brands Chispa, BLK, Archer, the League, Salams, Upward, and Yuzu). Notably, these various sites are not all owned by the same subsidiary of MGI but instead by several different companies.

To oversee all these dating sites, MGI has promoted the former CEO and General Manager of Match.com to be "CEO" and "COO" of E&E, respectively. The company will now be applying a "centralized discipline" and "shar[ing] best practices across our brands." These sites will have "shared teams" in numerous key areas, such as marketing and Customer Care, and the company is creating a "shared platform" in an effort to "unify[] our tech." As one example of this new consolidation effort, Defendants are merging Match.com and Meetic into a "single cohesive product."

Despite this company-wide consolidation effort, Defendants ask that the Court deviate from federal courts' standard practice of awarding such relief and instead take the unusual step of enjoining only one of Defendants' many dating sites. Yet despite extensive MSJ briefing on this topic, Defendants failed to identify even a single FTC case where a court or the Commission has limited an injunction to a single product. The Court should reject Defendants' request for a novel and inadequate injunction and instead enjoin both Defendants with standard injunctive relief that applies to Defendants—as opposed to one of their products—and prevents Defendants from engaging in similar law violations.

### E. Defendants are liable for monetary relief for their ROSCA violations.

#### 1. The Court should order Defendants to redress consumers harmed by Defendants' illegal cancellation mechanism.

Defendants' data shows that their illegal cancellation tactics took, conservatively, $56,085,269 from consumers.[38] The Court should exercise its authority to order this money returned to consumers.[39] The FTC calculated this precise figure using a straightforward methodology.[40] Specifically, the FTC totaled the amounts of money Defendants collected from users who had begun the online cancellation process but failed to successfully complete it and subtracted the amounts that individuals recouped through refunds and chargebacks. To be conservative, the FTC removed from its estimate of harm those users that dropped out of the flow but had demonstrated an intent to do something other than cancel their subscription.[41]

#### 2. The Court should impose substantial civil penalties to deter Defendants from continuing to flaunt the law.

---

[38] The statute of limitations for both Defendants should be calculated from the date the original complaint was filed in September 2019 because the FTC's claims against Defendant MGLLC "relate back" to this date under the federal rules. *See* Fed. R. Civ. P. 15(c)(1)(B). Defendants have contended that relation back is inappropriate because, in essence, the FTC was not diligent in suing MGLLC at the outset of this litigation. The Rule plainly sets forth an exclusive list of requirements for relation back, and the plaintiff's diligence is not among them." *See Krupski v. Costa Crociere S. p. A*, 560 U.S. 538, 130 (2010). Further, the information that the plaintiff had at the original time of filing is relevant "only if it bears on the defendant's understanding of whether the plaintiff made a mistake regarding the proper party's identity." *Id.*

[39] Section 19 explicitly provides that "[s]uch relief may include . . . the refund of money or return of property." *See* 15 U.S.C. § 57b(b); *see also FTC v. QYK Brands LLC*, No. SACV 20-1431, 2022 WL 3138761, at *8 (C.D. Cal. April 6, 2022).

[40] Defendants have contended that consumer relief should be reduced based on evidence-free speculation that maybe some consumers did not actually intend to cancel. But the FTC need not establish actual reliance by all consumers, as a presumption of actual reliance applies here. *See QYK Brands LLC*, 2022 WL 3138761, at *8 ("[P]roof of individual reliance by each purchasing consumer is not needed."); *MyLife.com, Inc.*, 567 F.Supp.3d at 1170. Courts apply this presumption because the FTC Act "serves a public purpose by authorizing the Commission to seek redress on behalf of injured consumers" and "[r]equiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of the section." *See Figgie Int'l*, 994 F.2d at 605 (citation and quotation marks omitted); *see also FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991). Moreover, to the extent there is any uncertain, Defendants should "bear the risk" of such uncertainty. *See FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997) (concluding that the defendants' "contention that the computer database lacked necessary information does not automatically mean that the Commission's calculations are not reliable" and that "'[t]he risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty'") (quoting *SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989)).

The Court should award substantial civil penalties to address Defendants' longstanding and egregious violations of ROSCA. Such penalties are critical to deter Defendants' profit-driven malfeasance from recurring in the future. The FTC Act authorizes the FTC to seek civil penalties from Defendants for their knowing violations of ROSCA.[42]

The Court may assess a civil penalty based on a per diem calculation of $200,672,640.[43] When calculating civil penalties for Defendants' continuing failure to comply with ROSCA, "each day of continuance of such failure shall be treated as a separate violation," and "[i]n determining the amount of such civil penalty, the court shall take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require."[44]

The maximum civil penalty is appropriate here. Defendants' violations of ROSCA were knowing and intentional and therefore committed with the knowledge required by Section 5(m)(1)(A) of the FTC Act.[45] Defendants were aware that Match.com's customers complained "again and again" about their illegal online cancellation process.[46] These problems were

---

[41] This reduction to the FTC's estimate of consumer harm relates to the second page of the resignation flow, where users are presented the choice of continuing the cancellation process or viewing the Subscription Status page. The FTC took the number of users that dropped out on this page and determined what percentage of them did not click on the "Cancel Subscription" link and instead chose to view their subscription status. The FTC then discounted the harm attributable to the second page of the flow by this percentage of users.

[42] 15 U.S.C. § 45(m)(1)(A).

[43] The FTC's civil penalties calculation based on the continuing nature of the violation begins on September 26, 2014 (consistent with the statute of limitations, which provides for five years before the filing of this action), and ends on January 31,2025, which was the date the FTC served Defendants with the last amendment to Plaintiff's Initial Disclosures. The FTC calculated the number of days between these dates, 3,780, and multiplied that by the statutory maximum fine per violation, $53,088. *See* 15 U.S.C. § 57b(d).

[44] 15 U.S.C. § 45(m)(1)(C).

[45] *See id.*

[46] *Cf. Amazon.com, Inc.*, 735 F. Supp. 3d at 1332-33 (concluding that the FTC had adequately alleged facts establishing the actual or constructive knowledge required for civil penalties under ROSCA because, among other things, Amazon was alleged to have "received an internal report showing that 'customers had trouble finding the

discussed throughout the company and at the highest levels. High-level executives were aware that Match.com "puts you through the [w]ringer if you want to cancel[.]" Defendants received a CID from the FTC in 2017 concerning these practices and the FTC's draft complaint in 2018. Yet Defendants audaciously continued these illegal practices undeterred and with full knowledge of their illegality, even making the cancellation process harder after learning that they were under investigation for these practices. This was intentional: Defendants intentionally designed a cancellation flow that would "confuse" and "distract" customers who sought to cancel. In short, Defendants have established themselves as scofflaws with a corporate culture of ignoring the law.

Defendants acted with a high degree of culpability, carrying out these egregious violations with knowledge that consumers struggled to complete the flow and an intent to make it even harder. They also have a long history of such violations, dating back nearly a decade. Moreover, Defendants are a high-revenue publicly traded company and its subsidiary. Defendant MGI's SEC filings reflect that Defendants have an ability to pay substantial penalties while continuing to do business. Finally, justice requires a substantial civil penalty to prevent similar future violations.

---

ingress to the Iliad Flow and prematurely abandoned the Iliad Flow under the incorrect assumption they had completed cancellation of their Prime subscription'").

### III.    Conclusion

As described above, Defendants have violated the FTC Act with a deceptive "Guarantee" and unfair chargeback policy. Defendants are currently violating ROSCA with a cancellation flow that is not simple by design. The Court should therefore issue an injunction against Defendants to put an end to these practices. The Court should further award consumers redress in the amount of $56,085,269 and imposes civil penalties in the amount of $200,672,640. Such relief is needed to redress the consumers Defendants have harmed with their illegal cancellation flow and prevent Defendants from continuing to knowingly flout the law.

Date: May 12, 2025

*/s/ Reid Tepfer*
REID TEPFER
M. HASAN AIJAZ
SARAH ZUCKERMAN (admitted *pro hac vice*)
ERICA R. HILLIARD
JASON C. MOON
NICOLE G. H. CONTE (admitted *pro hac vice*)
TAMMY CHUNG (admitted *pro hac vice*)
Texas Bar No. 24079444 (Tepfer)
Virginia Bar No. 80073 (Aijaz)
New York Bar No. 5603832 (Zuckerman)
Mississippi Bar No. 104244 (Hilliard)
Texas Bar No. 24001188 (Moon)
Virginia Bar No. 91552 (Conte)
New York Bar No. 5745476 (Chung)
Federal Trade Commission
1999 Bryan St. Ste. 2150
Dallas, Texas 75201
T: (214) 979-9395 (Tepfer)
T: (214) 979-9386 (Aijaz)
T: (214) 979-9376 (Zuckerman)
T: (214) 979-9379 (Hilliard)
T: (214) 979-9378 (Moon)
T: (202) 285-0062 (Conte)
T: (202) 676-7541 (Chung)
F: (214) 953-3079
Email: rtepfer@ftc.gov;
maijaz@ftc.gov;

szuckerman@ftc.gov;
ehilliard@ftc.gov;
jmoon@ftc.gov;
nconte@ftc.gov;
tchung@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

**CERTIFICATE OF SERVICE**

On May 12, 2025, I filed the foregoing document with the clerk of court for the U.S.

District Court, Northern District of Texas. I hereby certify that I have served the document on

counsel by a manner authorized by Federal Rule of Civil Procedure 5(b)(2)(E).

*/s/ REID TEPFER*
REID TEPFER